1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          22 CR 673 (LAK)

5   SAMUEL BANKMAN-FRIED,

6                Defendant.              Conference
    ------------------------------x
7
                                        New York, N.Y.
8                                       February 9, 2023
                                        10:35 a.m.
9

10  Before:

11
                        HON. LEWIS A. KAPLAN,
12
                                        District Judge
13
                        APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  DANIELLE SASSOON
         NICOLAS ROOS
17       ANDREW ROHRBACH
         DANIELLE KUDLA
18       Assistant United States Attorneys

19  COHEN & GRESSER, LLP
         Attorneys for Defendant
20  BY:  MARK S. COHEN
         CHRISTIAN R. EVERDELL
21
    Also Present:
22  Jonathan Lettieri, U.S. Pretrial Services

23

24

25

1              (Case called)

2              MS. SASSOON:  Good morning, your Honor, Danielle

3    Sassoon, Nicholas Roos, Andrew Rohrbach, and Danielle Kudla for

4    the United States.  We are also joined by Jonathan Lettieri

5    from pretrial services.

6              THE COURT:  Good morning.

7              MR. COHEN:  Good morning, your Honor, Mark Cohen,

8    Cohen & Gresser, for the defendant.

9              MR. EVERDELL:  Good morning, your Honor, Christian

10   Everdell from Cohen & Gresser for the defendant.

11             THE COURT:  Good morning.

12             First of all, since I didn't have this case when it

13   was first filed, I know that there are Rule 5(f) orders on the

14   docket.  Was the oral admonition ever given?

15             MS. SASSOON:  No, your Honor.  Thank you for raising

16   that.

17             THE COURT:  It is about to be.

18             I direct the prosecution to comply with its obligation

19   under *Brady v. Maryland* and its progeny to disclose to the

20   defense all information, whether admissible or not, that is

21   favorable to the defendant, material either to guilt or to

22   punishment, and known to the prosecution.

23             Possible consequences for noncompliance may include

24   dismissal of individual charges or the entire case, exclusion

25   of evidence and professional discipline or court sanctions on

1 | the attorneys responsible.

2 | There has already been entered a written order more

3 | fully describing this obligation and the possible consequences

4 | of failing to meet it, and I direct the prosecution to review

5 | and comply with that order.

6 | Does the prosecution confirm that it understands its

7 | obligations and will fulfill them?

8 | MS. SASSOON:  Yes, your Honor.

9 | THE COURT:  Lest anybody misunderstand, this is a

10 | statement that's required by an amendment to the rules that was

11 | passed, I believe, last year by Congress on the theory that

12 | it's not enough for the Supreme Court to say, well, this.  I

13 | have to read it to the prosecution in every criminal case.

14 | That being accomplished, obviously, you know I've

15 | received your proposed resolution of the government's motion

16 | and it has done nothing but spark more questions in my mind,

17 | anyway.

18 | First of all, why shouldn't whatever exemptions from

19 | the no-contact condition the government has agreed to be part

20 | of the order and explained to me.

21 | Ms. Sassoon.

22 | MS. SASSOON:  Yes, your Honor.  I believe the initial

23 | proposal by the government was a condition that said, to the

24 | extent anyone is exempted by the Court or the government, it

25 | won't apply, so we were engaging in that type discussion.  But

1    to the extent that the Court wants any exemptions to be run

2    through the Court, the government has no objection to that.

3    The nature --

4                THE COURT:  That really isn't the point.  The point

5    is, I understand that the government has already exempted some

6    people, assuming I approve this condition.  Why shouldn't I

7    know who they are and why I have exempted them?

8                MS. SASSOON:  The government has no issue with that,

9    and I can describe in broad strokes the nature of those who

10   were exempted.

11               THE COURT:  OK.

12               MS. SASSOON:  The defense provided us a list of people

13   whom they wanted exempted because the defendant considered them

14   close friends or wanted to maintain a personal relationship

15   with them.  The government reviewed that list and did not

16   approve certain people on that list who the government knew to

17   be represented, who the government knew did not want to be

18   contacted by the defendant, or who the government viewed as

19   potential witnesses at the trial.

