# Exhibit 9

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                           .  Chapter 11
                                      .
 4   FTX TRADING LTD., et al.,        .  Case No. 22-11068 (JTD)
                                      .
 5                                    .
                                      .  Courtroom No. 5
 6                                    .  824 Market Street
                 Debtors.             .  Wilmington, Delaware 19801
 7                                    .
                                      .  Monday, February 6, 2023
 8   . . . . . . . . . . . . . . . .  .  9:30 a.m.

 9                        TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE JOHN T. DORSEY
10              UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtor:         Adam Landis, Esquire
                             LANDIS RATH & COBB LLP
13                           919 Market Street, Suite 1800
                             Wilmington, Delaware 19801
14
                             James L. Bromley, Esquire
15                           Christopher Dunne, Esquire
                             SULLIVAN & CROMWELL LLP
16                           125 Broad Street
                             New York, NY 10004
17

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:         Jermaine Cooper

21   Transcription Company:  Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email: gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1  with the 3,800 pages, so ...

2          THE COURT:  Okay.

3          MS. SARKESSIAN:  Can we just have -- I don't know -

4  - I don't know how to do that technically, but I don't want

5  that entire thing being -- coming in as an exhibit.

6          THE COURT:  No, understood.  We'll just submit

7  Exhibit 1 to Mr. Glueckstein's declaration as a separate

8  exhibit as Debtors' Exhibit Number 1.

9          MS. SARKESSIAN:  Thank you, Your Honor.

10      (Debtors' Exhibit 1 received in evidence)

11      (Participants confer)

12         THE COURT:  Any other evidence, Ms. Sarkessian?

13         MS. SARKESSIAN:  I'm sorry, Your Honor?

14         THE COURT:  Any other evidence?

15         MS. SARKESSIAN:  No.

16         THE COURT:  Okay.

17         MS. SARKESSIAN:  No, Your Honor.

18         THE COURT:  Thank you.

19         Mr. Bromley.

20         MR. BROMLEY:  Your Honor, the debtors would like to

21  call John J. Ray, III to the stand.

22         THE COURT:  Okay.  Mr. Ray, please come forward,

23  take the stand and remain standing, please.

24         THE ECRO:  Please raise your right hand.  Please

25  state your full name and spell your last name for the court

1  record, please?
2          THE WITNESS:  John J. Ray, III.  Last name R-a-y.
3  JOHN J. RAY, III, WITNESS FOR THE DEBTORS, AFFIRMED
4          THE ECRO:  You may be seated.
5          Your Honor.
6          THE COURT:  Thank you.
7          Mr. Bromley, you may proceed.
8          MR. BROMLEY:  Thank you, Your Honor.
9                    DIRECT EXAMINATION
10 BY MR. BROMLEY:
11 Q    Mr. Ray, what's your current occupation?
12 A    I'm owner of an advisory firm called Owl Hill Partners,
13 and I'm also Chief Executive Officer of FTX.
14 Q    And could you please give a brief summary of your
15 educational background?
16 A    Yes.  I graduated in 1980 from the University of
17 Massachusetts.  In 1982, I graduated from Drake University
18 Law School, initially admitted in Iowa, Nebraska, and still
19 admitted in good standing in the State of Illinois.
20 Q    And could you please give the Court a short summary of,
21 say, the first ten years of your professional career?
22 A    The first ten years, I began at Touche Ross, an
23 accounting firm, doing tax work as a lawyer.
24      Thereafter, I moved on to become an associate at Mayer,
25 Brown & Platt, now known as Mayer Brown, in Chicago Illinois,

1  that was in a control position that today is in a control
2  position whatsoever.  That was eliminated, you know,
3  immediately on my taking control.
4  Q     Now, when you took control, the omnibus corporate
5  authority, which is Debtors Exhibit 1, referenced a request
6  for Mr. Bankman-Fried to consult with his counsel at Paul
7  Weiss regarding director appointments.  Did you ever consult
8  with Paul Weiss.
9  A     No, I did not.
10 Q     And why not?
11 A     I didn't think it was in the best interest of the
12 estate to consult with lawyers for someone we now know has
13 been charged with crimes.
14 Q     Now, Mr. Ray, I'd like to throw your attention on the
15 demonstrative to the lower right-hand corner, federal,
16 criminal, and regulatory authorities.  Do you see that?
17 A     Yes.  I do.
18 Q     Are you familiar with criminal and regulatory
19 investigations that are ongoing?
20 A     Yes.  I am.
21 Q     And what have you directed the company and your
22 advisors to do with respect to those investigations?
23 A     I made it very, very clear from the beginning of my
24 taking control, on virtually the day of the control, that we
25 would do whatever the Government request relative to

