# Exhibit G

952

LORD FRASER OF TULLYBELTON. My Lords, I have had the advantage A
of reading in draft the speech prepared by my noble and learned friend
Lord Wilberforce. I agree with it and, for the reasons given by him,
I would dismiss the appeal.

LORD RUSSELL OF KILLOWEN. My Lords, I have had the advantage
of reading in draft the speech of my noble and learned friend Lord
Wilberforce. I agree with it and with the conclusion that this appeal B
should be dismissed.

> *Appeal dismissed.*
> *No order as to costs save that appel-*
> *lant's costs be taxed in accordance*
> *with provisions of Schedule 2 to*
> *Legal Aid Act 1974.*          C

Solicitors: *Sharpe, Pritchard & Co. for Hall-Wrights, Birmingham;*
*Treasury Solicitor.*

M. G.

D

[HOUSE OF LORDS]

INLAND REVENUE COMMISSIONERS AND ANOTHER .     APPELLANTS

AND

ROSSMINSTER LTD. AND OTHERS .     .     .     .     . RESPONDENTS

[On appeal from REGINA *v.* INLAND REVENUE COMMISSIONERS,
*Ex parte* ROSSMINSTER LTD. AND OTHERS]

1979   July 30, 31; Aug. 1          Eveleigh L.J., Park and Woolf JJ.   F

   Aug. 13, 14, 15, 16                    Lord Denning M.R., Browne
                                                    and Goff L.JJ.

   Oct. 29, 30, 31;                      Lord Wilberforce, Viscount Dilhorne,
   Dec. 13                          Lord Diplock, Lord Salmon and Lord Scarman

> *Revenue—Search, right of—Search warrant—Revenue's suspicion* G
> *of tax fraud—Warrants not particularising offence—Whether*
> *valid—Seizure of documents—Whether revenue to disclose*
> *facts on which reasonable cause for seizure based—Whether*
> *seizure lawful—Taxes Management Act* 1970 (c. 9), s. 20C
> (1) (3) (*as substituted by Finance Act* 1976 (c. 40), *Sch.* 6)

Section 20C of the Taxes Management Act 1970, as
amended, provides:
       " (1) If the appropriate judicial authority is satisfied on   H
   information on oath given by an officer of the board
   that—(*a*) there is reasonable ground for suspecting that an
   offence involving any form of fraud in connection with,

A      or in relation to, tax has been committed and that evidence
       of it is to be found on premises specified in the
       information; . . . the authority may issue a warrant in
       writing authorising an officer . . . to enter the premises,
       if necessary by force, at any time within 14 days from
       the time of issue of the warrant, and search them . . .
       (3) On entering the premises with a warrant under this
       section, the officer may seize and remove any things what-
B      soever found there which he has reasonable cause to
       believe may be required as evidence for the purposes of
       proceedings in respect of such an offence as is mentioned
       in subsection (1) above . . ."

         Suspecting that some tax fraud had been committed, a
       senior revenue officer placed information before a circuit
       judge on July 12, 1979, and obtained search warrants for
       named revenue officers to search specified premises and seize
C      anything which they had reasonable cause to believe might be
       required as evidence in proceedings in respect of a tax fraud,
       in accordance with section 20C of the Taxes Management Act
       1970 as amended.  At 7 a.m. on Friday, July 13, 1979, teams
       of revenue officers accompanied by police officers arrived at
       the premises, including those of the applicants, and having
       gained entry, searched those premises.  They seized anything
       which they claimed that they had reasonable cause to believe
D      might be required as evidence of a tax fraud, but they did
       not inform the applicants of the offences suspected or of the
       persons suspected of having committed them.  In addition, the
       warrant contained no such particulars.  The applicants applied
       to the Queen's Bench Divisional Court for judicial review,
       seeking, inter alia, an order of certiorari to quash the search
       warrants and a declaration that the revenue officers were not
       entitled to remove the documents seized and were bound to
E      deliver them up to the applicants.  The Divisional Court
       refused the applications on the ground that there had been no
       abuse of power by the revenue.  The Court of Appeal reversed
       that decision and granted a full declaration.

         On appeal by the revenue: —

         Held, allowing the appeal, (1) (Lord Salmon dissenting)
       that the warrants, which conferred the power to enter and
F      search premises, regardless of their ownership, were strictly
       and exactly within the authority of section 20C (1) and under
       them the occupants had no right to be told at that stage what
       offences were alleged to have been committed, who were
       alleged to have committed them or the " reasonable ground "
       which the judge was satisfied existed for suspecting that an
       offence involving fraud relating to tax had been committed
       (post, pp. 998G—999B, 1000B, 1005G—1006B, 1009D–E, 1010A–B,
       1020G, 1023C–D, 1024C, E–F, 1026B–D).

G        Per curiam. It is desirable to include in a warrant issued
       under section 20C a recital of the essential fact that the judicial
       authority is satisfied himself that there are reasonable grounds
       for suspecting that a tax fraud has been committed (post,
       pp. 1000A–B, 1004F–G, 1009F—1010A, 1024E).  Per Lord Salmon
       dissenting.  Warrants like the present are invalid because they
       recite only that an information has been laid on oath before the
H      circuit judge (post, p. 1019F–C).

         (2) That under section 20C (3) the existence of " reasonable
       cause to believe " that any things found on the premises might
       be required as evidence for the purposes of proceedings in
       respect of the suspected offences was a question of fact to be

954

tried on evidence and on the question whether such a belief
existed in respect of individual documents seized the evidence   A
fell short of supporting the final declaration which alone could
be granted against the Crown (post, pp. 1000c–D, F–G, 1006H—
1007A, 1013F—1014A, 1021B–D, 1026A–B).

*Per* Lord Wilberforce and Lord Diplock. When criminal
proceedings are over, or, within a reasonable time, are not
taken, the immunity which exists at the stage of initial investi-
gation will lapse; then the revenue would have to make good    B
and specify the existence and cause of their belief that things
removed might be required for the purposes of tax fraud
proceedings if an action were brought against the revenue for
excess of power and trespass (post, pp. 1001A–B, 1012D–F).

Decision of the Court of Appeal, post, p. 968D, et seq.,
reversed.

The following cases were referred to in their Lordships' opinions in the   C
House of Lords:

*Broome* v. *Cassell & Co. Ltd.* [1972] A.C. 1027; [1972] 2 W.L.R. 645;
[1972] 1 All E.R. 801, H.L.(E.).

*Chic Fashions (West Wales) Ltd.* v. *Jones* [1968] 2 Q.B. 299; [1968] 2
W.L.R. 201; [1968] 1 All E.R. 229, C.A.

*Conway* v. *Rimmer* [1968] A.C. 910; [1968] 2 W.L.R. 998; [1968] 1
All E.R. 874, H.L.(E.).                                          D

*D.* v. *National Society for the Prevention of Cruelty to Children* [1978]
A.C. 171; [1977] 2 W.L.R. 201; [1977] 1 All E.R. 589, H.L.(E.).

*Entick* v. *Carrington* (1765) 2 Wils. 275; 19 State Tr. 1029.

*Home* v. *Bentinck* (1820) 2 Brod. & Bing. 130.

*Huckle* v. *Money* (1763) 2 Wils. 205.

*International General Electric Company of New York Ltd.* v. *Customs
and Excise Commissioners* [1962] Ch. 784; [1962] 3 W.L.R. 20;   E
v[1962] 2 All E.R. 398, C.A.

*Liversidge* v. *Anderson* [1942] A.C. 206; [1941] 3 All E.R. 338, H.L.(E.).

*Nakkuda Ali* v. *Jayaratne* [1951] A.C. 66, P.C.

*Rex* v. *Wilkes* (1763) 2 Wils. 151.

*Rookes* v. *Barnard* [1964] A.C. 1129; [1964] 2 W.L.R. 269; [1964] 1
All E.R. 367, H.L.(E.).                                          F

The following additional cases were cited in argument in the House of
Lords:

*Associated Provincial Picture Houses Ltd.* v. *Wednesbury Corporation*
[1948] 1 K.B. 223; [1947] 2 All E.R. 680, C.A.

*Eleko* v. *Government of Nigeria* [1931] A.C. 662, P.C.

*Jones* v. *German* [1896] 2 Q.B. 418; [1897] 1 Q.B. 374, C.A.   G

*Minister of National Revenue* v. *Wrights' Canadian Ropes Ltd.* [1947]
A.C. 109, P.C.

*Norwest Holst Ltd.* v. *Secretary of State for Trade* [1978] Ch. 201;
[1978] 3 W.L.R. 73; [1978] 3 All E.R. 280, Foster J. and C.A.

*Padfield* v. *Minister of Agriculture, Fisheries and Food* [1968] A.C. 997;
[1968] 2 W.L.R. 924; [1968] 1 All E.R. 694, C.A. and H.L.(E.).

*Parry-Jones* v. *Law Society* [1969] 1 Ch. 1; [1968] 2 W.L.R. 397; [1968]   H
1 All E.R. 177, C.A.

*Reg.* v. *Governor of Brixton Prison, Ex parte Ahsan* [1969] 2 Q.B. 222;
[1969] 2 W.L.R. 618; [1969] 2 All E.R. 347, D.C.

*Reg.* v. *Lewes Justices, Ex parte Secretary of State for the Home Department* [1973] A.C. 388; [1972] 3 W.L.R. 279; [1972] 2 All E.R. 1057, H.L.(E.).

*Reg.* v. *Secretary of State for Home Affairs, Ex parte Hosenball* [1977] 1 W.L.R. 766; [1977] 3 All E.R. 452, C.A.

*Reg.* v. *West London Metropolitan Stipendiary Magistrate, Ex parte Klahn* [1979] 1 W.L.R. 933; [1979] 2 All E.R. 221, D.C.

*Rex* v. *Fulham, Hammersmith and Kensington Rent Tribunal, Ex parte Zerek* [1951] 2 K.B. 1; [1951] 1 All E.R. 482, D.C.

*Wilover Nominees Ltd.* v. *Inland Revenue Commissioners* [1974] 1 W.L.R. 1342; [1974] 3 All E.R. 496, C.A.

The following cases are referred to in the judgments of the Court of Appeal:

*Chic Fashions (West Wales) Ltd.* v. *Jones* [1968] 2 Q.B. 299; [1968] 2 W.L.R. 201; [1968] 1 All E.R. 229, C.A.

*Christie* v. *Leachinsky* [1947] A.C. 573; [1947] 1 All E.R. 567, H.L.(E.).

*Entick* v. *Carrington* (1765) 2 Wils. 275.

*Ghani* v. *Jones* [1970] 1 Q.B. 693; [1969] 3 W.L.R. 1158; [1969] 3 All E.R. 1700, C.A.

*Huckle* v. *Money* (1763) 2 Wils. 205.

*International General Electric Company of New York Ltd.* v. *Customs and Excise Commissioners* [1962] Ch. 784; [1962] 3 W.L.R. 20; [1962] 2 All E.R. 398, C.A.

*Liversidge* v. *Anderson* [1942] A.C. 206; [1941] 3 All E.R. 338, H.L.(E.).

*Malone* v. *Metropolitan Police Commissioner* [1980] Q.B. 49; [1978] 3 W.L.R. 936; [1979] 1 All E.R. 256, C.A.

*Nakkuda Ali* v. *Jayaratne* [1951] A.C. 66, P.C.

*Padfield* v. *Minister of Agriculture, Fisheries and Food* [1968] A.C. 997; [1968] 2 W.L.R. 924; [1968] 1 All E.R. 694, C.A. and H.L.(E.).

*Reg.* v. *Hudson* [1956] 2 Q.B. 252; [1956] 2 W.L.R. 914; [1956] 1 All E.R. 814, C.C.A.

*Rex* v. *Wilkes* (1763) 2 Wils. 151.

*Secretary of State for Education and Science* v. *Tameside Metropolitan Borough Council* [1977] A.C. 1014; [1976] 3 W.L.R. 641; [1976] 3 All E.R. 665, C.A. and H.L.(E.).

*Wilover Nominees Ltd.* v. *Inland Revenue Commissioners* [1974] 1 W.L.R. 1342; [1974] 3 All E.R. 496, C.A.

The following additional cases were cited in argument before the Court of Appeal:

*D.* v. *National Society for the Prevention of Cruelty to Children* [1978] A.C. 171; [1977] 2 W.L.R. 201; [1977] 1 All E.R. 589, H.L.(E.).

*Inland Revenue Commissioners* v. *Plummer* [1979] Ch. 63; [1978] 3 W.L.R. 459; [1978] 3 All E.R. 513, C.A.

*Jeffrey* v. *Black* [1978] Q.B. 490; [1977] 3 W.L.R. 895; [1978] 1 All E.R. 555, D.C.

*Norwest Holst Ltd.* v. *Secretary of State for Trade* [1978] Ch. 201; [1978] 3 W.L.R. 73; [1978] 3 All E.R. 280, Foster J. and C.A.

*Pearlberg* v. *Varty* [1972] 1 W.L.R. 534; [1972] 2 All E.R. 6, H.L.(E.).

*Reg.* v. *Lewes Justices, Ex parte Secretary of State for the Home Department* [1973] A.C. 388; [1972] 3 W.L.R. 279; [1972] 2 All E.R. 1057, H.L.(E.).

*Reg.* v. *Patel* (1973) 48 T.C. 647, C.A.

*Reg.* v. *Secretary of State for Home Affairs, Ex parte Hosenball* [1977]    A
1 W.L.R. 766; [1977] 3 All E.R. 452, D.C. and C.A.

*Reg.* v. *West London Metropolitan Stipendiary Magistrate, Ex parte Klahn*
[1979] 1 W.L.R. 933; [1979] 2 All E.R. 221, D.C.

*Truman (Frank) Export Ltd.* v. *Metropolitan Police Commissioner* [1977]
Q.B. 952; [1977] 3 W.L.R. 257; [1977] 3 All E.R. 431.

*Vestey* v. *Inland Revenue Commissioners* [1979] Ch. 177; [1978] 2    B
W.L.R. 136; [1977] 3 All E.R. 1073.

The following case is referred to in the judgment of the Divisional Court:

*Reg.* v. *Secretary of State for Home Affairs, Ex parte Hosenball* [1977] 1
W.L.R. 766; [1977] 3 All E.R. 452, D.C. and C.A.

The following additional cases were cited in argument before the    C
Divisional Court:

*Ashburton (Lord)* v. *Pape* [1913] 2 Ch. 469, C.A.

*Chic Fashions (West Wales) Ltd.* v. *Jones* [1968] 2 Q.B. 299; [1968] 2
W.L.R. 201; [1968] 1 All E.R. 229, C.A.

*D.* v. *National Society for the Prevention of Cruelty to Children* [1978]
A.C. 171; [1977] 2 W.L.R. 201; [1977] 1 All E.R. 589, H.L.(E.).

*Malone* v. *Metropolitan Police Commissioner* [1980] Q.B. 49; [1978] 3    D
W.L.R. 936; [1979] 1 All E.R. 256, C.A.

*Nakkuda Ali* v. *Jayaratne* [1951] A.C. 66, P.C.

*Norwest Holst Ltd.* v. *Secretary of State for Trade* [1978] Ch. 201; [1978]
3 W.L.R. 73; [1978] 3 All E.R. 280, Foster J. and C.A.

*Pearlberg* v. *Varty* [1972] 1 W.L.R. 534; [1972] 2 All E.R. 6, H.L.(E.).

*Reg.* v. *Lewes Justices, Ex parte Secretary of State for the Home Depart-*    E
*ment* [1973] A.C. 388; [1972] 3 W.L.R. 279; [1972] 2 All E.R. 1057,
H.L.(E.).

*Reg.* v. *Patel* (1973) 48 T.C. 647, C.A.

*Reg.* v. *West London Metropolitan Stipendiary Magistrate, Ex parte Klahn*
[1979] 1 W.L.R. 933; [1979] 2 All E.R. 221, D.C.

*Secretary of State for Education and Science* v. *Tameside Metropolitan*
*Borough Council* [1977] A.C. 1014; [1976] 3 W.L.R. 641; [1976] 3    F
All E.R. 665, C.A. and H.L.(E.).

*Secretary of State for Employment* v. *ASLEF* [1972] 2 Q.B. 443; [1972] 2
W.L.R. 1362; [1972] I.C.R. 7; [1972] 2 All E.R. 853, N.I.R.C.

*Truman (Frank) Export Ltd.* v. *Metropolitan Police Commissioner* [1977]
Q.B. 952; [1977] 3 W.L.R. 257; [1977] 3 All E.R. 431.

*Wilover Nominees Ltd.* v. *Inland Revenue Commissioners* [1974] 1 W.L.R.
1342; [1974] 3 All E.R. 496, C.A.
    G

APPLICATION for judicial review.

By notice of motion of July 18, 1979, pursuant to leave of the
Divisional Court of the Queen's Bench Division given on July 17, 1979,
the applicants, Rossminster Ltd., A. J. R. Financial Services Ltd., Ronald
Anthony Plummer and Roy Clifford Tucker, applied for judicial review,
seeking, inter alia, an order of certiorari to quash the search warrants    H
issued in respect of the applicants' premises by Judge Leonard, Common
Serjeant of the City of London, on July 12, 1979, and a declaration that
the revenue officers were not entitled to remove and were bound to deliver

A.C.            Reg. v. I.R.C., Ex p. Rossminster (D.C.)

A  up to the applicants all documents and other things found at and taken
from the applicants' premises and all copies thereof. In its final agreed
form " ought " was substituted for " bound to " in the declaration.

The facts are stated in the judgments of Eveleigh L.J. and Lord
Denning M.R.

*Andrew Bateson Q.C.* and *Michael Tugendhat* for the applicants.
B  *Brian Davenport* for the revenue.

EVELEIGH L.J.  This application concerns the search for documents and
the seizure of documents at four different premises, when the revenue
purported to act under section 20C of the Taxes Management Act 1970,
as amended by Schedule 6 to the Finance Act 1976. They had obtained
C  warrants relating to each of the premises, and as they are in the same
form it is sufficient to read one of them. They were all obtained on the
authority of Judge Leonard, sitting at the Central Criminal Court.  The
document is headed " Search Warrant." It is addressed to

" Raymond Quinlan, and to the persons named in the first schedule
annexed to this warrant. Officers of the Board of Inland Revenue.
Information on oath having been laid this day by Raymond
D  Quinlan in accordance with the provisions of section 20C of
the Taxes Management Act 1970 stating that there is reasonable
ground for suspecting that an offence involving fraud in connection
with or in relation to tax has been committed, and that evidence
of it is to be found on the premises described in the second schedule
annexed hereto. You are hereby authorised to enter those premises,
E  together with all or any of the officers of the Board of Inland
Revenue named in the first schedule hereto and together with such
constables as you may require, if necessary by force, at any time
within 14 days from the time of issue of this warrant, and search
them; and on entering those premises with this warrant you may
seize and remove any things whatsoever found there which you have
F  reasonable cause to believe may be required as evidence for the
purposes of proceedings in respect of such an offence."

Application has been made to this court for certiorari to quash the
warrant on the ground that it was improperly issued, that the judge did
not or could not have properly exercised his discretion in relation to
it, and that it is bad on the face of it, because it lacks particularity.
G  Application is also made for mandamus for a declaration and for damages,
all on the grounds of abuse of power by the revenue.

It is not necessary to state the precise relief claimed in the motion.
Indeed, some of the matters in respect of which relief is prayed, for
example, access to the documents, have been resolved by mutual agree-
ment by the parties, but generally speaking what this court is concerned
H  is to decide whether the documents were lawfully taken or not, and
whether the revenue exceeded their power in seizing them.

Section 20C of the Taxes Management Act 1970, in so far as it is
relevant, reads:

"(1) If the appropriate judicial authority is satisfied on information A on oath given by an officer of the board that—(a) there is reasonable ground for suspecting that an offence involving any form of fraud in connection with, or in relation to, tax has been committed and that evidence of it is to be found on premises specified in the information; and (b) "—which is not relevant for this purpose—". . . the authority may issue a warrant in writing authorising an officer of the board to enter the premises, if necessary by force, at any time within 14 days B from the time of issue of the warrant, and search them. . . . . (3) On entering the premises with a warrant under section, the officer may seize and remove any things whatsoever found there which he has reasonable cause to believe may be required as evidence for the purposes of proceedings in respect of such an offence as is mentioned in subsection (1) above. . . ."

C

There then follow subsection (4) and subsection (5) which respectively deal with the provision of a list and access to the documents.

It is contended on behalf of the applicant that the revenue must specify a particular offence when applying for the warrant to the circuit judge who is the judicial authority for the purposes of the section, and further, that the warrant itself must prescribe that offence, and that the D warrant must specify the documents which are seizable or describe them with some particularity which relates them to the offence. It is also contended that subsection (3) permits seizure only of documents that are limited to being evidence of the offence which it is said has to be specified when application is made for the warrant.

It is further submitted that when the seizure is challenged, or alternatively if a prima facie case of irregularity is shown, then it is incumbent E upon the revenue to justify their behaviour, and justification involves giving details of the offence and of the "reasonable cause" for the belief. So, it is said, justification involves stating the offence, stating the belief, and the cause for it.

Finally, it is submitted in this case that should it be that after the documents have been seized those which are admitted to have been seized F wrongfully are returned, none the less the whole seizure is bad, and if all of the documents are returned, no copies may be kept by the revenue, because they will be, copies that have been obtained as a result of a seizure which taken as a whole is itself bad.

The revenue seek to answer those contentions by saying that all that is necessary is to satisfy the judge that there are grounds to suspect that some offence or other involving fraud against the revenue has been G committed. Further, they contend that on a proper construction of subsection (3) the revenue can seize anything which might be evidence of any offence of the kind referred to in subsection (1).

It is further said that once the judge is satisfied of the grounds for suspicion there is no necessity to tell the applicant of the nature of the offence, and no necessity to tell the applicant what the grounds are. It H has further been submitted on behalf of the revenue that if they are called upon to justify the seizure a bare assertion of the words in subsection (3) is in law enough, namely, it is enough to depose that they have

A    reasonable cause to believe that the documents may be required as
     evidence for the purposes of proceedings, etc.

         It is said that a lack of detail is justified in this type of case because
     these are not criminal proceedings. They are preliminary stages, which
     may result in criminal proceedings, and to descend to detail would in all
     probability involve the disclosure of the names or name of the informants
     or an informant. It is further argued that section 20C (3) gives the
B    officers who are conducting the search an unfettered discretion, as I under-
     stand the argument, that their assertion of a belief and reasonable cause
     is enough. This court was referred to the well known case of *Reg.* v.
     *Secretary of State for Home Affairs, Ex parte Hosenball* [1977] 1 W.L.R.
     766. It is to be noted, however, that the words of the Act with which that
     case was concerned are not the same as the words of the Taxes Manage-
     ment Act 1970, section 20C.
C        Further, it was argued by Mr. Davenport on behalf of the revenue that
     in any event these affidavits were not as limited as the applicants contend,
     and that they did in fact disclose sufficient to answer the case that was
     raised against him.

         I turn to consider the effect of section 20C. In doing so, it seems to
     me that the meaning of the two subsections with which we are concerned
D    is to be obtained by reading the whole of the section, and that help on the
     construction of subsection (1) is to be obtained from reading subsection (3)
     and vice versa. Doing that, what does one find? Not that the court
     has to be satisfied that an offence has been committed by a particular
     person, but that there is reasonable ground for a suspicion, and that
     suspicion has to be that an offence has been committed, but the nature
     of the offence is not specified. It is widely described, namely, one involving
E    any form of fraud in connection with, " or in relation to, tax . . ."

         I do not regard that subsection as giving, as it were, by description
     a catalogue of offences. What it is doing is defining the nature of the
     suspicion which, if supported by reasonable ground for it, will entitle
     this application for the warrant to be made.

         I then turn to subsection (3). Again, the words used in subsection (3)
F    are general, if one reads them, relating back as they do to the words of
     subsection (1). Subsection (3) does not say that they may seize and
     remove anything which the officer has reasonable cause to believe may
     be required as evidence for the offence for which application for the
     warrant was made, or any such specific words. The reference back to
     subsection (1) is, in my opinion, quite general and not selective. What the
     evidence has to relate to is " such an offence as is mentioned in subsection
G    (1) "—in other words, an offence involving any form of fraud in connec-
     tion with or in relation to tax.

