# Exhibit K



Neutral Citation Number: [2019] EWCA Crim 1062

Case No: 201803465 C3

**IN THE COURT OF APPEAL (CRIMINAL DIVISION)**
**ON APPEAL FROM THE CENTRAL CRIMINAL COURT**
**The Common Serjeant, H.H. Judge Marks QC**
**T20177384**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 20/06/2019

**Before :**

**THE PRESIDENT OF THE QUEEN'S BENCH DIVISION**
**(SIR BRIAN LEVESON)**
**MR JUSTICE JEREMY BAKER**
and
**MRS JUSTICE THORNTON D.B.E.**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

| | |
|---|---|
| **JACK SEBASTIAN SHEPHERD** | **Appellant** |
| - and - | |
| **THE QUEEN** | **Respondent** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Stephen Vullo QC**, **Andrew McGee** and **Kate O'Raghallaigh** for the Appellant
**Aftab Jafferjee QC** and **Michelle Nelson QC** for the Crown
**John Hardy QC** for the Crown (Bail Act offence)

Hearing date : 13 June 2019
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

Judgment Approved by the court for handing down.                                                                                                    R v Shepherd

**Sir Brian Leveson P :**

1. On 28 June 2018, Jack Sebastian Shepherd ("the appellant") was due to appear at the Central Criminal Court before the Common Serjeant, His Honour Judge Marks QC in connection with his trial for manslaughter. He had communicated with his solicitors that he did not intend to attend the trial and he did not do so. As a result, a bench warrant (not backed for bail) was issued. This followed an earlier bench warrant (not backed for bail) in connection with other proceedings.

2. In the event, without objection from his legal advisers (which included leading counsel), the trial subsequently proceeded in the appellant's absence. On 26 July, by majority verdict (11:1), he was convicted of manslaughter and, on the following day, equally in his absence, sentenced to a term of 6 years' imprisonment. Ancillary orders of forfeiture (of the speed boat involved) and in relation to the Victim Surcharge were also made.

3. Throughout the trial, the appellant was in communication with his legal advisors and, following its conclusion, he sought leave to appeal both conviction and sentence, which, in relation to conviction, he was granted by the single judge. On 11 April 2019, prior to his appeal being heard, he surrendered to the authorities in the Republic of Georgia. He did not contest extradition to the UK and, on his return, admitted an offence under s. 6 of the Bail Act 1976 for which he was sentenced to a term of 6 months' imprisonment to operate consecutively to the term of 6 years' imprisonment. He also seeks to challenge his conviction in relation to the Bail Act offence which, by virtue of s. 13 of the Administration of Justice Act 1960, he pursues as of right.

*Facts*

4. At some time before midnight on 8 December 2015, Charlotte Brown suffered fatal injuries when the appellant's speedboat struck a submerged tree on the river Thames. It was not in issue that, at times during that trip, the boat was travelling at excessive speed and that Ms Brown, who had no experience of driving a speedboat and who, along with the appellant, had been drinking alcohol, was at the wheel at the time of the incident.

5. The background was that Ms Brown and the appellant had met, for their first date, earlier that evening: two bottles of an expensive wine were bought but the extent to which the second bottle was consumed was in issue. They partook of some food with the alcohol at a restaurant in the City before returning to the appellant's houseboat in Hammersmith. The appellant then offered to take the victim out on his speedboat and they drank more alcohol (in the form of champagne) whilst they waited for the tide to rise.

6. At some time after 10.20 pm, they set off, it appearing to be the case that they took more alcohol with them. The appellant was driving. It was not in issue that on the outward leg of the journey the boat was travelling at excessive speed. At some point on the return journey, the appellant allowed Ms Brown to take the wheel and take control. CCTV images showed the boat move in a gradual line from the north to south side of the river: it seemed to slow significantly. As it approached Plantation Wharf,

<u>**Judgment Approved by the court for handing down.**</u>                                                                                              R v Shepherd

        witnesses describe the boat making a chugging sound, with reducing engine revolutions; that was not consistent with a vessel travelling at or above the permitted speed limit.

7.      Having impacted with the tree, the boat turned over throwing both the appellant and Ms Brown into the water; neither was wearing a buoyancy aid or life jacket. Tragically, Ms Brown was unresponsive when she was pulled from the water and subsequently died in hospital. Meanwhile, the appellant was rescued by the RNLI and handed over to a Marine Police Unit. He was suffering from hypothermia and appeared very concerned as to Ms Brown's welfare and whereabouts: he spoke to an officer, Con Winter, who described him as "clearly very drunk" as well as seemingly "extremely confused" and "clearly suffering from shock". While in the hospital, he answered a number of questions posed by Con Winter about the circumstances of the incident.

8.      The appellant was discharged from hospital on 9 December and interviewed as a significant witness later the same day: that interview was recorded and a transcript was and is available. At the core of this appeal are the circumstances in which that interview took place and the extent to which the appellant's rights were not respected.

9.      In the event, the prosecution case was that the appellant, as the owner of the boat and, under Thames byelaws, its master, owed Ms Brown a duty of care. It was contended that breach of that duty posed an obvious and serious risk of death and had been a significant contributory factor in her death. In particular:

      i)    The appellant had taken the boat out at night when it was cold and dark, when it was defective in a number of ways, in particular, in relation to the kill cord, steering, windscreen and seats.

      ii)    The appellant knew that both he and Ms Brown had been drinking and, furthermore, had taken more alcohol onto the boat.

      iii)    The appellant had driven at speeds well in excess of the speed limit, allowing Ms Brown to take the wheel, knowing how much alcohol she had consumed and that she had no experience of driving speed boats; he had failed to intervene when she, following his example, drove at excessive speed.

      iv)    Furthermore, the appellant had failed to inform Ms Brown that there were buoyancy aids/life jackets on board and failed to require her (or at least provide her with the option) of wearing one.

