UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x
                                         :

UNITED STATES OF AMERICA         :

                                      :            S5 22 Cr. 673 (LAK)

        v.                         :

                                      :

SAMUEL BANKMAN-FRIED,        :

                                      :

                Defendant.     :
--------------------------------------------------------X

 

**MEMORANDUM OF LAW IN SUPPORT OF SAMUEL BANKMAN-FRIED'S
MOTION TO DISMISS COUNTS 7 THROUGH 9 AND 1 THROUGH 2 OF THE
S5 INDICTMENT FOR FAILURE TO ALLEGE A VALID PROPERTY RIGHT**

<u>**PRETRIAL MOTION NO. 2**</u>

Mark S. Cohen
Christian R. Everdell
S. Gale Dick
Sri K. Kuehnlenz
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, NY  10022
(212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
skuehnlenz@cohengresser.com

*Attorneys for Samuel Bankman-Fried*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

I.    COUNT 9 MUST BE DISMISSED BECAUSE IT IS PREMISED ON AN
      INVALID "RIGHT TO CONTROL" THEORY OF PROPERTY FRAUD .................... 3

      A.    Legal Standard ................................................................................................. 3

      B.    The "Right to Control" Theory ........................................................................ 3

      C.    Count 9 Alleges that Bank-1 Was Deprived of the "Right to Control"
            Access to Its Bank Accounts ........................................................................... 5

      D.    The "Right to Control" Theory, as Currently Articulated, Will Not Survive
            the Supreme Court's Decision in *Ciminelli*. ................................................. 6

      E.    Count 9 Must Be Dismissed in Light of the Government's Confession of
            Error in *Ciminelli*. ......................................................................................... 9

II.   COUNTS 7 AND 8 DO NOT ALLEGE A PROPERTY INTEREST THAT CAN
      SUPPORT WIRE FRAUD AGAINST ALAMEDA'S LENDERS ............................. 11

III.  COUNTS 1 AND 2 DO NOT ALLEGE A PROPERTY INTEREST THAT CAN
      SUPPORT WIRE FRAUD AGAINST FTX CUSTOMERS ........................................ 14

CONCLUSION ................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cleveland v. United States*,
    531 U.S. 12, 121 S. Ct. 365 (2000) ........................................................................15

*Katz v. Oak Indus. Inc.*,
    508 A.2d 873 (Del. Ch. 1986) ........................................................................12, 13

*Kelly v. United States*,
    --- U.S. ---, 140 S. Ct. 1565 (2020) ....................................................3, 13, 15, 16, 17

*McNally v. United States*,
    483 U.S. 350, 107 S. Ct. 2875 (1987) ..............................................................14, 15

*Natl. Westminster Bank USA v. Ross*,
    676 F. Supp. 48 (S.D.N.Y. 1987) ........................................................................13

*Neder v. United States*,
    527 U.S. 1, 119 S. Ct. 1827 (1999) ........................................................................4

*Pasquantino v. United States*,
    544 U.S. 349, 125 S. Ct. 1766 (2005) ......................................................................4

*Skilling v. United States*,
    561 U.S. 358, 130 S. Ct. 2896 (2010) ....................................................................15

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012) ..................................................................................3

*United States v. Berroa*,
    856 F.3d 141 (1st Cir. 2017) ................................................................................4

*United States v. Benjamin*,
    No. 21-CR-706 (JPO), 2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022) ......................3

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015) ................................................................................11

*United States v. Blaszczak*,
    56 F.4th 230 (2d Cir. 2022) ......................................................................13, 16, 17

*United States v. Calderon*,
    944 F.3d 72 (2d Cir. 2019) ..............................................................................4, 5

*United States v. Carlo*,
    507 F.3d 799 (2d Cir. 2007)....................................................................5

*United States v. Connolly*,
    24 F.4th 821 (2d Cir. 2022) ...........................................................13, 17

*United States v. Finazzo*,
    850 F.3d 94 (2d Cir. 2017)................................................................5, 9

*United States v. Miller*,
    953 F.3d 1095 (9th Cir. 2020) ..............................................................15

*United States v. Percoco*,
    13 F.4th 158 (2d Cir. 2021) ...................................................................6

*United States v. Taveras*,
    504 F. Supp. 3d 272 (S.D.N.Y. 2020)...................................................3

**Statutes and Rules**

18 U.S.C. § 1344...................................................................................4, 5

18 U.S.C. § 1346.....................................................................................15

Fed. R. Crim. P. 12(b)(3) ......................................................................1, 3

