UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

UNITED STATES OF AMERICA

                v.

SAMUEL BANKMAN-FRIED,

                    Defendant.

           :
           :   S5 22 Cr. 673 (LAK)

---------------------------------------------------------------- x

**MEMORANDUM OF LAW IN SUPPORT OF SAMUEL BANKMAN-FRIED'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, SEVER COUNTS 12 AND 13 IN THE S5 INDICTMENT**

**<u>PRETRIAL MOTION NO. 4</u>**

Mark S. Cohen
Christian R. Everdell
S. Gale Dick
Sri K. Kuehnlenz
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, NY  10022
(212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
skuehnlenz@cohengresser.com

*Attorneys for Samuel Bankman-Fried*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................ 2

I.      COUNTS 12 AND 13 SHOULD BE DISMISSED .......................................................... 2

         A.     Count 12 of the S5 Indictment Should Be Dismissed Because It Fails to
               Make Out a Charge of Conspiracy to Violate the Campaign Finance Laws or
               Defraud the FEC. ...................................................................................................... 3

                1.     The S5 Indictment Fails to Allege a Conspiracy to Make Unlawful
                          Conduit Contributions in Violation of Section 30122. ............................. 5

                2.     The S5 Indictment Fails to Allege a Conspiracy to Violate
                          Section 30118. ........................................................................................ 8

                3.     The S5 Indictment Fails to Allege a Conspiracy to Defraud the
                          Federal Election Commission. ................................................................. 13

         B.     Count 13 Should Be Dismissed for Failure to Allege a Conspiracy to Violate
                the FCPA's Anti-Bribery Provision and Improper Venue. ................................... 14

                1.     The Government fails to allege that the object of the charged
                          conspiracy was to make improper payments "to obtain or retain
                          business," as required by the FCPA. ........................................................ 16

                  2.     Venue is improper in this district because Mr. Bankman-Fried was
                          not arrested or first brought here in connection with the FCPA
                        charge. .................................................................................................... 20

II.     IN THE ALTERNATIVE, COUNTS 12 AND 13 SHOULD NOT HAVE BEEN
      JOINED AND SHOULD BE SEVERED. .................................................................... 23

         A.     Counts 12 and 13 Are Misjoined and Subject to Mandatory Severance under
                Rule 8(a). ............................................................................................................... 24

                1.     Counts 1 through 11 Bear No Relation to Counts 12 and 13 .................... 24

                  2.     Counts 12 and 13 Should Be Severed. ..................................................... 26

         B.     Even if Counts 12 and 13 Were Properly Joined, the Court Should Sever
                Them Pursuant to Rule 14(a). ............................................................................... 29

CONCLUSION .................................................................................................................... 32

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Buckley v. Valeo*,
    424 U.S. 1, 96 S. Ct. 612 (1976) ............................................................................................7

*Chevron Corp. v. Donziger*,
    974 F. Supp. 2d 362 (S.D.N.Y. 2014) .............................................................. 16-17, 18, 20

*Fed. Election Comm'n v. Swallow*,
    304 F. Supp. 3d 1113 (D. Utah 2018) .....................................................................................6

*In re Flanagan*,
    No. ADV 1-05091-BTB, 2014 WL 764371 (B.A.P. 9th Cir. Feb. 26, 2014) ........................12

*In re TOUSA, Inc.*,
    422 B.R. 783 (Bankr. S.D. Fla. 2009) ..................................................................................12

*United States v. Abdalla*,
    334 F. Supp. 3d 582 (S.D.N.Y. 2018) .....................................................................................3

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012) .......................................................................................................2

*United States v. Benjamin*,
    No. 21-CR-706 (JPO), 2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022) ................................ 2-3

*United States v. Bezmalinovic*,
    No. S3 96-CR-97 (MGC), 1996 WL 737037 (S.D.N.Y. Dec. 26, 1996) .........................28, 29

*United States v. Caraway*,
    No. 08-CR-117A(SR), 2010 WL 275084 (W.D.N.Y. Jan. 20, 2010) ...............................26, 28

*United States v. Catino*,
    735 F.2d 718 (2nd Cir.1984) ............................................................................................15, 21

*United States v. Feng*,
    277 F.3d 1151 (9th Cir. 2002) ...............................................................................................23

*United States v. Forde*,
    699 F. Supp. 2d 637 (S.D.N.Y. 2010) ...................................................................................24

*United States v. Frey*,
    No. 2:19-cr-537 (DRH) (SIL), 2022 WL 2359665 (E.D.N.Y. June 30, 2022) ......................26

**Page(s)**

*United States v. Ghanem,*
    993 F.3d 1113 (9th Cir. 2021) ..................................................................15, 21, 22

*United States v. Halper,*
    590 F.2d 422 (2d Cir. 1978)................................................................... *passim*

*United States v. Harris,*
    805 F. Supp. 166 (S.D.N.Y. 1992) ......................................................28, 29, 31

*United States v. Hilger,*
    867 F.2d 566 (9th Cir. 1989) ..........................................................................22, 23

*United States v. Hoskins,*
    902 F.3d 69 (2d Cir. 2018)...............................................................................3

*United States v. Kay,*
    359 F.3d 738 (5th Cir. 2004) ...................................................................18-19, 20

*United States v. Kerik,*
    615 F. Supp. 2d 256 (S.D.N.Y. 2009).................................................28, 29, 30

*United States v. Kozeny,*
    667 F.3d 122 (2d Cir. 2011)....................................................................... 17-18

*United States v. O'Donnell,*
    608 F.3d 546 (9th Cir. 2010) ...........................................................................6

*United States v. Parnas,*
    No. 19-CR-725 (JPO), 2021 WL 2981567 (S.D.N.Y. July 14, 2021)............................29, 31

*United States v. Purcell,*
    967 F.3d 159 (2d Cir. 2020)...............................................................................3

*United States v. Randazzo,*
    80 F.3d 623 (1st Cir. 1996)...............................................................26, 28

*United States v. Sampson,*
    385 F.3d 183 (2d Cir. 2004)................................................................................31

*United States v. Shellef,*
    507 F.3d 82 (2d Cir. 2007)...........................................................................30, 31

*United States v. Taveras,*
    504 F. Supp. 3d 272 (S.D.N.Y. 2020)......................................................................2

*United States v. Todaro,*
    610 F. Supp. 923 (W.D.N.Y. 1985) .......................................................................30

Page(s)

*United States v. Vaughn,*
    No. CR PX 17-125, 2018 WL 558617 (D. Md. Jan. 25, 2018) .............................................29

**Statutes and Rules**

11 C.F.R. § 102.5 ..................................................................................................................10

11 C.F.R. § 106.5 ..................................................................................................................10

11 C.F.R. § 106.6 ..................................................................................................................10

11 C.F.R. § 110.4 ....................................................................................................................6

15 U.S.C. Ch. 2B § 78dd-1 *et seq.* ("FCPA")................................................................ *passim*

18 U.S.C. § 3238 ............................................................................................................. *passim*

52 U.S.C. § 30101, *et seq.* ("FECA") ............................................................................. *passim*

Fed. R. Crim. P. 8(a) ..................................................................................................... *passim*

Fed. R. Crim. P. 12(b)(3) ............................................................................................... *passim*

Fed. R. Crim. P. 14(a) ................................................................................................2, 3, 23, 29

Fed. R. Evid. 404 ...........................................................................................................26, 30

N.Y. Elec. Law § 14-114 .........................................................................................................11

**Other Authorities**

FEC Statement of Reasons, Matters Under Review 6538 & 6589, (July 30, 2014)......................11

Defendant Samuel Bankman-Fried ("Mr. Bankman-Fried") respectfully submits this memorandum of law in support of his motion to dismiss Counts 12 and 13 of the Superseding Indictment, Mar. 28, 2023, ECF No. 115 ("S5 Indictment") for failure to state an offense pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v) and to dismiss Count 13 for improper venue pursuant to Rule 12(b)(3)(A)(i), or in the alternative, to sever Counts 12 and 13 pursuant to Rules 12(b)(3)(B)(iv) & 12(b)(3)(D).

## PRELIMINARY STATEMENT

The Court should dismiss Counts 12 and 13 of the S5 Indictment, or in the alternative, sever these counts and try them separately from Counts 1 through 11.

