UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                  :

UNITED STATES OF AMERICA          :

                            :    S5 22 Cr. 673 (LAK)

          v.                   :

                            :

SAMUEL BANKMAN-FRIED,       :

                 Defendant.    :

-----------------------------------------------------------------x

**OMNIBUS REPLY MEMORANDUM OF LAW IN SUPPORT OF
SAMUEL BANKMAN-FRIED'S PRETRIAL MOTIONS**

Mark S. Cohen
Christian R. Everdell
S. Gale Dick
Sri K. Kuehnlenz
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, NY 10022
Phone: (212) 957-7600
Fax: (212) 957-4514
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
skuehnlenz@cohengresser.com

*Attorneys for Samuel Bankman-Fried*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

I.      COUNTS 4, 6, 9, 10, 12, AND 13 VIOLATE THE RULE OF SPECIALTY AND
        SHOULD BE DISMISSED ....................................................................................... 3

        A.      The Warrant of Surrender Does Not Include the Campaign Finance Charge
                (Count 12). ................................................................................................... 6

        B.      The Government Concedes That It Has Not Obtained The Bahamas'
                Consent to The New Charges (Counts 4, 6, 9, 10 and 13).................................. 10

        C.      The Government Has Violated the Rule of Specialty by Relying on Counts
                4, 6, 9, 10, 12 and 13 as Bases for Mr. Bankman-Fried's Continued
                Detention....................................................................................................... 11

        D.      Due to the Government's Specialty Violations, the At-Issue Charges Should
                Be Dismissed or, in the Alternative, Severed. ....................................................... 12

        E.      Dismissal is Warranted for the Specialty Violations Here. ................................. 12

        F.      In the Alternative, the At-Issue Charges Should Be Severed. .............................. 13

        G.      Mr. Bankman-Fried Has Standing to Invoke the Rule of Specialty. .................... 16

II.     COUNTS 7-9 AND 1-2 MUST BE DISMISSED BECAUSE THEY DO NOT
        ALLEGE VIABLE THEORIES OF FRAUD .................................................................. 19

        A.      Count 9 Must Be Dismissed Because It Is Charged Under the Invalid "Right
                to Control" Theory of Fraud. ................................................................................ 19

                1.      The Government Cannot Assert a New Charging Theory That Is Not
                        Alleged in the S5 Indictment. ................................................................... 20

                2.      The Government's New Theory Does Not Allege Bank Fraud................ 21

        B.      Counts 7 and 8 Must Be Dismissed for Failure to Allege a Property Interest
                That Can Support Wire Fraud Against Alameda's Lenders. ................................. 23

                1.      The Government May Not Amend the Lender Counts Through
                        Briefing to Allege an Uncharged Property Interest. ................................. 23

                2.      Even Under the Government's New Theory, the Lenders Do Not
                        Have a Traditional Property Interest That Can Support a Wire Fraud
                        Charge. ..................................................................................................... 24

C.      Counts 1 and 2 Must Be Dismissed for Failure to Allege a Property Interest That Can Support Wire Fraud Against FTX Customers......................................... 26

III.    THE COMMODITIES FRAUD CHARGES (COUNTS 3-4) SHOULD BE DISMISSED ............................................................................................................. 28

A.      The Government Has Failed to Allege Fraud "In Connection With" a Commodities Transaction. ........................................................................................ 28

B.      The S5 Indictment Seeks an Impermissible Extraterritorial Application of the CEA............................................................................................................................. 33

IV.     COUNT 10 MUST BE DISMISSED BECAUSE THE INDICTMENT DOES NOT ALLEGE SUBSTANTIAL ACTIVITY IN THE UNITED STATES THAT WOULD REQUIRE FTX TO REGISTER AS A MONEY TRANSMITTING BUSINESS......................................................................................................................... 37

V.      COUNTS 12 AND 13 SHOULD BE DISMISSED OR, IN THE ALTERNATIVE, SEVERED AS IMPROPERLY JOINED AND UNDULY PREJUDICIAL .................. 42

A.      Count 12 Fails to Allege a Conspiracy to Violate Campaign Finance Laws or Defraud the FEC and Should Be Dismissed........................................................ 42

1.      The Government Does Not Salvage the Allegations of Unlawful Conduit Contributions in Violation of Section 30122. ............................ 42

2.      The Government's Corporate Contributions Theory Is Fatally Flawed........................................................................................................... 44

B.      Count 13 Should Be Dismissed for Failure to Allege a Conspiracy to Violate the FCPA and for Improper Venue......................................................................... 46

1.      The Government Fails to Allege a Conspiracy to Pay Bribes to "Obtain or Retain Business." .................................................................... 46

2.      Venue Is Improper in This District Under 18 U.S.C. § 3238. .................. 49

C.      In the Alternative, Counts 12 and 13 Should Be Severed.................................... 51

VI.     THE GOVERNMENT'S DISCOVERY OBLIGATIONS EXTEND TO THE FTX DEBTORS' DOCUMENTS BECAUSE THEY ARE PART OF THE PROSECUTION TEAM........................................................................................................ 54

A.      The FTX Debtors Have Material Exculpatory Evidence That the Government Can Readily Obtain and, Under Brady, Must Obtain. ..................... 55

B.      The Government's Claim that Non-Governmental Entities Can Never Be Part of the Prosecution Team Misreads the Case Law. ........................................ 58

C.      The FTX Debtors Are Part of the Prosecution Team. ........................................... 58

D.      The Court Should Disregard the Government's Claims of Burden. ...................... 61

VII.    THE COURT SHOULD GRANT THE DEFENSE'S REQUEST FOR PRETRIAL
        DISCLOSURES ............................................................................................................. 62

A.      The Court Should Grant a Bill of Particulars ........................................................ 62

B.      The Court Should Grant the Requests for Additional Pretrial Disclosures. ......... 65

VIII.   COUNTS 1 AND 9, AND COUNTS 3 AND 10, ARE MULTIPLICITOUS ................. 66

A.      The Court Should Apply the Korfant Factors to Analyze Multiplicity of
        Counts 1 and 9 and Counts 3 and 10 ...................................................................... 67

B.      The Government Has Failed to Meet Its Burden of Establishing That the
        Conspiracies Are Distinct. .................................................................................... 68

C.      The Court Should Direct Election and Dismissal Pretrial to Avoid Prejudice
        to Mr. Bankman-Fried. ......................................................................................... 69

CONCLUSION ........................................................................................................................... 70

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Blockburger v. United States*,
284 U.S. 299 (1932)......................................................................................................67

*Brady v. Maryland*,
373 U.S. 83 (1963).................................................................................................. *passim*

*CFTC v. McDonnell*,
287 F. Supp. 3d 213 (E.D.N.Y. Mar. 6, 2018)..................................................29, 30

*CFTC v. Reynolds*,
No. 19-CV-05631 (MKV), 2021 WL 796683 (S.D.N.Y. Mar. 2, 2021) .................................35

*CFTC v. Royal Metals Grp., LLC*,
No 18-CV-8407 (JMF), 2019 WL 1996307 (S.D.N.Y. Jan. 25, 2019) ............................ 30-31

*CFTC v. Vartuli*,
228 F.3d 94 (2d Cir. 2000)...........................................................................................30

*Chevron Corp. v. Donziger*,
974 F. Supp. 2d 362 (S.D.N.Y. 2014)......................................................................47, 48

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
364 F. Supp. 3d 253 (S.D.N.Y. 2019)...........................................................................35

*Ciminelli v. United States*,
598 U.S. ---, 143 S. Ct. 1121 (2023)............................................................... *passim*

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
395 F.3d 25 (2d Cir. 2005)...........................................................................................29

*Dubin v. United States*,
No. 22-10, 599 U.S. ----, --- S. Ct. ----, 2023 WL 3872518 (U.S. June 8, 2023) ..........3, 28, 30

*FEC v. Swallow*,
304 F. Supp. 3d 1113 (D. Utah 2018) ....................................................................... 42-43

*Fiocconi v. Att'y Gen. of the United States*,
462 F.2d 475 (2d Cir. 1972)....................................................................................17, 18

*In re Flanagan*,
No. ADV 11-05091-BTB, 2014 WL 764371 (B.A.P. 9th Cir. Feb. 26, 2014)................. 24-25

**Page(s)**

*In re J.P. Jeanneret Associates, Inc.,*
    769 F. Supp. 2d 340 (S.D.N.Y. 2011) ....................................................................31

*Kelly v. United States,*
    590 U.S. ---, 140 S. Ct. 1565 (2020) ....................................................................3

*United States v. Khalupsky,*
    5 F.4th 279 (2d Cir. 2021) ....................................................................32

*Loughrin v. United States,*
    573 U.S. 351, 134 S. Ct. 2384 (2014) ....................................................................22, 23

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE,*
    763 F.3d 198 (2d Cir. 2014) ....................................................................34

*Pasquantino v. United States,*
    544 U.S. 349, 125 S. Ct. 1766 (2005) ....................................................................26

*In re Platinum & Palladium Antitrust Litig.,*
    61 F.4th 242 (2d Cir. 2023) ....................................................................34

*Prime Int'l Trading, Ltd. v. BP P.L.C.,*
    937 F.3d 94 (2d Cir. 2019) ....................................................................33, 34, 36

*Riggs Nat. Corp. & Subsidiaries v. Comm'r,*
    295 F.3d 16 (D.C. Cir. 2002) ....................................................................10

*S.E.C. v. Zandford,*
    No. 01-147, 2002 WL 485040 (U.S. Mar. 18, 2002) ....................................................................28-29, 30

*Saxe v. E.F. Hutton & Co.,*
    789 F.2d 105 (2d Cir. 1986) ....................................................................30

*SEC v. Zandford,*
    535 U.S. 813, 122 S. Ct. 1899 (2002) .................................................................... *passim*

*Shaw v. United States,*
    580 U.S. 63, 137 S. Ct. 462 (2016) ....................................................................20, 21, 27

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het*
    *Kapitaal Van Saybolt Int'l B.V. v. Schreiber,*
    327 F.3d 173 (2d Cir. 2003) ....................................................................47

*United States v. Adler,*
    186 F.3d 574 (4th Cir. 1999) ....................................................................25, 26, 27

*United States v. Akhavan,*
    No. 20-CR-188 (JSR), 2020 WL 2555333 (S.D.N.Y. May 20, 2020) ....................................................................63

**Page(s)**

*United States v. Alkaabi,*
   223 F. Supp. 2d 583 (D.N.J. 2002) ............................................................21, 24, 26

*United States v. Alvarez-Machain,*
   504 U.S. 655, 112 S. Ct. 2188 (1992) .......................................................................50

*United States v. Baez,*
   349 F.3d 90 (2d Cir. 2003).........................................................................................7, 10

*United States v. Barcelo,*
   628 F. App'x 36 (2d Cir. 2015) .................................................................................61

*United States v. Barinas,*
   865 F.3d 99 (2d Cir. 2017)..........................................................................16, 17, 18, 19

*United States v. Basciano,*
   599 F.3d 184 (2d Cir. 2010)......................................................................................67

*United States v. Blaszczak,*
   308 F. Supp. 3d 736 (S.D.N.Y. 2018).......................................................................58

*United States v. Bonventre,*
   No. 10-CR-228 (LTS), 2013 WL 2303726 (S.D.N.Y. May 28, 2013) .....................63

*United States v. Bortnovsky,*
   820 F.2d 572 (2d Cir. 1987)......................................................................................62, 64

*United States v. Bowe,*
   221 F.3d 1183 (11th Cir. 2000) ................................................................................18

*United States v. Bowe,*
   841 F. Supp. 1160 (S.D. Fla. 1993) .........................................................................16

*United States v. Braeger,*
   No. 21-CR-233, 2023 WL 2136722 (E.D. Wis. Feb. 21, 2023).............................23

*United States v. Budovsky,*
   No. 13-CR-368 (DLC), 2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015) .................41

*United States v. Catino*
   735 F.2d 718 (2d Cir. 1984)......................................................................................49

*United States v. Chalmers,*
   474 F. Supp. 2d 555 (S.D.N.Y. 2007).......................................................................41-42

*United States v. Chestnut,*
   533 F.2d 40 (2d Cir. 1976).........................................................................................43

Page(s)

*United States v. Coburn*,
   No. 19-CR-120 (KM), 2022 WL 357217 (D.N.J. Feb. 1, 2022) ...................................... 59-60

*United States v. Dubceac*,
   No. 09-CR-1164 (RWS), 2011 WL 1458115 (S.D.N.Y. Apr. 14, 2011) ...............................23

*United States v. Ebbers*,
   458 F.3d 110 (2d Cir. 2006)........................................................................................31, 32

*United States v. Eisenstein*,
   731 F.2d 1540 (11th Cir. 1984) ...............................................................................41

*United States v. Epps*,
   742 F. App'x 544 (2d Cir. 2018) ...............................................................................52

*United States v. Estrada*,
   320 F.3d 173 (2d Cir. 2003)........................................................................... 67-68, 69

*United States v. Feng*,
   277 F.3d 1151 (9th Cir. 2002) ...............................................................................49

*United States v. Gallego*,
   907 F. Supp. 735 (S.D.N.Y. 1995) ...............................................................................68

*United States v. Gole*,
   21 F. Supp. 2d 161 (E.D.N.Y. 1997) ...............................................................................26

*United States v. Guzman Loera*,
   24 F.4th 144 (2d Cir. 2022) ........................................................................... 18-19

*United States v. Halper*,
   590 F.2d 422 (2d Cir. 1978)........................................................................................53

*United States v. Harris*,
   805 F. Supp. 166 (S.D.N.Y. 1992) ...............................................................................53

*United States v. Hernandez*,
   No. 09-CR-625 (HB), 2009 WL 3169226 (S.D.N.Y. Oct. 1, 2009)........................... 67-68

*United States v. Hilger*,
   867 F.2d 566 (9th Cir. 1989) ...............................................................................49, 50

*United States v. Ho*,
   984 F.3d 191 (2d Cir. 2020)........................................................................................48

*United States v. Jain*,
   No. 19-CR-59 (PKC), 2019 WL 6888635 (S.D.N.Y. Dec. 18, 2019) ....................................63

Page(s)

*United States v. Kay*,
  359 F.3d 738 (5th Cir. 2004) ........................................................................ 46-47, 48

*United States v. Kerik*,
  615 F. Supp. 2d 256 (S.D.N.Y. 2009) .................................................................53

*United States v. Kogan*,
  16-CR-221 (RWS) (S.D.N.Y. 2017) ...................................................................63

*United States v. Korfant*,
  771 F.2d 660 (2d Cir. 1985) ..............................................................66, 67, 68

*United States v. Kozeny*,
  493 F. Supp. 2d 693 (S.D.N.Y. 2007) ...........................................................47, 48

*United States v. Kukushkin*,
  19-CR-725 (JPO), 2022 WL 861495 (S.D.N.Y.) ...............................................43

*United States v. Kukushkin*,
  No. 22-CR-666, 2023 WL 2396240 (2d Cir. Mar. 8, 2023) ...............................45

*United States v. Lebedev*,
  932 F.3d 40 (2d Cir. 2019) ................................................................................23

*United States v. Levy*,
  25 F.3d 146 (2d Cir. 1995) ..................................................................................7

*United States v. Levy*,
  905 F.2d 326 (10th Cir. 1990) .............................................................................7

*United States v. Levy*,
  947 F.2d 1032 (2d Cir. 1991) .............................................................................12

*United States v. Levy*,
  No. 11-CR-00062 (PAC), 2013 WL 8717859 (S.D.N.Y. Feb. 15, 2013) .............63

*United States v. Loera*,
  No. S4 09-CR-466 (BMC), 2017 WL 2821546 (E.D.N.Y. June 29, 2017)............13

*United States v. Lopez*,
  356 F.3d 463 (2d Cir. 2004).............................................................................68

*United States v. Males*,
  459 F.3d 154 (2d Cir. 2006).............................................................................27

*United States v. Mandell*,
  710 F. Supp. 2d 368 (S.D.N.Y. 2010) ...............................................................63

Page(s)

*United States v. Maxwell,*
   20-CR-330 (AJN), 2022 WL 1294433 (S.D.N.Y. Apr. 29, 2022)..............................67, 68-69

*United States v. Mazza Alaluf,*
   621 F.3d 205 (2d Cir. 2010)......................................................................................41

*United States v. McNeil,*
   320 F.3d 1034 (9th Cir. 2003) ..................................................................................23

*United States v. Meregildo,*
   920 F. Supp. 2d 434 (S.D.N.Y. 2013)........................................................58, 60, 61

*United States v. Moss,*
   344 F. Supp. 2d 1142 (W.D. Tenn. 2004)................................................................12-13

*United States v. Murgio,*
   209 F. Supp. 3d 698 (S.D.N.Y. 2016)......................................................................41

*United States v. O'Donnell,*
   608 F.3d 546 (9th Cir. 2010) ................................................................42-43, 45, 46

*United States v. O'Hagan,*
   521 U.S. 642, 117 S. Ct. 2199 (1997).................................................................29, 32

*United States v. Parnas,*
   19-CR-725 (JPO), 2022 WL 669869 (S.D.N.Y. Mar. 7, 2022)..................................43

*United States v. Polizzi,*
   257 F.R.D. 33 (E.D.N.Y. 2009) ................................................................................69

*United States v. Rajaratnam,*
   No. 09-CR-1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010) .....................63

*United States v. Ramos,*
   No. 06-CR-172 (LTS), 2009 WL 1619912 (S.D.N.Y. June 5, 2009).....................13

*United States v. Rigas,*
   258 F. Supp. 2d 299 (S.D.N.Y. 2003)....................................................................63

*United States v. Savin,*
   No. 00-CR-45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001)........................64

*United States v. Sensi,*
   879 F.2d 888 (D.C. Cir. 1989) ...................................................................................7

*United States v. Stein,*
   424 F. Supp. 2d 720 (S.D.N.Y. 2006)....................................................................66

Page(s)

*United States v. Stein*,
    488 F. Supp. 2d 350 (S.D.N.Y. 2007) ....................................................................61

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006)........................................................................58, 59

*United States v. Villa*,
    744 F. App'x 716 (2d Cir. 2018) .............................................................................67

*United States v. Wakil*,
    No. 21-CR-20406, 2023 WL 2898510 (S.D. Fla. Feb. 14, 2023)............................48

*United States v. Waknine*,
    No. 04-CR-373(A) (DT), 2005 WL 8156937 (C.D. Cal. Oct. 11, 2005) ...........12, 14

*United States v. Weigand*,
    482 F. Supp. 3d 224 (S.D.N.Y. 2020).....................................................................23

*United States v. Wood*,
    57 F.3d 733 (9th Cir. 1995) ...................................................................................55

*Yoo v. United States*,
    43 F.4th 64 (2d Cir. 2022) .......................................................................................9

## Rules & Statutes

17 C.F.R. R. 180.1 .............................................................................................28, 31

31 C.F.R. § 1010.100(ff).....................................................................................38, 41

166 Cong. Rec. H4582-83 (Sept. 21, 2020).................................................................54

76 Fed. Reg. 43585 (Jul. 21, 2011)........................................................................40-41

Fed. R. Evid. R. 404.............................................................................15, 53, 64, 66

Fed. R. Crim. P. R. 7.................................................................................................33

Fed. R. Crim. P. R. 14......................................................................................5, 12, 13

Fed. R. Crim. P. R. 5.................................................................................54, 55, 61, 65

Fed. R. Crim. P. R. 8...............................................................................................3, 51, 52

Fed. R. Crim. P. R. 14........................................................................................3, 13, 51, 52

Fed. R. Crim. P. R. 16........................................................................................3, 13, 61, 65

**Page(s)**

Fed. R. Crim. P. R. 17 ............................................................................................. 56

7 U.S.C. § 1 *et seq.* ("Commodity Exchange Act") ......................................... *passim*

15 U.S.C. § 78dd-2(a) ("FCPA") ...................................................................... *passim*

18 U.S.C. § 2 ............................................................................................................ 43

18 U.S.C. § 371 ................................................................................................. 43, 67

18 U.S.C. § 610 ....................................................................................................... 43

18 U.S.C. § 1344 .............................................................................................. 20, 23

18 U.S.C. § 1349 ..................................................................................................... 67

18 U.S.C. § 3238 .............................................................................................. 49, 50

18 U.S.C. § 3500 ("Jencks Act") ............................................................... 3, 65, 66

31 U.S.C. § 5311 *et seq.* ("Bank Secrecy Act") ............................................. *passim*

52 U.S.C. §§ 30121 ................................................................................................ 43

52 U.S.C. § 30109 .................................................................................................. 43

Bahamas Extradition Act ...................................................................................... 8, 9

Due Process Protections Act, Pub. L. 116-182, 134 Stat. 894 (Oct. 21, 2020) ...................... 54, 55

U.S.S.G. § 2C1.8(b)(2) ........................................................................................... 43

## PRELIMINARY STATEMENT

As noted in our opening, following the meltdown of the cryptocurrency sector at the end of 2022, the Government did not wait for the traditional civil regulatory processes to follow their ordinary course.  Instead, it rushed to judgment, indicting Mr. Bankman-Fried on December 9, 2022, less than a month after FTX's bankruptcy, and before it had even received, let alone reviewed, millions of documents and other evidence directly relevant to the issues in this case.  But in its haste to proceed against Mr. Bankman-Fried, the Government has repeatedly erred as to both matters of process and law, warranting relief from this Court.

