N6FDBANO

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                    22 Cr. 673 (LAK)

SAMUEL BANKMAN-FRIED,

              Defendant.           Conference
------------------------------x

                                   New York, N.Y.
                                   June 15, 2023
                                   10:30 a.m.


Before:

               HON. LEWIS A. KAPLAN,

                                   District Judge


                      APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  NICOLAS ROOS, ESQ.
     DANIELLE R. SASSOON, ESQ.
     DANIELLE M. KUDLA, ESQ.
     SAMUEL RAYMOND, ESQ.
     NATHAN M. REHN, ESQ.
     JIL SIMON, ESQ.
     Assistant United States Attorneys

COHEN & GRESSER, LLP
     Attorneys for Defendant
BY:  MARK S. COHEN, ESQ.
     CHRISTIAN R. EVERDELL, ESQ.
     SRI KUEHNLENZ, ESQ.
     STEPHEN G. DICK, ESQ.
```

N6FDBANO

1            (Case called; appearances noted)

2            THE COURT:  Good morning.

3            Where I would like to begin this morning is with the

4    government's letter of last night in the wee hours or the

5    closing hours of Flag Day, and I have some questions about it.

6    If I were to agree with the government's position that the

7    defendant has no standing to raise any rule of specialty issue

8    that there may be, why would the government want or need a

9    waiver from the Bahamas?

10            MR. REHN:  Yes, your Honor.  From the perspective of

11    the defendant's right to object, we agree with the Court, and

12    it's well-established in the Second Circuit that the defendant

13    does not have a right to object.  The government, however, has

14    its own diplomatic obligations that it complies with, and one

15    of those includes an obligation to the Bahamas to comply with

16    the terms of the extradition treaty.  And in accordance with

17    those obligations, we have been seeking a waiver of the rule of

18    specialty.  The government would not proceed on those counts

19    absent that waiver, and so as the defense suggested in their

20    reply brief, as an alternative, severing those counts, and

21    going forward with the counts as to which extradition was

22    originally granted seems to be appropriate given the

23    developments this week in the Bahamas.

24            THE COURT:  But the government would not proceed on

25    the basis of a policy decision, which is essentially one -- a

N6FDBANO

1    mixed decision of law and foreign policy, hmm?

2            MR. REHN:  That's correct, your Honor.  The government

3    has an interest in observing diplomatic relationships for a

4    number of reasons, and it's the government's view that it would

5    not proceed on counts added post extradition if the extraditing

6    country has not consented to that.

7            THE COURT:  And that would be true, wouldn't it, in

8    the event that the Bahamas takes no position?

9            MR. REHN:  With respect to the new counts, that's

10   correct, your Honor.  With respect to the one count as to which

11   the extradition record arguably contains some ambiguity, it's

12   the government's view that it intends to proceed.  The United

13   States has notified the Bahamas of that interpretation of the

14   extradition record, and asked the Bahamas to timely object if

15   it views the facts differently, and it has not received any

16   objection.

17           THE COURT:  Is there any reason I have to make the

18   determination now?

19           MR. REHN:  The determination as to --

20           THE COURT:  As to severance.  If I were to agree for

21   the sake of argument with the defendant's position, as to the

22   legal sufficiency of any of the newly added counts, you would

23   not have any issue of specialty problem, if you have one now,

24   with respect to that count or counts.

25           MR. REHN:  Your Honor, if the Court were not to sever

N6FDBANO

1    the counts, I think the issue that would be created would be

2    that there would be -- the parties would be under some

3    uncertainty as to whether those counts would be included in the

4    trial or not, which would affect the parties' trial

5    preparation.

6            When the government initially sought the superseding

7    indictment, it had already had some communications with the

8    Bahamas, and it continued to have those communications after

9    seeking the superseding indictment and was under the view that

10   the executive authorities in the Bahamas would be able to

11   respond to that waiver request well in advance of trial.

12   Because of the development in the Bahamian court this week,

13   it's our view we can't realistically estimate the timeframe for

14   that, and so the more prudent course would be to acknowledge

15   now, so the parties can focus on original counts in the

16   indictment that we will not be proceeding to those counts in

17   October.

18           THE COURT:  Could you be ready to try the case in

19   October, even if I don't sever?

20           MR. REHN:  We have always been of the view that we

21   would be ready to try the case in October, provided that the

22   Bahamas grant a waiver in advance of that date, yes.

23           THE COURT:  What impact would a severance have on

24   trial duration?

25           MR. REHN:  Your Honor, I believe that it would shorten

N6FDBANO

| | |
|---|---|
| 1 | the trial, although not significantly.  We would estimate that |
| 2 | the trial without these counts would take four to five weeks, I |
| 3 | think we've previously indicated, and we think a trial |
| 4 | including these counts would take five to six weeks, maybe |
| 5 | slightly more than that.  So it might take one to two weeks off |
| 6 | the trial time. |
| 7 | THE COURT:  Thank you, Mr. Rehn. |
| 8 | Mr. Cohen, anything that you'd like to add to this |
| 9 | discussion? |
| 10 | MR. COHEN:  Yes, your Honor, if I might, a couple of |
| 11 | points on the discussion the Court has been having. |
| 12 | In light of the government's letter last night, we |
| 13 | agree with your Honor that things have changed.  So, as we |
| 14 | argued in our papers to your Honor, we still believe that the |
| 15 | -- I'll call them the new charges that Mr. Rehn referred to, |
| 16 | should be dismissed.  There's law that we cited to your Honor |
| 17 | that calls for that, because, as of today, June 15, there is no |
| 18 | consent.  And, therefore, under those cases, there could be |
| 19 | dismissal. |
| 20 | In the altern -- |
| 21 | THE COURT:  What consent are you referring to? |
| 22 | MR. COHEN:  The consent from the Bahamas Government, |
| 23 | as Mr. Rehn just laid out, and as the government conceded in |
| 24 | its papers.  So we think dismissal of those counts would be the |
| 25 | better outcome obviously from our point of view, and also as |

N6FDBANO

| | |
|---|---|
| 1 | warranted under the cases we cited to your Honor, but in the |
| 2 | alternative, as we stated in our reply, and as the government |
| 3 | essentially agrees to in its letter, it's obviously still in |
| 4 | the Court's discretion under Rule 14, then we think those |
| 5 | counts should be severed.  There is the matter of the campaign |
| 6 | finance count, and specialty, which I am happy to address now, |
| 7 | or to wait if the Court would like. |
| 8 | THE COURT:  No.  Let's take that later. |
| 9 | MR. COHEN:  Okay. |
| 10 | THE COURT:  Well, I'm not going to rule on this now. |
| 11 | I'm going to give it a little bit more thought.  And for |
| 12 | purposes of this morning's festivities, I'll hear argument on |
| 13 | everything that two days ago we were expecting to hear argument |
| 14 | about, and then we'll have some other business at the end of |
| 15 | those arguments.  I thank both sides for the letters of the |
| 16 | last couple of days. |
| 17 | That said, we can start with the rule of specialty.  I |
| 18 | don't expect it to take a long time on this, and I do not have |
| 19 | infinite time, though I'm sure you guys could fill it up.  So, |
| 20 | let's see, 45 minutes to a side, all in, with a short rebuttal. |
| 21 | So I will hear from Mr. Cohen, or Mr. Everdell, or |
| 22 | whoever's going to do the honors. |
| 23 | MR. COHEN:  Yes, your Honor.  Would you like me to be |
| 24 | at the podium? |
| 25 | THE COURT:  Absolutely. |

N6FDBANO

| | |
|---|---|
| 1 | MR. COHEN:  Given where I think the Court is in its |
| 2 | thinking, and as reflecting upon what we've called the new |
| 3 | charges, I won't address them in this argument unless your |
| 4 | Honor has further questions you'd like me to cover.  And, |
| 5 | instead, I would like to address the campaign finance count. |
| 6 | THE COURT:  Well, that's your call, and it's your |
| 7 | judgment -- |
| 8 | MR. COHEN:  Thank you, your Honor. |
| 9 | THE COURT:  -- as to what I'm thinking. |
| 10 | MR. COHEN:  Well, I guess we'll know soon enough, but |
| 11 | yes, on the new charges, and let me briefly, for record |
| 12 | purposes, your Honor, just make that record on what everyone |
| 13 | has been calling the new charges, which is everything added in |
| 14 | S3 and S5, except the campaign finance count.  It is now |
| 15 | undisputed before this Court that the Bahamas U.S. Treaty |
| 16 | applies; that Article 14 of that treaty, which embodies the |
| 17 | rule of specialty, applies, as executed in the Bahamas by their |
| 18 | Extradition Act; that, under that rule, as the government has |
| 19 | stated today -- |
| 20 | THE COURT:  Their Extradition Act doesn't bind the |
| 21 | United States. |
| 22 | MR. COHEN:  Correct.  It's executing for them, because |
| 23 | our treaties are self-executing, their's are not.  That's |
| 24 | right. |
| 25 | It's undisputed that the government, as Mr. Rehn just |

N6FDBANO

1   repeated moments ago, has taken the position that it needs to

2   obtain consent from the Bahamas, and that consent has not been

3   obtained.  In fact, if your Honor -- I don't know if your Honor

4   has had the opportunity to see Justice Klein's decision from

5   the Bahamas that we sent to the Court.  It came out in a

6   decision that a formal request had not been made to the Bahamas

7   under the procedure required by the Bahamas until May 22nd,

8   which is three months after the S3 indictment was returned, two

9   months after the S5.

10          In light of all that, in light of the time, the

11   sequencing, which, by the way, is not a product of anything

12   this Court has done, or the defense has done, we think that

13   sequencing is another reason why, as we mentioned before, the

14   fair result here would be for the Court to dismiss the new

15   charges under the cases we cited in our briefs, and, in the

16   alternative, to set -- if need be, to sever them for another

17   trial.

18          Let me take up now the campaign finance charge, which

19   is --

20          THE COURT:  Well, before you leave this, I mean, you

21   have a major problem on standing.

22          MR. COHEN:  Well --

23          THE COURT:  Whatever the Bahamas' complaints against

24   the United States may or may not be, the question is whether

25   your client has any right to raise them.

N6FDBANO

1          MR. COHEN:  Right.  Well, your Honor, again, we think,

2     as the government just pointed out, and it did in its letter,

3     in the facts of this case, the Court need not reach the issue,

4     because the government's taken the position, as your Honor just

5     brought out, for matters of policy and relations that it will

6     not proceed without consent.

7          So for purposes of this proceeding, in this case, the

8     Court need not reach the issue.  However, if you'd like to, I

9     can address our view on that.

10          THE COURT:  Well, I think you should.

11          MR. COHEN:  Okay.  Thank you, your Honor.

12          So, as we laid out in our papers, we think that under

13     the line of cases that begins all the way back with *Rauscher*, a

14     1886 case of the Supreme Court, through *Fiocconi*, and into

