

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 28, 2023

**BY ECF**

Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

      Re:    *United States v. Samuel Bankman-Fried*, S5 22 Cr. 673 (LAK)

Dear Judge Kaplan:

      The Government writes in further support of its motion for the defendant's bail to be revoked and for the Court to enter an order of detention. The defendant's attempts to tamper with witnesses and interfere with the Government's and public's right to a fair trial and the due administration of justice, and his pattern of circumventing his bail conditions in that pursuit, demonstrate that no set of pretrial release conditions can adequately assure the safety of the community and that the defendant is unlikely to fully abide by any conditions of release. *See* 18 U.S.C. §§ 3142, 3148.

      A.  **Factual Background**

      **1.  The Defendant Attempts to Tamper with Witness-1 and the Initial Modifications of the Defendant's Conditions of Release**

      On December 22, 2022, the defendant was released on a bond. (Dkt. 13). A series of bail modifications ensued, precipitated first by the defendant's attempt to tamper with a potential trial witness and then his use of a Virtual Private Network ("VPN"), a mechanism of encryption that hides online activities from third parties and interfered with the administration of the bail conditions then in place. (*See* Dkts. 50, 58, 65, 66, 68, 82, 116, 118).

      As relevant here, on January 15, 2023, the defendant initiated communication with the current General Counsel of FTX US who may be a witness at trial ("Witness-1"), and who is represented by counsel. The defendant contacted Witness-1 over the encrypted messaging application Signal, as well as by email, and wrote, in part: "I would really love to reconnect and see if there's a way for us to have a constructive relationship, use each other as resources when possible, or at least vet things with each other." This conduct is undisputed. (*See* Dkt. 51).

The defendant's use of Signal was consistent with a history of using the application for obstructive purposes. As charged in the S5 Indictment, the defendant used and instructed others to use Signal to conceal unlawful conduct. (Dkt. 115 ("Indictment") ¶ 60; *see also id.* ¶¶ 43, 59). Indeed, the Government's investigation has shown that in or about 2021 and 2022, the defendant directed that Slack and Signal communications between FTX and Alameda employees—including his own business communications—be set to autodelete after 30 days or less. The defense does not appear to dispute this fact, which is consistent with the documentary evidence collected in this case that shows the autodelete function enabled on various communication channels where the participants in the chat were preserved but the underlying messages were autodeleted, including chats between the defendant and his co-conspirators. In fact, the autodeletion of FTX and Alameda's Slack and Signal communications has impeded the Government's investigation; potential witnesses have described relevant and incriminating conversations with the defendant that took place on these messaging applications that are not accessible now because of deletion settings implemented at the defendant's direction.

After the defendant contacted Witness-1, the Court entered an interim order that limited the defendant's contact with former FTX and Alameda employees, as well as his use of encrypted or ephemeral messaging applications. At a subsequent bail conference, the Court pressed the parties on whether these modifications were adequate, and whether the Government was focused too narrowly on ephemeral messaging applications, when witness tampering could be achieved by other methods. (*See generally* Tr. 2/9/2023; *see id.* at 10 ("I am far less interested in the defendant's convenience, given the record here, and his preferences than I am in avoiding what the government's proffer indicates to me is a very real risk of misuse.")). Shortly after this conference, the Government learned that the defendant had used a VPN on January 29, 2023, and February 12, 2023. (*See* Dkt. 66). As set out in the Government's prior letter, the defendant's use of a VPN prevented any third party, including the Government or Pre-Trial Services, from obtaining evidence of what websites the defendant used and what data the defendant sent and received online. (*Id.* at 1). The defense asserted that the defendant used a VPN to watch football, but—given the nature of a VPN—this assertion was unverifiable,[1] albeit still concerning. (*See* Tr. 2/17/2023 at 23-24 (The Court: "So what he was doing was sitting in California, in the United States, using the VPN to create the impression that he was going to use this international subscription from somewhere outside the United States and getting the service from the provider of the programming by using the VPN to deceive as to location.")).

