N7QKBANC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        22 CR 673 (LAK)

 5   SAMUEL BANKMAN-FRIED,

 6                                        Conference
                 Defendant.
 7   ------------------------------x

 8                                        New York, N.Y.
 9                                        July 26, 2023
                                          2:15 p.m.
10

11   Before:

12                    HON. LEWIS A. KAPLAN,

13                                        District Judge

14                         APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     DANIELLE SASSOON
17   NICOLAS ROOS
     SAMUEL RAYMOND
18   THANE REHN
     DANIELLE KUDLA
19        Assistant United States Attorneys

20   COHEN & GRESSER LLP
          Attorneys for Defendant
21   BY:  MARK STEWART COHEN
          CHRISTIAN R. EVERDELL
22
     SULLIVAN & CROMWELL, LLP
23        Attorneys for FTX Debtors
     BY:  NICOLE FRIEDLANDER
24
     ALSO PRESENT:  KRISTIN ALLAIN, FBI Special Agent
25                  JOSH ROTHMAN, Pretrial Services Officer
```

N7QKBANC

```
 1            (Case called)
 2            THE DEPUTY CLERK:  Government, are you ready?
 3            MS. SASSOON:  Yes.
 4            Good afternoon, your Honor.  Danielle Sassoon, for the
 5    United States, and I am joined by my colleagues, Nicolas Roos,
 6    Sam Raymond, Thane Rehn, and Danielle Kudla.  We are also
 7    joined at counsel's table by Kristin Allain, a special agent
 8    with the FBI.
 9            THE COURT:  Good afternoon, all.
10            THE DEPUTY CLERK:  Please be seated.
11            Defendant, are you ready?
12            MR. COHEN:  Yes.
13            Your Honor, good afternoon.  Mark Cohen,
14    Cohen & Gresser, for the defendant.
15            THE COURT:  Mr. Cohen.
16            MR. EVERDELL:  Good afternoon, your Honor.  Christian
17    Everdell, for the defendant.
18            THE COURT:  Mr. Everdell.
19            Okay.  Ms. Sassoon, your dime.
20            MS. SASSOON:  Your Honor, as you know, we submitted a
21    proposed order to govern extrajudicial statements in this case,
22    and today, we are seeking the detention of the defendant.
23            THE COURT:  Okay.
24            MS. SASSOON:  The record here, going back to the first
25    instance of attempted witness tampering with the FTX U.S.
```

N7QKBANC

1    general counsel up through now, this latest attempt to

2    discredit Caroline Ellison and intimidate witnesses through the

3    New York Times, supports the conclusion that no set of release

4    conditions can assure the safety of the community.

5          The defendant has shown now that he is intent on

6    exploiting the conditions of release and improperly influencing

7    this trial and prospective witnesses, regardless of the

8    conditions that are in place.

9          In this posture, it's the government's view that it is

10   not possible to design an adequate set of release conditions.

11         The government rejects the defense's version of events

12   and the assertion that the defendant did nothing wrong here,

13   and so I'd like to begin by describing the recent facts, as the

14   government understands them, and then place them in the broader

15   context of the pretrial release overall.

16         THE COURT:  Go ahead.

17         MS. SASSOON:  So the defense has described a toxic

18   media environment that they say leaves the defendant with

19   little choice but to respond.  We disagree with both the

20   characterization of the media environment and the supposed

21   propriety of the conduct here.

22         As you know, there was a recent New York Times article

23   that quoted from private writings Ellison had shared with the

24   defendant.  While the defense notes that the story had other

25   sources, it appears to be undisputed that the defendant is the

N7QKBANC

 1    one who supplied the private documents quoted in the article.

 2            The defendant did not only respond with comment or

 3    with an assertion of innocence, he provided documents not in

 4    the public record, that the Court has not deemed admissible at

 5    trial, and, in the government's view, for no other purpose than

 6    to discredit Ms. Ellison.  As we've written, it's harassing of

 7    a government witness, threatens to taint the jury pool, and has

 8    a chilling effect on other witnesses in this case.

 9            That is not responding for comment.  It is

10    affirmatively placing what the defendant plainly considered

11    materials damaging to Ms. Ellison in the hands of a reporter.

12    And, in the government's view, it is irrelevant if the ultimate

13    article was not as unflattering to Ms. Ellison as the defendant

14    would have wanted.

15            But this notion that the defendant was merely

16    contacted for comment by The New York Times on a story in

17    progress and against the backdrop of a toxic media frenzy is

18    also misleading.  While this case has attracted significant

19    attention by the media, that is in no small part due to the

20    defendant's own conduct beginning before his arrest, but after

21    the collapse of FTX.

22            As your Honor knows, the defendant went on a media

23    tour after FTX's collapse, and during his pretrial release, he

24    has been far from a passive observer amid a deluge of press

25    coverage.

N7QKBANC

1          As the defense knows and the Court knows, the

2    defendant has maintained a pen register on the defendant's

3    phone and email during his release, and he has not only

4    received outreach from journalists, but he has sent over 100

5    emails to various journalists who have been reporting on this

6    case, and he has had more than 1,000 phone calls with various

7    journalists and more than 100 calls with the author of the

8    article in question, dating back months, and many of those

9    calls were for around 20 minutes.

10          I also want to note that the defendant has made much

11   of the fact that before this article, there was an article in

12   May by the same author, that referred to Ms. Ellison's private

13   writings.  In light of the nature of what was reported there

14   and the continuous communication with the author of that

15   article, the government has every reason to believe that he was

16   a source for that article as well, which noted that the

17   government and the defendant's attorneys had declined to

18   comment.

19          This latest incident, though, is an escalation of an

20   ongoing campaign with the press that has now crossed a line.

21          I would also note that the defendant's calls and

