N8B8BANA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                           22 CR 673  (LAK)

5   SAMUEL BANKMAN-FRIED,

6                                            Conference

7               Defendant.

8   ------------------------------x

                                             New York, N.Y.
9                                            August 11, 2023
                                             2:00 p.m.

10

11  Before:

12               HON. LEWIS A. KAPLAN,

13                                        District Judge

14                       APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    DANIELLE SASSOON
17  NICOLAS ROOS
    SAMUEL RAYMOND
18  THANE REHN
    DANIELLE KUDLA
19       Assistant United States Attorneys

20  COHEN & GRESSER LLP
         Attorneys for Defendant
21  BY:  MARK STEWART COHEN
         CHRISTIAN R. EVERDELL

22

23  ALSO PRESENT:  KRISTIN ALLAIN, FBI Special Agent
                   JOHN MOSCATO, Pretrial Services Officer
24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N8B8BANA

1          (In open court; case called)

2          THE DEPUTY CLERK:    Government, are you ready?

3          MS. SASSOON:    Yes.  Good afternoon, your Honor.

4    Danielle Sassoon, Nick Roos, Sam Raymond, Thane Rehn, and

5    Danielle Kudla for the United States.  We are joined by Special

6    Agent Kristin Allain of the FBI and John Moscato from

7    probation.

8          THE COURT:    Good afternoon.

9          THE DEPUTY CLERK:    Defendant, are you ready?

10         MR. COHEN:    Yes.  Good afternoon, your Honor.  Mark

11   Cohen for Mr. Bankman-Fried.

12         MR. EVERDELL:    Good afternoon, your Honor.  Christian

13   Everdell for Mr. Bankman-Fried.

14         THE COURT:    Good afternoon.

15         Now, I do appreciate everybody coming in on the least

16   popular schedule that I could conceivably have devised, but it

17   was necessary for a variety of reasons, and I gather I am not

18   the only one doing this at the moment.

19         Ms. Sassoon.

20         MS. SASSOON:    Yes, your Honor.  And I have my code

21   book today.

22         THE COURT:    Well done.

23         MS. SASSOON:    Your Honor, I stood before you recently

24   and you now have the benefit of two letters from the

25   government, and so you have our view of the seriousness of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N8B8BANA

1    conduct here, as well as what we believe it shows about the

2    defendant's deliberate evasions of his bail conditions and why

3    these facts warrant detention.

4            But Just as a brief recap, we have previously homed in

5    on what the undisputed facts are here, and I will just recap

6    them briefly:

7            The Signal message to the FTX US general counsel,

8    after the defendant was arrested, that referred to being

9    resources for each other and vetting information.

10           The use of a VPN that concealed the defendant's

11   internet activity.

12           THE COURT:    Just pause on that one for a minute.

13           How is that exactly an evasion of the bail conditions?

14   I understand that he was evading his contractual obligations

15   and duty of candor to the vendor, but focus on the bail

16   conditions.

17           MS. SASSOON:    Yes, your Honor.

18           At the time that had happened, the Court had been

19   notified about what the government considered the improper

20   contact with Witness-1, and the parties were in the process of

21   designing a set of conditions that would allow the government

22   to monitor the defendant's internet activity and phone

23   activity.  And although those conditions had not been

24   solidified, the purpose of those conditions was plain, the

25   Court's interest in those conditions was plain, and while that

N8B8BANA

1   was ongoing, the defendant did something that was contrary to

2   that objective, which was concealing what he was doing on the

3   internet, after concerns had been raised about using a device

4   to tamper with a witness.

5            THE COURT:    Thank you.  Go ahead.

6            MS. SASSOON:    I will just note that that is one

7   example where there was a red flag, but there was also a limit

8   to what the government can ultimately know about how the VPN

9   was used.

10           So, certainly a VPN is capable of being exploited to

11   do certain things on the internet that would be problematic,

12   but the use of the VPN itself prevents the government from

13   knowing exactly what the defendant was doing, which in our view

14   is an ongoing problem here with the existing bail conditions.

15           Then more recently you have the secretive sharing of

16   information about Caroline Ellison, including her writings, in

17   a fashion that was difficult to detect and that evaded

18   detection through the monitoring that had been put in place on

19   the defendant's e-mail and phone.

20           And this activity was part of what the defense

21   concedes was an ongoing media strategy to influence the public

22   and potential jurors', effectively, views of the case.

23           THE COURT:    He has got a right to try to influence the

24   public up to a point, right?

25           MS. SASSOON:    Yes.  And nobody disputes that, and we

N8B8BANA

1    have emphasized that in court and in our papers.  We don't view

2    this as a First Amendment issue given the means by which the

3    defendant tried to do this, which we consider amounting to

4    witness intimidation and tampering.

5                 THE COURT:    So the line, if I understand you

6    correctly, is where the intent, in whole or in part, is to

7    influence, intimidate, or various other things a witness, yes?

8                 MS. SASSOON:    I think it's the intent, and I think

9    that intent is clear here.  But I also think the substance of

10   the communication matters too.  If he came out and said, I'm

11   innocent or I dispute the allegations in the indictment, that's

12   one type of communication.  Whereas, if the substance of the

13   communication can only be understood as trying to influence the

14   public's opinion by discrediting and harassing a witness,

15   that's both part of the witness intimidation, but also part of

16   what the rules, in governing the conduct of the attorneys at

17   the very least, consider tainting the jury and making improper

18   communication.

19                THE COURT:    The conduct informs one's view of the

20   intent, that is, the substance of the communication, right?

21                MS. SASSOON:    Yes.

22                In our view, the defense has not really engaged with

23   their view of what the least restrictive conditions should be

24   if the Court accepts the government's view of the evidence.

25   They have raised concerns about discovery access in the event

1  that the defendant is detained.  We have spoken to a number of

2  facilities, in light of the concerns that have been raised, and

3  Putnam County Correctional Facility has represented to us that

4  in the event the defendant were detained and designated to that

5  facility, they would permit the defendant to have a laptop that

6  is enabled for internet-based discovery review, which I think

7  would largely address the concerns raised by the defense.

8         Again, that's in the event that the defendant is

9  detained.  If that were to happen, that laptop would still

10  require some time to prepare, but it is feasible and the

11  facility is willing to accommodate that.

12         THE COURT:  How much time?

13         MS. SASSOON:  I would estimate about a week.

14         THE COURT:  Okay.  How do you avoid, if he were

15  designated to Putnam CF, use of the internet for purposes other

16  than trial prep, or are we getting right back to where we

17  started months ago?

18         MS. SASSOON:  The goal would be to implement features

19  similar to the laptop that the defendant currently is able to

20  use -- namely, one that would only permit access to the

21  defense's Relativity database and to the AWS database.

22         THE COURT:  Okay.  Go on, please.

23         MS. SASSOON:  Your Honor asked the parties to come

24  prepared not only to address the possibility of detention, but

25  also alternatives to detention.  And as I mentioned, the

1    defense, in our view, hasn't posited less restrictive

2    conditions that would be adequate here if you accept our

3    understanding of the evidence.  And the existing conditions, in

4    our view, are not adequate, and those followed extensive

5    negotiations between the parties to design conditions meant to

6    be tight, in fact.  And we don't think that the order governing

7    extrajudicial statements alone is sufficient, given what your

8    Honor noted about the difficulty of enforcing such an order,

9    and therefore the potential for abuse by a defendant who, like

10   this one, would be intent on evading his bail conditions.

11              It's also a challenge here to design appropriate

12   pretrial conditions for a defendant who, in our view, has

13   intentionally found ways around what were already carefully

14   designed conditions.  And I would point out specifically how

15   the defense requested access to Google Drive, claiming that

16   that was necessary for defense preparation, and that was the

17   tool used to find these documents that were provided to the New

18   York Times.

19              We put in monitoring --

20              THE COURT:    You say to find these documents?

21              MS. SASSOON:    Yes.

22              THE COURT:    Do we know anything about how they were

23   stored, who was supposed to have access, whether these were

24   files that he had personal access to for appropriate reasons?

25   What's the story, if we know?

1          MS. SASSOON:    My understanding is that they came from

2     his own personal Google Drive account.  But I noted in our most

3     recent letter we asked the defense to provide versions of the

4     documents that were not in PDF format, that would include

5     metadata in the original format of the documents, and those

6     have not been provided to the government.

7          I would also note that the final bail order included

8     monitoring of the defendant's phone and of his Google account.

9     And so here the defendant shared the documents in person, which

10    I see no other purpose for that than to avoid an electronic

11    trail of forwarding these documents, which I also think bears

12    on the intent.

13         THE COURT:    My recollection is that he invited the

14    reporter to visit him, yes?

15         MS. SASSOON:    Yes.

16         THE COURT:    Where was the reporter coming from and

17    going to for the purpose of that visit?

18         MS. SASSOON:    So the reporter visited him at his

19    residence.

20         THE COURT:    Palo Alto?

21         MS. SASSOON:    Yes.

22         THE COURT:    Is the reporter normally based in New

23    York?

24         MS. SASSOON:    I don't know the answer to that.

25         I would also note that the parties took pains to

1    design a set of conditions to restrict the defendant's behavior

2    in his residence in California.  The defendant is increasingly

3    traveling to New York for conferences, and presumably for trial

4    preparation, and that is a gap in the conditions because he is

5    effectively unsupervised when he is here.

