UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                           :

UNITED STATES OF AMERICA

                                           :

            - v. -

                                           :    S6 22 Cr. 673 (LAK)

SAMUEL BANKMAN-FRIED,
  a/k/a "SBF,"

                                           :

                           Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# THE GOVERNMENT'S MOTIONS TO EXCLUDE THE TESTIMONY OF THE DEFENDANT'S EXPERT WITNESSES

 

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Nicolas Roos
Danielle R. Sassoon
Danielle Kudla
Samuel Raymond
Thane Rehn
Assistant United States Attorneys
      *- Of Counsel -*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 1

LEGAL STANDARD .................................................................................................. 4

ARGUMENT ............................................................................................................. 7

   I.   The Court Should Exclude Lawrence Akka's Proposed Testimony .................................. 7

      A.   Mr. Akka's Proposed Testimony Usurps the Role of the Jury and Court, and Is Unreliable Under Rule 702 ................................................................ 7

      B.   Mr. Akka's Testimony Is Improper Under Rule 403 ........................................... 11

   II.   The Court Should Exclude the Testimony of Thomas Bishop and Brian Kim for Failure to Comply With the Notice Requirements of Rule 16 ........................................ 12

   III.  The Court Should Exclude Joseph Pimbley's Proposed Testimony ................................. 15

   IV.  The Court Should Exclude Bradley Smith's Proposed Testimony .................................. 18

   V.   The Court Should Exclude Peter Vinella's Proposed Testimony .................................... 20

      A.   Mr. Vinella Is Not Qualified to Offer His Proposed Opinions ............................. 22

      B.   Mr. Vinella's Background Testimony on the Financial Services Industry, the Emergence of Cryptocurrency, and FTX's Value and Innovation Fails the "Fit" Test of Rule 702, is Irrelevant Under Rule 402, and Should Be Precluded Under Rule 403 ................................................................................. 25

      C.   Mr. Vinella's Testimony Concerning the Regulatory Framework, FTX Operational Problems, Executives' Knowledge of Company Software, the Commercial Reasonableness of Measures, and Industry Practices Is Inadmissible ..................................................................................................... 29

      D.   In the Alternative, the Court Should Conduct a Daubert Hearing ........................ 34

   VI.  The Court Should Exclude Andrew Di Wu's Proposed Testimony ................................. 35

CONCLUSION .......................................................................................................... 39

# TABLE OF AUTHORITIES

Page

*Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*,
No. 08 Civ. 7508 (SAS), 2013 WL 1155420 (S.D.N.Y. Mar. 20, 2013) .................................. 30

*Amorgianos v. National Railroad Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ............................................................................. 6

*AU New Haven, LCC v. YKK Corp.*,
No. 15 Civ. 3411 (GHW), 2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019) ................................ 9

*Boucher v. U.S. Suzuki Motor Corp*,
73 F.3d 18 (2d Cir. 1996) ............................................................................... 27

*City of Provid., R.I. v. Bats Glob. Mkts.*,
No. 14 Civ. 2811 (JMF), 2022 WL 902402 (S.D.N.Y. Mar. 28, 2022) .............................. 5, 25

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993) ......................................................... 5, 6, 15, 24, 35, 37

*Dominion Res. SVC, Inc. v. Alstom Power, Inc.*,
No. 3:16 Civ. 544, 2018 WL 3752878 (D. Conn. Aug. 8, 2018) ............................................ 8

*Exch. Comm'n v. Lek Sec. Corp.*,
370 F. Supp. 3d 384 (S.D.N.Y. 2019) ................................................................. 24

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ...................................................................................... 6

*Highland Cap. Mgmt., L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y. 2005) ................................................................. 31

*Hous. Works, Inc. v. Turner*,
362 F. Supp. 2d 434 (S.D.N.Y. 2005) .................................................................. 8

*Hygh v. Jacobs*,
961 F.2d 359 (2d Cir. 1992) ........................................................................... 8, 9

*In re BFXNA Inc.*,
CFTC Docket 16-19, 2016 WL 3137612 (June 2, 2016) ................................................ 24

*In re Coinflip, Inc.*,
CFTC No. 15-29, 2015 WL 5535736 (Sept. 17, 2015) ................................................. 24

*In re Initial Pub. Offering Sec. Litig.*,
174 F. Supp. 2d 61 (S.D.N.Y. 2001) .................................................................... 8

*In re Refco Inc. Sec. Litig.*,
No. 07 MD 1902 (JSR), 2013 WL 12158586 (S.D.N.Y. Aug. 7, 2013) ................................ 32

*In re Rezulin Prods. Liability Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)................................................................ 5, 8, 30, 35

*In re TeraExchange LLC*,
    CFTC No. 15-33, 2015 WL 5658082 (Sept. 24, 2015) ...................................... 24

*Krys v. Aaron*,
    112 F. Supp. 3d 181 (D.N.J. 2015) ................................................................. 32

*Marx & Co. v. Diners' Club Inc.*,
    550 F.2d 505 (2d Cir. 1977)............................................................................ 8

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005)................................................................ 6, 22, 24

*Pearlman v. Cablevision Sys. Corp.*,
    No. 10 Civ. 4992 (JS), 2015 WL 8481879 (E.D.N.Y. Dec. 8, 2015) .................. 8

*Peterson v. Islamic Republic of Iran*,
    876 F.3d 63 (2d Cir. 2017)............................................................................ 25

*Primavera Familienstifung v. Askin*,
    130 F. Supp. 2d 450 (S.D.N.Y. 2001)............................................................ 33

*Querub v. Hong Kong*,
    649 F. App'x 55 (2d Cir. 2016) ................................................................ 22, 24

*Red Rock Commodities, Ltd. v. Standard Chartered Bank*,
    140 F.3d 420 (2d Cir. 1998).......................................................................... 8

*S.E.C. v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013)............................................................ 37

*Shatkin v. McDonnell Douglas Corp.*,
    727 F.2d 202 (2d Cir. 1984).......................................................................... 27

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991).................................................................... 8, 19

*United States v. Boissoneault*,
    926 F.2d 230 (2d Cir. 1991).......................................................................... 20

*United States v. Bronston*,
    658 F.2d 920 (2d Cir. 1981).......................................................................... 8

*United States v. Chastain*,
    No. 22 Cr. 305 (JMF), 2023 WL 2966643 (S.D.N.Y. Apr. 17, 2023).................... 27

*United States v. Chestman*,
    947 F.2d 551 (2d Cir. 1991).......................................................................... 11

*United States v. DiDomenico*,
    985 F.2d 1159 (2d Cir. 1993)...................................................................... 17, 18, 32

*United States v. Dukagjini*,
    326 F.3d 45 (2d Cir. 2003) .......................................................................... 28, 32

*United States v. Gatto*,
    986 F.3d 104 (2d Cir. 2021)................................................................................ 4

*United States v. Gole*,
    158 F.3d 166 (2d Cir. 1998)............................................................................. 12

*United States v. Jergensen*,
    797 F. App'x 4 (2d Cir. 2019) ........................................................................ 12

*United States v. Kaufman*,
    No. 19 Cr. 504 (LAK), 2021 WL 4084523 (S.D.N.Y. Sept. 8, 2021)................. 4, 7, 13, 37, 38

*United States v. Lumpkin*,
    192 F.3d 28 (2d Cir. 1999).................................................................. 5, 8, 9, 25

*United States v. Mahaffy*,
    No. 05 Cr. 613 (ILG), 2007 WL 1213738 (E.D.N.Y. Apr. 24, 2007) ....................................... 7

*United States v. Marsh*,
    568 F. App'x 15 (2d Cir. 2014) ................................................................. 14, 15

*United States v. Mejia*,
    545 F.3d 179 (2d. Cir. 2008)........................................................................... 28

*United States v. Mendlowitz*,
    No. 17 Cr. 248 (VSB), 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) .................. 18, 28, 34, 35

*United States v. Murtha*,
    803 F. App'x 425 (2d Cir. 2020) .................................................................... 12

*United States v. Newkirk*,
    684 F. App'x 95 (2d Cir. 2017) ............................................................ 18, 28, 34, 35

*United States v. Rosado*,
    728 F.2d 89 (2d Cir. 1984)............................................................................. 20

*United States v. Sanders*,
    No. 12 Cr. 0574 (LAK), 2013 WL 1421487 (S.D.N.Y. Mar. 27, 2013) .......................... 34, 35

*United States v. Scarpa*,
    897 F.2d 63 (2d Cir. 1990)............................................................................. 29

*United States v. Scop*,
    846 F.2d 135 (2d Cir. 1988)........................................................................ 8, 20

*United States v. Shea,*
 No. 20 Cr. 412 (AT), 2022 WL 1598189 (S.D.N.Y. May 20, 2022)........................................ 14

*United States v. Tin Yat Chin,*
 371 F.3d 31 (2d Cir. 2004)................................................................................................. 22

*United States v. Valle,*
 No. 12 Cr. 847 (PGG), 2013 WL 440687 (S.D.N.Y. Feb. 2, 2013) ........................................ 7

*United States v. Weaver,*
 860 F.3d 90 (2d Cir. 2017)................................................................................................. 12

*United States v. White,*
 No. 02 Cr. 1111 (KTD), 2003 WL 721567 (S.D.N.Y. Feb. 28, 2003) .................................... 20

*Vale v. United States of Am.,*
 673 F. App'x 114 (2d Cir. 2016) ........................................................................................ 24

*Water Works Bd. of City of Birmingham v. U.S. Bank Nat'l Ass'n,*
 No. 4:17 Civ. 4113 (LLP), 2020 WL 3077147 (D.S.D. June 10, 2020)................................. 32

## INTRODUCTION

The defendant has noticed his intention to call seven expert witnesses at trial. The defense's proposed experts and accompanying disclosures suffer from an array of deficiencies that warrant preclusion of all seven witnesses. For some, the disclosures fail at the most basic level to set forth the opinions of the expert; and most fail to provide a basis for the opinions, as required by Federal Rule of Criminal Procedure 16. Where the defendant does disclose the expert's opinions, the opinions are inappropriate subjects for expert testimony, lack a reliable methodology or basis in facts and data, or are irrelevant, unfairly prejudicial, and confusing to the jury. Among other things, the proposed experts would offer legal conclusions that invade the purview of the Court and the jury, or serve no other purpose than to provide an expert patina to inadmissible hearsay testimony about the defendant's supposed lack of criminal knowledge or intent. The Court should exercise its gatekeeping authority and preclude such impermissible expert testimony.

