**<u>Exhibit A</u>**

Expert Notice of Lawrence Akka

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

SAMUEL BANKMAN-FRIED,


Defendant

22 Cr. 673 (LAK)

**EXPERT WITNESS DISCLOSURE FOR
LAWRENCE AKKA KC**

## Introduction and Qualifications

1   I, Lawrence Akka KC, am an English barrister (since 1991) and King's Counsel (formerly Queen's Counsel, since 2012) specialising in commercial law and commercial disputes, particularly those involving technology and civil fraud.

2   I am a member of chambers at Twenty Essex in London, a leading commercial set of chambers. I have a particular specialisation in the law relating to digital assets. I am ranked as a leading KC in tier 1 in both the Legal 500 (IT & Telecoms) and Chambers (both Information Technology, and Cryptoassets) directories, and was the Legal 500 Technology and Data Silk of the Year in 2022.

3   In addition to practising before the High Court and Court of Appeal of England and Wales, and the UK Supreme Court, I frequently sit as commercial arbitrator in references governed by rules including those of the International Chamber of Commerce, the London Court of International Arbitration, the Singapore International Arbitration Centre, the United Nations Commission on International Trade Law and others. I am a member of the Society for Computers and Law, and the British Computer Society, and I am chair of the IT Panel of the Bar Council of England and Wales.

4    I am a co-author of the UK Jurisdiction Taskforce ("UKJT")[1] Legal Statement on Cryptoassets and Smart Contracts (2019), the aim of which was to address areas of perceived legal uncertainty relating to the characterisation of cryptoassets and smart contracts. It considered how English law[2] applied in relation to certain questions, including as to the nature of cryptoassets (in particular, whether they could amount to property), and smart contracts.

5    I have also authored or co-authored:

(a)    the UKJT Legal Statement on Digital Securities, February 2023 (which considered questions concerning the issuance and transfer of equity and contractual securities on DLT-based systems);

(b)    IT Contracts and Dispute Management (a textbook on the law and practice of technology contracts, now in its second edition (Edward Elgar, 2023));

(c)    The ICCA-IBA Roadmap to Data Protection in International Arbitration (ICCA, 2022);

(d)    the UKJT Digital Dispute Resolution Rules, April 2021 (arbitration rules intended to facilitate the rapid and cost-effective resolution of commercial disputes, particularly those involving novel digital technology such as cryptoassets, cryptocurrency, smart contracts, distributed ledger technology, and fintech applications);

(e)    A chapter on AI and Smart Contracts in Hervey and Lavy, The Law of Artificial Intelligence (Sweet & Maxwell 2020);

(f)    "What is the difference between a cryptocurrency trading platform and a kitchen blender" (Computers & Law, March 26, 2019);

(g)    "Could the English Courts Give Judgments in Bitcoin?" (Computers & Law, July 30, 2018).

6    I have not testified as an expert at trial or by deposition in the prior four years.

---

[1]   A taskforce set up by the UK Government as a collaborative discussion forum to promote the use of technology in the UK's legal sector, and chaired by Sir Geoffrey Vos, Master of the Rolls and President of the Civil Division of the Court of Appeal.

[2]   References to English law are to the law of England and Wales.

7    A copy of my *curriculum vitae* is attached as Akka Appendix A.

8    I have no financial interest in the outcome of this case. I am being compensated for my time and services on an hourly basis at the billing rate of £800 per hour. My compensation in this case is not in any way contingent or based on my opinions below or on the outcome of these legal proceedings.

## Instructions

9    I have been asked by counsel for Samuel Bankman-Fried to review the written terms of service (the "Terms") for FTX  Trading Ltd ("FTX") in effect from May 13, 2022 onwards. My understanding is that each customer agreed that the Terms would govern their use of the FTX cryptocurrency exchange.

10    The Terms state at section 38.11 that "The Terms and any Dispute shall be governed by, and construed in accordance with, English law."  Accordingly, I have been asked, as a practitioner qualified in English law, to opine on the nature of the relationship between FTX and its customers and in particular on whether that relationship constrained FTX in its use of fiat currency provided by those customers.

11    Answering these questions requires an analysis of whether the Terms contain a declaration of trust (such that an English law trust relationship is created, and along with it, a fiduciary obligation of loyalty on FTX), or whether they give rise to a contractual relationship only (such that FTX's obligation is that of a debtor: to repay an equivalent amount of fiat currency in due course).

12    Based on my review of the Terms, my opinion is that they did not contain a declaration of trust over any fiat currency, but gave rise only to a contractual creditor-debtor relationship. FTX therefore owed no obligations as trustee of any fiat currency, and its obligations were only those contractual obligations in the Terms. On the English law interpretation of the Terms, FTX was obliged to honour customer withdrawals (i.e. to repay the debt of fiat currency that it owed), but was not constrained to use fiat currency for any particular purpose in the interim.

13    If called as a witness, I may testify to the opinions and issues set out in this written opinion. Further, I reserve the right to respond to evidence and argument presented by the Government relating to the Terms or any other agreements between FTX and customers.

3

**Interpretation of contracts**

14    There are a number of well-known and often-cited cases at the highest level concerning how an English court must approach the task of interpreting a contract governed by English law.[3] In particular, the court seeks to ascertain the meaning which the words used would convey to a reasonable person, having all the background knowledge which would have been available to the parties in the situation in which they were at the time of the contract. It focusses on the meaning of the relevant words in their documentary, factual and commercial context, and assesses it in the light of (i) the natural and ordinary meaning of the provision in question, (ii) any other relevant provisions of the contract, (ii) the overall purpose of the provision and the contract, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions.

