```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                 :
   UNITED STATES OF AMERICA                                      :
                                                                 :
           - v. -                                                :
                                                                 :  22 Cr. 673 (LAK)
   SAMUEL BANKMAN-FRIED,                                         :
        a/k/a "SBF,"                                             :
                                                                 :
                          Defendant.                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

# THE GOVERNMENT'S OPPOSITION TO DEFENDANT SAMUEL BANKMAN-FRIED'S MOTIONS *IN LIMINE*

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Danielle Kudla
Samuel Raymond
Thane Rehn
Nicolas Roos
Danielle R. Sassoon
Assistant United States Attorneys
 *- Of Counsel -*

# TABLE OF CONTENTS

ARGUMENT ................................................................................................................................ 1

I.  Limited Evidence of The Bankruptcy of FTX and Alameda and the Defendant's
    Resignation as CEO of FTX Is Admissible at Trial ............................................................ 1

II. Public Statements that the Defendant Authorized About FTX Are Admissible ................ 5

III. The Court Need Not Enter Any Further *Brady* Order ...................................................... 8

CONCLUSION ........................................................................................................................... 10

The Government submits this memorandum in opposition to defendant Samuel Bankman-Fried's motions *in limine*. (Dkt. 207). For the reasons discussed below, the defendant's motions should be denied.[1]

**ARGUMENT**

I. **Limited Evidence of The Bankruptcy of FTX and Alameda and the Defendant's Resignation as CEO of FTX Is Admissible at Trial**

The parties are in apparent agreement that evidence and argument about whether FTX needed to declare bankruptcy, whether it was good for FTX and its customers to declare bankruptcy, whether the defendant supported the petition, whether the exchange would be operational today but for the bankruptcy, and whether attorneys benefited from the bankruptcy are irrelevant at trial. The defendant, however, seeks to go a step further and preclude any evidence whatsoever of the bankruptcy of FTX and Alameda and of the defendant's resignation as FTX's CEO. He argues that this evidence is irrelevant because "businesses seek bankruptcy protection for a variety of reasons" and the defendant was "strongarmed" into resigning. (Dkt. 207 at 10, 14). This evidence, however, is admissible as direct evidence of the defendant's crimes.

The company's bankruptcy is inextricably intertwined with the misappropriation of customer funds alleged in the Indictment and necessary to complete the story of the defendant's crimes, as it was FTX's inability to honor customer withdrawals that caused the company to declare bankruptcy. *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (evidence is admissible when it is "necessary to complete the story of the crime on trial"); *In re Physiotherapy Holdings, Inc.*, No. 18-1734 (LPS), 2019 WL 3916536, at *2 (D. Del. July 2, 2019) (denying

---

[1] The Government previously filed a letter in response to the defendant's motion in limine on discovery issues, and the Court denied the defendant's motion on August 31, 2023. *See* Dkt. 241.

motion *in limine* that sought to exclude references to a bankruptcy proceeding and reasoning that such evidence was "probative of the Debtor's financial condition"). Indeed, it will be impossible for the victims of the defendant's scheme to testify in a coherent manner about the deposit of funds, investment of money, or loaning of cryptocurrency—and the materiality of the defendant's false statements to induce them to part with money and property—without being able to reference the bankruptcy and what happened with their money.

Evidence of the defendant's resignation as FTX's CEO and his subsequent interference with the bankruptcy estate is also admissible to complete the story of the criminal conspiracy and to show the defendant's criminal intent. The Government expects that witnesses will testify that on November 11, after the defendant had resigned and FTX declared bankruptcy, the defendant contacted Caroline Ellison and requested that she assist him in moving FTX assets to the control of Bahamian authorities, which she refused. The defendant also contacted Gary Wang and arranged for the two to meet with Bahamian liquidators and regulators. The defendant and Wang then moved accessible cryptocurrency assets belonging to FTX, and which the defendant knew were of interest to the FTX Debtors, to a cryptocurrency wallet Wang understood was controlled by the Bahamian regulators. The purpose of these transactions was, according to the defendant, at least in part to induce Bahamian authorities to treat him more favorably, and ultimately enable the defendant to regain control of the companies. He also instructed Wang to stall the FTX Debtors seeking to recover assets on behalf of the U.S. bankruptcy. These were plainly acts in furtherance of the charged wire fraud scheme, as they were part of the defendant's efforts to retain control over FTX, and the remaining customer assets held by FTX, rather than allowing them to enter the bankruptcy estate to be distributed to FTX's customers and other creditors. Evidence of the surrounding facts, including FTX's declaration of bankruptcy and the defendant's resignation on

November 11, 2022, is important to place them in context.

Nor is there any basis to conclude that FTX's bankruptcy or the defendant's actions on November 11, including his resignation, subsequent statements to Ellison and Wang, and transfer of customer assets to a foreign authority, are particularly prejudicial as compared to the central allegations here involving misappropriation of billions of dollars from customers, investors, and lenders.

