UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                              :

UNITED STATES OF AMERICA         :

                                           :         S6 22 Cr. 673 (LAK)

         v.                            :

                                           :

SAMUEL BANKMAN-FRIED,        :

                                           :

                                         :

                       Defendant.     :

------------------------------------------------------------------x

 

**SAMUEL BANKMAN-FRIED'S MEMORANDUM OF LAW
IN OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE***

Mark S. Cohen
Christian R. Everdell
S. Gale Dick
Sri K. Kuehnlenz
Sharon L. Barbour
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York  10022
Phone:  (212) 957-7600
mcohen@cohengresser.com
ceverdell@cohengresser.com
sgdick@cohengresser.com
skuehnlenz@cohengresser.com
sbarbour@cohengresser.com

*Attorneys for Samuel Bankman-Fried*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT .......................................................................................................................... 3

I.     THE GOVERNMENT'S MOTIONS TO ADMIT CERTAIN "OTHER ACT"
EVIDENCE AS DIRECT EVIDENCE OR PURSUANT TO RULE 404(B)
SHOULD BE DENIED OR LIMITED ............................................................................. 3

     A.     Applicable Law ............................................................................................... 3

     B.     Evidence of the Severed FCPA Count Is Not Admissible ................................ 5

     C.     Evidence of the Withdrawn Campaign Finance Count Is Not Admissible. .......... 9

     D.     Evidence of the Severed Bank Fraud and Unlicensed Money Transmitting
Counts Is Not Admissible. .............................................................................. 13

     E.     Evidence Purporting to Show That Mr. Bankman-Fried "Manipulated" the
Value of FTT and Serum and Related Argument Should Be Excluded Under
Rule 403. ...................................................................................................... 15

     F.     Evidence Purporting to Show That Mr. Bankman-Fried "Selectively
Prioritized Payments to Certain Creditors" and Related Claims Should Be
Excluded Under Rule 403. .............................................................................. 16

     G.     To the Extent that Evidence Concerning the Institution of Autodeletion
Policies is Admissible, Mr. Bankman-Fried Must Be Permitted to Admit
Evidence That Such Policies Involved the Participation of Counsel................... 18

II.    THE GOVERNMENT'S REQUESTS TO EXCLUDE EVIDENCE AND CLAIMS
CENTRAL TO ELEMENTS OF THE CHARGED CRIMES ARE IMPROPER
AND SHOULD BE DENIED. .......................................................................................... 19

     A.     The Government's Request to Exclude Only the Portions of the FTX Terms
of Service That Contradict Its Theory Should Be Denied. .................................. 20

     B.     The Government's Requests to Exclude Evidence Regarding the Status of
Regulation of Cryptocurrency Exchanges and FTX.US's Compliance with
U.S. Law Are Either Not Ripe or Improper and Should Be Denied.................... 23

     C.     Evidence Concerning Cryptocurrency Industry Practices Is Admissible. ............ 24

D.    The Government's Request to Exclude Evidence Regarding Mr. Bankman-Fried's "Intent to Repay" Customers Should Be Rejected. ................................. 27

E.    Evidence Concerning the Presence of Attorneys is Relevant to Mr. Bankman-Fried's Intent Absent a Formal Advice of Counsel Defense. ............. 29

F.    Evidence Concerning the Understanding of Risk of FTX's Customers and Investors and Alameda's Lenders Is Relevant and Admissible........................... 31

G.    The Government's Requests to Categorically Exclude Evidence of Mr. Bankman-Fried's Good Acts Should Be Denied. .................................................. 33

H.    The Government's Requests to Exclude All Evidence of the Defendant's Personal Circumstances are Overbroad, Premature, and Should Be Denied........ 35

I.    The Government's Requests to Exclude Evidence and Claims About Its Own Conduct and Related Issues Should Be Denied. ......................................... 36

J.    The Court Should Exclude All Evidence of FTX and Alameda's Bankruptcy............................................................................................................... 37

III.    THE GOVERNMENT'S REQUESTS TO ADMIT HEARSAY STATEMENTS SHOULD BE DENIED ................................................................................................ 38

A.    The Government's Requests to Admit Certain Statements by Gary Wang, Nishad Singh, Caroline Ellison, and Other FTX and Alameda Employees Should Be Denied. ............................................................................................... 38

    1.    *Non-Hearsay under Rule 801(d)(2)(D) and Rule 801(d)(2)(E)* ................ 38

    2.    *The Government's Requests to Admit Ledgers, Notes, and Other Unspecified Documents Prepared by Gary Wang, Nishad Singh, and Caroline Ellison as Non-Hearsay Should Be Denied.* ............................. 39

    3.    *The Government's Claim that Statements of FTX and Alameda Employees Are Not Hearsay is Overbroad and Should be Rejected.* ....... 41

    4.    *Caroline Ellison's Remarks at a November 9, 2022 "All-Hands" Meeting Are Inadmissible Hearsay.*......................................................... 42

B.    Ryan Salame's Messages Regarding Campaign Contributions Are Irrelevant and Should Be Excluded........................................................................................ 45

C.    FTX Commercials Are Inadmissible Hearsay, Irrelevant, and Unfairly Prejudicial. ......................................................................................................... 47

IV.    THE GOVERNMENT'S REQUESTS REGARDING AUTHENTICATION OF
       RECORDS AND LIMITING CROSS-EXAMINATION OF CUSTODIAL
       WITNESSES SHOULD BE DENIED. ............................................................................ 48

       A.     The Government's Request to Admit Documents as Self-Authenticating Is
              Premature. ............................................................................................................... 49

       B.     The Government's Requests to Limit the Scope of Cross-Examination Are
              Premature and Should be Denied............................................................................ 50

V.     THE GOVERNMENT'S REMAINING REQUESTS SHOULD BE DENIED AS
       PREMATURE. ........................................................................................................... 50

       A.     The Government's Request to Preclude Cross-Examination About Its
              Witnesses' Recreational Drug Use Should Be Denied. ........................................ 50

       B.     The Government's Request Regarding Cross-Examination on Privileged
              Documents or Topics I Premature and Should Be Denied. ................................... 51

CONCLUSION................................................................................................................................. 52

**Cases**

*Baxter Diagnostics, Inc. v. Novatek Medical, Inc.*,
1998 WL 665138, No. 18-CR-76 (PAC), .............................................................. 31

*Boren v. Sable*,
887 F.2d 1032 (10th Cir. 1989) ......................................................................... 41

*Bourjaily v. United States*,
483 U.S. 171 (1987) .......................................................................................... 38

*Chambers v. Mississippi*,
410 U.S. 284 (1973) .......................................................................................... 37

*Howard v. S.E.C.*,
376 F.3d 1136 (D.C. Cir. 2004) .............................................................. 19, 29, 30

*Huddleston v. United States*,
485 U.S. 681 (1988) ............................................................................................ 4

*In re Reserve Fund Securities and Derivative Litigation*
09 Civ. 4346, 2012 WL 12354233 (S.D.N.Y. Oct. 3, 2012) ................................. 41

*Kyles v. Whitley*,
514 U.S. 419 (1995) .......................................................................................... 36

*Pappas v. Middle Earth Condo. Ass'n*,
963 F.2d 534 (2d Cir.1992) ................................................................................ 38

*Taylor v. Potter*,
148 Fed. App'x 33 (2d Cir. 2005) .................................................................. 38, 40

*TVT Records v. Island Def Jam Music Grp.*,
250 F. Supp. 2d 341 (S.D.N.Y. 2003) .............................................................. 2, 19

*United Realty Advisors, LP v. Verschleiser*,
No. 14-CV-5903 (JGK), 2019 WL 5285043 (S.D.N.Y. Oct. 3, 2019) ...................... 2

*United States v. Andrews*,
166 Fed. App'x 571 (2d Cir. 2006) ...................................................................... 8

*United States v. Balboa*,
No. 12-CR-0196, 2013 WL 6196606 (S.D.N.Y. Nov. 27, 2013) ....................... 33, 34

*United States v. Bankman-Fried*,
No. 22 CR. 673 (LAK), 2023 WL 4194773 (S.D.N.Y. June 27, 2023) ................................. 27

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991) .................................................................................................. 29

*United States v. Carboni*,
204 F.3d 39 (2d Cir. 2000) ........................................................................................................ 4

*United States v. Connolly*,
No. 16 Cr. 370 (CM), 2019 WL 2125044 (S.D.N.Y. May 2, 2019) ................................. 24, 25

*United States v. Cummings*,
60 F. Supp. 3d 434 (S.D.N.Y. 2014) .......................................................................................... 4

*United States v. Curley*,
639 F.3d 50 (2d Cir. 2011) ........................................................................................................ 3

*United States v. Desena*,
260 F.3d 150 (2d Cir. 2001) ............................................................................................... 42, 43

*United States v. Diaz*,
176 F.3d 52 (2d Cir. 1999) ................................................................................................. 42, 43

*United States v. Evanchik*
413 F.2d 950 (2d Cir. 1969) ..................................................................................................... 34

*United States v. Fiumano*,
No. 14-CR-0518, 2016 WL 1629356 (S.D.N.Y. Apr. 25, 2016) .............................................. 34

*United States v. Fratello*,
44 F.R.D. 444 (S.D.N.Y. 1968) ............................................................................................... 31

*United States v. Freedman*
18-CR-217 (KMW), 2019 WL 5387866 (S.D.N.Y. 2019) ...................................................... 39

*United States v. Freidin*,
849 F.2d 716 (2d Cir. 1988) ..................................................................................................... 40

*United States v. Geaney*,
417 F.2d 1116 (2d Cir. 1969) ................................................................................................... 38

*United States v. Gelzer*,
50 F.3d 1133 (2d Cir. 1995) ....................................................................................................... 8

*United States v. Goldstein*,
21-CR-550 (DC), 2023 WL 3662971 (E.D.N.Y. May 25, 2023) ....................................... 40, 41

v

*United States v. Graham*,
    2012 WL 1506027 (2d Cir. May 1, 2012) ............................................................. 32

*United States v. Harris*,
    805 F. Supp. 166 (S.D.N.Y. 1992) ..................................................................... 14

*United States v. Hawkins*,
    360 F. Supp. 2d 689 (E.D. Pa. 2005) ................................................................. 47

*United States v. Hsu*,
    699 F.3d 112 (2d Cir. 2012)............................................................................. 11

*United States v. Jabar*,
    19 F.4th 66 (2d Cir. 2021) ......................................................................... 10, 32

*United States v. Jadusingh*
    18-CR-257 (KAM), 2020 WL 207950 (E.D.N.Y. 2020)............................ 5, 7, 9, 15

*United States v. James*,
    607 F. Supp. 3d 246 (E.D.N.Y. 2022) ............................................................... 33

*United States v. Johnson*,
    507 F.3d 793 (2d Cir. 2007)............................................................................. 44

*United States v. Krug*
    15-CR-157-A, 198 F. Supp. 3d 236 (W.D.N.Y. 2016) ............................................ 5

*United States v. Lang*,
    589 F.2d 92 (2d Cir. 1978) .............................................................................. 43

*United States v. Litvak*,
    808 F.3d 160 (2d Cir. 2015)........................................................................ 25, 26

*United States v. McCallum*,
    584 F.3d 471 (2d Cir. 2009)............................................................................... 4

*United States v. Naiman*,
    211 F.3d 40 (2d Cir. 2000)................................................................................. 8

*United States v. Nektalov*,
    325 F. Supp. 2d 367 (S.D.N.Y. 2004) ............................................................. 4, 6

*United States v. Ojudun*,
    915 F.3d 875 (2d Cir. 2019)............................................................................. 45

*United States v. Ray*
    20-CR-110 (LJL), 2022 WL 558146 (S.D.N.Y. 2022)........................................... 43

*United States v. Saget*,
   377 F. 3d 223 (2d Cir. 2004)......................................................................... 46

*United States v. Sattar*,
   No. 02 Cr .395 (JFK), 2003 WL 22137012 (S.D.N.Y. Sept. 15, 2003) ................... 51

*United States v. Scott*,
   677 F.3d 72 (2d Cir. 2012)............................................................................ 3

*United States v. Shellef*,
   507 F.3d 82 (2d Cir. 2007)........................................................................... 32

*United States v. Tagliaferri, No.*,
   13 Cr. 115 (RA) ....................................................................................... 29

*United States v. Townsend*,
   No. S1 06 CR. 34 (JFK), 2007 WL 1288597 (S.D.N.Y. May 1, 2007).................... 4

*United States v. Tracy*,
   12 F.3d 1186 (2d Cir. 1993).......................................................................... 38

*United States v. Ulbricht*,
   79 F. Supp. 3d 466 (S.D.N.Y. 2015)............................................................ 5, 12

*United States v. Vargas*,
   18 CR. 76 (PAC), 2018 WL 6061207 (S.D.N.Y. Nov. 20, 2018) ..................... 35, 50

*United States v. Weaver*,
   860 F.3d 90 (2d Cir. 2017)........................................................................... 21

*United States v. Weigand*,
   20 CR 188 (JSR), 2021 WL 568173 (S.D.N.Y. Feb. 14, 2021) ............................ 49

*Washington v. Texas*,
   388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed. 1909 (1967)......................................... 19, 20

*Williamson v. United States*,
   512 U.S. 594, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994)...................................... 46

*Zaken v. Boerer*,
   964 F.2d 1319 (2d Cir. 1992)......................................................................... 40

## Statutes

18 U.S.C. § 3505.......................................................................................... 48

52 U.S.C. § 30122......................................................................................... 11

## Rules

Fed. R. Evid. 106 ............................................................................................ 44

Fed. R. Evid. 403 ................................................................................. 4, 6, 7, 47

Fed. R. Evid. Rule 404(b) ...................................................................... 3, 4, 5, 6

Fed. R. Evid. 801(c) ........................................................................................ 37

Fed. R. Evid. 802 ............................................................................................ 37

Fed. R. Evid. 804(b)(3) ............................................................................. 45, 46

Fed. R. Evid. 803(6) ............................................................................ 40, 48, 49

Rule 801(d)(1)(B) ...................................................................................... 43, 44

Rule 801(d)(2)(D) ..................................................................................... passim

Rule 801(d)(2)(E) .............................................................................. 38, 39, 42

Rule 804(b)(3)(B) ........................................................................................... 45

Rule 902(11) .................................................................................................... 48

Samuel Bankman-Fried respectfully submits this memorandum of law in opposition to the Government's motions *in limine*.

