N8UQbanO

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA
 3
              v.                          22 CR 673 (LAK)
 4
     SAMUEL BANKMAN-FRIED
 5
                  Defendant
 6   ------------------------------x
 7                                        New York, N.Y.
                                          August 30, 2023
 8                                        1:00 p.m.
 9
     Before:
10
                          HON. LEWIS A. KAPLAN
11                                        District Judge
12
                              APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorneys for the
          Southern District of New York
15   NATHAN REHN
     DANIELLE KUDLA
16   DANIELLE SASSOON
     SAMUEL RAYMOND
17   NICOLAS ROOS
          Assistant United States Attorney
18
     COHEN & GRESSER LLP
19        Attorneys for Defendant
     CHRISTIAN R. EVERDELL
20   MARK COHEN
21
22
23
24
25
```

N8UQbanO

1          (The Court and all parties appearing via Teams)

2          THE COURT:  Good afternoon everybody.  Let me first

3  make sure we have the reporter on the line.

4          (Replies)

5          THE COURT:  Perfect.

6          United States v. Samuel Bankman-Fried.

7          Counsel for the government, put in your appearances,

8  please.

9          MR. REHN:  Good afternoon, your Honor.

10          This is Thane Rehn for the United States.  We also

11  have on the line Nick Roos, Danielle Sassoon, Danielle Kudla

12  and Samuel Raymond.

13          THE COURT:  Good afternoon, folks.

14          For the defendant.

15          MR. COHEN:  Yes.  Good afternoon, your Honor.

16          Mark Cohen, Cohen & Gresser, for the defendant.

17          MR. EVERDELL:  Christian Everdell, Cohen & Gresser,

18  for the defendant.

19          THE COURT:  Good afternoon.  The sequencing which I

20  would like to deal with the matters we have before us this

21  afternoon are, first of all, the in limine motion, and I

22  propose to talk about the MDC situation, and we will deal with

23  the advice of counsel problem last.

24          Anybody have a different suggestion?  Okay.

25          MR. REHN:  That's fine, your Honor.

N8UQbanO

| | |
|---|---|
| 1 | THE COURT:  Who is going to address it for the |
| 2 | defendant? |
| 3 | MR. COHEN:  I will, your Honor. |
| 4 | THE COURT:  Happy to hear you. |
| 5 | MR. EVERDELL:  Thank you, your Honor. |
| 6 | Your Honor, as we set forth in our motion in limine, |
| 7 | the government has consistently missed deadlines that it |
| 8 | represented to the Court that it would make, and they have been |
| 9 | producing voluminous discovery to us just in the last several |
| 10 | weeks and even in the last few days. |
| 11 | Your Honor, the last status report the Court gave to |
| 12 | the -- that the government gave the Court on discovery was at |
| 13 | the June 15 hearing, and they said that they still needed to |
| 14 | produce data from Google accounts and slack data from Gary |
| 15 | Wang's laptop.  Of course there was still the voluminous |
| 16 | ongoing subpoena returns that kept coming in, and I believe are |
| 17 | continuing to come in. |
| 18 | THE COURT:  Excuse me.  They go to you, that material |
| 19 | or some subset of it goes to you because you asked for it under |
| 20 | Rule 16, right? |
| 21 | MR. EVERDELL:  Your Honor, yes, it is the burden of |
| 22 | the government to produce what they plan to use and what they |
| 23 | plan to rely upon at trial under Rule 16. |
| 24 | THE COURT:  Through Rule 16. |
| 25 | MR. EVERDELL:  Yes, it's Rule 16, your Honor. |

N8UQbanO

1       THE COURT:  And if I remember correctly, that's

2  reciprocal.  They don't have that obligation unless you ask for

3  it and agree to make some disclosure.  Is that right?

4       MR. EVERDELL:  I believe that's correct, your Honor.

5       THE COURT:  So what you're complaining about there is

6  that the government has been recently producing to you

7  materials that you asked, for which in some degree or another

8  is only now in the government's possession and control as

9  opposed to having been there all along, right?

10       MR. EVERDELL:  Well, your Honor, I think we need to

11  take a bit of a step back, because I think that we have to

12  frame the context for why we are here.  The reason why these

13  materials are only coming to the government right now and then

14  in turn only coming to us is because of the speed at which the

15  government chose to charge this case.  They chose this schedule

16  that we are on.  A lot of these materials --

17       THE COURT:  Well, now, that's not exactly -- sir, that

18  isn't exactly right either.  They indicted the case when they

19  had probable cause to go to the grand jury, and you both came

20  in at the very first conference and asked for October 5, right?

21       MR. EVERDELL:  Yes, your Honor.  And, your Honor, this

22  is where the tension lies because the defendant does have a

23  right to pick a date for a speedy trial.  We chose a date that

24  we thought would be -- you know, it was certainly an aggressive

25  date because our client wants to clear his name, and we didn't

N8UQbanO

1    choose one that was far out for that reason, but it shouldn't

2    be the case that if the client and if the defendant wants to

3    make that choice that then we have to sort of suffer the

4    consequences of late produced discovery coming to us in order

5    to keep that trial date.

6         THE COURT:  You are not complaining about, as I

7    understand it, the late produced discovery in the sense that

8    the government had it and withheld it.  You're complaining that

9    the government got it and turned it over to you, and when the

10   government got it and therefore turned it over to you, that was

11   late given the starting date that you all agreed on.  Yes?

12        MR. EVERDELL:  Yes, your Honor, I -- yes.  That is

13   correct.  The fact is because of the way the case was charged,

14   because the government charged it before they had even

15   requested a lot of these documents and requested this evidence,

16   this evidence is now coming to us far late in the game up to

17   the point where it's now four weeks till trial, and we're still

18   getting productions of millions of pages, and we should not

19   what bear the consequences of that decision for the government

20   to have charged the way that they did, and we are left in a

21   position where we're bearing the consequences not being able to

22   actually do a substantive review of these documents in time for

23   trial.

24        THE COURT:  Well, now most of the documents have been

25   produced in searchable form and with indices, have they not?

1    MR. EVERDELL:  Your Honor, this also butts up against

2    what our client's current situation is because he needs to be

3    able to review these documents as well.  And right now he's in

4    jail, and he doesn't have the ability to look at this stuff and

5    search it in the way he used to before he was out.  So we are

6    faced with a problem of getting documents produced millions of

7    pages within four weeks to go to trial, and our own client has

8    no real means to review them, and that -- and we can't be in

9    that position.  He has the right to look at discovery that's

10   being produced to him being used in the trial against him.  And

11   with the documents we're getting right now, he can't do that.

12        THE COURT:  Anything else?

13        MR. EVERDELL:  Your Honor, I think it's just that

14   given how late these were produced, and we have raised this

15   issue -- one moment, your Honor.  I would ask, for example, is

16   the government planning to make any additional productions at

17   this point?  Because, I mean, we've still gotten a number in

18   very recently, but there may be more coming.  It seems like the

19   subpoena returns, for example, keep coming in, and they're just

20   going to keep producing them.

21        THE COURT:  Well, do you object to their producing

22   them?  Are you saying now that any other Rule 16 material that

23   comes into the government's control post today, they have no

24   obligation to produce?

25        MR. EVERDELL:  Your Honor, what I think I'm saying is

N8UQbanO

1    that we -- they can't be used at this point at trial because if

2    we know they're going to be used, then we need to be able to

3    review them, and we can't review them this late in the game.

4    This is far too late in the game for us to be able to prepare

5    and review those documents in time to prepare the defense if

6    they're going to be used at trial.

7              THE COURT:  But you haven't asked for more time.

8              MR. EVERDELL:  No, we haven't, your Honor.

9              THE COURT:  Well, would you like to?

10             MR. EVERDELL:  Your Honor, I don't think we want to

11   ask for more time currently at the moment.  No.

12             THE COURT:  Okay.  Anything else you want to say on

13   the subject?

14             MR. EVERDELL:  No, your Honor.

15             THE COURT:  I had one question for you.  At some point

16   along the way there was a lot of expressed desire on the part

