*Lukoil Asia Pacific Pte Ltd. v. Ocean Tankers (Pte) Ltd.* [2018] EWHC 163 (Comm.)

Neutral Citation Number: [2018] EWHC 163 (Comm)

Claim No. CL-2017-000310

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**IN THE MATTER OF THE ARBITRATION ACT 1996**
**AND**
**IN THE MATTER OF AN ARBITRATION**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 02/02/2018

Before :

**THE HONOURABLE MR JUSTICE POPPLEWELL**
- - - - - - - - - - - - - - - - - - - -
Between :

**LUKOIL ASIA PACIFIC PTE LIMITED**                    **Claimant**

**- and –**

**OCEAN TANKERS (PTE) LIMITED**                    **Defendant**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Ms Natalie Moore** (instructed by **Clyde & Co LLP**) for the **Claimant**
**Mr Richard Lord QC** (instructed by **Thomas Cooper LLP**) for the **Defendant**

Hearing dates: 26 January 2018
- - - - - - - - - - - - - - - - - - - -

# Judgment Approved

**Mr Justice Popplewell :**

**Introduction**

1.      On 8 November 2013 the Claimant ("the Charterers") voyage chartered the tanker OCEAN NEPTUNE ("the Vessel") from the Defendant ("the Owners") for carriage of a minimum 35,000 metric tons, with Charterers' option up to a full cargo, of clean petroleum products, from one safe port Taiwan to one to three safe ports Australia. Demurrage was payable at US$17,500 per day pro rata. Laytime for loading and discharging was 84 hours in total at both ends, Saturdays and holidays included.

2.   The Charterers appeal against the decision in a Partial Award dated 25 April 2017 ("the Award") that in respect of delays at one of the discharge ports the demurrage claim by the Owners is not time barred.

**The Charterparty terms**

3.   The voyage charter was contained in a fixture recap email of 8 November 2013 ("the Fixture Recap") which incorporated the standard terms of the ExxonMobil VOY2005 form, and the Lukoil International Trading and Supply Company Exxonvoy 2005 clauses dated 30.05.2006 ("the LITASCO Clauses"), in each case as amended and supplemented in certain respects in the Fixture Recap.     The charterparty terms included the following (with strike out or underlining to illustrate where the ExxonMobil VOY2005 form or the LITASCO Clauses were amended by the Fixture Recap):

**ExxonMobil VOY2005 form**

8. DEMURRAGE/DEVIATION RATE. The rate for demurrage and/or deviation shall be the fixed dollar figure specified in part I(J) or the rate derived by determining the applicable rate from the WORLDSCALE Demurrage Table for tonnage specified in part I (J) and multiplying that rate by the Base Freight Rate. If a Part Cargo Minimum basis is specified in part I (E) and Charterer exercises its option to load additional cargo, any demurrage and/or deviation shall, nevertheless, remain payable at either the aforesaid fixed dollar rate or at the aforesaid rate based on the tonnage specified in Part I(J), whichever is applicable. The applicable rate under this Clause shall hearing after be called "Demurrage Rate" or "Deviation Rate" as is appropriate.

9. LOADING AND DISCHARGING PORT(S)/PLACE(S)

(a) Charterer shall nominate loading or discharging port(s) and/or place(s) or order Vessel to a destination for orders. If Vessel is ordered to a destination for orders, Charterer shall thereafter nominate loading or discharging port(s) and/or place(s). All such nominations or orders shall be made in sufficient time to avoid delay to Vessel.

(b) CHANGE OF DESTINATION. After nominating loading and/or discharging port(s) or place(s) pursuant to Paragraph (a) of this Clause, Charterer may nominate new port(s) or place(s), whether or not they are within the range of the previously nominated port(s) or place(s) and/or vary the rotation of any nominated port(s) or place(s) and Owner shall issue instructions necessary to make such change(s). It is understood and agreed, however, that the aforesaid option to nominate new loading port(s) or place(s) in different ranges shall lapse on Vessel tendering Notice of Readiness at a nominated loading port or place and that aforesaid option to nominate new discharging port(s) or place(s) in different ranges shall lapse on Vessel tendering Notice of Readiness at a nominated discharging port or place. If a change to, or varying the rotation of, nominated port(s) or place(s) occurs or if Vessel is sent to a destination for orders, any time by which the steaming time to the port(s) or place(s) to which Vessel is finally ordered exceeds that which would have been taken if Vessel had been ordered to proceed to such port(s) or place(s) in the first instance shall be compensated at the Deviation Rate per running day and pro rata for a part thereof. In addition, Charterer shall pay the extra bunkers consumed during such excess time at

Owner's documented actual replacement costs at the port where bunkers are next taken.

(c)  Any order of Vessel to a destination for orders, all nominations and any renominations pursuant to this Clause shall be consistent with Part I (C) and (D).

13.  LAYTIME/DEMURRAGE

(a) COMMENCEMENT/RESUMPTION. Laytime or time on demurrage, as herein provided, shall commence or resume upon the expiration of six (6) hours after receipt by Charterer or its representative of Notice of Readiness or upon Vessel's Arrival in Berth, whichever occurs first. Laytime shall not commence before ~~0600~~ 0001 hours local time on the Commencing Date specified in Part I (B) unless Charterer shall otherwise agree, in which case laytime shall commence upon commencement of the loading

(b) EARLY LOADING. In the event Charterer agrees to load Vessel prior to commencement of laydays, laytime will begin at commencement of loading and the amount of time from the commencement of loading until ~~0600~~ 0001 hours local time on the commencing date specified in Part I (B), shall be added to the laytime specified in Part I (I).

(c) DURATION. The laytime specified in Part I (I) shall be allowed free of expense to Charterer for the purpose of loading and discharging cargo and all other Charterer's purposes. Laytime or, if Vessel is on demurrage, time on demurrage, shall continue until all cargo hoses have been completely disconnected upon the final termination of the loading or discharging operation. Disconnection of all cargo hoses shall be promptly effected. If Vessel is delayed in excess of two (2) hours after such disconnection of the cargo hoses solely for Charterer's purpose, laytime or, if Vessel is on demurrage, time on demurrage shall resume upon the expiration of said two (2)-hour period and shall continue from that point until the termination of such delay.

(d) PAYMENT. Charterer shall pay demurrage per running day and pro rata for a part thereof for all time by which the allowed laytime specified in Part I (I) is exceeded by the time taken for the loading and discharging and for all other Charterer's purposes and which, under this Charter, counts as laytime or as time on demurrage.

14.  LAYTIME/DEMURRAGE CONSEQUENCES

(a) SPECIFIED. Any delay to Vessel after the expiration of six (6) hours from Charterer's receipt of Notice of Readiness before Arrival in Berth or any delay to Vessel after Arrival in Berth, due to unavailability of berth (prior to Arrival in Berth), unavailability of cargo, or solely for Charterer or terminal purposes, shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

(b) HALF-RATE DEMURRAGE. If demurrage is incurred and the Vessel has been delayed in berthing, loading and/or discharging (hereafter in this Paragraph (b) called "Delay") due to: weather and/or sea conditions; ~~[irrespective of any option given in Part I(C) and (D)]~~; fire; explosion; strike, picketing, lockout, slowdown, stoppage or restraint of labor; breakdown of machinery or equipment in or about the facilities of

Charterer, supplier, shipper or consignee of the cargo (hereinafter in this Paragraph (b) separately and jointly called "Listed Conditions"), be the Delay prior to or after the expiration of laytime, that span of time on demurrage equal to the period or periods of Delay as just described shall be paid at half of the Demurrage Rate. If, during a period of Delay, Listed Conditions co-existed, along with any of the other conditions described in Paragraph (a) of this Clause 14, the Listed Conditions shall conclusively be deemed to be the sole cause of the delay, either if they caused the Delay independently of the other conditions or could have caused the Delay if the other conditions had not so co-existed. Weather and/or sea conditions shall include, ~~but not be limited to, lightning,~~ restricted visibility (the term "restricted visibility" shall mean any condition in which visibility is restricted by fog, mist, falling snow, ice, heavy rainstorms, sandstorms and any other similar causes), storm, wind, waves and/or swells. The provisions of paragraph 14 (b) shall apply irrespective of any option given in Part I (C) and (D). The foregoing provisions as to payment of half the Demurrage Rate in respect to weather and/or sea conditions shall not apply where the Vessel is lightered or discharged at sea.

(c) EXCLUSIONS. Notwithstanding the provisions of any other Paragraph of this Clause or any other Clause of this Charter to the contrary, time shall not count as laytime or, if Vessel is on demurrage, as time on demurrage, if such time is spent or lost:

(i) As a result of labor dispute, strike, go slow, work to rule, lockout, stoppage or restraint of labor involving Master, officers or crew of Vessel ~~or tugboats or pilots~~ unless, in the case where Charterer has load/discharge port options, a labor dispute, strike, go slow, work to rule, lockout, ~~stoppage or restraint of labor of tug boats or pilots,~~ is in force at the port at the time Charterer nominated such port;

(ii) On an inward passage, including, but not limited to, ~~awaiting daylight, tide, tugs or pilot,~~ and moving from first anchorage or first other waiting place, even if lightering has taken place at the first anchorage or first other waiting place, until Vessel's Arrival in first Berth;

(iii) Due to overflow, breakdown, inefficiency, repairs, or any other conditions whatsoever attributable to Vessel, Master, officers, crew and/or Owner, including inability to load or discharge the cargo within the time allowed and/or failure to meet Vessel warranties stipulated in this Charter;

(iv) Due to Owner ~~or port authority~~ prohibiting loading or discharging;

(v) By reason of local law or regulations, action or inaction by local authorities (including, but not limited to, Port, Coast Guard, Naval, Customs, Immigration and/or Health authorities), with the exception, however, of port closure due to weather and/or sea conditions;

(vi) in ballasting or deballasting, lining up and/or draining of pumps/pipelines, cleaning of tanks, pumps, pipelines, bunkering or for any other purposes of the Vessel only, unless same is carried out concurrent with loading and/or discharging so that no loss of time is involved; or

(vii) Due to an escape or discharge of ~~oil~~ cargo and/or pollutant substances (herein after called "pollutants") or the threat of an escape or discharge of ~~oil~~ pollutants on or from Vessel. (The phrase "threat of an escape or discharge of ~~oil~~ pollutants" shall for the purposes of this paragraph (vii) mean a grave and imminent danger of the escape or

discharge of ~~oil~~ pollutants which, if it occurred, would create a serious danger of pollution damage).
…………

(e) UNSPECIFIED. Any delays for which laytime/demurrage consequences are not specifically allocated in this or any other Clause of this Charter and which are beyond the reasonable control of Owner or Charterer shall count as laytime or, if Vessel is on demurrage, as time on demurrage. If demurrage is incurred, on account of such delays, it shall be paid at half the Demurrage Rate.

**LITASCO Clauses**

2. CLAIMS

A…... CHARTERERS SHALL BE DISCHARGED AND RELEASED FROM LIABILITY IN RESPECT OF ANY CLAIMS OWNERS MAY HAVE UNDER THIS CHARTERPARTY (SUCH AS, BUT NOT LIMITED TO, CLAIMS FOR DEADFREIGHT, DEMURRAGE, SHIFTING OR PORT EXPENSES) UNLESS A CLAIM HAS BEEN PRESENTED IN WRITING TO CHARTERERS WITH SUPPORTING DOCUMENTATION WITHIN NINETY (90) DAYS <u>FOR DEMURRAGE AND 120 DAYS FOR OTHER CLAIMS</u> FROM COMPLETION OF DISCHARGE OF THE CARGO UNDER THIS CHARTERPARTY.

B. FOR DEMURRAGE CLAIMS SUPPORTING DOCUMENTS MUST INCLUDE <u>WHENEVER POSSIBLE</u> -
1. OWNERS' CALCULATION OF THE DEMURRAGE DUE; AND
2. THE CERTIFICATE OF NOTICE OF READINESS TENDERED AT EACH PORT OF LOADING AND DISCHARGE; AND
3. THE STATEMENT OF FACTS FOR EACH LOADING AND DISCHARGE BERTH WHICH MUST BE SIGNED BY THE MASTER OR THE VESSEL'S AGENTS AND, WHEREVER POSSIBLE, THE TERMINAL; AND
4. THE VESSEL'S PUMPING LOGS FOR EACH DISCHARGE BERTH; AND
5. ALL LETTERS OF PROTEST ISSUED BY THE VESSEL OR THE TERMINAL. THE NOR [sic].[1]

3. STATEMENT OF FACTS CLAUSE

IN ORDER TO BE CONSIDERED AN AUTHORIZED DOCUMENT, STATEMENTS OF FACTS MUST BE SIGNED BY THE MASTER OF VESSEL, VESSEL'S AGENTS, SUPPLIERS OR

---

[1] As the Tribunal found at paragraph 10 of the Award, the added words "THE NOR" were probably a typographical error and were in any event overtaken by the express words of Clause 2B2 which required only a certification of the NOR.  They did not require a copy of the actual NOR tendered by the Vessel.

RECEIVERS, IF POSSIBLE. IF NOT POSSIBLE, THEN MASTER TO ISSUE A LETTER OF PROTEST TO THE DISSENTING PARTY, SUBMITTED TOGETHER WITH OWNERS' DEMURRAGE CLAIM.

4.        WAITING        FOR        ORDERS        CLAUSE

IF CHARTERERS REQUIRE VESSEL TO INTERRUPT HER VOYAGE AWAITING <u>AT ANCHORAGE</u> FURTHER ORDERS, SUCH DELAY TO BE FOR CHARTERERS' ACCOUNT AND SHALL COUNT AS LAYTIME OR DEMURRAGE, IF VESSEL ON DEMURRAGE. <u>DRIFTING CLAUSE SHALL APPLY IF THE SHIP DRIFTS.</u>

**Fixture Recap terms**

5.  BIMCO ISPS CLAUSE

…

   (B) (II) EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS, DAMAGE, EXPENSE, EXCLUDING CONSEQUENTIAL LOSS, CAUSED BY FAILURE ON THE PART OF THE CHARTERERS TO COMPLY WITH THIS CLAUSE SHALL BE FOR THE CHARTERERS' ACCOUNT AND ANY DELAY CAUSED BY SUCH FAILURE SHALL BE COMPENSATED AT THE DEMURRAGE RATE.

…

7. INTERIM PORT CLAUSE

IF VESSEL CALLS MORE THAN ONE (1) LOADPORT AND/OR ONE (1) DISCHARGE PORT, CHARTERERS TO PAY FOR ADDITIONAL INTERIM PORT AT COST WITH ADDITIONAL STEAMING TIME, AT DEMURRAGE RATE, TO BE INCURRED FOR SUCH DEVIATION WHICH EXCEEDS DIRECT PASSAGE, BASIS BP DISTANCE TABLE, FROM FIRST LOAD PORT TO FINAL DISCHARGE PORT.  …

10. IF VESSEL IS ORDERED BY RELEVANT AUTHORITY(IES) OR CHARTERERS OR AGENTS TO DRIFT OFF OUTSIDE PORT(S), AT A LOCATION IN OWNERS'/MASTER'S OPTION, THEN THE FOLLOWING SHALL APPLY:

(I)     TIME FROM VESSEL'S ARRIVAL AT DRIFTING LOCATION TO THE TIME VESSEL DEPARTS, ON RECEIPT OF CHARTERERS' INSTRUCTIONS, FROM

> SUCH LOCATION SHALL BE COUNTED AS USED LAYTIME OR DEMURRAGE, IF ON DEMURRAGE.
>
> (II)   BUNKERS CONSUMED WHILST DRIFTING SHALL BE FOR CHARTERERS' ACCOUNT AT LAST PURCHASED PRICE, OWNERS SHALL PROVIDE FULL DOCUMENTATION TO SUPPORT ANY CLAIM UNDER THIS CLAUSE."

4.    The following facts are taken from the Award:

(1)    The Owners claimed demurrage in the total sum of US$772,327.87 together with interest and costs.  The Charterers denied liability for the claim on the grounds, amongst others, that it was time barred because the documents in support of the claim specified in LITASCO Clause 2B were not provided within 90 days of the completion of discharge as required by that clause.  The Charterers also advanced a counterclaim for alleged contamination and short delivery of the cargo in the sum of $2,015,903.09.  Pursuant to the Charterers' application, the Tribunal determined the time bar defence as a preliminary issue.

(2)    The Vessel tendered notice of readiness at the loadport of Mailiao, Taiwan, at 0900 on 17 November 2013 and the hoses were disconnected at 2250 on 19 November 2013.  The Owners claim that the total laytime used at the loadport was 57.25 hours.

(3)    The Vessel proceeded to her first discharge port, Gladstone, Australia, where she tendered notice of readiness on 2 December 2013 at 2100.  She berthed at 1350 on 3 December 2013 and remained at berth until 1410 on 5 December 2013 when she shifted back to the anchorage.  She remained at anchor until 2340 hours on 15 January 2014 when the Charterers ordered the Vessel to sail to Botany Bay.  The reason for the delay at Gladstone was that the receivers, Caltex, refused to take delivery of the cargo on the grounds that it was alleged to be contaminated/off specification.  It appears that Caltex also declined to co-operate with the Vessel in any way.  The Owners calculated the total time used at Gladstone as 1,048.58333 hours.

(4)    The Vessel tendered her notice of readiness at Botany Bay at 1618 on 18 January 2014 and the hoses were disconnected at 2150 on 19 January 2014 having discharged part of the cargo.  The Owners calculated that the total time used at Botany Bay was 27.83333 hours.

(5)    The Vessel proceeded to Port Alma where she tendered her notice of readiness on 22 January 2014 at 2320.  Hoses were disconnected at 0835 on 24 January 2014 following final discharge of the cargo.  The Owners calculated that the total time used at Port Alma was 22.9333 hours.

5.    The Owners' claim, with supporting documents, was sent by email on 6 February 2014.  The Tribunal held the Owners failed to provide all the supporting documents required by LITASCO Clause 2B because they did not include a statement of facts for

each of the ports of Mailiao, Gladstone, Botany Bay and Port Alma countersigned by the terminal, or if it was impossible to obtain such a countersignature, a letter of protest from the Master.   The Tribunal held that the demurrage claims were time barred for this reason, save in one significant respect.   It treated the delays at Gladstone as falling outside the scope of the time bar defence because although this was initially categorised as a claim for demurrage by the Owners, they subsequently re-labelled it as a claim for time lost waiting for orders falling within LITASCO Clause 4; the Tribunal held that the documentary requirements of LITASCO Clause 2B would not apply to the claim so re-labelled.   Its reasoning for that conclusion was contained in paragraph 20 of the Award in the following terms:

> "It seems to us that the strict application of the requirements of clause 2.B has to cut both ways and they are not applicable to a claim for time lost waiting for orders.   Not only does that follow from the proper construction of the rider clauses, but from a practical point of view it would make sense for the documentary requirements for demurrage not to be applicable to claims for time lost waiting for orders.   When a vessel has to wait for orders, she will often do so off port limits in order to avoid port charges.   As a result, the contact that a vessel will have with the shore representatives of those handing the cargo may well be totally absent.   The vessel's wait for orders may generate no communications at all with anyone at the port."

**Submissions**

6.      The Charterers submitted that a claim under LITASCO Clause 4 was a claim for demurrage; and that LITASCO Clause 2B applied in terms to claims for demurrage. There were no commercial reasons for failing to give the language of the LITASCO Clauses their clear and plain meaning.   On the contrary commercial considerations reinforced that plain meaning.

7.      The Owners submitted that Clause 2B was a restriction on what would otherwise be the Owners' right to present and prove their claim in a manner and at a time of their choosing, subject to any statutory limitation period, and accordingly should be restrictively construed.   There is a distinction to be drawn between claims for demurrage in relation to operational delays at the loading and discharge ports, and claims for time lost waiting for orders, which were to be treated differently. Demurrage is liquidated damages for breach of charter in relation to the use of the vessel, whereas LITASCO Clause 4 confers a contractual liberty which involves no breach by the Charterers.   The fact that a LITASCO Clause 4 claim was to "count as" demurrage for the purposes of computation did not make it a claim for demurrage for all purposes, and in particular did not do so for the purposes of clauses such as LITASCO Clause 2B.   There was no reason to suppose that any of the categories of documents listed in LITASCO Clause 2B were likely to be relevant or necessary for assessing a claim for time lost waiting for orders; the Tribunal's reasoning, as a matter of commercial sense, reinforced this construction of the language of the relevant clauses.

**Analysis**

8.      There is an abundance of recent high authority on the principles applicable to the construction of commercial documents, including ***Investors Compensation Scheme Ltd v West Bromwich Building Society*** [1998] 1 WLR 896; ***Chartbrook Ltd v Persimmon Homes Ltd*** [2009] 1 AC 1101; ***Re Sigma Finance Corp*** [2010] 1 All ER 571; ***Rainy Sky SA v Kookmin Bank*** [2011] 1 WLR 2900; ***Arnold v Britton*** [2015] AC 1619; and ***Wood v Capita Insurance Services Ltd*** [2017] AC 1173.   The court's task is to ascertain the objective meaning of the language which the parties have chosen in which to express their agreement.   The court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant.     The court must consider the contract as a whole and, depending on the nature, formality and quality of drafting of the contract, give more or less weight to elements of the wider context in reaching its view as to the objective meaning of the language used.   If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other.   Interpretation is a unitary exercise; in striking a balance between the indications given by the language and the implications of the competing constructions, the court must consider the quality of drafting of the clause and it must also be alive to the possibility that one side may have agreed to something which with hindsight did not serve his interest; similarly, the court must not lose sight of the possibility that a provision may be a negotiated compromise or that the negotiators were not able to agree more precise terms. This unitary exercise involves an iterative process by which each suggested interpretation is checked against the provisions of the contract and its commercial consequences are investigated.   It does not matter whether the more detailed analysis commences with the factual background and the implications of rival constructions or a close examination of the relevant language in the contract, so long as the court balances the indications given by each.

9.      LITASCO Clause 2B applies "for demurrage claims".   The question is therefore whether a claim under LITASCO Clause 4 is a "demurrage claim".   The ExxonMobil VOY2005 form and the LITASCO Clauses are detailed and carefully drafted terms, and the Fixture Recap is framed by reference to them.   It is therefore convenient to start with the language used in the charter as a whole.

10.      In my judgment the language of the charter provides in clear terms that a LITASCO Clause 4 claim is a demurrage claim.  Identification of what is meant by a claim for demurrage is to be found in clause 13(d) of the ExxonMobil VOY2005 form.   It is there that the obligation to pay demurrage is framed by the use of the words "Charterer shall pay demurrage…."   It provides that demurrage is to be paid for all time by which the allowed laytime "is exceeded by time taken for loading and discharging *and for all other Charterer's purposes and which, under this Charter, counts as laytime or as time on demurrage*."   The language of LITASCO Clause 4 provides that the delay caused by waiting at anchorage shall "count as" used laytime or demurrage.   The waiting time under LITASCO Clause 4 is, in the words of clause 13(d), time taken for Charterers' purposes which under the Charter counts as laytime or demurrage.   It therefore falls squarely within clause 13(d), giving rise to a claim for demurrage.   It is not just to be quantified in the same way as a demurrage claim at the

demurrage rate. It *is* a demurrage claim under clause 13(d). The italicised words make it clear that there is no distinction between an "ordinary" demurrage claim, in the sense of a claim where the Charterers have exceeded the allowed laytime by the time taken for loading and discharging, and a claim for delay waiting for orders where such delay is to count as laytime or time on demurrage. There is only one type of claim: a claim for demurrage to account for the time by which Charterers have exceeded the agreed laytime for loading, discharging and for any other of Charterers' purposes which count as laytime or time on demurrage under the Charterparty – including time spent waiting for orders under LITASCO Clause 4.

11. Providing that time is "to count" as laytime or demurrage and be treated as part of a demurrage claim is a common drafting technique in charterparty terms. The formulation is often used to describe periods which would otherwise not form part of the laytime, for example because the ship has not become an arrived ship, but are to be treated as such for the purposes of a demurrage claim: see for example per Lord Diplock in ***Dias Compania Naviera S.A. v Louis Dreyfus Corporation*** [1978] 1 WLR 261 at 263F-G.

12. This construction is reinforced by the fact that a claim for waiting time under LITASCO Clause 4 is not simply or necessarily a claim for all such time. A claim under the clause is not only to be quantified at the demurrage rate, but is also qualified by the laytime otherwise used or not used in the course of performance of other parts of the voyage. If a claim arises under the clause it is to count as laytime: to the extent that laytime has not otherwise been used, it will reduce the waiting time for which a claim can be made under the clause. It follows that any Clause 4 claim will have to take account of the time which has counted as used laytime, if any, at other stages of the voyage. In some circumstances there may be none, as for example when the order is to wait at an anchorage after the commencement of the approach voyage but prior to arrival at the loadport (although even then laytime used elsewhere will be relevant unless the waiting time itself exceeds the full 84 hours allowed); but it must have been intended to apply also when the waiting for orders takes place after arrival at the loadport and/or after loading and/or after part discharge at one discharging port. In such circumstances a Clause 4 claim could only be part of a claim for demurrage because it would not be possible to apply clause 13(d) as a separate claim for demurrage: a clause 13(d) claim for demurrage would by its terms have to treat the waiting time as laytime, because Clause 4 requires it, and could not ignore it so as to permit a demurrage claim to be advanced based only on the laytime used in loading and discharging. The Clause 4 claim is necessarily part and parcel of a clause 13(d) demurrage claim.

13. This construction is also supported by the contrast between the wording of LITASCO Clause 4 and that of clauses 5 and 7 of the Fixture Recap. Where the parties wanted to draw a distinction between demurrage claims and other types of delay claim they used clear language to do so. Clause 5 provides that any delay caused by breach of the ISPS clause obligations by the Charterers "shall be compensated at the demurrage rate". Clause 7 provides that where the Charterers deviate to an interim loading or discharging port beyond the number agreed, they are to "pay for…additional steaming time, at demurrage rate." This does not involve any analysis of used laytime and refers to the demurrage rate, not demurrage, as the yardstick for quantification of the value of the relevant time. The presumption that where parties have used different language in different parts of their contract they intend to achieve a different effect, is

one whose strength will vary according to the context. In this charterparty context, with specific additions and amendments to standard form clauses, it is to be inferred that the parties have taken care with the language used, and the presumption carries some weight.

14.     Ms Moore argued that this construction gained further support from the fact that the detailed exceptions and qualifications to laytime and demurrage set out in ExxonMobil VOY2005 clause 14 must also apply to the question of what part of the time spent waiting for Charterers' orders counts as laytime or demurrage, relying in this context on paragraph 15.60 of *Cooke on Voyage Charters* 4th edn and the decision of Hobhouse J on a different clause in *Huyton S.A. v Inter Operators S.A.* [1994] 1 Lloyd's Rep 298; so for example, she argued, the half rate demurrage provisions in clause 14(b) apply to such a period. That may be so, but I do not need to decide the point and prefer not to do so in a case where it does not directly arise in respect of particular facts.

15.     I turn to consider whether there are any commercial considerations or consequences which point to a LITASCO Clause 4 claim not being a "demurrage claim" for the purposes of engaging LITASCO Clause 2B.

16.     Clause 2B identifies documents which must accompany a demurrage claim, which by Clause 2A must be made within 90 days of final discharge. Such provisions are common in voyage charters, and often reflect a corresponding provision in a sales contract requiring the same conditions to apply to the charterers' claim against shippers or receivers: see *Schofield on Laytime and Demurrage* 7th edn paragraph 6.284. They are intended to enable the parties to have a final accounting as swiftly as possible and, if any factual enquiries have to be made, to ensure that the parties are able to do so whilst recollections are reasonably fresh. As Bingham J put it in *Babanaft International Co S.A v Avant Petroleum ("The OLTENIA")* [1982] 1 Lloyd's Rep 448, 453:

> "The commercial intention underlying this clause seems to me plainly to have been to ensure that claims were made by the owners within a short period of final discharge so that the claims could be investigated and if possible resolved while the facts were still fresh …. This object could only be achieved if the charterers were put in possession of the factual material which they required in order to satisfy themselves whether the claims were well-founded or not."

The arbitrators themselves described the purpose of LITASCO Clauses 2 and 3 in paragraph 9 of the Award in the following terms:

> "The aim of rider clauses 2 and 3 is that the Charterers should be presented with documentation complying with those clauses so they can accurately calculate their liability for demurrage. Not only is that conclusion consistent with giving proper effect to the contractual clauses agreed by the parties, but it is also consistent with the general trend for operational matters and demurrage claims to be handled by different departments in a charterer's organisation. Indeed the evaluation of demurrage claims is often outsourced to a third party".

17.     Courts and arbitration tribunals regularly insist on strict compliance with such clauses for this reason, although the expression strict compliance has been deprecated, and it

is perhaps more accurate to say that the court will give effect to the clarity and certainty which it is the purpose of such clauses to achieve (see ***National Shipping Company of Saudi Arabia v BP Oil Supply Co ("The ABQAIQ")*** [2012] 1 Lloyd's Rep 18 at [60]-[61]).

18.  This rationale applies as much to a claim for waiting time under LITASCO Clause 4 as to any other aspect of a demurrage claim.  The Tribunal focussed on the fact that documents of the kind enumerated in Clause 2B might not exist in relation to the waiting place of the Vessel, and in particular on the fact that if the Vessel was waiting for orders off port limits there would be no communications with anyone at the port.  With respect to the Tribunal, I do not find it helpful to look to the application of the clause in circumstances where there would be no documents of the type enumerated, because the clause is qualified by the words "whenever possible", and since it will not be possible to send documents which never existed the requirements of the clause will not be engaged.  The Tribunal did not say that there would never be circumstances in which such documents came into existence, and there clearly could be (as the particular facts of this dispute illustrate).  What is of more significance is that when such documents do exist in relation to a Clause 4 claim, they will often be relevant and necessary to fulfil the function which Clause 2 is designed to serve.  Whenever the waiting at anchorage takes place after arrival at the relevant port, there will be an NOR and likely be a statement of facts which can be required to be signed by the terminal or non-signature protested by the Master in relation to that port.  That will likely assist in the swift resolution or further investigation of events which give rise to the Clause 4 claim.  Clause 2B fulfils its primary function when such documents do exist, and is not engaged when they do not.

19.  Moreover, and to my mind importantly, it is not only the place where the Vessel waits which is relevant to this issue.  If the delay occurs at any stage of the voyage after NOR has been tendered at the first loading port, it will be necessary to calculate what laytime has been used quite apart from that caused by waiting for Charterers' orders.  In the present case, for example, the Clause 4 claim for time spent waiting at Gladstone necessarily requires a calculation of the laytime used at the loadport, Mailiao.  The very purpose of Clause 2B is to require those documents to be provided, and if they are regarded as necessary for a demurrage claim based solely on loading and discharging operations, there is no reason why they should be regarded as any less necessary when they determine a constituent element of a Clause 4 claim.  Yet if the Owners' submissions be correct, there is no need to provide any of the Clause 2B documents for the loadport.    Mr Lord QC sought to avoid this consequence by arguing that there would still be an obligation under Clause 2A to provide "supporting documentation" under the wording in that part of the clause; and that what amounted to sufficient supporting documentation would be for a tribunal to determine in any given case, but it would not be the prescriptive minimum required by Clause 2B.  If this were right, it would produce the surprising result that the parties intended different or potentially different documentation to be required in order to calculate used laytime at the loadport for the purposes of the two claims, notwithstanding that in each case it was to be provided for an identical purpose, namely to facilitate a swift accounting for, or investigation of, the laytime used.  The arbitrators found that the documentation supplied at the loadport in this case failed to fulfil the Clause 2B requirements and was not sufficient to fulfil a demurrage claim relating to loading and discharging operations.  That provided a complete time bar defence to the demurrage

claim in respect of time at the loadport and the two discharge ports after Gladstone, irrespective of the additional deficiencies in the documentation for the latter two ports.  Why, one asks, should the Owners be entitled to supply less rigorous documentation for Mailiao, merely because the claim is one for waiting at Gladstone, notwithstanding that loadport laytime is an essential element in both?  Commercial business sense suggests that the parties would have intended the same regimen in each case.

20.     There is an echo here of what Bingham J said in the passage in his judgment in ***The Oltenia*** immediately following that quoted above:  "the owners would not, as a matter of common sense, be debarred from making factual corrections to the claim presented in time…..nor from putting a different legal label on a claim previously presented, but the owners are in my view shut out from enforcing a claim, the substance of which and the supporting documents of which (subject always to de minimis exceptions) have not been presented in time."   Just as owners who have complied with the documentation requirements are not prevented from putting a different legal label on the claim, so conversely they should indeed be shut out from pursuing a claim which has not so complied and should not avoid that consequence merely by re-labelling the claim.

21.     Mr Lord argued that if the Charterers' construction were correct the Owners would at least in some circumstances be required to submit irrelevant documents.  He gave as an example where the Vessel was ordered to wait at anchorage for further orders prior to arrival at the first loadport and the time so spent exceeded the full 84 days allowed; in those circumstances, he argued, the documentation from the subsequent operations at the loading and discharging ports would be irrelevant to a waiting time claim under LITASCO Clause 4. To my mind there are two answers to this point.  First, in the particular example given, in which laytime had already been fully used prior to arrival at the loadport, the Owners would be likely to be advancing a demurrage claim for the time taken in loading and discharging thereafter, and they could be expected to collect and submit the documentation for those purposes in any event.  Secondly, and even if there might be some circumstances in which the Clause 2B documents were irrelevant, that is not a sufficient reason for failing to give effect to the clear wording of the contract.  The requirement is not onerous: it applies to a very limited class of documents which, if they exist, ought to be readily to hand and capable of submission without undue difficulty or expense.  If a provision which is designed to operate for good reason in most circumstances might occasionally require irrelevant documents, that is no reason to suppose that the parties did not intend it to have the effect for which it clearly provides.  The points made by Lord Neuberger in ***Arnold v Britton*** at paragraphs [16]-[23] on the limits to the impact of "commercial common sense" are pertinent in this context.

22.     Mr Lord also argued that the amended LITASCO Clause 4 dovetailed with clause 10 of the Fixture Recap, with the latter applying where the Vessel was drifting, and providing for the same consequences save that a contribution to bunkers was required because of the greater use of bunkers when not at anchorage.  He argued that because both were concerned with conferring on the Charterers a liberty to wait, and that there would never be any Clause 2B documents when ordered to wait drifting "outside ports", it followed that no such documents were intended to be required when ordered to wait at anchorage.  I agree that clause 10 of the Fixture Recap dovetails with

LITASCO Clause 4, in each case using the technique of time counting as laytime or demurrage so that a claim under either clause is a demurrage claim.  The premise for Mr Lord's argument is, however, a false one: there may be Clause 2B documents relating to the loading and/or discharging ports which are relevant to the calculation of laytime which may be a necessary part of a clause 10 drifting claim.  If the laytime is not all used in the loading and discharging operations, a clause 10 claim will be reduced or extinguished pro tanto.  Moreover, even if one were to assume that there could never exist Clause 2B documents which were relevant for a clause 10 claim, so that the former clause would not be engaged on its terms, it simply would not follow that Clause 2B was not intended to apply to a LITASCO Clause 4 claim where such documents do exist and Clause 2B is triggered on its terms.  Clause 10 of the Fixture Recap does not advance the construction for which the Owners contend.

**Conclusion**

23.    Notwithstanding the deference which I naturally pay to this experienced maritime tribunal, I find myself unable to agree with their conclusion for the reasons I have endeavoured to explain.    Accordingly the appeal will be allowed.  I will hear the parties on the appropriate form of relief.

*Generics (UK) Ltd. v. Yeda Research & Dev.
Co. Ltd.*, [2012] EWCA Civ. 726



Neutral Citation Number: [2012] EWCA Civ 726

Case No: A3/2011/3284

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**MR JUSTICE FLOYD**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 31st May 2012

**Before:**

**LORD JUSTICE WARD**
**LORD JUSTICE ETHERTON**
and
**SIR ROBIN JACOB**

**Between:**

| | |
|---|---|
| **GENERICS (UK) LIMITED** | Appellant |
| **- and -** | |
| **YEDA RESEARCH & DEVELOPMENT CO. LTD** | |
| **TEVA PHARMACEUTICAL INDUSTRIES LIMITED** | Respondents |

(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No: 020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

**Michael BLOCH Q.C. and Sebastian ALLEN** (instructed by **Simmons & Simmons LLP**)
for the Appellant
**Simon SALZEDO Q.C. and Thomas HINCHLIFFE** (instructed by **Bird & Bird LLP,
Pinsent Masons LLP**) for the Respondents

Hearing date: 23rd. February 2012

# Judgment
## As Approved by the Court

**Crown copyright©**

**Sir Robin Jacob:**

1.  This appeal is from a judgment of Floyd J of 25th November 2011, [2011] EWHC 3200 (Pat).  It was made in an action between Generics (UK) Ltd (who trade under the name "Mylan") and Yeda Research and Development Company Ltd. and Teva Pharmaceutical Industries Ltd.   Having heard the oral argument, we told the parties of the result, namely that the appeal would be allowed.  In view of the urgency (the action is shortly to come to trial) we indicated that the injunction granted by the judge would be discharged upon final judgment and meanwhile it would be suspended (in that way time for appeal would not start running). These are my reasons for allowing the appeal.

2.  In the action Generics seeks a declaration of non-infringement and revocation of Yeda's EP (UK) No. 0,762,888, under which Teva are exclusive licensees.    The patent relates to a pharmaceutical called Copaxone, sales of which form an important part of Teva's business.   The action commenced in March 2011 and the trial commenced on 14th May this year.

3.  In February 2011 a senior in-house patent attorney with extensive experience of litigation (she has been concerned with 150 or so oppositions in the EPO) was employed by Mylan as its Director of Intellectual Property.  Her duties were to be responsible for managing Mylan's European patent matters, including litigation, oppositions and prosecutions with respect to a portfolio of products.    Her responsibilities included the conduct of the action and a corresponding action in France.    Until Floyd J granted the injunction the subject of this appeal, Mylan's solicitors took their instructions from the senior in house patent attorney. There is a further corresponding action in the US but she does not have the conduct of that.

4.  From 2008 to January 2011 the in-house patent attorney for the Claimant was employed by Teva where she was responsible for oppositions in the European Patent Office.  She was not concerned with any litigation concerning Copaxone.   All she knew about it was that the product was being handled by a team in Israel.  No one in her department at Teva had any involvement with Copaxone litigation.

5.  Notwithstanding that, Teva claims that whilst working for it, the in-house patent attorney learned of confidential information about its Copaxone litigation.  So Teva contends that in the circumstances the in-house patent attorney ought not to be doing any work for Mylan in the action.   Floyd J acceded to that contention, granting an injunction that:

    > "[Mylan] shall cease to act by, or otherwise seek assistance or advice from, its Director of Intellectual Property, namely …, in relation to this action."

6.  The application for the injunction came about in a somewhat indirect way in that neither the in-house patent attorney nor Mylan has been sued directly.   It happened this way.  By an application of 15th November 2011 Mylan sought an order that their in-house patent attorney, subject to her signing a confidentiality undertaking, be given access to copies of the defendants' documents which had been disclosed as confidential.   By a counter-application of 21st November the injunction was sought.

7.    Teva accepts that Mylan's in-house patent attorney is entirely honest.  She said "I never received or obtained any confidential information (or indeed any information about patents or litigation) concerning Copaxone as a result of my employment with Teva."  She also said:

> "I also have no recollection of being copied in on any communications or being involved in any discussions on any aspect of litigation relating to Copaxone while at Teva.  Indeed the first time I learned about any litigation concerning Copaxone was during my interview process with Mylan when Steven Flynn (who has overall responsibility for global IP at Mylan) asked me whether I had ever done any work on Copaxone at Teva."

8.    Teva says she is mistaken; that there was some discussion about Copaxone litigation.  It took the form of being copied in on some emails and an oral discussion with Dr Hausdorff, Teva's Associate General Patent Counsel who has responsibility for Copaxone.  It is said that this communicated significant confidential information which, although Mylan's in-house patent attorney does not currently remember it, might be remembered, albeit subconsciously, and might be used against Teva in the action.

9.    The Judge accepted that, saying:

> "[17]    I should make it absolutely clear that I do not consider that [Mylan's in-house patent attorney] is being at all untruthful in any of the evidence that she has given, but it is a matter of common experience that although one feels, or feels strongly, that one has no relevant information on a topic, one's recollection can subsequently be shown to be wrong.  Indeed the way in which the evidence has gone in this case has suggested that [Mylan's in-house patent attorney's] initial recollection was at least to some degree incorrect and that she had been exposed, at least peripherally, to discussions concerning the Copaxone case.

> [18]    Mr. Turner submits that, rather like the case considered by Lightman J in *In re a Firm of Solicitors,* all that is involved here is the fact that [Mylan's in-house patent attorney] shared an office with those who were concerned with Copaxone and that there is not at present a sufficient identification of particular confidential information to justify the court's intervention.

> [19]    I have not found this an all together easy question to decide, but I have reminded myself that the threshold is not a particularly high one.  It seems to me that communications of the type which I have considered are by their very nature confidential and privileged.  The communications are not central to the litigation, with which this court is concerned, though they are, I think, relevant to it.  I think there is a risk in

> the present case that if [Mylan's in-house patent attorney]
> continues to act on behalf of Generics her memory of events
> such as those to which I have referred, …, may be at the back
> of her mind and may, I suspect unconsciously, nevertheless in
> fact influence her strategy and conduct and the consequent
> instructions she gives in the case.
>
> [20]    I have therefore come to the conclusion, somewhat
> reluctantly, that the case is an appropriate one for the court to
> intervene by way of injunction.  I have of course borne in mind
> that the right of a party to decide by whom it conducts its
> litigation is, absent the risk of misuse of confidential
> information, a very strong consideration, but it does seem to me
> that here is such a risk and accordingly I propose to protect the
> defendants by eliminating the risk by injunction."

10.    It was common ground before the Judge that the applicable principles were those
established in *Prince Jefri Bolkiah v KPMG* [1999] 2 AC 222.  There was no
argument about whether a patent attorney (the former name, still in statutory use, is
patent agent) should be treated in the same way as if she were an employed solicitor.
It was common ground that she should.

11.    Before us, Mr Michael Bloch QC, advanced a number of grounds.   Twelve points are
listed in the grounds of appeal.  They can be summarised into two broad groups.   I do
so in a different order from that in which they were advanced:

    i)    Assuming the *Bolkiah* principles apply, the information in respect of which
there is said to be a danger of misuse was too nebulous to satisfy the test and in
any event there was no realistic risk of Mylan's in-house patent attorney
misusing it even subconsciously.  The Judge was wrong in his assessment of
the position.

    ii)    The *Bolkiah* principles do not apply here.  They are limited to the provision of
legal services (or their equivalent, such as those of accountants) by third party
professionals.  Different principles apply to former employees even if they are
in-house lawyers or patent attorneys conducting litigation for their employers.
Those principles are the conventional principles by which a former employee
may not, post-employment, use the trade secrets properly so-called of his
former employer.  Barring orders of the sort granted in *Bolkiah* will not be
granted:  the most the employer can be granted is an injunction restraining use
of the trade secret, and such an injunction will only be granted if there is use or
threatened use or disclosure of that secret.

12.    Mr Simon Salzedo QC for Teva submitted broadly:

    i)    *Bolkiah* principles apply whether the litigator was in or out-house;

    ii)    It was for the Judge to evaluate the facts.  He had concluded there was a risk
that the "information may, unconsciously, influence Mylan's in-house patent
attorney's strategy and conduct and the consequent instructions she gives in

the case." It was not for this Court to interfere unless the Judge had made an error.

iii) Even if *Bolkiah* principles do not apply, the in-house patent attorney of the Claimant's contract of employment leads to the same result.

13. Mr Bloch disputed that last contention, submitting that the contract terms added nothing but if they did then they were void as being in unreasonable restraint of trade. It is not necessary to consider these points, which, because they have no general importance, I do not decide. I merely observe that my provisional view is that the express contract term point adds nothing.

14. There was also some discussion before us, but not before the Judge, about another aspect of the applicable principles. Given that neither Mylan nor its in-house patent attorney was actually being sued, quite what standard should be applied? Was it similar to that applicable for an interlocutory injunction? And in particular was there any question of balancing the interests of the parties and also of Mylan's in-house patent attorney? As far as Mylan is concerned there is the obvious damaging effect of the loss of her services. And as far as Mylan's in-house patent attorney is concerned it was suggested that we should infer that her employment with Mylan might be in danger if she could not work on Copaxone cases: Copaxone had been mentioned in her job interview and work on it was clearly intended to be an important part of her activities.

15. It is clear that if *Bolkiah* principles apply there is no question of any balancing, see *per* Lord Millett at p237B. The interests of the former client prevail. But if interlocutory injunction principles apply, then the potential harm to the defendant if an injunction is "wrongly" granted may potentially come into play.

16. In the end this point did not matter, for even on interlocutory injunction applications (and it should not be forgotten that *Bolkiah* itself was an interlocutory injunction case) the balance of convenience matters little if the reality is that the decision will determine the matter finally. So I say no more about "balancing".

17. As regards Mr Bloch's "too nebulous" point, since it is said to involve Teva's confidential information the parties were agreed that we should consider it "in private". Mylan's in-house people left the Court when it was discussed. They included Mylan's in-house patent attorney who has sensibly chosen not to see the allegedly confidential information which it is contended may lie at the back of her mind and be dredged up from her unconscious to be used against Teva. Although I doubt that the information is really confidential (it seems self-evident to me) I will deal with this point in a confidential appendix, stating only my conclusion here. It is that the Judge was wrong in his assessment. The alleged confidential information was at most peripheral to the Copaxone litigation. The evidence shows that Teva itself did not really regard a possibility of misuse as realistic. Otherwise it would have raised the point much much earlier. So, even though, once it is shown that a litigator has received confidential information, the burden of showing that there is no risk of misuse lies on her, the evidence in this case discharges that burden. The Judge overlooked some key points in coming to his assessment. For instance Teva do not say when they first knew that Mylan's in-house patent attorney would or might be working on Copaxone litigation. The fair inference on the evidence is that it knew

that at least eight months before it applied for an injunction. Its own conduct shows that there is no real risk of misuse of this peripheral point.

18.    I elaborate a little here. A barring order on its lawyer can obviously have a damaging effect on a party's litigation preparation. If a former client (or employer) really believes that there is a risk of misuse or disclosure of confidential information, then it will act at once. If it stands by, allows the litigator to get well into the case, and then claims there is a real risk of mis-use, the court will view the claim with considerable scepticism. If someone is treading on your toe or about to do so you shout. If you wait for months first then complain in a desultory way, you are apt not to be believed.

19.    I could stop here. But the question of the position of a former in-house litigator is clearly one of general importance and was fully argued. So I shall express my views. They are firstly that an employed patent attorney litigator stands in exactly the same position as an employed lawyer litigator (barrister or solicitor). And secondly that the *Bolkiah* principles apply with equal force to a former employed litigator as they do to a former independent litigator.

20.    I turn first to the question of whether there is a difference between the position of an in-house patent attorney and an in-house lawyer. As was the case below it was not suggested there is a difference, but it is worth considering why. Clearly a patent attorney acting for a client in litigation will be doing the same work whether in or out-house. The work involves the following sorts of thing, namely deciding what points to be run and not run, giving instructions to and discussing all aspects of the case with counsel, gathering evidence, conducting a disclosure exercise, selecting experts to give evidence, working on expert evidence, deciding what witnesses to call and not to call and so on. Work-wise there is no difference.

21.    Moreover there is no difference as regards privilege so far as intellectual property litigation is concerned. The Copyright, Designs and Patents Act 1988 as amended provides:

> "280(1)    This section applies to communications as to any matter relating to the protection of any invention, design, technical information or trade mark or as to any matter involving passing off.
>
> (2)    Any such communication –
>
> (a)    between a person and his patent agent, or
>
> (b)    for the purpose of obtaining, or in response to a request for, information which a person in seeking for the purpose of instructing his patent agent
>
> is privileged from disclosure in legal proceedings in England, Wales or Northern Ireland in the same way as a communication between a person and his solicitor or, as the case may be, a communication for the purpose of obtaining, or in response to a request for, information which a person seeks for the purpose of instructing his solicitor."

22.     The work of in-house litigation solicitors attracts litigation privilege in exactly the same way as if they were external lawyers, see *Alfred Crompton Amusement Machines v Commissioners of Customs & Excise No.2*, [1972] 2 QB 102 at 129 (per Lord Denning MR with whom the other members of the Court agreed).   This proposition was not challenged in the House of Lords, see [1974] AC 405 at p.431 *per* Lord Cross.   If the subject-matter of the claimed privilege is autonomous EU law then the work of in-house lawyers will not be privileged, (*Akzo Nobel v EC,* Case C-550/07P) and the work of patent attorneys will likewise be unprivileged.

23.     Likewise both solicitors and patent attorneys are members of professional bodies. They are subject to rules as to professional ethics and disciplinary proceedings for their breach.   This again makes both solicitors and patent agents stand somewhat apart from "ordinary" employees.   Of course there can be other sorts of professional employee, such as doctors, who are members of professional bodies, but their position is not quite the same.   This is because a breach of the rules as to the conduct of litigation, e.g. suppressing a document which ought to be disclosed, will not only be punishable in disciplinary proceedings but is central to their function as professionals. If there is a conflict between the interests of his employer and his professional duties a litigator, whether employed or engaged professionally, must put the latter first.

24.     So there can be no rational difference for treating the work of in-house patent attorneys and that of in-house lawyers differently.   I would hold they stand in the same position.

25.     I turn to the next question, therefore, do the *Bolkiah* rules apply to ex-employed litigators who may work against their former employer?   I begin by considering the rules themselves.     They were formulated by Lord Millett.   He held that the jurisdiction is founded "on the protection of confidential information", p.234H.  It is not based on a fiduciary relationship:

> "My Lords, I would affirm this [i.e. protection of confidential information] as the basis of the court's jurisdiction to intervene on behalf of a former client. It is otherwise where the court's intervention is sought by an existing client, for a fiduciary cannot act at the same time both for and against the same client, and his firm is in no H better position. A man cannot without the consent of both clients act for one client while his partner is acting for another in the opposite interest. His disqualification has nothing to do with the confidentiality of client information. It is based on the inescapable conflict of interest which is inherent in the situation (pp.234H-235A)
>
> ……
>
> Where the court's intervention is sought by a former client, however, the position is entirely different. The court's jurisdiction cannot be based on any conflict of interest, real or perceived, for there is none. The fiduciary relationship which subsists between solicitor and client comes to an end with the termination of the retainer. Thereafter the solicitor has no obligation to defend and advance the interests of his former

> client. The only duty to the former client which survives the
> termination of the client relationship is a continuing duty to
> preserve the confidentiality of information imparted during its
> subsistence (pp.235C-D)."

26.    However once it is shown that a solicitor did receive confidential information when
acting for a client, he comes under a strict duty to ensure that it cannot be used against
that client.  Lord Millett put it this way:

> "Accordingly, it is incumbent on a plaintiff who seeks to
> restrain his former solicitor from acting in a matter for another
> client to establish (i) that the solicitor is in possession of
> information which is confidential to him and to the disclosure
> of which he has not consented and (ii) that the information is or
> may be relevant to the new matter in which the interest of the
> other client is or may be adverse to his own. Although the
> burden of proof is on the plaintiff, it is not a heavy one. The
> former may readily be inferred; the latter will often be obvious.
> ….Whether a particular individual is in possession of
> confidential information is a question of fact which must be
> proved or inferred from the circumstances of the case, p.235D-
> F.

> *Degree of risk*

> It follows that in the case of a former client there is no basis for
> granting relief if there is no risk of the disclosure or misuse of
> confidential information, p.236B

> ….

> It is in any case difficult to discern any justification in principle
> for a rule which exposes a former client without his consent to
> any avoidable risk, however slight, that information which he
> has imparted in confidence in the course of a fiduciary
> relationship may come into the possession of a third party and
> be used to his disadvantage. Where in addition the information
> in question is not only confidential but also privileged, the case
> for a strict approach is unanswerable. Anything less fails to
> give effect to the policy on which legal professional privilege is
> based. It is of overriding importance for the proper
> administration of justice that a client should be able to have
> complete confidence that what he tells his lawyer will remain
> secret. This is a matter of perception as well as substance. It is
> of the highest importance to the administration of justice that a
> solicitor or other person in possession of confidential and
> privileged information should not act in any way that might
> appear to put that information at risk of coming into the hands
> of someone with an adverse interest, p.236G-H"

27.     I regard that last paragraph as conclusive of the question of whether or not an in-house lawyer is to be regarded as in a different position.   The "proper administration of justice" is of "overriding importance."     It makes no difference from that perspective whether or not the former lawyer was employed or not.     Both the perception and the substance are the same.

28.     Mr Bloch contended otherwise, that an employed lawyer was under a lesser duty. True it is, he submitted, that she cannot use her former employer's trade secrets after she has left, but that is both limited to a trade secret properly so-called (see the well-known somewhat comically named case of *Faccenda Chicken v Fowler* [1987] 1 Ch 117 at p. 137).     Moreover any injunction granted will be confined to preventing misuse of that trade secret;  a general barring injunction will not be granted.  For the latter proposition he relied on the recent case in this court, *Caterpillar Logistics v Huesca de Crean* [2012] EWCA Civ 156.  He said that a barring order would only be appropriate where it was to enforce a valid restrictive term in the contract of employment.  If the employer failed to extract such a term when the lawyer was employed, then no barring order will ever be made.

29.     I do not accept that any of this makes sense in the context of a former in-house lawyer or patent agent who had been concerned with conducting litigation for her employer. Once it is shown that a lawyer, whilst employed as a litigator, has received what can fairly be regarded as confidential information concerning or touching a piece of the employer's litigation it seems to me to be elementary that she cannot turn round after employment so as to act on the other side.  I think the information will self-evidently be regarded as a *Faccenda* trade secret properly so-called.  And the only practical way to protect its misuse would be by a barring order. After all the former employer will never be able to find out if the information was disclosed or used by the former litigator when acting for the other side.

30.     *Caterpillar* was a very different sort of case.  It was a grossly heavy-handed egregious attempt to prevent the ex-employee (not subject to any restrictive covenant) from working for a large customer of that employer.  The employee agreed that she had been privy to some confidential information whilst working for her former employer, but denied that she had ever used or threatened to use it (and was willing to undertake not to do so).  The former employer said that was not enough.  It wanted a barring order.  That order was refused with some force first by Tugendhat J and then by this court.

31.     An attempt was made to argue that *Bolkiah* principles should be extended to cover ordinary employees.  Stanley Burnton LJ giving the principal judgment quoted the passage from Lord Millett about the "highest importance to the administration of justice" which I have quoted.  He emphasised with italics those words and went on to say:

          "[49]     In my judgment there is nothing in Lord Millett's speech to justify the relief granted in that case, which prohibited KPMG from acting against their former client in connection with a matter in which they had previously acted for him, to the ordinary relationship of employer and employee. That the principle for which it is authority is confined to

> solicitors and the like is confirmed by the speech of Lord Hope
> [which he then cited]."

32.    It seems to me abundantly clear that Stanley Burnton LJ was treating solicitors who
       had acted for a client as subject to *Bolkiah* principles, and was not concerned with
       whether they had been "in-house" or not.   His emphasis on the administration of
       justice would not make sense otherwise.

33.    Stanley Burnton LJ also referred to the recent Hong Kong Court of Final Appeal case
       of *PCCW – HKT Telephone v David Aitken* [2009] HKCFA 11.   Mr Bloch took us to
       certain passages upon which he relied.   I can say with utter confidence that the case
       is of no assistance here.   For the leading judgment of Ribeiro PJ concludes with this
       passage, which it fell to Mr Salzedo to draw to our attention:

> "[45]    As a postscript what this judgment does *not* decide
> should be mentioned.   Questions concerning possible relief
> against an in-house lawyer who changes jobs to take up a
> position on the other side of a contentious issue;  or against a
> person who moves from employment as in-house lawyer to
> private practice as a solicitor (or vice-versa) to act on the other
> side of a contentious matter, do not arise on the present appeal.
> I wish to leave such questions open."

34.    Bokhary PJ, Chan PJ and Litton NPJ agreed with Ribeiro PJ.   Lord Hoffmann NPJ
       also gave a substantive judgment with which Bokhary PJ, Chan PJ and Litton PJ
       agreed.   It did not contain the express reservation of Ribeiro PJ which I have cited, but
       I think it is fairly clear that Lord Hoffmann was not intending to deal with a former
       employed litigator turning round after employment and acting on the other side.   The
       case was concerned with a former employee who had had access to legally privileged
       information.   But he had not himself acted as an in-house litigator even though he was
       in fact a lawyer.   Lord Hoffmann was at pains to point this out at [65].   There he
       distinguished *Canadian Pacific v Aikins, MacAuley & Thorvaldson* (1998) 157 DLR
       (4th) 473 on its facts.   The Manitoba Court of Appeal had restrained a former in-house
       lawyer of Canadian Pacific, now in private practice, from acting against his former
       employer because he had received information as counsel, albeit in-house.   If Lord
       Hoffmann had thought the case wrongly decided in law he would surely have said so
       rather than merely distinguishing it on its facts.

35.    There is, of course, one difference between an in and out-house litigator, a point relied
       upon by Lord Hoffmann at [62].   The former only has one client and cannot (without
       giving up his job) refuse to act.   An independent litigator has many clients and, at
       least in the case of a solicitor (not subject to the cab-rank rule) can choose not to act
       for a particular client.   I do not read Lord Hoffmann in this paragraph as saying that
       what he called the "special remedy against solicitors" did not apply to in-house
       litigator solicitors.   He was refusing to extend the special rule to "employees" who
       had had access to legal professional privilege.

36.    So this difference is not, to my mind, enough of a difference to put an in-house
       litigator in such a different position that the *Bolkiah*  principles do not apply to him.   I
       think his former employer is entitled to just as much protection from his former

employee litigator acting against him as if the litigator had been independently engaged.  The overriding interest in the administration of justice so requires.

37.  Thus I have come to the firm opinion that the *Bolkiah* principle applies every bit as much to a former employed litigator as it does to a former privately engaged litigator.

38.  What then is the *Bolkiah* principle?  In what way is it stronger than the general principle that a former employee may not use his former employer's trade secrets properly so-called?   Lord Millett provided the answer in clear and unmistakeable terms:

> "I prefer simply to say that the court should intervene unless it is satisfied that there is no risk of disclosure. It goes without saying that the risk must be a real one, and not merely fanciful or theoretical. But it need not be substantial, p.237A
>
> In my view no solicitor should, without the consent of his former client, accept instructions unless, viewed objectively, his doing so will not increase the risk that information which is confidential to the former client may come into the possession of a party with an adverse interest, p.237 E-F
>
> Once the former client has established that the defendant firm is in possession of information which was imparted in confidence and that the firm is proposing to act for another party with an interest adverse to his in a matter to which the information is or may be relevant, the evidential burden shifts to the defendant firm to show that even so there is no risk that the information will come into the possession of those now acting for the other party, p.237G."

39.  It is that test I have applied in the confidential appendix:  is there a real risk, one not merely fanciful or theoretical, that the alleged confidential information will be disclosed?   Teva by its own conduct has shown that there is none in relation to the peripheral points relied upon.   The Judge erred in his assessment of a real risk by not taking that conduct into account.

40.  It is for that reason that I think the appeal should be allowed.

### Confidential Appendix

…

**Lord Justice Etherton:**

41.  I agree with Sir Robin Jacob that this appeal should be allowed because there is no real risk that the alleged confidential information will be disclosed by Mylan's  in-house patent attorney.

42. I respectfully differ from him, however, in the analysis of the relevant legal principles and their application to the facts of the present case. In particular, I do not agree that the principles in *Prince Jefri Bolkiah v KPMG* [1999] 2AC 222 apply in the present case. The difference between us can be summarised briefly as follows. If the principles in *Bolkiah* apply, then, in order to avoid the injunction sought by the respondents, the burden lies on Mylan's in-house patent attorney, or rather the appellant, to satisfy the Court that there is no real risk of disclosure or other unauthorised use by Mylan's in-house patent attorney of the confidential information which she acquired while working for Teva and on which Teva relies for the injunction. That is so, even though the Judge concluded that Mylan's in-house patent attorney is not presently conscious that she holds any such information. Indeed, the very basis for the Judge's decision is that, because the memory of the relevant information may be at the back of Mylan's in-house patent attorney's mind, it may unconsciously influence her strategy and conduct in handling these proceedings. Although *Bolkiah* was not a case about employees, but about an independent firm of accountants, whose position was considered analogous to a firm of solicitors, Sir Robin Jacob considers there should be no difference between the obligations as to confidentiality of an employed patent attorney or an employed solicitor and one in private practice.

43. I fully appreciate the immediate attractiveness and simplicity of that approach. I consider, however, that there are sound reasons of principle and policy why, in the case of an employed patent attorney or, for that matter, an employed solicitor, the burden lies on the former employer to satisfy the court of the probability of wrongful disclosure or use of confidential information. In particular, there are the following material differences between the position of a person who is employed, whether or not a patent attorney or a solicitor, and a solicitor or patent attorney in private practice acting for a client: (1) the foundation of the legal relationship between an employer and an employee is the contract of employment, including its express and implied terms as to confidential information; (2) the relationship between a solicitor and a client (and, insofar as it is similar, a patent attorney and a client) is a fiduciary relationship, but an employment relationship is not of itself a fiduciary relationship; (3) an employee is, at any one time, contractually bound to a single employer, but can be expected to perform similar functions for each successive employer (whether or not a competitor), and, in order to pursue his or her career, will need to take to each successive employer (subject to any legal restrictions regarding confidential information) the knowledge, skill and experience previously gained; and (4) if the employer wishes to restrict the activities of the employee after termination of the employment, the employer can and should do so by means of a legally valid restrictive covenant.

44. In view of the importance of this issue, I set out my analysis more fully below.

45. The hearing before Floyd J proceeded on the footing that the issue whether Mylan's in-house patent attorney should be prevented from acting for the appellant, Generics (UK) Limited (trading as Mylan) ("Mylan"), in relation to these proceedings is to be determined by reference to the principles in *Bolkiah.*

46. In *Bolkiah* the House of Lords granted an injunction against the defendants from acting for the Brunei Investment Agency in an investigation into its financial affairs during the period when the claimant, Prince Jefri, had been its chairman, including the

location of certain assets which were suggested to have been used by Prince Jefri for his own benefit.   The ground for the application for the injunction was that the defendants had provided forensic accounting services and litigation support for the claimant, Prince Jefri, personally during that period and so gained access to confidential information relating to the extent and location of his assets. The case for Prince Jefri, and the reasoning in the House of Lords, proceeded on the basis that, for the purposes of determining whether or not an injunction should be granted, the defendants, acting as forensic accountants for Prince Jefri, were to be regarded as in the same position as solicitors.

47.    The leading speech was given by Lord Millett, with whom the other members of the appellate committee agreed. Lord Millett's starting point was that, although the fiduciary relationship between solicitor and client comes to an end with the termination of the retainer, the solicitor is under a continuing duty to preserve the confidentiality of information imparted during its subsistence:  page 235 D.  He referred to "the fundamental principle of equity that a fiduciary may not put his own interest or those of another client before those of his principal": page 237E.  His analysis and judgment were that, in a case where a plaintiff seeks to restrain the former solicitor from acting in a matter for another client, (1) it is for the plaintiff to establish (a) that the solicitor is in possession of information which is confidential to him and to the disclosure of which he has not consented, and (b) that the information may be relevant to the new matter in which the interest of the other client is or may be adverse to his own case; and, if so, (2) the court will intervene unless it is satisfied (that is to say, unless the former solicitor discharges the evidential burden of showing) that there is no real risk of disclosure:  pages 235E, 237A, 237G.

48.    The respondents contend (at least in their skeleton argument) that the reasoning in *Bolkiah* did not turn on the fiduciary status of the defendants.   That is plainly an oversimplification.  Lord Millett's reasoning was that the defendants were subject to a continuing fiduciary duty (to preserve confidentiality) in respect of the confidential information even after the termination of the contractual retainer.  The existence of the fiduciary duty was central to his decision.

49.    In applying the *Bolkiah* rule to the present case, the Judge said at [12]:

> "It is true to point out that a patent attorney is not a solicitor and it is not necessary for me to consider for the purposes of this application whether a patent attorney is a fiduciary. Nevertheless, the rule as there expressed applies to anyone in possession of confidential information.   Moreover, communications between a patent attorney and his client in matters relating to patents and patent prosecution enjoys a statutory privilege under the Patents Act 1977."

50.    The Judge summarised his conclusion, on the application of the *Bolkiah* rule to the facts, as follows:

> "19.   I have not found this an all together easy question to decide, but I have reminded myself that the threshold is not a particularly high one.   It seems to me that communications of the type which I have considered are by their very nature

confidential and privileged. The communications are not central to the litigation with which this court is concerned, though they are, I think, relevant to it. I think there is a risk in the present case that if [Mylan's in-house patent attorney] continues to act on behalf of Generics her memory of events such as those to which I have referred, [REDACTED], may be at the back of her mind and may, I suspect unconsciously, nevertheless in fact influence her strategy and conduct and the consequent instructions she gives in the case.

20. I have therefore come to the conclusion, somewhat reluctantly, that the case is an appropriate one for the court to intervene by way of injunction. I have of course borne in mind that the right of a party to decide by whom it conducts its litigation is, absent the risk of misuse of confidential information, a very strong consideration, but it does seem to me that there is such a risk and accordingly I propose to protect the defendants by eliminating the risk by injunction."

51. In view of the way that the matter was presented to the Judge, and argued before him, I can perfectly understand why the Judge approached the matter in that way and reached that conclusion. On the appeal, however, a very different approach was taken on behalf of Mylan's in-house patent attorney. Her argument before us was, in summary, that she had never been a fiduciary for her former employer, Teva UK Limited ("Teva"), or at least not in relation to the information on which Teva relied for its application for an injunction, and therefore *Bolkiah* is irrelevant. It is said by Mr Michael Bloch QC, on her behalf, that the applicable principles are those laid down by the Court of Appeal in *Faccenda Chicken Ltd v. Fowler* [1987] 1 Ch 117.

52. In *Faccenda Chicken* the Court of Appeal was concerned with the obligations of an employee or former employee not to make unauthorised disclosure or use of confidential information acquired during the employment. The principles stated by the Court of Appeal may be summarised as follows:

(1) Where the parties are, or have been, linked by a contract of employment, the obligations of the employee are to be determined by the contract with the employer.

(2) In the absence of any express term, the obligations of the employee in respect of the use and disclosure of information are the subject of implied terms.

(3) While the employee remains in the employment of the employer the obligations are included in the implied term which imposes a duty of good faith or fidelity on the employee. The extent of the duty of good faith will vary according to the nature of the contract.

(4) The implied term which imposes an obligation on the employee as to the employee's conduct after the determination of the employment is more restricted in its scope than that

which imposes a general duty of good faith. The obligation not to use or disclose information may cover secret processes of manufacture such as chemical formulae or designs or special methods of construction, and other information which is of a sufficiently high degree of confidentiality as to amount to a trade secret. The obligation does not extend, however, to cover all information which is given to or acquired by the employee during the period of employment, and in particular may not cover information which is only 'confidential' in the sense that an unauthorised disclosure of such information to a third party while the employment subsisted would be a clear breach of the duty of good faith.

(5) In order to determine whether any particular item of information falls within the implied term so as to prevent its use or disclosure by an employee after the employment has ceased, it is necessary to consider all the circumstances of the case, including the following. (a) Employment in a capacity where 'confidential' material is habitually handled may impose a high obligation of confidentiality because the employee can be expected to realise its sensitive nature to a greater extent than if employed in a capacity where such material reaches the employee only occasionally or incidentally. (b) The information will only be protected if it can properly be classed as a trade secret or as material which, while not properly described as a trade secret, is in all the circumstances of such a highly confidential nature as to require the same protection as a trade secret. (c) It is relevant whether the employer impressed on the employee the confidentiality of the information. (d) It is relevant whether the relevant information can be easily isolated from other information which the employee is free to use or disclose.

53. In relation to restrictive covenants by the employer to protect confidential information, the Court of Appeal in *Faccenda Chicken* cited with approval the following passage from the judgment of Cross J in *Printers and Finishers Ltd v Holloway* [1965] 1 WLR 1 at 6:

> "If [the managing director] is right in thinking that there are features in his process which can fairly be regarded as trade secrets and which his employees will inevitably carry away with them in their heads, then the proper way for the plaintiffs to protect themselves would be by exacting covenants from their employees restricting their field of activity after they have left their employment, not by asking the court to extend the general equitable doctrine to prevent breaking confidence beyond all reasonable bounds."

54. It is clear from *Faccenda Chicken* and other cases that, underlying those rules, are the policy considerations of, on the one hand, protecting from unauthorised use or disclosure confidential information acquired by the employee during the course of the

employment, and, on the other hand, enabling employees to earn their living by making use of the body of skill, knowledge and experience which they have acquired in the course of their careers.

55.    Although the issue whether or not Mylan's in-house patent attorney acquired the relevant information during her employment by Teva as a fiduciary lies at the heart of this appeal, there was very little analysis in the submissions as to the correct legal approach to be taken by the Court to determine that issue.  We were referred on that point to *Helmet Integrated Systems Ltd v. Tunnard* [2006] EWCA Civ 1735, [2007] FSR 16.  In that case the claimant, which manufactured protective helmets for fire fighters and other emergency service personnel, claimed that the defendant, whom it had employed as a sales person, breached a fiduciary duty and a duty of good faith in making preparations to set up in competition in respect of a new modular helmet which he had conceived while still employed by the claimant and which he successfully marketed through his own company after leaving the claimant. The Court of Appeal held that there had been no breach of his duty of loyalty and good faith or of any fiduciary duty.  Moses LJ, with whom the other two judges agreed, identified (at [33] and [37]) that the essence of the obligation of an employee as a fiduciary is that the employee must act solely or exclusively in the interest of the employer.  He took the test from the decision of Elias J in *University of Nottingham v Fishel* [2000] EWHC 2221 (QB), [2000] ICR 1462.  He quoted the following statement of Elias J:

> "…in determining whether a fiduciary relationship arises in the context of an employment relationship, it is necessary to identify with care the particular duties undertaken by the employee, and to ask whether in all the circumstances he has placed himself in a position where he must act solely in the interests of his employer. It is only once those duties have been identified that it is possible to determine whether any fiduciary duty has been breached ..."

56.    Moses LJ contrasted that fiduciary duty of exclusive loyalty with the employee's duty of fidelity, which does not prevent the employee, once the employment has ended, competing against the former employer and applying for his or her own benefit skills, knowledge and information acquired during the course of the employment, provided such information cannot properly be described as a trade secret:  see *Helmet Integrated Systems* at [26] and [27] and [37].

57.    On the facts Moses LJ accepted (at [42] to [46]) that, having regard to the express terms of the defendant's contract of employment, he would have had an obligation as a fiduciary not to misuse for his own benefit or for the benefit of someone other than the claimant information about the activities of a competitor learned while he was employed by the claimant as a salesman.  Moses LJ said (at [45]) that was because his employer would have no control over how he deployed what he had learned as a salesman, and would be dependent on him to pass on the information.  Moses LJ said (at [47]) that the defendant was, however, under no obligation to report his own activities because, first, the words of the defendant's job specification did not restrict his freedom to prepare for competition on leaving, and, secondly, the defendant was under no relevant fiduciary obligation to the plaintiff.

58.    We were referred to two cases in which former employers had unsuccessfully applied to the Court for orders restraining former employees from carrying out certain work for their new employers (which I shall refer to as "barring orders").  In *PCCW-HKT Telephone Ltd v Aitken* [2009] 2 HKLRD 274 the first defendant was a solicitor admitted in Australia but not in Hong Kong, who had been employed in Hong Kong by the plaintiff, the largest fixed network operator in Hong Kong, as General Manager, Regulatory Compliance.  He then joined the second defendant, the largest mobile network operator in Hong Kong, as the head of Regulatory and Corporate Affairs.  The plaintiff claimed injunctions to restrain the first defendant from, among other things, having any involvement in certain issues relating to fixed-mobile interconnection charges.  The Hong Kong Final Court of Appeal dismissed an appeal from the refusal of the first instance judge to grant that barring order.  The principal judgments were delivered by Ribeiro PJ and Lord Hoffmann NPJ, with both of whom the other justices agreed.  Both Ribeiro PJ and Lord Hoffmann contrasted the position of employees regarding confidential information with that of solicitors.    Lord Hoffmann said:

> "61. There is a very considerable difference between the position of a solicitor and an employee, even though the confidential information which they have obtained may be the same.  The solicitor will normally have many clients and will not be dependent upon one for his livelihood.  Even if the new client is important to him, he does not have to act for him in a matter in which he previously acted for the other side.  The employee can have only one employer at a time and, in the nature of things, his new employer is likely to be in the same line of business and therefore in competition with the previous one.  I therefore see no reason of logic or policy which requires the special remedy against solicitors to be extended to employees who have information which would be protected by [legal professional privilege].

> 63. … In the absence of an enforceable covenant, the courts do not interfere with the new activities of former employees.  There is no case in which they have done so.  Former solicitors (or forensic accountants) are different …"

59.    The plaintiff's claim in that case that the first defendant was in a position analogous to that of a solicitor was rejected on the facts since he offered the second defendant no legal advice whatever.  Ribeiro PJ expressly left open questions concerning possible relief against an in-house lawyer who changes jobs to take up a position on the other side of a contentious issue, or against a person who moves from employment as an in-house lawyer to private practice as a solicitor (or vice-versa) to act on the other side of a contentious matter.

60.    A similarly hostile reaction to an application for a barring order against a former employee, in the absence of a restrictive covenant, was taken by the Court of Appeal in  the very recent case of *Caterpillar Logistics Services (UK) Limited v Huesca de Crean* [2012] EWCA Civ 156.  The defendant had previously been employed by the defendant ("CLS") as an accountant.  Her contract of employment did not contain a restrictive covenant.  The Court of Appeal dismissed an appeal by CLS from the

judge's refusal of injunctions (both interlocutory and final) to prevent the defendant from disclosing certain information to her new employer and carrying out certain tasks for her new employer.  The claimant's case for a barring order was based on the submission that the defendant had been a fiduciary of CLS and the principles in *Bolkiah* applied.

61.    Stanley Burnton LJ said (at [49]) that there was nothing in Lord Millett's speech in *Bolkiah* "to justify the extension of the relief granted in that case … to the ordinary relationship of employer and employee", and that the principle for which *Bolkiah* is authority "is confined to solicitors and the like".  He observed (in [51]) that *Bolkiah* was applied by Floyd J in the present case to a patent attorney, and added that "patent attorneys share many of the characteristics of a litigation solicitor".  He referred to *PCCW* and quoted from the judgments in that case, including the passages in the judgment of Lord Hoffman set out above.  He said (at [58]) that the relationship between an employer and an employee is neither a fiduciary relationship nor a confidential one.  He quoted parts of the judgment of Elias J in *Fishel* to the effect that the employment relationship "is not a fiduciary relationship in the classic sense".

62.    Stanley Burnton LJ then gave his reasons for rejecting CLS' claim to a barring order, the first two of which were as follows.

> "60.  … The first [reason] is that as an employee she was not a fiduciary such as to be amenable to the jurisdiction to grant such relief. Clearly, the Court has power to grant such relief, but if it could ever be granted to an employer against an employee it could only be in the most exceptional circumstances, if at all. There is nothing exceptional in this case.
>
> 61.  The second reason is that this was not the relief for which CLS contracted. It could have required the respondent to enter into an express covenant not to enter the employment of a customer (or a competitor). Any such covenant would have had to be limited in time and reasonable as between the parties and in the public interest: it would have been a covenant in restraint of trade. It did not seek such a covenant, but instead obtained from the respondent her agreement in respect of its confidential information. …"

63.    He quoted the passage in the judgment of Cross J in *Printers & Finishers Ltd* cited in *Faccenda Chicken* (set out above), and then quoted the following passage in the judgment of Scott J in *Balston Ltd v. Headline Filters Ltd* [1987] FSR 330 at 351:

> "Employers who want to impose fetters of this sort on their employees ought in my view to be expected to do so by express covenant. The reasonableness of the covenant can then be subjected to the rigorous attention to which all employee covenants in restraint of trade are subject."

64.    Stanley Burnton LJ continued:

"64. In my judgment, it is no answer to say, as Mr [Selwyn] Bloch [counsel for CLS] did when the point was put to him, that it is not the practice for employers to contract for express covenants to prevent employees going to work for their customers. It seems that CLS was sufficiently concerned to protect its confidential information to require the respondent to enter into the confidentiality agreement, and it presumably designed that agreement to provide it with appropriate protection. Mr Bloch's answer is particularly inapt on the facts of the present case, where the respondent had left the employment of one of CLS's customers in order to work for it. Clearly, there was a possibility that she might return to work for that or some other customer. "

65.    He concluded, on the application for a barring order, as follows:

"65.  To my mind, it is not surprising that barring-out relief is unavailable in the present case. Mr Bloch accepted, as he had to, that the barring-out injunction sought by CLS would preclude the respondent from carrying out tasks in relation to the LSA that could not possibly involve the use of any of its confidential information. Placing an order, and raising a query as to delivery of spare parts to a customer of QH, are only two obvious examples. Mr Bloch submitted that if some of the work carried out by the respondent was innocent in this sense, but other work carried the risk of the misuse of CLS's confidential information, the respondent should be injuncted from both. In my judgment, this is the wrong way round. As between an employer and an employee, it is the former who is in the position of power, and who is able to protect its interests by requiring a suitable restrictive covenant. The law is concerned to protect the freedom of a former employee to use her knowledge and skills to her and the public's best advantage, unless it is shown that she has infringed, or has threatened to infringe, an enforceable right of her former employer. In other words, where the employee is innocent, in the absence of an express covenant, the former employer is not entitled to surround his rights with a penumbra of forbidden but innocent acts."

66.    Both Lewison and Maurice Kay LJJ agreed with Stanley Burnton LJ on that issue.

67.    It is difficult to extract from these cases a clear and consistent approach to the application of equitable principles for protecting confidential information in the context of a contract of employment.  That lack of clarity is reflected in the submissions that were made to the Judge in the present case, leading him to conclude that "the rule in *Bolkiah* applies to anyone in possession of confidential information". That is plainly not correct, as was recognised in the way this appeal has been argued, with a major issue being whether or not Mylan's in-house patent attorney received the relevant information as a fiduciary of Teva while in Teva's employment.  The lack of clarity is also reflected in the fact that the analysis in *Faccenda Chicken* was purely

on the contractual position, and there was no mention of equitable principles arising out of a fiduciary relationship between employer and employee; there was no mention of *Faccenda Chicken* in *Bolkiah* or *Fishel*; there was no mention of *Bolkiah* in *Helmet Integrated Systems*; and in *Caterpillar* there was omitted (it would appear deliberately, consistent with the concluding observations of Stanley Burnton LJ) the part of Elias J's judgment in *Fishel* in which he set out the test for establishing whether an employee was acting as a fiduciary and which was applied in *Helmet Integrated Systems*.

68.   It is appropriate to begin the analysis of the correct approach with some very basic observations.  The first is that, in the absence of a contract, equity will in appropriate circumstances protect the disclosure of information given in confidence: *Seager v Copydex Ltd* [1967] 1WLR 923.  Secondly, in the case of a contract of employment, and subject to any express terms, *Faccenda Chicken* lays down the principles as to the extent and nature of the employee's contractual duty not to use or disclose confidential information during the employment and after it has terminated.  Those principles reflect, as I have said, a compromise of policy considerations as to the protection of both the employer, on the one hand, and the employee, on the other hand.  Thirdly, if a person receives any information as a fiduciary for another, the information is held solely for the benefit of the beneficiary, unless the terms of the fiduciary relationship are qualified in some relevant way.

69.   The complication that has arisen in this field, since the Court of Appeal laid down the clear contractual principles in *Faccenda Chicken*, is the idea that those contractual principles are overridden by fiduciary obligations arising during employment and that those obligations are materially different from the implied contractual obligations elucidated by the Court of Appeal in that case.  It is possible to identify at least three sources for that idea, which together and separately have caused confusion.

70.   Firstly, Lord Millett, writing extra-judicially, has said that there are at least three distinct categories of fiduciary relationship which possess different characteristics and which attract different kinds of fiduciary obligation:  "*Equity's place in the law of commerce*" (1998) Vol. 114 LQR 214.  The first, which he said is the most important, is the fiduciary relationship of trust and confidence.  The second is the fiduciary relationship arising from influence, of which the defining characteristic is the vulnerability of one of the parties.  The third is what he described as "the relationship of confidence".  He said that this third category of fiduciary relationship arises whenever information is imparted by one person to another in confidence.  He said these different relationships may co-exist between the same parties at the same time. He gave as an example the solicitor and client relationship: it arises from a contract of retainer giving rise to a common law duty of skill and care, but at the same time it is a fiduciary relationship of trust and confidence, a fiduciary relationship of influence, and a relationship in which confidential information is entrusted to the solicitor in the course of a fiduciary relationship to be used for the benefit of the client and not the solicitor.  Lord Millett said:

> "There is a common thread to the fiduciary obligations to which these different fiduciary relationships give rise. It is the principle that a man must not exploit the relationship for his own benefit. This is what distinguishes a fiduciary relationship from a commercial one. What distinguishes the role of equity

> from that of the common law is that equity is proscriptive not
> prescriptive. It forbids the fiduciary to act for himself. It does
> not tell him what to do for his principal. And if, in breach of his
> fiduciary duty, he does act for himself, he is treated as if he had
> acted for his principal. In consequence, the remedies which
> equity makes available are very different from those which may
> be obtained at common law."

71.     Lord Millett did not address in those comments, or elsewhere in the article in which
        they were made, an employee's obligation of confidence.  He did not mention
        *Faccenda Chicken* or the principles and policy considerations which were considered
        in it.  His broad observation that a fiduciary relationship of confidence arises
        whenever information is imparted by one person to another in confidence plainly does
        not apply without qualification to a relationship of employer and employee since that
        would entirely undermine the fundamental distinction in *Faccenda Chicken* between
        the former employee's obligation to maintain the confidentiality of trade secrets, on
        the one hand, and his or her right to use or disclose other confidential information, on
        the other hand.  It is also clear that the example he gives of the fiduciary obligations
        arising in the relationship between client and solicitor was in the context of the
        retainer of a solicitor in private practice.

72.     Secondly, Elias J's decision in *Fishel*, which was the source of the fiduciary test
        approved by Moses LJ in *Helmet Integrated Systems*, was based on the analysis in
        Lord Millett's article.  In *Fishel* the claimant university sought an account of profits,
        or alternatively damages, for alleged breaches of fiduciary duties and breaches of
        contract by the defendant, a distinguished scientist employed by the university, who
        had earned substantial sums from sources of work outside the university.  Elias J
        found on the facts that the defendant was liable both for breach of contract and for
        breach of fiduciary duty.  It was not a case about the wrongful use or disclosure of
        confidential information.  In order to resolve the allegation of breach of fiduciary
        duty, however, Elias J subjected the employer and employee relationship to a
        penetrating and impressive analysis.  Having referred to Lord Millett's article, he said
        that Lord Millett's second and third categories of fiduciary relationship were not
        relevant to the case before him.  As to the third category, the receipt of confidential
        information, he nevertheless observed as follows:

> "Employees frequently fall into this latter category, because
> their work will often involve their being made privy to trade or
> business secrets of their employer. But although the existence
> of the employment relationship explains why the employee
> comes to be in possession of such information, and the contract
> of employment will define the purposes for which such
> information may be used, the employment relationship itself in
> such cases is really only incidental to the imposition of the
> fiduciary duties. As the Court of Appeal noted in *A-G v Blake*
> [1998] Ch.439 this fiduciary obligation of confidence often
> arises in the course of another fiduciary relationship but it is not
> derived from it. It is for this reason that the obligation of
> confidence can continue to subsist even when the employment

> relationship, and any fiduciary duties arising out of it, has terminated."

73.    Elias J did not refer anywhere, however, to *Faccenda Chicken*  or seek to resolve how the analysis in that case could be reconciled with what he considered would be the normality of an employee's enduring fiduciary position regarding all confidential information received by the employee regardless of the degree of secrecy or confidentiality involved.

74.    The principal part of Elias J's judgment was devoted to exploding the widely expressed, but plainly mistaken, view that the ordinary relationship between employer and employee is a fiduciary relationship.   His invaluable analysis in that regard focused on the identification of the duty to act in the interests of another as "the fundamental feature which, in [Lord Millett's first] category at least, marks out the relationship as a fiduciary one".   In that connection he said as follows:

> "The employment relationship is obviously not a fiduciary relationship in the classic sense. It is to be contrasted with a number of other relationships which can readily and universally be recognised as "fiduciary relationships" because the very essence of the relationship is that one party must exercise his powers for the benefit of another. Trustees, company directors and liquidators classically fall into this category which Dr. Finn, in his seminal work on fiduciaries, has termed "fiduciary offices". (See P.D Finn, ""Fiduciary Obligations" (1977)). As he has pointed out, typically there are two characteristics of these relationships, apart from duty on the office holder to act in the interests of another. The first is that the powers are conferred by someone other than the beneficiaries in whose interests the fiduciary must act; and the second is that these fiduciaries have considerable autonomy over decision making and are not subject to the control of those beneficiaries.
>
> By contrast, the essence of the employment relationship is not typically fiduciary at all. Its purpose is not to place the employee in a position where he is obliged to pursue his employer's interests at the expense of his own. The relationship is a contractual one and the powers imposed on the employee are conferred by the employer himself. The employee's freedom of action is regulated by the contract, the scope of his powers is determined by the terms (express or implied) of the contract, and as a consequence the employer can exercise (or at least he can place himself in a position where he has the opportunity to exercise) considerable control over the employee's decision making powers.
>
> This is not to say that fiduciary duties cannot arise out of the employment relationship itself. But they arise not as a result of the mere fact that there is an employment relationship. Rather they result from the fact that within a particular contractual relationship there are specific contractual obligations which the

employee has undertaken which have placed him in a situation where equity imposes these rigorous duties in addition to the contractual obligations. Where this occurs, the scope of the fiduciary obligations both arises out of, and is circumscribed by, the contractual terms; it is circumscribed because equity cannot alter the terms of the contract validly undertaken. …

The problem of identifying the scope of any fiduciary duties arising out of the relationship is particularly acute in the case of employees. This is because of the use of potentially ambiguous terminology in describing an employee's obligations, which use may prove a trap for the unwary. There are many cases which have recognised the existence of the employee's duty of good faith, or loyalty, or the mutual duty of trust and confidence - concepts which tend to shade into one another. As I have already indicated, Lord Millett has used precisely this language when describing the characteristic features which trigger fiduciary obligations. But he was not using the concepts in quite the same sense as they tend to be used in the employment field. Lord Millett was applying the concepts of loyalty and good faith to circumstances where a person undertakes to act solely in the interests of another. Unfortunately, these concepts are frequently used in the employment context to describe situations where a party merely has to take into consideration the interests of another, but does not have to act in the interests of that other.

….

Accordingly, in analysing the employment cases in this field, care must be taken not automatically to equate the duties of good faith and loyalty, or trust and confidence, with fiduciary obligations. Very often in such cases … there has been no need to decide whether the duties infringed, properly analysed, are contractual or fiduciary obligations. As a consequence, the two are sometimes wrongly treated as identical…

Accordingly, in determining whether a fiduciary relationship arises in the context of an employment relationship, it is necessary to identify with care the particular duties undertaken by the employee, and to ask whether in all the circumstances he has placed himself in a position where he must act solely in the interests of his employer. It is only once those duties have been identified that it is possible to determine whether any fiduciary duty has been breached …

It follows that fiduciary duties may be engaged in respect of only part of the employment relationship …"

75.     As I have said, that was the approach which Moses LJ took in *Helmet Integrated Systems*.  It does not, however, seem to have found favour with the Court of Appeal in

*Caterpillar,* which appears to have shown a general reluctance to colour the employee as a fiduciary in any respect.

76.    The Court of Appeal in *Attorney-General v Blake* [1998] Ch 439, to which Elias J referred in *Fishel*, expressed in its single judgment in remarkably expansive terms the view that the relationship between an employer and an employee is a fiduciary one: page 454B.  It also said that a fiduciary relationship of confidence arises whenever information is imparted by one person to another in confidence, "often, perhaps usually, imparted in the course of another fiduciary relationship such as that of employer and employee", and that, if so, the duty will survive the termination of the other relationship, for it is not derived from it:  page 454 F.  Once again, there was no reference to *Faccenda Chicken* in the judgment of the Court of Appeal.  For the reasons given by Elias J in *Fishel* the statement that the relationship between employer and employee is a fiduciary relationship cannot be correct.  No authority was cited by the Court of Appeal for the observation that, whenever information is imparted in confidence to an employee in the course of employment, it is held by the employee as a fiduciary.

77.    The third source for the idea that the implied contractual obligations of an employee with regard to confidential information are overlain by fiduciary duties which are more extensive than the contractual ones set out in *Faccenda Chicken* is the *Bolkiah* case itself.  *Bolkiah* has given rise to the argument that, if an employee has acquired information in a previous employment as a fiduciary, a barring order, such as that obtained in *Bolkiah,*  can be obtained even in the absence of a restrictive covenant circumscribing the employee's activities after termination of the employment.  It has also given rise to the argument (which was run but failed on the facts in *PCCW*) that, if a person such as a solicitor or a patent attorney would have been a fiduciary and subject to fiduciary duties if acting pursuant to a retainer while in private practice, then they should be similarly regarded if employed to carry out the same functions. The policy considerations applying to the use or disclosure of a former client's confidential information by the client's former solicitor (or others, like forensic accountants falling to be treated in the same way as solicitors) in private practice are, however, very different to those applying between employer and employee.  As Lord Hoffmann observed in *PCCW* in the passage I have quoted above, the solicitor in private practice will normally have many clients and can pick and choose for which of them to act.  By contrast, employees, including an employed solicitor (and others in a like position) are contractually bound to a single employer and, in the course of their career will need to take with them the knowledge, skill and experience acquired in the course of that career so as to perform similar tasks for each new employer.

78.    Arguments have also been raised, in the present case as in others, that comments of Lord Millett in *Bolkiah* (eg at pp. 234C and 236H) show that one of the reasons why solicitors, including employed solicitors, owe fiduciary duties in respect of confidential information is because communications between solicitors and their clients or employers enjoy legal professional privilege.  The point is relevant on the facts of the present case because communications between patent attorneys and their clients or employers are also privileged from disclosure in legal proceedings: Copyright, Designs and Patents Act 1988 s. 280 (as amended).  There is, however, no connection between the public policy underlying legal professional privilege and the issue of whether and when an employed solicitor or a patent attorney owes fiduciary

duties to the employer.  The argument to the contrary was rightly roundly rejected in *PCCW*.  In that case counsel for the claimant sought to argue that legal professional privilege was of such importance that it trumps all other policies, including those against restraint of trade and in favour of freedom of employment.  In rejecting the argument, Lord Hoffmann said as follows:

> "37.    I am unable to accept this argument.  The cases which characterise legal professional privilege as absolute and as a predominant public interest are concerned with maintaining the inviolability of privileged communications against competing policies in favour of compulsory disclosure of the relevant information.  Such issues are not engaged in the present case.  No one is suggesting that Mr Aitken is entitled or can be compelled to divulge or use for CSL's benefit PCCW's privileged information to which he is privy.  The respondents accept that they must abide by the Judge's orders against any disclosure or misuse.  This appeal is concerned with the nature and scope of the relief available to PCCW to maintain the confidentiality of information acquired by Mr Aitken as a former employee, an area where the policy against restraint of trade is of central importance.  Since issues concerning compelled disclosure of privileged information do not arise, there is no conflict with that policy and no question of it being "trumped" by policies sustaining the high importance of legal professional privilege.

79.    It is possible to find a way through this thicket of confusion.  Firstly, at the level of the Court of Appeal, it is necessary to accept that the receipt of confidential information by an employee in the course of employment gives rise to fiduciary duties by the employee in respect of the use and disclosure of that information.  *Attorney-General v Blake* is Court of Appeal authority to that effect notwithstanding that the relationship of employer and employee was incidentally incorrectly described in that case as a fiduciary one.

80.    Secondly, however, and critically, the nature and scope of the fiduciary obligations are coloured and restricted by, that is to say they must reflect, the contract between the employer and the employee.  In the well-known statement of Mason J in the High Court of Australia in *Hospital Products Ltd. V United States Surgical Corporation* (1984)156 CLR 41 at 97:

> "That contractual and fiduciary relationships may co-exist between the same parties has never been doubted. Indeed, the existence of a basic contractual relationship has in many situations provided a foundation for the erection of a fiduciary relationship. In these situations it is the contractual foundation which is all important because it is the contract that regulates the basic rights and liabilities of the parties. The fiduciary relationship, if it is to exist at all, must accommodate itself to the terms of the contract so that it is consistent with, and conforms to, them. The fiduciary relationship cannot be superimposed upon the contract in such a way as to alter the

> operation which the contract was intended to have according to
> its true construction."

81.    Thirdly, accordingly, the implied contractual terms as to the disclosure and use of confidential information by an employee elucidated by the Court of Appeal in *Faccenda Chicken* also define the extent of the employee's fiduciary obligations. This means that the fiduciary duties arising from receipt of the confidential information in practice add nothing to the contractual duties except in relation to remedies.  Subject to the express terms of the contract of employment, fiduciary duties, like the implied contractual duties, extend during the currency of the employment to all the confidential information received by the employee, but, after the employment has terminated, the fiduciary duties continue to extend only to information that carries a sufficiently high degree of confidentiality to amount to a trade or business secret.  In the case of employed solicitors, and others in a like position, the nature of their work may mean that a higher proportion than usual of the information they receive falls into the latter category.  One important difference between the contractual position and the fiduciary position is in relation to remedies. Although the speeches of the House of Lords in *Attorney-General v Blake* [2001] 1 AC 268 and the judgments of the Court of Appeal in *Experience Hendrix v PPX Enterprises Inc* [2003] EWCA Civ 323 show that an account of profits may be awarded for breach of contract in exceptional circumstances, an account of profits is a conventional remedy for breach of fiduciary duty.

82.    Fourthly, so far as concerns a barring order, there is no good reason to import into the employment field and to place on the former employee the *Bolkiah* evidential burden of proving the absence of any real risk of disclosure.  On the contrary, there are good reasons not to do so.  There is a long-established line of authority that, if an employer wishes to restrict the activities of an employee after termination of the employment, that should be done by a legally valid restrictive covenant.  This is because the employee must know with certainty what it is that the employee will be able to undertake for any new employer or otherwise in furtherance of the employee's career; and any new employer will want to know the same; the employee is entitled to deploy in furtherance of his or her career the general experience, skill and knowledge acquired in the course of it; and it may be, and probably will be, difficult to disentangle in relation to any new employment or other career activity protected confidential information, on the one hand, and other information which it is lawful for the former employee to use or disclose, on the other hand.  These are the inevitable consequences of an employee pursuing a career in which the same tasks are carried out and skills are deployed in successive employments.  They apply as much to an employed solicitor or, for that matter, an employed patent attorney as to any other employee.

83.    That is not to say that a barring order can never be made against a former employee if the former employer proves that trade or business secrets (or, in the case of a legally valid express term, other confidential information), which are subject to continuing contractual and fiduciary duties after termination of the employment, are likely to be disclosed or wrongly used by the former employee.  For the reasons I have just given, however, in the absence of a restrictive covenant that can only be in a most exceptional case.  Depending on the precise facts, it might apply in the type of case to which Ribeiro PJ referred in *PCCW*, such as an employed solicitor acting in a

sensitive and confidential role for the employer on a currently contentious matter and then taking up a position in a similar capacity working for the other side on the same contentious matter.

84.     It follows that, in my judgment, although quite understandable in view of the way the matter was argued before him, the Judge in the present case was wrong to conclude that, merely because the relevant information was confidential and privileged, and there was a risk that the information might be disclosed or wrongly used by Mylan's in-house patent attorney, a barring order should be made against her.

85.     On the facts of the present case, the relevant information was not sufficiently secret or confidential to amount to a trade or business secret in the *Faccenda Chicken* sense. Unlike the position in that case, however, the obligations of Mylan's in-house patent attorney to respect and maintain confidentiality do not turn on implied terms of her contract of employment.  Her contract of employment contained the following express provision, so far as relevant:

> "You will not during your employment or at any time afterwards, save where authorised by an Executive Director, divulge or communicate, use or misuse any confidential information of the Employer obtained by virtue of your employment.  You acknowledge that confidential information shall include, but is not limited to, lists or details of clients, employees or suppliers, details of contractual agreements, prices, commercial relationships or information concerning the business accounts, affairs, methods or finances of the employer."

86.     In view of the second sentence in that clause it is clear that, as a matter of interpretation, the expression "confidential information" in the clause is not confined to trade or business secrets in the *Faccenda Chicken* sense.  In Mylan's confidential supplementary skeleton argument it was submitted that the clause is an unlawful restraint of trade, at least insofar as it seeks to protect for an unlimited time and without any geographical restriction the confidentiality of information which is not a trade or business secret in the *Faccenda Chicken* sense.  The point was not addressed in any detail, however, in oral submissions, probably because the time allowed for the hearing of the appeal was manifestly too short.  In view of the general importance of the point, the lack of full oral submissions on it, and the existence of other grounds for allowing the appeal, I shall not express my view on the point.  I shall proceed on the assumption that Mylan's in-house patent attorney's employment contract with Teva protects the relevant information from disclosure even after the termination of her employment with Teva if the information is confidential.

87.     Mylan's in-house patent attorney had no responsibility for any Copaxone related oppositions or litigation while working Teva.  The Judge referred to two email chains on which the respondents rely as containing or connected with confidential information received by Mylan's in-house patent attorney and justifying the barring order against her.  The Judge made no finding on the confidentiality of the information to which one of those email chains related.  The confidentiality of the information to which the other email chain related may fairly be described as

exiguous, at best.   Like Jacob LJ, I have set out in a Confidential Appendix my detailed assessment of the confidentiality of the relevant information.

88.   What is clear is that a mere suspicion on the part of the Judge that "[Mylan's in-house patent attorney's] memory of [the relevant information on which the respondents rely] may be at the back of her mind and may … unconsciously … in fact influence her strategy and conduct and the consequent instructions she gives in the case" falls well short of satisfying the burden on Teva to prove a real risk that the information would be used or disclosed by Mylan's in-house patent attorney in connection with her role in the conduct of these proceedings.

89.   Moreover, the effect of the injunction would be to prevent Mylan's in-house patent attorney carrying out perfectly lawful activities for Mylan, and using her general skill and knowledge as a patent attorney in her current employment.   This is not an exceptional case in which, in the absence of a restrictive covenant, it would be right to make a barring order against an employee.

90.   For all those reasons I would allow this appeal.

## Confidential Appendix

…

## Lord Justice Ward:

91.   This appeal arises out of a claim brought early in 2011 by Generics (UK) Ltd ("Generics") for the revocation of, and a declaration of non-infringement of, the European Patent of a product (Copaxone used in the treatment of multiple sclerosis) marketed by Teva Pharmaceutical Industries Ltd ("Teva") under an exclusive licence from Yeda Research and Development Company Ltd ("Yeda").   In the course of that action Generics applied on 15th November 2011 for an order that it be permitted to provide its Director of Intellectual Property, with copies of documents disclosed by Yeda and Teva which had been designated as confidential.

92.   Mylan's in-house patent attorney was formerly employed by Teva.   She is a chartered United Kingdom and European patent attorney and patent attorney litigator.   From 2008 until February 2011 her work for Teva gave her responsibility for European oppositions.   In February 2011 she joined Generics where she took responsibility for managing its European patent matters, including litigation, oppositions and prosecutions with respect to a portfolio of products.   She became the person charged with the day-to-day management of the Copaxone litigation in the United Kingdom. She was the only internal member of Generics' Copaxone litigation team in the United Kingdom and was the person most familiar with the matter in this jurisdiction.

93.   The defendants, Yeda and Teva, objected to these confidential documents being disclosed to her, contending that during the course of her employment with them, she had become privy to confidential information concerning or potentially concerning the Copaxone litigation.   They accordingly applied on 21st November 2011 for an order that Generics should cease to act by, or otherwise seek assistance or advice from, its Director of Intellectual Property, Mylan's in-house patent attorney, in relation to that action.   On 25th November 2012 Floyd J. granted that order.

94. Floyd J. held that he should approach the application in accordance with the principles established by *Prince Jefri Bolkiah v KPMG* [1999] 2 A.C. 222. His conclusion was:

> "26. I have not found this an altogether easy question to decide, but I have reminded myself that the threshold is not a particularly high one. It seems to me that communications of this type which I have considered are by their very nature confidential and privileged. The communications are not central to the litigation with which this court is concerned, though they are, I think, relevant to it. I think there is a risk in the present case that if [Mylan's in-house patent attorney] continues to act on behalf of Generics her memory of events such as those to which I have referred … may be at the back of her mind and may, I suspect unconsciously, nevertheless in fact influence her strategy and conduct and the consequent instructions she gives in this case."

95. That finding is under attack in this appeal. Like Etherton L.J., I agree with Sir Robin Jacob that the alleged confidential information was at most peripheral to the Copaxone litigation. There was, moreover, no real risk of misuse of that information. Having come to a firm conclusion about that which is dispositive of this appeal, I was ready to agree and did agree at the end of the oral hearing before us that the appeal should be allowed. We informed the parties we would give our reasons in writing later.

96. Since the respondents failed to prove that Mylan's in-house patent attorney was in possession of any relevant confidential information I would not, for my part, wish to go any further. I am, therefore, most reluctant to adjudicate between the characteristically forceful common sense judgment of Sir Robin Jacob (who concludes that the *Bolkiah* principles apply to a former employed litigator as they do to a former privately engaged litigator) and the characteristically erudite judgment of Etherton L.J. (who holds that the *Bolkiah* rules do not apply to such employees). My reluctance is compounded by the fact that, given the urgency with which the matter was listed before us, time was restricted and counsel did not have the opportunity to marshal their arguments to cover the wide ground exposed by Etherton L.J. My views must, therefore, be taken as tentative at best. Taking a very broad view I share the concerns expressed by Etherton L.J.

97. I believe we would all agree that a solicitor, whether a former in-house lawyer or even an assistant in private practice, who is in possession of highly confidential information about his former employer or a client of his former firm, would be restrained from acting against the interests of the employer/client. That injunction would be granted whether one applied *Bolkiah* or relied on *Faccenda Chicken Ltd v Fowler* [1987] 1 Ch. 117. The difference between the two approaches has significance only at the margins. In a finely balanced case the burden of proving the real risk of harm of disclosure shifts to the solicitor in the *Bolkiah* case. That could be of vital importance. Take the present case: how can Mylan's in-house patent attorney show that she will not even subconsciously use confidential information when she genuinely does not know she has any confidential information to disclose? Given that we should not generate a modern state of commercial slavery (especially for young

solicitors keen to advance their careers by changing jobs) I feel obliged to express my views, tentative though they may be.

98.   The first question is whether a patent attorney can be equated with a solicitor.  I have no problem in agreeing that the patent attorney stands in the same position as a solicitor and that, therefore, an employed in-house patent attorney must be treated the same as an employed in-house solicitor.

99.   The next question is whether an employed solicitor (and henceforth I embrace patent attorneys with solicitors) is in the same position as a solicitor in private practice. (Perhaps the better way of elucidating the problem that troubles me is to ask whether a solicitor in private practice is in the same position as an employed in-house solicitor.)  I accept that for some and perhaps for most purposes they are equal.   I cannot and I do not dispute that:

> "They [salaried legal advisers] are regarded by the law as in every respect in the same position as those who practice on their own account.  The only difference is that they act for one client only, and not for several clients.  They must uphold the same standards of honour and of etiquette.  They are subject to the same duties to their client and to the court.  They must respect the same confidences.  They and their clients have the same privileges."

So said Lord Denning M.R. in *Crompton Ltd v Customs & Excise Commissioners* [1972] 2 Q.B. 102, 129.  But I respectfully venture to think that those observations must be seen in context.  The issue there was a narrow one: could legal professional privilege be claimed for bundles of documents consisting of communications between the Commissioners and their legal department.   The case draws the distinction between work done by a legal adviser which is of an executive nature which is not the subject of legal professional privilege and work done qua solicitor which must be treated as such.

100.   Our case involves much wider issues than privilege: specifically, but narrowly, can the former employer bar a former in-house solicitor from acting against it?  The judgments of my Lords give rise to wider questions: is the position of the solicitor different depending upon whether he is (1) an in-house solicitor employed by a commercial organisation, or (2) a partner in a firm of solicitors in private practice or, at a further remove, (3) an employed assistant solicitor who is not a member of the firm which is retained by the client whose confidential information is at risk.  There are obvious differences between them.   The essential nature of the relationship between the in-house solicitor and his employer is that of employer-employee and is governed by the terms of their contract of employment.  The relationship between the solicitor's firm and its client is established by the terms of the retainer but it is a special relationship from which fiduciary duties flow.  The assistant solicitor is an employee of the firm bound by the terms of his contract of employment but he has no contractual relationship with the clients of the firm.  He may – or he may not – be clothed with the same fiduciary duties *to the client* as are owed by the firm quite apart from fiduciary duties owed to the firm.  Overarching all of this are the professional responsibilities which all solicitors are bound by their professional codes of conduct to observe.

101.   When the employed solicitor gives advice to or conducts litigation for the commercial organisation which employs him, he may be conducting himself as a solicitor (because that is what he is employed to do) but is advising his employer, not his client, and is conducting proceedings for his employer, not for a client. He may be acting as a solicitor with all the duties and responsibilities that flow from his so-acting, but the employer is not truly his client. He is bound by a contract of employment, not by the terms of a retainer. That contract is, therefore, to be the primary source of the obligations which the employer wishes to impose on his employee, including in particular, covenants in restraint of trade. How does *Bolkiah* apply to him? *Bolkiah* clearly applies to the firm of solicitors and if it applies to the firm I venture to think it applies equally to at least the partner of the firm with conduct of the client's case. But do the *Bolkiah* rules apply to an assistant solicitor in that firm when he moves to a firm acting against a client of his former employers? Can the client restrain him from doing his job for his new firm?

102.   What is the rationale for *Bolkiah*? Although, as Lord Millett says at p.234 G-H, the basis of the court's jurisdiction to intervene on behalf of a former client is the protection of confidential information, it does not end there. Underpinning *Bolkiah* is the public interest in the proper administration of justice:

> "It is … difficult to discern any justification in principle for a rule which exposes a former client without his consent to any avoidable risk, however slight, that information which he has imparted in confidence in the course of a fiduciary relationship may come into the possession of a third party and be used to his disadvantage. Where, *in addition the information in question is not only confidential but also privileged,* the case for a strict approach is unanswerable. Anything less fails to give effect to the policy *on which legal professional privilege is based.* It is of overriding importance for the proper administration of justice that a client should be able to have complete confidence that what he tells his lawyer will remain secret. This is a matter of perception as well as substance. It is of the highest importance to the administration of justice that a solicitor or other person in possession of confidential *and* privileged information should not act in any way that might appear to put that information at risk of coming into the hands of someone with an adverse interest:" per Lord Millett at p. 236H.

(I have added the emphasis because it *may* be the due administration of justice demands the protection of information which is privileged only and that confidential information received by a solicitor which is not also privileged (though it is not easy to see how that distinction could be made) falls outside this protection. I shall assume the ordinary day to day dealings between a solicitor and his employer/client are covered. )

103.   This passage was cited in *PCCW-HKT Telephone Ltd v Aitken* [2009] 2 HKLRD 274 to support an argument that legal professional privilege was of such importance that it trumps all other policies, including those against restraint of trade and in favour of freedom of employment. Lord Hoffmann was unable to accept that argument. The issue was not engaged in that case because no one was suggesting that Mr Aitken, a

solicitor formerly in the appellant's employment, was entitled or could be compelled to use for his new employer's benefit privileged information to which he was privy. Lord Hoffmann said at p.288: "Since issues concerning compelled disclosure of privileged information do not arise, there is no conflict with that policy [the policy against restraint of trade] and no question of it being "trumped" by policies sustaining the high importance of legal professional privilege."

104.    The principle of public policy that any unreasonable restraint of trade is unenforceable is well established. It was authoritatively determined by Lord Macnaghten in the *Nordenfelt Case* ([1984] A.C. 535, 565), as it is, for the sake of brevity, commonly called:

> "The true view at the present time, I think, is this: The public have an interest in every person's carrying on his trade freely: so has the individual. All interference with individual liberty of action in trading, and all restraints of trade of themselves, if there is nothing more, are contrary to public policy, and therefore void. That is the general rule. But there are exceptions: restraints of trade and interference with individual liberty of action may be justified by the special circumstances of a particular case. It is sufficient justification, and indeed it is the only justification, if the restriction is reasonable – reasonable, that is, in reference to the interest of the parties concerned and reasonable in reference to the interest of the public, so framed and so guarded as to afford adequate protection to the party in whose favour it is imposed, while at the same time it is in no way injurious to the public."

*Herbert Morris v Saxelby* [1916] A.C. 688 is the leading authority applying this principle to employer and employee.

105.    Lord Millett in *Bolkiah* simply cannot be thought to be undermining this rule in any way. The case had nothing to do with the duties of employed solicitors. Lord Millett identified the question in that case to be:

> "whether, and if so in what circumstances, a firm of accountants which has provided litigation support services to a former client and in consequence has in its possession information which is confidential to him can undertake work for another client with an adverse interest. The question has become of increased importance with the emergence of huge international firms with enormous resources that operate on a global scale and offer a comprehensive range of services to clients," (p. 228).

Not allowing KPMG to shield behind a Chinese wall is a far cry from preventing a young employed in-house solicitor, still less, for example, an assistant solicitor in the litigation department of a large firm, advancing his or her career by moving to another employer or another firm. They should be free to move unless their previous employer can justify the restraint upon them: they should not be required to justify their freedom of movement.

106.     If and in so far as there is any tension between the two principles of public policy, and in my view there is, it seems to me that the protection of freedom of employment, being of more general application, should prevail.  Giving precedence to freedom of movement and trade should not seriously undermine the administration of justice.  If the employer's contract governs the use (or rather the misuse) of confidential information and includes a legitimate restraint of trade, then so be it.  The employer will have availed himself of the opportunity to regulate matters between him and his employee.  Outside of the contract and independently of it a duty of confidence may be imposed on an employee simply by virtue of being entrusted with confidential information.  If that information is "of a sufficiently high degree of confidentiality as to amount to a trade secret", per Neill L.J. in *Faccenda Chicken Ltd v Fowler* [1987] Ch. 117, 136, the duty of confidence continues after the termination of the contract of employment.  Given the nature of a solicitor's duties it is not difficult to see that there may be cases where the former employed solicitor has such vital information that in the interests of the proper administration of justice it will be appropriate for the court to grant an injunction to bar the solicitor from acting in competition with his former employer, or his former employer's client.  In a blatant case of that kind the administration of justice will prevail over the liberty to carry out one's profession freely.  Whether the balance of convenience will tip the scales in favour of the grant of a barring order, draconian as that may be, will, of course, depend on the facts and circumstances of each case.

107.     Thus my instinct is to uphold the liberty to ply one's trade freely and that leads me to prefer to judge any application by the former employer to bar an employed patent agent or solicitor from taking up or performing a new contract of service with a competitor on conventional employer/employee lines whilst at the same time recognising that protecting the administration of justice may justify the restraint of trade as a "special circumstance" of the case (per Lord Macnaghten) or may make the case exceptional enough to fall outside the general rule espoused in *Caterpillar Logistics Services (UK) Ltd v de Crean* [2012] EWCA Civ 156.   The client of the firm which used to employ the assistant solicitor has no contract on which to rely: the client's cause of action is for breach of confidence.   Good reason should be established to interfere with the liberty to work and so the client should show cause why he is entitled to an order restraining trade.   The search for justice should not require a former employed solicitor or an assistant solicitor to prove a negative and show there is no risk that confidential information will fall into the possession of those with an adverse interest to his former employer/client as required by *Bolkiah.*

121.     I acknowledge this may be a simplistic approach to the problem.   Etherton L.J. reaches a similar conclusion in a much more principled way and is very persuasive in doing so.   He certainly convinces me that there is "a thicket of confusion" surrounding this topic which, through no fault of counsel, was not fully developed in argument.  If Sir Robin Jacob is right, the ramifications for the legal profession as a whole, from partners, assistants and even trainees, are important enough for us to reserve our fully considered judgments for another case and another day when full argument will guide through the thicket.

122.     That said, I am still satisfied that this appeal should be allowed.

Lewin on Trusts, 20th Ed.
(Sweet & Maxwell, 2020), Part One

*TRUSTS, WILLS AND PROBATE LIBRARY*

# LEWIN ON TRUSTS

### *TWENTIETH EDITION*

*But they thinke it against al right and iustice, that men shuld be bound to those laws, which other be in numbre mo then be able to be readde, or els blinder and darker, then that any man can well understand them.*

Sir Thomas More
Bencher of Lincoln's Inn
*Utopia*, book II

BY

### LYNTON TUCKER, M.A., B.C.L.
*Barrister of Lincoln's Inn*

### NICHOLAS LE POIDEVIN, Q.C., M.A., LL.B.
*Bencher of Lincoln's Inn*

### JAMES BRIGHTWELL M.A., LL.M.
*Barrister of Lincoln's Inn*

EDITOR

### THOMAS FLETCHER, M.A., LL.M.
*Barrister of The Inner Temple*

ASSISTANT EDITOR

### AIDAN BRIGGS, B.A.
*Barrister of The Inner Temple*

SPECIAL CONTRIBUTOR

### SIMON ADAMYK, M.A., LL.M.
*Barrister of Lincoln's Inn*

**SWEET & MAXWELL**     

# *PART ONE*

# DEFINITION, CLASSIFICATION AND CREATION OF TRUSTS

CHAPTER 1

## DEFINITION AND CLASSIFICATION

*"And being always surrounded by a great number of nieces and nevys, as was always a-quarrelling and fighting among themselves for the property, he makes me his executor and leaves the rest to me in trust, to divide it among 'em as the will provided."*

*"Wot do you mean by leavin' it on trust?" inquired Sam, waking up a little. "If it ain't ready money, where's the use on it?"*

*"It's a law term, that's all," said the cobbler.*

*"I don't think that," said Sam, shaking his head. "There's wery little trust at that shop."*

Charles Dickens, *The Pickwick Papers*, Chapter 44

1.   DEFINITION OF A TRUST
     Definitions and descriptions  . . . . . . . . . . . . . . . . . . . . . . .   1-001
     A general judicial definition  . . . . . . . . . . . . . . . . . . . . . .   1-002
     Keeton and Sheridan's definition  . . . . . . . . . . . . . . . . .   1-003
     Sir Arthur Underhill's definition  . . . . . . . . . . . . . . . . . .   1-004
     Enforceable by beneficiaries  . . . . . . . . . . . . . . . . . . . . .   1-005
     A proprietary relationship  . . . . . . . . . . . . . . . . . . . . . . .   1-006
     Trustee may be a beneficiary  . . . . . . . . . . . . . . . . . . . . .   1-009
     Types of trust property  . . . . . . . . . . . . . . . . . . . . . . . . .   1-010
     Trusts enforceable in equity  . . . . . . . . . . . . . . . . . . . . .   1-011
     Personal representatives  . . . . . . . . . . . . . . . . . . . . . . . .   1-012
     Settled Land Act Trustees  . . . . . . . . . . . . . . . . . . . . . . .   1-013
     Settlement and will  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1-014
     Trust and contract  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1-017
        Trust or contract debt  . . . . . . . . . . . . . . . . . . . . . . .   1-017
        Trusts in commercial transactions  . . . . . . . . . . . . . .   1-020
     Trust and agency  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1-021
     Trust and bailment  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1-023
     Trust and foundation  . . . . . . . . . . . . . . . . . . . . . . . . . .   1-024
     Unique features stated in civilian terms  . . . . . . . . . . . .   1-027
2.   CLASSIFICATION OF TRUSTS
     Bare or simple trusts and special trusts  . . . . . . . . . . . .   1-028
     Fixed and discretionary trusts and powers  . . . . . . . . . .   1-029
     Lawful and unlawful trusts  . . . . . . . . . . . . . . . . . . . . . .   1-030
     Public and private trusts  . . . . . . . . . . . . . . . . . . . . . . . .   1-031
     Completely and incompletely constituted trusts  . . . . .   1-032
     Express trusts and trusts arising by operation of law  . .   1-033
     Resulting, implied and constructive trusts  . . . . . . . . . .   1-034
     Executed and executory trusts  . . . . . . . . . . . . . . . . . . .   1-035

[3]

3. CLASSIFICATION OF EQUITABLE INTERESTS UNDER TRUSTS

Absolute indefeasible interest in possession under a
    bare or simple trust  . . . . . . . . . . . . . . . . . . . . . . . .  1-036
  Absolute beneficiary's right to direct transfer of trust
      property  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-037
  Administrative directions by absolute beneficiary
      pending transfer  . . . . . . . . . . . . . . . . . . . . . . . .  1-038
  Powers of trustee for absolute beneficiary  . . . . . . . .  1-040
  Express powers conferred on trustee for absolute
      beneficiary  . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-041
  Absolute trust for minor  . . . . . . . . . . . . . . . . . . . .  1-042
  Trustee's own interest—unsatisfied rights of
      indemnity  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-043
  Custodian trustee  . . . . . . . . . . . . . . . . . . . . . . . . .  1-044
  Two or more persons absolutely entitled  . . . . . . . . .  1-045
  Sub-trusts of absolute trusts  . . . . . . . . . . . . . . . . . .  1-046
  Liability for knowing receipt  . . . . . . . . . . . . . . . . . .  1-047
Vested interests  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-048
  Indefeasible and defeasible vested interests  . . . . . . .  1-049
  Vested interest defeasible by prior or concurrent
      interest  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-050
  Vested interest defeasible by exercise of overriding
      power of appointment  . . . . . . . . . . . . . . . . . . . . .  1-051
  Terminable vested interests  . . . . . . . . . . . . . . . . . . .  1-052
  Fine distinctions between contingent and vested
      defensible interests  . . . . . . . . . . . . . . . . . . . . . .  1-053
  Practical significance of the distinction between
      contingent and vested defeasible interests  . . . . . .  1-054
Contingent interests  . . . . . . . . . . . . . . . . . . . . . . . . .  1-055
  Trusts for children  . . . . . . . . . . . . . . . . . . . . . . . . .  1-056
  Gift to a class upon a contingency and a gift to a
      contingent class  . . . . . . . . . . . . . . . . . . . . . . . . .  1-057
Unascertained interests  . . . . . . . . . . . . . . . . . . . . . . .  1-058
  Practical importance of the distinction between
      contingent and unascertained interests  . . . . . . . . .  1-059
  Endurance of the distinction between contingent and
      unascertained interests  . . . . . . . . . . . . . . . . . . . .  1-060
Discretionary interests  . . . . . . . . . . . . . . . . . . . . . . .  1-061
  Employee benefit trusts  . . . . . . . . . . . . . . . . . . . . .  1-063
Interests in possession  . . . . . . . . . . . . . . . . . . . . . . . .  1-065
Reversionary interests  . . . . . . . . . . . . . . . . . . . . . . . .  1-069
Entailed interests  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-072
  General characteristics of an entail before 1926  . . .  1-072
  Effect of the 1925 property legislation  . . . . . . . . . . .  1-074
  Effect of the Trusts of Land and Appointment of
      Trustees Act 1996  . . . . . . . . . . . . . . . . . . . . . . .  1-075

# 1. DEFINITION OF A TRUST

## Definitions and descriptions

The typical case of a trust is one in which the legal owner of property is constrained by a court of equity so to deal with it as to give effect to the equitable rights of another,[1] but there is no really satisfactory definition. Various definitions have been proposed but they contain large (though incomplete) elements of mere description. The first is from an international convention,[2]

> "For the purposes of this Convention, the term "trust" refers to the legal relationship created—*inter vivos* or on death—by a person, the settlor, when assets have been placed under the control of a trustee for the benefit of a beneficiary or for a specified purpose.[3]
> A trust has the following characteristics—
>
> (a) the assets constitute a separate fund and are not a part of the trustee's own estate;
> (b) title to the trust assets stands in the name of the trustee or in the name of another person on behalf of the trustee;
> (c) the trustee has the power and the duty, in respect of which he is accountable, to manage, employ or dispose of the assets in accordance with the terms of the trust and the special duties imposed upon him by law.
>
> The reservation by the settlor of certain rights and powers, and the fact that the trustee may himself have rights as a beneficiary, are not necessarily inconsistent with the existence of a trust."

Instead of transferring assets under the control of someone else as trustee, the settlor can declare himself to be a trustee.[4] With that addition, all trusts are within this definition. By a deliberate decision,[5] however, it was made wide enough also to include analogous institutions of foreign law.[6] These are not included in the usual meaning of "trusts" in the law of England and Wales, which does not include analogous common law or statutory institutions of that law.[7]

**1-001**

---

[1]  *Re Astor's Settlement Trusts* [1952] Ch. 534 at 541, *per* Roxburgh J.; *Westdeutsche Landesbank Girozentrale v Islington L.B.C.* [1996] A.C. 669 at 705, 709, *per* Lord Browne-Wilkinson.

[2]  Art.2 of the Convention on the Law Applicable to Trusts and on Their Recognition, enacted as part of English law (apart from some Articles) and extended by the Recognition of Trusts Act 1987, printed in its Schedule and ratified in several other jurisdictions. See Chap.12. The definition has been enacted as part of the general law of Bermuda: Trusts (Special Provisions) Act 1989, s.2, and the British Virgin Islands: Trustee Act 1961, s.2(2)-(4) inserted by the Trustee (Amendment) Act 1993. (Note the extension in s.2(5).) Contrast the very wide definition in Trusts (Jersey) Law 1984 (revised edn, 2019), art.2; Trusts (Guernsey) Law 2007, s.1.

[3]  The purpose will usually be a charitable purpose, but trusts for a narrow class of other purposes may be valid, see §§ 5-052 to 5-067. Charitable trusts are not dealt with in this work, see § 1-031.

[4]  See §§ 3-004 onwards, and on this aspect of the convention § 12-081.

[5]  Explanatory Report by Alfred E. von Overbeck, para.26.

[6]  Harris, *The Hague Trusts Convention*, puzzles over these institutions at pp.103 onwards.

[7]  See, for example *Re Deans* [1954] 1 W.L.R. 332 (President of Probate Division was not a trustee of estates vested in him by statute); *Tito v Waddell (No.2)* [1977] Ch. 106 at 122 (statutory arrangement a trust in higher sense only); and consider the case of bailment, see § 1-011.

### A general judicial definition

**1-002**    An Australian judge, Mayo J. gave[8] a general definition which also applies in England and Wales. He said:

> "No definition of a 'trust' seems to have been accepted as comprehensive and exact[9] … Strictly it refers, I think, to the duty or aggregate accumulation of obligations[10] that rest upon a person described as a trustee. The responsibilities are in relation to property held by him, or under his control. That property he will be compelled by a court in its equitable jurisdiction to administer in the manner lawfully prescribed by the trust instrument, or where there be no specific provision written or oral, or to the extent that such provision is invalid or lacking, in accordance with equitable principles. As a consequence, the administration will be in such a manner that the consequential benefits and advantages accrue, not to the trustee, but to the persons called *cestuis que trust*,[11] or beneficiaries, if there be any, if not, for some purpose which the law will recognise and enforce. A trustee may be a beneficiary, in which case advantages will accrue in his favour to the extent of his beneficial interest."

### Keeton and Sheridan's definition

**1-003**    The most satisfactory textbook definition is similar. Keeton and Sheridan[12] say:

> "A trust is the relationship which arises whenever a person (called the trustee) is compelled in equity to hold property, whether real or personal, and whether by legal or equitable title, for the benefit of some persons (of whom he may be one and who are termed beneficiaries) or for some object permitted by law, in such a way that the real benefit of the property accrues, not to the trustees, but to the beneficiaries or other objects of the trust."

---

8    *Re Scott* [1948] S.A.S.R. 193 at 196. For other judicial definitions see *Wilson v Lord Bury* (1880) 5 Q.B.D. 518 at 530–531, *per* Brett L.J. (trust or contract); *Smith v Anderson* (1880) 15 Ch.D. 247 at 275, CA, *per* James L.J. (meaning of trustee); *Re Williams* [1897] 2 Ch. 12 at 19, CA, *per* Lindley L.J. ("a confidence … enforceable in a court of equity"); *Hardoon v Belilios* [1901] A.C. 118 at 123, PC, *per* Lord Lindley (a very wide definition quoted in § 1-003, penultimate footnote, but see authorities cited in § 1-003, last footnote); *Re Marshall's Will Trusts* [1945] Ch. 217 at 219 and *Green v Russell* [1959] 2 Q.B. 226 at 241 (Sir Arthur Underhill's definition). On the distinction between trusts and powers, see § 1-029.

9    See *Allen v Distillers Co. (Biochemicals) Ltd* [1974] Q.B. 384 at 394, *per* Eveleigh J. Mr Lewin slightly adapted Coke's definition of a use (Co. Litt. 276b) as follows: "A confidence reposed in some other, which is not issuing out of the land, but as a thing collateral, annexed in privity to the estate of the land, and to the person touching the land … for which *cestui que trust* has no remedy but by *subpoena* in Chancery." For a commentary, see the 15th edn of this work, pp.11–13, and for the history of uses and trusts see Holdsworth, *History of English Law*, Vol.IV, pp.407–480; Vol.V, pp.304–309; Vol.VI, pp.543–545, 641–644; Vol.VII, pp.71–176.

10    Trusts, however, are not mere personal obligations: the beneficiary takes a proprietary interest in the trust property. See § 1-006. And a trust is not a contract, but see § 1-019.

11    The singular is *cestui que trust*. *Cestuis que trusts* is a possible plural, but *cestuis que trustent* "is hopelessly wrong": (1910) 26 L.Q.R. 196 (C.S.). The word "beneficiaries" is generally used in this edition.

12    *Law of Trusts* (12th edn), p.3.

That definition is preferable in describing a trust as a relationship rather than an obligation, which could be misleading. But its breadth, though supported by Lord Lindley,[13] is nonetheless excessive.[14]

### Sir Arthur Underhill's definition

Another definition, which has been judicially adopted, is that of Sir Arthur Underhill:[15]    **1-004**

> "A trust is an equitable obligation, binding a person (who is called a trustee) to deal with property over which he has control (which is called the trust property), for the benefit of persons (who are called the beneficiaries or *cestuis que trust*), of whom he may himself be one, and any one of whom may enforce the obligation."

In the latest edition of Sir Arthur's work,[16] the definition has been changed to read:

> "A trust is an equitable obligation, binding a person (called a trustee) to deal with property (called trust property) owned and controlled by him as a separate fund, distinct from his own private property for the benefit of persons (called beneficiaries or, in old cases, *cestuis que trust*), of whom he may himself be one, and any one of whom may enforce the obligation."

Sir Arthur's wording was perhaps preferable, as covering cases in which the trust property is owned by a nominee of the trustee, as most shares in quoted companies are nowadays, though such a case could be treated (somewhat awkwardly) as a trust of the trustee's equitable ownership.[17]

### Enforceable by beneficiaries

The last words of Sir Arthur Underhill's definition emphasise that, a trust being the    **1-005**
equitable equivalent of a common-law gift, the creator of the trust cannot enforce it, but the beneficiaries can, even though they were not ascertainable or in existence at the time it was created. If the beneficiaries have no rights enforceable against the trustees there are no trusts.[18] Even so, the proposition that any one of the beneficiaries may enforce rights against the trustees is an oversimplification, since the rights of beneficiaries and their standing to obtain relief vary according to the nature of their interests or eligibility to benefit under the trust, and the nature of the

---

[13] Part of his *ratio* in *Hardoon v Belilios* [1901] A.C. 118, PC runs at 123: "All that is necessary to establish the relation of trustee and *cestui que trust* is to prove that the legal title was in the plaintiff and the equitable title in the defendant." *cf.* § 1-012.

[14] *cf.* § 1-012, the limited liabilities of innocent recipients of trust property considered at §§ 44-041, 42-002; *Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1996] A.C. 669, HL, especially at 706–707 *per* Lord Browne-Wilkinson.

[15] Underhill and Hayton, *Law Relating to Trusts and Trustees* (15th edn), p.3 (the last edition containing Sir Arthur's definition without change). The definition was taken by Cohen J. as being adequate for his purpose in *Re Marshall's Will Trusts* [1945] Ch. 217 at 219 and was used by Romer L.J. in *Green v Russell* [1959] 2 Q.B. 226 at 241, CA.

[16] Underhill and Hayton, *Law of Trusts and Trustees* (19th edn), § 1.1. The wording of the 19th edn differs slightly from that of the 18th edn § 1.1, which in turn differed slightly from the 16th edn, p.3 and earlier editions. For the editors' explanation of the change in the definition, see 19th edn, § 1.2.

[17] See §§ 1-007, 1-010.

[18] *Armitage v Nurse* [1998] Ch. 241 at 253, CA, *per* Millett L.J.

relief sought.[19] The need for beneficiaries with enforceable rights does not, of course, apply to charitable trusts, which are enforceable at the instance of the Attorney-General.[20] Some jurisdictions have made provision by statute for non-charitable "trusts" which are not enforceable by beneficiaries. A notable example of this is in the Cayman Islands which make statutory provision for legal relationships commonly known as STAR trusts where the persons described as beneficiaries have no rights of enforcement as such, and rights that would otherwise have been enforceable by beneficiaries are instead enforceable by persons described as enforcers who may but need not be beneficiaries.[21] Non-charitable purpose trusts enforceable by enforcers are also permitted by statute in some jurisdictions,[22] but not, with limited exceptions, in England and Wales.[23] The question whether STAR trusts and foreign non-charitable purpose "trusts" count as trusts arises (otherwise than as a mere academic question) mainly in the context of their recognition and enforcement as trusts in English private international law, and in that context the definition referred to above[24] would seem to be[25] wide enough to cover them.[26]

### A proprietary relationship

1-006    A trust is not a mere obligation. It may confer on a beneficiary the equitable ownership of a trust asset, or a partial equitable interest in the asset. Even if he has neither, a beneficiary can enforce the trust against anyone to whom a trust asset may come, except a *bona fide* purchaser for value without notice,[27] so he has a proprietary right or interest in a broader sense of the term.[28] Though some remedies sought by beneficiaries do not turn upon the existence of a proprietary interest (and certainly not a proprietary interest in the narrow sense of a transmissible interest),[29] the proprietary nature, in the wide sense, of a beneficiary's rights, is at the heart of the proprietary remedy which can be asserted against trustees and others into whose hands trust property can be followed or traced.[30]

---

[19]   See §§ 21-091 and 41-071 onwards.

[20]   On enforcement of charitable trusts, see generally *Tudor on Charities* (10th ed), Chap.16.

[21]   Trusts Law (2020 Revision), ss.95–109 (Pt VIII), replacing Special Trusts (Alternative Regime) Law 1997. On STAR trusts, see Duckworth, *STAR trusts: the Special Trusts (Alternative Regime) Law 1997 Cayman Islands* (1998); Matthews (1997) 11 Tru.L.I. 67; Duckworth (1998) 12 Tru.L.I. 16; Matthews (1998) 12 Tru.L.I. 98; Duckworth (1999) 13 Tru.L.I. 158; Thomas and Hudson, *The Law of Trusts* (2nd edn), §§ 42.01 onwards; Hayton [2007] P.C.B. 39 at 49. See too Trusts Law (2020 Revision), ss.73-86 (Pt VI), concerning "exempted trusts", an earlier form of Cayman trusts unenforceable by beneficiaries.

[22]   See § 5-063.

[23]   See §§ 5-052 onwards.

[24]   See § 1-001.

[25]   The need for at least some rights for beneficiaries referred to in *Armitage v Nurse*, above, was spoken of in the context of the permissible scope of provisions limiting trustees' liability for breach of trust, not in the context of the question whether non-charitable legal relationships enforceable by enforcers, rather than by beneficiaries as such, were capable of counting as trusts. What was said in *Armitage v Nurse* should not be taken as being necessarily determinative of the latter question.

[26]   See § 12-139.

[27]   See §§ 44-119 onwards.

[28]   *Westdeutsche Landesbank Girozentrale v Islington London Borough Council*, above, at 705, point (iv).

[29]   *Schmidt v Rosewood Trust Ltd* [2003] UKPC 26; [2003] 2 A.C. 709; see generally §§ 21-016 onwards.

[30]   On the proprietary remedy of beneficiaries and vindication of property rights, see Chap.44. STAR trusts and foreign non-charitable purpose trusts (see § 1-005) do not confer proprietary interests or

A beneficiary can be said to be the equitable owner of a trust asset if the asset is sufficiently ascertained and he is the only beneficiary interested. Thus, under the constructive trust that arises in his favour, a purchaser of land is its equitable owner from the date of the contract of sale,[31] a specific devisee or legatee under a will is the equitable owner of the specific property from the testator's death,[32] and a beneficiary entitled to an interest in possession under a trust of shares in a company is the equitable owner of the dividends as soon as they are paid to the trustee, even though the trustee is entitled to deduct expenses before transmitting them to the beneficiary.[33] It is the same even if an annuity has first to be paid out of the income.[34] (The trustee has a lien for the expenses and the annuity payments are a charge on income.) The beneficiary with an interest in possession has, not ownership, but an equitable proprietary interest in the shares themselves in any such case.[35] So has a beneficiary entitled subject to prior interests, if in existence and ascertained. So have two or more capital beneficiaries of a trust concurrently interested, but not, it seems, two or more concurrently interested only in income.[36]

**1-007**

The beneficiary has no equitable proprietary interest in the narrower sense, and of course no equitable ownership, if either his rights or the assets in which they are to be enjoyed are not sufficiently ascertained. For instance, a discretionary beneficiary, who is merely a member of a class to whom the trustees have a discretion to apply trust capital or income, has no interest in the narrow sense. He has a right to require the trustees to consider from time to time how to exercise their power,[37] but this prevails against the trustees, and against a third party other than a *bona fide* purchaser, and so is a proprietary interest in a broader sense. Likewise, if assets are in course of administration and debts have to be paid out of them before the trust property is ascertained, the beneficiaries have no interest or ownership in

**1-008**

---

rights on beneficiaries even in the broadest sense. But that does not mean that the proprietary remedy asserted by enforcers is any different in extent from the proprietary remedy of beneficiaries who have rights in their capacity as such: the trustees do not have the beneficial interest and that is vindicated by the proprietary remedy asserted by enforcers.

[31] *Lysaght v Edwards* (1876) 2 Ch.D. 499, especially at 505; *Allen v I.R.C.* [1914] 1 K.B. 327; affd [1914] 2 K.B. 327; see §§ 4-003 onwards. The Supreme Court has cast doubt on these cases in *Scott v Southern Pacific Mortgages Ltd* [2014] UKSC 52; [2015] A.C. 385. The court held that a purchase under a contract for sale of land did not have a proprietary interest in the land capable of supporting the creation of proprietary interests by the purchaser prior to completion: see especially at [57]–[66] *per* Lord Collins and Lord Sumption; [111] and [122] *per* Lady Hale.

[32] *I.R.C. v Hawley* [1928] 1 K.B. 578 at 583. (The reason given in the headnote was not the judge's.)

[33] *Baker v Archer-Shee* [1927] A.C. 844, HL. This decision did not turn merely on the Income Tax Acts, but on English trust law, see *Archer-Shee v Garland* [1931] A.C. 212, HL, where the opposite result flowed when it was proved that the applicable New York trust law conferred no ownership or interest. See too *Corbett v I.R.C.* [1938] 1 K.B. 567 at 581. The reasoning in *Schalit v Joseph Nadler Ltd* [1933] 2 K.B. 79 at 83 turns on the view that a beneficiary has a mere right to an account, but it seems to misunderstand *Allen v I.R.C.*, above, and the *Archer-Shee* cases were not cited. *Snell's Equity* (34th edn), § 21-016 is more doubtful. The life tenant is the owner of the dividends even though (the trustee being entitled to make deductions) his only *remedy* is an account.

[34] *Nelson v Adamson* [1941] 2 K.B. 12.

[35] See *Re Neeld* [1962] Ch. 643 at 687–688, CA, *per* Diplock L.J. (tenant for life under specific devise takes an equitable interest on the testator's death).

[36] *Re Young* [1942] V.L.R. 4, Vic. SC, considering the speeches in *Baker v Archer-Shee*, above.

[37] *Gartside v I.R.C.* [1968] A.C. 553, HL; *Sainsbury v I.R.C.* [1970] Ch. 712; *Re Weir's Settlement Trusts* [1971] Ch. 146; *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2015] EWCA Civ 139; [2016] 1 W.L.R. 160 at [13]. And see §§ 1-061; 29-007 onwards, and 33-033.

a particular asset: it may be needed to pay the debts.[38] They are nonetheless entitled to enforce due administration of the assets, and so are interested in a wider sense,[39] and the personal representatives cannot be said to have "beneficial ownership" of any of the assets.[40]

### Trustee may be a beneficiary

**1-009**    A trustee need not, and commonly does not, have any beneficial interest in the trust property. In this case the beneficial enjoyment of the property, which is in the beneficiaries, is entirely separated from its management, which is vested in the trustee.[41] A trustee may hold the trust property on trust for himself and others, but he cannot hold upon trust for himself alone because, once the trust property and the whole[42] beneficial interest meet in the same person, the equitable obligation is swallowed up in the ownership.[43] That person thenceforth simply holds as absolute beneficial owner, and the property is sometimes said to be "at home".

### Types of trust property

**1-010**    Any property may be held upon trust, including for instance the legal estate in land, the legal property in chattels, a chose in action such as the benefit of a contract,[44] an equity of redemption and a beneficial interest under another trust.[45] This topic is further considered elsewhere.[46]

### Trusts enforceable in equity

**1-011**    A trust differs from such relations as contract and bailment in that it is enforceable only in equity. That system was originally administered only in the Court of Chancery,[47] but now law and equity are administered in all courts concurrently.

---

[38]   The best authorities concern administrations rather than trusts: *Sudeley v Att.-Gen.* [1897] A.C. 11, HL; *Dr Barnardo's Homes National Incorporated Association v I.R.C.* [1921] 2 A.C. 1, HL (residue); and *Commissioner of Stamp Duties (Queensland) v Livingstone* [1965] A.C. 694, PC (share of residue). (*cf.* Income and Corporation Taxes Act 1988, s.696, which reverses the tax consequences of the two earlier authorities.) The position must be the same for a trust: *Eastbourne Mutual Building Society v Hastings Corporation* [1965] 1 W.L.R. 861 (intestacy, where there is a statutory trust for the next of kin, see § 1-012); *Ayerst v C. & K. (Construction) Ltd* [1976] A.C. 167, HL (company in liquidation a trustee of its assets in the sense that it cannot use or dispose of them for its own benefit, but must do so for the benefit of other persons: see Lord Diplock at 180F).

[39]   *Commissioner of Stamp Duties (Queensland) v Livingston* [1965] A.C. 694 at 713F, PC; *Gartside v I.R.C.* [1968] A.C. 553 at 612, 617 onwards, HL; *Re Leigh's Will Trusts* [1970] Ch. 277.

[40]   *Ayerst v C. & K. (Construction) Ltd* [1976] A.C. 167, HL.

[41]   This distinguishes a trust from the civil law conception of a usufruct: see Professor Lawson's 1951 Hamlyn Lectures, *The Rational Strength of English Law*, Lecture 3. On the difference between a trust and the Roman-Dutch *fidei commissum*, see *Abdul Hameed Sitti Kadija v De Saram* [1946] A.C. 208, PC.

[42]   *Phillips v Brydges* (1796) 3 Ves. Jr. 120 at 125–127; *Merest v James* (1821) 6 Madd. 118.

[43]   *Goodright v Wells* (1781) Dougl. 771 at 778; *Selby v Alston* (1797) 3 Ves. jun. 339; *Creagh v Blood* (1845) 3 Jo. & La T. 133; *Re Selous* [1901] 1 Ch. 921; *Re Cook* [1948] Ch. 212 (survivor of legal and beneficial joint tenants of land was absolute beneficial owner in spite of the Law of Property Act, 1925, ss.23, 36(1) (as amended).

[44]   See §§ 2-034, 5-013 to 5-019.

[45]   See § 2-034.

[46]   See §§ 2-034 onwards.

[47]   For an historical note, see 12th and previous editions, and Holdsworth, *History of English Law*,

Equitable estates and rights are given effect in all the courts on the basis that where there is any conflict between the rules of equity and the rules of common law, the rules of equity prevail.[48] All causes and matters in the High Court for the execution of trusts are assigned to the Chancery Division.[49] The county court has concurrent jurisdiction with the High Court in proceedings for the execution of any trust or for a declaration that a trust subsists or proceedings under the Variation of Trusts Act 1958 where the trust fund does not exceed £350,000 in amount or value.[50]

### Personal representatives

Personal representatives often hold property upon trust within the above definitions. For instance, on an intestacy the administrators hold on express trusts,[51] and a will often imposes express trusts upon the executors. Many of the duties of personal representatives can be described as trusts.[52] Moreover, most of the provisions of the Trustee Act 1925 apply to personal representatives,[53] as do the provisions of the Trusts of Land and Appointment of Trustees Act 1996 concerning land[54] and the provisions of the Trustee Act 2000.[55] In a stricter sense of the word "trustee", however, it does not apply to personal representatives, and the administration of deceased estates is not dealt with in this work.[56]

**1-012**

### Settled Land Act Trustees

Trustees for the purpose of the Settled Land Act 1925 are trustees within the meaning of the Judicial Trustees Act 1896, even though the settled land is not vested in them.[57]

**1-013**

---

especially the passages mentioned in § 1-002. Equity was also administered to a certain extent in the Court of Exchequer, see Bryson, *The Equity Side of the Exchequer*. There has long been a developed law of trusts in Scotland though there has never been a separate court of equity there.

48  Senior Courts Act 1981, s.49. The House of Lords has deprecated references to the division between law and equity: *United Scientific Holdings Ltd v Burnley B.C.* [1978] A.C. 904, HL, especially at 924–925, 944–945, 957 but the very existence of trusts depends on equitable rights prevailing over legal titles under s.49, replacing the "common injunction". (Incidentally, without the distinction where stands Law of Property Act 1925, s.1?)

49  Senior Courts 1981, s.61(1) and Sch. 1, para.1(c). From October 2, 2017, the proceedings should be issued in the Property, Trusts and Probate List (ChD) of the Business and Property Court, as to which see §§ 39-004 to 39-006.

50  County Courts Act 1984, s.23(b), as amended by Crime and Courts Act 2013, s.17(5) and Sch.9, Pt 1, paras 1 and 10(1)(a); County Court Jurisdiction Order 2014 (SI 2014/503), art.3. The parties can confer greater jurisdiction by agreement under s.24, except for proceedings under the Variation of Trusts Act 1958: s.24(3). In the case of applications under statutory provisions referred to in Trustee Act 1925, s.63A(1) as inserted by County Courts Act 1984, s.148(1) and Sch.2, Pt.1, para.1, the county court limit is £30,000, see Trustee Act 1925, s.63A(6) and County Court Jurisdiction Order 2014 (SI 2014/503), art.3. There is no provision for increase of the jurisdiction under s.63A(1) and (6) by agreement.

51  Administration of Estates Act 1925, ss.33(1), 46(1).

52  *Commissioner of Stamp Duties (Queensland) v Livingston* [1965] A.C. 694 at 707, PC.

53  Trustee Act, 1925, s.68(1) (17); but not the statutory power of appointing new trustees.

54  Trusts of Land and Appointment of Trustees Act 1996, s.18.

55  Trustee Act 2000, s.35.

56  The reader is referred to Williams, Mortimer and Sunnucks, *Executors, Administrators and Probate* (21st edn).

57  *Re Marshall's Will Trusts* [1945] Ch. 217.

### Settlement and will

**1-014**   A document that looks like a lifetime settlement may be a will in disguise. "It is undoubted law that whatever may be the form of a duly executed instrument, if the person executing it intends that it shall not take effect until after his death, and it is dependent on his death for its vigour and effect, it is testamentary."[58]

**1-015**   If that was the intention of the settlor, then the settlement is a testamentary document, and therefore void under the Wills Act 1837 unless it was executed in the presence of two witnesses, and otherwise as required by that Act. The distinction between a settlement and will is further considered elsewhere.[59]

**1-016**   If a document which purports to be a lifetime settlement reserves to the settlor very extensive powers and control over the trust property during his lifetime, questions arise not only whether the document is testamentary in character so that any dispositions contained in the document taking effect after the death of the settlor will fail unless the document is executed in accordance with the formal requirements applicable to wills, but also whether the trusts declared in favour of persons other than the settlor are so squeletic as to be considered illusory, and so that the true effect of the document is to reserve to the settlor an absolute beneficial interest in the trust property, so that it creates a bare or simple trust rather than special trust.[60] These questions are considered elsewhere.[61]

### Trust and contract

*Trust or contract debt*

**1-017**   It is not always easy to say whether there is a trust or a mere contract debt. For instance, if A hands a cheque for £100 to B on terms that B is later to pay £100 to A, B may be a trustee of the cheque and its proceeds for A, or he may merely be a contract debtor of A. To know which he is may be vital, for instance where B has become insolvent[62] or the limitation period for recovering contract debts has expired.[63]

**1-018**   It depends on whether the parties intend B to keep the money separate, or whether he is to be free to use it as his own.[64] "It is clear that if the terms upon which the person receives the money are that he is bound to keep it separate, either in a bank

---

[58]   *Cock v Cooke* (1866) L.R. 1 P. & D. 241 at 243, *per* Sir John Wilde (later Lord Chelmsford), see Williams, Mortimer and Sunnucks, *Executors, Administrators and Probate* (21st edn), §§ 9-02 and 9-03, and see §§ 5-039, and 10-095 (concerning joint bank accounts). Principle applied in *Re AQ Revocable Trust* [2010] SC (Bda) 40 Civ; 13 I.T.E.L.R. 260 where the statement of the law in what is now this paragraph and (with some modifications) §§ 1-015, 1-016, 5-037 and 5-038 was approved at [9] and [17].

[59]   See §§ 5-036 to 5-039.

[60]   On the distinction between bare or simple trusts and special trusts, see § 1-028.

[61]   See §§ 5-031 to 5-040.

[62]   Trust property is not available for the creditors in a trustee's bankruptcy or winding-up, see §§ 27-010 onwards.

[63]   There would be no period of limitation for enforcing the trust: see §§ 50-004, 50-012 and 50-013, subject to difficult questions in the case of constructive trusts, see §§ 50-056 onwards.

[64]   *Re Nanwa Gold Mines* [1955] 1 W.L.R. 1080.

or elsewhere, and to hand that money so kept as a separate fund to the person entitled to it, then he is a trustee of that money and must hand it over to the person who is his beneficiary. If on the other hand he is not bound to keep the money separate, but is entitled to mix it with his own money and deal with it as he pleases, and when called upon to hand over an equivalent sum of money, then, in my opinion, he is not a trustee of the money, but merely a debtor."[65] The payment of interest for the use of the money tends to indicate that its recipient is entitled to use it as his own, and accordingly is a mere debtor.[66]

Similar considerations apply to debts constituted under statute.[67]                    **1-019**

*Trusts in commercial transactions*

The deposit of money in a bank does not of itself[68] create a trust in favour of the    **1-020**
depositor, whether or not any interest is paid, and indeed creates no fiduciary relation at all between bank and customer.[69] "The whole system of banking is based on that conception."[70] The bank can use the money as it pleases and the customer acquires no interest in or charge over any asset of the bank.[71] Generally the courts have been reluctant to introduce the intricacies and doctrines of trusts into ordinary commercial affairs.[72] On contracts that create trusts, see Chapter 4. On the trust that sometimes arises in favour of the creditors when a loan is made for the purpose of paying debts, and the *Quistclose* trust that results to the lender if that purpose fails, co-existing with the contractual right to repayment, see §§ 9-040 onwards. On trusts of the benefit of contracts see §§ 5-013 onwards.

---

[65] *Henry v Hammond* [1913] 2 K.B. 515 at 521, *per* Channell J.; applied by Slade J. in *Re Bond Worth Ltd* [1980] Ch. 228. See too *Neste Oy v Lloyds Bank Ltd* [1983] 2 Lloyd's Rep. 658 (overruled on other grounds: *Angove's Pty Ltd v Bailey* [2016] UKSC 47; [2016] 1 W.L.R. 3179); *Triffit Nurseries v Salads Etcetera Ltd* [2000] 1 All E.R. (Comm) 737, CA; §§ 1-020, 1-022. As to modification of the duty to keep trust property separate from other property, see § 34-040.

[66] *Re Broad, ex p. Neck* (1884) 13 Q.B.D. 740, CA. Otherwise if he merely accounts for interest which it earns when deposited or invested elsewhere. The payment of interest did not prevent the creation of a trust in *Merritt v Klijn* [2002] ABQB 729; 5 I.T.E.L.R. 461, Alberta QBD.

[67] *Duggan v Governor HMP Full Sutton* [2004] EWCA Civ 78; *The Times,* February 13, 2004 (no trust of prisoner's money held in prison account pursuant to Prison Rules 1999 (SI 1999/728), r. 43(3)).

[68] *Ex p. Plitt* (1889) 60 L.T. 397 (cheque handed to banker expressly "in trust").

[69] *Foley v Hill* (1848) 2 H.L.C. 28; *R. v Davenport* [1954] 1 W.L.R. 569, CCA.

[70] *Dunmore v McGowan* [1976] 1 W.L.R. 1086 at 1089, *per* Brightman J (affirmed [1978] 1 W.L.R. 617, CA).

[71] *Space Investments Ltd v Canadian Imperial Bank of Commerce Trust Co. (Bahamas) Ltd* [1986] 1 W.L.R. 1072 at 1073, PC (not questioned on this point in *Re Goldcorp Exchange Ltd* [1995] 1 A.C. 74 at 108–110, PC).

[72] *New Zealand and Australian Land Co. v Watson* (1881) 7 Q.B.D. 374 at 382, CA, *per* Bramwell L.J.; *Henry v Hammond* [1913] 2 K.B. 515 at 521, DC; *Scandinavian Trading v Flota Petrolera Ecuatoriana* [1983] Q.B. 529 at 540–541, *per* Robert Goff L.J. delivering the judgment of CA, approved by Lord Diplock with whose reasons the rest of HL agreed [1983] 2 A.C. 694 at 703–704; *Polly Peck International Plc v Nadir (No.2)* [1992] 4 All E.R. 769 at 782, CA, *per* Scott L.J., see further § 42-064; but note that constructive trusts often have been raised in commercial contexts, see for instance §§ 9-040 onwards, §§ 4-003 onwards, §§ 45-084 onwards, and it is mainly the old equitable rules of constructive notice that are out of place in a commercial context, see *Manchester Trust v Furness* [1895] 2 Q.B. 539 at 545.

**Trust and agency**

1-021    A trustee is not the agent of the settlor (or creator) of the trust, or of the beneficiaries. The trustee acts as principal. He is not under the direction of the settlor or of the beneficiaries in administering the trust, unless there is an express provision to that effect,[73] or he is a bare trustee,[74] and even a bare trustee is not the beneficiary's agent—nor is he the settlor's agent.[75] A term in an insurance policy excluding a claim made on behalf of a particular person does not exclude a claim by the trustee of a discretionary trust in which that person is beneficially interested since the trustee acts as principal not as representative or agent on behalf of the beneficiaries.[76]

1-022    Agency differs from trust in that (though it may be a fiduciary relationship) it is recognised by the common law and no property is necessarily involved. An agent may also be a trustee for his principal of property received as agent, but he is more often a mere bailee[77] of chattels so received. Whether he is an express trustee of money received as agent depends on the true construction of the agency agreement in the light of the surrounding circumstances including the intentions of the parties expressed or inferred, and in particular upon whether the agent is intended to keep the money separate from his own, when he is normally[78] but not always[79] a trustee, or whether he is not, when he is a mere contract debtor.[80] Even though the agent is not an express trustee he may sometimes hold the money received on a *Quistclose* trust,[81] but not a constructive trust on the ground of unconscionability.[82]

**Trust and bailment**

1-023    A bailee is not a trustee[83] of the chattels bailed to him. His primary duties are enforced by the common law rather than equity, though he is in a fiduciary posi-

---

[73]    Usually in the trust instrument, or the corresponding oral declaration if the trust is created by word of mouth; but Law of Property Act 1925, s.26(3) required trustees of a statutory trust for sale of land to give effect (within limits) to the wishes of the adult income beneficiaries, or the majority of them, and Trusts of Land and Appointment of Trustees Act 1996, s.11, is a similar provision applying to all "trusts of land", as to which see § 37-055.

[74]    On what is a bare trust, see §§ 1-028 onwards.

[75]    *Ingram v I.R.C.* [2000] 1 A.C. 293 at 305D–H, 310G, HL, approving dissenting judgment of Millett L.J. in CA [1997] 4 All E.R. 395 at 419 onwards.

[76]    *Liberty International Underwriters v The Salisbury Group Pty Ltd (in liq.)* [2014] QSC 240 at [32]–[47].

[77]    See § 1-023.

[78]    *Burdick v Garrick* (1870) 5 Ch. App. 233, *Re Fleet Disposal Service Ltd* [1995] 1 B.C.L.C. 345. And see *Brown v I.R.C.* [1965] A.C. 244, HL and § 1-019.

[79]    *Re Japan Leasing (Europe) Plc* [2000] W.T.L.R. 301 (express trust negatived by terms of contract) (overruled on other grounds: *Angove's Pty Ltd v Bailey* [2016] UKSC 47; [2016] 1 W.L.R. 3179).

[80]    *Wilsons and Furness-Leyland Line Ltd v British and Continental Shipping Co. Ltd* (1907) 23 T.L.R. 397; *Henry v Hammond* [1913] 2 K.B. 515, DC; *Neste Oy v Lloyd's Bank Plc* [1983] 2 Lloyd's Rep. 658 at 663–665 (overruled on other grounds: *Angove's Pty Ltd v Bailey*, above); *Walker v Corboy* (1990) 19 N.S.W.L.R. 382; *Hinckley Singapore Trading Pte Ltd v Sogo Department Stores (S) Pte Ltd* (2001) 4 I.T.E.L.R. 301, Sing CA.

[81]    See §§ 9-040 onwards.

[82]    See § 8-040.

[83]    *i.e.* in the normal modern sense of the word, but when equity was young bailment was commonly spoken of as a trust though enforced in the common-law courts. In *Rosenthal v Alderton & Sons Ltd* [1946] 1 All E.R. 583 at 584, the CA referred to a bailment as a delivery of goods in trust but they

tion, and the owner of the goods may also have the equitable remedy of tracing the proceeds of the goods.[84] The feature which distinguishes a bailment from a trust is that a bailee takes mere possession of the goods bailed, but a trustee takes the title to the trust property. From this it follows that a trustee selling in breach of trust can pass a good title to a *bona fide* purchaser for value and without notice, whereas (statute apart)[85] a bailee generally[86] cannot.[87]

### Trust and foundation

The private foundation is a civil law institution which has become increasingly common in offshore common-law jurisdictions during this century[88] following the introduction of legislation generally designed to emulate the provisions of the Liechtenstein Law on Persons and Companies which first created the civil law private foundation.[89] A private foundation is a creature of the statutory provisions of the country in which the foundation is formed: to that extent the requirements for the creation of a valid private foundation vary between jurisdictions.[90] Broadly, a private foundation is a separate legal entity created by incorporation or registration, governed by constitutional documents and a council or body. The foundation is established to hold, administer and distribute the assets endowed by the founder, but the beneficiaries have no interest (legal or equitable) in the assets of the foundation, and the foundation itself has no subscribers or shareholders.[91] The council or body charged with the management of the foundation owes duties to the foundation itself rather than to the beneficiaries.

**1-024**

A beneficiary of a private foundation, lacking any proprietary right to the endowed assets, has limited remedies against the foundation council or the foundation itself. Even if the constitutional documents confer on the beneficiary an immediate right

**1-025**

---

apparently had second thoughts on correcting the judgment: see [1946] K.B. 374.

[84] *Aluminium Industrie Vaassen B.V. v Romalpa Aluminium Ltd* [1976] 1 W.L.R. 676, CA. *cf. Borden (U.K.) Ltd v Scottish Timber Products Ltd* [1981] Ch. 25, CA, where there was no bailment and the goods lost their identity in the manufacturing process, *Re Peachdart Ltd* [1984] Ch. 131, where the goods had ceased to be bailed, and had been subjected instead to a charge registrable under the Companies Act 1948, s.95, now Companies Act 2006, s.859A, and *E. Pfeiffer Weinkellerei-Weineinkauf G.m.b.H. & Co. v Arbuthnot Factors Ltd* [1988] 1 W.L.R. 150, where there was never any bailment or fiduciary arrangement, but an equitable assignment of the proceeds of sub-sales.

[85] For instance, under Factors Act 1889 and Torts (Interference with Goods) Act 1977.

[86] Exceptions include sales by pledgees, cases where title is acquired by estoppel, *etc.*

[87] *MCC Proceeds Inc. v Lehman Bros International (Europe)* [1998] 4 All E.R. 675, CA.

[88] Private foundation legislation has been enacted in, *inter alia*, Panama (Law No.25 on Private Foundations 1995) and in a number of Commonwealth and British Islands countries; ST KITTS AND NEVIS: Foundations Act 2003; THE BAHAMAS: Foundations Act 2004; ANTIGUA AND BARBUDA: International Foundations Act 2007; ANGUILLA: Foundation Act 2008; SEYCHELLES: Foundations Act 2009; JERSEY: Foundations (Jersey) Law 2009; BELIZE: International Foundations Act 2010; ISLE OF MAN: Foundations Act 2011; COOK ISLANDS: Foundations Act 2012; MAURITIUS: Foundations Act 2012; GUERNSEY: Foundations (Guernsey) Law 2012.

[89] *Personen und Gesellschaftsrecht*, first enacted in 1926 and substantially amended in 2009.

[90] See R. Goldsmith, *Private Foundations: Law and Practice* (1st edn, 2011), Chaps 5–9; P. Panico, *Private Foundations: Law and Practice* (1st edn, 2014). Text cited in *Hamilton v Hamilton* [2016] EWHC 1132 (Ch); [2016] W.T.L.R. 1699 at [169].

[91] For example, Foundations (Jersey) Law 2009, art.25(1)(a) provides that "… a beneficiary has no interest in the foundation's assets …"; and the Seychelles Foundations Act 2009, s.31(a) provides that the foundation has full legal and beneficial title to the endowed assets.

to the income or capital of the foundation, that right is one enforceable pursuant to the statutory provisions governing the foundation,[92] rather than pursuant to any proprietary right vesting in the beneficiary. It would be equally mistaken to describe a beneficiary of a foundation as having a contractual right as against the foundation. Beneficiaries are not in general parties to the foundation's constitution and they acquire no private rights as against the foundation. The foundation's constitution may even prohibit the beneficiaries from obtaining information about the foundation, effectively preventing them from exercising any form of oversight over the foundation's council.[93] Some jurisdictions provide for foundations to have no ascertained beneficiaries, merely a discretion or power on the part of the foundation council, founder or guardian to nominate beneficiaries in the future.

1-026    The beneficiaries of a foundation are generally in no position to supervise the foundation council. The proper administration of the foundation will therefore be dependent upon the exercise of powers reserved to the founder and the powers of a guardian or protector. The founder's rights may include a reserved power to dissolve the foundation, revoke or amend its constitutional documents, or vary the purpose of the foundation. He may also have the power to confer or revoke membership of the foundation council, sit on the council himself, or give directions to the council. The guardian,[94] protector or enforcer[95] is generally empowered by legislation to supervise the foundation council and ensure compliance with the provisions of the foundation's constitutional documents, and in certain jurisdictions may be required to approve decisions made by the council. In some jurisdictions the legislation provides for the guardian or protector to owe fiduciary duties to the foundation, founder and beneficiaries,[96] while in others such duties have been explicitly ousted.[97]

### Unique features stated in civilian terms

1-027    Those trained in the civil law tend to treat the trust as the equivalent of one of their own institutions—for instance *fidei commissum* or the usufruct or *Treuhand*. This can lead to error, since the trust is unique. Its unique features can be summarised in terms familiar to civil lawyers, and without any need to refer to the difference between law and equity, as follows.[98] First, the control and management of the trust property is separated from its enjoyment and vested in the trustees, who yet are not agents of the beneficiaries or of the settlor (the founder of the trust). Secondly, the beneficiaries have proprietary interests in the trust property, concurrent with the proprietary interest of the trustees which confers control of the property on the trustees. The beneficiaries' concurrent interests prevail over those of the trustees, and over everyone else claiming through or under the trustees, including their creditors and heirs, indeed even third parties generally other than purchasers of the trust

---

[92]    For example, the Foundations (Jersey) Law 2009, art.25(2).
[93]    P. Panico, *Private Foundations*, Chap.4.
[94]    The term used in Jersey, Guernsey, St Kitts and Anguilla.
[95]    The term used in the Cook Islands and Isle of Man.
[96]    Belize International Foundations Act 2010, s.58; Foundations (Guernsey) Law 2012, s.19(2).
[97]    Foundations (Jersey) Law 2009, art.25(1)(b); Seychelles Foundations Act 2009, s.63.
[98]    We are glad to acknowledge our debt, in preparing the rest of this paragraph, to the United Kingdom Comparative Law Series, Vol.5, *Trusts and Trust-like Devices* (1981) edited by Professor J.A. Wilson, and to the late Mr E.H. Wall.

property in good faith. Thirdly, the trust property is a *fund*, in the sense that the trustees have power to sell its constituent parts free of the beneficiaries' proprietary rights, and reinvest the proceeds in other assets, which thereupon automatically become subject to those rights. The unique feature of this "real subrogation" in the case of a trust is that, if the trustees *wrongfully* transpose trust assets into other assets, the beneficiaries' proprietary interests attach to the new assets, and bind them, not only in the hands of the trustees, their creditors and successors, but also in the hands of third parties generally other than *bona fide* purchasers for value without notice.

## 2.   CLASSIFICATION OF TRUSTS

### Bare or simple trusts and special trusts

A distinction has traditionally been drawn between "bare" trusts, or "simple" or "naked" trusts, and "special" trusts. According to that distinction, a bare trustee holds property in trust for a single beneficiary absolutely and indefeasibly, and is a mere passive repository for the beneficial owner, having no duties other than a duty to transfer the property to the beneficial owner or as he directs. By contrast a trustee holding property on special trusts has active duties to perform, for example in executing the trusts of a will or settlement, with administrative (and perhaps also dispositive) powers accompanying his active duties. It is still possible to distinguish between an absolute trust for a single beneficiary, which might still be called a bare or simple trust, and other types of trust. On closer examination, however, a distinction cannot satisfactorily be drawn between bare and special trusts on the basis that a person holding property on trust for another absolutely and indefeasibly is always a mere passive repository for the beneficial owner while a trustee holding property on special trusts has active duties to perform. The description of a bare trustee as a mere passive repository for the beneficial owner with no active duties to perform other than a duty of transfer requires at least some qualification in its application to cases where a beneficiary has an absolute and indefeasible interest. We consider later in this Chapter aspects of the law concerning bare or absolute trusts and bare trustees, and the distinction between such trusts and special trusts.[99]

**1-028**

### Fixed and discretionary trusts and powers

Special trusts may be subdivided into fixed[100] trusts, where the objects are identified, and discretionary trusts, where their choice is left to the trustee. A trust for A for life with remainder to his children, or to B, is a fixed trust. A trust to divide the income among such of A's children and in such shares as the trustees think fit is a discretionary trust.[101] To be distinguished is a power, where the trustees are authorised, but not directed, to distribute.[102] What at first sight appears a power may impose a duty to distribute, requiring the trustees to choose the recipients. The

**1-029**

---

99   See § 1-036 onwards.
100   Or "ministerial" or "instrumental".
101   See, for instance, *Att.-Gen. v Scott* (1749) 1 Ves. Sen. 413 (trust to select preacher); *Gartside v I.R.C.* [1968] A.C. 553, HL.
102   See *McPhail v Doulton (Baden No.1)* [1971] A.C. 424, HL. On the release of a possibility of benefiting under such a power, see *Re Gulbenkian's Settlements (No.2)* [1970] Ch. 408 and § 28-148.

distinction between mere powers and powers which must be exercised is considered elsewhere.[103]

### Lawful and unlawful trusts

**1-030**   Again, trusts may be divided, with reference to the object in view, into lawful and unlawful. The former are directed to some honest purpose and will be administered by the court. The latter are trusts created for the attainment of some end contravening the policy of the law, and therefore not to be sanctioned in a forum professing not only justice but equity, for example a trust to defraud creditors or to defeat a statute.[104]

### Public and private trusts

**1-031**   Another division of trusts is that between public and private. Public trusts are trusts constituted for the benefit either of the public at large or of some considerable portion of it answering a particular description. To this class belong all trusts for charitable purposes, and indeed public trusts and charitable trusts may be considered in general as synonymous expressions. Charitable trusts are not dealt with in this edition. The reader is referred to the leading modern work on the subject.[105] In private trusts the beneficial interest is vested absolutely in one or more individuals who are, or within a certain time may be, definitely ascertained, and to whom, therefore, collectively, unless under some legal disability, it is, or within the allowed period will be, competent to determine the trust. The duration of trusts of this kind cannot be extended beyond the period allowed by the rule against perpetuities.[106] A public or charitable trust, on the other hand, has abstract, impersonal objects, and the trust itself may be of a permanent and indefinite character, and is not confined within the limits of the rule against perpetuities. These trusts may be said to have as their object some purpose recognised by the law rather than human beneficiaries.

### Completely and incompletely constituted trusts

**1-032**   Where the settlor's intention is to constitute another person as trustee of his property the trust is not effective until the settlor has done everything he needs to do to vest the property in the trustee. When that has been done the trust is said to be completely constituted; until it is done the trust is incompletely constituted.[107]

### Express trusts and trusts arising by operation of law

**1-033**   A distinction may be drawn between express trusts and trusts arising by operation of law.[108] Generally speaking an express trust may be said to arise from the intention of a person to create a trust declared directly or indirectly. Inferred or so-called precatory trusts, that is trusts created by expressions of wish or desire which

---

[103]   See §§ 28-004 onwards and §§ 33-027 onwards.
[104]   Bac. on Uses, 9. See, as to unlawful trusts, Chap. 6.
[105]   *Tudor on Charities* (10th edn).
[106]   See §§ 6-037 onwards.
[107]   See §§ 3-021 and 3-034 onwards.
[108]   Material in connection with limitation of actions, see §§ 50-056 onwards.

CLASSIFICATION OF NON-DISPOSITIVE INTEREST UNDER TRUSTS

on their true construction amount to declarations of trust, are express trusts, because in such cases the court finds as a matter of construction that the settlor expressed, indirectly, an intention to create a trust. Trusts arising by operation of law are trusts that are not express trusts.

**Resulting, implied and constructive trusts**

Trusts arising by operation of law comprise resulting, implied and constructive trusts. These trusts differ in many respects from express trusts and arise in widely varying sets of circumstances, which are considered elsewhere.[109]   **1-034**

**Executed and executory trusts**

This distinction refers to the method of drafting the trust instrument, which naturally affects its interpretation. An executed trust in this sense is one where the limitations of the equitable interests have been set out in complete and final form, whereas in an executory trust they are intended merely to serve as minutes or instructions for perfecting the settlement at a later date.[110]   **1-035**

### 3.   CLASSIFICATION OF EQUITABLE INTERESTS UNDER TRUSTS

**Absolute indefeasible interest in possession under a bare or simple trust**

The greatest interest that a beneficiary can have is an absolute indefeasible interest in possession under a bare or simple trust. We now turn to consider aspects of the law concerning bare or absolute trusts and bare trustees, and the distinction between an absolute indefeasible interest in possession under a bare or simple trust and interests under special trusts.   **1-036**

*Absolute beneficiary's right to direct transfer of trust property*

The trustee of a trust for a beneficiary absolutely entitled has a duty to transfer the property to or at the direction of the beneficiary,[111] assuming that the beneficiary is of full age and capacity and so able to give a valid direction and receipt, that the property is capable of transfer by the trustee in the manner directed, and that the trustee has no unsatisfied right of indemnity against the trust property. This is not a unique distinguishing feature of a bare trust, however, since the beneficiaries of a special trust, if they are all ascertained and of full age and capacity and act together, have a similar right under the rule in *Saunders v Vautier*.[112] A bare trustee has been described as a person who would, on the requisition of his beneficiaries, be compellable in equity to convey the estate to them, whether or not duties have been attached to his office, and whether or not a request for a conveyance has been made.[113] That description has been both rejected[114] and approved.[115] The descrip-   **1-037**

---

[109]  Mainly in Chaps 8–10 (see the definitions in §§ 8-002, 8-004), 41 to 45, 50; and see §§ 3-037 onwards, §§ 4-003 to 4-011, 4-036 onwards.
[110]  See § 7-002.
[111]  See § 22-003.
[112]  See §§ 22-014 onwards.
[113]  *Christie v Ovington* (1875) 1 Ch.D. 279.
[114]  *Morgan v Swansea Urban Sanitary Authority* (1878) 9 Ch.D. 582 at 584–585.

tion restates the rule in *Saunders v Vautier*, but does not, by itself, draw a distinction between a bare trust and a special trust by reference either to the nature of the beneficiary's interest or the scope of the powers and duties of a trustee for a beneficiary absolutely entitled. A trustee for a beneficiary absolutely entitled is liable to account to the trustee, and if he acts on behalf of the beneficiary in relation to the management of the trust property, he is liable to account as agent as well.[116]

*Administrative directions by absolute beneficiary pending transfer*

**1-038**   In the case of a special trust, the beneficiaries, even if they are all ascertained and of full age and capacity and act together, are not entitled to require the trustees, pending transfer of the trust property, to administer the trust in accordance with directions given by them,[117] unless the terms of the trust otherwise provide, and unless certain statutory exceptions to this rule about the appointment of new trustees apply.[118] The Court of Appeal has described a bare trustee of shares in a company as a "dummy",[119] and that imagery might suggest, perhaps, that the function of the bare trustee, pending transfer, is to do what he is told to do by the beneficiary, so that the beneficiary is entitled to give the trustee directions in relation to the administration of the trust property which are binding on the trustee, even if the terms of the trust do not so provide. If an absolute beneficiary were entitled to give such directions to the trustee, that would provide a significant distinction between a bare trust and a special trust.

**1-039**   It is, however, doubtful how far, in the absence of express provision, a trustee is bound to give effect to directions given by an absolute beneficiary, other than a direction to transfer the trust property to him or as he directs. The matter is to a very limited extent governed by statute. A trustee for a beneficiary absolutely entitled can (like a trustee of a special trust) effectively be given directions in relation to his compulsory retirement from office[120]; and (unlike a trustee of a special trust) effectively be given directions in relation to the insurance of trust property.[121] Leaving aside rights to give directions under statutory provisions, it is clear that, in the case of a trust of land, the beneficiary, though absolutely entitled, is not able to give the trustee binding administrative directions.[122] In the case of shares in a company and other assets, the position is less clear. Romer J. considered that there was no doubt that a bare trustee must vote shares at a meeting of the company in accordance with directions by the beneficial owner.[123] It has been held, however, in New Zealand that there is no such obligation.[124] It has been held also that where the

---

[115] *Re Cunningham and Frayling* [1891] 2 Ch. 567 at 571–572.
[116] *Cheong Soh Chin v Eng Chiet Shoong* [2015] SGHC 173 at [38].
[117] See §§ 22-031 and 22-032.
[118] See § 1-039, first fn in that paragraph.
[119] *I.R.C. v Silverts Ltd* [1951] Ch. 521 at 530, CA. See too *AAZ V BBZ* [2016] EWHC 3234 (Fam); [2017] 2 F.C.R. 415 at [85]–[86].
[120] Trusts of Land and Appointment of Trustees Act 1996, ss.19 and 20, as to which see §§ 24-034 referring to §§ 14-032 onwards (s.19) and §§ 16-028 onwards (s.20).
[121] Trustee Act 1925, s.19(2), as substituted by Trustee Act 2000, s.34. See § 1-040 and §§ 34-070, 34-071.
[122] *Ingram v I.R.C.* [1997] 4 All E.R. 395 at 424d, CA, *per* Millett L.J. in a dissenting judgment approved by HL [2000] 1 A.C. 293 at 305D–H, 310G.
[123] *Kirby v Wilkins* [1929] 2 Ch. 444 at 454; and see *Re Castiglione's Will Trusts* [1958] Ch. 549 at 558.
[124] *Re Kirkpatrick* [2005] NZHC 469; 8 I.T.E.L.R. 597. The judgment does not refer to the English cases

CO-TRUSTEE AND CO-EQUITABLE INTERESTS HELD JOINTLY

property consists of shares in a company subject to pre-emption provisions under the company's articles of association, the trustee is not bound to give effect to directions by the beneficiary concerning the implementation of the pre-emption procedure.[125] In Hong Kong, a trustee for a beneficiary absolutely entitled is not bound to execute a power of attorney in favour of the beneficiary even if protected by an adequate indemnity.[126] Australian authority supports the view that the only direction to which a trustee for a beneficiary absolutely entitled must give effect is a direction to transfer the trust property.[127] In a case where the only duty of the trustee is to obey the order of the court in relation to the transfer of property, the trustee is a bare trustee[128] and no question arises of any effective directions being given by the beneficiary who is absolutely entitled. Last and by no means least, the Court of Appeal has expressed the view that it is quite obvious that a trustee for a beneficiary absolutely entitled has no duty whatever to perform.[129]

*Powers of trustee for absolute beneficiary*

There are two potential explanations why a trustee holding property for a beneficiary absolutely entitled might have no duties other than a duty to transfer the property to the beneficiary or as he directs. The first explanation is that the position of such a trustee is so supine, being a mere repository, that he need do nothing whatever, save to effect the transfer. The other is that, pending transfer, he has powers, and hence with it, responsibility, of his own, and the exercise of the powers is up to him, not the beneficiary. The second explanation, to the extent that it is correct, militates against the view that a trustee for a beneficiary absolutely entitled has a passive role. Such a trustee has some powers, even in a case where the beneficiary is of full age and capacity,[130] and the trustee has no unsatisfied rights of indemnity:[131]

**1-040**

(1)  A trustee holding land on trust for an absolute beneficiary is not a mere cypher[132] and has the powers of a beneficial owner in relation to the land.[133] His role is therefore an active one.

(2)  A trustee holding property other than land appears to have powers under the Trustee Act 2000. This is clearest in the case of insurance. The statutory power of insurance under section 19(1) of the Trustee Act 1925,[134] as substituted by the 2000 Act,[135] is exercisable by a trustee for an absolute beneficiary or beneficiaries of full age and capacity, unless the beneficiary

---

cited in the previous footnote, but rather focuses on *Butt v Kelson* [1952] Ch. 197, CA, a case about special trusts considered in this context in § 22-032.

[125]  *Re Kirkpatrick*, above.

[126]  *Hotung v Ho Yuen Ki* (2002) 5 I.T.E.L.R. 556, HK CA.

[127]  *Herdegen v Federal Commissioner of Taxation* (1988) 84 A.L.R.271 at 281, Aus FC.

[128]  *Re Docwra* (1885) 29 Ch.D. 693.

[129]  *Re Lashmar* [1891] 1 Ch. 258 at 267, CA.

[130]  As to the powers of a trustee of an absolute trustee for a minor, see § 1-042.

[131]  As to the powers of a trustee with an unsatisfied right of indemnity, see § 1-043.

[132]  *Ingram v I.R.C.* [1997] 4 All E.R. 395 at 424d, CA, *per* Millett L.J. in a dissenting judgment approved by HL [2000] 1 A.C. 293 at 305D–H, 310G. See too *Byrnes v Kendle* [2011] HCA 26; 14 I.T.E.L.R. 299 at [21].

[133]  Trusts of Land and Appointment of Trustees Act 1996, s.6 which applies to bare trustees, see § 37-005. At common law a trustee of land for beneficiaries absolutely entitled did not have power to sell the land without their consent: *Lee v Somes* (1886) 36 W.R. 884.

[134]  Printed in § 34-070.

[135]  Trustee Act 2000, s.34.

or beneficiaries otherwise direct.[136] It is equally clear that the trustee is under the statutory duty of care in section 1 of the 2000 Act[137] when exercising the statutory power of insurance.[138] The fact that bare trustees are intended to have the revised statutory power to insure conferred by the 2000 Act tends to indicate that they are also intended to have the general power of investment under section 3 of that Act.[139] The question then arises whether a bank's or stockbroker's trustee company, for instance, holding shares as nominee for a customer, has power to change the investments, and even a duty to do so when a banker or stockbroker would conclude that it was unwise to continue to hold them. It is hard to escape the conclusion that it does on the wording of the 2000 Act. Although the provision that trustees are under the statutory duty "when exercising" the general power appears to exclude the time when they are considering whether, or when, to exercise it[140] that does not help. The reason is that it leaves them under the statutory duty carefully to review their investments from time to time.[141] Conceivably such a nominee is to be considered something different from a trustee, considering the use of different words in section 16 of the 2000 Act,[142] but that would be a difficult interpretation. All that can be said until judicial light is thrown on the puzzles thrown up by the failure to define "trustee" in the 2000 Act is that, whenever the Act confers on bare trustees a power to which the statutory duty is applied, the bare trustees are bound to come up to the statutory standard of care when exercising the power. The reasoning which indicates that the statutory power of investment applies to bare trustees suggests that other powers in the 2000 Act do so as well, with a statutory duty of care under the 2000 Act when applicable,[143] namely the power to acquire land under section 8 of the 2000 Act,[144] the power to delegate to agents under section 11 of the 2000 Act,[145] and powers concerning remuneration under sections 28 and 29 of the 2000 Act.[146]

(3)   The position as to administrative powers under the Trustee Act 1925 (other than section 19 as substituted by the 2000 Act,[147] concerning insurance) is unclear.[148] The statutory powers of maintenance and advancement in sections 31[149] and 32[150] of the Trustee Act 1925 are not mere administrative powers. The former cannot, in view of its terms, have any application in relation to an adult beneficiary with an absolute interest. The latter is expressed to apply to a beneficiary who is absolutely entitled, but it has

---

[136]  Trustee Act 1925, s.19(2) and (3), as substituted by Trustee Act 2000, s.34.
[137]  Printed in § 34-007.
[138]  Trustee Act 2000, s.2 and Sch.1, para.5. See § 34-008.
[139]  Printed in § 35-002.
[140]  See § 34-008.
[141]  See §§ 34-008(1) and 35-076.
[142]  See § 34-085.
[143]  See generally § 34-008.
[144]  Printed in § 35-123.
[145]  Printed in § 36-013.
[146]  See §§ 20-020 onwards.
[147]  Trustee Act 2000, s.34.
[148]  Matthews [2005] P.C.B. 336 at 343 suggests that the power under Trustee Act 1925, s.22(4) to have accounts audited applies to a bare trustee.
[149]  Printed in §§ 31-011 and 31-017.
[150]  Printed in § 32-011.

nonetheless been said that the power is destroyed when property vests absolutely in a beneficiary on attaining full age.[151]

(4) It is also unclear what, if any, powers a trustee for a beneficiary absolutely entitled has under the general law. There are authorities which suggest that a bare trustee has power to exercise his legal rights as owner of shares in a company in the interests of the beneficiary,[152] in default of directions by the beneficiary (to the extent that the beneficiary is entitled[153] to give effective directions).[154]

### Express powers conferred on trustee for absolute beneficiary

A trustee for a beneficiary absolutely entitled may have express powers and duties conferred or imposed upon him by the trust instrument or otherwise by agreement between him and the beneficiary, so that the relationship is, on any view, of an active nature. It may be argued that, in such a case, the express powers and duties necessarily derive from the law of contract, constituting an agency between the bare trustee and the beneficiary, so that the bare trustee remains a mere repository so far as the law of trusts is concerned.[155] Clearly an agency arrangement under the law of contract can be created, but we do not think that it should necessarily be assumed that this is the only way of conferring, at least, express administrative powers on a trustee for an absolute beneficiary. If the general law itself confers powers, to some extent, on such a trustee,[156] it is not obvious why it should not be possible to confer express powers under trust law to supplement or replace powers under the general law, or statutory powers. The point is not merely academic. If express powers (or duties) for a bare trustee necessarily derive from an agency, they would, for instance, fail on the incapacity of the beneficiary, unless created under an enduring[157] or lasting[158] power of attorney.

**1-041**

### Absolute trust for minor

Whatever is the position in relation to a bare trust created by a person of full age and capacity as a sole absolute beneficiary, it is clear, in our view, that an absolute trust can be created by a settlor for a minor beneficiary[159] with extensive administrative powers available during minority consistent with the beneficial interest, and with the statutory powers of maintenance and advancement conferred by sections 31[160] and 32[161] of the Trustee Act 1925 with modifications to those powers not altering their substantive character, whether by way of declaration of trust by the settlor,

**1-042**

---

[151] *Pilkington v I.R.C.* [1964] A.C. 612 at 641, HL, referring to the destruction of the power on absolute vesting in an adult.

[152] *Re Kirkpatrick*, above.

[153] As to whether an absolute beneficiary can give binding directions to the trustee pending transfer, see §§ 1-038 and 1-039.

[154] *Kirby v Wilkins* [1929] 2 Ch. 444 at 454. But see *Re Lashmar* [1891] 1 Ch. 258 at 267, CA; *I.R.C. v Silverts Ltd* [1951] Ch. 521 at 530, CA.

[155] See Matthews [2005] P.C.B. 266 at 267–268.

[156] See § 1-040.

[157] Under Mental Capacity Act 2005, s.66(3) and Sch.4 (which replaced Enduring Powers of Attorney Act 1985).

[158] Under Mental Capacity Act 2005, s.9 and Sch.1.

[159] *Note Herdegen v Federal Commissioner of Taxation* (1988) 84 A.L.R.271 at 282, Aus. FC.

[160] *Re Kehr* [1952] Ch. 26. If the minor dies during minority, accumulations will form part of his estate since they will follow the destination of the capital, see § 31-018. As to a revocable appointment of

or by transfer to trustees to hold on trust for the beneficiary. Plainly, the law of contract and agency has no role to play in bare trusts of this nature. And the description of the trustee of such a trust as a mere repository is inept. An absolute trust for a minor may be varied under the Variation of Trusts Act 1958.[162]

*Trustee's own interest—unsatisfied rights of indemnity*

**1-043**    A trustee who holds property for a beneficiary absolutely entitled is not, for some legal purposes, a "bare trustee" if the beneficiary's interest takes effect subject to any equitable interest or lien in the trust property to which the trustee is entitled (or any other beneficial interest of the trustee).[163] In our view, there is an important distinction between a trustee who holds the trust property for a beneficiary absolutely entitled, and free from any unsatisfied rights of indemnity of the trustee, and a trustee who holds property for such a beneficiary subject to unsatisfied rights of indemnity (which confer an equitable interest or lien on the trustee[164]). Though there are doubts about the extent of the trustee's powers and duties in the former case, there are none in the latter case. The express powers conferred on the trustee before the beneficiary became absolutely entitled survive pending satisfaction of the trustee's right of indemnity,[165] and the trustee has a right of retention and so is not bound to give effect to any direction by the beneficiary as to the transfer of the trust property, so far as the retention is proper to satisfy the rights of indemnity.[166] The trustee, in this latter case, is in no sense a mere repository and is in a similar (but not identical[167]) position to a trustee of a special trust, save that he has personal rights of indemnity against the beneficiary as well as a proprietary indemnity.[168]

*Custodian trustee*

**1-044**    A custodian trustee under the Public Trustee Act 1906 is not a bare trustee.[169]

---

an absolute interest to a minor, see *Re Delamere's Settlement Trusts* [1984] 1 W.L.R. 813, CA.
[161]  *Re Kehr*, above; *D (a child) v O* [2004] EWHC 1036 (Ch); [2004] 3 All E.R. 780 at [8]–[9]. See § 32-026.
[162]  *D (a child) v O*, above. See § 53-012.
[163]  *Morgan v Swansea Urban Sanitary Authority* (1878) 9 Ch.D. 582; *Re Blandy Jenkins' Estate* [1917] 1 Ch. 46. See too *Lysaght v Edwards* (1876) 2 Ch.D. 499 at 506; *Schalit v Joseph Nadler Ltd* [1933] 2 K.B. 79 at 81–82.
[164]  See § 19-044. The rights of a bare trustee to indemnity were considered in *Scoretz v Kensam Enterprises Inc.* [2017] BCSC 1356; 20 I.T.E.L.R. 511 at [51]–[60]; [2018] BCCA 66 at [38]–[40], where it was held at first instance that a bare trustee had a personal but no proprietary right of indemnity, and the appellate court was not persuaded that there was a right to security for indemnity, though thought that a bare trustee had a right of reimbursement. It is clear, however, from *Hardoon v Belilios* [1901] A.C. 118 at 124, PC, that the personal right of indemnity (see §§ 19-057 to 19-060) is in addition to not in place of the proprietary right of indemnity. *Scoretz* can be explained as a case where the trustee wrongly sought indemnification before transferring the trust assets to the beneficial owner when there was no unsatisfied right of indemnity.
[165]  *X v A* [2000] 1 All E.R. 490.
[166]  See § 24-038.
[167]  He has a duty to notify the beneficiary of an intention to exercise his powers, see *X v A* above.
[168]  See §§ 19-057 onwards.
[169]  *I.R.C. v Silverts Ltd* [1951] Ch. 521, CA. *Re Brooke Bond & Co. Ltd's Trust Deed* [1963] Ch. 357. As to custodian trustees, see §§ 18-059 onwards.

*Two or more persons absolutely entitled*

A trustee who holds property in trust for two or more persons absolutely is not in all respects in the same position as a trustee who holds property in trust for a single beneficiary absolutely.[170]                                                                          **1-045**

*Sub-trusts of absolute trusts*

If A holds property in trust for B absolutely and B declares that he holds his equitable interest in the property in trust for C absolutely, the declaration of trust is not tantamount in law to an assignment by B to C so that B drops out of the relationship. Rather A continues as a trustee for B who holds as sub-trustee for C.[171] Since B is a mere bare trustee for C, A may account directly to C, but is not bound to do so, and C cannot complain if A continues to pay the income of the property to B who in turn is liable under the sub-trust to pay C.[172] If C wishes to assert a direct equitable right against A, then he may terminate the sub-trust under the rule in *Saunders v Vautier*[173] by requiring an assignment from B, and if C wishes to obtain a transfer of the property itself, he may obtain an order for a transfer in proceedings against A to which B is party, and the court may not, since B is before the court and bound by the order made, require B to be a party to the transfer.[174]                                                                          **1-046**

*Liability for knowing receipt*

Distinctions may be drawn between the liability of beneficiaries for knowing receipt by their trustees, according to whether the trust is a nominee arrangement or a special trust.[175]                                                                          **1-047**

**Vested interests**

A vested interest[176] is an interest which is not subject to any condition precedent.[177] Thus a beneficiary may have a vested interest in trust assets even though he is not entitled to immediate enjoyment of those assets under the terms of the trust. An interest may be vested in interest or vested in possession. An interest vested in possession confers an immediate right to present enjoyment of the property while an                                                                          **1-048**

---

[170]  See generally §§ 22-006 to 22-012.

[171]  *Nelson v Greening & Sykes (Builders) Ltd* [2007] EWCA Civ 1358; 10 I.T.E.L.R. 689 at [56]–[57]; *Sheffield v Sheffield* [2013] EWHC 3927 (Ch); [2014] W.T.L.R. 1039 at [78] onwards; those cases considering and explaining earlier authorities which at first sight appear to be a contrary effect, namely *Burgess v Wheate* (1759) 1 Eden 177; *Head v Lord Teynham* (1783) 1 Cox Eq. 57; *Grainge v Wilberforce* (1889) 5 T.L.R. 436 at 437; *Re Lashmar* [1891] 1 Ch. 258 at 267, CA; *Grey v. I.R.C.* [1958] Ch. 690 at 715, CA. In *Re Charlotte Street Properties Ltd* [2019] EWHC 1722 (Ch) at [59], *Re Lashmar* was cited as authority for the proposition that, where the sub-trustee has no active duties to perform the legal owner as head-trustee could act on the directions of the beneficiaries under the sub-trust. The more recent authorities were not referred to. On the nature of the proprietary interest under a sub-trust see too *Re Lehman Brothers International (Europe) (in admin.)* [2010] EWHC 2914 (Ch) at [226] (on appeal [2011] EWCA Civ 1514; [2012] 2 B.C.L.C 151); *SL Claimants v Tesco Plc* [2019] EWHC 2858 (Ch) at [45]–[93].

[172]  *Sheffield v Sheffield*, above.

[173]  (1841) Cr. & Ph. 240. See §§ 22-014 onwards.

[174]  *Head v Lord Teynham*, above; *Grainge v Wilberforce*, above.

[175]  See §§ 42-053 and 42-061.

[176]  For a history of vested interests see Hawkins, *Construction of Wills* (5th edn), §§ 45-001 onwards.

[177]  *Skelton v Younghouse* [1942] A.C. 571 at 575, HL.

interest that is merely vested in interest confers a present right to future enjoyment. Both are distinct from a contingent interest which will not vest unless and until some requirement (other than merely the determination of a prior interest) is satisfied, for instance attainment of some specified age, or survival to a particular time, or the occurrence of some external event. Where property is held on trust for "A for life, then to B absolutely" both A and B have a vested interest in the property albeit A has the immediate right to enjoy the property. A's interest is vested in possession and B's interest is vested in interest. By contrast, a beneficiary with a contingent interest has no vested right until the contingency occurs.[178] A vested interest is transmissible and may be assigned by the beneficiary, and will form part of the beneficiary's estate upon his death.[179]

*Indefeasible and defeasible vested interests*

**1-049**   A vested interest, whether vested in possession or vested in interest, may be either indefeasible or defeasible. An interest is indefeasible if there is no prior or concurrent interest or power which is capable of defeating it in whole or in part. To take the simple case of a trust for A for life and then to B absolutely, the existence of A's life interest operates to postpone the vesting in possession of B's interest, but it cannot defeat it, and so B has an indefeasible interest.

*Vested interest defeasible by prior or concurrent interest*

**1-050**   A vested interest may be wholly or partially defeasible by a prior interest or partially defeasible by a concurrent interest. For example, if there is a trust for A for life, then for such of A's children as attain the age of 18 years, and then for B absolutely, B's interest is defeasible since it will be destroyed if A has children who attain that age and who have a interest which takes priority over B's interest. If a fund is held in trust for such of A's children whenever born who attain the age of 18 years, and it is clear from the wording used that the class of beneficiaries does not close when the eldest child reaches the age of 18 years,[180] then during A's lifetime any child of A who is over the age of 18 years has an interest which is vested but liable to be partially divested by the birth of another child to A.

*Vested interest defeasible by exercise of overriding power of appointment*

**1-051**   Where a power of appointment over capital and income of trust property is exercisable in favour of a class of beneficiaries, and subject to and until and in default of appointment, the property is held on trust for A for life and then to B absolutely, both A and B have defeasible vested interests since their interests are capable of being brought to an end in whole or in part by an exercise of the power of appointment. "The effect of such an exercise of the power is to defeat wholly or *pro tanto* the interests which up to then were vested in the persons entitled in default of appointment and to create new estates in those persons in whose favour the ap-

---

[178] See § 1-055.
[179] This paragraph was cited with approval in *Twin Benefits Ltd v Barker* [2017] EWHC 1412 (Ch) at [77].
[180] See §§ 6-088 onwards on closing of a class of beneficiaries.

pointment had been made."[181] And so a beneficiary with a vested interest may lose some or all of that interest if the trustees choose to exercise a power of appointment in favour of a different beneficiary.[182] Alternatively, a trust may provide for a beneficiary to take in default of the trustees exercising a power of appointment, in which case the default beneficiary will take a vested but defeasible interest.[183] A vested interest in remainder which is liable to be divested by the exercise of a power to appointment the capital of the trust in favour of the life tenant may be treated as a financial resource of the remainderman under section 25(2)(a) of the Matrimonial Causes Act 1973, and thereby brought into ancillary relief proceedings.[184]

*Terminable vested interests*

Closely similar to a defeasible vested interest is a terminable vested interest. A   **1-052**
terminable vested interest is one that is subject to a condition subsequent (rather than precedent) which, if it occurs, has the effect of bringing the interest to an end before the time of its natural termination, as for example where a testator leaves his estate upon trust for his widow for life or until her remarriage. A feature of a terminable interest is that it may sometimes be created so as to achieve some objective which is not permitted by law if sought to be achieved by direct prohibition. For instance, it is not permissible in English law to prohibit the assignment of interests under trusts, but it is permissible to create an interest which is for life or until an earlier assignment or attempted assignment of the interest by the holder of the interest.[185]

*Fine distinctions between contingent and vested defensible interests*

The distinction between a vested defeasible and contingent interest can often seem   **1-053**
to be both narrow and technical. If property is given to A if he reaches a certain age, with a subsequent gift over to B if A fails to reach that age, then A's interest in the property is a vested interest subject to divestment, rather than a contingent interest.[186] That particular rule is founded on the principle that the condition subsequent of the prior gift to A and the condition precedent of the later gift to B are counterparts to one another and the court, when faced with the two gifts, reads them together to indicate that A's interest should vest subject to the subsequent contingency of the gift over being satisfied.[187] Similarly, if property is devised to A for life and then to B and C in equal shares, with a gift over in the event of either B or C dying without issue, then B and C will take vested interests in remainder subject to being divested if they die before A leaving any issue, but which will become absolute interests if they predecease A but do not leave any issue.[188]

---

[181]  *Re Brook's Settlement Trusts* [1939] Ch. 993 at 997D–E.
[182]  *Howell v Lees-Millias* [2009] EWHC 1754 (Ch); [2009] W.L.T.R. 1163.
[183]  *Re Ware* (1890) 45 Ch. D. 269 at 279; *Re Peel* [1964] 1 W.L.R. 1232.
[184]  *C v C (Ancillary Relief: Trust Fund)* [2009] EWHC 1491 (Fam); [2010] W.T.L.R. 1419 at [64]. See §§ 51-011 and 5-046 onwards.
[185]  See §§ 6-179.
[186]  The rule in *Phipps v Ackers* (1842) 9 Cl. & Fin. 583. See further *Brotherton v I.R.C.* [1978] 1 W.L.R. 610, CA. See § 9-035 and § 33-013.
[187]  *In re Penton's Settlements* [1968] 1 W.L.R. 248 at 256 *per* Ungoed-Thomas J; *Re Mallinson's Consolidated Trusts* [1974] 1 W.L.R. 1120; see §§ 9-035 onwards.
[188]  *Browne v Moody* [1936] A.C. 635 at 649B–C, PC; *Re Brooke* [1953] 1 W.L.R. 439.

*Practical significance of the distinction between contingent and vested defeasible interests*

**1-054**  The main reasons why the distinction between a contingent and vested defeasible interest is significant are as follows:

(1)  Vesting is at the heart of the application of the rule against perpetuities, and the rule against perpetuities applies in a quite different way to contingent interests on the one hand and defeasible or terminable vested interests on the other hand. If an interest is contingent upon occurrence of an event which is too remote then the interest fails. If an interest is vested but defeasible by the occurrence of an event which is too remote then the condition subsequent fails and the interest is indefeasible.[189]

(2)  Similarly, the distinction between a contingent interest and defeasible interest is significant in determining whether the unlawful character of an event upon which an interest is dependent causes the interest to fail or causes the condition to fail.[190]

(3)  The distinction is important to the operation of[191] the doctrine of acceleration.[192]

(4)  Though statute[193] has to a large extent assimilated the treatment of income arising in respect of contingent and vested defeasible interests, the distinction between the two kinds of interest remains important in that the starting point to any consideration of interests in income is that a vested interest, subject to any prior vested interest, carries the right to income unless and until the interest determines, while a contingent interest does not carry that right until the contingency occurs.

**Contingent interests**

**1-055**  A contingent interest is an interest which may become a vested interest but is dependent for that transformation upon a future event or occurrence. The difference between an estate vested in interest and a contingent interest is the difference between a "present right of future enjoyment" and "a right of enjoyment which is to accrue, on an event which is dubious or uncertain."[194] As we have seen, in the case of a trust for A for life, then to B absolutely, both A and B have vested interests, and even if B predeceases A, then B's vested interest will pass to his estate.[195] In contrast, a trust for A for life, then to B provided that B shall outlive A creates a contingent interest in favour of B because B will obtain a vested interest only if he is still alive when A dies.[196]

---

[189]  See §§ 6-037 onwards and § 6-109.
[190]  See §§ 6-025, 6-026.
[191]  See § 9-035.
[192]  See §§ 9-031 onwards.
[193]  Trustee Act 1925, s.31 on which see Chap.31.
[194]  Fearne, *Contingent Remainders and Executory Devises* (10th edn, 1844), p.2.
[195]  *Browne v Moody* [1936] A.C. 65 at 644H–647B, PC.
[196]  This paragraph was cited with approval in *Twin Benefits Ltd v Barker* [2017] EWHC 1412 (Ch) at [77].

*Trusts for children*

A trust for such children of the settlor as attain the age of 18 years does not confer a vested interest on any child until he reaches 18. The interest remains contingent,[197] even if the trustees have the power to apply the income for the benefit of the beneficiaries before they reach 18.[198] If, however, the trust provides for the minor beneficiaries to receive the income of the trust before reaching 18 then that is likely to create a vested interest liable to be divested if they fail to live to the requisite age.[199] A trust in favour of children who attain 18 and, if there is only one child, in trust for that child, does not require the only child to reach 18 for the gift to vest: the contingency is applicable only if there is more than one child.[200]

**1-056**

*Gift to a class upon a contingency and a gift to a contingent class*

There is a distinction between a gift to a class upon a contingency, and a gift to a contingent class.[201] In the former case the rule is that the contingency is not imported by implication into the description of the class so as to confine the gift to those members of the class who survive the contingency. Where a testator created five life interests for his five children and after the death of the last survivor his trustees held the fund on trust for the issue of his children, the fact that some of the testator's grandchildren had predeceased him did not preclude their executors from claiming their share. The grandchildren as a class obtained a vested interest in the fund which was not dependent on surviving the last remaining child of the testator, and was not liable to divestment, *i.e.* an absolute vested interest.[202]

**1-057**

**Unascertained interests**

There is a distinction between a contingent interest and an unascertained interest. If property is held on trust for A for life, subject thereto for B (who is A's eldest son) if he survives A, subject thereto for C (who is A's second son) if he survives B, both B and C have future contingent interests. But suppose that instead property is settled on trust for A for life and subject thereto for the person who on A's death is A's eldest surviving son, or, which is the same thing, the son of A who would be his heir under the law in force concerning succession to freehold land before 1926. In such a case, on the authorities, neither B nor C has a contingent interest; each has a mere *spes*. The point has arisen in relation to trusts in favour of the person who will at a future date succeed to a title. It has been held that the presumptive heir does not have a contingent interest, but rather a mere expectancy. As was said by Stamp J. in *Re Midleton's Will Trusts*:[203]

**1-058**

---

[197] *Leake v Robinson* (1817) 2 Mer. 383; *Bull v Pritchard* (1847) 1 Russ. 213; *Dewar v Brooke* (1880) 14 Ch. D. 529; *Thomas v Wilberforce* (1862) 31 Beav. 299; compare *Bree v Perfect* (1844) 1 Coll. 128; *Re Bevan's Trusts* (1887) 34 Ch. D. 716.

[198] *Re Hume* [1912] 1 Ch. 693 at 699; *Haworth v I.R.C.* [1974] S.T.C. 378.

[199] *Re Hume*, above, at 698. See § 1-049.

[200] *Johnson v Foulds* (1867) L.R. 5 Eq. 268 at 276. Compare *Judd v Judd* (1830) 3 Sim. 525; *Merry v Hill* (1869) L.R. 8 Eq. 619 where the condition applied to the only surviving child as well.

[201] *Boulton v Beard* (1853) De G.M.&G. 608; *Orlebar's Settlement Trusts* (1875) L.R. 20 Eq. 711; *Hickling v Fair* [1899] A.C. 15, HL Sc; *Re Walker* [1917] 1 Ch. 38; *Re Sutcliffe* [1934] Ch. 219.

[202] *Re Sutcliffe* [1934] Ch. 219.

[203] [1969] 1 Ch. 600 at 607–608.

"A gift to A, if on the death of B he shall be the heir of B or one of the next-of-kin of B or shall then have some other specified characteristic, confers on A a present interest called contingent and which becomes vested if, on the death of B, A has the required characteristic. On the other hand, a gift to whomsoever shall at the death of B, a living person, be the heir of B or one of the next-of-kin of B, or shall then have some other characteristic, in my judgment confers no interest upon anyone until the death of B, when you enquire who has the required characteristic. A gift in equal shares to the persons who at the death of B shall be members of the Athenaeum club no more confers an interest, contingent or otherwise, on the present members of the club who may hope to remain members until the death of B. Neither class has during the life of B, even if B be in articulo mortis, more than a hope of being or becoming one of the designated class, *spes successionis*."

And so in that case a trust in favour of the person who should on the death of the present holder of a peerage become the holder of the peerage created no interest in favour of the presumptive heir.[204] Thus, there is a great deal of difference between the treatment of a trust for A, who is the eldest son of Lord X, contingently upon his surviving Lord X, and a trust for the person who becomes Lord X upon the death of the present holder of that peerage. In the first case A has all the protection conferred by trust law on future contingent interests while in the second case, A has nothing but a *spes successionis* while Lord X is alive, even though it is certain that A will take under the trust on his father's death if he survives his father.

*Practical importance of the distinction between contingent and unascertained interests*

1-059    The distinction between a contingent interest and an unascertained interest has practical importance as follows:

(1)    *Assignment.* A future vested or contingent interest under a trust is capable of being settled without consideration since it is a present right or existing contingent right[205] to future enjoyment.[206] In contrast, an unascertained interest cannot be assigned except for value.[207] Thus a line of cases[208] decides that a presumptive taker under a gift to the next of kin of a living person as such has no contingent interest, but a mere expectancy that cannot be assigned except for value.[209]

(2)    *Information.* A person with an unascertained interest is not, as the authorities stand, entitled to information or accounts from the trustees.[210]

(3)    *Breach of trust.* A person with an unascertained interest does not, as the authorities stand, have *locus standi* to bring a claim for breach of trust.[211]

[204]    *cf. Re St Albans Will Trusts* [1963] Ch. 365.
[205]    See § 2-037.
[206]    Lord *Dursley v Fitzhardinge* (1801) 6 Ves. Jr. 251 at 260, *per* Lord Eldon L.C.
[207]    See §§ 2-036, 2-037.
[208]    *Meek v Kettlewell* (1842) 1 Hare 464 at 475–476 (affd (1843) 1 Ph. 342); *Clowes v Hilliard* (1876) 4 Ch.D. 413; *Re Parsons* (1890) 45 Ch.D. 51; *Molyneux v Fletcher* [1898] 1 Q.B. 648 at 655–656; *Re Mudge* [1914] 1 Ch. 115, CA.
[209]    See §§ 2-039 onwards.
[210]    See §§ 21-009, 21-091.
[211]    See § 41-075.

(4) *Variation of Trusts Act 1958.* The court may approve a variation of trust on behalf of persons with unascertained interests, if satisfied that the variation is beneficial to them, other than any person whose interest would have been ascertained had the date or event upon which the ascertainment of his interest depended occurred at the time of the application to the court.[212] By contrast the court has no jurisdiction to approve a variation of trust on behalf of a person with a future contingent interest unless he lacks capacity.[213]

*Endurance of the distinction between contingent and unascertained interests*

The difference between the treatment of persons who have a future contingent interest and an unascertained interest to a large extent turns on the language used to describe the gift, rather than a difference of substance between the future contingent interest and the unascertained interest. We consider that the stark distinction between the treatment under the authorities as they now stand of a future contingent interest and an ascertained interest is open to reconsideration and perhaps restatement by the Supreme Court (though not any lower English court) or the Privy Council; and that the approach adopted by the Privy Council in *Schmidt v Rosewood Trust Ltd* to the question whether the distinction between a discretionary trust and a mere fiduciary power justified a totally different treatment of the rights of objects of them, might be influential to a re-consideration of the question whether the distinction between a future contingent interest and an unascertained interest justifies the totally different treatment in trust law of the persons who stand to take under them.

**1-060**

**Discretionary interests**[214]

The term 'discretionary interest' is convenient to describe the interests of the object of a discretionary trust. An object of a discretionary trust has no proprietary interest in the trust assets or capital[215] and no right to a definable part of the trust income.[216] In general, a discretionary trust has no one in whom the beneficial interest in the trust property can be said to be vested because vesting is contingent upon the selection of an object from a nominated class.[217] However, an object of a discretionary trust:

**1-061**

"… has a right to be considered as a potential recipient of benefit by the trustees and a right to have his interest protected by a court of equity. Certainly that is so, and when it is said that he has a right to have the trustees exercise their discretion "fairly" or "reasonably" or "properly" that indicates clearly enough that some objective consideration (not stated explicitly in declaring the discretionary trust, but latent in it) must be applied by the trustees and that the right is more than a mere spes."[218]

---

[212] See §§ 43-051 and 43-052.
[213] *Knocker v Youle* [1986] 1 W.L.R. 934.
[214] For further discussion of discretionary trusts, see §§ 28-024 onwards.
[215] *Gartside v I.R.C.* [1968] A.C. 553, HL at 617; *Re Tantular* [2014] JRC 128; 2014 (2) JLR 25 at [30]; *Granada Group Ltd v The Law Debenture Trust Corp. Plc* [2016] EWCA Civ 1289; [2017] Bus. L.R. 870 at [30]; *Biema Holdings Ltd v SG Hambros Bank (Channel Islands) Ltd* [2017] JRC 122 at [61].
[216] *Sainsbury v I.R.C.* [1970] Ch. 712 at 723H.
[217] *Murphy v Murphy* [1999] 1 W.L.R. 282, 290.
[218] *Gartside v I.R.C.* [1968] A.C. 553 at 605–606, HL *per* Lord Reid, at 617H–618B, *per* Lord

A discretionary interest includes a right to be considered for the exercise of the trustees' discretion;[219] a right to compel the due administration of the trust;[220] a *prima facie* right to obtain information and accounts from the trustees;[221] and a right to bring a claim for breach of trust, including a right to compel a third-party recipient of trust assets to restore them to the trustees.[222] It has been suggested that an object of a discretionary trust may have a legitimate expectation of being consulted before a regular payment is stopped, or at least given the opportunity to persuade the trustees to continue the payments.[223] The question whether a discretionary interest counts as an interest under a trust for the purposes of a freezing injunction is considered elsewhere.[224]

**1-062**   A discretionary interest can be surrendered[225] or assigned for value.[226] In certain circumstances all the objects of a closed class of discretionary beneficiaries may act together to bring the trust to an end.[227] However, the objects of a discretionary trust have no interest in possession in the trust fund, and that is the case whether the trust is exhaustive[228] or non-exhaustive.[229]

*Employee benefit trusts*

**1-063**   An employee benefit trust (EBT) is a species of discretionary trust established for the benefit of a company's employees, and will often include as objects the relatives and dependants of the employees. EBTs are often established to save tax by taking advantage of section 86 of the Inheritance Tax Act 1984 (trusts for the benefit of employees) or section 1166 of the Companies Act 2006 (employee share schemes). It should be noted that an attempt to use EBTs to avoid national insurance contributions or income tax is likely to be caught by the disguised remuneration provisions of Part 7A of the Income Tax (Earnings and Pensions) Act 2003. Generally, the trustee of the EBT is entirely separate from the company, which usually acts as the settlor, and from the senior management. It was a breach of trust for the trustees of an EBT established for the benefit of employees to transfer shares in the company to a second EBT established for the benefit of the company's senior management, and the director who instigated the transfer was liable for assisting in the breach of trust.[230] The trustees owe fiduciary duties in the same way as other

---

Wilberforce; *Re Munro's Settlement Trusts* [1963] 1 W.L.R. 145 at 149A; *I.R.C. v Eversden* [2002] EWHC 1360 (Ch); [2002] W.T.L.R. 1013 at [13]–[14] (affd [2003] EWCA Civ 668; [2003] W.T.L.R. 893); *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2015] EWCA Civ 139; [2016] 1 W.L.R. 160 at [13].

[219] *Re Hay's Settlement Trusts* [1982] 1 W.L.R. 202 at 209A–C. See § 29-007.

[220] *Whaley v Whaley* [2011] EWCA Civ 617; [2012] 1 F.L.R. 735 at [112].

[221] *Schmidt v Rosewood Trust Ltd* [2003] 2 A.C. 709 at [51], [66]–[67], PC. See §§ 21-020, 21-078 onwards.

[222] See § 41-073.

[223] *Scott v National Trust for Places of Historic Interest or Natural Beauty* [1998] 2 All E.R. 705 at 718C–H *per* Robert Walker J.; cited with approval in *Maciejewski v Telstra Super Pty Ltd* (1998) 44 NSWLR 601 at 605; doubted in *Re Y Trust* [2011] JRC 135; 14 I.T.E.L.R. 687.

[224] See § 21-118.

[225] *Re Gulbenkian's Settlement Trusts (No.2)* [1970] Ch. 408.

[226] See §§ 26-010 and 26-011.

[227] See §§ 22-022.

[228] *Sainsbury v I.R.C.* [1970] Ch. 712; *Re Weir's Settlement Trusts* [1971] Ch. 145.

[229] *Gartside v I.R.C.* [1968] A.C. 553, HL.

[230] *Roadchef (Employee Benefit Trustees) Ltd v Hill* [2014] EWHC 109 (Ch).

trustees of discretionary trusts,[231] and the beneficiaries have the same rights, including the right to compel the due administration of the trust; to be considered by the trustees; and if necessary to bring an action for breach of trust.

An EBT, as a discretionary trust, must comply with the rule against perpetuities. In certain circumstances an EBT may be drafted sufficiently widely to qualify as a charitable trust, for example for the relief of poverty among members of a class of beneficiaries, and capable of validation under the Charitable Trusts (Validation) Act 1954.[232]    **1-064**

### Interests in possession

An interest in possession is a present right to present enjoyment, a vested and indefeasible interest in the net trust income. In *Pearson v I.R.C.*[233] the House of Lords held that no interest in possession arises if the beneficiary's interest is subject to the trustees' power to accumulate the income thus depriving the beneficiary of access to any of the income from the trust assets, and that this is the case whether or not the trustees have in fact exercised the power to accumulate.[234] The principle applies whether there is a power to accumulate or a trust to accumulate.[235] The question is whether the beneficiary is entitled to call for the net income as soon as it arises. If the answer to that question depends on whether the trustees choose to exercise a power to accumulate the income, then the beneficiary has no interest in possession. The trustees' power must be a dispositive power—a power to dispose of the net income—rather than an administrative power exercisable, for example, to maintain the trust property.[236] An administrative power to apply the trust income would not deprive the beneficiary of an interest in possession because the present right to present enjoyment subsists, albeit that the entire income may be consumed by the trustees' application of the income in the preservation of the trust estate.[237] For the same reasons, a beneficiary will have an interest in possession even if the trust assets do not produce any income. The interest in possession is not created and extinguished according to whether or not there is any income; the beneficiary has an interest in possession if, in accordance with the terms of the trust, he is able to call for the income *if there is any*. For example, if the trustees have the power to make an interest free loan to the beneficiaries, and they exercise that power in such a way that the trust no longer has any income, the beneficiaries may still have an interest in possession provided they would be entitled to any (hypothetical) income the trust assets might generate.    **1-065**

A power of investment that expressly authorises investment in non-income producing assets does not preclude an interest in possession.[238] A trust which confers a right to occupy property, even if the right is not exercised, creates an interest in possession in the beneficiary of that right. Such a right may be shared between beneficiar-    **1-066**

---

[231] *Vigeland v Ennismore Fund Management Ltd* [2012] EWHC 3099 (Ch) at [191]–[201].
[232] *Ulrich v Treasury Solicitor* [2005] EWHC 67 (Ch); [2006] 1 W.L.R. 33.
[233] [1981] A.C. 753, HL.
[234] *Pearson v I.R.C.*, above, at 772A–773H *per* Viscount Dilhorne, 780B–782A *per* Lord Keith.
[235] [1981] A.C. 753 at 773H–774A, HL.
[236] [1981] A.C. 753 at 774G–775B, 784H–785C, HL); *R. v Walker* [2011] EWCA Crim 103; [2012] 1 W.L.R. 173 at [16]–[27].
[237] *Miller v I.R.C.* [1987] S.T.C. 108.
[238] *R v Walker* [2011] EWCA Crim 103; [2012] 1 W.L.R. 173.

ies jointly entitled to occupy a property,[239] and the right may be "dressed up" as administrative directions to the trustees which prohibit them from selling the property while the beneficiaries desire to occupy it. Such a clause is still likely to amount in substance to a dispositive provision creating an interest in possession.[240] In contrast, a beneficiary with a life interest in a residuary estate which includes real estate has no interest in possession in the land in circumstances in which the testator has directed that the land can be occupied rent free by a third party.[241] The direction in the will allowing rent free occupation was dispositive and acted to abate *pro tanto* the life interest of the beneficiary. The beneficiary of a trust of property who was given the right to occupy the property only had an interest in possession of that part which he was capable of occupying, and not that part which was subject to a lease, in circumstances in which the trust gave him no right to receive the rental income.[242]

**1-067**   A separate question arises when the trust deed includes an overriding power of appointment, as it did in *Pearson v I.R.C.*[243] The existence of a power of appointment or revocation does not prevent a beneficiary having a present right to present enjoyment of the income from the trust, although if it is exercised then the beneficiary will of course lose that interest. Unless and until it is exercised, however, the beneficiary has an interest in possession.[244] Forfeiture provisions, including those governing protective trusts under section 33 of the Trustee Act 1925, will also deprive a beneficiary of his interest in possession. Under section 33 if the principle beneficiary is absolutely entitled to receive the income from the trust (*i.e.* has a vested interest in possession) but something happens, for example his bankruptcy, which deprives him of the right to receive that income, then the trust in favour of the principal beneficiary is determined[245] and replaced by a discretionary trust of the income in favour of a class which includes the principal beneficiary.[246]

**1-068**   The sole beneficiary of a discretionary trust has no interest in possession in circumstances in which the discretionary class is not closed, even if the possibility of further entrants to the class is exceptionally remote.[247] If the discretionary class was closed then the sole beneficiary would have an interest in possession.[248] A discretionary trust which compels the trustees to distribute the income does not create an interest in possession in any one object of the trust because even if there is only one object of the exhaustive trust, the object has no interest in the income, only a right to have the trust properly administered.[249]

### Reversionary interests

**1-069**   The term 'reversionary interest' is sometimes used to describe an interest that reverts to the settlor upon the death of a life tenant (*e.g.* A settles property on trust

---

[239] *Woodhall v I.R.C.* [2000] S.T.C. (S.C.D.) 558; [2001] W.T.L.R. 475.
[240] *I.R.C. v Lloyds Private Banking Ltd* [1998] S.T.C. 559 at 566A, *per* Lightman J.
[241] *Oakley v I.R.C.* [2005] S.T.C (S.C.D.) 243; [2005] W.T.L.R. 181.
[242] *Cook v I.R.C.* [2002] S.T.C (S.C.D.) 318; [2002] W.T.L.R. 1003.
[243] [1981] A.C. 753, HL.
[244] [1981] A.C. 753 at 774C–D.
[245] Trustee Act 1925, s.33(1)(i).
[246] Trustee Act 1925, s.33(1)(ii). For forfeiture, see §§ 6-185 onwards.
[247] *Re Trafford's Settlement* [1985] Ch. 32.
[248] [1985] Ch. 32 at 38E–39E.
[249] *Sainsbury v I.R.C.* [1970] Ch. 712 at 724–725; *Re Weir's Settlement Trusts* [1971] Ch. 145 at 166D–167B.

Case 1:22-cr-00673-LAK  Document 341-1  Filed 10/30/23  Page 85 of 166

for B for life, then back to A), but it can be used to refer to any interest in remainder, being an interest under a trust which is postponed until the termination of a preceding interest. Section 47 of the Inheritance Tax Act 1984 defines a reversionary interest as:

> "a future interest under a settlement, whether vested or contingent (including an interest expectant on the termination of an interest in possession which, by virtue of section 50 below, is treated as subsisting in part of any property) …".

A reversionary interest is excluded property if the relevant conditions in section 48 of the Act apply, and the reversionary beneficiary can gift his interest *inter vivos* or by will without inheritance tax being chargeable in respect of the transfer.[250]

**1-070**
A reversionary interest may be vested and not subject to any condition, or it may be vested subject to divestment, or it may be a contingent reversion or "contingent remainder". If property is held on trust "for A for life, then to B" then B has a vested and indefeasible reversionary interest in the trust; if the trust is held "for A for life, then to B, but if B should predecease A then to C" then B has an vested interest in remainder, subject to divestment if he should predecease A; or if property is held on trust "for A for life, then to B if he should attain 21" then B's reversionary interest is contingent on him reaching 21. Any contingent reversionary interest must comply with the rule against perpetuities, *i.e.* the interest must vest within the perpetuity period.[251]

**1-071**
Ordinarily, a reversionary interest is one which is postponed behind that of a life interest. In such cases, the reversionary beneficiaries may have a vested interest liable to be divested either partially or entirely, for example where property is left to A for life and then to A's children in equal shares such that the birth of further children will reduce the existing children's shares. It is possible, if the remainder beneficiaries and the life tenant(s) unanimously consent, for the trust to be brought to an end wholly or partially under the rule in *Saunders v Vautier*.[252] While the antecedent interests remain the beneficiary with a reversionary interest has no right to the income. The interaction between the rights of a life tenant to the income and the right of a beneficiary with a reversionary interest in the capital, including the rule in *Howe v Lord Dartmouth* and *Re Earl of Chesterfield's Trusts*, is explained elsewhere.[253]

### Entailed interests

*General characteristics of an entail before 1926*

**1-072**
Until 1926 an entail, also called an estate tail or fee tail,[254] was a form of freehold estate in land, the others being a fee simple, which was equivalent to full ownership, and a life estate. An entail was created by a settlement or will which limited

---

[250] See *Dymond's Capital Taxes* at §§ 18.100–18.600.
[251] See § 6-060.
[252] *Berry v Green* [1938] A.C. 575 (HL) at 582F–G; *C v C (Ancillary Relief: Trust Fund)* [2009] EWHC 1491 (Fam); [2010] 1 F.L.R. 337 at [14].
[253] See Chap.23, especially §§ 23-113 to 23-185.
[254] See generally Megarry and Wade, *Law of Real Property* (9th edn) §§ 3-046 to 3-059.

land to a person in tail with remainders over.[255] Under the entail the descendants of that person, who was called a tenant in tail, stood to take the land in order of seniority after his death, themselves becoming tenants in tail so that their own interests endured only during their respective lifetimes. A common form of entail was one under which the descendants who could take were restricted to male descendants in the male line of descent in order of seniority, called a limitation in tail male, which was often followed in remainder subject to the limitation in tail male, by a limitation in tail under which all descendants could take in order of seniority. A settlement of land normally created a series of successive entails, for example for the first and every other son of the settlor in order of seniority, and then for the first any every other daughter of the settlor in order of seniority.

**1-073**   Save for a entail created by statute which was made unbarrable by statute,[256] a tenant in tail was entitled to bar his entail by a disentailing assurance executed as a deed.[257] If he was a tenant in tail in possession of the land, the effect of a disentailing assurance was to defeat all estates and interests under the settlement which took effect subject to his entail and to convert his entail into a fee simple,[258] so that the tenant in tail became the absolute owner and the settlement came to an end. If he was not a tenant in tail in possession, a disentailing assurance executed with the consent of the protector of the settlement had a similar effect, though did not prejudice limitations under the settlement having priority to his entail.[259] The protector of the settlement was normally the person who under the settlement was entitled in possession to an estate in the land.[260] The power of a protector to give consent was not subject to any fiduciary or other constraints and the protector was entitled to serve his own personal interests in deciding whether or not to give consent. If the tenant in tail was not entitled in possession, a disentailing assurance executed by him without the consent of the protector operated to create a base fee, that is an estate which did not destroy limitations under the settlement taking effect in remainder after his entail, and which lasted only for so long as his entail would have lasted had there been no disentailing assurance.[261] It was possible for the holder of a base fee to enlarge it into a fee simple estate in a similar way to the way in which land could be disentailed,[262] with the consent of the protector if the base fee holder was not entitled to an estate in the land in possession under the settlement.[263]

*Effect of the 1925 property legislation*

**1-074**   The 1925 property legislation had important effects on entails though did not alter the general characteristics of an entail described in the two previous paragraphs:

---

[255]  As to the wording needed to create an entail, see § 7-087.

[256]  See Fines and Recoveries Act 1833, s.18; *Robinson v Giffard* [1903] 1 Ch. 865. The terms of an unbarrable entail may, nevertheless, be varied under Settled Land Act 1925, s.64, see *Hambro v Duke of Marlborough* [1994] Ch. 158; and on s.64, see §§ 52-025 onwards.

[257]  Fines and Recoveries Act 1833 which replaced a procedure for barring entails by court process, see Megarry and Wade, work cited, §§ 3-048 to 3-052.

[258]  Fines and Recoveries Act 1833, s.15.

[259]  Fines and Recoveries Act 1833, s.34.

[260]  Fines and Recoveries Act 1833, s.22.

[261]  Fines and Recoveries Act 1833, s.34.

[262]  Fines and Recoveries Act 1833, s.19.

[263]  Fines and Recoveries Act 1833, s.35.

(1) Since 1926 entails have not existed as legal estates and can take effect only as equitable interests which must be given effect to by the estate owner.[264] All entails existing at law on January 1, 1926 were on that date converted by statute into equitable interests,[265] which are referred to in the 1925 property legislation as "entailed interests".[266]

(2) When the 1925 property legislation came into force on January 1, 1926, entailed interests could be created by way of trust in any property, real or personal, but only by the like expressions as those by which before 1926 a similar estate tail could have been created by deed (not being an executory[267] instrument) in freehold land, and with the like results, including the right to bar the entail either absolutely or so as to create an interest equivalent to a base fee, and accordingly all statutory provisions relating to estates tail in real property applied to entailed interests in personal property.[268]

(3) Since 1926[269] it has been possible for a tenant in tail[270] of full age to dispose by will or codicil of all property or money subject to an entailed interest of which he is tenant in tail in possession at his death by means of a devise of bequest referring specifically either to the property or to the instrument under which it was acquired, in like manner as though he had a fee simple or absolute interest.[271] Such a disposal can apply to an entailed interest created under the Law of Property Act 1925[272] and to an estate tail created before the commencement of that Act, not to entailed interests made unbarrable by statute.[273]

(4) In default of and subject to the execution of a disentailing assurance[274] or the exercise of the testamentary power conferred by section 176 of the Law of Property Act 1925,[275] an entailed interest (to the extent of the property affected) devolves as an equitable interest, from time to time, upon the persons who would have been successively entitled thereto if the entailed interest had, before 1926, been limited in respect of freehold land governed by the general law in force immediately before 1926 and such law had remained unaffected.[276]

---

[264] Law of Property Act 1925, ss.1(3), 3.

[265] Law of Property Act 1925, ss.1, 39 and Sch.1, Pt 1.

[266] Law of Property Act 1925, s.130(7).

[267] This is explained at § 7-002.

[268] Law of Property Act 1925, s.130(1). Proceeds of personal estate so entailed (not being chattels settled as heirlooms) may be invested, *etc.*, as if they were capital money arising under Settled Land Act 1925, from land settled on the like trusts: see Settled Land Act 1925, ss.67(2), 73.

[269] Law of Property Act 1925, s.176(4).

[270] Which includes the owner of a base fee in possession who has power to enlarge the base fee into a fee simple without the concurrence of any other person, see Law of Property Act 1925, s.176(3).

[271] Law of Property Act 1925, s.176(1).

[272] See Law of Property Act 1925, s.130 and § 1-075.

[273] Law of Property Act 1925, s.176(2).

[274] See § 1-073.

[275] See § 1-073.

[276] Law of Property Act 1925, s.130(4); *Re Price* [1928] Ch. 579, and *Re Hope's Will Trust* [1929] 2 Ch. 136.

*Effect of the Trusts of Land and Appointment of Trustees Act 1996*

**1-075**    The Trusts of Land and Appointment of Trustees Act 1996, which came into force on January 1, 1997,[277] prohibited the creation of new entailed interests. Where a person purports by an instrument coming into operation after January 1, 1997, to grant to another person an entailed interest in real or personal property, the instrument is not effective to grant an entailed interest, but operates instead as a declaration that the property is held in trust absolutely for the person to whom an entailed interest in the property was purportedly granted.[278] If an instrument purports to grant successive entailed interests, then the first one would, in our view, confer an absolute interest and the subsequent interests would not take effect at all since they would be repugnant to the prior absolute interest. Where a person purports by an instrument coming into operation after the beginning of 1997 to declare himself tenant in tail of real or personal property, the instrument is ineffective.[279] We consider that an "instrument coming into operation" from the beginning of 1997 will include a post-1996 appointment made under a pre-1997 power,[280] and a pre-1997 will or codicil of a testator who dies in 1997 or later. The 1996 Act also repealed the statutory provision which after 1925 permitted entailed interests to be created,[281] but provided that the repeals and amendments made by the 1996 Act do not affect any entailed interests created before the 1996 Act came into force.[282]

**1-076**    There is no reason why a settlor or testator who wishes to create an entailed interest should not substantially achieve his objective, within the constraints of the rule against perpetuities, by creating trusts which have a similar effect. It would not, however, be safe for the settlor or testator simply to direct (subject to perpetuity restrictions) that the property is to be held successively for his first and other children for the like interests that they would have taken had they been granted interests in tail and had the 1996 Act never been enacted, for such wording might well be caught by the 1996 Act. The safer course would be to write out the trusts in full. We consider that it would be permissible, for example, for the settlor or testator to direct that property is during some perpetuity period to be held in trust for A for life, subject thereto in trust for A's eldest son for life with power for the eldest son by deed to enlarge his life interest into an absolute interest but only with the consent of A during A's lifetime, subject thereto on trust for the eldest son of the eldest son for life with a similar power, and so on. Done this way, daughters could of course be substituted for sons as required. In practice, there are few settlors and testators who would now wish to produce trusts that would come as close as this to entailed interests.

---

[277]  Trusts of Land and Appointment of Trustees Act 1996 (Commencement) Order 1996 (SI 1996/2974).

[278]  Trusts of Land and Appointment of Trustees Act 1996, s.2(6) and Sch.1, para.5(1).

[279]  Trusts of Land and Appointment of Trustees Act 1996, s.2(6) and Sch.1, para.5(2).

[280]  Compare *Begg-McBrearty v Stilwell* [1996] 1 W.L.R. 951 (effect of statutory reduction of age of majority on Trustee Act 1925), see § 31-007.

[281]  Trusts of Land and Appointment of Trustees Act 1996, s.25(2) and Sch.4 (repeal of Law of Property Act 1925, s.130(1)-(3) and (6)).

[282]  Trusts of Land and Appointment of Trustees Act 1996, s.25(4).

McGhee, Elliott: Snell's Equity, 34th Ed.
(Sweet & Maxwell, 2020),
Excerpts of Chapters 7 and Chapter 21

# PART III—EQUITABLE PROTECTION

CHAPTER 7

# FIDUCIARIES

### CONTENTS

1.— Fiduciaries and Fiduciary Relationships . . . . . . . . . . . . . . 7-001
  1. "Fiduciary" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-002
  2. Fiduciary Relationships . . . . . . . . . . . . . . . . . . . . . . . . 7-003
2.— General Nature of Fiduciary Duties . . . . . . . . . . . . . . . . . . 7-007
  1. Loyalty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-008
  2. Concurrency of Fiduciary and Non-Fiduciary Duties . . . 7-009
  3. Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-010
  4. Proscriptive Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-011
  5. Scope and Duration of Fiduciary Duties . . . . . . . . . . . . 7-012
  6. Authorisation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-014
3.— Conflicts between Duty and Interest . . . . . . . . . . . . . . . . . . 7-018
  1. General Principle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-018
  2. Authorisation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-019
  3. Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-020
4.— Conflicts between Duty and Duty . . . . . . . . . . . . . . . . . . . . 7-036
  1. General Principle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-036
  2. Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-037
5.— Profits made out of Fiduciary Position . . . . . . . . . . . . . . . . 7-041
  1. General Principle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-041
  2. Authorisation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-042
  3. Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-043
6.— Remedies for Breach of Fiduciary Duty . . . . . . . . . . . . . . . 7-051
  1. General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-051
  2. Rescission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-053
  3. Account of Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-054
  4. Proprietary Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . 7-057
  5. Equitable Compensation for Loss . . . . . . . . . . . . . . . . . 7-058
  6. Forfeiture of Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-062
  7. Limitation Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-063
  8. Removal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-064
7.— Relationship with other Equitable Doctrines of Protection . 7-065
  1. Undue Influence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-065
  2. Confidential Information . . . . . . . . . . . . . . . . . . . . . . . . 7-070

### 1.— FIDUCIARIES AND FIDUCIARY RELATIONSHIPS

Separately from the equitable doctrines that modify existing rights of property **7-001** in the interests of justice, equity also provides protection against the inappropriate use of a position of superiority held over another person. One of the fundamental ways in which courts of equity have provided this sort of protection is through the

equitable doctrines applied to persons who are recognised as "fiduciaries" in their relationships with others.

## 1.  "Fiduciary"

**7-002**  The word "fiduciary" has been used in a variety of ways in equitable doctrine.[1] It has been used:

(i)    to describe certain kinds of duties, in order to distinguish those duties from other, non-fiduciary, duties;

(ii)   to identify relationships where fiduciary duties (in sense (i)) are owed;

(iii)  especially historically, as a description of a relationship that is sufficiently akin to the relationship between trustee and beneficiary that similar duties to those owed by a trustee are owed by the party in the trustee-like position[2];

(iv)   to describe relationships where fiduciary duties (in sense (i)) do not arise but where other related equitable doctrines of protection have been applied; and

(v)    inappropriately,[3] in an instrumental fashion in order to justify the imposition of remedies that appear to be unavailable unless the parties are characterised as being in a fiduciary relationship.

This multiplicity of usage, and "unthinking resort to verbal formulae",[4] has created confusion regarding the fiduciary concept and should be avoided.[5] The fiduciary concept has little practical utility unless it is:

"confined to those duties which are peculiar to fiduciaries and the breach of which attracts legal consequences differing from those consequent upon the breach of other duties."[6]

## 2.  Fiduciary Relationships[7]

**7-003**  **(a)  Fiduciary relationships and fiduciary duties.**  A fiduciary "is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them

---

[1]  See, e.g. *Lac Minerals Ltd v International Corona Resources Ltd* (1989) 61 D.L.R. (4th) 14 at 28–31.

[2]  P. D. Finn, *Fiduciary Obligations* (Sydney: Law Book Company, 1977) at [7]; Birks, "The Content of Fiduciary Obligation" (2000) 34 Israel L. Rev. 3 at 3, 8 (republished at (2002) 16 T.L.I. 34 at 36); *Gwembe Valley Development Co Ltd v Koshy* [2003] EWCA Civ 1478 at [89].

[3]  *Lac Minerals Ltd v International Corona Resources Ltd* (1989) 61 D.L.R. (4th) 14 at 29–30; *Norberg v Wynrib* (1992) 92 D.L.R. (4th) 449 at 481; *South Australia v Peat Marwick Mitchell & Co* (1997) 24 A.C.S.R. 231 at 266.

[4]  *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 16; *Re Coomber* [1911] 1 Ch. 723 at 728.

[5]  *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 16; *Girardet v Crease & Co* (1987) 11 B.C.L.R. (2d) 361 at 361; *Lac Minerals Ltd v International Corona Resources Ltd* (1989) 61 D.L.R. (4th) 14 at 26; *Permanent Building Society (In Liquidation) v Wheeler* (1994) 14 A.C.S.R. 109 at 157.

[6]  *Lac Minerals Ltd v International Corona Resources Ltd* (1989) 61 D.L.R. (4th) 14.

[7]  The propositions advanced in this subsection of the chapter were cited with approval in *Ross River Ltd v Waveley Commercial Ltd* [2012] EWHC 81 (Ch) at [235]–[238] (which decision was upheld on appeal as to the existence of a fiduciary relationship: *Ross River Ltd v Waveley Commercial Ltd* [2013] EWCA Civ 910).

FIDUCIARIES AND FIDUCIARY RELATIONSHIPS

that he is a fiduciary".[8] A fiduciary is someone who owes fiduciary duties, and a fiduciary relationship is a relationship between two or more persons in which one, the fiduciary, owes fiduciary duties to the other (or others).[9]

**(b)  Settled categories of fiduciary relationship.**   The paradigm example of a fiduciary relationship is the relationship between trustee and beneficiary: an express trustee owes fiduciary duties to his or her beneficiaries.[10] A resulting trustee or a constructive trustee may owe fiduciary duties to the beneficiaries of their respective trusts, but only once his or her conscience is affected by the trust (which will normally only be once he or she is aware of the trust).[11] Where the trustee is a company, the directors of the company will not ordinarily owe fiduciary duties directly to the beneficiaries of the trust, although they can do so where they have assumed such a responsibility.[12]

**7-004**

Several other categories of relationship are well-settled as fiduciary relationships. In these relationships there is a strong, yet rebuttable, presumption that fiduciary duties are owed.[13] Agents normally owe fiduciary duties to their principals.[14] Solicitors owe fiduciary duties to their clients.[15] Promoters owe fiduciary duties to the company which they are promoting.[16] Partners owe fiduciary duties to each other.[17]

---

[8]   *Lac Minerals Ltd v International Corona Resources Ltd* (1989) 61 D.L.R. (4th) 14; *Arklow Investments Ltd v Maclean* [2000] 1 W.L.R. 594 PC (New Zealand) at 600. This observation is drawn from Finn, *Fiduciary Obligations* (1977) at [3].

[9]   See *Chirnside v Fay* [2006] NZSC 68 at [72]; [2007] 1 N.Z.L.R. 433.

[10]  See, e.g. *Keech v Sandford* (1726) 25 E.R. 223; Sel. Cas. Ch. 61; *Dougan v Macpherson* [1902] A.C. 197.

[11]  See *Lonrho Plc v Fayed (No.2)* [1992] 1 W.L.R. 1 at 11–12; *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] A.C. 669 at 705–706; *R. v Chester and North Wales Legal Aid Area Office (No.12), Ex p. Floods of Queensferry Ltd* [1998] 1 W.L.R. 1496, 1500; P. Millett, "Restitution and Constructive Trusts" (1998) 114 L.Q.R. 399 at 405–406.

[12]  See *Sinclair Investment Holdings SA v Versailles Trade Finance Ltd* [2007] EWHC 915 (Ch) at [76]–[89]; [2007] 2 All E.R. (Comm) 993.

[13]  *Lac Minerals Ltd v International Corona Resources Ltd* (1989) 61 D.L.R. (4th) 14 at 28.

[14]  See, e.g. *De Bussche v Alt* (1878) 8 Ch. D. 286; *Boston Deep Sea Fishing & Ice Co v Ansell* (1888) 39 Ch. D. 339; *Kelly v Cooper* [1993] A.C. 205; *Paper Reclaim Ltd v Aotearoa International Ltd* [2007] NZSC 26 at [33]; [2007] 3 N.Z.L.R. 169; *FHR European Ventures LLP v Cedar Capital Partners LLC* [2014] UKSC 45 at [2]; [2015] A.C. 250. The word "agent" is used in a very broad sense in business, with the consequence that some who are described as agents will not necessarily owe fiduciary duties: *Tonto Home Loans Australia Pty Ltd v Tavares* [2011] NSWCA 389 at [177]. See also *UBS AG v Kommunale Wasserwerke Leipzig GmbH* [2017] EWCA Civ 1567 at [92]; Watts & Reynolds, *Bowstead & Reynolds on Agency*, 21st edn (2018), para.6-037. Like others, an agent's fiduciary duties must be moulded around the duties which the agent has undertaken in his or her retainer: see para.7-012; *Kelly v Cooper* [1993] A.C. 205, 214–215; *Tigris International NV v China Southern Airlines Co Ltd* [2014] EWCA Civ 1649 at [155].

[15]  See, e.g. *Nocton v Lord Ashburton* [1914] A.C. 932; *Moody v Cox* [1917] 2 Ch. 71; *Boardman v Phipps* [1967] 2 A.C. 46; *Clark Boyce v Mouat* [1994] 1 A.C. 428; *Bristol & West Building Society v Mothew* [1998] Ch. 1.

[16]  See, e.g. *Erlanger v New Sombrero Phosphate Co* (1878) 3 App. Cas. 1218; *Gluckstein v Barnes* [1900] A.C. 240; *Jubilee Cotton Mills Ltd v Lewis* [1924] A.C. 958; *Aequitas v AEFC* [2001] NSWSC 14 at [343]; (2001) 19 A.C.L.C. 1,006. See generally J. Gold, "The Liability of Promoters for Secret Profits in English Law" (1943) 5 U.T.L.J. 21; and see H. Gross, "Who is a Company Promoter" (1970) 86 L.Q.R. 493.

[17]  See, e.g. *Aas v Benham* [1891] 2 Ch. 244; *Thompson's Trustee in Bankruptcy v Heaton* [1974] 1 W.L.R. 605; *Chan v Zacharia* (1984) 154 C.L.R. 178; *Don King Productions Inc v Warren* [2000] Ch. 291; *Kao Lee & Yip v Koo* [2003] W.T.L.R. 1283 (Hong Kong).

Guardians owe fiduciary duties to their wards.[18] A receiver owes fiduciary duties to the person on whose behalf he is acting[19] (e.g. to the mortgagee when appointed under a power contained in the mortgage; not to the mortgagor or subsequent encumbrancers, to whom other, non-fiduciary, duties are owed[20]). Crown servants have been held to owe fiduciary duties to the Crown.[21]

Company directors have also consistently been held to owe fiduciary duties to the company.[22] This includes de facto directors,[23] and can also include shadow directors,[24] but not directors-elect.[25] The Companies Act 2006 now provides a statutory code of duties for directors in England and Wales, in place of the common law and equitable duties to which directors have hitherto been subject.[26] The result is that directors will no longer be subject to the duties discussed in this chapter, other than insofar as the 2006 Act so provides. Cases regarding directors which were decided prior to the implementation of the 2006 Act are, however, still relevant in two ways. First, many of them state principles which are of general application to fiduciaries. Secondly, the 2006 Act itself provides that such cases are relevant in interpreting the provisions of that Act.[27] However, caution must be exercised regarding cases decided under the 2006 Act before statements of principle in those cases are treated as statements of principles which apply to fiduciaries generally. The civil consequences of directors acting in breach of the duties contained in the 2006 Act will remain the same as if the corresponding common law or equitable duties had been breached.[28]

Directors' fiduciary duties are generally owed to the company, rather than to the

---

[18] See, e.g. *Hatch v Hatch* (1804) 9 Ves. 292; 32 E.R. 615; *De Manneville v De Manneville* (1804) 10 Ves. 52; 32 E.R. 762; *Clay v Clay* [2001] HCA 9; [2001] W.T.L.R. 393.

[19] See, e.g. *Nugent v Nugent* [1908] 1 Ch. 546; and see *Re B Johnson & Co (Builders) Ltd* [1955] Ch. 634 at 661–662.

[20] See, e.g. *Downsview Nominees Ltd v First City Corp Ltd* [1993] A.C. 295 at 312; *Medforth v Blake* [2000] Ch. 86 at 98–102.

[21] See, e.g. *Reading v Attorney General* [1951] A.C. 507; *Attorney General for Hong Kong v Reid* [1994] 1 A.C. 324; and see *Attorney General v Blake* [2001] 1 A.C. 268 at 280.

[22] See, e.g. *Aberdeen Railway Co v Blaikie Bros* (1854) 1 Macq. 461; 149 R.R. 32; *Imperial Mercantile Credit Association v Coleman* (1873) L.R. 6 H.L. 189; *Parker v McKenna* (1874) L.R. 10 Ch. App. 96; *Regal (Hastings) Ltd v Gulliver* [1967] 2 A.C. 134n.; *Guinness Plc v Saunders* [1990] 2 A.C. 663; *Nant-y-glo and Blaina Ironworks Co v Grave* (1878) 12 Ch. D. 738; *Eden v Ridsdales Railway Lamp and Lighting Co Ltd* (1889) 23 Q.B.D. 368.

[23] See, e.g. *Ultraframe (UK) Ltd v Fielding (No.2)* [2003] EWCA Civ 1805 at [39]; *Re Canadian Land Reclaiming & Colonizing Co* (1880) 14 Ch. D. 660 CA at 670 and 673; *Primlake Ltd v Matthews Associates* [2006] EWHC 1227 (Ch) at [284]; *Shepherds Investments Ltd v Walters* [2006] EWHC 836 (Ch) at [78]. On determining when someone is a de facto director, see *Holland v Revenue and Customs Commissioners* [2010] UKSC 51; *Wetton v Ahmed* [2011] EWCA Civ 610; *Smithton Ltd v Naggar* [2014] EWCA Civ 939 (also considering shadow directorship).

[24] *Instant Access Properties Ltd (in liq) v Rosser* [2018] EWHC 756 (Ch) at [255]–[275] (emphasising the highly fact-sensitive nature of this question); *Vivendi SA v Richards* [2013] EWHC 3006 (Ch) at [142]–[143]; *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1284] and [1289]. See also Companies Act 2006 s.170(5), which was amended in 2015 to make clear that the statute's "general duties apply to a shadow director of a company where and to the extent that they are capable of so applying".

[25] *Lindgren v L & P Estates Ltd* [1968] Ch. 572 at 596 & 604.

[26] Companies Act 2006 s.170(3). For a useful analysis of the duties which applied to company directors before and after 1 October 2007 (when ss.170–181 but not ss.175–177 of the Companies Act 2006 came into force), and before and after 1 October 2008 (when ss.175–177 of the Companies Act 2006 came into force); see *Bhullar v Bhullar* [2017] EWHC 407 (Ch) at [83]–[88].

[27] Companies Act 2006 s.170(4). See *Burns v Financial Conduct Authority* [2017] EWCA Civ 2140 at [64]–[75]; [2018] 1 W.L.R. 4161.

[28] Companies Act 2006 s.178(1).

shareholders of the company. However, in some cases courts have concluded that, in the special circumstances of that particular case, the directors owe fiduciary duties directly to the shareholders.[29] It has also been said that where the fiduciary's duty is owed to a company, courts are more prepared to look behind the corporate veil to identify the persons to whom, as a matter of practical and common-sense reality, the fiduciary's duties are owed.[30]

**(c)   Ad hoc fiduciary relationships.**

*(1)   Principles.*[31]   The categories of fiduciary relationship are not closed.[32] Fiduciary duties may be owed despite the fact that the relationship does not fall within one of the settled categories of fiduciary relationships, provided the circumstances justify the imposition of such duties. Identifying the kind of circumstances that justify the imposition of fiduciary duties is difficult because the courts have consistently declined to provide a definition, or even a uniform description, of a fiduciary relationship,[33] preferring to preserve flexibility in the concept. Numerous academic commentators have offered suggestions,[34] but none has garnered universal support. Thus, it has been said that the "fiduciary relationship is a concept in search of a principle".[35]

**7-005**

There is, however, growing judicial support for the view that:

> "a fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence."[36]

The undertaking can be implied in the circumstances, particularly where someone

---

[29] See, e.g. *Peskin v Anderson* [2000] EWCA Civ 326 at [31]–[36]; *Kyrris v Oldham* [2003] EWCA Civ 1506 at [142]; *Sharp v Blank* [2015] EWHC 3220 (Ch) at [9]–[10]; *Brunninghausen v Glavanics* (1999) 46 N.S.W.L.R. 538; *Coleman v Myers* [1977] 2 N.Z.L.R. 225; *Allen v Hyatt* (1914) 30 T.L.R. 444; *Glandon Pty Ltd v Strata Consolidated Pty Ltd* (1993) 11 A.C.S.R. 543 at 547 (NSWCA).

[30] *Ratiu v Conway* [2005] EWCA Civ 1302 at [78]–[80], [186] and [188].

[31] See generally M. Conaglen, *Fiduciary Loyalty: Protecting the Due Performance of Non-Fiduciary Duties* (Oxford: Hart Publishing, 2010), Ch.9; cited by the Full Court of the Federal Court of Australia in *Grimaldi v Chameleon Mining NL (No.2)* [2012] FCAFC 6 at [177]; (2012) 200 F.C.R. 296.

[32] *English v Dedham Vale Properties Ltd* [1978] 1 W.L.R. 93 at 110; *Tate v Williamson* (1866–67) L.R. 2 Ch. App. 55 LC at 61; *Waxman v Waxman* (2004) 7 I.T.E.L.R. 162 at [504] Ont CA; *South Australia v Peat Marwick Mitchell & Co* (1997) 24 A.C.S.R. 231, 264; *Schipp v Cameron* [1998] NSWSC 997 at [695].

[33] *Lloyds Bank Ltd v Bundy* [1975] Q.B. 326 at 341; *Hospital Products Ltd v United States Surgical Corp* (1984) 156 C.L.R. 41 at 96 and 141; *Maclean v Arklow Investments Ltd* [1998] 3 N.Z.L.R. 680 at 691; *Vivendi SA v Richards* [2013] EWHC 3006 (Ch) at [138].

[34] See, e.g. A. Scott, "The Fiduciary Principle" (1949) 37 Calif. L. Rev. 539 at 540; L. Sealy, "Fiduciary Relationships" [1962] C.L.J. 69 at 72–79; E. Weinrib, "The Fiduciary Obligation" (1975) 25 U.T.L.J. 1 at 4 and 15; Finn, *Fiduciary Obligations* (1977) at [467]; Shepherd, *The Law of Fiduciaries* (1981) at 96; J.C. Shepherd, "Towards a Unified Concept of Fiduciary Relationships" (1981) 97 L.Q.R. 51 at 74–76; P.D. Finn, "The Fiduciary Principle" in T.G. Youdan (ed), *Equity, Fiduciaries and Trusts* (Sydney: Law Book Company, 1989) 1 at 46 & 54; R. Flannigan, "The Fiduciary Obligation" (1989) 9 O.J.L.S. 285 at 309–310; J. Edelman, "When Do Fiduciary Duties Arise?" (2010) 126 L.Q.R. 302 (although see the critique of the latter piece in M. Conaglen, "Fiduciary Duties and Voluntary Undertakings" (2013) 7 Journal of Equity 105).

[35] A. F. Mason, "Themes and Prospects" in P.D. Finn (ed), *Essays in Equity* (Sydney: Law Book Company, 1985) 242 at 246. This paragraph was quoted in *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1285].

[36] *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 18; *Arklow Investments Ltd v Maclean*

# SNELL'S EQUITY

THIRTY-FOURTH EDITION

JOHN MCGHEE QC, MA (Oxon)
*of Lincoln's Inn, Barrister*

STEVEN ELLIOTT QC, BA (Hons), JD (Hons), DPhil (Oxon)
*of Lincoln's Inn, Barrister*

## CONTRIBUTORS

STUART BRIDGE MA (Cantab)
*One of Her Majesty's Circuit Judges; Bencher of the Middle Temple; Life Fellow of Queens' College, Cambridge; Law Commissioner for England and Wales 2001–2008*

MATTHEW CONAGLEN LLB (Hons) (Auck), LLM (Mich), PhD (Cantab)
*Professor of Equity and Trusts, University of Sydney; Academic Barrister, New South Wales and Door Tenant at XXIV Old Buildings*

PAUL S. DAVIES MA (Cantab), PhD
*Professor of Commercial Law, University College London; of Lincoln's Inn, Barrister*

DAVID FOX PhD (Cantab)
*of Lincoln's Inn, Barrister; Professor of Common Law, University of Edinburgh*

BEN MCFARLANE MA (Oxon), BCL
*Professor of English Law, Oxford*

RICHARD NOLAN MA (Cantab);
*Professor of Law, University of York; Barrister of the Middle Temple and Door Tenant at Erskine Chambers*

JANET O'SULLIVAN MA, PhD (Cantab);
*University Senior Lecturer, Faculty of Law, University of Cambridge; Fellow and Director of Studies in Law, Selwyn College, Cambridge*

SWEET & MAXWELL  THOMSON REUTERS

Published and typeset in 2020 by Thomson Reuters,
trading as Sweet & Maxwell
Registered in England & Wales, Company No.1679046.
Registered Office and address for service:
5 Canada Square, Canary Wharf, London E14 5AQ.

For further information on our products and services, visit
www.sweetandmaxwell.co.uk

Printed and bound by CPI Group (UK) Ltd, Croydon, CR0 4YY

No natural forests were destroyed to make this product; only farmed timber
was used and re-planted.

A CIP catalogue record for this book is available from the British Library.

ISBN 978-0-414-07150-6

All rights reserved. No part of this publication may be reproduced or
transmitted, in any form or by any means, or stored in any retrieval system of
any nature, without prior written permission, except for permitted fair
dealing under the Copyright, Designs and Patents Act 1988, or in accordance
with the terms of a license issued by the Copyright Licensing Agency in
respect of photocopying and/or reprographic reproduction. Application for
permission for other use of copyright material including permission to
reproduce extracts in other published works shall be made to the publishers.
Full acknowledgement of author, publisher and source must be given.

Crown copyright material is reproduced with the permission of the
Controller of HMSO and the Queen's Printer for Scotland.

Thomson Reuters, the Thomson Reuters logo and Sweet & Maxwell® are
trademarks of Thomson Reuters.

© 2020 Thomson Reuters

# TITLE HISTORY

| | |
|---|---|
| First Edition | (1868) by Edmund Henry Turner Snell |
| Second Edition | (1872) by J. R. Griffith |
| Third Edition | (1874) by J. R. Griffith |
| Fourth Edition | (1878) by Archibald Brown |
| Fifth Edition | (1880) by Archibald Brown |
| Sixth Edition | (1882) by Archibald Brown |
| Seventh Edition | (1884) by Archibald Brown |
| Eighth Edition | (1887) by Archibald Brown |
| Ninth Edition | (1889) by Archibald Brown |
| Tenth Edition | (1892) by Archibald Brown |
| Eleventh Edition | (1894) by Archibald Brown |
| Twelfth Edition | (1898) by Archibald Brown |
| Thirteenth Edition | (1901) by Archibald Brown |
| Fourteenth Edition | (1905) by Archibald Brown |
| Fifteenth Edition | (1908) by Archibald Brown |
| Sixteenth Edition | (1912) by Archibald Brown |
| Seventeenth Edition | (1915) by H. Gibson Rivington and A. Clifford Fountaine |
| Eighteenth Edition | (1920) by H. Gibson Rivington and A. Clifford Fountaine |
| Nineteenth Edition | (1925) by H. Gibson Rivington and A. Clifford Fountaine |
| Twentieth Edition | (1929) by H. Gibson Rivington and A. Clifford Fountaine |
| Twenty First Edition | (1934) by H. Gibson Rivington |
| Twenty Second Edition | (1939) by H. Gibson Rivington |
| Twenty Third Edition | (1947) by R. E. Megarry |
| Twenty Fourth Edition | (1954) by R. E. Megarry and P. V. Baker |
| Twenty Fifth Edition | (1960) by R. E. Megarry and P. V. Baker |
| Second impression, revised | (1963) by R. E. Megarry and P. V. Baker |
| Twenty Sixth Edition | (1966) by R. E. Megarry and P. V. Baker |
| Twenty Seventh Edition | (1973) by R. E. Megarry and P. V. Baker |
| Twenty Eighth Edition | (1982) by P. V. Baker and P. St.J. Langan |
| Twenty Ninth Edition | (1990) by P. V. Baker and P. St.J. |

|                       | Langan                                |
|-----------------------|---------------------------------------|
| Thirtieth Edition     | (1999) By J. A. McGhee                |
| Thirty-First Edition  | (2005) By J. A. McGhee                |
| Thirty-Second Edition | (2010) By J. A. McGhee                |
| Thirty-Third Edition  | (2015) By J. A. McGhee                |
| Thirty-Fourth Edition | (2020) by J. A. McGhee and S. Elliott |

# PART V—TRUSTS

Chapter 21

**DEFINITION AND CLASSIFICATION OF TRUSTS**

Contents

1.— The Core Case of the Trust  . . . . . . . . . . . . . . . . . . . . . . . . .  21-001
  1.    Definition  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21-001
  2.    Parties to Trust Relationship  . . . . . . . . . . . . . . . . . . . . .  21-007
  3.    Variants on Core Case  . . . . . . . . . . . . . . . . . . . . . . . . . .  21-012
  4.    Functional Approach to Ownership of Trust Property  . . .  21-016
2.— Classifications  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21-017
  1.    Express, Resulting and Constructive Trusts  . . . . . . . . . . .  21-018
  2.    Kind of Legal Event Creating the Trust  . . . . . . . . . . . . . .  21-023
  3.    Bare and Special Trusts  . . . . . . . . . . . . . . . . . . . . . . . . .  21-027
  4.    Private and Public Trusts  . . . . . . . . . . . . . . . . . . . . . . . .  21-030
  5.    Executed and Executory Trusts  . . . . . . . . . . . . . . . . . . . .  21-031
  6.    Completely and Incompletely Constituted Trusts  . . . . . .  21-032
3.— Trusts Compared With Other Relationships  . . . . . . . . . . . . .  21-033
  1.    Bailment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21-034
  2.    Fiduciary Relationships  . . . . . . . . . . . . . . . . . . . . . . . . .  21-035
  3.    Agency  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21-036
  4.    Contract  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21-037
  5.    Power  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21-040
  6.    Administration  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21-047
  7.    The Crown  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21-056

1.—   The Core Case of the Trust

## 1.   Definition

**(a)   General features.**   The general feature of an English trust is that a person **21-001**
in whom property is vested (called the "trustee") is compelled in equity to hold the
property for the benefit of another person (called the "beneficiary"), or for some
legally enforceable purposes other than his own. In the case of an express trust aris-
ing from a settlor's intentions, the conscience of the trustee is bound to give effect
to the entitlements of the beneficiary or to carry out the purposes for which the
property was vested in him. In the case of many trusts arising by operation of law,
the trust is imposed upon the trustee to prevent him from benefiting unconscion-
ably from his ownership of the property.[1]

---

[1] *Westdeutsche v Islington LBC* [1996] A.C. 669 at 705, 709; *Guardian Ocean v Banco do Brasil*
[1994] 2 Lloyd's L.R. 152. It has been said that since the existence of the trust depends on the
trustee's conscience being affected, a person cannot be a trustee of property if and so long as he is
ignorant of the facts alleged to affect his conscience: *Westdeutsche v Islington LBC* at 705, 709. This
may be questioned in the case of resulting trusts, which depend for their creation on presumptions
about the settlor's intentions, not the trustee's: See P.J. Millett (1998) 114 L.Q.R. 399 at 412.

In explaining the nature of a trust it is simplest to begin with the core example of a private express settlement of property. Some of the important variants on that example may then be introduced.

**21-002   (b)   Equitable rights enforceable against trustee and trust property.**   The effect of a trust is to divide the incidents of ownership of the property between the trustee and the beneficiary. The legal ownership vests in the trustee. As legal owner, the trustee enjoys the usual powers of enjoyment and disposition that are incidents of property of that kind. The trustee may, for example, transfer or charge the property as effectively in law as if he had been the entire owner of it. The trustee has the general liberty of a legal owner to deal with the property as he wishes, subject to the restraints of statute and the general law. He generally has the same freedom as any other legal owner to deal with his property as he wishes without having to account for his reasons or purposes in dealing with it.

But when a person holds property as trustee he is treated in equity as taking it subject to the beneficiary's equitable rights, as defined by the general law and stipulated in the trust instrument. The existence of this feature is generally sufficient for the relationship to be defined as a trust.[2] Since historically those entitlements would only have been recognised in equity, the division in the incidents of ownership is explained as a split in the legal and equitable title to the property.

**21-003   (c)   Content of equitable title.**   The beneficiary's equitable title consists in the totality of his equitable rights against the trustee and third parties in respect of the trust property. Since some of the beneficiary's rights are binding on third parties, his title to the trust property is analysed as a proprietary interest.

Against the trustee, the beneficiary's most important right is to hold the trustee accountable for his management of the trust fund and to require the trustee to administer it according to the terms of the trust.[3] The beneficiary can compel the trustee to distribute the economic benefits derived from the trust assets according to the terms of the trust. The beneficiary also has a limited right to control the reasons or purposes that inform the trustee's discretions in dealing with the property.[4]

Against third parties, however, the beneficiary cannot enforce the full range of duties that the original trustee owed to him. Those duties are only binding on the person who assumes the office of express trustee to the beneficiary. His right against a third party consists in a power to make him reinstate the trust property to the trustee if the trustee has transferred it without proper authority under the trust.[5]

**21-004   (d)   Source of beneficiary's equitable rights.**   The beneficiary's equitable rights are defined in the trust instrument and the general law.[6] They determine the trustee's

---

[2]   *Westdeutsche v Islington LBC* [1996] A.C. 669 at 707; *Don King Productions v Warren* [2000] Ch. 291 at 317, per Lightman J; affirmed by the CA; cf. *Hardoon v Belilios* [1901] A.C. 118 at 123, per Lord Lindley. See also *R. v Chester Legal Aid Office, Ex p. Floods* [1998] 1 W.L.R. 1496 at 1500, per Millett LJ describing this as raising a "semantic question"; and P.J. Millett (1998) 114 L.Q.R. 399 at 403–404.

[3]   *Target Holdings Ltd v Redferns (a firm)* [1996] A.C. 421 at 434; *AIB Group (UK) Plc v Mark Redler & Co Solicitors* [2014] UKSC 58 at [64].

[4]   See para.10-017 below.

[5]   See para.30-050 below.

[6]   The most important statutory sources of trustees' powers are the Trustee Act 1925 and Trustee Act

equitable powers and duties over the trust property. These powers and duties may, however, best be analysed as equitable limitations on the trustee's legal ownership of the property.[7] The reason is that if the trustee entered into a transaction that exceeded his equitable powers, then the transaction would be void in equity and possibly a breach of trust. The beneficiary might then have an equitable action to recover the property or a claim against the trustee to make good any losses resulting from his breach.[8] But the invalidity of the transaction in equity would not affect its validity at law. The trustee would have the legal power to enter into the transaction owing simply to his status as the legal owner of the trust property.

The main source of the trustee's powers and duties is the trust instrument. It defines the terms of the "trust bargain" between the settlor and the trustee, and the nature of the beneficiary's interest in the trust fund.[9] The general law is relevant where the trust instrument is silent or where it provides mandatory rules that override the provisions of the trust instrument.

**(e)   Irreducible core.**   An express trustee owes an "irreducible core" of duties **21-005** under the general law.[10] The settlor cannot modify or exclude these duties if the institution he seeks to create is nonetheless to be recognised as a trust. These include a duty not to act fraudulently towards his beneficiary; to be legally accountable to him for this management of the trust assets; and to preserve the integrity of the trust property as a fund separate from the trustee's own assets. The settlor cannot include terms in the trust instrument that conflict with the irreducible core of trustee duties. If he does, then the term is either void (because it is incompatible with the settlor's purported intention to create a trust) or it indicates an intention to enter into a transaction that the court will not give effect to as a trust.

**(f)   Trust property.**   An essential feature of a trust is that there should be **21-006** property vested in the trustee. This feature is often sufficient to distinguish the office of trustee from that of agent.[11] There are some situations, however, where a person who has neither received nor is in possession of property may be called a "constructive trustee". An example is where a third person incurs liability to the principal in a fiduciary relationship by assisting the fiduciary to breach his duties.[12] The description of such a person as a trustee is strictly inaccurate. He may not have received any relevant property which belonged to the beneficiary. The description of the defendant as a trustee is merely a formula to describe his equitable liability to account for the losses caused by his wrongful conduct.[13] Accordingly, such a person will not be described as a trustee in this book.[14]

The beneficiary has an equitable proprietary interest in the trust property. The effect is to segregate the property that the trustee holds for the trust from other

---

2000.
[7]   See R.C. Nolan (2006) 122 L.Q.R. 232; and (2006) 1 J. of Eq. 18.
[8]   See Ch.30.
[9]   See J. Langbein (1995) 105 Yale L.J. 625.
[10]   *Armitage v Nurse* [1998] Ch. 241; D.J. Hayton, Ch.3 in A.J.Oakley (ed), *Trends in Contemporary Trust Law* (Clarendon Press: Oxford, 1996).
[11]   See para.21-036 below.
[12]   See para.30-077.
[13]   *Paragon Finance Plc v Thakerer & Co* [1999] 1 All E.R. 400 at 408–409; *Dubai Aluminium Co Ltd v Salaam* [2003] 2 A.C. 366; [2002] UKHL 48 at [38]–[42].
[14]   See further para.26-004 below.

property that he holds beneficially for himself. The trust property operates as a separate patrimony which is not liable to the debts incurred by the trustee in his personal capacity.[15] The trustee's personal creditors have no claim to the trust property if the trustee becomes insolvent. The beneficiaries may trace and recover trust property that has been paid to a third party in excess of the trustee's equitable powers. The effect is to reconstitute the original fund of trust property.[16]

Although every beneficiary of a private trust may be said to have an equitable interest in the trust property, the content of that interest in may, in some instances, be highly attenuated. For example, the potential beneficiary of a discretionary trust has no vested interest any ascertainable part of the trust fund before the trustee makes an appointment to him.[17] His only right is to be considered by the trustee for a discretionary appointment from the fund. The beneficiary's interest is proprietary only in the limited sense that it would entitle the beneficiary to restrain the trustee from making an unauthorised application of property from the fund. The beneficiary would also have a sufficient title to require any third party who wrongfully received the property to reinstate it to the trustee.

The trustee does not always have the legal interest in the property. His interest may be equitable only, as where a beneficiary under a settlement creates a trust of his interest while the legal ownership is still in the hands of the trustees of the settlement, or where for some other reason the legal estate is outstanding. The effect is to create a sub-trust.[18] As a matter of law the intermediate beneficiary remains a party to the former settlement and a trustee to the ultimate beneficiary. But where the sub-trust is a bare trust the trustees of the original settlement may find it more convenient to deal directly with the beneficiary of the sub-trust.[19]

## 2.   Parties to Trust Relationship

21-007    The key parties to the express trust relationship are the trustee, the beneficiary, and the settlor or testator. Sometimes a trust may also have a protector.

21-008    **(a)   Trustee.**    The trustee is the person who generally owns the trust property.[20] He manages and deals with the trust assets for the beneficiary according to his limited equitable powers. The trustee's interest in the trust assets is described as a "bare title" since he is generally barred by the equitable limits on his ownership of the trust assets from deriving any economic benefit from them.

21-009    **(b)   Beneficiary.**    The beneficiary is the legal person for whose benefit the trustee administers the trust assets.[21] He has equitable rights to make the trustee account

---

[15]   G.L. Gretton (2000) 49 I.C.L.Q. 599 at 608–617; K.G.C. Reid (2000) 8 European Review of Private Law 427.

[16]   See para.30-050.

[17]   See para.22-005.

[18]   See, e.g. *Gilbert v Overton* (1864) 2 H. & M. 110. For "sub-trusts", see P. Matthews, *Scott on Trusts*, 4th edn (Aspen Publishers, 2006) para.10.7; [2005] P.C.B. 335.

[19]   *Nelson v Greening & Sykes (Builders) Ltd* [2007] EWCA Civ 1358; [2008] 1 E.G.L.R. 59.

[20]   The exception is where the trustees enter into a custodianship or custodian trusteeship arrangement. The trust property or any documents of title may be deposited with a custodian or vested in a custodian trustee. The management of the trust property or exercise of any trustee powers remains in the managing trustees: Trustee Act 2000 s.17; Public Trustee Act 1906 s.4.

[21]   The beneficiary must be a human being. A trust for an animal is a purpose trust since the animal lacks

to him for the economic benefits derived from the trust assets, whether individually or collectively with the other beneficiaries. He is the beneficial owner of those assets only to the extent of his entitlements defined in the trust instrument or under the general law. The residue of beneficial ownership is in the trustee to the extent that it is not defined to be in the beneficiary. This follows from the trustee's legal ownership of the trust property.

**(c)   Settlor or testator.**   The settlor or the testator is the person who creates the trust. He defines the terms of the trustee's powers and duties and constitute the trust by vesting the trust assets in the trustee. The word "settlor" is used for a person who creates a trust in an inter vivos transaction. It is not used of a person who creates a trust by will. The usual term "testator" or "testatrix" is used for such a person.   **21-010**

**(d)   Protector.**   Some trusts also have a protector.[22] This person, who is neither a trustee nor generally a beneficiary of the trust, has limited powers defined in the trust instrument to oversee the trustee's administration of the fund. These may include the power to give essential consents to the effective exercise of the trustee's powers, to appoint or remove trustees, or to approve the trustee's remuneration. The distinct office of protector is now formally recognised in some offshore jurisdictions.[23] But even in English law, functions like those of a protector have long been exercised by people who have been authorised to take a part in administering a trust.   **21-011**

## 3.   Variants on Core Case

Not all trust relationships involve trustee powers and duties arising from an express transaction and actionable by a beneficiary.[24] Outside the core case of the private express trust, either of these features may be absent.   **21-012**

**(a)   Trust arising by operation of law.**   Not all trusts arise through the express intention of a settlor or testator to create a trust. Some trusts arise by operation of law once certain facts have happened. These are constructive trusts and resulting trusts. The distinction between express trusts and those arising by operation of law can be a fine one. For example, a constructive trust often arises to give effect to an informal agreement between the trustee and the beneficiary.[25]   **21-013**

**(b)   No equitable powers.**   A trustee may sometimes hold property for a beneficiary without having any equitable powers of management over it and without owing any fiduciary duties to the beneficiary in respect of it. An example is a constructive trust imposed on a person to strip him of the benefits of his fraud against the claimant.[26] This relationship, though called a trust, is a really device to   **21-014**

---

the standing to enforce the trust.

[22]   D. Harnett and W. Norris [1995] P.C.B. 109; A. Duckworth [1996] P.C.B. 169, 245, 328.

[23]   For example Trustee Act 1998 (Bahamas) ss.3, 81; Trustee Ordinance 1961 (British Virgin Islands) s.86

[24]   P.J. Millett (1998) 114 L.Q.R. 399 at 403–406. cf. *Westdeutsche v Islington LBC* [1996] A.C. 669 at 705–707.

[25]   See Ch.24.

[26]   See para.26-011.

give effect to the claimant's entitlement to a proprietary remedy to recover the proceeds of the fraud.

**21-015**  **(c)   Trust for purpose without beneficiary.**   Some trusts do not have a beneficiary. A trustee may hold property to give effect to some purpose defined by the trust instrument or by the general law. In general, the only kind of valid purpose trust recognised in English law is the charitable trust.[27] In the absence of beneficiaries, the Attorney General or the Charity Commissioners have standing to enforce the trustee's equitable duties. Although there are no beneficiaries with equitable interests in the trust property, the property is nonetheless ring-fenced from the claims of the trustee's personal creditors.

## 4.   Functional Approach to Ownership of Trust Property

**21-016**     If, for example, T holds income from property on trust for B, it may be difficult to say who is the "real owner" of the income. Either B is to be regarded as the real owner of the income as it accrues (subject to T's right to deduct expenses),[28] or T is to be regarded as the real owner with B merely having a right to compel T to account to him for the balance due.[29]

But to ask who is the "real owner" may oversimplify the relationship: the question presupposes a universally applicable conception of ownership and a single conception of trust. It is better to approach the question in functional terms. The incidents of ownership are split between the trustee and the beneficiary according to the terms of the particular trust. The nature and extent of their entitlements cannot be determined in the abstract without referring to the terms of the trust instrument.[30]

The relevant conception of ownership may also depend on the purpose of the question. In determining, for example, whether an express trustee is the real owner of property, it may be more productive to ask whether, and to whom, he is accountable for his management of the property, and whether he owes a fundamental duty not to act dishonestly.[31] If he does, it can be said, at least negatively, that the trustee is not the "real" owner of the property. The beneficial incidents of the property may be divided among many different trust claimants or held in suspense.[32] The terms of tax legislation, rather than any abstract conception of ownership, may determine whether a beneficiary is to be treated as having a sufficient interest in the trust to be liable to tax.[33] Similarly, the terms of company or insolvency legislation may

---

[27] See Ch.23. For the approach offshore, see para.22-034.

[28] *Baker v Archer-Shee* [1927] A.C. 844 (B the real owner for income tax purposes); *Corbett v Commissioners of Inland Revenue* [1938] 1 K.B. 567 at 577; *Nelson v Adamson* [1941] 2 K.B. 12.

[29] *Schalit v Joseph Nadler Ltd* [1933] 2 K.B. 79 (B not entitled to distrain for rent due under lease of trust property granted by T).

[30] *CPT Custodian Pty Ltd v Commissioner of State Revenue* [2005] HCA 53; (2005) 79 A.L.J.R. 1724.

[31] D.J. Hayton, Ch.3 in A.J. Oakley (ed), *Trends in Contemporary Trust Law* (1996); *Armitage v Nurse* [1998] Ch. 241.

[32] Purpose trusts illustrate the possibility that a trustee may hold property without any other person having beneficial rights to it (see para.21-015 above). To suspend the beneficial ownership may be the very reason why the settlor vested the property in the trustee: D.J. Hayton (2001) 117 L.Q.R. 96; and P. Matthews, Ch.1 in A.J. Oakley (ed), *Trends in Contemporary Trust Law* (1996).

[33] *Gartside v IRC* [1968] A.C. 553 at 617–618, per Lord Wilberforce; *CPT Custodian Pty Ltd v Commissioner of State Revenue* [2005] HCA 53; (2005) 79 A.L.J.R. 1724. See generally D.M.W. Waters (1967) 45 Can. Bar Rev. 219.

require a court to inquire whether a trustee or beneficiary is entitled to exercise the voting rights or voting power attaching to shares held on trust. To ask who is the "real owner" of the shares without considering the purpose and context of the question would be simplistic.[34]

## 2.— CLASSIFICATIONS

Trusts may be classified in various ways. None of these classifications is absolute or mutually exclusive. Any one trust may be open to more than one classification, depending on the aspect of the relationship that is in issue. So, for example, it will be seen that a trust may be categorised as "constructive" in that it arises by operation of law, irrespective of the intentions of the owner of the property, and at the same time as "bare" in that it imposes no active duties of management on the trustee. An express trust, which arises through the intention of the settlor to create it, may either be public or private in its purposes. This section describes the more important forms of classification.

**21-017**

## 1.   Express, Resulting and Constructive Trusts

A classification of trusts in these terms refers to the degree to which the trust arises through the expression of a settlor's actual intention to create it, or by operation of law and irrespective of the settlor's intentions. The distinction is often a fine one, and depends on a close analysis of the relevant transaction.[35]

**21-018**

**(a)   Express trust.[36]**   An express trust is created by the actual intention of the person in whom the property is vested, as where A declares himself a trustee of Whiteacre for B, or conveys it to C on trust for B. The intention may be apparent from the express use of the words "trust" in the relevant instrument or gathered by inference from A's words or conduct.

**21-019**

**(b)   Resulting trust.[37]**   A resulting trust arises by operation of law, though in response to a legal presumption about the intentions of the person who transfers the property which becomes subject to the trust. If A transfers property to B when it is unclear whether A intends B to have the beneficial interest in it, then B may hold the property on resulting trust for A. The trust arises by operation of law to give effect to a presumption that A did not intend B to take the property beneficially.

**21-020**

**(c)   Constructive trust.**   A constructive trust is imposed by operation of law, rather than through the express or presumed intention of the owner of the property to create a trust or to retain any beneficial interest for himself. The trust may even arise contrary to the actual intentions of the owner, as where a person in a fiduciary position makes an unauthorised profit for himself, which equity then requires him to hold on constructive trust for his principal.[38] In other cases, the distinction between constructive and express trusts is less clear. So a constructive trust may be

**21-021**

---

[34] For example *Re Kilnoore Ltd (in liquidation)* [2005] EWHC 1410 (Ch); [2005] 3 All E.R. 730.
[35] See, e.g. *Cook v Fountain* (1676) 3 Swans. 585; *Soar v Ashwell* [1893] 2 Q.B. 390; *Re Llanover SE* [1926] Ch. 626; G.P. Costigan (1914) 27 Harv.L.R. 437.
[36] See Chs 22, 23.
[37] See Ch.25.
[38] For fiduciaries, see Ch.7, and for trusts arising from wrongs, see Ch.26.

imposed on property to give effect a person's intention to make a gift to another or to act as an express trustee, but where the formalities necessary to give effect to the gift or the express trust have not been fully complied with.[39]

**21-022   (d)   Significance and practical limits of distinction.**   The distinction between trusts which are express on the one hand, and resulting and constructive on the other, may be important in two main ways.

First, the formal requirement that a trust of an interest in land must be evidenced by signed writing only applies to express trusts. Since resulting and constructive trusts arise by operation of law, they may be enforced in the absence of writing.[40]

Secondly, the duties of an express trustee are typically more extensive than those of a resulting or constructive trustee. The office of express trustee is intentionally undertaken by the trustee. He should therefore enjoy the range of administrative powers and duties defined by the general law that are incidents of his office.[41] He should also be bound by fiduciary duties in exercising those primary powers.[42]

The duties of a resulting or constructive trustee are minimal. He is often no more than a bare trustee so that his only duty is to convey the property as the beneficiary directs. However, this is not necessarily the case. Statute defines the powers and duties of trustees of land, whether express, resulting or constructive, bare or active.[43] A constructive trustee who has intentionally assumed his office, such as a secret trustee, but whose undertaking is not directly enforceable for want of formality, may have the same range of powers and duties as an express trustee.[44]

## 2.   Kind of Legal Event Creating the Trust

**21-023**      A trust may be classified according to the distinction between rights arising through an actual intention, wrongful conduct and other events. In this way, it corresponds in part to the organisation of private law obligations into those arising by consent, wrongs, unjust enrichment and other events.[45]

**21-024   (a)   Intention and wrongs.**   This distinction between trusts arising through intent and through wrongs does not correspond perfectly to the distinction between express trusts on the one hand, and resulting and constructive trusts on the other. It has been seen that express trusts and resulting trusts arise through the expression of the settlor's intention or through default rules about a person's intention when he transfers property to another. Moreover, some kinds of constructive trust give effect to informal expressions of a person's intention to make a gift of property or to create an express trust which would otherwise be void or unenforceable.[46]

Trusts that arise through a person's wrongful conduct tend to be classified as constructive. A constructive trust commonly arises where it would be unconscion-

---

[39]   See para.24-005.
[40]   LPA 1925 s.53(1)(b), (2).
[41]   Trustee Act 2000.
[42]   P.J. Millett (1998) 114 L.Q.R. 399 at 405.
[43]   Trusts of Land and Appointment of Trustees Act 1996 s.1(2).
[44]   See para.24-023. See *Paragon Finance Plc v DB Thakerar & Co* [1999] 1 All E.R. 400 at 409, per Millett LJ.
[45]   See A.S. Burrows (ed), *English Private Law*, 2nd edn (OUP, 2007), vol.1 pp.xxxvii–xliii. P. Birks, *The Classification of Obligations* (Clarendon Press, 1997), Ch.1.
[46]   See paras 24-005, 24-041.

able for the owner of property to assert his own beneficial ownership in the property and deny the beneficial interest of another.[47] The effect of the trust is to make the defendant give restitution of property that he had acquired by an equitable wrong, as where a trustee makes a profit in breach of fiduciary duty to his beneficiary,[48] or where a person acquires property by committing a fraud against the claimant.[49]

**(b)   Unjust enrichment and resulting trusts.**   It has been argued that resulting trusts arise to reverse unjust enrichment: in the situations where a recipient of money is liable in a personal action at common law for unjust enrichment, such as mistake or failure of consideration, the payer does not intend to pass his beneficial interest in the money to the recipient. It has been argued therefore that a resulting trust should arise in those situations.[50] The decided cases have not accepted this view, and it is not relied upon to explain the classification of trusts in this book. In many instances, a person may intend to pass the beneficial interest in money even though the payment is made by a mistake or for a failed consideration.[51] The recipient of the money could therefore rebut any presumption that a resulting trust arose for the payer.

21-025

**(c)   Significance and practical limits of distinction.**[52]   The distinction between legal events is not absolute. A classification based on different types of legal event is only useful if it is treated as a general description of many particular instances of trusts. Since the reasons for recognising the existence of a trust are pragmatic rather than conceptual, any one trust may show features of more than one category of legal event. So a secret trust of property may give effect to the testator's informal intention to make a devise or bequest on death. But it also serves the policy of preventing the secret trustee from fraudulently relying on the informality of the testator's gift to take a personal benefit which the testator did not intend him to have.[53]

21-026

### 3.   Bare and Special Trusts

**(a)   Bare trust.**   A bare (or simple)[54] trust is one where property is vested in one person on trust for another, but where the trustee owes no active duties arising from his status as trustee. His sole duty is to convey the trust property as the beneficiary directs him. An example is where property is transferred to T "on trust for B absolutely". In such a case, T's sole duty is to allow B to enjoy the property and to obey any direction he may give as to how the property should be disposed of.

21-027

---

[47]   *Paragon Finance Plc v Thakerer & Co* [1999] 1 All E.R. 400 at 408–409, per Millett LJ.
[48]   See para.7-057.
[49]   See para.26-011.
[50]   See R. Chambers, *Resulting Trusts* (1997); P.J. Millett (1998) 114 L.Q.R. 399 at 408–411.
[51]   *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] A.C. 669 at 708–709, per Lord Browne-Wilkinson. See para.25-002 below.
[52]   P. Jaffey, *Private Law and Property Claims* (2007) Ch.1.
[53]   See para.24-030.
[54]   See generally P. Matthews [2005] P.C.B. 266, 335; and *Re Cunningham and Frayling* [1891] 2 Ch. 567 at 572; *Tomlinson v Glyns Executor and Trustee Co* [1970] Ch. 112 at 125, 126; *Herdegen v Federal Commissioner of Taxation* (1988) 84 A.L.R. 271.

**21-028**   **(b)   Special trust.**   A special trust, on the other hand, is one where the trust itself imposes duties of active management on the trustees, e.g. a trust for sale, or a trust for a life tenant and remainderman. The great majority of express trusts are thus "special". Such trusts may be either fixed or discretionary. In a fixed trust the settlor defines in the instrument the entitlements of the beneficiaries. In a discretionary trust, the settlor defines a range of potential objects of the trust but allows the trustee a discretion to select which of them should receive property from the trust.

**21-029**   **(c)   Significance and practical limits of distinction.**   Although the defining feature of a bare trust is that the trustee owes no active duties as trustee, he may nonetheless owe active contractual duties to him. This would happen, for example, where a solicitor employed under a contract of retainer holds money for his client on a bare trust.[55] Despite their apparent similarities, the features of a bare trust are strictly distinguishable from the rights of a beneficiary under the rule in *Saunders v Vautier*.[56] The beneficiaries of an active trust may give binding directions to their trustee about the disposition of the trust assets provided that they are all sui juris and collectively entitled to the entire beneficial interest.

Many constructive trusts arising in response to a person's wrongful conduct are bare trusts. The effect of imposing a bare trust on the wrongdoer is that the claimant may compel the trustee to restore the proceeds of his wrong to him.[57] A custodian trustee[58] is not a bare trustee, as he is not a mere name or "dummy" for the managing trustees or for the beneficiaries.[59]

## 4.   Private and Public Trusts

**21-030**   Trusts may also be divided according to the extent of the benefit they confer. The distinction is between private and public trusts. A trust is private if it is for the benefit of an individual or class with standing to enforce the trustee's duties. It is immaterial that the trust also confers an incidental benefit on the public at large. The only public trusts that are valid in English law are those which are charitable, according to the legal definition of charity.[60] It must also promote the public welfare, even if incidentally it confers a benefit on an individual or class. A charitable trust is enforced by the Attorney General or the Charity Commission.

## 5.   Executed and Executory Trusts[61]

**21-031**   This distinction refers to the degree of precision with which the trust instrument defines the beneficiaries' interests in the trust property. So an instrument which declares the full extent of the beneficiaries' entitlements under the trust is said to be executed. An instrument which defines a trust in a general way but which contemplates some further instrument to specify their interests in detail is said to be executory.

---

[55]   *Target Holdings Ltd v Redferns* [1996] A.C. 421. For the significance of this distinction in insolvency, see P. Matthews [2005] P.C.B. 266 at 269.
[56]   *Saunders v Vautier* (1841) 4 Beav. 115; affirmed Cr. & Ph. 240. See para.29-030 below.
[57]   See Ch.26.
[58]   Trustee Act 2000 s.17.
[59]   *IRC v Silverts Ltd* [1951] Ch. 521.
[60]   *Morice v Bishop of Durham* (1804) 9 Ves. Jun. 399; Charities Act 2006 ss.2(1)(b); 3. See Ch.23.
[61]   See below para.22-026.

### 6.    Completely and Incompletely Constituted Trusts[62]

This distinction, though sometimes drawn, is not actually about different **21-032**
categories of trust. It refers to whether all the relevant formal steps have been
completed which are necessary to vest the trust property in the intended trustee of
an express trust. Where the property has not been properly vested, the trust is said
to be incompletely constituted. Such an arrangement may not give rise to any trust
at all, or at least not the trust that the parties intended to create in the transaction.
The intended trustee may have no title to the property, and it is only in special
circumstances that the intended beneficiary would be entitled to an order compel-
ling the settlor to complete the vesting of the property in the intended trustee.[63]

### 3.—    Trusts Compared With Other Relationships

In a number of ways trusts resemble certain other legal relations, notably bail-    **21-033**
ments, agency, fiduciary relationships generally, contracts and powers.[64] The execu-
tion of a trust also has a marked affinity with the administration of the estate of a
deceased person. This section considers the similarities and differences between
trusts and these other legal relationships.

### 1.    Bailment[65]

To some degree, a bailment (e.g. a deposit of a chattel) is similar to a trust,[66] since    **21-034**
the bailee holds the chattel subject to duties towards the bailor. But the differences
are more marked. The duties of the bailee are recognised at common law, whereas
the duties of a trustee and the rights of the beneficiary to the trust property are only
enforceable in equity. Only personal chattels can be bailed, whereas any property
may be held in trust. Further, the trustee of an asset has the general ownership of it
at law, subject to the beneficiary's equitable entitlements. A bailee, however, merely
has a possessory interest in the chattel and the general ownership of it remains in
the bailor. An unauthorised sale by a trustee will accordingly confer a good title
upon a bona fide purchaser who acquires the legal interest without notice of the
trust, whereas such a sale by a bailee usually confers no title to the legal owner-
ship of the property as against the bailor.

### 2.    Fiduciary Relationships[67]

The relationship of express trustee and beneficiary is one of a number of relation-    **21-035**
ships generally described as fiduciary. A fiduciary relationship arises where one
person has undertaken to act for another in a particular matter in circumstances giv-
ing rise to a relationship of trust and confidence. Some of the common categories
of fiduciary relationship are agent and principal, solicitor and client, and director
and company. The distinguishing feature of such a relationship is the fiduciary's

---

[62]  See below para.22-041.
[63]  See below paras 22-047, 24-006–24-007.
[64]  See, e.g. *Re Nanwa Gold Mines Ltd* [1955] 1 W.L.R. 1080 (whether debt, bailment, or trust).
[65]  See F.W. Maitland, *Equity* (1909) Lecture IV.
[66]  They were even defined by the Court of Appeal in terms of trust in *Rosenthal v Alderton & Sons
      Ltd* [1946] 1 All E.R. 583 at 584 (omitted from [1946] K.B. 374).
[67]  See Ch.7.

duty of loyalty to this principal. He must act in good faith, not profit from his position, and not place himself in a position where his duty and his interest may conflict.

But not all fiduciary relationships can properly be described as trusts. A fiduciary is a trustee only if he has vested in them a fund of property or a power of disposal over it.[68] Not all trusts involve fiduciary duties. A fiduciary duty must arise from the voluntary conduct of the person bound by it.[69] Accordingly, a person who becomes a trustee by operation of law and has not voluntarily undertaken the office may not owe any fiduciary duties in respect of the trust property. An example is the trust imposed on a person to strip him of the benefits of his fraudulent conduct.[70] The trust merely gives effect to the equitable right of the claimant to hold the defendant personally liable to account for his profit, or to recover the property specifically. It is also open to the settlor of an express trust to modify or exclude the operation of the trustee's fiduciary duties under the general law.[71]

## 3.  Agency

21-036      An agent and a trustee resemble each other in that each is typically subject to fiduciary obligations towards his principal or beneficiaries, but there are many differences. Trusts are the exclusive creature of equity, whereas the basic incidents of agency arise at common law. In most trusts, there is no contractual relationship between the trustees and the beneficiaries. But apart from agents of necessity, agency normally arises by contract between principal and agent, and generally does not give rise to a trust.[72] Usually a trustee has property vested in him. His legal powers to deal with it and make contracts affecting it arise from his status as owner. Since a trustee contracts in his own right, he cannot make his beneficiaries directly liable on any transaction that he concludes with a third party. An agent, however, does not own the property that his principal authorises him to dispose of. His power to do so generally depends on the terms of the authority from his principal. An agent can make his principal directly liable on the contract that he concludes.[73]

## 4.  Contract

21-037      **(a)   The distinction.**   It is sometimes difficult to determine whether a debt obligation arises out of a trust or a contract. The difference may be important. If a fund is vested in T, who is insolvent, B will be paid if T was a trustee for him, but B can only claim in T's bankruptcy if T was merely B's debtor.[74] Contract and trust are distinct legal concepts. Contract was developed by the common law courts and involves the enforcement of purely personal obligations between the parties. Trust was developed in the courts of equity and involves the enforcement of personal obligations owed by the trustee and third parties in relation to a specific fund of assets. The beneficiaries' rights to the trust assets are proprietary in effect.[75]

---

[68]   See *Paragon Finance v DB Thakerar & Co* [1999] 1 All E.R. 400 at 416.

[69]   See generally P.J. Millett (1998) 114 L.Q.R. 214.

[70]   *Paragon Finance v DB Thakerar & Co* [1999] 1 All E.R. 400 at 414–415.

[71]   See above para.7-016.

[72]   See *Kingscroft Insurance v HS Weavers* [1993] 1 Lloyd's Rep. 187.

[73]   See generally H. Tjio (2005) 19 T.L.I. 75; and *Ingram v IRC* [2000] A.C. 293 at 305.

[74]   See *Re Kayford* [1975] 1 W.L.R. 279; *Re Farepak Food and Gifts Ltd (In Administration)* [2006] EWHC 3272 (Ch); [2008] B.C.C. 22.

[75]   See above para.2-003.

**(b)   Bare trust behind contract.**   The same transaction may involve both **21-038**
contract and trust. One example is a Quistclose trust.[76] Here a lender advances
money on the understanding that it must only be applied for certain purposes or to
pay certain persons. As a matter of contract at common law, the borrower is a debtor
to the lender. In equity, the borrower is a trustee to the lender, who retains a
beneficial interest in the money.[77] Another example is a bare trust of money exist-
ing concurrently with a contract of agency or retainer. So a solicitor who receives
funds from his client to be applied in a conveyancing transaction holds the funds
on bare trust for the client. The trust attaching to the funds is discharged once the
solicitor applies them according to the client's contractual instructions. If the solici-
tor should misapply the funds, then the terms of the contract may determine whether
he is concurrently liable in equity for the breach of trust.[78]

**(c)   Trust of benefit of contract.**   The trust concept has frequently been imported **21-039**
into contractual transactions to get round the general rule that only a party to a
contract may sue upon it. The Contracts (Rights of Third Parties) Act 1999 now
provides that a contract may confer the right to enforce a term of the contract on a
person who is not a party to it,[79] and these trust exceptions to the privity rule have
become less important than they once were.

A person entitled to the benefit of a contract may subsequently set up a trust of
that benefit for third parties either by declaring himself a trustee of it or by assign-
ing it to trustees for them.[80] A person may also contract as trustee for a third party
so that in equity the third party is entitled to the benefit of the contract ab initio. If
the contract is not performed, the trustee can take proceedings in his own name[81]
to enforce it for the benefit of the third party and, if the trustee refuses to do so, the
third party can sue, joining the trustee as a defendant.[82] The declaration of trust often
has effects similar to an outright assignment of the benefit of the contract,
particularly where the contract is for payment of a simple debt.

The main difficulty in these cases is to discover what test the courts will apply
in deciding whether the party intended to contract as trustee or to hold the benefit
of his contract as a trustee. The inquiry plainly involves the construction of the
contract and the special circumstances in which it is entered into. Beyond this
generalisation, it is hard to draw clear principles from the authorities.[83] A prohibi-

---

[76]   See below para.25-033.

[77]   *Barclays Bank Ltd v Quistclose Investments Ltd* [1970] A.C. 567; *Twinsectra Ltd v Yardley* [2002]
2 A.C. 164; [2002] UKHL 12.

[78]   *Target Holdings Ltd v Redferns (a firm)* [1996] 1 A.C. 421.

[79]   Contracts (Rights of Third Parties) Act 1999 s.1.

[80]   See the surveys by A. L. Corbin (1930) 46 L.Q.R. 12; and J. G. Starke (1948) 21 Austr.L.J. 382 at
422, 455; F. E. Dowrick (1956) 19 M.L.R. 374 at 386.

[81]   As, e.g. in *Gregory and Parker v Williams* (1817) 3 Mer. 582; *Lloyd's v Harper* (1880) 16 Ch. D.
290. In *Les Affreteurs Reunis Societe Anonyme v Leopold Walford (London) Ltd* [1919] A.C. 801
the trustee was not a party but the defendants agreed to treat the case as if they were.

[82]   *Vandepitte v Preferred Accident Insurance Corp of New York* [1933] A.C. 70 at 79. See, e.g. *Harmer
v Armstrong* [1934] Ch. 65.

[83]   Contrast *Lloyd's* (1880) 16 Ch.D. 290; *Harmer's* [1934] Ch. 63; *Walford's* [1919] A.C. 801; *Gregory
and Parker's* (1817) 3 Mer. 582 cases above; *Fletcher v Fletcher* (1844) 4 Hare 67; *Gordon, Re
Lloyds Bank v Lloyd* [1940] Ch. 851; *Royal Exchange Assurance v Hope* [1928] Ch. 179; *Re Webb*
[1941] Ch. 225; *Re Foster's Policy* [1966] 1 W.L.R. 222 where the court found a trust with
*Vandepitte*'s case [1933] A.C. 70; *Re Engelbach's Estate* [1924] 2 Ch. 348; *Re Sinclair's Life Policy*
[1938] Ch. 799; *Re Foster (No.1)* [1938] 3 All E.R. 357; *Green v Russell* [1959] 2 Q.B. 226; *Re*

tion on direct assignment of a contract does necessarily prevent a declaration of trust over the benefit of it. A trust of the proceeds of a contract claim would not necessarily entitle the beneficiary to interfere in the operation of the underlying contract. There is therefore no special reason to suppose that it would be inappropriate to find a declaration of trust.[84]

A trust of the benefit of a contract may also be imposed by statute, as where a person effects an insurance policy that is expressed to be for the benefit of his spouse or children.[85]

## 5. Power

**21-040**   A trust must be distinguished from a power. A power is an authority vested in a person (called a "donee") to deal with or dispose of property that is not his own.[86] It can take a number of forms. A power of attorney is simply a special type of agency which allows another to act on behalf of the principal in dealing with property. Administrative powers are powers to manage particular items of property. Finally, and most significantly for the distinction with trusts, are powers of a dispositive nature. These are powers of appointment that authorise the creation or grant of beneficial interests in property.

**21-041**   **(a)   Legal or equitable.**   Trusts are necessarily equitable, whereas powers may be legal. Thus a power of attorney may authorise the conveyance of a legal estate, and a mortgagee of freehold land has a statutory power to convey the legal fee simple when he exercises his power of sale.[87] After 1925, however, all powers of appointment have necessarily been equitable.[88]

**21-042**   **(b)   Imperative or discretionary.**   The substantial distinction is that a trust for the disposition of property is imperative, while a mere power of appointment is discretionary. Even with a discretionary trust (sometimes called a "trust power") the trustee holding the power of distribution has an obligation to make distributions from the fund though the trustee may select which of the potential objects is to receive them. Thus if A holds £10,000 upon trust to divide in his discretion among a certain class of persons, A has no option in the matter, but is bound to carry out the trust. If A fails to do so, the court will see that the property is duly divided according to its understanding of the settlor's intention. If the class of beneficiaries is small, such as immediate members of the settlor's family, the court may order equal distribution of the fund.[89] In the case of a large class of beneficiaries, each

---

[84]   *Cook's ST* [1965] Ch. 902 (appeal compromised: *The Times,* 7 November 1964); *Beswick v Beswick* [1966] Ch. 538 (in the House of Lords the point was abandoned: [1968] A.C. 58 at 95); *Swain v The Law Society* [1983] 1 A.C. 598; and *Southern Water Authority v Carey* [1985] 2 All E.R. 1077 where the court found none. See generally A.L. Corbin (1930) 46 L.Q.R. 12.

[84]   *Re Turcan* (1888) 40 Ch. D. 5; *Don King Productions Inc v Warren* [2000] Ch. 291; *Barbados Trust v Bank of Zambia* [2007] 1 Lloyd's Rep. 495 (noted P.G. Turner [2008] C.L.J. 23).

[85]   Married Women's Property Act 1882 s.11. See also Civil Partnership Act 2004 s.253.

[86]   See *Freme v Clement* (1881) 18 Ch. D. 499 at 504.

[87]   See para.39-034.

[88]   LPA 1925 s.1(7).

[89]   *Re Arnold, Wainwright v Howlett* [1947] Ch. 131 (grandchildren taking per capita equally with children). The relevant maxim is "Equality is equity".

with varying needs and claims on the settlor, the court may prepare a scheme of distribution.[90]

If, on the other hand, A is given a mere power to appoint the £10,000 among the members of the class, he cannot be compelled to exercise the power. If A fails to do so, whether from accident or design, the members generally have, in the absence of some improper purpose, no claim to make A pay them the money. It will pass to the persons entitled in default of appointment.[91]

**(c)   Marginal cases.**   The distinction between trusts and powers of appoint-   **21-043**
ment can become blurred, particularly where the donee of a power owes fiduciary duties to the objects. First, an instrument which initially appears to confer a mere power of appointment over a fund may, on its proper construction, create a trust for distribution of the fund. Secondly, the duties governing the way a discretionary trustee and a fiduciary donee of a power of appointment are very similar. Thirdly, the interests of a beneficiary of a discretionary trust or fiduciary power of appoint-ment are enforceable against third parties in the same way. In effect, therefore, the difference between a trust and a power of appointment is often more a distinction of degree than of type.

*(1)   Construction.*   In construing a gift as creating either a trust for distribution   **21-044**
of a fund or a power of appointment, the first thing to consider is whether there is a gift over in default of appointment. If there is, the power is a mere power[92]; if there is not, it will probably be a discretionary trust.[93] But the absence of a gift over is not conclusive.[94] The main question is whether the donor has shown an intention that, in any event, the property shall go to the objects of the power. The presence of a power to accumulate undistributed income from a fund is not inconsistent with the construction of the gift as a trust of the income.[95] Also, a gift that appears to be a primary power may actually be a primary trust subject to a secondary power to alter the interests under the trust. In *Burrough v Philcox*,[96] a testator gave property to his two children for their lives, and empowered the survivor of them to dispose of the property by will

> "amongst my nephews and nieces or their children, either all to one of them, or to as many of them as my surviving child shall think proper."

It was held that a primary trust was created in favour of the testator's nephews and nieces, subject to a power of selection and distribution in his surviving child. As the surviving child had failed to exercise the power, the property was divided equally between the objects.

---

90   *McPhail v Doulton* [1971] A.C. 424 at 451, 457.
91   *Brown v Higgs* (1803) 8 Ves. 561 at 570; *McPhail v Doulton* [1971] A.C. 424 at 456, 457. Exception-ally, the court has assumed the execution of a fiduciary power of appointment over a pension fund surplus where the donee was faced with an irreconcilable conflict of interest: *Mettoy Pension Trustees Ltd v Evan* [1990] 1 W.L.R. 1587. Statute has now removed this situation: Pensions Act 1995 s.25(2).
92   See, e.g. *Re Mills* [1930] 1 Ch. 654; and see *Re Gestetner Settlement* [1953] Ch. 672; see (1953) 69 L.Q.R. 309.
93   *Re Llewellyn's Settlement* [1921] 2 Ch. 281; *Re Weekes' Settlement* [1897] 1 Ch. 289; *Re Combe* [1925] Ch. 210; *Re Perowne* [1951] Ch. 785.
94   *Re Weekes' Settlement* [1897] 1 Ch. 289; *Re Combe* [1925] Ch. 210; *Re Perowne* [1951] Ch. 785.
95   *McPhail v Doulton* [1971] A.C. 424 at 448.
96   *Burrough v Philcox* (1840) 5 My. & Cr. 72; and see *Salusbury v Denton* (1857) 3 K. & J. 529.

**21-045**   *(2)   Duties.*   The donee of a fiduciary power of appointment owes similar duties in exercising it to a discretionary trustee. These include a duty to survey the class of potential objects; to group them into different categories; and then to prioritise those categories according to their needs.[97] The survey made by a donee of a mere power need not be as rigorous as that made by a discretionary trustee who has a duty to distribute the fund.

**21-046**   *(3)   Interest.*   The interest of the beneficiary of a discretionary trust or equitable power would be enforceable against a third party who received property that the trustee or donee did not have authority to transfer to him. Either kind of interest would give the beneficiary standing to follow or trace the property.[98] The priority of the power affecting the property would be preserved if the person holding the property became insolvent.[99] But the beneficiary's only right would be to have the asset or its proceeds reinstated to the trustee or donee.[100] The beneficiary could not compel the third party to transfer the asset directly to himself since this would give him a greater equitable right against the third party than he had against the trustee or donee.

## 6.   Administration[101]

**21-047**   **(a)   Resemblances.**   Trusts were the invention of the Chancellor, whereas the administration of the assets of a deceased person was regulated originally by the ecclesiastical courts. From early times, however, the Court of Chancery exercised a supplementary jurisdiction over the personal representatives, and their position has become more and more assimilated to that of trustees. Thus they must exercise the same degree of care as trustees in carrying out their duties. In general the provisions of the Trustee Act 1925 extend to them.[102]

**21-048**   **(b)   Distinctions.**   There are, nevertheless, a number of distinctions between trusts and the administration of estates. Six may be mentioned here.

**21-049**   *(1)   Objectives.*   In broad terms, the main function of personal representatives as such is to wind up the estate of the deceased, paying all debts and distributing the assets to those entitled to them or to trustees on their behalf. Trustees, on the other hand, are normally intended to hold the trust property and administer it in accordance with the trusts which bind them. In a phrase, the function of personal representatives is to wind up, and the function of trustees, at least in cases of special trusts, is to hold.

**21-050**   *(2)   Property.*   Until they assent, personal representatives usually have the whole ownership of the property of the deceased vested in them; the beneficiaries have no beneficial interest in any particular asset but merely the right to compel the due administration of the estate. Under a fixed trust, the beneficiaries may have an

---

[97]   *Re Manisty's Settlement* [1974] Ch. 17 at 25; *Re Hay's Settlement Trusts* [1982] 1 W.L.R. 202 at 209–210. See para.10-013.

[98]   See para.30-054.

[99]   *Mettoy Pension Trustees Ltd v Evan* [1990] 1 W.L.R. 1587.

[100]   *Gartside v IRC* [1968] A.C. 553 at 617–618; *Target Holdings Ltd v Redferns* [1996] A.C. 421.

[101]   See generally below section VI.

[102]   Trustee Act 1925 s.68(17); see also AEA 1925 ss.33, 39.

equitable interest in a specific trust assets and possibly even the right to compel the trustee to transfer it to them.[103] But the distinction is less clear where the beneficiaries have interests under a discretionary trust.

*(3)   Limitation.*   An action by a beneficiary to recover trust property or in respect of any breach of trust is, in general, barred after six years,[104] whereas the period in respect of claims to the personal estate of a deceased person is 12 years.[105] Neither limit applies in the case of fraud or property retained by the trustee or personal representative or converted to his own use.[106]   **21-051**

*(4)   Joint and several authority.*   One of several personal representatives may dispose of pure personalty,[107] whereas trustees must act jointly.   **21-052**

*(5)   Receipt of sole trustee or representative.*   Unlike a trustee, a sole personal representative acting as such may give a valid receipt for capital money arising on a trust of land, even though he is not a trust corporation.[108]   **21-053**

*(6)   New trustees.*   The Trustee Act 1925 gives wide powers of appointing new trustees.[109] These powers do not apply to personal representatives unless and until they are holding as trustees.[110] Personal representatives as such can be appointed only by will or by the court.   **21-054**

**(c)   Dual status.**   Despite these distinctions the dividing line between trustees and personal representatives tends to become blurred, so that a person may at the same time be both a trustee and a personal representative.[111] A will may set up certain trusts and appoint the same persons to be both executors and trustees. Once appointed, a personal representative remains a personal representative for the rest of his life[112] unless the grant is limited or is revoked, or unless he is removed from office by the court. Further, on an intestacy the personal representatives are constituted express trustees.[113]   **21-055**

It follows that no general test can be laid down; the distinction can be drawn only in relation to the particular assets in question. If the personal representatives have no duties to perform beyond the collection of assets, payment of creditors and distribution of the estate, they will remain personal representatives[114] (even if they have stated that they are trustees[115]) until assenting,[116] or, if the legatees are infants,

---

[103]  See *Corbett v IRC* [1938] 1 K.B. 567 at 577; and see above para.29-029.
[104]  Limitation Act 1980 s.21(3).
[105]  Limitation Act 1980 s.22(a).
[106]  See generally below para.30-035.
[107]  See below para.31-019.
[108]  See LPA 1925 s.27(2); compare above para.4-014.
[109]  See below para.27-012.
[110]  See *Re Ponder* [1921] 2 Ch. 59; *Re Pitt* (1928) 44 T.L.R. 371; *Re Yerburgh* [1928] W.N. 208; *Re Cockburn's WT* [1957] Ch. 438.
[111]  See *Re Timmis* [1902] 1 Ch. 176 at 182; and see generally B. S. Ker (1955) 19 Conv. (NS) 199.
[112]  *Attenborough v Solomon* [1913] A.C. 76 at 83; *Re Timmis* [1902] 1 Ch. 176 at 183.
[113]  AEA 1925 ss.33(1), 46(1); and see *Toates v Toates* [1926] 2 K.B. 30.
[114]  *Re Richardson, Pole v Pattenden* [1920] 1 Ch. 423; *Harvell v Foster* [1954] 2 Q.B. 36; disapproving dicta *Re Ponder* [1921] 2 Ch. 59.
[115]  *Re Mackay, Mackay v Gould* [1906] 1 Ch. 25; *Re Rowe* (1889) 58 L.J.Ch. 703.
[116]  *Attenborough v Solomon* [1913] A.C. 76 at 83; and see *Re Aldhous* [1955] 1 W.L.R. 459.

until availing themselves of the power to appoint trustees of the gifts to the infants.[117] This will be so even where the payment of the legacy is postponed.[118] However, where they are directed to hold the estate or some part of it upon certain trusts (e.g. for persons in succession[119] or upon trust for sale and division[120]) they will become trustees when the administration is complete,[121] though in the case of land not, it has been held, until they sign a written assent in their own favour.[122] The moment of transition from administration to trusteeship depends on the circumstances,[123] although when the personal representatives bring in their residuary accounts,[124] or exercise a power of appropriation,[125] there is a presumption that the trusteeship has begun. The mere existence of an outstanding mortgage does not prevent the residue from being ascertained.[126]

## 7.   The Crown

**21-056**  **(a)   Trustee.**   There is nothing to prevent the Crown acting as trustee.[127] But a trust does not arise in every case where money or property is held by the Crown and used for the benefit of others. The Crown may simply be administering the property in exercise of governmental functions.[128] These public duties are sometimes called "trusts in the higher sense" but do not give rise to an equitable relationship enforceable in the courts.[129]

**21-057**  **(b)   Beneficiary.**   The Crown can be a beneficiary under a trust but it has been held that where a minister or other public servant acting in his public capacity takes property on behalf of the Crown, there is no trust and the Crown and the minister are considered as one.[130]

---

[117] *Harvell v Foster* [1954] 2 Q.B. 36; *Re Davis, Evans v Moore* [1891] 3 Ch. 119: *Re Mackay, Mackay v Gould* [1906] 1 Ch. 25.

[118] *Re Barker* [1892] 2 Ch. 491.

[119] *Re Bowden, Andrew v Cooper* (1890) 45 Ch. D. 444; *Re Swain* [1891] 3 Ch. 233; *Re Timmis* [1902] 1 Ch. 176; *Re Oliver, Theobald v Oliver* [1927] 2 Ch. 323.

[120] *Re Claremont* [1923] 2 K.B. 718.

[121] See *Re Cockburn's WT* [1957] Ch. 438 at 440; and see *Lilley v Public Trustee of the Dominion of New Zealand* [1981] A.C. 839.

[122] *Re King's WT* [1964] Ch. 542. Sed quaere: see RRA Walker (1964) 80 L.Q.R. 328; J.F. Garner (1964) 28 Conv.(NS) 298.

[123] *Attenborough v Solomon* [1913] A.C. 76 at 82, 83.

[124] *Re Claremont* [1923] 2 K.B. 718.

[125] *Phillipo v Munnings* (1837) 2 My. & Cr. 309.

[126] *IRC v Smith* [1930] 1 K.B. 713.

[127] *Civilian War Claimants Association Ltd v The King* [1932] A.C. 14 at 27; *Nissan v Attorney General* [1970] A.C. 179 at 223.

[128] *Tito v Waddell (No.2)* [1977] Ch. 106.

[129] *Tito v Waddell (No.2)* [1977] Ch. 106 at 216, per Megarry VC.

[130] *Town Investments Ltd v Department of the Environment* [1978] A.C. 359; see (1977) 93 L.Q.R. 321.

*Wilkinson v. North*,
[2018] EWCA Civ. 161, [2018] 4 WLR 41

Court of Appeal

# Wilkinson and others *v* North and another

## [2018] EWCA Civ 161

2017 Nov 7; 2018 Feb 9                                        Gloster, David Richards LJJ

*Trusts — Creation — Sole trader's business — Claim that businessman creating trust in claimants' favour over undivided shares in business venture carried out by him as sole trader — Whether sufficient identification of property to be held on trust — Whether intention to create trust*

The claimants brought a claim against the defendants, the sons of the deceased, seeking a declaration that a residential property that was occupied by the second defendant and his family was held on trust for them. The claimants alleged that they had invested significant sums of money in the deceased's business as a sole trader on the basis of agreements with, or declarations by, him that they would each receive a percentage "equity position" in the business; that by such agreements and declarations the deceased had created a trust in the claimants' favour over undivided shares in his business; that under the trust they were each entitled to a percentage share of damages which the deceased had been awarded by a court in the United States; and that the mortgage loan used for the property's purchase had been repaid from funds subject to the trust. The judge granted the claim, finding that the deceased had validly created a trust in the claimants' favour. The defendants appealed, contending that the judge had erred in finding that there was certainty as to (i) the property that was subject to the trust and (ii) the deceased's intention to create the trust.

On the appeal—

*Held*, allowing the appeal, that the creation of a trust of a share in a sole trader's business caused difficulties which related more to the question of whether the settlor had intended to create a trust than to the issue of certainty of subject matter; that in the present case the judge had been right to hold that the property subject to the alleged trust was sufficiently certain; that, in particular, there was no obstacle to the subject of a trust consisting of (i) assets of a business which were constantly changing, (ii) a share of an indivisible asset such as real property, intellectual property rights or book debts, (iii) an undivided share of a holding of securities or of a credit balance in a bank account; that, further, if A declared himself trustee of a 5% share of his business for B, it could take effect as an equitable tenancy in common between A and B in the agreed proportions; that, however, on the facts of the present case, there had been no sufficient intention on the part of the deceased to create a trust of shares in his business; that the documents relied on by six of the claimants suggested that their main purpose had been to confer contractual rights on the claimants, the language used was inapposite to the creation of a trust and no consideration had been given to the issues that would need to be addressed if a trust were intended; that there was no reason to suppose that the investments made by the claimants who relied on oral discussions had been made on different terms; and that, accordingly, no trusts over the business or the assets of the business had been created (post, paras 12, 16–24, 54, 62–65, 66).

*In re Rhagg (decd)* [1938] Ch 828, *In re London Wine Co (Shippers) Ltd* [1986] PCC 121, *Hunter v Moss* [1994] 1 WLR 452, CA and *In re Lehman Bros International (Europe) Ltd* [2011] EWCA Civ 1544, CA considered.

Decision of Judge Pelling QC sitting as a judge of the Chancery Division [2016] EWHC 1242 (Ch) affirmed.

**APPEAL** from Judge Pelling QC sitting as a judge of the Chancery Division

By a claim form the claimants, Geoffrey John Wilkinson, Alan Charles Winch, Bryan John Richard Wilkins, Alexander Charles Smart, John Thomas Formby, Simon James Weir-Rhodes, Ian Philip Hornblow and Nicholas Colin Thomas, brought proceedings as purported beneficiaries of a trust created by John North (now deceased) against Steven John North and Peter North seeking a declaration that a residential property in Rackheath, Norfolk owned by JS Property Holdings Inc and occupied by the second defendant and his family was held on trust for the claimants on the basis that a mortgage loan used for its purchase had been repaid from

1

© 2018. The Incorporated Council of Law Reporting for England & Wales

funds that were subject to the trust. By a decision dated 27 May 2016 Judge Pelling QC sitting as a judge of the Chancery Division [2016] EWHC 1242 (Ch) allowed the claim.

By an appellant's notice dated 8 September 2016 and with permission of the Court of Appeal (Lewison LJ) granted 21 December 2016 the defendants appealed.

The facts are stated in the judgment of David Richards LJ.

*Thomas Munby* (instructed by *Hatch Brenner llp, Norwich*) for the defendants.
*Neil Cadwallader* (instructed by *Richard Slade & Co*) for the claimants.

The court took time for consideration.
9 February 2018. The following judgments were handed down.

**DAVID RICHARDS LJ**

*Introduction*

**1** The issue on this appeal is whether a trust was validly created by the appellants' father in favour of the first to eighth respondents ("the respondents") over undivided shares in a business venture carried on by him as a sole trader. The issue falls to be decided on the basis of the terms of documents prepared by the appellants' father, John North ("Mr North"), without any legal advice, construed against the relevant background facts as they existed at the dates of the documents.

**2** The creation of a trust has significant, and generally irreversible, consequences. The settlor, by creating the trust, ceases to be entitled to the benefit of the property subject to the trust. If, as in the present case, he continues to hold the legal title to the property, he holds it, to the extent of the interest created by the trust, for the benefit of the beneficiaries of the trust and becomes subject to exacting fiduciary duties owed to the beneficiaries in relation to the trust property. The law therefore requires certainty on three crucial elements: the intended beneficiaries, the property to be subject to the trust and the intention of the settlor to create the trust. These elements must be established objectively by reference to the documents, words or conduct relied on as creating the trust. statements as to the settlor's intention made subsequently are irrelevant. There is a parallel with the approach adopted to determine whether a contract has been made.

**3** There is, in the present case, no issue about the identity of the beneficiaries, if the other two elements are established. They are the respondents. The points in issue are whether Mr North intended to create a trust and, if so, the property to be subject to the trust. These issues are closely linked.

**4** Mr North died in February 2012, over four years before the trial, but so far as the claim to a trust rests on documents, as it very largely does, his evidence would have been irrelevant, as there was no real dispute about the background to the documents.

**5** Judge Pelling QC, sitting as a judge of the Chancery Division, held that Mr North had validly created trusts in favour of the respondents, albeit "with some hesitation". Permission to appeal was granted by Lewison LJ.

**6** The claim was for a declaration that a residential property in Rackheath, Norfolk which is occupied by Peter North (the second appellant) and his family was held on trust for the claimants (the respondents to this appeal). The claim was made on the basis that a mortgage loan used for its purchase had been repaid from funds that were subject to the trust. Legal title to the property was transferred to, and is still held by, the 9th respondent, a company established by Mr North, If the funds were subject to the trust, the company had notice of that fact through the knowledge of Mr North.

**7** Apart from the issue of the alleged trust, and on the assumption that it had been validly created, there were a number of defences and other issues before the judge, all of which he decided against the appellants and none of which are subject to this appeal.

**8** The judge helpfully and concisely set out the background facts [2016] EWHC 1242 (Ch):

"5. Mr North designed a spallation drilling device and then a component based on his spallation drilling device that could be applied in the manufacture of vacuum cleaners and washing machines amongst other things. Having entered into a confidentiality agreement with Electrolux Floor Care and Light Appliances AB ('Electrolux'), a corporation that manufactures such products, in breach of that agreement Electrolux adopted Mr North's designs other than by agreement with him. He instructed an attorney in Texas to commence proceedings for damages for breach of

2

contract against Electrolux. Those proceedings were settled before trial by a payment to Mr North, net of the attorney's contingency fee, of US$17,774,135·52 ('the damages').

"6. The claimants allege that they invested significant sums of money with Mr North for the purpose of enabling him to develop and exploit his inventions. The claimants maintain that they all invested on the basis of agreements with, or declarations by, Mr North that they would each receive back their initial investment, a sum equivalent to five times their initial investment and a percentage 'equity position' in 'the venture' that was different for each investor but appears to have depended on mutual agreement and the amount invested.

"7. It is the claimants' case that the damages were fruits of the venture and that following payment of the damages by Electrolux to Mr North they became entitled not merely to the return of their investment and the agreed uplift but a percentage share of the damages calculated by reference to their agreed percentage equity position. Mr North is said to have paid the investors all or most of their respective initial investments and the uplift but not any sum in respect of the investors' respective equity positions. None of the claimants maintain in these proceedings that they are entitled to recover anything other than the sums they maintain they are entitled to in respect of their respective equity positions.

"8. Mr North's failure to pay the investors the sums they maintain they are entitled to in respect of their respective equity positions resulted in proceedings in the Chancery Division by the claimants ('the first claim') in which it was alleged that the damages were held on trust as to the sum of the amounts claimed by each investor by reference to their agreed percentage equity position. Mr North did not co-operate in the conduct of those proceedings but in the end the claimants in the first claim recovered a default judgment against Mr North for £2·138m, which he failed to pay."

**9** The basis of the respondents' claims is not identical. The first respondent, Mr Wilkinson, relies on a document dated 25 June 1997 and signed by himself and Mr North ("the Wilkinson Agreement"). The third to seventh respondents rely on letters in substantially similar terms signed by Mr North and sent to them in 1999–2000. The second respondent, Mr Winch, relies on oral discussions between himself and Mr North in November 1997 and May 2004 and the eighth respondent, Mr Thomas, relies on discussions with Mr Wilkinson. As it is not suggested that any of the trusts were created over interests in land, they could be created orally.

**10** In order to determine whether Mr North intended to create trusts in favour of the respondents, it is necessary to examine the documents or discussions relied on, in the context of their surrounding circumstances. The question of whether there was sufficient certainty of subject, that is, sufficient identification of the property to be held on trust, is common to all the claims and I will address that first.

*Certainty of subject matter*

**11** In *Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1996] AC 669, 705, Lord Browne-Wilkinson identified four propositions fundamental to the law of trusts. They included, first, that to establish a trust there must be identifiable trust property (leaving aside the special case of constructive trusts, which is not relevant to the present case) and, secondly, that

"(iv) once a trust is established, as from the date of its establishment the beneficiary has, in equity, a proprietary interest in the trust property … enforceable in equity against any subsequent holder of the property (whether the original property or substituted property into which it can be traced) other than a purchaser for value of the legal estate without notice."

At p 709, Lord Browne-Wilkinson said that:

"A trust can only arise where there is defined trust property; it is therefore not consistent with trust principles to say that a person is a trustee of property which cannot be defined."

**12** It is worth recording that, so far as the researches of counsel and the court go, there is no decision of any court addressing a trust created by a sole trader of a share of his business. Nor has any discussion of such a trust been found in any textbook or precedents book. As will become apparent, even if such a trust is possible, it raises significant issues which one would expect to be addressed by anyone proposing to create such a trust.

3

© 2018. The Incorporated Council of Law Reporting for England & Wales

13 Although the judge said that the property subject to the trusts that he found to have been created in favour of the respondents other than Mr Wilkinson and Mr Winch was the "the assets of, and goodwill associated with, the business carried on using the trading name Hydratherm", he did not explicitly identify the assets subject to the trusts in favour of Mr Wilkinson and Mr Winch. The Wilkinson Agreement and the first discussion with Mr Winch pre-dated the Hydratherm business by at least two years and 18 months respectively (judgment at para 25), when Mr North had not yet developed the application of his spallation drilling technology to vacuum cleaners and washing machines. However, by a parity of reasoning, it is reasonably apparent that the judge considered that the trust in favour of Mr Wilkinson and Mr Winch covered the assets and goodwill of Mr North's business concerning "spallation drilling and its applications as well as the 'Hot Dry Rock' programme", to quote from the Wilkinson Agreement.

14 I will assume—no one has suggested the contrary—that there were at the date of the Wilkinson Agreement one or more assets falling within that description. It would seem likely that, if nothing else, Mr North had some intellectual property rights in respect of his spallation drilling technology. This is important because the creation of a valid trust requires the existence at that time of some assets to which the trust would apply: see Lord Browne-Wilkinson in the *Westdeutsche* case at p 705. If, however, there were no business assets at the time of the Agreement, there could not be a present trust, only an agreement to create a trust over future property, which would require consideration to be enforceable. The Wilkinson Agreement did not in my view contain any consideration moving from Mr Wilkinson. At most, it was an agreement to agree and hence lacked legal effect as a contract to create a trust.

15 Mr Munby, appearing for the appellants, submitted that there were three grounds on which the judge was wrong to hold that the property subject to the alleged trust was sufficiently certain.

16 First, there were insurmountable difficulties in identifying the relevant assets. Clearly, they did not include Mr North's personal non-business assets, but, without a separate business structure, it was impossible to draw the line with a sufficient degree of certainty. The example was given of a sum of money earmarked by Mr North for use in the business. Was it an asset of the business in circumstances where Mr North could change his mind and decide not to use it in the business?

17 I do not regard this as an insurmountable problem. The assets of a business will in the case of many assets be obvious. It is true that there may be difficult questions as to whether a particular asset falls for the purposes of a trust to be an asset of the business, but the courts have for many years had to resolve such issues. For example, there are numerous cases in which a testator has left his business, or one of his businesses, to a particular beneficiary, requiring the assets of the business, as opposed to the testator's other assets, to be identified. In *In re Rhagg (Deceased)* [1938] Ch 828, a testator bequeathed his business as a solicitor and the office furniture, law books and other articles in the office to his managing clerk, leaving the residue to charities. Questions arose as to whether the gift of the business included various assets, including the business premises and loans to clients. Simonds J held that they were included. He said, at p 836:

> "There will, no doubt, often be room for controversy what are the assets of the business, whether it be an individual business or a partnership business. But, if an asset can properly be called an asset of the business, I see no reason for its exclusion from the bequest, unless a particular context makes exclusion necessary."

18 For another example, see *In re White, Decd, McCann v Hull* [1958] Ch 762.

19 Second, Mr Munby submitted that assets of the business were a constantly changing collection of assets about which there would be uncertainty and over which a trust could not therefore be created. However, that constantly changing assets can form the subject of a valid trust is shown by the decision of this court in *In re Lehman Bros International (Europe) Ltd* [2011] EWCA Civ 1544 at [69]–[77].

20 The submissions dealt with above would apply to a trust of the whole business as much as to a trust of a share of the business, but Mr Munby's third submission is directed specifically at the situation in this case of a trust of an undivided share of a business. He submitted that such a trust could not take effect on account of an insufficient identification of the assets subject to the trust. He referred to the decision of this court in *Hunter v Moss* [1994] 1 WLR 452, in which a trust of 50 shares out of a holding of 950 shares was held to be valid, notwithstanding that there was no identification of the particular 50 shares. This, submitted Mr Munby, represented a particularly generous application of a strict rule, although I think it fair to say that the decision in the *Lehman Bros* case referred to above, in which *Hunter v Moss* was considered, goes further.

4

© 2018. The Incorporated Council of Law Reporting for England & Wales

21 In my judgment, a generalised statement is insufficient and it is necessary to look at each class of asset of the business. In terms of certainty of subject, I do not see a difficulty in a trust of a share of an indivisible asset, such as real property, intellectual property rights or book debts. Having regard to *Hunter v Moss* and the *Lehman Bros* case, there would not be an obstacle to a trust of an undivided share of a holding of securities or of a credit balance on a bank account (see *Hunter v Moss* at first instance: [1993] 1 WLR 934, 941H). However, in the present case, Mr Wilkinson's beneficial interest would attach not to 5% of a credit balance on a particular date but to 5% of such fluctuating credit balance as from time to time existed during the currency of the trust. In my view, such a trust would not lack certainty of subject matter but it raises serious issues, which I address below, as to how such a trust was intended to operate, those issues being relevant to whether Mr North had the necessary intention to create a trust.

22 On one view, any chattels comprised in the assets of the business could not be the subject of the trust without identification of the particular chattels: see *In re London Wine Co (Shippers) Ltd* [1986] PCC 121, *In re Goldcorp Exchange Ltd* [1995] 1 AC 74 and *In re Harvard Securities Ltd* [1998] BCC 567.

23 However, in a case where A declares himself trustee of a 5% share of his business for B, it could take effect as an equitable tenancy in common between A and B in the agreed proportions: see *In re London Wine Co (Shippers) Ltd* at p 137.

24 The creation of a trust of a share in a sole trader's business undoubtedly causes difficulties, which have not been explored in any authority, but, as I see it, they go more to the question of intention than to the issue of certainty of subject matter.

25 I therefore turn to the question whether a sufficient intention on the part of Mr North to create a trust of shares in his business can be found in the documents and discussions on which the respondents rely.

*Mr Wilkinson's claim*

26 The document on which Mr Wilkinson relies is dated 25 June 1997 and headed "Contract of Agreement between John North and Geoffrey Wilkinson including Provisional Terms and Conditions". It is signed by Mr Wilkinson and Mr North under the words "Agreed as written, read and understood".

27 It is necessary to set out the entire text of the document:

> "Preamble
> "The underwritten is to be considered the understanding between the mentioned parties, and constitutes the formal contract between the nominated parties. A contract will be signed by both parties and come into effect for a period of five years (5 yrs) with three (5 yr) options, as from the funding of any given entity that will conduct the business of the company responsible for 'Spallation Drilling' and its applications as well as the 'Hot Dry Rock' programme. The initial terms and conditions will remain in effect for the five year period unless otherwise agreed in writing by both parties. The equity position granted to Geoffrey Wilkinson at the signing of this agreement will remain the property of Geoffrey Wilkinson for perpetuity.
> "Terms and Conditions
> "Equity:
> "A five percent (5%), non dilutable, voting equity interest in the holding company, and/or any subsidiary company subsequently formed, heirs and/or successors of John North and Worldrill, will be made available to Geoffrey Wilkinson at the signing of this contract and demonstrated by the issuance of stock certificates. An additional non dilutable, three percent (3%) equity interest in all subsidiary or associated companies registered outside the UK, and/or a three percent (3%) profits interest in any UK company doing business outside the UK will be granted to GJW. The equity position will cover the activities of any company or corporate vehicle, trust, partnership or similar of John North, his heirs or successors. Geoffrey Wilkinson pledges that the above provision does not include any private trust or corporation set up by John North for the sole benefit of any heirs, assignees or successors of John North, [if] he donates or grants equity shares in the business, to same. John North covenants to donate, pledge or grant only that percentage of equity shares or interest to the trust or corporation owned outright by John North at that time.

5

© 2018. The Incorporated Council of Law Reporting for England & Wales

"Compensation:

"An annual salary of (to be agreed) will be paid bi-monthly to Geoffrey Wilkinson as from the signing of, and funding of the first contract. Other increases will be provided for as soon as the cash flow (revenue) allows same to be applied.

"Signed Bonus:

"A cash sum (to be agreed) to be paid at the commencement of the contract.

"Position:

"A full main board directorship, with the position of CEO reporting straight to John North, as well as the board of directors.

"Contract:

"The duration of the contract will be for a period of five years (5 yrs) with three (3) five year options, commencing as from the signing and funding of the first contract with an outside agency.

"Commencement:

"At the first funding of the company by an outside agency."

**28** I earlier mentioned that the relevant documents in this case were prepared without legal advice. Although the Wilkinson Agreement uses legal jargon, it does so in a way which shows that the parties had limited understanding of legal matters. To a lawyer, it borders in many places on the incoherent. But, as Mr Cadwallader for the respondents emphasised, there is no formality or particular language required for the creation of a trust. The court must examine the terms of the document to determine whether Mr North intended to create a trust and, if so, whether there is the certainty as regards the trust property required by the law.

**29** Although the document is headed "Contract of Agreement", it did not in my view have contractual effect. Critical terms are subject to further agreement (both Mr Wilkinson's annual salary and signing bonus were to be agreed).

**30** Whatever the contractual status of the Wilkinson Agreement, Mr Wilkinson's case rests on that part of it providing for the grant of an equity position to him. At the end of the Preamble, it is stated that the equity position is granted to him 'at the signing of this agreement' and will remain his property in perpetuity. There follow two paragraphs against the side heading "Equity". The first paragraph is principally addressed to the issue of shares in one or more companies to Mr Wilkinson and involves no question of a trust. Mr Wilkinson's case for a trust of 5% (or 8%) of the business carried on by Mr North as a sole trader rests essentially on the last sentence of the first paragraph: "The equity position will cover the activities of any company or corporate vehicle, trust, partnership or similar of John North, his heirs or successors".

**31** The judge said, at para 21, that "on its face, the Wilkinson Agreement was an agreement under which Mr Wilkinson would receive shares in a company to be formed … and would be employed as the CEO of that company". He observed that it was not on its face a declaration of trust. He said that it contemplated that at some stage in the future a company or companies would be formed with 5% of the shares being allotted to Mr Wilkinson, with an entitlement to an additional 3% shareholding in any non-UK company or to 3% of the profits made by a UK company carrying on business outside the UK.

**32** The judge correctly directed himself that for this document to create a valid trust, the words used by Mr North must show an intention to create a trust and that the trust property should be sufficiently certain. He concluded, with some hesitation, that those requirements were satisfied.

**33** The judge set out his reasoning at para 30:

"Whilst I accept that the Wilkinson Agreement has been formulated on the assumption that a company would be formed, and that Mr Wilkinson would have a shareholding in that company, I do not accept that the agreement was not intended to have any effect in the event that a company was not in the end formed. I reach that conclusion because of the final sentence in the sub-paragraph of the agreement entitled 'Equity', which is to the following effect: "The equity position will cover the activities of any company or corporate vehicle, trust, partnership or similar of John North …" Like much else in the agreement, the language used is imprecise. It could have been intended simply as a means by which dilution could be avoided by aggregating all holdings held by Mr North or on his behalf and those connected with him in whatsoever form in the proposed company. However, construing the words used in their commercial context leads me to conclude that it is much more likely that the sentence was included in order to cater for the possibility that as the business referred to in the Preamble developed it

6

was decided in the end by Mr North not to carry it on using a corporate vehicle. That was an obvious risk for an investor investing before the company was formed and is likely to be one that someone in Mr Wilkinson's position would want addressed. This analysis is supported by the use of the phrase 'any given entity that will conduct the business of the company …' in the Preamble and by the fact that the non-dilution issue had been expressly addressed in the opening sentence of the Wilkinson Agreement headed 'Equity'."

**34** At para 31, the judge said that this conclusion was supported by later acknowledgements and admissions against interest made by Mr North, to which I will later refer.

**35** As the judge observed in his judgment at para 21, the Wilkinson Agreement is not on its face a declaration of trust and appears to be either an agreement or conditional agreement entered into in contemplation of events that did not happen. With the qualification that in my view the Agreement was not an enforceable contract because it was too uncertain in its terms, I agree with what the judge said.

**36** While the judge accepted that the Wilkinson Agreement had been formulated on the assumption that a company would be formed and that Mr Wilkinson would have a shareholding in it, he did not accept that the agreement was not intended to have any effect if a company were not formed. For this he relied on the last sentence of the first paragraph under "Equity", quoted above. The judge concluded that this sentence was not aimed simply as a means by which dilution could be avoided but was included to cater for the possibility that Mr North might ultimately decide not to carry on the business using a corporate vehicle. This, the judge considered, was an obvious risk that someone in the position of Mr Wilkinson would want addressed.

**37** From this analysis, which he considered to be supported by the acknowledgements and admissions detailed at paras 27–28, the judge concluded that Mr North manifested an intention to hold the assets of the business on trust for himself and Mr Wilkinson in the agreed shares.

**38** It is the link between this analysis of the last sentence of the first paragraph under "Equity" and the conclusion of a trust that is principally challenged on this appeal. The judge does not appear to have considered that his analysis could lead to a conclusion other than a trust, in particular a personal obligation, nor to have considered the difficulties involved in a finding of a trust which in turn suggest that Mr North cannot have intended to create a trust.

**39** In my judgment, this challenge is well founded. I have three principal grounds for this view.

**40** First, the judge was right to identify as the primary purpose of the "Equity" section of the Wilkinson Agreement an agreement to provide Mr Wilkinson with an equity shareholding in the company that would carry on the business. That must inform the meaning to be given to the last sentence of the first paragraph dealing with Equity.

**41** A shareholding would not give Mr Wilkinson any proprietary interest in the assets, gross or net, of the company. A share, as is often said, is a bundle of rights. A shareholding would give him a contractual right to share, subject to the articles of association of the company, in any dividends declared by the company and in any capital distributions, whether made on a liquidation or otherwise. The indirect "interest" of a shareholder is in the net assets and profits of the company. The assets of the company are, of course, first applied in the payment of its liabilities. A shareholding of 5%, or 8%, would give Mr Wilkinson no right or power to control the appointment of directors or their conduct of the business. The shareholding would not itself entitle Mr Wilkinson to any participation in or influence over the management of the business, although the Agreement envisaged that he would be appointed CEO of the company, albeit reporting to Mr North and the board of directors.

**42** This is no template for a direct proprietary interest in the assets and goodwill of the business if carried on by Mr North as a sole trader. Just as a shareholding gives the shareholder contractual, and some statutory, rights against the company, so an agreement by Mr North to pay 5% or 8% of profits taken out of the business and of the proceeds of sale of the business would give Mr Wilkinson the equivalent rights if Mr North carried on the business in his own name. The main purpose of the Agreement therefore suggests that, if anything, contractual rights against Mr North were the intended effect of the critical sentence of the Agreement.

**43** This approach is, in my judgment, strongly supported by the issues that the Wilkinson Agreement does not begin to address if a trust were intended. This constitutes the second ground for my conclusion.

7

**44** First, how were the liabilities of the business to be dealt with? This is not an issue if the business were carried on by a company, as explained above. The judge held that the other respondents had a proprietary interest in the assets of, and goodwill associated with, the business, and presumably thought the same applied to Mr Wilkinson, although that is not spelt out in the judgment. If the judge meant that he was entitled to the agreed percentage of the gross assets, that cannot with respect be right. It is inconceivable that Mr North intended to give a proprietary interest in the assets, while not giving him any recourse as regards the debts of the business for which, as a sole trader, he would of course be personally liable. When, in the hearing of the appeal, Mr Cadwallader appearing for the respondents was asked about this, he submitted that Mr Wilkinson and the other respondents had a proprietary interest in the net assets. But, so stated, that cannot be right. Net assets are an accounting entry; they are the amount of the assets less the liabilities. They cannot form the subject matter of a trust. It would no doubt have been possible for Mr North to have agreed that, in the event of a sale or other realisation of the business, he would hold 5% of the ultimate net proceeds on trust for Mr Wilkinson. But that cannot be spelt out of the Wilkinson Agreement. If it were clear that a trust was intended, the solution that equity might provide would be to charge the assets with payment of the liabilities. The significant point in the present context is that no thought at all had been given to this issue, an obvious issue to business people as well as to lawyers.

**45** Nor had any thought been given to how the business would be managed if a trust were created. If the business were carried on by a company, the business would be managed by the directors, who in the discharge of their responsibilities would be subject to the duties now set out in sections 170 et seq of the Companies Act 2006. These are longstanding duties developed in the context of commercial concerns. They are significantly different from the duties of a trustee. Mr Cadwallader accepted that this was so, but submitted that the problem could be dealt with, if necessary, by application to the court for directions. It is difficult to imagine that any business people would think this a sensible way to proceed. If it was intended that Mr Wilkinson should have a direct proprietary interest in the assets of the business, the parties would have been likely to address the issue of management of the business, both as to rights of participation in management and as to the nature and extent of any restrictions on those responsible for management. The business was highly speculative and would likely involve the incurring of debts and liabilities which would not fit well with the conventional duties of trustees, but again no provision was made in this respect.

**46** No thought was given to the rights, if any, that Mr Wilkinson might have to withdraw his share. Beneficiaries with fixed absolute interests are entitled, subject to practical difficulties of division, to call at any time for the return of their shares. This would not be the case with shares in a company. A shareholder would have no right to require his shares to be purchased by the company or others, in the absence of special provision to that effect, of which there is no hint in the Wilkinson Agreement.

**47** The third ground for my conclusion is the simplest. The language of the Wilkinson Agreement is simply inapposite to create a trust, all the more so in the light of the considerations rehearsed above. The judge appears to have considered that the only way to give any effect to it was by way of a trust. I do not share that view. If effect was to be given to it, it seems to me that much the more obvious way would be by way of a personal obligation on the part of Mr North of the type to which I have referred. Further, it is wholly unclear as to the time at which the supposed trust would take effect. The judge thought that it was an obvious risk that Mr North might in the end decide not to carry on the business through a company, but does that mean that the trust was to take effect not immediately but at some indeterminate time in the future? If so, that would be an agreement to create a trust, for which consideration would be required but is not, in my view, contained in the Agreement.

**48** Although an intention to create a trust does not require the use of the word trust or similar language, there must be, as Scarman LJ said in *Paul v Constance* [1977] 1 WLR 527, 531, "a clear declaration of trust and that means there must be clear evidence from what is said or done of an intention to create a trust …" For the reasons given above, I do not consider that any such clear evidence is provided by the Wilkinson Agreement.

**49** Nor do I think that the admissions and acknowledgements on which the judge relied provide support for a trust.

**50** The acknowledgements comprised three lists, prepared in 2001, 2003 and 2006. The first is headed "shareholders list" and shows Mr Wilkinson with a 7% interest. It supported his case that he was entitled to shares in a company applying the spallation technology to washing machines and vacuum cleaners, but it does nothing to support the existence of a trust. The other two lists

show "company shares allowed [sic]". They also refer to partnership participation, but no one has suggested that a partnership ever existed.

51 The admissions arose in the course of proceedings brought by the respondents against Mr North in his lifetime, alleging the same trusts as they advance in the present case. In a consent order made in those proceedings, Mr North admitted the trusts but denied that they extended to the damages recovered from Electrolux. Directions were agreed for the trial of that issue. Mr North subsequently admitted that he held agreed percentages of the damages on trust for Mr Wilkinson, Mr Formby, another respondent to this appeal, and Mr Day, a claimant in these proceedings but not a respondent to the appeal. Judgment on admissions was entered in favour of those parties. In the present case, the judge rejected Mr Day's case based on the same allegation of trust and he has not appealed. Mr North failed to comply with the directions in the consent order and judgment in default was entered against him in favour of the other claimants, who are respondents to this appeal. Mr North applied to withdraw the admissions on which the first judgment was based and to set aside both judgments. The application failed.

52 In dealing with Mr Wilkinson's claim, the judge did not rely on these admissions as support for his claim that the Wilkinson Agreement had created a trust but for his case that the trust extended to the washing machine and vacuum cleaner business and to the damages.

53 The judge addressed directly the significance of the admissions in his judgment at para 42 in the context of a dispute about Mr Winch's percentage share, recording that they were not made in proceedings to which the appellants were parties and correctly holding that they were not bound by them. The admissions were "merely part of the evidence that has to be evaluated in order to arrive at a conclusion applying the relevant burden and standard of proof rules". I do not read the judgment as placing reliance on the admissions in support of the conclusion that a trust was created by the Wilkinson Agreement or, in the case of the other respondents, by later documents and discussions. It would not, in my judgment, be permissible to do so. The admissions were subsequent statements as to Mr North's subjective intention at the dates when the trusts were allegedly created. As such they are inadmissible as evidence of an intention to create a trust: see *Lewin on Trusts*, 19th ed (2015), paras 6-004–6-005 and the authorities there cited.

54 For these reasons, the judge was in my judgment wrong to hold that the Wilkinson Agreement created any trust over the assets of Mr North's business.

*The claims of the fourth to eighth respondents*

55 The claims of these respondents rest on letters sent to each of them in similar terms in 1999–2000.

56 The letters were headed "Hydratherm Energy International" and, in some of the letters, "A Division of Worldrill International" appeared immediately below this heading. The address of the "UK Office" was given. As the judge remarked, the heading to each letter suggested it was written by a company.

57 The text of the letter to Mr Formby, which will serve as an example, read as follows:

"This is to confirm Geoffrey Wilkinson has deposited on your behalf Four Thousand Pounds Sterling (£4,000·00) with Hydratherm Energy International as an investment into the company for the specific purpose of developing and building the third prototype cyclonic separator and centrifugal vacuum cleaner.

"Hydratherm is pleased to grant an equity position of One Half of One percent (·500%) in the company and or its successors. Additionally, and upon a successful manufacturing rights payment being received by Hydratherm, a direct financial reward will be payable to you of five times (5 times) the investment for a total of twenty thousand pounds (£20,000·00), plus the original investment."

"The company will in the near future go on to build and develop an ultra fast spallation gas jet/multi UHP hydro-jet drilling concept for ultra deep drilling and tunnelling in the oil, gas, water, geothermal, mineral industries and urban infrastructure with the creation of underground chambers for the incineration of general and toxic waste, at 1,100 C subterranean and 5,000°C surface plasma after-burning, of the waste flue gases, micro tunnelling for cable and pipe laying for utilities, and the creation of 'HOT DRY ROCK' super critical geothermal steam for cheaper heavy oil recovery and electrical power generation.

"We have over the last several years in particular, contracted and worked with all of the principal oil companies as well as the universities in the USA and UK. Upon a successful demonstration of the concept we will be immediately considered the worlds

© 2018. The Incorporated Council of Law Reporting for England & Wales

leading authority in this field. The patents have been lodged and everything is ready for financing.

"I would further confirm that the previous agreement still stands and that Hydratherm (Worldrill) will repay the principle [sic] and interest on the $30,000 and that the original one half of one percent (1/2%) be increased to one percent (1%).

"I thank you for making this investment and look forward to meeting you soon when I am next in the United States."

58 The letter plainly reads as referring to an investment in a company. The first paragraph refers to "an investment into the company". The second paragraph states that "Hydratherm is pleased to grant an equity position of One Half of One Percent (·500%) in the company and or it's [sic] successors". The fourth paragraph states that "The company will in the future go on to build and develop …" In the case of Mr Wilkins, this impression was reinforced by the provision to him of documents purporting to be share certificates issued by Hydratherm Energy International in respect of stated numbers of "fully paid up Shares … in the above-named Company, And the subsequent articles of Association of the new Company. Hydratherm Energy International Incorporated. Nassau, NP, Bahamas".

59 The judge held that the effect of these letters was to create a trust of the relevant percentage shares in the business being carried on by Mr North personally under the name Hydratherm. He said, at para 47:

"In the context in which the word was used in the letters, the reference to 'company' can only have been to Hydratherm. However, as is common ground, the business conducted under that name was never conducted by or transferred to a company and at the date when the letters were written it was nothing more or less than a trading name style or title used by Mr North. I have no means of knowing whether Mr North's reference to Hydratherm as being a company was the result of a lack of knowledge on his part as to what was and was not a company, or whether it was an attempt to deceive. It does not matter for present purposes. In my judgment the effect of what Mr North said was that he declared himself the trustee of the assets of the business conducted by him using the name style or title Hydratherm for otherwise what was set out in the letter could be of no effect."

60 He rejected the appellants' submission that the letters did no more than promise shares in a company and that, as the company was never formed, the investors had or may have had claims against Mr North for breach of contract or misrepresentation. The judge, at para 48, considered this to be a mistaken analysis:

"The letter does not contain a reference to a company to be formed but only a reference to 'the company'. As I have explained, in context that can only have been a reference to Hydratherm. That was not in fact a company but was the name style or title of an unincorporated business carried on by Mr North. What was being granted therefore was an equity position in that business—that is in its assets and goodwill."

61 The judge said at para 49 that the effect of what was being promised "could only take effect as a declaration of trust of the assets and goodwill of the business conducted using the Hydratherm name". It did not matter that some or all of the investors thought their position was akin to that of a shareholder in a company "for if there was no company there could be no shares".

62 I am unable to share the judge's approach. It does not follow from the failure by Mr North to give effect to what he promised in the letters that he created an immediate trust of undivided shares in his business in favour of the investors. There were no words suggesting the creation of a trust, and no consideration given to the issues and difficulties involved in such a trust, to which I have earlier referred. The obvious consequence of the failure is not a trust but, as was submitted by the appellants, a claim for damages against Mr North.

*Mr Thomas*

63 Mr Thomas made an investment at much the same time as the fourth to eighth respondents but he had no direct dealings with Mr North, dealing instead with Mr Wilkinson. There is no reason to doubt his claim as to the percentage shareholding that he was to receive. At the same time, there is no reason to suppose that his investment was made on terms differing from those set out in the letters. Indeed, in his evidence Mr Thomas stated that he understood

10

Wilkinson v North (CA)

that he was investing in a company and that he "would, indirectly, through my shareholding, have an interest in all the assets of the Venture which would, by then, have been transferred to the company".

*Mr Winch*

   64 The evidence of Mr Winch was that he made his investment in November 1997 following an approach from Mr Wilkinson, for which he was granted "1/8 of a percent in the Venture", increased in May 2004 to 1%. Mr North placed no restrictions "on my shares in the Venture". He said, "Although I knew at the outset that the company had not yet been incorporated, I regarded myself as being akin to a shareholder in a company in that I was receiving a share in all the assets of the Venture". Like Mr North, Mr Winch had died before the trial of these proceedings, so that the contents of their discussions could not be explored in cross-examination. In the light of the issues that I have earlier considered, I do not consider that a trust can be spelt out of this evidence, nor is it likely that Mr North intended to go further with Mr Winch than he had agreed with Mr Wilkinson or would later agree with the other respondents.

*Conclusion*

   65 For the reasons given in this judgment, I would therefore allow the appeal as against all the respondents.

   **GLOSTER LJ**

   66 I agree with David Richards LJ that, in the circumstances of this case, including the terms of the documents relied upon by the respondents, no trusts over the business or the assets of the business were created. Accordingly, the appeal must be allowed.

*Appeal allowed.*

ALISON SYLVESTER, *Barrister*

© 2018. The Incorporated Council of Law Reporting for England & Wales

*James Miller and Partners Ltd v Whitworth Street Estates (Manchester) Ltd,*
[1970] AC 583

583

A.C.

A                        [HOUSE OF LORDS]

JAMES MILLER & PARTNERS LTD.   .   .   .   APPELLANTS

                              AND

    WHITWORTH STREET ESTATES

B   (MANCHESTER) LTD.   .   .   .   .   .   .   RESPONDENTS

    [On appeal from WHITWORTH STREET ESTATES (MANCHESTER) LTD. v.
                  JAMES MILLER & PARTNERS LTD.]

    1970   Jan. 27, 28, 29;          Lord Reid, Lord Hodson, Lord Guest,
           Feb. 2; Mar. 3           Viscount Dilhorne and Lord Wilberforce

C
    *Arbitration—Arbitrator—Jurisdiction—R.I.B.A. contract—English
        standard form—Work to be done for English company in
        Scotland by Scottish company—English nominated architect—
        Dispute—Scottish architect appointed arbitrator—Arbitration
        in Scotland following Scottish procedure—Whether law of
        arbitration English or Scottish—Lex fori—Whether law of
        arbitration may be different from proper law of contract—*
D       *Conduct of parties after appointment of arbitrator—Whether
        showing acceptance by English company that Scottish law
        should govern arbitration proceedings.*

    *Conflict of Laws—Contract—Proper law—R.I.B.A. contract entered
        into for work to be done for English company in Scotland by
        Scottish company with nominated English architect—Whether
        proper law of contract English or Scottish—Tests to be applied
        in determining proper law of contract—Whether parties to*
E       *contract entitled to agree as to proper law—Selection of
        R.I.B.A. contract—Place of performance—Relative weight to
        be attached to—Arbitration held in Scotland—Whether law
        of arbitration English or Scottish—Whether may be different
        from proper law of contract—Lex fori.*

        On May 10, 1965, an agreement was entered into between
    an English company and a Scottish company by which the
F   Scottish company were to carry out certain conversion work
    at the English company's factory in Scotland. The agreement
    was in the then standard form of R.I.B.A. contract, there
    being at that time no R.I.B.A. form of contract specially
    adapted for use in Scotland although there was in common
    use a Scottish form of contract drawn up by a different pro-
    fessional body. The usual arbitration clause in the contract
    provided that any dispute should be referred to the arbitration
G   of a person to be agreed, or, failing agreement, to be appointed
    by the president of the R.I.B.A. The nominated architect
    was English, the agreement finally concluded in Scotland. A
    dispute arose, and the Scottish company applied to the
    president of the R.I.B.A. for the appointment of an arbitrator,
    stating that there was a submission to arbitration within the
    meaning of the Arbitration Act, 1950. The president appointed
    as arbitrator a Scottish architect practising in Scotland, and
H   the arbitration was held in Scotland following Scottish pro-
    cedure. Points of law arose, and the English company asked
    the arbitrator to state his award in the form of a special case
    for the decision of the English High Court, but the arbitrator
    refused to do so, holding that the arbitration was a Scottish

    A.C. 1970.                                            21 (2)

arbitration.  He subsequently issued his final award in favour
of the Scottish company.  On application by the English  **A**
company, the master ordered the arbitrator to state his award
in the form of a special case, but an appeal by the Scottish
company was allowed by the judge and the order rescinded.
The Court of Appeal allowed an appeal by the English com-
pany on the ground that the proper law of the contract was
English and the arbitration governed by English law, and
restored the master's order.

On appeal by the Scottish company:—       **B**

*Held*, (1) (Lord Reid and Lord Wilberforce dissenting),
that, notwithstanding the important factor that the place of
performance of the contract was in Scotland, the selection of
the R.I.B.A. form of contract showed that the contract was
to be governed by English law.

Observations on the tests to be applied in determining the
proper law of a contract.

Tests in *Rex* v. *International Trustee for the Protection of*  **C**
*Bondholders Aktiengesellschaft* [1937] A.C. 500; [1937] 2
All E.R. 164, H.L.(E.); *Bonython* v. *Commonwealth of
Australia* [1951] A.C. 201, P.C. and *In re United Railways
of Havana and Regla Warehouses Ltd.* [1961] A.C. 1007;
[1960] 2 W.L.R. 969; [1960] 2 All E.R. 332, H.L.(E.) applied.

*Per* Lord Reid, Lord Hodson, Viscount Dilhorne and Lord
Wilberforce.  A contract cannot be construed by reference to  **D**
the subsequent conduct of the parties (post, pp. 603D–E, 606E,
611D, 615A.

(2) That, however, the curial law of the arbitration could
be different from the proper law of the contract; and that,
on the facts, the conduct of the parties after the appointment
of the arbitrator sufficiently showed an agreement or accept-
ance on the part of the English company that the arbitration
proceedings should be governed by the law of Scotland, the
reference to the Arbitration Act, 1950, in the Scottish com-  **E**
pany's application for the appointment of an arbitrator not
availing the English company.

*Don* v. *Lippmann* (1837) 5 Cl. & F. 1, H.L.(Sc.); *Hamlyn
& Co.* v. *Talisker Distillery* [1894] A.C. 202, H.L.(Sc.); *Norske
Atlas Insurance Co. Ltd.* v. *London General Insurance Co.
Ltd.* (1927) 43 T.L.R. 541 and *N. V. Kwik Hoo Tong Handel
Maatschappij* v. *James Finlay & Co. Ltd.* [1927] A.C. 604,
H.L.(E.) applied.       **F**

*Per* Lord Hodson, Lord Guest, Viscount Dilhorne and
Lord Wilberforce.  Where the parties have failed to choose
the law governing arbitration proceedings, those proceedings
must be considered, at any rate prima facie, as being governed
by the law of the country in which the arbitration is held, on
the ground that that is the country most closely connected
with the proceedings (post, pp. 607A, 609C, 612E-F, 616F-G.

Decision of the Court of Appeal [1969] 1 W.L.R. 377;  **G**
[1969] 2 All E.R. 210, C.A. reversed.

The following cases are referred to in their Lordships' opinions:

*Bonython* v. *Commonwealth of Australia* [1951] A.C. 201, P.C.

*Don* v. *Lippmann* (1837) 5 Cl. & F. 1, H.L.(Sc.).

*Hamlyn & Co.* v. *Talisker Distillery* [1894] A.C. 202, H.L.(Sc.).

*Kwik Hoo Tong Handel Maatschappij (N.V.)* v. *James Finlay & Co. Ltd.*  **H**
[1927] A.C. 604, H.L.(E.).

*Norske Atlas Insurance Co. Ltd.* v. *London General Insurance Co. Ltd.*
(1927) 43 T.L.R. 541.

A
    *Rex* v. *International Trustee for the Protection of Bondholders Aktiengesellschaft* [1937] A.C. 500; [1937] 2 All E.R. 164, H.L.(E.).
    *United Railways of Havana and Regla Warehouses Ltd., In re* [1961] A.C. 1007; [1960] 2 W.L.R. 969; [1960] 2 All E.R. 332, H.L.(E.).

The following additional cases were cited in argument:

B
    *Amalgamated Building Contractors* v. *Waltham Holy Cross Urban District Council* [1952] 2 All E.R. 452, C.A.
    *Assunzione, The* [1954] P. 150; [1954] 2 W.L.R. 234; [1954] 1 All E.R. 278, C.A.
    *Howden & Co. Ltd.* v. *Powell Duffryn Steam Coal Co.,* 1912 S.C. 920.
    *Indyka* v. *Indyka* [1969] 1 A.C. 33; [1967] 3 W.L.R. 510; [1967] 2 All E.R. 689, H.L.(E.).
    *Kahler* v. *Midland Bank Ltd.* [1950] A.C. 24; [1949] 2 All E.R. 621, H.L.(E.).

C
    *Pick* v. *Stewart, Galbraith & Co. Ltd.* (1907) 15 S.L.T. 447.
    *Racecourse Betting Control Board* v. *Secretary of State for Air* [1944] Ch. 114; [1944] 1 All E.R. 60, C.A.
    *Rossano* v. *Manufacturers' Life Assurance Co.* [1963] 2 Q.B. 352; [1962] 3 W.L.R. 157; [1962] 2 All E.R. 214.
    *Sirdar Gurdyal Singh* v. *Rajah of Faridkote* [1894] A.C. 670, P.C.
    *Tzortzis* v. *Monark Line A/B* [1968] 1 W.L.R. 406; [1968] 1 All E.R. 949, C.A.

D

APPEAL from the Court of Appeal (Civil Division) (Lord Denning M.R., Davies and Widgery L.JJ.).

On May 10, 1965, a contract was entered into between an English company, Whitworth Street Estates (Manchester) Ltd., and a Scottish company, James Miller & Partners Ltd., building contractors, of Glasgow,
E by which the Scottish company were to carry out certain conversion work at the English company's premises at Dumbarton, Scotland. The contract was finally concluded in Scotland. It was in the then standard form (1963 ed.) published by the Royal Institute of British Architects (" R.I.B.A."), the usual arbitration clause providing:

F
" . . . in case any dispute or difference shall arise between the employer or the architect on his behalf and the contractor . . . then such dispute or difference shall be and is hereby referred to the arbitration and final decision of a person to be agreed between the parties, or, failing agreement within 14 days after their party has given to the other a written request to concur in the appointment of an arbitrator, a person to be appointed on the request of either party by the president or vice-
G president for the time being of the Royal Institute of British Architects."

There was no provision as to the place of arbitration or as to its procedure. The nominated architect was English and a member of a firm which had its offices in London. Disputes arose between the parties, and, on October 28, 1966, the Scottish company issued a writ in the Queen's Bench Division claiming certain moneys. They applied for judgment under R.S.C., Ord. 14,
H and concurrently the English company applied for a stay pursuant to section 4 of the Arbitration Act, 1950. On November 30, 1966, the master dismissed the Scottish company's application and made an order staying further proceedings. On December 5, 1966, the Scottish company applied

**Whitworth Street Estates Ltd. v. Miller (H.L.(E.) )**      **[1970]**

in terms of the arbitration clause in the contract to the president of the   A
R.I.B.A. for the nomination of an arbitrator.  Their application, on the
institute's printed form, contained the phrase:

> " Regarding the contract dated May 10, 1965, and made between
> [the parties] and where there is a submission to arbitration, within
> the meaning of the Arbitration Act, 1950. . . ."

The president of the R.I.B.A., in response to that application, appointed   B
as arbitrator a Scottish architect, a fellow of the institute, practising in
Scotland.  The arbitration was held in Scotland in accordance with Scottish
procedure.  Points of law arose, and the English company asked the arbitra-
tor to state his award in the form of a special case for the decision of the
English High Court, but the arbitrator refused to do so, holding that the
arbitration was a Scottish arbitration.  He subsequently issued his final
award, on December 10, 1968.  On application by the English company,   C
Master Elton, on July 22, 1968, ordered that the arbitrator state
his award in the form of a special case.  On October 31, 1968, Eveleigh J.
allowed an appeal by the Scottish company against the master's order and
rescinded it.  On January 29, 1969, the Court of Appeal allowed an appeal
by the English company, holding that the proper law of the contract had
been English law and that the arbitration had been governed by English   D
law, and restored the master's order.

The Scottish company appealed.

Further facts are stated in the opinion of Viscount Dilhorne.

*James Mackay Q.C.* (of the Scottish bar), *J. Raymond Phillips Q.C.*,
*A. J. Butcher* and *J. A. D. Hope* (of the Scottish bar) for the appellants.   E
The principal question in this appeal is, as Lord Denning M.R. said
[1969] 1 W.L.R. 377, 380: by what law is the procedure in the arbitration
governed?  In the circumstances, it was governed by the law of Scotland,
and, accordingly, it was not competent for the arbitrator either to state
a case during the currency of the arbitration or to state his final award
in the form of a special case as he has been ordered to do by the Court
of Appeal: except for section 4 (2), Part I of the Arbitration Act, 1950,   F
does not apply to Scotland.  The proper law of the contract was also
Scottish.  It may be that there is a third argument on discretion, but the
appellants do not propose to trouble the House much about that.

The arbitrator has not taken part in these proceedings beyond writing
a letter of July 12, 1968, stating that he did not wish to increase the costs
of the arbitration unless the master before whom the respondents' appli-
cation was heard desired his presence.   G

" Sanction," on the title page of the R.I.B.A. contract form, means no
more than that it is a drafted, approved form.  There was no R.I.B.A.
form with Scottish supplement at the time of the contract in this case.

With regard to clause 18 (1) of the R.I.B.A. contract, the suggestion
is that " common law " means English law.  The expression " common
law," is, however, commonly used in relation to Scotland.   H

It would probably not be impossible to conduct an English arbitration
in Scotland, though there might be difficulties if certain powers-in-aid
had to be resorted to.

A.C.                   **Whitworth Street Estates Ltd. v. Miller (H.L.(E.) )**

A    Under clause 27 (a) (ii) of the R.I.B.A. contract, the sub-contractor
would have to agree to be governed by English law.

There is probably no difference between English and Scottish law as
to the meaning of " submission to arbitration."   [Reference was also made
to clauses 18 (2), 19 (2) (a), 25 (2), 31 (1) (a) (i) and 35 of the R.I.B.A.
form of contract and to the Arbitration Act, 1950, ss. 4, 21 and 35 and
Sch. 1.]

B    Where an arbitration takes place within the territory of a country,
the law governing the procedure in the arbitration is, at least as a general
rule, the procedural (or " curial ") rules of that country.   It may be
(though this may be the exception rather than the rule) that the substantive
law to be applied may be different from the law of the country where the
arbitration takes place, involving the application by the arbitrator of a
law foreign to that territory.   These two concepts are, however, different,
C    and the right question here relates to the first:  the law by which the
procedure is to be governed.   As to the distinction between the two
concepts, see *Don* v. *Lippmann* (1837) 5 Cl. & F. 1, *per* Lord Brougham
at pp. 13 et seq., where a guide is to be found to determining whether a
particular matter is to be regarded as a matter of procedure to be governed
by the curial law or as a matter of substantive law to be governed by the
D    lex loci or proper law.   It is plain that such a thing as an appeal from
one court to another or from an arbitrator to a court is something which
goes to procedure and is normally ruled by the curial law.   The same
general principle is applicable in determining whether a matter which
arises in an arbitration is a matter of procedure.   On the basis of this general
principle, it is natural to apply, in matters of procedure at least, the law of
the territory where the arbitration takes place.   This is at the foundation of
E    the significance which the courts have always attached to the choice of the
seat of arbitration in determining the proper law of a contract.

In the present case, it was the agreement between the parties which
determined where the arbitration should take place.   The arbitrator did
not make the determination; the position by the time when the application
for his appointment was made was that the parties had agreed on Scots
F    law.   The respondents' remedy against the appointment of a Scottish arbitra-
tor if the parties had decided that the arbitration should be held in England
would have been a summons for the revocation of his authority unless he
was prepared to abide by that agreement.   The respondents here, however,
consented to the arbitration being carried on in Scotland according to
Scots law.   It is alleged that there is an estoppel on the appellants in that
they in some way represented that the law applicable was the law of
G    England by applying to the English courts for a stay, thereby showing that
they agreed that the Act of 1950 had no application.   The stay, however,
would have been equally applicable whether it was a Scottish or an English
arbitration.   An arbitration agreement, for the purposes of section 4 of the
Act of 1950, can include arbitrations not subject to the law of England.
" Submission to arbitration " occurs only in section 4 (2), where it must
H    include foreign submissions.   It is not contended that the respondents are
estopped by their having agreed to arbitration in Scotland and Scottish
procedure; what is alleged is that there was an agreement.   There was no
reservation of any kind regarding English control in the agreement to

Case 1:22-cr-00673-LAK    Document 341-1    Filed 10/30/23    Page 137 of 166

accept Scottish procedure. One matter which is treated as being procedural
is that of the competency of evidence: see section 18 (2) of the Civil Evidence    A
Act, 1968, which shows that the statutory provisions with regard to the
law of evidence apply to arbitration proceedings. If the parties have
agreed that the procedure should be governed by the law of Scotland and
a question arises regarding evidence, how is it to be determined? One gets
into an inextricable tangle if one says that the English courts can control
the evidence given in a Scottish arbitration.                                     B

The place where the arbitration is to take place has always been regarded
as of fundamental importance in determining the law which is to apply:
see *Hamlyn & Co.* v. *Talisker Distillery* [1894] A.C. 202, *per* Lord Her-
schell L.C. at p. 210, which is in line with what Lord Brougham said in
*Don* v. *Lippmann*, 5 Cl. & F. 1; see also *per* Lord Watson at p. 212,
where he recognises the rule that, where the tribunal has to investigate     C
the merits, the rules applicable are those of the place where the court is;
see also *per* Lord Ashbourne, at p. 215, and Lord Shand, at p. 216, to
the same effect, and *Norske Atlas Insurance Co. Ltd.* v. *London General
Insurance Co. Ltd.* (1927) 43 T.L.R. 541. The same principle was applied
in *N. V. Kwik Hoo Tong Handel Maatschappij* v. *James Finlay & Co.*
[1927] A.C. 204; see *per* Viscount Dunedin, at p. 608.

With reference to *Tzortzis* v. *Monark Line A/B* [1968] 1 W.L.R. 406   D
it would admittedly be strange if, if there had been Swedish sub-contractors
in this case, the arbitration would still have been governed by Scottish
law. The possibility is not excluded that there may be two proper laws,
one for some things and one for others. The sub-contractor can, however,
refuse nomination unless he is prepared to comply with all the provisions
of the contract, and this includes the arbitration clause. The only sub-
contractor nominated in this case was English.                               E

There are two stages of logic behind the cases: (1) the law of the place
of arbitration is the law governing the proceedings and perhaps even the
law to be applied; (2) because the parties have selected the place of
arbitration in their contract, that is the law which governs the contract.
These cases show (1). There is no authority which says that, when an
arbitration takes place in one country, the law to be applied *must* be the   F
law of that country, but the authorities do show that there is a strong
inference that this is so. If the arbitration takes place in Scotland with
the acquiescence of the parties and the procedure applied is Scottish
procedure, this is sufficient to make the arbitration governed by Scottish
law. The respondents' acquiescence in the selection of the arbitrator and
his decision to hold the arbitration in Scotland amounted to an addition
to the original contract. It is a reasonable inference that, when the parties   G
entered into their contract, they must have known that there was a high
probability that the president of the R.I.B.A. would act as he did and that
any arbitration would be held in Scotland. There was nothing to stop the
arbitration being held miles away from the site, but there were clearly
circumstances of convenience which the parties might well have anticipated
when they entered into the contract. The situation here is that, the   H
arbitration clause not having specified the place of arbitration, it was per-
fectly within the scope of that clause to have it in Scotland, and, once
it took place in Scotland, prima facie Scottish rules of procedure should

**A.C.**          **Whitworth Street Estates Ltd. v. Miller (H.L.(E.))**

A  apply.  It is clear that, once the arbitration was being held in Scotland, the parties acted throughout on that footing.  [Reference was made to *Dicey and Morris, Conflict of Laws,* 8th ed. (1967), p. 1047.]

The second paragraph of the protocol set out in the First Schedule to the Arbitration Act, 1950, is an application of the principle for which the appellants contend in this case; though it is not directly applicable although it does have statutory force.  See the reference to protocol in section 4

B  (2) of the Act of 1950.  Protocol is also referred to in section 35, which, by subsection (1) (*a*), defines "foreign award" by reference to the protocol.  See also section 37; subsection (1) (*c*) would bring one to the second paragraph of the protocol.  The protocol is part of the Act of 1950 for the purposes of sections 4 (2), 35 (1) (*a*) and 37 (1) (*c*).  "Agreement to which the protocol . . . applies" does not apply to an agreement within

C  the United Kingdom.  This is not a statutory enactment bearing directly on the present question, but it helps as an application of the principle in the statute.  If this is not an agreement to which the protocol applies, then there is no power in the Scottish court to assist within section 4 (2).  In England, under section 4 (1) it is plain that the court has a duty to assist by staying the proceedings.  This is an illustration of the recognition of principle in the protocol that the place of arbitration is to be the place

D  whose law will govern the arbitration procedure.  If there was an arbitration clause providing for arbitration in Scotland and litigation took place in England, the court would have power to stay the action under section 4 (1).  Any arbitration agreement would be a good basis for a stay—Scottish or any other, since "arbitration agreement" includes foreign arbitration agreements.

E  Another illustration of the recognition of the principle contended for is to be found in the Rules and Conditions of Arbitration of the International Chamber of Commerce: see article 16.

[Counsel was stopped on the ground that that was not authority.]

Again R.S.C., Ord. 73, r. 7, in particular, is not direct authority but shows that, in matters of control (of the appointment of an arbitrator or umpire) the important step of service out of the jurisdiction is permitted

F  with the leave of the court if the arbitration is held within the jurisdiction: see also Ord. 11, r. 9 (1).

If misconduct had been committed under English or Scottish law, an order would have to be obtained for the removal of the arbitrator, and, under R.S.C., Ord. 73, r. 7, there could be service of this order out of the jurisdiction only if the arbitration was held within the jurisdiction.  So, it would not run aganst the arbitrator in the present case, since he would need

G  to be served out of the jurisdiction.

With regard to comity, see *Indyka* v. *Indyka* [1969] 1 A.C. 33.  Comity is not the basis on which a foreign decree is recognised; the question is whether the foreign court had jurisdiction according to internationally recognised principles.  [Reference was made to *Sirdar Gurdyal Singh* v.

H  *Rajah of Faridkote* [1894] A.C. 670, 684, and *Pick* v. *Stewart, Galbraith & Co. Ltd.* (1907) 15 S.L.T. 447.]

[LORD REID: You assume that there was jurisdiction to make the order; the question is, is it the kind of order which you would enforce?]

590

The form of order is recognised: see *Dicey and Morris,* op. cit., p. 1017, r. 169.

    A

The second question in this appeal is: what was the proper law of this contract, including, in particular, the arbitration clause? It is clear that the parties made no express choice of law, and, in these circumstances, the test is to ask: with what system of law has the contract the closest and most real connection? See *The Assunzione* [1954] P. 150, *Bonython* v. *Commonwealth of Australia* [1951] A.C. 201 and *In re United Railways of Havana and Regla Warehouses* [1961] A.C. 1007, which shows that the whole of the circumstances have to be looked at. If one applies these tests in the circumstances of the present case, the answer to the question posed above should be: the law of Scotland.

    B

If the R.I.B.A. form had wished to make it clear that its acceptance constituted a choice of the law of England, it would be very natural to expect that it would have contained an express choice of law, but it has never done so. So, the form is one which could apply and operate in Scotland or in England. The R.I.B.A. is a *British,* not an English, body. The R.I.B.A. form was not chosen here because it was an English contract; it was chosen because it fitted the needs of the parties; it was a fixed-price contract. The fact that the place of performance of the contract was clearly Scottish and that it was a building contract to be carried out over a considerable period of time are factors to which weight should be given. The only system of law mentioned in the contract must be the law of Scotland: see the reference to statutory or common law claims for personal injury in clause 18. The law to be applied to that is that of wherever the claim is made—here, of Scotland because that was the place of performance of the contract. See *per* Lord Denning M.R. [1969] 1 W.L.R. 377, 380: " common law " can be of Scotland; liens are well-known in Scottish law also, and a provision for a receivership would be quite natural under a Scottish contract: see also *per* Widgery L.J., at p. 384.

    C

    D

    E

If both parties to this contract had been Scottish and had wanted an English architect because he was good, and he had selected the R.I.B.A. form, it would follow from the reasoning of the Court of Appeal decision that it would then have been an English contract.

    F

So far as the subsequent conduct of the parties is concerned, their actions cannot be looked at to determine what is the proper law of the contract: (1) The raising of the action in England was very natural where the person who would be liable to pay on the certificates was in England. (2) Again, the stay which was ordered does not advance the position. The situation is that section 4 (1) of the Arbitration Act, 1950, is part of the curial law of the courts of England, and, if they are faced with an arbitration agreement, their powers to stay an action under section 4 (1) arise. (3) The form of the appellants' application for the appointment of an arbitrator does not take the argument any further; the only place where the phrase " submission to arbitration " occurs is in section 4 (2), where it clearly includes foreign agreements.

    G

These actions cannot, therefore, be relevant in answering the question what is the proper law; alternatively, they do not assist.

    H

Accordingly, the proper law of this contract was Scots law, and the Court of Appeal was wrong in holding the contrary.

A    On discretion, the court has undoubted discretion, and, if the appellants are wrong on their other submissions and section 21 of the Act of 1950 does apply, the court is still not bound to order the arbitrator to state a special case. If it is not clear that an order would be enforceable, this will enter into the question whether an order should be made. Also, where questions of law were not formulated to the arbitrator, the court is really deprived of hearing from him. The principal point which the appellants

B make on discretion is, however, that concerned with the enforceability of any order.

   *J. Raymond Phillips Q.C.* following. The appropriate course for the respondents to have taken if they objected to the arbitrator sitting in Scotland would have been a motion by them for his removal under section 23 of the Act of 1950 on the ground that he had misconducted himself in the proceedings. This is on the basis that English law was the

C proper law of the contract and that the effect of the arbitration proceedings being held in Scotland was to submit them to the law of Scotland. Section 23 is wide enough to cover not only personal misconduct but also an error of law. The arbitrator is really a quasi-judge exercising quasi-judicial functions. It is true that this point has never quite arisen to make it necessary to put it in this way, but, for example, in deciding whether he

D must comply with the rules of evidence his position has been equated with that of a quasi-judge.

   With regard to an arbitration taking place in two countries simultaneously, one would look to the main part of the arbitration.

   On a second point of detail, namely, the rules of court with regard to the service of proceedings out of the jurisdiction, the relevant order seems to be R.S.C., Ord. 11, r. 9. If proceedings have been begun by writ, they

E cannot be served out of the jurisdiction. The only relevance of Ord. 73, r. 7, is that such a situation could arise; if the application were decided in favour of the respondents, it is not clear what machinery they could adopt to have the arbitrator removed. It seems that there would be no power to serve the order out of the jurisdiction in a case of this kind. This may be relevant to the question of discretion.

F    On the question of the proper law of the contract, see *per* Widgery L.J. [1969] 1 W.L.R. 377, 383–384. He is saying that there are three stages: (1) you ask whether there is an express agreement; (2) you ask whether it can be inferred what the parties intended; (3) only if you cannot do that, you look at all the circumstances, including the traditional tests with regard to where the contract was made and was to be performed, etc. Those three stages are plainly inappropriate in the circumstances of this case because

G it cannot be inferred what the parties intended without looking at the circumstances. This case was never argued on the basis that there had been a new contract—that there was the initial proper law with some variation. Widgery L.J. is really referring to the parties' pre-contract conduct.

   If the proper law cannot be determined by reference to the contract

H itself, then it must be determined by *all* the circumstances, and it is a criticism of the members of the Court of Appeal that they did not consider all the circumstances, only some of them. They paid no attention to the place where the contract was made, to the fact that it was to be

A performed in Scotland, to the fact that its subject-matter was land in Scotland and to the fact that the respondents were acting in their capacity of property-owners rather than as contracting parties. They were all plainly influenced by what Mr. Hayworth did when he went to London, but the R.I.B.A. form was accepted by Mr. Hayworth because he understood that, naturally, the architects, being London-based, would want that particular form of contract. We are dealing with London architects, and what was affecting them was the *technical* rather than the legal aspect. B [Reference was made to *Dicey and Morris*, op. cit., p. 1067.]

*Morris Finer Q.C.* and *Patrick Milmo* for the respondents. The proper order of approach to the questions in this appeal is not a mere matter of convenience. The proper order is: (i) what is the proper law of the contract? (ii) if it be possible to have a law of the arbitration different from the proper law of the contract, do the circumstances entitle the law C applicable to be split in this way? A good many of the difficulties which have arisen so far in the discussion of these questions resolve themselves if the matter is approached in this way.

There is in fact no case so far cited, the respondents have found none and the passage in *Dicey and Morris, Conflict of Laws*, 8th ed., pp. 1047–1048, suggests that there is none in which the law has ever been split in the way in which it is suggested by the appellants that it should be D (assuming that the proper law of the contract is English). There is, however, a useful passage in *Kahler* v. *Midland Bank Ltd.* [1950] A.C. 24 in the dissenting speech of Lord MacDermott at p. 42, referring to the reluctance of the courts to split the proper law, assuming that it is possible in theory to do so at all. It will only be done in very exceptional circumstances. See also *per* Lord Reid, at p. 50.

E The importance of the proper law of the contract as regards not only its substantive provisions but also as regards the arbitration clause is quite manifest. If the parties' intention in entering into the R.I.B.A. form of contract was that the proper law of the contract should be English, then it is in the highest degree unlikely that it was their intention that the law of the arbitration should be any other than English law. If this is right, the appellants here are in the position of having to suggest that there was F some sort of variation of the parties' original intention. Whether the proper law is determined by the country with which the contract is most closely connected or (as is the more accurate formulation) the system of law with which the contract is most closely connected, the question is always: what was the intention of the parties? It is only when the court finds itself at a loss to determine that intention that it has to impose rather artificial rules in order to seek a reasonable solution, though this solution could be G quite different from what the intention of the parties in fact was. Here, there was a *real* intention.

It is suggested that people like the parties in this case and architects are concerned merely with the technical aspects of the contract. This is wholly unrealistic. Anyone who is operative in a big way of business is perfectly well alive to the situation that, under Scots law, arbitration H is uncontrolled but that, under English law, it is subject to the control of the courts. This House will not assume without evidence that these people

A did not know their business; it will assume the contrary. If the respondents insisted on a contract in the R.I.B.A. form, there being in existence a Scottish form almost universally, if not universally, adopted, and deliberately chose to use the R.I.B.A. form which the appellants anticipated that they would want, then to say that all that can be deduced from that is that the respondents wanted the R.I.B.A. technical clauses but not that the court should have control over any dispute is wholly unrealistic. If

B an officious bystander had been told that the proper law of the contract was English and had been asked whether or not the Arbitration Act applied, he would have said: " yes, of course." If he had been asked by which law the contract was intended to be governed, he would have said: " the law of England."

The approach to the question of the proper law of a contract is accurately set out in *Dicey and Morris*, op. cit., p. 1047. If one is looking

C at intention, it is perfectly permissible to look at the conduct of the parties before, at the time of and after the making of the contract. This was a contract in English form. It was proffered in English form by an English surveyor in London, not by way of accident or inadvertence but specifically because the respondents wanted an English form of contract. The fact that the architect and the surveyor were English has to be accorded more

D weight than merely to say that it would have been their preference to have a form of contract with which they would be familiar. The architect plays a vital part in working out the contract. Two standard forms of contract existed all this time. One refers to institutions (see title page) which are predominantly English. So specifically English is it that, whatever the convenience of applying it in Scotland, it is necessary to have a supplement in order to make it more useful there. It cannot be said that

E it was regarded generally as a very useful document for use in Scotland and under Scottish law; otherwise the supplement would have been unnecessary. It is plain, on the evidence, that, however possible it might have been to stretch the English document to cover a Scottish situation, that was never done (pre-1963). Regard should be had to common and practical reality; this is the best guide in the absence of express words.

F The parties' intention might be common, yet founded on different motives and experience. Once one gets outside questions of pure construction, one has to look at all the surrounding circumstances. One is not seeking to imply a term but to establish as a matter of law what the proper law of the contract is. This is rather different from the question of the terms, express or implied, on which the contract was made.

All the members of the Court of Appeal based themselves on the leading

G idea that the R.I.B.A. code was incomplete unless it was governed by English law. The drafting of the R.I.B.A. contract is based on about 60 years of English case law, though the respondents do not suggest that anything in it is not perfectly intelligible to a Scots lawyer. All the cases on the R.I.B.A. contract are based on English case law. There is not a single Scottish decision on it (before 1963, when it was never in use in

H Scotland, at any rate), but scores of English cases. Many difficulties in it have been eked out by English case-law: see, e.g., *Amalgamated Building Contractors* v. *Waltham Holy Cross Urban District Council* [1952] 2 All E.R. 452. It is inconceivable that parties contracting on the standard

R.I.B.A. form were not adopting the decisions in the English cases
on it, and it is inconceivable that a Scottish court would decide the
points decided in those cases de novo. From 1909 to 1963, the form was
revised at least seven times. Those revisions were largely based on English
decisions which had shown up gaps in the code. The supplement was
published under the sanction of Scottish bodies. The contract itself is an
English contract. The respondents' primary submission is that this is a
factor which is, in a sense, involved in the construction of the R.I.B.A.
form of contract in that one is entitled to go outside the document itself
to see that it is based on a body of English law. The selection of this form
of contract indicated the parties' intention. Perhaps, on consideration, it is
best described not as a matter of construction but as something integral
in the contract, so that the parties, in adopting the contract, are integrally
adopting English law.

The position where one cannot get the intention of the parties from the
contract itself and has to look at the reality of the surrounding circumstances
to construct an intention should be contrasted with the artificialities of rules
of thumb such as the lex loci solutionis or contractus; the factor that the
R.I.B.A. form of contract is based on a body of English case law is over-
whelming, and should be preferred. Regarding the theory that there may
be an intermediate stage between pure construction and looking at the
circumstances, see *Dicey and Morris*, op. cit., p. 691. One does not really
reach the third stage mentioned there in this case.

The appellants persuaded the arbitrator that there was no contract at
all—that the matter ought to be dealt with on the basis of quantum meruit.
Would the respondent have entered into a contract which exposed them
to findings of that kind? They got no law at all. It is not necessarily to
be inferred that the respondents would have preferred to risk the waste of
time and money which can occur when costs go to and fro between
arbitrators and the courts, but the policy which English law favours is that,
in important commercial matters, though parties may prefer arbitration,
they do not intend to give arbitrators completely unfettered discretion
without recourse to the courts. The policy of the courts ought to be, in
matters of this description, to submit matters to the control of lawyers
rather than laymen.

Conduct is one of the circumstances from which an inference can be
drawn. A subsequent circumstance may be used in order to determine
the intention of the parties. Here, the conduct relied on is that there was
a reference to arbitration under the Arbitration Act, 1950.

There is plenty of evidence that the parties did apply their minds to
the question whether this was a Scottish or an English contract.

The arbitrator was appointed in London. But this is not a case where
the clause says " arbitration Glasgow " or " arbitration London." If the
place were specified, that would be a very powerful factor, but that is not
this case. Nor can it be right that, if the proper law were otherwise
manifestly Scottish, if the parties had chosen the English architect originally
suggested by the respondents as arbitrator that accident would have made
the proper law of the arbitration English. It is worth mentioning that it
was an arbitrator which was applied for, not an arbiter. Contrast clause 11
(4) (c) of the contract concerning rates with clause 1 of the Regulations and

A  General Conditions of Contract for Building Works in Scotland: in Scots
contracts you have the Scots method of measurement. The revision of the
Scottish form of contract as from 1968 makes it absolutely clear that Scots
law applies to that form.

It is wrong to say that no factor other than the form of contract
was considered by the Court of Appeal: see *per* Lord Denning M.R.
[1969] 1 W.L.R. 377, 381. [Reference was made to *Rossano* v. *Manu-*
B  *facturers' Life Assurance Co.* [1963] 2 Q.B. 352, *per* McNair J.] There is
no real conflict between *The Assunzione* [1954] P. 150 and other cases,
because the members of the court there were directing their minds to
different stages of the inquiry. In *The Assunzione*, they imputed an inten-
tion, so had to go into the circumstances.

Regarding the distinction between connection with the " country," and
with " the system of law," there are many cases where this dichotomy has
C  not been explained because it was not relevant to the inquiry. The
" system of law " test is much more accurate than the " country " test,
though it is not suggested that the country test must be excluded.
Admittedly, the place and manner in which the contract is to be carried
out can be connected with a system of law.

The respondents' submissions on the proper law of the arbitration,
D  assuming that there can be a split, are as follows: under his remit, this
arbitrator was bound by the Arbitration Act, 1950. So, right from the
beginning he never had vires to deal with the matters other than by refer-
ence to the Act. If this is right, it is conclusive of this case—if there are
no countervailing considerations—even if the proper law of the contract
was Scottish law. The arbitrator was acting under the Arbitration Act.
There is no evidence that he did anything not under the Act until he refused
E  to state a special case. The procedure was under the Act—it does not
matter whether the expression " points of claim " is used or the equivalent
Scottish expression (see the form of appointment). Of course the arbitra-
tor derives his authority from the arbitration clause, but one cannot ignore
the terms on which he was appointed. " Within the meaning of . . . ," in
the application for his appointment, can only really mean " under." The
F  fact that the application was made six days after the appellants' action
had been stayed under the Act may have some relevance, but there was
no point in referring to the Act unless he was being directed to the fact that
his authority was to act within the meaning of the Act.

Even if the proper law of the contract was originally Scottish, the parties
turned it into an English arbitration by their submission to arbitration.
They certainly did not turn it into a Scottish arbitration.
G
If one is talking about a submission to arbitration, only section 4 (2)
of the Act contains this phrase, and section 4 (2) has nothing to do with
the present matter. There is not even a reference here to " a submission
within section 4 (1)." What can be the meaning of " submission within
the meaning . . ." where the Act does not make a reference to it? Nor
does the Act define " arbitration," only " arbitration agreement." [Refer-
H  ence was made to section 32.] " Within the meaning of the Act " cannot
just be a convenient paraphrase of " whereas there is an arbitration
agreement."

Even if the reference to the Arbitration Act, 1950, in the application for

**Whitworth Street Estates Ltd. v. Miller (H.L.(E.) )**          **[1970]**

appointment does not have the definitive effect contended for, it is a material A
circumstance to be taken into account in determining the proper law of the
contract.

The time factor does not operate adversely if, it is recognised that
these forms are standard forms of application for appointment standing
collaterally with the standard forms of contract. One is going to get a
form from the Institute which refers to the Arbitration Act whether there
has been an antecedent stay or not. It is all part of the general English B
context. This is reinforced by the opening words of section 4 (1). It is
conceded that these words are apt to cover a case where the submission
to arbitration or arbitration agreement is a foreign one but the pro-
ceedings have been begun in the English courts. It looks as though one
can stay such a proceeding.

*Racecourse Betting Control Board* v. *Secretary of State for Air* [1944] C
Ch. 114, *per* MacKinnon L.J., at p. 126, shows that, when one is dealing
with a foreign submission, the power of the court to restrain proceedings
is inherent and existed before section 4 of the Arbitration Act, 1950. The
stay under section 4 was applied for on this basis and was obtained with-
out dissent by the appellants. This is one other factor in the general
context of the case indicating what the parties' intention was.

The appellants' argument is that the procedure adopted in the arbitration D
was wholly Scottish and was adopted without dissent by the respondents, and
that the arbitration was held in Scotland. This is, however, not a case
where the contract *specified* arbitration in Scotland; it is thus a different
class of case. The question is how the arbitration came to be held in
Scotland and whether that should be treated as conclusive as to the inten-
tion of the parties. It was, however, a pure question of convenience. So
far as the Scots form of pleadings is concerned, a reading of the corre- E
spondence makes it plain that one had the situation where the arbitrator
had been appointed and he and his clerk quite naturally began to use the
kind of terminology with which they were familiar. From quite early
on, the respondents and the appellants' English solicitors went on using
*their* terminology. Ultimately, as a matter of convenience and courtesy,
both sides fell in with the arbitrator's terminology. It is impossible to say F
that the law of the arbitration was intended to be different from the proper
law of the contract. The fact that the parties adopted terminology which
was convenient to the tribunal can have no effect on what is the proper law
of the arbitration. The parties did not, except in trivial matters, consent
to Scottish procedure. They did not agree to Scots law of procedure being
adopted by the arbiter. The respondents were advised by English leading
counsel then retained by them that the right time to raise the point regarding G
the stating of a special case was at the end of the evidence. They never
concluded from the clerk to the arbiter's letter of May 24, 1967, stating
that the procedure outlined was not in accordance with Scottish arbitration
procedure, that a case stated would not be possible. The correspondence
never went beyond matters of terminology. The letter of May 24 refers to
an interlocutory step of no importance. There is nothing in the respondents' H
acknowledgment of it to indicate that they intended to give up the right to
have the arbitration supervised by the courts. Nor was it even necessarily
the appellants' view that the arbitration would be without such supervision.

A.C.                 Whitworth Street Estates Ltd. v. Miller (H.L.(E.) )

A  It was not a case where one party wanted Scottish procedure in the full sense
to apply and the other did not. It is likely that both sides thought that, in
the full sense, it would not apply. Or, at least, they did not bend their minds
to the subject at all. On the contrary, the respondents throughout par-
ticularly wanted the R.I.B.A. form of protection, and the appellants knew it.

    The fact that the arbitrator had no difficulty in applying English law
is irrelevant: this was simply because he was Scottish as opposed to French
B  or German.

    *Howden & Co. Ltd.* v. *Powell Duffryn Steam Coal Co.* [1912] S.C. 920
shows that, in all these matters of pleading and terminology, the fact that the
arbitrator was dealing with the matter in Scottish form is irrelevant, because
it is well recognised in Scotland that these variations are of no importance
even in the case of matters of pure construction, let alone pleadings. If an
C  important point of procedure had arisen, arbitrator had a clerk to assist
him. The position is different from that of an arbitration going on in Spain,
for instance, in a different language. It is, in any event, not uncommon for a
point of foreign law to arise in an arbitration. One ought not, therefore, to
allow formal and unimportant matters to affect the conclusion.

    To say that the arbitrator, having made his final award, was functus
officio is demonstrably wrong having regard to at least three English
D  authorities. Once he is acting under the Arbitration Act, he cannot by
the form of his award exclude its application. Really, the term " functus
officio " begs the question (*In re Palmer, ex parte Brims* [1898] 1 Q.B. 419).

    On discretion, it is unarguable that the award was so right and clear
that the court should not grant the respondents a stated case. The dis-
cretion point is, however, put by the appellants in a different way—by
E  reference to the grip of the court over the arbitrator. What the Scottish
courts would do if the English court ordered the arbitrator to state a case
is a matter of Scots law. If Scottish conflicts rules are the same as English
conflicts rules on this subject, the answer to the question whether they
would enforce such an order is " no," any more than the English courts
would enforce an interlocutory award of an American court. This is,
however, of no importance, because refusal to comply with the order is in
F  the end going to lead to a final judgment, and final judgments are always
recognised by foreign states. The respondents would apply to have the
arbitrator removed, and to start a new arbitration. The Scottish courts
would enforce a final order of that kind, and they would not enforce the
existing award. The principle that a court does not make an order which
it cannot enforce is inapplicable to a situation where, ex concessis, one
G  starts off with one party to the proceedings being foreign. Also, with
regard to the service of proceedings on people out of the jurisdiction, or
resident abroad, the court regularly assumes jurisdiction under R.S.C.,
Ord. 11, over residents abroad, provided that it has jurisdiction to enter-
tain the proceedings in the first place.

    It does not therefore, matter that the arbitrator lives in Glasgow if
he is subject to the English courts. Suppose, for example, that the arbitra-
H  tion had started in England and the arbitrator had then gone to Germany
and held the arbitration there: is it to be supposed that the English courts
would have lost all control over it? Surely not.

Under R.S.C., Ord. 73, r. 3 (2), the proper respondents would be the       A
arbitrator and the other party to the reference. In applying to set aside
an award, however, the arbitrator is not joined, even if there is a question
of malpractice: see the precedents in *Russell on Arbitration.* R.S.C.,
Ord. 73, r. 7 (1) does not apply to proceedings requiring the arbitrator to
state a case at all; that is governed by R.S.C., Ord. 11, r. 9 (1), which
leaves the question of service of the originating summons out of the juris-
diction at large for the discretion of the court. The arbitrator would only       B
need to be served if the appellants could not be served with the neces-
sary process. They could not be served out of the jurisdiction, except
with regard to the case stated, but there is no problem there because they
are in this country. The fact that an order on an arbitrator to state a case
is left out of R.S.C., Ord. 73, r. 7, indicates that it is thought desirable
that the court should retain discretion and control. It is deliberately left
out of the restriction imposed by Ord. 73, r. 7.       C

The question has been put: how could the respondents have prevented
the appointment of the Scottish arbitrator to sit in Scotland? They could
not have. All that this shows, however, is how invalid the point is
that the appointment of a Scottish arbitrator sitting in Scotland determines
the law of the arbitration. The whole point of " consent " to Scottish
procedure is not so much that the arbitration was conducted by a Scot—       D
nothing could have been done about that—nor that he was sitting in Scot-
land—nothing could have been done about that either—but no more than
that the respondents did not raise at the earliest opportunity the doubt
which occurred to them as to whether the arbitration was to be governed
by Scottish procedure. If the proper law of the contract is manifestly
English law, then the fact that the arbitration proceedings are held in
Scotland is no more than prima facie evidence, and is certainly not con-       E
clusive, that that law is intended to govern the arbitration. It is perhaps
put rather too high in *Dicey and Morris* at p. 1048; it is a factor, though no
doubt quite a strong factor, in determining the proper law of the arbitration.
Whether, however, it is prima facie evidence or an important factor does
not matter much because, if it is prima facie evidence, this means prima
facie *in all the circumstances.*       F

There is nothing here to displace the overall presumption from the
rest of the contract that the parties intended the arbitration to be held as
an English arbitration. Admittedly, if the proper law of the contract was
English and the arbitration was English by operation of law rather than by
agreement, that might be a bit weaker because it could more easily be
shown that there was an agreement to hold it elsewhere. Even if the
arbitration was English by operation of law, however, the difficulty of       G
finding that there was a " split " of the proper law is still very considerable

*Dicey and Morris's* suggestion at p. 1048 is the high water-mark against
the respondents, but, in any event, it is displaced because there was no choice
of the parties here to have a Scots arbitration. The first time that the
question arose was when they had to ask: are we arbitrating by Scottish
law or English law? This is what is relevant even if the question should       H
have been asked earlier. The choice of the arbitrator was not the appel-
lants' or the respondents', so that there was no contest at that stage.
" Consent " cannot apply in a situation where there is no option to do

**A.C.**          **Whitworth Street Estates Ltd. v. Miller (H.L.(E.) )**

A anything else.  When the arbitrator was appointed, all that the respondents could have done was to make a fuss.  It is a loose use of the word " procedure " to use it in the relation to the form of pleadings in Scotland.  These can be in any form in Scotland; they are not governed by any law at all.  If any real question of substance had arisen and the respondents had agreed on Scottish procedure, that would have been a different matter.  But the first time that this arose was when they asked the arbitrator to

B state a special case.  Far from consenting then, they took proceedings.  It does not matter how the pleadings were headed.  There were no standard forms or procedure to consent to.  No estoppel has been pleaded.

To summarise the respondents' submissions:

1. The parties entered into a building contract in standard form which was intended to be governed by English law.  This assumption rests on the following foundations: (a) On the appellants' own evidence, the contract

C was " in English form."  This is virtually a concession that the proper law of the contract was English.  (b) The English form was not adopted fortuitously, but at the express request of the English architect.  Its selection was regarded by the appellants themselves as perfectly natural.  (c) The selection of the English form was an act of choice between the English form and an extant Scottish form in almost universal use in Scotland by

D building contractors for building work in Scotland.  (d) The appellants are a very large company engaged in work both in Scotland and in England, and it was for them just as convenient and a matter of indifference whether they contracted under English law or Scottish law.  (e) We know that the appellants had the advantage of the services of a lawyer engaged in a " consultative capacity to advise them on questions arising, inter alia, on building and civil engineering contracts."  So, again, the appellants were

E alive to these matters.  (f) The sponsorship of the English standard form is by English associations or authorities, or, in the case of the R.I.B.A., where not confined to English members, at least bodies with specified Scottish counterparts.  (g) The terminology of the contract is English.  It manifestly uses " common law " to mean the common law of England.  One reference to something which is not known to Scots law is that to receivership under

F a debenture.  (h) The standard form postulates a large body of English case law and practice which the parties take on with the contract and for which there is no counterpart in Scotland.  No Scottish case on the R.I.B.A. contract has been cited.

2. No case has been cited in which the proper law governing the conduct of an arbitration has ever been held to be different from the proper law of the contract.  *Dicey and Morris,* op. cit., p. 1048, state that this

G could be achieved by way of an express provision, but there is no such provision in this contract.  It follows that, if the proper law of the arbitration is to be held to be Scots law, this conclusion must come about by some inference or implication derived from the contract, or, if the contract does not yield such, from some other circumstance ex post facto.  There is absolutely nothing in this contract from which it could be said to be

H governed by Scottish law.  The overwhelming inference is that it is governed by English law.  So, if something is to override this inference, it must be something which occurred after the making of the contract (see *Dicey and Morris,* op. cit., p. 1047).  If *Dicey and Morris* are right in

saying that, prima facie, the law of the country in which the arbitration
is held governs it, for which statement there is no authority, still, prima
facie means no more than that one must look at all the circumstances.
The right question is: did anything happen to displace or alter the original
manifest expectation of the parties that the dispute would be arbitrated
according to English law?

3. No estoppel has been pleaded. The respondents rely on two references
to the Arbitration Act, 1950, in the arbitration agreement. They say that, on
any reasonable construction of the arbitrator's appointment, the conclusion
is reached that the arbitration was intended to be governed by the Act of
1950. The words of the application for appointment are not to be struck
out as being merely otiose. They are specific words, making clear refer-
ence to an English Act of Parliament. Either they are absolutely
meaningless or the arbitrator is to conduct the arbitration according to the
Arbitration Act.

4. There are ample grounds in this case on which the evaluation of the
proper law which was made by the Court of Appeal could be made, and
it would be wrong for this House to say that it was wrong in law or to
interfere, assuming that a different conclusion were possible.

This is a question of law, but a question of law stemming from the con-
clusion to which one comes on the facts. The Court of Appeal was unani-
mous and ought not to be overruled by this House.

*Mackay Q.C.* in reply. " Submission to arbitration " is a phrase cap-
able of more than one meaning. It may mean one particular dispute, or
it may be a general clause submitting all disputes. It may mean other
things also. On the ordinary use of language, the phrase used here means
no more than that " submission to arbitration " has the meaning which it
has in the Act. The passage in the application for appointment referring to
the submission to arbitration describes a provision in the contract. It does
not prescribe procedure. It is nothing more than a description of a
particular clause. In the Act, the phrase occurs only in section 4 (2),
which, as it happens, extends also to Scotland. It is plain that, in the
context of section 12 of the Act, " submission to arbitration " must embrace
many arbitrations which are not subject to English procedure. This ties
up with the three R.I.B.A. printed forms, because, in a case where there
is no provision for arbitration, the phrase does not occur. So, the phrase
in the application for appointment does not take the matter any further.

In looking at the realities of the situation, one should see the course
which the matter took. It was not expressed in the contract that the arbi-
tration should be governed by the law of England. Either the respondents
could object to the arbitration being held in Scotland because that was
inconsistent with the original contract or they could not object because it
was consistent. The arbitrator's first act was to appoint a Scottish solic-
itor to be clerk in the submission and neither party took any objection.
The clerk wrote his letter in January 19, 1967, to the respondents' English
solicitors in London before any point, trivial or otherwise, had arisen.
That was a clear indication that the procedure known to him, rather than
the procedure known to the solicitors, was the procedure to be followed.
The phrase " procedure " would be understood as it would be understood
by solicitors: *Don* v. *Lippmann* 5 Cl. & F. 1. Later letters made it plain

A   that Scottish arbitration procedure was being applied. The respondents
evinced agreement to that course being followed. This is not a mere matter
of trivia. " Scottish arbitration procedure " means " Scottish law regula-
ting arbitration procedure."  This law is fairly general in character, but,
equally, arbitrators are entitled to decide questions of law as well as fact
and to decide them finally. The English Evidence Acts apply to arbitra-
tion proceedings but do not apply to Scotland. If the reason given by
B   the clerk in his letter of May 24, 1967, was a good reason, then it would
have been a good reason in the case of any of these matters.

The whole conduct of the parties in the arbitration evinced a common
intention that the law governing at least the procedure should be that of
Scotland. The position should be tested as at the moment when the ques-
tion arose regarding the case stated. The pleadings are not just Scottish be-
cause they could be either, but are *characteristically* Scottish. The pleas-in-
C   law are unknown to English law, and one plea on which the respondents'
case depends is the relevancy of the averments. They are asking for a
decree arbitral, which is a Scottish form.

The fact that the arbitration took place in Scotland is of very consider-
able importance. If it was perfectly in accordance with the contract that it
should be so, then it was also perfectly within the contract that it should
D   be governed by the law of Scotland.

With regard to, e.g., section 12 of the Arbitration Act, 1950, it is, of
course, plain that " arbitration agreement " can be one answering the
definition in the statute, but section 12 does not apply to an arbitration
governed by the law of Scotland.

With regard to the proper law of the contract, it is accepted that the
appellants are in a fairly big way of business, but this question should be
E   approached on the basis of the evidence.

Regarding the deliberate use of the R.I.B.A. form, this is not a case
where the R.I.B.A. form is intended only for use in England. There is no
evidence to this effect. Scottish architects as such are directly represented
in the list of members of the bodies who sanctioned the form. There is a
form for Scotland on the one hand and a form for widespread use on the
F   other.

One cannot make assumptions one way or the other from the fact that
there are a considerable number of English decisions on the R.I.B.A. form.
The law governing procedure in Scotland is such that arbitrations normally
could never get to court. [Reference was made to *Howden & Co. Ltd.* v.
*Powell Duffryn Steam Coal Co.* 1912 S.C. 920.]

There are, therefore, no circumstances amongst those preceding the
G   making of the contract which evince the intention on the part of the con-
tracting parties to choose English rather than Scottish law for the contract.
There is nothing to be gathered from the wording of the contract. " System
of law " in the contract quite clearly means, in the context, Scottish law.
" Common law " is clearly Scottish common law. Clause 18 is quite
consistent with Scottish law.

H   What Lord Denning M.R. said at [1969] 1 W.L.R. 377, 380, is contrary
to *Bonython* v. *Commonwealth of Australia* [1951] A.C. 201, and to what
this House has held, since he does not give proper weight to the place of
performance.

It is accepted that the arbitrator is not a necessary party to the pro- **A** ceedings, but it would be necessary for the order to be served on him, otherwise there is no procedure for letting him know where he stands. The main use which the appellants make of R.S.C., Ord. 73, r. 7, however, is the importance which it gives to the place where the arbitration takes place. The arbitrator has no office in England, so the proceedings could not be served at all where the arbitration proceedings had take place entirely outside the jurisdiction. **B**

The respondents have accepted that the R.I.B.A. form might be used in circumstances where it would not carry the implication that the proper law was the law of England. If this is so, there are many other reasons for choosing the R.I.B.A. form.

If the R.I.B.A. wanted a form for general use, it was natural to leave out reference to English law. If, on the other hand, they had wanted **C** English law to be applicable, it would have been very simple for them to have said so.

Their Lordships took time for consideration.

March 3. LORD REID. My Lords, the appellants are building con- tractors whose registered office is in Scotland. The respondents are an **D** English company who owned premises in Dumbarton which they wished to convert into a bonded warehouse. They accepted the appellants' tender for the work and the contract made by the parties was in the form published by the Royal Institute of British Architects. This contract contained an arbitration clause and when disputes arose the parties, having been unable to agree, applied in terms of this clause to the president of the institute to nominate an arbitrator. He nominated Mr. Underwood, a fellow of the **E** institute, who practised in Glasgow. Mr. Underwood then, by an interloctu- tor in Scots form dated January 19, 1967, appointed a Glasgow solicitor to be clerk in the submissions. Thereafter all the proceedings in the arbitration were in Scots form, Scots counsel and solicitors being employed by both parties. After all the evidence had been heard counsel for the respondents asked the arbiter to state a case for the decision of the English High Court. **F** The arbiter refused to do so on the ground that this was a Scottish arbitra- tion. The respondents then, on June 28, 1968, applied to the High Court for a direction to the arbitrator to state his award in the form of a special case. Mr. Underwood did not do so: he issued his final award on December 10, 1968.

The question in this appeal is whether this was a Scottish or an English arbitration. If it was governed by the law of Scotland the arbiter acted **G** correctly. Under Scots law an arbiter is the final judge both of fact and law, and Mr. Underwood was entitled and, indeed, bound to issue his final award. But if the arbitration was governed by the law of England he was bound to state a case in order that questions of law which had arisen might be decided by the English court.

Two questions were argued: first, whether the proper law of the parties' **H** original contract was Scots or English law, and secondly, if the proper law was English law, was the arbitration nevertheless governed by the law of Scotland? I shall first consider what was the proper law of the contract.

A.C.         Whitworth Street Estates Ltd. v. Miller (H.L.(E.))         Lord Reid

A   The general principle is not in doubt.  Parties are entitled to agree what is to be the proper law of their contract, and if they do not make any such agreement then the law will determine what is the proper law.  There have been from time to time suggestions that parties ought not to be so entitled, but in my view there is no doubt that they are entitled to make such an agreement, and I see no good reason why, subject it may be to some limitations, they should not be so entitled.  But it must be a contractual

B   agreement.  It need not be in express words.  Like any other agreement it may be inferred from reading their contract as a whole in light of relevant circumstances known to both parties when they made their contract.  The question is not what the parties thought or intended but what they agreed.

It has been assumed in the course of this case that it is proper, in determining what was the proper law, to have regard to actings of the parties after their contract had been made.  Of course the actings of the parties

C   (including any words which they used) may be sufficient to show that they made a new contract.  If they made no agreement originally as to the proper law, such actings may show that they made an agreement about that at a later stage.  Or if they did make such an agreement originally such actings may show that they later agreed to alter it.  But with regard to actings of the parties between the date of the original contract and the date of Mr.

D   Underwood's appointment I did not understand it to be argued that they were sufficient to establish any new contract, and I think they clearly were not.  As I understood him, counsel sought to use those actings to show that there was an agreement when the original contract was made that the proper law of that contract was to be the law of England.  I must say that I had thought that it is now well settled that it is not legitimate to use as an aid in the construction of the contract anything which the parties said or

E   did after it was made.  Otherwise one might have the result that a contract meant one thing the day it was signed, but by reason of subsequent events meant something different a month or a year later.

The facts mainly relied on the show that there was an agreement that English law should be the proper law of this contract are that the R.I.B.A. form of contract is in English form and that there was in common use at

F   the time a Scottish form of contract drawn up by a different professional body.  What reason, then, could there be for adopting the English form other than an intention that the law of England should be the proper law of this contract?  But there could be a very good reason.  If an English architect is appointed to act in any building contract he may well prefer that the contract should be in a form with which he is familiar, because any form of building contract is exceedingly complicated.  And the parties

G   may accede to his wish without giving a thought to the question of proper law.  Indeed, this is what seems to have happened in the present case.  So I cannot find any agreement as to what should be the proper law of the contract, and I must consider how the law will determine that question.

At one time it was thought that the problem could be solved by means of an implied term in the contract.  But this creates difficulties similar to those

H   discussed in the more recent authorities dealing with frustration, and I think that the better view now is to apply a more objective test.  Two slightly different tests have been formulated: " the system of law by reference to which the contract was made or that with which the transaction has its

closest and most real connexion " (*per* Lord Simonds in *Bonython* v. **A** *Commonwealth of Australia* [1951] A.C. 201, 219) and " with what country has the transaction the closest and most real connection " (*per* Lord Denning in *In re United Railways of Havana and Regla Warehouses Ltd.* [1961] A.C. 1007, 1068). It has become common merely to refer to the system of law but I think that the two tests must be combined for all are agreed that the place of performance is a relevant and may be the decisive factor, and it is only in a loose sense that the place of performance can be equated **B** to the system of law prevailing there. In *Bonython's* case the question was the meaning of " pound sterling," the choice being between its meaning according to the law of England and its meaning according to the law of Queensland. So it was quite accurate to refer only to the two systems of law. But in the *United Railways of Havana* case the decisive factor was the place of performance and in the choice between Philadelphia and New York nothing turned on any difference between the systems of law in the **C** Commonwealth of Pennsylvania and the State of New York.

In the present case the form of the contract may be said to have its closest connection with the system of law in England but the place of performance was in Scotland and one must weigh the relative importance of these two. No other factor has any real weight in this case.

So I must first see how closely the contract is connected with the law of **D** England. In appearance it is in English form but some of its provisions can only refer to the law of Scotland. Clause 4 requires the contractor to comply with Acts of Parliament and bye-laws. As all the work was to be done in Scotland that can only mean Scottish legislation. Clause 18 requires the contractor to indemnify the employer against claims or proceedings arising under any statute or at common law: that can only mean the common law of Scotland because it is there that such claims will arise and they will have **E** to be determined by Scots law. It is true that there is a reference to " property real or personal " but in the context that refers to property in Scotland and must mean property heritable or movable. On the other hand, there are references in clauses 11 and 31 to English rates being applied in the absence of agreement to the contrary. Some importance was attached to a reference in clause 25 to a receiver, but that would be equally apposite **F** in a Scottish contract if the contractor were an English company. I can find nothing else in the contract which would not be equally apposite if the contract is a Scottish contract. I should perhaps refer in particular to the arbitration clause—clause 35. The first part provides for disputes being referred " to the arbitration and final decision " of a person to be agreed. That is completely accurate if the contract is a Scottish contract but if it is an English contract one must read in the right to take questions of law to **G** the court. And then there is a provision that in the absence of agreement an " arbitrator " is to be appointed by the President of the Royal Institute of British Architects. As its name implies that is a society with Scottish as well as English fellows. So, unless one lays undue stress on the use of the English term " arbitrator," that is a provision equally applicable to a Scottish contract for which the president would probably appoint one of the Scottish **H** fellows, as he did in the present case.

So the contract has many connections with the law of England but it also has very important connections with the law of Scotland. I cannot

**A** therefore hold that the form of the contract is in any way decisive as to the proper law.

The other important factor is the place of performance. All the work under the contract was to be done in Scotland, and, apart from the possibility of an arbitration being conducted in England, substantially every question which could arise in the course of carrying out the contract would arise in Scotland. The contractor was a Scottish contractor.

**B** It therefore appears to me that the weight to be attached to the place of performance being in Scotland is considerably greater than the weight to be attached to such connections as there are between the form of the contract and the law of England and so I would hold that the law of Scotland is the proper law of this contract.

If that is right the second question does not arise. But if the proper law **C** of the contract is the law of England, I think that the actings of the parties after the appointment of Mr. Underwood sufficiently show an agreement that the arbitration proceedings should be governed by the law of Scotland.

I would allow the appeal.

**D** Lord Hodson. My Lords, the question for determination on this appeal is: " What law governs certain arbitration proceedings " which have taken place between the parties in Scotland before a Scottish arbiter.

The matter arises in this way. An English company called Whitworth Street Estates (Manchester) Ltd. (registered in London), owned premises in Dumbarton in Scotland which they wished to convert into a whisky bonded warehouse. On May 10, 1965, this English company entered into an agreement in the English Royal Institute of British Architects' standard form **E** with James Miller & Partners Ltd., building contractors of Glasgow, for them to do the work of conversion.

Disputes having arisen between the parties, they resorted to arbitration in pursuance of the arbitration clause contained in the agreement. This provided that in case of any dispute or difference it:

" is hereby referred to the arbitration and final decision of a person to be agreed between the parties, or, failing agreement . . . a person to **F** be appointed on the request of either party by the president or a vice-president for the time being of the Royal Institute of British Architects."

Upon an application by the English company for him to state his award in the form of a special case the arbiter refused to do this, for by Scottish law he was not bound to do so, his decision being final on law and fact. Master Elton made the order to state a case. This order, reversed by the **G** judge in chambers, was restored by the Court of Appeal. Hence this appeal to your Lordships.

The arbiter in the meantime made a final award in favour of the contractors, who are now the appellants.

So far as the proper law of this contract is concerned, there has been a division of judical opinion which indicates that the factors to be considered **H** are evenly balanced in this case.

The contract was not in terms made by reference to any system of law and the proper law falls to be determined as that with which the transaction has its closest and most real connections: see *Bonython* v. *Commonwealth*

606
Lord Hodson        Whitworth Street Estates Ltd. v. Miller (H.L.(E.) )        [1970]

of Australia [1951] A.C. 201, a decision of the Privy Council in which the
judgment of the Board was delivered by Lord Simonds at p. 219.  These **A**
observations were applied in this House in *In re United Railways of Havana
and Regla Warehouses Ltd.* [1961] A.C. 1007, 1035, 1050, 1068, 1081.
Although my noble and learned friend, the Master of the Rolls, now regrets
having used the word "country" instead of "system of law" in this
connection (see his judgment in this case [1969] 1 W.L.R. 377, 380) I do
not myself see that this variation of language is important, although in some **B**
contexts one word may be more appropriate than another.

Applying this test I have for myself come to the same conclusion as the
Court of Appeal as to the proper law of the contract.  The parties not
having expressly chosen the proper law or stated their intention in terms
the court must act on the evidence before it and fix the presumed intentions
of the parties as best it can.  As the Master of the Rolls pointed out there
are factors which point to Scotland where the contract was to be performed, **C**
always an important consideration.  The contract concerned land in Scotland
owned by one party.  The other party was a Scottish contractor.  The
workmen to be employed would be Scottish and their relations with their
employers would be governed by Scottish law.  On the other hand, all the
members of the Court of Appeal held, and I agree with them, that the
contract itself was from its inception one intended to be governed by English **D**
law.  The parties deliberately used the R.I.B.A. form which has many
connections with English law.  An English architect was employed, and,
although a Scottish form could have been used, the English form was
adopted at his request.  I need not enumerate other considerations, for
the question is, to my mind, determined by the use of the English form, the
selection of which shows the intention of the parties to be bound by English
law.  I should add that I cannot assent to the view which seems to have **E**
found favour in the eyes of the Master of the Rolls and Widgery L.J.
that as a matter of construction the contract can be construed not only in
its surrounding circumstances but also by reference to the subsequent
conduct of the parties.

I am satisfied, however, that, whether the proper law of the contract is
English or Scottish, the arbitration being admittedly a matter of procedure **F**
as opposed to being a matter of substantive law is on principle and authority
to be governed by the lex fori, in this case Scottish law.  Furthermore, the
parties have, in my judgment, plainly submitted to the Scottish arbitration
on the footing that Scottish procedure was to govern.

The leading case of *Don* v. *Lippman* (1837) 5 Cl. & F. 1, a Scottish
appeal to your Lordships' House, was concerned with the law of prescription
and it was held that the sexennial period according to the lex fori prevailed **G**
over the lex contractus.  Lord Brougham, at p. 13, held that there is this
distinction between the contract and the remedy: that whatever relates to
the remedy is to be governed by the lex fori, the law of the country to
whose courts application is made for performance.  I see no reason why
this principle should not be applied to arbitration proceedings.  It appears
from *Norske Atlas Insurance Co. Ltd.* v. *London General Insurance Co.* **H**
*Ltd.* (1927) 43 T.L.R. 541, 542, that MacKinnon J. was of this opinion.
An opinion to the same effect is to be found in *Dicey and Morris, Conflict of
Laws,* 8th ed. (1967), where the editors submit, at p. 1048:

A
" Where the parties have failed to choose the law governing the arbitration proceedings, those proceedings must be considered, at any rate prima facie, as being governed by the law of the country in which the arbitration is held, on the ground that it is the country most closely connected with the proceedings."

I agree with this submission.

B
Here the parties did not, in the first place, choose the law which should govern the arbitration proceedings but they subsequently accepted a Scottish arbiter in Scottish arbitration proceedings. This agreement involved no variation of the original contract for it is not inconsistent with the terms of that agreement that arbitration, if any, should take place in Scotland and be governed by Scottish procedure. That Scottish arbitration procedure was to be followed was accepted by the parties as is shown by the correspon-

C
dence which took place following the appointment of the arbiter in Glasgow. The arbiter himself made the position abundantly clear by appointing as his clerk a Glasgow solicitor. Scottish procedure was followed throughout without objection until the application was made for a case to be stated. Then for the first time, when it was realised that this procedure was not available in Scotland, was any attempt made to depart from what had previously been agreed. The respondents submit that in agreeing to Scottish

D
procedure they were not contemplating the case stated process which is used in England but not in Scotland. This will not avail them since, as was admitted, stating a case is a procedural matter and the respondents cannot pick and choose from the various operations involved in Scottish procedure. The form of the application made by the appellants for the appointment of an arbitrator does not avail the respondents—merely because of the use of

E
the form of words " where there is a submission to arbitration, within the meaning of the Arbitration Act, 1950." There was in truth a submission within the meaning of the English Act, which does not apply to Scotland, but this does not lead to the conclusion that the English Act was to govern the Scottish arbitration proceedings.

I would allow the appeal.

F
LORD GUEST. My Lords, the arbiter in this arbitration which took place in Scotland was ordered by Master Elton upon the application of the respondents by way of originating summons to state his award in the form of a special case for the decision of the High Court in terms of section 21 of the Arbitration Act, 1950. The appellants appealed from the master's order on the ground that the proper law of the contract under which the

G
arbiter was appointed was Scots law and, as the Arbitration Act did not apply to a Scottish arbitration, the stating of an award in the form of a special case was inappropriate. Eveleigh J. allowed the appellants' appeal, but the respondents' appeal to the Court of Appeal was successful and the order of Master Elton was restored.

Two questions were argued before this House. The first was whether the proper law of the contract was Scots or English. The second question

H
was whether, assuming that the proper law of the contract was English, the law governing the procedure in the arbitration was Scots or English.

Upon the first question I have no doubt that the parties never chose

English law as the proper law of the contract or evinced any intention to be bound by this law.  In order to answer the question the courts must import a choice of law.  There are very strong factors either way and one of the most important is the fact that the place of performance of the contract was in Scotland.  But equally I recognise that there are persuasive factors in the opposite direction, one of them being the R.I.B.A. form of contract.  On balance I am not disposed to differ from the majority of your Lordships who think that the proper law of the contract is English.

A

B

· I now turn to the crucial question; what is the curial law of the arbitration.  It is said that there is no case where it has been held that the law of the arbitration was different from the law of the contract.  I am not impressed by this argument when it is conceded, as it was by Mr. Finer for the respondents, that this could be the position.  This concession could not have been withheld in view of the observations in· Don v. Lippmann, 5 Cl. & F. 5 and Hamlyn & Co. v. Talisker Distillery [1894] A.C. 202.

C

No question arises as to any split in the proper law of the contract or any variation of the proper law.  When the stage of an arbitration is reached, there must arise, apart from a particular term in the contract or some agreement between the parties, the question what procedural law is to be adopted by the arbiter.  This question must be: what procedural law did the conduct of the parties evince their intention to adopt?

D

In the present case the parties did not agree upon an arbiter and it therefore became necessary for the president of the Royal Institute of British Architects to appoint an arbiter.  It may be that the appellants thought that if they did not agree to the respondents' nominee, the president, in view of his practice spoken to by Mr. Stringer, would probably appoint a Scots arbiter.  However that may be, the president did in fact appoint an architect practising in Scotland as arbiter.  In the application by the appellants for the appointment made to the president of the Royal Institute of British Architects there occurs a reference to a " submission to arbitration, within the meaning of the Arbitration Act, 1950."  It was argued for the respondents that this was conclusive of the matter and amounted to a consent by the appellants to an arbitration under the English Arbitration Act, 1950, and an acceptance by the arbiter of the jurisdiction of the English High Court under that Act.  In my view, far too great an emphasis has been laid on this expression.  The expression " submission to arbitration " only occurs in section 4 (2) of the Act of 1950 in reference to foreign arbitrations and the reference in the application only imports what the law would in any case imply.  The arbiter's power and jurisdiction stem not from this application and his acceptance of office. but from the arbitration clause in the contract.  This form was merely the machinery for the appointment of the particular arbiter in view of the failure to agree upon an arbiter.

E

F

G

At this stage of the appointment of an arbiter I am satisfied that neither party applied his mind to what procedural law should be adopted.  But as soon as the arbiter was in the saddle matters took a more definite turn.  The arbiter appointed a Scottish solicitor as his clerk.  He made it clear to the parties that he was adopting Scots procedure.  The respondents instructed Scots solicitors and Scots counsel as did the appellants.  The pleadings took Scottish form and the respondents tabled pleas to the relevancy in Scots form and used Scots terminology for the remedies which

H

609

A they sought on the counterclaim, namely, " decree arbitral." The form
of order by the arbiter was a Scots interlocutor. The seat of the arbitration
continued to be in Scotland. With all these proceedings the respondents
acquiesced and took not a single objection.

Apart from the contract itself there was not a single factor in the parties'
conduct which suggested that any other procedural law was being adopted
but Scots law. I have little doubt that until the critical question arose as
B to the form of the award, neither party had any doubt that it was the Scots
form of procedure which was being adopted. That was certainly the view
of the arbiter and I feel certain that it would have been the view of " the
officious bystander " to the proceedings.

It has been suggested that the seat of the arbitration is unimportant and
that an arbiter might decide to sit in several different places and that no
party would restrain him for so doing. That may be so. However, the
C provisions of R.S.C., Ord. 73, r. 7, do indicate that the territorial nature
of the arbitration is important: see also the passage in *Dicey and Morris,*
op. cit., p. 1048.

Where all the proceedings take Scots form and the arbiter plainly
indicates that he is following Scots procedure, then, in the absence of any
protest, the parties will, in my opinion, be taken to have agreed that the
D arbitration will be governed by the curial rules of Scotland.

As a pure matter of convenience I should have thought it extremely
unlikely that a Scottish architect advised by a Scots solicitor before whom
Scots counsel instructed by a Scots solicitor appeared would think for one
moment of applying the English rules of procedure. The view of respon-
dents' counsel at any rate was that the respondents had consented to the
arbitration taking place in Scotland " under Scottish procedure " (see reason
E 3 in the respondents' case.)

Mr. Finer for the respondents conceded that the application for the
arbiter to state his award in the form of a special case under section 21
of the Arbitration Act, 1950, was a question of procedure. If the Scots
law of procedure is applicable to the arbitration, then as the Arbitration
Act, 1950, does not apply to Scotland the respondents must fail to obtain
F this remedy or, indeed, any other remedy under the Act of 1950.

I would allow the appeal and restore the order of Eveleigh J.


VISCOUNT DILHORNE. My Lords, the appellants carry on business in
England and Scotland. Their registered office is in Scotland. They have
an office in England.

The respondents, whose registered office is in England, entered into a
G contract with the appellants for the conversion of a building owned by
them in Dumbarton into a bonded warehouse for whisky.

The contract was in the form issued by the Royal Institute of British
Architects in 1963, headed " Private Edition Without Quantities." The
architect was English and a member of a firm which had its offices in
London.

H The first question for determination is: what is the law which governs
the contract? The agreement the parties entered into is silent on this point.
One might expect that, where a building contract is to be carried out in
Scotland by a Scottish company and with Scottish labour, the parties would

610

enter into a contract governed by Scottish law.  It certainly would not be
unreasonable to do so.  Nevertheless, where the employer of the contractor
was English, he and his architect might well require the use of an English
form of contract with the intention that it should be governed by English
law.

A

The use of the R.I.B.A. form gave rise, we were told, to :

" no difficulty of interpretation whatever either during the execution
of the work or during the arbitration proceedings, and in particular
no difficulty attributable to the use of the language of English law."

B

That was stated in an affidavit filed on behalf of the appellants by a Mr.
Hutton, a solicitor and notary public of Edinburgh who was engaged in a
consultative capacity by them to advise, inter alia, on building and civil
engineering contracts.

Mr. Ross Q.C., of the Scottish bar, in an affidavit also filed on behalf
of the appellants, recognised that the contract was " in English form."

C

There was some controversy on whether this form of R.I.B.A. contract
had, apart from its use in this case, ever been used, at the time this contract
was entered into, without modification as a contract for the construction
of building work in Scotland.  Mr. Hutton and Mr. Ross both said that it
had, Mr. Ross with modifications.  It was not, however, disclosed whether
either of the parties to the contract where it was used in the R.I.B.A. form
for building work in Scotland was English.  In the absence of information
on that, no useful inference can, in my opinion, be drawn from the use of
the R.I.B.A. form in relation to building work in Scotland.

D

There was at this time no R.I.B.A. form of contract specially adapted
for use in Scotland.  One was issued later.  There was in use in Scotland
a form of contract called the " Regulations and General Conditions of
Contract for Building Works in Scotland " and, in relation to building
work in Scotland where both parties were Scottish, one would expect that
that form of contract would generally have been used, not one " in English
form " where the language used was " the language of English law " and
where, as, in my opinion, Lord Denning M.R. rightly said, the contract was
" redolent of English law."  The forms issued by the R.I.B.A. are revised
from time to time in the light of decisions in the English courts.

E

F

In *Rex* v. *International Trustee for the Protection of Bondholders
Aktiengesellschaft* [1937] A.C. 500, Lord Atkin said, at p. 529 :

" The legal principles which are to guide an English court on the
question of the proper law of a contract are well settled.  It is the law
which the parties intended to apply.  Their intention will be ascer-
tained by the intention expressed in the contract if any, which will be
conclusive.  If no intention be expressed the intention will be presumed
by the court from the terms of the contract and the relevant surrounding
circumstances.  In coming to its conclusion the court will be guided by
rules which indicate that particular facts or conditions lead to a prima
facie inference, in some cases an almost conclusive inference, as to the
intention of the parties to apply a particular law : e.g., the country where
the contract is made, the country where the contract is to be
performed, if the contract relates to immovables the country where
they are situate, the country under whose flag the ship sails in

G

H

A.C.          Whitworth Street Estates Ltd. v. Miller (H.L.(E.) )          Viscount Dilhorne

A    which goods are contracted to be carried.  But all these rules but serve
     to given prima facie indications of intention: they are all capable of
     being overcome by counter indications, however difficult it may be in
     some cases to find such."

     In this case Widgery L.J. said in the Court of Appeal [1969] 1 W.L.R.
     377, 383:

B        " To solve a problem such as arises in this case one looks first at the
         express terms of the contract to see whether that intention is there to
         be found.  If it is not, then in my judgment the next step is to consider
         the conduct of the parties to see whether that conduct shows that a
         decision in regard to the proper law of the contract can be inferred
         from it.   If the parties' conduct shows that they have adopted a
         particular view with regard to the proper law, then it may be inferred
C        that they have agreed that that law shall govern the contract accordingly.
         Finally, if one fails in this inquiry also and is driven to the conclusion
         that the parties never applied their minds to the question at all, then
         one has to go to the third stage and see what is the proper law of the
         contract by considering what system of law is the one with which the
         transaction has its closest and most real connection."

D    I agree with this approach, subject to one qualification.   I do not
     consider that one can properly have regard to the parties' conduct after the
     contract has been entered into when considering whether an inference can
     be drawn as to their intention when they entered into the contract, though
     subsequent conduct by one party may give rise to an estoppel.
         Their conduct at the time of entry into the contract may, however, be
     very relevant and regard can, I think, properly be had to that.
E        If in this case one had to reach the third stage and consider with which
     system of law the transaction had its closest and most real connection, one
     is not required to consider only with what system of law the language
     and form of the contract is most closely connected.  One must have regard
     to other factors.  Where the contract is to be carried out is one and an
     important one.  If this stage was reached in this case, I would hold without
F    any hesitation that the Scottish system of law was the one with which the
     transaction had its closest and most real connection.
         I do not, however, think that in this case one gets to that stage for, in
     my opinion, the conduct of the parties at the time the contract was entered
     into shows that despite the fact that the work was to be done in Scotland
     both parties intended that the contract should be governed by the law of
     England.
G        Both parties knew that the work was to be done at Dumbarton with
     Scottish labour.  It appears from the evidence given by Mr. Hayworth on
     behalf of the appellants at the hearing of the arbitration that he first appre-
     ciated that there was likely to be a R.I.B.A. contract when he had a meeting
     in London with Mr. Seymour, the architect.  In answer to the next question
     he said " we knew there would have to be some sort of agreement, and the
H    surveyors, being a London-based firm, we thought it probably would be
     an R.I.B.A. contract."  Mr. Hayworth was the appellants' chief surveyor.
         It is to be presumed that the English respondents with their English
     architect would naturally choose a form of contract with which the architect

was familiar, a contract " in English form " and one governed by English
law.                                                                                          A

Mr. Hayworth, it is not unreasonable to assume as he was the appellants'
chief surveyor and in view of the appellants' extensive business in England
and Scotland, was familiar both with the R.I.B.A. form of contract and with
the form called the " Regulations and General Conditions of Contract for
Building Works in Scotland "  He did not object to the use of the R.I.B.A.
form and suggest the use of the Scottish form.  He agreed to the use of the    B
R.I.B.A. form and, by doing so, in the circumstances of this case must be
taken to have agreed that the contract in English form and with its language
based on English law should be governed by the law of England.

If I have reached the wrong conclusion on this, and the contract should
be regarded as governed by the law of Scotland, then there appears no ground
for holding that the arbitration by a Scottish arbitrator appointed in accord-    C
ance with the terms of the contract and held in Scotland was not subject to
Scottish procedure.

If I am right about this, it is still necessary to consider what procedural
law applied in relation to the arbitration.

In *Dicey and Morris*, op. cit., it is said, at pp. 1047–1048 :

" No case appears to have been reported in which the parties either
chose as the law governing the arbitration proceedings a system of law    D
other than the proper law of the contract, or failed to exercise their
power to choose the law governing the arbitration altogether.  It cannot
however be doubted that the courts would give effect to the choice of
a law other than the proper law of the contract.  Thus, if parties agreed
on an arbitration clause expressed to be governed by English law but
providing for arbitration in Switzerland, it may be held that, whereas    E
English law governs the validity, interpretation and effect of the arbi-
tration clause as such . . . the proceedings are governed by Swiss law.
It is also submitted that where the parties have failed to choose the law
governing the arbitration proceedings, those proceedings must be consi-
dered, at any rate prima facie, as being governed by the law of the
country in which the arbitration is held, on the ground that it is the
country most closely connected with the proceedings."                          F

I think this is right.  In this case, pursuant to the arbitration clause in the
contract, which, if my view be right, is governed by English law, the president
of the R.I.B.A. nominated as arbitrator a Mr. Underwood who lives in
Glasgow.  The application to the president was made by the appellants.  It
followed a form issued by the R.I.B.A.  It began by referring to the contract
and then said " where there is a submission to arbitration, within the mean-    G
ing of the Arbitration Act, 1950, of any dispute or difference . . ."  It then
stated that a dispute or difference had arisen and asked for the
appointment of an arbitrator.

The respondents contended that the words quoted above show that the
arbitration proceedings were to be subject to English law.  I reject this
contention.  I do not think that the reference to the Arbitration Act, whether    H
it relates to " arbitration " or to " submission to arbitration " has that effect.
The form of application made by the appellants cannot alter the contract
entered into.

A.C.        Whitworth Street Estates Ltd. v. Miller (H.L.(E.))        Viscount Dilhorne

A    On January 19, 1967, the respondents' solicitors were notified by the "clerk to the arbiter" of his appointment as clerk.  He is a Scottish solicitor.  His letter contained the following sentence: "If there are any points in our procedure you wish to be advised please let me know."

The inference to be drawn from the appointment of a Scottish solicitor as clerk and the reference to "our procedure" was that Scottish procedure would be followed.

B    On May 24, 1967, the matter was put beyond all doubt.  The clerk to the arbiter then wrote to the respondents' solicitors telling them that procedure proposed by them "was not in accordance with Scottish arbitration procedure."

The respondents appointed Scottish solicitors to act for them in the arbitration.  The pleadings were in Scottish form and the procedure followed at the hearing was Scottish.

C    It was not until towards the end of the hearing after all the evidence had been given that any question arose as to the law applicable to the arbitration.  Counsel for the respondents then asked for a case to be stated.  In the course of his address he said that he had never conceded that Scots law applied.  The arbitrator said that he had never been in doubt "and that is why I am astonished that it is raised now."

D    In the light of these facts I cannot escape from the conclusion that the respondents accepted that the arbitration was subject to Scottish procedure and so, too, to Scottish law.

It is not, in my opinion, necessary to consider whether their acceptance of this amounted to a variation of the contract or filled a gap in that contract.  Having followed that procedure in an arbitration held in Scotland from the inception of the arbitration, the hearing of which occupied 11 days, their

E    contention that English law governed the procedure at the arbitration in my view fails.  It was conceded by Mr. Finer in the course of his able argument that stating a case is part of the procedural law, and it was common ground that, unless the procedural law was English, the arbitrator could not be required to state a case.

In my opinion, the order of Eveleigh J. was right and should be restored.

F    I would allow the appeal.

LORD WILBERFORCE.  My Lords, this dispute arises out of a building contract to execute substantial works of conversion to a warehouse of the respondents at Dumbarton.  The respondents are an English company; the appellants' registered office is in Scotland but they have a large business on both sides of the border.  The parties adopted the Royal Institute of British

G    Architects' form of contract without quantities, 1963 ed., which contains no express choice of law.  It includes an arbitration clause covering any dispute in connection with the contract, but there was no provision as to the place of arbitration, or as to its procedure.  In the absence of agreement, the arbitrator was to be nominated by the president of the Royal Institute of British Architects.

H    Disputes arose and in the autumn of 1966 the appellants withdrew from the site.  On October 28, 1966, the appellants issued a writ in the Queen's Bench Division in England claiming £48,500.  They applied for judgment under R.S.C., Ord. 14, and concurrently the respondents applied for a stay

Case 1:22-cr-00673-LAK   Document 341-1   Filed 10/30/23   Page 163 of 166

pursuant to section 4 of the Arbitration Act, 1950. On November 30, 1966, the master dismissed the appellants' application and made an order staying further proceedings.

On December 5, 1966, the appellants requested the president of the Royal Institute of British Architects to appoint an arbitrator. He nominated Mr. Walter Underwood, F.R.I.B.A., a member of a Glasgow firm. Mr. Underwood accepted the nomination and appointed Mr. J. A. H. Lockhart, a solicitor and notary public practising in Glasgow, to be clerk in the submission. The arbitration proceeded, pleadings were drafted, the record was closed and a proof was fixed. Finally, on December 10, 1968, Mr. Underwood made an award.

Meanwhile the respondents, on June 28, 1968, had issued, in England, an originating summons for an order that the arbitrator should state his award in the form of a special case under section 21 (1) (b) of the Arbitration Act, 1950. This they served on the appellants at their English place of business. They also served a concurrent originating summons on the arbitrator in Scotland. The master made the order sought, but this was rescinded by Eveleigh J. in chambers. His order was in turn reversed by the Court of Appeal and the appellants now appeal to the House.

In the judgments of the Court of Appeal the main question examined was whether the proper law of the building contract was the law of England or the law of Scotland. This was dealt with by all three members of the court: they reached, unanimously, a conclusion in favour of the law of England. But there was a second question, to which attention was given particularly by Davies L.J., namely, what law should be taken to govern the arbitration procedure, a question which he answered also in favour of English law. Both questions were canvassed in this House. An answer is required to each of them. I deal first with the proper law.

I do not find it to be necessary to restate in quotation from well-known judgments, still less in my own language, the principles upon which the courts should decide what is the proper law of a contract where different elements point different ways. The guidance given by *Rex* v. *International Trustee for the Protection of Bondholders Aktiengesellschaft* [1937] A.C. 500, *Bonython* v. *Commonwealth of Australia* [1951] A.C. 201 and *In re United Railways of Havana and Regla Warehouses Ltd.* [1961] A.C. 1007 is consistent and clear. I only refer to these authorities because I find in the judgments of the Court of Appeal certain tests, at least indicated, which appear to differ from those which the authorities have validated. Particularly I find this divergence to lie in the reliance, in preference to surrounding circumstances, on subsequent conduct of the parties and also (though this may be a matter of terminology) in the antithesis apparently drawn between the "country" (viz., Scotland) and the "system of law" (viz., England) with which the contract was said to be connected. Reliance on subsequent conduct seems to have had considerable influence on the opinions expressed and, I would respectfully think, led the members of the court to attribute insufficient importance to the fact that the building site, and so the place of performance, was in Scotland. In my opinion, once it was seen that the parties had made no express choice of law, the correct course was to ascertain from all relevant contemporary circumstances including, but not limited to, what the parties said or did at the time, what intention ought to be

A    imputed to them on the formation of the contract.  Unless it were to found
an estoppel or a subsequent agreement, I do not think that subsequent
conduct can be relevant to this question.

On this basis, I find the choice of the system of law with which the
contract should be taken to be most closely connected a difficult one.  The
Royal Institute of British Architects is a United Kingdom institution with
English and Scottish members.  In 1963 it issued only one relevant form of
B    contract—that which the parties used.  It was only later that it produced a
specifically Scottish version.  There was some difference of opinion as to the
extent to which this form was used in relation to Scottish contracts, or
contracts with a Scottish element: it was certainly not used very often, but
I think that it is established that it was used.  There was another form, not
issued by the Royal Institute of British Architects, which was adapted for
Scottish use, but there was not the slightest evidence that the Royal Institute
C    of British Architects' form was deliberately chosen or preferred.  The Royal
Institute of British Architects' form uses English terminology and it is true
to say that it has been constructed over the years in part by reference to
decided English cases.  But both of these factors can be over-estimated.
As to terminology, whichever the governing law were to be it might be
necessary, if a Scottish party were involved, to translate these into terms
D    known in Scotland, a process familiar enough to Scottish lawyers.  And the
reference to the common law and to statute law must, on any view, include
the law of either country, for it is used in relation to accidents occurring at
the location of the works, and the works in this case were to be in Scotland.
That the form reflects English decisions is one of the weightiest factors on
this side.  The other factor to which I would give weight is that the super-
intending architect was a London architect, and it can be accepted that it
E    was on his suggestion that the Royal Institute of British Architects' form
was used.  But, again, one must not put too much weight on this fact.  Mr.
Seymour no doubt put forward the Royal Institute of British Architects'
form as that which he knew best, but it does not follow from this that he
put it forward as a document governed by English law.  We have not the
benefit of his evidence, and it is quite possible that he may have thought of
F    it as a document suitable for general use; more probably, he never thought
of the governing law at all.  Such are the straws in a southerly wind.

In the other direction there are two pointers.  First, it is rather significant
that the form does not contain any choice-of-law clause.  For many years
now it has been recognised as useful to insert an express provision, selecting
a specified law, in standard forms of contract where there is an arbitration
clause: its omission here may suggest that this United Kingdom document
G    might according to the circumstances be governed by whatever legal system,
within this country, best fitted the case.  But more important than this
argument a silentio is the, to my mind, very weighty fact that the place of
performance was in Scotland; the work was to be done on a Scottish site,
under Scottish regulations and probably by Scottish workmen.  If any
single factor carries more weight in these matters than others, it is the lex
H    loci solutionis, and this factor must be particularly important where the
whole contract is so visibly localised in one place.

The choice is, in my opinion, ultimately between the indicia which I
have mentioned.  Your Lordships' opinions are divided, and, as I am able

to decide this case on the second ground, it were tempting to leave this point aside.  But, if decision is necessary, I think that the law of Scotland prevails.

I turn to the second question: what law is to govern the arbitration procedure?  If the proper law of the contract is Scottish there could be no argument in favour of the intrusion of English law into the arbitration. But if the proper law is English, an interesting question arises.  One must ask first whether, in principle, it is possible for the law governing the arbitral procedure to differ from that governing the substance of the contract. No authority was cited to us which explicitly answers this question one way or the other, but I have no doubt as to the answer.  It is a matter of experience that numerous arbitrations are conducted by English arbitrators in England on matters governed by contracts whose proper law is or may be that of another country, and I should be surprised if it had ever been held that such arbitrations were not governed by the English Arbitration Act in procedural matters, including the right to apply for a case to be stated.  (I leave aside as a special case arbitrations conducted under the rules of the International Chamber of Commerce, though even these may be governed by the law of the place of arbitration.)  The principle must surely be the same as that which applies to court proceedings brought in one country concerning a contract governed by the law of another, and that such proceedings as regards all matters which the law regards as procedural are governed by the lex fori has been accepted at least since Lord Brougham's judgment in *Don* v. *Lippmann*, 5 Cl. & F. 1.  In my opinion, the law is correctly stated by Professor Kahn-Freund and Dr. Morris in *Dicey and Morris*, op. cit., p. 1048, where they say:

"It cannot however be doubted that the courts would give effect to the choice of a law other than the proper law of the contract.  Thus, if parties agreed on an arbitration clause expressed to be governed by English law but providing for arbitration in Switzerland, it may be held that, whereas English law governs the validity, interpretation and effect of the arbitration clause as such (including the scope of the arbitrators' jurisdiction), the proceedings are governed by Swiss law.  It is also submitted that where the parties have failed to choose the law governing the arbitration proceedings, those proceedings must be considered, at any rate prima facie, as being governed by the law of the country in which the arbitration is held, on the ground that it is the country most closely connected with the proceedings."

The first part of this is well supported by *Hamlyn & Co.* v. *Talisker Distillery* [1894] A.C. 202, *per* Lord Herschell L.C. and Lord Watson and also by *N. V. Kwik Hoo Tong Handel Maatschappij* v. *James Finlay & Co. Ltd.* [1927] A.C. 604, and both parts rest solidly on common-sense.

What law, then, should be taken to apply to the procedure here?  The arbitration clause itself is silent, and I would agree that in the normal case, where the contract itself is governed by English law, any arbitration would be held under English procedure.  Moreover, the mere fact that the arbitrator was to sit either partly or exclusively in another part of the United Kingdom, or, for that matter, abroad, would not lead to a different result: the place might be chosen for many reasons of convenience or be purely accidental; a choice so made should not affect the parties' rights.

**A.C.**        **Whitworth Street Estates Ltd. v. Miller (H.L.(E.) )**        **Lord Wilberforce**

A  But here there was much more than the fortuitous or convenient choice of a Scottish location.  The selected arbitrator, an architect practising in Glasgow, near where the works were situated, immediately on his acceptance announced the appointment of a Scottish solicitor as clerk in the submission and invited both parties to state if they wished advice as to " any points in our procedure."  The indication that the arbiter (as he should now be called) intended to conduct the proceedings in the Scottish manner,

B  advised by a Scots lawyer, could not have been clearer, and neither party objected.  It would not be right to place too much emphasis on the form of pleadings adopted: pleadings are, after all, only the manner in which parties state the facts on which they rely and arbitrations may use pleadings in any form with any degree of legal mystique, or no form at all.  But, on a later occasion (May 24, 1962), the arbiter through his clerk again explicitly took the position that he intended to act in accordance with

C  Scottish arbitration procedure, again without objection, and he maintained this position when formally asked to state a case.

The respondents' argument was that the arbitration had from the beginning been firmly placed under the control of the Arbitration Act, 1950.  They pointed to the fact that in the application which the appellants made to the president of the Royal Institute of British Architects to nominate

D  an arbitrator there was an explicit reference to the Act, and contended that this was both deliberate and decisive.  In my opinion, it was neither: the reference, taken from the standard Royal Institute of British Architects' application form, was merely a means of describing the nature of the arbitration clause in the contract—as a submission to arbitration—so as to activate the nomination by the president, and had no bearing upon the procedure of the arbitration when instituted.  This was the respondents' main (and

E  unsuccessful) contention, but they also argued that, until their application for a case, the arbiter had been concerned merely with trivia and that there had been no real committal of the proceedings to any decisively Scottish form.  I cannot agree with this.  The right to ask for a case to be stated, which may, under the Arbitration Act, 1950, be invoked at any stage in the arbitration, is essentially a matter of procedure—the respondents did not, indeed, dispute this.  It is clear that the arbiter embarked upon a continuous

F  and close-knit process, starting with definition of the issues both of fact and of pleas in law and continuing with the hearing of evidence, which was inconsistent with the exercise by a foreign (sc., English) court of the powers of direction and control contained in the English Act, whether the general procedural powers of section 12 or the special powers contained in section 21.

G  I find no basis on which the English courts are entitled to exercise authority over the arbiter: in my opinion, he was bound to conclude the proceedings in accordance with the law of Scotland.  In my opinion, the order of Eveleigh J. of October 31, 1968, rescinding the master's order was correct and should be restored and the appeal consequently allowed.

*Appeal allowed with costs.*
H                                    *Judgment of Eveleigh J. restored.*

Solicitors:  *Beddington, Hughes & Hobart*; *Kramer & Co.*

M. G.
22