```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                            22 CR 673 (LAK)

SAMUEL BANKMAN-FRIED,

                 Defendant.               Trial
------------------------------x

                                          New York, N.Y.
                                          October 3, 2023
                                          9:30 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                          District Judge

                          APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  DANIELLE R. SASSOON
     NICOLAS ROOS
     DANIELLE KUDLA
     SAMUEL RAYMOND
     THANE REHN
     Assistant United States Attorneys

COHEN & GRESSER, LLP
     Attorneys for Defendant
BY:  MARK S. COHEN
     CHRISTIAN R. EVERDELL
     SRI K. KUEHNLENZ
     S. GALE DICK
     SHARON L. BARBOUR

Also Present:
Luke Booth, FBI
Kristin Allain, FBI
Arjun Ahuja, USAO Paralegal Specialist
Grant Bianco, USAO Paralegal Specialist
```

1      (Case called)

2      MR. ROOS:  Good morning, your Honor, Nicholas Roos, Danielle Sassoon, Thane Rehn, Samuel Raymond, and Danielle Kudla for the United States.

5      THE COURT:  Good morning.

6      MR. ROOS:  We are joined at the rear table by special agents from the FBI, Luke Booth and Kristin Allain; paralegals working with our office, and I think we have another paralegal who is going to slot in at the end.

10     THE COURT:  Good morning.

11     MR. COHEN:  Good morning, your Honor.

12     THE COURT:  Mr. Cohen.

13     MR. COHEN:  Mark Cohen, Chris Everdell, Sri Kuehnlenz, and Dave Lisner for the defense.  Also sitting in the gallery, Gale Dick and Sharon Barbour of our firm.

16     THE COURT:  Good morning.

17     MR. COHEN:  Good morning, your Honor.

18     THE COURT:  The defendant isn't until the building yet, I understand.  I am not sure why that happened, but he is not.  He is not far away.

21     There were one or two things that I thought we could deal with before he gets here.

23     First of all, one point with respect to the voir dire. I have found over the years that particularly in what may well be a longer trial or a trial with controversy -- all trials

have controversy, but more than the usual dose, it is useful for me to ask right at the beginning of the voir dire, after having told the venire in broad terms what the case is all about, whether there is anything about the nature of the case or the parties that would make it difficult for them to be entirely fair and for any of them to be entirely fair to both sides and to come to a just and impartial verdict based solely on the evidence and so forth, and then, with the consent of counsel, if everyone consents, simply to excuse right at the outset everybody who holds their hand up in response to that.

This is a procedure that was recommended to me by the late Judge Duffy as a way to start every narcotics case because you lose them in buckets, but it generalizes beyond that.

Does anybody object to my doing that here?  Does everyone agree to my simply excusing anybody right out of the box who says, I would have a problem being fair in this case?

MR. ROOS:  The government has no objection to that process.

MR. COHEN:  Who are we to question Judge Duffy.

THE COURT:  Exactly, especially now that he's up on high.  That was the first thing.

The second thing that I wanted to deal with quickly is this controversy with respect to the possible Ukrainian witness.

Who is going to address this for the government?

1     MR. REHN:  I can address this, your Honor.

2     THE COURT:  Here is my question.  What, if anything,
3  would that witness, if I allowed him to testify remotely, have
4  to say that wouldn't be cumulative?

5     MR. REHN:  Your Honor, I do think there is some
6  overlap with other FTX customer witnesses.  As we articulate in
7  our letter, the government has made significant efforts to
8  identify a range of customer witnesses, but I think that one of
9  the factors that will be important for the jury to consider is
10 that there were in fact a range of FTX customers who put money
11 into FTX for different reasons, and their activity on FTX was
12 different.  Some, for example, put money on FTX to engage in
13 margin trading.  Others did not.  Some may have participated in
14 particular programs on FTX that others did not.  And the
15 expectations of all of those customers may not be exactly the
16 same, and certainly the experience they had with the exchange
17 may not be exactly the same.  He does bring another perspective
18 of a particular type of FTX customer.

