NA41BAN1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        22 CR 673 (LAK)

 5   SAMUEL BANKMAN-FRIED,

 6              Defendant.                Trial
     ------------------------------x
 7
                                          New York, N.Y.
 8                                        October 4, 2023
                                          12:05 p.m.
 9

10   Before:

11
                          HON. LEWIS A. KAPLAN,
12
                                          District Judge
13
                               APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  DANIELLE R. SASSOON
          NICOLAS ROOS
17        DANIELLE KUDLA
          SAMUEL RAYMOND
18        THANE REHN
          Assistant United States Attorneys
19
     COHEN & GRESSER, LLP
20        Attorneys for Defendant
     BY:  MARK S. COHEN
21        CHRISTIAN R. EVERDELL
          SRI K. KUEHNLENZ
22        S. GALE DICK

23   Also Present:
     Luke Booth, FBI
24   Kristin Allain, FBI
     Arjun Ahuja, USAO Paralegal Specialist
25   Grant Bianco, USAO Paralegal Specialist
```

NA41BAN1

1    (A jury of 12 and six alternates was duly impaneled

2    and sworn)

3    THE COURT:  Okay.  Folks, now that you're sworn, I

4    have a few preliminary instructions to facilitate your

5    participation in the trial.  I think I said before that your

6    job is going to be to decide the facts—that is to say, come to

7    a conclusion about what, if anything, happened.  That's your

8    job.  Nobody's going to tell you the answer.  As there are

9    conflicts in evidence, nobody is going to tell you who's

10   telling the truth.  Things like that are for you to decide.

11   You will then apply the law that I instruct you on, and you're

12   bound to do that.

13        Bear in mind that I run the trial, which means that in

14   the course of it, I'm going to make various rulings; I will say

15   things to the lawyers; I may ask questions of the witnesses.  I

16   want you to understand absolutely that under no circumstances

17   should you construe anything that I do or say as having any

18   bearing at all on your evaluation of whether the defendant has

19   been proved guilty or has not been proved guilty.  I'm

20   expressing no opinion on the case.  I just decide the issues of

21   law, and you do the rest.  And so if, as has been known on rare

22   occasions to happen, I seem that I'm getting impatient with a

23   lawyer or something like that, I'm just doing my job, and it

24   doesn't reflect on the lawyer's client or anything like that.

25   It doesn't reflect any views on my part.

NA41BAN1

1        The evidence from which you are going to find the

2   facts will consist of the testimony of the witnesses, documents

3   and other things that may come into the record as exhibits, and

4   in certain circumstances facts that the lawyers agree upon, or,

5   to use the jargon with which my profession is afflicted,

6   stipulate to.  A stipulation is simply an agreement between the

7   lawyers, and you must accept those agreements, if there are

8   any.  I'll instruct you in more detail if that happens.

9        Some things are not evidence, and they're not to be

10  considered by you, and let me just tick off a list.  First of

11  all, statements, arguments, and questions by the lawyers are

12  not evidence.  Lawyers object to evidence all the time.  They

13  have a job to do.  Their job includes objecting to evidence

14  when they think it shouldn't be offered or considered by you.

15  You shouldn't be influenced by the fact that lawyers make

16  objections.  I will rule on them.  If I let the evidence in,

17  you'll consider it like any other evidence.  If I don't let the

18  evidence in, you'll just ignore it entirely, you'll ignore the

19  question entirely, and you won't speculate about what the

20  answer might have been if I had let the witness answer the

21  question.

22        There are occasions when a piece of evidence comes in

23  because an objection is not voiced quickly enough or something

24  like that and I then tell you to strike it or disregard it.

25  When I do that, you must disregard it, disregard whatever came

NA41BAN1

1    in.

2              There will be occasions in all likelihood in this case

3    where I will instruct you that a particular piece of evidence

4    may be considered for a certain purpose but not for others, and

5    if I do that, you must follow that instruction.  That will

6    become clearer to you as we roll along here.

7              As I'm sure you understand by now, nothing that you

8    may have seen or heard outside the courtroom or may hereafter

9    hear or see outside the courtroom is evidence.  You must

10   disregard it and put it entirely out of your mind.  I remind

11   you you're not to do any research or allow yourself to be

12   exposed to any conversation or reporting or anything else like

13   that about the case.

14             You're not to tweet or make Instagram posts or

15   anything else about the case.  And I'm just not making these

16   up.  These things have all happened, and it's nothing but

17   aggravation, and it just eats up time when things like that

18   happen.  You are to decide the case based solely on what

19   happens in the courtroom.

20             You've probably all heard the terms "direct evidence"

21   and "circumstantial evidence."  I'll explain all that in more

22   detail at the end of the case.  The one thing I want you to

23   understand is what they mean, and the punchline, so to speak.

24   Direct evidence is something that either you observed in the

25   evidence, like what does a document say.  You can read it.

NA41BAN1

1    It's direct evidence of what the document says.  Or something a

2    witness tells you as the witness perceived it with the

3    witness's own senses, and is now here telling you:  I

4    personally saw it and this is what happened.  Circumstantial

5    evidence relates generally to the process of reasoning from

6    something you can observe to a conclusion about something that

7    is either not clear to you or that you can't observe.  I'll

8    give you the famous examples that are always used in this court

9    at the end of the case, but just bear in mind that whatever you

10   may have heard on TV, the law considers direct and

11   circumstantial evidence to be the same.  It just requires that

12   your verdict be a product of your reasoned and impartial

13   consideration of all the evidence, whether it's direct or

14   circumstantial.

15        Obviously part of what you're going to do in deciding

16   the facts is deciding which witnesses you believe or how much

17   of what a witness testified to you believe, and bear in mind

18   that that refers not only to matters as to whether you think a

19   witness is consciously lying to you but also to matters such

20   as, well, did the witness really have an opportunity to know

21   that; is the witness telling you something that he now believes

22   because he's talked himself into it and would like to believe

23   it.  Things like that.  Credibility of witnesses is a nuanced

24   thing sometimes.  And I just want you to understand that a lot

25   goes into making those nuanced evaluations.  And of course once

NA41BAN1

in a while it's clear as a bell.  You see somebody gets on the

witness stand and your sense of it, for all sorts of reasons,

may be, this is a made-up story.  That happens.  But that

doesn't happen all the time.  And juries all the time make

judgments about what you think is credible and what you think

isn't credible for reasons well short of that, even with

respect to things that people tell you in subjective good

faith, they think they're telling an accurate story, but you

think otherwise.  That's your job.  And I'm not going to give

you any answers about that at the end of the case.

          Now of course I told you basic rules about criminal

cases at the beginning.  Just to remind you, the defendant is

innocent unless and until proven guilty to the unanimous

judgment of all 12 jurors.

          The burden of proof is always on the government.  The

defendant has no burden to prove innocence, no burden to

produce any evidence, no burden to testify or obligation to

testify.  The defendant has an absolute right to remain silent,

and if that's what happens in this case, you may not consider

his silence against him in any way.

          I'll talk to you about what "proof beyond a reasonable

doubt" means at the end of the case.  Just bear in mind that

the burden of proof in a civil case—for example, who gets to

pay the damages for a bumper dent—is much lower.  Proof beyond

a reasonable doubt is a high burden, and it's intended to be a

NA41BAN1

high burden because people's lives are at stake.  I don't mean
in the literal sense of the death penalty, but important things
about their lives are at stake in criminal cases.

I'm going to say a few words about the charges, but
not too much, because I'm going to talk to you at great length
at the end, and I'll try to make it not so great length.

You know what the case is about generally.  There are
seven counts in the indictment.  And I want you to understand
that the indictment is a piece of paper that contains the
charges against the defendant.  The fact that there is an
indictment is not evidence.  The indictment is not evidence.
It is an accusation, and it's going to be your job to decide
whether it's been proven beyond a reasonable doubt or not.

There are seven accusations.

Counts One and Three——and you don't have to remember
this now because you'll get it all later again——charge the
defendant with committing the crime of wire fraud.  They
allege, generally, that he engaged in a scheme to defraud
customers of FTX——that's Count One——and a scheme to defraud
lenders to Alameda Research.  That's Count Three.

Counts Two and Four charge the defendant with two
different crimes of conspiracy.  In the case of Count Two, it's
a conspiracy to commit wire fraud, and to defraud customers of
FTX; and in the case of Count Four, it's to defraud lenders to
Alameda.

NA41BAN1

1            Count Five is another conspiracy charge.  It's a

2    charge of conspiracy to commit securities fraud, and it

3    alleges, very generally speaking, that the defendant and at

4    least one other person agreed to defraud investors in FTX in

5    connection with this alleged conspiracy.

6            Count Six is another conspiracy count.  That one is to

7    commit commodities fraud on customers of FTX.

8            And finally, Count Seven charges a fifth conspiracy,

9    and that is a conspiracy to commit money laundering, and it

10   alleges that the defendant and others agreed to violate either

11   of two federal statutes, which I'll explain to you later on.

12           The defendant, just to make absolutely clear, denies

13   all these charges.  He's presumed innocent, as I said before,

14   unless the government convinces the jury unanimously to the

15   contrary, and beyond a reasonable doubt.  You do have to

16   consider each of the seven charges separately.

17           Now I just want to give you a couple of points that

18   you should bear in mind about what the law is, and principally

19   about the law of conspiracy as distinguished from the law of

20   wire fraud.  The essence of the crime of conspiracy is an

21   agreement or an understanding between or among two or more

22   people to accomplish one or more unlawful objectives.  The

23   agreement that constitutes an element of conspiracy can be

24   explicit, such as if two people sat down around the dining room

25   table and agreed that they're going to do some horrible thing,

NA41BAN1

or it may be implicit; that is, it can be simply a matter of an

understanding among the people involved that they're going to

work toward some unlawful objective.  And the existence of an

implicit agreement is something that can be inferred from all

the evidence in a case.

I always use a concrete example to illustrate this

point.  If two guys sit down together and say, Let's rob the

Chase Manhattan Bank on the corner, and they agree, and one of

them gets a bag to carry loot out of the bank, the crime of

conspiracy to commit bank robbery is committed by what I have

just described to you, and that's true even if nobody ever robs

the bank.  If they rob the bank, that is a substantive crime of

bank robbery, and if that happens, the defendant can be found

guilty both of conspiring to rob the bank and of robbing the

bank.

Just to complete the circle, if one guy decides to rob

a bank and then goes and does it and there's no second person

involved, there's no conspiracy but there's a bank robbery,

substantive crime of bank robbery.  That's the law of

conspiracy as opposed to substantive crimes, and we have here

two substantive crimes charged, mail fraud, and five

conspiracies with different objectives, which I'll explain

later on.

What's wire fraud?  Real simple.  In order to prove a

case of wire fraud, the government has to prove that there was

NA41BAN1

1    a scheme to defraud a victim or more than one victim of money

2    or property by false or fraudulent pretenses.  The defendant

3    has to have participated in the scheme, and somebody, not

4    necessarily the defendant, foreseeably has to have used

5    interstate or foreign wires.  What is that?  Email, telephone,

6    cellphones, a lot more things, in this electronic world.

7           That's the elements of mail fraud, briefly stated.

8           Now I tell you, I'm going to explain this all in much

9    more detail later, and the takeaway for right now is:  This is

10   a brief summary.  To whatever extent at the end of the case my

11   instructions are more complete or even different, those are the

12   instructions you apply in deciding the case, and if they're

13   different from what I've said now——I doubt they will be but if

14   they are——it's those final instructions you apply, not this

15   quick summary, which I'm only giving you so you have some idea

16   of why people are putting in proof on different points.

17          The last thing I want to talk to you about is your

18   conduct as jurors, which I've pretty much covered, but I'll run

19   through it quickly, and how the trial will work.

20          I don't have to repeat what I've said about not

21   discussing the case or reading anything about the case, or

22   doing any research on the case.  If anybody approaches you and

23   tries to talk to you about the case, turn it off and tell Andy.

24          I told you all about not doing any research.  You

25   understand where we are on that.

NA41BAN1

1          Try to keep an open mind till the end of the trial.

2     Evidence does not come in at trials the way you would tell a

3     bedtime story to your kids, with a logical progression.

4     Lawyers do the best they can to accomplish that, but it's

5     impossible because sometimes you have four or five or six

6     people telling you different parts of the story, no one of

7     which is known to all of them.  So sometimes there's not one

8     person who can come and tell you everything that's relevant.

9     So just hang in there and follow it all.

10          You're welcome to take notes during the trial.  If you

11     decide to take notes, make sure, if you can, that it doesn't

12     interfere with listening and considering all the evidence.

13     Don't discuss your notes with anybody before deliberations

14     start at the end of the case.  Don't take your notes out of the

15     jury room at night.  Leave them there.  They'll be kept secure.

16     It's your individual obligation to follow the evidence, and I

17     know you're going to do that and do your very best whether or

18     not you're taking notes.

19          Okay.  We're starting the trial.  Or we've already

20     started, actually, but we're starting the next part, in just a

21     minute, with the opening statements.  Opening statements are

22     not evidence.  They're not arguments.  The way I often think

23     about opening statements is the way I think about trailers at

24     the movies.  The lawyers are going to get up and in a sense try

25     to tell you what the movie they plan to present is going to

NA41BAN1

turn out being.  They'll tell you the story and how it's going
to come out.  And when I see trailers in the movies and then
see the movie, sometimes it's just what I expected, and
sometimes it doesn't turn out that way.  So you'll listen to
the opening statements, and it will help you understand why the
lawyers are doing what they're doing, but it's going to be your
job to decide whether the presentations they make actually are
consistent or not consistent with the proof at the end.

        The government will go first.  The defendant has the
right but not the obligation to make an opening statement.  The
government then will call its witnesses.  The defense has the
right to cross-examine the government witnesses.  When the
government is all done, when they rest their case, as the
language goes, the defendant may, if he wishes, present
evidence.  He may elect not to do that.  We'll see.  If the
defense calls witnesses, the government gets to cross-examine
them.  When the evidence is all in, the government has the
right, although not the obligation, to make a rebuttal
presentation, which may involve witnesses.  And then we'll go
to closing arguments, where the lawyers will argue what they
think you should find they proved and why.  And then I'll
instruct you on the law, and then you will deliberate.

        One thing you should be aware of is that before the
lawyers give their closing statements, their closing arguments,
I have to meet with the lawyers and inform them of what my

1    instructions are going to be and hear any objections they may

2    have and resolve those objections.  The likelihood in a trial

3    of this duration is that you won't ever know that that's going

4    on.  But depending on how the timing works right at the end,

5    there may come a point where we may have a recess for an hour

6    or two while the lawyers and I flesh out some point of law and

7    so that they can sum up, and we'll do our best to avoid having

8    to do that.

9            We will likewise do our best to avoid too many

10   sidebars——you've seen quite enough of those already in the

11   course of jury selection——and to resolve matters affecting the

12   flow of the trial at the end of the day or over the lunch hour,

13   but we're very conscious of your time.  Believe me, we all are.

14           So there we are.  And we will now hear the opening

15   statement for the government.

16           And Andy, we have sworn the jury, right?

17           THE DEPUTY CLERK:  We have.

18           THE COURT:  We have.  Thank you.

19           Okay.  Mr. Rehn for the government.

20           MR. REHN:  One year ago, it looked like Sam

21   Bankman-Fried was on top of the world.  He ran a huge company

22   called FTX.  He lived in a $30 million apartment in the

23   Bahamas.  He jetted around the world on private planes.  He

24   hung out with celebrities like Tom Brady and politicians like

25   Bill Clinton.  His face was on magazine covers.  He had wealth,

1    he had power, he had influence.  But all of that, all of it,

2    was built on lies.  Behind the curtain, Sam Bankman-Fried was

3    not who he appeared to be.  He was using his company, FTX, to

4    commit fraud on a massive scale.  And the money he was spending

5    to build his empire, it was money he was stealing from FTX's

6    customers.  He was committing a massive fraud and taking

7    billions of dollars from thousands of victims.  Let me say that

8    again.  Sam Bankman-Fried, the defendant, was committing a

9    massive fraud and taking billions of dollars from thousands of

10   victims.

