```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        22 CR 673 (LAK)

 5   SAMUEL BANKMAN-FRIED,

 6              Defendant.                Trial
     ------------------------------x
 7
                                         New York, N.Y.
 8                                       October 5, 2023
                                         9:40 a.m.
 9

10   Before:

11
                        HON. LEWIS A. KAPLAN,
12
                                         District Judge
13
                             APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  DANIELLE R. SASSOON
          NICOLAS ROOS
17        DANIELLE KUDLA
          SAMUEL RAYMOND
18        THANE REHN
          Assistant United States Attorneys
19
     COHEN & GRESSER, LLP
20        Attorneys for Defendant
     BY:  MARK S. COHEN
21        CHRISTIAN R. EVERDELL
          SRI K. KUEHNLENZ
22        DAVID F. LISNER

23   Also Present:
     Luke Booth, FBI
24   Kristin Allain, FBI
     Arjun Ahuja, USAO Paralegal Specialist
25   Grant Bianco, USAO Paralegal Specialist
```

```
 1                 (Trial resumed; jury not present)

 2                 THE COURT:  I gather we are ready to go.

 3                 MS. KUDLA:  Your Honor, before we call in the jury --

 4       we can address these at a break, actually.  We can call in the

 5       jury.

 6                 MS. SASSOON:  Your Honor, should the witness be

 7       brought in?

 8                 THE COURT:  Yes.

 9                 (Jury present)

10                 THE COURT:  Good morning, everybody.  The defendant

11       and the jurors all are present, as they have been throughout.

12                 Members of the jury, Andy and John Hammel have put

13       together a little calendar showing the days we are sitting and

14       so forth.  We will pass it out.

15                 Mr. Yedidia, you are still under oath.  Ms. Sassoon,

16       you may proceed.

17       ADAM YEDIDIA, previously sworn.

18       DIRECT EXAMINATION (cont'd)

19       BY MS. SASSOON:

20       Q.  Good morning, Mr. Yedidia.

21       A.  Good morning.

22       Q.  Let's start this morning by talking about the people at FTX

23       and your role there.  Who founded FTX?

24       A.  Sam and Gary.

25       Q.  When you say Sam, are you referring to the defendant?
```

1   A.  Yes.

2   Q.  Who is Gary?

3   A.  Gary Wang.

4   Q.  Around when did the defendant and Gary Wang found FTX?

5   A.  I believe around 2019.

6           MS. SASSOON:  Can we show the witness what has been

7   marked as Government Exhibit 1801.

8   Q.  Who is the person in this photograph?

9   A.  Gary Wang.

10          MS. SASSOON:  The government offers Government Exhibit

11  1801.

12          THE COURT:  Received.

13          (Government Exhibit 1801 received in evidence)

14          MS. SASSOON:  Mr. Bianco, can you please publish

15  Government Exhibit 1801 for the jury.

16  Q.  Mr. Yedidia, who is in this photograph?

17  A.  Gary Wang.

18  Q.  Is that the Gary Wang you mentioned who cofounded FTX with

19  the defendant?

20  A.  Yes.

21  Q.  When you worked at FTX, where were FTX's offices?

22  A.  When I started working at FTX, FTX's offices were in Hong

23  Kong.  By late 2021, FTX had opened a new office, its primary

24  office in the Bahamas.

25  Q.  About how many employees worked at FTX when you started

1   there?

2   A.   About a hundred, maybe a little more.

3   Q.   Who was in charge at FTX?

4   A.   Sam Bankman-Fried.

5   Q.   What sorts of things did the defendant do at the company?

6   A.   He was the CEO, so he was sort of in charge of everything.

7   He did marketing and grand strategy, and he would make

8   decisions for what was important.  He would sometimes set

9   priorities for the dev team.  He would worry about

10   acquisitions.  There is other duties too, I'm sure.

11   Q.   From your vantage point, was he involved in the details of

12   the business?

13   A.   Yes.

14   Q.   You testified yesterday that you were a software developer

15   at FTX.  What did you do as a software developer?

16   A.   I wrote code.

17   Q.   What is code?

18   A.   Code is instructions for a computer.  It's how the computer

19   knows what to do.

20   Q.   Generally, what were you writing code for?

21   A.   The FTX website.

22   Q.   Is that FTX.com?

23   A.   Yes.

24   Q.   What does it mean to write code for the website?

25   A.   It means that you are writing words in a document that are

1    meant to tell the computer what to do when, for example, a user

2    presses a button.  So when a user presses a button, the

3    computer doesn't know what to do all by itself.  It instead

4    executes commands that were written by someone, so I was

5    writing those commands for the computer to execute.

6    Q.  When you were working on code for FTX.com, who did you

7    report to?

8    A.  Nishad Singh.

9            MS. SASSOON:  Mr. Bianco, can you please show the

10   witness what has been marked as Government Exhibit 1803.

11   Q.  Do you recognize this person?

12   A.  Yes.

13   Q.  Who is it?

14   A.  Nishad Singh.

15           MS. SASSOON:  The government offers Government Exhibit

16   1803.

17           THE COURT:  Received.

18           (Government Exhibit 1803 received in evidence)

19           MS. SASSOON:  Mr. Bianco, if you could publish that

20   for the jury.

21   Q.  Mr. Yedidia, who is in this photograph?

22   A.  Nishad Singh.

23   Q.  Was this the person that you reported to at FTX?

24   A.  Yes.

25   Q.  Did you report to anyone else informally?

 1   A.  Yes.

 2   Q.  Who?

 3   A.  Gary Wang and Sam Bankman-Fried.

 4   Q.  Who did Gary Wan and Nishad Singh report to?

 5   A.  Sam Bankman-Fried.

 6   Q.  Showing you what's been marked as Government Exhibit

 7   1450 -- this may take one moment -- do you recognize the people

 8   in this photograph?

 9   A.  Yes.

10   Q.  Are you in this photograph?

11   A.  Yes.

12           MS. SASSOON:  The government offers Government Exhibit

13   1450.

14           MR. EVERDELL:  No objection.

15           THE COURT:  Received.

16           (Government Exhibit 1450 received in evidence)

17           MS. SASSOON:  Mr. Bianco, if you could publish this

18   photograph for the jury.

19   Q.  Where are you in this photograph, Mr. Yedidia?

20   A.  I'm the second person from the left in the blue shirt.

21   Q.  Who is the man to your left in a gray hoodie?

22   A.  Gary Wang.

23           MS. SASSOON:  You can take that down.

24   Q.  Who oversaw the work you, Gary Wang and Nishad Singh did on

25   the FTX code?

 1    A.  Sam Bankman-Fried.

 2    Q.  I'd like to return to the FTX website which we started to

 3    look at yesterday.  Because of your work coding for the

 4    website, are you generally familiar with the FTX.com website as

 5    it existed when FTX was operating?

 6    A.  Yes.

 7    Q.  Are you familiar with certain features of the website?

 8    A.  Yes.

 9    Q.  Were you familiar with the processes for depositing and

10    withdrawing money on the exchange through the website?

11    A.  Yes.

12          MS. SASSOON:  If we could pull up for the jury and the

13    witness Government Exhibit 589, which is in evidence.

14    Q.  I want to direct your attention to the upper left of this

15    screen where it says balances in blue.

16          First of all, is this a screenshot from the FTX

17    website?

18    A.  Yes.

19    Q.  What does balances in blue refer to?

20    A.  It refers to the customers' balances on the website.

21    Q.  So what does this screenshot from the website generally

22    show?

23    A.  It shows a customer's balances.

24    Q.  When you say balances, what are you referring to?

25    A.  I'm referring to the money that they had on FTX.

1   Q.  I want to direct your attention to the left side where it

2   says USD with a dollar sign next to it.  What is USD?

3   A.  USD stands for United States dollar.  It's the official

4   currency of the United States.

5   Q.  For this particular account balances page, what is the

6   balance displayed in U.S. dollars?

7   A.  80 cents.

8   Q.  Once a customer went through the approval process for an

9   account on FTX, what would a customer do to begin trading on

10  the exchange?

11  A.  They would deposit money.

12  Q.  Do you see here where it says deposit with a red box around

13  it?

14  A.  Yes.

15  Q.  What does that refer to?

16  A.  It refers to depositing money on the exchange.

17  Q.  Let's take a look at Government Exhibit 590, another

18  screenshot from the website.  What were the four methods of

19  depositing money onto FTX?

20  A.  For USD they were USD stablecoins, credit or debit card,

21  wire transfer, and cryptocurrencies.

22  Q.  What is fiat?

23  A.  Fiat refers to any currency that's issued by a government,

24  so in some sense normal money.

25  Q.  Can you give some examples of normal money.

1    A.  The U.S. dollar is one example, the euro is another

2    example, the Japanese yen is another example, the Brazilian

3    real.

4    Q.  Could a customer deposit money onto FTX using fiat or

5    dollars?

6    A.  Yes.

7    Q.  Which of the four options reflected here are methods of

8    depositing fiat or dollars onto the exchange?

9    A.  Credit or debit card and wire transfer.

10   Q.  If I refer to fiat as dollars as a shorthand, will you

11   understand what I mean?

12   A.  Yes.

13        MS. SASSOON:  I'd like to take a look at Government

14   Exhibit 1561.  The government offers that exhibit pursuant to

15   stipulation, Government Exhibit 2000, which the parties have

16   agreed is a true and correct copy of a video posted on FTX's

17   home page called FTX User Guide, How to Deposit Fiat on FTX.

18        THE COURT:  It is received.

19        (Government Exhibit 1561 received in evidence)

20        THE COURT:  I will just say a word to the jury about

21   stipulations.

22        The parties, in order to simplify the trial, have

23   agreed on quite a few sort of basic undisputed facts.  Those

24   agreements are on pieces of paper labeled stipulations.  They

25   are just agreements about what these facts are.  That's all

1   there is to it.  And you must accept anything they have

2   stipulated to as the fact.

3         I should also say that in some cases there are

4   occasions when the parties will stipulate that if some person,

5   unimaginary person, John Jones, were called to testify, John

6   Jones would say A, B, and C.  In that circumstance you must

7   assume, you must take as granted that if John Jones were

8   called, John Jones would say on the witness stand A, B, and C.

9   But in that case, and that case alone, it would be up to you to

10  decide whether, assuming he said those things, he was

11  testifying accurately and had knowledge of what he was talking

12  about and all other things that may go to the credibility of

13  what John Jones would have said had John Jones been here.  But

14  that's not this particular stipulation.  This is a hard, fast

15  stipulation as to particular facts.

16        Let's move on.

17        MS. SASSOON:  Thank you, your Honor.

18        Mr. Bianco, if you could please play the first 45

19  seconds of FTX User Guide, How to Deposit Fiat on FTX.

20        (Video played)

21  Q.  Mr. Yedidia, what is this video about?

22  A.  How to deposit fiat to FTX.com.

23        MS. SASSOON:  Mr. Bianco, if you could please play

24  another portion of the video from two minutes and 27 seconds

25  through the end of the video, please.

1          (Video played)

2  Q.  Mr. Yedidia, this video described one method of depositing

3  dollars on the exchange involving a wire transfer.  In simple

4  terms, what is a wire transfer?

5  A.  It is when you tell your bank to send some of your money to

6  a different bank.

7          MS. SASSOON:  Let's go back to Government Exhibit 590.

8  Q.  Now, we have talked about credit or debit card deposits and

9  wire transfer deposits of dollars.  Generally, how would a

10 customer deposit stablecoins or cryptocurrency on the exchange?

11         THE COURT:  Excuse me.  Maybe we should pause a minute

12 before that question.

13         Tell us, Mr. Yedidia, please, what is a stablecoin?

14         THE WITNESS:  A stablecoin is a cryptocurrency that is

15 trying to have a value that's pegged to a particular fiat

16 currency.  So a USD stablecoin would be a cryptocurrency whose

17 value would be one USD in all cases.

18 Q.  So are stablecoins a subcategory of cryptocurrency?

19 A.  Yes.

20 Q.  That subcategory of coins that are supposed to maintain a

21 fixed price?

22         MR. EVERDELL:  Objection.

23         THE COURT:  Overruled.

24 A.  Could you repeat the question.

25 Q.  Of course.  Is that subcategory cryptocurrency called

1   stablecoins, does that have coins that are meant to maintain a

2   certain fixed dollar value?

3   A.   Yes.

4   Q.   I'd like to return now to how a customer would deposit

5   stablecoins or cryptocurrency on the exchange.  How would a

6   customer do that?

7   A.   The customer would be shown a deposit address for the

8   currency, and they would send their stablecoins to that deposit

9   address.

10  Q.   When you say deposit address, what do you mean by that?

11  A.   A deposit address is -- it's an address in which money can

12  live for a cryptocurrency.  So a cryptocurrency for each

13  possible address would have a balance associated with that

14  address, and the deposit address would be, you know, the

15  address you would enter to send your money to that particular

16  balance.

17  Q.   What is the relationship, if any, between a deposit address

18  and a cryptocurrency wallet?

19  A.   A cryptocurrency wallet would have a deposit address

20  associated with it.

21  Q.   And what is a cryptocurrency wallet?

22  A.   It's a place where you can have your cryptocurrency held.

23  Q.   When you say your cryptocurrencies held in this wallet, is

24  this online, is this somewhere else?

25  A.   For decentralized cryptocurrencies, the ledger that would

1   keep track of who owns what would be tracked across many

2   different computers, not just one.

3   Q.   These are wallets that are tracked on computers?

4   A.   Yes.

5         MS. SASSOON:  At this time the government offers

6   Government Exhibit 1560, which the parties have agreed is a

7   true and correct copy of a video posted on FTX's home page

8   called FTX User Guide, How To Deposit Crypto on FTX.

9         THE COURT:  It's received.

10        (Government Exhibit 1560 received in evidence)

11        MS. SASSOON:  Mr. Bianco, if you could please play the

12   first 14 seconds of Government Exhibit 1560.

13        (Video played)

14   Q.   What is this video about, Mr. Yedidia?

15   A.   How to deposit cryptocurrencies on FTX.

16        MS. SASSOON:  Mr. Bianco, if you could please play the

17   rest of the video.

18        (Video played)

19   Q.   Mr. Yedidia, in this video about crypto deposits, when a

20   customer is moving cryptocurrency to FTX, is that

21   cryptocurrency they own elsewhere that they are moving to the

22   exchange?

23   A.   Yes.

24   Q.   So this would be cryptocurrency that a customer already

25   owns that they are transferring over to FTX?

1    A.   Yes.

2         MS. SASSOON:   Let's go back to Government Exhibit 589

3    and look at customer balances.

4    Q.   Once a customer deposits money on the exchange through a

5    wire transfer or a cryptocurrency transfer, how is a customer

6    actually credited on the exchange?

7    A.   For a cryptocurrency transfer an automatic system would

8    notice that the money had landed in the user's deposit address

9    and credit them with the money on the exchange.  For a wire

10   transfer, something would notice that the money had landed in

11   the bank account, and some process would need to figure out

12   which customer on the exchange was the one whose account

13   matched the incoming transfer into the bank account.

14   Q.   Can you explain what it means to credit a customer on the

15   account for their transfer of money?

16   A.   It means that their balances on the balances page would

17   increase.

18   Q.   And in what way would the balances increase?

19   A.   By the amount of the transfer.

20   Q.   Where would this information be accessible to the FTX

21   customer?

22   A.   On the balances page.

23   Q.   If you look here where it says available balance, do you

24   see that column on the balances page?

25   A.   Yes.

1    Q.  What does that column convey to the customer?

2    A.  It shows the amount of money they have available in that

3    currency for trading or for withdrawal.

4    Q.  When you say for trading or withdrawal, you mean on FTX?

5    A.  Yes.

6    Q.  What is a withdrawal?

7    A.  It's when a customer requests that their money be sent to

8    one of their accounts that are external to FTX.

9    Q.  Is that a way of taking a customer's money back off the

10   exchange?

11   A.  Yes.

12           MS. SASSOON:  Let's take a look at Government Exhibit

13   594, which is in evidence.

14   Q.  What were some of the available methods for a customer to

15   withdraw money that they held on FTX?

16   A.  They could withdraw via stablecoin or via wire transfer or

17   credit card.

18   Q.  If a customer requested a wire transfer, would they be

19   receiving their money back in fiat or dollars?

20   A.  Yes.

21           MS. SASSOON:  You can take that down.

22   Q.  So you touched on this, but once a customer transferred

23   their money to FTX and they had these balances on the exchange,

24   what could a customer do with that money?

25   A.  It could trade with it.

1  Q.  What types of products were traded on FTX?

2  A.  Cryptocurrencies and derivatives on cryptocurrencies.

3  Q.  We will get into that in a moment.

4         MS. SASSOON:  Let's go back to Government Exhibit 599,

5  which we looked at yesterday from FTX's website.

6  Q.  Generally, what do these various boxes represent?

7  A.  With the exception of stake, they all represent things that

8  could be traded on the website.

9  Q.  I would like to you direct you to where it says spot.  What

10  does spot refer to here in the second box?

11  A.  Spot refers to the asset itself, as opposed to a derivative

12  on that asset.  So, for example, spot Bitcoin would be an

13  actual Bitcoin.

14  Q.  Could customers trade actual Bitcoin on FTX?

15  A.  Yes.

16  Q.  And other coins as well?

17  A.  Yes.

18  Q.  Is that called spot trading?

19  A.  Yes.

20         MS. SASSOON:  Let's look at Government Exhibit 582.

21  Q.  What does this show from the FTX website?

22  A.  This is the markets page.

23  Q.  For which market?

24  A.  Spot markets.

25  Q.  Let's just take an example.  Do you see the first row that

1    says BTC/USD Bitcoin?

2    A.  Yes.

3    Q.  What does that entire row refer to?

4    A.  It refers to the market on which customers could buy

5    Bitcoins with dollars or sell Bitcoins for dollars.

6    Q.  Do you see toward the end of this row where it says price?

7    A.  Yes.

8    Q.  Does that reflect the price of one Bitcoin on the

9    particular day of this screenshot?

10   A.  Yes.

11        MS. SASSOON:  Let's go back to Government Exhibit 599.

12   Q.  You see where it says futures?

13   A.  Yes.

14   Q.  Is that another product that was available for trading on

15   the exchange?

16   A.  Yes.

17   Q.  What are futures?

18   A.  Futures are a type of financial instrument or financial

19   derivative which tracked the price of a given asset.  So, for

20   example, a Bitcoin future would not represent a Bitcoin itself.

21   Rather, if it had an expiry date, for example, if it expired in

22   March of 2020, then that means that in March of 2020, whatever

23   the price of one Bitcoin was, that's the amount you would be

24   paid out for owning a future in Bitcoin that expires in March

25   2020.

1   Q.  Let me make sure I understand this.  Are those transactions

2   that allowed two parties, a buyer and a seller, to exchange

3   payments based on the change in value of a cryptocurrency?

4               MR. EVERDELL:  Objection.

5               MS. SASSOON:  Your Honor, I am just trying to clarify

6   a confusing subject.

7               THE COURT:  Just a minute.

8               Overruled.

9   Q.  I'll ask it again, Mr. Yedidia.

10              These futures transactions that you described, are

11  those transactions that allowed two parties, a buyer and a

12  seller, to exchange payments based on the change in value of a

13  cryptocurrency?

14  A.  Yes.

15  Q.  And were those futures traded on FTX?

16  A.  Yes.

17  Q.  Are there other types of futures that don't have an

18  expiration date?

19  A.  Yes.

20  Q.  What are those called?

21  A.  Those are called perpetual futures.

22  Q.  Were those traded on FTX?

23  A.  Yes.

24  Q.  What is your understanding of the volume of futures that

25  were traded on FTX relative to the spot market?

1  A.  My understanding is that the futures markets had more

2  volume than the spot markets.

3        MS. SASSOON:  Let's take a look at Government Exhibit

4  583.

5  Q.  Do you see where it says futures in blue on the left-hand

6  side?

7  A.  Yes.

8  Q.  And what does this page show?

9  A.  This is a list of futures markets on FTX.

10  Q.  Just taking one example, the first row where it says

11  Bitcoin June 2022 futures, what does that mean?

12  A.  These are futures that expire in June 2022 on the price of

13  Bitcoin.

14  Q.  Is everything listed here or listed on the spot markets

15  page things that customers could buy and sell on the exchange?

16  A.  Yes.

17  Q.  We have talked about some of the things customers could

18  trade on the exchange.

19        What was the FTX business model for making money?

20  A.  Collecting fees on trades.

21  Q.  What does that mean exactly?

22  A.  It means that when two customers trade from each other --

23  let's suppose Alex wanted to buy a Bitcoin from Bob for

24  $10,000.  Alex would lose $10,000 and gain one Bitcoin and Bob

25  would gain slightly less than $10,000 and lose one Bitcoin.

 1   That slightly less, that difference would be the fee that FTX

 2   collects.

 3   Q.  I want to turn back to the work you did at FTX.  When you

 4   first started working at FTX, which office were you working in?

 5   A.  The Hong Kong office.

 6   Q.  Over what time period was that?

 7   A.  That was from when I started in January 2021 to around

 8   October, early October of 2021.

 9   Q.  Can you describe the offices in Hong Kong.

10   A.  They were a large open office.

11          MS. SASSOON:  Let me show the witness what has been

12   marked as Government Exhibit 1636.

13   Q.  Do you recognize this?

14   A.  Yes.

15   Q.  What is it?

16   A.  It's the Hong Kong office.

17          MS. SASSOON:  Your Honor, we offer Government Exhibit

18   1636.

19          THE COURT:  Received.

20          (Government Exhibit 1636 received in evidence)

21          MS. SASSOON:  Mr. Bianco, can you publish Government

22   Exhibit 1636.

23   Q.  Are we looking at a portion of the Hong Kong office here?

24   A.  Yes.

25   Q.  Did you sit in an open floor plan like this when you worked

1    there?

2    A.  Yes.

3    Q.  Who did you sit with?

4    A.  I sat next to Nishad Singh.

5    Q.  Where was the defendant generally sitting relative to where

6    you sat at the Hong Kong office?

7    A.  He was sitting fairly close by.  If my memory serves,

8    Nishad was to my left and then Gary and Sam were sort of close

9    to that, but at their own sort of separate desk together near

10   the center of the office.

11   Q.  After Hong Kong, where did you live and work?

12   A.  The Bahamas.

13   Q.  Over what time period did you live and work in the Bahamas?

14   A.  From around October 2021 to when I resigned in November

15   2022.

16           MS. SASSOON:  Mr. Bianco if you could pull up again

17   Government Exhibit 1542, which we looked at yesterday.

18   Q.  What is depicted in this photograph?

19   A.  This is the common room of the penthouse apartment in which

20   I lived in the Bahamas.

21   Q.  I believe you testified yesterday you lived there with the

22   defendant?

23   A.  Yes.

24   Q.  Where was this apartment?

25   A.  It was in the Albany.

1    Q.   What is the Albany?

2    A.   It's a luxury resort on the western side of New Providence,

3    which is the main island of the Bahamas.

4              MS. SASSOON:  Mr. Bianco, if you could show the

5    witness Government Exhibit 1625.

6    Q.   Are you familiar with these messages?

7    A.   Yes.

8    Q.   Are you a participant in these messages?

9    A.   Yes.

10   Q.   Is the defendant also a participant in these messages?

11   A.   Yes.

12             MS. SASSOON:  The government offers Government Exhibit

13   1625.

14             THE COURT:  Received.

15             (Government Exhibit 1625 received in evidence)

16             MS. SASSOON:  Mr. Bianco, if you could publish this

17   for the jury.

18   Q.   Mr. Yedidia, what type of message exchange is this?

19   A.   Signal message exchange.

20   Q.   Is that a messaging platform?

21   A.   Yes.

22   Q.   Do you see at the top where it has the name of the message

23   group, people of the house?

24   A.   Yes.

25   Q.   Who is this group people of the house?  What does that

 1   refer to?

 2   A.   These were the ten people who lived in this apartment.

 3   Q.   Generally, what was the subject matter of this messaging

 4   group, people of the house?

 5   A.   Anything that related specifically to people who were

 6   residents of that apartment, social stuff sometimes.

 7   Q.   Do you recall expressing how you felt about paying for an

 8   expensive apartment in the Bahamas?

 9   A.   Yes.

10   Q.   What was that?

11   A.   Well, the number –– the cost of the rent sounded very high

12   if it was, you know, rent that would be commensurate with an

13   apartment that cost $35 million.

14   Q.   Can you read what the defendant said about that at the

15   bottom of this chat?

16   A.   Heh, I've been mentally assuming that aggregate rent

17   collected would be zero dollars and mostly thinking of bidding

18   in who gets to direct marginal donation dollars anyway.  I'm

19   totally fine/excited if others want to have economic exposure

20   to it, but have been assuming that it's basically just Alameda

21   paying for it in the end.

22   Q.   Where it says Alameda paying for it in the end, what was

23   the it you're referring to in this conversation?

24   A.   The apartment.

25   Q.   That's the $35 million apartment?

1   A.  That's correct.

2   Q.  So what was your understanding of how that apartment was

3   being paid for?

4   A.  Alameda was paying for it.

5   Q.  Were you aware of the defendant sleeping with any frequency

6   on a bean bag during your time as his roommate in the Bahamas

7   in the Orchid penthouse?

8   A.  It was much rarer than when we were in Hong Kong.

9   Q.  When you lived in the Bahamas, were you aware of him

10  sleeping with any frequency on a bean bag?

11  A.  I think he would take occasional naps, but not with much

12  frequency, no.

13  Q.  When you worked and lived with the defendant in the

14  Bahamas, were you also socializing with him?

15  A.  Yes.

16          MS. SASSOON:  Mr. Bianco, can you please show the

17  witness Government Exhibit 1452.

18  Q.  Do you recognize the people in this photograph?

19  A.  Yes.

20  Q.  Who is in this photograph?

21  A.  I am and Sam is and there is a third person.

22          MS. SASSOON:  The government offers Government Exhibit

23  1452.

24          THE COURT:  Received.

25          (Government Exhibit 1452 received in evidence)

```
 1              MS. SASSOON:  Mr. Bianco, please publish Government

 2    Exhibit 1452 for the jury.

 3    Q.  Where are you in this photograph, Mr. Yedidia?

 4    A.  I'm the man on the right.

 5    Q.  Who is the man on the left?

 6    A.  That's Sam Bankman-Fried.

 7    Q.  Where are you eating in this photograph?

 8    A.  The dining room of the apartment.

 9    Q.  Which apartment?

10    A.  The $35 million apartment.

11    Q.  I'd like to show you what's been marked as government of

12    Government Exhibit 1802.

13              Do you recognize the person in this photograph?

14    A.  Yes.

15    Q.  Who is it?

16    A.  Caroline Ellison.

17              MS. SASSOON:  The government offers Government Exhibit

18    1802.

19              THE COURT:  Received.

20              (Government Exhibit 1802 received in evidence)

21              MS. SASSOON:  Mr. Bianco, please publish Government

22    Exhibit 1802.

23    Q.  Who is this?

24    A.  Caroline Ellison.

25    Q.  Was she one of your roommates in the Bahamas?
```

1   A.  Yes.

2   Q.  Before you started working at FTX, what did the defendant

3   tell you about his relationship with Caroline Ellison?

