```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                         22 CR 673 (LAK)

 5    SAMUEL BANKMAN-FRIED,

 6              Defendant.                 Trial
      ------------------------------x
 7
                                           New York, N.Y.
 8                                         October 10, 2023
                                           9:30 a.m.
 9

10    Before:

11
                      HON. LEWIS A. KAPLAN,
12
                                           District Judge
13
                         APPEARANCES
14
      DAMIAN WILLIAMS
15         United States Attorney for the
           Southern District of New York
16    BY:  DANIELLE R. SASSOON
           NICOLAS ROOS
17         DANIELLE KUDLA
           SAMUEL RAYMOND
18         THANE REHN
           Assistant United States Attorneys
19
      COHEN & GRESSER, LLP
20         Attorneys for Defendant
      BY:  MARK S. COHEN
21         CHRISTIAN R. EVERDELL
           SRI K. KUEHNLENZ
22         DAVID F. LISNER

23    Also Present:
      Luke Booth, FBI
24    Kristin Allain, FBI
      Arjun Ahuja, USAO Paralegal Specialist
25    Grant Bianco, USAO Paralegal Specialist
```

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning, everyone.

3              Before we get the jury, Mr. Everdell, I got the filing

4    a short time ago that you filed after 11:00 last night, so I am

5    not going to be ruling on it now.

6              I assume the government got it, yes?

7              MR. ROOS:  Yes, your Honor.

8              THE COURT:  What is your pleasure?  Do you wish to

9    make a written response, or what do you want to do?

10             MR. ROOS:  No.  I think, broadly speaking, we don't

11   have an objection to them inquiring about.

12             THE COURT:  You do or you don't?

13             MR. ROOS:  We do not have an objection to the broad

14   topic of, were lawyers involved in the loan documentation in

15   some form.  I think we will take the questions as they come in

16   terms of specific objections, but we don't have an objection to

17   him inquiring on cross this morning into this topic.

18             THE COURT:  Then I don't have to do anything at the

19   moment.

20             Let's get the jury.

21             MR. ROOS:  Your Honor, can we get the witness as well?

22             THE COURT:  Yes.  Sure.

23             (Jury present)

24             THE COURT:  Good morning, everybody.

25             Mr. Wang, you are still under oath.

```
 1                  Mr. Everdell, you may continue.
 2                  MR. EVERDELL:  Thank you, your Honor.
 3    GARY WANG, resumed.
 4    CROSS-EXAMINATION (cont'd)
 5    BY MR. EVERDELL:
 6    Q.  Good morning, Mr. Wang.
 7    A.  Good morning.
 8    Q.  I want to talk to you about the time period in June of
 9    2022.  All right?
10    A.  OK.
11    Q.  I believe you testified before that in June 2022 the prices
12    of a number of cryptocurrencies fell by a large amount, is that
13    right?
14    A.  Yes.
15    Q.  Were you following the prices of cryptocurrencies at the
16    time, generally?
17    A.  Loosely.
18    Q.  Were you following the prices of Bitcoin at the time?
19    A.  Yes.
20    Q.  You can follow them on publicly available websites, right?
21    A.  Yes.
22    Q.  Like Yahoo Finance?
23    A.  Yes.
24                  MR. EVERDELL:  If we could call up, please, just for
25    the witness Defense Exhibit 1614, please.
```

1   Q.  Do you see that in front of you, Mr. Wang?

2   A.  Yes.

3   Q.  Do you know what that is?

4   A.  It's a graph of the price of Bitcoin.

5   Q.  From January 2022 to October 2022?

6   A.  Yes.

7           MR. EVERDELL:  Your Honor, the government offers

8   Defense Exhibit 1614.

9           THE COURT:  I don't think so.

10          MR. ROOS:  Your Honor, two things.  One, the

11  government does not offer this.

12          THE COURT:  That was the point.

13          MR. EVERDELL:  The defense offers.

14          MR. ROOS:  The other is, I am not sure if there is a

15  foundation about whether the witness thinks it fairly and

16  accurately actually reflects the price of Bitcoin.

17          THE COURT:  Sustained as to form.

18  Q.  Mr. Wang, based on what you are seeing in front of you,

19  does this, in your opinion, fairly and accurately represent the

20  fluctuations of the price of Bitcoin during that time period?

21  A.  Yes.

22          MR. EVERDELL:  Your Honor, the defense offers defense

23  Exhibit 1614, please.

24          THE COURT:  Received.

25          (Defendant's Exhibit 1614 received in evidence)

1               MR. EVERDELL:  If we could publish that to the jury,

2    please.

3    Q.  Mr. Wang, looking at what's in front of you, you see the

4    graph, it begins over on the left side, that's January of 2022?

5    A.  Yes.

6    Q.  Over on the right side is October 2022, right?

7    A.  Yes.

8    Q.  Just looking at this peaks and valleys here, I am going to

9    see if I can circle one here.  You see where I circled?

10   A.  Yes.

11   Q.  That's around June of 2022, right?

12   A.  Yes.

13   Q.  What do you observe happening here?

14   A.  The price fell.

15   Q.  And there was a previous fall here, right, in May?

16   A.  Yes.

17               MR. EVERDELL:  We can take that down.

18   Q.  So that fall in the price of Bitcoin caused a downturn in

19   the crypto markets, isn't that right?

20   A.  Yes.

21   Q.  And some of the Alameda's lenders were asking for their

22   money back at that time?

23   A.  Yes.

24   Q.  I believe you testified that around that time Sam gave you

25   and Nishad Singh and Caroline Ellison a project to calculate

 1  Alameda's total balances on FTX, is that right?

 2  A.  Yes.

 3  Q.  And what was the reason this project needed to be done at

 4  that point?

 5  A.  I mean at the time he told us to do it I didn't know at the

 6  time.  Later on I realized it was to figure out whether or not

 7  Alameda returned the balances to the lenders.

 8  Q.  But you did work on this spreadsheet with Nishad and

 9  Caroline to calculate Alameda's balances on the FTX exchange?

10  A.  Yes.

11  Q.  And when you first calculated the balances, I think you

12  said that it showed a debt that appeared way too big, is that

13  right?

14  A.  Yes.

15  Q.  Meaning it looked like Alameda owed FTX billions more than

16  it actually did?

17  A.  Yes.

18  Q.  But then you determined that the amount was overstated by

19  about 8 billion because of the bug in the fiat account?

20  A.  Yes.

21  Q.  When you corrected for the bug, the actual number of fiat

22  liability was, you said, roughly negative 11 million at that

23  point.

24  A.  Yes.

25  Q.  You had known about the bug for several months, correct?

```
 1    A.   Yes.

 2    Q.   You think it had been discovered at the end of 2021,

 3    roughly?

 4    A.   Yes.

 5    Q.   But you hadn't gotten the chance to fix it yet?

 6    A.   Yes.

 7    Q.   So you knew about the debt that Alameda owed to FTX for a

 8    few months prior to the bug fix?

 9    A.   Yes.

10    Q.   Did you think it was a problem when you first learned of

11    it?

12    A.   I mean, I learned of how much Alameda was borrowing from

13    FTX even before that when Sam was asking me to calculate how

14    much of -- how much to charge interest on Alameda's line of

15    credits.

16              THE COURT:  I'm sorry.  Mr. Wang, can you try to speak

17    a little bit more slowly.

18    A.   I don't know -- how much Alameda was borrowing from FTX a

19    couple of months before that, when Sam asked me to calculate

20    how much interest to charge on Alameda's line of credit on FTX.

21    Q.   I'm asking about when you found out about the bug.  You

22    learned about the bug discovered in the end of 2021?

23    A.   Yes.

24    Q.   At that point -- let's move on to June of 2022, when you

25    did the spreadsheet.  All right?
```

1    A.  OK.

2              THE COURT:  Sorry.  Just let me see if we can clarify.

3              When you learned about the bug at the end of 2021, did

4    you or did you not know the amount of the overstatement?

5              THE WITNESS:  I think at that point overstatement was

6    around 500 million.

7              THE COURT:  And did you or did you not know what was

8    owed by Alameda to FTX at that time?

9              THE WITNESS:  At that time I don't think I did an

10   exact calculation of what that number was, but I had a rough

11   idea.

12             THE COURT:  Go ahead.

13   Q.  Let's move forward then to June of 2022, when you worked on

14   the spreadsheet.

15             You recall being shown that spreadsheet when you

16   testified on direct examination, right?

17   A.  Yes.

18             MR. EVERDELL:  If we can pull up Government's Exhibit

19   50, which is already in evidence, please, and we can go to

20   sheet 2.

21   Q.  This is the spreadsheet that you worked on in June of 2022?

22   A.  Yes.

23   Q.  If you look at cells -- if you look at cells C13 and C14.

24   You see those?

25   A.  Yes.

1   Q.  The top one, negative 19 billion, that is the fiat

2   liability precorrection, right?

3   A.  Yes.

4   Q.  And below that is the correction itself?

5   A.  Yes.

6   Q.  And if you sum the two together, which is towards the

7   bottom here -- I'll just circle it, if you can see it.  Is that

8   the sum there?

9   A.  Yes.

10  Q.  So the corrected sum is, you said, negative 11 billion,

11  roughly?

12  A.  Yes.

13  Q.  And if you go -- that's just the fiat@ liability?

14  A.  Yes.

15  Q.  Again, just to remind ourselves, that reflects the amount

16  of cash deposits that FTX customers had placed on Alameda's

17  bank accounts, right?

18  A.  Yes.

19  Q.  Now, if you go to copy of sheet 2 and you go to that cell

20  over at J2, which is now highlighted.  You see that?

21  A.  Yes.

22  Q.  Where it says Gary's number, that's also roughly negative

23  11 billion, a little bit higher?

24  A.  Yes.

25  Q.  And that number represents the amount of all of Alameda's

1    balances on the FTX exchange, right?

2    A.  Yes.

3    Q.  According to your calculations.

4         MR. EVERDELL:  We can take that down.

5    Q.  Now, that number that we just looked at, the negative 11

6    billion, that represented just Alameda's balances on the FTX

7    exchange, correct?

8    A.  Yes.

9    Q.  So that did not include any assets that Alameda held off of

10   the FTX exchange?

11   A.  Yes.  That's correct.

12   Q.  If, for example, Alameda had cryptocurrency held on a

13   different exchange, that spreadsheet would not reflect it?

14        MR. ROOS:  Objection.  Assumes a fact not in evidence.

15        THE COURT:  Overruled.

16   A.  Can you repeat the question.

17   Q.  So, for example, if Alameda held cryptocurrency on a

18   different exchange than FTX, that spreadsheet would not reflect

19   it?

20   A.  That's correct.

21   Q.  Or if Alameda held any other assets that were not at FTX,

22   it wouldn't reflect it?

23   A.  That's correct.

24   Q.  Isn't it true that Alameda had several billions of dollars

25   worth of assets that were held off of the FTX exchange?

1    A.  I wasn't sure exactly what assets Alameda had at the time.

2    Q.  Well, are you familiar with the term net asset value?

3    A.  Yes.

4    Q.  That's sometimes called NAV?

5    A.  Yes.

6    Q.  It just means that your assets minus your liabilities,

7    right, roughly speaking?

8    A.  Yes.

9    Q.  If you have a positive NAV, you have more assets than you

10   have liabilities, right?

11   A.  Yes.

12   Q.  Now, isn't it true that when you figured out the

13   miscalculation caused by the fiat bug, you realized Alameda's

14   overall NAV became positive?

15   A.  Yes.

16   Q.  So the overall NAV included all of Alameda's assets, no

17   matter where they were held, right?

18   A.  Yes.

19   Q.  And in fact you felt relieved when you saw Alameda's NAV

20   was positive after all of that, right?

21   A.  Yes.

22   Q.  Among other things, that meant that the fiat liability was

23   secured by assets?

24   A.  Not necessarily liquid assets and not assets that could be

25   deposited onto FTX or be used to pay customers who are

```
 1   trying --
 2   Q.  I am not talking about liquid versus nonliquid.  I'm just
 3   talking about assets in general.  There were assets more than
 4   liabilities at that point, correct?
 5   A.  According to the current -- market values that we were
 6   using to compute them, yes.
 7   Q.  That was enough to make you feel relieved, as you said?
 8   A.  Yes.
 9   Q.  And how did Caroline and Nishad appear to you when they
10   learned this?
11   A.  I don't recall.
12   Q.  Isn't it true that you believed that they also felt relief?
13   A.  I am not sure.
14   Q.  Well, once you determined that the NAV was positive for
15   Alameda, at that point Caroline paid back the lenders, isn't
16   that right?
17   A.  Yes.
18   Q.  And isn't it true that Alameda's net asset value remained
19   positive all the way up to November of 2022?
20   A.  It depends a lot on how much value you assign to Alameda's
21   investments in other companies, whether you should mark them
22   down because of the crypto downturn or not, according to a
23   calculation that's made.
24   Q.  According to some calculations, Alameda's NAV was positive
25   all the way through November of 2022?
```

1    A.  There was some calculation that seemed to feel this, so I

2    am not, but I am not sure how accurate that was.

3    Q.  Thinking back to the numbers that we just looked at in that

4    spreadsheet, you said that the fiat@ liability that we looked

5    at was roughly negative 11 billion, right?

6    A.  Yes.

7    Q.  And Alameda's total liability was roughly negative 11

8    billion on that spreadsheet, right?

9    A.  On FTX.

10   Q.  On FTX?

11   A.  Yes.

12   Q.  So the fiat liability represented almost all of Alameda's

13   debt to FTX in June of 2022, isn't that right?

14   A.  I mean, there is a lot of positive and negative numbers --

15   the other accounts also had a bunch of positive and negative

16   numbers that summed up the deal at current market prices at the

17   time, but that some of that included Serum and --

18   cryptocurrency such as serum and FTT that were -- that were

19   illiquid and, if so, wouldn't be able to get the full value.

20   Q.  I'm simply asking about the numbers on the spreadsheet.

21   The numbers on the spreadsheet reflect about 11 billion

22   liability for fiat and almost a total of 11 billion liability

23   on the exchange, right?

24   A.  Yes.

25   Q.  Those are roughly equivalent.

```
 1   A.   I think they were off by 200 million or so.

 2   Q.   Now, in the months following June 2022, there was a project

 3   to get a clearer picture of what Alameda's net asset value was,

 4   right?

 5   A.   Yes.

 6   Q.   And that included getting a clearer picture of the fiat@

 7   liability that was owed by Alameda?

 8   A.   Yes.

 9   Q.   And I think by November of 2022, after that project had

10   been completed, I think you estimated the fiat@ liability was

11   roughly negative 8 billion.

12   A.   In November, yes.

13   Q.   In November, right.  OK.

14           And that fiat@ liability was still almost all the debt

15   that Alameda owed to FTX in November.

16   A.   Roughly, if you treat cryptocurrency and USD as equivalent

17   to each other.  Like if you treat like Bitcoin that Alameda

18   withdrew as being the equivalent to FTT or Serum that Alameda

19   had on FTX, yes.

20   Q.   You said that, in November of 2022, you estimated the debt

21   around 8 billion, right?

22   A.   Yes.

23   Q.   Alameda's debt to FTX?

24   A.   Yes.

25   Q.   And the fiat@ liability in particular was around 8 billion?
```

1    A.  Yes.

2    Q.  We have been focusing on the balance of the fiat@ account

3    just for now.  But just to be clear, the fiat@ account is

4    totally separate from the info@ account, right?

5    A.  I mean eventually the balance of one was transferred to the

6    other, into a subaccount of the other.

7    Q.  Let's step back to then June.

8         MR. EVERDELL:  We can pull up Government's Exhibit 50.

9    A.  In June, it was totally separate.

10   Q.  In June, they were separate.

11        MR. EVERDELL:  Let's look at, if we can go, sheet 2,

12   please.

13   Q.  So we have looked at this page before, right, and we see in

14   C13 and C14, that's the fiat@ liability, is that correct?

15   A.  Yes.

16   Q.  Now, if you look at C17.

17        MR. EVERDELL:  Can you highlight that, please, that

18   number.

19   Q.  That number refers to the account for

20   info@alamedaresearch.com, right?

21   A.  Yes.

22   Q.  So that's what we have been calling the info@ account,

23   right?

24   A.  The main account.

25   Q.  The main trading account?

1    A.   The main account, as opposed to the subaccounts of the main

2    account.

3    Q.   For Alameda?

4    A.   Yes.

5    Q.   This is Alameda's main trading account on the FTX exchange?

6    A.   Yes.

7    Q.   And what I want to say, just to be clear, in at least June,

8    as you are doing the spreadsheet, the fiat@ account is totally

9    separate from the info@ account, right?

10   A.   Yes.

11   Q.   Because the fiat@ account was a ledger that kept track of

12   FTX's customers' cash deposits that were sent to Alameda's bank

13   accounts, right?

14   A.   Yes.

15   Q.   The customers wired those funds directly to Alameda's bank

16   accounts, not to FTX, correct?

17   A.   Yes.

18   Q.   And if customers wanted to take cash withdrawals, the fiat@

19   account would keep track of the withdrawals too, right?

20   A.   Yes.

21   Q.   The info@ account, on the other hand, you said, was the

22   main trading account, right?

23   A.   Yes.

24   Q.   And it had a bunch of different subaccounts?

25   A.   Yes.

1    Q.   Some of those subaccounts had spot margin enable on them,

2    right?

3    A.   One of them did, yes.

4    Q.   So they could engage in spot-margin trading on that

5    account?

6    A.   Yes.

7    Q.   And the main account could engage in futures trading,

8    right?

9    A.   As well as -- as far as I knew, they do all the trading on

10   their main account and not the subaccounts.

11   Q.   They could do all that kind of margin trading on the main

12   account?

13   A.   They did futures trading and they did spot trading on the

14   main account.

15   Q.   Got it.

16          So if Alameda withdrew any funds from the FTX

17   exchange, it would be reflected in the info@ account, right?

18   A.   Yes.

19   Q.   Not the fiat@ account?

20   A.   Yes.

21   Q.   I think you testified on Friday that Alameda had withdrawn,

22   you used the word withdrawn, 8 billion from FTX, right?

23   A.   Well -- yes.  But it depends on whether you count the bank

24   account as part of FTX loan.

25   Q.   These are Alameda's own bank accounts, yes?

1    A.  That held customer funds.

2    Q.  But if you're with withdrawing from the bank accounts,

3    you're withdrawing from Alameda's bank accounts, correct?

4    A.  You're withdrawing customer funds from an account owned by

5    Alameda, yes.

6    Q.  You are not withdrawing them off of the exchange, is my

7    point?

8    A.  Through funds that were deposited by customers onto the

9    exchange which are being housed in Alameda bank accounts which

10   then Alameda withdrew.  It depends whether that counts --

11   depends on what you want to call that.

12   Q.  You recall being asked last week about Alameda's line of

13   credit from FTX?

14   A.  Yes.

15   Q.  You testified that Alameda had a $65 billion line of

16   credit?

17   A.  Yes.

18   Q.  So if Alameda borrowed any funds from FTX under its line of

19   credit, that would be reflected in the info@ account, right?

20   A.  Yes.

21   Q.  Because the line of credit didn't apply to the fiat ledger

22   that tracked the cash deposits?

23   A.  Yes.

24   Q.  So if Alameda withdrew funds from FTX to pay back its

25   lenders in June and the months following, you would expect the

1    info@ account liability to increase?

2    A.   Unless they withdrew it from a different subaccount that

3    had a negative but no line of credits.

4    Q.   But not from the fiat account?

5    A.   Not from the fiat account.

6    Q.   It would come from one of the accounts on the exchange.

7    A.   The money might still have come from the bank account.  I

8    don't know if the payments were made in cryptocurrency or in

9    dollars from bank accounts.

10   Q.   You don't know one way or the other?

11   A.   If it's cryptocurrency, then it would come from info@ or

12   one of its subaccounts.  If it is U.S. dollars, then it would

13   come from the bank account.

14   Q.   If it was cryptocurrency it would come from the info

15   account?

16   A.   Yes.

17            MR. ROOS:  Asked and answered.

18   A.   Or if it's coming from FTX, it also would come from

19   somewhere else.

20   Q.   I'm simply saying that, if there were a withdrawal from the

21   exchange of cryptocurrency to pay back lenders who withdraw

22   from the FTX exchange, that would be reflected in the info@

23   balance?

24   A.   Yes.

25   Q.   Now, the info@ account, we just looked at it, had a balance

1  of negative roughly 2.7 billion in June of 2022, is that right?

2  A.  Yes.

3  Q.  That's what the spreadsheet reflects?

4  A.  Yes.  For the main account, not counting the subaccounts.

5  Q.  I think you testified as well that the main account or the

6  info account had roughly the same balance of about negative 3

7  billion in late 2021.

8  A.  That was counting all of the subaccounts together, I think.

9  Q.  But roughly between 2.7, 3 billion, depending on which

10 subaccounts you're talking about, right?

11 A.  I was looking at the total across all subaccounts, so I am

12 not sure one way or the other, if you only look at the main

13 accounts, whether that would be negative 3 billion or not.

14 Q.  Based on what you had seen in the spreadsheet in June and

15 what you saw in the end of 2021, the info@ liability was

16 roughly between 2.7 and 3 billion?

17 A.  Here you're highlighting the main account.  And in late

18 2021, I was looking at all of the subaccounts added together.

19 Q.  Fine.  But either way, we are talking in the ballpark of

20 2.7 to 3 billion, right?

21 A.  In June, the main account had that number in the ballpark

22 and in late 2021, all of the accounts together had in the

23 ballpark of that number.

24 Q.  Well, focusing on June, where it's 2.7 in the main account,

25 right?

 1    A.  Yes.

 2    Q.  You said that the line of credit it had was 65 billion,

 3    right?

 4    A.  Yes.

 5            MR. ROOS:  Objection.  Asked and answered.

 6            THE COURT:  Sustained.

 7    Q.  Despite the line of credit that we talked about, it wasn't

 8    drawing on nearly that amount of money?

 9            MR. ROOS:  Objection.  Vague.

10            THE COURT:  Sustained.

11    Q.  You don't know sitting here today, Mr. Wang, whether the

12    info@ borrowing increased as a result of paying back the

13    lenders, Alameda's lenders in June and the months following?

14    A.  Correct.

15    Q.  And if it did, you don't know by how much.

16    A.  Correct.

17    Q.  And you don't know, sitting here today, how the number that

18    was paid back or -- compares to the amount of collateral that

19    Alameda had on the exchange?

20            MR. ROOS:  Objection.  He just said he doesn't know

21    any of this.

22            THE COURT:  Sustained.

23            MR. EVERDELL:  A moment, your Honor.

24    Q.  Mr. Wang, Alameda held assets on the FTX exchange, correct?

25    A.  Yes.

1    Q.  What was the main asset that was held by Alameda on the FTX

2    exchange?

3    A.  What do you mean by main asset?

4    Q.  I'll put it this way.  Did Alameda hold FTT on the FTX

5    exchange?

6    A.  Yes.

7    Q.  And FTT was FTX's own token, right?

8    A.  Yes.

9    Q.  It stood for FTX token?

10   A.  Yes.

11   Q.  You helped create FTT, correct?

12   A.  Yes.

13   Q.  FTT was first introduced in 2019?

14   A.  Yes.

15   Q.  FTX customers could trade FTT on the FTX exchange.

16   A.  Yes.

17   Q.  FTT was also traded on other cryptocurrency exchanges?

18   A.  Yes.

19   Q.  FTX did not set the price of FTT on other exchanges?

20   A.  Alameda traded FTT on other exchanges.  But, no, FTX itself

21   did not set the price of FTT and --

22   Q.  It traded at a market price?

23   A.  Yes.

24   Q.  Do you recall what price FTT was trading at in 2022, before

25   the days leading up to the bankruptcy?

1    A.   I don't remember the exact price.

2    Q.   Let's see if this refreshes your recollection.

3        MR. EVERDELL:   Could we display just for the witness

4    what's been marked as DX-1096.

5    Q.   Do you see that, Mr. Wang?

6    A.   Yes.

7    Q.   Does that refresh your recollection about what the price of

8    FTT was trading at during 2022?

9        THE COURT:   The question is whether it refreshes your

10   recollection.   You are not to just read it.

11   A.   Yes.

12       MR. EVERDELL:   We can take that down then.

13   Q.   Your recollection refreshed, do you know roughly how much

14   it was trading at during this time period in 2022?

15       MR. ROOS:   Objection.   What time period?

16       THE COURT:   Sustained.

17   Q.   Trading at between January of 2022 and up to the beginning

18   of just first day of November of 2022.

19   A.   Like 20 or 30 or $40, roughly, some double digit number of

20   dollars each.

21   Q.   Per token.

22   A.   Per token.

23   Q.   And do you know what the approximate value of the FTT that

24   was held by Alameda on the FTX exchange prior to November was

25   worth mark to market?

```
 1    A.   I think -- I am not sure that that number was the exact
 2    number, but I think it was around 1 or $2 billion.
 3    Q.   But you are not certain?
 4    A.   No.
 5    Q.   Third parties -- separate question, Mr. Wang.  Did third
 6    parties accept FTT as compensation or collateral?
 7    A.   What third parties?
 8    Q.   For example, do you recall that when FTX was launched in
 9    2019, Binance bought a partial stake in the company?
10    A.   Yes.
11    Q.   And in connection with that deal Binance also agreed to
12    acquire 35 million FTT tokens from FTX, right?
13    A.   I don't remember the exact number, but some of them were
14    FTT tokens.
15    Q.   Binance ended up selling their stake in FTT in around 2021?
16    A.   Selling their stake in FTX?
17    Q.   I'm sorry.  FTX in 2021.
18    A.   Yes.
19    Q.   As part of their compensation for selling their stake in
20    FTX in 2021, Binance accepted FTT tokens?
21    A.   I am not sure.
22              MR. EVERDELL:  If we can pull up just for the witness
23    what's been marked for identification as DX-1200.
24              We will come back to that, your Honor.
25              I think I misread it.  I'm sorry.  Can we pull that up
```

1    one more time, DX-1200.  It's the top part.  We can blow that

2    up.

3    Q.  If you could take a look at that and see if that refreshes

4    your recollection, Mr. Wang.

5            THE COURT:  See if it refreshes his recollection as to

6    what?

7            MR. EVERDELL:  As to whether or not Binance accepted

8    FTT tokens when it sold its stake in FTX.

9    A.  I am not sure.

10           MR. EVERDELL:  We will take that down.

11   Q.  Mr. Wang, you said you created the fiat@ ledger, is that

12   correct?

13   A.  Yes.

14   Q.  Were there any documents that memorialized the creation of

15   the FTX ledger?

16   A.  There were conversations on Slack about it, the internal

17   messaging that we used.

18   Q.  Now, you created the fiat@ ledger when Alameda first

19   started taking FTX customer deposits into its bank accounts,

20   correct?

21   A.  Yes.

22   Q.  Approximately when was that?

23   A.  It was in early 2019.

24   Q.  When you set up the fiat@ account in 2019, as you said, did

25   you have a view at that time as to what Alameda could do with

1  the customer deposits that are reflected in the fiat@ ledger?

2  A.  My understanding was that Alameda would either keep it

3  there or convert it into stablecoins and then deposit those

4  into its FTX accounts.

5  Q.  Did you have a view at that point about whether or not

6  Alameda could use the funds?

7  A.  Could use the funds for the purpose I just said.

8  Q.  So it was your view, in 2019, that what Alameda could do

9  with those funds was either convert them to stablecoins and

10  transfer them to their account on the exchange or hold the

11  money in the bank accounts, is that right?

12  A.  Or transfer them to a different bank account.  If they had

13  multiple bank accounts for holding -- for taking FTX customer

14  deposits and withdrawals, if they have multiple bank accounts

15  in different countries, it would also be fine --

16          THE COURT:  Mr. Wang, please slow down.

17  A.  If they had multiple bank accounts in different countries

18  for taking customer deposits, it was also fine to transfer

19  funds between those bank accounts.

20  Q.  So you could keep it in its own bank accounts, and it may

21  have had several bank accounts, right?

22  A.  Yes.

23  Q.  Or you're saying you could have transferred it as

24  stablecoins to its account on the exchange.

25  A.  Yes.

1    Q.  That's the sum total of what you thought it could do with

2    the money.

3    A.  Yes.

4    Q.  What was your view based on?

5    A.  So a couple of things.  One was just from talking to Sam.

6    Another was just understanding of how exchanges work, that

7    deposits were still owned by customers, based on my experience

8    working for Alameda, which was a customer of different

9    exchanges.

10   Q.  So in your experience working for Alameda, did you form

11   this opinion?

12   A.  Part of this opinion.

13   Q.  And you had worked for Alameda for two years prior to this,

14   right?

15   A.  Yes.

16   Q.  And I think sort of general understanding of what may

17   happen in the industry is what you said.

18             MR. ROOS:  That's not all he said.  Objection.

19             THE COURT:  Sustained.

20   Q.  Well, your experience working at Alameda was part of this,

21   right?

22   A.  Yes.

23   Q.  Anything else?

24   A.  And also just from talking to Sam about the process of

25   depositing -- customers depositing fiat into the bank account

1 and then Alameda depositing stablecoins into its -- from

2 talking to Sam about the process of customers depositing

3 dollars into a bank account and then Alameda converting that

4 into stablecoins.

5 Q.  So that sounds like a conversation about the process of

6 depositing the accounts and converting them into stablecoins?

7 A.  Yes.

8 Q.  To your knowledge, were there any documents or policies in

9 2019 that defined what Alameda could or could not do with the

10 funds it received?

11 A.  Not that I know of.

12 Q.  You never read the terms of service, correct?

13 A.  Not in its entirety, no.

14 Q.  You don't know what the terms of service says or doesn't

15 say about what Alameda could do with the funds that were

16 deposited in its bank accounts?

17 A.  No.

18 Q.  Did your view change at any point?

19 A.  My view of what Alameda was allowed to do?

20 Q.  Correct.

21 A.  I mean, when I talked to Sam in late 2019 about Alameda

22 having borrowed -- of having borrowed from FTX, and he said

23 that it was fine.

24      In late 2019, when I talked to Sam about Alameda's

25 negative balances and Sam said it was fine as long as -- if you

 1   include the value of all -- if you include the value of all of

 2   Alameda's holdings on FTX, including FTT, if that was positive,

 3   if the total value was positive, then it was fine.  That

 4   influenced -- that made me think that it was maybe fine for

 5   Alameda to be withdrawing funds.

 6   Q.  I am going to move on to a different topic, Mr. Wang.

 7            Now, I want to ask you a few questions about some of

 8   the tweets that you were shown on direct examination.  OK?

 9   A.  OK.

10   Q.  You were shown one of Sam's tweets, I think from July 31,

11   2019, with someone who called himself Bitshine, is that right?

12   A.  Yes.

13   Q.  That was a tweet where Sam told Bitshine that Alameda was

14   treated like every other FTX customer, right?

15   A.  Yes.

16            MR. EVERDELL:  If we can put up for the jury what's

17   already in evidence as Government's Exhibit 817.

18   Q.  Now, before we take a look at that, Mr. Wang, are you

19   familiar with the term front running?

20   A.  Yes.

21   Q.  What is front running?

22   A.  It's when some market maker on an exchange sees a different

23   customer's orders before it gets processed and places another

24   order ahead of the customer, before the customer's order gets

25   processed.

