```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        22 CR 673 (LAK)

 5   SAMUEL BANKMAN-FRIED,

 6              Defendant.                Trial
     ------------------------------x

 7
                                         New York, N.Y.
 8                                       October 19, 2023
                                         9:32 a.m.
 9

10   Before:

11
                       HON. LEWIS A. KAPLAN,
12
                                         District Judge
13
                             APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  DANIELLE R. SASSOON
          NICOLAS ROOS
17        DANIELLE KUDLA
          SAMUEL RAYMOND
18        THANE REHN
          Assistant United States Attorneys
19
     COHEN & GRESSER, LLP
20        Attorneys for Defendant
     BY:  MARK S. COHEN
21        CHRISTIAN R. EVERDELL
          SRI K. KUEHNLENZ
22        DAVID F. LISNER

23   Also Present:
     Luke Booth, FBI
24   Kristin Allain, FBI
     Arjun Ahuja, USAO Paralegal Specialist
25   Grant Bianco, USAO Paralegal Specialist
     Anthony Imperato, USAO Paralegal Specialist
```

1            (In open court; jury not present)

2            THE COURT:  Good morning, everyone.

3            MS. SASSOON:  Good morning.

4            THE DEPUTY CLERK:  Please be seated.

5            THE COURT:  Just before we get the jury, Andy.  Did

6    you work out an arrangement?

7            MR. ROOS:  On the schedule?

8            THE COURT:  Yes.  And notice to each other?

9            MR. COHEN:  Yes, your Honor.

10           THE COURT:  So what's the schedule?

11           MR. COHEN:  There's one piece to it that we need to

12   obviously—well, your Honor has to approve everything, but we

13   now believe that if there's a defense case at all, your Honor,

14   it will be one week or less.  In light of that, we would—I

15   think the government agrees with us that we will give them any

16   rebuttal expert disclosures on October 23rd, and that we will

17   disclose our other witnesses to them two days before they

18   testify.  The current status is that the trial will resume on

19   October 26th, and I guess the government has some witnesses for

20   that day.  Our request for the Court is that if we could begin

21   any defense case on the morning of the 27th.  If the Court was

22   okay with that, we would make our disclosures to the defense on

23   the 25th.

24           THE COURT:  What's the government's point of view

25   about this?

1   MR. ROOS:  So we oppose starting the next day, and the

2   reason is, the government currently has three potential

3   witnesses, were we to call any of them, for the 26th.  One is

4   an FBI Agent, and we proposed a stipulation to just eliminate

5   him.  One is an investor witness.  The length of the first

6   investor witness in this case was 30 minutes.  One is a

7   customer witness.  The length of the last customer witness was

8   about 20 minutes.  So were the government to put on all three

9   of those folks, I could see it being an hour and ten minutes.

10  So I think it's wasteful to take a whole day, after we've had a

11  break, to have the jury come in and then go home.

12       THE COURT:  Look, ordinarily, Mr. Cohen, I would

13  accommodate what you've asked except that you have almost a

14  full week with no court here preceding the government's brief

15  presentation on the 26th, and in those circumstances, I'm going

16  to hold you to what you said last night, which was that you

17  would be ready to start with any defense case as soon as the

18  government rests.  Obviously we have to deal with motions,

19  but——so that's what we're going to do.

20       And I would appreciate it if counsel on both sides

21  kept my chambers posted as you post each other about what

22  disclosures have been made and witnesses that you intend to

23  call and the like so that I know what is going to be happening

24  on the 26th.

25       MR. COHEN:  Your Honor, might I ask, if it's going to

1   be the 26th, that we not be required to start any defense case

2   until after the lunch break so we have——

3           THE COURT:  That's okay.

4           MR. COHEN:  ——a time certain.

5           THE COURT:  That's okay.

6           Okay.  Let's get the jury.

7           MR. ROOS:  Judge, one other thing.  You earlier in the

8   week asked for our letters on jury instructions today by the

9   close of business, and not to be cute about it, but I was

10  wondering what time the close of business is.

11          THE COURT:  5:00.

12          MR. ROOS:  Got it.

13          THE COURT:  And if they're going to be submitted in

14  the form of a whole new set of proposed instructions, as

15  opposed to——

16          THE DEPUTY CLERK:  Jury entering.

17          THE COURT:  ——specific proposed changes, I'm going to

18  have to have a redline with it, from whichever side does it

19  that way.

20          MR. ROOS:  Ours are just specifics.  It will be a

21  short letter.

22          THE COURT:  All right.

23          (Continued on next page)

24

25

1          (Jury present)

2          THE COURT:  Good morning, everyone.

3          The record will reflect that the defendant and the

4    jurors all are present.

5          Members of the jury, I talked to you a little bit

6    about the schedule yesterday.  My current best

7    estimate—subject to change always—is that the taking of

8    testimony in the case will finish not later than November 3rd.

9    If it were to finish on November 3rd, of course we would be

10   into the beginning of the next week for your deliberations and

11   the like, but we're now moving along a little faster than I had

12   hoped.

13         Okay.  Next witness for the government.

14         MS. SASSOON:  The government calls Can Sun.

15         THE DEPUTY CLERK:  Sir, if you could please step

16   around and raise your right hand.

17         (Witness sworn)

18         THE DEPUTY CLERK:  Thank you.  Please be seated.

19         If you could please state your name and spell your

20   first and last names for the record.

21         THE WITNESS:  My name is Can Sun, C-A-N, S-U-N.

22         THE COURT:  You may proceed.

23         MS. SASSOON:  Thank you, your Honor.

24

25

 1    CAN SUN,

 2         called as a witness by the Government,

 3         having been duly sworn, testified as follows:

 4    DIRECT EXAMINATION

 5    BY MS. SASSOON:

 6    Q.   Good morning, Mr. Sun.   What is your profession?

 7    A.   I'm an attorney.

 8    Q.   Where did you grow up?

 9    A.   I grew up in a number of countries——China, Singapore,

10    Canada, and the US.

11    Q.   And I'll just ask you to slow down a bit.

12              Where did you go to law school?

13    A.   I went to Yale.

14    Q.   And what did you do after Yale Law School?

15    A.   First I worked at a boutique firm in DC doing human rights

16    work; after that, I worked at Davis Polk here in New York; and

17    after that, moved to Fenwick & West in Seattle.

18    Q.   What kind of legal work did you do at these law firms?

19    A.   At the first boutique firm in DC I did human rights work;

20    and at Davis Polk, I did corporate mergers, acquisitions, IPO

21    work; and at Fenwick, I did startup and blockchain,

22    crypto-related work.

23    Q.   At any of these jobs did you practice criminal law?

24    A.   No.

25    Q.   Did there come a time when you left the law firms for a

1    different type of job?

2    A.   Yes.  In August '21 I left Fenwick & West to join FTX.

3    Q.   I believe you said, but can you just repeat when you joined

4    FTX.

5    A.   End of August 2021.

6    Q.   What was your position when you joined FTX?

7    A.   I was general counsel.

8    Q.   What were your general responsibilities as general counsel

9    at FTX?

10   A.   I headed up legal at FTX International.

11   Q.   And what types of duties did that involve?

12   A.   Included licensing regulatory strategy, internal corporate

13   work, everything from fundraising, cap tables, employment

14   agreements, stuff like that.

15   Q.   As part of your responsibilities as general counsel, were

16   you involved in any work related to how FTX treated and dealt

17   with customer assets?

18   A.   Yes.

19   Q.   At any time as general counsel, did you approve lending FTX

20   customer money to Alameda Research?

21             MR. COHEN:  Objection.

22             THE COURT:  What's the objection?

23             MR. COHEN:  Leading.

24             THE COURT:  Sustained.

25   Q.   At any time as general counsel, Mr. Sun, what, if anything,

1  did you approve related to lending FTX customer money to

2  Alameda?

3        MR. COHEN:  Same objection.

4        THE COURT:  Overruled.

5  A.  Never approved anything like that, and I would never have

6  done it either.

7  Q.  And if you could just speak up a little bit, Mr. Sun.  I

8  want to make sure the jury can hear you.

9  A.  No, absolutely not.

10  Q.  While you worked at FTX, did you have conversations with

11  the defendant about how FTX treated its customer assets?

12  A.  Yes.

13  Q.  And what, if anything, did the defendant tell you about how

14  FTX received customer fiat or dollar deposits?

15  A.  That they were received, safeguarded, and segregated from

16  FTX's customer funds—sorry—from FTX's proprietary funds.

17  Q.  And you mentioned that the defendant told you that customer

18  funds were segregated from FTX proprietary funds.  What did you

19  mean by FTX proprietary funds?

20  A.  So FTX's own funds as a company, funds that it uses to pay

21  for bills, to pay for, you know, website services, pay vendors,

22  those were FTX's own funds.  FTX customers' funds were always

23  separated from those.

24  Q.  And you referred to the defendant telling you that FTX

25  customer funds were segregated from proprietary funds.  What

1    does "segregated" mean?

2    A.   It means it is held separately, in a separate account from

3    FTX's own proprietary funds.

4    Q.   What did you understand was the purpose of segregating

5    customer funds from FTX proprietary funds?

6    A.   To clearly identify them as customer funds so that they

7    would not be misappropriated.

8    Q.   And when you say "misappropriated," what do you mean by

9    that?

10   A.   Stolen, used for anything else other than what the customer

11   instructs us to do.

12   Q.   Did you at any time observe public statements by the

13   defendant about how FTX treated customer assets?

14   A.   Yes.

15   Q.   In what forums?

16   A.   On Sam's tweets; his public congressional testimonies; his,

17   you know, statements to investors; to regulators; other

18   conversations.

19   Q.   And what kinds of things do you recall observing the

20   defendant say publicly about how FTX treated customer assets?

21   A.   That all customer assets of FTX were safeguarded,

22   segregated, protected.

23   Q.   You talked about customer dollar or fiat deposits.  What,

24   if anything, did the defendant tell you about how

25   cryptocurrency deposits were received at FTX?

1  A.  They were received and kept in an omnibus wallet for all

2  customer funds that was separated from FTX's own proprietary

3  funds as well.

4  Q.  And just to be clear, is that what the defendant told you?

5  A.  Yes.

6  Q.  And you mentioned——

7       THE COURT:  I didn't hear that.  I'm sorry.  I didn't

8  hear an answer.

9       THE WITNESS:  Yes.

10       THE COURT:  Thank you.

11  Q.  You mentioned that the defendant described an omnibus

12  wallet for customers.  What do you mean by an omnibus wallet?

13  A.  Right.  So say if two customers each had one Bitcoin and

14  they deposit it into the platform.  We would not have one

15  Bitcoin wallet for each customer; instead, we would keep both

16  of those customers' assets into one combined wallet, so that

17  one wallet would have two Bitcoins, but that is all customer

18  assets and it is separated from all of the remaining FTX

19  proprietary assets.

20  Q.  As general counsel of FTX, were you familiar with something

21  called the key principles of FTX?

22  A.  Yes.

23  Q.  And what were those?

24  A.  I used to be able to recite this, but——

25  Q.  So before you recite them, can you explain what we're

1    talking about when we talk about the key principles.

2    A.   Sure.  So Sam was on a movement to create a sensible

3    regulatory framework for regulating the crypto industry, and so

4    as part of that framework, FTX had a list of five

5    investor——sorry——key principles for investor protection, things

6    like market manipulation, things like market integrity,

7    prevention of financial crimes, safeguarding of customer

8    assets, and I can't remember the last one off the top right

9    now.

10   Q.   And these principles, were they documented?

11   A.   Yes.

12   Q.   How were they documented?

13   A.   It was on FTX policies website; it was in Sam's testimony

14   to Congress; and we also described it in various forums with

15   regulators we were working with around the world.

16   Q.   And so based on your work with the defendant, what's your

17   understanding of his role in crafting and disseminating these

18   key principles?

19   A.   He was very, very much involved.

20   Q.   And what do you recall, at a general level, about what

21   these key principles said about the treatment of customer

22   assets?

23   A.   Safeguarded and protected.

24   Q.   As general counsel of FTX, did you get questions from

25   regulators about how FTX handled customer deposits?

1    A.   Yes.

2    Q.   And what about from FTX customers?

3    A.   Yes.

4    Q.   And did you respond to those inquiries?

5    A.   Yes.

6    Q.   And how did you get the information to respond to those

7    inquiries?

8    A.   Based on the information that Sam gave me, based on

9    information I got from other management at FTX, from the

10   finance team, and obviously all of the public statements that

11   we had talked about earlier.

12   Q.   And so what types of things were you saying to regulators

13   and customers about how FTX treated customer assets?

14   A.   They were safeguarded, segregated, and protected.

15   Q.   Did you personally verify how customer dollar or crypto

16   deposits were treated by FTX?

17   A.   I did not.

18   Q.   Were you involved in any way in monitoring FTX's bank

19   accounts?

20   A.   No, I was not.

21   Q.   Did you have login access to the bank accounts or the

22   wallets?

23   A.   No, I did not.

24   Q.   You've talked about how assets were received.  What, if

25   anything, did the defendant tell you about how customer

1    deposits were treated upon being received into FTX's accounts

2    or wallets?

3    A.  Are you talking about fiat or crypto or both?

4    Q.  Why don't we start with fiat.

5    A.  So fiat, it would be transferred into what we call FBO bank

6    accounts held by FTX at various financial institutions and,

7    again, separated from FTX's own proprietary assets.

8            For crypto assets, they would come in to what we call

9    a sweep wallet and then combined into an omnibus wallet and

10   also separated and segregated from FTX's own proprietary

11   assets.

12   Q.  You mentioned a term called an FBO account.  What does that

13   mean?

14   A.  For the benefit of.  Basically where a bank account is

15   owned in the name of one entity but that entity does not

16   actually have beneficial ownership of the funds in that

17   account, and the funds in that account are actually held for

18   the benefit of others——in this case, FTX's customers.

19   Q.  Yes or no:  In your role as FTX's general counsel, did you

20   have expectations about how customer assets should be treated?

21   A.  Yes.

22   Q.  And if you could just speak up.  I see you're nodding,

23   but——

24   A.  Yes, yes.

25   Q.  And what were the expectations you had about how customer

1    assets should be treated based on?

2    A.   What is it based on?  So my understanding is FTX protects,

3    safeguards customer assets a hundred percent, and it was based

4    on, you know, my conversations with Sam, conversations with

5    other management, conversations with the finance team, FTX's

6    general standing in the industry, our regulatory requirements,

7    Sam's public statements.  Everything was unequivocally that FTX

8    protects customer assets a hundred percent.

9    Q.   Did you believe that FTX customer deposits could

10   permissibly be commingled with other funds of the business?

11   A.   No.

12   Q.   And why not?

13   A.   Those funds belongs to the customers and does not belong to

14   FTX.

15   Q.   Based on your conversations with the defendant, what was

16   your understanding about how, if at all, FTX could use customer

17   assets?

18   A.   Only at the direction of the customer.

19   Q.   And what does that mean?

20   A.   So if the customer wants to trade it, they can trade it; if

21   they want to withdraw it, they can withdraw it; but nothing

22   else.

23   Q.   And what was your understanding as to whether FTX could

24   borrow customer money without express authorization?

25   A.   None whatsoever.

1  Q.  What about whether Alameda could borrow customer money

2  without express authorization?

3  A.  None whatsoever.

4  Q.  When you say "none whatsoever," what do you mean?

5  A.  So there's——there's none.  There's none.  There's, you

6  know, there's a borrow-lending program.  If a user wants to

7  voluntarily, affirmatively choose to lend out their assets on

8  the platform, Alameda or other borrowers could borrow it, but

9  without express authorization from the user that they want to,

10  let's say, lend out their funds, neither FTX, Alameda, or

11  anyone had any rights to those assets because it belongs to the

12  user.

13  Q.  While you worked at FTX, were you aware of an entity called

14  North Dimension?

15  A.  Yes.

16  Q.  What did you know about North Dimension based on your work

17  at FTX?

18  A.  First time I saw it I think was in the spring of '22.  I

19  was putting together an organization chart showing the

20  different FTX and Alameda entities.  I saw that entity, wasn't

21  sure what it did, asked our finance team, and they mentioned

22  that it made some payments on behalf of FTX——of Alameda.

23  Q.  Were you aware whether North Dimension was receiving

24  customer deposits of FTX into its bank account?

25  A.  No, I was not.

1    Q.  And were you aware, prior to November 2022, of Alameda

2    receiving FTX customer deposits into its bank accounts?

3    A.  I was not.

4    Q.  As general counsel, would you have approved of Alameda

5    receiving FTX customer deposits?

6              MR. COHEN:  Objection.

7              THE COURT:  Sustained.

8    Q.  If you had been told that Alameda was receiving FTX

9    customer deposits, would that have raised concerns for you as

10   general counsel of FTX?

11             MR. COHEN:  Same objection.

12             THE COURT:  What is it?  What is the objection?

13             MR. COHEN:  Calls for speculation and hypothetical.

14             MS. SASSOON:  Your Honor, he was the general counsel.

15             THE COURT:  Yes, I understand.

16             MR. COHEN:  The phrase begins "If you had been told."

17             THE COURT:  Sustained.

18   BY MS. SASSOON:

19   Q.  While you worked as general counsel at FTX, were you aware

20   of an account within the FTX database called the fiat@ftx.com

21   account?

22   A.  I was not aware.

23   Q.  Did there come a time when you started working on terms of

24   service for FTX?

25   A.  Yes.

1    Q.   What are terms of service?

2    A.   It is a legal document that sets out the rights and

3    responsibilities of FTX and our users, how they relate to each

4    other.

5    Q.   As you understood it, were the terms of service the only

6    place where FTX spelled out the company's obligations to

7    customers?

8    A.   It was not.

9    Q.   Where else did the company spell out its obligations to

10   customers?

11   A.   FTX had a variety of other documents.  For instance, on our

12   Zendesk help page, there was literally dozens of articles

13   spelling out how our liquidation program works, how market

14   maker program works, and obviously that's in addition to public

15   statements made by Sam, his tweets, his congressional

16   testimonies, and stuff like that.

17   Q.   As far as you know, were the terms of service accessible on

18   the FTX website?

