```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4            v.                              22 CR 673 (LAK)

 5   SAMUEL BANKMAN-FRIED,

 6            Defendant.                      Trial
     ------------------------------x
 7
                                             New York, N.Y.
 8                                           October 26, 2023
                                             9:30 a.m.
 9

10   Before:

11
                          HON. LEWIS A. KAPLAN,
12
                                             District Judge
13
                              APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  DANIELLE R. SASSOON
          NICOLAS ROOS
17        DANIELLE KUDLA
          SAMUEL RAYMOND
18        THANE REHN
          Assistant United States Attorneys
19
     COHEN & GRESSER, LLP
20        Attorneys for Defendant
     BY:  MARK S. COHEN
21        CHRISTIAN R. EVERDELL
          SRI K. KUEHNLENZ
22        DAVID F. LISNER

23   Also Present:
     Luke Booth, FBI
24   Kristin Allain, FBI
     Arjun Ahuja, USAO Paralegal Specialist
25   Grant Bianco, USAO Paralegal Specialist
```

1          (Trial resumed; jury not present).

2          THE COURT:  We have a note from alternate number 4 in

3    which he requested to be excused for the day because he doesn't

4    feel well and he's throwing up.  I understand I have the

5    consent of the defense to excuse him.  I have not yet heard

6    back from the government.

7          MR. ROOS:  Your Honor, we consent as well.

8          THE COURT:  Thank you.

9          In your absence I decided to excuse him.  And when

10   that was conveyed to him he refused to leave because he says

11   he's involved and he -- if the price of leaving today is that

12   he's out of the case, he doesn't want to go.  So I propose to

13   excuse him regardless.  We are waiting for the nurse to come

14   see him.  We have one particularly vulnerable juror from a

15   health standpoint that I know of.  And of course who knows what

16   his problem is.  And it may be infectious.

17         Is there any objection to my excusing him now, even if

18   the nurse hasn't made it up here?

19         MR. ROOS:  No, your Honor.

20         MR. EVERDELL:  No, your Honor.

21         THE COURT:  Andy, he's out.

22         THE DEPUTY CLERK:  Are we ready for the jury

23   otherwise?

24         THE COURT:  We are ready for the jury otherwise.

25         Tell him, please, that we are all very appreciative of

1   his service, we wish he could stay, but in all the

2   circumstances we just can't allow that, and give him a hearty

3   thanks from everybody.

4           Thank you.

5           Mr. Roos, is there something that you wanted to raise?

6           MR. ROOS:  Yes, your Honor.  There are two items.  One

7   relates to the conclusion of the government's case.  Actually

8   three questions, I guess.  I'll take them in order.

9           Number one, the parties have a disagreement over a

10  single exhibit, Government Exhibit 505, that the government

11  will admit during its conclusion of its case.  As I understand

12  it -- I don't want to speak for the defense, what the objection

13  is.  We thought maybe it makes sense to resolve this now before

14  the jury comes in.

15          The second is, I want to know how your Honor wanted to

16  handle any sort of motion by the defense after the close of the

17  government's case.

18          Third is, we have an objection relating to some 26 --

19          THE DEPUTY CLERK:  Jury entering.

20          (Jury present)

21          THE COURT:  I think that we should simply proceed and

22  deal with whatever issues need to be dealt with as we go along.

23          Ms. Kudla.

24          MS. KUDLA:  Your Honor, at this time the government

25  calls agent Marc Troiano.

1              THE COURT:  For the benefit of the jury, alternate

2       number 4, Mr. Akahoho, is unwell and he has been excused.  I'm

3       simply not going to take a risk that he has something

4       infectious that could affect anyone else.  Of course he has our

5       thanks.

6       MARC TROIANO,

7              called as a witness by the government,

8              having been duly sworn, testified as follows:

9              THE COURT:  You may proceed, Ms. Kudla.

10             MS. KUDLA:  Thank you, your Honor.

11             Before beginning the direct with Agent Troiano, the

12      government offers the following exhibits at this time:  38A,

13      200, 294, 312, 313, 315, 322, 322A, 331, 348, 349, 449, 494,

14      495, 544, 766, 933, 1320A, 1360A, and S2005.

15             MR. EVERDELL:  No objection, your Honor.

16             THE COURT:  They are all received.

17             (Government Exhibits 38A, 200, 294, 312, 313, 315,

18      322, 322A, 331, 348, 349, 449, 494, 495, 544, 766, 933, 1320A,

19      1360A, and S2005 received in evidence)

20      DIRECT EXAMINATION

21      BY MS. KUDLA:

22      Q.  Good morning, Agent Troiano.

23      A.  Good morning.

24      Q.  Where do you work?

25      A.  I work for the Federal Bureau of Investigation.

1    Q.  What's your title there?

2    A.  I'm a special agent.

3    Q.  And how long have you been a special agent with the FBI?

4    A.  About eight years.

5    Q.  Are you assigned to any particular unit?

6    A.  Yes.

7    Q.  What unit is that?

8    A.  I work on a corporate securities and commodities fraud

9    squad.

10   Q.  What, if anything, were you asked to do for this case?

11   A.  Sure.  I was asked to review Signal groups found on two

12   different devices, one belonging to Gary Wang, which is a

13   laptop, and then one belonging to Caroline Ellison, which was a

14   phone, and review the Signal groups for information found

15   within there.

16   Q.  Apart from your review, did you have any other involvement

17   in this case?

18   A.  No, I did not.

19        MS. KUDLA:  Now, your Honor, at this time the

20   government offers S2006, an authenticity stipulation regarding

21   electronic devices.

22        THE COURT:  Received.

23        (Government Exhibit S2006 received in evidence)

24        MS. KUDLA:  May we publish to the jury?

25        THE COURT:  You may.

1  Q.  Agent Troiano, you mentioned that you had reviewed Gary

2  Wang's laptop and Caroline Ellison's cell phone extraction, is

3  that correct?

4  A.  Yes.

5  Q.  While we are waiting for that to come up, I can read some

6  of the stipulation to the jury.

7        Paragraph 1 states that:  On November 16, 2022, an

8  Apple iPhone with a particular IMEI number and FBI evidence

9  number ending in 1B10, the Caroline Ellison cell phone was

10  lawfully recovered by FBI agents, that Government Exhibit 1662

11  is a copy of certain contents and data extracted from the

12  Caroline Ellison cell phone.  The information in Government

13  Exhibit 1662 was contained on the Ellison cell phone at the

14  time it was seized on November 16, 2022.  And paragraph 2

15  states that, on November 17, 2022, a Dell laptop with a

16  particular serial number and FBI evidence item ending in 1B13,

17  the Gary Wang laptop, was lawfully recovered by FBI agents.

18  Q.  Agent Troiano, are those the electronics that you reviewed

19  for your Signal group analysis?

20  A.  Yes.

21  Q.  Now, how would you describe the volume of data contained in

22  the Signal groups on the Wang laptop and the Ellison phone

23  extraction?

24  A.  It was quite voluminous.  There were hundreds of chats with

25  hundreds of participants.

1          MS. KUDLA:  Mr. Bianco, can you please show the

2     witness what's marked for identification as Government Exhibit

3     1083.

4     Q.  Agent Troiano, you should have a binder there and there

5     should be a printed copy as well.

6          Agent Troiano, what is Government Exhibit 1083?

7     A.  This is a chart that shows the different Signal groups that

8     Samuel Bankman-Fried participated in from 2020 to 2022, and

9     they were taken from the -- the data was taken from Gary Wang's

10    laptop, the Signal group that he had there or Signal app that

11    he had there, and the Caroline Ellison phone extraction.

12    Q.  Have you reviewed all of the information contained in this

13    chart?

14    A.  Yes.

15         MS. KUDLA:  Your Honor, the government offers

16    Government Exhibit 1083, pursuant to Rule 1006.

17         MR. EVERDELL:  No objection, your Honor.

18         THE COURT:  I'm sorry.  I didn't hear you.

19         MR. EVERDELL:  No objection, your Honor.

20         THE COURT:  It's received.

21         (Government Exhibit 1083 received in evidence)

22         MS. KUDLA:  Your Honor, may we publish?

23         THE COURT:  You may.

24    Q.  Agent Troiano, now that this is visible to the jury, at a

25    high level, can you summarize what this chart contains?

1   A.   Sure.   So this is a chart that shows the different Signal

2   groups that Samuel Bankman-Fried was in from 2020 to 2022.

3   You'll see the first column says group name and that's what the

4   group was called.   Again, this data was pulled from the Gary

5   Wang laptop, his Signal app on there, and the Caroline Ellison

6   phone extraction.

7          The next column you will see is participants and

8   that's the people that were present in those Signal groups when

9   the review began once the devices were obtained.

10          And the last column is auto-deletion status.   That

11   shows the different auto-deletion settings that were found in

12   the group when we obtained it.

13   Q.   Agent Troiano, let's take a look at row 1 as an example to

14   go through the auto-deletion status.   In row 1, in the

15   auto-deletion status column it says:   May 11, 2021, one week.

16          What does that mean?

17   A.   So that means that, as of May 11 of 2021, the auto-deletion

18   status was set at one week, meaning that the messages would

19   remain for a week and then disappear.

20   Q.   Below that it also says November 9, 2022, auto deletion

21   turned off, SBF.

22          What is recorded here?

23   A.   So that shows that, as of that date, the auto-deletion

24   function was turned off, meaning that the message would stay,

25   it wouldn't be deleted, and the last part, SBF, that indicates

1   that in this case Samuel Bankman-Fried was the one who had

2   turned off the auto-deletion function.

3          MS. KUDLA:  Mr. Bianco, if we can now zoom in on row

4   16.

5   Q.  This portion of the chart does not have anything in

6   auto-deletion status.

7          What does that signify?

8   A.  That means there was no auto-deletion policy for that

9   group, meaning that none of the messages were automatically

10  deleted.

11         MS. KUDLA:  Mr. Bianco, we can take that down now.

12  Q.  To briefly show the jury any variables you evaluated in

13  your review, let's look at the raw data momentarily.

14         MS. KUDLA:  Mr. Bianco, can you please show the

15  witness what's marked for identification as Government Exhibit

16  3017.

17  Q.  Briefly, what is shown here?

18  A.  So here you'll see the Signal app view from the two

19  different devices.  So on the left this is what you would see

20  if you looked at this particular group from Gary Wang's laptop.

21  And then I took these screenshots here.  Then on the right it's

22  the same for what the view looked like from the Caroline

23  Ellison phone extraction.  Again, I took those screenshots.

24         MS. KUDLA:  Your Honor, may the government publish

25  Government Exhibit 3017 for demonstrative purposes only?

1         MR. EVERDELL:  No objection for simply demonstrative

2  purposes, your Honor.

3         THE COURT:  Yes, you may.

4  Q.  Now that's visible to the jury, you said on the left was

5  Gary Wang's laptop.

6         Can you describe to the jury what we see on the left

7  and the right.

8  A.  Sure.  On the left, these are the screenshots that I took

9  from Gary Wang's laptop, and you will see basically his Signal

10  app.  This is what you'd see if you clicked on the hashtag

11  organization Signal group.  And you will see the first -- right

12  side, that indicates kind of a log of when people joined and

13  left the group, as well as when the auto-deletion policies were

14  turned on or off or changed.  Behind it you will see --

15         MS. KUDLA:  Mr. Bianco, can we take that down now.

16  Q.  When you said behind it, are you referring to --

17  A.  The forefront photo.  The behind photo is where you will

18  see the members of that group.

19  Q.  What is shown on the right?

20  A.  On the right, this is the view of Signal app from the

21  extraction from Caroline Ellison's phone.

22  Q.  Looking at both of these together now, what is the name of

23  Signal group shown from the Wang laptop and the Ellison phone

24  extraction?

25  A.  It's hashtag organization.

1   Q.  Did you record that name in Government Exhibit 1083?

2   A.  Yes.

3   Q.  With the participants, how did you identify the

4   participants for Government Exhibit 1083?

5   A.  If you look at the participants, it will list the name and

6   phone number, so I put the name into the chart.

7   Q.  Were there ever occasions where the participant names were

8   not the same between the Wang laptop and the Ellison phone

9   extraction?

10  A.  Yes.

11  Q.  And what's an example of such a scenario?

12  A.  There could be a scenario where one person was just an

13  initial, like say the letter C, on like the laptop, and then

14  within the extraction it could be a full name, like Claire or

15  something like that.  If that was the case, I would look to see

16  if the phone number matched; and if it did, I would put the

17  most descriptive comprehensive names:  Claire.

18  Q.  Let's move on to auto-deletion status, Agent Troiano.

19  Using Government 3017 as a guide, describe what you did to

20  record the auto-deletion feature if it was turned on.

21  A.  Sure.  So for a lot of these groups once a member joined

22  the group, they would see what the current auto-deletion status

23  was at that time.

24         MR. EVERDELL:  Objection.  Knowledge of what people

25  would see that's not himself.

1  A.  I would see it.

2  Q.  Agent Troiano, is this information based on your review of

3  hundreds of single-group messages?

4  A.  Yes.

5  Q.  You can continue describing what you did for the review.

6  A.  Sure.  When I opened the Signal app on the two different

7  devices, I would see, when somebody was added to a group, you

8  could see what the auto-deletion policy was at that time.  I

9  would look to see between the two of them if it was the same

10  period of time, and I would go back to the further -- the most

11  backdated date to have the most comprehensive view of how long

12  that setting had been turned on.

13  Q.  Turning to the right for the Ellison extraction that we

14  look at there, what was the date that the auto-deletion status

15  feature was turned on?

16  A.  So for this one it looks like the user was added on May 11

17  of 2021.  It was able to see this auto-deletion status of

18  604800, which is seconds.

19  Q.  What is that equivalent of seconds equal to?

20  A.  One week.

21  Q.  Did you also record when auto-deletion status was turned

22  off?

23  A.  Yes.

24  Q.  And where do you see that here?

25  A.  If you look at the bottom, you will see, on November 9 of

1    2022, it says that Samuel Bankman-Fried set disappearing

2    message time from 604800, that one-week period, to zero,

3    meaning it turned off.

4    Q.  Did you record all of this information in Government

5    Exhibit 1083?

6    A.  Yes.

7         MS. KUDLA:  We can take that down now, Mr. Bianco.

8    Q.  Apart from the data that you just described to the jury,

9    did you review the content of the Signal group messages in any

10   way?

11   A.  No.

12   Q.  Do you have any knowledge about the identities of the

13   Signal group participants listed in Government Exhibit 1083

14   apart from the information that you just described?

15   A.  No.

16        MS. KUDLA:  Now, Mr. Bianco, can you please publish

17   Government Exhibit 1083.

18   Q.  Agent Troiano, does this exhibit contain the results of the

19   review you outlined to the jury for all the Signal groups you

20   reviewed?

21   A.  Yes.

22        MS. KUDLA:  Now, Mr. Bianco, please scroll through the

23   first few pages of Government Exhibit 1083 slowly.  Then you

24   can go to the last page, which should be page 25.

25   Q.  Between 2020 and 2022, how many Signal groups was

1    Mr. Bankman-Fried a participant in, based on your review?

2    A.  325.

3    Q.  And out of those 325 Signal groups, how many had the

4    auto-deletion feature turned on?

5    A.  288.

6    Q.  Once again, aside from your work in helping to prepare or

7    review this chart, have you had any other involvement in this

8    case?

9    A.  No.

10             MS. KUDLA:  No further questions, your Honor.

11             THE COURT:  Thank you.  Any cross-examination?

12             MR. EVERDELL:  Yes, your Honor.

13             THE COURT:  Let the record reflect that the defendant

14   and the jurors all are present, as they have been throughout.

15             Go ahead.

16   CROSS-EXAMINATION

17   BY MR. EVERDELL:

18   Q.  Good morning, Special Agent Troiano.

19   A.  Good morning.

20   Q.  Special Agent Troiano, you work for the FBI, correct?

21   A.  Yes.

22   Q.  Your job is to help the prosecutors investigate their

23   cases, right?

24   A.  Yes.

25   Q.  You weren't one of the case agents on this case, though,

```
1    correct?

2    A.  That's correct.

3    Q.  You were just asked to help out with this particular

4    project you testified about?

5    A.  Yes.

6    Q.  And you said that you were asked to review a document that

7    listed various Signal message groups, right?

8    A.  Yes.

9    Q.  And those Signal groups came from Signal messages that were

10   contained on Caroline Ellison's iPhone and Gary Wang's laptop,

11   correct?

12   A.  Yes.

13   Q.  Now, you didn't originally create the summary document that

14   is now Government Exhibit 1083, is that correct?

15   A.  I didn't like -- no, not the draft document.

16   Q.  So the original draft document was created by the

17   prosecutor's office, is that correct?

18   A.  The prosecutors gave it to me.

19   Q.  So they gave you the first draft of this document that we

20   now see as Government's 1083, correct?

21   A.  Yes.

22   Q.  Then they sent it to you, right?

23   A.  Yes.

24   Q.  And the prosecutors had already selected the Signal groups

25   that they wanted on that draft summary document, correct?
```

1    A.   Yes.

2    Q.   And they just asked you to verify the work that they had

3    already done, right?

4    A.   Yes.   They asked me to go through and look to verify the

5    names, the dates, everything.

6    Q.   If edits needed to be made to the document, the prosecutors

7    told you which information they wanted you to include or

8    exclude, is that right?

9    A.   If there were edits, if I had changes of like date or

10   things like that, I told them, and I made them myself.

11   Q.   But if there were certain Signal groups they wanted to

12   exclude or certain ones they wanted to include, they would tell

13   you that?

14   A.   I am not sure if they took groups out specifically.

15   Q.   Do you recall ever an instance where they may have told you

16   to exclude a group?

17            MS. KUDLA:   Objection.

18            THE COURT:   What's the objection?

19            MS. KUDLA:   We could do it at a sidebar, your Honor.

20            (Continued on next page)

21

22

23

24

25

1          (At sidebar).

2          MS. KUDLA:  Your Honor, we asked for certain groups to

3     be removed at defense counsel's request for -- we couldn't

4     reach a stipulation on certain groups that were contained

5     directly from the cell phone extraction or from the laptop, so

6     we removed those just to expedite things.  And then also we

7     redacted certain information based on groups that had the word

8     fraud in it.  We provided that type of instruction.

9          THE COURT:  Why the redactions?

10         MS. KUDLA:  The defense felt that the names of the

11    group wire fraud and fake fraud site was overly prejudicial.

12         MR. EVERDELL:  Yes, your Honor.  We did agree on those

13    sites.

14         I just want to clarify, on the first one, the one you

15    are referring to, the 302, where you say:  Thanks Marc, please

16    exclude that group based on the factors noted below, and it's

17    from September, I was not aware that this was in relation to

18    anything that we agreed upon.  That's why I was asking the

19    questions.  I'm certainly not trying to ask anything that would

20    be misleading.  I just saw it in the 302.

21         MS. KUDLA:  Yeah.  We asked him to remove that because

22    that seemed to have no relevance to this case.

23         MR. EVERDELL:  OK.  I can move on, your Honor.

24         THE COURT:  Let's fix the damage that's been done.

25         MR. EVERDELL:  Yes, your Honor.

```
1          I am happy to ask him -- if you would prefer me to ask
2    the question.  The government can do it on redirect.
3          THE COURT:  Whichever way you want to handle it.
4    There appears to be a misleading impression created.  Let's fix
5    it.
6          MS. KUDLA:  He may not know, so I think we could
7    strike the testimony.
8          MR. EVERDELL:  That's fine with me.  We will just
9    strike the question, your Honor.
10          THE COURT:  What is it precisely you are agreeing
11    should be stricken?
12          MS. KUDLA:  The question, the government directed you
13    to remove certain Signal groups, and his response.
14          MR. EVERDELL:  Happy to do that, your Honor.
15          MS. SASSOON:  While we are at sidebar, your Honor, it
16    occurred to me that it might be worthwhile to contact
17    alternative number 4 and explain to him that the case is
18    ongoing and he should not speak to the press about his
19    impressions of the case or anything that happened in the jury
20    breakout room for risk of prejudicing the case.
21          THE COURT:  Is there any objection to that being done?
22          MR. EVERDELL:  No objection, your Honor.
23          THE COURT:  Andy, that's your job.
24          MR. EVERDELL:  Just so we are clear, your Honor, do
25    you want me to clarify anything -- we are going to strike the
```

1    last question.

2              THE COURT:  We are going to strike the testimony about

3    whether he was asked by the prosecutors to remove anything.

4              (Continued on next page)

```
 1              (In open court)

 2              THE COURT:  Members of the jury, the question

 3    concerning whether the prosecutors ever asked that certain

 4    groups be taken off this list and the witness' answer are

 5    stricken, and you must disregard that.  That's by agreement of

 6    the parties.

 7              Let's proceed.

 8              MR. EVERDELL:  Thank you, your Honor.

 9    BY MR. EVERDELL:

10    Q.  Special Agent Troiano, the groups on your summary chart are

11    groups from the messaging app Signal, correct?

12    A.  Yes.

13    Q.  What is Signal?

14    A.  Signal is a security messaging app.

15    Q.  And it's secure -- it uses end-to-end encryption, is that

16    correct?

17    A.  Yes.

18    Q.  That means it's hard for people who are not the center or

19    the recipient to read it or get access to it, right?

20              MS. KUDLA:  Objection.

21              THE COURT:  Ground.

22              MS. KUDLA:  I don't know if he knows.  Lack of

23    foundation.

24    Q.  Are you aware of the features of Signal?

25    A.  Yes.
```

1   Q.  And you mentioned that you were familiar with end-to-end

2   encryption?

3   A.  Yes.

4   Q.  Can you just describe what your understanding is of the

5   security features.

6           MS. KUDLA:  Objection.

7           THE COURT:  Sustained.

8   Q.  In your job as an FBI agent, are you generally aware of

9   what types of messaging applications of out there on the

10  market?

11          MS. KUDLA:  Objection.

12          THE COURT:  Sustained.

13  Q.  Are you generally familiar with Signal?

14  A.  Yes.

15  Q.  Are you generally aware for how long it has been on the

16  market?

17          MS. KUDLA:  Objection.

18          THE COURT:  Sustained.

19  Q.  Let's look at your summary exhibit, Special Agent Troiano.

20  This is Government Exhibit 1083.  You said these are all --

21  every group that's on this list is a Signal group that Sam

22  Bankman-Fried was on, right?

23  A.  Yes.

24  Q.  If you scroll to the end, there are a total of 325 Signal

25  groups that he is on on your list, is that right?

1   A.   Yes.

2   Q.   And all of these groups were active until they got shut

3   down in the November 2022 time frame, right?

4   A.   What do you define active as?

5   Q.   I should say that -- fair point.  Let me withdraw.

6          All these groups at least were able to be used until

7   November of 2022, right?

8          MS. KUDLA:  Objection.

9          THE COURT:  Just give me a moment to deal with

10  something else.

11         Give me a sec.

12         The objection is on what ground?

13         MS. KUDLA:  Outside the scope of his knowledge.  He

14  was asked to do a very limited task.

15         THE COURT:  Sustained.  This is outside the scope.

16  Q.   In your summary chart you note for a number of these groups

17  when the auto deletion was turned off, correct?

18  A.   Yes.

19  Q.   Fair to say that there is an indication for most of the

20  groups that you list here when the auto-delete feature was

21  turned off, correct?

22  A.   I don't know the exact percentage, but a good amount, yes.

23  Q.   I think you testified that there were 325 groups, correct,

24  and that 288 had auto delete turned on?

25         THE COURT:  Mr. Everdell, it's a chart.  You can just

1   look at it.  If you want to count them and decide whether it's

2   most or some or a few, you can do it.

3           MR. EVERDELL:  Sure.

4           Why don't we just look at the first page, if we could.

5   Q.  Special Agent Troiano, you see on this first page as an

6   example the first 1, 2, and then skip to 3, 4, 5, 6 -- I am

7   just counting which ones have auto deletion turned off.  I

8   count on the first page 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,

9   indicating that they are turned off, right?

10  A.  Yes.

11  Q.  You see that?

12  A.  Yes.

13  Q.  And those turned-off dates are in the November 2022 time

14  frame, correct?

15  A.  Yes, they are.

16  Q.  If there is an indication that auto deletion was turned

17  off, that account was at least active during that time for auto

18  deletion to be turned off at that time, correct?

19          MS. KUDLA:  Objection.

20          THE COURT:  Sustained as to form.

21          MR. EVERDELL:  We will move on to a different topic.

22          We will keep the chart up, if we could, please.

23  Q.  Your chart, you testified, indicates the date when the

24  messages in the chats, at least some of them, were set to auto

25  delete, correct?

1   A.   Yes.

2   Q.   And it identifies how long the auto-delete function was set

3   for before it deleted the message, correct?

4           MS. KUDLA:  Objection.

5           THE COURT:  Ground.

6           MS. KUDLA:  Asked and answered.

7           THE COURT:  Yes, I think so.  Sustained.

8   Q.   Looking through your chart, and we can use the first page

9   as an example, there is an indication of when the auto-deletion

10  function was set and for how long, right?

11          MS. KUDLA:  Objection.  The chart speaks for itself.

12          THE COURT:  Sustained.

13  Q.   Let's look at this first page.  Just as an example, you see

14  in the auto-deletion status column an indication for how long

15  the auto-deletion status was set for for these chat groups on

16  the first page, correct?

17          MS. KUDLA:  Objection.  Asked and answered and speaks

18  for itself.

19          THE COURT:  Sustained.

20  Q.   Is it fair to say that the duration of the auto delete was

21  set for, the ones on the first page generally, between one week

22  and four weeks?

23          MS. KUDLA:  Same objection, your Honor.

24          THE COURT:  Same ruling.

25  Q.   Looking at that first row, the hashtag organization --

1    A.  Yes.

2    Q.  -- Signal group, you see in the auto-deletion status column

3    that auto deletion was turned off, correct?

4              MS. KUDLA:  Objection.  Asked and answered.

5              THE COURT:  Sustained.  This is not helpful.

6              MR. EVERDELL:  All right, your Honor.

7              I just want to point out one thing with certain

8    columns, if I could.

9    Q.  If you could look at number 1 that we just saw.  If you

10   could also look at number 5 and number 6, which are also on the

11   same page.

12             You see those, Special Agent Troiano?

13   A.  Yes.

14   Q.  Those all indicate that it was SBF who turned off the auto

15   deletion, correct?

16   A.  Yes, I believe those were the only three.

17   Q.  Thank you.

18             Let's look at one other or a few others.  If you could

19   take a look at number 29, row 29.

20             MS. KUDLA:  Objection, your Honor.  At this point we

21   are reading the chart.

22             THE COURT:  That's correct.

23             MR. EVERDELL:  I have not even asked my question yet.

24             THE COURT:  Ask your question.

25             MR. EVERDELL:  I just want to take a look at the

1    participants on the chart here for number 29.

2    Q.  Special Agent Troiano, you see the name -- one of the

3    participants is named Ryne Miller?

4            MS. KUDLA:  Objection, your Honor.

5            THE COURT:  Sustained.

6            This is not an exam for new eyeglasses.  I assume he

7    can read it just as well as everybody in the jury box can read

8    it.

9            MR. EVERDELL:  I am simply going to ask if he knows

10    who Ryne Miller is.

11            THE COURT:  Why don't you just ask him that.

12            MS. KUDLA:  Objection, your Honor, to that question.

13    It goes beyond the scope.

14            THE COURT:  You can ask him who Johnny Podres was.

15    Let's move along.  He pitched for the Brooklyn Dodgers.

16            MR. EVERDELL:  Let's look at number 201, if we could.

17    Q.  You see that row, number 201, that group -- the name of

18    that group is KYC/legal discuss, is that correct?

19    A.  Yes.

20    Q.  Do you see that the auto-delete function was enabled for

21    that group?

22    A.  Yes.

23    Q.  What was the duration of the auto-deletion function for

24    that group?

25            MS. KUDLA:  Objection, your Honor, 403, and this goes

```
 1    to the Court's pretrial rulings.
 2              THE COURT:  I'll allow that question.
 3    A.  It was one week.
 4              MR. EVERDELL:  One moment, your Honor.
 5              Nothing further, your Honor.
 6              THE COURT:  Thank you.
 7              Ms. Kudla.
 8              MS. KUDLA:  No redirect, your Honor.
 9              THE COURT:  Thank you.  You're excused, Agent Troiano.
10              (Witness excused)
11              THE COURT:  Who is next, folks?
12              MS. KUDLA:  Your Honor, at this time the government
13    offers Government Exhibit 505.  We can address that at a
14    sidebar.
15              THE COURT:  I appreciate it if someone brings a copy
16    up.
17              (Continued on next page)
18
19
20
21
22
23
24
25
```

1            (At sidebar)

2            MR. COHEN:  I was waiting for your Honor to say who

3    won game 7 of the '55 series.

4            THE COURT:  But I don't acknowledge that.  I'm a

5    denier as to the '55 World Series.

6            What's the issue here?

7            MR. EVERDELL:  Your Honor, I believe the government is

8    offering this -- it's a hearsay objection.  I believe the

9    government's basis for being able to offer this is under a

10   coconspirator exception and under a statement against interest

11   and unavailable declarant.  We don't think it's a coconspirator

12   statement on -- Mr. Salame did not plead to a conspiracy

13   charge.  He pled to a substantive charge on campaign finance.

14   This doesn't fall within the scope of a conspiracy.

15           And I don't think it's a statement against interest.

16   First of all, there is no indication in the record that he

17   would invoke.  So if they want to rely on that, I think there

18   should be some record made that he would invoke his Fifth

19   Amendment privilege if he were here to testify.  Even so, the

20   government's theory is that he was, I think, some sort of a

21   straw donor, but I think that the message here just reflects

22   the fact that he is going to be donating to causes that he

23   himself supports and that that doesn't make it a statement

24   against interests.

25           MR. ROOS:  I will take those in turn.

1        First, he did plead guilty to a campaign finance

2   conspiracy, so I am not sure what they are thinking of.

3        Page 29, footnote 8 of the government's pretrial

4   briefing indicated that the attorney for Mr. Salame represented

5   that if called as a witness he would take five, so, therefore,

6   under *United States v. Miller*, which is a Second Circuit case,

7   he is an unavailable declarant.

8        MR. COHEN:  Which footnote is that?

9        MR. ROOS:  Footnote 8 of page 29.

10       So he is an unavailable declarant.  The text of the

11  document indicates that he is making a statement against his

12  penal interests.  He said:  Pass Sam's donations through my

13  name, which is a clearly inculpatory statement in implicating

14  himself in a campaign finance conspiracy.  In fact, his plea

15  allocution was very close to that.

16       I think there is no question that it comes in under

17  804(b)(3).  I know defense counsel has not made the argument

18  yet, so we can let him go, if your Honor wants, but I think it

19  is also admissible as a coconspirator statement, potentially as

20  a nonhearsay basis also.

21       THE COURT:  Anything else?

22       MR. EVERDELL:  No, your Honor.

23       THE COURT:  Overruled.  It is received.

24       (Continued on next page)

25

```
 1                  (In open court)

 2                  THE COURT:  Government Exhibit 505 is received.

 3                  (Government Exhibit 505 received in evidence)

 4                  MR. ROOS:  With that, your Honor, the government

 5     rests.

 6                  THE COURT:  Ladies and gentlemen, that concludes the

 7     presentation of the government's evidence in this case, subject

 8     to any rebuttal they might choose to offer to any defense case

 9     that the defense may choose to offer.

10                  At this time we will take what I expect will be a very

11     short break to take care of some legal business, and we will be

12     back with you as soon as we can, probably within 15 minutes.

13                  (Jury not present)

14                  THE COURT:  Is there a motion?

15                  MR. COHEN:  Yes, your Honor.

16                  Pursuant to Rule 29, defense moves for a judgment of

17     acquittal.  Your Honor, we submit that the evidence is

18     insufficient to sustain a conviction on all counts.

19                  In particular, we call your Honor's attention to the

20     issues that have been covered in many of the letters before the

21     Court.  We don't think the government has set forth viable

22     legal theories of wire fraud.  If it hasn't done that, then the

23     evidence is insufficient.

24                  In particular, with regard to Counts One and Two for

25     wire fraud, as set forth in the briefing that your Honor has
```

1    received, it's our position that the government has not set

2    forth a viable theory under the misappropriation theory, and

3    therefore the evidence could not sustain this conviction.

4         That would also cover Count Seven, the money

5    laundering count which is predicated on Count One.

6         We have the same point for Counts Three and Four,

7    which are the lender counts.  In addition, we submit that

8    materiality has not been shown on those counts as well.

9         With respect to Count Five, we also submit that the

10   government has not put forth sufficient evidence of

11   materiality.

12        And with respect to Count Six, the commodities fraud

13   count, we submit that the government has not put forth

14   sufficient proof to sustain a conviction for committing fraud

15   in connection with a commodities transaction.

16        For those reasons, your Honor, we would move under

17   Rule 29 for a judgment of acquittal.

18        THE COURT:  Thank you.

19        Does the government want to be heard briefly?

20        MR. ROOS:  Your Honor, the government opposes the

21   motion and submits that there is sufficient evidence for the

22   jury to conclude on Counts One and Two that the defendant

23   either made, participated in making, and conspired to make

24   material false and fraudulent representations, promises,

25   pretenses in connection with a scheme to defraud and obtain

1    money and property.  I'm happy to elaborate on that further, if

2    your Honor would like.

3         On Counts Three and Four, which relate to fraud on

4    lenders, the Court heard testimony from Zac Prince, among other

5    evidence, about the materiality of balance sheets that were

6    false that were submitted to BlockFi to induce it to lend.

7         On Count Five, fraud on investors, the Court heard

8    evidence from two investors with extensive testimony about the

9    materiality of various statements that were made to them.

