```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                        22 CR 673 (LAK)

 5    SAMUEL BANKMAN-FRIED,

 6              Defendant.                Trial
      ------------------------------x

 7
                                         New York, N.Y.
 8                                       October 27, 2023
                                         9:30 a.m.
 9

10    Before:

11
                           HON. LEWIS A. KAPLAN,
12
                                         District Judge
13
                              APPEARANCES
14
      DAMIAN WILLIAMS
15         United States Attorney for the
           Southern District of New York
16    BY:  DANIELLE R. SASSOON
           NICOLAS ROOS
17         DANIELLE KUDLA
           SAMUEL RAYMOND
18         THANE REHN
           Assistant United States Attorneys
19
      COHEN & GRESSER, LLP
20         Attorneys for Defendant
      BY:  MARK S. COHEN
21         CHRISTIAN R. EVERDELL
           SRI K. KUEHNLENZ
22         DAVID F. LISNER

23    Also Present:
      Luke Booth, FBI
24    Kristin Allain, FBI
      Arjun Ahuja, USAO Paralegal Specialist
25    Grant Bianco, USAO Paralegal Specialist
```

```
 1                (In open court; jury not present)

 2                THE COURT:  Good morning, everyone.

 3                The record will reflect the defendant is present.

 4                I understand counsel have something for me?

 5                MS. SASSOON:  Two quick things, your Honor.  The first

 6    is—and I just want to be clear, I did not see or hear this

 7    myself, but I heard that there were some noises and gestures

 8    taking place in the—

 9                THE COURT:  I'm sorry.  Some?

10                MS. SASSOON:  Noises and gestures taking place in the

11    gallery yesterday during both direct and cross, so I would just

12    ask the Court to give a general reminder that those sitting

13    through the direct and cross should control their visible

14    reactions, whether audible or physical, to the testimony.

15                THE COURT:  All right.  Everyone is so reminded.  And

16    if there are infractions, people will be removed.

17                Yes?

18                MS. SASSOON:  The second is, once again, I encountered

19    a juror on my walk toward the courthouse, and the juror

20    attempted to greet me with just a "good morning," and I didn't

21    respond, so I would respectfully ask that the jury be reminded

22    that the lawyers are not permitted to speak to them and they're

23    not being rude, they're just following the Court's

24    instructions.

25                THE COURT:  Okay.  Anything on that, Mr. Cohen?
```

```
1              MR. COHEN:  We're fine with that.  We have something

2     to raise with the Court.

3              THE COURT:  Yes.  Go ahead.

4              MR. COHEN:  Your Honor, in connection with yesterday's

5     hearing, a few things for the record.

6              We wish to continue our objection to the parts of the

7     cross-examination that we think went beyond the issue about

8     involvement of attorneys.  We're not even sure that

9     cross-examination was necessary for the Court to make its

10    determination on the evidentiary issues, but putting that to

11    one side, we submit that that went far afield.  The Court

12    should not consider that testimony in connection with whatever

13    ruling it comes to.  And perhaps as importantly, we have an

14    application that that testimony not be used in

15    cross-examination of our client today or whenever we get to it,

16    or be used affirmatively, offered as affirmative proof.  It

17    amounted to a deposition.  Depositions are not typical in

18    criminal cases, and certainly not of the defendant.  So we

19    think that that process was improper, and we want to note that

20    for the record and make that application.

21             MS. SASSOON:  Yes, your Honor.

22             First of all, the defense waived a wholesale objection

23    to cross-examination because this objection was not raised

24    before cross-examination began.

25             THE COURT:  Clearly correct.
```

1              MS. SASSOON:  Cross-examination was also necessary in

2     part just to elicit the information about involvement of

3     counsel that was only addressed at the highest level during the

4     direct testimony, and the scope of cross-examination was

5     completely proper because it touched on conversations that the

6     defendant had with attorneys, whether or not he spoke to them

7     about the specific topics at issue, and also what he knew and

8     therefore what he did or did not share with counsel at the

9     relevant times.  That said, the government intends to use the

10    testimony from yesterday only to the extent that the defendant

11    testifies inconsistently with his hearing testimony.

12             THE COURT:  Okay.  First of all, to the extent any

13    objections were made yesterday——and they were quite

14    limited——with respect to the cross, and certainly not

15    categorical, I ruled on them.  The rulings stand.

16             I will not prohibit use of anything that the defendant

17    said yesterday on the grounds articulated by Mr. Cohen.

18             And to back up a little further, we've been having

19    this conversation about what I'll refer to——even acknowledging

20    that it's a misnomer——as the "quasi-advice of counsel defense"

21    that Mr. Cohen seeks to assert for a long time.  There has been

22    extensive briefing; there has been a prior written opinion on

23    the subject.  And the essence of the problem is that on the one

24    hand, there is a risk that the defendant, by introducing

25    alleged communications with counsel in the past on matters that

1    fall short of what traditionally is referred to—again,

2    improperly in my view, but referred to—as an "advice of

3    counsel defense," can have the effect of a suggestion from the

4    defense that because lawyers were involved in some degree or

5    another in pieces of what happened, the defendant was entitled

6    to take comfort from the involvement of the lawyers in assuming

7    or believing that he was acting within the bounds of the law.

8    That's an understanding of the defendant's position.  The

9    problem, of course, is that it can be a very misleading

10   impression, depending on the facts.  It is one thing for a

11   defendant to come in and to say:  I had a proposed course of

12   action, I went to a lawyer, I put all of the relevant facts in

13   front of the lawyer, and the lawyer advised me that it was

14   lawful, and therefore when I engaged in that course of action,

15   I had no criminal intent.  That's not what's happening here.

16   It's an impression that may be created.  In order for me to

17   assess the balance between the potential harm to the public

18   interest in creating a misleading impression and the

19   defendant's right to present a defense, I have to know—I had

20   to know—exactly what happened.

21        Now when the government first moved to preclude any

22   testimony of this sort by the defendant, I declined to rule

23   because what the defendant had put before me was at such a high

24   level of generalization that the relevant facts were just not

25   articulated.  So I didn't grant the government's motion.  I

1    denied it subject to consideration once we had the facts.  We

2    had the hearing yesterday for the purpose of my hearing

3    straight from Mr. Bankman-Fried's mouth what it is he proposed

4    to say.  In order to get a full picture, it of course was

5    necessary for the government to question him also.  I have a

6    slightly better sense of what's going on.  All of this has been

7    done to ensure that the defendant had a full opportunity,

8    despite the shortcomings of detail in everything that had been

9    said before yesterday in the defense presentations, to make his

10   case for the proposition that what he was endeavoring to do

11   would not be unfairly prejudicial and would be appropriate.

12   He's had his shot.

13        Now there are a number of specific points on which

14   counsel has sought to elicit testimony about the involvement of

15   lawyers.

16        First, I heard testimony yesterday that Mr. Friedberg

17   and other counsel for FTX implemented data retention policies

18   for the company.  That's no surprise to anybody.  There is no

19   suggestion in this case that having a data retention policy in

20   and of itself is fraudulent, or criminal, or improper.

21   Companies do that.  It's a common business practice.  Everybody

22   knows it.  And they're certainly not drafted by chief executive

23   officers, in my experience.  I don't see sufficient harm to the

24   public interest in allowing the defendant, to the extent he did

25   it yesterday, to adduce evidence that counsel were involved in

1   preparing the data retention policy, whatever it may have been,

2   and for the government to cross-examine about what it was, how

3   the defendant knows what it was, and all sorts of related

4   questions.  So to that extent, I'm granting the defense

5   application.

6       The other four items all involve circumstances in

7   which lawyers drafted plain vanilla legal documents and in

8   which the alleged problem was not the transaction in the

9   document per se, it was what was done and with what intent

10   collateral to the document.  In the event there's a conviction,

11   I will write on this subject, no doubt, more extensively than

12   most people will care to read, but we're not going to allow

13   that here.  That evidence would, in my judgment, be confusing

14   and highly prejudicial by falsely implying, given the testimony

15   yesterday, that the lawyers, with full knowledge of the facts,

16   all of the facts, blessed what the defendant is alleged to have

17   done.  And I didn't hear that at all yesterday.

18       First of all, the relevance of all of that material is

19   exceptionally tenuous, if it has any at all, and my best

20   judgment is it has none at all.  In any case, any probative

21   value of that evidence on the points at issue in this case

22   would be outweighed substantially by the risk of unfair

23   prejudice, confusion, and so forth.

24       Now just to illustrate, the fact that a lawyer was

25   involved in drafting a promissory note for a loan that

1   Mr. Bankman-Fried took out from Alameda has no relevance to

2   this case.  None.  What's relevant is something quite

3   different.

4          Okay.  Now we had an open issue at the end of the day

5   about omnibus wallets.  And I asked counsel to see if they

6   couldn't work their way through that issue.  Have you

7   succeeded?

8          MR. COHEN:  Your Honor, if we could confer with

9   counsel over the morning break, I think we can take care of

10  that.  I wouldn't touch it before.

11         THE COURT:  Okay.  And just let me clarify that on

12  reading the transcript, I think there's a real lack of clarity

13  all around.  I understood the testimony about omnibus wallets

14  on the blockchain with respect to crypto.  I don't understand

15  whether this has anything to do with fiat deposits or holdings.

16  And I didn't take the testimony as really addressing that at

17  all.

18         Okay.  Anything else before we get started?

19         MR. COHEN:  Yes, your Honor.  Just two things,

20  briefly.

21         We understand the Court's ruling.  For record

22  purposes, we'd like a standing objection to use of this

23  transcript along the lines that I said before, either——

24         THE COURT:  There's no provision in the Federal Rules

25  of Evidence for standing objections.  You've made your point.

1    I understand, obviously, that in every criminal case the

2    defense always has their eye on the Court of Appeals against

3    the possibility there's a conviction.  Just do what you think

4    you have to do.

5              MR. COHEN:  Well, what I'm responding to, your Honor,

6    if I might, is counsel said that we didn't make a categorical

7    objection before the hearing to topics we didn't know would be

8    covered because we would have thought they were improper.

9              THE COURT:  Mr. Cohen, that's the ruling.

10             MR. COHEN:  Thank you, your Honor.

11             THE COURT:  All right?  Okay.  Anything else?

12             MS. SASSOON:  No.

13             THE COURT:  Okay.  Let's get the defendant on the

14    stand and then, once he's situated, we'll get the jury.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

```
 1                     (Jury present)

 2              THE COURT:  Well, good morning, everybody.  I hope

 3    we're all refreshed.

 4              Call your next witness, please, Mr. Cohen.

 5              MS. SASSOON:  Your Honor, just the instruction to the

 6    jury, if you don't mind.

 7              THE COURT:  Thank you very much.

 8              Members of the jury, I just want to remind you of

 9    something I said quite a few weeks ago at this point——namely,

10    that there should be no contact whatever between anybody on the

11    jury and any lawyers.  I've reminded the lawyers of this also.

12    And that includes anything as simple as saying "good morning"

13    on the street or in an elevator or anything like that.  If you

14    happen to encounter a lawyer, maybe somebody who's sitting

15    4 feet away from you, somewhere and they ignore your existence,

16    they're not being rude.  They're being extremely careful.  So

17    don't hold it against anybody on either side, please.

18              Okay.  Your next witness.

19              MR. COHEN:  Thank you, your Honor.  The defense calls

20    Sam Bankman-Fried.

21              THE DEPUTY CLERK:  Mr. Bankman-Fried, would you please

22    rise and raise your right hand.

23              (Witness sworn)

24              THE DEPUTY CLERK:  Thank you.  Please be seated.

25
```

1    SAM BANKMAN-FRIED,

2         the Defendant,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. COHEN:

6    Q.  Good morning, Mr. Bankman-Fried.

7    A.  Good morning.

8    Q.  We've heard a lot about FTX over the last several weeks.

9    When did you found it?

10   A.  2019.

11   Q.  Who did you found it with?

12   A.  Gary Wang.

13   Q.  What did FTX stand for?

14   A.  Futures Exchange.  The F and the T both come from the word

15   "futures."

16   Q.  What was your vision for FTX when you founded it?

17   A.  We thought that we might be able to build the best product

18   on the market, an exchange that would combine the elements that

19   we thought were best from traditional financial products with

20   the elements we thought were best from the big crypto

21   ecosystem, that it could move the——move the ecosystem forward.

22   Q.  Did it turn out that way?

23   A.  No, it turned out basically the opposite of that.  A lot of

24   people got hurt——customers, employees——and the company ended up

25   in bankruptcy.

1    Q.   Did you defraud anyone?

2    A.   No, I did not.

3    Q.   Did you take customer funds?

4    A.   No.

5    Q.   We're going to talk in detail about what happened at FTX,

6    but can you tell us big picture.

7    A.   Yeah.  At a high level, there are multiple different types

8    of exchanges.  There are spot exchanges, which is where a

9    customer deposits a hundred dollars to buy a hundred dollars of

10   Bitcoin, or hundred dollars of Ethereum.  And there are margin

11   exchanges.  On margin exchanges, customers might deposit a

12   hundred dollars to buy $500 of Bitcoin or to sell $200 of

13   Bitcoin that they don't have, to borrow; customers might also

14   deposit a hundred dollars to withdraw $50 of Bitcoin that they

15   don't have, going negative in Bitcoin.  FTX was predominantly a

16   margin exchange.  The vast majority of activity happened on

17   margin on FTX.  When you have a margin exchange, you know, you

18   can think of it in some ways like a mortgage.  You know, if you

19   have a hundred-thousand-dollar house, you might take out a

20   $10,000 mortgage against that.  That would be the equivalent

21   of, you know, having a deposit of some number of Bitcoins,

22   withdrawing dollars against that.  And the biggest risk for

23   margin exchanges in general, and for FTX, is what happens if

24   one of those is threatening to go bad; that is to say—

25            MS. SASSOON:  Objection, your Honor.  Narrative.

```
 1              THE COURT:  Yes.  Ask another question, please.

 2   Q.  Mr. Bankman-Fried, did you make any mistakes along the way?

 3   A.  Yes, I made a number of small mistakes and a number of

 4   larger mistakes.  By far the biggest mistake was we did not

 5   have a dedicated risk management team, we didn't have a chief

 6   risk officer.  We had a number of people who were involved to

 7   some extent in managing risk, but no one dedicated to it, and

 8   there were significant oversights.

 9   Q.  Let me talk a bit about your background, sir.  Where did

10   you grow up?

11   A.  I grew up in Palo Alto.

12   Q.  And did you go to college?

13   A.  I went to MIT.

14   Q.  Okay.  What did you study there?

15   A.  Physics.

16   Q.  What years did you go to college?

17   A.  2010 to 2014.

18   Q.  Okay.  And where did you live there?

19   A.  I lived at it was called an independent living group called

20   Epsilon Theta.

21   Q.  Who did you live with in that house?

22   A.  There were about 20 of us living there, including Gary Wang

23   and Adam Yedidia, and others who I'd come to work with later.

24   Q.  Had you met Gary Wang before that?

25   A.  I met Gary in high school when we went to the same math
```

1    summer camp.

2    Q.   How long have you known Gary Wang?

3    A.   I guess about 15 years at this point.

4    Q.   Okay.  And how would you briefly describe the Epsilon Theta

5    House?

6    A.   It was—it was sort of a house that was coed, nerdy, and

7    dry.  It was transients living in a house, lots of board games,

8    no drinking, and it's, you know—formed a lot of friendships

9    there.

10   Q.   When did you graduate from MIT?

11   A.   2014.

12   Q.   And where did you work after that?

13   A.   The summer after my junior year of college, I interned at

14   Jane Street Capital, which is a quant trading firm on Wall

15   Street, and then when I graduated, I went to work there full

16   time.

17   Q.   Okay.  You said Jane Street was a quant trading firm.

18   Could you explain that to the jury, please.

19   A.   Yeah, it's a term that it can mean a lot of things in

20   different contexts.  For Jane Street in particular, it was

21   neither a high-frequency trading firm—a firm that made money

22   trying to send orders nanoseconds before other firms—it also

23   wasn't a discretionary firm that would take a long position on

24   Apple for a year if it thought Apple was a good company.  It

25   was somewhere between.  And the core thing that it did was

1   arbitrage.

2   Q.   What is arbitrage?

3   A.   Briefly, arbitrage is trying to buy low and sell high,

4   ideally at the same time.  So if you could buy a share of Apple

5   for a hundred dollars and simultaneously sell it somewhere else

6   for a hundred dollars and 3 cents, you would make 3 cents of

7   profit on that, with—with very little risk.

8   Q.   Just a bit more of terminology.  You used the phrase

9   "long."  Can you describe for the jury what it means to use

10  "long" and "short" in trading.

11  A.   Sorry.  Yeah.  They effectively mean buy and sell.  So if

12  you went long Bitcoin, that would mean you're buying Bitcoins;

13  if you went short Bitcoin, that meant you were selling, and in

14  fact selling more than you had, so that you ended up owing

15  Bitcoins.

16  Q.   During your—what was your job at Jane Street?  What was

17  your title?

18  A.   I was a trader.

19  Q.   Okay.  And in the course of your duties at Jane Street, did

20  you interact with prime brokers?

21  A.   Yeah, frequently.

22  Q.   What were they?

23  A.   Prime brokers—so a traditional broker, a place like

24  E*Trade or Schwab, is where an individual customer might go to

25  buy or sell stocks.  Prime brokers are sort of souped-up

1   versions of that for institutional trading firms.  So when most

2   trading firms would connect to trade stocks, rather than

3   trading directly on an exchange, they would go through what's

4   called a prime broker.  The prime broker would give them credit

5   in margin and interface between them and the exchanges.

6   Q.  Did you receive training at Jane Street?

7   A.  Yeah.  On compliance and a number of other topics.

8   Q.  Okay.  Did you ever hear the phrase "front running"?

9   A.  Yeah.  It came up a lot.

10  Q.  Tell the jury what "front running" meant to you.

11  A.  "Front running" meant effectively a concern of a market

12  practice where one participant would be about to send an order

13  to buy something; another customer would learn one way or

14  another that that first customer was about to do that trade,

15  and race in to do that trade before them, thus buying up the

16  asset when it was cheaper and then maybe even selling it back

17  to that first customer when their order was finally processed.

18  Q.  What, if anything, did Jane Street train you on with regard

19  to front running?

20  A.  Not to do it.

21  Q.  Okay.  During that period did you ever hear the phrase *"The*

22  *New York Times* test"?

23  A.  Yeah.  It came up a fair bit at Jane Street.

24  Q.  At Jane Street.  Can you describe for the jury what you

25  meant by that.

1  A.  Yeah.  I understood it to be a term for a test where

2  basically anything that you wrote down, there is some chance it

3  would end up on the front page of *The New York Times*, and so if

4  you were going to write something down, you should make sure

5  that you gave sufficient context for it, that you were clear

6  about exactly what you meant, because a lot of innocuous things

7  can look pretty bad out of context and there are lots of

8  examples of people getting burned by that.

9  Q.  Now I believe you said you were a trader at Jane Street.

10  A.  Yup.

11  Q.  Did you work for a particular desk?  And I'm going to ask

12  you to describe what a desk is, so two questions.

13  A.  I worked for the international ETF desk.

14  Q.  First tell us what a desk was.  We know what a desk is,

15  but——

16  A.  Right.  A desk really is——20 desks put together was one

17  bigger desk.  A desk, it was a group.  So it was a name for a

18  team at Jane Street that traded a particular type of product.

19  So there was a desk of, you know, about 20 people that traded

20  US stocks; there is a group that traded foreign stocks; a group

21  that traded commodities.  I was on a group that traded what are

22  called international ETFs.

23  Q.  What's an ETF?

24  A.  It stands——excuse me——it stands for exchange traded fund.

25  You can think of it like a mutual fund that is a thing you

1    could invest in which itself buys a little bit of a lot of

2    different companies to make it easy to diversify.  ETFs were

3    mutual funds which you could also trade on an exchange like you

4    could trade the stocks themselves.

5    Q.  Okay.  What was the size of the trades you worked on at

6    Jane Street?

7    A.  They——they varied.  The individual trades could be as small

8    as a hundred dollars or as large as a billion dollars, and I

9    managed roughly tens of billions of dollars a day of trading.

10   Q.  And was Jane Street——you said they were engaging in

11   arbitrage?

12   A.  Yeah.

13   Q.  Can you give us a brief example from your time there.

14   A.  Yeah.  So there were a lot of different types of examples.

15   The one that came up most frequently is with ETFs.  So in

16   theory, if you have a fund which is composed of one share of

17   500 different companies, it should be priced at the same value

18   as those companies added up.  You could effectively take one

19   share of each of those, do what's called a creation, turn it

20   into ETF, or it could turn ETF back into what it actually

21   owned.  And a lot of what we did was look for cases where,

22   especially when markets were going crazy, when there's large

23   volatile moves and it was very difficult for people to get good

24   prices on things, where we would figure out, you know, what

25   should these products be worth right now, given whatever the

1  things that they own are trading at and, you know, find ways to

2  buy——buy low and sell high, effectively.

3  Q.  How long did you work at Jane Street for?

4  A.  About three and a half years.

5  Q.  Did you enjoy your time there?

6  A.  Very much.  They were very good to me.  I learned a lot

7  there.  They did a really good combination, I felt, of sort of

8  giving responsibility to people while also giving mentorship.

9  Q.  Did anyone work at Jane Street who later worked beside you,

10  who later worked for Alameda or FTX?

11  A.  Yeah.  Caroline Ellison, who was a trader and then later

12  CEO at Alameda, was a trader at Jane Street; Adam Yedidia, who

13  was a developer at FTX, was an intern at Jane Street when I was

14  there; and a few other people at various points of the

15  company's history had worked at Jane Street at various points.

16  Q.  Mr. Yedidia was one of the people you lived with at MIT?

17  A.  That's correct.

18  Q.  Now after your time at Jane Street did there come a time

19  when you started a company called Alameda Research?

20  A.  Yeah, in the fall of 2017.

21  Q.  Why did you start it?

22  A.  This was——this was when crypto was starting to become

23  really publicly visible for the first time, at least in the

24  circles I was in.  You'd walk down the street in the fall of

25  2017, you'd see two people excitedly talking about something,

1    there was a pretty decent chance that thing was Bitcoin, that

2    they had a friend who had a friend who had tried buying Bitcoin

3    for the first time.  And in terms of pricing, Bitcoin went

4    from, you know, $1,000 to $10,000 in a few-month period, in

5    late 2017.  There was a ton of excitement, a ton of demand, and

6    there was very little infrastructure in the space.  Large

7    trading firms like Jane Street weren't trading cryptocurrencies

8    yet, the banks weren't involved, the brokers weren't involved.

9    It seemed like a place where there very well may have been a

10   pretty big demand for basically an arbitrage provider.

11   Q.  When you first started to get into the crypto world, what

12   did you know about it?

13   A.  Basically nothing.  I knew that a Bitcoin was digital.  I

14   knew there was no physical thing, that it was on computers, and

15   that you could trade it on websites called cryptocurrency

16   exchanges.  I knew that there were other cryptocurrencies, like

17   Ethereum and XRP.  And I had absolutely no idea how they

18   worked, what the technology behind them was, what the

19   difference was between different cryptocurrencies.  I just knew

20   they were things you could trade.

21   Q.  When you established Alameda, what was your goal for the

22   company from a business model?

23   A.  At a high level, doing arbitrage, something similar to what

24   Jane Street did, but in the new market.  In particular, there

25   were a lot of places you could buy and sell cryptocurrencies,

1    called exchanges. Coinbase, Binance are two well-known

2    examples. And in late 2017, when I started looking into it, it

3    appeared, from my initial overview of public data, that there

4    might be really, really large arbitrage opportunities

5    available.

6    Q. Okay. Maybe if you could explain that for the jury. What

7    were you seeing? First of all, what public data were you

8    looking at and then what were you seeing?

9    A. Yeah. So I was looking at websites like coinmarketcap.com.

10   That is one of the two premier placing sources for

11   cryptocurrencies, CoinGecko being the other one. And all it

12   did was basically take data from all the various

13   cryptocurrency, you know, exchanges and tokens and summarize it

14   together. And what I saw, it looked like there were some

15   places where you could buy a Bitcoin for $10,000, and others

16   where you could sell it for $11,000, at the same time. That's

17   a 10 percent difference in price. And for context, at Jane

18   Street, if we could do a trade that was 1 percent good, that

19   was unheard of. We never found a trade even 1 percent good.

20   1 percent of 1 percent was a typical trade. So that would be

21   something you could buy for a hundred dollars and 3 cents and

22   sell for $100.04 at the same time, making 1 penny on that

23   trade. It looked like the arbitrage opportunities in Bitcoin

24   might be a thousand times as large. It was—it was so large, I

25   wasn't sure I even believed it.

1    Q.  And where did Alameda's original funding come from?

2    A.  The very original funding was the money that I had left

3    over after my work at Jane Street, and after that, we cobbled

4    together what we could, mostly lines of credit borrows from

5    people, originally from friends that we knew.

6    Q.  Did you also borrow from third-party lenders?

7    A.  Yeah.  Over time we—we started to know more and more

8    third-party lenders.  These were generally companies whose

9    businesses were borrowing and lending cryptocurrencies.

10   Genesis, Voyager, Celsius, BlockFi, those are four examples

11   that Alameda had borrowing relationships with.  And that

12   ultimately was where the majority of its capital came from.

13   Q.  And how did borrowing from third parties compare, if at

14   all, to what went on at Jane Street?

15   A.  It was fairly similar.  Jane Street had been around,

16   obviously, a long time.  It was—well, a lot longer than

17   Alameda, at least.  They'd been around for about 20 years.

18   Alameda had been around for about 20 months at the time that

19   we're talking about.  So Jane Street had built up a large

20   amount of internal capital, just profits from its trading, but

21   in addition to that, it had borrows, lines of credit from

22   financial institutions.  It was a similar story to Alameda,

23   although we had had far less time to build up the profit

24   portion of that.

25   Q.  Where was Alameda's first office?

1   A.   The first office, it was in——it was a Airbnb that we rented

2   out in North Berkeley, California.

3   Q.   Can you describe the layout of that Airbnb.

4   A.   Yeah.  So it was listed as a two-bedroom Airbnb.  There

5   were three of us, but it had an attic, so that seemed like

6   three bedrooms to us.  There was a living room which was a

7   couch, so a fourth bedroom.  And then the rest of the area

8   there was the office.  We packed that with desks and computers,

9   and mostly boxes from Amazon.  Eventually we had to start

10  dealing with the cardboard box problem pretty soon.  And after

11  overflowing that apartment, after a few months, we got a more

12  traditional office space in downtown Berkeley.

13  Q.   Okay.  I want to come back to that in a moment.  But first

14  let me ask you:  Why did you name the company Alameda Research?

15  A.   Yeah.  So Alameda is——Berkeley, California, is in Alameda

16  County.  I'm not very good at naming things.  I didn't come up

17  with FTX's name and could not come up with anything better than

18  that.  Not that I thought it was that amazing of a name in the

19  first place.  But effectively, we wanted to be under the radar

20  at that point in time.  I didn't want to call it Sam's Crypto

21  Trading Firm or anything like that.  We——there are a lot of

22  competitors and people who we didn't particularly want to know

23  what we were building out because they would race to do it.

24  "Research" was a sort of generic word, which filled out the

25  company name.  And that was——it was far better than the

1   internal name that we had at that point, which was Wireless

2   Mouse.

3   Q.   Now let's come back to the early days in the Airbnb.  Who

4   else worked there besides you, Mr. Bankman-Fried?

5   A.   So there was myself, there was Gary Wang, and a host of

6   other people, some from very early on, some who came later, and

7   many of whom were not there by later in Alameda's history.

8   Q.   And why did you ask Gary Wang to join?

9   A.   I had known him, I mean, from math camp, but chiefly from

10  MIT.  He was a friend of mine.  I trusted and respected him.

11  He was a brilliant developer—developer meaning software coder.

12  I'm not much of a programmer.  My plan was to sort of lead the

13  trading operation, but we needed someone to build out all the

14  computer systems that we would be using.  Our plan was to trade

15  on, you know, tens of exchanges, hundreds of assets, 24/7, and

16  I, you know—I only have two hands.  You need thousands of

17  hands to do that.  So we were going to program computers to

18  actually manage a lot of that.  And, you know, this was, you

19  know, a few 25-year-olds who had no history starting a company

20  with—a startup without much of a long-term plan yet trading

21  in—

22            MS. SASSOON:  Your Honor, 611.

23            THE COURT:  Pardon me?

24            MS. SASSOON:  611.  Narrative.

25            THE COURT:  Sustained.  Ask a question, counselor.

1    Q.  As between you and Gary, what roles did you each play at

2    Alameda?

3    A.  Yeah.  I was originally leading the trading operation.

4    That meant basically doing trades myself, coming up with

5    parameters for computer trading systems and managing other

6    traders.  Gary was leading the technological efforts, basically

7    building out the computer systems themselves.

8    Q.  And the other people you hired in the early days, how did

9    you find them?

10   A.  They were all friends or friends of friends.  Those were

11   the people who we were able to find early on.

12   Q.  Okay.  How were you compensated at the beginning?

13   A.  We——I had a $200,000-a-year salary, I believe.  I think

14   that was what most of us had.

15   Q.  Did you end up hiring anyone else from Jane Street?

16   A.  Yeah.  A few months in, we hired Caroline Ellison.

17   Q.  Now did there come a time that you hired Nishad Singh?

18   A.  Yeah.  That was in between when we started and when we

19   hired Caroline, so it was after a month or so.

20   Q.  And how did you know him?

21   A.  He was a close friend of my brother's from high school.  I

22   had known him, although not as well, in high school.  He had

23   been a software developer at Facebook and was interested in

24   joining.

25   Q.  Okay.  Coming back to Ms. Ellison, about when did she join

 1   the company?

 2   A.  She joined in—right around late February or early March of

 3   2018.

 4   Q.  And after she joined, did anything happen?

 5   A.  Yeah.  There was a split, a schism, in the company.  There

 6   were sharp divides between two groups of the company, and

 7   ultimately one of them resigned and took most of the capital

 8   with it.

 9   Q.  Did there come a time when you spoke to Ms. Ellison about

10   what happened?

11   A.  Yeah, I did.

12   Q.  And what did you say?

13            MS. SASSOON:  Objection.

14            THE COURT:  Hearsay?

15            MS. SASSOON:  Yes.

16            THE COURT:  Are you actually asking what he said?

17            MR. COHEN:  What he said, yeah.

18            THE COURT:  All right.  Mr. Bankman-Fried, you may

19   answer to the extent of saying what you said to Ms. Ellison.

