NAV1BAN1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        22 CR 673 (LAK)

 5   SAMUEL BANKMAN-FRIED,

 6                   Defendant.           Trial
     ------------------------------x
 7
                                         New York, N.Y.
 8                                       October 31, 2023
                                         9:36 a.m.
 9

10   Before:

11
                     HON. LEWIS A. KAPLAN,
12
                                         District Judge
13
                         APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  DANIELLE R. SASSOON
          NICOLAS ROOS
17        DANIELLE KUDLA
          SAMUEL RAYMOND
18        THANE REHN
          Assistant United States Attorneys
19
     COHEN & GRESSER, LLP
20        Attorneys for Defendant
     BY:  MARK S. COHEN
21        CHRISTIAN R. EVERDELL
          SRI K. KUEHNLENZ
22        DAVID F. LISNER

23   Also Present:
     Luke Booth, FBI
24   Kristin Allain, FBI
     Arjun Ahuja, USAO Paralegal Specialist
25   Grant Bianco, USAO Paralegal Specialist
```

NAV1BAN1

1          (In open court; jury not present)

2          THE COURT:  Good morning.  Before we bring the jury

3   out, we've heard from the juror who didn't know her schedule

4   yesterday, and that juror has no problem—that is, with sitting

5   Friday.

6          Juror No. 3 cannot adjust her plans and make the event

7   she wants to make by rescheduling the flight later on Friday.

8   Is that right, Andy, Friday?

9          THE DEPUTY CLERK:  That's correct, Judge.

10         THE COURT:  And in any case, her return flight to New

11  York would be on Saturday.

12         So it seems to me there are three options on the

13  table.  One is, depending on how things go today, we finish the

14  government's rebuttal case, the cross and the rebuttal case,

15  distribute the charge, which would probably be sometime

16  midafternoon, and we do the charge conference today and close

17  tomorrow, with the rebuttal closing going over into the next

18  day, depending on how long the two closings are.  Or we seat an

19  alternate and excuse No. 3.  So I'll be happy to hear views.

20         MS. SASSOON:  The former proposal sounds realistic.

21  Especially given the anticipated remaining length of the cross,

22  it does seem feasible to have the charge conference later today

23  by our estimate, and so at this time, we don't see a need yet

24  to excuse one of the jurors.

25         THE COURT:  Thank you.

 1              Mr. Cohen?

 2              MR. COHEN:  Your Honor, I think our recommendation

 3   would be to wait until the end of the day and see where we are,

 4   because we could get pressed for time, depending on how the

 5   examinations go.

 6              THE COURT:  Okay.  We'll do that.

 7              Let's get the jury.

 8              I take it implicit in counsel's answers is that it

 9   would be appropriate to tell Juror No. 3 that one way or

10   another, she will make her flight.

11              MS. SASSOON:  Yes, your Honor.

12              MR. COHEN:  Yes.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

NAV1BAN1                        Bankman-Fried - Cross

1              (Jury present)

2              THE COURT:  Good morning, everyone.

3              THE JURORS:  Good morning.

4              THE COURT:  The record will reflect that the defendant

5    and all the jurors are present, as they have been throughout.

6              Mr. Bankman-Fried, you are still under oath.

7              Ms. Sassoon, you may continue.

8              MS. SASSOON:  Thank you, your Honor.

9     SAM BANKMAN-FRIED, resumed.

10   CROSS EXAMINATION CONTINUED

11   BY MS. SASSOON:

12   Q.  Mr. Bankman-Fried, you testified about meetings you had

13   with Bahamian government officials after FTX declared

14   bankruptcy in November 2022.  Do you recall that?

15   A.  Yup.

16   Q.  And at that point in time you were still hoping that you

17   could regain control of FTX, right?

18   A.  I was not myself prioritizing gaining control of FTX.

19   Q.  I didn't ask about your priority.

20             THE COURT:  Excuse me.  Yes.  I'm picking up where you

21   were going.

22   Q.  I didn't ask about—

23             THE COURT:  Just—go ahead, Ms. Sassoon.

24             MS. SASSOON:  Thank you, your Honor.  I apologize.

25             THE COURT:  Going the same place, I think.

NAV1BAN1                       Bankman-Fried - Cross

1    Q.  I didn't ask about your priority.  I asked if you were

2    hoping at that point in time to regain control of your company,

3    FTX.

4    A.  My memory is play a role but not control.

5    Q.  I didn't hear you.  I apologize.

6    A.  My memory is no; play a role but not control.

7    Q.  And so at that point in time you were hoping you could

8    still play a role within FTX, correct?

9    A.  Yes.

10   Q.  And at that time you had cultivated a cozy relationship

11   with the Bahamian government, right?

12          MR. COHEN:  Objection.

13          THE COURT:  Sustained as to form.

14   Q.  During your time as CEO of FTX, you spent time meeting with

15   Bahamian government officials, right?

16   A.  Yes.

17   Q.  And you cultivated a close relationship with members of the

18   Bahamian government, right?

19   A.  Some of them.

20   Q.  Philip Davis, for example, he was the prime minister of the

21   Bahamas while you were headquartered there, right?

22   A.  He was.

23   Q.  And you had meetings with him?

24   A.  I did.

25   Q.  In one of those meetings you discussed with him paying off

NAV1BAN1                    Bankman-Fried - Cross

1   the Bahamian national debt of around $11.6 billion, right?

2   A.  I don't remember that.

3   Q.  Just to be clear, you don't remember offering to Philip

4   Davis that FTX would pay off the Bahamian national debt?

5   A.  No.

6   Q.  Isn't it true you offered to help the Bahamian prime

7   minister's son with his job?

8   A.  I offered to have a talk with him, yeah.

9   Q.  About his job?

10  A.  Yeah.

11  Q.  And isn't it true you joked that Ryan Salame, your

12  employee, was effectively a member of the Bahamian government?

13  A.  No, I don't think so.

14          MS. SASSOON:  Let's pull up what's marked as

15  Government Exhibit 2504.

16  Q.  And do you see this is a chat called Project Chinchilla

17  Chatter?  Do you see that?

18  A.  I do see that.

19  Q.  And you're a member of this chat, correct?

20  A.  Yup.

21          MS. SASSOON:  The government offers Government

22  Exhibit 2504.

23          THE COURT:  It's received.

24          (Government's Exhibit 2504 received in evidence)

25          MS. SASSOON:  Mr. Bianco, can you publish that for the

NAV1BAN1                        Bankman-Fried - Cross

1    jury, please.

2    BY MS. SASSOON:

3    Q.   And now that the jury can see it, this is a chat called

4    Project Chinchilla Chatter, correct?

5    A.   Yup.

6    Q.   And it's dated December 2, 2021?

7    A.   Yup.

8    Q.   And you sent messages in this chat?

9    A.   Yup.

10   Q.   And in the first message you wrote, "yeah, tbh——" that

11   stands for "to be honest"?

12   A.   Yeah.

13   Q.   "——the Bahamas has already asked if we want to do anything

14   with their CBDC."  Do you see that?

15   A.   Yup.

16   Q.   And do you see a message from Nick Beckstead at 12:01 a.m.

17   that says, "Leopold is going to look online to try to figure

18   out who in the Bahamas government we should be talking to"?  Do

19   you see that?

20   A.   Yeah, I see that.

21   Q.   And you wrote back, "His name is Ryan Salame."  Right?

22   A.   Yup.

23   Q.   And that was one of your employees, correct?

24   A.   Yup.

25   Q.   You also gave the prime minister and his wife floor-side

NAV1BAN1                    Bankman-Fried - Cross

1    seats at the FTX Arena in Miami, right?

2    A.  I'm not sure.  I think they did go to a game.  I don't know

3    details.

4          MS. SASSOON:  If we could scroll down in this chat,

5    please, Mr. Bianco.

6    Q.  And do you see, you sent a message at 12:04 a.m.?

7    A.  Yup.

8    Q.  And can you read what you wrote?

9    A.  "But yeah the prime minister is currently at FTX Arena in

10   Miami using FTX's floor side seats with his wife."

11         MS. SASSOON:  We can take that down.

12   Q.  In April 2022 you invited the Bahamian prime minister to a

13   private dinner hosted by FTX, right?

14   A.  When was that?  Sorry?

15   Q.  Around April of 2022.

16   A.  It's possible.  I don't remember what that's referring to.

17   Q.  Well, do you recall inviting him to a private dinner in

18   2022 with former President Bill Clinton and former UK Prime

19   Minister Tony Blair?

20   A.  No, but it doesn't surprise me.

21   Q.  Did you in fact attend a dinner with the Bahamian prime

22   minister, Bill Clinton, and Tony Blair?

23   A.  During the conference, the FTX conference, there was

24   a—something like a dinner with them, yeah.

25   Q.  When you say "something like a dinner," was it a dinner?

NAV1BAN1                     Bankman-Fried - Cross

1   A.  It may—— I don't remember whether there was food.  It may

2   have been.

3   Q.  And you were there, right?

4   A.  Yup.

5   Q.  And you had invited the attendees, correct?

6   A.  We had as a company.

7   Q.  And Bill Clinton, he's one of the people you were

8   introduced to by Michael Kives, right?

9   A.  Yeah, that's right.

10         MS. SASSOON:  And at this time the government offers

11  Government Exhibit 1559, which is a video that was shared with

12  defense counsel.

13         THE COURT:  Received.

14         (Government's Exhibit 1559 received in evidence)

15         MS. SASSOON:  Mr. Bianco, can you please play

16  Government Exhibit 1559.

17         (Video played)

18  BY MS. SASSOON:

19  Q.  Mr. Bankman-Fried, were you in that video?

20  A.  Yup.

21  Q.  Along with Bill Clinton?

22  A.  Yup.

23  Q.  And Tony Blair?

24  A.  Yup.

25  Q.  And the Bahamian prime minister?

NAV1BAN1                        Bankman-Fried - Cross

1    A.  Yes.

2    Q.  Katy Perry?

3    A.  Yup.

4    Q.  And Orlando Bloom?

5    A.  Yup.

6    Q.  And that was at this conference you were talking about?

7    A.  Yup.

8    Q.  On November 9th——this was before FTX declared

9    bankruptcy——you learned that the Bahamas Securities Commission

10   requested Bahamian police to open an investigation of FTX

11   Digital Markets, right?

12   A.  I don't recall learning exactly that.  I had heard rumors

13   related to that and knew that the SCB was——had an

14   investigation.

15   Q.  So by November 9th, you were aware of the possibility of

16   Bahamian investigations, correct?

17   A.  Yeah, sometime around then.  Sorry.  I don't remember

18   exactly when it was.

19   Q.  And by November 9th, you had halted withdrawals from FTX

20   for FTX customers, right?

21   A.  Sometime around then.  I don't remember exactly when.

22   Q.  And withdrawals were halted because FTX was having

23   difficulty satisfying all customer withdrawals in a timely

24   fashion, correct?

25   A.  Yup, that's right.

NAV1BAN1                      Bankman-Fried - Cross

1    Q.  And after you halted withdrawals for FTX customers

2    generally, isn't it true that you offered to the Bahamian prime

3    minister to allow Bahamian customers on FTX to withdraw their

4    funds?

5    A.  I don't think it was the Bahamian prime minister, but I did

6    write that in response to an email from my memory is a

7    different member of the Bahamian government.

8    Q.  So to be clear, you offered to a member of the Bahamian

9    government to open withdrawals just for Bahamian customers so

10   that they could withdraw their funds, correct?

11   A.  I asked if that was what they had wanted me to do.

12   Q.  And you offered to do it, correct?

13   A.  If that's what they wanted, yes.

14          MS. SASSOON:  Well, let's pull up Government

15   Exhibit 248.

16   Q.  This is an email you wrote on November 9, 2022, right?

17          I didn't hear if you answered.  I apologize.

18   A.  Sorry.  I'm reading it.

19          Yes.

20          MS. SASSOON:  The government offers Government

21   Exhibit 248.

22          THE COURT:  Received.

23          (Government's Exhibit 248 received in evidence)

24          MS. SASSOON:  If we could publish that, Mr. Bianco.

25   Q.  And Mr. Bankman-Fried, this is an email you wrote on

NAV1BAN1                    Bankman-Fried - Cross

1   November 9, 2022?

2   A.   Yup.

3   Q.   Ryan Pinder, he's a member of the Bahamian government?

4   A.   Yup.

5   Q.   And looking at the bottom, No. 6, do you see where you

6   wrote, "We are deeply grateful for what the Bahamas has done

7   for us and deeply committed to it"?

8   A.   I do.

9   Q.   And looking at the next paragraph, do you see where you

10  wrote, "As part of this, we have segregated funds for all

11  Bahamian customers on FTX and we would be more than happy to

12  open up withdrawals for all Bahamian customers on FTX so that

13  they can, tomorrow, fully withdraw all of their assets, making

14  them fully whole"?  Do you see that?

15  A.   Yup.

16  Q.   And you did that, correct?

17  A.   Briefly.

18  Q.   And my question was unclear.  You did open the exchange for

19  Bahamian customers only to withdraw money, correct?

20  A.   For a short period, yes.

21       MS. SASSOON:  We could take that down.

22  Q.   I want to go back in time.  When you first started FTX, FTX

23  could not open its own bank accounts, right?

24  A.   That's essentially correct.

25  Q.   It was not easy to get a bank account for a cryptocurrency

NAV1BAN1                          Bankman-Fried - Cross

1   exchange, right?

2   A.   Yeah, especially with various properties.

3   Q.   Isn't it true that many banks did not want to transact at

4   all with a crypto exchange?

5   A.   I'm not sure what you mean by "transact with."  Are

6   you—opening a bank account or sending to one?

7   Q.   Well, isn't it true that many banks did not want to open a

8   bank account for FTX?

9   A.   Yes, that is true.

10  Q.   And at that time you were still CEO of Alameda, correct?

11  A.   Yup.

12  Q.   And you decided to use Alameda bank accounts to accept FTX

13  customer money, right?

14  A.   Yup.

15  Q.   And those bank accounts had not originally been opened for

16  the purpose of receiving FTX customer deposits, right?

17  A.   That's correct.

18  Q.   And you knew about this at the time, that Alameda bank

19  accounts would be used to receive customer money, correct?

20  A.   I knew it was used to receive deposits as of—I think it

21  was 2020, but, yeah.

22  Q.   And eventually Alameda began receiving FTX customer funds

23  into an account under the name North Dimension, right?

24  A.   It began receiving deposits into North Dimension, yes.

25  Q.   And you knew about that when that was happening, right?

NAV1BAN1                    Bankman-Fried - Cross

1    A.  I learned about that I think after it had been rolled out,

2    but yes.

3    Q.  You knew about it in 2020?

4    A.  I think it was 2020.  I don't remember the exact date.

5    Q.  Certainly by 2021, correct?

6    A.  Yup.

7         MS. SASSOON:  And let's pull up Government Exhibit 568

8    in evidence.

9    Q.  Looking at Government Exhibit 568, while North Dimension

10   was in use, this is what FTX customers would see when they went

11   to deposit dollars or fiat to their FTX account, right?

12   A.  Partly, some of the time.  I think it may have changed over

13   time.

14   Q.  For a period of time this is what customers would see,

15   right?

16   A.  It looks about right.

17   Q.  And I believe you testified that you were aware at the time

18   that FTX had rolled out North Dimension deposit instructions to

19   its customers, correct?

20   A.  At some time, yeah.

21   Q.  When you say "at some time," while those instructions were

22   active, right?

23   A.  Yup.

24   Q.  And looking at these instructions, nowhere does it say here

25   Alameda, right?

NAV1BAN1                    Bankman-Fried - Cross

1   A.  Those do not, that's correct.

2   Q.  And you never tweeted to your customers that Alameda was

3   receiving FTX customer fiat deposits into an entity called

4   North Dimension, right?

5   A.  Not—no, I didn't.

6   Q.  And you also never disclosed that Alameda was spending FTX

7   customer fiat deposits out of this account, right?

8           MR. COHEN:  Objection, form.

9           THE COURT:  Overruled.

10  A.  That wasn't my belief at the time.

11  Q.  At what time?

12  A.  The time I think you're referring to; the time period

13  during which it was receiving customer deposits.

14  Q.  I actually didn't ask about your beliefs.  I'm just asking

15  whether you ever disclosed that Alameda was spending FTX

16  customer fiat deposits out of the North Dimension account.

17  A.  No, I didn't know it was, and I certainly believed it

18  didn't.

19  Q.  And I believe you testified that by September, or October,

20  you certainly knew that the money had been spent, correct?

21  A.  Of 2022, to be clear?

22  Q.  Yes.

23  A.  I'm not sure I would say spend, but yeah, that it had been

24  used.

25  Q.  So when you say "been used," it had been used by spending

1   it on Alameda investments and expenses, correct?

2   A.  Investments, yeah, that's right.

3   Q.  And at the time that you knew this, in September and

4   October of 2022, at the very least, you did not disclose it at

5   that time to FTX's customers, correct?

6   A.  That's correct.

7   Q.  Now prior to September 2022 you knew that Alameda was not

8   keeping FTX customer money in its bank accounts, right?

9   A.  I'm not sure that I did, no.

10  Q.  You say you're not sure that you did.  Do you recall

11  knowing, prior to September and October 2022, that Alameda was

12  spending the FTX customer deposits?

13  A.  No, I don't recall that.

14  Q.  Well, isn't it true that as Alameda's CEO at the time, you

15  authorized the spending of FTX customer funds?

16  A.  No, that's not my memory.

17  Q.  Isn't it true you knew that those funds were being treated

18  as a liability that Alameda owed to FTX?

19  A.  Yeah.

20  Q.  And they were treated as liability because Alameda was

21  spending them, right?

22  A.  Not necessarily because it was.

23  Q.  You knew while you were Alameda's CEO that it was at least

24  possible, right?

25  A.  Yeah.

NAV1BAN1                    Bankman-Fried - Cross

1    Q.  And didn't you testify that you understood that to the

2    extent that Alameda was borrowing and using the fiat deposits,

3    that would be reflected as a borrow on Alameda's account?

4    A.  That's correct.

5    Q.  So you permitted this, right?

6    A.  I would have thought it was permissible.  I didn't

7    necessarily think it was happening.

8    Q.  But you didn't tell your employees, don't spend the FTX

9    customer deposits, right?

10   A.  It's not how I would have phrased it.  I didn't.  I deeply

11   regret not taking a deeper look into it.

12   Q.  And in substance, you did not tell your employees, don't

13   spend the FTX customer deposits.

14   A.  I don't think I gave any direction that I can recall

15   relating to them.

16   Q.  And you were CEO when the North Dimension account was set

17   up, correct, of Alameda?

18   A.  That's right.  That's right.

19   Q.  And at no point did you tell your Alameda employees to hold

20   that money for the benefit of FTX customers, right?

21   A.  I don't recall giving any directions.

22   Q.  And as CEO of Alameda, you never instituted measures to

23   segregate FTX customer deposits from other Alameda funds,

24   correct?

25   A.  I don't recall giving any directions relating to it.

NAV1BAN1                        Bankman-Fried - Cross

1    Q.  So you didn't put in place any measures to prevent

2    employees from spending that money.

3    A.  I don't recall putting in, you know—giving any directions

4    relating to it, no.

5    Q.  But at the time you were making representations before

6    Congress about the safeguarding of FTX customer assets,

7    correct?

8    A.  Yup, that's right.

9    Q.  You testified last week that it was the settlements team

10   that was managing the bank accounts, right?

11   A.  Yup.

12   Q.  The settlements team I think you said was between five to

13   ten people?

14   A.  Alameda's was, yes.

15   Q.  And these were lower-level employees within Alameda,

16   correct?

17   A.  Some were lower level, some mid to higher level.

18   Q.  What was the average salary of a settlements team employee?

19   A.  I'm guessing 150,000.

20   Q.  And that was a lot less than some of your higher-level

21   executives were making in salary and bonus, correct?

22   A.  Comparing apples to oranges.  The salary of one group was

23   less than the salary plus bonus of the other group, that is

24   correct.

25   Q.  Well, was the settlements team receiving bonuses in the

1   multimillion dollars?

2   A.   The higher-level employees, what I would refer to them,

3   was.

4   Q.   And what about the other members of the settlements team?

5   A.   I can't recall all of their compensation off the top of my

6   head.

7   Q.   Some of the settlements team employees, that was their

8   first job out of school, right?

9   A.   Yup.

10  Q.   And it was their job to process payments for other

11  employees of Alameda, right?

12  A.   Yeah, that's effectively correct.

13  Q.   For example, if you wanted to direct a trade on behalf of

14  Alameda, you might tell the settlements team to process that,

15  correct?

16  A.   Yup, that's correct.

17  Q.   The settlements team did not decide how money was spent,

18  right?

19  A.   Not unless it was spending related to their team.

20  Q.   So generally, when it came to trading, investments, those

21  were not settlements team decisions, right?

22  A.   Generally—there was some spillover between the trading and

23  settlements team.

24  Q.   Who was on both the trading and settlements team?

25  A.   It varied over time.  And my memory gets fuzzier as I got

1   less involved in Alameda.

2           MS. SASSOON:  Mr. Bianco, will you show the witness

3   what's been marked as Government Exhibit 2577.

4   Q.  Do you recognize the names on this list as members of the

5   Alameda settlements team?

6   A.  I recognize many of them.

7           MS. SASSOON:  The government offers Government

8   Exhibit 2577.

9           MR. COHEN:  No objection.

10          THE COURT:  Received.

11          (Government's Exhibit 2577 received in evidence)

12          MS. SASSOON:  Mr. Bianco, can you publish that.

13  BY MS. SASSOON:

14  Q.  Let's take Lena Ngoy as an example.  Do you recall that she

15  was a member of the Alameda settlements team?

16  A.  Yup.

17  Q.  She was not a trader, right?

18  A.  She was involved in OTC trades.

19          THE COURT:  Mr. Bankman-Fried, the question was

20  whether she was a trader.

21  A.  Her title was not trader.

22  Q.  And was she making trading decisions for Alameda?

23  A.  I'm not sure.

24  Q.  Are you aware of any trading decisions that Lena Ngoy made

25  for Alameda?

NAV1BAN1                        Bankman-Fried - Cross

1   A.  I can't recall any particular.

2   Q.  Anyone on this list you recall making multimillion-dollar

3   trading decisions for Alameda?

4   A.  Yes.

5   Q.  Who?

6   A.  Stephen Liu and Terence Choo.

7   Q.  Anyone on this list you recall making multimillion-dollar

8   investment decisions for Alameda?

9   A.  By investment, no, I don't think so with respect to

10  investments.

11  Q.  Now when you say you didn't know that Alameda customer

12  deposits were being——when you say you didn't know that FTX

13  customer deposits were being spent by Alameda, who was making

14  those decisions, Mr. Bankman-Fried?

15          MR. COHEN:  Objection to form.

16          THE COURT:  Sustained.

17  Q.  When you learned——when you claim you learned in September

18  and October that $8 billion had been spent, what, if anything,

19  did you know about who had spent it?

20  A.  I'm not——I don't remember knowing anything about particular

21  employees.

22  Q.  So it's your testimony that while you were CEO of Alameda,

23  some unknown people spent $8 billion without your knowledge.

24  A.  No, I don't think that was my testimony.

25  Q.  Well, in September and October you learned that $8 billion

NAV1BAN1                    Bankman-Fried - Cross

1    of FTX fiat deposits had been spent, right?

2    A.  Something approximating that, yes.

3    Q.  And I think you testified that this was news to you?

4    A.  Yeah.

5    Q.  And you didn't call in your deputies and employees and say,

6    *Who spent $8 billion?*

7    A.  You're referring to in September and October?

8    Q.  Yeah.

9    A.  I had conversations with Alameda's leadership, with

10   Caroline in particular.

11   Q.  And did you say, *Who spent $8 billion?*

12   A.  I asked her how it had happened, to the best of her

13   understanding.

14   Q.  Isn't it true that when the North Dimension account was set

15   up, Caroline Ellison was just a trader at Alameda?

16   A.  When it was set up, I think she was the head of trading.  I

17   can't remember exactly what her title was then.

18   Q.  She wasn't CEO, right?

19   A.  Not when it was initially set up, no.

20   Q.  Did you fire anyone for spending $8 billion of FTX customer

21   deposits?

22   A.  No.

23   Q.  And so just to be clear, it's your testimony that while you

24   were Alameda's CEO, your employees were spending millions and

25   then billions of customer funds without you knowing it?

NAV1BAN1                      Bankman-Fried - Cross

1          MR. COHEN:  Objection.  Asked and answered.

2          THE COURT:  Overruled.

3    A.  I don't think that was my testimony, no.

4    Q.  So is it your testimony now?

5    A.  I—I don't believe so.  I don't remember the exact time

6    line of things, but I, to my knowledge now, don't believe that

7    was true while I was CEO.

8    Q.  I believe you testified that in your view it was permitted

9    for Alameda to spend the dollar or fiat deposits of customers,

10   right?

11   A.  Yup, that's correct.

12   Q.  Did you ever institute any requirements for when or how

13   Alameda would repay that money?

14   A.  I was under the impression that that was folded into the

15   risk management of Alameda's FTX account.

16   Q.  When you say it was folded into the risk management, did

17   you put in place rules for that risk management while you were

18   CEO of Alameda?

19   A.  When I was CEO of Alameda, I was—let me rephrase this.

20          As CEO of Alameda, I was concerned chiefly with

21   Alameda's overall risk management, with the overall portfolio,

22   and I was paying attention to the risk management of that

23   overall portfolio.  As CEO of FTX, I was paying attention,

24   although not merely as closely as I should have been, to the

25   risk management of Alameda's account on FTX in particular.

NAV1BAN1                    Bankman-Fried - Cross

1    Q.  Did you give specific directions for the risk management of

2    any spending of FTX customer fiat deposits?

3    A.  I gave directions for the risk management of Alameda's

4    account on FTX, which I believed would have included that had

5    it happened.

6    Q.  Any specific directions to Alameda employees?

7    A.  No, I don't recall specific directions to Alameda

8    employees.

9    Q.  And are you aware of any other customer on FTX who had the