20               The individuals the government did approve to be

21   exempted were people who, although they had some connection to

22   FTX, we were confident did not fall within the core conduct or

23   the government's investigation such that we don't expect them

24   to be trial witnesses.  So the specter of witness tampering

25   that we are concerned about did not pertain to those

1    individuals.  And we made clear to defense counsel that

2    although we don't think these people fall within the purpose of

3    the no-contact provision, obviously, we don't countenance

4    harassment or intimidation of anybody who does not want to be

5    contacted by the defendant.

6             THE COURT:  Looking down the road, I could anticipate

7    the possibility of disputes about who has been exempted and on

8    the basis of what information they were exempted.  Wouldn't it

9    make sense to have the names of who has been exempted of record

10   and part of the order?  If there is a good reason for it to be

11   sealed, I can understand that argument.  What about that?

12            MS. SASSOON:  The exemptions were communicated in

13   writing, so it's documented in emails between defense counsel

14   and the government.  In the government's view, that's

15   sufficient.  I take it that defense counsel is operating in

16   good faith.  To the extent that anything is in writing, the

17   government does not anticipate any dispute about that.  So

18   perhaps it would help to include in the order exempted in

19   writing by the government or the Court.

20            THE COURT:  What about that, Mr. Cohen?

21            MR. COHEN:  Your Honor, we don't have any objection to

22   the Court having the names.  We would ask -- I think

23   Ms. Sassoon described the dialogue between us accurately.  The

24   way the current condition is drafted, it says the government or

25   the Court, but we have no objection to it.  We would ask, your

1    Honor, if the names could be submitted to you in camera.

2              THE COURT:  I am not sure.  As long as it's limited to

3    in writing by the government or the Court, then I don't have a

4    need for the names unless something happens, right?

5              MR. COHEN:  Yes.

6              THE COURT:  That's item number 1.

7              How is the government -- I'll ask the same question of

8    the defendant -- I think I know what encrypted means.  But what

9    exactly does the government mean?  I read all the spy novels

10   too.

11             MS. SASSOON:  It's my understanding that encrypted

12   pertains to applications that it's difficult for the government

13   to monitor or to obtain by way of, for example, a search

14   warrant.  Because there is some ambiguity there, that's why our

15   proposal now includes clarity about what specific programs we

16   believe the defendant should be permitted to use and which he

17   cannot.

18             And then with respect to WhatsApp, this monitoring --

19             THE COURT:  I read last night that there have recently

20   been discovered 57 letters written by Mary, Queen of Scots in

21   the 16th century that were encrypted without the use of any app

22   and before the invention of computers, and they finally cracked

23   the encryption.

24             We are being a little shortsighted in focusing only on

25   apps.

1          MS. SASSOON:  To the extent that the defendant decides

2   to communicate in handwritten code, that's not something the

3   government anticipated or that we are particularly concerned

4   about.  I think here the concern really pertains to electronic

5   communications, particularly given the history we laid out in

6   our letter of what we view as obstructive conduct through the

7   use --

8          THE COURT:  You don't think this defendant is bright

9   enough to encrypt something without a computer?

10          MS. SASSOON:  To the extent that that's done in a

11   document that then --

12          THE COURT:  You expect you will find it.

13          MS. SASSOON:  Yes, your Honor.

14          THE COURT:  Maybe you will be able to decrypt it.

15          What about ephemeral.

16          MS. SASSOON:  Ephemeral describes the feature of some

17   of these applications which are often also encrypted

18   applications that results in auto deletion.  So that could be a

19   feature that's activated on the application, such that after a

20   certain number of days it will disappear, or my understanding

21   of applications like Snapchat is, they automatically disappear

22   as they are sent.  So, again, this is an issue about

23   preservation.  To the extent that there is auto deletion, the

24   government, with this condition, seeks to prevent that.