1  cooperation.
2       We believe that, ultimately, not only is that, you
3  know, required but we believe that, you know, it's in the
4  best interest of creditors to allow these regulatory
5  authorities to get full access to the information on a real
6  time basis as we're learning about what happened in the
7  company.  They're virtually getting information, again, real
8  time, and we believe that was sort of fundamental to our, you
9  know, mission here which is to maximize value for the
10 creditors.
11 Q    And do you receive regular reports on the materials
12 that have -- and cooperation that's been given to the
13 investigative authorities?
14 A    Virtually, daily.
15 Q    I'd like to -- I'll come back to the slide in a moment,
16 but I'd like to turn to the next one.  You familiar with this
17 slide?
18 A    Very much so.
19          MS. SARKESSIAN:  Your Honor, I'm going to, again,
20 object on relevance.
21          THE COURT:  Overruled.
22 BY MR. BROMLEY:
23 Q    And Mr. Ray, what does this slide --
24 A    The first part of it, it talks really about -- speaks
25 to the volume, the massive amount of data that we have

1  produced.  As you can see, we've collected ten terabytes of
2  data, over twenty-seven million documents.  We've provided an
3  analysis of several hundred thousand documents.  We've
4  interviewed and received pro offers of 24 current and former
5  employees.  And then, we've also provided an analysis
6  relative to the transactions inside the companies databases.
7       The companies databases include a couple of different
8  databases of primarily primary databases, the AWS System
9  which Amazon Web Services, where we housed some of the
10 wallets, the hot wallets.  And the database itself is in the
11 millions of terabytes of date so it's a vast resource of
12 information, unfortunately, in a somewhat unconstructed
13 environment which requires, you know, the assistance of, you
14 know, people like Alvarez and people like AlixPartners to
15 sift through these terabytes to ultimately provide useful
16 data to the regulatory authorities.
17 Q    Are you familiar with the cooperation that's been given
18 to the U.S. Attorney's Office for the Southern District of
19 New York and the Department of Justice's National Crypto-
20 Currency Enforcement Team?
21 A    Yes.  Our teams have been involved with, you know,
22 virtually daily requests.  As you can see, we've had over 150
23 requests from the Southern District, produced substantial
24 amounts of information, and provided substantial cooperation
25 relative to instances where they wanted specific information

1  related to certain actions, prehistoric actions, for the
2  company.
3      So, it's virtually an ongoing exercise, but the last,
4  you know, roughly 90 days have been an extremely intense
5  effort to provide the information that the Government has
6  requested which, obviously, you know, yielded substantial
7  results in record time.
8  Q   Now, Mr. Ray, are you familiar with how these requests
9  come in from the Department of Justice?
10 A   Yes, I am.  I am familiar with how they contact the
11 company.  They do that through Sullivan & Cromwell primarily.
12 Q   And have you ever -- are you aware of any instances
13 where full cooperation was not given immediately?
14 A   That wouldn't be tolerated.
15 Q   I'd like you to turn your attention to the next slide.
16 Now in addition to the Southern District of New York, the
17 U.S. Attorneys Office, you are familiar with other U.S.
18 Attorneys Offices that have submitted information requests?
19 A   We have had full participation.  You know, we have had
20 numerous requests, as shown by this chart, from other
21 prosecutors around the country.  The Securities & Exchange
22 Commission has had a number of requests; again, all
23 cooperative presentations that have been provided.  The CFTC
24 has been extremely active here in connection with their
25 investigation and have submitted over 150 requests.

1      On a state basis, not shown on this chart, but we have
2 entered into dozens of cease and desist orders with respect
3 to licenses around the world, the money transaction sector,
4 licenses that were maintained by the company.  So, this chart
5 really doesn't show the full gambit of the things that we
6 have done to cooperate on a state, you know, and local basis,
7 as well as these particular federal agencies.
8 Q    If I could draw your attention to the next slide.
9 A    Yes.  This is really what I am referring to.  We self-
10 reported to 26 state regulators.  We produced a mountain of
11 documents there as well. We have been in regular contact with
12 these agencies; not leaving it to the agencies to come to us.
13 You know, we have taken a pro-active effort to work with
14 them.  We have hosted update calls with these agencies.  They
15 are almost treating these agencies, in effect, like they're
16 own committee, if you will, in giving them real time
17 information.
18           MS. SARKESSIAN:  Objection, Your Honor.
19           THE COURT:  Overruled.
20 BY MR. BROMLEY:
21 Q    Now in addition to the various states and state
22 authorities have you -- are you aware of additional requests
23 that have come from Congress and non-US authorities?
24 A    Yes.  I have been very active and personally involved in
25 these requests.  As everyone has reported, I testified in