         There are many possible offences in the criminal calendar which will
     cover fraudulent activity, and in my opinion it is enough, on an applica-
     tion for a warrant, to show that there are grounds for suspecting fraud
     which would fall under the heading of one or other of the offences in the
H    criminal calendar. Which particular offence might be selected would
     depend on the manner of the perpetration of the fraud, and as the whole
     section is initiated by suspicion only, I do not think that the legislature
     intended that particular offence to be named or specified at that stage.

Eveleigh L.J.        Reg. v. I.R.C., Ex p. Rossminster (D.C.)        [1980]

Therefore, it seems to me that the revenue in applying for a warrant A of this nature must rely upon a suspicion of fraud against the revenue which can come under the heading of some specific offence, but it is not necessary for them to elect which one. In so far as subsection (3) is concerned, I have said enough to indicate that in my view it is not limited to any particular criminal offence, provided it relates to that kind of offence as is specified in subsection (1).

That being so, the next question arises as to the nature of the belief B with which we are concerned. On the one hand, it can be said that there must be a belief that the document in question is evidence of a criminal offence, and that the phrase " may be required " relates only to the chances of that document which is evidence being actually used in the proceedings. That argument would of course necessitate " reasonable cause " being shown for a conclusion that the document or documents in question was C or were evidence.

On the other hand, it is said at the other extreme that all that is necessary is that the officer should believe that the documents seized might provide some evidence which could be used, or might be required. Those are the extremes of the contentions here.

In deciding what is the correct approach I first of all conclude that the proceedings referred to in subsection (3) are criminal proceedings, D and I understand that Mr. Davenport does not contest that. The evidence referred to will be evidence that is receivable in evidence in a court. That only brings us to the real nub of the problem.

Bearing in mind, as I say, that the whole section is based on suspicion, bearing in mind that subsection (3) is, as I read it, broadly drawn, bearing in mind that it may well be that no specific offence has yet been deter- E mined upon by the revenue, I have come to the conclusion that an officer is entitled to say: "I believe that this document is one which could afford evidence of an offence involving fraud," and consequently can reach the conclusion that it may be required as evidence for the purposes of proceedings.

This approach will not, in my view, permit wild speculation. First of all, although the subsection does not specifically say so, I think it is F necessary that there should be a belief, an actual belief should exist. The mere existence of the grounds for belief will not be enough. Conse- quently, the officer is required to go through a mental process and is not entitled to snatch documents willy-nilly. As I say, wild speculation as to the remote possibility of a document being used in evidence would not meet the test. One has to read the statement of that which is believed with the requirement that there have to be reasonable grounds, and it G follows that the belief must be based on those reasonable grounds, so there must be reasonable grounds for the belief formed as to the nature of the documents.

If it can be shown that the documents were seized in such a hurry that no possible consideration of their value could have been given, clearly it will not be possible, in my opinion, for the revenue to claim H the protection of subsection (3). It may well be, depending upon the facts of each particular case, that an applicant need not put his case as high as that.

961
A.C.        Reg. v. I.R.C., Ex p. Rossminster (D.C.)    Eveleigh L.J.

A    Then one has to consider what kind of evidence it is necessary to adduce before a court to show the existence of that belief which satisfies the requirement for the exercise of the seizure under subsection (3); to what extent must the grounds be detailed; and who has to prove the existence of those grounds?

In approaching that question, it is important to bear in mind that we are not concerned with a civil claim for the return of the documents. In
B such a case it might well be that all the applicant has to do is to allege that the documents have been taken without his permission. This would require a defence, and the defence might well read: "The documents were taken by an officer acting under a warrant, that officer having reasonable cause to believe," etc., etc. In the pleading the particular grounds for the belief would not have to be specified at that point, because looked at as a pleading there would be a defence in law disclosed,
C but if the defendant were asked for further and better particulars of the grounds of his belief I apprehend that he would have to give them, and those grounds for belief would be investigated at the trial and would be tested in cross-examination.

But we are not concerned with a claim for the return of documents. We are concerned with an allegation of an abuse of executive power,
D so it is the abuse of power that has to be demonstrated to this court. I would not accept the argument, if I understood it rightly, that the revenue should never descend to detail of their reasonable cause, on the grounds that to do so would almost certainly mean revealing the name of an informer or other information which might be useful to a person who knows his affairs are about to be investigated. I do not think that the revenue are entitled to claim such a wide privilege as that. It seems to me
E that what they have to disclose will depend on the case that is made against them. Consequently, each case will depend upon its own facts and upon its particular presentation.

That being my view of the law, what is the result in the present case? In so far as the warrant is concerned, we do not know what evidence was given on oath to the judge. What we do know is that it was
F sufficient to satisfy him that a warrant should issue. I see no grounds in this case whatsoever for concluding that he acted upon any wrong principle. That conclusion I would have reached in any event, whatever had been my opinion as to the necessity for an offence to be specified. There simply is not the evidence in this case to enable this court to say that the judge exercised his discretion improperly.

The description of the documents in the warrant it is true is a wide
G one, and so too are the introductory words of the warrant. I do not regard that as any defect in the warrant. The warrant is the key to the opening of the door to a power that is granted by subsection (3) and, as subsection (3) on the construction I have given it gives a wide power of seizure, there can be no limited description of the documents, other than in the words of the subsection itself, in the warrant. For the
H warrant to limit the description in terms other than those which appear in it would take away the power which is granted under the Act by subsection (3). When the officers enter and subsequently seize and remove, their power is derived from the subsection itself, albeit as I say,

the warrant opens the way for the revenue to invoke that subsection. A
I therefore see no ground for challenging the validity of the warrant.

Now I turn to consider the sufficiency of the affidavits for their pur-
pose, and I specifically do not say "for the purpose of establishing
whether the revenue had reasonable cause to believe." I have to consider
those affidavits as one does in proceedings for judicial review, as they are
read in this court. That is the evidence upon which this court has to
proceed, and that is the evidence upon which this court has to come to a B
conclusion whether or not there has been an abuse of the executive
powers. At the end of the day the court has to ask itself that simple
question.

Now, what are the facts as revealed in the affidavits? I will, of course,
have to summarise those. It amounts to this, that on July 13, 1979, the
Inland Revenue Special Investigations Section, supported by police C
officers, went to four different premises. They went to Nettlestead Place,
near Maidstone, which is the home of Mr. Tucker. He is a Fellow of the
Institute of Chartered Accountants, and he states that on the morning
of Friday, July 13, when he was in Guernsey on business, at 7.30 a.m.
he received a telephone call from his wife that the revenue had entered
the house. The affidavit evidence is to the effect that there was a hurried
collection of documents, and allegations are made to the effect that a D
number of documents were taken without examination, and that docu-
ments which were or which must be irrelevant to the purpose were
taken. It was claimed that bank statements relating to students who lived
at the house were taken. However, in an affidavit by the revenue it is
said that those bank statements were not taken. The envelopes containing
them were opened but the statements were then left where they were.
                                                                        E
It is alleged further that papers belonging to the deponent's brother
were removed from the attic, the brother being a man who was in
Venezuela. Furthermore, it is said the deponent's passport had been
taken.

There is also an affidavit of a Mr. Plummer. He is the managing
director of Rossminster Ltd. He is a chartered accountant and a
Fellow of the Institute of Taxation. He says that Rossminster is a bank, F
incorporated in 1978 in England, being a subsidiary of Rossminster Group
Ltd. He says:

"Other companies which are or were controlled by the same persons
as those controlling Rossminster have been involved in implementing
legal tax avoidance schemes. These have always been approved by
counsel, but in a number of cases they have been challenged in the G
courts."

The Rossminster Bank occasionally provides loans in the ordinary course
of its banking business to customers who require them in connection with
such schemes. He then states that at 7 a.m. on the morning of Friday,
July 13, 1979, he was at home when an officer of the revenue came to
execute the warrant. He says:                                           H

"They went to my filing cabinet and removed a large number of
files and made a list of those which they proposed to take. I saw

Case 1:22-cr-00673-LAK   Document 138-7   Filed 05/08/23   Page 13 of 77

963
A.C.          Reg. v. I.R.C., Ex p. Rossminster (D.C.)          Eveleigh L.J.

A  them look only at the names on the files. I did not see them examining the contents. I asked to check the list and I was not allowed to do so. Then they went to the safe and took building society passbooks, my children's passports and a number of cheque books belonging to my children. Then they went to my bedroom where I had a suitcase containing things that I had intended to take to Guernsey. They removed a bundle of papers mostly relating to

B  my mother who lives in Guernsey and my personal affairs. They did not read the papers. They then searched the house and took personal papers of my wife. Two of the bundles they took included copies of financial newspapers and similar publications. I did not see them read any document before they took it."

He then states that he went on to 1, Hanover Square, the premises of
C  Rossminster Ltd., and arrived at about 10 a.m. There were officers of the revenue and the police there. He said he stayed until 12 noon, and during that time he saw that the officers were removing large quantities of documents. " I did not see any officer perusing any document. The quantity of documents was so great that the officers could not have perused them before removing them." He produced also some lists of
D  documents which were given to a Mr. Fuller, the office manager, by the officers conducting the search. He said: " The officers had cleared out the whole of my room, taking even my internal telephone directory. Mr. Coysh "—who is also a director of Rossminster—" informed me that he saw other rooms similarly cleared out."

The court has been invited to examine the list of documents in this case and to note the times at the side of those lists, and has been invited
E  to conclude from that, that there was no time to examine the documents therein listed. In my opinion the contention that there was no time to examine all of the documents therein listed is well founded. It does not follow from that, that no documents were examined, and it does not necessarily follow from that, in my opinion, that the documents were seized willy-nilly.

F  For example, the list contains a very large number of files which were seized over a period of about two hours. It is quite clear that the contents of the files could not have been inspected page by page, or looked at page by page, let alone read, but does it follow from that, that no thought had been given to the nature of the documents that were being seized?

Certainly the affidavit evidence of Mr. Plummer—and I have not
G  referred to all of it—raises a case for an explanation by the revenue. On the face of those affidavits it does seem reasonable to infer a hurried search, where there would not have been an evaluation of everything that was taken.

So one turns to see what is the explanation that has been given. Broadly, that explanation can be summarised as follows: there was being
H  conducted an investigation, and as a result of that it was decided to ask for a warrant; that instructions were given to the officers concerned as to the type of documents they should look for, and that when the documents were seized a great number of them were examined closely. Others were

not. It has been submitted in this court, the fact that a file is taken as a
file does not necessarily lead to the inference that it was taken without   A
consideration or that it was not permissible to take it, because it is said
the file itself may tell a story, and consequently it is a relevant document
for the purpose of seizure.

Mr. Quinlan, one of Her Majesty's Inspectors of Taxes, says this in
reply to the affidavits of the applicants which he, Mr. Quinlan, had read:

"I am a Senior Inspector of Taxes employed in the Inland Revenue   B
Technical Division, Special Investigations Section. My duties include
the investigation of the activities of what may be called the Ross-
minster group of companies and the many trusts, companies, partner-
ships and individuals with whom the Rossminster group has a close
relationship."

Among those individuals are Mr. Plummer and Mr. Tucker. Among   C
those companies are A. J. R. Financial Services Ltd., whose premises
(which I should say in parenthesis, are at St. George Street, adjacent to
Hanover Square) were also searched, and in respect of which similar
evidence was adduced by the applicants. Mr. Quinlan says:

"During the course of my investigations I reached the conclusion that
I had ground for suspecting that offences involving a form of fraud   D
in connection with or in relation to tax had been committed and
that evidence of them was to be found at (inter alia) the addresses
set out in the notices of motion herein."

He says that his team carried out the search and that they were instructed
only to seize articles which they had reasonable cause to believe might be
required for evidence for the purpose of proceedings in such offences. He   E
stated that he was at the premises of 1, Hanover Square almost the
whole of the day of July 13:

"and I verily believe that the said instructions were duly carried
out. From time to time during the said search individual revenue
officers asked me whether certain material which they had found
came into the said category and I would give a ruling. During the   F
course of the day a great many documents were removed, but I
verily believe that they all fell within my said instructions."

He refers to Mr. Plummer's affidavit, and to Mr. Plummer's statement
that Mr. Coysh had said some officers only glanced at a few documents
and did not read more than a handful. He says that is not an accurate
description of what went on:                                               G

"For example during the day I went through the two volume securi-
ties register page by page with the manager of Rossminster sitting
beside me and selected only certain objects in such register. I went
through a very thick correspondence file of a Mr. Glatt and released
it all. I also went through all the incoming telex messages and the
manager's outgoing post, and released it all. I carried out a sample   H
check of the ledger cards and made special arrangements with the
manager to have them photocopied on the premises in order that
the originals could remain. These are but examples of some of the

Case 1:22-cr-00673-LAK   Document 138-7   Filed 05/08/23   Page 15 of 77

965
A.C.                    Reg. v. I.R.C., Ex p. Rossminster (D.C.)          Eveleigh L.J.

A       detailed searching which I, and I verily believe, other officers carried
        out on the day in question. But in a very great many instances
        files and bundles of documents were removed when their title or
        subject matter made it clear that their contents was such that the
        officers had reasonable cause to believe that they might be required
        as evidence for the purpose of proceedings."

B       There is an affidavit from a Mr. Ramage, an inspector of taxes. He
        went to 27, Radnor Place, London, the premises of Mr. Plummer, and he
        said he gave his team similar instructions to those which Mr. Quinlan
        refers to. He said:

        " Although Mr. Plummer appears to keep many business papers at
        his home, it was in almost all cases possible to ascertain from the
        titles of files, or the subject matter of bundles or categories of docu-
C       ments whether they fell into the above description, but where there
        was any doubt either I or one of the officers with me went through
        the papers in further detail until we were satisfied that they either
        should or need not be seized."

        There are other affidavits to a similar effect.

D       There was put before this court on this third day of the hearing an
        affidavit from Mr. Dermit, an Assistant Director in the Inland Revenue
        Technical Division in charge of Special Investigations Section. Mr. Dermit
        says:

        " These inquiries are often extremely complicated. I verily believe
        that it would be greatly detrimental to and obstructive of inquiries
        of this nature to disclose at this stage the precise nature of the offences
E       in respect of which proceedings may be taken and in which the
        documents seized may be required as evidence. Such disclosure, in
        my view, would be harmful because, inter alia, it might reveal to those
        suspected of having committed offences not only that those persons
        have been identified by the Inland Revenue, but also the extent and
        nature of the information in the revenue's possession concerning such
F       offences. I have carefully considered whether it is possible to say
        more about the nature of the detriment referred to, or how it would
        arise, but in my opinion it would not be possible to do so without
        risk of thereby producing such detriment."

        As I have said already, in my view an affidavit of that nature will
        not always provide an answer to the complaint. It depends on the nature
G       of the complaint and the evidence to support it. There may well be
        many cases where the court will itself require further particulars of the
        cause for the belief that is asserted. It will entirely depend on the view
        taken by the court of the evidence that is presented, or as it is presented
        before it.

        I turn to consider the nature of the contest in the present case and the
H       issue before this court. That issue, as I have said, is one of abuse of
        power and failure to follow the procedure which would entitle the revenue
        to exercise the power under subsection (3). That allegation of abuse of
        power rests upon evidence of a hurried search, on evidence of failure to

inspect every document. It seems to me, looking at the evidence as a
whole, that it cannot be said that an officer could not have reasonable $\quad$ A
cause for his belief simply because every document was not read. I
am not saying that in proceedings of this kind it is necessary for the
applicant to show that that could be no grounds for belief, in the way
that one meets that argument when one comes to consider whether there
has been an improper exercise of discretion or an improper finding by
the justices on a case stated. I simply say in this particular case that $\quad$ B
the evidence does not show that that could be no proper cause. Of
course, if the evidence did show that, the applicants' case would be strong.

What the applicants' evidence amounts to, as I say, is that not every
document was read, and not every document, as an individual document,
was examined. Files were taken as files. Then one has to look at those
facts, bearing in mind the affidavits from the revenue. It seems to me
that there can well be occasions when a glance at a document will tell $\quad$ C
an investigating officer whether it is the kind of document that he is
entitled to take. No one can expect that they should stay on the premises
to read the words and the details of every document.

Therefore, if one looks at the case in that light, is the inference to
be drawn from all this evidence that there was an abuse of power? I
do not think that one can come to that conclusion. In saying that, I am $\quad$ D
far from saying, as appeared to be submitted at one stage in argument,
that there would, as a result of such an approach, be a power in the
revenue to seize a whole mass of documents, unexamined, in the hope
that one of them might reveal some valuable evidential information. In-
deed, one only has to apply the test to such a situation to see that an
argument like that by the revenue is untenable. If they are seeking one
document thought to contain information, and they take 20, believing the $\quad$ E
document to be one of the 20, it also follows that they should believe that
19 of the documents are not permissible documents to seize. Consequently,
in such a case, in my opinion it would be the duty of the officer concerned
to search upon the premises for the document that he has in mind. If,
on the other hand, the whole 20 documents were of the type that fall
within the description of documents that I have stated earlier in this judg- $\quad$ F
ment that would be another matter. He could take them all, but he would
have to have reasonable cause to believe that they all might be required as
evidence for proceedings.

As I have said, I do not find it possible to say in this case that there
was an abuse of power. It is said that one should go further into the
allegation of reasonable cause. One should ask for details of that and,
as I say, in some cases that may be necessary because the evidence $\quad$ G
adduced by the applicant may only be answerable by such detailed infor-
mation coming from the revenue, but that is not, as I see it, this case. The
case that falls to be answered is not such a case. I therefore would refuse
these applications.

May I just say this, however. It was also suggested in argument that
if some document were improperly seized, then as I have already stated $\quad$ H
the whole of the seizure was bad, and even though documents improperly
seized were returned, or if they were returned, the revenue would not be
entitled to retain copies of documents improperly seized. In so far as

A   the documents returned are improperly seized, because they are not eligible documents, it is probably right to say that copies could not be retained. If, however, the documents that have been retained were documents that were of the class that could have been seized, but happen to have been improperly seized, for some reason or another—as I say, it does not apply in this case—then in my opinion copies could (I say " could ") be retained.

B   I am not giving a judgment on any particular claim. I am merely stating that one cannot assert as a bald proposition that no copies could be retained in such a case. Indeed, I do not think Mr. Bateson was really going that far.

Generally speaking, it seems to me the position would be this, that if the documents could have been seized lawfully, had the officer given consideration to the matter in the proper way, then those documents which

C   have now been returned could be made the subject of another search warrant and the revenue could go in again and collect those very documents. It seems to me, therefore, that if the copies that are retained are copies of eligible documents, then copies may be kept even though those documents were obtained improperly in the first place.

There were proceedings in this matter in the Chancery Division.

D   Those proceedings were transferred to this court. I would emphasise that the judgment I have given, assuming it is concurred in by Park J. and Woolf J., would not be res judicata in so far as the proceedings in the Chancery Division are concerned, but again I am in no position to influence a judge of the Chancery Division. I only say that because those proceedings have now been transferred to this court and have not been

E   proceeded with any further.

PARK J. I agree.

WOOLF J. I agree.

*Applications refused with costs.*

F
Solicitors: *Roney, Vincent & Co.; Solicitor of Inland Revenue.*

APPEAL from the Divisional Court.

The applicants appealed on the grounds, inter alia, that (1) the Divisional Court erred in construing section 20C of the Taxes Management Act 1970 as amended; (2) the court erred in holding that in applying for a warrant the

G   officers did not need to elect any particular offence; (3) the court erred in holding that subsection (3) referred to evidence of any offence of the class described in subsection (1) and not of a specific offence identified in subsection (1), namely the one or more which there were reasonable grounds for suspecting had been committed; (4) the court erred in holding that they were not concerned with a claim for the return of documents

H   but with an allegation of abuse of power and that the onus was upon the applicants to prove the abuse of power and not upon the officers to justify the seizure; (5) the court erred in finding that the evidence did not show that officers did not have reasonable cause for the belief required

Reg. v. I.R.C., Ex p. Rossminster (D.C.)                    [1980]

by the statute; (6) the court erred in holding that it was not necessary for    A
the court to be shown details of the grounds of the officers' belief or any
details of the offence suspected; (7) the court ought to have held that
it was for the persons who had seized the documents to satisfy the court
that they had acted in accordance with the statutory powers and the
judges ought to have found that they had failed to do so; (8) the court
ought to have held that the occupiers of the premises specified in the
warrant were entitled to be given in the warrant an indication of the nature    B
of the offence and the identity of the things to be seized to enable them
to know the exact object of the search and to protect themselves against
an abuse of the power given by the warrant and the statute; and (9)
the court ought to have applied the same principles as are applicable
when a power of search and seizure exercised by the police was challenged
in the High Court notwithstanding that the power here in question was
given to and exercised by servants of the Crown.                                C

   *Andrew Bateson Q.C.* and *Michael Tugendhat* for the applicants.
   *Brian Davenport* for the revenue.

   LORD DENNING M.R. It was a military style operation. It was carried
out by officers of the Inland Revenue in their war against tax frauds.    D
Zero hour was fixed for 7 a.m. on Friday, July 13, 1979. Everything
was highly secret. The other side must not be forewarned. There was
a briefing session beforehand. Some 60 officers or more of the Inland
Revenue attended. They were given detailed instructions. They were
divided into teams, each with a leader. Each team had an objective
allotted to it. It was to search a particular house or office, marked, I
expect, on a map: and to seize any incriminating documents found    E
therein. Each team leader was on the day to be handed a search warrant
authorising him and his team to enter the house or office. It would be
empowered to use force if need be. Each team was to be accompanied
by a police officer. Sometimes more than one. The role of the police
was presumably to be silent witnesses: or maybe to let it be known that
this was all done with the authority of the law: and that the householder    F
had better not resist—or else!

   Everything went according to plan. On Thursday, July 12, Mr. Quinlan,
the senior inspector of the Inland Revenue, went to the Central Criminal
Court and put before a circuit judge—the Common Serjeant—the
suspicions which the revenue held. The circuit judge signed the warrants.
The officers made photographs of the warrants, and distributed them to
the team leaders. Then in the early morning of Friday, July 13—the    G
next day—each team started off at first light. Each reached its objective.
Some in London. Others in the Home Counties. At 7 a.m. there was a
knock on each door. One was the home in Kensington of Mr. Ronald
Anthony Plummer, a chartered accountant. It was opened by his daughter
aged 11. He came downstairs in his dressing-gown. The officers of the
Inland Revenue were at the door accompanied by a detective inspector.    H
The householder Mr. Plummer put up no resistance. He let them in.
They went to his filing cabinet and removed a large number of files.
They went to the safe and took building society passbooks, his children's

Case 1:22-cr-00673-LAK   Document 138-7   Filed 05/08/23   Page 19 of 77

969

A.C.          Reg. v. I.R.C., Ex p. Rossminster (C.A.)          Lord Denning M.R.

A  cheque books and passports. They took his daughter's school report. They went to his bedroom, opened a suitcase, and removed a bundle of papers belonging to his mother. They searched the house. They took personal papers of his wife.

Another house was the home near Maidstone of Mr. Roy Clifford Tucker, a fellow of the Institute of Chartered Accountants. He was away on business in Guernsey. So his wife opened the door. The officers of

B  the Inland Revenue produced the search warrant. She let them in. She did not know what to do. She telephoned her husband in Guernsey. She told him that they were going through the house taking all the documents they could find. They took envelopes addressed to students who were tenants. They went up to the attic and took papers stored there belonging to Mr. Tucker's brother. They took Mr. Tucker's passport.

The main attack was reserved for the offices at no. 1, Hanover Square

C  of the Rossminster group of companies of which Mr. Plummer and Mr. Tucker were directors. They were let in by one of the employees. Many officers of the Inland Revenue went in accompanied by police officers. It was a big set of offices with many rooms full of files, papers and documents of all kinds. They took large quantities of them, pushed them into plastic bags, carried them down in the lift, and loaded them into a

D  van. They carried them off to the offices of the Inland Revenue at Melbourne House in the Aldwych. Twelve van loads. They cleared out Mr. Tucker's office completely: and other rooms too. They spent the whole day on it from 7 a.m. until 6.30 at night. They did examine some of the documents carefully, but there were so many documents and so many files that they could not examine them all. They simply put a number on each file, included it in a list, and put it into the plastic bag.

E  Against each file they noted the time they did it. It looks as if they averaged one file a minute. They did not stop at files. They took the shorthand notebooks of the typists—I do not suppose they could read them. They took some of the financial newspapers in a bundle. In one case the " top half " of a drawer was taken in the first instalment and the balance of the drawer was taken in the second.