10.     The defence case was that the appellant had not owed a duty of care to Ms Brown. Furthermore, there was no reasonably foreseeable risk of death and, in any event, no act or omission of his was a substantial cause of death. As for the alleged negligence, he denied that:

      i)    he was intoxicated to the extent alleged by the Crown or to a level which led to the accident;

      ii)    Ms Brown was obviously intoxicated;

      iii)    the boat was speeding as alleged or at all before the accident;

      iv)    he had been under any obligation to provide or insist on a buoyancy aid being worn by any guest on the boat;

      v)    the river or weather conditions were such as to have placed the boat at risk or to have contributed to the accident.

11. It was further contended that the appellant had been questioned without the benefit of a caution or legal advice and whilst suffering from shock and hypothermia. In these circumstances he may have made errors as to events and details when interviewed. However, he had been truthful throughout.

12. It is not in issue that the issues before the jury were the nature and extent of any duty of care owed by the appellant to Ms Brown, breach of that duty, reasonable foreseeability of a serious and obvious risk of death, causation and whether such breach amounted to such gross negligence as constituted a crime as explained by the authorities relating to gross negligence manslaughter. It is not suggested that these ingredients were not explained entirely appropriately to the jury or that they were not entitled to reach the verdict which they did. The prosecution did not rely on his answers to Con Winter going to or in the hospital and, notwithstanding what might have been subsequently asserted, the only basis upon which this verdict is challenged is the admissibility of the interview of the appellant conducted on 9 December, the day after the accident.

*Voire Dire*

13. It is first necessary to identify the nature of the application to the judge. Made pursuant to ss. 76 and 78 of the Police and Criminal Evidence Act 1984 ("PACE") it was:

> "to exclude the evidence relating to the defendant's account of his alcohol consumption and state of sobriety contained in (a) the evidence of Police Officer Liam Winter and (b) the significant witness interview."

14. It was said to have been made only on 1 July (in relation to the trial that had commenced) in these circumstances:

> "This application is made at this stage in light of the defendant's near-certain absence from his trial and an unopposed application to try the defendant in his absence having been granted.
>
> No application was made earlier because:
>
>     a.    had the defendant been in a position to give evidence at his trial, his account would have been broadly in line with what he said to [Con Winter] and in the significant witness interview, but with the correction of certain matters, in particular the amount of alcohol he had consumed;
>
>     b.    in those circumstances, the defendant would have benefited from the jury knowing that he had given a full and reasonably consistent account at an early stage;

Case 1:22-cr-00673-LAK   Document 138-11   Filed 05/08/23   Page 6 of 20

Judgment Approved by the court for handing down.                                                                R v Shepherd

      c. it is also the case that, had a successful application been made to exclude [Con Winter's] evidence and the significant witness interview at an earlier stage, the defendant would in effect have been precluded from giving evidence himself without the excluded evidence, at least arguably, becoming admissible and going before the jury."

15. In the event, the judge acceded to the application to exclude in very substantial part the evidence of what the appellant said about his alcohol consumption: on the face of it, therefore, the defence broadly succeeded in obtaining the relief that the written application sought. What the judge permitted to be adduced in evidence, however, was the appellant's initial account generally in answer to open questions to tell the officers what happened on the previous day.

16. In the light of the way in which the argument developed before this Court, it is necessary to set out the circumstances of the interview of the appellant on the day following the incident (as evidenced in a lengthy *voire dire*) and the judge's ruling in relation to it. Det. Sgt. Mullan (who had been present when it was conducted) explained the background. The appellant was interviewed as a significant witness to gain an understanding of what had happened: as frequently happens in such circumstances, that interview was recorded. At that stage of the investigation, there was nothing to indicate that he was involved in a criminal offence. At that stage no consideration had been given to any possible viable infringements of Thames by-laws. As a result, he was not cautioned.

17. Cross-examined, Det Sgt Mullan recognised that at the time of the interview he knew that both Ms Brown and the appellant had been drinking alcohol on and off the boat which was owned by the appellant and had capsized with both thrown into the Thames and that Ms Brown had died. The police were unsure whether either had been wearing lifejackets and believed that Ms Brown's lifejacket may have been lost in the water. They knew that the appellant had allowed Ms Brown to drive the boat shortly before the collision and that the appellant had appeared to be drunk or under the influence of alcohol when observed by officers at the hospital.

18. Det Sgt Mullan went on to explain that he had had no prior knowledge of or involvement with incidents on the river. He had been told by a senior officer, Det Insp Braganza, that the Marine Unit had informed him that no offences had been committed. In particular, he was not aware and did not consider that driving a boat whilst drunk might have been a criminal offence (albeit a summary offence contrary to Thames Byelaws). He accepted that if the incident had involved a car on a road he would "absolutely" have cautioned the appellant. The fact that he had not was because he had been told that no criminal offence had been committed.

19. He explained that, at the beginning of the interview, Det Con Sherrie Allen identified that the purpose of the interview was to take a witness statement. Initially, the appellant was permitted to give an account of what had happened and then that account was broken down by further questions. He had been asked whether he had taken out other "dates" and whether this was a technique he used to attract women. These questions had been asked because the appellant had mentioned something along these lines, elaborating that he had probably taken about ten women onto the boat and had allowed

Case 1:22-cr-00673-LAK   Document 138-11   Filed 05/08/23   Page 7 of 20

Judgment Approved by the court for handing down.                                                              R v Shepherd

the majority to drive it. He said that he had purchased the boat "with the intention of trying to pull women basically". The officer accepted that these questions related to previous incidents and said they were building a picture of how the evening had evolved and how it had "evolved before".