**Other Authorities**

Br. for Pet'r, *Ciminelli v. United States*,
    No. 21-1170, 2022 WL 3999796 (U.S. Aug. 29, 2022) ...................6, 7, 8

Br. for Resp., *Ciminelli v. United States*,
    No. 21-1170, 2022 WL 10224977 (U.S. Oct. 12, 2022) .................. *passim*

Br. for Resps. Aiello & Gerardi Supporting Pet'r, *Ciminelli v. United States*,
    No. 21-1170, 2022 WL 3999795 (U.S. Aug. 29, 2022) ..........................8

Tr. of Oral Argument, *Ciminelli v. United States*,
    No. 21-1170, 2022 WL 18033699 (U.S. Nov. 28, 2022) .................7, 8, 9

Defendant Samuel Bankman-Fried respectfully submits this memorandum of law in support of his motion to dismiss Counts 7 through 9 and 1 through 2 of the Superseding Indictment, Mar. 28, 2023, ECF No. 115 ("S5 Indictment") for failure to state an offense pursuant to Federal Rule of Criminal Procedure 12(b)(3).

## PRELIMINARY STATEMENT

The Court should dismiss the bank fraud conspiracy charged in Count 9 of the S5 Indictment and the wire fraud offenses charged in Counts 7 and 8 and Counts 1 and 2 of the S5 Indictment because they are premised on an invalid property right or do not allege a valid property interest that can form the basis for an offense under the bank fraud and wire fraud statutes.

The bank fraud conspiracy charged in Count 9 is premised on the "right to control" theory of property fraud which the Solicitor General recently conceded is invalid in *Ciminelli v. United States*, No. 21-1170, a case currently pending before the Supreme Court.  The S5 Indictment alleges that Mr. Bankman-Fried and his co-conspirators gave false information to "Bank-1" to open a bank account in the name of an entity called North Dimension to receive FTX customer deposits.  S5 Indictment ¶¶ 18-21, 86-87.  As such, the S5 Indictment does not allege that "Bank-1" was deprived of any "moneys, funds, credits, assets, securities," or any other traditional common law property interests that would qualify as "property" under the bank fraud statute.  *Id*.  Instead, it alleges that Bank-1 was deprived of the "right to control" access to its bank accounts.  In *Ciminelli*, the Solicitor General expressly conceded that the Second Circuit's "right to control" theory of property fraud is invalid except for a narrow band of cases involving actual or intended "tangible economic harm" to the victim.  Nowhere does the S5 Indictment allege that Bank-1 either suffered or could have suffered "tangible economic

harm" as a result of opening the North Dimension bank account—just that Bank-1 was deprived of the opportunity to conduct "enhanced due diligence" and executive committee review before opening the account. S5 Indictment ¶ 20. Hence, even if the government's more limited formulation of the "right to control" theory survives the Supreme Court's decision in *Ciminelli* (which seems very much in doubt), it cannot support the bank fraud conspiracy charged in the S5 Indictment. Count 9 must therefore be dismissed.

Similarly, the S5 Indictment does not allege any property right that would form the basis for the wire fraud and wire fraud conspiracy offenses related to Alameda's lenders charged in Counts 7 and 8. Counts 7 and 8 allege that Mr. Bankman-Fried engaged in a scheme to defraud Alameda's lenders by providing them false and misleading information regarding Alameda's financial condition. S5 Indictment ¶¶ 32-36, 81-84. But the S5 Indictment does not allege what "property" Mr. Bankman-Fried obtained from the lenders by providing this allegedly false information. Indeed, it does not identify any loan agreement at all, or any contract term that was violated. At most, it alleges that the lenders were deprived of accurate information about the state of Alameda's finances, which articulates a pure "right to control" theory of property now invalidated by the government's confession of error in *Ciminelli*. Accordingly, Counts 7 and 8 must also be dismissed.

For the same reasons, the S5 Indictment does not allege a valid property right underpinning the wire fraud offenses related to FTX customers charged Counts 1 and 2. The Government's core claim against Mr. Bankman-Fried as to Counts 1 and 2 is that he misused FTX customer funds by providing improper loans to Alameda. *See* S5 Indictment ¶ 3. Even if the loans to Alameda were improper as the Government alleges, the S5 Indictment still does not allege a property interest that was taken from FTX customers that meets the definition of

"property" under the wire fraud statute.  Rather, the S5 Indictment alleges intangible losses, which do not qualify as "property" under current Supreme Court and Second Circuit guidance. Accordingly, Counts 1 and 2 must be dismissed.