Count 12 of the S5 Indictment, which attempts to allege Mr. Bankman-Fried's participation in a conspiracy to make unlawful political contributions and defraud the Federal Election Commission (the "FEC"), should be dismissed pursuant to Rule 12(b)(3) for failure to state an offense.  In its eagerness to run up charges against Mr. Bankman-Fried, the Government alleges a wide-ranging, nefarious scheme by him and others to "flood" the American political system with illegal campaign contributions and "dark" money in order to gain influence.  But looking past the inflammatory rhetoric, the charges in Count 12 resoundingly lack supporting factual allegations, and are premised on incoherent or contradictory allegations regarding the aims and means of the purported conspiracy.  The S5 Indictment identifies only two contributions, neither of which would actually violate federal campaign finance laws; indeed, one of the two is self-evidently a state campaign donation that falls outside the reach of the statutes alleged to have been violated.

Count 13 charges Mr. Bankman-Fried with conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1, *et seq.*, by alleging his participation in a scheme to pay officials in the Chinese government to "regain

access to Alameda trading accounts that had been frozen" by Chinese law enforcement. S5 Indictment ¶ 1.  This count must be dismissed because the Government has failed to properly allege that payments were made "in order to assist [a] domestic concern in obtaining or retaining business," which is an essential element of an anti-bribery violation.  15 U.S.C. § 78dd-2(a). Furthermore, because neither Mr. Bankman-Fried nor any joint offender was arrested or first brought to the Southern District of New York in connection with the alleged conspiracy to violate the FCPA, venue in this district is improper and the count should be dismissed.

If the Court determines not to dismiss Counts 12 or 13 of the S5 Indictment for failure to state an offense, improper venue, or for violating the rule of specialty (*see* Pretrial Motion No. 1), the Court should sever these counts from the S5 Indictment. The alleged conspiracies in Counts 12 and 13 lack the necessary similarities or connection for proper joinder to the remaining counts in the S5 Indictment under Rule 8(a), requiring severance; and even if their joinder were proper, this Court should exercise its discretion to sever these offenses under Rule 14(a).

## ARGUMENT

## I.      COUNTS 12 AND 13 SHOULD BE DISMISSED

Pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, a defendant may move to dismiss an indictment for "failure to state an offense," Fed. R. Crim. P. 12(b)(3)(B)(v), that is, for failure to "allege a crime within the terms of the applicable statute."  *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012); *see United States v. Taveras*, 504 F. Supp. 3d 272, 277–78 (S.D.N.Y. 2020) ("[A] charge in an indictment is insufficient and must be dismissed when it does not describe conduct that is a violation of the criminal statute charged.") (citation omitted).  In deciding whether the government has failed to allege a crime, the court may consider, "whether the facts, as alleged on the face of the indictment, satisfy the statutory

definition of a crime." *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 WL 17417038, at *16 (S.D.N.Y. Dec. 5, 2022).  The court may narrow charges by dismissing individual objects of a multi-object conspiracy.  *See, e.g.*, *United States v. Hoskins*, 902 F.3d 69, 74-76, 97 (2d Cir. 2018) (upholding dismissal of one object of conspiracy to violate the FCPA).

Pursuant to Rule 12(b), a defendant may also move before trial to dismiss an indictment for "improper venue."  Fed. R. Crim. P. 12(b)(3)(A)(i).  For "offenses begun or committed . . . elsewhere out of the jurisdiction of any particular State or district," the proper venue "shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought."  *United States v. Abdalla*, 334 F. Supp. 3d 582, 587 (S.D.N.Y. 2018) (quoting 18 U.S.C. § 3238).  When "a defendant is charged with multiple crimes in a single indictment, the government must satisfy venue with respect to each charge."  *United States v. Purcell*, 967 F.3d 159, 186 (2d Cir. 2020), *cert. denied*, 142 S. Ct. 121 (2021).

A defendant may additionally move before trial to sever charges based on "improper joinder" under Rule 8(a), *see* Fed. R. Crim. P. 12(b)(3)(B)(iv), and for undue prejudice pursuant to Rule 14(a), *see* Fed. R. Crim. P. 12(b)(3)(D).

### A.   Count 12 of the S5 Indictment Should Be Dismissed Because It Fails to Make Out a Charge of Conspiracy to Violate the Campaign Finance Laws or Defraud the FEC.

The conspiracy charged in Count 12 of the S5 Indictment is alleged to have had three objectives:  (i) to make conduit contributions "in the names of other persons" in violation of Section 30122 of the Federal Election Campaign Act ("FECA"), 52 U.S.C. § 30101 *et seq.* (S5 Indictment ¶ 98); (ii) to make contributions to candidates for federal office and joint fundraising committees by a corporation, in violation of Section 30118 of FECA (*id.*¶ 99); and (iii) to defraud the FEC by impairing its ability to administer federal prohibitions on "corporate and conduit contributions."  *Id.* ¶ 100.

3

Because the S5 Indictment fails to allege facts stating an offense with respect to any of the three objects of this conspiracy, Count 12 should be dismissed.  Fed. R. Crim. P. 12(b)(3)(B). As to the alleged object to violate Section 30122, to the extent the Government's theory is that Mr. Bankman-Fried oversaw a scheme to disguise his own contributions by routing them through two other FTX executives acting as straw donors, the S5 Indictment fails to allege that any such contributions were in fact made; and, to the extent the Government's theory is that the real donor was Alameda,[1] the Government fails to allege any contributions that would actually violate the statute.

The S5 Indictment also fails to allege a conspiracy to make donations using Alameda funds in violation of Section 30118.  Despite broad allegations in the S5 Indictment regarding large numbers of corporate contributions, none of the specific donations that are alleged qualify as such.  The alleged contributions that come closest, in addition to being alleged in vague and self-contradictory terms, would have been incompatible with the basic premises of the alleged conspiracy.  In any event, the S5 Indictment alleges that the funds used by CC-1 and CC-2 to make political contributions were *loans* from Alameda.  Like any loan proceeds, those funds belonged to CC-1 and CC-2—and *not* to Alameda.

Finally, the third object of the conspiracy, to defraud the FEC, fails because the Government has not alleged any reporting deficiencies or other conduct that could be deemed to have defrauded the FEC or impaired its functions.

---

[1] Although it refers to the alleged use of "FTX and Alameda funds" for political contributions (*id.* ¶ 37), the S5 Indictment only alleges that transfers or loans for such contributions were made from Alameda accounts.

As described below, in addition to failing to describe conduct that, as alleged, would actually violate the statute charged, the campaign finance allegations reveal, yet again, the consequences of the Government's rush to indict Mr. Bankman-Fried.

> **1.      *The S5 Indictment Fails to Allege a Conspiracy to Make Unlawful Conduit Contributions in Violation of Section 30122.***

The first object of the alleged conspiracy was to violate the prohibition in Section 30122 of FECA on conduit contributions, or so-called "straw donor" contributions.  *See* S5 Indictment ¶ 98.  The S5 Indictment appears to allege two theories of conduit contributions:  First, that Mr. Bankman-Fried was the real (but undisclosed) donor and channeled contributions through two other FTX executives, designated CC-1 and CC-2; and second, that the funds for contributions made by CC-1 and CC-2 came from Alameda.  Because the Government fails to successfully allege either theory, the first object of the conspiracy in Count 12 should be dismissed.

> a.      The S5 Indictment Fails to Allege Any Contributions for which Mr. Bankman-Fried was the Undisclosed Contributor.

In its effort to portray a conspiracy to disguise large political contributions from Mr. Bankman-Fried by using conduits, the Government lards the S5 Indictment with nefarious-sounding allegations that Mr. Bankman-Fried tried to further his personal ambitions by (counterintuitively) concealing that he was the source of political contributions.  The S5 Indictment alleges that Mr. Bankman-Fried's "effort to influence politics" included contributions made by the two FTX straw donors" (S5 Indictment ¶ 37); and that conduit contributions were made "to improve his personal standing in Washington, D.C.," to "curry favor" with candidates," and to further his "personal agenda," while "obscur[ing] his association with certain contributions."  *Id.* ¶¶ 38, 39.