First, in its opposition brief the Government now admits that it has not properly followed the treaty between The Bahamas and the United States.  After The Bahamas agreed to extradite Mr. Bankman-Fried on only seven of the original eight charges, the Government ignored this direction, seeking to prosecute Mr. Bankman-Fried on all eight charges.  The Government then filed two superseding indictments adding six new charges without first seeking (or obtaining) consent from The Bahamas, as required under the extradition treaty.  And now, when confronted with the fact that the new charges—nearly half of the indictment—were not properly brought, the Government scrambles about, saying that it has belatedly sought the appropriate permission in The Bahamas and asking the Court and the defendant to bear with it.  But this is not how the process works.  Mr. Bankman-Fried is currently challenging the Government's new application for consent in The Bahamas, as is his right, and such proceedings may well take many months, even years to be litigated—well beyond the October 2 trial date set by this Court.  In light of this, the new charges must be dismissed for lack of personal jurisdiction, or in the alternative severed, so that we may go forward on the October 2 trial date; to proceed otherwise would cause significant prejudice to Mr. Bankman-Fried and should not be permitted, particularly where this entire situation is of the Government's own making.

Second, the additional charges piled on in the last few months are legally deficient and must be dismissed.  The Government has attempted to turn one core allegation (an alleged fraud on FTX customers) into a thirteen-count indictment, charging crimes as varied as commodities fraud, bank fraud, unlicensed money transmitting, and even violations of the federal campaign finance laws and the Foreign Corrupt Practices Act ("FCPA").  In doing so, it has relied on invalid legal theories like the now invalid "right to control" theory of property fraud, asserted charging theories that were never presented to the grand jury, misapplied and misinterpreted the governing case law, and stretched these criminal statutes well beyond their intended scope.  But the Government has stretched too far.  And when the defense sought clarity on these issues through a bill of particulars request and the production of potential *Brady* material in the possession of the FTX Debtors, the Government refused.  As a result, the defense has sought the following relief, set forth in this reply brief as follows.

- <u>Section I</u> addresses the Government's violation of the rule of specialty as a result of its failure to obtain The Bahamas' express consent to Mr. Bankman-Fried's prosecution for Counts 4, 6, 9, 10, 12 and 13.  As a result, the charges must be dismissed for lack of personal jurisdiction.  In the alternative, the charges should be severed.

- <u>Section II</u> addresses the Government's reliance on the invalid "right to control" theory and its failure to otherwise allege a valid property right sufficient to support the bank fraud and wire fraud charges.  As a result, Counts 7-9 and 1-2 must be dismissed.

- <u>Section III</u> addresses (i) the Government's failure to allege a domestic or permissibly extraterritorial application of the Commodity Exchange Act (the "CEA"), and (ii) the Government's failure to allege fraud "in connection with" commodities or commodities transactions.  As a result, Counts 3 and 4 must be dismissed.

- <u>Section IV</u> addresses the Government's failure to charge conspiracy to operate an unlicensed money transmitting business in light of the absence of allegations that any identified business had to obtain a license, requiring dismissal of Count 10.

- <u>Section V</u> addresses (i) the Government's failure to allege a conspiracy to violate campaign finance laws or defraud the FEC, (ii) the Government's failure to allege facts that could establish a conspiracy to bribe a Chinese official for a "business purpose" under the FCPA and its failure to establish proper venue; and (iii), in the alternative, the need to sever Counts 12 and 13 under Rule 8(a) or to avoid prejudice to Mr. Bankman-Fried under Rule 14(a).  As a result, Counts 12 and 13 must be dismissed, or alternatively, severed.

- <u>Section VI</u> addresses Mr. Bankman-Fried's argument that the FTX Debtors are members of the "prosecution team" by virtue of their extensive involvement in the Government's investigation.  As a result, the Government must produce any *Brady* or Rule 16 materials in the possession, custody, and control of the FTX Debtors.

- <u>Section VII</u> addresses the need for a bill of particulars and disclosure of *Brady*, *Giglio*, and Jencks Act materials, as well as the Government's witness list, so that Mr. Bankman-Fried may adequately prepare for trial.

- <u>Section VIII</u> addresses Mr. Bankman-Fried's argument that the S5 Indictment charges multiplicitous counts.  As a result, the Government should be required to elect before trial which of the multiplicitous charges it will prosecute.

In bringing these charges against Mr. Bankman-Fried, the Government has once again disregarded the Supreme Court's repeated direction to prosecutors that they should not expand the scope of federal criminal statues beyond "the crux of the criminality" they prohibit, *Dubin v. United States*, No. 22-10, 599 U.S. ----, --- S. Ct. ----, 2023 WL 3872518, at *7 (U.S. June 8, 2023) "criminalize[] traditionally civil matters and federalize[] traditionally state matters," *Ciminelli v. United States*, 598 U.S. ---, 143 S. Ct. 1121, 1128 (2023), or seek to turn every act of dishonesty or false dealing into a federal fraud offense.  *See Kelly v. United States*, 590 U.S. ---, 140 S. Ct. 1565, 1571-72 (2020).  For the reasons set forth below and in Mr. Bankman-Fried's initial briefs, the Court should grant the requested relief.

I.    **COUNTS 4, 6, 9, 10, 12, AND 13 VIOLATE THE RULE OF SPECIALTY AND SHOULD BE DISMISSED**

The Government has violated the rule of specialty in the Extradition Treaty six times over by prosecuting Mr. Bankman-Fried on nearly half of the counts in the S5 Indictment—the

substantive commodities fraud count (Count 4), the substantive securities fraud count (Count 6), the bank fraud conspiracy count (Count 9), the unlicensed money transmitting conspiracy count (Count 10), the campaign finance conspiracy count (Count 12) and the FCPA conspiracy count (Count 13) (together, the "At-Issue Charges").[1] None of the At-Issue Charges were included in the schedule of charges attached to the Minister's Warrant of Surrender (the "Warrant") nor, as the Government confirmed in its brief, has the Minister otherwise expressly consented to the At-Issue Charges. Indeed, after obtaining the superseding indictments, the Government did not promptly take the steps required to comply with its obligations to seek the Minister's consent under the Extradition Treaty—instead, as the defense understands it, the Government did not seek The Bahamas' consent to the New Charges or confirmation whether the campaign finance offense was intentionally omitted from the Warrant until May 22, 2023—three months after the S3 Indictment[2] (with the bulk of the New Charges) was returned and nearly two months after the S5 Indictment was returned. It appears to have only been after the defense indicated its intent to make a motion regarding specialty that the Government decided to take the requisite action at all.

The Government's delay in seeking The Bahamas' consent has not stopped the Government from pressing forward in prosecuting Mr. Bankman-Fried for these charges. After obtaining the S3 Indictment (adding what are now Counts 4, 6, 9 and 10 and realleging what is now Count 12) and the S5 Indictment (adding Count 13), the Government asked the Court to arraign Mr. Bankman-Fried on the S5 Indictment and to extend the bail order to the S5 Indictment, which the Court did. Thus, the Government's argument that indicting a defendant

---

[1] Since the Government concedes that it must obtain The Bahamas' consent to prosecute Mr. Bankman-Fried for Counts 4 and 6 (together with Counts 9, 10, and 13, the "New Charges") and has so far failed to do so, Mr. Bankman-Fried respectfully requests that the Court order the relief requested below as to Counts 4 and 6 as well. *See* Gov't Opp'n to Mr. Bankman-Fried's Mot. to Dismiss Based on the Rule of Specialty at 3 n.1, ECF No. 148 (the "Specialty Opposition").

[2] Superseding Indictment ¶¶ 67-68, 73-74, 80-86, February 23, 2023, ECF No. 80 ("S3 Indictment").

post-extradition on new charges does not violate the Extradition Treaty is simply beside the point—Mr. Bankman-Fried has not just been indicted on the charges at issue; the Government has relied on those charges as a basis for Mr. Bankman-Fried's continuing detention in clear violation of the Extradition Treaty.

Since the rule of specialty pertains to a court's personal jurisdiction over a defendant, a specialty violation means that the court lacks jurisdiction over a defendant.  Thus, personal jurisdiction is lacking here and the At-Issue Charges must be dismissed.  If the Court determines that it cannot dismiss any of the At-Issue Charges at this stage of the proceedings, they should be severed pursuant to Federal Rule of Criminal Procedure 14 due to the substantial prejudice Mr. Bankman-Fried will suffer if required to prepare for a trial that is less than four months away without knowing whether he will be tried on nearly half of the counts in the S5 Indictment. Severance would also be warranted because Mr. Bankman-Fried has commenced legal proceedings in the Supreme Court of The Bahamas (the court of first instance there) to enjoin the Minister from determining the Government's request for a specialty waiver without observing the proper legal process required under Bahamian law, including providing Mr. Bankman-Fried an opportunity to be heard.  The Bahamian Supreme Court expects to issue a written ruling tomorrow morning on whether it will hear Mr. Bankman-Fried's application regarding the process the Minister is required to follow and has ordered the Minister to abstain from making any decision on the Government's request in the interim.[3]  If the Bahamian Supreme Court subsequently determines that Mr. Bankman-Fried has a right to be heard by the Minister regarding the Government's specialty waiver request, the Minister may only decide the request after Mr. Bankman-Fried has been given an opportunity to be heard.  And if the Minister makes

---

[3] Upon receiving the Bahamian Supreme Court's written ruling, Mr. Bankman-Fried will promptly inform this Court of the ruling and update his request for relief based on such ruling if necessary.

an initial determination to grant the waiver, such initial determination is subject to an appeals process in The Bahamas up to the United Kingdom's Judicial Committee of the Privy Council (the "Privy Council"), which Mr. Bankman-Fried intends to pursue.  The appeals process would likely further stay the Minister's initial determination and is anticipated to take potentially months or years.  Thus, even if the Minister were to initially consent, this consent cannot be considered provided under the Extradition Treaty until the appeals process in The Bahamas has been exhausted.  For its part, due to its own delay in seeking The Bahamas' consent as discussed above, the Government cannot now reasonably contest the severance of the charges by citing some pretense of urgency that requires Mr. Bankman-Fried to be tried on the At-Issue Charges in October.

Accordingly, for the reasons discussed herein, Mr. Bankman-Fried requests that the Court dismiss the At-Issue Charges, or, in the alternative, sever the At-Issue Charges.

### A.    The Warrant of Surrender Does Not Include the Campaign Finance Charge (Count 12).

As noted in ECF No. 139 ("Opening Br. (Mot. No. 1)"), the Warrant states that Mr. Bankman-Fried was provisionally arrested for the offenses set out in the attached schedule of charges, which lists only seven of the eight counts on which the Government sought Mr. Bankman-Fried's arrest (omitting the campaign finance conspiracy charge—Count 8 in the Original Indictment and now Count 12 in the S5 Indictment) and which subsequently formed the basis for Mr. Bankman-Fried's extradition.  *See* Opening Br. (Mot. No. 1) at 8, 13, 15; Ex. 2 (Warrant of Surrender) at SDNY_03_01098055-56;[4] ECF No. 138 (Decl. of Hon. James Lewis KC) ("May 8, 2023 Lewis Decl.") ¶¶ 4, 17, 37, 44, 49, 53, 67.  Thus, The Bahamas granted extradition on only the first seven counts in the United States' request—a limitation that warrants

---

[4] Citations to "Ex. _" refer to exhibits attached to the Declaration of Christian R. Everdell in Support of Samuel Bankman-Fried's Pretrial Motions, May 8, 2023, ECF No. 137.

deference in this proceeding.  *See United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003) ("Courts should accord deferential consideration to the limitations imposed by an extraditing nation[.]").

In seeking to avoid the clear upshot of the Warrant, the Government suggests that the Court should look to the record of extradition proceedings as a whole, rather than focus on the Warrant.  Such focus on the Warrant is necessary, however, since, as the defense's expert avers, the Warrant is "the definitive document identifying the offences on which the fugitive was returned to the requesting state"—a point on which the Government offers no evidence of its own to rebut.  May 8, 2023 Lewis Decl. ¶ 49.

Moreover, even if the remainder of the record were relevant to determining the counts on which The Bahamas granted extradition, the record does not outweigh the significance of the Warrant and its omission of the campaign finance conspiracy count.[5]  *First*, the Government points to the fact that the Diplomatic Note and the arrest warrant the United States submitted to The Bahamas identified all of the charges in the Original Indictment.  The information the Government included in its initial request to The Bahamas for Mr. Bankman-Fried's provisional arrest has no bearing, however, on any determination *The Bahamas* made in response to such request.

---

[5] The cases cited on page 11 of the Specialty Opposition for the proposition that the rule of specialty is not violated where the extradition documents inadvertently omitted a charge are inapposite.  They involved instances where: (1) the document omitting a charge was issued by the United States and thus did not reflect the requested state's determination of the offenses on which extradition is based, *United States v. Levy*, 25 F.3d 146, 159 (2d Cir. 1995); (2) while not mentioning the offense at issue by name, the order of surrender specifically referred to the count for that offense in the indictment and analogized the offense to offenses under the requested state's laws, showing that the requested state intended to grant extradition based on the offense (in contrast to the Warrant here, which does not specifically reference Count 8 of the Original Indictment nor compare it to any similar offenses under Bahamian law), *United States v. Levy*, 905 F.2d 326, 328-29 (10th Cir. 1990); or (3) the treaty at issue allowed the defendant to be tried on "extraditable offense[s] established by the facts in respect of which his extradition has been granted," and there was factual overlap between the indictment the defendant was tried on and the counts in the foreign extradition order (by contrast, Article 14(1)'s language here is not expressly premised on factual overlap and the Diplomatic Note does not even allege any facts to support the campaign finance charge), *United States v. Sensi*, 879 F.2d 888, 895 (D.C. Cir. 1989).

*Second*, Mr. Bankman-Fried's extradition affidavit only sets forth his consent to be extradited without formal extradition proceedings—it does not set forth the charges on which he would ultimately be extradited.[6]  *See* Ex. 1 (Extradition Affidavit of Mr. Bankman-Fried) at 2. The question of what offenses Mr. Bankman-Fried would be extradited on was still an issue to be determined by the Minister of Foreign Affairs, and, as discussed above, the Warrant does not include the campaign finance charge.  *See* Supplemental Decl. of the Hon. James Lewis KC ¶¶ 3-13, June 11, 2023 ("June 11, 2023 Lewis Decl.").

*Finally*, the Government argues that the Bahamian magistrate ordered Mr. Bankman-Fried committed to custody for all the charges in the Diplomatic Note.  This overstates the scope of the magistrate's order.  The magistrate, after confirming that Mr. Bankman-Fried consented to extradition without formal extradition proceedings, simply ordered Mr. Bankman-Fried committed to custody to await extradition without determining the charges on which his extradition would ultimately be based.  Ex. 4 (Tr. of Dec. 21, 2022 Extradition Hr'g) at 11:4-7. And the scope of the magistrate's order accords with what The Bahamas Extradition Act requires the magistrate to do in simplified extradition proceedings.  Section 17(2) of the Extradition Act provides: "If the fugitive, upon being informed of his right to extradition proceedings, consents in writing to be extradited without such proceedings, the magistrate shall commit him to custody to await his extradition under this Act."  Ex. 3 (Bahamas Extradition Act) § 17(2).  Thus, the Extradition Act assigns the magistrate a narrow role and does not require the magistrate to determine the offenses on which a defendant may be extradited.  *See* June 11, 2023 Lewis Decl.

---

[6] That Mr. Bankman-Fried's affidavit stated that he "considered the charges set out in the said Diplomatic Note and arrest warrant" in consenting to simplified extradition does not mean that he consented to extradition on all the charges in the Diplomatic Note and arrest warrant.  *First*, the scope of his actual consent is narrow—the affidavit only states that he "hereby consent[s], in writing, to be extradited without formal extradition proceedings—such extradition being to The United States of America."  Ex. 1 at 2.  *Second*, his consent also took into consideration the rule of specialty.  *Id.* (citing Article 14 of the Extradition Treaty).  Thus, to the extent his review of the charges set forth in the Diplomatic Note and arrest have any weight in determining the scope of his consent, the rule of specialty (which incorporates the dual criminality requirement) must also be given weight in such determination.

¶¶ 3-5.  By contrast, the Extradition Act does allow the Minister of Foreign Affairs to exercise his discretion in determining the charges on which the defendant may be extradited.  *Id.* ¶¶ 6-12*. Section 17(3) provides that "the Minister *may . . .* order [the defendant] to be extradited forthwith to" the requesting state.  Ex. 3 § 17(3) (emphasis added).  And Section 17(4) provides that, in ordering the defendant's extradition, the Minister shall consider certain provisions of the Extradition Act, including provisions that a person shall not be extradited "if his extradition is prohibited by any law in force in The Bahamas" (*e.g.*, such extradition would violate Section 5's dual criminality requirement) or if The Bahamas lacks an agreement with the requesting state to observe the rule of specialty.  *Id.* §§ 5(1)(b), 7(1)(e), 7(4), 17(4).  Structuring extradition responsibilities in this way is not uncommon—indeed, it is similar to how responsibility is allocated within our own domestic extradition framework.  *See Yoo v. United States*, 43 F.4th 64, 71 (2d Cir. 2022) ("The Secretary of State does not have a legal duty to extradite a fugitive and may ultimately refuse to do so, even if the district court issues a certificate of extraditability.").[7]

In a further attempt to dilute the significance of the omission of the campaign finance offense from the Warrant, the Government suggests that its omission was a mistake, rather than a "deliberate decision to limit the terms of the extradition."  The Government proposes that this purported ambiguity cuts in its favor and that it should be presumed The Bahamas intended to consent to the charge, though the Government offers no principled basis for such presumption. ECF No. 148 at 10 ("Specialty Opp'n").  There is no basis to assume that The Bahamas would have consented to the campaign finance offense, because the Diplomatic Note and the arrest warrant do not include any factual allegations relating to the campaign finance offense that would have enabled The Bahamas to determine whether the dual criminality requirement had

---

[7] *Cert. denied*, 143 S. Ct. 576 (2023).

been satisfied.  Moreover, it is unclear if there are any analogous campaign finance laws in The Bahamas at all, such that the dual criminality requirement could ever be met.