15     *Barinas*, that there is a way in which a defendant situated like

16     our client does have standing to raise these claims.  And if

17     you look at what *Barinas* did, and that's the most recent

18     pronouncement on that, but the Court said, in the longer

19     passage, longer than the one that the government has been going

20     back and forth with us in the papers, what the Court said is

21     that absent -- this is at page 4 of my printout.  I will get

22     the Court after this the cite from the case itself, but the

23     formulation was, absent an express provision in the agreement

24     between the states, any individual rights are only derivative

25     through the states, and absent protest or objection by the

N6FDBANO

1    offended sovereign, a defendant has no standing to raise the

2    violation of international law.

3           And then it goes on to the passage that we've been

4    fighting about, as to "would object."  And, your Honor, our

5    view is that when the Court said, the Second Circuit said,

6    absent an express provision and absent protest, here we have an

7    express provision, here we have a protest, the decisions on

8    this area are driven by --

9           THE COURT:  Where's the protest?

10          MR. COHEN:  The protest is, and I believe it's now

11   undisputed, is the Bahamas has a standing objection to the U.S.

12   proceeding on new charges without it giving explicit consent.

13          THE COURT:  But that's not what the case is talking

14   about.

15          MR. COHEN:  Well, your Honor, I think it is, because

16   it's protest or objection.  And, as I understood, at least the

17   government's original argument, they were arguing if the

18   Bahamas was silent, they could go forward.  And now I think

19   they have come to the position that we have submitted, which is

20   supported by our expert affidavit, that the government -- that

21   the Bahamas must expressly consent to the new charges.

22          So, in effect, it is objecting, and it would object.

23   And the fact --

24          THE COURT:  Well, I --

25          MR. COHEN:  I'm sorry, your Honor.

N6FDBANO

1          THE COURT:  I just don't get that at all, and,

2     furthermore, if you look at the treaty that was at issue in

3     *Barinas*, the treaty between the United States and the Dominican

4     Republic, I don't see a material difference in this respect

5     between the Bahamas treaty and the Dominican Republic treaty,

6     where the Second Circuit explicitly found no language

7     indicating that the Dominican Republic and the United States

8     intended the treaty to be enforceable by individuals.

9          MR. COHEN:  Right.  Your Honor, I think there's an

10    important difference, that 1909 treaty was much shorter.  This

11    one has a built out -- the Bahamas treaty we're talking about

12    is built out, and it builds in this concept of requiring

13    express consent from the Bahamas, which --

14         THE COURT:  But it does not address enforceability by

15    the individual.

16         MR. COHEN:  Well, under *Barinas*, the individual's

17    rights derive from, right, under that line of cases, derive

18    from the rights of the request state, and that's the passage

19    that I was --

20         THE COURT:  The individual's rights.

21         MR. COHEN:  Right.

22         THE COURT:  Such as they may be.

23         MR. COHEN:  Right.  So our position, your Honor, is

24    that under that line of -- under that language in *Barinas*, and

25    under *Fiocconi*, the defendant on these facts on this treaty,

N6FDBANO

1    the way it's now been construed, and I think both sides agree

2    on the construction, gives the defendant a right to be heard on

3    that and standing to proceed before your Honor.  That's our

4    argument.

5              THE COURT:  Okay.  Now, let's not take up all your

6    time with this.

7              MR. COHEN:  Okay.  Well, whatever your Honor would

8    like to cover, I'm happy to cover.  And, by the way, I

9    apologize for my voice, so --

10             THE COURT:  There's nothing to apologize for.

11             MR. COHEN:  I'm losing it.

12             Let me turn back to the campaign finance count, Count

13   12, because that's very important, your Honor.  And our view is

14   that in light of what's happened with the rule of specialty,

15   and the proceedings in the Bahamas, that count should not

16   proceed to trial.  That count should be dismissed.

17             There is an alterative approach that I will get to in

18   a moment that comes out of the government's letter last night

19   that we will also lay out for the Court.  The argument here,

20   your Honor, and I think the thing to really emphasize is the

21   operative document coming out of the Bahamas on extradition is

22   the warrant of surrender, and -- hold on.  If we look at the

23   warrant of surrender, which is Exhibit 2 to the Everdell

24   Declaration that we submitted with our opening papers, it has a

25   page, your Honor, called Schedule of Charges, and it lists --

N6FDBANO

1    starts, for example, fraud by mail, and then it lists the

2    analogous criminal law provision in the Bahamas.

3           THE COURT:  I'm familiar with it.

4           MR. COHEN:  Okay.  So it gives the Bahamas' analog,

5    the U.S. Code provision, and the charge.  It does not list the

6    campaign finance charge.

7           Now, we have submitted expert testimony by Mr. Lewis,

8    who's been an ex -- who's been in this area for 35 years, has

9    been, in fact, engaged by the DOJ and the U.S. government 100

10   times, that the operative document is this warrant of

11   surrender.  And that makes sense, your Honor, because this we

12   think reflects a determination by the Bahamas that those counts

13   do not meet the dual criminality requirement in the Bahamas.

14   They could also be simply a reflection that no submission was

15   made, because it wasn't, under Article 8 of the treaty of facts

16   and materials that would give the minister an ability to make a

17   determination as to dual criminality.

18          But fundamentally, for purposes of this argument, it

19   almost doesn't matter.  It's the warrant of surrender that

20   controls.  And what the government does is it tries to get

21   behind it and say, well, Judge, you know, it was a mistake; it

22   was inadvertent; if you look at the record as a whole, that

23   record as a whole says that Mr. Bankman-Fried in fact consented

24   to this charge.  And, again, under the interpretation of

25   Bahamian law that we have before this, with this uncontradicted

N6FDBANO

1    declaration from Mr. Lewis, that's just not how the analysis

2    proceeds.

3              But even if you were to take on these arguments, if we

4    were to take them on, your Honor, we don't think they carry the

5    day.  The government makes a lot about --

6              THE COURT:  Do you acknowledge that he did, in fact,

7    consent to it?

8              MR. COHEN:  What we acknowledge is he consented to

9    simplified extradition, which your Honor must have my notes in

10   front of you, because that was the next point I was getting to.

11   What the record shows is he consented to simplified

12   extradition, and what that meant was he consented to not having

13   a long, extensive, formal proceeding in the Bahamas.  The

14   charges he would be extradited on were then up to the minister

15   to decide in accordance with their laws of the Bahamas.

16             THE COURT:  Did he consent to the minister extraditing

17   him on what is now Count 12 I think?

18             MR. COHEN:  No, he did not, because he consented to

19   being extradited on what the operative document said he'd be

20   extradited on, which is the warrant of surrender.  The minister

21   could have decided -- all he did --

22             THE COURT:  So your position is when he consented to

23   the simplified extradition, he had no idea what he was being

24   extradited to face?

25             MR. COHEN:  He certainly had an idea of the counts

N6FDBANO

1    that he could be extradited on for sure, your Honor.  There

2    were eight counts presented.  The minister could have --

3              THE COURT:  One of them was the campaign finance.

4              MR. COHEN:  Yes, of course.  Of course.  So it wasn't

5    no idea, but it was then the minister made a determination.

6    That was our argument.

7              THE COURT:  So your view is that your client consented

8    to being extradited by simplified procedure on all of the then

9    extant counts, including what is now Count 12, and the

10   minister, for God knows what reason, executed this warrant, and

11   I'm not entitled to look at what your client consented to and

12   what the minister intended to do when he granted an unopposed

13   request?

14             MR. COHEN:  We're saying that the problem with look --

15   the problem with looking at it is there's now competing

16   arguments as to what the minister intended, and that's why we

17   cited the presumption of irregularity of these proceedings.

18   That's why we shouldn't be getting into, we, the parties or the

19   Court, shouldn't be getting into what he intended.

20             And your Honor's question leads me to our alternative

21   suggestion, which comes out of the letter of last night.

22             THE COURT:  Well, as to the alternative suggestion,

23   between the consent to the simplified extradition and the

24   minister's execution of the warrant, was any presentation or

25   communication made on behalf of the defendant to the minister

N6FDBANO

| | |
|---|---|
| 1 | or his subordinates with respect to the scope of the warrant |
| 2 | that he should approve? |
| 3 | MR. COHEN:  No, your Honor. |
| 4 | THE COURT:  Okay. |
| 5 | MR. COHEN:  I can't speak for what the government |
| 6 | presented or not, but no. |
| 7 | THE COURT:  I didn't ask you about that. |
| 8 | MR. COHEN:  I know. |
| 9 | The alternative approach, your Honor, if your Honor is |
| 10 | inclined to sever the new charges that we've been talking |
| 11 | about, we would suggest respectfully, and as an alternative, |
| 12 | that the Court also sever the campaign finance charge, because |
| 13 | here we are, all of us, trying to get at what the Bahamas |
| 14 | intended when it did not include this in the schedule of |
| 15 | charges, and the simplest way to find out what the Bahamas |
| 16 | intend is to ask them and to bring a proceeding in the Bahamas, |
| 17 | either the government or us or both, where we can get clarity |
| 18 | that we can then convey to the Court. |
| 19 | THE COURT:  Okay. |
| 20 | MR. COHEN:  All right.  Your Honor, I think I've used |
| 21 | up my time, so I'm going to turn it over to Mr. Everdell. |
| 22 | THE COURT:  Thank you. |
| 23 | MR. COHEN:  Thank you. |
| 24 | MR. EVERDELL:  Thank you, your Honor. |
| 25 | I'm going to address the motions to dismiss the bank |

N6FDBANO

fraud, conspiracy count, Count 9, and the wire fraud counts

against Alameda's lenders, which are Counts 7 and 8, and the

wire fraud against FTX customers, which are Counts 1 and 2.

THE COURT:  I'm sorry.  So give me the numbers again.

MR. EVERDELL:  Sure.  The first is Count 9, which is

the bank fraud conspiracy; then Counts 7 and 8 are the wire

fraud and wire fraud conspiracy against Alameda's lenders; and

Counts 1 and 2 are the wire fraud and wire fraud conspiracy

against FTX customers.

THE COURT:  Thank you.

MR. EVERDELL:  Your Honor, as we set forth in our

motions, these counts do not allege a valid property interest

that can support federal fraud charges, and are based on the

now invalid right to control theory of property fraud that was

struck down by unanimous decision of the Supreme Court just one

month ago in *Ciminelli v. United States*.  The government, now