As a result, the Government proposed a tighter set of bail restrictions, which the Court questioned as nonetheless "putting an awful lot of trust" in the defendant. (Tr. 2/17/2023 at 7). The Court further pressed that:

> we are dealing with somebody who, on the basis of your proffer anyway, has done things that suggest to me that there may very well be probable cause to believe that he either committed or attempted to commit a federal felony while on release, namely, witness tampering or attempted witness tampering. . . . Why am I being asked to turn him loose in this garden of electronic devices[?]

---

[1] As the Court noted, the football games the defendant putatively watched using a VPN were otherwise freely available to anyone with a television. (Tr. 2/17/2023 at 23).

(Tr. 2/17/2023 at 14). The Government responded in part that it was "attuned to finding a solution that is narrowly tailored under the Bail Reform Act, but guards against these risks going forward." (*Id.*). The defense urged that the defendant needed access to the internet, and specifically to his Google docs, in order to prepare for trial with his attorneys. (*Id.* at 15-16). The Court once again urged the parties to submit proposed conditions "not tight just in characterization, but tight in fact." (*Id.* at 29). Ultimately, the Court adopted a set of conditions proposed by the parties that permitted the defendant some access to a phone and the internet, as well as in person visits, and prohibited contact with former FTX and Alameda employees, as well as the use of certain electronic applications, among other things. (Dkts. 116, 118).

   2. **The Defendant's Recent Attempts to Tamper with Additional Witnesses and Obstruct Justice**

On July 20, 2023, the *New York Times* published an article with the headline, *Inside the Private Writings of Caroline Ellison, Star Witness in the FTX Case* (the "Article"). *See* https://www.nytimes.com/2023/07/20/technology/ftx-caroline-ellison-bankman-fried.html. The Article quoted "documents . . . [that] offer new insight into Ms. Ellison's psychology during the final months of FTX," and described the writings as "personal and raw." As described in the Article, in these writings, among other things, Caroline Ellison describes feeling overwhelmed by her job at Alameda, the pain associated with her romantic break up with the defendant, and her professional insecurities.

The Article does not indicate who provided the documents to the Article's authors. It is now undisputed, however, that the documents were shared by the defendant with the Article's reporters. (*See* Dkt. 178). When the Government learned that the Article was forthcoming, defense counsel confirmed that the defendant had met with one of the Article's authors in person and had shared documents with him that were not part of the Government's discovery material. The Government understands that these documents came from the defendant's personal Google Drive account.

On the day the Article was published, the Government moved for an order prohibiting prejudicial extrajudicial statements by the parties and their attorneys. The Court scheduled a conference for July 26, 2023, and instructed the parties to come prepared to address the adequacy of the defendant's bail conditions. (Dkt. 177). On July 22, 2023, the defendant submitted a letter, subsequently filed on July 23, 2023, asserting that he had done nothing wrong by responding to a *New York Times* request for comment amidst a "toxic media environment," yet agreeing to an order governing extrajudicial statements and arguing that the bail conditions otherwise required no modification. (Dkt. 178). Prior to the conference on July 26, 2023, the Government analyzed the data from a pen register on the defendant's phone and email, and learned that over the last several months, the defendant sent over 100 emails to members of the media, had over 1,000 phone calls with members of the media, and had over 100 phone calls with one of the authors of the Article, many of them lasting for approximately 20 minutes. Many of these communications occurred prior to the publication of other articles about Ellison, including by the same author.