22   visitor log show substantial communication with the author,

23   Michael Lewis, who has a book poised for publication right at

24   the start of this trial.  He's had over 500 calls with Michael

25   Lewis, who has also visited the residence.  And the

N7QKBANC

1    government's now concerned about what material was provided to

2    Mr. Lewis that will be published on the eve of trial, as we are

3    selecting a jury.

4           I would also note that when the defendant contacted

5    the FTX USGC, your Honor noted that the encrypted message

6    said -- suggested a phone call.

7           THE COURT:  I didn't get the acronym you gave me.  FTX

8    USGC?

9           MS. SASSOON:  General counsel.

10          THE COURT:  Ah, thank you.

11          MS. SASSOON:  In that message, the defendant had

12   suggested a phone call, which your Honor noted would permit

13   undetected communication.  Here, I think it's notable that,

14   while the defendant has had substantial email and phone contact

15   with journalists, it was during an in-person meeting that he

16   shared these materials with the press.  While there is a

17   visitor log that has been maintained, the defendant knew his

18   phone was being monitored, he knows that the government had

19   already searched his email account, and he chose to share these

20   materials in person at a meeting that could not be monitored,

21   and in a situation where, although there's a visitor log that's

22   maintained, it is not routinely maintained by the probation

23   office, it's not in the possession of the government, but is

24   held by this private security firm, and the government only

25   received it upon request, after we learned about this incident.

N7QKBANC

1          What I think that shows is, even if you take away the

2    internet or the phone with this defendant, where there is a

3    will, there is a way, and, here, there's certainly a will.

4          I would also note that the defense letter mentioned

5    that Ms. Ellison is likely going to be crossed on topics

6    similar to what was reported on in this article.  But the Court

7    has not, at this point, deemed these particular documents

8    admissible, and when the government asked for copies from the

9    defense, they indicated that they have yet to decide whether

10   they are marking these as exhibits, and so they declined to

11   provide the documents to the prosecution team, offering,

12   instead, to provide the documents to the government's filter

13   team to assess whether they were in the discovery or not.

14         THE COURT:  Well, typically, documents are used for

15   cross that have not previously been identified as exhibits,

16   yes?

17         MS. SASSOON:  That's true, your Honor, but, at this

18   point, we don't know whether there will be a proper impeachment

19   basis for cross-examining Ms. Ellison with these documents.  I

20   expect that there are things that she will readily acknowledge

21   that are going to be the subject of cross-examination, and so

22   we don't know that these documents are prior inconsistent

23   statements or what the admissible basis for those documents

24   would be.

25         THE COURT:  Okay.  Continue.

N7QKBANC

1          MS. SASSOON:  The last thing I'll note in responding

2     to the defense's letter is:  There's much made of the

3     statements by John Ray or statements by the government.  I

4     don't think there's any assertion here that the government has

5     done anything but comply with Rule 23.1, and, as your Honor

6     knows, John Ray is not a party to this case, and the government

7     does not intend to call him as a witness in this case.  And

8     that really does not address the core issue here, which is the

9     propriety of providing Ms. Ellison's private writings to The

10    New York Times.

11          I'd now like to take a step back and talk about the

12    backdrop of the defendant's pretrial release.

13          Back in January, the government brought to the Court's

14    attention the defendant's history of obstruction in the form of

15    setting autodeletion for much of the records that were

16    maintained by FTX and the communications among FTX and Alameda

17    employees.

18          In January, the defendant initiated contact with the

19    FTX USGC, and your Honor indicated that the Court understood

20    this to be an invitation for witness one to align his views and

21    recollections with the defendant's version of events.  Then the

22    defendant used a VPN, which permitted him to use the internet

23    without it being traced to his IP.

24          And after these events, at the February 17th

25    conference, your Honor put the question to the government,

N7QKBANC

1   you're putting an awful lot of trust in him, aren't you?  And

2   at that time, the government was proceeding more incrementally,

3   but, in the end, we've concluded that these conditions did

4   place too much trust in the defendant.  And some of the very

5   conditions insisted on by the defense for the purpose of

6   defense preparation are precisely those that have been abused.

7   Specifically, your Honor had been considering restricting the

8   defendant's use of the internet, and defense counsel said that

9   they needed access to Google Docs and Google Drive for the

10  defendant to be able to collaborate with his attorneys on his

11  defense, and it's precisely his Google Docs and Google Drive

12  that appears to have been mined for material to provide to The

13  New York Times.

14          So, for all these reasons, the government submits that

15  there is no set of conditions short of detention to assure the

16  safety of the community.

17          THE COURT:  Talk to me about the legal basis for your

18  request, please.

19          MS. SASSOON:  Yes, your Honor.

20          In *LaFontaine* — I believe this case was cited in your

21  preliminary order on bail — the Court recognized that even

22  nonviolent witness tampering can be a basis for detention.  And

23  your Honor echoed that idea in *Stein*, in a case where your

24  Honor ultimately did not detain the defendant, but recognized

25  that nonviolent witness tampering is a basis for detention.

N7QKBANC

1        And, as your Honor knows, under 18 U.S.C.

2    3142(f)(2)(B), the Court can consider a serious risk that the

3    person will obstruct or attempt to obstruct justice or

4    threaten, injure, or intimidate, or attempt to threaten,

5    injure, or intimidate a perspective witness or juror.

6        Your Honor also noted at a prior bail conference that