6            So, in the event that the Court is considering

7    additional restrictions short of detention, at the very least

8    the government thinks that home incarceration would be

9    appropriate, no visitors, no internet, except to access the

10   database, the discovery database, and to conduct attorney Zoom

11   meetings, and no access to the Google Drive.  And I think that

12   that access is addressed by the fact that the government has

13   produced materials from Google in discovery, and although the

14   defendant already had access to his personal Google Drive to

15   date, the government will be producing shortly its own

16   production of those materials, which -- this was noted in our

17   letter -- were inadvertently not produced by Google in their

18   initial search warrant return.

19            I am happy to address any other questions the Court

20   has about our letter or the evidence.

21            THE COURT:    Thank you.

22            Mr. Cohen.

23            MR. COHEN:    Thank you, your Honor.

24            THE COURT:    Mr. Cohen, before you get rolling, maybe

25   you know the answer to the question where the reporter came

N8B8BANA

1   from.

2               MR. COHEN:    I believe he is based in California, your

3   Honor.

4               THE COURT:    Where in California?

5               MR. COHEN:    I don't know, but I believe we have

6   representatives of his employer in the courtroom.

7               THE COURT:    Go ahead.

8               MR. COHEN:    Your Honor, I think it's telling there

9   were two things that were absent from the presentation the

10  Court just received:  One was a discussion of the relevant

11  legal standards that govern here, and the relevant case law

12  that governs here; and two, the government continues with what

13  I would call argument by conclusion.  When your Honor just

14  asked the question about what was wrong with the use of the

15  VPN, the response was, it's wrong because we say it's wrong.

16              THE COURT:    I must have missed that.

17              MR. COHEN:    That was certainly how we took it.

18              But let me go back to the legal standard, your Honor.

19  The government, as we understand it, at least as of last week,

20  is moving under two statutes, 3148 and 3142(f)(2)(B).  And

21  under those standards, it has the burden under 3148 of showing

22  that there is probable cause to believe that the defendant

23  committed a crime.

24              Here, they are relying upon, as I understand, 1512(b),

25  which requires that the defendant act with a knowing and

N8B8BANA

1    willful or evil purpose to threaten, intimidate, or corruptly

2    persuade, or attempt to do so, a witness.  And that there is no

3    condition or combination of conditions that will assure the

4    safety of a person or the community, or the defendant is

5    unlikely to abide by those conditions.

6              THE COURT:    And if probable cause is found --

7              MR. COHEN:    There is a rebuttal presumption.

8              THE COURT:    -- there is a presumption.

9              MR. COHEN:    There we think the presumption was

10   rebutted because there are conditions that the Court can

11   design -- and designed last week, in fact -- to address the

12   concern, which was the temporary order the Court entered on the

13   consent of the parties.  And certainly we think that does it,

14   in terms of resolving this issue, but we would be amenable to

15   any other condition the Court thought was appropriate.

16              And when you look at the cases that construe these

17   legal standards, your Honor, the case cited by the parties is

18   *LaFontaine*, and it's one of the leading Second Circuit cases on

19   that.  The facts in that case are so dramatically different

20   from what we have here, where there was a finding that the bail

21   should be revoked.  There you had a bail condition that said

22   the defendant should not contact Witness-X, and it was

23   undisputed that the defendant went out and contacted Witness-X.

24   You had an indictment of the defendant for witness tampering.

25   You had an MCC tape in that case that had been played by the

N8B8BANA

1    defendant for the witness in violation of the protective order.

2    And even on that record, Judge Mukasey, who was the district

3    court judge at the time, determined it was a close call to

4    order remand.  And the Circuit in affirming said -- and I am at

5    page 7 of the printout, but I can get the actual page for your

6    Honor -- although we, like the district court, deem this aspect

7    of the case a close call, they were not going to overturn the

8    district court's determination.

9              And that's on facts that we would submit, your Honor,

10   are dramatically different from what we have here.  We don't

11   really have on this record a basis to satisfy the standard.  We

12   are not even close to *LaFontaine*.  We are not close to the

13   *Brown* case, where there was proof that the defendant had

14   offered a bag of cash to the witness.  We are also not close on

15   the 3142(f)(2)(B) standard, which your Honor addressed in the

16   *Stein* case, and also the Circuit addressed in the *Vendetti*

17   case, where the facts were very, very extreme of pretty obvious

18   repeated violations on a record that was not disputed.

19             And here we have, frankly, with respect, a very thin

20   record with a lot of spin.  Let's start with Witness-1.  When

21   we were last before your Honor on this, this was sometime in

22   March or April.  I apologize, I don't remember the exact date.

23   We were told, your Honor, this is a dramatic, dramatic

24   situation, it's a terrible thing, our client has attempted to

25   tamper with Witness-1.  We objected to that characterization

N8B8BANA

1    for record purposes, which the Court permitted us to do, but we

2    didn't litigate the issue because we thought we had resolved it

3    with a practical bail condition.

4            It gets raised now again, re-purposed as some effort

5    to create a pattern, maybe to get the Court to find there is a

6    pattern here.  But since that time in March and April, we have

7    gotten discovery from the government, which we didn't have at

8    the time, and also have been able to do our own review, which

9    shows that that e-mail and Signal chat in question was the end

10   of a sequence, not the beginning of a sequence.

11           THE COURT:    Well, I question that, frankly.  The

12   sequence of documents involves an exchange of some messages in

13   the middle of November, initiated you say by Witness-1, and

14   that may well be true.  And then we have the January 15 e-mail,

15   which is what you're talking about that the government relies

16   on.  And in between there was something very important.  The

17   company went bust.  The defendant got arrested.  He was

18   charged.  And what went before and what went after I find a lot

19   of trouble in reconciling.

20           MR. COHEN:    Although the in-between is more

21   complicated, your Honor.  It's not one message from Witness-1.

22   It's a follow-up message on November 13, at a time when we

23   know, because it was public, that the defendant was under

24   investigation, at a time when we now know that Witness-1 and

25   others were meeting with the government about the defendant.

N8B8BANA

1          THE COURT:  But not known then.

2          MR. COHEN:  I think it was known then.  The meetings

3     with the government were public.

4          THE COURT:  Where is the evidence of that?

5          MR. COHEN:  It was reported, I don't have it in front

6     of me, your Honor.

7          And then, I think the fair interpretation of this,

8     your Honor, is there's a couple of reach-outs.  There is an

9     effort to help.  My client making many public statements that

10    the government has pointed to, that he doesn't back away from,

11    that he was trying to help restore customers, get funds back

12    for customers.  And then the final end of the sequence, the

13    reach-out to Witness-1, John Ray, and the law firm for the

14    company.

15          Now, the notion that someone is trying to tamper with

16    a witness, or tend to tamper with the witness, makes no sense

17    when we are talking about the general counsel of a company,

18    that he doesn't control, who himself is represented by his own

19    counsel, who is working with company counsel, who is reporting

20    to the government.  It doesn't make any sense that this would

21    be the basis for some alleged tampering.  And the government,

22    with respect, is so hard-pressed, in its reply we are getting

23    interpretations of whether he used the word "resource" or

24    "resources," and we are told the use of the plural tense is

25    what turns this into witness tampering.

1          Judge, that is nothing like what was in *LaFontaine*.

2     That's nothing like what was in the other cases that both

3     parties have cited, and I am sure the Court is very familiar

4     with.  It doesn't meet the standard under 3148.  And it doesn't

5     meet the standard under 3142.

6          Now, turning to the other topics, I thought your Honor

7     asked a very good question about -- all your questions are very

8     good, but the question about VPN, that is not offered as

9     evidence of witness tampering because it couldn't be.  It's a

10    very circular way to get to some effort to violate bail

11    conditions, when the use of a VPN, I think it's undisputed, is

12    not inherently deceptive.  It's used by companies to give

13    remote access.  It's used by the government.  And, in fact, the

14    solution to give access to the AW database that the debtor

15    insisted upon, when we did that long document for the Court's

16    approval, was that a VPN be used.  So that doesn't carry the

17    day.

18          And that brings us to really the only thing new, which

19    is the communication with the reporter.  And one thing we

20    should start with is, the only reason we know about this, your

21    Honor, is because the defendant was complying with his bail

22    conditions.  A security guard reviewed the reporter.  He was

23    logged in.  The communications that were made were made on the

24    pen register.  And, as we went over last time, there has been

25    conservatively a million stories about this case, hundreds of

1     thousands about the defendant.

2          THE COURT:    And there is no record at all, other than

3     the three or so pages you have turned over, of what passed

4     between your client and the reporter in that meeting, or in

5     whatever it was, or of preceding conversations on the

6     telephone, save whatever notes the reporter may have, which he

7     is not about to turn over without going from here to the

8     Supreme Court and back.

9          MR. COHEN:    Right.

10         But, stepping back, there was no gag order in the

11    original bail conditions or any of the modifications either

12    before the magistrate judge or before your Honor.  A defendant,

13    as we have discussed last time and in our submission, is

14    permitted under the First Amendment to speak about his case, to

15    speak about his view of his case.  He is not limited, as

16    counsel just suggested, to saying, I think I'm innocent, that's

17    it.

18         THE COURT:    Of course not.  But do you disagree that

19    the law is that once the communication is undertaken as part of

20    or with the intent to intimidate or influence a witness, it's a

21    crime, and the First Amendment has nothing to do with it?  Do

22    you disagree with that?

23         MR. COHEN:    What I would say, your Honor, is that,

24    where a defendant has a reasonable and fair belief that he is

25    allowed to engage in fair comment, he is not acting with the

1     intent required under 1512. I think that's the appropriate way

2     to think about it.