## BACKGROUND

On August 14, 2023, a Grand Jury in this District returned a seven-count superseding indictment charging the defendant with wire fraud, conspiracy to commit wire fraud, conspiracy to commit securities fraud, conspiracy to commit commodities fraud, and conspiracy to commit money laundering. The charges arise out of the defendant's fraudulent misappropriation of billions of dollars of funds deposited by customers of FTX.com ("FTX"), and his related false and misleading statements to those customers, to investors in FTX, and to lenders to the defendant's trading firm Alameda Research ("Alameda"), all so that he could obtain their money. Trial on these charges is scheduled to begin on October 3, 2023.

Consistent with this Court's scheduling order, on August 16, 2023, the defendant provided his initial expert notice, identifying seven witnesses that the defendant may call as experts during

his case. *See* Ex. A - G (expert notices by the defendant). Those witnesses are: (1) Lawrence Akka; (2) Thomas Bishop; (3) Brian Kim; (4) Joseph Pimbley; (5) Bradley Smith; (6) Peter Vinella; and (7) Andrew Di Wu.[1] According to the defendant's notice, if permitted by the Court, the witnesses would opine on the following topics:

- Mr. Akka would opine that the FTX terms of service "did not contain a declaration of trust over any fiat currency, but gave rise only to a contractual creditor-debtor relationship," and therefore FTX "was not constrained to use fiat currency for any particular purpose." Ex A at 3.

- Mr. Bishop would testify about "calculations of financial figures and metrics (e.g., net asset value) for FTX Trading Ltd, Alameda Research LLC and other entities based on publicly available information or records produced." Ex. B at 2. The notice for Mr. Bishop does not otherwise identify any opinions that Mr. Bishop will offer.

- Mr. Kim would provide "background testimony concerning document metadata and potential or permissible inferences drawn therefrom." Ex. C at 2. The notice for Mr. Kim does not otherwise identify any opinions that Mr. Kim will offer.

- Mr. Pimbley would opine that "FTX's software infrastructure … had insufficiently robust reporting and insufficient testing and quality assurance of data integrity and code," and that "many of these deficiencies … were not visible to external users or recipients." Ex. D at 2.

- Professor Smith would provide background information on the United States campaign finance laws, including about specific restrictions on contributions and use of corporate funds. *See* Ex. E at 2-3.

---

[1] The expert notice of Lawrence Akka is Exhibit A; the notice of Thomas Bishop is Exhibit B; the notice of Brian Kim is Exhibit C; the notice of Joseph Pimbley is Exhibit D; the notice of Bradley Smith is Exhibit E; the notice of Peter Vinella is Exhibit F; the notice of Andrew Di Wu is Exhibit G; the defendant's rebuttal notice is Exhibit H; and the Government's notice for Peter Easton is Exhibit I.

- Mr. Vinella would opine on a variety of topics set forth in a twenty-page disclosure including, but not limited to, the development of new financial products and services, the practices and rules of cryptocurrency markets compared to other traditional financial systems, the nature of the cryptocurrency industry prior to the emergence of FTX, the content of the defendant's advocacy for cryptocurrency regulation, the substance of "FTX's value statement," the suite of "innovative products and services offered by FTX," the nature of "FTX's competitive position" compared to other crypto exchanges, the services provided by FTX, and his perception that "FTX appeared to have been successful prior to November 2022." He would also opine that there was a "lack of clarity concerning potentially applicable legal and regulatory frameworks," that "FTX was domiciled offshore and FTX International operated outside of the U.S.," that "FTX's operational workarounds, programming bugs, and other shortcomings were predictable," that "senior executives who are not software engineers typically do not know or direct the inner workings of their company's software," that "FTX took commercially reasonable steps to protect the interests of U.S. consumers," and that "many of the allegations set forth or implied in the indictment are, in fact, widely-accepted practices in the financial services industry" including "using third-party agents," "commingling of customer assets," "unrestricted use of customer assets," "preferential treatment provided to certain customers," and "loans to founders." Ex. F at 5-28.

- Professor Wu would provide background testimony about "blockchain technology and its key components," "the technology behind and the creation, uses, and functions of cryptocurrency coins and tokens," "business practices related to exchange-issued tokens," "common practices in the cryptocurrency industry around the making and taking of loans," "the principal operations of centralized cryptocurrency exchanges," and a "comparison of business

models and practices among cryptocurrency exchanges." Professor Wu would also offer a "timeline of the pandemic-led boom in cryptocurrency markets" and a "timeline of significant events throughout 2022 that contributed to the unexpected cryptocurrency meltdown." Ex. G at 2-4.

On August 21, 2023, the defendant informed the Government by letter that he may call Mr. Pimbley and Mr. Bishop "in rebuttal on the topics set forth in their Initial Expert Disclosures that may rebut, among other things, expert testimony presented at trial by Government expert Peter Easton." Ex. H at 1 (defendant's rebuttal expert notice). The defendant also notified the Government that he may call Mr. Kim to rebut the testimony of an FBI Special Agent that the Government expects to call to testify about content, metadata, and file paths associated with Slack data and Google documents. *Id.* Finally, the defendant indicated that he may call Mr. Vinella and Professor Wu as rebuttal experts to the testimony of a proposed Government expert, Andria van der Merwe. *Id.* at 2-4.

## LEGAL STANDARD

"An expert may be permitted to testify if he or she 'is qualified, reliable, and helpful.'" *United States v. Kaufman*, No. 19 Cr. 504 (LAK), 2021 WL 4084523, at *18 (S.D.N.Y. Sept. 8, 2021) (citing *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021), and Fed. R. Evid. 702). "The inquiry is 'guided' by Federal Rule of Evidence 702," *id.*, which provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if "the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is the product of reliable facts and methods that the expert has "reliably applied" to the case. Fed. R. Evid. 702. Districts courts play a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a

reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993).

The first requirement—that the "expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"—serves a dual purpose. First, "[i]n requiring that expert testimony be directed to 'scientific, technical, or specialized' knowledge," the requirement "ensures that expert witnesses will not testify about lay matters" that are properly left for the jury, such as "facts or opinions stated by other potential witnesses" or "interpretations of conduct or views as to the motivation of parties." *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004). Second, even testimony that is properly based on scientific, technical, or specified knowledge must "'fit' . . . the facts of the case." *City of Provid., R.I. v. Bats Glob. Mkts.*, No. 14 Civ. 2811 (JMF), 2022 WL 902402, at *8 (S.D.N.Y. Mar. 28, 2022). This requires the expert testimony to stay in bounds: the testimony must be directly pertinent to an issue that the jury has to resolve, but it must not "usurp[] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 28, 290 (2d Cir. 1999); *accord Rezulin Prods.*, 309 F. Supp. 2d at 541.

Rule 702 also requires that the proffered expert testimony "is the product of reliable principles and methods" that are "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. In *Daubert*, the Supreme Court set out a list of non-exclusive factors that the trial court may consider in determining whether an expert's reasoning or methodology is reliable: (1) whether the theory or technique used by the expert can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5)

whether the theory or method has been generally accepted within the relevant scientific community. *Daubert*, 509 U.S. at 593-94. The Court is not required "to admit opinion evidence that is connected to [the facts] only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (citations omitted).

Expert testimony may also be excluded under Federal Rules of Evidence 402 and 403 if it is irrelevant or its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Rule 403 has a "uniquely important role . . . in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberation." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

Finally, Federal Rule of Criminal Procedure 16(b)(1)(C) was recently amended to require the defendant, for each expert witness, to provide "a complete statement of all opinions that the defendant will elicit from the witness," along with "the bases and reasons for them." Fed. R. Crim. P. 16(b)(1)(C)(iii). While this "does not require a verbatim recitation of the testimony the expert will give at trial," it requires more than the "written summary" previously required under the Rules. Fed. R. Crim. P. 16 Adv. Comm. Notes, 2022 Amendment. Even before Rule 16(b)(1)(C) was amended in 2022, the advisory notes to the Rule recognized that the purpose of this requirement is "to provide the opponent with a fair opportunity to test the merits of the expert's testimony through focused cross-examination" and "to permit more complete pretrial preparation," Rule 16 Adv. Comm. Notes, 1993 Amendment, and this Court observed that "[m]erely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal

the expert's actual opinions." *Kaufman*, 2021 WL 4084523, at *19 (collecting cases); *see also United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) (same). "If a defendant fails to provide disclosures in accordance with Rule 16(b)(1)(C), the district court may exclude the expert's testimony at trial." *Kaufman*, 2021 WL 4084523, at *19; *see also United States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007) (same).