15    These principles have been conveniently summarised by Popplewell J in *Lukoil Asia Pacific Pte Ltd v Ocean Tankers (Pte) Ltd* [2018] EWHC 163 (Comm), [2018] 2 All ER (Comm) 108, [8]:

> "The court's task is to ascertain the objective meaning of the language which the parties have chosen in which to express their agreement. The court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. The court must consider the contract as a whole and, depending on the nature, formality and quality of drafting of the contract, give more or less weight to elements of the wider context in reaching its view as to the objective meaning of the language used. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other. Interpretation is a unitary exercise; in striking a balance between the indications given by the language and the implications of the competing constructions, the court must consider the quality of drafting of the clause and it must also be alive to the possibility that one side may have agreed to something which with hindsight did not serve his interest; similarly, the court must not lose sight of the possibility that a provision may be a negotiated compromise or that the negotiators were not able to agree more precise terms. This unitary exercise involves an iterative

---

[3]    *Arnold v Britton* [2015] UKSC 36 [15]–[23] (Lord Neuberger); *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50 [21]–[30] (Lord Clarke); *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38 [14]–[15], [20]–[25] (Lord Hoffmann), *Wood v Capita Insurance Services Ltd* [2017] UKSC 24, [2017] 2 WLR 1095.

> *process by which each suggested interpretation is checked against the provisions of the contract and its commercial consequences are investigated. It does not matter whether the more detailed analysis commences with the factual background and the implications of rival constructions or a close examination of the relevant language in the contract, so long as the court balances the indications given by each."*

16    As Lord Hodge put it in *Wood v Capita*,[4] "Textualism and contextualism are not conflicting paradigms in a battle for exclusive occupation of the field of contractual interpretation."

17    The emphasis therefore is on the objective meaning of the words the parties have used, against the factual background known to both at the time of contracting. The subjective intention of one party, or both parties, is irrelevant to questions of interpretation.

18    It is also irrelevant to consider anything said or done by the parties after the contract was made:

> *"I must say that I had thought it now well settled that it is not legitimate to use as an aid in the construction of the contract anything which the parties said or did after it was made. Otherwise one might have the result that a contract meant one thing the day it was signed, but by reason of subsequent events meant something different a month or a year later.[5]*

### Trusts and fiduciary obligations

19    There is no single definition of a trust in English law. It encompasses (but is not restricted to) the legal relationship created when assets are placed by someone (the settlor) under one party's control (the trustee) for the benefit of another (the beneficiary) or for a special purpose.[6] One textbook definition is:[7]

> *A trust is the relationship which arises whenever a person (called the trustee) is compelled in equity to hold property, whether real or personal, and whether by legal or*

---

[4]   n 3 [13].

[5]   *James Miller and Partners Ltd v Whitworth Street Estates (Manchester) Ltd* [1970] AC 583; Lewison: The Interpretation of Contracts (7th Ed and 1st Supp, Sweet & Maxwell) §3.183–3.196.

[6]   The settlor may be the same as the trustee.

[7]   Keeton and Sheridan Law of Trusts (12th ed), p 3, cited in Lewin on Trusts, 20th Ed (Sweet & Maxwell, 2020) §1-003.

> *equitable title, for the benefit of some persons (of whom he may be one and who are termed beneficiaries) or for some object permitted by law, in such a way that the real benefit of the property accrues, not to the trustees, but to the beneficiaries or other objects of the trust.*

20   A wider definition is given in Art 2 of The Hague Convention on the Law Applicable to Trusts and on their Recognition 1985,[8] for its own purposes:[9]

> *For the purposes of this Convention, the term "trust" refers to the legal relationships created – inter vivos or on death – by a person, the settlor, when assets have been placed under the control of a trustee for the benefit of a beneficiary or for a specified purpose.*
>
> *A trust has the following characteristics –*
>
> *a) the assets constitute a separate fund and are not a part of the trustee's own estate;*
>
> *b) title to the trust assets stands in the name of the trustee or in the name of another person on behalf of the trustee;*
>
> *c) the trustee has the power and the duty, in respect of which he is accountable, to manage, employ or dispose of the assets in accordance with the terms of the trust and the special duties imposed upon him by law.*

21   Where a trust relationship exists, the beneficiary generally has some proprietary rights in relation to the relevant assets, and the trustee is subject to a number of duties as a matter of law, though these may be modified or excluded by contract.[10] In particular, an express trustee is a fiduciary and owes obligations of loyalty to the beneficiary.[11]

22   A key question therefore in determining what, if any, constraint on FTX's use of customer fiat currency exists is whether the relationship between the parties is

---

[8]   In force in the UK since 1992, and signed by (but not ratified by) the USA in 1988.

[9]   The definition is deliberately wide because it is intended to include analogous institutions of non-English law and which would not be within the usual English meaning of "trusts". Lewin (n 7) § 1-001.

[10]   And the trustee may have wide or narrow powers to manage the trust property (Bridge, Gullifer and ors: The Law of Personal Property 3rd Ed (Sweet & Maxwell, 2022) §15-026)

[11]   McGhee, Elliott: Snell's Equity, 34th Ed (Sweet & Maxwell, 2020) §§7-003–7-004.

properly characterised as contractual only and governed by the Terms, or whether those Terms give rise to a English law trust such that the fiat currency is a trust asset and that FTX owes to that customer the additional fiduciary duties of a trustee.

## Signifiers of an express trust versus a contractual creditor-debtor relationship

23    For an express trust[12] to be created, there must exist what are commonly referred to as the "three certainties":[13]

> In each of these forms of trust, a valid trust is created if several requirements are met. The settlor must sufficiently evidence the intention to create a trust, and the trust's essential elements must be defined clearly enough to enable the trustee, or the court in default, to execute the trustee's duties. This is typically abbreviated by saying that the "three certainties" must be satisfied, recently restated as follows: "The creation of a trust requires certainty of intention, certainty of objects and certainty of subject matter. Certainty of intention refers to the intention of the settlor: it is not necessary that the beneficiaries should even be aware of the trust."[14]  Certainty of objects refers to the persons intended to have the benefit of the trust whereas certainty of subject-matter relates to the property that comprises the trust assets.