The defendant's cited cases on this point are inapposite. He first cites *HTC Corp. v. Tech. Properties Ltd.*, No. 08 Civ. 882 (PSG), 2013 WL 4782598 (N.D. Cal. Sept. 6, 2013). That case involved a lawsuit for patent infringement, where the defendant sought to introduce evidence of the plaintiff's bankruptcy to support the argument that the plaintiff's patents lacked market value. The court rejected the evidence on the basis that the defendant had "fail[ed] to tie [the plaintiff's] bankruptcy to a lack of success in licensing [its patent] portfolio." *Id.* Here, by contrast, Counts One and Two of the Indictment allege that the defendant misappropriated billions of dollars in customer deposits from FTX, depriving customers of their right to use their property, and FTX's bankruptcy is directly probative of the defendant's misappropriation, or at a minimum necessary to explain and contextualize the materiality of the misappropriation to victims.

The defendant also cites *Off. Comm. of Unsecured Creditors v. CalPERS Corp. Partners LLC*, No. 18 Civ. 68 (NT), 2021 WL 3264272, at *5 (D. Me. July 30, 2021), but in that case the court *denied* a motion to preclude evidence of a party's bankruptcy, reasoning that the bankruptcy was "relevant and part of the story of this case." *Id.* The court merely held that the plaintiff could not use the fact of bankruptcy to argue that the bankrupt entity had been insolvent at a much earlier point in time, an issue that is not relevant here. *Id.*

In support of his motion to preclude evidence of his resignation, the defendant relies,

mistakenly, on *United States v. Martoma*, No. 12 Cr. 973 (PGG), 2014 WL 31700, at *3 (S.D.N.Y. Jan. 6, 2014). There, the court precluded evidence of the defendant's termination, which had occurred two years after the charged conduct and had only limited probative value as to the defendant's motive to commit the charged offense, insider trading. Here by contrast, the defendant resigned as the companies he founded and controlled were falling apart, in the midst of his own lies to try to keep the fraud going, and he continued to commit acts in furtherance of the charged offenses after his resignation. Nothing about these events would risk "misleading and distracting the jury"—instead, the defendant's conduct leading up to his resignation and thereafter are important issues for the jury to consider in deciding his guilt. *Id.* And unlike in *Martoma*, the Government expects that multiple sources of evidence will establish precisely why the defendant resigned: his company were collapsing, and "senior managers at FTX-related entities" were rightfully worried about what had led to the collapse. (Dkt. 207 at 15).

Finally, the defendant argues that permitting evidence of FTX's bankruptcy would require a "mini-trial" over the subsequent conduct of the bankruptcy proceeding and whether FTX customers will or will not ultimately be made whole. (Dkt. 207 at 11). That is simply incorrect, for reasons discussed in the Government's motions *in limine*. (Dkt. 204 at 41-44, 49-53). In short, it is relevant to the charged crimes that FTX did not safely maintain customer deposits as the defendant publicly misrepresented that it did, and that FTX's resulting inability to cover customer withdrawals led to its declaring bankruptcy. But it is not relevant how the bankruptcy process will play out in the long term, or whether the company will ever recover sufficient funds to make customers whole. Any such arguments from the defense should be precluded. As the Court has already recognized in ruling on the defendant's pretrial motions, whether customers could be made whole in the future "is immaterial as a matter of law" because the crime of wire fraud is complete

where "there is an immediate intent to misapply and defraud." *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 4194773, at *9 (S.D.N.Y. June 7, 2023); *see also United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) ("where some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from the defendant's fraudulent conduct").

## II. Public Statements that the Defendant Authorized About FTX Are Admissible

The defendant moves to preclude statements pertaining solely to FTX.US, but the only such statements he references are "public statements and advertisements about FTX.US." (Dkt. 207 at 16). The defendant's suggestion that there was a clear public distinction between his promotion of FTX and FTX.US is inaccurate, as the evidence at trial will demonstrate. Internal documents indicate that FTX made no distinction between advertising for the international platform and for FTX.US: for instance, in a due diligence document, FTX employees specifically noted that "marketing expenses" were not distinctly allocated between FTX.US and FTX.com, because neither "may . . . be the sole beneficiary of the deal, as audiences/fans of that particular sport/artist may reside in multiple markets."

The actual advertising materials and public statements that the defendant authorized similarly make no such distinction: celebrities are featured in advertisements describing "FTX" as "a safe and easy way to get into crypto" and showing customers using a device displaying the FTX logo, not the FTX.US logo.[2] The Government expects that customers of FTX, including some

---

[2] *See* FTX Suber Bowl Commercial Featuring Larry David, at 2:10, available at https://www.youtube.com/watch?v=hWMnbJJpeZc (accessed September 1, 2023); *see also* FTX Commercial Featuring Tom Brady and Gisele Bündchen, at 1:24, available at https://www.youtube.com/watch?v=mfGtDjbpRBo&t (accessed September 1, 2023) (stating

located abroad and some located in the United States, will testify that they were aware of these false public statements made at the defendant's direction, and relied in part on those statements to trade on FTX or keep their funds on the platform. These false statements were more than "capable of leading a reasonable person to change his conduct," and should thus be admitted at trial. *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (defining materiality for purposes of the wire fraud statute).