## PRELIMINARY STATEMENT

The Government's motions *in limine* are unfounded, overbroad, and should be denied. Motions *in limine* are meant to allow the court to address in advance of trial questions of admissibility of proffered evidence. They should not be a vehicle to subject the defendant to trial on uncharged bad acts, effectively prevent a defendant from mounting a defense, or obtain advisory rulings on speculative legal and evidentiary issues based on an undeveloped factual record. But that is precisely what the Government's motions *in limine* do here.

The requests in the Government's motions generally fall into the following categories: (1) requests to admit irrelevant and prejudicial propensity evidence, primarily going to counts that the Government severed or withdrew; (2) requests to exclude evidence that might potentially undermine the Government's case or support fundamental defenses; (3) blanket requests to admit broad categories of hearsay; and (4) premature requests for rulings that cannot be adjudicated on the current record.

In seeking to admit evidence concerning uncharged conduct, the Government appears to ignore its own decision to withdraw entirely its campaign finance charges against Mr. Bankman-Fried and to ask the Court to sever other counts, including its charges of conspiracy to violate the Foreign Corrupt Practices Act, conspiracy to commit bank fraud, and conspiracy to operate an unlicensed money transmitting business. All that should remain at issue in the upcoming trial is alleged financial fraud—fraud on customers, investors, and lenders resulting from the alleged misappropriation and laundering of FTX customer funds. Yet one of the principal goals of the motions *in limine* appears to be to claw back the Government's earlier narrowing of the case and to try Mr. Bankman-Fried on the severed and withdrawn counts and other conduct that was never

charged and to tar him with improper propensity evidence.  Allowing the Government to do so would principally serve to prejudice Mr. Bankman-Fried, confuse the jury, and waste time at trial.

The Government also improperly attempts to hamstring Mr. Bankman-Fried's fundamental right to mount a defense by excluding relevant evidence and argument.  However much the Government may wish for Mr. Bankman-Fried to be left with no viable defense, it cannot legitimately attain that goal by asking the Court to admit only evidence favorable to the Government and exclude everything else.  Motions *in limine* that seek to preclude evidence or argument regarding entire defenses and theories—as the Government's motions do here—are "plainly improper."  *United Realty Advisors, LP v. Verschleiser*, No. 14-CV-5903 (JGK), 2019 WL 5285043, at *1 (S.D.N.Y. 2019).

The remainder of the Government's sweeping requests in its motions *in limine* are for the most part too generalized and hypothetical to be adjudicated on the present record.  Courts disfavor the approach the Government has taken here—an effort to "strike in shotgun fashion at whole topics and sources of prospective evidence, out of context and before any specific objection against its proper backdrop is raised."  *TVT Recs. v. Island Def Jam Music Grp.*, 250 F. Supp. 2d 341, 344 (S.D.N.Y. 2003).

In short, most of the issues raised by the Government cannot properly be addressed at this stage.  Most of the requests that could potentially be adjudicated seek to admit irrelevant and prejudicial evidence regarding conduct that is no longer or never was charged, to undercut any potential defense, and to admit broad categories of hearsay and other improper evidence. Unsupported by law and unworkable as a practical matter, the Government's motions *in limine* should be denied.

<u>**ARGUMENT**</u>

**I.    THE GOVERNMENT'S MOTIONS TO ADMIT CERTAIN "OTHER ACT" EVIDENCE AS DIRECT EVIDENCE OR PURSUANT TO RULE 404(B) SHOULD BE DENIED OR LIMITED**

**A.    Applicable Law**

Rule 404(b) of the Federal Rules of Evidence governs the admissibility of evidence of other "crimes, wrongs, or acts" that are not charged in the indictment. *See* Fed. R. Evid. 404(b). The rule provides, in relevant part:

> **(1) Prohibited Uses**.  Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> **(2) Permitted Uses**.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

*Id*.  "'Other act' evidence serves a proper purpose" only if "it is not offered to show the defendant's propensity to commit the offense." *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) (citing Fed. R. Evid. 404(b)).  To be admissible under Rule 404(b), "other act" evidence must meet three criteria: (1) it must be offered for a proper purpose; (2) it must be relevant to a disputed issue; and (3) pursuant to Rule 403, the probative value of the evidence cannot be substantially outweighed by its potential for unfair prejudice.  *See United States v. Scott*, 677 F.3d 72, 81 (2d Cir. 2012) ("[R]elevance is not the end of the inquiry: evidence admitted under 404(b) must be relevant to an issue *in dispute*.") (emphasis in original).  Additionally, at the defendant's request, the district court should give the jury an appropriate limiting instruction. *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)).[1]

---

[1] Mr. Bankman-Fried reserves all rights to seek appropriate limiting instructions.

Evidence of uncharged conduct may be admitted as direct proof of the charged conduct rather than "other act" evidence under Rule 404(b) "if it [1] arose out of the same transaction or series of transactions as the charged offense, [2] if it is inextricably intertwined with the evidence regarding the charged offense, or [3] if it is necessary to complete the story of the crime on trial." *United States v. Nektalov*, 325 F. Supp. 2d 367, 370 (S.D.N.Y. 2004) (quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)). In conspiracy cases, evidence of other acts may be direct evidence of the charged conspiracy if the acts were committed "in furtherance of the conspiracy." *United States v. Townsend*, No. S1 06-CR-34 (JFK), 2007 WL 1288597, at *1 (S.D.N.Y. 2007) (internal citation omitted); *see also United States v. Cummings*, 60 F. Supp. 3d 434, 437 (S.D.N.Y. 2014) ("[T]he Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy.") (internal quotation marks and citations omitted), *vacated on other grounds* 858 F.3d 763 (2d Cir. 2017).

In all events, "where it is not manifestly clear that the ['other act'] evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)." *Townsend*, 2007 WL 1288597, at *1 (citing *Nektalov*, 325 F. Supp. 2d at 372).

A determination that "other act" evidence is admissible under Rule 404(b) or as direct evidence is not the end of the inquiry. Otherwise-admissible evidence may also be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. It is thus proper to exclude relevant evidence under Rule 403 where, among other things, its admission would require "mini trials" on collateral issues, which "may mislead the jury and lead it to convict [the] defendant for uncharged conduct." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 492–93 (S.D.N.Y. 2015) (in

prosecution relating to the defendant's alleged operation of an online marketplace for illicit goods and services, excluding evidence that "may lead to a mini-trial on collateral issues, such as whether or not" certain goods not included in the indictment were in fact contraband); *United States v. Jadusingh*, 18-CR-257 (KAM), 2020 WL 207950, at *4 (E.D.N.Y. 2020) (excluding "other act" evidence that would require exploration of the circumstances of the prior act and "runs the risk of confusing the jury and leading to a mini-trial").

Where the probative value relative to the risk of unfair prejudice, confusion, misleading the jury, or waste of time cannot be resolved on the record available on a motion *in limine*, the court may reserve decision until closer to trial when the record is more fully developed. *See United States v. Krug*, 198 F. Supp. 3d 236, at 252 (W.D.N.Y. 2016) (reserving decision on motion to sever or admissibility of evidence of severed charges under Rule 404(b) until "closer to trial, once the parties have better identified their anticipated evidence and witnesses, and once they have had an opportunity to fully brief (and once the Court has had an opportunity to fully consider) the Rule 404(b) issue").

## B. Evidence of the Severed FCPA Count Is Not Admissible.

At the Government's request, the Court severed count 13 of the S5 Indictment, which charged Mr. Bankman-Fried with conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"). ECF No. 162; ECF No. 165. The superseding S6 Indictment contains no allegations relating to this charge. Yet the Government now seeks to reintroduce the FCPA-related allegations into the trial of the charges from which, at the Government's request, the FCPA charge was severed. This motion should be denied, because evidence relating to the alleged bribery scheme is neither direct evidence of fraud charges in the S6 Indictment nor admissible under Rule 404(b), and further because such evidence would be inadmissible under Rule 403.

The sole discernible impact on this trial of admitting evidence of the alleged bribery would be to risk improperly inducing the jury to believe Mr. Bankman-Fried had a criminal propensity.

*First*, evidence relating to the alleged scheme to bribe Chinese government officials to unlock assets belonging to Alameda but frozen by Chinese authorities bears no logical or factual relation to the core factual allegations of the charges that Mr. Bankman-Fried faces in this case— namely, defrauding FTX's customers and investors and Alameda's lenders by misusing FTX customer funds. The Government asserts three ways in which evidence relating to the alleged bribery scheme would serve as direct evidence of the alleged fraud: first, the alleged bribe "shares a motivation" with the fraud, namely, "funding Alameda's business activity;" second, that Mr. Bankman-Fried's alleged authorization of the bribe "rebuts the anticipated defense that he was not involved in Alameda decision-making;" and third, that the bribery conspiracy involved Caroline Ellison, then the CEO of Alameda. ECF No. 204 at 21-22. This logic sweeps far too broadly. Under the Government's theory, evidence of any effort to strengthen Alameda's financial position—in any context—would be deemed direct evidence of the charged conspiracy to misappropriate FTX customer funds; as would any decisions concerning Alameda in which Mr. Bankman-Fried and Ms. Ellison were both involved. In reality, the alleged actions relating to alleged bribery and those relating to the alleged misappropriation of customer funds were not part of the "same act or transaction," and evidence of one is neither "inextricably intertwined" with evidence of the other nor "necessary to complete the story of the crime on trial." *Nektalov*, 325 F. Supp. 2d at 370; *see also* ECF No. 142 at 24-31.

*Second,* evidence relevant to the severed FCPA charge is also not admissible under Rule 404(b). According to the Government, evidence that an alleged bribe was paid to unfreeze Alameda assets in 2021 "supplies part of the motive" for the alleged misappropriation of funds

and "reinforces that the defendant was intent on expanding Alameda's trading and spending power." ECF No. 204 at 12. But obtaining funds and expanding trading and spending power are not indicia of "criminal intent;" they are normal-course business objectives. Nor can such priorities be characterized as evidencing the same motive that allegedly animated the charged fraud except at the highest level of generality—which is not the appropriate standard. Any relevance to Mr. Bankman-Fried's intent is further undercut by the complete lack of similarity between the alleged conduct relevant to bribery and the alleged conduct underlying the charged conspiracy to misappropriate customer funds. *See Jadusingh*, 2020 WL 207950, at *4 (other acts are relevant only if they are "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the [state of mind] inference advocated by the proponent of the evidence.") (internal quotation marks and citation omitted).

*Third,* the Government's argument that evidence of Mr. Bankman-Fried's involvement in alleged bribery would rebut the "anticipated defense" of lack of knowledge of activity within Alameda reveals again the premature nature of many of its motions *in limine*.[2] In brief, none of the "permitted uses" of evidence relating to alleged bribery advanced by the Government have merit; all that remains as to this evidence is prohibited use to suggest a propensity for dishonest and illegal conduct.

*Fourth,* evidence relevant to the severed FCPA charge should also be excluded as prejudicial and risking confusion, delay, and inefficiency pursuant to Rule 403. As to prejudice, the Government asserts that it is sufficient that the alleged "other acts" not be "more inflammatory than the central conduct at issue here," relying on *United States v. Gelzer*, 50 F.3d

---

[2] Evidence of involvement in the alleged conspiracy also does not show a "pre-existing relationship between co-conspirators," *see* ECF No. 204 at 23, because the Government alleges that the bribe took place in "late 2021," a time when, according to the Government's theory, the charged conspiracies were already well underway.