17   of the defendant to get the FTX code base.  Has that been

18   turned over?

19             MR. EVERDELL:  Your Honor, we asked for both a code

20   base and the code base history, which is the edit history to

21   the code base.  The code base itself was supplied directly, I

22   believe, by the FTX debtors, but that has to be looked at

23   online.  And so, again, it butts up against the circumstances

24   that we face where the defendant really can't access that

25   without looking at it online.

N8UQbanO

1          THE COURT:  And you have seven expert witnesses, at

2     least some of whom are capable of understanding the code base,

3     yes?

4          MR. EVERDELL:  Sorry, your Honor.  Say again?

5          THE COURT:  You have seven expert witnesses you're

6     proposing, at least some of whom, or one of whom is capable of

7     looking at the code base and understanding it, yes?

8          MR. EVERDELL:  Well, your Honor, it's not a substitute

9     for the defendant's own review of the code base.

10          THE COURT:  You haven't answered the question.

11          MR. EVERDELL:  Your Honor, we have people who this --

12     this code base is a bespoke code base, right?

13          THE COURT:  I'm sorry, it's a what?

14          MR. EVERDELL:  It's a bespoke code base.  The people

15     who truly understand it best are the ones who designed it,

16     which are the government's own witnesses.  We are working as

17     best we can with our own experts to understand it and the

18     defendant, his input on it is critical.

19          THE COURT:  And when was that made available to you?

20          MR. EVERDELL:  Your Honor, I don't think I have the

21     date in front of me right now.  I can get it for you, your

22     Honor.

23          THE COURT:  Okay.  And is this something that's

24     included in any of the various totals of pages that are in your

25     letters?

N8UQbanO

1          MR. EVERDELL:  No, your Honor.

2          THE COURT:  Now, you asked for the edit history, you

3     said.  Did you get that.

4          MR. EVERDELL:  No, we have not received the code base

5     history.

6          THE COURT:  Does the government have it, as far as you

7     know?

8          MR. EVERDELL:  As far as I know, they have put us

9     directly in touch with the debtors because they say this

10    information has to come directly from the FTX debtors, and

11    that's how we got the -- and so I don't know if they have it or

12    they don't.  I don't think they do.

13         THE COURT:  Did you ask them for it?

14         MR. EVERDELL:  Yes, we've been asking them for it, and

15    they have put us in touch with the FTX debtors and said this

16    has to be produced directly --

17         THE COURT:  Did you ask the FTX debtors for it?

18         MR. EVERDELL:  Your Honor, we asked the government to

19    facilitate this for us because they offered to do this on our

20    behalf, hearing this would be actually the quickest way to get

21    it from the FTX debtors.

22         THE COURT:  Did you ask the FTX debtors for access to

23    it?

24         MR. EVERDELL:  I have to check to see if I have emails

25    between the FTX debtors on this.  I believe I had a

N8UQbanO

| | |
|---|---|
| 1 | conversation with them about this, and then I asked the |
| 2 | government to facilitate. |
| 3 | THE COURT:  And whom did you ask specifically? |
| 4 | MR. EVERDELL:  Your Honor, I have to go back and check |
| 5 | my notes. |
| 6 | THE COURT:  Anything further from the defense on this? |
| 7 | MR. EVERDELL:  No, your Honor. |
| 8 | THE COURT:  Who's going to address it for the |
| 9 | government, please? |
| 10 | MR. REHN:  I will be addressing it, your Honor. |
| 11 | THE COURT:  Okay. |
| 12 | MR. REHN:  Your Honor, as set forth in the |
| 13 | government's letter and response to defendant's motion in |
| 14 | limine, there has been no violation of Rule 16 in this case by |
| 15 | the government. |
| 16 | THE COURT:  I don't think that they claim that there |
| 17 | is. |
| 18 | MR. REHN:  We agree, your Honor, but that makes all |
| 19 | the more pertinent the fact that the remedy they're seeking is |
| 20 | preclusion of evidence from trial is completely inappropriate |
| 21 | because courts have found that even in instances in which there |
| 22 | were a Rule 16 violation, the preferred remedy would not be |
| 23 | preclusion.  That's an extreme and unusual remedy that's been |
| 24 | applied very rarely in a small number of cases which are |
| 25 | distinguishable for the reasons set forth in our letter. |

N8UQbanO

1          With respect to the question of the defendant's

2     ability to prepare for trial on the schedule that the Court has

3     set, the defense has not actually articulated a particular

4     prejudice arising from the volume --

5          THE COURT:  Well, just so we're clear, as a matter of

6     formality, I set the date, but you and the defendant came to me

7     with that date at the first conference, as I remember it, and I

8     went along with what you both suggested.

9          MR. REHN:  That's correct, your Honor.  And I think

10    also it's important to place in context the timing of the

11    production in this case and the reason why they've been through

12    some of the schedule they have been.  A big part of that is

13    that the more recent disclosures in particular have been in

14    large part due to requests made of the government by the

15    defense.  So the large volume of third-party productions, the

16    largest categories of that are productions from the FTX debtors

17    of slack messages, which the defense has repeatedly requested

18    of the government both in writing and in phone calls that we've

19    had with the defense.  And we've gone back to the FTX debtors

20    to request those productions and now turned them over to the

21    defense, and the defense is now saying, well, you know, we

22    don't have the ability to review this in time for trial.

23          So it's a situation where if the defense wanted these

24    materials, we've made efforts to get them from the debtors and

25    produce them to them, and they're receiving them on the same

N8UQbanO

schedule that the government is.  We're still more than a month

out from trial.  These are text searchable indexed productions

of messages that the FTX debtors produced to us, and there's no

reason why they can't be reviewed for potential -- materials

potentially relevant to trial by both parties in the more than

a month that we have remaining until trial.

          The next category that the defense highlights are the

Google documents.  As we explained in our letter, the vast

majority of the production from Google consists of a production

that was produced by Google to the government pursuant to a

search warrant of the defendant's own Google documents.  So

these are materials that the defendant has had access to

throughout the pendency of this case, and indeed before the

pendency of this case, and that the government only recently

came into possession of and produced promptly when it came into

possession of them.

          So it would be an extremely perverse remedy to suggest

that the defense should be able to preclude the government from

using materials when the defense has had them for many, many

months prior to the government and is presumably preparing to

make use of them for trial itself.  So there doesn't seem to be

a real basis for any remedy at all based on the record that the

defense has presented to us with respect to those categories of

documents.

          With respect to the last thing that the defense

N8UQbanO

1    mentioned, the code base history, we have been told by the FTX

2    debtors that they did provide access to the entire FTX code and

3    the code base history, what they called a commit history, which

4    every time somebody updates the code, it commits, so it's

5    called a commit history.  We have no further access beyond what

6    the defense has to the same code base and history, and so it's

7    our understanding that it is both the code base and commit

8    history that the defense has now had access to for some time.

9          THE COURT:  Just so we have a clear record, when we're

10   talking about access, we're talking about electronic access

11   over electronic connection.  Is that right?

12         MR. REHN:  That's my understanding, your Honor, yes.

13         THE COURT:  And that's true for the government, and

14   it's true for the defense?

15         MR. REHN:  That's correct, your Honor, yes.  With

16   respect to any excerpts of that that we have actually obtained

17   as documents, those have been produced to the defense promptly

18   as we received them.

19         THE COURT:  All right.  Anything further, Mr. Rehn, on

20   this?

21         MR. REHN:  Again, the one thing, just to highlight it,

22   these are all categories of production that the government

23   disclosed both to the Court and the defense back in June in our

24   letter prior to the June 15 conference, and we specifically

25   discussed at that conference that the slack messages from Gary

N8UQbanO