19    THE COURT:  Specifically what perspective does he
20 bring that nobody else brings?

21    MR. REHN:  I think he's an example of a customer that
22 viewed the exchange as a safe place to store assets in a
23 situation where he didn't have a lot of other safe options to
24 store his assets, which makes him unlike some of the other
25 customers that we will be calling.  In fact, I don't believe

1  there is another customer who would have exactly that
2  perspective.
3              THE COURT:  You are not going to call any other
4  witnesses who are going to say that they thought it was a safe
5  place to store their assets.
6              MR. REHN:  No.  Many witnesses will say that.  But
7  unlike some other witnesses, he didn't have other safe options,
8  in his view, to store assets.
9              THE COURT:  That's material here why?
10             MR. REHN:  Your Honor, we think it just illustrates
11 the way in which FTX is marketing appeal to a range of
12 customers, including customers who viewed it as one of their
13 only options to store their assets.
14             THE COURT:  As long as we have the time, Mr. Cohen, do
15 you want to address that?
16             MR. COHEN:  Your Honor, with your permission, we would
17 like for Mr. Dick to address it, if that's OK for the Court.
18             THE COURT:  Sure.
19             MR. DICK:  As described by the government, material
20 portions of his testimony are clearly cumulative of that of
21 other witnesses.
22             As your Honor notes, what distinguishes this witness,
23 according to the government, is simply that he felt he had no
24 other safe options, which is not really relevant to the issues
25 in this case.  I think, in addition, there is no set of

1  circumstances under which the confrontation clause rights of
2  our client could be fully protected if this witness were to
3  testify.
4              THE COURT:  Let's stick to the question I asked.  I
5  didn't think much of that argument.  I've been down this path
6  more than once before.
7              MR. DICK:  Fair enough.
8              THE COURT:  The Second Circuit made clear in *Gigante*
9  that the confrontation clause does not prohibit calling this
10 witness if there are extraordinary and compelling
11 circumstances.  There are obviously are.  The question is the
12 materiality and whether the prejudice substantially outweighs
13 doing it.
14             Any response, Mr. Rehn?
15             Thank you, Mr. Dick.
16             MR. REHN:  Your Honor, the one thing I would just say
17 is, if the Court is uncertain about whether this witness'
18 testimony would be cumulative, one option would be to defer
19 ruling until after one or more other customers have testified,
20 at which point it may be clearer whether there is a need for
21 this witness' testimony.
22             THE COURT:  There is no reason not to do that, so we
23 will entertain this down the road.
24             We will wait and see if the government doesn't decide
25 to bag it all together.

            In terms of other safeguards, I would, if this is going to happen, require that the testimony be given in a U.S. embassy in Ukraine or elsewhere which is not Ukrainian territory.  The State Department people on hand include people authorized to administer oaths.  And to the argument that there is no extradition treaty with Ukraine, the situation would not be any different than what happens when a foreign national or resident comes into the United States, testifies live in the courtroom, and then immediately leaves to go home to some place without an extradition treaty with the United States.  I can't distinguish that from this.

            In both cases it's reasonably obvious that if perjury is committed, the government has no way to get their hands on the perjurer, and I can't distinguish between the two.  It makes no sense to me.  But we will just kick down the road on whether it's cumulative and whether any unfair prejudice would substantially outweigh the value of the testimony, even if it's not wholly cumulative.

            That takes care of the things that I wanted to deal with in advance of starting the voir dire.

            The defendant is in the building now.  I am told that we can thank the delay to what's going on in the other courtroom nearby.  We will recess until we have the defendant in the courtroom.