11           You see, the defendant had started a company called

12   FTX, which was a cryptocurrency exchange.  That means that

13   customers of FTX could deposit money with the company and use

14   it to trade with each other.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1            MR. REHN:  But while the defendant told his customers

2    that they could deposit their money with FTX and FTX would keep

3    it safe for them, in reality, he was taking those customer

4    deposits and spending them for himself.  He spent the money on

5    lavish houses for himself, his parents, and his friends.  He

6    spent it so he could get introduced to celebrities.  He spent

7    millions more on political donations to gain influence in

8    Washington.  He poured money, other people's money, into his

9    own investments to try to make himself even richer.

10           But about a year ago the truth started to come out.

11   Customers tried to get their money back, the money they had

12   been told FTX was holding for them.  But that money, the

13   customers' money, was gone.  The defendant had taken it.

14           FTX collapsed and its customers were left with

15   billions of dollars in losses.  That's why we are here today.

16   Because when the defendant wanted money he didn't have, he

17   committed fraud.  He took other people's money.  He spent that

18   money in all sorts of ways on himself, and he lied about it.

19   We are here today to hold the defendant accountable for his

20   crimes.

21           This morning I am going to talk about what we expect

22   you will see in this trial.  First, I'll tell you what we

23   expect the evidence will show, and then I'll tell you about the

24   types of evidence that you will see at this trial.

25           First, let me tell you what the evidence will show the

1    defendant did.  The defendant was the founder and chief

2    executive officer of FTX, a cryptocurrency exchange that he

3    created in 2019.  Now, at this trial you will learn all about

4    how cryptocurrency exchange works.

5         For now, understand that FTX was a website where

6    people could buy and sell cryptocurrency from each other.  It's

7    not a bank.  An exchange is a marketplace that matches buyers

8    and sellers.  An exchange is supposed to make money by taking a

9    fee from each trade, not by borrowing or spending customer

10   money.  Customers could go to the FTX website or use an FTX app

11   on their phones to buy and sell cryptocurrency.

12        And cryptocurrency is just a kind of money that exists

13   on the Internet and is sometimes called crypto.  You can buy

14   crypto through a cryptocurrency exchange, and then you can

15   either spend that crypto or hold onto it as an investment,

16   hoping the price will go up.  You may have heard of Bitcoin.

17   That's one example of cryptocurrency.  And there are others as

18   well.

19        But to buy and sell crypto, using the FTX exchange,

20   customers needed to have money in their accounts.  So FTX

21   customers had to first deposit money with FTX to set up their

22   accounts.  They might send dollars from their bank accounts or

23   they might send cryptocurrency that they had already bought

24   somewhere else.

25        How did the defendant convince people to trust FTX

1    with their money?  Well, the defendant assured customers that

2    FTX was holding the money for them and that they would be able

3    to withdraw the money whenever they wanted.  He went to

4    Washington, D.C., and he told Congress and the whole world that

5    FTX had controls in place to protect customer money.  He also

6    said that FTX would not use customer money for itself.  In

7    other words, the defendant promised customers that the money

8    that he put into FTX was still their money.  It was not FTX's

9    money.  And the defendant set up the FTX website and the app to

10   lie to customers.  If you were a customer, you could open the

11   FTX app and this is what it looked like.  It would tell you how

12   much money you had in your account, tell you that it was there

13   for you and that it was available to you to withdraw at any

14   time.

15          And the defendant put this same promise in FTX's terms

16   of service, which told customers how the company would treat

17   their money.  Those terms of service told customers that their

18   crypto belonged to them and not to FTX, that the customers

19   could withdraw the money whenever they wanted and that FTX

20   would not use the customers' money.

21          In addition to the website, the defendant put

22   commercials on TV and the Internet, like this one, saying that

23   FTX was the most trusted way to buy and sell Bitcoin.  That's

24   right.  FTX's advertising slogan was about how customers could

25   trust it.  And the defendant went on Twitter and claimed that

NA4MBAN2                        Opening - Mr. Rehn

1    he was keeping customer money safe.

2             He said, and this is a quote from just one of his

3    tweets, that FTX had a long history of safeguarding client

4    assets, and that remains true today.  But that wasn't true.

5    You will learn that this tweet and all of the defendant's other

6    statements about keeping customer money safe were lies.  You

7    will learn that the defendant knew these were lies.  He knew

8    his company didn't keep customer money safe.

9             Why?  Because he was the one taking their money.  When

10   customers deposited dollars with FTX, he stole that money.  And

11   when customers deposited crypto with FTX, he stole that too.

12            Now I will explain just how he did that.  The

13   defendant used a second company, a smaller and more secretive

14   company that he owned and controlled.  That company was called

15   Alameda Research.  You can see here that the defendant owned

16   both FTX and Alameda.  They were both his companies.  Before

17   the defendant had started FTX, he had started Alameda.  Alameda

18   was a company that bought and sold crypto.  It made some money,

19   but it also suffered some losses, and he wanted to be more

20   successful and to make even more money, so he started FTX.  He

21   named a trader at Alameda, who was also his on-and-off

22   girlfriend, to be the CEO of Alameda.  But he was using her as

23   a front.  In reality, he was still calling the shots at

24   Alameda, and he came up with a scheme to take money from FTX

25   and give it to Alameda.

1          When the defendant created FTX, he set FTX up so that

2     Alameda had secret access to FTX customer money, and with that

3     access came the ability to take customer money.  And once

4     Alameda had the money, then the defendant walked out the door

5     with it and spent it as he pleased.

6          So how did the defendant give himself the secret

7     ability to send FTX customer money straight to his other

8     company, Alameda?  There were two ways.  First, as I mentioned,

9     customers sometimes deposited dollars onto FTX to trade crypto.

10    When customers sent dollars to FTX, the company would tell them

11    that the money was in their accounts at FTX.  You saw the app

12    earlier.  They could go onto the FTX website or go on the app

13    and see how much money supposedly sat in their FTX accounts.

14    This was what the customer saw.  This is what they were told

15    was happening with their money.  But the defendant was keeping

16    his customers in the dark about what is really happening.

17         In fact, the money never actually made it to FTX.

18    Instead, the defendant opened a bank account that was under the

19    control of Alameda, his other company.  He put the information

20    for that Alameda bank account on FTX's website as the place

21    where customers should send their money.  So when customers

22    thought their money was going to the exchange, they were

23    actually sending their money right into the defendant's pocket.

24    You will hear that the defendant even lied to a bank to set up

25    an Alameda bank account that he used for this.  Then the

NA4MBAN2                          Opening – Mr. Rehn

1   defendant told customers that the money was on FTX and in their

2   accounts.

3            But that was all a lie.  The website told them that

4   they had money in their FTX accounts, but the defendant had the

5   money in Alameda bank accounts that he controlled where he

6   could spend it whenever he wanted, and he didn't hold it in

7   those Alameda bank accounts.  He did spend it.  You will learn

8   that the defendant took billions of dollars in FTX customer

9   deposits from those Alameda bank accounts and he spent it, and

10  the customers had no way to know that their money was being

11  used in this way.

12           Now, here is the second way that the defendant sent

13  customer money to Alameda for his own spending.  The second way

14  involved the defendant taking customers' crypto.  When

15  customers transferred crypto, they already had to FTX, it went

16  to an account that FTX controlled.

17           You will learn that accounts that hold crypto are

18  called digital wallets.  And, again, this is what it looked

19  like to customers.  The customers could look into FTX and they

20  were told that the crypto was there in their accounts.  But,

21  again, the defendant was keeping his customers in the dark

22  about what was really happening.

23           The defendant set up FTX with a secret special

24  privilege for Alameda, again, his other company.  He gave

25  Alameda the ability to secretly withdraw as much of the FTX

1    customers' crypto as Alameda wanted.  The defendant made sure

2    that Alameda's special access to customer money was written

3    right into FTX's computer code.  It allowed the defendant to

4    use Alameda to make unlimited withdrawals and spend unlimited

5    amounts of money, and that is just what the defendant did.

6              Using Alameda, the defendant withdrew billions of

7    dollars worth of customer crypto out of the FTX digital wallet

8    and into Alameda's digital wallet that he owned and controlled.

9    Again, as you can see here, customers were told that the crypto

10   was there for them in FTX, but that was a lie.  The defendant

11   had taken that crypto out through Alameda and spent it.  And in

12   these two ways the defendant used Alameda to take both dollars

13   and crypto from FTX customers.  All that was left in FTX was

14   what amounted to an IOU from Alameda.

15             Now, you will hear that the defendant didn't steal all

16   the customer money from the beginning.  He started by taking

17   some of the money from the bank accounts and some of the money

18   from the FTX digital wallets, and for a while customers were

19   able to make withdrawals from their accounts because he left

20   some money in FTX and more and more customers were joining FTX,

21   and they had no reason to suspect that the defendant was

22   pulling some of their money out whenever he wanted to.

23             You will also hear that FTX had various programs for

24   its customers.  For example, customers could choose to lend out

25   their crypto to other customers on FTX.  But that's not what

NA4MBAN2                          Opening – Mr. Rehn

1    happened when the defendant took money.  You will learn that

2    the defendant took money secretly, that he took money from

3    customers who never agreed to that and who had no way of

4    knowing that he was taking their money.  He took it from

5    customers who were told that FTX would hold their money for

6    them and would not use it.  The billions of dollars that he

7    took for his own investments, for real estate, for his

8    political donations, he took it from people without their

9    consent or approval and after lying to them that he would keep

10   their money safe.

11          And, as time went by, the defendant used Alameda to

12   pull more and more customer money out of FTX, and the money the

13   defendant stole really started to add up.  By the summer of

14   2022, the defendant had used Alameda to take more than $10

15   billion of customer money out of FTX, $10 billion stolen from

16   thousands of customers.

17          That's not all.  The defendant didn't just defraud his

18   customers.  You will also hear that the defendant defrauded

19   other people as well.  He sold millions of dollars worth of

20   stock in FTX to investors by lying to them about how the

21   business worked and the money he was stealing, and he used

22   Alameda to borrow millions of dollars from lenders, and he lied

23   to those lenders by sending them false documents.  Just like

24   the fraud on his customers, the defendant lied to get money

25   from his investors, and he lied to get money from his lenders.

1    That's how the defendant took money from other people, based on

2    lies and misrepresentations.

3           During this trial you will also hear about how the

4    defendant spent the money that he got through his fraud.  He

5    took a lot of the money and put it into investments through

6    Alameda to try to make himself even richer.  He took millions

7    more and spent it on political donations so he could get

8    influence in Washington to help his businesses.  He bought

9    beachfront property in the Bahamas.  And to boost his public

10   image, he gave stolen customer money to a nonprofit

11   organization that his brother controlled.

12          You will also learn that the defendant tried to hide

13   how he was spending this stolen money.  He sent it through

14   various bank accounts to conceal where it came from.  He gave

15   some money to his friends and had them make political donations

16   in their own names, even though the money came from the

17   defendant.

18          In May and June of 2022, the defendant's schemes

19   started to fall apart.  At his direction, Alameda had made a

20   bunch of risky investments in crypto and a lot of those

21   investments were losing money.  That meant that Alameda didn't

22   have enough money to pay its bills.  But the defendant didn't

23   come clean.  Instead, he doubled down.  The defendant pulled

24   even more customer money out of FTX to pay off Alameda's loans,

25   more than he ever had before, and to cover up his fraud he

NA4MBAN2                          Opening - Mr. Rehn

1    directed the creation of false financial statements for Alameda

2    and he lied some more.

3           Within days of stealing billions of dollars of

4    customer money to cover Alameda's debts, he testified to

5    Congress again that FTX wasn't using customer money.  A few

6    days later he tweeted that protecting customer money was his

7    top priority.  The defendant lied to the world, and he kept the

8    truth about what he was doing with customer money a secret.  It

9    was a secret that he only shared with a few members of his

10   inner circle, his girlfriend and some of his closest friends,

11   the people who were helping him commit these crimes.

12          In September 2022, the defendant talked with his inner

13   circle about how deep the hole had gotten at FTX, how many

14   billions of dollars the defendant had taken, and how customers

15   could never be repaid.  But the defendant kept lying.  He kept

16   encouraging customers to deposit more money with FTX, and he

17   kept trying to get more money from investors and lenders.

18          But the defendant couldn't hide the truth forever.

19   You will hear that, in November 2022, some of Alameda's

20   financial information was leaked and published online.  People

21   started to realize that the defendant's companies were house of

22   cards and customers began asking to withdraw their money from

23   FTX.  Remember, this was the money that FTX had told its

24   customers was being kept safe for them, but FTX did not have

25   the money to pay the customers back.  It didn't have the money

NA4MBAN2                        Opening – Mr. Rehn

1    because the defendant had stolen billions in customer money and

2    spent it.

3           What did the defendant do?  He lied some more.  He

4    went on Twitter and said his customers' money was safe.  He

5    tweeted, and this is a quote from November, FTX is fine.

6    Assets are fine.  That was a lie.  He said that he had never

7    invested customer money in anything.  "We don't invest client

8    assets, even in treasuries."  That was a lie.  He had taken

9    customer money and sent it to Alameda and then spent it.  Where

10   FTX was supposed to have enough money for customers to withdraw

11   their money, now it just had a huge hole, a hole that was

12   billions of dollars deep.

13          Now, you will hear that the defendant knew all along

14   that his schemes might be exposed.  It planned for it.  He had

15   orchestrated a coverup in advance.  You will see how he took

16   steps to cover his tracks, to hide his crimes, how he acted

17   like he was no longer in charge of Alameda when the opposite

18   was true, how he backdated contracts to mislead outsiders about

19   how the company worked, about how he insisted that his

20   employees communicate over an encrypted messaging app, and also

21   demanded that they set their messages to auto delete after 30

22   days.  He didn't want a paper trail for his crimes.

23          In fact, the defendant also lied to FTX's employees,

24   and he used them as a front to make his business appear more

25   legitimate.  Only his small inner circle knew the truth, that

NA4MBAN2                    Opening - Mr. Rehn

1     he was taking customer money.

2              In the end, the hole that the defendant had created at

3     FTX was too big.  Once customers started asking for their money

4     back, the whole thing came crashing down.  Those customers were

5     left with billions of dollars in losses, and his investors and

6     lenders were left with nothing.

7              You will learn that even after his company collapsed,

8     the defendant tried to cover up his crimes.  He tried to

9     confuse the issue by pointing to parts of FTX's terms of

10    service that had nothing to do with the way he took customer

11    money, and by claiming that the customer's losses were caused

12    by a downturn in the crypto markets.  But you will see that

13    those excuses were false and that the truth was that the

14    defendant had committed fraud on his customers and taken their

15    money.

16             That is what the evidence at this trial will show.

17    The defendant lied to his customers, and he took the money that

18    they had entrusted to him.  He also lied to his investors and

19    to his lenders, and he spent other people's money for himself,

20    and then he lied to try and avoid being caught.

21             Now, what will the evidence be in this case?  First,

22    you will see documents.  The defendant wasn't able to delete

23    everything.  You will see documents he hopes to keep secret.

24    You will see internal company files that document the money

25    that he took and the ways in which he tried to cover it up.

NA4MBAN2                    Opening - Mr. Rehn

 1    You will see how customers were told they had money in their

 2    accounts as if it was sitting right there.

 3          And you will see and hear the defendant's own words.

 4    You will see the ways he made his customers believe that their

 5    money was safe and secure when they deposited it with FTX, even

 6    while he was secretly taking the money and spending it.  You

 7    will read parts of his testimony before Congress.

 8          And those tweets I told you about, the ones where he

 9    told his customers their assets were fine, the defendant tried

10    to delete those tweets, but you will see them here at this

11    trial.  You will also see the documents that the defendant gave

12    to his investors and the financial statements he sent to his

13    lenders and the lies they contain.

14          You will hear live testimony from witnesses.  You will

15    hear from some of the defendant's victims.  You will hear from

16    customers who put money into FTX, who trusted the defendant's

17    company with their money and believed the money would be kept

18    safe and available to withdraw.  And you will hear from

19    investors who trusted the defendant and bought stock in FTX

20    after hearing the defendant's lies.