4   A.  Sometime in early 2019, the defendant told me that he and

5   Caroline had had sex and asked if it was a good idea for them

6   to date.

7   Q.  What did you say?

8   A.  I said no.

9   Q.  How did he respond to that?

10  A.  He said he figured that was reasonable and thought that I

11  would say something like that.

12  Q.  What role did Caroline Ellison have in the defendant's

13  organization over your time there?

14  A.  When I joined, she was a trader at Alameda.  And then at

15  some point while I was working at FTX, she became the co-CEO of

16  Alameda.

17  Q.  When you worked with the defendant, did he ever describe to

18  you his approach to risk taking?

19  A.  Yes.

20  Q.  What types of things would he say?

21  A.  He felt that in general taking risks was a reasonable thing

22  to do in pursuit of other goals.

23  Q.  Did he describe his approach to risk taking relative to

24  other people?

25  A.  Yes.

1   Q.   How so?

2   A.   In general, I think he would have described his own

3   approach to risk taking as being more willing to take risks

4   than many others.

5   Q.   I want to turn in greater detail to your work at FTX.

6            We talked earlier about customers depositing money to

7   the exchange via wire transfer in dollars.  When you first

8   started working at FTX, where did you think customer fiat or

9   dollar deposits were being received?

10  A.   In the FTX bank account.

11  Q.   Did you come to learn otherwise in the course of your work?

12  A.   Yes.

13  Q.   What did you learn?

14  A.   I learned that in fact they were being received in a

15  different bank account labeled the North Dimension bank

16  account.

17  Q.   Who controlled the North Dimension bank account?

18  A.   Alameda.

19  Q.   As a software developer, did you become involved in a

20  project related to customer deposits and withdrawals of fiat or

21  dollar currency?

22  A.   Yes.

23  Q.   Who assigned you to this project?

24  A.   Sam.

25  Q.   What was the goal of the project?

1   A.  The goal of the project was to automate processing of

2   customer deposits and withdrawals.

3   Q.  What do you mean by automate?

4   A.  What I mean is, for the processing to happen automatically,

5   like for a computer to do it rather than a human.

6        MS. SASSOON:  Let's look at Government Exhibit 589,

7   the customer balance page.

8   Q.  When you talk about automating the process for crediting a

9   customer's account, what do you mean by crediting their

10  account?

11  A.  What I mean is that their account will show the balances of

12  the amount of the money that was sent.

13  Q.  Where else was this information tracked, if anywhere?

14  A.  In the FTX database.

15  Q.  What was the FTX database?

16  A.  The FTX database was essentially the repository for all of

17  the stateful information related to FTX.

18  Q.  This database, is it electronic?  Where is it housed?

19  A.  It's housed in a computer.  It's electronic.

20  Q.  When you said it's this electronic database housing

21  information about FTX, can you describe the types of

22  information that were contained in this database?

23  A.  Customer balances were contained within this database, but

24  also records of every trade, records of every deposit and

25  withdrawal, information on users that was collected.  Basically

1    anything you can think of was stored in the database.

2    Q.  The database stored information, but not, let's say, money,

3    is that correct?

4    A.  That is correct.

5    Q.  The process you have talked about of matching up a deposit

6    via customer to their account balance on the website, did that

7    involve moving any actual money or just information?

8    A.  Only information.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MS. SASSOON:

Q.   What about the actual money associated with the account;
would that remain with Alameda?

A.   Yes.

Q.   What was the goal of your project with respect to this
automation of customer deposits and crediting their account?

A.   It was to expedite the process of processing deposits and
withdrawals.

Q.   What did the defendant tell you about the reason for this
project of automating deposits and withdrawals when he assigned
it to you?

A.   The reason was twofold—one was, there was a problem where
more and more users were depositing money and this was placing
a lot of strain on the settlement team, whose job it was to,
for every deposit to the bank account, find which customer that
deposit belonged to and credit them with money on the exchange,
so because this is a manual process, as there were more and
more deposits, this job that they had was overwhelming them.
So the first reason for the project was to make it easier on
the settlement team.

     And the second task—no, second reason, was that
because the deposit-processing process was manual, it would
sometimes take a long time for a customer deposit to be
credited even after the money had landed in the bank, and that
would be very frustrating to customers in some cases if their

1   money was taking a long time to be credited to them.

2          So the two reasons essentially were to make it easier

3   on the settlement team, make their job less hard, and to make

4   processing customer deposits faster.

5   Q.   How involved did the defendant remain in the project after

6   he assigned it to you?

7   A.   He was very involved.

8   Q.   While working on this project, what did you learn about

9   where FTX customer deposits were being made?

10  A.   The North Dimension bank account.

11  Q.   And I think you mentioned this earlier, but who controlled

12  that account?

13  A.   Alameda did.

14  Q.   When you went to work at FTX, was the defendant still

15  operating Alameda, his cryptocurrency trading firm?

16  A.   Yes.

17  Q.   Was Alameda also a customer on the FTX exchange?

18  A.   Yes.

19  Q.   When you worked at FTX, what did you observe about the

20  relationship between FTX and Alameda?

21  A.   It was a very close relationship.

22  Q.   How so?

23  A.   Well, the two companies shared an office, and obviously the

24  same person was the CEO of both.

25  Q.   When you say the same person was the CEO of both, who was

1     that?

2     A.   Sam Bankman-Fried.

3     Q.   So this was before Caroline Ellison was named CEO.

4     A.   Correct.

5     Q.   When Alameda traded on FTX and made money, what was your

6     understanding of who was the ultimate beneficiary of Alameda's

7     profits?

8     A.   Sam and Gary.

9     Q.   You mentioned that you learned that Alameda was receiving

10    FTX customer deposits through a bank account called North

11    Dimension.

12              MS. SASSOON:  If we could take a look at Government

13    Exhibit 568.

14    Q.   What is this?

15    A.   These are deposit instructions for ftx.com.

16    Q.   So are these available to customers on the FTX website?

17    A.   Yes.

18    Q.   And if you could look at the top where it says "Where to

19    send the money to - Beneficiary Name - North Dimension," what

20    does that mean?

21    A.   It means that the name of the bank account——the bank

22    account was under the name North Dimension.

23    Q.   Which bank account?  Where it says——Let me take a step

24    back.

25              Where it says "Wire Instructions" at the top, who is

1    viewing these wire instructions?

2    A.   The customer.

3    Q.   And where it says "Where to send the money to – North

4    Dimension," what information is that relaying?

5    A.   That's relaying that if they want to deposit money on

6    ftx.com, they should wire the money to a bank account under the

7    name North Dimension Incorporated.

8    Q.   Where it says below that, "Receiving Bank – Silvergate

9    Bank," what does that mean?

10   A.   That means the bank that the bank account is in is

11   Silvergate Bank.

12   Q.   Does it say anywhere here that the customer money is going

13   to Alameda Research?

14   A.   No.

15   Q.   As far as you know, did FTX disclose to its customers that

16   the North Dimension account was controlled by Alameda?

17            MR. EVERDELL:  Objection.

18            THE COURT:  Ground?

19            MR. EVERDELL:  Personal knowledge.

20            THE COURT:  Overruled.

21   Q.   As far as you know——

22            THE COURT:  I'm sorry.  I overruled.  Are you just

23   repeating your question?

24            MS. SASSOON:  Yes.

25            THE COURT:  Okay.  Go ahead.

1   Q.   As far as you know, did FTX disclose to its customers that

2   the North Dimension account was controlled by Alameda Research?

3   A.   No.

4   Q.   How did you learn that North Dimension was controlled by

5   Alameda?

6   A.   I was told by one of Sam, Nishad, or Ryan Salame.

7   Q.   Who was Ryan Salame?

8   A.   He was the head of settlements at FTX.

9   Q.   And who was Ryan Salame's boss?

10   A.   Sam Bankman-Fried.

11   Q.   In the conversation where you learned about the North

12   Dimension account, what were you told about North Dimension and

13   why FTX customer money was being sent there?

14   A.   I was told that FTX couldn't——had had trouble opening its

15   own bank account and so this bank account was being used

16   instead.

17   Q.   Were you able to successfully automate a process for

18   customers getting credited for their deposits on the exchange,

19   for the money that was going to North Dimension?

20   A.   Yes.

21   Q.   About how long did that project take?

22   A.   About a month or two, maybe.

23   Q.   Around when was that?

24   A.   This was sometime in early 2021; maybe between March and

25   June.

1   Q.  Based on your work, what did you understand the money in

2   Alameda's North Dimension account—about who it belonged to?

3   A.  The customers of FTX.

4   Q.  Why is that?

5   A.  Well, they were the ones who deposited the money with the

6   expectation that—

7            MR. EVERDELL:  Objection, your Honor.

8            THE COURT:  What's the objection?

9            MR. EVERDELL:  He's talking about the customers'

10  expectations.

11           MS. SASSOON:  Your Honor, he was an employee at FTX,

12  and his understanding is relevant.

13           THE COURT:  Overruled.  Re-put the question.

14  BY MS. SASSOON:

15  Q.  Why was it your understanding that the money in Alameda's

16  North Dimension account belonged to FTX customers?

17  A.  Because they were the ones who sent the money to the

18  exchange, with the expectation that they would be able to use

19  it on the exchange as they saw fit.

20  Q.  Did there come a time when FTX customers were no longer

21  sending their deposits to Alameda?

22  A.  Yes.

23  Q.  What happened?

24  A.  FTX succeeded in opening its own bank account.

25  Q.  And when that happened, what did you do?

1   A.   I changed the deposit instructions so that instead of

2   pointing to North Dimension, they pointed to a different bank

3   account in the name of FTX Digital Markets.

4   Q.   Around when was that?

5   A.   Sometime in late 2021.

6   Q.   As far as you are aware, did some customer deposits

7   continue to go to North Dimension into 2022?

8   A.   Yes.

9   Q.   For the period during 2021 and 2022, the FTX customer

10   deposits going to Alameda, initially, was that concerning to

11   you?

12   A.   No.

13   Q.   Why not?

14   A.   Well, customers could still send their money wherever they

15   liked, and one common issue when switching deposit instructions

16   is that a customer would continue to use the old ones even

17   after the new ones had been rolled out.

18   Q.   Was it concerning to you that at any point in time customer

19   money was being deposited with Alameda, initially?

20   A.   No.

21   Q.   Why not?

22   A.   Well, I figured Alameda was just holding the money.

23   Q.   When you say "just holding the money," what do you mean?

24   A.   The money was there in Alameda's pockets, but they weren't,

25   you know—the—the money was there for Alameda to—to use—not

1   for Alameda to use, but for the customer; if the customer asked

2   for the money back, Alameda had it for them.

3   Q.  If you had been told that Alameda was spending the customer

4   money that was going into its bank account, would that have

5   raised concerns for you?

6   A.  Yes.

7           MR. EVERDELL:  Objection.

8           THE COURT:  Ground?

9           MR. EVERDELL:  Speculation.

10          THE COURT:  I'll allow it.

11  Q.  If you had been told that Alameda was spending FTX customer

12  money that was going into its bank account, would that have

13  raised concerns for you?

14  A.  Yes.

15  Q.  Why?

16  A.  Well, then the money wouldn't be there for the customer, if

17  the customer wanted it.

18  Q.  And why is that a problem?

19  A.  Then if the customer withdraws, their money isn't there.

20  Q.  How, if at all, was the money that Alameda owed back to FTX

21  customers for their deposits being tracked, by the company?

22  A.  It was tracked in an internal account and database called

23  fiat@ftx.com.

24  Q.  You said the money Alameda owed was being tracked in an

25  internal account in the database.  What database are you

1    talking about?

2    A.   The FTX database.

3    Q.   And you mentioned a specific account name.  What was that?

4    A.   Fiat@ftx.com.

5    Q.   So what was the fiat@ftx.com account?

6    A.   It was an account that was meant to track the net volume of

7    incoming fiat deposits.

8    Q.   Can you put that in simpler terms, when you say this

9    account was tracking the net volume of fiat deposits.

10   A.   Yes.  It was meant to track the total amount of fiat money

11   that was deposited by customers minus the total amount of fiat

12   money that was withdrawn by customers.

13   Q.   And so once you tracked the total amount deposited,

14   removing the amount that had been withdrawn, what amount

15   remained?

16   A.   The total amount of money that customers had deposited in

17   fiat, had net deposited in fiat on the exchange.

18   Q.   When you say the total amount of money net deposited, is

19   that money still owed back to customers for their deposits?

20   A.   Yes.

21   Q.   And the fiat@ftx.com account that was tracking the money

22   that was still owed back to customers, who was responsible for

23   that money that was still owed to FTX customers?

24   A.   Alameda.

25   Q.   And why was that money owed by Alameda?

1    A.  Alameda was the one that had received the money in their

2    bank account.

3             THE COURT:  Let me just see if I can clarify something

4    in my own mind.  So whatever that amount was that was in the

5    account you identified, the fiat@ftx.com account, that was

6    money which showed up as balances on the customer statements

7    that appeared on the ftx.com website that customers could

8    access, yes?

9             THE WITNESS:  I'm not sure if that's a totally

10   complete picture.  Do you mind if I clarify?

11            THE COURT:  No.  That's why I asked.

12            THE WITNESS:  So when a customer deposited money on

13   ftx.com, there were two things that happened.  One is that the

14   customer would be credited with the value of the monies they

15   deposited, so they would see their balances increase.  The

16   other thing that would happen is that this account would have

17   its balances decrease, so there was a corresponding decrease.

18   With this increase in the customers' balances, there would be a

19   corresponding decrease in the balances of the fiat@ftx.com

20   account.  So both things would happen.  And this other account

21   was just meant to track the total, the total amount net

22   deposited by customers.

23            THE COURT:  And why would the net deposited by

24   customers not match their fiat balances on the website to which

25   the customers had access?

```
 1              THE WITNESS:  Yes, you're right, your Honor.  The——it

 2    would match the total amount of all the customers, but any

 3    single customer would have an amount that differed from the

 4    amount——

 5              THE COURT:  Oh, okay.  Sure.  Thank you.

 6              Go ahead.

 7    BY MS. SASSOON:

 8    Q.  Just to be clear, if you added up all of customer fiat

 9    balances across the exchange, it should match the number that's

10    in the fiat@ftx.com account, except that would be a negative

11    number.

12    A.  Yes.

13    Q.  And that's because that's the amount of money that Alameda

14    still owed back to FTX customers.

15    A.  Yes.

16    Q.  And this fiat@ftx.com account, did it have actual money in

17    it or it was just tracking that information?

18    A.  The latter.

19    Q.  So it was tracking information.

20    A.  Yes.

21    Q.  So because this is a bit complicated, I'm just going to

22    make sure we all understand.

23              Every time a customer deposited money into Alameda's

24    bank account, what would happen to the customer's balance on

25    the FTX website?
```

1    A.  It would increase.

2    Q.  And what would happen to Alameda's liability to FTX

3    customers reflected in the fiat@ftx.com account?

4    A.  It would increase by the same amount.

5    Q.  When you say increase, do you mean go further negative?

6    A.  Yes.

7    Q.  And why would it go further negative?

8    A.  The negative value of the fiat@ftx.com account effectively

9    represented the liability Alameda owed to FTX's customers.

10            THE COURT:  Okay.  And a third piece of this would be

11   that the amount of fiat in the Alameda bank account at North

12   Dimension, back when North Dimension was being used, would

13   increase, yes?

14            THE WITNESS:  Yes.

15            THE COURT:  Okay.  So the money is in the North

16   Dimension account, the fiat currency, that grows when the

17   customer deposits money to the North Dimension account, the

18   fiat account you referred to, that would go down because North

19   Dimension was treating that as money it owed to FTX, and then

20   the customer balances in the aggregate on the FTX website that

21   the customers could see would go up, yes?

22            THE WITNESS:  That's correct, your Honor.

23            THE COURT:  Okay.  Let's go.

24   BY MS. SASSOON:

25   Q.  And you referred to Alameda's liability to FTX customers.

1    What is a liability?

2    A.  A liability is a debt owed.

3    Q.  And so following up on Judge Kaplan's question, is the

4    amount in Alameda's bank account supposed to match the amount

5    in the fiat@ftx.com account, except one's positive, one's

6    negative?

7    A.  Yes.

8    Q.  So if you added up all of customer-deposited balances

9    against Alameda's negative liability in the fiat@ftx.com

10   account, what number should you get?

11   A.  Zero.

12   Q.  Why?

13   A.  For every deposit, there's a corresponding increase in

14   customer balances and a corresponding decrease in

15   fiat@ftx.com's balances, and those two amounts should be the

16   same, so when you add the deposited value into the equal

17   negative value, they should cancel to zero, no matter how many

18   times you do that.

19   Q.  And just to take the opposite process, if a customer

20   withdrew money from their FTX account by wire transfer, how did

21   FTX pay for the customer's withdrawal?

22   A.  Until the bank account was switched, the North

23   Dimension——the North Dimension bank account.

24   Q.  And so when a customer withdrew fiat, what would happen to

25   the money in the North Dimension account?

1    A.  It would decrease.

2    Q.  And what would happen to Alameda's liability to FTX

3    customers reflected in the fiat@ftx.com account?

4    A.  It should decrease.

5    Q.  Meaning get less negative.

6    A.  Yes.

7    Q.  And what would happen to the total customer balances across

8    the exchange if someone withdrew some money?

9    A.  It would also decrease.

10   Q.  So the number in the fiat@ftx.com account in FTX's database

11   I believe you said documented how much money Alameda owed to

12   FTX customers for their dollar deposits; is that right?

13   A.  That's correct.

14   Q.  And in June of 2022, what did you learn about how much

15   money Alameda owed to FTX customers for their dollar deposits?

16   A.  $8 billion.

17   Q.  That is $8 billion of FTX customer money that had never

18   been withdrawn by FTX customers and that Alameda had not yet

19   repaid; is that right?

20   A.  That's correct.

21   Q.  So is that $8 billion money that Alameda still owed to FTX

22   customers?

23              MR. EVERDELL:  Objection.  Leading.

24              THE COURT:  Overruled.

25   Q.  And so that $8 billion that you saw in June of 2022, is

1    that money that Alameda still owed to FTX customers?

2    A.  Yes.

3    Q.  If Alameda had actually repaid the $8 billion it owed to

4    FTX customers, what effect would that have had on the number in

5    the fiat@ftx.com account?

6    A.  It would have gone to zero.

7    Q.  During your time at FTX did you ever learn of any of that

8    approximately $8 billion being repaid by Alameda to FTX

9    customers?

10   A.  No.

11   Q.  You testified that you automated the process for crediting

12   customers for their dollar deposits.  Was that in FTX's code?

13   A.  Yes.

14   Q.  In late 2021 what did you learn about the code that you had

15   written for tracking the money Alameda owed to FTX customers

16   for their dollar deposits?

17   A.  I learned that it had a bug.

18   Q.  When we're talking about code, what is a bug?

19   A.  A bug is an error by the programmer that causes the code to

20   do something different from what the programmer intended.

21   Q.  What was the nature of this error or bug in the code

22   regarding what Alameda owed to FTX customers?

23   A.  It exaggerated the liability to FTX customers.

24   Q.  So it made it seem bigger than it was.

25   A.  That's correct.

 1    Q.  And so this is a bug related to the fiat@ftx.com account in

 2    FTX's database?

 3              MR. EVERDELL:  Objection.

 4              THE COURT:  Sustained.

 5    Q.  In plain terms, what effect did this bug have on Alameda's

 6    debt to FTX customers for their deposits?

 7    A.  It made it look bigger than it was.

 8    Q.  So with this bug, when a customer withdrew money from FTX,

 9    what would happen to the customer's balance on FTX in the

10    database?

11    A.  Their balance would decrease.

12    Q.  And was that accurate?

13    A.  That was normal, yes.

14    Q.  And with this bug, what was happening to Alameda's

15    liability to FTX customers when it processed a withdrawal for a

16    customer?

17    A.  If the withdrawal was processed automatically, then

18    Alameda's liability to FTX would appear not to decrease as

19    well.

20    Q.  Was that correct?

21    A.  No, it was not.

22    Q.  So that was an error in the code.

23    A.  Correct.

24    Q.  And why was it an error in the code that nothing would

25    happen to Alameda's liability if it paid for a customer's

1   withdrawal?

2   A.  Alameda's liability was supposed to decrease by the amount

3   of the withdrawal.

4   Q.  How did you first learn about this error in the code?

5   A.  I was told about it by one of Gary or Nishad.  I think one

6   of them found it.  I think it was Gary.

7   Q.  And did you talk to the defendant about this error in the

8   code?

9   A.  Yes.

10  Q.  Initially, when you first learned of this bug or error in

11  late 2021, by how much money did the bug exaggerate the total

12  amount of money that Alameda owed to FTX customers?

13  A.  $500 million.

14  Q.  $500 million.  So by that time about how long had the bug

15  been in the code?

16  A.  About six months.

17  Q.  When was this error or bug in the code actually fixed?

18  A.  Six months after that.

19  Q.  So would that be around June 2022?

20  A.  Yes.

21  Q.  Who fixed the bug that was overstating how much money

22  Alameda owed to FTX customers?

23  A.  I did.

24  Q.  Who told you to fix the bug and make Alameda's liability to

25  FTX customers accurate?

1    A.  Sam Bankman-Fried.

2    Q.  What preceded the defendant telling you to fix the bug in

3    June of 2022?

4    A.  I observed a meeting between Sam, Caroline, Gary, and

5    Nishad.

6    Q.  What do you mean when you say you observed a meeting

7    between Sam, Caroline, Gary, and Nishad?

8    A.  I saw the four of them walk into a room and have a meeting

9    together.

10   Q.  And how did you perceive that group of people——the

11   defendant, Gary Wang, Nishad Singh, and Caroline Ellison?

12   A.  I saw them as the leadership of FTX at Alameda.

13   Q.  Did you learn some of what was discussed at that meeting?

14   A.  Yes.

15   Q.  From who?

16   A.  I think it was Nishad.

17   Q.  And what did Nishad tell you about that meeting?

18   A.  He told me that——

19            MR. EVERDELL:  Objection.

20            MS. SASSOON:  Your Honor, it's the statement of an

21   agent, and it also explains the witness's subsequent actions.

22            THE COURT:  All right.  Go ahead.

23   Q.  What did Nishad tell you about what happened in that

24   meeting?

25   A.  He told me that the purpose of the meeting had been to do a

1    full accounting of the two companies.

2    Q.  What is a full accounting of the two companies?

3    A.  Tallying up the——or enumerating the companies' assets and

4    liabilities.

5    Q.  When you say "the companies," which companies are you

6    referring to?

7    A.  I'm referring to FTX and Alameda.

8    Q.  And what does it mean to tally up assets and liabilities?

9    What are assets and liabilities?

10   A.  An asset is something that you own, and a liability is a

11   debt that you owe.

12   Q.  So in doing an accounting for FTX and Alameda, would the

13   fiat@ftx.com account fall into that accounting?

14   A.  Yes.

15   Q.  How so?

16   A.  It would be an asset for FTX and a liability for Alameda.

17   Q.  And why was it a liability for Alameda?

18   A.  Because it was a debt owed by Alameda to FTX's customers.

19   Q.  In this context of the full accounting review, what did the

20   defendant say to you about the bug?

21   A.  He told me he wanted the bug to be fixed.

22   Q.  Where did this conversation take place when the defendant

23   told you to fix the bug in Alameda's liability to FTX

24   customers?

25   A.  It took place in the offices in the Bahamas.

1    Q.   So this was an in-person conversation.

2    A.   Yes.

3    Q.   Did you in fact fix this bug or error in the code?

4    A.   Yes.

5    Q.   By the time you fixed the error in the code, by

6    approximately what dollar amount was Alameda's total liability

7    to FTX customers exaggerated?

8    A.   About $8 billion.

9    Q.   And so what was the total liability or debt reflected in

10   the fiat@ftx.com account to FTX customers while this bug was in

11   effect?

12   A.   You mean at the time I fixed it?

13   Q.   Yes.

14   A.   About $16 billion.

15   Q.   And once you corrected the bug, what did you learn about

16   approximately how much money Alameda actually owed to FTX

17   customers?

18   A.   Also about $8 billion.

19   Q.   So the error was about 8 billion and the actual amount was

20   also about 8 billion?

21   A.   As I recall, yes.

22   Q.   And together, that added up to 16 billion.

23   A.   Yes.

24   Q.   Okay.  Did you tell the leadership of the

25   companies——meaning the defendant and the others you

1    identified——when the bug was fixed?

2    A.   Yes.

3    Q.   Did you tell the defendant that the remaining amount of

4    money that Alameda owed to FTX customers for their dollar

5    deposits was about $8 billion?

6              MR. EVERDELL:   Objection.

7              THE COURT:   What's the objection?

8              MR. EVERDELL:   Leading.

9              THE COURT:   Sustained, form.

10   Q.   What, if anything, did you tell the defendant about the

11   actual dollar debt that Alameda owed to FTX customers, the

12   amount?

13   A.   I told him the amount of money owed by Alameda to FTX

14   customers.

15   Q.   What was that amount?

16   A.   $8 billion.

17   Q.   Around what date did you fix the bug?

18   A.   In June 2022.

19   Q.   And would that be mid-June, early June, late June?

20   A.   Mid-June.

21   Q.   Did you document the results of your work?

22   A.   Yes.

23   Q.   How so?

24   A.   I wrote a postmortem document that was meant to, in detail,

25   explain exactly what the bug was and exactly what I did to fix

1    it.

2    Q.  Did you share this document with the defendant?

3    A.  Yes.

4    Q.  How did you share it with him?

5    A.  By a Signal message.

6    Q.  And what exactly is Signal?

7    A.  Signal is an end-to-end encrypted messaging app.

8    Q.  When you say Signal is an encrypted messaging app, what

9    does encrypted mean?

10   A.  It means that the messages are not easily read while

11   they're in flight or possibly while they're stored.

12   Q.  Why were you using Signal to communicate with the

13   defendant?

14   A.  It was his instructions to use Signal in many cases for

15   communications.

16   Q.  When you say it was the defendant's instruction to use

17   Signal, who did he give that instruction to?

18   A.  To my knowledge, the entire company.

19   Q.  What features, if any, were implemented on the Signal

20   communications between employees of FTX and Alameda?

21   A.  Automatic deletion timers.

22   Q.  What is an automatic deletion timer?

23   A.  It causes messages to be deleted after a certain amount of

24   time.

25   Q.  Who implemented the auto-deletion feature on company Signal

1    communications?

2    A.  Would you clarify what you mean by "implemented."

3    Q.  Yes.  So why were your communications set to auto-delete on

4    Signal?

5    A.  Sam instructed people to do that.

6    Q.  When you say "people," do you mean employees of the

7    company?

8    A.  Yes.

9    Q.  Around the time that the defendant directed employees of

10   the company to auto-delete their Signal messages, what, if

11   anything, did he explain to you about this policy?

12   A.  He said that it was all downside for messages to be kept

13   around.

14   Q.  What, if anything, did he explain about why it was all

15   downside to preserve messages among company employees?

16   A.  There wasn't much benefit to keeping messages around, and

17   if regulators found something they didn't like in those

18   messages, that could be bad for the company.

19   Q.  Did the defendant say that?

20   A.  He didn't use exactly those words, but that was what the

21   substance——that's the substance of what he said.