1    Q.  What's the issue with doing that?

2    A.  It means that the customer might get a worse price.

3    Q.  For the front-running customer to do that, they need to

4    have awareness of what's happening in the markets to be able to

5    jump ahead, right?

6    A.  Yes.

7            THE COURT:  Sorry.  You said a moment ago it means

8    that the customer might get a worse price.  Which customer, the

9    front-running customer or the customer whose order was seen

10   before it was processed?

11           THE WITNESS:  The customer whose order was seen before

12   it was processed.

13           THE COURT:  Thank you.

14   Q.  Was front running a concern at FTX?

15   A.  What do you mean by concern?

16   Q.  Was it something that FTX tried to prevent?

17   A.  I mean, I don't think we did anything one way or the other

18   to prevent it.  I mean, it was not a thing that happened at

19   FTX, because there was not a way for anybody to see people's

20   orders before they were processed.

21   Q.  Now, Sam was, at least in 2019, when this tweet was sent,

22   he was still -- he owned Alameda, correct?

23   A.  Yes.

24   Q.  And that was a crypto trading firm, right?

25   A.  Yes.

1    Q.  And he was the CEO of FTX, right?

2    A.  Yes.

3    Q.  Which was a crypto exchange?

4    A.  Yes.

5    Q.  If Alameda got inside information about the movement of

6    crypto assets and the prices on FTX, theoretically, it could

7    trade against it, yes?

8    A.  Yes.

9    Q.  To your knowledge, Alameda wasn't given any kind of access

10   like that, correct?

11   A.  No.

12   Q.  So now let's look at what's in front here of the jury as

13   Government's Exhibit 817.  I am going to look just at the top,

14   which is the question that's posed by Bitshine.  I will read it

15   out.  It says:  @SBF_Alameda, how are you going to resolve the

16   conflict of interest of running your own derivative exchange

17   and actively trading against the market at the same time?

18   People complain that @cryptohayes trades against the market;

19   yet FTX and your shop is out there.

20          Did I read that correctly?

21   A.  Yes.

22   Q.  That is a question about front running, right?

23          MR. ROOS:  Objection.

24          THE COURT:  What it is the objection?

25          MR. ROOS:  Foundation.

```
 1              THE COURT:  Sustained.
 2   Q.  That is the question that Sam was responding to, right,
 3   when he said below that Alameda is -- their account is just
 4   like everyone else's, right?
 5              THE COURT:  I'm sorry.  Your question, Mr. Everdell.
 6   When you say that is the question, you are referring to the
 7   first part of Government Exhibit 817 under the heading
 8   Bitshine, is that correct?
 9              MR. EVERDELL:  That is correct, your Honor.
10              THE COURT:  Go ahead.
11   A.  That is the tweet that Sam is replying to, yes.
12   Q.  You testified that you heard Sam make the same sort of
13   representation about Alameda's account on phone calls, right?
14   A.  Yes.
15   Q.  And you said that these calls were with journalists, right?
16   A.  Amongst others.
17   Q.  And investors?
18   A.  Yes.
19   Q.  Which journalists?
20   A.  I don't know.
21   Q.  Which investors?
22   A.  I don't remember exactly which ones.
23   Q.  When did the calls take place?
24   A.  Many times.  During 2019, during 2020, during 2021.
25   Q.  You don't know exactly when these calls took place?
```

1    A.  They happened each of those times.

2    Q.  I think you testified that you were able to overhear these

3    phone calls because you sat near Sam, right?

4    A.  Yes.

5    Q.  But you could only hear his end of the conversation,

6    correct?

7    A.  Yes.

8    Q.  So you don't know what question he was answering when he

9    said Alameda's account was treated like any other, right?

10   A.  It was part of the thing he said at the beginning.  As part

11   of introducing what Alameda and FTX were, from the way he said

12   it, it doesn't sound like he was actually responding to a

13   question.

14   Q.  Mr. Wang, I'm simply referring to the phone calls you just

15   discussed about calls to investors and journalists, right?

16   A.  Yes.

17   Q.  You couldn't hear what was being said on the other end of

18   that line, correct?

19   A.  Yes.

20   Q.  And you didn't speak to those investors yourself, did you?

21   A.  No.

22   Q.  In fact, you didn't have any direct contact with investors

23   at all, isn't that right?

24   A.  I think there was one instance where I talked to someone

25   technical on one of the investors.  We were talking about the

1    FTX API or something.

2    Q.  So you recall one instance where you may have spoken to an

3    investor?

4    A.  Might have been a customer.  I don't remember the details.

5    Q.  You don't remember the details.  Regardless, it was about a

6    technical subject, right?

7    A.  Yes.

8    Q.  Mr. Wang, do you recall being asked questions on direct

9    examination about clawbacks?

10    A.  Yes.

11    Q.  Those are sometimes called socialized losses?

12    A.  Yes.

13    Q.  I think you testified that clawbacks happen when customers

14    are losing money and they are not liquidated fast enough, it

15    can result in losses to other customers on the exchange, right?

16    A.  Yes.  On other -- that was a practice on other non-FTX

17    exchanges.  That's what was happening.

18    Q.  Sorry.  I'll rephrase.

19         Generally speaking, if we are talking about what might

20    happen on another exchange, right?

21    A.  Yes.

22    Q.  Clawbacks can happen if a customer is losing money, doesn't

23    get liquidated fast enough.  Then the other customers have to

24    share the loss.

25    A.  Yes.

1    Q.  Now, FTX tried very hard to prevent clawbacks, isn't that

2    right?

3    A.  What do you mean?

4    Q.  Well, FTX designed a risk engine and liquidity engine that

5    would try to stop customers from losing money to the point

6    where other customers had to share in the loss?

7    A.  Yes.

8    Q.  And I think you testified that Sam said that clawbacks

9    would not happen, right?

10   A.  Yes.

11   Q.  Do you recall who Sam made those statements to?

12   A.  I mean, there was a blog post that Sam wrote where he

13   talked about how there is no clawbacks on FTX.

14   Q.  Well, isn't it true that FTX fully disclosed the risks of

15   clawbacks on its website?

16   A.  I don't think FTX even said that clawbacks is a thing that

17   could possibly happen on FTX.

18   Q.  Let me see if you can take a look at DX-964 for

19   identification.

20          MR. EVERDELL:  We can go to the second page, second to

21   last -- actually, the last two full paragraphs.

22          MR. ROOS:  Sorry.  Is he trying to get him to identify

23   the last two paragraphs, or is something else happening here?

24   Q.  I am going to ask if this refreshes your recollection.

25          MR. ROOS:  Objection to the foundation for refreshing.

         THE COURT:  Sustained.

Q.  Mr. Wang, you recall that you said a blog post that Sam put

out?

A.  Yes.

Q.  On the subject of clawbacks, right?

A.  Yes.

Q.  I want you to take a look at this document again.  Do you

recognize this?

A.  Yes.

Q.  Is this the blog post that you were referring to?

A.  Yes.

Q.  Now, taking a look at this and the paragraphs -- now,

stepping back, Mr. Wang, isn't it true that Sam disclosed that

the clawbacks were a possibility?

         MR. ROOS:  Objection.

         THE COURT:  Sustained.

Q.  Do you have any recollection about whether in the blog post

that you recall Sam disclosed the possibility that clawbacks

could happen?

         MR. ROOS:  Objection to this.  I don't know why this

document is up here.

         THE COURT:  Neither do I.

         MR. EVERDELL:  All right.  I'll take it down.

Q.  Let me ask a more general question, Mr. Wang.  Isn't it

true that when Sam mentioned clawbacks in things like blog

1    posts, he acknowledged the possibility that clawbacks could

2    occur?

3             MR. ROOS:  Objection.  Hearsay.

4             THE COURT:  Sustained.  Form.

5             MR. EVERDELL:  I'll move on.

6    Q.  Mr. Wang, during your direct testimony you were asked

7    something -- about something called the pointer system.  Do you

8    recall that?

9    A.  Yes.

10   Q.  That was Alameda's internal software for tracking Alameda's

11   trading positions and balances across all exchanges, right?

12   A.  Yes.

13   Q.  And not just FTX.

14   A.  Yes.

15   Q.  Do you recall testifying that Sam had pointer pages up on

16   his monitors?

17   A.  Yes.

18   Q.  Isn't it true that pointer has dozens of different pages?

19   A.  Yes.

20   Q.  For example, there were fills pages, right?

21   A.  Yes.

22   Q.  Those tracked Alameda's trades, correct?

23   A.  Yes.

24   Q.  That page did not show Alameda's account balances.

25   A.  Correct.

1    Q.   And then there was something called a transfers page,

2    correct?

3    A.   Yes.

4    Q.   And that tracked Alameda's deposits and withdrawals from

5    the exchanges?

6    A.   Yes.

7    Q.   And that would include all exchanges, not just FTX, right?

8    A.   Yes.

9    Q.   That page also did not show Alameda's account balances,

10   correct?

11   A.   Correct.

12   Q.   And sitting here today, you don't know which pointer pages

13   Mr. Bankman-Fried had open on his screen at any given time,

14   right?

15   A.   I think I remember seeing the balances page on one -- on

16   half of one of the screens, in addition to the fill screen that

17   you mentioned.

18   Q.   But you can't be sure, sitting here today?

19   A.   Of which screen it was on?

20   Q.   Correct.

21   A.   Like which monitor, which thing it was on, no.  The

22   balances page was one of them, but I don't remember exactly

23   which other ones.

24   Q.   And you don't know exactly when you saw this happening?

25   A.   No.

1    Q.  Mr. Wang, are you familiar with a document called FTX

2    stats?

3    A.  Yes.

4    Q.  What was FTX stats?

5    A.  It was an Excel spreadsheet that Sam made once in a while.

6    Q.  And that was a document that generally kept track of key

7    metrics and statistics related to the FTX exchange?

8    A.  Yes.

9    Q.  I want to ask you just about a few stats about the FTX

10   exchange, if I could.

11   A.  Sure, yes.

12   Q.  Is it true that, by 2021, FTX had roughly over 15 billion

13   in trades per day?

14   A.  Yes.

15   Q.  Is it also true that during that time FTX generated over 3

16   million in revenues per day, roughly?

17   A.  Roughly, yes.

18   Q.  And isn't it also true that, by 2022, FTX had over 6

19   million registered users?

20   A.  The number I recall is around 1 million users.  6 million

21   subaccounts, but those were only for 1 million users.

22   Q.  So users might have more than one subaccount, right?

23   A.  Yes.

24   Q.  Is the term registered user different?  Does that include

25   subaccounts?

1   A.   That usually refers to how many actual humans, actual

2   people, actual users, not subaccounts.

3   Q.   Isn't it true then, by 2022, FTX actually had over 6

4   million registered users?

5   A.   I don't think so.

6   Q.   Would the FTX stat sheet help refresh your recollection?

7   A.   I mean, there is a different number on the stat sheet,

8   which is number of people who have visited the website.  That

9   might be the number you're looking at.

10  Q.   If you saw a page that showed total registered users, would

11  that help refresh your recollection?

12  A.   I'm pretty confident in the 1 million -- the spreadsheet

13  might just be incorrect, I don't know.  I recall seeing 6

14  million account -- entries in the accounts table, which makes

15  it subaccounts --

16  Q.   6 million accounts.  We will call it that.

17  A.   Accounts and subaccounts, yes.

18  Q.   Let me now ask you a few questions about the months after

19  you discovered the fiat@ bug.  OK?

20  A.   Yes.

21  Q.   I should say, the months after June 2022, after you fixed

22  the bug.

23  A.   Yes.

24  Q.   After you resolved the bug issue, you and Nishad Singh

25  oversaw a review of the accounting for Alameda's net asset

1    value, is that right?

2    A.   For FTX's net asset value, not Alameda's.

3              (Continued on next page)

1   BY MR. EVERDELL:

2   Q.  All right.  But that would include getting a better

3   accounting for the fiat deposits and withdrawals on the Alameda

4   bank accounts, right?

5   A.  Well, by 2022—by 2022, we were no longer using—FTX was no

6   longer using Alameda bank accounts.

7   Q.  Right.  It had its own bank accounts by that point, right?

8   A.  Yes.

9   Q.  But you had the issue with the fiat@ liability still

10  existing, right?

11  A.  Yes.

12  Q.  And so there was a project to try to incorporate that

13  liability into Alameda's net asset value as it was reflected in

14  FTX.

15  A.  Not sure about the assets reflected in FTX.  There was a

16  project to figure out how much of that was Alameda, how much of

17  that was FTX, yes.

18  Q.  All right.  So that project took place after you fixed the

19  bug, right?

20  A.  Yes.

21  Q.  Okay.  And it was Sam who directed you to do that project,

22  right?

23  A.  Yes.

24  Q.  Okay.  And the goal of that project was to make sure that

25  the fiat@ liability would be tracked, right, appropriately?

1   A.  Yes.

2   Q.  And that it would be part of Alameda's balances going

3   forward.

4   A.  Yes.

5   Q.  Okay.  Because before that time it was not tracked as part

6   of Alameda's balances.

7   A.  Well, Alameda systems knew about that account because it

8   had——yes.

9   Q.  Alameda's——sorry.  I didn't mean to interrupt.

10  A.  The pointer system that Alameda uses has access to the——had

11  access to information about the contents of the fiat@ accounts.

12  Q.  Right.  Alameda's systems had that.

13  A.  Yes.

14  Q.  Okay.  But FTX's systems that tracked the balances were not

15  tracking the fiat@ liability.

16  A.  It was also tracking the fiat@ liability, just not as part

17  of Alameda's balances.

18  Q.  Okay.  It was not part of Alameda's balances.

19  A.  Right.  FTX's system, it was not part of Alameda's

20  balances.

21  Q.  Okay.  Got it.  All right.  Now are you familiar with the

22  admin user's dashboard?

23  A.  Yes.

24  Q.  That was a screen that could display information about any

25  customer on the FTX exchange, right?

 1    A.   Yes.

 2    Q.   And that was built for Sam?

 3    A.   It was built for a lot of functionalities; like, there were

 4    a lot of employees at FTX who needed access to various things.

 5    Q.   Built for employees who wanted to see account balances on

 6    FTX?

 7    A.   Amongst a lot of other things.

 8    Q.   Okay.  So if Sam wanted to see the account balances of any

 9    customer on the FTX exchange, he could call up that information

10    on the admin user's dashboard, right?

11    A.   Yes.

12    Q.   And he could do that for Alameda, for example.

13    A.   Yes.

14    Q.   And if he could do that, he could see information about the

15    Alameda info@ accounts and the various subaccounts, right?

16    A.   Yes.

17    Q.   Okay.  But as you said, the fiat@ liability was not part of

18    Alameda's balances on the admin user's page; is that right?

19    A.   Not as of June 2022.

20    Q.   Not as of June 2022.  Okay.  All right.

21    A.   I mean, it was added later and then removed.

22    Q.   Yeah.  We'll talk about that later.

23         But as of at least up till June 2022, that was not

24    reflected on the admin user's page if you called up Alameda's

25    balances.

1   A.   Correct.

2   Q.   Okay.  Now you mentioned that it was added later.  So that

3   happened after this project that we just spoke about had been

4   completed, right?

5   A.   Yes.

6   Q.   Okay.  So even after the project was completed, the fiat@

7   liability was still——was placed in a subaccount, one of the

8   Alameda subaccounts, right?

9           MR. ROOS:  Objection, form.

10          THE COURT:  Overruled.

11  A.   Yes.

12  Q.   Okay.  But it was placed in an account that did not appear

13  in the calculation of Alameda's NAV; is that right?

14  A.   From what Sam and Nishad told me, it was then removed from

15  Alameda's account.

16  Q.   Okay.  But this is the Korean friend account that you

17  testified about before?

18  A.   Yes.

19  Q.   Okay.  So the Korean friend account, if the fiat@ liability

20  was located there, it wouldn't appear on the admin user's

21  dashboard, right?

22  A.   For Alameda's account, yes.

23  Q.   Yes.  If you pulled up Alameda's accounts while the fiat@

24  liability was located in that subaccount, it would not appear

25  on the dashboard, if you pulled up Alameda's accounts.

1   A.  Correct.

2   Q.  Okay.  Okay.  Now you testified that in September of 2022,

3   you took part in a discussion about whether to shut down

4   Alameda.  Do you remember that?

5   A.  Yes.

6   Q.  Okay.  I think at that time you learned that Bloomberg was

7   going to publish an article about Alameda and FTX sharing

8   office space, right?

9   A.  Yes.

10  Q.  And that there was a concern about that, what the

11  implication of that article might be, right?

12  A.  Yes.

13  Q.  Okay.  That you were concerned about what people might

14  react to when they saw that.

15  A.  Yes.

16  Q.  Okay.  And so at that point Sam circulated a memo to you

17  and Nishad, right?

18  A.  Yes.

19  Q.  Okay.  And I think we saw that in your prior testimony,

20  right?

21  A.  Yes.

22          MR. EVERDELL:  All right.  If we can call up

23  Government Exhibit 18.

24          And I think we can just call up the top part of the

25  document, highlight the top part down to the sixth reason in

```
 1    this.
 2    Q.  This is the document that Sam circulated about Alameda?
 3    A.  Yes.
 4    Q.  Okay.  So in this document, Sam expressed a number of
 5    concerns about Alameda; is that right?
 6    A.  Yes.
 7              (Reporter interrupted for clarification)
 8    Q.  Okay.  Now that it's in front of the jurors, let's take a
 9    look at this, Mr. Wang.  Sam expressed a number of concerns in
10    this document, right?
11    A.  Yes.
12    Q.  Okay.  So let's look at the first reason, all right, which
13    is—I'll just circle it here, all right?  The first reason was
14    he was concerned about negative press, right, about FTX and
15    Alameda being linked together, right?
16    A.  Yes.
17    Q.  Okay.  And he was also concerned about—in No. 2, it says,
18    "The current Alameda leadership is good, but not good enough to
19    be able to trust with such a big operation."  Do you see that?
20    A.  Yes.
21    Q.  Okay.  And it was Caroline Ellison who was the current CEO
22    of Alameda, right?
23    A.  Yes.
24    Q.  All right.  So he was concerned that Caroline wasn't up to
25    the job of—
```

1          MR. ROOS:  Objection.

2  Q.  ——running Alameda.

3          THE COURT:  Sustained.

4  Q.  What is your understanding of what bullet No. 2 or reason

5  No. 2 meant?

6  A.  That——

7          MR. ROOS:  Objection.  Speaks for itself.

8          THE COURT:  Sustained.

9  Q.  All right.  Well, let's look at 2(A), right here, all

10  right?  That says, "The fact that we didn't hedge as much as we

11  should have alone cost more in EV than all the money Alameda

12  has ever made or will ever make, and that's the kind of

13  critical mistake we're likely to make if I'm not actually

14  around running the show there."

15          Okay.  So do you see where it says "that we didn't

16  hedge"?

17  A.  Yes.

18  Q.  Okay.  What does it mean to hedge?

19  A.  It means to not have a large position in one direction.  So

20  if you have a large Bitcoin, if you buy a bunch of——if you buy

21  a bunch of Bitcoin futures on margin on one exchange and then

22  don't have a——to hedge that would be to then sell a bunch of

23  Bitcoin futures on another exchange so that overall you

24  would——overall, if the Bitcoin rises or falls, you don't make

25  or lose too much money.

1   Q.  Okay.  So I'll use a simple example, right?  If I have a

2   bunch of positions, betting that the market is going to go up,

3   I might make some hedge positions that the market's going to go

4   down to kind of offset the risk; is that fair to say?

5   A.  Yes.

6   Q.  Okay.  All right.  Do you recall any issue with hedging

7   that had happened prior to this memo being circulated?

8   A.  Yes.

9   Q.  Can you describe what that was.

10  A.  Earlier that year, in some Signal chats containing Sam, me,

11  and some traders from Alameda, Sam mentioned the possibility

12  of—of selling short some S&P 500 futures, and then a few days

13  after that, the price of a bunch of cryptocurrencies fell, and

14  then after that, Sam sent a bunch more messages being angry at

15  Alameda for not doing—for not doing that.

16  Q.  Okay.  So just to sum up, Sam was angry that Alameda did

17  not hedge its positions, correct?

18  A.  Yes.

19  Q.  And that resulted in a loss of money for Alameda, right?

20  A.  Yes.

21  Q.  And it was Caroline Ellison's decision not to hedge,

22  correct?

23  A.  I mean, Caroline was the CEO of Alameda at the time.  I

24  don't—I don't know exactly what the decision-making process

25  was.

1   Q.  Well, if Sam had the ability to make the hedge, he could

2   have put on the hedge that he wanted, right?

3           MR. ROOS:  Objection.

4           THE COURT:  Sustained.

5           MR. EVERDELL:  Okay.  All right.  We can remove the

6   highlighting.

7   Q.  Okay.  Now you see that there are also a number of other

8   reasons that Sam lists as concerns about Alameda.  I won't go

9   through them all.  Do you see them there?

10  A.  Yes.

11  Q.  Okay.  But Sam didn't raise any concerns in this memo about

12  Alameda being unable to pay off its debt, correct?

13  A.  Correct.

14  Q.  Okay.  And so Sam recommended shutting Alameda down at this

15  point, right?

16  A.  I mean, he—he said that there was—he thought there was a

17  30 percent chance that shutting down Alameda was the correct

18  thing to do at this point.

19  Q.  Okay.  He was raising the possibility that this is

20  something we should consider.

21  A.  Yes.

22  Q.  Okay.  And at the time you didn't think that it should be

23  shut down, right, or wound down?

24  A.  Well, I wasn't sure either way, at the time that I saw

25  this.

1    Q.  Okay.  Well, isn't it true that you thought that from a

2    technical perspective, it would take a lot of work to replace

3    Alameda on the exchange, right?

4    A.  Yes.

5    Q.  Among other reasons, it would take a lot of work to replace

6    it as a market maker.

7    A.  Well, as a market——there were other market makers on the

8    exchange, so that part was mostly fine.

9    Q.  Well——

10   A.  But this was the other thing that Alameda was doing on FTX

11   that made things——made it difficult.

12   Q.  Well, didn't you tell the FBI and the prosecutors that from

13   a technical perspective, it would take a lot of work to replace

14   Alameda as a market maker?

15   A.  As a——I mean, I don't know if it would affect the market

16   maker——I mean, I might have said market makers.

17   Q.  Okay.  Well, let me see if this refreshes your

18   recollection.

19            MR. EVERDELL:  If we could pull up 3585-009, just for

20   the witness, at page 5.  And it's the third paragraph from the

21   bottom.

22            Sorry, if you could re-highlight it so it gets all of

23   it.

24   Q.  All right.  Now if you take a look at that.  And just look

25   at the last sentence there, Mr. Wang, see if that refreshes

1    your recollection.

2    A.  I mean, it's possible that—

3    Q.  Just take a look at the document and see if that refreshes

4    your recollection.

5    A.  I mean, not—

6            THE COURT:  Does it refresh your recollection is the

7    question.

8            THE WITNESS:  Not in particular.

9            MR. EVERDELL:  All right.  Take it down.

10   Q.  So you do not recall telling the FBI that from a technical

11   perspective, it would take a lot of work to replace Alameda as

12   a market maker?

13   A.  I mean, definitely said that would take a lot of work on a

14   technical level to replace Alameda on FTX, and I might have

15   said market maker, I might not have said market maker.  Still

16   depends on what the definition of market maker is, like if

17   you—like, last time you said that market making was placing

18   the order—

19   Q.  Mr. Wang, I'm simply asking you whether or not you said

20   that to the FBI.  I think your answer was you don't

21   specifically recall, right?

22   A.  Yes.

23   Q.  Okay.  All right.  Let's move on.

24           All right.  Mr. Wang, you were asked some questions on

25   your direct testimony about the time period in November 2022

1  right before the bankruptcy.  Do you recall that?

2  A.  Yes.

3  Q.  And you testified that on November 6th, Nishad came to your

4  room because he needed you to try to increase the speed of

5  processing customer withdrawals; is that right?

6  A.  Yes.

7  Q.  Because there had been a rapid increase in the volume of

8  customer withdrawals at that point, right?

9  A.  Yes.

10  Q.  And that was because the head of Binance had tweeted that

11  he was going to sell all of his FTT tokens; isn't that right?

12  A.  At the time I didn't know about that tweet.  I mean,

13  that—that morning I did not know about that tweet.  I found

14  out about it that evening.

15  Q.  Okay.  But he had done that, right?

16  A.  Yes.

17  Q.  And Binance was FTX's main competitor, wasn't it?

18  A.  Yes.

19  Q.  And his tweet triggered effectively a run on the bank at

20  FTX, right?

21          MR. ROOS:  Objection to the characterization.

22          THE COURT:  Sustained.

23  Q.  Well, it triggered a much larger volume of customer

24  withdrawals than FTX typically experienced; is that right?

25  A.  I'm not sure if it was the tweet or the leaked balance

1  sheet.

2  Q.  Okay.  Well, either way, that was a much larger volume of

3  withdrawals at that time.

4  A.  Yes.

5  Q.  And do you recall the volume of withdrawals that were

6  coming at around——on November 6th when you were asked to help

7  speed up the withdrawal process?

8  A.  Yes.

9  Q.  What was that?

10 A.  That was the part——the part that was backing up.  The part

11 that was slow was Bitcoin withdrawals.

12 Q.  I'm sorry.  The part that was slow?  Can you repeat?

13 A.  Yeah.  The part——the thing that was backed up, the thing

14 that was slow, was Bitcoin withdrawals.

15 Q.  Okay.  But my question is:  Do you remember roughly how

16 many withdrawals in dollars were happening over the course of,

17 say, November 6th?

18        THE COURT:  I'm sorry.  Were you asking the dollars,

19 the volume in dollars of all assets in respect of which

20 withdrawals were made, or are you asking about

21 dollar-denominated withdrawals?

22        MR. EVERDELL:  Understood, your Honor.  I'm asking

23 about the former.  I'm trying to get a sense of the volume of

24 withdrawals off the exchange of all types of withdrawals; not

25 just dollar withdrawals, but denominated in dollars.

1  A.   Yes.  I think it was around a hundred million dollars an

2  hour.

3  Q.   An hour.  So do you know what sort of typical volume was

4  prior to that date of withdrawal volume per hour?

5  A.   Around 10 million, I think.  Yeah, around a hundred million

6  per day.  Around 5 or 10 million, probably.

7  Q.   So it was multiple above that that you were experiencing on

8  the 6th.

9  A.   Yes.

10 Q.   Okay.  Now at that point Sam asked you to calculate how

11 many additional funds were needed to be deposited on the

12 exchange if all customers withdrew their funds, right?

13 A.   Yes.

14 Q.   Okay.  And you did that calculation, right?

15 A.   Yes.

16 Q.   And I think at first you came up with 0, roughly 0.

17 A.   Yes.

18 Q.   But you knew that was not correct, right?

19 A.   Yes.

20 Q.   Because you knew that Alameda owed roughly $8 billion to

21 FTX for the fiat liability.

22 A.   I wasn't sure exactly how much they owed at the time, but

23 it seemed unlikely to me that the correct answer was 0.

24 Q.   And then Sam asked if you were including that Korean friend

25 account; is that right?

1    A.  Yes.

2    Q.  Okay.  That, at the time, wasn't an account that you were

3    familiar with, right?

4    A.  Correct.

5    Q.  When you did include it, you saw a different balance,

6    right?

7    A.  Yes.

8    Q.  That's when you saw roughly negative 8 billion, right?

9    A.  Yes.

10   Q.  Now to be clear, what surprised you was not that there was

11   a negative $8 billion liability, right, or that the liability

12   existed?

13   A.  Correct.

14   Q.  You had known that there was a debt there for several

15   months, right?

16   A.  Yes.

17   Q.  What surprised you is simply that the fiat@ liability had

18   been placed in this other Alameda subaccount.

19   A.  In this non-Alameda account; in this account that's not

20   part of Alameda's.

21   Q.  In this other account, I should say.

22   A.  Yes.

23   Q.  Okay.  Now this being in a different account, I think you

24   said it didn't appear on the admin user's dashboard, right?

25   A.  Not unless you searched for that particular account.

1   Q.  Right.  So you don't know why it was relocated there,

2   right?

3   A.  Well, I asked Sam and Nishad about it and they answered.

4   Q.  Well, you don't know how long Sam—if Sam had been aware of

5   the transfer to this account.

6               MR. ROOS:  Objection to form.

7               THE COURT:  Sustained as to form.

8   Q.  Okay.  You don't know if and when Sam found out about the

9   fact that the liability had been transferred to this account,

10  do you?

11  A.  No.  I don't know exactly when that was.  I mean, he knew

12  about it because he told me, but I don't know when exactly that

13  happened.

14  Q.  You don't know when.  Okay.

15              All right.  Now the next day was November 7th; is that

16  right, Mr. Wang?

17  A.  Yes.

18  Q.  Okay.  And I think that day Sam put out some tweets; is

19  that right?

20  A.  Yes.

21  Q.  Okay.  And you were shown some of those in your direct

22  examination?

23  A.  Yes.

24              MR. EVERDELL:  All right.  If we can now show—we can

25  show this to the jury as well—in evidence as Government

1    Exhibit 866.

2              And if we just put up the first——okay.

3    Q.  Now I think you testified on direct that, well, first, you

4    didn't see these tweets when they came out, right?

5    A.  No.

6    Q.  You saw them after the fact.

7    A.  Yes.

8    Q.  Okay.  Couple days after the fact?

9    A.  I don't remember exactly when I——

10   Q.  But you didn't see them when they were posted.

11   A.  Correct.

12   Q.  Now you said, I think on direct, that you thought this

13   tweet that assets are fine was incorrect, right?

14   A.  Yes.

15   Q.  And I think you said it's because your view, FTX didn't

16   have enough assets for the customer withdrawals, right?

17   A.  Yes.

18   Q.  Now, Mr. Wang, are you familiar with the difference between

19   "solvency" and "liquidity"?

20   A.  I mean, now I am.  Before the events of November 6th, I was

21   not, but during discussions there——

22   Q.  Well, "solvency" roughly means that you have enough assets

23   to cover your liabilities, right?

24   A.  Yes.

25   Q.  "Liquidity" refers to how quickly you can convert an asset

```
 1    to cash, right?

 2    A.  Yes.

 3    Q.  So for example, to use a simple example, if I have a

 4    thousand dollars in the bank in cash and I owe $10 to my

 5    friend, I'm solvent, right?

 6    A.  Yes.

 7    Q.  Okay.  Because my assets, the thousand dollars I have in

 8    the bank, can cover my liabilities, which is the $10 I owe my

 9    friend.

10    A.  Yes.

11    Q.  And I'm also liquid, right?

12    A.  Yes.

13    Q.  Because my assets are in cash.

14    A.  Yes.

15    Q.  And I can pay my friend off right away if I need to.

16    A.  Yes.

17    Q.  Okay.  But let's say the only asset I own is a $100,000

18    house and I have debts of 50,000, okay?  I'm still solvent,

19    right?

20    A.  Yes.

21    Q.  Because my assets are still well above my liabilities.

22    A.  Yes.

23    Q.  But I'm just not liquid, right?

24    A.  Yes.

25    Q.  Because to pay off my debts, I'd have to sell my house,
```

1   right?

2   A.  Yes.

3   Q.  And that could take awhile.

4   A.  Yes.

5   Q.  So Sam's tweet here refers to assets, correct?

6   A.  I mean, also refers to other things, but that part refers

7   to assets.