19   A.   Yes.

20           MS. SASSOON:  And can we please pull up Government

21   Exhibit 587, which is in evidence.

22   Q.   Do you recognize this?

23   A.   Yes.

24   Q.   What is it?

25   A.   This is the sign-up page when a new user wants to sign up

1    for an account on FTX.

2    Q.   And as far as you know, did a customer have to agree to the

3    terms of service to open an account?

4    A.   Yes.

5         THE COURT:   Well, I'm going to strike the answer and

6    ask you to rephrase the question, because "as far as you know"

7    leaves this pretty delphic.

8         MS. SASSOON:   Yes.

9    Q.   Were you familiar with how this page operated in terms of

10   setting up an account?

11   A.   Yes.  So the user has to type in an email, a proposed

12   password, and click to agree to the FTX terms of service in

13   order to create the account.

14   Q.   How do you know that?

15   A.   It was——it was on our website.

16   Q.   Around when did you work on the terms of service?

17   A.   Right when I joined, in late August/early September '21.

18   Q.   And what was the status of FTX's terms of service when you

19   started working on them?

20   A.   It was about 80, even 90 percent done, and I came in and

21   brought it to completion.

22   Q.   And just to be clear, were there terms of service already

23   in place for the company at that time?

24   A.   Yes.

25   Q.   And so the terms of service that you were working on, how

1    did they relate to the preexisting terms of service?

2    A.   It was intended to be a replacement of the existing terms

3    of service.

4    Q.   And why were the existing terms of service being replaced?

5    A.   We were getting licensed in the Bahamas, and in order to

6    comply with regulatory requirements.  And also, the older terms

7    of service, which I did not draft, as I understand it, was more

8    of a, you know——more for a startup company.  As we were growing

9    bigger, we wanted a more robust set of terms and conditions.

10   Q.   What was the defendant's role, if any, in finalizing these

11   terms of service that you reviewed?

12   A.   He approved of it.

13   Q.   How did the defendant approve those terms of service?

14   A.   When we were going to go live with the terms of service in

15   May of '22, we created a——a chat group, and I notified everyone

16   in the group, including Sam, that basically we were going to go

17   live with the new terms of service, we were going to move all

18   customers to FTX Bahamas, and he approved of it.

19   Q.   You said that the terms of service were going live in May

20   of 2022.  When was the language of these terms of service

21   actually finalized?

22   A.   September '21.

23   Q.   Did the terms of service that you reviewed have a provision

24   on the use of customer assets?

25   A.   Use of customer assets.

1    Q.  Or the treatment of FTX customer digital assets.

2    A.  Yes.

3          MS. SASSOON:  At this time the government offers

4    Government Exhibit 558 pursuant to stipulation 2000, which the

5    parties have stipulated is FTX terms of service dated May 13,

6    2022.  The government is not offering this document or the

7    statements in it for their truth but for their effect, if any,

8    on readers of the terms of service.

9          MR. COHEN:  No objection, your Honor.

10         THE COURT:  Received on a limited basis stated by

11   counsel.

12         (Government's Exhibit 558 received in evidence)

13         MS. SASSOON:  Can we publish Government Exhibit 558,

14   please.

15         MR. COHEN:  Your Honor, may we briefly be heard at

16   sidebar?

17         THE COURT:  Yes.

18         (Continued on next page)

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. COHEN:  Your Honor, we would also ask that they be

3    admitted as a verbal act and not just for the effect on the

4    listener.  It's something I'd like to cover in my exam, and I

5    figured we could deal with it now since it's been put in, your

6    Honor.

7          THE COURT:  What exactly do you mean and what

8    significance would doing or not doing what you ask have?

9          MR. COHEN:  Well, what we plan to do——I don't know

10   what counsel is going to do, but I assume she's going to call

11   out certain sections of the terms of service and ask the

12   witness about them, and we would like to do the same thing, not

13   to say that what the sections relate to was actually done but

14   that——

15         THE COURT:  Not to say that the sections?

16         MR. COHEN:  In other words, not that the contract

17   terms——calling out the contract terms means the performance was

18   actually made or not made but simply that this is what they

19   say.

20         MS. SASSOON:  Two things, your Honor.

21         One, it's the government's direct exam right now so if

22   the defense wants to admit an exhibit or for another purpose,

23   it's not the appropriate time.

24         But two, what counsel described is also not a purpose

25   for the document's truth, as I understood his explanation, and

1    so the limited purpose of not offering it for its truth is not

2    undermined by what counsel just described.

3              THE COURT:  I'll leave this for cross.

4              MR. COHEN:  Okay.

5              THE COURT:  If there's anything to do here, I'm

6    puzzled by what you're doing with this, but that's another

7    matter.

8              MS. SASSOON:  With the terms of service?

9              THE COURT:  Yes.  But I'll listen.

10             MR. COHEN:  Okay.

11             THE COURT:  I mean, counsel, I trust you understand my

12   ruling that legal import of the terms of service is, in all

13   likelihood, a question of law for me, it's not a jury question.

14             MS. SASSOON:  Yes, your Honor.  I do think, to the

15   extent that this was disseminated to users of FTX, what's in

16   there is potentially relevant for its effect on the listener.

17   To the extent the defendant was aware of certain provisions, it

18   will be relevant to his state of mind, and to the extent that

19   these provisions are consistent with discussions that the

20   witness had with the defendant, that's also relevant to the

21   defendant's state of mind.  So Mr. Sun reviewed these terms of

22   service, he thought that the provisions about the treatment of

23   customer digital assets was consistent with company policy, and

24   he therefore approved this terms of service.

25             THE COURT:  Okay.  You have a different view,

1   Mr. Cohen?

2           MR. COHEN:  I'm going to listen to the direct, your

3   Honor.

4           THE COURT:  Okay.

5           MS. SASSOON:  One more thing, your Honor, just for

6   clarity.  We also plan to ask this witness about a provision

7   that the defense highlighted in its opening because they opened

8   on it, they're making an argument about a provision here, and

9   so we want to contextualize it.

10          THE COURT:  I'll listen.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                      (In open court)

            MS. SASSOON:  Mr. Imperato, if we could publish

Government Exhibit 558.

BY MS. SASSOON:

Q.  Mr. Sun, what is this?  And just make sure the mic is

positioned so that we can all hear you.

A.  Yes.  This is the FTX terms of service.

Q.  And which version of the terms of service?

A.  This is the new version that was published May 13, '22.

Q.  And are these the terms of service you described the

defendant approving?

A.  Yes.

            MS. SASSOON:  If we could go to page 10, and look at

provision 8.2.6.

Q.  Mr. Sun, is this a provision that you reviewed in the

course of finalizing the terms of service?

A.  Yes.

Q.  I want to direct your attention to (A), which says, "Title

to your Digital Assets shall at all times remain with you and

shall not transfer to FTX Trading."

            First of all, what is FTX Trading?

A.  That is the FTX entity providing services to customers

under the terms of service.

Q.  And so how does this entity relate to ftx.com, the

international exchange?

1   A.   It was the entity providing services at ftx.com on the

2   website.

3   Q.   And where it says, "Title to your Digital Assets shall at

4   all times remain with you," what did you understand that to

5   mean?

6   A.   It means when a user deposits their assets onto the

7   exchange, they continue to own those assets.

8   Q.   Directing your attention to provision (B), do you see where

9   it says, "None of the Digital Assets in your Account are the

10  property of, or shall or may be loaned to, FTX Trading"?

11  A.   Yes.

12  Q.   How does the language there correspond to discussions you

13  had with the defendant about the treatment of FTX customer

14  assets?

15  A.   It's fully consistent.

16  Q.   How so?

17  A.   That customer assets, when deposited onto the platform,

18  continued to belong to the customers and FTX has no rights to

19  customers' assets.

20  Q.   No. (C), it says, "You control the Digital Assets held in

21  your Account."  What does it mean to control the digital assets

22  in your account?

23  A.   You can choose to do whatever you want with the assets; you

24  can withdraw it, trade it, lend it, you know, do whatever you

25  want with it.

1  Q.  "Digital Assets," what does that mean?

2  A.  Cryptocurrencies.

3  Q.  So this paragraph does not mention fiat currency.  Did you

4  understand fiat currency to be treated differently by the

5  exchange?

6  A.  No.  Exactly the same.

7  Q.  As far as you know, did this provision, 8.2.6, regarding

8  Digital Assets, exist in prior versions of FTX's terms of

9  service?

10  A.  This exact language, not to my recollection.

11  Q.  And in your view as general counsel, did the addition of

12  this exact language represent a change in FTX policy?

13          MR. COHEN:  Objection.

14          THE COURT:  Overruled.

15  A.  No, it did not.  It was the same policy.

16  Q.  And so how do you explain the addition of this provision?

17  A.  Again, it was fully consistent with FTX's policy

18  throughout.  I like to make everything clear so the user knows,

19  you know, that assets deposited on the exchange continued to be

20  owned by them.

21  Q.  So when was this language in the terms of service actually

22  finalized?

23  A.  September '21.

24  Q.  And at that point, in September 2021, did you consider the

25  obligations set out here to be an existing FTX policy?

```
 1    A.  Yes.

 2          MS. SASSOON:  Okay.  We can take this zoom-out down

 3    and go to page 16.

 4    Q.  And I want to direct your attention to what is titled

 5    Section 16.  Do you see where it says "MARGIN TRADING"?

 6    A.  Yes.

 7    Q.  And do you see at the top, 16.1 says, "This Section 16

 8    applies only to the extent you are permitted to engage in

 9    margin trading on the Platform"?

10          So if a customer was not doing margin trading on FTX,

11    did this section apply to that customer?

12    A.  It would not.

13    Q.  Let's go to a subsection of Section 16, MARGIN TRADING, on

14    page 17, provision 16.4.

15          So first of all, is 16.4 within the Section 16 called

16    MARGIN TRADING?

17    A.  Yes.

18    Q.  And so does this provision apply only to people doing

19    margin trading?

20    A.  Yes.

21    Q.  Are you familiar with this provision?

22    A.  Yes.

23    Q.  Just looking at the first sentence, it says, "Under certain

24    market conditions, it may become difficult or impossible to

25    liquidate a position."
```

```
 1              As general counsel, did you hear the defendant
 2   describe FTX's liquidation protocols?
 3   A.  Yes.
 4   Q.  And based on what the defendant described, what did you
 5   understand to be the procedure for liquidating positions on the
 6   FTX exchange?
 7   A.  So it is a multistep process.  The first step happens is,
 8   if your collateral—if the value of your account on the
 9   exchange starts to decrease and it hits 3 percent of your
10   position size, that's when FTX's trading engine starts to
11   liquidate you on the market.  If the market moves further
12   adversely to you, it goes further down.  Let's say your
13   collateral, your value of your account drops to 1.5 percent of
14   your total position, notional size, then what happens is, your
15   positions are now moved to what we call backstop liquidity
16   providers, which are basically large market makers on the
17   exchange who signed up to accept these positions.  Now if it
18   goes even further negative and the backstop liquidity program
19   is not able to actually take on these positions, then there's
20   an insurance fund that kicks in, which is basically money that
21   is set aside specifically for the purpose of covering these
22   losses that cannot be satisfied on the platform.  And if that
23   insurance fund gets depleted, runs out, then there would be,
24   you know, socialized losses.  But it has been FTX's consistent
25   position that they have never depleted the insurance fund, we
```

1    have never clawed back users, and we have no intention of

2    clawing back users as well.  It was one of FTX's main marketing

3    and selling points.

4    Q.  So what you just described, are those things that you heard

5    the defendant talk about?

6    A.  Yes.

7    Q.  And where did you hear the defendant describing FTX's

8    liquidation engine and the selling points of that engine?

9    A.  So it comes up in conversations with regulators, our

10   regulators around the world who asks us about our liquidation

11   and margin programs; it comes up in questions from our users

12   who asks about, you know, how our liquidation waterfall works;

13   it's something that a lot of large traders are very much

14   focused on because many other crypto exchanges do not have a

15   good liquidation program, and FTX won a lot of customers

16   because, you know, we marketed it as having a really good

17   program, you have an insurance fund that's never been depleted,

18   we've never done clawbacks.

19   Q.  I want to break that down a little bit.

20          First of all, you said this was a selling point for

21   the exchange.  Why was this a selling point?

22   A.  So other crypto exchanges have had a lot of these losses in

23   the past basically where you have positions stuck in the system

24   that are in the negative that they have not been able to

25   liquidate, and so what other exchanges do—and there's a whole,

1   you know, variety of ways as to how they do them——is they would

2   take people who make money in those markets and give it to the

3   people who lost money, to cover the losses.  That is typically

4   known as a clawback——people who make money had their profits

5   taken away from them.  And you can imagine that this is not

6   something that traders like.  And so FTX prided itself on the

7   lowest rate of liquidations, on having an insurance fund, has

8   never been depleted, and not doing clawbacks.

9   Q.  You talked about an insurance fund.  Based on the

10  defendant's statements, what did you understand was the

11  insurance fund?

12  A.  I understand that it was $250 million sitting on the

13  ftx.com exchange and made readily available to cover losses.

14  Q.  And I think you said earlier that you understood that the

15  insurance fund was money that was set aside.  Why did you

16  understand that that money had been set aside?

17  A.  Sorry.  Why did I understand that money had been set aside?

18  It was a program created specifically for that purpose.

19  Q.  And what, if anything, did the defendant tell you about how

20  the insurance fund had been used over time?

21  A.  It started small, obviously, but it, you know, it grew as

22  FTX grew, and one of the key things I remember is that the

23  maximum drawdown from the insurance fund, meaning payouts to

24  cover losses from the insurance fund, is less than the profits

25  made by FTX on that day.

```
 1              THE COURT:  And just for the sake of clarification,

 2   this insurance fund did not involve any insurance in the normal

 3   sense of buying a policy from MetLife or John Hancock or

 4   Fireman's Fund; is that right?

 5              THE WITNESS:  Yes, that's right.

 6              THE COURT:  Thank you.

 7   BY MS. SASSOON:

 8   Q.  And just to be clear, your understanding that——can you

 9   repeat your understanding about the drawdowns from the

10   insurance fund and explain that.

11   A.  Sure.  So when there are these losses that couldn't be

12   liquidated into the system, there would be payouts from the

13   insurance fund to cover those losses, and, you know, what I

14   learned is that the maximum payout from the insurance fund on

15   any given day, since FTX started, is less than the amount of

16   money that FTX made on that day.

17   Q.  And just to be clear, where did you learn that from?

18   A.  From Sam; it was written on our FTX policy website; it was

19   in a lot of our regulator communications.

20   Q.  Did you personally verify that?

21   A.  I did not.

22              MS. SASSOON:  And if we could pull this exhibit back

23   up and look at——zoom in on 16.4, please.

24   Q.  The last sentence here says, "In addition, even if you have

25   not suffered any liquidations or losses, your Account balance
```

1    may be subject to clawback due to losses suffered by other

2    Users."

3            In your conversations with the defendant, what, if

4    anything, did he say to you about clawbacks?

5    A.  So I've not discussed the specific provision, to my

6    recollection, with Sam, but when I talked to Sam about

7    clawbacks, he's always made it clear that FTX does not claw

8    back money from users.

9    Q.  And what, if anything, are you aware of that the defendant

10   said publicly about clawbacks?

11   A.  That we do not claw back against users as well.

12   Q.  And so you said that you don't recall discussing this

13   provision with the defendant.  Did he ever say anything to you

14   that suggested he was aware of this provision?

15           MR. COHEN:  Objection, leading.

16           THE COURT:  Sustained.

17   Q.  In your discussions with the defendant, what, if anything,

18   did he ever say to you about this provision, specifically?

19   A.  I do not recall any conversations with Sam specifically

20   about this provision.

21   Q.  And how does this last sentence in 16.4 compare to the

22   defendant's public statements about clawbacks?

23           MR. COHEN:  Objection.

24           THE COURT:  Sustained.

25           MS. SASSOON:  Your Honor, he described hearing public

1     statements about clawbacks.

2              THE COURT:  I understand, and he told us what he

3     heard.

4              MS. SASSOON:  Okay.  Now we can take this down.

5     BY MS. SASSOON:

6     Q.  You talked about liquidations.  Did there come a time when

7     you learned that Alameda Research was exempted from

8     auto-liquidation?

9     A.  Yes.

10    Q.  When was that?

11    A.  That was either August or September of '22.

12    Q.  And when you learned this, what was your recollection to

13    that?

14    A.  I was shocked.  It was——it went against everything we had

15    told regulators, told our users about the relationship between

16    FTX and Alameda, and I asked for it to be removed.

17    Q.  When you asked for Alameda's exemption from

18    auto-liquidation to be removed, what were you told?

19    A.  I was told that the no-liquidation carveout for Alameda had

20    never been triggered and——but Sam and Nishad did not want to

21    remove it.

22    Q.  And how did you know that Sam and Nishad did not want to

23    remove it?

24    A.  I was told by Zach Dexter.

25    Q.  And what did you understand happened next?

1    A.   I pushed for it to be removed, continuously, and we got

2    them to agree to remove it and do a couple things: (1) it would

3    be replaced by a delayed-liquidation mechanism instead of a

4    no-liquidation mechanism; (2) we were going to make it clear to

5    all of the regulators, all of our users who had been, you know,

6    misrepresented in the past, that this program is in place; and

7    (3) we were going to offer the program on a nondiscretionary

8    basis to all large market makers on the platform.

9    Q.   And as far as you know, were those changes actually

10   implemented prior to November of 2022?

11   A.   I had done everything on the legal side of things to make

12   it happen, but as I understand it, it was stuck on the business

13   side of things.

14   Q.   So is that a no?

15   A.   No.  Yes.  So it didn't—as far as I know, it was not put

16   in place by the time FTX collapsed in November.

17   Q.   And at that point did you have any indication that as a

18   result of the exemption from auto-liquidation that Alameda was

19   using FTX customer funds?

20             MR. COHEN:  Objection.

21             THE COURT:  Sustained, at least as to form.

22   Q.   Now, Mr. Sun, if Alameda was exempted from

23   auto-liquidation, would that have been relevant to your views

24   about the risks associated with potential losses on the

25   exchange?