10        And on Count Six there is ample evidence in the record

11   about both commodities and swaps that were either transactions

12   in connection with those commodities or swaps that were either

13   fraudulent or resulted in embezzlement.

14        Therefore, it's sufficient to give it to the jury on

15   that question.

16        THE COURT:  The motion is denied.

17        Will there be a defense case?

18        MR. COHEN:  Yes, your Honor.

19        THE COURT:  And order of witnesses, please.

20        MR. EVERDELL:  Yes, your Honor.  The first witness

21   will be Krystal Rolle.  Second will be Joseph Pimbley.

22        One moment, your Honor.

23        Your Honor, I am just confirming that we don't have

24   any issues with stipulations.  I don't think we do, in which

25   case the third witness will be Mr. Bankman-Fried.

```
 1              THE COURT:  Now, how long do you expect the first two
 2    witnesses to take?
 3              MR. EVERDELL:  Your Honor, I don't think that's going
 4    to take very long.  I can't speak for cross-examination, but I
 5    believe Ms. Rolle will be 15 minutes, 20 minutes tops.
 6    Mr. Pimbley about the same.
 7              THE COURT:  Now of course I received the relatively
 8    lengthy letter from defense counsel last night raising various
 9    issues with respect to the admissibility of certain areas of
10    proposed testimony by the defendant.
11              I have concluded that in order to determine all or
12    most of those issues, probably all, I am going to take the
13    testimony initially out of the presence of the jury because the
14    letter provides insufficient detail for me to rule on it.
15              The question is, do you have sufficient other
16    testimony, without touching those subjects, to put
17    Mr. Bankman-Fried on and go as far as we can go and then break
18    for the hearing out of the presence of the jury, or is there
19    simply no point of starting him without having that hearing
20    take place and resolved?
21              MR. COHEN:  Your Honor, I think we have enough to
22    start.
23              THE COURT:  Give me an idea of how much time, please.
24              MR. COHEN:  As I mentioned on our call yesterday, I
25    think the direct will take about as long as Mr. Wang and
```

```
 1    Ms. Ellison, somewhere around four hours.

 2             THE COURT:  That's without touching these other

 3    subjects?

 4             MR. COHEN:  I think without touching them, yes.

 5             THE COURT:  Fine.

 6             Mr. Roos.

 7             MR. ROOS:  Just one thing on the first witness, your

 8    Honor.

 9             Last night we got some 26.2 material that contained

10    redactions to it.  Under Rule 26.2(c), the defense needs to

11    first submit the material to the Court for its in camera review

12    before making any redactions for privilege.  We would ask for

13    them to do that.  Then if it's not in fact privileged to give

14    us the unredacted copy of the 26.2 material.

15             In particular, this is a former current attorney for

16    the defendant.  We don't know what the direct is going to look

17    like.  I think there is a possibility that things that are

18    redacted, even if they are privileged, they could create an

19    implied waiver, depending on how the testimony goes.

20             So I think it's important that the Court have an

21    opportunity to review that material and give it to the

22    government, if it is not in fact privileged or if there is a

23    waiver.

24             THE COURT:  First of all, Mr. Cohen -- I assume it's

25    Mr. Everdell?
```

1           MR. EVERDELL:  Yes.

2           THE COURT:  What was the basis for redacting the

3    material that you turned over?

4           MR. EVERDELL:  There are two bases, your Honor.  Some

5    are simply notes that were jotted by the attorney who was --

6    notes of himself.  It wasn't based on --

7           THE COURT:  I didn't quite get that.

8           MR. EVERDELL:  Your Honor, the first basis is work

9    product because some of the redactions are attorney notes to

10   themselves on the same page that the actual statements of the

11   witness during the interview were transcribed.

12          THE COURT:  Which attorney?  Who?

13          MR. EVERDELL:  Attorney on my team who was preparing

14   the witness.

15          THE COURT:  You don't have a clean copy of the

16   document?

17          MR. EVERDELL:  They are on the same page, so we

18   decided just to redact that portion.  They are handwritten

19   notes.  Some are typed.  We could produce the version of the

20   typed notes without those, but we didn't want to alter the

21   original of the document.  But we can do that for the

22   typewritten notes.

23          THE COURT:  You said there were two bases.

24          MR. EVERDELL:  Yes.

25          The other basis is that during the prep there was some

1    discussion about legal advice that was given from the attorney

2    to the defendant, and we don't intend to go into that in the

3    direct of Ms. Rolle.

4            Just to be clear, your Honor, we are going to have her

5    elicit testimony not of any advice that she gave to the

6    defendant, but simply as a percipient fact witness because she

7    was there at the interview at the securities commission in the

8    Bahamas on November 12, which has already been testified about

9    by Gary Wang.

10           She is going to be testifying about -- she was

11   there -- just who was there, the fact that an interview took

12   place and what happened after the interview took place, because

13   she was there as well.

14           If you recall the testimony from Mr. Wang, they

15   returned to the FTX offices and they began -- after some other

16   things took place, there was -- they began transferring assets

17   to the SCB, and she was at the offices when this all took

18   place.

19           So the point of her testimony is purely fact

20   testimony.  We are going to stay away from any legal advice or

21   any discussions she had with the defense.  And we just want to

22   get her recollection of those events because she was there as a

23   participant.

24           THE COURT:  But the second basis is, you're asserting

25   attorney-client privilege with respect to the material

1    redacted, is that correct?

2           MR. EVERDELL:  Yes.  For those portions, yes, your

3    Honor.

4           THE COURT:  What is the volume of this material?

5           MR. EVERDELL:  It's two pages, three pages.

6           THE COURT:  Good.  Produce the unredacted ones to the

7    Court, please.

8           MR. EVERDELL:  Yes, your Honor.

9           THE COURT:  Andy will mark them court exhibit next in

10   order, whatever that is.

11          MR. COHEN:  Your Honor, in terms of timing, because I

12   know the Court wants to keep on top of that, even without the

13   topics that we will need to have a separate hearing on, it's

14   possible that the direct will be longer than four hours.  It

15   could be closer to five.  I don't know.

16          THE COURT:  Thank you for keeping me posted.

17          MR. EVERDELL:  Your Honor, I'm sorry.  I didn't hear

18   what you said.  I have redacted, unredacted copies of the two.

19          THE COURT:  Give me the unredacted copy, and we will

20   mark it court exhibit next in order, and I will review it.

21          Mr. Akahoho's note will be marked as an exhibit prior

22   to the redacted notes.

23          MR. EVERDELL:  The material that you have in the 3500

24   material has redactions on it.  Those are the unredacted

25   copies.

```
 1            THE COURT:  Right.  I guess I better have the other so
 2   I can tell what you redacted.
 3            MR. EVERDELL:  Exactly.
 4            THE COURT:  Court Exhibit G is the unredacted and
 5   Court Exhibit H is the redacted.
 6            So now I'm thoroughly confused because instead of two
 7   documents I have four.
 8            MR. EVERDELL:  Your Honor.
 9            THE COURT:  If anything has been redacted, I don't
10   necessarily see where.
11            MR. EVERDELL:  Yes, your Honor.  I apologize.  You
12   have two documents.  There is a pair of each.  One is the
13   redacted version, one is the unredacted version of the same
14   document.  So there are two documents:  One redacted, one
15   unredacted.
16            THE COURT:  There are two typewritten documents which
17   are marked G and I.  G, I take it, is unredacted, and I has one
18   subparagraph which has the letter D in front of it redacted.
19   That's what I should be dealing with with that pair?
20            MR. EVERDELL:  Your Honor, I'm sorry.  I don't know
21   how it was marked.  There is a set of typewritten notes and
22   then there is a set of handwritten notes.
23            THE COURT:  The typewritten notes are marked G and I.
24   G has no indication of any redactions.  I has what appears to
25   be one line or subparagraph marked privileged and not subject
```

1    to Rule 26.2.  That's the redacted version of G, is it, and

2    it's marked I.

3              MR. EVERDELL:  I think that's right, your Honor.  In

4    the first page there is a place that says privileged as well.

5              THE COURT:  Not on mine.

6              Excuse me.  I found it.  Yes.  Correct.

7              MR. EVERDELL:  That's the unredacted and redacted

8    version of that document.

9              THE COURT:  Handwritten document H appears to have no

10   redactions.

11             I guess this must be Exhibit J, Andy.  Is that a J?

12             THE DEPUTY CLERK:  Yes, Judge.

13             THE COURT:  That's a J.

14             That has a couple of redactions.

15             We will recess for a few minutes so I can sit down and

16   read them.

17             (Recess)

18

19

20

21

22

23

24

25

1           (In open court; jury not present)

2           THE COURT:  We are having an issue with the realtime

3    transcription, but we'll go ahead and the record will catch up

4    with us.

5           First of all, with respect to Court Exhibits G and I,

6    tell me again, please, who had the call with Ms. Rolle and who

7    is the author of the document?

8           MR. EVERDELL:  So G and I, your Honor, are the

9    handwritten notes, the typewritten notes?

10          THE COURT:  Yes.  The typewritten notes.

11          MR. EVERDELL:  The typewritten notes.  Sorry.  Okay.

12   That was an attorney on our team.

13          THE COURT:  And that attorney did the notes as well.

14          MR. EVERDELL:  Yes.

15          THE COURT:  Okay.  And exactly whose privilege is

16   asserted?  Who is the client, who is the attorney?

17          MR. EVERDELL:  Yes, your Honor.  So the privilege is

18   Mr. Bankman-Fried's privilege with Ms. Rolle as his attorney in

19   the Bahamas matters, and so some of the redactions relate to

20   advice that Ms. Rolle gave him in connection with that matter.

21          If it helps clarify, your Honor, for example, if we're

22   looking at the typewritten notes on the second page, where

23   there's D——there's a D1D, that bullet is redacted for

24   privilege.  And that bullet refers to discussions between

25   Ms. Rolle and Mr. Bankman-Fried that captures some legal

1    advice, and some discussions between him and his lawyer.

2           THE COURT:  All right.  The unredacted version of

3    Court Exhibit I need not be produced.

4           Let's go to the other one.

5           Same questions.

6           MR. EVERDELL:  Yes.  So starting with that one,

7    there's the note on the first page off the side, "not subject

8    to Rule 26.2."  That portion below is sort of the note that the

9    attorney made to herself, you know, for purposes of capturing,

10   you know—for purposes of preparing for the direct.  It wasn't

11   the statements that were made at that interview.  You can see

12   that they're talking about a few other things in the rest of

13   the notes about her background, and that's just a note to

14   herself to be able to prepare the direct.

15          THE COURT:  Okay.  And the second page?

16          MR. EVERDELL:  Yes.  Second page is similar.  This is,

17   again, notes to prepare the direct, and also, at the bottom,

18   it's the similar—it's the same thing we had before, which is,

19   it reflects discussions between Mr. Bankman-Fried and Ms. Rolle

20   that reflect legal advice.

21          THE COURT:  Okay.  The redactions objections are

22   overruled there too.

23          Okay.  Are we ready for the jury?  Bring the jury

24   back, please.

25          MR. EVERDELL:  Your Honor, would it be useful for me

1    to just mention this to the witness?  I can run out quickly

2    just to make sure that we're not going to run afoul of what we

3    discussed so——and give her some quick direction, make sure we

4    don't——

5              THE COURT:  Yes.  So let's hold on the jury for a

6    minute.

7              MR. EVERDELL:  Thank you, your Honor.  I'll be right

8    back.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Jury present)
 2              THE COURT:  Mr. Everdell, your witness.
 3              MR. EVERDELL:  Thank you, your Honor.  The defense
 4    calls Ms. Krystal Rolle.
 5              THE DEPUTY CLERK:  Please remain standing and raise
 6    your right hand.
 7                    (Witness sworn)
 8              THE DEPUTY CLERK:  Thank you.  Please be seated.  And
 9    if you can please state your name and spell your first and last
10    names for the record.
11              THE WITNESS:  First name is Krystal, K-R-Y-S-T-A-L,
12    surname Rolle, R-O-L-L-E.
13              THE COURT:  You may proceed, Mr. Everdell.
14              MR. EVERDELL:  Thank you, your Honor.
15    KRYSTAL ROLLE,
16         called as a witness by the Defendant,
17         having been duly sworn, testified as follows:
18    DIRECT EXAMINATION
19    BY MR. EVERDELL:
20    Q.  Good morning, Ms. Rolle.
21    A.  Good morning, Mr. Everdell.
22    Q.  Where do you live, Ms. Rolle?
23    A.  I live in New Providence, Nassau, Bahamas.
24    Q.  Are you a citizen of the Bahamas?
25    A.  I am.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.   What is your profession?

2    A.   I am a counsel, attorney at law, practicing in the Bahamas.

3    Q.   And where are you licensed?

4    A.   I'm licensed to practice in the Bahamas as well as in any

5    jurisdiction in the Caribbean.

6    Q.   When did you begin practicing law?

7    A.   In October of 1995.

8    Q.   Where did you obtain your legal education?

9    A.   I obtained my bachelor's of law degree at the University of

10   the West Indies, Cave Hill campus, Barbados; I obtained my

11   legal education certificate of merit, which is equivalent to

12   the bar equivalency, at the Norman Manley Law School in

13   Jamaica.

14   Q.   And when did you receive your law degree from University of

15   West Indies?

16   A.   In 1993.

17   Q.   Where did you work when you started practicing law?

18   A.   In 1995, I started off my career in the litigation

19   department of the firm of McKinney Bancroft & Hughes; I then

20   went to the litigation department of Graham Thompson; and in

21   January of 2003, I entered into partnership with my husband

22   Wallace Rolle, in the firm of Rolle & Rolle.

23   Q.   And is that where you currently practice?

24   A.   It is.

25   Q.   Are you familiar with the term King's Counsel?

1   A.   I am.  I am a King's Counsel.

2   Q.   Can you describe what that is, please.

3   A.   King's Counsel is a senior trial lawyer who has been

4   appointed by the Monarch, by the Crown, as one of its counsel,

5   learned in the law.

6   Q.   And when you say the Crown, what are you referring to?

7   A.   The Monarch of England.

8   Q.   Okay.  Understood.  And when did you become a King's

9   Counsel?

10  A.   Well, I became a Queen's Counsel initially——

11  Q.   Yes.

12  A.   ——in February of 2020, and when the Queen passed in

13  September of last year, automatically became a King's Counsel.

14  Q.   And what does it mean to be a Queen's Counsel or King's

15  Counsel?

16  A.   Well, it's a designation of honor.  You are recognized as a

17  premier advocate in your jurisdiction.

18  Q.   And how many King's Counsels are there, in the Bahamas?

19  A.   At present, practicing, there are approximately 40, and

20  that is of a bar of about 2,000 attorneys, so there are 40 of

21  us.

22  Q.   What are your primary practice areas, Ms. Rolle?

23  A.   My primary practice area is civil litigation, and that

24  includes all manner of civil litigation, including commercial,

25  corporate, personal injuries, I used to do some family

1  work——not a whole lot of it anymore——and I don't do any

2  criminal.

3  Q.  Okay.  Ms. Rolle, do you know Sam Bankman-Fried?

4  A.  I do know Mr. Bankman-Fried.

5  Q.  How do you know him?

6  A.  Mr. Bankman-Fried is my client in the Commonwealth of the

7  Bahamas.

8  Q.  And when were you retained by Mr. Bankman-Fried in the

9  Bahamas?

10 A.  I was retained on the morning of 12th November 2022.

11 Q.  What, if anything, happened on the morning of 12th of

12 November that led you to be retained?

13 A.  I was retained for the purpose of accompanying

14 Mr. Bankman-Fried at his interview that had been scheduled at

15 the Securities Commission of the Bahamas.

16 Q.  Can you tell the jury what the Securities Commission of the

17 Bahamas is.

18 A.  So the Securities Commission of the Bahamas is a statutory

19 body, so it's created by statute, and it is the sole regulator

20 who oversees and regulates commercial securities business in

21 the Bahamas, so that includes all manner of securities

22 business, capital markets, mutual and investment funds, and

23 then more recently digital asset business.

24 Q.  Okay.  And are they sometimes referred to as the SCB?

25 A.  Yes, that's the abbreviation.

1   Q.  Okay.  And who is the head of the SCB?

2   A.  The executive director, Christina Rolle.

3   Q.  And that's the same last name.  Are you related?

4   A.  Not at all.  I must say Rolle is the most common name in

5   the Bahamas.

6   Q.  Got it.  You mentioned digital asset companies that the SCB

7   has some jurisdiction over?

8   A.  Yes.

9   Q.  Can you explain that a little bit.

10  A.  Well, it's a pretty recent development.  There's a piece of

11  legislation that was passed at the end of 2020.  That's called

12  the Digital Assets Registered Exchange Act.  And so subsequent

13  to the passage of that legislation, they then became regulators

14  of digital asset business.

15  Q.  Did the SCB have any regulatory oversight over FTX?

16  A.  They did.

17  Q.  Which FTX entity did the SCB regulate?

18  A.  That would be FTX Digital Markets Ltd., which is a Bahamian

19  entity.

20  Q.  Okay.  And where is that entity in relation to the rest of

21  the company?

22  A.  Well——

23          MR. ROOS:  Objection.

24          THE COURT:  Ground?

25          MR. ROOS:  Foundation on this.

1          THE COURT:  Sustained.

2   Q.  Are you familiar with where FTX Digital Markets sits in

3   relation to other FTX entities?

4   A.  Well, FTX Digital Markets I believe to be a subsidiary, but

5   it is incorporated in the Commonwealth of the Bahamas.

6   Q.  Okay.  Now you mentioned that the SCB requested that

7   Mr. Bankman-Fried appear for an interview; is that right?

8   A.  That is correct.

9   Q.  Where—sorry—when was the interview supposed to take

10  place?

11  A.  On the 12th of November at 12 noon at their premises in the

12  Bahamas.

13  Q.  Okay.  And how was it that Mr. Bankman-Fried became aware

14  that he needed to appear for this interview?

15  A.  He was notified of his—that his attendance was required.

16  Q.  Do you know how he was notified?

17  A.  I—I can't say.  I don't know.

18  Q.  What, if any, was your understanding of the nature of the

19  appearance?

20  A.  The nature of the appearance was that this interview was

21  being conducted as a part of an investigation that the SCB was

22  conducting into the collapse of FTX.

23  Q.  And was there any indication about whether the interview

24  was voluntary or compulsory?

25  A.  Given that it was a part of their investigation and given

1   the fact that liquidation proceedings had already been

2   commenced, as it relates to the Bahamian entity, it was

3   mandatory for him to attend.

4   Q.  And when you say liquidation proceedings, can you explain

5   what you mean by that.

6   A.  I would imagine that it would be akin to bankruptcy

7   proceedings.

8   Q.  Okay.  Can you elaborate a little bit on that.

9   A.  Well, the Securities Commission had made application to the

10  Supreme Court of the Bahamas to place FTX Digital Markets Ltd.

11  into liquidation, and an order was granted by the Supreme Court

12  on the 10th of November 2022.

13  Q.  Okay.  Let's talk a little more about the interview.

14          Did you accompany Mr. Bankman-Fried to the interview

15  at the SCB?

16  A.  I most certainly did.

17  Q.  And did you represent Mr. Bankman-Fried in connection with

18  the proceedings before the SCB?

19  A.  I did.

20  Q.  All right.  What time did you arrive at the offices of the

21  SCB?

22  A.  I arrived shortly before noon.

23  Q.  Okay.  Was Mr. Bankman-Fried there?

24  A.  He was there at the time of my arrival, yes.

25  Q.  And about when did the interview begin?

1    A.  It began at approximately 12:40 p.m.

2    Q.  Who was present for that interview?

3    A.  So there were a number of persons: first of all, the

4    personnel from the Securities Commission——the Executive

5    Director Christina Rolle, and she had three members of her

6    team, who were Ms. Mechelle Martinborough, Mr. Gawaine Ward,

7    and Mr. Gladstone Brown; besides the Securities Commission

8    personnel, there was myself; there was Mr. Bankman-Fried; and

9    there was Mr. Joseph Bankman; the provisional liquidator who

10   had been appointed by the court, Mr. Brian Simms, was present;

11   as well as an assistant of his, Ms. Sophia Rolle——again, no

12   connection; and there was one of the members of

13   PricewaterhouseCoopers, I don't remember his name at the

14   moment; and a stenographer.

15   Q.  Understood.  You mentioned the provisional liquidator.  Can

16   you just explain what that was.

17   A.  So once the Securities Commission had petitioned the court

18   to place FTX Digital Markets into liquidation, the court

19   appointed a provisional liquidator.  This is an individual who

20   has then the responsibility of carrying out the liquidation

21   process.  So the person that was appointed was Mr. Brian Simms,

22   and Mr. Simms was present.

23   Q.  And do you know why they were present for the interview?

24   A.  Well, having been appointed as the provisional liquidators

25   of FTX Digital Markets, they were then involved in the process

1  of carrying out the liquidation.

2  Q.  And how long did that interview last?

3  A.  Just short of three hours.

4  Q.  So approximately when did it end?

5  A.  Shortly after 3 p.m.

6  Q.  What happened after the interview at the SCB concluded?

7  A.  After the interview at the premises of SCB concluded, we

8  then went to the office of FTX Digital Markets situated in the

9  Bahamas as well.

10  Q.  Where is that?

11  A.  In the Western District, on the island of New Providence,

12  Bahamas.

13  Q.  And who went back to the FTX offices after the interview?

14  A.  All the individuals that I listed.  Should I list them

15  again or——

16  Q.  No need.

17  A.  With the exclusion of Mr. Joseph Bankman.

18  Q.  And what was the purpose for going to the offices after the

19  interview?

20  A.  For the purpose of having Mr. Bankman-Fried then officially

21  turn over the premises to the provisional liquidator.

22  Q.  What happened when you arrived at the offices?

23  A.  Sometime after we had arrived, we were then notified by

24  Christina Rolle——that is the Executive Director of SCB——that

25  the Commission had made an order against Mr. Bankman-Fried

1    directing him to turn over the digital assets of FTX to the

2    custody of the Securities Commission.

3    Q.  Did you see this order?

4    A.  We were shown a copy of it on a laptop and it was read to

5    us.

6    Q.  Did you later see a written copy of this order?

7    A.  We were then presented with a written copy on the following

8    business day, which was Monday, the 14th.

9    Q.  And just to be clear, what day was the——

10   A.  The 12th was Saturday, so this was Saturday afternoon

11   that——that the interview took place and that we then went to

12   the premises of FTX.

13   Q.  And how did you——well, when you were on the premises, how

14   did you receive the order on the premises on the 12th?

15   A.  On the 12th, it was read to us, and it was shown to me on a

16   laptop.

17   Q.  And how did you receive it two days later when you saw the

18   written copy?

19   A.  A hard copy was delivered to my office, and I also received

20   it by email.

21   Q.  And did the Securities Commission ever make that order

22   public?

23   A.  They did.  It was subsequently posted on their website.

24   Q.  All right.  I would like to show for you, Ms. Rolle, what's

25   been marked for identification as Defense Exhibit 837.

1              MR. EVERDELL:  Brian, if you could just show that to

2      the witness, please.

3      Q.  Ms. Rolle, do you see what's in front of you there?

4      A.  I do.

5      Q.  And do you recognize that?

6      A.  I do.

7      Q.  What is that?

8      A.  This is the notice of order that was shown to me on the

9      evening of the 12th November and then hard-copied to me on the

10     14th.

11     Q.  And how do you recognize it?

12     A.  I've seen it before.

13     Q.  Is it a fair and accurate copy of the order that was shown

14     to you on the 12th and that you received later?

15     A.  At the moment I'm only seeing the first page.  That is.

16     Q.  Let's let you look at the second page as well.  If you

17     could flip to the second page.

18     A.  Yes, and that second page, that is it, yes.

19     Q.  Okay.  And is that order signed?

20     A.  It is.

21     Q.  Who is it signed by?

22     A.  It is signed by Christina Rolle, the Executive Director of

23     the Securities Commission.

24             MR. EVERDELL:  Your Honor, at this time defense offers

25     Defense Exhibit 837.

 1              MR. ROOS:  No objection.

 2              THE COURT:  Received.

 3              (Defendant's Exhibit 837 received in evidence)

 4              MR. EVERDELL:  All right.  If we can publish that to

 5  the jury.

 6  BY MR. EVERDELL:

 7  Q.  All right.  Ms. Rolle, this is the order that the

 8  Securities Commission read out orally at the offices on the

 9  12th?

10  A.  It is.

11              THE COURT:  I think we've covered that.

12              MR. EVERDELL:  Yes, your Honor.

13  Q.  Why don't we skip to the second page of the order.

14              And if we can first look at paragraph 6 of the order.

15  A.  Yes.

16  Q.  Do you see that, Ms. Rolle?

17  A.  I do.

18  Q.  Okay.  Can you—without reading the whole thing, can you

19  just summarize what that provision provides for.

20  A.  So it is notifying Mr. Bankman-Fried that the Commission

21  has taken a decision that he is to transfer all of the digital

22  assets of FTX to the Securities Commission.

23  Q.  And when you say FTX, which FTX are we talking about there?

24  A.  FTXDM.  That would be FTX Digital Markets Ltd., the

25  Bahamian entity.

1   Q.  Right.  So just to read it, read the language there, it

2   says, "to transfer to an account and/or digital wallet(s)

3   established and maintained by the Commission all of the digital

4   assets on the FTX.com platform within the possession, custody

5   and/or under the control of FTXDM, and its officers, directors,

6   employees, and/or agents."

7   A.  Yes.

8   Q.  Correct?

9   A.  Yes, correct.

10          MR. EVERDELL:  Okay.  We can take down that highlight.

11          And if we can look at paragraph 7.

12  Q.  Do you see that paragraph, Ms. Rolle?

13  A.  I do.

14  Q.  Can you summarize for the jury what that paragraph means.

15  A.  So this paragraph is now the order, the actual directive

16  directing Mr. Bankman-Fried to transfer the digital assets of

17  FTXDM to the Securities Commission of the Bahamas.

18  Q.  Okay.  And was Mr. Bankman-Fried subject to this order?

19  A.  He was.

20          MR. EVERDELL:  All right.  We can take that down.

21  Q.  All right.  Ms. Rolle, after the order was read out that we

22  just saw, what happened next?

23  A.  Approximately 45 minutes later to an hour, we were then

24  notified that an order had been made by the Supreme Court of

25  the Bahamas.

1   Q.  Okay.  And when you say the Supreme Court of the Bahamas,

2   what's that court?

3   A.  So the Supreme Court is the highest trial court.  We refer

4   to this as the first instance court.  It's the highest court

5   other than an appellate court.

6   Q.  So there are levels above the Supreme Court?

7   A.  Appellate court.  There's the Court of Appeal and the Privy

8   Council in London.

9   Q.  How did you learn that the Supreme Court of Bahamas had

10  issued an order?

11  A.  We were notified of this fact by Christina Rolle and also

12  by her counsel, who was then present.

13  Q.  And how did you become aware of the order?

14  A.  We were advised of it verbally by counsel for the

15  Securities Commission, Mr. Robert Adams, KC.

16  Q.  And did you later see the written order itself?

17  A.  We did.

18  Q.  When was that?

19  A.  On Monday, 14th of November, we were then served with a

20  filed copy of the order.

21  Q.  All right.  I want to show you what's been marked for

22  identification as Defense Exhibit 836.

23          MR. EVERDELL:  If we can just show that to the

24  witness, please.

25  Q.  Ms. Rolle, do you see what's in front of you?

1  A.  I do.

2  Q.  What is that in front of you?

3  A.  So this is the first page of the court order that I just

4  referenced, issued by the Supreme Court of the Bahamas.

5        MR. EVERDELL:  Why don't we let Ms. Rolle look at each

6  page, so we can scroll through.

7  A.  Yes, and this is the second page that I'm now looking at.

8  Q.  Okay.  And is this a fair copy of the court order that you

9  saw, that you saw on the 14th that was read to you on the 12th?

10 A.  Yes, it is.

11        MR. EVERDELL:  Your Honor, the defense offers Defense

12 Exhibit 836.

13        THE COURT:  Received.

14        (Defendant's Exhibit 836 received in evidence)

15        MR. EVERDELL:  Okay.  All right.  If we could publish

16 that to the jury.

17 BY MR. EVERDELL:

18 Q.  Okay.  Ms. Rolle, let's take a quick look at this document.

19 You see the title there, the caption, The Securities Commission

20 of the Bahamas and FTX Digital Markets Ltd., you see that?

21 A.  Yes, I do.

22 Q.  So we've discussed what the Securities Commission of the

23 Bahamas is, yes?

24        THE COURT:  Mr. Everdell, can we get to your point,

25 please.

 1              MR. EVERDELL:  All right.  We can take the callout

 2    down.

 3              Let's go to date.  If we can just highlight the date

 4    of the document.

 5              THE COURT:  I'm sorry.  Could we get to your point.

 6              MR. EVERDELL:  Yes, your Honor.

 7              We'll move to the second page.  And if we could

 8    highlight the "IT IS HEREBY ORDERED THAT."

 9    BY MR. EVERDELL:

10    Q.  All right.  Ms. Rolle, do you see that language in front of

11    you?

12    A.  I do.

13    Q.  You don't have to read the whole thing out, but can you

14    just summarize what that means for the jury.

15    A.  So essentially the Securities Commission of the Bahamas, as

16    the regulator, which has jurisdiction over FTX, its officers,

17    directors, directs FTX, its said officers and directors, to

18    transfer all of the digital assets of the company into the

19    custody of the Securities Commission.

20    Q.  Okay.  And was Mr. Bankman-Fried subject to this order?

21    A.  He was.

22    Q.  What consequences could he have faced if he did not comply

23    with this order?

24    A.  Well, this is a court order issued by the Supreme Court.

25    Failure to comply has a result of being held in contempt of

1   court and imprisonment.

2           MR. EVERDELL:  We can take that down, Brian.

3   Q.  After the Securities Commission Executive Director

4   presented orally this order, what happened next?

5   A.  Mr. Bankman-Fried, in conjunction with Mr. Gary Wang, then

6   began the process of transferring the assets into wallets that

7   had been created by the Securities Commission for that purpose.

8   Q.  And how long did this process take?

9   A.  Very, very long.  Didn't leave the premises until after

10  2 a.m. that night, from the following day.

11  Q.  And did anything else happen at FTX offices that evening

12  while the assets were being transferred?

13  A.  Yes.  During the process of the transfer of assets, two

14  officers from the Commercial Crime Division of the Royal

15  Bahamas Police force showed up.

16  Q.  Okay.  And what happened next?

17  A.  We met with them, being myself and Mr. Bankman-Fried, and

18  we offered to have Mr. Bankman-Fried attend an interview with

19  them the following week rather than accompany them that evening

20  for the purpose of questioning.

21  Q.  And what, if anything, happened with respect to passports?

22  A.  Mr. Bankman-Fried agreed to surrender his passport as an

23  indication of good faith, consistent with his agreement to

24  surrender himself for questioning the following week rather

25  than be taken that evening for questioning.

1    Q.  Did you see, what, if anything, occurred with Mr. Wang's

2    passport?

3    A.  The same.

4    Q.  Did you have—did you continue to represent

5    Mr. Bankman-Fried after the events of that evening?

6    A.  I did.

7    Q.  And did you have occasion to observe his interactions with

8    the SCB after the SCB interview on the 12th?

9    A.  I did.  I accompanied him on a number of interviews with

10   the SCB after the 12th of November.

11   Q.  Okay.  And what was the nature of those interactions?

12   A.  Pretty much the same; continuing questioning as to the

13   events of the FTX collapse.

14   Q.  And did you have occasion to observe his interaction with

15   the provisional liquidators after the SCB interview?

16   A.  I did.  I accompanied him on at least one of those meetings

17   with the liquidator.

18   Q.  Okay.  And what were the nature of those interactions?

19   A.  Similar to that as the Securities Commission fact-finding

20   questioning.

21           MR. EVERDELL:  One moment.

22           Nothing further, your Honor.

23           THE COURT:  Thank you.

24           Any cross?

25           MR. ROOS:  Just briefly.

1    CROSS EXAMINATION

2    BY MR. ROOS:

3    Q.   Good morning.

4    A.   Good morning.

5    Q.   We've never met before, right?

6    A.   I don't think so.

7    Q.   I don't think so either.  So nice to meet you.

8    A.   Likewise.

9    Q.   You have had a chance to speak with the defense lawyers

10   before, right?

11   A.   I have, yes.

12   Q.   And how many times, do you think?

13   A.   Difficult for me to say.  I've had discussions with them

14   relative to proceedings in the Bahamas.

15   Q.   Okay.  And did you have a chance to talk with them in

16   advance of your testimony here today about the testimony?

17   A.   I have.

18   Q.   And when was the most recent time, do you think?

19   A.   I would say this morning.

20   Q.   Okay.  And just to be clear, you weren't doing anything

21   wrong when you spoke to them in advance of your testimony here

22   today.

23              MR. EVERDELL:  Objection.

24              THE COURT:  Sustained as to form.

25   Q.   Did you think you were doing anything wrong when you spoke

1    to them in advance of your testimony?

2              MR. EVERDELL:  Objection.

3              THE COURT:  Overruled.

4    A.  No, I don't.

5    Q.  There's nothing irregular about meeting with lawyers in

6    advance of testifying, right?

7              MR. EVERDELL:  Objection.

8              THE COURT:  Overruled.

9    A.  Not to my knowledge, no.

10   Q.  Now, and just to be clear, meetings in advance of your

11   testimony did not affect your truthful answers in the

12   testimony, right?

13   A.  Absolutely not, no.

14   Q.  Now you said you were retained by Mr. Bankman-Fried on the

15   morning of November 12th?

16   A.  That's correct.

17   Q.  And that was after FTX declared bankruptcy; is that right?

18   A.  I don't know that FTX declared bankruptcy.  They were put

19   into liquidation by the Securities Commission.