20            THE WITNESS:  Understood.

21   A.  I—as context, the problems had started emerging after we

22   had given an offer to her, but I believe be—

23            MS. SASSOON:  Objection.

24            THE COURT:  Sustained.  Answer stricken.  Jury will

25   disregard it.

1          THE WITNESS:  Okay.

2   Q.  What did you say to Ms. Ellison?

3   A.  I——I said that I was——I apologized for not telling her

4   earlier when problems had started bubbling up that I suspected

5   that there might be bigger problems.

6   Q.  Okay.  Now after this schism and half of the company left,

7   what happened to Alameda's performance?

8   A.  It did——I felt like it did quite well after that.  We had

9   addressed the——the problems that had led to the schism.  We had

10  dozens of weeks of profit in a row.  We were making between 50

11  and a hundred percent returns annualized.

12  Q.  Now you started in Berkeley.  Did there come a time when

13  you——when the company moved?

14  A.  Yeah.  In beginning and late 2018, it started transitioning

15  to Hong Kong as headquarters.

16  Q.  Why did you move the company to Hong Kong?

17  A.  I had ended up there almost accidentally, going to a

18  conference.  While there, I had, in a one-week period, more

19  useful meetings than I'd had in the year prior in California.

20  I ended up canceling my return ticket and renting out a WeWork

21  in Hong Kong, and I felt like there were really large business

22  expansion opportunities for Alameda there.

23  Q.  The conference you went to, what was the topic of the

24  conference?

25  A.  It was a general——it was called the Sora Summit.  It was a

1    general crypto conference that many of the industry leaders

2    from a lot of different parts of the industry were there.

3    Q.  And did you take space in Hong Kong?

4    A.  Yeah.  So we, you know, started out at a WeWork, which was

5    I guess something like 30 square feet or something.  We could

6    fit maybe two or three desks in there and no more.  And it was

7    myself, one or two other people, eventually grew, and we rented

8    out a larger office.

9    Q.  Now I think you mentioned earlier that you began FTX, you

10   founded FTX in 2019 with Gary; is that correct?

11   A.  Yeah, that's correct.

12   Q.  What was your role in the founding; what was Gary's role?

13   A.  So after—after a week or so in Hong Kong, I'd had

14   conversations with a few other people who I'd met there about

15   the possibility of us starting a crypto exchange.  It's

16   something that we'd wanted to do, but that we'd had no idea at

17   all how we would get customers.  I still had no real idea, but

18   at least I'd started to meet other people from the industry,

19   and I'd also met companies that were potentially interested in

20   purchasing a crypto derivatives exchange, if we were to create

21   one.  So I called up Gary, he flew out to Hong Kong, and Gary

22   started building out the technical systems for FTX, and I

23   talked to him about the design philosophy and the goals.

24   Q.  Did there come a time that Nishad joined you?

25   A.  Yeah.  Nishad had been working at Alameda for I guess about

1    a year and a half at that point, and over the course of 2018,

2    he transitioned primarily out of Alameda into becoming the——or

3    sorry, 2019, rather——into becoming a developer at FTX instead.

4    Q.  Okay.  Did you supervise Gary?

5    A.  I——I was his supervisor in that ultimately I was the CEO

6    and ultimately I had authority, and I also had a number of

7    discussions with him about the goals of the systems that he was

8    building.  On the other hand, I wasn't much of a programmer.  I

9    didn't write any of FTX's code or read any of FTX's code.  So I

10   didn't supervise the direct work that he was doing.  And he and

11   Nishad were both authorized to make decisions on behalf of the

12   company without consulting with me, though they often would

13   consult with me about it.

14            MS. SASSOON:  Objection.

15            THE COURT:  What's the objection?

16            MS. SASSOON:  Testimony about Nishad is not

17   responsive.

18            THE COURT:  I'm sorry?

19            MS. SASSOON:  Testimony became unresponsive to the

20   questions, beginning with discussions about Nishad.

21            MR. COHEN:  Background, your Honor.

22            THE COURT:  Overruled.

23   BY MR. COHEN:

24   Q.  At this time, Mr. Bankman-Fried, in 2019 or so, about how

25   many crypto exchanges were there in the market?

1   A.   I mean, in total, there were hundreds or thousands, but

2   there were 10 or so that had most of the volume and maybe 50 or

3   so that had any appreciable activity.

4   Q.   So why start another one?

5   A.   We felt like, especially for the margin exchanges, there

6   was a really big hole in the space.  At the time we felt like

7   the design philosophies of most of the crypto derivatives or

8   margin exchanges were clunky and didn't make a lot of sense if

9   you wanted to trade, and when we tried trading on the leading

10  margin exchanges for crypto at the time, there were hundreds of

11  different wallets that you had to manage for a single account.

12  If you wanted to trade Bitcoin against dollars, you would have

13  to first use your dollars to buy physical Bitcoins, move them

14  into your Bitcoin-versus-dollar spot margin trading wallet, use

15  that as collateral.  If you then wanted to go trade Ethereum

16  against dollars, you'd have to move those Bitcoins out, sell

17  them for spot Ethereum, move your Ethereum into

18  Ethereum-versus-dollars trading wallet and then do that trade.

19  It was a many-step process every time you wanted to do a

20  different trade.

21  Q.   And were you trying to address that at FTX?

22  A.   Yeah, that was one of the core things that we were trying

23  to do differently than how most other crypto margin exchanges

24  were built at the time.

25  Q.   Let me ask you about another topic.  Have you ever heard

1    the phrase "cross-margining"?

2    A.   Yes.

3    Q.   What is that?

4    A.   That is effectively the opposite of what I just described.

5    That's——cross-margining is what we were intending to build and

6    what we did build.  The theory with cross-margining——at least

7    what we meant by it——was that you could deposit any one of a

8    number of assets as collateral and then you could trade any

9    market, or at least any——a number of products.  With that, you

10   could buy, you could sell, you could deposit, you could

11   withdraw, and all the exchange monitored——or at least most of

12   what it monitored was just that on net, your account's value

13   was sufficient.  You could go negative in any particular asset

14   as long as you had any other reasonable asset as security for

15   the borrowing that you did, rather than having what's called

16   isolated margin, where you had a completely separate system for

17   every single trade that you wanted to do.

18   Q.   So if a customer had 20 subaccounts——

19   A.   Yup.

20   Q.   ——and assets in each of them, how would that work for

21   cross-margining?

22   A.   So for cross-margining, if you had different subaccounts,

23   you could isolate those from each other if you wanted to, but

24   if you had 20 different assets in your account, FTX would

25   basically just add up the total value of them, add up the total

1   value of all of your borrows, of all of your liabilities, and

2   ensure that you had more assets than liabilities.

3   Q.   Did you ever hear of the term "clawbacks"?

4   A.   Yes.

5   Q.   What did that mean to you?

6   A.   So the risk associated with a margin system in general is

7   what happens if an account ends up with a negative overall

8   value, which is to say, what happens if the value of its

9   liabilities become greater than the value of its assets.   In

10  that case, you know, we could try to reach out to that——that

11  user and request that they send us more assets that might or

12  might not work, depending on who the user was.   We couldn't

13  rely on that for most users.   And absent that, there would then

14  be, you know, a net debt that that user had that had to be

15  covered by someone.   The exchange——FTX in our case——would try

16  to cover it, but if we couldn't, the risk was that it would

17  have to be socialized, what's called socialized loss or

18  clawback to many or all of the users on the platform where they

19  would cover the loss.

20  Q.   Can you explain that, the last part, socialized loss.

21  A.   Yeah.   So let's say that there were an account that had a

22  thousand dollars of assets and was borrowing $500 against those

23  assets.   Maybe it had deposited a thousand dollars of Bitcoin

24  and withdrawn 500 US dollars.   If Bitcoin fell in value by

25  50 percent, that would then be $500 worth of Bitcoin left in

1    the account.  If it fell by another 50 percent, there would be

2    $250 of the original thousand of assets, just because the

3    assets had fallen.  But still that account would have borrowed

4    $500.  So in total, the account would be worth negative.  It

5    would be worth negative $250, you know, the $250 of assets

6    minus the $500 of—of borrowing.  Another way to put that is we

7    wouldn't be able to sell those Bitcoins off for enough dollars

8    to cover that account's debts.  That then is, you know,

9    effectively negative $250 in net value that someone had to

10   cover, and if that client wouldn't deposit more and if FTX

11   couldn't cover it itself, then we would have to basically claw

12   back assets collateral from other users on the system, $250

13   worth in total, in order to true up that account that had gone

14   negative.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1   Q.  Now, during your time at Alameda, before you founded FTX, I

2   think you mentioned you traded on other exchanges, is that

3   correct?

4   A.  Yeah, that's correct.

5   Q.  Did they provide for clawbacks?

6   A.  Yes.

7   Q.  What is futures trading?

8   A.  So futures trading is -- it's another form of market or

9   leverage trading where instead of, for instance, trading an

10  actual Bitcoin, instead of depositing some number, you know, a

11  hundred dollars and buying 500 dollars of Bitcoins, you could

12  buy what's called a futures contract on Bitcoin.  You can think

13  of it as something that will eventually turn into however much

14  a Bitcoin is worth.  So if you bought a December Bitcoin

15  future, then in December that would turn -- and in December a

16  Bitcoin was worth $20,000, that future would be worth $20,000

17  at the end of the day.  And futures trading generally happened

18  with leverage, so you might deposit $100 of collateral and then

19  buy or sell $500 of Bitcoin futures and gain or lose, depending

20  on whether Bitcoin went up or down in price.

21  Q.  Last term.  Have you ever heard the term spot margin?

22  A.  Yes.

23  Q.  What was that?

24  A.  That's what I had been referring to as margin.  It's

25  basically when you have spot assets rather than futures assets,

1   so these are actual Bitcoins.  But where -- rather than being

2   fully collateralized and fully funded, you are borrowing.  So

3   that was what was happening.  If you deposited $100 in order to

4   buy $500 of Bitcoin, that would be spot margin trading.

5   Q.  From time to time during your time as CEO of FTX, would you

6   prepare something called explainers?

7   A.  Yeah.

8   Q.  What were they?

9   A.  These were pages that we posted on our website, generally

10  on Zendesk, which is sort of our customer support portal to

11  explain to customers how parts of the exchange worked.

12          MR. COHEN:  Can we call up Defendant's Exhibit 978 for

13  the defendant only for identification entitled spot-margin

14  trading explainer.

15  Q.  Can you go through this quickly, Mr. Bankman-Fried, and

16  tell us what it is.

17  A.  Yeah.

18          MS. SASSOON:  Objection.  I don't believe this is in

19  evidence.

20          THE COURT:  That's correct.

21          MR. COHEN:  That's right.  I am trying to lay a

22  foundation, your Honor.

23          MS. SASSOON:  Your Honor, he just asked him to explain

24  to the jury what this document is.

25          MR. COHEN:  Let me rephrase.  I didn't mean to say

1     that, your Honor.

2               THE COURT:  No harm, no foul.

3     Q.  Take a moment and go through it.

4               MR. COHEN:  Brian, if you need to scroll through it

5     for Mr. Bankman-Fried.

6     Q.  This question is only whether you recognize this document.

7     A.  Yes, I do.

8     Q.  What is it?

9     A.  This is the explainer page that we had written for

10    spot-margin trading for FTX and its customers.

11              MR. COHEN:  Your Honor, we offer DX-978 not for its

12    truth.

13              THE COURT:  Any objection?

14              MS. SASSOON:  One moment, your Honor.

15              It's not for its truth.  No objection, your Honor.

16              THE COURT:  It's received for the fact that such a

17    document existed, not for the truth of anything it said,

18    members of the jury.

19              (Defendant's Exhibit 978 received in evidence)

20              MR. COHEN:  We can take that down.

21              Can I publish it, your Honor?

22              THE COURT:  Yes.

23              MR. COHEN:  Let's publish it quickly.

24              The heading is spot-margin trading explainer.  I would

25    just like to go to one page.  I think it's the second page,

1    please, Brian.

2    Q.  Look at the top.  It says:  How does borrowing and lending

3    work.  You see that?

4    A.  Yup.

5    Q.  From time to time you would put out explainers about how

6    things in the market in the industry worked?

7    A.  That's correct.

8           MR. COHEN:  We can take that down.

9    Q.  Let's move forward, Mr. Bankman-Fried.

10          Did FTX have something called a risk engine?

11   A.  Yes.

12   Q.  Tell us what that was.

13   A.  The risk engine was basically a setup -- a system that

14   would attempt to monitor customer positions to watch to see if

15   any of them were in danger of becoming overall negative value

16   and, if so, would potentially learn about it and potentially

17   start to close down that position to prevent the risk of

18   losses.

19   Q.  How did the risk engine at FTX compare, if you know, with

20   what went on at other crypto exchanges?

21   A.  Yeah.  FTX's risk engine was, first of all, cross-margined.

22   Most other crypto exchanges at the time, as I understood it,

23   were not cross-margined.  So most others I understood to have a

24   separate risk engine effectively for every trade that you would

25   do, every market that you would do.

1        FTX has looked at users or accounts as a whole, just

2   looking at assets and liabilities overall, and it also had a

3   number of steps that were at least somewhat unique to FTX.  It

4   was mostly automated.  It would monitor markets 24/7.  And it

5   would close down positions if necessary.  It also had a

6   backstop liquidity provider system, which was something I

7   wasn't aware of other exchanges having at the time.

8   Q.  We will come to that in a moment.

9        I realize I meant to ask you --

10       MR. COHEN:  If we could call up just for the

11   witness --

12   Q.  Before we do that, in addition to explainers, from time to

13   time would you set forth your views about terms in the

14   industry?

15   A.  Yeah.

16   Q.  How would you do that?

17   A.  One of the ways was through blog posts that we would make.

18       MR. COHEN:  Just for the witness, if we could call up

19   DX-964 for identification.

20   Q.  If you could go through this and just tell us if you

21   identify the document, sir.

22   A.  Yes, I do.

23   Q.  What is this?

24   A.  This is a blog post that I had written early on in FTX's

25   history about clawbacks and FTX's approach to them.

1   Q.   Including the risk engine?

2   A.   Yes.

3           MR. COHEN:  We offer DX-964 not for its truth.

4           MS. SASSOON:  Objection, your Honor.

5           THE COURT:  Ground.

6           MS. SASSOON:  He just asked him earlier does this set

7   forth your views of the terms in the industry.  The defense

8   tried to admit this document -- perhaps better addressed at

9   sidebar, your Honor.

10          THE COURT:  All right.

11          (Continued on next page)

```
 1                      (At sidebar)

 2            MS. SASSOON:  Your Honor, it's a hearsay objection.

 3  The defense has not established a relevant nonhearsay purpose

 4  why offering it not for its truth has any relevance.

 5            THE COURT:  Mr. Cohen.

 6            MR. COHEN:  Sounds like a relevance objection.

 7            THE COURT:  Sounds like both.

 8            MR. COHEN:  Sure, your Honor.

 9            This is to rebut the evidence proffered by the

10  government that FTX was set up from the outset as a criminal

11  enterprise.  We are entitled to show that it was set up as a

12  real and legitimate business and that Mr. Bankman-Fried was

13  trying to educate his customers about things the like risk

14  engine and the liquidation engine.

15            THE COURT:  What is your support for the proposition

16  that the government is arguing that this was a criminal

17  enterprise from the beginning?

18            MR. COHEN:  The evidence they elicited from Mr. Wang

19  about encounters with Mr. Bankman-Fried in 2019 and 2020 where

20  he claims that he talked with Mr. Bankman-Fried and a trader

21  about the company being set up to take customer assets.  The

22  evidence --

23            THE COURT:  Being set up to what?

24            MR. COHEN:  To take customer assets, the encounter in

25  the hallway with the trader.
```

```
 1              THE COURT:  May I have a page reference to the
 2    transcript?
 3              MR. COHEN:  I don't have it with me.  I can get it for
 4    you, your Honor.
 5              THE COURT:  Please.
 6              MR. COHEN:  The evidence from Ms. Ellison implying
 7    that even at Alameda it was set up as a fraudulent operation
 8    and that early on, way before the events of June 2022 that we
 9    are all very familiar with, Mr. Bankman-Fried was essentially
10    running this as a fraud.
11              I think for the Court's consideration all I wanted to
12    do was put this in, read the title, and move on.  I am not
13    going to go through any of the terms.
14              MS. SASSOON:  May I respond, your Honor?
15              THE COURT:  If all you want to do is put it in and
16    read the title, then I'm reasonably convinced right now that it
17    is not relevant.
18              Go ahead.
19              MS. SASSOON:  I want to quit while I'm ahead.
20              THE COURT:  No.  Come on.
21              MS. SASSOON:  There is no RICO charge in this case.
22    It's a wire fraud.  As I understand it, including from
23    yesterday's hearing testimony, the defense actually doesn't
24    dispute a lot of these facts that, for example, Alameda was set
25    up to receive customer money.  They just dispute whether that
```

1          was criminal or not.

2                  To the extent that he wants to put this in to show

3          what Sam was saying to customers, there has been no foundation

4          that any customer saw this.  The one time that this document

5          came up, it was with Gary Wang who said he had never seen it

6          before.  I don't think that there is a foundation for that

7          purpose.

8                  MR. COHEN:  There is, your Honor.  To your Honor's

9          question, and I can hand you my copy if you'd like, there are

10         two paragraphs that I would like to call out but not spend a

11         lot of time on.  That's on the second page.  The bottom two

12         paragraphs where he talks --

13                 THE COURT:  I am going to send the jury out.  We will

14         take the morning break now.  I want to see the page references

15         to support your assertion.

16                 Unless you're conceding his assertion, the assertion

17         that this was -- your position is, this was all set up as a

18         fraud from the getgo.

19                 MR. COHEN:  The other thing, your Honor, to that, the

20         period of the conspiracy charged is 2019.  It's not 2022.  The

21         government is seeking to show that this was a fraudulent

22         enterprise from that --

23                 THE COURT:  When was that published?

24                 MR. COHEN:  This was published in 2019.  2020.  2020.

25                 MR. ROOS:  Judge, it's not just what it says and when.

1    It is that they are offering it clearly for its truth.  The

2    relevant purpose they are advancing is taking the document as a

3    stated fact to advance the truth.  I still have not heard a

4    relevant nonhearsay purpose.  They literally want to read his

5    musings.  For instance, the defendant posted a blog post that

6    said, I am not guilty.

7         THE COURT:  I am going to break now.  Somebody needs

8    to give me a copy of the document.  That's what we will do.

9         (In open court)

10        THE COURT:  Folks, we will take our morning break

11   early.  I'll see you in 15 minutes, and we will get this

12   resolved.

13        (Jury not present)

14        THE COURT:  I'll see counsel in five or six minutes.

15        (Recess)

16        THE COURT:  Mr. Cohen, again, what purpose is this

17   being offered for?

18        MR. COHEN:  Your Honor, this is being offered for the

19   purpose to show that this was put out on a blog of FTX in 2020

20   on the topic of the liquidation engine and clawbacks and that

21   FTX said on this blog that it would try to avoid or minimize

22   clawbacks, not that in fact it happened, but just again -- it

23   goes again, in our view, to the defendant's state of mind and

24   to rebut the evidence that I described at the sidebar.

25        THE COURT:  So far as the evidence you purportedly

1    described at the sidebar, what are the page references?

2           MR. COHEN:  Turns out, we have not been able to find

3    all of them, but the page reference I did find is the exchange

4    with the trader involving Mr. Wang, which is at 375.  The

5    sequence starts at line 4.  Goes for about a page.

6           THE COURT:  And concluding where, line 18?

7           MR. COHEN:  Yes, your Honor.

8           THE COURT:  Government, what do you have to say to

9    that?

10          MR. ROOS:  Starting with the last point, this says

11   that Mr. Wang had a conversation with the defendant in 2019

12   about Alameda having a negative balance.  How this blog post

13   from 2020 is a response to that is beyond me.  The blog post is

14   about comparing FTX's risk and liquidation system and its

15   history with clawbacks to one or more other exchanges, so it's

16   not responsive in any way to the question of whether there were

17   negative balances in 2019.  I don't know from where in this

18   portion of the transcript defense counsel is inferring the idea

19   that there is something of a sort of a grand conspiracy in 2019

20   to rebut.

21          The other points that they made were that this is

22   being offered to show that it was on the blog.  I think for

23   starters there are a few foundational questions relating to the

24   nonhearsay purpose there.

25          For one, the question that was posed to the witness

1    was whether or not he sometimes posted his views on the

2    Internet.  That is not necessarily a relevant purpose.  As I

3    mentioned at sidebar, of course a witness could post all sorts

4    of thoughts to the Internet.  That does not make them relevant

5    or provide a foundation for their relevancy.  In fact they

6    could post false exculpatories, they could post musings.  That

7    does not mean there is a relevant nonhearsay purpose,

8    particularly here where there is no evidence in the case that

9    any person who is relevant, that is, a customer or victim, saw

10   this.  And when defense counsel previously attempted to offer

11   this document through another witness, the witness said, I have

12   never seen this before and I did not know it existed.

13           I think there is a lack of a foundation to establish a

14   relevant nonhearsay purpose.  By the way, that's at page -- my

15   apologies.  Mr. Wang did say he saw this.  The Court just

16   sustained the admissibility objection to it.

17           On the question of state of mind, it's not clear how

18   the document is being offered for state of mind.  It's really

19   just being offered for the truthful assertion of various facts

20   in there.  To give your Honor some examples, starting with the

21   title, which defense counsel called out, the title is how we

22   significantly reduce clawbacks.  This is being offered for its

23   truth.  Same with, FTX has in fact never had a clawback.

24   Again, a truthful statement.  The defense of course can have

25   the defendant testify to these facts, but they can't sort of --

1    if they prefer the way it is written in the blog post,

2    introduce the blog post for its truth and that seems to be

3    what's happening here.

4              THE COURT:  Last shot, Mr. Cohen.

5              MR. COHEN:  Yes, your Honor.

6              Taking the last point first, we are not offering it to

7    show that the truth of the statement in the document actually

8    came to pass.  The Court has received a number of documents

9    from both sides during this case on that ground.

10             As to foundation, I'd be happy to ask additional

11   questions, but this was not a personal blog by the defendant,

12   but it was on the FTX blog and put out to customers.

13             As for the --

14             THE COURT:  And the difference it makes in this case

15   is what?  The difference in this case it makes is what?

16             MR. COHEN:  I'm just responding, your Honor, to

17   counsel's distinction, which he seemed to think was relevant,

18   that it would be treated differently if it was a personal blog

19   versus something put out by the company.  The answer was put

20   out by the company.  That's what counsel just said.

21             The last point, your Honor, with respect, I don't

22   think the government is offering this passage with Mr. Wang on

23   the limited ground it now claims.  I believe from both the

24   government's opening statement and questioning of other

25   witnesses, it is going to seek to offer this certainly in its

1    closing as proof that FTX was set up as a fraudulent enterprise

2    from the beginning.

3            THE COURT:  The reason we took the break, in part, was

4    because you made that assertion at the sidebar, and I asked you

5    to give me the reference that supported your claim that that's

6    the government's position.  You drew my attention to page 375.

7    I have read it.  It's not supportive of your position.  I don't

8    know what the government is going to argue at the end of this

9    case any more than you do.  The objection is sustained.

10           Let's get the jury.  Let's get the witness back on the

11   stand first.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  The record will reflect that the defendant

3   and the jurors all are present.

4        You may continue, counsel.

5        MR. COHEN:  Thank you, your Honor.

6   BY MR. COHEN:

7   Q.  Mr. Bankman-Fried, when we broke you were talking about

8   some of the early days at FTX.  You mentioned you were located

9   in Hong Kong?

10  A.  Yes.

11  Q.  And that you had picked Hong Kong because of the crypto

12  conference you went to?

13  A.  Yeah.

14  Q.  Were there any other reasons you found Hong Kong attractive

15  at that time?

16  A.  Yes.  There were a few primary reasons.  One, it was -- it

17  seemed to be the global epicenter of crypto.  It was far easier

18  to meet with counterparties there and it was far easier to get

19  business done if you can have face-to-face meetings with

20  people.  There were problems that Alameda had been having on

21  exchange accounts of its for months that got resolved within

22  days of me being there.

23        The second is that it had a much more -- a much

24  clearer regulatory environment for cryptocurrency exchanges at

25  the time.

1          So as we thought about building out FTX, that was

2     something that we were far more able to do in Hong Kong.

3     Q.  Why was having a more built-out regulatory instruction --

4     structure important to you?

5     A.  It was important for multiple reasons.  One was, we thought

6     it was appropriate for there to be regulatory oversight of

7     ourselves and the rest of the exchanges, and the second is

8     that, frankly, whether or not we wanted it, we felt like there

9     was going to be regulatory oversight that regulators were going

10    to be involved, licenses were going to be required, and we

11    didn't want to be on the wrong end of that.

12    Q.  When you first began to build the FTX exchange, what was

13    your plan for it?

14    A.  The original plan was most likely to sell it to an existing

15    cryptocurrency spot exchange that didn't have an associated

16    margin exchange.  Binance in particular was the first one that

17    we talked about with this.

18    Q.  Why weren't you thinking of running it?

19    A.  The biggest reason was, I had no idea how we would get

20    customers if we were to run it ourselves.

21    Q.  What made you change your mind?

22    A.  A few reasons.

23          One, Binance ended up, instead of working with us,

24    working with one of their internal teams to build out a futures

25    and margin exchange.

1          But the other was, the more that we talked about it,

2     the more that I thought about it, I became convinced of a few

3     things.

4          One was that I felt like we would be able to do a

5     better job of growing it than a company that we sold it to.

6          Second was I, as I met more and more people in Hong

7     Kong, still didn't know exactly how we would get customers, but

8     it felt less hopeless.  It felt like maybe we could figure the

9     it out.

10          Third was, I still thought we probably wouldn't figure

11     it out.  I thought there is maybe a 20 percent chance of

12     success and 80 percent chance that we would fail to launch or,

13     rather, that we'd have launched but failed to ever attract any

14     customers and just closed down after a few months.  But even

15     that 20 percent chance was a huge opportunity, given that the

16     biggest exchanges at the time were multibillion dollar

17     companies.

18     Q.   Once you decided not to sell the exchange, you have

19     mentioned a few times one of the challenges was getting

20     customers.

21          Do you recall that?

22     A.   Yup.

23     Q.   How did you try to do that at first?

24     A.   We reached out to people we knew in the industry, friends

25     of ours, basically.  We got a few initial customers that way, a

single-digit number.  They gave feedback.  We iterated on the

product in response to that.  Ultimately, some of them liked

the exchange.  They told some of their friends about it and it

started spreading that way basically organically through word

of mouth and eventually on social media.  We started

interacting with customers on social media and through customer

support, emails, and tickets.  We tried to be responsive.  It

was cobbling together those rather than a paid marketing

strategy.

Q.  In the beginning did you have a marketing budget?

A.  No.  We had no marketing team.  We had no marketing budget.

We could have scraped together some money together if we had a

brilliant marketing idea, but we didn't.

Q.  You mentioned support tickets in your prior answer.  What

are they?

A.  Support tickets, it's a name for when there is a customer

who has a question or problem with their account and they want

to get in contact with someone who works at the exchange to get

help.  They would file what's called a support ticket.

Q.  Did you have anything to do with support tickets?

A.  Yeah.  I tried to make sure that I was periodically

answering some of them.  There were a lot, ultimately thousands

a day.  We had a team of dozens of people managing it.  But I

wanted to make sure that I was -- I was the CEO, but I wanted

to make sure that I was still answering at least a handful of

1   support tickets from customers regularly because I worried

2   that, if I didn't, I would lose touch with what the actual

3   customer experience was like, what the actual concerns our

4   customers had, and I wouldn't know what we should be

5   prioritizing as a company because of that.

6   Q.  I want to move forward and talk about the FTX code base and

7   database.  Just a few terms first, Mr. Bankman-Fried.

8          Can you tell us what the code base was?

9   A.  Yeah.  The code base, it's computer code written by our

10  programmers, our developers that basically contains

11  instructions for how FTX, the website and the exchange,

12  operated.  Running that computer code is what made the exchange

13  run.

14  Q.  What was the database?

15  A.  The database was basically a set of computers that stored

16  all the individual pieces of data.  The code base would have

17  instructions for what happens when someone tries to buy an

18  asset, what happens when they try to sell an asset and types of

19  numbers to display on a user's account page.  The database is

20  where we would store user XYZ has three Bitcoins or on Tuesday

21  at 11 p.m. this other user deposited $3 or whatever.  So all

22  the individual millions of pieces of data were stored in the

23  database.

24  Q.  You said the database was on computers?

25  A.  Yeah.

1    Q.  About how many did you end up having?

2    A.  A lot.  I mean, it started at a few servers, which is

3    basically computers we were renting out.  By the end, it was

4    dozens, I think maybe hundreds of computers that we were

5    renting out to manage all of FTX's systems and data.

6    Q.  One last phrase.  What was an order book?

7    A.  Yeah.  Let's say that you were a customer and you wanted to

8    buy a Bitcoin for a thousand dollars.  You would send what's

9    called an order, which is basically an offer to buy it for a

10   thousand dollars.  So you would send an instruction to FTX, I

11   would like to purchase one Bitcoin for $1,000 if possible.

12   Another customer might say, well, I'd be interested in selling

13   a Bitcoin for $2,000, if possible.  They would send an order,

14   an offer to sell that Bitcoin for $2,000.

15        The order book was basically the thing that just

16   contained all of those offers that hadn't yet been filled that

17   were just sitting out there that anyone could trade against.

18        If you then came on the exchange, you could buy for

19   $2,000 from that second person or you could sell a Bitcoin for

20   $1,000 to that first person.  It contained all the buying

21   offers and selling offers for all the products.

22   Q.  Just to circle back, on the database, I meant to ask you,

23   did there come a time that FTX entered into an arrangement with

24   Amazon about the database?

25   A.  Yeah.  FTX, its primary database was stored on what's

1    called Amazon Web Services, AWS.  Basically, it was dozens of

2    computers that we needed to rent out.  We needed backups for

3    it.  We needed to be able to add more at a moment's notice if

4    the exchange grew.  And we couldn't manage all of that

5    hardware, all of that -- we'd need a warehouse to make that

6    work.  And Amazon is one of the companies that has a service

7    where you can rent servers, which are basically just computers

8    from them, on demand.