10   ability to spend FTX customer fiat deposits out of bank

11   accounts?

12   A.  I think so.

13   Q.  What customer?

14   A.  I think multiple other payment processors for FTX had

15   accounts on FTX as well.

16   Q.  Didn't you testify yesterday that those payment processors,

17   you did not know of a single one other than Alameda that was a

18   customer on FTX?

19   A.  I think some were.  I cannot say with a hundred percent

20   confidence.

21   Q.  Now when your company Alameda spent this money, it was not

22   used exclusively for margin trading on the FTX exchange, right?

23   A.  I'm not sure exactly the tracing of funds for it.

24   Q.  Well, let's take a look at Government Exhibit 1045 in

25   evidence.

NAV1BAN1                      Bankman-Fried - Cross

1        And do you recall Peter Easton testified about this

2    exhibit?

3    A.   I don't recall that exhibit in particular.  I think maybe

4    it would refresh my recollection if there was more context.

5    Q.   You were here for Peter Easton's testimony, correct?

6    A.   Yup.

7    Q.   And do you see here it says "FTX fiat liability

8    11.3 billion"?

9    A.   Yup.

10   Q.   Inside the big black circle?

11   A.   I see that.

12        MS. SASSOON:  If we could go to page 3 of this

13   exhibit, Mr. Bianco.

14        Thank you, Mr. Bianco.

15   Q.   Mr. Bankman-Fried, do you recall Peter Easton testifying

16   that this was how the $11.3 billion of fiat deposits were

17   spent?

18   A.   I do remember that, yes.

19   Q.   And I just want to take a look at a few of these.

20        Genesis, where it says $1.2 billion, Genesis was a

21   lender to Alameda, right?

22        Genesis, does that refer to Genesis Digital Assets?

23   A.   Genesis Digital Assets was not a lender to Alameda.

24   Q.   And did Alameda make a $1.2 billion investment in Genesis

25   Digital Assets or in a company called Genesis?

NAV1BAN1                        Bankman-Fried - Cross

1    A.   Sorry.   There are two companies with Genesis in their name.

2    I'm not sure which of those you're referring to.

3    Q.   Transferring $1.2 billion to Genesis, that's not a margin

4    trade on FTX, correct?

5    A.   Probably not for either Genesis.   Not saying I necessarily

6    agree with this exhibit.

7    Q.   Putting aside whether you agree with this exhibit, K5, do

8    you see where it says 600 million?

9    A.   Yup.

10   Q.   Giving money to K5, that's not a margin trade on FTX,

11   right?

12   A.   That's correct.

13   Q.   $500 million to Anthropic, do you see that?

14   A.   I do.

15   Q.   That's not a margin trade on FTX, right?

16   A.   That's correct.

17   Q.   And let's just take one more example.

18        Do you see where it says real estate, 228 million?

19   Spending money on real estate, that's not a margin trade on FTX

20   either, right?

21   A.   I agree, were this exhibit correct, that is what it would

22   show.

23   Q.   Again, I'm not asking about whether the exhibit is correct

24   or not—

25   A.   That's correct.

1   Q.  ——just whether transferring money to Modulo, Dave Inc.,

2   Anthropic, K5, real estate, none of those things are margin

3   trades, correct?

4   A.  They're not trades on FTX, I will say.

5   Q.  And those investments that I just went through, each of

6   those was your decision, right?

7   A.  No.

8   Q.  I think we covered this yesterday, but Modulo, K5, Dave

9   Inc., those were your decisions, right?

10  A.  Some of them were.

11  Q.  Not Lena Ngoy, correct?

12  A.  Some of them were neither mine nor Lena Ngoy's.

13  Q.  The ones I just went through, those were yours, correct?

14  A.  I may have authorized some of them.  Some of them I

15  actively decided, others were not me.

16  Q.  Modulo, that was you?

17  A.  Yup.

18  Q.  Anthropic, that was you?

19  A.  Yes.

20  Q.  K5, that was you?

21  A.  Yes.

22  Q.  Dave Inc., you said yesterday you were involved in that

23  decision?

24  A.  I was involved.  I was not the only one, but I was

25  involved.

NAV1BAN1                    Bankman-Fried - Cross

1   Q.  Buying the, $35 million apartment, that was your decision?

2   A.  Yes, that was one piece of the real estate.

3   Q.  And that was your decision.

4   A.  That particular one was, yes.

5   Q.  You testified that in June of 2022, you learned of an

6   $8 billion bug in the fiat@ account, right?

7   A.  That's correct.

8   Q.  And that bug you testified was the difference between

9   Alameda going bankrupt or not, correct?

10  A.  Yup, that's right.

11  Q.  And I believe you testified that your employees told you

12  that the bug related to the size of Alameda's liability to FTX

13  in the fiat@ account?

14  A.  That it had some relation to that, yes.

15  Q.  So they told you it related to the fiat@ account, right?

16  A.  So they——they said that it had some relation to Alameda's

17  liability to FTX and that it had some relation to fiat

18  deposits.  I don't remember them in that particular sentence

19  saying the fiat@ account in particular.

20  Q.  Didn't you testify last week that, "Gary and Nishad told me

21  in person that day in the conversation that it was stemming

22  from something called fiat@"?

23  A.  So separately in the conversation, they had——they mentioned

24  the word "fiat@."  I don't remember them mentioning it in that

25  same sentence as the one you referenced, but in the same

NAV1BAN1                    Bankman-Fried - Cross

1   conversation I did overhear them using the word "fiat@."

2   Q.  I'm not asking you about one particular sentence,

3   Mr. Bankman-Fried.

4   A.  Okay.

5   Q.  I asked you whether your employees told you that this bug

6   had to do with the fiat@ account.

7   A.  Yes, I do——sorry.  They said that.  They did not tell that

8   to me, but they did say it and I overheard it, or at least I

9   don't recall them specifically telling it directed to me.

10  Q.  So you overheard this.

11  A.  Yes.

12  Q.  And you didn't say, *Hey, guys, what's this fiat@ account*

13  *that had an $8 billion bug that almost made Alameda bankrupt?*

14  A.  When I heard it, I didn't have all that context, but I did

15  ask what the fiat@ account——if that was an account——was

16  referring to.

17  Q.  And you were told, weren't you, that it had to do with

18  Alameda's liabilities to FTX for customer funds, right?

19  A.  Not at that time.  I was told they were busy and I should

20  stop asking questions because it was distracting.

21  Q.  So it's your testimony that your supervisees told you to

22  stop asking questions?

23  A.  Yeah, and I agreed with them.

24  Q.  And you left it at that, you never followed up, *What's the*

25  *fiat@ account?*

NAV1BAN1                    Bankman-Fried - Cross

1   A.  I eventually did.  I don't recall following up that day and

2   regret not doing so.

3   Q.  You canceled a trip to DC because of a crisis, right?

4   A.  That's right.

5   Q.  And Alameda was on the verge of being bankrupt, right?

6   A.  That's what I—that's what I was concerned about for an

7   hour or two, yeah.

8   Q.  And it all came down to this $8 billion bug related to a

9   fiat@ account and you never got to the bottom of that?

10  A.  They were still getting to the bottom of the details of it

11  at that time, but no.  I had the number 2, 3, 4, and 5 people

12  at the company all each independently confirm to me that the

13  new understanding was correct, and I trusted them.

14  Q.  You trusted them, but you had no interest in understanding

15  an $8 billion bug in something called a fiat@ account?

16          MR. COHEN:  Objection.  Asked and answered.

17          THE COURT:  Overruled.

18  A.  I had interest in understanding it.  They also were busy

19  and I had prioritized getting the high-level updates and making

20  sure that they were working on fixing it.

21  Q.  An $8 billion bug, was that not a big deal to you?

22          MR. COHEN:  Objection.

23          THE COURT:  Sustained.

24  Q.  Now you told Adam Yedidia to fix this bug, right?

25  A.  I—I told the developer team and leadership to make sure it

1    got fixed, and Adam was ultimately one of the people chiefly

2    working on it.

3    Q.  You were in the courtroom for Adam Yedidia's testimony at

4    the start of this trial, correct?

5    A.  I was.

6    Q.  Do you recall his testimony that when he fixed the bug, he

7    told you that Alameda still owed $8 billion to FTX customers

8    for their dollar deposits?

9    A.  I recall something to that effect.

10   Q.  And is it your testimony that when Adam Yedidia said that

11   under oath under a grant of immunity in this courtroom, that he

12   had it wrong?

13   A.  I don't think I quite said that.  I don't remember him

14   saying it in that way.

15   Q.  So are you saying that Adam Yedidia had it wrong when he

16   described telling you that Alameda still owed $8 billion to FTX

17   customers?

18            MR. COHEN:  Objection.

19            THE COURT:  Sustained.

20            Look, Mr. Bankman-Fried, did he tell you, in words or

21   in substance, after the bug was fixed, that Alameda still owed

22   $8 billion to FTX customers for their dollar accounts?

23            THE WITNESS:  I don't recall him telling that to me on

24   or around that day in words or in substance.

25            THE COURT:  I didn't ask you about that day.

NAV1BAN1                    Bankman-Fried - Cross

1           THE WITNESS:  Oh.  I apologize.  Eventually, yes.

2           THE COURT:  Proceed, counsel.

3    BY MS. SASSOON:

4    Q.  And when, according to you, did Adam Yedidia tell you this?

5    A.  So I first remember having concrete conversations about

6    this in particular in October of 2022.  I was aware of some

7    pieces of it before then, however.

8           MS. SASSOON:  Let's pull up Government Exhibit 50 in

9    evidence, which the parties have stipulated is a document

10   called Alameda Balances by FTX Sub dated September 13, 2022.

11   And let's go to the second tab called Sheet 2.

12   Q.  And I just want to direct you to the Name column, the Name

13   column, row 13.  Do you see in row 13 where it says

14   fiat@ftx.com?

15   A.  I see that.

16   Q.  And do you see where it says the value is about negative

17   19 billion?

18   A.  I see that.

19   Q.  And beneath that, do you see where it says "fiat@ftx.com

20   correction"?

21   A.  I see that.

22   Q.  And do you see next to that where it says about

23   7.9 billion?

24   A.  I see that.

25   Q.  And looking at columns I and J, do you see where it says

NAV1BAN1                     Bankman-Fried - Cross

1    total negative 10 billion?

2    A.  I see that.

3             MS. SASSOON:  And I just want to correct myself.  I

4    said September 13, 2022.  The stipulation says this document is

5    dated June 13, 2022.

6             And we can take that down.

7    Q.  Fair to say, Mr. Bankman-Fried, that prior to November of

8    2022, you were not transparent with customers about the risks

9    posed to the safety of the exchange by Alameda's spending of

10   customer funds?

11   A.  It wasn't our policy to disclose customer account details.

12   Q.  That wasn't my question.  I asked you whether you would

13   agree that you were not transparent, prior to November of 2022,

14   about the risks posed to the safety of the exchange by

15   Alameda's spending of FTX customer funds?

16   A.  So that phrasing of the question, no, I do not agree.

17   Q.  Well, isn't it true that after FTX declared bankruptcy, you

18   gave assurances that if FTX reopened, it would have "way more

19   transparency"?

20   A.  Yes.

21   Q.  And you wrote, "There would have to be changes, of course,

22   way more transparency," right?

23   A.  Yes.

24   Q.  And you told customers at that time that FTX would operate

25   going forward with "radical transparency, transparency probably

NAV1BAN1                    Bankman-Fried - Cross

1   always should have been giving."  Did you say that?

2   A.  Sorry.  Said that to who?

3   Q.  On November——withdrawn.

4           You said that to customers, didn't you?

5   A.  I may have.  I don't remember saying that to

6   customers——excuse me——to customers.  I remember thinking about

7   saying that to customers.  I may have said it.

8   Q.  Is it fair to say that you didn't stick to your promise

9   that when it came to risk, customers on FTX would only be

10  exposed to what they think they are being exposed to?

11  A.  I'm not sure that's fair to say.

12  Q.  Do you agree, Mr. Bankman-Fried, that it was your practice

13  to maximize the potential to make money even if it created the

14  risk of going bust?

15  A.  It depends on the context.

16  Q.  In the context of your business dealings, wasn't it your

17  practice to maximize the potential to make money even if it

18  created the risk of going bust?

19          MR. COHEN:  Objection to form.

20          THE COURT:  Overruled.

21  A.  It depends on which business dealings you're referring to.

22  Q.  Would that be accurate with respect to some of your

23  business dealings, Mr. Bankman-Fried?

24  A.  With respect to some of them, yes.

25  Q.  You testified that in 2022 you reviewed Alameda balance

NAV1BAN1                        Bankman-Fried - Cross

1   sheets that Caroline Ellison sent you, correct?

2   A.  Yup, that's right.

3           MS. SASSOON:  Let's pull up Government Exhibit 11,

4   which the parties have stipulated is a document called Balance

5   Sheet 10/1/22, dated October 7, 2022.

6   Q.  I want to direct you to column E, row 5.  Do you see where

7   it says that Alameda had roughly $1.5 billion of loans from

8   third-party lenders?

9   A.  I see it says "loans," and that is what I understood it to

10  mean.

11  Q.  For example, the third-party lenders are actually broken

12  out and listed in column H, correct?

13  A.  That's correct.

14  Q.  And do you see beneath that row 17, where it says "FTX

15  borrows," 13.7 billion?

16  A.  I do see that, yes.

17  Q.  And under the assets column B, what is the total bank

18  balances listed on this October 2022 balance sheet?

19  A.  Bank balances are around 449 million.

20          MS. SASSOON:  If we could scroll down and look at row

21  32.

22  Q.  What is the NAV for Alameda on this October balance sheet?

23  A.  Around 7.8 billion.

24  Q.  So not 10 billion.

25  A.  On—

NAV1BAN1                        Bankman-Fried - Cross

1   Q.  On the balance sheet.

2   A.  On that particular balance sheet, the number is not

3   10 billion.  It is around 8 billion.

4   Q.  And if we could look back up at the assets column, do you

5   see the section labeled "liquid assets"?

6   A.  I do.

7   Q.  Now the liquid assets here include Robinhood shares for

8   $664 million, right?

9   A.  I—

10  Q.  I apologize.  Robinhood and Twitter.

11  A.  That's correct.

12  Q.  And those shares that Alameda owned of Robinhood and

13  Twitter, those were not deposited on FTX, correct?

14  A.  That's correct.

15  Q.  And do you see where it says FTT, $3.9 billion, under

16  "liquid assets"?

17  A.  Yup.

18  Q.  You understood, didn't you, that Alameda could not sell

19  $3.9 billion of FTT all at once without affecting the market

20  price, correct?

21  A.  That's correct.

22  Q.  This shows Serum 317 million?

23  A.  Yup.

24  Q.  Didn't you testify yesterday that Alameda did not own any

25  Serum?

NAV1BAN1                    Bankman-Fried - Cross

1   A.  That's not quite what I said.

2   Q.  I believe you testified Serum wasn't on the balance sheet?

3   A.  That's not quite what I said.

4   Q.  So——

5   A.  I apologize.  My memory is that most——that there was not a

6   extremely large quantity of it relative to the balance sheet

7   and that most of the Serum that could have been on the balance

8   sheet wasn't.

9   Q.  Understood.  And I want to direct your attention to assets

10  beginning on row 12 which are labeled "collateral."  These are

11  tokens posted as collateral with third-party lenders, correct?

12  A.  I'm not sure exactly how it's defined.  That's a reasonable

13  interpretation.  It might or might not be right.

14  Q.  You see the area "long-term assets," row 17?

15          MS. SASSOON:  If we could scroll down.

16  A.  I do, yes.

17  Q.  Let's take some examples from this section.

18          GDA, that's Genesis Digital Assets?

19  A.  Yup.

20  Q.  That was not an asset deposited on FTX, correct?

21  A.  Correct.

22  Q.  Anthropic, also not an asset deposited on FTX?

23  A.  That's correct.

24  Q.  K5, the same thing, right?

25  A.  Correct.

NAV1BAN1                     Bankman-Fried - Cross

1    Q.  And do you see where it says "locked Solana," 936 million?

2    A.  I do.

3    Q.  Locked, that means it couldn't be sold on the market for a

4    restricted period of time, correct?

5    A.  It means something to that effect.  I don't know exactly

6    what it meant in the case of Solana.

7    Q.  And you see where it says "locked Serum"?

8    A.  Yup.

9         MS. SASSOON:  Now let's take this down and look at

10   Government Exhibit 875.

11   Q.  You were involved——

12        MS. SASSOON:  And if we could publish this.  Thank

13   you.

14   Q.  You were involved in drafting this tweet, right?

15   A.  Yup.

16   Q.  And I just want to look at the last bullet where it says,

17   "Given the tightening in the crypto credit space this year

18   we've returned most of our loans by now."  Do you see that?

19   A.  I do see that, yes.

20   Q.  And it does not say "most of our third-party loans," does

21   it?

22   A.  No, it doesn't.

23        MS. SASSOON:  We could take that down.

24   Q.  You testified about clawbacks.

25   A.  Yup.

1    Q.  I want to clarify something.  Is it your view that what

2    happened to customers in November 2022 was a liquidation

3    clawback covered by 16.4 of the terms of service?

4    A.  It was my view that there was a risk as of November if

5    there were to be poor management of the process going forward,

6    that there could be a liquidation clawback.

7    Q.  And with respect to what happened on November——in November

8    2022——

9    A.  Yup.

10   Q.  ——would you characterize that as a liquidation clawback?

11   A.  As to what happened prior to November 11, 2022, I would not

12   describe it that way.

13   Q.  Now you never tweeted in November 2022 that FTX was

14   experiencing clawbacks, right?

15   A.  That's correct.

16   Q.  Let's pull up what you did tweet.

17             MS. SASSOON:  Mr. Bianco, if you could publish

18   Government Exhibit 866.

19             And if we could zoom in.

20   Q.  When you posted these tweets on November 7th, you wanted

21   FTX customers to feel reassured, correct?

22   A.  I would have liked it were that to be the case.  That

23   wasn't my only goal.

24   Q.  That was one of your goals, wasn't it?

25   A.  It was one factor.

NAV1BAN1                    Bankman-Fried - Cross

1    Q.  Was it one of your goals?

2    A.  Sure.

3    Q.  And you didn't want customers to withdraw their money from

4    FTX, right?

5    A.  That depends on the context.

6    Q.  Well——

7    A.  All else equal, that is correct.

8    Q.  And on November 7th, among other things, you tweeted, "FTX

9    has enough to cover all client holdings," right?

10   A.  Yup.

11   Q.  Your tweet doesn't say Alameda has enough to cover all

12   client holdings, does it?

13   A.  No, it doesn't.

14   Q.  And I believe you testified that in this tweet you were

15   referring to the fact that Alameda still had more assets than

16   liabilities, right?

17   A.  That is only part of what I was referring to.

18   Q.  Well, when you said, we have enough to cover all client

19   holdings, "FTX has enough to cover all client holdings," you

20   were factoring into that Alameda's balance sheet, right?

21   A.  That's not quite how I would put it.

22   Q.  Well, isn't it true, Mr. Bankman-Fried, that on

23   November 7th, FTX itself, if you disregarded Alameda's assets,

24   did not have enough to cover all client holdings?

25   A.  That's——I don't believe that's correct, no.

NAV1BAN1                     Bankman-Fried - Cross

1   Q.  Mr. Bankman-Fried, didn't you testify that you considered

2   this true because at the time, in your view, Alameda still had

3   far more assets than it had liabilities?

4   A.  That is part of the analysis.  I can explain if you want.

5   Q.  So without that part of the analysis, this would not be

6   true, correct?

7   A.  It would be dubious.  I would have considered it only

8   technically true——

9   Q.  Well——

10  A.  ——were Alameda underwater.

11  Q.  Well, when you considered Alameda's assets in your

12  analysis, you were including assets of Alameda's that were not

13  deposited with the FTX exchange, correct?

14  A.  For the analysis of Alameda's solvency, that is correct.

15  Q.  And you knew on November 6th, prior to this tweet, didn't

16  you, that the FTT on Alameda's balance sheet, for example, was

17  not liquid, right?

18  A.  Liquid isn't a binary, just as a qualification.

19  Q.  Yes or no:  Would you say you did not consider the FTT on

20  Alameda's balance sheet particularly liquid?

21  A.  I don't think I would have said that, no.

22          MS. SASSOON:  Mr. Bianco, can you pull up what's

23  marked as Government Exhibit 2502.

24  Q.  Mr. Bankman-Fried, is this a portion of a small group chat

25  that you were a participant on?

NAV1BAN1                      Bankman-Fried - Cross

1    A.  Yup.

2                MS. SASSOON:  Government offers Government

3    Exhibit 2502.

4                THE COURT:  Received.

5                (Government's Exhibit 2502 received in evidence)

6                MS. SASSOON:  Mr. Bianco, can you publish this.

7    Q.  Mr. Bankman-Fried, this is an excerpt from small group chat

8    on November 6, 2022, correct?

9    A.  That's correct.

10   Q.  And you were giving the other folks on this chat an update

11   about withdrawals and liquidity, correct?

12   A.  Yup.

13   Q.  And looking at your messages at the bottom, do you see

14   where you wrote, "so that would give us a buffer depending on

15   exactly what it turns out to be, marked to the end of tomorrow,

16   of roughly 2-3 billion beyond already pending withdrawals"?

17   A.  Yup.

18   Q.  And you see where you wrote, "that's without selling

19   FTT/SOL/etc. but I assume that right now there wouldn't be a

20   huge amount of liquidity for them so I don't know that that's a

21   huge factor"?

22   A.  Yup.

23   Q.  You wrote that, correct?

24   A.  I did.

25                MS. SASSOON:  Let's pull up Government Exhibit 406 in

1    evidence.

2              If we could zoom in at the top.

3    Q.  This is a chat from November 7, 2022, correct?

4    A.  Yup.

5    Q.  And in this chat——if we could zoom out——you wrote that over

6    the course of a week, you thought FTX and Alameda could likely

7    liquidate about $3.9 billion, right?

8              MS. SASSOON:  Mr. Bianco, if you could zoom out.

9    Yeah, scroll down.

10             Go back up.  Stop.

11   Q.  And do you see here, Mr. Bankman-Fried, that you wrote that

12   over the course of a week, you thought, between FTX and

13   Alameda, you could likely liquidate about $3.9 billion?

14   A.  Yeah.

15   Q.  And that included selling things like Robinhood shares and

16   Modulo investment, right?

17   A.  Included——I don't think selling is necessarily the right

18   word for Modulo investment, but yes.

19   Q.  Getting the money back from Modulo.

20   A.  Yes, that's right.

21   Q.  And again, Modulo, Robinhood, these are examples of assets

22   that were not deposited on the FTX exchange, correct?

23   A.  I'm not sure it's——whether that statement is true.

24   Q.  Didn't you testify a few minutes ago that Alameda's

25   Robinhood shares were not deposited on FTX?

NAV1BAN1                    Bankman-Fried - Cross

1  A.  That is correct.

2          MS. SASSOON:  Now if we could scroll down.

3  Q.  This is a message from you on November 7th at 3:08 a.m.

4  acknowledging that there was an $8 billion hole even if you

5  were able to liquidate all these assets in a week, correct?

6  A.  I don't know that "hole" is the word that I would use, but

7  liquidity gap, a potential liquidity gap, yes.

8  Q.  The gap between customer assets, excluding Alameda, and the

9  amount of money you could come up with in a week was about

10 $8 billion.

11 A.  With a few more qualifiers and scoping on it, yes.

12 Q.  The number you wrote here on the group chat is 8 billion,

13 right?

14 A.  Yes, that's right.

15 Q.  And Modulo, Robinhood, these items that you are including

16 in FTX assets, those are investments, right?

17 A.  Yeah.  Sorry.  In—in assets, that is correct.

18 Q.  You tweeted, didn't you, that "we don't invest client

19 assets"?

20 A.  That is correct.

21         MS. SASSOON:  We could take that down.

22 Q.  Now on November 7th, some customers responded to your

23 tweet, correct?

24 A.  I think so, yeah.

25 Q.  And some said in substance that they would not withdraw

NAV1BAN1                          Bankman-Fried - Cross

1   their funds, right?

2   A.  I think so.

3   Q.  And you liked those tweets, correct?

4   A.  That may be.

5   Q.  Yes or no:  Did you like tweets posted by customers——

6   A.  Yeah, I think I did.

7   Q.  ——that in substance said, *I'm not going to withdraw my*

8   *money*?

9   A.  I don't remember whether or not they were specifically in

10  response to that tweet, but it may have been.

11  Q.  Meaning you don't know if they were in response to your

12  tweet.

13  A.  Yeah, but they very well may have been.

14  Q.  But you did like customer tweets that said, *I'm not going*

15  *to withdraw my money*?

16  A.  Yup.

17  Q.  On November 7th.

18  A.  I think that's right, yeah.

19  Q.  Do you recall during the trial that clips were played from

20  the November 9th all hands meeting that Caroline Ellison had

21  with Alameda employees?

22  A.  Yes, I do.

23          MS. SASSOON:  Mr. Bianco, if you could play Government

24  Exhibit 433E.

25          (Audio played)

NAV1BAN1                    Bankman-Fried - Cross

1   Q.  Mr. Bankman-Fried, Ms. Ellison identified you, Gary, and

2   Nishad as her co-conspirators, correct?

3           MR. COHEN:  Objection.

4           THE COURT:  Sustained as to form.

5   Q.  During her testimony in court, you recall that Ms. Ellison

6   identified you, Gary, and Nishad as her co-conspirators, right?

7           MR. COHEN:  Objection.

8           THE COURT:  Sustained.

9   Q.  Mr. Bankman-Fried, you would agree that you, Caroline,

10  Gary, and Nishad were the ones involved in the decisions to

11  spend FTX customer money by Alameda, right?

12  A.  No.

13  Q.  Well, in December, you learned that Caroline had pleaded

14  guilty, right?

15  A.  I think that's correct, yes.

16  Q.  And you also learned in December that Gary had pleaded

17  guilty, right?

18  A.  I think that's correct, yes.

19  Q.  And you learned that both were cooperating with the

20  government, right?

21  A.  I had guesses about that.  I don't remember whether I

22  learned that with confidence.  I may have.

23  Q.  You learned that they pled guilty to cooperation

24  agreements, right?

25  A.  I can't remember when I learned that there were cooperation

NAV1BAN1                    Bankman-Fried - Cross

1  agreements.  It may have been then.  I just can't recall when I

2  learned that.

3  Q.  It wasn't until January, though, January 2023, that you