25          THE COURT:  Don't some of the things that you are

1    proposing now to allow permit auto deletion?

2              MS. SASSOON:  I believe that's true of WhatsApp.  But

3    in our discussions with the defense, they articulated some

4    reasons why this application was important to the defendant's

5    ability to communicate, and they propose this monitoring

6    technology, which, if they are able to implement, would resolve

7    the concerns about auto deletion.

8              THE COURT:  Doesn't iMessage allow a user to delete

9    any message he has sent or received within two minutes?

10             MS. SASSOON:  My understanding is that while some of

11   these applications allow you to delete these messages on your

12   own device, it's not as simple to delete it off another

13   person's device, which was the feature --

14             THE COURT:  Not as simple.  Is that what you said?

15             MS. SASSOON:  I'm not aware of that feature.

16             Your Honor, I may not understand the full scope of all

17   these different applications, but we don't want to completely

18   eliminate the defendant's ability to communicate.  So we

19   identified the applications that we think are susceptible to

20   better monitoring.  For example, with iMessage, even if things

21   are deleted, there are ways of detecting deletion.  There is

22   iCloud preservation.  There are toll records and there are

23   other things that are discernible, unlike with encrypted

24   applications.

25             THE COURT:  Are you telling me that you would be able

1    to ascertain that there was a message and it was deleted but

2    not what it said?

3            MS. SASSOON:  Sometimes that's the case, your Honor,

4    off of his own device.  But, again, I'm not aware of a feature

5    to have the message delete off the other side's device.

6            THE COURT:  Mr. Cohen, what do you say to that?

7            MR. COHEN:  Yes, your Honor.

8            With the Court's permission, we would ask that

9    Mr. Everdell be able to respond.

10            THE COURT:  OK.

11            MR. COHEN:  He is meaningfully younger than me and

12    understands this a lot better than I do.

13            MR. EVERDELL:  Thank you, your Honor.

14            I think the Court is correct that there is a little

15    ambiguity in the language here.  I think we were trying to come

16    up with a practical solution that allowed Mr. Bankman-Fried to

17    use certain communications platforms, including ones that he

18    prefers to use, encrypted-messaging apps like WhatsApp, and

19    still eliminate the concern about deleting messages, because we

20    understand that's the government's concern.  We are trying to

21    work with them on that, which is why we had done a fair amount

22    of work to try to figure out a solution for WhatsApp, and we

23    think we have come up with one.

24            If the issue is the deletion, we can simply deal with

25    that by itself and just have a condition that he can't delete

1    any of his messages.  But we were trying to work out a

2    practical solution with the government that worked for both

3    sides.

4              THE COURT:  Isn't iMessage, by default, ephemeral?

5              MR. EVERDELL:  With iMessage, your Honor, I confess it

6    actually changes with the different operating systems that get

7    updated.  I don't know if there is a feature with iMessage that

8    allows the user to delete from his device and also the

9    receiver's device.  It may be on the new ones there is.

10             But I also don't know whether Apple is able to keep

11   those messages in its own servers, and the government can

12   request them from Apple, as opposed to getting them from the

13   devices itself.  I don't know the answer to that.  This was a

14   platform the government was comfortable with, so we were

15   comfortable with it as well.

16             To be clear, your Honor, Mr. Bankman-Fried not is

17   going to use any of the deletion features.  He is not going to

18   auto delete or anything like that.

19             THE COURT:  I am far less interested in the

20   defendant's convenience, given the record here, and his

21   preferences than I am in avoiding what the government's proffer

22   indicates to me is a very real risk of misuse.  And the fact

23   that you have negotiated something that makes the government

24   sort of comfortable and makes you and your client comfortable

25   I'm not sure is going to make me comfortable.

1            MR. EVERDELL:  Understood, your Honor.

2            THE COURT:  There is still snail mail and there is

3    still email and there are all kinds of ways to communicate that

4    don't present the same risks.