1  front of Congress, but leading up to that congressional
2  testimony we have had 100 requests from the Financial
3  Services Committee.  We have requests from the Senate as well
4  and follow-up testimony that has been provided to the House
5  Financial Services Committee and then we've also been
6  involved in regulatory requests from outside the United
7  States.
8       They are listed here and pretty extensive requests that
9  stem from our international operations.  We have exchanges
10 that, for example, are in Japan and Singapore, Cyprus, we
11 have European operations where we host a European exchange.
12 So, all of these agencies relate to the operations outside
13 the United States, and they've been very active in terms of
14 requests as well as us responding to those requests.
15 Q    And since the -- you're aware of the appointment of the
16 creditors committee in these cases?
17 A    Yes, I am.
18 Q    And so what has been the level of cooperation with the
19 creditors committee since its appointment?
20 A    Well, I'd like to think it's a model of how a company
21 should work with the creditors committee.  My approach really
22 is a, sort of, partnership approach with the creditors
23 committee.  We have numerous requests from the committee.
24 They have been in place, I think, for less then probably a
25 full 45 days; something to that effect.

1  Q     Mr. Ray, can you take a look at the next slide.  So, Mr.
2  Ray, could you describe the computing environment at FTX
3  today?
4  A     We have created, you know, the environment, you know, as
5  it should be.  I mean we have hired experts in computer
6  science and cryptography.  I mentioned the Sygnia group as
7  well as the Alvarez & Marsal group that have been essential
8  to rebuilding the brick walls around these wallets to give
9  them some security.
10       We have gotten access to the code, the controls and the
11 data to prevent any further loss by way of hacking.  We have
12 moved hot wallets into what is called cold storage to secure
13 those.  We have also gone off to exchanges where wallets are
14 contained and moved those wallets over to a controlled
15 environment.
16       So, this first exercise, with the assistance of computer
17 experts, is to provide integrity to the environment, increase
18 the security, move those wallets into cold storage and secure
19 the assets for the benefit of customers and creditors.  That,
20 of course, involves, you know, the analytics that these
21 experts use to find wallets and also what is key here is to -
22 - we're doing a tracing analysis in to look at unauthorized
23 transfers of crypto that either were in wallets or in the
24 environment itself; all with the goal -- this isn't, sort of,
25 a study for study sake.  There is a purpose here to what this

1  is beyond just the integrity of the system and maintaining
2  it, and securing the assets.
3      This is, effectively, to also, you know, recoup those
4  assets to investigate who moved assets and for what purpose,
5  the source of the funds for those assets, whether that is
6  external or on an inter-company basis.  When we are
7  investigating who did that, the potential misconduct, the
8  wrongdoers, the claw back opportunities, really, to that.
9  And, of course, in the process of that all of the evidentiary
10 work that we are doing to cooperate with the Government is
11 not an exercise for exercise sake.
12     There is no, sort of, billing code that just says
13 cooperate with the Government.  We look at all of our
14 cooperation really on an end-use basis.  What do we do with
15 that information, what is the buy product of that
16 investigation.  The by-product is always with an asset in
17 mind or recovery in mind.  Its not sharing for sharing sake.
18 Its how do we use that information that we provided to
19 ourselves and to regulatory authorities to then synthesize it
20 in a way that provides us with the tools that we need to
21 recover on avoidance actions, to inevitably file actions
22 related to, you know, misfeasance or malfeasance against
23 insiders, for example.
24     Then, obviously, you know, there is the compliance with
25 our Chapter 11 obligations and disclosure.  You know, that is