F  Another set of offices was next door in St. George Street—I think along the same corridor. It was the office of A. J. R. Financial Services Ltd. The director Mr. Hallas was not there, of course, at seven o'clock. He arrived at 9.10 a.m. He found the officers of the Inland Revenue packing the company's files into bags for removal. He said that it amounted to several hundreds of documents. Police officers were in attendance there too.

G  At no point did any of the householders make any resistance. They did the only thing open to them. They went off to their solicitors. They saw counsel. They acted very quickly. By the evening they had gone to a judge of the Chancery Division, Walton J., and asked for and obtained an injunction to stop any trespassing on the premises. They telephoned the injunction through to Hanover Square at about a quarter to six at

H  night. The officers therefore brought the search and seizure to an end. They had, however, by this time practically completed it. So the injunction made very little difference. If the lawyers had had more time to think about it, they would have realised that it was not a case where an

970

injunction would lie against the officers of the revenue. They were A
officers of the Crown: and under section 31 of the Crown Proceedings
Act 1947 no injunction would lie against the Crown or its officers. So
the lawyers did not proceed with their claim for an injunction. They took
further advice. Counsel advised them that there might be a remedy
under a new procedure recently available. It is to restrain abuse of
power under R.S.C., Ord. 53. Counsel advised that they might now apply
for a declaration—a declaration which, if made, the Crown would be B
expected to obey. If the circumstances justified it—and if a declaration
was made that the seizure was bad—that might be an efficient and
expeditious remedy. Before that rule was enacted, the only thing to do
would have been to submit to the seizure: to wait until everything had
happened: and then to bring an action for damages. But under the
new rule, there might be an expeditious remedy available by way of C
judicial review.

So end the facts. As far as my knowledge of history goes, there has
been no search like it—and no seizure like it—in England since that
Saturday, April 30, 1763, when the Secretary of State issued a general
warrant by which he authorised the King's messengers to arrest John
Wilkes and seize all his books and papers. They took everything—all
his manuscripts and all papers whatsoever. His pocket-book filled up D
the mouth of the sack. He applied to the courts. Pratt C.J. struck down
the general warrant. You will find it all set out in *Rex* v. *Wilkes*
(1763) 2 Wils. 151; *Huckle* v. *Money* (1763) 2 Wils. 205 and *Entick* v.
*Carrington* (1765) 2 Wils. 275. Pratt C.J. said, at p. 207:

"To enter a man's house by virtue of a nameless warrant, in order
to procure evidence, is worse than the Spanish inquisition; a law under E
which no Englishman would wish to live an hour; it was a most daring
public attack made upon the liberty of the subject."

Now we have to see in this case whether this warrant was valid or not.
It all depends of course upon the statute. By the common law no search
or seizure at any man's house can be made except for stolen goods. I set
it all out in *Chic Fashions (West Wales) Ltd.* v. *Jones* [1968] 2 Q.B. 299. F
Search and seizure is only authorised—and has been authorised—by many
statutes in recent years. The one which concerns us was only passed in
July 1976. It is Schedule 6 to the Finance Act 1976. It is by section 20C.
As it is so important, I will read it:

"(1) If the appropriate judicial authority "—and he is defined as the
circuit judge—" is satisfied on information on oath given by an officer G
of the board that—(a) there is reasonable ground for suspecting that
an offence involving any form of fraud in connection with, or in
relation to, tax has been committed and that evidence of it is to be
found on premises specified in the information; and (b) in applying
under this section, the officer acts with the approval of the board given
in relation to the particular case, the authority may issue a warrant in H
writing authorising an officer of the board to enter the premises, if
necessary by force, at any time within 14 days from the time of issue
of the warrant, and search them. . . . (3) On entering the premises

A.C.                Reg. v. I.R.C., Ex p. Rossminster (C.A.)        Lord Denning M.R.

A        with a warrant under this section, the officer may seize and remove
any things whatsoever found there which he has reasonable cause to
believe may be required as evidence for the purposes of proceedings
in respect of such an offence as is mentioned in subsection (1)
above. . . ."

        That is the statute. It is under that statute that Mr. Quinlan went
to the appropriate judicial authority—in this case a circuit judge—the
B   Common Serjeant of the City of London. I would much like to know
the information which was given to the judge—the nature of the evidence
which was put before him to found the suspicion—and the offence of
which the accused were suspected. I would also like to know why these
private homes were believed to hold incriminating material. But we have
not been given any information as to what the Common Serjeant was told.
C   The revenue take the view that it would not be appropriate for us at this
stage to know what were the grounds of their suspicion. If this court were
told them, it would follow equally that Mr. Bateson and his clients would
be told them also. So we must remain in ignorance of the information
which was laid before the Common Serjeant. But I must say—and I think
it is right to say—that we should assume that there was laid before the
Common Serjeant material which did justify the view that there was reason-
D   able ground for suspecting that the applicants had been guilty of an offence
involving some fraud on the revenue; and also that incriminating documents
would be found in these offices and homes.

        Whilst I say that, I would like to emphasise that it is suspicion only.
In our law every man is presumed to be innocent until he is proved to
be guilty. Suspicion is not by itself enough to prove guilt. So I think we
E   should proceed on the presumption that these were innocent—or presumably
innocent—men: and so far there was only a suspicion.

        This brings me to the validity of the warrant—and indeed to consider
the statute.

### The validity of the warrant

F        Beyond all doubt this search and seizure was unlawful unless it was
authorised by Parliament. As to the statute, we are not allowed to read
Hansard—but you can. You can find it if you turn up the debate of May
17, 1976, columns 981 to 1050; and July 15, 1976, columns 923 to 1006.
The government of the day put forward the clause. It was opposed by
many as being a dangerous encroachment on individual freedom. It was
passed by a narrow majority.

G        Many will ask: why has Parliament done this? Why have they allowed
this search and seizure by the revenue officers? It did it here because the
Board of Inland Revenue were very worried by the devices used by some
wicked people, such as those—and we often see such cases in our courts—
who keep two sets of books: one for themselves to use; the other to be
shown to the revenue. Those who make out two invoices. One for the
H   customer. The other to be shown to the taxman. Those who enter into
fictitious transactions and write them into their books as genuine. Those
who show losses when they have in fact made gains. In the tax evasion
pool, there are some big fish who do not stop at tax avoidance. They

972

Lord Denning M.R.   Reg. v. I.R.C., Ex p. Rossminster (C.A.)   **[1980]**

resort to frauds on a large scale. I can well see that if the legislation were A confined—or could be confined—to people of that sort, it would be supported by all honest citizens. Those who defraud the revenue in this way are parasites who suck out the life-blood of our society. The trouble is that the legislation is drawn so widely that in some hands it might be an instrument of oppression. It may be said that " honest people need not fear: that it will never be used against them: that tax inspectors can be trusted, only to use it in the case of the big, bad frauds." This is an B attractive argument, but I would reject it. Once great power is granted, there is a danger of it being abused. Rather than risk such abuse, it is, as I see it, the duty of the courts so to construe the statute as to see that it encroaches as little as possible upon the liberties of the people of England.

### The warrant and the challenge to it

The warrant is challenged on the ground that it does not specify any C particular offence. I must read it in full, because this was what was given to all the teams of inspectors who went round:

" *Search Warrant.* To: Raymond Quinlan and to the persons named in the first schedule annexed to this warrant. Officers of the Board of Inland Revenue. Information on oath having been laid this day by Raymond Quinlan in accordance with the provisions of section 20C D of the Taxes Management Act 1970 stating that there is reasonable ground for suspecting that an offence involving fraud in connection with or in relation to tax has been committed and that evidence of it is to be found on the premises described in the second schedule annexed hereto. You are hereby authorised to enter those premises, together with all or any of the officers of the Board of Inland Revenue named in E the first schedule hereto and together with such constables as you may require, if necessary by force, at any time within 14 days from the time of issue of this warrant, and search them; and on entering those premises with this warrant you may seize and remove any things whatsoever found there which you have reasonable cause to believe may be required as evidence for the purposes of proceedings in respect F of such an offence. Dated July 12, 1979 "—signed by the circuit judge.

Then in the first schedule there are a whole number of names—over 60 officers. And in the second schedule annexed to this particular warrant is the address 1, Hanover Square: and there would be similar warrants in respect of the other premises which were searched. G

I come back to the challenge to the warrant. The challenge which is made here is that it does not specify any particular offence involving fraud. There may be 20 different kinds of fraud, as someone suggested, and this warrant does not specify which one of them is suspected. Each of the applicants, in complaining to the court, complain of this. There is a paragraph which each of them makes in his affidavit: H

" Despite requests by my solicitor so to do, the Inland Revenue have refused to disclose the nature of the offence or offences they have in mind and neither I, nor I verily believe my fellow directors, have the

Case 1:22-cr-00673-LAK   Document 138-7   Filed 05/08/23   Page 23 of 77

973

A.C.            Reg. v. I.R.C., Ex p. Rossminster (C.A.)        Lord Denning M.R.

A       slightest idea what offence or offences they do have in mind, or, even
        who is supposed to have committed it or them."

That is acknowledged by the revenue: and they give their justification for
it in an affidavit which was put forward—I think at the request of the
Divisional Court. It is an affidavit by Mr. Dermit. He said:

        " In the course of my duties I am responsible for initiating and con-
B       ducting many inquiries some of which may lead to proceedings for
        offences of fraud in relation to tax. I verily believe that it would be
        greatly detrimental to and obstructive of inquiries of this nature to
        disclose at this stage the precise nature of the offences in respect of
        which proceedings may be taken and in which the documents seized
        may be required as evidence. Such disclosure, in my view, would be
C       harmful because, inter alia, it might reveal to those suspected of having
        committed offences not only that those persons have been identified by
        the Inland Revenue but also the extent and nature of the information
        in the revenue's possession concerning such offences."

So there it is. The justification is: " We do not wish to tell more to
those we suspect because we do not want them to know too much about
D   what we intend to do. Otherwise they will be on their guard."

    Is this a just excuse? The words " an offence involving any form of
fraud in connection with, or in relation to, tax " are very wide words. We
were taken by Mr. Davenport through a number of offences which might
be comprised in them. There is no specific section in the Act itself. But
there are a number of other offences which involve fraud. There is " false
E   accounting " under section 17 of the Theft Act 1968. There is " evasion
of liability by deception " in section 2 of the Theft Act 1978. There is
perjury, forgery, conspiracy, and false statements relating to income tax.
You will find all those set out in Archbold, Criminal Pleading Evidence &
Practice, 40th ed. (1979). They are all offences which involve fraud. But
I myself would not be prepared to limit it to those half-dozen which Mr.
F   Davenport put before us. It seems to me that these words " fraud . . . in
relation to . . . tax " are so vague and so general that it must be exceedingly
difficult for the officers of the Inland Revenue themselves to know what
papers they can take or what they cannot take. Take an instance, for
example, which Mr. Davenport put before us. They may say to them-
selves, " This man must have been guilty of some fraud on the tax. His
income is only £1,000 a year—let us say—and he is spending at a rate of
G   £5,000 a year. He must be fiddling the tax in some way. Let us see how
he gets his money and what he spends it on." That, as we know in these
courts, is the sort of evidence relied on by the revenue when they are
charging a person with a tax fraud.

    If such is the ground of suspicion, if such is the sort of evidence which
points to fraud, see how wide a scope it gives to the inspectors of the
H   Inland Revenue. It enables them to pick up all a man's papers, saying
to themselves: " This looks as though there may be something useful in it.
Let's take it." The vice of a general warrant of this kind—which does
not specify any particular offence—is two-fold. It gives no help to the

officers when they have to exercise it. It means also that they can roam A
wide and large, seizing and taking pretty well all a man's documents and
papers.

There is some assistance to be found in the cases. I refer to the law
about arrest—when a man is arrested under a warrant for an offence. It
is then established by a decision of the House of Lords that the warrant
has to specify the particular offence with which the man is charged: see
*Christie* v. *Leachinsky* [1947] A.C. 573. I will read what Viscount Simon B
said, at p. 585:

> "If the arrest was authorised by magisterial warrant, or if pro-
> ceedings were instituted by the issue of a summons, it is clear law
> that the warrant or summons must specify the offence . . . it is a
> principle involved in our ancient jurisprudence. Moreover, the warrant
> must be founded on information in writing and on oath and, except C
> where a particular statute provides otherwise, the information and the
> warrant must particularise the offence charged."

Lord Simonds put it more graphically when he said, at p. 592:

> "Arrested with or without a warrant the subject is entitled to know
> why he is deprived of his freedom, if only in order that he may, with-
> out a moment's delay, take such steps as will enable him to regain it." D

So here. When the officers of the Inland Revenue come armed with a
warrant to search a man's home or his office, it seems to me that he is
entitled to say: "Of what offence do you suspect me? You are claiming
to enter my house and to seize my papers." And when they look at the
papers and seize them, he should be able to say: "Why are you seizing
these papers? Of what offence do you suspect me? What have these E
to do with your case?" Unless he knows the particular offence charged,
he cannot take steps to secure himself or his property. So it seems to me,
as a matter of construction of the statute and therefore of the warrant—
in pursuance of our traditional role to protect the liberty of the individual
—it is our duty to say that the warrant must particularise the specific
offence which is charged as being fraud on the revenue. F

If this be right, it follows necessarily that this warrant is bad. It should
have specified the particular offence of which the man is suspected. On
this ground I would hold that certiorari should go to quash the warrant.

If this be right, there is no need to go further. But I must go further
in case it be wrong. The warrant was issued under judicial authority. The
circuit judge—the Common Serjeant of the City of London—issued it.
But the seizure—the subsequent conduct of the officers at Hanover Square G
and in the homes of these men—was not subject to any judicial super-
vision. And as far as I know without any police check at all. The police
were there, but not doing anything except keeping the peace. The question
is whether or not that seizure came within the provisions of the statute,
which I will repeat: ". . . the officer may seize and remove any things
whatsoever found there which he has reasonable cause to believe may be H
required as evidence. . . ." Is he exempt from supervision in that regard?
Or is he the sole arbiter of "which he has reasonable cause to believe"?
surely not. In this regard I need only quote the words of Lord Radcliffe

975

A.C.          Reg. v. I.R.C., Ex p. Rossminster (C.A.)       Lord Denning M.R.

A  in *Nakkuda Ali* v. *Jayaratne* [1951] A.C. 66 on those very words " reasonable cause to believe." Lord Radcliffe said, at p. 77 :

    " After all, words such as these are commonly found when a legislature or law-making authority confers powers on a minister or official. However read, they must be intended to serve in some sense as a condition limiting the exercise of an otherwise arbitrary power. But if the question whether the condition has been satisfied is to be con-
B  clusively decided by the man who wields the power the value of the intended restraint is in effect nothing."

    So it cannot be that these officers are the people conclusively to decide whether there is reasonable cause to believe. The courts must be able to exercise some supervision over them. If the courts cannot do so, no one else can. Just see what these officers did here. Mr. Bateson went through
C  the evidence of what they did. Minute by minute. File after file. From their own lists. They could not possibly have had time to examine all these documents or to come to a proper decision as to whether they were reasonably required as evidence. Instead of examining them on the premises, they bundled them into plastic bags and took them off to Melbourne House. But, in fairness to the Inland Revenue, I will read what
D  Mr. Quinlan said was done. The description given by Mr. Plummer's manager, he said:

    " is not an accurate description of the way the search was carried out. For example, during the day I went through the two-volume securities register page by page with the manager of Rossminster sitting beside me and selected only certain objects in such register. I went through
E  a very thick correspondence file of a Mr. Glatt and released it all. I also went through all the incoming telex messages and the manager's outgoing post, and released it all. I carried out a sample check of the ledger cards and made special arrangements with the manager to have them photocopied on the premises in order that the originals could remain. These are but examples of some of the detailed searching
F  which I, and I verily believe, other officers carried out on the day in question. But in a very great many instances files and bundles of documents were removed when their title or subject matter made it clear that their contents were such that the officers had reasonable cause to believe that they might be required as evidence for the purpose of proceedings in respect of any such offences."

G    Mr. Quinlan tells us about the documents which he released. But he does not tell us what documents he retained and on what ground and for what purpose, or which particular fraud he had in mind. We are left to guess. I would ask, on what grounds did these officers decide whether or not there was reasonable cause for believing that they would be required in evidence? What about the shorthand notebooks, the
H  diaries and all that kind of thing—would they be reasonably required? Mr. Davenport said that at this stage the revenue would not wish to go further than they had. They would not tell us on what grounds they required these documents. At this stage, he said, it is not desirable. He

emphasised "at this stage," meaning, I suppose, not until after the criminal proceedings. A

To my mind that is not a sufficient answer. It means that these officers would be exempt from any control by the courts or anyone else until after the criminal proceedings—if there are criminal proceedings—take place. It would mean that for all this time no one would have any control over the operations of the officers of the Inland Revenue who are making this search and seizure. Nothing can be done even by the courts in case B they have exceeded their powers. No one can control them.

On the question of seizure, Mr. Bateson, for the applicants, has pointed to cogent reasons why it may be believed that the officers of the Inland Revenue misunderstood their powers, or exceeded them, or went too far. There is no way of deciding which documents were rightly taken—if they were rightly taken—and those which were wrongly taken—if they C were wrongly taken. In the absence of any possibility of dividing the good from the bad, it seems to me that this court has no option but to declare the whole seizure void—even at this stage.

The question was raised whether we could, under our new procedure, grant a declaration. I wish we could grant an interim declaration but it has been decided by this court that we cannot do so. That was decided in *International General Electric Company of New York Ltd.* v. D *Customs and Excise Commissioners* [1962] Ch. 784. All we can do is make a final declaration. So be it. If that be the only way, I would do it. This is a case where speed is of the essence. This is a case where the freedom of the individual is involved. It is a case where his right to his personal property is involved. It demands immediate remedy. It demands immediate decision. So I think we should decide it now, even upon the affidavit evidence we have before us. Upon that evidence, E it is a proper case under this new procedure (which is now entrusted in our hands) in which to make a declaration.

It has this drawback. It means that in any subsequent proceedings or in a pending action the matter will be said to be finally adjudged. The revenue may seek hereafter to say: "We did reasonably require all these documents and we did not exceed our powers." But the result of the F declaration will be—and I think both counsel agree to this—that the matter is finally adjudged now. Justice demands that we should decide it quickly—as we do—and give a decision now. I would hold that this seizure was bad and that the revenue officers exceeded the powers given to them by the statute.

This brings me to the end. This case has given us much concern. No G one would wish that any of those who defraud the revenue should go free. They should be found out and brought to justice. But it is fundamental in our law that the means which are adopted to this end should be lawful means. A good end does not justify a bad means. The means must not be such as to offend against the personal freedom, the privacy and the elemental rights of property. Every man is presumed to be innocent until he is found guilty. If his house is to be searched H and his property seized on suspicion of an offence, it must be done by due process of law. And due process involves that there must be a valid warrant specifying the offence of which he is suspected: and the

977

A.C.          Reg. v. I.R.C., Ex p. Rossminster (C.A.)     Lord Denning M.R.

A  seizure is limited to those things authorised by the warrant. In this case, as I see it, the warrant was invalid for want of particularity: and the search and seizure were not in accordance with anything which was authorised by the warrant. It was an illegal and excessive use of power.

I would therefore allow the appeal, quash the warrant, and make the declaration.

B     BROWNE L.J. I agree that this appeal should be allowed on the grounds stated by Lord Denning M.R., and that the results he has stated must follow. I confess that I have found it difficult to approach this case without emotion, but I hope that I have not allowed my emotions to influence my decision. I bear in mind, of course, the vital importance of stopping tax frauds, but the events of this case are deeply distasteful to my own old-fashioned, and perhaps now unfashionable, instincts. The C  knock on the door in the early morning. The entry of a posse of officials and police. The ransacking of the premises and the clearing out of almost every document down to children's passports and cheque books. But putting all that on one side, as I hope I do, I have no doubt that I am entitled—and bound—to remember the traditional right and duty of the judges to protect individuals from abuse of power by the executive.

D     The powers given by section 20C of the Taxes Management Act 1970 as inserted by the Finance Act 1976 are very wide and may involve very serious interference with what would normally be the liberties of individuals. In my judgment, the section should be construed strictly.

The procedure under section 20C has three stages. First, the application to the circuit judge; secondly, the issue of the warrant by the circuit E  judge; and, thirdly, the execution of the warrant by the revenue.

*Stage* 1. *The application to the circuit judge*

In stage 1, the application to the circuit judge, the circuit judge must be satisfied on oath of three things. First, that there is reasonable ground for suspecting that an offence involving any form of fraud in connection with or in relation to tax has been committed; secondly, that there is F  reasonable ground for suspecting that evidence of it is to be found on premises specified in the information; and, thirdly, that the officer applying acts with the approval of the board given in relation to the particular case. No question as to the third requirement arises in the present case.

Mr. Davenport accepted—as is obviously right—that the revenue must put before the circuit judge materials which satisfy him that there are G  reasonable grounds for the suspicions referred to in the subsection. In this case we are not directly concerned with this stage of the procedure. In the applicants' original statement under Order 53, they asked for certiorari to quash the warrants on the ground that there was no sufficient evidence to satisfy the judge; but in this court Mr. Bateson could not and did not persist in this part of the application because no information or evidence is available to us about what material was before the circuit judge. But H  I think the requirements which have to be fulfilled at this stage throw light on the construction of the provisions as to the later stages.

(a) Mr. Davenport told us that the offences to which this section relates

are not offences under the Tax Acts, which in England create no offences
of fraud in connection with or in relation to tax, but offences under the  A
general criminal law. He gave us a list of six common law or statutory
offences of fraud to which he said the suspicion could relate. They were
section 17 of the Theft Act 1968 which deals with false accounting; section
2 of the Theft Act 1978 which deals with the evasion of liability by
deception; section 5 of the Perjury Act 1911; the common law offence of
making a false statement relating to income tax in an attempt to defraud  B
the revenue, which is dealt with in *Archbold, Criminal Pleading Evidence
& Practice*, 40th ed., para. 3547; conspiracy to defraud; and forgery.

The revenue could no doubt apply to the circuit judge on the ground
that they had reasonable grounds to suspect that more than one offence
had been committed. But there is no power to authorise search for
evidence of tax avoidance, or even tax evasion, not amounting to a  C
criminal offence or of non-payment of tax. It seems to me that before
the board can decide to apply for a warrant they must have made up
their minds as to at least the general nature of the offence or offences out
of this comparatively small category which they suspect, and that before
the judge can be satisfied that there is reasonable ground for suspecting
that an offence has been committed he must be told at least the general
nature of the suspected offence. As I understood it, Mr. Davenport accepted  D
all this. This seems to me to dispose of any argument that it would be
impossible or difficult for the revenue to specify the offence or offences
in the warrant. I will come back to this later.

(b) The suspicion must be that an offence *has been* committed; there is
no power to authorise search for evidence that an offence may be committed
in the future.  E

(c) The suspected evidence to be found on the specified premises must
be evidence *of it*, that is, of the offence which is suspected to have been
committed. It is not enough that there should be ground for suspecting
that evidence of some other offence might be found.

(d) As Mr. Bateson emphasised, the premises authorised to be searched
need not be the premises of the person suspected of having committed  F
the offence; they could be those of some perfectly innocent third party.
Even if they are the premises of the suspected offender, the matter at this
stage rests in suspicion only, and it may turn out that no offence has been
committed.

*Stage* 2. *The warrant*

The warrant in this case, which Lord Denning M.R. has already read,  G
simply follows the wording of the statute; and Mr. Davenport submits
that this is enough. In my judgment, it is not. I have come to the
conclusion that the warrant must specify at least the general nature of the
offence or offences which are suspected to have been committed and to
evidence of which the search relates. If the circuit judge has been
satisfied that there are reasonable grounds for suspecting that more than  H
one offence has been committed, the warrant can of course specify both
or all of the offences. As I have said, the revenue must already have
made up their minds what offence or offences they suspect, and have

Case 1:22-cr-00673-LAK   Document 138-7   Filed 05/08/23   Page 29 of 77

979
A.C.          Reg. v. I.R.C., Ex p. Rossminster (C.A.)          Browne L.J.

A   satisfied the circuit judge that there are reasonable grounds for their
suspicion. If the warrant does not show the nature of the offence, the
occupier of the premises being searched will not know what the revenue
are looking for and can keep no check on their activities; for example,
to take a different type of case, if a search warrant was issued under the
Firearms Act 1968 to search for firearms or ammunition, the occupier would
know that the searchers were not entitled to search for documents, and
B   could prevent them from doing so. What is more important, unless the
offence is specified in the warrant it would be very difficult, if not
impossible, for the court to inquire under subsection (3) whether the officers
had reasonable cause to believe that a document may be required as
evidence for the purpose of proceedings in respect of the offence in relation
to which the warrant was granted. I am not going to try to define the
degree of particularity which is required beyond saying that it must be
C   enough for the two purposes I have mentioned. It is enough for the
purposes of this appeal to say that I am satisfied that the warrants in this
case did not sufficiently specify the offences. The result is that in my
judgment the warrants are bad on their face, and that an order of certiorari
to quash them should go.