20. He agreed that the appellant had been asked whether he would have got into a car having consumed a comparable amount of alcohol and whether he had ever done so. The appellant had replied that he would not have but had done so in the past. It was put to the officer that he was asking whether the appellant had ever committed a criminal offence: the explanation was that, at some point, the appellant had said he believed that he had done wrong and, based on the fact that he had responsibility whilst on the road, he had been trying to establish whether the appellant would have done the same on a river. The officer was asked whether he would usually ask witnesses if they had ever committed criminal offences and replied that he would though it would depend on the circumstances and the case was quite unique.

21. Det Sgt Mullan could not recall whether he was aware of the appellant's previous convictions prior to the interview but accepted that he knew of previous stops on the Thames. He accepted that he had asked questions as to these stops but said that he was not testing the appellant's truthfulness but getting his version of what had happened. He could not recall why, before the interview, an evidential blood sample had been taken. He could not recall whether he knew about it.

22. The interview had been reviewed by Det Ch Insp Armstrong on the following day and it was put to Det Sgt Mullan that his senior officer had noted the working theory that foul play was not suspected and that the incident had been an accident. He agreed that, in this context, foul play meant evidence of an assault or something similar. However, information gathering continued pending the results of the post mortem examination. Although it was noted that advice was pending as to whether legislation relating to being drunk in charge of a vessel included a pleasure boat, the officer confirmed that he did not believe that driving a boat on the Thames whilst drunk was an offence.

23. The officer was then taken to notes in which previous contact with the appellant by the Marine Support Unit as to the speed and condition of his boat was documented. There was also a note that further consultation would be needed with the Port of London Authority in relation to any subsequent enforcement of byelaws. It was put to him that, by 9 December, byelaw offences were being considered. He reiterated that, at the time of the interview, he did not believe an offence had been committed and, had he done so, he would have cautioned the appellant.

24. Re-examined, Det Sgt Mullan accepted that subsequently he became aware that it was an offence to drive a boat whilst "over the limit". He was also asked about the evidence of alcohol consumption. That evidence came from the bar where the two had dined earlier that evening: two bottles of wine had been consumed and foil from the top of a champagne bottle and two wine glasses with residue found on the appellant's houseboat. There had also been messages sent by Ms Brown to her sister and friend which referred to champagne being consumed whilst on the speedboat.

25. In his *ex tempore* ruling on the question of admissibility, although not emanating from any evidence from the appellant (but rather from what he had told by a defence toxicologist), the judge recounted the defence position in relation to alcohol to the effect

that he had overstated his actions in the interview both in relation to his consumption of alcohol and the effect this had had on the speed of the boat and his behaviour. It appears, however, to have been accepted that, much earlier in the evening the appellant had consumed a double vodka, shared with Ms Brown a bottle of wine in the bar and half a second bottle and, in addition, had had perhaps half a glass of champagne on the houseboat, taking the champagne on the boat with them. He had said that on the speedboat bottles tended to rock and the contents spill and the champagne had been more of a "prop" on the date.

26. The judge noted that the toxicology evidence was based on what the appellant had said to his instructing solicitors. There was no evidence of back calculation; when his blood sample taken at 13.30hrs on 9 December was tested there was a zero reading. The defence submitted that even on the Crown's analysis which gave an estimate of about 34-100 milligrams in blood there was a real possibility that his level had been far below the limit. The difficulty with the trial proceeding in the appellant's absence was that he was unable to give evidence and there was an interview in which he had said that he was drunk.

27. In this initial ruling, the judge said that there was a distinction to be drawn between questioning relating to alcohol consumption and other questions. However, in relation to being drunk and in charge of the boat the judge noted that at the beginning of the interview the appellant had given a lengthy account of what had happened. At that stage he was not being asked questions about any offence. As the interview progressed that situation had changed and he been asked specific questions about alcohol and the officer had admitted that had he known it was an offence at that stage he would have cautioned the appellant. In the circumstances, the judge ruled that the interview was not inadmissible and fairness did not demand that it be excluded in its entirety, but those passages in which he was specifically asked about alcohol would be excluded.

28. Later in the trial, the judge provided a written ruling explaining in greater detail the reasons for his decision on admissibility. He noted the background (not relied upon by the prosecution) that, while at hospital, the appellant had spoken to Con Winter who elicited that it was his boat, he had been driving but had permitted the victim to drive which is when the accident occurred and that they had both had a significant amount to drink.

29. The judge clearly accepted that the following day, both the Senior Investigating Officer, Det Insp Braganza, and Det Sgt Mullan (who were aware of the conversation in hospital) were of the view that nothing had come to light which led either of them to believe that the appellant had committed an offence. This was borne out by the briefing provided to the Forensic Services ("this is not being treated as a suspicious incident").

30. The judge accepted that the appellant was clearly a critical witness from whom the police needed to obtain an account. They decided to do so by recording an interview with him as a "significant witness". Mr Mullan believed the purpose of the interview was to "understand the facts of what had happened". The judge equally accepted that Rule 9 of the River Thames Bye-laws 1978 made it an offence for a master of a vessel to drive it when the blood level exceeded 35 and noted that there was no power of arrest for that offence which was punishable with a fine and repeated the officer's evidence that he was unaware that this was an offence otherwise he would have cautioned the appellant.

31. It was against that background that the defence sought to exclude part of the interview under s. 78 of PACE on the basis of a breach of Code C (failure to caution and afford legal representation). It was contended that the test to be applied was an objective one and that the prosecution could not fairly rely on the officer's ignorance of the bye-laws.

32. The judge referred to the terms of para 10(a) of Code C of the Codes of Practice and stated that it was necessary to consider the purpose of the interview: the obligation to caution arose "before any questions about an offence … are put". Det Sgt Mullan, on the other hand, had described the purpose of the interview as "to establish clear facts of the incident and [the appellant] was the only individual who could tell…what…happened". He had been treated as a significant witness because of his presence during the incident as he may have held vital information which needed to be accurately obtained to progress and direct the investigation. The CRIS report showed that the matter had not progressed as a criminal investigation until 16 December.