## I.  COUNT 9 MUST BE DISMISSED BECAUSE IT IS PREMISED ON AN INVALID "RIGHT TO CONTROL" THEORY OF PROPERTY FRAUD

### A.  Legal Standard

Pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, a defendant may move to dismiss an indictment for "failure to state an offense," Fed. R. Crim. P. 12(b)(3)(B)(v), that is, for failure to "allege a crime within the terms of the applicable statute."  *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012); *see United States v. Taveras*, 504 F. Supp. 3d 272, 277-78 (S.D.N.Y. 2020) ("[A] charge in an indictment is insufficient and must be dismissed when it does not describe conduct that is a violation of the criminal statute charged.") (citation omitted).  In deciding whether the government has failed to allege a crime, the court may consider, "whether the facts, as alleged on the face of the indictment, satisfy the statutory definition of a crime."  *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 WL 17417038, at *16 (S.D.N.Y. Dec. 5, 2022).

### B.  The "Right to Control" Theory

To prove an offense under the federal property fraud statutes, including wire fraud and bank fraud, the Government must show "not only that [the defendant] engaged in deception, but that an object of the fraud was property."  *Kelly v. United States*, --- U.S. ---, 140 S. Ct. 1565, 1571 (2020) (cleaned up, citing *Cleveland v. United States*, 531 U.S. 12, 26, 121 S. Ct. 365, 374 (2000)).  The wire fraud statute thus prohibits only deceptive "schemes to deprive [the victim of] money or property."  *Id.* (quoting *McNally v. United States*, 483 U.S. 350, 358, 107 S. Ct. 2875, 2880 (1987)).  Similarly, the bank fraud statute prohibits deceptive schemes to deprive a

3

financial institution of "moneys, funds, credits, assets, securities, or other property." 18 U.S.C.

§ 1344(2). For both statutes, the Government must show that the defendant "had an intent to

deprive the victim of money or property." *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir.

2019). The bank fraud statute was modeled after the mail and wire fraud statutes, and it is well

established that courts should uniformly construe terms that are common among these fraud

statutes—such as "property." *See Neder v. United States*, 527 U.S. 1, 20-21, 119 S. Ct. 1827,

1839 (1999) (construing identical language in the mail, wire and bank fraud statutes *in pari*

*materia*); *accord Calderon*, 944 F.3d at 88 (holding that "for the purposes of satisfying the

elements of mail, wire, or bank fraud, a victim can be deprived of 'property'" in the same

manner); *United States v. Berroa*, 856 F.3d 141, 150 (1st Cir. 2017) (rejecting argument that

common element of bank and mail fraud statutes should be interpreted differently and

characterizing it as a "distinction without a difference").

　　　In determining what constitutes "property" under the federal fraud statutes, courts are

limited by the boundaries of traditional common law property rights as they were understood at

the time of the enactment of the statues. *See Neder*, 527 U.S. at 21, 119 S. Ct. 1827, at 1840 ("It

is a well-established rule of construction that where Congress uses terms that have accumulated

settled meaning under . . . the common law, a court must infer, unless the statute otherwise

dictates, that Congress means to incorporate the established meaning of these terms.") (cleaned

up); *Pasquantino v. United States*, 544 U.S. 349, 359-61, 125 S. Ct. 1766, 1773-75 (2005)

(examining the state of the common law as of the year of the passage of the wire fraud statute to

determine whether a foreign government's right to collect tax revenue qualified as "property"

under that statute).

The Second Circuit, however, has broadened the definition of the term "property" in the mail, wire, and bank fraud statutes to include intangible property interests such as "the right to control the use of one's assets." *Calderon*, 944 F.3d at 88 (bank fraud); *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017) (mail and wire fraud).  Under this "right to control" theory, an individual commits fraud when he or she deprives an individual or entity of "potentially valuable economic information it would consider valuable in deciding how to use its assets." *See Finazzo*, 850 F.3d at 111; *accord United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007) (finding the definition of "property" includes the "information necessary to make discretionary economic decisions") (citation omitted).

### C.    Count 9 Alleges that Bank-1 Was Deprived of the "Right to Control" Access to Its Bank Accounts.

The bank fraud conspiracy in Count 9 is premised on such a "right to control" theory. The S5 Indictment alleges that Mr. Bankman-Fried and his co-conspirators gave false information to "Bank-1" to open a bank account in the name of an entity called North Dimension to receive FTX customer deposits.  S5 Indictment ¶¶ 18-20, 86-87.  The S5 Indictment further alleges that "Bank-1" had previously refused to open an account for FTX for that purpose and by being misled that the North Dimension account would perform the same function for FTX, "Bank-1" was deprived of the opportunity to conduct "enhanced due diligence" and perform a review of the account application by Bank-1's executive committee.  S5 Indictment ¶¶ 18-20.