The alleged motive behind this scheme makes little sense.  If Mr. Bankman-Fried hoped to "improve his personal standing" and advance his "personal agenda," it is unclear why he would go to such great lengths to "avoid certain contributions being publicly reported in his name" and "obscure his association" with certain contributions.  *Id.* ¶¶ 37-39.  More to the point, the S5 Indictment flatly fails to allege a conspiracy to violate Section 30122 by having Mr. Bankman-Fried make donations using CC-1 and CC-as conduits.  Section 30122 makes it unlawful for a "person [to] make a contribution in the name of another person."  52 U.S.C. § 30122.  The term "make" in this provision refers only to "the actual contributor, that is, the source of the monetary donation."  *Fed. Election Comm'n v. Swallow*, 304 F. Supp. 3d 1113, 1116 (D. Utah 2018); *see also United States v. O'Donnell*, 608 F.3d 546, 550 (9th Cir. 2010) (holding predecessor to Section 30122 applies to straw donor contributions, and accepting the Government's argument that "the original source of funds has *made* the contribution").

Under this straightforward reading of the text of Section 30122, a person who provides operational support or advice relating to contributions made by other persons, as Mr. Bankman-Fried is alleged to have done, does not "make" the contribution.  *See Swallow*, 304 F. Supp. 3d at 1116-17 (dismissing FEC action against defendant who allegedly "assisted" a co-defendant who made contributions through straw donors and holding that "[o]nly the person[s] . . . who are the source . . . of the monetary donation can qualify as those who 'make' contributions to the political candidates").[2]  Indeed, discussions among groups of people regarding strategies, goals,

---

[2] The FEC in *Swallow* charged the dismissed defendant with violating 11 C.F.R. § 110.4(b)(1)(iii).  That rule, promulgated by the FEC to implement Section 30122, proscribed "help[ing] or assist[ing] any person in making a contribution in the name of another." *Id.* at 1115.  The court held that this regulation impermissibly expanded the scope of Section 30122, which unambiguously limits culpability to the person who "makes" a contribution.  *Id.* at 1116-17.  The court enjoined the FEC from enforcing the regulation and ordered it stricken from the Code of Federal Regulations.  *Id.* at 1118.

and logistics of political contributions are commonplace, and Section 30122 simply does not (and could not)[3] criminalize such activity except where contributions are made in the name of one person but another person is the true source of funds.  Because the S5 Indictment nowhere alleges that Mr. Bankman-Fried was the source of funds for contributions made in the names of CC-1 or CC-2, it fails to allege that Mr. Bankman-Fried "made" any conduit contributions in violation of Section 30122.[4]

This deficiency is not cured by charging a conspiracy to violate Section 30122, for the simple reason that Mr. Bankman-Fried cannot have conspired to make contributions that are not alleged to have been made.  Again, the S5 Indictment does not allege any conduit contributions for which Mr. Bankman-Fried was the true (but undisclosed) source of funds.  While the S5 Indictment does allege that Mr. Bankman-Fried made "publicly reported" donations in his own name (S5 Indictment ¶ 37), there is no allegation that those donations were unlawful.  The S5 Indictment fleetingly suggests that use of "straw donors allowed [Mr. Bankman-Fried] to evade contribution limits on individual donations to candidates to whom he had already donated" (*id.* ¶ 46).  But because there are no allegations that Mr. Bankman-Fried was the source of funds

---

[3] The Government's theory that Mr. Bankman-Fried conspired with CC-1 and CC-2 to "make" campaign donations without actually being the source of such donations also raises serious First Amendment concerns.  What the Government darkly characterizes as "[Mr. Bankman-Fried's] unlawful political influence campaign" using hapless straw donors (S5 Indictment ¶ 5), was in fact very different:  a group of wealthy individuals working together to ensure their collective political contributions were as effective as possible.  As alleged, the co-conspirators decided that CC-1 would make "more left-leaning" contributions (*id.* ¶¶ 40-41), while CC-2, "who publicly aligned himself with conservatives," would contribute to Republican candidates.  *Id.* ¶ 42.  Among the goals of these activities were to "influence cryptocurrency regulation," (*id.* ¶ 1) and help pass "legislation concerning regulatory oversight over FTX and its industry." *Id.* ¶ 38.  Stripped of the cloak-and-dagger rhetoric, these contributions and related communications are squarely protected by the First Amendment – and are not prohibited by federal campaign finance laws.  *See, e.g., Buckley v. Valeo,* 424 U.S. 1, 14-15, 96 S. Ct. 612, 632 (1976) (FECA's "contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities," including the "freedom to associate with others for the common advancement of political beliefs and ideas.") (internal citations and alterations omitted).

[4] In fact, nowhere does the S5 Indictment identify contributions as to which Mr. Bankman-Fried was either the named donor or the true source of funds.

for any conduit contributions, none of the alleged conduit contributions could implicate his personal contribution limits.  In any event, evasion of personal contribution limits is not alleged as an object of the conspiracy.[5]

> b.    <u>The S5 Indictment Fails to Allege with Specificity Any Contributions for which Alameda was the Undisclosed Contributor.</u>

The second potential theory behind the alleged violation of Section 30122 is that CC-1 and CC-2 were acting as conduits for contributions using funds from Alameda.  *See, e.g.*, S5 Indictment ¶¶ 42, 45, 47.  To begin with, this theory negates the suggestion that Mr. Bankman-Fried was the real donor behind contributions by CC-1 and CC-2.  In any event, as explained immediately below, the S5 Indictment does not actually allege any specific conduit donations that could implicate the federal campaign finance laws for which Alameda was the true source of funds.  As a result, this theory of a conspiracy to violate Section 30122 also fails.

> **2.**    ***The S5 Indictment Fails to Allege a Conspiracy to Violate Section 30118.***

Turning to the second object of the campaign finance conspiracy, the Government fails to allege with sufficient specificity that Mr. Bankman-Fried participated in a conspiracy to make unlawful corporate political contributions.   Section 30118 of FECA makes it unlawful for "any corporation whatever . . . to make a contribution or expenditure in connection with" federal elections.  52 U.S.C. § 30118(a).   The statute makes it a felony for an individual to "knowingly and willfully commit[ ] a violation of any provision of this Act which involves the making,

---

[5] The S5 Indictment's charging paragraphs do not identify a violation of 52 U.S.C. § 30116, which governs contribution limits, as an object of the alleged conspiracy in Count 12.  *See* S5 Indictment ¶¶ 98 & 99 (alleging that the objects of the conspiracy were, respectively, violations of Section 30112 (contributions "in the names of others") and Section 30118 (corporate contributions); *id.* ¶ 100 (identifying "defraud[ing]" the Federal Election Commission as an object of the conspiracy).  Paragraph 97 of the S5 Indictment cites 52 U.S.C. § 30109(d)(1)(A) & (D), which are penalty provisions and not substantive provisions.

receiving, or reporting of any contribution, donation, or expenditure . . . aggregating $25,000 or more during a calendar year." *Id*. § 30109(d)(1)(A)(i).  However, the S5 Indictment identifies only two specific payments, neither of which can support the charged conspiracy to violate Section 30118.

        a.      <u>None of the Alleged Contributions, Even if Proven, Would Violate Section 30118.</u>

Although the S5 Indictment includes sweeping references to Mr. Bankman-Fried "flooding the political system" with illegal contributions, it only alleges two specific donations, both allegedly made by CC-1.  Neither of these alleged contributions could support a charge of conspiracy to violate Section 30118.  The S5 Indictment also broadly describes an additional category of alleged contributions made by CC-2, but those allegations are self-contradictory and, if proved, would be inconsistent or directly at odds with the alleged conspiracy in Count 12.

*First*, the Government alleges that Mr. Bankman-Fried and others agreed they should contribute to a "Super PAC" that was supporting a federal congressional candidate and "appeared to be affiliated with pro-LGBTQ issues," and chose CC-1 to make the contribution. *Id.* ¶ 41.  However, there is no allegation that this contribution was made using Alameda funds, and thus no violation of or conspiracy to violate Section 30118.  In fact, there is no allegation that the money contributed to the "Super PAC" came from anyone other than CC-1 himself:  the S5 Indictment alleges only that "*CC-1* . . . contributed to the PAC." *Id.* (emphasis added).  In other words, the S5 Indictment does not allege a contribution by a "corporation" or otherwise in violation of Section 30118.  This alleged contribution also would not violate Section 30122, since it is not alleged to have been made in the name of a person other than the actual donor.