Indeed, presuming that The Bahamas intended to consent to the campaign finance offense would contravene the presumption of regularity under United States and Bahamian law, which presumes that public officers "'have properly discharged their official duties.'" *Riggs Nat. Corp. & Subsidiaries v. Comm'r*, 295 F.3d 16, 21 (D.C. Cir. 2002) (tax receipt prepared by foreign government was entitled to presumption of regularity) (quoting *United States v. Chem. Found.*, 272 U.S. 1, 14-15, 47 S. Ct. 1, 6 (1926)); May 8, 2023 Lewis Decl. ¶ 37.  In light of the presumption of regularity, it must be assumed that the Minister of Foreign Affairs properly prepared the Warrant and that the campaign finance conspiracy count was intentionally omitted. Placing the burden on The Bahamas to confirm that the campaign finance conspiracy count was deliberately omitted and proceeding with such charge absent that confirmation, as the Government proposes to do, would run afoul of the deference The Bahamas' decisions must be accorded in this context.  *See Baez*, 349 F.3d at 93.

**B.     The Government Concedes That It Has Not Obtained The Bahamas' Consent to The New Charges (Counts 4, 6, 9, 10 and 13).**

The Government concedes that Counts 4, 6, 9, 10 and 13 are separate offenses from those on which Mr. Bankman-Fried's extradition was granted and thus The Bahamas' express consent is required to proceed on those charges (which the Government has not obtained, despite the passage of almost four months since the Government obtained an indictment on the bulk of the New Charges).  *See* Specialty Opp'n at 1, 3 n.1, 4-5; S3 Indictment ¶¶ 67-68, 73-74, 80-86.

**C.     The Government Has Violated the Rule of Specialty by Relying on Counts 4, 6, 9, 10, 12 and 13 as Bases for Mr. Bankman-Fried's Continued Detention.**

The Government suggests that it can indict Mr. Bankman-Fried on as many charges as it wishes without running afoul of Article 14's rule of specialty provision as long as it does not seek to "detain[], tr[y] or punish[]" Mr. Bankman-Fried on such charges. Specialty Opp'n at 3-4. But, as the clear record in these proceedings to date demonstrates, that is exactly what the Government has done here. Mr. Bankman-Fried was not merely indicted on At-Issue Charges; he has been *detained* based, in part, on them. Following the return of the S5 Indictment, the Government immediately sought to move forward in prosecuting Mr. Bankman-Fried on the At-Issue Charges, requesting that the Court schedule a pretrial conference to arraign Mr. Bankman-Fried on the S5 Indictment. *See* ECF No. 113 (Letter from Danielle Kudla *et al.* to the Hon. Lewis A. Kaplan, Mar. 28, 2023). The Court arraigned Mr. Bankman-Fried on the At-Issue Charges on March 30, 2023 and extended the bail order to the S5 Indictment, all at the Government's request. *See* Mar. 30, 2023 Tr. at 2:18-3:17, 11:25-12:7. Indeed, the Government acknowledges this procedural history elsewhere in its response to Mr. Bankman-Fried's pretrial motions. *See* ECF No. 149 at 39 ("Omnibus Opp'n") ("Following his arrest in this District, [Mr. Bankman-Fried] was arraigned on the Indictment, pled not guilty, and had his bail conditions extended to the new [FCPA conspiracy] charge.") (citing Mar. 30, 2023 Tr. at 3, 12). Thus, as the Government elsewhere admits, Mr. Bankman-Fried has been detained on the At-Issue Charges in violation of its specialty obligations under the Extradition Treaty.

Moreover, the Government did not obtain the S5 Indictment on a lark—it obtained it because it intends to try Mr. Bankman-Fried on the charges in the S5 Indictment. Thus, the Government's suggestion that the Extradition Treaty allows it to indict and prosecute Mr. Bankman-Fried on additional charges as long as it stops short of trying him on such charges

11

borders on sophistry.  Such an interpretation of the Extradition Treaty would allow the

Government to inundate the defendant with discovery relating to charges that the defendant will

not be tried on and force the defendant to sift through that discovery trying to isolate the

evidence relevant to the charges on which the Government can try him.  A reading of the

Extradition Treaty that would endorse this untenable outcome must be avoided.

**D.**     **Due to the Government's Specialty Violations, the At-Issue Charges Should Be Dismissed or, in the Alternative, Severed.**

To remedy the Government's violations of the rule of specialty, the At-Issue Charges

should be dismissed, or, in the alternative, severed pursuant to Federal Rule of Criminal

Procedure 14.

**E.**     **Dismissal is Warranted for the Specialty Violations Here.**

The rule of specialty imposes a limitation on a court's personal jurisdiction over a

defendant.  *See United States v. Levy*, 947 F.2d 1032, 1034 (2d Cir. 1991).  As such, if charges

against the defendant violate the rule of specialty, the court lacks jurisdiction over the defendant

with respect to such charges and they must "result in dismissal without a trial."  *Id.*

Here, the Court lacks jurisdiction over Mr. Bankman-Fried with regard to the At-Issue

Charges because The Bahamas did not extradite Mr. Bankman-Fried on Count 12 (previously

Count 8) despite its inclusion in the Government's December 2022 provisional arrest request and

has not consented to the Government's specialty waiver request for the New Charges.

Accordingly, the At-Issue Charges should be dismissed.  *See United States v. Waknine*, No. 04-

CR-373(A) (DT), 2005 WL 8156937, at *3 (C.D. Cal. Oct. 11, 2005) (granting defendant's

pretrial motion to dismiss charges in superseding indictment that were not covered by charges

underlying extradition order); *United States v. Moss*, 344 F. Supp. 2d 1142, 1147 (W.D. Tenn.

2004) (granting defendant's pretrial motion to dismiss charges on which requested state did not order extradition and thus violated treaty's specialty provision).[8]

**F.      In the Alternative, the At-Issue Charges Should Be Severed.**

If the Court determines it cannot dismiss the At-Issue Charges at this stage of the proceedings, the Court should sever the charges pursuant to Rule 14 to mitigate the substantial prejudice Mr. Bankman-Fried will face if this case moves forward towards trial in October without clarity as to whether he will be tried on nearly half of the charges in the S5 Indictment. Rule 14(a) provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  Courts have recognized that prejudice may exist under Rule 14 where circumstances may hinder a defendant's ability to adequately prepare for trial.  *See, e.g.*, *United States v. Ramos*, No. 06-CR-172 (LTS), 2009 WL 1619912, at *2 (S.D.N.Y. June 5, 2009) (defendant would be prejudiced if new counts added on the eve of trial were not severed).

Here, the Government has acknowledged that it cannot proceed to trial on the New Charges without first obtaining The Bahamas' consent.  And, upon learning that the Government had requested a specialty waiver from The Bahamas, Mr. Bankman-Fried promptly commenced

---

[8] If the Court does not dismiss the At-Issue Charges, the Government should be ordered to produce materials relating to The Bahamas' position regarding the At-Issue charges.  These materials are "material to preparing the defense" under Rule 16(a)(1)(E)(i), specifically Mr. Bankman-Fried's specialty challenge, because they will show, *inter alia*, whether The Bahamas confirms that Count 12 was deliberately omitted from the Warrant and whether The Bahamas has consented to the New Charges.  *See* Opening Br. (Mot. No. 1) at 26-27.  The case cited by the Government to rebut this request—*United States v. Loera*, No. S4 09-CR-466 (BMC), 2017 WL 2821546 (E.D.N.Y. June 29, 2017)—is inapposite.  There, the defendant sought discovery from the government in anticipation of moving to dismiss on specialty grounds without identifying any treaty provision that was allegedly violated, which raised concerns for the court that the defendant's "motion to compel production is more akin to a snipe hunt because there may be nothing there at all." *Id.* at *5, *7.  By contrast, Mr. Bankman-Fried has already filed his specialty motion, the Government has effectively conceded that it has violated the Extradition Treaty, and Mr. Bankman-Fried seeks discovery for the purpose of confirming The Bahamas' position with regard to the At-Issue Charges.

a proceeding in the Supreme Court of The Bahamas to ensure that the Minister follows the requisite process under Bahamian law for determining such request and enjoining the Minister from granting the specialty waiver in the interim.  As noted above, the Bahamian Supreme Court expects to issue a written ruling tomorrow morning on whether it will hear Mr. Bankman-Fried's application regarding the process the Minister is required to follow and the court has ordered the Minister to abstain from making any decision on the Government's request in the interim.[9]  If the Bahamian Supreme Court grants Mr. Bankman-Fried's application, there will be further proceedings regarding the process the Minister must follow under Bahamian law before he may determine the specialty waiver request.

Moreover, Article 14(1)(b) of the Extradition Treaty provides that the Minister can only consent to additional offences "in accordance with its laws," meaning that, even if the Minister initially were to consent, such consent is not given for purposes of the Extradition Treaty until the appeals process in The Bahamas has been exhausted (which may include appeal up to the United Kingdom's Privy Council) or the time for pursuing an appeal has lapsed.  *See* Ex. 2 at SDNY_03_01098075; *cf. Waknine*, 2005 WL 8156937, at *3 (recognizing that a defendant should "be allowed the opportunity to contest the pending specialty waiver request before a tribunal in" the requested state, where the government introduces in a post-extradition superseding indictment "a new theory of prosecution to that contained in the original indictment in support of the request for extradition.").  Should the Minister initially grant consent to any of the At-Issue Charges, Mr. Bankman-Fried may avail himself of any available remedies under Bahamian law, including appealing the decision to the Bahamian courts up through to the U.K. Privy Council—a process that will likely take several months or years to resolve.

---

[9] As noted above, Mr. Bankman-Fried will promptly update this Court after receiving the Bahamian Supreme Court's written ruling.

Thus, it is unlikely that there will be certainty regarding whether Mr. Bankman-Fried can be tried on the At-Issue Charges by the October trial date and such uncertainty will prejudice Mr. Bankman-Fried in his preparation for trial, during trial, and (if applicable) at sentencing. The uncertainty surrounding the charges for trial raises questions about, *inter alia*, the length of the trial, who the Government witnesses are likely to be, the likely scope of their testimony, and which documents are relevant evidence, significantly impeding Mr. Bankman-Fried's ability to prepare his defense. This is particularly so since the At-Issue Charges raise new topics and statutes that are vastly different than those implicated by the first seven counts in the Original Indictment. In addition, if Mr. Bankman-Fried is tried on any counts as to which the Court lacks jurisdiction, he will suffer prejudice in that the jury will hear evidence on counts that it may not have otherwise. *See* Fed. R. Evid. 404(b). And if Mr. Bankman-Fried is convicted on any of those counts at trial, there is a risk that such conviction will be overturned if The Bahamas does not give its consent (which the Government concedes it must for Mr. Bankman-Fried to be "detained, tried, or punished" on these charges). In that scenario, Mr. Bankman-Fried would be prejudiced by any sentence, including potential imprisonment, that may result from such conviction.

Severance would also be appropriate here due to the Government's delay in seeking The Bahamas' consent. In our understanding, the Government did not seek consent to the New Charges or confirmation whether the campaign finance offense was intentionally omitted from the Warrant until May 22, 2023—three months after the S3 Indictment (with the bulk of the New Charges) was returned and nearly two months after the S5 Indictment was returned. Thus, the Government cannot now claim that there is urgency to trying Mr. Bankman-Fried on the

At-Issue Charges when it previously allowed months to go by without seeking consent (which it acknowledges it must obtain before trying Mr. Bankman-Fried on those charges).

Accordingly, given the likely protracted nature of the uncertainty of The Bahamas' position, the At-Issue Charges should be severed.[10]  *See United States v. Bowe*, 841 F. Supp. 1160, 1165-66 (S.D. Fla. 1993) (ordering that, if The Bahamas does not provide its position on potential rule of specialty violation within 30 days, trial will proceed on only counts specifically mentioned in extradition order without prejudice to government reasserting the remaining accounts against defendant post-trial).

### G.     Mr. Bankman-Fried Has Standing to Invoke the Rule of Specialty.

Since the Government has conceded that it needs to obtain The Bahamas' consent prior to "detaining, trying or punishing" Mr. Bankman-Fried on the charges at issue, the relief requested above can be granted without determining whether Mr. Bankman-Fried has standing to invoke the rule of specialty.  As discussed in the Opening Brief (Mot. No. 1), Mr. Bankman-Fried has standing to challenge specialty violations, which provides further support for granting the relief sought above.  *See* Opening Br. (Mot. No. 1) at 15-20.

The Second Circuit's opinion in *United States v. Barinas*, 865 F.3d 99 (2d Cir. 2017) recognizes that a defendant has standing to assert the rule of specialty depending on the posture of the individual requested state: "[W]hile 'the "principle of specialty" reflects a fundamental concern of governments that persons who are surrendered should not be subject to indiscriminate prosecution by the receiving government,' that principle can afford 'the extraditee' himself a 'remedy only if the government *would object*, since the underlying substantive wrong, which

---

[10] If the At-Issue Charges are severed, Mr. Bankman-Fried respectfully reserves the right to address following the October trial the question of whether he can continue to be detained on any of the At-Issue Charges at that point, since, as discussed above, his detention on those charges contravenes the Extradition Treaty.

grows out of international law, is only to the latter.'"  *Id.* at 105 (quoting *Fiocconi v. Att'y Gen. of the United States*, 462 F.2d 475, 479-80 n.8, 481 (2d Cir. 1972)) (emphasis added).

The Government contends that this "language in *Barinas* about whether the surrendering government 'would object' is not an invitation for this Court to speculate about what a foreign sovereign hypothetically 'would' do."  Specialty Opp'n at 6.  But this is precisely what the Second Circuit precedent from which the *Barinas* Court draws the "would object" standard requires.  In *Fiocconi*, the Second Circuit was faced with the question of whether the rule of specialty provided the defendants a remedy where Italy had not taken a position on whether the defendants could be tried on charges in New York when their extradition was granted on similar charges in Massachusetts.  *See* 462 F.2d at 477-78.  Against this backdrop, the *Fiocconi* Court held that "the rule of domestic law conferring a judicial remedy on the extraditee can be a rule according him the remedy only if the surrendering government would object, since the underlying substantive wrong, which grows out of international law, is only to the latter."  *Id.* at 479 n.8; *see also id.* at 480 (holding that it is "essential to determine, as best one can, whether the surrendering state would regard the prosecution at issue as a breach," not whether the requested state actually objected to the specific charges at issue).  *Fiocconi*, and consequently *Barinas*, thus require courts to review the relevant treaty and diplomatic communications to determine the requested state's likely position on the charges.

As discussed in the Opening Brief (Mot. No. 1), the treaty with the Dominican Republic at issue in *Barinas* was dated and less robust than the Extradition Treaty here, in that it, *inter alia*, lacked a provision requiring that the requested state expressly consent to any charges added after extradition or setting forth a procedure for determining whether the rule of specialty was satisfied by any such charges.  *See* Opening Br. (Mot. No. 1) at 17.  Thus, the treaty did not

contain terms suggesting that the Dominican Republic "would object" to the new charges against the defendant.  By contrast, Article 14 of the Extradition Treaty effectively creates a default standing objection by The Bahamas to any charges (*i.e.*, Counts 4, 6, 9, 10, 12 and 13) other than those on which extradition was granted, unless The Bahamas has provided its express consent. *See* Ex. 2 at SDNY_03_01098074-75; May 8, 2023 Lewis Decl. ¶¶ 4, 55, 68.[11]

The Government cites language in *Barinas* stating that an "extraditee lacks standing to complain of noncompliance with an extradition treaty unless the treaty contains language indicating that the intent of the treaty drafters was that such benefits could be vindicated through private enforcement."  *See* Specialty Opp'n at 6 (quoting *Barinas*, 865 F.3d at 105).  This language, however, simply identifies another avenue for a defendant to obtain standing under *Barinas*, *i.e.*, a defendant has standing either (1) because the requested state "would object" to the anticipated prosecution of the defendant, or (2) because the treaty contains language indicating an intent of the treaty drafters to create "benefits that could be vindicated through private enforcement."  For the reasons discussed above, the first avenue confers standing on Mr. Bankman-Fried to invoke the rule of specialty here.

The Government also cites *United States v. Guzman Loera*, 24 F.4th 144 (2d Cir. 2022) as supporting its reading of *Barinas*, but *Guzman Loera* is inapposite.  There, the defendant did not argue that he satisfied the standard for standing under *Barinas* nor is it clear that he could have, as Mexico explicitly consented to trying the defendant on an indictment returned in the Eastern District of New York, rather than in the Western District of Texas and the Southern

---

[11] *Fiocconi* also recognized that a requested state's objections to the United States' prior breaches of the rule of specialty are relevant to determining whether that state "would object" to the present prosecution.  462 F.2d at 480 (citing *United States v. Rauscher*, 119 U.S. 407, 415-16, 7 S. Ct. 234, 238 (1886)), where there was evidence that requested state would object because its secretary of foreign affairs "expressed extreme displeasure" in a prior case where the defendant was tried for an offense different than that named in the extradition request).  Here, The Bahamas has sought to enforce the terms of its extradition orders in other cases involving the United States.  *See United States v. Bowe*, 221 F.3d 1183, 1187, 1191 (11th Cir. 2000) (The Bahamas clarified in a diplomatic note that it granted extradition to the United States on only one count, resulting in dismissal of 12 of 13 counts).

District of California.  *Guzman Loera*, 24 F.4th at 150-152.  By contrast, as discussed in this Section, the Extradition Treaty contains a default standing objection that establishes that The Bahamas "would object" to prosecuting Mr. Bankman-Fried for Counts 4, 6, 9, 10, 12 and 13 absent its express consent to those specific charges and thus he has standing under *Barinas*.

For the foregoing reasons and the reasons stated in the Opening Brief (Mot. No. 1), Counts 4, 6, 9, 10, 12 and 13 should be dismissed, or, in the alternative, severed.  If the Court determines it cannot dismiss Counts 4, 6, 9, 10, 12 and 13 at present, the Government should be ordered to produce the materials requested above before the Court rules on the motion.

## II.    COUNTS 7-9 AND 1-2 MUST BE DISMISSED BECAUSE THEY DO NOT ALLEGE VIABLE THEORIES OF FRAUD

In opposing the defense's motion to dismiss the bank fraud and wire fraud counts, the Government seeks to entirely rewrite these charges.  Having pled these counts under an invalid "right to control" theory of fraud struck down last month by a unanimous decision of the Supreme Court in *Ciminelli*, the Government now attempts to resuscitate these charges by reinventing its charging theories and revising the allegations in the S5 Indictment through its opposition brief, while insisting that these theories and allegations were in the S5 Indictment all along.  This is impermissible and should be rejected.  But for the reasons discussed below, even these new theories and allegations do not establish property interests that can support fraud charges.  The Court must therefore dismiss Counts 7-9 and 1-2.

### A.    Count 9 Must Be Dismissed Because It Is Charged Under the Invalid "Right to Control" Theory of Fraud.

The bank fraud conspiracy count (Count 9) must be dismissed because it is plainly charged under the "right to control" theory of fraud that the Supreme Court recently held was "invalid under the federal fraud statutes."  *Ciminelli*, 143 S. Ct. at 1128 (holding that because the reach of the federal fraud statutes is limited to "traditional property interests . . . the right-to-

control theory cannot form the basis for a conviction under the federal fraud statutes").  As set forth in Mr. Bankman-Fried's opening brief, the S5 Indictment alleges that Mr. Bankman-Fried provided inaccurate information to Bank-1 about the true purpose of the North Dimension bank account, which deprived Bank-1 of the opportunity to conduct "enhanced due diligence" in deciding whether to open the account.  *See* ECF No. 140 at 10 ("Opening Br. (Mot. No. 2)").  Bank-1's right to control access to its bank accounts is no longer a valid property right under *Ciminelli*, which, in turn, invalidates Count 9.