aware of *Ciminelli*, seems to recognize that the allegations in

the S5 indictment, do not allege valid fraud charges, and so

they're trying to pivot abruptly.  They assert for the very

first time in opposition brief new theories of fraud that were

not alleged in the S5 indictment and never presented to the

grand jury.  And they attempt to make the case that these

theories were in the S5 indictment all along, but that's simply

incorrect.

The Court not should not allow the government to

N6FDBANO

retroactively amend the indictment by asserting new allegations

and new charging theories in their opposition brief, and they

shouldn't allow the charges to proceed based on invalid and

insufficient theories, so they must be dismissed.

I will start first, Judge, with the bank fraud

conspiracy.  Mr. Bankman-Fried is charged under the second

subsection of the bank fraud statute, which is 18 U.S.C.

1344(2).  And, your Honor, what the government is trying to do

with this count is take what is fundamentally an allegation of

wire fraud against FTX customers and turn it into a bank fraud

charge, but this doesn't hold water for several reasons.

First, the bank fraud count, as it's actually pled in

the S5 indictment, is charged under the invalid right to

control theory.  The allegations concerning the bank fraud

count, your Honor, are found in paragraph's 14 to 21, but those

paragraphs are very clear.  They do not allege that

Mr. Bankman-Fried mislead bank one to steal money from the

bank, which is what the government is now claiming in their

opposition brief.

Those paragraphs allege that Mr. Bankman-Fried mislead

Bank One to trick the bank into opening a bank account for

North Dimension, so that it could receive deposits.  In other

words, the alleged bank fraud relates to the opening of the

bank account, not any misappropriation of customer funds.

THE COURT:  Well, I think you take a very narrow view

N6FDBANO

1    of Count 9 --

2            MR. EVERDELL:  Well, your Honor --

3            THE COURT:  -- and what goes before it in the

4    indictment.

5            MR. EVERDELL:  Your Honor, I'm looking at the

6    allegations, specifically in the bank fraud count, and it talks

7    about -- for example, I quote from paragraph 14, FTX needed

8    bank accounts that would allow FTX customers to deposit dollars

9    with FTX, and then it says that FTX -- the bank one told FTX

10   they wouldn't open the bank account for FTX.

11           THE COURT:  Right.

12           MR. EVERDELL:  So they gave them false information,

13   and, as a result, the bank approved the opening of the North

14   Dimension account.

15           THE COURT:  And he did all this, according to the

16   indictment as I read it, in order to create a vehicle secretly

17   under the control and influence of Alameda, which was, in turn,

18   under control of your client, and then used that control

19   regularly to take money from those accounts for his own

20   purposes.

21           MR. EVERDELL:  Your Honor, I think what you're

22   referring to there is sort of what I was saying before, that

23   refers to the fraud against the FTX customers.  What you're

24   describing there is the alleged fraud about taking the customer

25   deposits, but it's not referring to the fraud against the bank.

N6FDBANO

1          THE COURT:  You can't parse is that finely I don't

2     believe.

3          MR. EVERDELL:  Well --

4          THE COURT:  Furthermore, this idea, and I've voiced

5     the tentative conclusion, so that you know and you would have a

6     chance to respond to it, that the indictment has to allege a

7     theory as opposed to the elements, basically, it doesn't hold

8     water, at least in this circuit.

9          MR. EVERDELL:  Well, your Honor, I think the cases we

10    cite in our brief, including the *Piro* case, which says the

11    indictment requires -- the indictment clause of the Fifth

12    Amendment requires that an indictment contain some amount of

13    factual particularity to ensure that the prosecution will not

14    fill in elements of its case with facts other than those

15    considered by the grand jury.  And that's what I'm getting at

16    here, your Honor.  I'm looking at the indictment to see what

17    they actually allege, what facts they actually allege, and

18    whether those facts as they allege support a valid theory of

19    fraud.

20          And as I look at the allegations that relate to the

21    bank fraud count, they are targeted towards the opening of the

22    account.  And the cases are clear that if it's fraudulently

23    opening of the account, you're not depriving the bank of any of

24    the bank's property.  You're not taking funds, you're not

25    convincing the bank to release funds or divert funds elsewhere

1    by fraudulent means.

2              THE COURT:  He allegedly did it for the purpose of

3    getting his hands on the customer funds for the benefit of

4    Alameda and himself.

5              MR. EVERDELL:  Right, and I think --

6              THE COURT:  That's right in the paragraphs in the

7    complaint that are incorporated by reference in Count 9.

8              MR. EVERDELL:  But I guess where I'm respectfully

9    disagreeing with the Court is I don't see how that is taking

10   bank property, because to defraud the bank --

11             THE COURT:  Well, *Shaw* I believe dealt with that.

12             MR. EVERDELL:  Well, I don't think so, your Honor,

13   because I think we have a different situation here than *in*

14   *Shaw*.  In *Shaw*, the situation was that the defendant basically

15   impersonated an account holder, a different account holder.  He

16   had that person's identification and credentials, and told the

17   bank, impersonating this other person, to divert funds to a

18   different account, to himself, away from the actual account

19   holder.

20             So, in that case, the funds that were diverted, yes,

21   Shaw says that the bank has some property interest in customer

22   deposits, but, in that case, what was happening is the

23   defendant was misleading the bank to get the bank to divert

24   bank funds to himself, to another count from funds that were

25   held in the account of a different person.

N6FDBANO

1          Now, in this case, your Honor, Bank One, the account

2     was held in the name of North Dimension, and the customer

3     deposits were going into North Dimension.  So from Bank One's

4     perspective, the account was held by North Dimension.  They

5     were the lawful owners of those funds from Bank One's

6     perspective.  Right?

7          THE COURT:  Who were the lawful owners?

8          MR. EVERDELL:  North Dimension -- when the funds hit

9     the North Dimension account, from Bank One's perspective, those

10    are North Dimension's funds.  And so if account holders of the

11    North Dimension account, which is alleged to be Mr.

12    Bankman-Fried and others, then tell Bank One, we want to move

13    money out of this account, we want to withdraw it, we want to

14    transfer it, from Bank One's perspective, that's their money,

15    because -- they're allowed to do that, because --

16          THE COURT:  It's not exactly the bank's money.  You're

17    overlooking one of the key passages in *Shaw*, "when a customer

18    deposits funds, the bank ordinarily becomes the owner of the

19    funds, and consequently has the right to use the funds as a

20    source of loans that help the bank earn profits, though the

21    customer retains the right, for example, to withdraw funds."

22    So that property in a depositor account in a bank is property

23    in one sense of the bank's, and in another sense, of the

24    account holder.

25          When we all went to law school, we learned in property

N6FDBANO

1    one that the whole concept of property is a bundle of rights.

2             MR. EVERDELL:  That's correct.

3             THE COURT:  In this case, some of the bundle is the

4    bank's, and some of the bundle belongs to the customers.  Just

5    as if you owned 40 acres on which there was a driveway to your

6    neighbor's property across it, no doubt you own the 40 acres,

7    and if there's an easement that your neighbor has to get to his

8    house over your property, he owns the property right in the

9    right to use your property for the limited purpose of going to

10   his property.  It's no different.

11            MR. EVERDELL:  Yes, your Honor, but I think that the

12   bank's interest, whatever property the bank has in their

13   customer deposits, if we're talking about the customer's own

14   funds in their own account, that property interest ends at the

15   point when that customer says, I want to withdraw those funds,

16   or I want to transfer those funds.  So certainly while the

17   funds are sitting in that customer's account, as *Shaw* says, the

18   bank has a limited property interest.  They can use it to loan

19   it out, they can make money off of it, they can do other things

20   with it, but as soon as the customer tells -- the customer

21   whose funds those are, who is the holder of the account, says,

22   I want to retrieve those funds, the bank's interest in those

23   funds stops.  Those are the customer's funds.  They can

24   withdraw them.  And I think that is what *Shaw* says.

25            THE COURT:  They are the depositor's funds.

N6FDBANO

| | |
|---|---|
| 1 | MR. EVERDELL:  In this case, it's not clear to me, |
| 2 | Judge, and I don't think it's alleged that they were held in |
| 3 | the North Dimension account for the benefit of the depositor. |
| 4 | I think they were given to North Dimension, they were given |
| 5 | obviously to fund the FTX account with an equivalent amount of |
| 6 | money, but those funds were belonging to North Dimension.  And |
| 7 | there's nothing in the indictment that says there's some sort |
| 8 | of lingering obligation or -- |
| 9 | THE COURT:  The providers of the money, the ultimate |
| 10 | providers of the money, had no further property interest in it? |
| 11 | That's your position? |
| 12 | MR. EVERDELL:  Well, what they have, your Honor, what |
| 13 | the customers have at that point, is they are given an |
| 14 | equivalent amount of money on the FTX exchange, and they can |
| 15 | use that to trade.  So they have the right to use the money |
| 16 | that is leveraged over to FTX to make cryptocurrency trades. |
| 17 | Right?  They also have the right to withdraw an equivalent |
| 18 | amount.  Obviously when they send the funds in, money is |
| 19 | fungible, they don't get those specific deposits, but they can |
| 20 | withdraw an equivalent amount.  Right? |
| 21 | So certainly, if they want to, they can say I want my |
| 22 | money back, I want my cash back, and they have that right, too, |
| 23 | but -- |
| 24 | THE COURT:  Which is property. |
| 25 | MR. EVERDELL:  Well, when they withdraw it, it's their |

N6FDBANO

1    property.  But what the difference is I think with *Shaw* --

2              THE COURT:  The right to withdraw is property.

3              MR. EVERDELL:  The right to -- the right to get your

4    money back, it's a little like right to collect a debt, which I

5    think we're going to talk later.

6              THE COURT:  Which is also property.

7              MR. EVERDELL:  But what I think I'm getting at here

8    with the bank fraud count, your Honor, because I think we're

9    conflating what is the fraud against the alleged -- fraud

10   against the customers versus the alleged fraud against the

11   bank.  And the bank, in order to defraud the bank, what

12   *Ciminelli* says is there has to be a traditional property

13   interest that the bank has to be able to take the bank's

14   property, because you have to defraud the financial institution

15   under the bank fraud statute, so you have to be taking the

16   bank's property.

17             In this case, the bank doesn't have -- at the point

18   where the holders of the North Dimension account try to