At the July 26, 2023, conference, the Government moved for the defendant to be detained based on the defendant's pattern of witness tampering and evading his bail conditions. In support of the defendant's argument that he did nothing wrong, defense counsel asserted that "these were documents not part of the discovery . . . I think it's one page, maybe two pages. And he didn't give them to the reporter; he let the reporter look at them." (Tr. 7/26/2023 at 17). Defense counsel further claimed that the defendant was "just someone who's trying his best to protect his reputation, believing that he can." (Tr. 7/26/2023 at 18). It was therefore undisputed that the defendant's communications with the media were intended to affect the public's—including prospective jurors'—impression of the defendant's guilt. It was also apparent that in this instance he did so not by asserting his innocence, directing the reporter to information in the public record, or making other fair comment, but instead by funneling Ellison's diary entries that were not public but were in the defendant's possession to the *New York Times*, intending to portray a key cooperator testifying against him in a poor and inculpatory light, without attaching his name to the Article as a source. (*See* Tr. 7/26/2023 at 31 (The Court: "You have the admission that the defendant has a strategy here to counter what he puts forward as being extremely unfavorable publicity about him . . . . So that there is, essentially, an avowed intention to influence the perception of the defendant by the public at large, which includes prospective jurors and prospective witnesses. That's essentially admitted, as I understand the argument.")). In response to the defendant's assertions that he was merely exercising his First Amendment rights, the Government responded:

> I just want to be clear that the defendant is permitted to have a strategy, and this isn't a First Amendment issue, and having contact with the press alone is not witness tampering, and it's not a violation of the bail statute. But, here, where the strategy for rehabilitating his reputation was built on discrediting and blaming Caroline Ellison in a national and international publication, that is read by many prospective jurors in this district, it crossed a line toward improperly influencing those prospective jurors and intimidating a witness and sending a message to other prospective witnesses. And against the backdrop of the prior admonitions, the other indications of evasion, including the use of a VPN, and then conducting this meeting with the journalists on background or off the record — I don't know what the right term is — and in person, it also rehabilitates the concerns that your Honor had at the outset, when the government thought we had come up with conditions that could be adequate.

(Tr. 7/26/2023 at 32).

Following the conference, the defense provided the Court and Government pdf versions of the three documents shared with the reporter, which totaled eight pages. Defense counsel indicated to the Court and the Government that the reporter "reviewed only certain portions of the documents," but did not indicate which portions. To date, the defense has not asserted one way or the other whether the defendant shared these or any other documents with other members of the media, including the other journalists who have visited the defendant's home. On July 27, 2023, the Government asked defense counsel for the documents shared with the reporter in their original form (which presumably would have been in Word format and contained metadata), but has yet to receive a response.

### B. Applicable Law

#### 1. 18 U.S.C. § 3142

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the defendant shall be detained pending trial. 18 U.S.C. § 3142(e). In seeking pretrial detention under Section 3142, the Government bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can address those risks. *See* 18 U.S.C. § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). A risk that the defendant "will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness" is also to be considered by courts as a potential danger to the community. 18 U.S.C. § 3142(f)(2)(B); *United States v. Gulkarov*, No. 22 Cr. 20 (PGG), 2022 WL 205252, at *3 (S.D.N.Y. Jan. 24, 2022). "As with dangerousness, [a court considering pretrial release] must first determine whether the defendant presents a risk of obstruction, and then whether any condition or combination of conditions will reasonably assuage that risk." *Id.* (citation omitted).

Section 3142(g) sets forth the customary factors to consider when "determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community": (1) the "history and characteristics of the person" including "family ties, employment, financial resources, length of residence in the community, [and] community ties"; (2) "the nature and circumstances of the offense charged"; (3) "the weight of the evidence against the person"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). "[N]onviolent witness tampering and obstruction poses a danger to the community," and where there is a risk that such activities will continue, pretrial detention may be appropriate. *United States v. Stein*, No. 05 Cr. 888 (LAK), 2005 WL 8157371, at *2 (S.D.N.Y. Nov. 14, 2005). Indeed, the Second Circuit has been clear that "obstruction of justice has been a traditional ground for pretrial detention by the courts." *United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000).