7    if there is probable cause to believe that the person committed

8    a felony, there's a rebuttable presumption of detention.  When

9    your Honor raised that, the parties put forward conditions

10   that, at the time, we believed could overcome the presumption,

11   and, in light of the defendant's exploitation of those

12   conditions, we no longer think that presumption has been

13   overcome under 18 U.S.C. 3148.

14       THE COURT:  Well, the crime that you say I have

15   probable cause to believe that the defendant has committed is

16   witness tampering under --

17       MS. SASSOON:  18 U.S.C. 1512.

18       THE COURT:  You took the words right out of my mouth.

19       Just give me a moment.

20       (Pause)

21       THE COURT:  So let's walk through the elements.

22       MS. SASSOON:  Yes, your Honor.

23       I noted to my colleague as we got here that I failed

24   to bring a codebook.  I don't know if your Honor has them

25   handy, and I apologize for being underprepared in that respect.

N7QKBANC

| | |
|---|---|
| 1 | THE COURT:  Isn't that the first rule in the U.S. |
| 2 | Attorney's Office, never go to court without the rulebook? |
| 3 | Do we have an extra here? |
| 4 | THE DEPUTY CLERK:  I do not have an extra, but I can |
| 5 | get another one. |
| 6 | THE COURT:  Well, I'm going to keep mine, but would |
| 7 | you kindly get us another one. |
| 8 | MS. SASSOON:  Thank you, your Honor. |
| 9 | (Pause) |
| 10 | MS. SASSOON:  Although I don't have the statute in |
| 11 | front of me, I think, at bottom, the government would have to |
| 12 | prove an attempt to influence the testimony of a witness when |
| 13 | there is a pending court proceeding.  And in the circumstance |
| 14 | of the FTX USGC, the message referred to having a constructive |
| 15 | relationship and vetting their version of events, which your |
| 16 | Honor described, quite colorfully, as a request to sing from |
| 17 | the same hymn book. |
| 18 | With respect to this New York Times article, I think a |
| 19 | fair conclusion is also that the only intent or explanation for |
| 20 | sharing these private writings was to intimidate Ms. Ellison, |
| 21 | who's poised to testify in approximately two months, and to |
| 22 | send a warning to other potential witnesses in this case |
| 23 | considering testifying against the defendant. |
| 24 | Thank you, Andy. |
| 25 | THE COURT:  Okay.  Just take a minute. |

N7QKBANC

1             So it's 1512(b)(1).

2             MS. SASSOON:  So I think here, with respect to the FTX

3    USGC, I would characterize the communication as an attempt to

4    corruptly persuade the FTX USGC in order to influence his

5    potential testimony, and I think the second instance involves

6    both indirect corrupt persuasion, but also intimidation.

7             THE COURT:  So, in each case, it's (b)(1)?

8             MS. SASSOON:  Yes.

9             THE COURT:  Okay.

10            Is that the sole legal basis, or is there another one?

11            MS. SASSOON:  May I have a moment?

12            (Pause)

13            MS. SASSOON:  That's what we're relying on, your

14   Honor.

15            THE COURT:  Okay.

16            Have you concluded?

17            MS. SASSOON:  Yes, your Honor.

18            THE COURT:  All right.

19            Who is going to take this for the defense?

20            MR. COHEN:  I will, your Honor.

21            THE COURT:  Okay.

22            MR. COHEN:  Thank you, your Honor.

23            I want to start with a process point.  We were sent a

24   letter by the government on Thursday seeking an order under

25   Rule Local Rule 23.1(h).  Knowing how prompt your Honor is, we

N7QKBANC

1   worked over the weekend to respond to that application, and we

2   learned for the first time, one minute before court began, that

3   the government had changed its position and was moving for

4   detention.  Had we known that, we would have been able to put

5   in a written submission for your Honor to consider and for

6   record purposes.  And if the Court is inclined to rule in that

7   direction, we would like the opportunity to put in a

8   submission.  That was just not a proper process to follow,

9   given that we all knew we would be before your Honor on

10   Wednesday, today.

11         In any event, let's start with the bail reform statute

12   and the part of the statute that counsel did not read of

13   3142(f)(2)(B), which requires that on a motion by the

14   government for detention, or actually for modification of bail,

15   based on risk of obstruction of justice, as they describe it,

16   that they make a showing that the finding the Court needs to

17   make is by clear and convincing evidence, not by a

18   preponderance.  Counsel did not address that, and we

19   respectfully submit, your Honor, that, yet again, from the

20   government, which dropped three documents on our desk one

21   moment ago — never sent them to us yesterday --

22         THE COURT:  What documents are those?

23         MR. COHEN:  They claim to be, I believe, the printouts

24   from the pen registers, your Honor.  I haven't had a chance to

25   study them.  I just got them.

N7QKBANC

1      The record before your Honor is no different than it

2 was based on the parties' submissions of Thursday and Saturday.

3 And on that record, we submit there is a question if there has

4 ever even been a violation of 23.1(a) or (d), and our view, as

5 we said in our letter, is rather than require the Court to wade

6 into that, when the Court has plenty else to do, that we would

7 consent to the relief of a 23.1(h) order.  And the way that

8 ties into the bail argument, your Honor, is that is a

9 sufficient, least restrictive alternative to address the

10 concern that the government has raised here.  And as of, as far

11 as I know, yesterday, that was the government's position.  As

12 of one minute before court, that was the government's position.

13      On the record before your Honor, we submit that

14 nothing more has changed.  The defendant did not violate the

15 protective order.  That's not disputed.

16      The defendant did not try to directly contact any

17 witnesses.  And, of course, for record purposes, as your Honor

18 knows, we dispute the government's characterization about the

19 prior contact involving the FTX GC, which your Honor addressed

20 last time -- well, several times ago.

21      And the standard under 23.1 requires a finding of a

22 substantial likelihood to interfere.  Now, it could be

23 argued --

24      THE COURT:  We're not now talking about 23.1.  We're

25 talking about 3148(b)(1)(A), as I understand it.

N7QKBANC