3                And what I keep coming back to, your Honor --

4                THE COURT:    You think if two guys walk into a store

5     and say to somebody, boy, this is an awfully nice store you

6     have here, it would be a shame to see it burned to the ground,

7     and, you know, maybe you ought to be nice to us.

8                Now, I suppose it could be said that those fellas

9     walking into the store are just civic-minded people who are

10    expressing their fair comment on the nice operation the man has

11    and how terrible it would be if something happened, and yet, if

12    the intent is to intimidate the man, the owner, it's a crime,

13    and the fact that it was committed by speaking words doesn't

14    give it any First Amendment protection at all.

15                Do you disagree with that?

16                MR. COHEN:    I would say it depends on the facts, your

17    Honor.

18                THE COURT:    Well, what depends on the facts is what

19    the intent was.

20                MR. COHEN:    Correct. I agree with that. And on this

21    record, which is what we are operating on, the showing has not

22    been made. The example you just gave is the sort of example

23    you would see in a case like *LaFontaine* and *Brown* and so forth.

24                THE COURT:    That's an easy case.

25                MR. COHEN:    I would agree with your Honor.

N8B8BANA

1              But what if, for example, and this is to pick up on

2      your Honor's point, a journalist calls the defendant and says,

3      you have been indicted, the government says you're guilty, what

4      do you have to say?  And the defendant says, well, I think not

5      only do I think I'm innocent, I think someone else did it, and

6      I think the witnesses against me are lying.  That's *Gentile*.

7      That's the Supreme Court case in *Gentile* which says that's

8      permitted.  And here we have a situation where the defendant

9      fairly believed, in our view, that he was able to make these

10     comments, at the time when it was not inconsistent with the

11     protective order, it's not inconsistent with the bail

12     conditions, it's not inconsistent with any order that had been

13     issued by the Court.  Obviously, it would be a different

14     situation after last week when the Court had issued the

15     temporary order, that would be a very different analysis.

16              So, your Honor, we submit that when you come back to

17     what the cases say and what the rule says, the statute says --

18     we are talking about 3148, but 3142(f), as I'm sure your Honor

19     knows, has a clear and convincing standard to show,

20     essentially, the elements of witness tampering and, again, that

21     there is no condition or combination of conditions that would

22     assure the appearance -- we think the showing hasn't been made

23     on this record, that the Court, as it has already, can craft

24     conditions, which would be extending the temporary order to a

25     permanent one.  If there are other conditions the Court would

N8B8BANA

1    like to add, I am sure we would be amenable to it.  But here we

2    are two months before trial, your Honor, we want to be able to

3    prepare for trial in a realistic, meaningful way.  Getting sort

4    of boilerplate platitudes about how everything can be converted

5    to hard drives in a week, we are still getting discovery that

6    was promised to us two months ago, so I am skeptical of that.

7            That was all I wanted to say, your Honor.  I think if

8    the Court would like further discussion on the First Amendment,

9    Mr. Everdell is prepared to address that.

10            THE COURT:    I don't think there is really a dispute

11    about the First Amendment.  I think the principles are clear.

12    The question, as you rightly said, are the facts.

13            MR. COHEN:    I know at the end of the last conference

14    the Court said it was interested in the First Amendment issues.

15            THE COURT:    Of course.  It's a serious question, and I

16    have spent a lot of time looking into it and reading all the

17    material you submitted, none of which alluded to the problem of

18    speech with a criminal intent.  Quite a significant omission,

19    if I may say so, especially whence it came.  But there we are.

20    I don't think I need anything further.

21            MR. COHEN:    I agree with your Honor, it's

22    fundamentally a fact determination.  That on this record before

23    the Court, given the two standards that the government is

24    relying on, we are not even close to those cases, and the right

25    way to address this is with appropriate conditions.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:    Thank you.

2          Anything else, Ms. Sassoon?

3          MS. SASSOON:    Just briefly, your Honor.

4          I think the fact that the defendant here was more

5    subtle in his methods than a mobster does not mean that the

6    conduct was benign, that it wasn't designed to evade his bail

7    conditions, and that it wasn't done with a criminal intent,

8    especially here when some of the behavior tracked the

9    defendant's MO while he was CEO of FTX, and that includes

10    instructing his employees to delete their messages and telling

11    multiple people a variation of, there is only downside to

12    putting things in writing, especially when it comes to

13    regulators.  And then doing that same thing here of meeting in

14    person with a reporter who he had active communication with by

15    other methods.  The clear inference is that he was continuing

16    the same type of technique to avoid detection, which is not the

17    behavior of someone who reasonably and fairly believes what he

18    is doing is just fair comment, when he is secretively providing

19    documents and not agreeing to be identified as the source for

20    the article.

21          I also want to make clear that, while we think that

22    this was done improperly and to intimidate Caroline Ellison a

23    couple of months before trial, the Court need not find that

24    this conduct itself was witness tampering under a criminal

25    statute for detention to be appropriate here.  One of the bases

N8B8BANA

1    that we argued for detention is 18 U.S.C. 3148, and if the

2    Court deems the contact with Witness-1 to have been witness

3    tampering under the probable cause standard, that triggers the

4    rebuttable presumption.  And it's enough for the Court to then

5    conclude under either subsection that detention is appropriate,

6    and one of those is that he is unlikely to abide his bail

7    conditions.

8               And so, even if the Court concludes that the conduct

9    with respect to Ms. Ellison falls short of *LaFontaine* or the

10   other cases that you have been looking at, detention is still

11   appropriate here given all of the evidence that this is not a

12   defendant who is likely to abide by his bail conditions and who

13   seems intent on interfering with the integrity of the trial.

14              THE COURT:    Thank you.

15              MR. COHEN:    Your Honor, if I might briefly respond?

16              THE COURT:    Briefly.

17              MR. COHEN:    Again, nothing in counsel's presentation

18   changes the record.  The defendant did not intend to tamper

19   with witnesses, and the record doesn't support it under either

20   the 3148 or 3142 standard.  We get more allegations and no

21   proffer of proof.  As the Court knows, we have denied the

22   allegations about deletion.  We plan to contest that at trial.

23              THE COURT:    I'm sorry.  You have denied the

24   allegations about?

25              MR. COHEN:    Deletion.  What counsel just said that he

1    was directing deletion of e-mails.

2              THE COURT:    He was directing the use of an encrypted

3    app and that it be set to delete everything after 30 days,

4    isn't that true?

5              MR. COHEN:    We dispute that that was done for the

6    purpose of --

7              THE COURT:    You don't dispute that it was done, right?

8              MR. COHEN:    We also don't dispute that that very

9    system was used by everyone in the company, including the

10   lawyers.

11             THE COURT:    That's neither here nor there.  I am

12   trying to get to the question of whether you acknowledge that

13   at his direction that system was used, whether it was because

14   he liked apple pie or for some other reason.

15             MR. COHEN:    It doesn't quite work like that.

16   Sometimes he would do it, sometimes others would do it.

17             THE COURT:    Sometimes he would do what?

18             MR. COHEN:    He would put on the delete function,

19   sometimes others would.

20             THE COURT:    And didn't he instruct people to use it?

21             MR. COHEN:    Not for the purpose the government is

22   suggesting.

23             THE COURT:    I guess I am not going to get a straight

24   answer, Mr. Cohen.  I appreciate how candid you have been all

25   through this proceeding.  I admire the work you have done here,

N8B8BANA

1    to tell you the truth.  But it's a simple question.  May I have

2    an answer?

3                    (Counsel confers with defendant)

4                    MR. COHEN:    There is a distinction here that I'm not

5    sure is relevant to the discussion we are having with the

6    Court.  But certainly the defendant would set some of his own

7    settings to delete, and I think that's the Court's question.

8                    THE COURT:    No, it wasn't.  It was included within the

9    question, but the question went more broadly to people in the

10   company.

11                   MR. COHEN:    He disputes that.

12                   THE COURT:    At all.  He never gave such direction?

13                   MR. COHEN:    He disputes that, your Honor.

14                   Lastly, in terms of the last point that counsel made,

15   that was under a 3148 factor about unlikely to abide by

16   conditions.  And I think there is a good record here of the

17   defendant abiding by very complex conditions.  In fact, the

18   reason we have this instant dispute presented to the Court is

19   because the conditions were followed.

20                   So, again, we submit that the Court can construct a

21   set of conditions that would be the least restrictive

22   alternative to assure the safety of a person or the community.

23                   THE COURT:    Thank you.

24                   Ms. Sassoon, am I incorrect in recalling that earlier

25   in these proceedings about bail, over many months, there was a

N8B8BANA

1    representation or a proffer not only that the defendant had

2    instructed others in the company to use the delete function,

3    but also made a comment to the effect that legal cases are

4    built on documents and that's why you should do it, or words to

5    that effect?

6         MS. SASSOON:    Yes, your Honor.  And, as the Court and

7    the parties know, at a bail hearing you can proceed by proffer.

8    I am surprised to hear defense counsel dispute that this was a

9    company-wide policy that the defendant instituted.  And if the

10   Court thought it was relevant or important, we could provide

11   more documentation of that.

12         For purposes of today, I will say we previously made

13   that proffer to the Court, and just yesterday we were meeting

14   with a different witness, who also stated that the defendant

15   instituted this auto-deletion policy and indicated to him that

16   it was only downside if their company communications were in

17   writing because regulators could review them.  And that's in

18   sum and substance what was proffered to us.