## ARGUMENT

### I. The Court Should Exclude Lawrence Akka's Proposed Testimony

The defendant intends for Lawrence Akka, an English barrister, to opine that FTX's terms of service "did not contain a declaration of trust over any fiat currency, but gave rise only to a contractual creditor-debtor relationship," and therefore FTX "was obliged to honour customer withdrawals … but was not constrained to use fiat currency for any particular purpose in the interim." Ex. A at 3. Under controlling Second Circuit authority, such testimony must be precluded because interpreting the meaning of a written agreement, like the terms of service, improperly usurps the role of the court in instructing on the law and the jury in applying the law to the facts. Additionally, the testimony should be excluded under Rule 403 because it is certain to confuse the jury and mislead them as to the relevant issues in the case. Accordingly, Mr. Akka's testimony should be excluded in its entirety.

### A. Mr. Akka's Proposed Testimony Usurps the Role of the Jury and Court, and Is Unreliable Under Rule 702

Mr. Akka's proposed testimony, which is based exclusively on his interpretation of FTX's terms of service, and which concerns the proper legal interpretation of the terms, and nothing more, is plainly inadmissible under Rule 702. A fundamental principle underlying Rule 702 is that it is the court's job to instruct the jury on the law, and the jury's job to apply the facts to that law.

*Lumpkin*, 192 F.3d at 290. For that reason, "[a]s a general rule an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). The Second Circuit has repeatedly held that such expert testimony should be excluded. *See, e.g.*, *Red Rock Commodities, Ltd. v. Standard Chartered Bank*, 140 F.3d 420, 423-24 (2d Cir. 1998); *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992); *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988); *United States v. Bronston*, 658 F.2d 920, 930 (2d Cir. 1981); *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977). So has this Court. *See, e.g.*, *Hous. Works, Inc. v. Turner*, 362 F. Supp. 2d 434, 448 (S.D.N.Y. 2005); *Rezulin Prods.*, 309 F. Supp. 2d at 541. Indeed, "[t]he rule prohibiting experts from providing their legal opinions or conclusions is 'so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle.'" *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (citations omitted).

It is equally well established that the prohibition on experts offering legal opinions encompasses opinions, like those proposed by Mr. Akka, about how to interpret a contract. In *Marx*, the Second Circuit held that an expert's "legal opinions as to the meaning of the contract terms at issue" invaded the district court's authority to instruct the jury on the applicable law. 550 F.2d at 509-510; *see also Bilzerian*, 926 F.2d at 1294 (summarizing the holding in *Marx*). As a result, "courts have held that an expert may not testify as to the parties' obligations under the contract or whether the contract was breached." *Dominion Res. SVC, Inc. v. Alstom Power, Inc.*, No. 3:16 Civ. 544, 2018 WL 3752878, at *10 (D. Conn. Aug. 8, 2018) (collecting cases); *see also Pearlman v. Cablevision Sys. Corp.*, No. 10 Civ. 4992 (JS), 2015 WL 8481879, at *8 (E.D.N.Y. Dec. 8, 2015) (excluding expert testimony that "essentially interprets the Terms of Service and speaks to what was necessary for Cablevision to 'fulfill the covenant of the contract'" (citing *Marx*,

550 F.2d at 509)); *see also AU New Haven, LCC v. YKK Corp.*, No. 15 Civ. 3411 (GHW), 2019 WL 1254763, at *10 (S.D.N.Y. Mar. 19, 2019) (excluding foreign law expert testimony, noting "for the same reasons that [the expert] cannot instruct the jury on domestic patent law, he may also not instruct the jury on foreign patent law, . . . because it would improperly infringe on the Court's role of instructing the jury"). The reason for the rule is clear: "experience is hardly a qualification for construing a document for its legal effect when there is a knowledgeable gentleman in a robe whose exclusive province it is to instruct the jury on the law." *Hygh*, 961 F.2d at 364.

The defendant makes no secret of the fact that Mr. Akka is being offered solely to provide a legal opinion about the terms of service. As the defendant's disclosure states, Mr. Akka's opinion is based solely on "interpreting [the] contract," and not on the "subjective evidence of any party's intentions" or "anything said or done by the parties after the contract was made." *Id.* at 4-5.

But as in prior cases where expert interpretation of a contract was precluded, the jury here is capable of reviewing the terms of the contract and, together with the other alleged false statements, representations, and conduct in the case, determining whether a scheme to defraud existed. *Lumpkin*, 192 F.3d at 290 (holding that the jury must "apply[] th[e] law to the facts before it"). To the extent instructions are necessary to aid the jury in its factual determinations, the Court—and not an expert—should provide the instructions on the law, including if necessary applicable principles for interpreting a contract. Fed. R. Crim. P. 26.1 ("[i]ssues of foreign law are questions of law").[2]

Mr. Akka's proposed testimony is also fatally unreliable in two respects. For one, Mr. Akka acknowledges that under English law (which he purports to apply here) courts ascertain the

---

[2]  Notably, the defendant cited no foreign law sources in his proposed request to charge. Dkt. No. 215.

meaning of words "having all the background knowledge which would have been available to the parties in the situation," including the "factual and commercial context," the "natural and ordinary meaning of the provision in question," "the facts and circumstances known or assumed by the parties," and "commercial common sense." Ex. A at 4. But his proposed opinion testimony does not take into account the commercial context of the terms of service, such as past statements by the defendant or FTX. Mr. Akka also fails to consider the common understanding of cryptocurrency customers of the relevant provisions of the terms of service, or their expectations in depositing funds. Rather, Mr. Akka's interpretation is based solely on the written words and his selections of particular English case law, and there is no reason to believe that his particular interpretation, devoid of all context, is reliable or would aid the jury.

Second, to the extent the issue of whether the terms of service constituted a declaration of trust is relevant, Mr. Akka has not reliably demonstrated that there is a uniform manner in which "trust" is defined. In fact, his expert notice concedes, as it must, that "[t]here is no single definition of a trust in English law." Ex. A at 5. Rather than surveying the range of definitions of trust, Mr. Akka cites just one example under English law, and then cites the Hague Convention definition of trust. *Id.* at 6. Notably absent from his opinion is any acknowledgement that the definition of trust can have a different and less formal meaning when used in the context of cryptocurrency custody. *See, e.g.*, Law Commission of England and Wales, *Digital Assets: Consultation Paper*, No. 256 (July 28, 2022), at pp. 341-42 (outlining the features of a direct custody arrangement over crypto tokens that create a trust), https://shorturl.at/foNO8. Because there is no single definition of "trust," and the concept may have a different meaning or meanings when applied to cryptocurrency exchanges, Mr. Akka's testimony defining the term is unreliable and should be excluded.

## B. Mr. Akka's Testimony Is Improper Under Rule 403

Mr. Akka's proposed statements of law should also be precluded because they are inconsistent with legal instructions about the governing criminal law that the Court is likely to give, and will therefore confuse and mislead the jury. Because the minimal probative value of any exposition on English law is substantially outweighed by the prejudice that will come from the resulting misdirection and confusion, such testimony must be excluded under Rule 403.

*First*, it is incorrect and misleading to suggest that customers of FTX were not defrauded so long as the terms of service did not create a formal declaration of trust under English law. Mr. Akka proposes to answer the question of "whether the relationship [between FTX and its customers] constrained FTX in its use of fiat currency provided by those customers," by looking at whether FTX's terms of service "contain a declaration of trust … or whether they give rise to a contractual relationship only." Ex. A at 3. But for purposes of deciding whether the defendant participated in a scheme to defraud by misappropriating money that was entrusted to him by customers, the jury may conclude that customers entrusted the defendant with money and property even in the absence of a formal trust. *See United States v. Chestman*, 947 F.2d 551, 569 (2d Cir. 1991) (misappropriation involves a fiduciary relationship or a "similar relationship of trust and confidence," which includes not just a "trustee and trust beneficiary," but also several other relationships such as when a beneficiary "entrust[s] the fiduciary with custody over property"). Framing the issue as a dichotomy—with a trust relationship on one hand and a contractual one on the other—is therefore misleading, inconsistent with the elements of wire fraud, and irrelevant to the issues that must be decided by the jury.

*Second*, it is legally incorrect to imply to the jury that its focus should be solely on the terms of service, as Mr. Akka intends to do, rather than on the full range of the defendant's misrepresentations and misleading conduct. *See* Ex. A at 4-5. "[T]he fact of a contractual

relationship between the parties does not remove a party's conduct from the scope of fraud." *United States v. Murtha*, 803 F. App'x 425, 427 (2d Cir. 2020) (citation omitted). Indeed, the Second Circuit has rejected the argument that a contract can "render prior false statements immaterial for purposes of criminal fraud statutes." *United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017). Thus, "the course of the parties' dealings," including "fraudulent misrepresentations made in the course of performance or to feign performance under [a] contract may show the requisite [fraudulent] intent." *Murtha*, 803 F. App'x at 427 (citation omitted). Mr. Akka's proposed testimony, however, would direct the jury that it should "disregard[] subjective evidence of any party's intentions," and instead look solely to the text of the terms of service. Ex. A at 4. Such an opinion would be contrary to law, and even if Mr. Akka attempted to limit his testimony to the interpretation of English law, there is a reasonable likelihood it would confuse the jury in their deliberations.