24    No particular form of words is necessary, as long as it is clear that a trust is intended by the settlor. The use of the word "trust" is neither necessary nor determinative.[15] Similar principles to those of contractual interpretation apply— the relevant intention must be established objectively by reference to the documents, words or conduct relied on as creating the trust. Subjective intentions are irrelevant, as are "subsequent statements as to … subjective intention at the dates when the trusts were allegedly created."[16]

---

[12]  A distinction may be drawn between express trusts and trusts arising by operation of law. Generally speaking an express trust may be said to arise from the intention of a person to create a trust declared directly or indirectly. Resulting and constructive trusts arise by operation of law (for example, where there is an apparently voluntary payment for property or when an express trust fails (*Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] AC 669 (HL)), where property is received in breach of trust or some other obligation, on failed transfers under certain types of contract etc). I do not consider that they are relevant in the present circumstances (Lewin (n 7) §§1.033–1.034).

[13]  Law of Personal Property (n 10) §15-027.

[14]  *Re BA Peters plc* [2008] EWHC 2205 (Ch); [2008] BPIR 1180 (Ch D) [18].

[15]  Law of Personal Property (n 10) §15-029.

[16]  *Wilkinson v North* [2018] EWCA Civ 161, [2018] 4 WLR 41 [2], [53]; Lewin (n 7) §7-004, 7-005.

25   There is a reluctance, in the commercial context, to find that a trust exists in the absence of clear words:

> …Courts are generally disinclined to overlay common commercial transactions with trusts. Where the parties explicitly adopt equitable techniques, effect will generally be given to them. However, allegations that the parties have impliedly invoked equitable concepts will be viewed sceptically. In Manchester Trust v Furness, Withy & Co, Lindley LJ famously cautioned against "the extension of the equitable doctrines of constructive notice to commercial transactions … in commercial transactions possession is everything, and there is no time to investigate title; and if we were to extend the doctrine of constructive notice to commercial transactions we should be doing infinite mischief and paralyzing the trade of the country." Echoing this in the twentieth century, Lord Browne-Wilkinson reiterated: "wise judges have often warned against the wholesale importation of into commercial law of equitable principles inconsistent with the certainty and speed which are essential requirements of the orderly conduct of business affairs.[17]

26   For that reason, it has long been held that the relationship of a bank and customer is not, barring special circumstances, a trust, but is a contractual one of debtor and creditor only. This means that the customer of a bank has no proprietary interest in the money in their account—the money is the bank's to do with as it pleases:[18]

> Money, when paid into a bank, ceases altogether to be the money of the principal (see Parker v. Marcliant, 1 Phillips 360); it is then the money of the banker, who is bound to return an equivalent by paying a similar sum to that deposited with him when he is asked for it. The money paid into the banker's, is money known by the principal to be placed there for the purpose of being under the control of the banker; it is then the banker's money; he is known to deal with it as his own; he makes what profit of it he can, which profit he retains to himself, paying back only the principal, according to the custom of bankers in some places, or the principal and a small rate of interest, according to the custom of bankers in other places. The money placed in the custody of a banker is, to all intents and purposes, the money of the banker, to do with it as he pleases; he is guilty of no breach of trust in employing it; he is not answerable to the principal if he puts it into jeopardy, if he engages in a hazardous speculation; he is not bound to keep it or deal with it as

---

[17]   Law of Personal Property (n 10) §15-032. The final quotation is from Lord Browne-Wilkinson in *Westdeutsche Landesbank Girozentrale* (n 12), 704.

[18]   *Foley v Hill* (1848) 2 HL Cas 28; *Hart v Sangster* [1957] 1 Ch 329, at 337; *Joachimson v Swiss Bank Corp* [1921] 3 KB 110, at 127; *First City Monument Bank plc v Zumax Nigeria Ltd* [2019] EWCA Civ 294, [25].

*the property of his principal, but he is of course answerable for the amount, because he has contracted, having received that money, to repay to the principal, when demanded, a sum equivalent to that paid into his hands.*[19]

*Now, as to the banker: is his position with respect to his customers that of a trustee with respect to his cestui que trusts. Is it that of a principal with respect to an agent? Or that of a principal with respect to a factor? I see no ground for contending that there is any identity in those two points. I am now speaking of the common position of a banker, which consists of the common case of receiving money from his customer on condition of paying it back when asked for, or when drawn upon, or of receiving money from other parties, to the credit of the customer, upon like conditions to be drawn out by the customer, or, in common parlance, the money being repaid when asked for, because the party who receives the money has the use of it as his own, and in the using of which his trade consists, and but for which no banker could exist, especially a banker who pays interest. But even a banker who does not pay interest could not possibly carry on his trade if he were to hold the money, and to pay it back, as a mere depositary of the principal. But he receives it, to the knowledge of his customer, for the express purpose of using it as his own, which, if he were a trustee he could not do without a breach of trust.*[20]

*The essential relationship between a bank and its customer is contractual. It is not a fiduciary relationship. The banking relationship comprises a general contract, which is basic to all transactions, together with any special contracts which arise only as they are brought into being in relation to specific transactions or banking services. The bank's fundamental obligations under the general contract are to open and operate its customer's accounts, honour its customer's instructions in accordance with its mandate and to repay on demand monies deposited in an account. Other obligations may come into existence by virtue of specific agreements.*[21]

27    In this context, I understand that FTX is not regulated as a bank, but an English court would likely apply similar reasoning[22] (in addition to the reasons

---

[19]   *Foley v Hill* (n 18), Lord Cottenham LC.