The defendant's arguments that these statements are not relevant or otherwise inadmissible because they purportedly relate only to FTX.US are flatly inconsistent with the statements themselves. Both of the commercials referenced above refer repeatedly to "FTX," full stop, and not to "FTX.US," and the advertisements repeatedly display the FTX logo. The Super Bowl advertisement contains only one reference to FTX.US, not spoken but buried in the fine print on the closing frame of the commercial for approximately two seconds. When viewing that frame, the viewer's eye is more likely to be drawn to the large FTX logo on the screen than to the reference to FTX.US that is barely legible in the notice at the bottom. And the notice does not even purport to limit the advertisement to FTX.US, but only states that the commercial's copyright was owned by FTX.US, as seen below:

---

"FTX: The most trusted way to buy & sell" various digital assets).



The advertisement featuring Tom Brady and Gisele Bündchen has a similar concluding frame, also visible for mere seconds, seen below:



There is thus ample evidence that these advertisements would be considered by a "reasonable person" as pertaining to FTX, which is the applicable standard for materiality, and thus they are relevant to the defendant's scheme to defraud customers of FTX. Of course, the defendant is permitted to argue that these statements were not material because the fine print references FTX.US, but that argument goes to what weight to place on the advertisements—a jury question—not whether they are relevant and admissible. Finally, because the Government does not intend to call U.S.-based customers of FTX.US, there is no concern about prejudice, jury confusion, or waste of time.

### III. The Court Need Not Enter Any Further *Brady* Order

On January 6, 2023, pursuant to Fed. R. Crim P. 5(f), the Court entered an order to confirm the Government's disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. (Dkt. 35). The Government has repeatedly acknowledged its *Brady* obligations in this case and continues to comply with those obligations, and the defendant offers no reason to doubt that conclusion. There is no need for the Court to enter any further order.

On May 4, 2023, the Government sent defense counsel a 60-page letter, with enclosures of more than 100 pages, summarizing information the Government learned in its investigation as of that date that could be relevant to potential defenses. That letter included potential *Brady* materials that had been identified by the Government, and included statements by dozens of potential witnesses, including information taken from more than twenty attorney proffers. Thus, while the defense asserts that the Government has only produced potential *Brady* material in "written form," those disclosures memorialize witness and attorney statements made to the Government. (Dkt. 207 at 18).

Additionally, with its disclosure of Jencks Act material on September 8, 2023, the

Government intends to produce materials in its possession containing statements from potentially testifying witnesses, and also, in an abundance of caution, from other witnesses that the Government has interviewed (or received attorney proffers from) but does not intend to call at trial. Moreover, last week, the Government produced statements and other materials pertaining to dozens of individuals who the Government does not intend to call at trial, including information provided by the FTX Debtors orally. Because the Government has made a good-faith representation to the court and the defense counsel that it recognizes and continues to comply with its disclosure obligations under *Brady*, there is no need to enter a further *Brady* order. *See, e.g., United States v. Zelaya-Romero*, No. 15 Cr. 174 (LGS), 2018 WL 1033235, at *3 (S.D.N.Y. Feb. 21, 2018) (Government assurances that it "'is aware of its obligations under Rule 16, *Brady*, and *Giglio*, is currently in compliance with those obligations, and will remain in compliance with those obligations in the future,' are sufficient"); *United States v. Rivera*, 16 Cr. 175 (LGS), 2017 WL 1843302, at *2 (S.D.N.Y. May 8, 2017) (denying defendants' motions to disclose *Brady* material after "the Government represented that it does not have any [*Brady* material], is not aware of any, and will 'promptly' produce any of which it becomes aware").

## CONCLUSION

For the reasons set forth above, the defendant's motions should be denied.[3]

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


By: /s/ Thane Rehn
    Danielle Kudla
    Samuel Raymond
    Thane Rehn
    Nicolas Roos
    Danielle R. Sassoon
    Assistant United States Attorneys
    (212) 637-2354

Dated: September 1, 2023
       New York, New York

---

[3] In his motions *in limine*, the defendant also "reserves his right to respond" to the Government's motions; he has such an opportunity to do so in his opposition. The defendant also seeks to "reserve[] his right to oppose" admissibility of evidence regarding metadata. Because the defendant has not actually objected to any particular evidence, this request is not ripe. Furthermore, the defendant's arguments about how metadata is "not necessarily accurate" would not be a valid basis to preclude evidence about metadata, but rather would go to the weight of the evidence and would be appropriately explored through cross-examination and argument at trial. *See* Dkt. 207 at 20.