1133 at 1139-40 (2d Cir. 1995), *United States v. Naiman*, 211 F.3d 40, 50 (2d Cir. 2000) and

*United States v. Andrews*, 166 Fed. App'x 571, 573 (2d Cir. 2006) (unpublished), *see* ECF No.

204 at 13-14. *Gelzer* is instructive only by contrast to the present situation. The "other acts"

evidence in that robbery case related to a prior armed robbery that linked the defendant to a

firearm found at the scene of the robbery at issue. Here, there is no comparable bridge between

the alleged bribe to a foreign official and the alleged misappropriation of customer funds.

*Naiman* and *Andrews* provide no further support, as both cases considered "prejudicial spillover"

in the entirely different context of evidence related to bribery counts that were actually charged

but did not result in a conviction, for purposes of reversing conviction or ordering a new trial on

other counts. *See Naiman*, 211 F.3d at 50; *Andrews*, 166 Fed. App'x at 573. In any event,

paying bribes to influence a Chinese official is highly inflammatory, particularly given the

current geopolitical tensions between the United States and China.

Even if relevant, evidence concerning the alleged foreign bribery scheme should be

excluded under Rule 403 because it poses a risk of confusing the jury and wasting time. It will

require detailed exploration of complex factual issues that are wholly collateral to the rest of the

trial, posing a risk of confusing the jury and wasting time. For example, to prove that Mr.

Bankman-Fried knowingly participated in paying a bribe, and to rebut any such showing, would

require evidence of, among other things, the nature of the frozen Alameda assets and why and by

which government agencies they were frozen, how and to whom the payment was allegedly

made, what government action the alleged payment was allegedly meant to induce, Mr.

Bankman-Fried's knowledge and intent on all of these issues, and advice given to Mr. Bankman-

Fried about the legality of the payment. Because these issues are entirely ancillary to the charges

at trial, would expose Mr. Bankman-Fried to unfair prejudice, confuse the jury, and waste time,

and further because the Government should not be permitted to test its evidence on severed charges, evidence concerning the alleged bribery scheme should be excluded under Rule 403. *See Jadusingh*, 2020 WL 207950, at *4 (precluding "other act" evidence that would require a "mini-trial" on "how and why" the defendant was involved in the prior act).

        **C.**       **Evidence of the Withdrawn Campaign Finance Count Is Not Admissible.**

The Government withdrew count 12 of the S5 Indictment, which alleged conspiracy to violate campaign finance laws, in recognition of its obligations under the Rule of Specialty to The Bahamas, after that nation confirmed that it did not intend to extradite Mr. Bankman-Fried on that charge. ECF No. 181. The Government has attempted an end-run around this development by including allegations in the S6 Indictment that campaign contributions were made using customer funds. ECF No. 202 ¶¶ 5, 9. The S6 Indictment does not, however, include the campaign finance charge or expressly allege that any political contributions were illegal.

The Government's motions *in limine* take this end-run a step further by asking the Court to admit evidence not only about the existence of political contributions but also evidence that the contributions were illegal, both as "direct proof" of the alleged wire fraud scheme and pursuant to Rule 404(b). ECF No. 204 at 8. To the extent this motion seeks to admit evidence concerning the legality of the campaign contributions, it should be flatly rejected. The legality or illegality of political contributions is irrelevant to any issue in the present case. Introducing evidence of purported illegality would serve no purpose other than to support an impermissible inference of criminal propensity, prejudice Mr. Bankman-Fried, and trigger a trial-within-the-trial on allegations the Government is not permitted to charge as a crime.

As to admissibility as direct evidence, the Government contends that "the fact that the defendant spent his customers' money" on political contributions somehow "proves that the

money was indeed misappropriated." ECF No. 204 at 8-9. The Government relies for this point on *United States v. Jabar*, 19 F.4th 66, 79-82 (2d Cir. 2021), but *Jabar* is inapposite. In that case, the Second Circuit held that evidence that defendants diverted United Nations grant funds for their own personal use showed the defendants' intent to harm the United Nations and their motive for seeking the grant in the first place – i.e., the use of funds showed the requisite intent as to the fraud charged in that case. *Id.* at 79-80. Here, in contrast, the Government asserts that the use of FTX customer funds for political contributions establishes criminal intent as to a *separate* offense—violation of the campaign finance laws—which the Government did not and cannot charge against Mr. Bankman-Fried.

Similarly, the Government contends that the political donations are "probative of the defendant's motive for defrauding FTX's customers and investors"—namely, to "burnish his own image and improve the regulatory prospects of his business." ECF No. 204 at 9. Even assuming this inferential leap were sound, its landing point would be fraudulent intent rather than the mens rea underlying a campaign finance violation.

Nor does the Government's argument that Mr. Bankman-Fried "wanted access to capital that he could use, in part, for political donations" justify admitting evidence concerning the legality of the campaign contributions. *Id.* Again, to prove the requisite fraudulent intent for offenses charged in the S6 Indictment, the fact of the campaign contributions may be relevant, but their purported illegality is not.

The Government's reliance on *United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012) is likewise misplaced. There, the defendant was on trial for campaign finance violations and never objected to the introduction of testimony regarding a related, uncharged Ponzi scheme, although the trial court ultimately raised concerns *sua sponte* over the volume of testimony introduced on

the uncharged scheme. *Id.* On review, the Second Circuit held that testimony from investors in the Ponzi scheme was sufficiently relevant because several testified that their decisions to invest were "directly linked to the campaign finance scheme," and that it was therefore not plain error to admit their testimony, particularly in the absence of any objection. *Id.* at 119-120. Here, by contrast, the Government nowhere claims that Mr. Bankman-Fried's alleged use of illegal straw donors for certain political donations supported or was "directly linked to" the scheme to commit wire fraud on customers. Moreover, unlike the defendant in *Hsu*, Mr. Bankman-Fried strongly disputes the relevance of the legality of the campaign contributions as anything other than an improper suggestion of a propensity to break the law.

Next, the Government asserts that the alleged use of straw donors is "direct proof of money laundering," and that "to prove concealment for the money laundering conspiracy, the Government intends to prove that misappropriated customer assets were routed through straw donors to disguise their source." ECF No. 204 at 10. This argument appears to combine the "source . . . of the proceeds of specified unlawful activity" for purposes of money-laundering with a source of funds for purposes of conduit contributions under 52 U.S.C. § 30122. But these are distinct concepts, and the use of a straw donor to avoid disclosing that Alameda was the true donor for campaign finance purposes would not further conceal that FTX customers were an underlying source of the funds for Alameda than if Alameda had made the donation directly. In any event, the Government does not explain why it would need to prove that the campaign contributions were illegal conduit contributions to sustain the indicted charges. Specifically, there is no reason—outside of improper prejudice to the defendant—to adduce evidence that the use of straw donors violated federal or state law, as opposed to evidence that merely shows the political contributions were a means to disguise that the initial source of funds for such

contributions purportedly was FTX customer deposits. Such evidence would be relevant only to the existence of a campaign finance violation—not the alleged money laundering or wire fraud conspiracies.

Any minimal relevance that the legality of the campaign contributions may have is substantially outweighed by the risk of unfair prejudice, jury confusion, and inefficiency. As discussed, evidence that political spending was illegal would serve almost no function but prejudice, and specifically to show a propensity for criminality. And the effort to prove that particular donations were unlawful would spin off a host of intricate factual and legal questions regarding state and federal election laws, the specific nature of the donations and the true sources of funds, and the extent to which Mr. Bankman-Fried knew of or directed particular contributions using particular funds—all of which would divert the jury's attention and the Court's time and resources from the charges that will actually be at issue.[3]

In sum, evidence of the alleged illegality of political donations at issue is not admissible as direct evidence of the charged fraudulent schemes, would be offered for a "prohibited use" for purposes of Rule 404(b), and should be excluded as unfairly prejudicial and a source of waste and confusion pursuant to Rule 403.

---

[3]Relatedly, while arguing in its motion *in limine* that evidence of Mr. Bankman-Fried's use of illegal straw donors should be admitted, the Government has separately moved to exclude Mr. Bankman-Fried's proposed expert testimony from a former FEC Commissioner, Bradley Smith, on campaign finance issues, arguing that such testimony is "irrelevant, confusing, and a waste of time, especially now that the trial will no longer include a charge arising from the defendant's illegal campaign finance scheme." ECF No. 236, at 19. The Government apparently believes that it should be able to introduce as much evidence of Mr. Bankman-Fried's allegedly "illegal" campaign finance activities—which it cannot—while preventing Mr. Bankman-Fried from effectively countering such evidence.

**D.    Evidence of the Severed Bank Fraud and Unlicensed Money Transmitting Counts Is Not Admissible.**

The Government should also be precluded from introducing evidence or offering argument relating to the severed conspiracy counts of bank fraud and operation of an unlicensed money transmitting business.  Specifically, the Government seeks to admit evidence purportedly showing that Mr. Bankman-Fried incorporated North Dimension to open a bank account to accept FTX customer funds, authorized misrepresentations to the bank that this would be a trading account rather than an account to receive and transmit FTX customer deposits, and "falsely claimed that North Dimension was not a money services business."  ECF No. 204 at 6.

In support, the Government characterizes the alleged misstatements as direct evidence of the alleged fraud on FTX customers.  *Id.* at 7.  But it is the North Dimension account—and not the circumstances of its opening—that the Government asserts "was a vehicle to misappropriate FTX customer deposits to pay for Alameda's expenses and Alameda's investments."  *Id.*  Any alleged misstatements made to the bank in the opening of the account would be direct evidence only of the severed bank fraud count.  Likewise, whether any entity should have registered as a money services business or operated as an unlicensed money transmitting business would be direct evidence only of the severed unlicensed money transmitting business conspiracy count.  As to the fraud charges being tried, such evidence would serve only as impermissible evidence of criminal propensity.

The Government next argues that evidence of alleged false statements to the bank in opening the account is admissible under Rule 404(b) because it shows, among other things, Mr. Bankman-Fried's "plan to mislead others regarding purposes and uses of funds" in the account and "his control over Alameda employees and his ability to cause subordinates to engage in deceptive conduct."  ECF No. 204 at 7-8.  But such conclusions are the very definition of the use

of evidence to demonstrate a propensity for unlawful and dishonest acts that Rule 404(b) prohibits.

Even if otherwise admissible, evidence of any purported misstatements to Bank-1 and evidence relating to the severed money transmitting business claim should be precluded under Rule 403. This district has recognized that evidence of bank fraud that is distinct from the central charges of corporate fraud should be excluded as unduly prejudicial. In *United States v. Harris*, 805 F. Supp. 166, 182 (S.D.N.Y. 1992), a CEO was charged with both defrauding banks into issuing loans to his corporation and defrauding another bank to secure a personal loan. The court severed the charges and held that evidence relating to the fraud as to the personal loan was not admissible under Rule 404(b) at the trial on the remaining counts, "conclud[ing] without difficulty that the Rule 403 balance tips against the government in seeking to offer" such evidence. *Id.* at 184. The same conclusion is warranted here.

Such evidence would also divert the trial into complex and prejudicial skirmishes on disputed facts such as whether North Dimension was a money services business or FTX was required to register as a money transmitting business, arcane regulations, and thorny legal questions regarding the U.S. registration requirements applicable to foreign exchanges. *See* ECF No. 141 at 17-19. These issues are entirely ancillary to the charges for which Mr. Bankman-Fried is being tried, but he will be forced to address them—and the jury would be required to understand and weigh them—unless this evidence is excluded. To avoid the inevitable risk of confusion of the jury and waste of time, evidence of any statements made in opening North Dimension's bank account and whether any entity was operating as an unlicensed money transmitting business should be excluded. *See Jadusingh*, 2020 WL 207950, at *4 (excluding evidence to avoid mini trials on collateral issues).

**E.** **Evidence Purporting to Show That Mr. Bankman-Fried "Manipulated" the Value of FTT and Serum and Related Argument Should Be Excluded Under Rule 403.**

The Government seeks to admit certain evidence regarding cryptocurrency tokens as direct evidence of the charged fraud on Alameda's lenders. In particular, the Government moves to admit evidence that Mr. Bankman-Fried "created" the cryptocurrency token FTT, that at his direction, Alameda secretly "amassed substantial holdings" of FTT and other tokens "such as Serum," and that Mr. Bankman-Fried directed others to manipulate the value of such tokens and tried to conceal their ownership of Serum tokens. ECF No. 204 at 14. This motion should be denied.

*First,* the admissibility of evidence on this vague but seemingly extensive and complex set of alleged facts cannot be adjudicated in the abstract. Here again, the Government is seeking less a ruling on admissibility than broad advisory guidance from the Court on the categories of evidence it might try to introduce and theories of liability it may wish to pursue. At a minimum, the Court should deny this aspect of the Government's motion as unripe.