```
1    Wang's laptop would still need to be processed; that we were
2    waiting on additional production of documents from Google
3    search warrant; and that we were receiving additional
4    third-party productions and producing them as we received them.
5    So there's been no dilatory behavior by the government or no
6    surprise to the defense that these particular productions would
7    be forthcoming as time went by.  And so the suggestion that the
8    defense is somehow surprised by the fact that these have
9    arrived, as the government stated that they would, we don't
10   think it holds water.
11            THE COURT:  Anything further, Mr. Everdell?
12            MR. EVERDELL:  Your Honor, just on that point, it
13   can't really be that the government says as long as we disclose
14   that we're going to be producing these documents so late, then
15   we can so produce them whenever we want and still use them at
16   trial even when they are produced so close to trial and the
17   defense has no meaningful way to actually review them before
18   trial.  So I don't see how that --
19            THE COURT:  Well, you have text searchable databases,
20   you have indices.  Isn't that true?
21            MR. EVERDELL:  We have a database, yes, your Honor,
22   but what we don't have at this point is the ability to be able
23   to do this and search this with our client, and that is a
24   problem for preparing.
25            THE COURT:  Well, we'll get to that in due course, but
```

N8UQbanO

1   I am not going to preclude any of this.  And I want to be clear

2   about why.  Starting I think in a letter on June 5 and

3   continuing in the motion the defendant made to preclude the

4   government from using documents produced after July 1 -- and of

5   course I'm using documents not only to refer to physical pieces

6   of paper but information in electronic form also -- and then

7   still further in its letter of August 28, the defense complains

8   that the government recently has produced millions of pages of

9   documents belatedly and in violation of what it characterizes

10   as promises by the government and court deadlines.

11          Well, no one, least of all the government, disputes

12   that it would have been preferable if the documents could have

13   been produced earlier.  The accusations of broken promises and

14   missed deadlines are not at all accurate.  They ignore the

15   substance of what the government actually said.  Moreover, the

16   defense ignores the fact that the entire document production

17   made to date, and conceivably parts of which are yet to come,

18   occurred to discharge the government's obligation to comply

19   with discovery obligations to the defendant which were created

20   by the defendant's request for the material.

21          Moreover, the material is produced to the defendant on

22   request, not to satisfy some urge of the government, but to

23   further the goal of ensuring that the defendant gets a fair

24   trial, and the defense ignores the reasons for the delays in

25   producing some of the documents, consideration of which in my

N8UQbanO

judgment demonstrate that the nature of the defendant's
complaints of broken promises and missed deadlines show that
it's misleading.

To go back to square one -- and I think the defendant
has acknowledged it in this conversation -- the only obligation
on the part of the government was to produce documents in the
government's possession, custody or control pursuant to Rule 16
and the defendant's request.  On January 3, the very first
conference I held in this case, the government made a clear
distinction between materials that already were in its
possession, which it expected to produce within the four
ensuing weeks, save for data contained in electronic devices
that were in the government's possession but the contents of
which required extraction and review for privilege and
responsiveness.  The likelihood that additional materials would
come into its possession in the days and weeks to come was
clear and unequivocal.

There is no claim here that the government failed
promptly to produce any of the materials that were in its
possession last January, but the government was crystal clear
that there were subpoenas and document requests outstanding;
that the investigation was continuing; that it was attempting
to extract and process information from accounts and electronic
devices that it had obtained and would obtain, and that
discovery would continue on a rolling basis.

N8UQbanO

1           On March 10, the government advised the defense and

2     the Court that there were some problems with information that

3     had not been in the government's possession earlier.  One very

4     large category was Google's slow, and as of that time

5     incomplete, response to an outstanding search warrant.  Another

6     was difficulties in extracting information from some electronic

7     devices and then reviewing the extracted information for the

8     reasons I alluded to.  But I set no deadline for completion

9     because it was impossible to do it.  The government did say

10    that it believed that it would be able to produce the

11    information from the electronic devices by the end of March and

12    the material yet to come from Google by the end of April, but

13    that was an anticipation.  It wasn't a promise, and it wasn't a

14    deadline.  I could go on in a lot more detail, but it is

15    unnecessary.

16          The fact of the matter is that the government kept

17    both the defendant and the Court fully apprised of the reasons

18    for the continuing production of these documents that were

19    coming from non-parties, notably Google, or from extraction

20    from electronic devices.  There is just no evidence at all that

21    the government didn't act in good faith and didn't make sincere

22    efforts to expedite the whole process.  There is no evidence

23    that the government inappropriately delayed production of

24    responsive information once the government had it.

25          On June 5, the defendant complained that a few

N8UQbanO

1   categories of expected documents hadn't been produced, and as

2   the correspondence that's been filed in recent days

3   demonstrates, most of those complaints -- not all, but most --

4   have been rendered moot by June 14.  Moreover, the government

5   went to considerable pains, I imagine, to produce all or most

6   of this material in text searchable and indexed form,

7   drastically reducing any burden in reviewing it for matters

8   that were potentially important to the case.

9       Now, most recently the defendant complains that the

10  government produced another 4 million documents -- I should say

11  pages -- on August 24 and then 3.7 million more on August 28.

12  But those complaints are really somewhat misleading.  The