            I am going to take up one thing with the defendant

1   present, namely, his right to testify in his own defense and
2   the fact that that's ultimately his decision, not the lawyers.
3   I am not criticizing the lawyers.  Of course they understand
4   that.  But it's my practice to do that with the defendant live
5   and in person.  As soon as we are ready to do that, we will do
6   that, and then we will bring up the first batch of jurors.
7           I'll see you quite shortly, I'm sure.
8           (Recess)
9           THE COURT:  The jurors are on their way up.  Before
10  they get here, there is something I want to discuss directly
11  with the defendant, who is now present.
12          Mr. Bankman-Fried, I want to make sure this is
13  something that you understand.  You have the right to testify
14  in your own defense in this case, and the decision as to
15  whether or not you testify is a decision solely for you.  You
16  are entitled to have your counsel's best advice on whether they
17  think it is wise or potentially advantageous or not
18  advantageous for you to testify, but they can't make the
19  decision for you.  It is your call.  And you could decide to
20  testify against their advice or not to testify against their
21  advice.  You need to understand that.
22          Now, if for any reason we get to the point where the
23  government has rested and your lawyers say the defense has no
24  case or the defense rests, and you wish to testify, what you
25  should do at that point, what you must do is simply stand up,

don't say anything, just stand up and I'll send the jury out and I'll find out why you're standing.  I'll probably know by that time anyway.  But I'll find out.  And if it's that you want to testify, you will be given that opportunity.

Likewise, if there is a defense case and your lawyers at some point say the defense rests, and you haven't testified and you wish to do so, do the same thing.  Stand up, I'll take the jury out, I'll find out why you're on your feet.  And if you want to testify, you will be permitted to do so, regardless of whatever advice you have received.

Do we understand each other on this?

THE DEFENDANT:  Yes.

THE COURT:  Fine.

Andy, is the jury outside yet?

THE DEPUTY CLERK:  I am going to go look for them now, Judge.

MR. ROOS:  Your Honor, as you probably know, in many cases the government's practice is to put either the existence or rejection of plea offers or the absence of plea offers on the record.

THE COURT:  Go ahead and do it.

MR. ROOS:  Your Honor, the government early on in the case, after the case was charged, raised the question of whether the parties should engage in plea discussions, and the answer was no, meaning there were no discussions about a plea,

1  and the government never made any plea offers.

2            THE COURT:  Mr. Cohen, is that accurate?

3            MR. COHEN:  Yes, your Honor.

4            THE COURT:  Thank you.

5       With the exception of the one question I already

6  discussed, the questions I intend to put to the jurors are all

7  typed out.  Because of the way I will deal with the potential

8  jurors who are not in the courtroom, they will all have a copy

9  of the questions, for reasons that I'll explain, and I'll ask

10 John Hammel to give each side two copies of the script that I

11 will be using, just so you can have it in front of you.

12 Obviously, I may change a word here or there, but the substance

13 will be exactly what's on the pages.

14       Out of curiosity, are there going to be Power Points

15 on the openings?

16           MR. REHN:  Yes, your Honor.  The parties exchanged

17 slides last night.  I think we intend to meet and confer about

18 some potential issues.  But if there is any issues we can't

19 resolve, we will raise them with the Court.

20           THE COURT:  Defense going to use a Power Point?

21           MR. COHEN:  We will be using slides, your Honor.  We

22 have been conferring with the government.

23           THE COURT:  OK.

24           MS. SASSOON:  Your Honor, may I have a moment to

25 confer with defense counsel?

1            THE COURT:  Sure.

2            MS. SASSOON:  Your Honor, whenever convenient for you,

3   the parties had one question to raise about the voir dire.

4            THE COURT:  Yes.

5            MS. SASSOON:  As your Honor knows, the parties had

6   some briefing regarding questions related to pretrial publicity

7   about the case.  And in reading the proposed voir dire, I noted

8   that there are questions about prospective publicity, meaning,

9   are you willing to not look at any publicity going forward, and

10  also a question about following the Court's instructions about

11  that.  And then there is a question about one specific pretrial

12  news story, the CBS special.

13           And the government would propose asking a more general

14  question about whether the jurors have seen any pretrial

15  publicity and whether, nonetheless, they can render a fair

16  verdict.

17           THE COURT:  You can bring that up at the end.

18           I think, Ms. Sassoon, you might look at question 46.

19           MS. SASSOON:  Thank you, your Honor.  That addresses

20  the government's question.

21           THE COURT:  I'm afraid the jury kept had been told

22  that they were all ready to be sent up, but they weren't.  We

23  will recess until they get here.

24           (Jury selection follows under separate cover)

25