21          You will also hear directly from the members of the

22    defendant's inner circle, including his close friends who were

23    his most trusted employees at FTX and who knew about and helped

24    the defendant commit the fraud.  They will give you an

25    insider's view of how the defendant's crimes occurred.  They

NA4MBAN2                          Opening – Mr. Rehn

1    will tell you about how the defendant told them to create the

2    secret access that Alameda had that let it take customer money

3    out of FTX.  They knew this meant that the defendant was taking

4    customer money, but they agreed to do it anyway.  They will

5    tell you how they helped the defendant commit the fraud and

6    helped him keep it a secret.

7          One of the members of the defendant's inner circle was

8    his girlfriend who he put in charge of Alameda.  She will tell

9    you about how she and the defendant stole the money that

10   customers entrusted to FTX and used it to make investments

11   through Alameda.  She will testify that she and the defendant

12   took customer money again and again to spend it and invest it

13   through Alameda.

14         Make no mistake about it, these witnesses have

15   committed crimes, and they have accepted responsibility for

16   their conduct, pled guilty, and agreed to testify in the hope

17   of receiving a shorter sentence.  So you should scrutinize

18   their testimony carefully, ask yourself whether it is

19   consistent with the documents and other testimony in this case.

20   When you do that, you will see that what these witnesses say

21   makes sense and is backed up by the other evidence in the case.

22         Now, the evidence is not going to come in all at once.

23   You will see it witness by witness, document by document, one

24   piece at a time.  But by the end of this trial, after you have

25   heard the testimony and you have seen the evidence, you will

NA4MBAN2                                Opening – Mr. Cohen

1   see the full picture.  This man stole billions of dollars from

2   thousands of people.  He defrauded sophisticated investors and

3   lenders, and he emptied the accounts of ordinary customers too.

4   He bought himself wealth, power, and influence.

5            At the end of this trial you will know how he

6   committed this fraud and you will have seen the evidence that

7   holds him to account.  And you will see that there is only one

8   verdict consistent with the evidence in this case and with your

9   common sense, that the defendant, Sam Bankman-Fried, is guilty.

10           THE COURT:  Thank you, Mr. Rehn.

11           Mr. Cohen.

12           MR. COHEN:  Thank you, your Honor.

13           THE COURT:  You may proceed.

14           MR. COHEN:  Thank you, your Honor.

15           Good morning, ladies and gentlemen.  Really, good

16   afternoon.

17           I'm Mark Cohen, and I'll be presenting the case, the

18   defense on behalf of Mr. Bankman-Fried, along with my

19   colleague, Mr. Everdell.  We are privileged to do so.  We are

20   grateful to you for your service.  As the evidence comes in

21   before you in this case, we ask you to consider it based on

22   your real-world experience.  We submit that when you do that,

23   you will see that it tells a very different story than the

24   government claimed in its opening statement.

25           How shall we answer these allegations?  Let's start

1    with the basics.  Sam didn't defraud anyone.  Sam didn't intend

2    to defraud anyone.  Sam acted in good faith in trying to build

3    and run FTX and Alameda.

4           You know, in its opening statement the government used

5    the phrase over and over again that Sam committed theft, that

6    he stole funds.  They claim that, under Sam, FTX stole funds

7    from its customers and improperly loaned them to Alameda.  But

8    there was no theft.

9           Rather, you will learn that Sam believed, reasonably

10   believed, that loans that FTX made to Alameda were permitted

11   and backed by reasonable security and collateral.  And far from

12   being secret, they were open and known within both companies.

13   As well, Sam believed that the loan funds were not spirited

14   away but remained in investments, and Sam did not steal from

15   anyone.  He did not intend to steal from anyone.

16          Now, I am not going to address every single point in

17   the government's opening statement or talk about every piece of

18   evidence you will see over these many weeks.  That's not the

19   purpose of this opening statement.  Rather, the purpose is to

20   give you, members of the jury, a context for what really

21   happened at the time and suggest ways for you to think about

22   the evidence as it comes in before you.

23          So what will the evidence show about what really

24   happened?  This case is in many ways about the crypto world

25   from 2017 to 2022.  You will learn that crypto was not for

NA4MBAN2                          Opening - Mr. Cohen

1    everyone.  On the one hand, it was new and exciting.  Now

2    people could use a currency like Bitcoin to buy and sell

3    things.  They could trade in Bitcoin and other

4    cryptocurrencies, buy and sell it, but, on the other hand, many

5    factors that nobody controlled could make crypto go up or down

6    in value.

7            So two crypto companies themselves could rise and fall

8    very quickly.  Sam entered this world in 2017.  In the

9    government's opening they'd have you think he was quite the

10   villain or, more precisely, almost a cartoon of a villain.

11   Think of the photo they chose to show you of him.  You will see

12   many other photos like that.

13           But the evidence will give you a very different

14   context.  The evidence will show that Sam was someone who

15   worked very hard to try and build things, not harm them.  He

16   was a math nerd who didn't drink or party.  He went to college

17   at NYT.  He worked for a few years for a traditional trading

18   firm on Wall Street, and then, in 2017, he got into the new

19   world of trading, in crypto, by founding Alameda.

20           Brian, could we get the next slide, please.

21           What was Alameda?  The government made it sound like

22   it was this dark secret company, that it only existed to accept

23   transfers from Sam in the dark of night.  But that's not true

24   at all.  You will learn that Alameda was a trading firm called

25   a hedge fund and it traded in cryptocurrency, so it was called

a crypto hedge fund.  And over time Alameda grew to more than
30 employees, traders, computer developers, and settlements
people who handled the details of the trades.  Alameda became
successful in a short period of time.  It ultimately traded in
hundreds of millions of dollars and earned billions in profits.
And along the way, to build the business, Alameda raised funds
by borrowing from lenders who specialized in crypto and wanted
to be involved because they believed in crypto and they thought
Alameda was a new and exciting company.  There is nothing wrong
with that.  After all, that was the lender's business.

         In 2019, based on the success, Sam founded FTX, which
was a foreign company.  FTX was a crypto exchange.  Now, an
exchange sits between buyers and sellers and let's them make
transactions from each other.  The New York Stock Exchange,
just a few blocks south of here, is one of the most famous
exchanges.  At the time there were already a lot of crypto
exchanges out there.  As it grew, FTX tried to stand out and be
different, to be more innovative.

         Many people have heard of Bitcoin, but, as it turns
out, you will learn there were thousands of cryptocurrencies.
So FTX offered its customers the ability to trade in many of
them.  It provided other innovations as well.

         As you see on the slide, one thing it offered its
customers was the ability to take something called margin
loans, which you will hear about in this case.  What is a

1   margin loan?  Well, at a high level, it's a loan that an

2   exchange makes to a customer where the customer puts up

3   collateral, and FTX every customer who wanted to take a margin

4   loan also agreed that under certain circumstances his or her

5   collateral could be used to cover the losses of other customers

6   who also had margin accounts.

7            Brian, the next slide.

8            No need to study this now, but this is a section of

9   the terms of service of FTX that relates to margin trading and

10  what I just talked about.  Again, there was nothing wrong with

11  margin trading or margin loans, nothing wrong with this.  From

12  a business point of view, the issue was whether the customer

13  taking the margin loan had sufficient security or collateral

14  for that loan.

15           Now, FTX grew rapidly in just a period of a few years,

16  but it was a start-up company too.  You know there is an

17  expression about startup companies that you all may have heard.

18  Working on a startup or at a startup is like building a plane

19  as you are flying it.

20           You will learn that happened here as well.  Sam and

21  his colleagues were building the plane as they were flying it.

22  They had to figure out how to navigate a world where they were

23  running FTX, building out its systems, dealing with hacking

24  threats, managing the credit risk of their customers, managing

25  hundreds of employees, all while building up their actual

NA4MBAN2                         Opening – Mr. Cohen

exchange.

          You will learn that, as FTX grew, it hired more and
more people to address these matters, ultimately reaching 350
employees.  To listen to the government's opening, there were
no employees.  It was Sam doing everything by himself.  That
wasn't true.  No one person, no CEO, certainly not Sam, could
be everywhere and do everything, particularly at such a
fast-growing, complex business, and they built out a team.

          Things were happening quickly, very quickly.  Sam and
others made hundreds of decisions a day.  At any given point in
time there are dozens of things on his to-do list and on others
too, everyone else's too.  As a result, some things got
overlooked, some things were still in progress, things a more
mature company, an older company would have built out over
time.  But at FTX they were still works in progress, building
the plane as you're flying it.  For example, you will learn
that FTX had not yet built out a fully-developed risk
management team.  It didn't have a chief risk officer, which
became an issue later on, when the storm hit.

          Even so, in a few years FTX became very successful.
This was a very real, innovative, successful company.  As you
can see on the slide, it had 6 million registered users,
handled over 15 billion in trades per day, and over 3 million
in revenues per day.

          As it grew, in order to build the company still

NA4MBAN2                         Opening - Mr. Cohen

1    further, FTX sought to raise funds from investors.  Nothing

2    wrong with that.  FTX would announce an offering to investors,

3    would provide them with standard data and materials, and within

4    days that offer would be sold out because if you wanted to

5    invest in crypto, with all its risks, FTX had huge potential.

6          So it was FTX, the crypto exchange, and there was

7    Alameda, the crypto trading hedge fund.  Did they have business

8    relationships with each other?  Yes, they did.

9          In its opening the government claimed that from the

10   very beginning these relationships were corrupt and part of a

11   fraud, a dark and secret fraud.  But to the contrary, during

12   this trial you will learn that these business relationships

13   were reasonable under the circumstances.

14         Let me just go through them for you quickly.

15   Customer.  You will learn that Alameda was one of the many

16   customers of FTX.  It had its own account on FTX which was

17   called the Alameda info@ account.  Nothing wrong with that.  It

18   was open and known.  The employees at Alameda could access this

19   account.  At FTX many of the company could see this account

20   just as they could see any other customer's account.

21         As I mentioned a moment ago, FTX offered all its

22   customers the ability to take margin loans.  As a customer,

23   Alameda signed up for and took margin loans.  Alameda was a big

24   customer, so it took big margin loans, but it also posted large

25   amounts of security or collateral.  Again, nothing wrong with

1      that.

2             Market maker.  What's that?  In order to run an

3      exchange, FTX needed to provide liquidity.  If an exchange has

4      more people who want to buy something than sellers who want to

5      sell it, the whole system can freeze up.  The way the exchange

6      deals with it is by having companies act as market makers who

7      step in, buy for their own account when there are no other

8      available buyers.

9             When FTX opened, it was starting from scratch.  It

10     needed a way to have liquidity for its customers, so Alameda

11     took on the role of market maker.  Nothing wrong with it doing

12     so.  The hope was that over time the exchange would become

13     successful and it would be able to track other companies to

14     also be market makers and that's what happened.

15            By 2022, Alameda handled less than 5 percent of that

16     activity, and other market makers had stepped in to handle the

17     rest.

18            Payment agent, what's that?  Well, back when FTX

19     started in 2019, it didn't have its own bank account to receive

20     dollars, which in the crypto world you will learn are called

21     field.  As more and more customers wanted to send in dollars,

22     there needed to be a way to receive them.  The idea was this

23     would be short term until FTX could get its own bank accounts,

24     which it later did.  FTX would ask customers who wanted to open

25     accounts to send their dollars to an Alameda bank account or an

NA4MBAN2                          Opening - Mr. Cohen

1    associated account.  From the customer viewpoint they were

2    getting what they requested.  They were able to wire dollars

3    from their institutions to Alameda in order to set up their FTX

4    Trading account, and there was no secret that the funds for

5    their FTX account were being wired to an Alameda account.

6           We can look at the next slide, Brian.

7           Here you see just one example, wire instructions from

8    June 24 of 2020.  Customer wants to open an account at FTX, is

9    told if he or she wants to do that they have to wire the funds

10   to Silvergate Bank in the name of Alameda.  Nothing secret

11   about that.

12          Now, what happened?  The funds went into the bank

13   account at Alameda, and they were tracked on a ledger entry at

14   FTX called the fiat@ entry, and we will hear a lot about this

15   fiat@ account.  This was tracked in a way similar to if the

16   customer had paid in his or her dollars using PayPal or a

17   credit card.  The fiat@ account was open and known.  But as we

18   will get to in a moment, due to the lack of a fully built-out

19   risk management function, this fiat@ entry was not tracked and

20   not reconciled as it should have been, which became an issue

21   later on when the storm hit.

22          Now, what can FTX do -- we are not up to that, Brian.

23   Sorry.

24          What could FTX do with the funds that came in, the

25   fiat@, the dollars that came in.  You heard from the government

NA4MBAN2                        Opening - Mr. Cohen

1    this morning their view that it would it not have been invalid

2    for Sam to believe that they could be loaned out.  It would not

3    have been invalid for him to believe in good faith that FTX

4    could do so.

5          But what will the evidence show?  Again, the evidence

6    will show that Sam reasonably believed that there were no laws

7    or provisions in the terms of service that prohibited FTX from

8    loaning out these deposits, whether loans went to Alameda or to

9    other customers.  And for Sam, as the CEO, from a business

10   perspective, the issue was whether the borrower had sufficient

11   security or collateral to pay back any loans.

12         As you listen to this evidence, think about this.  If

13   Sam believed in good faith the funds were permitted to be

14   loaned by FTX to Alameda, then there was nothing wrong with

15   Alameda using them, provided there was sufficient assets for

16   them to be paid back.  So given Sam's good-faith belief, how

17   could there be a theft.  There wasn't.  In short, you will

18   learn that each of these business relationships between FTX and

19   Alameda were in keeping with business practice.  They were not

20   set up to create some grand fraudulent scheme.

21         Over time Sam stepped away from the day to day at

22   Alameda because he was running FTX, which was more than a

23   full-time job.  In 2021, he gave up his role as CEO of Alameda

24   and turned it over to Caroline Ellison and another person and

25   ultimately to just Ms. Ellison.

1         Did he stay involved?  Of course he did.  He was still

2    the majority owner of Alameda, still interested in its

3    performance.  But he relied on her and he trusted her to act as

4    the CEO and manage the day to day of trading management,

5    preparing financial documents, handling lender relationships,

6    and he stayed involved as owners do.

7         As I mentioned, 2021 ended on a high note for FTX and

8    Alameda, and the crypto world was booming.  But you will learn

9    that, based on his overall view of the market, Sam became

10   concerned.  What would happen if things changed?  What if the

11   price of Bitcoin and other cryptocurrencies that Alameda was

12   invested in were to go down?  What if it were to go down a lot?

13   As the majority owner of Alameda, he spoke to Ms. Ellison, the

14   CEO, and he urged her to put on a hedge, something that would

15   protect against such a downturn.  She didn't do so at the time,

16   and this also becomes an issue later on, when the storm hit.

17        OK, Brian.

18        That brings us to 2022, in many ways the turning point

19   year in the case.  And what happened from May to November?  As

20   I mentioned, Sam and the others had been building the plane as

21   they flew it, but now, unknown to them, they were about to fly

22   into the perfect storm.

23        In May, you will learn that a series of market shocks

24   took place.  The price of Bitcoin, the leading cryptocurrency,

25   dropped by 70 percent.  Further drops were coming, could be

NA4MBAN2                          Opening - Mr. Cohen

1    coming.  The entire crypto world was affected.  Many crypto

2    companies suffered great shocks and losses and wound up going

3    out of business.

4          What did this mean for Alameda, the crypto hedge fund?

5    Well, Alameda was a hedge fund that traded in crypto.  And if

6    crypto was going down in value, plummeting, that meant Alameda

7    was losing value.  Some of the lenders recalled their loans to

8    Alameda, in other words, asked to be paid back.

9          And what happened?  Well, you will learn that Sam and

10   Ms. Ellison discussed the situation and Sam didn't say, well,

11   to heck with the lenders, don't pay them, put them off.  You

12   will learn that Sam believed in good faith that, consistent

13   with Alameda's business and assets, this could be done.  So

14   Alameda paid the lenders back on time, in full.  As you listen

15   to that evidence come in, ask yourselves, how can these lenders

16   be victims of fraud when they were paid back this way.  They

17   weren't.

18         Now, the government in its opening claimed that Sam

19   also directed the creation of false statements or false

20   documents to be sent to these lenders, and you will learn

21   during this trial that that's not what happened.