22   Q.  You said that you communicated with the defendant about

23   Alameda's debt to FTX customers by Signal.  Do those Signal

24   messages still exist?

25   A.  The documentation that I created does, but the message that

1    carried the documentation does not.

2    Q.   Meaning the message to the defendant with your analysis

3    does not exist?

4    A.   Correct.

5    Q.   Why not?

6    A.   It was deleted.

7    Q.   And this was deleted in keeping with the company policy?

8    A.   Right.  It was deleted by the automatic message deletion

9    timer.

10   Q.   You testified that after the bug was fixed you learned that

11   Alameda still owed FTX customers about $8 billion.  How did you

12   know that number?

13   A.   I saw it.

14   Q.   Where did you see it?

15   A.   In the FTX database.

16   Q.   Were you aware whether that information was visible to

17   other executives at the company, like the defendant?

18   A.   Yes.

19   Q.   Was it?

20   A.   Yes.

21   Q.   So in the course of fixing the bug, you learned that

22   Alameda owed FTX customers about $8 billion.  What was your

23   reaction to that?

24   A.   The number seemed large to me.

25   Q.   And what was your reaction to the $8 billion debt seeming

1   large to you?

2   A.  I had a conversation with Sam.

3   Q.  Before you had a conversation with Sam, what was your

4   reaction to this $8 billion liability being very large that led

5   to your conversation with Sam?

6   A.  It concerned me.

7   Q.  Why did it concern you?

8   A.  It seemed like a lot of money for Alameda to be owing FTX,

9   and I wanted to be certain that Alameda could repay that debt.

10  Q.  Why did you want to be certain that Alameda could repay its

11  $8 billion debt to FTX customers?

12  A.  Because it was possible that FTX customers would need that

13  $8 billion to be repaid themselves if they withdrew.

14  Q.  But did you share those concerns with the defendant?

15  A.  Yes.

16  Q.  Can you describe that conversation.

17  A.  Yes.  So the conversation began with me bringing up

18  the——the large debt owed by Alameda to FTX and asking something

19  like, *Are things okay?*  In response, Sam said something like,

20  *We were bulletproof last year but we're not bulletproof this*

21  *year.*  And in response to that, I asked, *How long until we're*

22  *bulletproof again?*  And he said, *I'm not sure.  I'm not sure* is

23  his words.  *Maybe something like six months to three years.*

24  And I said, *Are things going to be okay?*  Basically.  And he

25  said, *Yeah, yeah,* or, you know, he——from that point on I——I

1    recall him saying some things that were meant to reassure.

2    Q.  So let's break that down.

3         Around when was this conversation with the defendant

4    about Alameda's debt to FTX?

5    A.  Soon after I fixed the bug.

6    Q.  And around when was that?

7    A.  Around——it would have been probably in late June or early

8    July 2022, maybe.

9    Q.  Where did this conversation with the defendant take place?

10   A.  It took place in the paddle tennis court.

11        MS. SASSOON:  Mr. Bianco, can you please show the

12   witness Government Exhibit 1457.

13   Q.  Do you recognize this?

14   A.  Yes.

15   Q.  What is it?

16   A.  It's a paddle tennis court.

17   Q.  Does this resemble the paddle tennis court where you had

18   this conversation with the defendant?

19   A.  Yes.

20        MS. SASSOON:  Government offers Government

21   Exhibit 1457.

22        THE COURT:  Received.

23        (Government's Exhibit 1457 received in evidence)

24        MS. SASSOON:  Mr. Bianco, please publish Government

25   Exhibit 1457.

1   BY MS. SASSOON:

2   Q.  What is this, Mr. Yedidia?

3   A.  It's a paddle tennis court.

4   Q.  And where is this paddle tennis court?

5   A.  It's in The Albany.

6   Q.  And can you remind us, what's The Albany?

7   A.  The Albany is a luxury resort on the western side of New

8   Providence, Bahamas.

9   Q.  So is that where your apartment was?

10  A.  Yes.

11  Q.  And is this where you had this conversation with the

12  defendant that you've been describing?

13  A.  I believe so, yes.

14  Q.  And when you had this conversation with the defendant about

15  the money that Alameda owed to FTX customers, what had you been

16  doing beforehand with the defendant?

17  A.  I believe I'd been playing paddle tennis.

18  Q.  And where were you for this conversation with the defendant

19  that you've been describing, using this photo as a reference?

20  A.  We were under or around that——that little hut in between

21  the two courts on the——the——on the near side of the photo.

22  Q.  And when you were with the defendant near this hut between

23  the paddle courts, can you describe the substance of the first

24  question that you posed to the defendant.

25  A.  I asked about the debt that Alameda owed to FTX and I

1    asked, *Are things okay?*

2    Q.  Why were you asking if things were okay in connection with

3    the debt that Alameda owed to FTX customers of about

4    $8 billion?

5    A.  It was a very large debt, and I wanted to know that Alameda

6    could repay it.

7    Q.  What did the defendant say in response to your question?

8            MR. EVERDELL:  Asked and answered.

9            THE COURT:  Sustained.

10   Q.  Where was the defendant when he responded that *We're not*

11   *bulletproof anymore,* during this conversation?

12   A.  He was in——I think somewhere underneath this——this little

13   hut in between the two courts.

14   Q.  When you responded to the defendant, *How long until we're*

15   *bulletproof again?* when he said *We're no longer bulletproof,*

16   who was the "we" that you were referring to?

17           MR. EVERDELL:  Objection.

18           THE COURT:  Overruled.

19   A.  I understood "we" to mean Alameda and FTX.

20   Q.  And when you asked *How long until we're bulletproof again,*

21   what did you mean by that?

22   A.  I was asking at what point Alameda and FTX's financial

23   health would be sound.

24   Q.  When the defendant responded to you, *Maybe in about six*

25   *months to three years,* how would you describe his demeanor?

1          MR. EVERDELL:  Objection.

2          THE COURT:  Overruled.

3   A.   Worried, or nervous.

4   Q.   What makes you say that he appeared worried or nervous?

5   A.   His facial expression at the time.

6   Q.   Was that typical of your interactions with the defendant

7   over the course of your about decades-long relationship?

8   A.   No.

9   Q.   After this conversation did you feel reassured that Alameda

10  would be able to repay its approximately $8 billion debt to

11  FTX?

12         MR. EVERDELL:  Objection.

13         THE COURT:  Sustained.

14  Q.   When the defendant said *We're not bulletproof anymore,* did

15  you press for more details?

16         MR. EVERDELL:  Objection.

17         THE COURT:  Overruled.

18  A.   No.

19  Q.   Why not?

20  A.   I was a developer at FTX rather than an accountant or a

21  trader at Alameda.  I felt that my duties were to make sure

22  that FTX's code ran well and to build more features for FTX.

23  And I──I trusted Sam.  I hoped that Sam and Caroline and others

24  at Alameda would handle the situation.

25  Q.   After this conversation you had with the defendant on the

1  paddle court about not being bulletproof anymore, did you and

2  the defendant have any subsequent conversations about FTX's

3  financial situation?

4  A.   Yes.

5           THE COURT:  Let's break here for about 15 minutes.

6           THE DEPUTY CLERK:  Would the jury please come this

7  way.

8           (Recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    THE COURT:  Let's get the jury.

 2                    MR. ROOS:  Judge, there was something I wanted to

 3      raise with you about transcript binders relevant to the next

 4      witness.  I don't think we are going to get there before lunch.

 5                    THE COURT:  Transfer binders?

 6                    MR. ROOS:  Transcript.

 7                    THE COURT:  Transcript binders.

 8                    MR. ROOS:  There are two recordings with the next

 9      witness.  We have little binders for the jury that have

10      transcripts so that they can read along with the recording.  I

11      just wanted to run it by your Honor before we do that, but my

12      sense right now is maybe we will break for lunch before that.

13                    THE COURT:  Could be.

14                    (Jury present)

15                    THE COURT:  The defendant and the jurors all are

16      present, as they have been throughout.

17                    You may continue, Ms. Sassoon.

18                    MS. SASSOON:  Thank you, your Honor.

19      BY MS. SASSOON:

20      Q.  Mr. Yedidia, after your conversation with the defendant on

21      the paddle court, did you have any subsequent conversations

22      with the defendant about FTX's financial situation?

23      A.  Yes.

24      Q.  What do you recall about that?

25      A.  There was a conversation that Sam and I had that I had the
```

1    impression was related to the previous conversation in which he

2    talked about his plans for raising money from Saudi Arabia

3    and/or the United Arab Emirates.

4    Q.  When you say he talked about raising money from Saudi

5    Arabia or United Arab Emirates, what, if anything, did he say

6    about what he was raising money for?

7    A.  FTX.

8    Q.  Did the defendant explain why he wanted to raise money for

9    FTX from Saudi Arabia or the United Arab Emirates?

10   A.  He said he wanted FTX to have more cash as I recall.

11   Q.  As far as you know, were any efforts to raise money from

12   Saudi Arabia or the United Arab Emirates successful?

13   A.  No.

14   Q.  About how soon after that conversation did FTX go bankrupt?

15   A.  Somewhere between one and three months, I think, maybe one

16   and four months.

17   Q.  And around what month of 2022 was that?

18   A.  November 2022.

19   Q.  Before FTX declared bankruptcy, what was happening at FTX

20   with respect to FTX customer withdrawals?

21   A.  A lot of customers were all withdrawing at once.

22   Q.  And what happened when large numbers of customers were all

23   trying to withdraw their money at once?

24   A.  Not all of them received their money.

25   Q.  Did you have any conversations with the defendant in

1    November of 2022 about what was happening at FTX?

2    A.  We had a conversation over Signal.

3    Q.  What do you recall about that conversation?

4    A.  I said, I love you, Sam, I am not going anywhere.  Don't

5    worry.

6    Q.  Why did you say, I'm not going anywhere?

7    A.  I had learned that a lot of the other employees had quit,

8    and I wanted to reassure him that I wouldn't do the same.

9    Q.  Yesterday you testified that you resigned from FTX in

10   November of 2022.  So what changed?

11   A.  I learned that Alameda had used FTX customer deposits to

12   repay its loans to creditors.

13   Q.  And why did that change your mind about staying at FTX?

14   A.  What Alameda did seemed like a flagrantly wrong thing to

15   have done.

16              MS. SASSOON:  No further questions.

17              THE COURT:  Thank you.

18              Cross-examination.

19   CROSS-EXAMINATION

20   BY MR. EVERDELL:

21   Q.  Good morning, Mr. Yedidia.

22   A.  Good morning.

23   Q.  Mr. Yedidia, you went to college at MIT, correct?

24   A.  Correct.

25   Q.  You majored in electrical engineering and computer science?

```
 1   A.  And math as well, yes.

 2   Q.  You graduated MIT in 2014, is that right?

 3   A.  That's right.

 4   Q.  And you went back to MIT to do your graduate work?

 5   A.  That's correct.

 6   Q.  You got a doctorate?

 7   A.  Yes.

 8   Q.  Did some postdoctorate work at Berkeley?

 9   A.  Yes.

10   Q.  I think you met your now wife, Andrea Lincoln, at MIT?

11   A.  Yes.

12   Q.  You first met Mr. Bankman-Fried while you were at MIT?

13   A.  Yes.

14   Q.  You lived in the same house, you said?

15   A.  Yes.

16   Q.  Did you also meet Gary Wang at MIT?

17   A.  Yes.

18   Q.  And he lived in the same house as well, isn't that right?

19   A.  That's correct.

20   Q.  You became friends with Sam in college?

21   A.  Yes.

22   Q.  You got to know him?

23   A.  Yes.

24   Q.  Sam grew up in California, is that right?

25   A.  I believe so, yes.
```

1    Q.   After college he worked at Jane Street Capital, is that

2    right?

3    A.   Yes.

4    Q.   That was a well-regarded trading firm on Wall Street?

5    A.   Yes.

6    Q.   Jane Street does something called quantitative trading, is

7    that right?

8    A.   Yes.

9    Q.   Quantitative trading, just generally speaking, involves

10   using computer algorithms, right, and mathematical models to

11   identify trading opportunities?

12   A.   I don't actually know the definition of quantitative

13   trading.

14   Q.   They identify trading opportunities to trade with, right?

15   A.   Yes.

16   Q.   And they can involve the use of complicated schemes or

17   thought-out schemes or methods to trade on -- they can use

18   mathematical methods, for example, to determine how and when to

19   trade on something?

20   A.   Yes.

21   Q.   Jane Street is what's called a proprietary trading firm,

22   isn't that right?

23   A.   Yes.

24   Q.   Sometimes that's called a prop trading firm?

25   A.   I've heard it called that.

 1    Q.  That means it is a firm that trades its own money or money

 2    it receives from lenders, right?

 3    A.  I think that's where the name comes from, yes.

 4    Q.  So it doesn't have any customers itself, right?

 5    A.  I am not sure if prop shops always do or don't have

 6    customers.

 7    Q.  It doesn't make trades on behalf of customers.

 8    A.  I guess I am not sure.

 9    Q.  He worked there at Jane Street for a few years before

10    starting Alameda Research, right?

11    A.  Yes.

12    Q.  Now, you said in, I think, 2017, Sam offered you an

13    internship position at Alameda, is that right?

14    A.  That's correct.

15    Q.  So this is when Sam was the CEO of Alameda?

16    A.  I believe he was the co-CEO, yes.

17    Q.  Who was he co-CEO with?

18    A.  Tara MacAulay.

19    Q.  But he coowned that company with Gary Wang, isn't that

20    right.

21    A.  I believe so, yes.

22    Q.  That was a private company, correct?

23    A.  To my knowledge, yes.

24    Q.  It was not a public company?

25    A.  To my knowledge, that's correct.

1  Q.  And you were working there as an intern before he started

2  FTX?

3  A.  Correct.

4  Q.  And you interned there for a couple of months, roughly I

5  think you said December 2017 to January '18, 2018?

6  A.  That's right.

7  Q.  And this was before you went back to MIT to do your

8  graduate work?

9  A.  That's right.

10 Q.  Alameda was a trading firm that traded in cryptocurrencies,

11 is that right?

12 A.  Yes.

13 Q.  And it typically engaged in what's called arbitrage

14 trading, is that right?

15 A.  Yes.

16 Q.  That just means that Alameda was trying to find

17 opportunities to buy a particular cryptocurrency where the

18 price was lower in another and sell it where it was higher in

19 another place.  Is that right?

20 A.  Yes.

21 Q.  And it was very successful with its trading strategies,

22 right?

23 A.  I don't know exactly how successful Alameda was.

24 Q.  It was a profitable company.

25 A.  I don't know if that's true.

1  Q.  Well, you worked as a trader during your internship at

2  Alameda?

3  A.  Yes.

4  Q.  That was your first exposure to trading, right?

5  A.  I had been an intern at Jane Street earlier in my life, but

6  I did no trading at Jane Street, so yes.

7  Q.  You were at Jane Street but I think you were working in

8  data analysis there, right?

9  A.  Right.

10  Q.  You weren't trading because you were an intern?

11  A.  Correct.

12  Q.  Now, in October, I believe October of 2020, you reached out

13  to Sam about maybe getting a job working at FTX, is that right?

14  A.  That's correct.

15  Q.  And you said you began working for FTX in Hong Kong around

16  January of 2021?

17  A.  Correct.

18  Q.  And you worked for several months in Hong Kong?

19  A.  Yes.

20  Q.  And then FTX moved to the Bahamas, you said?

21  A.  Yes.

22  Q.  So you moved to the Bahamas in, you said, roughly October

23  2021?

24  A.  Yes.

25  Q.  And you continued working for FTX in the Bahamas until

1   November of 2022?

2   A.  Yes.

3   Q.  And you said FTX was a cryptocurrency exchange, right?

4   A.  Yes.

5   Q.  Explain to us again what that is.

6   A.  It's a website on which people can buy and sell

7   cryptocurrencies from each other.

8   Q.  So it's a little like the New York Stock Exchange, right,

9   in the sense that it's an exchange?

10  A.  It has the word exchange in it.  I don't know to what

11  extent it resembles the New York Stock Exchange in terms of how

12  it works.

13  Q.  Understood.  But New York Stock Exchange is a place where

14  buyers and sellers of stock can trade stock with each other,

15  right?

16  A.  To my knowledge, yes.

17  Q.  FTX is a similar concept, except it allows buyers and

18  sellers of cryptocurrency to buy and sell with each other?

19  A.  Yes.

20  Q.  Now, you worked, when you got to FTX, you worked as a

21  developer, right?

22  A.  Yes.

23  Q.  That's someone who, as you said, deals with code, right?

24  A.  That's correct.

25  Q.  Computer code.

1          And you reported directly to Nishad Singh, is that

2   correct?

3   A.   Yes.

4   Q.   And he was the head of engineering, is that right?

5   A.   That's correct.

6   Q.   And Mr. Bankman-Fried was the CEO?

7   A.   Yes.

8   Q.   He ran the company, is that right?

9   A.   Yes.

10  Q.   And Gary Wang was the chief technical officer, is that

11  right?

12  A.   I thought chief technology officer, but yes.

13  Q.   CTO, is that what he was?

14  A.   Yes.

15  Q.   And he was the senior most developer himself, wasn't he?

16  A.   Do you mean senior in the sense of having worth in the

17  company longer or senior in the sense of higher ranking?

18  Q.   I mean higher ranging.

19  A.   Yes.

20  Q.   But you yourself became one of the senior developers at FTX

21  while you were there?

22  A.   Yes.

23  Q.   Your job was to generally to maintain and update the

24  computer code that allowed FTX to function, is that right?

25  A.   Yes.

 1    Q.  Your role was to run queries in the FTX transactional

 2    database to retrieve and analyze data occasionally?

 3    A.  Yes.

 4    Q.  And I think you said you wrote computer code itself for the

 5    company, correct?

 6    A.  Yes.

 7    Q.  In particular, about the website design.

 8    A.  Yes.

 9    Q.  And as a senior developer you supervised and trained other

10    FTX developers, isn't that right?

11    A.  I did a lot of training of other developers, but I didn't

12    do very much supervising.

13    Q.  But you trained them?

14    A.  Yes.

15    Q.  Now, you said that one of your jobs was also to fix bugs in

16    the code base, right?

17    A.  Yes.

18    Q.  So, generally speaking, a computer bug is when the code

19    isn't functioning properly, is that right?

20    A.  Yes.

21    Q.  It may happen when a coder writes a piece of code

22    incorrectly, for example.

23    A.  Yes.

24    Q.  And that incorrect code might cause unexpected results in

25    the functioning of the code base.

```
 1    A.   Yes.

 2    Q.   And you would fix those bugs.

 3    A.   I would fix some bugs, yes.

 4    Q.   It was a pretty regular part of your job, to fix bugs,

 5    correct?

 6    A.   Correct.

 7    Q.   So there were lots of times where you had to do this.  This

 8    was something that happened on a fair number of occasions?

 9    A.   Yes.

10    Q.   You didn't yourself have any role with the finances of FTX,

11    did you?

12    A.   No.

13    Q.   You didn't interact with the investors.

14    A.   No.

15    Q.   You didn't deal with marketing or advertising, right?

16    A.   No.

17    Q.   You didn't deal with the media.

18    A.   No.

19    Q.   You didn't have any role in deciding how FTX spent its

20    money.