8   Q.  Assets.  Now isn't it true that when you first talked to

9   the government about this tweet, you said you thought it was

10  true because Sam was careful to say that FTX was solvent, it

11  just wasn't liquid.

12  A.  Yes.

13  Q.  Okay.  You——

14  A.  I said it was true but misleading.

15  Q.  Well——

16          THE COURT:  You said it was true but what?

17          THE WITNESS:  But misleading.

18  Q.  All right.  You said it was true but misleading.  Isn't it

19  true that you simply said to the government on November 17th,

20  your first proffer, that it was true because it was——he was

21  careful to say that FTX was solvent but not liquid?

22  A.  I said that amongst other things, yes.

23  Q.  Okay.  Well, isn't it true that you also met with the

24  government a few days later, on November 29th?

25  A.  Yes.

1   Q.  All right.  And at that point you also said that it was

2   true because the announcement was FTX was solvent and

3   had——Alameda had collateral, including FTT and Serum?

4           THE COURT:  I'm sorry.  I can't hear you.

5           MR. EVERDELL:  I'll rephrase, your Honor.

6   Q.  Isn't it true that you spoke again to the FBI a few days

7   later?

8   A.  Yes.

9   Q.  The prosecutors were there too, right?

10  A.  Yes.

11  Q.  And isn't it true at that session with them you also said

12  that you thought the tweet was true because Sam was careful to

13  say that FTX was solvent, it just wasn't liquid, and it was

14  solvent because it had collateral?

15          MR. ROOS:  Objection to compound.  Also, this tweet

16  doesn't say solvent in it, so——

17          THE COURT:  Sustained as to form.

18  Q.  Okay.  Isn't it true that you said the same thing, that you

19  thought the tweet was true, you said the same thing to the FBI

20  a few days later?

21  A.  Probably, yes.

22  Q.  And isn't it true that you said that Alameda had collateral

23  at that meeting?

24  A.  Yes.

25  Q.  Okay.  All right.  Mr. Wang, I'll move on to a different

1  topic.

2         You testified about some loans you received.  Do you

3  recall that?

4  A.  Yes.

5  Q.  Okay.  I think you testified that you received over

6  $200 million in loans from Alameda, right?

7  A.  Yes.

8  Q.  And I think you testified that you received these loans for

9  two different purposes; is that right?

10  A.  Yes.

11  Q.  The first category you said were loans you received so that

12  FTX could make venture investments, right?

13  A.  Yes.

14  Q.  And you received several of those loans.

15  A.  Yes.

16  Q.  The second category was a personal loan that you received

17  to buy a house, right?

18  A.  So I received a—after the first company loan, I then

19  needed to pay interest on that loan, which I didn't have money

20  for, so then I asked Sam to give me—what to do about this, and

21  then he gave my account at FTX a $1 million loan for the

22  interest payments.

23         And then after—and then afterward—and then at some

24  point afterward, maybe a year afterwards, I had then used

25  $200,000—well, he gave me the million dollars for this and

1    other—whatever else I needed to pay for, and then about a year

2    after that I used $200,000 of that; I withdrew $200,000 of that

3    for a house.

4    Q.   I'm going to see if I can break that down a bit.

5          You said that you got loans to pay for venture

6    investments, right?

7    A.   Yes.

8    Q.   And you said I think just now at one point you also got a

9    loan because the interest you owed on your prior loans, you

10   needed money to pay that interest.

11   A.   Yes.

12   Q.   Okay.  And you also got a loan at some point later, which

13   you used some of to pay for a house.

14   A.   That was the same loan.

15   Q.   Same loan as the one to pay for the interest.

16   A.   Yes.

17   Q.   Okay.  Got it.  That one I think was for a million dollars;

18   is that right?

19   A.   Yes.

20   Q.   And you withdrew, or you used $200,000 of it to pay for a

21   house, right?

22   A.   Yes.

23   Q.   All right.  The loans that you received were memorialized,

24   weren't they?

25   A.   Yes.

1    Q.  They were memorialized in what's called promissory notes,

2    right?

3    A.  Yes.

4    Q.  A promissory note is a written agreement between a borrower

5    and a lender?

6    A.  Yes.

7    Q.  And it says the borrower will pay back the amount borrowed

8    plus interest.

9    A.  Yes.

10   Q.  Who was involved in drafting those promissory notes?

11   A.  Not sure exactly who was involved, but they were handed to

12   me by lawyers.

13   Q.  Okay.  Which lawyers handed you the loans?

14   A.  Some of them came from Can Sun and some of them came from

15   Dan Friedberg.

16   Q.  So starting with Can Sun, what was his position at the

17   company?

18   A.  He was a lawyer working for FTX.

19   Q.  Wasn't he the general counsel?

20   A.  Don't remember exactly what his title was.

21   Q.  Was he a senior lawyer or was he someone lower down the

22   chain?

23   A.  I think Dan Friedberg——he reported to Dan Friedberg, but, I

24   mean, fairly senior, I guess.

25   Q.  Dan Friedberg, what was his position?

1    A.  He was another lawyer for FTX.

2    Q.  Okay.  He was a senior lawyer at the company, right?

3    A.  Yes.

4    Q.  And you said these two were some of the ones who handed you

5    the promissory notes, right?

6    A.  Yes.

7    Q.  What was your understanding about what involvement they had

8    in structuring the promissory notes?

9    A.  I wasn't sure exactly.  I mean, I wasn't sure exactly what

10   the process was.

11   Q.  Okay.  But you knew at least they were familiar with the

12   promissory notes, right, because they were giving them to you

13   to sign.

14   A.  Yes, yes.

15   Q.  Okay.  Did you talk to the lawyers about the promissory

16   notes before you signed them?

17   A.  No.

18   Q.  Okay.  Do you know why the lawyers structured the

19   transactions as loans with promissory notes as opposed to some

20   other structure?

21   A.  No.

22   Q.  You didn't ask about that.

23   A.  No.

24   Q.  Okay.  But you didn't have any concerns at the time you

25   were signing about how the loans were structured, did you?

```
 1    A.  No.
 2    Q.  Okay.  Now you signed several of those promissory notes,
 3    correct?
 4    A.  Yes.
 5    Q.  All right.  And they were signed I think between July of
 6    2021 and September 2022, right?
 7    A.  Yes.
 8              MR. EVERDELL:  One moment, your Honor.
 9              Your Honor, with the Court's permission, I just wanted
10    to hand up a binder that contains some documents for Mr. Wang
11    to review.
12              THE COURT:  Okay.
13              MR. EVERDELL:  Okay?
14              THE COURT:  Do you have one for me, too?
15              MR. EVERDELL:  Yes, your Honor.  I will direct you to
16    the tabs.
17              Your Honor, I think this is the one you need.
18              THE COURT:  Thanks.
19    BY MR. EVERDELL:
20    Q.  All right.  I just handed you a binder, Mr. Wang.  If you
21    could take a look at that.
22              MR. EVERDELL:  And your Honor, this, for your binder,
23    is tabs 28 to 36.
24    Q.  Let me know when you're done reviewing those, Mr. Wang.
25              THE COURT:  You're asking him to review——
```

```
 1              MR. EVERDELL:  I'm asking him to review the documents
 2    in the binder and let me know when he's finished.
 3              THE COURT:  All of them?
 4              MR. EVERDELL:  Just flip through them, yes.
 5    BY MR. EVERDELL:
 6    Q.  Have you had the chance to take a look at those, Mr. Wang?
 7              THE COURT:  There are 50——
 8              MR. EVERDELL:  No, your Honor.  Sorry.  Your binder
 9    has more.  He has just——I'll direct you.  Your tabs are tabs——
10              THE COURT:  Is that what you meant when you referred
11    to 28 to 36?
12              MR. EVERDELL:  28 to 36 in your binder, your Honor.
13              THE COURT:  Okay.  Got it.
14    A.  Okay.
15    Q.  Okay.  Have you had a chance to look at those?
16    A.  Yes.
17    Q.  All right.  And those are what's been marked for
18    identification as DX 20, DX 22, DX 211, DX 184, DX 15, DX 16,
19    DX 34, DX 23, and DX 24.
20              Do you recognize those documents, Mr. Wang?
21    A.  Yes.
22    Q.  What are they?
23    A.  They're the promissory notes I signed.
24    Q.  Okay.  And did you sign those promissory notes on the dates
25    reflected in the documents?
```

1    A.  Yes.

2           MR. EVERDELL:  All right.  The defense offers DX 20,

3    22, 211, 184, 15, 16, 34, 23, and 24.

4           THE COURT:  They're received.

5           (Defendant's Exhibits 20, 22, 211, 184, 15, 16, 34,

6    23, and 24 received in evidence)

7    Q.  All right.  Let's take a look at just one of those

8    documents.

9           MR. EVERDELL:  This is Tab 32 for your Honor and it's

10   DX 15, and we can publish for the jury, please.

11          All right.  And if we could blow up the top, up

12   to—down one more paragraph.  Yeah.  Okay.

13   Q.  Mr. Wang, this is one of the promissory notes that we just

14   looked at?

15   A.  Yes.

16   Q.  Okay.  And this one is dated April 30th of 2022, right?

17   A.  Yes.

18   Q.  Okay.  And this note is for roughly $35 million; is that

19   right?

20   A.  Yes.

21   Q.  Okay.  And you agree to pay Alameda back that sum of money,

22   correct?

23   A.  Yes.

24   Q.  All right.  Now I want to flip to the back page quickly.

25   And do you see the signature line on the bottom?

 1   A.   Yes.

 2   Q.   Okay.  And you see your signature there?

 3   A.   Yes.

 4   Q.   And the lender is who?

 5   A.   Alameda Research.

 6   Q.   And who signs on behalf of Alameda?

 7   A.   Caroline.

 8   Q.   Okay.  And she was CEO at the time?

 9   A.   Yes.

10   Q.   All right.  Let's flip back to the first page.

11        MR. EVERDELL:  And we'll just blow up those three

12   paragraphs again.

13   Q.   Okay.  You see that final paragraph, talks about interest?

14   A.   Yes.

15   Q.   Okay.  What's the interest rate there?

16   A.   2.21 percent per year.

17   Q.   So you had to pay interest on this loan, right?

18   A.   Yes.

19   Q.   And you had to pay interest on all the loans you received

20   through the promissory notes; is that right?

21   A.   Yes.

22   Q.   You treated them as real loans, correct?

23   A.   What do you mean?

24   Q.   Well, you had to pay interest, right?

25   A.   Yes.

```
1    Q.  And in fact, as you said, you got to the point where the
2    interest was so much, you had to get another loan to help pay
3    the interest on the previous loans, right?
4    A.  Yes.
5    Q.  All right.  So you believed this was an obligation, that
6    you had to continue paying the interest on these loans.
7    A.  Yes.
8            MR. EVERDELL:  Okay.  All right.  We can take that
9    down.
10   Q.  Now you said I think that——now I want to move forward to
11   the real estate, the one you used for the real estate, for the
12   house.
13   A.  Okay.
14   Q.  Okay.  So for that one, that was a loan you received in
15   2021; is that right?
16   A.  Yes.
17   Q.  Okay.  And that one, you said you used a portion of it to
18   pay for a house, right?
19   A.  Yes.
20   Q.  That was a house in the Bahamas, right?
21   A.  No.
22   Q.  No.  Where was that?
23   A.  That was in St. Kitts.
24   Q.  In St. Kitts.  Sorry.  Say again?
25   A.  In St. Kitts.
```

 1    Q.   Okay.  Okay.  I'll now move on.

 2            Okay.  Mr. Wang, I now want to talk to you about the

 3    time leading up to when you left the Bahamas, all right?

 4    A.   Okay.

 5    Q.   Nishad Singh left the Bahamas before you did; is that

 6    right?

 7    A.   Yes.

 8    Q.   I think he left around November 9th of 2022?

 9    A.   Yes.

10    Q.   And before he left I think he spoke to you?

11    A.   To Sam and I, yes.

12    Q.   Okay.  And how did he seem to you?

13    A.   He seemed distraught.

14    Q.   Okay.  And after that conversation Nishad left the Bahamas,

15    no?

16    A.   Yes.

17    Q.   He went back to the United States?

18    A.   As far as I know.

19    Q.   And you decided to stay in the Bahamas.

20    A.   For a few more days, yes.

21    Q.   Now you testified that you and Sam met with the Securities

22    Commission of the Bahamas on November 12, 2022; is that right?

23    A.   Yes.

24    Q.   Okay.  That Securities Commission of the Bahamas is

25    sometimes referred to as the SCB, right?

1    A.  Yes.

2    Q.  Do you recall why you met with the SCB?

3    A.  Because they asked us to.

4    Q.  Okay.  Well, isn't it true that you received a letter from

5    the SCB requiring you to attend the meeting?

6    A.  Yes.

7    Q.  Okay.  I want to show you what's been marked—just for the

8    witness—what's been marked for identification as DX 260.  Do

9    you see that, Mr. Wang?

10   A.  Yes.

11   Q.  Do you recognize that?

12   A.  Yes.

13   Q.  What is it?

14   A.  It's a letter that was sent to me.

15   Q.  And how do you recognize it?

16   A.  Hmm?

17   Q.  How do you recognize it?

18   A.  By seeing it.

19   Q.  Okay.  And is it a fair and accurate copy of the letter you

20   received from the SCB?

21   A.  Yes.

22          MR. EVERDELL:  Defense offers DX 260.

23          MR. ROOS:  No objection.

24          THE COURT:  Received.

25          (Defendant's Exhibit 260 received in evidence)

1                MR. EVERDELL:  All right.  Now we can publish to the

2      jury.

3                THE COURT:  Yes.

4                MR. EVERDELL:  Thank you, your Honor.

5                All right.  If we can highlight the paragraphs

6      starting with the third paragraph going down; third, fourth,

7      fifth paragraphs.

8      BY MR. EVERDELL:

9      Q.  Okay.  Now you see that the first paragraph, it says that,

10     in the second line, "The commission hereby requires you to

11     attend the Commission's office at" that address, which I won't

12     read out.  Do you see that?

13     A.  Yes.

14     Q.  Okay.  And it says, "You are required to appear at 2:00 in

15     the afternoon to answer questions, including under oath"; is

16     that right?

17     A.  Yes.

18     Q.  Okay.  And if you look at the next paragraph——

19               THE COURT:  Mr. Everdell, the jury can read this as

20     well as the witness, I guess.

21               MR. EVERDELL:  Sure.  Understood.  May I highlight one

22     thing on the bottom paragraph, your Honor?

23               THE COURT:  Sure.

24     Q.  All right.  Last paragraph, do you see that in the second

25     line, starting with——

```
 1              MR. EVERDELL:  Well, let's highlight the first two

 2    lines of the last paragraph.

 3    Q.  Okay.  Doesn't that say, Mr. Wang, that your failure to

 4    attend the Commission's office as requested may result in you

 5    being liable to be committed to prison for contempt, right?

 6    A.  Yes.

 7              MR. EVERDELL:  Okay.  We can take that down.

 8    Q.  So you obviously went to this meeting at the offices of the

 9    SCB, right?

10    A.  Well, Sam met with them first, and then by the time their

11    meeting was over, there wasn't enough time for me to meet.

12    Q.  Well, my question was:  You went to the offices, correct?

13    A.  Yes, I went to their office.

14    Q.  Sam met with the SCB people?

15    A.  Yes.

16    Q.  And I believe you waited in a conference room outside,

17    right?

18    A.  Yes.

19    Q.  Okay.  Now after that meeting the SCB officials went with

20    you and Sam back to FTX's offices; is that right?

21    A.  Yes.

22    Q.  Okay.  And while you were there, the head of the SCB,

23    Christina Rolle, directed you to transfer the remaining FTX

24    assets to SCB.

25    A.  Yes.
```

1   Q.   I'm sorry.  To the SCB.

2   A.   Yes.

3   Q.   In fact, she read out a legal statement that required FTX

4   to move the funds to them; isn't that right?

5   A.   Yes.

6   Q.   Okay.  And that's when you transferred the assets to the

7   SCB.

8   A.   Yes.

9   Q.   Okay.  Now do you recall anything else happening that

10  night?

11  A.   Yes.

12  Q.   What happened later that night?

13  A.   So while we were in the——well, a lot of things happened.

14  So continued doing the transfers.  At one point some police

15  officers showed up and——

16  Q.   Let me stop you there, Mr. Wang.  It was around

17  9 p.m.——isn't that right?——when the police officers showed up?

18  A.   Around that time.

19  Q.   Okay.  And these were Bahamian police; is that correct?

20  A.   Yes.

21  Q.   Sorry.  I couldn't hear you.

22  A.   Yes.

23  Q.   They arrived at the offices; is that right?

24  A.   They arrived at the offices.

25  Q.   These are the FTX offices, right?

1    A.   Yes.

2    Q.   And this was while you were in the process of transferring

3    assets to the SCB, right?

4    A.   Yes.

5    Q.   And isn't it true that the police demanded that you and Sam

6    give them your passports?

7    A.   They asked us to vol——they asked us to voluntarily give

8    them our passports.

9    Q.   Okay.  And you complied with that request, right?

10   A.   Yes.

11   Q.   So you handed over your passport.

12   A.   Yes.

13   Q.   Okay.  All right.  Now the next day was November 13th; is

14   that right?

15   A.   Yes.

16   Q.   Okay.  Now by that point, Mr. Wang, you had hired lawyers.

17   A.   Yes.

18   Q.   These were lawyers here in New York, right?

19   A.   Yes.

20   Q.   Because you knew at this point that the US prosecutors were

21   investigating FTX; isn't that right?

22   A.   I mean, at this point I didn't know what the government

23   was——the US government was doing.

24   Q.   Okay.  But you knew that you needed lawyers, right?

25   A.   Yes.

1  Q.  Okay.  And you knew that you could be facing potential

2  charges.

3  A.  I mean, I wasn't sure.  That's why I hired lawyers.

4  Q.  Okay.  And you wanted to consider your options at that

5  point; is that right?

6  A.  Yes.

7  Q.  Okay.  One of the options you wanted to consider was

8  cooperating with the government.

9  A.  Yes.

10  Q.  All right.  And you knew that if you did want to get a

11  cooperation agreement, you needed to act quickly; isn't that

12  right?

13  A.  I mean, I was told that there were advantages to acting

14  quickly but it was not necessary for cooperation.

15  Q.  Okay.  You were at least considering the option about

16  getting—trying to get a cooperation agreement with the

17  government at that point, right?

18  A.  Yes.

19  Q.  And acting quickly had its advantages, right?

20  A.  I was told.

21  Q.  All right.  So you had your lawyers reach out to the

22  prosecutors on that same day, November 13th; isn't that right?

23  A.  Yes.

24  Q.  And they had a discussion with them?  Don't tell me what

25  they discussed, but they had a discussion?

1   A.   Yes.

2   Q.   And that same day your lawyers flew down to the Bahamas; is

3   that right?

4   A.   Earlier that day, yes.

5   Q.   Okay.  And they met with you in your apartment, right?

6   A.   Yes.

7   Q.   And you met with your lawyers for several hours that day;

8   isn't that right?

9   A.   Yes.

10  Q.   Behind closed doors.

11  A.   Yes.

12  Q.   Okay.  Now the next day was November 14th, correct?

13  A.   Yes.

14  Q.   And you're still in the Bahamas; is that right?

15  A.   Yes.

16  Q.   And you still didn't have your passport, did you?

17  A.   No, but I was told that they were going to give it back to

18  me.

19          THE COURT:  This looks like a good time to take our

20  morning break.

21          MR. EVERDELL:  Yes, your Honor.

22          THE COURT:  Fifteen minutes.

23          (Recess)

24          (Continued on next page)

25

1          THE COURT:  Let's get the witness.

2          MR. ROOS:  Just for planning purposes, when do you

3    expect to take a lunch break?

4          THE COURT:  Later.  At some point before 1.

5          (Jury present)

6          THE COURT:  You may proceed, Mr. Everdell.

7          MR. EVERDELL:  Thank you, your Honor.

8          THE COURT:  Let me reflect for the record that the

9    jurors and the defendant all are present.  Go ahead.

10         MR. EVERDELL:  Thank you.

11   BY MR. EVERDELL:

12   Q.  Mr. Wang, I think where we left off was on November 14,

13   right?

14   A.  Yes.

15   Q.  This was after the evening before when the police had

16   arrived, right?

17   A.  This was the day after that.

18   Q.  I had asked you -- you still didn't have your passport on

19   the 14th, is that right?

20   A.  The 14th, it's a Sunday or Monday?  Monday, right?

21   Q.  I believe so.

22   A.  It's two days later.  At that point I was told that they

23   were canceling the interview, and I was going to get my

24   passport back.

25   Q.  Did you have your lawyers speak to the prosecutors again at

1    that point?

2    A.   I am not sure how much --

3    Q.   I'm just asking, did you have them speak to the

4    prosecutors?

5    A.   They may have spoken.

6    Q.   By the next day -- before I ask that, was it your

7    understanding that there was a pending investigation at that

8    point in the Bahamas?

9    A.   Yes.

10   Q.   And so your lawyer spoke to the prosecutors, right, that

11   day?

12   A.   The U.S. prosecutors.

13   Q.   The U.S. prosecutors.

14   A.   Yes.

15   Q.   And by the next day, November 15, is it your understanding

16   that the Bahamian investigation had been dropped?

17   A.   Yes.

18   Q.   But you were still having some difficulty getting your

19   passport back from the Bahamian police, is that right?

20   A.   Yes.

21   Q.   So you had your lawyers contact the U.S. prosecutors again?

22   A.   Yes.

23   Q.   And did you eventually get a passport that you could

24   travel?

25   A.   Yes.

1   Q.   And you left the Bahamas on November 16, correct?

2   A.   Yes.

3   Q.   And the very next day you met with the prosecutors, isn't

4   that right?

5   A.   Yes.

6   Q.   You were there with your lawyers?

7   A.   Yes.

8   Q.   The prosecutors were there?

9   A.   Yes.

10  Q.   The FBI agents were there?

11  A.   Yes.

12  Q.   And there were attorneys from the SEC there too, right?

13  A.   Yes.

14  Q.   And there were attorneys from the CFTC, right?

15  A.   Yes.

16  Q.   That is the Commodities Futures Trading Commission?

17  A.   Yes.

18  Q.   You did not have a cooperation agreement with the

19  prosecutors at that time, right?

20  A.   Correct.

21  Q.   The government hadn't decided at that point whether they

22  were going to give you one yet, correct?

23  A.   Correct.

24  Q.   That was a meeting for the government to evaluate you,

25  right?

1    A.   Yes.

2    Q.   To see if you could be a cooperator for them.

3    A.   Yes.

4    Q.   And you turned over your computer to the agents, is that

5    right?

6    A.   Yes.

7    Q.   And you also turned over your two cell phones, right?

8    A.   Yes.

9    Q.   And you had agreed to do that ahead of time, right?

10   A.   Yes.

11   Q.   Because you knew that your computer and phones may have

12   documents that the prosecutors wanted to see?

13   A.   Yes.

14   Q.   And you gave them access to your devices, right?

15   A.   Yes.

16   Q.   You didn't require the prosecutors to get a search warrant

17   for them?

18   A.   Correct.

19   Q.   You consented to the search?

20   A.   Yes.

21   Q.   You wanted to be cooperative, right?

22   A.   Yes.

23   Q.   Now, you had several other meetings with the prosecutors

24   over the next several months, isn't that right?

25   A.   Yes.

     1   Q.  I believe you met with them five times over the course of

     2   the next month.  Does that sound right?

     3   A.  Yes.

     4           THE COURT:  I'm sorry.  Was that the word month or

     5   months?

     6           MR. EVERDELL:  Over the course of the next month, your

     7   Honor.

     8           THE COURT:  Plural?

     9           MR. EVERDELL:  Singular.

    10           THE COURT:  Thank you.

    11   Q.  Just to be clear, let's focus on the dates.  The first was

    12   on November 17?

    13   A.  Yes.

    14   Q.  The second was on November 23.

    15   A.  Yes.

    16   Q.  The third was on November 29.

    17   A.  Yes.

    18   Q.  Fourth was on December 7.

    19   A.  Yes.

    20   Q.  And the fifth was on December 16.

    21   A.  Yes.

    22   Q.  So that is a month period, yes?

    23   A.  Yes.

    24   Q.  These sessions were called proffer sessions, is that right?

    25   A.  Yes.

1   Q.  And a proffer is just where you give your information,

2   right?

3   A.  Yes.

4   Q.  And the prosecutors needed to hear what you had to say

5   before they decided whether or not to give you a cooperation

6   agreement, right?

7   A.  Yes.

8   Q.  And you knew that, among other things, the government would

9   be evaluating your credibility in those proffer sessions?

10  A.  Yes.

11  Q.  You knew it was entirely up to the prosecutors as to

12  whether or not you would get a cooperation agreement?

13  A.  Yes.

14  Q.  Now, when you first met with the prosecutors on November

15  17, you signed what's called a proffer agreement, is that

16  right?

17  A.  Yes.

18          MR. EVERDELL:  I'd like to show for the witness what's

19  been marked as 3585-14.

20  Q.  Mr. Wang, do you recognize what that is?

21  A.  Yes.

22  Q.  What is that?

23  A.  It's a proffer agreement.

24  Q.  Did you sign that proffer agreement?

25  A.  Yes.

1   Q.  And did you sign it on the date that the proffer agreement

2   reflects?

3   A.  Yes.

4   Q.  Is it a fair and accurate copy of the proffer agreement

5   that you signed?

6   A.  It's only -- I can only see the first page.

7          MR. EVERDELL:  Let's go to the second page as well.

8   Q.  Is that the signature page?

9   A.  Yes.

10  Q.  Did you sign that page?

11  A.  Yes.

12  Q.  Is it a fair and accurate copy of the proffer agreement?

13  A.  Yes.

14          MR. EVERDELL:  The defense offers 3585-014.

15          THE COURT:  Received.

16          (Government Exhibit 3585-014 received in evidence)

17  Q.  The proffer agreement set forth the terms and conditions

18  for how the proffer would proceed, right?

19  A.  Yes.

20          MR. EVERDELL:  We can publish that to the jury.

21  Q.  Now, the proffer agreement says that you are agreeing to

22  provide to the government with information so they can evaluate

23  your information to make their prosecutorial decisions, is that

24  right?

25  A.  Yes.

1              MR. EVERDELL:  You can highlight that first paragraph.

2   Q.  You see where it says this is not a cooperation agreement?

3   A.  Yes.

4   Q.  In the first sentence it says:  You have agreed to provide

5   information -- I'll skip forward -- so that the government may

6   evaluate client's information and responses in making

7   prosecutive decisions.

8              You see that?

9   A.  Yes.

10  Q.  One of those decisions was whether or not to give you a

11  cooperation agreement, right?

12  A.  Yes.

13             MR. EVERDELL:  You can take that down.

14  Q.  Now, during the course of your five proffer sessions with

15  the government in that month time period we discussed, you

16  answered the government's questions, right?

17  A.  Yes.

18  Q.  Those meetings lasted several hours?

19  A.  Yes.

20  Q.  And you went over all the events that you discussed in your

21  testimony at trial here?

22  A.  Yes.

23  Q.  You talked about Alameda?

24  A.  Yes.

25  Q.  And you talked about FTX?

 1   A.   Yes.

 2   Q.   And you spoke about the computer code modifications you

 3   made to the code base?

 4   A.   Yes.

 5   Q.   You talked about the bug fix and the fiat@ liability?

 6   A.   Yes.

 7   Q.   You gave them information about everything you knew?

 8   A.   All that is relevant yes.

 9   Q.   Everything that was relevant for their case?

10   A.   Yes.

11   Q.   At the end of that process you did receive a cooperation

12   agreement, isn't that right?

13   A.   Yes.

14   Q.   You signed that cooperation agreement on December 19, 2022,

15   correct?

16   A.   Yes.

17   Q.   That was almost exactly one month after you left the

18   Bahamas?

19   A.   Yes.

20   Q.   And you are testifying here today pursuant to that

21   cooperation agreement?

22   A.   Yes.

23           MR. EVERDELL:   If we can show to the jury what's

24   already in evidence as 3585-030.

25   Q.   Mr. Wang, I believe we have seen this before.  This is your

1   cooperation agreement, isn't it?

2   A.  Yes.

3   Q.  Now, as part of your cooperation agreement you agreed to

4   plead guilty to some crimes, is that right?

5   A.  Yes.

6   Q.  To be specific, you agreed to plead guilty to four

7   different crimes?

8   A.  Yes.

9          MR. EVERDELL:  If we can highlight just the last three

10   paragraphs there.

11   Q.  Now, the first two counts were wire fraud and wire fraud

12   conspiracy against FTX customers, is that right?

13   A.  Yes.

14   Q.  Those are the first two counts?

15   A.  Yes.

16   Q.  The third count there is commodities fraud conspiracy

17   against FTX customers, right?

18   A.  It just says commodities.

19   Q.  Conspiracy to commit commodities fraud.

20   A.  Yes.

21          MR. EVERDELL:  If we can go to the next page and do

22   the top paragraph.

23   Q.  That's the fourth count?

24   A.  Yes.

25   Q.  In that you agreed to plead guilty to conspiracy to commit

1   securities fraud?

2   A.   Yes.

3   Q.   Is that right?

4   A.   Yes.

5   Q.   So you agreed to plead guilty to all four of these counts

6   as part of your cooperation agreement, correct?

7   A.   Yes.

8   Q.   If we look at the paragraph below that, these four counts

9   carry a maximum prison sentence of 50 years, isn't that right?

10  A.   Yes.

11  Q.   Now, I am not going to cover all of the cooperation

12  agreement.  I know we have covered that on direct.  But I will

13  ask you a few questions.

14         Under the cooperation agreement, if the government

15  determines that you provided substantial assistance to them,

16  they will then send what's called a 5K letter to the Court, is

17  that right?

18  A.   Yes.

19  Q.   And you talked about that 5K letter before, right?

20  A.   Yes.

21  Q.   The Court can consider this 5K letter when it sentences

22  you, is that right?

23  A.   Yes.

24  Q.   And that 5K letter will include all of the cooperation that

25  you gave to the government for their case, right?

1    A.   Yes.

2    Q.   And the more cooperation you give, the better the 5K letter

3    can be, is that right?

4    A.   Yes.

5    Q.   But it's up to the government to make the determination

6    ultimately about whether you are going to get your 5K letter.

7    Isn't that right?

8    A.   Yes.

9    Q.   And if the government decides that you did not provide

10   substantial assistance, it can decide not to file the 5K

11   letter, is that right?

12   A.   Yes.

13   Q.   And then you would be bound by your guilty plea?

14   A.   Yes.

15   Q.   And regarding the securities fraud count that we spoke

16   about, Count Four, you remember that?

17   A.   Yes.

18   Q.   That was securities fraud with regard to FTX investors,

19   correct?

20   A.   Yes.  This just says -- this agreement just says securities

21   fraud.

22   Q.   Your understanding is that the people who were defrauded in

23   that count were FTX investors, yes?

24   A.   Yes.

25            MR. EVERDELL:  We can take this down.

 1   Q.  After you pled guilty on December 19 of 2022, you continued

 2   to meet with the prosecutors, correct?

 3   A.  Yes.

 4   Q.  And you continued to help them investigate their case

 5   against Sam?