1    A.  Yes.

2    Q.  How so?

3    A.  So when losses occur, if you have a margin-leveraged

4    trading system, the way to prevent these losses is to liquidate

5    the user before their account value goes negative.  So just to

6    maybe use a basic example, you have $10,000, you get a 20,000

7    Bitcoin position.  Bitcoin falls from 20,000 down to 5,000, you

8    know, normally you would have a minus 5,000 account balance.

9    Now if you're just trading on the exchange and you have a minus

10   5,000 account balance, you're not going to bring your assets

11   from out of the exchange onto the exchange just to cover that

12   hole, so the way to prevent that from happening is before your

13   account goes even a single dollar negative, when you're at

14   1.5 percent, you would liquidate that position by basically

15   selling it to other people.  Now if Alameda is exempt from this

16   no liquidation—it's exempt from liquidation, that would mean

17   that Alameda could go infinitely negative and there would be

18   nothing to prevent those losses from being, you know, stuck on

19   the system.

20   Q.  Now at that point when you learned about this exemption,

21   what, if anything, were you aware of with respect to Alameda

22   using customer funds?

23            MR. COHEN:  Objection.

24            THE COURT:  What's the objection?

25            MR. COHEN:  Leading.

1          THE COURT:  Overruled.

2   A.  I was not aware.

3   Q.  And as far as you know, were customers ever informed that

4   Alameda had been exempted from auto-liquidation?

5   A.  Not to my knowledge.

6   Q.  Once the terms of service that we looked at went live in

7   May of 2022, what did you do with the terms of service?

8   A.  It was uploaded onto our website.  It replaced the prior

9   terms of service.  We notified our institutional investors of

10  the change in the terms of service, and since then, between May

11  and November, when FTX collapsed, we made a few more updates to

12  comply with local regulatory requirements.

13  Q.  You mentioned institutional investors.  Are those customers

14  of the exchange?

15  A.  Yes.

16  Q.  And what's an institutional customer?

17  A.  So there are two types of customers on the exchange.  One

18  is, you know, a natural person, so like an individual; the

19  other one is like corporate entity, and we typically refer to

20  those as institutional customers.

21  Q.  And did your job responsibilities include some

22  communication with institutional customers of FTX?

23  A.  Yes.

24  Q.  What is Sculptor?

25  A.  Sculptor is one of the institutional customers on the

1    exchange who requested changes to our terms of service.

2              MS. SASSOON:  Mr. Imperato, can you please show the

3    witness what's been marked as Government Exhibit 326.

4    Q.  And do you recognize this email?

5    A.  Yes.

6    Q.  Are you on this email exchange?

7    A.  Yes.

8    Q.  And who are you communicating with on this email?

9    A.  I was communicating with Sculptor.

10             MS. SASSOON:  The government offers Government

11   Exhibit 326.

12             THE COURT:  Received.

13             (Government's Exhibit 326 received in evidence)

14             MR. COHEN:  Your Honor, can we have a limiting

15   instruction as to, other than Mr. Sun, the speakers.

16             THE COURT:  Give me a moment to read it.

17             Can you enlarge it, please.

18             MS. SASSOON:  None of this is being offered for the

19   truth, your Honor, but just for the fact that it was said to

20   Sculptor.

21             THE COURT:  That resolves your objection, doesn't it,

22   Mr. Cohen?

23             MR. COHEN:  It does, your Honor.  Thank you.

24             THE COURT:  Okay.  Received on that basis.

25   BY MS. SASSOON:

 1   Q.  Mr. Sun, do you——

 2           MS. SASSOON:  Mr. Imperato, can you please publish

 3   Government Exhibit 326.

 4   Q.  And Mr. Sun, do you see that this is an email thread on

 5   May 13, 2022?

 6   A.  Yes.

 7   Q.  And who generally are the participants in this email

 8   exchange?

 9   A.  So generally speaking, when a customer requests

10   modifications to our terms of service, they would reach out to

11   our institutional BD team, who would then refer it either to

12   myself or someone else on the legal team.

13   Q.  And so are you on this email exchange?

14   A.  Yes.

15   Q.  And are there representatives of Sculptor on this email

16   exchange?

17   A.  Yes.

18   Q.  May 13, 2022, what happened on that date?

19   A.  Our new terms of service was published that became the

20   governing terms of service going forward.

21   Q.  And if I could direct your attention to the bottom email

22   from cansun@ftx.com.  On May 13, 2022, you wrote, "Hi, Elise."

23   Where did Elise work?

24   A.  Sculptor.

25   Q.  And in this email, you wrote, "Our new terms of service

 1    just went online today."  And what is the link that you

 2    included there?

 3    A.   That is the link to our new terms of service.

 4              MS. SASSOON:  And we can take that down.

 5              At this time, Mr. Imperato, can you show the witness

 6    what's marked as Government Exhibit 514.

 7    Q.   Who are the participants in this email exchange, Mr. Sun?

 8    A.   This is Sculptor and someone from the legal team, Adrian.

 9              MS. SASSOON:  Your Honor, the government offers

10    Government Exhibit 514, not for its truth.

11              MR. COHEN:  May we be heard at the sidebar, your

12    Honor?

13              THE COURT:  Yes.  But somebody please bring up a hard

14    copy.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  What's the issue here?

3           MR. COHEN:  Your Honor, we would object to this, the

4    admission of Government Exhibit 514.  It's very different from

5    the one that was just admitted, 326.  Mr. Sun is not on this

6    document at all.  And there may well be, and I think there are,

7    hearsay issues as to it, but more importantly——

8           THE COURT:  It's not offered for the truth.  That was

9    the first thing.

10          MR. COHEN:  Okay.  But more importantly, your Honor,

11   this is about a different set of policies issued by a different

12   entity, FDM.

13          THE COURT:  A different entity?

14          MR. COHEN:  There was a newly created Bahamas entity

15   called FDM, which was not FTX International, the company we've

16   been talking about in this case.  These were different policies

17   issued by a different entity that——and it's an email chain

18   which Mr. Sun is not on.  I believe the government is going to

19   try to argue that these policies also should be considered

20   either construing the set of policies we just looked at or on

21   their own, and we submit that under 403 it would be both

22   confusing for the jury to be dealing with policies issued by

23   different corporate entities perhaps for a different purpose

24   that Mr. Sun was——on an email he wasn't on, and also

25   substantially prejudicial to my client.  So that's the

1   objection.

2       MS. SASSOON:  Your Honor, FTX Digital Markets was the

3   Bahamian entity created with respect to the ftx.com exchange.

4   Sculptor is a customer of the ftx.com exchange.  These are

5   statements by representatives of FTX to a customer referring to

6   policies that Mr. Sun will be able to explain what they are.

7   He's not on this email, but all I'm going to ask him are about

8   what these policies are, and I'm going to show him those

9   policies, and those were policies that governed the ftx.com

10  exchange.

11      MR. COHEN:  They were policies that governed the new

12  company, your Honor, as to which there's been no testimony as

13  to the existence or relationship of.

14      THE COURT:  I just heard a proffer that he's going to

15  testify that they're on the ftx.com exchange.

16      MR. ROOS:  Didn't he say the new terms of service were

17  for that entity?

18      MS. SASSOON:  That was FTX Trading.  But before we

19  admit it, I can ask him what's FTX Digital Markets, and based

20  on his answer, if your Honor is satisfied, then we can offer

21  this exhibit.

22      THE COURT:  Well, let's take it a step at a time.

23      MR. COHEN:  This exchange points out how confusing

24  this is under 403.  So——

25      THE COURT:  I'm not confused yet.

1          MR. COHEN:  You're not confused, your Honor, but I

2    think the rest of us are.

3          THE COURT:  Okay.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court)

2        THE COURT:  Proceed.

3        MS. SASSOON:  Mr. Imperato, let's pull back up

4   Government Exhibit 326 just for a moment.

5   BY MS. SASSOON:

6   Q.  And Mr. Sun, I want to direct your attention to your email

7   at the bottom.  And in this email to Sculptor on May 13, 2022,

8   you wrote, "we've actually just changed the operating entity

9   for ftx.com to our Bahamas DARE Act-licensed entity FTX Digital

10  Markets Ltd."  So can you explain what FTX Digital Markets Ltd.

11  was.

12  A.  It's our Bahamian subsidiary that was licensed under the

13  Bahamian DARE Act.  Under the new terms of service, that was

14  going to be the default and predominant entity that serviced

15  our customers going forward.

16  Q.  So just to be clear, how did FTX Digital Markets relate to

17  ftx.com?

18  A.  It is the entity providing the bulk of the services that

19  are available to users on ftx.com.

20      MS. SASSOON:  We can pull that down now.

21      And Mr. Imperato, can you pull back up Government

22  Exhibit 514, just for the witness.

23      And at this time the government offers Government

24  Exhibit 514.

25      MR. COHEN:  Same objection.

1     THE COURT:  Overruled.

2         (Government's Exhibit 514 received in evidence)

3     MS. SASSOON:  Mr. Imperato, can you please publish

4  this exhibit for the jury.

5  BY MS. SASSOON:

6  Q.  Now just to be clear, Mr. Sun, are you on this email

7  exchange?

8  A.  I am not.

9  Q.  Who is Adrian Guye?

10 A.  He is a member of our legal team.

11 Q.  And Elise Knaus, does she work at Sculptor?

12 A.  Yes.

13 Q.  And do you see in Adrian's June 23, 2022, email to Elise,

14 he wrote, "Please find attached the FTX Digital Markets

15 policies that I can share with you," and a little farther down,

16 he wrote, "as reflected in the attached safeguarding of assets

17 policy"?

18 A.  Yes, I see that.

19 Q.  Were you familiar with the safeguarding of assets policy?

20 A.  Yes.

21 Q.  And what was it?

22 A.  It's one of the policies that we put together and was

23 required to be bound by under our Bahamian license to safeguard

24 and protect customer assets.

25 Q.  And do you see at the end of that paragraph Adrian Guye

1    wrote, "As further reflected in this policy under safeguarding

2    and segregation, in the unlikely event that FDM becomes

3    insolvent, customer funds will be ring-fenced from such

4    insolvency"?  First of all, what does FDM stand for?

5    A.   FDM stands for FTX Digital Markets Ltd., our Bahamian

6    subsidiary.

7    Q.   What does it mean to ring-fence customers from insolvency?

8    A.   Keep it separate and segregated so in the event of an

9    insolvency in FTX Digital Markets, FTX Digital Markets's

10    customers will be able to receive their funds back.

11         (Continued on next page)

1  Q.  Just to be clear, when you say FDM's customers, how does

2  that relate to FTX.com's customers?

3  A.  They are the same.

4  Q.  Now you are not on this email, but is that sentence there,

5  how does that relate to what your understanding was about --

6              MR. COHEN:  Objection.

7              THE COURT:  Sustained.

8  Q.  What, if any, understanding did you have, separate and

9  apart from this email, about what would happen to customer

10  funds in the event of insolvency?

11  A.  It would be fully protected and segregated and returned to

12  customers.

13              MS. SASSOON:  We can take that down.  Mr. Imperato, if

14  you can pull up for the witness.

15              THE COURT:  I'm sorry.  Let me just --

16              Was that true in your mind with respect to FTX Digital

17  Markets, FTX.com, or both?

18              THE WITNESS:  It would be both.  If FDM -- FTX Digital

19  Markets, the payment subsidiary, provides the bulk of the

20  services that are available on FTX.com.

21              THE COURT:  Explain what that means to the jury.

22              THE WITNESS:  There are a number of services available

23  on FTX.com.  Not all of them are provided by FTX Digital

24  Markets Limited.  We are a Bahamian subsidiary.  For instance,

25  if you are from Japan or Australia and you were trading on

1 FTX.com, you were not serviced by FTX Digital Markets.  You

2 were serviced by our Japan and Australian subsidiaries.

3          THE COURT:  Would it be fair to say that the legal

4 department that dealt with all of this dealt with it for all

5 these FTX companies?

6          THE WITNESS:  Yes, for the most part.  We don't

7 practice local law, your Honor, obviously.

8          THE COURT:  Local law meaning, for example, the

9 Bahamas.

10          THE WITNESS:  Bahamas, Japan, Australia, yup.

11          THE COURT:  Were the people supervising the services

12 provided by these various entities the same?

13          THE WITNESS:  For the most part, we have in each

14 jurisdiction wherever you are licensed a local team as well to

15 make sure that whatever we do locally is also in compliance

16 with local laws.

17          THE COURT:  Go ahead.

18          MS. SASSOON:  Mr. Imperato, can you please pull up

19 Government Exhibit 340 for the witness.

20 Q.  Do you recognize this?

21 A.  Yes.

22 Q.  What is it?

23 A.  This is the safeguarding of assets and digital management

24 policy.

25 Q.  Did this apply to FTX.com?

1    A.  Yes.

2    Q.  As general counsel, did you review this?

3    A.  Yes.

4    Q.  And did this document go through an approval process?

5    A.  Yes.

6    Q.  For what purpose?

7    A.  This was one of the documents for our Bahamian license

8    application, so it had to be approved by the CEO and typically

9    approved by the board as well.

10   Q.  When you say it had to be approved by the CEO, who was the

11   CEO?

12   A.  It was Ryan Salame.

13   Q.  What about the board, who was on the board?

14   A.  It was Ryan, Sam.  I think we might have added Nishad later

15   down the road, but I can't remember exactly when.

16   Q.  But Sam Bankman-Fried was on the board that would approve

17   these policies?

18              MR. COHEN:  Objection.  Leading.

19              THE COURT:  Sustained in that form.

20   Q.  When you said Sam was on the board, which Sam are you

21   referring to?

22   A.  Sam Bankman-Fried.

23              MS. SASSOON:  The government offers Government Exhibit

24   340.

25              MR. COHEN:  Same objections as made at the sidebar,

1    your Honor.

2         THE COURT:  Overruled.  It's received.

3         (Government Exhibit 340 received in evidence)

4    Q.  I just want to clarify.  You said Ryan Salame was CEO.  CEO

5    of what entity?

6    A.  FTX Digital Markets Limited, our Bahamian subsidiary.

7         MS. SASSOON:  Mr. Imperato --

8         THE COURT:  Excuse me.

9         Who owned the shares of digital markets, the Bahamian

10   subsidiary?

11        THE WITNESS:  It was owned 100 percent by FTX Trading

12   Limited, our holding company in Antigua.

13        THE COURT:  Who owned the shares of that entity?

14        THE WITNESS:  So Sam has a majority, followed by Gary

15   Wang and Nishad Singh.

16        THE COURT:  Thank you.

17        Let's go on.

18        MS. SASSOON:  Mr. Imperato, can you publish Government

19   Exhibit 340.

20   Q.  Looking at this cover page, can you read the title of this

21   document.

22   A.  FTX Digital Markets Limited, safeguarding of assets and

23   digital token management policy.

24   Q.  At a high level, what is this document?

25   A.  This sets out the policies and processes by which FTX

1  Digital Markets Limited safeguards customer assets.

2  Q.  Was this a document that was shared with FTX customers?

3  A.  Not to my knowledge.  So there are some cases where an

4  investor -- sorry -- a user could potentially ask, but it is

5  not a document that is generally made available to users.

6  Q.  Just to be clear, was it sometimes made available to users?

7  A.  Yes.

8           MS. SASSOON:  Let's go to page 4.

9  Q.  Can you read the first sentence beneath introduction.

10 A.  This policy outlines FDM's approach to the safeguarding of

11 assets.

12 Q.  Under the objectives section, what is the first bullet

13 point under this policy's objectives are to?

14 A.  Emphasize our stringent commitment to safeguarding assets

15 belonging to both FDM and its customers.

16          MS. SASSOON:  Let's go to page 5.

17 Q.  Do you see where it says FDM's responsibilities?

18 A.  Yup.

19 Q.  What does it say beneath that?

20 A.  Appropriately account for the difference between its own

21 assets and its customers' assets.

22 Q.  Sorry.  The sentence right beneath the header, FDM's

23 responsibilities.

24 A.  FDM is ultimately responsible for the safeguarding of its

25 customers' assets.

1  Q.  Do you see beneath that it says:  FDM's key roles and

2  responsibilities in relation to safeguarding of assets are

3  outlined below.

4       Now, can you read the first bullet beneath that.

5  A.  Appropriately account for the difference between its own

6  assets and its customers' assets.

7  Q.  And can you read the third bullet.

8  A.  All third-party providers are aware that customer assets

9  are held in trust.

10 Q.  What does it mean for assets to be held in trust?

11 A.  It means that you hold them, that you are not the

12 beneficial owner of them, and you are holding it for the

13 benefit of someone else; in this case, customers.

14      MS. SASSOON:  Let's go to page 7.

15 Q.  Do you see the section entitled safeguarding and

16 segregation?

17 A.  Yes.

18      MS. SASSOON:  Can you please, Mr. Imperato, zoom in.

19 Q.  Mr. Sun, can you read the first sentence below that

20 heading.

21 A.  FDM has a responsibility to ensure that customer assets are

22 appropriately safeguarded and segregated from its own funds.

23 Q.  Can you read the first bullet, please.

24 A.  Customer assets, both fiat and virtual assets, are

25 segregated from its own assets.

1    　　　　　MS. SASSOON:  Can you highlight, Mr. Imperato, the

2    sentence after the bolded words SCB where it says:  Customer

3    accounts will be designated as such, and the money contained

4    therein will be appropriately ring-fenced and protected from

5    claims against FDM.

6    Q.  Can you remind us what it means to appropriately

7    ring-fenced assets from claims against FDM?

8    A.  Sure.  Customer assets belongs to the customer.  When they

9    come in, they are kept in separate accounts, protected and

10   separate from FDM OR FTX's own assets, so that if FTX or FDM

11   has a bankruptcy event, customer assets, which belongs to the

12   customer, does not belong to FTX, will be returned to

13   customers.

14   Q.  What, if any, conversations did you have with the defendant

15   about the subject matters that we have just been looking at

16   related to protection of customer assets?

17   A.  In all my conversations with Sam, it has always been

18   represented to me that customer assets are protected,

19   segregated, as set out in the policy.