20   Q.  I'm sorry.  Do you know—I'll ask it this way:  Do you know

21   when, if you know, there was a bankruptcy in the United States?

22   A.  I'm vaguely familiar with that, now.

23   Q.  Okay.  Fair enough.

24              Just to be clear then, you didn't work at FTX, right?

25   A.  No.

1   Q.  And when you were hired, that was as a lawyer, not as an

2   FTX employee, correct?

3   A.  As a lawyer for Sam Bankman-Fried personally, yes.

4   Q.  Got it.  Now so you weren't involved in what happened with

5   FTX customer funds, right?

6   A.  Not at all.  Was not even familiar with FTX.

7   Q.  Okay.  So you don't have any firsthand knowledge about

8   that.

9   A.  Not at all, no.

10  Q.  And you don't have any involvement in the spending of FTX's

11  money, right?

12  A.  No.

13  Q.  And so the information that you have here today is

14  irrelevant to what happened before the liquidation, right?

15          MR. EVERDELL:  Objection.

16          THE COURT:  Sustained as to form.

17  Q.  The information you've testified today relates to stuff

18  after the liquidation proceedings occurred, right?

19          MR. EVERDELL:  Objection.

20          THE COURT:  Overruled.

21  A.  I don't know when the liquidation proceedings occurred.

22  The information that I gave today is as to the occurrences on

23  the 12th of November and thereafter.

24  Q.  So the 12th of November and then afterwards, right?

25  A.  Correct.

1    Q.  The information you gave today doesn't relate to anything

2    prior to the 12th of November.

3    A.  No.

4             MR. ROOS:  Thank you very much for coming out here.

5             THE WITNESS:  You're welcome.

6             THE COURT:  Thank you.

7             Mr. Everdell, anything else?

8             MR. EVERDELL:  Nothing further for this witness, your

9    Honor.

10            THE COURT:  Thank you.

11            Ms. Rolle, thank you very much.  You're excused.

12            THE WITNESS:  Thank you, your Honor.

13            (Witness excused)

14            THE COURT:  Next witness.

15            MR. EVERDELL:  Your Honor, the defense calls Joseph

16   Pimbley.

17            THE DEPUTY CLERK:  Remain standing, raise your right

18   hand.

19            (Witness sworn)

20            THE DEPUTY CLERK:  Thank you.  Please be seated.

21            Pull yourself up to the microphone.  Would you please

22   state your name and spell your last name for the record.

23            THE WITNESS:  Yes.  My name is Joseph Pimbley,

24   P-I-M-B-L-E-Y.

25            THE DEPUTY CLERK:  Thank you.

JOSEPH PIMBLEY,

     called as a witness by the Defendant,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. EVERDELL:

Q.  Good morning, Mr. Pimbley.

A.  Good morning.

Q.  Mr. Pimbley, what do you do for a living?

A.  I am a consultant for financial issues.

Q.  Okay.  And what does it mean to be a consultant for
financial issues?

A.  It means I have clients who hire me for a variety of both
skills and tasks they need, which does include litigation for
financial disputes; it also includes building models for
complex investments and giving advice on investments and risk
management.

Q.  And where do you work?

A.  Well, New York State.  I live in New York State and I work
out of my home office.

Q.  Are you affiliated with any consulting companies?

A.  Yes.  For this and several engagements, I'm affiliated with
PF2 Securities.

Q.  And what is PF2 Securities?

A.  It's a firm that specializes in litigation dispute
services.

1    Q.   What is your educational background, Mr. Pimbley?

2    A.   Education is all in physics.  I have a bachelor's,

3    master's, and PhD.

4    Q.   Where are those degrees from?

5    A.   Rensselaer Polytechnic Institute.

6    Q.   When did you receive those degrees?

7    A.   1980, a bachelor's degree in math—minor.  I'm sorry.

8    Bachelor's in physics, minor in math; master's degree in

9    physics, 1981; PhD, theoretical physics, 1985.

10   Q.   Can you describe your work or professional background,

11   please.

12   A.   Yes.  I started my career at GE Research Center in upstate

13   New York.  I was a physicist for semiconductor devices, an

14   expert on that topic.

15        I then, later in the '80s, became an assistant

16   professor of applied math at Rensselaer Polytechnic Institute

17   and worked there for several years.

18        I joined Citibank in 1993, 30 years ago.  They were

19   looking to hire quantitative finance people and needed somebody

20   with my background.

21   Q.   Can you explain what quantitative finance is.

22   A.   Yes.  It's—of course finance, like many fields, has many

23   branches, many important aspects.  I was hired, you know, for

24   Wall Street type problems, in both investments and derivatives,

25   but those areas often require a lot of code writing, solutions

of mathematics problems, and to translate the math and the

computer code into practical instructions or practical devices,

practical investments, practical analyses for institutions like

Citibank.

Q.   So you mentioned you were hired for some of your particular

skills.  Does that include the coding skills that you're

discussing here?

A.   Yes, sir, it does.

Q.   And can you describe your familiarity with coding and

databases.

A.   Yes.  In particular I've been writing computer code really

my whole career, starting at age 20 or so, so that's quite

awhile.  But in my——in my physics work, also as a math

professor, I would be required to——I actually——shouldn't say

required.  But my research would need computer code.  I

actually taught courses in computer code, as well as other more

typical mathematics classes.  And Wall Street, in the financial

field, data is supremely important, so all the models I built

would have to interact with the data——read input data, write

output data——and so the database work, which is a much more

formalized use of a high volume of data, became much more

important to me when I worked with a large investment firm in

the early 2000s.

Q.   Can you describe your work with that firm.  And what firm

was that?

1    A.   That firm was ACA Capital.  I joined in 2002.  I had——I was

2    originally a portfolio manager for a complex type of security

3    called a collateralized debt obligation——CDO——and I was——I

4    built several of these CDOs, billions of dollars,

5    billion-dollar sizes each, with, you know——working within my

6    firm to sell to investors and manage for them.  Lots of data is

7    needed for that, and the models need to interact with that.

8         But two years later, they promoted me to the executive

9    vice president level to——really, to lead all of risk for the

10   firm, and that——the most important component of that is the

11   database system——I'll call it the data system——that we needed

12   to rebuild for that firm.  So——

13   Q.   Can you describe what that was.

14   A.   Yes.  And what we——what we and my team of people, which

15   included the information technology group, that underlying

16   database was using a product called SQL server, and we also

17   used a——what's called a code base or code platform, computer

18   code, that needs to work with that database.  It actually

19   manages, inputs the data, extracts data, in very quick time,

20   does all the calculations that a financial firm needs, so that

21   a data system really means this database, this formal database,

22   but what I call a code layer that goes over that database.

23   Q.   You mentioned a few concepts there.  Let's see if I can

24   break that down.

25        First, you mentioned SQL; is that right?

1    A.   Yes, sir.

2    Q.   What is SQL?

3    A.   SQL is not the word, it's just the letters S-Q-L, and it

4    stands for "structured query language," and it—essentially

5    what it is is what it sounds like; it is a special language

6    that a person can use, sitting in front of the computer, just

7    type a few commands for particular data you want to extract

8    from a database.

9    Q.   And are you familiar with SQL?

10   A.   Yes, I am.

11   Q.   Are you able to craft SQL queries on the database?

12   A.   Yes.

13   Q.   You also used the terms "code platform" and "code layer."

14   Can you describe what you mean by those.

15   A.   Yes.  By "code platform," what I was thinking as I said

16   that, something called dot-net, and programmers—when I use the

17   word "programmer," the word "developer" means the same thing.

18   Somebody who writes computer code is called a programmer or

19   developer.  So developers will understand that this is an

20   extensive Microsoft product which essentially just has

21   different languages you can put under one program.  We happened

22   to focus on one particular language, but it's broad enough for

23   several languages.  That's the code platform.  And one of the

24   most important elements of that type of code is how it's able

25   to get data out of the database quickly but also write data

1   into the database.

2   Q.  Okay.  So can you describe briefly how the code interacts

3   with the database.

4   A.  Yes.  Just as you asked a minute ago about SQL——"sequel" is

5   how we say SQL——that's a language you can sit in front of a

6   computer, type a command, get answers out of the data.  What

7   the code does is it does these SQL commands inside its code.

8   It's a——it's a variant on the SQL that you might see

9   separately, but it's very important for that code language to

10  have the ability to query.  We still call it a query when we

11  put it in that code.  It queries the database.

12  Q.  And are you familiar with how to write queries to interact

13  with databases to extract data?

14  A.  From the code as well, yes.

15  Q.  Okay.  One last term.  Are you familiar with the term

16  "relational database"?

17  A.  Yes.

18  Q.  Can you describe what that is.

19  A.  Yes.  Essentially the dominant form of——when I say

20  database, within the financial world is what's called the

21  relational database.  It's a concept that's almost 50 years old

22  now, but it was a great concept, and what makes the database

23  relational is the question of, well, how is the data structured

24  or stored inside this——lots of hardware that has lots of

25  memory, and the answer is that it's configured as tables.

1    Think of a table as just rows and columns for something that's

2    important.  It might be the users in those systems, such as

3    FTX, that all the users have to be listed somewhere.  Each row

4    in the table is a different user.  And the columns going across

5    are just——they may all be simple but just different simple

6    attributes of the user that needs to be stored somewhere.

7    Maybe it will be changed when a new user is added, but, you

8    know, the database has to be increased in size.  That's one

9    table.  But a database, a relational database will have many

10   tables.  We'll talk about FTX later, but it's normal to have

11   tens to hundreds of tables within one particular database.

12          Finally, what makes the word "relational" matter is

13   that each of these tables has an ID number——I'll call it a

14   key——a key that lets me easily go to another table to get

15   information I need elsewhere to use.  If I'm also getting

16   information from table No. 1, I can also couple that or pair

17   that with information from a different table.  That's the

18   relational aspect.

19   Q.  I stopped at your career path.  Did you use any of your

20   expertise in databases and code in the rest of your career

21   following ACA Capital?

22   A.  Yes, I did.  If I could——

23   Q.  Please go ahead.

24   A.  Okay.  It seems essentially all roles that I've had have

25   certainly used computer code one way or another.  Sometimes

1   it's the most important aspect, sometimes it's only a secondary

2   aspect.  But databases, after——after ACA——if this is what you

3   meant——after the work that I did leading that effort and

4   creating what I think was a great data system for that firm, I

5   only used databases when I have a client who wants that, and

6   I've had, you know, essentially one or two clients in those

7   last ten years or so who asked for that capability.

8   Q.  Okay.  Have you ever taught or given lectures on financial

9   data systems in your professional capacity?

10  A.  Yes, I have.

11  Q.  Please describe that.

12  A.  Yeah.  The largest financial risk management organization

13  in the world is called Global Association of Risk

14  Professionals.  There's a——there are second and third kind of

15  organizations, but they're all important.  Just, again, what it

16  sounds like, a professional society.  I was a member of this

17  global association for many years, and I wrote articles for

18  them on quantitative finance as a regular column.  I

19  contributed at all their——or many of their conferences as a

20  speaker.  They invited me to be the first person to create a

21  video series for them on how one should understand credit risk

22  in the financial world and how to manage it, and how to assess

23  it.  And one of the key videos I created out of the nine of

24  that series focused on financial data systems.  And the short

25  story is, financial data systems are just absolutely required

1    to manage——to even just run your firm, okay, or not just manage

2    risk but to run your entire firm, you need a very

3    high-integrity, high-capability financial system, and the

4    database is the first key element of that; the code layer is

5    the second key element of that.

6    Q.   And have you ever served on the board of any companies that

7    involve financial data systems?

8    A.   Yes.

9    Q.   Can you describe that briefly, please.

10   A.   Yes.  I served on the board for years 2013 to

11   2019——something like that——for a firm called SOLVE Advisors.

12   They have since rebranded as SOLVE.  They were a startup.  I

13   was their only early investor.  So I was on the board for many

14   years.  The founders are actually colleagues of mine at ACA

15   Capital, where we felt we had built this——the financial data

16   system for ACA, and my colleagues ended up going to a business

17   that specializes in an excellent database that they use for

18   what's called fixed-income pricing data.

19          MR. EVERDELL:  Your Honor, at this time the defense

20   offers——

21          THE COURT:  You don't need to do that.

22          MR. EVERDELL:  Thank you, your Honor.

23          All right.  I'll move on.

24   Q.   Mr. Pimbley, what is your connection to this case?

25   A.   I was retained by your law firm in August of this year.

1    Q.  And to do what?

2    A.  I was asked to assist with their extraction of data from

3    the database.

4    Q.  Which database are you talking about?

5    A.  Oh.  I was provided with what was represented as a snapshot

6    of the FTX database that's hosted on Amazon Web Services, so we

7    often say AWS, Amazon Web Services; and in fact, I'll often

8    call this the AWS database or the FTX database.

9    Q.  Okay.  You were asked to extract data from the database,

10   from the FTX database?

11   A.  Yes.

12   Q.  To your knowledge have you ever met any of the witnesses in

13   this case?

14   A.  I don't believe I have, no, sir.

15   Q.  Have you ever met Mr. Bankman-Fried?

16   A.  No, sir.

17   Q.  And do you have any personal knowledge of the facts of this

18   case other than the work you performed with the database?

19   A.  Other than the work I've performed, I have essentially zero

20   knowledge beyond——it's really beyond what I've seen in

21   headlines.  I don't follow the stories, but what I know about

22   headlines.  The trial is going on, so I know that.  I'm limited

23   to that kind of knowledge.

24   Q.  Okay.  Mr. Pimbley, are you being compensated for your work

25   on this case?

1    A.  Yes, I am.

2    Q.  What is your hourly rate?

3    A.  $720.

4    Q.  Okay.  And roughly how much have you spent on this case?

5    A.  I would say about 70 hours thus far, something to that

6    effect.

7    Q.  Is your pay in any way dependent on the opinions you give

8    in the courtroom today?

9    A.  No, sir.

10   Q.  And is it dependent in any way on the outcome of the case?

11   A.  No, sir.

12   Q.  Okay.  Let's go back to the AWS database that you mentioned

13   a minute ago.  What is the AWS database?

14   A.  It's the database that represents all of the——essentially

15   all of the data that FTX as a going concern had to have——for

16   example, who are the users, who are——which could be customers,

17   it could be other people, but who are the users, what are the

18   coins, and other positions that are traded on the database,

19   what are the values of these; all the information you can

20   imagine to make that business run.

21   Q.  Okay.  And you said it was a snapshot.  You used the phrase

22   "snapshot."

23   A.  Yes, sir.

24   Q.  Was the snapshot at a particular date?

25   A.  Yes.  And I——I don't know a precise date.  I think it's

1    November 12, 2022, but it's some day in November 2022.

2    Q.  And did you become familiar with the AWS database in the

3    course of your work?

4    A.  Yes, sir.

5    Q.  How big is the database?

6    A.  Well, in terms of number of tables, I believe it's almost

7    300.  I think it's 289, but I'll say about 300 tables in the

8    database.  In terms of memory, I believe it's like 30 terabytes

9    of memory.

10   Q.  Can you give a sort of rough estimate in layman's terms of

11   what 30 terabytes means in terms of data.

12   A.  Well, for me——and that's one of the first things I did is,

13   how many users are there in this database, was this, you know,

14   a thousand users; it turns out it's more like somewhere of 9 to

15   11 million users, so imagine storing, you know, I'll just say

16   roughly 9 to 11 or 10 million users, and what trades they have

17   on and when they——when they put money in, when they took money

18   out, deposits and withdrawals.  So to me it's a huge amount.

19   Unlike many problems, you can't just scroll down a screen to

20   see what's going on.  Really, it's a huge amount.

21   Q.  Okay.  How did you familiarize yourself with the AWS

22   database?

23   A.  Well, I downloaded software——first of all, I was given

24   access to the database, not——it doesn't——it's not on my

25   computer, it's just a remote link that I'm able to do——to use

1    to AWS to see the database.  But I also needed special software

2    that lets me run queries, but also just review the tables even

3    without running queries, and so I can see all the table names,

4    I can choose any one I want and go look into it, and I—I did a

5    lot of that just to understand how can I, you know—I'm going

6    to get my arms around this, so let me look at—look into all

7    the tables I can see here.

8    Q.  So is that background work to get ready for your—the

9    specific projects on this case?

10   A.  Yes, it was.  That was background, but also it's good, you

11   know, to jump in and work on the real problems as you're

12   learning at the same time, and so that was my philosophy there.

13   Q.  And so you did that work?

14   A.  Yes, I did.

15   Q.  Are you familiar with the term "query"?

16   A.  Yes, sir.

17   Q.  Can you explain what a query is in relation to a database.

18   A.  It's really like it sounds.  It's, you ask the database to

19   tell you something.  I gave the example a minute ago.  The

20   simplest example might be, how many users are there.  So you

21   can write a query that will answer that question, okay?  And

22   that's what a query is.  You're asking the database a question.

23   Q.  Okay.  And what language do you use to write those queries?

24   A.  SQL.

25   Q.  Did you familiarize yourself in any way with the code that

1    relates to the FTX database?

2    A.  Yes, sir.

3    Q.  Can you describe how you did that.

4    A.  Yes.  I was also provided——I believe it's on discovery in

5    this case——what I'll call the code base for the computer code.

6    It's printed in language called Python, which means I was

7    given, you know, a folder of size I forget, but maybe 25

8    megabytes in size, 17,000 individual files, each of which is

9    Python code; and I also have software called developer

10   environment ID——or it's a type of developer environment.

11   Visual Studio.  But I already had this code that lets me view

12   essentially any part of this Python code that I want, so I

13   became very familiar with the Python code also.

14   Q.  And are you yourself familiar with Python code?

15   A.  Yes, sir.

16   Q.  Okay.  All right.  Now in connection with your work on this

17   case, were you given any specific projects to complete relating

18   to the data in the AWS database?

19   A.  Yes, sir.

20              (Continued on next page)

21

22

23

24

25

1   Q.  How many projects were you given?

2   A.  Three.

3   Q.  And can you just, at a very high level, summarize each of

4   the three projects you were asked to complete.

5   A.  Yes.  I'll order them so I can say it this way.

6          First was, at a high level, we want to know the in-use

7   line of credit, which was just stated as LOC, line of credit,

8   what was the in-use line of credit of Alameda's entities that

9   you can extract from the database.

10  Q.  Alameda, you are referring to what?

11  A.  I'm sorry.  Alameda Research as being one of the dominant

12  accounts within the FTX database.

13  Q.  When you say in-use line of credit, what do you mean by

14  that?

15  A.  Well, to me the simplest -- a simple and good analogy is

16  credit cards.  Many of us have credit cards.  The credit card

17  company will give us a maximum amount we can charge, but that

18  maximum may not actually be what you are using.  You might be

19  charging much less, purchasing much less.

20          So the in use is the portion of that credit card that

21  you're actually using, and that's the part you pay interest on.

22  You wouldn't pay interest on the full size if you are not using

23  that money.

24  Q.  We will get to the specifics of that project in a bit.

25          You said there were two other projects, is that right?

1    A.  Yes, sir.

2    Q.  Can you just, high level again, describe what those two

3    projects were.

4    A.  Yes.  They asked me, please, from the database, we want you

5    to tell us the total balance, which is total of invested

6    amount, but that's again at a high level, that's a simple

7    description, but excluding Alameda and excluding any FTX

8    entity.  So it's, essentially, what's the total amount of

9    everybody who is not at Alameda or FTX.  And we want that

10   number divided down into a few different groups, and that

11   involves all coins versus some small number of coins, and coin,

12   we may discuss, is like a currency, and also a special request

13   about certain -- whether certain accounts are margin enabled or

14   not.

15          Essentially, it was get us the total balance but

16   without Alameda or FTX, and a few more requests.

17   Q.  We will discuss those in a little bit more detail in a

18   second.

19          Let's talk first about that first project, the one

20   that was related to the line of credit for Alameda entities.

21   OK?

22   A.  Yes, sir.

23   Q.  What specifically were you asked to do in connection with

24   Alameda's line of credit in use?

25   A.  Well, it was essentially, we are looking at a specific --

out of the 300 tables in the AWS database, there is one

specific table that tells us, from October 2021 to November

2022, what the in-use principal was, the in-use LOC amount was,

and we wanted only those for the Alameda entities, the total

for that time period.

Q.  What was the name of that table?

A.  It was LOC interest charges.

Q.  Did you construct a query to extract that information from

the database?

A.  Yes.  But I should clarify that I was working with a

colleague.  My colleague provided the query.  I took the query,

ran it, tested it, derived the output, but I did -- with that

colleague, yes, sir.

Q.  You verified the query yourself?

A.  Yes, sir.

Q.  First explain to the jury what the query was that you used

to retrieve this information from the database.

A.  Well, the query -- I'm focused on just one table.  Again, I

said it was called LOC interest charges.  So a table, as I

said, is just rows and columns, very few columns, only five or

six columns going across, but the rows essentially were all the

accounts.  But I was able -- with a query you would say, look,

ignore everything that's not Alameda because we just want

Alameda.  I tell it, just give me Alameda.  And then there is a

column that says principal, and that principal is what we want.

1    That's the amount of line of credit that's in use.

2         There is a column next to it called size, and I

3    mention this because it is relevant that it shows the amount of

4    interest to be charged on that day to that account because of

5    this principal amount, the in-use LOC.

6    Q.  How did you satisfy yourself that the amount in the

7    principal column was the in-use LOC?

8    A.  How I satisfied myself was, the table in the database on

9    its own is suggestive of the in-use LOC, but to really be

10   confident that's what it's meant to be -- because the label

11   principal, it could be different things -- is, I went to the

12   python code.  It's really in the Python code where it actually

13   interacts with this particular table that you can see what the

14   code is doing and it helps you understand.

15        For example, and this is -- this may be a very good

16   example -- the function in this Python code that was used to

17   generate that column was called get LOC in use.  So, in a

18   sense, that's what computer code writers do and developers,

19   programmers, whatever we call them, when they write their code,

20   they try very much to name things in a descriptive way so it

21   helps them remember -- not just somebody like me -- it helps

22   them remember what the purpose of the function is.

23        I ran -- since I can read the code, I read all the

24   lines of code to understand how it was doing its calculation,

25   and I can see that, yes, that's what they were doing and that's

1    what they called the principal.

2    Q.  Once you verified that the query gives you the in-use LOC

3    for Alameda, what did you do next?

4    A.  Well, again, ran the query in concert with understanding

5    and validating, like you just said.  I got the output results,

6    because the result of running the query is for every day from

7    October 21 to November 22, it would give me an amount that

8    might be a billion dollars or so.  It varied over time.  So I

9    generated that output.  I compared it to what my colleague that

10   I mentioned before, what he had gotten for his output.

11        It's clearly a good idea for two independent people to

12   compare their results.  I had agreed with what he had done and

13   I agreed with the numbers that came out.

14        And from that I then made a plot that I have provided

15   to this case here that shows that graph.  It's really a graph

16   over time of what that in-use Alameda line of credit is.

17   Q.  Just one more clarifying question.  When you say Alameda,

18   was there only one account of Alameda on the database or were

19   there more than one.

20   A.  The answer to that is, I am going to say yes and no and

21   explain.  If I run just the one dominant Alameda account that I

22   see in the database, I get the results that I'm presenting, but

23   I verified that.  I checked that because really it's reasonable

24   to define Alameda as a much larger number of accounts also,

25   because there are two different concepts, an account ID and a

1    user ID.  A user like Alameda can have more than one account.

2    So my goal was to get essentially all of the Alameda accounts.

3    So I also ran the query using the user ID.  So it's a different

4    query and it got exactly the same answers as the first result.

5    That's one of the ways that I checked that the queries are

6    correct.

7    Q.  Was the data that you were extracted voluminous?

8    A.  Was it voluminous.  Three or 400 lines of output.  The

9    extracted data wasn't that bad.

10   Q.  Did you summarize those three or 400 lines in the graph --

11   A.  Yes.  They are all in the graph.  So the graph is an

12   excellent visual display of what the output is.

13           THE COURT:  Mr. Pimbley, would it be accurate to

14   understand what you said as being that the object of the

15   exercise was to find a dollar amount of the line of credit of

16   Alameda for each day from October 2021 through November 2022

17   and that for each day there was a single number?  Is that

18   right?

19           THE WITNESS:  Yes, sir.

20           THE COURT:  Thank you.

21   Q.  I want to show you, Mr. Pimbley, what's been marked as

22   Defense Exhibit 1617 for identification.

23           MR. EVERDELL:  Just for the witness, please.

24   A.  Yes, sir.  That's the appendix I recognize, the graph.

25   Q.  Is that the graph you produced from the data that you

1  extracted?

2  A.  Yes, sir.

3  Q.  Does this summarize the data that you extracted?

4  A.  Yes.  As I said a few times, I start in October 2021 to

5  November 2022.  Those dates are simply because that's what was

6  in the table in the database.

7         MR. EVERDELL:  Your Honor, the defense offers Defense

8  Exhibit 1617.

9         MR. REHN:  No objection.

10        THE COURT:  Received.

11        (Defendant's Exhibit 1617 received in evidence)

12        MR. EVERDELL:  We can publish that to the jury.

13 Q.  I am not going to spend a ton of time on that, Mr. Pimbley,

14 but if you can just look at the graph you produced.

15        You see the start date on the left-hand side, is that

16 right?

17 A.  Yes, sir.

18 Q.  End date on the right-hand side?

19 A.  Yes, sir.

20 Q.  Just that first time period, just so we know what the

21 numbers mean on the left-hand axis, what does the left-hand

22 axis reflect?

23 A.  It reflects in billion dollars what the in-use LOC for

24 Alameda was.

25 Q.  In that first time period you see it from the first four

1   months hovering around what number?

2   A.  It's just above $1 billion.

3   Q.  I want to direct your attention to one other thing, if we

4   can fast forward to the month of June 2022.

5        Do you see that month?

6   A.  Yes, sir.

7   Q.  What do you see with the in-use line of credit for Alameda

8   happening, according to the graph there?

9   A.  Well, it starts close to 3 billion in June, but then it

10  drops very precipitously about mid June.

11       MR. EVERDELL:  We can take that down now.

12  Q.  I want to turn now to the second and third projects that

13  you were asked to do, Mr. Pimbley.  OK.

14       Let's start with the second --

15       MS. SASSOON:  Your Honor.

16       THE COURT:  We will take a 15-minute break, folks.

17       (Jury not present)

18       (Recess)

19       THE COURT:  Mr. Everdell, before we bring the jury in,

20  I just want to note that we long ago left behind your estimate

21  for 15 to 20 minutes on this witness.

22       MR. EVERDELL:  I apologize, your Honor.  I am going to

23  try to streamline the next two more charts.

24       THE COURT:  That would be a good idea.

25       MR. EVERDELL:  Yes, your Honor.

1              THE COURT:  Let's go.

2              (Jury present)

3              THE COURT:  Defendant and the jurors are all present,

4    as they have been throughout.

5              Let's continue.

6              MR. EVERDELL:  Thank you, your Honor.

7    BY MR. EVERDELL:

8    Q.  Mr. Pimbley, when we left off we finished the first

9    project, right?

10   A.  Yes, sir.

11   Q.  Let's talk briefly about the second and third projects you

12   were asked to do.

13   A.  Yes.

14   Q.  Did both of those projects involve pulling data from the

15   database?

16   A.  Yes, they did.

17   Q.  Did you create visual representations of the data that you

18   pulled for those two projects?

19   A.  Yes, sir, I did.

20   Q.  I want to show you what's been marked for identification as

21   Defense Exhibits 1618 and 1619, if we can put those side by

22   side.

23             Do you see what's in front of you, Mr. Pimbley?

24   A.  Yes, sir.

25   Q.  Do you recognize what those are?

1  A.  Yes, sir.

2  Q.  What are those?

3  A.  These are two pie charts that I made from data extracted

4  from the AWS database.

5  Q.  And these relate to the second and third projects you were

6  asked to do?

7  A.  Yes, they do.

8          MR. EVERDELL:  Your Honor, the defense offers Defense

9  Exhibits 1618 and 1619.

10          THE COURT:  Received.

11          (Defendant's Exhibits 1618 and 1619 received in

12  evidence)

13          MR. EVERDELL:  We can publish those to the jury.

14  Q.  Mr. Pimbley, let's start with the one on the left.  Can you

15  explain what this second project was.

16  A.  Yes.  I was asked to run a query that would find the total

17  balances on the AWS database of all accounts but excluding

18  Alameda and FTX entities.

19  Q.  What do you mean by balances?

20  A.  It's essentially the dollar -- I'm sorry.  It's -- balances

21  is, first, the number of coins that each account holds, and

22  coins is a term that they use in the database, and by reading

23  the database and the code you realize it's a different way to

24  say it would be the currency.  I use the word coins, but it

25  would be easier to understand if I said currency.

1          The dominant currency there is just U.S. dollars.  You

2    can own U.S. dollars in your FTX account, as per the database

3    that I see, but you can also own other currencies, like you can

4    own Japanese yen, you can own Swiss Francs, you can own

5    Bitcoin.  Bitcoin is a cryptocurrency.  If we just think of all

6    these as being just currencies, then there is a specific coins

7    table in the database that lists all the possible coins.  It

8    actually has 700 entries, so one could say there are hundreds

9    of coins that you may own.

10         When I say total balance, what I really mean and what

11   the query does, it says, look at each account that's not

12   Alameda and not FTX and what's the dollar value of the sum of

13   all of its coins that it owns.  So if it owns Japanese yen, you

14   have to convert that yen into dollars to give its dollar

15   equivalent.  If you own Bitcoin in the account, you convert

16   that back to dollars, and you add up all those dollars and the

17   conversion factors are in the database itself, so using the

18   data that's in the database.

19   Q.  Once you get the balance number, what was the next part of

20   the analysis?

21   A.  Once I get the balance number properly excluding Alameda

22   and FTX accounts, then it was to please form some different

23   groups on that.  For example, the first group on the left said,

24   I get the total balances, but I am also going to restrict

25   ourselves to only four coins, again, four currencies, if I can

1   call it that, out of the 700 or so.  But the four that I was

2   asked to isolate were the dollar, U.S. dollar, Ethereum,

3   Bitcoin, and Tether as the names -- these are often --

4   Q.  Just to be clear, you are tallying up the coin holdings for

5   these four categories of coins for the users on the FTX

6   database that are not Alameda and not FTX?

7   A.  That's correct.

8   Q.  What about the one on the right?

9   A.  The one on the right says the same thing.  Everything is

10  the same except instead of just the four coins, take all the

11  coins, all the balances.

12  Q.  What do the different portions of the pie chart represent?

13  A.  And then that's a separate way to get -- create subgroups.

14  So the two -- each pie chart has two groups.  One group says,

15  take only those accounts that have something called spot

16  margin, that the accounts are identified as being enabled for

17  spot margin or spot margin lending or have -- the accounts have

18  had futures activity, which means the accounts have done some

19  long or short of futures at some point in time, according to

20  the database.

21  Q.  What is the other category?

22  A.  The other category is simply those accounts that fall out

23  of the first category.

24  Q.  In the charts that we are looking at here, which category,

25  blue or red, is the one that have the spot margin enabled and

1    the spot margin lending enabled versus everything else?

2    A.   It is the blue which is the larger in both cases and the

3    percentages are about the same in both cases, but the blue

4    larger one has those spot margin enabled, spot margin lending

5    enabled.

6    Q.   Just a few clarification questions.  What are the dates of

7    the balance information for these charts that are reflected

8    here?

9    A.   This would be the snapshot date in November 2022.

10   Q.   When you talk about the coins, just looking at the

11   left-hand side with the four coins you selected, one of them is

12   USD?

13   A.   Yes, sir.

14   Q.   What does that refer to?

15   A.   That is the dollar --

16   Q.   It includes currencies, not just cryptocurrencies?

17   A.   Yes.

18   Q.   ETH is there.  What does that refer to?

19   A.   ETH.  I believe that's Ethereum.

20   Q.   BTC?

21   A.   Bitcoin.

22   Q.   And USDT.

23   A.   Is Tether.

24   Q.   Let's just look at the numbers you were able to get to with

25   your database extraction.

1        Looking at the left-hand side, which is the four
2  coins, how much total were the balance information as of that
3  date in November that you found from doing your data pull?
4  A.   That was like 5.8 billion.
5  Q.   Of that 5.8 billion, roughly, how much of that were in
6  accounts that were enabled for spot margin, spot margin lending
7  and had futures activity?
8  A.   About 4.54 billion was in that category.
9  Q.   And then the rest left over is 1.3 billion in the other
10 category?
11 A.   That's correct.
12 Q.   What are the rough percentages breakdown?
13 A.   78 percent in the category was spot margins, spot margin
14 lending enabled and the futures activity, 22 percent that are
15 not in that category.
16 Q.   Skipping over to the right-hand side where you were
17 considering all currencies, all coins, what are the total
18 number -- what is the total balance number you arrived at as of
19 that date in November?
20 A.   That total was $8.9 billion.
21 Q.   Again, the portion that was with those categories enabled
22 is what?
23 A.   6.91 billion.
24 Q.   The rest is 2.03, right?
25 A.   Yes.

 1              MR. EVERDELL:  One moment, your Honor.

 2              Very briefly, your Honor.

 3   Q.  Mr. Pimbley, you were asked to perform these queries that

 4   generated the charts that we saw, correct?

 5   A.  Yes, sir.

 6   Q.  Did you do any independent analysis in the database apart

 7   from verifying the data that you did for these projects?

 8   A.  Yes.  First, primarily run the query, validate that it

 9   works and it gets the results that not just are consistent with

10   what our colleague may have found, but also do the results make

11   sense.  The queries do generate the output without -- very

12   clearly.

13              The second part is, when there is an intent of what

14   the query should be, I did as much as I could to look through

15   the code as well to understand where the code was interacting

16   with that particular data I was extracting, that the code also

17   was consistent with my understanding of what it should mean.