9    Q.  Moving forward, once FTX was up and running, did it have

10   any business relationships with Alameda?

11   A.  Yes, it did.

12   Q.  I am going to talk about a few of them.

13        Have you heard the term market maker?

14   A.  Yes.

15   Q.  What is that?

16   A.  A market maker is a company that intends to have buying and

17   selling offers out at most points in time for a product.  The

18   purpose that we saw for market makers was, without them, if a

19   customer is signed up for FTX, they deposited dollars they

20   wanted to buy at Bitcoin, and no one on the exchange was

21   currently trying to sell a Bitcoin, no one was offering a

22   Bitcoin for any price, then there would be nothing to buy from

23   and the customer, they would go through all the work of

24   creating the account, funding it, they would realize they

25   couldn't actually buy a Bitcoin, there were no sellers, and

1    they would be angry and leave.

2          An important thing for customers was that at any point

3    in time they could open up their account and buy, if they

4    wanted to buy, and sell, if they wanted to sell.  That meant

5    that we needed to have market makers.  We needed to have people

6    who were always willing to buy for some price, sell at another

7    price, probably higher, but not that much higher, reasonable

8    prices.

9          And early on it was difficult to get market makers.

10   Early on we didn't have very much volume or activity on the

11   exchange.  Market makers, they made a penny on every hundred

12   dollar trade that they did.  Those were big companies, so they

13   weren't going to bother going through the process of trading on

14   FTX or market making on FTX if they are only getting to ten

15   trades a day and make ten cents a day, which meant that

16   until -- unless and until we got more customers and more

17   volume, we weren't going to get most of the market makers on

18   the platform.  These were -- some of these were Wall Street

19   trading firms.  Some of these were crypto-specific ones.

20         Alameda was a market maker, so Alameda was the primary

21   market maker on FTX at the beginning.

22   Q.  Over time did that role change?  Was Alameda still the

23   primary market maker?

24   A.  It did change.  Alameda was always a market maker.  Where

25   it was something like half of all volume on the exchange for

1   the first few months, which was obviously far larger than any

2   other single user was, by 2022, it was down to roughly 3

3   percent of the trades on the exchange because we had

4   successfully gotten a number of other market makers and Alameda

5   was now just one of 10 or 15 core market makers.  When I say

6   liquidity, I mean basically the same thing as market maker.

7   Q.  Back when you were at Jane Street, were you involved with

8   market makers?

9   A.  Yes.  Jane Street was a market maker.

10  Q.  What about the desk that you worked on at Jane Street?

11  A.  Yeah.  The desk that I was on was one of the largest, if

12  not the largest market maker for international ETFs.  When a

13  new ETF would come into existence, the company would often

14  reach out to us and request that we be a market maker, that is

15  to say, have offers to buy and sell out at all times so that

16  people could buy their products if they wanted to.

17  Q.  Are you familiar with the term line of credit?

18  A.  Yes.

19  Q.  In particular, are you familiar with the term line of

20  credit in connection with being a market maker?

21  A.  Yes, I am.

22  Q.  Can you explain that to the jury, please.

23  A.  At least on FTX some market makers, many of them had lines

24  of credit.  The original impetus for this, as I understood it,

25  was that we needed people to have bids and offers to buy and

1       sell at all times in all of the markets.

2            As we grew as a platform we had thousands of different

3       order books of markets.  There were hundreds of different, if

4       not thousands of different currencies that you could buy and

5       sell, and each one you could buy and sell in a few different

6       ways.

7            And on every single one of those, in order to have a

8       good experience for customers, we wanted a customer to be able

9       to come on to the exchange 24/7 and spend at least a million

10      dollars to buy or be able to sell a million dollars of it.  For

11      many customers it was just important to have a thousand

12      dollars.  But we had companies that were signing up to FTX to

13      trade that wanted to large-size trades, and they were a

14      significant fraction.

15           MS. SASSOON:  Objection, your Honor.  Narrative.

16           MR. COHEN:  It's for background, your Honor.

17           MS. SASSOON:  The original question was:  What's a

18      line of credit?

19           MR. COHEN:  That wasn't the question he was responding

20      to.

21           THE COURT:  The question he was responding to was:

22      Explain that to the jury.

23           MR. COHEN:  It was the question before that, your

24      Honor.

25           THE COURT:  The question before that was a yes/no

1    question and he said yes.

2            MR. COHEN:  Let me rephrase then, to your Honor's

3    point.

4    Q.  Let's focus this one, Mr. Bankman-Fried.  Was there any way

5    that having a line of credit related to acting as a market

6    maker in FTX?

7    A.  Yes, there was.

8    Q.  Can you tell us about that.

9    A.  Yes.  We wanted to have a substantial size of orders out,

10   of offers out in thousands of markets, that by the time FTX had

11   reached its peak in 2022 meant billions of dollars of orders

12   out at all points in time.  By default that required

13   collateral.  You had to have assets deposited on the system in

14   order to send those orders.

15           But in the particular case of market makers, they were

16   a service, the orders were a service to FTX.  So we would often

17   give market makers lines of credit to make it more efficient

18   for them to be able to send those orders.

19   Q.  Next concept.  Have you ever heard the term backstop

20   liquidity provider?

21   A.  Yes.

22   Q.  What was that?

23   A.  That was a term that FTX created to describe one of the

24   steps in our risk waterfall.

25   Q.  Can you explain what you mean by the risk waterfall.

A.   Yeah.  If there was an account which had some level of
assets, some level of liabilities and the assets started
dropping or the liabilities rising, to the point where we
became concerned that it might not be able to repay its debts,
and that we might not be able to sell its assets to repay its
debts, we would start to do that, ideally before it dropped
into overall negative territory.

The first step of the risk waterfall was to just go
out into the order books and start selling off the assets of
the account.  In the case of an account that had deposited say
$500 of Bitcoin and withdrawn 250 U.S. dollars against that,
we'd start selling off those Bitcoins to recoup the dollars
that it had borrowed.  That was the primary line of defense.

But sometimes that would look like it might be about
to fail.  In other words, the assets would keep dropping or the
liabilities would keep rising, to the point where we didn't
think that we were going to be able to sell off all of those
assets in the market in time, that the account might end up
creating a hole if we weren't careful.

As a backup we had what were called backstop liquidity
providers.  Those were generally market makers on FTX who
agreed that, in the event of a customer position that we were
liquidating, that we were closing down because we were
concerned about its risk, if it was too big to close down in
the market or markets were moving too fast, that, instead, we

1   could basically just hand the position to those backstop

2   liquidity providers.

3            In the hypothetical with $500 of Bitcoin borrowing

4   $250, we would hand basically that -- those Bitcoin and the

5   dollar liability over to the backstop liquidity providers, who

6   would then fill the liability out of their assets and, by doing

7   that, effectively take care of the liquidation.

8   Q.  Was Alameda a backstop liquidity provider?

9   A.  Yes, it was.

10  Q.  Was Alameda also a customer on the FTX exchange?

11  A.  Yes, it was.

12  Q.  Did it have an account?

13  A.  Yeah.  It had a few accounts.  It had one primary trading

14  account.

15  Q.  Was it sometimes referred to as the main account?

16  A.  Yes.  So there is the info@ user.  User refers to sort of

17  overall entity or person using the system, which had a number

18  of accounts on it, subaccounts.  One of them, the main account

19  had most of the trading activity.

20  Q.  Was that the info@AlamedaResearch.com account?

21  A.  Yes.  Info@AlamedaResearch.com was the user.  Then the main

22  account of that was the primary trading account.  That's right.

23  Q.  As a customer of the exchange, was Alameda permitted to

24  borrow from the exchange?

25  A.  Yeah.

1    Q.   When it borrowed, where was the money coming from?

2    A.   The money -- my understanding was that it was coming from

3    basically margin traders.  It was coming from collateral or --

4    basically collateral from other margin traders or from assets

5    that were earning interest on the platform, and that those were

6    sent to FTX as security for borrowing other traders were doing

7    and was being lent out to traders, including Alameda, that were

8    borrowing.

9    Q.   What could Alameda do with the funds it borrowed off the

10   exchange?

11   A.   In general, FTX didn't have restrictions on what people

12   could do with funds that they borrowed.  So the answer like for

13   other users was, anything -- so long as we believed that the

14   risk was being managed, which is to say, so long as we believe

15   that its assets were greater than its liabilities, we didn't

16   care if a user withdrew funds and used them to buy muffins, to

17   pay business expenses, to invest, or anything else.

18   Q.   Let's move forward to the next topic, Mr. Bankman-Fried.

19        How did the volume of trading on the FTX exchange

20   change, if at all, over time?

21   A.   It grew substantially.  In the early days it was trading a

22   few million dollars a day.  That grew to tens of millions of

23   dollars a day in 2019.  In 2020, that grew to hundreds of

24   millions of dollars a day.  And by 2022, it was 10 to $15

25   billion per day of trading volume.

1    Q.  Did there come a time that this growth created any issues

2    with respect to the risk engine?

3    A.  Yeah.  It frequently created -- they are growing pains all

4    the time and few specific to the risk engine.

5    Q.  Let me turn to one specific and call your attention to

6    2020, approximately 2020.

7    A.  Um-hum.

8    Q.  You recall an event that happened with respect to the risk

9    engine?

10   A.  Yes.

11   Q.  Can you tell us about it.

12   A.  Yeah.  So as FTX grew, the number of orders and trades and

13   the amount of data and the number of users that the systems had

14   to process grew quite a bit, which put strain on the computer

15   systems.

16           At this point, in 2020, the risk engine was

17   effectively sagging under the weight of that growth and was

18   running behind, which is to say, it took some number of minutes

19   for it to -- for it to learn about what was happening in the

20   markets.  We had a user with a relatively small position that

21   had to be liquidated, that had to be closed down by the risk

22   engine, so the risk engine liquidated that position.  I recall

23   it being thousands of dollars to begin with.

24           But because it was taking minutes for the risk engine

25   to learn about market events, including its own trades, a few

seconds later the risk engine looked at that same account,

didn't realize it had already closed down that position, and

did so again, and again and again and again, until it had to

close down the same position many, many, many times.  That

position went, I think, from thousands of dollars to millions

of dollars.

When it finally caught up to all the liquidations it

had done, it realized it had to undo most of those, so it then

ping-pong'd back in the opposite direction.  That became vastly

more in buying back all the sales that it had done on that

account and it ping-pong'd back and forth, I believe got to

from thousands of dollars to trillions of dollars in not too

long.  It was growing exponentially.  And this all from a

few-minute delay.  In reading its own fills, there is a

feedback loop.

That, in turn, caused downstream issues,

unsurprisingly.  That position quickly became -- it was

ridiculous, but it became so large that it had to go to the

backstop liquidity providers.  At that point that was primarily

Alameda.

So the risk engines started passing off thousands,

millions, billions, trillions of dollars in effectively

erroneous fills to Alameda's account.  That, in turn, caused

Alameda's account to go under water because of the positions it

was being handed in the trillions of dollars and triggered a

1    potential liquidation of Alameda's account which in turn,

2    because there was no backstop liquidity provider, would go to

3    the final phase of the risk engine, which was the phase we

4    always tried to minimize and hope to avoid, which was

5    socializing losses on all of the customers of the platform.

6    Q.  Was there a name for what happened?

7    A.  So the auto deleveraging was a name for liquidations

8    effectively closing it down, and then clawbacks was the name

9    for what was going to happen to most or all of the users on the

10   platform.

11   Q.  And what was your reaction --

12           THE COURT:  Excuse me for just a clarification.

13           You used the term realized probably more than once.

14   This was all an automated process, is that correct?

15           THE WITNESS:  That is correct.

16           THE COURT:  There were no human beings making

17   decisions along the way of what you have described.

18           THE WITNESS:  That is correct.

19           THE COURT:  Go ahead.

20           MR. COHEN:  Thank you, your Honor.

21   Q.  What was your reaction to this auto deleveraging event?

22   A.  Well, it was potentially very bad for the platform.  The

23   whole thing shouldn't have happened in the first place.  It

24   should have been a routine liquidation of, I think, thousands

25   of dollars of an account with no large downstream events, but

1    it grew into a ridiculous set of erroneous trades that

2    ultimately would claw back funds from the entire platform's

3    users.  That would be catastrophic for the platform and for its

4    customers.

5          Once we have realized, once the humans realized what

6    was really happening, we shut it down.  We unwound all of the

7    sort of trades that never should have happened in the first

8    place.  It was still a really inconvenient event for everyone

9    involved.  The exchange was basically unusable for an hour as

10   we dealt with all of this.  And it was scary.

11         This was something which presented systematic risk to

12   the entire system and all of its platforms.  We addressed the

13   specific problems there by increasing the number of servers, of

14   computers that we devoted to the risk engine so that it

15   wouldn't fall behind again.  That was what triggered this in

16   particular.  But it exposed a larger concern as well, which was

17   that if there was a liquidation of Alameda's account or of any

18   other account of that size on the platform, although at the

19   time Alameda was the only one.

20         MS. SASSOON:  Objection.

21         THE COURT:  What's the objection?

22         MS. SASSOON:  Nonresponsive to the question at this

23   point.

24         THE COURT:  Finish your answer, please.  Overruled.

25   A.  That if there were an erroneous liquidation of Alameda, it

1    would have disastrous consequences for the platform and its

2    users.  I had a conversation with --

3              THE COURT:  I think let's stop there.

4              Next question.

5              MR. COHEN:  Yes.  Thank you, your Honor.  That was my

6    thought as well.

7    Q.  You mentioned a few times in the last answer we.

8    A.  Yeah.

9    Q.  Who were you referring to?

10   A.  Myself, Gary, and Nishad were involved in understanding

11   what happened here.

12   Q.  Did there come a time when you spoke with Gary and Nishad

13   about any steps that were necessary to prevent this from

14   happening again?

15   A.  Yes.

16             MS. SASSOON:  Objection.  Leading.

17             THE COURT:  Overruled.

18   Q.  Can you tell us about that conversation.

19   A.  Yeah.  Immediately after this --

20             THE COURT:  I'm sorry.  Rephrase the question.

21   Q.  What did you discuss?

22             THE COURT:  Rephrase the question.

23             (Continued on next page)

24

25

BY MR. COHEN:

Q.  Can you please tell us what you said to Gary and Nishad in
that conversation.

A.  Yeah.  In addition to addressing the particular problem at
hand here, I said that we should have some system in place to
catch or stop erroneous liquidations of Alameda's account, and
that maybe it would be an alert or a delay or something of that
form.

Q.  And what happened after that?

A.  They——I was told by them that they had implemented some
feature of that sort.

Q.  Do you know what that was?

A.  At the time I couldn't have told you the details of it or
its name.  I now believe I know what that feature was.

Q.  What was that?

A.  "Allow Negative."

Q.  Did you ever hear the term "delay liquidation"?

A.  Yes.

Q.  What did that mean to you?

A.  Delayed liquidation was a——a concept whereby for an account
on FTX, especially a large account, where there would be
significant market distress if there were a liquidation, that
rather than immediately liquidating it, if the collateral
started to drop in value, we would effectively send out alerts,
prompt that user to deposit more collateral or manage the risk

1   themselves, and then after some period of time, if that hadn't

2   happened, that we would move forward and liquidate the account.

3   Q.  Did the topic of delayed liquidation come up in your

4   conversations with Gary and Nishad?

5   A.  Yes, it did.

6   Q.  What did you say to them?

7   A.  So at the time in 2020, that was roughly the feature that I

8   was proposing in some sense was, you know, to be implemented,

9   and it came up later on in 2022 as well.

10  Q.  Okay.  Just quickly going back for a moment, you told us

11  that in Alameda's role as a customer, when it borrowed off the

12  exchange, there were no restrictions on the use of the funds.

13  Do you recall that, sir?

14          MS. SASSOON:  Objection.

15          THE COURT:  Sustained.

16  Q.  Were there restrictions on other customers' use of funds

17  when they borrowed off the exchange?

18  A.  No.

19          THE COURT:  So Mr. Bankman-Fried——

20          THE WITNESS:  Yeah.

21          THE COURT:  ——did "borrow off the exchange" mean, for

22  example, a customer going to Chase Manhattan and taking out a

23  loan or did it mean something else?

24          THE WITNESS:  Sorry.  It meant the following:  It

25  meant that if a customer had some sort of collateral or

1   security for their FTX account, they could borrow assets

2   from——from FTX, so go negative in those assets, withdraw them

3   to their personal bank account or——or wallets, and at that

4   point FTX lost track of those assets.

5            THE COURT:  Thank you.

6            Go ahead.

7            MR. COHEN:  Thank you, your Honor.

8   BY MR. COHEN:

9   Q.  You spoke earlier about a line of credit.  Do you recall

10  that, sir?

11  A.  Yes.

12  Q.  Okay.  When Alameda first began on the exchange, did you

13  know what the line of credit was, the total?

14  A.  Sorry.  When Alameda first began trading on the exchange?

15  Q.  Yeah.  Yes, sir.

16  A.  I'm not aware that there was——if there was a line of credit

17  on the very inception of Alameda trading on the exchange.

18  Q.  Fair enough.  When it began to have a line of credit.

19  A.  I'm——I was aware of roughly the amount that it was

20  utilizing, or the amount that it was borrowing.  I was not

21  aware of if there was a clear, like, maximum and if so, what

22  that was.

23  Q.  What was your awareness about the amount it was using?

24  A.  So it grew over time as FTX and Alameda grew.  It was

25  millions in 2019, it grew to hundreds of millions, and then by

1   2022, my understanding was that it was around $2 billion on

2   average of borrowing through the info@ account.

3   Q.  And did there come a time when you had a discussion with

4   Gary and Nishad about Alameda hitting its line of credit?

5             MS. SASSOON:  Objection, leading.

6             THE COURT:  Sustained.

7   Q.  Did there come a time when you had any discussions about

8   Alameda's line of credit increasing?

9   A.  Yes.

10  Q.  Who were those with?

11  A.  I remember those being with Gary and Nishad.

12  Q.  Okay.  Tell us what you said, sir.

13  A.  There were a few instances in which Alameda would have out

14  so much in open orders as the scale of the exchange was growing

15  that it ran out of collateral, of credit.

16            MS. SASSOON:  Objection, your Honor.  The question

17  was:  "Tell us what you said."

18            THE COURT:  Sustained.  The answer is stricken.  The

19  jury will disregard it.

20  Q.  Just tell us what you said to Gary and Nishad.

21  A.  I said that it was potentially quite destructive for the

22  platform if all of Alameda's orders got canceled at once and it

23  wasn't able to send further orders because that would mean that

24  customers who came onto the platform wouldn't have anything to

25  trade against, and furthermore, that the risk engine might end

1    up getting whacky prices for various assets, if an order were

2    cleared out entirely, it wouldn't be able to figure out what a

3    Bitcoin was worth and so might liquidate people when it

4    shouldn't, and that as such, as long as Alameda was still

5    maintaining a positive net value on the——on the exchange and

6    the scale of borrowing was reasonable, that it probably made

7    sense to increase the line of credit such that it would be able

8    to continue providing orders.

9    Q.  And do you know what happened after this conversation?

10   A.  My understanding at the time was that they implemented some

11   feature to address that.  I believe now that what that was was

12   increasing the maximum size drawable of info@'s line of credit.

13   Q.  Okay.  Now let's move forward, Mr. Bankman-Fried.

14        MR. COHEN:  If we could call up GX 817 in evidence.

15   Q.  And just to orient us, this is a chain from July 31, 2019.

16   Someone named Bitshine asks you the question:  "How are you

17   going to resolve the conflict of interest of running your own

18   derivative exchange, AND actively trading against the market at

19   the same time?"

20        And if we could drop down to your answer, you say:

21   "Alameda is a liquidity provider on FTX but their account is

22   just like everyone else's.  Alameda's incentive is just for FTX

23   to do as well as possible; by far the dominant factor is

24   helping to make the trading experience as good as possible."

25        Do you recall this exchange, sir?

1   A.  Yes, I do.

2   Q.  So what did you mean by "Alameda is a liquidity provider on

3   FTX but their account is just like everyone else's"?

4   A.  I was responding to Bitshine's question, which I

5   interpreted to be about front running.  I understood him to be

6   concerned about scenarios whereby Alameda would have access to

7   customer orders, so information about what trades people were

8   doing on FTX, would look at those trades, and would find a way

9   to jump ahead of them, to do front runs on those customers,

10  thus doing the trades they wanted to do before they could—the

11  customers could do those trades, and causing the customers to

12  get worse prices on those trades, or other similar types of

13  concerns.  And that was not something that I ever intended or

14  thought Alameda would do on—on FTX or, frankly, any other

15  platform.  And I wanted to reassure Bitshine that that was the

16  case.

17  Q.  Okay.  Thank you.

18          MR. COHEN:  We can take that down.

19  Q.  Now let's talk about how customers could deposit assets on

20  the exchange.  Let's start with:  What types of assets could

21  they deposit?

22  A.  They could deposit a number of different assets, chiefly

23  cryptocurrencies or digital assets and fiat currencies, meaning

24  dollars and euros and stuff.

25  Q.  Let's start with crypto.  How would customers get crypto

1    onto the exchange?

2    A.   So a customer would create an account on FTX, you know,

3    you'd enter a user name, a password, you would then have to go

4    through a "Know Your Customer" process for compliance reasons,

5    where you would basically give usually a photo of your ID and

6    background information about yourself.  You know, presuming

7    you've completed that, if you went to your account page, you

8    would get an address, a blockchain address, where you could

9    deposit a cryptocurrency.

10   Q.   And where on the exchange would those assets be placed?

11   A.   So when a user went to their—to their balances, their

12   account page, what they were given was a deposit address that

13   was unique to them, so that if they sent an asset there, we

14   knew who it was coming from.  There's no sender field

15   necessarily on those transfers, but we need to know which

16   customer to credit.  So you had your own unique place to send

17   the cryptocurrencies.  But we wouldn't store them all in a

18   separate address for each individual user.  That would be

19   impractical.  That would mean every time there's a trade on the

20   platform, we would need to send a transfer on the blockchain of

21   those assets.  If you deposit an Ethereum token and someone

22   else bought that token from you, we'd need to send that token

23   from your address to their address.  That cost a few dollars in

24   general, and would have cost millions of dollars a day in fees

25   for customers.  So instead what we did is we had an omnibus

1  customer wallet, which meant, in effect, that customers would

2  deposit digital assets and they would then all be transferred

3  to one central customer wallet for that type of address—asset.

4  So we had a customer Ethereum wallet where all—where the net

5  amount of Ethereum tokens that represented customer account

6  balances on the platform would be held.

7  Q.  Okay.  So when a trade was made involving customers with

8  assets in the omnibus wallet, were funds transferred?

9  A.  No.

10  Q.  So what happened?

11  A.  It was a database change, effectively.  So if Alice bought

12  one Bitcoin from Bob for a thousand dollars, then the computer

13  code would go to the database, it would increase the number of,

14  you know, Alice's Bitcoin balance by one, decrease Bob's

15  Bitcoin balance by one, and conversely, it would increase Bob's

16  dollar balance by a thousand and Alice's decreased by a

17  thousand.

18  Q.  Now—

19          THE COURT:  Again, a clarification.

20          MR. COHEN:  Yes.

21          THE COURT:  The question was directed to whether funds

22  were transferred.  Am I correct or not correct in inferring

23  that your answer actually related to digital assets rather than

24  money—

25          THE WITNESS:  My answer—

```
 1              THE COURT:  ──fiat money?

 2              THE WITNESS:  So my answer for that particular

 3    question about funds being transferred actually applied to

 4    both.  Neither digital assets nor fiat assets were physically

 5    transferred when a trade happened on the platform.  The answer

 6    about how deposits worked was specific to digital assets.

 7              THE COURT:  Pardon me?

 8              THE WITNESS:  My earlier answer about how deposits

 9    worked, how you'd send funds to the platform, was specific for

10    digital assets, not for fiat assets.

11              THE COURT:  I think you'd better clarify, Mr. Cohen.

12    BY MR. COHEN:

13    Q.  Okay.  Let's trace through the digital assets again, sir.

14    A.  Yup.  All right.

15    Q.  So the question was:  When a trade happened──

16    A.  Yeah.

17    Q.  ──with respect to digital assets──

18    A.  All right.

19    Q.  ──were actual funds transferred──

20    A.  Understood.  No.

21    Q.  ──as the judge suggested?

22    A.  The answer is no, and if you instead take a situation where

23    a Bitcoin would trade for five Ethereum, for instance, both of

24    which are digital assets, there's no movement of digital assets

25    when that trade happened.  We would just go to the database and
```

1   update the balances of both of the users involved in the trade

2   so that we'd remember that that trade had happened and so that

3   their own balances page would correctly reflect that the new

4   user now had the Bitcoin and the other user had the Ethereum,

5   because they just swapped.

6   Q.  And just following up, when the transaction involved

7   fiat——we'll talk about fiat in a moment——

8   A.  Right.

9   Q.  ——but were actual funds transferred?

10  A.  No.  Funds were not transferred either in that case either

11  when a trade happened.

12  Q.  Now were FTX's own corporate assets stored in the omnibus

13  wallet?

14  A.  No, they were not.

15          MR. COHEN:  Can we take a look at Government

16  Exhibit 914A in evidence.

17  Q.  Mr. Bankman-Fried, this is your testimony before the U.S.

18  Senate Committee on Agriculture from February 2022.  Do you

19  recall that, sir?

20  A.  Yes, I do.

21          MR. COHEN:  Okay.  Let me call your attention, Brian,

22  to page 11, in the second paragraph.  If you just highlight the

23  last sentence.

24  Q.  You said, "Additionally, as a general principle, FTX

25  segregates customer assets from its own assets across our

1    platforms."

2            What did you mean by that, sir?

3    A.   Yeah, so what that——that meant, essentially, was that for

4    digital assets, we would have an omnibus wallet that

5    represented the net customer holdings on the exchange, but the

6    profit that FTX as a company had made wouldn't be there.  And

7    in terms of banks, at least by 2022, we had separate bank

8    accounts where net customer assets would be held versus where,

9    again, FTX's profit would be held.  So, you know, FTX had about

10   a billion or two, depending on when you're measuring it,

11   in——in, you know, in revenue.  That would be held in corporate

12   or operating bank accounts, which were separate from where

13   the——where customer——net customer assets would be held, and

14   then same thing for blockchain wallets.

15           MR. COHEN:  Okay.  We can take this down.

16   Q.   Now we talked about how to deposit crypto onto the

17   exchange.  How did customers deposit fiat currency onto the

18   exchange?

19   A.   Yeah.  So that, there were a number of routes, and it

20   changed over time.  Originally, in 2019——really in 2020 I think

21   is when this program started——FTX had not yet been able to get

22   bank accounts in its own name.  It had applied, it was going

23   through that process with banks, but we anticipated that it

24   would take a year or two for it to actually be able to open up

25   a bank account.  And in the interim, a lot of our customers

1    wanted to be able to wire money to the exchange, to send

2    dollars in in order to buy Bitcoins.  We had a few third-party

3    payment processors we worked with——MasterCard, PayPal, and

4    others——but for bank transfers, the largest was Alameda.  For a

5    period of a year or two, we originally just, in some cases, and

6    ultimately throughout FTX International, gave wire bank account

7    information for an Alameda bank account to customers where they

8    could wire funds in and be credited on FTX to trade.

9    Q.  What would they see on their FTX account?

10   A.  What they would see when they went to deposit is the bank

11   account information of Alameda, or whatever Alameda entity had

12   the bank account, and then if they wired the money in, what

13   they would see is if they wired in a thousand dollars, for

14   instance, they would then see a balance of 1,000 USD on their

15   account page.

16   Q.  And who at Alameda handled the incoming deposits to the

17   Alameda account?

18   A.  There was a settlements team that was——I think Alameda

19   settlements team was five or ten people, and they were in

20   charge of managing the——everything related to Alameda's bank

21   accounts.

22   Q.  And you mean settlements with an S, settlements team?

23   A.  That is correct, yes.

24   Q.  Now in 2020, when this began, what was your understanding,

25   Mr. Bankman-Fried, of how, if at all, these funds were being

1    tracked?

2    A.   I wish I had a better understanding than I did.   My

3    understanding at the time was that there were teams that were

4    managing this process and that to whatever extent there was any

5    borrowing, either from those assets or from others, that it

6    would be reflected in Alameda's info@ account.

7    Q.   Can you explain that.

8    A.   Yeah.   So the——effectively, when customers wired funds to

9    Alameda Research's bank account, you know, customer wired a

10   thousand dollars there, that customer then had a balance on FTX

11   of 1,000 US dollars, which they could use to buy Bitcoins or

12   use as margin, as collateral for a margin trade, or whatever

13   else they wanted to do on FTX with it.   But FTX didn't actually

14   custody those dollars.   It didn't have bank accounts to do it

15   with.   Alameda did.   There were a number of things that could

16   have been happening there that I at the time believed could

17   have been happening there.   Alameda could have found a way to

18   transfer those——

19            MS. SASSOON:   Objection.

20            THE COURT:   Ground?

21            MS. SASSOON:   Speculative.   There were things that

22   could have been happening, could have, could have.

23            THE COURT:   Mr. Cohen?

24            MR. COHEN:   Let me rephrase, your Honor.

25   BY MR. COHEN:

1  Q.  What did you believe was happening with the funds at the

2  time?

3  A.  So at the time, I wasn't entirely sure what was happening.

4  What I believed was that either the funds were just being held

5  in a bank account and, you know, not used or removed, or that

6  they were being sent to FTX in one way or another, maybe as

7  stablecoin, or to the extent that those weren't happening and

8  that Alameda was borrowing funds and using them, that that

9  would be reflected as a borrow on Alameda's info@ account; in

10  other words, that that would be——if Alameda was trading

11  with——with funds and ultimately owed those funds back to FTX,

12  which it did in this case, that that would be, like other

13  borrowers, shown as a negative number in Alameda's account on

14  FTX.

15  Q.  I'm going to come to this in more detail, but for now, when

16  Alameda began, you were the CEO, correct?

17  A.  Yes, that's correct.

18  Q.  Just for a timing point of view, did there come a time when

19  you ceased to be the CEO?

20  A.  Yes.

21  Q.  When was that?

22  A.  That was in the summer, late summer of 2021.

23  Q.  Okay.  All right.  Now did Alameda have something called

24  the pointer system?