4  learned that Nishad had also pleaded guilty, right?

5  A.  January or February.  I don't remember when exactly.

6  Q.  And in December, when you learned that Caroline pled guilty

7  and Gary pled guilty, you were surprised to not learn anything

8  about Nishad, right?

9  A.  I was surprised to have learned something about those two

10  and not about Nishad.

11  Q.  Because Nishad was the fourth person involved in your

12  scheme to use FTX customer money, right?

13  A.  Nope.

14  Q.  Well, let's look at Government Exhibit 2556 in evidence.

15          And this is something you wrote on December 25, 2022,

16  right?

17          I believe you testified yesterday that you wrote this

18  document, right?

19  A.  I——I have a vague memory of this.

20          MS. SASSOON:  And if we could zoom in on item No. 5.

21  Q.  Do you see it says "Nishad"?

22  A.  I do.

23  Q.  And (a) says "lots of the complaints/etc. filed at this

24  point make claims like the 3 co-conspirators in a way that

25  doesn't really seem to leave much room for them adding on a

NAV1BAN1                    Bankman-Fried - Redirect

1   fourth—-they don't seem to be keeping a seat warm for him as a

2   defendant."  Do you see that?

3   A.  I do see that.

4   Q.  "(b) also there's no plea deal, no nothing, yet," do you

5   see that?

6   A.  I do see that.

7   Q.  And "(c) what does this mean?  (i) He got immunity?  (ii)

8   they aren't bothering with him?  (iii) they'll just have a

9   separate, parallel set of complaints for him once they get past

10  whatever the blocker is?  (iv) something else?"

11          You wrote that, Mr. Bankman-Fried, correct?

12  A.  I think so.

13          MS. SASSOON:  No further questions.

14          THE COURT:  Thank you.

15          Mr. Cohen.

16          MR. COHEN:  Thank you, your Honor.

17  REDIRECT EXAMINATION

18  BY MR. COHEN:

19  Q.  Mr. Bankman-Fried, do you recall being asked a series of

20  questions yesterday about the discovery in this case?

21  A.  I do.

22  Q.  And you were asked about whether you had reviewed all the

23  documents received in this case?

24  A.  I do.

25  Q.  To your recollection, sir, how many documents were

NAV1BAN1                         Bankman-Fried - Redirect

1   received?

2   A.  My recollection is that it was around 10 million, not

3   including the database.

4   Q.  Okay.  So millions and millions?

5   A.  Yeah.

6   Q.  Did you review every single page?

7   A.  Absolutely not.

8   Q.  You were asked yesterday——transcript at 2670——"You ran

9   queries in the database?"  Referring to the AWS database.  And

10  you answered, "Yup."  "You knew how to do that?"  "A.  I

11  learned how to do that, yes."  Do you recall that testimony,

12  sir?

13  A.  I do.

14  Q.  What were you referring to?

15  A.  As part of discovery in this case, so after the collapse of

16  FTX and before this trial, the defense was given access to at

17  least a snapshot of the AWS database that FTX had maintained,

18  and as part of my defense, I explored that database,

19  familiarized myself with its workings.  Much of it was similar

20  in form to the Google database that I had spent a month or so

21  with last year and then ran queries to prepare for trial.

22  Q.  And the Google database you're referring to, you got access

23  to that in October; is that correct?

24  A.  That's right.

25  Q.  Prior to getting access to the Google database, had you run

NAV1BAN1                    Bankman-Fried - Redirect

1   queries in the AWS database?

2   A.  No.

3   Q.  You were asked a number of questions yesterday and today

4   about whether you had made disclosures to customers of FTX.  Do

5   you recall that, sir?

6   A.  Yup.

7   Q.  Was FTX a public company?

8   A.  No.

9   Q.  It was a private company?

10  A.  Yup.

11  Q.  Did you believe you had a obligation to make daily

12  disclosures?

13          MS. SASSOON:  Objection.

14          THE COURT:  Sustained.

15  Q.  What was your view of when you had to make disclosures to

16  customers?

17          MS. SASSOON:  Objection.

18          THE COURT:  Sustained.

19  Q.  Mr. Bankman-Fried, in connection with your duties as CEO of

20  FTX, did you have occasion to review whether to make

21  disclosures to customers?

22  A.  In some cases, yes.

23  Q.  Okay.  And what factors went into that consideration?

24  A.  So specifically around customer positions on the exchange,

25  our general policy for disclosures was that if a customer

1    account got to the point where we believed that that customer

2    may be insolvent or very close to it, that the NAV is falling

3    close to or to zero, and as for that, we began to liquidate

4    that—that customer.  We would generally disclose those

5    liquidation fills to other customers of FTX.  Beyond that, I

6    think we almost never disclosed information about a customer's

7    account to the public or to other customers.

8    Q.   Okay.  Moving on, Mr. Bankman-Fried.

9         Do you recall yesterday you were asked the following

10   question?  This is at transcript 2727.  "Is withdrawing money

11   from FTX to repay a lender within your definition of a margin

12   trade?"  And you answered:  "Potentially, yeah.  I can explain

13   if you want."  And you weren't asked to explain.  Can you

14   explain, Mr. Bankman-Fried.

15   A.   Yeah.  So the way that—that margin worked on FTX was if a

16   customer was able to go below zero in a particular asset, for

17   instance, via enabling margin trading, then in most cases they

18   were allowed to do so via withdrawing.  So you could withdraw

19   below zero.  And if they were doing it via withdrawing, there

20   were no restrictions on what they could then do with their

21   assets, including assets or, you know, the fraction of the

22   value of their assets that was—that had, you know, originally

23   come from that borrow from FTX.  So if that customer wanted to

24   return a loan it had taken from someone else, and if they were

25   permitted to borrow from FTX in the first place, there's

NAV1BAN1                    Bankman-Fried - Redirect

1   nothing prohibiting them from margin trading in the first

2   place, nothing prohibiting them from withdrawing to the

3   negative in a particular asset from FTX and then repaying that

4   lender with those or other funds.

5   Q.  Okay.  Do you recall being asked yesterday about the risk

6   engine?

7   A.  Yes.

8   Q.  And you were asked—this is transcript at 2694—"A moment

9   ago didn't you say that a customer exploited loopholes in the

10  risk engine?"  "Yes.  I can explain if you want."  Do you

11  recall being asked that question and giving that answer?

12  A.  I do, yes.

13  Q.  Can you explain what you meant by "loopholes in the risk

14  engine."

15  A.  Yes.  That was a messy situation.  Roughly a day or two

16  prior to the time—it may have even been a few days prior to

17  when ultimately that position was passed off to Alameda, I had

18  personally intervened.  Concerns had been raised to me about

19  that particular account by a few employees, by a combination of

20  Ryan Salame, Nishad, and Gary.  They expressed—I—I had

21  understood them to be concerned that there might be something

22  that was happening with that account, that it might be

23  attempting to exploit FTX.  I acknowledged that.  I agreed that

24  there was a risk of that.  I thought it probably wasn't but

25  might have been and so that I would personally manually monitor

1   it and adjust some settings to attempt to protect against such

2   a risk without at that point liquidating the customer, because

3   they were otherwise a valuable customer.  In doing so, I

4   overrode FTX's standard risk procedures there and personally

5   took responsible [sic] for that account.  I was—they were

6   right.  I was not nearly as correct.  I was effectively wrong.

7   The customer did attempt ultimately to—to abuse the risk

8   procedures and found loopholes in, among other things, the

9   parameters I had manually set while attempting to monitor that

10  account.  In keeping the account open, I had blocked

11  withdrawals on the account but had forgotten to block transfers

12  between other FTX accounts.  To my memory is that they

13  transferred between another FTX account, which they then

14  withdrew.  As such, I viewed that as much as anything else a

15  personal scruff on my part for a situation I had personally

16  taken responsibility for, and that made me feel like it was

17  further appropriate for Alameda to be the one to take on that

18  position.

19  Q.  And which currency or token does this relate to?

20  A.  This was MobileCoin and/or BTMX, and I think there may have

21  been a few more involved as well.

22  Q.  Okay.  So what did you do when you wanted—you decided you

23  needed to take a personal responsibility in connection with the

24  MobileCoin transaction?

25  A.  Yeah.  Effectively what that meant was the account, which

1    was still a substantially positive NAV asset at that point,

2    also—I had strong suspicions about how it would fare over

3    time, passed it off to Alameda, both as a backstop liquidity

4    provider and also as a trading firm that I at the time owned

5    and ran, and that would then have to shoulder the risk

6    associated with that account.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAVMBAN2                      Bankman-Fried - Redirect

1    Q.  Ultimately was a loss suffered with respect to MobileCoin?

2    A.  I think so.  I actually don't remember exactly how the

3    market turned out, but I don't think it ended up being a winner

4    of a position.

5    Q.  You transferred it from FTX to Alameda, correct?

6    A.  Well, I transferred it from that user on FTX to Alameda on

7    FTX as a -- essentially as a backstop liquidity provider.

8    Q.  And you owned 90 percent of Alameda?

9    A.  That's correct.

10   Q.  So if there was a loss you were going to bear most of it?

11   A.  That's correct.

12   Q.  Do you recall that yesterday you were asked questions about

13   your context with journalists between November 11 and running

14   into December.

15            Do you recall those questions?

16   A.  Yeah, I do.

17   Q.  About how many journalists did you speak with?

18   A.  In that period in particular?

19   Q.  Yes.

20   A.  I mean, probably 50 or so.  I don't remember the exact

21   number.

22   Q.  What was your level of preparation for those calls or

23   meetings?

24   A.  For the most prepared, I probably spent an hour; for the

25   least prepared, probably 30 seconds.

NAVMBAN2                          Bankman-Fried - Redirect

1    Q.  What materials did you have access to after November 11?

2    A.  Just my memory.  I was cut off from company systems.  I

3    didn't have data access.

4    Q.  Do you remember every single statement you made to a

5    journalist during that time period?

6    A.  Definitely not.

7    Q.  You recall you were shown excerpts from articles written

8    about FTX with you during that time period.

9         Do you recall that, sir?

10   A.  Yes.

11   Q.  Do you recall everything written in every article about you

12   during that time period?

13   A.  Certainly not.

14   Q.  Do you recall that yesterday you were shown part of a chain

15   between you and a journalist for an entity called Vox.

16        Do you recall that?

17   A.  Yes.

18   Q.  V-o-x.  What was Vox?

19   A.  Vox is an online news and opinion publication.

20   Q.  Who was the reporter?

21   A.  Kelsey.  She had been a friend of mine for about a decade.

22   Q.  And do you recall being shown a portion of the chain in

23   which you used the phrase fuck regulators?  Do you recall that,

24   sir?

25   A.  Yes, I do recall that.

1   Q.  Was that the full extent of the chain between you and

2   Kelsey?

3   A.  No, it was not.

4   Q.  What else did you discuss in that chain about regulators?

5   A.  The primary discussion there --

6   Q.  About regulators.

7   A.  -- about regulators in particular was I had -- it was me

8   telling Kelsey, in response to a question from her, that I

9   essentially had grown to be frustrated by regulators that I had

10  become skeptical about whether I really had been able to

11  attempt to get good regulation and not bad regulation, and had

12  over time, and especially very recently, as of then, especially

13  at that moment, when I was somewhat frustrated, felt like all

14  the work that I had done to work with regulators might have

15  ended up encouraging bad regulation as much as good regulation

16  in retrospect, and I was not happy with that.

17  Q.  That chat was on November 16?

18  A.  Yeah, that's right.

19  Q.  Five days after FTX had gone bankrupt?

20  A.  Yeah, that's correct.

21  Q.  Do you recall being asked questions yesterday about your

22  testimony in front of Congress?

23  A.  Yes.

24  Q.  Also the written testimony that you submitted to Congress.

25  A.  In fact, I think only -- I don't recall the spoken

1    testimony, but written testimony, yes.

2    Q.  How many times, if you remember, did you appear before

3    Congress?

4    A.  Three times.

5    Q.  And each time did you also submit written testimony?

6    A.  Yes.

7    Q.  Were you the only one who worked on that testimony?

8    A.  No.

9    Q.  Who else did?

10   A.  Our policy team, Mark Wetjen particularly, did.  Zach

11   Dexter, the CEO of FTX US derivatives, did as well.  Others may

12   have as well.  I am not sure.

13   Q.  Do you remember every paragraph from those written

14   submissions that were made to Congress?

15   A.  No, I do not.

16        MR. COHEN:  Let's call up GX-914A.

17   Q.  This was portions of your testimony to Congress.  Do you

18   recall being asked about that yesterday, Mr. Bankman-Fried?

19   A.  Yes.

20   Q.  And you were directed to the portion that stated that about

21   FTX's key principles.

22        Do you recall that?

23   A.  Yes.

24   Q.  And you read out a section that said one of its key

25   principles was to ensure customer and investor protection.

1              Do you recall that?

2   A.  Yes.

3   Q.  Was that a goal of FTX?

4   A.  Yes.

5   Q.  Did you try to achieve that goal?

6   A.  Absolutely.

7   Q.  How did you do that?

8   A.  A number of ways.  One of the ways was through thinking

9   about equity access for customers, thinking about, in

10  particular, as much as possible letting all users of FTX have

11  direct trading access rather than smaller customers having to

12  go through a number of intermediaries and encountering a number

13  of logistical hoops along the way.  That's something we put in

14  a lot of work into.  We put a lot of work into the risk engine

15  on FTX.  Ultimately, we also had a very large oversight and

16  mistake related to risk management.  But at the time I felt

17  like we had done a good job of that.  And we put work into the

18  digital security of assets on FTX and, I mean, a number of

19  other smaller things as well.

20  Q.  Do you recall being asked yesterday in connection with your

21  congressional testimony whether FTX had followed the key

22  principle of maintaining adequate liquid resources to ensure

23  the platform can return the customer's assets upon request?  Do

24  you recall being asked about that?

25  A.  I do.

NAVMBAN2                    Bankman-Fried - Redirect

1    Q.  Did FTX do that?

2    A.  It did do what my understanding of that was.

3    Q.  Why don't you tell us.

4    A.  So my understanding of that sentence was that in the case

5    of customer withdrawal requests, we wanted to be able to, as

6    quickly as possible, fill that request and that, as such, we

7    wanted to maintain enough assets in terms of liquidity and in

8    terms of the forum and place they were stored, that for

9    typical, or even substantially more than typical, activity, we

10   would be able to promptly and painlessly process customer

11   withdrawals.  There is a separate -- I can't remember for that

12   sentence or the next as well about -- which is referring to

13   having an insurance fund of -- in the case of risk of clawbacks

14   as well.

15   Q.  Just, finally, on this point you were asked questions about

16   your congressional testimony and you said that -- you said one

17   of the key principles was to avoid or manage conflicts of

18   interest.

19            Do you recall that testimony?

20   A.  I do, yes.

21   Q.  What did you mean by that?

22   A.  I meant that in general -- as a general matter, managing

23   conflicts of interest is an important part of a business and

24   that at the time I felt like we had potential conflicts of

25   interest with Alameda and in a few cases potentially with

1    others.  I had felt like we were doing a relatively good job at

2    managing and mitigating the risks associated with those.  I

3    don't know that I would say the same today.

4    Q.  Do you recall being asked a number of questions about the

5    tweets you put out in order to try to get customers to use FTX?

6    A.  Is there a question?

7              JUROR:  Can we get a bathroom break?

8              THE COURT:  We will take our morning break.  15

9    minutes, folks.

10             I should say, with respect to juror number 3, one way

11   or another, you are going to make your flight.

12             (Jury not present)

13             THE COURT:  In no way am I rushing you, Mr. Cohen.

14   Give me the best idea you can, please.

15             MR. COHEN:  I think, your Honor, about 40 minutes to

16   an hour.

17             THE COURT:  Thank you.

18             (Recess)

19             THE COURT:  Mr. Roos, your estimate on a rebuttal?

20             MR. ROOS:  Yesterday we told the Court two witnesses.

21   We have cut one already.

22             THE COURT:  Which one?

23             MS. SASSOON:  Zachary Allen is out.  So it's just the

24   FBI agent, and we produced those materials.  We are still

25   seeing --

NAVMBAN2                       Bankman-Fried - Redirect

1              THE COURT:  Time is what I'm interested in.

2              MR. ROOS:  Right.

3              MR. REHN:  The direct would be 20 minutes.  It may not

4    even happen.  We are evaluating.

5              (Recess)

6              THE COURT:  Bring in the jury.

7              (Jury present)

8              THE COURT:  The jurors and the defendant all are

9    present, as they have been throughout.

10             Mr. Bankman-Fried, you are still under oath.

11             Mr. Cohen, you may continue.

12             MR. COHEN:  Thank you, your Honor.

13   BY MR. COHEN:

14   Q.  Mr. Bankman-Fried, do you recall being asked yesterday a

15   series of questions about the ways in which FTX got customers?

16   A.  Yes, I do.

17   Q.  And you recall being asked:  And one way that it grew was

18   through your interactions with customers on social media, fair?

19   And you answered:  Yeah.

20   A.  Yup.

21   Q.  Is that the only way FTX got customers?

22   A.  No.

23   Q.  How else did it get customers?

24   A.  Initially, the primary way was word of mouth from existing

25   customers.  It was just customers who tried the product, and

NAVMBAN2                    Bankman-Fried - Redirect

1    those who liked it often told their friends about it.  And on

2    social media it was primarily customers talking with each

3    other.  I did have some interactions as to FTX with them.

4    Ultimately, we began testing out more marketing strategies; in

5    particular, brand advertisements, brand partnerships, things

6    like FTX Arena.

7    Q.  What effect, if any, did the quality of your products have

8    on getting customers?

9    A.  My understanding at the time was that that was the primary

10   driver of the growth of the exchange, that we lived and died by

11   having a better product than competitors, and that at least

12   measured by volume or revenue that nearly all of our business

13   and all of our customers already used competitors before they

14   tried out FTX, so we generally, in my belief at the time, got

15   customers only if they liked our product better.

16   Q.  You recall yesterday being asked a series of questions

17   about what happened after Ms. Ellison and Mr. Trabucco took

18   over as co-CEOs at Alameda?

19   A.  Yup.

20   Q.  And in particular what your role was with respect to

21   Alameda after you stepped down as CEO.

22   A.  Yup.

23   Q.  What was your role?  What did you do and what did you not

24   do?

25   A.  Yeah.  I was chiefly the majority owner of Alameda.  So as

1    owner I got updates on financials and other high-level updates

2    periodically.  I cared about the company a fair bit.

3            There were a few other specific ways that I was

4    involved.  Venture investments was an area.  Ultimately we

5    ended up deciding that many of the venture investments didn't

6    exactly fit under the Alameda brand in the first place,

7    although we didn't resolve where it should be.  But I was

8    involved in many of the venture investments.

9            And then beginning, to a lighter extent, in the first

10   half of 2022 and a much heavier extent in the second half, I

11   was very involved in decisions around hedging because I viewed

12   it as existential risk for the company to get that right, and I

13   was concerned that the leadership wasn't, in my view, at the

14   time taking it seriously enough, although I understand the

15   complexity around that, and that I may not have been

16   communicating very clearly in the first place or as clearly as

17   I thought I was.  And then there were random one-off occasions

18   on which I would have discussions about some particular topic

19   that would come up.

20           Those were the ways I chiefly was involved.  Caroline

21   would also sometimes give me previews of things that she was

22   thinking of doing and asked for my impression of them; not

23   always, but now and then.

24           What I did not view myself as involved in was

25   day-to-day trading decisions, which was what I at least

NAVMBAN2                    Bankman-Fried - Redirect

referred to as trading or trading decisions or day-to-day

trading.  That's sort of how I described those things.

Although, obviously, you could use the word trading to use

venture investments sometimes, but other things or hedging.

          Every day Alameda would do, I think, millions of

trades and billions of dollars, and I was essentially

uninvolved with those core operations, I think starting a bit

before I passed off the CEO role.

Q.  You recall yesterday Ms. Sassoon asked you questions about

notes you had made after the bankruptcy filing on November 11.

A.  Yeah.

Q.  And she asked you, this is transcript 2678:  Didn't you

write, Mr. Bankman-Fried, if Alameda had been a hundred percent

separate completely unrelated trading firm in every way, this

wouldn't have happened, at least it wouldn't have happened to

FTX.  Alameda would have had the fiat@ -- wouldn't have had the

fiat@ relationship and wouldn't have had on nearly as large of

a position.

          Do you recall being asked about that yesterday?

A.  Yup.

Q.  What did you mean by that, Mr. Bankman-Fried?

A.  In my view, essentially the entirety of the ultimate

liability or at least net liability that Alameda had to FTX was

about the size of the fiat@ account.  But that was what myself

and I think almost all of us had not been aware of, at least

NAVMBAN2                    Bankman-Fried - Redirect

until sometime in the second half of 2022, about that roughly

$8 billion liability.  And that had it been -- had Alameda

never had any relationship with FTX of any form, I think we

would have had much better systems in place to monitor the

fiat@, what I came to learn was the fiat@ account, the payment

agent relationship in general, and I think, in retrospect, our

oversight of that was very poor.

Q.  Let me move to another topic.  Do you recall being asked a

number of questions yesterday and today about margin trading?

A.  Yup.

Q.  And you were asked, this is transcript 2726:

"Q.  Just to be clear, Mr. Bankman-Fried, taking money from FTX

to pay back lenders, that's not margin trading, is it?

"A.  I'm not -- I don't think that's what happened and I'm also

not saying that's not margin trading."

        Do you recall being asked that question and giving

that answer?

A.  Yes.

Q.  What did you mean by that?

A.  Two pieces to that.  The first piece, which I won't belabor

too much again, but was essentially when customers did margin

trading on FTX, in general they could withdraw it down to a

negative number in a particular asset, and they could do

whatever they wanted with their funds.  The moment they did

that withdrawal, those funds became their funds, not customer

NAVMBAN2                        Bankman-Fried - Redirect

1   funds.  They could spend it or invest it or repay it to someone

2   else or do what they liked with it.  FTX just managed the risk

3   associated with them as a customer.

4   Q.  How did FTX manage the risk associated with the customer?

5   A.  The chief way was through monitoring the net-asset value

6   effectively.  The assets at FTX could ultimately get claimed to

7   versus the liabilities to FTX, monitoring basically which of

8   those was higher or whether the liabilities were approaching

9   the assets in size and then beginning to margin-call the

10  customer and potentially liquidate them if that was the case.

11  So that was one of the two things that I was I think

12  referencing there.

13          The other was that I don't actually remember it being

14  the case that, at least on net, and I don't know about specific

15  movements, that it seemed like Alameda did increase its

16  borrowing on FTX to repay lenders.

17  Q.  What did you mean by the phrase on net?

18  A.  Yeah.  Every day Alameda would do hundreds of millions of

19  dollars of deposits and withdrawals from FTX.  There would be

20  assets of various forms coming in and out.  This was standard

21  of big customers on FTX.  Many of them had large deposits and

22  withdrawals per day.  But generally the net was much smaller,

23  meaning the deposits minus the withdrawals, so whether the

24  account value was increasing or decreasing.

25          One thing I knew Alameda would do sometimes is use an

1  FTX wallet to collect assets, pool assets that it was going to

2  send somewhere.  So if it had one Bitcoin each in five

3  different wallets, it might send all of those to some

4  subaccount on its FTX account for recordkeeping purposes and

5  then send those out to some other place.  In that case there

6  would be a withdrawal from FTX.  It would be sending those five

7  Bitcoins out from its FTX account, but only right after having

8  deposited a similar number of Bitcoins to that FTX account.  It

9  was a way station, effectively, in some cases.

10          I don't know about the detailed flow of funds.  But if

11  you looked at line of credit utilization, for instance, I don't

12  remember that increasing in June 2022.

13  Q.  You were asked some questions earlier this morning about

14  the time period from September to October.  Do you recall being

15  asked about that period when you were discussing the $8 billion

16  liability?

17          Do you recall that?

18  A.  Yes.

19  Q.  And you were asked whether or not you had spent the $8

20  billion, and you said no.

21  A.  That's right.

22  Q.  Why did you say that?

23  A.  A few reasons.