5            MR. EVERDELL:  Your Honor, I think the risk that

6    animated this concern was the risk that he is going to reach

7    out improperly to potential witnesses in this case.  I suppose

8    you could do that using any method of communication, but the

9    issue I think they are raising with the femoral apps is that

10   there won't be a record of it later.

11           THE COURT:  Exactly.

12           MR. EVERDELL:  So we are trying to find the methods

13   that don't present that problem.

14           With respect to WhatsApp, your Honor, because that's

15   something I think we did a fair amount of work on, I think we

16   have found a solution, which I can describe to you briefly, we

17   are still working out a bit of the details, but there are

18   companies, we found one in particular, that provide a

19   compliance app that gets put on the phone that automatically

20   archives messages sent to and from a WhatsApp to a cloud-based

21   archive.  This company provides this solution to major

22   companies who, for example, want to give their employees the

23   ability to use WhatsApp for work-related communications, but

24   they want those communications preserved for compliance

25   purposes, for regulatory compliance.  So this is a solution

1    that exists out on the market.

2              We can put that on Mr. Bankman-Fried's iPhone and then

3    those messages will automatically be preserved.  In case the

4    government ever wants to issue a search warrant for those, they

5    will be on a cloud archive that are accessible.

6              I think that solution addresses the issue that

7    everybody is concerned about, which is that we don't want these

8    messages being deleted.  They will be there and accessible.

9              THE COURT:  I will be a lot happier if that was

10   coextensive with the permitted means of communication.

11             MR. EVERDELL:  Yes, your Honor.

12             THE COURT:  That kind of solution.

13             MR. EVERDELL:  On that, your Honor, I think what may

14   benefit is some additional discussions between us and the

15   government about which platforms are usable, which allay the

16   Court's concerns, and then propose a list to the Court in a

17   subsequent submission.

18             THE COURT:  Ms. Sassoon, make sense?

19             MS. SASSOON:  Yes.  To the extent that this monitoring

20   technology can be applied to other applications, I take your

21   Honor's point that it would make sense to apply it to other

22   applications as well.

23             THE COURT:  What I will do is to extend the order I

24   entered on February 1, at least pending the receipt of whatever

25   further submission you want to make, and I have gotten enough

1    time to chew on it a little bit.

2                 When do you propose to make a further submission?

3                 MR. EVERDELL:  Your Honor, I think we could possibly,

4    subject to what the government says, make a submission by

5    Monday.

6                 MS. SASSOON:  Yes, your Honor.

7                 THE COURT:  I am going to extend the February 1 order

8    to and including a week from Tuesday at 11:59 p.m. to take

9    account of the President's Day holiday.

10                Does somebody have a calendar and can tell me what a

11   week from Tuesday is?  February 21.

12                I will enter a written order later, but it is now

13   extended to and including 11:59 p.m. on February 21, and I will

14   look forward to your submission Monday.  If you need a little

15   more time, you will let me know.

16                MR. EVERDELL:  Thank you, your Honor.

17                THE COURT:  I just also wanted to make sure we are

18   still on track with everything else we have talked about in

19   terms of preparation.

20                Defendant's motions, April 3; government's response,

21   April 24; and so on.

22                We are still on track.  Any problems?

23                MR. EVERDELL:  Yes, your Honor.  I think we are on

24   track at this point.

25                THE COURT:  Ms. Sassoon, yes?

1          MS. SASSOON:  Yes, your Honor.  If you'd like a more

2    detailed update about discovery, we can provide it.

3          THE COURT:  No, no.  I've got extremely able counsel

4    on both sides here, and I don't need to have that.  As long as

5    you tell me you're on track, you're on track.

6          Anything else?

7          MS. SASSOON:  Not from the government.  Thank you,

8    your Honor.

9          MR. COHEN:  Not from the defense, your Honor.

10          THE COURT:  Thank you.

11          (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25