1  an ongoing obligation that we have and that is fulfilled
2  through this very exercise.  Then lastly, as I mentioned, our
3  by-product of that leads to sharing evidence and cooperating
4  with the authorities.
5       This is an ongoing, you know, circular effort, right,
6  you know, answers, we get questions, we provide information,
7  that information gets synthesized, that turns into new
8  inquiries, new questions, and we're continuing to evolve in
9  the process.  We have been at it 90 days. Its night and day.
10 When you see this environment today it's a very simple chart,
11 but to get from where we were 90 days ago, which I would
12 describe as pure hell, to where we are today is pretty
13 satisfying.
14 Q   Mr. Ray, do you think there would be a danger of
15 introducing a new party into the environment?
16           MS. SARKESSIAN:  Objection.  His opinion on this
17 issue is not relevant to the Court's determination regarding
18 appointing an examiner.
19           THE COURT:  Overruled.
20           THE WITNESS:  There is a danger.  You know, beyond
21 the -- we have a lot of seats at the table.  We are happy to
22 feed all those people at the table, but what is unique about
23 this, you know, is this controlled environment.  This isn't
24 some, you know, lawyer exercise, you know, where we bring in
25 a well-healed professional who observes some misconduct by

1  people.
2           Literally you have to operate in this laboratory
3  to investigate, to secure these assets, and to develop a
4  process of translating this data into recoverable assets for
5  customers.  This is just too fragile of an environment for me
6  to accept, you know, yet another seat at the table of someone
7  who just bounces into this environment and puts ourselves at
8  risk.  We have come too far to allow that to happen in my
9  mind.
10          MR. BROMLEY:  That's all I have for this witness
11 at the moment, Your Honor, reserving time for redirect.
12          THE COURT:  All right.  Thank you.
13          Let's go ahead and take a 15-minute recess.  We
14 will reconvene at 11:25.
15     (Recess taken at 11:11 a.m.)
16     (Proceedings resumed at 11:27 a.m.)
17          THE COURTROOM DEPUTY:  All rise.
18          THE COURT:  Thank you, everybody.  You may be
19 seated.  We are back on the record.
20          Whenever you're ready.
21          MS. SARKESSIAN:  Thank you, Your Honor.  And for
22 the record Juliet Sarkessian on behalf of the U.S. Trustee.
23                    CROSS-EXAMINATION
24 BY MS. SARKESSIAN:
25 Q    Good morning, Mr. Ray.

1  who are going to do the exact same thing, with no evidence
2  that any of those professionals or this examiner to be
3  appointed would be any more independent, any more qualified,
4  any more able to secure these assets.  It's simply going to
5  be the duplication of effort and an enormous amount of
6  expense.
7           The fact that we may have $1.2 billion of
8  unrestricted cash is not the point.  We need $8 billion of
9  unrestricted cash.  We do not have enough money to pay back
10 all of our creditors.  And the U.S. Trustee, for pure
11 purposes of public policies, because bleach and sunshine is a
12 public policy that we need here, says that we should spend
13 tens, or even hundreds of millions of dollars to provide some
14 guidance to states that have written one paragraph that said,
15 We agree with what they said before.
16          And the evidence that Mr. Ray has put on, and is
17 uncontradicted, is that we have done nothing over the past 90
18 days, other than cooperate and provide massive amounts of
19 information to warrant regulators all around the world.
20          THE COURT:  Well, let me ask you a question.  You
21 mentioned bleach and sunshine, so let me ask you about one
22 issue that the U.S. Trustee raises, which is that under 1106,
23 if I appointed an examiner, there'd be a public report filed.
24          MR. BROMLEY:  Uh-huh.
25          THE COURT:  And what is the view of the debtors in

1  this case of the need to provide the creditors in this case
2  with something that shows them what's been done:  what
3  investigations have been undertaken, how they were
4  undertaken, and what the results of those investigations are,
5  because under 1107, a debtor-in-possession doesn't have that
6  obligation.
7              MR. BROMLEY:  Well, there are two things, Your
8  Honor, right.  One is what we've already done and we continue
9  to do and then there's what the Bankruptcy Code provided in
10 other sections.  So, what we have already done is one of the
11 exhibits, which we agreed to jointly, is a very extensive
12 presentation that the debtors made to the Creditors'
13 Committee.  It is not normal course in a case of this size or
14 substance that when you meet with the Creditors' Committee,
15 that you publish the same day for the public, the complete
16 contents of the presentation that we made.  We did that.  We
17 will continue to do things like that.
18              It is the view of Mr. Ray and the management of
19 the directors that there is -- this is a different case.  We
20 need to approach that in a different way.  Do we have a
21 specific schedule of things that we're going to say and at
22 what point?  No.  But are we going to continue to follow in
23 those footsteps that we've already set forth?  Yes, we will.
24              In addition, Your Honor, we have an obligation to
25 put together a disclosure statement.  That disclosure