D   *Stage* 3. *The execution of the warrants*

In view of the importance of the question and the full arguments
which were addressed to us, I must also deal with the position on the
assumption, contrary to my view, that the warrants were good.

As a matter of construction of subsection (3), I have no doubt at all
that it is for the court to decide whether an officer had reasonable cause to
E   believe: see *Nakkuda Ali* v. *Jayaratne* [1951] A.C. 66, 76–77, from
which Lord Denning M.R. has already quoted. It is not enough
for an officer to swear that he had reasonable cause to believe—he must
state the facts on which his belief was based so that the court can judge
whether or not his belief was reasonable. There was argument as to the
meaning of the last words of the subsection—" proceedings in respect of
such an offence as is mentioned in subsection (1) above." Does this
F   mean *any* " offence involving any form of fraud in connection with, or in
relation to, tax," or is it limited to the particular offence or offences in
relation to which the warrant was issued by the circuit judge? Because
of the attitude taken up by the revenue in refusing to disclose what offence
they suspect, it is not necessary to decide that question in this case; but
I am inclined to think that the effect of the subsection is to put the
G   revenue in a position analogous to the position of the police when executing
a search warrant to search for stolen goods, as laid down in *Chic Fashions
(West Wales) Ltd.* v. *Jones* [1968] 2 Q.B. 299 and *Ghani* v. *Jones* [1970]
1 Q.B. 693. In the *Ghani* case Lord Denning M.R. said, at p. 706:

"I would start by considering the law where police officers enter a
man's house by virtue of a warrant, or arrest a man lawfully, with
H   or without a warrant, for a serious offence. I take it to be settled law,
without citing cases, that the officers are entitled to take any goods
which they find in his possession or in his house which they reasonably
believe to be material evidence in relation to the crime for which

Case 1:22-cr-00673-LAK  Document 138-7  Filed 05/08/23  Page 30 of 77
980
Browne L.J.          Reg. v. I.R.C., Ex p. Rossminster (C.A.)          [1980]

he is arrested or for which they enter. If in the course of their A
search they come upon any other goods which show him to be
implicated in some other crime, they may take them provided they
act reasonably and detain them no longer than is necessary."

Lord Denning M.R. then referred to two authorities. But in the present
context it seems to me that the "other crime" referred to in that passage
must mean a crime falling within the definition of section 20C (1).

The attitude of the revenue is that they refuse to disclose at this stage B
what offence or offences they suspected or what grounds they had for
seizing the documents they did seize because such disclosure might be
detrimental to their investigations and to the conduct of any criminal
proceedings which may ensue and would or might involve disclosure,
directly or indirectly, of the identity of informers. Mr. Davenport laid
great stress on this last point and on the public interest privilege which C
requires the identity of informers to be protected. Like the Divisional
Court (ante, p. 961D–E), I am not impressed by the informer argument.
The applicants are not asking for disclosure of the identity of informers (if
there are any), and I cannot see why the disclosure of the nature of the
offences and the grounds for belief in the relevance of documents need
involve any such disclosure. Mr. Dermit does not mention this point in D
his affidavit.

As I understand it, the revenue's refusal to disclose "at this stage"
extends to the whole period until any ensuing criminal proceedings have
been completed or it has been decided not to prosecute. They also say,
as I understand it, that the court should not come to any decision by
way of judicial review until the revenue is prepared to disclose its evidence.
As Mr. Bateson pointed out, the practical effect of the revenue's E
contention, if it is right, would be to take away from the court any
power to supervise the activities of the revenue under section 20C(3).
When any criminal proceedings are over or it has been decided not to
prosecute, the things seized will presumably be returned anyway, but
meanwhile their owners will have been deprived of them, probably for
many months. As I have already said, the occupier of the premises F
searched and owners of the articles seized may be innocent of any
offence and may not even have been the people suspected. It is true
that they might in some cases have a right of action for damages, but
in many cases damages would be a wholly inadequate remedy. I therefore
reject the revenue's contention that they have a right or privilege to refuse
to disclose at this stage.

The application for judicial review must be dealt with on the evidence G
before the court. It is, of course, most unsatisfactory to have to reach a
final decision which will amount to res judicata without full evidence
from the revenue. If the revenue—the defendants in the action begun
in the Chancery Division and transferred to the Queen's Bench Division—
had not been the Crown, the problem could have been satisfactorily solved
by making an interim injunction, leaving the substantive issues to be fully H
explored and decided at the trial. But· no injunction can be granted
against the Crown. Mr. Bateson and Mr. Davenport agree that—most
unfortunately, I think—we cannot make an interim declaration; we were

A  referred to *International General Electric Company of New York Ltd.* v. *Customs and Excise Commissioners* [1962] Ch. 784. But if the revenue decided not to disclose the nature of the offences they suspect and the grounds for their belief that the documents they seize may be required as evidence, they must take the consequences. I entirely agree with what I understand Goff L.J. is going to say about this aspect of the case.

B  Lord Denning M.R. has fully stated the facts, and I do not think I need repeat them. On the available evidence, the applicants have satisfied me that in respect of the bulk of the documents seized the revenue officers had no reasonable cause to believe *before* they seized the documents that those documents may be required as evidence for the purposes of proceedings for any relevant offence. The evidence on behalf of the applicants and the lists prepared by the revenue, especially as to the times of seizure, raise a strong prima facie case that the great bulk of the

C  documents were not examined at all and certainly not examined in enough detail to form any opinion about their evidential value. There was evidence from the revenue officers that some documents were examined in detail, but even in respect of those documents the officers give no grounds for their belief as to their relevance and merely assert that they had reasonable grounds for it. Even if the revenue did sufficiently

D  examine some documents to have reasonable grounds for belief that that particular document may be required as evidence, this is not a case where it is possible to split up the documents seized and say that some were seized properly and some were seized improperly. It is a case, as Lord Denning M.R. has said, of all or nothing.

Accordingly I agree with Lord Denning M.R. that the applicants have

E  made out their case, and that they are entitled to the two remedies Lord Denning M.R. has mentioned—certiorari to quash the warrants and a declaration that the seizure was bad, and that the revenue must return the documents and all copies of them. We may wish to hear counsel further about the detailed wording of the declaration.

F  GOFF L.J. Lord Denning M.R. has fully stated the facts of this case and I will not waste time by repeating a recital of them, but will proceed at once to state in my own words the reasons which lead me to concur with the conclusions both Lord Denning M.R. and Browne L.J. have reached, which reasons do not, I think, conflict in any way with theirs which I also adopt.

G  We do not know what was the evidence on oath on which the circuit judge authorised the isssue of the warrants in this case, and, therefore, in my judgment we cannot consider whether it was sufficient, and we must I think proceed upon the assumption that it was and that he acted regularly.

The only way, if any, in which we could possibly arrive at a different conclusion on that point, as it seems to me, would be on the ground that

H  the warrant lacks sufficient particularity, if that be right, and that we should infer, therefore, that the evidence on which it was issued was similarly lacking. That approach, however, would make the question whether the judge acted regularly in substance the same as the question

982

what form the warrant ought to take. I, therefore, proceed on the basis A that the warrant was regularly issued.

Then I turn to the question whether the warrant is good or bad on the face of it for want of particularity. It is to be observed that the Act does not specify any particular form, which can, therefore, only be gathered from the true construction of section 20C (1) of the Taxes Management Act 1970 as amended which is quite general in its terms: ". . . an offence involving any form of fraud in connection with, or in relation to, tax. . . ." B The warrant simply uses these same words. The applicants say that that is not enough, and there ought to be some definition or description of the suspected offence. In their statement, filed pursuant to R.S.C., Ord. 53, r. 3 (2), they say that the warrants are illegal and void in that they do not state by whom and when there are reasonable grounds for suspecting an offence has been committed and the precise nature of and/or the particular C acts constituting the offence. Mr. Bateson was, however, I think forced to concede that the case cannot be put as high as that. At all events, I do not accept that it can. Bearing in mind that the warrant issues upon suspicion and comes in the investigatory stage, it seems to me that the Inland Revenue cannot be expected to give, nor need the warrant specify, the suspected offence with any degree of particularity, but I think it cannot be right simply to copy the general words of the section into the warrant. D

Mr. Davenport has pointed out (a) that those words define a genus and exclude all criminal offences outside that genus; (b) that with one exception, and that applicable only to Scotland, the Income Tax Acts do not create any criminal offences; those have to be culled from the general law; and (c) that there are only six types of offence within the genus.

These may be shortly summarised as follows: (1) false accounting E within section 17 of the Theft Act 1968; (2) dishonestly obtaining exemption or abatement of liability under section 2 of the Theft Act 1978; (3) perjury, which would include false statements in tax returns; (4) common law cheating, and there is an actual instance of that in a revenue case in Reg. v. Hudson [1956] 2 Q.B. 252; (5) conspiracy to defraud; and (6) forgery. F

Mr. Davenport argues, therefore, that as the genus is thus limited, and the different species within the genus may overlap and it may well be difficult to determine before search within which category or categories the offence lies, and because the Inland Revenue must be entitled to specify more than one type of offence, it should be sufficient in the warrant merely to state the whole genus.

On the other hand, in order to obtain the approval of the board, G which is a prerequisite to the application to the circuit judge (see section 20C (1) (a) and (2)), and further to satisfy him that there is reasonable ground for suspicion that an offence involving any form of fraud in connection with or in relation to tax has been committed, and that there is evidence of it at the premises sought to be searched, the Inland Revenue must have sifted the matter to a considerable degree, and in my judgment H the warrant ought, therefore, to state on its face that it relates to all or to some one or more, and, if so, which of the six species of offence within the genus.

A    The words " such an offence " in subsection (3) would I think cover any of the offences within subsection (1) and justify retention of documents found disclosing an offence other than that upon which the warrant was based, but do not in my view justify the warrant being drawn in entirely general terms. If the Inland Revenue in any case are relying on what I have just said to enable them to seize documents other than those in relation to the offence upon which the warrant was issued, it would be a

B    condition that they must have been acting reasonably.

In my judgment, therefore, the warrant was bad on its face and the applicants are entitled to an order of certiorari to quash it, and it follows to a declaration that the revenue were not entitled to seize any of the documents which they took from any of the premises and are bound to deliver them up together with all copies.

C    That is sufficient to dispose of the case, but I will consider how the matter stands on the assumption that I am wrong in the conclusion I have so far reached.

Before doing so, however, I pause to say that it is not necessary to consider any question of mandamus, since there is here no duty for the enforcement of which that remedy could be made available. The sole question is whether the applicants are entitled to the declarations I have

D    mentioned notwithstanding the assumed validity of the warrant.

Mr. Bateson submits that the evidence shows that there was really here no search to find things, which the searchers might have reasonable grounds to believe were evidence of a suspected offence or offences in respect of which the warrant was obtained, but a general ransacking of the premises to see if evidence of some crime or other would show up, and he relies on the following passage in the judgment of Lord Denning M.R. in *Ghani*

E    v. *Jones* [1970] 1 Q.B. 693, 706–707 :

" The common law does not permit police officers, or anyone else, to ransack anyone's house, or to search for papers or articles therein, or to search his person, simply to see if he may have committed some crime or other. If police officers should so do, they would be guilty of a trespass. Even if they should find something incriminating against

F    him, I should have thought that the court would not allow it to be used in evidence against him if the conduct of the police officers was so oppressive that it would not be right to allow the Crown to rely upon it . . ."

More specifically he says, first, that the documents taken were so numerous, and the inspection of many of them so cursory, that with respect

G    to a large proportion the inspectors could not at the time of seizure have had reasonable grounds for believing that they might be required as evidence of an offence, but only hoped that when compared with others and diligently examined a case might be established.

Akin to this he says that the documents must be examined on the premises. There is no power to remove them for examination elsewhere,

H    since they can only be removed if seized, and they cannot be seized until examined to see if there be reasonable grounds for believing that they might be required as evidence. He argues that impracticability of examination on the premises cannot give a right of removal for search elsewhere.

Against that, Mr. Davenport, whilst he admits that the searchers must    A
make up their mind whilst on the premises that there are reasonable
grounds for believing that the documents removed may be required as
evidence, and that reasonable grounds for that belief must then and there
exist, asserts that the Inland Revenue may then seize all documents as to
which they have on reasonable grounds formed such belief and may there-
after on their own premises or anywhere else analyse them, submit them
to forensic examination, and obtain expert advice, legal or otherwise,    B
about them.

If, and when, as a result they ascertain that any are not required, then,
as Mr. Davenport readily accepted, they must return them, but otherwise
they are entitled to keep them until the contemplated criminal proceedings
have been launched and decided, in support of which he relies on *Malone
v. Metropolitan Police Commissioner* [1980] Q.B. 49 where the police    C
were held entitled to retain moneys seized under a search warrant until the
end of the criminal trial, although they had not been used in the committal
proceedings; and, in my judgment, if the documents were properly taken
in the first instance, that would follow.

In the end, as it seems to me, the position comes down to this. The
applicants' evidence does raise a strong prima facie case that Mr. Bateson's
submissions are right so that there was an abuse of power. Therefore, it    D
is incumbent upon the revenue to justify the seizure.

I should here observe that on the facts of this case there are no means
of distinguishing between documents properly seized and those not properly
seized so as to enable the court to separate them and to grant relief limited
to the latter category. I say this so that it may not be thought that my
judgment is authority for the proposition that taking too much necessarily    E
invalidates the whole seizure. There may well be many cases in which
it will not.

This being so, the answer of the Inland Revenue is twofold. (1) We
are not at this stage obliged to do more than swear that we did believe
and had reasonable grounds to believe that the documents we took might
be required as evidence of an offence involving any form of fraud in con-
nection with or in relation to tax, because it would or might be detrimental    F
to our inquiries; and in support of that, in an affidavit put in on the last
day of the hearing before the Divisional Court, Mr. Dermit said:

" I verily believe that it would be greatly detrimental to and obstruc-
tive of inquiries of this nature to disclose at this stage the precise
nature of the offences in respect of which proceedings may be
taken and in which the documents seized may be required as evidence.    G
Such disclosure, in my view, would be harmful because, inter alia,
it might reveal to those suspected of having committed offences not
only that those persons have been identified by the Inland Revenue
but also the extent and nature of the information in the Revenue's
possession concerning such offences."

H

Mr. Davenport also relied on *Wilover Nominees Ltd. v. Inland Revenue
Commissioners* [1974] 1 W.L.R. 1342, but that is I think distinguishable
and posed a different problem.

A    (2) In any event, we did give sufficient evidence to show that we had
reasonable grounds. Here Mr. Davenport relies in particular on the
affidavit of Mr. Quinlan from which I read the following extracts:

"Before the search warrants were executed all the teams were
addressed in my presence by Mr. W. M. Dermit, the Assistant Director
in charge of the Special Investigations Section, as to the principles
and procedure to be followed in the search. Mr. Dermit made it
B    quite clear to all those involved that they were only to seize documents
or articles which they had reasonable cause to believe might be
required as evidence for the purpose of proceedings in respect to
such offences. I had arranged with each team leader to give detailed
instructions to his team in relation to the particular premises to be
searched by them. In the case of my team I arranged for these
C    instructions to be given by the said Mr. Thomas and I verily believed
that this was duly done. I have read the affidavit to be sworn
herein by the said Mr. Thomas and the instructions to which he
there refers were as I had discussed with him in advance. . . .

"From time to time during the said search individual revenue
officers asked me whether certain material which they had found
came into the said category and I would give a ruling. During the
D    course of the day a great many documents were removed but I verily
believe that they all fell within my said instructions.

". . . during the day I went through the two volume securities
register page by page with the manager of Rossminster sitting beside
me and selected only certain objects in such register. I went through
a very thick correspondence file of a Mr. Glatt and released it all.
E    I also went through all the incoming telex messages and the manager's
outgoing post, and released it all. I carried out a sample check of the
ledger cards and made special arrangements with the manager to have
them photocopied on the premises in order that the originals could
remain. These are but examples of some of the detailed searching
which I, and I verily believe, other officers carried out on the day in
question. But in a very great many instances files and bundles of
F    documents were removed when their title or subject matter made it
clear that their contents were such that the officers had reasonable
cause to believe that they might be required as evidence for the pur-
pose of proceedings in respect of any such offences. . . .

"Consideration of the documents and other articles seized at the
said premises of A. J. R. Financial Services Ltd. and the homes of
G    Mr. Plummer and Mr. Tucker reinforces my belief that none of the
officers searching such premises seized material which he did not have
reasonable cause to believe might be required for the aforesaid
purposes."

Mr. Davenport also referred us to the affidavit of Mr. Thomas, from which
I read the following short passage:
H
"When actually searching it was in almost all instances clear from
the title to a file or the subject matter of a bundle of documents
whether or not it should be seized. But during the course of the day

I and my colleagues read through a large number of documents in A
whole or in part in order to decide whether they should be seized
or not."

Then Mr. Ramage in his affidavit said:

"Although Mr. Plummer appeared to keep many business papers
at his home it was in almost all cases possible to ascertain from the
title of files or the subject matter of bundles or categories of documents B
whether they fell into the above description but where there was any
doubt either I or one of the officers with me went through the papers
in further detail until we were satisfied that they either should or need
not be seized. I am quite satisfied in relation to each of the documents
of which Mr. Plummer makes specific mention in the said paragraph 5
that they did fall within the above description and that I did have
reasonable cause to believe that they might be required for the said C
purpose."

Finally Mr. Watt said:

"Mr. Tucker did not appear to keep any business papers at his
home and it was in all cases possible to ascertain from the title of files
or the subject matter of bundles or categories of documents whether D
they fall into the above description. I did not have any difficulty in
making up my mind in accordance with my instructions what I should
and what I need not seize. I am quite satisfied in relation to each of
the documents at Mr. Tucker's house to which Mr. Tucker makes
specific mention in his said affidavit that they did fall within the above
description and that I did have reasonable cause to believe that they
might be required for the said purposes, with the exception of the E
bank statements belonging to student tenants to which Mr. Tucker
refers in paragraph 3 of his affidavit. These I examined but did not
seize."

In support of the first limb of this argument, Mr. Davenport relies
upon the duty of the board to detect and prosecute criminal dishonesty
in evading taxes, and the dangers to their inquiries if they are called upon F
to give reasons for their belief. It is, he submits, a case of balancing the
public interest in the detection and punishment of crime and the necessity
of protecting the rights of private individuals in respect of their property,
see *Ghani* v. *Jones* [1970] 1 Q.B. 693 where Lord Denning M.R. said,
at p. 708:

"What is the principle underlying these instances? We have to G
consider, on the one hand, the freedom of the individual. His privacy
and his possessions are not to be invaded except for the most
compelling reasons. On the other hand, we have to consider the
interest of society at large in finding out wrongdoers and repressing
crime. Honest citizens should help the police and not hinder them
in their efforts to track down criminals."

H
I agree that this balancing problem does present itself, but in carrying
out the exercise in this case there are, as it seems to me, three important
considerations to bear in mind: (1) the general duty of the court to exercise

A.C.          Reg. v. I.R.C., Ex p. Rossminster (C.A.)          Goff L.J.

A  surveillance over the exercise of executive power. (2) The extremely wide and general nature of the power conferred by section 20C and consequent danger of abuse. (3) The fact that it authorises the search of premises belonging to persons believed, or even known to be, entirely innocent and the seizure of the documents of such persons either on their own premises or elsewhere. If the documents of such persons can be taken and retained till after a decision has been reached to launch criminal proceedings against

B  other people and until those proceedings have been heard, the consequences for the innocent party may be very serious indeed, if not totally ruinous.

The importance of this duty of surveillance is in my judgment clearly borne out by *Ghani's* case and the following authorities. First, in *Padfield* v. *Minister of Agriculture, Fisheries and Food* [1968] A.C. 997 Lord Pearce said, at pp. 1053–1054:

C      " I do not regard a minister's failure or refusal to give any reasons as a sufficient exclusion of the court's surveillance. If all the prima facie reasons seem to point in favour of his taking a certain course to carry out the intentions of Parliament in respect of a power which it has given him in that regard, and he gives no reason whatever for taking a contrary course, the court may infer that he has no good

D      reason and that he is not using the power given by Parliament to carry out its intentions."

I am not overlooking Mr. Davenport's answer that such an inference should not be drawn where the party concerned gives the grounds upon which he refuses to disclose his reasons, but that very argument defeats the court's right and duty to effect surveillance.

E      Secondly, a most important authority in this connection to which I would make reference is *Nakkuda Ali* v. *Jayaratne* [1951] A.C. 66 where Lord Radcliffe delivering the judgment of the Board, after quoting *Liversidge* v. *Anderson* in the House of Lords [1942] A.C. 206, said, at p. 77:

"But the elaborate consideration which the majority of the House

F      gave to the context and circumstances before adopting that construction itself shows that there is no general principle that such words are to be so understood; and the dissenting speech of Lord Atkin at least serves as a reminder of the many occasions when they have been treated as meaning ' if there is in fact reasonable cause for A.B. so to believe.' After all, words such as these are commonly found when a legislature or law-making authority confers powers on a

G      minister or official. However read, they must be intended to serve in some sense as a condition limiting the exercise of an otherwise arbitrary power. But if the question whether the condition has been satisfied is to be conclusively decided by the man who wields the power the value of the intended restraint is in effect nothing. No doubt he must not exercise the power in bad faith: but the field in

H      which this kind of question arises is such that the reservation for the case of bad faith is hardly more than a formality. Their Lordships therefore treat the words in regulation 62, ' where the controller has reasonable grounds to believe that any dealer is unfit to be allowed

988

to continue as a dealer' as imposing a condition that there must in   A
fact exist such reasonable grounds, known to the controller, before
he can validly exercise the power of cancellation."

Finally, see *per* Lord Wilberforce in *Secretary of State for Education
and Science* v. *Tameside Metropolitan Borough Council* [1977] A.C. 1014.
Lord Wilberforce said, at p. 1047:

"The section is framed in a 'subjective' form—if the Secretary of   B
State 'is satisfied.' This form of section is quite well known, and at
first sight might seem to exclude judicial review. Sections in this
form may, no doubt, exclude judicial review on what is or has
become a matter of pure judgment. But I do not think that they go
further than that. If a judgment requires, before it can be made, the
existence of some facts, then, although the evaluation of those facts   C
is for the Secretary of State alone, the court must inquire whether those
facts exist, and have been taken into account, whether the judgment
has been made upon a proper self-direction as to those facts, whether
the judgment has not been made upon other facts which ought not
to have been taken into account. If these requirements are not met,
then the exercise of judgment, however bona fide it may be, becomes   D
capable of challenge . . ."

Which way the balance lies is not wholly easy to determine, but I have
in the end come to a firm conclusion that the case is one in which the
revenue are required even at this stage to state the grounds for their belief
so that the court can determine whether they are reasonable, and that, of
course, they have failed to do.                                          E

In my judgment Mr. Quinlan's affidavit and the other evidence on
behalf of the revenue to which I have referred is not sufficient for these
reasons. First, of course, it goes only to some of the documents, and this
is a case of all or nothing; secondly, except possibly some items in the
securities register and the ledger cards, it does not identify which of the
documents Mr. Quinlan or any other searcher decided should be seized   F
because they might be required as evidence; and, thirdly, of course, and
most important, still the revenue do not state the grounds for their belief.

Mr. Davenport argued strenuously and persuasively that the various
kinds of documents taken might well be evidence for this or the other
reason, and in particular the children's cheque books, because one might
want to see where money had gone, and passports to show whether the
holder had gone to some particular place at some particular time. This   G
line of argument, however, is insufficient in my judgment both because
it is hypothetical, and because much of it depends upon assuming an
offence has been committed or appears to have been committed, but, of
course, that has not been shown. There is no evidence at all to show that
the individuals and the companies whose premises were searched, or any one
or more of them, or anybody in particular is suspected, much less proved   H
to be guilty. As I have observed, the power of search given by section 20C
extends to perfectly innocent persons, and unless and until the revenue
adduce evidence showing that they suspect this person or that, the question

Case 1:22-cr-00673-LAK   Document 138-7   Filed 05/08/23   Page 39 of 77


A    of reasonable grounds must be decided on the assumption of innocence. If the revenue's argument were allowed to prevail, the court would be precluded from control not only at this very moment but until after the conclusion of the criminal trial or the decision not to prosecute, as the case may be.