33. In the circumstances, the judge concluded that whilst there were grounds to suspect the appellant of having committed an offence under the bye-laws, para 10(a) of Code C was not engaged because questions were not being put to him about an offence; he was being questioned to ascertain the circumstances in which the accident had occurred which at that time the police did not believe involved criminal conduct.

34. Looking at the substance of the interview it began with the appellant being asked to give an account which he had done at some length. In the course of this he referred to the fact that both he and the victim had drunk significant amounts. As a result of the account the officers had questioned him at some length to get more detail. He was asked a number of questions about drinking.

35. Furthermore, the application to exclude had been made late and against a background of the appellant having absconded and failed to attend his trial. The judge explained:

> "I mention this because the defence have made it clear that if D had been in attendance at the trial, they would not have made this application to exclude the interview; on the contrary, as they put it in their skeleton argument, 'the defendant would have benefited from the jury knowing that he had given a full and reasonably consistent account at an early stage'.
>
> They add 'had the defendant been in a position to give evidence at his trial, his account would have been broadly in line with what he said … in the significant witness interview, but with the correction of certain matters, in particular in relation to the amount of alcohol he had consumed'.

36. In those circumstances, although the judge had found the matter unusual and difficult, he concluded that there had been no breach of Code C but, in view of the concession that the appellant would have been cautioned had the officer been aware of the bye-law, the passages in which the appellant was asked specifically about drink should be excluded. The judge added that if he was wrong as to whether the Code had been breached, based on s. 78 of PACE, his conclusion would have been the same. In relation to the contention that he had been denied the right to legal representation, the judge

Case 1:22-cr-00673-LAK   Document 138-11   Filed 05/08/23   Page 10 of 20

Judgment Approved by the court for handing down.                                                R v Shepherd

concluded that this provision related to detainees and that the appellant had not been detained at the time of the interview.

37. It is important to underline what evidence, which Stephen Vullo QC (who acted for the appellant at trial as he did before us) sought to exclude but was admitted as a consequence of the ruling. The answers (part of a long account to tell the officer in as much detail as possible about what happened) identified by Mr Vullo were as follows:

> "…so yeah we had dinner and then we drank quite a lot of wine. We drunk two bottles of wine and got a taxi to mine and then we got to mine and drank more and then decided to go out on the boat and we'd talked about it over dinner. … so we went out on the boat and had some wine on the boat as well … so my memory's quite hazy of the whole evening really because we drank very heavily ….  I mean it's hazy because we'd been drinking …".

In addition, Mr Vullo sought to exclude an acknowledgement by the appellant of a summary of this account proffered by Det Con Allen.  Further, in answer to an open question (requesting that he tell the officer about the arrangement) included the explanation:

> "… went into the restaurant where he had yeah ordered a bottle of wine and kind of drunk that and then had some food and then another bottle of wine and yeah left and got the taxi back.  To be honest with [sic] I'm even quite hazy about the leaving restaurant."

*The Appeal*

38. Mr Vullo contended that the judge should have excluded, wholly or in part, evidence of the answers given by the appellant in his significant witness interview. Whilst at the hospital the appellant had been questioned by a police officer and told the officer that he had been drunk, that he and the victim had continued to drink on the boat and that he had allowed the victim to drive the boat.  This information formed part of the background (not relied on) but demonstrated that, by the time of the interview, there were clearly objective grounds for suspecting the appellant had committed a criminal offence based on his earlier answers and the fact that the victim had died.  In addition, although not relied on before the judge, there was the offence of exceeding the speed limit on the Thames (contrary to para. 16 of the Byelaws).  Accordingly, he should have been cautioned and afforded his rights under Code C of PACE in relation to legal advice and representation and pre-interview disclosure. Given that he had not been cautioned and had not had the benefit of his rights under Code C the interview should have been excluded.

39. Mr Vullo went on to argue that most of the damaging evidence against the appellant came from the answers he had given in that interview: these included driving at excessive speed, alcohol intake, life jackets, allowing the victim to steer and the fact that she had been at the helm at the time of the accident.  In that regard, the officer's

Case 1:22-cr-00673-LAK   Document 138-11   Filed 05/08/23   Page 11 of 20

Judgment Approved by the court for handing down.                                                               R v Shepherd

mistake as to the law was fatal to the admissibility of the interview. The judge ruled that there had been no breach of Code C but in view of the concession that the appellant would have been cautioned had the officer known of the bye-law, this conclusion could not be sustained.

40. In short, the judge erred in failing to exercise his discretion to exclude the interview in that the test for whether grounds exist to suspect someone of committing an offence must be objective and, irrespective of the officer's subjective opinion there was ample evidence to suspect that offences, including manslaughter, had been committed. In those circumstances, there had been a breach of para. 10(a) of Code C and the judge's analysis of the provision was unduly restrictive. In any event, even in the absence of a breach of the Code, it was unreasonable not to exclude the interview.

41. Further, Mr Vullo submitted that the judge had placed undue weight on the fact that the defence made the application to exclude late and would not have done so had the appellant attended his trial and given evidence. This was not, he contended, a relevant consideration and should not have been taken into account.

42. In response, Aftab Jafferjee QC, who also appeared for the prosecution before the Common Serjeant, submitted that, for the reasons given by the judge, there was no breach of Code C of PACE. Alternatively, any such breach was not substantial or significant and no unfairness arose by the admission of parts of the significant witness interview of the appellant; exclusion of the evidence was subject to judicial discretion which was properly exercised. He noted that parts of the interview (dealing with subsequent answers in relation to alcohol) were excluded.