To prove bank fraud as charged in Count 9, the Government must establish that Mr. Bankman-Fried and his co-conspirators obtained the "property" of Bank-1 by means of false or fraudulent pretenses, representations, or promises.  S5 Indictment ¶ 87; 18 U.S.C. § 1344(2). The S5 Indictment does not allege that Bank-1 was deprived of any "moneys, funds, credits, assets, securities," or any other traditional common law property interests.  *Id*.  Instead, it alleges

5

that Bank-1 was misled about the true purpose of the North Dimension bank account and was

therefore deprived of complete and accurate information bearing on its decision to open the

account.  S5 Indictment ¶ 20.  In other words, the only purported property interest Bank-1 was

allegedly deprived of was the "right to control" access to its bank accounts.  That theory of

property fraud has been expressly abandoned by the Solicitor General in *Ciminelli v. United*

*States*, No. 21-1170, a case now pending before the Supreme Court.

> **D.      The "Right to Control" Theory, as Currently Articulated, Will Not Survive
> the Supreme Court's Decision in *Ciminelli*.**

In November 2022, the Supreme Court heard oral argument in *Ciminelli v. United States*,

No. 21-1170.  *Ciminelli* is the appeal from the Second Circuit's decision in *United States v.*

*Percoco*, 13 F.4th 158 (2d Cir. 2021), in which the Circuit affirmed the convictions of several

defendants for wire fraud conspiracy for their role in a bid rigging scheme to obtain New York

State-funded building projects by tailoring the bidding process so that, among other things, Mr.

Ciminelli's business would be selected as a preferred developer.  *Percoco*, 13 F.4th at 163-64.

At the Second Circuit, the defendants challenged their convictions on the grounds that the rigged

bidding process only afforded them the opportunity to negotiate with the company awarding the

building projects and did not cause any economic harm to the victim because no other company

offered "lower prices, better quality, or better value."  *Id*. at 171.  The defendants further argued

that the "right to control" theory of wire fraud upon which their convictions were based was

invalid because "the right to control one's own assets is not 'property' within the meaning of the

wire fraud statute."  *Id*. at 164 n.2.

At the Supreme Court, the Petitioner in *Ciminelli* raised the following question presented:

> Whether the Second Circuit's "right to control" theory of fraud—
> which treats the deprivation of complete and accurate information
> bearing on a person's economic decision as a species of property

> fraud—states a valid basis for liability under the federal wire fraud
> statute, 18 U.S.C. § 1343.

*See* Br. for Pet'r at i, *Ciminelli v. United States*, No. 21-1170 (U.S. Aug. 29, 2022), *available at*

2022 WL 3999796 ("Pet'r Br.").  In its opposition brief and at oral argument, the government

conceded that the "right to control" theory, as currently articulated by the Second Circuit, is

invalid and should not be followed.  *See, e.g.*, Br. for Resp. at 24, *Ciminelli v. United States*,

No. 21-1170 (U.S. Oct. 12, 2022), *available at* 2022 WL 10224977  ("Resp. Br.") ("[T]o the

extent that language in the [Second Circuit's] opinions might suggest that depriving a victim of

economically valuable information, without more, necessarily qualifies as 'obtaining money or

property' within the meaning of the fraud statutes, that is incorrect."); Tr. of Oral Argument

at 33, *Ciminelli v. United States*, No. 21-1170 (U.S. Nov. 28, 2022), *available at* 2022 WL

18033699 ("Tr.") ("[W]e would be fine with the Court explaining that that's not the right way

for the Second Circuit to be going about thinking about these cases."); *id*. at 34 (the Second

Circuit's "fundamental conceptual mistake" in articulating the right to control theory was

"gerrymander[ing] the definition of property beyond something that Congress would have

understood").

The Justices comments at oral argument concerning the "right to control" theory were to

the same effect.  *See, e.g.*, Tr. at 6-7 (JUSTICE KAGAN: "Didn't we basically take this case to

decide was there a scheme to obtain property here?  Well, no, there wasn't, because the

government thought about it as the right to control . . . ."); *id.* at 39-40 (MR. FEIGIN: "[T]he

right to control assets . . . isn't itself something that Congress would have conceived of as

property and can be prone potentially to abuses."); *id.* at 40 (JUSTICE GORSUCH: "I think

we're all . . . in radical agreement about that.").