*Second*, the S5 Indictment alleges a $107,000 contribution to the New York State Democratic Committee ("NYSDC") that was originally intended to be made in Mr. Bankman-

Fried's name but was ultimately made by CC-1.  *Id.* ¶ 43.  But this contribution was clearly made to the NYSDC for <u>state</u> election activities, rather than federal election activities, and thus was outside the jurisdiction of the federal campaign laws.

Political committees that finance political activity in connection with both state and federal elections must either establish separate accounts for federal and non-federal election activities, or use a combined account.  *See* 11 C.F.R. § 102.5(a).  Where separate accounts are established, only the federal account is subject to federal reporting requirements and other "prohibitions and limitations" of FECA.  *Id.*  The non-federal account is not subject to FECA's reporting requirements, although the federal account must disclose the non-federal portion of disbursements for shared federal/non-federal activity, in addition to its own portion.  11 C.F.R. § 102.5(a)(1)(i); 11 C.F.R. § 106.5(g); 11 C.F.R. § 106.6.  Thus, only a contribution to NYSDC's federal account would be subject to FECA's "prohibitions and limitations," including the provisions invoked by the S5 Indictment.

The NYSDC is registered with the FEC and maintains separate federal and non-federal accounts,[6] and a donation to the organization's non-federal account is not subject to Sections 30118 or 30122 of FECA.  The $107,000 contribution alleged in paragraph 43 of the S5 Indictment was for non-federal political activity.[7]  Accordingly, this donation is not governed by federal campaign finance laws or FEC reporting requirements.

---

[6] *See New York State Democratic Committee: Financial Summary 2021-2022*, FEC, https://www.fec.gov/data/committee/C00143230/?cycle=2022&tab=summary (last visited on May 7, 2023).

[7] *See* Declaration of Christian R. Everdell in Support of Samuel Bankman-Fried's Pretrial Motions, dated May 8, 2023, Ex. 8 (12/14/2022 email from Neil P. Reiff of Sandler, Reiff, Lamb, Rosenstein & Birkenstock, P.C. to the Government) at SDNY_03_00662417 (describing the contribution to NYSDC as, "[CC-1] - $107,000 on 10//28/22 [sic] into the NYS Campaign account **(non-federal account)**" (emphasis added).
    The non-federal nature of the contribution is also apparent on the face of the S5 Indictment given the amount in question.  At the time of the alleged contribution, individual donations to state political parties under New York State election law were capped at $117,300, while under federal law, such donations were capped at $10,000.  *See* NY Board of Elections, *New York State Board of Elections Campaign Handbook 2019*, 47 (2019),

*Finally,* the S5 Indictment alleges that CC-2 "made contributions to Republican candidates that were directed by [Mr. Bankman-Fried] and funded by Alameda." S5 Indictment ¶ 42.  But the S5 Indictment does not identify any particular contributions by CC-2, much less specify how Alameda "funded" them, how Mr. Bankman-Fried "directed" them, or whether Mr. Bankman-Fried knew or had any role in causing the alleged donations to be made with "Alameda funds."

The allegations relating to CC-2 are also self-contradictory to the point of being incomprehensible and give no notice of what is actually being alleged.  The Government alleges that "it was the preference of [Mr. Bankman-Fried] to keep contributions to Republicans 'dark,'" and that "[i]n keeping with that preference," CC-2 "made contributions to Republican candidates."  *Id.*  But "dark" contributions are not made to candidates; they are made to politically active nonprofits organized under section 501(c) of the Internal Revenue Code, and are not publicly disclosed.  *See, e.g.*, FEC Statement of Reasons, Matters Under Review 6538 & 6589, July 30, 2014, at 1 n.1 ("The term 'dark money' generally refers to federal election spending by 501(c) groups that do not disclose their donors, in part because they claim they are not 'political committees.'") (citations omitted).  To the extent that CC-2 contributed "to Republican candidates," as alleged, he did so *contrary* to Mr. Bankman-Fried's alleged "preference" to avoid disclosure of these contributions.  Therefore, CC-2's contributions were presumptively not part of the conspiracy charged in Count 12.  Alternatively, if CC-2 contributed "dark" money to certain 501(c) groups, it is hard to understand how such undisclosed

---

https://www.elections.ny.gov/NYSBOE/download/finance/hndbk2019.pdf ) ("Party or Constituted Committees may not, in a calendar year, receive more than $117,300 from any one contributor.") (citing N.Y. Elec. Law § 14-114(10)); 52 U.S.C. § 30116(a)(1)(D) (providing that individual contributions to a "political committee established and maintained by a State committee of a political party" may not exceed $10,000).

contributions would further the conspiracy's alleged goal of enhancing Mr. Bankman-Fried's "personal standing" or "curry[ing] favor" with politicians.  S5 Indictment ¶ 38.

In sum, to the extent the allegations relating to the second object of the conspiracy can be understood at all, they fail to allege a conspiracy to violate Section 30118.  The only specific contributions alleged in the S5 Indictment (those made by CC-1) would not violate the statute, while the alleged contributions from CC-2 are only vaguely alleged, and appear inconsistent or directly at odds with critical aspects of the alleged conspiracy.

       b.    <u>The Allegation that the Funds Contributed by CC-1 and CC-2<br>Were Loans from Alameda Fatally Undermines the Government's<br>Corporate Contribution Theory.</u>

The S5 Indictment fails to allege a conspiracy to violate the corporate contribution limits in Section 30118 for an additional, independent reason:  the alleged contributions by CC-1 and CC-2 are *not* alleged to have been made with funds belonging to Alameda, but with the proceeds of "*loans*" from Alameda to CC-1 and CC-2.  S5 Indictment ¶ 47.  As a matter of common sense and basic accounting principles, "upon disbursement, loan proceeds generally belong to the borrower."  *In re Flanagan*, No. ADV 1-05091-BTB, 2014 WL 764371, at *14 (B.A.P. 9th Cir. Feb. 26, 2014), *aff'd*, 642 F. App'x 784 (9th Cir. 2016); *see also In re TOUSA, Inc.*, 422 B.R. 783, 872 (Bankr. S.D. Fla. 2009), *quashed in part*, 444 B.R. 613 (S.D. Fla. 2011) (noting "the principle that when funds are loaned to a borrower, they become the property of the borrower (who incurs a contractual obligation to repay the loan).").

A borrower's contractual obligation to repay the lender remains in place—and the note held by the lender retains its value—regardless of whether and how the borrower disburses the loan proceeds (barring contractual restrictions not alleged here).  And when the borrower repays the loan, the lender does not reduce the payment obligation by the amount disbursed by the

borrower.  Accordingly, if, as alleged, CC-1 or CC-2 received loans from Alameda and then contributed funds to a candidate or committee, they used their own money—not Alameda's.

The allegation that the money for political donations "originated from Alameda bank accounts," and was then transferred "to bank accounts in the names of the donors" (S5 Indictment ¶ 45) simply describes the flow of funds in any loan.  At the point the funds were transferred from Alameda's accounts to the donors' accounts, they ceased to be corporate funds and FECA's corporate contribution restrictions ceased to apply.

The loan allegations are also fatal to the Government's straw donor theory, because if CC-1 and CC-2 allegedly contributed their own money in their own names, there could not have been a violation of Section 30122's ban on conduit contributions.

In an apparent effort to skirt the issue, the S5 Indictment alleges that the loans to CC-1 and CC-2 were not fully documented and there were no set interest rates, collateral, or evidence of repayment.  S5 Indictment ¶ 47.  But there is no allegation that the donors believed they would not have to repay the borrowed funds to Alameda.[8]  In fact, the S5 Indictment appears to allege the opposite:  CC-1 allegedly expressed concern about "debt" in his name that was reflected on Alameda's ledger as a result of loans, which debt was allegedly linked to the alleged "campaign finance scheme."  S5 Indictment ¶ 48.

### 3.    The S5 Indictment Fails to Allege a Conspiracy to Defraud the Federal Election Commission.

The third object of the alleged conspiracy was to defraud the FEC by

> impairing, obstructing, and defeating [the agency's] lawful functions . . . to administer federal law concerning source and amount restrictions in federal elections, including the prohibitions applicable to corporate contributions and conduit contributions.

---

[8] Nor is there any allegation that Mr. Bankman-Fried was involved in deciding how loans were documented, structured, or recorded.