> **1.**     ***The Government Cannot Assert a New Charging Theory That Is Not Alleged in the S5 Indictment.***

The Government does not dispute that *Ciminelli* invalidates the "right to control" theory, nor could it.  Instead, it attempts to pivot from the invalid theory pled in the S5 Indictment to a new theory that purportedly evades *Ciminelli*—namely, that the object of the scheme to defraud Bank-1 was to obtain "money in the form of [FTX] customer deposits," which it claims is "a traditional property interest protected by Section 1344(2)."  Omnibus Opp'n at 8.  The Government cites *Shaw v. United States* for the proposition that a bank typically has a property right in customer deposits held in the bank's custody.  *See* 580 U.S. 63, 67, 137 S. Ct. 462, 466 (2016).  The Government then attempts to reverse-engineer this property interest into its charging theory by asserting that the goal of the conspiracy in opening the North Dimension bank account was to "obtain FTX customer deposits that were transmitted to the bank account" and then "withdraw[] [them] from the bank's custody."  Omnibus Opp'n at 8.

But this theory is nowhere to be found in the S5 Indictment.  Paragraphs 19-21, where the Government claims this theory is alleged, say nothing about Mr. Bankman-Fried or his co-conspirators withdrawing customer funds from Bank-1's custody.  *See* S5 Indictment ¶¶ 19-21 (cited in Omnibus Opp'n at 8).  Those paragraphs allege that the North Dimension bank

account was used by "FTX customers" to deposit or withdraw their *own* funds into and out of their FTX accounts.  *See id.* ¶ 19 (alleging North Dimension account "was created for the purpose of transmitting customer deposits on and off the FTX exchange"); *id.* ¶ 21 (alleging FTX customers "deposited or withdrew fiat currency" into and out of the North Dimension account and received a corresponding credit or debit in their FTX accounts).  The Government cannot simply wave its hands over its own allegations to salvage a count that is no longer viable.  Nor can it be permitted to use its motion response to amend the charging theory alleged in the S5 indictment to one that was never presented to the grand jury.  *See, e.g.*, *United States v. Alkaabi*, 223 F. Supp. 2d 583, 589 (D.N.J. 2002) (dismissing mail fraud charges and noting that "[t]he Government cannot usurp the role of the grand jury by advancing new, unalleged theories of property in its briefs in an effort to save the [i]ndictments" and collecting cases).[12]  Count 9 must therefore be dismissed.

### 2.    The Government's New Theory Does Not Allege Bank Fraud.

Even if the Court were to consider the Government's uncharged theory (and it should not), it does not properly allege bank fraud.  As detailed above, the Government now claims that Mr. Bankman-Fried defrauded Bank-1 to obtain FTX customer deposits in the North Dimension account.  *See* Omnibus Opp'n at 8-10.  This theory fails for two reasons.

First, this is not a situation like *Shaw*, relied upon by the Government, where the defendant fraudulently induced a bank to divert funds held in the name of another customer to himself.  *See* 580 U.S. at 65-66.  Here, the Government alleges that FTX directed customer deposits to the North Dimension bank account and that Mr. Bankman-Fried fraudulently

---

[12] Indeed, this is *exactly* what the Supreme Court refused to let the government do in *Ciminelli* in the context of amending charges presented to a trial jury.  *See Ciminelli*, 143 S. Ct. at 1129 (2023) (declining to "cherry-pick facts presented to a jury charged on the right-to-control theory and apply them to the elements of a *different* wire fraud theory in the first instance" (emphasis in original)).

withdrew those funds.  Omnibus Opp'n at 8-9.  But as alleged, Bank-1 held those funds in the name of North Dimension, not the FTX customers.  S5 Indictment ¶¶ 19, 21.  The FTX customers received a corresponding credit on their FTX accounts which they could use to engage in trading activities and retained the right to withdraw an equivalent amount of funds from FTX at any time.  *Id.* ¶ 21.  Once the funds were deposited, however, from Bank-1's perspective they belonged to North Dimension.  Hence, the North Dimension account holders (including, as alleged, Mr. Bankman-Fried) were free to withdraw funds from the account for any purpose just as any account holder is free to withdraw their own funds.  That is not bank fraud.

Second, the Government does not establish the required nexus between the alleged false statements and the acquisition of the bank's funds.  In *Loughrin v. United States*, the Supreme Court expressed concern that any fraud involving a bank account could be converted into a federal bank fraud charge, which would federalize large numbers of state crimes.  *See* 573 U.S. 351, 361-66, 134 S. Ct. 2384, 2392-95 (2014).  The Court held that the "by means of" clause of Section 1344(2) is a limiting principle that prevents this outcome by requiring a direct connection between the false statement and obtaining the bank's property.  The Court explained:

> Under [18 U.S.C. § 1344(2)], it is not enough that a fraudster scheme to obtain money from a bank and that he make a false statement. The provision as well includes a relational component: The criminal must acquire (or attempt to acquire) bank property "by means of" the misrepresentation. That phrase typically indicates that the given result (the "end") is achieved, at least in part, *through* the specified action, instrument, or method (the "means"), such that the connection between the two is something more than oblique, indirect, and incidental. . . . Section 1344(2)'s "by means of" language is satisfied when, as here, the defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control.

573 U.S. at 362-63 (emphasis in original).  The Government's new theory does not establish this "relational component."  The Government does not assert that Mr. Bankman-Fried made a false

statement to Bank-1 to induce it "to part with money in its control."  *Id.*  It asserts only that

Mr. Bankman-Fried made false statements to induce Bank-1 to open a bank account for North

Dimension.  S5 Indictment ¶¶ 19-20.  That is insufficient to allege bank fraud.  *See Loughrin*,

573 U.S. at 362-64; *United States v. Braeger*, No. 21-CR-233, 2023 WL 2136722, at *6 n.2

(E.D. Wis. Feb. 21, 2023) ("Section 1344(2) is not concerned with fraud in opening an account;

it requires a false statement inducing a bank to release funds.").[13]

In fact, the Supreme Court's concern in *Loughrin* that Section 1344(2) should not be

construed as "a plenary ban on fraud" is particularly apt here.  573 U.S. at 362.  The

Government's new bank fraud theory boils down to this: (1) Mr. Bankman-Fried defrauded FTX

customers of their deposits and (2) those deposits were sitting in a bank account.  Finding this to

be bank fraud would stretch the bank fraud statute well beyond its intended scope and sweep in

virtually all claims of wire fraud that also involve a bank account—a result that *Loughrin* sought

to avoid.  Count 9 must therefore be dismissed.

### B.     Counts 7 and 8 Must Be Dismissed for Failure to Allege a Property Interest That Can Support Wire Fraud Against Alameda's Lenders.

The wire fraud counts related to Alameda's lenders (Counts 7-8) must also be dismissed

because they fail to allege a "traditional property interest" that can support a wire fraud charge.

#### 1.     *The Government May Not Amend the Lender Counts Through Briefing to Allege an Uncharged Property Interest.*

As it did with the bank fraud conspiracy count (Count 9), the Government attempts to

brief around their failure to plead any traditional property interest by inventing a new property

interest and an entirely new charging theory; namely, that Mr. Bankman-Fried fraudulently

---

[13] The other cases cited by the Government are similarly distinguishable because they all involved misstatements to induce a bank to release bank funds to process credit and debit card transactions, make wire transfers to new accounts at other banks, and/or cover cash withdrawals.  *See United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019); *United States v. Weigand*, 482 F. Supp. 3d 224 (S.D.N.Y. 2020), *aff'd sub nom. United States v. Patterson*, No. 21-CR-1678, 2022 WL 17825627 (2d Cir. Dec. 21, 2022); *United States v. McNeil*, 320 F.3d 1034 (9th Cir. 2003); *United States v. Dubceac*, No. 09-CR-1164 (RWS), 2011 WL 1458115 (S.D.N.Y. Apr. 14, 2011).

induced the lenders "to lend new money or to forbear from calling existing loans for immediate repayment." Omnibus Opp'n at 14.  This charging theory is found nowhere in the S5 Indictment.  The Government insists that this is "exactly" what the S5 Indictment alleges in paragraph 36 and chides the defense for not citing the "relevant language." *Id.*  But the phrases "lend new money" and "forbear from calling existing loans" do not appear anywhere in that paragraph, nor does it contain any language with similar meaning.  *See* S5 Indictment ¶ 36. Instead, paragraph 36 purports to identify the alleged misstatements that would satisfy the "by means of false or fraudulent pretenses, representations, or promises" element of the wire fraud statute, ending with a concise summary of the government's theory: "BANKMAN-FRIED and Ellison provided false and misleading financial statements to creditors." *Id.*  It does not allege any property interest the conspiracy intended to obtain from Alameda's lenders by means of those alleged misstatements.  *See id.*  As discussed above, the Government cannot introduce new allegations and amend the S5 Indictment through its opposition brief.  *See Alkaabi*, 223 F. Supp. 2d at 589.  For this reason, the Court should dismiss Counts 7 and 8.

> ### 2.    *Even Under the Government's New Theory, the Lenders Do Not Have a Traditional Property Interest That Can Support a Wire Fraud Charge.*

Even if the Court were to consider the Government's alternative charging theory (and it should not), Counts 7 and 8 would still fail.  First, even assuming the loan agreements gave Alameda's lenders the right to "call[] existing loans for immediate repayment," Omnibus Opp'n at 14, the Government does not allege that Mr. Bankman-Fried ever deprived or intended to deprive the lenders of that contractual right.  Second, because the existing loans were already disbursed to Alameda, the lenders no longer have a property interest in the specific loan funds themselves.  *See, e.g.*, *In re Flanagan*, No. ADV 11-05091-BTB, 2014 WL 764371, at *14 (B.A.P. 9th Cir. Feb. 26, 2014) ("[U]pon disbursement, loan proceeds generally belong to the

borrower."), *aff'd*, 642 F. App'x 784 (9th Cir. 2016).  Thus, the lender charges must be dismissed.

Judge Luttig's opinion in *United States v. Adler* is instructive on this point.  186 F.3d 574 (4th Cir. 1999).  In *Adler*, the defendant owed a contractual debt to a t-shirt supplier related to a large t-shirt order that fell through.  *Id.* at 575.  The defendant sued the purchaser of the t-shirts and eventually settled the claim for close to $1 million.  *Id.*  But instead of paying the supplier, the defendant diverted most of the settlement money to himself while giving the supplier false information to keep him from suing.  *Id.*  The defendant was charged and convicted of wire fraud for defrauding the supplier, but acquitted by the trial court.  *Id.* at 576.

In affirming the judgment of acquittal, the Fourth Circuit noted that there were "only two kinds of property of which [the supplier] could have been deprived": (1) its right to collect the contractual debt owed by the defendant (referred to as the "chose in action" in the opinion) and (2) the settlement money that the defendant received.  *Id.*  As to the first, the Court held that although the supplier "clearly had a property interest in the chose in action, it was not deprived of that property; in fact, [the supplier] exercised its right to sue on that interest and secured a default judgment in a court of law."  *Id.*  As to the second, the Court held that neither the defendant's false assurances, nor the contract, gave the supplier a property right in the settlement funds.  *Id.* at 576-80.  Ultimately, the Court concluded that the defendant "did not deprive [the supplier] of anything in which it had a property right and thus . . . however unsavory his conduct and whatever other laws he may have violated, he did not violate section 1343."  *Id.* at 580.

So too here.  The Alameda lenders were not deprived of their contractual rights to collect the existing loans.  In fact, we understand that Alameda's lenders are vigorously asserting their rights in the FTX bankruptcy proceedings.  Hence, the lender counts cannot be based on the

lenders' right to collect their loans.  Moreover, the Government has not cited any provisions of

the operative loan agreements establishing that the lenders had a property interest in the existing

loan funds themselves.  *See id.* at 579 ("[A] claim on a debt is distinct from a claim to particular

funds to satisfy that debt and . . . the mere existence of the former does not give rise to the

latter.").  The Government's only remaining theory is that lenders were deprived of accurate

information about Alameda's finances which impacted their decision about whether to recall

their loans.  S5 Indictment ¶ 36.  That is a "right to control" theory that was struck down in

*Ciminelli*.  *See* 143 S. Ct. at 1124 ("'[P]otentially valuable economic information' 'necessary to

make discretionary economic decisions' is not a traditional property interest . . . .").[14]

The lender fraud counts are an impermissible attempt to charge a garden variety contract

dispute as a federal fraud offense.  *See id.* at 1128 ("The right-to-control theory . . . criminalizes

traditionally civil matters and federalizes traditionally state matters.").  Counts 7 and 8 must

therefore be dismissed.  *See Alkaabi*, 223 F. Supp. 2d at 585 (granting motion to dismiss mail

fraud charges where "alleged property interest [was] not a traditional property interest cognizable

under the mail fraud statute").

### C.      Counts 1 and 2 Must Be Dismissed for Failure to Allege a Property Interest That Can Support Wire Fraud Against FTX Customers.

The counts alleging wire fraud against FTX customers (Counts 1-2) fail for the same

reasons set forth above.  The S5 Indictment alleges that FTX customers deposited their fiat

currency into bank accounts controlled by FTX and in return received a corresponding credit on

their FTX account that they could use to trade.  S5 Indictment ¶ 21.  The S5 Indictment does not

---

[14] The cases cited by the Government are inapposite.  *Pasquantino v. United States*, 544 U.S. 349, 125 S. Ct. 1766 (2005) involved a government's right to collect tax revenue, which is "money legally due" to the sovereign, not a contractual right to collect a debt that can be exercised at the discretion of the debt holder.  *United States v. Gole*, 21 F. Supp. 2d 161 (E.D.N.Y. 1997) does not address the "money or property" element of the federal property fraud statutes and, in any event, the defendant there made misrepresentations to keep money that he was never entitled to receive and was therefore never his property, unlike the funds loaned to Alameda.

allege that the FTX customers retained a property right in their specific deposits or that they had any right to control what happened to their funds once they were deposited with FTX.  The only other right FTX customers had with respect to their funds was the right to receive an equivalent amount of money back when they requested a withdrawal.

Hence, just like the t-shirt supplier in *Adler*, the FTX customers retained a contractual right of repayment, not a right to their specific deposits.  And just as traditional banks do not commit wire fraud when they use customer deposit funds "as a source of loans that help the bank earn profits," *Shaw*, 580 U.S. at 66, then even assuming Mr. Bankman-Fried used FTX customer funds to make investments as alleged in the S5 Indictment, that too would not be wire fraud as long as he intended to cover customer withdrawals.  The S5 Indictment does not allege anything to the contrary.  Unlike *United States v. Males*, 459 F.3d 154 (2d Cir. 2006), cited by the Government, this is not a situation where Mr. Bankman-Fried is alleged to have deprived the FTX customers of the ability to use their funds while he used those same funds for his personal benefit.  *See* Omnibus Opp'n at 12.  While FTX customers' funds were deposited with FTX, the only use of funds the FTX customers expected was what they received—the ability to trade on FTX.  Accordingly, the Government has not alleged wire fraud against FTX customers. Counts 1 and 2 must therefore be dismissed.[15]

---

[15] Dismissal of the wire fraud charge in Count 2 would necessarily result in the dismissal of money laundering conspiracy charged in Count 11.  Count 11 expressly incorporates Count 2 as the underlying "specified unlawful activity."  *See* S5 Indictment ¶¶ 94-95 (alleging that the objects of the conspiracy were to launder proceeds of "specified unlawful activity, to wit, the wire fraud alleged in Count Two of this Indictment").  Because "specified unlawful activity" is an essential element of the offense of money laundering, dismissal of Count 2 for failure to state an offense requires the dismissal of Count 11 as well.

III.     **THE COMMODITIES FRAUD CHARGES (COUNTS 3-4) SHOULD BE DISMISSED**

A.     **The Government Has Failed to Allege Fraud "In Connection With" a Commodities Transaction.**

As previously shown, the Government has failed to state an offense under the CEA and Rule 180.1 because the S5 Indictment does not allege a fraud "in connection with" commodities or commodities transactions.  ECF No. 141 ("Opening Br. (Mot. No. 3)") at 3-8.  Specifically, the alleged misappropriation of customer funds was merely incidental, and not integral, to any alleged misrepresentations or any commodity or commodities transaction, and therefore insufficient as a matter of law.

In response, the Government attempts to offer several alternative theories of commodities fraud.  Omnibus Opp'n at 17-21.  None of these theories articulates a "connection" with commodities or commodities transactions consistent with the statutory text, caselaw, or common sense.  All of them overstretch the CEA.  And collectively, the Government's disparate theories perfectly illustrate the need, reiterated by the Supreme Court just days ago, to interpret criminal statutes narrowly, particularly where they include malleable and "equivocal" terms such as "in connection with."  *See Dubin*, 2023 WL 3872518, at *11-12 (rejecting the government's broad reading of "in relation to" in the federal identity theft statute and stressing the need to "avoid[] reading incongruous breadth into opaque language in criminal statutes"); *cf. SEC v. Zandford*, 535 U.S. 813, 820, 122 S. Ct. 1899, 1903 (2002) ("[T]he statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b) . . . .").

*First,* the Government asserts that some customer deposits "were commodities, namely cryptocurrencies," and thus that their misappropriation was "in connection with" commodities and commodities transactions for CEA purposes.  Omnibus Opp'n at 17.  But this theory runs

aground on the logic of *Zandford* and other authorities.  *See, e.g.*, *Zandford*, 535 U.S. at 825 n.4 (the "in connection with" requirement would not be met if "a broker embezzles cash from a client's account"); *United States v. O'Hagan*, 521 U.S. 642, 656-57, 117 S. Ct. 2199, 2209 (1997) (indicating that "embezzl[ing] cash from another" would not satisfy the "in connection with" requirement).[16]

The Government tries to evade *Zandford*'s reasoning by asserting that the Supreme Court did not faithfully reflect the Solicitor General's statement during oral argument that only embezzlement from a non-brokerage account would fall outside the CEA.[17]  Omnibus Opp'n at 20.  But the Supreme Court should be presumed to have meant what it said.  Indeed, the Second Circuit has characterized as "uncontradicted dictum" *Zandford*'s statement regarding "a broker embezzl[ing] cash from a client's account," which the Government now claims is inaccurate, *see Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 37 & n.19 (2d Cir. 2005).[18]  In any event, *Zandford* made clear that "a simple theft of *cash or securities in an investment account*" would not meet the "in connection with" requirement of the CEA. 535 U.S. at 820 (emphasis added).

The Government misleadingly implies that *CFTC v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. Mar. 6, 2018) held that the misappropriation of virtual currency violated the CEA, without any further connection between the fraud and commodities or commodities trades. Omnibus Opp'n at 17-18 (citing *McDonnell*, 287 F. Supp. 3d at 227).  The cited passage from *McDonnell* only addressed the scope of the CFTC's authority; it says nothing about the "in

---

[16] In *Zandford*, the transactions that "enabled" the fraudulent scheme involved a broker writing checks against his clients' mutual fund account "knowing that redeeming the check would require the sale of securities."  535 U.S. at 820-21.  The fraud thus "coincided with the sales themselves."  *Id.*  Here, however, the wiring of customer funds to Alameda and North Dimension and the subsequent alleged misappropriation of funds in corporate bank accounts were discrete events with only an incidental relationship to commodities or commodities transactions.

[17] To the extent the colloquy is relevant at all, it expressly rejects another of the Government's newly articulated theories of commodities fraud, as discussed below.

[18] *Vacated and remanded on other grounds*, 547 U.S. 71, 126 S. Ct. 1503 (2006).

connection with" requirement.  On the facts, *McDonnell* is easily distinguished:  the defendants

there promised but failed to provide "trading advice and guidance" for virtual currencies and

promised to engage in authorized trades, but instead misappropriated customer funds.  *Id.* at 232-

33.