19   withdraw the funds from the North Dimension account or transfer

20   it, the bank's interest in that property stops, because from

21   the bank's perspective, that money belongs to North Dimension.

22   And so we're not defrauding the bank of its property.  They

23   have the right to use it, to lend out, to make loans, and do

24   whatever they want to do with it while it is sitting in the

25   account, but when North Dimension account holders say they want

N6FDBANO

that back, or want to transfer it somewhere, from the bank's

point of view, they're not being defrauded from any of their

property interest.  Whatever it may be, what the providence of

those funds were, and the allegations of fraud on the

customers, we're talking about the bank's property when it

comes to the bank fraud statute.

       And they have not been actually deprived of their

property at that point.  They've had the full use of whatever

property rights they had to lend out money while the money was

sitting there, but when the customer, in this case the North

Dimension account holders, comes to the bank and says, I would

like those monies transferred, it's not the bank's property

that's being defrauded, it's not the bank's property that's

being taken, separate and apart from anything to do with the

customer.

       So, your Honor, I don't think that *Shaw* is controlling

here.  I think that under this situation, it's different, and

we don't have -- we do not have a bank fraud.

       Your Honor, also, I would point out that there is

no -- in the indictment, there is no relational component

between the false statements and the movement of the funds out

of the bank, right, because *Loughrin v. the United States* says

that, it's not enough that a fraudster's scheme to obtain money

from a bank and that he made a false statement.  The provision

as well includes a relationship component.  The criminal must

N6FDBANO

1    acquire or attempt to acquire bank property by means of a

2    misrepresentation."

3            So there has to be a nexus between the

4    misrepresentation and the acquisition of the bank's property.

5    In the indictment, there is no allegation, as far as I can see,

6    of a misstatement given to Bank One in order to trick Bank One

7    to release funds from the North Dimension bank account.

8    There's no misrepresentations alleged that related to that at

9    all.  All of the misrepresentations that are in the indictment

10   relate to the opening of the account, not to the release of

11   funds.

12           So under *Loughrin*, there is no relational component

13   here.  It's simply been failed to be alleged here.  There is no

14   way that the indictment establishes the bank fraud, because all

15   of the misrepresentations that are there refer to the opening

16   of the account, the information given to Bank One to determine

17   whether or not to open the account.  And so under that

18   standard, your Honor, under that case, that is a separate and

19   independent reason why the allegations in the indictment do not

20   establish a valid bank fraud charge.

21           Your Honor, unless there's further -- in the interest

22   of time, I should probably move on to the next count.  Okay.

23   So now I'll address briefly the lender counts, your Honor,

24   which are 7 and 8.  And I think with these counts, Judge, the

25   government is trying to do what the Supreme Court cautioned

N6FDBANO

1   again in *Ciminelli*, which is trying to criminalized a

2   traditionally civil matter by turning a contract dispute into a

3   federal fraud crime.  So just like the bank fraud count, Your

4   Honor, they're trying to introduce a new charging theory in

5   their opposition brief.

6          Now, the new theory, as I see it, in opposition brief

7   contains two elements, right, that the lenders were deprived of

8   their new money in the sense that money of lenders would have

9   given Alameda as a part of the new loan agreements, right; and

10  the right to call existing loans.  So there's the existing

11  loans which they were deprived of the right to recall, and

12  according to what's alleged in the brief at least, there were

13  these rights to -- they approached them for new loans, so they

14  were seeking new money from the lenders.

15         Now, on that, your Honor, as to the new loans, there

16  is nothing whatsoever in the indictment alleging anything about

17  going to seek new loans from the Alameda lenders.  What the

18  indictment talks about is there is a downturn in the markets,

19  and the lenders want their funds returned, and so there's an

20  issue about this, and there's an attempt to deal with this

21  problem.  But it is all about the lenders and the existing

22  loans, and them trying to get back their existing loans.  It

23  says nothing about Mr. Bankman-Fried or anybody else going to

24  lenders to get new loans.  That's totally invented in the

25  opposition briefs, nowhere in the indictment.

N6FDBANO

1           And that's significant, your Honor, because that is, I

2     think, an attempt to try to get around *Ciminelli*, because that

3     alleges, theoretically, a fraud in the inducement, right?  So

4     they're going to the lenders to try to get new loans, making

5     false representations to get their money right from the get go,

6     fraud in the inducement.

7           That's not alleged, right?  If anything is alleged it

8     is this right -- it is the deprivation of this right to collect

9     an existing loan; and, your Honor, that is not an actual right

10    that is sufficient to sustain a property fraud claim, and

11    here's why.  What we have there, if the property interest is

12    anything, it is the right to collect.  Well, I think that's

13    based on a misunderstanding of what the lenders' rights

14    actually are.  The lenders' rights derive entirely from the

15    loan agreements, which the government does not cite in the

16    indictment.

17          They clearly don't have a property interest in the

18    specific funds that they gave to Alameda, right?  When lenders

19    loan money, when you loan money to somebody, the borrower owns

20    those funds.  It's the borrower's funds.  You do have a right

21    to collect your loan, and that's usually dictated by the terms

22    of the loan agreement of when and how and those terms, but the

23    money itself is with the borrower.  It's their property.  So

24    the specific loan funds, they do not have an interest in.

25          The only potential interest they have is the right to

N6FDBANO

1    collect at a later time, but here, your Honor, the lenders have

2    not been deprived of that right.  In fact, our understanding is

3    they are vigorously exercising those rights in the bankruptcy

4    proceedings.  As we speak, they are trying to collect the money

5    that's owed to them.  So the right to collect, to the extent

6    that it is a property right, has not been deprived, right?

7         And it is true that you do not have to cause actual

8    loss to have a wire fraud offense, but what you do have to

9    prove is that the scheme, if it were successful, would result

10   in economic harm to the victim.  And here, Judge, as alleged,

11   this scheme was successful in the sense that false financial

12   information caused the lenders to hold off calling the loans.

13   But lenders did not lose the right to collect.  They still have

14   it.  So that cannot form the basis of the property fraud

15   claims -- or the wire fraud claims against them.

16        THE COURT:  It's been impaired a little bit, don't you

17   think?

18        MR. EVERDELL:  Sorry, your Honor?

19        THE COURT:  It's been impaired a little bit, don't you

20   think?

21        MR. EVERDELL:  Well, I don't know if it's been

22   impaired.  The right itself exists.  Whether or not there are

23   sufficient funds to cover the outstanding amounts, I guess

24   that's up to the bankruptcy to decide.  But the right itself

25   exists, and the right is something that can be exercised.

N6FDBANO

1              And, to be honest, Judge, there certainly is not an

2      allegation I think that the intent of the scheme was to deprive

3      them of their rights to collect, right?  It was -- I mean, they

4      still have it, so that's -- that doesn't hold water in my view.

5              Your Honor, I think -- we cited the *Adler* case, which

6      I don't want to take time going through, because I'm sure your

7      Honor's read the briefs.  I think it's very much on point,

8      where Judge Luttig addressed a very similar situation, and said

9      the right to collect a debt is maybe a property right, but it

10     is not one that has been deprived here.  And so the same

11     situation applies here.

12             Your Honor, I'll finally move to the wire fraud

13     against the customers.  And what I think is going on here is

14     that, you know, the government is alleging that

15     Mr. Bankman-Fried deprived the FTX customers of funds they

16     deposited on the exchange.  But once again I think we need to

17     be clear about what the property right is, what rights and

18     interests did the FTX customers have once they deposited their

19     funds on FTX.

20             And the indictment alleges first that the customers

21     received a credit, a corresponding credit that they could use

22     to trade.  So this is not a situation like the *Merrill* case

23     that the government cited where the customers were actually

24     deprived of their funds, their funds were actually tied up and

25     they couldn't use them.  They could use them.  They used them

N6FDBANO

1    in the form of a credit to be able to trade.  It was an

2    equivalent amount.  And the customers had a contractual right

3    to be repaid an equivalent amount on demand, but, again, the

4    customers were not deprived of that right.  They have that

5    right.  They are looking to exercise that right.

6            Now, these, I don't think create a valid fraud theory.

7    And, again, in the interest of time, your Honor, I will rest on

8    the papers unless the Court has questions.

9            THE COURT:  Thank you.  I congratulate you on an

10   extraordinarily imaginative argument.

11           MR. EVERDELL:  Thank you, your Honor.

12           THE COURT:  Counsel.

13           I'm sorry.  You're rising, Mr. Cohen.  Are you --

14           MR. COHEN:  We had thought we had a bit more time,

15   your Honor.

16           THE COURT:  You have five minutes.

17           MR. COHEN:  We have five minutes.  All right.  Then

18   one moment, your Honor.

19           So, your Honor, in the four and a half minutes I now

20   have, let me briefly touch on the motion that we made for *Brady*

21   disclosures and discovery.

22           THE COURT:  Well, I'm going to deal with that

23   separately.

24           MR. COHEN:  Okay.  Your Honor doesn't need --

25           THE COURT:  We'll deal with that later.

N6FDBANO

1          MR. COHEN:  Okay.  Then --

2          THE COURT:  All right.  Who's going to argue this one

3  for the government?

4          MR. REHN:  Good morning, your Honor.

5          THE COURT:  Good morning.

6          MR. REHN:  I was planning to address any specialty

7  issues that the Court had, and also the fraud counts that took

8  up the majority of the defense counsels' time.

9          THE COURT:  Yes.  I think on the specialty, if you

10  would just address briefly the argument which, if I were to

11  adopt it, would ignore the fact that the defendant consented to

12  simplified extradition, and there was apparently no doubt in

13  anybody's mind, including his, as to what he was consenting to;

14  but I'm to blind myself to that, and focus on the omission of

15  what is now Count 12 in the documents signed by the minister.

16  Is that it?

17          MR. REHN:  Yes, your Honor.  I think, as to that