As courts have recognized, "[b]ail conditions are not set in stone." *United States v. Wang*, -- F. Supp. 3d --, No. 23 Cr. 118 (AT), 2023 WL 3033729, at *6 (S.D.N.Y. Apr. 21, 2023), *aff'd*, No. 23 Cr. 118 (AT), 2023 WL 4551637 (S.D.N.Y. July 14, 2023). A "changed situation or new information may warrant altered release conditions." *United States v. Dzhamgarova*, No. 21 Cr. 58 (MKV), 2021 WL 3113036, at *1 (S.D.N.Y. July 21, 2021) (internal quotation marks and citation omitted). The Court "may at any time amend" the terms of release, *see* 18 U.S.C. § 3142(c)(3), after considering "the statutory standards applicable to the setting of bail." *United States v. Zuccaro*, 645 F.2d 104, 106 (2d Cir. 1981); *see also United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 1490417, at *2 (S.D.N.Y. Feb. 1, 2023) ("Dkt. 58") ("courts in this district have found that judicial 'authorization to amend a release order' under section 3142(c) arises where there is 'a changed situation or new information [that] warrant[s] altered release conditions'") (citing cases).

### 2. 18 U.S.C. § 3148

Where the Government alleges that a defendant has committed a crime while on pretrial release, 18 U.S.C. § 3148(b) provides that the Court should revoke pretrial release and detain a defendant if, after a hearing, the Court finds that two conditions have been met. *First*, the Court must find either that there is "probable cause to believe" that the defendant has committed a federal, state, or local crime while released on bail, or that there is "clear and convincing evidence" that the defendant has violated any other condition of his release. 18 U.S.C. § 3148(b)(1)(A)-(B); *LaFontaine*, 210 F.3d at 130. *Second*, the Court must find by a preponderance of the evidence either based on the customary factors in 18 U.S.C. § 3142(g) that "there is no condition or combination of conditions of release that will assure" that the defendant will not flee or pose a danger to the community; *or* that the defendant "is unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. § 3148(b)(2)(A)-(B). *See*, *e.g.*, *United States v. Gotti*, 794 F.2d 773, 777-78 (2d Cir. 1986) (preponderance of the evidence standard applies to Section 3148(b)(2)). Where there is probable cause to believe that the defendant has committed a felony while released on bail, then "a rebuttable presumption" arises that no combination of conditions will assure that the defendant "will not pose a danger" to the community. *LaFontaine*, 210 F.3d at 130 (citing § 3148(b)(2)).

### 3. Bail Hearings

The "rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing." 18 U.S.C. § 3142(f)(2)(B). Therefore, "[a] detention hearing need not be an evidentiary hearing. While the defendant may present his own witnesses and cross-examine any witnesses that the government calls, either party may proceed by proffer and the rules of evidence do not apply." *United States v. El-Hage*, 213 F.3d 74, 82 (2d Cir. 2000) (citing 18 U.S.C. § 3142(f) (1994 & Supp. III 1997) and *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995)); *see also United States v. Galanis*, 656 F. App'x 560, 562-63 (2d Cir. 2016) (district court did not err in proceeding based on the government's proffer and a review of the complaint, rather than on the basis of an evidentiary hearing, where defendant was given an opportunity to call witnesses and provide evidence of his own); *LaFontaine*, 210 F.3d at 130-31 (proffers are permissible both in the bail determination and bail revocation contexts).

### C. Discussion

The defendant's detention is warranted under both Sections 3148 and 3142.

Under Section 3148, there is probable cause that the defendant has twice attempted to tamper with witnesses under 18 U.S.C. § 1512(b), which applies to "[w]hoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding." 18 U.S.C. § 1512(b)(1). His message to Witness-1 was, on its face, an attempt to corruptly persuade that witness to "vet things with each other" – in other words, to coordinate their statements in a manner designed to assist the defendant's criminal case.