```
1              MR. COHEN:  That's correct.
2              THE COURT:  And correct me if I'm mistaken or
3     misreading it, but the standard under 3148(b)(1)(A) is probable
4     cause to believe that the person has committed a crime while on
5     release.
6              MR. COHEN:  Right.  But --
7              THE COURT:  The clear and convincing standard does not
8     apply to that.  Am I right?
9              MR. COHEN:  The government is moving -- they just said
10    they're moving under 3142(f) for modification, and that's --
11    the clear and convincing standard is in that same section, your
12    Honor.  That's all I was pointing out.
13             THE COURT:  Well, I think, possibly, there's a
14    misunderstanding here.
15             MR. COHEN:  Okay.  All right.
16             THE COURT:  Let me find out.
17             MR. COHEN:  Okay.
18             THE COURT:  Ms. Sassoon, are you proceeding under
19    3148(b)(1)(A), or are you proceeding under the other statute?
20             MS. SASSOON:  I think we fall under either, your
21    Honor.
22             THE COURT:  Okay.
23             Then go ahead, Mr. Cohen.
24             MR. COHEN:  On the record before your Honor — not
25    innuendo that the government, yet again, dropped before the
```

N7QKBANC

1    Court today — but on the record before your Honor, what we have

2    here is a defendant who believes — and this may or may not be a

3    good strategy, in terms of trying to protect one's reputation —

4    who believed that, given the many, many negative stories,

5    1 million stories out there, most of them overwhelmingly

6    negative about him, given the literally thousands of stories

7    about Ms. Ellison and his relationship already in the public

8    domain, already put forward by the government — some of it in

9    the indictment itself, similar quotes in the indictment

10   itself — he believed that as long as he was not violating the

11   protective order, which he wasn't, as long as he was not trying

12   to directly contact any witness, which he wasn't, that he had

13   the right, under the First Amendment, to make fair comment.

14       Now, that might be a good strategy, it might not be a

15   bad strategy.  The fact that the stories continue to be

16   negative about him might suggest it's not the best strategy,

17   but it doesn't rise to the level of a violation of 1512, and it

18   doesn't negate the need for the Court to apply the least

19   restrictive alternative here, which is the gag order that the

20   government has proposed, which we thought we were going to be

21   considering today, put it in place, and eliminate this risk.

22       The other thing I wish to note — and I don't usually

23   do this, your Honor — the government has given the back of the

24   hand to the fact that it appears that in the article in

25   question, the government itself is one of the sources.  And I

N7QKBANC

think if one were to ask the many reporters sitting in this

room now, and hearing on the overflow, if they have had

government sources over the life of this case --

THE COURT:  They would all decline to answer, as we

all well know.

MR. COHEN:  They would, they would.

What's ironic here is, your Honor, our client did it

in a way that complied with his bail conditions so his contacts

would be known.

There's a log.  Reporters signed in on the log.

There's no secret to this.  The calls, he knew there was a pen

register, we knew there was a pen register.  He believed that

he had a right --

THE COURT:  What documents did he give them?

MR. COHEN:  Your Honor, these were documents not part

of the discovery, that were exchanged between him and

Ms. Ellison.  I think it's one page, maybe two pages.  And he

didn't give them to the reporter; he let the reporter look at

them.

Now, this is a level of detail, your Honor, no one

else would provide to the Court.  If you brought the reporter

in here, they would not answer you, they wouldn't have to.  The

government is pretending that it never speaks to the media

about this case.  The Court has done this a long time.  I'll

leave that to the Court to consider.

N7QKBANC

1          It's just when you step back, and you look at the

2     context, I would grant, your Honor, that if we were on a blank

3     slate, and this was a run-of-the-mill case, and there weren't a

4     million stories, and the defendant started to make contacts

5     like this, we would be having a very different kind of argument

6     and a very different kind of situation.  But to pick out this

7     one story, which, for all the innuendo, is all the government

8     is relying on, and say this is an --

9          THE COURT:  Well, it isn't all.  There's the contact

10     with the U.S. general counsel, which troubled me a great deal.

11          MR. COHEN:  I understand that, your Honor.  Although

12     that was, with respect, inconclusive, and he made it at the