19         And we have also seen, in the evidence and records in

20   this case, that around August 2021, these auto-delete features

21   were instituted on company communications, and it's our

22   understanding from our investigation that this was a policy

23   instituted by the defendant.

24         THE COURT:    Mr. Cohen, does your client dispute the

25   substance of the remark attributed to him about there being

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N8B8BANA

1    only downside if communications were in writing?

2         MR. COHEN:    Your Honor, I think what my client would

3    say is a couple of things on that.  That what he said, and

4    witnesses may be misremembering it, is don't write things that

5    could be taken out of context, which is very different from the

6    way that it's being presented in the court.  That's what we

7    thought then, that's what we thought at the time.

8         And as your Honor may recall, there was some

9    litigation about us trying to get access to the files from the

10   outside law firm because the policies, at least our client's

11   understanding, and there's billing records to confirm this, the

12   policies about deletion and so forth were reviewed by an

13   outside and an inside firm.  So we just have a very different

14   view of this evidence, your Honor, and obviously that's for

15   trial.

16        THE COURT:    Okay.  Thank you.

17        I am prepared to rule on this now, and it may take

18   more than five minutes.

19        As we all know, the defendant in this case is charged

20   with perpetrating a multibillion dollar fraud relating to his

21   operation of cryptocurrency companies that he founded and

22   controlled, FTX and Alameda.  He was arrested in the Bahamas on

23   December 12, 2023 and extradited to the United States on or

24   about December 21.  He initially was released on a $250 million

25   personal recognizance bond, subject to conditions, including

N8B8BANA

1    detention in his parents' home in California.

2              At the same time, the government announced that

3    Caroline Ellison and Gary Wang both had pleaded guilty in this

4    case and were cooperating with the government.  Both formerly

5    were senior executives of one or both of the defendant's

6    companies, and perhaps others, and in the case of Ms. Ellison,

7    formerly had been in one or more intimate relationships with

8    the defendant.

9              Over the ensuing months, the better part of a year by

10   this time, the conditions of defendant's release have been

11   tightened, at least twice that I remember, and probably more

12   times, in response to government concerns that the defendant

13   was tampering or might tamper with witnesses or engage in other

14   troublesome conduct.

15             On July 20, the government again moved to tighten the

16   conditions of the defendant's release, at that time by limiting

17   extrajudicial statements by the parties and witnesses that were

18   likely to interfere with a fair trial.  Its focus was largely

19   on the defendant's alleged leak of private materials of Ms.

20   Ellison to the New York Times.

21             Also, following some concessions by the defendant and

22   the receipt by the government of additional information,

23   basically relating to the frequency of the defendant's contacts

24   with media, but also others, the government, on the 26th of

25   July, orally moved to revoke the defendant's bail.  Since then

N8B8BANA

1    I have received submissions by members of the media and from a

2    well-known constitutional scholar who submitted views in this

3    case in the unusual form of an affidavit rather than an amicus

4    curiae brief.  But all of these were addressed to the

5    contention that limitations on extrajudicial statements would

6    violate the First Amendment.  I have since had rather full

7    briefing and heard argument.

8            Now, I am going to focus on Section 3148(b), which

9    provides, in relevant part, that a judge shall enter an order

10   of revocation and detention if after a hearing the judge finds:

11           First, that there is either probable cause to believe

12   that the person has committed a federal, state or local crime

13   while on release, or that there is clear and convincing

14   evidence that the person has violated any other condition of

15   release; and in addition finds either, based on factors set

16   forth elsewhere in the Bail Reform Act, there is no condition

17   or combination of conditions of release that would assure that

18   the person will not flee or pose a danger to the safety of any

19   other person or the community, or, alternatively, that the

20   person is unlikely to abide by any condition or combination of

21   conditions of release.

22           If there is probable cause to believe that a

23   defendant, while on release, committed a felony, then -- and I

24   quote -- "a rebuttable presumption arises that no condition or

25   combination of conditions will assure that the person will not

N8B8BANA

1   pose a danger to the safety of any other person or the

2   community." And I refer to 18 U.S.C. 3148(b) and the

3   *LaFontaine* case to which counsel have referred.

4           The government's position is that the record in this

5   case now establishes that there is probable cause to believe

6   that the defendant committed attempted witness tampering and/or

7   attempted obstruction of justice, either of which would be a

8   felony, and I am going to address witness tampering.

9           The relevant statute is 18 U.S.C., Section 1512(b),

10  which provides in substance, and in relevant part, that whoever

11  knowingly uses intimidation, threatens or corruptly persuades

12  another person, or attempts to do so, with intent to influence,

13  delay, or prevent the testimony of any person in an official

14  proceeding is guilty of a felony.

15          I have previously written, following the Second

16  Circuit's decision -- namely, *LaFontaine* -- that nonviolent

17  witness tampering and obstruction poses a danger to the

18  community and that the risk of such activities in an

19  appropriate case would support pretrial detention. *United*

20  *States v. Stein*, 2005 WL 8157371, at *2 (S.D.N.Y. Nov. 14,

21  2005). Probable cause exists when there is a practical

22  probability that the evidence supports a finding that the

23  defendant has committed a crime while on bail.

24          Now, let's look at the factual basis the government

25  relies on. On January 15, the defendant sent the general

N8B8BANA

1   counsel of FTX US, who has been referred to as Witness-1, the

2   following message via Signal, an encrypted communications

3   medium: "Hey, I know it's been a whole while since we have

4   talked, and I know things have ended up on the wrong foot. I

5   would really love to reconnect and see if there is a way for us

6   to have a constructive relationship, use each other as

7   resources when possible, or at least vet things with each

8   other. I would love to get on a phone call sometime soon and

9   chat."

10           The defendant has proposed a quite benign reading of

11   that message. It's one I didn't share at the beginning, and I

12   don't share it now.

13           The message is addressed to Witness-1 and seeks

14   reconciliation of an apparently damaged personal relationship.

15           Now let's focus on the time period. The previous

16   communications, at least written communications, between Mr.

17   Bankman-Fried and Witness-1 had been before the disaster really

18   struck publicly, before the defendant was indicted, before Ms.

19   Ellison and Mr. Wang were known to be cooperating with the

20   government and pleading guilty. Witness-1 says in this January

21   15 message -- excuse me, Mr. Bankman-Fried says, "The

22   relationship was left in a bad place and we haven't talked for

23   quite a long time," suggesting that they hadn't been in contact

24   since before, to use a colloquial phrase, it all hit the fan.

25   And the message proposes that the defendant and Witness-1 "vet

1    things with each other."

2            Now, this isn't the time for a final after-trial

3    determination about what all of this meant.  It's a time for

4    assessing probable cause.  The message, in my opinion, in its

5    entirety seems to be an invitation for Witness-1 to get

6    together with Mr. Bankman-Fried so that his views and

7    recollections would be on the same page with the defendant's

8    version of events, and in that way make the relationship

9    between the two of them more constructive.  In the past, I

10   referred to this as probably being an effort to have the two of

11   them sing out of the same hymn book for their mutual benefit,

12   and I rather suspect that as of January 15, with indictments of

13   some top people in the company already having come down, Mr.

14   Bankman-Fried was wondering whether Witness-1 was wondering

15   whether Witness-1 might be on the list in the future.

16           Now, Mr. Cohen, and I meant every good thing I said

17   when I had an exchange with him before, he's a wonderful lawyer

18   and he's doing a wonderful job, has a different view.  He says,

19   when I reached that view at the beginning of February, that I

20   didn't have the full context of these communications, which he

21   says show that this Signal message to Witness-1 was benign and

22   when you consider it all together, it doesn't support probable

23   cause.  I don't agree with that.

24           Mr. Cohen submits evidence that Mr. Bankman-Fried and

25   Witness-1 exchanged messages in mid-November, but that was in a

1    different world.  That was almost two months before this

2    January 15 message.  While it may be true historically that the

3    first of these messages between the two individuals was made by

4    Witness-1, that first message happened long before the time

5    period in which the January 15 message was written, and the

6    January 15 message, obviously, by its own terms, reinitiated

7    the communication between them that had lapsed for some time.

8            So I don't buy the argument that it was Witness-1 who

9    reached out first to encourage the defendant to align his

10   efforts with Witness-1, except in one maybe narrow sense.  It

11   was to everybody's interest, once Mr. Bankman-Fried had been

12   indicted, once the companies had gone bust, to support customer

13   assets and recover as much as could be recovered.  That all

14   stood potentially to benefit everybody.

15           So the January 15 conversation, or overture, or

16   message, to be more precise, comes about in a radically

17   different context than the ones on which the defendant relies

18   as showing that I took this out of context.  I didn't at all.

19   And it's his evidence that proves it.

20           There is no evidence before me of any communication

21   between Witness-1 and the defendant following the defendant's

22   arrest or even after mid-November until January 15.

23           The second point is this.  The defense relies on the

24   fact that Mr. Bankman-Fried communicated with John Ray, who

25   once Mr. Bankman-Fried was out of these companies was the

32

N8B8BANA

1    receiver or liquidator, or whatever the magic term is under

2    Bahamian law, of FTX, and with a partner at Sullivan &

3    Cromwell, which is representing the FTX debtors I believe.

4            Now, first of all, there is a vast difference between

5    John Ray and Sullivan & Cromwell, on the one hand, and

6    Witness-1 on the other.  Witness-1 is a witness to the charged

7    crimes.  Mr. Ray and Sullivan & Cromwell, so far as this record

8    shows, were not.  The interest of Ray and Sullivan & Cromwell

9    was to marshall the assets.  Mr. Bankman-Fried evidently

10   thought helping them do that, to the extent he might accomplish

11   that, would help Mr. Bankman-Fried, but it wasn't because they

12   were going to help him as witnesses in this case.