*Finally*, and similarly, Mr. Akka's opinion that it is "irrelevant to consider anything said or done by the parties after the contract was made," Ex. A at 5, is legally incorrect. Statements and conduct by a defendant after a contract is signed may serve to continue a fraud by inducing a victim to allow a defendant to retain property, *see United States v. Gole*, 158 F.3d 166, 168 (2d Cir. 1998), or by lulling a victim to not report the defendant to authorities, *see United States v. Jergensen*, 797 F. App'x 4, 6 (2d Cir. 2019). To tell the jury otherwise will mislead them and will cause unfair prejudice by contradicting the Court's legal instructions on the elements of wire fraud.

Accordingly, Mr. Akka's testimony should be excluded under Rule 403.

## II. The Court Should Exclude the Testimony of Thomas Bishop and Brian Kim for Failure to Comply With the Notice Requirements of Rule 16

The defendant's expert notices for two proposed experts—Thomas Bishop and Brian Kim—fall far short of the requirements of Rule 16(b)(1)(C) because the notices do not state the

anticipated opinions of the witnesses or the reasons for those opinions. Rather, the notices merely identify general topics of testimony, which is insufficient under the Rule. *Kaufman*, 2021 WL 4084523, at *19.

Starting with Mr. Bishop, his expert disclosure states the following, and nothing more, about his potential opinions:

> If called as a witness, I may testify to the following opinions and issues:
>
> Calculations of financial figures and metrics (*e.g.*, net asset value) for FTX Trading Ltd, Alameda Research LLC and other entities based on publicly available information or records produced in the above-captioned matter.
>
> Rebuttal of calculations of financial figures and metrics presented by the Government through, without limitation, expert disclosures or at trial.

Ex. B at 2. That notice is plainly insufficient. It does not state what calculations Mr. Bishop has conducted and, more importantly, what opinions he has formed from those calculations. The defendant's 32-word summary of the topics on which Mr. Bishop would testify would not even pass muster under the prior version of Rule 16, and certainly fails to meet the requirement under the amended Rule that the defendant specify the expert's opinions and bases for them. Likewise, "rebuttal of calculations … presented by the Government," *id.*, does not state which opinions of the Government's expert Mr. Bishop intends to respond to, what the nature of his opinion is, or the basis for his disagreement with the Government's expert. The defendant subsequently noticed Mr. Bishop as a rebuttal expert to the Government's expert witness, Peter Easton. *See* Ex. H. But while Professor Easton's expert disclosure details several opinions and findings relating to financial analysis and tracing of funds, *see* Ex. I (expert disclosure for Peter Easton), the defendant's rebuttal notice does not indicate what opinions Mr. Bishop will be rebutting, what his alternative opinions or findings are, or the methodologies that form the basis for those opinions.

The disclosure of Mr. Kim is no different, describing only that Mr. Kim will offer:

> Background testimony concerning document metadata and potential or permissible inferences drawn therefrom.
>
> Responsive analyses and conclusions to evidence, argument, or analyses presented by the Government of metadata associated with documents or information produced in this litigation.

Ex. C at 2. It is not clear what sort of "background testimony" Mr. Kim intends to provide, what sort of "potential or permissible inferences" he is referring to, or why a witness must be qualified as an expert to testify about document metadata. *See United States v. Marsh*, 568 F. App'x 15, 16–17 (2d Cir. 2014) (proper exercise of district court's discretion to permit law enforcement agent to testify as a lay witness about his extraction and review of data from a cellphone); *United States v. Shea*, No. 20 Cr. 412-4 (AT), 2022 WL 1598189, at *2 (S.D.N.Y. May 20, 2022) (permitting a government witness on metadata, who had been noticed as an expert, to testify as a lay witness). In other words, the notice fails to set forth any sort of opinion. Of course, whatever testimony Mr. Kim might seek to provide, it is almost certainly improper for him to instruct the jurors on what inferences they may draw from the evidence.

Additionally, the notice says Mr. Kim will set forth "responsive analyses and conclusions to evidence, argument, or analyses presented by the Government of metadata," Ex. C at 2, but the Government intends to introduce observable metadata through lay witnesses, without any type of expert "analyses" or opinion. Even if that were not the case, the defendant's notice fails to specify what Mr. Kim's opinion is in response to the expected testimony by Government witnesses. The rebuttal expert notice on his behalf repeats the same error: it says Mr. Kim will rebut "expert testimony presented at trial by the FBI Special Agent whom the Government expects to present at trial regarding the content, metadata, and file paths associated with Slack data and Google documents." Ex. H at 1. But the Government does not intend to offer or qualify that FBI Special Agent as an expert or elicit any opinions from him. He will simply testify about observable

metadata associated with certain Government exhibits, such as creation data, last modified date, author, persons the document was shared with, file name, and file path. Expert qualification is not required for such testimony. *Marsh*, 568 F. App'x at 16-17. And if the defendant wishes to call an expert to testify about something more than readily observable metadata, he needs to indicate what that expert's opinions are about metadata, the bases and reasons for them, and how such expert opinions are applied to the facts of this case. No such articulation has been made.

These deficiencies are prejudicial because they hamper the Government's ability to challenge Mr. Bishop's and Mr. Kim's reasoning in a *Daubert* motion and to adequately prepare for examining them at trial. The Government respectfully submits that the deficiencies warrant exclusion of Mr. Bishop's and Mr. Kim's testimony, *see* Fed. R. Crim. P. 16(d)(2)(C), but at a minimum, the defense should not be permitted to frustrate the Court's gatekeeping function under *Daubert* by resting on the barebones notice it has provided.[3]

## III. The Court Should Exclude Joseph Pimbley's Proposed Testimony

The proposed expert testimony of Joseph Pimbley about FTX's software infrastructure, specifically its database and computer code, should be excluded for three reasons: the notice disclosing his opinions and the reasons for them is insufficient; expert testimony on FTX's code is unnecessary; and the proposed testimony is neither relevant under Rules 401 and 402, nor permissible under Rule 704.

---

[3] If the defendant is permitted to supplement Mr. Kim's expert disclosure, and he puts forward arguments that metadata associated with documents are inaccurate, he must specify which documents Mr. Kim contends have inaccurate metadata, and the bases for such a conclusion. An opinion that, in substance, "metadata could be wrong" would be speculative, irrelevant, and not methodologically sound, and under such circumstances, the Government will move to preclude such testimony or request a *Daubert* hearing.

First, Mr. Pimbley's disclosure is incomplete in many respects. The defendant's notice says that Mr. Pimbley will opine that FTX's software infrastructure—in particular, its database and computer code—had "insufficiently robust reporting and insufficient testing and quality assurance of data integrity and code." Ex. D at 2. But his disclosure fails to specify what he means by "reporting," "testing," and "quality assurance of data integrity," or what aspects of the FTX database and code he intends to testify about. It also does not say what "insufficiently robust" means. This short and vague disclosure could be a reference to the general functionality of FTX's database and code, the lack of testing of parts or the entirety of the database or code, the reporting out of data from some portions of the database or code such as deposit and withdrawal activity or user account creation, or something else entirely. The defendant's notice also does not specify the bases or reasons for that conclusion.

Equally problematic is the ambiguous disclosure that Mr. Pimbley intends to opine that "many of these deficiencies in the software infrastructure were not visible to external users or to recipients of infrastructure-generated risk and financial reports, including, for example, the fiat@ programming." Ex. D at 2. Mr. Pimbley's notice does not state what "deficiencies" he is describing, which "external users" he claims cannot see the deficiencies, who the "recipients of infrastructure-generated risk and financial reports" are, what "infrastructure-generated risk and financial reports" he intends to testify about, or what the reasons and bases are for these conclusions.

The vague nature of Mr. Pimbley's disclosure is further problematic because it is far from clear how the proposed testimony would be relevant to the issues at this trial or helpful to the jury, a second reason it should be precluded. Whether or not FTX's database and computer code has sufficiently robust "reporting" and "testing and quality assurance of data integrity and code" Ex.

D at 2, is not relevant to the issues the jury must decide at the conclusion of trial. The fraud allegations against the defendant do not concern whether or not FTX's software infrastructure worked well. Rather, the allegation, as is relevant to FTX's database and computer code, is that Alameda was knowingly and intentionally granted special privileges that permitted it to misappropriate billions of dollars in customer assets at the defendant's direction.

It appears, however, that the defendant wishes to offer Mr. Pimbley's testimony as a vehicle to argue that the defendant did not know about the use of customer assets—including the way customer assets were accounted for in a double-entry bookkeeping system the defendant's notice references as "fiat@ programming"—because "deficiencies … were not visible … to recipients of infrastructure-generated risk and financial reports…." Ex. D at 2. Use of expert testimony as a substitute for the defendant's own testimony about his knowledge or intent is improper and precluded by Rule 704.