[20]   *Foley v Hill* (n 18), Lord Brougham.

[21]   Paget's Law of Banking, 15th Ed (Butterworths, 2018) §4.1.

[22]   Adapting the words of Lord Brougham in *Foley v Hill*, FTX's position "*consists of the common case of receiving money from [its] customer on condition of paying it back when asked for, or when drawn upon, … because the party who receives the money has the use of it as his own, and in the using of which his trade consists, and but for which no banker could exist.*"

discussed below) and conclude that the relationship between FTX and its customers was a contractual creditor-debtor relationship.

### Do the Terms create an express trust?

28    Turning then to the Terms, I consider that an English Court would find the following factors in particular to be of potential interest or relevance:

(a)    The Terms do not expressly use the words "trust", "trust property", or "beneficial interest". Use of those words is not necessary for a trust to be created, but their absence in professionally drafted terms relating to financial transactions such as those in question might be thought to be significant. The word "Trustee" appears in s 9,[23] and appears intended to constitute FTX (or an affiliate) as trustee in specific circumstances where Assets are abandoned. It indicates (i) that FTX is not a Trustee in other circumstances (or the words would not have been necessary), and (ii) that the contracting parties are objectively aware of the concept of a trust, and are capable of using relevant terminology where they have an intention to create one.

(b)    Three provisions in the Terms—ss 2.1.3, 2.2.2 and 38.6—state that FTX does not have a fiduciary relationship with its customer. s 2.1.3 provides that FTX "has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services." Similarly, s 2.2.2 ends with the words "We provide no warranty as to the suitability of the Digital Assets traded under the Terms and assume no fiduciary duty to you in connection with such use of the Services." s 38.6 says, under the heading "No partnership or agency", "Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other cooperative entity between the parties for any purpose whatsoever." These provisions on their face indicate an intention not to create a trust.

(c)    s 2.10 says "No deposit: Neither Digital Assets nor any fiat currency or E-Money held in your Account is eligible for any public or private deposit insurance protection." Although the word "deposit" is mentioned, this

---

[23]   Although it is capitalised, it is not a defined term.

provision appears to be aimed at excluding the applicability of deposit protection schemes set up in various countries (such as the Financial Services Compensation Scheme in the UK).[24] I do not read it as having any relevance to the question of whether the Terms create a trust.

(d)  s 8.2.6 concerns the manner in which Digital Assets (i.e. not fiat currency or E-Money) are held:

> *All Digital Assets are held in your Account on the following basis:*

> (A) *Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.*

> (B) *None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.*

> (C) *You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.*

There is no parallel provision concerning fiat currency. That fact suggests to me that there is no intention that any property in fiat currency should remain with the customer, and that the fiat currency should accordingly become FTX's property.[25] On any view, whether all property remains with the customer (as appears to be expressly provided for in the case of Digital Assets), or no property remains with the customer (as one might conclude from the absence of a parallel provision), s 8.2.6 does not appear to reflect any intention to create a trust. That is because a trust requires that the legal interest in property be with or be transferred to the trustee, and that the

---

[24]  The scheme was set up under s 213 of the Financial Services and Markets Act 2020. Broadly, the scheme only protects depositors (and others) in certain UK regulated companies and firms.

[25]  As one might expect in this context—see paragraph 26 above.

beneficial interest remain with or be transferred to the beneficiary—an allocation of interests that s 8.2.6 does not accomplish.[26]

(e)  s 8.3 refers to E-Money. s 8.3.2 says that "Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money ('E-Money'), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account." E-Money does not earn interest (s 8.3.4), and may be used to purchase Digital Assets (s 8.3.5). When Digital Assets are purchased with E-Money, the relevant amount of E-Money is debited from the Account (s 8.3.5) and when they are sold, E-Money is credited (s 8.3.6). It may be redeemed at any time (s 8.3.7) (discussed further below). E-Money is not a Digital Asset as defined by the Terms, nor is it legal tender (s 8.3.3). E-Money was not, as I understand it, itself property or money in any legal sense, but a representation of the amount in a customer's account and thus the customer's ability to trade on the FTX exchange—it was in effect a book entry on FTX's books. If that is correct, then s 8.3 indicates to me that customers who received E-Money in exchange for fiat currency received what they had bargained for (a right to trade on the exchange) and that there was no intention to hold fiat currency on trust:

(i)  the fiat currency was not kept in its original form, but was replaced with an accounting entry that enabled the customer to trade on the FTX exchange. The Terms did not constrain what FTX could do with the fiat currency after it had been exchanged for E-Money.

(ii)  no interest was payable—were there to be a trust, interest would normally accrue to the beneficiary.

(f)  s 8.3.3 says "E-MONEY IS NOT LEGAL TENDER. FTX TRADING IS NOT A DEPOSITORY INSTITUTION AND YOUR E-MONEY IS NOT A

---

[26] "… while B may be described as the 'legal' owner of the property, A is regarded as the 'equitable' or 'beneficial' owner.  …There is academic controversy as to whether the interest created under a trust is properly to be regarded as 'proprietary': see the helpful summary by Lord Mance JSC in Akers v Samba [2017] UKSC 6; [2017] A.C. 424, at [15]–[16]. The conventional view is that it is." (Grant, Mumford (eds), Civil Fraud 1st Ed 1st Supp (Sweet & Maxwell, 2022) §9-005).

"With transfers on trust, by contrast, the necessary formalities are simply those for the effective transfer of the intended trust property from settlor to trustee since there are no formalities for the inter vivos declaration of trust over personal property. In such a scenario, a trust is not constituted until the trust property vests in the trustee. Until then, the trust is simply a future possibility: the beneficiaries have no proprietary interest in any property, and cannot claim the benefit of the trustee's duties." (Law of Personal Property (n 10) §15–046).