*Second*, the evidence, as described, is *not* direct evidence of the charged fraud, as the Government asserts.[4] The Government's apparent theory is not that acquiring tokens and manipulating their value were themselves fraudulent acts; only that they "explain[] how the defendant put Alameda in a position to borrow billions of dollars from lenders, whom the defendant ultimately defrauded." *Id.* at 15. Left unexplained is why evidence of Alameda's alleged efforts to bolster its borrowing power—if not themselves fraudulent—are direct evidence of the fraud.

---

[4] The Government does suggest that inflating the prince of FTT "created a deceptive picture for Alameda's lenders about the health of Alameda." ECF No. 204 at 16. But if that were the Government's theory of culpability on the lender fraud charge, it presumably would not seek to admit evidence of price manipulation as "other acts" evidence.

*Third*, any limited and vague probative value of evidence relating to the creation, valuation, and alleged manipulation of tokens would almost certainly be substantially outweighed by the risk of jury confusion and undue delay. Extensive portions of the trial would be subsumed by evidence, likely including expert testimony, regarding, for example, the interplay between the "paper" value and "liquid" value of various tokens, and the relative importance of these metrics from the standpoint of Alameda's accounting and lenders' borrowing decisions; the definition and scope of alleged market manipulation, as well as defenses to such allegations; whether certain trading activity constituted manipulation of the tokens' value; and the impact of these holdings on Alameda's net asset value and "the chain of events" that led to FTX's collapse. Because this would lead to mini trials on collateral issues, it should be excluded under Rule 403.

**F.  Evidence Purporting to Show That Mr. Bankman-Fried "Selectively Prioritized Payments to Certain Creditors" and Related Claims Should Be Excluded Under Rule 403.**

The Government seeks to admit evidence regarding certain actions "during the collapse of FTX," namely (1) that "after the defendant halted withdrawals from FTX, he opened withdrawals exclusively for Bahamian customers in order to curry favor with the Bahamian government," and (2) that Mr. Bankman-Fried informed "associates" that he had used Alameda assets to offset a "$45 million hole at FTX US." ECF No. 204 at 16-17.[5] This evidence is wholly irrelevant to the core fraud charges to be tried, and should also be excluded under Rule 403 as unduly prejudicial and threatening to side-track the trial and confuse the jury.

---

[5] The Government also asserts, without elaboration, that "the defendant told Ellison to prioritize repaying loans to a particular lender that was a U.S.-based entity in order to minimize the prospect of U.S. regulatory scrutiny." ECF No. 204 at 17. It is unclear from the Government's briefing whether there is a particular piece of evidence that the Government seeks to admit in connection with this point. Accordingly, Mr. Bankman-Fried reserves his right to object to the admissibility of evidence bearing on this point until the Government makes a more specific presentation.

*First*, evidence (if any exists) that Mr. Bankman-Fried permitted withdrawals for Bahamian customers is unrelated to the alleged misappropriation of customer funds and alleged fraud on lenders and investors. And the suggestion that Mr. Bankman-Fried did so to "curry favor" with the Bahamian government would be highly and unfairly prejudicial, particularly because the Government has not alleged that Mr. Bankman-Fried's conduct violated Bahamian or other law. Further, this would require the defense to delve into whether the Bahamian government directed or otherwise indicated to Mr. Bankman-Fried or others that it desired such payments be made to customers.

*Second*, the motion is premature. The Government asserts that the evidence at issue would be admissible to rebut public statements by Mr. Bankman-Fried that his priority was to repay customers. It is premature for the Court to rule at this time on the admissibility of evidence to rebut a potential defense theme.

*Third*, the admission of evidence that Mr. Bankman-Fried asserted that Alameda funds were used to fill a hole in the FTX.US balance sheet would necessitate still another mini trial on another ancillary but complicated set of issues. These include, among other things, the nature of the alleged problem with the FTX.US balance sheet, which Alameda assets were used to address the issue, when, and under what circumstances.

To rebut the claim that this transfer was evidence of Mr. Bankman-Fried's criminal intent, the defense would introduce evidence that, among other things, Zach Dexter, then the CEO of FTX.US Derivatives, urged Mr. Bankman-Fried to make this transfer. Further, the reason for the urgency was that Mr. Dexter was negotiating the sale of the FTX.US Derivatives business, without having the authority to do so, and needed to clean up this anomaly on the balance sheet before the balance sheet would move forward. *See, e.g.*, Declaration of Christian

R. Everdell in Opposition to the Government's Motions *in Limine* ("Everdell Decl."), Ex. A, at SBF Signal_Batch 03_0000000097.

Moreover, the evidence described by the Government would create the highly prejudicial but unavoidable implication that there was fraud or other misconduct relating to FTX.US harming U.S.-based customers of that exchange. Such evidence would be highly prejudicial and confusing to the jury because it would give the incorrect impression that the Government is charging Mr. Bankman-Fried with defrauding U.S.-based customers of FTX.US. *See* ECF No. 207, Memorandum of Law In Support of Samuel Bankman-Fried's Motions *In Limine*, at 21. The only customers at issue in the upcoming trial are those of FTX, which, unlike FTX.US, was not available to U.S. customers.

All of this would be required in order for the Government to present what would undoubtedly be minimally relevant and cumulative evidence purporting to show Mr. Bankman-Fried's criminal intent and consciousness of guilt. The Government's request to admit this evidence should therefore be denied.

### G. To the Extent that Evidence Concerning the Institution of Autodeletion Policies is Admissible, Mr. Bankman-Fried Must Be Permitted to Admit Evidence That Such Policies Involved the Participation of Counsel.

The Government next moves to introduce evidence that in 2021 Mr. Bankman-Fried directed Alameda employees to communicate principally via ephemeral messaging applications and to set communications to autodelete after a brief retention period. ECF No. 204 at 17-18. These policies were allegedly intended to "prevent incriminating evidence from being preserved for a future criminal investigation," which in the Government's view would demonstrate "consciousness of guilt" and constitute "proof of knowledge and intent, and the defendant's role as the mastermind of the charged schemes" for purposes of Rule 404(b). *Id.*

The defense disputes the Government's characterization of the purposes of these communications retention policies, as well as the suggestion that having input on a business's communications and message retention policies signifies that Mr. Bankman-Fried is a "mastermind" of alleged fraud schemes. Nonetheless, to the extent that the Court deems this material admissible, the defense should be permitted to introduce evidence that counsel was involved in these policies. The fact that Mr. Bankman-Fried knew that counsel was advising on the question of the appropriateness of the use of ephemeral messaging applications and communication retention policies would show that these policies were instituted in good faith. *See Howard v. S.E.C.*, 376 F.3d 1136, 1147 (D.C. Cir. 2004) ("[R]eliance on the advice of counsel need not be a formal defense; it is simply evidence of good faith, a relevant consideration in evaluating a defendant's scienter."). It is therefore essential to rebutting the Government's claim that such policies are evidence of criminal intent and consciousness of guilt.

## II. THE GOVERNMENT'S REQUESTS TO EXCLUDE EVIDENCE AND CLAIMS CENTRAL TO ELEMENTS OF THE CHARGED CRIMES ARE IMPROPER AND SHOULD BE DENIED.

The right to "an opportunity to be heard in [one's] defense" is among "the most basic ingredients of due process." *Washington v. Texas*, 388 U.S. 14, 18, 87 S. Ct. 1920, 1923, 18 L. Ed. 1909 (1967) (internal quotation marks and citation omitted). In its fourth motion *in limine*, the Government asks the Court to preclude eleven separate categories of evidence, many of which are directly relevant to Mr. Bankman-Fried's core defenses. As such, the Government's motion impermissibly operates as a "preemptive weapon" to preclude topics that it anticipates the defense "may contemplate introducing at some point during the course of the trial, or as [a] dispositive means to fully obviate a trial altogether." *TVT Records*, 250 F. Supp. 2d at 344-45 (explaining that motions *in limine* that, "in the guise of addressing limited evidentiary issues," "would effectively serve as a form of advance trial of substantive portions of the case, or indeed

as a substitute for the trial itself" are impermissible and should be denied on that basis). The Government's requests are therefore improper and should be denied because they would infringe on Mr. Bankman-Fried's fundamental "right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *See Washington*, 388 U.S. at 18, 87 S. Ct. at 1923, 18 L. Ed. 1909.

As addressed below, the categories of evidence the Government seeks to exclude are: (A) portions of FTX's Terms of Service, excepting an excerpt that the Government believes supports its case, *see* ECF No. 204 Part IV.C; (B) evidence concerning the regulation of cryptocurrency exchanges and that FTX.US complied with U.S. law, *see* ECF No. 204 Parts IV.F and IV.I; (C) evidence relating to practices and norms in the cryptocurrency industry, *see* ECF No. 204 Part IV.B; (D) evidence regarding Mr. Bankman-Fried's "intent to repay" FTX customers, *see* ECF No. 204 Part IV.D; (E) evidence concerning the involvement of legal counsel, *see* ECF No. 204 Part IV.E; (F) evidence concerning FTX customers' and investors' and Alameda's lenders' understanding of certain risks, *see* ECF No. 204 Part IV.A; (G) evidence concerning Mr. Bankman-Fried's "good acts" and non-criminal conduct, *see* ECF No. 204 Part IV.J; (H) evidence concerning Mr. Bankman-Fried's personal circumstances, *see* ECF No. 204 Part IV.K; (I) evidence concerning the Government's investigation and related issues, *see* ECF No. 204 Part IV.G; and (J) evidence concerning the bankruptcies of FTX and Alameda. The Government's requests are discussed in turn below.

A.   **The Government's Request to Exclude Only the Portions of the FTX Terms of Service That Contradict Its Theory Should Be Denied.**

The Government states that it intends to introduce and rely on portions of the FTX Terms of Service, while at the same time asking this Court to preclude the defense from making

arguments or eliciting testimony about other portions of that document. This position is unfair and illogical on its face, and the Court should reject it.

As an initial matter, the Terms of Service are relevant and admissible in their entirety. The Terms of Service govern the scope and details of the relationship between FTX and its customers, and as such are directly relevant to the question whether customers were defrauded. Among other things, the Terms of Service are relevant to whether FTX's or Alameda's use of customer fiat currency was inconsistent with representations to customers in the document itself and rights and obligations it sets forth regarding customer assets—and thus to whether there was any actual fraud or "misappropriation" of customer funds. The Terms of Service are also relevant to establishing Mr. Bankman-Fried's good faith belief that FTX's and Alameda's handling of customer fiat currency complied with the Terms of Service and was therefore permissible.

The specific portions of the Terms of Service that the Government seeks to exclude— disclaimers of liability and damages—are also relevant. Those and other provisions address risks associated with transacting with FTX. As discussed further in Section II.F *infra*, FTX customers' understanding of the risks associated with transacting with FTX is relevant to the materiality of alleged misrepresentations about FTX being "safe."[6]

Equally unavailing is the Government's argument that "evidence or arguments about disclaimers" would "confuse" the jury into applying civil or common law concepts to a criminal

---

[6] The Government's reliance on *United States v. Weaver*, 860 F.3d 90, 95-96 (2d Cir. 2017) for the proposition that admitting evidence relating to disclaimers in the Terms of Service would lead the jury to confuse materiality with reliance is misplaced. ECF No. 204 at 41. *Weaver* did not consider the admissibility of evidence regarding disclaimers; at issue there was whether contractual disclaimers merited a judgment of acquittal because they rendered earlier misrepresentations immaterial as a matter of law. Any risk that the jury would conflate reliance and materiality can be gauged based on the context in which questions regarding the Terms of Service are asked and whether a limiting instruction could ameliorate any such risk.

fraud case. ECF No. 204 at 41. There is no reason to believe that simply admitting in full a document that the Government wants admitted in part would cause confusion as to the relevant legal standard, and any confusion could be cured with an appropriate limiting instruction.

Moreover, Federal Rule of Evidence 106 plainly states that, where a party introduces a portion of a document, an adverse party "may require the introduction . . . of any other part" of the document that "in fairness ought to be considered at the same time." Fed. R. Ev. 106. Consistent with this rule, the Government may not cherry pick excerpts from the Terms of Service it wants to introduce at trial without permitting the defense to seek to introduce missing portions of the document.

At a minimum, the Government's request to preclude cross-examination and other evidence on any aspect of the Terms of Service before a single witness has testified is premature and should be denied. As just one example, if a Government witness testifies as to his understanding of the portions of the Terms of Service proffered by the Government, the defense must be able to test the witness's credibility by probing his understanding of other portions of the same document. In any event, at this preliminary stage, the defense and the Court are left to consider hypotheticals rather than make concrete determinations in the proper trial context. The Government's request to exclude cross-examination on all but one aspect of the Terms of Service should therefore be denied. *See United States v. Evanchik*, 413 F.2d 950 at 953 (2d Cir. 1969) (affirming refusal to issue advisory opinion to preclude cross-examination because "whether the cross-examination about which the appellants were inquiring would have been proper could not have been determined until after the character witnesses testified").