13  government points out that the 4 million pages produced on

14  August 24 were documents that only recently it obtained from

15  Google which Google had not previously turned over to the

16  government as a result of a production error of which the

17  defendant was advised a long time ago.

18      Even more to the point, the vast majority of these

19  documents were from the defendant's own Google accounts.  They

20  were therefore documents to which he had independent and

21  essentially unfettered access until he was detained on

22  August 11.  He, therefore, had months in consultation with

23  counsel, and whomever else he wanted to be in consultation

24  with, to review and consider those documents.  And he was in

25  his parents' home with access to a computer and the internet

N8UQbanO

1    the whole time.

2          The 3.7 million page production on or about August 28

3    the government has explained consists very substantially of a

4    duplicate subset of documents that were produced to the

5    defendant a few days before.  To be sure, I understand that the

6    defendant claims in its letter of this morning that a little

7    more than a quarter of those 3.7 million documents were, and I

8    quote, "additional discovery, most of it from the FTX debtor

9    entities."  But the defendant does not contend that the

10   government had that additional discovery material, materially

11   before it produced it.  He has given no indication of what the

12   material contains, whether and why it's important, whether the

13   defendant had access to all or part of it in the past, or how

14   he is prejudiced by the government's discharge of its

15   obligation to turn that material over.

16         So this latest of the defendant's complaints

17   concerning an alleged deluge of millions of documents is very

18   seriously exaggerated.  He acknowledges that he had access to

19   at least the vast majority of the 7.7 million documents through

20   his own Google accounts for months before his bail was revoked,

21   and to whatever extent there might have been an implication

22   that the government violated its discovery obligations or

23   failed to act in good faith, that implication is without merit.

24         Now, I am by no means unmindful about the burdens of

25   the information age and the proliferation of electronic

N8UQbanO

devices, and the problems that they can give to counsel and

litigants in cases like this.  I'm very much aware of them, but

I have heard absolutely nothing to justify precluding the

government from using evidence that it has lawfully come by in

a good faith effort to satisfy the defendant's Rule 16

obligations and to meet the trial date that the defendant and

the government jointly proposed and adhered to for months and

that the defendant adheres to to this day.

          Now, I, of course, understand that the defendant

asserts that there is a tension between being ready to go to

trial on October 3 and the sort of review they claim they need

in order to be properly prepared.  In some degree, in a

material degree, that's a tension of the defendant's own

making.

          Nonetheless, if the defendant in good conscience feels

that he needs a postponement, which would be the ordinary

relief that would be granted in the event of a Rule 16

violation -- and there has been none here that I'm aware of --

they can ask for it.  I'm not saying I would necessarily grant

it, but they can ask for it.  And they will have to demonstrate

if they do so a genuine and unanticipated need, which is not

going to be satisfied, at least not likely to be satisfied,

simply by talking about numbers of pages of documents.  That's

a factor to be considered, but there has to be more meat on

those bones to make out the kind of case the defendants are

N8UQbanO

1    putting to me.

2            It is also vitally important that if the defendant is

3    going to do this, they do it by the end of this week.  The

4    deadline for me to request a jury to start a trial on October 3

5    is September 7.  And if we go past September 7, that means we

6    would have called in a large number of prospective jurors to

7    pick a jury starting October 3, and any change in the schedule

8    would be a needless and useless imposition on them and would

9    certainly weigh against the defense with respect to a

10   postponement, although I would face it with an open mind

11   altogether.  It would not be the first time a jury panel had

12   been called unnecessarily, but I take seriously the defendant's

13   obligation here to move promptly if they're going to move, and

14   that means by the end of this week.

15           Now, we already have -- and I'm not committing myself

16   one way or another with respect to where a possible request

17   might go if it were granted -- a second trial date in this case

18   which has been held against the possibility that the Bahamas

19   would grant consent to trying the severed charges.  That date

20   is March 11.  Among the options that might be on the table

21   would be a postponement to March 11, but I am not committing

22   myself either to granting a postponement or as to the date.

23   I'm simply putting all the cards on the table so counsel

24   understands the apparent lay of the land.  But that is the way

25   it looks to me today, reserving all rights.

N8UQbanO

1          Okay.  As to that, let's go on to the MDC problem.

2     Who is going to address that for the government?

3          MS. KUDLA:  Your Honor, I will.  This is AUSA Danielle

4     Kudla.

5          THE COURT:  Let me tell you what the problems are.

6     I'm sure you know them, but I can't understand why the

7     defendant as of this morning didn't have hard drives that have

8     been promised and that were delivered last week.  For the

9     defendant I don't understand the problem with battery life in

10    the laptop they take to the cellblock when they go the

11    cellblock because there are batteries, I mean, they have --

12    they run automobiles, I think they can run laptop computers.

13    And there is something I found useful in the course of my life,

14    it's called an extension cord so that you can plug in.  I don't

15    know whether or why that can't be used.

16         I want to come back to the government and say I don't

17    understand what's going on about the air-gapped laptop that's

18    been talked about and that apparently hasn't been produced.  I

19    will want to hear from the defense about why they didn't avail

20    themselves of the opportunity to visit their client in the

21    cellblock this week on the two days that the marshal service

22    has been able to make available, and I want to know what

23    visitation rights counsel have availed themselves of since

24    August 11 .

25         So let's start with that.  That's my list of

N8UQbanO