22         But staying in this period from May forward, where you

23   see all the price of Bitcoin plummeting, another issue

24   developed.  Remember that fiat account I told you about.  This

25   was the account set up to receive the bank account set up to

1    receive -- the account set up to receive dollars back in 2019,

2    when FTX didn't yet have its own bank accounts.

3          Now, FTX had since gotten its own bank accounts and

4    Sam reasonably believed that Alameda had stopped taking

5    deposits from FTX customers.  And even though this fiat@

6    account had been in place for three years, it hadn't been dealt

7    with.  It should have been from a risk management viewpoint.

8    Again, this was part of the claim that they didn't get built

9    out while they were flying it, but it hadn't.

10         Now this fiat@ account had a large balance in it, 8 to

11   $10 billion.  Alameda had assets, but many of them were not

12   liquid.  They couldn't be quickly turned into funds.  Now,

13   Alameda owed payments on back to FTX, which would be used to

14   pay FTX's customers if they asked to withdraw the funds.

15         Well, how did Sam react?  During this trial we will go

16   through the details with you, but for now we ask you to think

17   about the big picture as you hear the evidence from that

18   period, and it's this.  Sam acted in good faith and took

19   reasonable business measures.  He reviewed financial documents

20   for both Alameda and FTX and believed they had the assets to

21   weather the storm.  Things were tight, much tighter than they

22   had been at the beginning of the year, and tight because

23   earlier in the year Ms. Ellison had not put on the hedges for

24   Alameda, which would have offset some of this.

25         But Sam still believed in good faith that both

1    companies remained good, innovative profitable companies that

2    were dealing with a liquidity crisis that they could get

3    through it.  He took reasonable steps in good faith.  Among

4    other things, Sam began speaking to outside investors to line

5    up capital if necessary.  He always kept nearly all of his own

6    assets in the companies, and now he was willing, if necessary,

7    to give up everything he owned personally in order to make

8    things work.

9              That brings us to November 2022, which you also heard

10   about from the government.  In particular, you will hear a lot

11   about the period from November 1 to November 11.  No question,

12   a lot happened in those 11 days.

13             As you hear the evidence about this time, consider the

14   following.  Things were changing moment to moment, minute to

15   minute.  Alameda and FTX came under attack in crypto media.

16   Then the CEO of Binance, the largest crypto exchange and FTX's

17   fierce competitor, put out a tweet attacking Alameda.  Because

18   of Alameda's association with FTX, this triggered a run on the

19   bank at FTX.  Now, many customers sought to withdraw their

20   funds.  Normally, FTX would see around 50 million flowing in

21   and out of the company in a day normally.  But now, on November

22   7, it saw billions of dollars of withdrawals in a single day.

23   At the same time, the market fear caused a crash in Alameda's

24   assets.  Its value fell dramatically over a 12-hour period.

25             What did this all mean?  Well, Alameda had

1   liabilities, but its assets were investments that weren't

2   liquid, which meant that if it had to pay back all of its loans

3   to FTX immediately, it couldn't.  In a matter of months, weeks,

4   years, sure, but they wanted to process all the withdrawals --

5   if they wanted to process all the withdrawals of U.S. dollars

6   that week, they couldn't.

7            And, again, what did Sam do?  In the face of this

8   liquidity crisis, he didn't run away.  He addressed it in good

9   faith and put measures in place to attempt to stabilize the

10  company and repay customers.  This was a frenetic time.  The

11  plane was going into the very eye of the storm.

12           As you hear the evidence of these days, you must

13  consider what Sam did and said in real time and the context

14  that shows about his state of mind.  You will learn that his

15  approach was the opposite of someone who intended to harm.

16  Well, that's certainly a different narrative than you heard

17  from the government, isn't it.

18           As I mentioned, I am not going to go through

19  everything they said in their opening statements, but let me

20  mack a few points about their case.  As you listen to their

21  evidence, we ask you to consider this.  A lot of their case is

22  what we would call a hindsight case.  The approach goes like

23  this.  FTX was worth billions and ultimately filed for

24  bankruptcy, alameda was worth billions and went out, people

25  lost money, so Sam must have committed fraud.

1           Of course it's not a crime to be the CEO of a company

2     that later files for bankruptcy.  It's not a crime to run a

3     business in good faith that winds up going through a storm.

4           What does the government do?  It points to various

5     business practices that were reasonable at the time and says,

6     well, in hindsight, given what we know now about what happened,

7     it must have been part of a fraudulent scheme.

8           I won't go through every example now, but let me just

9     touch on a few.  You heard multiple times in the government's

10    opening about the apartments in the Bahamas, the spending on

11    the apartments in the Bahamas.  Because that's what a bad guy

12    does, he steals money, goes to the Caribbean and buys

13    apartments.  Well, is that what the evidence will show you?

14          Here is what the government didn't say in its opening.

15    FTX bought those apartments, not Sam, and they were bought for

16    FTX employees in order to attract the best and the brightest

17    who worked at places like Google and Facebook to see if they

18    could get them to move to the Bahamas.

19          As to meetings with famous people, television ads,

20    these have also been taken out of context to make Sam look like

21    a bad guy.  At the time they were appropriate business and

22    advertising expenses.  It's not a crime to try to get Tom Brady

23    to go on ads for your company.

24          The government also referred to loans that Alameda

25    made to Sam and others claiming they proved Sam committed a

1   crime.  But wait a minute.  As I mentioned, Alameda was a

2   private company, it was worth billions, and Sam was the

3   majority owner.  He was permitted to take such loans.  They

4   went along with what Alameda could do and used them for

5   benefits that would benefit Alameda and FTX and the remaining

6   value for the companies.  Nothing wrong with that.

7          What else did the government tell you?  We heard

8   multiple times, my hand wasn't keeping up, but at least four or

9   five about special secret privileges in the Alameda code base,

10  special secret privileges.

11         Remember back when FTX started it needed liquidity, so

12  Alameda served as its primary market maker.  You will learn

13  that Mr. Wang and Mr. Singh put certain things in the code base

14  to allow Alameda to function as a market maker.  Now today they

15  are called special secret privileges.  In fact, you will learn

16  that they were done for reasonable purposes at the time related

17  to the market maker role and they were far from secret.  Any

18  senior computer developer at FTX could see them.

19         The government also referred to the terms of service,

20  but they failed to tell you that the terms of service didn't

21  apply to the fiat transfers or margin loans we just talked

22  about, and they claimed another bad act that Sam misused auto

23  delete at the company and that was bad.  But you will learn

24  that what the company used were forms of communication called

25  Slack and Signal that were used to talk internally and with

NA4MBAN2                          Opening - Mr. Cohen

1    other companies all over the world and that the approach which

2    was ultimately taken at FTX regarding what to delete and what

3    to keep was reasonable under the circumstances.  And there are

4    many more examples like this, but you have the point.

5         Taking something out of context and in hindsight and

6    calling it improper is not proof beyond a reasonable doubt.

7    That's critical because, as Judge Kaplan told you, the

8    government has the burden of proving its case beyond a

9    reasonable doubt.  He told you, and he is right, of course,

10   that a criminal case is different, very different, and rightly

11   so.  A life is at stake.

12        In a criminal case the government must prove its case

13   beyond a reasonable doubt.  These are not just words but the

14   bedrock of our system.  What does it mean?  It means if the

15   government doesn't prove its case beyond a reasonable doubt,

16   you must find Sam not guilty, period.  The government has the

17   burden of proof.  It never shifts to the defendant and it's a

18   very heavy burden.

19        We just told you about what really happened at FTX and

20   Alameda and the perfect storm, but in fact we weren't even

21   required to do that.  We are not required to ask a single

22   question or offer any evidence at all.  And the burden of proof

23   also means that if Sam in good faith made business decisions

24   that didn't work out or ended up poorly or turned out to be

25   mistaken, this is not the stuff of a criminal case.

1          You must also keep the burden of proof in mind when

2     you consider the government's evidence, and there are many gaps

3     and limitations in its case in addition to what I have pointed

4     out.

5          Now, Mr. Rehn mentioned documents and other things,

6     and you will certainly see plenty of those.  But, in the end,

7     this case turns on the testimony of the witnesses and three

8     witnesses in particular who we referred to, Ms. Ellison,

9     Mr. Wang, and Mr. Singh.  You will evaluate them.  You will

10    evaluate all the witnesses for yourself.  But let me suggest a

11    way to think about their testimony and other testimony as it

12    comes in before you.  Each of them has pleaded guilty to

13    various offenses.  It took them a while to get to that.  Their

14    own pleas have no bearing to the case, but it is relevant to

15    the context of the testimony.

16         You will learn that they entered into cooperation

17    agreements and, as a result of their pleas, they face

18    potentially very serious consequences unless they cooperate and

19    satisfy those agreements.  Let's face it.  Here in the real

20    world cooperation means testifying against Sam in a way that

21    supports the government case.  It overhangs everything they

22    will say to you.  So be careful as you hear from them to think

23    about what they did and said then and what they are saying now.

24    As you hear their testimony, ask yourselves, are they saying

25    that Sam was part of the conversations and they don't really

1    remember, saying Sam did things that he didn't really do when

2    they are guessing he did.  Are they pointing to out-of-context

3    or ambiguous statements that now they are saying led to

4    black-and-white conclusions?

5            Perhaps, most of all, are they spinning things that

6    Sam said and did at the time that were good-faith business

7    decisions that they themselves were fine with and now claiming

8    they were sinister and deceitful and they knew it all along.

9    Ask the same questions when you hear from the other government

10   witnesses as well.

11           In the end, Sam started and built two billion-dollar

12   companies in the span of a few years.  They both grew very

13   quickly, maybe too quickly, a little too quickly.  Then

14   building a plane as they were flying it.  And part of their

15   management was not fully developed.  A giant market crash wiped

16   out the crypto sector.  FTX survived that.

17           But, in November, a follow-on crash specifically hit

18   FTX and Alameda.  Even then Sam took reasonable measures under

19   the circumstances.  He didn't steal any money.  He invested

20   nearly everything he had in the companies, and when they faced

21   a crisis he was the first to lose and that each point in time

22   he made business decisions that he thought were right when he

23   made them.

24           We will have another opportunity to speak with you in

25   the closing statement.  When we do, we will ask you to find

NA4MBAN2

1    that the government has not met its very heavy burden of proof

2    beyond a reasonable doubt, and we will ask you to find Sam not

3    guilty on all counts.  Thank you.

4              THE COURT:  Thank you, Mr. Cohen.  We will break for

5    lunch until 2:40.  See you then.

6              Members of the jury, I am not going to remind you all

7    the time every time you go in and out not to talk about the

8    case.

9              (Jury not present)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NA41BAN3

                              AFTERNOON SESSION

                                  2:43 p.m.

1              (In open court; jury not present)

2              THE COURT:  Good afternoon, folks.  We are still

3    missing a juror at last count, but I gather there's something

4    you wanted to raise with me, so let's try.

5              MS. SASSOON:  Yes, your Honor.  Last night the

6    government shared with the defense the exhibits it intends to

7    introduce through its first and second witnesses, and the

8    defense noted that it had some objections to those exhibits,

9    and so we thought we could address them now for efficiency.

10             THE COURT:  There's a binder up here that looks like

11   it's got a couple dozen exhibits in it.  So what are we talking

12   about?

13             MS. SASSOON:  We're going to pass to your Honor the

14   binder of exhibits for the witness, Adam Yedidia, which are

15   going to be discussed now.

16             THE COURT:  Okay.  So what are we talking about?  This

17   one has even more.

18             MS. SASSOON:  The government intends to present this

19   witness with a binder of photographs, and I have a copy of that

20   binder here, which I can share with the Court.  Otherwise it's

21   at Tab 1500-1555 of your Honor's binder.  These are photographs

22   of the Albany penthouse apartment, and my understanding is that

23   the defense objects to some of these.

NA41BAN3

1          THE COURT:  To some or all of them, Mr. Everdell?

2          MR. EVERDELL:  Well, your Honor, there are two flavors

3     of objections.  We'll start with the specific photos.

4     Generally they are cumulative.  In our view there's tons of

5     photos in there about the same apartment.  I don't know if

6     they're all actually necessary.  But let's start with the

7     actual specific objections.  There's 1533, 1549, and 1550.

8     I'll tell you the objection after you've taken a look.

9          THE COURT:  Yes.  So?

10         MR. EVERDELL:  So, your Honor, each of those

11    photographs, you can see a large luxury yacht in the

12    photograph.  The government has opened on the fact that they

13    intend to show and argue that the defendant spent lavishly on

14    himself with customer funds, and there's no evidence in the

15    record at all that he bought a yacht or anything really

16    expensive like that with any funds, and I think the jury sees

17    photographs——

18         THE COURT:  Other than the $30 million condo, which

19    used to be expensive in New York.

20         MR. EVERDELL:  Your Honor, there are obviously a lot

21    of photographs of the condo so we're not objecting to every

22    single one of those, but the ones with the yacht in the

23    background, the jury could assume everyone who had a house in

24    this complex owns a yacht like that, and that's not what the

25    evidence shows and that's I think prejudicial.

NA41BAN3                         Julliard - Direct

1          THE COURT:  Overruled.  Let's get the jury.

2          MS. KUDLA:  Your Honor, one point while we wait for

3     the jury to come in.  For the introductory witness, there are

4     at least two stipulations.  They are in your binder.  For

5     Marc-Antoine Julliard.  They are Government Exhibit 2000 and

6     Government Exhibit 2001.  Based on the length of the

7     stipulations, with the Court's permission, we will offer the

8     stipulation but we will not publish or read it to the jury.

9          THE COURT:  Then what's the point of offering it?

10         MS. KUDLA:  Your Honor, we just will not publish it

11    for the jury and read it out loud.  We can—

12         THE COURT:  Look, that's not the point.

13         MS. KUDLA:  It authenticates the exhibits that we are

14    going to offer and publish to the jury.

15         THE COURT:  All right.  You don't have to read them.

16    I mean, I don't think anybody wants you to read them.  You'll

17    just offer them and they'll be received, I assume.

18         MS. KUDLA:  Thank you, your Honor.

19         THE COURT:  Okay.

20         THE DEPUTY CLERK:  Okay.  Jury entering.

21         (Continued on next page)

22

23

24

25

1              (Jury present)

2              THE COURT:  Okay.  The record will reflect that the

3      defendant and the jurors are all present, as has been the case

4      throughout.

5              The government will call its first witness.

6              MS. KUDLA:  Thank you, your Honor.  The government

7      calls Marc-Antoine Julliard.

8              THE DEPUTY CLERK:  Sir, please come this way.

9              Please step around and remain standing for a moment,

10     and raise your right hand.

11             (Witness sworn)

12             THE DEPUTY CLERK:  Thank you.  Please be seated.

13             And if you could please state your name and spell your

14     first and last names for the record.

15             THE WITNESS:  My name is Marc-Antoine Julliard.

16             THE DEPUTY CLERK:  If you could just step back a

17     little bit from the mic.  That's perfect.

18             THE WITNESS:  M-A-R-C hyphen A-N-T-O-I-N-E.  And my

19     last name is Julliard, J-U-L-L-I-A-R-D.

20             THE COURT:  You may proceed, Ms. Kudla.

21             MS. KUDLA:  Thank you, your Honor.

22       MARC-ANTOINE JULLIARD,

23         called as a witness by the Government,

24         having been duly sworn, testified as follows:

25

NA41BAN3                      Julliard - Direct

1   DIRECT EXAMINATION

2   BY MS. KUDLA:

3   Q.   Mr. Julliard, where are you from?

4   A.   I'm from a Paris suburb in France.

5   Q.   And did you grow up in France?

6   A.   Yes, I have.

7   Q.   Do you still live in France?

8   A.   I do not.

9   Q.   And where do you live now?

10  A.   I live in London for the last ten years.

11  Q.   Now what do you do for a living in London?

12  A.   I work in commodities trading, and I'm specialized as a

13  cocoa broker.

14  Q.   Have you ever bought or sold cryptocurrency?

15  A.   Yes, I have.

16  Q.   And did you ever buy and sell cryptocurrency on FTX.com?

17  A.   Yes, I have.

18  Q.   Now let's start off:  What was FTX?

19  A.   A centralized exchange allowing customers of retail or

20  professional investors to accept—access cryptocurrencies

21  trading.