21    A.   No.

22    Q.   Those were all the responsibility of other people, right?

23    A.   Yes.

24    Q.   I think you said that Sam was the public face of FTX, is

25    that right?
```

1   A.   Yes.

2   Q.   And he was highly involved, I think you said, in marketing

3   and brand strategy, right?

4   A.   Yes.

5   Q.   That's what a CEO does, right?

6   A.   Yes.

7   Q.   They are the public face of the company, right?

8   A.   In most cases I would say, yes.

9   Q.   And they are typically in most cases the ones to talk to

10  the media, right?

11          MS. SASSOON:  Objection.

12          THE COURT:  Sustained.

13  Q.   Well, Sam had a lot of roles to fill at the company, didn't

14  he?

15  A.   Yes.

16  Q.   He was, as you said, the one who typically talked to the

17  media, right?

18  A.   Yes.

19  Q.   Did he set the strategic goals for the company?

20  A.   Yes.

21  Q.   Did he deal with the finances of the company?

22  A.   Yes.

23  Q.   Deal with investors?

24  A.   Yes.

25  Q.   And he had to manage the employees as well who were beneath

1    him?

2    A.   Yes.

3    Q.   But Sam himself was not one of the developers, right?

4    A.   That's correct.

5    Q.   For example, he didn't review any code that you wrote for

6    the time he was there?

7    A.   Correct.

8    Q.   He himself wasn't doing the coding in the database.

9    A.   He was not.

10   Q.   In fact, he didn't have access to the code base, did he?

11           MS. SASSOON:  Objection.

12           THE COURT:  Sustained.  Form at least.

13   Q.   As you said, he was not reviewing lines of code, that at

14   least you created, right?

15   A.   Not to my knowledge.

16   Q.   Mr. Yedidia, outside of your summer interns and Alameda,

17   you didn't have any experience in the financial industry, is

18   that right?

19   A.   That's right.

20   Q.   You didn't have any experience yourself in financial

21   regulatory compliance.

22   A.   No.

23   Q.   And you didn't have any formal accounting experience?

24   A.   No.

25   Q.   You didn't have any experience in custody and customer

 1    funds, things like that.

 2    A.  No.

 3    Q.  Mr. Yedidia, FTX, where you worked in Hong Kong and then in

 4    the Bahamas, was set up as an international exchange, is that

 5    correct?

 6    A.  Yes.

 7    Q.  So it's first based in Hong Kong, correct?

 8    A.  I think the company may have been incorporated elsewhere,

 9    but the offices were based in Hong Kong.

10    Q.  Then the offices became based in the Bahamas, right.

11    A.  Yes.

12    Q.  It was not a U.S. company?

13             MS. SASSOON:  Objection.

14             THE COURT:  Sustained at least as to form.

15    Q.  It was not a company that was incorporated in the U.S., to

16    your knowledge?

17    A.  Not to my knowledge, no.

18    Q.  And it was not a company whose headquarters or offices were

19    based in the U.S.?

20    A.  Not to my knowledge, no.

21    Q.  And the exchange itself was not open to U.S. residents, was

22    it?

23    A.  No.

24    Q.  So if you're a U.S. resident, you did not have the ability

25    to open an account on the FTX international exchange, right?

1          MS. SASSOON:  Objection.  Form.

2          THE COURT:  Sustained as to form.

3  Q.  So if you were a U.S. resident, you could not --

4          MR. EVERDELL:  One moment, your Honor.

5          I'll rephrase.

6  Q.  To your knowledge, Mr. Yedidia, if you were a U.S.

7  resident, you couldn't open an account on the exchange?

8          THE COURT:  Sustained as to form.  The

9  to-your-knowledge formulation is susceptible to two equal and

10 opposite meanings.  Why don't you try to rephrase that.

11         MR. EVERDELL:  I will move on to one question that I

12 think should help.

13 Q.  Mr. Yedidia, you previously testified that companies that

14 were based in the U.S. but had subsidiaries in foreign

15 countries, the subsidiaries could trade on the exchange, is

16 that correct?

17         MS. SASSOON:  Objection.  Misstates the testimony.

18         THE COURT:  Do you have a page for me?

19         MR. EVERDELL:  Your Honor, I'm sorry.  I don't have a

20 page for you.

21         THE COURT:  I'll take advice from wherever I can get

22 it.

23         Do you want to rephrase?

24         MR. EVERDELL:  Yes.  I'll ask a separate question.

25 Q.  Mr. Yedidia, is it your understanding that companies that

1   were based in the U.S. but had subsidiaries in foreign

2   countries, the subsidiaries could trade on the exchange?

3   A.  Yes.

4   Q.  These were multinational companies, right?

5   A.  Yes.

6   Q.  And so in your dealings with these companies, it was only

7   the foreign subsidiary who could open the account, is that

8   correct?

9            MS. SASSOON:  Objection.  Foundation.

10           THE COURT:  Sustained.

11           MR. EVERDELL:  Your Honor, I can give you a page cite

12   for the other point.

13           THE COURT:  I don't need it now because you have moved

14   on.

15           MR. EVERDELL:  I'm moving back to the question, your

16   Honor.

17   Q.  Mr. Yedidia, you testified that institutions that were

18   based in the U.S. but had entities outside the U.S. were

19   allowed to trade on FTX.com, but assuming they were trading

20   with their other entities, isn't that right?

21   A.  That was my understanding.

22   Q.  So the other entities being the ones located outside the

23   U.S., right?

24   A.  Yes.

25   Q.  And isn't it true that a foreign -- a company that was

1   going to do that had to attest that all trading decisions could

2   be made by non-U.S. personnel?

3            MS. SASSOON:  Objection.  Foundation.

4            THE COURT:  Well, the witness can answer if he knows.

5            But if you don't know, don't speculate.

6   A.  I'm sorry.  Could you repeat the question, please.

7   Q.  Sure.  Are you aware of any attestations that the companies

8   have to make if they were going to engage -- have their foreign

9   subsidiaries transact on the account?

10  A.  I don't recall that.

11  Q.  You do recall dealing with a company called, I think,

12  Tower.  Do you remember a company called Tower?

13  A.  I recall a company called Tower, yes.

14  Q.  And they did business on the exchange, right?

15  A.  Yes.

16  Q.  And they were a multinational company, to your knowledge?

17  A.  I don't know.

18  Q.  You recall having discussions with developers from Tower,

19  right?

20  A.  No, I don't recall having discussions with developers from

21  Tower.

22  Q.  Do you recall having discussions with people located in

23  Singapore?

24  A.  I had discussions with people located in Singapore, but not

25  in the context of Tower.

1    Q.  Let me ask this question, Mr. Yedidia.  Didn't FTX, the

2    international exchange where you worked, take steps to try to

3    prevent U.S.-based customers from accessing the international

4    exchange?

5    A.  Yes.

6    Q.  So, for example, FTX set up geofencing, didn't it, to block

7    U.S.-based IP addresses?

8    A.  Yes.

9    Q.  And that just means that you would look to see where the

10   customer was connecting to the exchange, right?

11   A.  You would look at the IP address to infer from country they

12   were connecting from.

13   Q.  You would look at IP address and look at what country that

14   suggested.  And if it looked like they were connecting from a

15   U.S.-based IP address you would block their access, correct?

16             MS. SASSOON:  Objection.  Form.

17             THE COURT:  Overruled.

18   A.  Correct.

19   Q.  And FTX had know-your-customer protocols, correct?

20   A.  Yes.

21   Q.  Know-your-customer protocols are sometimes called KYC

22   protocols, is that right?

23   A.  Yes.

24   Q.  And just means you try to find out information about who

25   your customers were, right?

1   A.   Yes.

2   Q.   And that's in part at least to make sure that they were

3   ones who were permitted to use the exchange, right?

4   A.   Yes.

5   Q.   So FTX had KYC protocols to do just that, didn't it?

6   A.   Yes.

7   Q.   And FTX implemented those KYC protocols to verify their

8   customers.

9   A.   Yes.

10  Q.   For example, you'd have customers provide personal

11  information about themselves, like name, date of birth, right?

12  A.   Yes.

13  Q.   And at one point you implemented a phone verification to

14  make sure the customer was who they said they were, right?

15  A.   By you, do you mean me specifically?

16  Q.   No.  Who the customer says you were.  The company had a

17  protocol whereby that was implemented, is that right?

18  A.   Yes.

19  Q.   And in fact in some cases customers were required to have

20  their faces scanned by a web cam, isn't that right?

21  A.   That was one of the options available, yes.

22  Q.   This is to make sure it was an actual human being and not

23  some bot somewhere, right?

24  A.   Yes.

25  Q.   These were all procedures that the company used to make

 1   sure that the people using the exchange were actually

 2   foreign-based customers, not U.S. customers, right?

 3   A.  That was one of the purposes, yes.

 4   Q.  And this is an effort that Mr. Bankman-Fried, Sam,

 5   endorsed, right?

 6   A.  Yes.

 7   Q.  This is something he cared about, right?

 8            MS. SASSOON:  Objection.

 9            THE COURT:  Sustained.

10   Q.  Well, it's true that he wanted to make sure that this

11   problem was being addressed if it was a problem?

12            MS. SASSOON:  Objection.

13            THE COURT:  Sustained.

14   Q.  You had discussions with Sam about non-U.S. customers using

15   the international exchange, didn't you?

16   A.  Yes.

17            MS. SASSOON:  Objection.  Hearsay, to the extent he is

18   going to elicit the conversations.

19            THE COURT:  Let's see what the next question is.

20   Q.  Did he want to make sure that the problem was being

21   addressed?

22            THE COURT:  Sustained.

23   Q.  Was it your understanding --

24            MR. EVERDELL:  Withdrawn, your Honor.

25   Q.  It's true that at the time Mr. Bankman-Fried was engaging

1   with regulators about his exchange, correct?

2          MS. SASSOON:  Objection, form.  What time are we

3   talking about?

4          THE COURT:  Sustained.

5   Q.  During your employment at FTX, which you said began in

6   January of 2021 going through November of 2022,

7   Mr. Bankman-Fried was trying to have discussions with

8   regulators at the time, right?

9          MS. SASSOON:  Objection.

10          THE COURT:  Sustained.

11   Q.  Are you aware that Mr. Bankman-Fried had discussions with

12   regulators?

13   A.  Yes.

14   Q.  Are you aware that he was having discussions with law

15   makers too?

16   A.  Yes.

17   Q.  He did not want to ignore regulators and law makers,

18   correct?

19          MS. SASSOON:  Objection, your Honor.

20          THE COURT:  Sustained.

21   Q.  This was part of a company effort to engage with law

22   makers, wasn't it?

23          MS. SASSOON:  Objection to form.

24          THE COURT:  Sustained.

25   Q.  Are you aware that Sam testified in front of Congress?

1   A.  Yes.

2   Q.  And it wasn't typical, was it, for an executive of a crypto

3   company to want to engage with law makers at the time?

4           MS. SASSOON:  Objection.

5           THE COURT:  Sustained.

6   Q.  Are you aware of -- you yourself didn't think this was

7   going to be a worthwhile effort, isn't that true?

8           MS. SASSOON:  Objection.  Form.

9           MR. EVERDELL:  I'll rephrase.

10          THE COURT:  Sustained.

11  Q.  Did you have an opinion about engaging with regulators and

12  whether that was worthwhile for the company to do?

13  A.  Which regulators are you talking about?

14  Q.  U.S. regulators.

15          THE COURT:  That's a yes-or-no question, unless there

16  is an objection.

17          Is there an objection, or not?

18          MS. SASSOON:  Relevance, your Honor.

19          THE COURT:  Sustained.

20          MR. EVERDELL:  One moment.

21          I'll move to a different topic.

22  Q.  Mr. Yedidia, at the time you joined FTX in January of 2021,

23  it was growing quickly, wasn't it?

24  A.  Yes.

25  Q.  I think you said that when you got there it had roughly 200

1  employees is what you said?

2  A.  I think what I said was maybe a hundred, maybe a little bit

3  more.

4  Q.  It eventually got up to about 350 employees, thereabouts.

5  Is that about right?

6  A.  About right, yeah.  Within 100 or so in either direction.

7  Q.  So that's roughly doubling the time that you are there.

8  A.  Right.

9  Q.  Now, part of the reason why it was the growing quickly is

10  that it offered products and services that other exchanges

11  didn't have, isn't that right?

12  A.  I am not sure that's true.  I don't know.

13  Q.  You did offer services that certain exchanges didn't have,

14  right?  You had a lot of products?

15  A.  Could you give a specific example of a product?

16  Q.  Sure.  Let's take a competitor at least in the U.S.  You're

17  familiar with Coinbase, right?

18  A.  Yes.

19  Q.  Coinbase was one of the largest exchanges at the time,

20  right?

21  A.  Yes.

22  Q.  And Coinbase was a spot exchange, right?

23  A.  To my knowledge, yes.

24  Q.  That allows customers to trade cryptocurrencies one for

25  one, right?

1   A.   Right.

2   Q.   In other words, if I had $100 worth of Bitcoin, I could

3   trade it for $100 worth of Ethereum?

4   A.   Right.

5   Q.   FTX was different.  FTX allowed customers to trade on

6   margin, is that right?

7   A.   You're talking about the international exchange?

8   Q.   International exchange, yes.

9   A.   Yes.

10  Q.   And that just means that customers are allowed to borrow

11  funds and trade, as long as they put up collateral to back the

12  borrowing, right?

13  A.   That's my understanding, yes.

14  Q.   So, for example, if I had $100 worth of Bitcoin in my FTX

15  account and I wanted to borrow $500 worth of Ether to trade

16  with, I could do that, right?

17  A.   I am not sure about the details of that, but the broad

18  strokes are correct, to my knowledge.

19  Q.   I would just have to post my $100 as collateral, right?

20       MS. SASSOON:  Objection.  Form, and he said he doesn't

21  know the details.

22       THE COURT:  Let him answer.

23       Please answer.

24  A.   Could you repeat the question, please.

25  Q.   I would just have to post some collateral for that

1   borrower.

2   A.   That's my understanding.

3   Q.   That would serve as security for the borrowed funds.

4   A.   Sorry.   I am unfamiliar with that term.   What do you mean

5   by that?

6   Q.   Meaning if you started losing your money, that funds that

7   you posted as collateral could be taken by the exchange to

8   protect against the loss?

9   A.   Right.   My understanding, at a broad level, is that the

10   customer could be liquidated, which means that their collateral

11   would be turned into whatever it needed to be turned into in

12   order to even out their position.

13   Q.   Correct.   So to avoid a loss?

14   A.   Right.

15   Q.   And margin trading was a feature that FTX allowed, right?

16   A.   Yes.

17   Q.   And it allowed other products as well too, the

18   international exchange?

19   A.   Yes.

20   Q.   And it processed in settled trades faster sometimes than

21   other exchanges too, is that right?

22   A.   I'm not certain it was faster than other exchanges.

23   Q.   But there were a lot of products that were sophisticated

24   that other exchanges didn't offer, is that right?

25   A.   I guess if you're comparing specifically to Coinbase, then

1    FTX.com, as we discussed, did offer products that Coinbase did

2    not.

3    Q.  We talked a little bit about the rapid growth.  You

4    mentioned the number of employees just now that went up, is

5    that right?

6    A.  Yes.

7    Q.  Also, the average amounts of trades per day went up during

8    that time period, isn't that right?

9              MS. SASSOON:  Objection, form.  What time period?

10             MR. EVERDELL:  I'm referring to the time period of

11   your employment from January 2021 to November of 2022.

12   A.  I am not sure that trading volume went up the entire time,

13   but I think -- there were various points during my employment

14   during which trading volume did go up.

15   Q.  At some point it averaged billions of trades per day.  Does

16   that sound right?

17   A.  I am not certain.

18   Q.  And FTX's revenue also was increasing; isn't that correct?

19   A.  I believe that there were points during my employment

20   during which FTX's revenue was increasing, but I don't have

21   specific knowledge of what it was.

22   Q.  And its number of users was going up too, wasn't it?

23   A.  Yes.

24   Q.  I think by 2020 at some point it had about 6 million

25   registered users.  Does that sound about right?

 1   A.  I don't know.

 2   Q.  Well, give or take.  Is that in the ballpark of what your

 3   understanding might be?

 4   A.  I have very little understanding of how many users the

 5   exchange had in 2020.

 6   Q.  Understood.

 7          I'm saying 2022, Mr. Yedidia.

 8   A.  Apologies.

 9   Q.  Let me rephrase the question so we make sure that we have

10   it correctly.  I am referring to the time period in 2022 now.

11          In 2022, or by 2022, FTX had about 6 million users or

12   thereabouts.  Does that sound correct?

13   A.  I have substantial uncertainty about how many users it had

14   exactly, but it sounds about right, maybe within a factor of

15   ten.

16          THE COURT:  I'm sorry.  I lost the end of your answer.

17          THE WITNESS:  I was saying -- I was trying to quantify

18   my uncertainty about how many users FTX had during 2022.  I was

19   saying --

20          THE COURT:  You're quantifying your uncertainty about

21   the quantities you're talking about.

22          THE WITNESS:  Yes.

23          THE COURT:  Good.  I'm glad we now know what quants

24   are.

25          Do you have any knowledge, however many registered

1   users there were, how many of them were active?

2              THE WITNESS:  I don't know, your Honor.

3              THE COURT:  Let's move on.

4              MR. EVERDELL:  Yes, your Honor.

5   Q.  Safe to say that this was a pretty busy time for everybody

6   at FTX?

7              MS. SASSOON:  Objection.

8              THE COURT:  Sustained.

9   Q.  During this time we just spoke about, where FTX is growing,

10  you were working fairly hard yourself, weren't you,

11  Mr. Yedidia?

12  A.  Yes.

13  Q.  You were working very long hours, correct?

14  A.  Yes.

15  Q.  So typically how many hours were you working during a day?

16  A.  I was probably working about nine hours a day six days a

17  week.

18  Q.  And others were working even harder, isn't that right?

19             MS. SASSOON:  Objection.

20             THE COURT:  Sustained.

21  Q.  Did you observe others in the offices or in the apartments

22  doing work and seeing how often they were working?

23  A.  Yes.

24  Q.  And isn't it true, based on your observations, that people

25  were working very hard at that time?

1          MS. SASSOON:  Objection.

2          THE COURT:  Sustained.

3   Q.  Well, isn't it true that you were concerned about, for

4   example, Gary Wang?

5   A.  Yes.

6   Q.  You were concerned because he was working so hard you

7   thought he might burn out, isn't that right?

8   A.  Yes.

9   Q.  In fact, you were so concerned that you had to institute a

10  rule not to wake him up at night to fix bugs in the code

11  because he wasn't getting enough sleep.

12  A.  Yes.

13  Q.  And others like him were working that hard as well, weren't

14  they?

15         MS. SASSOON:  Objection.

16         THE COURT:  Sustained.  I think you have made your

17  point, counselor.

18  Q.  By this point FTX had a billion dollar valuation, isn't

19  that right?

20         MS. SASSOON:  Objection.

21         THE COURT:  Sustained.

22  Q.  Now, let me talk a bit about the types of employees that

23  FTX had while you were there.  I think we said it was several

24  hundred employees by the time --

25         THE COURT:  We have been up and down that mountain a

 1   couple of times.

 2   Q.  Let me get to some categories.  There were computer

 3   developers, is that right?

 4   A.  Yes.

 5   Q.  There was a whole team of computer developers, is that

 6   right?

 7   A.  Yes.

 8   Q.  There were marketing people?

 9   A.  Yes.

10   Q.  There were investor relations people?

11   A.  Yes.

12   Q.  There were customer service people?

13   A.  Yes.

14   Q.  Compliance people?

15   A.  Yes.

16   Q.  And settlements people.  We talked about that a little bit

17   already.

18   A.  Yes.

19   Q.  Now, one issue that I think you noticed, though, that

20   persisted was FTX needed more developers, didn't it?

21   A.  Yes.

22   Q.  So in the time that you were there, there weren't enough

23   developers to do the work, isn't that fair?

24   A.  Certainly, a lot of projects were bottlenecked on

25   developers.

1   Q.  So you had a lot of things that needed to get done that

2   needed to get done by developers, is that right?

3   A.  Yes.

4   Q.  And it was hard to find enough developer time to get all

5   those projects done, right?

6   A.  Yes.

7   Q.  That was a byproduct of the company's growth, right?

8   A.  Yes.

9   Q.  And I think you even mentioned you discussed this issue

10  with Nishad Singh, didn't you?

11  A.  Yes.

12  Q.  And he was your supervisor.

13  A.  Yes.

14  Q.  And you were also concerned about Nishad too, right, about

15  his burnout?

16  A.  Nishad worked very, very hard, but I wasn't afraid that he

17  would burn out exactly.  I didn't think it was likely that he

18  would burn out completely.

19  Q.  You had to cover some of his responsibilities from time to

20  time because he was so busy, isn't that right?

21  A.  On occasion, yes.

22  Q.  I think at some point you had to ghostwrite some of his

23  employee's reviews because he didn't have time to do that.

24  A.  Yes.

25  Q.  Still, despite all these issues with man power, at least

1   with the developers, you thought that FTX was very well run,

2   didn't you?

3              MS. SASSOON:  Objection, form.

4              THE COURT:  Sustained.

5   Q.  Didn't you speak to members of the FBI and the prosecutors?

6              MS. SASSOON:  Objection, your Honor.

7              THE COURT:  Sustained.

8   Q.  Did you have a sense -- isn't it true, Mr. Yedidia, that

9   you thought FTX was a well-run company?

10  A.  Yes.

11  Q.  And despite the difficulties in manpower, you believed in

12  FTX, right?

13  A.  Yes.

14  Q.  In fact, you still thought that one day FTX could overtake

15  Binance and Coinbase as the biggest exchange on the market,

16  isn't that right?

17  A.  Yes.

18  Q.  Now, Mr. Yedidia, you received a salary for your work at

19  FTX?

20  A.  Yes.

21  Q.  And you also received bonus compensation as well, right?

22  A.  Yes.

23  Q.  And you paid fairly well for your work there, right?

24  A.  Yes.

25  Q.  Your annual compensation was between $175,000 and 200,000

 1  per year, is that right?

 2  A.  That was the base salary, yes.

 3  Q.  And then you also got bonuses on top of that, right?

 4  A.  Yes.

 5  Q.  And you got two bonuses in 2021?

 6  A.  Yes.

 7  Q.  So your July 2021 bonus was -- I think it was $650,000 in

 8  cash, is that right?

 9  A.  Yes.

10  Q.  And you had stock options worth one to two million?

11  A.  Yes.

12  Q.  FTX stock.

13  A.  I think it was FTX U.S. stock if you're talking about --

14  yeah, fine.

15  Q.  In December of 2021, your second bonus was $6 million in

16  cash, is that correct?

17  A.  Yes.

18  Q.  And another 5 million in stock options.

19  A.  Yes.

20  Q.  And then I think you used that cash to immediately buy $5

21  million worth of FTX equity, is that right?

22  A.  Yes.

23  Q.  Because you thought it was a good investment, I guess.

24  A.  Yes.

25  Q.  You were putting your money back into the company?

```
 1   A.  That's correct.

 2   Q.  And you got another midyear bonus in July of 2022?

 3   A.  Yes.

 4   Q.  That was another 5 to 6 million?

 5   A.  About half in cash and half in options, yes.

 6   Q.  So all told, you received several million in cash and

 7   several million in options, right?

 8   A.  Yes.

 9   Q.  That's for about a year and a half of work.

10   A.  Yes.

11   Q.  Now, Sam was making a lot of money too, wasn't he?

12   A.  Yes.

13   Q.  He was the majority owner of both FTX and Alameda.

14   A.  Yes.

15   Q.  And they were both billion dollar companies.

16   A.  Yes.

17   Q.  So Sam himself was a billionaire many times over himself?

18          MS. SASSOON:  Objection.

19          THE COURT:  Sustained.

20   Q.  Well, he owned both companies, right?

21   A.  He owned a large stake in both companies.

22   Q.  As the owner, he could have paid himself out a sizeable

23   portion of the profits, couldn't he?

24          MS. SASSOON:  Objection.

25          THE COURT:  Sustained.
```

1    Q.  Well, he could have spent quite a bit of money on himself,

2    couldn't he?

3              MS. SASSOON:  Objection.

4              THE COURT:  Sustained.

5    Q.  Let's talk about, did you observe Mr. Bankman-Fried and how

6    he spent his money in your day-to-day interactions with him?

7    A.  To some extent, yes.

8    Q.  Well, you saw what he wore, for example?

9    A.  Yes.

10   Q.  You saw what things he bought for himself?

11             MS. SASSOON:  Objection.

12             THE COURT:  Overruled.

13   A.  I apologize.  Can you repeat the question.

14   Q.  You saw what things he bought for himself?

15   A.  I saw some of the things he bought for himself, yes.

16   Q.  So he didn't buy, for example, fancy watches, did he?

17   A.  Not to my knowledge, no.

18   Q.  To your knowledge, he didn't buy an expensive sports car?

19   A.  No.

20   Q.  He didn't buy a yacht, correct?

21   A.  Correct.

22             MS. SASSOON:  Objection.

23             THE COURT:  Overruled.

24   Q.  You can answer.

25   A.  To my knowledge, he did not buy himself a yacht.

```
 1   Q.  Do you know what car he did drive?

 2   A.  No.

 3   Q.  Do you recall seeing a Toyota Corolla?

 4            MS. SASSOON:  Objection.  He just said he --

 5            THE COURT:  I think there is anybody in the room who

 6   has never seen one, so let's get on with it.

 7   Q.  In terms of clothes, he didn't buy fancy clothes, right?

 8   A.  I didn't see him wear fancy clothes.

 9   Q.  He wore the same T-shirt and shorts he always wore, didn't

10   he?

11   A.  He was typically wearing a T-shirt and shorts.

12   Q.  I want to just show what's already in evidence as

13   Government's Exhibit 1469, if I could.

14            Mr. Yedidia, we took a look at this photo already on

15   the direct exam.  You see that?

16   A.  Yes.

17   Q.  I think you said you recognize the people in the photo,

18   right?

19            MS. SASSOON:  Objection.  He didn't testify --

20            THE COURT:  Look.  I have given you a lot of latitude.

21   The purpose of cross-examination is not to repeat the direct.

22   Let's get on with it.

23            MR. EVERDELL:  Yes, your Honor.

24   Q.  One last question on this.  Are you aware whether or not

25   Mr. Bankman-Fried had any personal safety concerns?
```

```
 1              MS. SASSOON:  Objection.

 2              THE COURT:  Sustained.

 3   Q.  Let's go to a different topic, Mr. Yedidia.

 4              You said that when you moved to the Bahamas you

 5   eventually lived in the Orchid penthouse, is that right?

 6   A.  Yes.

 7   Q.  We saw some pictures of the Orchid, correct?

 8   A.  Yes.

 9   Q.  I think before you lived in the Orchid you lived in an

10   apartment called the Cube, is that right?

11   A.  That's right.

12   Q.  And that was also in the Albany housing development?

13   A.  Yes.

14   Q.  And that was -- that meant you didn't have to live in a

15   hotel, for example, right?

16   A.  Yes.

17   Q.  And that was housing that was FTX housing, right?

18   A.  I lived there.

19   Q.  I think in October of 2021, your fiance at that point,

20   Andrea Lincoln, came to work at FTX?

21   A.  I'm sorry.  When did you say that was?

22   Q.  October 2021.

23   A.  In October 2021, she came to the Bahamas, but she only

24   began working at FTX later.

25   Q.  Understood.  But she joined you in the Bahamas, right?
```

 1   A.  While she was in the Bahamas she joined FTX.

 2   Q.  And you both lived in the Cube?

 3   A.  Yes.

 4   Q.  Sam lived in the Cube too, right?

 5   A.  Yes.

 6   Q.  And there are other apartments that other employees lived

 7   in too, right?

 8   A.  Yes.

 9   Q.  And I think a few months later you moved to the Orchid

10   penthouse, right?

11   A.  Right.

12   Q.  And we saw pictures of that apartment, correct?

13   A.  Yes.

14   Q.  Now, Sam lived there as well, right?

15   A.  Yes.

16   Q.  He didn't -- he lived there with lots of other people,

17   including yourself, right?

18   A.  That's right.

19   Q.  I think you said -- for example, Nishad Singh lived there,

20   didn't he?

21   A.  Yes.

22   Q.  So did his girlfriend?

23   A.  Yes.

24   Q.  And Gary Wang lived there as well?

25   A.  Yes.

1    Q.  So did his girlfriend?

2    A.  Yes.

3    Q.  Caroline Ellison live there?

4    A.  Yes.

5              THE COURT:  This is needlessly repetitive, counsel.

6    A.  Yes.

7              MR. EVERDELL:  Understood, your Honor.

8    Q.  I'll keep going.  This was essentially like dorm living,

9    right?

10   A.  It was similar to dorm living in certain senses and

11   different in others.

12   Q.  Everybody was sort of together, at least those people that

13   I mentioned were together living together in that apartment,

14   right?

15   A.  There were ten of us living in that apartment.

16   Q.  And that allowed you guys, for example, to discuss the

17   business together, right?

18   A.  Yes.

19   Q.  So that apartment was never actually used as Sam's personal

20   apartment, right?

21             MS. SASSOON:  Objection, form.

22             THE COURT:  Sustained.

23   Q.  There were always other people living there, correct?

24   A.  I believe at all points there were people besides Sam

25   living in that apartment.

1   Q.  Thank you.

2           MR. EVERDELL:  I'll move on, your Honor.

3   Q.  Mr. Yedidia, you testified before that you are testifying

4   today under a grant of immunity, is that right?

5   A.  Yes.

6   Q.  Now, that means that you asserted your Fifth Amendment

7   right not to testify, is that correct?

8   A.  Yes.

9   Q.  But the prosecutors gave you immunity for your testimony.

10  A.  Right.

11  Q.  Immunity means that the prosecutors can't use any of this

12  testimony or information that you give today or that you gave

13  before against you in a criminal case, right?

14  A.  Right.

15  Q.  But testimony at trial here isn't the only time you were

16  given immunity, is that right?

17  A.  That's right.

18  Q.  You were also given immunity back in December of 2022, when

19  the grand jury was investigating this case?

20  A.  Yes.

21  Q.  And you testified that you don't recall getting a subpoena

22  from the prosecutors at that time, right?

23  A.  I made a mistake during my testimony about the subpoena.  I

24  was uncertain about what had happened there, but I apologize

25  for that mistake.  I don't know if that's what you're referring

 1   to here.

 2   Q.  Did you get a subpoena from the prosecutors?

 3   A.  Yes.

 4   Q.  It wasn't your idea to reach out to the prosecutors, right?

 5   A.  I wanted to reach out to the prosecutors.

 6   Q.  But you got a subpoena, right?

 7   A.  Right.

 8   Q.  You received a subpoena.  And you spoke to them because

 9   they wanted to talk to you, right?

10   A.  Yes.

11   Q.  And the prosecutors contacted your lawyers, I think, at the

12   end of 2022, right?

13   A.  I am unsure of the exact date, but that's plausible.

14   Q.  A few weeks after you resigned from FTX, right?

15   A.  Around then.

16   Q.  And it was just a few weeks after you left the Bahamas to

17   return to the United States?

18   A.  Yes.

19   Q.  And you knew the prosecutors were investigating what

20   happened at FTX?

21   A.  Yes.

22   Q.  And you knew they were investigating Sam.

23   A.  Yes.

24   Q.  And they told you that the lawyers -- they told your

25   lawyers the investigation was moving quickly, right?

 1              MS. SASSOON:  Objection.

 2              THE COURT:  Overruled.

 3  Q.  They told your lawyers that the investigation was moving

 4  quickly, didn't they?

 5              MS. SASSOON:  It's beyond the scope.

 6              THE COURT:  Sustained.

 7  Q.  You knew that they wanted to talk to you, right?

 8  A.  Yes.

 9  Q.  And they said that are all options were on the table for

10  you, right?

11  A.  I don't recall that verbiage.

12  Q.  You needed to come talk to them soon, isn't that right?

13              MS. SASSOON:  Objection, form.

14              THE COURT:  Sustained, form.

15  Q.  Was it your understanding that they wanted you to come talk

16  to them right away?

17              MS. SASSOON:  Objection.

18              THE COURT:  Overruled.

19  A.  It was my understanding that they wanted to talk to me

20  quickly.

21  Q.  That was serious, wasn't it?

22  A.  Yes.

23  Q.  That made you worry, didn't it?

24  A.  I was aware of the seriousness of the situation.

25  Q.  Because you were a senior developer at FTX, right?

227 of 208

1   A.  Yes.

2   Q.  Worked there for two years.

3   A.  A little bit less, but yes.

4   Q.  And you were close to Sam.

5   A.  Yes.

6   Q.  You didn't know what the prosecutors thought about you at

7   the time, did you, when they give you a subpoena?

8   A.  No.

9   Q.  You didn't know how they thought about your conduct, did

10   you?

11   A.  No.

12   Q.  So you asked them to give you immunity for your testimony

13   before you spoke to them, right?

14   A.  Yes.

15   Q.  And they agreed to do it?

16   A.  Yes.

17   Q.  And so the prosecutors -- you asserted your right not to

18   talk to them, is that right, not to testify?

19   A.  Right.

20   Q.  And the prosecutors obtained an order from the judge

21   compelling you to testify, right?

22   A.  Yes.

23   Q.  Now, under this order the prosecutors couldn't use any

24   testimony or information provided against -- that you provided

25   against you in a criminal case, right?

1          MS. SASSOON:  Objection.  Misstates the order and this

2    was asked and answered.

3          THE COURT:  Sustained as to both.

4    Q.  Isn't it true that the order says that any information that

5    is directly or indirectly derived from your testimony or other

6    information -- excuse me.  I take it back.  No testimony or

7    other information compelled under this order or any information

8    directly or indirectly derived from such testimony or other

9    information may be used against you.

10          MS. SASSOON:  Objection.  Mischaracterizes the order.

11          THE COURT:  Somebody have the order?

12          MS. SASSOON:  Your Honor, there is a caveat, which is,

13   he can be prosecuted if he lies under oath.

14          THE COURT:  Sustained.

15   Q.  Let's just put it this way.  It is your understanding that,

16   based on what testimony you give today, you can't be prosecuted

17   for your testimony that you give, correct?

18          THE COURT:  Sustained.

19          MS. SASSOON:  Objection.

20          THE COURT:  Counselor, Ms. Sassoon just told you what

21   the problem with your question is, which has been in each

22   iteration of the question.

23          MR. EVERDELL:  All right.

24   Q.  You understood, Mr. Yedidia, that if the prosecutors

25   thought you were lying to them, then you could still be

1    prosecuted, is that right?

2    A.   That was my understanding, yes.

3    Q.   Now, if you were going to be prosecuted for lying, it's the

4    prosecutors who would decide to prosecute you, correct?

5    A.   I don't know who would prosecute me if I lied.

6    Q.   Well, you had to tell the truth, right?

7    A.   Yes.

8    Q.   And it's the prosecutors who are going to be listening to

9    what you have to say, correct?

10   A.   Yes.

11   Q.   They are the ones who are going to be evaluating whether or

12   not you are telling the truth, right?

13   A.   I don't know who would evaluate whether or not I was

14   telling the truth, but, yeah.

15   Q.   They are the ones you were providing information to,

16   correct?

17   A.   Yes.

18   Q.   If they thought you were lying, they could prosecute you

19   for perjury, correct?

20   A.   Yes.

21   Q.   So it was up to the government to decide whether or not you

22   were telling them the truth, correct?

23   A.   Yeah.

24            (Continued on next page)

25

1   BY MR. EVERDELL:

2   Q.   They're the ones who would be making that evaluation,

3   correct?

4   A.   As I understand, yes.

5   Q.   Okay.  Now you never actually testified in front of the

6   grand jury, right?

7   A.   No.

8   Q.   You just met with the government instead.

9   A.   Yes.

10  Q.   All right.  And they debriefed you about your recollection

11  of what happened at FTX.

12  A.   Yes.

13  Q.   All right.  So you met with them a number of times, didn't

14  you?

15  A.   Yes.

16  Q.   You met with them on December 13th, for example, if you

17  recall.

18  A.   That sounds right.

19  Q.   You met with them again in February—February 6th, in fact,

20  right?

21  A.   The date sounds plausible.

22  Q.   You met with them again in August; August 10th this time.

23  A.   Yes.

24  Q.   All right.  And then you met with them four more times this

25  past month to prepare for your testimony here, correct?

1    A.   Yes.

2    Q.   Three times in September, once in October, right?

3    A.   That sounds about right.

4    Q.   Okay.  And in fact, the last time you met with them was

5    earlier this week, wasn't it?

6    A.   Yes.

7    Q.   Okay.  And these meetings were all covered by this immunity

8    order that we just looked at, right, that we just spoke about?

9    A.   As I understand, yes.

10   Q.   Okay.  And in those meetings the prosecutors went over the

11   questions they were going to ask you on the stand, right?

12   A.   They asked me questions in the meetings, yes.

13   Q.   All right.  They went over your responses to the questions.

14   A.   They would ask me questions and I would respond.

15   Q.   Okay.  Right.  They would ask you questions about what they

16   might ask you on the stand, right?

17   A.   They would ask me questions.

18   Q.   Okay.  And you would give your responses.

19   A.   Yes.

20   Q.   And you went through this process multiple times, right?

21   A.   There were several occasions on which they asked me

22   questions and I gave answers.

23   Q.   Okay.  And for your trial testimony today you also received

24   a separate immunity order as well.

25   A.   Yes.

1   Q.   Okay.  And it's essentially the same agreement that we've

2   been talking about as before; is that right?

3           MS. SASSOON:  Objection.  It's not an agreement, your

4   Honor.

5           THE COURT:  Sustained.  Rephrase.

6   Q.   Well, the order has the same provisions, roughly the same

7   provisions as the one for the grand jury immunity, correct?

8   A.   As I understand, yes.

9   Q.   Meaning you can still be prosecuted if you lie, right?

10  A.   Yes.

11  Q.   But you will not be prosecuted apart from that by what you

12  testify to here today, right?

13  A.   Right.

14  Q.   Your statements here today can't be used against you,

15  right?

16          MS. SASSOON:  Objection.

17          THE COURT:  Sustained.

18          MR. EVERDELL:  One moment, your Honor.

19  Q.   Okay.  Let's move forward to a different topic,

20  Mr. Yedidia.

21          All right.  Let's talk now about fiat deposits on FTX,

22  all right?

23  A.   Yes.

24  Q.   You talked about that in your direct.

25  A.   Yes.

1  Q.  Okay.  Now when you began working at FTX, FTX customers

2  were able to deposit fiat currency on the exchange to trade

3  with, right?

4  A.  Yes.

5  Q.  Okay.  Customers who wanted to deposit fiat, they'd click

6  on a button, right, on the FTX website?

7  A.  Yes.

8  Q.  We looked at some of that in your direct, correct?

9  A.  Yes.

10  Q.  Okay.  And at least during your early time in the company,

11  they would be provided with bank account details for a company

12  called North Dimension; is that right?

13  A.  Yes.

14  Q.  And North Dimension had a bank account with Silvergate

15  Bank, right?

16  A.  Yes.

17  Q.  Okay.  And that bank account was owned by Alameda, no?

18  A.  That's what I was told, yes.

19  Q.  Okay.  So Alameda was receiving the deposits of customer

20  funds on behalf of FTX.

21  A.  Yes.

22  Q.  It was difficult, I think you mentioned, at the time for

23  FTX to have its own bank accounts; is that right?

24  A.  That's what I was told.

25  Q.  Okay.  And so FTX used the Alameda accounts in order to

 1   accept the fiat deposits, right?

 2   A.  That's what I was told, yes.

 3   Q.  Okay.  And this arrangement was known within FTX and

 4   Alameda, right?

 5          MS. SASSOON:  Objection.

 6          THE COURT:  Sustained.

 7   Q.  Well, you were aware of this, right?

 8          THE COURT:  That's what he just said.

 9   Q.  Okay.  The people who worked in the settlements groups at

10   both companies knew about this arrangement.

11          MS. SASSOON:  Objection.

12          THE COURT:  Sustained.

13   Q.  You're familiar with what the settlements group does?

14   A.  Yes.

15   Q.  Okay.  They are the ones who, when a deposit comes in,

16   right—they're the ones who credit the customer's FTX account

17   when the deposit comes in; is that right?

18   A.  That was how the manual system worked, yes.

19   Q.  The manual system.  Right.  So if there was a fiat deposit

20   that had to be reconciled, as they did early on before the

21   automated system came around, that would need to be reconciled

22   by someone in the settlements group, right?

23   A.  Right.

24   Q.  Okay.  All right.  And so the settlements group was the one

25   dealing with the bank accounts, right?