 6   A.  Yes.

 7   Q.  And as we got closer to trial, you met with them several

 8   times to prepare for trial testimony, is that right?

 9   A.  Yes.

10   Q.  All told, you've met with the government 18 times since you

11   left the Bahamas.  Does that sound about right?

12   A.  Sounds about right, yes.

13   Q.  You mentioned the five dates before, is that right?

14   A.  Yes.

15   Q.  You met with them on January 10, is that right?

16   A.  Yes.

17   Q.  And on May 8.

18   A.  Yes.

19   Q.  On July 27.

20   A.  Yes.  One of those -- some of them for longer, some of them

21   for shorter, yes.

22   Q.  But you still met with them?

23   A.  Yes.

24   Q.  August 10?

25   A.  Yes.

1   Q.  August 16?

2   A.  Yes.

3   Q.  August 30?

4   A.  Yes.

5   Q.  September 13?

6   A.  Yes.

7   Q.  September 18?

8   A.  Yes.

9   Q.  September 20?

10  A.  Yes.

11  Q.  September 22?

12  A.  Yes.

13  Q.  September 27.

14  A.  Yes.

15  Q.  October 2?

16  A.  Yes.

17  Q.  October 4?

18  A.  Yes.

19  Q.  And that last one was the same week that you testified,

20  right?

21  A.  Yes.

22  Q.  I want you to take a look at what has been marked for

23  identification as Defense Exhibit 1613, please.

24          You see that in front of you, Mr. Wang?

25  A.  Yes.

1    Q.  Does that accurately capture the dates that we just

2    discussed when you met with the government?

3    A.  Yes.

4            MR. EVERDELL:  Your Honor, we would like to publish

5    this as a demonstrative to the jury.

6            MR. ROOS:  Objection.  It's not needed under 1006, nor

7    under 611(a).  It's not a summary of voluminous material under

8    1006, and he has already talked about these dates, so it's not

9    necessary under 611(a).

10           THE COURT:  Sustained.

11   Q.  Fair to say, Mr. Wang, that you met with the government 18

12   times, right?

13           THE COURT:  That was fair a long time ago, sir.

14           MR. EVERDELL:  Understood.

15   Q.  Your attorneys, Mr. Wang, have spoken to the government

16   several more times on your behalf, is that right?

17   A.  Yes.

18   Q.  That's separate and apart from the dates that we just

19   mentioned, right?

20   A.  Yes.

21   Q.  Now, in the more recent meetings that we just discussed,

22   you were preparing for the testimony that you gave here today,

23   is that right?

24           MR. ROOS:  Sorry, your Honor.  This document is still

25   on the screen.

```
 1              MR. EVERDELL:  I'm sorry.  Take it down.
 2   Q.  Mr. Wang, are the dates that you just mentioned, in the
 3   latter dates in September and October, you were preparing for
 4   your testimony that you gave, is that right?
 5   A.  Yes.
 6   Q.  And that included roughly seven or so meetings over the
 7   course of the last month, right?
 8   A.  Yes.
 9   Q.  And the prosecutors went over the questions they were going
10   to ask you?
11   A.  They went over some questions, not all questions.
12   Q.  And they went over your responses?
13   A.  I gave my responses, and sometimes they gave me feedback on
14   whether it was clear or whether it was too long or too short or
15   if I was speaking too quickly or things of that sort.
16   Q.  Did they give you any other instructions?
17   A.  To tell the truth.
18   Q.  And this was all in preparation for your testimony at
19   trial, is that right?
20   A.  Yes.
21   Q.  And now you are hoping to get your 5K letter, isn't that
22   right?
23   A.  Yes.
24              MR. EVERDELL:  One moment, your Honor.
25              Nothing further, your Honor.
```

```
 1              THE COURT:  Thank you.

 2              Redirect.

 3              MR. ROOS:  Thank you, your Honor.

 4   REDIRECT EXAMINATION

 5   BY MR. EVERDELL:

 6   Q.  Good morning, Mr. Wang.

 7   A.  Good morning.

 8   Q.  The defense attorney showed you a bunch of loan agreements

 9   in a binder.

10              Do you remember that?

11   A.  Yes.

12   Q.  Let me start with the document he showed on the screen.

13              MR. ROOS:  Can we please see Defense Exhibit 15.

14   Q.  Mr. Wang, do you see that document there?

15   A.  Yes.

16   Q.  This is the document he asked you about, right?

17   A.  Yes.

18   Q.  And the promissory note amount on this is for $35 million.

19   Do you see that?

20   A.  Yes.

21   Q.  Do you know what this was for?

22   A.  For some -- I don't remember exactly which investment this

23   is for.

24   Q.  You are not sure which investment this is for?

25   A.  No.
```

1          MR. ROOS:  Can we see Defense Exhibit 22, please.

2   Q.  Mr. Wang, do you see this?

3   A.  Yes.

4   Q.  This is another one of those loan documents?

5   A.  Yes.

6   Q.  This is for $54 million and change?

7   A.  Yes.

8   Q.  Do you know what this was for?

9   A.  I don't recall.

10          THE COURT:  I'm sorry.  I couldn't understand the

11   answer.

12          MR. ROOS:  He says he didn't recall.

13          THE COURT:  You don't recall.

14          THE WITNESS:  I don't recall.

15          MR. ROOS:  How about Defense Exhibit 211.  I'm sorry.

16   Defense Exhibit 184.

17   Q.  Mr. Wang, this one is for $2.6 million.

18          You see that?

19   A.  Yes.

20   Q.  Do you know what this was for?

21   A.  No.

22          MR. ROOS:  You can take this down.

23   Q.  I think defense counsel showed you nine different loan

24   documents like this, right?

25   A.  Yes.

1  Q.  Do you remember what any of them were for?

2  A.  I remember the lawyer telling me it was for some investment

3  in this or that, but I don't remember what any of those were.

4  I think one of them was for LedgerX, but I don't remember which

5  one in particular that was.

6  Q.  Sitting here today, you don't know what each of these loans

7  were for?

8  A.  No.

9  Q.  Why did you sign a bunch of loan documents for tens or

10  hundreds of millions of dollars not knowing what they were for?

11  A.  I was given them to sign, they said it was for an

12  investment, and I believed them and they wanted me to sign, so

13  I just signed it.

14  Q.  Why did you sign it if Sam wanted you to sign it?

15  A.  I trusted him.

16  Q.  Now, do you know where the money came from for these loans?

17  A.  From Alameda.

18  Q.  And do you know where Alameda got that money?

19         MR. EVERDELL:  Objection.  Foundation.

20         THE COURT:  Sustained.

21  Q.  You said the money came from Alameda?

22  A.  Yes.

23  Q.  Do you know what money Alameda used?

24         MR. EVERDELL:  Objection.

25         THE COURT:  Foundation.  Sustained.

```
 1  Q.  Where did the money come from?
 2          MR. EVERDELL:  Objection.  Asked and answered.
 3          THE COURT:  Asked but not answered.  Overruled.
 4  A.  I mean, at the time I just thought they were from Alameda.
 5  Q.  Did you know if the lawyers who presented this to you knew
 6  where the money came from?
 7          MR. EVERDELL:  Objection.  Calls for speculation.
 8          THE COURT:  He was asked whether he knew.  Why don't
 9  you ask what he was told, if anything.
10  Q.  What, if anything, did the lawyers tell you about where the
11  money was coming from?
12  A.  I don't remember them telling me where the money came from.
13  Q.  Now, on Friday, you were asked on cross-examination about
14  Alameda's special features and the reasons they were added.
15          Do you remember that?
16  A.  Yes.
17  Q.  Defense counsel asked you if the purpose of these special
18  features were for what he was calling market making.
19          Do you recall that?
20  A.  Yes.
21  Q.  So let me ask you, was market making the only purpose that
22  these special features were used for?
23  A.  No.
24  Q.  What other purposes were they used for?
25  A.  To withdraw money from FTX for Alameda to use for trading
```

1    away an investment.

2    Q.  Over time does Alameda use its ability to make withdrawals?

3    A.  Yes.

4    Q.  And approximately how much in withdrawals did Alameda make

5    using these special features?

6    A.  $8 billion.

7    Q.  Was it necessary for Alameda to withdraw $8 billion from

8    the exchange for market making?

9            MR. EVERDELL:  Objection.

10           THE COURT:  Overruled.

11   A.  No.

12   Q.  You were asked whether Alameda's line of credit was helpful

13   to its roles in market maker.

14           Do you remember that?

15   A.  Yes.

16   Q.  In 2022, how much market making was Alameda doing?

17   A.  I think it was doing around 10 percent of the market making

18   of the exchange.

19   Q.  Does that require a $65 billion line of credit?

20   A.  No.

21   Q.  Why not?

22   A.  It could have been more efficient with placing its orders,

23   and it was not using the entire $65 billion for its open

24   orders.

25   Q.  Were there other market makers on FTX in 2022?

1   A.  Yes.

2   Q.  Did those market makers have a $65 billion line of credit?

3   A.  No.

4   Q.  Were those market makers doing a similar size of market

5   making or something different?

6            MR. EVERDELL:  Objection.

7            THE COURT:  What's the objection?

8            MR. EVERDELL:  Asked and answered.

9            THE COURT:  Overruled.

10  A.  A similar size.

11  Q.  When Alameda incurred a negative balance on FTX in the

12  several billion dollar range you just mentioned, was that the

13  result of simple market making?

14  A.  No.

15  Q.  On Friday you were asked some questions about going

16  negative in a particular coin.

17           Do you remember that?

18  A.  Yes.

19  Q.  Mr. Everdell asked you about whether customers doing margin

20  trading have to go negative in a particular coin when they

21  borrow things.

22           Do you remember that?

23  A.  Yes.

24  Q.  So I want to clear something up.  Is going negative in a

25  particular coin or cryptocurrency the same as having an account

1    go negative?

2    A.  No.

3    Q.  How are they different?

4    A.  You can go negative in a particular coin but still have

5    overall positive balances in your account after you add

6    everything up.  You can still have positive collateral if you

7    are just following a particular coin.

8    Q.  For a particular customer, if their overall account balance

9    is negative or close to negative, what happens?

10   A.  They get liquidated.

11   Q.  For Alameda what happened?

12   A.  Nothing would happen.

13   Q.  Mr. Everdell also asked you on Friday whether Alameda had

14   an unlimited collateral because of its line of credit.

15              Do you remember that question?

16   A.  Yes.

17   Q.  I just want to clarify.  Are line of credit and collateral

18   the same thing?

19   A.  So the line of credit takes the form of collateral -- the

20   line of credit takes the form -- the line of credit for a

21   particular amount of money, that amount of money is treated by

22   the system as being collateral for your position, risk

23   calculations.

24   Q.  Are a line of credit and collateral the same?

25   A.  No.

1    Q.  For most customers, do they have to have collateral on FTX?

2    A.  Yes.

3    Q.  What about for Alameda?

4    A.  No.

5    Q.  You were asked about Alameda -- whether Alameda's

6    liquidation would hurt other customers.

7            Do you remember that?

8    A.  Yes.

9    Q.  So if Alameda was liquidated, would it hurt the exchange?

10   A.  Yes.

11   Q.  To what extent was Alameda's multibillion dollar negative

12   balance a reason that it would hurt other customers?

13           MR. EVERDELL:  Objection.

14           THE COURT:  Sustained as to form.

15   Q.  To what extent, if at all, was Alameda's negative balance a

16   reason that it would cause problems when being liquidated?

17           MR. EVERDELL:  Objection.  Form.

18           THE COURT:  Sustained.  Form.

19   Q.  Mr. Wang, you just testified that if Alameda was liquidated

20   it would harm the exchange?

21   A.  Yes.

22   Q.  To what extent, if at all, was Alameda's negative balance a

23   part of that?

24           MR. EVERDELL:  Objection.

25           THE COURT:  Sustained.

1   Q.  Why was it that Alameda being liquidated would hurt the

2   exchange?

3   A.  Alameda had a large -- had a very large position -- had a

4   large position on FTX, and selling all of those positions

5   either on the order book or selling them to other market makers

6   would cause a large price movement on FTX and might overwhelm

7   the capacity of other market makers to handle the liquidation.

8   Q.  When you say large position, does that include the negative

9   balance?

10  A.  Yes.

11  Q.  This morning you were asked about the spreadsheet that you

12  worked on in June.

13          Do you remember that?

14  A.  Yes.

15          MR. ROOS:  And why don't we pull that up.  Can we see

16  Government Exhibit 50.

17  Q.  Mr. Everdell asked you about Alameda's main account.  Which

18  one was that?

19  A.  That was row 17.

20          MR. ROOS:  Can we highlight that.

21  Q.  What was the balance in that main account when you worked

22  on this project?

23  A.  Negative $2.8 billion.

24  Q.  And is this different than the money Alameda owed for fiat?

25  A.  Yes.

1  Q.  So in addition to the fiat, its main account had a negative

2  almost 2.8 billion balance?

3  A.  Yes.

4  Q.  You were asked some questions on cross-examination about

5  the overall balance.

6          Do you remember that?

7  A.  Yes.

8  Q.  And you said that the fiat number, negative number, could

9  have been a large part of that balance, right?

10  A.  Yes.

11  Q.  Now, to what extent was FTT a part of that balance?

12  A.  It was included as part of the balance, so it makes the

13  number more positive.

14  Q.  On cross-examination you were asked about the

15  mark-to-market value of FTT.

16          Do you remember that?

17  A.  Yes.

18  Q.  What's mark to market?

19  A.  Just using whatever the current market price is for one FTT

20  multiplied by however much FTT there was.

21  Q.  How much FTT did Alameda have?

22  A.  Around 100 million.

23  Q.  Could all of that FTT be sold at the market price?

24  A.  No.

25  Q.  Why not?

1    A.  Because if all of that -- if Alameda tried to sell all of

2    that at once, that would cause the price of FTT to fall by a

3    large amount.

4    Q.  In what amount would you need to discount the value of FTT

5    to sell it?

6    A.  I am not sure exactly how much it would be.  If Alameda

7    tried to sell all of it, it would probably cause it -- the

8    price to fall pretty close --

9              MR. EVERDELL:  Objection.  Seems to be speculating.

10             THE COURT:  Mr. Roos.

11             MR. ROOS:  I think he opened the door to this by

12   asking about the value of FTT over time.

13             MR. EVERDELL:  They opened the door of speculation on

14   the part of the witness.

15             THE COURT:  The witness testifies he is not sure

16   exactly how much it would be, but it would be probably cause

17   the price to fall pretty close, and then I am not sure he

18   finished the answer.  I thought I heard an answer.  Try to come

19   at it a different way, Mr. Roos.

20             MR. ROOS:  Yes, your Honor.

21   Q.  Mr. Wang, on cross-examination you were asked some

22   questions about liquid versus illiquid investments.

23             Do you remember that?

24   A.  Yes.

25   Q.  What do you mean by illiquid?

1  A.  Difficult to sell.  It would take a long time to sell or

2  the prices might change as you sell it.

3  Q.  Can you explain what you mean by the prices might change as

4  you sell it?

5  A.  It's something that if you try to sell all of it or a large

6  portion of it, that might be more than however many people are

7  around that actually want to buy it, which would then cause the

8  price to fall.

9  Q.  Was FTT a liquid or illiquid token?

10  A.  It was -- it was less liquid than Bitcoin, Ethereum, or any

11  of the bigger cryptocurrencies.  It was not as illiquid as some

12  other things, but it was fairly illiquid.

13  Q.  What about selling a large share of FTT, a large amount of

14  FTT, was that liquid or illiquid?

15        MR. EVERDELL:  Objection.

16        THE COURT:  Sustained as to form.

17  Q.  I will ask it this way.  Did any of these accounts on the

18  screen have a large amount of FTT?

19  A.  Yes.

20  Q.  Which one?

21  A.  Cotton Grove trading account.

22  Q.  Without that account, do you know what the balance would

23  be?

24  A.  It would be $4 billion lower.

25        MR. ROOS:  So, Mr. Bianco, in cell C4, can you put the

1    number 0.

2    Q.  Mr. Wang, without the FTT, what was Alameda's balance?

3    A.  Negative 16 billion.

4    Q.  You said negative 16 billion?

5    A.  Yes.

6    Q.  Is that more than just the fiat liability?

7    A.  Yes.

8    Q.  After you had a discussion about the information on this

9    spreadsheet -- withdrawn.

10            Did you see this spreadsheet?

11   A.  Yes.

12   Q.  And did the defendant?

13   A.  Yes.

14   Q.  And after you discussed this spreadsheet, what did the

15   defendant say to do?

16   A.  For Alameda to return the borrows.

17   Q.  Did you have another conversation about Alameda's balance

18   in September of 2022?

19   A.  Yes.

20   Q.  And by September of 2022, how did Alameda's balance compare

21   to the balance on this screen?

22   A.  It was more negative.

23   Q.  And at that point, in September '22, what was the balance?

24   A.  It was negative 14 billion.

25   Q.  Negative 14 billion, how does that compare to the fiat

1    liability?

2    A.  It was much more.

3    Q.  What does that mean then?

4    A.  It means that Alameda was borrowing more than just what

5    was -- what customers had deposited as U.S. dollars.

6            MR. ROOS:  You can take this down.

7    Q.  You were asked some questions about Alameda's -- the

8    discussion around Alameda's shutdown.

9    A.  Yes.

10   Q.  Was Alameda shut down?

11   A.  No.

12   Q.  What was the real reason that Alameda wasn't shut down?

13   A.  I don't know --

14           MR. EVERDELL:  Objection.

15           THE COURT:  Sustained.

16   Q.  Did you have a conversation with the defendant about

17   shutting down Alameda?

18   A.  Yes.

19   Q.  In that conversation did you state whether or not Alameda

20   could be shut down?

21   A.  Yes.

22           MR. EVERDELL:  Objection.

23           THE COURT:  Overruled.

24   A.  Yes.

25   Q.  And what did you say?

```
 1  A.   That Alameda was borrowing too much for it to be shut down.

 2  Q.   At this point, when Alameda was borrowing $14 billion?

 3            THE COURT:  I'm sorry.

 4            Mr. Wang, what, if anything, did the defendant say in

 5  response to your saying it was too big to shut down or it was

 6  borrowing too much to shut down?

 7            THE WITNESS:  Acknowledged.

 8            THE COURT:  Proceed.

 9            MR. ROOS:  Thank you, your Honor.

10            Can we put up Government Exhibit 866.  Can we zoom in

11  on the top tweet.

12  Q.   Mr. Wang, you were asked about the lines in this tweet, FTX

13  is fine.  Assets are fine.

14            Do you remember that?

15  A.   Yes.

16  Q.   Does this tweet say anything about FTX being illiquid?

17  A.   No.

18  Q.   That was a word that Mr. Everdell was using, right?

19  A.   Yes.

20  Q.   And does this tweet state that assets are fine?

21            MR. EVERDELL:  Objection, your Honor.  The tweet

22  speaks for itself.

23            THE COURT:  Sustained.

24  Q.   You were asked on cross-examination about the words in this

25  tweet.
```

1          Do you remember that?

2    A.  Yes.

3    Q.  And your answer was that you thought the tweet was

4    misleading, is that right?

5    A.  Yes.

6    Q.  Why did you think it was misleading?

7    A.  Because it was unlike -- regardless of how you define

8    assets, FTX did not have enough money to satisfy customer

9    withdrawals.

10   Q.  Why not?

11   A.  Because the money wasn't sitting in its wallets and there

12   was no easy or fast way for somebody to get into its wallets.

13          MR. ROOS:  Why don't we zoom out of this and zoom in

14   on the two tweets below it.

15   Q.  Mr. Wang, were you asked on cross-examination about the

16   first line:  FTX has enough to cover all client holdings?

17   A.  Yes.

18   Q.  Were you asked on cross-examination about that?

19   A.  No.

20   Q.  Were you asked on cross-examination about the line, we

21   don't invest client assets?

22          MR. EVERDELL:  Objection.  The record speaks for

23   itself.

24          THE COURT:  Sustained.

25   Q.  Mr. Wang, I want to ask about your meetings with the

1    government.

2              MR. ROOS:  We can take this down.

3    Q.  Mr. Wang, how long after you left the Bahamas -- what was

4    the amount of time between when you left the Bahamas and when

5    you met with the government?

6    A.  I met with the government the very next day.

7    Q.  Who reached out to who?

8    A.  My lawyers reached out to the government.

9    Q.  At your first meeting with the government did you admit to

10   committing crimes?

11   A.  Yes.

12   Q.  At that first meeting did you admit to committing crimes

13   with the defendant?

14   A.  Yes.

15   Q.  At that point did you have any agreement with the

16   government?

17   A.  No.

18   Q.  And in some of the meetings you testified about, did you go

19   over topics that aren't part of this trial?

20   A.  Yes.

21   Q.  Did you talk about people that aren't part of this trial?

22   A.  Yes.

23   Q.  And in those meetings did anyone tell you what answers to

24   give in your testimony?

25   A.  No.

```
 1    Q.  What were you told in those meetings?

 2    A.  To tell the truth.

 3              MR. EVERDELL:  Objection.

 4              THE COURT:  Overruled.

 5    Q.  What's your understanding of what would happen if you lied

 6    in those meetings?

 7    A.  I would not be able to get the cooperation agreement, and I

 8    might also be charged with a crime for lying to the government.

 9    Q.  Now, you were asked about your cooperation agreement.

10              MR. ROOS:  Can we bring up 3585-30.  Let's zoom in on

11    Counts One, Two, and Three, that portion that you were asked

12    about on cross-examination.

13    Q.  Now, these are the crimes you pled guilty to?

14    A.  Yes.

15    Q.  And did you speak with the prosecutors?

16              MR. EVERDELL:  Objection, your Honor.

17              THE COURT:  What's the objection?

18              MR. EVERDELL:  There is more than just what's on this

19    screen.

20              MR. ROOS:  Fair.  We can go to the next page.

21    Q.  You pled guilty to four crimes, right, Mr. Wang?

22    A.  Yes.

23    Q.  I will ask you some questions, and you will understand from

24    my questions that I'm asking about the three on the first page

25    and the fourth on the next page.
```

```
 1   A.  Yes.

 2   Q.  And did you talk about the facts relating to these crimes

 3   in your meetings with the government?

 4   A.  Yes.

 5   Q.  What about in the first meeting?

 6   A.  Yes.

 7   Q.  Now, the three of the four charges here are conspiracies.

 8   A.  Yes.

 9   Q.  Who generally did you conspire with when you committed

10   fraud on customers and investors?

11   A.  With Sam Bankman-Fried, with Nishad, and with Caroline.

12   Q.  One last topic for you.

13            MR. ROOS:  We can take this down.

14   Q.  Mr. Wang, you were asked on cross-examination a little bit

15   ago about your meeting with regulators in the Bahamas.

16            Do you remember that?

17   A.  Yes.

18   Q.  And you were asked about a letter that was sent to you?

19   A.  Yes.

20            MR. ROOS:  Why don't I bring that up.  That's Defense

21   Exhibit 260.

22   Q.  This is the document that Mr. Everdell showed you?

23   A.  Yes.

24   Q.  What was the date on this letter?

25   A.  November 12.
```

1   Q.  Is that the same day that you transferred money to

2   regulators?

3   A.  Yes.

4   Q.  This letter and the portion Mr. Everdell asked you about

5   says you had to report by 2:00 in the afternoon.

6           You see that?

7   A.  Yes.

8   Q.  Do you remember when this letter was sent to you?

9   A.  Earlier that morning.

10  Q.  Let me ask you about that.

11          MR. ROOS:  Can we show the witness what's been -- we

12  will mark -- just for the witness, Government Exhibit 549.

13  545, I think, is what I have on this.

14  Q.  Mr. Wang, do you recognize this?

15  A.  Yes.

16  Q.  What is it?

17  A.  It's a screenshot of a conversation on Signal.

18          MR. ROOS:  Government offers 545.

19          MR. EVERDELL:  Your Honor, we object.

20          THE COURT:  What's the basis?

21          MR. EVERDELL:  Can we have a sidebar, your Honor?

22          THE COURT:  Sure.

23          (Continued on next page)

24

25

```
1                 (At sidebar)

2          MR. EVERDELL:  It's not clear to me what time zone we

3    are talking about, whether there is any hours that have been --

4    when the hours are the same.  I am not --

5          THE COURT:  That's a subject for cross.

6          Anything else?

7          MR. ROOS:  While we were up here, I can hand your

8    Honor copies.  I can going to offer these three.

9          THE COURT:  545, 46, and 49 have been handed to me.

10         Anything else?

11         MR. COHEN:  Your Honor, just before we leave for

12   lunch, can I just ask the Court something, or I could ask you

13   now?

14         THE COURT:  You can ask me now.

15         MR. COHEN:  Just logistically, I know me and the

16   government often speak at midnight, but what is an appropriate

17   time to get you a letter if it has to do with the next day's

18   testimony?

19         THE COURT:  8:00.

20         MR. COHEN:  We want to be respectful.

21         THE COURT:  I understand that.  Everybody is working

22   very hard.  I know that.  In other circumstances I would have

23   been considerably out of joint, but I understand.

24         MR. COHEN:  I don't see you ever out of joint, your

25   Honor.
```

1          THE COURT:  Thank you.

2          (Continued on next page)

```
 1              (In open court)
 2              MR. ROOS:  Bring back up 545, which is marked on the
 3  screen as 549.  Can we bring up 546.
 4  Q.  Mr. Wang, do you recognize this?
 5  A.  Yes.
 6  Q.  What's this?
 7  A.  It's another screenshot of the Signal chats.
 8  Q.  That's a chat that you participated in?
 9  A.  Yes.
10              MR. ROOS:  Government offers 549, 546.
11              THE COURT:  Clarify for me the confusion about whether
12  we are talking about 545 or not.
13              MR. ROOS:  Your Honor, the paper copies that Mr.
14  Everdell and I have both say 545.  The one on the screen says
15  549.  For the record, since it's the one that the jury will
16  see, we will use 549, and we will fix the paper.
17              THE COURT:  What's being offered now is 546 and 549,
18  is that right?
19              MR. ROOS:  Yes, your Honor.
20              THE COURT:  Received.
21              (Government Exhibits 546 and 549 received in evidence)
22              MR. EVERDELL:  Your Honor, I am confused just because
23  I have another exhibit that's 549.  I am not trying to be
24  difficult.  What are we calling these two exhibits now?
25              MR. ROOS:  These are going to be 549 and 546, and we
```

```
 1    will put a different sticker on that paper that you have.

 2              THE COURT:  What I'm looking at at 546, the top line

 3    has 1155 on it, and show me what I'm supposed to be looking at

 4    as 549, please.  That has the 1154 at the top.

 5              MR. ROOS:  Yes, your Honor.

 6              THE COURT:  Are we all on the same page, your Honor?

 7              MR. EVERDELL:  I believe so, your Honor yes.

 8              THE COURT:  OK.  Let's go.

 9              MR. ROOS:  Please publish 549 to the jury.

10    Q.  Mr. Wang, what is this a screenshot of?

11    A.  It's a screenshot of the small group chats, Signal group.

12    Q.  What's the date on this small group chat?

13    A.  November 12.

14    Q.  This is the same day you visited Bahamas regulators?

15    A.  Yes.

16    Q.  Is it the same day as that letter that defense counsel

17    showed you?

18    A.  Yes.

19    Q.  And do you see a message on this page from the defendant?

20    A.  Yes.

21    Q.  And what does it say?

22    A.  It says:  Gary and I are with Bahamian regulators.

23    Q.  What time was that sent?

24    A.  1056.

25              MR. ROOS:  Can we please look at Government Exhibit
```

1   546, which is in evidence.

2   Q.  Is this from the same chat?

3   A.  Yes.

4   Q.  What day is it on?

5   A.  November 12.

6   Q.  And do you see a message by the defendant?

7   A.  Yes.

8   Q.  What does he say?

9   A.  He says we are talking with regulators.

10  Q.  What time did he say that?

11  A.  12 p.m.

12  Q.  These messages are before the 2 p.m. time that was listed

13  in that letter, right?

14  A.  Yes.

15  Q.  So were you already meeting with regulators before that 2

16  p.m. time?

17  A.  At this time we were meeting with Bahamian liquidators, not

18  the regulators.

19  Q.  When did you meet with the regulators?

20  A.  I think around 12 or 1.

21          MR. ROOS:  Now, please bring up Government Exhibit

22  548.

23          THE COURT:  Might it be helpful to find out what he

24  means by Bahamian liquidators.

25          MR. ROOS:  Sure, your Honor.

1   Q.   Who are the Bahamian liquidators?

2   A.   They were consultants hired by the Bahamas government to

3   handle liquidating the Bahamas entity of FTX.

4   Q.   And then after that, around 1, you said is when you met

5   with the regulators?

6   A.   Yes.

7            MR. ROOS:   Can we bring up Government Exhibit 548.

8            THE COURT:   Let get this straightened out, please.

9            Nice tie, Andy.

10            MR. ROOS:   Can we please publish for the witness 547.

11   Q.   Mr. Wang, do you see an email on your screen?

12   A.   Yes.

13            MR. ROOS:   Can we go to the second page.

14   Q.   Is this the letter that defense counsel showed you?

15   A.   Uh-huh, yes.

16   Q.   Do you see it attached to an email?

17   A.   Yes.

18            MR. ROOS:   The government offers 547.

19            MR. EVERDELL:   Objection.   Hearsay.

20            THE COURT:   First of all, the second page, the page

21   that is on the screen, if memory serves, is in evidence and you

22   offered it, right?

23            MR. EVERDELL:   I'm referring to the cover email, your

24   Honor.

25            THE COURT:   Show me the email.

bottom

```
 1              And you will say?

 2              MR. ROOS:  A few things.  The rule of completeness.

 3    It's a verbal act and nothing is being offered for the truth

 4    and it's for the effect on the listener, for the effect on

 5    Mr. Wang.

 6              THE COURT:  It's received, not for the truth.

 7              Members of the jury, the email you are about to see is

 8    not offered for the truth of anything that it states, but

 9    rather for the fact that it was stated and the effect it may

10    have had on Mr. Wang's conduct, if any.

11              (Government Exhibit 547 received in evidence)

12              MR. ROOS:  Now, may we publish to the jury and start

13    on the second page.

14    Q.  Mr. Wang, do you recognize this?

15    A.  Yes.

16    Q.  Is this the letter that defense counsel showed you?

17    A.  Yes.

18    Q.  The exhibit defense counsel showed you, was it attached to

19    an email?

20    A.  The exhibit or the original version of the document?

21    Q.  Just the version that the defense counsel showed you.

22    A.  No.

23              MR. ROOS:  Why don't we go to the first page of this

24    document.

25    Q.  Mr. Wang, you said that you met with the regulators around
```

1?

A.  Yes.

Q.  And the letter they sent you said to appear by 2?

A.  Yes.

Q.  What time was this email sent to you with that letter?

A.  Around 3 p.m.

Q.  So the email was sent to you after those things happened?

A.  Yes.

Q.  So this was after the defendant had met with the regulators?

A.  I think this was sent during their meeting.  I think they finished -- they finished meeting around 5 p.m. and they met for several hours.  So this was during the meeting.

Q.  So you were already there?

A.  Yes.

Q.  And then you got this?

A.  I also remember getting -- I am trying to remember -- that morning -- Sam got the letter first and that was the one I first saw and that was in the morning.  Yeah.  This one, I didn't get it until after I got there.