20   　　　　　MS. SASSOON:  You can take that down.

21   　　　　　Mr. Imperato, can you please show the witness

22   Government Exhibit 26.  Can you go to the series B tab.

23   Q.  Do you recognize this spreadsheet, Mr. Sun?

24   A.  Yes.

25   Q.  What is it?

1    A.  This is a spreadsheet that was maintained in connection

2    with our fundraisers.  So each of the tabs, series B, B1, C,

3    C1, those are different rounds of fundraising that we have been

4    doing, and in each of these tabs it lists the name of the

5    investor, their contact information, and so on and so forth.

6    Q.  As general counsel, did you review the spreadsheet?

7    A.  Yes.

8    Q.  And were you familiar with the content?

9    A.  Yes.

10              MS. SASSOON:  The government offers Government Exhibit

11   26.

12              MR. COHEN:  No objection.

13              THE COURT:  Received.

14              (Government Exhibit 26 received in evidence)

15              MS. SASSOON:  Mr. Imperato, if we can publish this to

16   the jury and stay on the series B tab where you have it.

17   Q.  Now that the jury has the benefit of seeing the

18   spreadsheet, can you explain what series B refers to.

19   A.  So series B was our fundraising round that was completed in

20   July of 2021, before I joined.  So this is basically a

21   fundraising event whereby investors invest money into FTX and

22   in return get shares in the company.

23   Q.  Do you see the column A that says name?

24   A.  Yes.

25   Q.  What is listed under name?

1    A.   That is the name of the investor.

2    Q.   Can you just read the first nine names there.

3    A.   Sequoia, Paradigm Capital, Thoma Bravo, Soft Bank, Third

4    Point LLC, Insight Partners, Robbitt Capital, Lightspeed

5    Venture Partners.

6    Q.   You can stop there.

7              Were the names you read and the ones following

8    investors in FTX?

9    A.   Yes.

10             MS. SASSOON:   If we can scroll to column R.

11   Q.   Do you see this column where it says amount?

12   A.   Yes.

13   Q.   What does this refer to?

14   A.   That is the amount of money that they invested into FTX.

15   Q.   The next tab is called series B1.  What does that refer to?

16   A.   That is our subsequent investment round that was completed

17   in October of 2021.

18   Q.   And the first name here is OTPP.  What does that stand for?

19   A.   Ontario Teachers' Pension Plan.

20   Q.   Can you read the name of the investor in row 5.

21   A.   Temasek.

22   Q.   There is another tab here called series C.  What does that

23   refer to?

24   A.   That was our next fund-raising round that was completed in

25   January of 2022.

1  Q.  So here the first two names are Paradigm and Temasek, which

2  we saw in earlier tabs.  What does that mean that they are

3  reappearing here?

4  A.  That they invested a gain into FTX at the new round.

5  Q.  You see that there is a tab called series C1.  What is

6  that?

7  A.  That is -- that was a round that we started in, I think,

8  late summer and fall of 2022, but it never closed.

9  Q.  When you say it never closed, what does that mean?

10  A.  So the investors did not actually put money into FTX.

11  Q.  As general counsel, did you participate in any

12  conversations with FTX investors?

13  A.  Yes.

14  Q.  And what, if anything, did you tell investors about the

15  relationship between FTX and Alameda?

16          MR. COHEN:  Objection.

17          THE COURT:  Ground.

18          MR. COHEN:  Hearsay.

19          MS. SASSOON:  Not offered for its truth, your Honor.

20          THE COURT:  Of course.  Overruled.

21  A.  Consistently told our investors that FTX and Alameda are

22  two fully independent and separate companies.

23  Q.  Where did you get that information from when you told

24  investors that FTX and Alameda were two separate companies?

25  A.  Based on representations made to me by Sam.

1  Q.  I want to talk about investments for a moment.  What

2  involvement, if any, did you have with venture investments by

3  the defendant?

4  A.  From time to time, there would be investments that needed

5  legal support, and sometimes I was brought in to help to review

6  investment negotiation investment agreements.

7  Q.  At all times prior to November 2022, what did you believe

8  about where the money came from for these investments?

9  A.  That it was all profits of Alameda, basically house money

10  that was made by Alameda.

11  Q.  What, if anything, did anyone ever tell you about whether

12  the investments involved customer money?

13  A.  Nothing whatsoever.

14  Q.  And what role, if any, did you have with any loans from

15  Alameda to parties related to the company of FTX?

16  A.  Yes.  I documented a series of loans made by Alameda to

17  Sam, Gary, Nishad, and others.

18  Q.  Can you describe what you did.

19  A.  Yes.  So it generally happens in two ways.

20         MR. COHEN:  Can we have a time frame, your Honor?

21         THE COURT:  Yes.

22  Q.  Over what time period did you document loans for Sam and

23  others?

24  A.  From the time when I joined FTX in late August '21 until

25  the collapse in November '22, throughout my time there.

1  Q.  Throughout your time there, can you describe your

2  involvement in documenting loans?

3  A.  Sure.  These loans typically come up in two ways.

4      One way is, if I were working on a transaction myself,

5  such as an acquisition, and we needed certain funds in order to

6  close the transaction, I would go to Sam or other members of

7  management and say, hey, we need a capital injection in order

8  to close this transaction.

9      The second way it comes up is, if there is a

10  transaction that I'm not working on but apparently needs a

11  capital injection, then Sam or someone will pull me aside and

12  say, hey, we need to put X amount of dollars of a capital

13  injection into one of these companies.

14  Q.  What were you told, if anything, about why these

15  investments were being funded through loans to the defendant

16  and others?

17  A.  So the way that these loans were structured was in place

18  when I joined, and even after I joined we had worked with

19  outside counsel on structuring these loans.  So all of the

20  loans I worked on came -- the lender was Alameda and the

21  borrower was typically Sam, Gary, Nishad.

22      So what would happen is, let's say there is a need for

23  a $250 million injection into FTX.US, which was the case in

24  December '21, when FTX.US needed that for its CFTC margin

25  application, I would discuss with Sam how to make the capital

1  injection, and the preferred way of doing it is to have Alameda

2  make a personal loan to each of the founders, Sam, Gary, and

3  Nishad, and then they would actually invest the funds into FTX

4  US in the form of an investment.

5  Q.  What was your view of this practice that you were involved

6  in?

7  A.  I had no idea that customer funds were being used.  We had

8  worked with outside counsel on structuring these transactions.

9       Sorry.  Your question?

10 Q.  Can you describe what was your view of just the practice of

11 using loans to the defendant to fund investments?

12 A.  Under the circumstances, back then, we did not know it was

13 customer funds, and we worked with outside counsel on it, and

14 we thought it was legal and it was fine to do that.

15 Q.  Did you have any views beyond that?

16 A.  Yes.  It was probably -- from an optics perspective, it was

17 probably not the most transparent, but under those

18 circumstances back then we did not know it was customer funds.

19      MS. SASSOON:  Your Honor, at this time I would ask

20 permission to hand the witness a binder which has within it

21 Government Exhibits 211, 225, 236 through 242, and what's

22 already in evidence as Defense Exhibits 15, 16, 20, 22 through

23 24, 34, 184, and 211.

24      THE COURT:  You can hand him the binder.

25      MS. SASSOON:  Thank you.

1   Q.   Mr. Sun, do you recognize this binder?

2   A.   Yes.

3   Q.   How do you recognize it?

4   A.   The initial on the cover.

5   Q.   What's inside this binder?

6   A.   These are series of loans that I documented from Alameda to

7   the founders.

8          MS. SASSOON:   The government offers Government

9   Exhibits 211, 225 and 236 through 242.

10          THE COURT:   Received.

11          (Government Exhibits 211, 225 and 236-242 received in

12   evidence)

13          MS. SASSOON:   Let's just take one example.

14          Mr. Imperato, can you please pull up Government

15   Exhibit 236.   If you can zoom to the first paragraph and

16   everything above that.

17   Q.   You see here it says promissory note.   Is that a loan?

18   A.   Yes.

19   Q.   What's the date of this loan?

20   A.   April 30, '22.

21   Q.   Who is the recipient?

22   A.   Sam Bankman-Fried.

23   Q.   What's the amount of this loan from Alameda to Sam

24   Bankman-Fried?

25   A.   $369,667,182.50.

1   Q.  Is this an example of a loan that you were involved in

2   documenting while general counsel?

3   A.  Yes.

4   Q.  You mentioned a few times not knowing anything about use of

5   customer funds.  Would you have documented loans that involved

6   the use of customer funds?

7           MR. COHEN:  Objection.

8           THE COURT:  I will allow that.  Overruled.

9   A.  Absolutely not.

10  Q.  What awareness, if any, did you have of loans to Ryan

11  Salame?

12  A.  There were three loans that were documented to Ryan.

13  Q.  Apart from three loans that you documented to Ryan Salame,

14  were you told anything about any other loans to Ryan Salame?

15  A.  I was not.

16          MS. SASSOON:  Can we show the witness what's been

17  marked as Government Exhibit 79.

18  Q.  Do you recognize this?

19  A.  Yes.

20  Q.  What is it?

21  A.  This is the spreadsheet that I maintained to keep track of

22  all of the loans.

23  Q.  Did you maintain this as the loans were being documented?

24  A.  Yes.

25          MS. SASSOON:  The government offers Government Exhibit

79.

         MR. COHEN:  No objection.

         THE COURT:  Received.

         (Government Exhibit 79 received in evidence)

         MS. SASSOON:  Mr. Imperato, if you can publish this,
please.

Q.  Now that the jury can see it, can you explain what this
spreadsheet is.

A.  Sure.  So this includes -- on a row-by-row basis every
single row is a loan that I documented.  The amount of the loan
is in column D.  The borrower is column B.  The lender in all
of these was Alameda.  And the purpose of each loan is
described in column A.

         MS. SASSOON:  If we could scroll down to see how many
rows are here.  This goes down to row 35.

Q.  How does the content here relate to the total loans that
you were involved in documenting?

A.  So all of the loans that came through my desk that I
handled is documented on these except for two personal loans
that was part of a management incentive program for two
employees, including myself, to purchase property in the
Bahamas, but everything else is on here.

Q.  Apart from those loans that you just mentioned that are not
on here, does this spreadsheet reflect the total amount of the
loans that you were involved in documenting?

 1  A.  Yes.

 2  Q.  And where is that?

 3  A.  Cell D38, 2.17 billion.

 4  Q.  Apart from these loans that you were involved in

 5  documenting, were you informed of other loans to Gary, Nishad,

 6  and Sam?

 7  A.  No.  All the loans I was aware of that I documented is on

 8  the spreadsheet.

 9          MS. SASSOON:  We can take that down.

10          At this time the government offers Government Exhibit

11  141A, which the parties have stipulated is an excerpt from the

12  Alameda Research general ledger, dated November 13, 2022.

13          MR. COHEN:  No objection.

14          THE COURT:  Received.

15          (Government Exhibit 141A received in evidence)

16          MS. SASSOON:  Mr. Imperato, if you can publish that,

17  please.

18  Q.  Mr. Sun, prior to your meetings with the government, had

19  you seen this document before?

20  A.  No, I had not.

21          MS. SASSOON:  Mr. Imperato, if you can zoom in on the

22  top half.

23  Q.  Do you see a number of transaction types labeled expense

24  that are described as outgoing money transfers to Samuel

25  Bankman-Fried?

1   A.   Yes.

2   Q.   In your time as general counsel, had you been aware of

3   these transfers?

4   A.   If they are not on my spreadsheet, I was not aware of them.

5   Q.   Do you see the column called amount?

6   A.   Yes.

7   Q.   Just taking an example, do you see a September 16, 2022

8   transfer to Sam Bankman-Fried in the amount of $4 million?

9   A.   Yes.

10   Q.   And were you aware of that transfer?

11   A.   I was not.

12   Q.   As far as you know, were any of these transfers documented

13   in any form of promissory note or loan?

14   A.   No, they were not documented.

15        MS. SASSOON:  If we could zoom in on the bottom half

16   of this document.

17   Q.   Do you see here a number of transfers to Ryan Salame in the

18   millions of dollars?

19   A.   Yes.

20   Q.   Do any of these look familiar to you?

21   A.   No.   These do not look like any of the loans that are

22   documented for Ryan.

23        MS. SASSOON:  We can take that down.

24   Q.   Mr. Sun, did you personally get any loans from Alameda?   I

25   think you mentioned one.

```
 1   A.  Yes, I did.

 2   Q.  And besides that one, did you receive any others?

 3   A.  No.  That was the only loan I got.

 4   Q.  What was the amount of that loan?

 5   A.  2.3 million.

 6   Q.  And for what purpose did you receive that loan?

 7   A.  As part of a management incentive program to incentivize

 8   employees to move to the Bahamas.  A hundred percent of it was

 9   used for the purchase of a house in the Bahamas.

10   Q.  When you got that loan, where did you think that money was

11   coming from?

12   A.  Alameda's own money, profits.

13   Q.  Mr. Sun, did you enter any agreements with the government

14   prior to your testimony today?

15   A.  Yes.

16   Q.  What type of agreement?

17   A.  A nonprosecution agreement.

18   Q.  What's your understanding of your obligations under the

19   nonprosecution agreement?

20   A.  That I shall speak the truth.

21   Q.  What, if anything, do you understand the agreement to

22   provide in return?

23   A.  That I will not be prosecuted by the government if I speak

24   the truth.

25   Q.  Did you request a nonprosecution agreement from the
```

1    government?

2    A.  Yes.

3    Q.  Why?

4    A.  I had no idea that customer funds were being used.  I

5    didn't do anything wrong.  As general counsel I was involved in

6    transactions that now, in hindsight, may have involved the

7    misappropriation of customer funds, so, out of an abundance of

8    caution, I asked the government for protection.

9         MS. SASSOON:  Your Honor, I have one more section.  I

10   can continue and finish and then we can take a break, or we can

11   take a break now, whatever you prefer.

12        THE COURT:  How long a section is it?

13        MS. SASSOON:  Maybe 15 minutes.

14        THE COURT:  Let's get it done.

15   Q.  I want to talk to you about November of 2022, Mr. Sun.

16        Did there come a time in November 2022 when you

17   assisted in efforts to raise capital for FTX?

18   A.  Yes.

19   Q.  Who did you try to raise capital from?

20   A.  Apollo Capital.

21   Q.  What is Apollo Capital?

22   A.  It's a large investment fund.

23   Q.  What was your role in discussions with Apollo about raising

24   money for FTX?

25   A.  So it was on the afternoon of November 7, at around 1 p.m.,

1    I was asked to join a call with Apollo without much context.

2    There was myself and Ramnik, our head of product, and they

3    asked for Apollo -- for them to invest in FTX to help solve a

4    liquidity problem that FTX had for customer withdrawals.

5    Q.  Did your discussions with Apollo involve reference to any

6    documents?

7    A.  Yes.  So on the call with Apollo that we had, they asked

8    for a copy of FTX's financial statements describing FTX's

9    financial condition.  Neither Ramnik for myself had that

10   information, so we took that offline and prepared that after

11   the call.

12   Q.  And so was a spreadsheet prepared with some financial

13   information?

14   A.  Yes.  So what happened after the call is, neither Ramnik

15   nor myself had that information.  We sat down in a room and

16   asked for that information.  After about 30, 45 minutes or so,

17   I got a spreadsheet from either Sam or Ramnik that included

18   various financial information relating to FTX and Alameda.

19   Q.  Where were you when you received this spreadsheet with

20   information about FTX and Alameda?

21   A.  I was in an apartment in Albany in the Bahamas.

22   Q.  Just to be clear, you said you were in an apartment in

23   Albany.  What's Albany?

24   A.  Albany is an apartment complex situated at the southwestern

25   end of the Bahamas.

1  Q.  Who were you with you when you received the spreadsheet at

2  the apartment in Albany?

3  A.  There was Sam, Nishad, Ramnik, and Joe.

4  Q.  Did you review the spreadsheet in the presence of those

5  individuals?

6  A.  Yes.

7  Q.  What, if anything, did you learn in looking at this

8  spreadsheet?

9  A.  I was shocked because it showed that FTX was short $7

10 billion to satisfy customer withdrawals, and there was a

11 separate tab in that spreadsheet that showed the amounts of

12 money that Alameda could return to FTX to satisfy customer

13 withdrawals.

14 Q.  Why did that information shock you?

15 A.  Because as we have talked about, it has been my

16 understanding throughout my time at FTX that FTX has

17 safeguarded, segregated customer assets, that we do not misuse,

18 we do not touch customer assets.  So -- and not just Alameda,

19 but anyone.  So when there is a $7 billion deficit and FTX

20 relied on Alameda to return money to be able to plug in that

21 hole, I was shocked.

22 Q.  So as you are reviewing this spreadsheet in the Albany with

23 Sam, Nishad, and others, what, if anything, were you saying?

24 A.  I was asking questions.  I was asking questions about how

25 the arithmetic was calculated.  The way that the Excel

1  spreadsheet was set up was not straightforward.  I asked about

2  different line items, how those were calculated.  But I did not

3  get straight responses.

4  Q.  You said you were not getting straight responses.  How, if

5  at all, was anyone responding to you?

6  A.  Most often I was throwing a question out there and no one

7  was responding.  And sometimes when I asked a question about,

8  for instance, whether this line item is inclusive or exclusive

9  of certain other line items, I would get a very vague answer.

10 Q.  What was the defendant doing while you were asking these

11 questions about the spreadsheet?

12 A.  Sam was in a room, he was typing away on his computer, and

13 after a while he stepped out to make some calls.

14 Q.  What about Nishad?

15 A.  Nishad was sitting there.  His entire face was pale, gray.

16 It looked like his soul had been plucked away from him.

17 Q.  What did you conclude from reviewing this spreadsheet?

18         MR. COHEN:  Objection.

19         THE COURT:  Sustained at least as to form.

20 Q.  What views, if any, did you form in reviewing the

21 spreadsheet?

22 A.  I had a growing suspicion that FTX did not have the

23 customer money and that it had been misappropriated most likely

24 by Alameda.

25 Q.  Did you share this information with Apollo?

1   A.   We shared the spreadsheet with Apollo.

2   Q.   What happened after that?

3   A.   About an hour or two after we sent out the spreadsheet, Sam

4   pulls me aside and he says he heard an update from Apollo.