18   Q.  Understood.

19              Apart from that, did you evaluate the opinions of

20   anybody else involved in this case as part of your work on the

21   case?

22   A.  No, sir.

23              MR. EVERDELL:  Nothing further, your Honor.

24              THE COURT:  Thank you.

25              Cross-examination.

1    CROSS-EXAMINATION

2    BY MR. REHN:

3    Q.  Good morning, Mr. Pimbley.

4    A.  Good morning.

5    Q.  You and I have never met, correct?

6    A.  We have not met.

7    Q.  I believe you testified on direct that you have never met

8    the defendant, Sam Bankman-Fried?

9    A.  Yes.  I have testified to that, yes.

10   Q.  So that means you did not interview him, correct?

11   A.  That's correct.

12   Q.  Your testimony isn't based on any conversations you had

13   with him?

14   A.  I had no conversations with him.

15   Q.  So you don't know what was in the defendant's head when he

16   was running FTX and Alameda, right?

17            MR. EVERDELL:  Objection.

18            THE COURT:  Overruled.

19   A.  No, sir.

20   Q.  Or what he intended at particular points in time.

21   A.  No, sir.

22   Q.  And you don't know what information he was actually looking

23   at while he was running FTX and Alameda, right?

24            MR. EVERDELL:  Objection.

25            THE COURT:  Overruled.

1    A.  No, sir.

2    Q.  And you can't say whether the queries you ran in the FTX

3    database were ever actually used by the defendant at any point

4    in time, can you?

5    A.  No, sir.

6    Q.  You can't say whether those are queries that anyone else at

7    FTX ever used, can you?

8    A.  No, sir.

9    Q.  You in fact did not interview any FTX employees?

10   A.  That is correct, I did not.

11   Q.  And you didn't interview any FTX customers?

12   A.  That is correct, I did not.

13   Q.  And you did not interview any FTX investors?

14           MR. EVERDELL:  Objection.

15           THE COURT:  Overruled.

16   A.  That is correct, I did not.

17   Q.  So your testimony is based on certain queries that you ran

18   on certain tables in the FTX database?

19   A.  That's correct.

20   Q.  But you don't know how those tables were actually used in

21   the course of business at FTX, right?

22   A.  That's correct.

23   Q.  And you have not talked to any of the coders or developers

24   who designed the database?

25           MR. EVERDELL:  Objection.

```
 1                  THE COURT:  Overruled.
 2   A.  No, sir.
 3   Q.  So you didn't investigate, for example, whether the
 4   decisions were made to include or exclude particular data from
 5   the database?
 6   A.  No, sir.
 7   Q.  So you can't say that the particular tables that you
 8   queried contain all the relevant data for your analysis?
 9                  MR. EVERDELL:  Objection.
10                  THE COURT:  Overruled.
11   A.  That's correct.
12   Q.  What your testimony is, is that if you run these queries on
13   these particular tables in the FTX database, you get these
14   results.  Is that fair to say?
15   A.  That is correct.
16   Q.  And based on your work, you can't draw any further
17   conclusions beyond that?
18   A.  Correct.
19   Q.  In fact, I believe on direct you said you had zero
20   knowledge of this case aside from the data you extracted from
21   the FTX database, is that right?
22   A.  Well, I believe I included headlines.  I have seen some
23   headlines.  Other than that, correct.
24   Q.  Zero direct knowledge, is that fair to say?
25   A.  Yes, sir.
```

1  Q.  So the FTX database, that reflects information that was

2  maintained inside of FTX?

3  A.  It was -- I presume so, yes, that they -- I presume they

4  did not use any outside contractors, consultants, or whatever.

5  I just don't know.  I should say I don't know who maintained

6  the data in the FTX database.

7  Q.  Is it fair to say the database doesn't, for example, hold

8  any actual cryptocurrency inside of it?

9  A.  I don't want -- I believe almost certainly the answer is

10  no, but I can't say I can testify that I know that's the case.

11  Q.  And it's not a bank.  It doesn't hold actually any fiat

12  currency --

13          MR. EVERDELL:  Objection.

14          THE COURT:  Sustained as to form.

15  Q.  As far as you know, the FTX database does not hold actual

16  funds; it just has information about FTX, is that right?

17  A.  As far as I know, yes.

18  Q.  And you did not look at any bank statements in connection

19  with your testimony this morning, correct?

20          MR. EVERDELL:  Objection.

21          THE COURT:  Overruled.

22  A.  I did not look at any bank statements, no.

23  Q.  And you did not compare the amount of customer deposits

24  held in bank accounts to the amount that was reflected on

25  customer balances within FTX, did you?

1    A.  I did not.

2    Q.  So nothing in your testimony would address whether there

3    was a deficiency between what was in FTX, Alameda, and North

4    Dimension bank accounts and what was reflected in the FTX

5    database being owed to FTX customers.

6              MR. EVERDELL:  Objection.

7              THE COURT:  Overruled.

8    A.  That's correct.

9    Q.  In your testimony on direct you didn't look at the fiat@

10   account in FTX, did you?

11   A.  The fiat@ account was not part of my testimony, that's

12   correct.

13   Q.  In fact, you did not engage in any financial tracing for

14   your testimony today, did you?

15   A.  I'm sorry.  Could you repeat the question.  Me engaging in

16   financial trades?  I want to make sure I understand your

17   question.

18   Q.  You did not engage in any financial tracing in connection

19   with your testimony this morning, correct?

20   A.  Of course not, no, no, sir.

21   Q.  For example, you did not address whether FTX customer fiat

22   currency deposits were used to pay for investments.

23   A.  I did not address that, no, sir.

24   Q.  And your testimony did not address whether FTX customer

25   fiat currency deposits were used to pay for real estate,

```
 1    correct?

 2            MR. EVERDELL:  Objection.

 3            THE COURT:  Overruled.

 4    A.   Correct.  My testimony did not address the issue you just

 5    named.

 6    Q.   And it did not address whether those customer deposits were

 7    used to purchase Robinhood shares for the defendant, correct?

 8    A.   That's correct.

 9    Q.   Moving on from fiat currency tracing, you also did not

10    engage in any cryptocurrency tracing, did you?

11    A.   I did not engage in any cryptocurrency tracing.

12    Q.   For example, you didn't look at the Blockchain to see what

13    was actually happening to the cryptocurrency?

14    A.   I did not look at the Blockchain, no, sir.

15    Q.   Your testimony is based on the queries you ran within the

16    FTX database, right?

17            THE COURT:  Asked and answered.

18    Q.   To be clear, your testimony did not address whether the

19    amount of crypto held in FTX crypto wallets was less than the

20    amount of crypto that it owed to FTX customers?

21            MR. EVERDELL:  Objection.

22            THE COURT:  Overruled.

23    A.   That's correct.

24    Q.   And you also did not look at whether FTX customer crypto

25    deposits were used to pay for Alameda expenditures?
```

1  A.  I did not look at that, no, sir.

2  Q.  And you did not do Blockchain tracing, for example, of how

3  Alameda's lenders were actually paid back in the summer of

4  2022, is that right?

5          MR. EVERDELL:  Objection.

6          THE COURT:  Overruled.

7  A.  Apologies, sir.  Could you repeat the question, because I

8  just want to make sure I'm answering your question.

9  Q.  You did not do any tracing on the Blockchain of how

10  Alameda's lenders were actually paid back in the summer of

11  2022?

12  A.  I did not do any tracing on the Blockchain of the nature

13  you just described.

14  Q.  Your testimony does not say where the crypto to pay

15  Alameda's lenders back came from?

16          MR. EVERDELL:  Objection.

17          THE COURT:  Sustained as to form.

18  Q.  In your testimony you did not offer an opinion as to where

19  the crypto that was used to pay Alameda's lenders back came

20  from, is that right?

21          MR. EVERDELL:  Objection.

22          MR. REHN:  I'm asking about his opinion, your Honor.

23          THE COURT:  Overruled.

24  A.  Again, I apologize.  Could you summarize that question

25  again, please.

1   Q.   In your testimony you did not offer an opinion about where

2   the crypto that was used to pay Alameda's lenders back came

3   from, is that right?

4   A.   I did not offer an opinion on that topic, no, sir.

5   Q.   So you can't say one way or another whether those payments

6   came from FTX customer funds, right?

7   A.   I can't say.  I also have no knowledge of that, so I

8   certainly can't say.

9   Q.   Let's look at what you did do.

10          I want to start by asking about your first slide,

11   which I believe was marked as Defense Exhibit 1617 of Alameda's

12   LOC, I think it said, on the chart.  Is that right?

13   A.   Sounds right, sir.

14   Q.   We don't need to bring it up at the moment.

15          LOC means line of credit, is that right?

16   A.   That's my interpretation, yes, sir.

17   Q.   And I believe your testimony is that this chart shows the

18   amount of line of credit that was used by Alameda between

19   October 2021 and November 2022, is that right?

20   A.   Yes.

21   Q.   And you calculated that by running a query in the FTX

22   database?

23   A.   That's correct.

24   Q.   What was the particular table that you ran that query in?

25   A.   It was called LOC_interest_charges was the name of the

1    table.

2    Q.   Who decided to pick that particular table?

3    A.   It was -- first, that was suggested to me by the colleague

4    I worked with.  He looked at that.  I also looked at all the

5    tables in the database, including that one, to make my own --

6    satisfy myself that that was the -- really I think it was the

7    only source of in-use LOC that I knew, but I did look to see if

8    other tables were also relevant.

9    Q.   But you never worked at FTX, is that right?

10   A.   That's correct.

11   Q.   I think you said before you have not interviewed any

12   current or former FTX employees?

13            MR. EVERDELL:  Objection.

14            THE COURT:  Sustained.

15   Q.   Is it fair to say you don't have any information from the

16   company that would indicate what the actual purpose of that LOC

17   interest charges table was, do you?

18            MR. EVERDELL:  Objection.

19            THE COURT:  Sustained.  I think you have covered this.

20   Q.   In connection with this table you did not run a query of

21   the actual balances of Alameda accounts, is that right?

22   A.   I did run queries of, again, on the balances table, if

23   that's your question.  I am not sure it is.

24   Q.   You did run some queries on user balances for your other

25   two tables, is that right?

1   A.  Well, that's true, yes.

2   Q.  But to generate what you showed us in Defense Exhibit 1617,

3   you did not actually query Alameda's balances, is that right?

4   A.  I would not agree to that statement.  If the question is,

5   did the specific query I used reference a table other than LOC

6   interest charges?  No, that query didn't reference a different

7   table.

8          But I'm wondering if you are asking, did I ever access

9   Alameda balances anywhere else?  I am not sure.

10  Q.  No.  I'm asking about the basis for the table that you

11  presented during your direct testimony.

12  A.  The basis for the table is my belief, judgment, opinion

13  that that is the appropriate table that has the in-use LOC for

14  Alameda, and also for other entities if I had chosen to look at

15  other entities.

16  Q.  Just to be clear, that table does not tell us what the

17  overall aggregate balance of Alameda accounts was, is that

18  right?

19  A.  That is correct, it does not tell you that.

20  Q.  That would have required a different query in the balances

21  table.

22  A.  Yes.  A different query in the balances table would be more

23  appropriate for that question.

24  Q.  By the same token, it doesn't tell us what the aggregate

25  balance in Alameda accounts that had the allow-negative flag

```
 1    was, is that right?

 2    A.   That's correct.

 3    Q.   The table you presented doesn't address that question at

 4    all?

 5    A.   It does not.

 6    Q.   That means those balances in those Alameda accounts could

 7    have been more negative than the line-of-credit amounts that

 8    are reflected in the table you presented, is that right?

 9              MR. EVERDELL:  Objection.

10              THE COURT:  Let me have the question back, please.

11              (Record read)

12              THE COURT:  Rephrase it.

13    Q.   So the aggregate Alameda balances could be more negative

14    than the amount that's reflected in the line-of-credit balances

15    that you presented, is that right?

16              MR. EVERDELL:  Objection.

17              THE COURT:  Overruled.

18    A.   Yes.  If the concept of a negative asset balance is

19    appropriate.  As you know, the LOC -- the in-use LOC is a debt.

20    It's a liability of whoever has drawn that amount.  That's a

21    liability of Alameda.  Now you are asking me to compare a

22    liability of Alameda to assets of Alameda, and of course I say

23    that assets and liabilities are two ends of the same coin, if I

24    can use that term.

25              But if you are asking me to go into something I didn't
```

1   study, which is that Alameda assets in some sense could be

2   negative, which is -- it's an ambiguous way to talk about the

3   financial condition of a company.  Since I have not studied it,

4   I really don't think I can give you much more of an opinion.

5   Q.  You didn't look at the aggregate balance of Alameda

6   accounts that had the allow-negative feature.

7          MR. EVERDELL:  Objection.  Asked and answered.

8          THE COURT:  Overruled.

9   A.  That is correct.

10  Q.  On the table that you did generate, you identified the LOC

11  in-use amount for Alameda accounts, is that right?

12  A.  That's correct.

13  Q.  You did that using the user ID, is that correct?

14  A.  I did it two ways and I got the same answer both ways.  One

15  was with user ID and one was with just the single-account ID

16  for Alameda Research.

17  Q.  And the user ID for Alameda was the number 9, is that

18  right?

19  A.  That was the account ID, was number 9.

20  Q.  The account ID was number 9.  If you put that account ID

21  into the LOC in-use query, you would get the results that you

22  presented?

23  A.  That is correct.

24  Q.  Now, you said that you looked at the code that underlied

25  that particular query, is that right?

1   A.  Yes, sir.

2   Q.  And you examined the code to determine how the query was

3   put together?

4   A.  Yes, sir.

5           But may I clarify my previous answer?  May I reanswer?

6   It would be more clear if I answered that previous question

7   differently.

8   Q.  I am not sure which previous question.  If you could just

9   answer my question.

10          Did you examine the code to determine how the data

11  responsive to your query was generated?

12  A.  Yes.  I like the way you asked that question.  It was a

13  little bit different than how you phrased it before.  I am

14  going to say yes to that question.

15          THE COURT:  Mr. Rehn, you're getting a good grade.

16          MR. REHN:  If we could pull up for the witness

17  Government Exhibit 1737.

18          If we could expand the part, the top there.

19  Q.  Mr. Pimbley, do you recognize this as a portion of the FTX

20  code that would be used to return the data responsive to the

21  query you ran?

22  A.  Yes, I do -- it doesn't have all the identifying

23  information that's helpful for me looking at code, like the

24  name of the file of the code, but, yes, this is a function that

25  I remember from my review.

1   Q.  In particular, during direct you testified about the

2   get-LOC-in-use query?

3   A.  Yes, sir.

4   Q.  This is a portion of the code relating to how to respond to

5   get LOC in use?

6   A.  Yes, sir.  But I would -- if you don't mind my qualifying,

7   there were two versions of this function that are very close to

8   each other in the file, and both are important, but this is one

9   of them, yes.

10              MR. REHN:  The government offers Exhibit 1737.

11              THE COURT:  Isn't this already in?

12              MR. REHN:  I don't believe so, your Honor.

13              THE COURT:  Hearing no objection, it's received.

14              (Government Exhibit 1737 received in evidence)

15              MR. REHN:  Now, if we could publish that.

16   Q.  Mr. Pimbley, do you see that this has some code relating to

17   if there is a query in that get LOC in use relating to user

18   account PMMID?

19   A.  Yes.

20   Q.  Is PMMID the user account that references the Alameda

21   account?

22   A.  Yes.  Elsewhere in the code that variable is hard coded to

23   mean 9, and 9 is the Alameda account ID, so, yes, that is the

24   Alameda account ID.

25   Q.  So this portion of the code tells how to generate data

1    responsive to a get-LOC-in-use query if the query relates to

2    Alameda, is that right?

3    A.  I am going to say yes, but I am going to, if I can, modify

4    how I might say that if I were you.  I would say, in the case

5    where the account happens to be this one Alameda account, this

6    code says do something a little bit different.

7    Q.  And this is the Alameda account that you used to run the

8    query that supports the data in your chart, is that right?

9            MR. EVERDELL:  Objection.

10           MR. REHN:  I can rephrase, your Honor.

11           THE COURT:  Go ahead.

12   Q.  So this Alameda account, you used that account to query

13   this database to generate the data in your chart, correct?

14   A.  That is correct.

15   Q.  If we look at the code here, it says:  If that user account

16   is identified, it directs the database to pull some other

17   accounts.  Is that right?

18   A.  That's what it says, yes, sir.

19   Q.  And that means those are accounts that wouldn't be pulled

20   if it was only pulling the Alameda accounts, is that right?

21   A.  I think that's a fair statement.  A code is essentially --

22   I'm not going to disagree strongly with what you said.  The

23   code is essentially saying, look, in the case of this Alameda

24   account, we are going to -- for the purposes of this function,

25   we are going to imagine or state or hypothesize or decree that

1    additional accounts need to contribute.

2            I am going to answer yes, but it is a deliberate

3    aspect of the code that whoever the developer was, they did

4    this on purpose, yes.

5    Q.  You are saying the developer of this code deliberately

6    chose to add two other accounts to a query for the Alameda

7    account, is that right?

8    A.  Yes.  In fact, you can look at the account IDs all the way

9    over to the right-hand side.  That's true, yes.

10   Q.  Mr. Pimbley, did you look at what those account IDs are?

11   A.  I did have to do that, yes.

12   Q.  So looking at that first one, the one that says 1405310, is

13   that the Cotton Grove trading account?

14   A.  I remember that one of the two was called Cotton Grove.  I

15   don't know which one, but I will submit that you may be right,

16   yes.

17   Q.  And the second one, 3880629, was that ventures at Alameda

18   Research?

19   A.  I couldn't find the identity of that within the code, but

20   it had some other special significance elsewhere in the code,

21   but I am going to answer no and say I didn't know anything

22   about Alameda ventures.

23   Q.  In your chart, to be clear, it presents the data responsive

24   to this query, in other words, including these two accounts in

25   the Alameda line of credit, is that right?

1    A.   I believe that is true, yes.

2    Q.   And so the balances of those accounts would affect the

3    numbers that are on the chart at Defense Exhibit 1617?

4    A.   When you say balance, I wouldn't agree to balance.  I would

5    say that -- as you can see at the end of the function, where it

6    says return, it's saying now take this information and call

7    this other function, but my point being that it's going -- the

8    code will say, of all these accounts, including these two, then

9    perform the in-use LOC calculation, including those accounts.

10   That's what it will say.

11   Q.   In other words, the data you presented on Defense Exhibit

12   1617 was using a query that pulled the Alameda account plus

13   these two additional accounts.

14   A.   Yes.  The query was doing exactly what we wanted it to do,

15   which was identify Alameda, and this is what the code does.  I

16   see that point, yes.

17         MR. REHN:  We can take that down.

18   Q.   Now, did you do any analysis of the balances or the LOC in

19   use for those two accounts?

20   A.   Well, I believe -- actually, I believe I did, not for

21   balances.  I might have looked to see how do these contribute

22   to the in-use LOC because that's what mattered.  My

23   recollection -- again, I'm not -- my recollection is that they

24   had no material impact or was actually zero, but it's a little

25   bit hazy for me.

1    Q.  That's not reflected anywhere in the chart or the data

2    underlying the chart that you presented today, is it?

3    A.  No.  Actually, let me be clear about that.  The chart says

4    I ran this query, I got this result.

5    Q.  It doesn't break out the fact that these other two

6    accounts --

7    A.  No.  What it says is, the AWS system treated -- I ran this

8    query saying Alameda account, account ID equals 9, and that's

9    the definition the data system is using.  I'm saying the code

10   plus the database itself is leading me, as the user -- even

11   somebody who gets to see the source code is leading me to say,

12   this is how we define Alameda.

13           The query is doing what it was supposed to.  The

14   question is how expansive is this definition of Alameda.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

BY MR. REHN:

Q.  But just to be clear, you did not prepare a separate chart showing what it would have looked like without these two extra accounts included that the code—

A.  Well, that's correct, because my recollection is that the diligence I did said this had no meaningful impact, or it was negligible or zero.

Q.  Now before you did your database queries, did you review any of the notes of the government's interviews with Gary Wang?

A.  No, sir.  I had no access to anything other than the code base and the AWS database, so no, sir.

Q.  The defense counsel didn't provide you with any notes of interviews with Gary Wang or Nishad Singh?

A.  The answer is no.  My understanding of my assignment from my defendant-client was stick to the database and the code base.  That was my assignment.

Q.  In general, when you're trying to evaluate data in a code base, is it fair to say that understanding why it was designed in a particular way is relevant?

A.  It is relevant, yes.

Q.  So if you had known that Mr. Wang said that the defendant directed the inclusion of these subaccounts to make the used line of credit appear lower, would that have been relevant to your analysis?

            MR. EVERDELL:  Objection.

```
 1              THE COURT:  Overruled.
 2   A.  That statement, representation, allegation, whatever I call
 3   it, is unknown to me.  I have no knowledge of that.
 4   Q.  I'm saying if you knew that that was an aspect of how the
 5   code was designed, would you have taken that into consideration
 6   in your analysis?
 7   A.  No, sir.  Simply because my analysis here—you say would it
 8   is have changed my analysis.  My role here was, to my defendant
 9   counsel-client, please pull this data from the database, okay,
10   as—you know, with this intent of Alameda account.  So I don't
11   think it—I don't think I could start using what did the
12   developer actually intend when he or she wrote the code.  I
13   think that would have been pretty speculative of me and pretty
14   far afield.
15   Q.  Okay.  Now let's go to an account that is not included in
16   the query you ran.
17              Are you aware of an account called fiat@ftx?
18   A.  I have, in my—yes, in my work through the database and the
19   code, I had some awareness of that, yes.
20   Q.  And that is an entry in the FTX ledger that reflects how
21   much fiat currency was owed to FTX customers?
22              MR. EVERDELL:  Objection, your Honor.  Beyond the
23   scope.
24              MR. REHN:  It's relating to data that's not included
25   in the chart, your Honor.
```

1           MR. EVERDELL:  We had a lot of discussion about things

2    that are not included but——

3           THE COURT:  I'm sorry?

4           MR. EVERDELL:  Your Honor, beyond the scope.

5           THE COURT:  And why is it within the scope?

6           MR. REHN:  Your Honor, I'm attempting to cross-examine

7    the witness regarding what this chart actually shows and what

8    it doesn't show.

9           THE COURT:  Well, I think you can rephrase it to ask

10   more directly.

11   BY MR. REHN:

12   Q.  So the fiat@ftx account was not included in the line of

13   credit chart that you created to show Alameda's line of credit,

14   correct?

15   A.  That is my understanding, that it was not included in

16   either of two ways I ran that query, but that's my——to be

17   honest, since I don't have the code in front of me or the——and

18   the table——the database tables in front of me, I can't say for

19   sure, but my impression was it was not included, no.

20   Q.  And did you review any of the testimony in this case?

21   A.  No, sir.

22   Q.  Are you aware of a transfer of fiat liability to an account

23   called FTX fiat old?

24           MR. EVERDELL:  Objection.

25           THE COURT:  Sustained.

1   Q.  Are you familiar with an account in the FTX database called

2   FTX fiat old?

3            MR. EVERDELL:  Objection.

4            THE COURT:  Sustained.

5   Q.  In the course of your review of the FTX database, did you

6   look at the FTX fiat old account?

7            MR. EVERDELL:  Objection.

8            THE COURT:  Sustained.

9            He has told you what he did at length.

10           MR. REHN:  Yes, your Honor.  I was attempting to

11  evaluate whether he included this account as well, but we can

12  move on.

13           THE COURT:  Yes.

14           MR. REHN:  So let's go ahead and bring up

15  Exhibit 1617.  Defense Exhibit 1617.

16  BY MR. REHN:

17  Q.  So looking at your chart, in terms of what is actually

18  included here, is it fair to say you calculated that Alameda

19  was in fact using more than a billion dollars on its line of

20  credit throughout 2022?

21  A.  Yes, sir.  Maybe there's a very brief dip below a billion

22  dollars at Jan 7, but it's fair to say a billion dollars or

23  more, yes, sir.

24  Q.  And your analysis also shows that the amount of its line of

25  credit that Alameda was using generally went up over the course

```
 1   of 2022; is that correct?

 2              MR. EVERDELL:  Objection.

 3              THE COURT:  Overruled.

 4              The chart speaks for itself.  We can all see it.

 5   Q.  So looking at October 2022, Alameda is using between 4 and

 6   $5 billion of its line of credit; is that right?

 7              MR. EVERDELL:  Objection.

 8              THE COURT:  Sustained.

 9   Q.  Is it fair to say that based on your calculation, Alameda

10   went from having a $1 billion use on its line of credit to

11   having more than $4 billion between January and October of

12   2022?

13              MR. EVERDELL:  Objection.

14              THE COURT:  Look, you have an opportunity to do a

15   closing argument in this case, and the numbers are right in

16   front of you.  Let's move it on.

17   Q.  Does Defense Exhibit 1617 list of Alameda accounts that

18   were used to generate this chart include any accounts under the

19   email address seoyuncharles88@gmail.com?

20              MR. EVERDELL:  Objection.

21              THE COURT:  Overruled.

22   A.  Yeah, I'm sorry.  I know you gave an account or a chart

23   number, but can you ask me, are we talking about this in use

24   loc query?

25   Q.  I'm talking about, for the account you used to generate
```

1   this particular chart, did it include an account under the

2   email address seoyuncharles88@gmail.com?

3   A.  I have seen that account name, okay, and I believe it was

4   not part of this Alameda group, but I can't—as I'm sitting

5   here, I don't have the database in front of me, and I can't

6   testify to that precisely.

7   Q.  When you were preparing this chart, did you consider

8   whether any other customer of FTX had the ability to have a

9   line of credit that ran into the billions of dollars?

10              MR. EVERDELL:  Objection.

11              THE COURT:  Sustained.

12  Q.  Did you look at the available lines of credit that other

13  customers of FTX had?

14              MR. EVERDELL:  Objection.

15              THE COURT:  Sustained.

16              MR. REHN:  Your Honor, he's testified about the line

17  of credit that Alameda had.  I think some cross-examination on

18  whether other customers had similar lines of credit is

19  warranted.

20              THE COURT:  Look, he has told you, and he told

21  Mr. Everdell, that essentially the charts he prepared added up

22  certain numbers in the table, date by date, and he told you

23  what numbers in the table were added up, and obviously the ones

24  that he did not enumerate as having been added up are not

25  included.  Why isn't that self-evident at this point?

```
 1              MR. REHN:  Fair enough.  I'll move on.

 2              THE COURT:  Okay.

 3              MR. REHN:  So we can bring that down.

 4    Q.  Let's talk about your second and third charts.  These deal

 5    with the sum of FTX user balances for user accounts; is that

 6    right?

 7    A.  Yeah.  If I can——I think I'm probably saying what you just

 8    said, but it's the sum of balances of the non-Alameda, non-FTX,

 9    other users.

10    Q.  And the second chart was just for US dollars, Bitcoin,

11    Ether, and Tether?

12    A.  That's correct.

13    Q.  And then the third chart was the same concept but it

14    included the sum of FTX user balances for all coins; is that

15    right?

16    A.  Yes.  Again, with the caveat, I don't know the term "FTX

17    user balances."  User——again, we're excluding Alameda and FTX

18    entities, but I guess that's clear.

19    Q.  So, and you looked at the final user balance numbers in the

20    database, right?

21    A.  Yes, sir.

22    Q.  So that means these are the values of FTX user balances as

23    of around November 11, 2022?

24    A.  Yes, sir.

25    Q.  That's when FTX declared bankruptcy and stopped processing
```

1    customer withdrawals; is that right?

2    A.   I don't know that.  I don't have that information.

3    Q.   But your testimony with respect to these two charts is just

4    a snapshot of that moment in time?

5    A.   Yes, sir, and it's the only snapshot I received in evidence

6    in this case, yes, sir.

7    Q.   You didn't look at what was happening with user balances at

8    any earlier point in time; is that right?

9    A.   Essentially, no, but I will volunteer and say that there

10   was a table in the database that tried to capture balance

11   history.

12   Q.   But you didn't look at that table, for these charts; is

13   that right?

14   A.   For these charts—for these charts, I did not use that

15   table, correct.

16   Q.   And to calculate the value of the customer balances that

17   was reflected on your charts, you didn't look at any outside

18   sources, right?

19   A.   Correct.

20   Q.   You used what's called the approx fair value in the FTX

21   database?

22   A.   That's correct.

23   Q.   So that's what your testimony is based on, the approx fair

24   value?

25   A.   Yes, sir.

1    Q.  And so you didn't take, for example, the value of Bitcoin

2    from an outside source and then multiply it by the balance of

3    Bitcoin that FTX users had?

4    A.  I did not take the value of Bitcoin, say, in US dollars

5    from an external source.  I used precisely what was in the AWS

6    database, yes, sir.

7    Q.  And you did not evaluate whether the valuations inside the

8    FTX database reflected real-world values, right?

9              MR. EVERDELL:  Objection.

10             THE COURT:  Overruled.

11   A.  That is correct.

12   Q.  And in fact, around the time of FTX's collapse, there were

13   some pretty significant fluctuations in crypto values, right?

14             MR. EVERDELL:  Objection.

15             THE COURT:  Sustained.

16   Q.  Are you aware of fluctuations in crypto values in November

17   of 2022?

18   A.  I—I can't testify to that, no.  No.

19   Q.  It's fair to say your analysis did not evaluate whether the

20   approx fair value in the FTX database is a realistic valuation

21   of FTX user balances?

22             MR. EVERDELL:  Objection.

23             THE COURT:  Sustained.

24   Q.  For generating the charts, the pie charts that we looked

25   at, you just took the internal FTX database valuation, right?

1          MR. EVERDELL:  Objection.

2          THE COURT:  Sustained.

3          MR. REHN:  And then if we could pull up Defense

4    Exhibit 1619.

5    Q.  And then what you did was, you identified the accounts with

6    certain things enabled in them to generate the pie chart; is

7    that right?

8          MR. EVERDELL:  Objection.

9          THE COURT:  Overruled.

10   A.  Yes, sir.

11   Q.  And so one thing you identified were accounts with futures

12   trading?

13   A.  Yes, sir.

14   Q.  And accounts with spot margin enabled and accounts with

15   spot margin lending enabled, right?

16   A.  That's correct.

17   Q.  And then you put all of those accounts together and you

18   took the total balance of those accounts; is that right?

19   A.  Yes, remembering, as I'm sure you have, that we're

20   excluding Alameda and FTX accounts, but—but, yes, the grouping

21   you just mentioned—spot margin enabled, spot margin lending

22   enabled, or—these are ors—or futures activity—that formed

23   one group, and then the second group was just all of the—all

24   those cases that fell outside the first group.

25   Q.  So starting with futures trading, those are customers who

1    engaged in buying and selling of crypto futures on FTX; is that

2    right?

3    A.  Sir, that's actually going beyond my specific knowledge of

4    how FTX worked.  I think to be fair to me and to—to the entire

5    court, I should just be clear.  We developed a specific way to

6    query the database to isolate those accounts that had never

7    traded futures at all versus—and of course the others would be

8    those that had at one point in time traded futures, and

9    it—these just come however the database interpreted that.  Did

10   futures include Bitcoin futures or these other futures; it's

11   however the table in the database—whatever signals it gave is

12   what we used.

13   Q.  But customers who participated in futures trading but did

14   not participate in the spot margin program, they did not agree

15   to lend out their assets; is that right?

16               MR. EVERDELL:  Objection.

17               THE COURT:  Sustained.

18   Q.  Did you evaluate whether customers who engaged in futures

19   trading on FTX agreed to lend out their assets?

20               MR. EVERDELL:  Objection.

21               THE COURT:  Sustained.

22   Q.  So moving on to the spot margin program.  So spot margin

23   lending enabled, is that the feature that allows FTX customers

24   to lend money on the exchange?

25               MR. EVERDELL:  Objection.

1            THE COURT:  Sustained.  Look——

2            MR. REHN:  He generated the charts using that data,

3    and I'm allowed to inquire——

4            THE COURT:  I understand that.  He explained in detail

5    how he did it.  And it has, I imagine you will argue, certain

6    inherent limitations.

7            Okay.  You know, when I was a kid, I worked in my

8    father's deli, and if he gave me the assignment to go add up

9    the column that showed how many pounds of smoked fish we sold

10   last month and I gave him a number, it means pastrami is not

11   included, neither is cole slaw, or macaroni salad, and we can

12   keep on going through every SKU in the deli.  But we're not

13   taking the time to do that.

14           MR. REHN:  Fair enough, your Honor.

15   BY MR. REHN:

16   Q.  Can I ask, who decided to exclude these three, or to lump

17   together these three categories?

18           MR. EVERDELL:  Objection, your Honor.

19           THE COURT:  Overruled.

20   A.  It was the Cohen & Gresser request to me that made that

21   decision.  I did not make that decision.

22   Q.  And you didn't evaluate whether there's any significance to

23   putting together those three types of accounts, did you?

24   A.  No, sir, I did not.

25   Q.  And you did not form an opinion on why those three types of

1    accounts would be lumped together on this chart, did you?

2    A.  No, sir, I did not.

3    Q.  And just to be clear, you did not conduct any analysis of

4    how much money was actually being lent in the FTX spot margin

5    lending program, did you?

6             MR. EVERDELL:  Objection.

7             THE COURT:  Sustained.

8    Q.  This chart does not——

9             THE COURT:  This is getting to be time to wrap it up.

10            MR. REHN:  Yes, your Honor.  Just a couple more

11   questions.

12   Q.  Does this chart reflect how much money was actually being

13   lent in the spot margin lending program?

14            MR. EVERDELL:  Objection.

15            THE COURT:  Overruled.

16   A.  No, it does not.

17   Q.  And you also did not evaluate how much money Alameda was

18   actually borrowing in the spot margin program, did you?