25  A.  Yes.

1  Q.  What was that?

2  A.  That was the name for the system Alameda employees would

3  use to do basically everything that they did.  So if you wanted

4  to do a trade as an Alameda trader, you would use a pointer web

5  page built by the developers to do that trade.  It was just the

6  name for the system that Alameda's developers built.

7  Q.  And at FTX was there something called the FTX admin

8  dashboard?

9  A.  Yes.

10  Q.  What was that?

11  A.  So that was a dashboard for FTX employees, built by FTX's

12  developers, which gave employees the ability to do a lot of

13  what they needed to do.  So as an example, the admin dashboard

14  had a page that listed recent customer support requests so that

15  the customer support team could look through those, choose ones

16  to respond to, give a response.  There was a page that had a

17  list of deposits and withdrawals so that the settlements team

18  could manage those.  And there was what we've called the admin

19  users page, where FTX employees could view accounts of

20  customers to help, you know, debug customer support tickets or

21  similar things.

22  Q.  So an FTX employee using the admin dashboard could view

23  user accounts.

24  A.  Yes, that's right.

25          MR. COHEN:  All right.  Can we call up Government

1    Exhibit 1475, please.

2    Q.  Do you recall seeing this photograph before,

3    Mr. Bankman-Fried?

4    A.  Yes.

5    Q.  Okay.  Now I noticed——well, we can see that you have a

6    number of screens up in front of you.  Can you describe for us

7    what those screens related to.

8    A.  Yeah.  I had six screens, generally.  I found it really

9    helpful.  The——I had different things up on different screens.

10   This is——are you asking about this period of time?

11   Q.  I'm asking you about the period of time after you were no

12   longer the CEO of Alameda.

13   A.  Understood.  So in 2022, I would generally have email——I

14   have two things usually per screen, so 12 total things open.  I

15   would have email open, I would have Slack open, I would have

16   Signal open, I would have a few websites open, I would have a

17   few FTX admin pages, admin dashboard pages open, I would have

18   some project I was working on——a spreadsheet usually——open, and

19   I would have a spreadsheet that displayed market data open that

20   basically had prices and moved in various currencies open, I

21   also had a few pointer pages which were associated with that

22   spreadsheet generally behind it.

23   Q.  And what were you——what did you have up on the pointer

24   system?

25   A.  So the pointer system was what was actually providing the

1    data for that spreadsheet, so part of the answer is that

2    spreadsheet which showed what is a Bitcoin trading at now, what

3    is Solana, what is Ethereum trading at now, how much have they

4    moved today.  Behind that I had a few tabs of the pointer

5    system that I hadn't removed from my auto-open when I opened my

6    computer.  The one that I still used occasionally was the fills

7    page.

8    Q.  What is a fills page?

9    A.  A fills page was a scrolling list of all trades that

10   Alameda did.  So every time, on any exchange that Alameda

11   bought or sold something, it would appear on that page.  I

12   found it useful to get an overall sense of what was happening

13   in the crypto market.  Behind that I would have two other

14   pages.  I think one was the balances page and I forget what the

15   other one was.

16   Q.  If a user had subaccounts, did you have those up on the

17   pointer system?

18   A.  No.  You could have found those.  If—sorry.  Do you mean

19   if Alameda had subaccounts?

20   Q.  Well, yes.

21   A.  Yes.  So I—you could have searched for those on the

22   balances page, but I—I didn't have that—have those open and

23   displayed by default.

24        MR. COHEN:  Okay.  We can take that exhibit down.

25   Q.  So my next—I'm going to move forward, Mr. Bankman-Fried.

1    My next question is about several categories of assets.  We

2    talked about spot margin trading and margin, and futures

3    accounts.

4    A.   Yep.

5    Q.   Let me ask you this:  How did FTX safeguard customer assets

6    involved in spot margin trading?

7    A.   So there were a few different pieces to that.  One was

8    around physical security of those assets against hacking

9    attempts.  The one that came up more was around the risk

10   management system.

11   Q.   Can you explain that.

12   A.   So a lot of that was the risk engine that we had talked

13   about that would monitor user accounts.  The risk that it was

14   designed to prevent was a user account where the——basically

15   assets could no longer repay the liabilities, and that that

16   would cause a loss to the system, and if FTX couldn't fill it,

17   it would be socialized to other users.  We felt at the time

18   that we had built a better risk management system than other

19   exchanges.  It was something we put a lot of thought and time

20   into, how a risk engine worked, and that as such, we hoped that

21   we would reduce clawbacks and ideally avoid them entirely.  We

22   had not had a clawback ever to that point.  There had been some

23   small losses from accounts.  FTX was able to cover those.  That

24   was the——that was the goal of the risk management system.

25   Q.   And was there a difference between spot margin and the

1    margin used, for example, on futures trading?

2    A.  Yes and no.  There——they were financially somewhat similar.

3    In general, if you deposit a hundred dollars and then buy $500

4    of Bitcoin with that, that's very similar to if you deposited a

5    hundred dollars and bought $500 of Bitcoin futures with that.

6    The financial difference is that at some point in time that

7    future would expire and it would just turn into however many

8    dollars the Bitcoin was worth then, whereas the Bitcoin

9    wouldn't expire ever.  And there were few other technological

10   differences.  The margin system treated them as fairly similar.

11   Q.  And talking about fiat balances, which we just were

12   discussing, what steps, if any, did FTX take to safeguard

13   those?

14   A.  So to the extent that they were involved in margin trading,

15   or futures trading, the answer is the same as for safeguarding

16   digital assets involved in that trading.  There weren't the

17   same concerns around blockchain hacking attempts for wallets

18   because dollars weren't on the blockchain, but we had, you

19   know, settlements team that was managing the bank accounts.

20   Q.  Okay.  Did FTX have terms of service with its customers?

21   A.  Yes.

22          MR. COHEN:  Okay.  Can we call up GX 558, please, in

23   evidence.

24   Q.  Take a moment to go through this, Mr. Bankman-Fried, and

25   let me ask you if you recognize it.

1    A.  Yes, I do.

2    Q.  Okay.  What is it?

3    A.  This is the FTX terms of service that were created in May

4    of 2022.

5    Q.  Okay.  Did you ever have occasion to review these?

6    A.  I did.

7    Q.  Okay.  Do you know about when you did that?

8    A.  I skimmed it over a few times.  I went through parts of it

9    in more detail after its release.

10             MR. COHEN:  If we could go to page 17, please.

11             Back one page.  I'm sorry.

12   Q.  Do you see Section 16?

13             MR. COHEN:  If you could call that out, Brian.

14   Q.  That refers to margin trading.  Was this one of the

15   provisions that you reviewed?

16   A.  Yes.

17             MR. COHEN:  Okay.  And now continuing to the next

18   page.  16.4, if you can call out that paragraph.

19   Q.  Without me reading the entire thing to you, sir, can you

20   tell the jury what your understanding of this provision was.

21   A.  Yeah, my understanding was that this was referring to two

22   different features of the platform, not features as a

23   necessarily positive connotation, but the first was the risk of

24   liquidations.  When it talks about, you know, liquidating your

25   position, that's—that's referring to the risk that if your

1     assets fell in value, FTX might sell off your positions to

2     reduce risk in your account.  The second part of this is

3     talking about clawbacks, or socialized losses, when it says

4     that even if you haven't suffered any losses yourself, your

5     balance might be clawed back if other users had losses, in

6     particular losses large enough that they created a hole in the

7     system.

8              MR. COHEN:  Okay.  And can we continue on to page 35.

9     And blow that up.

10    Q.  It says Service Schedule.  Futures Market.  Do you see

11    that, sir?

12    A.  Yup.

13    Q.  And again, without having to read through the whole thing,

14    what was your understanding of what Schedule 5 provided for?

15    A.  Yeah.  My understanding was this provided terms that were

16    specific to futures trading rather than spot trading.

17    Q.  Okay.  And did it have the same provisions relating to

18    clawback you just discussed?

19    A.  Yeah.  My memory is it actually just ref—it referenced the

20    margin trading provisions.

21    Q.  Okay.  Good.

22             MR. COHEN:  All right.  If we could go to the middle

23    of that page, where it says Important.

24    Q.  Okay.  If you can just read the first sentence.

25             MR. COHEN:  Brian, if you could highlight that.

1    Above, above, next to Important.

2    Q.  Is this what you were referring to, Mr. Bankman-Fried?

3    A.  Yes.  That's what I was referring to.

4           MR. COHEN:  Okay.  We can take that down.

5    Q.  Let me move forward, Mr. Bankman-Fried.  Are you familiar

6    with something called FTT?

7    A.  Yes.

8    Q.  What was that?

9    A.  FTT is a token that was created and issued by FTX around

10   the time of its launch.  It's what's called an exchange token.

11   Q.  Okay.  What was the purpose of FTT?

12   A.  The purpose of FTT was for——to be a——a token that users of

13   FTX could buy and trade if they wanted, that would give their

14   account benefits if they held it, and where they would benefit

15   if FTX had success.

16   Q.  And more generally——let me step back——did other exchanges

17   issue tokens?

18   A.  Yeah.  Most of the non-American crypto exchanges issued

19   tokens.

20   Q.  Can you give us an example.

21   A.  Binance issued BNB, for instance, which is Binance's

22   exchange token.

23   Q.  And how did Binance compare in size to other exchanges?

24   A.  Binance was——when FTX first started, it was one of the five

25   largest exchanges.  By 2022, it was by far the largest

1    exchange.

2    Q.  And who created FTT?

3    A.  I mean, FTX did.  So——and I guess you could say myself and

4    Gary and, you know, the other early employees.

5    Q.  Okay.  Did you ever hear the term "buy and burn"?

6    A.  Yes.

7    Q.  Can you explain to us what that meant.

8    A.  Yeah.  So one of the key features of FTT was the buy and

9    burn.  What that refers to is every week, FTX would take 1/3 of

10   the——of the money that it had made that week and use it to buy

11   up FTT tokens and then——and then burn them, similar to a share

12   buyback.  So if, for instance, FTX had $3 million of revenue in

13   a week, it would take 1 million of those dollars and use that

14   to buy FTT tokens in the market, effectively giving value to

15   FTT token holders.

16   Q.  Have you ever heard the term "white paper"?

17   A.  Yes.

18   Q.  What's that?

19   A.  It's a term that——at least I've heard it in the context of

20   the cryptocurrency industry, where, when someone is going to

21   launch a token or some other project, they will often write a

22   explainer on what they intend that to be.  It's called a white

23   paper.  It's usually sent out to early users or investors.

24   Q.  And was a white paper prepared in connection with FTT?

25   A.  Yup.

1    Q.  Who prepared it?

2    A.  Myself and others at FTX at that time, which was right

3    around when it was being founded.

4           MR. COHEN:  Okay.  Can we call up DX 006 for

5    identification, just for the witness.

6    Q.  Take a moment to go through it, sir.

7    A.  Yup.

8    Q.  What is it?

9    A.  That is the FTT white paper.

10          MR. COHEN:  The defense offers Exhibit 6, not for its

11   truth.

12          MS. SASSOON:  No objection.

13          THE COURT:  Received.  Not for its truth.

14          (Defendant's Exhibit 6 received in evidence)

15   Q.  Now did FTT trade on the FTX exchange?

16   A.  Yup.

17   Q.  Did it only trade on the FTX exchange?

18   A.  No.  Originally it primarily traded on FTX, but by 2022, it

19   was listed on almost every non-American exchange.

20   Q.  Like Binance?

21   A.  Yup, like Binance, Huobi, OKX, and others.

22   Q.  And how was the price for FTT determined?

23   A.  Just the market price, whatever price it was trading at

24   across those exchanges.

25   Q.  Right.  Were you familiar with the price of FTT?

1   A.   Yeah.

2   Q.   Were you familiar with the price of FTT in 2022?

3   A.   Yeah.  I obviously don't remember every day's price, but I

4   remember the high level.

5   Q.   Let me step back.  This white paper that you prepared——

6          MR. COHEN:  Oh, can we publish it, your Honor?  I'm

7   sorry.  Exhibit 6.

8          It's as if I heard a voice telling me to publish it.

9   Okay.

10  Q.   Was this white paper published anywhere?

11  A.   I——it was on FTX's website, yeah.

12          MR. COHEN:  Okay.  All right.  Now let's call up

13  DX 1096 for identification.

14          Okay.  Just for the witness.

15  Q.   Can you tell us what this is, Mr. Bankman-Fried.

16  A.   Yeah.  This is a graph of the price of FTT over the course

17  of 2022.

18  Q.   And in the upper left-hand corner, it refers to

19  CoinMarketCap.  What was that?

20  A.   Yeah.  That is one of the two premier websites for crypto

21  pricing information.  CoinGecko was the other one.

22          MR. COHEN:  The defense offers DX 1096.

23          MS. SASSOON:  One moment, your Honor.

24          No objection.

25          THE COURT:  Received.

1              (Defendant's Exhibit 1096 received in evidence)

2  Q.  Mr. Bankman-Fried, I don't want to go through every——

3              MR. COHEN:  Well, can we publish it to the jury.

4  Excuse me.

5              THE COURT:  Yes.

6  Q.  Okay.  I don't want to go through every up and down in the

7  chart, but as a general matter, what does this chart reflect?

8  A.  This reflects the price of FTT.  And I think I misspoke.

9  It's not just——oh, no, it is, yeah, I think just of 2022,

10 looking at the——the bar down at the bottom.  It shows that FTT

11 was trading between 20 and $60 over the course of the year of

12 2022.

13 Q.  What was FTT's market cap?  Well, let me back up.

14             What does the phrase "market cap" mean to you?

15 A.  Yeah.  Market cap is the total value of a token project, so

16 if you——the value of all of the tokens put together, what it

17 would cost to buy, you know, all——all of a token if the price

18 didn't change.

19 Q.  And if you know, what was FTT's market cap in 2022?

20 A.  It fluctuated, but it was generally around $10 billion.

21             MR. COHEN:  Now we can take that down.

22 Q.  When FTX entered into transactions with other companies,

23 other crypto companies, would they accept FTT as payment?

24 A.  Yeah, they sometimes would.

25 Q.  Okay.  Do you recall a time that FTX bought out shares from

1    Binance, that Binance owned?

2    A.   Yeah.   I recall a time when we bought out the Binance's

3    shares of FTX.

4    Q.   I'd better give some foundation.

5         Did Binance invest in FTX to begin with?

6    A.   Yeah, they were FTX's first investor.

7    Q.   And how much did they invest?

8    A.   They invested—well, they invested using BNB as the primary

9    form of their investment.   At the time they invested, it was

10   about $80 million worth.

11   Q.   Okay.   Did there come a time that FTX bought back the

12   shares?

13   A.   I don't know that FTX was the entity that bought back the

14   shares, but there did come a time when I bought back those

15   shares, yes.

16   Q.   So FTX arranged for payment to Binance, correct?

17   A.   Yes.

18   Q.   And what forms of payment did that include?

19   A.   It was split between FTT, BNB, and US dollars, or

20   stablecoin.

21   Q.   Okay.   Now let me call your attention to mid-2021.   Did

22   there come a time that Binance began to sell the FTT it had

23   received?

24   A.   That's what we—we believed was happening, yes.

25   Q.   Did you have discussions with anyone about that?

1   A.  Yes.

2   Q.  Who did you have discussions with?

3   A.  I had discussions in a group I know that Caroline——Caroline

4   Ellison, Sam Trabucco, and Ben Xie were in that group.  I'm not

5   sure if other people were as well.

6   Q.  Okay.  And why don't you tell us what you said in those

7   discussions.

8   A.  I said that in general, it was my understanding that

9   especially for things that Alameda was a large market maker in,

10  it would try to buy low and sell high, and so if there was a

11  significant decrease in price, that it would often try and buy

12  after that decrease, and if there was a significant increase,

13  it would often try and sell to that increase.  I remember

14  asking if Alameda was buying FTT, if and when the price

15  decreased due to Binance's selling, and if so, you know, at

16  what price point Alameda thought it would be a good trade to

17  start buying.

18  Q.  Did you ever hear the term "market manipulation"?

19  A.  Yes.

20  Q.  When did you first hear that?

21  A.  I first at least substantively heard it when I was a trader

22  at Jane Street.

23  Q.  And what did you learn then?

24  A.  It was a term that was used to refer to a variety of

25  practices that were effectively traders trying to do trades

 1    they would not otherwise want to do—bad trades—for the

 2    purpose of changing the price of some asset.

 3    Q.  You said something—you referred to something called a "bad

 4    trade."

 5    A.  Yes.

 6    Q.  What does that mean?

 7    A.  Right.  So any trade that anyone ever does is—may change

 8    the price of that asset.  If you buy Apple stock, probably that

 9    at least marginally increases the price of Apple stock.  It's

10    supply and demand.  The more buyers, the higher it trades.  My

11    understanding was that in terms of valuating whether a trade

12    was legitimate or whether it was market manipulation,

13    there—the core test was whether it was a trade which, for its

14    own sake, you thought would be profitable, so if you buy an

15    asset and you think you're buying low, you think you're buying

16    lower than you can or will be able to sell it off for, then

17    that is a hallmark of a legitimate trade.  If you think you are

18    buying high, that you're going to lose money because you're not

19    going to be able to sell it for as much as you're buying it for

20    but are instead doing it in order to increase the price of an

21    asset, that is the hallmark of market manipulation.

22    Q.  And this was—

23              MS. SASSOON:  Objection.

24              THE COURT:  Excuse me, counsel.

25              Yes.  Your objection?

1          MS. SASSOON:  Clarification about this being his

2    opinion and what that's based on rather than opining on the law

3    here.

4          THE COURT:  Exactly.

5          MR. COHEN:  Let me try to follow up, your Honor.

6          THE COURT:  You can follow up when I'm through.

7          MR. COHEN:  I'm sorry.  I thought you were.

8          THE COURT:  "Manipulation" is a legal term that has

9    significance, among other places, in the law of securities and

10   commodities, and probably fraud, and you may accept what the

11   witness says as what he thought it meant, without regard to

12   whether what he thought was right or wrong, and if it becomes

13   necessary to instruct you about what "manipulation" means for

14   purposes of this case, you will take what I say as what

15   "manipulation" means.

16         Counsel, go ahead.

17         MR. COHEN:  Thank you, your Honor.

18   BY MR. COHEN:

19   Q.  This discussion you were just—this answer you were just

20   giving, was that based on a discussion with anyone?

21   A.  The—actually, it was based on—

22         THE COURT:  Mr. Bankman-Fried, that's a yes or a no.

23         THE WITNESS:  Oh.  Yes.

24   Q.  Who?

25   A.  It was based on my understanding of discussions with

1    traders and managers at Jane Street when I was working there.

2    Q.  And then—yes or no—did you discuss this topic with anyone

3    at Alameda?

4    A.  Yes.

5    Q.  And who did you discuss it with?

6             MS. SASSOON:  Objection.  Depending on the answer.

7             THE COURT:  I think you need to narrow the question,

8    counselor.

9             MR. COHEN:  I don't want to—I'm not sure how to

10   respond to a not-yet-interposed objection, but I just want the

11   names of people and not what was said, okay?

12   Q.  Did you discuss this topic with anyone at Alameda?

13   A.  Yes, I did.

14   Q.  And what people?  Just the names.

15   A.  I know that I discussed it with Caroline Ellison, Sam

16   Trabucco, and Ben Xie.  I likely discussed it with others as

17   well but don't remember the specifics.

18   Q.  And just to remind us, who was Ben Xie?

19   A.  He was the head of trading at Alameda.

20   Q.  And who was Sam Trabucco?

21   A.  He was the—so he was a trader at Alameda.  He then became

22   one of the co-heads of trading along with Caroline at Alameda,

23   and then when I stepped down as CEO, he became a co-CEO of

24   Alameda, along with Caroline.

25   Q.  Okay.  All right.  Let's move on, Mr. Bankman-Fried.

1          Coming into 2021, end of 20, 2021, did FTX experience

2     growth?

3     A.   Yes.

4     Q.   Can you give the jury a sense of that growth in terms of

5     the number of users, the daily volume, the daily revenue.

6     A.   Yeah.  So the number of users grew from, I mean, one user,

7     obviously, at the very beginning, to, by late 2021, millions of

8     users.  The revenue annually grew from 10 or 20 million in 2019

9     to about 80 million in 2020, to roughly a billion in 2021.

10    That meant a daily revenue of about $3 million by late 2021.

11    And the daily trading volume had grown to 10 to $20 billion of

12    daily trades on the website.

13    Q.   When you started FTX in 2019, did you expect this level of

14    growth?

15    A.   No, absolutely not.

16    Q.   Now over time did FTX hire employees?

17    A.   Yeah.

18    Q.   About how many employees did you have by 2021 going into

19    2022?

20    A.   We had a few hundred.

21    Q.   Okay.  And just by category, we already talked about

22    developers and settlements people.  Who else did FTX have by

23    category?

24    A.   So in addition to those categories, there were

25    marketing——there was a marketing team, there was a customer

1   support team, there was a "Know Your Customer" team, compliance

2   team and legal team, and an operations team, and then a number

3   of sort of one- or two-person departments.

4   Q.  Okay.  You mentioned a "Know Your Customer" team.

5   A.  Yeah.

6   Q.  What did that do?

7   A.  So whenever a user created an account on FTX, they had to

8   go through what we called a "Know Your Customer" process.  This

9   was mandated by various regulatory agencies.  And what that

10  meant basically is we needed to know who was trading on the

11  exchange.  We had to know what their real name was and have

12  evidence that it was in fact really them.  So we would

13  generally ask for something like a photo of their ID or

14  passport, you know, basic background information on themselves.

15  We would look at the IP address they were accessing, the

16  website from which——basically where in the world was their

17  computer, see if that was in line with other things they were

18  saying.  We would sometimes ask for a cellphone number.  And

19  they would submit this information.  We had a team internally

20  then, the "Know Your Customer" team, that would validate,

21  basically, this information, make sure that it looked

22  legitimate.  One problem we had sometimes is people

23  photoshopping IDs, effectively.  So the "Know Your Customer"

24  team would, themselves and with software that they ran, check

25  to see if the——if everything appeared to be legitimate.

1    Q.   You mentioned an operations team.

2    A.   Yeah.

3    Q.   What did they do?

4    A.   Everything.  It was sort of a catchall category for

5    anything that needed to be accomplished that wasn't clearly

6    someone else's responsibility.  So that included everything

7    from trying to find a new office to trying to figure out how to

8    transport visitors to and from the office to figuring out how,

9    you know, to open up accounts at service providers, figuring

10   out, translating things for various users, or any other odd

11   tasks that came up.

12   Q.   Did FTX at that time have a risk management department?

13   A.   We sure should have, but no, we did not.

14   Q.   Now during this period from 2019 to 2021, can you give us a

15   sense of what kind of hours you were working.

16   A.   On a light day, I would work 12 hours or so; on a heavy

17   day, 22, roughly.  I probably took off one day every couple

18   months.

19   Q.   And based on your interactions with Gary and Nishad, did

20   you have a sense of how hard they were working?

21   A.   I did.

22   Q.   And what was that?

23   A.   Not quite the hours I was working but still quite long

24   hours.

25            MR. COHEN:  Can we call up—actually, we'll do that

1    later.

2    Q.  Now you mentioned emails.

3    A.  Yes.

4    Q.  How many emails would you receive in a typical day?

5    A.  Thousands.

6    Q.  Okay.  And how many were in your inbox at a given time?

7    A.  So I know some people shot for inbox zero.  I was shooting

8    for inbox 60,000, roughly.  If I could get under 60,000 on my

9    messages, that would be a slightly less overwhelming number.  I

10   didn't usually succeed.

11   Q.  You mentioned that the company also used Signal to

12   communicate.

13   A.  Yup.

14   Q.  And I believe people refer to it as being on a Signal

15   channel.  Was that correct?

16   A.  Yeah.

17   Q.  Okay.  Around this time in the 2021 period, how many Signal

18   channels were you on?

19   A.  A few hundred, I think.

20   Q.  Now did the growth of FTX affect in any way your

21   relationship with Alameda?

22   A.  Yeah, it did.

23   Q.  Okay.  Tell us what happened.

24   A.  In 2017 and 2018, I was running Alameda.  I was the CEO.  I

25   was in charge day to day, overseeing directly much of its

1    operations.  In 2019, I founded FTX.  My times began to shift.

2    By 2020, I was spending part of my days at Alameda, part of my

3    days at FTX.  So sometimes I was running Alameda, sometimes I

4    was not.  I was always running FTX.  As FTX grew, it became

5    untenable for me to run both companies at once, at least in a

6    realistic, day-to-day process.  So by 2021, I was not involved

7    in a day-to-day manner at Alameda, and, you know, in the summer

8    of that year, I formally handed off the CEO role.  There were

9    still some areas of Alameda that I was involved in, including

10   venture investments and including, at least by mid-2022,

11   hedging and risk management.

12   Q.   Okay.  And who did you turn over Alameda to as CEOs?

13   A.   Originally it was Caroline Ellison and Sam Trabucco.

14   Q.   And why did you ask them to do it?

15   A.   They had been the second and third in command at Alameda

16   when I had been CEO.  They were both very good traders, very

17   smart, capable people.  They complemented each other fairly

18   well.  In addition, they had complementary strengths, and

19   together I felt like they could make a good team to run the

20   company.  And I have——they're the best options I had at the

21   time.

22   Q.   You said you viewed them as complementary.  In your view

23   how were they complementary?  In what ways?

24   A.   So Caroline was generally regarded as a very good manager.

25   I received very positive reports from people who she managed.

1    They described her as involved, as smart, as empathetic.  She

2    was a——she was not a software developer, but for a trader, she

3    was a very good software developer, and so she was relatively

4    good at interfacing with the developer team as well.  She was

5    also a——a good trader and very good at doing research for

6    trades, writing mathematical models.  That was, you know——those

7    were a bunch of areas of responsibility at Alameda.  She had

8    not focused as much on risk management or on sort of unusual

9    trading opportunities or risks.  Trabucco focused much more on

10   those areas, had been doing that as trader, and I anticipated

11   would continue to as CEO, as co-CEO.

12   Q.  Now did there come a time after they became co-CEOs that

13   Mr. Trabucco stepped away?

14   A.  Yeah, he formally stepped away in mid-2022, but my

15   understanding was that by shortly after he was named co-CEO, he

16   was drifting away towards what I understood to be effectively

17   early retirement.

18   Q.  And that left Ms. Ellison as the sole CEO.

19   A.  That's right.

20   Q.  Did the topic of adding a new co-CEO ever come up with her?

21   A.  Yes, it did.

22   Q.  What did you tell her?

23   A.  I suggested——I believe she——there was at least one time I

24   can specifically remember with her, whether she would want Ben

25   Xie as a co-CEO for the company.

1    Q.   And Ben Xie was a trader at Alameda?

2    A.   Yeah, and at the time he was the head of trading at

3    Alameda.

4    Q.   Okay.  And what happened?

5    A.   She rejected the idea and that was—that was that.

6    Q.   Okay.  You said that you remained involved in Alameda, I

7    believe you said in venture investments.

8    A.   Yes.

9    Q.   In any other area did you stay involved after the

10   transition?

11   A.   Well, to some extent, and ultimately to a fairly

12   significant extent, in risk and hedging.

13   Q.   Okay.

14   A.   There may have been a few other areas I'm forgetting as

15   well, but those are the main ones.

16   Q.   Why did you stay involved?

17   A.   I was an owner, I was the largest owner, of the company.  I

18   cared about how well it did.  And especially with Trabucco

19   stepping back, it was an overwhelming job for any one person,

20   and I felt that Caroline was doing quite well at many areas but

21   that there were some areas that it was important that she have

22   help and support and was concerned about how things would go

23   otherwise.  There were also areas, particularly in the ventures

24   space, where it was complementary to what I was doing at FTX.

25            MR. COHEN:  Your Honor, this might be a good time for

 1    our lunch break.

 2              THE COURT:  I'd like to continue for a while.

 3              MR. COHEN:  Okay.  Thank you.

 4              THE COURT:  Give me an idea of how much longer you

 5    expect to be.

 6              MR. COHEN:  Well, that's one of the things I want to

 7    calculate over the lunch break in light of some of the rulings

 8    we've been talking about, so—

 9              THE COURT:  Well, you may have less to calculate over

10    lunch if we have lunch a little later.

11              MR. COHEN:  Okay.  I will do whatever your Honor

12    wants.

13              THE COURT:  Thank you.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Mr. Bankman-Fried, let's move forward.

2         Did there come a time that you moved FTX from Hong

3    Kong?

4    A.  Yes.

5         THE COURT:  I'll tell you what, Mr. Cohen.  We will

6    break now.

7         But 1:30 sharp, folks.

8         MR. COHEN:  Thank you, your Honor.

9         (Luncheon recess)

```
 1                        AFTERNOON SESSION

 2                           1:30 p.m.

 3            THE COURT:  What's the latest estimate, Mr. Cohen?

 4            MR. COHEN:  Yes.  Your Honor, I believe that I will be

 5    finished on Monday morning.

 6            THE COURT:  When on Monday morning?

 7            MR. COHEN:  I don't anticipate going through lunch.

 8    Depends on how fast we go this afternoon, but couple of hours

 9    Monday morning at the most, I think, your Honor.

10            THE COURT:  OK.  Let's get the jury.

11            (Jury present)

12            THE COURT:  The defendant and the jurors all are

13    present.

14            The witness is reminded he is still under oath.

15            Let's proceed, Mr. Cohen.

16            MR. COHEN:  Thank you, your Honor.

17    BY MR. COHEN:

18    Q.  Mr. Bankman-Fried, let's move forward in time.  Did there

19    come a time when FTX left Hong Kong?

20    A.  Yeah.  In late 2021.

21    Q.  Why did you leave Hong Kong?

22    A.  There were multiple reasons.  The two largest:  One was

23    that we were looking for a location where we could be fully

24    licensed where there was a local regulator that would oversee

25    FTX.  We had been hoping that Hong Kong would be that location.
```

1   There had been lots of announcements that I had seen about

2   upcoming crypto regulatory framework overhauls.  Those hadn't

3   come in the way that we were expecting, and it was becoming

4   more and more important for us to be in such location.

5           In addition, there were domestic issues in Hong Kong

6   at that time that caused us to at least be looking for

7   potential new homes.