24          One of them is, I don't even know how I would have

25  defined an answer to who spent that money, which is to say,

Alameda had 20 employees.  They were each collaborating on

hundreds of decisions every day.  Funds were being deposited

and withdrawn all over the place constantly.

         At least in my knowledge, I don't think it would be

the case that there was a clear simple pointer decision at

which a particular person or people, you know, decided to spend

particular dollars.  Money is fungible anyway.  There are a lot

of things that I don't think I would have been able to define

in trying to answer that question if I had investigated it.

         The other part of it, I mean, I don't know if this is

right or wrong, but for better or for worse, it has been a part

of me that like I wasn't particularly interested in trying to

dole out blame for it.  That wasn't my priority.  It generally

wasn't my priority.  It was generally something I deprioritized

as later, and I tried to focus as much as I could on what stuff

has happened, what's the best thing we can do going forward.

Q.  And what was the issue, as you understood it, once you

understood the $8 billion liability existed?

A.  As I understood it, the issue was basically that the scale

of Alameda's total liabilities borrowing from FTX was -- there

are various numbers, depending on when and how you define it,

but in the $10 billion range, and that was a significant scale

of borrowing even by the standards of FTX for Alameda.  That

was a risk that had to be managed and meant that if Alameda

were to go under water, it would potentially have serious

NAVMBAN2                        Bankman-Fried - Redirect

1    implications for FTX as well.

2    Q.  Did you try to manage that risk?

3    A.  I did.

4    Q.  Moving on, you were asked a number of questions yesterday

5    about Alameda's line of credit.

6            Do you recall that, sir?

7    A.  Yup.

8    Q.  And you were asked, transcript at 2633:  Sitting here

9    today, do you deny that Alameda's main trading account had a

10   $65 billion line of credit that no other customer had?  Your

11   answer:  No.  That was the maximum withdrawable size.

12           Do you recall this?

13   A.  Yes.

14   Q.  What do you mean by maximum withdrawable size?

15   A.  I was just trying to clarify between two different things

16   you could talk about.  One was the $65 billion number, which I

17   understand to be a limit put in the database at some point that

18   meant, separate from anything else, in those circumstances

19   could Alameda use more than 65 billion of a line of credit.

20           I separately understood that Alameda never used

21   anything even close to that of its line of credit.  The actual

22   line of credit used by Alameda was typically in the $2 billion

23   range, at least during 2022, so I want to differentiate between

24   the theoretical maximum and the amount actually used of line of

25   credit.

NAVMBAN2                    Bankman-Fried - Redirect

1   Q.  And you asked yesterday and today a number of questions

2   about whether FTX could include customers' assets held off the

3   exchange as collateral for borrowing.

4           Do you recall those questions?

5   A.  Yes.

6   Q.  And specifically you were asked, transcript at 2622:

7   "Q.  The general rules did not allow for pledging an outside

8   investment as collateral in the exchange, right?

9   "A.  I'm not sure that's true."

10          Do you recall giving that testimony?

11  A.  I do, yes.

12  Q.  What did you mean by that, Mr. Bankman-Fried?

13  A.  There was no automated process, no sort of mass-market

14  process for considering off-platform assets.  Anything would

15  have to be sort of individualized because, by default, FTX can

16  only look at what it sees, at what it has.  FTX doesn't

17  natively know about your house, but it could be taught about

18  that.

19          And so as I understood it, we were allowed to on a

20  discretionary basis if it felt appropriate from a risk

21  management perspective.

22          MS. SASSOON:  Objection, your Honor, to allowed to.

23          THE COURT:  You can cross on it.

24  A.  Was that, you know, if it felt reasonable on various

25  metrics that we could consider other assets that we could give

1    lines of credit or other accounting for other assets that were

2    not on the exchange and that we had investigated doing so in a

3    few cases and had done so in a few cases.

4    Q.  Now, during 2022, you were the 90 percent owner of the

5    Alameda?

6    A.  Yeah.

7    Q.  Were you aware of the assets Alameda had on the FTX

8    exchange?

9    A.  Yes, I was aware of the assets it had on the FTX exchange.

10   Q.  Were you aware of the assets it had off the exchange?

11   A.  Essentially.

12   Q.  And during this same period you were the majority owner of

13   FTX?

14   A.  I think that's right.  I think it was a little over 50.

15   Q.  Were you aware of the assets that FTX had?

16   A.  I was aware of the approximate assets that FTX had.

17   Q.  During this period you also owned certain assets in your

18   own name?

19   A.  Yes.

20   Q.  Were you aware of the size of those assets?

21   A.  Approximately, yes.

22   Q.  You were asked some questions earlier today, and I think

23   yesterday also, about June 2022, in particular about a

24   spreadsheet that was sent to you by Caroline Ellison.

25               Do you recall that, sir?

1   A.   There were a few spreadsheets.  Is this the Alameda balance

2   sheet?

3   Q.   Let me focus it for you.

4        Referring to GX-44, the spreadsheet with multiple

5   tabs, at transcript 2731 you were asked the following question

6   and gave the following answer:  On or around late June 2022, do

7   you recall receiving a spreadsheet with eight tabs?  I don't.

8   I don't.  I don't specifically recall there being eightish tabs

9   on it.  There may well have been.

10       What do you mean by that, sir?

11  A.   I guess I can describe what I do remember.  I remember I

12  was sent sometime around then a balance sheet by Caroline.  It

13  was typical that when she sent me balance sheets they would be

14  in spreadsheets with multiple tabs on them.  Often other times

15  it would be underlying calculations.  And I remember at a high

16  level the conversation that we had about it.  It was fairly

17  brief.

18  Q.   What was that conversation?

19  A.   She had sent it to me and said she was thinking of sending

20  this out and wanted to know if I had any thoughts, and I

21  remember saying something like, yeah, that sounds reasonable.

22  Q.   Do you recall whether or not you went over each of the tab

23  entries on the spreadsheet?

24  A.   I don't recall going over multiple tabs on the spreadsheet.

25  There may have been other tabs.  I just don't have a memory one

1  way or another about how many tabs there were or what other

2  tabs would have shown, so it very well could have been that

3  spreadsheet.

4  Q.  And you said earlier in your answer that this was typical

5  for your interactions with Ms. Ellison?

6  A.  Yeah.

7  Q.  Can you explain that.

8  A.  Yeah.  She would generally send me, when she sent me a

9  balance sheet, I would say about half the time that she sent

10 them, maybe more than that, it would be in a worksheet, an

11 Excel or Google Sheets worksheet, usually Excel, that had many

12 tabs on it, and she would often say, look at this particular

13 tab to see the updated balance sheet, or something like that,

14 so I would, by default, do that.  Sometimes I would look

15 through the other tabs at a high level.  Sometimes I wouldn't.

16 Q.  Yesterday you were asked about a discussion you had with

17 Ms. Ellison about a venture investment in Genesis Digital

18 Assets.

19          Do you recall that, sir?

20 A.  Yes.

21 Q.  And that was a crypto mining company?

22 A.  Yup.

23 Q.  Do you recall a discussion with Ms. Ellison about whether

24 or not the investment should have been made?

25 A.  Yes, I do.

NAVMBAN2                         Bankman-Fried - Redirect

1    Q.  Why don't you tell us that.

2    A.  Caroline expressed, I remember her saying that she didn't

3    think it should have been made, I think -- that's what I

4    remember her saying -- because of the capital usage, and I

5    inferred some skepticism about the investment itself.

6    Q.  What did you say, if anything?

7    A.  I had, in substance, that I thought it was good if hedged,

8    that in particular, given the calculations that had been done

9    by members of our team on GDA, it looked like we are going to

10   be buying it for -- buying into it at less than the amount of

11   money we thought that it would make as a company, but that that

12   amount would vary with Bitcoin's price.  In other words, you

13   could think of it as buying a future stream of Bitcoins at less

14   than, as of then, the price of a Bitcoin, but that there was

15   risk associated with it unless it was paired with removing that

16   risk of Bitcoin price decrease by hedging.

17   Q.  Were you talking about a hedge of the general market or a

18   hedge of something relating to GDA?

19   A.  So in the GDA case in particular, there is actually

20   something much more specific, which was, I had understood that

21   there is going to be a roughly $2 billion Bitcoin hedge put on

22   corresponding to the GDA investment, a hedge of roughly twice

23   the amount that we had invested in Bitcoin.

24          MR. COHEN:  Can we call up Government Exhibit 14A,

25   please, and go to row 2 and highlight that, please.

NAVMBAN2                          Bankman-Fried - Redirect

1    Q.  Do you recall being shown this yesterday in relation to the

2    GDA investment?

3    A.  Yup.

4             MS. SASSOON:  Objection.  I don't believe he was shown

5    this spreadsheet.

6             THE COURT:  14A?  Is it 14A?

7             MR. COHEN:  14A, your Honor.

8             I'll rephrase, your Honor.

9             Can we go to the end of the column, please.

10            This is in evidence, your Honor.

11            You can highlight the entry under Y and Z.  It says:

12   Hedged with 2X BTC.

13   Q.  What does that refer to, Mr. Bankman-Fried?

14   A.  That refers to the expectation or the understanding that,

15   in connection with the investment in Genesis Digital Assets,

16   Alameda had put on a hedge with Bitcoin as in sold Bitcoins

17   and, in particular, sold twice the value of Bitcoins as the

18   size of the investment.  There are reasons why twice made sense

19   in that case, which I could go into if you're interested.

20   Q.  No.  I think that's fine.

21            MR. COHEN:  We can take that down.

22   Q.  Do you recall being asked several questions yesterday about

23   FTX providing for your use of a private jet?

24   A.  I do, yes.

25   Q.  And I believe we were shown a photograph of you on the jet

NAVMBAN2                    Bankman-Fried - Redirect

1    or a jet.

2    A.  Very flattering one.

3    Q.  As CEO of FTX, did you believe that use of a private jet

4    was a valid business expense?

5    A.  Yeah.  Depending on the context.

6    Q.  Can you tell us why.

7    A.  Yeah.  I didn't believe it would be a valid business

8    expense if used for recreational travel, you know, for a

9    vacation, and I did not use it for those purposes.  But it was

10   a very logistically difficult to travel between the Bahamas and

11   a few places, chiefly including Washington, D.C.  I had to go

12   to D.C. frequently in 2022.  I think I spent more than a month

13   there in aggregate, and I had meetings with senators, with

14   regulators that I couldn't be late to.

15           There were not very many commercial flights between

16   the Bahamas and D.C.  They were often delayed or cancelled.

17   And I had tight deadlines to make.  And separately at that

18   point in time my understanding was that the amount -- that the

19   expense associated with it was, although large compared to the

20   scales I would have thought about a few years earlier for the

21   company or for myself, fairly small compared to the scale of

22   the business at that point in time.

23   Q.  Let's move on, Mr. Bankman-Fried.

24           Do you recall yesterday being asked a series of

25   questions about shares in a company called Robinhood?

NAVMBAN2                        Bankman-Fried - Redirect

1    A.  Yes.

2    Q.  The shares of Robinhood were shares that were acquired,

3    correct?

4    A.  They were purchased, yes.

5    Q.  Who purchased them?

6    A.  Emergent Fidelity was the entity that purchased them.

7    Q.  Who owned Emergent?

8    A.  Myself and Gary.

9    Q.  Do you recall being shown an affirmation that you had

10   signed in connection with some litigation over Robinhood

11   shares?

12   A.  Yes.

13   Q.  Where did that litigation take place?

14   A.  Antigua.

15   Q.  Why Antigua?

16   A.  Robinhood was a U.S. company, but Emergent Fidelity, the

17   entity that owned the shares in Robinhood, was an Antigua-based

18   company.  It was my understanding that it had been sued by some

19   individual, not by a bankruptcy estate, in Antigua court.

20   Q.  Were you asked the following question and gave the

21   following answer?  Transcript 2711:  And the purpose of this

22   affirmation was to lay claim to the Robinhood shares, correct?

23   "A.  That wasn't how I understood it at the time."

24            Do you recall giving that testimony?

25   A.  I do.

1    Q.  What do you mean by that, sir?

2    A.  So my understanding, and my understanding --

3    Q.  At the time?

4    A.  -- at the time was a little bit hazy.  But what I

5    understood was that Emergent was being sued by a particular

6    individual in an Antiguan court case, that it would a

7    logistical headache for everyone if that lawsuit proceeded

8    without any statements from Emergent, and that this was not a

9    sort of proper -- this is not a process that, in my

10   understanding at the time, was designed to return the Robinhood

11   shares that were in Emergent to one of the various global

12   bankruptcy estates for the purposes of customers and in fact

13   might impede that process.

14   Q.  And answer this question yes or no, please.  Yes or no,

15   were you represented by an Antiguan attorney or an attorney in

16   connection with the Antigua litigation?

17   A.  Yes.

18   Q.  Let's move forward, Mr. Bankman-Fried.

19              MR. COHEN:  Can we call up Government Exhibit 248,

20   please.

21              Can I ask the government to call this up.  I think the

22   version you are using is redacted.  I want to use that one.

23   Would that be possible?

24              MS. SASSOON:  Sure.

25              MR. COHEN:  Thank you.

NAVMBAN2                    Bankman-Fried - Redirect

1   Q.  Do you recall being shown this email exchange earlier this

2   morning?

3   A.  Yup.

4   Q.  To refresh everyone, this is an exchange on November 9

5   between you and someone named Ryan Pinder.

6           You see that, sir?

7   A.  Yes.

8   Q.  Do you recall being asked questions about that?

9   A.  Yes.

10  Q.  Who was Mr. Pinder?

11  A.  He was the Attorney General of the Bahamas.

12  Q.  Why were you in communication with him on November 9?

13  A.  He and Christina Rolle, the head of the securities

14  commission, who is also cc'd on this, had reached out to ask

15  questions about FTX, given what I think -- what they described

16  as the rumors that they had heard about turmoil and the various

17  public statements we had made.

18          MR. COHEN:  If we might call out number 6, the whole

19  section underneath the block, and pull it out.

20  Q.  Do you recall being shown news this morning,

21  Mr. Bankman-Fried?

22  A.  I do, yes.

23  Q.  And counsel showed you the second paragraph.  As part of

24  this we have segregated funds for all Bahamian customers on

25  FTX -- this is you speaking -- and we would be more than happy

NAVMBAN2                    Bankman-Fried - Redirect

1    to open up withdrawals for all Bahamian customers on FTX so

2    that they can, tomorrow, fully withdraw all of their assets,

3    making them fully whole.

4            MR. COHEN:  If we could highlight in yellow the next

5    sentence, please.

6    Q.  Is it fair to say you went on to say:  It is your call

7    whether you want us to do this, but we are more than happy to

8    and would consider it the very least of our duty to the

9    country, and could open it up immediately if you reply saying

10   you want us to.

11           What did you mean by that?

12   A.  At the time that I sent this email, I had interpreted a

13   prior email sent to me by Mr. Pinder as implying that they

14   wanted us to take this action or something similar.  They

15   were -- the security commission in the Bahamas was the primary

16   regulator for FTX International, and we were headquartered in

17   the Bahamas, so I felt beholden to them.

18           MS. SASSOON:  Objection.  The question is, what did

19   you mean by that?

20           THE COURT:  Yes.  Strike that last part.

21   Q.  Finish your answer.

22   A.  So I was responding, trying to clarify if that was what

23   they had wanted us to do.

24           MR. COHEN:  We can take this down.

25   Q.  You mentioned two entities in the Bahamas yesterday, the

NAVMBAN2

1    SCB and the JPLs.  Can you tell us again who those were.

2    A.  The SCB is the Securities Commission of the Bahamas.  It's

3    the chief financial regulator in the Bahamas and the head

4    regulator of FTX.  The JPLs, joint provisional liquidators,

5    were a group of people appointed by the SCB to manage the

6    future direction of FTX and its liquidity insolvency

7    proceedings in the Bahamas.

8    Q.  After you stepped down on November 11, through December,

9    did you continue to have communications with the SCB and the

10   JPLs?

11   A.  Yup.

12   Q.  What was your reason for doing so?

13   A.  I wanted to help the company.  I wanted to help the

14   customers.  I wanted to help make the customers as whole as

15   possible.  And they were -- at least had expressed to me that

16   it would be helpful for doing so for me to tell them what I

17   knew and give them my thoughts.

18   Q.  Thank you, Mr. Bankman-Fried.  I have nothing further.

19            THE COURT:  Thank you.

20            Any recross, Ms. Sassoon?

21            MS. SASSOON:  No, your Honor.

22            THE COURT:  You are excused, Mr. Bankman-Fried.  You

23   may step down.

24            (Witness excused)

25            THE COURT:  Any additional evidence from the

NAVMBAN2

1    defendant?

2              MR. COHEN:  No, your Honor.  The defense rests.

3              THE COURT:  Is there to be a rebuttal case?  I am

4    reserving your motion for the time being.

5              MS. SASSOON:  Your Honor, may we take an early lunch

6    break so we can confer -- even just a five-minute break or the

7    lunch break, whichever your Honor prefers.

8              THE COURT:  It depends how fast you want to eat.

9              MS. SASSOON:  Just a five-minute break.

10             THE COURT:  No one needs to bolt their food.

11             Five minutes.

12             (Jury not present)

13             (Recess)

14             THE COURT:  What's the story?

15             MR. ROOS:  We are not planning on calling any

16   witnesses and there is one outstanding item, which is

17   Government Exhibit 2534, which there was a foundation objection

18   to yesterday because the witness did not recognize the

19   document.  Your Honor admitted it subject to connection.  We

20   have been chatting with defense counsel.  It sounds like they

21   have some concerns.  We can authenticate the document by

22   calling that fellow from Google back up from Texas, but I

23   prefer not to.

24             THE COURT:  That really went over big.

25             MR. COHEN:  Your Honor, if I might cut through this,

NAVMBAN2

we don't want the fellow from Texas to come.  The issue we have

is that the document on its face is, to us, appears to be a

draft.

          THE COURT:  I, of course, don't have it in front of

me, so I don't know what we are talking about.  I lost total

recall at about number 1800.

          MR. COHEN:  Sorry, your Honor.

          If you look at the second to last page of the

document -- they are not numbered -- it says:  FTX token raise,

note, 3/21/2019.  This is still prospective and just a draft of

what we might do.  That date is before FTX was even launched.

          We don't have an issue with it being admitted if it is

not being presented as a final version and something that was

in effect after FTX was launched, but we don't think that the

document supports it and there was no testimony to that effect.

That's our concern, your Honor.

          MR. ROOS:  On this, Judge, the witness was crossed

about a different page relating to preventing clawbacks.  If it

would solve the issue, we would just redact the page that says

draft on it.

          MR. COHEN:  With respect --

          THE COURT:  I don't think that solves Mr. Cohen's

problem.

          The part of this that matters to the government.

Please educate me.

NAVMBAN2

1          MS. SASSOON:  Doesn't have page numbers, your Honor --

2          THE COURT:  I can count.

3          MS. SASSOON:  -- several pages in there is a page that

4     has a heading:  How is FTX solving these issues?  And it says:

5     Preventing clawbacks.

6          The witness was questioned about that and questioned

7     about the three items beneath that describing how the

8     liquidation model works.  We have not --

9          THE COURT:  Don't you have this already?

10          MS. SASSOON:  This was offered subject to connection.

11          THE COURT:  Yes, I understand that.

12          MS. SASSOON:  We don't think there is a basis to

13     strike the testimony about this document which was shown to the

14     jury, and we are not and have not made a representation that

15     this deck went to a particular person or was a final draft.  He

16     was questioned about his understanding of those terms and

17     whether he disputed that FTX was marketed that way.

18          We think, given that this came off his Google Drive

19     and that a Google witness could authenticate it, and that

20     doesn't seem to be the defense's issue, there is no reason not

21     to admit it when the government is not misrepresenting how we

22     are using it, and where we don't redact that page they are free

23     to say this was a draft.

24          THE COURT:  This was all about the distinction between

25     preventing clawbacks and significantly reducing the likelihood

NAVMBAN2

1    of clawbacks, yes?

2           MS. SASSOON:  Also about the three tiers of the

3    liquidation system which the defendant on the stand said that,

4    in substance, he agreed with how it was described here, but

5    perhaps he would have described the insurance fund in slightly

6    different words.

7           THE COURT:  So what.

8           MS. SASSOON:  I see no basis to strike that testimony,

9    your Honor, which would be a consequence of not admitting this

10   document.

11          THE COURT:  Except you have not authenticated it.

12          MS. SASSOON:  The authenticity issue doesn't seem to

13   be the objection from the defense.  They seem to be prepared to

14   stipulate that this came off his Google Drive.  To the extent

15   that this is at all relevant to closings --

16          THE COURT:  It came off his Google Drive and what?

17   And you have got metadata that would say that?  Is that the

18   point?

19          MS. SASSOON:  A Google witness could say, this is an

20   authentic document.  It was taken off of the defendant's Google

21   Drive.

22          THE COURT:  Mr. Cohen, presumably, rather than bring

23   the guy back from Texas --

24          MR. COHEN:  No, we are not doing that.

25          THE COURT:  You would be prepared to stipulate that,

NAVMBAN2

1    if called, the guy who came from Texas would have testified

2    that if this came off the metadata it indicates it came off his

3    Google Drive, no?

4                 MR. COHEN:  Yes.

5                 THE COURT:  Solves the problem.

6                 MR. COHEN:  It does, your Honor.

7                 THE COURT:  Problem solved?

8                 MS. SASSOON:  Yes.  Logistically, the government plans

9    to offer this one document in its rebuttal case.

10                THE COURT:  It's in, subject to connection.  What we

11   are talking about is a hypothetical motion to strike it, which

12   is now moot because you have a stipulation.

13                MR. COHEN:  As your Honor has laid out.

14                THE COURT:  Yes.

15                MS. SASSOON:  We are all set on this, it seems.

16                THE COURT:  The stipulation solves the problem.  It's

17   in evidence.  It has been connected.  So there is no rebuttal

18   case.

19                MR. ROOS:  Correct.

20                THE COURT:  Let's talk schedule for a minute since the

21   jury is out there enjoying their five minutes.

22                We will have the charge ready for you to look at

23   whenever John Hammel gets back with the copies.

24                The question is whether I send the jury home now or

25   whether I hold them here for several hours, or however long it

NAVMBAN2

1    takes, in the hope of starting somebody's closing toward the

2    end of the day.  I'm disinclined to do that, but I'll be happy

3    to listen to counsel.

4              MR. ROOS:  I think it's good news that we are done,

5    and we should do the charge conference and start tomorrow

6    morning.

7              THE COURT:  Any different view, Mr. Cohen?

8              MR. COHEN:  We defer to the Court.

9              THE COURT:  Bring in the jury.

10             I'll deal with the motion once the jury is out of the

11   room, and then we will get the charge down.

12             (Jury present)

13             THE COURT:  Defendant and the jurors all are present,

14   as they have been throughout.

15             Does the government have any rebuttal evidence to

16   present?

17             MR. ROOS:  No, your Honor.

18             THE COURT:  Ladies and gentlemen, that concludes the

19   presentation of evidence in this case.

20             Here is what happens now.  I will be meeting this

21   afternoon with the lawyers concerning the legal instructions

22   that I am going to give you.  I am going to send you home for

23   the rest of the day and see you back at 9:30.

24             But don't get up yet because I have to have one

25   further word with counsel at the sidebar about how we are going

NAVMBAN2

1    to proceed from here.

2              (Continued on next page)

NAVMBAN2

1              (At sidebar)

2              THE COURT:  I'm disinclined, if I think about it, to

3    bring all these alternates in tomorrow only to send them home

4    at 9:30.  I think what I will do, unless somebody has a better

5    idea, is to bring in alternates 1 and 2 and not discharge 3, 5,

6    and 6.  They are going to be subject to call if need be.

7              Does that work for anybody?

8              MS. SASSOON:  Don't they need to hear the summations,

9    your Honor?

10             THE COURT:  Of course they do.  Thank you.  That takes

11   care of that.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

NAVMBAN2