1  statement in a case like this is going to be a recitation of
2  everything that has taken place.  And it'll be up to you,
3  Your Honor, to determine whether the information set forth in
4  that disclosure statement is adequate, under the
5  circumstances.
6          We believe that in order for us to confirm a plan,
7  we're going to have to put together a disclosure statement
8  that brings that bleach and sunshine to this situation.  So,
9  we believe that -- well, and I will note, 1106 and 1107 and
10 1104 do not require in every circumstance that there be a
11 public report.  When we talk about the debtors furthering
12 public policy, we have spent, literally, tens of millions of
13 dollars, complying with public policy by reporting to the
14 Congress, to the House, to the Senate, to the U.S. Attorney's
15 Office in the Southern District of New York and three other
16 Districts.  It has led to the indictment of three individuals
17 who led the company in record time.  There have been lawsuits
18 already filed by the SEC and the CFTC.
19          When you talk about the debtors dedicating assets
20 to transparency to the public process, I don't think you can
21 find a case where debtors have done anything matching what
22 these debtors have done in the first 90 days of the case.
23 And will we continue to do that?  Yes, we will.
24          What Mr. Ray testified to is that on a daily
25 basis, we receive emails that, in substance, say, We would

1  like you to look at these transactions, these individuals,
2  and get us this information in 24 hours.  And what that
3  requires, Your Honor, is us to actually go in -- and when I
4  say, "us," it's the entirety of the investigations team -- to
5  go into this virtual environment and track down the
6  information that's being requested by the authorities.  It's
7  not simply going into a warehouse and picking things off of a
8  shelf.  It's interpreting code.  It's making sure that when
9  the code is discovered and accessed, it doesn't trigger
10 things that Mr. Ray was talking about that might damage the
11 assets.
12          We don't have -- there are no wallets.  There are
13 no keys.  There are no buildings.  Everything we have is a
14 series of zeros and ones and any time that environment is
15 accessed, it creates risk that damage will occur.  And so
16 every time we're going into that environment, the
17 investigation exercise is also securing assets.  It's also
18 figuring out whether there are claims as to whether or not
19 the issues that we're finding in the environment have some
20 explanation that's other than a mistake or incompetence or
21 inexperience.  Maybe it's fraud.  You don't know that.
22          When we talk about fraud in court, we also talk
23 about badges of fraud.  You don't have badges of fraud in the
24 same way when you're sitting there and having digital experts
25 in Israel and in the United States trying to figure out why

1  the code was changed from X to Y, by whom, who had the right
2  to change it, who had access to it; all of that is a
3  consolidated exercise that takes place every single day.  So,
4  quite honestly, the idea that we are able to simply hand over
5  that environment to an examiner is naive.
6          Mr. Ray said he will comply with any order of this
7  Court and I know he will and I know we all will.  But the
8  idea that there's going to be some ability to find somebody
9  else out there and put together a team and have that team
10 operate as independently and as effectively as the team
11 that's in place and then write a report, simply means that
12 we're going to add on top of this, months, if not years of
13 additional time and tens of millions, if not hundreds of
14 millions of additional cost.
15          And who bears that cost?  The creditors,
16 Mr. Pasquale's clients.
17          We should not be sitting here duplicating the same
18 thing that is happening every single day because the U.S.
19 Trustee believes that there's a policy point of view that
20 1104 says that it's mandatory no matter what.  And the
21 slippery slope of that mandatory argument is not in this
22 courtroom.  It's not because the U.S. Trustee is going to be
23 an advocate or pushing a particular agenda.  I don't believe
24 that.
25          But 1104 doesn't stop at the U.S. Trustee.  It

1                          CERTIFICATION
2            We certify that the foregoing is a correct
3   transcript from the electronic sound recording of the
4   proceedings in the above-entitled matter to the best of our
5   knowledge and ability.
6
7   /s/ William J. Garling                      February 6 2023
8   William J. Garling, CET-543
9   Certified Court Transcriptionist
10  For Reliable
11
12  /s/ Tracey J. Williams                      February 6, 2023
13  Tracey J. Williams, CET-914
14  Certified Court Transcriptionist
15  For Reliable
16
17  /s/ Mary Zajaczkowski                       February 6, 2023
18  Mary Zajaczkowski, CET-531
19  Certified Court Transcriptionist
20  For Reliable
21
22  /s/ Coleen Rand                             February 6, 2023
23  Coleen Rand, CET-341
24  Certified Court Transcriptionist
25  For Reliable