     For these reasons I would allow this appeal and make the declarations asked for, subject to any observations by counsel as to the precise form
B    in which they should go, even if the warrant was good.

     Before I close this judgment, I would like to add a few observations on a point which did trouble me during the argument. The applicants commenced proceedings by an ordinary writ action and moved for interlocutory relief which, but for the fact that the revenue are in effect the Crown, could have been granted without prejudice to what might be determined
C    later at the trial. Because of that fact, however, such relief could not be granted, and these proceedings by way of judicial review are the only means by which the applicants can obtain expeditious relief, but then the order we make is a final one and, as both parties agree, the declarations will make the issue of lawful or unlawful seizure res judicata between the parties at the trial of the Chancery action, now transferred to the Queen's Bench Division, leaving the revenue with no answer to a claim for damages,
D    the only question being that of quantum.

     I was concerned whether anything could or should be done to prevent the procedural change having also this substantive effect. It was suggested that we should in the exercise of our discretion refuse to make a declaration at all on the ground that it is not in all the circumstances of the case just and convenient: see Ord. 53, r. 2 (c). In my judgment, however, that
E    cannot be right. We have heard and decided the case, and must grant relief.

     Then I considered whether it might be correct to qualify our declaration by a proviso to the effect that it should be without prejudice to the issue of legality of the seizure at the trial or perhaps more generally to any question of damages. I am satisfied, however, that this is not open to the court, since it would inevitably make the declaration an interlocutory or
F    interim one, and that it is well settled in this court is not permissible, at all events against the Crown: see *International General Electric Company of New York Ltd.* v. *Customs and Excise Commissioners* [1962] Ch. 784. I need only read part of the headnote of that case, at p. 785:

          " On appeal:—*Held,* that an order declaring the rights of parties must in its nature be a final order and (subject to appeal) be res
G         judicata between the parties; and that in proceedings against the Crown it was not possible to obtain an order which corresponded to an interim injunction or an interim declaration which did not determine the rights of the parties but which was only intended to preserve the status quo."

H         In my judgment, therefore, we must make a final declaration even though at a later stage the revenue might otherwise have adduced further evidence to show reasonable grounds. This may perhaps be unfortunate for the revenue, but they did know that the applicants were seeking a

990

final order, and they elected to take their stand that they could not at this **A** stage be required to give reasons.

I am comforted on this point also by the fact that if I am right on the question of the validity of the warrant, the question of interim or final order does not arise at all.

Be all that as it may, the conclusion that the applicants are on the evidence before us entitled to a final order by way of declaration, and that it is the duty of the court to make one, appears to me to be clear. **B**

> *Appeal allowed with costs here and below.*
> *Order of certiorari to quash warrants.*
> *Declaration in terms agreed.*
> *Leave to appeal.*
> *Applicants undertaking to preserve docu-* **C**
> *ments returned to them pending appeal.*
> *Revenue undertaking not to use copies*
> *retained by them pending appeal.*

Solicitors: *Roney, Vincent & Co.; Solicitor of Inland Revenue.*

[Reported by SUSAN DENNY, Barrister-at-Law] **D**

———

The Inland Revenue Commissioners and Raymond Quinlan appealed **E** to the House of Lords.

*Robert Gatehouse Q.C., Brian Davenport, M. H. D. Neligan* and *Julian Flaux* for the appellants. If the warrants were valid under section 20C of the Taxes Management Act 1970, as they are, the question remains whether the manner of their execution was an abuse of power. The Divisional Court applied the right test which was con- **F** sistent with what Lord Greene M.R. said in *Associated Provincial Picture Houses Ltd.* v. *Wednesbury Corporation* [1948] 1 K.B. 223. The Court of Appeal was wrong.

The applicants' case depended on affidavits tending to show that from observations of the security officers who conducted the search no con- sideration was given to the relevance of the documents and articles seized. Their case also depended on a detailed examination of the list **G** of the documents and articles seized to be produced under section 20C (4). Reliance was placed by them on the nature of some of the articles seized which, it was said, no reasonable security officers would have thought were relevant. The appellants say that such inferences do not necessarily follow from the evidence and it would be unsafe to draw them from untested affidavits. These inferences of fact were not **H** in the affidavits but were raised in argument. From the affidavits and the inferences the Court of Appeal reached the conclusion that the present respondents had made out a prima facie case which required

A   an answer from the revenue so that there must be set out, not only a belief that the articles in question might be required for proceedings in respect of an offence but also all the evidence on which that belief rested. But the revenue does not have to disclose the evidence which would show the suspected persons of what they were suspected and enable them to destroy the evidence. The warrant is directed, not to persons but to premises. The revenue should not disclose its confidential

B   methods of fraud detection or its sources of information. Reasonable belief is a subject for objective tests and in proper proceedings the revenue must disclose the grounds for that belief, but it should not be obliged to disclose them at the investigative stage. The court is not deprived of its powers of surveillance, but, at the investigative stage, where there is a serious conflict as to the actual facts, that is not the time to examine it. The respondents rely on *Padfield* v. *Minister of*

C   *Agriculture, Fisheries and Food* [1968] A.C. 997, but it is in the public interest that such matters as the identity of informers should not be disclosed in these circumstances: see *Home* v. *Bentinck* (1820) 2 Brod. & Bing. 130. There is nothing to compel the disclosure of the identity of informers who may be a disaffected ex-employee, a wife, a current employee who has found out something which is wrong or accountants

D   who have seen the relevant accounts. All these may be sources of information which are not to be disclosed. It is also in the interests of a suspected person that his identity should not be disclosed because of the possible damage to his reputation.

   By section 21 (1) (*a*) of the Crown Proceedings Act 1947 the court may not grant an injunction against the Crown but may make an order

E   declaratory of the rights of the parties. Since a declaration is final, there can be no interim declaration.

   There is nothing new about these powers of search. Over 50 statutes authorise searches. There are similar search powers, for example, in paragraph 2 of Part I of Schedule 5 to the Exchange Control Act 1947; section 33 of the Finance Act 1972; section 51 of the Betting, Gaming and Lotteries Act 1963; section 43 of the Gaming Act 1968; section 19

F   of the Lotteries and Amusements Act 1976; section 9 (1) of the Official Secrets Act 1911; section 2 (5) of the Public Orders Act 1936; section 23 (2) of the Misuse of Drugs Act 1971 and section 537 of the Merchant Shipping Act 1894.

   The Crown need not specify the information on which the relevant suspicion is based nor the particular goods for which the search is

G   desired: *Jones* v. *German* [1896] 2 Q.B. 418; [1897] 1 Q.B. 374. See also *Archbold's Justices of the Peace*, 7th ed. (1875), vol. 1, pp. 150, 723. When an officer enters a house on a search warrant for stolen goods he may seize both goods which he reasonably believes to be covered by the warrant and also other goods which he believes on reasonable grounds

H   to have been stolen: *Chic Fashions (West Wales) Ltd.* v. *Jones* [1968] 2 Q.B. 299

   In such cases as this the facts may be very complicated and much documentation may be necessary. Parliament envisaged that a power

Case 1:22-cr-00673-LAK   Document 138-7   Filed 05/08/23   Page 42 of 77
992
Reg. v. I.R.C., Ex p. Rossminster (H.L.(E.) )          [1980]

of search was essential. The revenue officers must take the necessary  A
documents.

Lord Denning M.R. in his judgment referred to many circumstances
which were not in evidence. Fewer officers were involved than he states.
There is no evidence that photographs were taken. There is no evidence
that a child's school report was seized. There is no evidence that 12
van loads of documents were taken from Hanover Square. As to
documents taken, files might be relevant to show where a company  B
was managed. Children's cheque books and passports may be relevant
when there is a question of passing money out of the country. This
was not a " pack and remove " operation. The search at Hanover
Square lasted 11½ hours during which five full time searchers were
engaged for ten hours, occupying, say, 50 man hours. The premises
comprised 8 rooms and a basement and the search would occupy an  C
average of 5/6 man hours a room.

*Associated Provincial Picture Houses Ltd.* v. *Wednesbury Corpor-
ation* [1948] 1 K.B. 223, 228–229, 233, lays down the duty of the court
in deciding whether executive action which it is sought to set aside was
something which no reasonable person would have done. In the present
case it would not be just and convenient to decide such matters on
affidavit evidence, concluding against the Crown at an early stage: see  D
*Rex* v. *Fulham, Hammersmith and Kensington Rent Tribunal, Ex parte
Zerek* [1951] 2 K.B. 1, 11. As to an application for judicial review
when a declaration is sought: see R.S.C., Ord. 53, r. 9 (5), and Ord. 28,
r. 8. There can be no interim declaration: *International General Electric
Company of New York Ltd.* v. *Customs and Excise Commissioners*
[1962] Ch. 784, 787–790.                                        E

In a number of recent cases in different contexts persons suspected
have sought, during the investigation stage, to obtain information as to
the matters of which they are suspected or the sources of information.
These attempts have not been successful. The courts have recognised
the investigating authority being authorised to carry out its investigations
and proceed to the judicial stage without having to disclose these matters.  F
Recent examples of such cases are: *Parry-Jones* v. *Law Society* [1969]
1 Ch. 1, 6A–B, 8F–G; *Norwest Holst Ltd.* v. *Secretary of State for Trade*
[1978] Ch. 201, 224B–C, 228 F; *Reg.* v. *West London Metropolitan
Stipendiary Magistrate, Ex parte Klahn* [1979] 1 W.L.R. 933 and in a
slightly different context, *Wilover Nominees Ltd.* v. *Inland Revenue
Commissioners* [1974] 1 W.L.R. 1342, 1345, 1348.               G

The court should not assume that the Crown's reasons were non-
existent because they were not disclosed. On this point the respondents
relied on *Padfield's* case [1968] A.C. 997, 1032–1033, 1053, 1061–1062
but the circumstances of that case were different.

During the judicial stage the accused is entitled to know all the
evidence which will be adduced to prove the case against him. He is  H
not entitled, unless and until it is proposed to use it as evidence, to
know what was the basis of the prosecutor's suspicions. It is well
established that there is a public interest privilege against the disclosure

A  of such matter. The public interest against the disclosure of the identity
of informers or anything which may lead to such disclosure is well
known. It is fully considered and emphasised in *Reg.* v. *Lewes Justices,*
*Ex parte Secretary of State for the Home Department* [1973] A.C. 388,
401E–G, 405D–G, 407H—408D, 413D. The importance of the informer in
criminal investigations and the need to keep his identity secret was stated
in *Reg.* v. *Secretary of State for Home Affairs, Ex parte Hosenball* [1977]

B  1 W.L.R. 766, 783–784. In the particular context of tax frauds the public
policy against disclosing sources of information has been recognised since
at least 1820: *Home* v. *Bentinck,* 2 Brod. & Bing. 130, 162. In *D.* v.
*National Society for the Prevention of Cruelty to Children* [1978] A.C.
171, the House of Lords affirmed the importance of respecting the con-

C  fidence of those who give information even in a context which may never
lead to criminal proceedings.

Section 103 of the Larceny Act 1861 provides an example of a
search warrant. As to the question what should go into a warrant,
the test lies in the purpose for which it is required. If the object is
the return of the property of another person that property must be
specified at least in general terms. On the other hand, the object may

D  be to obtain evidence as in section 20C of the Taxes Management Act
1970. Under that section it is unnecessary to specify the offence sus-
pected save in general terms, because till the matter has been investigated
it is not known what charge to bring.

*Andrew Bateson Q.C.* and *Michael Tugendhat* for the respondents.
The two basic issues relate to the terms of the warrants and the propriety
of their execution. Both are subject to the condition precedent that the

E  court can supervise those terms and that execution. If it can, when should
the matter be examined? What is the extent of the power of supervision?
The power of the court depends on the nature of certiorari. So far as the
execution of the warrants is concerned the power of supervision is exercised
by the court ascertaining the facts on which it is alleged that the revenue
had reasonable cause to believe that the documents might be required as

F  evidence for the purposes of proceedings in respect of an offence. The
appellants do not claim any special executive privilege nor contend that
their actions are above supervision by the courts or that the belief of their
officers need only be a subjective belief.

As to the question when the power of supervision may be exercised,
the appellants submitted in the court below that it cannot be exercised

G  at this stage. But the court has power to supervise the execution of
the warrant now. The nature and extent of that supervision is to see
whether the facts exist and whether the right facts were taken into
account by the revenue. Had they reasonable cause to believe that the
documents might be needed in proceedings for a revenue offence? There
is no information now before the court on which it can exercise its

H  supervisory powers, since the warrant does not disclose the offence or
what is suspected. But the court should know the offence, who is
suspected and what are the grounds of the suspicion.

The evidence shows a virtually total removal of documents. If the A
onus as to the issue or the execution of the warrant rests on the
respondents, they have discharged it. The right of the court to super-
vise that execution arises immediately on the act of seizure. It cannot
be that the test whether it is lawful or unlawful depends on something
which happens afterwards, i.e., whether or not proceedings are brought.
Eventually the documents would be returned anyhow without any super-
vision of the court: see the *Chic Fashions* case [1968] 2 Q.B. 299, 312. B
There is no authority that the court may not supervise the manner of
the execution of a warrant. The exercise of this power is important in
the case of two businesses brought virtually to a halt which had no
immediate remedy before the courts save judicial review: see the notes
to R.S.C., Ord. 53, in the *Supreme Court Practice 1979.* It is the only
expeditious remedy against the Crown. It has a universal application C
to the extent to which the court may supervise the execution of a
warrant. It is wrong that an individual should be at the mercy of any
person employed by the Crown who is instructed to seize his documents
and may prevent him from carrying on his business. This power of
supervision may be exercised at any time unless there are good grounds
of public policy to prevent it.

The authorities relied on by the appellants were all cases in which D
the identity of the informant was expressly sought. But the nature of
the offence said to have been committed can be disclosed without dis-
closing the name of the informer. There is no ground for supposing
that if the information now in the Crown's hands were disclosed the
respondents would destroy other information.

The appellants say that the warrant is against premises and not E
suspected persons. If so, the House of Lords is not in a position to
assume that the respondents are suspected persons. It would be a
hardship if an unsuspected and innocent person could not get his
documents back because, if he did, some other guilty person might be
put on his guard and might destroy other evidence.

If the information to be made available were restricted because it F
would reveal how much the revenue knew, that would mean that the
revenue were licensed to go beyond search in respect of the offence
they suspected in order to find other offences. They are not entitled
to do that.

The power under section 20C of the Act of 1970 is wholly new. It
can be exercised by any person authorised by Parliament to search G
premises. It has regard to an offence which " has been committed."
The power is confined in its operation to those offences of which the
revenue has sufficiently accurate information that it has been committed.
In subsection (3) the power of search is related to " such an offence as
is mentioned in subsection (1)." It cannot be some other offence not
suspected of having been committed. The warrant is to search for
evidence of that offence which the revenue consider will be found on H
the premises, not evidence of something else. Otherwise the revenue
could take any document on any premises. It was not intended to

A give the revenue an unfettered right to take all the documents from the
premises of the company.

The powers given by section 20C of the Act of 1970 are not as wide
as those in paragraph 2 of Part I of Schedule 5 of the Exchange Control
Act 1947.   In section 51 (1) (*a*) of the Betting, Gaming and Lotteries
Act 1963 the words " for the purposes of proceedings in respect of any
such offence " refer to the offence which is suspected.   The words in
B section 43 (5) of the Gaming Act 1968, as opposed to the various words
in other Acts indicate that very wide powers are conferred.

The onus of proof in cases like this is primarily on the Crown:
*Wade, Administrative Law,* 4th ed. (1977), p. 292; *Eleko* v. *Govern-
ment of Nigeria* [1931] A.C. 662, 670 and *Reg.* v. *Governor of Brixton
Prison, Ex parte Ahsan* [1969] 2 Q.B. 222, 231–232. The onus of proof
C does not depend on the adoption of a particular sort of procedure.   A
minister's failure to give reasons for his actions does not exclude the
court's surveillance: *Padfield's* case [1968] A.C. 997, 1053–1054 and
*Minister of National Revenue* v. *Wrights' Canadian Ropes Ltd.* [1947]
A.C. 109, 124–125.

On the trial of an action there could be no doubt that the revenue
would fail on the evidence standing as it does.   The revenue are now
D claiming privilege from disclosure on the ground of public policy.   They
can no more claim it now than they could at the trial of the action.

As to the case of *Associated Provincial Picture Houses* [1948] 1 K.B.
223 relied on by the appellants, the proper test is set out in *Nakkuda Ali*
v. *Jayaratne* [1951] A.C. 66, 77.   The proper test in such a case is the
existence of reasonable grounds of belief.

E Under section 20C (3) the revenue only had power to remove those
things which they had reasonable cause to believe might be required
as evidence for the purposes of proceedings indicated in subsection (1).
On that basis they must look at the documents before seizing them.
The search and seizure must be on an informed basis, not just a clearing
out of rooms.   The revenue did not look at and could not have looked
at all the documents they seized.

F The Divisional Court did not make an order for trial under R.S.C.,
Ord. 53, r. 9, nor did the revenue make any interlocutory application
under r. 8.   The Divisional Court did not find that it could not do
justice between the parties on the evidence before it and its decision
was based on onus of proof.   For the scope and operation of R.S.C.,
Ord. 53, see the notes at pp. 824–825 of the *Supreme Court Practice*
G *1979.*   The Divisional Court may order a trial as if the proceedings
had been begun by writ or, if it does not do so, it can adjudicate by
judicial review applying the same principles of substantive law.   There
was no power to grant an interlocutory declaration against the Crown;
it had to be final or nothing.   In the circumstances the Court of Appeal
were entitled to do what they did and were justified in doing so.   As to
H judicial review: see *Wade's Administrative Law,* 4th ed. p. 558.

The warrant fails to define or identify the offence alleged which is
supposed to have been committed.   It is general in its terms covering a
wide area.   On that basis Lord Denning M.R. was right to apply *Entick*

Case 1:22-cr-00673-LAK Document 138-7 Filed 05/08/23 Page 46 of 77

Reg. v. I.R.C., Ex p. Rossminster (H.L.(E.))          [1980]

v. *Carrington* (1765) 2 Wils. 275. Lord Denning M.R. set out the law
in the *Chic Fashions* case [1968] 2 Q.B. 299. The power of search in    A
any given case depends on the particular statute. If a statute is intended
to give powers greater than under a normal warrant it must say so.
Section 20C of the Act of 1970 does not. On the terms of the warrant
in the present case the person involved cannot know whether or not the
powers have been exceeded. In *Jones* v. *German* [1897] 1 Q.B. 374
it was held that it was not necessary to identify the particular goods   B
for which the search was desired. But the warrant had to be sufficient
to enable a proper search to be made by identifying the loss and the
place. But on the warrant in the present case the respondents cannot
know whether they are the persons suspected; they do not even know
who the suspect is. The only inference to be drawn is that it is suspected
that the whole business is being carried on as a tax fraud. If that is
so, the revenue should have said so. The warrant should specify which   C
of the several offences "involving any form of fraud in connection
with, or in relation to tax" is suspected. The date of the suspected
offence should also be specified.

Prima facie a search warrant authorises a trespass. It must set out
sufficient details to justify the trespass. Here the Act is silent on the
nature of the warrant and therefore it should be in the common law   D
form. The persons affected should be sufficiently informed so that they
may protect themselves from the search going further than it should.
The offence should be set out with details sufficient for the court in its
investigative capacity to know the proper extent of the search.

It cannot be a justification for not disclosing the identity of a suspected
person that his reputation might be damaged. A search warrant in which   E
he was not named would do as much damage as if he was named. In
the present case the result was the immediate withdrawal of very con-
siderable sums from the company's accounts. When a person's premises
are searched it makes no difference to his reputation whether he is
named or not. Reliance is placed on *Ghani* v. *Jones* [1970] 1 Q.B.
693, 698D–E, 706–709.                                                        F

*Gatehouse Q.C.* in reply. The decision of the Court of Appeal did
not constitute res judicata.

There is a conflict as to the manner in which the search was carried
out; the respondents saying that the revenue could not have considered
the documents or formed a view as to their evidential value. That
conflict can only be resolved at a trial.                                   G

One cannot say in the case of a generally specified offence what
documents would be relevant. It is only a matter of suspicion.

The appellants do not deny that in this case there must be weighed
in the balance the rights of private individuals, on the one hand, and
the public interest in the detection and prosecution of crime, on the
other. The respondents sought relief at the stage at which investigation   H
is being carried out and before any charges have been brought (if any
are to be brought) in the future. The Court of Appeal failed to give
due weight to the fact that if the suspected person has committed the

A    offences disclosure of his identity would give him vital information
enabling him to take steps to prevent the success of the inquiry or to
leave the jurisdiction with the proceeds of the fraud.    The Court of
Appeal did not appreciate the problems facing the appellants as a
body investigating suspected criminal offences for which, if the offences
have been committed, those guilty should in the public interest be tried
and convicted.    The relevant principles were set out in *Conway* v.
B    *Rimmer* [1968] A.C. 910, 953, and these should be applied to tax
evaders.

The area of judicial review must always be limited.    It is unsuitable
for the resolution of disputed facts in such a case as this.

A common law search warrant does not specify the suspected person,
the date of the suspected offence, the goods sought (save in a general
C    way) nor the offence suspected.    The respondents can get no help from
it.    These matters should not be disclosed on judicial review.

As to the form of the common law warrant, see *Entick* v. *Carrington*,
2 Wils. 275, 278.    See also the form of warrant in *Rex* v. *Wilkes* (1763)
2 Wils. 151.

D    Their Lordships took time for consideration.

December 13.  LORD WILBERFORCE.  My Lords, the organised searches
by officers of the Inland Revenue on Friday, July 13, 1979, on the respon-
dents' offices and private premises were carried out under powers claimed
to be conferred by Act of Parliament—the Finance Act 1976, section 57,
E    and Schedule 6, section 20C amending the Taxes Management Act 1970,
section 20.

The integrity and privacy of a man's home, and of his place of business,
an important human right has, since the second world war, been eroded
by a number of statutes passed by Parliament in the belief, presumably,
that this right of privacy ought in some cases to be over-ridden by the
F    interest which the public has in preventing evasions of the law.    Some of
these powers of search are reflections of dirigisme and of heavy taxation,
others of changes in mores.    Examples of them are to be found in the
Exchange Control Act 1947, the Finance Act 1972 (in relation to VAT)
and in statutes about gaming or the use of drugs.    A formidable number
of officials now have powers to enter people's premises, and to take
G    property away, and these powers are frequently exercised, sometimes on a
large scale.    Many people, as well as the respondents, think that this process
has gone too far; that is an issue to be debated in Parliament and in the
press.

The courts have the duty to supervise, I would say critically, even
jealously, the legality of any purported exercise of these powers.    They are
the guardians of the citizens' right to privacy.    But they must do this in
H    the context of the times, i.e. of increasing Parliamentary intervention, and
of the modern power of judicial review.    In my respectful opinion appeals
to 18th century precedents of arbitrary action by Secretaries of State and

998

references to general warrants do nothing to throw light on the issue. A
Furthermore, while the courts may look critically at legislation which
impairs the rights of citizens and should resolve any doubt in interpretation
in their favour, it is no part of their duty, or power, to restrict or impede
the working of legislation, even of unpopular legislation; to do so would
be to weaken rather than to advance the democratic process.

It is necessary to be clear at once that Parliament, in conferring these
wide powers, has introduced substantial safeguards. Those relevant to this B
case are three:

(1) No action can be taken under section 20C without the approval of
the Board of Inland Revenue—viz., two members, at least, acting personally.
This board consists of senior and responsible officials expert in the subject
matter, who must be expected to weigh carefully the issues of public interest
involved.

(2) No warrant to enter can be issued except by a circuit judge, not, as
is usually the case, by a magistrate. There has to be laid before him
information on oath, and on this he must be satisfied that there is reason-
able ground for suspecting the commission of a " tax fraud " and that
evidence of it is to be found in the premises sought to be searched. If the
judge does his duty (and we must assume that the learned Common
Serjeant did in the present case) he must carefully consider for himself the D
grounds put forward by the revenue officer and judicially satisfy himself,
in relation to each of the premises concerned, that these amount to reason-
able grounds for suspecting, etc. It would be quite wrong to suppose that
he acts simply as a rubber stamp on the revenue's application.