43. Mr Jafferjee went on to challenge the proposition that the case depended on the admissions made by the appellant. He pointed to the following evidence available entirely outside what the appellant said in interview.

   i) At the restaurant two bottles of wine each at 13.5% vol were consumed and a light meal ordered. The first bottle of wine was ordered at 18.50 the second at 19.38. The bill was paid at 21.15, that is to say nearly two hours after the second bottle of wine had been ordered.

   ii) The appellant and Ms Brown went by taxi to his houseboat moored at Hammersmith where, in the early hours of 9 December 2015, two wine glasses each containing a small amount of liquid and foil from the top of a champagne bottle were found.

   iii) Ms Brown sent text messages which were retrieved to the effect that she had consumed champagne whilst on the speedboat.

   iv) Expert evidence demonstrated that on the outward journey the boat travelled at speeds of between 26 to 30 knots whereas the speed limit is 12 knots. Footage recovered from the victim's mobile telephone had her making the point that " .... we're going so fast".

   v) Although the evidence that Ms Brown was at the helm on part of the return journey came from accounts given to the police by the appellant, CCTV footage

Case 1:22-cr-00673-LAK   Document 138-11   Filed 05/08/23   Page 12 of 20

Judgment Approved by the court for handing down.                                                    R v Shepherd

          showed that, in that period, the boat slowed. It was estimated to be travelling at between 22 and 29 knots.

    vi)    It was the location and extent of the damage caused to the boat by the tree or log that supported the conclusion that the vessel had hit it at speed.

    vii)    At 00:05, in answer to calls from residents along the Thames, the police arrived. Between 00.05 and 00.14, when the appellant's temperature was first taken, the police recorded that he was "in a very poor state". He repeatedly asked "Is she alright?" and "have you found her?". Con Winter described him as "clearly very drunk, smelling quite heavily of alcohol and slurring his words".

    viii)    In his words, Con Winter "attempted to gather information" from the appellant who was not able to give any "real" answers. He was described as "extremely confused and clearly suffering from shock as well as being drunk making it hard for him to remember details". What he said was not relied upon but his condition was important.

    ix)    To a paramedic, he said that he had been out for a meal, was drinking and thought it a good idea to go out in a boat down the Thames. He was with his "date" (he could not remember her name) and the boat tipped over. He said she wanted to have a go at driving the boat. Throughout the exchange he was very distressed, very cold and garbled. In the meantime, Ms Brown's body was recovered at 00.46 and she was pronounced dead at 01.55.

    x)    It was in that context that Con Winter obtained an account from the appellant during which he spoke of what the two had drunk, explaining that Ms Brown had asked to "drive" and he had allowed her to. She had struck something and they had been catapulted into the water. The appellant's mobile telephone was seized and permission given for the police to enter the houseboat. Con Winter left the hospital and at that time did not believe that any offence was apparent.

    xi)    Against that background, on the afternoon of 9 December 2015, the appellant was interviewed as a significant witness by Det Con Allen and Det Sgt Mullan. The officers did not know that being drunk in charge of a boat on the Thames was an offence and viewed the interview as being necessary to gain an understanding of what had happened.

    xii)    Records revealed that the matter was not viewed as a criminal investigation until 16 December 2015. It was only after a lengthy investigation that, in November 2017, a summons alleging manslaughter was issued.

44.    As to the facts, therefore, Mr Jafferjee submits that, when first speaking to the appellant at the scene and at the hospital the police were doing no more than trying to identify the victim and her family and to ascertain what had happened. The appellant gave an incomplete, incoherent account (upon which reliance was not placed) and the significant witness interview which followed was to obtain information about what the police believed was the accidental death of the victim. It was not an interview to establish whether the appellant had committed bylaw offences, or, indeed, any offence.

Case 1:22-cr-00673-LAK   Document 138-11   Filed 05/08/23   Page 13 of 20

Judgment Approved by the court for handing down. R v Shepherd

45. Although the appellant admitted helming the boat while drunk, that matter was not "the" or even "an" offence under consideration on 8 or 9 December. The police did not know how or what had led to the capsizing of the boat. Further, for the purposes of Code C 10.1 and the Notes for Guidance 10A of PACE, the information which was then available did not provide reasonable or objective grounds to suspect him of any offence, let alone unlawfully killing Ms Brown.

46. Furthermore, the application to exclude the significant witness interview was made because the appellant had absented himself from the trial and was focused solely on the issue of the quantity of alcohol he told the police he had consumed. In determining fairness, the judge was entitled to have regard to the fact that the appellant accepted the accuracy of the content of the interview and would have sought to rely on it had he been present; in that regard, throughout the trial, he was well aware of (and providing instructions in relation to) what was being raised.

47. In the circumstances, Mr Jafferjee argued that the judge was correct to find that there was no breach of the Code and, in any event, in the exercise of his discretion, had specifically excluded specific questions and answers relating to alcohol consumption.

*Discussion*

48. In the context of a case which has generated so much publicity, it is worthwhile repeating the fundamental principles. The provisions of s. 76(2) of PACE require the court, among other circumstances, to exclude evidence of a confession unless it is sure that it has not been obtained "in consequence of anything said or done which was likely, in the circumstances existing at the time, to render unreliable any confession which might be made by him in consequence". Furthermore, s. 78 permits the court to refuse to admit evidence on which the prosecution proposes to rely if it appears to the court:

> "… that having regard to the circumstances, including the circumstances in which the evidence was obtained, the admission of the evidence would have such an adverse effect on the fairness of the proceedings that the court ought not to admit it."

Codes of Practice issued pursuant to s. 66 of PACE are admissible and, if relevant to any question arising in the proceedings, "shall be taken into account in determining that question": see s. 67(11) of PACE.