As Petitioner in *Ciminelli* explained, the "right to control" theory erroneously disposes of a common law element of fraud—the proof of intended harm to a recognized property interest—because the withholding of information alone does not constitute a deprivation of property. *See generally* Pet'r Br. at 9-49; Br. for Resps. Aiello & Gerardi in Supp. of Pet'r at 30-40, *Ciminelli v. United States*, No. 21-1170 (U.S. Aug. 29, 2022), *available at* 2022 WL 3999795 ("Aiello Br."). The right to control theory is further undermined by the structure of the mail, wire, and bank fraud statutes and multiple canons of statutory construction, which require narrow construction of the term "property" to avoid criminalizing ordinary transactional conduct that Congress did not intend to criminalize through a property fraud statute. *See id.* Similarly, a defendant does not "obtain" property from a victim—as required by the text of the bank fraud and other property fraud statutes—when the defendant deprives another of "potentially valuable economic information" because the defendant does not acquire a transferable property interest. *See generally* Aiello Br. at 14–30.

Conceding the invalidity of the "right to control" theory as currently formulated by the Second Circuit, the government instead argued that a subset of "right to control" cases involving actual or intended "tangible economic harm" to the victim are salvageable on an alternate theory—one in which the defendant obtains property by fraudulently inducing the victim to enter into a contract or transaction. *See* Resp. Br. at 23-24, 26-31; Tr. at 31 ("right to control" theory should survive in fraudulent inducement cases "where the victim is tricked into paying for something fundamentally different from what he bargained for"). In such circumstances, the case may still "satisfy the traditional elements of property fraud." *See id.* at 12-13. But even the government conceded that preserving the "right to control" theory with the "tangible economic harm" requirement "might still go too far," Tr. at 37, while the Justices expressed at argument

that they "took the case to resolve the right-to-control issue and not this other theory that you're attempting to develop about fraudulent inducement." *Id.* at 38 (Gorsuch, J.).

Even if this tenuous variant of the "right to control" theory survives the Supreme Court's decision in *Ciminelli*, the Second Circuit has suggested that "tangible economic harm" is present only in certain circumstances, like when the defendant's misrepresentation caused the victim to incur a loss by paying higher prices for goods than it would have otherwise paid.  *See Finazzo*, 850 F.3d at 111 n.18.  However, if defendant's misrepresentation caused the victim reputational harm—for example, if a defendant misrepresents itself as an ethical supplier of goods but it later is publicly revealed to employ child labor—there is "tangible economic harm" only if the government shows that the reputational harm "could lead or did lead to economic losses." *See id.*  By contrast, no "tangible economic harm" is involved, for example, if a defendant-supplier conceals its identity to avoid an informal embargo from the victim based solely on the victim's personal dislike for the defendant—in such a circumstance, the defendant merely interfered with the victim's right to make decisions around how to use its assets, which does not establish harm to a traditional property interest.  *See id.*

Hence, even if the Second Circuit's "right to control" theory survives *Ciminelli* (and there is a good chance that it will not), the theory will, at most, be limited to the government's narrow formulation, which requires a showing of "tangible economic harm" to the victim.

### E.    Count 9 Must Be Dismissed in Light of the Government's Confession of Error in *Ciminelli*.

Count 9 must be dismissed in light of the Solicitor General's confession of error in *Ciminelli*, regardless of the outcome in that case.  If the Supreme Court invalidates the Second Circuit's "right to control" theory entirely, as several justices suggested they were prepared to do, there is little question that Count 9 must be dismissed because it is premised on Bank-1's

"right to control" access to its bank accounts.  The S5 Indictment alleges that Mr. Bankman-Fried and others concealed North Dimension's relationship with Alameda and made false representations on the account application and due diligence questionnaire for the North Dimension bank account that hid the true purpose of the account.  *See* S5 Indictment ¶¶ 18-19. This allegedly deprived Bank-1 of potentially valuable economic information by causing Bank-1 to open the North Dimension account without performing "enhanced due diligence" or seeking "review by Bank-1's executive committee, as would have been required had the true purposes of North Dimension's account been disclosed to Bank-1."  *Id.* ¶ 20.  This theory of fraud falls squarely within the broad formulation of the "right to control" theory that the government abandoned in *Ciminelli* because it does not (i) allege intended harm to a recognized property interest or (ii) fall within the scope of conduct Congress intended to criminalize when it premised the bank fraud statute on a defendant's procurement of bank "property."