S5 Indictment ¶ 100.

The alleged conduct that purportedly fulfilled this object of the conspiracy is derivative of and coterminous with that of the first two objects. *See id.* ¶ 101 (alleging as the overt act in furtherance of all three objects of the conspiracy the making of corporate contributions that were reported in the name of another person). The Government has not alleged any reporting deficiencies or other conduct that could be deemed to have defrauded the FEC or impaired its functions.

Consequently, the third object of the conspiracy founders for the same reason as the first two: As set forth above, the S5 Indictment fails to allege any contributions that violate or are subject to federal "prohibitions applicable to corporate contributions and conduit contributions." *Id.* ¶ 100.

> ### B. Count 13 Should Be Dismissed for Failure to Allege a Conspiracy to Violate the FCPA's Anti-Bribery Provision and Improper Venue.

Count 13 of the S5 Indictment attempts to allege that Mr. Bankman-Fried conspired with others to violate the anti-bribery provisions of the FCPA, 15 U.S.C. § 78dd-2. Mr. Bankman-Fried is alleged to have participated in an effort to make payments to "Chinese government officials" to "regain access to Alameda trading accounts that had been frozen by Chinese law enforcement authorities." S5 Indictment ¶ 1; *see also id.* ¶¶ 28-31; 102-05. The S5 Indictment is silent as to the identities, positions, agencies, and official duties of the alleged recipients of the payments or how they were able to unfreeze Alameda's assets. The S5 Indictment is also vague at best as to which Chinese authorities issued the "freeze orders," *id.* ¶ 29, and on what basis, or the purported grounds on which they were issued. *Id.* ¶ 28 (alleging only that the assets were frozen "as part of an ongoing investigation of a particular Alameda trading counterparty.")

This count should be dismissed for two independent reasons.  *First*, the Government has failed to properly allege an essential element of an anti-bribery violation, namely, that any alleged payments were made "in order to assist [a] domestic concern in obtaining or retaining business." 15 U.S.C. § 78dd-2(a).  Instead, the S5 Indictment alleges that payments were made to unfreeze assets that belonged to Alameda—not to secure or retain a contract with a foreign government agency, gain an unfair advantage, or achieve an objective of the sort addressed in the FCPA's text or legislative history or in relevant caselaw.  As such, the alleged payment did not violate the FCPA, and Mr. Bankman-Fried's alleged agreement with others to effect the payment could not have been a conspiracy to violate the FCPA.  Accordingly, Count 13 should be dismissed for failure to state an offense pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v).

*Second*, venue for the FCPA charge is improper in this district.  The S5 Indictment purports to base venue on 18 U.S.C. § 3238, which applies to offenses "begun or committed . . . out of the jurisdiction of any particular State or district."  As invoked by the Government here, venue is proper pursuant to Section 3238 "in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought." 18 U.S.C. § 3238.  Courts have interpreted this language to mean arrested or first brought "*in connection with the offense charged*." *United States v. Catino*, 735 F.2d 718, 724 (2nd Cir.1984) (discussing the "arrested" prong of Section 3238) (emphasis in original); *see United States v. Ghanem*, 993 F.3d 1113, 1122 (9th Cir. 2021) (same as to "first brought" prong).  Neither Mr. Bankman-Fried nor any joint offender was arrested or first brought to this district in connection with the alleged conspiracy to violate the FCPA.  Because the applicable venue provision is not satisfied, Count 13 should be dismissed pursuant to Fed. R. Crim. P. 12(b)(3)(A)(i).

> **1.** ***The Government fails to allege that the object of the charged conspiracy was to make improper payments "to obtain or retain business," as required by the FCPA.***

The FCPA anti-bribery provision invoked by the Government applies where, among other things, a "domestic concern," such as a U.S. resident or a resident's agent, engages in certain conduct "in furtherance of" a payment to a foreign official "to assist . . . in obtaining or retaining business for or with, or directing business to, any person." 15 U.S.C. § 78dd-2(a). *See Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 596-599 (S.D.N.Y. 2014) (discussing the elements of an FCPA anti-bribery violation, including the "business purpose test"). "'Congress intended for the FCPA to apply broadly to payments intended to assist the payor, either directly or indirectly, in obtaining or retaining business for some person.'" *Id.* at 598-99 (quoting *United States v. Kay*, 359 F.3d 738, 755 (5th Cir. 2004)). As discussed below, the business purpose requirement is met where payments are intended to obtain an unfair business advantage to which the person who allegedly will "obtain[] or retain[] business" would not otherwise be entitled. Because the alleged payments here were only intended to recoup assets undisputedly belonging to Alameda and deploy those assets as would occur in the normal course, the Government has failed to satisfy this business purpose requirement here.

As noted, the S5 Indictment alleges that Mr. Bankman-Fried participated in a conspiracy to make payments to "Chinese government officials" to "regain access to Alameda trading accounts that had been frozen by Chinese law enforcement authorities." S5 Indictment ¶ 1. Also as noted, the S5 Indictment does not identify the officials who allegedly froze the accounts or those who received the bribes by name, title, or even government agency. The absence of even basic information about the alleged bribe recipient is critical, because the effort to make payments to a "foreign official" and the intent to induce that "foreign official" to take or refrain

from taking particular actions are essential elements of an FCPA anti-bribery violation. 15 U.S.C. § 78dd-2(a)(1); *Donziger*, 974 F. Supp. 2d at 596.

Importantly, the S5 Indictment makes clear that the frozen assets belonged to Alameda. Indeed, the assets are characterized as "Alameda cryptocurrency accounts" containing "Alameda's funds." S5 Indictment ¶ 28, 29. This fact distinguishes the alleged payment here from the types of bribes prohibited by the FCPA: As alleged in the S5 Indictment, the objective of the alleged conspiracy was not to "assist in obtaining or retaining business," 15 U.S.C. § 78dd-2, but to "regain access" to funds belonging to Alameda. S5 Indictment ¶ 1.

In an apparent effort to fill the hole in their FCPA theory, the Government alleges that after regaining access to the assets based in China, "Alameda used the unfrozen cryptocurrency to fund additional Alameda trading activity." S5 Indictment ¶ 31. This allegation does not rescue the FCPA charge. Under the Government's apparent theory, the business purpose test would be met inevitably and solely because Alameda was a business and deployed its assets as it would—and was entitled to—in the normal course. The only way to have avoided an FCPA violation after Alameda recouped its rightfully owned assets would have been to stow them under a mattress and refrain from investing them altogether. As further explained below, this theory is at odds with the FCPA's business purpose requirement.

The Government may argue that even if the objective was to restore Alameda's lawful access to its own assets, the FCPA prohibits pursuing such an objective by making payments to foreign officials. However, this logic would conflate the business purpose requirement with the requirement that an FCPA defendant act "corruptly," § 78dd-2(a), which the Second Circuit has interpreted to mean with the "improper motive of accomplishing either an unlawful result or a *lawful result by some unlawful method or means*." *United States v. Kozeny*, 667 F.3d 122, 135

17

(2d Cir. 2011) (emphasis added).  The business purpose requirement is an independent element of an FCPA violation, and it has not been met here.

This Court's decision in *Donziger* provides an instructive contrast in this regard.  There, the defendant was found to have been instrumental in directing bribes to an Ecuadorian court official to obtain a multibillion-dollar judgment against Chevron Corp., of which the defendant would be entitled to a portion as a contingency fee.  In concluding that the payments were for a business purpose, the Court noted that "the payments increased the likelihood that Donziger's business—that of contingency litigation—would benefit from a favorable judgment." *Donziger*, 974 F. Supp. 2d at 599.

The alleged FCPA conspiracy in this case is fundamentally different.  It was not Alameda's business to recoup assets that had been frozen by foreign regulators in the same way as Donziger's business was to pursue contingency fees.  And Alameda is not alleged to have intended to procure new business opportunities or to preserve existing business that would not otherwise have been available to it in the same way Donziger procured a fraudulent judgment. In other words, Alameda is only alleged to have used its unfrozen assets to *engage in* business, not to obtain or retain business.