     *Second,* the Government argues that customers were induced to join FTX "for the

purpose of trading commodities," such as bitcoin.  Omnibus Opp'n at 18.  By this logic, the

requisite connection exists solely because FTX happened to be a commodities exchange.[19]  The

Supreme Court rejected this theory in the same colloquy in *Zandford* that the Government

incorrectly cites to bolster its misappropriation of commodities theory.  The Court characterized

as "quite a leap" from its prior decisions the Government's assertion that "any fraudulent

conversion by a broker from a brokerage account" is "in connection with" securities "because . .

. the very purpose of the brokerage account is to buy and sell securities."  Tr. of Oral Arg. at *6,

*S.E.C. v. Zandford*, No. 01-147, 2002 WL 485040 (U.S. Mar. 18, 2002).

     Moreover, every case cited by the Government involved the type of integral connection

between the alleged fraud and commodities that is absent from the S5 Indictment.  *See CFTC v.*

*Vartuli*, 228 F.3d 94, 101-02 (2d Cir. 2000) (defendants marketed a trading system that would

recommend specific trades, establishing a "direct link between the advertising and the currency

trading"); *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 110-11 (2d Cir. 1986) (defendant promised

to provide conservative investment advice and discretionary trading services—

misrepresentations that "affected all subsequent trades made on appellant's behalf"); *CFTC v.*

*Royal Metals Grp., LLC*, No 18-CV-8407 (JMF), 2019 WL 1996307, at *7 (S.D.N.Y. Jan. 25,

---

[19] As such, the Government's theory exhibits the boundless "riffing on equivocal language" the Supreme Court cautioned against in *Dubin*.  2023 WL 3872518, at *11; *cf. id.* at *6 (noting that if the term "'in relation to' . . . were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes there would be no limits") (internal quotations omitted).

2019) (respondent entered into contracts to buy and sell precious metals but instead misappropriated client funds and commodities); *In re J.P. Jeanneret Associates*, *Inc.*, 769 F. Supp. 2d 340, 363 (S.D.N.Y. 2011) (fund manager had discretion to reinvest customer assets and made misrepresentations about the prudence of investing with Bernie Madoff for discretionary trading); *see also Zandford*, 535 U.S. at 821 (the defendant, without client authorization, wrote checks from the clients' mutual fund account, "knowing that redeeming the check would require the sale of securities").

Here, in contrast, there is no allegation that customers were misled into believing that FTX would engage in particular types of trades with or on behalf of its customers or provide investment advice. Instead, customers were allegedly induced to join FTX and deposit "funds" with the platform; thereafter, customers made their own decisions regarding when to trade and what transactions to enter into. S5 Indictment ¶ 19. The alleged misrepresentations and misappropriation did not relate to the risks of commodities or commodities transactions, but to the risks of depositing assets on the platform.

The Government also asserts that FTX customers were fraudulently induced to hold commodities, relying on *United States v. Ebbers*, 458 F.3d 110, 127 (2d Cir. 2006). Omnibus Opp'n at 20. But *Ebbers* did not consider the "in connection with" requirement; the cited portion only addressed "loss calculation" for sentencing purposes.[20] In addition, the fraud at issue in

---

[20] To uncertain end, the Government emphasizes the term "swap" in Rule 180.1, asserting that no purchase or sale of a swap is required to establish commodities fraud. Omnibus Opp'n at 17, 22. But a "swap" is defined in the CEA as an "agreement, contract, or transaction" meeting various criteria. 7 U.S.C. § 1a(47)(A). A swap is thus not different in kind from a "contract of sale … or for future delivery" governed by the other portions of Section 6(c) of the CEA or Rule 180.1. The Government also cites CFTC guidance stating that Rule 180.1 reaches fraud in connection with the "*pendency[] or termination* of any swap." Omnibus Opp'n at 17 (quoting 76 Fed. Reg. at 41,406) (emphasis in Omnibus Opp'n). The Government does not cite, and we are not aware of, any decision applying the "pendency or termination" language. In any event, Rule 180.1 indisputably requires the same "connection" to swaps as to other commodities.

*Ebbers*—a series of fraudulent financial disclosures potentially relied upon by Worldcom investors, *see id.*—was fundamentally different from the conduct alleged here.

*Third*, the Government claims the requisite "connection" is established by the allegation that misappropriated customer assets were used "in commodities and swap transactions for the benefit of Alameda."  Omnibus Opp'n at 21.  Again, the authorities cited by the Government undermine rather than support its position.  *Khalupsky* involved the use of hacked press releases to execute trades before the information was made public.  5 F.4th 279, 290 (2d Cir. 2021).  The link between the fraud and securities transactions was clear—the stolen information related to specific securities and was used as the basis for specific trades.  *Id.* at 290-91.  *O'Hagan* is also easily distinguished.  *See* 521 U.S. at 655-56 (reasoning that "[t]he securities transaction and the breach of duty . . . coincide" because the material nonpublic information permits "no-risk profits through the purchase and sale of securities"); *see also id.* at 521 U.S. at 656-57 (noting that the misappropriation of money may "be viewed as sufficiently detached from a subsequent securities transaction that § 10(b)'s 'in connection with' requirement would not be met").

Indeed, both *O'Hagan* and *Zandford* explain precisely why the Government's latest theory—that customer funds were misappropriated and later used in commodities transactions— is different, and why it fails.  *See Zandford*, 535 U.S. at 280 (distinguishing a cognizable fraud from "a case in which a thief simply invested in the proceeds of a routine conversion in the stock market"); *O'Hagan*, 521 U.S. at 656 ("The misappropriation theory would not . . . apply to a case in which a person . . . embezzled cash from another, and then used the proceeds . . . to purchase securities")[21]; Opening Br. (Mot. No. 3) at 7-8.

---

[21] Notably, the *O'Hagan* opinion is here quoting from the Government's brief in that case, which took a position directly opposed to the position it advances here.

B.    **The S5 Indictment Seeks an Impermissible Extraterritorial Application of the CEA.**

In addition to their failure to satisfy the "in connection with" requirement for commodities fraud, Counts 3 and 4 should be dismissed for failure to allege a domestic or permissible extraterritorial application of the CEA.

As a threshold matter, the Government incorrectly suggests that it would be premature to dismiss CEA charges on extraterritoriality grounds absent "full factual development at trial." Omnibus Opp'n at 21-22.  But if no alleged conduct comes within a statute's territorial reach, there is no offense is all.  Consequently, facts sufficient to satisfy the territoriality requirement are "essential facts constituting the offense charged," and they must be alleged in an indictment pursuant to Federal Rule of Criminal Procedure 7(c)(1).[22]  Because the Government has failed to do so with respect to Counts 3 and 4, those counts must be dismissed.

As discussed in the Opening Brief, the CEA does not apply extraterritorially, and the S5 Indictment fails to allege a permissible domestic application of the statute.  *See* Opening Br. (Mot. No. 3) at 11-14.  Instead, the S5 Indictment's allegations and judicially noticeable facts suggest a predominantly foreign scheme in which Mr. Bankman-Fried is alleged to have defrauded the users of FTX.com, a foreign commodities market organized in Antigua that generally operated abroad and did not accept U.S. users.  *See id.* at 11.

The Government also suggests that *any* manipulative conduct taking place in the United States is sufficient to establish a domestic application of the CEA.  But the presumption against extraterritoriality "cannot evaporate any time '*some* domestic activity is involved.'"  *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 106 (2d Cir. 2019) (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266, 130 S. Ct. 2869 (2010)).  Rather, the rule is that the alleged

---

[22] The Government's citation to cases in which courts *have* considered territoriality challenges based on the trial record does not mean that is the *only* time they can do so.

conduct cannot "be 'so predominantly foreign' as to render the claims impermissibly extraterritorial."  *Id.* at 107 (quoting *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014)).[23]

Nevertheless, the Government contends that the S5 Indictment sets forth a domestic application of Section 6(c)(1) by alleging that (1) Mr. Bankman-Fried made purportedly misleading statements in the United States, (2) statements were "directed to" or received by "prospective U.S. customers," and (3) allegedly relevant "banking activity and customer transactions" took place in the United States.  *See* Omnibus Opp'n at 24-26.  None of these allegations and arguments establish a domestic application of the CEA.

The only statements Mr. Bankman-Fried allegedly made while present in the United States are those he made in a single appearance before Congress, which are not sufficient to allege a domestic application of the CEA.  *See* Opening Br. (Mot. No. 3) at 12.

The assertion that alleged misrepresentations were directed to or received by potential customers in the U.S. is also unhelpful to the Government, because statements made outside the United States that reach a U.S. audience do not establish a permissible domestic application.  *See Parkcentral*, 763 F.3d at 216 (securities fraud claim was predominantly foreign where it was premised on "statements made primarily in Germany with respect to stock in a German company

---

[23] The Second Circuit in *Prime Int'l* applied *Parkcentral*'s "predominantly foreign" standard to Section 22 of the CEA, but clearly indicated the standard also applies to Section 6(c)(1) (7 U.S.C. § 9(1)), which underlies Counts 3 and 4.  Specifically, the *Prime Int'l* court explained that application of the "predominantly foreign" standard is necessary to avoid "divorc[ing] the private right afforded in Section 22 from the requirement of a domestic violation of a substantive provision of the CEA," including Section 6(c)(1).  *Prime Int'l*, 937 F.3d at 105.  *See also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 266-67 (2d Cir. 2023) (explaining that to state a claim under Section 22, a plaintiff must allege "domestic" conduct violative of the CEA's substantive provisions, such as Section 6, meaning conduct that is not "predominantly foreign").

traded only on exchanges in Europe," even if statements were alleged to "have been intended to deceive investors worldwide.").[24]

In addition, the allegation that statements regarding the safety of the FTX platform found their way to U.S. persons is irrelevant to the alleged fraud involving the alleged misappropriation of FTX customer funds, because FTX was not open to U.S. customers, a limitation made clear, among other places, on Mr. Bankman-Fried's Twitter profile.[25]  Such alleged misrepresentations would therefore not be "in connection with" the fraud as alleged in the S5 Indictment.  *See also* Section III.A, *supra*.   The same is true of the argument that "banking activity and customer transactions took place in the United States."  Omnibus Opp'n at 24-25.  Customer transactions on FTX.com—the relevant commodities market here—took place *outside* the U.S.  And the use of North Dimension's U.S.-based bank account was tangential to any commodities transaction or markets.  *See* Opening Br. (Mot. No. 3) at 5-8; Section III.A, *supra*.

The Government also misreads Mr. Bankman-Fried's argument that the alleged impact of the purported scheme on U.S. commodities prices is "too attenuated a connection to establish a domestic application of the CEA," characterizing it as a challenge "to the strength of the proof of price impact on commodities" that must be deferred until after trial.  Opening Br. (Mot. No. 3) at 13-14; Omnibus Opp'n at 26.  Mr. Bankman-Fried is not challenging on the present motion the Government's ability to prove an impact on U.S. commodities prices at trial.  The point is that

---

[24] The case cited by the Government, *CFTC v. Reynolds*, No. 19-CV-05631 (MKV), 2021 WL 796683, at *3-4 (S.D.N.Y. Mar. 2, 2021) is not persuasive authority because (1) *Reynolds* was a default judgment decision; and (2) the CFTC's complaint, unlike the S5 Indictment here, alleged that customers of trading company resided in the United States.

[25] *See, e.g.,* @SBF_FTX Twitter Account (as of June 9, 2022), https://web.archive.org/web/20220609142234/https://twitter.com/SBF_FTX/ (last visited June 10, 2023) (Mr. Bankman-Fried's Twitter profile, stating that "FTX.com/intl and FTT not available in the United States or prohibited jurisdictions.").  We respectfully request that the Court take judicial notice that Mr. Bankman-Fried's Twitter profile included this statement.  *See Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 263 (S.D.N.Y. 2019) (taking judicial notice under Fed. R. Evid. 201(b)(2) of statements made via public official's Twitter account), *aff'd*, 788 F. App'x 85 (2d Cir. 2019).

any such impact (even if adequately alleged) would not be sufficient to allege a domestic application of the CEA.  If the Government's view were correct, it would bring within the scope of the CEA any action anywhere in the world that tangentially impacts the U.S. commodities market—this is exactly the type of "ripple effect" that the Second Circuit held to be insufficient in *Prime International*.  *See* 937 F.3d at 108.

To the extent that 7 U.S.C. § 2(i) extends the CEA to foreign conduct involving swaps, the S5 Indictment fails to allege that the alleged fraud had a "direct and significant connection" with U.S. commerce.  7 U.S.C. § 2(i).  Rather than pointing to sufficient factual allegations in the S5 Indictment that would be encompassed by this provision (because there are none), the Government makes expansive representations about what the "proof at trial" will show.  *See* Omnibus Opp'n at 23-24.  Even if credited at this stage, none of the proffered (but unalleged) facts establish the requisite "direct and significant connection" to U.S. commerce.

*First*, the Government asserts that FTX marketed swaps to and served U.S.-based customers.  Here, the Government appears to be repurposing its factual allegations in the S5 Indictment regarding *FTX.US* to fill in the gaps in its theory with regard to *FTX*, a foreign commodities market serving only non-U.S. users.  *See* S5 Indictment ¶ 2.  Again, however, marketing and trading involving FTX.US customers in the United States does not establish a domestic application of the CEA to a purported scheme involving FTX customers.

*Second*, the Government alleges that "funds used to buy swaps were misappropriated from U.S. bank accounts."  Section 2(i)'s requirement of a connection between foreign swaps-related conduct and U.S. commerce does not obviate the need to allege a connection between the alleged fraud and commodities required by the CEA's substantive provisions.  Even if the Government's speculative proffer as to the former satisfied its pleading burden (it does not), it

has failed to allege a sufficient connection between the alleged misappropriation from U.S. bank accounts and commodities or commodities transactions for purposes of the CEA's "in connection with requirement."  *See* Section III.A, *supra*; Opening Br. (Mot. No. 3) at 4-8.

*Third*, the Government asserts that the evidence will show that allegedly misappropriated funds were used for "spending in the United States."  By this logic, the CEA would apply every time a person is involved in purely foreign misconduct related to swaps and then spent some of the proceeds in the United States.  Such a connection is neither direct nor significant.  In addition, the only U.S.-based expenditures alleged in the S5 Indictment were campaign contributions.  *See* S5 Indictment ¶¶ 45, 47.  But the alleged contributions were several steps removed from any foreign swaps-based activity and cannot plausibly be said to bear a "direct and significant connection" to U.S. commerce.

*Finally*, the Government's representation that it will proffer evidence at trial showing that the alleged fraud had an effect on "the cryptocurrency markets in the United States" is insufficient to establish a "direct and significant connection" to U.S. commerce.  Omnibus Opp'n at 23-24.  For example, neither the S5 Indictment nor the Government's proffer indicate how or why an allegedly fraudulent scheme related to FTX—a foreign commodities market serving only non-U.S. users—ultimately impacted the price of commodities in the U.S. market.

Because the Government has failed to allege a domestic or permissibly extraterritorial application of the CEA, Counts 3 and 4 should be dismissed.

## IV.   COUNT 10 MUST BE DISMISSED BECAUSE THE INDICTMENT DOES NOT ALLEGE SUBSTANTIAL ACTIVITY IN THE UNITED STATES THAT WOULD REQUIRE FTX TO REGISTER AS A MONEY TRANSMITTING BUSINESS

The Government contends that Mr. Bankman-Fried conspired to operate an unlicensed money transmitting business that was required to register under the Bank Secrecy Act ("BSA") but failed to do so.  Although FTX was a foreign company operating overseas that did not

provide services to U.S.-based customers,[26] the Government asserts that FTX was nonetheless required to federally register as a money transmitting business because of its "substantial activities" as a money services business ("MSB") in the United States.  *See* Omnibus Opp'n at 26-30.  According to the Government, such substantial U.S.-based MSB activities arise from FTX's own activities and because certain Alameda and North Dimension entities were incorporated in the United States.  *See id.*  But the allegations in the S5 Indictment are not sufficient to establish that FTX was required to register.  The Government attempts to cure this deficiency by proffering misleading and irrelevant evidence outside the four corners of the S5 Indictment, misreading the governing law and regulations, and relying on inapposite precedents.  These efforts are unavailing.  Count 10 must therefore be dismissed.

> *First*, the Government has not identified an actual business that was the purported unlicensed money transmitting business at issue in Count 10.  The BSA requires that any person who owns or controls a money transmitting business "shall register *the business* . . . with the Secretary of the Treasury," and requires the registration to include basic information specific to the particular business such as its "name and location" and the names of its owners, directors, and officers.  31 U.S.C. § 5330(a)(1) & (b) (emphasis added).  The BSA registration requirements are directed to a specific individual, business, or other thing with legal status as a "person," defined to include corporations and "*all entities cognizable as legal personalities.*"  31 C.F.R. § 1010.100(ff) (MSB must be "[a] person"); *id.* § 1010.100(mm) (definition of "person") (emphasis added).  The Government asserts that the relevant "business" alleged in the S5 Indictment was not FTX, but some undefined amalgam of FTX and "at various times . . . U.S.-based companies Alameda and North Dimension."  Omnibus Opp'n at 27.  Such a loose

---

[26] Count 10 undisputedly does not concern FTX.US, FTX's U.S. business that served U.S.-based customers and was registered as an MSB.  *See* Opening Br. (Mot. No. 3) at 15.

patchwork of different entities that shifted over time is insufficient to identify a particular business that purportedly had to register under the BSA and its implementing regulations. Indeed, it would be impossible for the "business" identified by the Government to comply with the registration requirements.  *See* 31 U.S.C. § 5330(b).  The S5 Indictment therefore does not state an offense under Section 1960(b)(1)(B).[27]

*Second*, even if the Government has properly alleged a business (and it has not), the allegations in the S5 Indictment are insufficient to support a charge under Section 1960(b)(1)(B). FinCEN's regulations and the Final Rule (defined below) do not require a "foreign-located" MSB to register unless it does business as an MSB "in substantial part" within the United States, and further state that "a foreign-located person's mere maintenance of a bank account in the United States should not cause that person to be defined as an MSB."  *See* Opening Br. (Mot. No. 3) at 15-18.  The Government contends that the S5 Indictment alleges "significant additional activity" within the United States beyond the "mere maintenance" of "U.S.-based bank accounts in the names of Alameda and North Dimension."  Omnibus Opp'n at 28-29.  But in fact, as the Government recognizes, the S5 Indictment alleges only that (1) Alameda and North Dimension entities were "incorporated in the United States and subject to Delaware law," and (2) "wire transfers sent by customers or FTX were received in or transmitted through the Southern District of New York."  *Id*.

These allegations do not establish any additional MSB activity in the United States that would trigger the registration requirement.  As to the first, the Final Rule explicitly states that

---

[27] Mr. Bankman-Fried sought clarity on this issue in his request for a bill of particulars, in which he asked the Government to "identify the unlicensed money transmitting business alleged in Count Ten."  On May 1, 2023, the Government provided a non-committal response that, while referencing FTX, went out of its way *not* to identify FTX or any other business as the relevant money transmitting business, stating that: "Count Ten alleges that the defendant conspired with others to operate an unlicensed money transmitting business by using United States bank accounts to accept real currency from FTX.com customers and transmitting the equivalent of the real currency to their FTX.com customer accounts, and by using United States bank accounts to transmit real currency to FTX.com customers making withdrawals from their FTX.com accounts."