18  issue -- and we do think defendant's consent is important, but

19  leaving that aside for the moment, there's two reasons why it

20  -- that does not invalidate proceeding on the campaign finance

21  count.  The first reason, very importantly, is that the

22  defendant lacks standing to raise that issue in this court, and

23  I think that's especially warranted here.

24          This case kind of illustrates the wisdom of the Second

25  Circuit's rule on standing, because what the defense is asking

N6FDBANO

the Court to do is basically insert itself into a series of

Bahamian legal questions combined with issues of diplomatic

communications between two sovereign nations about the precise

meaning of the extradition that took place here.  And that's

really something that doesn't need to be done, because it's a

matter for the diplomatic relationship between the United

States and the Bahamas.

So just on the Second Circuit's standing

jurisprudence, the Court should deny the defendant's motion

challenging this count.

THE COURT:  Implicit in that argument is that I should

reject the defendant's argument with respect to all the other

new counts as to standing, yes?

MR. REHN:  That's correct, your Honor, and we think

that is a reason not to dismiss those counts.  As we discussed

earlier, the government would not proceed, in any event, on

those counts absent -- because the United States does take its

diplomatic obligations seriously.

THE COURT:  Yes, so that's a diplomatic policy

decision, not a concession on the legal point.

MR. REHN:  That's correct, your Honor.

THE COURT:  Okay.

MR. REHN:  Now, if the Court were to inquire into the

extradition record, I think we acknowledge there is ambiguity

here, but if you look at what the courts have done, and I think

N6FDBANO

the most important decision is the Second Circuit's decision in

the *Levy* case, where that case was actually less favorable to

the government than this case, because in that case, the

government's own extradition request did not even mention the

count being contested by the defendant; and then in the order

granting extradition from the country, it just referred to the

charges in the indictment, and there was no indication in the

record that the extraditing country had specifically been

notified of or had considered the contested count, because it

wasn't even in the government's initial extradition request.

And, nonetheless, the Second Circuit said, that's a sufficient

record, because we will not interpret the record narrowly;

we're going to assume that the -- the United States is

proceeding in accordance with an understanding of the

extraditing country that it can proceed on the charges for

which it sought extradition.

            THE COURT:  Here the record supports the view what is

now in Count 12 was in the extradition request.

            MR. REHN:  Certainly, and I don't think it's contested

the count was in the extradition request.  The defendant had a

copy of the extradition request, said in writing that he had

reviewed all of the counts in that, and that he was consenting

to extradition on those counts.  Then he goes to the Bahamian

court, and I think this is very important, because other cases

from other circuits who have looked at this have said, well,

N6FDBANO

did the courts consider whether this count was part of the

extradition or not, so to the extent that this Court were to

inquire into the extradition record, it would be appropriate to

look at what the Bahamian Court did, and the Bahamian Court

expressly listed all of the counts, including the campaign

finance count, and stated that this is one of the charges that

the defendant will have to answer to upon extradition.  So it

was the understanding of all of the parties involved that this

was part of the record of extradition.

Subsequently, after all of that happened, the minister

of foreign affairs issued this warrant, which is actually just

addressed to the Bahamian Police, authorizing them to turn over

the defendant to the United States.  It's not even expressed

directly to the United States.  And we acknowledge that warrant

does not specifically reference this count, although it does

reference the defendant's consent and the Bahamian Court's

order that listed this as one of the counts of extradition.

And so considering that record on the whole, we don't

think that the Court should narrowly focus on the omission of

this count in the attachments to the surrender warrant to the

exclusion of the other evidence that this was part of the

extradition.

THE COURT:  Okay.  Thank you.

MR. REHN:  Your Honor, with respect to the fraud

counts, I'll be brief, and I'm happy to address any particular

N6FDBANO

1    questions that the Court has, but I'll just go through them.

2    On the bank fraud count, I think that there's two separate

3    prongs to the defendant's argument as to both of which the

4    defendant is just misreading the case law.  So I think the

5    defense gives away the game when they said at one point in

6    their argument that, you have to defraud a financial

7    institution in order to succeed on this count.  That's directly

8    contrary to the Supreme Court's holding in *Loughrin* when it

9    says that for a prosecution under 1344(2) alleging a scheme to

10   obtain money or property in the custody of the bank, there is

11   no requirement that the government prove the defendant

12   defrauded a financial institution.

13        And that dovetails with the Supreme Court's decision

14   in *Shaw*, which the Court is very familiar with, saying that a

15   scheme to obtain property or money in the custody of the bank

16   is a bank fraud, regardless of whether the bank itself was

17   defrauded or suffered any loss, and that is exactly what is

18   alleged here.

19        THE COURT:  Well, of course, Mr. Everdell says it's

20   not property in the custody of the bank.  It is property that

21   belongs to the bank, for whatever analytical force that has.

22        MR. REHN:  And that's exactly the reason why the bank

23   fraud statute has this separate prong that criminalizes any

24   attempt to obtain property in the custody of the bank.

25   Basically, the bank fraud statute broadly applies to schemes to

N6FDBANO

obtain money that the bank has.  Whether it's the bank's

property or the property of depositors in the bank, the issue

is the defendant made false statements to a bank for the

purpose of obtaining property that the bank held.  And

certainly the indictment alleges the bank did withdraw funds

from that bank account for his own purposes, and that's

certainly sufficient under these cases that we've discussed in

our brief.

I would just highlight one case in particular, the

*Lebedev* case from the Second Circuit, which is very similar to

this case.  And just the very first paragraph of *Lebedev* says

in that case the defendant "opened bank accounts in the name

of," and then it lists a phoney company that the defendant

provided to the bank in that case when they opened that

account.  And then the defendant subsequently used that account

to facilitate, interestingly enough, customer deposits onto an

offer of -- cryptocurrency exchange.

*Lebedev* is exactly the theory that's at issue here

that the Second Circuit upheld, so the Court should also uphold

the theory in this case as well.  It has nothing to do with the

right to control that was the issue in *Ciminelli*.

With respect to the lender fraud, the defense is right

that there's two prongs -- there's two ways in which lenders

were defrauded.  They were defrauded by providing new money, to

the -- lending new money to the defendant's companies in

N6FDBANO

reliance on fraudulent misrepresentations, and they were

defrauded in forbearing their right to demand immediate

repayment of loans they had already made.  And the indictment,

conveniently enough, lists both of these in the account, money

and property.  Both of those are well-established property

interests that are alleged in the indictment, that the

defendant obtained by means of his fraud.

Focusing on the second one, the right to call existing

loans, the indictment specifically alleges in paragraph 32 that

Alameda was required to repay its loans on demand.  So this

idea that the lenders were not deprived of a property interest

when they forbore on executing that immediate right to

repayment, simply doesn't hold water.  That ability to obtain

repayment on demand is an extremely important contractual

property right in the context of a loan that the lenders lost

as a result of the defendant's fraud.

THE COURT:  Well, Mr. Everdell's argument is they

didn't lose it; they can demand all they want for the rest of

time.

MR. REHN:  Well, there's a big difference between

demanding immediate repayment in July of 2022 and seeking

repayment now post bankruptcy.

THE COURT:  His point really is they had the right,

they didn't exercise it, but they had the right.

MR. REHN:  But not exercising a right is being

N6FDBANO

1  deprived of that right if the reason you don't exercise a

2  contractual property right is because of a defendant's

3  fraudulent statements.

4         THE COURT:  Your argument is the right to demand

5  payment was taken them by the fraud.

6         MR. REHN:  That's correct, your Honor.  And they've

7  lost obviously significantly.

8         And I would just highlight the *Pasquantino* Supreme

9  Court case from 2005, 544 U.S. 349, at 357, which says, the

10  right to be paid money has long been thought to be a species of

11  property.  Fraud at common law included a scheme to deprive a

12  victim of his entitlement to money.  And certainly that's

13  what's alleged here with respect to these lenders, in addition

14  to the fact that the lenders made additional new loans based on

15  the defendant's fraudulent statements in the summer of 2022.

16         And then just very briefly on the customer fraud, I

17  don't think the defense really has any argument here.  The most

18  traditional theory of wire fraud that has been long recognized

19  is misappropriation of funds that are entrusted to a defendant.

20  Misappropriation is exactly what's laid out in Counts 1 and 2.

21  The customers were certainly defrauded by a series of false

22  representations about how the customers' deposits would be

23  handled, about the customer protections that were purportedly

24  in place on the platform.  And they've made those deposits.

25  The defendant misappropriated those funds.  And that's about as

N6FDBANO

1     traditional wire fraud theory as you can get.

2              So unless the Court has questions on that --

3              THE COURT:  No.  Thank you.

4              Ms. Sassoon.

5              MS. SASSOON:  Your Honor, given that we have not I

6     don't think used up our 45 minutes, if your Honor does have

7     questions or concerns with any of our other arguments regarding

8     any of the motions to dismiss any of either counts, we can

9     address them.

10             THE COURT:  I don't think that will be necessary.  I

11    think we can turn to the questions that I had my deputy raise

12    with both sides, and to the discovery arguments.

13             I have the government's letter on the status of

14    discovery dated the 14th of June, so let me start there.  In

15    the second paragraph of the letter, the government states that

16    it has now made seven discovery -- I imagine the word

17    "productions" got lost -- which were accompanied by detailed

18    indexes, and include the materials discoverable under Rule 16,

19    et cetera.

20             I take it that means you are telling me you have made

21    all of the Rule 16 disclosures of everything in the possession,

22    custody, or control of the government?  Was that the other word

23    left out?

24             MR. ROOS:  Yes.  First of all, your Honor, apologies

25    for the missing words here.  Clearly the timing of the --

N6FDBANO