*See, e.g.*, *United States v. Amato*, 86 F. App'x 447, 450 (2d Cir. 2004) (explaining that 1512(b) was "written broadly to encompass non-coercive efforts to tamper with a witness . . . the government need only 'prove that the defendant's attempts to persuade were motivated by an improper purpose'" (quoting *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996))). The conclusion that the defendant was attempting to corruptly persuade Witness-1 with respect to his potential trial testimony is reinforced by the facts that, until FTX declared bankruptcy, the defendant had been Witness-1's boss, and that the defendant suggested that they shift their discussion to the telephone, instead of continuing in writing. *See, e.g.*, *Gotti*, 794 F.2d at 777 ("[P]robable cause under section 3148(b)(1)(A) requires only that the facts available to the judicial officer 'warrant a man of reasonable caution in the belief' that the defendant has committed a crime while on bail." (citation omitted)); *LaFontaine*, 210 F.3d at 133 ("Probable cause under § 3148(b)(1)(A) requires only a practical probability that the evidence supports a finding that the defendant has committed a crime while on bail." (internal quotation marks and citation omitted)). This conduct alone is sufficient to satisfy the first step of the inquiry under Section 3148, as the Court has previously indicated:

> the message [to Witness-1] in its entirety seems to be an invitation for Witness-1 to align his views and recollections with defendant's version of events and thus make their relationship "constructive." In perhaps more colloquial terms, it appears to have been an effort to have both the defendant and Witness-1 sing out of the same hymn book.

(Dkt. 58 at 5); *see also* (Tr. 2/17/2023 at 14) ("we are dealing with somebody who . . . has done things to suggest to me that there may very well be probable cause to believe that he either committed or attempted to commit a federal felony while on release, namely witness tampering or attempted witness tampering").

    More recently, the defendant's leaking of Ellison's private writings is yet another instance of the defendant trying to intimidate and corruptly persuade Ellison with respect to her upcoming trial testimony, as well as an effort to influence or prevent the testimony of other potential trial witnesses by creating the specter that their most intimate business is at risk of being reported in the press. *See* 18 U.S.C. § 1512(b). By sharing Ellison's private writings about her insecurities and heartache with the hope that it would be published by the *New York Times*, the defendant's conduct also constitutes an attempt to "intentionally harass[]" Ellison to hinder, prevent, or dissuade her from testifying. *See* 18 U.S.C. § 1512(d). Finally, as appears to be undisputed, the defendant shared this information with the *New York Times* intending to affect the public's (including prospective jurors') perception of the merits of the case and the credibility of Ellison outside and in advance of the fair presentation of evidence at trial. *See Amato*, 86 F. App'x at 450 (message relayed to witness through intermediary was still witness tampering). As the Court observed: "You have the admission that the defendant has a strategy here to counter what he puts forward as being extremely unfavorable publicity about him . . . . So that there is, essentially, an avowed intention to influence the perception of the defendant by the public at large, which includes

prospective jurors and prospective witnesses. That's essentially admitted, as I understand the argument." (Tr. 7/26/2023 at 31).

The defendant's argument that the defendant did nothing other than exercise his First Amendment rights is a red herring. Witness tampering is not constitutionally protected speech. *See, e.g.*, *Thompson*, 76 F.3d at 452 (Section 1512(b) is not unconstitutionally broad because the statute prohibits "only such persuasion as is 'corrupt[],'" which is not constitutionally protected speech). Moreover, in the context of an ongoing criminal case, a party's First Amendment interest may be outweighed by the constitutional right to a fair trial, permitting a court to proscribe prejudicial extrajudicial statements. *See, e.g.*, *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966); *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991) (noting that "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors, and an outcome affected by extrajudicial statements would violate that fundamental right"); *Application of Dow Jones & Co., Inc.*, 842 F.2d 603, 611-12 (2d Cir. 1988); *United States v. Brown*, 218 F.3d 415, 428 (5th Cir. 2000).