13     same time that he also contacted John Ray, the CEO of the

14     debtor and who's trying to reach out to them.

15          So, what we have here, I say with respect, is not some

16     sinister effort to move an overwhelmingly negative tide against

17     him, but just someone who's trying his best to protect his

18     reputation, believing that he can.  He consented to

19     extradition.  He's asserted his innocence from the beginning.

20     He pleaded not guilty.  We asked your Honor for an early trial

21     date, which your Honor was kind enough to give us.

22          I forget the case the quote comes from, but where do

23     you go to get your reputation back if you prevail at trial?  It

24     might be a good strategy, it might be a bad strategy, but it's

25     a permitted strategy to respond to this wave of inquiries and

N7QKBANC

1    try to protect your reputation and try to move forward.

2              The notion that this could have tainted the jury pool

3    really just doesn't seem viable in light of all that's gone on.

4    And the notion that this really rises to the level of a 1512

5    violation, or even probable cause to believe that, this is a

6    very thin record, especially if we're thinking about it from a

7    clear and convincing -- they're moving to a different statute.

8              In any event, your Honor, when you step back, and you

9    look at what we're dealing with, what the defendant is dealing

10   with, with the overwhelming crush of media, almost all of it

11   negative, when you look at his effort to follow the protective

12   order, his effort to follow his conditions down to the point of

13   having the reporter sign and filing all the records, we submit

14   that the way to address this is with a less restrictive

15   alternative.

16             Now, if I might, your Honor — and I just want to touch

17   this briefly --

18             THE COURT:  There are lots of less restrictive

19   alternatives.  One of them is to do nothing at all, which is

20   less restrictive, but also highly ineffective.  And one of the

21   questions bothering me here is how effective this proposed

22   order from the government could conceivably be in these

23   circumstances.

24             MR. COHEN:  Well, your Honor, I'm glad you asked that

25   question, because I think what the government has proposed is a

N7QKBANC

1   23.1(h) order, which, as far as we can tell, would be a full

2   gag order.

3          Now, interestingly, although in their letter, they

4   described it to your Honor as covering parties and witnesses,

5   in the draft they sent to your Honor, they dropped the

6   witnesses.

7          THE COURT:  But, of course, I have no authority to

8   enjoin witnesses.

9          MR. COHEN:  Well, you don't --

10         THE COURT:  I don't even know who they are.

11         MR. COHEN:  I'm not sure if your Honor doesn't

12   under --

13         THE COURT:  Well, I commend to your attention Learned

14   Hand's decision in *Alemite Manufacturing* --

15         MR. COHEN:  Yes, yes.

16         THE COURT:  -- which says that I can't issue an order

17   against the world.

18         MR. COHEN:  In any event, that order will be a full

19   gag order.  There will be no more communication, which,

20   frankly, in the real world we're living in, will only be to my

21   client's disadvantage and to his reputational disadvantage, for

22   all the reasons I discussed.

23         THE COURT:  Look, I was going to put this question —

24   and I still will — to Ms. Sassoon, but what happens if somebody

25   is alleged to have violated what you refer to as the gag order?

N7QKBANC

1    What's the remedy?

2            MR. COHEN:  I assume -- if the gag order is now made

3    part of a bail condition, I assume it's an application like

4    today.  Right?

5            THE COURT:  Well, that's a possibility.

6            MR. COHEN:  Right.

7            THE COURT:  That's not the usual --

8            MR. COHEN:  But it's certainly within the Court's

9    discretion to craft that.

10           THE COURT:  Yes, of course, that's true.

11           And then the argument gets made that it was vague,

12   right?

13           MR. COHEN:  I don't see how that order, as drafted, is

14   vague, since it tracks the local rule, which is, as your Honor

15   knows --

16           THE COURT:  It wouldn't be the first time.

17           MR. COHEN:  I know, but it follows the model rule.  So

18   where you have it on consent of the parties, and the Court so

19   ordering a consented order, it's hard to see --

20           THE COURT:  But what is a communication about the case

21   which could interfere with a fair trial?  So the government

22   comes in and says, hypothetically, revoke bail because he did

23   this, and it, quote, could interfere with a fair trial.  And

24   you will say, I predict, who knows what could interfere with a

25   fair trial.  No?

N7QKBANC