13           Secondly, unlike Mr. Bankman-Fried's messages to

14   Mr. Ray and Sullivan & Cromwell, his message to Witness-1

15   referred to Bankman-Fried, on the one hand, and Witness-1

16   "using each other as resources" and "vetting things with each

17   other."  Nothing like that was said to Ray and Sullivan &

18   Cromwell.  Those are things that are said between people with a

19   common interest in a litigation situation like this one.

20           Finally, in Mr. Bankman-Fried's messages to Mr. Ray,

21   he copied his attorneys.  He did not copy any attorneys on the

22   message to Witness-1.

23           I can imagine that a jury conceivably might conclude

24   that the message to Witness-1 was not what it now appears to

25   have been.  But in my mind there is a practical probability

N8B8BANA

1   that the message was an attempt to have Witness-1 and the

2   defendant, to use the phrase I used in February, sing out of

3   the same hymn book, and it was an attempt at witness tampering.

4           I come to the more recent event, which relates to the

5   New York Times July 20, 2023 article, titled "Inside the

6   Private Writings of Caroline Ellison, Star Witness in the FTX

7   case." The article quotes from personal diaries and other

8   private documents written by Ms. Ellison. They describe her

9   feelings and insecurities with respect to her work at Alameda

10  and her personal relationship with the defendant. The article

11  doesn't state the source or sources of the quoted materials,

12  the documents. It now is undisputed that the defendant spoke

13  to at least one of the New York Times authors many, many times

14  in the period preceding the publication and, on the virtual eve

15  of the publication of the article, entertained that reporter at

16  his parents' home in Palo Alto, California, and showed the

17  reporter allegedly a small portion of Ms. Ellison's private

18  writings. Those writings portrayed Ms. Ellison in an

19  unfavorable light. I don't know what else was shown. I don't

20  know what else was said. The defense has not proffered that.

21  The government has not either, presumably because they don't

22  have it.

23          Based on the government's public filings and

24  statements in court, it had been known widely, at least since

25  the defendant was presented in this court in November, months

1    before the Times article was published, that Ms. Ellison would

2    be an important witness at the defendant's trial.  It is the

3    government's position that -- and I am quoting the government

4    here -- "by sharing Ms. Ellison's private writings about her

5    insecurities and heartache with the hope that it would be

6    published in the New York Times, the defendant's conduct was

7    intended, at least in part, to harass Ellison and to hinder,

8    prevent or dissuade her from testifying, or to influence the

9    testimony of Ellison, and to influence or prevent others by

10   creating the specter that their most intimate business is at

11   risk of being reported to the press, and thus to influence

12   prospective jurors."

13          Now, I lost where I should have closed that quote.  I

14   will fix that in the transcript.  But the substance of what I

15   just read out is the substance of the government's position,

16   which in any case is already a matter of public record because

17   I am taking it out of a publicly filed document.

18          Now, the defendant's main response has been that the

19   defendant has a First Amendment right to communicate with the

20   press, and certainly the various press organizations that have

21   been heard from on my docket take the same position.

22          I am exceptionally mindful of the defendant's First

23   Amendment rights, and there isn't any question that having

24   frequent contact with the press on its own, and for no malign

25   purpose, does not constitute obstruction or witness tampering

N8B8BANA

1  or anything else criminal.  But the First Amendment arguments,

2  as I think is clear from my colloquy with counsel, ignore a

3  very well established principle that has been articulated in a

4  line of Supreme Court decisions going back to a case called

5  *Giboney v. Empire Storage*, 336 U.S. 490 (1949), decided in the

6  40s.  The Supreme Court there said, "It has never been deemed

7  an abridgment of freedom of speech or press to make a course of

8  conduct illegal merely because the conduct was in part

9  initiated, evidenced, or carried out by means of language,

10  either spoken, written or printed."  *Id.* at 503.  And lest

11  anybody think I am relying on ancient legal history from the

12  last century, the Supreme Court repeated that point within the

13  last couple of weeks in *United States v. Hansen*, in which it

14  held that "speech intended to bring about a particular unlawful

15  act has no social value" and therefore "is unprotected."

16            Thus, a defendant's speech is not protected to the

17  extent that it is intended to bring about a crime; where such

18  an intent is present, the speech becomes part of a crime.  And

19  that's precisely why my hypothetical of two thugs going into a

20  grocery store and making the statement that I related to

21  counsel during the colloquy is a crime.  The purpose of that is

22  to extort the grocery store.  And the fact that the extortion

23  is carried out by spoken words and, indeed, no physical actions

24  other than being there, doesn't matter.

25            It's worth noting also that a defendant may be

N8B8BANA

1    convicted even of a specific intent crime as long as the

2    defendant acted out of mixed motives, as long as one of those

3    motives satisfies the necessary criminal intent.  I cite, for

4    example, *United States v. Technodyne*, 753 F.3d 368, at 365.

5              So the question boils down to whether there is a

6    practical probability that Mr. Bankman-Fried was motivated even

7    in part by a desire to influence or intimidate Ms. Ellison

8    and/or other witnesses.

9              Now, the defense has made a lot of the fact that he

10   has gotten a lot of bad press and he is entitled to try to

11   repair his reputation.  Fair enough.  I assume for the purposes

12   of this discussion that that was a material part of his

13   motivation in all of his speaking out to the press.  But I find

14   that there was a practical probability that with respect to the

15   communication with Witness-1 and Ms. Ellison, and quite likely

16   others, whose names we don't even know, or at least I don't at

17   this point, was intended also, even if in modest part, to

18   influence those people, to have them back off, to have them

19   hedge their cooperation with the government in the case of

20   those who have agreed to cooperate.

21             And there are other circumstances that support my

22   judgment that there is probable cause to believe he acted at

23   least in part with that motive.  I find it significant that the

24   defendant, rather than providing copies of the excerpts from

25   Ellison's private papers to a reporter with whom he had been in

N8B8BANA

1    close touch, he had the reporter come to his home, and didn't

2    give him copies; he let the reporter read it and take notes

3    from it. We know he took notes because there are quotes in the

4    New York Times that are identical to the language in those

5    documents. It was a way, in his view, of doing this in a

6    manner in which he was least likely to be caught; not

7    impossible to be caught, least likely. He was covering his

8    tracks.

9              Also, the content of these documents in some respects

10   tends to support the conclusion they are extremely, in some

11   parts, personal and intimate. Those parts are relationship

12   oriented, not business, commercially or legally oriented,

13   except -- and I don't say that's universally true of the

14   content, but it is true of parts of the content -- they are

15   something that someone who has been in a relationship, or is in

16   a relationship, would be very unlikely to share with anybody,

17   lest the New York Times, except to hurt, discredit, and

18   frighten the subject of the material. Those views are not

19   essential to my conclusion, but I believe they tend to support

20   it.

21             In view of the evidence, specifically the proffers

22   presented by both sides, to the extent each is uncontradicted,

23   my conclusion is that there is probable cause to believe that

24   the defendant has attempted to tamper with witnesses at least

25   twice within the meaning of 18 U.S.C., Section 1512(b). I am

1    speaking of Witness-1 and Ms. Ellison.

2                Accordingly, under Section 3148, there is a rebuttal

3    presumption that no condition or combination of conditions will

4    assure that Mr. Bankman-Fried will not pose a danger to the

5    safety of any other person or his community if he remains at

6    liberty.  It's well established in prior cases that the safety

7    of the community includes protecting the community against the

8    consequences of witness tampering.

9                Mr. Cohen admirably argues that the presumption has

10   been rebutted.  I disagree.  He has offered up a gag order on

11   all communications with the press.

12               Now, it's not, strictly speaking, exactly that broad,

13   but the problems are multiple with such a thing.  I don't have

14   the text of the temporary order before me.  Maybe, Andy, you

15   can put it on my computer screen.  Here it is.

16               The temporary order that I signed on July 26, for one

17   thing, has a carve-out from media contacts for assertions of

18   innocence or references to information that is contained either

19   in publicly filed court filings or transcripts of court

20   proceedings in the case.  So right away, even if the gag on

21   communications with the media were in effect long term, it

22   doesn't really stop all communications with the media.  It

23   leaves one fighting about what are references to information

24   contained in various kinds of documents.

25               More broadly, the operative part, the first and most

1    significant part of the previous order, would prohibit him, if

2    I were to adopt this long-term, from communicating with any

3    public communications media anything about the case.  In this

4    day and age, I don't know what public communications media are,

5    and I don't think anybody else does either.  Is that anybody

6    who posts on Instagram?  How about people who comment on the

7    Washington Post opinion pieces?  It's arguably anybody who

8    wants to be included.  Moreover, judging by the submissions I

9    have received from the media, even if I were to go along with

10   this despite the problems, I'd rather imagine we would be in

11   for collateral litigation of some moment.  I don't think that

12   it's a workable solution longer term, particularly with someone

13   who has shown a willingness and desire to risk crossing the

14   line in an effort to get right up to it, no matter where the

15   line is.