Rule 704(b) of the Federal Rules of Evidence prohibits expert witnesses from "stat[ing] an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged," as "[s]uch ultimate issues are matters for the trier of fact alone." Fed. R. Evid. 704(b). The rule prevents an expert from stating an "inference as to a defendant's actual mental state at the time of a crime" as "expert testimony concerning a defendant's mental state poses a uniquely heightened danger of intruding on the jury's function." *United States v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir. 1993). In *DiDomenico*, the defendant was charged with wire fraud and interstate transportation of stolen property, and sought to call an expert witness who would "assist the jury to determine [the defendant's] state of mind" by testifying about how the defendant suffered from a dependent personality disorder, which is why she assisted her boyfriend in selling goods that were stolen. *Id.* at 1161. The district court excluded

that testimony and the Second Circuit affirmed, concluding that while the defendant proclaimed that the expert was not going "to testify as to the ultimate issue of whether [the defendant] knew the computer equipment was stolen," it was "semantic camouflage" and a violation of Rule 704(b). *Id.* at 1165. The same is true here. Mr. Pimbley's planned testimony that "deficiencies … were not visible" is simply camouflage for the suggestion that the *defendant* did not know of the alleged infrastructure deficiencies. Such testimony is impermissible under Rule 704(b) and should be precluded.

Third, expert testimony regarding FTX's code is unnecessary. At trial, the Government will call at least two witnesses—Gary Wang and Nishad Singh—who were involved in writing FTX's code. They are lay witnesses who are competent to testify about the code, and relevant and admissible questions the defendant has about the code may be put to these witnesses during cross-examination. There is no need for a separate "expert" witness to testify on such matters, especially in light of the fact that such testimony would duplicate the testimony of fact witnesses. *See United States v. Newkirk*, 684 F. App'x 95, 97 (2d Cir. 2017) ("In these circumstances, the district court acted well within its discretion in concluding that other witnesses with financial backgrounds were competent to explain the transactions and related terminology presented by the case."); *United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120, at *7 (S.D.N.Y. Dec. 20, 2019) ("Because many of these witnesses had prior experience working for credit card processors or had knowledge generally about the industry because of their work history, there was no need for expert testimony related to industry practice.").

## IV.    The Court Should Exclude Bradley Smith's Proposed Testimony

The defendant intends to call Professor Smith to testify about the federal election laws, prohibitions and reporting requirements, their history and purpose, past enforcement actions by the Federal Election Commission, "the nature and frequency of reported or alleged violations …

that are reviewed or adjudicated by the FEC, including by persons found to have acted in good faith," and the permissible uses of corporate funds and loans. *See* Ex. E at 2-3. Professor Smith's proposed testimony should be rejected for several reasons.

*First*, it is improper to offer an expert to testify about the legal framework that applies to political contributions at the federal level. "[A]n expert's testimony issues of law is inadmissible." *Bilzerian*, 926 F.2d at 1294. And to the extent the jury requires instructions on the federal election laws—which is far from clear as the trial will not contain a count alleging a violation of the election laws—the Court can provide the jury with instructions appropriately tailored to the facts of the case.

*Second*, Professor Smith's testimony is irrelevant, confusing, and a waste of time, especially now that the trial will no longer include a charge arising from the defendant's illegal campaign finance scheme. The history, purpose, recent developments in campaign finance laws, and general background on large-scale political donations are irrelevant to the trial. So too is the structure of the FEC, the roles of its commissioners, and its processes for issuing advisory opinions or adjudicating matters. Testimony concerning the "nature and frequency of reported or alleged violations" of Sections 30122 and 30118 of the Federal Election Campaign Act, as well as descriptions of instances in which persons were "found to have acted in good faith," has nothing to do with the case. Ex. E at 3. Only the defendant is on trial. Professor Smith's testimony is likely to confuse the jury about the facts at issue at trial, and will interject misleading and irrelevant comparisons to other FEC matters into the case. Indeed, the purpose of the proposed testimony appears to be an improper one: to invite the jury to nullify the money-laundering count based on policy views regarding the federal election laws or FEC or other matters outside the purview of

the jury. The proposed testimony also risks a mini-trial about the election laws within a fraud trial to the extent the Government disagrees with Professor Smith's portrayal of the legal landscape.

*Finally*, Professor Smith's testimony is improper under Rule 704(b) and Rule 403 because his opinions about instances when "persons [were] found to have acted in good faith" or had "permissible uses of loans and loaned funds in connection with political contributions," Ex. E at 3, will imply to the jury that the defendant acted in good faith compliance with the campaign finance laws. There are multiple problems with such testimony. It is inadmissible state of mind testimony under Rule 704(b). It impermissibly relies "directly upon the language of the statute," *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988), by invoking the federal election laws, and drawing "conclusions as to the significance of [the defendant's] conduct or evidence in the particular case," *United States v. Boissoneault*, 926 F.2d 230, 233 (2d Cir. 1991). And it focuses "on whether others may have committed uncharged crimes" which is a "waste of time and thus is totally irrelevant." *United States v. White*, No. 02 Cr. 1111 (KTD), 2003 WL 721567, at *7 (S.D.N.Y. Feb. 28, 2003); *cf., e.g.*, *United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial"). The Court should thus exclude Professor Smith's testimony.

## V.     The Court Should Exclude Peter Vinella's Proposed Testimony

The defendant intends to call Peter Vinella, a managing director at an expert services and consulting firm, who appears to have experience in the financial services industry, as an expert to offer opinions on a variety of topics relating to, among other things, new financial services companies, the cryptocurrency markets, FTX's services and advantages relative to other actors in

the cryptocurrency markets, the lack of regulatory clarity in the cryptocurrency market, and customs and practices in the cryptocurrency industry.

Mr. Vinella's testimony should be precluded in its entirety on several grounds. First, he lacks sufficient experience or expertise in cryptocurrency, cryptocurrency markets, or cryptocurrency companies to opine as an expert. Second, his background testimony on the financial services industry and the emergence of cryptocurrency fails the "fit" test of Rule 702, is irrelevant under Rule 402, and should be precluded under Rule 403 because it is likely to confuse the jury. Mr. Vinella's planned testimony about the defendant's success developing a cryptocurrency exchange, the defendant's advocacy for regulation, the innovative products and services offered by FTX, FTX's competitive position, and FTX's profitability before late 2022 also lacks a reliable foundation, would merely regurgitate inadmissible hearsay evidence, and is more appropriate (to the extent it is admissible) as testimony from percipient witnesses. Third, Mr. Vinella's proposed opinions that laws and rules applying to FTX were not clear, that "senior executives who are not software engineers typically do not know or direct the inner workings of their company's software," that FTX took "commercially reasonable steps to protect the interest of U.S. customers," and that many of the allegations in the Indictment are "widely-accepted practices in the financial services industry" are all impermissible attempts to argue that the defendant lacked the requisite intent to commit the charged crimes, which should be precluded under Rule 704(b). These opinions are also improper, as described in the Government's motions *in limine*, and are appropriately precluded under Rule 403. At a minimum, the Court should conduct a *Daubert* hearing on Mr. Vinella's qualifications, methodology, and the relevance and reliability of his proposed testimony before he is permitted to testify before the jury.

### A. Mr. Vinella Is Not Qualified to Offer His Proposed Opinions

Much of Mr. Vinella's testimony should be excluded because he is not qualified to testify as an expert witness about cryptocurrency's history, the cryptocurrency markets, cryptocurrency exchanges, how FTX compares to other cryptocurrency exchanges, or practices and customers in the cryptocurrency market. Tellingly, Mr. Vinella's description of the cryptocurrency markets contains many factual errors indicative of a lack of sufficient expertise in this area.

A threshold issue is whether the witness "is qualified as an expert" to render the proposed opinion. *See Nimely*, 414 F.3d at 396. A witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004). Just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely*, 414 F.3d at 399 n.13; *see also Querub v. Hong Kong*, 649 F. App'x 55, 57 (2d Cir. 2016) (excluding expert familiar only with foreign accounting standards, noting that because the expert "is not qualified to opine on [Public Company Accounting Oversight Board] standards, she has no basis for comparing them with other standards").

Mr. Vinella has no specific cryptocurrency experience and has, at best, limited experience related to decentralized finance ("DeFi"), which is merely one use of cryptocurrency technologies. Mr. Vinella's only cryptocurrency-specific academic qualification appears to be limited to a certificate obtained after completing a 36-hour online continuing education course in "blockchain and cryptocurrencies." Ex. F at 31 (citing to U.C. Berkeley's Executive Education program, viewable at https://em-executive.berkeley.edu/blockchain-and-cryptocurrencies). Further, Mr.

Vinella's curriculum vitae makes no reference to any other cryptocurrency expertise as reflected by a lack of any expert testimony, publications, or presentations specific to the cryptocurrency industry. Instead, he has a one-line reference to the fact that his "current academic research also includes decentralized finance" and lists only a single, self-published, non-peer reviewed working paper titled "Some of the Challenges Facing DeFi for Mass Adoption." Ex. F at 40. That working paper, however, according to Mr. Vinella, is "not meant to be an exhaustive academic study of DeFi or its underlying technology," and "most, if not all of the opinions, conclusions, and conjectures presented therein are based on the authors' firsthand, practical working experience in the financial services industry rather than rigorous, unbiased research." Peter Vinella, *Some of the Challenges Facing DeFi for Mass Adoption*, PVA Toucan International Working Paper (June 2022), https://pvatoucan.com/articles.