DEPOSIT OR INVESTMENT ACCOUNT. YOUR E-MONEY ACCOUNT IS NOT INSURED BY ANY PUBLIC OR PRIVATE DEPOSIT INSURANCE AGENCY." A "Depository Institution" is not an English legal concept. The sentence concerning deposit insurances seems to have the same effect as s 2.10.[27]  As a whole, the provision appears designed to avoid FTX being subject to certain regulations. I do not consider it to be relevant to the question of whether a trust relationship has been created between FTX and its customers.

(g)   s 8.3.7 says "You may redeem all or part of any E-Money held in your account at any time, subject to outages, downtime, and other applicable policies (including the Terms), by selecting the relevant option in the Site and following the instructions."  Thus, the Terms required FTX to allow customers to redeem E-Money denominated in fiat currency for fiat currency but there are otherwise no express limitations on what FTX could do with a customer's fiat currency.

(h)   There is no provision requiring a customer's fiat currency to be ring-fenced, or held in a separate account, which is indicative that there is no trust relationship.

(i)   There are various references throughout the Terms to assets "in" or being "held in" an account, to freezing, withdrawal and redemption, to "your assets" (s 7.10), and to the "loading" and "storing" of fiat currency into your account" (8.1, 8.3.2). Such words and phrases are in my view neutral. They are commonly used when speaking of a bank account, even though there is no trust in such circumstances:

> … it is quite possible to speak of money in a bank account "belonging" to the customer even though the money is in truth owed to the customer by the bank.[28]

> … it is all too easy to fall into the use of loose language when speaking of bank accounts. Although we speak of "money being transferred" from one bank account to another; or of money in a bank account "belonging" to the customer, these phrases are inaccurate.[29]

---

[27]   see paragraph 28(c) above.

[28]   *First City Monument Bank plc v Zumax Nigeria Limited* [2019] EWCA 294 [37] (Newey LJ).

[29]   ibid [73] (Lewison LJ).

> *… The relation between customer and banker is a contractual relationship of creditor and debtor. What is represented by the balance in the customer's account is the amount of the debt that the bank is required to pay the customer if he demands it. Its legal character is that of a chose in action. This has been settled law for over 150 years.*[30]

> *… No "money" actually changes hands. In point of law, the payment instruction is an instruction to the bank to debit the customer's account in the amount of the payment; and to credit (or procure the credit) of the payee's account with a credit in the equivalent amount.*[31]

(j)   s 21 gives FTX the right to change the services it provides, unilaterally, and s 22 gives it the right to change the Terms by posting revisions on its website. Such terms are more common when there is a purely contractual relationship, than when there is a trust, because a trustee is not typically vested with authority to unilaterally change the terms governing a trust.

29   As indicated above, when interpreting a contract, English law does not look at individual clauses in isolation, but carries out a unitary exercise seeking to ascertain the meaning in the light of the contract as whole. It is not for me to express a concluded view as to the ultimate question to be decided by the Court, but I do consider that the several indications in the contractual wording that there was no intention to hold fiat currency in trust, and the few (if any) indications to the contrary, indicate that the relationship between the parties concerning fiat currency was one of creditor and debtor only.

### Effect of subsequent statements

30   To the extent that FTX or its representatives made public statements about FTX's practices after customers agreed to the Terms, such statements would not be relevant for the purposes of the interpretation of the Terms.[32]

---

[30]   ibid [74].

[31]   ibid [76].

[32]   Paragraph 18 above.

**Materials relied on**

31    My opinions are based on my own academic and professional education, training and personal experience, and knowledge regarding, but not limited to, contracts and trusts, which I have developed over the course of my career. Additionally, my opinions are based on publicly available documents and records produced in discovery in this case, including, but not limited to:

(a)    S6 22 Cr. 673 (LAK) DOJ superseding indictment;

(b)    S5 22 Cr. 673 (LAK) DOJ superseding indictment;

(c)    FTX Terms of Service;

(d)    Payment Agent Agreement between Alameda Research Ltd. and FTX Trading Ltd;

(e)    Explanations of FTX deposits and withdrawal procedures provided to FTX's auditor;

(f)    Information publicly available on FTX's website, including information regarding deposits and withdrawals of fiat currencies.

Respectfully submitted,

Lawrence Akka KC
16 August 2023



**TWENTY
ESSEX**

# Lawrence Akka KC

**SILK: 2012 | CALL: 1991**

✉ enquiries@twentyessex.com

☎ +44 (0)20 7842 1200

Languages: French



## Overview

Lawrence's practice encompasses high value and technically complex commercial and contractual disputes. He specialises in cases involving new technologies, media and telecommunications, frequently with an international element. Lawrence is instructed to appear in courts at all levels. He also acts in numerous confidential IT, shipping, commodity and commercial arbitrations and mediations in the UK and abroad.

In his technology practice, Lawrence has acted in a wide range of disputes involving software and hardware procurement, outsourcing, development, fintech and blockchain technologies, data protection, e-commerce, broadcasting, internet and telecommunications law. He is the Legal 500's Technology and Data Silk of the year for 2022.

He has been involved with IT for over 30 years and has a thorough grasp of the technical and other issues involved in the industry. Lawrence is a member of the UK Jurisdiction Taskforce of the Lawtech Delivery Panel, and the ICCA-IBA Joint Task Force on Data Protection in International Arbitration, and is the chair of the Bar Council IT Panel. He has written domestic and business software applications and is fluent in several computer programming languages.

Lawrence also has a significant wider commercial practice in shipping, banking, commodities, fraud and commercial law.