In sum, the Terms of Service in their entirety are relevant and the Government should not be permitted to cherry pick the provisions it views as helpful to its case, while keeping from the jury ones that are not.

### B. The Government's Requests to Exclude Evidence Regarding the Status of Regulation of Cryptocurrency Exchanges and FTX.US's Compliance with U.S. Law Are Either Not Ripe or Improper and Should Be Denied.

The Government makes two separate requests regarding the regulatory environment in which cryptocurrency exchanges operate. Neither has merit.

*First*, the Government seeks generally to preclude Mr. Bankman-Fried from "attempting to shift the blame for FTX's collapse onto regulators" or "argu[ing] for acquittal on the basis of extraneous public policy considerations," such as "the role of regulatory agencies in responding to recent cryptocurrency market events." ECF No. 204 at 46. It is unclear what specific evidence or arguments the Government is targeting here other than a straw man constructed out of certain of Mr. Bankman-Fried's public statements. Until Mr. Bankman-Fried were to seek at trial to blame "regulators" for FTX's collapse or assert a defense based on the regulatory response to that collapse—which he has no current plans to do—the Government's motion on this point is premature.

*Second*, the Government asks the Court to preclude any argument that Mr. Bankman-Fried "is not guilty because FTX was not regulated within the United States and he followed the rules with respect to FTX US." ECF No. 204 at 53. The Government is mistaken.

The status of regulation of cryptocurrency exchanges in the United States and elsewhere is relevant to both the actus reus and the mens rea underlying the Government's theory of fraud based on the alleged misappropriation of FTX customer funds. Specifically, the Government must prove that the funds were in fact misappropriated. The Government has not alleged that there are any laws or regulations prohibiting cryptocurrency exchanges from using funds

originating in customer deposits for their own purposes—as is commonly done by financial institutions such as banks and digital payment platforms—or providing any relevant guidance as to what may be done with customer deposits. The apparent absence of relevant law or guidance bears directly on whether the alleged use of customer deposits would constitute misappropriation as opposed to a permissible business practice.

The Government will also have to prove that Mr. Bankman-Fried acted with criminal intent. As further argued below, the apparent absence of clearly applicable laws or regulations, as well as evidence that pooling and reallocation of customer funds was common among cryptocurrency exchanges, supports the inference that Mr. Bankman-Fried did not believe that his conduct was unlawful or improper.

The Government's contention that Mr. Bankman-Fried should be precluded from raising the fact that "he adopted more careful practices for FTX.US" is also wholly unsupported. Mr. Bankman-Fried is entitled to introduce evidence that he intended to comply with all applicable laws as shown by the fact that he ensured compliance with laws and regulations applicable to FTX.US, and that he similarly complied with all applicable laws in the Bahamas and other jurisdictions with regard to the operation of the relevant entities. Such behavior is consistent with and supports the fact that Mr. Bankman-Fried never intended to violate any laws and acted in good faith.

### C. Evidence Concerning Cryptocurrency Industry Practices Is Admissible.

The Government seeks to preclude Mr. Bankman-Fried from "arguing or adducing evidence that other companies or individuals were using customers' assets or otherwise engaging in misconduct." ECF No. 204 at 38-39. Contrary to the Government's argument, such evidence

is centrally relevant, would not risk prejudice or jury confusion, and it should not be precluded as a blanket matter at this stage.

The issue of cryptocurrency industry practices concerning the use of customer funds is a core issue in this case. Evidence that, for example, other cryptocurrency exchanges were pooling and reallocating customer deposits, in the absence of laws or regulations that clearly restrict what exchanges could do with these assets, would corroborate a good faith belief by Mr. Bankman-Fried that what FTX was doing was not improper or unlawful, but instead that he was engaged in proper, industry-standard business practices.

The Government argues that evidence of misconduct by other actors in the industry is irrelevant because the statement that "everyone speeds" is "not a defense if your car happens to get picked up on the radar." *Id.* at 39 (quoting *United States v. Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2125044, at *13 (S.D.N.Y. 2019)). But this presupposes that the conduct at issue in this case contravened an established, bright-line law. Here, the Government has not alleged that the cryptocurrency industry outside the United States was subject to any regulations restricting the use of funds from customer deposits. To take up the Government's analogy of speeding, if a driver does not know the speed limit because there is no posted limit—or even whether there is or is not a speed limit—the fact that a driver matches pace with the flow of traffic is probative of the driver's good faith belief that she is driving at a lawful speed. The defense should be able to explore comparable conduct across the cryptocurrency exchange sector (and the Government will be entitled to cross-examine witnesses on this point).

The Government cites *Connolly* to support its argument that evidence of cryptocurrency industry practices should be excluded, but *Connolly* supports the opposite position – that juries should be entitled to hear and consider such evidence. *Connolly* involved alleged wire fraud in

connection with LIBOR manipulation.  The court *admitted* evidence that the alleged misconduct

was widespread; at issue was whether that and other evidence were sufficient to sustain criminal

convictions.  *See Connolly*, 2019 WL 2125044, at *13 (denying motion for judgment of acquittal

or new trial).

Even more instructive is *United States v. Litvak*, 808 F.3d 160, 189–90 (2d Cir. 2015).  In

*Litvak*, the Second Circuit found it was error to exclude evidence that the defendant's supervisors

"regularly approved of conduct identical to that with which [the defendant] was charged."  *Id.* at

189.  The court observed that the district court incorrectly "characterized the proffered evidence

as improperly 'suggest[ing] that everybody did it and therefore it isn't illegal.'"  *Id.* at 189-90.

Rather:

> As Litvak's counsel stated at trial, this evidence would provide a fair basis
> upon which to infer that when Mr. Litvak did the very same thing, the
> supervisors saw and approved of [it] as standard operating procedure.
> Such an inference would support Litvak's attempt to introduce a
> reasonable doubt as to his intent to defraud, *i.e.*, that he held an honest
> belief that his conduct was not improper or unlawful, a belief the jury may
> have found more plausible in light of his supervisors' approval of his
> colleagues' substantially similar behavior.

*Id.* (internal quotation marks, citations, and ellipses omitted).  Therefore, the Second Circuit

found it was error to exclude the testimony as irrelevant.  *Id.*

Here, too, evidence that it was common practice in the cryptocurrency industry to utilize

customer deposits in much the same way that other financial institutions, such as banks and

insurers, make use of client funds could bear on Mr. Bankman-Fried's good faith belief that the

charged conduct was appropriate and lawful.

The Government's next argument, that such evidence should be excluded under Rule 403

because its probative value is substantially outweighed by the risk of delay, prejudice, and

confusion, should also be rejected.  The Government points to the potential need to adduce

rebuttal evidence on the conduct of others in the cryptocurrency industry, which would be "wholly irrelevant to any element or material fact at issue in the charged offenses."  ECF No. 204 at 39.  But as discussed, evidence of industry practice *would be* relevant to intent—an essential element of the Government's charges.  The Government also provides no reason to believe that such evidence would confuse or mislead the jury.

Accordingly, the Government's request to exclude evidence and argument about the prevalence of such practices in the cryptocurrency industry should be denied.

### D. The Government's Request to Exclude Evidence Regarding Mr. Bankman-Fried's "Intent to Repay" Customers Should Be Rejected.

The Government asks the Court to preclude Mr. Bankman-Fried from offering any evidence or arguing that he intended to "repay victims' funds and therefore that he did not act with intent to defraud."  ECF No. 204 at 41.  This argument is pitched at a straw man and should be rejected.  Briefly stated, evidence of Mr. Bankman-Fried's good-faith belief that FTX and Alameda were not acting improperly with respect to FTX customer assets is surely admissible, as is evidence that Mr. Bankman-Fried believed these entities were obligated to honor customer withdrawals and assessed the business risks with that obligation in mind.

The Government's request to exclude evidence of Mr. Bankman-Fried's belief in the importance of ensuring that customers would be able to withdraw assets they deposited with FTX is based on the false premise that the relevant question is whether Mr. Bankman-Fried "intended to repay" customers who had been defrauded.  This formulation presupposes an intent to defraud customers in the first place.  The Government invokes the Court's statement, in ruling that the S5 Indictment contained sufficient allegations to state a count of wire fraud, that "it is immaterial as a matter of law whether the defendant intended to repay the misappropriated funds because the offense is 'complete,' where, as *alleged* here, there is an 'immediate intent to

misapply and defraud.'" *Id.* at 42 (quoting *United States v. Bankman-Fried*, No. 22 CR. 673 (LAK), 2023 WL 4194773, at *9 (S.D.N.Y., 2023) (emphasis added)). But allegations are no longer sufficient; the Government must now prove beyond a reasonable doubt that Mr. Bankman-Fried had the requisite "immediate intent." And the defense is entitled to rebut evidence to that effect.

To be clear, Mr. Bankman-Fried's defense is not that he intended to steal funds and give them back. Rather, Mr. Bankman-Fried should be permitted to present to the jury evidence and argument establishing that he believed in good faith that he was acting within the parameters of what was permitted in the industry, by law and under the Terms of Service. This good faith belief would be further corroborated by evidence that Mr. Bankman-Fried believed it was his primary legal obligation to ensure that customer withdrawals could be honored, that he believed this obligation could be fulfilled, and that he endeavored to ensure that this was true. Here, too, the Government seeks to foreclose any effort to establish lack of fraudulent intent through a blanket exclusion of evidence related to Mr. Bankman-Fried's state of mind and actions regarding the need to ensure customers could ultimately withdraw their assets. The Court should decline to make such a ruling.

Finally, the Government's request to exclude evidence of Mr. Bankman-Fried's "intent to repay" customers should also be evaluated in light of its insistence that evidence that Mr. Bankman-Fried did *not* have that intent; specifically, that in late 2022, he prioritized payments to certain clients over at the expense of individual FTX customers. ECF No. 204 at 16; *see* Section I.F, *supra*. At the very least, the Government cannot be permitted to introduce evidence to rebut an evidentiary showing the defense is not permitted to make.[7]

---

[7] To the extent that the Government seeks to preclude evidence about the amount of assets that have been recovered through the bankruptcy proceedings for purposes of suggesting to the jury that victims will be made whole, the

### E. Evidence Concerning the Presence of Attorneys is Relevant to Mr. Bankman-Fried's Intent Absent a Formal Advice of Counsel Defense.

The Government seeks to preclude Mr. Bankman-Fried from "suggesting that the presence of attorneys at his companies or the involvement of attorneys in certain decision-making demonstrates that he lacked criminal intent," absent a "formal advice of counsel defense." ECF No. 204 at 44.

To begin with, the Government makes this request after having prevented the defense from obtaining in discovery documents reflecting the full scope of advice provided by legal counsel on many of the key issues raised by the S6 Indictment and relevant to the trial. *See* ECF Nos. 151, 155, 156. Its position cuts sharply against principles of fundamental fairness.

In any event, evidence that Mr. Bankman-Fried was aware that counsel from Fenwick & West and Sullivan & Cromwell, as well as in-house counsel for FTX, including Dan Friedberg, Can Sun, Ryne Miller, and others, were involved in decisions related to these and other matters is directly relevant to his good faith and lack of criminal intent, even if not introduced as part of a formal advice of counsel defense. *See, e.g.*, *United States v. Tagliaferri*, No. 13 Cr. 115 (RA) (S.D.N.Y. 2014), Trial Tr. at 83-85 (notwithstanding that defendant was not entitled to advice-of-counsel instruction, permitting testimony regarding involvement of attorneys in transaction as evidence of the defendant's state of mind). Reliance on counsel is relevant to the question of intent even in the absence of evidence that the defendant formally sought out the advice of counsel, received legal advice, and followed the advice given. *Howard v. S.E.C.*, 376 F.3d 1136,

---

defense does not object to this request. For the reasons discussed in the Memorandum of Law in Support of Mr. Bankman-Fried's Motions *in Limine*, ECF No. 207, evidence or argument as to whether the FTX Debtor Entities will be able to make their creditors whole is irrelevant, speculative, and unduly prejudicial. *See* ECF No. 207 at 12-14. However, should the Government introduce evidence relating to the bankruptcy, the defense should be permitted to rebut the prejudicial inferences such evidence would occasion, as set forth in Mr. Bankman-Fried's Motions *in Limine*. *See id.* at 15-18.

1147 (D.C. Cir. 2004) ("[R]eliance on the advice of counsel need not be a formal defense; it is simply evidence of good faith, a relevant consideration in evaluating a defendant's scienter."); *see also United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (in evaluating a defense of good faith, "[defendant's] conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent."); Sand et al., Modern Federal Jury Instructions, Instr. 44-5 ("It may also be appropriate to instruct the jury that consulting counsel could be considered as evidence of good faith.").