1      questions.  Ms. Kudla, you can take the ones that are addressed

2      to the government.

3              MS. KUDLA:  Your Honor, I think let's start with the

4      air-gapped laptop.  That has been delivered to the BOP this

5      morning, and the issue with that was -- the delay was waiting

6      for BOP approval to allow the laptop to be admitted into the

7      MDC.  We found that approval on Monday of this week.  We

8      immediately provided counsel with technical specifications that

9      the laptop could meet.  We received that computer this morning.

10     Our IT staff prepared it for the MDC and delivered it prior to

11     this conference.

12             The next one that I would --

13             THE COURT:  What about moving it from whoever took

14     possession of it at the MDC to the defendant?  I guess it's

15     going into the visiting room, right?

16             MS. KUDLA:  That is correct, your Honor.  At this

17     point in time I know it was dropped off to MDC legal, and my

18     assumption -- we would have to check with MDC at this point

19     about whether or not they moved it directly into the visiting

20     facility, but that is something that we can inquire about.  It

21     will be available, I would like to comment on the hours.  The

22     laptop that has now been provided is available Monday through

23     Friday 8:00 a.m. to 7:00 p.m. in the visiting rooms and

24     Saturday and Sunday 8:00 a.m. to 3:00 p.m.

25             And this laptop is equipped with Microsoft Office,

N8UQbanO

1  Excel, PowerPoint and Adobe, which are primarily the tools that

2  are allowing the defendant to record his information

3  electronically and share that information with defense counsel

4  through the exchange of hard drives back and forth.

5        And we have also -- that leads me into the next point,

6  your Honor, about the hard drives if you would like me to

7  address that.

8        THE COURT:  I would, yes.

9        MS. KUDLA:  So the hard drives, your Honor, we learned

10  that the issue about the delivery of the drives through

11  Mr. Everdell's letter last night and immediately contacted BOP

12  regarding this issue.  They confirmed that the drives were

13  received on Monday and Tuesday of this week, and that they will

14  be delivered to the defendant today.  Obviously, there was a

15  gap in time that serves no one's interest, but I think the

16  effort here is to make sure that the defendant has these

17  materials immediately and as quickly as possible.  And in light

18  of that, the BOP has agreed to procedures that will expedite

19  this process dramatically in the future.  And what they're

20  going to be permitting the defendant to do is for counsel to

21  drop off both drives, as many as they would like, both empty

22  and filled with defense material, directly to the BOP legal

23  staff.  They will take those drives.  They will etch it so it's

24  a marking that will be tracked, and they will allow counsel to

25  exchange those drives directly with the defendant at the legal

visitation hours, which, as we went over the hours, are
available seven days a week if they choose to utilize those.

So that is with respect to the air-gapped laptop and
the hard drives.  I would just like to note that this is a
process in the amount of time that all these procedures have
come together that requires coordination of all parties.  So to
the extent there is an issue with the hard drives, such as the
one that defense counsel raised, it is helpful that we become
aware of those as soon as possible so we can alert the BOP and
expedite the process as well.

Now, with respect to the battery life, your Honor, on
the battery life issue, this is a process we -- it was put in
place for one week to allow the defendant internet enabled
access.  It was raised that there was an issue with the battery
life.  We found out that the battery can be replaced, and we
provided defense counsel with the exact requirement for the
ability to purchase a battery for the computer.  If we were to
do that, it would take ten weeks for the government procurement
process, so that's why we passed this information along
immediately along to defense counsel to maximize the time and
expedite this as fast as possible.  That should enable the
defendant to have approximately four to five hours of time in
the cellblock.

Now, you mentioned the point about the extension cord.
Your Honor, we have looked into that.  That is a security risk

N8UQbanO

1    right now that the U.S. marshals are concerned about,

2    admittedly so, having lengthy cords inside a cellblock area.

3    But I want to step back, your Honor, from the technical

4    requirements and look at basically what this is permitting the

5    defendant to do, all of these procedures put in place by both

6    the BOP and the marshal service.

7            He is permitted to review electronic discovery for

8    approximately 70 hours per week if he wanted to through the

9    air-gapped laptop that is now at the MDC and through the

10   internet enabled laptop at the cellblock.  He is able on both

11   of these computers that are equipped with Microsoft Suite

12   products to electronically record his work product and share

13   that work product through the exchange of external drives with

14   his defense counsel.  He is able to view, build, edit and share

15   electronic work product with counsel to assist them.  And

16   counsel has the ability to meet with the defendant seven days a

17   week.  And it's important to note here that this is not a

18   pro se defendant.  The defendant is not preparing his defense.

19   He has a team of at least six attorneys, five additional legal

20   staff members and at least seven experts that the government

21   are aware of that are assisting in the preparation of this

22   defense.  And there is no question is that the defendant's

23   attorneys and experts are continuing each day to prepare around

24   the clock, and the defendant can continue to review his

25   discovery and take notes around the clock as well.

1          So we believe that, you know, these accommodations are

2    being set up in coordination with the BOP and the U.S. Marshal

3    Service, which sometimes takes time to coordinate, but the

4    moment we become aware of a problem, we assist in trying to

5    expedite it and find solutions to that to allow the defendant

6    to take advantage of them in a meaningful way if he so chooses.

7          THE COURT:  What about the claim that the internet

8    access from the cellblock has been difficult?

9          MS. KUDLA:  Your Honor, I think that is the one

10   constraint that is the more challenging to address.  We have

11   tested the laptop from the cellblock.  The cellblock does have

12   internet reception there.  It is not the strongest of a 5G

13   network because the cellblock was never designed to have