22  Q.   So let's break that down.  You mentioned a centralized

23  exchange to access cryptocurrency.  What is cryptocurrency?

24  A.   It's a digital online currency that is not state or not

25  government regulated and that works on a blockchain process.

NA41BAN3                        Julliard - Direct

1    Q.  So you mentioned state- or government-owned currency.  Is

2    there an example of that?

3    A.  Yes.  We refer to that as fiat currency.

4    Q.  And are there different types of cryptocurrency,

5    Mr. Julliard?

6    A.  Yes, many of them.

7    Q.  Can you provide a few examples to the jury.

8    A.  Bitcoin, Ethereum are the main two I would look at.

9    Q.  So I want to turn back to FTX for a moment.  How did you

10   first learn about FTX?

11   A.  Through a friend.

12   Q.  Now after hearing about FTX through your friend, did you

13   take any additional steps to learn more about the exchange?

14   A.  I went onto Google, researched it online.

15   Q.  And before going into what you learned, why did you

16   research FTX?

17   A.  I was about to commit significant amounts of money to

18   trading cryptocurrencies, and I wanted to be sure of what I was

19   dealing with, so I wanted to assess the exchange.

20   Q.  And you mentioned that you went online.  Can you describe

21   the types of online resources you reviewed.

22   A.  I went onto the website first; I went onto newswires; I

23   researched many articles on Google and also used—via social

24   media.

25   Q.  And what type of social media are some of the examples that

NA41BAN3                          Julliard - Direct

1    you used?

2    A.  I would use Twitter.

3    Q.  And with respect to Twitter, did you follow any particular

4    accounts?

5    A.  Yes.

6    Q.  And which were those?

7    A.  I would follow the official account of the exchange FTX,

8    and I would also follow the account of its CEO.

9    Q.  And who was the CEO of FTX?

10   A.  Sam Bankman-Fried.

11   Q.  Now as part of your research, did you ever see any

12   photographs of Mr. Bankman-Fried?

13   A.  Yes, plenty online.

14           MS. KUDLA:  Can we please show for the witness what's

15   marked for identification as Government Exhibit 1633.

16   Q.  Mr. Julliard, who is this?

17   A.  The CEO of FTX.

18   Q.  And as you previously identified, that is

19   Mr. Bankman-Fried?

20   A.  Yes.

21           MS. KUDLA:  The government offers Government

22   Exhibit 1633.

23           MR. COHEN:  No objection, your Honor.

24           THE COURT:  Received.

25           (Government's Exhibit 1633 received in evidence)

NA41BAN3                      Julliard - Direct

1              MS. KUDLA:  May we publish?

2              THE COURT:  You may.

3    BY MS. KUDLA:

4    Q.  Now, Mr. Julliard, in the news articles and online research

5    you were doing, how was Mr. Bankman-Fried described in the

6    publications?

7    A.  He would come across to me as the future face of the

8    general crypto industry, as a leading CEO and a leader of the

9    industry.

10   Q.  How did Mr. Bankman-Fried stand out in any way, if at all,

11   compared to others in the cryptocurrency industry?

12   A.  Wanting to do good towards the industry; giving access to

13   customers, retail investors like me; provide to the platform a

14   great user-friendly access; and to me, just wanted to develop

15   the industry, really, is how I felt.

16   Q.  And what effect, if any, did that have on you in choosing

17   FTX as a cryptocurrency exchange?

18   A.  The level of engagement was important and as well as when I

19   researched the company, the number of users and the size of the

20   exchange, which came across to me as second biggest in the top

21   three biggest exchanges, that combined together was important

22   to my decision.

23   Q.  So let's focus for a moment on FTX.  You mentioned the

24   number of users was an important factor for you.  In

25   particular, why did the number of users stood out?

A.   I joined cryptocurrency trading later than many people, in

the spring of 2021.  Many people were trading already.  Bitcoin

existed at the time for somewhere around 10 or 12 years, maybe

more.  So I considered that a vouch——a vote of confidence from

these people, and I felt comfortable that having users around

the world and a presence in most continents, the size of it led

me to believe that I was comfortable.

Q.   And in particular, apart from the size of FTX, did anything

else stand out to you about FTX during your research?

A.   No.

Q.   During the course of your research did you ever learn about

any investors into FTX?

A.   Major venture capital firms seemed to have been involved in

investing in the company itself, FTX.

Q.   And what, if any, effect did the fact that major venture

capital firms had invested into FTX have on you?

A.   Well, they don't commit hundreds of millions without doing

due diligence, checking the books, the accountancy of the firm,

going through several compliance process, so that was also a

vote of confidence for me.

Q.   Now as part of your research, Mr. Julliard, did you ever

see any advertisements about FTX?

A.   I did.

Q.   And can you provide an example of some of the types of

advertisements that you saw.

NA41BAN3                      Julliard - Direct

1   A.   I would——I remember Formula One sponsorship.

2   Q.   What is Formula One?

3   A.   Car racing.

4   Q.   Okay.  And in the advertisements that you saw, did you ever

5   see individuals featured or hear about individuals featured in

6   advertisements for FTX?

7   A.   There were on social media celebrities, influencers

8   advertising for FTX.

9   Q.   Any particular celebrities or influencers that you recall

10  sitting here today?

11  A.   I do remember one.

12  Q.   Who was that?

13  A.   A model, Gisele.  I don't know her last name.

14          MS. KUDLA:  The government offers Government Exhibit

15  S-2000, a stipulation; and pursuant to that stipulation as to

16  authenticity, the government offers Government Exhibit 902.

17          THE COURT:  S-2000 is received.

18          (Government's Exhibit S-2000 received in evidence)

19          THE COURT:  Government Exhibit 902 is received.

20          (Government's Exhibit 902 received in evidence)

21          MS. KUDLA:  May we publish to the jury?

22          THE COURT:  You may.

23  BY MS. KUDLA:

24  Q.   Mr. Julliard, do you recognize anyone in this ad?

25  A.   Yes, the person I just mentioned.

NA41BAN3                    Julliard - Direct

1   Q.  And what is her name, first name?

2   A.  Gisele.

3           MS. KUDLA:  We can take that down now.

4   Q.  Now what impression, if any, did FTX marketing materials

5   that you described with Formula One, Gisele, and others have on

6   you, as you researched the company?

7   A.  Well, I can think of another example when it comes to

8   marketing.  I didn't see the ad, but I remember reading online

9   that FTX was advertising the company at the Super Bowl, so

10  you're under the impression when you commit major amounts in

11  marketing at major events, that you have some financials behind

12  the company.

13  Q.  Now, Mr. Julliard, did you ever open an FTX customer

14  account?

15  A.  Yes, I have.

16  Q.  And approximately when did that occur?

17  A.  In the spring of 2021.

18          MS. KUDLA:  So pursuant to Government Exhibit S-2000

19  as to authenticity, the government now offers Government

20  Exhibit 587.

21          THE COURT:  Received.

22          (Government's Exhibit 587 received in evidence)

23          MS. KUDLA:  May we publish to the jury?

24          THE COURT:  You certainly may.

25  BY MS. KUDLA:

NA41BAN3                    Julliard - Direct

1    Q.  Mr. Julliard, what is Government Exhibit 587?

2    A.  The website page of FTX for creating your account.

3    Q.  Is this one of the first FTX online pages that you were

4    directed to when creating your account?

5    A.  Yes.

6    Q.  And what is the box below email and password?

7    A.  "I agree to the FTX terms of service."

8    Q.  Now did you have to accept the FTX terms of service to open

9    your account?

10   A.  Yes.

11   Q.  After you opened your FTX account, Mr. Julliard, did you

12   need to fund your account to begin trading?

13   A.  Yes.

14           MS. KUDLA:  So pursuant to Government Exhibit S-2000,

15   the stipulation as to authenticity, the government offers

16   Government Exhibit 590.

17           THE COURT:  Received.

18           (Government's Exhibit 590 received in evidence)

19           MS. KUDLA:  May we publish?

20           THE COURT:  Yes.

21   BY MS. KUDLA:

22   Q.  Mr. Julliard, what is Government Exhibit 590?

23   A.  This is the FTX website page giving you four ways of

24   funding your account.

25   Q.  And which of these ways did you use to fund your FTX

NA41BAN3                         Julliard - Direct

1    account?

2    A.   I would only use the last three——credit or debit cards,

3    wire transfer, or cryptocurrencies; but nearly most of it, wire

4    transfer.

5    Q.   Now after you opened and funded your FTX account did you

6    engage in cryptocurrency trading?

7    A.   Yes.

8             MS. KUDLA:   And pursuant to Government Exhibit S-2000

9    as to authenticity, the government now offers Government

10   Exhibit 599.

11            THE COURT:   Received.

12            (Government's Exhibit 599 received in evidence)

13            MS. KUDLA:   And may we publish to the jury?

14            THE COURT:   Yes.

15   BY MS. KUDLA:

16   Q.   Mr. Julliard, what are we looking at now in Government

17   Exhibit 599?

18   A.   The FTX website page with the product offering, what you

19   could trade with the website.

20   Q.   Now what, if any, of these various products that we see

21   here did you use?

22   A.   I would use the spot trading.

23   Q.   And can you describe for the jury what spot trading is.

24   A.   I would directly trade the instant price of

25   cryptocurrencies on the blockchain.

1   Q.  So using the example of Bitcoin, can you provide an

2   example, a simple example of spot trading.

3   A.  Yes.  I would have funded my account with fiat currency,

4   GBP, Great British Pounds, or US dollars, and with that, I

5   would be able to buy, for instance, one Bitcoin.

6   Q.  Okay.  And then what is the goal after you buy the Bitcoin

7   with that type of trading, later on?

8   A.  I had a pretty simple long-term strategy.  I would

9   accumulate over a period of time Bitcoins and with a view to

10  sell within five to ten years back, hopefully at higher prices.

11  Q.  Now does spot trading involve trading on margin?

12  A.  It does not.

13  Q.  And what is margin trading?

14  A.  I'm not especially, but my understanding, it gives you

15  leverage to commit bigger amounts of funds than you actually

16  have, so you're borrowing money, in a sense.

17  Q.  And Mr. Julliard, to be clear, did you engage in margin

18  trading on the FTX exchange?

19  A.  I would not.

20          MS. KUDLA:  So we can take that down now.

21          And can we please show Mr. Julliard what's marked for

22  identification as Government Exhibit 426.

23  Q.  Mr. Julliard, do you recognize what is shown on your

24  screen?

25  A.  The history of my deposits on FTX.

1                MS. KUDLA:  The government offers Government

2      Exhibit 426.

3                THE COURT:  Any objection?

4                MR. COHEN:  No, your Honor.

5                THE COURT:  Received.

6                (Government's Exhibit 426 received in evidence)

7                MS. KUDLA:  May we publish, your Honor?

8                THE COURT:  Yes.

9      BY MS. KUDLA:

10     Q.  So, Mr. Julliard, you testified that this was your deposit

11     history.  Is this the deposit history shown here from the FTX

12     website or the FTX mobile app?

13     A.  This would be from the mobile app.

14     Q.  And how frequently did you use the FTX mobile app?

15     A.  Certainly daily; probably almost hourly.

16     Q.  And what were you using it for?

17     A.  Well, for trading and monitoring the price change of the

18     crypto monies I was interested in and monitoring the price

19     changes of my portfolio.

20               MS. KUDLA:  Mr. Ahuja, can we please pull up

21     Mr. Julliard's deposit history from April 20, '22, to May 12,

22     2022.

23     Q.  First, to orient the jury, what is USD?

24               THE COURT:  I'm sorry.  Let's just get it clear.  Is

25     Government Exhibit 426 a multiple-page exhibit?

NA41BAN3                          Julliard - Direct

1           MS. KUDLA:  No, it's not, your Honor.  It's a one-page

2      exhibit.

3           THE COURT:  So what are you referring to now?

4           MS. KUDLA:  It is the portion——it's a callout of the

5      deposit history on specific dates.  Do you see that in the

6      middle?  Below GBP, there will be a date, your Honor.

7           THE COURT:  Yes, I see that.

8           MS. KUDLA:  And so all we're doing is calling out the

9      deposit history for a particular period of time, April 2022 to

10     May 12, 2022.

11          MR. COHEN:  Your Honor, I'm not sure I follow.  Is

12     this——

13          THE COURT:  I'm not sure either.

14          MR. COHEN:  Yeah.  Is this a new exhibit?

15          THE COURT:  I'm told that Government 426 is a single

16     page.

17          MS. KUDLA:  Yes, this is a——

18          THE COURT:  Except at the bottom, on the left image on

19     the screen, it says page 6 of 9.

20          MR. COHEN:  That's what I was looking at.

21          THE COURT:  That refers, presumably, to the 3600

22     materials.  So I'm really not a hundred percent clear how the

23     image on the right side of my screen is any different than the

24     image on the left side, other than the fact that the border is

25     different, and I don't know how you're calling out if 426 is a

1   one-page exhibit.  You follow me?

2           MS. KUDLA:  I do, your Honor.  I think I can help.

3   We're just trying to make it larger for the jury to see.  I can

4   ask Mr. Julliard a few questions to clarify.

5           And Mr. Ahuja, could we take down the callout and just

6   show the exhibit.

7           THE COURT:  Okay.

8           MS. KUDLA:  There we go.

9   BY MS. KUDLA:

10  Q.  So Mr. Julliard, to help orient the Court and the jury, how

11  did you have this history shown here?  How did you get this?

12  A.  This would be a screenshot I've taken of my history

13  deposits on my iPhone at the time the app was working.

14  Q.  Okay.  And let's start at the bottom of Government

15  Exhibit 426, where it says GBP, May 19, 2021, that bottom row

16  there.  Mr. Julliard, what is the date?  What do we see there?

17  What does that bottom row represent?

18  A.  This is the very first deposit I made—I made on my FTX

19  account to try out the process and make sure it was functioning

20  correctly for me.

21  Q.  Okay.  And how much money did you deposit at that point in

22  time?

23  A.  This would have been 50 pounds.

24  Q.  Okay.  And then what was the next deposit after that?

25  A.  I transferred some Doge currency.

NA41BAN3                      Julliard - Direct

1    Q.   Okay.  And so are the remaining deposits here

2    deposits——your entire deposit history on FTX?

3    A.   Yes.

4    Q.   Okay.  So at this point in time I'd like to focus on your

5    deposit history that was from April 20, 2022, to May 12, 2022.

6    And what I've done here is just magnified it for you to be able

7    to see.  Can you see it now?

8    A.   Yes.  Thank you.

9    Q.   Okay.  So Mr. Julliard, starting off, what is USD?

10   A.   United States national currency.

11   Q.   Okay.  And then we also see BTC.  What is BTC?

12   A.   This would be cryptocurrency, Bitcoin.

13   Q.   And you've already told us what GBP is.  Now during this

14   time period of April 20, 2022, to May 12, 2022, approximately

15   how much money did you deposit into your FTX account?

16   A.   110,000 pounds.

17   Q.   Now what is the approximate US dollar equivalent of that?

18   A.   The rate varies, but it would be somewhere between 140,

19   $150,000.

20   Q.   Mr. Julliard, was that a significant amount of money for

21   you at this period of time?

22   A.   Huge.

23   Q.   Setting aside trading risk, did you have any major concerns

24   about the safety of depositing your money into your FTX

25   account?

NA41BAN3                        Julliard - Direct

1   A.  No.

2            MS. KUDLA:  Mr. Ahuja, we can take that down now.

3   Q.  Now when you deposited your money into your FTX account,

4   did you see that deposit recorded anywhere?

5   A.  Yes, in the history of deposits.

6            MS. KUDLA:  Could we please show the witness what's

7   marked for identification as Government Exhibit 425.

8   Q.  And, Mr. Julliard, do you recognize this exhibit?

9   A.  Yes.  This would be a screenshot of my portfolio I've taken

10  at some point in time.  I don't know the date.