```
 1              MS. SASSOON:  Objection, form.

 2              THE COURT:  Sustained.

 3   Q.  Settlement group would see the deposits coming in?

 4   A.  Yes.

 5   Q.  And they would see the bank accounts that they were coming

 6   into, right?

 7   A.  Yes.

 8   Q.  Okay.  And that would include the North Dimension bank

 9   account.

10   A.  Yes.

11   Q.  Okay.

12              THE COURT:  Were there others?

13              THE WITNESS:  Were there other?  Other what?

14              THE COURT:  Other bank accounts into which customer

15   fiat deposits were going.

16              THE WITNESS:  Yes.

17              THE COURT:  Okay.  Go ahead.

18   BY MR. EVERDELL:

19   Q.  All right.  So this was not a secret to those people at the

20   company, right?

21              MS. SASSOON:  Objection.

22              THE COURT:  Sustained.

23   Q.  Well, the customers also were aware that their money was

24   going to the North Dimension bank account, right?

25   A.  Yes.
```

 1    Q.  Okay.  Because that was on the wire instructions that they

 2    were given, right?

 3    A.  Yes.

 4    Q.  And when they did make their deposits, they got a credit on

 5    their FTX account, right?

 6    A.  Yes.

 7    Q.  Now you mentioned that the deposits were not fully

 8    automated when you started, right?

 9    A.  That's right.

10    Q.  Okay.  And there was a project that you were assigned to

11    work on to automate that process; you testified about that.

12    A.  Yes.

13    Q.  Okay.  And that was a project that Sam had assigned you,

14    right?

15    A.  Yes.

16    Q.  Okay.  And Sam wanted the process automated to, among other

17    things, cut down on the delays in processing customer funds,

18    right?

19            MS. SASSOON:  Objection.

20            THE COURT:  Ground.

21            MS. SASSOON:  What Sam wanted and——

22            THE COURT:  Yes, sustained.

23    Q.  Mr. Yedidia, your understanding that one of the reasons why

24    the project was necessary was because there were delays,

25    bottlenecks in processing all of the deposits.

1   A.   It was my understanding that part of the point of the

2   project was to expedite deposit processing.

3   Q.   Okay.  And the project that you worked on involved an

4   application programming interface, right?

5   A.   Yes.

6   Q.   That's called an API?

7   A.   Yes.

8   Q.   That's just a way for different computer systems to talk to

9   each other, right?

10  A.   Yes.

11  Q.   So in this case the goal was to have the computer systems

12  for Silvergate Bank talk to FTX's computer systems, right?

13  A.   Yes.

14  Q.   And this would allow FTX to automate the deposit process

15  for customer funds that were wired to Silvergate Bank, right?

16  A.   Yes.

17  Q.   Okay.  And you were the lead developer on this project,

18  right?

19  A.   I worked closely with Nishad on it, but I would say that I

20  was primarily working on it.

21  Q.   Okay.  And you completed the project roughly around March

22  2021?

23  A.   That could be right, but it also could be later.

24  Q.   Okay.  But early 2021?

25  A.   Yes.

1   Q.  Okay.  So by early 2021 you yourself were aware of the fact

2   that Alameda was receiving FTX customer fiat deposits, right?

3   A.  Right.

4   Q.  And you were also aware, true, that Alameda's liability to

5   FTX that resulted from the transfers was being tracked by the

6   fiat account, right?

7   A.  I only became aware of the importance of the fiat account

8   as a means of communicating between FTX and Alameda when the

9   bug was found.

10  Q.  Okay.  We'll talk about the bug in a minute.  But at least

11  in early 2021 you were aware that Alameda was receiving FTX

12  customer funds, fiat deposits?

13  A.  Yes.

14  Q.  And that fact alone didn't concern you, right?

15  A.  That's correct.

16  Q.  Okay.  There was nothing that raised any concerns about

17  that.

18  A.  Right.

19          MR. EVERDELL:  Okay.  One moment, your Honor.

20          Your Honor, I may be starting a new topic now.  Does

21  it make sense to break?

22          THE COURT:  How much longer do you expect to be with

23  the witness?

24          MR. EVERDELL:  I still have, I would say, maybe an

25  hour, maybe less.

1        THE COURT:  Folks, I'll see you at 2:00.

2        Counsel remain, please.

3        THE DEPUTY CLERK:  Will the jury please come this way.

4   Bring your notebooks with you.

5        (Jury not present)

6        THE COURT:  Be seated, folks.

7        Mr. Everdell, I just want to express my growing

8   concern about the extent of the entirely unnecessary

9   repetition, and I've given you a lot of latitude, but you're

10  wearing out the welcome on the repetition.  I understand there

11  are things that need to be repeated in this case because this

12  is unfamiliar ground in some respects, and I'm making allowance

13  for it, but it needs to be curbed.

14        Okay.  Thank you.  I'll see you at 2:00.

15        THE LAW CLERK:  All rise.

16        (Luncheon recess)

17

18

19

20

21

22

23

24

25

Marc Cohena

1                         AFTERNOON SESSION

2                            2:00 p.m.

3              (In open court; jury not present)

4              THE COURT:  Before we bring in the jury, let me put on

5     the record that I have a note from Juror No. 5, who writes that

6     his family is concerned that he is the only juror called out by

7     name in the articles he's seen on the internet.  "PS – I

8     understand that there's probably nothing that can be done.  I

9     just wanted to make you aware."

10             I will tell him there is nothing that can be done.

11    Any objection?  That will be marked Court Exhibit next in

12    order.

13             MS. SASSOON:  No objection.  And perhaps we can also

14    tell the juror that if he's getting unwanted contacts, he can

15    let the Court know?

16             THE COURT:  Good point.  Thank you.

17             Let's get the jury.  And let's get the witness.

18             (Continued on next page)

19

20

21

22

23

24

25

```
 1                   (Jury present)

 2                   THE COURT:  Mr. Zimmer, I have your note.  Your

 3      supposition that there's nothing I can do about it is

 4      absolutely right.  But if for any reason you get any

 5      unwarranted communications, please let us know and we'll take

 6      appropriate action.

 7                   Mr. Yedidia, you are still under oath.

 8                   Mr. Everdell, you may proceed.

 9                   MR. EVERDELL:  Thank you, your Honor.

10      CROSS-EXAMINATION CONTINUED

11      BY MR. EVERDELL:

12      Q.  Good afternoon, Mr. Yedidia.

13      A.  Good afternoon.

14      Q.  All right.  You testified on direct examination about a bug

15      that existed that related to the fiat@ account.  Do you recall

16      that?

17      A.  Yes.

18      Q.  That was the bug that caused it to overstate the size of

19      the fiat balance, right?

20      A.  Yes.

21      Q.  Okay.  That bug, I think you discovered it—you became

22      aware of it around December of 2021; is that right?

23      A.  Yes.

24      Q.  But that bug was introduced I think first in July or

25      thereabouts, 2021; is that right?
```

1    A.   Yeah, or thereabouts, yeah.

2    Q.   Okay.  And I think it was you who introduced the bug; is

3    that right?

4    A.   That's correct.

5    Q.   Okay.  And that bug made it appear that Alameda owed more

6    to FTX than it actually did, right?

7    A.   Yes.

8    Q.   Meaning that normally when customers withdrew fiat deposits

9    from FTX, the balance of the fiat account became less negative,

10   right?

11   A.   Right.  That would be the normal way it worked.

12   Q.   Right.  By the same amount that was returned to the

13   customer, right?

14   A.   Yes.

15   Q.   But because of the bug that was introduced, when customers

16   asked to withdraw certain fiat deposits, the fiat account

17   didn't change; it stayed where it was.

18   A.   That's right.  If the withdrawals were processed

19   automatically, that's what happened.

20   Q.   So the fiat@ account in those cases wouldn't increase or

21   become less negative, right?

22   A.   That's right.

23   Q.   So over time the fiat@ account looked more negative than it

24   should have, correct?

25   A.   Yes.

 1   Q.  Meaning that it looked like Alameda owed FTX more money

 2   than it actually did.

 3   A.  Yes.

 4   Q.  Okay.  Now you said you discovered this, or you became

 5   aware of it for the first time around December of 2021?

 6   A.  That's correct.

 7   Q.  And by that time, because of the operation of the bug, the

 8   fiat account was already overstated; is that correct?

 9   A.  Correct.

10   Q.  And at that point Alameda's debt to FTX was overstated by

11   around 500 million, I think you said, right?

12   A.  Correct.

13   Q.  Okay.  And there was some discussion I think around that

14   time about fixing the bug.

15   A.  Yes.

16   Q.  Okay.  I think maybe you had some discussions with Mr. Wang

17   and Nishad Singh about that?

18   A.  Yes.

19   Q.  Okay.  And I think it was agreed that this is something

20   that one of the two of them would handle at the time.

21   A.  That's correct.

22   Q.  Okay.  So you weren't going to do it at that point.

23   A.  Correct.

24   Q.  Okay.  But in fact to your knowledge, neither Mr. Wang or

25   Mr. Singh fixed the bug.

```
 1   A.  That's correct.

 2   Q.  Okay.  So they just——they never got around to it.

 3           MS. SASSOON:  Objection.

 4           THE COURT:  Sustained.

 5   Q.  Well, safe to say that the bug didn't get fixed until you

 6   fixed it, right?

 7   A.  That's correct.

 8   Q.  Okay.  But if anything, that bug made Alameda's financial

 9   position look worse than it actually was, right?

10           THE COURT:  That's the third time since lunch that

11   you've made that point, and I was serious about what I said to

12   you earlier.

13   Q.  So the bug wasn't fixed until about June or so of 2020,

14   right?  2022.  Excuse me.

15   A.  Yes, yes.

16   Q.  That was several months later, right?

17           THE COURT:  June is several months after December.

18   Q.  All right.  So now let's jump to June, Mr. Yedidia.  That

19   was a time when a decision was finally made to fix the bug.

20   A.  Correct.

21   Q.  Okay.  And I think you testified that you saw a meeting

22   take place around that time?

23   A.  Yes.

24   Q.  And that was a meeting between——you said it was Sam,

25   Caroline Ellison, Gary Wang, and Nishad Singh, right?
```

 1    A.  Yes.

 2    Q.  Okay.  And that you think you saw them enter a room in the

 3    offices; is that right?

 4    A.  Yes.

 5    Q.  Okay.  But you weren't inside the room yourself.

 6    A.  That's correct.

 7    Q.  Okay.  So you don't know what was discussed between them in

 8    the room.

 9    A.  I was told afterwards about the substance of the meeting,

10    but I don't know firsthand what the——what was discussed.

11    Q.  Understood.  But after the meeting you had a conversation

12    with Nishad; is that right?

13    A.  Yes.

14    Q.  And after that meeting there was——there was going to be a

15    need for a full accounting; isn't that right?

16    A.  I thought the full accounting was done within the meeting.

17    Q.  Well, I think you got direction, right, after the meeting

18    that there needed to be an accounting of the assets and

19    liabilities of FTX and Alameda, right?

20    A.  I was directed to fix the bug.

21    Q.  Okay.  Well, so you were told to fix the bug.  Okay.  And

22    it was Sam who told you to fix the bug, right?

23    A.  Yes.

24    Q.  Okay.  So Sam wasn't ignoring the problem with the bug,

25    right?

 1          THE COURT:  At what point in time?

 2   Q.  This was in—I believe you said it was in June, at that

 3   time?

 4   A.  Yes.

 5   Q.  So Sam told you to fix the bug in June.

 6   A.  Correct.

 7   Q.  Okay.  And you implemented the bug fix.

 8   A.  Yes.

 9   Q.  Okay.  And as part of the bug fix, you wrote new code to

10   correctly process those fiat withdrawals that had been sent by

11   the API, right?

12   A.  Yes.

13   Q.  Okay.  And you also, as part of that, were trying to figure

14   out how much Alameda's liabilities were overstated as a result

15   of that, right?

16   A.  Yes.

17   Q.  Okay.  And you learned that as a result of the fiat@ bug,

18   that Alameda's liability was about $8 billion bigger than it

19   should have been, right?

20   A.  Yes.

21   Q.  And you said you also learned that the remaining liability

22   after you corrected the bug was roughly 8 billion as well,

23   right?

24   A.  Yes.

25   Q.  Okay.  And you kept notes, right, about how you fixed the

1    bug.

2    A.   Yes.

3    Q.   And you did that because you wanted to make sure you

4    recorded what you did to fix the bug.

5    A.   Yes.

6            THE COURT:   Sorry.   Can I clarify something here.

7    Mr. Yedidia, you said that as of December, the amount in the

8    fiat account was overstated by 500 million; is that right?

9            THE WITNESS:   Yes.

10           THE COURT:   And when you fixed the bug, just before

11   you fixed the bug, the liability in that account was $8 billion

12   larger than it should have been, yes?

13           THE WITNESS:   Yes.

14           THE COURT:   The $7½ billion difference between the

15   500 million in December and the 8 billion when you fixed the

16   bug in June, where did that come from?   How did that happen?

17           THE WITNESS:   It came from, I presume, customers

18   withdrawing a total of $7.5 billion in withdrawals that were

19   processed by the API during that time period.

20           THE COURT:   During the interval between December and

21   June; is that right?

22           THE WITNESS:   Yes.

23           THE COURT:   Okay.   Thank you.

24           Go ahead.

25   BY MR. EVERDELL:

1    Q.  So you said you made a recording of the steps you took to

2    fix the bug, right?

3    A.  Yes.

4    Q.  And it was Gary Wang who told you to do that, right?

5    A.  As I recall, it was Nishad Singh who told me to record the

6    steps I took to fix the bug.

7    Q.  Well, did you prepare a document that summarized the steps

8    you took to fix the bug?

9    A.  Yes.

10   Q.  Okay.  And I think you said that that was—you circulated

11   that via Signal; is that right?

12   A.  Yes.

13   Q.  Okay.  And the Signal message that has that document, that

14   message doesn't exist anymore, right?

15   A.  Right.

16   Q.  But the document itself does exist, right?

17   A.  That's right.

18   Q.  Okay.  You called it a postmortem, I think, for the actions

19   you took?

20   A.  Yes.

21   Q.  And you noted in that document that the error from the fiat

22   bug was approximately 8.2 billion; isn't that right?

23   A.  Yes.

24   Q.  Okay.  But you didn't note in that document what the

25   remaining liability was, did you?

1    A.   That's correct.

2    Q.   Okay.  So at this point, Mr. Yedidia, after the bug fix,

3    you had been aware for some time that Alameda was receiving

4    fiat deposits for FTX customers, right?

5    A.   Yes.

6    Q.   And you'd been aware of the existence of the fiat@ account

7    since you first learned about the bug in end of 2021, right?

8            MS. SASSOON:  Asked and answered prior to the break.

9            THE COURT:  Sustained.

10   Q.   Okay.  Well, so the change, the new information you had at

11   this point after fixing the bug was you were now aware of the

12   size of the liability; is that right?

13   A.   Yes.

14   Q.   Okay.  And when you learned about the size of the remaining

15   $8 billion liability, that's what gave you some concern, right?

16   A.   Yes.

17   Q.   Okay.  Okay.  So that made you concerned because you felt

18   like that was risky.

19   A.   The number seemed enormously large to me.

20   Q.   Okay.  All right.  So now you said that next or soon

21   afterwards, you had a discussion with Sam on the paddle tennis

22   court; is that right?

23   A.   Yes.

24   Q.   Okay.  And you said that was sometime in the summer of

25   2022.

 1  A.  Yes.

 2  Q.  Okay.  And you said that you spoke to him after you guys

 3  played paddle tennis?

 4  A.  Yes.

 5  Q.  And you said that in the conversation you asked Sam if

 6  everything was going to be okay, right?

 7  A.  Yes.

 8  Q.  All right.  And I think you said that Sam responded that

 9  FTX was bulletproof, right?

10  A.  Had been bulletproof.

11  Q.  Excuse me.  Had been bulletproof.  Okay.  And that it

12  wasn't anymore.  Okay.  And you responded, *Well, how long*

13  *before we're bulletproof again*; is that right?

14  A.  Yes.

15  Q.  Okay.  And he said he wasn't sure, it was going to be about

16  three to—three months or so, or maybe longer.

17  A.  As I recall, he said something like six months to three

18  years.

19  Q.  Okay.  Now you didn't know what necessarily

20  Mr. Bankman-Fried meant when he said "bulletproof," right?

21  A.  I had some idea of what he meant.

22  Q.  He didn't tell you.

23  A.  He didn't clarify beyond using the word "bulletproof."

24  Q.  Right.  He simply used the word "bulletproof," right?

25  A.  Yes.

1    Q.   Okay.  All right.  But at the time, at the time of that

2    conversation, Mr. Yedidia, this was right in the middle of the

3    crypto winter, wasn't it?

4    A.   You could call it that.

5    Q.   Okay.  So there was a lot of distress in the crypto markets

6    at this point, right?

7    A.   Yes.

8    Q.   Okay.  There was a company you're familiar with called

9    Three Arrows Capital?

10   A.   Yes.

11   Q.   That company had collapsed, right?

12   A.   That's correct.

13   Q.   Crypto lenders also were in distress?

14   A.   I know less about that subject.

15   Q.   You're familiar with a company called Voyager.

16   A.   I've heard of them, yes.

17   Q.   Didn't they declare bankruptcy sometime in July?

18   A.   That sounds familiar, but I'm——I don't know the exact time

19   line.

20   Q.   Well, the price of Bitcoin was way down at the time, wasn't

21   it?

22   A.   Yes.

23   Q.   Okay.  So at that point really no crypto company looked

24   bulletproof, given the scenario, did it?

25             MS. SASSOON:  Objection.