Q.  While you were there, were you present with the defendant when he was meeting with the regulators?

A.  No.

Q.  Do you know what they talked about?

A.  No.

1    Q.  And after the meeting, was it then that you were told to

2    transfer the assets?

3    A.  Yes.

4    Q.  One last thing, Mr. Wang.

5            MR. ROOS:  We can take this down.

6    Q.  You were asked about at some point a question about, in

7    2021, the status of customer assets.

8    A.  Yes.

9    Q.  And on cross-examination Mr. Everdell asked you about a

10   conversation that happened when FTX's -- I'm sorry.  Withdrawn.

11           Mr. Everdell asked you about a conversation that

12   happened with the defendant in 2021 when Alameda's balance was

13   negative.

14           Do you remember that?

15   A.  Yes.

16   Q.  Today you testified that that's when the defendant

17   suggested to you including the FTT, is that right?

18   A.  That conversation was in 2019 or 2020 -- late 2019, early

19   2020, the one about Alameda having a negative balance on FTX

20   but not if you also include FTT.

21   Q.  That was in 2019?

22   A.  Yes.

23   Q.  And so at that time you said you went along with it?

24   A.  Yes.

25   Q.  And that's because the math worked out, right?

```
 1   A.   Yes.

 2   Q.   Fast forward to 2022.

 3   A.   Yes.

 4   Q.   When Alameda had a $14 billion negative balance.

 5   A.   Yes.

 6   Q.   Was that more than FTX's revenue?

 7   A.   Yes.

 8   Q.   Was that more than the FTT?

 9   A.   Yes.

10            MR. ROOS:  No further questions.

11            THE COURT:  Thank you.

12            Mr. Everdell.

13            MR. EVERDELL:  Nothing from us, your Honor.

14            THE COURT:  I'm sorry.  You said nothing?

15            MR. EVERDELL:  Nothing.

16            THE COURT:  I have a couple of questions.

17            (Continued on next page)

18

19

20

21

22

23

24

25
```

1                   THE COURT:  Please show Mr. Wang Defendant's

2       Exhibit 15, which both counsel questioned about, the promissory

3       note for $35 million.  Do we have it up there?

4                   Can you see it on your screen, Mr. Wang?

5                   THE WITNESS:  No.

6                   THE COURT:  Members of the jury, do you have it?

7                   THE WITNESS:  Okay.  Now I see it.

8                   THE COURT:  Does the jury have it now?

9                   THE JURORS:  No.

10                  Yes.

11                  THE COURT:  Yes.  Okay.

12                  This promissory note, I believe you told us──and

13      correct me if I'm wrong, please──was for $35 million that was

14      to be used to make an investment, yes?

15                  THE WITNESS:  Yes.

16                  THE COURT:  An investment by whom or by what entity?

17      Do you know?

18                  THE WITNESS:  No.

19                  THE COURT:  Was it an investment by you?

20                  THE WITNESS:  May have been, yes.

21                  THE COURT:  What may you have spent $35 million on as

22      an investment?

23                  THE WITNESS:  Some company that Sam wanted to invest

24      in, but I don't recall.

25                  THE COURT:  Some company that Sam?

1           THE WITNESS:  Wanted to invest in, but I don't recall

2     which one it was.

3           THE COURT:  Were there occasions where there were

4     companies that he wanted to invest in and you made the

5     investment?

6           THE WITNESS:  I mean, with the promissory——with these

7     promissory notes.  My understanding was that Sam also signed a

8     promissory note for larger amounts.

9           THE COURT:  Well, how did you come to have that

10    understanding?

11          THE WITNESS:  Told——I was told this by the lawyers.

12          THE COURT:  Did you ever receive any dollars in your

13    name for this $35 million note?

14          THE WITNESS:  Not in any bank account that I know of.

15          THE COURT:  Did you ever receive any stock or other

16    assets in your name, or the name of some entity you controlled,

17    for this $35 million investment?

18          THE WITNESS:  Not that I'm aware of.

19          THE COURT:  Now this note is payable to Alameda

20    Research, yes?

21          THE WITNESS:  Yes.

22          THE COURT:  And who owned Alameda Research?

23          THE WITNESS:  Sam and I.

24          THE COURT:  Do either counsel want to ask any further

25    questions in light of my questions?

```
 1                MR. ROOS:  No, your Honor.

 2                THE COURT:  Mr. Everdell?

 3                MR. EVERDELL:  One clarification question, your Honor.

 4                THE COURT:  Sure.

 5   RECROSS EXAMINATION

 6   BY MR. EVERDELL:

 7   Q.  You said it's your understanding that you didn't get any

 8   equity stakes in any of the companies that were invested in

 9   with this money?

10   A.  Well, I don't know what form that would take, but I assume

11   that there would be in my name, but I don't know what form that

12   is, if—I didn't receive any pieces of paper saying I owned X

13   amount of Y company.

14   Q.  But your understanding was that you did get equity stakes

15   in the companies that were invested in.

16   A.  Probably.  I wasn't entirely sure, but seemed—that was my

17   rough understanding.

18                THE COURT:  You were a 10 percent owner of Alameda,

19   right?

20                THE WITNESS:  Yes.

21                THE COURT:  So in that sense, if Alameda made the

22   investment, you indirectly had an equity stake, yes?

23                THE WITNESS:  Yes.

24                THE COURT:  Did anybody ever explain to you why you

25   were to sign this note?
```

```
 1                    THE WITNESS:  Something about——

 2                    THE COURT:  Before you tell me what it is, I just

 3      wanted a yes or no answer to that question.

 4                    THE WITNESS:  They said something, yes.

 5                    THE COURT:  Who's the "they" to whom you're referring?

 6                    THE WITNESS:  Sam.

 7                    THE COURT:  Okay.  And what, if anything, did Sam tell

 8      you about why you were signing this note?

 9                    THE WITNESS:  Sam mentioned something about not

10      wanting this to come directly——or something about it being an

11      FTX investment but didn't want the money to come from Alameda.

12      I wasn't entirely clear on what the explanation was.

13                    THE COURT:  Okay.  Counsel, anything you want to ask

14      in light of that?

15                    MR. ROOS:  No, your Honor.

16                    MR. EVERDELL:  No, your Honor.

17                    THE COURT:  Okay.  The witness is excused.  Thank you.

18                    (Witness excused)

19                    THE COURT:  Would this be a good time for lunch?

20                    MS. SASSOON:  Your Honor, we can call the next witness

21      for half an hour or we can break now; whatever you prefer.

22                    THE COURT:  Whatever you'd like to do.  That's for

23      both sides to be heard on.

24                    MS. SASSOON:  Okay.  The government would like to call

25      Caroline Ellison to the stand.
```

```
 1              MR. COHEN:  We'd prefer to break, your Honor, if
 2    that's all right.  You have another burning issue to decide.
 3              THE COURT:  Oh, yes.  And I'll do it in the
 4    time-honored tradition.  We'll go for 15 minutes with
 5    Ms. Ellison.
 6              (Witness sworn)
 7              THE DEPUTY CLERK:  Thank you.  Please be seated.
 8              And if you could please state your name and spell your
 9    first and last names for the record.
10              THE WITNESS:  My name is Caroline Ellison,
11    C-A-R-O-L-I-N-E, E-L-L-I-S-O-N.
12              THE COURT:  You may proceed.
13              MS. SASSOON:  Thank you, your Honor.
14     CAROLINE ELLISON,
15         called as a witness by the Government,
16         having been duly sworn, testified as follows:
17    DIRECT EXAMINATION
18    BY MS. SASSOON:
19    Q.  Good afternoon, Ms. Ellison.
20    A.  Hi.
21    Q.  How do you know the defendant, Sam Bankman-Fried?
22    A.  We met when I was an intern at Jane Street, and we worked
23    together; later, we worked together at Alameda and dated for a
24    couple of years.
25    Q.  When you were working at Alameda, did you commit any
```

1   crimes?

2   A.  Yes, we did.

3   Q.  When you say "we," who do you mean by "we"?

4   A.  I mean Sam and I and others.

5   Q.  What kinds of crimes did you commit with Sam?

6   A.  Fraud, conspiracy to commit fraud, and money laundering.

7   Q.  Who did you defraud?

8   A.  The customers of FTX, the investors in FTX, and lenders to

9   Alameda.

10  Q.  And just to be clear, did you commit these crimes alone?

11  A.  No.  They were committed with Sam.

12  Q.  Do you see the defendant Sam Bankman-Fried in the courtroom

13  today?

14          And if you need to stand up.  I know there are a lot

15  of people here.

16          MR. COHEN:  Stipulated, your Honor.

17          MS. SASSOON:  Your Honor, we'd like the witness to

18  answer the question.

19          THE COURT:  Please answer the question.

20  A.  Yes, I do.

21  Q.  Can you identify him by where he's sitting in the courtroom

22  and an article of clothing that he's wearing.

23  A.  He's over there, wearing a suit.

24          MS. SASSOON:  Let the record reflect that the witness

25  looked at and gestured towards the defendant.

```
 1              THE COURT:  Yes.
 2    Q.  You said that you defrauded FTX's customers and Alameda's
 3    lenders with the defendant.  What was his involvement in those
 4    crimes?
 5    A.  He was originally the CEO of Alameda and then the owner of
 6    Alameda, and he directed me to commit these crimes.
 7    Q.  Have you pled guilty to a number of federal felonies in
 8    connection with these crimes?
 9    A.  Yes, I have.
10    Q.  Are you testifying today under the terms of a cooperation
11    agreement with the government?
12    A.  Yes, I am.
13    Q.  You testified that you committed fraud against FTX
14    customers with the defendant.  At a general level, what did you
15    do that makes you guilty of fraud against FTX customers?
16    A.  Alameda took several billion dollars of money from FTX
17    customers and used it for our own investments and to repay
18    debts that we had.
19    Q.  What are some of the ways that Alameda was able to steal
20    customer money?
21    A.  We had access to an essentially unlimited line of credit on
22    FTX, and we received FTX customer funds directly into our bank
23    accounts as part of the FTX fiat deposit system.
24    Q.  And what was the defendant's role in taking that money and
25    spending it on Alameda?
```

1  A.  He was the one who set up the systems that allowed Alameda

2  to take the money, and he was the one who directed us to take

3  customer money to repay our loans.

4  Q.  Around how much FTX customer money did Alameda use to repay

5  its lenders?

6  A.  In the ballpark of $10 billion.

7  Q.  Once Alameda——and this $10 billion, does that include other

8  spending of customer money besides repaying loans?

9  A.  Yes.

10  Q.  Once Alameda repaid its lenders and spent billions of

11  dollars of FTX customer money, about how much money had Alameda

12  taken from FTX customers in all by that point?

13  A.  We ultimately took around $14 billion, some of which we

14  were able to pay back.

15  Q.  You said you defrauded Alameda's lenders with the

16  defendant.  How did you defraud Alameda's lenders?

17  A.  I sent balance sheets to our lenders at the direction of

18  Sam that incorrectly stated the amount of our assets and our

19  liabilities and made Alameda's balance sheet look less risky

20  than it really was.

21  Q.  Turning to November of 2022, what happened when FTX

22  customers tried to withdraw their money in large numbers?

23  A.  Initially FTX was able to process some withdrawals, but

24  pretty soon it started running out of money.  Alameda tried to

25  send more money to FTX, but there wasn't enough to cover all

1   the customer claims.

2   Q.  And why was there not enough money for customers in

3   November of 2022?

4   A.  Because Alameda had taken it to make our own investments

5   and to repay our lenders.

6            MS. SASSOON:  Your Honor, I can turn now to the

7   witness's background or we can break for lunch.

8            THE COURT:  Okay.  We'll break.  2:00, folks.

9            (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     AFTERNOON SESSION

 2                        2:04 p.m.

 3          (In open court; jury present)

 4          THE COURT:  The defendant and the jurors are all

 5  present, as they have been throughout.

 6          You may proceed, Ms. Sassoon.

 7          MS. SASSOON:  Thank you, your Honor.

 8  BY MS. SASSOON:

 9  Q.  Ms. Ellison, I want to pick up with a little bit about your

10  background.

11          How old are you?

12  A.  I'm 28.

13  Q.  Where did you grow up?

14  A.  I grew up in the Boston area.

15  Q.  Where did you go to college?

16  A.  I went to school at Stanford.

17  Q.  What did you study at Stanford?

18  A.  I was a math major.

19  Q.  What was your first job out of college?

20  A.  I worked as a trader on the equities desk at Jane Street.

21  Q.  What is Jane Street?

22  A.  Jane Street is a trading firm based in New York.

23  Q.  When you began working there, had you worked there before?

24  A.  I had worked as an intern there before I started full time

25  after college.
```

1   Q.  How did you meet the defendant?

2   A.  I met him when I was an intern there and he was a trader.

3   Q.  Did there come a time when you learned that the defendant

4   had started his own company?

5   A.  Yes.  After I started working at Jane Street full time, he

6   left.  A few months after he left, I got coffee with him and he

7   told me about a crypto trading firm that he had started called

8   Alameda Research.

9   Q.  Did you start working there?

10  A.  Yes, I did.

11  Q.  Around when?

12  A.  This was in March of 2018.

13  Q.  And how did that happen that you started working at

14  Alameda?

15  A.  After he told me about it, I asked if he wanted me to work

16  there and he said yes and gave me a job offer.  I thought about

17  it for a bit and decided to quit Jane Street and move to

18  California to work for him.

19  Q.  Was that job at Alameda your second full-time job?

20  A.  Yes, that's right.

21  Q.  Initially what was your role at Alameda?

22  A.  I was a trader.

23  Q.  When you started working at Alameda as a trader, what did

24  you learn shortly after starting this new job?

25  A.  Shortly after I started, I learned that the company was in

NCASE 1:22-cr-00673-LAK   Document 358   Filed 12/12/23   Page 136 of 236   649

much worse shape than I realized.  Right before I had started

working there, they had suffered large losses and just

discovered them.  Right after I started working there, the

lenders pulled out a lot of their money and more than half of

the company ended up quitting.

Q.  When the defendant offered you a job at Alameda, had he

shared with you the rough circumstances at Alameda?

A.  No.

Q.  And when you learned about it, did you discuss this with

him?

A.  Yes, I did.

Q.  And what did you talk about?

A.  I asked why he hadn't shared more of this information.  He

apologized and he said that he hadn't known how to tell me.

Q.  What were your responsibilities as a trader at Alameda?

A.  It was a variety of things; everything from doing research

and working on our——our trading models to monitoring automated

systems to moving things like Bitcoin around the different

exchanges.

Q.  What was the defendant's role at the time that you worked

as a trader at Alameda?

A.  He was the CEO.

Q.  Did your relationship with the defendant remain purely

professional?

A.  No, it didn't.

1    Q.  Can you explain.

2    A.  Yeah.  In the fall of 2018—so not too long after I started

3    working at Alameda—we started sleeping together on and off; in

4    the summer of 2020, we eventually started a romantic

5    relationship.

6    Q.  And over what periods of time were you in a romantic

7    relationship with the defendant?

8    A.  Yeah.  We first dated from summer of 2020 to summer of

9    2021; we broke up and then got back together in the fall of

10   2021; and broke up for good in the spring of 2022.

11   Q.  While you dated what, if anything, did the defendant tell

12   you about his professional goals?

13   A.  He was very ambitious.  He talked about wanting Alameda and

14   eventually FTX to be successful and to end up being huge

15   companies that did a wide variety of things.  He was also very

16   interested in politics and talked about wanting to use his

17   money to have influence on politics.  He said at one point he

18   thought there was a 5 percent chance he would become president

19   some day.

20   Q.  When you say president, what are you referring to?

21   A.  Of the United States.

22   Q.  Around when did the defendant start the FTX exchange?

23   A.  It was around the beginning of 2019.

24   Q.  And when the defendant started FTX, what role did he play

25   in Alameda at that time?

1    A.   He was still the CEO.

2    Q.   Was Alameda a customer on the FTX exchange?

3    A.   Yes, we were.   Initially we were the largest trader on the

4    FTX exchange.   Our market share decreased gradually over time.

5    Q.   As a customer on the exchange, what types of things did

6    Alameda do on FTX?

7    A.   We did trading; we provided on all of the markets on FTX

8    and did our normal sort of arbitrage-type trading there.

9    Q.   Did Alameda buy Bitcoin on FTX?

10   A.   Yes, we bought Bitcoin.

11   Q.   Did that include purchases of spot Bitcoin?

12   A.   Yes.

13   Q.   And what about Bitcoin futures?

14   A.   Yeah, Bitcoin futures too.

15   Q.   How would you describe the relationship between FTX and

16   Alameda when FTX was created?

17   A.   Initially they were very integrated, they were both run by

18   the same teams; eventually they became more separate over time,

19   though still remained fairly integrated.

20   Q.   If Alameda made money on FTX, who was the beneficiary of

21   those profits?

22   A.   Sam, because he owned Alameda.

23   Q.   When you started working at Alameda, where did the company

24   get its money from to buy cryptocurrency and to trade?

25   A.   Initially we were funded primarily by loans from——from

1    acquaintances and friends of friends.

2    Q.  And you touched on this, but what happened to some of the

3    loans that Alameda had after you started working there?

4    A.  The majority of them were recalled, like a few weeks after

5    I started working there.

6    Q.  Can you explain what you mean by "recalled."

7    A.  What I mean is that the lenders asked for their money back.

8    Q.  And these lenders were these third-party lenders?

9    A.  Yes.

10   Q.  What's a third-party lender?

11   A.  A lender who's separate from us, so not FTX or Alameda.

12   Q.  So after a number of these loans were recalled, how would

13   you describe Alameda's ability to borrow from third parties

14   when you were working there as a trader?

15   A.  It was initially not very good.  This was something Sam

16   talked about a lot as a big priority for the company, figuring

17   out ways to get more loans.

18   Q.  You said it was a big priority for the defendant to get

19   more loans.  What did he describe about why he wanted to borrow

20   more money for Alameda?

21   A.  In order to do more trades or just have the ability to do

22   whatever valuable things came up.

23   Q.  When you say "valuable things," what kinds of things are

24   you talking about?

25   A.  Things like investments or acquisitions.

1    Q.  And what kinds of things would the defendant say to you

2    about trying to borrow money?

3    A.  He said that we should be——

4              MR. COHEN:  Your Honor, might we have a time frame.

5    Q.  While you were working as a trader at Alameda.

6    A.  Yeah, he said that we should be trying really hard to find

7    new sources of money.

8    Q.  Were there times that Alameda did not have enough money to

9    do all the things that the defendant wanted to do in terms of

10   spending and trading?

11   A.  Yes, definitely.

12   Q.  Did there come a time while you were working at Alameda

13   that Alameda began using money that belonged to FTX customers

14   as a source of capital?

15             MR. COHEN:  Objection, leading.

16             THE COURT:  Sustained.  Form.

17   Q.  You said the defendant wanted to be borrowing from various

18   sources.  While you worked as a trader, what was one of the

19   sources that Alameda began using?

20   A.  When we began borrowing from third-party crypto lenders as

21   well as borrowing customer funds that were deposited on FTX.

22   Q.  What was the defendant's involvement in using FTX customer

23   money as a source of funds for Alameda in FTX's early days?

24             MR. COHEN:  Same objection.

25             THE COURT:  Overruled.

1    A.   Sorry.  Can you repeat the question.

2    Q.   Of course.  What was the defendant's involvement in using

3    FTX customer money as a source of funds for Alameda in those

4    early days at FTX?

5    A.   He said that FTX would be a good source of capital, and he

6    set up the system that allowed Alameda to borrow from FTX.

7    Q.   To your knowledge were customers of FTX ever told that

8    their money was being taken and used by Alameda?

9    A.   No, not to my knowledge.

10   Q.   Before the lunch break you described two ways that Alameda

11   took customer money from FTX, so let's talk about those.

12             What role, if any, did Alameda have with respect to

13   FTX customer fiat or dollar deposits?

14   A.   Yeah.  Initially, when FTX was getting started, it was hard

15   for it to get bank accounts, so Alameda would receive money in

16   its bank accounts for FTX customer deposits.

17   Q.   And why were FTX customers depositing money?

18   A.   Because they wanted to use it to maybe convert into

19   cryptocurrencies or just use as collateral for their trading.

20   Q.   What was the approximate time frame of Alameda receiving

21   FTX customer money into its bank account?

22   A.   I recall it happening as early as 2020.  I'm not sure if it

23   was earlier.  And I know that it was still happening to some

24   extent in 2022, though we had largely moved to FTX bank

25   accounts at that point.

1  Q.  What was the name of one of the entities that was listed

2  for those bank accounts?

3  A.  North Dimension is the main one I'm aware of.

4  Q.  Apart from FTX customer funds, as far as you know, did

5  other money get deposited into the North Dimension bank

6  account?

7  A.  Not that I know of, but I'm not sure about that.

8  Q.  About how much FTX customer money would you approximate got

9  deposited with Alameda over time on a net basis?

10         MR. COHEN:  Objection to form.

11         THE COURT:  I don't understand the objection.

12         MR. COHEN:  Compound, your Honor.

13         THE COURT:  Overruled.

14  A.  I think it was ballpark of 10 to $20 billion.

15  Q.  How, if at all, did Alameda keep track of these billions of

16  dollars of customer money that it was accepting into its bank

17  accounts?

18  A.  There was an account on FTX with the email fiat@ftx.com

19  where, if a customer deposited money into an Alameda bank

20  account, then there would be a negative ledger entry created in

21  this account to offset the money that Alameda was receiving.

22  Q.  What about if a customer withdrew money from FTX?

23  A.  It was supposed to—the process was supposed to happen in

24  reverse, though I later learned that there was a bug that

25  prevented this from happening at least some of the time.

1    Q.  When you say the process was supposed to happen in reverse,

2    do you mean the negative liability was supposed to get less

3    negative?

4    A.  Yes, that's right.

5    Q.  And was Alameda paying for those withdrawals?

6    A.  Yes, we were.

7    Q.  You testified that approximately billions of dollars went

8    through the Alameda bank account.  Did Alameda maintain most of

9    this FTX customer money in that bank account?

10   A.  No, we did not.

11   Q.  What did Alameda do with a portion of that money?

12   A.  Some of that money was withdrawn to other exchanges, was

13   spent on expenses, was used to repay loans, was used for

14   investments.

15   Q.  Was some of that money used for something called stablecoin

16   conversion?

17   A.  Yes, that's right, some of it was.

18   Q.  What is that?

19   A.  So a stablecoin is a cryptocurrency that's supposed to

20   track the price of the fiat currency—for example, US dollar.

21   So a USD coin is supposed to be worth the same as a US dollar.

22   So sometimes FTX customers would deposit like US dollars

23   through a bank account and want to withdraw USDC, so Alameda

24   would take the dollars that it deposited, convert them to USDC

25   so they could withdraw.

1   Q.  Is that a way of sending the money back to customers?

2   A.  Yeah, that's right.

3   Q.  I think you said about $10 billion went into this Alameda

4   bank account.  About how much of that was used to send money

5   back to customers in the form of stablecoin?

6   A.  I think in the ballpark of $2 billion.

7   Q.  So what happened to the remaining $8 billion or so that was

8   not used to convert money to stablecoin for customers?

9   A.  It was used for Alameda's trading and other purposes.

10  Q.  Who was the CEO of Alameda when this practice of spending

11  FTX customer money on Alameda trading and expenses started?

12          MR. COHEN:  Objection.

13          THE COURT:  Overruled.

14  A.  Sam was the CEO.

15  Q.  Generally, about how much money was kept in the North

16  Dimension bank account relative to the amount of money that

17  customers were depositing into it?

18  A.  Much less.  I don't think it was more than, you know, in

19  the hundreds of millions of dollars.

20  Q.  Why is that?

21  A.  Because it could be put to use generating returns if we

22  used it for trading.

23  Q.  And whose decision was that?

24  A.  It was Sam's initially.

25  Q.  Over time what was your impression of how FTX marketed the

1    securities customer assets on the FTX exchange?

2    A.   My impression was that FTX marketed itself as a safe,

3    reliable, audited, and highly regulated exchange.

4    Q.   Did you consider using customer deposits in Alameda trading

5    as consistent with that?

6    A.   No, I didn't.

7    Q.   Why not?

8    A.   Because it meant that those assets were at risk.  I mean,

9    as a trader, I was a customer in other exchanges, and if I knew

10   that this was happening in another exchange, I would feel

11   uncomfortable leaving a lot of money there.

12   Q.   So you had mentioned that Alameda took customer money in

13   two ways.  We just talked about one.  What was the other way

14   that Alameda took customer money?

15   A.   We had a——a line of credit on FTX that allowed us to borrow

16   cryptocurrency.

17   Q.   What do you mean by line of credit?

18   A.   What I mean is that we had a——a setting that allowed us to

19   withdraw coins from our account, even if we didn't have them in

20   our balances, or to sell them again, even if we didn't have

21   them.

22   Q.   And when you talk about using this line of credit, did it

23   allow Alameda to take money off of the FTX exchange to spend

24   elsewhere?

25   A.   Yes, that's right.

1    Q.  What is collateral?

2    A.  Collateral is money that you post if you're taking out a

3    loan to secure the loan so that if you don't repay it, then

4    whoever lent you the money can use that collateral and maybe

5    sell it and use it to make up the value of the loan.

6    Q.  Generally, when Alameda traded on other cryptocurrency

7    exchanges besides FTX, did it have to post collateral?

8    A.  Yes, we did.

9    Q.  As a result of Alameda's line of credit on FTX, was it

10   required to post collateral for its transactions on the

11   exchange?

12   A.  No.

13   Q.  Were you aware of any other customers that did not have to

14   post collateral to trade on FTX?

15   A.  No.

16   Q.  How was the money that Alameda could access through this

17   line of credit different from the customer money it was using

18   out of the North Dimension bank account?

19   A.  It included all coins on FTX, not just the fiat currencies,

20   so we could borrow cryptocurrency as well.

21   Q.  And where was this money being stored before Alameda took

22   it?

23   A.  It was being stored in FTX's wallets.

24   Q.  And when you say "FTX's wallets," what do you mean by that?

25   A.  It's like in a blockchain address that you use to store

1    cryptocurrency.

2    Q.  When Alameda took this customer money from FTX's wallets,

3    where did the money go?

4    A.  To whatever we needed it for, potentially to another

5    exchange or to a DeFi platform.

6    Q.  What gave Alameda this capability?

7    A.  My understanding is that it was a special setting on FTX.

8    Q.  Was this in FTX's code, as far as you understood it?

9    A.  I believe so.

10   Q.  Did you implement those features into FTX's code?

11   A.  No.

12   Q.  Did you generally have access to FTX's code?

13   A.  No.  I'd seen parts of it at various times, but I never

14   made any changes and I don't recall ever seeing this specific

15   part of it.

16   Q.  While you worked at Alameda were you ever told about the

17   exact size of the line of credit?

18   A.  Not that I recall.

19   Q.  When did you learn about this special feature of this line

20   of credit that allowed Alameda to withdraw customer money?

21   A.  I learned about it I think around the time that our FTX

22   account was set up; we were told that we had this ability.

23   Q.  And what was your impression of the amount of customer

24   cryptocurrency that Alameda could take using this line of

25   credit?

1    A.  My impression was that it was unlimited.

2    Q.  In your time as an Alameda trader what instructions, if

3    any, did the defendant give you about using the line of credit?

4    A.  He said to use it but to make sure we kept money on FTX so

5    that if customers were withdrawing that we would be able to

6    process those withdrawals, but he didn't tell us to keep any

7    more money on FTX beyond that.

8    Q.  And when you say to process customer withdrawals, generally

9    were all customers withdrawing their money at once?

10   A.  No, no.  Usually it was much smaller than that.

11   Q.  You mentioned that Alameda was a market maker on FTX.  Was

12   an unlimited line of credit necessary for Alameda to perform

13   its market-making functions on the exchange?

14   A.  No, I wouldn't say so.

15   Q.  Why not?

16   A.  Well, there was a—a limited amount of trading on the

17   exchange so there's really only a limited line of credit that

18   could be necessary.

19   Q.  When you say Alameda would have only needed a limited line

20   of credit, what size are we talking about?

21   A.  Our lines of credit on other exchanges, I think the largest

22   that I can recall were around the hundred or maybe $200 million

23   range.

24   Q.  And that was million, with an M?

25   A.  Yeah, with an M.

1    Q.  And over time, on FTX, did Alameda's market-making

2    responsibilities increase or decrease?

3    A.  Over time they decreased.  Initially I think we were around

4    half of the volume, and later it went down a lot to something

5    more like 2 percent.

6    Q.  With respect to this line of credit were you aware of any

7    contracts that accompanied borrowing customer money through the

8    line of credit?

9    A.  No, I wasn't aware of any.

10   Q.  Were you aware of any specific written terms on when

11   Alameda had to return the money that it took?

12   A.  No.

13   Q.  Were you aware of any terms or understandings at all of

14   when Alameda had to return this money?

15   A.  No.

16   Q.  How did you know that Alameda was spending customer money

17   and not just FTX revenue?

18   A.  I mean, initially, when we started borrowing money, we

19   would borrow coins that I knew FTX didn't have on its balance

20   sheet, like relatively illiquid assets.  Later on, once we

21   started borrowing in the billions of dollars, I knew that our

22   borrowing exceeded the total amount of money that FTX had from

23   its revenue and from its fundraising so I knew that some of

24   what we were borrowing at least had to be customer funds.

25   Q.  Prior to June 2022 generally in what kinds of amounts was

1   Alameda borrowing through its line of credit?

2   A.  Could be amounts ranging from, you know, a hundred thousand

3   dollars to $10 million at a time.

4   Q.  And generally for what purpose was it doing that?

5   A.  For trading purposes.

6           THE COURT:  Ms. Ellison, could you get a little closer

7   to the microphone.

8           THE WITNESS:  Oh, yeah, sure.

9   Q.  Can you give an example of that.

10  A.  For instance, if there was a coin that was trading at a

11  higher price on another exchange, like Binance, it might be

12  profitable to withdraw that coin from FTX and sell it on

13  Binance.

14  Q.  Did you perceive this as a benefit to Alameda?

15  A.  Yeah, I did.

16  Q.  Why?

17  A.  Because it allowed us to make profitable trades that we

18  wouldn't have been able to make otherwise.

19  Q.  While you were working as a trader at Alameda using this

20  line of credit, did you ever have any concerns about the fact

21  that Alameda was withdrawing customer funds from the exchange?

22          MR. COHEN:  Objection to form.

23          THE COURT:  Sustained.

24  Q.  While you worked as a trader, what, if any, concerns did

25  you have about Alameda using customer funds through the line of

1  credit?

2          MR. COHEN:  Same objection.

3          THE COURT:  Overruled.

4  A.  Yeah, I was somewhat concerned because I thought it was

5  something that customers weren't aware of and wouldn't be happy

6  if they knew about, though as I was just a trader at the time,

7  I didn't really see it as my role to make decisions on that.

8  Q.  The concerns that you just described having, did you ever

9  voice them to the defendant?

10  A.  Yeah.  I remember one conversation that we had about when

11  FTX was first being audited, when I asked him whether this line

12  of credit would show up on the FTX audit because I was

13  concerned that, you know, it would raise concerns with

14  investors and other people who were seeing the audit, and he

15  said, like, *No, don't worry, the auditors aren't going to look

16  at that.*

17  Q.  Around when was this conversation that you raised concerns

18  with the defendant?

19  A.  Maybe something like 2020.

20  Q.  And you described voicing concerns in the context of an

21  audit.  What is an audit?

22  A.  An audit is when an external accounting firm looks at the

23  finances of the company to certify that they are what they say

24  they are.

25  Q.  What, if anything, did the defendant tell you about why FTX

1    was having an audit?

2    A.   He said it was to appeal to potential investors.

3    Q.   So why did you ask the defendant about whether Alameda

4    using customer funds would cause problems with the audit?

5    A.   Because I thought that if I were an investor or someone

6    else interested in the finances of FTX, that would be important

7    information about FTX's finances that I would want to know.

8    Q.   When the defendant told you not to worry because the

9    auditors wouldn't see it, did he say anything about whether

10   what you were doing was actually okay?

11   A.   No, not that I recall.

12   Q.   And as far as you know, was FTX disclosing to auditors,

13   customers, or the public that unlike other customers on

14   exchange, Alameda had this line of credit?

15            MR. COHEN:   Objection to form.

16            THE COURT:   Sustained as to form.

17   Q.   As far as you were aware, was FTX disclosing the existence

18   of Alameda's line of credit to auditors, the public, or

19   customers?

20            THE COURT:   It's compound.   Rephrase.

21   Q.   As far as you know, was FTX disclosing to customers the

22   existence of Alameda's line of credit?

23   A.   No, not as far as I know.

24   Q.   And as far as you know, was Alameda disclosing to auditors

25   the existence of Alameda's line of credit?

1    A.   No.

2    Q.   And as far as you know, was FTX disclosing to investors the

3    existence of Alameda's line of credit?

4    A.   No.

5    Q.   Prior to June of 2022 are there any occasions that stand

6    out in your mind when the defendant told you to use Alameda's

7    line of credit?

8    A.   Yeah.   There was one instance when we were buying FTX

9    equity back from Binance that he did so.

10   Q.   What is Binance?

11   A.   So Binance was another major crypto exchange.   They were

12   initially an early investor in FTX but later on became more of

13   a competitor to FTX, but they still owned a large stake of FTX

14   stock.   It was about $2 billion.   So Sam wanted to buy it back

15   from them.

16   Q.   And around when was this discussion with the defendant

17   about buying back Binance's stake in FTX?

18   A.   I think it was the summer of 2021.

19           MS. SASSOON:   Mr. Bianco, can you show the witness

20   Government Exhibit 1638.

21   Q.   Do you recognize the people in this photograph?

22   A.   Yes.

23   Q.   Who are they?

24   A.   That's Sam with CZ or Changpeng Zhao, who is the CEO of

25   Binance.