5   They asked him for a legal justification as to why the funds

6   were missing and were at Alameda, and he asked me to come up

7   with legal justifications.

8   Q.   Once the defendant asked you to come up with legal

9   justifications about the missing funds, what do you understand

10  had happened to the customer funds?

11  A.   I mean, basically confirmed my suspicion that had been

12  rising all day that FTX did not have the funds to satisfy

13  customer withdrawals and that they had been misappropriated by

14  Alameda.

15  Q.   And this conversation with the defendant where he asked you

16  to come up with a legal justification, where did it take place?

17  A.   In the same Albany apartment.

18  Q.   And in that conversation did the defendant identify any

19  legal justifications that he was aware of?

20  A.   No.

21  Q.   And in that moment did either of you provide a legal

22  justification?

23  A.   No.

24  Q.   What, if anything, did the defendant tell you in that

25  conversation had actually happened with the customer money?

1   A.   He did not say anything about that.

2   Q.   After this conversation where the defendant asked you to

3   come up with a legal justification, did you explore possible

4   legal justifications for the missing customer money?

5   A.   Yes.

6   Q.   And did you come to any conclusions?

7   A.   Yes.   That there were no legal justifications for the money

8   being taken away.

9   Q.   Did you have a subsequent discussion with the defendant

10  about those conclusions?

11  A.   Yes.

12  Q.   Where did that conversation take place?

13  A.   So it was right around 7:00 that evening, November 7.   It

14  was still in the same Albany apartment.   And Sam pulls me aside

15  and says he is talking to Apollo in 10, 15 minutes.   He asked

16  me to go on a walk with him.   I go on a walk with him and

17  basically tell him that there was no legal justification for

18  the funds being missing and taken by Alameda.   I did tell him

19  that there were theoretical arguments, but none of them was

20  supported by the facts.

21  Q.   You just testified that you told the defendant there were

22  some theoretical arguments but none were supported by the

23  facts.   Did you walk through those theoretical arguments with

24  the defendant during this walk?

25  A.   Yes.

1  Q.  And what was the first one that you spelled out for the

2  defendant?

3  A.  The first argument is section 9 of our terms of service

4  which deals with dormancy, or otherwise known as abandoned

5  property.

6         What happens is, if there is a prolonged period of

7  time where FTX is not able to contact the customer, then in

8  that scenario FTX would be able to charge a dormancy fee for

9  administering the user's funds.

10  Q.  What, if anything, did you tell the defendant about whether

11  this was an adequate legal justification?

12  A.  Yes.  I told Sam that this would not justify the amount

13  that was taken away by Alameda.

14  Q.  Why not?

15  A.  The amount of active users on the exchange was very few,

16  and FTX had only been around since 2019, so the amount of funds

17  that we could even call dormant is very little.

18  Q.  I just want to be clear.  When you said certain users or

19  very few, did you say active or inactive?

20  A.  Sorry.  Inactive users with large account balances.

21  Q.  Were what?

22  A.  Very few.

23  Q.  How did the defendant respond to what you said?

24  A.  He acknowledged it.

25  Q.  How did he acknowledge it?

1  A.  Yup, yup.

2  Q.  I'm sorry.  When you just went yup, yup, is that what he

3  was saying?

4  A.  Yes.  That is what Sam said.

5  Q.  And did you raise any other potential arguments with the

6  defendant on this walk?

7  A.  Yes.  The second theoretical argument is section 16 of our

8  terms of service, which provides that if a user voluntarily

9  affirmatively chooses to lend out their money to other users on

10 the platform, then if the borrower then defaults and unable to

11 return the money, then the lender's money is gone.

12         Alternatively, also under section 16 of our terms of

13 service, if a user decides to take his assets and use it as

14 collateral to trade on leverage, then he is pledging those

15 collateral -- pledging his assets as collateral to trade on

16 margin, and if he or she is liquidated, then those assets will

17 be taken away as well.

18 Q.  What, if anything, did you explain to the defendant about

19 whether this argument was supported by the facts?

20 A.  I had previewed this argument with Nishad and Ramnik before

21 the walk, and they had pulled some numbers that showed that it

22 was not supported by the facts as well.

23 Q.  Did you relay that to the defendant?

24 A.  Yes.

25 Q.  And how did he respond to that?

1    A.  He acknowledged as well.

2    Q.  How did he acknowledge it?

3    A.  He said yup, yup.

4    Q.  Were there any other theoretical arguments you described to

5    the defendant?

6    A.  Yes.  There was a third one, which is some crypto exchanges

7    do not make it clear what is the relationship between a user

8    when they deposit funds onto the exchange and the exchange.  I

9    told him that unfortunately that is not even feasible for us

10   because our terms of service make it very clear that when a

11   user deposits assets onto the exchange, those assets continue

12   to belong to the user.

13   Q.  Did the defendant respond to this explanation?

14   A.  Yes.  He acknowledged as well.

15   Q.  Did you offer any other theoretical arguments, or was it

16   primarily those three?

17   A.  It was those three.

18   Q.  Once you walked through those three arguments on this walk,

19   how did the defendant react to what you had told him?

20   A.  I was actually expecting a bigger response, but it was very

21   muted.  Sam basically said something like, got it.  He was not

22   surprised at all.

23   Q.  Did the defendant push back on what you said?

24   A.  No.

25   Q.  I couldn't hear you.

 1              MR. COHEN:  Objection.

 2              THE COURT:  Couldn't hear the answer.

 3   A.  No.

 4              THE COURT:  Overruled, Mr. Cohen.

 5   Q.  During this discussion, what, if any, of his own

 6   justifications did the defendant provide?

 7   A.  I do not recall any.

 8   Q.  That same day did you have any conversations with Nishad

 9   Singh?

10   A.  Yes.

11   Q.  What do you recall about that?

12   A.  It was later that evening, around 11 p.m., Nishad pulled me

13   aside, and we went for a quick walk around the building as

14   well.  Nishad basically asked me about his personal exposure,

15   about the loans he had taken from FTX, about the bonuses that

16   he had received.  The one thing he had mentioned as well is

17   that the no-liquidation mechanism that Alameda had is also the

18   same mechanism by which Alameda was able to withdraw customer

19   assets from the exchange.

20   Q.  Had you known that before this conversation with Nishad?

21   A.  No, I did not.

22   Q.  What, if anything, did Nishad tell you about his prior

23   conversations with the defendant?

24   A.  Yes.  He said that he found out about the hole, basically

25   that Alameda was taking FTX customer assets in late summer of

1   '22, so August or September of 2022.  He said that he talked

2   to -- he confronted Sam directly about it, and Sam told him

3   back then that it is what it is and there is nothing we can do

4   about it.  The only thing we can do is to grow the company and

5   fill in the hole.

6   Q.  When did you leave FTX?

7   A.  The next day.

8   Q.  Under what circumstances?

9   A.  I resigned.

10          MS. SASSOON:  At this time the government offers

11  Government Exhibit 923B, which the parties have stipulated is

12  an excerpt from a Good Morning America interview with Sam

13  Bankman-Fried, dated December 1, 2022.

14          THE COURT:  Received.

15          (Government Exhibit 923B received in evidence)

16          MS. SASSOON:  Mr. Imperato, if you can please play

17  this interview excerpt from December 1, 2022 for the jury.

18          (Video played)

19  Q.  Mr. Sun, the demeanor of the defendant that you observed on

20  this video, how does that compare to your interactions with

21  him?

22          MR. COHEN:  Objection.

23          THE COURT:  Sustained.

24  Q.  How would you generally describe the defendant's demeanor

25  during your interactions with him?

1          MR. COHEN:  Same objection.

2          THE COURT:  Overruled.

3   A.  Very confident.

4   Q.  And on this video did you hear the defendant mention a

5   borrow-lend facility on FTX?

6   A.  Yes.

7   Q.  And was the borrow-lend facility one of the potential

8   justifications you had discussed --

9          MR. COHEN:  Objection.  Leading.

10         THE COURT:  Overruled.

11  Q.  Was the borrow-lend facility a potential justification that

12  you had discussed with the defendant on November 7, 2022?

13  A.  Yes.

14  Q.  And what had you said to the defendant about that?

15  A.  It was not supported by the facts.

16  Q.  And what was his response?

17  A.  He acknowledged it.

18         MS. SASSOON:  No further questions.

19         THE COURT:  Thank you.

20         We will take a 15-minute break.

21         (Recess)

22         (Continued on next page)

23

24

25

1                    (In open court; jury not present)

2                    MS. SASSOON:  Your Honor, it seems unlikely to arise,

3    but as I mentioned yesterday, we do have lawyers from the FTX

4    debtors here.

5                    THE COURT:  Understood.  Thank you.

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1           (Jury present)

 2           THE COURT:  The defendant and the jurors all are

 3    present, as they have been throughout.

 4           THE DEPUTY CLERK:  Please be seated, everyone.

 5           THE COURT:  The witness is reminded he's still under

 6    oath.

 7           THE WITNESS:  Yes.

 8           THE COURT:  Mr. Cohen, cross-examination, please.

 9           MR. COHEN:  Thank you, your Honor.

10    CROSS EXAMINATION

11    BY MR. COHEN:

12    Q.  Good morning, Mr. Sun.

13    A.  Good morning.

14    Q.  Now you testified earlier today that you went to Yale Law

15    School; is that correct?

16    A.  Yes.

17    Q.  Before that you took a degree from the University of

18    Toronto in electrical engineering?

19    A.  Yes.

20    Q.  And then you did a PhD program at Princeton; is that

21    correct?

22    A.  That's right.

23    Q.  And after graduating from Yale Law School you worked for a

24    firm called Davis Polk in New York.

25    A.  That's right.

1  Q.  And you became admitted to the New York bar?

2  A.  That's right.

3  Q.  And you're still admitted to the New York bar.

4  A.  Yes.

5  Q.  Okay.  Davis Polk is one of the premier financial law firms

6  in the world?

7  A.  Yes.

8  Q.  And then you went from there to—you moved out to Seattle

9  and you worked for Fenwick & West, correct?

10  A.  That's right.  That's right.

11  Q.  And they're also a major law firm, correct?

12  A.  Yes.

13  Q.  Specializing in startup companies?

14  A.  That's right.

15  Q.  And when you were at Fenwick, Alameda and then FTX were

16  clients of Fenwick, correct?

17  A.  That's right.

18  Q.  And they remained clients of Fenwick during the time you

19  were there.

20  A.  That's right.

21  Q.  And then after you moved over to FTX, Fenwick continued to

22  provide legal work for FTX and Alameda.

23  A.  That's right.

24  Q.  And that's called outside counsel?

25  A.  That's right.

1  Q.  Now I think you told us you began at FTX in August of 2021

2  and you were there through November 2022; is that correct?

3  A.  That's right.

4  Q.  And at first, when you first started at FTX, where were you

5  physically located?

6  A.  I was in Hong Kong.  I flew to Hong Kong.  So before that I

7  was in Seattle.  I flew to Hong Kong to start the job.

8  Q.  And there came a time when you decided to move to the

9  Bahamas, correct?

10 A.  That's right.

11 Q.  And that was to be in the FTX corporate headquarters.

12 A.  Yes.

13 Q.  And that was the end of 2021?

14 A.  I moved to Bahamas late September '21.

15 Q.  Okay.  September 2021.  And you mentioned that you received

16 a management incentive compensation loan to buy a house in the

17 Bahamas.  Do you recall that?

18 A.  Yes.

19       MR. COHEN:  Okay.  Let's call out for identification,

20 for the witness only, Defendant's Exhibit 268, please.

21 Q.  So the first question, Mr. Sun, is:  Take a moment to look

22 through this document and let me ask you if you recognize it.

23 A.  Yes.

24 Q.  And is this the promissory note that you entered into in

25 connection with the loan?

1  A.  That's right.

2          MR. COHEN:  Your Honor, we offer Defendant's

3  Exhibit 268.

4          MS. SASSOON:  No objection.

5          THE COURT:  Received.

6          (Defendant's Exhibit 268 received in evidence)

7  Q.  Now if you can see at the top, sir, this is—you're the

8  borrower and you're receiving a loan of $2.34 million, correct?

9  A.  That is correct.

10  Q.  And this was the loan you were going to use to buy the

11  house in the Bahamas.

12  A.  That's right.

13          MR. COHEN:  If we could scroll down to the next

14  paragraph.  Can you call out those terms.

15          If you look at the first—the first sentence is on the

16  first to occur.  If we can go from there all the way down to

17  maturity date.

18  Q.  And just to simplify this, Mr. Sun—correct me if I'm

19  wrong—you didn't have to start paying back the loan right

20  away, correct?

21  A.  Give me a moment to review it.

22  Q.  Take as much time as you need.

23  A.  Yes, no immediate payments.

24  Q.  Right.  So there was a maturity date five years out,

25  correct?

1   A.  Or earlier——yeah.

2   Q.  So unless——well, let me go through it.  You didn't have to

3   pay back the loan for five years unless the property was sold

4   or you ceased to work for the company, correct?

5   A.  At a high level, yes.

6           MR. COHEN:  Okay.  Continuing on to the next——the next

7   entry, Brian, next paragraph, "Interest shall accrue."

8   Q.  "Interest shall accrue on any unpaid principal based on a

9   simple interest rate of the midterm AFR."  Do you see that,

10  sir?

11  A.  That's right.

12  Q.  And my question simply is:  What does "Interest shall

13  accrue" mean?

14  A.  So the midterm applicable federal rate, the AFR, as of

15  December 2021.

16  Q.  Did it mean you had to make monthly interest payments?

17  A.  No.

18  Q.  So the principal and the interest were deferred until some

19  future date, correct?

20  A.  Right.

21  Q.  Now you then moved to the Bahamas in September, you said?

22  A.  That's right.

23          MR. COHEN:  Okay.  You can take that down, Brian.

24  Q.  And you purchased the home, correct?

25  A.  That's right.

1  Q.  Okay.  And is it fair to say that in January of 2022, you

2  received a bonus?

3  A.  That's right.

4  Q.  Also for $2.3 million.

5  A.  I think it was actually 3.5 total.

6  Q.  And what was the purpose of receiving that bonus?

7  A.  To——to incentivize me to join the company as well as bonus

8  for the work I had done at FTX.

9  Q.  And you had been at FTX since August.

10 A.  That's right.

11 Q.  So six months, and you received a $3.5 million bonus after

12 signing a promissory note to pay back 2.3; is that correct?

13 A.  No.  There were separate——the 3.5 is separate and apart

14 from the 2.3.

15 Q.  You didn't see them connected at all.

16 A.  So depends on what you mean by connected.  Now one of them

17 is obviously related to my employment, and, you know, the

18 house——the payment terms we just went through is also related

19 to my employment.

20 Q.  So you believe that the loan to buy the house was a valid

21 loan.

22 A.  Yes.

23 Q.  Now you described some of your duties as the general

24 counsel at FTX, so I don't want to go through all of them, but

25 let me just ask you:  General counsel is the chief legal

1   officer of the company, correct?

2   A.  Generally, yes.  I would just note that Dan Friedberg was

3   also, so I was reporting to both him and Sam.

4   Q.  Okay.

5   A.  So he was managing some of the legal as well.

6   Q.  So Dan Friedberg was someone you had known at Fenwick &

7   West, correct?

8   A.  Yes.

9   Q.  You had both been attorneys at Fenwick?

10  A.  Yes.

11  Q.  And you both came in-house to work for FTX.

12  A.  Yes, so he joined much earlier than I did, a year and a

13  half earlier.

14  Q.  Okay.  With the exception of Mr. Friedberg and the

15  relationship you just described, were you the senior-most legal

16  officer at FTX?

17          MS. SASSOON:  Objection, form.

18          THE COURT:  Sustained.

19  Q.  Did you supervise other attorneys at FTX?

20  A.  Yes.

21  Q.  Okay.  Who supervised you?

22  A.  As I said, I reported to Dan and Sam.

23  Q.  And I think you mentioned that one of the projects you took

24  on at the beginning was trying to get licenses for FTX.  Do you

25  recall that, sir?

1    A.   That's right.

2    Q.   And can you explain to the jury what you meant by that.

3    A.   Sure.  So in the summer of 2021, a lot of FTX's competitors

4    were getting hit by fines, investigations, subpoenas, by

5    regulators around the world, and when I joined FTX, one of my

6    main mandates was—FTX was unregulated at that time, and one of

7    my main mandates was to help FTX get regulated and licensed in

8    as many countries as possible.

9    Q.   And you worked on that.

10   A.   That's right.

11   Q.   With other attorneys in the legal department.

12   A.   That's right.

13   Q.   About how large was the legal department?

14            MS. SASSOON:  Objection.

15            THE COURT:  What's the objection?

16            MS. SASSOON:  Relevance.

17            THE COURT:  Sustained.

18   Q.   Were there other attorneys in the legal department besides

19   you and Mr. Friedberg?

20            MS. SASSOON:  Objection.

21            THE COURT:  Sustained.

22            He already testified he supervised other attorneys.

23            MR. COHEN:  Okay.  I understand, Judge.  I'll move on.

24   Q.   And were you successful in obtaining those licenses?

25   A.   Yes, we got a good number of licenses over the course of

1    the year, year and two months I was there.

2    Q.  Okay.  Now I believe you testified that another project you

3    took on was handling the corporate structure, corporate setup

4    of the company, correct?

5    A.  That is correct.

6    Q.  And when you got there, your view was that the corporate

7    housekeeping was sort of a mess, correct?

8    A.  That is right.

9    Q.  So you had to organize many different companies that had up

10   to that point not been organized properly, in your view,

11   correct?

12   A.  That is right.

13   Q.  Now if we could turn to another topic, Mr. Sun.

14          Do you recall giving testimony earlier this morning

15   about various loans that were made to Sam, Gary, and others?

16   A.  That's right.

17   Q.  And you kept track of them you said on a spreadsheet that

18   you kept.

19   A.  That's right.

20   Q.  And Ms. Sassoon went over that spreadsheet with you.  There

21   was about 15 to 20 of them, correct?

22          MS. SASSOON:  Objection, form.

23          THE COURT:  Sustained.

24   Q.  How many loans, to your recollection——we can always bring

25   it up, but how many loans were there?