19            MR. EVERDELL:  Objection.

20            THE COURT:  Sustained.

21   Q.  Did you present any opinions or charts today about how much

22   Alameda was actually borrowing in the spot margin program?

23            MR. EVERDELL:  Objection.

24            THE COURT:  Overruled.

25   A.  No, sir.

1    Q.  And so your testimony did not address whether Alameda's

2    balances on FTX were connected to borrowing through the spot

3    margin program, did it?

4            MR. EVERDELL:  Objection.

5            THE COURT:  Overruled.

6    A.  No, sir.

7            MR. REHN:  Nothing further, your Honor.

8            THE COURT:  Thank you.

9            Mr. Everdell.

10           MR. EVERDELL:  Nothing from the defense, your Honor.

11           THE COURT:  Thank you.  Thank you, sir.

12           THE WITNESS:  Thank you.

13           THE COURT:  You're excused.

14           (Witness excused)

15           THE COURT:  All right.  We'll break for lunch till 2.

16           Counsel, please remain for a minute.

17           THE DEPUTY CLERK:  Would the jury please come this

18   way.  Bring your notebooks with you, please.

19           (Continued on next page)

20

21

22

23

24

25

```
 1                 (Jury not present)

 2                 THE COURT:  Be seated, folks.

 3            Okay.  Mr. Cohen, is there anything else on the

 4    defense case other than the testimony of your client?

 5                 MR. COHEN:  That's it, your Honor.

 6                 THE COURT:  Okay.  We'll resume at 2:00.

 7                 MS. SASSOON:  Your Honor, at this point do you have a

 8    sense of when you intend to conduct the hearing?

 9                 THE COURT:  Based on what Mr. Cohen has told me, I do

10    not expect him to finish the direct on the subjects other than

11    those that are implicated in the hearing today, and we will

12    probably have to finish that tomorrow morning and we will then

13    have the hearing.  Now I am going to think over the lunch hour

14    about what to do with the jury while we're having the hearing,

15    which might be to send them home and come back Monday, and it

16    might not.

17            Mr. Cohen, how long a hearing should I be planning

18    for?

19                 MR. COHEN:  If we could confer over lunch and I can

20    come back with a more precise answer for you, your Honor?

21                 THE COURT:  Okay.  Thank you.  2:00.

22                 MS. SASSOON:  And your Honor, perhaps, depending on

23    the length, we could conduct the hearing in the morning and

24    have the jury come in a little later, even if the rest of the

25    direct hasn't been completed.
```

1          THE COURT:  That's possible too.

2          THE DEPUTY CLERK:  All rise.

3          (Luncheon recess)

```
 1                          AFTERNOON SESSION

 2                              1:57 p.m.

 3             (In open court; jury not present)

 4             THE COURT:  Okay.  Counsel, what's the estimate as to

 5   how much time we need for a hearing?

 6             MR. COHEN:  I think, your Honor, 60 to 90 minutes.

 7             THE COURT:  Government?

 8             MS. SASSOON:  We expect to cross-examine maybe for 45

 9   minutes.

10             THE COURT:  Given those estimates, it seems to me the

11   best thing to do may be to send the jury home now, do the

12   hearing this afternoon, and start fresh tomorrow.  What do you

13   think?

14             MR. COHEN:  Whatever your Honor wants.  We're ready to

15   start, if you'd like.

16             THE COURT:  I understand that.

17             MS. SASSOON:  Government's amenable to that.

18             THE COURT:  Okay.  That's what we're going to do.

19   Then we'll bring the jury in and give them what I imagine

20   they're going to welcome as news, as soon as they're all here.

21             (Continued on next page)

22

23

24

25
```

1              (Jury present)

2              THE COURT:  Okay.  The defendant and the jurors all

3    are present, as they have been throughout.

4              Ladies and gentlemen, I have some scheduling

5    information for you, and what may be a little bit of a

6    surprise.  There is something that has to happen at this point

7    in the trial that will take a couple of hours, and that is not

8    something that concerns you.  In consequence, you've got the

9    rest of the day off.  We'll see you at 9:30 tomorrow morning.

10   You will hear the rest of the defense case starting at 9:30

11   tomorrow morning.  And you can reasonably expect that you will

12   get this case to decide in the first two or three days of next

13   week.  We're in the home stretch.  Of course I can't guarantee

14   it.  No insurance.  But there we are.

15             Okay.  So have a pleasant afternoon.  And I want to

16   reiterate, do not read or get informed in any way about what's

17   going on.  You've heard all those instructions before.  It's

18   especially important now.

19             Okay.  Thank you.

20             THE DEPUTY CLERK:  Would the jury please come this way

21   and bring your notebooks with you.

22             (Continued on next page)

23

24

25

1                    (Jury not present)

2          THE COURT:  Okay.  Be seated, folks.

3          Now just so that everyone who has taken the trouble to

4    get here today understands what is going on and why, there are

5    a number of areas of potential testimony from Mr. Bankman-Fried

6    that the defense wishes to elicit.  The government asserts that

7    I shouldn't hear any of it, or, to be more precise, that the

8    jury shouldn't hear any of it.  And despite a great deal of

9    effort on the part of everybody concerned, the amount of

10   information that I have to date is, in my judgment, inadequate

11   to resolve the admissibility of this testimony, in significant

12   part because it's not sufficiently detailed or specific.

13         I have the authority under the rules of evidence to

14   conduct a hearing so that the defendant can put in the evidence

15   for my ears alone, following which I'll be in a position to

16   rule one way or another as to whether the evidence is

17   admissible before the jury, in whole or in part, and if in

18   part, to what extent; and once that happens, we will then be

19   able to proceed with Mr. Bankman-Fried's testimony before the

20   jury, whatever the scope of it winds up being.  That's what's

21   happening.

22         And so Mr. Cohen, I take it you're going to call your

23   client to testify in this hearing; is that right?

24         MR. COHEN:  Yes, your Honor.  The defense calls Sam

25   Bankman-Fried.

```
 1              THE DEPUTY CLERK:  Please remain standing for a moment
 2     and please raise your right hand.
 3              (Defendant sworn)
 4              THE DEPUTY CLERK:  Thank you.  Please be seated.
 5              MS. SASSOON:  Your Honor, what's your practice when it
 6     comes to objections during a hearing of this nature?
 7              THE COURT:  Well, not having had a hearing of this
 8     nature in quite a long time, if ever, I will hear whatever
 9     objections there are.  I don't have a practice, in other words.
10     Seems to me appropriate to hear whatever is to be said.
11     SAM BANKMAN-FRIED,
12          the Defendant,
13          having been duly sworn, testified as follows:
14     DIRECT EXAMINATION
15     BY MR. COHEN:
16     Q.  Good afternoon, Mr. Bankman-Fried.
17     A.  Good afternoon.
18     Q.  You heard his Honor.  We're only going to cover certain
19     topics today.  So let me start with one topic.
20              What communications platforms did employees at FTX
21     use?
22     A.  Internally, the primary platforms used were Slack, Signal,
23     and to some extent Telegram; externally, email and to some
24     extent Telegram, in addition to Slack and Signal.
25     Q.  What are Slack and Signal?
```

1    A.  Slack is a workplace communications software where

2    basically employees can post threads, comment on those threads,

3    post files, react; there are various other channels that you

4    can use for whatever purpose, but we generally use them for

5    different topics.

6           Signal, it's a——it's a secure, encrypted peer-to-peer

7    communication platform that is one of the more used platforms

8    in the cryptocurrency industry, where you can form groups to

9    have conversations.

10   Q.  And why were they used at FTX?

11   A.  Both of them had advantages, especially for internal

12   conversations over email, for instance.  With email, it's easy

13   to have a single message sent to a group of people, but

14   threaded conversations with multiple topics, each of which

15   expand into subtopics with comments on those, files uploaded,

16   are not displayed or sort of maintained nearly as clearly.  So

17   we wanted something that involved more interactivity.  Slack

18   and Signal both had that.

19   Q.  Have you ever heard the term "encryption"?

20   A.  Yes.

21   Q.  How did that relate, if at all, to Slack and Signal?

22   A.  So the——almost all internet access is encrypted at this

23   point.  Signal in particular was encrypted in a stronger way,

24   which is to say that there was no third party that stored

25   unencrypted or raw versions of messages.  Instead, the

1    participants had access to the raw versions of messages but

2    would only send the——what's called the encrypted version to

3    each other, you know, online or through the platform.

4    Q.  What about Slack?

5    A.  Slack was accessed via encryption in terms of the internet

6    access that people had, but the platform stored the raw text

7    that was sent.

8    Q.  Was encryption important to FTX?

9    A.  It was.

10   Q.  Why?

11   A.  There were a number of reasons, in different occasions.

12   One concern was always security threats from the outside.

13   There were constant hacking attempts on FTX from third parties.

14   And any unencrypted data was potentially vulnerable.  So, you

15   know, one standard example of this, which we had concerns

16   about, was confidential user information.  We didn't want any

17   breaches of our systems.  We certainly didn't want information

18   like Social Security numbers of our customers that we had to

19   collect via the new customer process to be accessible by any

20   security breach, so we had, you know, more stringent

21   securities, including storing only encrypted versions of some

22   pieces of data and storing them in more secure locations.

23          There were also foreign policy concerns, for lack of a

24   better word.  For most of FTX's existence, we were

25   headquartered in Hong Kong.  There were some, you know,

1  political occurrences during our period there, which meant that

2  there was concern with employees about unauthorized access to

3  their devices.

4       And, you know, finally, there were concerns about

5  former employees, you know, having access to data that they

6  could sell to a competitor, for instance.

7  Q.  You mentioned the risk of hacking.

8  A.  Yeah.

9  Q.  Did FTX ever get hacked?

10 A.  Well, there were constant attempts to hack FTX.  There was

11 never a core breach, I would say, of FTX's systems themselves,

12 but a number of the third-party services that it used had

13 breaches or what appeared to us at the time as being breaches,

14 of various sorts.  Sometimes we weren't sure what caused them

15 exactly, but we could see the effect, and they would leak out

16 confidential information associated with FTX to the world.

17 Q.  Have you ever heard the term "document retention policy"?

18 A.  Yes.

19 Q.  What did it mean to you?

20 A.  It's a policy that a company keeps that specifies which

21 sorts of data have, you know——are retained, that is to say

22 stored in a company's files, for what periods of time, which

23 sorts of data are not stored, and sort of other related things.

24 Q.  Did there come a time that FTX had put into place a

25 document retention policy?

1    A.  Yes, it did.

2    Q.  Can you tell his Honor how that came about.

3    A.  Yeah.  In short, in response to a number of things, one of

4    which was just the company growing and becoming relatively more

5    mature, at least, it began time for us to formalize a number of

6    the policies that we had.  There were also constant regulatory

7    inquiries from regulators across the world.  We were

8    interfacing with, you know, regulatory infrastructure in dozens

9    of countries, and those each had associated document retention

10   requirements in various cases, and so the chief——chief

11   regulatory officer, Dan Friedberg, along with Fenwick & West,

12   one of our external law firms, put together a document

13   retention policy which described in what circumstances FTX was

14   to have, you know, various forms or lack thereof of retention

15   or deletion of data and then worked with employees at FTX to

16   implement that.

17   Q.  You described Mr. Friedberg as a chief regulatory officer.

18   Was he also an attorney?

19   A.  Yes, he was.

20   Q.  And he worked with Fenwick & West, which was an outside law

21   firm?

22   A.  Yes, when I first met him, he was a——an attorney and later

23   a partner at Fenwick & West and one of our outside counsel that

24   we used.  Subsequent to that, we hired him internally as a

25   in-house lawyer.

1  Q.  Did Mr. Friedberg and the lawyers from Fenwick communicate

2  with you about what they were going to do with regard to this

3  policy?

4  A.  Yeah.  They came up with drafts, they communicated that to

5  myself, to other members of management, and discussed what the

6  details of an implementation of it might look like.

7  Q.  In big picture, what was your understanding; what was your

8  takeaway?

9  A.  My big-picture takeaway was that there were certain classes

10 of data that we had very clear retention requirements around.

11 Those tended to be regulatory.  So a few subsidiaries had

12 particular regulatory requirements on them, and those had

13 particular document retention policies trying that out.

14        In addition, often when we had specific interactions

15 with the regulator, they would request that we retain a

16 particular class of documents or data, and so there were topics

17 that we had a duty to retain.  Those topics tended to concern

18 compliance-related things, "Know Your Customer" policies being

19 an example of that.  So that was one class of data for which

20 there were effectively mandates that we retain corporate

21 records related to it.

22        Separately, there were classes of data for which we

23 had requirements not to retain, at least not to retain beyond a

24 particular time or without particular sorts of security or

25 encryption.  Those tended to be sensitive pieces of customer

1    information, customer passwords, customer Social Security

2    numbers, things like that.

3         And then beyond that, there were just broad topics

4    that, you know, I think for various channels on Slack——for

5    instance, we——the document retention policy, even if not

6    specifically mandated to by regulation, you know, said that we

7    would not have auto-delete features on, you know, channels

8    related to compliance to formal accounting records and other

9    things like that.

10   Q.   If a category was not in one of the ones you described as

11   requiring deletion, what was your understanding of what the

12   participants could do?

13   A.   Sorry.  To be clear, if it was not in the required deletion

14   category.

15   Q.   Like regulatory, for example.

16   A.   Right.  So for documents that were in the required

17   retention category, the answer was that any——at least any

18   formal business communications, anything memorialized, any

19   business policy, any decisions made or records thereof, would

20   be——would not be deleted.  They would be, you know, in email or

21   Slack channel without any auto-deletion turned on.

22        For, I would say, informal chatter, obviously a lot of

23   that would happen verbally, a lot of questions would be asked

24   via that manner, and if we weren't in person, Signal was a

25   standard chat app to use for sort of informal questions, but

1   not for company policies or for decisions concerning them or

2   for, you know, formal document releases or anything like that.

3   Q.  Coming back to the policy, did there come a time that

4   Mr. Friedberg and Fenwick completed the policy?

5   A.  Yes.

6   Q.  Okay.  And did you understand they had completed it?

7   A.  Yup.

8   Q.  And what did it mean to you as CEO of FTX?

9           THE COURT:  This would be a lot more helpful to you if

10  I was not getting just vague generalities about what he

11  understood, if you understand where I'm going with that.

12          MR. COHEN:  Sure.  I'm just trying to give your Honor

13  all the context.  Obviously the defense's position that this is

14  presented in sort of snippets, so I'm trying to give your Honor

15  context.

16  BY MR. COHEN:

17  Q.  Mr. Bankman-Fried, did you discuss with Mr. Friedberg the

18  policy?

19  A.  Yes.

20  Q.  Tell us what you discussed with him.

21  A.  He presented to myself and a few other people at the

22  company drafts of this policy.  He talked about it with us in

23  person and sent us documents drafting it.  He had meetings with

24  myself and others to discuss which channels would fall under

25  various categories within this document retention policy.  He

1   sent us a finalized version of it, and that was then

2   implemented.

3   Q.  Okay.  And after it was implemented did you believe you

4   acted in accordance with the policy?

5   A.  To my knowledge, yes.

6   Q.  Okay.  Now when you communicated with the attorneys and

7   compliance people at FTX——

8   A.  Yup.

9   Q.  ——what form did you communicate over?

10  A.  It depended on what the message was.  To give some

11  examples, if we were——if I had, for instance, an announcement,

12  if there was a company policy, that would generally be in a

13  Slack channel.  It would generally be either in a general Slack

14  channel if it was intended for broad consumption or in a

15  compliance- or regulatory-deemed Slack channel.  Those would

16  not have any auto-deletion set on them.  They would be retained

17  forever.

18          If it was an informal question, like, you know,

19  describe to me what your off-the-cuff impression is of the

20  regulatory environment in some country we're not currently

21  operating in so that we can decide whether to allocate more

22  time into investigating whether to operate there, that could be

23  in person, it could be over Signal, it could be in a Slack

24  channel.

25  Q.  Now the government has introduced——I don't want to give the

1    count, but——about half a dozen exhibits in which you were the

2    person who put auto-delete onto a message.  Do you recall that,

3    sir?

4    A.  Yes.

5    Q.  When you did that, did you believe you were acting in

6    accordance with the policy?

7    A.  Yes.

8    Q.  Tell us why.

9    A.  So as a general matter, those were not channels where there

10   would be formal business records or, for that matter, even

11   informal business records.  Those were not channels in which

12   decisions would be made or announced, or enacted.  And those

13   were not channels in which documents relevant to regulatory

14   inquiries or potential or otherwise were intended to be

15   discussed.  Those would be for——for chatter, for conversation,

16   the types of, you know, workplace communications that would

17   often just be someone wandering over to my desk and saying:

18   Hey, Sam, you know, do you have any thoughts about the Japanese

19   regulatory environment right now?

20          MR. COHEN:  Okay.  Can we put up——it was introduced

21   this morning--Government Exhibit 1083, please.

22   Q.  Okay.  Mr. Bankman-Fried, if you could look at the first

23   page, and you see the entry for item 1 is hashtag organization?

24   A.  Yup.

25   Q.  Item 5 is direct messages between you and Ms. Ellison, and

1    item 6 is messages between you and Gary Wang.

2    A.   Yes.

3    Q.   And then the far right-hand corner, it says, "auto-deletion

4    turned off SBF."

5    A.   Yes.

6    Q.   Do you recall doing that, sir?

7    A.   Yes, I do.

8    Q.   And can you explain to us what happened.

9    A.   Yeah.  So these were Signal channels for which there had

10   previously been an auto-deletion policy, generally one week.

11   In November 2022, for a variety of reasons but including

12   because what had been communicated to me, what I understood to

13   be coming from regulators, I took an effort to disable

14   auto-deletion on, you know, any place that I found it, and so I

15   went through Signal's chats generally as they were used as

16   people messaged in them that I was a part of, and if I received

17   a message, saw that auto-delete was set, I would disable that,

18   and I also went through the ones that I could think of and, you

19   know, proactively disabled auto-delete on them.

20        MR. COHEN:  Moving in the document to the next page,

21   if you could go to item—one page after, Brian.  I'm sorry.

22   Item 29.  The heading is Sensitive Chatter, and there's a

23   number of folks on that, description in the middle.

24   Q.   Can you identify for us—it says—Gary Wang, we know.  Who

25   is Can?

1   A.   That was Can Sun, the general counsel of FTX International.

2   Q.   Who was Ryne Miller?

3   A.   That was the general counsel of FTX.US.

4   Q.   Okay.  And who was Brett Harrison?

5   A.   Brett Harrison was the president of FTX.US at the time.

6   Q.   And dropping down to the next entry, Small Group Chat, can

7   you explain who Rahul Sharma was, at the very bottom.

8   A.   Rahul Sharma was——I actually don't know for sure who he was

9   employed by.

10  Q.   Let me rephrase.

11  A.   Yeah.

12  Q.   Were there folks in this who were either in the legal group

13  or the compliance group?

14  A.   Yes.  Absolutely.

15  Q.   Can you identify them for the Court.

16  A.   Yeah.  Ryne Miller, again, general counsel, FTX.US; Ryan

17  Mendel was——you could classify him as compliance; Kumanan——this

18  is a group that was created in November 2022 during the crisis

19  period.  Kumanan was an employee of a consultant who was

20  brought in by the FTX debtor entity to work, my understanding

21  is, on compliance matters.  And my understanding is that Rahul

22  was also a compliance specialist, I believe with FTX US

23  Derivatives, but I'm not a hundred percent sure on that.

24          MR. COHEN:  Okay.  And if we could continue to entry

25  252 on this exhibit.

1    Q.  Mr. Bankman-Fried, the entry on 252 refers to

2    Privileged/Confidential CFTC.  Do you see that?

3    A.  I do.

4    Q.  Who was on that?

5    A.  Gary Wang, CTO; Nishad Singh, head of engineering; myself;

6    Ryne Miller, the general counsel of FTX.US; and Can Sun, the

7    general counsel of FTX International.

8    Q.  And what was your understanding of what that referred to,

9    that entry?

10   A.  That entry was for privileged communications between

11   management and the heads of the legal departments around our

12   interactions with the CFTC, the Commodities Futures Trading

13   Commission, with respect to regulatory applications and

14   inquiries that we had there.

15   Q.  And for that entry, just to complete your testimony,

16   auto-deletion had been turned off, correct?

17   A.  That's right, in the same November period.

18              THE COURT:  By someone else.

19              THE WITNESS:  That's right, by Gary Wang.

20              THE COURT:  Long after you received the message, yes?

21              THE WITNESS:  I'm not sure what message you're

22   referring to.

23              THE COURT:  The one we're talking about.

24              THE WITNESS:  That's correct.  I was in many Signal

25   channels.  There was no way to turn off auto-delete on all of

1    them at once, so I did that on any channel for which I received

2    a message or had a recent message that would have been deleted

3    otherwise, or for the channels I thought of.  I'm guessing this

4    channel had not been used for a while prior to that, but I

5    don't recall for certain.

6              THE COURT:  Thank you.

7              MR. COHEN:  Let me move, your Honor——if your Honor is

8    fine with this, I'll move to another topic, or——

9              THE COURT:  You're moving to another topic now?

10             MR. COHEN:  Yes.  Unless you want me to ask any more

11   questions on this.

12             THE COURT:  It's up to you.

13             MR. COHEN:  All right.  Let me——

14             THE COURT:  One thought that readily occurs:  Where is

15   this policy?

16             Let's move on.

17   BY MR. COHEN:

18   Q.  All right.  Let me move to another topic,

19   Mr. Bankman-Fried.

20             Do you recall hearing about a company called North

21   Dimension?

22   A.  Yes.

23   Q.  Okay.  What do you recall about that?

24   A.  North Dimension was a subsidiary of Alameda Research, which

25   was incorporated for payment processing purposes.  I believe it

1    was around 2020 that this happened.

2    Q.  And how did it get set up?

3    A.  Dan Friedberg, the chief regulatory officer of FTX

4    International, in combination with Fenwick & West, one of our

5    outside law firms, was—were the ones who drafted the

6    incorporation documents, had incorporated and also corresponded

7    with banks about opening up bank accounts for it.  I believe

8    there were a few other employees who were involved as well.

9    Q.  Do you recall whether the banks required North Dimension to

10   fill out any forms?

11   A.  Yes.  They had bank account opening forms.

12   Q.  Okay.  And who filled those out?

13   A.  Dan Friedberg did, or at least he was the one who presented

14   them to me.

15   Q.  And when Mr. Friedberg presented them to you, what did you

16   do?

17   A.  I signed them.

18   Q.  Why did you do that?

19   A.  I had a lot of things that passed my desk each day to sign.

20   I trusted that they were proper forms.  And they were necessary

21   for opening up a bank account.  I also briefly reviewed them

22   and didn't see anything that looked obviously wrong to me.

23   Q.  Did there come a time when the topic of an agreement for

24   Alameda to process FTX customer deposits came up?

25   A.  Yes.

1    Q.   Okay.  What do you recall about that?

2    A.   There is a payment agent agreement between Alameda and FTX

3    related to the payment processing.

4            MR. COHEN:  Can we call up DX 245 for identification,

5    please.

6    Q.   Mr. Bankman-Fried, why don't you go through this document.

7            MR. COHEN:  And Brian, if you could scroll so he can

8    see the whole thing.

9    Q.   Okay.  Let's go to the first page.  What is this document,

10   Mr. Bankman-Fried?

11   A.   This is that payment agent agreement.

12   Q.   And do you recall how it was presented to you?

13   A.   Yeah.  Dan Friedberg presented it to me.

14   Q.   Okay.  And what was your understanding of who had drafted

15   it?

16   A.   My understanding is that it was drafted with Fenwick &

17   West, who was our primary external law firm at the time.

18   Q.   And what was the purpose of the agreement?

19   A.   It was to memorialize the ways in which Alameda Research

20   acted as one of the payment agents or payment processors for

21   FTX, which is to say a avenue via which customers could

22   deposit.

23           MR. COHEN:  Okay.  If you can go to the last page,

24   Brian.

25   Q.   You see the signature page.  There's a signature for

1    Alameda, and is that your signature underneath?

2    A.   Yes.

3    Q.   And there's also a signature for FTX.  Is that your

4    signature underneath?

5    A.   Even though they look a little bit different, yes, those

6    are both mine.

7    Q.   Mr. Bankman-Fried, why were you signing both sides of that

8    agreement?

9    A.   At the time that it was presented to me, I was the CEO of

10   Alameda Research and I was also the CEO of FTX.

11   Q.   And you see there there's an entry, effective date?

12   A.   Yep.

13   Q.   What was your understanding of that?

14   A.   My understanding is that that was the date that the

15   relationship had started, that this was memorializing that

16   relationship.

17   Q.   Okay.  So when customers wired funds into the Alameda bank

18   accounts or the North Dimension bank accounts, did you believe

19   that it was covered by this agreement?

20   A.   Yup.

21   Q.   And how did it work?

22   A.   How did the—how did that process work?

23   Q.   Yes, exactly.

24   A.   Okay.  So this was over the course of 2020 and 2021.  This

25   was prior to FTX having its own customer bank accounts.  So FTX

1   had attempted from inception to get bank accounts, what are

2   called FBO bank accounts, "for benefit of other" bank accounts,

3   that customers could deposit funds into.  But it took a couple

4   years to get those bank accounts.  In lieu of that, prior to

5   those, it used a number of different payment processors, but

6   the most used is──was Alameda Research.  We put on the FTX

7   originally OTC page and eventually on the FTX website wire

8   transfer instructions for Alameda Research, where customers

9   could wire fiat currencies, generally dollars──I think maybe

10  exclusively dollars in──and have balances credited on their FTX

11  account to trade on FTX.

12  Q.  Did you believe that this process of transferring or wiring

13  funds into Alameda North Dimension was permitted based upon the

14  payment agent agreement?

15  A.  Yup.

16        MR. COHEN:  We would offer it.  Before the jury, we'd

17  offer the document, your Honor.

18        Let me move to another topic, Mr. Bankman-Fried.

19        You can take that down.

20        Before we do, if we could pull up Defendant's

21  Exhibit 255.

22        Take a moment and go through that, all the pages for

23  him, Brian.

24  BY MR. COHEN:

25  Q.  The first question is whether you recognize it.

1           MS. SASSOON:  Your Honor, I believe this is in

2    evidence as Government Exhibit 267.

3           MR. COHEN:  Okay.  Then let's use the GX number.

4           THE COURT:  Thank you.

5    A.  I do recognize that.

6    Q.  And what is it, sir?

7    A.  That is the form that was used to apply for a North

8    Dimension bank account with Silvergate Bank.

9    Q.  And the first page, it notes name of compliance contact,

10   and it says Dan Friedberg, General Counsel and Compliance

11   Officer.  Do you see that, sir?

12   A.  Yes.

13   Q.  What was your understanding of that?

14   A.  This had been compiled and presented by Dan Friedberg, who

15   was the general counsel and the compliance officer of North

16   Dimension and of Alameda.

17   Q.  And was this the diligence form that got filled out for

18   Silvergate Bank that you referred to a moment ago?

19   A.  Yes, this was.

20          MR. COHEN:  Okay.  All right.  We can take that down.

21   Q.  Let me move to another topic, Mr. Bankman-Fried.

22          Do you recall that you and others made a number of

23   venture investments?

24   A.  Yes.

25   Q.  Okay.  And where did the funds for those investments come

1   from?

2   A.   They came from Alameda Research.

3   Q.   Okay.   And how was the transfer of funds structured?

4   A.   It depended on the investment.   There were various entities

5   that did the investing.   If it was Alameda Research's core

6   trading entities that invested, then I believe funds were wired

7   straight from Alameda, or sent via the blockchain in the case

8   of investments done in the form of cryptocurrency.   If it was

9   done via another entity——for instance, one of the Alameda

10  venture entities——then there would generally be an intercompany

11  loan in which Alameda Research would lend money to the

12  affiliate that was making the investment, and that affiliate

13  would then make the investment.   And in some cases there were

14  affiliated entities that had heavily overlapping ownership with

15  Alameda Research, and there would be loans from Alameda to

16  myself and/or the other owners of that entity that would then

17  infuse the capital into that entity for it to make the

18  investment.

19              (Continued on next page)

20

21

22

23

24

25

1  Q.  Let's start with that example.  So there would be times

2  where the loans would go first to you?

3  A.  Yup.

4  Q.  Or Gary or Nishad?

5  A.  Yup.

6  Q.  Were those loans documented?

7  A.  Yes.

8  Q.  How were they documented?

9  A.  There were promissory notes drawn up between us and Alameda

10 Research.

11 Q.  Who drafted those?

12 A.  The legal department drafted those memos, those promissory

13 notes.

14 Q.  Do you ever recall -- let me rephrase.

15       Did you ever recall the issue coming up of whether to

16 denominate those transfers as loans or dividends?

17 A.  At least in a few cases it did come up, and at the time I

18 remember concerns about risk of double taxation if they were

19 structured improperly.  There were also cases where the

20 entities that we were investing in expressed strong preferences

21 about what entity invested in them.

22 Q.  Who did you discuss these issues with?

23 A.  I discussed them with counsel.  It depended on the

24 particular instance which counsel.  Some of them I discussed

25 with Fenwick & West there and attorneys there.  Some of these I

1    discussed with Dan Friedberg and Can Sun, and some with Ryne

2    Miller as well.

3    Q.  Based on the conversation with these attorneys, what was

4    your understanding about the loan structure?

5    A.  My understanding --

6          THE COURT:  I'm sorry, Mr. Cohen.  I'll let you get an

7    answer to this, but a better question would be, what did you

8    say to them and what did they say to you on that subject?

9          MR. COHEN:  You are right, your Honor.

10   Q.  Let's go with his Honor's question.

11   A.  In those cases, maybe describing the earlier ones by the

12   later ones, a lot of the context had already been built up, I

13   described to them that ultimately there is an investment that I

14   wanted to make.  I described that -- what the investment was,

15   that ultimately funds would be coming from Alameda Research to

16   do it, and gave the reasons why there had been some preference

17   expressed for it to not be Alameda Research itself, the entity

18   that ultimately made the investment, that that is, that was the

19   ultimate acquiring entity of these shares or assets.  And I

20   then asked about what structures would be appropriate for doing

21   that.  Ultimately, we decided on -- for some of them a personal

22   loan to myself coupled with an investment in the entity that

23   was itself making the ultimate investment.

24   Q.  They shared with you their view that it ought to be

25   structured as a loan?

 1   A.   That either it ought to or that it was one of the

 2   permissible options, yes.

 3   Q.   What was your reaction to that?

 4   A.   I had no strong reaction to that.  I was thinking about it

 5   from a business perspective of trying to find a solution that

 6   would check all the boxes.  I was glad that we had found one.

 7   Q.   Did you take comfort from the fact that the lawyers had

 8   structured the loans?

 9   A.   Yes, of course.

10        MR. COHEN:  Pull up, I thought it was in evidence,

11   GX-240, please.  We can just look at the first page.  Maybe you

12   can make that bigger.

13   Q.   What is this, Mr. Bankman-Fried?

14   A.   That is -- can you go to the signature page.

15        OK.

16   Q.   What is that?

17   A.   That is one of the promissory notes in which Alameda gave a

18   loan to myself.

19   Q.   That's an example of one of the documents you were just

20   discussing?

21   A.   That is correct, yes.

22        MR. COHEN:  We can take that down.

23   Q.   Let's go to another topic, Mr. Bankman-Fried.

24        MR. COHEN:  Can we pull up Government Exhibit 558 in

25   evidence.

1          Take a moment and go through the pages for him.

2   A.  I think we don't have to go through all the pages of this.

3   That's enough.

4   Q.  What is this, sir?

5   A.  That is the May 2022 updated version of the FTX

6   International terms of service.

7   Q.  Did you ever see this document before?

8   A.  Yes.

9   Q.  About when did you see it?

10  A.  I first was presented with drafts of it in, I believe,

11  early 2022, possibly late 2021, and I was presented with a

12  completed version of it around May of 2022.

13  Q.  If you know, who worked on this document?

14  A.  I know that Can Sun, who is the general counsel of FTX

15  International, was heavily involved in working on it and

16  interfacing with me on it.  I know he worked with outside law

17  firms.  I am not sure which ones.

18  Q.  Did you speak with Mr. Sun about the terms of service?

19  A.  Yes.

20  Q.  Tell us what you discussed.

21  A.  We discussed the fact that, at least in part because of the

22  Bahamian entity, FTX Digital Markets, which is regulated by the

23  Securities Commission of the Bahamas, we wanted to have an

24  updated terms of service and that he was working on drafting

25  and ultimately releasing one.

1    Q.  Did you believe that the terms of service addressed margin

2    trading?

3    A.  Yes.

4           MR. COHEN:  Can we go to section 16, please, Brian.

5    Page 16.  I'm sorry.  If we can call out section 16.

6    Q.  Mr. Bankman-Fried, based on your review of that document

7    and your discussions with Mr. Sun, what was your understanding

8    of what it provided for?

9    A.  My understanding is that this section provided for various

10   terms and disclosures related to customers engaging in margin

11   trading on FTX.

12          MR. COHEN:  If we go to the next page --

13          THE COURT:  Mr. Bankman-Fried, did you read this

14   entire document before it was promulgated?

15          THE WITNESS:  I read parts in depth, parts I skimmed

16   over.

17          THE COURT:  Go ahead.

18   Q.  Turning to 16.4, Mr. Bankman-Fried.

19   A.  Yup.

20          MR. COHEN:  Can we call that out.  Brian, can you call

21   that out, 16.4.

22   Q.  Turning to the last two sentences, no need for me to read

23   them, can you tell us what your understanding was of these

24   provisions?

25   A.  Yeah.  Those provisions referred to a few different

1    potential -- features isn't quite the right word -- properties

2    of FTX.