8   Q.  What domestic issues?

9   A.  Two chiefly.  The first was COVID.  We were in Hong Kong

10  from 2018 through 2021.  And in response to COVID-19, Hong Kong

11  had a quarantine policy whereby anyone, including a permanent

12  resident or a citizen, entering the city had to quarantine for

13  three weeks in a hotel room before they could get in.  That

14  made job interviews basically impossible.  If we are trying to

15  hire people, no one wants to go for a one-day job interview

16  complete with a three-week quarantine in a hotel.  And it made

17  employees unhappy because they could never leave, effectively.

18  And there were domestic disputes with China around that time

19  that was also causing a pretty large drag on quality of life in

20  the city.

21  Q.  Where did you end up going?

22  A.  In the end we moved to the Bahamas.

23  Q.  Why did you pick the Bahamas?

24  A.  There was a pretty short list of countries that had

25  actually rolled out full regulatory frameworks for crypto

1    exchanges, especially countries that could regulate a crypto

2    derivatives or margin exchange.  To my memory, there were a

3    single-digit number of countries with a framework that we found

4    sort of suitable, and we looked into all of those different

5    countries, into the merits of them.  We had employees go check

6    out each of them.

7           And at the end of the day the employees who checked

8    out the Bahamas came back with very positive stories about what

9    it would be like if we moved there.  I took a trip there in the

10   fall of 2021 and agreed.

11   Q.   What was the nature of the regulatory system in the

12   Bahamas?

13   A.   The head regulator in the Bahamas --

14           MS. SASSOON:  Objection.

15           THE COURT:  Sustained.

16   Q.   When you moved to the Bahamas, Mr. Bankman-Fried, where did

17   you end up living?

18   A.   I lived in Albany.

19   Q.   What was that?

20   A.   It was a housing complex and also vacation spot in New

21   Providence, Nassau, which is the main island.

22   Q.   How did you come to live there?

23   A.   When I first moved to the Bahamas, I lived in a different

24   place on the other side of the island called One Cable Beach.

25   After I think about a month there or so, a number of other

1    employees had moved to Albany.  That seemed to be the center of

2    where the company was congregating.  I checked it out.  It had

3    a lot of good housing, enough for myself and for a lot of the

4    company.  So I moved there with a few other colleagues.

5    Q.  How many people did you end up living with?

6    A.  First, I was living with two other people, with Adam

7    Yedidia and Andrea Lincoln in one apartment there.  After

8    another month or so, we moved into a larger apartment for ten

9    of us.

10   Q.  You mentioned Andrea Lincoln.  Who was she?

11   A.  She at the time -- she was Adam's fiance at the time, now

12   wife.  She was someone who I had met at MIT.  She was in one of

13   my math classes and started dating Adam at the time, and she

14   would later become a developer at FTX.

15   Q.  You mentioned you ended up living with ten people.  Who

16   were they?

17   A.  It was myself; Caroline; Adam and Andrea; Gary and his

18   partner, Cheryl; Nishad and his partner, Claire; Ross and Lela.

19   Q.  Who were Ross and Leila?

20   A.  Leila was a developer at FTX.  Ross worked for the FTX

21   charitable arm.

22   Q.  Why did you end up living ten together?

23   A.  It replicated the living experience to some extent that we

24   had in college, which I had really liked and enjoyed, where a

25   group of us were living together.  It also served as an office

```
1    away from the office, a place where much of the management of

2    FTX lived in that apartment.  It gave us a good spot to hang

3    out, to chat after work, and to host other employees.

4             MR. COHEN:  Let's pull up GX-1642, please.  It's in

5    evidence.

6    Q.  Do you see that, sir?

7    A.  Yes, I do.

8    Q.  That's a photograph with you holding a deck of playing

9    cards.

10   A.  Yup.

11   Q.  Why did you hold playing cards?

12   A.  I sort of compulsively fidget with things, with my hands.

13   For a while I would have decks of playing cards by me.  I

14   started doing that in college.  I would go through a deck every

15   week or so before the cards would get worn out.  I later

16   transitioned to fidget spinners.

17   Q.  Did you play poker?

18   A.  No.  I hadn't played for many years.

19   Q.  Did you ever go to Las Vegas?

20            MS. SASSOON:  Objection, your Honor.

21            THE COURT:  Sustained.

22            MR. COHEN:  We can take 1642 down.

23   Q.  Now, I think you mentioned -- let me ask it this way.

24            Did there come a time that you had a romantic

25   relationship with Ms. Ellison?
```

1   A.  Yes, I did.

2   Q.  What was the timing of that relationship?

3   A.  We began dating in 2020, and we dated on and off for about

4   two years.

5   Q.  When did you break up?

6   A.  Our final breakup was in the spring of 2022.

7   Q.  What was the reason for the breakup?

8   A.  I didn't have the time or the energy to put in what I think

9   she wanted from our relationship.  It wasn't the first time

10  that I had that problem.  From a combination of my working

11  hours, but also it's not something I have been great at as a

12  person historically being able to sustain romantic

13  relationships for long periods.  I think my understanding was

14  that she wanted more from it than I was able to give.

15  Q.  Please answer this question yes or no.  Yes or no, would

16  you have philosophical conversations with her?

17  A.  Yes.

18  Q.  Yes or no.  This is not -- just answer as to the person.

19          THE COURT:  I'm sorry.  Maybe start that one again,

20  please.

21          MR. COHEN:  I am trying to keep this very tight, your

22  Honor.

23  Q.  As to those conversations, who would initiate them?

24  A.  Generally, she would.

25  Q.  Without giving any of the substance, what would be the

 1  nature of the conversations?

 2  A.  Generally, she would stake out a position on some

 3  philosophical topic, usually a contrarian one, and we would

 4  debate it.

 5  Q.  Now, before we move on, you mentioned there was a time when

 6  you stepped down as CEO of Alameda.

 7          Do you recall that, sir?

 8  A.  Yes.

 9  Q.  Ms. Ellison and Mr. Trabucco became co-CEO?

10  A.  Yes.

11  Q.  Then Ms. Ellison.

12  A.  Yes.

13  Q.  You remained an owner?

14  A.  Yes.

15  Q.  Did you receive any reporting from Ms. Ellison?

16  A.  I did.

17  Q.  What kind of reporting did you receive?

18  A.  In addition to sort of unofficial or scattershot things as

19  scenarios arose, the standard thing that I would get would be

20  balance sheets from her periodically.

21  Q.  Would you get other financial documents as well?

22  A.  Yeah.  I would get associated documents to those balance

23  sheets.

24  Q.  Did you receive them on a regular basis?

25  A.  Yeah.  Once every couple of months.

```
 1              MR. COHEN:  Let's pull up Defense Exhibit 78 for
 2    identification for the witness only.
 3    Q.  Take a moment to go through this, sir, and just let me ask
 4    you if you have seen it before?
 5              THE WITNESS:  Click on the parameters briefly.
 6              MR. COHEN:  Click on the parameters.
 7              THE WITNESS:  Scroll up, and to the left.  Sorry.
 8    A.  Yes, I have.
 9    Q.  What is it?
10    A.  This is one of those balance sheets and associated
11    underlying data that she would send me.
12    Q.  This is from 2021?
13    A.  From late 2021 and early 2022.  It covers two dates.
14    Q.  And this document was sent to you in the ordinary course of
15    Alameda's business?
16    A.  Yes.
17    Q.  It was her regular practice to send you such documents?
18    A.  Yes.
19              MR. COHEN:  The defense offers DX-78.
20              MS. SASSOON:  Objection, your Honor.
21              THE COURT:  Basis.
22              MS. SASSOON:  Hearsay.
23              THE COURT:  Address the business records point,
24    please.
25              MS. SASSOON:  Yes.  The defense counsel asked two
```

1   leading questions, but he has not established what went into

2   preparing these documents.  It has multiple tabs with tons of

3   data.  He didn't put in that data, he has not authenticated

4   that data, and he didn't prepare this balance sheet.

5          MR. COHEN:  He doesn't have to prepare it for it to be

6   a business record.

7          MS. SASSOON:  He has not established a foundation for

8   how Ms. Ellison prepared it and how he knows that it was

9   prepared in the regular course of business.

10          THE COURT:  Sustained for the moment.  See if you can

11   lay a better foundation.

12   Q.  Mr. Bankman-Fried, what was the data contained in this

13   document?

14   A.  The data contained in this document was for a particular

15   time period.  The positions or balances of Alameda across all

16   the platform --

17          MS. SASSOON:  Objection.  Foundation.

18          THE COURT:  Yes.  You want to rephrase it.

19          MR. COHEN:  Yes.

20   Q.  Did you have any discussions with Ms. Ellison about how

21   this document was prepared?

22   A.  Yes.

23   Q.  Tell us about those.

24          MS. SASSOON:  Objection.  Hearsay.

25          THE COURT:  Sustained.

1              Presumably you're offering it for the truth, right,

2   Mr --

3              MR. COHEN:  Yes, your Honor.

4   Q.  In the course of those discussions, without revealing those

5   discussions, did the method of preparation come up?

6   A.  Yes.

7   Q.  What was your understanding of the method of preparation?

8              MS. SASSOON:  Objection.  Derived from hearsay.

9              THE COURT:  Sustained.

10  Q.  Mr. Bankman-Fried, without getting into the specifics, did

11  you have an understanding of how this document was prepared?

12  A.  Yes.

13  Q.  Tell us.

14             MS. SASSOON:  Objection.

15             THE COURT:  Sustained.

16  Q.  Do you know the inputs that went into this document,

17  Mr. Bankman-Fried?

18  A.  Yes.

19  Q.  What were those inputs?

20             MS. SASSOON:  Objection.

21             THE COURT:  Sustained.

22  Q.  Mr. Bankman-Fried, when you were CEO of Alameda, did you

23  prepare balance sheets?

24  A.  Yes, I did.

25  Q.  How did you prepare them?

1    A.   I prepared them by putting together spreadsheets, first

2    assembling the underlying data, and then creating balance

3    sheets based on those.

4    Q.   What inputs did you use?

5    A.   I used as inputs data from the pointer system, which, in

6    addition to being the front-end interface that triggers would

7    use, was also used to refer to the database that Alameda

8    maintained.  I would use from that system Alameda's balances

9    and positions at two different points in time, and, in addition

10   to that, the trades that they had done between those two

11   periods of time to reconcile and confirm that the difference in

12   the balances was similar to the set of trades that happened

13   over that point in time and assumed that was the case, or after

14   adjusting for any errors that came up because of that, I would

15   then create balance sheets based on the data at those two

16   points in time.

17   Q.   Did there come a time that you stopped preparing the

18   balance sheets?

19   A.   Yes, I did.

20   Q.   Who took over for you?

21   A.   Ryan Salame and Caroline Ellison.

22   Q.   Did you provide them with the format that you had used?

23   A.   Yes, I did.

24   Q.   Taking a look now at DX-78 for identification, was this the

25   same format?

1  A.  It is a very similar format drive from the same process.

2         MR. COHEN:  Offer.

3         MS. SASSOON:  Objection.

4         Your Honor, they had an opportunity to authenticate

5  this through the witness --

6         MR. COHEN:  Can we have a nonspeaking objection,

7  please.

8         THE COURT:  Counsel, we are all trying to do the same

9  thing here, which is get to the bottom of things in a fair and

10  appropriate way.  If it's helpful when I look at counsel who

11  just objected, it usually signifies that I'm waiting to hear

12  what the objection is.

13         Now, if you want to take the view that if I or a

14  subsequent court will sustain whatever I do with respect to an

15  objection, whatever I do, if there is any imaginable basis on

16  which I might have been right, we can proceed that way.  But if

17  you would rather proceed on the basis that I should know what

18  the objection is and rule on what the objection is, that might

19  be preferable.  Don't you think?

20         MR. COHEN:  I think we should proceed on whatever

21  basis your Honor thinks is best.

22         THE COURT:  So we will do that.

23         That doesn't mean I'm inviting lots of speaking

24  objections or lots of sidebars.  Believe me, I'm not.  But I

25  have to know what's going on here in counsel's mind in this

1   particular instance.

2          MR. COHEN:  I would be happy to come up to the

3   sidebar.

4          THE COURT:  Let's take one thing at a time.

5          The phrase "from the same process" is stricken.  It is

6   unresponsive and it of course is not based on personal

7   knowledge from what the record shows so far.  If you'd like to

8   have a sidebar on the rest of it, let's do it.

9          MR. COHEN:  No.  I think we should move on, your

10  Honor.

11         THE COURT:  If you want to brief it over the weekend,

12  I gather we will have an opportunity to do that.

13         MR. COHEN:  OK.  I am sure your Honor would love a

14  brief over the weekend.

15         THE COURT:  You can be certain of that.

16         MR. COHEN:  We will come back to this.

17         Let's take this down for now.

18  Q.  Without looking at the document, can you describe the kind

19  of financial information Ms. Ellison would provide you?

20  A.  Yeah.  She would provide chiefly tabs that had a

21  consolidated balance sheet for Alameda Research, generally two

22  different periods in time, a start and an end time, which would

23  have assets and liabilities and net-asset values.  And also in

24  those spreadsheets would be the set of positions at those two

25  points in time that generated that balance sheet and also a set

1   of trades between those points in time.

2   Q.  You mentioned something called positions.  What was that?

3   A.  Yeah.  It's a term that was used differently by different

4   platforms that Alameda would access, but often positions would

5   be used to refer to what the equivalent of balances was for

6   futures.  So if you had a balance of plus five Bitcoins and a

7   negative $400, you might have a position of plus five Bitcoin

8   futures and a balance of plus $100.

9   Q.  You also mentioned that part of the information related to

10  trades.  What did you mean by that?

11  A.  The trades that Alameda had done across all of the

12  exchanges that it traded on between those two points in time.

13  Q.  Thanks, Mr. Bankman-Fried.

14          Let's move forward.  I want to talk about some of the

15  marketing spending by FTX.

16          Did FTX have a marketing team?

17  A.  Yes.

18  Q.  Who was on that team?

19  A.  There were around 15 people or so on that team.  Sina was

20  one of the leaders of that team.  There were regional people in

21  different countries as well.

22  Q.  Did you interact with the team?

23  A.  I did.

24  Q.  How did you do that?

25  A.  I was CEO of the company, and so I would be involved at a

1   high level in some decisions, and for particularly important

2   decisions I would sometimes be involved in the details of what

3   they were discussing, often in discussions with Sina or others

4   who are leading the team, sometimes with the team as a whole.

5   Q.  Did FTX ever use an outside marketing firm?

6   A.  Yeah.  It used multiple.

7   Q.  What was your approach?  We are now in the period of 2021?

8   What was your approach to marketing?

9   A.  Going into it, I was unsure of how to approach marketing.

10  I had absolutely no background in marketing.  I had no idea how

11  companies would market, how it would be successful, and what we

12  should do.  But as FTX began to grow from thousands of

13  customers, most of whom were deep in the crypto community and

14  had heard about us from social media or their friends, to a

15  business with hundreds of thousands, then millions of users, it

16  became important for us to think about marketing.

17         So I began to think much more about marketing over the

18  course of 2021 and came to some views about pathways that we

19  should try doing.

20  Q.  What were those views?

21  A.  The primary views that I came to were that I was skeptical

22  of what was called performance marketing, which meant Facebook

23  ads and Google ads; basically, the little squares you would see

24  when using one of those platforms saying, click here to try

25  FTX.  I had not been convinced that those were effective.

However, I came to the view that I thought that it might be
quite effective to do brand marketing, things like
partnerships, sponsorships, so I began exploring with a few
other employees at FTX what brand partnerships FTX could
potentially form.

MR. COHEN:  Can we call up Government Exhibit 343 in
evidence.

Q.  I want to focus on the first entry for the Miami Dade FTX
Arena.  Can you see that, sir?

A.  Yes.

MR. COHEN:  Can you also expand that to row 3, cell 3P
further out, where it says years.  Go back.  Go back to your
left, Brian.  Right there is fine.

Q.  First, tell me how the -- did FTX sponsor the Miami Dade
FTX Arena?

A.  Yes, it did.

Q.  How did it come about?

A.  In 2021, prompted by me, we began seriously investigating
stadium naming opportunities.  The reason that I prompted that
was it had been my impression that the names of stadiums of
professional sports teams in America, particularly baseball,
football and basketball teams, were very widely known.  I, as a
somewhat average-level sports fan, could name dozens of stadium
names, almost all of which I have never been to, and that was
true of others I talked to as well.

1        It seemed to me at the time to give a level of brand

2   awareness that was far above and beyond other partnerships that

3   we were presented with.  I remember comparing it to various

4   commercials that I saw which, at least anecdotally to me at the

5   time, appeared to have almost zero recollection value.  I would

6   watch a commercial that was played before every single football

7   game involving Dak Prescott and Sleep Number bed, and nobody

8   who I talked to who watched those games could remember that,

9   but many of them could remember arena names.

10        Because of that, I felt like that arena names were

11   potentially a big opportunity in marketing.

12   Q.   Did you consider any other arenas?

13   A.   I did.  Our marketing team, which was smaller at that

14   point, reached out to various agents to figure out if there

15   even were any arenas that were available to be renamed.

16   Generally, they are under long-term contracts, and that year

17   there were four or so major arenas that were potentially

18   available.  I remember FTX or, at that point, American Airlines

19   Arena for the Miami Heat, a basketball team; the New Orleans

20   Saints arena, football team; the Kansas City Chiefs, another

21   football team; and the Kansas City Royals, a baseball team.

22   Q.   How did you land on Miami?

23   A.   We explored the New Orleans Saints and the Kansas City

24   Chiefs.  Both of them had already been in talks with their

25   partners that they ultimately went with.  And with no offense

1    to the Royals, I didn't want to be known as the Kansas City

2    Royals of crypto exchanges, so we passed on that one.  And we

3    pursued ultimately the Miami Heat Arena.

4    Q.  If you could look up at line 1A.

5          MR. COHEN:  If we go, Brian, a little bit to the left.

6    Q.  It says that the agreement was for 19 years?

7    A.  Yup.

8          MR. COHEN:  Continue to the right, Brian.

9    Q.  The total payment was $135 million and the first payment

10   was 14 million?

11   A.  Right.

12   Q.  What did that mean to you, sir?

13   A.  That meant that it was -- I believe there were a few other

14   payments in the lines below it that were associated with it as

15   well.  Putting those together, it was around $10 million per

16   year for this contract.

17   Q.  Did you think this was a good use of marketing expenses?

18   A.  I did.  The thought process I had at the time was that 10

19   million a year was around 1 percent of FTX's revenue, and I

20   imagined that this might increase FTX's brand awareness by much

21   more than 1 percent, that it might grow the business by far

22   more than what it cost.  My understanding at the time was that

23   when I looked into competitors' marketing budgets, they tended

24   to be around 100 percent of the revenue.  We were spending 10

25   to 20 percent of ours on marketing, which felt to me

1   comfortable, so we pursued this.

2   Q.  Where did you believe the funds were coming from to support

3   this sponsorship?

4   A.  FTX's corporate funds, the revenue that it had made and the

5   investments that venture capital firms had made in the company.

6          MR. COHEN:  We can take this slide down.

7   Q.  I think you mentioned a few times in your testimony the

8   term venture investments.

9   A.  Yup.

10  Q.  Can you tell us what you understood that to mean.

11  A.  Yeah.  Alameda and other companies made a number of venture

12  investments over a few-year period.  I understood that or at

13  least I used that to refer to a few different types of

14  investments, basically Alameda either investing early stage in

15  companies that were not public companies yet -- they were not

16  listed on the New York Stock Exchange, like Apple or Google

17  were.  They were startups -- or it could have meant and in some

18  cases did refer to investing in cryptocurrency tokens that were

19  not yet listed or very recently listed that were sort of akin

20  to early-stage projects or anything else that was in the nature

21  of those.

22  Q.  You used the phrase early stage several times.  Could you

23  explain that to the jury, please.

24  A.  Yeah.  That basically means a company or project that

25  wasn't yet mature, so not a company that had been around for 30

1   years and had a stable business that was effectively

2   unchanging.  Instead, something more like a startup that was a

3   few years old, where their business was still rapidly changing,

4   ideally growing, and most of the point in investing was

5   depending on what you hoped it would be, not what it already

6   was.

7   Q.   Did you ever hear the term due diligence?

8   A.   Yes.

9   Q.   What was that?

10  A.   That referred to the process that you would have prior to

11  an investment where we would research the company, talk to it,

12  look through its documents and, based on those, come to a

13  decision about whether or not to invest.

14  Q.   Did you perform due diligence before making venture

15  investments?

16  A.   Yeah.  I and others did.

17  Q.   Who were the others?

18  A.   Ramnik was the person most involved in it.  There are a

19  team of people under him.  Amy was involved as well.  And in

20  some of them I was involved.

21  Q.   You mentioned Ramnik.  Who was that?

22  A.   He was the head of -- his title was originally head of

23  product at FTX.  He ended up leading the investment and

24  fundraising arms.

25  Q.   Was his last name Arora?

1   A.  Yes, that is correct.

2   Q.  Who was Amy?

3   A.  Amy was a former venture capitalist who we had hired to

4   work on and help lead our investment team as well.

5   Q.  I don't want to go through all the investments.  I just

6   want to talk about one.

7        Do you recall the investment in Solana?

8   A.  Yes.

9   Q.  Can you describe for the jury the due diligence, if any,

10  that was performed.

11  A.  Yes.  Solana is a cryptocurrency.  It's a token, like

12  Bitcoin or Ethereum.  In the spring of 2020, it was a new

13  cryptocurrency, had just been launched.  We were investigating

14  various blockchains at the time to compare them and figure out

15  the pros and cons.  I and others had calls with the leadership

16  of most of the major cryptocurrency teams in the space and

17  asked them questions about their technology, about their future

18  projections, how they were going to get there, what they were

19  prioritizing, and came away with the impression from those

20  calls that Solana was --

21        MS. SASSOON:  Objection.  Hearsay.

22        THE COURT:  Yes.

23        Don't tell us what anyone else said,

24  Mr. Bankman-Fried.

25  Q.  To his honor's point, just tell us what your takeaway is.

1   A.  Understood.

2            MS. SASSOON:  Objection.  It is based on hearsay.

3            THE COURT:  Sustained.  That's another way of doing

4   it, but it's still hearsay.

5   Q.  Following his Honor's ruling, say what you did.

6   A.  I ended up believing --

7            MS. SASSOON:  Objection.

8   Q.  Just tell us --

9            MS. SASSOON:  He can describe what he did, not what he

10  believed based on his conversations.

11  Q.  Tell us what you did in connection with the Solana

12  investigation.

13  A.  I ended up making a significant investment in the

14  cryptocurrency Solana at prices starting, I think, around 20

15  cents per token.

16  Q.  Where did you believe the funds for the venture investments

17  came from?

18  A.  I believe that they came from Alameda Research's operating

19  profits and, in some cases, from the loans that it had from

20  third-party borrow lending desks.

21  Q.  What entities would make the investments?

22  A.  It varied.  Sometimes, especially for liquid -- for tokens

23  that were already trading, it would be Alameda Research's core

24  trading entities.  For more early-stage projects, or things

25  that were not in the cryptocurrency sector, it would generally

1  be made by one of the Alameda Research venture-related

2  entities, and occasionally there would be a new entity created

3  for an investment.

4          MR. COHEN:  Let's call up GX-80, please, in evidence.

5  Q.  Take a look at GX-80.  That indicates that an entity called

6  Alameda Ventures LLC had changed its name to Clifton Bay

7  Investments LLC.

8          Do you see that, Mr. Bankman-Fried?

9  A.  Yes.

10 Q.  Why was the name changed?

11 A.  This was in, I believe, October of 2022, on or around

12 October 2022.  By that point it had become clear that the

13 venture investing didn't chiefly belong under the Alameda

14 Research brand or umbrella.  It had less and less to do with

15 Alameda's core business of arbitrage and market making.  We

16 hadn't yet decided what the long-term brand would be for it and

17 the long-term structure.  This was an initial step in the

18 direction of separating it out from Alameda's brand towards a

19 dedicated venture investing brand.

20         MR. COHEN:  We can take that down.

21 Q.  From time to time, would Alameda make loans to you,

22 Mr. Bankman-Fried?

23 A.  Yes.

24 Q.  How did that come about?

25 A.  It came in general -- it usually came because there was an

 1   investment that I wanted to make and that I needed capital for,

 2   so it would borrow funds from Alameda for it.  This was also

 3   the case for some donations and contributions that I made.

 4   Q.  Why did you believe you could borrow funds from Alameda?

 5   A.  I owned Alameda, I was the primary owner of it, and it had

 6   had a few billion dollars, to my understanding, of

 7   arbitrage-based profit over the prior few years and far more

 8   than that in operating capital.  So I saw no reason that I

 9   couldn't borrow funds from it.

10   Q.  Were those loans documented?

11   A.  I believed that they all were at the time.  I think most of

12   them were, but the most recent ones may not have been yet

13   documented.

14   Q.  Let's move on.

15          MR. COHEN:  We could pull up GX-3, please.

16   Q.  GX-3, without going through it in detail, is a list of a

17   number of properties in the Bahamas.

18          Do you see that, Mr. Bankman-Fried?

19   A.  Yes, I do.

20   Q.  Did FTX purchase those properties?

21   A.  Yes, it did.

22          MR. COHEN:  We can take it down.

23   Q.  Why did FTX purchase the Bahamas properties?

24   A.  We were relocating our corporate headquarters to the

25   Bahamas, and we wanted the core staff to move there.  We also

1    wanted to hire a number of new employees to work for FTX from

2    the Bahamas headquarters.  As part of that we wanted to provide

3    an easy pathway for them to have housing in the Bahamas; rather

4    than as part of the recruitment and job starting and job

5    training process, have steps devoted to evaluating Bahamian

6    real estate agents.  Since the company just did that work, it

7    purchased a number of properties and rented them out to

8    employees as part of an incentivization package essentially.

9    Q.  What types of people were you trying to recruit?

10   A.  The typical employee would be a highly compensated employee

11   at Google or Facebook joining our software developer team.

12   Q.  Where did you believe the funds for the Bahamas, the

13   purchase of the Bahamas properties came from?

14   A.  From FTX's operating cash.  That is the same thing as the

15   FTX Arena funds, which is to say from its revenue and from

16   venture capital investments in the company.

17   Q.  Who was responsible for being the public face of FTX?

18   A.  I was.

19   Q.  Why did you do it?

20   A.  It was an accident at first.  I hadn't intended to be a

21   public face of anything.  I'm somewhat introverted, naturally.

22   I took a few interviews and those ended up going better than I

23   thought they would.  After not too long, there was more demand

24   for me to do interviews.  Even when it became sort of

25   overwhelming, when there were more PR and interview requests

1    than I could manage or that made any sense for me to be doing

2    as CEO, by that point it was too late to have a new public face

3    of the company.  I had become that public face.  Most of the

4    outlets weren't interested in having someone else speak.

5              MS. SASSOON:  Objection.

6              THE COURT:  Strike what other outlets were or weren't

7    interested in.

8              MR. COHEN:  We can move on.

9    Q.  Why did you wear the shorts and the T-shirts?

10   A.  I found them comfortable.

11   Q.  What about not getting a haircut?

12   A.  I was kind of busy and lazy and didn't bother getting

13   haircuts for long periods of time.

14             MR. COHEN:  Let's pull up GX-1451.

15   Q.  Do you recall seeing that, Mr. Bankman-Fried?

16   A.  Yes, I do.

17   Q.  Where was that taken?

18   A.  This was taken in Los Angeles at the 2022 Super Bowl.

19   Q.  I am going to ask you to identify whoever you can in the

20   photograph, starting at the left.

21   A.  That's Katy Perry on the left.  Next to her is Orlando

22   Bloom, her partner.  Michael Kives is in the center in the

23   white shirt.  That's me next to Kives.  On the right there is

24   Kate Hudson.

25   Q.  Were you in the Super Bowl stadium?

1    A.   Yes.

2    Q.   How did you come to be there?

3    A.   I was going to LA for a few business trips.  It was around

4    the time of the Super Bowl.  We were running a Super Bowl ad

5    that year, FTX was, and for some reason at the time those fit

6    together in the minds of myself and a few people at the company

7    and it seemed natural for me to go to the Super Bowl.  I had

8    never been.  I thought maybe it would be interesting.  So I

9    ended up there.

10   Q.   When had you met Michael Kives?

11   A.   Two nights earlier.

12   Q.   Whose suite or box was that?

13   A.   This was -- it was the box that Kives and friends were in.

14   I am not sure exactly who was renting it.  I had been wandering

15   around the stadium late for another meeting.

16            MS. SASSOON:  Objection.

17            THE COURT:  Yes.

18   Q.   Let me ask, to counsel's point, how did you come to be in

19   the box?

20   A.   I had been wandering around that area of the stadium late

21   for another meeting I couldn't find.  I ran into them and they

22   invited me in.

23   Q.   Now, who was Mr. Kives?

24   A.   Mr. Kives --

25            MR. COHEN:  You can take that down.

1  A.  He was formerly a talent agent who had become an investor

2  and venture capitalist.

3  Q.  Did there come a time you invested in his company?

4  A.  Yes.

5  Q.  What was his company?

6  A.  K5.

7  Q.  Which entity actually did the investment?

8  A.  It was funded by Alameda Research.  I don't know off the

9  top of my head the name of the entity that did the investment.

10  Q.  What was the reason for investing in K5?

11  A.  I thought that they had a number of very promising venture

12  investments and, in addition to that, they had a number of

13  promising -- what they called incubations, essentially

14  companies that they would help start, that they would help get

15  off the ground, and then take an ownership stake in return for.

16  Q.  Did Mr. Kives have relationships with celebrities and

17  politicians?

18  A.  Yeah, he did.

19  Q.  Did you take that into consideration in making the

20  investment?

21  A.  I did.  I felt like it could be potentially useful for FTX

22  to be able to have brand partnerships.  I wasn't sure of the

23  exact pathway that that might take.

24  Q.  Did there come a time that you became interested in making

25  donations to political candidates?

1    A.   Yup.

2    Q.   When about did that begin?

3    A.   I made my first substantial contributions in 2020, but I

4    became much more involved and did far more in 2021 and 2022.

5    Q.   Why did you get involved with political donations at that

6    time?

7    A.   I had come to the belief that I could have substantial

8    impact on the world.  There were issues that I personally cared

9    about for the world a fair bit, pandemic prevention being the

10   chief one.  And I believe that the most effective way to help

11   prepare the world for future pandemics was through policy and

12   through discussions with Congress and the executive branch.