```
 1              (In open court)
 2              THE COURT:  Folks, we will see you all tomorrow
 3    morning at 9:30, and we will start right out with closing
 4    arguments.
 5              Folks, you have all earned your buttons.
 6              (Jury not present)
 7              THE COURT:  If there are any motions, I will hear them
 8    now.
 9              MR. COHEN:  Your Honor, we renew our motion for a
10    judgment of acquittal.
11              THE COURT:  Denied.
12              One of my law clerks -- you have the charge yet?  No.
13              The copying machine is running furiously.  As soon as
14    the copies are ready, we will bring them down.
15              Charge conference, 1:45.
16              (Luncheon recess)
17
18
19
20
21
22
23
24
25
```

NAVMBAN3

                        AFTERNOON SESSION

                           2:00 p.m.

1          THE COURT:  We will mark as Court Exhibit X for

2    identification a copy of the circulation draft of the proposed

3    charge.  As soon as I get organized, we will get started.

4          Any objections or suggestions from the government from

5    the beginning through page 5, line 12?

6          MR. ROOS:  Yes, Judge.

7          On page 1, line 18 and 19 and page 2, lines 6 and 7,

8    the crime is described as, by misappropriating those customers'

9    deposits.  We would ask for it to be, by making false

10   statements or representations to obtain money or property and

11   by misappropriating those customer deposits to reflect the fact

12   that the government is going to argue both affirmative

13   misrepresentations and misappropriation.

14         THE COURT:  Who is going to speak from the other side?

15         MR. DICK:  I will, your Honor, Gale Dick.

16         We object to charges that omit the misappropriation

17   theory all together.

18         THE COURT:  You object to charges that omit the

19   misappropriation --

20         MR. DICK:  I beg your pardon.  Omit the

21   misappropriation theory altogether.

22         THE COURT:  I don't understand what you have just

23   said.

NAVMBAN3

1          MR. DICK:  I misspoke.  Sorry.

2          The indictment charges the misappropriation theory.

3   It does not charge a misrepresentation theory.  In our view,

4   instructions that omit discussion of the misappropriation

5   theory and focus on the misrepresentation theory are

6   constructive.

7          THE COURT:  We are going to have to work out a way of

8   understanding each other.  We are going to have you start by

9   you speaking more slowly.

10          MR. DICK:  Sure.

11          THE COURT:  Could we try that again.

12          MR. DICK:  Yes, we certainly can.

13          It's our position, your Honor, that the indictment

14   charges solely a misappropriation theory.  It does not charge a

15   misrepresentation theory of wire fraud on customers.  So

16   instructions that reference a misrepresentation theory, in our

17   view, are improper and a constructive amendment of the

18   indictment.

19          THE COURT:  Mr. Roos, what do you have to say?

20          MR. ROOS:  It's definitely not a constructive

21   amendment because the speaking indictment outlines several

22   categories of false representations, statements, promises made

23   by the defendant, so there is certain no constructive

24   amendment.

25          If they are referring to the description in the "to

NAVMBAN3

1    wit" clause, I think the law is clear that that does not bind

2    the Court in terms of considering how it can describe the

3    indictment or the theory, so I think it's appropriate to do

4    both.

5              THE COURT:  Counsel, frankly, I didn't get your name.

6    Tell me again.

7              MR. DICK:  It's Gale Dick.

8              THE COURT:  Mr. Dick, to my recollection, and I've had

9    the issue recently, Mr. Roos is absolutely right with respect

10   to the "to wit" clause.  Is there any other basis on which you

11   are objecting to submission of false statements?

12             MR. DICK:  Yes, your Honor.

13             In the speaking portions of the indictment, it does

14   make reference to misrepresentations to lenders and to

15   investors but not to consumers, customers.

16             THE COURT:  You are going to address that?

17             MR. ROOS:  I think, no.  The answer is no.  That's not

18   correct.  Not that I'm not going to respond.  The answer is,

19   that is not a fair characterization of the indictment.  It

20   describes his lies to Congress, the lies to the public.

21             THE COURT:  Overruled.

22             Your proposed language, Mr. Roos, is page 1, line 18

23   to start with.

24             MR. ROOS:  Right.

25             Your Honor, we defer to the Court on the specific

NAVMBAN3

1    language you want to use, but the idea being, the thrust of the

2    wire fraud charge, which is by making material

3    misrepresentations, or you can describe it as a representation

4    or a statement or a promise to obtain money or property.

5           THE COURT:  I am going to ask you to give me proposed

6    language later on, so you have time to work it out.  We will

7    come back to that.

8           Anything else on the section I inquired about?

9           From the defense?

10          Mr. Roos, you are going to have to stand.

11          MR. ROOS:  I was just going to say no, but I saw your

12   Honor moving on.

13          THE COURT:  What about you, Mr. Dick?

14          MR. DICK:  Yes, your Honor.

15          On page 4, line 13, it reads:  Proof that the crime

16   charged actually was committed or attempted.  We do not believe

17   attempted has been charged or proved.  We would strike the

18   words, and attempted.

19          THE COURT:  I thought it said, or attempted.

20          MR. DICK:  Or attempted.  I beg your pardon.  We would

21   strike those.

22          THE COURT:  Mr. Roos.

23          MR. ROOS:  That's fine.

24          MR. DICK:  Your Honor, at the bottom of that page,

25   lines 22 and line 23, it states in the indictment that the

NAVMBAN3

1    defendant aided and abetted the commission of the crime.  The

2    proofs at trial have been about principal liability, not aiding

3    and abetting, and we would strike that.

4              THE COURT:  Unfortunately, I believe that it cites 18

5    U.S. Code Section 2, which is, among other things, aiding and

6    abetting.

7              Overruled.

8              Anything else on that section?

9              MR. DICK:  Nothing, your Honor.

10             THE COURT:  Page 5, line 13 through page 6, line 19.

11             Government.

12             MR. REHN:  We have nothing.

13             THE COURT:  Defense.

14             MR. ROOS:  We have nothing.

15             MR. DICK:  I won't repeat this every time, your Honor,

16   but I objected previously to what we view as a constructive

17   amendment versus with respect to wire fraud on customers.  As

18   to the misrepresentation theory, I won't repeat that objection

19   every time.

20             THE COURT:  Overruled.

21             Page 6, line 20 through page 8, line 15.

22             Government.

23             MR. REHN:  Yes, your Honor.

24             Related to the previous point, on the bottom of page

25   7, at line 23, this is after describing the misrepresentation

NAVMBAN3

1    theory.  Rather than saying a scheme to defraud existed if the

2    government has proved, we would submit that the instruction

3    should say, a scheme to defraud also includes a scheme to

4    fraudulently embezzle or misappropriate, and then picking up

5    with property at the top of the next page.

6          THE COURT:  Let me just see if it's charged in

7    substance.

8          Any response to that, Mr. Dick?

9          MR. DICK:  None, your Honor.  Thank you.

10          THE COURT:  I will charge it in substance as the

11    government suggests.  Again, I'd like to have specific language

12    submitted.

13          MR. REHN:  Certainly, your Honor.

14          THE COURT:  Anything else from the defense down to

15    line 15 on page 8?

16          MR. DICK:  Yes, your Honor.

17          MR. REHN:  We had one more, your Honor.

18          THE COURT:  OK.

19          MR. REHN:  Sorry about that.

20          In that same sentence, after it says, property

21    belonging to another, there is an or there and then it gets

22    into a definition of property entrusted to the defendant's

23    care, which we think that the or is incorrect because it --

24    really this is a definition of what it means to be property

25    entrusted to the defendant's care.  So the government would

NAVMBAN3

1    suggest a period after another and then take the remainder of

2    that sentence and move it to the bottom of this paragraph and

3    have it just say, money or property is entrusted to the

4    defendant's care.  And then it continues as it is.

5            THE COURT:  Any comment on that, Mr. Dick?

6            MR. DICK:  Not on that, although I do have a comment

7    on this section more generally.

8            THE COURT:  I'll come back to you in a minute.

9            What the government is suggesting is that on line 8 we

10   start a new sentence.

11           MR. REHN:  Money or property is entrusted, and then it

12   just continues with the rest of the sentence.  That's on lines

13   2 through 5.

14           THE COURT:  We are picking up there 2 through 5.  I

15   follow.  I will do that.

16           Anything else from the government on this section?

17           MR. REHN:  Not through line 15, your Honor.

18           THE COURT:  Mr. Dick, anything on your side?

19           MR. DICK:  Yes, your Honor.

20           With respect to this definition, I will say loosely

21   related to fiduciary duty, there is a concept that we think is

22   important to include, and relying here on the Second Circuit's

23   decision in *Skelly*.  This is the notion of reliance, dominance

24   or control.  I have some proposed language that I can read to

25   you and then submit later.

NAVMBAN3

1          THE COURT:  You can read it.

2          MR. DICK:  It says:  A fiduciary relationship involves

3    discretionary authority and dependency and at the heart of the

4    fiduciary relationship lies reliance and de facto control and

5    dominance.

6          THE COURT:  Who is going to address that for the

7    government?

8          MR. ROOS:  Judge, I think the language, you have great

9    confidence and trust, also comes from some of the Second

10   Circuit cases about fiduciary relationships or other

11   relationships of special trust.  And I guess the question with

12   the defense citation is what exact language are they proposing

13   from it.

14         We are not opposed, I think, conceptually to defining

15   this in a way, if the Court wants to consider that, but we need

16   to know what the language is that they are actually proposing.

17   That doesn't sound like a jury instruction.

18         THE COURT:  It doesn't.

19         MR. DICK:  We would be happy to submit some language,

20   your Honor.  The concepts are drawn from the same body of case

21   law, including *Chestman*.

22         THE COURT:  That's all well and good.  But if you are

23   requesting a charge, as you know, it has got to be specific,

24   and I have to conclude that the way in which you are requesting

25   it is exactly consistent with the law, and I don't know what

NAVMBAN3

1     the language is.

2                 MR. DICK:  I'm happy to submit the language in writing

3     slightly later today.

4                 THE COURT:  Anything else through line 15 on page 8

5     from either side?

6                 MR. REHN:  Your Honor, we just noticed, there is a

7     typo on line 14 at the end of the line, the word the before

8     whether should be stricken.

9                 THE COURT:  You are correct.  I will make that change.

10                Page 8, line 15 through page 9, line 23.

11                Government.

12                MR. REHN:  We did have some thoughts on this terms of

13    service language.  I don't know if it makes sense to hear the

14    defense position because they have recently submitted briefing

15    on this.  I don't know if our concerns may be mooted if they

16    have concerns.

17                THE COURT:  Mr. Dick, how about you?

18                MR. DICK:  Yes, your Honor.

19                I have something higher up on page 9, if you would

20    like to hear that now, and then we can turn back to terms of

21    service.

22                THE COURT:  Higher up on page 9?

23                MR. DICK:  Beginning on line 3, the clickwrap

24    instruction.

25                THE COURT:  All right.

NAVMBAN3

1          MR. DICK:  It's our view that this clickwrap

2     instruction is unnecessary.  The conspicuousness of what is and

3     is not contained in the terms of service has not been subject

4     to proof at trial and it will confuse the jury and is

5     unnecessary.

6          THE COURT:  Of course it has been subject to proof at

7     the trial.  It's right there on an exhibit.  I don't remember

8     the exhibit number, but it's right there.

9          Back to you, Mr. Rehn.

10          MR. REHN:  If the defense is proposing to cut this

11     part -- are they just proposing to cut this paragraph?

12          MR. DICK:  That's correct, the clickwrap paragraph.

13          MR. REHN:  Just that paragraph, not the first

14     paragraph.

15          MR. DICK:  No.  I'm sorry if I wasn't clear.  Page 9,

16     lines 3 to 11.

17          MR. REHN:  I think if you are going to cut that, you

18     may need to cut the previous paragraph as well because that

19     refers to some of the concepts that seem --

20          THE COURT:  Is the government objecting to those two

21     paragraphs or not?

22          MR. REHN:  We would, I think, not object to cutting

23     both paragraphs.

24          THE COURT:  That wasn't my question.

25          MR. REHN:  If the defense doesn't want them, the

NAVMBAN3

1    government is not asking for them, if that's the question.

2              THE COURT:  No, that's not the question.  Please

3    listen to the question and answer it.

4              MR. REHN:  We would say -- if the first paragraph is

5    included, the second paragraph provides necessary context to

6    the first paragraph.  If both paragraphs are included, we would

7    also ask that the Court include the language about disclaimers

8    that the government has proposed in its letters, which I could

9    provide to the Court, that's taken from the *Weaver* case.

10             THE COURT:  We will come back to that.

11             What's the defendant's position on this?

12             MR. DICK:  The defendant's position is that the

13   introductory sentence to the last paragraph on page 8, first,

14   my recollection that there is only one version of the terms of

15   service, lines 18 and 19.  We have no objection to keeping that

16   in.  We view the remainder with respect to clickwrap and the

17   agreement as unnecessary, and we would ask that that be

18   removed.  So that would be --

19             THE COURT:  Is there an objection to that or not?

20             MR. DICK:  The one I articulated, in our view, the

21   clickwrap and the conspicuousness, is not a subject of proof at

22   trial.

23             THE COURT:  What exactly is the defendant's position?

24   If I take this out, what's the jury to be told about the

25   significance or the relevance, for that matter, of the terms of

service?

MR. DICK:  In our view, your Honor, that's taken up in the paragraph on page 9, line 12, and we did submit last night, your Honor --

THE COURT:  Yes.  I got the submission late last night with 240 pages attached to it.  I have not read all 240 pages yet.

MR. DICK:  Yes, your Honor.

In our view, the legal significance and the legal meaning of the terms of service are a proper subject for the jury to consider.  Because it is a contract, its meaning is for the Court to instruct the jury on.

THE COURT:  Whether it is a contract depends, does it not, on whether clicking on the box formed a contract and, if so, what the terms of that contract were.  Isn't that true?

MR. DICK:  Point taken, your Honor.

In that event, I would be happy to submit this later in writing.

On page 8, the sentence after the first -- this would go from lines 19 through 22.  There is evidence that a prospective customer had to click on a box that said I agree to the FTX terms of service in order to open an account.  We would keep that in, which, in our view, establishes the formation of a contract, and the meaning of the contract we would then turn to the paragraph on page 9.

NAVMBAN3

1          THE COURT:  Which paragraph on page 9?

2          MR. DICK:  The one beginning the third point on line

3    12.

4          THE COURT:  Which doesn't address the meaning of the

5    contract.

6          MR. DICK:  It doesn't in fact.  That's what --

7          THE COURT:  That's what you want.  You want to say

8    there was a contract and you don't want to address the meaning

9    of it.

10          MR. DICK:  No.

11          THE COURT:  You just want to wing it on closing.

12          MR. DICK:  No, your Honor.

13          In fact, the meaning of the contract is the subject of

14    the submission we made last night.

15          THE COURT:  Yes, I know.  But I am not going to charge

16    that.

17          MR. DICK:  OK.

18          Then the terms of the contract --

19          THE COURT:  That submission was untimely, it's

20    incomplete, it does not state the relevant law, it may not

21    apply the right law.  It has all kinds of problems that I've

22    only touched on.

23          MR. DICK:  Understood, your Honor.

24          MR. REHN:  Your Honor, it's the government's position

25    that the core important point for the jury to be instructed on

NAVMBAN3

1    is what the Court has on page 9, beginning on line 12, that

2    this is a criminal wire fraud case and not a civil

3    breach-of-contract case.  We don't think that the jury needs

4    instruction on the terms of service as set forth in the

5    previous two paragraphs.  We do believe that if the Court is to

6    provide that instruction, an instruction from *Weaver* regarding

7    disclaimers --

8              THE COURT:  You said that already.  I understand that.

9              There is no evidence whatsoever in the record, am I

10   right, as to what the terms of service actually were before May

11   22, 2022.  Isn't that so?

12             MR. REHN:  I believe that's correct, your Honor.

13   There is reference to existing prior drafts, but I do not

14   believe they are in evidence.

15             THE COURT:  There is reference in the testimony but

16   certainly not a document and, to my recollection, certainly not

17   even testimony as to what those terms were.  Yes?

18             MR. REHN:  I think that's right.  I'm reminded by my

19   colleague, there may have been some general description in Can

20   Sun's testimony.

21             THE COURT:  Can Sun's testimony, I believe, was to the

22   effect that when he came aboard, there had been one or more

23   prior documents which are terms of service, that there was a

24   draft of a new one in progress, that the new one was finished

25   under his administration, and that it went live, so to speak,

NAVMBAN3

1    became operational in May of 2022, right?

2              MR. REHN:  That's correct, your Honor.

3              THE COURT:  And he said something to the effect that

4    there were some things in what went before that were in the May

5    draft, but other things that weren't, something to that effect.

6    Isn't that so?

7              MR. REHN:  I think that's largely accurate.

8              THE COURT:  So there is no evidence as to what the

9    terms of service substantively said before May of 2022.  That

10   being the case, there is no evidence of a contract before May

11   of 2022 because, clickwrap validity or not, there is no

12   evidence as to whether the clickwrap approach was used before

13   May '22, although maybe someone could infer that, but certainly

14   no evidence as to what they were agreeing to then.  Yes?

15             MR. REHN:  Yes.

16             THE COURT:  Now, then we come back to May of 2022.  I

17   understand that the defense wants me in one way or another to

18   say that this was a contract when somebody clicked on the box

19   after May of 2022.  Aren't there issues of fact in that regard

20   for this reason?  If the clicking was not legally effective to

21   form a contract between the customer and FTX, then the

22   governing law clause in the terms of service has no bearing

23   whatsoever.  There has been no proof in this case, apart from

24   that clause, as to whether there was ever a contract that

25   whatever this relationship was, it was governed by English law

NAVMBAN3