(3) The courts retain their full powers of supervision of judicial and
executive action. There is nothing in section 20C which cuts these down: E
on the contrary, Parliament, by using such phrases as " is satisfied," " has
reasonable cause to believe " must be taken to accept the restraints which
courts in many cases have held to be inherent in them. The courts are
concerned, in this case, only with two matters bearing upon legality.

First, were the warrants valid? Secondly, can the actual action taken
under subsection (3) be challenged on the ground that the officers did not
have, or could not have had, reasonable cause to believe that the documents F
they seized might be required as evidence for the purposes of proceedings
in respect of a " tax fraud "?  A third possible issue, namely, that there
was not before the judge sufficient material on which to be satisfied as the
section requires was not pursued, nor thought sustainable by the Court of
Appeal. It is not an issue now.

The two first mentioned are the only issues in the case. Three judges G
have decided them in favour of each side. For myself I have no doubt
that the view taken by the Divisional Court on each was correct and I am
willing to adopt their judgment. I add a few observations of my own.

1. I can understand very well the perplexity, and indeed indignation, of
those present on the premises, when they were searched. Beyond knowing,
as appears in the warrant, that the search is in connection with a " tax H
fraud," they were not told what the precise nature of the fraud was, when
it was committed, or by whom it was committed. In the case of a concern
with numerous clients, for example, a bank, without this knowledge the

A.C.          Reg. v. I.R.C., Ex p. Rossminster (H.L.(E.))   Lord Wilberforce

A   occupier of the premises is totally unable to protect his customers' confiden-
tial information from investigation and seizure. I cannot believe that this
does not call for a fresh look by Parliament. But, on the plain words of
the enactment, the officers are entitled if they can persuade the board and
the judge, to enter and search *premises* regardless of whom they belong to:
a warrant which confers this power is strictly and exactly within the
parliamentary authority, and the occupier has no answer to it. I accept
B   that some information as regards the person(s) who are alleged to have
committed an offence and possibly as to the approximate dates of the
offences must almost certainly have been laid before the board and the
judge. But the occupier has no right to be told of this at this stage, nor
has he the right to be informed of the " reasonable grounds " of which
the judge was satisfied. Both courts agree as to this: all this information
is clearly protected by the public interest immunity which covers investiga-
C   tions into possible criminal offences. With reference to the police, Lord
Reid stated this in these words:

> " The police are carrying on an unending war with criminals many
> of whom are today highly intelligent. So it is essential that there
> should be no disclosure of anything which might give any useful
> information to those who organise criminal activities. And it would
D   > generally be wrong to require disclosure in a civil case of anything
> which might be material in a pending prosecution: but after a verdict
> has been given or it has been decided to take no proceedings there is
> not the same need for secrecy." (*Conway* v. *Rimmer* [1968] A.C.
> 910, 953–954).

E       The Court of Appeal took the view that the warrants were invalid
because they did not sufficiently particularise the alleged offence(s). The
court did not make clear exactly what particulars should have been given—
and indeed I think that this cannot be done. The warrant followed the
wording of the statute " fraud in connection with or in relation to tax ":
a portmanteau description which covers a number of common law
F   (cheating) and statutory offences (under the Theft Act 1968 et al.). To
require specification at this investigatory stage would be impracticable given
the complexity of " tax frauds " and the different persons who may be
involved (companies, officers of companies, accountants, tax consultants,
taxpayers, wives of taxpayers etc.). Moreover, particularisation, if required,
would no doubt take the form of a listing of one offence and/or another
or others and so would be of little help to those concerned. Finally, there
G   would clearly be power, on principles well accepted in the common law,
after entry had been made in connection with one particular offence, to
seize material bearing upon other offences within the portmanteau. So,
particularisation, even if practicable, would not help the occupier.

   I am unable, therefore, to escape the conclusion, that adherence to the
statutory formula is sufficient.

H       The warrants, being valid, confer an authority to enter and search: see
section 20C (1). This being in terms stated in the Act, I do not appreciate
the relevance of an inquiry into the form of search warrants at common
law (which in any case admitted of some flexibility in operation) still less

into that of warrants of arrest. There is no mystery about the word
" warrant ": it simply means a document issued by a person in authority
under power conferred in that behalf authorising the doing of an act which
would otherwise be illegal. The person affected, of course, has the right to
be satisfied that the power to issue it exists: therefore the warrant should
(and did) contain a reference to that power. It would be wise to add to it
a statement of satisfaction on the part of the judicial authority as to the
matters on which he must be satisfied but this is not a requirement and
its absence does not go to validity. To complain of its absence in the
present case when, as is admitted, no challenge can be made as to the
satisfaction, in fact, of the judge, would be technical and indeed irrational.
I can find no ground for holding these warrants invalid.

2. The second matter, on which the intervention of the court may be
called for, arises under section 20C (3). This confers a statutory power
independent of any authority in the warrant to seize and remove. Like all
statutory powers conferred on executive officers it is subject to supervision
by the courts exercising their classic and traditional powers of judicial
review. It is undisputed that the words " has reasonable cause to believe "
are open to examination in spite of their subjective form: see *Nakkuda
Ali* v. *Jayaratne* [1951] A.C. 66 et al. The existence of this reasonable
cause and of the belief founded upon it is ultimately a question of fact to
be tried on evidence.

So far as regards these appeals this issue is complicated in three ways.
First, it has been raised at an interlocutory stage, and at the very beginning
of the investigation, upon affidavit evidence. Secondly, the revenue have
refused, so far, to disclose their reasonable grounds, claiming immunity
from so doing, on the grounds stated above. Thirdly, the defendants being,
in effect, the Crown or Crown servants, an interlocutory injunction cannot
be granted (section 21 of the Crown Proceedings Act 1947).

The Court of Appeal sought to meet this situation by granting a
declaration: and recognising, rightly in my opinion, that an interim declara-
tion could not be granted, gave a final declaration in effect that the revenue
had exceeded their powers. I regret that I cannot agree that this was
correct. It is to me apparent that there was a substantial conflict of
evidence as to the manner in which the searches were carried out, the
respondents broadly contending that the officers gave no real consideration
to the question whether individual documents might be required as evidence:
the revenue asserting that they had detailed instructions what to look for
and seize and that these were complied with. I shall not further analyse
this issue which was fully and satisfactorily treated by the Divisional Court,
for I am satisfied that even if, which I doubt, there might have been enough
evidence to justify the granting of interlocutory relief, this fell very far
short of supporting a final declaration. I believe that the Court of Appeal
was itself really of this opinion. The final declaration granted must clearly
be set aside.

Two remarks in conclusion. First, I would wish to make it clear that
the failure of the respondents at this stage is not necessarily the end of the
matter. They can proceed with an action against the revenue for, in effect,
excess of power and for trespass and any aggravation can be taken into

Case 1:22-cr-00673-LAK   Document 138-7   Filed 05/08/23   Page 51 of 77
1001
A.C.                     Reg. v. I.R.C., Ex p. Rossminster (H.L.(E.))   Lord Wilberforce

A   account. At some stage, which cannot be particularised now with precision but which broadly would be when criminal proceedings are over, or, within a reasonable time, are not taken, the immunity which exists at the stage of initial investigation will lapse. Then the revenue will have to make good and specify the existence and cause of their belief that things removed might be required as evidence for the purpose of " tax fraud " proceedings and the issue will be tried in a normal manner. Secondly, I must express

B   reservations as to the suggestion that the law ought to be changed so as to allow interim declarations to be granted. As regards persons other than the Crown, I see no need for this head of relief, given the power to grant interim injunctions. As regards the Crown I can see that there may be formidable objections against allowing, on incomplete evidence, a form of relief which, in effect, may have much the same effect as an injunction. As I have already commented in another context, sensible limits have to

C   be set upon the courts' powers of judicial review of administrative action: these I think, as at present advised, are satisfactorily set by the law as it stands.

The appeals must be allowed and the judgment and orders of the Court of Appeal set aside.

D   VISCOUNT DILHORNE.   My Lords, on July 12, 1979, the Common Serjeant at the instance of the appellants issued four warrants under section 20C of the Taxes Management Act 1970 as amended, authorising the search of four premises named in the warrants by the appellant, Mr. Raymond Quinlan, a senior inspector of taxes and other persons named in each warrant.   The four premises were the homes of Mr. Ronald Arthur Plummer, managing director of Rossminster Ltd., and of Mr. Roy Clifford

E   Tucker and the offices of Rossminster Ltd., at 1 Hanover Square, London W.1 and the adjoining offices of A. J. R. Financial Services at 19/24 St. George Street.   Each warrant was in similar form.   That in relation to Rossminster's offices authorised their search by Mr. Quinlan and 63 other officers of the Inland Revenue.

The next day, July 13, at 7 a.m., named officers of the Inland Revenue

F   accompanied by police officers came to Mr. Plummer's and Mr. Tucker's homes to execute the search warrants relating to those premises.   At the same time other officers of the Inland Revenue accompanied by police officers went to Rossminster's offices and those of A. J. R. Financial Services.   There they waited until an employee arrived to let them in but at Mr. Plummer's and Mr. Tucker's homes they demanded admittance at 7 a.m.

G   The revenue sought to justify this early visit on the ground that they wanted to get to these homes while someone was at home so as to avoid having to force an entry.   This does not appear to me to be a good ground for arriving at that time.   If they had come a little later, they might have caused less disturbance and distress and still have found someone at home. It cannot, however, be said that they acted illegally by demanding entry

H   at that time for a warrant issued under section 20C authorises entry " at any time " even in the middle of the night.   If this section is revised, consideration might be given to restricting the time within which such a search warrant can be executed, as is done by some other Acts.

1002

The search and seizure of documents and things in the offices of     A
Rossminster and A. J. R. Financial Services continued throughout the day
but came to an end that evening on it being learnt that at the instance of
Mr. Plummer, Mr. Tucker, Rossminster and A. J. R. Financial Services,
Walton J. had granted an injunction against the appellants. In view of
the terms of section 21 of the Crown Proceedings Act 1947, this injunction
should not have been granted.

On July 16, 1979, the respondents issued a writ in the Chancery Division   B
against the appellants claiming damages for wrongful interference with
their goods, an injunction and delivery up of anything removed by an
officer of the Inland Revenue in respect of which that officer had not
reasonable cause for belief that it might be required as evidence for the
purpose of proceedings in respect of an offence involving fraud in connec-
tion with or in relation to tax.

On July 17 the respondents obtained the leave of the Divisional Court   C
to move that court for an order of mandamus, an injunction and a declara-
tion that the appellants were not entitled to remove and were bound to
deliver up all documents and other things in respect of which there was
no reasonable cause for belief that they might be required as evidence in
such proceedings.

That motion was heard by the Divisional Court (Eveleigh L.J., Park   D
and Woolf JJ.) on August 1, 1979, and dismissed. The respondents' appeal
from that decision was allowed by the Court of Appeal (Lord Denning
M.R., Browne and Goff L.JJ.) on August 16, 1979. That court made orders
of certiorari quashing the search warrants and granted a declaration, not
to take effect until the appeal to this House had been heard or abandoned,
that Mr. Quinlan and the other officers of the Inland Revenue were not
entitled to remove the documents and other things taken from the premises   E
searched and ought to deliver them up and to destroy all copies, all extracts
and notes etc. they had made.

The warrant authorising the search of Rossminster's offices was in the
following terms:

" IN THE CENTRAL CRIMINAL COURT                                           F

SEARCH WARRANT

" To: Raymond Quinlan
      and to the persons named in the first schedule annexed to this
      warrant officers of the Board of Inland Revenue

" Information on oath having been laid this day by Raymond Quinlan   G
in accordance with the provisions of section 20C of the Taxes
Management Act 1970 stating that there is reasonable ground for
suspecting that an offence involving fraud in connection with or in
relation to tax has been committed and that evidence of it is to be
found on the premises described in the second schedule annexed
hereto. You are hereby authorised to enter those premises, together
with all or any of the officers of the Board of Inland Revenue named   H
in the first schedule hereto and together with such constables as you
may require, if necessary by force, at any time within 14 days from

A.C.     Reg. v. I.R.C., Ex p. Rossminster (H.L.(E.) )     Viscount Dilhorne

A       the time of issue of this warrant, and search them; and on entering those
premises with this warrant you may seize and remove any things
whatsoever found there which you have reasonable cause to believe
may be required as evidence for the purposes of proceedings in respect
of such an offence.

Dated this 12th day of July 1979

B       Sd. John Leonard
Circuit Judge

The First Schedule

(63 names)

C       The Second Schedule

1 Hanover Square London W1R 9RD

Dated 12th July 1979
Sd. John Leonard
Circuit Judge."

D       Section 20C, subsections (1) and (2), reads as follows:

" (1) If the appropriate judicial authority is satisfied on information
on oath given by an officer of the board that—(a) there is reason-
able ground for suspecting that an offence involving any form of
fraud in connection with, or in relation to, tax has been committed
and that evidence of it is to be found on premises specified in the
information; and (b) in applying under this section, the officer acts
E       with the approval of the board given in relation to the particular case,
the authority may issue a warrant in writing authorising an officer of
the board to enter the premises, if necessary by force, at any time
within 14 days from the time of issue of the warrant, and search them.
(2) Section 4A of the Inland Revenue Regulation Act 1890 (board's
functions to be exercisable by an officer acting under their authority)
F       does not apply to the giving of board approval under this section."

Section 20D provides that a circuit judge is the appropriate judicial
authority in England and Wales for the purposes of section 20C, a section
which is free from any kind of ambiguity and in my opinion a model of
clarity.

If the terms of this section are reconsidered by Parliament, it might be
G       thought desirable to replace a circuit judge by a High Court judge as the
appropriate judicial authority. The power given by section 20C to seize
and remove other person's property and the fact that tax frauds more often
than not are of great complexity suggest that it should be the responsibility
of a High Court judge to satisfy himself of the matters specified in sub-
section (1) (a) and (b). In saying that I do not wish to cast any reflection
H       on the Common Serjeant. As the requirement that a judge should be so
satisfied is the final safeguard against abuse of the powers given by the
section, it might be preferable to place the responsibility for their exercise
on a more senior judge.

The Act does not prescribe that such a warrant must be in any particular
form. It does not say that it must state that requirements for its issue have
been complied with. If the warrants in this case had omitted their first
paragraphs and, after stating to whom the warrants were addressed, had
just stated that the persons named in it were authorised to enter and to
search the premises named, I can see no ground on which their validity
could have been successfully challenged.

A

These warrants, however, no doubt with the intention of showing that
the requirements for their issue had been complied with, said that infor-
mation on oath had been laid in accordance with the provisions of section
20C " stating that there is reasonable ground for suspecting that an offence
involving fraud " had been committed and that evidence of it was to be
found on the premises named.

B

It cannot in my view be emphasised too strongly that the section re-
quires that the appropriate judicial authority should himself be satisfied
of these matters and that it does not suffice for the person laying the
information to say that he is.

C

Does the fact that the warrants did not state that the Common Serjeant
had satisfied himself of these matters lead to the conclusion that the
warrants were in law invalid? That in my opinion would be so if the
omission meant that he had not done so. Applications for the issue of
warrants under this section cannot, I think, be so very frequent that
circuit judges are familiar with the terms of the section. I do not doubt
that before issuing these warrants authorising such extensive searches the
Common Serjeant would have looked at the section. If he did, he must
have realised that he had to be satisfied and that he was not empowered
to act on another person being satisfied. The warrants were not, I
expect, drawn up by him and when he signed them, it is much more
likely that he failed to notice the omission than that he failed to discharge
the duty laid upon him. I see no grounds whatsoever for assuming or
inferring that the Common Serjeant misconstrued the section. If he
thought—and there is no ground for thinking that he did—that he was
entitled to authorise the issue of the warrants merely in reliance on
Mr. Quinlan stating on oath that there was reasonable ground for the
board's suspicions, then indeed he would be blameworthy having regard
to the clear language of the section.

D

E

F

Although it is not made necessary by the section, I think that it is
most desirable that a warrant issued under this section should make it
clear that the statutory conditions precedent to the issue of a valid
warrant have been complied with, and also that the warrant should state
accurately what it authorises to be done.

G

The issue of a warrant only authorises entry and search. It does not
authorise seizure and removal of anything. The power to seize and
remove is given by section 20C (3) which is in the following terms:

" On entering the premises with a warrant under this section, the
officer may seize and remove any things whatsoever found there
which he has reasonable cause to believe may be required as evidence
for the purposes of proceedings in respect of such an offence as is
mentioned in subsection (1) above."

H

A    Anyone reading the warrants issued in this case might reasonably conclude that the warrants themselves authorised seizure and removal. If that were the case, then it might lend some force to the contention that the warrants should give some indication of the nature of the things which might be seized and removed.   Strictly I see no need for the warrant to refer at all to the power to seize and remove but if it is thought desirable to do so, then it should be stated that the power of

B  seizure and removal is exercisable by virtue of this subsection.

The respondents contend that the warrants should have given some indication of what was being searched for.   To be valid, they say, the warrants should have specified or sufficiently identified the nature of the offence or offences suspected.   They say that the information contained in the warrants was not specific enough to enable the officers of the board, the owners of the documents and the respondents to know

C  what the officers were authorised to search for, seize and remove or to enable a court to determine whether the officers had had belief and reasonable cause to believe that a document might be required as evidence.

These contentions found favour in the Court of Appeal, Lord Denning M.R. saying, ante, pp. 976H—977A, that to be valid, a warrant

D  must specify the offence suspected and that " the seizure is limited to those things authorised by the warrant."   Browne L.J. held that a warrant must specify at least the general nature of the offence or offences suspected and Goff L.J. ante, p. 982G–H, that to be valid, it must state on its face " that it relates to all or to some one or more " of the criminal offences to which a tax fraud could give rise.

My Lords, I do not find myself able to agree.   The section does not

E  require the warrant to state what criminal offence or offences are suspected.   Officers of the board when making their searches and deciding what to seize, act in accordance with the instructions they have received and do not rely on the terms of the warrant for guidance.   The warrant does not authorise seizure or say what may be seized.   It is subsection (3) that does that.   Tax frauds may take many forms and lead to a variety of

F  criminal charges.   If the Court of Appeal is right, it means that before any evidence secured by the search has been considered and when the circuit judge has only to be satisfied that there is reasonable ground for suspecting the commission of " an " offence involving a tax fraud, for the warrant the section then authorises him to issue to be valid, it must specify the offence or offences suspected.

My Lords, I do not think that these contentions of the respondents

G  and the conclusions of the Court of Appeal on this are right.   A warrant issued under the section will be invalid if the provisions of the section are not complied with or if there is some rule of law independent of the section that requires the particular offence or offences to be stated. These warrants did comply with the section and I know of no rule of law that requires that.   In the course of the argument reference was

H  made to general warrants.   Lord Denning M.R. also referred to them.   In my view the old well-known cases on general warrants really have no reference to this case.   Here the warrants were not general. They authorised named persons to enter named premises and to search

them. On entry with such a warrant, their power of seizure and removal was limited by, controlled by and authorised by subsection (3). It may be that there are many persons who think that in 1976 too wide a power was given to the revenue. If it was, and I express no opinion on that, it must be left to Parliament to narrow the power it gave. That, in my view, cannot be done by judicial interpretation when the language of the enactment is clear and does not warrant it and when that cannot be done in accordance with any rule of law.

For these reasons in my opinion the warrants were not invalid and should not have been held to be.

The respondents also contended that the way in which the search was conducted showed that the officers searching could not reasonably have formed the belief in respect of many of the documents seized that they might be required as evidence in criminal proceedings. Affidavits were sworn by Mr. Plummer, Mr. Tucker and others to establish this and affidavits were filed in reply by a number of officers of the Inland Revenue. It would not serve any useful purpose to summarise the contents of these affidavits. It suffices to say that there was a conflict of evidence on a number of matters and that the main contention of the respondents was that the times of seizure of the various documents and files shown on lists prepared by the revenue's officers showed that a great many of them could not possibly have been examined before seizure, and in the absence of examination there could not have been any reasonable belief that they might be required as evidence.

A great many documents were seized and removed. Many officers were employed in the operation. Lists were made up of what was seized and the time of seizure recorded. A short interval of time between two entries on a list would be a strong indication that there could not have been a proper examination, if one officer dealt with the documents referred to in those two entries, but with a number of officers searching and examining documents, the times of seizure do not in my opinion provide the slightest indication of whether or not before seizure there was examination. The time necessary to form a view whether a file or a document might be required as evidence would vary. If the fraud suspected involved inter-company transactions between a large number of companies, it would not take up much time to decide that a file relating to one of the companies might reasonably be believed as likely to contain material which might be required as evidence; and such a conclusion might properly be reached without looking at every document in the file.

The respondents satisfied the Court of Appeal that the seizure and removal were unlawful. When taking so many documents as were taken in this case, mistakes may occur and some documents be taken that should not have been. But the fact that they should not have been does not, in my opinion, justify the conclusion that the other documents taken were not taken after adequate examination and in the belief that they might be required in evidence. Omnia praesumuntur rite esse acta. If the respondents claimed the entry into their premises was a trespass, they would be met with the answer that the warrants made the entry legal. If they assert that following a lawful entry, documents and things

A   were seized and removed when there was no right to take them, the onus, in my opinion, lies on them to establish a prima facie case of that and that, in my opinion, they have not done.

In these proceedings for a judicial review the Court of Appeal made a final declaration that the appellants should deliver up all they had taken. No injunction can be granted against the Crown but one would expect the Crown to comply with any declaration made. No interim

B   declaration can be made, and while I do not wish to express an opinion on the point, I doubt very much whether it would be advisable that the courts should have power to grant one affecting the Crown which would have much the same effect as an interim injunction.

The Court of Appeal, not having power to make an interim declaration, made a final one. While I would not go so far as to say that there

C   can never be a case where on a judicial review a final declaration against the Crown can properly be made, such a case should, I think, be very exceptional. Such a declaration should not be made unless there is no dispute as to the material facts, which is not the case here, or unless the dispute as to the facts has been determined after something in the nature of a trial, which again did not happen here.

· In my opinion no final declaration should have been made.

D   · One does not know the nature of the tax fraud, the commission of which the Common Serjeant was satisfied there were reasonable grounds to suspect. It may have been, one does not know, a tax fraud of great magnitude, involving a number of persons and a lot of money. The purpose of the warrants was to enable entry to be made on to premises where it was thought evidence of the fraud might be found.

E   The effect of the Court of Appeal's order was to prevent evidence which might be required for a criminal prosecution being secured.

If this appeal is allowed, it will not prevent the respondents continuing their action for damages for the wrongful seizure of documents, though if there is a prosecution, it may well be desirable that that action should not be tried until after the conclusion of the criminal case.

F   In my opinion, for the reasons I have stated, this appeal should be allowed.

LORD DIPLOCK. My Lords, all the events with which this appeal is concerned took place in the course of an investigation by officers of the Board of Inland Revenue into suspected criminal offences. Two competing public interests are involved: that offences involving tax frauds should

G   be detected and punished; and that the right of the individual to the protection of the law from unjustified interference with his use and enjoyment of his private property should be upheld. What underlies the questions of law which this House must now determine is how those two competing, and at times conflicting, public interests can be reconciled under the new procedure for judicial review for which R.S.C., Ord. 53 now provides.

H   Three questions of law are raised in this appeal.

(1) The first is how much information must be disclosed upon the face of a search warrant issued by a circuit judge under section 20C (1)

of the Taxes Management Act 1970; (2) the second is: whether upon an
application for judicial review of acts of an officer of the Board of    A
Inland Revenue in seizing and removing documents under section 20C (3)
any onus lies upon the applicant to show that the officer did not have
reasonable grounds for believing that the documents seized might be
required as evidence for the purpose of such proceedings as are referred
to in that subsection; and (3) the third is: whether if there is an unresolved
conflict of affidavit evidence of relevant fact, it is nevertheless a proper   B
exercise of judicial discretion to make a final declaration in favour of
the applicant.