49. At the relevant time, Code C provided:

> "C:10.1  A person whom there are grounds to suspect of an offence, see *Note 10A*, must be cautioned before any questions about an offence … are put to them if either the suspect's answers or silence … may be given in evidence to a court in a prosecution. A person need not be cautioned if questions are for other necessary purposes, *e.g*....
>
> C:10.2  Whenever a person not under arrest is initially cautioned … that person must at the same time be told they are not under

> arrest and informed of the provisions of para. 3.21 which explain how they may obtain legal advice…"

The examples are not relevant but Note 10A makes it clear:

> "There must be some reasonable, objective grounds for the suspicion based on known facts or information which are relevant to the likelihood the offence has been committed and the person to be questioned committed it."

50. Dealing with interviews, C: 11.1A makes it clear:

> "An interview is the questioning of a person regarding their involvement or suspected involvement in a criminal offence or offences which, under paragraph 10.1 must be carried out under caution. Before a person is interviewed, they and, if they are represented, their solicitor must be given sufficient information to enable them to understand the nature of any such offence, and why they are suspected of committing it … in order to allow for the effective exercise of the rights of the defence."

51. Reference to C:3.21 deals with those who are not arrested but are cautioned making it clear that, if they agree to remain, they may obtain "free and independent legal advice if they want". The Code then goes on to require the interviewer:

> "… must ensure that other provisions of this code and Codes E and F concerning the conduct and recording of interviews of suspects and the rights and entitlements and safeguards for suspects who have been arrested and detained are followed insofar as they can be applied to suspects who are not under arrest."

52. It is worth adding that failure to comply with the Code will not necessarily result in a breach of s. 76 of PACE because it may not render unreliable anything that was said. The real test, however, is to be found in s. 78, namely, whether admission of the evidence would have such an adverse effect on the fairness of the proceedings.

53. The thrust of the legislation is clear: it is to be fair to those who are suspected of committing a criminal offence and to ensure that their rights are respected. It was not suggested (and the judge most certainly did not find) that the officers were acting in bad faith and suspected the appellant of having committed a criminal offence. They were not aware of the byelaw offence or offences and, in the light of the evidence, clearly were not then contemplating unlawful killing of any sort: Note 10A proceeds on the premise that there was, in fact, a suspicion. Their questioning, on that basis, did not fall within C:11.1A which requires questioning in relation to suspected involvement in a criminal offence and it is difficult to see what information could have been provided to enable a legal adviser to understand the nature of any such offence, where none was, in fact, suspected. Save for the impression of the police officer, at that stage, it is even unclear whether there was evidence that he exceeded the limit of alcohol that the byelaw specified. Suffice to say that, in relation to C:3.21, it is clear that the judge concluded

Case 1:22-cr-00673-LAK   Document 138-11   Filed 05/08/23   Page 15 of 20

Judgment Approved by the court for handing down.                                                    R v Shepherd

that the appellant was not, in fact, suspected of having committed a criminal offence not least because they did not know about the byelaw.

54. It is obvious that, in an attempt to escape compliance with the Codes, the police cannot ignore the possibility that a criminal offence (even one punishable with a financial penalty at the behest only of a different authority) but it is equally important that police officers should not be subject to a potential trap if, by careful searching of byelaws, an esoteric offence of which they cannot be expected to be aware can be found. The purpose of the interview, as clearly found by the judge, was not to investigate any suspected criminal offence but to find out what had happened. If, during the course of such an interview, a suspicion of criminality arises, needless to say, the interview must be brought to a close and all the provisions of the Code (both in relation to caution and access to legal advice) observed.

55. It is unnecessary to decide whether the existence of an unknown byelaw offence which could have triggered Code C did, in fact, do so. For our part, in the context of this particular case, although we readily recognise that different facts might produce a different result, we are not prepared to say that the judge was wrong to conclude that it did not: as a matter of fact, the police were not then investigating any suspected criminal offence even if, objectively, they could have been. The result is that the obligation to caution (and, pursuant to C:10.2 obtain legal advice) was not triggered.

56. We do not, however, rest our conclusion on that ground. We have also been prepared to proceed on the basis that there were breaches of the Code and therefore to consider the exercise of discretion pursuant to s. 78 of PACE. Whether or not (as the single judge believed was arguable although we doubt the proposition) the judge proceeded on the basis the appellant was not entitled to legal advice on the basis that he was not detained, we have no doubt that the only proper conclusion to reach was that the evidence of the interview in the redacted form (which included what the appellant said at its start in relation to open questions but omitted most of the material relating to later questions as to the appellant's sobriety) was admissible.

57. We reach that conclusion for the following reasons. First, the judge clearly accepted that, at the time of the interview, the relevant officers did not, in fact, suspect that any offence might have been committed. This was not least because a senior officer in the Marine Unit had made that clear and the question is whether or not they should have been aware of the byelaws of driving a boat while over a specified limit of alcohol or speeding (which, unlike in relation to a motor car, bite on the 'master' of the vessel and not only on the driver). Although at one stage it appeared to be suggested that the officers should then have been considering the offence of manslaughter, this was not pursued and it is equally clear that they were not. In fact, the appellant was not, in fact, suspected of having committed any offence. The Code (dealing with legal advice, disclosure of information and explanation) proceeds on the premise of suspicion and the investigation of one or more offences: it is that which gives rise to the requirement of a caution.

58. Until information is gathered about any incident (save where it is obvious from the circumstances), there is frequently an investigative phase which is simply seeking an understanding of what happened before there is any question of suspicion. Provided that the police always act in good faith (which means justifying the view they have reached), it is obviously in the public interest that investigating officers are able to

Case 1:22-cr-00673-LAK   Document 138-11   Filed 05/08/23   Page 16 of 20

Judgment Approved by the court for handing down. R v Shepherd

pursue that phase; the other side of the coin is that when an investigation generates suspicion that an offence may have been committed, the protection of the Codes become engaged. For the reasons advanced by Mr Jafferjee, we reject the proposition that the prosecution depended on the evidence in the interview: for the reasons he advanced (set out above) it clearly did not.