Even if the Supreme Court endorses the Solicitor General's narrower formulation of the "right to control," the S5 Indictment does not allege a violation under this version of the theory. At most, the S5 Indictment alleges that Bank-1 would not have opened an account for North Dimension had it known the truth about North Dimension's connection to Alameda and the purpose for which the account would be used.  In other words, the S5 Indictment alleges that the misleading statements on the account application and the due diligence questionnaire caused Bank-1 to "enter into a transaction it would otherwise have avoided."  That is insufficient to support a conviction under the government's revised formulation of the "right to control."  Resp. Br. at 26-27 (citing *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015)).

Missing from the S5 Indictment are any allegations concerning the "tangible economic harm" that Bank-1 suffered or could have suffered as a result of opening the bank account for

North Dimension.  Bank-1 is not alleged to have suffered a direct economic loss (*e.g.*, accepting a higher contract price than it would have otherwise paid) as a result of the alleged misrepresentations.  To the contrary, Bank-1 almost certainly *profited* from opening the account by taking fees and other amounts from North Dimension that are customary for banks to charge account holders.  Without such allegations of "tangible economic harm," which are necessary to support a conviction under the narrow subset of "right to control" cases that the Solicitor General believes are still good law, the charge must fail.  *See* Resp. Br. at 27-29 (quoting *Finazzo*, 850 F.3d at 111).

For the reasons set forth above, the bank fraud conspiracy, as charged in Count 9 of the S5 Indictment, is based on an invalid theory of fraud and must be dismissed.[1]

## II.  COUNTS 7 AND 8 DO NOT ALLEGE A PROPERTY INTEREST THAT CAN SUPPORT WIRE FRAUD AGAINST ALAMEDA'S LENDERS

The wire fraud offenses charged in Counts 7 and 8 must also be dismissed because the allegations in the S5 Indictment do not identify a property interest that can form the basis for a wire fraud offense against Alameda's lenders.  The "essential elements" of wire fraud, which the Government must prove at trial, are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the . . . wires to further the scheme."  *Binday*, 804 F.3d at 569 (citation omitted).  Counts 7 and 8 allege that Mr. Bankman-Fried provided "false and misleading information" to Alameda's lenders "regarding Alameda's financial condition" and thereby deprived the lenders of "money and property."  S5 Indictment ¶¶ 82, 84.  But the S5 Indictment does not identify what "property" Mr. Bankman-Fried obtained from Alameda's lenders with this allegedly false information.  At most, the S5 Indictment alleges that the lenders

---

[1] It is very likely that the Supreme Court will issue its decision in *Ciminelli* before the conclusion of the briefing schedule on June 12.  At the very least, the decision will issue before the Court's term ends on June 30.  In the event the defense is unable to incorporate discussion of the Court's decision in *Ciminelli* because of the timing of the decision, we respectfully request the opportunity to submit additional briefing.

were deprived of accurate information about the health of Alameda's finances, which might bear on their ability to make informed decisions about their loans to Alameda.  S5 Indictment ¶ 36. That is not sufficient to support charges for wire fraud and wire fraud conspiracy even under the Solicitor General's more limited formulation of the "right to control" theory proposed in *Ciminelli*.

The factual allegations relating to the wire fraud offenses charged in Counts 7 and 8 are contained in paragraphs 32 through 36 of the S5 Indictment.  S5 Indictment ¶¶ 32-36.  It is evident from that section of the S5 Indictment that the Government is not alleging a fraudulent inducement theory.  That is, the Government is not alleging that Mr. Bankman-Fried provided false and misleading information to Alameda's lenders to induce them to enter into loan agreements with Alameda in the first place.  Rather, the S5 Indictment alleges that at some point between June 2022 and November 2022, *after* the lenders had already paid the loan proceeds to Alameda, at a time when the cryptocurrency markets were experiencing a downturn, Mr. Bankman-Fried allegedly directed his co-conspirator, Caroline Ellison, to provide false and misleading financial statements to the lenders that misrepresented Alameda's financial position with respect to FTX.  S5 Indictment ¶ 36.

The S5 Indictment stops there, however, and does not identify any property Mr. Bankman-Fried sought to obtain from the lenders by means of the allegedly false financial statements.  Despite alleging fraud in connection with lenders, the S5 Indictment alleges nothing that would indicate which loans are at issue, any terms that may govern those loans or may have been violated, or any amounts owed on those loans that were not repaid.  Whatever property interests Alameda's lenders had with respect to the loans would have been set forth in the terms of the loan agreements themselves.  *See, e.g.*, *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 879 (Del.