The Fifth Circuit's analysis of the business purpose test in *United States v. Kay* makes clear why an alleged payment to recoup one's own assets and conduct business with them, as alleged here, does not satisfy the business purpose test.  359 F.3d 738, 742-56 (5th Cir. 2004). The defendant in *Kay* allegedly orchestrated payments to Haitian officials to obtain favorable customs duties and tax treatment.  The central question addressed by the court's analysis was whether procuring unwarranted favorable tax treatment could "*ever* constitute the kind of bribery that is proscribed by the FCPA."  *Id.* at 743 (emphasis in original).  The court held that such

payments "*could* fall within the purview of the FCPA's proscription," *id.* at 756 (emphasis in original), but "hasten[ed] to add . . . that this conduct does not *automatically* constitute a violation of the FCPA." *Id.* (emphasis added). As the court explained:

> Avoiding or lowering taxes reduces operating costs and thus increases profit margins, thereby freeing up funds that the business is otherwise legally obligated to expend. And this, in turn, enables it to take any number of actions to the disadvantage of competitors. Bribing foreign officials to lower taxes and customs duties certainly *can* provide an unfair advantage over competitors and thereby be assistance to the payor in obtaining or retaining business.

*Id.* at 749 (emphasis in original).[9]

Importantly, simply reducing a company's tax burden—i.e., "freeing up funds" —would not satisfy the business purpose test under the Fifth Circuit's reasoning. Nor would that requirement be satisfied solely because those funds were deployed for operational purposes. Rather, under the *Kay* analysis, the question is whether the intent of the payor was to obtain a sufficient windfall to create a previously unavailable "nexus to garnering business [in Haiti] or to maintaining or increasing business operations . . . there." *Id.* at 749. In *Kay*, that "nexus" could have (but would not necessarily have) taken the form of an "*unfair* advantage over competitors" flowing from the "increase[d] profit margin" created by "favorable but unlawful tax treatment." *Id.* at 749, 756 (emphasis added). In *Donziger*, the business purpose was to increase the likelihood of a favorable judgment—itself "business" under the circumstances—to which

---

[9] The court in *Kay* framed the inquiry into whether bribes to obtain favorable tax treatment were, in fact, intended to generate an unfair advantage over competitors and thus satisfy the business purpose test, as "a matter of proof and thus evidence" – i.e., a question for trial rather than a motion to dismiss. *Id.* at 749. However, as explained below, the alleged objective of the FCPA conspiracy regarding Alameda's Chinese assets is categorically different than the bribe at issue in *Kay*. Consequently, even if the Government proves at trial what it has alleged in the S5 Indictment, it will not satisfy the business purpose test. In brief, the S5 Indictment has failed to state an offense for purposes of Fed. R. Crim. P. 12(b)(3).

Donziger's clients may not have been entitled, and a proportionately large contingency fee for Donziger.  974 F. Supp. 2d at 599.

In contrast, the alleged objective here was not to obtain "unfair" or "improve[d]" business opportunity for Alameda, *Kay*, 359 F.3d at 749, nor was it to "increase the likelihood" of an improper business opportunity akin to Donziger's favorable judgment.  974 F. Supp. 2d at 599. Rather, the alleged payments here were only alleged to have enabled Alameda to "regain access" to its own assets, S5 Indictment ¶ 1, and to deploy those assets in the manner to which it was entitled.  The ostensible objective of the FCPA conspiracy alleged in the S5 Indictment is categorically different than those at issue in *Donziger* and *Kay*, and it falls outside the purview of the FCPA.

Because the Government has not alleged a conspiracy to violate the FCPA by making unlawful payments "to assist in obtaining or retaining business," Count 13 of the S5 Indictment should be dismissed.

### 2.     *Venue is improper in this district because Mr. Bankman-Fried was not arrested or first brought here in connection with the FCPA charge.*

The Government purports to establish venue in this district pursuant to 18 U.S.C. § 3238, which governs venue for most offenses "begun or committed" outside the United States.  In those circumstances, the statute provides that:

> The trial . . . shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia.

18 U.S.C. § 3238.

The Government attempts to use this provision to place venue for Count 13 in this district by alleging a conspiracy among "the defendant[] and others known and unknown, at least one of whom was first brought to and will be arrested" here.  S5 Indictment ¶ 103.  As explained below, neither this allegation nor any other portion of the S5 Indictment is sufficient to lay venue in the Southern District of New York with respect to this count.  Consequently, Count 13 should be dismissed.

The "first brought" portion of Section 3238 is inapplicable here, because it "applies only in situations where the offender is returned to the United States already in custody."  *United States v. Catino*, 735 F.2d 718, 724 (2d Cir. 1984).  Although Mr. Bankman-Fried was "first brought" to the Southern District of New York in custody on December 22, 2022, that was in connection with the initial indictment in this case, which was unsealed on December 12, 2022 and for which Mr. Bankman-Fried was arraigned on December 22, 2022.  *See United States v. Ghanem*, 993 F.3d 1113, 1122 (9th Cir. 2021) ("The 'first brought' portion of § 3238 applies only if the defendant 'is returned to the United States already in custody' in connection with the offense at issue.") (citation omitted).

The Government has not properly alleged that Mr. Bankman-Fried was "arrested" in this District within the meaning of Section 3238.  Courts have interpreted the word "arrest" in the statute to mean the place where the defendant is "first restrained of his liberty *in connection with the offense charged*."  *Catino*, 735 F.2d at 724 (emphasis in original).  This portion of the statute is applied where the defendant is already in custody in a particular district for another offense when he is indicted and arrested for a separate offense which satisfies the territorial requirement of Section 3238.  *See, e.g., id.* (defendant who was in custody in the Southern District of New York for one offense and was indicted and arraigned for a separate offense was "arrested" in this

district for purposes of Section 3238); *United States v. Ghanem*, 993 F.3d 1113, 1122 (9th Cir.

2021) (the "arrest" portion of Section 3238 "applies only if the defendant is already *inside* a

district when first restrained of liberty in connection with the offense.") (emphasis in original).

     The sequence relating to the FCPA charge against Mr. Bankman-Fried was very

different.  When the S5 Indictment was unsealed on March 28, 2023, Mr. Bankman-Fried was in

California pursuant to the then-current bail conditions imposed by the Court.  Because the

arraignment on the new charges had to be conducted in person, Mr. Bankman-Fried was required

to travel and did travel to the Southern District of New York.  The arraignment took place on

March 30, 2023, and Mr. Bankman-Fried was arrested on the newly charged offenses

immediately prior to the arraignment.

     We have not located decisions within the Second Circuit addressing this situation, but in

*United States v. Hilger*, 867 F.2d 566 (9th Cir. 1989), the Ninth Circuit dismissed an indictment

for improper venue on closely similar facts.  There, the defendant was located in Massachusetts

when he was indicted in the Northern District of California for a maritime offense based on

events that occurred outside any U.S. jurisdiction.  He traveled to California pursuant to a

summons issued when the indictment was filed and was arrested in the Northern District of

California when he arrived.  The district court denied the defendant's motion to dismiss for

improper venue but dismissed the indictment on other grounds.  The Ninth Circuit affirmed but

disagreed with the lower court on the venue issue.  The court emphasized that the defendant was

arrested in California "only because he was responding to a summons," and thus "had no choice

but to come to the Northern District."  *Id.* at 568  (emphasis omitted).  The court also noted that

the defendant was indicted before he was either arrested or "'brought' (meaning first brought . . .

while in custody) into any district, and [that] the indictment was not filed in the district of [his]

last known residence." *Id.* (citations omitted).  In describing the *Hilger* decision in a more recent

case, the Ninth Circuit explained that "[a]lthough Hilger was arrested in the Northern District of

California, we held that he was not 'arrested' in that district" for purposes of Section 3238.

*United States v. Feng*, 277 F.3d 1151, 1156 (9th Cir. 2002).

While not binding on this Court, *Hilger* is on all fours with the present case.  Here, as

there, the S5 Indictment containing the FCPA conspiracy charge was filed while Mr. Bankman-

Fried was located outside the Southern District of New York; as in *Hilger*, Mr. Bankman-Fried

was arrested in connection with the FCPA charge only after he traveled here to be arraigned on

the S5 Indictment; and as in *Hilger*, venue is improper in this District, and Count 13 of the

S5 Indictment should be dismissed.