"an entity qualifies as an MSB based on *its activity within the United States*, not *the physical presence* of one or more of its agents, agencies, branches, or offices in the United States."  Bank Secrecy Act Regulations; Definitions and Other Regulations Relating to Money Services Businesses, 76 Fed. Reg. 43585, 43588 (Jul. 21, 2011), *available at* 2011 WL 2881105 (the "Final Rule") (citing 31 C.F.R. § 1010.100(ff)) (emphasis added).  Hence, the simple allegation that Alameda and North Dimension entities were incorporated in the United States is of no moment.  As to the second, the alleged "wire transfers" relate to the process by which FTX, a *foreign* entity, accepted dollar deposits from its *foreign* customers so that they could fund their FTX accounts and engage in transactions on the FTX exchange *outside of the United States*. Indeed, the S5 Indictment alleges that this was the only function the Alameda and North Dimension bank accounts served for FTX.  *See* S5 Indictment ¶ 17 ("FTX . . . use[d] Alameda trading accounts to accept customer deposits and process customer withdrawals."); *id.* ¶¶ 18-19 (North Dimension "had no employees or business operations outside of its bank account" and had no functions other than as "an account to receive and transmit FTX customer deposits").  As set forth in Mr. Bankman-Fried's opening brief, this is not the sort of significant MSB activity within the United States that would trigger the registration requirement.  *See* Opening Br. (Mot. No. 3) at 18.

The Government's efforts to proffer anticipated proof that will purportedly establish significant MSB activity within the United States fare no better.  The Government asserts that the proof at trial will show that some employees of the amorphous money transmitting "business" and "substantial portions of its infrastructure" were located in the United States.  Omnibus Opp'n at 29.  These attempted proffers, however, refer to the physical location of the business and its

agents, not to the business's MSB *activity* within the United States, which is the relevant

consideration, as set forth above.  *See* Final Rule, 76 Fed. Reg. at 43588.

 *Finally*, the Government asserts that a foreign-based money transmitting business

qualifies as a "domestic financial institution" that must register under the BSA (and face criminal

penalties under Section 1960 if it does not) if the business's use of U.S. bank accounts is "central

to the money transmitting business."  Omnibus Opp'n at 30.  This standard is invented and found

nowhere in the governing law, regulations, or precedent.  As discussed above, a foreign-located

money transmitting business will only be considered a "domestic financial institution" that is

required to register under the BSA if it provides MSB services "in substantial part within the

United States."  *See* 31 C.F.R. § 1010.100(ff); Final Rule, 76 Fed. Reg. at 43588; *see also* 31

U.S.C. § 5312(b) (defining the term "domestic financial institution" as applying "to an action in

the United States of a financial . . . institution").  Whether or not the use of a U.S. bank account

is "central" to the money transmitting business is therefore meaningless and irrelevant.[28]

 When, as here, criminal offenses are expressly premised upon implementing regulations,

charges must be dismissed when the allegations in the indictment are legally insufficient to state

a claim within the meaning of such regulations.  *See, e.g.*, *United States v. Chalmers*, 474 F.

Supp. 2d 555, 565-66 (S.D.N.Y. 2007) (dismissing charges for failure to allege that entity

---

[28] Moreover, the Government's cases are inapposite.  *United States v. Mazza Alaluf*, 621 F.3d 205 (2d Cir. 2010) and *United States v. Eisenstein*, 731 F.2d 1540 (11th Cir. 1984) were decided before the effective date of the Final Rule and, in any event, involved significant U.S.-based MSB activity beyond what has been alleged here.  *See Mazza Alaluf*, 621 F.3d at 211-13 (business received checks and wire transfers from U.S.-based customers and used those funds to make outgoing transfers); *Eisenstein*, 731 F.2d at 1542-43 (business involved "receiving dollars in the United States" from a U.S.-based person).  *United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016) and *United States v. Budovsky*, No. 13-CR-368 (DLC), 2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015) similarly involved more significant U.S.-based MSB activity.  *See* No. S3 15-CR-769 Indictment ¶ 3, *United States v. Murgio*, 2016 WL 11857895 (S.D.N.Y. Apr. 21, 2016) (alleging business "exchanged millions of dollars for Bitcoins on behalf of customers throughout the United States"); *Budovsky*, 2015 WL 5602853, at *5 (business allegedly "had over 200,000 users in the United States," including "criminal rings operating in the United States").

qualified as a "United States person" within the meaning of Iraqi sanctions regulations incorporated into criminal statute). Accordingly, Count 10 must be dismissed.

## V.   COUNTS 12 AND 13 SHOULD BE DISMISSED OR, IN THE ALTERNATIVE, SEVERED AS IMPROPERLY JOINED AND UNDULY PREJUDICIAL

### A.   Count 12 Fails to Allege a Conspiracy to Violate Campaign Finance Laws or Defraud the FEC and Should Be Dismissed.

As explained in ECF No. 142 ("Opening Br. (Mot. No. 4)"), the S5 Indictment bears the hallmarks of a rush to judgment and fails to allege facts stating an offense with respect to any of the three objects of the conspiracy charged in Count 12. In opposition, the Government sidesteps Mr. Bankman-Fried's arguments, relies on inapposite authorities, and concedes that the only specific contributions alleged in the S5 Indictment fail to support charges against Mr. Bankman-Fried. Despite wholly reimagining the Government's theories for Count 12, the Opposition only further exposes the infirmities in the allegations that Mr. Bankman-Fried violated Sections 30122 and 30118 or defrauded the FEC. Count 12 should therefore be dismissed.

### 1.   *The Government Does Not Salvage the Allegations of Unlawful Conduit Contributions in Violation of Section 30122.*

Mr. Bankman-Fried previously showed that the Government has failed to allege that he "made" or conspired to "make" straw donor contributions in violation of Section 30122, because the S5 Indictment nowhere alleges that Mr. Bankman-Fried was the true, but undisclosed, source of funds. Opening Br. (Mot. No. 4) at 5-8. The Government appears to concede that Mr. Bankman-Fried was not the true source of any straw donor contributions,[29] and instead argues that it is "not the law" that individuals cannot be liable under Section 30122 unless they are personally the source of the funds. Omnibus Opp'n at 32. This is incorrect; the law is clear that

---

[29] Although the Government appears to suggest that Mr. Bankman-Fried could be deemed to be the source of the funds because he allegedly "controlled Alameda, which was the source of the funds," Omnibus Opp'n at 32, the Government does not allege facts from which it could be deduced that Alameda was an alter ego of Mr. Bankman-Fried, such that Alameda's funds could be attributed to him.

the true source of funds "makes" a contribution for purposes of the straw donor ban. *See id.*;
*United States v. O'Donnell,* 608 F.3d 546, 550 (9th Cir. 2010); *FEC v. Swallow*, 304 F. Supp. 3d
1113, 1116-17 (D. Utah 2018).  The Government relies solely upon cases that do not pertain to
conduit contributions under Section 30122.  *United States v. Chestnut* affirmed a conviction
under 18 U.S.C. § 2 principal liability (not conspiracy) for causing another to violate 18 U.S.C.
§ 610, which was a predecessor to the ban on corporate contributions, not conduit donations.[30]
533 F.2d 40, 42 (2d Cir. 1976).  The defendant in *United States v. Kukushkin* was convicted for
violating the ban on contributions by a foreign national in Section 30121.  In fact, "Kukushkin
was not alleged to have participated in, or to have had any connection to, the Straw Donor
Scheme."[31]  *United States v. Parnas*, 19-CR-725 (JPO), 2022 WL 669869, at *1 (S.D.N.Y.
Mar. 7, 2022), *aff'd sub nom. United States v. Kukushkin*, 61 F.4th 327 (2d Cir. 2023).[32]

That the Government attempts to charge a conspiracy to violate Section 30122, rather
than a direct violation, would alter the outcome, if at all, only if the object of the conspiracy were
to cause contributions to be made in the name of others for which Mr. Bankman-Fried was the
true source of funds.  No such contributions are alleged.  Rather, the Government's theory
appears to be that the true source of funds was loans to individuals from Alameda.  As discussed
below, that theory also fails.[33]

---

[30] In 1970, at the time of the offense charged in *Chestnut*, 18 U.S.C. § 610 made it unlawful for corporations to
make, and for any person to accept, contributions in connection with Senate general or primary elections.  533 F.2d
at 42.
[31] *See also* Sentencing Submission of the United States of America, *United States v. Kukushkin*, 19-CR-725 (JPO),
2022 WL 861495 (S.D.N.Y.), ECF No. 308 (noting Kukushkin's convictions for making and conspiring to make
"campaign contributions by a foreign national," in violation of 18 U.S.C. § 371, 52 U.S.C. §§ 30121 and
30109(d)(1)(A), and 18 U.S.C. § 2.)
[32] The foreign donor prohibitions in Section 30121 stand apart from other provisions of FECA.  The statute is one of
only two FECA prohibitions that applies to non-federal elections, and there are unique and substantial sentencing
enhancements for FECA violations involving a foreign national or foreign government.  *See* U.S.S.G. § 2C1.8(b)(2).
[33] In addition, the Government does not acknowledge, much less address, the First Amendment implications of
broadly criminalizing discussions among people regarding strategies, goals, and logistics in making political
contributions under Section 30122.  Opening Br. (Mot. No. 4) at 6-7 & n.3.

**2.      The Government's Corporate Contributions Theory Is Fatally Flawed.**

Notwithstanding the Government's provocative language about Mr. Bankman-Fried

"flooding the political system" with purportedly illegal contributions, the Government's

allegations that Mr. Bankman-Fried conspired to violate the corporate contributions ban under

Section 30118 fail to hold water.

*First*, the only specific contributions alleged in the S5 Indictment—a donation of at least

$1 million to a Super PAC supporting a "pro-LGBTQ" candidate, and a $107,000 donation to the

New York State Democratic Committee, both allegedly made by CC-1—would not support a

conspiracy charge to violate Section 30118.  Opening Br. (Mot. No. 4) at 9-10.  The Government

concedes this without explaining why it included allegations regarding contributions that were

legal but none that were allegedly illegal.  Omnibus Opp'n at 32.  Left unsaid is that *neither* of

these alleged transactions would support *any* of the objects charged in Count 12.  Opening Br.

(Mot. No. 4) at 9-10.

*Second*, the Government's corporate contribution allegations involving CC-2 are

incomprehensible or self-contradictory, *see* Opening Br. (Mot. No. 4) at 9-12, and the

Government's Opposition does nothing to clarify them.  The S5 Indictment includes the muddled

but sinister-sounding allegation that Mr. Bankman-Fried directed CC-2 to give "dark" money to

Republican candidates.  But "dark money" is a campaign finance term that refers to lawful

contributions to 501(c) groups that are not required to be disclosed;[34] Mr. Bankman-Fried could

not conspire to have CC-2 make undisclosed "dark" contributions directly to candidates, because

candidates must report such contributions themselves.  Opening Br. (Mot. No. 4) at 11.  Despite

---

[34] *See* Opening Br. (Mot. No. 4) at 11 (noting that "the term 'dark money' generally refers to federal election spending by 501(c) groups that do not disclose their donors," because such groups do not qualify as political committees under applicable law) (quoting FEC Statement of Reasons, Matters Under Review 6538 & 6589, July 30, 2014, at 1 n.1).

the Government's effort to downplay these issues as secondary questions of "motive," Omnibus Opp'n at 32-33, these flaws demonstrate that the S5 Indictment fails to make non-contradictory allegations of a conspiracy to violate Section 30118 and does not give Mr. Bankman-Fried adequate notice of the nature and scope of the charges against him.

*Finally*, the Government's arguments concerning the use of loans to make campaign contributions are not rooted in relevant authority and inherently do not make sense. For example, *Kushkin*, in addition to involving violations of Section 30121 (foreign donations) rather than violations of Sections 30118 or 30122, also involved contributions by individuals that were later "reimbursed" by foreign persons. *United States v. Kushkin*, No. 22-CR-666, 2023 WL 2396240, at *1 (2d Cir. Mar. 8, 2023). This is the opposite of a loan, which is repaid to the lender. *O'Donnell* is of no help to the Government for similar reasons. That case involved neither corporate contributions nor loans, but contributions made by employees at the request of their employer using funds that were advanced or subsequently reimbursed by the employer. *O'Donnell*, 608 F.3d at 548. At root, the Government's position would turn every donation funded even in part by a bank loan or credit card into an unlawful corporate contribution by the lender or credit card issuer. No authority cited by the Government supports this limitless view of the campaign finance laws.

As the Government acknowledges, S5 Indictment ¶ 48, loans allegedly made to CC-1 caused him to owe a debt that was reflected on Alameda's ledger, and thus CC-1 was obligated to make *Alameda* whole, rather than vice versa. Therefore, if CC-1 and CC-2 received loans from Alameda as alleged and then contributed funds to a candidate or committee, CC-1 and CC-2 contributed *their own money*, rather than Alameda's, which does not support a violation of Section 30118 or Section 30122. Moreover, the allegation that CC-1 and CC-2 were high-level

FTX executives who sought to coordinate their political contributions to maximize their effectiveness is a far cry from the "essentially ministerial role" of the employees in *O'Donnell*, who were directed by their boss to make contributions to a particular campaign using funds specifically advanced for that purpose. *Compare* S5 Indictment ¶¶ 37-47 *with O'Donnell*, 608 F.3d at 550.

In sum, the S5 Indictment does not support a valid straw donor theory under Section 30122 or a valid corporate contributions theory under Section 30118, and objects 1 and 2 of Count 12 should be dismissed. Because the Government does not address object 3 to defraud the FEC, and does not dispute that object 3 is derivative of and coterminous with the first two objects, *see* Opening Br. (Mot. No. 4) at 13-14, it should be dismissed as well.

**B.    Count 13 Should Be Dismissed for Failure to Allege a Conspiracy to Violate the FCPA and for Improper Venue.**

*1.    The Government Fails to Allege a Conspiracy to Pay Bribes to "Obtain or Retain Business."*

As set forth in the defense's opening brief, the S5 Indictment fails to state an offense as to the FCPA conspiracy charge in Count 13, because it fails to allege facts that would establish a conspiracy to pay a bribe to a Chinese official in order to "obtain or retain business" for Alameda, an essential element of an anti-bribery violation under 15 U.S.C. § 78dd-2(a). ECF No. 145 ("Opening Br. (Mot. No. 7)") at 16-20. Instead, the S5 Indictment alleges that payments were made to unfreeze assets that, as alleged, rightfully belonged to Alameda, so that it could deploy those assets in a way it was legally entitled to do.

The Government's arguments in opposition all fail. *First*, the Government argues that the S5 Indictment need only "track[]" the statutory language, because "'the business nexus element . . . does not go to the FCPA's core of criminality.'" Omnibus Opp'n at 34. This position is premised on the Fifth Circuit's analysis in *United States v. Kay*, 359 F.3d 738, 761

(5th Cir. 2004).  But this Court and the Second Circuit have both identified the "business purpose" requirement as an essential element of an FCPA anti-bribery charge.  *See Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 179-80 (2d Cir. 2003) (listing the business purpose standard as an "element[] of the crime" under the FCPA anti-bribery provisions); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 596 (S.D.N.Y. 2014) (listing "obtaining or retaining business" as a condition to the applicability of the anti-bribery provisions, and citing *Schreiber*).  In any event, the S5 Indictment purports to allege facts that, if proved, would *not* amount to an FCPA violation for the reasons set forth in the Opening Brief and not rebutted by the Government's Opposition.

*Second*, the Government asserts that the business purpose requirement should be applied "broadly."  Omnibus Opp'n at 35.  But the implication of the Government's position is that this discrete statutory requirement need not be applied at all, as further explained immediately below.  The Government also offers purportedly analogous examples from *Kay* and *Donziger*— authorities which, as explained in the Opening Brief, illustrate why the S5 Indictment falls short.  Opening Br. (Mot. No. 7) at 18-20.

*Third*, the Government contends that the alleged payment here was unlawful because there is no requirement that the business advantage sought to be attained be one "to which the defendant is not otherwise entitled."  Omnibus Opp'n at 36.  This argument would strip the business purpose requirement of any limiting principle and sweep in purely gratuitous payments that are not intended to advantage or alter the business interests of the payor or anyone else.  Not surprisingly, every case cited by either party on this issue is to the contrary.[35]  In each instance, the business purpose test was met because bribes were intended to create an otherwise

---

[35] As discussed below, the only authority cited by the Government for this point (aside from a dictionary definition of "retain" and related legislative history, which add nothing to the analysis) is the Second Circuit's inapposite discussion of a separate FCPA element in *Kozeny*, 667 F.3d at 135 (2d Cir. 2011).

unavailable windfall, whether in the form of a new business opportunity, the retention of opportunities that may otherwise have been in jeopardy, or a tax reduction that might create an unfair competitive advantage. *See United States v. Ho*, 984 F.3d 191, 196-97 (2d Cir. 2020) (payments made in an effort to procure business opportunities in Chad and Uganda); *Donziger*, 974 F. Supp. 2d at 599 (unlawful payments "increased the likelihood . . . [of] a favorable judgment"); *United States v. Kozeny*, 493 F. Supp. 2d 693, 713 (S.D.N.Y. 2007) ("payments made for the purpose of inducing foreign officials to make available a lucrative investment opportunity"), *aff'd*, 541 F.3d 166 (2d Cir. 2008); *Kay*, 359 F.3d at 749, 756 (holding that bribes to obtain "favorable but unlawful tax treatment" *could* violate the FCPA, provided the result was to "free[] up funds" sufficient to create "an unfair advantage over competitors").[36] *See also Kozeny*, 493 F. Supp. 2d at 705 (noting legislative history reflecting Congress's intent to prohibit "any bribes that give an advantage *to which a business entity is not fully entitled*.") (quoting *Kay*, 359 F.3d at 756) (emphasis added).

*Finally*, the Government argues that the FCPA also applies to bribes paid to accomplish "a 'lawful result by some unlawful method or means.'" *Kozeny*, 667 F.3d at 135. As previously argued, however, this is a recitation of the FCPA's "corrupt" intent requirement and does not displace or negate the "business purpose" element. Opening Br. (Mot. No. 7) at 17-18.

For the foregoing reasons and those explained in the Opening Brief, Count 13 should be dismissed for failure to state an offense.

---

[36] In *United States v. Wakil*, No. 21-CR-20406, 2023 WL 2898510, at *6 (S.D. Fla. Feb. 14, 2023), the defendant argued that the Government failed to allege that his businesses "were not legally entitled to payments for already 'obtained' contracts." The court rejected that argument, not because obtaining funds to which the defendant was already entitled would still violate the FCPA, but because the defendant was alleged to have "illegally procured or retained these contracts through bribe payments." *Id.*

### 2.     *Venue Is Improper in This District Under 18 U.S.C. § 3238.*

As demonstrated in the Opening Brief, the Government fails to allege a proper basis for

venue for Count 13 under 18 U.S.C. § 3238, because the facts as alleged show that

Mr. Bankman-Fried was neither "first brought" nor "arrested" in this district.  Opening Br.

(Mot. No. 7) at 20-23.

The Government relies on *United States v. Catino*, in which the defendant was in custody

in the Southern District of New York for a separate offense when he was indicted and arrested on

a new charge.  735 F.2d 718, 724 (2d Cir. 1984).  Contrary to the Government's characterization

of Mr. Bankman-Fried's position, *Catino* is distinguishable not because Mr. Bankman-Fried was

not previously in custody in this district when Count 13 was handed down, but because he was

outside the district altogether and was required to travel to New York for arraignment on the new

indictment.

As previously explained, these facts place the present case on all fours with *United States*

*v. Hilger*, 867 F.2d 566 (9th Cir. 1989) (holding that venue was improper under Section 3238

where the defendant was outside the district when the indictment was issued, traveled to the

Northern District of California pursuant to a summons, and was arrested when he arrived).

Opening Br. (Mot. No. 7) at 22-23.  The Government seeks to discredit *Hilger* by claiming that

the Ninth Circuit has "taken pains to limit" that decision "and has largely avoided citing it

altogether." Omnibus Opp'n at 40.  The Government offers no support for this conjecture beyond

the assertion that the Ninth Circuit "declin[ed] to follow" *Hilger* in *United States v. Feng*, 277

F.3d 1151 (9th Cir. 2002).  This is simply wrong.  Courts do not abrogate their own precedent by

distinguishing them on the facts, as occurred in *Feng*.  *See id.* at 1156 ("distinguish[ing]"

*Hilger*).  *Hilger* remains good law in the Ninth Circuit, and because it is the most on-point case

cited by either party, we respectfully submit that it is persuasive authority in this case.