```
 1   timing of the letter betrays that probably we could have read

 2   it again.

 3           THE COURT:  At least you didn't blame it on one of

 4   these AI crypt devices.

 5           MR. ROOS:  That's right.  I'm sure --

 6           THE COURT:  I'd have to send you to Judge Castel

 7   immediately.

 8           MR. ROOS:  I'm sure it would have at least written a

 9   full sentence, if not cited a fake case.

10           To answer your Honor's question, the answer is yes,

11   subject to the various outstanding items that are listed on

12   pages 2 and 3 of the letter that we're providing -- that we

13   provided updates on --

14           THE COURT:  Yes, but the outstanding -- there are

15   almost no outstanding items listed.  There is the Slack data,

16   which needs to be converted into files loadable into Relativity

17   and screened, and then you're going to produce that; and there

18   are some documents identified in paragraph 3 that are in the

19   process of being translated.  So with the amendment of those

20   two items -- the exclusion, everything else that the government

21   is obliged to produce under Rule 16, and that is within its

22   possession, custody, or control, has by now been produced.

23           Is that right?

24           MR. ROOS:  I just wanted to add, highlight sort of the

25   two other caveats.  So in paragraph 2 at the end it notes a
```

N6FDBANO

1    very small volume of additional Google documents we're

2    anticipating getting from Google and producing.  Basically,

3    Google made an incomplete production.

4              THE COURT:  Yes.  I noted that, but what you say in

5    that paragraph is you currently don't have them.

6              MR. ROOS:  Correct, your Honor.

7              THE COURT:  Okay.

8              MR. ROOS:  And the other is paragraph 5 there is a

9    discussion of cell phones that were seized, one of which is

10   accessible.  And there's a -- I would say an ongoing

11   conversation about whether that's something that either party

12   would consider to be Rule 16 in this case.

13             The final caveat would be paragraph six, which is just

14   an acknowledgment that many parties, including the FTX debtors

15   and several parties who have been subpoenaed, continue to

16   produce these things.

17             THE COURT:  That's not in your possession, custody, or

18   control either.

19             MR. ROOS:  That's correct, your Honor.

20             So you're right, just the two paragraphs that you

21   highlighted are in the possession, custody, or control.

22             THE COURT:  All right.  Now, Mr. Cohen, is there any

23   dispute about that?  Or is it Mr. Everdell?

24             MR. COHEN:  Mr. Everdell will handle this, your Honor.

25             MR. EVERDELL:  Well, your Honor, I note that there are

1    ongoing subpoena return productions.

2              THE COURT:  So the second time I note we don't have to

3    talk about that.

4              MR. EVERDELL:  Sure.  I note that in paragraph 8, we

5    can talk about the FTX code.  I know the government is claiming

6    that they don't have an obligation to get this, but it seems

7    like they're agreeing now to obtain the FTX codebase and

8    codebase history, which is what we've been asking for.

9              THE COURT:  I'm sorry.  Finish.

10             MR. EVERDELL:  Yes.  The codebase history is what

11   we've been asking for.  This is no. 8.

12             THE COURT:  Well, they've agreed that they've talked

13   to FTX about it.

14             MR. EVERDELL:  Yes.

15             THE COURT:  They haven't agreed to give it to you.

16   They don't know whether they're going to get it I assume.

17             MR. EVERDELL:  Well, understood, your Honor.

18   Obviously we're very eager to get those, and --

19             THE COURT:  Well, I'm sure you are, but that doesn't

20   mean they have it.

21             MR. EVERDELL:  Yes.  That's true.  But to the extent

22   they're agreeing to request it and get it, then that's

23   something we need to get to.

24             THE COURT:  Right.  They've agreed to request it and

25   presumably have requested it.  All right.  That takes care of

N6FDBANO

1     that.

2          Now, you've already given the estimates as to trial

3     duration.  Have you folks given any thought to filing dates for

4     in limine motions, proposed voir dire, and requests to charge?

5          MS. SASSOON:  We have, your Honor.

6          THE COURT:  Is there a proposal?

7          MS. SASSOON:  Two days ago we outlined a proposal to

8     the defense that they are still considering, so we do not have

9     a joint proposal, but we are in discussions and expect to

10    continue to meet and confer.  We're happy to provide the Court

11    with our proposed schedule, but it has not been --

12         THE COURT:  I understand holey water has not yet been

13    sprinkled, but why don't you tell me what your proposal is,

14    because if I don't find it acceptable, it may change your

15    discussions.

16         MS. SASSOON:  Yes, your Honor.

17         Our proposal is that six weeks before trial, the

18    government would produce 3500 material, *Giglio*, and other

19    related witness materials; and that six weeks before trial as

20    well, the parties would provide expert notice.  Five weeks

21    before trial, the government would provide 404(b) notice.  Four

22    weeks before trial, the parties would provide rebuttal expert

23    notice; and the government would provide a witness list, and an

24    exhibit list, and the parties would file their motions in

25    limine.  Three weeks before trial --

N6FDBANO

1           THE COURT:  You're going a little fast for me.

2           MS. SASSOON:  I'll slow down.

3           THE COURT:  Four weeks before, you give 404(b) notice.

4           MS. SASSOON:  Five weeks before would be 404(b)

5      notice.

6           THE COURT:  Five weeks.

7           MS. SASSOON:  Four weeks before trial would be

8      rebuttal expert notice.

9           THE COURT:  Just hold off now.

10          So six weeks before trial would be expert notice,

11     right?

12          MS. SASSOON:  Yes, your Honor.

13          THE COURT:  Five weeks before would be 404(b).

14          MS. SASSOON:  404(b).

15          THE COURT:  Four weeks before --

16          MS. SASSOON:  Rebuttal expert notice, from both

17     parties.

18          THE COURT:  Uh-huh.

19          MS. SASSOON:  Motion in limine deadline for both

20     parties.

21          THE COURT:  Four weeks before?

22          MS. SASSOON:  Yes.  And government witness and exhibit

23     lists.

24          THE COURT:  Also, four weeks?

25          MS. SASSOON:  Yes.  Although, as explained to the

N6FDBANO

1   defense, these proposals of government deadlines were

2   conditioned on the defense agreeing to a reasonable schedule

3   for their exhibits and disclosures, which I'll get to, because

4   that's also built into our proposal.

5           THE COURT:  Okay.

6           MS. SASSOON:  And as is also customary in our view, we

7   would anticipate that we would continue to update our exhibit

8   list and witness list in the weeks before trial, and that the

9   exhibit list four weeks before trial would not be final.

10          THE COURT:  Proposed charge?

11          MS. SASSOON:  So three weeks before trial would be

12  proposed charge, *Daubert* motions, voir dire, and the deadline

13  for defense exhibit list and witness list.

14          THE COURT:  Uh-huh.

15          MS. SASSOON:  Two weeks before trial, deadline for

16  opposition to motions in limine, and the deadline for defense

17  production of 26.2 material.

18          And, finally, we have proposed that one week before

19  trial, we'd have a final pretrial conference.

20          THE COURT:  All right.  Let me just make sure -- I

21  think your proposed schedule, with respect to *Daubert* motions,

22  which I fear are going to be extensive and complicated, it does

23  not give me nearly enough time.  The same is true for the

24  proposed charge, and for the motions in limine.  So I'm going

25  to ask you to go back to the drawing board on that.

1          MS. SASSOON:  Yes.  Thank you.  It's very useful to

2     have your Honor's input.

3          THE COURT:  I look here and I see four lawyers at the

4     back table, and, oh, a bunch at the front table, and Lord knows

5     how many more there are; and I have myself, and two law clerks,

6     and 300 other cases.

7          MS. SASSOON:  Do you have anything more specific in

8     mind when you say you'd like these materials sooner?

9          THE COURT:  Several more weeks earlier.

10          MS. SASSOON:  Yes, your Honor.

11          THE COURT:  Even that would be pressing it.  Okay?

12          MS. SASSOON:  Understood.

13          MR. COHEN:  Your Honor, on the schedule we have, we

14     have a couple of other points, if we might.

15          THE COURT:  Sure.

16          MR. COHEN:  And we're happy to first discuss this with

17     the government, and then come back to your Honor.  We're going

18     to talk internally, and with the government about their

19     proposed schedule for the defense exhibit list and the rebuttal

20     expert list from the defense or designation from the defense.

21     Given that we don't have an obligation to call an expert, we

22     think that may be a little too early, but we'll talk to the

23     government about it and come back to your Honor.

24          THE COURT:  Well, you of course have no obligation to

25     call an expert, and I will probably break out a bottle of

N6FDBANO

1    champagne if you elect to exercise your right not to call one.

2           MR. COHEN:  What kind of champagne, your Honor?

3           THE COURT:  Well, maybe not the very best, but it

4    would be high up there.

5           MR. COHEN:  The other thing is, we just raised it with

6    the government, and, in fairness, we should talk to them about

7    it first, and we may be asking the Court to use a jury

8    questionnaire.  And if the Court agrees to that, we'll have to

9    build it into the schedule.  We're not ready to --

10          THE COURT:  I will tell you it will take a good deal

11   of convincing --

12          MR. COHEN:  Okay.

13          THE COURT:  -- to push me that far, because I've used

14   them, and I've not used them, and I've seen what happens when

15   colleagues use them.  The administration of the process is

16   remarkably complicated and error prone.  Think of the *Maxwell*

17   case as one error --

18          MR. COHEN:  I am familiar with that case, your Honor.

19          THE COURT:  I bet you are.

20          Think of how much work the jury department has to do,

21   how much stuff has to be copied under extreme time pressure,

22   how many questionnaires are you going to get, what are you

23   going to do with them.  The only kind of jury questionnaires I

24   have been using, in my later years on the bench, on occasion,

25   and only on occasion, is directed only to the issue of

N6FDBANO

1   hardship.

2           MR. COHEN:  Uh-huh.

3           THE COURT:  Because you can very often screen that in

4   a lengthy trial right up front.

5           MR. COHEN:  Hardship arises from the length of the

6   trial.

7           THE COURT:  Length of the trial, but also travel,

8   commuting problems.  We do get Rockland County jurors and

9   Putnam County jurors, as I remember.

10          MR. COHEN:  Yes.

11          THE COURT:  It can be very difficult for those folks.

12  There are issues with employer payments.

13          MR. COHEN:  Yes.

14          THE COURT:  Now, this --

15          MR. COHEN:  Yes.  Like your Honor, we've used them,

16  and we've also not used them, your Honor.  We will take your

17  Honor's comments to heart.  We think, given the complexity of

18  this case and the issues that have arisen, there may well be an

19  appropriate use for them here, but we'll think about it and

20  come back, your Honor.

21          THE COURT:  Look, in my last trial, which everybody

22  knows something about, both sides wanted questionnaires.  I

23  said no.  I solicited voir dire questions.  They submitted

24  about 25 questions, and I had a questionnaire, but I used it in

25  court.  It had 70 or 80 or 90 questions, and nobody had