And the facts simply do not support the defendant's narrative. The defendant's recent communications here were not assertions of innocence, or a response to an inquiry or to a purportedly "toxic media environment" as the defendant claims (Dkt. 178 at 3), but instead precisely that which has been deemed prejudicial to a fair trial: the selective sharing of a cooperating witness's writings in an effort to discredit, intimidate, and humiliate her. *See* SDNY Local Criminal Rule 23.1(d)(4). The defense has focused on the defendant's desire to defend his reputation in response to allegations by John Ray and others. But the defendant did not respond to John Ray's allegations or give comment on the record; instead he advanced his public relations strategy through the anonymous sharing of embarrassing personal writings by a witness. This conduct is not only presumptively prejudicial to a fair trial under SDNY Local Criminal Rule 23.1, *see* Rule 23.1(d) (statements that "presumptively involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice within the meaning of this rule," includes those concerning "[t]he identity, testimony, or credibility of prospective witnesses"), but also the type of conduct that courts have deemed the appropriate subject of an order restricting extrajudicial statements. *Gentile*, 501 U.S. at 1070 ("Extrajudicial comments on, or discussion of, evidence which might never be admitted at trial and *ex parte* statements by counsel giving their version of the facts obviously threaten to undermine [the] basic tenet" that "[t]he outcome of a criminal trial is to be decided by impartial jurors, who know as little as possible of the case, based on material admitted into evidence before them in a court proceeding."). As the Government noted at the conference, while the "defendant is permitted to have a [press] strategy . . . . here, where the strategy for rehabilitating his reputation was built on discrediting and blaming Caroline Ellison in a national and international publication, that is read by many prospective jurors in this district, it crossed a line toward improperly influencing those prospective jurors and intimidating a witness and sending a message to other prospective witnesses." (Tr. 7/26/2023 at 32).

As noted, the first incident with Witness-1 alone creates a "rebuttable presumption" under Section 3148 that no conditions of release will assure the safety of the community, and the defendant's more recent conduct at a minimum reinforces his intent to influence witnesses. *See, e.g.*, *LaFontaine*, 210 F.3d at 134. And it also supports the conclusion that the defendant is

"unlikely to abide by any condition or combination of conditions of release." 18 U.S.C. § 3148(b)(2)(B); *see also LaFontaine*, 210 F.3d at 134 ("In *Gotti*, we held that a single incident of witness tampering constituted a 'threat to the integrity of the trial process' . . . and was sufficient to revoke bail" under Section 3148(b)(1)(A) and (b)(2)(B)). While the Government initially agreed to less restrictive conditions, the defendant's latest efforts to interfere with a fair trial—whether deemed attempted witness tampering under Section 1512 or not—more than establishes by a preponderance of the evidence both that no set of release conditions will assure the safety of the community and that the defendant is unlikely to abide by any release conditions. *See, e.g.*, *Wang*, 2023 WL 3033729, at *9 (agreeing with the Government that new information justified detention).

Indeed, based on the totality of the facts to date, the customary bail factors support a finding that no pretrial release conditions will ensure the safety of the community even under the more stringent clear and convincing evidence required for detention under Section 3142. While the defendant has no criminal history, the defendant is facing a slate of serious charges that expose him to a potential sentence of over 100 years. *See* 18 U.S.C. § 3142(g)(1) (court to consider "the nature and circumstances of the offense charged"). The Indictment alleges that he was the mastermind and leader of a multi-year criminal scheme that involved defrauding investors, lenders, and retail customers of billions of dollars, and spending fraud proceeds to corruptly influence United States politics. During the course of the scheme, the defendant instituted company policies to destroy documentary evidence of his scheme. (*See* Indictment ¶ 60); *see also Gulkarov*, 2022 WL 205252, at *6 ("[T]he Government may proceed by proffer at a bail proceeding, and may rely on allegations in an indictment." (citations omitted)). Despite his efforts to obstruct justice, the evidence against the defendant is overwhelming, which is only becoming more apparent as the Government completes discovery and the parties prepare for trial. *See* 18 U.S.C. § 3142(g)(2) (court to consider the "weight of the evidence against the person"). Among other things, three of the defendant's coconspirators—including his former girlfriend, his FTX cofounder, and another top FTX executive—have pleaded guilty and are expected to testify against the defendant and place him at the center of the criminal conspiracies.