```
1          MR. COHEN:  Well --

2          THE COURT:  And you will say it's vague, how would

3    anybody understand it?

4          MR. COHEN:  We're not saying it's vague, and in our

5    submission to your Honor, we did not challenge on vagueness.

6    We would like to get to — and maybe this helps your Honor --

7          THE COURT:  That goes to vague on its face.  What if

8    you say, well, it's not vague on its face, it's merely vague as

9    applied to this communication?

10         MR. COHEN:  Well, I think where we're trying to get

11   to, your Honor — and maybe it's a drafting question — is at

12   this point, going forward, we want our client to be able to

13   work with his defense team, continue his review of the

14   discovery, have social visits with his friends that are on the

15   approved list that we've worked out with the government --

16         THE COURT:  Well, they haven't been approved yet.

17         MR. COHEN:  I mean the prior list, assuming the Court

18   decides to continue that.  That's, obviously, the Court's

19   decision.

20              -- and speak with his parents, and that's it.

21         So, if that order doesn't get us there, we would be

22   amenable to language that did, because one point your Honor has

23   touched on — and I'm glad you reminded me, I did want to make

24   this point, your Honor — is that this is a very unusual case in

25   a lot of ways.  One way in which it's unusual, besides the
```

N7QKBANC

media coverage, is the nature of the discovery.  Ironically, in a government press conference — I know we shouldn't be bringing up government sources — they described it as the most extensive discovery production they've ever made.

We've received 4.3 million documents, 13 million pages.  If this was physically printed out, it would be the size of three Sears Towers -- or Willis Tower.  I'm sorry, I'm dating myself.

The only way our client, who is integral to our defense — and it's meaningful for him to participate in his defense — can work with this is on an internet written-abled computer that, among other things, allows him to use the Relativity program.  He would not be able to do this if he were remanded.  In fact, one of the reasons the government gave in its papers for why a bill of particulars wasn't required here is because they said, we've produced to you documents that, even though they're voluminous, they're organized and searchable.  The searchable goes away if he's remanded, or perhaps could be replicated with some sort of hard drive, which would take literally weeks to produce and put together, when we have an October 2 trial date.

Second, all of the trading records and accounting records — and this is a financial case — are on the AWS database.  And I know your Honor has heard a lot about this, probably more than you'd care to, but that's hosted in the

N7QKBANC

1    cloud.  So if our client is remanded, he can't access it, and

2    we can't access it with him.

3          Third, there is a bunch of discovery that the

4    government has provided to us that they've labeled attorneys'

5    possession only.  We got a 60-page disclosure from the

6    government about potential *Brady* issues.  Our client can only

7    read that with us, with attorneys present, and if he's

8    remanded, it's possible — I'm not saying it's not — but it

9    becomes dramatically more difficult, and we expect that much of

10   the 3500 material that your Honor has ordered to be produced on

11   a tight schedule will also be designated that way, making it

12   even more difficult.

13         So, this is a complex case, involving complex

14   financial transactions.  It really would be very, very --

15   almost impossible, as I see it, to work with our client if he

16   were remanded and not able to have the basic access.

17         So we respectfully would ask the Court to deny the

18   application and put forth an order, however strict the Court

19   determines is required, so that we can just put this issue

20   behind us.  Your Honor has appropriately given us a scheduling

21   order that I'm sure both sides are committed to meeting, and

22   that's where we should be putting our attention, and that's

23   where our client should be putting his attention, and he

24   understands that at this point.

25         And to the extent the Court is inclined otherwise, we

N7QKBANC

1    would like a chance to make a written submission, if necessary.

2             THE COURT:  All right.  Thank you.

3             Ms. Sassoon?

4             MS. SASSOON:  A couple of points, your Honor, and I'm

5    happy to address any outstanding questions.

6             In terms of the insinuation that the government was

7    hiding the ball here, that's not accurate.  The Court put out

8    an order asking the parties to be prepared to address bail.  It

9    was no secret that that would be a topic at this conference,

10   and the government put in a letter on Monday saying that we'd

11   arrive prepared to address the bail conditions, and at no point

12   did defense counsel reach out to understand the government's

13   position, even when the government reached out for the visitor

14   log.  And this has been an evolving --

15            THE COURT:  There is, in fact, a little more to it

16   than that.  The government brought this on by a letter dated

17   July 20th, and Mr. Everdell communicated with my deputy, saying

18   that I would have a response from the defense by the end of the

19   day on the 21st.  And my initial order raised the prospect of

20   bail being on the table.

21            I didn't get it on the 21st.  Then I was told late on

22   the 21st that I would get it on the 22nd.  And you were

23   anticipating that, I'm sure, and it never came on the 22nd, or

24   it came very late on the 22nd, and it didn't address the bail

25   issue.

N7QKBANC

1          MS. SASSOON:  I believe it did at the very end, your

2     Honor.

3          THE COURT:  Did it?

4          MS. SASSOON:  And my recollection is defense counsel

5     submitted it in the evening on the 22nd, and filed it on the

6     23rd.

7          THE COURT:  Ah, that's why I think I didn't see it

8     until the 23rd.  Okay.

9          Yes, but it was really a cursory addressing of the

10    bail issue.

11         MS. SASSOON:  And from the government's point of view,

12    this was not a static situation.  We learned of the forthcoming

13    article, the article was published, we wanted to alert the

14    Court right away, and we did in the form of requesting this

15    order at a time where we still did not have the handle on all

16    the facts that we've presented today, we didn't have the

17    benefit of the defense position, an explanation that, in their

18    view, the defendant did nothing wrong, and we didn't, at that

19    point, have the benefit of analyzing the pen register and

20    visitor log, which, in our view, also changed the equation

21    because it showed more than a hundred calls with this

22    particular reporter, including before the preceding article in

23    May that also referenced Ms. Ellison's writing, in which, in

24    our view, gives the lie to this narrative of the defendant

25    merely responding to comment on an article that was already

N7QKBANC

1    effectively baked.

2            In terms of the order, I take your Honor's point that

3    it's subject to competing interpretations and, standing alone,

4    is not going to be effective, given the record that we have

5    here.  Were the defendant to violate the order, I think

6    possible remedies are criminal contempt, if it's a willful

7    violation, and that could be established, or if it's made a

8    part of the bail conditions, if it's a proved violation of his

9    bail, it creates a possibility for remand.

10           There was a lot of discussion about the voluminous

11   discovery here.  And as your Honor knows, the government took

12   steps to accommodate discovery review and coordination with

13   counsel in designing the prior bail conditions.  But that's not

14   a get-out-of-jail-free card, it's not an exception to the bail

15   statute or to the considerations that a court should give

16   weight to in deciding on the appropriate conditions of release,

17   or whether release is possible to assure the safety of the

18   community.  And I think it would set a dangerous precedent to

19   keep the defendant on release purely on the basis of discovery.

20   That would basically send a message that white collar

21   criminals, because their cases tend to involve more voluminous

22   discovery, have more leeway to interfere with a fair trial or

23   to tamper with witnesses.  And the government has plenty of

24   experience coordinating with the MDC and the other prisons to

25   get access to discovery to detained defendants.

N7QKBANC