16           It's certainly true, for example, that his use of the

17   VPN to watch a football game over an account on which he wasn't

18   entitled to watch it from the United States didn't violate any

19   of his bail conditions.  It wasn't even a big deal in and of

20   itself, but there it is.  He subscribed to this service from

21   the Bahamas, then used a VPN to log into it as if he were in

22   the Bahamas, when he was sitting in Palo Alto and could have

23   watched the game on public television.  It says something about

24   the mindset.  The means of sharing the documents with the New

25   York Times says to me something about the mindset.  And I think

N8B8BANA

1    he has already, without violating any other bail condition,

2    save that he not commit another crime, has gone up to the line

3    over and over again.

4              So all things considered, I am going to revoke bail,

5    but I have a couple of other things to say.  I fully appreciate

6    everything that Mr. Cohen said last time we were together and

7    today concerning the desirability of continuing trial

8    preparation without the defendant being incarcerated.  It's not

9    one of the factors that I am obliged or, indeed, arguably even

10   permitted by the statute to consider here, but I have

11   considered it.  I was a trial lawyer in my youth and I know

12   what Mr. Cohen is talking about, and I appreciate it.  I don't

13   think, however, that the revocation of bail is quite the

14   insurmountable problem that has been made out.

15             Now, Ms. Sassoon spoke about the possibility of

16   detention in the Putnam County Correctional Facility, and that

17   internet access of some kind would be available there.  And I

18   don't know whether that's actually doable.  And I think if the

19   government has any such thing in mind, they better talk to the

20   marshal for this district who may have views on this subject.

21   And that's the first thing.  I am not opposed to that.  I am

22   not taking any position on it.  But I am more focused on the

23   possibility that he will be detained pending trial at the MDC,

24   which is not on anybody's list of five star facilities.

25             That said, I understand that he could have a dedicated

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N8B8BANA

1    laptop at the MDC, which would be retained in the visiting room

2    area, to which he would have access very liberally -- nine,

3    ten, eleven, twelve hours a day, I'm not sure exactly.  He

4    would be permitted, as I understand it, to retain optical disks

5    and hard drives in his housing area and take them with him when

6    he goes to the laptops.  I understand that these various

7    databases could be put on portable disks or drives.  I am not

8    an expert on how long it would take.  I imagine the necessary

9    software could be put on the laptop, but I'm not an expert on

10   that.

11            I am also aware that the trial date is coming before

12   too very long, and there is a remedy of last resort here if the

13   situation can't be worked out appropriately wherever he is

14   detained.  And that is Section 3142(i) of the Bail Reform Act,

15   which provides in part:  The judicial officer may by subsequent

16   order permit the temporary release of the person, i.e., the

17   defendant, in the custody of the United States marshal, or

18   another appropriate person, to the extent that judicial officer

19   determines such release to be necessary for preparation of the

20   person's defense or for another compelling reason.

21            Now, what that says to me is that, on an appropriate

22   showing, I could entertain -- I am not promising what I would

23   do with it, but I could entertain -- an application for Mr.

24   Bankman-Fried to spend time, possibly significant time as trial

25   approaches, in counsel's office, under supervision and under

N8B8BANA

1    appropriate safeguards, so that any problems with the

2    correctional situation could be avoided for significant periods

3    of time.

4            Ms. Sassoon.

5            MS. SASSOON:    Yes, your Honor.

6            In preparation for this hearing, the government also

7    communicated with the MDC to understand the discovery access,

8    and your Honor is correct that they have dedicated desktops as

9    well as situations where they allow a laptop for discovery

10   review.  The reason why the government is proposing Putnam is

11   because, given where we are in the case and the amount of

12   discovery that has been produced to date given that the

13   defendant was not detained at the outset, the time it would

14   take to load the discovery we have today onto a laptop would

15   take at least weeks, based on our conversations with our IT

16   folks, and we don't have complete visibility at this point into

17   how readable or searchable that data would be in this format,

18   which is why we are proposing Putnam, where instead he could

19   have more immediate access to the discovery through the

20   defense's Relativity database and be able to review the

21   discovery through the internet in the searchable format.

22           My understanding in terms of the marshal's willingness

23   to accommodate this is that Putnam would have room for the

24   defendant, that the FBI would assist in transporting him there,

25   but that for trial itself the defendant would have to be at the

N8B8BANA

1    MDC or somewhere closer, because to transport him here for

2    trial each day I think would be several hours each way.  At

3    that point I think the discovery issues will be more

4    manageable, in that the defendant has had these many months to

5    review discovery, he will have the time in advance of trial to

6    review discovery, and by the time trial itself is actually

7    starting, we will have a universe of trial exhibits that could

8    be easily put onto a drive and accessed and reviewed at the MDC

9    given its expansive hours for discovery review and trial

10    preparation.

11            One last thing.  With respect to 3142(i), I know we

12    are not at that crossroads yet.  My understanding from

13    preliminary conversations is there are some obstacles toward

14    arranging to bring a defendant to a place like an attorney's

15    office from a security standpoint.  But if that is something

16    that the Court wishes to explore, we can get additional

17    information about that.

18            THE COURT:    I think it's sufficient that if we get to

19    the point that Mr. Cohen feels he needs something like that,

20    first explore it, explore it with Mr. Cohen, and if I need to

21    do something, I will do it, provided I am convinced that it's

22    safe and efficacious and so forth.

23            So bail is revoked.  The defendant is remanded.

24            Is there anything else, Mr. Cohen?

25            MR. COHEN:    Yes, your Honor, a couple of things.

N8B8BANA

1          Obviously, we intend to appeal this.  So I believe we

2     are going to need a written order from your Honor so we have

3     something to appeal from.  I don't know if the Court will be

4     issuing one.

5          THE COURT:    Look, you will have the transcript

6     overnight, I'm sure, right?  And I can do a short form order

7     before I leave the premises today.

8          MR. COHEN:    Also, your Honor, we have an application

9     to stay your Honor's ruling today pending appeal.

10          THE COURT:    Ms. Sassoon.

11          MS. SASSOON:    May I have a moment, your Honor.

12          We oppose that, your Honor.

13          THE COURT:    You want to address it?  Who wants to

14     speak first?

15          MR. COHEN:    Your Honor, we submit that there are very

16     important issues here relating to a discussion we have been

17     having -- let me go over here -- a discussion we have been

18     having about application of 3148 and 3142(f)(2)(B).  We have an

19     unusual --

20          THE COURT:    You're aware that I didn't rely on 3142.

21          MR. COHEN:    I understand, your Honor.

22          We have an unusual situation factually, and we think

23     this is something that the Circuit will take on its motion

24     calendar.  We won't docket it as a normal appeal so we can have

25     resolution quickly.  And not to repeat the argument, we

N8B8BANA

1    understand the Court has ruled, but we think there are novel

2    issues here about the application of 3148 and its interplay

3    with 1512, as well as the First Amendment context.  Obviously,

4    we respectfully disagree and want go to the Circuit and believe

5    it can be done promptly.  There has been no allegation of any

6    conduct by the defendant since your Honor issued the temporary

7    order which was more than a week ago.  So we are not talking

8    about a long period of time.  So we would ask that the Court

9    stay today's ruling and allow us time to appeal to the Circuit.

10                  THE COURT:    Thank you.

11                  MS. SASSOON:    Your Honor, this case does not appear to

12    involve a novel application of 3148.  Your Honor found not one,

13    but two instances of probable cause that the defendant

14    committed a felony.  The order would have been supported by one

15    of those alone and by the other indications of the defendant

16    going up against the line of his bail conditions.  And given

17    that finding by the Court, there is a lot of reason for concern

18    that if there is an interim period of several days before the

19    defendant is detained, who knows what kind of mischief he can

20    accomplish in that time with the will to do so.  And so we

21    would oppose.

22                  THE COURT:    Mr. Cohen, I respect your application.  I

23    would have made it myself if I were in your shoes.  You know

24    that.  But I am going to deny it, and I am going to deny it

25    because I disagree that there is anything novel about this

N8B8BANA

1    other than a factual issue.  And the factual issue, and I think

2    our colloquy established that everybody agreed on this, was

3    whether the proffered facts that are not in dispute give rise

4    to probable cause; whether a reasonable person viewing it all

5    would consider it practically likely that the defendant had

6    attempted to tamper.  That is not a question of law.  It has

7    nothing to do with the First Amendment.  I think by the end of

8    the discussion today we all agreed on what the First Amendment

9    had to say about this.  3142 is not involved in this.  I didn't

10   rely on it at all.  And 3148 is clear.

11         You have simply an appeal in which you are going to

12   argue that it was unreasonable for me to find the probability

13   given the facts.  You have a right to take that up, but I don't

14   think the likelihood of success on that is very high,

15   recognizing always that I never think back when my rulings are

16   appealed, and once in a while I find out otherwise.  But that's

17   their job, and I do mine, and we all understand that.  And if I

18   thought there really was a substantial issue, I would give you

19   what you asked, but I don't.

20         Okay.  The defendant is remanded.

21         Thank you, all.

22         MS. SASSOON:    One point just for the record.

23         In the government's view, this should not change

24   anything about the trial schedule or the pretrial deadlines,

25   but we do have a number of deadlines on Monday and Wednesday of

47

N8B8BANA

1    next week.  So I want to confirm that the government intends to

2    stick by those deadlines and inquire if anyone has a different

3    view.

4              MR. COHEN:    We would like to be able to come back to

5    your Honor on that.

6              THE COURT:    Your deadline is Monday?

7              MS. SASSOON:    For motions *in limine* and Rule 404(b)

8    notice, your Honor.

9              MR. COHEN:    We are going to make the Monday deadline.

10   I didn't know that's what counsel was referring to.

11             THE COURT:    So you are going to make the Monday

12   deadline.