Mr. Vinella's lack of expert knowledge of the cryptocurrency industry is evident from several errors in his recitation of information relating to cryptocurrency. For example, Mr. Vinella asserts that FTX was essentially an innovator without parallel, Ex. F at 13, 15–16, but in fact, at the time of FTX's launch in 2019 there were hundreds of other cryptocurrency exchanges, many of which were built on white-label exchange software and offered products similar to FTX, including, *inter alia*, spot and derivative margin loans and peer-to-peer lending. *See* Token Insight, *$13.8 Trillion Annual Spot Exchanges Trading Volume – 2019 Cryptocurrency Spot Exchange Industry Annual Report Shows* (Jan. 14, 2020), https://tokeninsight.medium.com/2019-cryptocurrency-spot-exchange-industry-annual-report-d022d1c29e3f (noting the existence of 239 centralized cryptocurrency exchanges by 2019). Another example is Mr. Vinella's discussion of cryptocurrency regulation: he asserts that "there are few legal or regulatory underpinnings" governing cryptocurrency markets, and states that he knows of no "cryptocurrency trading

platform that had been licensed in the U.S." Ex F at 13. But since at least 2015, regulators—including the SEC and CFTC—have taken legal and regulatory action against cryptocurrency market participants. *See In re Coinflip, Inc*., CFTC No. 15-29, 2015 WL 5535736 (Sept. 17, 2015); *In re TeraExchange LLC*, CFTC No. 15-33, 2015 WL 5658082 (Sept. 24, 2015); *In re BFXNA Inc*., CFTC Docket 16-19, 2016 WL 3137612 (June 2, 2016); *S.E.C. v. RECoin Grp. Foundation, et al*., No. 17 Civ.05725 (E.D.N.Y.). And contrary to the claim that no platform has been licensed, *see* Ex. F at 19, in October 2021, FTX itself purchased LedgerX, an entity which had previously been approved by the CFTC to operate as a Derivatives Clearing Organization, Designated Contract Market, and Swap Execution Facility. *See* Commodity Futures Trading Commission, *CFTC Approves LedgerX, LLC to Clear Fully-Collateralized Futures and Options on Futures*, No. 8230-20 (Sept. 2, 2020), www.cftc.gov/PressRoom/PressReleases/8230-20. While errors in Mr. Vinella's opinions are an appropriate subject for cross-examination, the court may also consider the fact that he is "not familiar with" certain relevant facts in making a threshold determination that he is not qualified to testify. *Vale v. United States of Am.*, 673 F. App'x 114, 116 (2d Cir. 2016) (district court did not abuse discretion in determining proposed expert was not qualified because he lacked the appropriate training, was not familiar with treatment for the relevant condition, and lacked the correct license).

Mr. Vinella's past experience in the financial services industry does not qualify him to be an expert on cryptocurrency topics. *Sec. & Exch. Comm'n v. Lek Sec. Corp.,* 370 F. Supp. 3d 384, 407-13 (S.D.N.Y. 2019) (holding that expert's general experience in "finance and economics" did not qualify him to testify about the more narrow topic of "layering or Cross-Market Strategy"); *see also Nimely*, 414 F.3d at 399 n.13; *Querub*, 649 F. App'x at 57. Indeed, as a court in this District previously noted, Mr. Vinella's prior experience in finance is not necessarily the "right

experience" to qualify him to testify on all topics involving finance. *Peterson v. Islamic Republic of Iran*, No. 13 Civ. 9195 (KBF) (S.D.N.Y. Sept. 19, 2014), Dkt. 147 at 7, 23 ("I don't think Mr. Vinella's got the right experience" and "I am thinking of ignoring Mr. Vinella, saying that under the *Daubert* standard he is entitled to no weight, because he seems like he is a professional witness").[4] And Mr. Vinella's own disclosure makes clear that his past experience in the financial services industry does not qualify him to testify about cryptocurrency, noting that the "philosophy, practices, and rules of crypto-markets are radically different from those of a traditional financial system," and that "many widely accepted customs, practices, and standards of the incumbent financial system do not fit or apply to crypto markets." Ex. F at 10.

Accordingly, Mr. Vinella should be precluded from opining on topics relating to cryptocurrency, including but not limited to market dynamics, regulation, and industry practices. While the Court may exclude Mr. Vinella's testimony without a hearing, at a minimum the Court should conduct a *Daubert* hearing before Mr. Vinella is permitted to testify before the jury.

**B. Mr. Vinella's Background Testimony on the Financial Services Industry, the Emergence of Cryptocurrency, and FTX's Value and Innovation Fails the "Fit" Test of Rule 702, is Irrelevant Under Rule 402, and Should Be Precluded Under Rule 403**

Expert testimony must be "directly pertinent to an issue that the jury has to resolve," *Lumpkin*, 192 F.3d at 29, and "fit" the facts of the case. *City of Provid.*, 2022 WL 902402, at *8. Mr. Vinella's meandering exposition on facets of the financial services industry, as well as on the history and philosophy behind cryptocurrency are largely irrelevant to, and in any event ill-fitted for, a case about the defendant's commission of fraud and money laundering offenses. The lessons

---

[4] Although the court harbored doubts about the validity of Mr. Vinella's opinion, it ultimately did not hold a *Daubert* hearing. *See Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 75 (2d Cir. 2017).

that Mr. Vinella draws from this background information cannot be "reliably applied … to the facts of the case," Fed. R. Evid. 702, and are certain to confuse the jury.

With respect to the opinions set forth in Section A of his expert disclosure, Mr. Vinella intends to opine that:

- The "financial system is constantly evolving," "financial innovation is often attributable to [several enumerated] factors," and "FTX was subject to all of these forces." Ex. F at 5.

- A "new financial service or service provider" often will "face significant obstacles" identified by Mr. Vinella, and "FTX was subject to all of these issues." Ex. F at 5.

- Success of a new financial service often depends on "quickly … developing an initial early production version …, gaining market acceptance, and … capturing market share," which "often requires using 'short-cuts' and workarounds," and "Mr. Bankman-Fried and the FTX founders and developers' general business development strategy reflects [this] approach." Ex. F at 7.

- "[M]any of the issues experienced in the crypto industry are comparable to the early-stage development of other financial innovations," such as hedge funds, automated trading, swaps, and e-commerce. Ex. F at 7.

There are several problems with this proposed testimony. Mr. Vinella has not and cannot establish that the attributes and features of financial service providers apply to a company like FTX. As Mr. Vinella concedes, the practices of cryptocurrency market players "are radically different from those of a traditional financial system," and therefore "widely accepted customs, practices, and standards of the incumbent financial system do not fit or apply to crypto markets." Ex. F at 10. Even without that concession, Mr. Vinella has not set forth any reliable methodology for determining that archetypes of the traditional financial system apply to FTX. It appears he has

conducted no interviews of cryptocurrency market participants, has not run any studies, and has based his conclusions on a handful of documents provided by defense counsel. His testimony would be "in essence an 'apples and oranges comparison.'" *Boucher v. U.S. Suzuki Motor Corp*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Shatkin v. McDonnell Douglas Corp*. 727 F.2d 202, 208 (2d Cir. 1984)). Moreover, his disclosure does not set forth the reasons or bases for the conclusions that FTX was subject to all of the issues and market forces he outlines in his disclosure.

More to the point, these opinions are irrelevant. Whether or not FTX was innovative, faced significant obstacles, was required to act quickly and take short cuts, or resembles other past innovation in the financial sector is irrelevant to the issues at trial. A detour through the features of the financial services industry is not probative of any contested fact and will certainly confuse and waste the time of the jury. *See United States v. Chastain*, No. 22 Cr. 305 (JMF), 2023 WL 2966643, at *9 (S.D.N.Y. Apr. 17, 2023) (precluding expert testimony about the academic definitions of certain finance terms and a comparison between those terms and the information in the case because such testimony had "limited or no bearing on the issues in this case" and any probative value was "substantially outweighed by the dangers of confusing or misleading the jury").

The same is true for Mr. Vinella's proposed testimony about the history, philosophies, practices, and rules of the cryptocurrency market, and how they differ from traditional finance (*i.e.*, everything in Section B of his expert disclosure). *See* Ex. F at 10-13. It will be irrelevant and confusing to the jury to hear about the origins of cryptocurrency markets, the beginnings of the crypto-anarchist movement, a manifesto by Timothy May, Satoshi Nakamoto's paper on bitcoin, the "core tenets" of cryptocurrency, the operational features of the cryptocurrency market, and the lack of legal and regulatory clarity. *Id.* Such testimony will unnecessarily prolong the trial,

misdirect the jury to issues not relevant to trial, and would also be improper by suggesting that there were no rules that applied to the defendant.