He sits as sole, party-appointed and presiding arbitrator in both technology and commercial disputes and has accepted appointments under many different sets of rules.

## Publications

- *IT Contracts and Dispute Management* (Second edition, Edward Elgar, 2023) (co-author). This is the only English law book addressing the law relating to technology projects and the practical, procedural and legal issues that arise at each stage.
- Legal Statement on Digital Securities (UK Jurisdiction Taskforce, 2023) (co-author).
- *ICCA-IBA Roadmap to Data Protection in International Arbitration* (ICCA-IBA, 2022) (co-author).
- UKJT Digital Dispute Resolution Rules (2021)(co-author).
- AI and Smart Contracts, in Hervey and Lavy, The Law of Artificial Intelligence (Sweet & Maxwell 2020) (co-author).
- *Legal Statement on the Status of Cryptoassets and Smart Contracts* (UK Jurisdiction Taskforce, 2019) (co-author).

## Professional memberships

- British Computer Society
- Commercial Bar Association
- Fraud Lawyers Association

## Education

- University of Oxford, St Catherine's College: BA (Hons) in Law, First Class, University Trusts Prize

- LMAA
- Society for Computers and Law

## Lectures / talks

- Chair, Bar Council Cybersecurity Conference (2023)
- The Digital Dispute Resolution Rules (Tel Aviv Arbitration Week 2023)
- Data Protection in International Arbitration (SCL Conference 2022)
- Paris Arbitration Week/SVAMC: Panel on Use of Experts in Technology Arbitration (July 2020)
- Fordham International Arbitration Conference: Panel on 'GDPR-International Arbitration Meets Data Protection: Practical Guidance for Compliance' (November 2018)
- Shenzhen Court of International Arbitration: Guest speaker on blockchain technology (November 2018)
- Singapore Academy of Law: Guest speaker on 'Demystifying blockchain' (November 2018)
- Bar Council GDPR conference:Speaker on 'Travelling with data' (April 2018 and March 2019)
- Disruptive Developments: Speaker on 'Technologies driving disruptive developments—AI, blockchain and the Internet of Things' (October 2018)
- Chancery Bar Association Annual Conference 2018: Guest speaker
- Fresh perspectives conference, Blockchain (Barcelona May 2018)
- Fraud Lawyers Association: 'Civil fraud—annual roundup' (November 2017)
- 'Freezing orders—recent developments' (November 2017)

## Example cases

- *ADM International SARL v Grain House International SA & Ors (Re Contempt of Court)* [2023] EWHC 135 (Comm): Imprisonment for contempt of court following breach of asset disclosure order.

- *Koninklijke Philips NV v Guangdong Oppo Mobile Telecommunications Corp, Ltd & Ors* [2022] EWHC 1703 (Pat): Anti-anti-suit injunction/mobile phone patents.

- *Webster & Ors v WPP Group (UK) Ltd* [2021] EWHC 2153 (Comm): Earn-out agreement dispute in the adtech industry.

- *CIS General Insurance Ltd v IBM* [2021] EWHC 347 (TCC): Representing CISGIL at the 8 week TCC trial of its claim for £132 million concerning the development of new insurance IT system.

- *SAP (UK) Ltd v Diageo Great Britain Ltd* [2017] EWHC 189 (TCC): representing SAP in a claim for £54 million for usage of SAP's ERP software in excess of licence by Diageo – the leading case on indirect use or access.

- *T-Systems Ltd v EE* – Represented T-Systems against Everything Everywhere in an £80 million IT services dispute regarding the migration and management of Orange and EE's legacy IT infrastructure.

- *Filmflex Movies v Piksel*: dispute over the rights under a development and managed services contract to the source code for a video-streaming platform involving consideration of source code escrow and distributed version control systems.

- *Nokia Corp v HTC* Corp: application for a stay under s 9(3) Arbitration Act 1996 in multi-jurisdictional mobile telephone patent litigation.

- *Skype Technologies SA v Joltid Ltd*: acting for Skype/eBay in a multinational software licencing and copyright dispute concerning the use of the P2P technology at the core of the Skype VOIP application.

- *Atos Consulting Ltd v Avis Europe plc*: application relating to multi-million pound pan-European ERP software project.

- *Peregrine Systems v Steria* (TCC and Court of Appeal): helpdesk outsourcing – software development and implementation contract – termination clause and common law termination – misrepresentation – meaning of remediable breach – documentation and training requirements – ITIL compliance – reasonable time for performance of IT contracts.

- *TARBS Europe SA v Macedonia*: Commercial Court claims for over €60 million concerning the provision of satellite segment space and broadcasting facilities.

- *Asia Islamic Trade Finance Fund Ltd v Drum Risk Management Ltd* [2015] EWHC 3590 and [2015] EWHC 3748 (Comm): one of the leading cases on committal and sentencing for contempt of court for breach of an asset disclosure order.

- *Fiona Trust v Privalov* [2010]: Commercial Court shipping fraud claims for over US$800 million.

## Information technology

- *Tibco Software (Ireland) v Tesco Stores:* Software licensing claim for £87m, due for Commercial Court trial in 2024.

- *Capita v Pearl Group:* Technology outsourcing dispute, due for Commercial Court trial in 2025.

- *Morton v Nexo*: Claim concerning crypto-trading account, tort of intimidation. Due for Commercial Court trial in 2024.

- *CIS General Insurance Ltd v IBM* [2021] EWHC 347 (TCC): Representing CISGIL at the 8 week TCC trial of its claim for £132 million concerning the development of new insurance IT system.

- *Koninklijke Philips NV v Guangdong Oppo Mobile Telecommunications Corp, Ltd & Ors* [2022] EWHC 1703 (Pat): anti-anti-suit injunction/mobile phone patents.