In *Tagliaferri*, Judge Abrams permitted "the defendant to elicit testimony that attorneys were involved in the transactions [and] . . . to argue that this involvement affected [the defendant's] state of mind, thus bearing on whether he acted with fraudulent intent." *Tagliaferri* June 16, 2014 Trial Tr. at 83-84; *see also id.* at 84 ("[T]he defendant may argue that attorneys who drafted or reviewed documents related to the charged transactions did not inform him of the illegality of his receiving fees or that formal disclosure of them was required, and that the defendant took comfort in the attorney silence.").

Similarly, in *Howard*, the defendant, who allegedly violated the securities laws in connection with certain transactions, introduced evidence that both transactions had been reviewed and approved by counsel. 376 F.3d at 1138-39, 1147-48. The Court found that these facts constituted "powerful evidence" of the defendant's good faith. *Id.* at 1148.

Mr. Bankman-Fried's awareness that counsel was involved in, among other things, the use of ephemeral messaging applications and auto-deletion policies at FTX; the formation and incorporation of the North Dimension entities, and the banking relationship between Silvergate Bank and Alameda, North Dimension, and FTX; loans given to FTX and Alameda executives; the Terms of Service; and intercompany agreements between FTX and Alameda, is relevant to

rebut the Government's claim that Mr. Bankman-Fried acted with criminal intent to defraud. For example, the Government currently argues that it should be permitted to elicit evidence that Mr. Bankman-Fried implemented auto-deletion policies and the use of ephemeral messaging applications to show consciousness of guilt. ECF No. 204 at 17-18. It cannot plausibly also argue that evidence that these policies were reviewed and approved by legal counsel is not relevant to Mr. Bankman-Fried's intent.

The Government's attempt to preclude evidence concerning the involvement of counsel that bears directly on Mr. Bankman-Fried's good faith should be denied.

F. **Evidence Concerning the Understanding of Risk of FTX's Customers and Investors and Alameda's Lenders Is Relevant and Admissible.**

The Government seeks to exclude evidence or argument that "FTX customers engaged in risky conduct by trading in cryptocurrency, that FTX investors knew that cryptocurrency companies and startups are risky and often fail, or that Alameda's lenders were to blame for a lack of diligence." ECF No. 204 at 37. In support, the Government argued evidence of such awareness of risk is irrelevant because "reliance is not an element of criminal fraud." *Id.* at 37.

This generalized argument appears to be an effort to elicit a preview of the defense's strategy, which the Government is not entitled to do. *See United States v. Fratello*, 44 F.R.D. 444, 452 (S.D.N.Y. 1968). Further, the Government's blanket request to preclude such broad categories of evidence is overbroad and premature before trial, in part because the Government cannot at this stage demonstrate that all of this evidence is "clearly inadmissible on all potential grounds." *See Baxter Diagnostics v. Novatek Medical, Inc,* No. 18-CR-76 (PAC), 1998 WL 665138, at *3 (S.D.N.Y. 1998) (internal quotation marks and citation omitted).

In any event, evidence of FTX customers' understanding of the risks of transacting with a foreign unregulated exchange and the adequacy of FTX investors' and Alameda's lenders' due

diligence would not solely be relevant to reliance or "a gullible victim defense." *See* ECF No. 204 at 36. Among other things, these issues may be relevant to whether the defendant was entitled to believe that his borrowing from customer funds was allowable, or more significantly, whether the depositors should have been aware that such actions might well take place. This also potentially goes to the credibility of victim witnesses. For example, should a lender claim that it would have recalled its loan had it known that Alameda and FTX were more closely related than was disclosed, the defense would be entitled to test the credibility of this assertion by questioning whether this was an area addressed as part of the lender's due diligence. This is equally the case should an investor in FTX claim that it would not have invested in FTX had it known how FTX was handling funds from customer deposits.

The adequacy of FTX investors' and Alameda's lenders' due diligence and FTX customers' understanding of the inherent risks they face is also relevant to the materiality of the alleged misrepresentations. While neither reliance nor damages are required to establish criminal wire fraud, *see United States v. Graham*, 2012 WL 1506027, at \*4 (2d Cir. May 1, 2012), materiality is an essential element. *United States v. Jabar*, 19 F.4th 66, 82 n.60 (2d Cir. 2021), *cert. denied sub nom. Bowers v. United States*, 142 S. Ct. 1396 (2022) (liability under the wire fraud statute "turns on the materiality of the misrepresentations" and "whether the alleged deception 'affect[ed] the very nature of the bargain.'") (citation omitted); *see also United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) ("Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid-which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.").

Here, the scope of the lenders' due diligence is directly relevant to what they considered material in evaluating the risk of lending to Alameda, and therefore what information would have affected the nature of the bargain of the loan transactions. Likewise, FTX investors' understanding of the risks attendant in cryptocurrency investments is relevant to the materiality of alleged misrepresentations. In the case of FTX customers, their understanding of the restrictions on what a cryptocurrency exchange can do with customer deposits and of the contours of their relationship with FTX with respect to their deposits is relevant to assessing the materiality of alleged misrepresentations—and to whether there was any misrepresentation at all.

The Government further seeks to preclude the defense from "cross-examin[ing] lender witnesses in a manner that implies that their due diligence was inadequate" in light of civil lawsuits against the lenders challenging the adequacy of that due diligence. ECF No. 204 at 37. But such evidence is directly relevant to whether the investors were defrauded. Further, the pendency of such lawsuits surely cannot be an impediment to the defendant providing an important element of his defense. Moreover, the potential relevance of these issues will depend on the content of these witnesses' direct testimony and whether they open the door to cross-examination on their own misstatements and the adequacy of their due diligence. This determination cannot be made now.

### G. The Government's Requests to Categorically Exclude Evidence of Mr. Bankman-Fried's Good Acts Should Be Denied.

The Government asks the Court to preclude Mr. Bankman-Fried from presenting any evidence or argument concerning his prior commission of "good acts" or "non-criminal activities" "to disprove his guilt of the crimes charged." *See* ECF No. 204 at 54-56. Without identifying any specific evidence to be excluded beyond Mr. Bankman-Fried's "charity [and] philanthropy," the Government argues that *all* "good acts evidence" would be inadmissible to

show innocence and lack of intent and would create the risk of jury confusion and jury nullification. *Id.* The Court should reject this request as premature and overbroad. Mr. Bankman-Fried should be permitted to admit evidence of prior "good acts" that, for example, contradict the Government's theories of motive and intent, and for any other purpose that is appropriate in light of the evidence adduced at trial.

"[E]vidence of a defendant's prior 'good acts' may be relevant . . . where such 'good acts' 'would undermine the underlying theory of a criminal prosecution.'" *United States v. James*, 607 F. Supp. 3d 246, 257 (E.D.N.Y. 2022) (quoting *United States v. Balboa*, No. 12-CR-0196, 2013 WL 6196606, at *3 (S.D.N.Y. 2013)). In *Balboa*, the defendant was charged with artificially inflating the value of certain warrants issued by the government of Nigeria. 2013 WL 6196606, at *1. The court denied the government's motion *in limine* to preclude evidence that the defendant marked down the value of other assets in the same hedge fund, reasoning that such evidence "might demonstrate that he lacked the incentive to artificially inflate the value of the Nigerian Warrants," which would undermine the government's proposed motive of increasing profits to increase his performance-based-pay. *Id.* at *3.

Here, the defense would be entitled to introduce evidence of Mr. Bankman-Fried's "good acts" and non-criminal conduct that undercut the Government's theories of motive and criminal intent. For example, the fact that Mr. Bankman-Fried registered FTX.US as a money transmitting business tends to rebut the Government's theory of criminal intent. *See* Section II.B, *supra*.

Other examples of relevant "good acts" include Mr. Bankman-Fried's charitable giving, donations to political groups focusing on pandemic preparedness, and investing funds to build FTX and Alameda's businesses. The Government will most likely attempt to show that Mr.

Bankman-Fried was motivated by personal greed as evidenced by certain uses to which funds originating as FTX customer deposits were put. *See, e.g.*, S6 Indictment ¶ 7 (asserting that customer funds were used to pay for, among other things, Mr. Bankman-Fried's "personal expenses, real estate in The Bahamas, speculative venture investments, [and] a wide-ranging political influence operation"). Mr. Bankman-Fried is entitled to rebut such arguments by showing that he acted not out of avarice but in good faith and with charitable and proper business motives. Accordingly, the Government's request to categorically preclude "good acts" evidence should be denied.

In the alternative, the Court should reserve decision on whether to preclude particular "good acts" evidence until it is proffered. *See United States v. Fiumano*, No. 14-CR-0518 (JFK), 2016 WL 1629356, at *8 (S.D.N.Y. Apr. 25, 2016) (reserving "decision on whether any ['good acts'] evidence the Defendant seeks to introduce is, in fact, inadmissible . . ." because "[n]either the Government nor the Defendant identify specific acts that should be precluded").

## H. The Government's Requests to Exclude All Evidence of the Defendant's Personal Circumstances are Overbroad, Premature, and Should Be Denied.

The Government asks the Court to preclude Mr. Bankman-Fried from raising at trial his personal circumstances including, among other things, his family background, health, and age. In support, the Government cites authorities for the uncontroversial proposition that a defendant should not be permitted to introduce irrelevant personal details solely to garner sympathy from the jury. *See* ECF No. 204 at 56. The Government cites no authorities to support a blanket pretrial order excluding any evidence of any personal circumstances—a determination that should be made case by case based on the specific evidence and the issue for which it is proffered. Mr. Bankman-Fried is, after all, a human being whose actions and intentions will be subject to intense scrutiny at trial. It makes no sense to foreclose in advance broad, vaguely defined

categories of evidence about him.  *Cf. United States v. Vargas*, 18-CR-76 (PAC), 2018 WL

6061207, at *3 (S.D.N.Y. Nov. 20, 2018) (declining at the motion *in limine* stage to "bar

Defendant from presenting character witnesses or testimony about his personal circumstances to

the extent they rebut facts brought into issue in the Government's case in chief").

I.     **The Government's Requests to Exclude Evidence and Claims About Its Own
       Conduct and Related Issues Should Be Denied.**

In seeking to exclude evidence and argument "about the speed of the Government's

charging decisions, the cooperation of the Debtors' attorneys, and the circumstances of the

Defendant's extradition," the Government mistakes the legitimate questions regarding the impact

on the trial of certain actions with accusations of prosecutorial misconduct.  *See* ECF No. 204 at

47.  On that flawed basis, the Government asserts that evidence regarding, for example, "the

reasons for or timing of the defendant's prosecution and extradition" would serve only to

"distract the jury from evidence of the defendant's guilt or to encourage jury nullification."  *Id.* at

47-48.

The Supreme Court has recognized that it is proper for a defendant to explore and

challenge "the thoroughness . . . of the [government's] investigation."  *Kyles v. Whitley*, 514 U.S.

419, 445, 115 S. Ct. 1555, 1571 (1995).  Here, for example, the Government appeared so eager

to arrest Mr. Bankman-Fried and hold a press conference that, at the time of his extradition, the

Government had failed to comply with its obligations to another sovereign and had not yet

requested many of the documents it now seeks to use against him.  The speed with which the

Government brought this case is relevant to the thoroughness of its investigation.  The defense

should therefore be permitted to point out that the Government rushed to judgment at a time of

economic upheaval and market instability across the cryptocurrency industry, and that this has

colored its conclusion that Mr. Bankman-Fried committed and conspired to commit fraud.

As to the Government's request to preclude the defense from raising the cooperation of the FTX Debtors' attorneys in the Government's investigation, this subject may be relevant on cross-examination if the door is opened by the Government.

**J.      The Court Should Exclude All Evidence of FTX and Alameda's Bankruptcy.**

The Government seeks to exclude "certain" evidence and claims regarding the bankruptcy of FTX and Alameda. ECF No. 204 at 49-50. At the same time, the Government asserts that "the fact that the FTX and Alameda entities declared bankruptcy on November 11, 2022, will certainly be put before the jury," *id.* at 50, without elaborating on the extent to which it intends to address this fact or for what purpose. That statement in combination with the request to preclude Mr. Bankman-Fried from introducing evidence or making arguments about some—but not all—aspects of the bankruptcies implies that the Government may seek to pick and choose what it wants to say about these issues while tying the defense's hands.

While the defense agrees with the Government that "the bankruptcy proceeding itself is not relevant to whether the defendant is guilty of the charged offenses," *id.*, the Government cannot preclude the defense from introducing rebuttal evidence if the Government seeks to argue or introduce evidence to show that the fact that the FTX and Alameda entities declared bankruptcy is evidence of Mr. Bankman-Fried's guilt. For example, the defense should be permitted to elicit evidence that Mr. Bankman-Fried was strongarmed into relinquishing control of FTX before the bankruptcy. *See* Everdell Decl., Ex. B, at SDNY_02_00411941. Indeed, testimony concerning the bankruptcies could be highly relevant to a witness's credibility, depending on what is elicited during direct examination.