14   internet reception, but it does permit internet-based access to

15   the relativity database and the AWS database that the defendant

16   is working on.  So in terms of that, it's misleading to say

17   that there is no internet access.  There is --

18         THE COURT:  They didn't say that.

19         MS. KUDLA:  Your Honor, the issue about trying to

20   improve the quality of the internet service is something that

21   we continue to explore, but there are structural issues that

22   make it complicated.  But that said, defense counsel is able to

23   have their laptops available and provide excerpts of the

24   materials that they would like the defendant to specifically

25   review and review that both at the MDC, and they can also

N8UQbanO

1    review that together at the cellblock if so desired.

2              THE COURT:  Please remind me what floor of the

3    courthouse the cellblock is on?  It's on four, is it?

4              MS. KUDLA:  Yes, your Honor I believe that is correct.

5    It's on the fourth floor.

6              THE COURT:  And the defense has made a good deal about

7    wanting a proffer room that the U.S. Attorney's Office uses.

8    Where would that be, if it were feasible?

9              MS. KUDLA:  Your Honor, if it were feasible, it's on

10   the fifth floor of the building.

11             THE COURT:  Which building?

12             MS. KUDLA:  500 Pearl Street.

13             THE COURT:  My recollection, of course, is that the

14   courthouse does not have Wi-Fi everywhere, and I'm not sure

15   it's any better on the fifth floor than it is on the fourth

16   floor.

17             MS. KUDLA:  Your Honor, I think we'd have to inquire

18   into different floors about the internet availability, but I

19   think one aspect of this that is worth noting and one of the

20   considerations that goes into this analysis is the resources

21   that are needed to accomplish it, and the cellblock allows the

22   U.S. Marshals which are allocated to provide protection to not

23   only the defendant but all defendants.  It allows them to

24   provide that to the defendant in the area where they are and

25   also to all defendants that they are monitoring that day.

1          Moving it to another location within the building

2    requires the manpower and resources of the U.S. Marshals that

3    (A) raises concerns regarding the ability of the defendant to

4    be in a proffer room alone with multiple electronic devices

5    with his attorneys, who, for a number of reasons, can be

6    momentarily distracted.  There are those security concerns,

7    along with multiple cords, and then also the manpower needed to

8    supervise and man that operation by the U.S. Marshal Service

9    that is designed to protect everyone, not solely the defendant.

10          THE COURT:  Thank you, Ms. Kudla.

11          I assume is Mr. Everdell is going to discuss this, or

12   Mr. Cohen.

13          MR. EVERDELL:  That would be me, your Honor.

14          THE COURT:  Go ahead.

15          MR. EVERDELL:  Thank you, your Honor.

16          So I think what Ms. Kudla said is telling because I

17   think the devil is in the details here, right?  You asked the

18   question about what about this internet access in the

19   cellblock, and I think Ms. Kudla quite candidly said, well,

20   it's not designed for that.  It's not really all that great.

21   I'm paraphrasing, of course, but that is the upshot, right?

22          So while these solutions may appear as if they may be

23   solutions, they do not pan out in practice.  That's what we're

24   seeing, right?  So the problem with the cellblock access, let's

25   start with that.  Up until this point -- I think the government

N8UQbanO

1    is proposing to change this, but up until this point it was

2    simply that the defendant would be able to be produced to the

3    cellblock twice a week to be able to use an internet enabled

4    computer to review the discovery that was online.  At that

5    point in the prior weeks up until this point, it didn't have

6    any capability of recording information; it didn't have a

7    Microsoft Office Suite; it didn't have any ability for the

8    defendant to actually look at what he was doing and then make

9    notes or make work product that he could then bring back to the

10   MDC.  It was simply having a computer in the cellblock.  He

11   could look at things, and then he's got to, I guess remember

12   it, and go back to the jail and do something with it that he

13   remembered seeing in the cellblock.

14        And it was a problem, your Honor, because, as

15   Ms. Kudla points out, the internet access is not viable there.

16   The two times we tried to use it in the weeks he was produced,

17   the first week this was available to him, he was produced

18   Tuesday, and I believe it was Thursday of that week, and both

19   times the internet went in and out, and it made it totally

20   ineffective for him to be there and try to review documents

21   with the internet going in and out.

22        The same thing with the battery life.  At that time

23   there was no power cord.  I don't think there's going to be a

24   power cord because of the safety issue, so you have to rely on

25   the battery.  The first time he showed up, there was I think

1    only one hour on the battery.  He can't bring the laptop with

2    him.  It has to stay with the marshals in the cellblock, so

3    they are the ones having to remember to charge it.  And if they

4    don't, then we get that problem no matter what battery is in

5    there.

6              THE COURT:  And you could be the ones to bring down

7    the backup battery when you go down to see him there.

8              MR. EVERDELL:  Your Honor, we would be happy to do

9    that.  The problem is that every time we have a procedure like

10   this, there is always a hitch.  We won't be able to -- I

11   anticipate we will be told we won't be able to give the battery

12   across to the marshals.  There's always something that goes

13   wrong.  For example, when the defendant was first produced,

14   when he was produced to the cellblock, I guess it was last week

15   or the week before, he wanted to bring some papers with him,

16   and the marshals said you can't have papers with you and they

17   confiscated the papers.

18             Every time there seems to be something that we are at

19   least trying to work with, in practice it breaks down because

20   of things that are beyond our control.  A random MDC person can

21   say, I'm not going to give your laptop.  You can't bring that

22   to the cellblock with you or the battery isn't charged.  All of

23   these things have happened and we anticipate will happen.

24             MR. COHEN:  Your Honor, if I might, jut to give a

25   little more context.  I know once upon a time your Honor was

N8UQbanO