11           MS. KUDLA:  The government offers Government

12  Exhibit 425.

13           MR. COHEN:  No objection.

14           THE COURT:  Received.

15           (Government's Exhibit 425 received in evidence)

16           MS. KUDLA:  May we publish to the jury?

17           THE COURT:  You may.

18  BY MS. KUDLA:

19  Q.  Mr. Julliard, looking at Government Exhibit 425, where is

20  your FTX account balance shown, if anywhere?

21  A.  On the top left, just on the wallet balance.

22  Q.  Now you mentioned the term "wallet balance."  What is a

23  wallet?

24  A.  It's—it's akin to my account, but it's the aggregated

25  value of all my positions, so fiat currency and cryptocurrency

1   converted to the US dollar rate.

2   Q.  Do you see any difference between the term your "wallet" or

3   your FTX account?

4   A.  I would not.

5   Q.  Now how frequently would you see your FTX wallet balance?

6   A.  Daily.

7   Q.  And when you saw your FTX wallet balance recorded in the

8   manner that we see here, what effect, if any, did it have on

9   you?

10  A.  I was——no effect.  It was the value of my holdings.

11  Q.  Did you have any understanding about whether you could

12  withdraw the money that you see here?

13  A.  Yeah.

14  Q.  And what was your understanding about that?

15  A.  That I could withdraw it at any point in time.

16  Q.  Was the ability to control when you were able to withdraw

17  your deposits at any point in time an important asset to you?

18  A.  Well, it was essential.  I wouldn't put money somewhere if

19  I couldn't take it back with me.

20  Q.  So Mr. Julliard——

21          MS. KUDLA:  And Mr. Ahuja, we could take it back for a

22  moment now.

23  Q.  Let's switch gears for a minute.  You testified earlier

24  that FTX was a cryptocurrency exchange to buy and sell crypto.

25  What was your understanding about how FTX made money?

NA41BAN3                         Julliard - Direct

1    A.   It would charge a fee on each and every single trade.

2    Q.   And did you pay FTX trading fees?

3    A.   Yes.

4    Q.   And when you deposited money into your FTX account, did you

5    expect anyone other than you would use your money?

6    A.   No.

7    Q.   Did you ever agree to lend out your money?

8    A.   Not that I can recall.

9    Q.   Did you expect that anyone would borrow or lend out your

10   money?

11   A.   No, and this is why I refrained from trading certain

12   products that were offering interest rates if you lend your

13   cryptocurrencies.  I would refuse to trade that.

14   Q.   Now I want to focus for a moment.  If another party was

15   borrowing your deposits, the 110,000 Great British Pounds we

16   just looked at, would you have considered that information

17   important to know?

18   A.   Essential.

19   Q.   Why?

20   A.   If I trade, I'm responsible of my own decisions and I bear

21   the consequences.  I had the strategy.  I was prepared for—I

22   knew how it was calculated and for what period of time.  If

23   someone else trades on my behalf, all for themselves and face

24   consequences, that's not the consequences of my actions.  If

25   money is lost, I'm not responsible for it.  That's not what I

NA41BAN3                         Julliard - Direct

1    signed up for.

2    Q.  When you evaluated the risks associated with cryptocurrency

3    trading, did you ever consider the risk that FTX was borrowing

4    your money?

5    A.  I did not.

6    Q.  Mr. Julliard, you mentioned certain products.  Did you ever

7    opt into any FTX trading market that allowed you to lend your

8    deposits to other FTX customers?

9    A.  Not that I can recall.

10   Q.  And did you ever see in your FTX account a reflection of

11   any interest payments that would suggest that your money was

12   being borrowed?

13   A.  Not that I can recall.

14   Q.  Let's focus for a moment.  After opening your FTX account

15   did you continue in any way to follow news about FTX?

16   A.  Yes, alongside general cryptocurrency news.

17   Q.  Did you continue to follow any news about

18   Mr. Bankman-Fried?

19   A.  I would see—I would check daily cryptocurrency dedicated

20   newswires, and it would be many articles on a weekly basis.

21   Q.  During this time period, Mr. Julliard, did you continue to

22   follow FTX on Twitter?

23   A.  I cannot remember when I precisely stopped following the

24   account, but yes.

25   Q.  And you had mentioned previously that you did follow FTX,

NA41BAN3                         Julliard - Direct

1   however, though.

2   A.   Yes.

3   Q.   And that was true with Mr. Bankman-Fried?

4   A.   Yes.

5   Q.   So during the time period after opening your account what

6   types of news did you hear about Mr. Bankman-Fried?

7   A.   Well, it goes to what I said earlier.  He would generally

8   be a leader of the crypto industry and the face of the crypto

9   industry.  I remember some——I remember seeing videos with him

10  and politicians.  I remember him bailing out companies, other

11  cryptocurrency companies, and the——and pledging money to——to

12  help customers that were detrimentally affected by the

13  consequences of that.

14          MR. COHEN:  Your Honor, might we have a limiting

15  instruction about that testimony.

16          THE COURT:  You have to enlighten me a little more

17  about what you want it to be limited to.

18          MR. COHEN:  Yes, that it's——oh, I'm sorry.

19          (Continued on next page)

20

21

22

23

24

25

NA41BAN3                          Julliard – Direct

```
 1              (At the sidebar)
 2              MR. COHEN:  Your Honor, if I heard correctly, he said
 3    he didn't remember what news he heard or followed, and now he's
 4    being asked to give a summary of that.  I assume the
 5    government's not asking that for its truth.  I'm fine with the
 6    testimony, but I would ask for that instruction.  He's giving a
 7    summary of—
 8              THE COURT:  Of what he heard.
 9              MR. COHEN:  Yeah, yeah.
10              MS. SASSOON:  It's being offered for the effect on the
11    listener, so that's fine.
12              THE COURT:  Yes.  Okay.
13              (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25
```

NA41BAN3                      Julliard - Direct

1           (In open court)

2           THE COURT:  This evidence about what Mr. Julliard

3    remembers from seeing videos about bailing out companies and

4    the other things he mentioned is offered not for the truth of

5    the things that he remembers but for the effect on his actions

6    and knowledge at the time.

7           MS. KUDLA:  Thank you, your Honor.

8    BY MS. KUDLA:

9    Q.  Mr. Julliard, you had mentioned a number of items, and I

10   want to go back to them.

11          First, you had mentioned you had seen photographs or

12   articles of Mr. Bankman-Fried with politicians.

13          MS. KUDLA:  At this point in time can we please show

14   for the witness what is marked as Government Exhibit 1469.

15   Q.  Do you recognize the individuals in Government

16   Exhibit 1469?

17   A.  The CEO of FTX to the right, Sam Bankman-Fried; Bill

18   Clinton, a former US president, in the middle; and Tony Blair

19   to the left, our former UK prime minister.

20          MS. KUDLA:  The government offers Government

21   Exhibit 1469.

22          THE COURT:  Received.

23          (Government's Exhibit 1469 received in evidence)

24          MS. KUDLA:  May we publish to the jury?

25          THE COURT:  You may.

NA41BAN3                    Julliard - Direct

1   BY MS. KUDLA:

2   Q.  Now, Mr. Julliard, you had also mentioned that you heard

3   about Mr. Bankman-Fried bailing out other cryptocurrency

4   companies at that time.  What effect, if any, did hearing this

5   news, seeing who Mr. Bankman-Fried was with, have on you, if

6   any, at all?

7   A.  Well, one of two.  You believe that the person wanted to do

8   good towards people and the industry, so it goes to building

9   your faith in the company and the CEO; and two, I—I don't

10  precisely recall details of—of the—the collapse of Terra and

11  Luna at the time, cryptocurrency-related firms, but my

12  understanding is it was significant amounts of money and

13  therefore that FTX would have excess liquidities and would be

14  in strong financial health.

15          MS. KUDLA:  We could take that down now.  Thank you

16  very much.

17  Q.  Mr. Julliard, I'd like to turn your attention now to

18  November 2022.  Did there come a point in November 2022 when

19  you learned that FTX was receiving increased customer

20  withdrawals?

21  A.  Yes.

22  Q.  Now at this time what were the forms of information that

23  you were learning?  Like how were you learning about this?

24  A.  I use professional newswires systems, such as Bloomberg; I

25  had a number of news outlets with cryptocurrency-related

NA41BAN3                         Julliard - Direct

1   topics; I would be on social media such as Twitter; and I would

2   also, as I mentioned earlier, go on specialized newswires, such

3   as CoinDesk, for instance.

4   Q.  And when you mentioned social media such as Twitter, did

5   that include Mr. Bankman-Fried's Twitter feed?

6   A.  Yes.

7            MS. KUDLA:  And the government offers, pursuant to the

8   stipulation in Government Exhibit S-2001, Government

9   Exhibit 863.

10           THE COURT:  Received.

11           (Government's Exhibit 863 received in evidence)

12           MS. KUDLA:  May we publish to the jury, your Honor?

13           THE COURT:  You may.

14  BY MS. KUDLA:

15  Q.  Mr. Julliard, looking at the top, who posted this tweet?

16  A.  SBF account.

17  Q.  And who is SBF?

18  A.  FTX CEO, Sam Bankman-Fried.

19  Q.  And what is the date of this tweet?

20  A.  November the 6th, 2022.

21           MS. KUDLA:  Can we please zoom in on No. 3.

22           November——SBF, November 6, 2022.  "3.  We've already

23  processed billions of dollars of deposits withdrawals today.

24  We'll keep going.  Taking up antispam checks to process more.

25  Sorry if you got those.  We're hitting node rate capacities.

NA41BAN3                         Julliard - Direct

1   We'll keep going.  Also tons of USD stable coin conversions

2   going on."

3              Did you see this tweet, Mr. Julliard?

4   A.  Yes.

5   Q.  And what did you understand from this tweet about the

6   reasons for the slow withdrawals on FTX?

7   A.  Technical computing difficulties.

8   Q.  Was there any indication from what's written here that

9   there was a shortfall in customer funds?

10  A.  No.

11  Q.  Did you withdraw your money from your FTX account on

12  November 6, 2022?

13  A.  No, I did not.

14             MS. KUDLA:  And can we please take that down now.

15             And pursuant to Government Exhibit S-2001 as to

16  authenticity, the government offers Government Exhibit 866.

17             THE COURT:  Received.

18             (Government's Exhibit 866 received in evidence)

19             MS. KUDLA:  May we publish to the jury, your Honor?

20             THE COURT:  Yes.

21  BY MS. KUDLA:

22  Q.  And Mr. Julliard, who posted this tweet?

23  A.  Sam Bankman-Fried.

24  Q.  And recognizing it's a little bit harder to read, what is

25  the date of this tweet?

NA41BAN3                          Julliard - Direct

1    A.  November 7th.

2    Q.  Now is that of 2022?

3    A.  Yes.

4    Q.  Did you see this tweet?

5    A.  Absolutely.

6    Q.  We're going to zoom in on No. 1.

7            "A competitor is trying to go after us with false

8    rumors.

9            "FTX is fine.  Assets are fine."

10           Can we please zoom in on No. 2.

11           "2.  FTX has enough to cover all client holdings.

12           "We don't invest client assets (even in treasuries).

13   We have been processing all withdrawals, and will continue to

14   be."

15           Can we now pull up No. 3.

16           "3.  It's heavily regulated.  Even when that slows us

17   down, we have gap audits with greater than 1 billion excess

18   cash.  We have a long history of safeguarding client assets,

19   and that remains true today."

20           Mr. Julliard, what did you understand about your FTX

21   deposits from this series of tweets?

22   A.  Money was there, it was fine, technical—technical

23   difficulties, wait for the dust to settle, just sit and wait.

24   Q.  Did you withdraw your money on November 7th?

25   A.  I did not.

NA41BAN3                         Julliard - Direct

1   Q.  Did you ever attempt to withdraw your money?

2   A.  Yes.

3   Q.  And when?

4   A.  I believe the day after that.

5            MS. KUDLA:  Can we please show for the witness what is

6   marked for identification as Government Exhibit 427.

7   Q.  Mr. Julliard, do you recognize this?

8   A.  Yes.  It's a screenshot of my phone app of my withdrawals

9   attempt.

10           MS. KUDLA:  Now the government offers Government

11  Exhibit 427.

12           THE COURT:  Received.

13           (Government's Exhibit 427 received in evidence)

14           MS. KUDLA:  May we publish?

15           THE COURT:  Yes.

16  BY MS. KUDLA:

17  Q.  Mr. Julliard, do you see your first withdrawal attempt

18  anywhere on Government Exhibit 427?

19  A.  Yes, I would have—so I was keeping fiat USD currency on my

20  account for the purpose of having more trading power to buy

21  cryptocurrencies if the prices were coming off, so I could add

22  to my Bitcoin position.  I first tried—when I understood the

23  situation was not what it seems, I first tried to withdraw the

24  fiat currency, which isn't the easiest process of the two.

25  Q.  And what was the date of your first withdrawal attempt?

1    A.  8 of November 2022.

2    Q.  And how much did you request to withdraw?

3    A.  About $20,000.

4    Q.  Was the request that we see highlighted on the screen, was

5    that request processed?

6    A.  It was never processed.

7    Q.  How did it make you feel when it was not processed?

8    A.  Extremely anxious.

9    Q.  And did you make any other subsequent attempts?

10   A.  Yes.  I then went on to try and withdraw Bitcoin, but

11   because I wasn't clear whether it was technical difficulties or

12   indeed missing money, I——I wanted to spread my transactions and

13   not do all at once, so I went on to try and withdraw one

14   Bitcoin on the same day I tried to withdraw the US dollars.

15   Q.  Was that request processed?

16   A.  It was never processed.

17   Q.  Now looking at Government Exhibit 427, what was the

18   approximate amount of Bitcoin valued at at that time?

19   A.  I don't know the exact amounts on that particular day, but

20   Bitcoin was ranging around $20,000.

21   Q.  And in November of 2022, how many Bitcoin did you have in

22   your account?

23   A.  Four.

24   Q.  And how much US dollars did you have in your account?

25   A.  $20,000.

NA41BAN3                    Julliard - Cross

1   Q.  So fair to say about a hundred thousand dollars?

2   A.  Yes.

3   Q.  Were any of the withdrawal requests that we see in

4   Government Exhibit 427 processed?

5   A.  Never.

6   Q.  And as we sit here today, have you ever been able to

7   withdraw your FTX customer deposits that we see?

8   A.  Never.

9           MS. KUDLA:  Your Honor, no further questions on

10  direct.

11          THE COURT:  Thank you.

12          Cross-examination?

13  CROSS EXAMINATION

14  BY MR. COHEN:

15  Q.  Good afternoon, Mr. Julliard.

16  A.  Good afternoon.

17  Q.  Now you and I have never met; is that correct?

18  A.  Correct.

19  Q.  And you told us on your direct that you are originally from

20  Paris; is that right?

21  A.  Yes, Paris suburb.

22  Q.  Okay.  And you're a French citizen?

23  A.  I am.

24  Q.  But you now work for a—you've moved to London; is that

25  correct?

NA41BAN3                          Julliard - Cross

1    A.  Yes.

2    Q.  And you work as a broker in commodities.

3    A.  Yes.

4    Q.  Okay.  Are you a licensed broker?

5    A.  I am regulated, yes.

6    Q.  Okay.  And you said I believe that you——the commodity you

7    work in is cocoa; is that correct?

8    A.  Correct.

9    Q.  Okay.  And commodities can be things like cocoa or corn or

10   other products, correct?

11   A.  Yes.

12   Q.  Okay.  Help me understand how you interact with your

13   customers.

14             MS. KUDLA:  Objection.

15             THE COURT:  Grounds?

16             MS. KUDLA:  Relevance.

17             MR. COHEN:  Your Honor, this is to follow up on the

18   direct about his job as a broker.  I just want to understand

19   whether he has direct client contact, which was not brought out

20   on direct.

21             THE COURT:  Why don't you ask that question.

22   BY MR. COHEN:

23   Q.  I think I'll ask whether you have direct contact with your

24   clients.

25             THE WITNESS:  Can I answer?

NA41BAN3                         Julliard – Cross

1          THE COURT:  Oh, yes.  I'm sorry.

2   A.  Yes, I do have direct contact with my clients.

3   Q.  And you advise them on commodity purchases they're

4   considering making; is that correct?