```
 1              THE COURT:  Sustained.
 2   Q.  Now your only concern was whether Alameda and FTX had
 3   sufficient assets to cover the debts, right?
 4   A.  Yes.
 5   Q.  Okay.  Now you didn't yourself have a sense of the
 6   financial picture of Alameda, did you?
 7   A.  No.
 8   Q.  You didn't yourself have a good sense of the financial
 9   picture of FTX, right?
10   A.  No.
11   Q.  That wasn't really what you focused on, right?
12   A.  That's correct.
13   Q.  And you didn't really have a picture of what assets were
14   available to cover a liability like the one Alameda owed, did
15   you?
16   A.  No.
17   Q.  Okay.  That was—that part of the business, in terms of
18   thinking about assets and liabilities, was more Sam's
19   bailiwick, right?
20   A.  Him and others, yes.
21   Q.  Okay.  And he acknowledged that there was an issue, right,
22   in the "bulletproof" conversation?
23   A.  Yes.
24   Q.  Okay.  But he wasn't treating it as a full-scale crisis,
25   was he?
```

1                    MS. SASSOON:  Objection.

2                    THE COURT:  Sustained.

3    Q.  His opinion was FTX would be able to weather the storm,

4    right?

5                    MS. SASSOON:  Objection.

6                    THE COURT:  Sustained.

7                    MR. EVERDELL:  One second, your Honor.

8    Q.  All right.  Mr. Yedidia, I just want to talk to you about

9    your decision to resign from FTX, okay?  All right.

10                   Now you testified that you resigned because you said

11   you learned that Alameda used FTX customer funds to repay loans

12   to creditors; is that right?

13   A.  Yes.

14   Q.  And you said that you recall learning this from a phone

15   call; is that right?

16   A.  That's correct.

17   Q.  You had this phone call with another developer at FTX,

18   right?

19   A.  That's correct.

20   Q.  Do you remember who that was?

21   A.  Yes.  Her name was Leila.  Do you want her last name as

22   well?

23   Q.  Please.

24   A.  Clark.

25   Q.  So you learned this on a phone call with Leila Clark?

 1   A.  Correct.

 2   Q.  And did Leila say where she had gotten that information?

 3   A.  I believe she said that she heard it from Alameda employees

 4   who had attended the all hands meeting with Caroline.

 5   Q.  Okay.  So she said that she got it from an Alameda

 6   employee.

 7   A.  I don't recall if she said she got it from a single Alameda

 8   employee or several.

 9   Q.  But she didn't identify which ones.

10   A.  I don't recall her identifying which ones.

11   Q.  Okay.  And you said that she said that the Alameda

12   employees had attended a meeting; is that right?

13   A.  Yes.

14   Q.  Okay.  And you weren't at that meeting, right?

15   A.  That's correct.

16   Q.  And Leila Clark I guess wasn't at that meeting.

17   A.  I presume not.

18   Q.  Okay.  And the employees who were at that meeting were

19   reporting on something that was said at the meeting?

20   A.  Leila told me that Alameda employees had told her that they

21   had heard at this meeting that they were at with Caroline——

22   Q.  Okay.

23   A.  Sorry.

24   Q.  Finish, please.

25   A.  ——that Caroline had said the thing about Alameda repaying

1    its debts to creditors with FTX customer funds.

2    Q.  Okay.  So your information was you heard from Leila, who

3    heard from unnamed Alameda employees who had been at a meeting,

4    who had heard from Caroline what was discussed.

5    A.  Correct.

6    Q.  Okay.  All right.  So—and that, you say, is when you

7    decided that you thought something bad had happened here,

8    right?

9    A.  Yes.

10   Q.  So based on that chain of conversations, that information,

11   that's when you decided that you had to resign.

12   A.  Yes.

13   Q.  So it was not—you were not resigning because Alameda

14   had—you were aware that Alameda had borrowed $8 billion from

15   FTX, right?

16   A.  Right.

17   Q.  That wasn't the problem, right?  Because you had known

18   about that a few months earlier.

19   A.  Right.

20   Q.  Okay.  It's because of what you learned in this phone

21   conversation, that's what you did.

22   A.  Yes.

23            MR. EVERDELL:  One moment, your Honor.

24            Nothing further, your Honor.

25            THE COURT:  Thank you.

1        Ms. Sassoon, anything further?

2        MS. SASSOON:  Yes, your Honor.

3    REDIRECT EXAMINATION

4    BY MS. SASSOON:

5    Q.  Mr. Yedidia, you testified about correcting the bug and

6    learning that the amount of money Alameda actually owed to FTX

7    customers was $8 billion in June of 2022; do you remember that?

8    A.  Yes.

9    Q.  Why when you learned that Alameda owed customers $8 billion

10   did you not resign at that point?

11   A.  I figured things were still probably fine and that

12   customers could be repaid.

13   Q.  Did you have any idea at that point that Alameda was

14   spending $8 billion of customer money out of its bank account?

15        MR. EVERDELL:  Objection.

16        THE COURT:  What's the objection?

17        MR. EVERDELL:  Presumes facts not in evidence, and

18   it's leading.

19        THE COURT:  Sustained.

20   Q.  At that point did the defendant or anyone else tell you

21   anything about whether Alameda was spending the $8 billion of

22   customer money out of the bank account?

23   A.  No.

24   Q.  If you had been told that, would that have concerned you?

25   A.  Yes.

1    Q.   Why?

2    A.   Because if they spend the money that belongs to the FTX

3    customers, then it's not there to give the FTX customers should

4    they withdraw.

5    Q.   And why is what you heard in November of 2022, that Alameda

6    had used customer money to repay loans, why did that lead you

7    to resign?

8    A.   Because if Alameda was repaying its loans with FTX customer

9    money, that implied that it didn't have money of its own to

10   repay the loans with, which means the money was simply gone.

11              MR. EVERDELL:   Objection.

12              THE COURT:   Overruled.

13              MR. EVERDELL:   Okay.

14   Q.   And had you heard anything like that prior to November of

15   2022?

16   A.   No.

17   Q.   I want to talk to you about your conversation with the

18   defendant on the paddle court.

19              Mr. Everdell asked you about what the defendant meant

20   when he said, *We're not bulletproof*.   When the defendant said

21   that to you, what had you just asked him?

22   A.   I had just asked him about the debt that Alameda owed FTX

23   and I'd asked, *Are things okay?*

24   Q.   And so when he said, *We're not bulletproof,* what did you

25   understand that to be referring to?

1    A.   The debt owed by Alameda to FTX.

2    Q.   And what did you understand that to mean with respect to

3    the debt Alameda owed to FTX?

4    A.   I understood it—

5            MR. EVERDELL:  Objection.

6            THE COURT:  Overruled.

7            MS. SASSOON:  He opened the door, your Honor.

8            MR. EVERDELL:  Asked and answered.

9    A.   Sorry.  Could you repeat the question, please.

10   Q.   Yes.  And so in that context of talking about Alameda's

11   liability to FTX customers, what did you understand *We're not*

12   *bulletproof* to mean?

13   A.   I understood it to be expressing doubt about the ability of

14   Alameda to repay FTX customers.

15   Q.   Did the defendant provide you more details during that

16   discussion?

17   A.   No.

18   Q.   Did he say anything to you that indicated to you that he

19   might have more information than you had available to you?

20   A.   Yes.

21   Q.   What was that?

22   A.   Well, he was saying things to me like the fact that, you

23   know, we, whoever "we" was, wasn't—weren't bulletproof, and

24   that was news to me, so that implied he had information I

25   didn't, because he was saying stuff to me that I didn't

1    previously know.

2    Q.  You were asked on cross-examination about your meetings

3    with prosecutors.  Why did you first meet with the government

4    after FTX went bankrupt?

5    A.  I wanted to help them figure out what happened.

6    Q.  In those meetings what, if anything, did the government

7    tell you to do in court today?

8    A.  Tell the truth.

9    Q.  You were asked some questions on cross-examination about

10   the defendant's spending.  What was the FTX Arena?

11   A.  The FTX Arena was——

12           MR. EVERDELL:  Objection, your Honor.

13           THE COURT:  Yes.  What's the objection?

14           MR. EVERDELL:  Beyond the scope of the cross.

15           MS. SASSOON:  There were questions about the

16   defendant's spending, and this was a form of spending.

17           THE COURT:  Proceed.  Overruled.

18   BY MS. SASSOON:

19   Q.  What was the FTX Arena?

20   A.  The FTX Arena was the renamed version of the Miami Heat

21   Arena in Miami.

22   Q.  Is that a basketball stadium?

23   A.  I believe so, yes.

24   Q.  And did you learn about how much money the defendant spent

25   on branding the Miami Heat basketball arena with the name FTX?

1  A.  As I recall, it was about a hundred million dollars.

2  Q.  Did the defendant otherwise share with you how much money

3  he was spending on marketing of FTX?

4  A.  I don't recall him sharing other numbers for marketing.

5  It's possible that he did and I don't recall the numbers

6  anymore, but——

7        MS. SASSOON:  Mr. Bianco, if you could pull up

8  Government Exhibit 1469, please.

9  Q.  You were shown this photograph on cross-examination of the

10  defendant with Bill Clinton and Tony Blair.  Did the defendant

11  share with you how much money he gave to be introduced to Bill

12  Clinton and Tony Blair?

13  A.  No.

14  Q.  Did the defendant share with you how much money he spent in

15  political donations?

16  A.  No.

17  Q.  Did the defendant share with you how much money he gave

18  himself in personal loans from Alameda?

19  A.  No.

20  Q.  You were asked some questions about your $35 million

21  penthouse apartment.  I think Mr. Everdell called it a housing

22  development.  How would you describe it?

23  A.  It was a luxury apartment.

24  Q.  You were asked some questions about spending some time

25  living in The Cube in the Bahamas as well.  Was there other

1   housing options on the island besides The Albany and The Cube?

2   A.  Yes.

3        MS. SASSOON:  Let's pull up Government Exhibit 1452.

4        I apologize.  Let's pull up Government Exhibit——if you

5   give me just one moment——1542.

6   Q.  Mr. Everdell asked you some questions about dorm living.

7   How did this apartment compare to your living arrangement with

8   the defendant at MIT college?

9   A.  The living arrangement in the Bahamas was more luxurious.

10  Q.  Did this feel like a dorm to you?

11  A.  It felt like a dorm in the sense that I was living with

12  others but not like a dorm in the sense that it was very

13  luxurious.

14  Q.  What, if any, other apartments did the defendant purchase

15  for himself in the Bahamas?

16  A.  Sam had another apartment, I think in the Gemini building,

17  on the first floor.  I'm not sure if he owned it.  I presume he

18  did.  But there was another apartment in which he would

19  sometimes spend time.

20  Q.  And you said the Gemini.  Is that part of The Albany?

21  A.  Yes.

22  Q.  And as far as you know, did this other apartment in The

23  Albany resort, did the defendant share it with other roommates?

24  A.  Not as far as I know.

25  Q.  You were asked some questions on cross-examination about

```
 1   your belief in FTX as a business.  Do you recall those
 2   questions?
 3   A.  Yes.
 4   Q.  And I think you testified that at some point in 2022 you
 5   really believed in FTX.  Do you recall that?
 6   A.  Yes.
 7   Q.  Did your belief in FTX change?
 8   A.  Yes.
 9   Q.  Why did it change?
10   A.  Well, FTX defrauded all of its customers.
11           MR. EVERDELL:  Objection.
12           MS. SASSOON:  Your Honor, I didn't know exactly how
13   the witness would phrase his answer, but I can move on.  And we
14   can strike that testimony.
15           THE COURT:  Stricken.
16   BY MS. SASSOON:
17   Q.  You were asked some questions about your compensation.  Was
18   all the compensation that you described on cross-examination in
19   dollars?
20   A.  No.
21   Q.  How were you compensated?
22   A.  I was compensated partly in dollars and partly in options
23   on the company.
24   Q.  And so what happened to the compensation you received?
25   A.  Well, most of it was lost because most of it was either put
```

1    into buying equity or put into taxes paid.

2    Q.  When you say money was lost put into buying equity, what

3    equity are you talking about?

4    A.  The equity that I bought in December 2021, FTX equity.

5    Q.  Just to be clear, you used your compensation to buy a stake

6    in FTX; is that what you're saying?

7    A.  Yes.

8    Q.  And what happened to that?

9    A.  It became worthless.

10   Q.  What was your most recent employment subsequent to

11   resigning from FTX?

12   A.  I became a teacher.

13   Q.  What have you been teaching?

14   A.  I taught math at a high school; two—two sections of

15   Geometry, one of Algebra II, one of AP Statistics.

16   Q.  You were asked some questions about things you were aware

17   of around the time that you fixed the bug, including that you

18   knew Alameda was receiving customer deposits.  Do you remember

19   that?

20   A.  Sorry.  Could you repeat the question, please.

21   Q.  Yes.  You were asked some questions about information you

22   were aware of as an employee at FTX, including that Alameda was

23   receiving customer deposits.  Do you recall that?

24   A.  Yes.

25   Q.  Did anyone ever tell you, prior to November 2022, that

1    Alameda was spending customer money from the North Dimension

2    account on its own expenses and investments?

3    A.   No.

4              MS. SASSOON:  No further questions.

5              THE COURT:  Thank you.

6              Any recross?

7              MR. EVERDELL:  No, your Honor.

8              THE COURT:  Thank you.  You are excused, Mr. Yedidia.

9    Thank you.

10             THE WITNESS:  Thank you.

11             (Witness excused)

12             THE COURT:  Next witness?

13             MR. REHN:  Your Honor, the government calls Matt

14   Huang.

15             (Witness sworn)

16             THE DEPUTY CLERK:  Thank you.  Please be seated.

17             And if you could please state your name and spell your

18   last name for the record.

19             THE WITNESS:  Kungyu Matthew Huang.  K-U-N-G-Y-U,

20   M-A-T-T-H-E-W, H-U-A-N-G.

21             THE COURT:  All right.  You may proceed, Mr. Rehn.

22    KUNGYU MATTHEW HUANG,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25

1   DIRECT EXAMINATION

2   BY MR. REHN:

3   Q.  Good afternoon, Mr. Huang.

4   A.  Hi.

5   Q.  Where do you work?

6   A.  Paradigm.

7   Q.  And what is Paradigm?

8   A.  Investment firm focused on cryptocurrency.

9   Q.  And what sort of an investment firm is it?

10  A.  Venture capital investment firm.

11  Q.  And what's a venture capital investment firm?

12  A.  It's an investment firm that makes investments in

13  early-stage companies that have the potential to grow over

14  time.

15  Q.  If I could just ask you to move the microphone a little

16  closer.

17  A.  Sure.

18  Q.  So you said that it invests in early-stage companies with

19  the potential to grow?

20  A.  Generally, yes.

21  Q.  And when you're investing in those companies, where does

22  the money in your fund come from?

23  A.  We ourselves have investors called limited partners.

24  Q.  And can you give us a sense of what type of entities are

25  your limited partners.

 1  A.   University endowments, nonprofit foundations and the like.

 2  Q.   So organizations like that give money to Paradigm and then

 3  Paradigm invests in startups on their behalf?

 4  A.   That's right.

 5  Q.   And what is your job at Paradigm?

 6  A.   I'm one of the co-founders and managing partners.

 7  Q.   When did you co-found Paradigm?

 8  A.   2018.

 9  Q.   Did you say 2018?

10  A.   2018, yeah.

11  Q.   Sorry.  If you could just try to speak up into the

12  microphone.

13       And does Paradigm have any particular investment

14  focus?

15  A.   We focus on digital assets and cryptocurrencies as well as

16  the companies in the ecosystem.

17  Q.   So in your capacities as a managing partner and co-founder

18  of Paradigm, have you gained some knowledge and experience of

19  digital assets in the companies in the cryptocurrency

20  ecosystem?

21  A.   I believe so, yes.

22  Q.   Does that include some knowledge of how cryptocurrency

23  exchanges work?

24  A.   It does.

25  Q.   And have you invested in any cryptocurrency exchanges other

1   than FTX?

2   A.  We have.

3   Q.  Did there come a time when you became aware of a company

4   called FTX?

5   A.  Yes.

6   Q.  When was that?

7   A.  Around 2019.

8   Q.  And did there come a time when you began seriously

9   considering an investment in FTX?

10  A.  Yes, in early 2021.

11  Q.  And did you speak to anyone in particular at FTX regarding

12  the possibility of investing in the company?

13  A.  We did.

14  Q.  Who did you speak with?

15  A.  Two people.  One was the founder and CEO, Sam

16  Bankman-Fried; and another was an employee at the company named

17  Ramnik Arora.

18  Q.  And you mentioned Sam Bankman-Fried as the founder and CEO?

19  A.  Right.

20  Q.  And what was Ramnik Arora's role at the company?

21  A.  My understanding at the time was that he worked on product

22  and then was also involved in fundraising.

23  Q.  How did you speak with Sam Bankman-Fried when you were

24  considering investing in the company?

25  A.  Via Zoom.

1   Q.  How many Zoom calls would you say you had with him prior to

2   your investment?

3   A.  Don't recall specifically, but about a handful.

4   Q.  Did you ever meet Sam Bankman-Fried in person?

5   A.  Yes.

6   Q.  When was that?

7   A.  Subsequent to the investment we have met in person a

8   handful of times.

9   Q.  And where was that?

10  A.  Initially he was taking a trip out to this——the SF Bay area

11  where we're based, and we had a couple of dinners, and then

12  subsequent to that, a couple other times as well.

13  Q.  Do you see him here in the courtroom today?

14  A.  I do.

15  Q.  Can you identify him by the location and an article of

16  clothing.

17  A.  He's sitting back there——he's sitting back there.  I can't

18  really see an article of clothing.

19          THE COURT:  All right, Mr. Huang.  It's stipulated

20  that the witness has identified the defendant.

21  Q.  So in early 2021, is that the time period when the

22  defendant spoke with you about the possibility of investing in

23  FTX?

24  A.  Yes, that's right.

25  Q.  And what sort of an investment were you considering?

 1   A.  We were considering participating in what they called the

 2   Series B, which was a equity financing.  They were raising

 3   funds to help operate the business.

 4   Q.  Could you explain what an equity financing is.

 5   A.  It's an investment where investors are buying shares in a

 6   company that they hope will become more valuable as the company

 7   succeeds.

 8   Q.  So as an investor, what is the value to you of purchasing

 9   shares in a company?

10   A.  We hope that the business will succeed and therefore the

11   shares that we own will become more valuable.

12   Q.  What are some of the factors you look at when evaluating

13   whether to invest in a particular business?

14   A.  It can depend on the company.  There are a lot of factors.

15   We start often with a sense of the team and, you know, what we

16   think of them and how impressive they are; we'll think about

17   the market and maybe competitors; we'll look at financial

18   information, like revenue and costs; and we'll think about

19   risks as well.

20   Q.  How do you get information about a company you're

21   considering investing in?

22   A.  Usually through talking to the team directly.

23   Q.  And by the team, are you referring to the team at the

24   company?

25   A.  That's right.

1   Q.   Do you rely on the information that the team at the company

2   provides you with?

3   A.   We do.

4   Q.   So going back to the Zoom calls you mentioned earlier that

5   you had with the defendant before you invested, do you recall

6   what topics were discussed on those calls?

7   A.   Some of them, yes.

8   Q.   And what were some of the topics that you discussed with

9   the defendant?

10  A.   One of the things that drew us to the company was how fast

11  they appeared to be growing and, you know, not just in revenues

12  or trading volumes but in particular market share, so it

13  would——it was sort of unusual to see a new crypto exchange grow

14  market shares so quickly.  We were also focused on some of the

15  risks we were thinking about around governance and the lack of

16  a formal board, as well as risks from the entanglement between

17  FTX and Alameda.

18  Q.   Did the defendant provide you with a presentation on FTX's

19  business?

20  A.   They did.

21         MR. REHN:  Mr. Bianco, could you please show the

22  witness what's been marked for identification as Government

23  Exhibit 532.

24  Q.   Mr. Huang, do you recognize this document?

25  A.   I do.

1    Q.   What is it?

2    A.   It appears to be a PowerPoint presentation from the

3    company, FTX.

4             MR. REHN:  We'd move to admit this, your Honor.

5             MR. LISNER:  No objection.

6             THE COURT:  Received.

7             (Government's Exhibit 532 received in evidence)

8             MR. REHN:  And if we could bring that up for the jury.

9    BY MR. REHN:

10   Q.   Mr. Huang, did you review this presentation in connection

11   with deciding whether to invest in FTX?

12   A.   We did.

13   Q.   And did you discuss the contents of this slide deck with

14   the defendant?

15   A.   That's what we recall, yes.

16            MR. REHN:  If we could go to page 10 of this exhibit.

17   Q.   Mr. Huang, do you see this?  This page lists the people who

18   are identified as "Our Team" from FTX?

19   A.   I do.

20   Q.   And who were the members of the FTX team that you in

21   particular spoke with prior to investing?

22   A.   We spoke with Sam on the top left and Ramnik, as well as

23   one Zoom call with Dan Friedberg, the general counsel.

24            (Continued on next page)

25

1          MR. REHN:  If we could go back to page 2 of this

2   exhibit.

3          Mr. Bianco, if you could highlight the line:  FTX is

4   the leading digital assets exchange.  Then at the bottom on

5   that same side can you highlight:  The fastest growing crypto

6   exchange.

7   Q.  Mr. Huang, what was the type of business that you

8   understood you were going to be investing in when you were

9   looking at FTX?

10  A.  We understood FTX to be an exchange that facilitated the

11  trading of cryptocurrencies and crypto assets and that it was

12  growing really fast.

13  Q.  Could you explain what a crypto exchange is.

14  A.  It's a platform that generally centralized exchanges like

15  FTX would take customer deposits that people would deposit

16  while they are trading on the platform, and the business would

17  take a fee on those trades.

18  Q.  So in connection with the business, would customers deposit

19  funds into FTX?

20  A.  Yes.

21          MR. REHN:  Mr. Bianco, can we go to the next page of

22  this exhibit.

23  Q.  Mr. Huang, do you see where it says that FTX is the

24  infrastructure layer of crypto?

25  A.  Yes, I do.

1    Q.  Underneath that there is a number of numbered points?

2    A.  Yup.

3         MR. REHN:  Mr. Bianco, if I could ask you to expand

4    the fourth numbered points and all of the subpoints underneath

5    that.

6    Q.  Mr. Huang, do you see that this fourth point refers to the

7    exchange wallets of FTX?

8    A.  I do.

9    Q.  And under that, one of the things it says is that FTX

10   serves as a custodian.

11        Do you see that?

12   A.  Yes.

13   Q.  When you were considering your investment in FTX, were you

14   told that the FTX exchange wallets served as the custodian for

15   customer deposits?

16   A.  That was our understanding, yes.

17   Q.  And based on your experience as an investor in financial

18   technology companies, what does it mean for a crypto exchange

19   to maintain exchange wallets that serve as a custodian?

20   A.  Our general understanding was that the platform would take

21   in deposits and hold onto them while their customers could

22   trade on the platform.  If those customers wanted those funds

23   back, that they could withdraw them.

24   Q.  Is handling customer deposits, holding them in custody, and

25   then processing withdrawals part of the ordinary business of a

1   crypto exchange?

2   A.   Generally, yes, for centralized exchanges.

3   Q.   When you were considering your investment in FTX, were you

4   ever told that the exchange could take those customer deposits

5   and use them for its own business purposes?

6   A.   We were not.

7   Q.   If you had been told that, would that be inconsistent with

8   the description of its role here as a custodian?

9   A.   Yes.   In the context of the exchange wallets, yes.

10  Q.   Would that have been something you would have taken into

11  account in deciding whether to invest in the company?

12  A.   Yes, we would have.

13  Q.   If you had been told that FTX could take customer funds out

14  of the exchange wallets for its own business purposes, would

15  you have still invested in the exchange?

16  A.   We would have wanted to learn more, but likely not.

17  Q.   And why not?

18  A.   I think it would have been the general expectation by

19  customers in the crypto industry that an exchange like FTX

20  would be holding onto customer deposits and not spending them

21  or doing other things with them.   If it became known that they

22  were doing that, I think the exchange would lose credibility in

23  brand and people wouldn't want to use it, so it would be

24  existential to the business.

25          MR. LISNER:   Objection, your Honor.   Move to strike

1    for general expectation in the industry versus Mr. Huang's

2    personal knowledge.

3         MR. REHN:  Your Honor, he testified based on his

4    experience investing in other crypto companies and his

5    knowledge in the markets.

6         THE COURT:  The question was why not.  It's perfectly

7    responsive to the question and it was an appropriate question

8    to which no objection was made.

9         MR. LISNER:  Thank you, your Honor.

10        MR. REHN:  Mr. Bianco, we can take that exhibit down.

11        If I could ask you to show the witness what's been

12   marked for identification purposes as Government Exhibit 320.

13   Q.  Mr. Huang, do you recognize this document?

14   A.  I do.

15   Q.  What is this?

16   A.  It's an email from SBF to a few team members at paradigm,

17   including myself.

18   Q.  When was this email sent?

19   A.  April 25, 2021.

20        MR. REHN:  Your Honor, we move to admit Government

21   Exhibit 320.

22        MR. LISNER:  No objection.

23        THE COURT:  Received.

24        (Government Exhibit 320 received in evidence)

25        MR. REHN:  Mr. Bianco, if I could ask you to expand

1    the top part of this, just showing who the top email is from

2    and who it's to.

3    Q.  Mr. Huang, was this email sent from the defendant to you

4    and a couple of other people at Paradigm?

5    A.  It was.

6    Q.  Who is Arjun Balaji?

7    A.  He's a member of the Paradigm investment team.

8    Q.  Was he also involved in deciding whether to invest in FTX?

9    A.  He was.

10          MR. REHN:  If we could take down the expanded portion

11   of this email.

12          If we could look at the email that begins at the

13   bottom of page 1, Mr. Bianco.

14   Q.  Mr. Huang, on April 23 of 2021, and Arjun Balaji write an

15   email to the defendant?

16   A.  It appears he did, yes.

17          MR. REHN:  Could we go to the next page of this

18   exhibit, Mr. Bianco.  If you could expand the portion of this

19   email under the bullet point governance.

20   Q.  Mr. Huang, in connection with your evaluation of your FTX

21   investment, did Paradigm communicate certain concerns to the

22   defendant?

23   A.  Yes, we did.

24   Q.  If we look at the first concern being communicated, could

25   you read the first two sentences after the word governance.

1    A.   The first two sentences read:  As we understand, FTX is

2    effectively owned and controlled by Sam, lacking more

3    traditional corporate governance model, rights, etc.  One

4    example of where this can negatively manifest with crypto

5    companies is through (unintended) value leakage; for example,

6    via FTT, Alameda, or some other mechanism.

7    Q.   Now, at this point in time did you know what Alameda was?

8    A.   We had an understanding that it was a trading firm also

9    founded by SBF.

10   Q.   How did you know about Alameda?

11   A.   At the time it was generally known in the crypto industry,

12   so we had heard about it before and had learned a little bit

13   about it from talking to SBF directly as well.

14   Q.   Could you explain what your concern was about value leakage

15   to Alameda.

16   A.   What I recall is, we were focused on a couple issues.

17          One, we were thinking about making investment in FTX

18   the company, not in any of these other assets, like Alameda, so

19   we were worried about how much time would Sam spend on the

20   business, and we didn't want to make the investment and then

21   have him spend more of his time on Alameda at our expense and

22   the business' expense.

23          And the second concern we were worried about was to

24   what extent did Alameda have any preferential treatment on the

25   exchange, because we knew that if that were the case, that

1    would be damaging to the reputation and customers wouldn't want

2    to use the exchange.  Given we were investing in the exchange,

3    we wanted to make sure that that wasn't happening so that the

4    investment would hopefully go well.

5    Q.  Why would it be damaging to the business' reputation if

6    Alameda had preferential treatment on the exchange?

7    A.  I think there are a lot of ways that that could manifest.

8    We were worried about things like front running or maybe access

9    to the order book or various other ways that Alameda could have

10   favorable treatment, and, therefore, be at an advantage to the

11   other customers that were trading there.  If customers found

12   that out, they would want to trade elsewhere.

13   Q.  After Paradigm sent this email to the defendant, did you

14   discuss these concerns with the defendant?

15        THE COURT:  Before we get to discussions, could we

16   elicit what he was talking about.  Front running, for example,

17   access to an order book.

18        MR. REHN:  Certainly, your Honor.

19   Q.  Could you explain what front running is.

20   A.  We were worried that if Alameda had the ability to trade

21   faster than customers that they would be able to insert their

22   trades ahead of other customers and wield an advantage.

23        On the topic of visibility into the order book, that

24   would show them what their customers -- where their customers

25   were positioned.  And especially if there was margin on the

```
 1   exchange and there were thresholds that would liquidate

 2   customers, that would give Alameda an advantage to kind of

 3   going after those customers.

 4           But those are just two examples.  We were generally

 5   concerned about any type of preferential treatment.

 6   Q.  After you sent this email, did you have a call with the

 7   defendant where you discussed the concern about preferential

 8   treatment?

 9   A.  We did.

10   Q.  Do you recall what the defendant said in response to your

11   concern about preferential treatment for Alameda?

12   A.  I recall that we were told that there was no preferential

13   treatment for Alameda, that Alameda was one of the larger

14   traders on the platform, but that was decreasing over time.  We

15   were shown some data about that.

16           MR. REHN:  Mr. Bianco, we can take this down.

17   Q.  In considering your investment in FTX, did you learn

18   anything about the exchange's risk management?

19   A.  We did.

20   Q.  Did you learn anything about something called a liquidation

21   engine?

22   A.  We did.

23   Q.  From your perspective as an investor, was the liquidation

24   engine a factor that informed your decision to invest?