```
 1                MS. SASSOON:  The government offers 1638.

 2                MR. COHEN:  No objection.

 3                THE COURT:  Received.

 4                (Government's Exhibit 1638 received in evidence)

 5                MS. SASSOON:  Mr. Bianco, please publish the

 6     photograph to the jury.

 7     BY MS. SASSOON:

 8     Q.  Who's in this photograph?

 9     A.  This is Sam with CZ, who is the CEO of Binance.

10     Q.  And in the summer of 2021, what was the size of Binance's

11     investment in FTX?

12     A.  It was around $2 billion.

13     Q.  What did the defendant tell you about buying out Binance's

14     $2 billion stake in FTX?

15     A.  He said it was really important because if we didn't buy it

16     out, otherwise Binance would do things to mess with FTX.

17     Q.  Where did this conversation take place?

18     A.  This was in person in the Hong Kong office.

19     Q.  When you say "the Hong Kong office," whose offices?

20     A.  It was the office where both FTX and Alameda staff worked.

21     Q.  Who was there for this conversation with the defendant

22     about buying out Binance's $2 billion stake?

23     A.  It was me, Sam, and I believe Trabucco

24     Q.  Who is Trabucco?

25     A.  He was at the time another trader at Alameda.  He later
```

1  became co-CEOs with me.

2  Q.  Co-CEOs with you of Alameda?

3  A.  Yes, that's right.

4  Q.  What was your reaction when the defendant proposed buying

5  out Binance's $2 billion stake in FTX?

6  A.  I was concerned about the amount of money.  Like, FTX had

7  just raised a lot of money, which made me feel more confident

8  about its financial position, but then we were going to use I

9  think it was more than the amount of money that they had just

10 raised to buy back this share of FTX from Binance.

11 Q.  What did you say to the defendant?

12 A.  I said something like, *We don't really have the money for*

13 *this, we'll have to borrow from FTX to do it.*

14 Q.  When you said, *We'll have to borrow from FTX to do it,* what

15 did you mean?

16 A.  I meant use our line of credit on FTX.

17 Q.  When you said to the defendant that you didn't really have

18 the money and you would have to borrow from FTX, what did he

19 say?

20 A.  He said, *That's okay, I think this is really important, we*

21 *have to get it done.*

22 Q.  And did you get it done?

23 A.  Yes, we did.

24 Q.  About how much money did Alameda take from FTX customers to

25 buy out Binance?

1   A.  It was in the ballpark of $1 billion.

2   Q.  Is this the first time you recall Alameda spending about a

3   billion dollars of customer cryptocurrency from FTX?

4           MR. COHEN:  Objection.

5           THE COURT:  What's the objection?

6           MR. COHEN:  Builds a conclusion into the sentence.

7   This is supposed to be direct examination, your Honor.

8           MS. SASSOON:  The witness just testified to those

9   facts.

10          THE COURT:  Overruled.

11  A.  Yeah, the first time that I can recall an amount that large

12  being taken from FTX.

13  Q.  Who made that decision?

14  A.  It was Sam's decision.

15  Q.  And what was Sam's title at Alameda at the time?

16  A.  At the time I believe he was CEO.

17  Q.  What, if anything, did you take away from this experience

18  with the defendant telling you to buy out Binance using

19  Alameda's line of credit?

20  A.  I took away more confirmation that he saw Alameda's line of

21  credit on FTX as a general backstop source of funds for

22  whenever we needed funds.

23  Q.  When you say "whenever we needed funds," who are you

24  referring to?

25  A.  Alameda.

1  Q.  And after that, when Alameda needed money for trading or

2  other expenses, what sources of capital did you draw from?

3  A.  We drew from——I mean, we were funded largely with loans at

4  that point, and if we needed money for any particular thing, we

5  would take from exchanges, including FTX.

6  Q.  You mentioned loans.  Besides the line of credit, what was

7  Alameda's primary source of money to invest and do trading in

8  2021?

9  A.  It was loans from third-party crypto lending desks.

10  Q.  And initially, when you started working at Alameda, about

11  how much money was Alameda borrowing from third parties?

12  A.  Maybe around a hundred million dollars.

13  Q.  Did there come a time when the defendant spoke to you about

14  getting more loans?

15  A.  Yeah.  Around the end of 2018 or beginning of 2019, he met

16  people from Genesis, which was a large crypto lending desk, and

17  he told me he was very excited about that and he thought we

18  should try to get loans from them.

19  Q.  Did he mention any other lenders?

20  A.  None at the time that I recall, though we later, you know,

21  over the course of, especially in 2021, found more lenders.

22  Q.  And prior to that had Alameda faced any difficulty in

23  getting loans?

24  A.  Yeah, for a lot of 2018, we had a lot of trouble getting

25  loans.

1    Q.  When did that change?

2    A.  It started to improve in the beginning of 2019, but the

3    situation definitely got better towards the end of 2019 when

4    we—after we created FTT.

5    Q.  I want to talk about FTT in a moment.  But let me ask you:

6    If Alameda had a line of credit on FTX, why was Alameda also

7    seeking out these other lenders?

8    A.  I mean, in those days, back in 2019, the amount of FTX

9    customer deposits wasn't very large so it wasn't a very good

10   source of funds for Alameda.

11   Q.  You mentioned that Alameda was able to borrow more money

12   with the creation of FTT.  What is FTT?

13   A.  FTT was the FTX exchange token.

14   Q.  What does that mean?

15   A.  That means that FTX would take a third of the revenue that

16   they earned from fees and use it to buy up this token, so

17   effectively they were trying to transfer that value to the

18   token holders.

19   Q.  How did FTT come about?  How did it originate?

20   A.  Sam created it.

21   Q.  And when you say he created it, can you explain that.

22   A.  I think he and others on the business development team came

23   up with the idea and some of the developers at FTX created the

24   actual token.

25   Q.  And what reason, if any, did the defendant give for

1    creating FTT?

2    A.   Initially he said that it would be a good way to raise some

3    funds and build an equity cushion for FTX, and he thought it

4    had the potential to get really big, similar to BNB or other

5    popular exchange tokens at the time.

6    Q.   So when you say the defendant created FTT, in practice,

7    does that mean creating a bunch of coins online?

8    A.   Yeah.

9    Q.   And how were these coins that the defendant created

10   initially distributed?

11   A.   Some were sold in the seed round to outside investors and

12   to employees, and the rest were owned by Alameda.

13   Q.   Roughly what percentage of that initial distribution of FTT

14   went to Alameda?

15   A.   Not sure.  Maybe, ballpark, 60 or 70 percent.

16   Q.   What did Alameda pay for its initial supply of FTT that was

17   about 60 or 70 percent of all the tokens?

18   A.   Nothing as far as I know.

19   Q.   So it got the tokens for free.

20   A.   As far as I know.

21   Q.   And when FTT was first actually listed for sale, what was

22   the approximate price?

23   A.   The price in the seed round was 10 cents, but when it was

24   listed on exchanges, it quickly went up to around a dollar.

25   Q.   What, if any, instructions did the defendant give you about

1  trading FTT?

2  A.  He said that he thought 1 dollar was a psychologically

3  important price, and if it went below a dollar, then people

4  might lose confidence in it, so that we should try to buy it if

5  it started going below a dollar.

6  Q.  And again, when you say "we" should try to buy FTT if it

7  goes below a dollar, who's the "we"?

8  A.  Alameda.

9  Q.  Over time did the——

10        THE COURT:  Excuse me for a minute.  You used the

11  phrase "seed round."  Would you explain to the jury what you

12  meant by that.

13        THE WITNESS:  Yeah.  "Seed round" means an initial

14  investment round.  So before FTT was ever listed on exchanges,

15  it was sold privately to some investors for the price of 10

16  cents.

17  BY MS. SASSOON:

18  Q.  And then it was eventually listed publicly?

19  A.  Yes, that's right.

20  Q.  And is that when it went to about a dollar?

21  A.  Yes.

22  Q.  Over time did the value of FTT change?

23  A.  Yeah.  It eventually went up to around $50.

24  Q.  And that would be $50 for one FTT token?

25  A.  Yes, that's right.

1   Q.  And the total value of FTT held by Alameda, how did that

2   change?

3   A.  It went up a lot with the price of FTT, so it was several

4   billion dollars at one point.

5   Q.  What, if anything, did the defendant say to you about the

6   benefit to Alameda from these FTT coins if it became worth much

7   more money?

8   A.  He said that, you know, after——shortly after they were

9   listed, he said that we should start putting them on our

10  balance sheet and that they would be able to get us more loans

11  from third-party lenders.

12  Q.  Over time what additional instructions, if any, did the

13  defendant give you about trading FTT?

14  A.  At various points he——he gave us a lot of instructions

15  about FTT; at various points he instructed us to buy if there

16  was a large amount of selling or if the price was going down

17  too much.

18  Q.  And do you recall any specific occasions when the defendant

19  told you to buy FTT when the price was going down?

20  A.  Yeah.  One that comes to mind is in 2021, when Binance was

21  selling some of their stake in FTT.

22  Q.  What did the defendant tell you to do?

23  A.  He said to start buying once the price had gone down a bit.

24  Q.  Was this something the defendant discussed openly in front

25  of you with other employees?

 1    A.  No.  He tended to be pretty careful about not discussing it

 2    too openly.

 3    Q.  What, if anything, did the defendant say to you about that?

 4    A.  He at one point got upset at me when I had discussed our

 5    FTT trading what he thought was too openly around several other

 6    employees and he said to keep our discussions of FTT trading,

 7    you know, between us or us and a few other people.

 8            MS. SASSOON:  Mr. Bianco, can you show the witness

 9    Government Exhibit 1622.

10    Q.  Do you recognize this?

11    A.  Yes, I do.

12    Q.  What is this?

13    A.  This is a Signal chat between me and Victor Xu, who was a

14    trader at Alameda at the time.

15            MS. SASSOON:  The government offers Government

16    Exhibit 1622.

17            MR. COHEN:  No objection, your Honor.

18            THE COURT:  Received.

19            (Government's Exhibit 1622 received in evidence)

20            MS. SASSOON:  Mr. Bianco, please publish this exhibit

21    for the jury.

22    BY MS. SASSOON:

23    Q.  So who is Victor Xu, who is on this chat?

24    A.  He was a trader at Alameda at the time.

25    Q.  What is the date on this chat?

```
 1  A.  It's July 16, 2021.

 2  Q.  And was this around the time of the Binance transaction?

 3  A.  Yes, it was.

 4  Q.  Can you read your messages to Victor Xu.

 5  A.  Yeah.  "So sorry if I was being cagey about the FTT convo.

 6  FTT price is definitely something SBF has got upset at me for

 7  talking about too publicly before so I was feeling stressed out

 8  about that/struggling how to respond.  Obvi important to get

 9  right tho, and I think we get fucked up by not taking it down

10  more earlier."

11  Q.  What were you referring to when you said you were being

12  cagey about the FTT convo?

13  A.  I was having a conversation with Victor where he was

14  expressing disagreement with our FTT trading strategy and he

15  said that we should be buying less, we should be waiting for it

16  to—the price to go down more before we bought, and I was

17  pushing back against him because Sam had said he wanted to buy

18  FTT at this price.

19  Q.  Did what Victor Xu said to you, that you shouldn't be

20  buying at the low price, make sense to you?

21  A.  Yeah, it did make sense.  I thought that what he was saying

22  would be a more profitable trading strategy.

23  Q.  So why were you pushing for a different trading strategy?

24  A.  Because Sam had said that he wanted to buy more, and I—I

25  understood that to be because he didn't want to spook the
```

1    market or didn't want to put any of our loans in danger by

2    having the price go down too much.

3    Q.   What was the effect of buying FTT when the price was going

4    down?

5    A.   The effect was that we made the price go back up and

6    prevented it from going down very much but that we lost some

7    money doing so.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Q.  You said FTT helped Alameda secure more third-party loans.
 2   What, if any, financial information did Alameda provide its
 3   lenders about Alameda?
 4   A.  We provided balance sheets to our lenders, traditionally
 5   quarterly.  We would also provide them more frequently if a lot
 6   of things were going on or if lenders were asking for more
 7   frequent updates.
 8   Q.  What is a balance sheet?
 9   A.  A balance sheet is a document that shows the company's
10   assets and liabilities, so it showed what were the things that
11   we owned, how much they were worth, and what were our debts.
12   Q.  And who would prepare the balance sheet?
13   A.  Various people did it at Alameda over time, but I was one
14   of the primary ones, and I was the one who did it throughout
15   2022.
16   Q.  What was the purpose of sending balance sheets to Alameda's
17   lenders?
18   A.  To provide them with information on Alameda so they could
19   assess how risky it was to lend to us.
20   Q.  Initially did you put Alameda's FTT holdings on Alameda's
21   balance sheet?
22   A.  Not initially.
23   Q.  Why not?
24   A.  Because it was a very large number because we owned a lot
25   of the supply of FTT, but I thought it was somewhat misleading
```

1   because we wouldn't have been able to sell all the FTT for that

2   much and it was much larger than the rest of the items on our

3   balance sheet at the time.

4   Q.  Let's break that down.  You said you thought it was

5   misleading to put the FTT on the balance sheet because you

6   couldn't sell it for that much.  When you say that much, what

7   numbers are you talking about?

8   A.  Like maybe it was mark to market worth around $200 million

9   at the time, so the price basically market price was around

10  $200 million.  But if Alameda had actually tried to sell the

11  FTT that we owned, it would have ended up kind of making us way

12  less than that.

13  Q.  Why did you believe it was the case that if Alameda

14  actually tried to sell its FTT the price would drop

15  significantly?

16  A.  Because I was trading FTT and watching the markets, and I

17  could see when people, like some of the seed round investors

18  started to sell their FTT after it listed publicly, and I could

19  see how much they were selling and see how much that moved the

20  price.

21  Q.  Who owned most of the FTT?

22  A.  It was Alameda.

23  Q.  You believe there was a market for the amount of FTT that

24  Alameda owned?

25  A.  Not at the time.

1          MR. COHEN:  Can we have a time frame, your Honor?

2          THE COURT:  Yes.

3          MS. SASSOON:  Sure.

4   Q.  2021.

5   A.  No.  I don't think there was a market for the amount of FTT

6   Alameda owned in 2021.

7   Q.  Did you ever come to believe that there was a market for

8   the entire holdings that Alameda had of FTT on its balance

9   sheet?

10  A.  No.  I would say it was always a lot more than what just

11  kind of the normal market trading could support.  If we wanted

12  to sell that amount, we would have had to find sort of a buyer

13  who was willing to do a large block trade or something like

14  that.

15  Q.  You said initially you didn't put FTT on the balance sheet

16  because you thought it would be misleading.  Did there come a

17  time when you did put FTT on Alameda's balance sheet?

18  A.  Yeah.

19  Q.  Why did you do that?

20  A.  Sam directed me to do so.

21  Q.  When the defendant directed you to put FTT on Alameda's

22  balance sheet, what, if anything, did he explain about that?

23  A.  He said he thought it would help us get more loans from

24  Genesis and from other lenders.

25  Q.  What was your response to that initially?

1   A.   I thought it was a little potentially misleading to put it

2   on, but he said that as long as we sort of put it on and broke

3   it out into its own category and made it clear that it was FTT

4   that he thought it was fine, and I agreed with that.

5   Q.   When you say you thought it was misleading, did you share

6   that thought with the defendant?

7   A.   Yeah.  I think I did initially.

8   Q.   Did you put FTT on the balance sheet?

9   A.   Yeah.

10  Q.   In these discussions with the defendant, did he dispute

11  that FTT was, in practice, worth less than the value on the

12  balance sheet?

13  A.   No, not that I recall.

14  Q.   And did putting FTT on the balance sheet help Alameda get

15  more loans?

16  A.   Yeah.

17  Q.   Were there other cryptocurrency coins that the defendant

18  created or helped promote?

19  A.   Yeah.  Some of the other major ones were Serum, MAPS, OXY,

20  and Solana, which he didn't create, but he played a large role

21  in promoting.

22  Q.   Did these coins, along with FTT, have a nickname?

23  A.   Yes.  They were sometimes referred to as Sam coins.

24  Q.   Why were they sometimes referred to as Sam coins?

25  A.   Because he either created them or played a large role in

1   them.

2   Q.  Did Alameda have holdings in these other Sam coins?

3   A.  Yes.  We had large holdings.

4   Q.  And were they ultimately put on Alameda's balance sheet?

5   A.  Yeah.

6   Q.  How would you describe the overall liquidity of these coins

7   as a group?

8   A.  Overall, it was not very high, so it varied between coins.

9   Like Solana was significantly more liquid than the other ones.

10  Q.  When we are seeing liquidity, can you just be clear what we

11  mean by that?

12  A.  Yeah.  So liquidity is a measure of how much market trading

13  activity there is in something and how easy it is to buy and

14  sell it without moving the price too much.  So for some of

15  these coins, like MAPS, if you tried to buy a little bit of

16  MAPS, the price would go up a lot, and, conversely, if you

17  tried to sell it, the price would go down a lot.

18  Q.  Who owned most of these Sam coins?

19  A.  It varies by coin, but Alameda was generally a large holder

20  for some coins.  Like Serum, Alameda had significant holdings,

21  but also Sam personally and other people at the company

22  personally held a lot.

23  Q.  What was the effect of that on the price of these coins?

24  A.  It meant that there wasn't a very large supply.  So if most

25  of it was held by Alameda or FTX or insiders, then there

1  weren't that many other people left to sell the coin,

2  basically.

3  Q.  If Alameda had these coins on its balance sheet, how does

4  that correspond to the amount of money Alameda could actually

5  get if it tried to sell blocks of these coins?

6  A.  If we actually tried to go out and sell all these coins in

7  the market, we would end up getting a lot less.

8  Q.  Did your title at Alameda ever change?

9  A.  Yeah.  In 2021, I was appointed co-CEO.  And in 2022, I

10  became CEO when my co-CEO stepped down.

11  Q.  Around when in 2021 were you promoted to co-CEO?

12  A.  I believe it was summer of 2021.

13  Q.  What did the defendant say to you about why he was

14  promoting you to co-CEO?

15  A.  He said that he had been wanting to step down as CEO

16  officially of Alameda for a while and that he thought it was

17  important to separate Alameda and FTX more optically and not

18  have him be too officially associated with Alameda.

19  Q.  When you say he wanted to separate FTX and Alameda

20  optically, what, if anything, did he explain about why that was

21  important?

22  A.  He said that it was a concern that a lot of FTX customers

23  had that Alameda and FTX's relationship was too close and,

24  therefore, that FTX might favor Alameda over other traders.

25  Q.  At the time you were named co-CEO, what was your personal

1  relationship status with the defendant?

2  A.  We were on a break at the time.

3  Q.  Did there come a time that you dated again?

4  A.  Yes, there did.

5  Q.  Over what time period?

6  A.  We started dating again in, I believe, November of 2021.

7  Q.  How would you describe the power dynamic of your personal

8  relationship with the defendant?

9          MR. COHEN:  Objection, your Honor.

10         THE COURT:  Sustained.  Form.

11 Q.  How would you describe the nature of your personal

12 relationship with the defendant?

13 A.  I would say the whole time that we were dating he was also

14 my boss at work, which created some awkward situations.  I

15 would say in our personal relationship there was a general

16 theme that I sort of wanted more from our relationship but

17 often felt like he was distant or not paying attention to me.

18 Q.  Why did you ultimately break up?

19 A.  Because of those things I mentioned, because I felt like he

20 wasn't paying much attention to me or spending much time with

21 me in the relationship.

22 Q.  Were you and the defendant open with other FTX and Alameda

23 employees about your personal relationship?

24 A.  Not really.  The first time that we dated, we agreed to

25 keep it secret, though some people did end up finding out.  The

1    second time that we dated, Sam agreed that we could make it

2    public, and we were living together, but it still wasn't

3    something that we really talked about openly with people much.

4    Q.  When you became co-CEO of Alameda, did your salary change?

5    A.  No.

6    Q.  What was your salary throughout your time at Alameda?

7    A.  $200,000 a year.

8    Q.  Did it remain that way?

9    A.  Yeah.

10   Q.  What about bonuses and other monetary benefits that you

11   received?

12   A.  Yeah.  I received bonuses twice a year.  They ranged from

13   in the range of $100,000 at the beginning, when I started

14   working there, to the largest one, which was for 2021, was

15   around $20 million.

16   Q.  What did you do with that money?

17   A.  I generally kept most of it on the FTX exchange.  I

18   withdrew about $10 million for a personal investment in a

19   startup.  I also withdrew a hundred thousand dollars for a loan

20   to my parents, and I withdrew several million dollars each for

21   taxes and for donations, including transfers to my personal

22   donor advised fund.

23   Q.  As a trader at Alameda and then co-CEO and then CEO, did

24   you ever get an equity stake in Alameda?

25   A.  No, I did not.

1  Q.  Did you ever ask for equity in Alameda?

2  A.  Yes.  I did ask Sam after I became co-CEO.  He initially

3  seemed somewhat receptive but eventually said that he thought

4  it was too complicated and it didn't make sense to give me

5  equity in Alameda.

6  Q.  Who retained ownership of Alameda throughout your time

7  there?

8  A.  It was Sam or at least mostly Sam.

9  Q.  How about FTX, did you get any equity in FTX?

10 A.  I did receive some equity in FTX as part of my bonuses.

11 Q.  About how much?

12 A.  I believe it was around .5 percent of FTX.

13 Q.  Let's talk a little bit more about when you became co-CEO

14 in the summer of 2021.  How did your job responsibilities

15 change?

16 A.  They didn't really change with the title change.  I would

17 say over time I started like -- both before and after the title

18 change I gradually took on more responsibility at Alameda.

19 Q.  Did you feel equipped to be CEO of Alameda?

20 A.  Not particularly.  I felt like it was a big job, and I

21 wasn't very experienced.  But Sam said that he thought it made

22 sense for me to be co-CEO and that there wasn't a better person

23 for the job.

24 Q.  Did you have an employment agreement as CEO?

25 A.  I did, yeah.

1   Q.   Under that employment agreement who did you report to, if

2   anyone?

3   A.   To Sam.

4   Q.   How would you describe the decision-making process once you

5   were co-CEO of Alameda?

6   A.   I handled a lot of day-to-day decisions and

7   responsibilities in Alameda.  But for any major decisions I

8   would always run them by Sam, and I would always ultimately

9   defer to Sam if he thought that we should do something.

10  Q.   Why were you running big decisions by Sam and deferring to

11  Sam?

12  A.   I mean, he was the person I officially reported to.  He

13  owned the company.  And he was the one who set my compensation

14  and had the ability to fire me if he wanted.

15  Q.   Did your job responsibilities in 2021 include preparing

16  Alameda balance sheets?

17  A.   Yeah, it did.

18  Q.   What about in 2022?

19  A.   Yeah.

20  Q.   Apart from the Sam coins that we have talked about, how

21  would you gather information for the balance sheet?

22  A.   There was a somewhat automated process involving a

23  spreadsheet that would pull data from Alameda's systems, but

24  then it would also require a lot of manual work by me to find a

25  mistake or mistakes or to look at discrepancies.

Q. In preparing Alameda's balance sheets what, if anything, did you learn about loans Alameda was making?

A. I learned that Alameda had loaned billions of dollars to Sam, Gary, Nishad, and to other entities that were owned by Sam.

Q. Did you know about all of these loans at the time that they were made?

A. Not necessarily. Some of them I hadn't recalled knowing about them at the time they were made and only learned about them after the fact.

Q. The ones you didn't know about, how did you learn about them?

A. Either by looking through transfers when I was preparing our balance sheets or by asking people if they were aware of any loans.

Q. Were there some loans that you signed?

A. Yeah.

Q. What was the rough total size of these loans to company insiders like the defendant, Nishad, and Gary?

A. Just the loans to them or including the other entities as well?

Q. Thanks for the clarification.

Including entities controlled by them.

A. I recall in mid 2022 it was around $5 billion.

Q. Did you receive similar loans from Alameda?

1   A.   I received one loan of $3.5 million.

2   Q.   What was that loan for?

3   A.   It was for a gambling company that some people at FTX

4   wanted to start, and they asked if they could start it in my

5   name since I wasn't affiliated with FTX.  So the money -- like

6   I never really saw or used the money.  It went straight to

7   this -- to seed this gambling company.

8   Q.   Were these billions of dollars in loans that you mentioned,

9   what did you learn about how this money was being spent?

10  A.   A lot of it was being spent on investments, including in

11  FTX and in other companies, a lot of early-stage companies.

12  Some was used for political donations.

13  Q.   You mentioned investments.  Can you describe a little bit

14  more what types of investments these loans were being used for?

15  A.   Yeah.  There was like a large investment in a Bitcoin

16  mining firm, another large one in an AI company, another in, I

17  believe it was like a venture fund.

18  Q.   Did you learn of any large loans to any company insiders

19  besides the defendant, Gary, and Nishad?

20  A.   Yeah.  I learned that Alameda had loaned, I think it was

21  around $35 million to Ryan Salame as well.

22  Q.   What, if anything, did the defendant say to you about Ryan

23  Salame as an employee?

24  A.   He said that he really valued Ryan for his loyalty.

25  Q.   What, if anything, did you learn about how the multimillion

1    dollar loans to Ryan Salame were being spent?

2    A.   They were being used for donations to republican

3    candidates.

4    Q.   What, if anything, did the defendant tell you about

5    spending money on politics?

6    A.   He said he thought it was very effective, that you could

7    get very high returns in terms of influence by spending

8    relatively small amounts of money.

9    Q.   When you say relatively small amounts of money, what are we

10   talking about here?

11   A.   I mean, he donated, I think, $10 million to Biden, and that

12   was sort of a relatively small amount of money compared to the

13   amount of money he ended up having later on, but he still felt

14   like that was something that got him some amount of influence

15   and recognition.

16   Q.   You have described these billions of dollars of loans that

17   Alameda was making.  What was your reaction to that?

18   A.   I was somewhat concerned because a lot of these loans

19   seemed to be going to very illiquid things, so that the loans

20   couldn't necessarily be paid back easily.

21   Q.   When you say they were going to illiquid things, can you

22   explain what you meant by that?

23   A.   What I mean is, they were being used to make investments in

24   things like early-stage companies that you couldn't easily sell

25   your stake in if you needed to repay the loans.

1    Q.  Why, if you're investing in an early-stage company, is it

2    difficult to sell that investment?

3    A.  Because it's not a company that's listed on say the New

4    York Stock Exchange or the NASDAQ.  In order to sell your

5    stake, you would need to go out and find a person who is

6    willing to buy it, and that might be hard, depending on the

7    market conditions or depending on who you know.

8    Q.  You mentioned that you learned about some of these loans

9    while working on Alameda balance sheets.  How did you feel

10   about including these loans on Alameda's balance sheet?

11   A.  I didn't feel good about it.  I thought it was something

12   that might raise concerns for Alameda's lenders.

13   Q.  Why do you think that those loans to insiders might raise

14   concerns with lenders?

15   A.  For one thing, because I didn't think that they would --

16   Alameda would easily be able to get the loans back if we needed

17   to, and for another thing, I thought it might look like Alameda

18   was sort of funneling or giving money to the FTX executives.

19   Q.  In your view, how did these loans to FTX executives affect

20   the health of Alameda's balance sheet?

21   A.  They made Alameda significantly riskier.

22   Q.  You testified that, by late 2021, Alameda had increased its

23   borrowing -- by late 2021, how would you describe the state of

24   Alameda's borrowing from third parties?

25   A.  By late '21, we were borrowing a lot.  I think it was in

1    the ballpark of 10 to $15 billion from third parties.

2    Q.  Was that billion with a B?

3    A.  Yeah.

4    Q.  What kinds of loans did Alameda get from these third-party

5    lenders?

6    A.  They were either in -- U.S. dollars, in stablecoins,

7    Bitcoin, or ETH were the most common currencies.

8    Q.  How would you describe the terms of these loans?

9    A.  They were mostly open-term loans, meaning that the lender

10   could ask for it to be repaid at any time, and Alameda would

11   have to repay it.

12   Q.  How would you describe the riskiness of an open-term loan?

13   A.  I would say it's more risky than a fixed-term loan because

14   of the risk that the loan could be called at any time, and then

15   you would have to repay it even if you don't necessarily have

16   the funds available.

17   Q.  Just to be clear, when you say the loan could be called at

18   any time, what does that mean?

19   A.  When a loan is called, that means the lender asks for their

20   money back.

21   Q.  So what kind of risk did that present to Alameda?

22   A.  It put us in a situation where if all of our loans were

23   called at once but we didn't have the funds available, we might

24   have to default on our loans or go bankrupt.