1    A.  There were about 30 to 40, but as you said, it's on that

2    spreadsheet.

3    Q.  Okay.  And you told us that you worked with others on how

4    the loans should be structured as a legal matter; is that

5    correct?

6    A.  That's correct.

7    Q.  Did the others include Fenwick & West?

8    A.  Yes.

9    Q.  Who else worked on the loans?

10   A.  Myself, Dan, Fenwick, we also had valuation consultants,

11   and our tax and accounting firms were also brought in from time

12   to time.

13   Q.  Okay.  Just so we're clear, what's a valuation consultant?

14   A.  Sure.  So it's a company that tries to calculate the value

15   of the shares of the company.  So unlike a public company

16   where, you know, shares are traded, there's always a price for

17   it, for a private company that's not gone public yet, the

18   valuation firm tries to guesstimate as best as they can what

19   the valuation of the shares are.

20   Q.  Valuation, tax attorneys.  Okay.

21       Now let's talk about Sam and Gary.  They were the

22   owners of Alameda, correct?

23   A.  Right.

24   Q.  Now they could have taken these funds out as dividends,

25   correct?

1    MS. SASSOON:  Objection.

2    THE COURT:  What's the objection?

3    MS. SASSOON:  Form and speculative.

4    THE COURT:  Sustained.

5  Q.  As a general counsel of FTX, did you have a view as to

6  whether Sam and Gary could have received these funds in a

7  different form than a loan?

8  A.  Yes.  There were probably different ways—again, the

9  fundamental assumption we were working under is that Alameda

10  was owned 90 percent by Sam, 10 percent by Gary, and that all

11  of the money that was at Alameda, because of their ownership,

12  belonged to them.  We were not aware that they were customer

13  money.

14  Q.  And in terms of structure, there were other ways, in

15  alternative to the loan structure, correct?

16  A.  Yes, probably so.

17  Q.  But after the process you just described, the loan

18  structure was selected, correct?

19  A.  So the loan structure was actually in place at the time

20  that I joined FTX.  It was—it was one that I inherited.  But,

21  you know, throughout my time there, we worked with outside

22  consultants to identify potential issues with it and to take,

23  you know, measures to mitigate those risks.

24  Q.  So you inherited this structure.

25  A.  Yes.

1    Q.  But as you took it over, you didn't change it.

2    A.  That's right.

3    Q.  Okay.

4    A.  That's right.  For the most part.  So there were a few

5    changes that we, you know, worked with outside consultants to

6    make.

7    Q.  All right.  Let's move to another topic, Mr. Sun.

8          MR. COHEN:  If we could pull up Government Exhibit 558

9    in evidence.

10   Q.  These are the May 13, 2020 terms of service.  Do you recall

11   giving testimony about these this morning?

12         MS. SASSOON:  Objection.  It's not 2020.

13         MR. COHEN:  2022.  I apologize.

14   A.  Yes.

15         MR. COHEN:  Too many twos.

16   Q.  Okay.  And I believe you told us that when you came on

17   board, they were 80 to 90 percent drafted?

18   A.  That's right.

19   Q.  Who had drafted them?

20   A.  So this was part of a Bahamian license application.  I know

21   that we had hired an external consultant working with Dan,

22   Adrian, and our outside counsels, Fenwick and Herbert Smith.

23   Q.  And Herbert Smith is a different law firm than Fenwick?

24   A.  That is right.

25   Q.  And that's headquartered in London, correct?

1    A.   I actually don't know where they're headquartered.

2    Q.   Which office of Herbert Smith were you working with?

3    A.   Singapore.

4    Q.   So basically you took the draft that they had started and

5    then you brought it to the——brought it to conclusion.

6                THE COURT:   Sustained as to form.   Who's "they"?

7                MR. COHEN:   Let me start again, your Honor.

8    Q.   So you mentioned that the two law firms that had worked on

9    it, to your knowledge, were Fenwick & West and Herbert Smith;

10   is that correct?

11   A.   That's right.

12   Q.   Okay.   And then is it your testimony, sir, that you then

13   completed the work?

14   A.   Working with them, yes.

15   Q.   And I believe you told us that what you were trying to do

16   in the terms of service was to lay out the obligations of FTX

17   and its customers, correct?

18   A.   That's right.   That's what the terms of service spells out.

19   Q.   Okay.   Why don't we take a look at the terms of service.

20               MR. COHEN:   Let's take a look at page 10 at the

21   bottom, please.

22               Okay.   If you can go, Brian, up to the top, 8.2.

23   Q.   That section is headed Digital Assets.   Do you see that,

24   sir?

25   A.   Yes.

1  Q.  And you testified about that this morning on your direct,

2  correct?

3  A.  Yes.

4  Q.  Okay.  And if we could go down to 8.2.6.  Do you see that?

5  A.  Yup.

6  Q.  And you told us that this provision related to digital

7  assets and title to digital assets and all the other things

8  laid out in A, B, and C.  I'm not going to go through it again.

9  Is that correct?

10  A.  Yes.

11  Q.  Now is it fair to say, Mr. Sun, that fiat was addressed in

12  different sections of the terms of service?

13  A.  Yes, it's not covered by the definition of digital assets

14  here.

15  Q.  Okay.  Fiat is something different than digital assets,

16  correct?

17  A.  Under the definitions, yes.

18          MR. COHEN:  Okay.  If we could look to the next page,

19  page 11, bottom of the page.  Call out 8.3.

20  Q.  This is a section called "Fiat currency," correct, sir?

21  A.  Yes.

22  Q.  And it called out whatever the obligations that FTX and the

23  customers had with regard to fiat, correct?

24  A.  Yes.

25          MR. COHEN:  All right.  Continuing in the document, if

1   we could go to page 27.

2   Q.  Top of the page.  Do you see that section, sir?  What does

3   that relate to?

4   A.  The governing law of the——

5           MS. SASSOON:  Objection.

6           THE COURT:  Well, it says what it says, and the

7   agreement is in evidence, but I would suggest caution.

8           MR. COHEN:  I'm just going to ask one question.

9   Q.  Could you read that out, sir.

10  A.  "The terms and any dispute shall be governed by, and

11  construed in accordance with, English law."

12  Q.  Okay.  Thank you, sir.

13          MR. COHEN:  Now if we could go back to page 17.

14  Excuse me.  16.  And go to the heading 16.

15          And Brian, if you could highlight 16, just the

16  heading.

17  Q.  That refers to the section about margin trading, correct,

18  sir?

19  A.  Yes.

20  Q.  And you told us earlier there was an entire section devoted

21  to margin trading.

22  A.  Yup.

23  Q.  Based on your experience working at FTX, did you have a

24  view about what percentage of the assets were participating in

25  the margin trading program?

1    MS. SASSOON:  Objection, foundation.

2    THE COURT:  Sustained.

3  Q.  In connection with your work at FTX, did you ever——did you

4  ever look into how many——how many users took advantage of the

5  margin trading program?

6    MS. SASSOON:  Objection.  Also vague as to time frame.

7  Q.  During the time you were the general counsel.

8  A.  I do not recall.

9  Q.  Okay.  Before we——well, let me——before we move on, if you

10  could look at Section 16.4.

11    Do you recall giving testimony about that today, sir?

12  A.  Yes.

13  Q.  And if I might go through it with you.

14    MR. COHEN:  At the top of the first——if you could

15  highlight the first sentence.

16  Q.  It says, "Under certain market conditions, it may become

17  difficult or impossible to liquidate a position."

18    And then you described for us, sir, how, if there was

19  a difficulty liquidating a customer's account, the backstop

20  liquidity providers might have to be brought into it, correct?

21  A.  That's right.

22  Q.  And let's continue on.

23    MR. COHEN:  If you could go, Brian, to the sentence

24  that begins, "In such an event."  Right here.  Highlight that

25  sentence.

1   Q.  "In the event that the customers did not have sufficient

2   assets, in such event, our backstop liquidity provider program

3   may come into play, but there is no assurance or guarantee that

4   any such program activities will be sufficient or effective in

5   liquidating your position."  Do you see that, sir?

6   A.  Yes, I see that.

7   Q.  That was the next step you described to us earlier.

8   A.  That's right.

9   Q.  Okay.  And then to complete that, "as a result, you may

10  lose all of your assets or incur a negative balance in your

11  account.  In addition, even if you have not suffered any

12  liquidations or losses, your account balance may be subject to

13  clawback due to losses suffered by other users."

14         So is that—let me not try to—let me just ask you

15  your understanding of those sentences, sir.

16  A.  So as it described, this is—describes our liquidation

17  waterfall.  I would just maybe caveat by saying this is a very

18  shortened version that is drafted mostly for disclaimer

19  purposes.  There is a much more detailed description of our

20  liquidation and risk engine on our help desk web page and also,

21  as I mentioned earlier today, that, you know, this does not

22  actually describe the insurance fund, which is something that

23  we have, and as I mentioned earlier today, my understanding is

24  that our insurance fund has never been depleted.

25  Q.  You said this was describing, at least in part, something

1    you called the liquidation waterfall.  What do you mean by

2    that?

3    A.   It basically means the order in which liquidations occur.

4    Q.   Okay.  And so at least according to this provision, there

5    could be a time when, even if a customer had not suffered any

6    losses of their own, their balances could be subject to

7    clawback due to losses suffered by other users; is that

8    correct, sir?

9              MS. SASSOON:  Objection.

10             THE COURT:  Sustained.  It says what it says and we've

11   been over this at least twice.

12             MR. COHEN:  Your Honor, he's the author of the

13   document.

14             MS. SASSOON:  Objection.  No, he's not.

15             THE COURT:  He's not the author of the document.  He's

16   somebody who participated, starting at a point where it was 80

17   to 90 percent finished, and in any case, the words are on the

18   page, and it doesn't help to read them six times.

19             MR. COHEN:  Okay.  I won't go for six, your Honor.

20   BY MR. COHEN:

21   Q.   Mr. Sun, have you ever heard of the term

22   "auto-deleveraging"?

23   A.   Yes.

24   Q.   What's your understanding of that?

25   A.   It means that when there is significant volatility in the

1  market that could lead to losses, leveraged positions will be

2  automatically closed out as part of the liquidation mechanism.

3  Q.  And in your understanding, sir, are there times when

4  auto-liquidation occurs when one customer's assets could be

5  used to cover the losses of another customer's assets?

6          MS. SASSOON:  Objection.

7          THE COURT:  What's the objection?

8          MS. SASSOON:  Confusing and foundation.

9          MR. COHEN:  He just said he knew it.

10          THE COURT:  Give me a moment.

11          MS. SASSOON:  Your Honor, the previous question was

12  about auto-deleveraging.

13          THE COURT:  Yes, it was, and this question is about

14  something called auto-liquidation.  Sustained.  Let's try

15  again.

16          MR. COHEN:  I'm sorry.  Let's have the last question

17  read back, please.  Two questions ago.

18          (Record read)

19          MR. COHEN:  Okay.  I take his Honor's point.  I will

20  move on.

21  BY MR. COHEN:

22  Q.  Now you were asked some questions about something called

23  segregation of assets.  Do you recall that, Mr. Sun?

24  A.  Yes.

25  Q.  Can you describe for us what your understanding of

1    segregation of assets was.

2    A.  Sure.  Which is when FTX receives assets of customers,

3    whether it's fiat or crypto, that they will hold those assets

4    in segregated bank accounts or crypto wallets separate and

5    apart from FTX's own assets.

6    Q.  So I want to just go through a couple things here.

7           You were talking about separation of FTX's operational

8    assets.  I think you gave the example of payroll, for example,

9    for customer assets, correct?

10   A.  Right.

11   Q.  Now that's a different concept than separation of customer

12   A's assets versus customer B's assets, correct?

13   A.  That's correct.

14   Q.  And I think you said at FTX, with customer A, B, and so

15   on's deposited assets, they were all held in one account.

16   A.  That's right.  We do not maintain individual wallets or

17   accounts for each customer.

18   Q.  And that was called an omnibus account, or omnibus wallet.

19   A.  Yes.  So we hold all customer assets in, you know, these

20   combined wallets, which we refer to as omnibus accounts.

21   Q.  Okay.

22          THE COURT:  Was that true generally or with respect

23   only to crypto assets?

24          THE WITNESS:  My understanding it was the same for

25   both fiat and crypto assets.

1    THE COURT:  Thank you.

2    THE WITNESS:  Thank you.

3    BY MR. COHEN:

4    Q.  Now let me move forward in time, Mr. Sun.

5    I think you described a situation in August of 2022

6    when you learned about Alameda having certain privileges on the

7    FTX exchange.  Do you recall telling us about that?

8    A.  Yes.

9    Q.  And how did you learn of that?

10   A.  I was informed by Zach Dexter and Ryne Miller.

11   Q.  And this was about——this was in about——in or about August

12   of 2022?

13   A.  About August or September.

14   Q.  Okay.  Did you discuss this with anyone else besides

15   Mr. Dexter and Mr. Miller around that time?

16   A.  Yes.  I discussed it with Dan Friedberg, Nishad, and Sam.

17   And David.

18   Q.  And I believe you told us that when you first learned of

19   this, you were shocked.

20   A.  That's right.

21   Q.  And the take-away was that this was going to be changed to

22   a delayed liquidation?

23   A.  Yes.  After some back-and-forths, the take-away is that

24   they will change it to a delayed liquidation mechanism, make it

25   known to our users and our regulators, and also offer it on a

1    nondiscretionary basis to all large market makers.

2    Q.  And that was going to be implemented sometime after August

3    of 2022, correct?

4    A.  That's right.

5    Q.  Okay.  And I think you said that you were not aware of

6    whether that was ever implemented, correct?

7    A.  That's right.

8    Q.  Did you follow up?

9    A.  So as I understand it, I had completed everything on the

10   legal front to implement that.  It was passed on to the

11   business team, and they were stuck in a process of discussing

12   what other nondiscretionary terms that we were to offer to

13   other market makers on the exchange.

14   Q.  So it never got implemented.

15   A.  That's my understanding.

16   Q.  And you left it to the business team.

17   A.  That's my understanding.

18   Q.  Did you think about resigning over it?

19   A.  I did.

20   Q.  But you didn't.

21   A.  That's right.  And the difference is, when I first heard

22   about it in August of 2022, there was—I did not know that that

23   was the same mechanism that Alameda used to withdraw customer

24   assets until Nishad told me around 11 p.m. on November 7.

25           Second, Nishad had assured me that that mechanism had

1      never been triggered.

2             And three, as we've discussed, you know, we had a path

3      to actually get rid of it.

4      Q.  Okay, sir.  Let me move to a different topic.

5             In your experience, have you ever heard the term

6      "document protection policies"?

7      A.  Document protection, in what——in what sense?

8      Q.  Or "data protection policies."

9      A.  Yes.

10            THE COURT:  Which one are you asking about?

11            MR. COHEN:  The second one, your Honor; data

12     protection policies.

13     A.  So again, if you could be a bit more specific, it would be

14     helpful.  It could be——

15     Q.  Sure.  Have you ever heard of policies that companies use

16     to decide what data to keep or not keep?

17     A.  Yes.

18     Q.  What do you——how do you think of them?  What term do you

19     use?

20            MS. SASSOON:  Objection.

21            THE COURT:  What's the objection?

22            MS. SASSOON:  The "how do you think of them" seemed

23     vague, but if he's just asking for terminology, I'll withdraw

24     it.

25            THE COURT:  Are you just asking for terminology?

 1              MR. COHEN:  For now, yes.

 2              THE COURT:  All right.

 3   A.  So—so yeah.  So companies have policies to help guide them

 4   as to their, you know, data retention, protection policies.

 5   Q.  Okay.  Based on your experience at FTX, did FTX have such

 6   policies?

 7   A.  So again, data protection policies can cover a very wide

 8   range of things, from user privacy to, you know, separate

 9   security, to, you know, document retention.  I can't say that

10   FTX had all of them, but it had some of them.

11   Q.  Did you ever participate in reviewing or drafting such

12   policies?

13              MS. SASSOON:  Objection, vague.  Which—

14              THE COURT:  Sustained.

15   Q.  I'll break it down.

16              Did you ever participate in reviewing such policies at

17   FTX?

18              MS. SASSOON:  Objection.  It's still vague.  What such

19   policies?  He just said it could be 20 different things.

20              THE COURT:  Sustained, form.

21   Q.  Okay.  Let's break this down even more, Mr. Sun.

22              To your knowledge did FTX have any documentation that

23   dealt with data retention?

24              MS. SASSOON:  Objection, form.

25              THE COURT:  Overruled.

1  A.  I can't remember off the top right now.

2  Q.  Nothing comes to mind.

3       THE COURT:  That's what he said.

4  Q.  Answer the next questions yes or no, please.

5       Did you ever talk with Dan Friedberg about data

6  retention issues?

7  A.  Yes.

8  Q.  Answer this question yes or no, please:  Did you ever talk

9  to anyone at Fenwick & West about data retention issues?

10      MS. SASSOON:  Objection.

11      THE COURT:  What's the objection?

12      MS. SASSOON:  401, 403, raised before trial.

13      THE COURT:  Sustained, on all grounds.

14 Q.  During the time you were the general counsel of FTX, did

15 FTX ever receive subpoenas?

16 A.  Yes.

17 Q.  Did you participate in responding to those subpoenas?

18 A.  Yes.

19 Q.  In connection with responding to those subpoenas, did

20 you——answer this yes or no——did you have to deal with data

21 retention issues?

22 A.  Yes.

23 Q.  Have you ever heard of communications called Signal and

24 Slack?

25 A.  Yes.

1    Q.  What are they?

2    A.  Signal is a text messaging app, and Slack is a workspace

3    collaboration messaging app.

4    Q.  And were they used at FTX?

5    A.  Yes.

6    Q.  Were they used by the legal department?

7    A.  Yes.

8    Q.  Let's move on, Mr. Sun.

9         MR. COHEN:  If we could go back to Government

10   Exhibit 326 in evidence.

11   Q.  Do you recall giving testimony about this document, sir?

12   A.  Yes.

13        MR. COHEN:  And if we look at the bottom of the page.

14   If you can highlight, Brian, the "from" and the "sent."

15   Q.  So this is an email sent by you.  Were you can@ftx.com?

16   A.  Yes.

17   Q.  And the date is Friday, May 13, 2022, correct?

18   A.  Yes.

19        MR. COHEN:  And go to the body of the email.  And if

20   you can highlight the text of that, Brian, the first paragraph.