3            The first is referring to liquidations, to the fact

4    that if a user engaged in margin trading and their collateral

5    fell below a certain level, their positions might be forcibly

6    shut down in order to mitigate risk associated with their

7    account.

8            The second was what's called clawbacks or socialized

9    losses, which is that if another margin trading user suffered

10   losses, if the value of their collateral fell or their

11   obligations rose, to the point where the net value of their

12   assets minus liabilities, which is to say their net asset value

13   became negative, that if FTX itself was not able to cover that

14   shortfall, it could be effectively socialized on other users.

15   That was something we always hoped to avoid, but that was

16   always a risk.

17   Q.  Based on this and other parts of the terms of service, did

18   you believe that Alameda borrowing funds from FTX exchange was

19   permitted under the terms of service?

20   A.  Yes, in many circumstances.

21           MR. COHEN:  Now, let's turn to schedule 5 of that

22   document and page 35.

23   Q.  That's a service schedule.  At the top it's entitled

24   futures market.

25           Do you see that, sir?

1   A.  Yes.

2   Q.  We don't have to go through it in detail, but what is your

3   understanding of what this provided?

4   A.  My understanding is that it provided for various terms that

5   only applied to futures trading and not to spot markets on FTX.

6   Q.  And based on the terms of service, did you believe Alameda

7   was permitted to engage in futures trading?

8   A.  Yes.

9           MR. COHEN:  We can take that down.

10  Q.  Any other conversations about the terms of service that I

11  have not covered today?

12  A.  Around --

13          MS. SASSOON:  Objection, your Honor.

14          THE COURT:  Sustained.

15  Q.  Let me ask a better question.  Other than the conversations

16  you relayed with Mr. Sun, did you have any other conversations

17  with him about the terms of service?

18  A.  About these particular terms of service?

19  Q.  Yes.

20  A.  We had conversations in which I authorized him to move

21  forward with the new terms of service so long as the exchange

22  infrastructure was prepared for them.  I know there were

23  requirements in terms of going back through old users and

24  reaffirming some of their know-your-customer status in order to

25  release the new terms of service.

1   Q.   The terms of service we were just looking at were issued on

2   May 13, 2022?

3   A.   Yup.

4   Q.   To your knowledge, sir, were there versions of the terms of

5   service before that?

6   A.   Yes.

7   Q.   What is your basis for saying that?

8   A.   I mean, FTX always had a terms of service.  I believe from

9   day one I remember posting a terms of service on the website.

10  Q.   How many versions were there prior to the May 13 version?

11  A.   I know that there were a few main versions and likely a

12  number of edits.  I am not sure exactly how many.

13  Q.   Did you review those?

14  A.   I reviewed the initial terms of service and would

15  occasionally skim through updated ones.  I don't know that I

16  reviewed every single edit to them.

17  Q.   Who prepared those?

18  A.   They were originally prepared by Dan Friedberg and Fenwick

19  & West.

20  Q.   Did you believe that you were managing FTX in accordance

21  with the earlier terms of service?

22  A.   Yes.

23  Q.   Let's move to another topic, sir.

24          THE COURT:  Are you going to put the earlier terms

25  into evidence?

```
 1              MR. COHEN:  We are.  We are just getting them, your
 2    Honor.
 3              THE COURT:  Go ahead.
 4    Q.  Let me move to another topic, Mr. Bankman-Fried.
 5              While you were CEO of FTX, did you attempt to
 6    safeguard customer assets?
 7    A.  Yes.
 8    Q.  How did you do that?
 9    A.  There were a variety of ways.  The single biggest was the
10    physical security of the assets that FTX custodied.  And in
11    terms of their physical security, one potential threat,
12    obviously, was a hacking attempt on FTX's core servers.  That,
13    in practice, was not the most frequent attack that we faced,
14    however.
15              By far more frequent was fishing attacks on FTX
16    customers.  In short, a fishing attack --
17    Q.  Mr. Bankman-Fried, let me focus this more.  I want to take
18    up the issue that the Court is concerned with.
19    A.  Yes.
20    Q.  I apologize.
21              Did you ever hear the term segregation of assets?
22    A.  Yes.
23    Q.  What did it mean to you?
24    A.  What it meant to me in the context of FTX was segregating
25    FTX's corporate assets, which is to say the roughly $1 billion
```

1  of profit that it had accumulated versus the omnibus wallets

2  that stored net customer assets in them.

3  Q.  How were individual customer assets stored?

4  A.  There was no particular wallet for each individual

5  customer.  We had millions of customers.  And if we tried to

6  keep each customer's Bitcoin in a wallet specifically for that

7  customer, then every time there was a trade we would have

8  needed to do a transfer of that physical Bitcoin.  It would

9  have been millions to tens of millions of dollars per day in

10  fees charged to users to cover those transfers.  It would have

11  been completely impractical from a business perspective.

12        So what we had were what are called omnibus wallets

13  and omnibus bank accounts, which effectively mean one wallet

14  where we put all of the net customer Bitcoins in.

15  Q.  All the customer Bitcoins were in one omnibus account?

16  A.  That's right.

17  Q.  Was that separated from the FTX operational account?

18  A.  Yes.

19  Q.  You got into the crypto industry in 2017?

20  A.  Um-hum.

21  Q.  And you worked in there through 2022?

22  A.  Yeah.

23  Q.  You traded on other exchanges?

24  A.  Yup.

25  Q.  You interacted with other leaders in the industry?

1   A.  Yes.

2   Q.  Based on your exposure to that, did you form a view about

3   whether other exchanges used these omnibus wallets?

4   A.  Yes, I did.  Nearly all of them used omnibus wallets.  In

5   fact, to my knowledge, every centralized exchange did.

6           THE COURT:  Mr. Cohen, I'll let you do whatever you

7   want here, but this degree of persuasiveness to personal

8   knowledge that is not present when somebody says my view based

9   on everything I have heard in my life was X.

10          MR. COHEN:  This last piece was just an industry

11  practice point, your Honor.

12          THE COURT:  Similar point.

13  Q.  Let me break it down to his Honor's question:  How did you

14  get your knowledge that other exchanges used omnibus wallets?

15  A.  A variety of means.  I traded on, more or less, every large

16  exchange in the industry, on dozens of exchanges.  In doing so,

17  I would deposit funds into accounts that I owned or controlled

18  on those exchanges.  I would watch Blockchain explorers to see

19  where those funds originally went and where they ultimately

20  were pooled, and in doing so it became clear that there were

21  wallets generally identified explicitly by Blockchain explorers

22  in which all or at least a large segment of customer Bitcoins

23  would end up being pooled, the same with other

24  cryptocurrencies.

25          For instance, if you're depositing to Huobi, which was

1   one of the larger cryptocurrency exchanges, and you

2   deposited -- when I deposited Bitcoin into accounts that I

3   operated there, I would originally send it to a Bitcoin address

4   that was specifically associated with my account, hoping it was

5   me that was sending the deposit, but immediately thereafter it

6   would be forwarded on to a wallet that was marked on a

7   Blockchain explorer as Huobi wallet number 3.  I would see many

8   different deposit addresses for many different customers, all

9   being pooled in that omnibus wallet.  And when I requested a

10  withdrawal from my Huobi account, it would be sent from one of

11  these omnibus wallets.

12          Later on, as I became more involved in the industry

13  and the people in the industry, especially after I moved to

14  Hong Kong, I had discussions with the leaders of other

15  exchanges about how we operated our platform, how they operated

16  their platform, and talked about how they managed their wallet

17  infrastructure.  And every one of them that I talked to

18  confirmed that they used omnibus wallets, with the exception of

19  decentralized exchanges and of custodians that might have some

20  exchange-like qualities but were primarily not exchanges.

21  Q.  What did you mean by decentralized exchanges?

22  A.  So there was a variety of platforms, still is, in the

23  crypto industry called a DEX, a decentralized exchange.  That

24  means it is sort of like a traditional exchange where you can

25  buy and sell assets.  But rather than being run by a company

1    and maintained in a cloud-computing service, like Amazon Web

2    Services, in the way that FTX was, it was hosted directly on a

3    Blockchain.  SushiSwap was an Ethereum Blockchain based

4    decentralized exchange, Uniswap was another Ethereum Blockchain

5    based decentralized exchange.

6           On decentralized exchanges, there was no central

7    custody of assets.  Instead, you would interact with them

8    directly from your own wallets.  What this meant was, there is

9    no intermediary.  It also meant, though, that any time you did

10   a trade on one of those decentralized exchanges, there was a

11   fixed cost of whatever the blockchain gas fees were at the

12   time, generally a few dollars per transaction, because they did

13   have to do an actual blockchain transfer for every trade, and

14   chiefly, because of that, decentralized exchanges had a far

15   smaller volume than centralized exchanges.

16          THE COURT:  One other question.  You used the phrase

17   Blockchain explorer.

18          THE WITNESS:  Yes.

19          THE COURT:  What is that?

20          THE WITNESS:  A Blockchain explorer -- the Blockchain

21   itself is a ledger of all transfers that have ever happened, so

22   there is an Ethereum Blockchain, which is a ledger involving

23   Ethereum transfers.  It is formally maintained in a

24   decentralized manner, which is to say, a lot of different

25   validators for the network all agree, come to consensus on what

1   that Blockchain is.

2          However, for almost all purposes you don't want to

3   have to be running a sophisticated computer system to be able

4   to ask the question, did someone send an Ethereum token on this

5   day to this address.  So there are a variety of providers that

6   created websites that listed out in a centralized but

7   easy-to-view fashion all of the transfers on the Blockchains,

8   and there are a variety of these.  For each of the major block

9   chains Etherscan was, by far, the most used for the Ethereum

10  Blockchain.

11          THE COURT:  Etherscan?

12          THE WITNESS:  Yes.

13          THE COURT:  Thank you.

14          Go ahead, Mr. Cohen.

15          MR. COHEN:  Thank you.

16  Q.  The larger exchanges, like FTX, used omnibus wallets,

17  correct?

18  A.  Yes.

19  Q.  Let me just go back to a point his Honor made before.

20          MR. COHEN:  If we can pull up DX-165, please.

21  Q.  Take a look and we can go through it, if you would like.

22          My question, sir, is whether you recognize this.

23  A.  Yes, I do.

24          MR. COHEN:  Let's go to the last page.

25  Q.  What is this, Mr. Bankman-Fried?

```
 1   A.   That is an older version of the FTX terms of service.

 2   Q.   DX-179, same question.

 3   A.   Same answer.  It's an older version of the FTX terms of

 4   service.

 5   Q.   And DX-434.  Same question.

 6   A.   Same answer, an older version of the FTX terms of service.

 7   Q.   Mr. Bankman-Fried, one more topic.

 8        I want to move now to November.  Did there come a time

 9   that you met with the securities commission of the Bahamas at

10   their offices?

11   A.   A number of times, yes.

12   Q.   How did this come about?

13   A.   This was immediately following the bankruptcy filing of FTX

14   International and just before that the joint provisional

15   liquidators being appointed for FTX Digital Markets, the

16   Bahamian entity.

17   Q.   For these next questions, Mr. Bankman-Fried, I want you to

18   answer yes or no.  OK?

19   A.   OK.

20   Q.   Did you attend the meeting?

21   A.   Yes.

22   Q.   You said there were a number of meetings.  Do you recall

23   when the first one was?

24   A.   I believe that it was November 12, 2022.

25   Q.   Did anyone attend with you?
```

 1    A.  Yes.

 2    Q.  Who was that?

 3    A.  So in the meeting itself that I was part of, there is

 4    myself; Krystal Rolle, Bahamian counsel; my father; then there

 5    was Christina Rolle, the head of the securities commission of

 6    the Bahamas; Brian Simms, one of the joint provisional

 7    liquidators; and staff for both of them.  In addition, Gary

 8    Wang, the CTO of FTX, was in the building at the time but not

 9    present in the meeting itself.

10    Q.  For these questions I do not want you to reveal any

11    conversations between yourself and Krystal Rolle.  OK?

12    A.  Understood.

13    Q.  How long did that meeting you just described last?

14    A.  It took a few hours.

15    Q.  Were you asked questions?

16    A.  Yes.

17    Q.  After the meeting, where did you go?

18    A.  After the meeting, the group of us, roughly the same group

19    of people as had been at that meeting, but also including Gary

20    Wang and consultants from PricewaterhouseCoopers who had been

21    with Gary in the outer office, all drove to the FTX

22    headquarters in Nassau, Bahamas.

23    Q.  What happened there?

24    A.  At the FTX headquarters, I don't know whether this will

25    have already been covered, but the day prior to that, there was

1    a hack on FTX's assets.  This was immediately following the

2    transfer of control and bankruptcy filing.  In response to that

3    there had been urgings to move FTX's assets.

4    Q.   Let me move on, Mr. Bankman-Fried.

5    A.   Yup.

6    Q.   When you came to the office, this was Christina Rolle, the

7    SCB commissioner there?

8    A.   Yes.

9    Q.   Do you recall if she read anything?

10   A.   She did, yes.

11   Q.   What did she read?

12   A.   She read an order that Gary and I assist her in

13   transferring assets that we had access to through FTX's systems

14   to the custody solution that they had set up.

15   Q.   Did you and Gary comply with that order?

16   A.   Yes, we did.

17   Q.   That same night did the Bahamian Police come to your

18   office?

19   A.   Yes.

20   Q.   What happened then?

21   A.   The officers showed up, they had conversations with

22   Christina Rolle, the head of the SCB; with Krystal Rolle; my

23   counsel; and with myself.

24          We agreed that I would voluntarily attend meetings

25   with them that following week and that in the interim I and

```
 1   Gary would surrender our passports.

 2           Sorry.  Just to clarify, we agreed that Gary and I

 3   would both voluntarily attend meetings with them that following

 4   week.

 5   Q.  Did you surrender your passport?

 6   A.  Yes.

 7   Q.  Did you ultimately go to those meetings?

 8   A.  No.  Prior to those meetings, prior to when they were to

 9   have been had, I was informed that they were no longer

10   necessary.

11           MR. COHEN:  One moment, your Honor.

12           Nothing further, your Honor.

13           THE COURT:  Thank you.

14           Ms. Sassoon.

15           MS. SASSOON:  May we have a short break, your Honor?

16           THE COURT:  Sure.

17           MS. SASSOON:  Fifteen minutes, your Honor.  Is that

18   reasonable?

19           THE COURT:  Yes.

20           (Recess)

21           THE COURT:  You may proceed.

22           MS. SASSOON:  Thank you, your Honor.

23   CROSS-EXAMINATION

24   BY MS. SASSOON:

25   Q.  Mr. Bankman-Fried, I want to begin by talking to you about
```

1  Signal.  I want to drill down a little bit more on your

2  testimony.

3  A.  OK.

4  Q.  Did you discuss your use of Signal with lawyers?

5  A.  Yes.

6  Q.  When did you first discuss your use of Signal with lawyers?

7  A.  More or less as soon as I began using Signal.  I think this

8  was sometime around 2020 or so.  And there were lawyers who

9  were involved in some of the original Signal chats.

10 Q.  Which lawyers?

11 A.  At the beginning, Dan Friedberg, who was the general

12 counsel at the time, and then ultimately with most of the

13 lawyers who joined the company.

14 Q.  Did you discuss with lawyers auto deletion of Signal

15 messages?

16 A.  I discussed with them the fact that there was auto

17 deletion, and it was a topic that had come up in connection

18 with the various data-retention policies.  I don't know if

19 there is something more specific you are asking about.

20 Q.  When did you first discuss with lawyers that you were going

21 to be auto deleting your Signal messages?

22 A.  The earliest memories that I have of it were about

23 particular channels, particular channels that lawyers were

24 added to somewhat early on.  I am not sure if you are referring

25 to -- sorry.  I think the answer was, you know, shortly after I

1   started using Signal, although not originally in the context of

2   a formal policy.

3   Q.  Let me ask you this.  When, as a general practice, did you

4   start setting your Signal messages to auto delete?

5   A.  I can't recall the exact date.

6   Q.  Was it around the spring of 2021?

7   A.  That sounds pretty plausible to me.

8   Q.  And before you started doing that, as a matter of general

9   practice, did you discuss doing that with any attorneys at FTX?

10  A.  I mentioned it.  I don't know that we had formal

11  discussions about it.

12  Q.  When you say you mentioned it, what does that mean?

13  A.  It means that I mentioned that I was going to be -- I

14  think -- at least what I remember is at some point changing the

15  default toggle on my Signal app.  I am not sure there is

16  another incident there, but that toggle I think I changed to

17  one week for chats -- for new chats that were created at some

18  point in time.  The spring of 2021 sounds like it may have been

19  the right period for that to me.

20  Q.  Before you changed that setting for your Signal chats to be

21  set to auto delete, did you seek approval of that decision from

22  a lawyer?

23  A.  I don't know that I sought specific approval for that, no.

24  Q.  So you mentioned a document-retention policy?

25  A.  Yes.

1    Q.  Was that a written policy?

2    A.  Yes.

3    Q.  When did that go into effect?

4    A.  I believe that went into effect around late 2021.

5    Q.  Whose idea was it to enact a document-retention policy?

6    A.  Originally, it was Dan Friedberg's idea.

7    Q.  What was the scope of that policy?

8    A.  The scope of that policy was for official workplace

9    communications for FTX.

10   Q.  Did that written policy include any provisions specifically

11   about the use of Signal?

12   A.  I don't remember whether it was mentioned by name.

13   Q.  Did that policy, as far as you recall, have any provisions

14   specifically about auto deletion of Signal messages?

15   A.  It had various policies that would have applied to Signal,

16   but I don't know that it had any that specified -- that singled

17   out Signal as a platform.

18   Q.  What about any policies in this written document that you

19   can recall that pertained to the destruction or deletion of

20   company communications?

21   A.  There were -- I mean, there were a number of parts of it

22   that discussed the time periods at which it was or it wasn't

23   appropriate for some subsets of communications to do so.  There

24   were also conversations -- I am not sure whether or not they

25   are in connection with that -- around mandates that we had from

1  various regulators for specific pieces of data to have no

2  longer than a particular shelf life.

3  Q.  I think you said something like there was some subset of

4  communications to do so.  I didn't understand what that means.

5  Did the policy specifically say anything about the

6  permissibility of deleting or destroying company documents?

7  A.  Yeah.  It said that in various circumstances it was not

8  permissible and in other circumstances it was permissible.

9  Q.  What do you recall the policy saying about when it was

10  permissible to destroy company communications?

11  A.  So I remember -- my memory of the policy is that it laid

12  out various circumstances in which it was not permissible to do

13  so or in which there needed to be a lengthy retention period

14  for company communications, and that outside of those sets of

15  topics or forums, there was permissibility to have effectively

16  whatever data-retention link or setting felt appropriate.

17  Q.  Do you recall that policy --

18          THE COURT:  Excuse me a minute, Ms. Sassoon.  What

19  does it mean that there was permissibility about that?  Does

20  that mean you could do whatever you wanted?

21          THE WITNESS:  Sorry.

22          THE COURT:  Yes.  That was from me.

23  A.  So long as there was no particular reason that you didn't

24  do a particular thing, yes.

25  Q.  Is it your recollection that the policy expressly

1   authorized deleting company communications that did not fall

2   within the regulated categories?

3   A.   That is my memory, yes.

4   Q.   Where is this written policy?

5   A.   I'm not sure if my answer is admissible.

6         THE COURT:  Don't worry about that.  You worry about

7   Blockchain explorers.  I will worry about what's admissible.

8   A.   When I was a member of the company, I remember interacting

9   with the policy and discussing it.  As part of this case I

10  think we have been unable to serve the subpoenas we have

11  requested asking for it.

12  Q.   You said that Signal was not expressly mentioned in the

13  policy.  Did you talk to lawyers about whether Signal was

14  covered by the policy?

15  A.   Yeah.

16  Q.   And what were those conversations?

17  A.   That Signal was treated in many ways like the other

18  communication platforms that we used.  There were a few cases

19  where specific platforms were mentioned.  I think there were

20  provisions specifically referring to email, for instance, in

21  the policy, but, otherwise, that it depends not on the app that

22  was used but on the nature of the communication.

23  Q.   I think you said you mentioned in passing that you set this

24  auto-delete feature on Signal.  Did you ever discuss with a

25  lawyer whether that was covered by this policy?

1    A.  Yeah.

2    Q.  With who?

3    A.  With Dan Friedberg.

4    Q.  When?

5    A.  This was around the time that he was discussing the auto

6    deletion and data-retention policy with us, which my memory was

7    late 2021.

8    Q.  So which is it?  Did you just mention that you were putting

9    on this setting or did you seek approval from Dan Friedberg?

10   A.  I think -- I apologize.  I may have misinterpreted.  I

11   interpreted your early question as what conversations I had

12   contemporaneous with when I originally changed that setting,

13   which my memory it was prior to the discussions around the

14   auto-deletion policy.  So there is no formal policy around it

15   when I had initially changed the default settings on my Signal

16   app to one week, but we did have formal discussions about it in

17   connection with the data-retention policy which happened some

18   number of months later.

19   Q.  Just to make sure I follow your testimony, you implemented

20   this setting and later this policy was put into place?

21   A.  I believe that is correct, yes.

22   Q.  Did you discuss with lawyers the retention period that you

23   were placing on your auto-delete feature?

24   A.  Yeah.

25   Q.  How was the retention period decided upon?

1   A.   The retention period from my particular Signal -- like the

2   default on my particular Signal was just what it had been.

3   That was not meant to represent what the companies for official

4   communications or for memorializing business decisions or for

5   storing business documents would set on channels for which

6   retention was important or mandated.

7   Q.   Did any lawyer authorize you to set auto delete for your

8   communications with Caroline Ellison, Nishad Singh, and Gary

9   Wang?

10  A.   Via -- my memory is that, via the data-retention policy,

11  for communications that were not otherwise protected or

12  required to be retained that we were authorized to use whatever

13  retention period we felt like was appropriate.

14  Q.   So you never sought out specific authorization for that?

15  A.   It was, I think, explicitly authorized, although not

16  singled out by the data-retention policy.  It was also

17  something that the lawyers were aware of.

18  Q.   I think you testified that documents related to formal

19  business decisions, it was your understanding that those had to

20  be preserved based on your conversations with lawyers.  Is that

21  accurate?

22  A.   Documents that memorialized formal business decisions were

23  sort of finalized versions of those that were distributed to

24  the company or externally.  That was my understanding.

25  Q.   Can you explain what you mean by that.

1    A.  So effectively -- I apologize.  I wish I had that policy

2    now.  I am working off my memory of it -- is that the policy

3    considered communications which, as an example, we're sending

4    to the company, here is our policy on a particular topic or

5    that were compliance decisions that were made and communicated

6    to a department of the company, or that were us storing

7    know-your-customer related information or that were formal

8    discussions of accounting documents would be, but that, for

9    instance, there is not, to my knowledge, any requirement that

10   every rough draft of documents and the conversation around

11   those, especially informal conversations, be preserved.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MS. SASSOON:

Q.   What about the decision, for example, to repay Alameda's
lenders, do you consider that a formal business decision?

A.   So I would consider formal business document to be the
balance sheets that were sent out to Alameda's lenders.  To the
extent that there was a communication to Alameda's employees
that there was some policy decision, I would expect that that
would be.  Now I——

Q.   Let me make this concrete.  Do you recall Caroline Ellison
testified that she sent to you Government Exhibit 44, the
spreadsheet with seven alternative tabs via Signal?

A.   Yeah.

Q.   Do you recall that testimony?

A.   I do, yes.

Q.   And do you consider that document a formal business
document?

          MR. COHEN:  Objection.  Beyond the scope of this
hearing.

          THE COURT:  Overruled.

A.   I——to be clear, to the extent that there was a document
that was sent out or intended to be directly sent out to
lenders, I would have thought of that as the type of document
that, had it been an FTX document, I would have, you know,
posted in a semiformal way in Slack.  I can't speak for certain
about what practices Caroline followed with respect to Alameda.

1   However, a rough draft of that that was still being workshopped

2   I would not have yet considered a formal business document that

3   had to be separately memorialized, nor would I have considered

4   the sending of that to one other person so they could look over

5   it to be a formal business decision.

6   Q.  So just to be clear, I want to make sure I understand that.

7   A.  Yup.

8   Q.  It's your view that receiving that seven-tab spreadsheet

9   over Signal and that message getting deleted was consistent

10  with the company's policy?

11  A.  Yeah.

12  Q.  And what specific conversations do you recall with counsel

13  that informed that understanding?

14  A.  We had conversations that effectively——I had conversations

15  with counsel that conversations that people had internally were

16  not in general required to be recorded; for instance, verbal

17  conversations were not required to be recorded, generally

18  messages between two specific people at the company were not

19  required to be recorded because those would generally not be,

20  you know, formal business decisions that were being

21  communicated to the company more generally as there were only

22  two people involved in that and——

23  Q.  You were CEO of FTX, right?

24  A.  Yes.

25  Q.  And Caroline Ellison for a time was CEO of Alameda?

1    A.   Yes.

2    Q.   And it was your view that no one-on-one communications with

3    Caroline Ellison had to be preserved.

4    A.   I don't know that I would make a statement quite that

5    strong.  I would say in general that was the case, but I—I,

6    you know—one could probably come up with such a communication

7    that would make sense to preserve.

8    Q.   Well, give me an example.

9    A.   I don't actually have any examples.  I can try and think of

10   one.

11   Q.   Do you think you ever violated this policy by communicating

12   with Caroline Ellison in messages that were later deleted?

13   A.   Not to my knowledge.

14   Q.   So am I correct that all your messages with Caroline from I

15   believe around May 2021 onward until November 2022 over Signal

16   were auto-deleted, right?

17   A.   I think that was for Signal communications, yes, not

18   necessarily communications via other methods.

19   Q.   So it's your testimony that there were no communications

20   over that period that would have violated the policy by being

21   auto-deleted?

22   A.   I can't think of any that I believe would have.  I

23   obviously don't remember every message that was sent and don't

24   have, unfortunately, copies of that policy in front of me right

25   now.

1   Q.  What about conversations over Signal with Gary Wang, Nishad

2   Singh, and Caroline Ellison about shutting down Alameda because

3   of a hole in the FTX balance sheet?

4   A.  I'm not sure that's how I would characterize the

5   conversations that I think you're referring to there.  If

6   you're referring to the—are you referring to the "we came, we

7   saw, we researched" document, or are you referring to something

8   else?  Sorry.  I may be misunderstanding.

9   Q.  Did you have conversations over Signal with Gary, Nishad,

10  and Caroline about an approximately $13 billion hole at FTX?

11  A.  I don't specifically recall such conversations.  I wouldn't

12  be surprised that they had sent a Signal message about it at

13  some point.

14  Q.  And so that type of Signal message, do you think that was

15  covered by the retention policy?

16  A.  I would expect that it would be.  I would, but again, it's

17  a little—I can't be confident with a hypothetical message.

18  Q.  Meaning that you would expect that it should be preserved

19  or that it could be deleted?

20  A.  No, no.  So it depends on the exact nature of the message.

21  It's hard to give a definitive general answer to it, because

22  for instance, they would communicate an official vetted company

23  number that action was to be taken based on, and that was to

24  be—you know, that would be different than a conversation in

25  which people were trying to hash out what a number was based on

1    various approximations, so it's hard for me to answer in the

2    abstract.

3    Q.  Do you recall, were you here for Adam Yedidia's testimony?

4    A.  Yes, I was.

5    Q.  Do you recall him testifying about a conversation you had

6    with him saying preserving Signal messages would be all

7    downside, or something to that effect?

8    A.  I recall something that is at least to some extent to that

9    effect.  I don't recall the specific things that he said.

10   Q.  Did you have a conversation with him along those lines?

11   A.  I don't specifically recall that, but I very well may have.

12   Q.  And did you have that view?

13   A.  Have what view in particular?

14   Q.  That preserving company messages would be all downside with

15   regulators.

16   A.  I didn't have that view with respect to all company

17   messages.  I had that view with respect to particular types.

18   Maybe to—to clarify that a little bit, I thought it was

19   important to memorialize and to store company decisions,

20   official company documents.  On the other hand, I was very

21   concerned about what would happen if an employee was careless

22   about how they phrased something, made a statement that was not

23   in fact nefarious but which, taken out of context, could look

24   bad and unfortunately they didn't give the appropriate context

25   and that that in turn could be publicized and be effectively

1    embarrassing for the company.

2    Q.  Did you share that concern with lawyers when crafting your

3    document retention policy?

4    A.  I shared that conversation, that—sorry—that concern in

5    general with lawyers.  I'm not sure whether I specifically

6    shared it in connection with the data retention policy.

7    Q.  So you don't have a recollection of expressing that concern

8    with respect to formulating the data retention policy?

9    A.  Yeah, I'm not sure either way about whether that was one of

10   the contexts in which we had that conversation, though I know

11   that prior to that and after that, I had had that conversation

12   with lawyers.

13   Q.  What about when you mentioned to lawyers that you turned on

14   the auto-delete function, did you explain that one purpose was

15   to destroy things that could be downside with regulators?

16   A.  I certainly would not have used that language or described

17   it that way.  I don't recall such a conversation.

18            THE COURT:  How would you have described it?

19            THE WITNESS:  So what I would have said—to give some

20   context on this, the company I worked at prior to

21   joining—well, to founding Alameda and then FTX was Jane Street

22   Capital, and at Jane Street, there was frequent discussion of

23   something called "*The New York Times* test."  Context for this

24   was effectively, anything that you write down might end up on

25   the front page of *The New York Times*.  And so especially if

1   you're describing something which is sensitive, you should make

2   sure that you are considerate about how you write it down, that

3   you think about how it could be interpreted, and that you make

4   sure that it could not be misinterpreted, and this was combined

5   with various stories that were told about cases where there was

6   a very negative public or regulatory reaction to an inoffensive

7   actual behavior because of careless things that people had used

8   to describe it.  And so that was the type of concern that I

9   chiefly had.

10  BY MS. SASSOON:

11  Q.  And did you direct your employees to discuss legally

12  sensitive topics by Signal?

13  A.  It depends on what sorts of discussions.  For, I would say,

14  employees, like, spitballing questions to—to lawyers, I think

15  that often would happen either verbally or over Signal.  If

16  this was asking what is our policy on a particular thing or

17  describing that policy or communicating it, that I would not

18  have suggested particularly be over Signal.

19  Q.  Did FTX ever get subpoenas that resulted in a hold on

20  destruction of records?

21  A.  Yup.

22  Q.  Did you retain Signal records after you got those holds?

23  A.  So my understanding was that we retained records that were

24  responsive to those holds.  Not all Signal channels had

25  auto-deletion turned on, some of them did not, and many Slack

1    channels did not, and emails in general did not.

2    Q.  Did you ever turn off your auto-delete function on messages

3    with Gary, Caroline, or Nishad in response to such a hold?

4    A.  Just because——we're talking specifically about a group chat

5    with the three of us or are we talking about broader groups

6    that we may have been in?

7    Q.  Groups that would have included only those individuals.

8    A.  Got it.  So those were some subset of the four of us.

9    Q.  Yes.

10   A.  I'm not actually sure if I was——what the deletion history

11   was with those chats.  I don't recall specifically doing so.

12   Q.  When you got such a hold, did you consult lawyers about

13   which Signal chats you should preserve?

14   A.  Yes.

15   Q.  Who did you discuss that with?

16   A.  I remember discussing that with Ryne Miller and Dan

17   Friedberg.

18   Q.  And what were you told?

19   A.  I was told that we basically immediately had to come up

20   with a set of channels and forums that should be fully

21   retained, and I believe that we did so.

22   Q.  And who decided which channels those would be?

23   A.  I mean, there——I want to make sure I answer this correctly.

24   There were a bunch of us——no, a bunch——probably seven or so

25   people involved in that conversation.  Ultimately it was Dan

1  and Ryan who made the judgment call on which channels did and

2  didn't fall into that, but with, you know, context given by a

3  few other employees.

4  Q.  Did you tell Ryne Miller or Dan Friedberg that you were

5  discussing company business in Signal chats with, for example,

6  Gary, Nishad, and Caroline?

7  A.  Yeah.

8  Q.  And what guidance, if any, did they give you about

9  preservation of those messages?

10 A.  They did not generally tell me that those had to be

11 preserved so long as they were not, you know, formal business

12 decisions or other similar things.

13 Q.  They used the word "formal business decisions"?

14 A.  I don't actually recall the specific phrase they used.

15 Q.  So what phrase do you recall them using?

16 A.  I don't recall a specific one.

17 Q.  Well, what do you recall about the substance of what they

18 said?

19 A.  I recall that the substance of what they said was that for

20 informal company communications, those were permissible to

21 happen in person or over Signal, but that for things that

22 looked like company records, for instance—

23 Q.  So you're giving that as an example.  I want to

24 understand—

25           MR. COHEN:  Please let him finish his answer.

1          THE COURT:  Yes.

2   A.  But that for things that were like company records or

3   decisions announced to the company that employees were expected

4   to enact, or logs of customer information, that those would not

5   be happening over Signal.

6   Q.  Did anyone use the words "informal business discussions"?

7   A.  Yup.

8   Q.  Did any lawyer tell you about sharing company spreadsheets

9   or informal business conversations?

10  A.  I had conversations with lawyers in which we shared

11  business-related spreadsheets over Signal.  I don't know if I'd

12  specifically asked them about that, but they were well aware

13  that that would sometimes happen.  I would not use that as a

14  way to distribute a finalized spreadsheet.  That was generally

15  a way that I would sometimes send it to a few people to look

16  over and see if I was messing anything up.

17  Q.  And how did this policy you've described apply to anything,

18  any communications related to Alameda?

19  A.  My understanding is that there was a version of this policy

20  for Alameda as well, although I don't know the details of it.