13   Q.   Were any political donations related to FTX's business?

14   A.   Yeah, there were some that were.  There were a few that

15   were specifically done by FTX or to cryptocurrency logging

16   organizations.  That wasn't the purpose of the majority of the

17   contributions, but it was the purpose of some.

18   Q.   The ones that were related to the business, what was your

19   goal in making those donations?

20   A.   Primarily, trying to foster the formation of a regulatory

21   structure for the crypto industry in the United States.

22   Q.   Did others at FTX make donations?

23   A.   Yeah.

24   Q.   Who?

25              MS. SASSOON:  Objection.  Foundation first.

1          THE COURT:  Yes.  Sustained.

2     Q.  Based on your interaction with others at FTX, did you ever

3     come to learn whether other employees of the company made

4     political donations?

5     A.  Yes, I did.

6     Q.  Who was that?

7     A.  I know that Ryan Salame and Nishad Singh both made

8     political contributions.  Others may have as well.  I am not

9     aware of significant contributions by others.

10    Q.  Let's take them one at a time.  Did you ever have

11    discussions with Mr. Salame about political donations?

12    A.  Yup.

13    Q.  Did you ever tell him to make donations?

14    A.  No.

15    Q.  What would have happened if he said he didn't want to make

16    one?

17         MS. SASSOON:  Objection.

18         THE COURT:  Sustained.

19    Q.  Did you ever direct Mr. Salame to make donations?

20    A.  No.

21    Q.  Did you have discussions with Nishad Singh about donations?

22    A.  Yup.

23    Q.  Did you ever direct him to make donations?

24    A.  No.

25    Q.  Based on your interactions with Mr. Salame and Mr. Singh

1  about donations, did you come to a view of where the funds were

2  coming from for their donations?

3  A.  Yes.

4  Q.  What was that?

5           MS. SASSOON:  Objection, your Honor.

6           THE COURT:  Sustained.

7  Q.  Let me go back to your donations, Mr. Bankman-Fried.  What

8  was the source of funds for your donations?

9  A.  Loans from Alameda Research.

10 Q.  Did you hire political consultants at all?

11 A.  Yes.

12 Q.  Do you remember who you hired?

13 A.  There were a number of them for different purposes.

14 Guarding Against Pandemics is a group that we worked with a

15 bunch, on the crypto side there were others that we worked

16 with, and there were a dozen or so others in the wings.

17 Q.  What was your reason for hiring political consultants?

18 A.  I had had a full-time job.  I was not an expert on

19 political donations.  I wasn't an expert on where they would be

20 effective.  I was not an expert on how to do them effectively

21 or in a compliant way.  And I didn't -- it wasn't going to

22 become my area of expertise, so I talked with consultants and

23 others about it.

24 Q.  Do you remember the name Michael Sadowsky?

25 A.  Yup.

1    Q.   Who was he?

2    A.   He was one of the people that ran Guarding Against

3    Pandemics.

4    Q.   During this same period of 2020 to 2021, did you give to

5    charitable causes?

6    A.   Yes.

7    Q.   Where did the funds come from that you gave to charitable

8    causes?

9    A.   So, similarly, they were from -- some were made directly by

10   Alameda Research, some were contributions that I gave, and the

11   majority of the funds for that were loans that I took out from

12   Alameda.

13   Q.   During this period did you also engage with members of the

14   United States Congress and their staff?

15   A.   Yes.

16   Q.   What was your reason for doing that?

17   A.   There were two chief reasons.  The first was, I would talk

18   with them about pandemic prevention and other nonbusiness

19   related areas that I cared about for the world.  The second

20   was, I had a number of discussions with them about

21   cryptocurrency regulation.

22   Q.   What was your goal in connection with cryptocurrency

23   regulation?

24   A.   The primary goal --

25           MS. SASSOON:  Objection.  I believe this was asked and

1    answered.

2          THE COURT:  Overruled.

3    A.  The primary goal was helping to establish a regulatory

4    framework for crypto in general in the United States, and in

5    some cases specifically one that FTX would hopefully be able to

6    participate in.

7    Q.  Now, FTX, the FTX we have been talking about, was an

8    international company, correct?

9    A.  That's correct.

10   Q.  So why were you interested in U.S. regulation?

11   A.  There was a different company that, as you said, we have

12   not been talking about, FTX US.  FTX US was a separate exchange

13   that I had started which was small, quite small, compared to

14   FTX international but which was U.S. based which did take U.S.

15   customers and which was seeking to offer crypto futures

16   products in the United States through regulatory frameworks

17   there.

18   Q.  When did you start FTX US?

19   A.  2020.

20   Q.  Now, did there come a time that you testified in front of

21   Congress?

22   A.  Three times, yes.

23   Q.  Approximately when was the testimony?

24   A.  There was one in late 2021, I don't remember the exact

25   date, there was one in early 2022, and there was one in the

1    late spring, early summer of 2022.

2    Q.  So starting with the first one at the end of 2021, you

3    recall what body you testified before?

4    A.  The House Financial Services Committee.

5    Q.  How did that come about?

6    A.  The committee was hosting a hearing on cryptocurrency, and

7    they asked a few people in the industry to testify.  They

8    requested that I come to testify.  I originally declined.  They

9    reached back out and reiterated their request more strongly, at

10   which point I accepted.

11   Q.  And the testimony in early 2022, where was that before?

12   A.  That was the senate agricultural committee.

13   Q.  Why the agricultural committee?

14   A.  The CFTC, the Commodity Futures Trading Commission, was the

15   prime U.S. regulator for commodity futures contracts and in

16   particular for Bitcoin futures contracts.  As such, it was my

17   understanding at the time that if there would be a regulatory

18   license law framework for a company like FTX, it was likely to

19   be issued by the CFTC, and in fact FTX US had a subsidiary with

20   a CFTC license at that point.  The senate agricultural

21   committee had oversight over the CFTC.

22   Q.  Did the FTX have a government affairs department?

23   A.  Yes.

24   Q.  What did that do?

25   A.  It assisted on everything related to FTX US' operations in

1  Washington D.C., chiefly meetings with regulators and

2  congressmen and their staffers about the crypto industry as a

3  whole and regulatory frameworks for it, and with respect to FTX

4  US derivatives applications, in particular for licensure.

5  Q.  Who was the head of that group?

6  A.  Mark Wetjen.

7  Q.  Do you know Mr. Wetjen's background?

8  A.  Yes.  He was a former --

9          MS. SASSOON:  Objection.  401.

10          THE COURT:  Sustained.

11  Q.  How did Mr. Wetjen come to be hired by FTX?

12  A.  I had met Mr. Wetjen as an employee of another exchange --

13  not a cryptocurrency exchange; a traditional exchange in the

14  United States -- that we had been in talks with.  I started

15  talking more with him about his goals, and he seemed like a

16  very good fit as a head of policy for FTX US.

17  Q.  Before your testimony did you make written submissions?

18  A.  Yes.

19  Q.  Did you work with anyone on those submissions?

20  A.  Yes.

21  Q.  Who was that?

22  A.  Mark Wetjen and Zach Dexter were both involved.

23  Q.  Who was Zach Dexter?

24  A.  Zach Dexter was the CEO of FTX US Derivatives, the

25  subsidiary of FTX US that had a CFTC license.

1  Q.  I think you mentioned three times in the testimony.  We

2  have talked about two.  The third time was in the middle of

3  2022, is that right?

4  A.  Yes, that's right.

5  Q.  Who did you testify before then?

6  A.  The house agricultural services committee.

7  Q.  What was the reason for that testimony?

8  A.  I think I mangled the name a little bit, but the house

9  agricultural committee.

10       FTX US Derivatives had an application before the CFTC

11  to expand its license, to allow it to actually offer

12  cryptocurrency futures in the traditional sense in the United

13  States.

14       There was -- I was aware of a fair bit of political

15  talk about this in Washington, D.C.  The house agricultural

16  committee ended up hosting a hearing on FTX's application, FTX

17  US Derivatives application to the CFTC.  So it was a house

18  committee hearing on the company that I owned, and there were

19  competitors of ours who I believed to be pushing back against.

20       MS. SASSOON:  Objection.  No foundation.

21       THE COURT:  Beyond that, it's essentially all

22  unresponsive.  The question was:  Who did you testify before?

23  And the answer was:  The house agricultural committee, and then

24  it went on from there.

25       MS. SASSOON:  I believe the question was, what was the

1   reason for the testimony?  And this portion of the answer, your

2   Honor, about what he believed competitors were doing, there is

3   a lack of foundation.

4          THE COURT:  Thank you.  Sustained.

5          MR. COHEN:  Let me come back to that.

6   Q.  Mr. Bankman-Fried, did you come to a view as to what

7   competitors were doing with regard to the agricultural

8   committee?

9   A.  Yes.

10         MS. SASSOON:  Objection.

11  Q.  Before you answer --

12         THE COURT:  What's the ground?

13  Q.  What's the basis for it?

14         THE COURT:  Excuse me.

15         MS. SASSOON:  Leading.

16         THE COURT:  Overruled.

17  Q.  Don't tell me what they said.  Just tell me what your basis

18  for it was.

19  A.  My basis for it was conversations with staff both at FTX

20  and with staff of congressmen.

21  Q.  What was your understanding then?

22         MS. SASSOON:  Objection.

23         THE COURT:  What's the relevance of this, counsel?

24         MR. COHEN:  It's to round out why he was appearing on

25  this testimony which the government has played for the jury.

1          MS. SASSOON:  Your Honor, not only is this not

2    relevant, but it's clear that the answer is derived from

3    hearsay conversations, not any firsthand observations by the

4    witness.

5          THE COURT:  Sustained.

6          MR. COHEN:  We will move on.

7    Q.  New topic, Mr. Bankman-Fried.

8          Are you familiar with something called EcoSerum?

9    A.  Yes.

10   Q.  What was that?

11   A.  It was an entity that was pushing for adoption of a token

12   called Serum, SRM.

13   Q.  Did you ever hear of the phrase staking?

14   A.  Yes.

15   Q.  What does that mean to you?

16   A.  Staking referred to a practice in the cryptocurrency

17   ecosystem where if you held some cryptocurrency asset, you

18   could do what's called staking it, which meant effectively

19   putting it somewhere, locking it up for some period, often so

20   it couldn't be withdrawn, and then giving an interest payment

21   as a reward for doing so.

22   Q.  Could customers on FTX stake their Serum?

23   A.  Yes.

24   Q.  What would they receive if they did so?

25   A.  They would receive tokens, chiefly Serum tokens, but also

1    in some cases other tokens as a reward over time.

2    Q.  Did there come a time that you had a discussion with anyone

3    about ECO Serum staking?

4    A.  Yes.

5    Q.  When was that?

6    A.  This was in late 2021 or early 2022.

7    Q.  Who did you speak with?

8    A.  Nishad.

9    Q.  Tell us what you said.

10   A.  I had told Nishad that I saw a significant increase in

11   interest payment -- sorry.  That's later on.  This one was, I

12   had told Nishad or, rather -- I apologize.  I told Ramnik first

13   and then later had a conversation with Nishad about the same

14   topic.

15   Q.  Let me do it this way, sir.

16          At the end of the year, year end 2021, did you have

17   any conversations with Ramnik?

18   A.  Yes.

19   Q.  What was the topic of those discussions?

20   A.  So with Ramnik I had a conversation around FTX's revenue

21   for the year 2021.

22   Q.  What did you say?

23   A.  I saw that it was -- that it looked to me at the time like

24   it was going to be a little over $1 billion.

25   Q.  Did it turn out to be over $1 billion?

1    A.  Ramnik told me that his calculations had it as a little bit

2    under $1 billion.

3    Q.  What, if anything, did you do after that?

4    A.  I asked him to first confirm if that was correct because my

5    calculations were a little bit different, and if it was correct

6    to check if there were any other sources of revenue that we

7    were missing that would frankly get it over 1 billion.

8    Q.  And what happened after that?

9    A.  I didn't hear back about it for a little while.  I then

10   asked Ramnik for an update on it.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. COHEN:

Q.  Moving back, why did you want the revenue to get over a billion?

A.  It's just a round number.

Q.  Okay.  Did you hear back from anyone about this issue?

A.  Yeah.  I heard from Ramnik that Nishad had updates on it, so I then asked Nishad.

Q.  What did he tell you?

A.  Nishad told me that he had dealt with it.

Q.  Did you come to learn anything more about that?

A.  Yeah.  I——I asked him what that meant.  He said that there were EcoSerum staking rewards that were another 50 million or so of revenue.

Q.  And what had been done, if anything, with those rewards?

A.  That there were——that FTX was charging a fee on the interest payments made for people staking EcoSerum——I believe it was about a 25 percent fee on the interest payments——and that that was contributing revenue to FTX.

Q.  And that's what got you to the billion?

A.  Uh-huh.

Q.  What was your reaction to that?

A.  I was a little surprised.  I had not thought of EcoSerum-staking-related things at all.  I hadn't been anticipating getting that as a response.  I had been anticipating either that no, there was no other revenue or yes,

1    there were other, you know, interest payments with respect to

2    some program that I had thought more about or maybe OTC-related

3    things that had not been accounted for.

4    Q.  You mentioned OTC-related things.

5    A.  Yes.

6    Q.  What is that?

7    A.  There was an OTC platform and feature on FTX whereby

8    customers, if they wanted to, instead of putting out an offer

9    to buy a Bitcoin for $10,000 in an order book, they could

10   instead go to a market maker, usually Alameda, and just say,

11   I'd like to buy one Bitcoin, what price would you sell that at

12   right now, they'd give back a number, and they could either

13   accept or decline.

14   Q.  In connection with reaching a billion dollars in revenue

15   for 2021, did you—did the topic of backdating any document

16   come up?

17   A.  I don't recall it coming up, no.

18   Q.  Were you familiar with something at FTX called the

19   insurance fund?

20   A.  Yes.

21   Q.  What was that?

22   A.  The insurance fund is a word we used to describe the amount

23   of money that we were pledging to cover customer account

24   losses.  This was related to the risk of clawbacks or

25   socialized losses.

1    Q.  Can you explain how that worked.

2    A.  Yes.  So if there were a customer account that had a margin

3    position, either futures or—or a spot open, markets moved, its

4    assets declined in value, and it ended up with more liabilities

5    than assets, it ended up with, say, you know, $3,000 of

6    liabilities, $2,000 of assets backing that, it had a net

7    liability of a thousand dollars, would close down the accounts

8    position but it would still have that net liability, and

9    someone had to cover it.  Either it had to be FTX had to cover

10   it or FTX's customers had to cover it.  That's what socialized

11   losses or clawbacks were.  But before those came, FTX would try

12   and cover it.  The insurance fund, that was the amount of money

13   FTX pledged to use to cover such customer account losses.

14            MR. COHEN:  Can we call up GX 751 in evidence.

15   Q.  Okay.  If you look at the top, there's an FTX message.  The

16   5.25 million—

17            MR. COHEN:  Can you highlight the top, Brian.

18   Q.  "The 5.25 million FTT we put in our insurance fund in 2019

19   now makes the fund worth over 100 million USD."  What was your

20   understanding of that, Mr. Bankman-Fried?

21   A.  My understanding was that we were pledging to our customers

22   that if there were any losses from—from a customer's account,

23   before socializing any losses on other users, before clawing

24   back funds, FTX would spend at least 5.4 million US dollars and

25   5.2 million FTT tokens in covering that account.

1   Q.  And then underneath it, there's something called backstop

2   fund——

3   A.  Yes.

4   Q.  ——with size and some number.  Do you see that?

5   A.  Yes.

6   Q.  Okay.  Were you the person who calculated the numbers

7   behind the backstop fund?

8   A.  No.

9        MR. COHEN:  Okay.  All right.  You can take that down.

10  Q.  Did there come a time that the insurance fund did not cover

11  a large loss?

12       MS. SASSOON:  Objection, leading.

13       THE COURT:  Sustained.

14  Q.  Let me come at it this way:  Have you ever heard of an

15  entity called MobileCoin?

16  A.  Yes.

17  Q.  What was MobileCoin?

18  A.  MobileCoin was a cryptocurrency.

19  Q.  Okay.  And did there ever come a time that there was an

20  issue with MobileCoin on the exchange?

21  A.  Yes.

22       MS. SASSOON:  Objection.  Still leading.

23       THE COURT:  I'll allow it.

24  Q.  Tell us about that.

25  A.  Yes.  So there was a trader on FTX that put on a

1    significant position in a few cryptocurrencies.  MobileCoin was

2    one; BTMX, another cryptocurrency, was another one.  The

3    account grew in value and was borrowing a substantial amount,

4    collateralized by those assets.  It grew to hundreds of

5    millions of dollars in assets and hundreds of millions of

6    dollars that it was borrowing.  That was significant but not

7    particularly unusual for FTX at the time.  However, there was a

8    steep increase in the price of the assets it was using as

9    collateral——BTMX and MobileCoin and others.  BTMX went up over

10   a thousand percent over, so more than ten times in price.  That

11   significantly increased the value of its account, and the

12   amount that it could and did borrow against that.

13           As this was happening, concerns were raised to me by

14   Ryan Salame and Gary and Nishad about whether this account was

15   engaging in something improper.  They expressed concerns to me

16   that this account might be——although we, to my knowledge,

17   didn't have proof——that that——that it was——or confidence that

18   it was——might be engaging in what we would have thought of as

19   market manipulation.  As——as the judge said, I don't mean that

20   as a legal term, just as my understanding of what that meant.

21   In particular, their concern was that it might be causing a

22   substantial increase in the price of BTMX and MobileCoin and

23   others.

24           MS. SASSOON:  Objection.  Narrative.

25           THE COURT:  Sustained.  Ask another question,

1    Mr. Cohen.

2            MR. COHEN:  Sure.

3    Q.  As a result of what was going on, did FTX suffer a loss?

4    A.  FTX did not itself suffer a loss, no.

5    Q.  Did any entity suffer a loss?

6    A.  Alameda took on a large position.

7    Q.  Why was that?

8    A.  This trader's position grew to hundreds of millions of

9    dollars in assets and in borrows.  I looked at it and said that

10   I was going to take responsibility for monitoring it.  I

11   probably didn't do as good a job as I could have.  The account

12   ended up withdrawing a lot of money, exploiting a——a loophole

13   that I hadn't noticed, and at that point I became very

14   concerned about the account's position.  It still had a

15   negative——a positive value, rather.  The assets were still

16   worth far more than the liabilities, but the assets had

17   increased a extremely large amount, very recently, and I was

18   skeptical of the future pricing of those.  This was time for

19   the risk engine process to kick in.  But the position was large

20   enough and the tokens illiquid enough that it couldn't happen

21   in the order book.  It went to the backstop liquidity provider

22   system, and the only backstop liquidity provider willing to

23   take on a large position in those tokens was Alameda Research.

24   As such, we passed that account's position over to Alameda

25   Research.

1    Q.  Did the insurance——

2               MS. SASSOON:  Objection.  Objection, your Honor, to

3    the testimony that it was Alameda Research.  That's not a

4    person.  Saying Alameda Research was willing to take on the

5    position.

6               THE COURT:  Overruled.

7               But let me clarify something.  You said the position

8    was large.  That was a position in what, just for clarity?

9               THE WITNESS:  It had assets of a few different

10   cryptocurrencies——MobileCoin and BTMX——and it had borrows of a

11   significant amount of US dollars and Bitcoin.

12              THE COURT:  And the tokens were illiquid, what did

13   that mean?

14              THE WITNESS:  The trading volume was not that large in

15   BTMX particularly and MobileCoin.  In addition to that, their

16   price——at least BTMX's price——had gone up by more than a factor

17   of 10 over the past weeks, which I felt was potentially

18   indicative of a market that might not sustain itself.

19              THE COURT:  And so by tokens illiquid, did you

20   mean——or did you mean something else——did you mean that if you

21   went to sell the tokens, you couldn't get the price at which

22   the tokens had been trading in the very near recent past?

23              THE WITNESS:  That is essentially what I meant, yes.

24              THE COURT:  Thank you.

25              Please go on.

1          MR. COHEN:  Thank you, your Honor.

2     BY MR. COHEN:

3     Q.  Did the insurance fund wind up being involved here?

4     A.  Not substantially.  I'm not sure if it was involved not at

5     all or only to a small extent.

6     Q.  Why is that?

7     A.  The account still had positive net asset value when it was

8     passed off to Alameda Research as a backstop liquidity

9     provider.  In addition to that, I felt at the time that I had

10    taken responsibility for the management of that account by

11    saying as much to Ryan and Gary and Nishad, that I felt that

12    they had been right to be concerned about it, that I had not

13    done as much as I should have monitoring that account

14    subsequent to taking responsibility, and that as such, it was

15    further appropriate that Alameda Research, which I owned,

16    should be the one to end up with that position.

17    Q.  Why not FTX?

18    A.  So FTX itself did not take positions in assets like that.

19    FTX was not itself a backstop liquidity provider and didn't

20    itself take on liquidating accounts.  It would pass them on to

21    trading firms that knew how to deal with large token balances.

22    Q.  And did it wind up going to Alameda?

23    A.  Yup.

24    Q.  Okay.  All right.  New topic, Mr. Bankman-Fried.

25          I think you mentioned several times Slack and Signal.

1   A.   Yup.

2   Q.   What were they?

3   A.   They were two messaging platforms that FTX used.

4   Q.   Why did FTX use them?

5   A.   It used them chiefly because they had a much better

6   platform designed for conversational-style interactions.  Email

7   works well for distributing a message to a person or group of

8   people or for a back-and-forth with one person on a topic, but

9   Slack, for instance, had a number of features that made it easy

10  to create channels for different topics, to have different

11  threads within the channel, to post files or comments, to

12  interact with many people at once on those in realtime, and so

13  it was—it was I understood to be one of the standard workplace

14  communications software, and it was something that we found

15  very useful.

16  Q.   And have you ever heard the term "encryption"?

17  A.   Yes.

18  Q.   What was your understanding of that term?

19  A.   "Encryption" refers to effectively the ability to send a

20  message to someone without third parties overhearing that

21  message.  It was prominent, you know, in World War Two with the

22  Allied and Axis's messages and code-breaking efforts.  In

23  modern internet, I understood it to be a way to communicate

24  messages electronically whereby you would have the message and

25  the recipient would have the message but no one else would be

1     able to see what that message said.

2     Q.  And how, if at all, did Slack and Signal relate to

3     encryption?

4     A.  So both were encrypted from the general public, as in they

5     weren't public messages that you would send.  They would only

6     be visible to the intended targets.  However, with Slack, the

7     company Slack itself would also have access to those messages.

8     Signal had what was called end-to-end encryption, which meant

9     that even Signal, the company, didn't know what messages were

10    being sent, only the sender and receiver did.

11    Q.  And was there a business reason for using this?

12    A.  Yeah.  There were a few different business reasons for

13    using it.

14    Q.  What were they?

15    A.  We were concerned about hacking attempts on ourselves or on

16    third-party providers.  There were a few instances where

17    third-party software that we used got hacked and FTX

18    information that it had access to was leaked out to the world.

19         We were also concerned about ex-employees potentially

20    taking data from the company and selling it to competitors.  We

21    had seen that happen in the industry before.  And especially

22    when we were headquartered in Hong Kong, there were concerns—

23         MS. SASSOON:  Objection, your Honor.  The witness has

24    repeatedly used the phrase "we," "we," "we" here and in other

25    responses, and we'd just like clarification on the "we."

```
 1              MR. COHEN:  I'm happy to follow up, Ms. Sassoon.

 2              THE COURT:  Okay.

 3    Q.  You used the term "we."

 4    A.  Yes.

 5    Q.  Who do you refer to?

 6    A.  I apologize.  I refer to myself there, to me.

 7    Q.  Okay.

 8    A.  I have a habit that I still haven't broken of using the

 9    term "we" so as to not single out myself or other employees.

10    Q.  So going forward, please let us know when you mean "we" and

11    others or "we" yourself.

12    A.  Yes.

13    Q.  Okay.  Did FTX have a——well, let me back up.

14              Have you ever heard of a data retention policy?

15    A.  Yeah.

16    Q.  What did it mean to you?

17    A.  It meant a policy about what corporate records needed to be

18    kept for the long-term, which ones had to be deleted promptly,

19    and which fell into neither category.

20    Q.  Okay.  And did FTX have such a policy?

21    A.  Yeah.

22    Q.  Yes or no:  Did you review it?

23    A.  Yeah.

24    Q.  Okay.  What was your understanding, Mr. Bankman-Fried, of

25    how the policy worked?
```

1   A.  My understanding was that there were groups of documents

2   and records and communications that needed to be preserved for

3   the foreseeable future.  Those included various regulatory

4   interactions, they included all official communications and

5   business records on particular topics, especially topics that

6   regulators had expressed interest in to us.  And that there

7   were, on the flip side, some sorts of records and

8   communications that had to be deleted after some time period

9   for data sensitivity reasons, and then many that there's no

10  requirement in either direction.

11  Q.  Okay.  So three categories?

12  A.  Yeah.

13  Q.  Mr. Bankman-Fried, did there come a time that outside

14  investors invested in FTX?

15  A.  Yup.

16  Q.  Okay.  And about when was that?

17  A.  Other than the seed investment that Binance had made in

18  2019, the first substantial one was in 2021, the spring of

19  2021.

20  Q.  And do you recall what name was given to that?

21  A.  It was the series——I believe it was the series B.

22  Q.  So it was investors invest——outside investors investing in

23  FTX in a round called series B?

24  A.  Yeah.

25  Q.  Do you recall about how much was invested?

1   A.   It was around a billion dollars.

2   Q.   And that was in mid-2021?

3   A.   Yup.

4   Q.   Was there another investment by outside investors in FTX?

5   A.   Yup.

6   Q.   When was that?

7   A.   There was a follow-on investment a few months after that

8   first investment, and then there was another round that was I

9   believe agreed to in late 2021 and closed in early 2022.

10  Q.   Okay.  Let me break this down.  You used the phrase

11  "follow-on."

12  A.   Yes.

13  Q.   What do you mean by that?

14  A.   It was a—I believe we called it the B1 round.  It was at

15  effectively the same or very similar terms to the first, the

16  series B investment, for investors who basically needed more

17  time from that round to complete their diligence process.

18  Q.   And about how much was the series B1 investment for?

19  A.   I believe it was around 500 million or so.

20  Q.   And about when was that?

21  A.   That was in the summer of 2021.

22  Q.   Okay.  And was there another investment in FTX by outside

23  investors?

24  A.   Yup.

25  Q.   When was that?

1   A.  That was negotiated and agreed to in late 2021, closed in

2   early 2022.

3   Q.  Okay.  And did that have a name?

4   A.  I believe it was—that was a series C.

5   Q.  Series C.  And about how much was invested in that round?

6   A.  I think it was around a billion as well.

7   Q.  Okay.  Now coming back to the series B round, what

8   information, if any, was provided to the investors before they

9   invested?

10  A.  Before they invested, there were a number of documents and

11  spreadsheets that we sent to prospective investors, and in

12  addition, we had conversations with them.

13  Q.  Did you ever hear the term "data room"?

14  A.  Yes.

15  Q.  What does that mean to you?

16  A.  It's a—a folder, effectively, posted online, where you can

17  upload a bunch of files and share them with people.  In this

18  case, we had a data room for—that we created that we uploaded

19  files to that the investors could look at.

20  Q.  And that was for the series B?

21  A.  Yeah, although we had one for each of the investment

22  rounds.

23  Q.  Would the data room get updated from time to time?

24  A.  Yup.

25  Q.  Okay.  What would it be updated with?

1    A.  It would be updated with new documents and new financials

2    as they came out, or other sort of ad hoc things.

3    Q.  On the FTX side, who interacted with outside investors?

4    A.  Ramnik was the one who did so the most; I did so as well;

5    and then there were some people who occasionally did.

6    Q.  Do you remember who they were?

7    A.  The people who occasionally did?

8    Q.  Yes.

9    A.  There would occasionally be a call for developers, and so I

10   think Nishad was on a couple calls with investors at some point

11   in time.  We would sometimes have some someone from our finance

12   team get on the call with prospective investors.  I think

13   Jayesh was sometimes on calls with investors.  We would

14   sometimes have someone from the US team, from FTX.US, on calls

15   with investors.  Brett Harrison and Zach Dexter were both on

16   some calls.  We also would sometimes have someone from the

17   legal department on the calls, which would be Dan Friedberg or

18   Can Sun.

19   Q.  You mentioned someone named Jayesh.

20   A.  Yes.

21   Q.  Who was that?

22   A.  He was the head of finance for FTX International.

23   Q.  And what was his last name?

24   A.  I——Peswani.  I'm mispronouncing that, I'm pretty sure.

25   Q.  That's okay.  And you said on the US team you mentioned a

1  new name, Brett Harrison.

2  A.  Yes.

3  Q.  Who was that?

4  A.  He was for a time the president of FTX.US.

5  Q.  Okay.  Have you ever heard, in connection with an outside

6  investment, the term "valuation"?

7  A.  Yes.

8  Q.  What does that mean?

9  A.  That meant the value of the total company according to an

10  investment round.  So if investors, for instance, bought

11  10 percent of a company for $5 million, that would mean the

12  valuation of the total company was 50 million.

13  Q.  Okay.  And if you recall, sir, what valuation——

14            THE COURT:  Excuse me.  Again, to clarify.

15            MR. COHEN:  Sure.  Sorry, your Honor.

16            THE COURT:  That's just one way of putting a value on

17  a company that's not publicly traded, right?

18            THE WITNESS:  That is correct.  That is the only way

19  I've ever heard the term "valuation" used in that context, but

20  that does not mean it's the only way one could decide what the

21  company is worth.  One could absolutely come up with other

22  metrics that——to value a company.

23            THE COURT:  Let's go on.

24            MR. COHEN:  Thank you, your Honor.

25  BY MR. COHEN:

1    Q.  What valuation were the investors using in the rounds we've

2    just described?

3    A.  Yeah, so again, using the metric that—that—that I had

4    talked about, the first round, the series B round, was a

5    valuation of roughly $18 billion.  The last round, the series

6    C, was of 40 billion.

7    Q.  So investors were investing in FTX in the last round at a

8    valuation of 40 billion.

9    A.  Yeah.

10   Q.  Okay.

11           MR. COHEN:  Your Honor, this might be a good time for

12   our afternoon break.