```
1    or anything else, right?
2              MR. REHN:  There has really been no discussion of
3    that.
4              THE COURT:  Nothing.
5              So what we have here is a situation in which the
6    existence of a contract in the May 2022 period, putting aside
7    for a minute the precise terms, depends on the circumstances in
8    which a so-called clickwrap agreement is effective to form a
9    contract, yes?
10             MR. REHN:  That's correct, your Honor.
11             THE COURT:  And in the absence of proof that foreign
12   law, whether that's New Jersey or Antigua or the United Kingdom
13   or Nauru, and that that foreign law is different than the law
14   of New York, the Court is bound to apply New York law.  Yes?
15             MR. REHN:  Well, your Honor, there is no need for the
16   Court or the jury to consider any substantive contract law
17   because, as articulated in cases like *Weaver*, in a criminal
18   federal wire fraud case the jury should consider all of the
19   evidence of the relationship between parties, not just whether
20   there was or was not compliance with the literal terms of the
21   contract.
22             THE COURT:  But if there is no contract, they can't
23   consider an alleged contract, right?
24             MR. REHN:  Your Honor, they can consider all of the
25   ways in which the parties made representations and
```

1   communications to each other and the terms of service are a

2   form that was available to customers.  For example, there was

3   evidence that Can Sun sent the terms of service to Sculpture,

4   which was a prospective customer at FTX, when they were asking

5   questions about how their assets would be treated at FTX.  So

6   the question there is not whether Sculpture entered into a

7   contract when it became a customer, but what it understood its

8   assets would be treated as on the exchange.

9        THE COURT:  Now I think I am beginning to understand

10  your point.

11       Mr. Dick, any response to that?

12       MR. DICK:  Well, it's, at a minimum, conceded by the

13  government that the terms of service, whether considered as a

14  contract or as a series of representations, are relevant.  So

15  those contents, I think, are properly before the jury.  And as

16  your Honor is alluding to, whether or not it was in fact a

17  contract is certainly relevant to the nature of the

18  relationship between the customers and FTX.  So our view is --

19       THE COURT:  Whether or not it was a contract depends

20  on whether the clickwrap agreement is sufficient for contract

21  formation, isn't it?

22       MR. DICK:  I take your Honor's point on that.

23       THE COURT:  Given what I said about no proof of

24  foreign law and no ruling by the Court on any foreign law, I

25  apply the law of New York to whether there was a contract, as

NAVMBAN3

1    opposed to some idle communication that was headed terms of

2    service.

3              Do you agree with that too?

4              MR. DICK:  I do.

5              THE COURT:  So the government's point is, they would

6    like to drop essentially the last -- the carryover paragraph on

7    page 7.

8              Is that right, Mr. Rehn?

9              MR. REHN:  What we said is that we would certainly be

10   fine with dropping both the paragraph beginning first that's on

11   page 8 at line 18 and then the next paragraph that begins on

12   page 9 at line 3, or include both with the government's

13   proposed disclaimer instruction.  Either one, we think, is

14   acceptable.

15             THE COURT:  I'm sorry.  I think I said page 7, but I

16   didn't mean page 7.  I meant page 8.  But you picked that up.

17             MR. REHN:  Yes, your Honor.

18             THE COURT:  So you would drop the paragraph beginning

19   on 8, line 18 through 9, line 11.

20             MR. REHN:  To be clear, we don't object to the Court's

21   views on this.  If the Court thinks it's appropriate to include

22   these paragraphs, we don't object to that.

23             What we had a problem with was the defense suggestion

24   that just cut one of the two paragraphs.  So we are happy with

25   cutting both or with keeping both with our proposed addition.

NAVMBAN3

1          THE COURT:  Given that position now, Mr. Dick, where
2    are you?
3          MR. COHEN:  I don't want to keep belaboring the point,
4    your Honor, but for record purposes it is our view that there
5    was a submission in English law --
6          THE COURT:  It's your position that what?
7          MR. DICK:  There was a submission with respect to the
8    meaning of English law.
9          THE COURT:  Yes, I know there was.
10          MR. DICK:  That being so, we reviewed the contract,
11    the terms of service, should the jury find there to have been a
12    contract, to be relevant, its terms, under English law, to be
13    relevant.  And in that event we would actually keep the
14    language with respect to clickwrap because your Honor has
15    pointed out, as to contract formation, that language lays that
16    groundwork.
17          THE COURT:  I am going to leave it with the change the
18    government suggested.
19          MR. DICK:  Just for record purposes, your Honor, on
20    the *Weaver* instruction, the disclaimer instruction --
21          THE COURT:  The *Weaver* instruction, where do I find
22    that language?
23          MR. REHN:  Your Honor, a version of it is in the
24    letter that the government filed on October 19 at page 3, but I
25    could also provide it to the Court now.

NAVMBAN3

1          THE COURT:  In your view, it would go where?

2          MR. REHN:  It would go after line 11 on page 9.  In

3    considering whether a statement or omission is material, let me

4    caution you that a clause in a contract or a disclaimer cannot

5    render any misrepresentations, including any oral

6    misrepresentations, immaterial as a matter of law.

7          THE COURT:  Mr. Dick.

8          MR. DICK:  Our views on this were set out in our

9    letter of October 24.  We view that instruction as unnecessary.

10         THE COURT:  I have had, I am going to guess now, 200

11   pages of submissions in letters and proposed jury instructions,

12   and if you're seriously advocating this position you are going

13   to have to tell me what it said.

14         MR. DICK:  In brief, your Honor, an instruction with

15   respect to disclaimers we view as unnecessary and potentially

16   confusing.  The terms of service, again, in our view, formed a

17   contract with substantive provisions.  Rather than purely

18   disclaimers with respect to prior disclosures regarding risk

19   and those substantive procedures, we believe the jury would be

20   tempted to disregard by the government's proposed instruction.

21         THE COURT:  I think your position on this is in some

22   respects inconsistent with what you said a minute ago about

23   contract formation and disclaimers are in fact substantive

24   provisions of contracts.

25         So I am not going to adopt your suggestion, and I am

NAVMBAN3

1   going to charge, in substance, what the government said about

2   disclaimers.  There was something else after disclaimers.

3          MR. REHN:  Yes, your Honor.  Let me caution you that a

4   clause in a contract or a disclaimer cannot render any

5   misrepresentation.

6          THE COURT:  When I go back upstairs and try to find

7   the specific language, it's in your October 19 letter, page

8   what?

9          MR. REHN:  I have it here, page from our letter.

10         THE COURT:  Oh, well, how wonderful.

11         MR. REHN:  I believe that's more or less almost word

12   for word of what was approved in *Weaver*.

13         THE COURT:  Now, I think we got through page 9, line

14   23.  Did we get that far?

15         MR. REHN:  We had one more on page 9, your Honor.

16         THE COURT:  OK.

17         MR. REHN:  Beginning on line 18, there is a sentence

18   that begins, and if the government has proved such a

19   relationship of trust and confidence, it says, you must

20   determine whether or not the government has proved that FTX

21   customers were materially deceived or misled.

22          The issue there is that that seems that the government

23   must prove misrepresentation and misappropriation, as opposed

24   to what the law is, which is that it's an alternative theory.

25   Because there is other places in the instructions where both

NAVMBAN3

1    alternatives are set forth, we think that sentence can just be

2    cut.

3              Separately, the instructions adequately define both

4    misappropriation and material misrepresentations.

5              THE COURT:  Mr. Dick.

6              MR. DICK:  We have no objection to that, your Honor.

7              THE COURT:  That's out.

8              Anything else through page 9, line 23 from either

9    side?

10             Hearing none, we will move on.  Line 9-24 through page

11   11, line 7.

12             Government.

13             MR. REHN:  We are on page 10 now, your Honor.

14             THE COURT:  We are on page 9, starting with line 24

15   through 11, line 7.

16             MR. REHN:  Again, in keeping with the theme, on page

17   10, line 5, at the end of the line it says, that is sufficient

18   to establish.  We would propose the word also there.

19             THE COURT:  Any objection to that, Mr. Dick?

20             MR. DICK:  No, your Honor.

21             THE COURT:  I'll make that change.

22             Anything else from the government through page 11,

23   line 7?

24             MR. REHN:  No, your Honor.

25             THE COURT:  Defendant.

NAVMBAN3

1           MR. DICK:  I beg your pardon.  The end point of your

2     current request?

3           THE COURT:  11, line 7.

4           MR. DICK:  None, your Honor.  Thank you.

5           THE COURT:  I think the hard part is over.

6           Page 11, line 8 through page 14, line 14.

7           Government.

8           MR. REHN:  Your Honor, the government has previously

9     briefed the issue of the appropriate definition of willfully

10    with respect to each of these crimes.  It's our view that in

11    the context of the wire fraud and securities fraud and

12    commodities fraud charges, all of which are going to use the

13    same definition of willfully, there is not a requirement that

14    the defendant act with knowledge that one's conduct is

15    unlawful.  We think that's the heightened willfulness standard,

16    and the willfulness standard that applies to these crimes -- to

17    act willfully means to act voluntarily and with wrongful

18    purpose.

19          THE COURT:  Mr. Dick.

20          MR. DICK:  With respect to the wire fraud counts, your

21    Honor, we don't have any objection to that.

22          THE COURT:  We will strike, with knowledge that one's

23    conduct, through the end of line 17 and -- I misspoke there.

24    We will strike, with knowledge that one's conduct is

25    unlawful -- I did not misspeak -- through the end of line 17

NAVMBAN3

1    and insert, voluntarily and with wrongful purpose.

2              That picks up your point, Mr. Rehn?

3              MR. ROOS:  Yes.  Thank you, your Honor.

4              THE COURT:  Anything else through 14, line 14?

5              MR. REHN:  Similarly, on page 12, at lines 23 and 24,

6    there is a sentence that says:  Good faith is an honest belief

7    by the defendant that his conduct was not unlawful.  I think

8    that's the inverse of what we just discussed and imports an

9    incorrect willfulness standard into the good-faith instruction.

10             THE COURT:  And, therefore.

11             MR. REHN:  Therefore, that sentence should be

12   stricken.

13             THE COURT:  Mr. Dick.

14             MR. DICK:  In our view, the sentence under discussion,

15   which goes from lines 23 to 24, on page 12 should read:  Good

16   faith is an honest belief by the defendant that his conduct was

17   not unlawful or improper.  The invert proposition Mr. Rehn was

18   referring to, we don't think is applicable, an honest belief

19   that one's conduct was not unlawful.

20             THE COURT:  Picking up the language that we just

21   adopted on page 11, would it solve the concerns to say, good

22   faith is an honest belief by the defendant that his conduct was

23   not wrongfully intended?

24             MR. REHN:  That would be fine with the government,

25   your Honor.

NAVMBAN3