### The validity of the warrant

What has to be disclosed upon the face of the search warrant depends
upon the true construction of the statute.   The construing court ought,   C
no doubt, to remind itself, if reminder should be necessary, that entering
a man's house or office, searching it and seizing his goods against his
will are tortious acts against which he is entitled to the protection of
the court unless the acts can be justified either at common law or under
some statutory authority.   So if the statutory words relied upon as
authorising the acts are ambiguous or obscure, a construction should be
placed upon them that is least restrictive of individual rights which would   D
otherwise enjoy the protection of the common law.   But judges in
performing their constitutional function of expounding what words used
by Parliament in legislation mean, must not be over-zealous to search
for ambiguities or obscurities in words which on the face of them are
plain, simply because the members of the court are out of sympathy
with the policy to which the Act appears to give effect.                      E

My Lords, it does not seem to me that in construing section 20C of
the Taxes Management Act 1970 any assistance is to be gained from a
consideration of those mid-18th century cases centring on John Wilkes
and culminating in *Entick* v. *Carrington* (1765) 2 Wils. 275, which
established the illegality of " general warrants " and were cited by Lord
Denning M.R. in his judgment in the instant case.   *Rex* v. *Wilkes* (1763)   F
2 Wils. 151 was not concerned with a warrant for arrest and seizure of
documents but with a warrant of commitment to the Tower of London of
John Wilkes by name and was decided on a point of parliamentary
privilege from arrest alone.   *Huckle* v. *Money* (1763) 2 Wils. 205 was a
case reported on the question of the right of the Court of Common
Pleas to order a new trial on the ground that excessive damages had
been awarded by a jury.   It was an action for false imprisonment brought   G.
by a journeyman printer who apparently had played no part in printing
the famous issue No. 45 of " The North Briton " but had been arrested
under a warrant issued by a Secretary of State authorising a King's
messenger to arrest the authors, printers and publishers of that issue
(without naming or identifying any of them), to seize all their papers
and to bring them before the Secretary of State to be examined by him.   H.
Pratt C.J. referred to the fact that in this particular case the warrant did
not name the persons to be arrested under it as a matter which might
be taken into account in aggravation of damages; but as was ultimately

A    held in *Entick* v. *Carrington* 2 Wils. 275 the invalidity of warrants of
this kind did not depend on the absence of the name of the person to
be arrested, for Entick was so named.   Their invalidity was more
fundamental; a Secretary of State, it was held, did not have any power
at common law or under the prerogative to order the arrest of any
citizen or the seizure of any of his property for the purpose of discovering
whether he was guilty of publishing a seditious libel.

B        In the instant case the search warrant did not purport to be issued by
the circuit judge under any common law or prerogative power but pursuant
to section 20C (1) of the Taxes Management Act 1970, alone.   That sub-
section makes it a condition precedent to the issue of the warrant that the
circuit judge should himself be satisfied by information upon oath that
facts exist which constitute reasonable ground for suspecting that an
C    offence involving some form of fraud in connection with or in relation to
tax has been committed, and also for suspecting that evidence of the
offence is to be found on the premises in respect of which the warrant to
search is sought.   It is not, in my view, open to your Lordships to
approach the instant case on the assumption that the Common Serjeant
did not satisfy himself on both these matters, or to imagine circumstances
which might have led him to commit so grave a dereliction of his judicial
D    duties.   The presumption is that he acted lawfully and properly; and it is
only fair to him to say that, in my view, there is nothing in the evidence
before your Lordships to suggest the contrary; nor, indeed, have the
respondents themselves so contended.

All that the subsection expressly requires shall be specified in the
warrant are the address of the premises to be searched and the name
E    of the officer or officers of the board who are authorised to search them.
The premises need not be in the occupation of the person suspected of the
offence; they may be premises of some wholly innocent custodian or third
party.   The matter is still at the investigatory stage; good grounds must
exist for suspecting that a tax fraud has been committed, but as yet there
is not sufficient evidence in a form admissible at a criminal trial to prove
F    it.   The sole purpose of the search is to obtain such evidence.

Even though the statute may not strictly so require (a matter on which
I express no concluded opinion) the warrant in my view ought to state upon
its face the statutory authority under which it has been issued.   This the
form of warrant issued in the instant case does, though I agree with my
noble and learned friend, Viscount Dilhorne, that the wording of the
G    recital of the fulfilment of the two statutory conditions precedent to its issue
might be improved.   But for the reference to section 20C in accordance
with whose provisions the information is stated to have been laid, the
wording of the warrant would be consistent with its meaning that the infor-
mation had not specified for consideration by the judge the grounds of
suspicion on which the informant relied; but the express reference to the
H    section, in my view, resolves any ambiguity and makes untenable the
suggestion that the preamble to the warrant constitutes an admission by
the judge that he had adopted blindly a statement of the informant that
there existed some reasonable grounds for suspicion the nature of which,

however, was not disclosed. This was not a contention that the respondents A
were willing to advance. The warrant, in my view, ought also to state
what are things found on the premises that the searching officers are
entitled to seize and to remove, i.e. potential evidence of a particular
category of offences. This form of warrant in the instant case also does
by reproducing the terms of section 20C (3).

Ought it to disclose more in order to be a valid warrant under the
section? It was submitted on behalf of the respondents that it was B
defective in three respects. First, it was said, it ought to identify the
suspected offender, secondly, it ought to specify which one or more of the
six or more species of offences which fall within the genus " an offence
involving any form of fraud in connection with, or in relation to, tax," the
suspect is suspected of having committed, and thirdly it ought to state
the date of any offences of which he is suspected.

My Lords, if the subsection does indeed require that any of this addi- C
tional information should be disclosed upon the face of the warrant, this
must be by necessary implication only. There is no express requirement;
and for my part I cannot see that any such implication is justified. The
information would not protect the innocent; it might well assist the guilty
to destroy or to remove beyond the jurisdiction of the court of trial the
documentary evidence of their tax frauds. Tax frauds generally involve D
the use of confederates, whether ignorant of or parties to the fraud. To
identify a suspect where the search extends to premises that are not in his
personal occupation is to alert him to the suspicions of the revenue and
if they are well founded, it may give him an opportunity of covering his
tracks; while if the suspicions ultimately turn out to be groundless, his
reputation with those whose premises have been searched will be E
unnecessarily besmirched. It is to be observed that the form of warrant
at common law to search premises for stolen goods does not state who is
alleged to have been the thief. As regards more detailed specification in
the warrant of the offence of which the circuit judge was satisfied that there
were reasonable grounds for suspecting had been committed this would
not help the person whose premises were searched to know what docu-
ments were liable to be seized, since the right of seizure under subsection (3) F
is not limited to documents that may be required as evidence in proceed-
ings for that offence alone but, on the true construction of the subsection,
extends to documents that may be required as evidence in proceedings
for any other offence that falls within the genus of offences " involving
any kind of fraud in connection with, or in relation to, tax." This, as
it seems to me, is the plain meaning of the words " such an offence as is G
mentioned in subsection (1) above." Nor do I find it surprising that
Parliament should grant a power of search under the warrant wider in its
scope than those things which it was already suspected would be found on
the premises when the warrant was issued. Even at common law as it had
developed by the time the Act was passed a warrant to search premises
for stolen goods particularised in the warrant justified seizure of other H
goods found upon the premises at the time the warrant was executed if
there were reasonable grounds for believing that those other goods were
stolen: *Chic Fashions (West Wales) Ltd.* v. *Jones* [1968] 2 Q.B. 299.

1011

A.C.          Reg. v. I.R.C., Ex p. Rossminster (H.L.(E.))          Lord Diplock

A    In agreement with the Divisional Court I would accordingly uphold the
sufficiency and validity of the search warrant.

*The onus of proof on an application for judicial review*

     With the issue of the warrant the functions and responsibilities of the
circuit judge come to an end. The power of the officer of the board
to seize and remove things that he finds upon the premises which the
B warrant authorises him to enter and search, is conferred directly upon
him by subsection (3) which limits his powers of seizure and removal to
things " which he has reasonable cause to believe may be required as
evidence for the purposes of proceedings " for an offence involving a tax
fraud. These words appearing in a statute do not make conclusive the
officer's own honest opinion, that he has reasonable cause for the prescribed
C belief. The grounds on which the officer acted must be sufficient to induce
in a reasonable person the required belief before he can validly seize and
remove anything under the subsection. This was affirmed in *Nakkuda Ali*
v. *Jayaratne* [1951] A.C. 66, a decision of the Privy Council in which Lord
Radcliffe writing for the board expressed the view that the majority
speeches in *Liversidge* v. *Anderson* [1942] A.C. 206, in which a contrary
construction had been placed on similar words in the wartime regulation
D 18B of the Defence (General) Regulations 1939, should be regarded as an
authority for the meaning of that phrase in that particular regulation alone.
For my part I think the time has come to acknowledge openly that the
majority of this House in *Liversidge* v. *Anderson* were expediently and,
at that time, perhaps, excusably, wrong and the dissenting speech of Lord
Atkin was right.

E    I would also accept that since the act of handling a man's goods without
his permission is prima facie tortious, at the trial of a civil action for
trespass to goods based on the seizure and removal of things by an officer
of the board in purported exercise of his powers under the subsection, the
onus would be upon the officer to satisfy the court that there did in fact
exist reasonable grounds that were known to him for believing that the
F documents he removed might be required as evidence in proceedings for
some offence involving a tax fraud—not that they *would* be so required, for
that the seizing officer could not know, but that they *might* be required
if sufficient admissible evidence were ultimately forthcoming to support a
prosecution for the offence and it were decided to prosecute. But although
this onus would lie upon the officer at the trial, there remains the question:
At what stage in the civil action is the officer bound to disclose the grounds
G of his belief? It is at this point that the problem is reached of reconciling
the two competing and conflicting public interests which I mentioned at
the outset that offences involving tax frauds should be detected and
punished, and that the right of the individual to the protection of the law
from unjustified interference with his private property should be upheld.

     What is required for the protection of the former public interest was
H stated by Lord Reid in that part of his speech in *Conway* v. *Rimmer*
[1968] A.C. 910, 953–954, which dealt with public interest immunity
from discovery in civil actions of document and information in the
hands of the police. What he said appears to me to apply with equal

force to the Board of Inland Revenue as to the police and to those who    A
perpetrate tax frauds as it does to those who organise other criminal
activities.

" The police are carrying on an unending war with criminals many
of whom are today highly intelligent. So it is essential that there
should be no disclosure of anything which might give any useful
information to those who organise criminal activities. And it would
generally be wrong to require disclosure in a civil case of anything    B
which might be material in a pending prosecution : but after a verdict
has been given or it has been decided to take no proceedings there
is not the same need for secrecy."

The public interest in immunity from disclosure of the grounds of the
officer's belief that a document that he seized may be required as evidence
in a future prosecution for an offence involving a tax fraud, is thus, in    C
general, temporary in its nature, except as regards identity of informants
cf. D. v. National Society for the Prevention of Cruelty to Children
[1978] A.C. 171 and possibly new and unusual methods of investigation
used by the Inland Revenue. This, as it seems to me, provides an
obvious method of reconciling the two conflicting public interests where
an ordinary civil action is involved. If there is to be a criminal prosecu-    D
tion it is, in my view, clearly in the public interest in the proper
administration of justice, both criminal and civil, that the civil action
should not proceed to trial until the criminal trial is over; so discovery,
whether of documents or by interrogatories, directed to eliciting the
factual grounds for the officer's belief, can be deferred at least until the
Inland Revenue have had a reasonable time to complete their investiga-
tions into suspected tax frauds and to decide whether to bring criminal    E
proceedings at all and, if so, for what offences. If they decide to bring
proceedings the public interest immunity would continue to apply until
the conclusion of the criminal trial; if they decide not to bring any
criminal proceedings the public interest immunity would come to an end
with that decision. The court in the civil action could and should be
vigilant to see that the Inland Revenue proceeded with their investigations    F
with reasonable dispatch and reached their decision whether to prosecute
or not without unreasonable delay. If this were not done the court could
properly hold continuation of the immunity to be no longer justified in
the public interest, and allow discovery to go ahead.

In cases where those claiming a public interest immunity against
premature disclosure of information relating to criminal investigations
or pending prosecutions are not (unlike the appellants in the instant case)    G
protected against injunctive relief by section 21 of the Crown Proceedings
Act 1947, the immunity would, in my view, extend to applications for an
interlocutory mandatory order for return of the documents seized.
Despite the fact that when the action came to be tried the onus would
lie upon the defendant to show that there existed reasonable grounds for
his belief that they might be required as evidence in criminal proceedings,    H
the court should not require him to disclose the grounds of his belief in
opposition to the claim for interlocutory relief, but should be satisfied
with his statement on affidavit that he had reasonable grounds for his

A   belief, unless the other evidence on the application was strong enough to justify the inference that no reasonable person could have thought so. It is to be borne in mind that if at the trial it should turn out that the defendant was unable to satisfy the onus of proving that reasonable grounds did in fact exist, the plaintiff has the advantage that the action falls into one of those exceptional categories in which punitive damages may still be awarded: *Rookes* v. *Barnard* [1964] A.C. 1129 and *Broome* v.
B   *Cassell & Co. Ltd.* [1972] A.C. 1027.

In the same way, it would not in my view be open to a person claiming to have been injured by the purported but unlawful exercise by a public officer of statutory powers, to circumvent the public interest immunity against premature disclosure of the grounds on which the officer's exercise of the power was based, by applying under R.S.C., Ord. 53 for judicial review instead of bringing a civil action. Order 53 amends and simplifies
C   the procedure for obtaining on a single application the kind of relief that was formerly obtainable only in an ordinary civil action against a public officer or authority and the kind of relief that was formerly obtainable only upon an application for a prerogative order of mandamus, prohibition or certiorari; but it does not alter the differing roles played by the court in applications for these two categories of relief.

D       Seizure of documents by an officer of the board under section 20C (3) involves a decision by the officer as to what documents he may seize. The subsection prescribes what the state of mind of the officer must be in order to make it lawful for him to decide to seize a document: he must believe that the document may be required as evidence in criminal proceedings for some form of tax fraud and that belief must be based
E   on reasonable grounds. The decision-making power is conferred by the statute upon the officer of the board. He is not required to give any reasons for his decision and the public interest immunity provides justification for any refusal to do so. Since he does not disclose his reasons there can be no question of setting aside his decision for error of law on the face of the record and the only ground upon which it can be attacked upon judicial review is that it was ultra vires because a
F   condition precedent to his forming the belief which the statute prescribes, viz. that it should be based upon reasonable grounds, was not satisfied. Where Parliament has designated a public officer as decision-maker for a particular class of decisions the High Court, acting as a reviewing court under Order 53, is not a court of appeal. It must proceed on the presumption omnia praesumuntur rite esse acta until that presumption
G   can be displaced by the applicant for review—upon whom the onus lies of doing so. Since no reasons have been given by the decision-maker and no unfavourable inference can be drawn for this fact because there is obvious justification for his failure to do so, the presumption that he acted intra vires can only be displaced by evidence of facts which cannot be reconciled with there having been reasonable cause for his belief that the documents might be required as evidence or alternatively which cannot
H   be reconciled with his having held such belief at all.

I agree with my noble and learned friend, Viscount Dilhorne, that the evidence filed on behalf of the applicants in the instant case would have

fallen short of that even if there had been no affidavits in answer filed on   A
behalf of the board to throw a different light upon the matter. So I would
hold, as the Divisional Court did, that the respondents have failed to
establish upon their application for judicial review that the officers of the
board acted ultra vires or otherwise unlawfully in seizing any of the
documents that they seized.

*The final declaration*                                                         B

There was a clear conflict of affidavit evidence of relevant facts before
the Court of Appeal as to the time spent by officers in examining
individual documents and files before deciding to seize them.      The
respondents contend the time spent on examining at any rate some of
the documents seized was too short to enable the officer concerned to
consider whether or not there was reasonable cause to believe that the   C
documents might be required as evidence in criminal proceedings; the
appellants deny this. Clearly there are issues of fact to be resolved which
cannot with justice be disposed of on the existing affidavit evidence.

The Court of Appeal were of opinion, which I do not share, that on
the affidavit evidence before them the respondents had made out a prima
facie case that all the documents had been seized unlawfully, and ought
to be delivered up to the respondents. But for the fact that the appellants   D
were officers of the Crown against whom there was no jurisdiction to
grant injunctive relief, it would appear that the Court of Appeal would
have thought it appropriate to grant an interlocutory injunction only,
leaving the question of whether the respondents were entitled to a final
injunction to be decided on full oral evidence at the trial.   However,
section 21 of the Crown Proceedings Act 1947 permits only a declaration   E
of the rights of the parties in lieu of an injunction against officers of
the Crown and it has been held, in my continued view correctly, that
this does not empower the court to grant interlocutory declarations
which would be a contradiction in terms: *International General Electric
Co. of New York Ltd.* v. *Customs and Excise Commissioners* [1962]
Ch. 784. Faced with this dilemma the Court of Appeal made a final   F
declaration instead.

In so far as this declaration was based upon the quashing of the
search warrant only it may be that a final declaration was appropriate,
though I express no concluded view on that; but in so far as it was based
in the alternative upon the court's prima facie view only, formed upon
conflicting affidavit evidence, that even if the warrant were valid the
actual seizure of documents by the officers of the board was unlawful.   G
it was, in my view, clearly wrong to make a final declaration which would
have the effect of making this hotly disputed issue res judicata between
the parties without any proper trial.

My Lords, this serves once again to draw attention to what, for my
part, I regard as a serious procedural defect in the English system of
administrative law: it provides no means of obtaining interlocutory relief   H
against the Crown and its officers. The useful reforms effected by the
amendment to the Rules of Court by substituting the new Order 53 for
the old system of prerogative orders, could not overcome this procedural

A  defect, which would require primary legislation. Such legislation has been recommended in the Report of the Law Commission on which the revision of Order 53 was based. It is greatly to be hoped that the recommendation will not continue to fall upon deaf parliamentary ears.

LORD SALMON.  My Lords, it is very much in the public interest that anyone who commits an offence involving any form of fraud in relation
B  to tax—a very grave offence—should be brought to justice. It is at least equally in the public interest that individual liberty should be protected by the judges who have the traditional right and duty to protect individuals from an abuse of power by the executive. Accordingly, at common law, it would be unlawful for any officer of the Inland Revenue or any member of the police to force his way into the home or business premises of any person and search for and seize any documents he might find
C  there, even if he believed that there was reasonable ground for suspecting that an offence involving any form of fraud in relation to tax had been committed and that the documents seized might be required as evidence for the purpose of proceedings in respect of the offence which he suspected.

The uncontradicted evidence shows that in the early morning of
D  Friday, July 13, 1979,

(a) several officers of the Inland Revenue and a detective inspector entered 27, Radnor Place, London, W.2, the home of Mr. R. A. Plummer, on a warrant (to which I shall refer later). Mr. Plummer is a chartered accountant, a Fellow of the Institute of Taxation and the Managing Director of Rossminster Ltd. This
E  company carries on business as a bank and is a member of the Rossminster Group of companies. Virtually all the papers and documents which Mr. Plummer's house contained were seized and removed.

(b) A large number of officers of the Inland Revenue and of the police entered the Rossminster Bank on a warrant and took
F  away van loads of documents leaving very few behind them. They remained in the premises all day and left them shortly after 6 p.m. The banking business of Rossminster Ltd. was carried on in a separate part of the premises at 1, Hanover Square, London, W.1. Other parts of those premises were occupied by other companies of the Rossminster Group whose business it was to devise lawful schemes to enable clients lawfully to avoid tax.
G
(c) Much the same as occurred at 1, Hanover Square occurred at the premises of A. J. R. Financial Services Ltd. at 19/24, St. George Street, London, W.1. A. J. R. carries on the business of providing secretarial and accounting services to several hundred clients. The Rossminster Group of companies is one of its best clients but otherwise has no connection with it.
H
(d) Much the same occurred at Mr. R. C. Tucker's house as occurred at Mr. Plummer's. Mr. Tucker, who is a chartered accountant, has had a close business relationship with the Rossminster Group

of companies for some time. Recently, before July 13, he left his A own offices which he had occupied for seven years and moved into 1, Hanover Square for the time being.

The Inland Revenue was asked by or on behalf of everyone whose home or offices were searched and whose papers and documents were seized, what offence was alleged to have been committed and by whom. The Inland Revenue refused to give any answer to either part of that B question.

It seems to me to be obvious that the news of the events I have described must have spread like wildfire and been a calamity for those who experienced them. Their names must have been seriously tarnished and they have no doubt suffered serious financial loss. This must apply also to the Rossminster Group of companies; in particular those in the group whose business was to devise lawful schemes for avoiding tax C which would otherwise have been exigible from their clients. No sensible client would be likely to continue to employ anyone to draw up such a scheme for him if he contemplated that the scheme might land him in prison.

On Friday July 13 the bank had an issued share capital of £1,250,000, about one thousand customers with current accounts and more than D £6,000,000 held for customers on deposit. On Monday, July 16, there was a run on the bank; on that day, £1,956,695 was withdrawn by customers and instructions given for the withdrawal of over £400,000 on the following day; these instructions were obeyed.

The bank had intended to apply to the Bank of England for an important licence under the Banking Act 1979 and had been reporting quarterly to the Bank of England on its financial position since its E inception.

On the afternoon of Monday July 16 Mr. Roper of the Bank of England telephoned a director of the bank inquiring about the circumstances surrounding the Inland Revenue's seizure of the bank's documents on the previous Friday. The director explained what had happened and Mr. Roper informed him that it was unlikely that the F Bank of England would entertain any application for a licence until the situation with the Inland Revenue had been clarified.

It is impossible at this stage to know when the prosecution (if there is to be a prosecution) will take place or, if there is to be no prosecution, when the Inland Revenue will announce its decision. More than four months have already gone by and no decision has been made—and none G may be made for years. In the meantime, vast sums of money may be lost as a result of the acts done by the Inland Revenue on July 13, 1979; and the persons concerned may be ruined. Moreover, I doubt whether these persons will ever be able to recover the loss they will have suffered even if the search warrants are invalid. The Inland Revenue would no doubt put forward the defence to any proceedings brought against them H for damages for entering the premises concerned, that they had entered on the authority of a warrant permitting them to enter and issued on July 12, 1979, by a circuit judge.

A    I express no concluded view as to whether the plaintiffs would be able
to discharge the onus of proof (which would undoubtedly be upon them)
of showing, maybe many years after July 12, 1979, (a) that on that date,
there had been no reasonable ground for suspecting that an offence in-
volving any form of fraud in relation to tax had been committed and (b)
that the Inland Revenue had no reasonable cause to believe that the
documents which they seized and removed might be required in respect of
B    an offence of the kind I have mentioned.

Prior to 1976 I should have thought that the law afforded the Inland
Revenue ample power to detect offences involving any form of fraud in
relation to tax. Nevertheless section 20C inserted into the Taxes Manage-
ment Act 1970 by section 57 of the Finance Act 1976 greatly increased the
Inland Revenue's pre-1976 powers by introducing what I regard as an
C    altogether unnecessary power which, in my view, dangerously encroaches
on individual liberty. [His Lordship read section 20C, so far as relevant,
and continued:] However much the courts may deprecate an Act they
must apply it. It is not possible by torturing its language or by any other
means to construe it so as to give it a meaning which Parliament clearly
did not intend it to bear. I am certain my noble and learned friend
Lord Denning M.R. was not departing from that principle when he said,
D    ante, p. 972B:

"Once great power is granted, there is a danger of it being abused.
Rather than risk such abuse, it is . . . the duty of the courts so to
construe the statute as to see that it encroaches as little as possible
upon the liberties of the people of England."

E    I respectfully agree with this passage which I think is consistent with
the view that the courts should construe a statute which encroaches upon
liberty so that it encroaches upon it no more than the statute allows,
expressly or by necessary implication.

Section 20C (1) says nothing more in express terms about the contents
of a warrant than that the appropriate judicial authority

F    " may issue a warrant in writing authorising an officer of the board
to enter the premises, if necessary by force, at any time within 14
days from the time of issue of the warrant, and search them."

It may be that a warrant is valid which says nothing more than that it
authorises officers of the Board of the Inland Revenue to enter the
premises and search them. Such a warrant may be sufficient to state by
implication that the important conditions in section 20C (1) (a) and (b)
G    have been complied with. I express no concluded view of this topic
because the warrants in the present case are very different in form from
those that I have postulated. In my view, they show that section 20C (1)
(a) was not complied with for reasons which I shall presently explain.

To issue search warrants which are based on no more than suspicion
can lead to disastrous results for persons who may be innocent of fraud.
H    Suspicion can easily be aroused, and honestly aroused in some more easily
than in others—without any reasonable ground to support it. Officers of
the Board of Inland Revenue are not immune from having such suspicions
any more than many other highly respectable bodies of people. That, I

think, is why Parliament, certainly not as clearly as it should have done, A
laid down in section 20C (1) (a) that if officers of the board require search
warrants, they must give evidence on oath laying before a circuit judge
the grounds for their suspicion and that the duty of the judge must then
be to consider the evidence and decide whether he (the judge) is satisfied
that it establishes reasonable ground for the board's suspicion.