59. Second, the issue for the judge was whether, if established, breaches of the Code (or, indeed, any other circumstances) were such that the admission of the interview would have such an adverse effect on the fairness of the proceedings that the court ought not to admit it. There is no rule of exclusion if the Code is breached: it is one of the features, albeit important, to be taken into account. In this case, the introduction to the skeleton argument regarding s. 76 and s. 78 of PACE was to exclude the evidence relating to the appellant's account of his alcohol consumption and state of sobriety and nothing else. Indeed, the point was made that the appellant's account (were he to have given evidence) would have been "broadly in line with what he said … in the significant witness interview" albeit with the correction of "certain matters in particular the amount of alcohol he had consumed". The point is also made that the appellant would have benefited from the jury knowing that he had given a full and "reasonably consistent" account at an early stage. Thus, in relation to the general thrust of the defence, it is difficult to see how its admission could have an adverse effect on the fairness of the trial. The expert evidence that Mr Vullo was unable to call as to alcohol consumption was not inadmissible because of what was said by the appellant to the police but because the factual basis for his opinion was derived from instructions given by the appellant who had decided not to attend his trial and establish those facts.

60. Third, Mr Vullo submits that this last point only explains why no application was made earlier and that the appellant's failure to attend his trial is irrelevant. In one sense, that is correct because the judge had to assess the risk of an adverse effect on the fairness of the trial as it was proceeding. On the other hand, the appellant's deliberate decision to abscond (while keeping in touch with his lawyers throughout the trial) could not be used to provide him with an argument that he should be in a better position than he would have been had he been present.

61. Neither counsel referred to the appellant's rights under the ECHR but, for the sake of completeness, we have considered the guidance offered by the Grand Chamber in *Ibrahim v United Kingdom* (2016) 61 EHRR 9. Mr Vullo was aware of the case (having been instructed by one of the appellants) but did not suggest that it advanced his argument. We agree. Mr Ibrahim's success consequent upon the failure to caution him was based on that fact that the decision was deliberate and followed a recognition that he had made incriminating statements which justified caution ([300]); furthermore, the *voir dire* and subsequent scrutiny were compromised by a "striking" unavailability of oral evidence from the officer who authorised the withholding of safeguards ([304]).

62. As to the general principles, there was no suggestion that the relevant safeguards needed to be administered before suspicion arose (see [249] and [296]). Further, the Grand Chamber explicitly rejected the submission that a restriction not justified by compelling reasons automatically results in a violation of Article 6 (at [260]-[262]): the fairness of proceedings as a whole must be taken into account. This is entirely in accord with our approach.

Case 1:22-cr-00673-LAK   Document 138-11   Filed 05/08/23   Page 17 of 20

Judgment Approved by the court for handing down.                                                                R v Shepherd

63. Although the facts are very different to the present case, it is worth underlining that the decision that there was no violation of Article 6 was based, at least in part, on features equally apparent here. First, there was a lengthy *voir dire* (see [282]). Second, it was open to the appellant to give evidence to challenge the admitted evidence at trial ([283]); though the appellant did not do so, it is important that the Grand Chamber considered this factor relevant in respect of Mr Ibrahim even though he elected not to give evidence ([305]). Third, the prosecution could depend on considerable material aside from the impugned statements ([288]-[291]). Finally, the judge summed up the case thoroughly, explaining how the impugned statements came to be made ([292]): similarly, in this case, no criticism is made of the way in which the Common Serjeant directed the jury in this case. Further, when the jury asked about whether parts of the statement had been removed, they were correctly directed that there was often material which was irrelevant which is why the interview had been edited.

64. When granting leave, the single judge made the point that the appellant should not be overoptimistic as to the outcome. That warning was prescient. The appeal against conviction is dismissed.

*Breach of Bail*

65. Although the appellant admitted the offence of failing to surrender to bail, contrary to s. 6 of the Bail Act 1976 (for which he was sentenced to 6 months' imprisonment consecutive to the term passed for manslaughter), Mr Vullo submitted that it had subsequently emerged that the extradition request made to authorities in Georgia (where the appellant was living) did not explicitly request extradition for this offence. Thus, by reason of the rule of specialty, there was no jurisdiction to deal with this offence.

66. The documentation is comparatively clear. On 26 February 2010, the Extradition Section of the Home Office wrote to Givi Bagdavadze, the Head of the International Co-operation Unit at the Office of the Prosecutor General of Georgia seeking extradition in relation to two separate cases which were identified as the offence of Manslaughter (for which he had been convicted) and Wounding or Causing Grievous Bodily Harm with Intent (the other offence for which he had failed to surrender to bail). The accompanying statements make it clear that he had failed to surrender to bail but do not specifically seek extradition for an offence under the Bail Act 1976.

67. Correspondence followed from which it was clear that the specialty rule was not waived. On 27 March, after the appellant had consented to extradition and the order had been made by the court (but before the matter had been put before the Minister), Alison Riley, the Specialist Extradition Prosecutor at the CPS, asked:

> "Does the fact that [the appellant] consented to extradition mean under your law that he has lost his specialty protection? If so, the UK courts will be able to impose separate penalties for the breaches of bail if they so wish. If not, I will have to make sure that everyone understands that he cannot be dealt with by either court for failing to appear."

68. Mr Baghdavadze replied:

Case 1:22-cr-00673-LAK   Document 138-11   Filed 05/08/23   Page 18 of 20

Judgment Approved by the court for handing down.                                                    R v Shepherd

> "As to your question on the specialty rule, the answer is no. …
> Is breach of bail a criminal offence in the UK? We don't have such an offence. If it's not a criminal offence then perhaps you won't need to apply rule of specialty."