Ch. 1986) ("The terms of the contractual relationship agreed to and not broad concepts such as fairness define the corporation's obligation to its bondholders."); *Natl. Westminster Bank USA v. Ross*, 676 F. Supp. 48, 51 (S.D.N.Y. 1987) ("The relationship between a guarantor and a lender is contractual in nature and defined by the contract of guarantee.") (citation omitted).  Yet the S5 Indictment does not cite to a single loan agreement, or describe the contents of any loan agreement, or allege any contractual right belonging to the lenders that would qualify as "property" under the wire fraud statute.[2]

Instead, the S5 Indictment alleges only that Mr. Bankman-Fried and Ms. Ellison misled Alameda's lenders with false financial statements.  S5 Indictment ¶ 36.  The S5 Indictment alleges nothing as to how (if at all) any loan agreements were violated by an alleged misrepresentation designed to deprive Alameda of money or property.  And simply making a false statement, by itself, does not constitute wire fraud unless it is made for the purpose of obtaining money or property from the victim of the fraud.  *See Kelly*, -- U.S. at --, 140 S. Ct. at 1571 (to prove wire fraud, the government must show "not only that [the defendant] engaged in deception, but that an object of the fraud was property" (cleaned up)); *see also id*. (the federal fraud statutes are "limited in scope to the protection of property rights" and do not "criminaliz[e] all acts of dishonesty"); *accord United States v. Blaszczak*, 56 F.4th 230, 242-43 (2d Cir. 2022) (citing *Kelly*, 140 S. Ct. at 1571-1572); *United States v. Connolly*, 24 F.4th 821, 834 (2d Cir. 2022) ("[The] federal fraud statutes are not catch-all laws designed to punish all acts of wrongdoing or dishonorable practices.").

Read together, the allegations in the S5 Indictment allege, at most, that Alameda's lenders were deprived of accurate information about the financial health of Alameda that would

---

[2] The defense asked the Government for a Bill of Particulars related to Counts 7 and 8 to understand the Government's theory of prosecution.  The Government refused.  We reiterate our request in the Motion for a Bill of Particulars and Pretrial Disclosures.

allow them to properly evaluate whatever rights they may have had under the loan agreements. That is exactly the sort of intangible right that the government abandoned in *Ciminelli* as a basis to support a wire fraud charge. *See* Resp. Br. at 25-26 ("If . . . the right to make informed decisions about the disposition of one's assets, without more, were treated as the sort of 'property' giving rise to wire fraud, it would risk expanding the federal fraud statutes beyond property fraud as defined at common law and as Congress would have understood it."). Accordingly, the Government has not alleged a theory of fraud on Alameda's lenders that is cognizable under the wire fraud statute. Counts 7 and 8 must therefore be dismissed.

## III.   COUNTS 1 AND 2 DO NOT ALLEGE A PROPERTY INTEREST THAT CAN SUPPORT WIRE FRAUD AGAINST FTX CUSTOMERS

The wire fraud offenses charged in Counts 1 and 2 must also be dismissed because the allegations in the S5 Indictment do not identify a property interest that can form the basis for a wire fraud offense against FTX's customers. Piercing through the hyperbolic language in the S5 Indictment, the Government's core claim against Mr. Bankman-Fried as to Counts 1 and 2 is that he misused FTX customer funds by providing improper loans to Alameda. *See* S5 Indictment ¶ 3 ("Contrary to [Mr. Bankman-Fried's] promises to FTX customers that the exchange would protect their interests and segregate their assets, [Mr. Bankman-Fried] routinely tapped FTX customer assets to provide interest-free capital for his and Alameda's private expenditures, and in the process exposed FTX customers to massive, undisclosed risk.").

Even if we assume for the purposes of this motion that there were improper loans to Alameda as the Government alleges, the S5 Indictment still does not allege a property interest that was taken from FTX customers that meets the definition of "property" under the wire fraud statute. Fraud under the wire fraud statute requires a scheme to cause economic loss to the victim. *See McNally v. United States*, 483 U.S. 350, 358, 107 S. Ct. 2875, 2881 (1987) (mail

fraud requires the depriving the victim of "something of value"); *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020) (wire fraud requires a scheme "to cheat someone out of something valuable").  Instead, the S5 Indictment alleges a hodgepodge of different intangible losses—from the right to honest services, to the loss of control of assets, to the deprivation of valuable information—none of which pass muster under current Supreme Court and Second Circuit guidance.  Accordingly, Counts 1 and 2 must be dismissed.