## II.      IN THE ALTERNATIVE, COUNTS 12 AND 13 SHOULD NOT HAVE BEEN JOINED AND SHOULD BE SEVERED.

If the Court concludes that Counts 12 and 13 should not be dismissed for failure to state

an offense, improper venue, or as violating the rule of specialty (*see* Pretrial Motion No. 1), the

Court should sever those counts from the S5 Indictment.  By charging these offenses together

with the remaining counts in the S5 Indictment, the Government impermissibly attempts to cram

together offenses that cannot and should not be charged or tried together for at least two reasons.

*First,* the alleged conspiracy to violate federal campaign finance laws (Count 12) and the alleged

conspiracy to violate the FCPA (Count 13) lack the required similarities or connection to render

their joinder to the S5 Indictment proper under Rule 8(a).  In such a situation, Rule 8(a) requires

the Court to sever these counts.

*Second,* even if joinder were proper and severance of Counts 12 and 13 were not

mandatory (neither is true), this Court should exercise its discretion to sever these offenses under

Rule 14(a).  Combining offenses that should plainly be tried separately into a single trial would

be unduly prejudicial to Mr. Bankman-Fried and these proceedings.  Among other things,

sufficient prejudice arises through the heightened risk that the jury would aggregate or make

impermissible inferences from unrelated evidence and through the low impact on judicial

economy when factually and legally separate counts are severed.

A.      **Counts 12 and 13 Are Misjoined and Subject to Mandatory Severance under Rule 8(a).**

Federal Rule of Criminal Procedure 8(a) provides that separate offenses are appropriately

joined against a defendant in one indictment only when the offenses satisfy one of the three bases

set forth by the Rule, *i.e.*, the offenses are:  (i) "of the same or similar character," (ii) "based on

the same act or transaction," or (iii) "connected with or constitute parts of a common scheme or

plan."  Fed. R. Crim. P. 8(a).  "The appropriate remedy for misjoinder is severance."  *United

States v. Forde*, 699 F. Supp. 2d 637, 640 (S.D.N.Y. 2010).

None of these Rule 8(a) bases is satisfied here.  In relation to other counts of the

S5 Indictment and to each other, the offenses charged in Counts 12 and 13 are fundamentally

dissimilar in character, based on wholly discrete acts and transactions, and are not unified by any

cognizable scheme or plan.  Those counts are therefore misjoined and must be severed.

### 1.      *Counts 1 through 11 Bear No Relation to Counts 12 and 13.*

Counts 1-11 allege financial crimes that are closely tied to the alleged "misappropriation"

of FTX customer funds for use by Alameda and the relationship between Alameda and FTX.

Specifically:

- Counts 1 through 4 allege conspiracy and substantive wire and commodities fraud accomplished by "misappropriating [FTX] customers' deposits."  S5 Indictment ¶¶ 65, 67, 70, 73.

- Counts 5 and 6 allege conspiracy and substantive securities fraud on FTX investors, largely by misrepresenting and concealing that Alameda was allegedly permitted to "draw on FTX accounts funded by customer assets," and FTX customer funds were being "commingl[ed] . . . with Alameda funds."  *Id.* ¶¶ 24, 27; *see id.* ¶¶ 76, 79.

24

- Counts 7 and 8 allege conspiracy and substantive wire fraud on Alameda's lenders, principally by permitting Alameda to repay its lenders using customer assets from FTX.  *Id.* ¶ 33; *see id.* ¶¶ 82, 84.

- Count 9 alleges a conspiracy to commit bank fraud in connection with opening accounts to "receive and transmit [FTX] customer funds."  *Id.* ¶¶ 87, 14-21.

- Count 10 alleges a conspiracy to operate a money transmitting business involving FTX customer funds that was not compliant with the relevant registration requirements.  *Id.* ¶¶ 17, 90.

- Count 11 alleges conspiracy to commit money laundering in relation to the proceeds of "the wire fraud alleged in Count [2]."  *Id.* ¶ 94.

The alleged campaign finance and FCPA charges in Counts 12 and 13 exist entirely outside this orbit.  Count 12 is exclusively concerned with alleged political contributions by two FTX executives—CC-1 and CC-2—and the allegations that such executives were conduit donors for contributions actually made by others or consisting of Alameda funds.  *Id.* ¶¶ 39–40, 98–100. A trial on this charge could entail, among other things, testimony and evidence, likely including expert testimony, on hundreds of donations to candidates and PACs; the distinctions between "hard," "soft," and "dark" contributions; and what Mr. Bankman-Fried, CC-1, and CC-2 knew and intended in connection with the contributions and the campaign finance laws.

In turn, Count 13 alleges still another discrete, self-contained violation of a separate, detailed statute by means of a complicated, non-overlapping set of alleged facts and transactions concerning a purported bribe to a Chinese official.  *Id.* ¶¶ 30, 104.  A trial on the FCPA conspiracy would likely focus on, among other things, the freeze order allegedly imposed on Alameda's assets by the Chinese government and the alleged Chinese investigation into an Alameda trading counterparty; details of Alameda's Chinese trading operations; communications among FTX and Alameda employees and agents in various countries; the alleged flow of cryptocurrency from Alameda to a private cryptocurrency wallet, presumably belonging to a Chinese government official or intermediary; communications with or regarding that official and

any intermediaries; actions taken by Chinese officials to unfreeze the assets; how the Alameda assets were redeployed once the freeze order was lifted; and Mr. Bankman-Fried's knowledge of and intent as to all of these events.  At least some material witnesses are likely located in China, and at least some documentary evidence is likely to be in Mandarin.

### 2.    *Counts 12 and 13 Should Be Severed.*

The above discussion makes clear that none of the bases for joinder of offenses in Rule 8(a) apply here.  *First*, Counts 12 and 13 cannot plausibly be said to be of "the same or similar character" as one another or the remaining counts.  Fed. R. Crim. P. 8(a).  On the contrary, Counts 12 and 13 bear the hallmarks of offenses that courts have held to be unrelated enough to require severance:  they are premised on "distinctly different facts," *United States v. Frey*, No. 2:19-cr-537 (DRH) (SIL), 2022 WL 2359665, at *2 (E.D.N.Y. June 30, 2022) (internal quotations and citation omitted), and would "requir[e] vastly different evidence to prove," *United States v. Caraway*, No. 08-CR-117A(SR), 2010 WL 275084, at *2 (W.D.N.Y. Jan. 20, 2010). Joinder of counts as of the "same or similar character" is further undermined when such disparate proof is unlikely to be independently admissible in proving the other crime.  *See United States v. Halper*, 590 F.2d 422, 431 (2d Cir. 1978); *see also United States v. Randazzo*, 80 F.3d 623, 627 n.1 (1st Cir. 1996) (noting that, for properly joined "same or similar character" cases, "[a]bout the best one can say is that in such cases the evidence of one crime is more likely to be independently admissible, on theories reflected in Fed. R. Evid. 404(b), in proving the other, 'similar' crime.").

Based on the facts alleged in the S5 Indictment, few or none of the complex and varied alleged facts relating to Counts 12 or 13 would be relevant in a trial of any other offenses charged in the S5 Indictment.  And for the reasons explained *infra*, Section II.B., evidence of Counts 12 and 13 likely would not be admissible in a separate trial on Counts 1-11 under the

Federal Rules of Evidence; their joinder serves only as an attempt to manufacture some tendency towards deceit on the part of Mr. Bankman-Fried by piling on proof of entirely dissimilar alleged other crimes.

*Second*, joinder is improper under the "same act or transaction" portion of Rule 8(a).  The S5 Indictment does not allege a single act common to Counts 12 and 13 or linking those alleged offenses to Counts 1-11.  Fed. R. Crim. P. 8(a).  And "however broadly the term 'transaction' may be interpreted," it cannot plausibly encompass, as a single transaction, alleged contributions to political candidates and committees in the United States, payments to Chinese government officials, and the acts alleged in connection with Counts 1-11, such as the alleged manipulation of the FTX trading platform computer code to permit Alameda to accrue negative balances and alleged misrepresentations relating to FTX and Alameda.  *See Halper*, 590 F.2d at 429.

*Third*, the offenses charged in Counts 12 and 13 are not "connected with [and do not] constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).  In relation to one another and to the remaining counts, neither the campaign finance conspiracy nor the FCPA conspiracy satisfy this prong of Rule 8(a), which permits joinder only if "one of the offenses . . . depended upon []or necessarily led to the commission of the other" or "proof of the one act . . . constituted []or depended upon proof of the other."  *Halper*, 590 F.2d at 429.