The Government also complains that reliance on *Hilger* would mean that the only other potential venue for Count 13 under Section 3238 would be the Northern District of California, but that venue would be improper there.  It is the Government's task to establish a basis for venue under Section 3238 or any other statute.  That they have failed to do so here cannot be blamed on Mr. Bankman-Fried or the statute itself.

Venue is improper for another reason as well, namely that Mr. Bankman-Fried's detention for Count 13 is in violation of the Extradition Treaty.  *See* pp. 3-19, *supra.* Consequently, Mr. Bankman-Fried was not validly "arrested" in this District, and venue is improper here pursuant to 18 U.S.C. § 3238.

It is undisputed that Mr. Bankman-Fried was brought to the United States pursuant to the Extradition Treaty.  Omnibus Opp'n at 2.  As such, he "may only be detained, tried, or punished" in the United States "for the offense for which extradition was granted."  Ex. 2 (Warrant of Surrender) at SDNY_03_01098074-75; *cf. United States v. Alvarez-Machain*, 504 U.S. 655, 665, 112 S. Ct. 2188, 2194 (1992) (holding that the terms of an extradition treaty govern "the procedures to be followed when the [treaty] is invoked").  The Extradition Treaty explicitly requires that the Requesting State obtain consent from the Requested State prior to "detain[ing]" the extradited person on additional charges.  Ex. 2 (Warrant of Surrender) at SDNY_03_01098074-75.  Yet the Government has confirmed that it has not received the consent of The Bahamas to date.  Specialty Opp'n at 5.  By the terms of the Extradition Treaty, the United States lacked the authority to detain Mr. Bankman-Fried at that time.  Because the arrest on which venue is premised was *ultra vires*, venue cannot lie in this District under Section 3238.

Because the Government has failed to establish venue in the Southern District of New York under the statute it seeks to invoke, Count 13 should be dismissed.

**C.      In the Alternative, Counts 12 and 13 Should Be Severed.**

The motion in the alternative to sever Counts 12 and 13 from the other counts in the

S5 Indictment should be granted for two reasons:  (i) joinder of these counts was improper

pursuant to Rule 8(a) because they are not "connected with" and are not "parts of a common

scheme or plan" with the offenses charged in Counts 1-11;[37] and (ii) even if joinder were proper,

Counts 12 and 13 should be severed pursuant to Rule 14(a) because a joint trial would be unduly

prejudicial.  *See* Omnibus Opp'n at 45-56.

<u>Misjoinder under Rule 8(a).</u>  The Government's attempt to stitch together a sufficient

"connection" between Counts 12 and 13 and the remaining charges falls short.

To begin with, the joinder of Counts 12 and 13 with the remaining charges cannot be

justified by a broadly alleged commonality of funds, financial motives, or entities.  *See* Omnibus

Opp'n at 48-51.  As previously explained, a simple pecuniary incentive—*e.g.*, to "obtain money"

or buoy commonly controlled enterprises—is an insufficient basis for joinder of otherwise

dissimilar charges.  *See* Opening Br. (Mot. No. 4) at 28-29.  Such a high level of generality

would create an artificial "connection" between vast swaths of otherwise unrelated offenses.

Symptomatic of the flaw in the Government's argument is its reliance on an inapposite line of

cases permitting joinder of non-tax offenses to obtain money with tax offenses to conceal the

gains from those non-tax crimes.  Omnibus Opp'n at 48-49 (citing, *inter alia*, *United States v.

Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1988) (noting permissibility of joining tax with non-tax

counts where "funds derived from non-tax violations either are or produce the unreported

income")).  The refrain sounded in the Government's brief—that "customer funds" were used in

---

[37] The Government does not challenge (and therefore concedes) that joinder was improper under Rule 8(a)'s "same act or transaction" and "same or similar character" prongs.  However, it tries to borrow portions of these standards in its argument regarding the "connected with" or "common scheme or plan" prong of Rule 8(a).  *See, e.g.*, Omnibus Opp'n at 47 (citing cases discussing schemes of a "similar character" or involving a "general likeness").  The subparts of Rule 8(a) are distinct, and the Court should disregard these cross-over arguments and authorities.

campaign contributions and the alleged bribe payment—is a smokescreen masking different alleged offenses with different objectives, means, motives, and timeframes.

Similarly, the Government's reliance on generic themes such as "corrupt[ion]" or "conceal[ment]", Omnibus Opp'n at 48-50, cannot justify joinder.  *See* Opening Br. (Mot. No. 4) at 28-29 (collecting cases rejecting joinder of counts unified by themes of fraud, dishonesty, and similar).  *United States v. Epps* is illustrative of the overreach.  742 F. App'x 544 (2d Cir. 2018). Unlike the distinct and unrelated offenses alleged in Counts 12 and 13 as opposed to Counts 1-11, the *Epps* court affirmed joinder of counts as "sufficiently similar" based on a common threat of "corruption" because both crimes involved efforts to "collect fraudulently on insurance policies."  *Id.* at 547.

Finally, the Government's effort to summarize "overlapping" evidence serves only to illustrate the absence of connection or a common scheme across the various charges.  Omnibus Opp'n at 50.  For example, the Government wrongly contends that establishing wire fraud under Counts 1 and 2 "will require prov[ing] that customer funds in Alameda's accounts were used for, among other things, [political] contributions."  Omnibus Opp'n at 50.  And the purported need for proof, again for the wire fraud counts, "about the total inflows and outflows from Alameda's accounts," *id.* at 51, and to analyze the North Dimension bank account cannot plausibly be said to be sufficiently "interconnected and overlapping" with the proof, relevant to Count 13, of a few discrete transactions involving Alameda funds and the alleged transfer of cryptocurrency to a "private wallet" for use in a payment to a Chinese government official.  *See* S5 Indictment ¶ 30.

Discretionary Joinder under Rule 14(a).  Even if Counts 12 and 13 were properly joined under Rule 8(a), this Court should sever them under Rule 14(a) to avoid the substantial prejudice to Mr. Bankman-Fried of a joint trial.  As previously argued, there is a material risk that the

introduction of evidence relating to Counts 12 and 13 in a trial on Counts 1-11 will have little

probative value while leading a jury to unfairly "infer a criminal disposition" on the part of

Mr. Bankman-Fried or to improperly aggregate evidence.  *United States v. Halper*, 590 F.2d 422,

431 (2d Cir. 1978); *see* Opening Br. (Mot. No. 4) at 29-31 (collecting cases).  Severance would

also not have an undue adverse impact on judicial economy given the unrelated allegations and

disparate expected proof.  *See* Opening Br. (Mot. No. 4) at 29, 31 (collecting cases).

The Government's counterarguments are unavailing.  For example, the Government

claims that proof concerning the relationships among the principals are integral to all counts,

*see* Omnibus Opp'n at 53-54, but the unremarkable fact that alleged co-conspirators were not

strangers does not automatically outweigh the near certainty of prejudice in this case.

*See* Opening Br. (Mot. No. 4) at 29-31.  Similarly, the alleged common motive across counts of

gaining "access to capital" or expanding the "trading and spending power" of Alameda,

*see* Omnibus Opp'n at 54-55, does not make it open season for the introduction of otherwise

inadmissible Rule 404(b) evidence.  *See United States v. Harris*, 805 F. Supp. 166, 182-83

(S.D.N.Y. 1992) (granting severance where evidence would not be mutually admissible under

Rule 404(b) because the sole similarity alleged was that "each involved fraud and . . . the

objective of persuading a bank to lend its money").

The Court should also not rely on the speculative possibility that limiting instructions can

minimize prejudice.  Indeed, the S5 Indictment itself encourages a jury to infer a criminal

propensity and aggregate unrelated evidence by, for example, describing the sum of

Mr. Bankman-Fried's charged conduct as constituting "a pattern of fraudulent

schemes." S5 Indictment ¶ 1; *see United States v. Kerik*, 615 F. Supp. 2d 256, 275

(S.D.N.Y. 2009) (finding substantial prejudice to support discretionary severance including

because government characterized unrelated charges as forming "*an extensive crime spree*" (emphasis in original)).  The Court should therefore sever Counts 12 and 13 in its discretion.

## VI.     THE GOVERNMENT'S DISCOVERY OBLIGATIONS EXTEND TO THE FTX DEBTORS' DOCUMENTS BECAUSE THEY ARE PART OF THE PROSECUTION TEAM

The Government is clearly reluctant to take steps that would lead to the production of exculpatory material which would undermine its case.  To be clear, the defense is simply asking that, given the extraordinary access and assistance the FTX Debtors have given the Government, the Government be required to turn over discoverable material in the FTX Debtors' possession, custody, and control.  Nothing more.  If the Court finds the record is not sufficiently developed as to the FTX Debtors' involvement in the Government's investigation, we ask the Court to hold an evidentiary hearing to determine the extent of its involvement.  *See* ECF No. 143 ("Opening Br. (Mot. No. 5)").

The Due Process Protections Act (the "Act"), Pub. L. 116-182, 134 Stat. 894 (Oct. 21, 2020), amends Rule 5(f) to unambiguously obligate the Government to comply with its *Brady* obligations from the outset of the criminal case.  *See* Fed. R. Crim. P. 5(f).  After numerous instances of prosecutors withholding exculpatory information in violation of their *Brady* obligations, Congress passed the Act to prevent the grave injustice that occurs whenever prosecutors fail to comply with *Brady*.  *See* 166 Cong. Rec. H4582-83 (Sept. 21, 2020).  This Court's Rule 5(f) Order clarifies that, under *Brady*, the Government has an affirmative obligation to promptly disclose to the defense "all information 'favorable to an accused' that is 'material either to guilt or to punishment' and that is known to the Government."  ECF No. 35 (Rule 5(f) Order).  Notwithstanding this clear obligation, the prosecution here has resisted without justification turning over from the FTX Debtors exculpatory information that it could easily obtain.  The Government is hiding behind the wall of the FTX Debtors despite having breached

that wall at its convenience to find inculpatory materials.  That is unfair, unfortunate, and directly inconsistent with the intent of the Due Process Protections Act, Rule 5(f), and, of course, *Brady*. Under *Brady*, "[t]he government cannot with its right hand say it has nothing while its left hand holds what is of value."  *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995).  Nonetheless, the Government refuses to produce exculpatory evidence that is readily available to it from the FTX Debtors.

### A.     The FTX Debtors Have Material Exculpatory Evidence That the Government Can Readily Obtain and, Under *Brady*, Must Obtain.

The Government claims that the defense has failed to identify material exculpatory evidence.  Omnibus Opp'n at 58.  Yet the defense has identified, and the Government has refused to disclose, at least two categories of documents that it could readily obtain from the FTX Debtors that contain potentially favorable evidence—namely, FTX's codebase editing history and documents related to legal advice from Fenwick & West ("Fenwick") concerning FTX's document retention policy and use of ephemeral messaging applications.  *See* Opening Br. (Mot. No. 5) at 12.

The FTX codebase history is central to the case, as Mr. Bankman-Fried is accused of orchestrating a scheme to defraud by, among other things, directing changes to FTX's codebase to allow Alameda to borrow unlimited FTX customer funds.  S5 Indictment ¶ 24.  It is therefore highly relevant who made alleged edits to the codebase and when.  The FTX Debtors' refusal to provide the codebase history to the defense and the Government's refusal even to ask for it highlights the Catch-22 the defense faces.[38]  The FTX Debtors, having no *Brady* obligations, need not produce the codebase history unless compelled by the Court or requested by the

---

[38] The Government's response that it has already produced "code data extracted from Gary Wang's laptop, as well as screenshots of portions of the code" from other custodians is no answer.  Omnibus Opp'n at 62.  As the defense has repeatedly told the Government, that is not the codebase history showing the edits to the FTX codebase. Further, the code from Gary Wang's laptop does not even appear to be a complete copy of the codebase itself.

Government, and have refused the defense's requests to do so voluntarily.  When the defense asked the Government for the codebase history, the Government said it has no control over data held by the FTX Debtors.  And should the defense subpoena the FTX Debtors for this information pursuant to Rule 17, the Government would undoubtedly object that such subpoena is improper.[39]  If the Government wanted this information (and believed it to be inculpatory), we have little doubt that it would have requested it, and the FTX Debtors would have disclosed it.

Similarly, the documents related to Fenwick's advice concerning FTX's document retention policy and use of ephemeral messaging applications directly relates to the allegation that Mr. Bankman-Fried instructed FTX employees to use self-deleting messaging applications like Signal to prevent the preservation of evidence of the alleged fraud.  S5 Indictment ¶ 60. Both the FTX Debtors and the Government have opposed the defense's motion to subpoena Fenwick for these documents.  The Government has said it cannot request these documents from the FTX Debtors unless they waive privilege and, in any event, it has no obligation to request documents from third parties.  Omnibus Opp'n at 62 & n.12.  But unless the Government asks the FTX Debtors for the documents, the FTX Debtors will not have to decide whether to waive privilege as it has with other advice from Fenwick (let alone produce a privilege log that could subject its privilege claims to scrutiny).  Another Catch-22.

Moreover, the Government's claim that these records are "almost certainly privileged" and thus "beyond the Government's reach," Omnibus Opp'n at 62 n.12, is likely incorrect. These records are also likely to include: (1) non-privileged documents, (2) documents as to which there is a joint representation or individual representation as to which Mr. Bankman-Fried controls the privilege, (3) documents concerning topics on which the FTX Debtors have already

---

[39] This is precisely what occurred when the defense sought to subpoena Fenwick.  *See* ECF No. 156 (Gov.'s Opp'n to Def.'s Mot. to Compel the Gov. to Produce Documents and for an Order Authorizing a Subpoena to Fenwick).

waived privilege, and (4) documents that the FTX Debtors claim on a privilege log, which would be subject to challenge and determination by the Court.  It is not sufficient for the Government to baldly assert, based on nothing more than its own speculation, that those materials would necessarily be beyond its reach.

The Government obfuscates the issues by claiming that the defense has accused it of collaborating with the FTX Debtors to "hide exculpatory material."  Omnibus Opp'n at 61-62. That is not the case.  The defense has pointed out, accurately, that the FTX Debtors themselves have no *Brady* obligations and, while opening their books to the Government, have repeatedly publicly blamed Mr. Bankman-Fried for the downfall of FTX—hardly the position of a neutral custodian furnishing pertinent facts.[40]  But the FTX Debtors are the single most significant source of documents and other information on which the Government has relied for its investigation.  Despite not being named a target (a point the Government does not dispute), and therefore having no need for cooperation credit, the FTX Debtors have produced millions of documents and terabytes of data to the Government without a subpoena.  Ex. 9 (Feb. 6 Tr. 52:24-53:6).

The Government's refusal to request crucial, potentially exculpatory information raises the question of what, exactly, it fears will be uncovered.  The Government should not be permitted to close its eyes to exculpatory material within its reach, thereby preventing Mr. Bankman-Fried from accessing it for his defense; nor should the identification of exculpatory materials be left up to the FTX Debtors.  For the reasons discussed in Mr. Bankman-

---

[40] *See, e.g.*, Objection of U.S. Trustee ¶ 3, *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Jan. 13, 2023), ECF No. 496 (questioning objectivity of FTX Debtors' counsel); Ex. E to Decl. of FTX Debtors' Counsel, *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Dec. 12, 2022), ECF No. 205-5 (Bahamian Government press release admonishing "intemperate statements" by FTX Debtors).

Fried's opening brief and below, the FTX Debtors are part of the prosecution team, and the Government's disclosure obligations extend to their documents.

**B.    The Government's Claim that Non-Governmental Entities Can Never Be Part of the Prosecution Team Misreads the Case Law.**

The Government mischaracterizes the case law by suggesting that non-governmental entities may not be deemed part of the prosecution team.  Omnibus Opp'n at 57-58.  "[T]he relevant inquiry is what the person *did*, not who the person *is*."  *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006) (emphasis in original).  Thus, "the propriety of imputing knowledge to the prosecution is determined by examining the specific circumstances of the person alleged to be an 'arm of the prosecutor.'"  *Id.*; *see also United States v. Meregildo*, 920 F. Supp. 2d 434, 443 (S.D.N.Y. 2013) ("Other courts, in different contexts, have held that the prosecution is responsible for information known by cooperating witnesses.") (citing *United States v. Stein*, 488 F. Supp. 2d 350, 360 (S.D.N.Y. 2007)).  There is no *per se* rule that non-governmental entities or witnesses cannot be deemed part of the prosecution team.  As this Court observed, *Stewart* indicated that a civilian expert witness could be deemed an arm of the prosecution if he "interviewed witnesses or gathered facts, or reviewed documents or developed prosecutorial strategy'"—all steps the FTX Debtors have taken here.  *See United States v. Blaszczak*, 308 F. Supp. 3d 736, 741-42 (S.D.N.Y. 2018) (quoting *Stewart*, 433 F.3d at 298-99, cleaned up).

**C.    The FTX Debtors Are Part of the Prosecution Team.**

The Government asserts that the FTX Debtors' cooperation, in the "colloquial" sense, has been typical of a third party who "voluntarily respond[s] to the Government's document requests without any formal agreement."  Omnibus Opp'n at 57.  That assertion is flatly contradicted by the record.  *See* Opening Br. (Mot. No. 5) at 5-14.  Although the Government characterizes its requests to the FTX Debtors as "neutral" requests for garden variety documents like "bank

records" and "balance sheets and ledgers," Omnibus Opp'n at 62, it concedes that it asked the FTX Debtors' counsel for a "presentation on anything you can determine with respect to whether FTX.com, Alameda Research, and/or North Dimension were acting as an unlicensed money transmission business." Omnibus Opp'n at 64; Ex. 10 at SDNY_03_00568322. This request was anything but "neutral" and asked the FTX Debtors' counsel to conduct a legal and factual analysis evaluating the viability of a charge that was eventually added to the S5 Indictment. *Cf. Stewart*, 433 F.3d at 299 (developing prosecutorial strategy would weigh in favor of finding witness part of the prosecution team). The Government backpedals on this point, representing that the requested presentation was never given and that it has since "withdrawn" its request. *See* Omnibus Opp'n at 64-65.[41] But the fact that the Government made this request highlights the role the FTX Debtors have played in the development of the criminal case. The Government has treated them as an adjunct team of prosecutors to whom it can outsource fundamental work of the prosecution team, like evaluating which charges to bring.

The Government does not dispute that, upon its request, the FTX Debtors gathered and synthesized facts pertaining to the prosecution's "priorities," identified and presented factual connections in produced documents that the Government had not made on its own, and shared interview findings. *See* Omnibus Opp'n at 61, 64; *see also* Ex. 10; Ex. 11; *cf. Stewart*, 433 F.3d at 299 (interviewing witnesses, gathering facts, and reviewing documents would weigh in favor of finding witness part of the prosecution team). The Government also admits that it asked for, and the FTX Debtors provided, "read outs" of witness interview memoranda. Omnibus Opp'n at 64. Thus, at the Government's request, the FTX Debtors disclosed privileged work product to

---

[41] The fact that the Government withdrew its request after numerous requests to the FTX Debtors' counsel for this presentation, *see* Ex. 10, raises significant questions about why the Government abandoned its request.

the Government to share its findings from witness interviews.[42]  *See United States v. Coburn*,
No. 19-CR-120 (KM), 2022 WL 357217, at *7 (D.N.J. Feb. 1, 2022) ("[T]o the extent that
summaries of interviews were conveyed to the government, whether orally or in writing, the
privilege is waived as to all memoranda, notes, summaries, or other records of the interviews
themselves.").