N6FDBANO

1  anything significant that they wanted me to ask about by the

2  time I got finished.

3       MR. COHEN:  Okay.

4       THE COURT:  So it will be a thorough voir dire, you

5  can be assured of that, but the added overlay of dealing with

6  the questionnaires is just a big cost.

7       MR. COHEN:  We hear your Honor.  We'll come back to

8  your Honor.

9       THE COURT:  All right.  Fine.  We're all determined to

10  get to the same place, which is a fair jury.

11       MR. COHEN:  Yes.

12       THE COURT:  One that can sit without worrying that

13  they're going to be able to pay for the paper towels on Friday.

14       Okay.  So much for that.  Now let me get to the

15  discovery-related motions.  I think our discussion of the

16  schedule may well have mooted everything but the question of

17  whether the FTX debtors are part of the prosecution team.

18       Am I right, that's all that's left?

19       MS. SASSOON:  The defendant made a bill of particulars

20  motion, but we think that our proposed schedule moots what we

21  view as essentially a request for an early exhibit list.

22       THE COURT:  I thought so, but is there any

23  disagreement about that?

24       MR. EVERDELL:  I mean, your Honor, I don't want to

25  reiterate our papers on the bill of particulars, or take too

N6FDBANO

1    much time about that, but we're still at a loss to understand

2    what the lenders we're --

3            THE COURT:  You know, the reason I ask you to use that

4    is because my hearing is no longer exactly what it was when I

5    was 23.

6            MR. EVERDELL:  I understand, your Honor.

7            I'll be brief on this.  I think the only point we'd

8    raise on the bill of particulars is we still don't have

9    information that we think is essential to understand, for

10   example, the lender accounts and the investors' accounts.  For

11   example, yes, there is a speaking indictment, it does talk

12   about a narrative, and, yes, we have a lot of discovery.  But

13   we don't know which lenders.  There are dozens of lenders.  We

14   have thousands of loan agreements.  Which loan agreements are

15   we talking about?

16           It's impossible for us to search and know what loans

17   were the ones that were allegedly at issue in the lender fraud

18   counts simply by searching the discovery.  We can't identify

19   which lenders and which loans we're talking about.  Same thing

20   with the investors' counts, dozens of investors, thousands if

21   not almost a million pages of documents.  How can we know what

22   offering is related to, or which perspective offering, which

23   potential investor, what is the misleading document.

24           I think these, in particular, your Honor, these are

25   things we don't know and don't really have a way of knowing

N6FDBANO

with the information we've been given, even with the voluminous

discovery, and so we would require a bill of particulars, or

ask for a bill of particulars on those issues, respectfully.

THE COURT:  I'll hear from the other side.

MS. SASSOON:  Your Honor, this is the type of request

that Courts in this district have routinely rejected as seeking

the evidentiary minutia of trial, particularly where, as here,

the government is prepared to provide early disclosure of an

exhibit list and of witness material.  The defense' requests

have no legal support, including from the only cases that they

cite in their brief, and I don't want to belabor the points

that we made in our opposition, but I'd like to just draw the

Court's attention to *Akhavan*, which is cited in the defendant's

reply brief.

They cite that case as an example where a bill of

particulars was ordered in a case with voluminous discovery,

but, in fact, in that opinion by Judge Rakoff, the Court

rejected precisely these kind of bill of particular requests.

For example, the Court denied a request for details about the

victim banks in a wide ranging bank fraud conspiracy,

explaining that this sought, at best, evidentiary detail.  And,

as Judge Rakoff noted, the goal of the alleged conspiracy in

that case was not to defraud any one bank in particular.

That's similar to this case here, where the indictment alleges

a general scheme with similar types of misrepresentations made

N6FDBANO

1    to lenders and investors.

2            The Court in *Akhavan* also denied a request for details

3    about specific actions, including misrepresentations made in

4    furtherance of the scheme, and Judge Rakoff held that this was

5    simply an attempt to pin the government to particular

6    evidentiary details; the indictment's description of the scheme

7    is sufficiently clear for the defendants to understand the

8    crime of which they are accused.

9            That's true here.  Despite what counsel has said about

10   the difficulty of discerning the nature of the government's

11   allegations, the indictment is very detailed about the nature

12   of the scheme, the types of misrepresentations being made

13   across the board to investors and lenders about FTX's financial

14   condition, about the relationship between FTX and Alameda,

15   about the secret misappropriation of customer money, about

16   secret aspects of the computer code that favored Alameda; and,

17   in this case, that are only four investment rounds that are at

18   issue, with a similar set of documents that were generally

19   provided to investors.

20           The defense has referenced dozens of lenders, dozens

21   of investors, but, in fact, the government has produced a

22   narrower set of material from specific investors and lenders

23   that produced documents to the government organized by

24   producing party.  And the government has also produced, among

25   other things, a 60-page disclosure letter that includes some

N6FDBANO

1    information provided to the government by investors.

2                The only bill of particulars granted in *Akhavan* was

3    for a list of the names of co-conspirators under circumstances

4    very different from those here, as we lay out in our opposition

5    brief.  And I'll just say that there's a bit of a mismatch here

6    between a description of the complexity of the case and the

7    discovery, versus the discovery that pertains specifically to

8    the lenders and investors.

9                As the defense notes in its own reply brief, they

10   identify only about 44,000 pages produced by a dozen different

11   investors, and about 900,000 pages produced by a dozen lenders.

12   That's not an unmanageable amount of material for the

13   defendants to -- I see your Honor is laughing.  In the scheme

14   of the white collar cases brought in this district where --

15               THE COURT:  I know, it's nothing.  We've got to go

16   back to carbon paper.

17               MS. SASSOON:  In the context of other cases where

18   Courts have rejected similar bill of particular requests, that

19   does not take this case outside of the norm for cases that are

20   being charged in the white collar field these days.

21               So unless your Honor has questions about that, it's

22   our position that this should be rejected.

23               THE COURT:  Thank you.

24               Any response to that, Mr. Everdell or --

25               MR. EVERDELL:  We rest on our papers, your Honor.

N6FDBANO

1          THE COURT:  Yes.  There will be no bill of

2   particulars.  That's denied.

3          So other than the FTX debtors being part of the

4   government team, that takes care of discovery, that and the

5   schedule discussions, yes?

6          Okay.  Everybody's nodding affirmatively.

7          So let's get to that argument.  Is that you,

8   Mr. Cohen?

9          MR. COHEN:  Yes, your Honor.

10         THE COURT:  Let's try and do it in the next 5, 10

11   minutes.

12         MR. COHEN:  Yes.  I'll be brief, your Honor.

13         So there's no dispute that the government is under an

14   order from this Court to produce *Brady* material that is known

15   to the government promptly in realtime.  As your Honor pointed

16   out in *Blaszczak*, that's a variance from the prior practice of

17   how *Brady* was evaluated, which was retrospective.

18         There's no question the government --

19         THE COURT:  I'm not sure I agree with that

20   characterization, but go ahead.

21         MR. COHEN:  Okay.  I may be shorthanding too much in

22   the interest of time, your Honor.

23         But moving on, the question is whether or not the

24   debtors have become part of the prosecution team, and I

25   couldn't really tell in the government's papers whether they're

N6FDBANO

1    taking the position that a third-party could never become a

2    part of the prosecution team, or they're position is less than

3    that.  We think it's clear under the *Martha Stewart* case,

4    *Blaszczak* from your Honor, and other cases in this circuit that

5    there is no per se test, that what Courts do is they look at

6    various factors to make a determination whether, in the

7    specific case before it, there is a basis for the finding.

8             And we submit, and as we laid out in our papers, when

9    you look at those factors, they're all present here.  The

10   government has, or the FTX debtors have controlled the

11   documents, they have reviewed documents in what they describe

12   as a circular effort with the government.  They've acted --

13   gone back and forth in terms of gathering facts.  We laid out

14   in our paper a very significant sequence with respect to the

15   charge of unlicensed money transmitter, in which the government

16   sent an email to the debtors and said, this is one of our top

17   priorities; we'd like you to gather everything on this; and

18   their response was, there are 6,000 documents we have to go

19   through them, and we'll make a presentation to you.  That's how

20   you would talk to someone who is on your team.

21            It doesn't matter whether the government leads the

22   team or not.  I think there's something to that effect in the

23   papers which I think misses the point.  It's whether they were

24   a part of the team.  And they then, at the end of this

25   sequence, the debtors waived privilege, and they said, we're

N6FDBANO

1    waiving it to assist in the investigation or its investigation.

2    So that's under the *Stewart*, *Blaszczak* factors, another

3    example.

4           The government has interviewed -- excuse me, the

5    debtors have interviewed witnesses, but, more importantly, for

6    purposes of this analysis, they've done readouts of those

7    interviews to the government attorneys.  Now, the government in

8    its papers says, well, they didn't give us any memorandum.

9    They just gave us readouts.  But, you know, they're reading --

10          THE COURT:  Who selected the people they interviewed

11   for whom readouts were given?

12          MR. COHEN:  As I understand it, the government

13   selected who they give the readouts to.

14          THE COURT:  My question is who decided to interview

15   those people.

16          MR. COHEN:  I don't know that, your Honor, but at

17   least the submission of the government said who did that -- who

18   made the decision of who they would interview.  In addition,

19   your Honor, they have -- the record reflects, and, again, we're

20   only getting bits and pieces of this from the bills filed in

21   the bankruptcy proceeding from certain materials that have been

22   produced to us in discovery.  That's why we're making this

23   application.  But it indicates that the government -- the

24   debtors have assisted the government in drawing conclusions

25   about how facts and materials relate to each other, such as the

N6FDBANO

allegation relating to the $45 million hole in the FTX U.S.
account.

So when you put all this together, we submit, your
Honor, it shows that for these facts, in this case, and we're
not advocating this as a uniform rule applicable in all cases,
given how involved this debtor was, spending 90 percent of its
time in the -- from the beginning of the case working with the
government, countless hours of its own and attorneys' time,
there's a basis to make the finding.  And the other thing we
wanted to stress to your Honor is --