Finally, the defendant's pretrial release poses a danger to the community. *See* 18 U.S.C. § 3142(g)(4). The Second Circuit has recognized that "attempt[s] to influence a witness" support a finding of dangerousness to the community, even where the "evidence of tampering does not include either actual violence or threats of violence against any trial witnesses." *LaFontaine*, 210 F.3d at 134. *LaFontaine* went on to note that a "single incident of witness tampering" may be sufficient to revoke bail, *id.* at 134, and that the "harm to the integrity of the trial is the same no matter which form the tampering takes," *id.* at 135.

Here, the defendant twice attempted to tamper with witnesses, and each incident reinforces the defendant's improper intent to influence potential trial testimony and intimidate witnesses. The Second Circuit has also recognized that where, as here, a defendant has shown himself intent on corruptly influencing the trial, a condition "[p]rohibiting [a defendant] from committing a crime or intimidating a witness does not at all impede his ability to do so, and requires no more of him than that which the law already demands from [a defendant] and every other citizen." *Ferranti*, 66 F.3d at 544 (alterations in *Ferranti* and internal citations omitted). Thus, an order barring the defendant from prejudicing the trial or tampering with witnesses (or, as in this case, prohibiting

extrajudicial statements) is "insufficient to meet the clear risk posed by" the defendant. *See id.* The record supports a determination that the "defendant presents a risk of obstruction," and that no "condition or combination of conditions will reasonably assuage that risk." *Gulkarov*, 2022 WL 205252, at *3; *see also LaFontaine*, 210 F.3d at 134 (explaining that in *Gotti*, the Second Circuit "reasoned that pretrial detention was even more justified in cases of violations related to the trial process (such as witness tampering) than in cases where the defendant's past criminality was said to support a finding of general dangerousness").

The bail conditions previously negotiated by the parties, while strict, have proven insufficient to the task, a fact that confirms that no combination of conditions to the defendant's pretrial release will protect the integrity of the trial. *LaFontaine* affirmed the district court's conclusion that "conditions of home confinement, electronic monitoring, phone tap, and relocation . . . would not assure [the defendant's] future compliance with the court order not to contact any witnesses," where that "sort of electronic surveillance . . . can be circumvented" and the defendant's "past circumvention of court orders demonstrates that pretrial monitoring is not sufficient." *LaFontaine*, 210 F.3d at 135. So too here. After the Government had raised concerns about the defendant's use of encrypted messaging to contact Witness-1, the defendant was caught using a VPN, a mechanism of encryption that hides online activities from third parties. After that, the parties painstakingly designed a restrictive set of conditions meant in part to prevent the defendant from tampering with witnesses or obstructing justice. Faced with a condition that prohibited contact with former FTX and Alameda employees, the defendant devised a means of indirect witness intimidation through the press. Faced with a series of conditions meant to limit the defendant's use of the internet and the phone, the defendant pivoted to in-person machinations. Permitted to access Google Docs for the ostensible purpose of trial preparation, the defendant mined those documents for material to discredit Ellison in the media—material, it should be noted, that may well be entirely inadmissible at trial. The defendant met with a reporter and showed documents to him in person, rather than transmitting them by text message or email, which he knew were being monitored. And that is only what we know: as yet, the defense has made no representations about what transpired during the defendant's in-person meetings with other members of the media and the Government has no way of knowing, highlighting only one gap in the existing conditions.

The Court therefore cannot be assured that any pretrial conditions are adequate when the defendant has left no room for doubt of his continued intent to prejudice the trial and his capacity to find ways to circumvent his bail conditions in that pursuit. In short, where, as is the case here, there is a "a *serious* risk of obstruction in the future," detention is appropriate where no court-imposed conditions can reasonably protect from that risk. *United States v. Madoff*, 586 F. Supp. 2d 240, 250 (S.D.N.Y. 2009); *see also United States v. Bellomo*, 944 F. Supp. 1160, 1167 (S.D.N.Y. 1996) (ordering detention where the "proposed supervision would be inadequate, and the proposed electronic surveillance could be circumvented").