```
1          THE COURT:  You're proceeding, essentially, by
2   proffer.
3          What, if any, facts are disputed?
4          MS. SASSOON:  I think in this case, the key things are
5   not disputed, which is the language of the message to the FTX
6   USGC, and that the material quoted in The New York Times
7   article was provided by the defendant in person to the
8   reporter.
9          THE COURT:  Well, I'm just told that it was one or two
10  pages.  Is that accurate, or do you not know?
11         MS. SASSOON:  We don't know because the defense has
12  declined to provide us with the material.
13         Based on the article, it appears that there was more
14  than one document that was previewed to the journalist.
15         THE COURT:  Stay with the question I raised.
16         What's disputed and what isn't?
17         MS. SASSOON:  I think the interpretation of the
18  conduct is disputed, but very little else is disputed.  The
19  defense indicated it needs time to assess the call log records
20  we provided.  The FBI agent who prepared those records is here
21  in court, and it's drawn straight from the pen register being
22  maintained by the FBI.
23         THE COURT:  Okay.  Anything else?
24         MS. SASSOON:  No, your Honor.
25         THE COURT:  Mr. Cohen, anything else from you?
```

N7QKBANC

1          MR. COHEN:  Only, your Honor, that --

2          THE COURT:  Same question to you that I put to

3     counsel.

4          MS. SASSOON:  That's the one I was addressing.

5          It's not just the interpretation, but I would put it

6     slightly more broadly, your Honor — it's the reason for the

7     contact.

8          THE COURT:  Are you proffering the document or

9     documents themselves?

10         MR. COHEN:  Your Honor, we were willing to, and remain

11    willing to, provide them to the government's filter team for

12    review.

13         May I have a moment, your Honor?

14         THE COURT:  Yes.

15         (Counsel confer)

16         MR. COHEN:  We would certainly be willing to provide

17    them to the Court if the Court wanted to see them.

18         THE COURT:  Ex parte or --

19         MR. COHEN:  I would think, at this point, we would

20    prefer ex parte to the Court, and then also to the filter team

21    if they want to see them, because, under your Honor's

22    scheduling order, we're not required to make a production yet,

23    and these are documents we may or may not provide, but

24    certainly to resolve this issue, we'd be willing to provide

25    them to the Court.

N7QKBANC

1      THE COURT:  The purpose of having it go to the filter

2  team is what?

3      MR. COHEN:  It's so that someone from the government's

4  side can see them, where, if we don't use them at trial, the

5  trial team doesn't have them.  That was our thinking with

6  respect to the filter team.

7      THE COURT:  But, normally, the filter team is used

8  where something is already deemed privileged, where there's

9  going to be a privilege determination.

10      MR. COHEN:  This is the analogue, your Honor.  These

11  are documents that, under your Honor's order and under 16(b),

12  we may never have to provide to the defense.  So our preference

13  would not be to unless and until the date comes, but in the

14  meantime, if it's to resolve this issue, we'd be happy to

15  provide them to the Court and to the filter team.

16      THE COURT:  The government is asking me to draw an

17  inference here about what was provided.  And you're asking me

18  to draw a different inference.  That's at the minimum.  The

19  government also wants me to find that there was a lot more

20  provided to The New York Times reporter than one or two pages.

21      Certainly, on the first of those points, don't you

22  have an interest in the government seeing it and seeing whether

23  they really dispute your assertion, or not?

24      MR. COHEN:  One moment, your Honor?

25      (Counsel confer)

N7QKBANC