13             And then the next deadline after Monday is when?

14             MS. SASSOON:    Wednesday for expert notice and defense

15   notice on advice of counsel and mental defect.

16             MR. COHEN:    We are going to make that deadline as

17   well, your Honor.  I didn't know if counsel meant other

18   deadlines beyond that which may be impacted by an appeal and so

19   forth.

20             THE COURT:    So I think we are all right at least for a

21   few days.

22             MR. COHEN:    Yes.

23             MS. SASSOON:    Part of the concern here is our motions

24   are going to disclose information about the trial.  Again, I

25   see no reason why this should prompt a request for a lengthy

N8B8BANA

1    trial adjournment, but in the event that one is anticipated --

2              THE COURT:    Well, if one is anticipated, I better find

3    out now.

4              Mr. Cohen.

5              MR. COHEN:    Your Honor, we are going to wait and see

6    what we receive from the government, but at the moment we have

7    no application to adjourn the trial date.

8              THE COURT:    Okay.

9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

N8B8BANA

1    have emphasized that in court and in our papers.  We don't view

2    this as a First Amendment issue given the means by which the

3    defendant tried to do this, which we consider amounting to

4    witness intimidation and tampering.

5             THE COURT:    So the line, if I understand you

6    correctly, is where the intent, in whole or in part, is to

7    influence, intimidate, or various other things a witness, yes?

8             MS. SASSOON:    I think it's the intent, and I think

9    that intent is clear here.  But I also think the substance of

10   the communication matters too.  If he came out and said, I'm

11   innocent or I dispute the allegations in the indictment, that's

12   one type of communication.  Whereas, if the substance of the

13   communication can only be understood as trying to influence the

14   public's opinion by discrediting and harassing a witness,

15   that's both part of the witness intimidation, but also part of

16   what the rules, in governing the conduct of the attorneys at

17   the very least, consider tainting the jury and making improper

18   communication.

19            THE COURT:    The conduct informs one's view of the

20   intent, that is the substance of the communication, right?

21            MS. SASSOON:    Yes.

22            In our view, the defense has not really engaged with

23   their view of what the least restrictive conditions should be

24   if the Court accepts the government's view of the evidence.

25   They have raised concerns about discovery access in the event

N8B8BANA

1    thousands about the defendant.

2          THE COURT:   And there is no record at all, other than

3    the three pages you have turned over, of what passed between

4    your client and the reporter in that meeting, or in whatever it

5    was, of preceding conversations on the telephone, save whatever

6    notes the reporter may have, which he is not about to turn over

7    without going from here to the Supreme Court and back.

8          MR. COHEN:   Right.

9          But, stepping back, there was no gag order in the

10   original bail conditions or any of the modifications either

11   before the magistrate judge or before your Honor.  A defendant,

12   as we have discussed last time and in our submission, is

13   permitted under the First Amendment to speak about his case, to

14   speak about his view of his case.  He is not limited, as

15   counsel just suggested, to saying, I think I'm innocent, that's

16   it.

17         THE COURT:   Of course not.  But do you disagree that

18   the law is that once the communication is undertaken as part of

19   or with the intent to intimidate or influence a witness, it's a

20   crime, and the First Amendment has nothing to do with it?  Do

21   you disagree with that?

22         MR. COHEN:   What I would say, your Honor, is that,

23   where a defendant has a reasonable and fair belief that he is

24   allowed to engage in fair comment, he is not acting with the

25   intent required under 1512.  I think that's the appropriate way

N8B8BANA

1      At the same time, the government announced that

2   Caroline Ellison and Gary Wang both had pleaded guilty in this

3   case and were cooperating with the government.  Both formerly

4   were senior executives of one or both of the defendant's

5   companies, and perhaps others, and in the case of Ms. Ellison,

6   formerly had been in one or more intimate relationships with

7   the defendant.

8      Over the ensuing months, the better part of a year by

9   this time, the conditions of defendant's release have been

10  tightened, at least twice that I remember, and probably more

11  times, in response to government concerns that the defendant

12  was or might tamper with witnesses or engage in other

13  troublesome conduct.

14      On July 20, the government again moved to tighten the

15  conditions of the defendant's release, at that time by limiting

16  extrajudicial statements by the parties and witnesses that were

17  likely to interfere with a fair trial.  Its focus was largely

18  on the defendant's alleged leak of private materials of Ms.

19  Ellison to the New York Times.

20      Also, following some concessions by the defendant and

21  the receipt by the government of additional information,

22  basically relating to the frequency of the defendant's contacts

23  with media, but also others, the government, on the 26th of

24  July, orally moved to revoke the defendant's bail.  Since then

25  I have received submissions by members of the media and from a

N8B8BANA

1   community."  And I refer to 18 U.S.C. 3148(b) and the

2   *LaFontaine* case to which counsel have referred.

3              The government's position is that the record in this

4   case now establishes that there is probable cause to believe

5   that the defendant committed attempted witness tampering and/or

6   attempted obstruction of justice, either of which would be a

7   felony, and I am going to address witness tampering.

8              The relevant statute is 18 U.S.C., Section 1512(b),

9   which provides in substance, and in relevant part, that whoever

10  knowingly uses intimidation, threatens or corruptly persuades

11  another person, or attempts to do so, with intent to influence,

12  delay, or prevent the testimony of any person in an official

13  proceeding is guilty of a felony.

14             I have previously written, following the Second

15  Circuit's decision -- namely, *LaFontaine* -- that nonviolent

16  witness tampering and obstruction poses a danger to the

17  community and that the risk of such activities in an

18  appropriate case would support pretrial detention. Probable

19  cause exists when there is a practical probability that the

20  evidence supports a finding that the defendant has committed a

21  crime while on bail.

22             Now, let's look at the factual basis the government

23  relies on.  On January 15, the defendant sent the general

24  counsel of FTX US, who has been referred to as Witness-1, the

25  following message via Signal, an encrypted communications

*[handwritten annotation: United States v. Stein, 2005 WL 815757, at *2 (S.D.N.Y. Nov. 14 2005)]*

29

N8B8BANA

1    medium: "Hey, I know it's been a whole while since we have

2    talked, and I know things have ended up on the wrong foot. I

3    would really love to reconnect and see if there is a way for us

4    to have a constructive relationship, use each other as

5    resources when possible, or at least vet things with each

6    other. I would love to get on a phone call sometime soon and

7    chat."

8            The defendant has proposed a quite benign reading of

9    that message. It's one I didn't share at the beginning, and I

10   don't share it now.

11           The message is addressed to Witness-1 and seeks

12   reconciliation of an apparently damaged personal relationship.

13           Now let's focus on the time period. The previous

14   communications, at least written communications, between Mr.

15   Bankman-Fried and Witness-1 had been before the disaster really

16   struck publicly, before the defendant was indicted, before Ms.

17   Ellison and Mr. Wang were known to be cooperating with the

18   government and pleading guilty. Witness-1 says in this January

19   15 ~~e-mail~~ Message -- excuse me, Mr. Bankman-Fried says, "The

20   relationship was left in a bad place and we haven't talked for

21   quite a long time," suggesting that they hadn't been in contact

22   since before, to use a colloquial phrase, it all hit the fan.

23   And the message proposes that the defendant and Witness-1 "vet

24   things with each other."

25           Now, this isn't the time for a final after-trial

N8B8BANA

1    determination about what all of this meant.  It's a time for

2    assessing probable cause.  The message, in my opinion, in its

3    entirety seems to be an invitation for Witness-1 to get

4    together with Mr. Bankman-Fried so that their *his* views and

5    recollections were *would be* on the same page with the defendant's

6    version of events, and in that way make the relationship

7    between the two of them more constructive.  In the past, I

8    referred to this as probably being an effort to have the two of

9    them sing out of the same hymn book for their mutual benefit,

10   and I rather suspect that as of January 15, with indictments of

11   some top people in the company already having come down, Mr.

12   Bankman-Fried was wondering whether Witness-1 was wondering

13   whether he *Witness-1* might be on the list in the future.

14            Now, Mr. Cohen, and I meant every good thing I said

15   when I had an exchange with him before, he's a wonderful lawyer

16   and he's doing a wonderful job, has a different view.  He says,

17   when I reached that view, at the beginning of February, I *that*

18   didn't have the full context of these communications, which he

19   says show that this Signal message to Witness-1 was benign and

20   when you consider it all together, it doesn't support probable

21   cause.  I don't agree with that.

22            Mr. Cohen submits evidence that Mr. Bankman-Fried and

23   Witness-1 exchanged messages in mid-November, but that was in a

24   different world.  That was almost two months before this

25   January 15 message.  While it may be true historically that the

N8B8BANA

1    first of these messages between the two individuals was made by

2    Witness-1, the first ~~of the~~ *that* messages happened long before the

3    time period ~~that~~ *in which* the January 15 message was written, and the

4    January 15 message, obviously, by its own terms, reinitiated

5    the communication between them, *that had lapsed for some times*

6            So I don't buy the argument that it was Witness-1 who

7    reached out first to encourage the defendant to align his

8    efforts with Witness-1, except in one maybe narrow sense.  It

9    was to everybody's interest, once Mr. Bankman-Fried had been

10   indicted, once the companies had gone bust, to support customer

11   assets and recover as much as could be recovered.  That all

12   stood potentially to benefit everybody.

13           So the January 15 conversation, or overture, or

14   message, to be more precise, comes about in a radically

15   different context than the ones on which the defendant relies

16   as showing that I took this out of context.  I didn't at all.