Section C of Mr. Vinella's expert disclosure lacks a reliable methodology and fit, and is inadmissible under Rules 402 and 403 for similar reasons. *See* Ex. F at 10-18. Mr. Vinella asserts that "FTX appears to have been a functioning crypto-exchange (as opposed to a shell), one that offered its customers truly innovative products and services at the time." Ex. F at 13. Such a claim—analogous to calling the Titanic a functioning ship—is not based on any sort of reliable methodology. Mr. Vinella appears to base his opinion on the defendant's "public commentary" and materials he reviewed. Ex. F at 14. He conducted no first-hand review of FTX; he did not interview witnesses, at least as far as his disclosure makes clear; and there is no scientific or technical methodology evident. The opinions contained in Section C of Mr. Vinella's disclosure are plagued by two additional issues. The first is that an expert may not serve as a vehicle for the transmission of hearsay. *See United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003) (an expert witness may not "circumvent rules prohibiting hearsay" by "relying on … conversations with non-testifying witnesses" (citing Fed. R. Evid. 801(c) and 703)); *United States v. Mejia*, 545 F.3d 179, 197 (2d. Cir. 2008) ("The expert may not, however, simply transmit hearsay to the jury…. Otherwise, the expert is 'simply repeating hearsay evidence without applying any expertise whatsoever.'"). But because Mr. Vinella lacks the expertise to do any actual analysis to aid the jury, he appears to have done nothing more than read materials, including several statements by the defendant, as well as second-hand, partial notes of interviews with witnesses, and used those as the exclusive source for his "opinions" about FTX. Second, expert testimony is not appropriate where, as here, a fact witness is capable of testifying as to relevant facts. *See Newkirk*, 684 F. App'x at 97; *Mendlowitz*, 2019 WL 6977120, at *7. Gary Wang, a co-founder of FTX, and Nishad

Singh, a senior executive at the company, several other employees—and the defendant himself, if he chooses to testify—could all describe the background factual information set forth in Section C of Mr. Vinella's disclosure to the extent admissible under the other rules of evidence.

Finally, the opinions identified in Section C of Mr. Vinella's disclosure are not relevant, and are likely to confuse the jury. Whether FTX was innovative or provided value will not be an issue at trial. Rather, one of the key questions will be whether billions of dollars of FTX customer assets were embezzled or misappropriated. Additionally, some of Mr. Vinella's opinions in this area are facially unreliable because they are not based on actual review or investigation of underlying financial data. Take, for instance, his opinion that "FTX operated a successful business prior to November 2022" because it, among other things, "generated net profits of nearly $400 million on revenues of more than $1 billion." Ex. F at 18. That conclusion does not appear to be the product of an attempt to actually calculate FTX's profits or revenue, and does not take into account various losses that were covered by Alameda using customers' deposits. Accordingly, general background testimony about some of the good features of FTX, as well as opinions about the success of FTX, will not serve a probative purpose, and the risk of confusion and delay substantially outweigh any value such testimony would have to the jury. *See United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990) ("A defendant may not seek to establish his innocence … through proof of the absence of criminal acts on [other] specific occasions.").

## C. Mr. Vinella's Testimony Concerning the Regulatory Framework, FTX Operational Problems, Executives' Knowledge of Company Software, the Commercial Reasonableness of Measures, and Industry Practices Is Inadmissible

The opinions of Mr. Vinella set forth in Sections D, E, F, and G of his expert disclosure are inadmissible under Rules 702, 704, 402 and 403. *See* Ex. F at 19-28.

Mr. Vinella's testimony that there was a lack of clarity concerning potentially applicable legal and regulatory frameworks, as described in Section D of his disclosure, is improper for

several reasons. First, Mr. Vinella's proposed testimony about the reasons why regulations or laws are typically enacted, and lag behind the introduction of new products, is unreliable and irrelevant. Mr. Vinella has not conducted any type of study relating to why regulations are enacted, or the temporal proximity of those regulations to new innovations. *See Rezulin Prods.*, 309 F. Supp. 2d at 547 ("[T]he opinions of these witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise."). There is also no probative value to such testimony, and it is likely to confuse and complicate issues for the jury unnecessarily.

Mr. Vinella's opinions relating to the clarity and application of laws and regulations are also improper under Rule 704(b). He speculates that "even a knowledgeable person with material experience with traditional financial services (much less someone with primarily crypto experience) would have trouble navigating the numerous U.S. regulatory regimes in the context of launching a new product, service, or means of delivery." Ex. F at 19. Mr. Vinella has no basis or reliable methodology, beyond what he "expect[s]," for such a conclusion, or a reason to believe that such an opinion applies to the facts here. In any event, such testimony is expressly precluded by Rule 704(b) because it states, "an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged." Fed. R. Evid. 704(b). Mr. Vinella also blames the "lack of legal and regulatory clarity" for "numerous operational failures in crypto markets," Ex. F at 20, but as explained in the Government's motions *in limine*, arguments blaming regulators, or urging acquittal because the applicable rules were unclear, are impermissible under Rules 402 and 403. *See Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*, No. 08 Civ. 7508 (SAS), 2013 WL 1155420, at *7 (S.D.N.Y. Mar. 20, 2013) (precluding evidence about general failures by credit rating agencies leading up to financial crisis

and noting that court will not "let this trial become an inquiry into the role of the Rating Agencies in the financial crisis").[5]

Next, Mr. Vinella's opinion in Section E of his disclosure should be precluded. First, the opinions that "many of FTX's operational problems were, in fact, predictable" and that "FTX never intended to give such a large credit line to Alameda Research," Ex. F at 22-23, are not the product of scientific, technical, or specialized knowledge, nor are they based on reliable principles and methods. Indeed, it is entirely unclear what these opinions are based on other than conjecture, surmise, and statements to Mr. Vinella by the defendant or his representatives. Mr. Vinella cannot reliably say that a substantial credit line for Alameda was "not unusual," "was part of a workaround to prevent the failure of a particular piece of code," was "never intended to give such a large credit line," and was not fully used. Ex. F at 23. He does not have a reliable basis or methodology for concluding that large lines of credit are "not usual," and how other financial service providers act is not relevant at trial. His disclosure does not articulate what technique he used that has been our could be tested. There is also no apparent basis for Mr. Vinella's conclusion that Alameda's $65 billion line of credit was a "workaround" to address a coding issue, and Rule 704(b) precludes him from testifying about what was "intended" by the credit line. More generally, whether or not problems at FTX were predictable or common is not relevant. To the extent Mr. Vinella's would testify that these issues were knowable, that does not matter; and to the extent his testimony would be that individuals at FTX did know or likely knew of them, such testimony is also improper under Rule 704(b). *See Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y.

---

[5] Mr. Vinella also suggests that because FTX was domiciled offshore it "further complicates the issues of what are prevailing legal and regulatory jurisdictions." Ex. F at 20. As the Government argued in its motions *in limine*, such arguments are impermissible. *See* Gov't Motions *in Limine* (Dkt. 204), at 53-54.

2005) (rejecting expert's attempt to speculate "regarding the state of mind and motivations of certain parties" and as to the "knowledge possessed by defendants and non-parties").

Mr. Vinella's next opinion, that "senior executives who are not software engineers typically do not know or direct the inner workings of their company's software," Ex. F at 23, is improper for similar reasons. That opinion is based on Mr. Vinella's unspecified "experience" and his surmise that it is "unlikely that a single person (such as Mr. Bankman-Fried)" could operate an exchange on his own. Such guesswork is not proper under Rule 702. In fact, Mr. Vinella has been precluded on three prior occasions from offering similar opinions. *See Water Works Bd. of City of Birmingham v. U.S. Bank Nat'l Ass'n*, No. 4:17 Civ. 4113 (LLP), 2020 WL 3077147, at *10 (D.S.D. June 10, 2020) (precluding Mr. Vinella from opining "on what actions USB should have and would have taken if USB has acted in accordance with industry customs and standards" because it was an improper opinion on "intent, motives, or state of mind"); *Krys v. Aaron*, 112 F. Supp. 3d 181, 205 (D.N.J. 2015) (excluding "Mr. Vinella's testimony concerning Defendants' state of mind"); *In re Refco Inc. Sec. Litig.*, No. 07 MD 1902 (JSR), 2013 WL 12158586, at *4 n.10 (S.D.N.Y. Aug. 7, 2013) (adopted report and recommendation of magistrate judge finding that "Vinella's report is replete with conclusory allegations regarding the state of mind of the Defendants" which had previously been precluded for another expert as improper).

While Mr. Vinella does not set forth the basis for these opinions, he seems to be parroting arguments previously advanced by the defendant. And if that is indeed the source of his information, it is impermissibly based on hearsay. *See Dukagjini*, 326 F.3d at 59. More to the point, "stating the final conclusion or inference as to a defendant's actual mental state at the time of a crime" as "expert testimony concerning a defendant's mental state poses a uniquely heightened danger of intruding on the jury's function." *DiDomenico*, 985 F.2d at 1164. Therefore, speculative

opinions about whether or not the defendant could run FTX on his own, whether he had "intimate knowledge of the inner workings of its overall operations," whether he was a computer programmer, whether he "would have been able to independently detect the existence of potential problems with the code," and whether he would or did "rely on the representations of his staff" are inadmissible.