- *Webster & Ors v WPP Group (UK) Ltd* [2021] EWHC 2153 (Comm): Earn-out agreement dispute in the adtech industry.

- Advising in relation to the recovery of £millions  of cryptocurrencies following computer hacking.

- Advising in a dispute concerning the operation of the law of mistake in algorithmic trading transactions.

- Advising on regulatory aspects of launch of blockchain trading accounts.

- Advising a technology supplier concerning one of the biggest outsourcing projects in the UK.

- *SAP (UK) Limited v Diageo Great Britain Limited* [2017] EWHC 189 (TCC) – Representing SAP in a claim for £54m for usage of SAP's ERP software in excess of licence by Diageo – the leading case on indirect use or access.

- *T-Systems Ltd v EE* – Represented T-Systems against Everything Everywhere in an £80 million IT services dispute regarding the migration and management of Orange and EE's legacy IT infrastructure.

- *Filmflex Movies v Piksel* – Dispute over the rights under a development and managed services contract to the source code for a video streaming platform involving consideration of source code escrow and distributed version control systems.

- Advising in relation to a dispute concerning the renewal of hosting arrangements for a national professional body.

- Advising in a multi-million pound dispute concerning the use of software outside the licensed territory, including issues of assignment/novation/interpretation.

- Regularly advising in relation to claims for delay and defects in very large scale (£10s of million) transformation, design and implementation projects for and against many of the leading IT services companies.

- Advising a government department in relation to a £multi-million contract for national roll-out of outsourced IT services.

- Advising in relation to disclosure of confidential information and availability of injunctions concerning bid documentation for IT outsourcing project.

- Providing expert evidence of English law for foreign court on jurisdiction/arbitration clauses in a Mobile telecoms distribution agreement.

- Advising on Worldwide Freezing injunctions and the effect of the hacking of an email account involving a fraudulent SWIFT transaction.

- Advising an international operator of a multi-year contract for services in connection with defence ministry performance.

- Advising a worldwide software provider in relation to unauthorised resale of software licences.

- *Nokia Corp v HTC Corp* – Application for a stay under s.9(3) of the Arbitration Act 1996 in multi-jurisdictional mobile telephone patent litigation.

- *Skype Technologies SA v Joltid Limited* – Acting for Skype / eBay in a multinational software licencing and copyright dispute concerning the use of the P2P technology at the core of the Skype VOIP application.

- *Atos Consulting Ltd v Avis Europe plc* – Multi million pound pan-European ERP software project – application to strike out 60 page Particulars of Claim under CPR 3.4 – exercise of Court's jurisdiction and discretion – termination of a master services agreement relating to ERP software and Shared Service Centre (9 week trial in TCC which settled during hearing).

- *Peregrine Systems v Steria* – (TCC and Court of Appeal) Helpdesk outsourcing – software development and implementation contract – termination clause and common law termination – misrepresentation – meaning of remediable breach – documentation and training requirements – ITIL compliance – reasonable time for performance of IT contracts

## Media / broadcasting

- Advising an international broadcaster in relation to TV series production contract/distribution rights/quality issues.

- Advising on interpretation and termination of media distribution contracts for a major broadcaster.

- Advising on commercial issues arising out of a high profile broadcasting libel.

- Advising on interpretation and breach of a media talent contracts, including for breach by a well known TV celebrity and commercial rights.

- Advising in relation to a claim for breach of a media distribution and licensing agreement.

- Advising in relation to termination of contract for distribution rights of video on demand.

- Advising national broadcaster in dispute with global media company for on-demand content provision

- *TARBS Europe SA v Macedonia* – Commercial Court claims for over €60 million concerning the provision of satellite segment space and broadcasting facilities.

## Commercial contracts

- *ADM International SARL v Grain House International SA & Ors (Re Contempt of Court)* [2023] EWHC 135 (Comm): Imprisonment for contempt of court following breach of asset disclosure order.

- Obtaining Worldwide asset disclosure orders and Wordwide Freezing Orders in several related cases, resulting in successful enforcement of arbitration awards.

- Advising on claims under bills of lading and sale contracts for condensation damage during shipment. Allegations of breaches of the Hague/Hague Visby Rules, and of failure to enter into a shipping contract on appropriate terms.

- Acting/advising in multiple connected disputes in different jurisdictions and fora in a multi-million dollar dispute concerning the operation of a bioethanol plant.

- Advising in several Bill of Lading disputes concerning identity of shipper problems.

- Advising on a charterparty dispute concerning identity and amount of cargo to be shipped.

- Advising in relation to ship-financing and security problems arising on sale of ships.

- Advising in numerous ship and container laytime and demurrage disputes.

- Advising in relation to recovery of damages/general average against various parties in relation to a ship fire.

- Advising in relation to the bank financing arrangements concerning ship sale contracts worth in exces of US$26 million.

- Acting in numerous GAFTA/FOSFA/RSA/SAL and other trade body commodity arbitration disputes.

- Advising on remedies arising for breach of Worldwide Freezing Orders in several banking, commodities and shipping cases, including the applicability of receivership orders.

- Providing an expert opinion on English law for a foreign court in relation to dangerous cargoes and the law of indemnities.

- Providing an expert opinion on English law for the Malaysian Court in ship arrest proceedings concerning the OW Bunkers litigation.

- Advising in [...] classes of indirect losses along with questions over remoteness of damage, title to goods and privity of contract.

- *Asia Islamic Trade Finance Fund Ltd v Drum Risk Management Ltd* [2015] EWHC 3590 and [2015] EWHC 3748 (Comm) One of the leading cases on committal and sentencing for contempt of court for breach of an asset disclosure order. Fraud/theft of security provided in relation to a Sharia Compliant Murabaha Financing Agreement/ Structured Commodity Trade Finance. Conversion/trespass to goods/bailment/conspiracy/pledge interests.