Rather than foreclose altogether the possibility of prejudicial and selective reference to the FTX and Alameda bankruptcies by either Party, the better course would be for the Court to exclude evidence of the FTX bankruptcy, the solvency of FTX and Alameda, and the ability of

those entities to make customers whole, as argued in support of Mr. Bankman-Fried's motions *in limine*. ECF No. 207 at 8-14.

## III. THE GOVERNMENT'S REQUESTS TO ADMIT HEARSAY STATEMENTS SHOULD BE DENIED

Hearsay, generally meaning an out-of-court statement offered for the truth of the matter asserted therein, is inadmissible unless it falls within an enumerated exception, *see* Fed. R. Evid. 801(c), 802, or is "not hearsay." Fed. R. Evid. 801(d). The rule against hearsay is "grounded in the notion that untrustworthy evidence should not be presented to the triers of fact," because an out-of-court "declarant's word is not subject to cross-examination" and "he is not available in order that his demeanor and credibility may be assessed by the jury." *Chambers v. Mississippi*, 410 U.S. 284, 298, 93 S. Ct. 1038, 1047 (1973).

The Government seeks to invoke three exceptions and carve-outs to the rule against hearsay—set forth in Rules 801(d)(2)(D), 801(d)(2)(E), and 804(b)(3)—to admit vast and poorly defined categories of evidence. This request should be denied.

### A. The Government's Requests to Admit Certain Statements by Gary Wang, Nishad Singh, Caroline Ellison, and Other FTX and Alameda Employees Should Be Denied.

#### 1. Non-Hearsay under Rule 801(d)(2)(D) and Rule 801(d)(2)(E)

Rule 801(d)(2)(D) provides in relevant part that a statement is not hearsay if it "is offered against an opposing party and was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). To introduce evidence under this rule, the Government must lay a sufficient foundation by establishing "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Taylor v.*

*Potter*, 148 Fed. App'x. 33, 35 (2d Cir. 2005) (unpublished) (quoting *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992)).

Rule 801(d)(2)(E) provides in relevant part that a statement is not hearsay if it "is offered against an opposing party and was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Statements are admissible pursuant this rule only if a court finds that (1) a conspiracy existed at the time the statement was made; (2) the declarant and the defendant against whom the statement is offered were members of the conspiracy; and (3) the statement was made (a) in furtherance of the conspiracy and (b) during the course of the conspiracy. *See United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993) (citing *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778 (1987)). Under what is sometimes called the *Geaney* rule, declarations proffered as co-conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of proof of the *Bourjaily* prerequisites. *Id.* at 1299 (citing *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969)). However, where the scope of the alleged conspiracy is ill-defined and the statements' "content and context" unclear, "[t]he proper procedure is to determine the issues surrounding admissibility . . . ***during the trial***, and, if necessary, outside the presence of the jury." *United States v. Freedman*, 18-CR-217 (KMW), 2019 WL 5387866, at *2 (S.D.N.Y. Oct. 22, 2019) (emphasis added) (internal quotation marks and citation omitted).

### 2. The Government's Requests to Admit Ledgers, Notes, and Other Unspecified Documents Prepared by Gary Wang, Nishad Singh, and Caroline Ellison as Non-Hearsay Should Be Denied.

The Government seeks a ruling allowing it to admit "ledgers, notes, and other documentary evidence," prepared by Gary Wang, Nishad Singh, and Caroline Ellison as statements made in furtherance of the charged conspiracies under Rule 801(d)(2)(E) and within the scope of an agency relationship under Rule 801(d)(2)(D). These documents reportedly

include "excel documents" that tracked money flows between Alameda and FTX, as well as "handwritten and typed notes that Ellison maintained," such as "notes at meetings with her co-conspirators" that discussed "the financial health of Alameda and its liabilities to FTX," and "personal notes and to-do lists." ECF No. 204 at 22-23.

It is impossible to ascertain from the Government's descriptions whether any particular document is admissible under Rule 801(d)(2)(E)—let alone the broad category encompassed by the Government's request – without reviewing the documents themselves and the basis for their introduction. The Court should deny the pretrial motion and reserve ruling on specific requests until trial. *Freedman*, 2019 WL 5387866, at *2.

Likewise, there is no justification at this point for admitting these categories of documents as statements of Mr. Bankman-Fried's agents under Rule 801(d)(2)(D). The Government asserts that allegations in the Indictment and proof at trial will demonstrate that Wang, Singh, and Ellison were agents of Mr. Bankman-Fried. ECF No. 204 at 24. But allegations in a pleading and advance characterization of future proofs do not lay an actual foundation for admission of agent statements as non-hearsay. The Court should therefore deny the Government's request to admit these statements under Rule 801(d)(2)(D). *See Taylor v. Potter*, 148 Fed. App'x at 36 (affirming ruling that statements were inadmissible under Rule 801(d)(2)(D) where "there is insufficient evidence in the record to support [plaintiff's] position that his co-workers had the duty he alleges").

In sum, the Court should deny the Government's requests or reserve decision on the admissibility of these documents until they are proffered with an adequate foundation.[8]

_____

[8] It is also impossible at this stage to assess the Government's assertion in a footnote that "[c]ertain of these materials may well also be covered by the so-called business records exception to the hearsay rule embodied in Federal Rule of Evidence 803(6)." ECF No. 204 at 24 n.4. Indeed, the Government's description of several of these documents suggests that they would not be admissible as business records. "[A]dmissibility under Rule 803(6)

40

### 3. The Government's Claim that Statements of FTX and Alameda Employees Are Not Hearsay is Overbroad and Should be Rejected.

The Government requests to admit potentially any statement made by any of the hundreds of employees of FTX or Alameda as a statement of Mr. Bankman-Fried's agent under Rule 801(d)(2)(D). The sole basis for this request is that Mr. Bankman-Fried "was the CEO of FTX and the owner of Alameda." ECF No. 204 at 25. This request should be rejected.

The mere fact that a defendant is a senior executive does not mean that all lower-ranking corporate employees can be deemed the defendant's agent for purposes of Rule 801(d)(2)(D). *See United States v. Goldstein*, 21 CR. 550 (DC), 2023 WL 3662971, at *6 (E.D.N.Y. May 25, 2023) (finding defendant's "immediate subordinate" to be an agent for purposes of Rule 801(d)(2)(D) but declining to rule as to other employees due to insufficient information on scope of agency). Rather, "the Second Circuit has applied a functional test" that considers "the relationship between the declarant and the defendant." *Id.* (citing *Zaken v. Boerer*, 964 F.2d 1319, 1322-23 (2d Cir. 1992)) (ruling that statements by an employee who was "directly responsible to" the CEO were admissible against the CEO under the agency rule); *id.* at *7 (the "directly responsible to" test may be satisfied "by a direct reporting relationship" or "by facts demonstrating the declarant depended on the defendant for her position and job instructions."); *see also In re Res. Fund Sec. & Deriv. Litig.*, No. 09 Civ. 4346, 2012 WL 12354233, *7-8 (S.D.N.Y. 2012) (statement of senior corporate staff admissible against persons controlling corporate entity where defendant "is the declarant's ultimate supervisor," either "directly" or through a direct report); *Boren v. Sable*, 887 F.2d 1032, 1040 (10th Cir. 1989) (where defendant CEO and president of company testified that he was an absentee owner and had turned over

---

requires both that a memorandum have been 'kept in the course of a regularly conducted business activity' and also that it was the 'regular practice of that business activity to make the memorandum.'" *United States v. Freidin*, 849 F.2d 719-220 (2d Cir. 1988).

management to plaintiff, "mere occupation of a subordinate position in the corporate chain of command" was not sufficient to establish an agency relationship under Rule 801(d)(2)(D)).

Here, apart from identifying Mr. Bankman-Fried as "the CEO of FTX and the owner of Alameda," the Government cites as an "example" anonymous "FTX Employee-1," who the Government asserts (without foundation) "acted at the defendant's direction and regularly consulted with the defendant about FTX's fundraising efforts." ECF No. 204 at 25. This is not a sufficient foundation to determine whether "FTX Employee-1" was "directly responsible" to Mr. Bankman-Fried or "depended on the defendant" for his or her "position and job instructions." *See Goldstein*, 2023 WL 3662971, at *7. The Government offers no information on the other individuals it may regard as agents within the scope of Rule 801(d)(2)(D). The Government's sweeping request to admit any statement from any FTX or Alameda employee as an agent of Mr. Bankman-Fried's should be denied.

### 4. Caroline Ellison's Remarks at a November 9, 2022 "All-Hands" Meeting Are Inadmissible Hearsay.

The Government seeks to admit an audio recording of Caroline Ellison's statements from a November 9, 2022 "all hands" meeting of Alameda employees as statements of an agent or co-conspirator pursuant to Rules 801(d)(2)(D) and 801(d)(2)(E), respectively. This request should be denied.

Because the Government has failed to lay a sufficient foundation as to the scope of the alleged agency relationship between Ms. Ellison and Mr. Bankman-Fried, the Government has not established that the statements in the recording are within the scope of the alleged agency. In particular, the Government has made no showing that Mr. Bankman-Fried supervised Ms. Ellison's oversight of Alameda employees such that her statements at an all-hands meeting could

be deemed Mr. Bankman-Fried's vicarious admissions.  The Government has therefore failed to show that the recording is admissible under Rule 801(d)(2)(D).

The Government's assertion that the statements should be admitted as co-conspirator statements under Rule 801(d)(2)(E) is equally infirm.  The Government claims that, in "tr[ying] to persuade employees to 'stick around' by acknowledging the solvency crisis that was already becoming apparent, . . . apologizing and accepting responsibility, and expressing appreciation for the employees," Ms. Ellison was furthering the conspiracy by "'provid[ing] reassurance' and 'facilitat[ing] and protect[ing]' the conspiratorial activities."  *See* ECF No. 204 at 28 (quoting *United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001) and *United States v. Diaz*, 176 F.3d 52, 87 (2d Cir. 1999)).  This characterization defies all logic.  To the extent that Ms. Ellison's remarks can be viewed as describing any conspiracy, they at most represent an effort by Ms. Ellison to undermine and expose the conspiracy by letting her employees know that (1) Alameda would likely wind-down because, in order to meet loan recalls, Alameda "ended up borrowing a bunch of funds on FTX which led to FTX having a shortfall in user funds," (2) that she had "talked about [the shortfall] with, like, Sam, Nishad, and Gary," and (3) that she "guess[ed]" that the person "who made the decision on using user deposits" was Mr. Bankman-Fried.  *See*  ECF No. 204 at 26-27.

The Government's reliance on *Desena* and *Diaz* to suggest that this somehow furthered the conspiracy is wholly misplaced, as those decisions considered statements from one co-conspirator to another co-conspirator—not statements from one co-conspirator disclosing the existence of the purported conspiracy to non-conspirators.  Ms. Ellison's remarks to Alameda's staff, at the very most, are more akin to the statements that the Second Circuit held were not admissible in *United States v. Lang*, 589 F.2d 92, 100 (2d Cir. 1978).  In that case, which

involved counterfeiting charges, the Second Circuit held it was reversible error to admit as a co-conspirator statement a tape-recorded conversation between the defendant's co-conspirator and an undercover agent to whom the co-conspirator intended to sell counterfeit bills. The Second Circuit found that the conversation, in which the co-conspirator explained that the defendant had been arrested with counterfeit bills supplied by the co-conspirator, and the agent warned the co-conspirator to be careful in future dealings with the defendant, "cannot sensibly be viewed to advance the interests of any conspiracy between [the co-conspirator] and [the defendant.]" *Id.* The court explained that the conversation "would, if anything, discourage any future dealings," and "indicated that [the defendant] was a bad risk and this advanced no interest of [the defendant's] or his alleged co-conspirator." *Id.*

Accordingly, Ms. Ellison's statements at the "all-hands" meeting are inadmissible hearsay.[9]

In the alternative, should the Court deem the recording admissible, the Government should be required to introduce the recording in its entirety under the rule of completeness. *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (explaining that "even though a statement may be hearsay, an omitted portion of the statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion")

---

[9] The Government also asserts in a footnote that, "[t]o the extent the defendant attacks Ellison's credibility in his opening statement or on cross examination, these statements are prior consistent statements under Rule 801(d)(1)(B) and therefore not hearsay." ECF No. 204 at 29 n.5. It is premature to adjudicate whether the statements would be admissible under Rule 801(d)(1)(B). Ellison has not testified, and the parties have not opened. It is not clear at this pretrial stage that Ellison's testimony would be consistent with the prior statements or that she will be attacked. To the extent that the Government is moving *in limine* for a ruling under Rule 801(d)(1)(B), the Court should deny the motion and decide at trial whether the statements are admissible. *See United States v. Ray*, 20-CR-110 (LJL), 2022 WL 558146, at *6 (S.D.N.Y. Feb. 24, 2022) (denying government's motion *in limine* for a ruling that statements of witness who had not yet testified admissible under Rule 801(d)(1)(B)).