```
1    yourself a trial attorney, a superb one.  This is what happened
2    to us.  We went to cellblock.  There are no outlets in the
3    cellblock for security reasons.  We were given a laptop that
4    was said there is only an hour of charge on it.  We asked your
5    Honor's question, can we get an extension cord, which is a
6    great question.  We were told no.  So we were faced with our
7    client having to be transported for five hours to sit in a cell
8    where he had limited life of a battery and flickering in and
9    out internet access.  It just wasn't viable for any kind of
10   real trial preparation.  It's not glass.  It's a very thick
11   screen so we can't even write notes that we can show each
12   other.  So having done that for two days, we decided that this
13   was just not viable.  That's why we requested that he not be
14   produced, and we see him instead at the MDC every day last week
15   and every day this week someone from our firm has seen him,
16   usually me or Mr. Everdell or both.
17           It's just in practice, your Honor, we understand that
18   the Bureau of Prisons says a lot of things and everyone's
19   experience on this call promises a lot of things just don't
20   happen.  And the weeks tick by and the days tick by and we're
21   put at a very difficult disadvantage.  There is no substitute
22   for speaking with your client in defending a criminal case.
23   There just isn't in a meaningful way.
24           MR. EVERDELL:  Where that leaves us, your Honor, is I
25   don't think we have faith that the solutions proposed by
```

N8UQbanO

1    Ms. Kudla are going to work in practice.  So we feel like,

2    especially given the short amount of time leading up to trial

3    that we have, we've already lost three weeks because, your

4    Honor, he has not had access to discovery for three weeks.  And

5    now we have only a short amount of time he left.  Given that we

6    foresee that there will be hitches and problems that this will

7    not work out in practice --

8            THE COURT:  Maybe yes or maybe no.

9            MR. EVERDELL:  Well, your Honor, given the track

10   record I think that we have seen so far, we're not trying to

11   assign blame here, but it's just the practical reality that we

12   haven't been able to make effective use of our client's time at

13   least in the cellblock elsewhere, and he doesn't have this

14   computer yet in the MDC.  We really are at the point where we

15   feel like a temporary release is necessary so that he can

16   actually prepare for his trial.  And that it is -- this is the

17   type of situation where given the complexity of the

18   information, the extraordinary volume, and the fact that the

19   alternatives that we have been trying to reckon with have not

20   worked out in practice, and the fact that we only have a

21   limited amount of time before trial starts, that we need him to

22   be released to temporary release so we can properly prepare for

23   trial.  And I'm happy to discuss with the Court what we think

24   the contours of that would look like, but we think that we're

25   at that point and we need that remedy.

N8UQbanO