5          MS. KUDLA:  Objection.

6          THE COURT:  Sustained.

7   Q.  Now you told us that you opened an account at FTX in, if I

8   have this right, the spring of 2021?

9   A.  Yes.

10  Q.  Okay.  You thought FTX had a good product, correct?

11  A.  Absolutely.

12  Q.  That it was innovative?

13  A.  I don't know about innovative, but I liked the user

14  interface of the product.

15  Q.  You thought it had a strong trading platform.

16  A.  Yes.

17  Q.  That it was user friendly.

18  A.  Yes.

19  Q.  That it had a good fee structure.

20  A.  Yes.

21  Q.  And I think you told us that you were a little bit late to

22  the crypto market; is that correct?

23  A.  Yes.

24  Q.  And you told us that crypto was not regulated.

25  A.  It was not regulated by governments of——that's correct.

NA41BAN3                          Julliard - Cross

1    Q.  And in fact, sir, isn't that one of the reasons you wanted

2    to put funds into the crypto market?

3    A.  I was allowed to trade cryptocurrencies because they were

4    not regulated.

5    Q.  Right.  So just to understand this, at the company you

6    worked for, you were able to trade crypto because it wasn't

7    regulated.

8    A.  Correct.

9    Q.  If you had traded in things that were regulated, you would

10   have had to make disclosures to your company and get them

11   approved.

12   A.  Yes, correct.

13   Q.  And you understood that crypto was new and also a risky

14   asset, didn't you, sir?

15   A.  Yes.

16   Q.  You could make a lot but you could lose a lot.

17   A.  Yes.

18   Q.  Now you had other accounts, right?  You had a savings

19   account, you had other brokerage accounts?

20   A.  I have a bank account, a couple.

21   Q.  Do you have any other investment accounts?

22            MS. KUDLA:  Objection.

23            THE COURT:  Basis?

24            MS. KUDLA:  Relevance.

25            THE COURT:  I'll allow it.  We'll see where it goes.

NA41BAN3                          Julliard - Cross

1   A.  I have what we call an ISA in England, United Kingdom.

2   It's an investment account akin to preparing for your

3   retirement.

4   Q.  I'm sorry, sir.  I didn't—

5   A.  Used to prepare for your retirement.

6   Q.  So, okay.  I think we might call it a 401(k) here, but

7   okay.

8           So you had that account and you had a savings account,

9   and then you told us you opened a crypto account.

10  A.  Yes.

11  Q.  And how much of your assets did you put in the crypto

12  account, percentagewise?

13  A.  I don't know.  I cannot answer that.

14  Q.  Okay.  Is it fair to say that you put 70 percent of your

15  savings into this crypto account?

16  A.  I don't know in British pounds how much I had in there.  It

17  would be a significant amount of my savings, yes.

18  Q.  Now I think on direct you were shown the slide—I don't

19  think we have to put it up again—where you checked the box

20  that you had received the terms of service for FTX, correct,

21  sir?

22  A.  Yes, correct.

23  Q.  Now you didn't review those at the time, correct?

24  A.  Not that I can recall.

25  Q.  Okay.  And I think you also were asked some questions about

NA41BAN3                        Julliard - Cross

1   advertisements.  Do you recall we saw the advertisement of the

2   model you called Gisele?  Do you recall that, sir?

3   A.  Sorry.  Can you repeat the question.

4   Q.  Sure.  Let me try a better question.

5          You testified on direct about some advertisements for

6   FTX that you saw, correct?

7   A.  Yes.

8   Q.  Okay.  And one of them was the photo we saw of the model,

9   the fashion model advertising FTX.

10  A.  Yes.

11  Q.  Okay.  Now you're not saying you made an investment

12  decision based on a model, an ad with a model in it, are you,

13  sir?

14  A.  Correct, I'm not saying that.

15  Q.  You certainly didn't make an investment decision based on a

16  Formula One car racing advertisement, correct?

17  A.  Not investment decision.

18  Q.  Now you also mentioned that one of the things that you

19  looked at when you were deciding whether to select FTX was you

20  said that other investors——or excuse me——investors had invested

21  in FTX.  Do you recall that, sir?

22  A.  So I——I misphrased if I said that.  I meant there were many

23  customers not investing into FTX the company but using FTX the

24  exchange as customers.

25  Q.  Let me try a better question.  I think——correct me if I'm

NA41BAN3                    Julliard - Cross

1    wrong——you told us that one of the things you looked at was

2    that major firms, major investment firms had invested in FTX;

3    is that right?

4    A.  Yes, correct.

5    Q.  Okay.  And I believe you told us that this was a factor you

6    considered because those firms did what you called due

7    diligence, correct?

8    A.  Yes.

9    Q.  So they asked FTX questions about what it was doing and

10   they got their answers and they were satisfied, correct?

11          MS. KUDLA:  Objection.

12          THE COURT:  Sustained.

13   Q.  You took comfort from the fact that other investors had

14   looked at FTX, correct, sir?

15          THE COURT:  Sustained.

16   Q.  Now let me move forward to the period in November——

17          THE COURT:  Let me see if I can just help out a little

18   bit.

19          You took comfort from the fact that, as you understood

20   it, other people had invested, and you assumed that they had

21   done their homework; is that right?

22          THE WITNESS:  It was contributory, yes, correct, on

23   top of doing some of my own research.

24          THE COURT:  Okay.  Go ahead, please.

25   BY MR. COHEN:

NA4MBAN4                          Julliard - Cross

Q.   Okay.  You talked about the dates November 6th and 7th and

November 8th.  Do you recall that testimony, sir?

A.   Yes.

Q.   And you told us you had some issues with your withdrawals

then, correct?

        MS. KUDLA:  Objection.

        THE COURT:  Sustained as to form.

Q.   Let me rephrase.

        Before November of 2022, did you ever try to withdraw

funds from FTX?

A.   I did not.

        MR. COHEN:  Your Honor, one moment?

        (Continued on next page)

NA4MBAN4                    Julliard - Redirect

1  Q.  Sir, is it fair to say that you never met my client in

2  person before today?

3  A.  Correct.

4  Q.  You have never spoken to him in person before today?

5  A.  Never.

6  Q.  You have never emailed with him before today?

7  A.  Never.

8          MR. COHEN:  Your Honor, I have nothing further.

9          THE COURT:  Thank you.

10         Is there any redirect?

11         MS. KUDLA:  Your Honor, just very briefly.

12  REDIRECT EXAMINATION

13  BY MS. KUDLA:

14  Q.  Mr. Julliard, you were asked about cryptocurrency being

15  risky on cross-examination.

16         Do you recall that?

17  A.  Yes.

18  Q.  Is that because the price of Bitcoin could fluctuate very

19  quickly?

20  A.  It's a very volatile asset.

21  Q.  Did you ever consider one of the risks of FTX was that they

22  could take your money and spend your money?

23  A.  I did not.

24  Q.  And who did you believe owned the Bitcoin and dollars in

25  your FTX account?

NA4MBAN4                    Julliard - Redirect

1    A.  Myself.

2              MS. KUDLA:  No further questions, your Honor.

3              THE COURT:  Thank you.  Anything further, Mr. Cohen?

4              MR. COHEN:  No, your Honor.

5              THE COURT:  Thank you, Mr. Julliard.

6              THE WITNESS:  Thank you.

7              (Witness excused)

8              THE COURT:  Anybody on the jury who needs a break or

9    shall we just go?

10             Let's continue.

11             MS. SASSOON:  Your Honor, there is a computer issue

12   that we would like to address, so a five-minute break --

13             THE COURT:  Take a short break.

14             (Jury not present)

15             THE COURT:  Ms. Sassoon, I assume that there is

16   agreement on how far in advance you are disclosing your

17   witnesses to the defense.

18             MS. SASSOON:  Yes, your Honor.  We disclosed to the

19   defense --

20             THE COURT:  Do you think I could be privy to the

21   understanding so I know what's coming?

22             MS. SASSOON:  Your Honor, that is a very reasonable

23   request.  Absolutely.

24             So the next witness is Adam Yedidia.  Subsequent to

25   Mr. Yedidia, I suspect we will be calling Matt Huang.  And

NA4MBAN4                          Yedidia - Direct

1   after Matt Huang, Gary Wang, and that will likely take us to

2   the end of this week.

3           THE COURT:  Thank you.  Keep me posted as we move

4   along, please.

5           (Recess)

6           THE COURT:  Ready to bring your witness in?

7           MS. SASSOON:  The government calls Adam Yedidia.

8           (Jury present)

9           THE COURT:  Your next witness, Ms. Sassoon.

10          MS. SASSOON:  Yes.  The government calls Adam Yedidia.

11          THE COURT:  Swear the witness, please.

12  ADAM YEDIDIA,

13       called as a witness by the Government,

14       having been duly sworn, testified as follows:

15          THE COURT:  You may proceed, Ms. Sassoon.

16          MS. SASSOON:  Thank you, your Honor.

17  DIRECT EXAMINATION

18  BY MS. SASSOON:

19  Q.  Good afternoon, Mr. Yedidia.

20  A.  Good afternoon.

21  Q.  How do you know Sam Bankman-Fried?

22  A.  We were longtime friends.  We met in college.

23  Q.  In college were you friends?

24  A.  Yes.  We were close friends.

25  Q.  How about after college?

1    A.  We remained friends.

2    Q.  Were there times that you and Mr. Bankman-Fried lived

3    together?

4    A.  Yes.

5    Q.  Did you also work together?

6    A.  Yes.

7    Q.  Where were you working a year ago?

8    A.  A year ago I worked for FTX.

9    Q.  What was FTX?

10   A.  FTX was a cryptocurrency exchange.

11   Q.  What is a cryptocurrency exchange?

12   A.  A cryptocurrency exchange is a website where people can go

13   in order to buy and sell cryptocurrency from each other.

14   Q.  Who ran FTX?

15   A.  Sam Bankman-Fried.

16   Q.  Did you ever work for Sam Bankman-Fried at another company?

17   A.  Yes.

18   Q.  What company?

19   A.  Alameda Research.

20   Q.  What was Alameda Research?

21   A.  It was a cryptocurrency trading firm.

22   Q.  Do you see Sam Bankman-Fried in the courtroom today?  And

23   there are a lot of people.  So if you need to stand up to

24   survey the courtroom, take your time.

25   A.  I see him.

NA4MBAN4                        Yedidia - Direct

1   Q.  Can you point him out by where he's sitting and an article

2   of clothing that he is wearing.

3   A.  Yes.  He's right there.  He's wearing a suit with a purple

4   tie.

5          MS. SASSOON:  Let the record reflect that the witness

6   has identified the defendant, Sam Bankman-Fried.

7          THE COURT:  Yes.

8   Q.  Before you saw the defendant today, when was the last time

9   that you saw him?

10  A.  The last time I saw him was early November 2022.

11  Q.  Have you spoken to him since then?

12  A.  No.

13  Q.  Are you still working at FTX?

14  A.  No.

15  Q.  AND when did you stop working at FTX?

16  A.  I stopped working in early November 2022, the Thursday of

17  the week when the company went bankrupt.

18  Q.  Why did you stop talking to the defendant and working at

19  FTX in November of 2022?

20  A.  That day I received a phone call from another developer at

21  the company in which I learned that FTX --

22          THE COURT:  Hold it right there.

23          MS. SASSOON:  The question is being asked to explain

24  the witness' subsequent actions.

25          MR. EVERDELL:  Hearsay objection.

1          THE COURT:  Members of the jury, the answer here is to

2    be received not for the truth of whatever, if anything, this

3    other person told the witness unless I otherwise instruct you

4    in the course of the trial, but to understand why the witness

5    did what he did, if anything.

6    Q.  At a general level, Mr. Yedidia, can you explain why you

7    stopped talking to the defendant and working at FTX in November

8    of 2022?

9    A.  I learned that Alameda Research had used customer -- FTX

10   customer deposits to pay back its loan to creditors.

11   Q.  After you learned that, what did you do?

12   A.  I resigned.

13   Q.  Do you know what happened to FTX shortly after you

14   resigned?

15   A.  It went bankrupt.

16   Q.  Mr. Yedidia, have you ever testified in court before?

17   A.  No.

18   Q.  Did you receive a subpoena requiring you to be here in

19   court today?

20   A.  No.

21   Q.  Are you aware whether your lawyer was provided a subpoena

22   requiring your testimony?

23   A.  I am not certain.

24   Q.  Are you testifying under an immunity order from the Court?

25   A.  Yes.

NA4MBAN4                        Yedidia - Direct

1    Q.  What do you understand an immunity order does?

2    A.  It protects me from being prosecuted on the basis of my

3    testimony.

4    Q.  And in order to be protected by the immunity order, what do

5    you understand you must do in court today?

6    A.  I must tell the truth.

7    Q.  And if you don't tell the truth, can you be prosecuted for

8    lying under oath?

9    A.  Yes.

10   Q.  Do you have any agreements with the government about your

11   testimony here today?

12   A.  No.

13   Q.  Are you willing to testify at trial without receiving an

14   immunity order from the Court?

15   A.  No.

16   Q.  Why did you believe you needed immunity?

17   A.  I was concerned that as a developer at FTX I may have

18   unwittingly written code that contributed to the commission of

19   a crime.

20   Q.  I want to turn to your personal background, Mr. Yedidia.

21         Where did you go to college with the defendant?

22   A.  MIT.

23   Q.  What year did you graduate?

24   A.  I graduated in 2014.

25   Q.  How did you meet the defendant at MIT?

1  A.  We lived together at a living group -- we met at that

2  living group.

3  Q.  I believe you touched on this, but what was the nature of

4  your friendship while you were in college?

5  A.  It was a close friendship.

6  Q.  What did the defendant do professionally after college?

7  A.  He went to go work at Jane Street.

8  Q.  What is Jane Street?

9  A.  It's a trading firm.

10 Q.  So the defendant went into finance.  What did you do?

11 A.  I began a Ph.D.

12 Q.  Did your professional paths cross after that, Mr. Yedidia?

13 A.  Yes.

14 Q.  When was that?

15 A.  It was in late 2017, I went to go work for Alameda Research

16 for two months.

17 Q.  What was Alameda Research?

18 A.  It was a cryptocurrency trading firm.

19 Q.  Had the defendant started Alameda Research?

20 A.  Yes.

21 Q.  If I refer to Alameda Research sometimes as Alameda, will

22 you know what I'm talking about?

23 A.  Yes.

24 Q.  About how long had Alameda existed when you went to work

25 there?

1   A.   I think about six months.

2   Q.   When you worked there, what was the defendant's role at

3   Alameda?

4   A.   He was the co-CEO.

5   Q.   What did you do at Alameda when you worked there?

6   A.   I was a trader.

7   Q.   And what does it mean to be a trader?

8   A.   It means that you trade things.  You buy and sell

9   cryptocurrencies.

10  Q.   Why did you stop working at Alameda?

11  A.   I wanted to return to my Ph.D. studies.

12  Q.   Did you do that?

13  A.   Yes.

14  Q.   And did there come a time when you went to work for the

15  defendant again?

16  A.   Yes.

17  Q.   Around when was that?

18  A.   January 2021.

19  Q.   How did it come about that you went back to work with the

20  defendant in January 2021?

21  A.   I had a phone call with him in which he invited me to

22  become a software developer at FTX.

23  Q.   And did you go work as a software developer at FTX?

24  A.   Yes.

25  Q.   I want to talk more about your work, but, first, I want to

1    spend some time with you talking about FTX and what it is and

2    how it worked.

3             What is a cryptocurrency exchange?

4    A.  A cryptocurrency exchange is a website where people can go

5    to buy and sell cryptocurrencies from each other.

6    Q.  What is cryptocurrency?

7    A.  Cryptocurrency is a form of digital currency which in most

8    cases is decentralized, which means that the currency exists

9    across many different computers rather than a single one.