25   A.  It was.
```

1    Q.  Can you explain what the liquidation engine was.

2    A.  So customers on FTX could take leverage positions, which

3    means they put up $100 but maybe they actually buy $500 worth

4    of cryptocurrency.  And what the liquidation engine does is, it

5    makes sure that if prices of that cryptocurrency moves against

6    the customer that they close the position in time so that the

7    customer has enough money to cover whatever their losses are.

8         So it's very important that the liquidation engine

9    functions properly to make sure that the exchange isn't losing

10   money to customers.  So part of the pitch for FTX was actually

11   that not only was the liquidation engine well functioning, but

12   it was sort of industry best in class, and that actually

13   enabled them to offer better forms of leverage to their

14   customers.  So it was part of why we were attracted to the

15   business.  We felt that the liquidation engine was impressive

16   and, as we learned more about it, it seemed like a great

17   selling point.

18   Q.  Were you ever told that Alameda was exempt from FTX's

19   liquidation engine?

20   A.  We were not.

21   Q.  Would that be inconsistent with the statement that it does

22   not get preferential treatment?

23   A.  Yes, it would be inconsistent.

24   Q.  If you had been told that Alameda was exempt from the

25   liquidation engine, would that have been a concern for you in

1  determining whether to invest in FTX?

2  A.  It would have been a concern.

3  Q.  Why is that?

4  A.  It would have meant that Alameda could trade with leverage

5  on the platform and, if those trades didn't work out, could

6  ultimately incur a negative balance that would have to be paid

7  for somehow.  In a typical case that might come from the money

8  we were investing into the company.  That would go to fund

9  operations.  But in any case, it would leave the business at

10  risk of becoming insolvent.

11  Q.  Were you ever told that Alameda was permitted to have a

12  negative balance on FTX?

13  A.  No, we were not.

14  Q.  Would that be inconsistent with this statement that it does

15  not get preferential treatment?

16         MR. LISNER:  Objection, your Honor.  The statements

17  speak for themselves.

18         THE COURT:  Sustained.

19  Q.  If you had been told that Alameda could have a negative

20  balance, would that have been something you would have taken

21  into account in deciding whether to invest?

22  A.  Yes, we would have.

23  Q.  Why is that?

24  A.  If we had known Alameda could have a negative balance on

25  the exchange, it would be both a risk to the business that we

1    were investing in, but there would be a strong possibility, if

2    crypto prices were volatile, that the business could be

3    insolvent and our investment would do poorly.  It would also be

4    damaging to the brand and customer trust if that ever got out,

5    because, as a customer, I don't think I would want to trade on

6    an exchange where that was possible either.

7    Q.  Were you ever told that Alameda had the ability to access

8    and use the customer deposits from other FTX customers?

9    A.  We were not.

10             MR. LISNER:  Objection.  Foundation.

11             THE COURT:  Overruled.

12   Q.  If you had been told that Alameda had the ability to access

13   and use the deposits of other customers, would you have taken

14   that into consideration in deciding whether to invest?

15   A.  We would have wanted to know more, yes.

16   Q.  Why would that be a concern that you would have taken into

17   account?

18   A.  Based on a lot of our general market understanding, but

19   also other investments in centralized crypto exchanges, it was

20   generally understood that customer deposits are sort of sacred,

21   that when customers deposit into the exchange, they expect the

22   ability to get them back out.  So to the extent that wasn't

23   true, we would want to know more.  And without knowing more, it

24   would be a problem for an investment.

25             MR. REHN:  Mr. Bianco, could you pull back up this

1    exhibit.  If we could go to the top email again.

2    Q.  Is this the email from the defendant to you, Mr. Huang?

3    A.  It is.

4    Q.  Was this sent on April 25, 2021?

5    A.  It appears to be.

6           MR. LISNER:  Objection, your Honor.

7           THE COURT:  First of all, this is Government Exhibit

8    320.  What's the objection?

9           MR. LISNER:  Document speaks for itself.  He has no

10   personal knowledge of when it was sent.

11          THE COURT:  Overruled.

12   Q.  Is there an attachment to this email, Mr. Huang?

13   A.  There appears to be, yes.

14   Q.  What is the title of that attachment?

15   A.  FTX stats, 2021, April 23.

16   Q.  Is this an Excel spreadsheet?

17   A.  It appears to be, yes.

18   Q.  Was this sent to you by the defendant?

19   A.  It appears to be, yes.

20          MR. REHN:  Mr. Bianco, could you please bring up

21   Government Exhibit 320A for the witness.

22   Q.  Mr. Huang, do you recognize this exhibit?

23   A.  I do.

24   Q.  What is this?

25   A.  It appears to be some business and financial metrics about

 1   FTX.

 2   Q.  Is this the attachment to that email we were just looking

 3   at?

 4   A.  It appears to be, yes.

 5          MR. REHN:  The government offers Government Exhibit

 6   320A.

 7          THE COURT:  Received.

 8          (Government Exhibit 320A received in evidence)

 9          MR. LISNER:  No objection.

10          MR. REHN:  We could bring that up.

11   Q.  Mr. Huang, looking at the spreadsheet that the defendant

12   sent you, does this have information about FTX's revenue and

13   expenses?

14   A.  It appears to, yes.

15   Q.  If we look in the rows 7 through 12, does that show some

16   annualized approximations?

17   A.  It appears to, yes.

18   Q.  I'd like to direct your attention to column F, which says

19   2021 Q1.

20   A.  Yup.

21   Q.  On row 7.

22          Before we look at these numbers, can you explain what

23   annualized approx revenue means here?

24          MR. LISNER:  Objection, your Honor.

25          THE COURT:  Ground.

1           MR. LISNER:  He could testify to his understanding.

2           THE COURT:  Rephrase.

3    Q.  Mr. Huang, based on your perspective as an investor, what

4    was your understanding of what annualized approx revenue

5    represents?

6    A.  My understanding of what that means would be to take the

7    revenue that the company generated in the first quarter of 2021

8    and multiply it by four to estimate, if the revenues stayed the

9    same, how much would they make for the rest of the year.

10          MR. REHN:  Mr. Bianco, if there is a way to highlight

11   row 8 in column F.

12   Q.  What's the annualized revenue for quarter 1 2021 that's

13   being recorded?

14   A.  596 million.

15   Q.  So if that's an annualized number, what do you understand

16   that to mean, the actual revenue for quarter 1 2021 was that

17   you were being told?

18   A.  I would understand that to mean about 149 million in Q1.

19   Q.  Beneath that, do you see that there are some columns

20   listing various expenses or some rows listing some various

21   expenses?

22   A.  Yup.

23   Q.  If we look, for example, at EST trading expenses in row 10.

24          MR. REHN:  Mr. Bianco, if you can highlight on column

25   F.

1   Q.   How much is being reported as the annualized trading

2   expenses for this quarter?

3   A.   63 million.

4   Q.   What does that mean, the actual number for the quarter was?

5   A.   About 15 million.

6   Q.   So you multiply the four quarters to get the annualized

7   number based on the first quarter?

8   A.   That's right.

9   Q.   Now, on row 12 there is an entry for estimated net profit.

10          MR. REHN:   If we could highlight column F, row 12.

11   Q.   What was the estimated net profit on an annualized basis

12   for quarter 1 that the defendant was reporting to you?

13   A.   322 million.

14   Q.   Again, what would that be, the actual number was for the

15   first quarter of 2021?

16   A.   About 80 million.

17   Q.   Do you understand how the number in row 12 is derived?

18   A.   It appears to be revenue minus the three costs rows.

19   Q.   If the estimated net profit for the quarter was 85 million,

20   that's taking basically the revenue for that quarter and

21   subtracting the expenses for that quarter, is that right?

22   A.   That's right.

23   Q.   Now, if we look at these expenses, if the company had

24   hundreds of millions of dollars in expenses in the first

25   quarter of 2021 that were not included here, what would be the

 1   effect that that would have on the profits for the quarter?

 2           MR. LISNER:  Objection.  Calls for speculation.

 3           THE COURT:  Overruled.

 4   A.  If there were expenses excluded, then the profits would

 5   look artificially high.

 6   Q.  If the amount of expenses that was excluded was in the

 7   hundreds of millions, what effect would that have on the

 8   estimated net profit?

 9   A.  It would mean that the profit was actually negative rather

10   than positive.

11   Q.  If the numbers that were reported to you had showed

12   negative profits for the first quarter instead of positive

13   profits, would that have been something you would have taken

14   into account?

15   A.  It would have been.

16   Q.  Would it have been something that would have affected your

17   willingness to invest in the company?

18   A.  We would have at least wanted to know more and the nature

19   of the costs.  And certainly if there were costs being excluded

20   from numbers we were being shown, we would want to understand

21   why.

22   Q.  More generally, if you had been told that the company was

23   moving certain expenses off the financial statements it was

24   sharing with you, would that have been something you would have

25   wanted to know something more about?

1    A.   Yes.

2    Q.   Why is that?

3    A.   We expect the numbers being shown to us to be generally

4    accurate.  If they are missing certain expenses, we would at

5    least want to ask if that is accidental or on purpose; and if

6    it was on purpose, that would be a problem.

7            MR. REHN:  We can bring that down.

8    Q.   Mr. Huang, did Paradigm ultimately decided to invest in

9    FTX?

10   A.   We did.

11   Q.   When did you make your initial investment in FTX?

12   A.   In mid 2021.

13   Q.   And how much did you invest?

14   A.   About 125 million.

15   Q.   Did you have an understanding of why FTX was raising funds

16   at that time?

17   A.   We understood them to be raising funds to fund operations

18   of the business.

19   Q.   When you were speaking with the defendant before making the

20   investment, were you ever told that FTX was taking the money it

21   was raising from this fund raising and transferring the money

22   to Alameda?

23           MR. LISNER:  Objection.

24           THE COURT:  Why?

25           MR. LISNER:  Foundation.

```
 1              THE COURT:  Overruled.
 2   A.  No, we were not.
 3   Q.  If you had been told that, would that have been something
 4   you would have taken into account in determining whether to
 5   invest?
 6   A.  Yes.
 7   Q.  Why would that be?
 8   A.  When we invest in a company, we expect them to do what they
 9   told us they were going to do with it, so we understood them to
10   be raising money to fund operations of the business.
11              Even more than that, because we were concerned about
12   the potential interlink between Alameda and FTX, we had focused
13   a lot on their relationship, and we were assured that they
14   would become less linked over time.  So it would be very
15   concerning for them to being sending money from FTX To Alameda.
16   Q.  After that initial investment in July 2021, did Paradigm
17   make any further investments in FTX?
18   A.  We did.
19   Q.  When were those investments?
20   A.  We made a subsequent investment in the series C round the
21   company raised as it closed the beginning of 2022.
22   Q.  Did you also make some investments in FTX.US?
23   A.  We did.
24   Q.  What was the total amount you invested in FTX and FTX.US?
25   A.  So the next round that we did was about 150 million, so in
```

 1    total about 278 million or so.

 2    Q.  Does Paradigm have a current estimate of the value of its

 3    $278,000 investment in FTX?

 4    A.  We have marked it to zero.

 5              MR. REHN:  No further questions.

 6              THE COURT:  Thank you.

 7              We will take our afternoon break.  Fifteen minutes.

 8              (Recess)

 9              THE COURT:  The witness is reminded he is still under

10    oath.

11              Cross examination, Mr. Lisner.

12    CROSS-EXAMINATION

13    BY MR. LISNER:

14    Q.  Good afternoon, Mr. Huang.  I'm David Lisner, and we have

15    not met before right now, correct?

16    A.  Correct.

17    Q.  You testified that you're one of Paradigm's cofounders?

18    A.  Yes.

19    Q.  You cofounded Paradigm with Mr. -- forgive the

20    pronunciation -- Ehrsam?

21    A.  That's right.

22    Q.  Before you founded Paradigm with Mr. Ehrsam, you worked at

23    Sequoia Capital?

24    A.  That's right.

25    Q.  Is Sequoia Capital a leading investment firm in the Silicon

1    Valley?

2                MR. REHN:  Objection.

3                THE COURT:  Sustained.

4                Depends who you ask, I imagine.

5    Q.  You testified that Paradigm focuses on investing in the

6    cryptocurrency sector?

7    A.  That's right.

8    Q.  That covers investing in both crypto assets themselves and

9    also crypto companies?

10   A.  That's right.

11   Q.  And in this instance you were an investor in FTX, correct?

12   A.  That's right.

13   Q.  Paradigm was never a customer buying or selling crypto

14   assets on the exchange?

15   A.  That's correct.

16   Q.  Is it your understanding that Paradigm never opened an

17   account because FTX would not allow U.S. customers on the site?

18               THE COURT:  Sustained.

19               MR. REHN:  Objection.

20   Q.  Why did Paradigm not have an account on FTX?

21   A.  I can't speak directly to that because the people that make

22   that decision are on our trading team, but my understanding is,

23   we had plenty of venues or exchanges that we were already

24   trading on.

25   Q.  And you understand that the crypto market is risky?

1  A.  I would say it's like any other market.

2  Q.  You don't consider the crypto sector to be different from

3  other technology sectors?

4           MR. REHN:  Objection, your Honor.

5           THE COURT:  Sustained.

6  Q.  Now, it's important when Paradigm picks the companies that

7  it invests in that it picks good, promising companies so it can

8  earn a return on its investments?

9  A.  That's right.

10  Q.  And to pick the right companies, does Paradigm perform

11  research or something in the industry referred to as due

12  diligence of potential investments?

13  A.  We do.

14  Q.  And, as part of that, you consider a lot of factors, some

15  of which are important to your investment decision?

16  A.  Yes, that's right.

17  Q.  And there are also less important factors that have little

18  or no importance to your investment decision?

19  A.  That's right.

20  Q.  As part of Paradigm's typical diligence or research

21  process, do you consider internal documents from the company

22  that you are looking to invest in?

23  A.  Sorry.  Could you repeat that.

24  Q.  I'll rephrase it.

25           As part of your investment research, Paradigm

 1   considers internal documents from the potential company you're

 2   looking to make an investment in?

 3   A.   We consider documents that are presented to us by the

 4   company.

 5   Q.   And those typically include financial statements?

 6   A.   Sometimes, yes.

 7   Q.   Company balance sheets?

 8          THE COURT:  Those would be financial statements, I

 9   imagine, don't you think?

10          MR. LISNER:  It's a subset of, but I take your

11   point --

12          THE COURT:  I am quite familiar with that.

13          MR. LISNER:  Thank you, your Honor.

14   Q.   Company contracts?

15   A.   Actually, typically, we focus more on the business case and

16   business metrics that we receive.  But, yes, occasionally we

17   will do deeper legal due diligence in some cases, but not

18   always.

19   Q.   Turning to FTX in particular, do you recall that Paradigm

20   received access to what's called an electronic data room?

21   A.   I do.

22   Q.   An electronic data room is essentially a computer folder

23   where one person, in this case FTX, could upload documents for

24   someone else to review?

25   A.   That's right.

1   Q.   This is standard in the investment community?

2   A.   Yes, relatively standard.

3   Q.   In reviewing information provided by FTX, you testified

4   that you asked questions of FTX's management?

5   A.   That's right.

6   Q.   And they gave you answers and you had follow-up questions

7   I'm sure?

8   A.   That's right.

9   Q.   And you were satisfied with the responses you received?

10  A.   On the whole, yes.   That's why we subsequently ultimately

11  invested.

12  Q.   Who initiated contact between FTX and Paradigm for a

13  potential investment?

14  A.   I don't recall exactly.   Initiated with my team member

15  Arjun Balaji.   I don't know exactly whether he contacted the

16  company or vice-versa.

17  Q.   You testified on direct that you considered a number of

18  factors in a potential investment, including concerns that

19  Paradigm and yourself had about FTX's corporate governance,

20  true?

21  A.   That's right.

22  Q.   Is corporate governance that refers generally to the rules

23  and practices that a company follows and applies to themselves?

24  A.   What I understand it to mean and what I believe it to have

25  meant when we discussed it was around the general practices of

1    the company, as well as a way of adjudicating certain conflicts

2    that might arise between the company and ourselves as investors

3    or other parties, like employees or customers.

4    Q.  And with respect to a potential investment in FTX, Paradigm

5    was concerned that FTX had no board of directors, true?

6    A.  That's right.

7    Q.  And can you describe what a board of directors does at a

8    general high level?

9    A.  Generally, they serve a governing role to the CEO and

10   executive team of the company, and they approve certain

11   transactions or decisions they have governance over.

12   Q.  Fair to say that a board of directors oversees and

13   supervises company management?

14   A.  That's fair to say.

15   Q.  And fair to say that a corporate board is typically made up

16   of experienced business professionals?

17   A.  That's fair to say.

18   Q.  And you knew before you made an investment or before

19   Paradigm made an investment that FTX did not have a board of

20   directors at all, true?

21   A.  That's true.

22   Q.  Fair to say you think every $20 billion company should have

23   a board of directors?

24              MR. REHN:  Objection, your Honor.

25              THE COURT:  Sustained.

1    Q.  Did FTX's lack of a board of directors weigh against making

2    a potential investment in the company?

3    A.  I would say that it was a negative factor that we

4    considered, and we actually pressed SBF on the idea of creating

5    a board.  It's not uncommon for investors, especially in a

6    round as large as this, to request board seats, and we know

7    that we weren't the only investor that had requested that.  Our

8    understanding was that SBF was very resistant to having

9    investors on the board.  I don't think he thought -- he told us

10   that he didn't think investors had that much to add, but he did

11   represent that he would be creating a board at some point and

12   to be filling it with experienced business executives that

13   could help with the business.

14   Q.  By the time you invested, there was no board of directors?

15   A.  That's right.

16   Q.  And that caused Paradigm to walk away from the deal?

17             THE COURT:  Obviously.

18             MR. LISNER:  Thank you, your Honor.

19   Q.  Fair to say that the lack of a board of directors was not a

20   material factor to your investment decision?

21             MR. REHN:  Objection.

22             THE COURT:  Look.  Come to the sidebar.

23             (Continued on next page)

24

25

1              (At sidebar)

2              THE COURT:  First of all, you either just crossed a

3    motion *in limine* ruling that I made or you are right at the

4    very edge in suggesting that the investment loss was the

5    product of gullibility and negligence by the investor.

6              Number two, you've been over this already six ways to

7    Sunday and you got your answer.  Move on.  The goal here is not

8    to set a record for the longest trial.  It's to have the

9    fairest trial.  Let's get moving.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court)

2              MR. LISNER:  Thank you, your Honor.

3  Q.  At the time that Paradigm chose to invest in FTX, was it

4  your understanding that Mr. Bankman-Fried owned the

5  overwhelming majority of FTX?

6  A.  Yes.

7  Q.  Do you recall if that percent was approximately 80 percent

8  of the company?

9  A.  I don't recall exactly.

10  Q.  Did that factor weigh in favor or against a potential

11  investment in FTX?

12  A.  I would say it's neutral.  It's what we expected to be the

13  case generally.

14  Q.  You testified that Paradigm also had concerns about FTX's

15  relationship with Alameda, true?

16  A.  That's right.

17  Q.  And you testified on direct that --

18              MR. LISNER:  Your Honor, could I request a sidebar?

19              THE COURT:  All right.

20              (Continued on next page)

21

22

23

24

25

```
 1                    (At sidebar)
 2              MR. LISNER:  I think we could skip the sidebar.
 3              MR. COHEN:  We are going to skip the sidebar.
 4              Your Honor, if I might come back to your Honor's
 5    comment before.  As I understand the direct, they are
 6    presenting him as a sophisticated witness and got essentially
 7    lay expert testimony from him.  I don't understand how this
 8    comes up against the idea of gullibility, which might be
 9    appropriate for a customer who they questioned as the first
10    witness.  The government was presenting him, in effect, as an
11    expert on exchanges.
12              THE COURT:  There is no such thing as, in effect, an
13    expert.  They had an obligation to make disclosure if he was
14    called as an expert.  They didn't.  If there was an objection
15    to his giving testimony as an expert, you should have made it.
16              MR. COHEN:  Your Honor, they drew out from him
17    testimony about how exchanges work, how the market works, and
18    we believe we can cross on that since it was brought up on
19    direct.
20              THE COURT:  That's not what your colleague is doing.
21    What your colleague is doing is repeating the direct and
22    repeating the repetition of the direct, and then asking
23    inappropriate questions on top of that.
24              MR. COHEN:  I have your Honor's point on that.  We
25    will work on that tonight.
```

```
 1              I am worried about going forward, your Honor, because

 2    I understand there is going to be other investor witnesses,

 3    sophisticated lenders who they are not presenting --

 4              THE COURT:  I have made rulings on a lot of that

 5    already.

 6              MR. COHEN:  The last thing we want to do is run afoul

 7    of your rulings.

 8              THE COURT:  I accept that, Mr. Cohen.

 9              MR. COHEN:  We don't agree with that, but we are going

10    to follow it.

11              THE COURT:  I understand that.  I have absolutely no

12    concerns about bad faith or anything like that.  To the

13    contrary.

14              MR. COHEN:  We are trying to follow, but this was a

15    little different, at least from what I expected, in terms of

16    how they present it, and they are entitled to, it's their case,

17    but we need to be able to cross-examine on that.

18              THE COURT:  Of course you do, and you have every

19    opportunity to do it.

20              MR. COHEN:  Understood.

21              (Continued on next page)

22

23

24

25
```

```
 1                    (In open court)

 2                    MR. LISNER:  Thank you, your Honor.

 3                    THE COURT:  Let's proceed.

 4    BY MR. LISNER:

 5    Q.  Mr. Huang, you testified——you were asked on direct:  Do you

 6    recall what effect it would have been if you were told that

 7    Alameda was using customer assets or was involved in customer

 8    assets, correct?

 9    A.  Could you repeat that.

10    Q.  On direct were you asked about whether you were told about

11    Alameda's relationship or use of customer assets on FTX?

12    A.  Yeah.

13                    MR. LISNER:  Can we publish to the witness and the

14    Court DX 787.

15                    THE COURT:  Did you say D or G?

16                    MR. LISNER:  D, Defense Exhibit 787.

17    Q.  Do you recognize this to be an audited set of financials

18    from FTX that were provided to Paradigm?

19    A.  Yes.

20                    MR. LISNER:  Your Honor, I'd like to introduce this

21    for a nonhearsay purpose of the information that was disclosed

22    by the company to a potential investor.

23                    MR. REHN:  Objection, your Honor.  There doesn't seem

24    to be any foundation for any such purpose.

25                    THE COURT:  I'm sorry?
```

1          MR. REHN:  I haven't heard a foundation for any such

2    nonhearsay purpose.

3          THE COURT:  Well, neither have I.

4    BY MR. LISNER:

5    Q.  Mr. Huang, do you recall reviewing this document in

6    connection with researching a potential investment in FTX?

7    A.  I don't recall reviewing it prior to the investment, and

8    my—I'm not sure if I recall whether it was available or not.

9          MR. LISNER:  No further questions, your Honor.

10         THE COURT:  Okay.  Thank you.

11         Any redirect?

12         MR. REHN:  Nothing further, your Honor.

13         THE COURT:  All right.  Thank you.  You're excused,

14   Mr. Huang.

15         (Witness excused)

16         THE COURT:  Next witness.

17         MR. ROOS:  Thank you, your Honor.  The government

18   calls Gary Wang.

19         THE DEPUTY CLERK:  Remain standing and raise your

20   right hand for a moment.

21         (Witness sworn)

22         THE DEPUTY CLERK:  Thank you.  Please be seated.

23         Pull your chair up to the microphone and please state

24   your name and spell your last name for the record.

25         THE WITNESS:  Gary Wang, W-A-N-G.

```
 1              THE DEPUTY CLERK:  Thank you.

 2              THE COURT:  You may proceed, Mr. Roos.

 3              MR. ROOS:  Thank you, your Honor.

 4    GARY WANG,

 5         called as a witness by the Government,

 6         having been duly sworn, testified as follows:

 7    DIRECT EXAMINATION

 8    BY MR. ROOS:

 9    Q.  Mr. Wang, where were you working a year ago?

10    A.  At FTX.

11    Q.  What, generally, is FTX?

12    A.  It's a cryptocurrency trading platform.

13    Q.  What was your job at FTX?

14    A.  I was chief technical officer.

15    Q.  Did you have any role founding the company?

16    A.  Yes.  I was the co-founder.

17    Q.  Did you commit financial crimes while working at FTX?

18    A.  Yes.

19    Q.  What types of crimes did you commit?

20    A.  Wire fraud, securities fraud, and commodities fraud.

21    Q.  Did you commit these crimes by yourself or with other

22    people?