25   Q.  Who was driving the strategy in late 2021 when it came to

 1  how much Alameda --

 2           MR. COHEN:  Objection to form.

 3           THE COURT:  Sustained.

 4  Q.  Who if anyone, as far as you know, was directing Alameda's

 5  strategy with respect to borrowing in late 2021?

 6  A.  Sam was directing us at the time to borrow as much money as

 7  we could from whatever sources we could find at whatever terms

 8  we could get.  This was something he emphasized a lot and

 9  talked to us about frequently.

10  Q.  In these frequent conversations with the defendant about

11  borrowing money, what, if anything, did he say about the

12  purpose of trying to borrow more and more money?

13  A.  Aside from just the general benefits of having money on

14  hand if we needed it, he also said that he wanted to make a lot

15  of investments, potentially in the billions of dollars of

16  venture investments, so investments in like relatively

17  early-stage companies.

18  Q.  What was your view of this strategy being proposed by the

19  defendant of borrowing more and more money for investments?

20  A.  I thought it was risky to borrow money through these

21  open-term loans when it might get called at any time if we were

22  going to put the money in these investments that couldn't be

23  sold easily.

24  Q.  Just to be clear, what connection did you see between

25  having open-term loans and these illiquid long-term

1    investments?

2    A.   I saw that as creating a risk.  Because if the loans were

3    called, we wouldn't necessarily be able to sell the investments

4    to repay our loans.

5    Q.   During your time working with the defendant, how, if at

6    all, did he describe his approach to risk taking?

7    A.   He described himself as truly risk neutral, meaning that --

8    most people are risk averse, meaning that they would rather not

9    take a risk if they don't have to, or they try to avoid risks.

10   But he said that he was totally comfortable taking a risk, as

11   long as he thought it was a positive EV.

12   Q.   What do you mean by positive EV?

13   A.   EV stands for expected value, so that was a term that we

14   used a lot when talking about trading.  So, yeah.  Positive EV

15   just means that sort of, on average, you expect it to pay off

16   well even if maybe there are lots of cases where you will end

17   up with zero or you'll end up losing lots of money, because

18   there are like some cases where you make a lot of money.

19   Q.   Did the defendant ever give any example to describe his

20   approach to risk taking?

21   A.   Yeah.  He talked about being willing to take large coin

22   flips, like a coin flip where -- if it comes up tails, you

23   might lose $10 million, but if it comes up heads, you make

24   slightly more than $10 million.

25   Q.   Did he ever give other coin-flip examples?

1    A.   Yeah.  I guess he also talked about this in the context of

2    thinking about what was good for the world, saying that he

3    would be happy to flip a coin, if it came up tails and the

4    world was destroyed, as long as if it came up heads the world

5    would be like more than twice as good.

6              MS. SASSOON:  Your Honor, this would be a natural

7    point for a break, if we are going to take an actual break.

8              THE COURT:  We are.

9              Fifteen minutes.

10             (Jury not present)

11             (Recess)

12             THE COURT:  Let's get the witness, please.

13             (Jury present)

14             THE COURT:  The defendants and the jurors are present,

15   as they have been all throughout.

16             Please be seated.

17             Ms. Sassoon, when the jury is all seated.

18             MS. SASSOON:  Thank you, your Honor.

19   Q.   Before the break we were talking about expected value.  As

20   part of your job, did you analyze scenarios and their expected

21   value?

22   A.   Yeah, I did.

23   Q.   Can you explain again what you mean by expected value.

24   A.   Expected value is the average amount you expect to make or

25   lose in a scenario, taking into account the different potential

```
 1   outcomes and their probabilities.
 2           MS. SASSOON:  Mr. Bianco, can you please show the
 3   witness Government Exhibit 48B.
 4   Q.  Do you recognize this?
 5   A.  Yeah.
 6   Q.  Are these notes you took in the course of your time at
 7   Alameda?
 8   A.  Yeah.  This is an excerpt from a sort of personal to-do
 9   list Google Doc that I kept.
10           MS. SASSOON:  The government offers Government Exhibit
11   48B.
12           MR. COHEN:  No objection.
13           THE COURT:  Received.
14           (Government Exhibit 48B received in evidence)
15           MS. SASSOON:  Mr. Bianco, can you publish Government
16   Exhibit 48B.
17   Q.  Did you write parts of this page?
18   A.  Yes, I did.
19   Q.  Is this page part of a larger document?
20   A.  Yes.
21   Q.  What was that document?
22   A.  It was a Google Doc that I kept with personal to-do lists
23   and other notes.
24   Q.  Was that a common practice of yours?
25   A.  Yes, it was.
```

1    Q.  Can you just generally describe how you would keep these

2    Google Docs or lists?

3    A.  It was in a very disorganized way.  I would sort of add

4    notes to whatever part of the doc I was currently looking at

5    rather than chronologically.

6    Q.  All the things on this page, check on Indodax, better email

7    system, did they all relate to each other?

8    A.  No.

9    Q.  Are these notes you took at different times?

10   A.  Potentially, yeah.

11   Q.  I want to direct your attention to the part that's

12   highlighted in gray here.

13            Who wrote this?

14   A.  That was written by Sam.

15   Q.  How did it end up on your Google Doc?

16   A.  I copied and pasted that from a message that he sent me

17   asking me to analyze this scenario.

18            (Continued on next page)

19

20

21

22

23

24

25

BY MS. SASSOON:

1  
2  Q.  And do you recall roughly when it was that you copied and  
3  pasted this list that the defendant wrote into your Google Doc?  
4  A.  Yeah, I think it was like summer or fall of 2021.  
5  Q.  And so what is this, before we take a closer look at each  
6  line?  
7  A.  This is a potential bad scenario for FTX and Alameda.  
8  Q.  What kind of bad scenario, in broad strokes?  
9  A.  Scenario where the crypto market is down and a lot of our  
10 investments are down a lot and we've sort of lost a lot of  
11 money.  
12 Q.  And what did the defendant say to you in connection with  
13 sending you this bad scenario?  
14 A.  He referred to it as a 10th percentile scenario, meaning  
15 that he thought 10 percent of outcomes were similar to this or  
16 worse.  
17 Q.  And why did he send this to you?  What did he say about  
18 that?  
19 A.  He said he wanted to analyze what would happen to our  
20 balance sheet in this scenario.  
21 Q.  Let's take a closer look at this bad scenario that the  
22 defendant sent you.  
23      Item No. 1 says "Most of crypto down 50 percent."  
24 What does that refer to?  
25 A.  That means like the overall crypto market, like Bitcoin and

1   Ethereum, are down 50 percent.

2   Q.  Why would that be bad for Alameda?

3   A.  Because Alameda had long positions in crypto.

4   Q.  And when you say long positions, what does that mean in

5   simple terms?

6   A.  That means we owned a lot of cryptocurrency.

7   Q.  The next item on this list is 2, "Our venture investments

8   down 100 percent."  What is that referring to?

9   A.  So that's referring to investments that we made in

10  early-stage companies or projects, and it's saying that those

11  had gone down a hundred percent, meaning that they're worth

12  zero.

13          MR. COHEN:  I apologize.  Did we have a date for when

14  this document was created?

15          MS. SASSOON:  Yes, I believe——

16          THE COURT:  We did.

17          MR. COHEN:  Thank you.

18          THE COURT:  Summer or fall of 2021.

19          MR. COHEN:  Thank you, your Honor.

20          MS. SASSOON:  2021, yeah.

21  BY MS. SASSOON:

22  Q.  How could it be that your venture investments would go down

23  a hundred percent to zero?

24  A.  A lot of these investments were quite speculative, so if

25  the company that we invested in went under or didn't work out

1    for some reason, then it could end up being worth zero.

2    Q.  And is that something that you discussed with the defendant

3    could happen, that your investments would go down to zero?

4    A.  Yeah.

5    Q.  The next item says, "FTT, SOL, Serum down 75 percent."  So

6    first, just remind us, FTT, SOL, Serum, what are those?

7    A.  FTT was the exchange token of FTX created by Sam; Serum was

8    the exchange token of a DFI exchange that was also created by

9    Alameda, and then Solana was the——a token that wasn't created

10   by us but that Alameda owned a lot of and that Sam promoted.

11   Q.  So are these all Sam coins that were on Alameda's balance

12   sheet?

13   A.  Yeah.

14   Q.  And these Sam coins going down 75 percent, what does that

15   refer to?

16   A.  That means that their price is down 75 percent so they're

17   only worth one quarter of what they used to be.

18   Q.  And is that something you discussed with the defendant

19   could happen?

20   A.  Yeah.

21   Q.  And how could these coins lose so much value, going down

22   75 percent?

23   A.  I mean, they were very volatile, meaning that they moved up

24   and down a lot, and for coins like FTT, you know, initially it

25   was worth 10 cents and then it was a dollar and then it was

1    $50; it seemed totally plausible it could go back down to

2    something like $10.

3    Q.  No. 4, "Stocks down 25 percent, growth tech stocks down

4    50 percent," what's that referring to?

5    A.  That refers to like equities.

6    Q.  The traditional stock?

7    A.  Traditional stock, not cryptocurrency.

8    Q.  The fifth item says "Genesis, etc., tighten up on their

9    requirements from us, potentially restricting use of FTT, etc.

10   as collateral somehow.  I don't know how exactly."  What is

11   this referring to?

12   A.  So at the time we were borrowing billions of dollars from

13   Genesis, using FTT as collateral for these loans, so if they

14   had some kind of restriction on the amount of FTT they were

15   willing to accept as collateral, then we would no longer be

16   able to borrow so much money from them.

17   Q.  What, if anything, did you discuss regarding restricting

18   using FTT as collateral?

19   A.  I don't recall if we discussed this explicitly, but, I

20   mean, it made sense to me that if FTT was down a lot, they

21   might be less willing to accept it as collateral.

22   Q.  So I want to go to item No. 8, which says, "We can't easily

23   raise funds by equity because of bad FTX news.  Maybe

24   regulatory."  Around this time what was FTX's rough equity

25   value?

1   A.   I think it was in the ballpark of $20 billion.

2   Q.   And what does that refer to, the equity value of FTX?

3   A.   That means that when FTX was selling stock, the stock was

4   priced such that the value of all of the stock of FTX was worth

5   $20 billion.

6   Q.   So this was what investors in FTX had valued the company

7   at?

8   A.   Yes, that's right.

9   Q.   And what does this scenario that the defendant sent to you

10  suggest about what might happen to FTX equity in a bad market

11  scenario?

12  A.   It suggests that FTX might not be able to sell any more

13  equity so that it might be, you know, almost effectively

14  worthless.

15  Q.   At the bottom here it says "10th percentile scenario."

16  What is that?

17  A.   That means that he expected something this bad or worse to

18  happen about 10 percent of the time.

19  Q.   And you said "he."  So who wrote "10th percentile

20  scenario"?

21  A.   That was Sam.

22  Q.   So the defendant had quantified these eight things

23  happening as a probability of 10 percent?

24            MR. COHEN:   Objection.

25            THE COURT:   Overruled.

1    A.  Yeah.

2    Q.  A 10th percentile scenario, did you take that seriously as

3    a potential risk to Alameda?

4    A.  Yeah, definitely.  10 percent is something that could

5    plausibly happen in trading.  10th percentile scenarios happen

6    every day.

7    Q.  And in what context was the defendant asking you to analyze

8    the effect on Alameda in this 10th percentile scenario?

9    A.  He said that he was thinking of making $3 billion more of

10   venture investments and wanted to know how that would affect

11   Alameda's finances in this type of scenario.

12            MS. SASSOON:  We can take this down.

13   Q.  What other steps, if any, did you take to analyze the risks

14   of making several billion dollars more in investments in late

15   2021?

16   A.  I made a spreadsheet to analyze the risks.

17   Q.  And what does the analysis in your spreadsheet show?

18   A.  It showed that at a high level, making $3 billion more of

19   venture investments and funding that with open-term loans would

20   put Alameda in a significantly riskier position and make it

21   much less likely or almost impossible that we would be able to

22   pay off our loans if all of our loans were called at once.

23   Q.  And in the scenario where Alameda might not be able to pay

24   off its loans, what were the implications of that to FTX, if

25   any?

1    A.   Yeah, that would also be a bad scenario for FTX because

2    Alameda had this line of credit on FTX, it was borrowing some

3    funds from FTX, so FTX might lose money in this scenario; it

4    would also just be a bad sort of public relations event for

5    FTX; it might shake confidence in FTX.

6    Q.   And just to be clear, why were you conducting this

7    analysis?  Who told you to do it?

8    A.   Sam did.

9    Q.   Did you share your conclusions with the defendant?

10   A.   Yeah, I showed him the spreadsheet and we talked about it.

11   Q.   And what was his overall reaction to the conclusions you

12   just described?

13   A.   He suggested that I should try to move some of our loans to

14   fixed term but that overall he still wanted to go ahead with

15   the venture investments.

16   Q.   When you say move your loans to fixed term, what do you

17   mean by that?

18   A.   What I mean was that our loans at the time were mostly open

19   term, meaning that lenders could call them at any time.  He

20   wanted us to change them to fixed term, meaning that, you know,

21   we didn't have to pay them back for at least three months or

22   six months, something like that.

23   Q.   But apart from that, what did he say about an additional

24   $3 billion of investments?

25   A.   He said that he wanted to do it.  He thought it was high

1    expected value.

2    Q.  Did the defendant dispute the risks that you just outlined?

3    A.  No, not that I recall.

4    Q.  In assessing the risks of taking on more loans, or making

5    billions of dollars more in investments, what did you and the

6    defendant discuss, if anything, about how Alameda would repay

7    its third-party loans if Alameda's lenders asked for their

8    money back?

9    A.  We used the assumption that Alameda would take FTX customer

10   funds, if they were available, to repay our loans.

11              MR. COHEN:  Move to strike.

12              THE COURT:  Is this something that he said to you?

13              THE WITNESS:  I don't recall if he said it to me.  It

14   was the assumption that was—that I used in the spreadsheet,

15   and then we both discussed the analysis in the spreadsheet.

16              THE COURT:  Answer stricken.  The jury will disregard

17   it.

18   BY MS. SASSOON:

19   Q.  In the analysis that you conducted of the risks associated

20   with additional investments, what did you assume for purposes

21   of your analysis about how Alameda would repay its lenders?

22   A.  I assumed that we would use FTX customer funds, if they

23   were available and if we were out of other money to repay our

24   lenders with.

25   Q.  And was that assumption laid out in your spreadsheet

1    analysis?

2    A.   Yeah.

3    Q.   And is that the spreadsheet you said you reviewed with the

4    defendant?

5    A.   Yes.

6    Q.   And after which reviewing he said he wanted to make

7    additional investments.

8    A.   That's right.

9    Q.   Why did you view FTX customer funds as something Alameda

10   could use to repay its loans?

11   A.   Because it was something we had used in the past for, you

12   know, various small cases, for larger cases, such as the

13   Binance buyback, and it was the only available large source of

14   capital I could think of if all of the rest of our loans were

15   being called.

16            MS. SASSOON:   At this time the government offers

17   Government Exhibit 2003, which is a stipulation between the

18   parties, as well as Government Exhibit 36, which the parties

19   have stipulated is a document called NAV Minus Sam Coins dated

20   September 27, 2021.

21            MR. COHEN:   No objection, your Honor.

22            THE COURT:   Yes.   I appreciate that.

23            They're received.

24            (Government's Exhibits 2003 and 36 received in

25   evidence)

```
 1              THE COURT:  But am I looking at Government Exhibit 36?

 2              MS. SASSOON:  Mr. Bianco, can you please pull that up

 3     for the judge and the witness.

 4              THE COURT:  Well, I'm looking at something but it

 5     isn't marked.

 6              MS. SASSOON:  It's in Excel and so it doesn't have an

 7     exhibit sticker on it.

 8              THE COURT:  We've got to fix that problem.

 9              MS. SASSOON:  Understood.

10              THE COURT:  We can't send this computer screen where

11     it may have to go some day.

12              MS. SASSOON:  Understood, your Honor.

13              THE COURT:  All right.  And we'll get that fixed

14     today, please.

15              MS. SASSOON:  Yes.

16              THE COURT:  2003 and 36 are both received.

17              MS. SASSOON:  Thank you.

18              Mr. Bianco, can you please publish Government

19     Exhibit 36, NAV Minus Sam Coins, for the jury.

20     BY MS. SASSOON:

21     Q.  Ms. Ellison, do you recognize this?

22     A.  Yes, I do.

23     Q.  And what is this?

24     A.  This is a spreadsheet that I made in the fall of 2021

25     because Sam asked me to make it.
```

1   Q.   And is this the first tab of that spreadsheet?

2   A.   Yes, that's right.

3   Q.   And what——there are a lot of numbers here, but at a high

4   level, what were you analyzing here?

5   A.   I was analyzing Alameda's NAV, or net asset value, meaning

6   our assets minus our liabilities, and then I was subtracting

7   the value of the Sam coins we owned, so coins like FTT, SOL,

8   and Serum.

9   Q.   If you were calculating Alameda's assets and liabilities,

10  why would you exclude Sam coins, which were one of Alameda's

11  assets?

12  A.   I mean, we didn't exclude them in all of our analyses, but

13  Sam physically asked me to exclude them in this one.  I don't

14  recall if he specified why.

15  Q.   What was your understanding of why?

16  A.   I thought it was because those coins weren't very liquid,

17  and so if we were talking about making large investments, he

18  wanted to know what liquid assets we had available.

19  Q.   And what was the rough value of Alameda's Sam coins on

20  paper in late 2021?

21  A.   It was maybe in the ballpark of $10 billion.

22  Q.   And you kept that off the spreadsheet.

23  A.   That's right.

24  Q.   Why didn't you consider that $10 billion——

25              THE COURT:  Excuse me.  Let me just clarify.  When you

1    say "on paper," valued how?

2              THE WITNESS:  The values that we would put on our

3    balance sheet, which were using the current market prices for

4    those coins.

5              THE COURT:  Mark to market.

6              THE WITNESS:  Mark to market, that's right.

7              THE COURT:  Thank you.

8    BY MS. SASSOON:

9    Q.  And why, in assessing whether Alameda should make

10   additional venture investments, would you exclude $10 billion

11   of assets?

12   A.  Because they weren't assets that we could sell very easily

13   and they were assets that might go down a lot if the market

14   went down.

15   Q.  And in connection with creating the spreadsheet, what, if

16   anything, did you discuss with the defendant about the

17   relevance of FTT and other Sam coins to Alameda's actual

18   financial health?

19   A.  He asked if I could create the spreadsheet so that he could

20   analyze whether it made sense to make more venture investments,

21   and he asked me to exclude coins like FTT.  I don't recall

22   anything else specific.

23   Q.  The spreadsheet at the top refers to Q1, Q2, July to

24   August, September.  What year is this referring to?

25   A.  This is from 2021.

1  Q.  And where on this spreadsheet does it reflect your

2  conclusion about what Alameda's net asset value was without Sam

3  coins?

4  A.  As in cell E18.

5  Q.  So cell E18 says negative 2700.  What does that number

6  represent?

7  A.  Yeah, this is in millions.  So that was saying I believed

8  our current net asset value minus Sam coins to be about

9  negative 2.7 billion.

10  Q.  There's another column here, H, that says December to

11  February.  Do you recall what that column is about?

12  A.  Yeah.  I recall adding that column at a later date after I

13  initially made the spreadsheet.

14  Q.  So when you analyzed Alameda's balances and saw that it had

15  a net asset value of negative 2.7 billion if you excluded Sam

16  coins, how did that affect your view of making more illiquid

17  investments?

18  A.  I thought it made it riskier.

19  Q.  Why?

20  A.  Because if we used things like US dollars to make these

21  further venture investments, then our liquid assets would go

22  down even further.

23  Q.  And what would be the implications of your liquid assets

24  going down even further?

25  A.  It would mean that we would lose even more money in a

1  market crash and we would be unable to repay our loans if all

2  of our loans were called.

3  Q.  Did you share this analysis with the defendant?

4  A.  Yes, I did.

5  Q.  What was his view after reviewing this tab of the

6  spreadsheet?

7  A.  He said he still thought it was a good idea to make the

8  investments.

9  Q.  The next tab of this spreadsheet is called Questions.  And

10  before we take a closer look, when you wrote Questions, what

11  does that refer to with respect to this tab?

12  A.  That refers to questions I had for Sam about this

13  investment strategy.

14  Q.  And why did you do further analysis after you created the

15  first tab of this spreadsheet that we just looked at?

16  A.  Because I wanted to consider other options besides the

17  options that——the option that Sam was suggesting and see if

18  there are ways to reduce the risk of these investments.

19  Q.  Did you share your analysis on this tab with the defendant?

20  A.  Yeah.

21  Q.  Did you discuss it with him?

22  A.  Yeah.

23  Q.  So let's take a closer look here.  And before we do, for

24  the analysis that you did here about the risks of additional

25  investments, did you account for FTX customer funds in that

1   analysis?

2   A.  Yes, I did.

3   Q.  And at a general level how did you include that in your

4   analysis?

5   A.  I included the amount of funds that customers currently had

6   deposited on FTX, and I assumed that in the events that our

7   loans got called that we could use those funds to repay our

8   loans.

9   Q.  So let's take a closer look, piece by piece.

10        MS. SASSOON:  Mr. Bianco, if you could expand columns

11  F and G from rows 2 to 7 of the "questions" tab.

12  Q.  So this says, "Main Question:  Should we (1) raise more

13  equity, (2) invest less in ventures, (3) sell more FTT, (4) get

14  shorter overall, (5) other stuff?"  Who are you posing these

15  questions to?

16  A.  To Sam.

17  Q.  And what is the meaning of this list of questions?

18  A.  These were all ways that we could reduce our risk.

19  Q.  And are these alternatives to taking out more loans for

20  investments?

21  A.  Yeah.

22  Q.  Does the remainder of the spreadsheet analyze these

23  questions?

24  A.  Yes, it does.

25  Q.  So let's look at the first question, which is "raise more

1   equity."

2            MS. SASSOON:  Mr. Bianco, can you expand columns A

3   through C from rows 1 to 7.

4   Q.  So this says, "What is the negative EV of raising equity?"

5   Can you explain what that question means.

6   A.  So Sam said that he didn't want to sell more equity in FTX

7   at the time because he believed that if we waited, we could

8   sell equity later at a higher valuation.  So this was trying to

9   quantify, you know, how much more we would make if we waited to

10  sell FTX equity.

11  Q.  And what was the conclusion, in your analysis of this

12  question?

13  A.  Based on the——Sam——what Sam told me, I estimated it at a

14  cost of $1 billion.

15  Q.  Meaning if you raise money now instead of later, you'd be

16  giving up a billion dollars?

17  A.  That's right.

18  Q.  And so let's zoom out and look at your second question.

19            MS. SASSOON:  Mr. Bianco, this would be columns A

20  through D, rows 9 through 13.

21  Q.  And this asked the question, "What is the positive EV of

22  venture investments?"  So what are you analyzing here?

23  A.  That's the positive, what is the expected value from making

24  venture investments, like how much do we think these

25  investments are worth.

1    Q.   Is the analysis you did here complete?

2    A.   No.

3    Q.   Why not?

4    A.   I didn't know very much about our venture investments, so I

5    got a few numbers from Sam but didn't feel like I had a full

6    picture of them.

7    Q.   And so these numbers—600, 300—what's that meant to

8    represent?

9    A.   That's how much I think he thought these investments would

10   be worth, so 600 million and 300 million.

11   Q.   And are these some of the investments the defendant wanted

12   to make with the 3 billion additional dollars?

13   A.   That's right.

14   Q.   Let's zoom out.  The third question on your list to the

15   defendant is "Sell more FTT."  Did you analyze whether that

16   could be a source of additional capital for Alameda?

17   A.   Yeah, I did.

18            MS. SASSOON:  So Mr. Bianco, if you could now bring up

19   columns A through C, rows 111 through 114.

20            This says, "What are the effects of selling FTT?  Sell

21   1B," and there's an arrow, "negative 50 percent."  Is that

22   3 billion less of Genesis borrows?

23   A.   Yes, that's right.  So this is saying that I thought that

24   if we sold a billion dollars of FTT, it would go down something

25   like 50 percent and then we would have $3 billion less of loans

1    from Genesis because the value of our FTT collateral would go

2    down.

3    Q.   Just to break that down, why did you think FTT would go

4    down in value by 50 percent if you sold a billion dollars'

5    worth of FTT?

6    A.   Because there weren't that many buyers outside of Alameda

7    and it wasn't a coin that had a ton of trading.

8    Q.   And if you sold that amount of FTT and the value went down,

9    why would that result in less borrowing from Genesis?

10   A.   Because our borrows from Genesis at the time were mostly

11   collateralized with FTT and so we had to maintain a certain

12   value of collateral compared to the value of our loans, so if

13   our collateral went down, we would have fewer loans.

14           MS. SASSOON:  Mr. Bianco, let's zoom out again, and if

15   we could zoom in on the question in row 18.

16   Q.   This says, "What is the negative EV from downside risks of

17   funding with loan?"  Does this go back to kind of the core

18   original question in your analysis?

19   A.   Yeah.  This is asking how much risk are we taking on by

20   funding these venture investments with these open-term loans.

21   Q.   And at a high level, what did you conclude were the risks

22   of funding billions more of investments with loans?

23   A.   I concluded that it would significantly increase the risk

24   that we would be unable to meet loan recalls.

25           MS. SASSOON:  Mr. Bianco, let's take a look at some of

1   this analysis, and if you could expand rows 18 through 29,

2   columns A through E.

3   Q.  So this list, "Current Liquid Assets and Loans," whose

4   liquid assets and loans is this listing?

5   A.  Alameda's.

6   Q.  And what is meant by current?

7   A.  That meant in the current scenario, without assuming any

8   market moves or without assuming any further investments.

9   Q.  And why are you calculating Alameda's liquid assets and

10  loans?

11  A.  Because I wanted to calculate our financial health in a

12  baseline scenario.

13  Q.  And where it says Liquid Assets, what's a liquid asset?

14  A.  That means an asset that can easily be sold for something

15  else that has a lot of active trading in it.

16  Q.  And according to this spreadsheet, what were Alameda's

17  liquid assets at this time?

18  A.  At the time it was $8 billion.

19  Q.  And what was the rough size of Alameda's loans at that

20  point?

21  A.  $9.4 billion.

22  Q.  And when we're talking about loans here, are these loans

23  from third parties?

24  A.  Yes, that's right.

25  Q.  And is that broken down beneath it?

1    A.  Yeah, that's broken down into Genesis, Bitcoin, Genesis US

2    dollars, and other sources.

3    Q.  I want to direct your attention to row 27, where it says

4    "FTX borrows," followed by "USD 3" and "crypto 4."  Where you

5    wrote "FTX borrows," what does that refer to?

6    A.  That referred to the amount of FTX customer deposits that

7    were currently on the exchange and that were available for

8    Alameda to borrow.

9    Q.  And just to be clear, the numbers 3 and 4, what do those

10   signify?

11   A.  That means there was 3 billion——about $3 billion of USD and

12   about $4 billion of crypto.

13   Q.  So by what means were you assuming that Alameda would make

14   use of this $7 billion of FTX customer funds?

15   A.  I was assuming that we could use our line of credit to

16   borrow some of these funds if we needed to.

17   Q.  How, if at all, did these numbers account for the customer

18   money Alameda was already using that came in the form of

19   customer fiat or dollar deposits?

20           MR. COHEN:  Objection.

21           THE COURT:  Overruled.

22   A.  I don't recall exactly how they accounted for that, like

23   whether that's included in the current totals or not.

24   Q.  Why did you assume that Alameda would use FTX customer

25   money through its line of credit to repay loans?

```
1    A.  Because we had used FTX—our FTX line of credit for other
2    large funding needs in the past, large and small funding needs;
3    and from, you know, the founding of FTX, Sam had talked about
4    FTX being a good source of capital for Alameda.
5    Q.  You testified that you shared your analysis with the
6    defendant.  Did the defendant at any time question this
7    assumption in your spreadsheet?
8            MR. COHEN:  Objection.
9            THE COURT:  What's the objection?
10           MR. COHEN:  Builds a conclusion into the question.
11   It's leading.
12           THE COURT:  Overruled.
13   A.  No.  He never questioned it.
14           MS. SASSOON:  So Mr. Bianco, can you please display
15   this same tab, lines 50 through 65.
16   Q.  At the top here it says, "How does this change with another
17   3B—" is that billion?
18   A.  Yeah.
19   Q.  "How does this change with another 3 billion of venture
20   investments?"  What question are you posing here?
21   A.  I'm looking at how our balances change if Sam makes the
22   $3 billion of venture investments that he was talking about
23   making.
24           MS. SASSOON:  So Mr. Bianco, if you could display this
25   alongside the original calculation of Alameda's current assets.
```

1   Q.  So on the left-hand side here we have Alameda's current

2   liquid assets and loans, on the right-hand side——

3          MS. SASSOON:  Mr. Bianco, can you please go back to

4   them side by side.

5   Q.  So on the right-hand side here we have the scenario of

6   $3 billion of additional venture investments.  How are the

7   numbers different in that scenario?

8   A.  The only difference is that our liquid assets go down by

9   $3 billion.

10         MS. SASSOON:  Mr. Bianco, if you could highlight row

11  21 and 53.

12  Q.  And so what effect would an additional $3 billion of

13  investments have on Alameda's overall ability to repay

14  $9.4 billion in loans, if necessary?

15  A.  It would make it significantly more difficult.

16  Q.  And why is that?

17  A.  Because the——the available assets that we had to repay the

18  loans would go down from 8 billion to 5 billion.

19  Q.  So let's take a look at another part of this spreadsheet.

20         MS. SASSOON:  And I know it's long, but Mr. Bianco, if

21  you could now display columns A through C, row 30 to 32.

22  Q.  And so here you wrote, "Very bad FTX news, market down

23  20 percent, FTT, Serum down 50 percent, we buy 300 million FTT,

24  100 million Serum, 2 billion in Deltas."  What are you

25  analyzing here?

1   A.  So that's a scenario that Sam suggested if there was very

2   bad news about FTX, maybe the market would be down around

3   20 percent, FTT and Serum would be down 50 percent, and we'd

4   buy some of all these coins as they went down.

5   Q.  So we looked at another document a little bit ago with the

6   10th percentile scenario.  How does what you wrote here compare

7   to that 10th percentile scenario the defendant sent you?

8   A.  This is similar, though a bit less bad.

9   Q.  And why in this scenario are you assuming that you would be

10  buying large quantities of FTT and Serum?

11  A.  Because as market makers, our models were generally set up

12  to buy FTT and Serum as they went down.

13  Q.  And why?

14  A.  Because we wanted to support them, provide liquidity.

15  Q.  When you say support them, do you mean keep the price up?

16  A.  Yeah, that was one of the reasons.

17  Q.  Did you compare in the spreadsheet what would happen to

18  Alameda's risk profile in this bad scenario if Alameda invested

19  another $3 billion?

20  A.  Yeah, I did.

21          MS. SASSOON:  Mr. Bianco, can you please display two

22  parts of the spreadsheet, columns A through D, row 30 to 45 and

23  row 62 to 77.

24  Q.  What is being compared here, Ms. Ellison?

25  A.  So this is our assets and liabilities, assuming this bad

1    market scenario, both in the case where we made no further

2    investments and the case where we made this $3 billion of

3    investments.

4    Q.   So that the scenario of an additional $3 billion of

5    investments, is that on the right-hand side?