21        The whole first paragraph.

22   Q.  You are providing to Ms. Knaus the new terms of service,

23   correct?

24   A.  That's right.

25   Q.  And then you give a place for her to click on.  That's the

1    document we were just looking at as Government Exhibit 558,

2    isn't it, sir?

3    A.   That's right.

4             MR. COHEN:   Take that down.

5    Q.   By the way, FDM was a different entity than FTX

6    International, correct?

7    A.   So FTX International wasn't an entity by itself.   It

8    was──you know, we had one parent holding company and we had

9    maybe 2,000 operating entities below.

10   Q.   Thank you, sir.

11            Now do you recall giving testimony about some events

12   in November of 2022?

13   A.   That's right.

14   Q.   Okay.   And you gave──you described a meeting you were in

15   with Sam and others where you went over a spreadsheet.   Do you

16   recall that, sir?

17   A.   That's right.

18   Q.   And one of the things you took away from this meeting was

19   that in your view, the spreadsheet reflected a $7 billion hole,

20   I believe you told us.

21   A.   That's right.

22   Q.   And as you understood it, Mr. Bankman-Fried was talking to

23   investors at the time, correct?

24   A.   That's right.

25   Q.   And this spreadsheet got sent to Apollo; that's one of the

 1    investors you were mentioning at the time.

 2    A.  That's right.

 3    Q.  The spreadsheet with the hole in it got sent to Apollo.

 4    A.  That's right.

 5    Q.  And then you told us you went, you had a discussion with

 6    Mr. Bankman-Fried, and I think you said you went on a walk with

 7    him; is that correct?

 8    A.  That's right.

 9    Q.  Okay.  And you went over possible justification for what

10    happened, correct?

11    A.  That's right.

12    Q.  And then after that, Mr. Bankman-Fried had a call with

13    Apollo?

14    A.  He stepped out, saying that he was going to go for a call.

15    Q.  And I take it you weren't on that call.

16    A.  I was not on the call.

17    Q.  You also mentioned that during the same period, that during

18    that same week, you had a conversation with Nishad Singh.  Do

19    you recall that?

20    A.  That's right.

21    Q.  And he told you he was concerned about the loans he had

22    received from the company.

23    A.  That's right.

24    Q.  Did he tell you they weren't really his loans?

25    A.  Sorry.  What do you mean?

 1   Q.  Did he tell you he wasn't really on the hook for them?

 2   A.  That he was not really on the hook for them.  I think his

 3   conversation with me was he was worried about his ability to

 4   repay those loans and what was going to happen to those loans.

 5   Q.  Okay.  Understood.

 6            Okay.  Now one more topic, Mr. Sun.

 7            You mentioned that you're here today pursuant to a

 8   non-prosecution agreement.

 9   A.  That's right.

10            MR. COHEN:  Okay.  Can we pull up Government

11   Exhibit 12 in evidence.

12            Oh, I'm sorry.  I'm sorry.  It's 3524-012 in evidence.

13            MS. SASSOON:  This is not in evidence, your Honor.

14            MR. COHEN:  Oh, it's not in?  I'm sorry.  I thought

15   you moved it in.  Well, then let's do this.  Just show it to

16   the witness.

17            THE COURT:  I'm still not clear what it is you're

18   proposing to show to the witness.  What exhibit?

19            MR. COHEN:  3524-012.  It's in the 3500, your Honor.

20            THE COURT:  And is it a government exhibit, is it a

21   defense exhibit, or has nobody bothered to mark it?

22            MR. COHEN:  It's not marked outside of that, your

23   Honor.  We could mark it.

24            THE COURT:  Let's mark it.

25            MR. COHEN:  Okay.  What is the next DX number?

1          MS. SASSOON:  Your Honor, I think yesterday we marked

2     it using the same number but adding a DX, so to keep with the

3     convention——

4          THE COURT:  That's fine.  So it will be Defendant's

5     Exhibit 3524-012 for identification.

6     BY MR. COHEN:

7     Q.  Take a look at this document, sir, and my question is

8     whether you recognize it.

9     A.  Yes, I do.

10    Q.  What is it?

11    A.  This is the non-prosecution agreement.

12    Q.  And if you can turn to the second page.

13         Is that your signature?

14    A.  Yes.

15         MR. COHEN:  Your Honor, we offer DX 3524-012.

16         MS. SASSOON:  No objection.

17         THE COURT:  Received.

18         (Defendant's Exhibit 3524-012 received in evidence)

19    Q.  So this is a document you are——you mentioned you're

20    testifying here pursuant to a non-prosecution agreement; is

21    that correct?

22    A.  That's right.

23    Q.  And this is the agreement?

24    A.  That's right.

25    Q.  If we could call your attention to the second full

1   paragraph.

2            MR. COHEN:  And call that out.

3   Q.  And look at the first sentence.  It says, "On the

4   understandings specified below, the Office of the United States

5   Attorney for the Southern District of New York will not

6   criminally prosecute Mr. Sun for any crimes (except for

7   criminal tax violations, if any, as to which this Office cannot

8   and does not make any agreement) related to the schemes by

9   [Mr.] Bankman-Fried" and others, and so on.

10           So what is your understanding, Mr. Sun, of how this

11   provision works, or this agreement works?

12  A.  My understanding of the agreement is I am to testify

13  truthfully on the stand.  If I do so, I will not be prosecuted

14  by the government.

15  Q.  And who makes the determination of whether you've been

16  truthful on the stand?

17  A.  You know, I'm supposed to tell the truth here on the stand.

18  And that's—that's—

19  Q.  Isn't it fair to say that's the government who makes the

20  determination?

21  A.  I think I'm required to testify as to the truth on the

22  stand.

23  Q.  If the government determines that you haven't been truthful

24  or you've provided incomplete or misleading testimony, this

25  agreement doesn't apply, correct?

```
 1                 MS. SASSOON:  Objection, form.

 2                 THE COURT:  Sustained.

 3                 MR. COHEN:  Let's go down to the next paragraph.

 4                 Call it out.

 5                 If we can go to the first sentence, Brian, and

 6    highlight it in yellow.

 7    BY MR. COHEN:

 8    Q.  "It is understood that, should Mr. Sun commit any crimes

 9    subsequent to the date of signing of this agreement, or should

10    the government determine that he has knowingly given false,

11    incomplete, or misleading testimony or information, or should

12    he otherwise violate any provision of this agreement, Mr. Sun

13    shall thereafter be subject to prosecution for any federal

14    criminal violation of which this Office has knowledge,

15    including perjury and obstruction of justice."  Do you see

16    that, sir?

17    A.  Yup.

18    Q.  Is it fair to say that if the government determines that

19    you've knowingly given false, incomplete, or misleading

20    testimony or information, you could be subject to prosecution?

21                 MS. SASSOON:  Objection, form.  The question is his

22    understanding.

23                 MR. COHEN:  Can we have a nonspeaking objection.

24                 THE COURT:  Sustained, form.

25    Q.  Mr. Sun, what is your understanding of whether you can be
```

1  prosecuted?

2  A.  If I tell the truth on the stand, I will not be prosecuted.

3  Q.  Okay.  And what is your understanding of who makes that

4  determination?

5  A.  I guess, you know, who makes the determination about truth.

6  Q.  You signed this——

7          MR. COHEN:  Drop down.  Drop the paragraph down.

8          Go back to the first page, Brian.  I'm sorry.

9          Okay.  Go to the top of the page.  And the date.  Just

10  up at the top, Brian.

11  Q.  So you signed this agreement on October 17th; is that

12  correct?

13  A.  That's right.

14  Q.  That was earlier this week?

15  A.  That's right.

16  Q.  And then did you meet with the government after you signed

17  it?

18  A.  Yes.

19  Q.  That was yesterday?

20  A.  That's right.

21          MR. COHEN:  Okay.  No further questions.

22          THE COURT:  Thank you.

23          Any redirect?

24          MS. SASSOON:  Just briefly.

25          Just keep that exhibit up, if you don't mind.

1    REDIRECT EXAMINATION

2    BY MS. SASSOON:

3    Q.  Mr. Sun, can you please read the second sentence of the

4    first paragraph of this agreement.

5    A.  "This agreement is in furtherance of the request for

6    Mr. Sun to testify, and should not be construed as a legal or

7    factual determination that Mr. Sun has violated any federal

8    law."

9         MS. SASSOON:  Thank you for zooming in on that.  We

10   can take this down.

11   Q.  You were asked about signing this on October 17, 2023.

12   Prior to that had you met with the government?

13   A.  Yes.

14   Q.  Sorry.  I couldn't hear you.

15   A.  Yes.

16   Q.  And did you meet with the government voluntarily?

17   A.  Yes.

18   Q.  And where did you come from to testify in court today?

19   A.  On this trip, from Japan.

20   Q.  And why did you come from Japan to testify?

21   A.  Because I wanted to tell the truth on the stand and make

22   the truth known.

23        MS. SASSOON:  No further questions.

24        THE COURT:  Thank you.

25        Anything else, Mr. Cohen?

 1          MR. COHEN:  No, your Honor.

 2          THE COURT:  All right.  You're excused, Mr. Sun.

 3 Thank you.

 4          (Witness excused)

 5          THE COURT:  Do we have another witness today?

 6          MR. REHN:  We do, your Honor.  It's a witness who I

 7 think can probably be done by lunch if we extend a little bit

 8 later, to 1:00 or so.

 9          THE COURT:  Can everybody hold their appetites?

10          Okay.  Let's do it.

11          MR. REHN:  The government calls Robert Boroujerdi.

12          THE DEPUTY CLERK:  If you'd please step around and

13 remain standing and raise your right hand for a moment.

14          (Witness sworn)

15          THE DEPUTY CLERK:  Thank you.  Please be seated.

16          Sir, if you could please state your name and spell

17 your last name for the record.

18          THE WITNESS:  Sure.  Robert Boroujerdi.  B as in boy,

19 O-R-O-U-J-E-R-D-I.

20          THE COURT:  You may proceed, Mr. Rehn.

21 ROBERT BOROUJERDI,

22      called as a witness by the Government,

23      having been duly sworn, testified as follows:

24 DIRECT EXAMINATION

25 BY MR. REHN:

1  Q.  Mr. Boroujerdi, I'd like to direct your attention to 2021.

2  Where were you working at that time?

3  A.  Third Point.

4  Q.  What is Third Point?

5  A.  It's an institutional alternative asset manager.

6  Q.  What is an alternative asset manager?

7  A.  We invest across a broad spectrum of different types of

8  securities, both public and private companies, in different

9  asset classes, and we serve everything from pension funds,

10  endowments, foundations, and high-net-worth individuals as

11  clients.

12  Q.  So your clients that you just mentioned invest money with

13  Third Point?

14  A.  Yes.

15  Q.  And then what?  How does Third Point invest that money?

16  A.  We look for opportunities where we think that what we would

17  invest in would appreciate in value over time.

18  Q.  Where is Third Point located?

19  A.  New York City.

20  Q.  Where specifically in New York City?

21  A.  Hudson Yards.

22  Q.  What was your job at Third Point?

23  A.  I was a managing director.  I led our markets business and

24  strategy.  I invested and helped manage portions of the firm.

25  Q.  And so were you looking for investment opportunities for

1    Third Point?

2    A.   Yes.

3    Q.   And did you do research into potential investment

4    opportunities?

5    A.   I did.

6    Q.   What sort of markets were you researching?

7    A.   Equity markets, interest rate markets, digital asset

8    markets, credit from time to time.

9    Q.   And when you say digital asset markets, does that include

10   the cryptocurrency market?

11   A.   It does.

12   Q.   And cryptocurrency exchanges?

13   A.   Yes.

14   Q.   Did there come a time when you became aware of a company

15   called FTX?

16   A.   Yes.

17   Q.   When was that?

18   A.   That would be late 2020, early 2021.

19   Q.   Did there come a time when you began considering an

20   investment by Third Point in FTX?

21   A.   Yes.

22   Q.   And when was that?

23   A.   That would be late Q1 of '21, early Q2 of 2021.

24   Q.   And when you said Q1 and Q2, what are you referring to?

25   A.   Sure.   Take a calendar year and break it up into quarters.

1    So January, February, March would be quarter 1, and then so on

2    for quarter 2.

3    Q.  How were you introduced to FTX?

4    A.  A gentleman who was a salesperson at one of our brokers

5    made an introductory email to myself and a CIO of the firm to

6    individuals at FTX.

7         MR. REHN:  Mr. Imperato, could you please pull up

8    Government Exhibit 523, just for the witness.

9    Q.  Mr. Boroujerdi, do you recognize this document?

10   A.  Yes, I do.

11   Q.  And could you describe what the document is.

12   A.  This is an email exchange, and I assume if we go down a

13   couple pages you'll see more of it, but email exchange where

14   there's an introduction made to myself and a colleague of mine

15   to Sam, and we were working to set up an introductory phone

16   call.

17   Q.  And you mentioned Sam.  Who were you referring to in

18   particular?

19   A.  Sam Bankman-Fried.

20   Q.  Did you have an understanding of who Sam Bankman-Fried was

21   when you received this email?

22   A.  Yes.

23   Q.  And who was he?

24   A.  He was the CEO and founder of FTX.

25        MR. REHN:  Your Honor, the government offers

1    Exhibit 523.

2              THE COURT:  Received.

3              (Government's Exhibit 523 received in evidence)

4              MR. LISNER:  No objection.

5              MR. REHN:  And Mr. Imperato, could we go to the third

6    page of this exhibit.  And bring it up for the jury.

7              And if you could expand the email that's in the middle

8    of this page.

9    BY MR. REHN:

10   Q.  Mr. Boroujerdi, you mentioned that you were introduced to

11   FTX in the first quarter of 2021.  Is this the email you were

12   referring to?

13   A.  Yes, it is.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

 1   Q.  After you got this introductory email, did you have some

 2   email exchanges with Sam Bankman-Fried?

 3   A.  Yes.  There was logistic based, trying to set up a call.

 4           MR. REHN:  We can bring that down, Mr. Imperato, and

 5   go up to the next page.

 6           If we could expand the email in the middle from

 7   Sunday, March 14 of 2021.

 8   Q.  Mr. Boroujerdi, can I ask you to read the email that was

 9   sent by the defendant on March 14, 2021.

10   A.  Hey, would love to jump on a call and feel free to share

11   the data room with them as well.

12   Q.  So there is a reference here to a data room.  Could you

13   explain what that is.

14   A.  Sure.  In the investment world, when you are looking at

15   potential investments, a lot of documents can come across the

16   chasm, be it a strategic deck, set of financial statements, org

17   chart, kind of name it.

18           What happens is, you can set up a virtual room where

19   you're permissioned by your email or a user name, and the

20   company that you made or other investors would be looking at

21   were just one access in one place.  It allows the company to

22   track who is looking at their stuff, but it also gives them a

23   degree of control.  But it, by and large, has information, as

24   you begin to evaluate an investment or you're evaluating it, to

25   give you background and color.

1   Q.  Did you go to the data room that the defendant shared with

2   you?

3   A.  Yes.

4   Q.  What do you recall was in the data room?

5   A.  Best of my recollection, there was certainly a strategic

6   deck where it laid out kind of the goals and background of not

7   only the crypto industry, the exchanges that were in it, things

8   like market share and then what FTX wanted to do from a

9   strategic perspective, there was also an org chart of business

10  organization and a set of financial statements.

11  Q.  Just to be clear, this isn't a physical room.  Could you

12  explain in a little more --

13  A.  Imagine if you wanted to just go in your bank account on

14  the Internet, you would log into that Internet and then your

15  account would pop up and you would look at it.  Rather than

16  seeing the balance of your account, assume that there is a

17  Power Point presentation or Microsoft Word document.

18  Effectively, they are digital documents that you can click on,

19  view, and, if given permission, you can download them as well.

20  Q.  I think you mentioned that one of the things that was in

21  that data room was some financial data?

22  A.  Yes.

23  Q.  What sort of financial data?

24  A.  It was actual data.  My recollection, this was financial

25  statement data that showed things like revenue and profit and

1    market share and growth over time.

2    Q.   So it included information about FTX's revenues and costs?

3    A.   Yes.

4    Q.   And the profits calculated after taking into account those

5    revenues and costs?

6    A.   Yes, that would be correct.

7    Q.   In deciding whether to invest in FTX, did Third Point rely

8    on the financial data it received from the company?

9    A.   Yes.

10   Q.   Did you expect that the numbers that FTX provided you were

11   an accurate depiction of its revenues and costs?

12   A.   We did.

13   Q.   Did anyone ever tell you that certain expenses were not

14   included in the revenue and cost numbers that FTX was reporting

15   to you?

16   A.   No.

17   Q.   If you had been told that, would you have taken that into

18   account in deciding whether to invest in the company?

19            MR. LISNER:   Objection.

20            THE COURT:   Overruled.

21   A.   Yes.

22   Q.   Why is that?

23   A.   When you receive financial statements from a corporate or

24   an investment, you believe that that representation is

25   accurate, and all flow of information should be reflected

1    there, good or bad.

2              MR. REHN:  Mr. Imperato, we can bring this part down

3    and go up to the first page of this document.

4              If you could expand the top two emails.

5    Q.  Mr. Boroujerdi, did you ultimately have a call with some

6    people from FTX?

7    A.  Specifically, yes.  It was a Zoom call, not a phone call.

8    Q.  Approximately when was that Zoom call?

9    A.  It was in the middle of March of 2021, middle to late March

10   of 2021.

11   Q.  And who was on the Zoom call?

12   A.  Myself and members of the investment team at Third Point,

13   half a dozen or so of us were on that, and then Sam was on it

14   from the FTX side.  I don't recall if there were other people

15   from FTX on the call.

16   Q.  When you say Sam, are you referring to the defendant?

17   A.  Yes.

18   Q.  Who did the majority of talking on that Zoom call?

19   A.  Outside of us asking questions or more notation of answers,

20   Sam led and drove the entirety of the call.

21   Q.  Did you have any other Zoom calls with the defendant prior

22   to investing?