21  Q.  Were you involved in forming that policy?

22  A.  Not in any depth.

23  Q.  What does that mean?

24  A.  I was aware that it was happening.  It was mentioned

25  sometimes in the same conversations as the ones that I had with

1   counsel about the FTX policy, but I don't know that I reviewed

2   the Alameda policy and I don't remember learning specifically

3   what channels were——were not going to be preserved at Alameda.

4   Q.  When do you recall that taking place?

5   A.  I think late 2021.  I don't remember the exact time.

6   Q.  And what was your involvement in Alameda at that point?

7   A.  So this was after the CEO role had transitioned to Caroline

8   Ellison and Sam Trabucco.  It was during a period where it was,

9   you know——Trabucco was slowly drifting effectively towards

10  retirement, so it was primarily Caroline.  I was involved in a

11  few areas of Alameda.  I was particularly involved in

12  venture-related investments, and later on I became involved in

13  hedging decisions.  I was not on a day-to-day level involved in

14  other topics that I can recall——there——there may well be one or

15  two I'm forgetting there——although I would get periodic updates

16  from Caroline about it and she would sometimes elicit input

17  from me.

18  Q.  Were you in a Signal group called Vertex?

19  A.  Yes.

20  Q.  Was that with Caroline, Sam Trabucco, and Ben Xie?

21  A.  Yup.

22  Q.  And were Alameda trade decisions discussed in Vertex?

23  A.  I——yeah, occasionally.

24  Q.  And was that chat set to auto-delete?

25  A.  I don't recall.  It may have been.

1    Q.  Do you recall consulting with anybody about setting that

2    chat to auto-delete?

3    A.  Not specifically for that chat.

4    Q.  You've described some consultations with attorneys.  Do you

5    have any paper records of these consultations?

6    A.  I—no, I don't.  I believe we've requested some of those

7    but have not been given them.

8    Q.  When you say "requested some of those," what did you

9    request?

10   A.  I requested both the data retention policy and all

11   communications surrounding that.

12           MS. SASSOON:  Your Honor, permission to approach the

13   witness with a document.

14           THE COURT:  Yes.

15           MS. SASSOON:  I've provided a copy to defense counsel.

16   I'd like to provide one to the Court, and the witness.  I don't

17   know if that leaves one for me, but—

18   BY MS. SASSOON:

19   Q.  Mr. Bankman-Fried, could you just take a look at that and

20   tell me if you recognize this document.

21           THE COURT:  Let's get it marked.

22           MS. SASSOON:  We can mark that as Government

23   Exhibit 3000.

24           THE COURT:  Thank you.  For identification.

25           MS. SASSOON:  Yes.

1    A.  I——

2              MS. SASSOON:  4000.  4000.

3              THE COURT:  4000 for identification.

4    A.  To be explicit, I do recognize this but not

5    contemporaneously.  I'm aware of this, but I don't remember

6    becoming aware of this when it was actually enacted.  I am

7    certain that I saw this starting, you know, on or around

8    November 2022.

9    Q.  Is that the document retention policy you've been talking

10   about?

11   A.  No, this is not.

12   Q.  And does it resemble in substance what was in the retention

13   policy you've been talking about?

14   A.  No, it does not.

15   Q.  So the supposed policy you've been testifying about, you

16   have no record of it sitting here today.

17   A.  That's correct.  We have requested it numerous times.

18   Q.  Okay.  One moment.

19            I'm going to turn now——before I move on to another

20   topic, I just want to ask if, in your view, you ever violated

21   the document retention policy.

22   A.  I don't have any knowledge that I did.  Although, again,

23   I'm not now looking at a copy of it so I——I don't recall

24   precisely what it said.

25   Q.  Okay.  I want to talk to you about North Dimension.

1   A.   Yup.

2   Q.   First of all, whose idea was it to incorporate North

3   Dimension?

4   A.   It was communicated to me by Dan Friedberg.  I know there

5   were others involved.  I'm not sure whose idea originally North

6   Dimension in particular was.

7   Q.   You've described a couple things now where you've said that

8   something was Dan Friedberg's idea.

9   A.   Mm-hmm.

10  Q.   Can you explain generally the relationship between you and

11  Dan Friedberg, and generally, were you giving him direction or

12  was he just popping ideas on your desk?

13  A.   There were some of each.  That relationship, it changed a

14  little bit over different periods of time.  I can just give an

15  overview.  If there's a specific time period you want me to

16  zoom in on, I'm happy to do that as well.

17  Q.   Let's focus first on North Dimension.  Did you give Dan

18  Friedberg any direction about North Dimension?

19  A.   I don't recall giving specific direction to him about it.

20  Yeah, no, I don't recall giving a direction to him about it.

21  Q.   And why the name North Dimension for this entity?

22  A.   I honestly don't know where the name came from.

23  Q.   So is it your testimony you didn't come up with the name?

24  A.   That is correct.

25  Q.   And do you have any knowledge of why this entity didn't

1    have Alameda in the name?

2    A.   I—I don't know for sure why it did not.

3    Q.   I think you testified that FTX couldn't get bank accounts?

4    A.   Yup.

5    Q.   At first, were FTX customer funds getting wired to a bank

6    account in Alameda's name?

7    A.   Originally customers were wiring deposits to Alameda

8    Research.

9    Q.   Why did that stop?

10   A.   Ultimately it stopped because FTX got its own bank

11   accounts, but I'm guessing you're talking about before then, is

12   that—

13   Q.   Why did FTX transition from using bank accounts in the name

14   of Alameda to a bank account in the name of North Dimension?

15   A.   My understanding from what I was told at the time was that

16   there were cases where various banks had difficulty wiring to

17   an Alameda Research bank account or—and/or various customers

18   did, and that it was smoother to process them using a North

19   Dimension bank account.

20   Q.   Were you told that banks did not want to transfer money to

21   Alameda, a cryptocurrency hedge fund?

22   A.   I don't know if I was told that explicitly, but I—it

23   wouldn't surprise me.

24   Q.   Did you understand that at the time?

25   A.   I knew that there were some banks that did not want to do

1  so.  I didn't know whether that was the impetus for North

2  Dimension.

3  Q.  Just to be clear, when North Dimension was created, you

4  were CEO of Alameda, right?

5  A.  I believe that's correct, yes.

6  Q.  And is it your testimony that as CEO of Alameda, you had no

7  insight into why Alameda stopped receiving customer funds into

8  a bank account in Alameda's name?

9  A.  I——it is correct that I do not know why it incorporated

10  North Dimension.  It wasn't a project that I was driving,

11  although it was one that I was made aware of.  I had contextual

12  clues that I could try to draw on, but in general, I was——even

13  for companies that I was fully running day to day, there were a

14  lot of things that happened that I was either not informed of

15  or after the fact sort of summarily informed of, and at that

16  point with Alameda, I was still CEO, I was still involved

17  sometimes in the day-to-day operations, but I often was not.  I

18  was, you know, about halfway, I would say, through

19  transitioning from running Alameda day to day to running FTX

20  day to day.

21  Q.  So we've looked at, or you looked with Mr. Cohen at a bank

22  account application for North Dimension.

23  A.  Yup.

24  Q.  When you signed that, what was your understanding of what

25  you were doing?

1   A.  My understanding was that Alameda wanted to open up a bank

2   account for North Dimension and this was a form that I had to

3   fill out to do so.

4   Q.  Who told you that?

5   A.  I knew that Dan Friedberg specifically told me that.  I'm

6   not sure if I had conversations with other people about it as

7   well.

8   Q.  What, if anything, did you discuss with Dan Friedberg about

9   the purpose of this bank account?

10  A.  At the time of the——the form, or later on or——

11  Q.  Before and at the time.

12  A.  I'm not sure I remember having discussions before or at the

13  time about the purpose of the bank account.  I know that there

14  had been——yeah.  Sorry.  I'm not sure that I did.  I'm not sure

15  that I did entirely.  I just don't recall any in particular.

16  Q.  When did you learn that the purpose of the bank account was

17  to receive FTX customer funds?

18  A.  I think I learned that when I saw that it had been——so I

19  think I learned when FTX rolled out North Dimension deposit

20  instructions for customers that at least one of the purposes

21  for it was going to be for customer deposits.

22  Q.  Did that raise any concerns for you at the time?

23  A.  I don't think it raised any particular concerns.

24  Q.  Did you discuss with counsel that the purpose of the bank

25  account was to receive customer funds?

1    A.  Sorry.  Let me actually amend my previous answer.  There

2    was a related thing that did raise a concern to me at the time,

3    that I did raise as a concern with counsel, which was, I saw

4    that one of the North Dimension entities was a US entity, and I

5    was surprised to see that a US entity was being used for——for

6    what seemed like payment processing.

7    Q.  So as far as you understand it, whose decision was that?

8    A.  Whose decision was it to roll it out for FTX or to open the

9    bank account or——

10   Q.  To use North Dimension to receive FTX customer money.

11   A.  I'm actually not entirely sure whose decision it originally

12   was.  I think Nishad was the one who added it to the code base,

13   but presumably that was after conversations with other people.

14   I'm not sure who sort of made that decision initially.

15   Q.  So it's your testimony you weren't part of that decision.

16   A.  The original decision related to North Dimension, I don't

17   recall being a part of it.  I do know that I became——certainly

18   became aware of it and had conversations with it as it was

19   happening, and I may have been in conversations around

20   difficulties that Alameda was having sometimes receiving wire

21   transfers.  I don't recall being conversations around North

22   Dimension in particular until it was being implemented.

23   Q.  What do you mean you may have been in conversations about

24   the account receiving customer money?

25   A.  Sorry.  Conversations——was this referring to the

1  conversations around difficulties with——

2  Q.  Yes.  I think you said "I may."  So were you——what's your

3  testimony?

4  A.  So, excuse me.  I was in conversations that——in which it

5  was conveyed to me that sometimes people had difficulty wiring

6  to Alameda.  I'm not sure if those were related.  They may have

7  been.

8  Q.  So what conversations, if any, did you have with lawyers

9  about the permissibility of using North Dimension to receive

10  FTX customer funds?

11  A.  We had conversations around Alameda generally acting as a

12  payment processor, as a payment agent for FTX, which were, you

13  know, memorialized in a payment agent agreement, and I had

14  conversations with that at a high level with lawyers, and I was

15  at least aware of conversations that were happening with the

16  accountants and auditors around that as well.  I know that

17  there were lawyers who were, I mean, involved in and driving

18  the incorporation and usage of North Dimension as part of this

19  payment agent.  I'm not sure if I initiated a specific

20  conversation after seeing it around that, the——it was initiated

21  with me.  But yeah.

22        THE COURT:  So I take it the answer is you don't

23  remember; is that about it?

24        THE WITNESS:  I don't remember that specifically.  I

25  do know that lawyers were involved in that decision.  I don't

 1    know that I specifically——

 2            THE COURT:  No.  The question was about conversations

 3    you had.

 4            THE WITNESS:  That's right.

 5            THE COURT:  So the answer is you don't remember; is

 6    that right or not?

 7            THE WITNESS:  Sorry.  I want to make sure I'm

 8    answering the right question.  Conversations that I had with

 9    lawyers around——

10            THE COURT:  The permissibility of using North

11    Dimension to receive FTX customer funds.  That was the

12    question.

13            THE WITNESS:  Right.  No, I——not unless you count

14    conversations I had around the permissibility of using Alameda

15    as a payment agent, and North Dimension was a wholly-owned

16    subsidiary of Alameda.  I don't know that I had conversations

17    around the permissibility of North Dimension in particular.

18            THE COURT:  Listen to the question and answer the

19    question directly.

20    BY MS. SASSOON:

21    Q.  When you signed the bank account opening document for the

22    North Dimension bank account, at that time, I believe you

23    testified you did not know the bank account would be used

24    specifically to receive FTX customer funds; that was your

25    testimony?

1    A.  I believe that's correct.

2    Q.  And so at that time when you signed the account opening

3    document, you had not had any conversations with lawyers about

4    the permissibility of using the North Dimension account to

5    receive customer funds; is that accurate?

6    A.  I don't recall having any, no.

7    Q.  And is it likely you did, given that you are testifying

8    that you didn't know the purpose of the account?

9    A.  I don't think that I did, but I can't be certain about the

10   order in conversations here.  I'm relying on my memory here,

11   and this was not a thing I was focused on at the time.

12          MS. SASSOON:  Well, let's look at Government

13   Exhibit 267.

14          Mr. Bianco, if you could pull that up.

15   Q.  This is the bank account application document you signed,

16   right?

17   A.  Yes.

18          MS. SASSOON:  And if we could just go to the last

19   page.

20   Q.  That's your signature?

21   A.  Yes.

22   Q.  And this is dated December 9, 2020, so you were CEO of

23   Alameda at the time?

24   A.  Yes.

25   Q.  And that's a wet signature, right?

1    A.  I guess it looks like one.

2    Q.  Sometimes you used DocuSign, right?

3    A.  Yes.

4    Q.  In this instance you did not?

5    A.  It doesn't look like I did.  I don't recall.

6    Q.  And did you review this document before you signed it?

7    A.  I reviewed it briefly.

8    Q.  Did you discuss it with a lawyer before you signed it?

9    A.  I——it was presented to me by a lawyer.  I didn't have a

10   lengthy discussion with him about it, though.

11   Q.  Did you have any discussion that you can recall, sitting

12   here today, about this document?

13   A.  Not other than, I mean, him saying that there's a document

14   for you to sign related to a bank account opening for a

15   subsidiary of Alameda's, and I said, all right.  That's all I

16   can recall from the moment of that signing.  I'm not entirely

17   sure there isn't something I'm not remembering.  I don't recall

18   anything other than that.

19   Q.  Let's go to the first page.

20   A.  Mm-hmm.

21   Q.  And do you see here under 1, it says "Description of

22   business.  Select all that apply"?

23   A.  Yup, mm-hmm.

24   Q.  And what's checked is "proprietary trading firm" and

25   "over-the-counter trading firm."

1    A.   Yup.

2    Q.   As far as you know, was North Dimension either of those

3    things?

4    A.   I viewed it to be one.  It was a wholly-owned subsidiary of

5    Alameda, which was both of those things.

6    Q.   And as far as you understood it, was this bank account used

7    for either of those purposes?

8    A.   I'm actually not entirely sure all the things that it ended

9    up being used for.

10   Q.   Did you discuss this section of the application with Dan

11   Friedberg?

12   A.   I don't recall discussing it with him.

13   Q.   In the course of preparing for this trial did you review

14   reports of meetings the government had with Dan Friedberg?

15   A.   I——I'm not sure.  I——I think at least a little bit.  I

16   don't know if I did.

17   Q.   Did you review the witness notes and materials provided to

18   you by the government?

19   A.   I reviewed some of them.

20   Q.   And did you review some of the reports related to Dan

21   Friedberg?

22   A.   Some, but I believe not all of them.

23   Q.   And did you read in one of those reports that Friedberg

24   says he could not recall who asked for North Dimension to be

25   formed but it would have been either you or Andy Croghan?

1  A.  I don't specifically recall reading that, no, but it very

2  well may have been in there.

3  Q.  Is it possible that you asked Dan Friedberg to form North

4  Dimension?

5  A.  I don't recall doing so.

6  Q.  Do you recall reading in the report that Friedberg said he

7  was not part of any discussion of FTX customer funds depositing

8  into Alameda Research accounts?

9  A.  I remember hearing that that had been there.  I'm not sure

10  whether I read it myself or discussed it.

11  Q.  And do you dispute that?

12  A.  I can't know for sure what is intended by that.  All I have

13  is discussion of the notes.  That's not how I would have I

14  think described it myself, but I don't want to put words in his

15  mouth, as I don't know exactly what he intended by that.

16  Q.  So I'm not asking you that.  I'm asking whether, according

17  to you, Dan Friedberg was in fact part of discussions of FTX

18  customer funds depositing into Alameda Research accounts.

19  A.  So just to clarify, I do think that Dan Friedberg——I do

20  remember Dan Friedberg being involved in discussions relating

21  to Alameda being——Alameda bank accounts being used as a way to

22  accept deposits from customers of FTX.

23  Q.  And when were those discussions?

24  A.  Those discussions were happening when we were discussing

25  the payment agent agreement.  That was, as I understood it, the

1  primary purpose of the payment agent agreement was to describe

2  that relationship.

3  Q.  And when did you discuss the payment agent agreement with

4  Dan Friedberg?

5  A.  I don't recall exactly when it was.  I think that it was

6  certainly at some points in 2020 and possibly at other times as

7  well.

8  Q.  When did you sign the payment agent agreement?

9  A.  I don't remember when I signed it.

10  Q.  What's your best recollection of when you signed the

11  agreement?

12  A.  I—in 2020 is my best guess, but I—that could be wrong.

13  Q.  We looked at the effective date on the document, which was

14  2019.

15  A.  Yup.

16  Q.  Did you sign it on the effective date of the document?

17  A.  No, I don't think so.

18  Q.  Did you sign it after the effective date of the document?

19  A.  Yeah.

20  Q.  Possibly a year later?

21  A.  It's possible.

22  Q.  Possibly two years later?

23  A.  Possible.  I would have guessed it wasn't that late, but,

24  yeah, it could have been.

25  Q.  Are there any other lawyers you talked to about North

1    Dimension being used to receive FTX customer funds?

2    A.  I——that I——I personally did not have many discussions

3    around North Dimension.  I know that——I'm honestly not entirely

4    sure.

5    Q.  Did you have any conversations with lawyers about Alameda

6    spending FTX customer money that was deposited into its bank

7    accounts?

8            MR. COHEN:  Objection, scope.

9            THE COURT:  Overruled.

10   A.  Can you repeat the question.  Sorry.

11   Q.  Did you have any conversations with lawyers about the

12   permissibility of Alameda spending FTX customer deposits that

13   were deposited into Alameda bank accounts?

14   A.  I don't recall any conversations that were contemporaneous

15   and phrased that way.

16   Q.  So what do you recall?

17   A.  So there were certainly conver——I certainly had

18   conversations with lawyers far later about when we were trying

19   to reconcile things in November of 2022, and there were

20   conversations with lawyers around Alameda being used as a

21   payment processor, as a payment agent for FTX.  I frankly don't

22   recall conversations with lawyers or otherwise about the

23   details of the funds or of the usage of the North Dimension

24   bank account or what would happen with assets after that.  I

25   certainly, in retrospect, wish that I had.  I wish I had had

1    conversations, that I myself had been more informed.  I'm not

2    sure if other people were involved in conversations.

3    Q.  So any conversations about this prior to November of 2022

4    with lawyers that you can recall?

5    A.  Sorry.  Give me one second.  I just want to think about

6    conversations that may be scoped to be within that.

7            I recall having conversations with lawyers around some

8    things related to Alameda as a payment agent, including

9    stablecoin creations and redemptions, and I recall

10   conversations with auditors and accountants around it.  I'm not

11   sure that I recall.  And I was also involved in conversations

12   with lawyers around the general practice of using payment

13   processors and storing funds with payment processors.  I'm not

14   sure there were ones specifically around this topic.

15   Q.  Mr. Bankman-Fried, I want to be clear the answer to the

16   question I'm asking you, which is—

17   A.  Yup.

18   Q.  —prior to November of 2022, do you recall conversations

19   with lawyers about the topic of Alameda spending FTX customer

20   deposits that came into Alameda bank accounts?

21   A.  I don't recall that specifically, no.

22   Q.  And did you have conversations about that with auditors?

23   A.  There were conversations with auditors around the fact that

24   deposits had gone to Alameda and that it was a liability owed

25   to FTX.  I don't know if there were discussions around exactly

1    how Alameda used its—its assets.

2    Q.   So I believe you said in your direct testimony that North

3    Dimension was created for payment processing purposes.

4    A.   Yup.

5    Q.   What is that understanding based on?

6    A.   That understanding is based on, after having created it,

7    the ways in which I observed it being used.

8    Q.   And so you saw directly it was being used for this purpose?

9    A.   Yeah.

10   Q.   And the payment agent agreement that we looked at during

11   your direct testimony, does it say anything about Alameda being

12   authorized to spend FTX customer funds?

13   A.   So I believe that it authorizes—that it gives a fair bit

14   of discretion to Alameda about what it—how it acts in general,

15   clarifying that it has an obligation upon demand to FTX of that

16   amount of money, but not specifying that it has to be—what has

17   to—what Alameda has to do with any of it, of its assets.  That

18   is my understanding of it.

19   Q.   So is it your understanding that under the agreement

20   Alameda was permitted to spend FTX customer deposits?

21   A.   I wouldn't phrase it that way.  But I think that the answer

22   to the question I understand you to be trying to ask is yes.

23   Q.   Well, let's look at Defense Exhibit 245.

24   A.   Mm-hmm.

25   Q.   And I'm happy to scroll for you, but maybe you could point

1    out to us where in this agreement you think Alameda is

2    permitted to spend FTX customer funds.  And if you need us to

3    turn the page, just let me know.

4    A.  So I should preface this by saying I'm not a lawyer.  I'm

5    not giving a legal interpretation of this.  I'm just giving, as

6    best I can, what my memory is.  And the parts of this that jibe

7    with that, I, you know——I'm not trying to give a definitive

8    legal ruling on what this does or doesn't say.  The——I'm not

9    sure that I would quite answer yes to the question as you most

10   recently phrased it.  I'm going to try as best I can to give

11   the answer that I believe, which is that the——as——at least as I

12   remember understanding it at the time, FTX either itself or I

13   think as actually happened, without FTX as an intermediary,

14   customer's fiat funds would be sent to Alameda bank accounts,

15   FTX would retain a——effectively a debt from Alameda for those

16   and a——in the lien section here, a lien on Alameda's assets as

17   security for that ongoing liability, that it would be repayable

18   on direction from FTX in the return section here, and——and in

19   the payment directive section.  And——one second.

20          And that the provider could hold or transfer the funds

21   as laid out in the FTX assets section unless or until directed

22   to return them to FTX.

23          All of that being said, I did not do a careful reading

24   of this document at the time contemporaneously, and I would

25   have treated it as effectively, yeah, as a liability from

1   Alameda to FTX, that it had a contractual obligation to—to

2   make whole.

3   Q.  Is there any line in this exhibit you can point me to that

4   in your view authorized Alameda to spend the FTX customer

5   funds?

6           MR. COHEN:  Objection.  This has been covered.

7           MS. SASSOON:  He didn't answer my question, your

8   Honor.

9           THE COURT:  I agree.  Overruled.

10  A.  So I—there is the line that the—that FTX may, without

11  notice or demand, without notice to or demand on provider,

12  transfer any crypto or cash asset on hand to the provider, to

13  Alameda, to be held and/or transferred by provider.  I would

14  have interpreted that as saying that Alameda had the right to

15  hold or transfer those assets and that—oh, sorry.

16  Q.  Go ahead.

17  A.  And that the—the—what these represented was, in the

18  return section, a secured liability, and that it was secured,

19  as described in the lien section, by a lien against the

20  provider, in this case Alameda, which would implicitly have

21  access to all of Alameda's assets, which is how I would imagine

22  describing a contractual loan obligation, effectively.

23  Q.  Did any lawyer at FTX tell you that any language in this

24  agreement meant that Alameda could spend FTX customer deposits?

25  A.  I don't know that I had contemporaneous conversations with

1   lawyers about exactly what this agreement meant.

2   Q.  And any conversations you did have about what it meant were

3   in November of 2022?

4   A.  With lawyers in particular, yes.

5   Q.  As far as you know, was this agreement ever disclosed to

6   the public?

7   A.  I'm not sure if it was.

8   Q.  Are you aware of anywhere or any time that it was disclosed

9   to the public?

10  A.  I'm aware of it being disclosed to auditors.  I'm not sure

11  if that in turn turned out to be disclosed to other parties or

12  not.  I'm not aware of any specific incidents in which it was.

13          MS. SASSOON:  Your Honor, I apologize.  I'm not going

14  to finish at 4:30.  I'm happy to continue past 4:30 if the

15  Court would like.  I'm going to move to the next topic, which

16  is the terms of service.

17          THE COURT:  Keep going.

18          MS. SASSOON:  Okay.

19          THE COURT:  We're going to finish.

20  BY MS. SASSOON:

21  Q.  Let's talk about the terms of service.

22  A.  Yup.

23          MS. SASSOON:  Mr. Bianco, can you pull up 558.

24  Q.  I think you testified that you saw this as early as late

25  2021.  Do I have that right?

1   A.  I was sent it.  I don't know that I looked through it in

2   detail then.

3   Q.  And I think you said some parts you looked at more closely

4   than others; is that right?

5   A.  Yeah.

6           MS. SASSOON:  Can we go to provision 8.2.6, I think it

7   is.

8           8.2 and 8.2.6.  Yeah, that's right.  If we could zoom

9   in on 8.2.6.

10  Q.  Is this one of the provisions you looked at closely?

11  A.  I don't believe I looked at it closely at the time.

12  Q.  What do you recall about your review of this at the time?

13  A.  I recall at the time that I had interpreted this as

14  referring to purely spot trading on the platform and that this

15  was referencing, you know, omnibus segregated wallet setup for

16  spot assets.

17  Q.  Did you discuss that understanding with any attorney?

18  A.  I don't recall doing so, no.

19          MS. SASSOON:  Let's look at Section 16.  And let's go

20  to 16.4.

21  Q.  Did you discuss 16—I think you talked about your

22  understanding of this provision.  Did you discuss the meaning

23  of this provision at the time with any attorneys?

24  A.  Not at the time, no, I didn't.  I don't actually recall

25  discussing specific provisions, any specific provisions with

1    this at the time with attorneys.

2    Q.  And do you know how this provision ended up in the terms of

3    service?

4    A.  I'm not a hundred percent sure how it did, no.  I don't

5    know who drafted which parts of it.

6    Q.  This provision, as you understand it, does it have anything

7    to do with Alameda's fiat liability to FTX?

8    A.  So as I understand it, this refers to assets of——that users

9    post as collateral for their margin positions, so I think that

10   what it would refer to is on a net basis, that——that set of

11   assets, not purely spot assets.

12   Q.  But you think the fiat liability is encompassed within that

13   for this provision?

14   A.  So when you discuss the fiat liability, at least as I

15   understand it——but I may be misinterpreting your question——I

16   think of that as being a liability from Alameda to FTX of a

17   particular size, rather than referring to the

18   particular——rather than referring to the nature of other

19   customers' accounts on the platform.  So, sorry.  Probably be a

20   little bit clearer.  I think that this could potentially relate

21   to any liability on the platform, depending on the nature and

22   amount of assets that were posted in various methods to the

23   platform.

24   Q.  When you reviewed and authorized the terms of service, I

25   believe you said to Can Sun——is that right?

1    A.   Yeah.

2    Q.   —did you discuss with him Alameda's line of credit on FTX?

3    A.   I don't think I discussed it with him then, no.

4    Q.   Did you discuss with him Alameda's "Allow Negative" feature

5    and whether it was consistent with the provisions of the terms

6    of service?

7    A.   I—this was—you're referring to in May 2022, this is?

8    Q.   Yes.

9    A.   I don't know that I had any specific conversations with Can

10   when I authorized him to take action if he felt appropriate on

11   new terms of service.

12   Q.   So did you—and I just want to make sure I'm clear on this.

13   Did you have any discussions with Can Sun related to Alameda

14   being exempt from auto-liquidation in connection with

15   authorizing Section 16 of the terms of service?

16           MR. COHEN:   Objection, form.

17           THE COURT:   Overruled.

18   A.   I—same answer as before.  I don't know that I had any

19   specific conversations about anything with Can when I

20   authorized him as general counsel to do what he felt was

21   appropriate with new terms of service.

22   Q.   And at that point in time, May 2022, had you discussed any

23   of those topics I just outlined outside the context of the

24   terms of service with Can Sun?

25   A.   I—certainly not by me.  I'm not sure I was aware of those

1    topics by name at that time.

2    Q.   Which topics were you not aware of by name?

3    A.   I——you had asked——I was aware of the existence of some of

4    them and not others.   I was aware of the existence of lines of

5    credit by name.   I'm not sure that I was aware of the other

6    terms used by name.

7    Q.   So "Allow Negative," in May 2022, you were not aware of it

8    by name?

9    A.   I don't recall being aware of it then, no.

10   Q.   What about Alameda's exemption from auto-liquidation?

11   A.   I——I recall being aware that there was some form of delay

12   or something like that, or manual check.   I don't recall being

13   aware of the specifics at that time.

14   Q.   Can you explain what you mean by that.

15   A.   What I——what I mean by that is——by——particularly the part

16   about delayed liquidation or more generally?

17   Q.   You said you knew some things but not specifics.   So I want

18   to understand what you mean by that.

19   A.   I apologize.   I thought I had gone through that.   I can

20   repeat that though.   So I don't believe that I was aware of

21   "Allow Negative" by name.   I don't believe that I was aware at

22   that time——sorry.   I was aware of the existence of lines of

23   credit at that time.   And I——

24   Q.   Sorry.   I'm asking specifically about exemption from

25   auto-liquidation.

A.  Ah, okay.  So at that time I was aware that there were at

least some speed bumps in place on Alameda's account.  I'm

not——I don't remember being aware of the exact nature of them.

Q.  So what did you know about the speed bumps?

A.  I knew that some had been put in place in response to

events in which Alameda——in which an improper liquidation had

been triggered or about to be triggered on Alameda's account,

which in turn caused chaos on the platform.

Q.  And what was the nature of the speed bump, as you

understood it?

          MR. COHEN:  Objection.  Beyond the scope.

          THE COURT:  Overruled.

A.  I——I don't know that I was aware of any particular nature

of it.  I——I wish I could tell you more, but thinking back to

contemporaneously, at that point in time, I don't particularly

recall knowing more specifically about it.

Q.  You used the term "speed bumps," so can you explain to me

what you meant when you said you were aware of speed bumps in

May 2022.

A.  So I——sorry.  I apologize.  This is——because of the order

that we're doing this in, this will be a somewhat substantial

digression if——for me to provide all of the context for that.

I'm happy to do it, though.  Or I'm happy to give a summary of

it.

Q.  I don't think my question calls for extensive context.  I'm

1  asking you what you knew in terms of Alameda's exemption from
2  auto-liquidation.  You used the term "speed bumps."  What do
3  you mean by "speed bumps"?
4  A.  I understand there had been prior incidents in which
5  liquidations had been erroneously triggered on accounts in
6  general and in some cases on Alameda's account, or had been
7  almost triggered, and in response to those, I had conversations
8  with Gary, Nishad, and others around putting in place some
9  checks to prevent an erroneous liquidation of Alameda's
10 account, which would cause chaos on the platform, and I
11 understood that they had implemented some features that would
12 do as such.  That is roughly the extent of my specific
13 knowledge of it.
14 Q.  So when you say "do as such," you understood these checks
15 would prevent Alameda from being liquidated like any other
16 account would?
17 A.  That it would attempt to address the risk of improper
18 erroneous liquidations on Alameda's account by doing some
19 combination, I wasn't confident which, of having delays, having
20 annual checks, having alerts.  I wasn't sure if it was a alert
21 that you had to click on to liquidate or not to liquidate.  I
22 apologize.  I wish I could give you a more specific answer.  I
23 obviously now have a more specific set of answers to that
24 question, but at the time, that is my best recreation of the
25 state of my knowledge at that point in time.

1  Q.  So at the time you understood that there were certain

2  checks or features in place such that Alameda would not be

3  liquidated in the same fashion as other accounts; is that

4  accurate?

5  A.  I thought that there might be other accounts on similar or

6  the same program.

7  Q.  What about with respect to the typical customer account?

8  At that time did you understand that the typical process for a

9  typical customer account did not apply to Alameda?

10          MR. COHEN:  We're far afield of the topic of this

11  hearing, your Honor.

12          THE COURT:  Overruled.

13  A.  So at that point in time, in May 2022, I was well aware

14  that there were various programs that market makers

15  participated in that were gated on volume.

16  Q.  Mr. Bankman-Fried——

17  A.  Yeah.

18  Q.  ——I will allow you to answer the questions I ask, but

19  that's not the question I asked.  The question I asked was

20  about a typical customer, not a market maker.  As you

21  understood it in May 2022, did you understand that Alameda was

22  not subject to the same auto-liquidation as a typical customer

23  account?

24  A.  If by typical customer you mean not a market maker, so a

25  very dissimilar account from Alameda, then yeah, I did.

1    Q.  Okay.  And you mentioned that at this time you were not

2    aware of "Allow Negative" by name.

3    A.  Yeah.

4    Q.  So I just want to clarify.

5    A.  Yeah.

6    Q.  Were you aware that Alameda could go negative regardless of

7    the name for that feature?

8    A.  I was aware that Alameda and many other accounts on the

9    exchange, in fact most by volume, could go negative in a

10   particular asset.  That was a core property of FTX as an

11   exchange.  I'm not——but I——I'm sorry.  I'm probably not

12   addressing your——your question.

13   Q.  Let me rephrase it.  I'm asking about Alameda and only

14   Alameda.

15   A.  Yeah.

16   Q.  Were you aware at that time in May of 2022 that Alameda

17   could have an overall negative balance on FTX?

18   A.  By an overall negative balance, are you referring to a

19   negative balance, a negative net asset value, or are you

20   talking about a negative balance in a particular asset, or are

21   you——sorry.  I just want to make sure I understand what you

22   mean by overall.

23   Q.  That if you added up all the accounts, they could have a

24   overall negative balance.

25   A.  And adding up all assets, not talking about particular

1  assets; is that correct?

2  Q.  That's correct.

3  A.  Okay.  My understanding was that we were ensuring that

4  Alameda's——at that time my understanding was that we were

5  ensuring Alameda had a positive overall net asset value on FTX.

6  I was not sure whether that was enforced into a code base or

7  whether that was something that we inspected to confirm it was

8  true.  It was something that I had discussed at various points

9  with Gary and others, and had checked that Alameda's overall

10 net asset value on the platform had remained positive.

11 Q.  So when you said that you were not aware of "Allow

12 Negative" by name but you had some understanding of it, tell me

13 what you meant by that.