13           THE COURT:  Okay.  Fifteen minutes, folks.

14           THE DEPUTY CLERK:  Will the jury please come this way,

15   bring your notebooks with you.

16           (Recess)

17           (Continued on next page)

18

19

20

21

22

23

24

25

1                    (In open court; jury not present)

2              THE COURT:  Okay.  Everybody here?  Please be seated.

3              Counsel, just so you have it in mind, though I'm not

4    going to say anything to the jury now, I don't know how this is

5    going to go over the next few days, but if we are not done by

6    next Thursday, I'm considering sitting next Friday.

7              MR. COHEN:  Understood, Judge.

8              THE COURT:  Okay.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury present)
 2              THE COURT:  The defendant and the jurors all are
 3    present, as they have been throughout.
 4              You may continue, Mr. Cohen.
 5              MR. COHEN:  Thank you, your Honor.
 6    BY MR. COHEN:
 7    Q.  Mr. Bankman-Fried, I want to move forward in time now.  I
 8    want to call your attention to May of 2022.  What, if anything,
 9    did you—did you observe occurring in the crypto markets at
10    that time?
11    A.  There was a large decrease in cryptocurrency prices.
12    Q.  Okay.  Can you give an example of what you saw.
13    A.  So Bitcoin, the largest cryptocurrency, fell from roughly
14    $40,000 per coin to about 30,000, so 25 percent decrease, and
15    most other cryptocurrencies had similar declines.
16              MR. COHEN:  Can we call up DX 1614, please, in
17    evidence.
18    Q.  This is a price, list of prices for Bitcoin.  Calling your
19    attention to the May 2022 period, what did you observe,
20    Mr. Bankman-Fried?
21              THE COURT:  Hasn't he just told us precisely that?
22              MR. COHEN:  Well, okay.
23    Q.  Let me go further.  Did you observe anything beyond May,
24    Mr. Bankman-Fried?
25    A.  After May, that it—
```

1    Q.   Yeah, in terms of Bitcoin.

2    A.   Yeah.  After dropping to about $30,000 in May, it fell

3    again in mid-June to about $20,000.

4         MR. COHEN:  Okay.  We can take 1614 down.

5    Q.   And did this have any impact on the market?

6    A.   Yeah.  The whole crypto market fell both times.  Many coins

7    fell similar amounts to what Bitcoin had, a few—

8         MS. SASSOON:  Objection, your Honor.  I don't think

9    the witness is in a position to opine whether it was this that

10   caused an impact on the market.

11        THE COURT:  Mr. Cohen, what do you say?

12        MR. COHEN:  I think I can get at it a different way,

13   your Honor.

14   BY MR. COHEN:

15   Q.   Mr. Bankman-Fried, were you familiar with a company called

16   Terra and a company called Luna?

17   A.   It was one ecosystem, but yes.

18   Q.   What did you know about them?

19   A.   Terra was a cryptocurrency, Luna was another

20   cryptocurrency, related to each other.  Terra was a volatile

21   cryptocurrency that was, you know, the token representing the

22   value of the project.  Luna—sorry.  Luna was.  I misspoke.

23   Luna was the volatile one.  Terra was a stablecoin, which means

24   it—it's—it was intended to maintain a price of about 1 dollar

25   consistently.  Its backing was in Luna tokens, however.

1  Q.  What, if anything, did you observe with regard to Terra and

2  Luna in the May period?

3  A.  In May 2022, Luna crashed close to zero from tens of

4  billions of dollars of value, and then Terra, which was backed

5  by the value of Luna, fell close to zero as well, losing its 1

6  dollar peg.

7  Q.  Were you familiar with a company called Three Arrows

8  Capital?

9  A.  Yes.

10  Q.  What were they?

11  A.  They were a cryptocurrency trading firm, sort of like

12  Alameda.

13  Q.  Did you observe anything happening——what did you observe,

14  if anything, with regard to Three Arrows Capital during this

15  period?

16  A.  Three Arrows Capital ended up going bankrupt in June of

17  2022, and I understood that that had been caused by, among

18  other things, them having——

19       THE COURT:  Sir, sir, you were asked what you

20  observed, not what you understood.

21  Q.  Just what you observed.

22  A.  Understood.  Three Arrows Capital went bankrupt in June of

23  2022.

24  Q.  Okay.  And continuing, I think earlier you mentioned

25  certain crypto lenders——

1    A.   Yeah.

2    Q.   ──do you recall that?  And again, who were the large

3    lenders in the space?

4    A.   Genesis, Celsius, BlockFi, and Voyager were four of the

5    larger ones.

6    Q.   What, if anything, did you observe about them in the May to

7    June period?

8              MS. SASSOON:  Objection, your Honor.  Vague.

9              THE COURT:  Rephrase, please.

10             MR. COHEN:  Okay.

11   Q.   All right.  I'll take it one by one then.

12             Mr. Bankman-Fried, what, if anything, did you observe

13   in the market with regard to Celsius?

14             MS. SASSOON:  Objection, your Honor.  Same objection.

15             THE COURT:  Sustained.

16   Q.   Were you in communication with any of the lenders during

17   the May to June period?

18   A.   Yes.

19   Q.   Okay.  And did you also observe what was happening to them

20   in the marketplace?

21   A.   Yes.

22   Q.   Okay.  And what──just your personal knowledge, sir.  What

23   did you observe?

24             THE COURT:  Sustained.

25             MS. SASSOON:  Objection, your Honor.

```
 1              THE COURT:  Look, if somebody called in a loan on
 2   which his company was on the hook, that's one thing, but that's
 3   not what you're doing.  You're asking much broader questions.
 4              MR. COHEN:  Okay, your Honor.
 5              THE COURT:  And you're calling for all kinds of
 6   hearsay.  And opinion.
 7              MR. COHEN:  Okay.
 8   BY MR. COHEN:
 9   Q.  Did the decline in price in Bitcoin have any impact on
10   Alameda?
11   A.  Yes, it did.
12   Q.  What was that?
13   A.  Alameda had been leveraged long the market for the prior
14   year.  That basically means it had a bunch of assets that were
15   correlated with the market, and it had loans, liabilities, many
16   of which were in dollars, and as the market crashed, the value
17   of its assets fell.
18   Q.  Okay.  Let me go back.  You said Alameda had been leveraged
19   long.
20   A.  Yes.
21   Q.  What does that mean?
22   A.  So Alameda had a number of assets.  Some of them——a few
23   billion, to my understanding——were from trading profits from
24   arbitrage.  Substantially more than that, tens of billions, as
25   of late 2021, were from investments that it had made, venture
```

investments.  Those investments, it had financed in part

through borrowing of——from third-party lenders like Genesis and

Celsius and others.  That meant that it had tens of billions, I

think, tens of billions——over 40 billion of assets at the peak

in late 2021, but it also had substantial liabilities.  And it

was leveraged long because the exposure it had to the market

was that it made money if the market went up and it lost money

if the market went down.  Many of its assets had that property.

Most of them did.  And——

Q.  If I could interrupt.

A.  Yup.

Q.  Long meaning you bought the stock?

A.  Right.  Long meaning we bought these companies rather than

short selling, which would be betting on them to decline.  And

it was leveraged because it was more than a hundred percent of

its value was in its positions, because it had taken on debt to

make those investments.

Q.  You also used the phrase "correlated with the market."

What does that mean?

A.  It means that it had historically tended to be the case

that if the cryptocurrency market would increase in value——that

is, say, if Bitcoin and other major cryptocurrencies went

up——that the assets Alameda held would increase in price, and

conversely, that if the market overall were to decline, if

there were a market crash, that the assets Alameda held would

1   decrease in value.

2   Q.  So what happened to Alameda's value around May 2022?

3   A.  Well, there were, you know, large decreases in——in market

4   prices, Bitcoin fell from $65,000 or so at the peak in late

5   2021 to 30,000 in May 2022 and 20,000 in June 2022, and as a

6   result, Alameda's net asset value fell from above $40 billion

7   at the peak in late '21 to around $10 billion ultimately in

8   June of 2022.

9   Q.  One more term.  I'm not sure we defined "net asset value."

10  A.  Ah, yes.  So when a company has assets and also has

11  liabilities, the net asset value is those assets minus those

12  liabilities.  So if you had $10,000 of assets but you took out

13  a $2,000 loan to purchase those, your net asset value would be

14  $8,000.

15  Q.  Are you familiar with the concept of hedging?

16  A.  Yes.

17  Q.  What is your understanding of that concept?

18  A.  Hedging is putting on a trade to protect against the risk

19  of a market move.

20  Q.  Did there come a time that you discussed the topic of

21  hedging with anyone at Alameda?

22  A.  Yes.

23  Q.  Who was that?

24  A.  Chiefly with Caroline Ellison, sometimes with other people

25  as well.

1   Q.  When was the first time you remember discussing hedging

2   with Ms. Ellison?

3   A.  In late 2021.

4   Q.  And what did you say to her?

5   A.  At that time Alameda was leveraged long the market.  It had

6   far more at the time in assets than in liabilities.  It had, my

7   understanding at the time, was something like 50 billion of

8   assets against——

9           MS. SASSOON:  Objection.  Move to strike.  The

10  question was what did he say to her.

11          THE COURT:  The answer is all stricken.  The jury will

12  disregard it.

13          Put the question again.  Please read it back to the

14  witness.

15          MR. COHEN:  Sure.  Read it back.

16          (Record read)

17  A.  I suggested that Alameda hedge its exposure, its risk

18  of——that could come in a market decrease.

19  Q.  Okay.  And what was her response?

20  A.  She discussed it with me.  She ultimately weakly said that

21  she would look into doing so but was——I interpreted her to be

22  far less enthusiastic than I was about it.

23  Q.  After the conversation in late 2021 about hedging, did you

24  have any other conversations about hedging?

25  A.  Yes.

1   Q.   Who were they with?

2   A.   Chiefly with Caroline Ellison, sometimes with other people

3   as well.

4   Q.   Okay.  About how many other conversations did you have and

5   when?

6   A.   I had a conversation every month or two with her over the

7   course of 2022.

8   Q.   And I don't think we have to go one by one, but generally

9   what was the substance of what you said in these conversations?

10  A.   I would check in periodically to see if Alameda had in fact

11  hedged, and was told each time that it had not done so but was

12  planning to look into doing so in the near future.

13  Q.   As of June 2022, had Alameda hedged against the market?

14  A.   No.

15  Q.   You said you also spoke to other people besides

16  Ms. Ellison.  Who was that?

17  A.   Ben Xie and Sam Trabucco and Ramnik Arora.

18  Q.   And again, Ben Xie was?

19  A.   Head of trading at Alameda.

20  Q.   And Sam Trabucco?

21  A.   He was formerly the co-CEO, although on the way out.

22  Q.   Okay.  And I think you mentioned——I think we covered

23  Ramnik.

24  A.   Yes.

25          MR. COHEN:  Can we bring up for the witness Government

Exhibit 36 in evidence.

Q.   Take a moment.  Do you recall seeing this document,
Mr. Bankman-Fried?

A.   Yes.

Q.   And what was it?

A.   This was a document Caroline put together to discuss how to
manage Alameda's risk in late 2021.

Q.   Okay.  And do you recall the context in which this document
was prepared?

A.   Yes, I do.

Q.   What was that?

A.   There were multiple pieces of context, one of which was
Alameda considering making more venture investments, second one
of which was me expressing some concern about Alameda's risk to
Caroline.

Q.   Okay.  Take a look in the middle at the entry called main
question.

A.   Yeah.

Q.   It lists five topics.  Do you see that?

A.   I do, yes.

Q.   Do you recall discussing those topics with Ms. Ellison?

A.   Yes.

Q.   Okay.  Can you go through them for us.  Let's start with
the first one.

A.   Yeah.  Bullet point 1 referred to FTX raising money from

1  equity investors.

2  Q.  And what was that a reference to?

3  A.  That was a reference to the fact that at that point FTX had

4  raised money from equity investors at an $18 billion valuation,

5  and was considering doing another fundraising round.

6  Q.  Okay.  And what about the second entry, "invest in less

7  ventures"?

8  A.  That's somewhat straightforward, but do less venture

9  investing, spend less capital on it.

10  Q.  These were options you were discussing with her.

11  A.  Yes.

12  Q.  What about No. 3, "sell more FTT"?

13  A.  Alameda had a substantial holding in FTT and could have

14  chosen to sell some more of it.

15  Q.  And four, get shorter overall.

16  A.  Yes.  That was referring to hedging.

17  Q.  Okay.  How does shorter refer to hedging?

18  A.  The particular risk that Alameda had, it was long the

19  market.  It had—it owned stakes in assets that were correlated

20  to the market and so it was at risk of losing money if there

21  was a market decrease.  Getting shorter means selling assets,

22  so that would have been the direction that would have protected

23  or mitigated that risk.

24  Q.  Okay.  Did you ever discuss with anyone specific

25  investments that Alameda should hedge?

1   A.  Yes.

2   Q.  Who did you discuss that with?

3   A.  Caroline Ellison, Ramnik Arora, and there were a few other

4   people who were listening in.

5   Q.  When were those discussions?

6   A.  Late 2021.

7   Q.  And do you recall what specific investments you discussed

8   hedging?

9   A.  I recall discussing it as a general matter and then

10  specifically with respect to Genesis Digital Assets, GDA.

11  Q.  And what was GDA?

12  A.  That was the Bitcoin mining firm that Alameda invested in.

13  Q.  And what did you say about——what, if anything, did you say

14  about hedging GDA?

15          MS. SASSOON:  Objection, your Honor.  These refer to

16  conversations with multiple different people and so the

17  question is vague.

18          THE COURT:  Yes.

19          MR. COHEN:  Okay.  I'll break it down.

20  Q.  The conversation about GDA, who was that with?

21  A.  I had a conversation with Ramnik and then a conversation

22  with Caroline and Ramnik.

23  Q.  Okay.  And when were those conversations?

24  A.  Late 2021.

25  Q.  Okay.  Let's take the first one with Ramnik.  What did you

1    say to him?

2    A.   I said that I expected that if we invested more in GDA, we

3    would hedge our stake in the company with Bitcoin.

4    Q.   Why did you say that?

5    A.   GDA was a Bitcoin mining firm.  That meant that the——the

6    revenue that it made was in Bitcoins, and its future business

7    was in Bitcoins.  It, you know, got Bitcoins using computers

8    over time.  Because of that, it was very——seemed very clearly

9    to me to be correlated to the market and to Bitcoin in

10   particular.  I had felt that the GDA investment was good in

11   that we were buying it for less than I expected it would bring

12   in, in profit, but had strong market risk.  And so the trade

13   that I expressed to Ramnik would make sense would be investing

14   in GDA and simultaneously hedging with Bitcoin the market risk

15   from that.

16   Q.   And you mentioned a second conversation with Ramnik and

17   Ms. Ellison.

18   A.   Yes.

19   Q.   What did you discuss with them?

20   A.   In that conversation I informed Caroline that there was

21   going to be an investment in GDA and suggested that Alameda

22   hedge roughly $2 billion worth for it.

23   Q.   Did Alameda put on that hedge?

24   A.   No.

25            MR. COHEN:   Okay.  We can take this down, Brian.

1   Q.  Let me call your attention now to June of 2022,

2   Mr. Bankman-Fried.

3   A.  Yup.

4   Q.  Did an issue arise at that time about Alameda's NAV?

5   A.  Yes.

6   Q.  Okay.  What do you recall happening?

7   A.  The first thing that I recall happening is I was in the FTX

8   hut as were Gary and Nishad, and Caroline came over to us

9   concerned.

10  Q.  Let me stop you for a moment.  You mentioned the FTX hut, I

11  believe.

12  A.  Yes.

13  Q.  What was that?

14  A.  So this was the FTX Bahamas headquarters.  There was a

15  giant parking lot.  On that parking lot there were about seven

16  buildings, which we called huts.  Each one could fit about 20

17  people or so.  And the main part of the FTX headquarters was

18  one of those huts.

19  Q.  Did Alameda also have a hut in that area?

20  A.  Yeah.  One of those seven was Alameda's office.

21  Q.  Okay.  So you mentioned that Ms. Ellison came over to the

22  FTX office.

23  A.  Yes.

24  Q.  Who was there?

25  A.  I was there, Gary and Nishad were there, at least as of

1    later on, Adam Yedidia was there, and there were likely other

2    people in the office as well that I can't remember.

3    Q.   What, if anything, did Ms. Ellison say?

4    A.   She approached us and said that she was concerned that

5    Alameda might have just gone bankrupt.

6                    (Continued on next page)

1    Q.  Did she say anything else?

2    A.  Yeah.  She asked what we should do, what we should tell

3    Alameda's lenders, and if there were other things we should be

4    doing or thinking about.

5    Q.  What was your reaction?

6    A.  I was very surprised and fairly concerned.

7    Q.  Why were you surprised?

8    A.  I had not expected that Alameda would be bankrupt.  Bitcoin

9    had just crashed from $30,000 to $20,000, and I did expect

10   Alameda would have a NAV decrease from that, but I had

11   anticipated that it would still have roughly positive $10

12   billion of net-asset value as of then.

13   Q.  How would you describe her demeanor?

14   A.  She was nervous.

15         MS. SASSOON:  Objection.

16         THE COURT:  Overruled.

17         MS. SASSOON:  She was nervous.  It's not a description

18   of her demeanor.

19         THE COURT:  Overruled.

20   Q.  What happened next?

21   A.  I asked her how confident she was that Alameda had just

22   gone nearly bankrupt.

23   Q.  What, if anything, did she say?

24   A.  She had she was not very confident.

25   Q.  So what happened next?

1   A.  I said that before we got into what steps we had to take,

2   we should first figure out what exactly had happened and what

3   Alameda's NAV definitely was.

4   Q.  Did you speak to anyone else at the time?

5   A.  Yes.  Gary and Nishad.

6   Q.  What happened then?  What did you say to Gary and Nishad?

7   A.  I described the situation, said that Caroline had

8   uncertainties about Alameda's NAV, and she had expressed

9   particular uncertainties about Alameda's balances on FTX, and

10  so asked that they investigate this.

11  Q.  What, if anything, did they do?

12  A.  They spent the next three hours digging into Alameda's NAV

13  in general and its accounts on FTX.

14  Q.  And they being Gary and Nishad were in the FTX office?

15  A.  Yes.

16  Q.  Did Ms. Ellison remain in the office?

17  A.  For some time, but she later went back to the Alameda

18  office to work on it from there.

19  Q.  Prior to hearing this information, what had been your plan

20  for the day?

21  A.  I had a trip scheduled to Washington, D.C. later that

22  afternoon.  I had meetings scheduled with senators and their

23  staff.

24  Q.  Why were you meeting with senators and their staff, very

25  briefly?

1    A.  There was a proposed bill in the senate, senate agriculture

2    committee in particular, that would create a regulatory

3    framework for crypto derivative exchanges.

4    Q.  After your conversation with Ms. Ellison and Gary and

5    Nishad, what did you do with respect to this trip?

6    A.  I put that off.  I was not going to fly to D.C. while

7    Alameda might be bankrupt.

8    Q.  Now, I believe you said that Gary and Nishad spent about a

9    couple of hours working on the issue?

10   A.  Yeah.

11   Q.  Did anyone else help them?

12   A.  Caroline did as well, and then later on Adam Yedidia and

13   Andrea.

14   Q.  Is that Andrea Lincoln?

15   A.  Yes.

16   Q.  Did there come a time that they told you what they had

17   found out?

18   A.  Yes.

19   Q.  Can you go over that for us.

20   A.  Yeah.  After a few hours, they told me that there had been

21   a bug and that Alameda's NAV was about $8 billion higher than

22   Caroline had thought.

23   Q.  What was your understanding about a bug?

24   A.  I didn't --

25            THE COURT:  Could we find out what was said, if that's

1    what you want to elicit.

2            MR. COHEN:  Yes, your Honor.  Your question is better

3    than mine.

4    Q.  What was said about the bug?

5            MS. SASSOON:  Your Honor, I would just ask for

6    clarification about who is speaking.

7            THE COURT:  Please.

8            MR. COHEN:  Let me start again.

9    Q.  Was there a conversation after Gary, Nishad, Adam and

10   Andrea finished their work?

11   A.  After they finished their preliminary work, yes.

12   Q.  Tell us who said what.  Please go through that.

13   A.  Nishad said that there had been a bug that had caused

14   Alameda to miscalculate its balances and that it had $8 billion

15   more than it thought.  Caroline said that that, in turn, meant

16   that Alameda's overall net-asset value was roughly positive 8

17   to $10 billion rather than zero to 2 billion.

18   Q.  Did anyone say anything else?

19   A.  I asked how confident people were in the new number.  I

20   wanted to make sure that there wasn't going to be a further

21   revision back down.  All of the developers' pricing confirmed

22   that they had looked into this and could each corroborate that

23   the new number was the correct one.  I asked Caroline to

24   confirm that this definitely meant that Alameda's NAV was

25   positive 8 to 10 billion, that it hadn't already been taking

1    this into account, and she said that they had in fact confirmed

2    that and that in fact this explained some otherwise confusing

3    decreases in Alameda's assets over the past few months.

4    Q.  How would you describe her demeanor?

5    A.  It appeared to be relieved.

6    Q.  How would you describe Nishad's demeanor?

7    A.  Similar.

8    Q.  And Gary?

9    A.  Similar.

10   Q.  After you had this conversation, what happened next?

11   A.  So after that conversation and after I had confirmed for

12   sure that things were as we understood, a few things happened

13   that day.  The first was that Caroline said that, given this

14   update that Alameda was not in fact bankrupt, that it probably

15   made sense to go ahead and send a balance sheet to lenders who

16   were asking for one.  I said that sounded right to me.  She

17   also said it probably made sense to go ahead and send back

18   loans to lenders who were asking for loans back from Alameda,

19   and I said that that sounded right to me as well.

20   Q.  We will come back to that.

21        Did you have any further discussions with anyone in

22   the room about what to do about -- now that you had found the

23   book?

24   A.  Yes.  With the FTX developers, I suggested, first, that

25   they prioritize fixing this particular bug and making sure that

1   all of the numbers associated with it were correct and, after

2   having done that, that they review whatever system had led to

3   this bug in the first place and strongly consider rewriting

4   that system or cleaning it up because it was probably not a

5   very robust system in my mind if it had led to a very large

6   misreported figure.

7            THE COURT:  Excuse me for a minute.

8            You used the phrase a minute ago, "send back loans to

9   lenders."

10           THE WITNESS:  Yes.

11           THE COURT:  What did that mean?

12           THE WITNESS:  Yeah.  I apologize.  I forgot to give

13   context for that.

14           Some of Alameda's third-party lenders, like Genesis

15   and others, had requested that Alameda return some of the loans

16   that it had taken out from them.

17           THE COURT:  You mean pay them?

18           THE WITNESS:  Yes.

19           THE COURT:  Go ahead, counsel.

20           MR. COHEN:  Your Honor, thank you for clarifying.

21   Q.  In these discussions after the bug was discovered, did the

22   topic of FTX's accounting come up?

23   A.  Yes.

24   Q.  What was discussed?

25   A.  I suggested that it would probably make sense to do a more

1   general overhaul of FTX's accounting, given both this and other

2   things that were going on at the same time.

3   Q.  Now, moving forward, did there come a time that the bug was

4   fixed?

5   A.  Yeah.

6   Q.  Who worked on that?

7   A.  I know that Adam Yedidia and Nishad Singh both worked on

8   it.

9   Q.  Do you know if the fix of the bug was recorded anywhere?

10  A.  Yes.  There is a memo they wrote up to memorialize it.

11         MR. COHEN:  Can we call up DX-488 for identification.

12  Q.  Take a moment to go through this, Mr. Bankman-Fried, and

13  let me when you have.  If you need to see multiple pages, let

14  us know.

15  A.  Yup, that looks like it.

16  Q.  What is this document?

17  A.  This is that memo that was written up.

18  Q.  Did you see it at the time?

19  A.  Yes.

20         MR. COHEN:  The defense offers Exhibit 488, not for

21  its truth.

22         MS. SASSOON:  Objection, your Honor.

23         THE COURT:  Ground.

24         MS. SASSOON:  401 and hearsay.

25         THE COURT:  Mr. Cohen.

1          MR. COHEN:  Your Honor, we are just offering it for

2     the fact that the memorandum was done, not for the content of

3     the memo.

4          THE COURT:  Memorandum being done divorced from the

5     content is not relevant.

6          MR. COHEN:  Not for the -- your Honor, may we come to

7     sidebar?

8          THE COURT:  No.  This is straightforward.

9          Sustained.

10    Q.  You also mentioned that one of the follow-up items was the

11    accounting.  Do you recall what happened after that?

12    A.  Yeah.  There is -- there are two projects related to FTX's

13    accounting.  One of them was to overhaul the entire accounting

14    system and the other was specifically to overhaul the parts of

15    it that were related to bank deposits and withdrawals.

16    Q.  Do you know whether that took place?

17    A.  The second one did take place and was completed.  The first

18    one was begone but not fully completed.

19    Q.  Who handled the project about bank withdrawals?

20         THE COURT:  I think you misspoke.  I think the witness

21    said deposits.

22         MR. COHEN:  I'm sorry, your Honor.

23    A.  Adam Yedidia.

24         MS. SASSOON:  Your Honor, I want to make a foundation

25    objection.  I don't believe it was elicited who was part of the

1    discussions about accounting and how he would know who did this

2    project.

3              THE COURT:  The objection is overruled.  The answer is

4    in.

5              Next question.

6    Q.  Mr. Bankman-Fried, did there come a time that you learned

7    about another liability that Alameda owed to FTX?

8    A.  Yes.

9    Q.  When did you learn about that?

10   A.  I learned about pieces of it at different points in time.

11   The first pieces of it were on this day in June.

12   Q.  Who did you learn about it from?

13   A.  I learned about it from the developers at FTX, from Gary

14   and Nishad in particular, and then later from conversations

15   with Caroline as well, ultimately from a new database that was

16   created.

17   Q.  Let's take them one by one.  Take us through the

18   conversations -- let me ask this.  The conversations with Gary

19   and Nishad, did you speak with them together?

20   A.  There were conversations with us together.  There were also

21   conversations I overheard.

22   Q.  Let's break this down.  The conversations you participated

23   in with Gary and Nishad, what was discussed?

24   A.  The ones in June 2022 or later?

25   Q.  Start with June, and then we will move to later.

1    A.  So in June 2022, around this date, I was told that there

2    was the bug, this $8 billion miscalculation of Alameda's

3    net-asset value.  And Gary and Nishad told me in person that

4    day in the conversation that it was stemming from something

5    called fiat@.  That was the -- that it was related to bank

6    account deposits and withdrawals and two of those that had gone

7    through Alameda historically.

8    Q.  Did you know what fiat@ was at the time?

9    A.  No.

10   Q.  Did you later learn?

11   A.  Yes.

12   Q.  How did you learn?

13   A.  I ultimately learned what it was by looking it up in a

14   database that I ultimately got access to, although I had heard

15   bits and pieces about it in the interim.

16   Q.  Did Gary and Nishad in that initial conversation discuss

17   the size of the liability?

18   A.  There were some discussions about liabilities.  There was

19   also a lot of uncertainty that they were still looking into.  I

20   remember hearing that there was.

21          THE COURT:  Excuse me, please.  We will all get done

22   with this more efficiently if you would focus on the question

23   better.

24          The question was:  Did Gary and Nishad in that initial

25   conversation discuss the size of the liability?  They either

1  they did, they didn't, or you don't recall, presumably.  Would

2  you answer that.

3  A.  I don't recall them specifically discussing that liability,

4  no.

5  Q.  Did there come a time where you had later conversations

6  with Gary and Nishad where you discussed the liability?

7  A.  By the liability, are you referring to the fiat@?

8  Q.  Yes.

9  A.  Ultimately, by October of 2022, yes, there were explicit

10  conversations with them about the fiat@ liability.

11  Q.  Now, you mentioned you also had conversations, I think you

12  said, with Ms. Ellison?

13  A.  Yes.

14  Q.  Do you recall those conversations about the liability?

15  A.  I had conversations with her about Alameda's liabilities

16  and liabilities on FTX.  I am not sure I had conversations with

17  her until later on about the fiat@ liability in particular.

18  Q.  I think you also mentioned Mr. Yedidia.

19  A.  Yes.

20  Q.  Same question.

21         MS. SASSOON:  Your Honor, form.

22  Q.  Do you recall having a discussion with Mr. Yedidia about

23  the liability, fiat@ liability?

24  A.  I don't recall having a discussion at the time with him

25  about the fiat@ liability size in particular.  I don't recall

1    discussing that with him until November 2022, although I did

2    have other discussions with him.

3    Q.  Did there come a time that you learned of the size of the

4    fiat@ liability?

5    A.  Yes.

6    Q.  What was the size?

7    A.  Around 8 billion.

8    Q.  Who did you learn that from?

9    A.  I ultimately learned confidently that the fiat@ liability,

10   in particular its size, was 8 billion from a database.

11   Q.  Can you explain that.

12   A.  Yes.  In around September and October of 2022, FTX's

13   developers had built a second database, a Google-hosted

14   database that was similar to but different -- but not the same

15   as the AWS primary database.  The primary purpose of this was

16   to have a source that nondevelopers could interact with.  They

17   had expressed the concerns to me that if I accidentally

18   requested too much data --

19            MS. SASSOON:  Objection.  Hearsay.

20            MR. COHEN:  Your Honor, I might be able to streamline

21   this, if I might.

22            THE COURT:  We are all on the same team on that.

23            MR. COHEN:  Thank you.

24            THE COURT:  That's not to say that you can elicit

25   hearsay like this.

1          MR. COHEN:  I understand.  I think there is a way to

2     shorten this.  We shall see.

3     Q.  This database you referred to, Mr. Bankman-Fried, when did

4     that come into effect?

5     A.  I am not sure when it first came into effect.  I believe I

6     got access in October of 2022.

7     Q.  Was it a database that had been available to you before

8     October?

9     A.  No.

10    Q.  Did you go on the database?

11    A.  Yes.

12    Q.  What did you find?

13    A.  Among other things, I found something called fiat@FTX.com.

14    Q.  What did you conclude after finding that?

15    A.  That there was an account with a negative $8 billion

16    balance that was a subaccount of an Alameda affiliate.

17    Q.  What was your reaction, if any, of finding out that Alameda

18    had a liability of $8 billion?

19    A.  I was very surprised.

20    Q.  Why was that?

21    A.  I had certainly, as of prior to this sequence, been under

22    the belief that Alameda's total liability to FTX was reflected

23    in the info@ account that I had looked at.  That was Alameda's

24    primary trading account on FTX.  I had seen liabilities of

25    roughly $2 billion in that account and far more than that in

1   assets.  Now I had come to realize that the total liability was

2   far more than that.

3   Q.  How did this liability compare to what you had seen on the

4   info@ account?

5   A.  So this liability was larger.  It was about 8 billion

6   instead of about 2 billion, making roughly 10 billion in total,

7   and without substantial collateral posted directly on the FTX

8   account.

9   Q.  Upon seeing this, what was your reaction?

10  A.  I was surprised.  I reached out to developers to confirm

11  what this was, and I started to think through what the

12  implications of it were.

13  Q.  Did you believe that it could be paid back?

14  A.  Yes.

15  Q.  What did you base that on?

16  A.  I had confirmed multiple times, and I did again, that

17  Alameda's net-asset value had already included all liabilities,

18  including this one, in other words, that Alameda had

19  approximately 10 billion more in the value of its assets than

20  in its liabilities, including this liability.  As such, I was

21  of the view that Alameda had plenty in asset value to be able

22  to cover the liability.

23  Q.  Did you consider any other assets?

24  A.  By other assets, can you clarify, other than what?

25  Q.  Of Alameda.

A.   Yes.   I looked at obviously the collateral on FTX.   I

looked at its off-FTX assets, and I also looked into Paper Bird

and a few other things not on Alameda's balance sheet.

Q.   Let me break that down.   What was Paper Bird?

A.   Paper Bird was a company that held my equity stake in FTX.

Q.   Why were you looking at Paper Bird in connection with this

liability?

A.   In connection with this liability, I wanted to check

basically, is Alameda going to be able to be good for it.   Does

Alameda have enough in value to cover a total liability of $10

billion.   And that meant doing a more comprehensive view of

what assets it had access to.

          Traditionally it had not put my holding in FTX equity

through Paper Bird on its balance sheets.   It had treated those

as separate, but I was more than happy to pledge everything I

had, including that, as security for any of Alameda's

liabilities, including this one, and so it could potentially

act as backup security for liabilities.

Q.   Let me go back for a moment.   I meant to cover this.

          You recall a conversation in June with Ms. Ellison

about repaying Alameda's lenders?

A.   Yeah.

Q.   Did that repayment take place?

A.   Repayments did take place, yes.

Q.   How much was repaid?

1    A.  My understanding was, it was initially around a billion, in

2    total about two billion in June.

3    Q.  How, in your experience, did that compare with other loans

4    that Alameda had paid back to lenders?

5    A.  It was a sizeable but not extremely anomalous loan recall

6    amount.

7    Q.  Where did you believe the funds to pay the lenders were

8    coming from?

9    A.  From Alameda's assets.  Alameda had at the time 5 to $10

10   billion of highly liquid assets off of FTX in its wallets, bank

11   accounts, and other exchange accounts.

12   Q.  Now, I think we discussed earlier that from time to time

13   Ms. Ellison would send you balance sheets.

14           Do you recall that?

15   A.  Yup.

16   Q.  How regularly would she do that?

17   A.  Every month or two.

18   Q.  What would the balance sheets show?

19   A.  They would show Alameda's net-asset value and a

20   consolidated summary of its assets and liabilities.

21   Q.  How long would they be?

22   A.  The ultimate balance sheets would usually be one page,

23   maybe two pages.

24   Q.  During the summer of 2022, do you recall speaking with

25   Alameda's lenders yourself?

1   A.  I did, yes.

2   Q.  Who did you speak with?

3   A.  I had conversations with Genesis, with BlockFi, with

4   Celsius, and with Voyager.

5   Q.  Let's stay with Genesis.  Who did you speak with at

6   Genesis?

7   A.  I spoke with two people:  Matt Ballensweig, who had been

8   one of Alameda's account managers there, and I spoke with their

9   ultimate CEO, so the CEO of the company that owns Genesis.

10  Q.  First of all, who initiated the conversation with the CEO?

11  A.  Genesis.  Matt Ballensweig actually reached out to set that

12  up.

13  Q.  What did you discuss with the CEO?

14  A.  We had a phone call.  We touched on Alameda's borrowing

15  from Genesis, though it was not the primary topic.  The primary

16  topic was Genesis talking about potentially raising equity

17  capital.

18  Q.  From whom?

19  A.  From me.

20  Q.  Me, meaning you personally?

21  A.  Me personally, FTX, Alameda, or any source.

22  Q.  Did FTX ultimately invest in Genesis --

23  A.  No.

24  Q.  -- or provide capital?

25          Did you have a conversation with anyone from BlockFi

1    during the summer of 2022?

2    A.   Yes.

3    Q.   Who did you speak with?

4    A.   I spoke with Zac Prince, CEO, and a number of other people

5    in their management team.

6    Q.   What was the topic of that discussion?

7    A.   The topic was BlockFi potentially raising capital from FTX.

8    Q.   Did FTX ever provide capital to BlockFi?

9    A.   Yes.

10   Q.   How did that come about?

11   A.   After a number of discussions over a fairly brief time

12   period, we understood that it was urgent.  We gave a

13   substantial line of credit, I think a couple of hundred million

14   dollars, to BlockFi in return for options to acquire the

15   company.

16   Q.   Did you have conversations with anyone from Celsius during

17   this period?

18   A.   Yes.

19   Q.   Who did you speak with at Celsius?

20   A.   I spoke with the board of directors.

21   Q.   What was the topic of that conversation?

22   A.   They were looking for emergency capital.

23   Q.   Did FTX provide any capital to Celsius?

24   A.   No.

25   Q.   Finally, did you have conversations during this period with

 1  anyone from Voyager?

 2  A.  Yes.

 3  Q.  Who were those conversations with?

 4  A.  Its CEO.

 5  Q.  What was the topic?

 6  A.  Voyager was looking for emergency capital.

 7  Q.  Did FTX provide any capital to Voyager?

 8  A.  It provided a small amount and did not ultimately provide

 9  more.

10  Q.  Now, let's return back to June of 2022.  You mentioned that

11  you would get balance sheets on a regular basis from

12  Ms. Ellison, is that correct?

13  A.  Yes.

14  Q.  Do you recall receiving a balance sheet from her in or

15  about June 2022?

16  A.  Yeah, roughly then.

17  Q.  Do you recall discussing it with her?

18  A.  Not in depth, but briefly, yes.

19  Q.  Tell us what you remember about that conversation.

20          In fact, hold on.

21          MR. COHEN:  Let's pull up GX-44.

22  Q.  This is GX-44 in evidence.  Do you recognize this, sir?

23  A.  Yes, I do.

24  Q.  What is this?

25  A.  This is the balance sheet that she sent me around then.

1    Q.  And this being the one that's displayed, alt 7?

2    A.  Yes.

3    Q.  Do you recall discussing it with her at the time?

4    A.  Briefly, yes.

5    Q.  Tell us what you remember about the discussion.

6    A.  She said that she was preparing balance sheets for lenders.

7    This was late June.  The second quarter ended at the end of

8    June, so Alameda was going to send an update to most of its

9    lenders in the week or two after this.  She sent me this as a

10   balance sheet that she was planning to send to Alameda's

11   lenders.

12   Q.  What, if anything, did you say to her or she to you about

13   this balance sheet?

14        MS. SASSOON:  Your Honor, objection.  Vague.  He is

15   saying this balance sheet.  There is a full government exhibit,

16   Government Exhibit 44, on the screen.  He has also referred to

17   a single tab.  So I would ask for clarification.

18        MR. COHEN:  Sure.  I thought I had clarified, but I

19   can clarify again.

20   Q.  We are talking about what's displayed on the government

21   exhibit at alt 7.

22   A.  That's what I recall, yes.  It may have been this larger --

23   as part of this larger spreadsheet.

24        THE COURT:  The exhibit appears to contain six or

25   seven parts, and the witness is testifying as if the exhibit is

one thing.

        MR. COHEN:  Right.  I'm getting to that, your Honor.

        THE COURT:  That would be a very good idea.

        MR. COHEN:  You read my mind.

        THE COURT:  No, I didn't.

        MR. COHEN:  Maybe it's unreadable.

Q.  At the bottom -- if you could lift it up a little bit,
Brian -- you notice that there are a number of tabs?

A.  Yup.

        MR. COHEN:  Just for identification, just go to alt 1
and alt 2, alt 5, and so on.

Q.  Mr. Bankman-Fried, do you recall talking about each of the
entries on this spreadsheet?

A.  No.

Q.  Do you recall whether the topic of Paper Bird came up?

A.  Yes.

Q.  How did it come up?

A.  I asked her whether Paper Bird was included in the balance
sheets.  I believe I had asked this once or twice before as
well.

Q.  And what did she say?

A.  She said that, no, it was not included in the spreadsheets
because she didn't view it as a subsidiary or part of the
Alameda group.

Q.  What was your reaction?