```
1              THE COURT:  Mr. Dick.
2              MR. DICK:  Your Honor, we would ask for the original
3    charge, conduct was not unlawful.  We think that's proper.
4              THE COURT:  Overruled.
5              Anything else from either side to and including page
6    14, line 14?
7              MR. REHN:  Nothing further from the government, your
8    Honor.
9              THE COURT:  Mr. Dick.
10             MR. DICK:  Your Honor, on the top of page 13, there is
11   what's been called the no-ultimate-harm instruction beginning
12   on line 3.  It's the sentence, however.  We made a submission
13   that we don't view that as necessary here.  To the extent that
14   the evidence shows Mr. Bankman-Fried believed customers would
15   never be harmed, including in the short term, which is what we
16   submit the evidence shows, this instruction is not necessary,
17   and that's in our prior submission.
18             MR. REHN:  Your Honor, there has been quite a bit of
19   evidence for them in the defense case about a belief that the
20   companies would be able to repay the customers, so there is a
21   factual predicate for this instruction in the record, and it's
22   an instruction that has been approved repeatedly in exactly
23   these terms by the Second Circuit when a factual predicate
24   exists in the trial record.
25             THE COURT:  Overruled, Mr. Dick.
```

NAVMBAN3

```
1              Anything else from either side to 14, line 14?

2              Hearing none, 14, line 15 through 15, line 13.

3              Government.

4              MR. REHN:  Nothing, your Honor.

5              THE COURT:  Mr. Dick.

6              MR. DICK:  Nothing, your Honor.

7              THE COURT:  15, line 15 to 16, line 16.

8              MR. REHN:  Nothing, your Honor.

9              MR. DICK:  Nothing from us either.

10             THE COURT:  Thank you.

11             16, line 17 through 19, line 7.

12             Government.

13             MR. REHN:  Your Honor, on page 19, at 4 and 5, this is

14   in respect to the aiding-and-abetting instruction.  The prior

15   sentence explains what the jury must find in order to convict

16   the defendant on an aiding-and-abetting theory, but then the

17   next sentence suggests they may not find the defendant guilty

18   of the substantive crime if they don't find aiding and

19   abetting, which suggests --

20             THE COURT:  You're right.

21             MR. REHN:  It should read:  If, however, you do not so

22   find, you may not find the defendant guilty of that substantive

23   crime on an aiding-and-abetting theory.