Mr. Raymond Quinlan, one of the board's inspectors, represented the
board on the application for the warrants. His affidavit, sworn in the B
present proceedings, shows that he had made a thorough investigation
of the activities of the Rossminster Group of companies and other
persons and bodies with whom the group had special relationships. He
informed the Common Serjeant on oath (as the warrant signed by the
Common Serjeant shows) that he had reasonable ground for suspecting
that an offence involving fraud in relation to tax had been committed C
and that evidence establishing fraud might be found on the premises
described later in the second schedule annexed to the warrants.   No
one could blame the Common Serjeant for thinking that Mr. Quinlan's
oath stating that there was reasonable ground for the board's suspicion
was something on which he could and indeed should rely; and he
accordingly signed the search warrants.   I would like to make it plain
that, in my respectful view, no blame of any kind can be attributed to D
the learned judge.   Section 20C is by no means as clear as it should
be, and there is no reason to suppose that the judge had had sufficient
opportunity to study it at length before the application in the present
case was made.

The section is, in my view, so drafted that if an officer of the Inland
Revenue who had made a long and careful investigation of the respon-
dents' affairs, informed the judge on oath that there was reasonable ground E
for suspecting that an offence or offences involving fraud in relation to
tax had been committed etc., the judge might well make the mistake of
misconstruing section 20C as meaning that the information given on oath
was sufficient to satisfy him that there was reasonable ground for suspi-
cion and to empower him to issue the warrants.

Each of the warrants read as follows:                                        F

"Search Warrant.   To: Raymond Quinlan and to the persons
named in the first schedule annexed to this warrant officers of the
Board of Inland Revenue.

"Information on oath having been laid this day by Raymond
Quinlan in accordance with the provisions of section 20C of the Taxes
Management Act 1970 stating" the underlining is mine " that there G
is reasonable ground for suspecting that an offence involving fraud
in connection with or in relation to tax has been committed and
that evidence of it is to be found on the premises described in
the second schedule annexed hereto.   You are hereby authorised
to enter those premises, together with all or any of the officers of
the Board of Inland Revenue named in the first schedule hereto and H
together with such constables as you may require, if necessary by
force, at any time within 14 days from the time of issue of this
warrant, and search them; and on entering those premises with this

1019

A.C.                    Reg. v. I.R.C., Ex p. Rossminster (H.L.(E.))         Lord Salmon

A    warrant you may seize and remove any things whatsoever found
there which you have reasonable cause to believe may be required
as evidence for the purposes of proceedings in respect of such an
offence.

Dated this 12th day of July 1979 "—signed by the circuit judge.

The first part of the warrant explains the grounds on which the
B   warrant is issued. In my view, this part of the warrant makes it plain
that the warrant was issued on the faith of the information on oath by
Raymond Quinlan stating that there was reasonable ground for suspect-
ing, etc. It follows therefore that section 20C (1) (*a*) was not complied
with. If it had been, the first part of the warrant would have read quite
differently, perhaps somewhat as follows:

C       " Evidence on oath which establishes that there is reasonable ground
for suspecting etc. having been laid before me this day by Raymond
Quinlan, I am satisfied in accordance with the provisions of
section 20C of the Taxes Management Act 1970 that there is
reasonable ground for suspecting etc. . . ."

Section 20C makes a wide inroad into the citizen's basic human rights,
D   the right to privacy in his own home and business premises and the right
to keep what belongs to him. It allows the Inland Revenue the power to
force its way into a man's home or offices and deprive him of his private
papers and books. In my view, it provides only one real safeguard against
an abuse of power. That safeguard is not that the Inland Revenue is
satisfied that there is reasonable ground for suspecting that an offence
involving fraud in relation to tax has been committed, but that the
E   judge who issues the search warrant is so satisfied after he has been told
on oath by the Inland Revenue full details of the facts which it has
discovered. That is why I am inclined to the view that it is implicit in
section 20C that a search warrant signed by the judge should state that
he is so satisfied, i.e., that the warrant should always give the reason
for its issue. In any event, I hope that in the future the practice will
F   always be that such warrants state plainly that the judge who signed
them is so satisfied.

I am, however, convinced that search warrants like the present are
invalid because they recite as the reason for their issue only that an
officer of the Inland Revenue has stated on oath that there is reasonable
ground for suspecting that an offence involving fraud in relation to tax
has been committed. If the judge gives that as his reason for issuing
G   a warrant, it seems to me to follow that his reason for issuing it cannot
be that he is so satisfied by the information given to him on oath by an
officer of the Inland Revenue of the detailed facts which the officer
has ascertained; but that the judge's reason for issuing the warrant was
because the officer had stated on oath that there is reasonable ground to
suspect, etc. I am afraid that I do not agree that the warrants in the
H   present case make it clear that they were issued by the judge pursuant to
the powers conferred on him by section 20C. Indeed, for the reasons I
have given, I consider that the exact contrary is made clear by these
warrants.

It had never occurred to me before reading some of your Lordships' speeches that anyone could imagine that I was suggesting that this highly A respected judge had acted improperly and unfairly. I had hoped that I had made it crystal clear that I was suggesting no more than that, in my opinion, the judge had misconstrued a statutory provision (section 20C) whose meaning was not very clear—the sort of mistake which every judge, except perhaps the infallible, would agree that he has made at some time during his career. To make such a mistake surely B cannot be regarded as improper or unfair, still less as a dereliction by the judge of his judicial duties.

I think that the point that I have been making is covered by the following in the notice pursuant to Ord. 53, r. 6 (3) dated July 23, 1979:

" That the learned judge erred in law . . . in issuing the said warrants in that he was not satisfied . . . that there was reasonable ground for C suspecting that any . . . person had at any . . . time done any . . . act such as to constitute an act involving fraud . . . in relation to tax."

This point, however, was not argued in the Divisional Court nor in the Court of Appeal nor in your Lordships' House, nor did it appear in the respondents' case. I did, however, put it to counsel for the appellants in D the course of his argument.

I recognise, of course, that in any ordinary case between litigant and litigant the point could not be allowed to be relied on now. This, however, is by no means any ordinary case. It is a case of great constitutional importance which can seriously affect individual liberty. The point which I have ventured to make, as I have already said, in my opinion affords the only real safeguard against an abuse of power by the Inland E Revenue. I recognise that section 20C, not very clearly, indicates that a warrant is invalid if it shows on its face (as, in my opinion, each of the four relevant warrants do) that it was issued by the judge not because he was satisfied by any evidence of facts discovered by the Inland Revenue and put before him on oath that there was reasonable ground for suspecting that an offence involving fraud relating to tax had been committed, F etc. but because he was told on oath by an officer of the Inland Revenue that there was reasonable ground for suspecting that such an offence had been committed. In my view, the judge misconstrued section 20C by thinking that it laid down that what he had been told on oath by the officer of the Inland Revenue was sufficient to allow the warrants to be issued.

I entirely agree with your Lordships for the reasons which you have G given that the warrants cannot be successfully attacked on the ground that they do not sufficiently particularise the offences to which they refer; and that the well-known mid-18th century authorities on which the Court of Appeal relied lend no real support to the contrary view.

The genus of the offences specified in section 20C is specified in the warrants. There are six or more species of that genus. If the warrants H were to set out these species in the alternative to each other, as they might do, they could not help the persons whose homes or offices were entered and searched.

A    I agree for the reasons stated by my noble and learned friend, Viscount Dilhorne, that so long as section 20C remains on the statute book, it is highly desirable that it should be amended so that the application for a warrant should be made to a High Court judge. This is certainly not out of any disrespect for the circuit judges but because of the enormous powers conferred upon the Inland Revenue under section 20C, the great harm it may do to individual liberty and the ruin

B it may inflict upon those upon whom it is exercised, however innocent they may be.

I also agree that having regard to the conflicting affidavit evidence, it was wrong to hold that, even if the warrants were valid, the seizure of documents by the officers of the board was unlawful because their failure properly to examine the documents which they seized made it impossible

C for them to have reasonable cause to believe that the documents might be required as evidence. Such an issue could only be properly decided by a judge at an ordinary trial after he had seen the witnesses on each side examined and cross-examined. This however is of no great importance since section 20C (3) empowers an officer " on entering the premises with a warrant under this section " to seize and remove documents which he has reasonable cause to believe might be required as evidence. The

D warrant referred to in subsection (3) must, in my view, be a valid warrant. And accordingly the powers conferred by the subsection cannot operate if the warrants were invalid as, in my opinion, they were.

My Lords, for the reasons I have stated I would dismiss the appeal.

LORD SCARMAN. My Lords, these appeals raise two questions: the

E validity of the search warrants issued by the Common Serjeant, and the legality of the seizure and removal by officers of the Inland Revenue of the documents found on the premises searched. The respondents are applicants for judicial review of the validity of the warrants and of the legality of the seizure. They attack the warrants by seeking an order of certiorari to remove them into the Queen's Bench Division so that

F they may be quashed: and they seek a declaration that the seizure and removal of the documents were unlawful. If they fail in their case against the warrants, they may yet succeed in their case against the seizure and removal of the documents. But, if they succeed against the warrants, it does not necessarily follow that they must succeed in their attack upon the seizure and removal of the documents. Both forms of relief were sought, as is now possible, by applying for judicial review. The Divisional

G Court refused the applicants any relief. The Court of Appeal upheld the applicants' appeal, quashing the warrants and declaring that the officers of the Inland Revenue " were at no material time entitled to remove " the documents and things taken from the premises searched.

My Lords, I agree that these appeals should be allowed and add some observations only because of the importance of the issues raised, and

H because I share the anxieties felt by the Court of Appeal. If power exists for officers of the Board of Inland Revenue to enter premises, if necessary by force, at any time of the day or night and then seize and remove any things whatsoever found there which they have reasonable

cause to believe may be required as evidence for the purposes of proceedings in respect of any offence or offences involving any form of fraud in connection with, or in relation to, tax, it is the duty of the courts to see that it is not abused: for it is a breath-taking inroad upon the individual's right of privacy and right of property.  Important as is the public interest in the detection and punishment of tax frauds, it is not to be compared with the public interest in the right of men and women to be secure in the privacy of their homes, their offices, and their papers.  Yet if the law is that no particulars of the offence or offences suspected, other than that they are offences of tax fraud, need be given, how can the householder, or occupier of premises, hope to obtain an effective judicial review of the entry, search and seizure at the time of the events or shortly thereafter?  And telling the victim that long after the event he may go to law and recover damages if he can prove the revenue acted unlawfully is cold comfort—even if he can afford it.

It is therefore with regret that I have to accept that, if the requirements of section 20C of the Taxes Management Act 1970, a section which entered the law as an amendment introduced by section 57 of the Finance Act 1976, are met, the power exists to enter, and search premises, and seize and remove things there found and that the prospect of an immediate judicial review of the exercise of the power is dim.  Nevertheless, what Lord Camden C.J. said in *Entick* v. *Carrington* (1765) 19 State Tr. 1029, 1066, remains good law today:

"No man can set his foot upon my ground without my licence, but he is liable to an action, though the damage be nothing . . . If he admits the fact, he is bound to show by way of justification, that some positive law has empowered or excused him."

The positive law relied on in this case is the statute.  If the requirements of the statute have been met, there is justification: but, if they have not, there is none.

The essential requirement of the statute is the issue under subsection (1) of the section by a judicial authority of a warrant in writing authorising an officer of the board to enter the premises, if necessary by force, at any time within 14 days from the time of issue of the warrant and search them.  The subsection provides that the appropriate judicial authority (in England and Wales, a circuit judge) may issue a warrant only if satisfied on information on oath given by an officer of the board of two matters: first, that there is reasonable ground for suspecting that an offence involving a tax fraud has been committed and that evidence of it is to be found on premises specified in the information; and secondly, that in making his application the officer has the approval of the board given (by at least two members) in relation to the particular case.

The judge must himself be satisfied.  It is not enough that the officer should state on oath that he is satisfied, which is all that the warrants say in the present case.  The issue of the warrant is a judicial act, and must be preceded by a judicial inquiry which satisfies the judge that the requirements for its issue have been met.

There is no reason to believe, nor is it possible, as counsel for the respondents properly conceded, to suggest, that in this case the Common

A  Serjeant failed in his judicial duty. I cannot agree with my noble and learned friend, Lord Salmon, that the words of the warrant make clear that the Common Serjeant was content to rely solely on Mr. Quinlan's oath, and so neglected to satisfy himself. They do not even, in my view, raise a doubt. It is not to be supposed, in the absence of evidence, that a circuit judge will have been so careless of the rights of citizens as to fail to carry out his duty, when a statute plainly requires him to act as

B  the protector of those rights. Neither in the Divisional Court where the respondents lost, nor in the Court of Appeal where they succeeded, was any such suggestion made, though it had found a place in the amended statement filed by the respondents in support of their application for judicial review. The point which the respondents have taken on the four warrants is a different one, namely that the warrants did not state by whom and when there are reasonable grounds for suspecting an

C  offence has been committed or the precise nature or the particular acts constituting the suspected offence.

It is, therefore, necessary to approach the case upon the basis that the judge did satisfy himself upon the matters which he was required to be satisfied before issuing the warrants.

The only warrant required by the statute is one authorising entry and

D  search. Clearly it must specify the premises to be entered and searched. But that is the limit of the authority given by the warrant. The judge's warrant is not the authority for seizing and removing things found on the premises. That power is conferred by the statute, i.e., subsection (3). As the Divisional Court well said, the warrant is only the key of the door, it does not confer the power to seize and remove, although, until and unless

E  it opens the door, the power to seize and remove does not arise.

Each of the four warrants which the judge issued did in terms authorise the officers it named to enter and search the premises which it identified. Each warrant also made clear that it was issued by the judge pursuant to section 20C of the Taxes Managements Act 1970. The warrants therefore contained sufficient information to enable an occupier of premises to know that they were issued under subsection (1) of the section and to identify

F  the premises to be searched.

If the warrant to be valid must also contain particulars of the offences suspected, I would have expected to find this requirement expressly stated in, or necessarily to be implied from the language of, subsection (3) which confers the power to seize and remove things of possible evidential value. But in my judgment, subsection (3) says nothing of the sort. An officer

G  can enter only if armed with a warrant issued under subsection (1), i.e. a warrant authorising entry and search. Having entered, he may seize and remove anything which he has reasonable cause to believe may be required as evidence " . . . in respect of such an offence as is mentioned in subsection (1) above." I construe these words as a reference to the kind of offence there mentioned and not limited to the particular offences

H  suspected, i.e. to any offence involving any form of fraud in connection with or in relation to tax. Such a construction is, as my noble and learned friend, Lord Diplock, points out, consistent with the power of seizure of goods other than those mentioned in the warrant conferred by a common

**Lord Scarman**      Reg. v. I.R.C., Ex p. Rossminster (H.L.(E.))      **[1980]**

law warrant to search premises for stolen goods: *Chic Fashions (West Wales) Ltd.* v. *Jones* [1968] 2 Q.B. 299, 314. There being nothing in A the section to require the warrant to give particulars of the offences suspected, does the general law import the requirement?  For the reasons given by my noble and learned friends I think not.  Indeed, I would think it a wrong approach to modern legislation to reason by analogy from common law powers. The relevance of *Entick* v. *Carrington*, 19 State Tr. 1029, 1066 is that it recognises that, where the justification B for what would otherwise be a trespass is a statute, the judge must look to the statute.  Today that means looking to the legislative purpose of the enactment as well as the words and context of the specific provision. If that approach be adopted, there are strong grounds for holding that the statute does not require the revenue, before it has decided to take proceedings and when it is still at the investigatory stage of a case, to C reveal to a possible wrong-doer its suspicions or the extent of its knowledge.

I therefore reject the submission of counsel for the respondents that the warrants should have given particulars of the offences suspected. One criticism may, however, fairly be made, but was not made by counsel for the respondents, of the warrants in this case.  It is that they fail to recite that the judge was himself satisfied as to the matters upon which he D has to be satisfied.  No doubt, and absolutely correctly, counsel took the view that the omission was not fatal to the validity of the warrants. Nevertheless the recital in the warrants is incomplete.  If anything was going to be recited as to the proceedings before the judge, the fact that the judge was satisfied should have been.  In a matter of such importance as the issue of these warrants it is, I think, desirable to include a recital of E the essential fact that the judge was satisfied that there were reasonable grounds for suspicion and that the board itself had authorised the application.

For these reasons I conclude that the warrants, which are the only record of the judge's decision to issue them, disclose on their face no error of law.  Certiorari, therefore, does not lie.  But even if there was error F of law in their issue, it would not necessarily follow that the actions of the officers of the Inland Revenue in entering the premises and exercising their statutory powers of seizure were unlawful.  Like my noble and learned friend, Lord Diplock, I would not wish to pre-judge a question not raised in this appeal, namely whether an entry and seizure made in the bona fide belief that the warrant was properly issued would be illegal, G provided always the appropriate judicial authority had issued the warrant and the officer, who had entered relying on it, had reasonable cause to believe that what he seized might be required as evidence.

The main thrust of the respondents' submissions in your Lordships' House was directed against the lawfulness of the seizure and removal of the respondents' papers.  Subsection (3) provides that an officer may H seize and remove anything which he has reasonable cause to believe may be required as evidence.  The revenue conceded that the officer must in fact have had reasonable cause for this belief and that it is not enough

A merely to show that he honestly believed he had such cause. The ghost of *Liversidge* v. *Anderson* [1942] A.C. 206 therefore casts no shadow upon this statute. And I would think it need no longer haunt the law. It was laid to rest by Lord Radcliffe in *Nakkuda Ali* v. *Jayaratne* [1951] A.C. 66, 77, and no one in this case has sought to revive it. It is now beyond recall.

B There being, therefore, no challenge to the requirement of an objective test of reasonable cause, the respondents seek a judicial review of the exercise of the power of seizure. They say there was an abuse of power and that the evidence does not support the revenue's assertion that the officers who conducted the search had reasonable cause for their belief. They have endeavoured to support the submission by an analysis of the available evidence to show that the officers seized a great quantity of documents without reading them, or even looking at some of them.

C The Divisional Court held that the question of reasonable cause could not be decided upon the basis of contested affidavits and, in effect, dismissed as premature the application for judicial review. The Court of Appeal, noting that the revenue refuses to disclose the grounds for believing that the documents seized may be required as evidence, concluded that, since in many instances the officers seized documents with-

D out reading them, the existence of reasonable cause for their belief could not be proved, and that the quantity of such unexamined material was such that the whole exercise of seizure and removal must be held illegal— the " all or nothing " argument, as it was described.

The application for judicial review is a recent procedural innovation in our law. It is governed by R.S.C., Ord. 53, r. 2 which was introduced

E in 1977. The rule made no alteration to the substantive law; nor did it introduce any new remedy. But the procedural reforms introduced are significant and valuable. Judicial review is now the procedure for obtaining relief by way of prerogative order, i.e. mandamus, prohibition or certiorari. But it is not confined to such relief: an applicant may now obtain a declaration or injunction in any case where in the opinion of the

F court " it would be just and convenient for the declaration or injunction to be granted on an application for judicial review." Further, on an application, the court may award damages, provided that the court is satisfied that damages could have been awarded, had the applicant proceeded by action. The rule also makes available at the court's discretion discovery, interrogatories, and cross-examination of deponents.

G And, where the relief sought is a declaration, an injunction, or damages but the court considers it should not be granted on an application for judicial review, the court may order the proceedings to continue as if they had been begun by writ.

Thus the application for judicial review, where a declaration, an injunction, or damages are sought, is a summary way of obtaining a

H remedy which could be obtained at trial in an action begun by writ: and it is available only where in all the circumstances it is just and convenient. If issues of fact, or law and fact, are raised which it is neither just nor convenient to decide without the full trial process, the court may dismiss

the application or order, in effect, a trial. In the present case there are,
in my judgment, insuperable objections to the granting of a declaration in    A
proceedings for judicial review. With all respect to the Court of Appeal,
the evidence is not such that a court could safely say at this stage that the
officers had no reasonable cause to believe that what they seized might be
required as evidence. A trial is necessary, if justice is to be done. The
applicants could have asked for the proceedings to be continued as if
begun by writ, but did not—no doubt, because they have already begun    B
proceedings by writ issued in the Chancery Division. I agree with the
views expressed by the Divisional Court on this point as well as on the
point relating to the validity of the warrants.

At the end of the day one fundamental issue divides the parties and
calls for the decision of the House. Is it a requirement of the law that
particulars of the offences suspected to have been committed be shown
either on the face of the warrant or by the revenue, if challenged, in pro-    C
ceedings for judicial review? The statute contains no express provision
spelling out such a requirement. Is the requirement to be implied? I
know of no common law rule which compels the implication. Indeed, the
common law supports the converse: for the nearest common law analogy
is the rule, based on public policy, which protects from disclosure police
sources of information: *Home* v. *Bentinck* (1820) 2 Brod. & Bing. 130.    D
Talk of " general warrants " is beside the point: these warrants make clear
that they are issued by judicial authority in the exercise of the power con-
ferred in the statute. When one turns from the common law to consider the
legislative purpose of the section, it is plain that the purpose could be
defeated if a warrant must particularise the offences suspected: for warrants
are issued at the stage of investigation when secrecy may be vital to the
success of detection. But can the revenue, if their seizure be challenged    E
in proceedings for judicial review, refuse at that stage to disclose par-
ticulars of the offences suspected? That is a matter for their decision. If
the revenue chooses, as in this case, not to disclose them, it runs the risk
of failing to show that there is a triable issue as to " reasonable cause."
But if, as in the present case, the affidavits disclose evidence sufficient
to show a triable issue, it is " just and convenient " to leave the issue to    F
trial. And, as my noble and learned friends, Lords Wilberforce and
Diplock, have emphasised, trial (or an investigation in substitute for trial,
if undertaken in the proceedings for judicial review) should ordinarily
be delayed until after criminal proceedings have been completed or
abandoned or, if none are begun, after a reasonable period, in which to
take a decision whether or not to institute such proceedings, has elapsed.    G

Two questions were canvassed in the course of argument, upon which I
wish to comment. The first was the suggestion that the burden of proving
the legality of the seizure was upon the revenue. The suggestion rests on a
misunderstanding. An applicant for judicial review has to satisfy the court
that he has a case. If he proves that his house has been entered or his
documents seized without his consent, he establishes a prima facie case.    H
But as soon as the respondent pleads justification, e.g. in this case the
statute, and leads evidence to show that he has acted within the power

A    conferred on him by law, issue is joined and the prima facie case has to
be judged against the strength of the matters urged in defence.  Unless the
court on judicial review can safely say that the defence will surely fail, it
cannot be just to grant final relief, and it must be convenient to allow the
issue to go to trial.  The summary proceedings are a substitute for trial
only if the court can be confident that the trial is unnecessary.  The only
rider I would add is that the court can, if it thinks fit, grant an interlocutory

B    injunction (save against the Crown) or test evidence by allowing discovery,
interrogatories, or cross-examination, in which case it may be able to reach
a decision without the need of sending the case to trial by a single judge.
But these are powers to be sparingly used, if the new procedure is to be
a success.

The second point on which I desire to comment is as to the possibility of
an " interim declaration."  Under existing law only a final and conclusive
C    declaration may be granted by a court.  This means that, where the Crown
is defendant or respondent, relief analogous to an interim injunction is
not available.  Many commentators, including the Law Commission,
recommend that interim relief should be available against the Crown and
that an " interim declaration " would be the appropriate way of providing
it.  I gravely doubt the wisdom of interim relief against the Crown.  The

D    state's decisions must be respected unless and until they are shown to be
wrong.  Judges neither govern nor administer the state: they adjudicate
when required to do so.  The value of judicial review, which is high,
should not be allowed to obscure the fundamental limits of the judicial
function.  And, if interim relief against the Crown be acceptable, the inter-
locutory declaration is not the way to provide it.  For myself, I find

E    absurd the posture of a court declaring one day in interlocutory proceedings
that an applicant has certain rights and upon a later day that he has not.
Something less risible must be devised.

For these reasons I would allow the appeals.

*Appeals allowed.*

F    Solicitors: *Solicitor of Inland Revenue; Roney, Vincent & Co.*

F. C.

G

H