69. Ms Riley then explained the problem. She wrote (on the same day):

> "Breach of bail can be a criminal offence in the UK, depending on the circumstances but it is not one which is 'prosecuted' as such where there is a failing to appear, but rather something for which a Judge can of his own motion impose a consecutive sentence. For this reason we do not seek extradition for it specifically, but rather include the facts in the formal extradition request. The 'pool of facts' doctrine allows us to deal with the matter where a person is returned to the UK on everything contained in the formal extradition request. ….
>
> In view of your clear explanation of Georgian law …, do you think specialty applies and we should tell both courts that they may not impose an additional sentence on Shepherd for failings to appear?"

70. That elicited the response:

> "Under Georgian law failure to respect bail obligations may result in confiscating bail deposit and/or judge may apply more severe penalty than s/he would use in a similar crime case where the defendant behaved properly during trial. However, we in no case consider it prosecution for 'failure of complying with bail order' as a separate offence. If this is a similar case as yours then from our perspective rule of specialty is inapplicable."

71. It is common ground that the prosecution did not include an allegation of a Bail Act offence and although s. 151A(3)(b) of the Extradition Act 2003 as amended by s. 76(3) of the Policing and Crime Act 2009 and the Anti-Social Behaviour, Crime and Policing Act 2014 ("the 2003 Act") also allows a court to deal with offences "disclosed by the information provided" to the requested state, it is clear that the absence of any reference at all is insufficient (see *R v Seddon* [2009] 2 Cr App R 9 at [21] followed in *R v Dey* [2010] EWCA Crim 1190 by concession and *R v Birch* [2015] EWCA Crim 2289). Thus, it is equally common ground that the only route by which the Bail Act conviction can stand is by the operation of s. 151A(3)(c) of the 2003 Act which also includes "an offence in respect of which consent to the person being dealt with is given on behalf of the territory".

72. Mr Hardy made it clear that it should not be thought that the failure to seek extradition for the Bail Act offence was an oversight. The problem arises because in those cases in which bail is granted by the court, CPD 14C.4 makes it clear that it is more appropriate that the court should initiate the proceedings by its own motion and CPD 14C.7 provides that proceedings under s. 6 of the Bail Act 1976 may be conducted either as a summary offence or a criminal contempt of court. The decision to prosecute is thus made after arrest and not at the time of the failure to attend whereas Article 1 of

Case 1:22-cr-00673-LAK   Document 138-11   Filed 05/08/23   Page 19 of 20

Judgment Approved by the court for handing down.                                      R v Shepherd

       the European Convention on Extradition requires surrender of 'all persons against whom the competent authorities …. are proceeding for an offence'.

73. For our part, we acknowledge the difficulty which the circumstances surrounding failure to attend will generate in requests for extradition and, furthermore, that there is no failsafe, or necessarily easy, answer.  It may be, however, that states from whom extradition is sought will recognise that breach of bail (which, in Georgia, appears to be an aggravating factor in relation to sentence) is a separate matter in the UK. With an explanation of the way in which breach will be considered by the court and on the basis that punishing those who fail to answer bail is a necessary component of an effective criminal justice system which releases most of those charged with crime rather than requiring their detention in custody, it may well be that s. 151A(3)(c) of the 2003 Act provides a potential answer.  Thus, in every case the consent of the state from which extradition is sought should unequivocally be requested with an explanation of why this is necessary. If, in those circumstances, criminal proceedings have to be commenced (rather than proceedings by way of contempt of court), it should not be impracticable to start such proceedings at the time that extradition is sought.

74. Reverting to this case, the question can be posed in simple terms.  Did the Republic of Georgia consent to the appellant being dealt with for an offence under the Bail Act? Mr Hardy argued that inferential consent can be spelt out of the exchange of correspondence which we have set out above.  Mr Vullo did not accept that Mr Bagdavadze, although Head of the International Co-operation Unit at the Office of the Prosecutor General of Georgia, was proved to have the authority to consent.  In any event, he submitted that a proper construction of the correspondence revealed neither request for consent nor the provision of consent.

75.  In our judgment, the correspondence reveals an exchange of information about the different approaches to breach of bail, particularly in the context of specialty.  At no stage does Ms Riley formally request consent to pursue the appellant for his breach of bail and nothing in Mr Bagdavadze's response (even assuming that he has the necessary authority to consent) can be taken as consent on behalf of the Republic of Georgia.  In those circumstances, there was no basis in the extradition from Georgia to pursue the appellant for his breach of bail and the proceedings against him are a nullity.  His appeal in relation to this aspect of the case, therefore, succeeds.

76. It is important to underline the consequence of this finding.  It is beyond argument (and is not in issue) that the appellant failed to answer to his bail both in relation to the allegation of Manslaughter (which he admitted) and in respect of the proceedings for Wounding with Intent. This conviction and sentence is quashed as a nullity but it does not necessarily mean that the appellant is free of liability for his failure to attend.  By s. 151A(2) of the 2003 Act, he may be dealt with in the UK for an offence committed before his extradition not only in the circumstances set out in s. 151A(3) discussed above but also if the condition in s. 151A(4) is satisfied namely if he has returned to the territory from which he was extradited or he has been given an opportunity to leave the United Kingdom.  That will probably mean waiting not only for the conclusion of the sentence but also the termination of any licence period (if a term of his licence is that he must not leave the UK).  Whether the appellant may then arguably be pursued for this egregious breach of the provisions of the Bail Act is a matter for the authorities.  The alternative (if there is a specialty bail offence in the requested jurisdiction) is to

**Judgment Approved by the court for handing down.** R v Shepherd

commence criminal proceedings for breach of bail and include that offence in the warrant.

*Conclusion*

77. The appeal against conviction for manslaughter is dismissed. The challenge to the conviction for breach of the Bail Act 1976 is allowed: that conviction is a nullity. Whether the appellant is further pursued for the breach is a matter for the authorities in due course.