Since the Supreme Court's decision in *McNally*, the Court has repeatedly struck down or significantly curtailed the Government's attempts to broaden the definition of "property" under the federal fraud statutes to intangible rights that lie outside the boundaries of traditional common law property rights.  In *McNally*, the Supreme Court declined to construe the federal property fraud statues to "proscribe[] schemes to defraud citizens of their intangible rights to honest and impartial government," holding instead that the fraud statues were "limited in scope to the protection of property rights."  *McNally*, 483 U.S. at 355, 360, 107 S. Ct. at 2879, 2882. When Congress subsequently passed the honest services fraud statute barring fraudulent schemes "to deprive another of the intangible right of honest services," 18 U.S.C. § 1346, the Supreme Court again stepped in and limited the reach of Section 1346 to schemes involving only bribes or kickbacks.  *Skilling v. United States*, 561 U.S. 358, 405, 130 S. Ct. 2896, 2929 (2010).  The Supreme Court again limited the scope of the fraud statutes in *Cleveland v. United States*, 531 U.S. 12, 121 S. Ct. 365 (2000), holding that a state's regulatory "right to control the issuance, renewal, and revocation of video poker licenses" does not qualify as "property" under the mail fraud statute.  *See Cleveland,* 531 U.S. at 23, 121 S. Ct. at 372.  And most recently in *Kelly*, in which the defendants were convicted of violating the wire fraud statute by using their regulatory authority to "commandeer" the lanes of the George Washington Bridge for a corrupt

political purpose, the Supreme Court reversed the convictions and reiterated its direction that the federal fraud statutes are "limited in scope to the protection of property rights" and do not "criminaliz[e] all acts of dishonesty." *Kelly,* 140 S. Ct. at 1571; *see also Blaszczak*, 56 F.4th at 242-43 (holding that, under the reasoning of *Kelly*, confidential information belonging to a government agency that does not have economic value does not qualify as property under the fraud statutes).

The allegations in the S5 Indictment as to Counts 1 and 2 fly in the face of these clear mandates. The S5 Indictment does not allege that Mr. Bankman-Fried engaged in a scheme to cause economic loss to FTX customers because it does not allege that he never intended to pay back the loans to Alameda. Instead, the S5 Indictment alleges that Mr. Bankman-Fried defrauded FTX customers of their property because the loans to Alameda "exposed FTX customers to massive, undisclosed risk." S5 Indictment ¶ 3. Stated differently, the S5 Indictment alleges that had FTX customers known that Mr. Bankman-Fried would loan out their deposits to Alameda to make riskier investments than they may have made themselves, they would not have chosen to deposit their funds with FTX. That is not a property right recognized under the wire fraud statue even under the Solicitor General's reformulation of the "right to control theory" in *Ciminelli. See* Resp. Br. at 25-26 ("If . . . the right to make informed decisions about the disposition of one's assets, without more, were treated as the sort of 'property' giving rise to wire fraud, it would risk expanding the federal fraud statutes beyond property fraud as defined at common law and as Congress would have understood it.").

In the end, the Government is trying to transform allegations of dishonesty and unfair dealing into violations of the federal fraud statutes. While such conduct may well be improper, it is not wire fraud. *See Kelly,* 140 S. Ct. at 1571 (the federal fraud statutes are "limited in scope to

the protection of property rights" and do not "criminaliz[e] all acts of dishonesty"); *accord Blaszczak*, 56 F.4th at 242-43 (citing *Kelly*, 140 S. Ct. at 1571-1572); *Connolly*, 24 F.4th at 834 ("[The] federal fraud statutes are not catch-all laws designed to punish all acts of wrongdoing or dishonorable practices.").  Counts 1 and 2 must therefore be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Bankman-Fried respectfully requests that the Court dismiss Counts 7 through 9 and Counts 1 through 2 of the S5 Indictment.

Dated: May 8, 2023
New York, New York

Respectfully submitted,

*/s/ Mark S. Cohen*
Mark S. Cohen
Christian R. Everdell
S. Gale Dick
Sri K. Kuehnlenz
**COHEN & GRESSER LLP**
800 Third Avenue
New York, NY 10022
212-957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
skuehnlenz@cohengresser.com

*Attorneys for Samuel Bankman-Fried*