The Government does not, because it cannot, make a serious effort to articulate a common scheme or plan to unify the S5 Indictment.  The sole alleged touchpoint between Count 12 and Counts 1-11 is a single, incidental allegation that the money used for political contributions was drawn from Alameda accounts that included FTX customer funds.  *Id.* ¶ 45.

The allegations relating to Count 13 lack even that distant tie-in.[10]  *Cf. id.* ¶ 28 (alleging account freeze arose from Chinese government investigation of an Alameda trading *counterparty*).  The alleged use of customer funds has no bearing on whether political contributions were unlawful as alleged in Count 12.  At most, this allegation would render Count 12 "one step removed" from Counts 1-11, which is insufficient to avoid severance.  *Caraway*, 2010 WL 275084, at *3; *see also Randazzo*, 80 F.3d at 628 ("Congress did not provide for joinder for unrelated transactions and dissimilar crimes merely because some evidence might be common to all of the counts."); *United States v. Bezmalinovic*, No. S3 96 CR. 97 MGC, 1996 WL 737037, at *5 (S.D.N.Y. Dec. 26, 1996) (severing counts when overlapping proof was "minor").

No other conceivable common thread can be drawn between Counts 1-11 on the one hand and Counts 12 and 13 on the other that might justify their joinder in the S5 Indictment. Mr. Bankman-Fried himself cannot be the "lone common link" between otherwise distinct offenses.  *United States v. Kerik*, 615 F. Supp. 2d 256, 275 (S.D.N.Y. 2009).  Nor is joinder proper simply because FTX and Alameda allegedly played parts in each offense.  *See Bezmalinovic*, 1996 WL 737037, at *3-4 (S.D.N.Y. Dec. 26, 1996) (holding that the alleged use of entities controlled by a defendant does not satisfy either the "same or similar character" or "common scheme or plan" prong of Rule 8(a)).

The Government also cannot justify joinder by collectively describing the charged offenses as "a pattern of fraudulent schemes."  S5 Indictment ¶ 1; *see Kerik*, 615 F.Supp.2d at 275 (rejecting government's effort to broad-brush commonalities from "broad motif" of "dishonesty"); *United States v. Harris*, 805 F. Supp. 166, 182 (S.D.N.Y. 1992) (offenses were

---

[10] The only true overlap between the offenses in Counts 12 and 13 and those in Counts 1-11 is the alleged involvement of Mr. Bankman-Fried, FTX, or Alameda.  As discussed below in Section II.B., however, this fact reveals the prejudicial impact—and likely intent—of joining these offenses together.

not of "similar character" only because "each involved fraud").  Nor is joinder justified by any attempt to unify counts through efforts to "obtain[] money" or buoy FTX or Alameda. *Bezmalinovic*, 1996 WL 737037, at *3 ("The fact that each offense was an attempt . . . to fraudulently obtain money" does not unite them under a "common scheme or plan"); *United States v. Vaughn*, No. CR PX 17-125, 2018 WL 558617, at *1-2 (D. Md. Jan. 25, 2018) (holding no proper joinder of bribery and wire fraud counts based on defendant's alleged "common motive to extricate himself from dire financial straits").

### B.     Even if Counts 12 and 13 Were Properly Joined, the Court Should Sever Them Pursuant to Rule 14(a).

Pursuant to Rule 14(a), the Court may order separate trials of counts that may otherwise satisfy the Rule 8(a) joinder requirements to avoid undue prejudice.  *See United States v. Parnas*, No. 19-CR-725 (JPO), 2021 WL 2981567, at *2 (S.D.N.Y. July 14, 2021).

Severance is appropriate under Rule 14(a) if the prejudice of a joint trial would be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials."  *Id.* (quoting *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986)).  Such prejudice may exist when, for example, the jury "may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged," or "cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find."  *Halper*, 590 F.2d at 430 (citation omitted).  Where, as here, there is "no discernible, let alone meaningful, connection" between the counts sought to be severed and those that would remain, both the risk of prejudice and the interest of judicial economy are more likely to favor severance.  *Harris*, 805 F. Supp. at 182; *see Kerik*, 615 F. Supp. 2d at 276 ("When totally unrelated offenses are joined, a defendant faces a considerable risk of substantial prejudice.").

These standards favor discretionary severance of Counts 12 and 13.  *First*, a joint trial would risk substantial prejudice to Mr. Bankman-Fried.  Given the complete lack of overlap between these counts and the remainder of the S5 Indictment, the only effect—and evident intent—of trying these offenses together would be to tempt the jury to "infer a criminal disposition" on the part of Mr. Bankman-Fried.  *Halper*, 590 F.2d at 430; *see, e.g.*, *United States v. Shellef*, 507 F.3d 82, 102 (2d Cir. 2007) (noting that evidence of conspiracy, wire fraud, and money laundering counts could have led jury to believe that defendant was "predisposed to commit crimes of deceit such as those alleged in [tax fraud counts]"); *United States v. Todaro*, 610 F. Supp. 923, 926 (W.D.N.Y. 1985) (severing count as a matter of discretion to avoid "unfair influence upon the jury" that would occur by "enabl[ing] the government to adduce evidence" of prejudicial allegations on such count that would not be independently admissible in combined trial).  Indeed, the allegations impermissibly invite such an inference.  *Compare* S5 Indictment ¶ 1 (describing the sum of Mr. Bankman-Fried's alleged conduct as "a pattern of fraud") *with Kerik*, 615 F. Supp. 2d 275-76 (citing the government's assertion that the defendant engaged in "an *extensive crime spree*" as a "suggestion of some 'criminal disposition' . . . [that] would result in impermissible prejudice requiring severance" (emphasis in original)).

Moreover, in separate trials, evidence relevant to the campaign finance and FCPA charges is unlikely to be either directly relevant to the financial crimes charged in Counts 1-11 or admissible as other acts evidence pursuant to Federal Rule of Evidence 404(b); its use would thus likely be prohibited by Federal Rules of Evidence 404(a)(1), 403, and 404(b)(1) as improper character evidence.  A joint trial would thus create an end-run around the improper use of character evidence, leading to a substantial risk that the jury would understand such evidence to indicate a general predisposition to fraud and "general mendacity" on the part of Mr. Bankman-

Fried.  *Shellef*, 507 F.3d at 101 (reversing conviction for failure to sever offenses and discussing the prejudicial effect of introduction in joint trial of evidence regarding non-severed claims that would otherwise have been inadmissible in separate trials); *accord United States v. Sampson,* 385 F.3d 183, 192 (2d Cir. 2004) (same); *see also Harris*, 805 F. Supp. at 183-85 (severing counts to avoid prejudice and noting that evidence of personal loan fraud would not be admissible in severed trial on corporate loan fraud because of dissimilar nature of crimes).

 *Second*, a joint trial would offer only marginal—if any—gains in efficiency and judicial economy under the circumstances.  *See Parnas*, 2021 WL 2981567, *2 (severing, without objection from the government, campaign finance counts from wire fraud count given "relatively little overlap in the trial evidence"); *Harris*, 805 F. Supp. at 181 (rejecting argument that "limited judicial and prosecutorial resources will be conserved by one trial instead of two" given lack of "discernable, let alone meaningful, connection" between alleged frauds);  *see also Halper*, 590 F.2d at 430 (stating that "the customary justifications for joinder (efficiency and economy)" are not met by trying together offenses that are not based on the same act or transaction and are not connected to a common scheme or plan).

 The Court should therefore exercise its discretion and sever Counts 12 and 13 to prevent substantial prejudice to Mr. Bankman-Fried and in the efficient administration of justice.

## **<u>CONCLUSION</u>**

For the reasons set forth above, we respectfully request that the Court dismiss Counts 12 and 13, or in the alternative, sever Counts 12 and 13 and order that they be tried separately.

Dated:  May 8, 2023
New York, New York

Respectfully submitted,

*/s/ Mark S. Cohen*
Mark S. Cohen
Christian R. Everdell
S. Gale Dick
Sri K. Kuehnlenz
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, NY  10022
(212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
skuehnlenz@cohengresser.com

*Attorneys for Samuel Bankman-Fried*