      The Government also does not dispute that the FTX Debtors have taken the extraordinary
step of expressly waiving privilege for topics related to Counts 10 and 13.  Opening Br.
(Mot. No. 5) at 10.  The Government's claim that the FTX Debtors' privilege waivers were not
intended to aid the Government, Omnibus Opp'n at 65, is directly contradicted by the words of
the FTX Debtors' counsel.  Ex. 10 at SDNY_03_00568315 ("[A]s part of its cooperation, the
FTX Debtors agreed to waive privilege on these topics to assist in your investigation.").

      Finally, the Government makes the unremarkable point that it has conducted its own
investigation and the FTX Debtors did not participate in numerous aspects of the prosecution.
*See* Omnibus Opp'n at 59.  But the FTX Debtors do not need to lead or participate in every
aspect of the prosecution to be considered part of the prosecution team.  There is no single test to
determine when an individual is a member of the prosecution team, and no one factor is
dispositive.  *Meregildo*, 920 F. Supp. 2d at 441-42.  Rather, courts must look to "the totality of
the circumstances," and individuals that are significantly involved in the prosecution can (and
should) be considered part of the prosecution team.  *Id.* at 442 ("[T]he more involved individuals
are with the prosecutor, the more likely they are team members.").  Relevant factors may include
"whether the individual actively investigates the case, acts under the direction of the prosecutor,

---

[42] The Government's claim that although it "did request an interview 'read out,' counsel for the FTX Debtors did not
. . . indicate that they were reading from a memorandum, or disclose attorney work product," Omnibus Opp'n at 64,
is nonsensical.  The Government offers no explanation for how the FTX Debtors' counsel could have provided an
interview "read out" if not by reading from an interview memorandum, thereby disclosing attorney work product.

or aids the prosecution in crafting trial strategy," all of which the FTX Debtors here have done. *Id.*; *see also United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (summary order) ("Individuals who perform investigative duties or make strategic decisions about the prosecution of the case are considered members of the prosecution team."). Given the FTX Debtors' extraordinary assistance to the Government, they are a member of the prosecution team.

### D.  The Court Should Disregard the Government's Claims of Burden.

The Government's claim that complying with its disclosure obligations here would be too burdensome, Omnibus Opp'n at 56-57, 58, warrants no consideration. The defense is not seeking a rule that the government must always search and produce files from cooperating companies. This is the rare case where the Government has relied so heavily on the investigative work of the FTX Debtors that they must be deemed part of the prosecution team. The law therefore requires the Government to produce discoverable materials from the FTX Debtors. This is not a civil litigation where the relative burdens of discovery on the parties are central to the scope of disclosure. Mr. Bankman-Fried's rights to disclosure from the Government are both constitutionally protected and enshrined in procedural rules and this Court's Rule 5(f) Order. ECF No. 35. Inconvenience is no excuse for noncompliance, particularly where, as here, there is a grave risk of prejudice absent the disclosures. This Court has rejected similar claims that compliance with disclosure obligations under Rule 16 would be unduly burdensome to the government. *See Stein*, 488 F. Supp. 2d at 363-64 (ordering prosecutors to produce materials from defendants' former employer, KPMG). It should do the same here. Should the Court find the record is not sufficiently developed, it should order a hearing as requested in Mr. Bankman-Fried's opening brief. *See* Opening Br. (Mot. No. 5) at 16.

## VII.  THE COURT SHOULD GRANT THE DEFENSE'S REQUEST FOR PRETRIAL DISCLOSURES

### A.  The Court Should Grant a Bill of Particulars.

A bill of particulars is necessary to apprise Mr. Bankman-Fried of the charges against him.  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).  Neither the S5 Indictment nor the avalanche of discovery give Mr. Bankman-Fried adequate notice.  *See* ECF No. 144 at 7-12 ("Opening Br. (Mot. No. 6)").  For example, the Government produced over a million pages of documents concerning over 50 lenders and 100 investors.  But the defense has no way of identifying from the discovery which of the numerous lenders and investors the Government claims were defrauded, or which statements the Government contends were untrue.  A bill of particulars is necessary to avoid forcing the defense to plow through mountains of irrelevant data with no direction.  Mr. Bankman-Fried is not seeking information that would be merely "helpful" to his defense, nor is he seeking a list of overt acts or minutiae about the alleged fraudulent transactions.  Rather, he is seeking fundamental information to allow him to understand what conduct is at issue so that he may reasonably prepare his defense.  *See* Opening Br. (Mot. No. 6) at 7-12 (requesting particulars related to Counts 5-8, 1-2, and 12-13).

Contrary to the Government's assertion, the mountains of discovery produced by the Government do not help Mr. Bankman-Fried identify the nature of the charges against him.  The volume of documents produced in this case is larger than any other criminal case we have identified in the Southern District.  To date, the Government has produced 3.5 terabytes of data[43] including 3.6 million documents totaling more than 10 million pages.  Nearly 70 percent of those documents were produced on May 23, 2023—a mere 4.5 months before trial is set to begin on

---

[43] One terabyte is equal to slightly more than 1,000 gigabytes.  If printed out on paper, this amount of data would be roughly the size of a multi-story building.  *See* Bytes in Perspective, *available at* https://youtu.be/-aYat9357mE?t=41.

13 charges.  This case is more complex and involves more voluminous discovery and shorter

timeframes than other cases where a bill of particulars was held to be appropriate.  *See, e.g.,*

*United States v. Rajaratnam*, No. 09-CR-1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13,

2010) (many millions of pages produced seven months before trial); *United States v. Akhavan*,

No. 20-CR-188 (JSR), 2020 WL 2555333 (S.D.N.Y. May 20, 2020) (involving one terabyte of

information).  The cases cited by the Government denying requests for a bill of particulars

involved substantially smaller volumes,[44] or are distinguishable on the facts.[45]  The Government

cannot rely on discovery to fill in gaps in an otherwise insufficient indictment.  *Rajaratnam*,

2010 WL 2788168, at *2.[46]

      The Government relies on *United States v. Rigas*, 258 F. Supp. 2d 299, 305 (S.D.N.Y.

2003) for the proposition that "[t]he law does not 'allow a Defendant to use the vastness or

complexity of the alleged conspiracy and its attendant documentary evidence as a sword against

the government, when the Indictment, discovery, and other information provided by the

government adequately notify the Defendant of the charges against him.'"  Omnibus Opp'n at 81

(cleaned up).  *Rigas* involved "millions of pages" of discovery produced nine months before

trial.  *See* Mot. for Bill of Particulars, 2003 WL 25802388 (March 10, 2003).  However, in *Rigas*

the Government ultimately agreed to provide a bill of particulars, thereby obviating the need for

a court order.  258 F. Supp. 2d at 305-06.  Moreover, the court in *Rigas* had already ordered early

---

[44] *See, e.g.*, *United States v. Levy*, No. 11-CR-00062 (PAC), 2013 WL 8717859 (S.D.N.Y. Feb. 15, 2013) (involving hundreds of thousands of documents); *United States v. Kogan*, 16-CR-221 (RWS), Dkt. 141 (S.D.N.Y. 2017) (same).

[45] *See, e.g.*, *United States v. Jain*, No. 19-CR-59 (PKC), 2019 WL 6888635, at *1 (S.D.N.Y. Dec. 18, 2019) (Indictment identified "dates, identifications of the sender and recipients, and a specific description of the contents of the email" that was the basis for the fraud claim); *United States v. Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010) ("substantially all of the Government's discovery," totaling 32 boxes of materials, came from a single investor); *United States v. Bonventre*, No. 10-CR-228 (LTS), 2013 WL 2303726, at *7 (S.D.N.Y. May 28, 2013) (holding that "[t]he Government's opposition brief sufficiently alerts [the defendant] as to its theories concerning the crimes with which he is charged" but nevertheless ordering early disclosure of exhibit list and 404(B) evidence).

[46] The document totals and time frames referenced in this Section are drawn from the underlying briefing on these motions. If the Court wishes, the defense will provide Westlaw cites for these submissions.

disclosure of the Government's intended trial exhibits (30 days before trial), as well as a witness list, disclosure of Rule 404(b) evidence, and impeachment materials (6 weeks before trial).  *See* Scheduling Order, No. 02-CR01236 (KMW), ECF No. 35.

It is no answer for the Government to say that Mr. Bankman-Fried may "search" the discovery to glean the nature of the charges against him.  *See* Omnibus Opp'n at 68-69; 73-74. One simply cannot use search terms to find documents that allegedly evidence fraud without knowing which statements were allegedly misleading and which transactions they allegedly relate to.  Moreover, it improperly shifts the burden to the defense.  *Bortnovsky*, 820 F.2d at 575; *United States v. Savin*, No. 00-CR-45 (RWS), 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001).

Contrary to the Government's claims, the "detailed indices" produced by the Government do not provide additional guidance.  Omnibus Opp'n at 71.  In fact, they underscore the breadth of what could potentially be at issue in the Government's claims.  The indices show:

- Over 440,000 pages produced by a dozen different investors.  The defense is aware of over 100 investors and potential investors in FTX;

- Over 900,000 pages produced by a dozen lenders.  To date, the defense has identified 55 lenders and well over 1,000 Alameda loan agreements in the discovery materials; and

- Over 11,000 pages produced by 81 campaigns, political parties, and PACs.  The S5 Indictment alleges more than 300 political contributions.  S5 Indictment ¶ 46.

Without identifying which fundraising rounds or offerings, which loans, and which campaign contributions are at issue, Mr. Bankman-Fried would need to scour more than one million pages to ascertain the nature of the charges against him.

Nor is it sufficient that the Government intends to produce a witness list and exhibit list closer to trial.  Omnibus Opp'n at 75.  The sheer volume of the materials provided to date (and discovery is ongoing) means that even targeted searches for documents rebutting the

Government's case are likely to return more documents than can be reviewed shortly before trial. A bill of particulars is therefore warranted here.

### B.      The Court Should Grant the Requests for Additional Pretrial Disclosures.

The Government must immediately disclose any *Brady* material to the defense.  Under *Brady* and this Court's Rule 5(f) Order, the Government has an affirmative obligation to disclose *Brady* materials "promptly after its existence becomes known to the government" so that the defense "may make effective use" of it in preparing its case for trial.  ECF No. 35.  As set forth above and in Mr. Bankman-Fried's separate motion to compel, *see* ECF No. 151, the Government has refused to request potentially exculpatory documents from the FTX Debtors, like the FTX codebase history and relevant legal documents from Fenwick, asserting that it has no obligation to request documents from a third party.  The Government cannot be permitted to use Rule 16 as a shield to circumvent its *Brady* obligations by turning a blind eye to specific documents that are potentially exculpatory and readily available to it.  The Court should therefore order the Government to produce these materials.

Furthermore, accelerated disclosure of Jencks Act material and the Government's witness list is essential for the defense to be able to effectively prepare for trial.  *See* Opening Br. (Mot. No. 6) at 12-17.  To date, the Government has identified at least 50 potential witnesses and produced to the defense a 60-page *Brady* disclosure letter enclosing over 100 pages of excerpted interview notes from interviews of these witnesses.  Omnibus Opp'n at 69.  These excerpts are just the subset of material that the Government believes could potentially be useful for the defense.  The total volume of interview notes and other Jencks Act materials (including FBI 302s and other reports) will no doubt dwarf this number.  Knowing the "general universe of potential witnesses," Omnibus Opp'n at 80, does not enable Mr. Bankman-Fried to prepare for trial given the millions of pages of documents that have been produced and will lead to countless hours of

wasted time and resources closely reviewing prior statements of potential witnesses who will not
be called at trial.  Early disclosure of the full witness statements and other Jencks Act materials is
therefore essential to permit their effective use at trial.  *See United States v. Stein*, 424 F. Supp.
2d 720, 728 (S.D.N.Y. 2006) (Kaplan, J.) (recommending the "salutary practice" of early
disclosure of Jencks Act materials, "which often serves to avoid 'those abhorrent lengthy pauses
at trial to examine documents.'") (citation omitted); Opening Br. (Mot. No. 6) at 12-14.[47]

Pursuant to the Court's request, the defense has asked the Government to propose a
schedule for pretrial disclosures, including Jencks Act material, *Giglio* material, Rule 404(b)
material, and the Government's witness list.  We will speak with the Government and be
prepared to discuss a disclosure schedule at the conference on June 15, 2023.

## VIII.   COUNTS 1 AND 9, AND COUNTS 3 AND 10, ARE MULTIPLICITOUS

The S5 Indictment charges two pairs of conspiracy counts against Mr. Bankman-Fried—
Counts 1 and 9, and Counts 3 and 10, respectively—that are the same as each other in law and
fact, such that conviction on both counts would subject Mr. Bankman-Fried to Double Jeopardy
in violation of the Fifth Amendment.  *See* Opening Br. (Mot. No. 7) at 1-2, 4-10.  In opposition,
the Government primarily disputes the appropriate test for determining multiplicity of conspiracy
counts in this Circuit, and in so doing largely fails to engage with the multiplicity analysis
required under *United States v. Korfant*, 771 F.2d 660 (2d Cir. 1985), which governs the counts
in question.  Omnibus Opp'n at 41-44.  Accordingly, the Court should either dismiss the
multiplicitous counts in the S5 Indictment or require the Government to elect between them
before trial.

---

[47] The Government's concerns of potential witness-tampering are not sufficient grounds to deny Mr. Bankman-Fried
this information.  *See* Omnibus Opp'n at 80.  Mr. Bankman-Fried has fully complied with the extremely restrictive
bail conditions imposed earlier this year, including refraining from contacting potential witnesses, and will continue
to abide by those conditions.

A.     **The Court Should Apply the *Korfant* Factors to Analyze Multiplicity of Counts 1 and 9 and Counts 3 and 10.**

Ignoring precedent in this Circuit and prior practice in this Court, the Government argues that the "same elements" test from *Blockburger v. United States*, 284 U.S. 299 (1932), rather than the multifactor test in *Korfant*, governs the multiplicity analysis. Omnibus Opp'n at 42-43. The Government is wrong.

In *United States v. Maxwell*, the court applied the *Korfant* factors to analyze multiplicity of Section 371 conspiracies that alleged different crimes as their objects—circumstances precisely like these. *United States v. Maxwell*, 20-CR-330 (AJN), 2022 WL 1294433, at *3 (S.D.N.Y. Apr. 29, 2022). The *Maxwell* court followed the Second Circuit's guidance in *Basciano* that the *Korfant* factors are relevant to determining whether "conspiracy charges brought *under the same statute* [are] the same for double jeopardy purposes." *United States v. Basciano,* 599 F.3d 184, 198 n.11 (2d Cir. 2010) (emphasis in original).

In line with *Basciano* and *Maxwell*, this Court should analyze multiplicity using the *Korfant* factors because Counts 1 and 9 are brought under the same conspiracy statute (18 U.S.C. § 1349) and Counts 3 and 10 are also brought under the same conspiracy statute (18 U.S.C. § 371).[48] *Korfant* remains the correct analytical framework regardless of whether the conspiracy counts allege violations of different statutes as their objects. *See, e.g.*, *United States v. Villa*, 744 F. App'x 716, 720 (2d Cir. 2018) (applying *Korfant* factors to assess multiplicity of Section 371 conspiracies charging violations of different statutes as their objects, and applying *Blockburger* to assess multiplicity of substantive counts); *United States v. Estrada*, 320 F.3d 173, 180 (2d Cir. 2003) (applying *Korfant* factors to determine multiplicity of conspiracy to distribute cocaine and

---

[48] In *Basciano*, unlike here, the conspiracy counts arose under different statutes, prompting the Second Circuit to apply the *Blockburger* test rather than the *Korfant* factors. *See Basciano*, 599 F.3d at 196 (applying *Blockburger* and finding no Double Jeopardy violation).

conspiracy to distribute crack); *see also United States v. Hernandez*, No. 09-CR-625 (HB), 2009 WL 3169226, at *8 (S.D.N.Y. Oct. 1, 2009) (explaining that "[t]he *Blockburger* 'same elements' test . . . is ill-suited to the comparison of successive conspiracy prosecutions for double jeopardy purposes," and that courts in the Second Circuit instead apply the *Korfant* factors).   Indeed, this Court has previously applied the *Korfant* factors when assessing, before trial, whether a charge in an indictment of conspiracy to commit murder was multiplicitous with a prior guilty plea of conspiracy to commit robbery.  *United States v. Gallego*, 907 F. Supp. 735, 737 (S.D.N.Y. 1995), *aff'd*, 191 F.3d 156 (2d Cir. 1999).   The Court should do so again here.

### B.   The Government Has Failed to Meet Its Burden of Establishing That the Conspiracies Are Distinct.

Mr. Bankman-Fried's Opening Brief sufficiently showed that Counts 1 and 9, and Counts 3 and 10, respectively charge single conspiracies.  Application of the *Korfant* factors with respect to Counts 1 and 9 demonstrates substantial or complete overlap of participants, time, geographic scope, common objectives, and interdependence, and shows that Count 9 is encompassed within the conspiracy charged in Count 1.  Opening Br. (Mot. No. 7) at 4-7.  The same is true of Count 10 *vis à vis* the larger conspiracy alleged in Count 3.  *Id.* at 7-10.  It is thus the Government's burden "to show, by a preponderance of the evidence, that there are in fact two distinct conspiracies."  *United States v. Lopez*, 356 F.3d 463, 467 (2d Cir. 2004).

The Government concedes that there is overlap in participants, time periods, and geographic scope, and then summarily states that other *Korfant* factors differ.  Omnibus Opp'n at 44.  Rather than address the factors in any detail, the Government instead argues that it is "unnecessary" to consider them where the conspiracies in question charge different objects.  *Id.* That is not so.  The offenses charged and common objectives are factors to be considered in a *Korfant* analysis, but "no single *Korfant* factor is dominant or dispositive."  *Maxwell*, 2022 WL

68

1294433, at *4.  Moreover, because conspiracies that charge different statutory objectives "can arise from the same agreement," it is error to argue, as the Government does, that two such conspiracies *per se* cannot violate the Double Jeopardy clause.  *Id.* at *4, *7 (holding that conspiracies to violate distinct statutes were multiplicitous); *cf. Estrada*, 320 F.3d at 181 (noting that "a prior cocaine distribution conspiracy can be the same in fact and law as a later heroin distribution conspiracy for double jeopardy purposes where the evidence demonstrates one overall distribution network.")

Because the Government has failed to meet its burden to show by a preponderance of the evidence that Counts 1 and 9 charge distinct conspiracies, and that Counts 3 and 10 charge distinct conspiracies, the Court should find that the counts are multiplicitous.

### C.     The Court Should Direct Election and Dismissal Pretrial to Avoid Prejudice to Mr. Bankman-Fried.

Mr. Bankman-Fried respectfully urges the Court to grant this motion, direct the Government to elect which of the conspiracy charges it will prosecute, and dismiss the multiplicitous counts.  "District courts presented with what are recognized before or during trial to be multiplicitous indictments will avoid any problem by requiring the prosecution to elect between counts charged rather than by merging the counts at sentencing."  *United States v. Polizzi*, 257 F.R.D. 33, 36-37 (E.D.N.Y. 2009).  To avoid undue prejudice to Mr. Bankman-Fried, the Court should order such an election and dismissal here.

## **CONCLUSION**

For the foregoing reasons, Mr. Bankman-Fried's Pretrial Motions Nos. 1-7 should be granted in full.

Dated:  June 12, 2023
New York, New York

/s/ *Mark S. Cohen*
Mark S. Cohen
Christian R. Everdell
S. Gale Dick
Sri K. Kuehnlenz
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, NY  10022
Phone:  (212) 957-7600
Fax:  (212) 957-4514
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
skuehnlenz@cohengresser.com

*Attorneys for Samuel Bankman-Fried*