THE COURT:  It's in the debtors' interest, is it not,
to further the prosecution for its own purposes?

MR. COHEN:  Well, the debtor has its own purposes, and
that's, in fact, your Honor, part of our argument.  They're a
third-party here that doesn't have a *Brady* obligation.  And to
the extent they've become involved with and enmeshed within
part of the team, that's being kept from the defense.  And I
think the best -- not the best, but one of the examples that is
most relevant, because there were letters about it today, and
your Honor just touched on it, was the codebase history.

THE COURT:  The what?

MR. COHEN:  The codebase history.  I'm sorry, your
Honor.  The codebase history.

Let me give the significance, your Honor, and the
sequence, and I think this ties right into the motion.  The

N6FDBANO

significance is, as I understand it, and I'm learning like your

Honor a lot about technology in this case, but the codebase

history reflects who worked on the code, what drafts there were

of the code, what edits were made to the code, who made them,

what comments were made when the edits were made, who had

access to and read those comments, and who didn't.

And given the allegations about Mr. Bankman-Fried

causing or directing an adjustment to the code in a nefarious

way, it's obviously highly relevant that this evidence may well

show or may tend to show that there are alternative

explanations for these edits and adjustments, that others,

including the cooperating witnesses, were aware of, and that

Mr. Bankman-Fried did not access.  This is all incredibly

relevant.

So here is the sequence, your Honor.  We asked the

government for it in our Rule 16 *Brady* letter.  They said to

us, no, you can't have it, because they're not -- FTX is not

part of the prosecution team.  We went to FTX, the debtor, and

asked them informally for it.  They said, no, you can't have

it.  We're here before your Honor, and I'm sure the next step

would be -- well, the next step would be if we filed a motion

like we did, like I'm sure your Honor's going to deal with on

the other issue, there would be an opposition to the motion on

Rule 16, Rule 17.  And all we've gotten is a statement in

today's letter, well, we'll ask them about it.

N6FDBANO

| | |
|---|---|
| 1 | That's far different than an order from your Honor |
| 2 | saying, here's a schedule, you have to -- you have to ask them |
| 3 | about it, you have to ask them to provide it, you have to |
| 4 | provide it by X date, because otherwise, your Honor, we're |
| 5 | faced with a situation where they are, quote, asked about it; |
| 6 | they consider it for a month; they get back; they say they |
| 7 | can't do it, so on and so forth, and the clock has run out on |
| 8 | it us.  And this is potentially very important information that |
| 9 | would tend to exculpate our client. |
| 10 | So in the interest of time -- |
| 11 | THE COURT:  Or inculpate him. |
| 12 | MR. COHEN:  Also possible.  Also possible. |
| 13 | And we took that into account in making this request, |
| 14 | your Honor, although I have a feeling if the government thought |
| 15 | it would inculpate my client, they would have the codebase |
| 16 | already.  But so in the interest of time, you know, I think |
| 17 | that's the gist of the argument, your Honor. |
| 18 | THE COURT:  Okay.  I'll hear from the government. |
| 19 | MS. SASSOON:  Just a few points, your Honor. |
| 20 | I'll start where Mr. Cohen ended.  The case law is |
| 21 | clear that the power to act on behalf of the government to |
| 22 | collect documents is not equivalent to a duty to act, and here |
| 23 | the government does not have a duty to review the entirety of |
| 24 | the materials in the possession of the FTX debtors, because |
| 25 | they're not part of the prosecution team. |

N6FDBANO

1          I want to respond to a few things that Mr.  --

2          THE COURT:  Let me just get clear about one thing.

3   The FTX debtors are a group of a number of different entities,

4   right?

5          MS. SASSOON:  Yes, and they're all represented by

6   Sullivan & Cromwell.

7          THE COURT:  Where are they located?

8          MS. SASSOON:  The debtors?

9          THE COURT:  The debtors.  Are they in the United

10  States?

11         MS. SASSOON:  Some of the entities are in the United

12  States.

13         THE COURT:  Where are the others?  How many -- what's

14  the breakdown, U.S. versus foreign?

15         MS. SASSOON:  I don't have it at my fingertips.  It's

16  dozens of entities, your Honor, including foreign.

17         THE COURT:  Mostly U.S. or mostly foreign?

18         MS. SASSOON:  Mostly foreign.

19         THE COURT:  Go ahead.

20         MS. SASSOON:  So a few additional things.  5(f) in the

21  government's view does not change our constitutional

22  obligations with respect to *Brady* or our obligations under Rule

23  16.  This case does not require the Court to consider whether a

24  third-party can ever be part of the prosecution team, because

25  this is not a case that's far afield of the heartland of cases

N6FDBANO

1    in this district that have found that cooperating third parties

2    are not part of the prosecution team, and their materials are

3    not in the possession of the government.

4          Mr. Cohen said that all the factors that Courts

5    consider in deciding whether a third-party is part of the team

6    or present here, that just can't be squared with the facts

7    here.  Whereas the government has laid out, the debtors did not

8    participate in any of the investigative duties of the

9    government, did not participate in any strategic decision

10   making, had no role in pursuing charges against the people

11   being prosecuted here, had no role in the defendant's arrest,

12   did not attend a single witness interview.

13         In *Blaszczak*, which Mr. Cohen referenced, your Honor

14   found that the SEC was not part of the prosecution team even

15   though the SEC had participated in interviews with the

16   government and more materials had been shared between the

17   parties.  Here, the government has not shared any 6(e) material

18   with the debtors, they have not reviewed documents the

19   government has collected in its case, other than for purposes

20   of assessing privilege, and this case is just not different

21   from the many cases we've cited where a third-party cooperator

22   was not considered part of the prosecution.

23         As your Honor -- in response to your Honor's question

24   about who selected the interviewees for the FTX debtor

25   interviews, that was FTX.  After learning about who the debtors

N6FDBANO

1    interviewed, the government requested readouts related to some

2    of those interviews, which were conducted for the debtors' own

3    purposes.  And as your Honor noted, it is true that the debtor

4    has its own interests here in being cooperative and

5    investigating the fraud, and that is precisely why it would be

6    untenable to deem them part of the prosecution team.

7         In their reply brief, the defendants made light of the

8    scope of their request, which is not limited to the codebase.

9    It's a request that the government review all of the FTX files

10   for discoverable information, which necessarily would involve

11   millions of pages of document, and terabytes of data.  And they

12   claim that this burden on the government, quote, warrants no

13   consideration.  But, thankfully, the Second Circuit and Courts

14   in this district have been less sanguine about this, and

15   they've recognized, including the Second Circuit in *Avelino*,

16   that imposing that type of duty on prosecutors would result in

17   a state of paralysis in prosecutions, and would be untenable.

18   And we think that that's true here.

19        Unless your Honor has questions about the

20   circumstances of the debtors' cooperation that I can address,

21   or any other questions, we'll rest on our submission.

22        THE COURT:  Thank you.

23        Anything else, Mr. Cohen?

24        MR. COHEN:  Just briefly, your Honor.

25        One point I meant to mention in my initial comments on

N6FDBANO

1    this is how extraordinary this is, your Honor.  This is far

2    beyond what we typically see in a cooperation situation.

3           We have an entity that is not a target of an

4    investigation; as far as we know, has no other reason to do it;

5    that has been from literally day one involved with the

6    government in making presentations, controlling the documents.

7    Usually the government takes control of the documents.  It's

8    really extraordinary.  Waiving privilege when there is no

9    requirement that it do so.  Turning over the contents of

10   interview memos when there is no requirement to do so.

11          And on these facts, given the level -- the level at

12   which the debtor, by its own admission and public statements

13   that we cited to your Honor, has been enmeshed with the

14   government, what I keep asking myself is if the debtor hadn't

15   done these things, someone on the government team would have

16   done them, would have reviewed the unlicensed money transmitter

17   documents, work through the issues about whether there's a

18   potential charge there or not, work through the issue of the

19   $45 million hole.

20          Now, the government can say, we did that anyway.

21   Okay.  I understand that.  But somebody would have done that,

22   and somebody did do that, and that was the debtor.  So if we

23   look at, as the *Martha Stewart* case says, we look at what

24   people do rather than their status, on these facts, certainly

25   from the sequence from December to now, there's a basis for the

N6FDBANO

1    finding.  There's certainly a basis for the Court to order that

2    specific *Brady* request from the defense be considered, that the

3    government have the debtors respond to and consider specific

4    *Brady* requests from the defendant, like the one I mentioned

5    about the codebase history, and some of the others that are in

6    our papers.

7              THE COURT:  I understood that they have made that

8    request.

9              MR. COHEN:  Well, again, it's a far different thing to

10   make the request without the force of an order from your Honor

11   behind it, and a schedule.

12             THE COURT:  I request the Bureau of Prisons to do

13   things all the time.  There's an old Yiddish expression, *gar*

14   *nicht helfen*, which means "it doesn't help at all."

15             MR. COHEN:  Well, I can think of the comeback, but I'm

16   not going to say it here.

17             THE COURT:  Okay.  My father's long lost knowledge of

18   some Yiddish.

19             MR. COHEN:  Right.  So, and then I won't invoke the

20   *rachmones* doctrine here, your Honor.

21             THE COURT:  Right.

22             MR. COHEN:  But, yes, I think your Honor has the

23   argument.

24             THE COURT:  You're going to very much enjoy the court

25   reporter's transliteration of our discussion.

N6FDBANO

1          MR. COHEN:  We'll get ChatGPT to do that, your Honor.

2          THE COURT:  Yes.  Fine.  I will probably -- probably,

3     I don't promise, write something brief about this, but

4     substantially for the reasons that the government has advanced,

5     insofar as the motion is to require the government to review

6     the files of the FTX debtors, it's denied.  The bill of

7     particulars is denied.

8          The part of the motion that seeks immediate production

9     of *Brady* and *Giglio* material is denied without prejudice to

10    renewal in the event that's necessary after the parties work

11    out a schedule that is mutually acceptable to them and to me.

12    The same is true for the part of the motion seeking immediate

13    production of the Jencks Act material, and the witness list,

14    with the same qualification.  The same is also true of the

15    404(b) evidence disclosure part of the motion.

16         I think, then, that takes care of it for this morning,

17    yes?

18         MR. COHEN:  (Nodding)

19         THE COURT:  I really do appreciate counsels'

20    succinctness and responsiveness.  You wrote great papers.  You

21    made good, targeted arguments.  Now it's my turn.

22         Thank you.

23         (Adjourned)

24

25