For similar reasons, the record establishes by a preponderance of the evidence that the defendant is "unlikely to abide by any condition or combination of conditions of release," which is an alternative basis for detention under Section 3148(b)(2)(B). 18 U.S.C. § 3148(b)(2)(B); *see also LaFontaine*, 210 F.3d at 133-34. Despite numerous attempts at the Court's urging to design release conditions that were "not tight just in characterization, but tight in fact" (Tr. 2/17/2023 at

29), the defendant has exploited inevitable gaps in the release conditions at every turn such that there can be no assurance that any amended release conditions will anticipate the next potential abuse. Because the defendant's repeated abuses show that any revised release conditions will likely result only in further circumvention or violation, detention is appropriate. *See United States v. Fortunato*, 51 F. App'x 350, 350-52 (2d Cir. 2002) (affirming district court conclusion that defendant was "unlikely to abide by any conditions or combination of conditions" after "government proffered extensive evidence of [the defendant's] repeated violations of the terms of his release" and the district court considered defendant's "arguments about his motives and rejected them"); *United States v. Kwok*, No. 23 Cr. 118 (AT), 2023 WL 3027440, at *7 (S.D.N.Y. Apr. 20, 2023) (denying bail to white-collar defendant where, among other things, the defendant's "past obstructive conduct . . . demonstrate[s] that the Court does not have reasonable assurance that Defendant will abide by any conditions of pretrial release").[2]

In sum, the defendant certainly has the right to speak and defend himself to the press, even on hundreds of occasions as is the case here. *Cf. In re Grand Jury Subpoenas Dated Mar. 24, 2003 Direct to (A) Grand Jury Witness Firm & (B) Grand Jury Witness*, 265 F. Supp. 3d 321, 326-27 (S.D.N.Y. 2003) (discussing the role of attorneys in publicly defending clients). What the defendant may not do, and what he has now done repeatedly, is seek to corruptly influence witnesses and interfere with a fair trial through attempted public harassment and shaming. Because he has done so, and because he has flouted even the increasingly strict conditions placed upon him, the evidence demonstrates well beyond a preponderance, and indeed is clear and convincing, that no combination of conditions will reasonably assure the safety of community and the integrity of

---

[2] The defendant's effort to fall back on the volume of discovery in this case should be rejected. (*See* Tr. 7/26/2023 at 23-24). Voluminous discovery is not an enumerated consideration in evaluating a motion for detention. If anything, in the event he is detained, the defendant may then move for pretrial release under 18 U.S.C. § 3142(i), which states that the Court: "may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that [the Court] determines such release to be necessary for preparation of the person's defense or for another compelling reason." In light of the defendant's substantial time to date on pretrial release with the opportunity to review discovery, and the accommodations afforded by federal facilities to review discovery and meet with counsel, it is unlikely, however, that such a motion would be meritorious. *See, e.g.*, *United States v. Dupree*, 833 F. Supp. 2d 241, 248 (E.D.N.Y. 2011) ("[W]hile [the defendant's] release would certainly make it more convenient for him and his counsel to prepare his defense, his release is not 'necessary' for the preparation of his defense under 18 U.S.C. § 3142(i).").

this trial, and that detention is warranted under Section 3142 and 3148.

                    Respectfully submitted,

                    DAMIAN WILLIAMS
                    United States Attorney

by: /s/ Danielle R. Sassoon
     Danielle R. Sassoon
     Nicolas Roos
     Samuel Raymond
     Thane Rehn
     Danielle Kudla
     Assistant United States Attorneys
     (212) 637-1115

Cc:    Defense Counsel (by ECF)