```
1          MR. COHEN:  We would be willing to provide them the
2    documents, your Honor.
3          THE COURT:  Well, I leave it up to you.  We'll get to
4    talking about a schedule here in a minute.
5          Ms. Sassoon, does the government's case on this boil
6    down to something like this, or is there more to it?  We have
7    the communication with the U.S. general counsel months ago,
8    which I then thought, and still think, gives good reason to
9    suspect that the purpose was to influence the testimony of that
10   individual.  You have the admission that the defendant has a
11   strategy here to counter what he puts forward as being
12   extremely unfavorable publicity about him, and it could be
13   inferred to -- well, let me not go to the next step because I
14   needn't make this more complicated.  So that there is,
15   essentially, an avowed intention to influence the perception of
16   the defendant by the public at large, which includes
17   prospective jurors and prospective witnesses.  That's
18   essentially admitted, as I understand the argument.
19         And now you learn, since July 20th, of the
20   extraordinary amount of contact between the defendant,
21   journalists in general, and the author of this particular New
22   York Times article, the conceded making of availability of
23   these documents, however many they are, to the author.  Let me
24   just stop there.
25         And you say, in light of the new facts, there's
```

N7QKBANC

1    probable cause to believe he's engaged in witness tampering and

2    conceivably also created a justification for revocation under a

3    different statute.

4           Does it boil down to that?  And if there's more, what

5    else is there to it?

6           MS. SASSOON:  Yes, your Honor.  I just want to be

7    clear that the defendant is permitted to have a strategy, and

8    this isn't a First Amendment issue, and having contact with the

9    press alone is not witness tampering, and it's not a violation

10   of the bail statute.  But, here, where the strategy for

11   rehabilitating his reputation was built on discrediting and

12   blaming Caroline Ellison in a national and international

13   publication, that is read by many prospective jurors in this

14   district, it crossed a line toward improperly influencing those

15   prospective jurors and intimidating a witness and sending a

16   message to other prospective witnesses.

17          And against the backdrop of the prior admonitions, the

18   other indications of evasion, including the use of a VPN, and

19   then conducting this meeting with the journalists on background

20   or off the record — I don't know what the right term is — and

21   in person, it also rehabilitates the concerns that your Honor

22   had at the outset, when the government thought we had come up

23   with conditions that could be adequate.

24          THE COURT:  All right.  Let's talk about getting this

25   teed up.

N7QKBANC

1          First of all, would there be any objection, from

2     either side, to an interim order to give both sides an

3     opportunity to make more formal presentations, and using, as a

4     starting point, the government's proposed order, but striking

5     out the words "anything about the case which could interfere

6     with a fair trial," to avoid uncertainty?

7          Any objection to that, purely pendente lite?

8          MS. SASSOON:  I just want to understand the edit.

9     We'd be striking the words "which could interfere with a fair

10    trial"?

11         THE COURT:  Yes.  That amends what I said, but I think

12    that's better.

13         MS. SASSOON:  Yes, your Honor, no objection to that.

14         MR. COHEN:  No objection, your Honor.

15         THE COURT:  All right.

16         Now, who should go first with a written submission?  I

17    suppose the government, right?

18         MS. SASSOON:  Yes, your Honor.

19         THE COURT:  How quickly can you get it done, properly?

20         MS. SASSOON:  We'd propose Friday or tomorrow, if your

21    Honor prefers tomorrow.

22         THE COURT:  Friday is okay with me.

23         Now, when I say "properly," I didn't mean to suggest

24    that you don't always do things properly — both sides do — but

25    what I mean is with careful attention to the statute or

N7QKBANC

1    statutes you're proceeding under, and all of the case law that

2    is pertinent to proceeding by proffers, and when a hearing is

3    required and when it isn't.  And that's addressed to both

4    sides, obviously.

5              So, the government by Friday.

6              And, Mr. Cohen, what would you like?

7              MR. COHEN:  Would we be able to respond by Tuesday,

8    your Honor?

9              THE COURT:  Is there any objection to that?

10             MS. SASSOON:  No, your Honor.

11             THE COURT:  Tuesday is what date, please?  I should be

12   able to figure that out for myself.

13             THE DEPUTY CLERK:  August 1st, Judge.

14             THE COURT:  August 1st.

15             And any reply, August 3rd, how about that?  Yes?

16             MS. SASSOON:  Yes.

17             THE COURT:  Okay.

18             What I'm going to do with the proposed order, I'm

19   adding a paragraph to the order that reads:  "This order shall

20   remain in effect until determination of the government's oral

21   application for detention unless extended by the Court."

22             Is that satisfactory?

23             MS. SASSOON:  Yes, your Honor.

24             MR. COHEN:  Yes.

25             THE COURT:  All right.  So I'll enter that when I get

N7QKBANC

1    upstairs.

2              Is there anything else we need to do?

3              MS. SASSOON:  We'd request that the defense provide us

4    with the documents today so that we have an opportunity to

5    address them in our letter.

6              THE COURT:  Any reason why not, Mr. Cohen?

7              MR. COHEN:  We have a technical issue, but we should

8    be able to work through it and get it to them today, your

9    Honor.

10             MS. SASSOON:  Great.

11             THE COURT:  Okay.

12             Let me just say a word or two.

13             I'm aware, I think pretty fully, about the document

14   issues and the need for access by the defendant.  I am

15   certainly very mindful of his First Amendment rights, and I am

16   very mindful of the government's interest in this issue, which

17   I take seriously.  And I say to the defendant,

18   Mr. Bankman-Fried, you better take it seriously, too.

19             Okay.  I think we're concluded for this afternoon.

20   Thank you, all.

21             (Adjourned)

22

23

24

25