17   And it's his evidence that proves it.

18           There is no evidence before me of any communication

19   between Witness-1 and the defendant following the defendant's

20   arrest or even after mid-November until January 15.

21           The second point is this.  The defense relies on the

22   fact that Mr. Bankman-Fried communicated with John Ray, who

23   once Mr. Bankman-Fried was out of these companies was the

24   receiver or liquidator, or whatever the magic term is under

25   Bahamian law, of FTX, and with a partner at Sullivan &

N8B8BANA

1    Cromwell, which is representing the FTX debtors I believe.

2              Now, first of all, there is a vast difference between

3    John Ray and Sullivan & Cromwell, on the one hand, and
                  on the other,
4    Witness-1. Witness-1 is a witness to the charged crimes.

5    Mr. Ray and Sullivan & Cromwell, so far as this record shows,

6    were not.  The interest of Ray and Sullivan & Cromwell was to

7    marshall the assets.  Mr. Bankman-Fried evidently thought

8    helping them do that, to the extent he might accomplish that,
           Mr. Bankman-Fried,
9    would help him, but it wasn't because they were going to help
                     es
10   him as a witness in this case.

11             Secondly, unlike Mr. Bankman-Fried's messages to

12   Mr. Ray and Sullivan & Cromwell, his messages to Witness-1

13   referred to Bankman-Fried, on the one hand, and Witness-1

14   "using each other as resources" and "vetting things with each

15   other."  Nothing like that was said to Ray and Sullivan &

16   Cromwell.  Those are things that are said between people with a

17   common interest in a litigation situation like this one.

18             Finally, in Mr. Bankman-Fried's messages to Mr. Ray,

19   he copied his attorneys.  He did not copy any attorneys on the

20   message to Witness-1.

21             I can imagine that a jury conceivably might conclude

22   that the message to Witness-1 was not what it now appears to

23   have been.  But in my mind there is a practical probability

24   that the message was an attempt to have Witness-1 and the

25   defendant, to use the phrase I used in February, sing out of

N8B8BANA

1    the same hymn book, and it was an attempt at witness tampering.

2              I come to the more recent event, which relates to the

3    New York Times July 20, 2023 article, titled "Inside the

4    Private Writings of Caroline Ellison, Star Witness in the FTX

5    case." The article quotes from personal diaries and other

6    private documents written by Ms. Ellison. They describe her

7    feelings and insecurities with respect to her work at Alameda

8    and her personal relationship with the defendant. The article

9    doesn't state the source or sources of the quoted materials,

10   the documents. It now is undisputed that the defendant spoke

11   to at least one of the New York Times authors many, many times

12   in the period preceding the publication, and on the virtual eve

13   of the publication of the article, entertained that reporter at

14   his parents' home in Palo Alto, California, and showed the

15   reporter allegedly a small portion of Ms. Ellison's private

16   writings. Those writings portrayed Ms. Ellison in an

17   unfavorable light. I don't know what else was shown. I don't

18   know what else was said. The defense has not proffered that.

19   The government has not either, presumably because they don't

20   have it.

21              Based on the government's public filings and

22   statements in court, it had been known widely, at least since

23   the defendant was presented in this court in November, months

24   before the Times article was published, that Ms. Ellison would

25   be an important witness at the defendant's trial. It is the

N8B8BANA

1  very well established principle that has been articulated in a

2  line of Supreme Court decisions going back to a case called

3  *Giboney v. Empire Storage*, decided in the 40s. The Supreme
   336 U.S. 490 (1949),

4  Court there said, "It has never been deemed an abridgment of

5  freedom of speech or press to make a course of conduct illegal

6  merely because the conduct was in part initiated, evidenced, or

7  carried out by means of language, either spoken, written or

8  printed." And lest anybody think I am relying on ancient legal
   *Id. at 503.*

9  history from the last century, the Supreme Court repeated that

10 point within the last couple of weeks in *United States v.*

11 *Hansen*, in which it held that "speech intended to bring about a

12 particular unlawful act has no social value" and therefore "is

13 unprotected."

14        Thus, a defendant's speech is not protected to the

15 extent that it is intended to bring about a crime; where such

16 an intent is present, the speech becomes part of a crime.  And

17 that's precisely why my hypothetical of two thugs going into a

18 grocery store and making the statement that I related to

19 counsel during the colloquy is a crime.  The purpose of that is

20 to extort the grocery store.  And the fact that the extortion

21 is carried out by spoken words and, indeed, no physical actions

22 other than being there, doesn't matter.

23        It's worth noting also that a defendant may be

24 convicted even of a specific intent crime as long as the

25 defendant acted out of mixed motives, as long as one of those

N8B8BANA

1   from it.  We know he took notes because there are quotes in the

2   New York Times that are identical to the language in those

3   documents.  It was a way, in his view, of doing this in a

4   manner in which he was least likely to be caught; not

5   impossible to be caught, least likely.  He was covering his

6   tracks.

7            Also, the content of these documents in some respects

8   tends to support the conclusion they are extremely, in some

9   parts, personal and intimate.  ~~They~~ *those parts* are relationship oriented,

10  not business, commercially or legally oriented, except -- and I

11  don't say that's universally true of the content, but it is

12  true of parts of the content -- they are something that someone

13  who has been in a relationship, or is in a relationship, would

14  be very unlikely to share with anybody, lest the New York

15  Times, except to hurt, discredit, and frighten the subject of

16  the material.  Those views are not essential to my conclusion,

17  but I believe they tend to support it.

18           In view of the evidence, specifically the proffers *to the extent each is uncontradicted,*

19  presented by both sides, my conclusion is that there is

20  probable cause to believe that the defendant has attempted to

21  tamper with witnesses at least twice within the meaning of 18

22  U.S.C., Section 1512(b).  I am speaking of Witness-1 and Ms.

23  Ellison.

24           Accordingly, under Section 3148, there is a rebuttal

25  presumption that no condition or combination of conditions will

N8B8BANA

1    assure that Mr. Bankman-Fried will not pose a danger to the

2    safety of any other person or his community if he remains at

3    liberty.  It's well established in prior cases that the safety

4    of the community includes protecting the community against the

5    consequences of witness tampering.

6              Mr. Cohen admirably argues that the presumption has

7    been rebutted.  I disagree.  He has offered up a gag order on

8    all communications with the press.

9              Now, it's not, strictly speaking, exactly that broad,

10   but the problems are multiple with such a thing.  I don't have

11   the text of the temporary order before me.  Maybe, Andy, you

12   can put it on my computer screen.  Here it is.

13             The temporary order that I signed on July 26, for one

14   thing, has a carve-out from media contacts for assertions of

15   innocence or references to information that is contained either

16   in publicly filed court filings or transcripts of court

17   proceedings in the case.  So right away, even if the gag on

18   communications with the media were in effect, it doesn't really

19   stop all communications with the media.  It leaves one fighting

20   about what are references to information contained in various

21   kinds of documents.

22             More broadly, the operative part, the first and most

23   significant part of the previous order, would prohibit him, if

24   I were to adopt this long-term, from communicating with any

25   public communications media anything about the case.  In this

N8B8BANA

1   day and age, I don't know what public communications media are,

2   and I don't think anybody else does either.  Is that anybody

3   who posts on Instagram?  How about people who comment on the

4   Washington Post opinion pieces?  It's arguably anybody who

5   wants to be included.  Moreover, judging by the submissions I

6   have received from the media, even if I were to go along with

7   this despite the problems, I'd rather imagine we would be in

8   for collateral litigation of some moment.  I don't think that

9   it's a workable solution longer term, particularly with someone

10  who has shown a willingness and desire to risk crossing the

11  line in an effort to get right up to it, no matter where the

12  line is.

13          It's certainly true, for example, that his use of the

14  VPN to watch a football game over an account on which he wasn't

15  entitled to watch it over from the United States didn't violate

16  any of his bail conditions.  It wasn't even a big deal in and

17  of itself, but there it is.  He subscribed to this service from

18  the Bahamas, then used a VPN to log into it as if he were in

19  the Bahamas, when he was sitting in Palo Alto and could have

20  watched the game on public television.  It says something about

21  the mindset.  The means of sharing the documents with the New

22  York Times says to me something about the mindset.  And I think

23  he has already, without violating any other bail condition,

24  save that he not commit another crime, has gone up to the line

25  over and over again.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N8B8BANA

1    would be permitted, as I understand it, to retain optical disks

2    and hard drives in his housing area and take them with him when

3    he goes to the laptops.  I understand that these various

4    databases could be put on portable disks or drives.  I am not

5    an expert on how long it would take.  I imagine the necessary

6    software could be put on the laptop, but I'm not an expert on

7    that.

8              I am also aware that the trial date is coming before

9    too very long, and there is a remedy of last resort here if the

10   situation can't be worked out appropriately wherever he is

11   detained.  And that is Section 3142(i) of the Bail Reform Act,

12   which provides in part:  The judicial officer may by subsequent

13   order permit the temporary release of the person, i.e., the

14   defendant, in the custody of the United States marshal, or

15   another appropriate person, to the extent that judicial officer

16   determines such release to be necessary for preparation of the

17   person's defense or for another compelling reason.

18             Now, what that says to me is that, on an appropriate

19   showing, I could entertain -- I am not promising what I would

20   do with it, but I could entertain an application for Mr.

21   Bankman-Fried to spend time, possibly significant time as trial

22   approaches, in counsel's office, under supervision and under

23   appropriate safeguards, so that any problems with the

24   correctional situation could be avoided for significant periods

25   of time.