In Section G of his disclosure, Mr. Vinella argues that FTX took commercially reasonable steps to protect the interest of U.S. customers. *See* Ex. F at 23. As is the case with the other opinions described above, Mr. Vinella has not articulated a reliable basis for reaching such a conclusion. Additionally, testimony about whether a party conducted itself in a "commercially reasonable manner" is effectively testimony about "the customs and standards of an industry, and … how a party's conduct measured up against such standards." *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 528-29 (S.D.N.Y. 2001). Such testimony impermissibly "makes statements concerning the parties' intent," "strays outside the scope of proper expert testimony," and should therefore be precluded. *Id.*

Finally, the opinions in Section H of Mr. Vinella's disclosure set forth fifteen practices that he asserts are "widely-accepted customs" in the financial services industry, including the use of third party agents, commingling of customer assets, unrestricted use of customer assets, and preferential treatment of some customers. *See* Ex. F at 23-28. Expert testimony regarding what is generally "customary" in industries could improperly suggest to the jury that the issue before it is whether the defendant's actions were consistent with industry practice, which is plainly not actually at issue. Such testimony would be unfairly prejudicial, suggesting that the jury should believe that the alleged fraudulent conduct was ordinary or routine and that this somehow mitigates or eliminates the defendant's scienter. Because jurors are likely to give additional import to

testimony designated as "expert testimony," the risk of misleading the jury weighs even more heavily in this Rule 403 balancing test. Given the minimal, if any, probative value of testimony on general industry practice, and the substantial risk of misleading the jury as to the issue before it, this testimony should be precluded pursuant to Rule 403. *See Newkirk*, 684 F. App'x at 97 (affirming district court's exclusion of expert testimony concerning industry practice as irrelevant to "attorney obligations not to convey information they actually know, or consciously avoid knowing, is false"); *United States v. Sanders*, No. 12 Cr. 0574 (LAK), 2013 WL 1421487, at *2 (S.D.N.Y. Mar. 27, 2013) (precluding proposed expert testimony as to "custom and usage in the insurance industry" as irrelevant to the question of whether "inaccurate information allegedly supplied by the defendant was not material to the insurance carriers" and unhelpful to the jury "given the abundant evidence thus far offered by percipient witnesses"); *Mendlowitz*, 2019 WL 6977120, at *5 (precluding expert testimony on the "general industry practices in the payment processing industry" as not relevant to whether the defendant violated the wire fraud statute).

### D. In the Alternative, the Court Should Conduct a Daubert Hearing

If the Court does not grant the Government's motion to preclude Mr. Vinella's testimony on the papers, the Government respectfully requests that the Court conduct a *Daubert* hearing to evaluate the expert's qualifications, his methodology, and the relevance and reliability of the proposed expert testimony. Mr. Vinella's opinion is replete with cursory and vague conclusions about the defendant, and those conclusions alone raise significant questions regarding the relevance and reliability of the proposed testimony, as well as the reliability of Mr. Vinella's methods. A *Daubert* hearing would therefore be appropriate before any of this confusing and prejudicial evidence is presented to the jury, especially in areas where courts have recognized that the potential for prejudice is particularly high.

**VI.    The Court Should Exclude Andrew Di Wu's Proposed Testimony**

Professor Wu intends to (1) provide background testimony about blockchain, cryptocurrency, cryptocurrency exchanges, and cryptocurrency lending; (2) compare the business models and practices of cryptocurrency exchanges; and (3) provide a timeline of the crypto markets "boom and bust." Ex. G at 2-4. That testimony is not relevant to the contested issues at trial, is improper under Rules 702 and 704, and "[s]uch material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence." *Rezulin Prod.*, 309 F. Supp. 2d at 551 (precluding expert's "history of Rezulin" that would have included "a narrative reciting selected regulatory events" as "simple inferences drawn from uncomplicated facts").

First, Professor Wu's testimony is inadmissible under Rules 402 and 403 for many of the same reasons that Mr. Vinella's testimony would be improper, and portions of it also lack a reliable methodology under Rule 702. Much of Professor Wu's proposed background testimony about cryptocurrency would be irrelevant at trial and would only serve to confuse the jury. That includes backgrounds about "blockchain technology and its key components," including its "decentralized, immutable database," "core use cases," "roles of various stakeholders," and "data validation." Ex. G at 2. It is not apparent what any of those topics have to do with the issues at trial. The same is true for background testimony about the technology behind the creation and use of cryptocurrency. *Id.*

Other opinions by Professor Wu stray from irrelevant to impermissible. Professor Wu's proposed testimony about cryptocurrency lending should be precluded in its entirety. It is an improper attempt to educate the jury on "common practices" and "industry practices" around lending. Such "industry practice" testimony is inadmissible under Rules 402 and 403, as explained above. *See Newkirk*, 684 F. App'x at 97 (excluding expert testimony concerning industry practice as irrelevant); *Sanders*, 2013 WL 1421487, at *2 (same); *Mendlowitz*, 2019 WL 6977120, at *5

(same). Thus, Professor Wu should not be permitted to testify about common practices around "making and taking loans," practices concerning "loan collateralization" and the use of digital assets, "lender disclosures of their due diligence practices," or the "common use cases of loaned funds." Ex. G at 3. While Professor Wu's notice is not clear as to what his opinion is with respect to lenders and their "due diligence practices," he should not be permitted to argue that lenders somehow acted inappropriately or were not sufficiently diligent. *See* Gov't Motions *in Limine* (Dkt. 204), at 36.

Professor Wu's proffered testimony on cryptocurrency exchanges, set out in paragraphs 12 and 13 of his disclosure, is inadmissible. Like the proposed testimony about lenders, industry custom testimony about how cryptocurrency exchanges function, how depositing and trading works across the industry, "the nature of exchange ledgers," "the nature and use of virtual user account balances," "the crediting and debiting process on these ledgers," and "the use of omnibus wallets" is irrelevant and improper because this trial does not concern how other exchanges operate. Ex. G at 3. For the same reason, all of Professor Wu's planned testimony comparing FTX to other cryptocurrency exchanges, including comparing their "disclosures around exchange operations and risk" and their "terms of service" is both irrelevant and would confuse the jury by focusing them on the terms of service of other exchanges. It is also improper state of mind evidence masquerading as industry practice evidence, but both are inadmissible because they lack relevance and are unduly prejudicial.

Professor Wu's opinions on these topics also lack any reliable basis or methodology, at least as disclosed in his expert notice. His notice states that his opinions are based on his own education, training, and academic experience, as well as his review of literature, and filings in this and related cases. But it is not clear what the scientific or technical bases are for his opinions—it

is not apparent that he has, for instance, conducted a first-hand study of exchanges and their features. Accordingly, it does not appear that Professor Wu's proposed expert testimony about ledgers and "omnibus wallets" are used in the cryptocurrency exchange industry is the product of a reliable methodology.

The timeline proposed in paragraph 14 of Professor Wu's disclosure is also not a proper subject for expert testimony. As a general matter, "[a]cting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise, nor is such a narration traceable to a reliable methodology," and for that reason, "[m]ere narration … fails to fulfill *Daubert*'s most basic requirements." *Kaufman*, 2021 WL 4084523, at *21 n.226 (quoting *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013)). In addition, to the extent the proposed timeline sets forth events that Professor Wu has deemed "significant" because they "contributed" to a downturn in the cryptocurrency market, his conclusions about partial causation must be the product of a reliable methodology. In other words, it would be improper for an expert to assert that something contributed to the downturn in cryptocurrency prices if he did not do any form of analysis, such as an event study or some other form of reliable scientific or technical examination. Were Professor Wu not to ascribe significance, causation, or correlation to any event, and merely plotted them on a timeline, then there is no basis for expert qualification or testimony. Moreover, Professor Wu's related opinion that the events in the cryptocurrency market were "unexpected" and "resulted in confusion from many market participants, including cryptocurrency exchanges," is an improper opinion about intent, which must be precluded under Rule 704(b).

Second, even if some of the topics identified in Professor Wu's notice were relevant, they would not be proper for expert testimony. Rather, former FTX employees and other percipient witnesses are capable of testifying about relevant background related to cryptocurrency,

cryptocurrency exchanges, and changes in the market for cryptocurrency. Witnesses from Alameda's lenders can and will testify about cryptocurrency lending. And victim investors will be able to testify, if relevant, about broader trends within the cryptocurrency market at the times they were investing. Professor Wu's testimony would be "needlessly cumulative" of such testimony, and any probative value of his testimony would be outweighed "by the danger of undue delay and wasting time." *Kaufman*, 2021 WL 4084523, at *19 (precluding expert testimony that would have "educated the jury" about loans and illustrated "the similarities and differences" between types of loans).

Accordingly, Professor Wu's testimony should be excluded. In the event that the testimony is not excluded in its entirety, the Court should conduct a *Daubert* hearing to determine whether Professor Wu's conclusions about cryptocurrency lenders, cryptocurrency exchanges, and changes in the cryptocurrency market are the product of a reliable methodology.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should exclude the testimony of (1) Lawrence Akka; (2) Thomas Bishop; (3) Brian Kim; (4) Joseph Pimbley; (5) Bradley Smith; (6) Peter Vinella; and (7) Andrew Di Wu.

Dated:  New York, New York
        August 28, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York


By:  /s/ Nicolas Roos
      Nicolas Roos
      Danielle Kudla
      Samuel Raymond
      Thane Rehn
      Danielle R. Sassoon
      Assistant United States Attorneys
      Southern District of New York