- *Flame SA v Glory Wealth Shipping Pte Ltd* [2013] EWHC 3153 (Comm), [2014] QB 1080 Challenges under ss68 and 69 of the Arbitration Act 1996 relating to a long-term COA. One of the key cases concerning the assessment of damages for breach of contract when the innocent party would not have been able to perform.

- Advising concerning claims in excess of US$20 million for unperformed voyages under a long-term COA.

- *Novasen SA v Alimenta SA* [2011] 1 Lloyd's Rep 390 Jurisdictional challenge under s.67 of the Arbitration Act 1996 arising from a FOSFA commodity arbitration – agency – undisclosed principal – separability of arbitration agreements.

- *JSC BTA Bank v Ablyazov* [2010] EWHC 1779 (Comm), [2010] EWCA Civ 1141, etc, Commercial Court and Court of Appeal. Multi-billion dollar banking fraud in Kazakhstan – Freezing injunctions – receivership – ordinary course of business proviso – tracing – breach of fiduciary duty.

- *Fiona Trust v Privalov* [2010] Commercial Court shipping fraud claims for over US$800 million.

- *Novologistics SARL v Five Ocean Corp* – "The Merida" [2009] EWHC 3046 LMAA arbitration appeal to Commercial Court – demurrage – responsibility for delay at Chinese port – port or berth charterparty.

- *Farenco Shipping Co Ltd v Daebo Shipping Co Ltd* – The "Bremen Max" [2009] 1 Lloyd's Rep 81. Delivery without bills of lading – misdelivery – validity of security and standard form charterparty letters of indemnity.

- *Gulf Agri Trade FZCO v Aston Agro Industrial AG* [2008] 2 Lloyd's Rep 376 Arbitration appeal from GAFTA award – default clause and notice – anticipatory breach of contract.

- *Serena Navigation Ltd v Dera Commercial Establishment* – "The Limnos" [2008] 2 Lloyd's Rep 166 Package or unit limitation under the Hague and Hague Visby Rules Art IV rule 5(a) – Economic loss – meaning of "goods lost or damaged".

- *Gold Coast Ltd v Naval Gijon SA* – "Hull 553" [2006] 2 Lloyd's Rep 400 Long running shipbuilding dispute concerning delay in the construction of a chemical tanker for USD38 million – seven arbitration awards – Arbitration Act section 57 – correct test for granting extensions of time.

## Arbitral appointments

In addition to having appeared as counsel in hundreds of arbitrations, Lawrence has been appointed as arbitrator under many different sets of rules. Recent examples include:

- E-commerce agreement dispute (ICC, party appointed arbitrator)
- Shipping/bill of lading dispute (LMAA, party appointed)
- Computer game development (LCIA, chair)
- Power station coal supply agreement (LCIA, party appointed)
- Shareholder dispute/social media company (LCIA, chair)
- Provision of internet/telecommunication services (UNCITRAL, sole arbitrator)
- LLP members' agreement (LCIA, party appointed)
- Coal sale agreement (LCIA, chair)
- Broadcasting joint venture (ICC, party appointed)
- Sugar sales (RSA/SAL, tribunal legal advisor)
- Shipping/letter of credit/demurrage (LCIA, chair)
- Provision of telecommunications services (ICC, sole)
- Blockchain startup investment dispute (SIAC, sole)

## Recommendations

Combines a brilliant legal mind with unparalleled knowledge of the IT sector. Plus he is wonderfully user friendly. Clients love him. The Legal 500 UK Bar 2023

He cuts through complex issues and makes it easy for the judge. Chambers UK Bar 2023

He is clear, persuasive and very easy to work with and he provides very clear advice, as well as imaginative solutions to difficult problems. The Legal 500 UK Bar 2023

He is very good at understanding technology and is highly commercially aware. Chambers UK Bar 2023

A calm, collected and extremely intelligent barrister with clarity of thought and an ability to articulate complicated concepts in a simple way. The Legal 500 UK Bar 2022

He's a very good advocate, in the rarefied category of people at the Bar who can also code, and he's a leading member of the Bar for cryptocurrency. Chambers UK Bar 2022

The cleverest person in the room. A pleasure to work with. A very nice guy but a very clever and sharp litigator. You want him to be on your side. The Legal 500 UK Bar 2022

Very accessible, calm and unflappable, he offers creative solutions. The Legal 500 UK Bar 2022

Very good at conveying complex issues easily and quickly, and has a huge ability to absorb large amounts of work. Chambers UK Bar 2021

Brilliant and highly commercial; a go-to IT silk, in particular for media businesses. Chambers UK Bar 2021

He is fantastic – approachable, insightful and clear. Very measured; strong analytical skills; expert in IT issues; pleasure to work with. The Legal 500 UK Bar 2021

He has genuine IT experience which is very helpful. He is very easy to work with and very bright, and has a good combination of legal and IT skills. Chambers UK Bar 2020

He is very able and user-friendly, a top choice for technology disputes. The Legal 500 UK Bar 2020

He has written code and so he has a deep understanding of how technology works. He is also a very good lawyer. Chambers UK Bar 2020

He is a real star in tech disputes. The Legal 500 UK Bar 2018

Very good at the complex technical side of a case, and great at encapsulating and explaining the technology against the legal backdrop. Chambers UK Bar 2019

He is an excellent standalone commercial silk but combines that with a deep knowledge of the IT industry and IT, so he can run complex cases very efficiently. Chambers UK 2018

Skilled at handling complex technical cases. The Legal 500 2017

He doesn't just look at the law but get involved in the underlying merits, which is very important. Chambers UK 2017