(alteration and internal quotation marks omitted), *cert. denied*, 552 U.S. 1301, 128 S. Ct. 1750

(2008);*see* Fed. R. Evid. 106.

### B. Ryan Salame's Messages Regarding Campaign Contributions Are Irrelevant and Should Be Excluded.

The Government's request to admit messages sent by Ryan Salame, former Co-CEO of

FTX Digital Markets, concerning political donations under Rule 804(b)(3) should be denied.

*First*, the messages are relevant only to the withdrawn campaign finance count, and

should thus be excluded as irrelevant and unfairly prejudicial (*see* Section I.C, *supra*).

*Second*, the Government fails to provide adequate information for the Court to assess

whether the messages fall within Rule 804(b)(3), and the scant information the Government

provides about certain excerpts of one message suggests that it does not meet the requisite

criteria under that rule.[10]

Under Rule 804(b)(3), statements against the declarant's own interests are not excluded

by the rule against hearsay if the declarant is unavailable as a witness and the statement is one

that:

> (A) a reasonable person in the declarant's position would have made
> only if the person believed it to be true because, when made, it was
> so contrary to the declarant's proprietary or pecuniary interest or had
> so great a tendency to invalidate the declarant's claim against
> someone else or to expose the declarant to civil or criminal liability;
> and
> (B) is supported by corroborating circumstances that clearly indicate
> its trustworthiness, if it is offered in a criminal case as one that tends
> to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3).

---

[10] The Government also indicates in a footnote that it "may seek to admit certain statements made by Salame in furtherance of the straw donor scheme under Rule 801(d)(2)(E)." ECF No. 204 at 29 n.7. While there is insufficient information to assess whether any other statements by Salame would be admissible as co-conspirator statements, to the extent these statements are relevant only to the illegality of campaign contributions, these statements should also be excluded as irrelevant for the reasons discussed in Section I.C above.

The Government has only proffered excerpted portions of the messages, so it is impossible to conduct the particularized assessment required under Rule 804(b)(3). The Government is effectively seeking an advisory opinion, which the Court should decline to provide. *See United States v. Ojudun*, 915 F.3d 875, 887 (2d Cir. 2019) (concluding that the district court, in holding an entire set of a declarant's statements to be within the scope of Rule 804(b)(3), "erred in failing to make a particularized assessment of the various individual assertions, in failing to determine whether the relevant assertions were sufficiently corroborated as required by Rule 804(b)(3)(B), and in failing to recognize that the [declarant's] statement that was most damaging to [defendant] was not within Rule 804(b)(3) because it did not implicate [the declarant] at all.").

Further, the excerpts the Government does provide suggest that the messages do not satisfy the criteria for admission under Rule 804(b)(3). As the Government acknowledges, a self-inculpatory statement that implicates a person other than the speaker may be admitted in full only if it is clear that the declarant was not attempting to "minimize his own culpability [or] shift blame onto" the defendant against whom the statement was offered. ECF No. 204 at 30 (quoting *United States v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007)). Based on the excerpts and description provided by the Government, Salame appears to have been doing exactly that— attempting to "minimize his own culpability" and "shift blame onto" Mr. Bankman-Fried. In particular, Salame's explanation is essentially that his own anticipated political contributions were the idea of Mr. Bankman-Fried. *Compare United States v. Saget*, 377 F. 3d 223, 231 (2d Cir. 2004) (noting that "the majority of [the declarant's] statements were descriptions of acts that he and Saget had jointly committed. Thus, [the declarant] does not appear to have been attempting to shift criminal culpability from himself to Saget.").

Nor is there any foundation to assess the trustworthiness of the statements. For example, there is no way for the defense to test the Government's characterization that Salame's message was to a "trusted family member." There is also no more reason to believe Salame was confiding the truth in a trusted family member than that he was attempting to avoid potential political disagreement with that family member for supporting Republicans. "The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth." *Williamson v. United States*, 512 U.S. 594, 599-600, 114 S. Ct. 2431, 2435 (1994). These statements should not be admitted unless the Government is able to establish—for each assertion—each factor under Rule 804(b)(3), and it is not at all clear at this stage that the Government will be able to do so at trial.

Accordingly, the Government's request to admit this statement under Rule 804(b)(3) should be denied.

### C. FTX Commercials Are Inadmissible Hearsay, Irrelevant, and Unfairly Prejudicial.

The Government requests to admit videos of unspecified FTX commercials that advertised the exchange. Even assuming the commercials are admissible, commercials pertaining to FTX.US are irrelevant and highly prejudicial and should therefore be excluded under Rules 401 and 403.

Advertisements regarding FTX.US are irrelevant because the charges and allegations in the S5 and S6 Indictments relate to alleged fraud on lenders to Alameda Research and customers and investors of FTX (*i.e.*, FTX Trading Ltd.)—not FTX.US. *See* Memorandum of Law in Support of Mr. Bankman-Fried's Motions *in Limine*, ECF No. 207 at 16-17. Commercials for FTX.US were aired in the United States to a U.S. audience who could not use FTX, the

international exchange.  The Government offers no basis to assert that commercials about FTX.US are relevant to the charged fraud.  These statements are therefore irrelevant and should be excluded under Rule 401.

Even if the advertisements had some minimal relevance, it would be substantially outweighed by the risk of unfair prejudice, confusion of the issues, and waste of time.  *See* Fed. R. Evid. 403.  The Government has not charged or alleged any fraud in connection with FTX.US.  Introducing allegedly misleading advertisements about FTX.US would be highly prejudicial and confusing to the jury because it would give the incorrect impression that the Government is charging Mr. Bankman-Fried with defrauding U.S.-based customers of FTX.US. The only customers at issue in the operative S6 Indictment are those of FTX, not FTX.US.  This is a crucial distinction because, unlike FTX.US, FTX was not available to U.S. customers. Suggesting that U.S. customers were defrauded, when the allegations involve customers of FTX, a business that was not open to U.S. customers, is inflammatory and raises an unavoidable risk of unfair prejudice.

Admitting advertisements about FTX.US would also risk wasting time spent adducing and rebutting evidence about collateral issues such as whether the statements were materially misleading and could fairly be attributed to Mr. Bankman-Fried.  *Cf. United States v. Hawkins*, 360 F. Supp. 2d 689, 696 (E.D. Pa. 2005) (defendant's alleged misstatement under oath about his wealth was not admissible in perjury prosecution, where statement was collateral to actual charge of perjury, and evidence rebutting statement would open a line of collateral evidence).  The Court should therefore exclude advertisements about FTX.US.

## IV. THE GOVERNMENT'S REQUESTS REGARDING AUTHENTICATION OF RECORDS AND LIMITING CROSS-EXAMINATION OF CUSTODIAL WITNESSES SHOULD BE DENIED.

### A. The Government's Request to Admit Documents as Self-Authenticating Is Premature.

The Government asks the Court to rule that a long list of categories of documents—without identifying or proffering any specific documents—be admitted as self-authenticating business records under Federal Rules of Evidence 803(6) and 902(11) and 18 U.S.C. § 3505.[11] ECF No. 204 at 34. The Government asserts, with no further explanation or description, that each document in these categories will qualify as a business record under Rule 803(6) and therefore be self-authenticating under Rule 902(11) for domestic records and 18 U.S.C. § 3505 for foreign records.

This broad request is purportedly necessary now because "the defendant has not yet" stipulated to the authentication of these categories. The defense is willing to discuss the evidence and potential stipulations after the Government provides its exhibit list. However, the defense cannot agree to a blind stipulation based on the Government's mere description of the categories and its argument that the documents are business records, that it has or will produce the certifications, and that the documents meet the criteria for self-authentication.

Rather than wait until an appropriate stipulation can be negotiated based on exhibit lists or some narrowing principle, the Government makes the same unreasonable and premature request of the Court that it has made of the defense. The Court need not and should not grant the

---

[11] The list of categories includes:

> FTX.com user transaction records; transaction records, IP logs, and access logs produced by banks, credit card companies and brokerages; transaction records, IP logs, and access logs produced by cryptocurrency exchanges besides FTX, including exchanges based overseas; transaction records from cryptocurrency lenders; records from political campaign platforms; and subscriber information, device information, access logs, and IP logs from internet service providers; and call detail records, historical location data, subscriber information, and IP logs from telephonic service providers, which have been provided to the Government either pursuant to a subpoena or voluntarily.

ECF No. 204 at 34.

request at this time.  *See United States v. Weigand*, 20 CR 188 (JSR), 2021 WL 568173, at *2 (S.D.N.Y. Feb. 14, 2021) (declining to find materials to be self-authenticating under Rule 803(6) where purported business records and their certifications had not yet been presented).

**B.     The Government's Requests to Limit the Scope of Cross-Examination Are Premature and Should be Denied.**

The Government's request to preclude the defense from cross-examining custodial witnesses on "topics unrelated to authenticating records" is premature and should be denied.  *See* ECF No. 204 at 35-36.  At this stage, it is unclear which custodial witnesses, if any, will testify, what the appropriate scope of cross-examination will be, and whether the defense may justifiably seek to ask questions about topics that are beyond the strict scope of direct examination but are nonetheless relevant to avoid having to re-call the witness as a defense witness.  An advance ruling on the scope of cross-examination of all potential witnesses designated as custodial by the Government is unnecessary and inappropriate.  The same is true of the Government's demand that the defense disclose in advance the names of any Government custodians it may wish to question about topics other than record authentication.

**V.     THE GOVERNMENT'S REMAINING REQUESTS SHOULD BE DENIED AS PREMATURE.**

**A.     The Government's Request to Preclude Cross-Examination About Its Witnesses' Recreational Drug Use Should Be Denied.**

The Government seeks to preclude cross-examination of its witnesses about their recreational drug use on the ground that "it is not probative of a witness's truthfulness and would serve only to harass the witness and prejudice the jury against them."  ECF No. 204 at 59.  Like many of the Government's motions *in limine*, this request is premature and should be denied.

Although occasional recreational drug use, without more, is typically not probative of a witness's truthfulness, that is not categorically true.  Here, for example, drug use could implicate

a witness's truthfulness or credibility if it impaired the witness's perceptions or recollections, or if the witness sought to conceal his or her drug use from relevant authorities, or if it was a clear violation of company policy. Drug use that impaired an employee's performance of duties in a manner that could have affected the accuracy of company records or the reliability of contemporaneous statements may also be relevant not just to credibility but also to important factual issues. *See United States v. Vargas*, 18-CR-76 (PAC), 2018 WL 6061207, at *2 (S.D.N.Y. Nov. 20, 2018) (rejecting motion *in limine* to preclude evidence of drug use by government witnesses in healthcare fraud trial, and noting that if either witness "used drugs while working, or . . . lied about their drug use to the Government," such conduct would "speak directly to their credibility as witnesses and the reliability of the observations they made"). The Court should reject the Government's motion *in limine* and address the issue if and when it arises based on specific context and facts then available.

### B. The Government's Request Regarding Cross-Examination on Privileged Documents or Topics I Premature and Should Be Denied.

The Government's request to require the defense to raise in advance and outside of the presence of the jury any privileged topics on which it might cross-examine witnesses is premature. *See* ECF No. 204 at 57-58. The Government has not made any showing that the process of *in camera* review approved during the pretrial discovery stage in *United States v. Sattar*, No. 02 Cr .395 (JFK), 2003 WL 22137012, at *21 (S.D.N.Y. Sept. 15, 2003), is necessary or appropriate for trial here and in any event that decision is not binding authority on this Court. The defense understands the law and will endeavor to raise in advance privileged topics that it can foresee seeking to raise during cross-examination. However, because the identities of all of the Government's witnesses have not yet been disclosed, and the scope of their testimony will not be known until trial, the Government's request cannot be adjudicated at this time.

## CONCLUSION

For the foregoing reasons, the Government's motions *in limine* should be denied or

limited or, in the alternative, the Court should reserve decision until the Government presents

specific items of evidence closer to trial as set forth above.

Dated:  September 1, 2023
      New York, New York

                             Respectfully submitted,

                             */s/ Mark S. Cohen*
                             Mark S. Cohen
                             Christian R. Everdell
                             S. Gale Dick
                             Sri K. Kuehnlenz
                             Sharon L. Barbour
                             **COHEN & GRESSER LLP**
                             800 Third Avenue, 21st Floor
                             New York, New York  10022
                             Phone:  (212) 957-7600
                             mcohen@cohengresser.com
                             ceverdell@cohengresser.com
                             sgdick@cohengresser.com
                             skuehnlenz@cohengresser.com
                             sbarbour@cohengresser.com

                             *Attorneys for Samuel Bankman-Fried*