```
1          THE COURT:  Ms. Kudla, anything else?

2          MS. KUDLA:  Your Honor, I would just note one point.

3   The defendant prior to August 11, it should be clear, he had

4   unfettered access to all of the discovery in multiple ways,

5   including the ability to communicate with his entire team of

6   attorneys and legal staff and a number of experts.  And during

7   this time he had that ability to communicate through a variety

8   of means:  In-person meetings, telephone calls,

9   videoconferencing, and electronic document sharing applications

10  which played into the events of August 11.  And that changed

11  when the defendant improperly -- the defendant had -- there was

12  a determination that he posed a danger to the community and to

13  others.  And now that is what we're talking about here, and at

14  this point in time there are a number of procedures in place

15  very quickly, I might add, that allow him access to review

16  discovery and to communicate with attorneys seven days a week

17  up to 70 hours if he so chooses.  So, your Honor, the Sixth

18  Amendment does not guarantee a right to every desire that a

19  defendant may want, but it's effective assistance of counsel

20  and to meaningfully participate in a defense, and that's what

21  we think these accommodations have provided.

22          THE COURT:  Okay.  I'm not going to rule on this

23  application now.  What I would like is a joint report Tuesday

24  morning concerning the exact situation at the MDC as of that

25  time.  What's been provided, what's in place, what works; and
```

N8UQbanO

1   if anything doesn't work, I want to know about that too, and we

2   will see.  And, as I say, if there is to be an application for

3   more time from the defense, it would best be made by the close

4   of business Friday, but it's not a deadline.  I would consider

5   one made later but with reluctance.

6          Okay.  Advice of counsel.  I will start out by saying

7   that I am going to order some disclosure, but I think the

8   defendant's suggestion that disclosure on this subject might

9   make more sense after the government's disclosures on

10  September 8.  I think that makes sense.  And so I am going to

11  require that the defendant's disclosures, whatever they turn

12  out to be, be made on or before September 15.

13         So what I would like to have is a joint proposal by

14  the close of business Friday as to exactly what disclosures the

15  defendant will make.  If the parties can't agree entirely, I

16  would like a joint letter setting out what they agree upon and

17  what they haven't and their respective positions on the areas

18  of disagreement, and then I will resolve the disagreement over

19  the weekend, and that will give the defendant time to make

20  disclosures by the 15th.

21         Now, please understand, I understand I have demanded a

22  lot from you folks in the last week.  You have demanded a lot

23  from me.  That's fine.  I'm very appreciative of the efforts

24  that you have all made on both sides and the zealous and very

25  capable advocacy on both sides.  It's been very helpful, and I

N8UQbanO

1  think that's where we stand.

2          Anybody want to raise anything else before we

3  terminate this?

4          MR. COHEN:  Not from the defense, your Honor.

5          MR. ROOS:  Your Honor, just one thing from the

6  government.  I don't know your Honor is very aware of this, but

7  I think in addition to the issue relating to the jury pool

8  coming in and the need to know promptly an adjournment, which,

9  by the way, I don't think we think is necessary, and I know the

10  Court is not expressing an opinion on, but also our 3500 and

11  exhibits are due on September 8.  So if the defense was

12  contemplating an adjournment request, I think it would be

13  important to know before then before all those materials are

14  disclosed.

15          THE COURT:  I'm glad you mentioned that, Mr. Roos.

16  It's a very important point.  And I think the defense should

17  take heed.  Certainly an application made after the 3500

18  material has been produced and witnesses identified puts us in

19  a whole different realm on the question of an adjournment, and

20  I'm sure you appreciate that.  If I am misapprehending

21  something about that, Mr. Cohen, you need to tell me now.

22          MR. COHEN:  No.  We understand, your Honor.

23          THE COURT:  Okay.  All right.  Anything else?

24          Well, I would wish you all a good weekend, but that

25  would be rubbing salt in an open wound, I understand that.

N8UQbanO

1   Have the best ones you can.  Thank you very much.

2              MR. REHN:  Thank you, your Honor.

3              MS. SASSOON:  Thank you, your Honor.  You too.

4              (Adjourned)