10   Q.  Can you give us some examples of popular cryptocurrencies.

11   A.  Bitcoin, Ethereum, Solana are all popular cryptocurrencies.

12            MS. SASSOON:  At this time the government offers

13   Government Exhibit 1566, which is a video called Get To Know

14   Crypto, full version, which paragraph 3 of a stipulation

15   between the parties at Government Exhibit 2000 notes was posted

16   on FTX's home page.

17            MR. EVERDELL:  No objection.

18            THE COURT:  It's received.

19            (Government Exhibit 1566 received in evidence)

20            MS. SASSOON:  Mr. Ahuja, if you could please play

21   Government Exhibit 1566 for the jury, which is called Get To

22   Know Crypto.

23            (Video played)

24   Q.  Mr. Yedidia, did you recognize the cartoon man in the blue

25   T-shirt in this video?

1    A.  Yes.

2    Q.  Who was that?

3    A.  Sam Bankman-Fried.

4    Q.  Generally, was the defendant the public face of FTX?

5    A.  Yes.

6    Q.  As far as you were aware, was he involved in the public

7    marketing of FTX?

8    A.  Yes.

9    Q.  How would you describe his role?

10   A.  I would say he was highly involved in marketing and grand

11   strategy, for lack of a better term.

12   Q.  Do you remember him being featured in the press?

13   A.  Yes.

14           MS. SASSOON:  Mr. Ahuja, did you could please show the

15   witness Government Exhibit 1471.

16   Q.  Do you recognize this?

17   A.  Yes.

18   Q.  What is this?

19   A.  This is Sam Bankman-Fried on the cover of Forbes.

20           MS. SASSOON:  The government offers Government Exhibit

21   1471.

22           MR. EVERDELL:  No objection.

23           THE COURT:  Received.

24           (Government Exhibit 1471 received in evidence)

25           MS. SASSOON:  Mr. Ahuja, if you could publish this for

1   the jury.

2   Q.  Mr. Yedidia, now that the jury has the benefit of seeing

3   the exhibit, can you describe what this is.

4   A.  This is Sam Bankman-Fried on the cover of Forbes.

5   Q.  Do you remember around when this was published?

6   A.  I think it was published sometime in 2022.

7   Q.  Did FTX also have advertisements in order to attract

8   customers?

9   A.  Yes.

10  Q.  Did you ever see any advertisements that emphasized the

11  trust or safety of FTX?

12  A.  Yes.

13          MS. SASSOON:  At this time the government offers

14  Government Exhibits 900 and 905 pursuant to stipulation

15  Government Exhibit 2000.

16          THE COURT:  They are received.

17          (Government Exhibits 900 and 905 received in evidence)

18          MS. SASSOON:  Mr. Ahuja, if you could please play

19  Government Exhibit 900.

20          (Video played)

21  Q.  In this video who said that FTX is the safest and easiest

22  way to trade crypto?

23  A.  Tom Brady.

24          MS. SASSOON:  Mr. Ahuja, if you could please pull up

25  Government Exhibit 905 and play the first 20 seconds.

NA4MBAN4                        Yedidia - Direct

1          (Video played)

2          MS. SASSOON:  If you could play a few more seconds of

3    the video, please.

4          (Video played)

5          MS. SASSOON:  Please hit pause, Mr. Ahuja.

6    Q.  Do you recognize this?

7    A.  Yes.

8    Q.  What is this?

9    A.  This is a Super Bowl ad.

10   Q.  Who did you recognize in the Super Bowl ad?

11   A.  Larry David.

12   Q.  Did you see this commercial, this Super Bowl ad, around the

13   time of the Super Bowl?

14   A.  Yes.

15         MS. SASSOON:  If we could please play to the end of

16   Government Exhibit 905.

17         (Video played)

18         THE COURT:  Just to make sure we are all complete, who

19   is Tom Brady?

20         THE WITNESS:  He's a professional football player.

21   Q.  You're anticipating my next question, which is, who is

22   Larry David?

23   A.  He's a comedian.

24   Q.  Did you hear on that commercial of Larry David and FTX

25   being a safe and easy way to trade crypto?

NA4MBAN4                        Yedidia - Direct

1          MR. EVERDELL:  Objection.

2          THE COURT:  Sustained.

3          MS. SASSOON:  Your Honor, the audio of the recording

4     is not going to be in the transcript, so it's for clarity of

5     the record.

6          THE COURT:  The audio -- I withdraw the ruling.

7          Answer the question, please.

8     Q.  Did you hear in the commercial with Larry David FTX being

9     described as a safe and easy way to trade crypto?

10    A.  Yes.

11    Q.  If a customer wanted to trade on FTX, how did people go to

12    the exchange?

13    A.  They visited the website.

14    Q.  And what website is that?

15    A.  FTX.com.

16         MS. SASSOON:  At this time the government offers

17    screenshots from the FTX website, Government Exhibits 568, 582,

18    583, 589, 594.  This is pursuant to the stipulation, Government

19    Exhibit 2000, which states that these exhibits are true and

20    correct copies of materials that were available on the FTX

21    website.

22         THE COURT:  They are all received.

23         (Government Exhibits 568, 582, 583, 589, and 594

24    received in evidence)

25         MS. SASSOON:  Mr. Ahuja, if we could begin by pulling

1   up Government Exhibit 599.

2            THE COURT:  Do you mean 589?

3            MS. SASSOON:  599 I believe is already in evidence.

4            THE COURT:  Thank you.

5   Q.  Mr. Yedidia, were you familiar with the FTX website?

6   A.  Yes.

7   Q.  What is this that we are looking at?

8   A.  I believe this is the front page of the website.

9   Q.  Where were FTX's customers located?

10  A.  All over the world.

11  Q.  Was FTX.com the main website for the FTX exchange?

12  A.  Yes.

13  Q.  And as far as you know, did FTX.com, the main exchange

14  website, have some customers that were based in the United

15  States?

16  A.  Yes.

17  Q.  What types of customers based in the United States were you

18  aware of that were permitted to trade on FTX.com?

19  A.  Institutions that were based in the United States but had

20  entities outside the United States I believe were allowed on

21  FTX.com, assuming they were trading with their other entities.

22           MR. EVERDELL:  Objection, your Honor.

23           THE COURT:  What's the objection?

24           MR. EVERDELL:  Seems to be based on a belief rather

25  than actual knowledge.

1          MS. SASSOON:  Your Honor, he worked at the company.

2          THE COURT:  Let's do a foundation, please.

3   Q.  Mr. Yedidia, in the course of working at FTX, did you learn

4   about customers at the exchange?

5   A.  Yes.

6   Q.  How did you learn about the types of customers that traded

7   on the FTX exchange?

8   A.  In the course of working at the company, it was natural to

9   see what customers were doing.  As a developer I needed to fix

10  bugs sometimes which could relate to customers, and then I

11  would see that those customers existed.

12  Q.  In the course of performing your duties you learned things

13  about FTX customers?

14          MR. EVERDELL:  Objection.

15          THE COURT:  Overruled.

16  A.  Correct.

17  Q.  Did that sometimes include information about where the

18  customers were located?

19  A.  Yes.

20  Q.  Including information about customers that had offices in

21  the United States?

22  A.  Yes.

23  Q.  Can you please explain again what types of customers with a

24  connection to the United States were permitted to trade on FTX?

25  A.  I believe that institutions that had entities that were

1   offshore were permitted to trade --

2           MR. EVERDELL:  Objection, your Honor.

3           THE COURT:  Is that a conclusion you drew from data

4   and code that you saw, Mr. Yedidia?

5           THE WITNESS:  I'm thinking.  Yes.

6           THE COURT:  I'll allow it.

7   Q.  To trade on FTX, did a customer need an online account?

8   A.  Yes.

9   Q.  If we can look at Government Exhibit 587, which is in

10  evidence, what is this?

11  A.  This is the sign-up dialogue.

12  Q.  When you say sign-up dialogue, is this a step for a

13  customer to create an account on the website?

14          MR. EVERDELL:  Objection.  Leading.

15          THE COURT:  Sustained.

16  Q.  Can you explain what you meant by that.

17  A.  This is a dialogue that a customer could use to sign up for

18  an account on the exchange.

19  Q.  What is the box below email and password?

20  A.  It's a check box that is labeled, I agree with the FTX

21  terms of service.

22  Q.  Did a customer have to accept the terms of service to open

23  an account?

24  A.  Yes.

25          THE COURT:  Explain what you mean by accept the terms

NA4MBAN4                        Yedidia - Direct

1   of service, please, Mr. Yedidia.

2               THE WITNESS:  Yes, your Honor.  A customer had to

3   click the check box so that it displayed a checkmark before

4   pressing the create-an-account button.

5               THE COURT:  Are you familiar with the code underlying

6   the website as to whether or not it was necessary for the

7   customer or putative customer, hopeful customer to read or look

8   at the terms of services before clicking the box?  Do you know?

9               THE WITNESS:  I'm not certain at this moment.

10              THE COURT:  Go ahead.

11              MS. SASSOON:  At this time I would ask to approach the

12  witness with a binder of materials.

13              THE COURT:  Yes.

14  Q.  Mr. Yedidia, I've handed you a binder of materials.  Do you

15  recognize it?

16  A.  Yes.

17  Q.  Does it have your initials on it?

18  A.  Yes.

19  Q.  What does this binder contain?

20  A.  It contains pictures of the apartment in which I lived

21  while I was in the Bahamas.

22  Q.  Have you reviewed the material in this binder prior to your

23  testimony?

24  A.  Yes.

25  Q.  Are the photographs of your apartment in the Bahamas

NA4MBAN4                        Yedidia - Direct

1    accurate depictions of that apartment?

2    A.  I recognize them, yes.

3            MS. SASSOON:  The government offers Government

4    Exhibits 1500, 1501, 1509, 1510, and 1530 through 55.

5            MR. EVERDELL:  Subject to the Court's prior ruling on

6    this, no objection.

7            THE COURT:  They are received.

8            (Government Exhibits 1500, 1501, 1509, 1510, and

9    1530-1555 received in evidence)

10   Q.  Mr. Yedidia, when did you live in the Bahamas?

11   A.  I lived in the Bahamas from I think around October 2021

12   until November 2022.

13   Q.  These photographs I have handed you, are those pictures of

14   an apartment that you lived in in the Bahamas?

15   A.  Yes.

16   Q.  Who did you live in that apartment with?

17   A.  I lived in that apartment with nine other people, one of

18   whom was Sam Bankman-Fried.

19   Q.  The remaining individuals who lived in that apartment, were

20   they also employees of the defendant?

21   A.  Yes.

22   Q.  What is your understanding of how much that apartment cost?

23   A.  As I recall, I believe it costs around $35 million.

24   Q.  Who purchased the apartment?

25   A.  Sam did or --

1              MR. EVERDELL:  Objection.

2              THE COURT:  What's the objection?

3              MR. EVERDELL:  Seems like he is not certain of this.

4    He just hesitated.

5              THE COURT:  You can cross-examine him about that.

6    Q.  Mr. Yedidia, you hesitated.  Do you want to explain why?

7    A.  Yes.  I believe it's Alameda who purchased the apartment at

8    Sam's direction.

9              MS. SASSOON:  Mr. Ahuja, if you could publish

10   Government Exhibit 1501.

11   Q.  Mr. Yedidia, what are we looking at here?

12   A.  This is a photograph of the orchid, which is the

13   building -- top floor of this building was the apartment in

14   which I lived.

15   Q.  Just to be clear, is this the apartment you were just

16   describing in which you lived with the defendant?

17   A.  That's correct.

18   Q.  Where was your apartment located in this photograph?

19   A.  The top floor of the building that we see in the front.

20             MS. SASSOON:  Mr. Ahuja, if you could publish

21   Government Exhibit 1509.

22   Q.  What's depicted in this photograph, Mr. Yedidia?

23   A.  That's the interior of the apartment.

24             MS. SASSOON:  Mr. Ahuja, if you could please publish

25   Government Exhibit 1545.

NA4MBAN4

1    Q.   What is this, Mr. Yedidia?

2    A.   That's the balcony.

3    Q.   At the time that you moved into this apartment, were you

4    already living in the Bahamas?

5    A.   Yes.

6    Q.   And were you already working at FTX?

7    A.   Yes.

8    Q.   Did you remain working at FTX because the defendant

9    purchased this apartment?

10   A.   No.

11          MS. SASSOON:  Your Honor, I see it's about 4:30.  This

12   would be a natural breaking point.

13          THE COURT:  We will break now.  See you folks 9:30

14   tomorrow morning.  Thank you.

15          (Jury not present)

16          MS. SASSOON:  May the witness be excused, your Honor?

17          THE COURT:  Yes.  The witness is excused for now.

18   You're due back tomorrow morning.

19          Anything else we have to take up?

20          MR. COHEN:  Yes, your Honor.  One item.  It has two

21   parts, your Honor.

22          As the Court is aware, you have issued an order that

23   Mr. Bankman-Fried receive four doses of Adderall per day.  In

24   the Bureau of Prisons he has only been getting two.  But more

25   to the point is, when he comes here to court he is not getting

NA4MBAN4

1    anything at lunchtime.  He was woken up this morning early to

2    get here on time.  He didn't get a dose then.

3         When he doesn't have it, it's very hard for him to

4    focus, your Honor.  We could bring it, if we were permitted to,

5    and give it to him at lunchtime, or, otherwise, we'd ask the

6    Court to issue an order to the Bureau of Prisons directing it

7    to do so, because it's not happening.

8         THE COURT:  Have you been in touch with Ken Bork at

9    the Bureau of Prisons?

10        MR. COHEN:  We speak to him a lot, your Honor.

11        THE COURT:  Have you been in touch with him about

12   this?

13        MR. COHEN:  No.  I just found out about this today.

14        THE COURT:  Please get in touch with him.

15        MR. COHEN:  If we can't resolve it, we would like to

16   come back to your Honor about it.

17        THE COURT:  My problem, of course, is that the last I

18   know, I don't have a medical license.

19        MR. COHEN:  Relatedly, last week your Honor indicated

20   that you would issue an order that Mr. Bankman-Fried could be

21   produced early.

22        THE COURT:  And I did.  It was filed on Sunday.

23        MR. COHEN:  He will be produced tomorrow morning.

24        THE COURT:  That's the theory.  You can check the

25   order.  It's online.  I know the marshal service is aware of it

NA4MBAN4

1    because I sent it to them Monday or Tuesday.

2                    MR. COHEN:  OK.

3                    THE COURT:  Anything else?

4                    MS. SASSOON:  No.  Thank you, your Honor.

5                    THE COURT:  Thank you, folks.

6                    (Adjourned to October 5, 2023, at 9:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2        Examination of:                              Page

3         MARC-ANTOINE JULLIARD

4        Direct By Ms. Kudla  . . . . . . . . . . . . .65

5        Cross By Mr. Cohen . . . . . . . . . . . . . .92

6        Redirect By Ms. Kudla  . . . . . . . . . . . 100

7        ADAM YEDIDIA

8        Direct By Ms. Sassoon  . . . . . . . . . . . 102

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      GOVERNMENT EXHIBITS

 2    Exhibit No.                              Received

 3    1633    . . . . . . . . . . . . . . . . .67

 4    S-2000    . . . . . . . . . . . . . . . .70

 5    902   . . . . . . . . . . . . . . . . . .70

 6    587   . . . . . . . . . . . . . . . . . .71

 7    590   . . . . . . . . . . . . . . . . . .72

 8    599   . . . . . . . . . . . . . . . . . .73

 9    426   . . . . . . . . . . . . . . . . . .75

10    425   . . . . . . . . . . . . . . . . . .79

11    1469    . . . . . . . . . . . . . . . . .85

12    863   . . . . . . . . . . . . . . . . . .87

13    866   . . . . . . . . . . . . . . . . . .88

14    427   . . . . . . . . . . . . . . . . . .90

15    1566    . . . . . . . . . . . . . . . . 109

16    1471    . . . . . . . . . . . . . . . . 110

17    900 and 905   . . . . . . . . . . . . . 111

18    568, 582, 583, 589, and 594   . . . . . . 113

19    1500, 1501, 1509, 1510, and . . . . . . . 118

20            1530-1555

21

22

23

24

25
```