23    A.  With other people.

24    Q.  Who were the main people you committed these crimes with?

25    A.  Sam Bankman-Fried, Nishad Singh, and Caroline Ellison.
```

1   Q.  Mr. Wang, do you see any of the people you committed those

2   crimes with in the courtroom today?  You can stand up if you

3   need to.

4            MR. COHEN:  Stipulated, your Honor.

5   A.  Yes.

6   Q.  Who do you see?

7   A.  Sam Bankman-Fried.

8            MR. ROOS:  Let the record reflect the witness has

9   identified the defendant.

10           THE COURT:  It will so reflect.

11           MR. ROOS:  Thank you, your Honor.

12  Q.  Mr. Wang, in general terms for now, what did you do with

13  the defendant that was the wire fraud you were referring to?

14  A.  We gave special privileges to Alameda Research on FTX,

15  which allowed it to withdraw unlimited amounts of funds from

16  the platform, and we lied about this to the public.

17  Q.  When you say withdrew unlimited funds from the platform,

18  what are you referring to?

19  A.  It had the ability to, regardless of what was in the

20  account, to withdraw unlimited amounts of money.

21  Q.  You're talking about Alameda Research?

22  A.  Yes.

23  Q.  Okay.  We'll come back to it in a minute.

24           When you say withdrew unlimited amounts of funds,

25  whose funds are you talking about?

1   A.  Those of customers.

2   Q.  Let's talk about—sorry.  And customers of what?

3   A.  Customers of FTX.

4   Q.  All right.  You mentioned Alameda Research.  What was

5   Alameda Research?

6   A.  This was a cryptocurrency trading firm.

7   Q.  What is a cryptocurrency trading firm?  Let me rephrase

8   that.

9        What did Alameda Research as a cryptocurrency trading

10  firm do?

11  A.  It had accounts on various cryptocurrency exchanges and on

12  them it bought and sold cryptocurrency.

13  Q.  Who owned Alameda Research?

14  A.  Sam and I.

15  Q.  Now you said Alameda Research was given special privileges

16  on FTX.  What were you referring to?

17  A.  It had the ability to withdraw funds or transfer funds

18  regardless of what it had in its account, even if that would

19  cause the account balance to become negative, and it had a very

20  large line of credit, more than other customers, which allowed

21  it to have—

22        (The reporter interrupted for clarification)

23        THE COURT:  Mr. Wang, could you kindly slow down and

24  speak at a different rate of speed.

25        THE WITNESS:  Yes.

1    A.   So one, it had the ability to have negative balances by

2    either transferring funds or withdrawing funds from the

3    platform regardless of what was in its account; it had a very

4    large line of credit which allowed it to have open orders and

5    open positions, essentially without any limit; it had the

6    ability to place orders on the platform slightly faster than

7    other market makers on the platform; and it had——and when

8    customers deposited USD to FTX, some of those went into

9    Alameda's bank account instead.

10   Q.   Let me ask you a few follow-up questions about your answer.

11         So first of all, where did those special advantages

12   exist?

13   A.   In the code for FTX.

14   Q.   And what do you mean by the code for FTX?

15   A.   In the computer code which——for the FTX platform, the

16   computer code that instructs what the platform should do.

17   Q.   You then listed a few advantages, and I just want to take

18   them each in turn.

19         You said Alameda could have negative balances and make

20   unlimited withdrawals.  Did I understand you correctly?

21         MR. EVERDELL:  Objection.

22         MR. ROOS:  I'm just trying to, since it was quick——

23         THE COURT:  What is the objection?

24         MR. EVERDELL:  He's restating the witness's answer.

25         THE COURT:  I'm sorry?

1            MR. EVERDELL:  He's restating the witness's answer in

2     the question.

3            THE COURT:  Overruled.

4     BY MR. ROOS:

5     Q.  Mr. Wang, I think the first thing you said was Alameda had

6     the ability to have negative balances and make unlimited

7     withdrawals.  Did I understand you correctly?

8     A.  Yes.

9     Q.  What did you mean by that?

10    A.  There——normally, when customers withdraw funds from the

11    platform, they need to have those funds in their account before

12    they can do so, but for Alameda, this was not the case.  For

13    Alameda, they can withdraw funds even if that would cause their

14    account balance to become negative as a result of it, as a

15    result of the withdrawal.

16    Q.  What do you mean by a negative balance?

17    A.  So less than zero.  So if they have $10 in their account,

18    they can still——for normal customers, if a customer had $10 in

19    their account, they can only withdraw $10, but for Alameda,

20    this was not the case.  They could withdraw a thousand dollars

21    and then afterwards their account would have negative $990 in

22    it.

23    Q.  And how much over the course——just generally speaking, how

24    much money over the course of your time at FTX did Alameda

25    withdraw into the negative?

1   A.  By the——by the time FTX declared bankruptcy, Alameda had

2   withdrawn $8 billion.

3   Q.  Now the second thing I heard you say related to a line of

4   credit.  What were you saying there as a special advantage?

5   A.  Alameda had a large line of credit to act as collateral for

6   their positions and orders on their account.  So normally when

7   a customer places an order or opens a position on FTX, they

8   need——that position needs to be collateralized by some funds

9   that they've deposited onto their accounts, but for Alameda,

10  they have——this was not the case because they had a very——they

11  had a $65 billion line of credit on their platform.

12  Q.  So what's like a normal line of credit for a customer?

13  A.  For——normally, for large market makers, it's usually in the

14  single- to double-digit millions.

15  Q.  And how much was Alameda's?

16  A.  65 billion, with a B.

17  Q.  You mentioned those two advantages and a few others.  Were

18  those advantages?

19          THE COURT:  Excuse me, Mr. Roos.  I just want to make

20  sure what the witness said.

21          You said normally, for large makers, it's in the

22  single- to double-digit——did you say millions or billions?

23          THE WITNESS:  Millions, with an M.

24          THE COURT:  Okay.  Thank you.  So the reporter will

25  correct the record.

1          MR. ROOS:  Thank you, your Honor.

2    BY MR. ROOS:

3    Q.  So just to be clear, for larger customers, it was millions,

4    as the judge just asked you, and was it millions or billions

5    for Alameda?

6    A.  Billions for Alameda.

7    Q.  Thank you.  Were these special advantages disclosed to the

8    general public?

9    A.  No.

10   Q.  What was your involvement in implementing these computer

11   code advantages at FTX?

12   A.  I implemented some of these features——some of these

13   features I implemented, and some of these features I used

14   others' implementation of.

15   Q.  And whose, if anyone's, direction did you act on when you

16   did that?

17   A.  On Sam's.

18   Q.  What happened as a result of Alameda's ability to have a

19   negative account balance?

20   A.  It withdrew so much that FTX was not able to repay

21   customers who were trying to withdraw.

22   Q.  And when you say it withdrew so much, what are you

23   referring to?

24   A.  Assets from the platform.  Combination of USD and

25   cryptocurrency.

 1   Q.  Okay.  And an amount?

 2   A.  Yeah, of $8 billion.

 3   Q.  What ended up happening to FTX?

 4   A.  FTX declared bankruptcy.

 5   Q.  You mentioned that you committed financial crimes at FTX.

 6   Have you pled guilty to those crimes?

 7   A.  Yes.

 8   Q.  Are you testifying here under a cooperation agreement?

 9   A.  Yes.

10   Q.  So we're going to come back to that further.  But first, I

11   just want to take a step back and talk to you a little bit

12   about your background.

13           Where did you grow up?

14   A.  I was born in China, then moved to the US when I was 7, and

15   then I grew up in Minnesota.

16   Q.  Did you go to college?

17   A.  Yes.

18   Q.  Where did you go to college?

19   A.  At MIT.

20   Q.  What did you study at MIT?

21   A.  Math and computer science.

22   Q.  When did you first meet Samuel Bankman-Fried?

23   A.  We met at summer camp when I was in high school.

24   Q.  Did you reconnect with him again?

25   A.  Yes.

1  Q.  When?

2  A.  At college.  We lived in the same living group and we were

3  friends, and we were roommates for a while.

4           MR. ROOS:  Mr. Bianco, can we please show just the

5  witness for identification Government Exhibit 1804.

6  Q.  Mr. Wang, do you recognize this?

7  A.  Yes.

8  Q.  What is it?

9  A.  It's a picture of me and Sam.

10           MR. ROOS:  The government offers Exhibit 1804.

11           MR. EVERDELL:  No objection.

12           THE COURT:  Received.

13           (Government's Exhibit 1804 received in evidence)

14           MR. ROOS:  May we publish it?

15           THE COURT:  Yes.

16  BY MR. ROOS:

17  Q.  Mr. Wang, now that the jury can see the image, what does

18  this show?

19  A.  Shows me and Sam.

20  Q.  From when?

21  A.  From college.

22  Q.  What did you do after college?

23           MR. ROOS:  Mr. Bianco, we can take this down.

24  A.  I worked at Google for a couple years.

25  Q.  Okay.  And did there come a time after college when you

 1   reconnected with the defendant?

 2   A.  Yes.

 3   Q.  And roughly when was that?

 4   A.  In fall of 2017.

 5   Q.  How old are you now, by the way?

 6   A.  30.

 7   Q.  So how old were you back then?

 8   A.  24.

 9   Q.  So you reconnected with the defendant back in the fall of

10   2017.  How did that happen?

11   A.  He came up to Boston for a weekend, talked—and he talked

12   to me about starting a cryptocurrency trading firm with him.

13   Q.  Okay.  And what was the name of that cryptocurrency trading

14   firm?

15   A.  Alameda Research.

16   Q.  Where was Alameda Research located?

17   A.  In Berkeley, California.

18   Q.  You said Alameda—early in your testimony you said Alameda

19   Research was a cryptocurrency trading firm.  How did that work?

20   A.  So it had accounts on various cryptocurrency trading sites

21   and it deposited funds under those sites and it would buy and

22   sell cryptocurrency, so it would buy them at a low price, sell

23   them at a higher price, and make money that way.

24   Q.  Who picked the name Alameda Research?

25   A.  Sam did.

1    Q.    Why the name Alameda Research?

2    A.    Alameda because we were located in Alameda County,

3    California; and Research because it sounds prestigious and it

4    doesn't mention cryptocurrency.

5    Q.    What, if anything, did the defendant say about why you

6    should use the name Research?

7    A.    He said that it makes it easier to do business if——if the

8    name doesn't mention trading with cryptocurrency, that it would

9    be easier to get bank accounts or to get office leases and

10   things like that.

11   Q.    I want to ask you about a part of an interview.

12            MR. ROOS:    And the government at this time offers

13   Government Exhibit 917 pursuant to the stipulation which is

14   already in evidence as Government Exhibit 2000.

15            Mr. Bianco, before we do that, it has to be admitted.

16            THE COURT:    Received.

17            (Government's Exhibit 917 received in evidence)

18            MR. ROOS:    And the stipulation states in relevant part

19   that Government Exhibit 917 is an excerpt from a Blockworks

20   podcast interview with Samuel Bankman-Fried on April 1, 2021.

21   With the Court's permission, can we play Government Exhibit 917

22   for the witness and the jury.

23            THE COURT:    Yes.

24            (Video played)

25   BY MR. ROOS:

 1    Q.  Mr. Wang, how did those comments you just heard compare to

 2    the things that Mr. Bankman-Fried said to you at the time you

 3    were starting Alameda Research?

 4    A.  They agree with each other.

 5         MR. ROOS:  We could take the recording down.

 6    Q.  Who ran Alameda Research?

 7    A.  Sam did.

 8    Q.  And when you started, what kind of work were you doing at

 9    Alameda Research?

10    A.  I was doing software, so I was doing coding.

11    Q.  What do you mean by coding?

12    A.  So writing computer code.

13         MR. ROOS:  All right.  Could we show the witness and

14    the jury what's already in evidence as Government Exhibit 1801.

15    Q.  Who is this?

16    A.  Me.

17    Q.  When is this roughly from?

18    A.  From 2018.

19    Q.  And where were you working at the time this photo was

20    taken?

21    A.  At Alameda.

22    Q.  All right.  While you were working at Alameda, did you meet

23    someone named Nishad Singh?

24    A.  Yes.

25    Q.  What was his job?

1    A.  He was another developer.  He was another coder at the

2    company.

3            MR. ROOS:  May we please show the witness what's in

4    evidence as Government Exhibit 1803.  The witness and the jury.

5    Q.  Who are we looking at here?

6    A.  Nishad.

7    Q.  And when, roughly, is this picture from?

8    A.  Also roughly 2018.

9            MR. ROOS:  All right.  We can take that down.

10   Q.  Did you meet someone named Caroline Ellison at Alameda

11   Research?

12   A.  Yes.

13   Q.  What was Caroline Ellison's job there?

14   A.  She was a trader.

15   Q.  I'm sorry.  I forgot to ask you:  What was Nishad Singh's

16   job at Alameda Research?

17   A.  He was a coder.

18   Q.  Okay.  So he was a coder.  And you said Caroline Ellison

19   was a trader.  What's a trader?

20   A.  She came up with trading strategies for the company and

21   then watched and supervised the execution of those trades

22   either by the automated system or manually.

23           MR. ROOS:  Mr. Bianco, can you show the witness and

24   the jury Government Exhibit 1802, which is in evidence.

25   Q.  And who is this, Mr. Wang?

1   A.  Caroline.

2   Q.  Caroline Ellison?

3   A.  Yes.

4   Q.  And when, roughly, is this from?

5   A.  Also from 2018.

6         MR. ROOS:  We can take that down.

7   Q.  So who owned Alameda Research?

8   A.  Sam and I.

9   Q.  And what was the ownership breakdown?

10  A.  Sam owned 90 percent, I owned 10 percent.

11        MR. ROOS:  Show just the witness what's been marked

12  for identification as Government Exhibit 67.

13  Q.  Do you recognize this?

14  A.  Yes.

15  Q.  What is it?

16  A.  It's a description of the ownership breakdown for Alameda

17  Research.

18        MR. ROOS:  Government offers Exhibit 67.

19        MR. EVERDELL:  No objection.

20        THE COURT:  Received.

21        (Government's Exhibit 67 received in evidence)

22        MR. ROOS:  May we publish it?

23        THE COURT:  Yes.

24  BY MR. ROOS:

25  Q.  Mr. Wang, now that the jury can see this document, what is

1    it?

2    A.  It's a description of the ownership breakdown for Alameda.

3    Q.  And what does it show the ownership breakdown was?

4    A.  That I owned 10 percent of the company and Sam owned

5    90 percent of the company.

6    Q.  Do you see in the lower left corner there is something that

7    is certified?

8    A.  Yes.

9    Q.  And who signed the certification on this document?

10   A.  Sam did.

11   Q.  Did the ownership percentages as indicated on this

12   document——withdrawn.

13          This document says at the top that it's dated

14   January 30, 2020.  Did the ownership percentages of Alameda

15   ever change over the entirety of the time you were an owner of

16   it?

17   A.  No.

18   Q.  And from when to when were you an owner of Alameda?

19   A.  From 2017 until——unclear, unclear what the current

20   ownership status is.

21   Q.  Until at least until November of 2022; is that right?

22   A.  Yes.

23   Q.  And did Alameda Research ever have any other owners?

24   A.  No.

25   Q.  How about any other investors?

 1   A.  No.

 2   Q.  So from this time until November 2022, Samuel Bankman-Fried

 3   continued to own 90 percent of the company.

 4   A.  Yes.

 5            MR. ROOS:  We can take this down.

 6   Q.  You said Alameda Research would buy and sell

 7   cryptocurrency.  Where did it get the money to do that?

 8   A.  So initially some of the funds came from Sam personally,

 9   and then the——and then the remaining came from various lenders.

10   Q.  What do you mean by various lenders?

11   A.  So various investment firms or other people's money would

12   lend money to Alameda at an interest rate and then Alameda

13   would use that to do trading.

14   Q.  Did there come a time when the defendant spoke to you about

15   starting a new business?

16   A.  Yes.

17   Q.  What was the new business?

18   A.  FTX.

19   Q.  And where did the name for FTX come from, or what does it

20   stand for?

21   A.  Stands for Futures Exchange.

22   Q.  I'm showing you now Government Exhibit 1567.  Do you

23   recognize this?

24   A.  Yes.

25   Q.  What is it?

1    A.   The screenshot of FTX's home page from 2019.

2           MR. ROOS:  Government offers Exhibit 5715—I'm sorry.

3    The government offers Government Exhibit 1567.

4           MR. EVERDELL:  No objection.

5           THE COURT:  Received.

6           (Government's Exhibit 1567 received in evidence)

7           MR. ROOS:  May we publish it?

8           THE COURT:  Yes, sir.

9    BY MR. ROOS:

10   Q.   Mr. Wang, what are we looking at here?

11   A.   The screenshot of the ftx.com home page from 2019.

12   Q.   So let me ask you some questions about the FTX exchange.

13   You said it was a place people could buy and sell

14   cryptocurrency; is that right?

15   A.   Yes.

16   Q.   What types of cryptocurrency?

17   A.   There was a large set of cryptocurrency, but such as

18   Bitcoin, Ethereum, Ripple, and USDC.

19   Q.   In addition to allowing users to buy and sell

20   cryptocurrency, what were some of the other things that users

21   could do on the website?

22   A.   They could buy and sell, they could trade various futures.

23   Q.   What's a future?

24   A.   It's a—it's a contract where you can either be—you can

25   either buy it or if you buy—or you can short or sell it, short

1   it, and at some future——at some particular future date,

2   depending upon what future it is, based on what——so for

3   example, for a Bitcoin future, you would have a——it would be a

4   future on Bitcoin and it would settle at some particular date

5   in the future, and at that future time, whoever shorts the

6   future pays whoever is long on the future, whatever the price

7   of Bitcoin is on that date.

8   Q.  I think some people maybe have heard of shorting a stock.

9   How does shorting a stock compare to one of these Bitcoin

10  futures?

11  A.  It's the same concept, where you can either be long or be

12  short on the future, but if you think the price of Bitcoin is

13  going to go up, you can buy or become long on the future, and

14  if you think the price of Bitcoin is going to go down, you can

15  short or sell the future.

16  Q.  Mr. Wang, if I can just ask you to go particularly slow

17  here because it can be a little more complicated, okay?

18  A.  Yup.

19  Q.  All right.  So with the futures, what are the two——what are

20  the parties trading?  The two users on the exchange, what are

21  they trading when they're trading a future?

22  A.  They're trading the contract.

23  Q.  What does that mean?  What are they actually exchanging?

24  A.  So they're essentially exchanging obligation on some future

25  date to transfer the price of one Bitcoin between each other.

1   So if one user buys a Bitcoin future from another user, they're

2   essentially agreeing that at some date in the future whoever

3   sells the future would pay whoever bought the future the price

4   of one Bitcoin.

5   Q.  So whether it's trading Bitcoin or trading a future, how

6   did FTX make money?

7   A.  From trading fees.  So there would be a small fraction of

8   every trade that would go to the platform.

9   Q.  What were some of the types of customers that traded on

10  FTX?

11  A.  There were large——there were both large institutions, or

12  large trading firms, and then there were also smaller retail

13  users.

14  Q.  What do you mean by——we'll start with:  What do you mean by

15  larger trading firms?

16  A.  So either trading——either trading firms or investment firms

17  that make money trade——make money either trading or holding

18  assets.

19  Q.  And what do you mean by like a retail customer?

20  A.  So just individuals who would just want to invest in

21  cryptocurrency or bet on the price of cryptocurrency.

22  Q.  Who were the founders of FTX?

23  A.  Sam and I.

24  Q.  And did the defendant ever say to you why he wanted to

25  start a cryptocurrency exchange?

1    A.  He was dissatisfied with the existing cryptocurrency

2    exchanges at the time.

3    Q.  Who was in charge at FTX?

4    A.  Sam was.

5    Q.  And you were co-founders.  Did you share responsibilities

6    equally?

7    A.  No.

8    Q.  What were your primary responsibilities?

9    A.  I was responsible for the technology, for the code, for

10   writing the code, for reviewing the code that other people

11   within——or direct——for setting the technical direction of the

12   company.

13   Q.  What role, if any, did Sam Bankman-Fried have with the

14   coding?

15   A.  He directed that certain features be implemented, so he

16   told us what features that he wanted to add to the——add or

17   change to the website.

18   Q.  So let me just be clear about this.  Did he do the coding

19   himself?

20   A.  No.

21   Q.  So what then did he do?

22   A.  He told us what things to implement.

23   Q.  Can you give us an example.

24   A.  So for example, the rules for how much collateral is needed

25   for certain positions or where things should be placed on the

1   website, or limits on how much——limits on how large positions

2   can be or limits on how much people can deposit, withdraw,

3   things like that.

4           MR. ROOS:  Mr. Bianco, we can take down 1567.

5   Q.  You said a moment ago that your responsibilities were not

6   equal.  What responsibilities did the defendant have that were

7   not——that you were not involved with, generally?

8   A.  The business aspects, so——and PR, talking to investors,

9   talking to the public——to the media, talking to the public,

10  giving interviews, doing advertisements, raising funds from

11  investors, lobbying and——

12  Q.  And in terms of your work on a day-to-day basis, did you do

13  anything besides the coding work you described?

14  A.  No.

15  Q.  Now who, if anyone, did you report to when you worked at

16  FTX?

17  A.  To Sam.

18  Q.  And you were co-founders.  What happened if there was a

19  disagreement between the two of you?

20  A.  Sometimes we would talk about it, but in the end, it's Sam

21  decision to make.

22  Q.  Okay.  Now when you worked at FTX were you paid a salary?

23  A.  Yes.

24  Q.  What was your salary?

25  A.  $200,000 a year.

1    Q.  Did you get any sort of performance bonus?

2    A.  No.

3    Q.  Did you get any sort of stock?

4    A.  I was equity holder for FTX.

5    Q.  And how much stock did you get, approximately?

6    A.  I owned around 17 percent of FTX.

7    Q.  Do you know how much the defendant owned?

8    A.  Around 60, 65 percent.

9    Q.  Did FTX have other owners or investors?

10   A.  Yes.

11   Q.  What types?

12   A.  So there was Nishad owned I think around 5 percent of the

13   company, and then there were a number of outside investors.

14   Q.  Now counting the value of the FTX stock that you owned, was

15   there a time you were a billionaire?

16   A.  Yes.

17   Q.  What about Sam Bankman-Fried?

18   A.  Yes.

19   Q.  Do you know who was worth more?

20   A.  Sam was.

21   Q.  Did you ever get any other money from FTX?

22   A.  I also had some cryptocurrency called Serum when we created

23   that crypto coin——when we created that cryptocurrency, and then

24   I received a number of loans from the company.

25   Q.  What kind of loans are you referring to?

1   A.   There were loans to invest in—to making investments in

2   various companies that the company wanted to acquire or invest

3   in and that there were—and there was one personal loan.

4   Q.   Let's start with the personal loan.  How much was that for?

5   A.   So that was for a million dollars, but then I only actually

6   withdrew $200,000 of that from FTX.

7   Q.   And what did you use it for?

8   A.   To buy a house.

9   Q.   You also mentioned company loans.  How much were you

10  loaned—let me start by asking:  What company loaned you money?

11  A.   Alameda did.

12  Q.   Alameda Research?

13  A.   Yes.

14  Q.   And do you know what those company loans were for?

15  A.   For various companies that Alameda or FTX wanted to invest

16  in or acquire.

17  Q.   And who presented those loans to you?

18  A.   Either Sam or a round of lawyers at the company.

19  Q.   What did you do when you were presented with the loans?

20  A.   I signed the paperwork.

21  Q.   Why did you sign them?

22  A.   I was told to.

23  Q.   What did you believe the expectation was when you were

24  presented with one of these loans?

25  A.   That I would sign it.

1   Q.  And with these loans, how much money are we talking about?

2   A.  Around 2 or $300 million.

3   Q.  So you had 2 or $300 million loaned by what entity?

4   A.  By Alameda Research.

5   Q.  And do you know what happened to that money after it was

6   loaned to you?

7   A.  As far as I know, it was used to make these investments.

8   Q.  Just to be clear, this money that was loaned, the 200 to

9   $300 million that was loaned from Alameda to you, did it ever

10  go into your bank account?

11  A.  No.

12  Q.  Do you know where the money went?

13  A.  As far as I know, it went to the things I was told it

14  was—the things—the places I was told it was going to, which

15  is the various companies we were investing in.

16  Q.  And who told you that?

17  A.  Sam did.

18          MR. ROOS:  Your Honor, I'm about to switch to another

19  topic.  We could stop here or I could start with another topic.

20          THE COURT:  I think we'll stop here.

21          Ladies and gentlemen, see you tomorrow morning, 9:30.

22          THE DEPUTY CLERK:  Would the jury please come this way

23  and bring your notebooks with you.

24          THE COURT:  Mr. Wang, you can step out of the room.

25  We'll see you tomorrow too.

```
 1                 (Jury not present)

 2                 THE COURT:  Be seated, folks.

 3                 Andy is polling the jury with respect to lunch

 4     tomorrow, as to whether we get some snacks in for them and have

 5     a 20-minute lunch break or whether we go straight through till

 6     2 without a lunch break and stop at 2, and I think he's got

 7     another option on his menu.  So I should have the result of

 8     that in a minute.  If anybody has a preference to voice, now

 9     would be a good time.

10                 MR. ROOS:  So I think our view is, I'm sure as your

11     Honor can tell, we're a little behind where we were hoping to

12     be at the end of the week, and so we certainly favor something

13     that gives the jury more time with the witnesses, hopefully to

14     try to get this guy's testimony finished by the end of the

15     week.  But we defer to the Court on snack break versus working

16     through and ending a little earlier.

17                 THE COURT:  Yes.  Mr. Cohen?

18                 MR. COHEN:  We defer to the Court.

19                 THE COURT:  Okay.  So we'll see what they have to say.

20                 So Mr. Roos, do you want to give me what the program

21     is as we go forward.

22                 MR. ROOS:  What the plan is for?

23                 THE COURT:  Into next week.

24                 MR. ROOS:  Into next week?  So, your Honor, we had——

25                 THE COURT:  Let me find out what Andy says.
```

1            THE DEPUTY CLERK:  The jury votes to go straight to

2    2:00 without taking a lunch break.

3            THE COURT:  Okay.  Fine.  Without any break at all.  I

4    mean, a bathroom break.

5            THE DEPUTY CLERK:  Yes.

6            THE COURT:  A bathroom break.  So no food before 2:00.

7            Okay.  All right.  Go ahead, Mr. Roos.

8            MR. ROOS:  So, your Honor, the plan, I think Gary Wang

9    will pick up tomorrow.  I think based on that schedule, I'm

10   hopeful that his direct will end about halfway through our time

11   tomorrow.  And we had two other witnesses that were Zac Prince

12   and Elan Dekel, and if it's okay with your Honor, we just need

13   to reassess whether those people will be Tuesday witnesses or

14   whether, given the fact that we're now into the next week, we

15   need to make a change.  So we could tell your Honor tomorrow

16   morning or something like that.

17           THE COURT:  All right.  Is there any revised estimate

18   on the duration of the trial?

19           MR. ROOS:  I don't think so.  I think we're a little

20   bit behind, but, you know, these things—we can catch up, and

21   arguably the witnesses are maybe largely on track, jury

22   selection just went a little bit longer, so—

23           THE COURT:  Okay.  Mr. Cohen, anything to enlighten me

24   with?

25           MR. COHEN:  No, your Honor.  I think we just have to

1   see how things go tomorrow and Tuesday, but I don't have

2   anything to add in terms of timing.

3         THE COURT:  Okay.  I think I've sufficiently made my

4   point about cutting out repetition, and I'm sure that the jury

5   will appreciate everything you can accomplish on that because I

6   think they were finding some of it pretty rugged.

7         MR. COHEN:  We understand, your Honor.  We may want to

8   be heard on the matter I raised at sidebar, but obviously not

9   today.

10         THE COURT:  And that matter is?

11         MR. COHEN:  The pretrial ruling about certain investor

12   witnesses and customer witnesses, but we don't have to cover

13   that today.

14         THE COURT:  Okay.  We will not cover it today.

15         MR. ROOS:  Your Honor, a few just very minor and quick

16   housekeeping matters.

17         There were I think two or three exhibits yesterday,

18   420 and I think 427—425 through 427.  Your Honor asked about a

19   little like white box at the bottom that said page 6 of 7 and

20   had a 3500 number?

21         THE COURT:  Yes.

22         MR. ROOS:  And that was basically our mistake.

23   Actually the version the Court had and defense had didn't have

24   that.  We loaded the 3500 version of it.  So anyways, we've

25   corrected it, and assuming nobody has an objection, the version

1    that will go to the jury won't have that confusing—

2            THE COURT:  Will or will not?

3            MR. ROOS:  Will not have the white margin on the

4    bottom.

5            The other—if the Court's okay with it, yesterday we

6    offered exhibits pursuant to stipulation 2001, which—and those

7    exhibits were admitted.  Reviewing the transcript, we don't see

8    that 2001 itself, the stipulation, was admitted, so we could do

9    it in front of the jury if your Honor would like, but we also

10   would just move now to offer 2001.

11           THE COURT:  Do you have a preference, Mr. Cohen?

12           MR. COHEN:  No preference, your Honor.

13           THE COURT:  Okay.  2001 is admitted.

14           (Government's Exhibit 2001 received in evidence)

15           THE COURT:  Since Andy is out of the room, I charge

16   you, Mr. Roos, with making sure Andy, who is the keeper of the

17   keys—oh, there he is.  My goodness.  He's always out of the

18   room doing what he has to do.  Okay.  That's fine.  Andy's got

19   it.  So we will see you all tomorrow.

20           THE DEPUTY CLERK:  All rise.

21           (Adjourned to October 6, 2023, at 9:30 a.m.)

22

23

24

25

331

INDEX OF EXAMINATION

Examination of:                                    Page

ADAM YEDIDIA

Direct By Ms. Sassoon  . . . . . . . . . . . 126

Cross By Mr. Everdell  . . . . . . . . . . . 186

Redirect By Ms. Sassoon  . . . . . . . . . . 256

 KUNGYU MATTHEW HUANG

Direct By Mr. Rehn . . . . . . . . . . . . . 265

Cross By Mr. Lisner  . . . . . . . . . . . . 290

 GARY WANG

Direct By Mr. Roos . . . . . . . . . . . . . 303

                         GOVERNMENT EXHIBITS

Exhibit No.                                          Received

1801    . . . . . . . . . . . . . . . . . . 127

1803    . . . . . . . . . . . . . . . . . . 129

1450    . . . . . . . . . . . . . . . . . . 130

1561    . . . . . . . . . . . . . . . . . . 133

1560    . . . . . . . . . . . . . . . . . . 137

1636    . . . . . . . . . . . . . . . . . . 144

1625    . . . . . . . . . . . . . . . . . . 146

1452    . . . . . . . . . . . . . . . . . . 148

1802    . . . . . . . . . . . . . . . . . . 149

1457    . . . . . . . . . . . . . . . . . . 179

532    . . . . . . . . . . . . . . . . . . 271

320    . . . . . . . . . . . . . . . . . . 275

320A    . . . . . . . . . . . . . . . . . . 284

1804    . . . . . . . . . . . . . . . . . . 311

917    . . . . . . . . . . . . . . . . . . 313

67    . . . . . . . . . . . . . . . . . . 316

1567    . . . . . . . . . . . . . . . . . . 319

2001    . . . . . . . . . . . . . . . . . . 330