6    A.   That's right.

7    Q.   Let's look at the left-hand side first, which is the

8    current scenario.

9         If Alameda maintained its current assets, what did you

10   estimate would be Alameda's liquid assets in the event of a

11   market downturn?

12   A.   It would go down to $4.8 billion.

13   Q.   And how would that compare to Alameda's loans?

14   A.   Its loans would be $8 billion.

15   Q.   I believe we looked before and Alameda had loans of

16   9.4 billion.  Why has it gone down to 8 billion here?

17   A.   Because some of our loans were in cryptocurrency, so the

18   value of those loans would go down if the market went down.

19   Q.   Likewise here, if you look at FTX borrows in row 40 and 41,

20   the amount of USD and crypto that you wrote were available is

21   1.5 billion and 1.5 billion.  Why have those numbers gone down?

22   A.   I was assuming that in a bad market scenario that customers

23   would withdraw some money from FTX.

24   Q.   And what would that mean about what was available for

25   Alameda?

1    A.   It would mean there was less available for Alameda to

2    borrow.

3    Q.   Looking beneath that, where it says "Assets, 7.8 billion,"

4    what is that referring to?

5    A.   So that's our liquid assets plus the FTX borrows.  That's

6    the total liquid assets that we would have access to in this

7    case.

8    Q.   So is that assuming that FTX customer money would be

9    available to Alameda as an asset?

10   A.   That's right.

11   Q.   Beneath that where it says "Liabilities, 8 billion," what

12   does that refer to?

13   A.   That refers to our total loans in this bad market scenario.

14   Q.   And beneath that, where it says "Genesis, 4.8 billion,"

15   what is that?

16   A.   That's specifically the loans that we were taking out from

17   Genesis.

18   Q.   So is that a subset of the liabilities?

19   A.   That's right.

20   Q.   Let's look at the right side.

21        What did your analysis show about how $3 billion of

22   additional investments would affect Alameda's total liquid

23   assets?

24   A.   Go down to 1.8 billion.

25   Q.   So that's $3 billion less?

1    A.  Yeah.

2    Q.  And how does this affect, at the bottom, the total assets

3    that would be on hand to repay loans?

4    A.  We would only have $4.8 billion of assets on hand to repay

5    loans, including the FTX customer funds that we had access to.

6    Q.  So that $4.8 billion number is adding the liquid assets

7    with the customer funds?

8    A.  Yes, that's right.

9    Q.  Did you use these numbers to make any predictions about

10   Alameda's ability to repay its loans in the event of a market

11   downturn?

12   A.  Yeah, I did.

13       MS. SASSOON:  Mr. Bianco, can you please bring up

14   columns E through G, rows 21 through 25 and row 31 through 34.

15   Q.  You'll see that there are two new boxes at the bottom.  And

16   so let's focus on the left-hand side, the bottom rows.

17       Does this pertain to a scenario where Alameda did not

18   make any additional investments?

19   A.  Yes, that's right.

20   Q.  And looking at these four bottom rows—can we zoom in on

21   that please—what did you conclude about the probability that

22   Alameda could repay its loans if they were recalled in a market

23   downturn scenario?

24   A.  I concluded that there was a 30 percent chance that we

25   would not be able to meet our loan recalls, so there was a

1   70 percent chance that we would be able to.

2   Q.  And just to be clear, where it says "P v bad FTX news

3   10 percent," what's "P v bad FTX news"?

4   A.  That's the probability of a scenario like this with very

5   bad FTX news.

6   Q.  Where did you put that probability?

7   A.  I said it was about 10 percent.

8   Q.  And the next line, "P Genesis freaks out immediately,

9   15 percent," what does "P Genesis freaks out immediately" mean?

10  A.  That's the probability that in this bad market scenario

11  Genesis would recall all of our loans.

12  Q.  And what is "P we can't meet that" referring to?

13  A.  It means the probability that we're unable to meet those

14  loan payments.

15  Q.  And so just to be clear, this is your estimate that there

16  was a 30 percent chance of not repaying loans under the current

17  situation.

18          MR. COHEN:  Objection.

19          THE COURT:  Sustained in that form, certainly.

20  Q.  Okay.  We've been talking about a bad market scenario.  In

21  what scenario are you concluding here that there's a 30 percent

22  chance of not being able to repay your loans?

23  A.  In this scenario; in the scenario where there's a bad

24  market scenario but we haven't made any additional investments.

25  Q.  And the 30 percent chance of not being able to repay loans,

1    was that concerning to you?

2    A.  Yeah, that was somewhat concerning.

3    Q.  Let's take a look at your calculations in the event that

4    Alameda made an additional $3 billion of venture investments.

5    Is that reflected in this bottom box on the right?

6    A.  Yes, that's right.

7    Q.  And can you walk us through your analysis of what would

8    happen in a market downturn if Alameda made an additional

9    $3 billion of venture investments.

10   A.  Yeah.  So the probability of very bad FTX news doesn't

11   change.  The probability that Genesis recalls our loans goes up

12   from 15 percent to 25 percent; and the probability that we're

13   unable to make those loan payments goes up from 30 percent to

14   100 percent.

15   Q.  And so what is a hundred percent probability of not being

16   able to repay your loans if recalled, what does that mean?

17   A.  That means if we made this $3 billion of investments and

18   there was bad market news leading to a significant market

19   downturn and our loans got called, that there was no way we

20   would be able to make the payments.

21   Q.  And when you concluded there was no way to be able to make

22   the payments, was that even accounting for using FTX customer

23   money?

24            MR. COHEN:  Objection.

25            THE COURT:  Sustained as to form.

1  Q.  When you concluded that there was a hundred percent chance

2  of not being able to repay your loans, what, if any,

3  assumptions did you make about whether Alameda would be using

4  customer funds?

5          MR. COHEN:  Same objection.

6          THE COURT:  Overruled.

7  A.  I assumed that we would be able to borrow FTX customer

8  funds to make these repayments.

9  Q.  And you still would not be able to repay.

10  A.  That's right.

11  Q.  And in this scenario where Alameda would be unable to repay

12  its third-party lenders, what were the implications of that

13  about any money available to repay the money that Alameda owed

14  FTX customers at this time?

15  A.  Yeah.  If we used FTX customer money to repay lenders, then

16  we would have no source to repay the FTX customer money we had

17  borrowed unless we were able to find new loans, or, you know,

18  make a lot of money or something.

19  Q.  Do you recall how you shared this spreadsheet with the

20  defendant?

21  A.  No.  I don't recall if I sent it over Signal or if we just

22  like looked at it on my computer and discussed it.

23  Q.  Are those two different ways that you sometimes reviewed

24  documents together?

25  A.  Yeah.

1   Q.  So sometimes communicating over Signal and sometimes in

2   person?

3   A.  That's right.

4   Q.  When you shared this spreadsheet analysis with the

5   defendant, did he dispute any of your calculations?

6   A.  The only feedback that he gave was he said that I should

7   redo the calculations assuming that Alameda was able to convert

8   a lot of its loans to fixed term.

9   Q.  Just to be clear, did he dispute your calculation of the

10  risks associated with the scenarios you mapped out here?

11            MR. COHEN:  Objection.

12            THE COURT:  Sustained.

13  Q.  What, if any, feedback did he give on the calculations you

14  had made with respect to a scenario with open-term loans and

15  $3 billion of venture investments?

16  A.  He didn't raise any objections to the calculations I had

17  made in that scenario.

18  Q.  So when the defendant told you to consider what would

19  happen if Alameda changed to fixed-term loans, did you conduct

20  any additional analysis?

21  A.  Yes, I did.  I added that to the spreadsheet.

22  Q.  And is that reflected in this version of the spreadsheet?

23  A.  Yeah.

24            MS. SASSOON:  And Mr. Bianco, so can you please bring

25  up columns A through B, this time with lines 62 through 77,

1    side by side with lines 93 through 108.

2    Q.   So now just to be clear, what scenario do we have on the

3    left-hand side?

4    A.   The left-hand side is the scenario of bad market conditions

5    and $3 billion of venture investments have been made.

6    Q.   And so we've just looked at that; is that right?

7    A.   Yeah.

8    Q.   And what do we have on the right-hand side now?

9    A.   The right-hand side is the same thing but assuming that

10   we're able to convert our loans with Genesis to fixed term.

11   Q.   So the numbers here look the same except for the

12   liabilities and the Genesis row at the bottom.  Why is that?

13   A.   Because the liabilities and the Genesis rows are assuming

14   that only a fraction of the loans are able to be recalled so

15   that those lines are listing the loans that are able to be

16   recalled.

17   Q.   Meaning if some were fixed term, they couldn't be recalled

18   on a moment's notice.

19   A.   Yeah, not immediately.

20   Q.   And did you analyze the probability of Alameda being able

21   to repay its loans under that scenario?

22   A.   Yes, I did.

23            MS. SASSOON:  So Mr. Bianco, can you please bring up

24   columns E through G, rows 31 through 34 and rows 39 through 42.

25   Q.   So on the left-hand side, these probabilities for

1    $3 billion more ventures, is that what we previously looked at?

2    A.  Yes, that's right.

3    Q.  And looking at the right-hand side, what did you conclude

4    was the probability you'd be unable to repay your loans with a

5    new loan structure in a bad market scenario?

6    A.  I estimated that it would go back down to 30 percent.

7    Q.  And 30 percent, what was your view of that level of risk?

8    A.  I mean, it was still a somewhat concerning level of risk

9    but less so, especially given that it was sort of risk

10   conditional on these two previous assumptions.

11   Q.  Were you in fact able to change all of Alameda's loans to

12   fixed-term loans?

13   A.  No.  We were able to change some, but the majority remained

14   open-term loans.

15   Q.  Did you share that information with the defendant?

16   A.  Yeah, I regularly updated him on the progress of our—of

17   getting loans and changing loan terms.

18   Q.  So after you prepared this spreadsheet and shared it with

19   the defendant, what did he do?

20   A.  He directed me to try to change more of our loans to fixed

21   term, and he said that he wanted to go ahead with billions of

22   dollars of venture investments.

23   Q.  And after the defendant directed you to try to change the

24   loan terms and stated that he still wanted to make these

25   investments, what did you understand the plan was if Genesis

1    recalled its loans?

2    A.   I understood the plan was as was laid out in the

3    spreadsheet, to use our liquid assets to try to repay if we

4    could and to borrow from FTX if we were out of other assets.

5          MS. SASSOON:  Pursuant to Government Exhibit 2001, the

6    government offers Government Exhibit 837.

7          And Mr. Bianco, if you could pull it up for the Court,

8    please.

9          MR. COHEN:  No objection, your Honor.

10          THE COURT:  837 is received.

11          (Government's Exhibit 837 received in evidence)

12          MS. SASSOON:  Mr. Bianco, please publish this exhibit

13    for the jury.

14    BY MS. SASSOON:

15    Q.   Ms. Ellison, do you recognize the Twitter account at

16    SBF_FTX?

17    A.   Yes, that was Sam's Twitter.

18    Q.   What's the date of this tweet?

19    A.   January 14, 2022.

20    Q.   And at the top here it says, "First, we're launching a

21    $2 billion venture fund, FTX Ventures.  As a founder, it's

22    important to support other founders creating great companies.

23    Hopefully this will allow us to do that a lot more."

24          How, if at all, does this tweet relate to the analysis

25    we were just looking at in your NAV Minus Sam Coin spreadsheet?

```
 1  A.  This is part of the——Sam's general push to do more venture

 2  investments.

 3  Q.  And what's your understanding whether the defendant in fact

 4  did billion dollars more of venture investments?

 5  A.  Yes, he did.

 6  Q.  And was this after you tried to change all the loans to

 7  fixed-term loans?

 8  A.  That's right.

 9  Q.  And had you informed him that that was unsuccessful?

10  A.  Yeah.

11  Q.  What was your understanding of where the $2 billion of

12  additional money for this venture fund was coming from?

13  A.  It was coming from Alameda.

14  Q.  How did you know that?

15  A.  I knew that because I knew that when there was a venture

16  investment, people would, you know, post in Slack asking

17  someone from Alameda to send money for the investment, things

18  like that.

19  Q.  If the money was coming from Alameda, what, if anything,

20  did the defendant say about why the investment fund was called

21  FTX Ventures?

22  A.  He said he thought that Alameda's brand was less good and

23  that he wanted to associate himself more with the venture

24  investing but he didn't want his name associated with Alameda's

25  name.
```

1   Q.  You just testified that you understood that the plan, if

2   loans were recalled from Genesis and others, was to borrow from

3   FTX.  What did you mean by borrow from FTX?

4   A.  What I meant was use the line of credit that I've talked

5   about on FTX.

6   Q.  Meaning whose funds?

7   A.  Meaning that it was ultimately coming from customer funds.

8   Q.  In 2022 did the defendant buy shares of a company called

9   Robinhood?

10  A.  Yes, he did.

11  Q.  What is Robinhood?

12  A.  It's a publicly traded company that has an app where you

13  can buy and sell stock.

14  Q.  Were you aware of what entity paid for the shares in

15  Robinhood?

16  A.  Yes, it was paid for by Alameda.

17  Q.  And what entity ultimately bought the shares?

18  A.  Alameda did the initial buying of the shares, but before we

19  reached the point where the buying had to be publicly

20  disclosed, Sam asked for the shares to be moved to a different

21  entity with a different name.

22  Q.  Do you recall the name of that entity?

23  A.  Yeah, I think it's the Emergent Fidelity Technologies.

24  Q.  What, if anything, did the defendant explain to you about

25  why he moved the shares to another entity other than Alameda?

1   A.  He said that he wanted to be able to talk about his

2   Robinhood investment but he didn't want his name associated

3   with Alameda.

4   Q.  By mid-2022 what was the rough amount of Alameda's

5   borrowing from third parties like Genesis?

6   A.  It was in the ballpark of $10 billion.

7   Q.  And what were the loans from Genesis and other third-party

8   lenders being used for?

9   A.  Some were being used for our general trading, others had

10  been used for these venture investments that we've talked

11  about.

12  Q.  Was Alameda also still borrowing money from FTX?

13  A.  Yeah.  We were borrowing some money.

14  Q.  And did this include through the line of credit?

15  A.  That's right.

16  Q.  Were you keeping track of that borrowing?

17  A.  Yeah.  Not necessarily carefully, but to some extent.

18          MS. SASSOON:  Mr. Bianco, can you please show the

19  witness Government Exhibit 48A.

20  Q.  Do you recognize this?

21  A.  Yeah, this is a section from one of the personal to-do list

22  documents.

23  Q.  Meaning you wrote this?

24  A.  Yes, that's right.

25          MS. SASSOON:  The government offers Government

Exhibit 48A.

MR. COHEN:  We need a foundation, your Honor.

THE COURT:  Yes, you do.

Q.  Ms. Ellison, you testified that you wrote this?

A.  Yes, I did.

Q.  Around when did you write this?

A.  I think it was in the spring of 2022.

Q.  And what are you writing about here?

A.  Those were the funds that Alameda was currently borrowing from FTX through this line of credit.

Q.  And did you take these notes in the course of performing your job responsibilities at Alameda?

A.  Yeah.

MS. SASSOON:  The government offers Government Exhibit 48A.

MR. COHEN:  No objection.

THE COURT:  Received.

(Government's Exhibit 48A received in evidence)

MS. SASSOON:  Mr. Bianco, can you please publish Government Exhibit 48A.

BY MS. SASSOON:

Q.  So just to orient us, is this an excerpt from a longer document?

A.  Yes, it is.

Q.  And around when did you write this part of the document?

1    A.  In spring of 2022.

2    Q.  The first bullet says, "Borrowing from FTX hot wallet,"

3    followed by some numbers and letters.  Where it says 1B, what

4    does B represent?

5    A.  Billion.

6    Q.  And where it says, for example, 600M, what does M

7    represent?

8    A.  Million.

9    Q.  And what are these various acronyms?

10   A.  Those are various coins and fiat currencies.  So SOL is

11   Solana, USD is US dollars.

12   Q.  And what was this list?

13   A.  This was a list of coins and currencies that Alameda was

14   borrowing from FTX at the time.

15   Q.  It says at the top "Borrowing from FTX hot wallet."  Was

16   all this money coming from an FTX hot wallet?

17   A.  Not necessarily.  That was more of a shorthand I used for

18   just borrowing from FTX, but some of these were fiat currencies

19   like US dollars, so that wouldn't have been in a hot wallet;

20   that would have been in a bank.

21   Q.  So for example, where it says 10 billion US dollars, what's

22   that referring to?

23   A.  That's referring to 10 billion of US dollars fiat currency

24   that Alameda was borrowing.

25   Q.  And was some of that from Alameda's bank account?

1    A.   Yeah, that's right.

2    Q.   What does this list show about how much crypto Alameda was

3    borrowing from FTX around the time you made this list?

4    A.   It shows that it was borrowing around $3 billion.

5    Q.   And would that be through the line of credit?

6    A.   That's right.

7    Q.   Can you describe Alameda's financial situation going into

8    the spring of 2022.

9    A.   We had a quite positive NAV, net asset value, because we

10   had a lot of these coins like FTT and Solana that were worth a

11   lot, but we were fairly leveraged because we had been——we had a

12   lot of loans and we were using a lot of those loans for

13   investments.

14   Q.   When you say you were fairly leveraged, can you explain

15   what you mean by that.

16   A.   What I mean is that we were in a fairly risky situation

17   where our, like, total assets were significantly larger than

18   our net assets.

19   Q.   Can you explain what you mean by that.

20   A.   So total assets is just all of the assets we have; net

21   assets is our assets minus our liabilities.

22   Q.   And so why did that put you in a leveraged situation?

23   A.   Because that means——I mean, if you're not leveraged, then

24   your assets have to go down a hundred percent for you to lose

25   all of your value, but if you are leveraged, then they can go

1    down less than a hundred percent and you can still lose all of

2    your value, so that's the situation that Alameda was in.

3    Q.  Were you discussing that with the defendant?

4    A.  Yeah, we were talking about Alameda's balance sheet and our

5    positions.

6    Q.  I'm showing you what's been marked as Government

7    Exhibit 49A.

8             Do you recognize this?

9    A.  Yes, this is a—a update document that I wrote about things

10   that had been happening at Alameda and that I sent to Sam.

11            MS. SASSOON:  At this time the government offers

12   Government Exhibit 49A pursuant to stipulation 2003, which the

13   parties have stipulated is a document titled Alameda Updates

14   5/7, dated May 7, 2022.

15            THE COURT:  Received.

16            (Government's Exhibit 49A received in evidence)

17            MR. COHEN:  I was about to say no objection.

18            MS. SASSOON:  Mr. Bianco, if you can publish this for

19   the jury.

20   BY MS. SASSOON:

21   Q.  So who wrote this document, putting aside the comment

22   bubbles that say Sam Bankman-Fried?

23   A.  I wrote this document.

24   Q.  Why did you write this document?

25   A.  I somewhat regularly wrote update documents about Alameda

1  both for my own reflection and to send to Sam and get his

2  comments and feedback.

3  Q.  And around when did you write this?

4  A.  In May of 2022.

5  Q.  And do you see comment bubbles that say Sam Bankman-Fried?

6  A.  Yes, I do.

7  Q.  How often would he write comments on these update documents

8  that you shared with him?

9  A.  Pretty often.

10  Q.  Let's turn to page 2, the end of this document.  I want to

11  direct your attention to where it says Worries/Questions.  What

12  did you mean by Worries/Questions?

13  A.  Those were either things I was concerned about or questions

14  I wanted Sam's input on.

15  Q.  The last item here says, "Leverage, both actual leverage

16  and presenting on our balance sheet."  What did you mean by

17  that in describing actual leverage and how to present it on

18  your balance sheet as a worry?

19  A.  By actual leverage, I meant that I thought Alameda's

20  financial position was risky and that if the market went down

21  significantly, we would lose a lot of money, and by presenting

22  on our balance sheet, I meant that I was concerned about

23  conveying that information to lenders and having them worry

24  about Alameda's financial health and recall their loans.

25  Q.  And Sam Bankman-Fried wrote a comment on that line.  Can

```
 1   you read it.
 2   A.   It says, "Yup, and could also get worse.  Do you put Paper
 3   Bird/FTX equity on the balance sheet?"
 4   Q.   What are Paper Bird and FTX equity?
 5   A.   Paper Bird was an entity that Sam held most of his FTX
 6   equity in, and FTX equity being shares in the company FTX.
 7   Q.   You wrote a comment, "I don't think so," in response.  Why
 8   didn't you put Paper Bird and FTX equity on Alameda's balance
 9   sheet?
10   A.   Because Paper Bird was a separate company that wasn't owned
11   by Alameda or part of the Alameda tree, so it wasn't something
12   that our lenders had any recourse to if we failed to pay back
13   our loans.
14   Q.   Explain what you mean when you say your lenders wouldn't
15   have recourse to the Paper Bird/FTX equity.
16   A.   I meant that if we failed to pay back our loans, our
17   lenders could potentially get some money back in the form of
18   Alameda's assets, but because Paper Bird was a separate entity,
19   it wasn't the one loaning them the money, it shouldn't really
20   affect their assessment of the loans.
21   Q.   The defendant's comment in response to what you wrote about
22   leverage says, "Yup, and could also get worse."  In what ways
23   could things get worse?
24   A.   If the market went down, Alameda would lose money and
25   our—our leverage and our risk would increase.
```

1    Q.  Did things get worse?

2    A.  Yes, they did.

3    Q.  Was the possibility of things getting worse something that

4    you and the defendant had analyzed together?

5    A.  Yeah, it was, like, in the spreadsheet that we looked at

6    earlier.

7              MS. SASSOON:  Your Honor, I see it's just about 4:30.

8    This is a natural break point.  I could also continue.

9              THE COURT:  Okay.  We will break here.

10             Members of the jury, please wait in the jury room

11   because Rhonda——whom you all met, the head of our jury

12   department——wants to see you before you go.

13             See you at 9:30 in the morning.  And counsel remain,

14   please.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

```
 1                  (Jury not present)

 2              THE COURT:  Be seated, folks.

 3              Who are the government's next several witnesses?

 4              MS. SASSOON:  So, your Honor, this is by far our

 5     longest witness, and I expect that between the direct and

 6     cross-examinations, she's certainly going to be on for all of

 7     tomorrow.  And then after that, we have Christian Drappi, Zac

 8     Prince——and we can provide more names tomorrow, your Honor.

 9              THE COURT:  Okay.  What's the new and revised——of

10     course that assumes a fact as to which there's no evidence

11     yet——estimate of the duration of government's case?  When do

12     you expect to rest?

13              MS. SASSOON:  I think we're proceeding on pace and we

14     could rest as early as the fourth week, after your Honor

15     returns from the conference.

16              THE COURT:  26th, 27th of October?

17              MS. SASSOON:  Yes, your Honor.  That's our goal.

18              THE COURT:  And Mr. Cohen, obviously I'm not going to

19     hold you to anything, but what do you anticipate with respect

20     to a defense case, if any?

21              MR. COHEN:  It's very hard to know, your Honor, since

22     we're only through the first week and a day, but I would think,

23     subject to future rulings the Court might make on things like

24     rebuttal experts, a week?  Week and a half?

25              THE COURT:  Okay.  Thank you.
```

1          I know I have at least one outstanding item, which was

2     the defense application of I think October 2, right?  Is there

3     anything else that's outstanding that I'm not calling to mind?

4          MR. REHN:  Your Honor, we did—we were hoping to get a

5     ruling in the near future, at least, regarding the issue of

6     remote witness testimony that we had submitted at the beginning

7     of the trial.

8          THE COURT:  Well, yes, and I'm waiting for a serious

9     answer—not that you weren't serious before, but perhaps a more

10    informed answer as to what the potential remote witness has to

11    say that wouldn't be cumulative.

12         MR. REHN:  Yes, your Honor.  I think in looking at

13    the—we've only had one customer so far and we do anticipate

14    some additional customers, but in looking at the

15    cross-examination of the initial customer who testified, some

16    of the cross went to the fact that that customer had traded in

17    crypto, and there was cross suggesting that the customer had

18    understood that they were engaged in risky crypto trading.  The

19    witness who would be testifying from Ukraine solely used their

20    FTX account to hold assets and did not engage in trading, which

21    is unlike the other customers we anticipate calling.

22         THE COURT:  And you don't have anybody else who can

23    testify similarly?

24         MR. REHN:  That's the witness we were proposing to

25    offer, your Honor.

```
1              THE COURT:  Yes, I understand that, but you have a
2   burden to carry on that and you wouldn't as to other witnesses.
3              MR. REHN:  We understand that, your Honor.  We're
4   asking if the Court will permit the remote testimony.
5   Obviously we would, you know, evaluate our witness list and
6   consider alternatives if the Court denied the motion.
7              THE COURT:  I think you'd better consider
8   alternatives.  I'm not ruling now, but in order for me to make
9   the findings that I need to make, I think I have to be
10  satisfied that this person is unique, important, and that means
11  noncumulative to me.  Am I wrong about that?
12             MR. REHN:  I think that's certainly a factor for the
13  Court to take into account.  So in light of that, we will
14  resubmit this issue later this week.
15             THE COURT:  Okay.  Mr. Cohen?
16             MR. COHEN:  Your Honor made my point.
17             THE COURT:  Well, these things are bound to happen in
18  a long trial.
19             MR. COHEN:  A stopped clock is right twice a day, your
20  Honor.
21             THE COURT:  Somebody else said that before.  I've
22  heard it before.
23             Okay.  Anything else this afternoon?
24             MR. REHN:  We have one more issue just to put on the
25  Court's radar.  We had also filed a letter over the weekend
```

1    regarding preclusion of the defense eliciting testimony

2    regarding the value of and shares in this Anthropic startup

3    company.

4            THE COURT:  I'm sorry.  Say it again slowly.

5            MR. REHN:  We submitted a letter to the Court over the

6    weekend——

7            THE COURT:  That was the part I got.

8            MR. REHN:  ——requesting that the Court preclude the

9    defense from eliciting any testimony——

10           THE COURT:  Oh, yes, yes, yes.

11           MR. REHN:  ——about the value of defendant's investment

12    in a company called Anthropic.

13           MR. COHEN:  Your Honor, might we respond to that and

14    put in a submission on that?

15           THE COURT:  Yes.

16           MR. COHEN:  When would you like it, your Honor?

17           THE COURT:  When would you like a ruling?

18           MS. SASSOON:  Well, your Honor, this witness who's on

19    the stand made a personal investment in Anthropic and has

20    knowledge of the company's investment in Anthropic, and so in

21    the event that the Court deems this admissible, it might be an

22    issue that we want to raise with her.  We don't think that this

23    is a permissible topic of questioning, but if it is, we may

24    want to ask her questions about it.

25           THE COURT:  And you may want to do it tomorrow.

1              MS. SASSOON:  Yes.

2              MR. COHEN:  So we'll have something tonight, your

3    Honor, before 8:00.

4              THE COURT:  Yes, not at 11:05, as we discussed.

5              MR. COHEN:  I also think the door's been opened in

6    light of the direct, but we'll make that point in our letter.

7              THE COURT:  Well, I'm sure you will.

8              MS. SASSOON:  Your Honor, may I raise one more thing.

9              THE COURT:  Yes.

10             MS. SASSOON:  We may ask—we had a motion *in limine* in

11   our motions *in limine* that we filed before trial about the all

12   hands meeting in November where Caroline Ellison made certain

13   statements to her employees about the prior events and the

14   involvement of the defendant in borrowing FTX customer money.

15             THE COURT:  This is the "Sam I guess" meeting, right?

16             MS. SASSOON:  Yes.  So we had moved that it was an

17   agent statement, a co-conspirator statement.  We think it's

18   admissible for those two reasons based on what's been

19   established so far.  We also think it's admissible as a prior

20   consistent statement at this point given statements in the

21   opening that the witnesses had a motive to provide the

22   government information about Sam in order to get a cooperation

23   agreement, and so the fact that she made these statements prior

24   to any meetings with the government or knowing of the

25   government investigation meets the standard for prior

1    consistent statement.

2           THE COURT:  When did she make these statements?  Just

3    refresh me.

4           MS. SASSOON:  November 9th, so it's before the

5    declaration of bankruptcy.

6           THE COURT:  Oh, yes.  That's when she has the

7    explanation——

8           MS. SASSOON:  When Binance has agreed to acquire FTX.

9    So at that point she thinks that Binance is going to acquire

10   FTX, the customers will be made whole, and she is coming clean

11   to her employees.

12          THE COURT:  And that's in furtherance because?

13          MS. SASSOON:  So as laid out in our motion, she

14   discusses this meeting in a Signal message with the defendant

15   prior to the meeting and he gives her input on trying to

16   reassure employees so that they don't quit, and that's in

17   furtherance of the conspiracy because they need employees to

18   keep working to keep satisfying customer withdrawals so the

19   house of cards doesn't collapse.

20          THE COURT:  Okay.

21          MR. COHEN:  Your Honor, we would oppose that.  Even

22   counsel's description just now is self-contradictory.  I don't

23   know how coming clean to move forward with no co-conspirators

24   is a co-conspirator statement.

25          THE COURT:  Well, I thought the explanation was right

```
1   on target.  He still needs the employees, and if the threat is
2   they're all walking out the door unless she gives an
3   explanation, there's an interest in keeping them.  And my
4   recollection is we heard testimony today that that wouldn't
5   have been the first time half the employees walked out the
6   door.
7                MR. COHEN:  Well, your Honor, I don't think right at
8   the moment there is a foundation, there is a basis for that.
9   We haven't heard that testimony as to this meeting.
10               THE COURT:  That testimony being what in particular?
11               MR. COHEN:  As to the purpose behind the November 9th
12  meeting.  We had earlier testimony about a different meeting.
13               THE COURT:  No, I know.
14               MR. COHEN:  I take your Honor's point, but we haven't
15  gotten to the point of direct about November 9th.
16               THE COURT:  Okay.  Thanks, folks.
17               THE DEPUTY CLERK:  All rise.
18               (Adjourned to October 11, 2023, at 9:30 a.m.)
```

748

1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3    GARY WANG

4    Cross By Mr. Everdell  . . . . . . . . . . . 516

5    Redirect By Mr. Everdell . . . . . . . . . . 608

6    Recross By Mr. Everdell  . . . . . . . . . . 640

7     CAROLINE ELLISON

8    Direct By Ms. Sassoon  . . . . . . . . . . . 642

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GOVERNMENT EXHIBITS

Exhibit No.                                              Received

3585-014   . . . . . . . . . . . . . . . . . 598

546 and 549   . . . . . . . . . . . . . . . 630

547   . . . . . . . . . . . . . . . . . . . 634

1638   . . . . . . . . . . . . . . . . . . 667

1622   . . . . . . . . . . . . . . . . . . 675

48B   . . . . . . . . . . . . . . . . . . . 696

2003 and 36   . . . . . . . . . . . . . . . 706

837   . . . . . . . . . . . . . . . . . . . 730

48A   . . . . . . . . . . . . . . . . . . . 734

49A   . . . . . . . . . . . . . . . . . . . 737

DEFENDANT EXHIBITS

Exhibit No.                                              Received

1614   . . . . . . . . . . . . . . . . . . 517

20, 22, 211, 184, 15, 16, . . . . . . . . . 581

        34, 23, and 24

260   . . . . . . . . . . . . . . . . . . . 585