23   A.  Yes, we did.  After that initial call, we continued our

24   process as a team and spoke to him several weeks later, again

25   on a Zoom call.

1    Q.  Where you were when you participated on those Zoom calls

2    with the defendant?

3    A.  Keep in mind at the time FTX was located in Hong Kong, so

4    this was at night.  I was in my New York City apartment.

5    Q.  In your Zoom calls with the defendant, what was the subject

6    matter that was discussed?

7    A.  We discussed the state of the crypto industry broadly, we

8    spoke about FTX's competitive positioning, growth drivers,

9    strategic plans, and what that opportunity said could be for

10   the business.

11   Q.  Do you recall any particular aspects of FTX's business that

12   were discussed?

13   A.  Yes.  We spent quite a bit of time talking about what we

14   would call a risk engine, which was a technology process inside

15   FTX that was different than what we had been used to.  It was

16   an automated process which took out a degree of humanity and

17   effectively treated every client the same.

18   Q.  And focusing on that risk engine, what, if anything, did

19   the defendant say about that?

20   A.  He stated that this technology had been built to

21   effectively take out human emotion, so people were treated

22   fairly and equitably, and it would also improve speed and

23   transparency.

24   Q.  Was this conversation in the context of Third Point

25   considering whether to make an investment in FTX?

```
1    A.  Yes.

2    Q.  Why would you be considering the risk engine in deciding

3    whether to invest?

4    A.  So exchanges, by and large, are interesting business models

5    and things we had looked at from an investing perspective

6    through time.  You can think of the New York Stock Exchange or

7    you can think of eBay.  These are auctions and marketplaces.

8    That means you match buyers and sellers.  And if someone should

9    build a better mousetrap, quote/unquote, you could tend to

10   garner more share and more trust and more use.

11   Q.  What in particular does the risk engine do to contribute to

12   the success of the business?

13   A.  When you think about -- when you buy assets, you sometimes

14   don't put all the money down that you need to buy that asset,

15   and it creates margin.  And what this did was ensure that you

16   would either post the amount of margin that was required for

17   that position automatically or that position would be sold out

18   if you did not post that.

19   Q.  What sort of risks to the exchange would that account for?

20   A.  Can you repeat the question or rephrase it, please.

21   Q.  Would there be any risks to the exchange that would be

22   prevented by the risk engine?

23           MR. LISNER:  Objection.

24           THE COURT:  Overruled.

25   A.  It would -- from our perspective, it would make -- it would
```

 1  have less human interaction.  It would be a speedier, more

 2  potentially effective exchange.

 3  Q.  Now, on those Zoom calls with the defendant, did a company

 4  called Alameda Research ever come up?

 5  A.  Yes, it did.

 6  Q.  And what, if anything, did the defendant say about Alameda

 7  Research?

 8  A.  He spoke to Alameda Research as a hedge fund that he had

 9  founded and started.  The frustration at Alameda was about

10  trading on exchanges and that led to the birth of FTX.  Beyond

11  that, we discussed the relationship of ownership and it was

12  conveyed to us that these -- this was an arm's length business,

13  that they operated independently, and served their own

14  self-interest.

15  Q.  You used the term arm's length business.  What, if

16  anything, did you understand that to mean?

17  A.  These were independent businesses and, again, they operate

18  under their own self-interest.  We understood that Alameda

19  could trade on the FTX exchange if needed, but these were

20  separate entities that Sam did control both from an equity

21  perspective, but that was the extent of it.

22  Q.  In this conversation did the defendant ever say that

23  Alameda was exempt from the FTX risk engine?

24  A.  No.

25  Q.  Were you ever told by anyone at FTX that Alameda was exempt

```
 1  from the exchange's risk engine?
 2  A.  No.
 3           MR. LISNER:  Objection.  Form.
 4           THE COURT:  Sustained.  Leading.
 5  Q.  Prior to investing in FTX, did you have an understanding as
 6  to whether Alameda was exempt from the exchange's risk engine?
 7  A.  Can you ask the question again.  Pardon me.
 8  Q.  Prior to investing in FTX, did you have any understanding
 9  as to whether Alameda Research was exempt from the exchange's
10  risk engine?
11  A.  No.
12  Q.  Just to clarify, was your understanding that it was not
13  or --
14  A.  We understood that Alameda was nonexempt.
15  Q.  And if you had been told that Alameda was exempt, would
16  that have been something you took into account before deciding
17  whether to invest?
18  A.  Yes.
19           MR. LISNER:  Objection.
20           THE COURT:  Overruled.
21  Q.  Why would you have taken that into account?
22  A.  There should be no preferential treatment on an exchange.
23  That would undermine the integrity of the exchange, upset
24  clients, and hurt the business model and thus the value, in our
25  view, of the asset over time.
```

1   Q.  And if you had been told that Alameda was exempt from that

2   risk engine that was described to you, would you have invested

3   in FTX?

4   A.  No.

5   Q.  I don't think I heard --

6   A.  No.

7   Q.  In your Zoom calls with the defendant prior to investing,

8   did the subject of FTX custody of customer funds ever come up?

9   A.  Yes.

10  Q.  What, if anything, did the defendant say about that?

11  A.  That they used a combination of hot and cold wallets,

12  largely hot wallets, that they worked with select banks to

13  shift -- to allow for people to move from one custodian to

14  another, themselves included, and individuals could hold assets

15  on the exchange and trade there.

16  Q.  Did the defendant ever say that Alameda Research could

17  withdraw customer funds from the exchange?

18  A.  No, that was never said.

19  Q.  If you had been told that Alameda could withdraw customer

20  funds from the exchange, would you have still invested in FTX?

21          MR. LISNER:  Objection.

22          THE COURT:  Overruled.

23  A.  No.

24  Q.  Ultimately, did Third Point invest in FTX?

25  A.  Yes.

```
 1              MR. REHN:  Mr. Imperato, can we bring up what's in
 2   evidence as Government Exhibit 823.
 3   Q.  Mr. Boroujerdi, do you recognize this?
 4   A.  Yes, I do.
 5   Q.  What is this?
 6   A.  This is an announcement from Sam's Twitter account speaking
 7   about a capital raise that occurred with a handful of investors
 8   back in July of 2021.
 9   Q.  And is Third Point identified as one of the investors in
10   this tweet?
11   A.  It is.
12              MR. REHN:  Mr. Imperato, if we can highlight the Third
13   Point LLC.
14   Q.  What's the date on this tweet?
15   A.  July 20, 2021.
16   Q.  Approximately how much did Third Point invest in FTX in
17   July of 2021?
18   A.  35 million.
19   Q.  What was the purpose of FTX's fundraising, as you
20   understood it?
21   A.  It was to hire staff, grow strategic initiatives, increase
22   market share, and look at new business lines that they could
23   potentially add.
24   Q.  Were you told that FTX was taking money raised from this
25   investment round and transferring that money to Alameda
```

1   Research?

2   A.  No.

3   Q.  If you had been told that FTX would transfer the money

4   rates from investors to Alameda, would that have affected your

5   investment decision?

6           MR. LISNER:  Objection.

7           THE COURT:  Overruled.

8   A.  Yes.

9   Q.  How so?

10  A.  These are two separate entities.  This capital was for the

11  growth of FTX.  It was not for any related party in

12  transactions or businesses.

13          MR. REHN:  We can bring that down.

14  Q.  Mr. Boroujerdi, after Third Point made its initial

15  investment in July of 2021, did you continue to pay attention

16  to FTX's business?

17  A.  Yes.

18  Q.  Why is that?

19  A.  Well, as a steward of capital you are looking to obviously

20  watch that investment grow and improve.  You try to provide

21  feedback.  It's an important portion of the process.

22  Q.  And did Third Point ever participate in additional

23  fund-raising rounds by FTX?

24  A.  Yes.

25  Q.  Approximately when were those?

1   A.  That was later in 2021, that I recall.

2   Q.  Approximately how much in total did Third Point invest in

3   FTX?

4   A.  In FTX international, $60 million.

5   Q.  Have you ever met the defendant in person?

6   A.  Yes.

7   Q.  When was that?

8   A.  I met him at a Bitcoin Miami conference, large industry

9   conference, in June of '21; I met him in an Equinox Hotel event

10  in Hudson Yards in New York City in September of 2021; as well

11  as an FTX Bahamas event in 2022 in the middle of the year.

12  Q.  With reference to the Equinox Hotel event you mentioned,

13  what was the purpose of that event?

14  A.  That was an event that was cohosted by a company called

15  Circle, a Blockchain technology company called Solana, and FTX.

16  The three of them were providing some of their leadership to

17  speak to customers, speak to investors, and industry

18  participants to get to know each other, talk a little bit about

19  what the strategic outlook was, areas of focus, and time to

20  spend.

21  Q.  Aside from that event hosted by the FTX and other companies

22  at the Equinox Hotel, were there any other times where you saw

23  the defendant in New York City?

24  A.  Yes.  JP Morgan had a conference in December of 2021.  Sam

25  was on the dais with the host and key speaker.  They did a

1   fireside chat at that time.

2   Q.   Where was that?

3   A.   That was in JP Morgan's, I believe, headquarters --

4   corporate office that JP Morgan owns or leases in midtown

5   Manhattan.

6   Q.   In 2022, did you ever learn that FTX was engaged in

7   additional fundraising?

8   A.   Yes.

9   Q.   How did you learn that?

10   A.   Their head of product, who also dealt with investors, his

11   name was Ramnik Arora, and Ramnik reached out to keep us up --

12   to ask us about interest.

13   Q.   Did you ever talk with the defendant about FTX fundraising

14   in 2022?

15   A.   I don't recall, and I don't know if others at Third Point

16   did.

17   Q.   In your conversations with Ramnik Arora, were you ever told

18   that FTX was raising funds because there was a hole in FTX's

19   balance sheet?

20          MR. LISNER:  Objection.  Form.

21          THE COURT:  Sustained.  Leading.

22   Q.   What, if anything, did Mr. Arora tell you about the reason

23   FTX was continuing to raise funds in 2022?

24   A.   It was largely about growth, some increased marketing, and

25   potential acquisitions.

1           MR. LISNER:  Could we get a time period in 2022.

2   Q.  Approximately when were the conversations that you had with

3   Mr. Arora in 2022?

4   A.  They were towards the middle to later part of the summer

5   into the early fall.

6   Q.  Going forward in time to November 2022, did there come a

7   time when you became aware that FTX was encountering financial

8   difficulties?

9           MR. LISNER:  Objection.  Form.

10          THE COURT:  Overruled.

11  A.  I became aware.  One of the industry trade publications had

12  published what they had stated was the balance sheet of FTX in

13  a news article, and that found its way onto social media, and

14  Twitter in particular, and that's when it started to become

15  more prevalent.

16  Q.  Were you following the defendant on Twitter?

17  A.  I was not, but others at Third Point were.

18  Q.  And did you instruct others at Third Point to keep you

19  updated on what the defendant was saying?

20  A.  Yes.  And to be clear, I did check his Twitter feed.  I did

21  not -- I was not subscribed, but others were.

22          MR. REHN:  If we could bring up for the witness

23  Government Exhibit 529.

24          If we could expand this for the witness.

25  Q.  Mr. Boroujerdi, do you recognize this?

1   A.  Yes, I do.

2   Q.  And what is this?

3   A.  This is a member of the investment team who had worked and

4   looked at FTX as well who had sent over an email with a set of

5   deleted tweets from Sam Bankman-Fried.

6           MR. REHN:  Your Honor, the government offers

7   Government Exhibit 529.

8           MR. LISNER:  No objection.

9           THE COURT:  Received.

10          (Government Exhibit 529 received in evidence)

11  Q.  This one seems to be a little hard to read, but are you

12  able to read the tweet that was sent to you on November 9 of

13  2022?

14  A.  Is that the top one?

15  Q.  The top tweet.  Just the first two sentences.

16  A.  FTX has enough to cover all client holdings.  We don't

17  invest client assets, even in treasuries.

18  Q.  Is this description of how FTX treats client assets

19  consistent with what you were told about FTX treatment of

20  client assets when Third Point made its investment?

21          MR. LISNER:  Objection.  Documents speak for

22  themselves.

23          THE COURT:  Sustained.

24  Q.  Is this description consistent with what your understanding

25  was of how FTX treated client assets?

1   A.   That is -- yes, it is consistent with the terms of service

2   and agreement as well.

3   Q.   What is the current value of the $60 million investment

4   that Third Point made in FTX?

5   A.   Zero.

6             MR. REHN:  No further questions.

7             THE COURT:  Thank you.

8             Cross-examination.

9   CROSS-EXAMINATION

10  BY MR. LISNER:

11  Q.   Good afternoon.  I know we are on the cusp of lunch, so I

12  will be brief.

13            You testified, Mr. Boroujerdi, that after the initial

14  investment you continued to pay attention to FTX, is that

15  right?

16  A.   Yes.

17  Q.   Do you recall reviewing audited financials for FTX after

18  your investment?

19  A.   We looked at both unaudited and audited financials.

20  Q.   And do you recall if the audited financial -- let me

21  rephrase.

22            Do you recall learning, from your review of FTX's

23  audited financials, that FTX relied on related parties or

24  currency and treasury management activities?

25            MR. REHN:  Objection.

```
1              THE COURT:  Ground.

2              MR. REHN:  Hearsay.

3              THE COURT:  Sustained.

4   Q.  Did you have an understanding that FTX relied on related

5   parties for currency and treasury management activities?

6              MR. REHN:  Same objection.

7              THE COURT:  Overruled.

8   A.  We understood that there were fiat on-ramps and off-ramps

9   and partners that would work with them on specific pieces.

10  Whether it was in the audited financials or not, it was part of

11  the diligence process.

12  Q.  Did you have an understanding of whether related parties to

13  FTX served as conduits of fiat or crypto transactions for FTX?

14  A.  We understood that partners like Signature Bank and others

15  could move fiat and USDC, which is a digital version of cash,

16  to and from FTX and other exchanges.

17  Q.  My question was whether you are aware that related parties

18  had that relationship.  Was Signature Bank a related party?

19  A.  I would be unaware from a technical definition if that's

20  true.

21  Q.  Were you aware of any related parties that performed that

22  function?

23  A.  I do not know.

24             MR. LISNER:  Can we put up for the witness only

25  Defendant's Exhibit 683.
```

1   Q.  Would it refresh your recollection to review the document

2   on the screen?

3           MR. REHN:  Foundation.

4           THE COURT:  As to what?

5           MR. LISNER:  I just asked --

6           THE COURT:  I was here.  I remember.  I even have it

7   in writing in front of me.

8   Q.  Do you recall knowing whether related parties served as

9   conduits of fiat or crypto transactions for FTX?

10          MR. REHN:  Asked and answered.

11          THE COURT:  Sustained.

12          MR. LISNER:  No further questions.  Enjoy lunch,

13  everybody.

14          THE COURT:  Thank you.

15          Anything else, Mr. Rehn?

16          MR. REHN:  Nothing further.

17          THE COURT:  You are excused, sir.  Thank you.

18          (Witness excused)

19          THE COURT:  Anything else today?

20          MS. SASSOON:  No.

21          THE COURT:  Members of the jury, here comes your

22  intermission until next Thursday.  Enjoy.

23          Do not do any research.  Do not talk about this case.

24  Do not read anything.  You understand that.  With a big gap I

25  thought I had to say it again, but I know you know it.

1                  See you at 9:30 next Thursday.

2                  (Jury not present)

3                  THE COURT:  Anything else?

4                  MS. SASSOON:  Very quickly, your Honor.

5                  We just wanted to put on the record that since our

6      discussion in the robing room, no issues have been raised with

7      us, and we are aware of none.  It's our understanding that

8      everything with respect to that has been proceeding smoothly.

9                  THE COURT:  Thank you for doing that.  I had meant to,

10     but I didn't remember.

11                 Mr. Cohen, we have no problems on that front, right?

12                 MR. COHEN:  Your Honor, my client has been receiving

13     the extended-release medication that your Honor helped us to

14     obtain.

15                 THE COURT:  Since when?

16                 MR. COHEN:  Since yesterday.

17                 THE COURT:  OK.

18                 MR. ROOS:  Judge, one other thing.

19                 Apparently, the record from yesterday, after speaking

20     with Andy, says Government Exhibit 1027.  I had intended to say

21     1027, which includes the subparts A and B.  So I just want to

22     put that on the transcript so that we have the right exhibit.

23     There is no 1027.  It's 1027A and B.

24                 THE COURT:  Any problem with that, Mr. Cohen?

25                 MR. COHEN:  It's an outrage, your Honor.

1           THE COURT:  I'm assuming that is consented to having

2    the necessary correction made.

3           I'll see you all next week.

4           (Adjourned to October 26, 2023, at 9:30 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        INDEX OF EXAMINATION

Examination of:                                    Page

CAN SUN

Direct By Ms. Sassoon  . . . . . . . . . . .1896
Cross By Mr. Cohen . . . . . . . . . . . . .1968
Redirect By Ms. Sassoon  . . . . . . . . . .2001

ROBERT BOROUJERDI

Direct By Mr. Rehn . . . . . . . . . . . . .2002
Cross By Mr. Lisner  . . . . . . . . . . . .2022
                    GOVERNMENT EXHIBITS

Exhibit No.                                  Received

 558  . . . . . . . . . . . . . . . . . . . .1910

 326  . . . . . . . . . . . . . . . . . . . .1927

 514  . . . . . . . . . . . . . . . . . . . .1934

 340  . . . . . . . . . . . . . . . . . . . .1939

 26   . . . . . . . . . . . . . . . . . . . .1943

 211, 225 and 236-242  . . . . . . . . . . .1949

 79   . . . . . . . . . . . . . . . . . . . .1951

 141A  . . . . . . . . . . . . . . . . . . .1952

 923B  . . . . . . . . . . . . . . . . . . .1965

 523  . . . . . . . . . . . . . . . . . . . .2006

 529  . . . . . . . . . . . . . . . . . . . .2021

                    DEFENDANT EXHIBITS

Exhibit No.                                  Received

 268  . . . . . . . . . . . . . . . . . . . .1971

 3524-012  . . . . . . . . . . . . . . . . .1997