14 A.  So I'm not sure that——I apologize.  I might be

15 misunderstanding what the "Allow Negative" feature did.

16 I——I——I think I've given you what my understanding was, but I

17 suspect I might be wrong about what it——what it did.

18 Q.  Well, let's talk about Alameda's main trading account.  Are

19 you aware that that main trading account could go negative?

20 A.  And so to clarify, you're talking about info@, the main

21 account, or the entire user?

22 Q.  The info@ main account.

23 A.  So account No. 9.

24 Q.  Yes.

25 A.  And by "go negative," you're talking about negative in a

1    particular coin or negative net asset value?

2    Q.  Just have a negative balance, Mr. Bankman-Fried.

3    A.  Sorry.  I——

4    Q.  Let me make this easier for you.

5            MS. SASSOON:  If we could pull up Government

6    Exhibit 50 and go to Tab 2.

7    A.  Okay.  The——

8            MR. COHEN:  Your Honor, I would object to this.  The

9    issue for this hearing is the scope of counsel relationship.

10   This is a deposition now.

11           MS. SASSOON:  May I respond.

12           THE COURT:  Yes.

13           MS. SASSOON:  They're asserting a presence of counsel

14   defense.  It's relevant what he did or did not tell counsel,

15   and to understand that, it's also relevant what he did or did

16   not know at the time that he was not telling counsel certain

17   things.

18           MR. COHEN:  That has no limiting principle, your

19   Honor.  That could be let's do our entire case through

20   deposition and then ask him if he told counsel about it.

21           THE COURT:  Well, look, I'm going to allow this.  I

22   understand your point.

23           I've gotten beyond my tether here.

24           I'm going to allow this.  I am going to acknowledge

25   the point you make, but all things are relative, and there is a

good deal to what the government says also, and part of the

problem is that the witness has what I'll simply call an

interesting way of responding to questions for the moment.

MR. COHEN:  I would say, your Honor, with respect,

part of the problem is just the nature of this kind of a

hearing, where we're doing things sort of out of order, out of

sequence, because we have to address legal issues.

THE COURT:  Well, Mr. Cohen, there's a simple answer

to that, and the simple answer to that is that if you want to

push ahead with the evidence you're seeking to introduce, it's

through this hearing, if at all.

MR. COHEN:  Understood, your Honor.  But I was just

responding to the last point, your Honor.

THE COURT:  I understand.  Let's go ahead.

(Continued on next page)

1           MS. SASSOON:  Mr. Bianco, if you could just highlight

2     row 17.

3     Q.  Mr. Bankman-Fried, in May of 2022, were you aware that

4     account ID 9 @AlamedaResearch.com could have an overall

5     negative value?

6     A.  I am giving you my best guess at answering the question.

7     Q.  I'm not asking for a guess.  I'm asking what you understood

8     at the time.

9     A.  I am going to answer what I think the question you are

10    asking is, but I apologize if I'm answering the wrong question.

11          I don't know exactly what that cell was referring to.

12    As of May 2022, I believe that I did not have any specific

13    knowledge about the extent to which, for instance, one

14    subaccount of Alameda Research's info@ account, as in, i.e.,

15    the account number 9, was treated as part of a collection of or

16    separate from other subaccounts of that user or other users

17    affiliated with Alameda.

18          What I believe I knew at that time was, or at least

19    what I believed at that time was that Alameda overall

20    maintained a positive net asset value on FTX.  I don't think at

21    that time I had specific beliefs about how that did or didn't

22    apply to a particular subaccount of Alameda's.

23          I'm assuming that overall net asset value, rather than

24    value in a particular coin, is what I think that you are going

25    for here, so that's how I was answering that question.  That is

1    my answer as of that time.

2           THE COURT:  Mr. Bankman-Fried, you have been asked

3    that question in one form or another quite a number of times

4    and not once did the question include the phrase net asset

5    value.  Unless I'm mistaken, every single answer you have given

6    responded on the assumption that counsel had asked you about

7    net asset value.

8           Now, that's just an observation.  If I'm mistaken,

9    I'll stand corrected, but it says what it says.

10          THE WITNESS:  I apologize if that's correct.

11   A.  If that's true, I don't know what you mean by negative

12   balance.

13          MS. SASSOON:  I am going to move on, your Honor.

14          THE COURT:  OK.

15   Q.  On your direct examination you testified that, in May 2022,

16   that you thought in certain circumstances Alameda Research

17   borrowing funds from FTX was permitted.

18          Do you recall that testimony?

19   A.  Yeah.

20   Q.  Can you explain under what circumstances you believed

21   Alameda was permitted to borrow funds from FTX.

22   A.  I apologize.  I think you said this, but this was as of May

23   2022?

24   Q.  Yes.

25   A.  Yup.  I believe that it was permissible for there to be

borrowing from assets that FTX was holding that were acting as
security or collateral for margin or futures positions as of
that point in time and that that was what at least I was
internally treating as the core metric.

Q.   Did that include withdrawing those assets off the exchange?

A.   Potentially there would have to be a risk analysis
associated with doing so.  But, in general, FTX's margin
programs did not differentiate between a position or borrow put
on by a trade or one put on by a withdrawal.

Q.   Just to be clear and to understand the answer to my
question, when you just described the borrowing you thought
Alameda was permitted to do, did that include withdrawing those
assets off the exchange and using them somewhere else?

A.   Potentially, subject to a risk analysis.

Q.   Did you believe that Alameda had to post collateral to make
those withdrawals off the exchange?

A.   I would have believed that it had to post security and that
the most straightforward and the version I would have been most
comfortable with that would have been collateral physically
posted to FTX.  We did have discussions with other market
makers as well around assets that FTX couldn't physically
custody but could get contractual claims on.  I would view that
as a possibility, albeit a less desirable one.

Q.   I'm asking about Alameda only.  In your view, in May of
2022, that Alameda's collateral could take the form of assets

1    that were not posted to the exchange.

2    A.   I had the view that it potentially could.  I also had the

3    view that I would have been less comfortable on a relative

4    basis with that.

5    Q.   Did you discuss that with an attorney?

6    A.   At the time discuss that.  In particular, are you referring

7    to the off-exchange assets, or are you referring to something

8    else?

9    Q.   Yes, that.

10   A.   As of May 2022, in that context, no.

11   Q.   Did you discuss it with an attorney prior to November of

12   2022?

13   A.   In the general context -- give me one second -- I discussed

14   some specific instances of potentially using off-exchange

15   assets as collateral with attorneys prior to November 2022.  I

16   don't know that I had a general discussion around such a

17   practice.

18   Q.   Which attorneys?

19   A.   I believe that we had discussions involving -- I had

20   discussions with Ramnik, who described discussions with

21   attorneys around the potential of accepting some collateral

22   from Three Arrows Capital.

23   Q.   OK.  I am going to stop you.  Ramnik is not an attorney,

24   correct?

25   A.   That is correct.

1   Q.  I'm asking if you had direct conversations with any

2   attorneys about Alameda specifically using as collateral for

3   borrowing assets that were not on the FTX exchange prior to

4   November 2022.

5   A.  I don't believe that I personally, rather than through an

6   intermediary, had discussions, particularly about Alameda doing

7   it prior to November 2022 that I can recall right now, no.

8   Q.  The answer is no?

9   A.  That is correct.

10  Q.  When you had that you thought that Alameda could borrow

11  assets in this fashion, can you explain through what program?

12  Is this the borrow-lend program, something else?

13          MR. COHEN:  Objection.  Scope.

14          THE COURT:  Overruled.

15          I'm sorry.  Sustained.

16  Q.  Let's talk about loans.  Were all of your loans from

17  Alameda documented?

18  A.  Are you referring to the personal loans?

19  Q.  Yes.

20  A.  I was under the belief at the time that they were all

21  documented.  I am not sure today that the most recent ones had

22  been documented yet.

23  Q.  Sitting here today, are you aware that some were not?

24  A.  Sitting here today, I believe that some of the most recent

25  ones prior to the collapse had not yet been documented, that is

1    correct.

2    Q.  At any point in your discussions with counsel about the

3    structure of these loans, was it discussed that some of the

4    funds were coming from FTX customer money?

5    A.  I would not classify that as particularly what happened,

6    so, no.  That is certainly not how I discussed it with

7    attorneys.

8    Q.  What was the reason that the investments were not made

9    directly from Alameda Research?

10   A.  By the investments, you're referring to things like

11   Robinhood, is that correct?

12   Q.  Let me be a little clearer.  You described certain

13   investments being funded by loans that first went to you from

14   Alameda Research toward the investments.  Why not just straight

15   from Alameda Research?

16   A.  It depended on the particular circumstance.  I will say

17   that the most frequent reason, according to my memory, is that

18   the investment target did not want Alameda Research to be the

19   investing entity for one reason or another, or, alternatively,

20   that -- yeah.  That's the reason I can most frequently

21   remember.  In some cases I honestly don't know what the reason

22   is.

23   Q.  Were there occasions when you did not want Alameda to be

24   the investing entity?

25   A.  Yeah.

1    Q.  For example, with Robinhood, is it right that you did not

2    want Alameda to be the investing entity?

3    A.  Yeah.

4    Q.  Did you disclose that to your attorneys?

5    A.  Yeah.

6    Q.  What was the reason you didn't want Alameda to be the

7    investing entity?

8    A.  I was concerned about the potential for conflicts in

9    interest or at least the appearance of conflicts of interest.

10   In particular, Alameda had at various points engaged in talks

11   with Robinhood about potentially being a liquidity provider for

12   Robinhood's flow of cryptocurrency and I did not want anyone,

13   including Robinhood, to view this investment as related to

14   those discussions.

15   Q.  Did you disclose that to your attorneys?

16   A.  Yeah.

17   Q.  Was the buyout of Binance through loans?

18   A.  It was financed -- are you referring to personal loans or

19   intercompany loans?

20   Q.  Any loans.

21   A.  The buyout of Binance, I believe the bulk of it, the

22   international version, my memory is that it was financed

23   through -- it may have been a loan to Paper Bird.  I believe

24   Paper Bird is the entity that ended up with that equity stake,

25   which is where the bulk of my equity stake in FTX was held.

1   I'm not entirely sure if there is an intercompany loan, but I

2   would suspect there may have been associated with that.  There

3   is separately the FTX US portion of the Binance buyout, which I

4   think was structured through personal loans.

5   Q.  Were lawyers involved in that transaction?

6   A.  Yup.

7   Q.  Did you discuss with lawyers that some of the money was

8   coming from FTX customer funds?

9   A.  That is not what I viewed to be happening, so that is

10  certainly not how I discussed it with attorneys.

11  Q.  Let's talk, finally -- I have two more topics.  They should

12  be shorter.

13          You talked about safeguarding of assets.

14  A.  Um-hum.

15  Q.  I think you mentioned in your testimony the physical

16  security of the assets to protect from hacks.

17  A.  Yup.

18  Q.  Is that the limit of your understanding of what it means to

19  safeguard assets?

20  A.  No.  I apologize.  I think that answer was cut short a

21  small fraction the way it's written.  There are a number of

22  things that I would have considered to be related to that.

23  Q.  Would that include not embezzling customer assets, for

24  example?

25          MR. COHEN:  Objection.

1              THE COURT:  Sustained.

2    A.  Yes, it would include that.

3              MR. COHEN:  You didn't have to answer if it has been

4    sustained.  Haven't you been sitting here for four weeks.

5              THE WITNESS:  I felt the need to answer that one.

6    Q.  You talked about discussions with other industry

7    participants about omnibus wallets?

8    A.  Yup.

9    Q.  When you referred to omnibus wallets, are you referring to

10   omnibus FBO wallets?

11   A.  Sorry.  Are you referring to cryptocurrency wallets or FBO

12   bank accounts?  I have not heard FBO as a term applied to

13   wallet, but I could guess what it would mean.

14   Q.  I don't want you to guess.

15             When you talk about a crypto omnibus wallet, did you

16   understand that to be for the benefit of customers?

17   A.  Yes.

18   Q.  When you spoke to industry participants, did they say

19   anything about a practice of using funds from these customer

20   crypto wallets for their own purposes?

21   A.  Of using them for their own purposes -- it depended on the

22   counterparty that I was talking to and the nature of their

23   business.  I don't know that anyone would have described it

24   that way.  The discussions were obviously different after I was

25   talking to a borrow lending desk, for instance.

1    Q.  Let's limit it to an exchange.

2    A.  Limited to an exchange, I think the answer is no, but let

3    me just give you precisely what my answer would be, and you can

4    tell me if that is not responsive, which is that it did not

5    include industry participant exchanges saying that they would

6    use funds from omnibus customer wallets for the exchange's

7    corporate expenses.  Does that respond --

8    Q.  What about CEOs of these exchanges using customer funds for

9    any of their own spending?

10               MR. COHEN:  Objection.

11               THE COURT:  Form.

12   Q.  Did you have conversations with CEOs of crypto exchanges

13   about whether it was proper to use customer money out of

14   omnibus crypto wallets for purposes other than customer trading

15   and withdrawals and the like?

16               MR. COHEN:  Objection.  Beyond the scope of the

17   direct.

18               THE COURT:  Overruled.

19   A.  Let me, A, apologize if this isn't responsive, so tell me

20   that.  I will try to be responsive.

21               I certainly did not have conversations with CEOs about

22   them discretionarily taking funds from -- as CEO of the

23   exchange from customer omnibus wallets for their own personal

24   expenses.

25   Q.  What about CEOs discussing using customer funds in omnibus

1   crypto wallets for the spending of their affiliated companies?

2           MR. COHEN:  Same objection.

3           THE COURT:  Same ruling.

4   A.  So, once again, I will give a specific answer, but if this

5   is not scoped correctly, tell me.

6   Q.  Go ahead and give your answer, and I will ask another

7   question if it's not responsive.

8   A.  Thank you.

9           I certainly did not have conversations with CEOs about

10  them as CEO of an exchange, taking -- using funds from omnibus

11  customer wallets for their own spending of any sort.  However,

12  I'm not entirely sure what the implied relationship there was

13  between the CEO of the exchange and the affiliates, so it's

14  hard for me to answer that.

15  Q.  Let me ask it another way.  Did you have any conversations

16  with industry participants that led you to believe that it was

17  proper for you to spend customer cryptocurrency deposited into

18  omnibus crypto wallets for your affiliates?

19          MR. COHEN:  Objection.  Scope and form.

20          THE COURT:  Overruled.

21  A.  So let me again attempt to answer that.

22          What I did have discussions with industry participants

23  about was on margin wallets for margin exchanges that

24  customers, including in some cases affiliates, might have

25  borrows.  They might have liabilities.  And those would

1    necessarily have come out -- been part of the net customer

2    balances.  There were negative numbers in those customer

3    balances that added up to the overall customer balances.  That

4    would be a separate thing from a flow-of-funds perspective than

5    the CEO not as a customer but as just the exchange or the CEO

6    of the exchange using funds from customer wallets for corporate

7    expenses.

8    Q.  I apologize now.  Now I'm apologizing.  I don't know that I

9    understood that answer.

10           The wallets you are referring to are those the omnibus

11   wallets that you have been talking about, or different ones?

12   A.  No.  Same wallets, yeah.

13   Q.  I want to talk to you about Dan Friedberg for a few

14   minutes.

15   A.  Um-hum.

16   Q.  You hired him?

17   A.  Yes.

18   Q.  Before you hired him, you had been reluctant to hire a

19   general counsel, correct?

20   A.  I had been reluctant to hire the wrong general counsel is

21   how I would put it.

22   Q.  The wrong general counsel, in your view, was someone who

23   would inhibit you from taking risks for the company, wasn't it?

24           MR. COHEN:  Objection.

25           THE COURT:  Ms. Sassoon.

1          MS. SASSOON:  Your Honor, they are asserting a

2     presence-of-counsel good-faith defense and it's relevant to

3     this, whether in good faith he hired an attorney who was a

4     respectable attorney.

5          MR. COHEN:  Your Honor, that's a very thin soup.

6     Continued objection.

7          THE COURT:  I think the question is appropriate,

8     without endorsing the use of the word respectable.

9     A.   It depends on what exactly you mean by that.  I did want to

10    find a general counsel who would be comfortable with the

11    business being allowed to take reasonable risks, so long as

12    they were otherwise permissible and consistent with its

13    obligations.  I did not want a general counsel who would

14    permit -- who would restrict the company from taking any risks

15    or any significant risks under any circumstances, but I also

16    didn't want a general counsel that would permit it to take any

17    risks without bound.  The answer, it depends on the specifics.

18    Q.   Didn't you tell Caroline Ellison that Dan Friedberg was

19    unlike most lawyers you knew because he was not going to stop

20    you from taking risks?

21    A.   I don't recall saying that in particular.  Had I said

22    something like that, and I may have, it would have been, I

23    suspect, with further context that would have clarified the

24    sorts of risks that it did and didn't refer to.

25    Q.   Were you aware when you hired Dan Friedberg that he had

1   previously been general counsel at a company that suffered an

2   insider trading scandal?

3   A.  I wasn't aware of the details of it, but I was aware at a

4   high level that there had been scandals with one of the

5   companies that he had been counsel for before, yes.

6   Q.  Did you understand that when you hired him that he had been

7   at a company with a criminal scandal?

8           MR. COHEN:  Objection.

9           THE COURT:  Sustained.

10          MS. SASSOON:  Your Honor, he said at a high level

11  scandal.  It was not responsive to the question.

12          MR. COHEN:  Well beyond the topic of this hearing,

13  your Honor.

14          THE COURT:  The topic of this hearing includes

15  good-faith reliance, and I am going to allow the question.

16  A.  I don't know that I know exactly what you are referring to

17  as a criminal scandal, and I don't know that I knew the details

18  of the incidents at the company or companies he had prior

19  worked at in much more specificity than the -- admittedly than

20  specificity I have supplied so far.

21  Q.  Did you know there had been a criminal investigation at his

22  prior company?

23          THE COURT:  Ms. Sassoon, let's move on.

24  Q.  Were you aware that Dan Friedberg used illegal narcotics

25  with your employees?

```
 1                MR. COHEN:  Objection.

 2                THE COURT:  Sustained.

 3                Let's wrap it up.

 4   Q.   Alameda at one point had a general counsel?  His name was

 5   Bailey Korrell.

 6   A.   Something like that is correct, yes.  I am not sure I know

 7   exactly what his title was.

 8   Q.   Were you aware that Dan Friedberg fired Bailey Korrell?

 9                MR. COHEN:  Objection.

10                THE COURT:  Sustained.

11                MS. SASSOON:  Your Honor, may I be heard on this?

12                THE COURT:  Yes.

13                MS. SASSOON:  I would like to inquire of the witness

14   about whether he was aware of the reason Dan Friedberg hired

15   Bailey Korrell, which is relevant to the good-faith reliance on

16   counsel here.

17                THE COURT:  That's for another day.

18                MS. SASSOON:  This is my second-to-last question, if

19   not my last question.

20                THE COURT:  Let's get on to the next one.

21                MS. SASSOON:  May I have a moment, your Honor?

22                THE COURT:  Yes.

23                MS. SASSOON:  I'll do you one better.  No further

24   questions, your Honor.

25                THE COURT:  Thank you.
```

1              Mr. Cohen, anything else?

2              MR. COHEN:  No, your Honor.

3              THE COURT:  You're excused, Mr. Bankman-Fried.

4              (Witness excused)

5              THE COURT:  I'll hear you briefly on the issue I have

6    to decide.

7              Mr. Cohen.

8              MR. COHEN:  Your Honor, given the hour, I will be

9    brief.

10             I think there is a couple of things running through

11   the government's examination, to the extent it was actually

12   about these topics, that sort of goes beyond the mark here.

13             Our position is not that any of these are entitled to

14   a formal advice-of-counsel defense -- we have been very clear

15   with the Court from the beginning to that effect -- nor is our

16   position that the government might challenge the weight of the

17   evidence or the way that our client interpreted things.  That's

18   also not the test here.  But we think there is a sufficient

19   basis for us to elicit the testimony about the topics covered

20   today.

21             The government is free to cross-examine

22   Mr. Bankman-Fried, as it has already done today, and the issue

23   is not whether they think the evidence has great weight, no

24   weight, or whatever weight.  The issue is whether we ought to

25   be allowed to do that.

1          As to each of the topics, Mr. Bankman-Fried testified

2     that he consulted with counsel, and he took comfort from those

3     consultations, which is all we have ever taken as a position.

4     We have never advanced the formal advice-of-counsel defense, as

5     your Honor knows.

6          The narrow point on industry practice is the only

7     thing different from the five other topics, and there we think

8     there was a basis for him to say that the use of one omnibus

9     wallet to hold multiple customer funds or funds from multiple

10    customers, and that was contrasted with funds held by FTX

11    operationally was something we believe was done by other

12    exchanges through the other information he learned from other

13    exchanges, and we think that there is a basis for that.

14          I don't think the issue is whether the testimony or

15    whether the evidence has sufficient weight, no weight, or so

16    forth.  The question is whether we have made a sufficient

17    showing to put it forward, and, without belaboring the direct

18    and the cross, we think there is a sufficient basis.

19          That's all I have.

20          THE COURT:  Let me ask you a question.  I am going to

21    approach it in stages.

22          Let's assume that somebody robs a bank, knocks over

23    Wal-Mart, whatever, and comes upon a large sum of illegally

24    obtained money and the person decides it might be a good idea

25    to salt this away and make sure nobody is going to discover it.

1     Do we agree that engaging in a transaction, an object of which

2     is to conceal the source of the money, is money laundering,

3     assuming the jurisdictional hooks are satisfied?

4              MR. COHEN:  On your Honor's hypothetical, yes.

5              THE COURT:  The next step is the guy says, let me

6     figure out how to do this, and he goes to a lawyer.  And he

7     says to the lawyer, I want to buy an expensive condo on

8     billionaire's row and I want to form a limited liability

9     company, which we ought to call Gold Dust, and I've got just

10    the apartment and I'd like you to prepare a contract of sale,

11    and the lawyer is not told where the money came from, not one

12    word, not one word about why the objective is to hide the money

13    or the source, and the lawyer incorporates or organizes the

14    LLC, the lawyer prepares the contract of sale.  The lawyer

15    represents Gold Dust at the closing and now the defendant is

16    apprehended, the buyer, the true buyer, and charged with money

17    laundering.

18             And the defense is, well, but I had a lawyer.  I had a

19    lawyer who organized the LLC.  I had a lawyer who did the

20    contract of sale.  I had a lawyer at the closing.  And I offer

21    this as evidence that I didn't have a criminal intent in hiding

22    the money.  I did just exactly what the lawyer said.

23             And how is that different from what you are trying to

24    do in principle?  I am not saying anything about your client's

25    guilt or innocence.

1           MR. COHEN:  I understand your Honor is speaking a

2    hypothetical.

3           I think the pivotal difference is, it's the defense's

4    position in this case that in your Honor's hypo, the source of

5    the funds is robbing a bank, so obviously an illegal act.

6    That's what we are fighting over in this case.

7           Our client, our position is that the source of funds,

8    the use of funds was not improper and our client did not

9    believe it was improper or, at minimum, that it was

10   inconclusive.  It's not the same hypothetical situation.

11          THE COURT:  Those are all defenses on the merits.

12          MR. COHEN:  Those are defenses on the merits, but in

13   those situations, speaking with a lawyer when you yourself

14   don't believe you have done everything wrong, is a relevant

15   consideration.

16          THE COURT:  It's sure relevant if you tell the lawyers

17   what all the facts are.

18          MR. COHEN:  True.  I know he was criticized, but I

19   think Mr. Bankman-Fried was clear about when he had

20   conversations with lawyers and when he didn't, and some of them

21   were not as clear as others.

22          I agree with your Honor.  But there were times, for

23   example -- I think the cleanest example that your Honor asked

24   the question about was, how do you structure these founders

25   loans.  How do you do them?  Do you do them as a loan, as a

1    dividend?  How can we do that?  Our position is obviously that

2    the source of the loan in the first place was not improper.  If

3    we agreed it was improper, we would be in a different

4    proceeding.  That's why I think --

5              THE COURT:  How does the fact that some lawyer drew up

6    a promissory note shed any light on whether it was improper in

7    the first place?

8              MR. COHEN:  If the client is doing something he thinks

9    is proper and asks the lawyer to process it and draw up

10   paperwork and the lawyer doesn't raise any other concern,

11   again, our position is the commercial conduct is inconclusive

12   or unclear.  It's not robbing a bank.  Under the cases we cited

13   many letters ago, the client can take some comfort from that.

14   It is not a pure advice-of-counsel defense.  We are not

15   saying --

16             THE COURT:  I understand that.  You know I understand

17   it because I wrote an opinion about it and it states your

18   position clearly.  I understand your position.  I'm pretty

19   dubious about it in some applications here, but I understand

20   your position.

21             Let me hear from the government.

22             MR. ROOS:  Just briefly, your Honor.

23             Mr. Cohen framed the issue, the defendant's defense as

24   whether he believed the use of funds was improper.  So I think,

25   directly on your Honor's hypothetical, some of the areas they

1    have highlighted for lawyer involvement go to collateral

2    issues.

3          So, for instance, lawyer involvement in the terms of

4    service, the defendant testified on the stand that he didn't

5    talk about any of the specific provisions before the terms of

6    service were enacted.  He didn't raise the use of customer

7    funds by Alameda.  He didn't raise Alameda's ability to borrow

8    from FTX.

9          So I think, much like the loan or the property in your

10   Honor's hypothetical, this is sort of collateral involvement of

11   lawyer that doesn't go to the core defense, which is the use of

12   funds and whether or not it was proper, the same I think I

13   heard on the payment agent agreement, which is that he believes

14   Dan Friedberg was involved in drafting the agreement, but I

15   didn't hear any testimony that Dan Friedberg was informed about

16   the use of funds that may have been occurring under the payment

17   agent agreement or that there was a conversation with the

18   lawyer that said the payment agent agreement authorizes you to

19   use the funds.  The same, again, with the loans.

20         By the way, the case already has a bunch of testimony

21   about these loans.  It was the subject of cross.  It was the

22   subject of cross and direct of Can Sun last week.  But, again

23   there, this is what is happening with money, which may or may

24   not be customer funds, but, again, that is the defense whether

25   or not it's customer funds, not whether or not a lawyer

1    subsequently papered a transaction.

2             So I think for each of these, when you are doing the

3    401, 403 balancing test, the question is what is the probative

4    value of lawyer involvement on the margins where there is not

5    evidence that the lawyer is aware, after this hearing, aware of

6    the relevant facts central to the defense, coupled on the 403

7    side of the risk of prejudice, confusion, and a misleading

8    impression being given to the jury, and those are the cases

9    your Honor cited in your opinion on that, from just suggesting,

10   oh, there was lawyers involved when it doesn't go to the core

11   thing.  It goes to buying the apartment, not to robbing the

12   bank.

13            THE COURT:  There is one other point I wanted you to

14   respond to, and I want to get to my notes.

15            What about the testimony relating to industry practice

16   on the omnibus wallets?

17            MR. ROOS:  Thank you, your Honor.  I meant to hit

18   that.

19            I actually think, based on the limited testimony that

20   we heard about omnibus wallets, I am not sure there is actually

21   a dispute amongst the parties about whether or not customer

22   funds were kept in an omnibus wallet.  I have not heard -- I

23   don't recall hearing any witness saying that each individual

24   user's funds was held in an individual user on chain wallet.  I

25   think the question in the case is whether those customer fund

1   omnibus wallets were commingled or accessed.

2           THE COURT:  And depleted.

3           MR. ROOS:  And depleted.

4           I think when you look at it from that perspective --

5   and I think even Mr. Rehn opened by saying there were these

6   omnibus wallets that had customer money, and they stole a bunch

7   of money out of it.

8           So I don't think the existence or the practice of

9   using an omnibus customer fund wallet is in dispute in the

10  case.  So I think, then again, assessing the marginal relevance

11  of the testimony of what other industry participants are doing,

12  weighed against the potential prejudicial risk, as articulated

13  in the government's motions *in limine* about inviting

14  discussions about whether Huobi or some other exchange are

15  custodying and how they are custodying, there is not much of a

16  probative value there and it is outweighed.  Just to be clear,

17  we are not saying the omnibus wallet is improper.

18          THE COURT:  Let me just look at something for a

19  minute.

20          Mr. Sun, Can Sun, testified as general counsel of FTX:

21  "Q.  Did you get questions from regulators about how FTX

22  handled customer deposits?

23  "A.  They were received and kept in an omnibus wallet for all

24  customer funds that was separated from FTX's own proprietary

25  funds as well."

1              You are telling me there is no dispute about that, is

2     that right?

3              MR. ROOS:  That's what that witness said.  I think

4     that's what the government's position was.  I thought I

5     understood that the defendant was saying that customer funds

6     were kept in a separate omnibus wallet, but maybe I

7     misunderstood.

8              MR. COHEN:  Your Honor, if I might, I'm happy to hear

9     that the government is now saying there is no dispute on that.

10    But it's one thing --

11             THE COURT:  They called a witness to testify to it.

12    That's kind of a hint.

13             MR. COHEN:  Sure.  But it's one thing for the

14    defendant to testify to that and then be cross-examined on how

15    that's just his opinion.  It's quite another for him to be able

16    to say in fact this was industry practice.  That's the point

17    I'm trying to make.

18             THE COURT:  There may be a difference between saying

19    on the basis of personal knowledge that it's industry practice

20    and saying, I talked to a lot of people.  I don't have any

21    names, don't know where or when.  But after doing all of that,

22    it's my view that it's industry practice, which is essentially

23    what he said.

24             But I put that to one side.  I imagine the two of you

25    can work this out overnight.  If you can't, I'll rule on it in

1      the morning.  I'll rule on everything else in the morning.

2              Anything else?

3              MR. COHEN:  No.

4              THE COURT:  Any new forecast about how long we are

5      going to be with Mr. Bankman-Fried?

6              MR. COHEN:  Well, I still -- I'd like to take the

7      night to take a look.

8              THE COURT:  Obviously, I'm not holding you to it.

9              MR. COHEN:  I will have a much better sense in the

10     morning, your Honor.

11             MS. SASSOON:  Your Honor, the government is obviously

12     planning cross-examination.

13             THE COURT:  What a surprise.

14             MS. SASSOON:  We will try to keep it tight.  But if

15     the defendant is unresponsive, it could take longer.

16             THE COURT:  I understand that.

17             To voice a complaint I have voiced more than once in

18     29 years here, what did you understand is sometimes a good

19     question, but not so often.  Let's not spend the day at sidebar

20     about it.

21             MR. ROOS:  Judge, one last thing.  There are a few

22     times Ms. Sassoon asked the defendant about whether he has any

23     records that supported a consultation with a lawyer and his

24     answer, and it was fine in this setting, of course, was my

25     subpoena got denied or whatever the --

1           THE COURT:  He said we have been asking for it for a

2     long time.

3           MR. COHEN:  I can address that, if you'd like,

4     Mr. Roos.

5           MR. ROOS:  Go ahead.

6           MR. COHEN:  As your Honor may recall, we issued a

7     17(c) subpoena to Fenwick & West, and the debtor counsel

8     objected and the subpoena was denied.  If you go back and look

9     through the categories of requests, one of them was for a

10    data-retention policy.  I believe that's what my client was

11    thinking of.

12          THE COURT:  Did you serve a trial subpoena?

13          MR. COHEN:  No.

14          MR. ROOS:  My point is, not where did that answer come

15    from.  My point is, he shouldn't be permitted to say that on

16    the stand.  There was an application.  It was denied.  My

17    recollection is for a lot of reasons, including failing the

18    *Nixon* standard.  There hasn't been another request, it sounds

19    like, so it's not a permissible answer to say, I tried but

20    failed.

21          THE COURT:  If the defendant goes off in that

22    direction and there is a request for it, I will consider and

23    hear both sides on the issue of whether I should instruct the

24    jury that the defense had the right to serve a trial subpoena

25    on the debtor seeking such a document and whatever else, if

1    anything, might be appropriate in that regard.

2                MR. ROOS:  Thank you.

3                THE COURT:  Thank you.

4                (Adjourned to October 27, 2023 at 9:30 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2     Examination of:                                    Page

3     MARC TROIANO

4     Direct By Ms. Kudla  . . . . . . . . . . . .2043
      Cross By Mr. Everdell  . . . . . . . . . . .2053
5     KRYSTAL ROLLE

6     Direct By Mr. Everdell . . . . . . . . . . .2082
      Cross By Mr. Roos  . . . . . . . . . . . . .2100
7     JOSEPH PIMBLEY

8     Direct By Mr. Everdell . . . . . . . . . . .2104
      Cross By Mr. Rehn  . . . . . . . . . . . . .2133
9     SAM BANKMAN-FRIED

10    Direct By Mr. Cohen  . . . . . . . . . . . .2170
      Cross By Ms. Sassoon . . . . . . . . . . . .2207
11                        GOVERNMENT EXHIBITS

12    Exhibit No.                                   Received

13     38A, 200, 294, 312, 313, 315, 322,  . . . .2043
                   322A, 331, 348, 349, 449, 494,
14                 495, 544, 766, 933, 1320A,
                   1360A, and S2005
15    S2006  . . . . . . . . . . . . . . . . . . .2044

16    1083  . . . . . . . . . . . . . . . . . . . .2046

17    505  . . . . . . . . . . . . . . . . . . . .2069

18    1737  . . . . . . . . . . . . . . . . . . . .2146

19                         DEFENDANT EXHIBITS

20    Exhibit No.                                   Received

21    837  . . . . . . . . . . . . . . . . . . . .2093

22    836  . . . . . . . . . . . . . . . . . . . .2096

23    1617  . . . . . . . . . . . . . . . . . . . .2124

24    1618 and 1619  . . . . . . . . . . . . . . .2127

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300