```
 1   A.  I said it was totally her call, but that she could consider

 2   doing it.

 3   Q.  Did the topic of limiting any of the materials sent to the

 4   lenders come up?

 5           MS. SASSOON:  Objection.  Leading.

 6           THE COURT:  Sustained.

 7   Q.  What else did you talk about with Ms. Ellison?

 8   A.  To be clear, this is talking on or around June 20?

 9   Q.  Yes.  In connection with this spreadsheet.

10           MS. SASSOON:  Again, objection to this spreadsheet.

11           MR. COHEN:  To alt 7.

12   A.  I recall her saying that she was tentatively planning on

13   sending something like this out, that she had thought about a

14   few different ways of constructing it.  I don't remember any

15   detail being discussed about that.  And I remember looking over

16   it and saying that it seemed reasonable to me.

17   Q.  Let's move forward to July and August, Mr. Bankman-Fried.

18           Do you recall having a conversation with Mr. Yedidia

19   in which the term bulletproof came up?

20   A.  Yes.

21   Q.  First of all, do you remember where that conversation took

22   place?

23   A.  No, I don't.

24   Q.  But you recall what the subject matter of the conversation

25   was?
```

1    A.  Yes.

2    Q.  Why don't you tell us.

3    A.  Adam had asked me what Alameda's risk profile had looked

4    like after the market crash in -- crashes in May and June of

5    2022.  I said that I thought that it -- in effect that it

6    thought it was decent but not bulletproof anymore.

7    Q.  What did you mean by not bulletproof?

8    A.  I meant that I thought that there was some risk associated

9    with Alameda at that point, that I could conceive of a way in

10   which it could reasonably have serious risk further down the

11   road if action weren't taken.

12   Q.  What kind of risks?

13   A.  The risk I was thinking about chiefly at the time was the

14   risk of a future market crash.  Its NAV had fallen from about

15   40 billion to about 10 billion since late 2021, as Bitcoin fell

16   about 70 percent.  I had been of the view that if Bitcoin fell

17   another 50 percent from then, in addition to the 70 percent it

18   had already fallen, as if it had fell down to about $10,000 per

19   coin, that Alameda might then be roughly insolvent.

20   Q.  Let's move forward to August of 2022.

21        You recall mentioning a project to work on the

22   accounting for Alameda's NAV, correct?

23   A.  Yes.

24   Q.  What, if anything, did you notice about Alameda's NAV in

25   August 2022?

1  A.  To be clear, its overall NAV or its NAV on FTX?

2  Q.  Its NAV on FTX.  I'm sorry.

3          MS. SASSOON:  Objection.  Form.

4          THE COURT:  Ground.

5          MS. SASSOON:  What did you notice about the NAV?  It's

6  not something you can see in front of you, so there is no

7  foundation, and the form.

8          THE COURT:  Sustained as to form.

9          MR. COHEN:  Maybe we could do it another way.

10 Q.  Did there come a time, Mr. Bankman-Fried, that you observed

11 anything regarding interest payments on Alameda's account?

12         MS. SASSOON:  Objection.  Leading.

13         THE COURT:  Sustained.

14 Q.  Did you have a conversation with Nishad Singh in or around

15 October -- August 2022?

16         MS. SASSOON:  Objection.

17         THE COURT:  Overruled.

18 A.  Yes.

19 Q.  What was the subject of that conversation?

20         THE COURT:  Was there one conversation or more than

21 one?

22         MR. COHEN:  I was going to take them one by one, your

23 Honor.

24 Q.  Go ahead.  More than one?

25 A.  I had many -- on what topic in particular?

1   Q.   On the Alameda account.

2   A.   Yes.

3   Q.   What was the subject of that conversation?

4   A.   I had noticed that the amount of revenue FTX was collecting

5   from interest had suddenly increased by a substantial amount.

6   I had brought that up with Nishad as just a flag.  It was

7   something I frequently did when I saw it, significant changes

8   in data, so that people would investigate if there was

9   something unexpected going on.

10  Q.   What, if anything, did Nishad say to you?

11  A.   He said, after a little bit of investigating, oh, yeah, I

12  know what's going on there.  I'll deal with that.

13  Q.   Did he tell you what it was?

14  A.   I believe he said something about interest payments in

15  Alameda.  I don't remember there being detail.

16  Q.   Did there come a time when you found out the detail?

17  A.   Yeah.

18  Q.   When was that?

19  A.   That was in, I believe, late October of 2022.

20  Q.   Who did you find it out from?

21  A.   I found it out from Nishad.

22  Q.   What did he tell you?

23  A.   The fiat@ account, the one that had the $8 billion

24  liability, had been moved from its own separate account to

25  becoming a subaccount of info@ of Alameda's primary trading

1    user, which had resulted in a substantial increase in

2    line-of-credit interest payments on that user.  It had then

3    subsequently been moved to a different Alameda affiliated

4    account in -- I don't remember exactly when that second move

5    happened.

6    Q.  Did Nishad tell you why it had been moved?

7    A.  He said that it had been moved in response to interest

8    payments.

9    Q.  Did you ever hear the term around this time the Korean

10   account?

11   A.  Yes.

12   Q.  What was your understanding of that?

13   A.  That was that second Alameda affiliated account.  It had an

14   email address which was roughly seoyun88, I think, and was

15   referred to a few times as the Korean account, and I think I

16   referred to it that way as well.

17   Q.  Continuing in August of 2022, did the topic of hedging come

18   up again with anyone?

19   A.  Yes.

20            THE COURT:  I'm sorry.  I thought we were just

21   discussing October.

22            MR. COHEN:  I had to go back and cover this.

23            THE COURT:  So we are not continuing in August of '22.

24   We are returning, going back.

25            MR. COHEN:  Can we step back.

```
 1              THE COURT:  Return to the future.
 2              MR. COHEN:  Thank you, your Honor.
 3    Q.  Stepping back.
 4    A.  Yes.
 5    Q.  Did the topic of hedging come up again?
 6    A.  Yes.
 7    Q.  Who did it come up with?
 8    A.  Chiefly with Caroline.
 9    Q.  Can you tell us what was discussed with Caroline.
10    A.  Yes.  Subsequent to the June market crash and the fiat@ bug
11    and fix, I became fairly concerned about Alameda's risk.  It
12    had fallen 75 percent in asset value since late the previous
13    year as a result of market crashes.  It had not hedged against
14    those market crashes, despite the many conversations, and I was
15    very concerned that if there was one or two more market crashes
16    subsequent to that, Alameda might go bankrupt.
17    Q.  What would a hedge have done in connection with Alameda's
18    NAV?
19    A.  Had there been a sufficient quantity of hedges late the
20    previous year, its NAV would still have been --
21              MS. SASSOON:  Objection.
22              THE COURT:  What's the objection?
23              MS. SASSOON:  Speculative to say what exact effect a
24    hedge would have.
25              THE COURT:  I think that's for cross-examination.  He
```

1  has already qualified it by saying, a sufficient amount of

2  hedges.  Who knows what that means.

3        MS. SASSOON:  Yes, your Honor.

4        THE COURT:  Let's go ahead.

5  Q.  Please finish your answer, sir.

6  A.  Its NAV would have fallen not very much from the previous

7  year.  It would still be many times higher than it was that

8  day.  In other words, it would have offset much of the losses

9  that its assets had suffered.

10        MR. COHEN:  Can we call up GX-25B in evidence, please.

11  These are notes by Ms. Ellison.

12        Can we turn to the second page, please.  Pull up the

13  paragraph entitled:  Things Sam is freaking out about.  First

14  entry is hedging.

15  Q.  Do you recall discussing this with Ms. Ellison?

16  A.  Yes.

17  Q.  Were you freaking out?

18  A.  I don't tend to show a lot of freakoutness, but relative to

19  my standard, yes.

20        MR. COHEN:  We can take that down.

21  Q.  Now let's move to September, Mr. Bankman-Fried.

22  A.  Yes.

23  Q.  Did there come a time when you considered shutting down

24  Alameda?

25  A.  Yes.

1   Q.  Why were you considering shutting it down?

2   A.  There were a few concerns that were combining in my mind.

3   One was that it hadn't hedged.  It had a large decrease in

4   value from that, and I was concerned about future risk of its

5   positions and also concerned about its risk management

6   capabilities at that point in time.

7          At the same time, I had the impression at the time

8   that its culture had been decaying somewhat, that it was harder

9   and harder for Alameda to hire good employees, chiefly because

10  they kept going to FTX instead, and that there might not be the

11  right management in place for Alameda to justify its risk going

12  forward.

13         MR. COHEN:  If we could call up GX-18 in evidence,

14  please.

15  Q.  Did you write a memo about this?

16  A.  Yes, I did.

17  Q.  Is this the memo?

18  A.  Yes.

19         MR. COHEN:  Call out the second line.  But I think it

20  might be time for Alameda Research to shut down.  It is the

21  second line from the top.  Can you highlight that, Brian.

22         Brian, you can drop that down.  Go back to the

23  reasons.

24  Q.  These were the reasons you have discussed about why you

25  were considering shutting down Alameda?

1    A.  Yes.  Those and some that I have not yet mentioned.

2         MR. COHEN:  If we can call out number 2, Brian, and

3    2A, please, and highlight it.

4    Q.  You said:  The fact that we didn't hedge as much as we

5    should have alone cost more in EV than all the money Alameda

6    has ever made or ever will make, and that's the kind of

7    critical mistake we're likely to make if I'm not actually

8    running the show here.

9         What did you mean by that, sir?

10   A.  I had meant that Alameda had, on the one hand, lost a very

11   large amount of value by not hedging, probably north of $10

12   billion, that, in addition to that, I was concerned that in the

13   future it might make similar mistakes, that those both had

14   negated directly a lot of the value, that Alameda had made all

15   the money that it had made over time, and that any amount of

16   risk that it had caused was a big concern in my mind above and

17   beyond the actual direct money loss so far.

18   Q.  What did you mean by EV?

19   A.  Sorry.  Expected value.

20        MR. COHEN:  We can take this down.

21   Q.  Now, this memo we were just looking at, who did you send it

22   to?

23   A.  I sent this to Gary and Nishad.

24   Q.  And did you have conversations with them about it, either

25   in person or over Signal?

1   A.  I did over Signal.  I am not sure that I did in person.

2   Q.  What did you say to them and they to you?

3   A.  I sent this to them.  I said, roughly, just throwing this

4   out here, interested in your guys' takes on it.

5   Q.  What was their reaction?

6   A.  They took a little bit to discuss it.  They said that they

7   were talking with Caroline about it as well, and they

8   ultimately came back and said they didn't think it was a good

9   idea.

10  Q.  Did they tell you why?

11  A.  I at the time did not feel confident that I had gotten a

12  clear reason why.  I do believe that they said something about

13  it being difficult to shut Alameda down.

14  Q.  Do you recall at a certain point that Caroline was included

15  in the conversations you were having?

16  A.  There were -- there was a separate conversation that did

17  include her ultimately, yes.

18  Q.  Let me just lay the foundation.  This separate

19  conversation, who was on that?

20  A.  Myself, Caroline, Gary and Nishad.

21  Q.  What was discussed in that one?

22  A.  It was on the same topic of whether or not to shut Alameda

23  down.

24  Q.  What was Caroline's view on whether to shut Alameda down?

25  A.  She did not think we should.

1    Q.  Did you end up shutting Alameda down in September?

2    A.  No.

3    Q.  Continuing in September, do you recall having a

4    conversation with Nishad with regard to Alameda's condition?

5    A.  Yes.

6    Q.  How did that come about?

7    A.  I was -- I believe I was traveling.  Some day in September

8    I received a message from him that he wanted to talk to me when

9    I got back.  I got back fairly late that evening, and he asked

10   to talk to me on the balcony of the Orchid.

11   Q.  I'm sorry.  I didn't hear.  Someone was coughing.  You said

12   the Orchid?

13   A.  I'm sorry.  The Orchid 6, the Orchid penthouse.

14   Q.  Did you speak with him on the balcony?

15   A.  Yes.

16   Q.  What did he say to you and you to him?

17   A.  He said that he was very concerned about a number of

18   topics.  He said he was concerned about liabilities, about

19   Alameda, and about marketing, and wasn't sure what to do.

20   Q.  Let's take those one at a time.

21          Nishad said he was concerned about liabilities?

22   A.  Yes.

23   Q.  What did he say to you?  What did you say to him?

24   A.  He said -- and I don't remember it being specified more

25   clearly than what I'm about to say -- that liabilities had

1    gotten far larger than they had used to be or then we had

2    thought they were.

3    Q.  Was he referring to liabilities of Alameda or FTX?

4             MS. SASSOON:  Objection.

5             THE COURT:  Sustained.

6    Q.  Keep going, Mr. Bankman-Fried.  What else did he say, if

7    anything, about liabilities?

8             MS. SASSOON:  Objection.

9             THE COURT:  Ground.

10            MS. SASSOON:  Form.

11            THE COURT:  Overruled.

12   A.  He said that he didn't know what to do and wanted my

13   thoughts on the scale of liabilities, and I think he may have

14   thrown out a number of 8 billion or so.

15   Q.  What did you say to him?

16   A.  I said, effectively, that I was also concerned about

17   Alameda's liabilities, that they were larger than I would have

18   wanted them to be, larger than I had thought they were.

19            I also said that I felt that Alameda still was quite

20   net positive in value, that its net-asset value was around

21   positive $10 billion, that it was still making money trading,

22   and that -- yeah.  Sorry.  On the topic of liabilities.  That's

23   what I remember him saying.

24   Q.  You said the topic of marketing came up.

25   A.  Yes.

1    Q.   What was discussed?

2    A.   Nishad expressed concern about marketing expenses.

3    Q.   What did he say?

4    A.   He said that he was skeptical and concerned with our

5    marketing.  He mentioned FTX's brand partnerships and

6    endorsements.  He mentioned K5, Kives' firm, and thought that

7    they were bad and didn't make sense.

8    Q.   What, if anything, did you say?

9    A.   I said that my impression, although I wasn't confident, was

10   that the more recent marketing opportunities that we found

11   didn't seem very good but that we hadn't been doing many of

12   them for that reason, that the marketing team was a little bit

13   of a mess, in my opinion, at that point in time, and that was

14   one of the reasons I didn't particularly trust the new

15   opportunities they were finding and didn't want to greenlight

16   significant new marketing.

17            I also said that I thought some of the older marketing

18   expenses hadn't turned out to work, that there were some duds

19   there, but that it had been my impression that if you added it

20   up all together, it actually looked quite effective and that,

21   in addition to being very effective, it was a reasonable

22   expense relative to the size of FTX, that FTX was making about

23   a billion a year in revenue, spending 1 to $200 million a year

24   on marketing all told, and that the impact from that put

25   together, I thought, had been quite large and very successful,

1    that a number of our earlier deals -- the FTX Arena being one,

2    the Tom Brady partnership being another one, the MLB umpire

3    patches being the third one, and the Super Bowl commercial

4    being the fourth -- had together been extremely valuable and

5    effective and more than outweighed the other ones, but that I

6    wasn't confident about any piece of that, and that if he and/or

7    Claire, who was his partner and had been looking into this to

8    some extent at the time, want to take charge of this, look into

9    it, come up with the recommendations, make decisions, I would

10   be really happy for them too.

11   Q.  Let me just back up.  Who was Claire?

12   A.  This was Claire Watanabe, Nishad's romantic partner at the

13   time.

14   Q.  Did she live in the apartment with you?

15   A.  Yes.

16   Q.  What connection, if any, did she have to marketing?

17   A.  She had been doing a review of the marketing team at both

18   her own and my initiative because of our suspicions that it was

19   not functioning very well at the moment.

20   Q.  How would you describe Nishad's demeanor during this

21   conversation?

22   A.  I interpreted him to be very nervous, very halting.

23   Q.  How did you leave things at the end of the conversation?

24   A.  I asked if he had any thoughts or suggestions or ideas.  He

25   said he really appreciated the thought of looking into

1  marketing more and that either he or Claire would do so, that

2  he understood my points about it, and he asked me what I

3  thought he should focus on.  I said that there were a huge

4  number of things he could focus on and that he should focus on

5  what he wanted but that, for what it was worth, I thought the

6  most valuable thing that he had been doing by far was the value

7  he had been providing to FTX, both in terms of its code base

8  and in terms of his management and employees.

9       MR. COHEN:  Your Honor, this might be a natural

10 breaking point.

11      THE COURT:  All right, ladies and gentlemen, Monday

12 morning, 9:30.

13      Counsel remain.

14      Enjoy the weekend, folks.

15      (Jury not present)

16      THE COURT:  Mr. Cohen, this is time to play guess the

17 question.

18      MR. COHEN:  Yes.  I think I know what your Honor is

19 going to ask.

20      I would say, your Honor, assuming nothing unusual,

21 extended sidebars, evidentiary issues, and we will take up --

22 over the weekend we will think about your Honor's point about

23 the balance sheets and whether we want to submit anything or

24 not.  I think I will finish in the morning on Monday.

25      THE COURT:  A little finer than that, please, if you

1  can.

2           MR. COHEN:  I think maybe by 11:30, maybe sooner.

3           THE COURT:  What do you anticipate, Ms. Sassoon?

4           MS. SASSOON:  Significant cross-examination, your

5  Honor.

6           THE COURT:  I got that on one.

7           MS. SASSOON:  Sorry.  I missed the end of what you

8  said.

9           THE COURT:  I got that on one.

10          MS. SASSOON:  I would like to --

11          THE COURT:  I am not going to hold you to it.  I just

12  want to try to plan the week.

13          MS. SASSOON:  I don't think anyone would benefit from

14  a day and a half of cross-examination, so I will try to keep it

15  streamlined, and it obviously depends on when the defense

16  finishes.  But if it is midday on Monday, I expect the cross

17  will continue into Tuesday.

18          THE COURT:  Any current view of whether there will be

19  a rebuttal case and, if so, how long?

20          MR. REHN:  Your Honor, we are expecting a brief

21  rebuttal case, probably less than two hours total of testimony.

22          THE COURT:  So that gets us all the way through

23  Tuesday, yes?

24          MS. SASSOON:  Yes.

25          THE COURT:  One more question.  Give me an idea of

1     what each side is going to want in terms of closing argument.

2          MR. ROOS:  I think for the government, somewhere

3     between two and three hours.

4          THE COURT:  Plus rebuttal, yes?  Is that what you have

5     in mind?

6          MR. ROOS:  Plus rebuttal.

7          THE COURT:  Mr. Cohen.

8          MR. COHEN:  About the same for the defense, your

9     Honor.

10          THE COURT:  Putting aside a charge conference, which I

11    anticipate might be somewhat protracted, given the track record

12    in this case, I don't see any real chance of the case going to

13    the jury before Thursday or even Friday.

14          Anybody disagree with that?

15          MR. ROOS:  No.  Depending on what your Honor is

16    thinking for the charge conference, I think there is --

17          THE COURT:  I think it ought to be 10 minutes, and I

18    have tried bigger and harder cases than this with charge

19    conferences that long, but I'm not very sanguine here.

20          MR. ROOS:  Depending on whether the closings would

21    start sometime on Wednesday and carry into Thursday or start on

22    Thursday and likely end on Thursday, I think your Honor is

23    right, that likely the jury is not going to get the case until

24    sometime Thursday or Friday.

25          THE COURT:  Or conceivably Monday.

1          MR. ROOS:  Or conceivably Monday.  Although I think,

2    as your Honor indicated, I think Friday, it would be -- it

3    would make sense, given how things are going, to sit Friday of

4    next week, or at least allow them to deliberate that day.

5          THE COURT:  I'm certainly leaning that way, but I

6    imagine delivering the charge is going to take a matter of

7    hours in this case.  I would like it to be much shorter, but

8    that has been significantly within the hands of counsel.  We

9    may have a lot of disagreements about it, but you've asked for

10   a lot of things.

11         OK.  Anything else we can accomplish this afternoon?

12         MR. ROOS:  Just on the subject of the charge

13   conference, does your Honor want to just wait until we are

14   done, or schedule it now for some time next week?

15         THE COURT:  I am not going to do it until the fat lady

16   has sung.

17         MR. COHEN:  Your Honor, we have one last point.

18         THE COURT:  Yup.

19         MR. COHEN:  If the government is going to go ahead

20   with a rebuttal case, we would ask that the identity of the

21   witnesses be provided to us in advance and not the night

22   before.

23         MR. ROOS:  I think the point of rebuttal is rebuttal

24   to whatever the defense has done.  Since they are still putting

25   on their case, we can't really know, and it may be the night

1    before.  We will keep it in mind.  They gave us maybe 24 hours

2    before they put on their case who the witnesses were, so we

3    will keep that in mind and try to act reciprocally.

4            THE COURT:  All I am going to say about it is, I

5    understand Mr. Cohen's point.  And if I were in his shoes, I

6    would ask for the same thing.  I understand Mr. Roos' point.

7    And if I were in his shoes, I would give you the same answer.

8            Treat each other with respect, which you have almost

9    uniformly done in this case, and any lapses have been

10   uncharacteristic and inadvertent, I know.

11           Thank you.  Good weekend.

12           (Adjourned to October 30, 2023 at 9:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

                          INDEX OF EXAMINATION

Examination of:                                    Page

SAM BANKMAN-FRIED

Direct By Mr. Cohen  . . . . . . . . . . . . .2296

                        DEFENDANT EXHIBITS

Exhibit No.                                   Received

 1096   . . . . . . . . . . . . . . . . . . .2377

 6  . . . . . . . . . . . . . . . . . . . . .2375

 978  . . . . . . . . . . . . . . . . . . . .2321