24             THE COURT:  You're absolutely right.

25             And on page 3, the word must should be changed to
```

NAVMBAN3

1   should.

2               MR. REHN:  That's fine with the government, your

3   Honor.

4               THE COURT:  I assume it's fine with the defense.

5               MR. DICK:  Yes, your Honor.

6               THE COURT:  Page 19, line 8.

7               MR. DICK:  I beg your pardon, your Honor.

8               THE COURT:  I'm sorry?

9               MR. DICK:  With respect to page 3 earlier on aiding

10   and abetting --

11               THE COURT:  Page 3.

12               MR. DICK:  -- it is our position that that is not in

13   the case that has been tried.

14               THE COURT:  I'm sorry.  Page 3.

15               MR. DICK:  Just on the aiding-and-abetting charge,

16   your Honor.  It's our position that the case that has been

17   tried is not an aiding-and-abetting case and this instruction

18   is unnecessary.  Your Honor's earlier point about the statute

19   and the aiding-and-abetting charge is taken, so we could just,

20   for record purposes, record our view that the

21   aiding-and-abetting charge --

22               THE COURT:  I take your point.

23               What about that, Mr. Rehn?

24               MR. REHN:  Your Honor, there has been quite a bit of

25   evidence that other people committed substantive crimes and

NAVMBAN3

1    that the defendant took various acts in furtherance of that.

2    For instance, Ms. Ellison testified that she sent fraudulent

3    balance sheets to lenders after consulting with the defendant.

4    A jury could certainly conclude that even if they don't find

5    that the defendant caused her to do that, such that he's guilty

6    as a principal, he nonetheless aided and abetted her by

7    reviewing the balance sheets.  That's just one of many examples

8    in which the defendant communicated with others in furtherance

9    of substantive crimes that they were committing.

10            THE COURT:  Why isn't that right, Mr. Dick?

11            MR. DICK:  Those are conspiracy charges, your Honor,

12   not aiding-and-abetting charges.

13            THE COURT:  Well, I don't think that's right, is it?

14   Because I certainly take your point that it could be a

15   conspiracy charge.  But if the crime was then actually

16   committed by someone else, the defendant's conduct, Mr. Rehn

17   argues, could be viewed as aiding and abetting that person in

18   committing the substantive mail fraud and wire fraud offense.

19            MR. DICK:  I understand your Honor's point.  In our

20   view, that has not been what the case has been about or what

21   the proof at trial has been about, but we can record our

22   position for the record.

23            THE COURT:  Your position is recorded.  Overruled.

24            Page 19, line 8 through page 21, line 24.

25            Government.

NAVMBAN3

1            MR. REHN:  Nothing from the government, your Honor.

2            THE COURT:  Defense.

3            MR. DICK:  Nothing from us either, your Honor.

4            THE COURT:  Thank you.

5            Page 21, line 25 through page 24, line 17.

6    Government.

7            MR. REHN:  Nothing, your Honor.

8            THE COURT:  Mr. Dick.

9            MR. DICK:  Nothing, your Honor.

10           THE COURT:  Page 24, line 18 through page 29, end of

11   the page.

12           Government.

13           MR. REHN:  We had one issue that comes up on page 28

14   at lines 24 and 25.

15           THE COURT:  Yes.

16           MR. REHN:  The law does not require the government to

17   prove an overt act that is alleged in the indictment.  It only

18   needs to prove an overt act.  We would suggest striking the

19   words alleged in the indictment.

20           So that sentence should read:  The government may

21   satisfy the overt-act element by proving an overt act, but it

22   is not required to prove the particular overt acts alleged in

23   the indictment.

24           THE COURT:  I hate to tell you how many times the

25   charge has been given in these precise words.  I understand

NAVMBAN3

1    that as a matter of drafting what you propose sounds harmless,

2    but what's here accurately states the law.

3              Your point is overruled.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAV1BAN4

1          MR. REHN:  Your Honor, we think that the issue is the

2     law does not require the overt act that's set forth in the

3     indictment to have been proven.

4          THE COURT:  Yeah, and how is that not covered in the

5     sentence that begins on line 24?

6          MR. REHN:  Well, the sentence on line 24 says that we

7     may satisfy it by proving an overt act alleged in the

8     indictment.

9          THE COURT:  Keep reading.

10          MR. REHN:  But it is not required to prove any of

11     those particular overt acts.

12          THE COURT:  Right.

13          MR. REHN:  I take your point.  I think that's fine.

14     Yes, that's fine, your Honor.

15          THE COURT:  Okay.  Anything from the defense on this

16     section?

17          MR. DICK:  Yes, your Honor.  On page 27, lines 6 and

18     seven, "wilfully," in the context of securities fraud, our

19     charge proposed and it's our position that "wilfully" in this

20     context requires a specific intent to violate the securities

21     law.

22          THE COURT:  Mr. Rehn?

23          MR. REHN:  That's not correct under the governing law.

24     I'm not sure what authority the defense is looking to.

25          THE COURT:  Mr. Dick, maybe you'll enlighten us?

NAV1BAN4

1    MR. DICK:  Certainly, your Honor.  Two cases that I'm

2    thinking of: *United States v. Cassese,* 428 F.3d 92, 98 (2d Cir.

3    2005); and *United States v. Peltz*, 433 F.2d 48, 55 (2d Cir.

4    1970).

5         THE COURT:  Give me the second one, please?

6         MR. DICK:  Yes.  *United States v. Peltz*, P-E-L-T-Z,

7    433 F.2d 48, 55 (2d Cir. 1970).

8         THE COURT:  Let me take a look.

9         MR. REHN:  Your Honor, with respect to the *Kaiser*

10   case, 609 F.3d 556, 569, specifically held that willfulness

11   does not require a showing that the defendant had awareness of

12   the general unlawfulness of his conduct.

13        THE COURT:  Does not require?

14        MR. REHN:  That's correct, your Honor.

15        THE COURT:  An awareness of the general unlawful

16   nature of his conduct?

17        MR. REHN:  That's right.  But rather that he had an

18   awareness of the general wrongfulness of his conduct, which is

19   what we discussed earlier in the context of the wire fraud

20   charge.

21        One other authority for the Court, Judge Rakoff gave

22   an instruction along the lines of what we've suggested in

23   *United States v. Petit*, and the Second Circuit just recently

24   affirmed that.  That's *United States v. Petit*.  The citation

25   for the Second Circuit case is 2022 WL 3581648 at *4.

NAV1BAN4

1          THE COURT:  All right.  Now give me a couple of

2    seconds to look at these authorities.

3          Mr. Dick, *Peltz* and *Cassese*, if it adopted the

4    standard you said at all, did so for insider trading cases

5    alone; isn't that right?

6          MR. DICK:  I think I disagree, your Honor, and if one

7    looks at the *Kaiser* decision, it seemed to say that for insider

8    trading cases only, the specific intent I mentioned——intent to

9    violate the securities law——was not required, but for a

10   misrepresentation on investors theory, it was required.

11         THE COURT:  Mr. Rehn, what about it?

12         MR. ROOS:  I believe he actually has that backwards.

13   I believe in the insider trading context——I don't have the case

14   in front of me, your Honor, but as I recall, the insider

15   trading cases sometimes do have a stronger willfulness

16   instruction than the more general misrepresentation on

17   investors cases, so on my recollection, that's what the *Kaiser*

18   case says.  It certainly was the case in *Petit* that the Second

19   Circuit recently affirmed an instruction that the defendant

20   acted deliberately and with a bad purpose and said that there

21   was no further instruction required for willfulness.

22         *Petit*, I believe, was not an insider trading case; it

23   was just a general securities fraud case.

24         THE COURT:  The government is right on this, so that

25   it will stand as written.

NAV1BAN4

1          Anything else on this section from either side?

2          Mr. Dick?

3          MR. DICK:  No, your Honor.

4          THE COURT:  Mr. Rehn?

5          MR. ROOS:  No.

6          MR. REHN:  No, your Honor.

7          THE COURT:  Page 30, line 1, through 34, line 10.

8          MR. REHN:  Very minor, your Honor.  On page 30, at

9   lines 14 and 15, it says, "this Count Six."  I think just the

10  word "this" should be stricken in both places.

11         THE COURT:  It is very minor.  I'm not going to change

12  it.

13         MR. DICK:  Yes, your Honor.  A couple of items.

14         THE COURT:  Yes.

15         MR. DICK:  On page 33, beginning on line 9, the

16  instruction with respect to in connection with commodities

17  fraud——fraud, that is, in connection with commodities trades,

18  the Court's instruction reads, "One way the government may

19  prove a sufficient connection to the United States——"I beg your

20  pardon.  I'm on the wrong page.  I'm on page 32.  I apologize,

21  your Honor.  This is in the middle of page 32, beginning on

22  line 11.

23         The charge proposes that the "in connection with"

24  requirement would be met as long as there was some nexus or

25  relation between the alleged fraud, fraudulent conduct, and the

NAV1BAN4

1    swap or contract of sale of a commodity, and in the next

2    sentence, on line 15, it suggests that that connection

3    requirement would be met if the fraudulent conduct touched upon

4    a swap or a contract of sale of commodity.  In our view, under

5    the *Brady* standard, that's insufficient.

6              THE COURT:  Mr. Rehn?

7              MR. REHN:  Your Honor, again, I don't have the cases

8    in front of me, but I believe that this is consistent with the

9    government's proposed instruction, which drew from some of

10   these same authorities that the Court has drawn from, so unless

11   there's a specific authority the defense is citing, I think

12   these are correct.

13             THE COURT:  What specifically do you rely on,

14   counselor?

15             MR. DICK:  With respect to the requirement in general,

16   we're relying on——

17             THE COURT:  With respect to this point.

18             MR. DICK:  Yes, to this point.  To the "in connection

19   with" requirement, we were relying on *Dabit v. Merrill Lynch*,

20   Second Circuit of 2005, which required an integral relationship

21   between the fraud and commodities trades.

22             THE COURT:  Citation, please.

23             MR. DICK:  395 F.3d 25.

24             THE COURT:  I'm sorry.  395?

25             MR. DICK:  Yes, 395 F.3d 25, 37.  I'll note that that

NAV1BAN4

1    case, *Dabit*, was overruled on other grounds——specifically, the

2    scope of preemption under SLUSA.

3          THE COURT:  All right.  I'll take a look.

4          What language are you asking for here, Mr. Dick?

5          MR. DICK:  "The connection must be integral to and not

6    merely incidental to."

7          THE COURT:  I'm not going to charge it in those terms.

8    I'm going to leave it as it is.  While I understand that there

9    is identical language in *Dabit*, quoted from another case,

10   reading *Dabit* overall, I think the instruction I propose to

11   give is consistent with the case law.  Certainly *Dabit* did not

12   purport to adopt the view that would be reflected if I charged

13   it in the precise terms the defense is requesting.  It takes it

14   out of context.

15         Anything else?

16         MR. DICK:  Yes, your Honor.  On page 33——

17         THE COURT:  Yes.

18         MR. DICK:  ——in the paragraph beginning on line 9,

19   with respect to extraterritorial conduct, with the territorial

20   application of the statute.  As written, the charge would have

21   that element, the territoriality requirement, satisfied by a

22   showing that, "some conduct relevant to the offense charged in

23   Count Six occurred in the United States."  In our view, there

24   should be additional language in that sentence, saying "and

25   that the fraudulent conduct was not predominantly foreign."

NAV1BAN4

1           THE COURT:  Mr. Rehn?

2           MR. REHN:  Your Honor, that would be inconsistent with

3    a number of recent cases that say that as long as there is

4    domestic conduct in the United States, that's sufficient for

5    facing jurisdiction on this particular provision of the

6    commodities law.  For instance, *In re Platinum and Palladium*

7    *Antitrust Litigation*, 61 F.4th 242, 267 (2d Cir. 2023), it held

8    that it was proper to apply the Commodities and Exchange Act

9    domestically where the plaintiffs alleged domestic conduct by

10   the defendants that violated the CEA.

11          THE COURT:  What are you relying on, Mr. Dick?

12          MR. DICK:  I was relying on the "predominantly

13   foreign" phrase from *Prime International*, which the *Platinum*

14   *and Palladium* case and others have cited and relied upon.

15          THE COURT:  What's the citation?

16          MR. DICK:  I beg your pardon.  Just give me one

17   moment.  I'll find it for you.

18          THE COURT:  And Mr. Rehn, the case you were citing was

19   62 or 67?

20          MR. REHN:  It was 61 F.4th 242, 267.

21          THE COURT:  Thank you.

22          MR. DICK:  Your Honor, I apologize.  I do not have

23   that citation.  I'd be happy to provide it shortly after the

24   conference, but I simply don't have it right here.

25          THE COURT:  Okay.  Let me just read the government's

1    case.

2            Just to digress for a moment, I note on page 31,

3    line 27, where it says "interstate commerce," I think it should

4    say "interstate or foreign commerce."  Anybody disagree with

5    that?

6            MR. REHN:  No, your Honor.  That seems correct.

7            MR. DICK:  No, your Honor.  Thank you.

8            THE COURT:  Okay.  Getting back to where we were.

9    I'll ask the defendant to submit the authority to my chambers,

10   unless you have it now.

11           MR. DICK:  I do have it now.

12           THE COURT:  Good.

13           MR. DICK:  The citation is 937 F.3d 94, 107.

14           THE COURT:  Thank you.

15           Now, Mr. Dick, I hate to do this, but restate your

16   point on this, your language?

17           MR. DICK:  Yes, your Honor.  This would be beginning

18   on line 11 of page 33.  The end of that sentence currently

19   reads, "some conduct relevant to the offense charged in Count

20   Six occurred in the United States," and I would propose adding

21   "and that the fraudulent conduct was not predominantly

22   foreign."

23           THE COURT:  That sounds right to me, Mr. Rehn.

24           MR. REHN:  Your Honor, I have that *Platinum and*

25   *Palladium* case, which seems to indicate that just an allegation

NAV1BAN4

1    of domestic conduct is sufficient.

2              THE COURT:  Well, so you'd better point me to exactly

3    where, because——

4              MR. REHN:  There's language there in which the court

5    upheld domestic application of the statute, and it says,

6    "because plaintiffs also allege domestic conduct by the

7    defendants," which I don't believe that case has further

8    language requiring "predominantly."

9              THE COURT:  All they're saying is that the complaint

10   said there was domestic conduct.  That can't be taken I think

11   in this context to mean that any claim of any domestic conduct

12   is enough, can it?

13             MR. REHN:  Your Honor, the Commodities Exchange Act I

14   do believe does criminalize commodities fraud if conduct

15   committed in furtherance of the offense is committed within the

16   United States.  There is very specific law about when it's

17   appropriate to have purely extraterritorial application of the

18   law.

19             THE COURT:  Yes.

20             MR. REHN:  But——

21             THE COURT:  So what part of the CEA says that action

22   in furtherance in the United States is enough?

23             MR. REHN:  So, your Honor, what we would point to is 7

24   U.S.C. Section 2, subsection (i), which defines the——or no.  I

25   apologize, your Honor.  That's incorrect.  That's relating to

NAV1BAN4

swaps, which is the next paragraph.  I'm actually looking at

CFTC's Rule 180.1, which is what defines sort of the scope of

commodities fraud that the CFTC——

            THE COURT:  What title of the C.F.R. is that?

            MR. REHN:  I believe that's 7 C.F.R. 180.1.

            THE COURT:  180.1?

            MR. REHN:  I apologize, your Honor.  I think it's 17

C.F.R.

            THE COURT:  17.

            I don't think that really supports you.  So give me

your language, Mr. Dick.  I'm going to adopt it.

            MR. DICK:  Yes, your Honor.  This would be page 33,

line 11, beginning right after the word "states."  That is at

the beginning of the sentence.  And we would propose "and that

the fraudulent conduct was not predominantly foreign."

            THE COURT:  But this is a conspiracy count, yes?

            MR. DICK:  That's correct, your Honor.

            THE COURT:  Which changes it.  I would adopt your

language if it were a substantive count.  Doesn't it change it?

            MR. DICK:  I believe this is as to the object element

of the conspiracy, which does have to be specific.  It doesn't

mean that Mr. Bankman-Fried's conduct has to have been here or

there.  The fraudulent conduct as a whole——that is, the object

of the conspiracy——must be predominantly foreign.

            THE COURT:  Well, then shouldn't it read, "and that

NAV1BAN4

1  the fraudulent conduct that was the object of the conspiracy

2  would not have been predominantly foreign"?

3              MR. DICK:  I would agree with that, your Honor, yes.

4              THE COURT:  Mr. Rehn?

5              MR. REHN:  No objection given that the Court has

6  overruled our earlier position.

7              THE COURT:  Okay.  We're done through page 34,

8  line 10, right?

9              MR. DICK:  With apologies, on this very hard-fought

10  page, one last issue, your Honor?  In the bottom paragraph on

11  page 33, beginning on line 15, actually the sentence that

12  begins on line 20, which says, "In assessing this issue, you

13  may also consider whether conduct in furtherance," etc.  This

14  is essentially saying, if conduct had an effect on commerce in

15  the United States, it may satisfy the territoriality

16  requirement.  In our view, this sentence from here to the

17  bottom of the paragraph actually belongs at the end of the

18  prior paragraph that begins, "One way the government."  As to

19  swaps, which is the beginning of this paragraph.  Swaps, "the

20  conduct may be foreign provided there is a direct and

21  significant effect on US commerce."  With respect to

22  commodities other than swaps, the standard is the one that's

23  quoted at the bottom of this paragraph.

24              THE COURT:  You've lost me.

25              MR. DICK:  Yes, your Honor.

1          So for swaps, there is a specific carveout or a

2     specific rule saying that extraterritorial conduct is covered

3     by the statute, provided there is a direct and significant

4     effect on United States commerce.  That is the rule that's

5     quoted in the first lines of this paragraph, 15-20.  For other

6     commodities, an effect on United States commerce may be a way

7     of proving a territorial application of the statute, but it is

8     not the direct and significant allegation, it is the language

9     that we believe is set forth beginning on lines 20-25.

10         THE COURT:  Mr. Rehn?

11         MR. REHN:  Your Honor, I think actually we agree with

12    the defense on this point.  I think that lines 20-25 should be

13    moved up and come at the end of the previous paragraph.

14         THE COURT:  Okay.  I will move it into the prior

15    paragraph.  That solves the problem all around?

16         MR. DICK:  It does for us, your Honor.

17         THE COURT:  Okay.  Page 34, line 11.

18         MR. REHN:  Just one note, your Honor?  Sorry.  Going

19    back to page 31, we noticed on line 5, it also needs to be

20    interstate or foreign commerce.

21         THE COURT:  Thank you.

22         Page 34, line 11 through page 39, line 10.

23    Government?

24         MR. REHN:  The one thing is on page 38 at lines 8 and

25    9.

NAV1BAN4

1          THE COURT:  Yes.

2          MR. REHN:  We found it a little confusing where it

3    says, "The government must prove that a person would have

4    agreed to conduct financial transactions with the knowledge

5    that."  The "would have" I think was——it seems a little

6    confusing.  We would just suggest specifically, "The government

7    must prove beyond a reasonable doubt an agreement to conduct

8    financial transactions with knowledge."

9          THE COURT:  Sounds like an improvement.  Mr. Dick?

10         MR. DICK:  No objection, your Honor.

11         THE COURT:  Okay.  Anything else on that section, from

12   either side?

13         MR. DICK:  Nothing from us.

14         THE COURT:  Okay.  Page 39, line 11 through page 42,

15   line 9.

16         MR. REHN:  We had a similar issue at the top of

17   page 41, your Honor where there were just a number of sort of

18   subjunctive phrasings of "would."

19         THE COURT:  So tell me how you would propose to fix

20   it.

21         MR. REHN:  So starting at line 1, we would suggest, "I

22   instruct you that the government is not required" rather than

23   "would not be required."

24         THE COURT:  Yes.

25         MR. REHN:  In line 2, that the person in question

NAV1BAN4

1    "knew" rather than "would have known," on line 3, "the

2    government is required" rather than "would be obliged."  On

3    line 4, that the person in question "knew," again, rather than

4    "would have known."  And then on line 7, again, just strike

5    "would have known" and put "knew" and strike "would have"

6    before "involved."

7              THE COURT:  Mr. Dick?

8              MR. DICK:  We found your Honor's instruction as

9    written perfectly clear so we don't think this is necessary.

10             THE COURT:  This is just parallel to the change we

11   just made, isn't it?

12             MR. DICK:  Understood, your Honor.  No objection.

13             THE COURT:  Okay.  I'll adopt those suggestions,

14   without objection.

15             Conscious avoidance.  Is the government seeking that

16   or not?

17             MR. REHN:  Yes, your Honor.  We think that there is

18   clearly a basis for a conscious avoidance instruction.

19             THE COURT:  And it is?

20             MR. REHN:  Yes, your Honor.  To take just one example,

21   earlier this morning, the defendant testified that he overheard

22   references to the fiat@ account and chose not to ask any

23   further questions, which in and of itself would be a basis for

24   deliberately avoiding knowing a truth that was apparent to him.

25   And there were a number of other instances in his testimony

2881

NAV1BAN4

1    where he acknowledged being aware of facts that should have

2    given rise to knowledge but avoided learning more.

3            In addition to the defendant's own testimony, there

4    was testimony in the government's case in chief regarding this.

5    For example, Nishad Singh testified that the defendant made up

6    excuses to avoid meetings where the financial hole at FTX was

7    discussed, suggesting that the defendant was deliberately

8    avoiding that knowledge.

9            And so there's a basis for the instruction.

10           THE COURT:  Mr. Dick?

11           MR. DICK:  Judge, your Honor, in our view, the

12   evidence——the government has sought to prove direct or actual

13   knowledge, which is not the right factual predicate for a

14   conscious avoidance charge, and we would object.

15           THE COURT:  Why not?  Why isn't it?  The government's

16   position is he knew or he blinded himself to it.  That's true

17   in every case, or almost every case, where there's a conscious

18   avoidance charge.

19           MR. DICK:  In our view, the government has tried to

20   prove that he knew that there was actual or direct knowledge.

21           THE COURT:  So what?

22           MR. DICK:  We don't think a conscious avoidance charge

23   is warranted.

24           THE COURT:  Do you have any case law that supports

25   that?

NAV1BAN4

1          MR. DICK:  I don't with me, no, your Honor.

2          THE COURT:  Okay.  Overruled.

3          I mean, you know, to take the textbook example of a

4     conscious avoidance charge, defendant is observed standing on

5     the corner of some busy intersection and somebody comes up to

6     him and says, *Do me a favor, would you take this suitcase*

7     *across the street to the barbershop, and if you make it across*

8     *the street with the suitcase, I'm going to give you $2,000.*

9     *And here's the two thousand dollar bills torn in half.  You get*

10    *the other half when you come back.*  And the government seeks to

11    prove that the defendant knew the suitcase was full of crack

12    cocaine, and their alternative position is, if he didn't know

13    it was crack cocaine, well, then he certainly blinded himself

14    to the fact that there really were drugs in the suitcase.

15    Classic case.  That's the definition, isn't it?

16          MR. DICK:  That hypothetical does reflect the

17    definition, your Honor.  We don't think this charge is

18    necessary here.

19          THE COURT:  Okay.  Overruled.

20          Venue.  Are we really going to have a venue

21    instruction?  Is that going to be necessary or not?

22          I understand the government's position.

23          Mr. Dick?

24          MR. DICK:  We submitted it in our proposed charges,

25    your Honor, and we do think it's important.

NAV1BAN4

1    THE COURT:  Okay.  Any objection to the venue charge
2    as I've stated it here?
3    MR. REHN:  We just had one minor thing on line 15.  I
4    think it should be "this district" as opposed to "the
5    district."
6    THE COURT:  I think we can make that change.
7    MR. REHN:  Although this is the district, your Honor.
8    THE COURT:  Of course it's the district.  "The
9    Sovereign District," right?  That's your office's position.
10   Any problems with the venue charge, Mr. Dick?
11   MR. DICK:  None here, your Honor.
12   THE COURT:  Or the variance in dates?
13   MR. DICK:  No, your Honor.
14   THE COURT:  Okay.  Section III.  Anything from the
15   government?
16   MR. REHN:  No, your Honor.
17   THE COURT:  Defense.
18   MR. DICK:  No, your Honor.
19   THE COURT:  Section IV, anything from the government?
20   MR. REHN:  Your Honor, on the top of page 49, the
21   first three lines relate to stipulations of testimony, which I
22   don't believe there are any in the case.  All the stipulations
23   are of fact.  So we would strike those first three lines and
24   then get rid of "Moreover," beginning on line 4.
25   THE COURT:  Well, you made a stipulation of testimony

NAV1BAN4

1  out of the presence of the jury this morning.  Do you want that

2  presented to the jury or not?

3         MR. REHN:  I don't think we intend to present that to

4  the jury, but if the defense intends to, we're open to keeping

5  this language.

6         MR. DICK:  Just one moment, your Honor.

7         THE COURT:  All right.  Look, let's not take a lot of

8  time.  The first paragraph on page 49 is stricken.

9         Anything else on the last section?

10        MS. SASSOON:  Page 53, your Honor.

11        THE COURT:  Another quarter is heard from.

12        MS. SASSOON:  Just to keep it moving.

13        Sections J and K referred to "at least one witness"

14  and "at least one witness."  I think it was just one witness

15  for each.

16        THE COURT:  Fine.

17        Anything else in IV?

18        MR. DICK:  Your Honor, on page 49, *falsus in unum,* we

19  view that as unnecessary here.  The general credibility charge

20  covers the ground, we believe.  We understand that charge is

21  disfavored, although it is in the Court's discretion, and it is

22  unnecessary here.

23        THE COURT:  Overruled.

24        MR. REHN:  Your Honor, on page 53, there is a

25  instruction regarding expert witnesses.  Because the expert

NAV1BAN4

1    witnesses weren't qualified on the record, I don't know if they

2    should be identified or—

3              THE COURT:  Do we need this charge at all?

4              MR. REHN:  Your Honor, I think it is helpful because

5    the testimony given by the experts was so different from other

6    witnesses in the case and was based on, in part, their

7    qualifications and their methodologies, and so an instruction

8    explaining that as a basis for admitting that testimony we

9    think is typically given and is appropriate.

10             THE COURT:  Look, I'm willing to give it.  I'm just

11   trying to make this less than a three-hour read to the jury.

12             MR. REHN:  I understand.  They don't have to be named,

13   your Honor, if the Court prefers not to.

14             THE COURT:  I do prefer not to, unless both sides

15   wants it.  Identification.

16             MR. DICK:  Your Honor, we don't believe it's

17   necessary, but we do want the instruction.

18             THE COURT:  Okay.  Fine.

19             Anything else?

20             MR. REHN:  Your Honor—

21             THE COURT:  Through 56?  Let's go to that.

22             MR. REHN:  Yes, on the bottom of page 54, with respect

23   to the relevance of the campaign finance violations, because

24   Mr. Salame is not charged as a co-conspirator in the crimes

25   charged in this case, we think that should only refer to his

NAV1BAN4

1    relationship of mutual trust with Mr. Singh and so should

2    strike Mr. Salame.

3              MR. DICK:  No objection.

4              THE COURT:  Okay.  Done.

5              MR. DICK:  However, your Honor, in that same section,

6    there are a couple of references to alleged violations of the

7    campaign laws, and that's on line 15——

8              THE COURT:  That's correct.  You want to take out the

9    word "alleged."

10             MR. DICK:  Violations of the campaign laws, your

11   Honor.  It's the campaign contributions that are in evidence

12   here.  The government, prior to trial, said they would not seek

13   to prove that the violation——that the campaign contributions

14   were unlawful.  They did not seek to prove that.  It's not in

15   evidence, and we submit that language is improper.

16             THE COURT:  Mr. Rehn?

17             MR. ROOS:  So the complication here, of course, is

18   that Nishad Singh, who testified under a cooperation agreement

19   with a charge of conspiring to violate the campaign finance

20   laws, was crossed on that charge and then said on redirect that

21   he conspired with the defendant.  Your Honor appropriately gave

22   a limiting instruction, and this is not a point we're going to

23   press at the close of the case, but I think it's not totally

24   accurate to say that we were limited just to a discussion of

25   donations, given what the cross did.

NAV1BAN4

1         THE COURT:  Suppose I struck the word "alleged" and

2    after "violations" inserted "Mr. Singh."  Does that solve

3    anybody's problems?

4         MR. DICK:  We would not object to that, your Honor.

5         THE COURT:  Does that solve your problem?  I know you

6    don't want to commit to anything.  I understand that.  I'm

7    asking you a direct question.  I'd like a direct answer.

8         MR. DICK:  I beg your pardon.  I didn't know you were

9    speaking to me.  Yes, your Honor.

10         THE COURT:  Yes.

11         Government okay with that?

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. REHN:  One moment, your Honor.

2              Your Honor, we have an alternative proposal.

3              THE COURT:  What's your proposal?

4              MR. REHN:  We think to avoid kind of characterizing it

5    one way or another, instead of alleged violations of campaign

6    finance laws, we could say, alleged political straw donations

7    on line 15 and also on line 23.

8              The problem with limiting it to Mr. Singh is that, as

9    the testimony came in, clearly it related to a coordinated

10   conspiracy between the defendant and Mr. Singh regarding those

11   campaign donations.  I think limiting it to Mr. Singh might

12   leave a misimpression.

13             THE COURT:  Why don't we deal with this by simply

14   adding at the end of the paragraph that, I remind you that the

15   defendant is not charged in this case with any violation of the

16   political -- of the campaign finance laws.

17             MR. REHN:  The government wouldn't object to that,

18   your Honor.

19             THE COURT:  Does that solve the problem?

20             MR. DICK:  It does, your Honor.  Thank you.

21             THE COURT:  I'm assuming there is nothing else up to

22   and including page 57, line 22.

23             Do we need the charges in paragraphs T and U at all,

24   57 and 58?

25             MR. REHN:  Your Honor, we certainly think that U

NAVMBAN5

1    should be included.

2           With respect to T, I guess we don't think it's needed,

3    unless the defense closes by reference to certain investigative

4    techniques which are not employed here, which obviously we

5    don't yet know if that's going to happen yet.

6           THE COURT:  Mr. Dick, what about it?

7           MR. DICK:  Paragraph T we do not view as necessary.

8           THE COURT:  I'm sorry?

9           MR. DICK:  Paragraph T we do not view as necessary.

10   We also don't think that U is necessary.

11          THE COURT:  T is out, and you are not going to make

12   that argument.

13          What are the false exculpatories that you are relying

14   on?

15          MS. SASSOON:  For example, your Honor, the Good

16   Morning America clip where he said this was permitted by the

17   borrow/lend program and other statements that were elicited

18   that he made after the collapse to justify the conduct.

19          THE COURT:  The defendant's objection is overruled.

20   That's enough.

21          Anything else through the end of the draft charge?

22          MR. ROOS:  Judge, in V, line 19 on page 58, it says:

23   Communications sent and received over the messaging

24   applications Signal and Slack.

25          I think the way the evidence came in is that the

NAVMBAN5

1   government just argued or you heard evidence about the

2   defendant deleting or causing to be deleted Signal, so we could

3   delete, and Slack.

4           THE COURT:  I am sure Mr. Dick has no objection to

5   that.

6           MR. DICK:  None, your Honor.

7           THE COURT:  Anything else through the end of the draft

8   charge?

9           MR. DICK:  Just one moment, your Honor.

10          Nothing further.

11          THE COURT:  Thank you.

12          MR. ROOS:  One thing that's not in here.  Your Honor

13  gave an instruction on the limited purpose of prior consistent

14  statements about halfway through the trial.  We thought it

15  might be appropriate to just repeat the same instruction or

16  something close in your Honor's final instructions.

17          THE COURT:  Prior consistent statements?

18          MR. ROOS:  Correct.  It was in the context of those

19  all-hands meeting recordings.  Right before they were played,

20  your Honor gave a legal instruction about how the jury should

21  consider those.

22          THE COURT:  Well, I'm sure it was profound, but I

23  can't remember it.

24          Can you point me to where it is in the transcript.

25          MR. ROOS:  Ms. Sassoon is pulling it right now.  I

NAVMBAN5

1  believe your Honor used a modified version of the Third

2  Circuit's model instructions at the time.

3          THE COURT:  I need more help than that.

4          MS. SASSOON:  Transcript 1141.

5          THE COURT:  Thank you.

6          Mr. Dick, what do you say to that?

7          MR. DICK:  As long as it's consistent with the

8  instruction your Honor gave before, we don't object.

9          THE COURT:  I'm sorry.  I couldn't get the last --

10         MR. DICK:  If it is consistent, if it's the

11  instruction your Honor gave during trial, we do not have an

12  objection.

13         THE COURT:  I'll insert it in substance.

14         Now, let me get a yellow pad.  I just want to make

15  sure that I know for certain what we have, for want of a better

16  term, left open.

17         On page 1, line 17, the government owes me language

18  about misrepresentation and false statement.  That also applies

19  to page 2 around line 6, as I remember it.

20         Then at page 7, onto 8, we have the requests by the

21  government for something out of *Weaver*, right, or have we

22  adequately covered that?

23         MR. REHN:  I think that was at the end of the

24  paragraph on page 9 where the *Weaver* instruction was.  On page

25  7 and 8, we had proposed some instructions.

NAVMBAN5

1          THE COURT:  Give me just one second.

2          On page 9, I had agreed to add the language, in

3    considering whether a statement or omission was material.  Let

4    me caution you that a clause in an investment contract or

5    disclaimer cannot render any misrepresentation, including any

6    oral misrepresentation, immaterial as a matter of law.  That's

7    the *Weaver* instruction.

8          MR. REHN:  That's the *Weaver*.

9          THE COURT:  Is there anything else on 7 and 8 that I'm

10   waiting on you on, or did the movement of the entrusted

11   language in paragraph 8 to the end of that paragraph take care

12   of whatever we had discussed?

13         MR. REHN:  I think you had asked us to propose a

14   slight change to the sentence that runs from the bottom of page

15   7 to the top of page 8 to reflect that a scheme to defraud also

16   includes a scheme to fraudulently --

17         THE COURT:  Yes, you are right.  That's three things

18   that the government owes me.

19         I think that's it.

20         The defense, I don't think I'm waiting on for any

21   language or authority, right?

22         MR. DICK:  I believe that's correct.

23         THE COURT:  Can the government get this stuff to me by

24   4:30?

25         MR. REHN:  Certainly, your Honor.

NAVMBAN5

1          THE COURT:  Any comments by either side on the draft

2    verdict form?

3          My law clerk reminds me of his understanding that the

4    defense was going to submit proposed language based on *Skelly*

5    with respect to page 8, is that right?

6          MR. DICK:  Yes, your Honor.  I had forgotten that.  We

7    will do that by 4:30 too.

8          THE COURT:  Thanks, John Hammel.

9          The draft verdict form has been distributed, yes?

10          MR. REHN:  I don't believe we have it, your Honor.

11          THE COURT:  John Hammel has been very busy today.

12          MS. SASSOON:  Sorry.  That's my computer, not my

13    phone.

14          THE COURT:  You're lucky, not having brought your

15    toothbrush.

16          We will mark a copy of the circulation draft Court

17    Exhibit Y for the record.

18          Does anybody have anything on the verdict form?

19          MR. REHN:  Nothing from the government, your Honor.

20          THE COURT:  I wouldn't have thought so.

21          MR. EVERDELL:  No, your Honor.

22          THE COURT:  Let's just take a minute to talk about

23    closing argument.

24          Where do we stand on how long you expect to be?

25          MR. ROOS:  I think somewhere between two and three

NAVMBAN5

1    hours, probably closer to the two than the three range.  That's

2    for the principal summation, not for the rebuttal.

3              THE COURT:  Mr. Cohen.

4              MR. COHEN:  Two to three hours, your Honor.

5              THE COURT:  It would, of course, be highly desirable

6    to get both arguments in tomorrow, which I think may be hard,

7    but I think it's in everybody's interest.  And we normally get

8    around five hours of testimony.  We can shorten the lunch break

9    a little, which I will try to do, but I leave it in your hands.

10   Then we will hear on Thursday the rebuttal closing.

11             How long do you think, folks?

12             MS. SASSOON:  Your Honor, that will depend in part on

13   the defense closing, but I would estimate 45 minutes.

14             THE COURT:  OK.

15             MS. SASSOON:  To make sure I understand, that will be

16   scheduled for Thursday?

17             THE COURT:  I am told we have somewhere roughly five

18   or six hours of closing arguments tomorrow.  If that's the

19   case, there is an outside chance, unless you want a commitment,

20   in which case I'll give it to you, we can start Thursday.  But

21   bear in mind that if the closings, including the rebuttal, go

22   into Thursday, then we have the rebuttal argument and

23   delivering the charge.  This charge, as you know, is about 60

24   some pages long.  I am not going to be able to read that in a

25   half hour.  It's going to take a long time.

NAVMBAN5

|   |   |
|---|---|
| 1 | MS. SASSOON:  Your Honor, what I would propose, if the |
| 2 | Court is amenable, is to begin the rebuttal, if defense closing |
| 3 | ends by 3:30, but otherwise plan for Thursday so that there |
| 4 | isn't a risk of keeping the jury past 4:30 and grumpy. |
| 5 | THE COURT:  Sound fair, Mr. Cohen? |
| 6 | MR. COHEN:  I'm sorry.  I am not sure I follow your |
| 7 | Honor. |
| 8 | THE COURT:  Ms. Sassoon proposed that she will give |
| 9 | the rebuttal closing tomorrow if you wind up by 3:30. |
| 10 | Otherwise, she will start first thing Thursday morning. |
| 11 | MR. COHEN:  In other words, if I run later, I am not |
| 12 | going to get limited.  She will just start -- |
| 13 | THE COURT:  You are not going to get limited.  I am |
| 14 | not limiting anybody here.  It's just a matter of how the day |
| 15 | goes and what each side does. |
| 16 | Then, of course, it seems to me that if we wind up |
| 17 | with the rebuttal going into Thursday, we probably finish the |
| 18 | closing just before or in the half hour or hour after lunch, |
| 19 | and the jury will get the case sometime in the afternoon.  And |
| 20 | then in light of juror number 3's flight, we would break until |
| 21 | Monday, unless somebody has a better idea. |
| 22 | MS. SASSOON:  If the jurors wanted to stay later on |
| 23 | Thursday to deliberate longer, we would have no objection to |
| 24 | that. |
| 25 | THE COURT:  Yes.  Thank you. |

NAVMBAN5

1          I assume you don't either.

2          MR. COHEN:  We don't object to that.  It's also

3   possible to seat the alternate, your Honor.  We would like to

4   have the jury come in on Friday.

5          THE COURT:  Given where we are, I would be willing to

6   do that if both sides agree to do that.  I am inclined to think

7   not otherwise.

8          MS. SASSOON:  At this point we are not prepared to

9   seat the alternate.

10         MR. COHEN:  We would be amenable to doing that.

11         THE COURT:  Well, I am not foreclosing you from making

12   an application if you think you can justify it.  I don't have a

13   view one way or another about whether you can justify it.  If

14   it's done by consent, that's one thing.  If it's not by

15   consent, that's another issue for me to decide.  That's where

16   we are.

17         MS. SASSOON:  One quick question, your Honor.  If I

18   have no exhibits or need for a monitor during rebuttal, is it

19   possible to use the smaller podium in front of the jury?

20         THE COURT:  What smaller podium are we talking about?

21         MS. SASSOON:  I know some courtrooms have access to a

22   more easily moved podium that doesn't have a monitor affixed to

23   it.  I would feel more comfortable there if the Court were

24   amenable to it.

25         THE COURT:  I would feel more comfortable if you would

1    use that one.

2            MS. SASSOON:  Understood.

3            THE COURT:  That may be why there isn't another one in

4    this room.

5            Yes, Mr. Rehn.

6            MR. REHN:  One more thing, your Honor.

7            It is our understanding that the Court's practice is

8    to send the indictment back to the jury.  We wanted to confirm

9    that.

10           THE COURT:  It is.

11           Anything else?

12           It's also my practice to keep you in or in the

13   environs of the courtroom while the jury is deliberating,

14   except for a designated lunch period every day.

15           MR. EVERDELL:  Your Honor, with your Honor's practice

16   of sending the indictment back to the jury, is it just the

17   charging language, or does it include the speaking portions of

18   the indictment as well?

19           THE COURT:  The whole indictment.

20           MR. EVERDELL:  The forfeiture allegations as well?

21           THE COURT:  Good question.  Normally, I do, but it's

22   never come up before, that I can remember.

23           MR. EVERDELL:  Your Honor, if you would give us maybe

24   just the evening to think about whether we want to make any

25   application with respect to redacting the indictment, we would

NAVMBAN5

1    appreciate it.

2              THE COURT:  Sure.

3              No more letters.

4              MR. EVERDELL:  Of course, your Honor.

5              MS. SASSOON:  Except by 4:30.

6              THE COURT:  Except by 4:30.

7              That's it, folks.  See you in the morning.

8                             o0o

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAV1BAN6

1          (In open court; jury not present)

2          THE COURT:  Be seated, please.

3          Sorry to bring you all back, but when I went back to

4     consider some of the points raised in respect of the charge, I

5     was reminded that the government, in its letter of

6     October 25th, docket item 334, seemed to me took the position

7     that the government would be required to show a false statement

8     in order to prevail on the misappropriation theory.

9     Specifically, there was an objection by the defense to a

10    sentence in a proposed charge by the government that the

11    government was not required to show that the defendant made a

12    misrepresentation or false statement in order to fraudulently

13    embezzle or misappropriate, and the government agreed to remove

14    the sentence requiring proof of a false statement.  And then we

15    constructed the charge that we were discussing earlier——Court

16    Exhibit X——on the basis that the government would have to prove

17    a false statement, but the government objected to all the

18    statements in the charge that so indicated.  And the defense

19    said they were fine with removing the sentence the government

20    objected to.  And I just thought it was significant enough to

21    bring you all together and find out whether I just am incapable

22    of understanding the letter the government sent me or whether

23    something else has gone awry in this process.

24          MR. REHN:  Your Honor, it has been the government's

25    position throughout that the misappropriation theory does not

NAV1BAN6

1    require proof of a false statement or misrepresentation.  I

2    unfortunately actually don't have a copy of that particular

3    letter.  I think that was in the context of a dispute over some

4    particular language in the defendant's proposed instruction

5    that I think became——ended up not being included in any event,

6    but like I said, I don't have the letter in front of me,

7    unfortunately.

8             THE COURT:  Borrow my copy.  Page 2, first full

9    paragraph.

10            MR. REHN:  This was in relation to the special

11   verdict.

12            So, your Honor, as we say on the first page of the

13   letter, there is not a need for a special verdict form.  I

14   think we were addressing the possibility that if the Court was

15   concerned about that, a sentence that previously appeared in

16   our proposed instruction could be removed.  I don't believe

17   that sentence is actually in the current instruction.

18            THE COURT:  No.  But it isn't because in light of what

19   you said in the letter, the proposed instruction that we

20   discussed earlier——Court Exhibit X——takes the view that I took

21   the government to be expressing in its letter.

22            MR. REHN:  So are you particularly highlighting the

23   sentence that we proposed to strike on page 9, I think, is

24   where that——

25            THE COURT:  Page 9 of what?

NAV1BAN6

1          MR. REHN:  Of the charge that the Court circulated

2     earlier.

3          THE COURT:  Well, it occurs in relation to page 1,

4     lines 17 and 18, page 2, lines 5-7, and page 7, lines 22

5     through page 8, line 1.  And also the sentence on page 9,

6     lines 18-21.

7          MR. REHN:  So, I mean, in each case I think what we

8     had proposed is a correct statement of the applicable law.  If

9     the issue is——

10         THE COURT:  What you have proposed this afternoon——and

11    we'll mark it Court Exhibit X1 to indicate the proposed

12    language you sent me after the earlier charge conference——is,

13    to my way of thinking, inconsistent with your letter to me of

14    October 25th.

15         MR. REHN:  So again, I think as we said earlier this

16    afternoon, what we're proposing is that the misappropriation

17    theory is an alternative way of the jury of convicting.

18         THE COURT:  I know you're now saying that, and I know

19    that the suggestions you made during the charge conference

20    reflect that view, which I regard as a view you abandoned for

21    the purpose of eliminating a dispute or a disagreement about a

22    special verdict and about the problem——perhaps problem——of

23    there being two alternative theories on which you were

24    proposing to convict the defendant as a principal on the wire

25    fraud count.

NAV1BAN6

1          MR. REHN:  I take your point as to this paragraph in

2     the letter, your Honor.  I'm not sure——you know, I think our

3     view that we've expressed today is the view that we have

4     adopted previously in the case, and the view that——

5          THE COURT:  You did.  You adopted it earlier, and then

6     you bailed out of it.

7          MR. REHN:  Your Honor, I guess the question that this

8     raises is, if the Court is proposing that to do the alternative

9     instruction requires a special verdict form, you know, in that

10    context, I think we would evaluate whether it makes sense to

11    have a special verdict form and whether, you know, we'd rather

12    have a single instruction without a special verdict form, you

13    know.  I think that was the context in which this was drafted.

14         THE COURT:  Believe me, I know what the context was.

15    I've heard enough about context in the last five weeks to last

16    me a very long time.  But that's another matter.

17         MR. REHN:  So I don't view us as having abandoned any

18    prior positions.  And again, if we're put to the question of

19    whether the instruction as we proposed it today requires a

20    special verdict form, you know, we would ask that, you know,

21    the Court give us an opportunity to consider that issue.  That

22    wasn't the context in which we discussed the instructions this

23    afternoon.

24         THE COURT:  Let me hear from the defense.

25         MR. COHEN:  Thank you, your Honor.

NAV1BAN6

1          Now that your Honor has pointed it out, we agree with
2    your Honor's analysis, and we think we should go back to the
3    language that your Honor originally drafted before the
4    modification to 17 and 18 because otherwise, as your Honor
5    points out, we'd be in a special verdict form situation where I
6    don't think either side wants to be.
7          MR. REHN:  Your Honor, I think that we would have to
8    consider——I think we are, I think, open to going back to some
9    of the originally——the language in the original charge, if
10   that's the Court's——if the Court believes that that would
11   require a special verdict form, which as we said in our letter,
12   we don't think it would.  But I think that at least with
13   respect to some of the language, rather than saying what the
14   government's burden is as to one of the theories, there was a
15   suggestion the government would have to prove both separate
16   theories, and I think that was our primary concern.
17         THE COURT:  Well, look, I'm the one who introduced the
18   term "special verdict," and as I know I pointed out on the
19   record, that was a misnomer on my part.  It's not a special
20   verdict that's in other kinds of cases.  It would be special
21   interrogatories.  And it would raise other issues.  And I'm not
22   professing to know the answer to the question of whether it
23   would require special interrogatories or what the consequences
24   of posing special interrogatories would be.  Where I am is that
25   we had a deadline for proposed charges, we had a second

NAV1BAN6

1    deadline for amended proposed charges, we have had a blizzard

2    of letters and so forth, and six days ago today, the government

3    took the position that it took in their letter, and after we

4    have gotten to the point of being about 15 hours from closing

5    argument and an hour or more after the conclusion of the charge

6    conference, subject only to you giving me some proposed

7    language on one or two points, all of which are implicated by

8    this, and a request to the defendant for something also, now

9    all of a sudden, to my perception, you're—whether you intended

10   it or not—backing off the position you took six days ago, and

11   I don't see why I should put up with it.  I don't mean put up

12   with it in a sense that I'm carping or anything, I mean, but

13   the fact is, it just seems to me too late in the game to undo

14   what's been done.

15            MR. REHN:  Your Honor, if that's the Court's position,

16   we understand it.  It was certainly not our intention to change

17   positions.  I think there was a context in which we were

18   suggesting a particular sentence in our proposed requests to

19   charge didn't need to be included, and then when we got the

20   Court's request to charge, we proposed certain language we

21   thought would clarify.

22            THE COURT:  I'm not saying anybody acted in bad faith

23   with respect to this charge.  Not a bit.  But I think that's

24   where I am.  I know it's where I am.

25            And so on those points, on pages 1, 2, and 7 and 8,

NAV1BAN6

1    I'm going to charge as I initially proposed, save with respect

2    to moving what is the second very large clause at page 8,

3    lines 2-5, into a separate sentence at the end of that

4    paragraph.  That was not controversial.  But the charge is I

5    think making clear that the government has to prove a false

6    statement in order to prove misappropriation.  And that's how

7    it's going to go to the jury.

8            Now this ought not to be much of a problem for the

9    government because god knows there's more than sufficient

10   evidence of both, to get to the jury, obviously.  And it's a

11   matter, in significant measure, of ordering the trial in a way

12   that is consistent with what everybody has said with good

13   intentions and avoiding other unintended consequences that

14   might follow from allowing the government to change its

15   position here, whether or not the position they took was

16   exactly what they thought they were taking.  So that's the

17   answer.

18           Now should I have somewhere a letter from the defense

19   on the one point I was going to get a proposal for, as to

20   language?

21           MR. EVERDELL:  We didn't file it on the docket, but we

22   can hand up a copy right now.

23           THE COURT:  Okay.  Hand it up and we'll get this all

24   put to bed.

25           And you've seen this, Mr. Rehn, right?

NAV1BAN6

1          MR. REHN:  I just was handed it by the defense

2     counsel.

3          THE COURT:  Well, why don't you take a minute, and

4     I'll get the case they cite up on my computer, assuming my

5     computer is going to work.  And we'll mark the letter that

6     defense counsel handed up Court Exhibit X2 for identification.

7          Ready, Mr. Rehn?

8          MR. REHN:  I don't actually have a copy of *Skelly*, but

9     I can address more generally the principles without seeing

10    whether *Skelly* requires this language.  I'm doubtful it does in

11    light of the fact that the instruction that has been proposed

12    by the government and I think is broadly in line with the

13    Court's proposed instruction is modeled on this Court's

14    instructions in *Gatto* and *Blaszczak*, both of which were in

15    2018, postdating the *Skelly* case.  And those instructions rely

16    primarily on the leading Second Circuit case, which is the

17    *Chestman* case, that requires just language regarding a

18    relationship of trust and confidence.  I don't believe there's

19    any need to insert this additional language from *Skelly*.  I

20    think requiring a relationship of trust and confidence to be

21    proven is sufficient to instruct the jury on the nature of the

22    relationship of trust that the government has to prove.

23         THE COURT:  Defense want to be heard on this any

24    further?

25         MR. DICK:  I don't think there's much to add, your

NAV1BAN6

1    Honor.  As your Honor knows, having looked at *Skelly*, there was

2    reversal there for giving an instruction very much like what's

3    currently based on *Chestman* and in the Court's proposed charge,

4    but without this added language, which is with respect to

5    reliance, dominance, and de facto control.

6         THE COURT:  Yes, I don't regard the adaptation of

7    language from *Skelly* as a fully accurate assessment of the

8    holding of *Skelly*, but even if I did, *Skelly* cites *Chestman*

9    approvingly.  *Chestman* is an *en banc* decision.  It deals not

10   only with the elements of fiduciary duty but also of its,

11   quote-unquote, functional equivalent.  It is, in my view,

12   somewhat broader than *Skelly* and still controlling in the

13   circuit, and it goes beyond the proposed instruction by the

14   defense.  So I'm not going to give that charge.

15        So I think we are now set.  We all know where we are.

16   And I will see everybody in the morning.  Have a good evening.

17        THE LAW CLERK:  All rise.

18        (Adjourned to November 1, 2023, at 9:30 a.m.)

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3     SAM BANKMAN-FRIED

4    Cross By Ms. Sassoon . . . . . . . . . . . .2749

5    Redirect By Mr. Cohen  . . . . . . . . . . .2793

6                    GOVERNMENT EXHIBITS

7    Exhibit No.                          Received

8     248    . . . . . . . . . . . . . . . . . .2756

9     1559    . . . . . . . . . . . . . . . . . 2754

10    2502    . . . . . . . . . . . . . . . . .2787

11    2504    . . . . . . . . . . . . . . . . . 2751

12    2577    . . . . . . . . . . . . . . . . .2765

13

14

15

16

17

18

19

20

21

22

23

24

25
```