1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        22 CR 673 (LAK)

5   SAMUEL BANKMAN-FRIED,

6              Defendant.                Trial
    ------------------------------x

7
                                         New York, N.Y.
8                                        November 1, 2023
                                         9:35 a.m.
9

10  Before:

11
                         HON. LEWIS A. KAPLAN,
12
                                         District Judge
13
                             APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  DANIELLE R. SASSOON
         NICOLAS ROOS
17       DANIELLE KUDLA
         SAMUEL RAYMOND
18       THANE REHN
         Assistant United States Attorneys
19
    COHEN & GRESSER, LLP
20       Attorneys for Defendant
    BY:  MARK S. COHEN
21       CHRISTIAN R. EVERDELL
         SRI K. KUEHNLENZ
22       DAVID F. LISNER

23  Also Present:
    Luke Booth, FBI
24  Kristin Allain, FBI
    Arjun Ahuja, USAO Paralegal Specialist
25  Grant Bianco, USAO Paralegal Specialist

1             (Trial resumed; jury not present)

2             THE COURT:  I am going to have John Hammel give

3     counsel the final charge.  This is redlined against the

4     circulation draft that was the subject of the charge

5     conference.  There are knit-type changes in a bunch of places,

6     only two or three that are of any interest to anybody I think,

7     but you have a few minutes to flip through it, and before we

8     bring the jury, let me know if there is any further problem.

9             We have one juror stuck in traffic, hopefully will be

10    here in the next 15 minutes.

11            Pending arrival I don't think we really have anything

12    else to do, but let me know if you have a different view.

13            Any different view on what your time estimates are?

14            MR. ROOS:  Same, I would say, as yesterday.

15            MR. COHEN:  Yes, your Honor, the same.

16            MS. SASSOON:  Same.

17            THE COURT:  I'll just stay on this floor.  As soon as

18    we have the full jury, we will proceed.

19            (Recess)

20            MR. ROOS:  Judge, one thing I wanted to ask you was,

21    would you like me to suggest a time partway through my

22    summation for a break?

23            THE COURT:  Yes.

24            MR. ROOS:  OK.

25            (Jury present)

1        THE COURT:  Good morning, everyone.  Everyone can be

2   seated.  The defendant and the jurors all are present.

3        A word to the jury about schedule.  You are going to

4   hear closing argument today.  We may finish them entirely today

5   or we may not.  That depends on how the day goes.  If we don't,

6   they will be finished tomorrow morning.  In either case, you

7   will get the case tomorrow morning for decision.

8        If anyone would have a problem, should the need arise,

9   in staying beyond 4:30 tomorrow, please let me know in a note

10  this morning and what the nature of the problem is, because it

11  may become appropriate to ask you to stay late tomorrow if

12  there is no verdict.  I am not suggesting there should or

13  shouldn't be.  My operating assumption, which I will confirm

14  before I ask you to stay, if I ask you to stay, is that you

15  would get dinner on the government if you stayed.  I don't

16  vouch for the quality, but you would be entitled to dinner.

17  And I think we might be able to provide car services if you

18  stay to a certain hour.  But I'm holding myself available for

19  Thursday night if that would be helpful.

20       As for Friday, I'll keep you posted as the day goes

21  by, and indeed maybe even tomorrow.

22       We are now going to hear the closing argument on

23  behalf of the government.

24       Mr. Roos.

25       MR. ROOS:  Thank you, your Honor.

1        Almost a year ago, thousands of from people from all

2   over the world who had deposited money with FTX started

3   withdrawing their funds.  With each day the withdrawals grew.

4   Millions of dollars turned into hundreds of millions of

5   dollars, which turned into billions of dollars.  Thousands of

6   people were trying to withdraw their investments, their

7   savings, their nest eggs for the future, but their withdrawals

8   weren't being processed.  Money wasn't being returned.  And as

9   those customer withdraw requests froze, they were overcome with

10  anxiety.  With each additional click of the withdrawal button,

11  their dread turned to despair.  Their money was gone.  FTX was

12  bankrupt.  Billions of dollars from thousands of people gone.

13       As the dust settled and bankruptcy proceedings began,

14  and FTX ceased to exist, a series of questions emerged.  Where

15  did the money go?  What happened?  Who is responsible?  Now

16  that you have seen all the evidence and heard all the

17  testimony, you know the answers to those questions.

18       Who was responsible?  This man, Samuel Bankman-Fried.

19  What happened?  He spent his customers' money and he lied to

20  them about it.  Where did the money go?  The money went to pay

21  for investments, to repay loans, to cover expenses, to purchase

22  property, and to make political donations.  This was a pyramid

23  of deceit built by the defendant on a foundation of lies and

24  false promises, all to get money, and eventually it collapsed,

25  leaving countless victims in its wake.  That's what happened.

1     That's where the money went.  The defendant is responsible.

2           I am going to ask you to think about these questions

3     this morning and throughout the rest of your time, including

4     into your deliberations.  Where did the money go?  What

5     happened?  Who is responsible?  We have been at this together

6     for a little while now, for over a month, and you have heard

7     from a lot of witnesses, and you have seen a lot of documents

8     and spreadsheets on your screen, and you've been playing close

9     attention.  We have seen that.  This is our opportunity to walk

10    you through all the evidence.  I am not going to go through

11    every document.  You have seen a lot of it.  But it's our

12    opportunity to talk with you about how it all fits together.

13          Let's start with a few straightforward facts that

14    aren't in serious dispute at this point.  The first is that

15    there is no serious dispute that thousands of customers from

16    all over the world put billions of dollars on FTX and that the

17    exchange at least said it was holding billions of dollars of

18    customer deposits when it collapsed.

19          Second, there is no serious dispute that customers

20    believed that their deposits were theirs, for them alone to

21    use.  And you remember five weeks ago now the first witness in

22    the case, Mark-Antoine Julliard, who flew here from London, he

23    told you that having his money used or borrowed by someone

24    else -- and these were his words -- was not something he signed

25    up for.

1          And it wasn't just customers.  The defendant's public

2    statements, FTX's ads, FTX's policy documents and its terms of

3    service all said the same thing.  And advertisements like the

4    ones we saw with Tom Brady or Larry David.  FTX said it was the

5    safest and easiest way to buy cryptocurrency.  And in its terms

6    of service FTX said that assets are the property of its

7    customers and do not belong to FTX.  In its policies FTX said

8    that customer assets, both fiat and cryptocurrency, are

9    segregated, that customer funds do not represent the property

10   of FTX, and that customer assets are held in trust.

11          Employees and investors all testified that they

12   believed the customer deposits belonged to the customers, that

13   they could not be taken or used or borrowed, and you heard

14   about the reaction of employees when they learned that FTX

15   customer deposits were being used.  Adam Yedidia quit within a

16   half hour.  Can Sun resigned.  So did Christian Drappi.  The

17   defendant's partners in crime said the same thing.  Caroline

18   Ellison, Nishad Singh, Gary Wang, their understanding was that

19   customer funds were not allowed to be used by FTX or Alameda or

20   anyone else.  They believed it was wrong and illegal.  It

21   didn't matter if it was a customer, an investor, a lender, an

22   employee, or a coconspirator.  It was a universal view from the

23   witnesses you heard.  Customer funds belong to customers and

24   could not be used.

25          Third, there is no serious dispute that around $10

billion went missing.  The evidence you saw, and we will talk

about it again, shows that there was a huge difference between

what FTX's system said they were supposed to have for customers

and what FTX actually had for customers.  Billions of dollars

missing in cryptocurrency, billions of dollars missing from

bank accounts, and there is no serious dispute about that.

          Fourth, there is no serious dispute about where the

missing money went.  Professor Easton traced the money.  The

missing billions went to pay for investments, stock-share

buybacks, real estate purchases, donations, trading expenses,

and loan repayments.  The clear uncontradicted evidence shows

that the defendant was responsible for these giant investments,

for stock repurchases, for real estate purchases, for political

donations.

          Over the last month you have heard evidence about

Bitcoins and Blockchains, auto-liquidation and

auto-deleveraging, computer code, and so-called Korean

accounts, about a lot of other concepts.  Here is the thing.

This is not about complicated issues of cryptocurrency.  It's

not about hedging.  It's not about technical jargon.  It's

about deception, it's about lies, it's about stealing, it's

about greed.

          What is the dispute in this case?  One of the disputes

is whether the defendant knew.  That's what they have said.

The evidence that the defendant knew that he was spending FTX

1     customer money, though, I submit, is beyond dispute.

2            The core dispute in this case is whether the defendant

3     knew taking the money was wrong.  That's the core question.

4     And the answer is clear.  He took the money.  He knew it was

5     wrong.  He did it anyway.  Because he thought he was smarter

6     and better and he that he could figure his way out of it, he

7     could walk his way out of it and talk his way out of it, and

8     today, with you, that ends.  You have sat through this trial.

9     You have seen the evidence.  And, very simply, when you apply

10    your common sense and look at the evidence, you see the

11    defendant schemed and lied to get money, which he spent, and

12    now it's gone.

13           You see over and over and over again he and his

14    company were telling customers their money would be protected,

15    and they were using it at the same time for whatever the

16    defendant wanted to use it for.  And you see over and over

17    again from his own statements, from his own conduct that he

18    knew what he was doing was wrong.  There is overwhelming guilt,

19    overwhelming evidence of the defendant's guilt.

20           Before we dive into the evidence, let me say something

21    about the fact that the defendant took the stand in this case.

22    He didn't have to testify in this trial.  He has a right not to

23    do that, and he doesn't have a burden to put on any evidence.

24    The burden is on the government, and we embrace that burden.

25           But the defendant did take the stand, and he told a

story, and he lied to you.  Did you notice how on Friday his

testimony was smooth, like it had been rehearsed a bunch of

times?  He testified for hours about things that don't really

matter for the case, like what the Epsilon Beta House at MIT

was like, or background about Jane Street or the layout of

Alameda's first office in an Airbnb, or the reasons they moved

to Hong Kong and then left Hong Kong again, or why he picked

the Miami Arena as the one to brand.  This was the CEO, who was

able to define on Friday 50 terms on direct examination and had

a perfect memory.

But let's talk about how the defendant's testimony

looked on cross-examination.  He was a different person.

Suddenly on cross-examination he couldn't remember a single

detail about his company or what he said publicly.  It was

uncomfortable to hear.  He never said he couldn't recall during

his direct examination, but it happened over 140 times during

his cross-examination.  He had to be asked and reasked.  He

looked away.  He lied about big things, and he lied about

little things.  He asked for terms to be defined that he used

freely on direct examination a day earlier.  He approached

every question like up was down and down was up, and you saw

how he listened to the testimony in this case.  He came up with

a tale that was conveniently put together in a story that

excluded him from the fraud.

The story the defendant told you was that he didn't

1    know what was going on and didn't think what he was doing was

2    wrong, and that was a lie.  Over three days he took the stand

3    and he lied.  Because to believe the defendant's story, you

4    would have to ignore all the evidence you saw at this trial.

5    You would have to ignore the testimony of the defendant's

6    partners in crime, his deputies, Caroline Ellison, Nishad

7    Singh, Gary Wang.  You would have to ignore the documents, the

8    secret spreadsheets, the flow of money.  You would have to

9    ignore the financial records.  You would have to ignore the

10   defendant's own statements.  You'd have to ignore his lies,

11   lies that he told before FTX's bankruptcy and afterward.  You

12   would have to believe that the defendant, who graduated from

13   MIT, who ran two billion-dollar companies and who was

14   testifying before Congress, was actually clueless, and he had

15   no idea what was happening at his own company, and he had no

16   idea what he was doing was wrong.

17          But you sat through this trial and you know none of

18   that is true.  You don't have to wonder what the defendant

19   would say if he thought you weren't listening.  You already

20   know.  You know because you heard it from his coconspirators,

21   because you saw the secret documents, because you paid careful

22   attention to the evidence in this case, to the difference

23   between his public statements and his private ones, and all of

24   this shows that the defendant is guilty beyond a reasonable

25   doubt on each and every one of the charges.

```
 1            Here is the plan for this morning.  We are going to

 2   talk about the evidence and focus on those questions, where did

 3   the money go, what happened, who was responsible.  Then I am

 4   going to talk a bit about some of the defense arguments you

 5   heard in this case.  And, finally, I am going to talk briefly

 6   about the charges.

 7            Let's start with what happened.  I am going to talk to

 8   you about what the evidence shows happened.  What does the

 9   evidence show?  The defendant took money, and he took

10   cryptocurrency, and he took it from FTX customers who were told

11   that their assets would be kept safe and segregated.  That's

12   fraud.  It's stealing, plain and simple.

13            Before there was FTX, there was Alameda.  That was the

14   defendant's trading firm.  You see it on the screen.  He was

15   the 90 percent owner.

16            JURORS:  It's not working.

17            THE COURT:  Is it not on the screen?

18            MR. ROOS:  How about now?

19            THE COURT:  Has it come up yet.

20            JUROR:  No.

21            MR. ROOS:  It's here and it's in the front row they

22   have got it, just not the middle row.

23            JUROR:  It just went on and went off again.

24            THE COURT:  Obviously, there is a loose wire down

25   there.
```

```
 1                We are going to have to take a short recess because we

 2       understand there is a panel underneath the jury box, and we

 3       need to get you out of the jury box to get to the panel.  I

 4       usually just unplug things and plug things back in.

 5                (Jury not present)

 6                (Recess)

 7                THE COURT:  Let's get the jury back.

 8                (Jury present)

 9                THE COURT:  The record will reflect that the jurors

10       and the defendant are present.

11                Please be seated, folks.

12                Now, we have had a malfunction --

13                JUROR:  They are on.

14                THE COURT:  I still have a couple of things to say

15       about it, though.

16                The panel that may be the cause of the problem is in

17       the back corner of the jury box closer to the bench, we think,

18       so nobody go near that corner.  We have moved alternate number

19       1 into the seat for alternate number 4, which was vacant.

20                Secondly, when it was out, was it only the second row

21       monitors that were out?

22                Folks in the second row, please look down to the first

23       row if the second row goes out again.  Can we continue and have

24       you look over into the first row?  Will you able to see that?

25                I am getting affirmative nods.
```

1          That's backup plan 1.

2          Backup plan 2 is, we are going to see whether we can

3     get a very large screen that can be hooked up later on just to

4     have a second backup if the need arises.

5          Matt, you can convey my sincere thanks for the

6     contractor responsible for whatever just went wrong.

7          I very much regret that there was that interruption,

8     but there we are.  We are all tough.  We are going to roll with

9     it.

10          MR. ROOS:  Thank you, your Honor.

11          The defendant is Alameda.  He was Alameda.  He was the

12     90 percent owner.  He was publicly its CEO until 2021.  He was

13     the chairman and sole member of Alameda's board.  And when

14     Alameda made a profit, it was the defendant who profited.

15          Now, Alameda didn't have investors.  Instead, it

16     borrowed money in order to make its investments.  And the way

17     Alameda had money to do cryptocurrency trading was by taking

18     out loans.  Alameda was always looking for more sources of

19     capital, meaning more money.

20          Then the defendant founded FTX, a cryptocurrency

21     exchange you have heard a lot about, where customers can buy

22     and sell cryptocurrency, and FTX would earn money by just

23     taking a fee on those customers' trades.

24          Once the defendant founded FTX and started getting

25     customer money, he thought he had a new source of money to take

1    for Alameda.

2        Here is the testimony of Caroline Ellison.  The

3    defendant, quote:  Said that FTX would be a good source of

4    capital, and he set up the system that allowed Alameda to

5    borrow from FTX.  That's from the transcript at page 654.

6        I am going to be quoting from some of the witnesses'

7    testimony this morning.  So if you want to see it, write down

8    the transcript cite.  It's in the bottom right corner by their

9    testimony and it's also something I'll say out loud.  The same

10   goes for some of the government exhibit numbers.  I am going to

11   say some of them out loud, particularly some of the most

12   important evidence, and if you want to see it, just make a

13   note.

14       The defendant tells Ellison that FTX would be a good

15   source of capital, and then he sets up a system that would

16   allow Alameda to borrow from FTX.  When Ellison said, borrow

17   from FTX, what she was referring to was borrowing from FTX

18   customers using their deposits.

19       Now, the defendant set up two secret ways through

20   which Alameda could take or borrow customer money.  You heard

21   about that from Caroline Ellison.  You heard about it from Gary

22   Wang.  You heard about it from Nishad Singh.  They were each

23   the defendant's friends and his coconspirators, his partners in

24   crime.  Each of these witnesses testified that they stole

25   customer money at the defendant's direction, and they described

1     the ways he told them to do it.

2            Let me just take a step back for a second.  That means

3     that if you believe even one of those witnesses is telling the

4     truth about this, the defendant is guilty.  I'll say that

5     again.  If you believe even one of these witness' testimony,

6     Ellison, Wang, Singh, about the way customer funds were stolen

7     by the defendant, that is fraud, and you should find the

8     defendant guilty.

9            Let's talk about what each of the witnesses said about

10    the secret ways set up at the defendant's direction for taking

11    customer money.

12           Here is how Ellison described the secret ways they

13    were able to take FTX customer money:  Quote, we had access to

14    an essentially unlimited line of credit on FTX, and we received

15    FTX customer funds directly into our bank accounts as part of

16    FTX's fiat deposit system.

17           This is from her testimony at page 644 of the

18    transcript.

19           By the way, an unlimited line of credit is just a way

20    of saying unlimited borrowing of customer funds.  It's

21    unlimited stealing.

22           Now, there were two ways that they were able to take

23    customer money, by withdrawing it from FTX from its

24    cryptocurrency wallets in unlimited amounts, and by taking it

25    out of the bank accounts that received those customer deposits.

 1          Ellison also told you who was responsible for the

 2    setup, the defendant.  Quote:  He was the one who set up the

 3    systems that allowed Alameda to take the money, and he was the

 4    one who directed us to take customer money to repay our loans.

 5    That's at page 645 of the transcript.  And Gary Wang said the

 6    same thing when he testified, that the defendant directed that

 7    Alameda be given these secret special ways of taking customer

 8    money.

 9          Let's talk about in more detail those two secret

10    systems the defendant set up to give Alameda the ability to

11    take customer money.  First, Ellison told you that one of those

12    secret ways was what we just read as an essentially unlimited

13    line of credit on FTX.  What was she referring to?  She was

14    referring to the way Alameda had an ability to borrow unlimited

15    amounts of money on FTX, withdraw unlimited amounts of money

16    from FTX, and run up a giant negative balance.  Each of the

17    defendant's deputies described this secret system.

18          Let's talk about how unusual, how different, how risky

19    the defendant's secret setup was.  Before we talk about how the

20    secret system for taking customer money worked, let's talk

21    about what borrowing was like for a typical customer, a

22    customer without those special secret privileges, like the ones

23    you heard about during this trial.

24          You heard that a major selling point of FTX was the

25    way it managed risk.  It was a safe exchange.  And the key to

1    that is what they called the automatic liquidation engine.  The

2    defendant marketed this to his customers and to his investors

3    as a way that customers could trade safely on FTX and trust FTX

4    instead of like another cryptocurrency exchange.  And customers

5    had to maintain an overall positive balance on the exchange.

6    They had to post what has been called in this case collateral

7    or security or assets to the exchange.  They had to put it on

8    the exchange before they could borrow money for trading.

9    That's how it normally worked.  If the customer's collateral

10   held by FTX went down in value, and the customer's overall

11   account value went down, either to zero or close to zero, then

12   under the normal system, FTX's risk system, its automatic

13   liquidation engine would kick in and it would close the

14   account.  And you heard from a bunch of the witnesses about

15   this.  This was the standard system.  This was the way they

16   contained risk.

17          When the defendant was on the stand, he tried to make

18   this whole thing sound a lot more complicated and full of

19   exceptions and weird procedural rules.  But as the CEO of FTX,

20   it was a lot simpler, and this is exactly what he told the

21   public and his customers.

22          This is his statement before Congress:  FTX's

23   risk-management program requires that digital-asset collateral

24   be placed on the platform itself, rather than pledged, but not

25   delivered to the platform.  So it has got to be placed, not

1    just pledged.  And the reason is to ensure that the platform

2    has immediate access to the collateral for purposes of managing

3    market risks.

4           And to borrow money from the exchange, well, a

5    customer had to opt into that spot-margin system which, as I

6    mentioned, requires that they put their collateral up before

7    they borrowed.  And the defendant said this was necessary for

8    customers to have prefunded collateral deposits, not simply

9    credit extensions.  That was how typical customers were allowed

10   to borrow money through FTX.

11          So to take a step back, there is a system in place, a

12   standardized advertised system, a system that the defendant

13   testified about before Congress.  It's straightforward.  You

14   got to put your money up before you want to borrow money.  The

15   reason is, so that if the value of what you are doing on the

16   exchange goes down, there is security for them to take to make

17   sure you don't create a massive hole.  It was a system that was

18   subject to rules, with limits on borrowing, with requirements

19   where the collateral be kept.

20          This wasn't a secret.  This was in the defendant's

21   public testimony and public statements; secretly, though,

22   secretly the defendant gave Alameda a different way of

23   borrowing customer money, a system that only existed for

24   Alameda, that wasn't subject to the same rules as other

25   customers, that wasn't subject to the same limitations,

1    designed to keep customers' money safe and reduce risk.

2          These secret rules, as you know, as you learned,

3    allowed Alameda to borrow billions of dollars without

4    collateral on the exchange, to rack up multimillion dollar,

5    billion dollar negative account balances without any risk of

6    being shut down, to being liquidated through FTX's risk system,

7    the very same system that the defendant was publicly saying

8    would keep customer money safe.

9          Let me pause here for a minute again.  The company

10   that the defendant had publicly said was completely separate

11   and free from conflicts of interest was secretly able to take

12   billions out the back door of FTX, and the defendant knew it.

13   And the way you know he knew it is because he set up a system,

14   a public system for everyone and a secret system just for

15   Alameda.  We are going to talk more about that.  And he

16   directed others to make it work that way.

17         The defendant directed Gary Wang and Nishad Singh to

18   program the secret way of taking customer money right into

19   FTX's computer code.  Starting with the computer code, you

20   heard from Wang that at the defendant's direction a feature was

21   added to the code that permitted accounts to go negative, and

22   the naming was not very creative.  It was called Allow

23   Negative.  And the defendant had it turned on for just one

24   customer's account, Alameda.

25         Here is the code history that shows the code -- the

1    allow-negative code was added for just one customer's accounts,

2    Alameda.  Here is Alameda's account on FTX.  This is the

3    database information.  And you can see this allow-negative

4    feature far in the right side, in the red box, was turned on.

5          Now, Wang testified that this feature was added to

6    Alameda's account at the defendant's direction.  While there

7    were originally some potentially sensible reasons for some of

8    the code editions, Wang saw that very quickly the defendant

9    started using this feature right here.  This is, by the way,

10   Government Exhibit 644.  He started using it to allow Alameda

11   to borrow more money than it had.

12         And to ensure that Alameda was able to withdraw

13   essentially limitless amounts of money, the defendant also had

14   Wang give Alameda a gigantic line of credit.  This is that same

15   exhibit again, Government Exhibit 644.  This is the screenshot

16   of the code and it's just in black and white right there, a $65

17   billion line of credit right on Alameda's account.  Wang told

18   you the defendant directed him to set up Alameda's line of

19   credit this high so they can make unlimited withdrawals.

20         Here is that testimony.  Quote:  Sam asked us to take

21   it to -- Sam asked us to take it to a large number.  I took it

22   up to a billion dollars and then the issue happened again.  The

23   issue he's talking about is where Alameda exhausted its line of

24   credit.  And then he asked me to take it up even farther, and I

25   told him I'm taking it up to 65 billion.  He said he is fine

1   with that, and I did that.

2          As a result of Alameda's ability to go negative and

3   its $65 billion line of credit, it was able to run up this

4   massive negative balance, billions of dollars.  When I'm

5   talking about a negative balance, I'm talking about an account

6   that's in the red.  It has got a negative sign in front of it,

7   which means it's in a deficit, it's in a hole, and Alameda was

8   in a multibillion dollar hole.

9          This presented really a massive, totally undisclosed

10  risk to FTX's customers.  They were told that their assets

11  would be safe.  They were told that if a customer's account

12  would go negative, the way they would be kept safe is by having

13  that customer's account liquidated or shut down.

14          And what they didn't know, what you all know but they

15  didn't know and what the defendant hid from them, is that

16  Alameda had this multibillion dollar negative balance in its

17  account.  And Wang testified that that -- it was these special

18  features that allowed and caused Alameda to have such a large

19  hole at FTX, and Singh said the same thing.

20          Now what the defendant does -- actually, let me put it

21  this way.  What the testimony from these witnesses tells you

22  about the defendant, about the core issue in dispute, is, it

23  tells you the defendant gave special secret privileges to

24  Alameda, knowing it would be allowed to take, to steal customer

25  money.  It shows that he knew it was wrong to take money and

1    the way -- and this is critical -- the way you know that it

2    shows he knew it was wrong to take customer money is, if he

3    thought this was legit to just have a giant line of credit and

4    this allow negative feature and borrow from other customers,

5    why was it so secret?  Why not just say, hey, Alameda, by the

6    way, has a $65 billion line of credit?  The reason it is secret

7    is because he knows it's wrong.  Now because of these secret

8    features Alameda was not subject to the same rules as other

9    customers.  And while there were limits on how other customers

10   could borrow, there were no limits on Alameda's borrowing.  Let

11   me talk about one of those limits on other customers.

12            Other customers were not allowed to withdraw funds

13   advanced from a line of credit.  Here is a customer contract

14   prohibiting it.  That restriction, though, as you heard, did

15   not apply to Alameda's borrowing.  So while other customers had

16   to have collateral on the exchange, while other customers could

17   not withdraw their lines of credit, it says it right in this

18   contract, Government Exhibit 69, that rule did not apply to

19   Alameda.

20            As a result of these special features, Alameda ran up

21   a huge negative balance on FTX.  This is Government Exhibit

22   1002.  This is Alameda's borrowing through its accounts that

23   were allowed to go negative.  So this exhibit shows what

24   happened in the major cryptocurrencies in those accounts that

25   had that special allow-negative box checked.  The box that we

1    saw in Government Exhibit 644, it's these accounts, and that's

2    what happened.  They went as low as negative $12 billion.

3           By the way, here is another reason why Government

4    Exhibit 644 is critical.  This wasn't typical borrowing, right.

5    We have talked about the spot-margin program.  And notice

6    Alameda's main account.  It didn't even have spot margin

7    enabled.  Why that's important is, it was not participating in

8    the program where typical customers had to opt in and post

9    collateral.  It was borrowing the defendant's way, through the

10   special advantages.  It was borrowing through the $65 billion

11   line of credit, not through the spot-margin program.

12          As I said, when we are talking about borrowing here, I

13   just want to be clear, Alameda is taking money off the

14   exchange.  Unlike a typical customer, who was doing borrowing

15   to trade on FTX, Alameda was just taking the borrowed customer

16   money off of FTX for its own purposes, to cover expenses or to

17   pay for investments.

18          And Professor Easton gave you some examples.  Here is

19   one.  This is Government Exhibit 1017A and 1017B.  And we saw

20   some of these exhibits for each of the lenders.  It goes 1017A

21   through -- I think it's H.  There is one for each lender.  And

22   what each of them shows is that Alameda's special secret

23   borrowing was used to take customer money to repay Alameda's

24   third-party lenders.  This is Government Exhibit 1024.

25   Alameda's special secret borrowing was used to take customer

1   money to buy back FTX's stock.

2          This is something -- I am not going to go into the

3   details now, because we are going to talk about this further in

4   a bit, but this is another example of using -- again, you can

5   see it at the bottom -- that allow-negative account to borrow a

6   billion dollars to buy back stock.

7          Alameda had one more secret exception that made

8   everything even riskier.  It was exempt from the liquidation

9   system.  A liquidation system in some ways is like the giant

10  parachute.  It's what -- if an account is getting to a risky

11  position and is about to go bankrupt, liquidation is what stops

12  that process and what stops that risk from turning into some

13  big hole.  It closes out the account.  But Alameda was exempt.

14  It was not part of that liquidation system.  And what that

15  meant is, it would not be shut down.  Its account would never

16  be closed, no matter how negative it got, no matter how risky

17  it became.

18         Here is the proof.  This is, again, another piece of

19  the computer code that exempted Alameda from being liquidated.

20  It was added by Gary Wang in 2020, and he testified that

21  defendant directed him to do it.

22         Keep in mind this date that's on this exhibit.  This

23  is important.  611 is the number.  Because on cross-examination

24  the defendant admitted to this.  This was a stunning moment, I

25  thought, of cross-examination because here is what he admitted.

1          The question was:  In 2020, isn't it true that you

2    directed Gary and Nishad to change the rules in the code so

3    that the auto liquidation rules that applied to other customers

4    on the exchange would not apply the same way to Alameda?  That

5    was the question that was asked of him on page 2659 of the

6    transcript.  Here is his answer:  I suggested that they make

7    some alteration to it.  And he was asked a follow-up.  For that

8    purpose, correct?  And he said yup.

9          So by 2020, here is the question.  So by 2020, you

10   knew that Alameda had distinct rules for liquidation.  That was

11   the final question here.  And what was his answer?  Yeah.  2659

12   of the transcript.  On cross-examination he admitted to knowing

13   about that code change.  He admitted to knowing that Alameda

14   had distinct rules for liquidation.  That's a concession that

15   he knows that Alameda was exempt from the rules that applied to

16   all the other customers.

17         What was the result of Alameda's secret exemption and

18   privileges on FTX?  You know.  The defendant took billions of

19   dollars in customer funds, leaving an enormous gap between what

20   FTX said it had in customer money and what it actually had in

21   cryptocurrency wallets.

22         (Continued on next page)

23

24

25

1              MR. ROOS:  And this is important.  This is covered in

2      Government Exhibit 1051, which we'll see in a bit, but it

3      proves that FTX didn't have anywhere close to the amount of

4      money to cover customer deposits, because of these secret

5      privileges.

6              Now the defendant took the stand and denied that he

7      knew everything about these special features, like that the

8      total size of the line of credit was 65 billion, and he denied

9      that he was told about some of the code features, but he

10     admitted to you that he was the one who directed Gary and

11     Nishad to change the code to prevent Alameda from being

12     liquidated if its overall account was negative; and he admitted

13     to you that he was the one who told Gary and Nishad to increase

14     Alameda's line of credit.  He even admitted that he knew

15     Alameda was using a line of credit to borrow billions of

16     dollars.

17             Let's talk about what that means.  Knowing that

18     Alameda was using its unusually large line of credit to take

19     money from FTX, that means that the defendant knows, he knew

20     that Alameda was taking money from FTX customers.  He was

21     taking money from FTX customers when he was saying something

22     totally different publicly, when he was lying publicly, and

23     that makes him guilty of fraud.

24             Now he told you he never queried the FTX or AWS

25     database, or looked at the code.  Not only is that farfetched

and completely not believable that as the CEO, he was

unfamiliar with the computer code that ran the website and the

database that had all the transactions for the website, it's

also irrelevant.  He told his deputies to exempt Alameda from

the rules that applied to other customers, to increase

borrowing limits, and that's fraud.  It's stealing.

You also know that the defendant was deeply familiar

with these special features and how they were used to take

customer funds because of the documents in this case.

This is Government Exhibit 5.  It's an excerpt.  This

is a spreadsheet created by the defendant.  It's important.  He

admitted during his cross-examination——and he had to, because

of this Google metadata.  You remember the brief witness from

Google who introduced metadata evidence for certain documents.

Metadata evidence is like the data information about when

documents were created or saved or viewed.  And the Google

metadata shows that the defendant was the sole creator of this

spreadsheet, Government Exhibit 5, and that he made it in early

September 2022.  And in this spreadsheet it lists out all of

the lines of credit.  You can see them.

Now that's important, because look at these numbers

that are on here, and the email addresses.  This is not the

type of thing you can memorize, right?  It's not the type of

thing where you're like, I'm going to——I'm going to commit to

memory, 65,365,999,994.  And then do that for a thousand

different lines of credit.  The way he has this is because it's

coming from the database.  And right there is Alameda's line of

credit.  And that also shows you that he wasn't telling the

truth when he said he couldn't see any of these things.

By the way, did you notice how the exact same number

that's on the defendant's spreadsheet, Government Exhibit 5,

also is the exact same number in the screenshot that we've

looked at, Government Exhibit 644?  But again, it shows you,

he's able to view these things.

What the defendant's spreadsheet also shows——again,

this is Government Exhibit 5——is that he knew Alameda's balance

sheet was in terrible shape without the money he had stolen,

without the secret $65 billion line of credit from FTX.  The

number here that's key is the net.  That shows how much money

Alameda had without its line of credit.  And negative 5 billion

right here, that number at the bottom, is actually sugarcoating

the situation, because without the FTT——which are those coins

that the defendant created for his company, which couldn't

actually be turned into cash——the balance of Alameda's main

account, he knew, was negative 10 billion.  So the defendant

plainly knew that because of Alameda's giant line of credit, it

was able to and did borrow billions.  Those billions came from

FTX customers.

The defendant mentioned a few times when he testified

that FTX made a billion dollars in revenue, before expenses.

1    When Alameda was borrowing billions, it was right off the FTX

2    platform, and it was borrowing 10 billion or so, 5 billion,

3    10 billion.  Simple math tells you it's coming from customers.

4    1 billion revenue, 5 billion borrowing.  Like whose money do

5    you think you're taking?  Right?  It's—if you are—if there's

6    only 1, at most, 1 billion to take and you're borrowing 10,

7    that means it's coming from the other people who have put the

8    money on the platform.  That's not your money; that's customer

9    money.  This alone makes the defendant guilty of fraud.

10            Now compare what the defendant told FTX customers to

11   what was actually happening.  The defendant told customers that

12   his exchange operated one way that was trustworthy, that it had

13   the liquidation engine, that it kept customer money safe, that

14   it kept—and then simultaneously, he had this hidden, massive

15   exception to that rule that put everyone's money at risk, and

16   allowed him to steal customer money.

17            You heard a lot about the fiat liability and the use

18   of customer fiat deposits.  We're going to talk about that.

19   But keep this in mind.  If you conclude that the defendant

20   stole customer money using these code features that I've just

21   described, you can and you should find him guilty on that basis

22   alone.  It doesn't matter what happens with those fiat deposits

23   because he's just ripping money right off the FTX exchange.

24            But that wasn't all.  You did hear the evidence about

25   the fiat deposits, and this is a reason also, all by itself, to

find the defendant guilty of fraud.  He had customers send
their bank deposits, their money, fiat deposits, directly into
Alameda's bank accounts, and then he spent it.  Here's how
Ellison described it.

          "We received FTX customer funds directly into our bank
accounts as part of the FTX fiat deposit system."

          Ellison explained to you that long before she was
Alameda's CEO, the defendant set up a system to receive FTX
customer deposits into bank accounts that belonged to Alameda,
and a lot of those deposits came through this entity that we've
heard some about called North Dimension.  The defendant was
involved in opening that account.  He signed the application.
That is his name right there, as the principal officer.  This
is Government Exhibit 1348.  So he knew.

          Once FTX customers' deposits landed in Alameda's bank
accounts, they were used as a source of free cash.  This is
Government Exhibit 1050.  In some ways, the picture here just
tells you everything, right?  Professor Easton traced the
money.  Rather than holding the customers' money in custody, it
was moved all around, commingled, mixed, spent, transferred
from one account that received customer money for customers to
operating accounts, to FTX accounts, to out the door to all
sorts of expenditures, to the defendant's own company called
Paper Bird.  And that's because, as Ellison told you, the
defendant said they could use the money to fund Alameda.

1           There was a sort of——there was this funny part of the

2     cross-examination yesterday that stuck with me, which was a

3     point when my colleague was asking the defendant:  So who moved

4     the money if it wasn't you?  Like, who thought they could do

5     this?  And we went through this list of names, and it was these

6     low-level people.  And so the theory here is that somehow the

7     lowest levels of people, I guess, just moved and took

8     $8 billion.  That's not credible, right?  That doesn't make

9     sense.  That doesn't line up with the evidence.  The evidence

10    shows——that we're about to go through——it was the defendant,

11    right?  And that makes sense.  He owned it, he was the boss, he

12    set up the system, he was FTX's CEO, he was Alameda's CEO when

13    this got started, he was the sole chairman of the board.  He's

14    the reason why the money is moving in crazy directions like

15    this.

16          And how did they use those fiat deposits that came

17    into Alameda's bank accounts?  Here's an example.  They used it

18    on——a hundred million dollars in real estate in the Bahamas,

19    they used it on investments like buying Robinhood shares.  And

20    what was the result?  The result was billions of dollars that

21    Alameda spent and owed back to FTX customers.

22          This chart, Government Exhibit 1004, tells the story.

23    The black line, FTX's systems said there were over 10 billion

24    in fiat deposits with Alameda.  But in reality, it was the

25    green line, and that's because the defendant and his

1    co-conspirators spent the money, and that's why there's this

2    giant gap in the middle, hole.

3         I want to be clear about something.  Nothing about how

4    FTX customer fiat deposits were taken or borrowed resembled

5    anything close to the system that the defendant had put in

6    place that permitted typical customers to borrow money from

7    FTX.  This was not margined borrowing, right?  It wasn't even

8    through the system.  The defendant admitted that yesterday.  He

9    was asked questions:  Was this margin trading?  Was this margin

10   trading?  There was no collateral posted here.  This wasn't

11   even Alameda's special secret line of credit.  This was all off

12   the exchange, off the books.  And during cross-examination,

13   when the defendant was asked whether he could name any other

14   customer that accepted FTX customer deposits besides Alameda,

15   he couldn't name a single one.  Alameda was exceptional in that

16   regard, and the way it was exceptional is that it was allowed

17   to take these deposits and use them, because, as Ellison said,

18   there was an additional source of capital for the defendant's

19   agenda.  Common sense tells you it was the defendant who set up

20   these systems.

21        Let's think about the other options.  It couldn't have

22   been Ellison alone.  She never worked at FTX.  She didn't have

23   any way to give Alameda the special ability to withdraw money

24   from FTX, right?  She didn't have the access to go into the

25   computer code.  And because she didn't work at FTX, she also

1   didn't have the ability to set the wiring instructions to send

2   the customer deposits to Alameda.  And of course when this

3   whole system was set up, the defendant is the one who was both

4   the CEO of FTX and of Alameda.  Caroline was just a trader.  So

5   it can't be her alone.

6          And then on the other hand, you've got Gary Wang and

7   Nishad Singh, and they could not have acted alone without the

8   defendant.  They worked at FTX, but they didn't have any role

9   at Alameda.  Wang was a minor owner but had no real role in the

10  business.  He had no involvement in the spending.  He was

11  sometimes given documents to sign, but as he testified on

12  direct examination, cross-examination, and redirect, he didn't

13  even know what the documents were for.  And Singh didn't even

14  ever work at Alameda.  He had no role with the company.  So it

15  couldn't have been them alone.  They didn't have access to the

16  money to spend it.

17         Now the defendant, he lied to you when he pretended he

18  didn't know Alameda was spending the customer fiat deposits.

19  He told you that he was the CEO of Alameda when this started

20  and never gave a single employee any guidance on safeguarding

21  or segregating FTX customer fiat deposits.  And four

22  witnesses——Adam Yedidia, Caroline Ellison, Gary Wang, and

23  Nishad Singh——all told you that in June of 2022, they discussed

24  with the defendant that Alameda's liability to FTX for spending

25  FTX customer fiat deposits was 8 billion.  But the defendant,

1    he claims that he just had no idea about this fiat deposit,

2    just had no idea about the liability, no idea about the

3    accounting structure that was then in place, until September,

4    or was it October, or was it the end of October?  That's just

5    simply not remotely credible.

6         The truth is that there was just one person who had a

7    motive to set up the system to give Alameda the secret special

8    ability to borrow money from FTX customers.  Who had control?

9    These are the questions.  Who had control of FTX in order to

10   give Alameda secret access to customer money?  And who had

11   control at Alameda to spend that money?  There's one

12   person—the defendant.  He set up a system; he directed a

13   system where Alameda could borrow unlimited amounts of money,

14   without any limits, without a requirement that the collateral

15   be on the platform, without any restrictions on withdrawing the

16   money, and without any chance of liquidation; and he set up

17   another system where Alameda would receive customer fiat

18   deposits directly and it could use that money without any

19   restrictions.

20        And just to take a step back about thinking about what

21   the alternative explanation is, so somehow, two different sets

22   of people—because there's no other overlap—two different sets

23   of people come up with two different systems that both happen

24   to give the defendant's company secret access to money.  That's

25   got to be the alternative explanation.  And you know that's not

1    credible.  The defendant knew what he was doing was wrong.  He

2    tried to tell you he thought this was actually permissible to

3    use the fiat deposits, but his testimony flew in the face of

4    what every customer who testified says they thought how their

5    money was treated.  And you know that because of the things he

6    said publicly that were totally inconsistent with what he was

7    doing in secret.

8           So one of the ways you know he was lying, one of the

9    ways you know he knew what he was doing was wrong, was while

10   the defendant was secretly giving access to FTX customers and

11   spending it, he was saying something totally different to the

12   customers, to the investors, to the public, and to the United

13   States Congress.  He was lying to the public, and he told those

14   same lies on the witness stand.

15          Let's start with the advertisements.  He ran ads

16   saying FTX was safe.  "The safest and easiest way to buy and

17   sell cryptocurrency."  He told Congress and the public that by

18   "logging in to the customer's account at FTX, the customer can

19   immediately view the types of assets they own, held in custody

20   by FTX."  And that last part is critical.  He said, they can

21   view the "assets they own, held in custody by FTX."  And that

22   wasn't true.  When customers logged in to their accounts, they

23   saw a balance.  Behind the scenes, the money wasn't there.

24   That in and of itself is a lie.  A customer logs in——the first

25   customer witness we saw in this case logged in and saw a number

1   that represented his balance, and that wasn't real.  That was

2   false.  And that was a lie.  It had been taken off the

3   exchange.

4        And here's the proof of that.  This is the chart I was

5   talking about earlier.  There was a huge deficit, a huge hole

6   on the exchange.  This is Government Exhibit 1051.  And it

7   shows you what customers thought they had.  That's the black

8   line, right?  This is what customer balances were on the

9   exchange.  But what they actually had was the yellow line.

10  What was actually there was something totally different.

11  Billions of dollars different.  And the difference between the

12  black line and the yellow line is the hole.  And this proves

13  that the defendant was lying publicly because he was saying one

14  thing—that we held the assets that you own in custody—when in

15  fact something totally different was going on.

16       Now the defendant had said he wasn't aware of some of

17  the stuff that was going on, and he lied when he said that.  He

18  said something like, *it was messy accounting and that was on my*

19  *list of priorities.*  So, I mean, give me a break.  That's a

20  lie.  If that was true, that they had messy accounting, like he

21  claimed, then why did he tell Congress that "FTX regularly

22  reconciles customer trading balances against cash and digital

23  assets held by FTX"?  Regularly reconciling means comparing.

24  Regularly reconciling trading balances against cash and assets

25  held would have told the defendant, did tell the defendant,

1    that there was a huge, significant hole, right?

2            Go back an exhibit.

3            If the defendant is regularly reconciling

4    balances——that's the black line——against, as he said, what

5    money they had——the yellow line——he knows that there was a huge

6    gap.  He knows that.  And when he's saying everything is fine,

7    after saying, *we regularly reconcile*, he's lying.  And that

8    tells you that he knows what he's doing is wrong.

9            Now yesterday morning on redirect, the defendant came

10   out and he said that he thought it was okay for Alameda to use

11   customer fiat deposits, and that's a claim that not a single

12   witness besides the defendant has made in this case, right?

13   Universally, they've said this was a bright red line.  You

14   cannot touch that money.  No one thought it was okay.  And the

15   truth was that the defendant, he knew that Alameda was not

16   allowed to use that money, and again, the way you know it is

17   because he said something totally different to Congress.

18   Twice, the defendant told Congress that when an intermediary

19   like Alameda receives customer assets, they must ensure there

20   was "no delay in returning customer funds upon request, and no

21   shortfall where an amount lesser than the value of that

22   customer's assets can be returned."  And he told Congress that

23   to ensure that happens, it's important that there be "a

24   restriction on the custodian"——so that's Alameda——"a

25   restriction on the custodian, including, for example, a

restriction on the use of customer assets to finance other

business expenses and initiatives."  Think about that last part

of his testimony here.  He's saying the third party, the

intermediary that receives the money, there must be a

restriction on it on using customer assets to finance other

business expenses and initiatives.  And if you're thinking,

well, that sounds familiar, that's because the defendant did

exactly the opposite.  He used customer assets to finance other

business expenses and initiatives.  But privately, in secret,

you know he knew exactly what was going on and he knew it was

wrong.

We've talked a lot about all the special advantages

and secret privileges that Alameda had.  The defendant knew how

wrong and unfair these privileges were to every other customer

on the exchange, how these privileges flew in the face of

everything he said about trust and safety on the exchange.  So

he lied about it, to cover it up.

And what was the defendant saying about the

relationship between FTX and Alameda?  Throughout his time at

FTX, the defendant was saying things publicly like, Alameda is

treated just like everyone else.  He tweeted that.  "Alameda is

a liquidity provider on FTX but their account is just like

everyone else's."  He was quoted in articles as saying that

Alameda is a wholly separate entity.  And he told CNBC that he

"worked to eliminate conflicts of interest," and that he

1    doesn't run Alameda anymore, and that Alameda is a "neutral

2    piece of market infrastructure."  Those were lies.  Privately,

3    the defendant knew that Alameda had all sorts of special

4    privileges and features on FTX.  It wasn't wholly separate, it

5    wasn't just a piece of neutral market infrastructure, its

6    account was not like everyone else's.  Unlike any other

7    customer, Alameda had the $65 billion line of credit.  It was

8    able to do unlimited amounts of withdrawals, make unlimited

9    amounts of borrowing, have its account go negative, not post

10   any collateral, not be liquidated, not be shut down.  Its

11   borrowing wasn't just through the spot margin program.  Much of

12   it wasn't even on FTX.  If customers knew that the defendant

13   had directed these special privileges for its own affiliated

14   company, they would have run for the exits.  It would have been

15   clear as day that their money wasn't safe, that the defendant

16   was treating their deposits as his personal piggy bank by

17   funneling that money to Alameda.  And so the reason he made

18   these public statements is to conceal what he was doing,

19   because he knew what he was doing was wrong.

20        You know these were deliberate lies.  He told

21   customers that backstopping customer assets was primary within

22   weeks of using customer money to repay his debts.  He told

23   reporters that Alameda was totally separate in September, when

24   he was internally freaking out about the close relationship

25   between FTX and Alameda.  And at the same time, in September

2022, when he wrote this spreadsheet, Government

Exhibit 5—this is the spreadsheet we were looking at a little

bit ago, where the defendant listed out all of the lines of

credit and listed out Alameda's line of credit as 65 billion,

and the next closest as 150 million—this is the same time he

made those statements to Bloomberg and to CNBC; the same time

he said, they're totally separate, treated like everyone else,

neutral market infrastructure.

And you saw an example of a line of credit agreement

that VIP other customers used.  And those customers had to sign

these documents, and there was of course a limit on how much

they could borrow.  And it was only as much as their line of

credit.  And they were prohibited from withdrawing it.  So no

other customer had a setup like Alameda.  And as Alameda was

using this line of credit to spend billions on loan repayments,

on investments, and on expenses, it had nothing to do with

their trading at FTX.

So from this, here are the key points:  (1) Alameda

had a special feature, a secret advantage over other customers,

and it certainly was not treated like other customers; and (2)

the defendant knew about it at the same time he was making

public statements.

So you sat through this trial, obviously, and you've

seen a lot of examples of the defendant saying something

publicly different than what he was doing in secret.  And what

1    does this say about his intent?  Right?  Because that's one of

2    the key questions.  To view FTX as safe, secure, custodian of

3    their money, that's what he was projecting publicly.  He wanted

4    it to be viewed as a trustee.  These public lies also, though,

5    show his criminal intent.  The fact that he was saying things

6    publicly that were different than what he was doing privately

7    shows he knew what was going on behind the scenes wasn't okay.

8           So next I want to talk about some of the details of

9    where the money went and who was responsible.  But before I do

10   that, let me ask your Honor if you want to take a break right

11   now or later.

12          THE COURT:  Sure.  Fifteen minutes.

13          (Recess)

14          (In open court; jury not present)

15          THE COURT:  I take it there were no issues with the

16   changes in the charge overnight, correct?  Mr. Cohen?

17          MR. COHEN:  No, your Honor.

18          THE COURT:  Mr. Rehn.

19          MR. REHN:  That's correct, your Honor.

20          THE COURT:  Okay.  Let's get the jury.

21          Mr. Roos, time estimate?

22          MR. ROOS:  I think I'm about a third of the way

23   through, but in terms of time, I've now lost track of time with

24   our various——

25          THE COURT:  I suspect you have company.  Okay.

1              (Jury present)

2              THE COURT:  Okay.  The defendant and the jurors all

3    are present.

4              You may continue, Mr. Roos.

5              MR. ROOS:  Thank you, your Honor.

6              So the defendant directed that these systems be put in

7    place that allowed him to take FTX customer money, and then

8    once the systems were in place, there were points in time,

9    points along the road, where the defendant was presented with a

10   choice——come clean or double down.  And every time he chose to

11   double down, to take more criminal steps to dig the hole in

12   customer deposits deeper.

13             And so what we're going to do now is I'm going to talk

14   about six moments in time.  And here are the first three.  But

15   six moments in time in 2021 and 2022 where the defendant was

16   presented with a choice about coming clean or doubling down and

17   digging the hole deeper.  And each time, he indisputably knew

18   the financial situation at FTX and Alameda, and he knew that he

19   would be spending customer money, and each of these times, he

20   took the path of doing the wrong thing, he took the criminal

21   path, and so that's what we're going to talk about.

22             And No. 1, the first reason is the defendant's

23   purchase, his buying back of stock from Binance using customer

24   money in 2021.

25             So starting in the middle of 2019, back when FTX was

started, the defendant sold some of FTX's stock to a company

called Binance, which was run by this guy on the left.  And

fast forward two years later, FTX and Binance, according to the

defendant, are rivals, and the defendant hated the fact that

his rival owned part of FTX, so in 2021, the defendant wanted

to buy out Binance.  And buying out Binance or buying back

Binance's ownership of FTX stock was expensive.  Binance had

about $2 billion worth of FTX's stock.  And so remember what

the defendant said about how much money in revenue they were

making at this point——about a billion dollars.  That's only

half of the $2 billion that he needs to buy back FTX's stock

from Binance.  They didn't have enough money to do it.  But the

defendant kept telling Caroline Ellison it was really important

to him to buy back Binance's stock.

He said——and this is testimony.  He said to her, and

this is what she said to him:  "We don't really have the money

for this, we'll have to borrow from FTX to do it."  And he said

this in response:  "That's okay, I think this is really

important, we have to get it done."

Let me say it again.  This is from page——by the way,

this is from page 668 of the transcript.  She says, "we don't

have the money, we have to borrow it."  And what she's talking

about is taking it from FTX customers.  And he says, "that's

okay, we have to get it done."  It doesn't matter how much he

wants to do it; if they're talking about money from customers,

it's clear as day the defendant knows that they're stealing and

committing fraud.  And that's exactly what they do.

This is Government Exhibit 1024.  To pay the

$2 billion to buy back the stock shares, they used the billion

dollars they had and then a billion dollars of customer money

from FTX.  And this came out of that main Alameda account with

the "Allow Negative" turned on and the $65 billion line of

credit.  This has nothing to do with the members of the

settlement team that he was saying were in charge of spending

fiat deposits.  This wasn't margin trading.  This was just

taking money straight out of an account with a negative balance

that had a special privilege so that he could pay the nearly

$2 billion he needed.

And notice what the defendant said and what he didn't

say when he testified about this.  He admitted that there was a

stock buyback, and he admitted the amount of money he used, but

he was totally silent about the specifics.  He didn't say

anything about the conversation with Caroline Ellison, and

that's because it was bad for him.  Bad for him because they

were using FTX customer money.  Way back in 2021—and this is

important.  The timing here is important.  Way back in 2021,

well before there was market turmoil that caused problems, way

before all the events the defendant testified in 2022, when he

bought back these shares, they didn't have those issues.  So

when he was asked about the buying back of the shares, the

1    defendant gave a vague answer.  And remember what his answer

2    was?  It was, he didn't know exactly which entity bought back

3    the shares.  And he didn't want to say who bought back the

4    shares, and the reason he was vague and didn't give a straight

5    answer when he testified is because the truth on this one is

6    particularly inconvenient for the defendant.

7            And this is the critical document.  This is Government

8    Exhibit 317.  It's an email, and it's from the defendant, okay?

9    And it's him saying transfer the money to buy back these

10   Binance shares.  And let me just point out something about

11   who's on this email.  No one from Alameda, right?  They're not

12   even copied.  It's the defendant who's leading this effort.

13   And that tells you everything you need to know about this.

14   He's the one, and he knew exactly where the money was coming

15   from.  It wasn't like there were settlement people who were

16   doing this process.  It was him.  He took about a billion

17   dollars of customer money, without his customers knowing, and

18   when FTX did not have all the money it needed to do this

19   buyout.  This wasn't something that he needed to do to make the

20   exchange run, this wasn't the result of bad luck, this wasn't

21   the result of, you know, some hedging gone wrong.  This was a

22   deliberate decision.  This was him spending money that he

23   wanted to spend.  And remember why he did it.  He said this was

24   "really important to me."  He was confronted with the question

25   by Ellison, we have to spend customer money, and he said,

 1    "that's okay, this is really important to me."  So that's how

 2    you know the defendant knowingly took FTX customer money and

 3    intentionally committed fraud.  He knew this wasn't permitted

 4    borrowing, because it was not a way that was allowed on FTX.

 5    He did it because it was really important to him, because he

 6    really cared about this rivalry.  And when he was given the

 7    choice of not buying the stock back that they couldn't afford

 8    or digging a deeper hole by taking more customer money, what

 9    did he do?  He decided to double down, to take more customer

10    money, to make that Alameda account more negative, and when the

11    question about this was put to him on the witness stand, he had

12    no answer for it.  That's the first moment to think about.

13    When you deliberate, that's a moment in time to think about,

14    when the defendant was presented with a choice and he chose to

15    double down, he took a criminal act, and that tells you

16    everything you need to know about his knowledge and his intent.

17           Here's the second moment in time, the second instance

18    when the defendant was given a choice and yet again he decided

19    to double down.  And what I'm talking about now is a period in

20    the fall of 2021 when Alameda was already borrowing customer

21    money and was financially not in good shape.  But the defendant

22    was greedy.  And when he was presented with a choice again of

23    coming clean or doubling down and digging the hole deeper, you

24    know what he did.  He kept digging.  And this is the second

25    point in time that you can see where the defendant indisputably

1    knew about the financial situation, indisputably knew that they

2    were taking customer money, and then did it anyways.  And that

3    shows you that he knew what he was doing was wrong.

4              So here's some background.  In the fall of 2021, the

5    defendant sends Caroline Ellison what he calls the 10th

6    Percentile Scenario, which Ellison told you is something like a

7    scenario that could plausibly happen, isn't so likely to

8    happen, but you have to take seriously because it might happen.

9    And here's the question the defendant puts to her:  What

10   happens in a scenario where cryptocurrency prices drop and a

11   bunch of our investments lose money, and what would happen if

12   in the meantime, we spend $3 billion more on investments?  So

13   it's like this scenario he's mapped out.  And in everyday

14   terms, this is like:  What would happen if I brought a brand

15   new sports car that's really expensive and then at the same

16   time the economy got really bad and at the same time I also

17   lost my job?  This is like his version of:  What is this thing?

18             And she, because everyone loves spreadsheets, does a

19   spreadsheet, and she makes a spreadsheet for the defendant that

20   addresses this question:  What are Alameda's assets and

21   liabilities?  And this is another critical document in the

22   case.  This is one to think about.  Government Exhibit 36.  And

23   the name of this is NAV Minus Sam Coins.  A funny name.  It's

24   net asset value, or NAV, minus the Sam coins, which are the

25   coins, like FTT, that he created.  So what's our financial

1    picture without the Sam coins?  And this is something that she

2    shows the defendant, and he admitted during his testimony that

3    he saw it.  That's at page 2458 of the transcript.

4            So let's look at what the defendant saw when he looked

5    at this spreadsheet back in 2021.  So right off the bat,

6    Ellison has a calculation for the defendant of what Alameda's

7    value is without the Sam coins, NAV Minus Sam Coins.  And the

8    Sam coins, by the way, are FTT, Solana, Serum.  And the reason

9    they're doing the NAV minus the Sam coins is because those

10   coins are not so easy to sell.  We heard like tons about this

11   in this case.  They're not very liquid.  There's not a market

12   for them.  If you try to sell them, they're not easily──there's

13   not like a buyer out there who wants to buy $3 billion of the

14   Sam coins.  And so they've got a value, but that's just on

15   paper.  In real life, you can't actually sell these things for

16   that much.  So her estimate for what their finances are without

17   those Sam coins is what looks like, you know, as written, as

18   $2700, negative 27, but we know these are all in millions, so

19   what that is is negative 2.7 billion.  They are negative

20   2.7 billion at this point in late 2021.  And then Ellison adds

21   up the assets and liabilities at the time, and here's what the

22   defendant saw.  They've got 8 billion in assets, and 9 billion

23   in loans.  So math, 8 minus 9 is negative 1, and so they're in

24   the negative.  At this point he's already able to see in late

25   2021 that Alameda has more loans than it has assets.

1          And let me just pause here for a second and mention

2     that throughout his testimony, the defendant was saying these

3     things like, ah, at the time we had tens of billions, we had a

4     NAV of 40 billion, and that was funny number accounting and

5     just plain bald-faced lies.  And when you think about it, think

6     about where is the evidence that those were actually real

7     numbers, where is the balance sheet that says those numbers,

8     where is the balance sheet that says those numbers with assets

9     that they could actually use or sell or spend, there isn't any.

10    And there are still—by the way, these are still billions, very

11    large numbers, but the point is, they're in the red.

12         And then there are these two lines on here that say

13    "FTX borrows," and Ellison told you, "that referred to the

14    amount of FTX customer deposits that were currently on the

15    exchange and that were available for Alameda to borrow."  Let

16    me translate that.  By "available. . . to borrow," what she's

17    talking about is FTX customer funds that are available to

18    steal, right, and spend however the defendant wanted.

19         So the defendant is looking at the situation with

20    Caroline, he sees that they've got more loans than assets, he

21    sees they're in the red.  And I don't want to pass over this

22    like it's just some random number.  When they're talking about

23    borrowing from FTX, they're talking about borrowing customer

24    money, and this number here, 3 plus 4, is how much customer

25    money exists there.  It's like how much money is in the bank

1    that you could potentially rob.  This is like the target right

2    here.  3 plus 4 is 7.  This is how much money we can take.  And

3    so this is the conversation:  Here's how much money we could

4    take to potentially spend.  And then the next question the

5    defendant asks Caroline, which is right in the spreadsheet, is:

6    What happens if the economy gets worse and how does this change

7    with another 3 billion of venture investments?  Right?  'Cause

8    this was his question.  This was:  What happens if the economy

9    gets bad and then I want to buy that new sports car?  And there

10   isn't a dispute over this.  During his testimony, the defendant

11   admitted that the point of this spreadsheet was to consider

12   more investments for Alameda, coming out of customer money.

13        So, look, you don't have to go to MIT to know that if

14   you have more debts than you have money and you want to spend

15   more money, you're going to be in more debt.  So when the

16   defendant had more debts than assets and the only available

17   money was this FTX customer money, where is the $3 billion for

18   investments coming from in this scenario?  And the answer is:

19   Customers.

20        So Caroline does the math, where she takes this

21   current financial picture and she assumes the economy gets bad

22   and crypto prices drop and then assumes $3 billion more in

23   investments, and she told you her math told her spending

24   3 billion on investments was a really bad idea because they

25   could already not afford 3 billion without spending customer

money.  How did the defendant respond?  He said he wanted to go

ahead with billions of dollars of venture investments anyways.

So when you're thinking about the defendant's mind-set, think

about that.  Think about how he's—how she's like, so financial

picture is not so good, also, we're going to spend $3 billion

more and I think that's a really bad idea, and he says, I hear

what you're saying and I want to go ahead with it and do it

anyways.  And this is easy math for him.  He knows where the

money is coming from.  It's coming from customers.  And he

knows it could be a really bad situation where they don't have

the money for the customers, but he spends it anyways.

Now when the defendant was questioned about this

document, did you notice how he evaded talking about what the

document was actually about?  He commented on some notes about

FTT and the note about hedging, and he just totally glossed

over what the spreadsheet was about, which was about how they

were in a poor financial position and did not have the money to

pay for new investments.  And that was a deliberate decision by

him when he testified.  It was deliberately evasive and it was

a misdirection.  And that tells you how—why this spreadsheet

is important.  It shows that he knew they were using customer

funds, and the way he reacted to this piece of evidence shows

you that he knew what he was doing was wrong.

Okay.  So they have this moment in time.  They talk

about this spreadsheet.  They see the potential financial

1    picture.  The defendant says, let's spend the money.  And he

2    goes on this spending spree that would rival someone that had

3    just won the lottery, except he had not, obviously, won the

4    lottery, he had stolen billions of dollars.  And so what does

5    he spend the money on?  Professor Easton told you he spent the

6    money on this $30-plus million penthouse apartment for him and

7    his friends and his co-conspirators to live in.  And he spent

8    the money on a $16 million house for his parents.  And it

9    totaled 100 million on real estate.  And all that came from

10   customer money.  There's no real dispute that the money that

11   was used to pay for this real estate was coming from customers.

12        And by the way, when the defendant was asked about

13   these property purchases, when he testified on direct, he told

14   you another half-truth.  As you can see, what he told you was,

15   it was that FTX paid for these, and that was only half the

16   truth.  When you look at it, the money came directly from FTX,

17   but where did the money originally come from?  It was passed

18   through a bunch of accounts, and it originally came from

19   Alameda.  And where did the money originally come from to

20   Alameda?  From customers.  Why would he tell you it came from

21   FTX without acknowledging the true source if he thought it was

22   okay?

23        So the defendant also spends billions during this

24   period on investments.  Right?  And this was the plan.  He

25   bought hundreds of millions of dollars of stock in Robinhood,

1   and here's the analysis by Professor Easton.  Almost all of it

2   was customer money.  He transferred that stock from Alameda to

3   a company he controlled called Emergent Fidelity Technologies.

4   And this is Government Exhibit 200.  This is another important

5   document.  And look who does this sale of all of Robinhood

6   shares held by Alameda to Emergent Fidelity Technologies.  The

7   defendant, as the chairman and sole member of the board of

8   Alameda.  This is all the defendant.  He spent that money.

9        And did you notice how he responded when he was asked

10  about this particular document on cross-examination?  He was,

11  again, evasive.  First, he wasn't sure which board of directors

12  this was referring to, then he couldn't recall what Alameda

13  entity this was about, then he didn't want to admit that he was

14  the sole member of the board of directors of Alameda, then it

15  wasn't until he was asked whether he became a director by

16  mistake or accident that he acknowledged that he was the sole

17  member of the board.  The reason he didn't want to talk about

18  this document is because this was a handshake with himself,

19  right?  It's incriminating.  Because it shows a transfer of

20  hundreds of millions in stock bought by Alameda using customer

21  money directly to the defendant.  Just him, no one else, right?

22  It's a handshake deal with himself.  And that tells you

23  everything you need to know about the defendant's intent.

24       He also spends 300 million on investing in K5, and

25  almost all that is customer money.  And this is Government

Exhibit 56.  It's the payment confirmation for that K5

investment, and it's signed by the defendant.  It proves he's

responsible for this spending.  Remember it was the defendant

who really wanted to invest in K5.  Nishad Singh told you about

how he told the defendant it was an awful idea, but the

defendant wanted to invest with these guys because—the guy who

ran K5 because he hung out with celebrities, took the defendant

to dinner with famous people and made connections.  Now the

defendant claimed, looking at this picture, that he just

happened to bump into these people at the Super Bowl, but right

after the defendant got back from the Super Bowl, he wrote to

Nishad and others that the guy who ran K5 was "probably the

most connected person I've ever met and we can get from them

essentially infinite connections."  So he was celebrity

chasing.  And he liked it.  He liked the vibe of all this, he

liked the connections, and for him, it cost about $300 million.

And he didn't have that $300 million, so he took that money.

        And there was other spending we saw evidence of too.

Genesis Digital, the crypto mining company; Anthropic, the

artificial intelligence company; Dave Inc., that online bank.

I'm not going to go through all of these.  But during Professor

Easton's testimony and during the defendant's

cross-examination, he admitted that he was involved in all

these transactions.

        Let me just pause here and note that the defendant

1    made a big point of saying that yes, he made these investments,

2    but he really only wanted to do some of them if Alameda also

3    hedged.  Right?  And let's just be clear about this.  Wanting

4    to hedge these investments, that is not a defense.  The

5    defendant was gambling with customer money.  And whether he

6    thought these were sure bets or safe bets or risky bets or

7    almost sure bets, or that he was going to win more money back

8    in the long run, it doesn't matter.  When he took the money and

9    he played roulette with it, he was stealing.

10          I expect Judge Kaplan is going to tell you just that.

11   He's going to instruct you on the law, and what he says

12   controls.  I'm not going to read you the detailed legal

13   instructions that Judge Kaplan does, so you should defer to

14   everything he says.  What he says trumps what I say about the

15   law.  So I expect you're going to hear that if you wrongfully

16   take someone else's money, even if you think you might later be

17   able to put it back, that's still fraud.  The defendant here

18   was greedy.  He wanted to spend money.  He wasn't satisfied

19   with what he had.  This was like a person who just doesn't like

20   the financial situation but other—but rather than living with

21   what he has, he went out and took more money.  And all the

22   dollars he spent on real estate and on investments and other

23   things are reasons you know the defendant is guilty.

24          The third point in time that I want to talk to you

25   about, where the defendant had a choice and doubled down and

1    dug the hole even deeper, is the discussion the defendant had

2    with his co-conspirators——his friends, the people who were his

3    roommates in June 2022——about Alameda having a $10 billion

4    negative balance and then how he told Ellison to repay

5    Alameda's lenders, spending billions of dollars more in the

6    process.  And this was another critical moment in the

7    defendant's scheme.  He knows the financial situation.  He

8    knows they're deeply in the red.  And he decides to use more

9    customer money, knowing what he's doing.  So let's walk through

10   that.

11           To set the scene at this point in time, it's May or

12   June and cryptocurrency prices have dropped, and Caroline

13   Ellison is looking at Alameda's balances and she sees they may

14   be insolvent, out of money, and the defendant is looking at

15   Alameda's balances at this time too.  And you heard from

16   several witnesses that the defendant would sit at his computer

17   and would constantly have it open on six monitors, a page

18   showing Alameda's balances.  And even when the defendant was

19   questioned about this, he ultimately admitted that, yeah, he

20   had a balances page on his computer, but it was just an auto

21   open.  But he also told you that Ellison would routinely send

22   him Alameda's balance sheets and that he was reviewing them.

23   So he knew the financial situation at the time.  He sees

24   Alameda's balances are not good.  And he gets more bad news.

25   Alameda's lenders now want their money back, because the market

1    is going down.

2           Here's an example.  This is Matt Ballensweig from the

3    crypto lender Genesis.  He's messaging the defendant and

4    Caroline on June 13th, and he says, basically, we need our

5    loans back.  Here's one of those messages.  He writes, "We're

6    going to increase the OT loan pull back"—which" is open term

7    loan pull-back—and he's looking for $400 million back.  And he

8    wants to know the ETA on 250 million.

9           So they're under the gun.  They've got their lenders

10   asking for money.

11          And you heard a similar thing from Zac Prince, who was

12   the CEO of BlockFi, who testified on one of the Fridays that we

13   sat.  And he made similar demands for the loan paybacks.

14   Ellison told you they were getting loan demands back from all

15   the lenders.  And so the defendant knows that: (1) Alameda's

16   balances are not in a good place; and (2) they're about to get

17   even worse because all the lenders want those loans repaid.

18          By the way, this is literally the scenario that the

19   defendant and Ellison had talked about a few months prior,

20   right?  A scenario which was like, our balances are not so

21   good, we've got more loans than assets, and what happens if the

22   market gets worse, and we've spent $3 billion, and now here

23   they are.  So he knew something like this could happen, and

24   then it happens.  And then he's presented with another point in

25   time where he has to make a choice, and again, he's got two

1    options.  Option one is what you heard some other

2    cryptocurrency companies did.  Zac Prince told you about it.

3    The market got bad and they closed up shop; they couldn't repay

4    their loans.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        MR. ROOS:  One option for the defendant was come

2   clean, face the consequences, and he didn't pick that option.

3   The other option was double down, more lies, dig the hole

4   deeper, spend more customer money when it came to repay.

5        And he doesn't stumble into this.  He gets his

6   coconspirators together.  He says:  Let's figure out Alameda's

7   balances.  Let dig in, figure how much debt it has, how much

8   money it can pull together.  And you heard from each of the

9   witnesses about this, right.  All three of them testified about

10  this moment in time.  So this is a very important moment in

11  which the defendant has a criminal conspiracy where they know

12  what the financial situation is, and then he makes another

13  choice to do something wrongful.

14        Here is Caroline Ellison's testimony.  The defendant

15  asked Caroline, Gary, and Nishad to put together a spreadsheet

16  showing Alameda's balances on FTX.  She makes an initial

17  version and then Gary and Nishad revise it.  Here is what that

18  looks like.  This is Government Exhibit 50.  This is a very

19  important document.  It's one you have heard a bunch about.

20  And this is the balances sheet calculation for Alameda in June

21  of 2022.  Taking a look at this exhibit, you immediately can

22  see that Alameda has a lot of negative balances, including

23  almost 3 billion negative in its main account.  It's right

24  there.

25        Right there on the spreadsheet it has that fiat@FTX

account.  You can see, even after that bug correction we heard

about, it has an $11 billion negative balance, in addition to

the fact that the spreadsheet showed the defendant that Alameda

had a gigantic negative balance on FTX and it showed the

defendant that it had a -- that it had a fiat liability that

was very large and it showed the defendant had an overall

negative balance that was very large.  Gary tallies up that

balance.  That's the number right there.  They are over

negative 11 billion.  This is all in Government Exhibit 50.

So Gary told you that without Alameda's FTT that

Alameda's balance gets even higher as negative -- by higher, I

mean more negative, even more negative, to 16 billion.  So

Ellison also makes an additional analysis.  This is the same

exhibit.  And it's a tab in the spreadsheet where she

calculates how much customer money they have taken to this

point, and here is that calculation.  The tab is called balance

sheet by liquidity.

And one of the numbers on here which the defendant

sees is how much they are borrowing in customer money from FTX.

The number is 13.25 billion.  Here is what Ellison said about

it.  That represents 13.25 billion.  That represents money that

Alameda was borrowing from FTX customers.  So it's right there

in the spreadsheet.  The defendant sees it.

And there is another key piece of information on the

spreadsheet.  It's this.  USD 13,000, 3,000 minus 10,000.  What

1   does that number mean?  Ellison told you.  Those are the total

2   assets that were held by FTX at the time.  So they, customers,

3   had deposited 13 billion and only 3 billion was available at

4   FTX.  The other 10 billion, that minus 10, that's what they

5   borrowed on FTX.

6           So this spreadsheet, Government Exhibit 50, is very

7   important and from it the defendant knows the following:  1.

8   Alameda has a total negative balance of $11 billion; 2.  It has

9   borrowed over $13 billion in customer money; 3.  Around 3

10  billion of that is by going negative on FTX in its main

11  account.  And there is another 10 or 11 by taking fiat

12  deposits.  Finally, 4, as little as a quarter of the customer

13  money is actually on FTX.  This shows there was a gigantic

14  hole.

15          This spreadsheet is a key piece of evidence because it

16  basically shows you everything you need to know about the

17  defendant's conspiracy, and what's so important about it is

18  that he and his coconspirators all work on it together.  It's

19  absolute proof that he knew in June 2022.

20          Now, you have at this point heard about the

21  defendant -- you have heard the defendant testifying about this

22  meeting and this balance sheet.  He told a very different

23  story.  He acknowledged there was an issue with Alameda, and he

24  even acknowledged that Gary and Nishad and Caroline did a

25  spreadsheet, but then he just skipped the discussion of the

spreadsheet.  He didn't talk about Government Exhibit 50 in his

direct testimony at all.  And the reason he didn't want to talk

about it is because looking at the exhibit would tell you he

was lying during his testimony, that he knew clearly from the

exhibit exactly what was going on with customer money, he knew

where Alameda's balances were, he knew how much had been

borrowed, he knew what was left on the exchange.

You know that the defendant was lying about this

meeting because you heard from the three other people who were

not just in the meeting but were his friends, his closest

confidants.  I think the defendant described him as the numbers

2, 3, and 4 people.  And they all have testified about this

meeting.  But there is another reason you know he's lying about

seeing this or knowing what's going on, and that's because we

were able to go back and get the metadata for this document.

You heard something about the metadata in this case, but I

don't think you folks actually saw the metadata.  We are about

to look at it now.

Metadata, like I said, is just the information from

Google that tells you information about who viewed the

document, and we can use that metadata to determine whether the

defendant's version of what happened is right or whether all

three of the cooperating witnesses gave the right testimony --

sorry -- testified about what happened.

Here is that metadata, and it shows you the truth is

1    exactly what Nishad, Caroline, and Gary testified to.  The

2    defendant viewed this spreadsheet on June 14.  That means he

3    saw that fiat@ account.  He saw Alameda's huge negative

4    balance, he saw Caroline's calculations, and he saw how much

5    money he was missing.  The metadata fully corroborates what the

6    witness has told you, and it completely undermines everything

7    the defendant said about this.

8            By the way, this is Government Exhibit 50.  The

9    metadata is called 50M.

10           There is more.  The witnesses also told you about a

11   Google meeting they had over their computers to discuss the

12   spreadsheet.  Here is Nishad Singh's testimony.  He said during

13   cross-examination, actually, that I know that she, Caroline,

14   sent it, meaning the spreadsheet, to me, Sam, and Gary.  I'm

15   sure that the four of us got on Google Meet and worked on it,

16   like investigating it.  One Google Meet, one long discussion

17   over Google Meet.

18           Here is the evidence that happened.  This is a Google

19   Meet record for June 14, 2022.  And you can see the people who

20   joined the meeting, the Google Meet are the defendant,

21   Caroline, Nishad, and Gary.  Here is the really important part

22   about this.  Who started this Google Meet?  The defendant.  How

23   long was he logged into this meeting?  17,000 seconds, which is

24   a little under 30 minutes.

25           So when the defendant was on the stand and was

testifying that he didn't look at this and didn't know what was

going on, that was a total lie.  He was studying it with his

coconspirators.  He viewed the document.  That's what the

metadata shows, that's what the witnesses said, and he had a

30-minute-long meeting to discuss it.

How did everyone react to Alameda's negative balances?

You heard that they were pleased to learn that there was no bug

and that the negative balance was 11 billion and not negative

20 billion.  It was negative 11 billion and not negative 20

billion.  But they still knew this was a big problem.  Here is

an example.

Ellison testified in June 2022, we were in a bad

situation, and she was mostly concerned that if anyone would

find out, everything would come crashing down.  The defendant

was thinking the same thing.  He had seen Alameda's balances.

He knew its financial position was getting worse.  He knew that

Alameda's lenders wanted their money back.  So he knew that

everything could come crashing down if the truth came out.

Let me pause here for a second and just note something

about the relationship between these four people:  The

defendant, Ellison, Wang, and Singh.  By June 2022, you heard

the evidence in this case.  By June 2022, they are sitting in a

room and on a Google Meet and looking at the negative balances,

and they have a long history together at this point.  I am not

just talking about friends or as roommates or as people who

1    were dating.  I'm talking about a long criminal history

2    together.

3         Remember, the defendant had directed Nishad to

4    backdate documents to inflate revenue a whole year earlier.

5    The defendant and Ellison have already stolen money to pay

6    Binance to get those shares back, and they had paid a bribe.

7    That all happened a year prior.

8         They had all lied to auditors by this point.  The

9    defendant had told all three of his deputies, transfer a giant

10   negative MobileCoin loss to Alameda to hide it.  He had Nishad

11   and Gary maintaining that fake insurance fund number.  So they

12   have got a history together, right.  They are used to at this

13   point doing crime together.

14        And so the reason that's important is, Government

15   Exhibit 50 is actually shockingly explicit in how it lays out

16   what they are doing, what they owe.  But there is also and I

17   expect you are going to hear this from Judge Kaplan, a level of

18   history and comfort level, and that's why these folks can speak

19   in innuendo, in code, they can avoid labeling things explicitly

20   because they have a long criminal history together at this

21   point.

22        I told you that the defendant had a choice to make in

23   June 2022, and at this moment he decides what to do.  He

24   doesn't decide to give up.  Instead, he knows they are in a bad

25   place and he decides to double down, when Alameda is already in

significant debt, and repay lenders.  And Gary Wang was asked

this directly:  Where was the money coming from to repay those

lenders?  And his answer was:  Either from Alameda's FTX

account or from Alameda's accounts elsewhere, but, either way,

the money -- all the money came from FTX customers.

Caroline Ellison said the same thing.  They knew where

the money was coming from.  So did the defendant.  He obviously

knew because this was his company.  He was checking the balance

sheets, he was having his people work on the spreadsheet

project, so he knows where the money is coming from.  Then it

is him, the defendant, who makes the call to repay those

lenders.  Here is Ellison's testimony.  It was Sam's decision.

So Ellison testified that the defendant continued to direct her

to repay loans.  He was telling her to use customer funds to

repay our loans.

Wang said the same thing.  He turned to Caroline,

meaning he, the defendant, turned to Caroline and said that

Alameda can go ahead and return the borrows to lenders who loan

Alameda's money.  We are asking for it back.  That's what they

did.  Here is two documents, two exhibits we have looked at

already.  They pay back the lenders using customer money.  It's

in black and white.  And it comes out of Alameda's account with

that big negative balance.  It's customer money.

Overall, of the $6.5 billion they used to repay

customer money, 4.5 -- of the 6.5 they used to repay lenders,

4.5 was coming from customer money.  This is Government Exhibit
1018.

Let me just put this in context.  We heard multiple
times over the course of this trial that there was somewhere
between 9 and 12 billion in cryptocurrency on FTX in the summer
of 2022.  So when Alameda takes 4.5 billion off of FTX to repay
lenders, they are taking between half and a third of all of the
cryptocurrency on FTX, right.  Let me say that again.  They are
taking as much as half of the cryptocurrency that is supposed
to be sitting in the wallets to repay their lenders.

As the owner of Alameda and the CEO of FTX, that's
something the defendant clearly knew about.  But according to
him, half the money from his exchange is gone, and he doesn't
know.  According to him, Alameda has to pay back almost all of
its loans, has to pay out $6 billion, and he doesn't know where
it's coming from.  And, according to him, he is not checking
Alameda's bank accounts, he is not checking their balances,
he's not checking the fiat@ account.  He can't see any of this.
None of it adds up.

If you were to believe the defendant's testimony, it
would have to be that somehow each of these people who reported
directly, his 2, 3, and 4 people, knew about Alameda's
balances, knew where the money was coming from.  That just
doesn't add up that he doesn't.

Do you remember what he said when my colleague asked

1    him?  He claimed that the people he supervised told him to stop

2    asking questions.  He claimed that even though he had been

3    concerned, he was worried that Alameda was insolvent.  He was

4    asking them to check the balances.  There is this bug in the

5    system.  He claimed that the people who reported to him were

6    like, stop asking questions.

7         And then, even though he had cancelled his trip to

8    D.C. and he was worried that maybe Alameda was insolvent, he

9    just didn't follow up, and he doesn't now remember what ended

10   up happening.  I think his answer was, I can't recall.

11        There were four witnesses in this trial that said they

12   talked to the defendant about Alameda's massive negative fiat@

13   balance in June 2022:  Yedidia, Wang, Ellison, and Singh.  When

14   the defendant testified that he didn't learn and couldn't

15   remember, that was a lie.  And the reason he's lying about that

16   is because this is a moment in time where he clearly knows that

17   Alameda is using FTX customer money, and he lied on the stand

18   because he knows it's wrongful and totally inconsistent with

19   everything he said publicly.

20        Let me make one last point about what happened in June

21   and why it proves the defendant knew what he was doing was

22   wrong.

23        Here is what the defendant does in May and June of

24   2022:

25        May 13.  FTX publishes terms of service that say:

1    None of the digital assets in your account are the property of

2    or shall or may be loaned to FTX Trading.  Promise to FTX

3    customers.

4              June 13.  Genesis and other lenders asked the

5    defendant for loan repayments.

6              June 14.  The defendant has the spreadsheet project,

7    and they look at all of it, and they see the negative balances.

8    He sees they are in the hole.  He makes the decision to repay

9    the money anyways.

10             June 16.  Repayment happens to places like BlockFi and

11   Genesis using customer money.

12             Then here is the revealing part.  June 23.  The

13   defendant's congressional testimony that we have already looked

14   at where he says:  Whoever is in control of customer assets

15   cannot be misallocating or misusing those assets.

16             Then June 27 he tweets:  Backstopping customer assets

17   should always be primary.

18             What this sequence tells you is that the defendant

19   went out in public, promised them, we are not using your money,

20   it's safe.  Then in June he needs money, so he's taking his

21   customers' assets.  And then if that wasn't enough, he has the

22   audacity within a week to go before Congress under oath and go

23   on Twitter and tell his customers, his victims, that he's not

24   using their money, that money, protecting their money is his

25   top priority, and when the defendant is doing that, when he is

1    taking their money secretly and then within a week is out there

2    publicly lying about it, that tells you he knows what he's

3    doing is wrong.

4           The next moment in time is June 2022, when the

5    defendant works with Caroline Ellison to send a fake balance

6    sheet to Alameda's lenders.  This is another moment where the

7    defendant made a deliberate decision to double down on this

8    fraud.  So what happened?  We have been talking about June.

9           And after Alameda repays its lenders and spends

10   billions more in customer money, the defendant wants to take

11   out new loans, because he hasn't had enough of spending money

12   already, so he goes to Genesis and BlockFi and others, but

13   there has been changes in the cryptocurrency market and prices

14   have fallen and some of these companies have gone out of

15   business, so as third-party lenders they asked for new balance

16   sheets, and now he is presented with a situation that he has to

17   make a decision in.

18          No lender who actually knew the state of Alameda's

19   balances were ever going to lend them money, right.  It was 10

20   billion plus in the hole, and that was before they repaid their

21   loans, and then he spent a few billion dollars more repaying

22   the loans, so they are deeply in the red, totally under water.

23   This was very clear to the defendant.

24          Caroline comes to him and says:  I think it looks bad.

25   I don't think we can send this to Genesis, talking about their

balance sheet.  Do you agree?  And he says:  Yeah, that sounds

right.

            Here is Alameda's real balance sheet in June 2022,

Government Exhibit 44, the main tab.  What's the reason they

can't send this to Genesis and other lenders?  Ellison told you

it showed that Alameda was in a very risky position, borrowing

around 10 billion from FTX and with about 5 billion of its

loans to FTX's executives.  Where does it show that?  Here.

Exchange borrows:  9,900.  That means, according to Ellison,

Alameda had borrowed 9.9 billion from FTX customers.

            Here, related-party loans.  That was 4.5 billion in

loans to the defendant, Wang, and Singh.  According to Ellison,

it might make it look like Alameda was effectively giving or

funneling money to FTX executives.

            So at this point the defendant knows Alameda is deeply

in debt.  He knows they borrowed customer money, he knows that

it's in the billions, and he knows they have made billions in

loans to FTX executives.

            So the defendant had to make a choice, and this is

another critical point, and he decides to lie yet again.  He

told Ellison that she should prepare some alternative ways of

presenting this information and setting this thing up, ways to

conceal things in their balance sheet.

            So Ellison creates seven alternative balance sheets,

and here is that.  This is Government Exhibit 44.  It's another

1    critical document to think about.  The main tab here is the

2    real balance sheet, and then there are seven alternative

3    options.  The alternative options hide Alameda's borrowing of

4    FTX customer funds and the big loans to the executives.

5          By the way, this spreadsheet is so obviously for the

6    defendant, because why would Ellison just be doing this solo?

7    In what world is a person making eight alternative balance

8    sheets for themselves and not be shared?  She makes seven

9    alternatives because she knows someone else is picking an

10   alternative and that person is the defendant.  So she testifies

11   then that Sam said we should use alternative 7.  He said

12   alternative 7 looked like and that she, Ellison, should send

13   that one to Genesis.

14         The difference between the real balance sheet and the

15   fake alternative 7 balance sheet is obvious.  Here they are

16   side by side.  And what's missing from alternative 7?  Exchange

17   borrows, meaning borrowed or stolen customer money.  10 billion

18   is missing.  What else is missing?  Related party loans for 4.5

19   billion.  Remove from the spreadsheet.  The defendant picked

20   alternative 7 because it concealed the evidence of his fraud.

21         And in case there was any doubt about the defendant's

22   involvement in this, here is the metadata on this document.

23   Government Exhibit 44M.  It shows it was shared with the

24   defendant and he viewed it on June 19, 2022.  He took a look at

25   it just hours before it went out the door to lenders.

1      If you have a balance sheet for your own private

2    viewing and then you make it an external balance sheet to send

3    to your lenders, that's fraud.  And if you have two balance

4    sheets and they are totally different, then you -- clearly you

5    have one too many balance sheets.  And if you prepare seven

6    alternative balance sheets and you are like, hey, let's go with

7    alternative 7, that's definitely the best one of how we stole

8    $10 billion, that is definitely fraud, and you know that from

9    your own common sense and life experience.

10      The CEO of one of the lenders who testified in this

11    case, he said lending crypto isn't that different from other

12    types of lending, so imagine you knew someone who wanted to get

13    a mortgage or a small business loan, but before they walked out

14    the door to go to the bank, they said, you know what, let's

15    come up with an alternative statement of my financial position,

16    one that doesn't make my debts look so bad, makes them look

17    smaller.  Let's actually come up with seven alternatives, and

18    then let's pick the version that makes my debt seems the

19    smallest, and let's give that to the bank.  You would obviously

20    say to them, using your own common sense and life experience,

21    no, you cannot come up with alternative versions of your

22    finances and give them out to go get a loan.

23      Well, the defendant, he did just that.  He picked the

24    alternative 7.  He told Ellison to send it to their lenders to

25    get new loans.  She sent it out.  It went to Genesis.  It went

1    to BlockFi.  It went to other lenders.  We looked at examples,

2    their balance sheet.  Here is Government Exhibit 17.  It's the

3    false balance sheet that went to Genesis.  Here is Government

4    Exhibit 419.  It's the false balance sheet that went to

5    BlockFi.  Ellison told you all these were false because they

6    all omitted those key parts that the defendant wanted to hide.

7           As a result of sending out those fake balance sheets,

8    they got new loans.  This shows it.  Over a billion dollars in

9    new money came in.  That's new money that the CEO of BlockFi

10   testified they never would have loaned had they been -- had the

11   truth been revealed.

12          So this is another important moment because it tells

13   you everything about the defendant's knowledge and his intent.

14   From just looking at the balance sheet, the defendant has to

15   know that they have been using customer money, both FTX

16   customer crypto and fiat deposits, because it says it.  He sees

17   Alameda doesn't have much money in its bank account.  It says

18   500 million in the bank, just a fraction of what it owes, and

19   he sees without its -- without those long-term investments,

20   which he can't sell and can't get out of, they actually have

21   fewer assets than liabilities, so he knows they are borrowing

22   customer funds.

23          The spreadsheet also tells you that taking and

24   spending billions of dollars of customer funds is wrong.  Why

25   else would the defendant want to remove from Alameda's balance

1   sheets these figures, right?  It's not like he is removing even

2   every liability.

3        Like if it was just about minimizing liabilities,

4   which by the way would still be a crime, but if it was just

5   about that, he would remove all of them, but he removes a

6   specific one, and the one he removes is the one that says, I'm

7   stealing money from FTX customers.  So there is no confusion or

8   uncertainty about what his mental state is.  He is picking the

9   one that is revealing that they have a fraud, and that's why he

10  is sending out a doctored balance sheet.

11       Now, we heard the defendant's story about this.  This

12  time at least he admitted to seeing the spreadsheet.  But his

13  testimony was extremely vague and evasive.  Remember he said he

14  got the spreadsheet with the main tab and seven alternatives,

15  and he had to admit that because he has seen the metadata

16  proving it.  But what did he tell you?  He said that he doesn't

17  remember any of the details.  He can't remember for sure which

18  tab he looked at.  He can't remember if it had seven

19  alternatives.  And he just went with one that seemed

20  reasonable.

21       Think about this explanation for a moment.  Remember,

22  the defendant admitted that he was just warned this month that

23  his company might be on the verge of bankruptcy, and then he

24  gets his balance sheet for it and it has all these

25  alternatives, but he wants you to believe that he only just

1    looked at one of them and it just happened to be alternative 7,

2    and that he didn't ask Caroline any questions, and then they

3    just sent it out.  It's not plausible.  He has got no

4    explanation for the spreadsheet because it's really

5    incriminating evidence and because the metadata shows that he

6    viewed it.  There is no innocent explanation for having eight

7    alternatives to a balance sheet and then picking one of the

8    alternative ones that omits the key crimey fraudy parts of the

9    balance sheet.

10            The next moment in time where the defendant presses

11   forward with his fraudulent scheme that we are going to talk

12   about is September.  He has a conversation with the same

13   people.  They have discussed Alameda's negative balances and

14   then he, again, made a choice to spend more customer money.  So

15   it's another reason you know the defendant knew what he was

16   doing, knew that it was wrong, and then proceeded forward.

17            So in September 2022, the defendant knew that Alameda

18   was borrowing billions of dollars from FTX customers.  In June,

19   the period that we just looked at, he saw these numbers on

20   spreadsheets.  He knew they had just borrowed more from

21   lenders.  They had just repaid money to lenders also.  And by

22   September 1, he knows the number is $13.7 billion.

23            How do we know that?  Government Exhibit 90.  This is

24   another important document.  This is an internal balance sheet

25   from September 1, 2022.  It shows that the defendant -- right

1   there it shows that Alameda is borrowing 13.7 billion from FTX.

2   There is no dispute the defendant saw this.  Not only did

3   Ellison tell you he saw it, but, again, there is metadata that

4   shows it.  By the first day of September he knows that Alameda

5   is negative.  13 or 14 billion, right.  Keep this date in mind.

6   This is September 1.  We are going to talk about what happens

7   next in September.

8          Notably, this is an exhibit that the defendant just

9   skipped over.  He didn't even have an explanation for it.  By

10   the way, remember, when the defendant claimed Caroline's

11   spreadsheet usually had multiple tabs, well, there is no

12   additional tabs on this one.  It's just one tab and it says it

13   right there, right on its face, FTX borrows 13.7 negative, so

14   he knows in September.

15          A few days later, on September 7, the defendant sends

16   Wang and Singh a Google Doc about the pros and cons of shutting

17   down Alameda, and it's Government Exhibit 18.  Here is the key

18   line in this document.  Really hard to unwind Alameda.  What's

19   that a reference to?  When the defendant is writing, it's

20   really hard to unwind Alameda, what he's talking about is the

21   fact that Alameda has almost $14 billion in debt of money it

22   took from FTX's customers.  And that's not reading between the

23   lines.  That's literally what they discussed when the defendant

24   raised this question of shutting down Alameda.

25          Here is Gary Wang's testimony.  He says at pages 449

1   to 450 of the transcript:  So I asked Caroline how much Alameda

2   was currently borrowing from FTX, and she said 14 billion.  And

3   he was asked whether there was any way that wouldn't involve

4   the use of customer money, and Wang said no.  Because FTX did

5   not have that much money itself.

6          Here is what Caroline said about this when she was

7   asked about Alameda's ability to repay that 13.7.  She said:

8   We had no way to repay it.  That's page 823 of the transcript.

9          Here is what Nishad Singh said at page 1403 of the

10  transcript.  He learns that Alameda is borrowing 13 billion

11  from FTX.  And Caroline Ellison tells him, Gary, and the

12  defendant over a Signal chat that it is impossible to close out

13  Alameda's borrowing because of the size of the hole.

14         How did the defendant respond to all this?  Here it

15  is.  Gary was asked just that question.  Ellison says Alameda

16  was borrowing 14 billion.  Do you recall the defendant

17  responding with any message of surprise?  And Gary's answer was

18  no.  No.  He was not surprised when Ellison said they were

19  nearly 14 in the red because he already knew it.  He was the

20  one who designed the systems.  He was the one who had directed

21  the spending.  He knew it from over the summer.  He knew it

22  from the prior year.  He knew it from the internal balance

23  sheets he was getting in September.  He knew it from the

24  balance sheet he got six days before.

25         So Wang told the defendant the hole was too big to

 1    shut down Alameda.  And what did the defendant say?  He said:

 2    Acknowledged, acknowledged.  No pushback, no request for

 3    clarification, no like, well, what hole are you talking about

 4    or what do you mean?  No confusion.  He just acknowledged it.

 5            Here we have another conversation where you have three

 6    witnesses who all said the same thing.  They all said -- they

 7    talked about a giant hole, between 13 and 14 billion, and

 8    that's why they couldn't shut down Alameda.  And the defendant

 9    sat through this trial and he knows that's the witness'

10    testimony, and he knows they are saying he is part of that

11    conversation, and there is too much evidence for him to say, I

12    didn't know what was going on.  I wasn't involved.

13            What does he say about it?  Well, keep in mind at this

14    point we know that the defendant -- he admitted this, that

15    Alameda is only doing like 3 percent of the market making on

16    FTX, so he knows he can't say at this point the reason we

17    didn't shut down Alameda was because Alameda -- the reason we

18    didn't shut down Alameda is because Alameda was too important

19    to FTX.  That's not a realistic or credible argument at this

20    point.  He knows that.  So he didn't say that.

21            What he said was, quote:  He did not feel confident he

22    had gotten a clear reason why.  So he was asked, what's the

23    reason?  He says, I'm not confident I got a clear reason why.

24            Just think about this explanation.  The defendant

25    wrote a five-page memo that includes six numbered points for

1    why to shut down Alameda.  The metadata shows he worked on this

2    for hours, and it has got several subpoints and it has got a

3    list of alternatives and it has got the pros and cons and it

4    has got a two-page-long tweet string of what he would tweet out

5    if he announced Alameda being shut down.  But his testimony is

6    that Gary and Caroline and Nishad came to him and said, we

7    can't do this, and then without any reason he just dropped it.

8    That's not a credible story.

9         That night the defendant and Nishad speak on the

10   balcony and Singh asked the defendant -- this is at page 1407

11   of the transcript -- what about what Caroline said today?  And

12   Gary said today that there is a 13 billion borrowed and we

13   can't pay it all.  He put the question to him directly.  And

14   the defendant says:  Right, that.  We are a little short on

15   deliverables.

16        Again, there is no confusion, no question by the

17   defendant.  He knows exactly what Nishad is talking about.  He

18   says right, that.  He is not surprised.  He is not confused.

19   He has known for months.  And he says:  We are a little short

20   on deliverables.  And this, by the way, is quite an

21   understatement for a $13 billion hole, but it's still a damning

22   concession.  He knows there is a hole.  He knows they can't

23   fill it if the customers want their money back.  We are a

24   little short on deliverables.

25        And then the next thing he says is critical.  He says:

1    This has been taxing me for some 5 to 10 percent of my

2    productivity for this year.  What is he saying?  He is saying

3    that this has been weighing on him because he knows that

4    Alameda cannot repay this debt and that FTX is at risk, which

5    means he is at risk of having his fraud be exposed.  That's

6    what is weighing on him.  And Nishad says:  This is going to be

7    doing a lot more damage to me hitting me a lot harder.  And the

8    defendant says:  Yeah.  I was worried about that.  It might

9    have been a mistake for me to circulate that document this

10   morning.  People are going to freak out.  They have stolen the

11   money.

12            Nishad sees the giant hole, and he is freaking out,

13   and the defendant knew they were stealing the money too, but he

14   wasn't freaking out as much as Nishad.  You know the reason why

15   is because he was already comfortable with the situation.  He

16   had already known about it for a long time and it was his

17   decision to take that money, so he has come to terms with it.

18   He wanted to use the money.  He did use the money.

19            He had the arrogance to think he could get away with

20   it and just raise more money from other investors or come up

21   with somehow.  When people like Nishad started freaking out

22   about it, he said the mistake here wasn't, we by accident took

23   the customer money.  The mistake here wasn't, I thought we

24   could use the customer money.  The mistake was telling Nishad

25   about it.  That tells you everything you need to know about

1  what the defendant was doing, why this was deliberate, and why

2  what he was doing was wrong.

3       This is another place where we heard a different story

4  from the defendant.  He admitted that he talked about Alameda's

5  liabilities, but he was very vague about what actually was

6  discussed in the conversation.

7       But you know that Nishad's explanation, his testimony

8  is corroborated by another witness, because you heard from Can

9  Sun.  He was the last witness before our break.  And what he

10  told you is, he told you about a conversation that he had with

11  Nishad before FTX went bankrupt, as it was collapsing.

12       Here is what Can Sun said that Nishad said to him

13  right before the collapse.  He said that he had found out about

14  the hole, basically that Alameda was taking FTX customer assets

15  in September 2022.  He said that he confronted Sam directly

16  about it, and Sam told him back then that it is what it is and

17  there is nothing we can do about it.  That's page 1954 of the

18  transcript.  That's very important.  It's how you know that

19  Nishad is telling the truth about the conversation with the

20  defendant.

21       And defense counsel may get up and say that Nishad has

22  a poor memory, but remember this testimony from Can Sun.  Can

23  Sun told you that he had a conversation with Nishad, right.

24  And Nishad told him, recounted what happened, and this happened

25  long before Nishad ever met with the government, long before he

 1    ever testified here.  It's a prior statement by him, a

 2    statement before, according to the defendants, he didn't have

 3    any reason to change his story, and that tells you, that's

 4    evidence for you to consider when you are evaluating his

 5    testimony.

 6          Now, what happened next is predictable.  Caroline told

 7    you that throughout 2022, she was in a constant state of dread,

 8    and she was worried imagining every day what might happen.

 9          Nishad told you that he was blindsided and horrified

10    that FTX had turned out to be so evil, that spending anything

11    after September was necessarily digging the customer deficit

12    hole deeper continuing the crime.

13          But what did the defendant do?  Again, he doubled

14    down.  Here is the proof.  This is a spreadsheet of all sorts

15    of investments the defendant was doing, and look at these two:

16    250 million to Modulo Capital on September 26, 45 million to

17    Skybridge on September 7.  Those are hundreds of millions of

18    dollars after Nishad confronts him, after he tells him to stop

19    spending customer money, and the defendant keeps doing it.

20          And notice the names on the spreadsheet.  The names on

21    the spreadsheet are the defendant and people who he said

22    reported to him.  They are not Caroline, they are not Nishad,

23    they are not Gary.  It's the defendant who is doing the

24    spending.

25          Here is the proof it was the customer money.  This is

1    Government Exhibit 1033.  Professor Easton testified that, on

2    September 26, a payment to Modulo Capital came exclusively from

3    customer money.  Here is Exhibit 314.  It's a Slack message in

4    which the defendant says he wants to make that payment to

5    Modulo.  Here is Government Exhibit 350.  This is the contract

6    signed by the defendant committing 250 more to Modulo.  This is

7    all the defendant's doing.

8         The same is true for that payment to Skybridge.  This

9    is Government Exhibit 1028.  It proves the Skybridge investment

10   was paid for with customer money.  Here is the proof it was the

11   defendant's doing:  Government Exhibit 201.  It's the

12   investment credit contract signed by the defendant as founder

13   of Alameda Research ventures.

14        One more.  This is part of Alameda's ledger.  And in

15   September and October 2022, there are millions of dollars going

16   out to Sam Bankman-Fried.  That's Government Exhibit 141A.

17   Below that shows that at least some of that money went to

18   political donations.  That's Government Exhibit 1089.

19        Here is why that's so important.  This is a really

20   important point, and think about the timing.

21        September 1, the defendant sees a balance sheet

22   listing Alameda's borrowing of customer money at 13.7 billion.

23        September 7, he proposes shutting down Alameda, talks

24   to his coconspirators.  They all talk about how there is a

25   giant hole.  Nishad confronts him on the balcony.  He's

1    freaking out.  He tries to get the defendant to stop spending

2    money.  He tells the defendant:  Every dollar you spend is

3    customer money.

4         The same day he spends $45 million on Skybridge.  Ten

5    days later he transfers $10 million out to himself.  September

6    26 -- September 22, transfers $4 million to himself.

7         On September 26, transfers $250 to Modulo for his

8    investment.

9         Finally, October 3, he transfers 6 million more for a

10   political donation.

11        In the month of September he knows Alameda is

12   massively in debt, he knows it doesn't have the money, he knows

13   they are taking from customers, and he knows what he's doing is

14   wrong.  That's all that you need to know to find him guilty.

15        The last moment in time I want to talk about is

16   November.  In November, the defendant tells more lies,

17   including false tweets to try to keep customer money.

18        Now, you remember in November customers started

19   withdrawing their money from FTX as a pace faster than the

20   defendant had seen before.  Everyone was nervous, and the

21   defendant and his coconspirators were nervous, not just about

22   the pace of the withdrawals, but what could happen as a result

23   of all the withdrawals.  Their fraud might be exposed.

24        Here is what Ellison said.  She was terrified.  This

25   is what she had been worried about for months.  When she was

1    asked if they could repay she said:  We could not.

2           Now, the defendant knew he had a problem.  He was

3    doing the math and watching the withdrawal numbers and wrote a

4    Google Doc on November 6 with notes about the current status.

5    And this is a very important document, Government Exhibit 21.

6    Here is what he wrote.  They had, quote, enough to process

7    about one-third of remaining client assets.  Let me repeat

8    that.  He writes, the defendant writes:  We have enough to

9    process one-third of remaining client assets.  In other words,

10   they are missing two thirds of the money.  But the defendant

11   had a plan, a criminal plan, fraudulent, and this alone is a

12   basis to convict him.  Here is his plan.  Send a confident

13   tweet thread.  That's what he calls them.  What does that mean?

14   Nishad told us, quote:  A very confident and therefore

15   misleading statement or false statement about FTX's financial

16   condition.  The point here, folks, was to stop getting people

17   to stop withdrawing their money.

18          Now, Nishad told the defendant he was, quote, not

19   comfortable with this.  He said:  No, no way.  Recusing myself.

20   He didn't want a part of it.  And the defendant acknowledged in

21   a kind of annoyed way, and then he proceeded to tweet.  Here is

22   what he has tweeted, and you have now seen this tweet a bunch

23   of times.  You know it well.  Government Exhibit 866.

24          The first tweet on November 7 says:  FTX is fine.

25   Assets are fine.  Every witness said this tweet was false or

1    misleading.

2           Here is Gary Wang.  Was the tweet accurate?  No.  Why

3    not?  FTX was not fine.  Assets were not fine because FTX did

4    not have enough assets for customer withdrawals.

5           Here is Nishad.  Was that accurate as of November 7,

6    2022?  No.  We had determined definitively that FTX had a hole.

7    So this first tweet was plainly a lie.  It was a confident

8    tweet to fool customers into not withdrawing their money.

9           Look.  It wasn't just the defendant's coconspirators

10   who knew this was false.  The defendant knew this was false,

11   and we know that from the time.  Notice when he sends this

12   tweet that assets are fine.  It's on November 7 at 7:38 a.m.

13   That's after he has written internally that they only have

14   one-third of the assets they need.  So compare those, 866,

15   Government Exhibit 866, to Government Exhibit 21.

16          Here is another example.  At 3:08 a.m. on November 7,

17   the defendant sends a list of possible assets that they have in

18   the small group Signal chat.  And here is his math.  He

19   estimates there are 12 billion in customer assets they need to

20   meet, but he is only able to come up with that number at the

21   bottom, 3.9 billion.  So he has got a difference, and there it

22   is, a deficit, a hole of 8.1 billion.  Remember the time.  This

23   is at 3:08 a.m. on November 7.

24          What does he do four hours later?  Tweets.  He's

25   missing 8.1 billion, according to his own chat, and he says,

1    assets are fine.  FTX has enough to cover all client holdings.

2           This is yet another case where the defendant took the

3    stand and said something totally that was contradicted by the

4    evidence.  He sat there and he said he only realized there was

5    a hole on November 8.  But you have seen his own Signal

6    messages now.  You have seen his own Google documents.  You

7    know that was not the case.

8           Defendant didn't stop there.  This is his second

9    tweet:  FTX has enough to cover all client holdings.  We don't

10   invest client assets, even in treasuries.  That was false.

11   Gary Wang testified this was not true because FTX did not in

12   fact have enough assets to cover all client holdings and

13   because FTX was lending client assets to Alameda.

14          Caroline testified that the tweet was not true because

15   FTX only had 4 billion to cover 12 billion of client holdings.

16   Nishad testified that the tweet was even more false than the

17   last one, that FTX did not have enough to cover client

18   holdings.

19          What was the result of the defendant's lies?  FTX

20   customers didn't withdraw their money.  Here is what one

21   customer said.  He was relieved after seeing the defendant's

22   tweets.  He found it reassuring.  Another customer told you

23   that after seeing the defendant's tweets he felt comfortable to

24   just sit and wait.

25          That's what the defendant had intended.  He sent a

confident tweet thread, a series of false tweets to lull his

victims into leaving their money, to convince them that

everything was fine, assets were fine, while the wall was

coming crashing down.

          The fact that the defendant lied on Twitter to

convince people to not withdraw their money is really important

for two reasons.

          The first reason is, it shows he had criminal intent.

He knew the situation and he lied.  He knew he had only a third

of the money, four out of 12, $8 billion hole.  He knew that

before he tweeted, and then he tweeted anyway.  It wasn't an

accident.  It wasn't a misunderstanding.  He had intended it.

          The second reason, these are important, is I expect

Judge Kaplan will tell you that if after obtaining money, like

customer deposits, the defendant participated in a scheme to

keep the victim's money by making false or fraudulent

representations, that is, to retain it, that can be a scheme to

defraud.  So when you find the defendant made these false

tweets, that alone is a reason to find him guilty of fraud.

          There is one more thing I want to talk about briefly

for November, and that is a conversation that happens the next

day with Nishad Singh as he's leaving the Bahamas.  So he has a

conversation over Signal with the defendant.  And in that

Signal chat the defendant makes an admission.

          Let's look on November 8, shortly before Nishad

 1    leaves.  He was in a dark place.  He was suicidal, as he told

 2    you, and he sends a Signal message to the defendant.  This is

 3    Government Exhibit 480C.  So he sends the message and he says:

 4    This is Nishad.  He says:  Wildly selfish of me.  But they, the

 5    FTX employees, may need to know that there wasn't a ton of

 6    people orchestrating it.  I think it makes them more likely to

 7    want to be here to help save the situation.  What's the it?

 8    The it is the fraud.  Nishad is saying to the defendant:  FTX

 9    employees need to know there wasn't a ton of people

10    orchestrating this fraud.  And Nishad explained this.  He

11    said -- he testified about it.  He said he wanted the defendant

12    to clarify what everyone's role in this fraud was.  He said it

13    was selfish of him because he wanted the defendant to clarify,

14    that he, Nishad, wasn't orchestrating it.  Nishad was saying to

15    the defendant that he should clarify, that is, the defendant

16    should clarify he was orchestrating it.

17         How does the defendant respond?  Yup.  For what it's

18    worth, I don't think that's super selfish.  I think that's

19    probably correct.  There it is.  Nishad asked the defendant to

20    clarify that he was orchestrating the fraud, and the defendant

21    says, I think that's probably correct.  This is an admission to

22    his coconspirator at the end of the conspiracy that the

23    defendant was orchestrating.  That is a reason right there to

24    convict him.

25         Notice what he doesn't say.  He doesn't say:

1    Orchestrating what?  He doesn't say:  That's not right.  He

2    doesn't say:  Anyone else is to blame.  He says:  I think

3    that's probably correct.

4             Keep in kind this context.  The context is, this is a

5    Signal message, one of the messages that they have been sending

6    all along to auto delete, and this is one of his closest

7    confidants.  It is not a public tweet.  It is not an interview.

8    This is a private space between him and his coconspirator over

9    an encrypted messaging platform with auto delete set so he can

10   tell, Nishad, I think that's probably correct.

11            I told you the questions we were going to answer.

12   They were:  What happened?  Where did the money go?  Who was

13   responsible?  We have now answered those questions together,

14   what happened.  The defendant was motivated by greed and

15   ambition, and he wanted more money for Alameda, so he set up

16   systems to take the money.  We have talked about what he did.

17   We talked about where the money went.  It went to investments,

18   to purchases, to expenses, to donations.  It was siphoned off.

19   And the defendant is responsible.

20            Your Honor, do you want me to keep going?  I'm about

21   to switch sections.

22            THE COURT:  I thought you were.  I think we will break

23   for lunch.  Ten minutes past 2 we will resume.

24            (Jury not present)

25            THE COURT:  Time.

1              MR. ROOS:  I think I'm over three-quarters of the way

2    done.  I think I gave the jury a roadmap, and I said the last

3    two parts were a few defenses and the elements.  That's what I

4    have left.

5              THE COURT:  Time.

6              MR. ROOS:  I am going to estimate 30 minutes.  Could

7    be a little longer.

8              THE COURT:  OK.  Thank you.

9              (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        AFTERNOON SESSION

2                            2:14 p.m.

3              (In open court; jury present)

4              THE COURT:  Defendant and the jurors all are present,

5    as they have been throughout.  You may be seated, folks.

6              You may continue, Mr. Roos.

7              MR. ROOS:  Thank you.

8              When we left off, we had talked about what happened,

9    where did the money go, and who was responsible, and you now

10   know the answer to all those three questions.

11             Now at the beginning, this morning, I told you there

12   were a few things we were going to do, and the last two were

13   talk about the crimes and talk about some of the defense

14   arguments you've heard, and these parts will be a lot shorter.

15   We've already covered the meat of it.  So let's get into it.

16             The defendant is charged with seven crimes, and

17   they're up there on the screen.  You can read them.  And

18   basically they fall into four categories——fraud on FTX's

19   customers; fraud on FTX's investors; fraud on Alameda's

20   lenders; and conspiracy to commit money laundering.  And Judge

21   Kaplan is going to give you detailed instructions on these

22   crimes tomorrow, and you should listen to them closely.  I'm

23   just going to talk to you about how some of the evidence you've

24   heard fits within these crimes.

25             So let's turn to the fraud crimes.  There are three

1  counts relating to the fraud on FTX's customers——wire fraud on

2  customers, conspiracy to commit wire fraud on customers, and

3  the essence of Counts One and Two is that there was a scheme to

4  defraud FTX's customers by making false statements to get them

5  to deposit their money, and then by misappropriating or

6  embezzling or stealing that money that had been entrusted to

7  the defendant and his company, the defendant knowingly and

8  wilfully participated in that fraud, and that there were

9  interstate wires that were used as part of it.  And that last

10  part just means wires are things like emails, financial

11  transactions that go across states, phone calls.

12        Count Two relates to the same types of conduct but

13  it's a conspiracy charge, and the essence is that the defendant

14  had agreed with at least one other person to commit the wire

15  fraud, okay?

16        So let's talk also about Count Six.  Count Six is the

17  conspiracy to commit commodities fraud charge.  And this is

18  another conspiracy charge, and there are three elements.  And

19  they're up here on the screen.  And they're very similar to the

20  wire fraud elements except for a few distinctions that I'm

21  going to talk about in a few minutes.

22        Here's the objective of the commodities fraud

23  conspiracy, and you'll see there are elements that resemble

24  parts of the wire fraud charge.  Again, Judge Kaplan's going to

25  give detailed instructions on all of this.  You don't need to

1    learn or memorize this now.  But the key is that there was——in

2    connection with the sale of commodities or swaps, the defendant

3    knowingly and wilfully participated in a scheme that involved

4    an artifice of fraud or manipulative device.

5         Now these fraud crimes are what we spent most of the

6    morning talking about, right?  We spent the entire morning

7    talking about the false statements the defendant made.  We

8    talked about the false pretenses he set up by displaying

9    customer balances while simultaneously not actually having that

10   money behind the scenes.  We talked about the relationship of

11   trust he established, how his policy documents indicated he and

12   his company were a trustee of his customers, how they were in a

13   custodial relationship, and how, simultaneously, he was lying

14   about that, how he embezzled and stole that money.

15        And we've talked about how the defendant orchestrated

16   the scheme by convincing customers that they could trust him,

17   about how he made lies, about how he directed people, how he

18   made statements and representations, how he moved the money,

19   how he stole and how he misappropriated.  And we've also talked

20   at length about the overwhelming proof that he knew what he was

21   doing was wrong, that he knew what was happening with customer

22   money, that he had a fraudulent intent, and that he agreed with

23   his co-conspirators.  So we've already gone through all the

24   evidence that establishes that he's guilty of these frauds on

25   customers.

1          And on this last element that we talked about, about

2     the wires, you saw the tweets, you saw the financial

3     transactions, so that's met too.

4          Now on the conspiracy charge, conspiracy to commit

5     commodities fraud, for that charge only, there is an additional

6     element, which is that the crypto involved fit the definition

7     of a commodity.  And the defendant even admitted that before

8     Congress in 2021.

9          There it is right there.  He's admitting that Bitcoin

10    and Ethereum are two tokens covered as commodities under the

11    CFTC definition.  You also heard evidence from Adam Yedidia

12    where he explained that the futures that were sold on FTX were

13    the exchange of risk which resembled what Judge Kaplan will

14    describe to you as a swap.

15         And the other requirement is that some of the

16    conduct——and this is, again, just for the commodities

17    conspiracy——either occurred in or affected the United States.

18    And Judge Kaplan will give detailed instructions on that, and

19    follow his instructions.  And what I'll tell you now is that

20    there's plenty of evidence that in connection with the

21    commodities fraud charge, Alameda was in the United States.

22    That's where its bank accounts were; it itself was incorporated

23    there; North Dimension, through which the defendant sold

24    customer fiat deposits, that was set up in the United States

25    and had a bank account in California; the defendant made false

1    statements in the United States when he was physically located

2    in Washington, DC; there were customers like BlockFi and

3    Sculptor of the United States.  So this requirement is easily

4    met.

5            Counts Three and Four charge the defendant with wire

6    fraud on lenders and conspiracy to commit wire fraud on

7    lenders.  And the essence of Counts Three and Four is that the

8    defendant schemed and conspired to make material false

9    representations to Alameda's lenders, and that he knowingly and

10   wilfully participated in that.  And again, they used the wires.

11   And on these counts, the evidence is straightforward, and it's

12   overwhelming.  I'm not going to spend much time on it because

13   the key document here is that alternative spreadsheet,

14   Government Exhibit 44.  That's the spreadsheet that laid out

15   the real balance sheet and the alternative balance sheets.  And

16   you've heard and you've seen all the evidence that that fake

17   balance sheet was sent to BlockFi and to Genesis and then

18   afterwards they loaned new money.  And you heard testimony from

19   the CEO of BlockFi, who told you that those types of

20   representations mattered to them, that they would have not made

21   the same lending decisions had they known the truth, had they

22   known there was a massive borrow from FTX customers, or had

23   they known that the balance of assets and liabilities were

24   different, or had they known that there were these undisclosed

25   loans to executives.  So that's all evidence of why the

defendant participated in and conspired to participate in a
scheme to defraud Alameda's lenders.  And the evidence on that
is overwhelming.

Let's talk about Count Five.  This is the securities
fraud on FTX's investors.  And this is another conspiracy
charge.  And there are three elements——that there existed a
conspiracy to commit securities fraud; that the defendant
joined the conspiracy; and that one member of the conspiracy
committed an overt act.

And I expect Judge Kaplan is going to tell you that
the crime of securities fraud, which now there's a summary on
the screen, the essence of it is that there's a scheme to
defraud or make false statements in connection with the selling
of a security——so here, FTX's stock——and that the defendant
knowingly and wilfully engaged in that scheme or conspired to
engage in that scheme.  And again, this involved the interstate
or foreign commerce.

So what are we talking about here for Count Five?
Again, the evidence is overwhelming.  And the primary evidence
here is very similar to the other counts.  We heard from
investors like Matt Huang, who was the first week of the trial,
one of the first witnesses; and Robert Boroujerdi, who was one
of the later witnesses, I think the last witness in the
government's case——second to last witness.  The last witness
before the break.  They testified about how the representations

about—and the statements they received about how customer

funds were treated, how they were used, were all important to

them, and if they had known the truth, they never would have

invested.

But the fraud on FTX's investors is not just limited

to those types of false statements.  There's also other frauds

that were made on FTX's investors, and so I just want to

highlight those for you.  And you've heard evidence about this.

And one is, for both those investors, you heard that

they were very interested in the relationship with Alameda,

right?  And this is separate and apart from how the customer

funds were used.  They were interested in whether there was a

conflict of interest between Alameda and FTX or the defendant

in being involved with both those companies.  And the defendant

told those investors time and time again that there was no

conflict of interest, that Alameda was treated just like

everyone else, that they were separate, and those are lies that

mattered to those investors.  And that alone is enough to

convict the defendant of securities fraud, or conspiracy to

commit securities fraud.  You could even convict him of

conspiracy to commit securities fraud without deciding the

question of whether he knowingly used the customer money.  And

of course that evidence is overwhelming, but I make this point

because there were so many lies to those investors.

Here's another one.  He lied about the revenue

information.  Do you remember this document?  And it came up on
cross-examination.  There was a point in time in 2021 where the
defendant wanted the revenues to be over a billion dollars for
FTX.  And so he had a conversation with Nishad Singh, and they
agreed on putting in some revenue, some money, some income, for
something called Serum staking, right?  And this was of course
at the end of 2021, so it's kind of——it's like the last day of
the year.  It's too late to earn a bunch of money.  And so they
just add these numbers to their balance sheets, to the FTX stat
sheets, and we've got——we saw that.  That was Government
Exhibit 51.  So they add this fake revenue, and it's backdated.
And Nishad Singh admitted to that.  But the defendant
initially, when he testified, he said, oh, I wasn't involved in
that, I didn't know about that, but then on cross-examination,
he was confronted with the exhibit you're looking at right
here, Government Exhibit 323.  And this is the key.  This is
signed by the defendant, right?  And it's dated in January of
2021.  So the deal goes down, the backdated transaction, at the
end of 2021, but he signs this document dated January 2021, and
he admitted that on the stand.  And what that tells you is he
agreed to this backdating, he agreed to trick his investors,
and those investors testified that if they knew the revenue
numbers or the expenses numbers were different, they wouldn't
have invested.  That would have mattered for their
decision-making.  They of course would not have invested if

1    they had known that the defendant was lying to them, that he

2    was backdating transactions, that he was coming up with phony

3    documents.

4              There were some other points you heard about the

5    investors.  The defendant fraudulently concealed the fact that

6    they were shifting some of the losses to Alameda.  He concealed

7    the fact that the FTX insurance fund wasn't so big.  You heard

8    testimony early in the case from Gary Wang about how in fact

9    that FTX insurance fund number was a made-up number.  They

10   literally just had this random number generator that they used

11   to come up with a fake number for the insurance fund so they

12   could project that out.  And that was the same information they

13   were giving to their investors, when they're saying this is a

14   safe system.  So the lies to the investors are pervasive, they

15   mattered to them, they invested, and they lost all their money,

16   and it's very straightforward, and the evidence is

17   overwhelming.

18             One last point on this.  You remember he moved FTX

19   investor money from FTX to Alameda.  And we saw one of the

20   things they spent that money on; that was on real estate.  And

21   so this is Government Exhibit 1023, and it shows you all the

22   investors who had their money moved over from FTX, which they

23   thought they were investing in, to the Alameda slush fund.  And

24   so he duped investors by lying about this too.  And that's

25   another reason to find him guilty of investor fraud.

1          Let's talk about the last count, Count Seven,

2    conspiracy to commit money laundering.  As I expect you'll hear

3    from Judge Kaplan, there are two ways to commit money

4    laundering.  The first way is in essence to engage in a

5    financial transaction that is designed to conceal a source or

6    the nature or the ownership of the money that came from that

7    wire fraud the defendant engaged in.  And the other way is by

8    doing a financial transaction over $10,000 that involves the

9    money from the wire fraud.  And you've got both of those here.

10   And you're going to have to be unanimous on at least one of

11   them, but he can be found guilty if you find unanimously that

12   he is guilty of either of them.  And he certainly did that

13   here.  And I'm not going to spend a lot of time on that because

14   we've already this morning walked through dozens of

15   transactions in which the defendant moved money from Alameda's

16   bank accounts that had customer money to another bank account

17   and to another bank account, and to another bank account, and

18   to another bank account, and they did it for those donations

19   that they were running through Nishad Singh and Ryan Salame,

20   they did it for the investor—for the investments, where they

21   ran it through a bunch of bank accounts, and so the evidence on

22   this is very straightforward.

23          And keep in mind, I'm not going to go through all

24   Professor Easton's charts, but they're numbered Government

25   Exhibits 1001-1051.  That's the full range.  And so if you want

1  to look at all his tracing, his analysis of the balances,

2  that's the range to ask for, 1001-1051.  They all show that the

3  defendant stole money and moved money, and engaged in money

4  laundering to conceal the source of the funds.

5          There's one last requirement which here is called

6  venue.  And that just means that acts in furtherance of the

7  crimes need to have taken place in the Southern District of New

8  York, which includes Manhattan.  And there was plenty of that

9  in this case.  FTX processed wires through Signature Bank,

10  which was located in Manhattan.  So is ED&F Man, where those

11  Robinhood shares were purchased.  Tareq Morad, who was one of

12  the customers who testified in this case, he told you that the

13  wire to fund the accounts was processed through a Wells Fargo

14  bank in New York.  BlockFi and Genesis, which are both lenders

15  in the case of BlockFi, which is also a customer, are in New

16  York.  Zac Prince, the CEO of BlockFi, said he got those

17  balance sheets while he was in Manhattan.  And customers and

18  investors like Third Point and Sculptor are based in Manhattan.

19  And finally, you know from Richard Busick, who was the FBI

20  Agent who did the cellular tower analysis, he told you that the

21  defendant was all over Manhattan doing meetings with investors,

22  acts in furtherance of his crimes.  And that analysis is

23  Government Exhibit 1080.  So venue has been met.

24          Those are the crimes the defendant is charged with,

25  and the evidence is overwhelming.

1        And so in our final minutes together, what I want to

2   talk about are some of the defenses you've heard in this case.

3   And like I said, the defense didn't need to make any arguments.

4   We have the burden, and we embrace that.  But when they do make

5   arguments, you should scrutinize them.  And I want to focus on

6   just three arguments that have come up in this case.

7        Here they are: the argument that the defendant acted

8   in good faith; the argument that he thought it would all work

9   out in the end; and lastly, this argument that this was somehow

10  margin lending.

11       And so starting with the first argument, I expect

12  Judge Kaplan will tell you that good faith is when someone

13  honestly believes in the truth of what they're saying or

14  honestly believes the victims were not being deprived of

15  property.  And that's not what happened here.  We spent this

16  morning talking about all the reasons you know the defendant

17  knew what he was doing was wrong, and those are all reasons why

18  the defendant wasn't acting in good faith.

19       Here's another reason.  We've seen this chart before.

20  This is Government Exhibit 1083.  The defendant used Signal.

21  Now of course there's nothing wrong with texting and nothing

22  wrong with encrypted apps.  But what the defendant insisted on

23  was auto-delete.  He insisted that their Signal chats be

24  deleted.  And I expect Judge Kaplan will tell you that if you

25  find that the defendant deleted communications, you can infer

1    that he believed he was guilty, that he didn't have good faith.

2    And so how do you know that was his purpose here?  Well, Adam

3    Yedidia testified that when the defendant began insisting that

4    people use Signal and delete messages, he said it was "all

5    downside for the messages to be kept around.  And if regulators

6    somehow found out, found something they didn't like in those

7    messages, that could be bad for the company."  And the result

8    was that when FTX collapsed and people were asking questions,

9    there were no Signal messages before November, and that made it

10   a lot easier for the defendant to claim that he had no idea

11   what happened.  And so this is important.  It's in some ways a

12   small point, but in other ways it's very significant.  He knew

13   what he was doing was wrong.  He envisioned a day like today.

14   He knew that some day the regulators would see something they

15   didn't like.  What he means is they would see something that

16   was incriminating.  And so he had in mind a courthouse, a

17   courtroom like today, and he didn't want it to be like that so

18   he demanded that the messages be set to auto-delete.  And of

19   course he couldn't delete everything, but that was the aim

20   here, and that tells you about his intent and that it wasn't

21   good faith.

22           And you also heard about coded language he used.

23   Ellison told you the defendant would get upset when they used

24   explicit words, so she said things like "FTX borrows" or "the

25   thing," instead of saying things like FTX customer funds.

1              And finally, on this topic of good faith, I want to

2    talk about one conversation the defendant had with Can Sun, who

3    was one of FTX's lawyers, as FTX was collapsing.

4              In FTX's final days, after one potential investor

5    asked the defendant for "a legal justification as to why the

6    funds were missing, and were at Alameda," the defendant asked

7    Can Sun to come up with legal justifications.  And this

8    testimony by Can Sun all begins around page 1959 of the

9    transcript.  Now importantly, at this point the defendant

10   didn't point to any legal justifications for taking the money.

11   He had none.  When Sun asked whether the defendant

12   identified──when Sun was asked whether the defendant had

13   identified any justifications that he was aware of, the answer

14   was no.  And that shows you──this is an important point.  The

15   answer "No" is important because it shows you the defendant was

16   not acting in good faith.  He didn't have a justification at

17   the time for why he honestly thought this was okay.  He posed

18   the question to Sun.  He didn't say, I think I'm allowed to use

19   this customer money, can you please confirm this for me; he

20   said quite the opposite.  He didn't provide any justification.

21   And so then what happens next?

22             Can Sun takes a look at the terms of service and does

23   some other research around the company, and then goes on a walk

24   with the defendant, and during that walk, here's what Can Sun

25   tells the defendant.  He says there was no justification for

1  the funds being missing and taken by Alameda.  He says there

2  were theoretical arguments, but none of them were supported by

3  the facts.  And what's important about this conversation is

4  what happened next.  It's the defendant's reaction is what

5  particularly matters here.  And so he tells——Sun tells the

6  defendant that while there are some other crypto exchanges that

7  do not make it clear what is the relationship between a user

8  when they deposit funds on the exchange and the exchange,

9  that's not feasible for us because of our terms of service.

10  They make it very clear that when a user deposits assets onto

11  the exchange, those assets continue to belong to the user.  So

12  in other words, Sun is telling him Alameda cannot use customer

13  money.  And then, like I said, what's important is how the

14  defendant responds, because it tells you everything about his

15  good faith or lack of good faith here today.  The defendant

16  doesn't fight him.  He agrees with Can Sun.  He says——and

17  here's the testimony——"he acknowledged."  He "basically said

18  something like, got it."  He "wasn't surprised at all."  If the

19  defendant actually believed that he was allowed to use customer

20  money, as he claimed when he took the witness stand, why didn't

21  he say that back in 2022?  In this private conversation back in

22  2022, why didn't he say what he said up on that witness stand?

23  He didn't direct Can Sun to some part of the terms of service.

24  He just acknowledged Sun's conclusion and didn't seem

25  surprised.  And that tells you he wasn't acting in an honest

1    belief or in a good faith.

2           There's another part of this conversation that matters

3    and tells you something about the defendant not acting in good

4    faith.  And that's that Can Sun told the defendant that he

5    considered, as one of the theoretical justifications, whether,

6    under Section 16 of the terms of service, which concerned

7    margin trading, whether FTX could have theoretically argued

8    that it could take the customer funds.  So that was another

9    theoretical justification that Can Sun raised with the

10   defendant.  And Sun told the defendant that he asked Nishad and

11   Ramnik Arora, another employee, to pull some numbers, and those

12   showed that this theoretical justification was not supported by

13   the facts.  And how did the defendant respond?  Again, this is

14   the key part for knowing about his intent.  He acknowledged.

15   "He said, yup, yup.  No pushback."  By the way, do you notice

16   how Can Sun's answer resembled exactly the way the defendant

17   answered?  "He said, yup, yup.  No pushback."  This tells you

18   that the same time the defendant didn't think this was part of

19   the terms, at this time the defendant did not think this part

20   of the terms of service allowed him to use customer money.  And

21   that's important, not just for his good faith or lack thereof,

22   but it's important because of what happens next.

23          After FTX declared bankruptcy, the defendant did

24   interviews.  You heard about that during his testimony.  And

25   one of them was on *Good Morning America* with George

1    Stephanopoulos.  And during the interview the defendant is

2    confronted with the exact same terms of service that he spoke

3    to Can Sun about in that private meeting.  And Stephanopoulos

4    presses him.  He says, "If Alameda is borrowing the money that

5    belongs to FTX depositors, that's a bright red line, isn't it?"

6    And Stephanopoulos is gesturing to the terms of service.  It

7    says that "digital assets may not be loaned out to FTX.  They

8    can't be loaned out."  So Stephanopoulos confronts him with

9    this.

10            And the defendant takes a long pause.  And then he

11   gives a false excuse.  He says, "There existed a borrow lending

12   facility on FTX, and I think that's probably covered in the

13   terms of service."  So the defendant gives Stephanopoulos, on

14   television, the very justification he had discussed with Sun as

15   not being a theoretical justification that worked.  And this is

16   a false excuse.  And I expect Judge Kaplan will tell you

17   tomorrow that if a defendant gives a false excuse or a false

18   exculpatory in order to divert——in order to divert suspicion

19   from himself, you may consider that as evidence that he

20   believed he was guilty.  So this is another reason you know

21   that the defendant was not acting in good faith, because he

22   thought he was guilty, and that's why he lied and gave a

23   justification he knew wasn't true on television before he was

24   charged with a crime.

25            There's another defense I want to touch on just very

1    briefly, and this is the defense that the defendant has brought

2    up again and again, that he just got unlucky.  When he took the

3    witness stand, he blamed everyone and everything.  He claimed

4    the problem wasn't from—that they didn't hedge right, that

5    they had bad luck, that FTT prices dropped, that the

6    investments happened to be illiquid, and the defendant claimed

7    that with just a little more time, everything could have worked

8    out, and they could have processed some more withdrawals.  And

9    I expect Judge Kaplan is going to tell you that a belief by a

10   defendant, even an honest belief, that ultimately everything

11   would work out fine or that victims wouldn't ultimately lose

12   money, does not mean the defendant acted in good faith.  The

13   crime here was when the defendant took the money, when he made

14   false statements to get that money.  What ended up happening

15   later on doesn't make him not guilty of the crime.

16           The last argument I want to talk about today is this

17   idea that it was all margin lending.  And with every hour the

18   defendant spent on the witness stand, we saw this argument get

19   more and more absurd.  Suddenly, any withdrawal off the

20   exchange, to repay any sort of third-party debt or expense, or

21   to buy muffins, this was a margin trade, according to the

22   defendant.  And according to the defense opening, the theory, I

23   guess, is that Alameda was also doing these margin loans and

24   that somehow, under the terms of service, they could just rip

25   all the customers' money because everyone was doing margin

1    trading.  And this was an argument that was put out by the

2    defendant after he committed his crimes, after he was arrested.

3    It isn't supported by any facts.  You should reject it.

4         Here's what really happened.  First things first.  FTX

5    customers did not automatically have their money in the spot

6    margin loan program.  It wasn't free money for the defendant to

7    take or borrow.  Customers had to opt in.  They had to agree.

8    They had to enable margin trading.  That's what we're looking

9    at on the screen.  So if a customer didn't enable spot margin

10   trading, their money couldn't be borrowed.  One example is the

11   very first witness you heard in the case.  He testified that he

12   never enabled spot margin trading.  His money wasn't in the

13   program.  It shouldn't have been taken.

14        And even after a customer opted into the spot margin

15   trading, their money still isn't in the program.  It's not just

16   there just because you turned on the opt-in.  You have to then

17   take another step and lend it out.  And that's what this shows.

18   Customers had to actually click the lend.

19        Now the defendant called this witness Mr. Pimbley, and

20   he showed some charts of the balances of people who had just

21   opted in.  But that didn't represent what was actually going

22   on.  As he conceded during cross-examination, his charts don't

23   show how much money customers actually agreed to lend out.  It

24   just shows the balances of the customers who had opted in, not

25   what they actually lent.  The amount that was actually

 1    available to be borrowed, the amount that actually had been

 2    lent, was a lot smaller.  And we can see that from one of

 3    Professor Easton's charts.

 4         Here's a third problem with the defendant.  The main

 5    account that Alameda was borrowing through did not even have

 6    spot margin enabled.  So this whole idea that, oh, they're just

 7    borrowing through the spot margin program, in fact, notice how

 8    all of Alameda's accounts with the "Allow Negative" set were

 9    not enabled for the spot margin borrowing.  That means none of

10    the accounts that match up to the withdrawals were ones that

11    had spot margin trading.  Maybe Alameda had other accounts that

12    had spot margin trading, but the key is these accounts they

13    used to make those gigantic withdrawals of customer money,

14    those were not part of the spot margin system.

15         And here's some proof of that.  Government

16    Exhibit 1002.  It tells you that the giant negative balance is

17    the one that's coming out of these "Allow Negative" accounts,

18    from 2 to 12 billion negative.  And that's not any borrowing in

19    the spot margin program.

20         And by the way, we're just talking about stealing

21    money off the exchange right now.  Of course we talked this

22    morning about stealing customer money through fiat deposits.

23    And there was tons of spending of customer money on

24    investments——K5, the crypto mining company, the AI company, the

25    donations, the real estate, that all was just coming out of

1    bank accounts.  And that is just straight embezzlement.  That

2    is theft.  That is not borrowing on the spot margin program.

3    That was off-the-exchange borrowing.

4            Here's the fourth problem I want to highlight with

5    this defense.  Professor Easton told you there was not enough

6    money in the spot margin program to explain all Alameda's

7    borrowing.  What this shows is that from June to November 2022,

8    Alameda had taken between 8 and 12 billion, when there was at

9    most 4 billion in the margin lending program.  This is

10   critical.  It is literally, mathematically impossible that they

11   could have taken the money from the borrow/lend or the spot

12   margin program.  It's impossible, mathematically, that this

13   could have been a loan, right?  And this is the key distinction

14   I was talking about.  You have to look at what customers were

15   actually lending out, what was actually available to be

16   borrowed.  That's the key.  It's not—the number is not the

17   balances.  It's what was actually being lent out, what was

18   available to be borrowed.  And these are in Government

19   Exhibits 1010 and 1011.

20           Finally, there's a real problem with the claim that

21   defense counsel made in his opening that FTX could somehow claw

22   back money from unwitting customers who were doing margin

23   loans.  Here's the piece of the terms of service they put up in

24   their opening statement.

25           Nishad Singh testified, after this argument emerged,

1    he testified that clawbacks weren't even implemented.  The code

2    could never cause a clawback.  So how about this.  This whole

3    argument of, oh, well, there's a scenario where you can claw

4    back money because, you know, we socialized the losses,

5    fiction.  They actually hadn't even built the system.  It was

6    not in the code.  This was not a real capability.  This was

7    just, well, we'll get to it, we'll tell you what this is.

8            What Can Sun said, who was one of the authors of the

9    terms of service, he was asked about this, and what I want to

10   highlight is what he said about it.  He said he talked about

11   this——he had not discussed the specific provision with Sam,

12   right, but when he talked with Sam about clawbacks, the

13   defendant always made it clear that FTX does not claw back

14   money from users, right?  So we have this argument now that's

15   totally contrary to the defendant's prior statements.  And

16   here's the important point.  At the end, "I just asked you,

17   what's the reason this is in there?  If it's not——if they

18   couldn't even do it, what's the reason it's in there?"  Can Sun

19   said, "Well, in fact, this provision was drafted mostly for

20   disclaimer purposes, nothing more."

21           I expect Judge Kaplan will tell you tomorrow that a

22   defendant cannot disclaim away his false statements and lies by

23   putting a provision in a terms of service.  And keep in mind

24   these terms of service, they weren't even adopted until May of

25   2022, which means there were thousands of customers who never

1    even agreed to this when they joined FTX.

2              Here's my last thought on this margin defense.

3              When the defendant was asked directly yesterday under

4    cross-examination whether he was saying the big hole in

5    customer funds in November was the result of a clawback, he

6    sort of fumbled for a second.  And then he said he wouldn't

7    describe it that way.  He conceded that's not actually what

8    happened.  This is a distraction.  It's something manufactured

9    after the fact.  It's something that he came up with after

10   everything came crashing down.  He came up with it for a day

11   like today, in a courthouse, and you should reject it.

12             You've all paid close, careful attention.  Let me

13   leave you with this thought.  This was a fraud that occurred on

14   a massive scale.  Thousands of people lost billions of dollars.

15   Everyday people lost savings, companies went bankrupt, all

16   because of this defendant's fraud, because he wanted more money

17   to do whatever he wanted with.  So when you go back to the jury

18   room, follow the truth.  Let the evidence prevail over his

19   storytelling.  The defendant, he lied and he stole from his

20   customers; he lied and he stole from his lenders; he lied and

21   he stole from his investors.  He's guilty of wire fraud; he's

22   guilty of securities fraud; he's guilty of commodities fraud;

23   and he's guilty of money laundering.  Do justice.  Reach the

24   only verdict consistent with the evidence, with the law, and

25   with the truth, that the defendant is overwhelmingly, beyond

1     any reasonable doubt, guilty.

2             THE COURT:  Thank you.

3             Mr. Cohen.

4             MR. COHEN:  Thank you, your Honor.

5             THE COURT:  And somewhere in the next 45 minutes, if

6     you can reach a point that's convenient to you to stop for the

7     afternoon break.  And I'll also say to the jury, depending on

8     how things are going, I may ask you to stay a little late this

9     evening just to allow Mr. Cohen to finish.

10            MR. COHEN:  Ladies and gentlemen, I want to start by

11    thanking you again for your service in this case.  We saw that

12    you took your duties as jurors seriously, and you listened very

13    hard to the evidence as it came in.  You've all done an

14    excellent job listening to a case about many foreign terms,

15    about crypto and jargon like margin and cross-margining and

16    Bitcoin and so on, in what may have been an entirely new

17    industry for you.  And we're very grateful for you for giving

18    us the time from your lives and your service on this jury and

19    for keeping an open mind.

20            You know, there have been times during this past four

21    weeks when I have wondered what case it is we're actually

22    trying here.  What do I mean by that?  Time and again——and we

23    just heard it this morning——the government has sought to turn

24    Sam into some sort of villain, some sort of monster.  They

25    spent an extraordinary amount of time on this.  It's both wrong

 1   and unfair, and I hope and believe that you have seen that it's

 2   simply not true, and, more importantly, it's not a basis on

 3   which to decide this case, which is about specific charges in

 4   an indictment and specific counts.  The government's core case

 5   is premised on——it's based on a false premise, which their own

 6   witnesses have rejected, that from the very beginning, from

 7   jump, FTX was a fraudulent enterprise established by Sam and

 8   Gary, Caroline and Nishad, to intentionally steal customer

 9   funds from the very earliest days, and that the events of June

10   through November of 2022 were simply a continuation of that

11   fraud.  And as we'll get into, that's not what the evidence

12   showed here.

13        And that's why we submit that the government keeps

14   portraying Sam as this villain.  According to the government,

15   everything Sam ever touched and said was fraudulent.

16        Can we pull up the slide.

17        So here we got evidence about Sam's hair, his clothes,

18   testimony about his sex life, photos of him looking awkward

19   next to celebrities, photos of him sleeping on a private jet;

20   photos of him with big hair, photos of him with messy hair;

21   photos of him holding a deck of playing cards.  They started

22   off, first sentence, second sentence of the opening statement,

23   what were we talking about, charges in the indictment?  No, we

24   were talking about how he lived in a $30 million apartment and

25   flew on private planes and met with Tom Brady and Bill Clinton.

 1              And the list goes on.  In opening, Mr. Rehn gave us a

 2    movie opening, where he pointed at Sam, "that man, that man."

 3    We just saw that again in summation, like you'd see in a movie.

 4    Every witness who had been his friend pointed to him from the

 5    stand, even though we stood up and stipulated, of course it's

 6    Sam.  He's here.  Why?  Why?  For the effect.  Why does the

 7    government keep doing this?  Is it because they want to make

 8    him into someone you'll dislike, someone you won't approve of

 9    and therefore you'll vote to convict him, rather than making

10    the case about whether the facts do or do not satisfy their

11    burden of proof?  You know, Sam's appearance has nothing to do

12    with how the FTX exchange worked or with Alameda's trading or

13    asset values, and his appearance and his romantic relationships

14    have nothing to do with whether he's guilty of the specific

15    counts charged in the indictment.

16              And let us say this, just to get it out of the way.

17    We'll agree that there was a time when Sam was probably the

18    worst-dressed CEO in the world, and had the worst haircut.  And

19    we'll agree that the evidence in this case showed that Sam

20    would talk to just about anyone——any TV reporter, any

21    journalist, any blogger, you name it.  And that made his life

22    messy and made things messy as well, but that's not a crime.

23    The reason we focused——the reason the government focused much

24    of its case on Sam's appearance is that every movie needs a

25    villain.  And let's face it, an awkward high school math nerd

1  doesn't look particularly villainous, so what did they do?

2  They wrote him into this movie as a villain, a bad guy,

3  directing others, who apparently had no free will of their own,

4  to steal billions of dollars.  They invited you to overlook the

5  absence of proof that Sam actually committed any of the crimes

6  charged in the indictment, and they relied on that evidence.

7  Just as in a movie, the cooperating witnesses——and there were

8  five of them, five cooperating witnesses, Gary, Caroline,

9  Nishad, Can Sun, who had a non-prosecution agreement, and Adam

10  Yedidia, who had immunity, in short, the only five people who

11  had direct contact with Sam on the key facts alleged in the

12  case——they went up to the stand and, on cue, over and over and

13  over again, they said, "Sam told me to do it."  Even as to

14  simple things which we would normally think they would admit as

15  of their own free will.

16         And that depiction of him made no sense in the real

17  world, especially coming from these witnesses who were his

18  closest friends, who knew him for years, who had gone to camp

19  with him, to college, who had lived together with him, who'd

20  worked with him for years, starting two businesses, who

21  traveled with him and moved all over the world with him.

22  That's a lot to do with someone you're now coming forward and

23  saying is so terrible.

24         And what the government kept leaving out of its movie

25  is the "why."  Why did FTX develop the way it did?  Why did Sam

make the decisions he did?  And what was he thinking at the

time when he was CEO?  And in doing so, in not focusing on the

"why," they didn't fully address whether they carried their

burden of showing that Sam acted with criminal intent.

And I'm going to go through the evidence that was

presented at the trial, but before I do that, let me just give

you a couple of quick examples on this point.

If you can put up the last slide.

The first slide.  The first slide.

Okay.  Look at the photo on the left.  And the

government exhibits, numbers are on the slide.  This is the one

they put up of him shuffling the deck of cards.  Of course they

never asked any of their witnesses what the significance of it

was.  They were just trying to imply that he's a gambler.  One

of the themes of the case is Sam takes too many risks.  He

takes more risks than the other witnesses.  Well, we asked the

"why" question, and it turns out that he'd been shuffling cards

to control his natural fidgeting, and he was doing this for

years.  He didn't even play poker.  And then today we heard on

the government's summation, oh, and during his testimony he

looked away.  Really?  What does that show?

The government asked its witnesses about the change to

the code base.  We'll talk about that in some detail in a

moment.  But they never ask why the changes were made at the

time.  But why?  We did.  And what you heard not just from Sam

1  but from the government's witnesses, that the code changes were

2  put in place as responses to specific events.  And they were

3  put in for valid business reasons, not to carry out some grand

4  fraudulent scheme.

5       Another quick example.  The government raised the fact

6  with you that because FTX at first did not have its own bank

7  accounts that Alameda received deposits.  Alameda did and then

8  this other account in North Dimension.  And in its opening

9  statement, the government told you that in and of itself was a

10  crime, part of the crime.  But then what did their witness say?

11  It wasn't a crime.  We understood why they had to do it.  We

12  didn't have bank accounts for FTX so it was fine to receive the

13  funds in the account.

14       And because they don't focus on the "why," the

15  government failed to mention in its summation that none of the

16  witnesses at this trial testified that Sam told them or

17  directed them to violate the law or said or did anything that

18  showed he thought he was violating the law.  Back in 2019, Sam

19  didn't say to Gary, hey, we just created this successful

20  company Alameda, I've got a great idea, let's set up FTX so we

21  can use our secret company Alameda——wasn't secret——to steal

22  customer money.  No witness came forward and said that Sam told

23  them to steal customer money or commit crimes.

24       Now in contrast, what we've been trying to present to

25  you, and I'll discuss today, is more of a real-world

perspective.  And in the real world, unlike the movie world,

things can get messy.  We know that real life doesn't unfold

like it does in the movies.  In the real world, people misjudge

things.  They make mistakes.  They hesitate.  They don't plan

for the unexpected.  They make good and bad business decisions,

and they make mistakes that later on they wish they could have

fixed.  And Sam explained what really happened and why things

unfolded the way they did on his watch.  They may not fit the

government's movie of making Sam into a villain, but that's

what this case comes down to—what was his intent at the time

of the events in this case.

　　　　　　And this case breaks down roughly into two periods,

two time periods.  From 2019 to 2021, the events in this case,

the evidence in this case don't show Sam acting with criminal

intent.  The evidence doesn't support that.  In fact, none of

the cooperating witnesses—not Gary, not Caroline, not Nishad,

not the others—acted during this period like they thought they

were doing anything wrong, like there was any business problem

at all, let alone wrongdoing.  They all were making millions of

dollars.  None of them left.  None of them resigned.  None of

them notified the authorities or called attorneys, or

confronted Sam about what they're now saying were improper

practices.  None of that.  Because they didn't think they were

doing anything wrong.  Instead, up until June 2022, everyone

thought they were operating one of the most successful crypto

1    exchanges in the world, which they had built together over the

2    past few years.  They thought they'd come up with a better

3    mousetrap for a crypto exchange and customers would be joining

4    in the millions.

5         Now the government suggested during the evidence that

6    all this growth into a company of this size and complexity was

7    because Sam sent out a few fraudulent tweets and got customers

8    to put their funds on the exchange.

9         Is that really what the evidence showed?  Rather, the

10   business grew because they all worked very hard together.  The

11   business grew because they had excellent products.  And it was

12   an excellent business that ultimately grew and had had hundreds

13   of employees, licenses in many countries throughout the world,

14   and had millions in daily revenue.  We asked why these things

15   happened the way they did during this period, and the

16   government doesn't want to focus on that.

17        As for the next period, second period of the case,

18   that's the period we all spent a lot of time on in this trial,

19   from June to November of 2022.  And here we would submit to you

20   that what we have with the government is really a tale of two

21   different cases.  We all know by now that May and June of that

22   year is when what's been called the "crypto winter" began.

23   Very simply, if you were in crypto at that point in time, all

24   you had to do was look out your window and you were going to

25   see stress and crisis.  Businesses failing, businesses going

1   under.

2          And this was the same time that the fiat@ coding bug

3   was discovered and became understood by FTX and Alameda's

4   leadership, and we'll cover that in a bit.  And it was also the

5   first time that it started to become clear that Alameda might

6   have been borrowing not only from the info@ account, the main

7   account, the one that Sam observed and checked, but also from

8   customer deposits via the fiat@ account.  The government did

9   not establish that Sam knew about these issues until the fall

10  of 2022, because he didn't.  In the period from June to

11  November 2022 is when the government——when the government's

12  witnesses we heard from had a different take on what was

13  happening than Sam.  In fact, they had a different take on what

14  was happening from each other.  Between Gary, Caroline, Nishad,

15  and Sam, everyone had a different view of when they first

16  understood the meaning, the impact of this fiat liability, and

17  what their view was and whether Alameda could have the

18  liabilities as they came due.  Sam for his part looked at the

19  situation in the fall of 2022 as a liquidity problem, not a

20  solvency problem.

21          And just to take up quickly something Mr. Roos said at

22  the end of his summation, this wasn't Sam saying, oh, don't

23  worry, I just thought everything would work out okay.  No.  At

24  the time, as events unfolded, Sam perceived this as a liquidity

25  problem, whether Alameda could pay its liabilities as they came

1    due, and as they were due, and as the period unfolded, in

2    hindsight, he may not have been perfect.  I don't think any of

3    them were.  He may have hesitated.  He may have moved too

4    slowly.  But he always thought that Alameda had sufficient

5    assets on the exchange and off the exchange to cover all of its

6    liabilities.

7            Now the government made a big deal about that.  Well,

8    you're not supposed to consider assets off the exchange.

9    You're only supposed to consider Alameda's assets on the

10   exchange in thinking about whether it could meet its

11   obligations.  But then in the same way they also say Sam owned

12   Alameda, Sam controlled Alameda, Sam knew what Alameda had.

13   Well, if he owned Alameda, he knew what its assets were, both

14   on and off the exchange, and he knew what could be brought to

15   bear if necessary to pay liabilities.  And he also knew that he

16   owned FTX, or was the majority owner of FTX, and it had its own

17   value and its own equity, its own worth that could be used, if

18   necessary, if it came to it, as well as his own personal

19   assets.  And these were differences in opinion, differences in

20   business judgment between Sam and the others about how to value

21   Alameda's assets, what you could consider, what you couldn't

22   consider, and how to act, how to act during the period, which

23   now in this case——and that's why I opened with the comment I

24   made——the government has tried to spin into a crime.  But the

25   question of whether Sam's business judgment was reasonable,

1    even if it later turned out to be mistaken, is not a criminal

2    one.

3              And there's something hanging over everything, ladies

4    and gentlemen, something that Sam mentioned and some of the

5    other witnesses weren't mentioned at all.  FTX did not have a

6    sufficiently built out risk management system, nor did it have

7    a chief risk officer, someone to head up the risk management

8    function.  If it had a chief risk officer, wouldn't she have

9    insisted on fixing the bug when Gary first spotted it, not in

10   2022 but at the end of 2021?  If they'd had a chief risk

11   officer, would it really have taken six more months for

12   Caroline to notice that the bug had grown so large that it was

13   having an $8 billion effect?  If they'd had a chief risk

14   officer, wouldn't she have insisted that the fiat liability

15   issue be handled the minute FTX got its own bank accounts, so

16   the funds didn't sit there and build up in value?

17             And Sam told you during his testimony that FTX sure

18   should have had a better built out risk management department,

19   and he's absolutely right.  But again, systems of poor risk

20   management is not a crime.  Again, bad business judgments are

21   not a crime.

22             We'll walk through the November sequence for you in

23   detail later on.  And let me just——before I turn to the next

24   part of what I have to say, let me just ask, why are we

25   covering this?  We don't have a burden.  We don't have a burden

1   to offer any proof.  We could simply just try to respond to the

2   government's case.  The reason we're doing this, the reason

3   we're showing you what we believe really happened, is to show

4   you there's an alternative way to think about it, fully

5   supported by the proof, and that negates the government's

6   burden.  It means the government has not carried its burden of

7   proof.

8          Now for the next parts of my summation, I'm going to

9   talk about a few things just to orient you.  First, I'm going

10  to talk a little bit about the legal standards you are to

11  consider; then I'm going to go through for you our view of the

12  chronology of what really happened during these key periods;

13  then I'll make some points about the government's case; and

14  finally, I'll have some concluding remarks.

15         Now let me start with the legal standard.  Now I

16  should say——and I agree with Mr. Roos on this——the only person

17  whose word controls on the legal standards is Judge Kaplan.  He

18  will give you the legal instructions.  And you, of course, are

19  bound to do what he says in applying the law.  But we

20  anticipate that he will give you some of the following

21  instructions, and I want to go through them for you.

22         If we could bring up slide 3, please.

23         You've heard about good faith a lot in this case.  At

24  the top you can see good faith is a complete defense to all the

25  charges in the case.  The government bears the burden of

establishing a lack of good faith.  And we expect you will hear

that because an essential element of the crime charged is

intent to defraud, it follows that good faith on the part of a

defendant is a complete defense to the charge of wire fraud.

Good faith is an honest belief by the defendant that his

conduct was not wrongfully intended.  Moreover, a defendant has

no burden to establish a defense of good faith; it remains the

government's burden to prove fraudulent intent and the

consequent lack of good faith beyond a reasonable doubt.

Good faith, as I mentioned, is a complete defense to

all the charges in this case.  Now what does that mean?

If we could go to the next slide.

Here are some things that we submit do not establish,

do not establish a lack of good faith.  If the defendant made

mistakes; if he made bad business decisions; didn't have a risk

management department or a fully built out one; if he delayed

or hesitated; if there were coding and accounting errors; if he

had an honest belief that statements were truthful; or if he

didn't know what fellow executives didn't share with him or

other witnesses were inconsistent.  None of those establish a

lack of good faith, we submit.

If we could move to the next slide.

And all this discussion of good faith is of a piece

with the following:  In a criminal case, the government bears a

heavy burden, which never shifts to the defense.  To convict

1    Sam of any count, the government, you must find beyond a

2    reasonable doubt, including that Sam did not act in good faith

3    and he acted knowingly and wilfully, and your verdict must be

4    unanimous.

5           And the Court will instruct you on what it means to

6    act knowingly and wilfully, and you should follow the Court's

7    instruction.

8           So this burden of proof is very heavy, and is very

9    high.  And that's why the government gets to speak twice.

10   Mr. Roos spoke this morning, I'm going to speak, and then the

11   government gets to speak again.  And your first reaction might

12   have been, why do they get to speak twice?  Well, that's why,

13   because they have the burden of proof.  It never shifts to the

14   defense.  We were not required to do anything.  We didn't have

15   to question a single witness or offer any evidence.  And again,

16   as part of the government's burden, you must be unanimous in

17   order to find Sam guilty of any count.

18           (Continued on next page)

19

20

21

22

23

24

25

1          MR. COHEN:  As you consider the evidence in your

2    deliberations, we ask you to think very carefully about the

3    burden of proof and good faith, and I'll come back to these in

4    the summation.

5          Another point I want to cover with you which I

6    mentioned in opening four weeks ago is that the government

7    can't present its case by arguing about facts in hindsight.

8    The focus must always be on what Sam's intent was at the time,

9    as events are unfolding.

10         That's particularly relevant here, where we all now

11   know there has been a bankruptcy.  We all know what happened on

12   November 11.  There is a famous quote from a book which two

13   characters are discussing bankruptcy.  One had gone into

14   bankruptcy.  One asked the other:  How did you go bankrupt?

15   And he responds:  Gradually.  Then suddenly.

16         That's what happened here.  Remember that, in the

17   summer of 2022, Sam didn't know that November 11 would be their

18   last day, that both companies would file for bankruptcy then.

19   Rather, during this period he believed in good faith he was

20   dealing with a liquidity issue at Alameda, and that if he could

21   convert assets to cash and pay back its obligations to FTX and

22   its customers, he could address it.  In good faith he didn't

23   believe the issue was one of insolvency but of liquidity.

24         And what he didn't know, had no reason to know, was

25   that there wasn't going to be a near future, that with the

1    continuing market crash and other events going on outside the

2    window, by earlier November there would be a run on the

3    exchange and a crash that ended in bankruptcy.  So please keep

4    this in mind when you consider what Sam did in the summer of

5    2022, when you consider what his intent was.

6           And also the test of whether Sam acted in good faith

7    is not whether people suffered losses and looking back wished

8    they never got involved with FTX or Alameda.  For sure, today

9    any customer, any investor, any lender would say that, and we

10   understand that.  We understand why they would be upset they

11   suffered losses.  Sam acknowledged that, and he acknowledged a

12   lot of people suffered losses and got hurt, and he felt

13   terrible about it.

14          But that's not the test.  The test of intention is not

15   whether, looking back, Sam was a good manager, whether FTX took

16   too much risk, whether it did or didn't hedge enough, whether

17   they didn't have a fully built-out risk management function, or

18   whether he didn't act quickly enough.  That's not for a

19   criminal case.  The test is whether the government has carried

20   its heavy burden of proving beyond a reasonable doubt that Sam

21   acted with criminal intent and not in good faith, and it has

22   not.

23          Another thing I want to cover before we turn to the

24   chronology is Sam's own testimony.  Very important.  Now, Sam

25   testified before you in this case.  And as a defendant in a

1    criminal case he had the right not to testify under our

2    Constitution, but he came forward to testify because he wanted

3    to tell you what happened.  And I submit, it's hard to think of

4    a more stressful situation for a person than that.

5         And the government, we submit, was unfair today in how

6    they described it when they described his testimony.  If Sam

7    gave a long answer to a question, they said it was too long.

8    Therefore, you shouldn't rely on it.  If he gave a short answer

9    to a question, they said it was too short and you shouldn't

10   rely on it.  If he gave an answer and he tried to explain it,

11   they said he's being evasive.  Under that standard there was

12   apparently nothing he could say that would satisfy the

13   government's view of him and would make them not regard it as

14   proper.

15        It was a dynamic -- and I am going to talk about that

16   in a moment -- that was set up by the government, and you heard

17   it again today in summation.  It's sort of a heads, I win;

18   tails, I lose dynamic in.  No matter how Sam answered these

19   questions, we are now being told it was not credible.

20        What really happened?  Sam testified, he did his best

21   to tell you what had happened and what he remembered.  And

22   unlikely some of the government's witnesses, he was far from

23   polished.  Remember, all the yups and the yeahs he gave in

24   response to questions.  Remember the times when he had to stop

25   and close his eyes to think about the questions before he

1    answered.  But he was himself.  He was Sam.  He told you when

2    he didn't remember things, when he didn't remember saying

3    things or doing things, even though he had sat here during the

4    trial, and he knew that other witnesses had claimed he did

5    them.  If he was just trying to spin a new -- a lie, as the

6    government said, why would he do that?  He didn't.  If he

7    remembered something, he told you.  If he didn't remember, he

8    told you as well.

9         And he also told you, by the way, that he couldn't

10   remember every single word he had said to every journalist or

11   reporter he had spoken to or everything in any written

12   submission to Congress, and we would submit it would be unfair

13   to require anyone to know that.

14        So when you consider his testimony, as part of your

15   deliberations, we ask that you consider it overall, as a whole,

16   and we submit that he did his best to remember and speak to

17   you, he set out his memory as accurately as he could, and he

18   told you what happened and, critically, what he believed in

19   good faith at the time.

20        Now, let me talk a little bit more about this dynamic

21   we have heard from the government, this sort of heads, I win;

22   tails, you lose dynamic.  They spent a lot of time during the

23   case and today portraying Sam as a villain, as a criminal

24   mastermind.  We heard today that, in addition to all the other

25   adjectives, he was apparently evil, arrogant, so forth.  But

1    then when he did something that perhaps a criminal mastermind

2    wouldn't do, we heard, well, that doesn't matter, it's still

3    wrongful.  It's a different kind of lie, different kind of

4    fraud.

5           An example.  Sam testified before Congress three times

6    and submitted written testimony.  Well, if he is the criminal

7    mastermind the government says he is, why in the world would he

8    go before Congress and subject himself to public questioning

9    when he doesn't have to, when he could be asked just about

10   anything by members of Congress, if the whole idea was that he

11   was running a secret scheme using Alameda to defraud customers.

12   The answer, he wouldn't.

13          Yet the government goes on about this and says, well,

14   no, no.  On this one that's not what we mean.  We mean he is

15   going before congress because -- not because he is trying to

16   hide things from them, because he's so clever, he is spinning a

17   tale where he is going to go an all of congress and tell a

18   series of lies to Congress that will match what he is saying

19   internally.  Does that make any sense?

20          We heard a similar refrain from the government about

21   journalists.  If the idea here was that Alameda -- FTX and

22   Alameda were part of a secret scheme, why in the world would

23   you go out and speak on Good Morning America, in front of

24   millions of people, when you have one of the toughest

25   questioners in the country questioning you and you are there

1   without an attorney, without an entourage, and you don't even

2   know the questions beforehand.  You wouldn't.

3         Another example of this heads, I win; tails, you lose

4   approach to the evidence.  We heard a lot in this case from the

5   government about what I would call risk analysis, and the basic

6   theme was Sam took too much risk.  And I guess that by itself

7   is a crime.  So whenever Sam was contrasted with Gary or Nishad

8   or Caroline or someone else, we were told, look at the risks,

9   look at the risks the other witnesses pointed out, and Sam

10  didn't agree with them.  Sam decided to do something or not to

11  do something.  He took too much risk.  Therefore, he committed

12  a crime.  And we saw that just in today's summation, when

13  Mr. Roos talked about an event at the end of 2021, when Sam was

14  considering whether to make a venture investment, an additional

15  venture investment, and he asked Caroline to do an analysis of

16  this, and he asked her to make certain assumptions.  That's

17  called the 10 percentile scenario document we looked at.

18        Now, given how the government has approached this

19  case, we can be sure if Sam hadn't asked Caroline to do that,

20  we would be hearing today, look how reckless he is.  He

21  considers a new investment of $3 billion and doesn't do any

22  analysis, doesn't ask anyone to do any analysis.

23        Now he asks her to do an analysis, and he also asks

24  her to make very specific assumptions, pretty close to a

25  doomsday scenario, and on those assumptions she recommends

1    don't do it.  He considers it, decides that we are not in

2    doomsday and decides to do it.  Who is right?  Who is wrong?

3    It doesn't matter.  They each had business judgments of whether

4    to take that risk at the time, but Sam is not agreeing with

5    Caroline, happened to be Caroline in that case, but it doesn't

6    mean he was acting with criminal intent.  It meant they had a

7    difference in business judgment.

8           One last example of this heads, I win; tails, you lose

9    formulation.  We heard about September 2022, and I'll get to

10   that in the chronology.  And you will recall one of the events

11   in September 2022 is that Sam sent a message to Gary and Nishad

12   about whether to continue with Alameda in business, and it's

13   the memo that's entitled:  We Came, We Saw, We Researched.  And

14   you heard Sam testify that he was putting it out there to start

15   a conversation about whether they should close Alameda.  And

16   there is a lot of back and forth between Gary, Nishad, and Sam,

17   and later Caroline is added to the conversation, where there is

18   a different channel with her on it, and they ultimately decide

19   not to close Alameda.  If Sam is a criminal mastermind and

20   Alameda is the key to the fraud to stealing customer money, why

21   would he be the one proposing to close it in the first place?

22   Why would he be the one starting this conversation?  Answer:

23   He wouldn't.  Because that's not what he was doing.

24           So with some of those thoughts in mind about how to

25   think about the evidence and how to think about what happened,

1  let me now turn to the first period we have identified, the

2  period from 2019 to 2021.

3  One thing I thought was just absolutely striking in

4  the government's summation today is not one word was mentioned

5  about the business that was built here, the business of

6  Alameda, the business of FTX.  To hear the government tell it,

7  four people got together, decided to steal money using Alameda

8  as a vehicle, and went on and created these businesses, but

9  that's not what the evidence showed here.  The evidence showed

10  that they were legitimate, valid, innovative businesses, and

11  they were legitimate, valid, innovative businesses in a new and

12  changing world, the crypto world.

13  You heard from Sam that he joined the crypto world

14  because it was new and growing rapidly and it offered an

15  opportunity for a math nerd like him.  And you heard from him

16  that because it was new, it was a place where someone who

17  didn't have extensive business experience could start, and you

18  heard how Alameda started.

19  Maybe we could put up the next slide.

20  There is a whole story here of the building of a

21  legitimate business that the government never touched on, and

22  it's relevant because it goes to what Sam's intent was at the

23  time, and it's relevant because it shows how he thought later

24  about things like the code base, which we will talk about.

25  You heard from Sam that he worked at a company called

Jane Street, which I think is undisputed in this case was a

highly regarded trading firm.  He left Jane Street and he

basically wanted to create in Alameda a Jane Street for crypto,

a crypto trading company, and he set out to do that.

And, by the way, one of the ideas he got from working

at Jane Street was that you could fund this company by taking

third-party loans because that's what he had seen at Jane

Street.

So throughout most of the period in question, this

period and later period, Alameda at any given time had 8, 9,

10, $12 billion of third-party loans from companies like

Genesis and BlockFi.  It had capital that it could use later on

to make expenditures.

And then you heard how, in 2018, Sam and Gary started

to build what would become FTX.  The focus was to build a

futures exchange.  That's why they named it FTX, which,

unsurprisingly, was short for futures exchange.

And Sam and Gary saw that the crypto industry didn't

have any sufficiently good exchanges for trading futures on

margin.  Here is Sam's testimony of why he started the

business.  This is not someone setting out to create a fraud.

This is Sam.  We thought we might be able to build the best

product on the market in exchange that would combine the

elements that we thought were best for traditional financial

products with the elements we thought were best for the crypto

1    ecosystem, that it could move the ecosystem forward.

2            So this was not two guys, Sam and Gary, setting out to

3    commit a fraud.  They saw a legitimate, important financial

4    opportunity, and they went for it.

5            Building FTX was an enormous undertaking.  They worked

6    all the time, and they had to build the exchange from scratch.

7    They had no off-the-shelf solution to use, and they were

8    productive and they were innovative.

9            Other exchanges required customers to have separate

10   accounts for each of their cryptocurrencies.  FTX came up with

11   a way to allow customers to hold all their digital assets in

12   one account and buy and sell them seamlessly.

13           FTX introduced cross margining, which we heard a lot

14   about, which essentially meant that customers could trade at

15   the same time across different currencies.  If you owned

16   Bitcoin and you owned Ethereum, you could trade at the same

17   time.  This was another major innovation.

18           Let's focus now on margin, margin trading.

19   Understanding how margin trading worked on FTX is a key, we

20   submit, to understanding what Sam did and, critically, what he

21   thought at the time.  FTX permitted customers to trade futures,

22   it is called a futures exchange, and buy and borrow crypto on

23   margin.

24           What did this mean?  This meant that the way margin

25   trading worked at FTX, customers would borrow other assets

1    posted to the exchange.  These were on the exchange -- these

2    were assets on the exchange posted by other customers.  There

3    was no other place for them to come from.  That means that

4    every customer trading on margin is using and relying on assets

5    posted to the exchange by other customers.  It wasn't that

6    there was just one limited pool that FTX had and that would

7    limit margin trading.  Customers were always borrowing

8    essentially from each other.

9         And at FTX, the way it was set up, margin customers

10   could use the funds they borrowed from the exchange for any

11   purpose.  At the time no one thought this was a problem because

12   the customers who borrowed funds on margin had to post

13   collateral to support their borrowing.  And if a customer's

14   position lost money, which means risk of going down, the

15   collateral could be used to liquidate their position before it

16   went under water.

17        There is nothing wrongful about margin trading.  There

18   is nothing wrongful about saying that in margin trading at

19   times one customer is borrowing from another customer.  That's

20   how it works.

21        And you recall we had testimony from Dr. Pimbley, who

22   did an analysis of the data, and he concluded that 80 percent

23   of the assets on FTX were margined assets used in futures

24   trading.  80 percent are in this margin trading where customers

25   are always borrowing other customers' assets.

1          We can take that down.

2          Now, as FTX developed, Alameda did play some

3    legitimate business roles.  Nothing wrong with that.  I

4    mentioned that in our opening statement and the evidence

5    supported that.

6          To bring it full circle, if we can have the next

7    slide, Alameda had three legitimate business relationships with

8    FTX.  It was a customer on the exchange, which it was permitted

9    to be.  It was a market maker, and that was critical because

10   when FTX began, it was a new exchange.  It didn't have any

11   other market makers.  If it couldn't provide liquidity to its

12   customers, it wouldn't have grown at all.  So Alameda stepped

13   in and performed that role.  As well, Alameda served as a

14   payment agent.  We have heard this in the evidence many times

15   already, that at the beginning FTX couldn't open its open bank

16   accounts and that funds were received in the Alameda account

17   and the North Dimension account or the North Dimension account,

18   and the government's own witnesses told you there was nothing

19   wrong with setting that up.

20          If we could look at the next slide.

21          Here is what a customer saw.  If you want to open an

22   account with FTX, you are going to have to wire funds to

23   Silvergate Bank, to an account for the benefit of North

24   Dimension.  There is nothing secret here.  Customers were told

25   what was going on.

1         These roles that Alameda played in the early days, in

2    particular, were very important for FTX to get started and

3    launched as a business.  Over time, as FTX became more

4    successful, other market makers came in.  So by the end, by

5    2022, it was handling less than 5 percent of the market maker

6    volume.  But in the beginning, when you needed liquidity and

7    when you needed customers, because without customers you

8    wouldn't have a business, this was an important role that

9    Alameda played, and there was nothing wrong with hat.

10        Putting this all together, Sam and Gary and the others

11   created in just a few years a very successful crypto exchange.

12   Remember that Sam told you that he thought, when he started

13   FTX, his chance of succeeding was no better than 20 percent.

14   Yet, against all these odds, in just a few years they built two

15   highly successful innovative companies worth billions.

16        Let's go back to the slide about the time period.

17   Let's talk about FTX's growth and Alameda's growth because what

18   happened in this first period, particularly towards the end of

19   2021, is critical to understanding what was in Sam's mind as he

20   went into 2022, and in particular as we went into the crypto

21   winter in May and June of 2022.

22        Gary Wang testified that FTX in this period handled

23   $15 billion in trades and 3 million in revenue per day and that

24   the exchange had 6 million accounts.  That's Mr. Wang's

25   testimony at transcript 553.

1          And you learned that from the attorney, Can Sun, that

2    FTX was licensed in jurisdictions all over the world.  That's

3    transcript at 1974.

4          And Zac Prince, the CEO of BlockFi, the lender BlockFi

5    who we will get to in a moment, he told you that of all the

6    exchanges that have been founded in this period, FTX, among the

7    hundreds, was one of the few that mattered.

8          Along the way FTX created and launched its own

9    exchange token called FTT.  We heard a lot about FTT in this

10   case.  And the government has suggested and argued that FTT was

11   somehow a fake token, not a real asset, not real collateral.

12         That's not what the evidence showed.  The evidence

13   showed that, by the end of 2021, FTT had grown in value.  It

14   was worth 30, 40, $50 per token and it had its own market cap

15   of about $10 billion.  That's at transcript 2372.

16         The government wants to portray FTT as fraudulent, but

17   that's not what happened.  It was traded on multiple exchanges,

18   not just on FTX.  Other exchanges having nothing to do with FTX

19   traded it.  It was accepted as collateral by sophisticated

20   third-party lenders, just like BlockFi.  And Mr. Prince told

21   you in his testimony that FTT was one of the top

22   cryptocurrencies that he would accept as collateral for loans.

23         All this happened quickly, and FTX grew enormously.

24   You learned that, in the last investment round in 2021, and

25   early 2022, FTX International was valued at $32 billion and FTX

1    US was valued at $8 billion.  And if you look -- bring the

2    timeline back up -- go back, again.

3            If you look at, starting in the middle of the page, on

4    July 2021, there is a series of fundraising rounds.  There is a

5    series B round in July, then the B1 round, and then the C

6    round.  What is that?  That's outside investors investing in

7    FTX because they believed in the business, investing billions

8    of dollars as a valuation of 32 billion for FTX International.

9            Just to complete that, you heard from Ms. Ellison in

10   her testimony that even though she has certainly many negative

11   things to say about Sam, and we will get to that, and many

12   negative things to say about what happened, particularly in the

13   June to November time period, she told you that as of July --

14   year end July 2021, Alameda financials were not misleading.  So

15   based on building the business, nonmisleading financials, it

16   did these three fund raisings at this high valuation.

17           You also learned toward the end of this period that

18   Alameda was also -- had also grown and was successful and it

19   was worth tens of billions of dollars in net-asset value.

20           And this means that as we came to the end of 2021, it

21   was Sam's view that, given this high valuation of both

22   companies, that Alameda could easily cover any of the expenses

23   or liabilities that it was reasonably likely to incur, either

24   through its own value, its own revenue and profits, or its

25   third-party loans.

1              And he also came into the year with the view that FTX

2    was highly valuable, and he could sell its equity, if he needed

3    to, to generate liquidity, and he personally also had a high

4    value, was by that point a millionaire, billionaire, and he

5    could put his personal wealth to use to resolve any issues on

6    the exchange if necessary.  That's what he believed as we came

7    into the year.

8              Your Honor, I'm at the 45-minute mark.

9              THE COURT:  OK.  Is this a convenient spot?

10             MR. COHEN:  Yes.

11             THE COURT:  We will take 15 minutes.

12             (Recess)

13             THE COURT:  Let's get the jury.

14             (Jury present)

15             THE COURT:  The defendant and the jurors all are

16   present, as they have been throughout.

17             You may be seated, folks.

18             Mr. Cohen, you can proceed as soon as the jury is all

19   seated.

20             MR. COHEN:  Thank you, your Honor.

21             Ladies and gentlemen, when we broke I was just about

22   to talk about the spending, some of the spending that was done

23   by FTX and Alameda.  And, again, this is another example, we

24   submit, of the government trying to show you the movie of Sam

25   the villain.  But the business expenses that were incurred and

1    paid for were entirely normal for a company of FTX's size and

2    complexity and its business model, as well as Alameda, and this

3    is perhaps best encapsulated by the evidence we all reviewed

4    together about sponsorships.

5            This is a really good example of the government trying

6    to prove its case by hindsight.  You recall Sam told you about

7    a sponsorship that FTX did of the arena in Miami, the FTX

8    Arena.  The government in its presentation said, aha, this is a

9    perfect example of what we are seeing, ladies and gentlemen.

10   FTX bought that with customer funds.

11           But, in fact, Sam testified, and the evidence about

12   the world going into 2021 was that FTX had a multibillion

13   dollar valuation, it had a billion dollars a year in revenue,

14   and certainly had more than enough assets and revenues and

15   profits to pay for such expenses.

16           So the government said, aha, this is a great example

17   of using the fiat@ funds improperly.  Of course the evidence in

18   the case was clear that not Sam, not any of the others knew

19   about the fiat@ issues until mid 2022.  Then the government

20   says, well, it doesn't matter.  This is yet another example of

21   Sam being reckless in his spending or spending too much, and

22   that's what Nishad testified to when the government went

23   through this with him.

24           You saw that when they went through the actual facts

25   and the evidence of what went on, the government had Nishad

1  tell you that the total deal for all sponsorships was 1.13

2  billion for one year.  That's transcript at 1334, on Government

3  Exhibit 343 at row 72.

4         But it turns out that wasn't true.  FTX never paid

5  that amount.  The sponsorship wasn't for one year.  It was for

6  19 years, as shown on the chart.  The government -- and FTX was

7  going to pay Miami, the arena, over a period of 19 years, and

8  in the first year for the naming rights it was going to pay

9  about 19 million or 14 million.  Now, certainly that's a lot of

10 money.  We are not saying it's not.  But relative to the size

11 of FTX and relative to the size of its marketing expense, it

12 was a reasonable investment, and Sam told you that FTX spent

13 about 10 to 20 percent of its revenue on marketing, which is

14 less than he believed their competitors spent.  This was no

15 different than having a field in New York being called Citi

16 Field or suites at Yankee Stadium called Delta Suites.  There

17 was no evidence of a crime.

18        We also heard a lot about the properties in the

19 Bahamas that were purchased.  But the real issue is, again, the

20 why.  Why did Sam purchase these properties?  Why did FTX

21 purchase them?  Sam was clear on this in his testimony.  The

22 Bahamas real estate was corporate housing for FTX employees.

23 It had to convince skilled professionals to uproot their lives

24 and move their family and friends to the Bahamas to work for

25 FTX.

1          He saw these properties as a valid business expense

2     for FTX.  It's one thing to look for a resort in the Bahamas

3     for a week or weekend, finding long-term housing that appeals

4     to workers who could otherwise be at Google or Facebook is

5     quite another, and no one in FTX thought the company's

6     investment in the real estate was a problem at the time.  No

7     one refused to live in the company-owned housing despite their

8     protests after the fact.

9          In fact, you heard from Can Sun about this.  We will

10    talk about him later as well.  Remember, the government

11    referred to him.  He came on to be the general counsel of FTX.

12    Now, we will talk about it later.  His testimony was, shall we

13    say, sculpted.  Very careful.  This was someone who had a

14    Ph.D. from Princeton, law degree from Yale, who had worked for

15    one of the leading law firms in the world, was admitted in New

16    York, was the general counsel of FTX but told you he wasn't

17    even sure if that was the senior legal position there.

18         And later we will see he was very, very careful in

19    what he told us about what he thought happened with Sam in

20    later events.  He even said he was coming just to tell us what

21    happened and didn't bother to mention that he had received a

22    nonprosecution agreement which he had signed two days before he

23    testified.

24         Even someone who was as careful as Can Sun admitted

25    that he received a $2.3 million loan.  What was the purpose?

It was part of a management incentive program to incentivize employees to move to the Bahamas. Did he take the loan? Sure, he did. He didn't think there was anything wrong with it. It was a valid corporate expense.

And you heard a lot about the penthouse apartment that Sam lived in with nine other people, including Gary and Nishad and for a time Caroline. You will recall during the questioning when a witness would refer to the apartment, the government would interrupt them and say: You mean the $30 million apartment. The apartment. You mean the $30 million apartment. Until the witness would get it and say, as I meant, the $30 million apartment. What was that all about? To make you think, who is this guy, living in a $30 million apartment. What kind of nerve does he have. Make you dislike him more. But, again, given that FTX at the time was a multibillion dollar company and that Sam and the others wanted to live together and work together, and they were the senior leadership of the company, it was a valid business expense.

And you heard I asked Nishad about it, and I pointed out that the ten people living in the apartment at the time were either millionaires or billionaires and asked him if he thought that was an acceptable expenditure on a relative basis. He told you, well, I can't say how a billionaire is supposed to live, which is frankly not an answer.

You heard today about the private plane. Same idea.

1    Sam flew in private planes.  Sam told you why he did that.  He

2    thought it was a valid business expense, given the size of the

3    company and his need to get to places like Washington, D.C.,

4    where were weren't that many flights available on a given day;

5    again, a valid business expense for a company of the size and

6    complexity of FTX.

7            You heard a lot about venture investments and loans

8    that were made by Alameda to Sam or Gary and Nishad to fund the

9    venture investments.  But, again, Sam told you he believed that

10   Alameda, based upon its capital base, its third-party loans,

11   its profits and so on, had the basis to make those loans and in

12   fact they were -- if we go to the next slide -- they were

13   documented by promissory notes.

14           Let's talk about another thing that counsel mentioned

15   this morning that sort of sets the backdrop as we come into the

16   period in May of 2022, the terms of service.  You saw -- if we

17   could pull it up -- a terms of service that was dated May 13,

18   2022 and issued by FTX.

19           Now, the government's case, when it comes to the fiat@

20   account, depends on FTX not being allowed to borrow assets from

21   FTX customer fiat deposits.  That's what it depends on.

22   Because if they could do that, that part of their case falls

23   away.

24           So what did we get here over four weeks?  Witness

25   after witness comes before you, and conveniently none of them

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   happen to read the terms of service.  The government didn't

2   want to focus you on that.  Why?  Again, the only witness who

3   said he had read the terms of service was Can Sun, the general

4   counsel who had helped to draft it.  Even though he was very

5   careful in what he told you, he admitted that nowhere do the

6   terms of service contain language that prevents FTX from

7   loaning customer fiat deposits to Alameda or anyone else.

8          Just a quick point on the venture capital investments.

9   Not only could Alameda have funded those from the capital base

10  it had from third-party loans, you heard the government's own

11  witness, Professor Easton, testify that, in 2021, Alameda had

12  borrowed $15 billion from third-party lenders, again confirming

13  this point that there were more than ample funds to make the

14  venture investments.

15         Given what the world looked like to Sam and the

16  others, as they moved from 2021 into 2022, why would he think

17  that money owed to customers was ever at significant risk when

18  the assets he had access to were so much greater than the debts

19  that needed to be paid out?  He didn't, and he wouldn't.

20         A few more key points for this period before we move

21  on.  We have heard a lot of testimony about the difference

22  between the info@ account on FTX and the fiat@ account.

23         We could pull up that slide.

24         I just want to briefly spend some time on this, ladies

25  and gentlemen, because it affects how we think about what

1    happened later on.  Two different accounts, often in the

2    government's presentation they get mushed together, but they

3    are actually distinct and the distinction is important.  If you

4    look to the right-hand side, info@ Alameda was the trading

5    account that Alameda had on the FTX exchange where it was

6    trading for its own account.  If you look at the visibility on

7    the admin user dashboard at the bottom, when Sam was the CEO of

8    FTX, no longer running Alameda, he would use that admin

9    dashboard, as others would, to check accounts of all customers,

10   including Alameda, and what he could see was what was in the

11   info@ Alameda account, the trading account.  On the left-hand

12   side is the FTX -- fiat@FTX.com account.  That was very

13   different.  It was a tracking account.  It was supposed to

14   track FTX customer deposits and withdrawals of fiat or dollar,

15   currency, so forth, via Alameda bank accounts, and it wasn't

16   visible from the admin user dashboard.

17          When Sam would check, and he told you this, the info@

18   account at the end of 2021 going into 2022, what did he see?

19   He saw that Alameda had borrows, loans, of 2 billion because

20   Alameda did trade on futures, which allows for margin, and some

21   of the subaccounts were margin accounts.  But that those

22   borrows were covered by many more assets than $2 billion.  No

23   reason for him to think there was a problem.

24          And, in addition, toward the end of 2021 and frankly

25   going into 2022, all the way to November, at no point was there

a time when a customer wanted to withdraw funds from the

exchange where he or she could not.  Gary told you that no

customer waited longer than a day for a withdrawal prior to

November 2022, that all withdrawal requests were honored.

That's Gary's testimony at page 504.  Again, this gave Sam no

reason to think anything wrong was happening in Alameda's

accounts or how they were being tracked in FTX's systems or

that customers were not being able to receive withdrawals if

they wanted to.

        Now let's turn to a topic that counsel spent a lot of

time on today, a lot of time, and during this trial.  That's

the codes and the code base.  The government's theory is, these

codes were secret and that Sam, in perhaps one of his most

villainous acts, secretly directed Gary and Nishad to put these

codes in place.  I think the government's word was so that he

could create a back door to steal customer money.  That's what

we were told over and over and over again.

        But the evidence was different.  The evidence was the

opposite.  We found out that the codes were not secret, that in

fact anyone who had access to the FTX code base could see them.

        So if you look at this slide, this we went over with

Nishad, and it says:  Coding features were visible to anyone

with access to the code base.

        If you look at the bottom, here is what's called a

code commit that Nishad wrote that says to other developers who

1    looked at this:  Be careful not to liquidate PMM, which we

2    learned was primary market maker, which at the time was

3    Alameda, clean up messages.

4        We asked Nishad about this.  We asked about visibility

5    in the first place.  And here was the exchange.  Based on your

6    experience as head of engineering at FTX, did you have an

7    understanding of who might access the code commits we were just

8    looking at?  They were available to the whole company in Slack,

9    if nothing else.  There were Slack logs of all the messages.

10       We submit this is the opposite of secret.  If these

11   coding rights were actually intended to serve as tools to

12   steal, it makes no sense that the group of people in a company

13   with hundreds of employees would have access to them.  It makes

14   no sense.  The whole idea of a conspiracy is that you are

15   trying to keep things secret so you won't be detected.  There

16   was nothing about this code base and the commits that were kept

17   secret.

18       Let's talk for a moment about the allow-negative

19   function that counsel spent a lot of time on.  The government

20   claims that it was set up as another way to siphon funds, but,

21   again, that is not the evidence in the case.  You heard from

22   both Gary and Nishad, and the quotes are up here, that they

23   were set up originally, Allow Negative, for a few other

24   bookkeeping accounts on FTX, said Gary, and for accounting

25   oriented accounts to go negative, said Nishad.  Again, this

1      wasn't set up to be some back door to abuse anything.

2                  We can take that down.

3                  You heard a lot today and during the trial about the

4      line of credit.  What you heard was that the government kept

5      saying one of the reasons we know Sam was a fraudster is, he

6      directed Gary and Nishad to put up the line of credit to 65

7      billion.  Look at that.  That's bigger than anyone else in the

8      company.  That's way bigger than anyone else.  But they never

9      asked the why question.  They never went into the fact that in

10     fact, in practice, only about 3 billion of the line of credit

11     was used, not 65 billion, and that it had been raised because

12     of the fact that when Alameda was the main market maker, it had

13     to put out many, many open orders during the day, and in order

14     to be able to put those orders out, it needed more collateral.

15                 So the letter of credit was used to take its place,

16     and, in response to that, Gary raised the limit several times

17     until, finally, he decided to raise it to a level where it

18     wouldn't be hit again, just move the parameters out.  That's

19     his testimony at 397 and Nishad's testimony at 1554.  This was

20     all done in response to specific issues, to business issues,

21     and done to help customers, not to hurt them.

22                 In a related vain, let's talk about this complicated

23     word, auto-deleveraging event.  You heard both Sam and Nishad

24     testify about this.  What was it all about?

25                 When liquidations were happening on FTX, Alameda and

1    other large traders would step in as backstop liquidity

2    providers to close out the insolvent accounts and prevent

3    further harm to the exchange or customers.  An auto

4    deleveraging event happened when FTX ran out of backstop

5    liquidity capacity.  In other words, first, they went to the

6    collateral in the customer account.  If that didn't work, the

7    risk engine went to the backstop liquidity provider.  And if

8    that didn't work, we had an auto-deleveraging event where the

9    engine would start to pull in collateral from any customer's

10   account who had authorized margin trading.  And FTX wanted to

11   avoid that because customer A didn't want to have his or her

12   funds used to cover losses from customer B if it could be

13   avoided.

14          Sam told you about an event that happened in 2020

15   where due to the servers being overworked, it ran -- it was

16   running behind, and there was a threat not just of the backstop

17   liquidity providers being liquidated but Alameda itself being

18   liquidated, and they concluded this would be really bad for its

19   role as a market maker.  It would hurt customers, so they put

20   in a provision to delay that liquidation.

21          (Continued on next page)

22

23

24

25

1           MR. COHEN:  Again, not out of some intent to steal,

2     not out of some nefarious intent.

3           And before we take that down, I just put up Government

4     Exhibit 1617, which is before you, just to show the letter of

5     credit actual usage in the pre-October 2022 period.

6           So that takes us to the end of this first period of

7     2019 to 2021.

8           And I also want to point out something else as we came

9     to the end of this period.

10          Sam's good faith, as I mentioned, is a defense to all

11    the charges against him.  And no witness who testified about

12    this period has testified that Sam ever told them that he'd set

13    up FTX to steal funds or allowed anyone to install secret

14    code-based features to steal funds, or told them that he was

15    using this as a way to steal funds from the exchange.  The

16    testimony counsel pointed to earlier today from Caroline was

17    simply about the ability to borrow on the exchange; it wasn't

18    some secret code base to steal from customers.

19          So now let's move to the second period.

20          Put up the next slide, please.

21          Okay.  I'm going to talk about the fiat bug, which we

22    all spent a lot of time on this case, but again, first let me

23    set the stage.  In May and June of 2022, if you look outside

24    your window, if you're in the crypto world, you see a storm.

25    Companies are going out of business.  There's stress

 1    everywhere.  Bitcoin, the leading indicator and the hallmark,

 2    it has dropped by 70 percent.  And it's against this backdrop

 3    that the sequence around the bug plays out.  And what happened

 4    as a result of this is that a group of people began to realize

 5    that there was a fiat@ bug and there was a fiat@ liability,

 6    which I'll talk about in a moment.

 7         So again, what happens?  Well, we learned from the

 8    evidence that in July, the year before, a bug had been

 9    introduced inadvertently into the system.  And the effect of

10    the bug was it caused an error that caused the fiat@ accounting

11    entry to appear as if it was 8 billion larger than it was.  The

12    upshot of this was it looked like Alameda owed FTX $8 billion

13    more than it really did.  So that's right here, what was going

14    on.

15         And in fact, later in 2021, Gary, Nishad, and Adam

16    Yedidia complained about the bug, and at the time, it was only

17    causing a $500 million impact.  Now to most of us that's a lot

18    of money, but at the time, you heard the testimony from Nishad

19    that Gary was relaxed, not stressed about this.  This was

20    apparently on everyone's list of something that needed to be

21    attended to and hadn't yet been attended to.  And so it doesn't

22    go—it doesn't get corrected or fixed.

23         Six months go forward and now in June 2022, the stage

24    is set when Caroline comes to the FTX office where Sam, Gary,

25    and Nishad are working, and she tells Sam she thinks Alameda

1   might be insolvent, and that it also will need to repay its

2   lenders.  And I want you to stop and really think about this,

3   because it's a very important moment for an issue we submit

4   hangs over the whole case.  And think about what it means for

5   not having a fully built out risk management system.  The CEO

6   of Alameda wasn't aware that there was a bug in the system for

7   six months after it had already been discovered, and she woke

8   up one day and believed that her company, which previously had

9   a NAV of 8 to 10 billion, was now bankrupt, overnight.  How

10  could that happen?  Not through Caroline's fault, not through

11  Sam's fault, not through anyone's fault.  It resulted from FTX

12  lacking a fully built out accounting risk management system.

13  Ask yourself, if they had had a full-time chief risk officer,

14  would that person have let it happen?  And what's even more

15  remarkable about this is but for the seemingly accidental

16  discovery of the bug in June, we don't know when Alameda or Sam

17  or the others would eventually have appreciated the scope of

18  the fiat@ liability, or taken steps to address the underlying

19  causes.

20          So coming back to this, to the time line, when Sam

21  heard that Alameda might be bankrupt and needed to repay

22  lenders, he said—and he testified to this to you—that didn't

23  sound right to him.  And he asked Caroline, *How confident are*

24  *you in this, that Alameda is insolvent?*  And she responded, up

25  front, *Not very confident.*

1            So what did they do next?  They bring in Gary, who's

2    the chief technology officer at FTX, Nishad, who's the number

3    two technology person, and then other developers, Adam Yedidia,

4    Andrea Lincoln, and other developers, to get into the issue and

5    figure out what happened.  And again, if what's really going on

6    here is that this "inner circle" is running a conspiracy, the

7    last thing they would do when this bug came to the fore is

8    bring in all these other developers to look at it.

9            After about an hour, or after about two or three hours

10   of work, the team led by Gary determines that the $8 billion

11   liability isn't real and there was a bug in the system.  And

12   everyone's relieved.  You thought that Alameda was insolvent

13   and now you find out it's back to being worth 8 to 10 billion

14   in NAV.

15           And this led to the other issue we talked about,

16   repayment of the loans.  Now when Caroline first——Sam told you

17   that when Caroline first came to him about concern about

18   insolvency, she raised another valid concern, can we repay our

19   lenders, should we repay our lenders?  And Sam told you that

20   once he understood that the bug was fixed and believed that the

21   NAV was back to 8 to 10 billion, which, again, was consistent

22   with what he saw on the info@ account, that it was——he was fine

23   with repaying the lenders.  And that payment was made.

24           Now there is a problem with some of the testimony

25   about that payment, and it has to do with how it was done and

1    the scale.  And you should consider that when you evaluate the

2    whole sequence.  Caroline testified to you that what happened

3    was, Alameda "would have to take the money from our line of

4    credit to pay the lenders."  And that's at transcript page 763.

5    And I asked her, *Well, if that's true, if the lenders were*

6    *being repaid off the line of credit, wouldn't the amount of the*

7    *line of credit go up?*  She said, *Yes, it would.*  And I said,

8    *How much did it go up by?  Oh, 5 to 10 billion.*

9           But when you look at the actual data that was pulled

10   by Dr. Pimbley——and that's Defendant's Exhibit 617——you see

11   that in fact the line of credit did not go up during the period

12   when the loans were being repaid.  In fact, it went down for

13   much of the period.  It repaid some of its line of credit,

14   Alameda repaid some of its line of credit usage but not on the

15   order of the 5 to 10 billion that Caroline claims.  She was

16   just mistaken in that.

17          And during that same sequence, we heard a lot from the

18   government——we heard about it today——about a spreadsheet of

19   seven alternative balance sheets that Caroline prepared.  And

20   we heard, this is one of the most nefarious things Sam did.  He

21   directed Caroline to prepare multiple spreadsheets to send to

22   the lenders, and the idea was, let's pick the one that's going

23   to be the most misleading and send it to the lenders.  But

24   again, we submit that the evidence didn't support this

25   interpretation.  Sam told you he reviewed the spreadsheet.  The

1    government made a big deal today about, oh, the metadata showed

2    that he didn't.  He said he did, but he only remembered

3    reviewing one of the——one of the balance sheets.  And that's

4    actually consistent with Caroline's testimony, where she said

5    at page 1070 of the transcript that she only discussed some of

6    them with him.  And if you think about it, Sam believed——we had

7    gone from thinking Alameda was oh, my god insolvent to being

8    worth 8 to 10 billion.  He certainly was now okay repaying the

9    lenders.  He received the balance sheet that he looked at,

10   which looked like the ones he had seen many times before from

11   Caroline, and given all the other things he was doing, working

12   12 to 22 hours a day, dealing with 60,000 emails in his inbox,

13   being a member of hundreds of Signal groups, it seemed

14   reasonable to rely on the spreadsheet he had been given by

15   Caroline.

16        And two other things about this.  Ask yourself, if

17   you're a fraudster, why would you repay the lenders?  Why don't

18   you just keep the money and run?  That's a billion dollars,

19   even on the reduced scale.  You wouldn't.  If you were a

20   fraudster, why would you repay the lenders and give them a

21   false balance sheet?  It doesn't make any sense.

22        And there's a third layer that's really important,

23   perhaps the most important layer for this sequence, that, in

24   fairness to Caroline, she couldn't know about.  Sam was having

25   separate discussions with the leadership of all the lenders,

1   BlockFi, Zac Prince, Genesis, Voyager.  At the same time as

2   these loans were being repaid, they were reaching out to Sam in

3   a separate discussion.  Their other employees were talking to

4   Caroline about the loans at issue, but these CEOs were reaching

5   out to Sam about the following:  Hey, we're in the crypto

6   winter too, hey, we're having problems, you think FTX could

7   loan us some money?  You think FTX could invest some money in

8   us to help us get through?  And in fact, you heard that FTX

9   wound up making a loan, and with the possibility of an

10  investment, to BlockFi.  You heard that both from Sam and from

11  Zac Prince, the CEO.  And ask yourself, if you were making a

12  loan to a company that you're going to maybe buy eventually,

13  why in the world would you spend time sending it a false

14  balance sheet?  You wouldn't.

15          So coming back to the aftermath of the bug, once the

16  bug is discovered, what do Sam and the others do?  Well, we

17  submit they sort of act sensibly, and Sam does as well.  First

18  thing he says is, you know, we got to fix this.  We got to make

19  sure we don't have another situation where we're off by

20  $8 billion in our account.  So he asked the team that ends up

21  being led by Nishad and Adam Yedidia to fix the bug.  And they

22  do.  It takes a few weeks.

23          What's the other thing he does?  Well, if you'd call

24  up slide 26.

25          He says, it's not just the bug, we really need to fix

our accounting, because we can't have this where we're off by
so much, and whether you——this is now looking at it from FTX's
point of view.  We can't have a customer like Alameda, large
customer, where the accounting is so far off.  And he went over
with you his live issues for September 27, and his list of
priorities, which we looked at earlier this week.  Each of
these priorities——there's this list of 16.  Each of them
involves or collectively they involve billions of dollars.  And
what does he call out as something that's really important?
Let's get the accounting right on FTX.  And he had asked Andrea
Lincoln, one of the developers, to work on that, with an ETA of
October 15th.  So that's something else that you would expect a
CEO to do, to want to do.  Let's get the accounting in shape.

And coming out of that sequence, Sam told you that for
the first time he learns that separate and apart from the bug,
okay——take that 8 billion, get it off the table, separate and
apart from that——he learns through this sequence, through
discussions, that there's another liability that Alameda owes,
that's in the neighborhood of 8 to 10 billion.

And again, not just Sam, but no one testified that
they knew about this liability, which we've come to learn was
related to the fiat@ account, before June 2022.  In fact,
Caroline told you that during her time as CEO of Alameda,
before that, she had been seeing what she called otherwise
confusing decreases in Alameda's assets from the bug.  She

1    didn't quite know what was going on with this liability.  And

2    Sam told you he certainly didn't know in and around this time

3    in June that there was this big liability, 8 to 10 billion.

4    The government makes it sound like he's fighting with the

5    others about knowing this.  He wasn't.  But what he didn't put

6    together until September or October, which is, by the way, when

7    Nishad put it together, that Alameda had this additional

8    8 billion, $10 billion liability and it was associated with the

9    fiat@ account.

10            And as Sam is piecing things together and thinking

11   about it, what does he think?  He thinks——and the government

12   was critical of this, but frankly, we think this is how many

13   CEOs would think——he thinks, well, it is what it is.  We don't

14   have the situation.  We had a messed up accounting system.  We

15   had a messed up risk management system.  And now we have a very

16   big liability that we didn't know about that we have to

17   address.  And he spends——and he thinks about it as a liquidity

18   issue.  Does Alameda have assets on the exchange or off the

19   exchange to take care of it over time?  Are there assets at

20   FTX, can he use his equity, can he use other assets.  And we

21   would expect that's a reasonable way for him to look at it as

22   the CEO at the time.  And this isn't what Mr. Roos said.  This

23   isn't saying, oh, things will work out all right at the end.

24   This is how he's thinking about it at the time, and it's a

25   reasonable way.

1          And let's turn now to September.  This is another

2   point where the government says, oh, there's this "aha" moment

3   about Sam proposing shutting down Alameda, and I talked about

4   that earlier in my summation, where Sam sends the memo "We

5   Came, We Saw, We Researched," where he proposes shutting it

6   down.  And as I mentioned before——I won't belabor it here——if

7   he really thought Alameda was the key to his fraud, if this was

8   the engine to keep stealing money from customers, the last

9   thing he would do would be to propose shutting it down.  And

10  there's a discussion between Caroline, Gary, Nishad, and Sam

11  where they decide not to shut it down and they move forward.

12  And we think, and we submit, that what the evidence showed is

13  that each of them came to different realizations at different

14  points in time.  Caroline told you she came to her realizations

15  about the impact of the fiat liability in June and July.

16  Nishad told you he came to that realization in September.  Gary

17  was somewhere in between.  Sam told you around September and

18  October.  Does that make any of them right or wrong, for not

19  being consistent with each other?  No.  That's how they looked

20  at it from a business point of view, from a business judgment

21  point of view, of people trying to figure out what had

22  happened, what this liability was, how do we deal with it, how

23  do we get our arms around it.

24          Which brings us now to November 2022.  And when we

25  talk about November 2022——and there's been a lot of testimony

1    and evidence about this in this case——I want to break it into

2    two categories: what happened; and what were Sam's statements

3    during November?  And we're talking about those 11 days,

4    November 1 to November 11.  And I told you in opening——and I

5    think I was borne out by this——that a lot happened in those 11

6    days.  Things were literally changing moment by moment.  And

7    that affects what Sam thinks moment to moment, that affects how

8    he reacts moment to moment, and we submit as he reacts moment

9    to moment, his state of mind is somebody who's acting in good

10   faith and doing the best he can under what are very, very

11   difficult circumstances.

12          So the sequence begins on November 2nd, when an

13   article is leaked by CoinDesk, which is a leading crypto

14   publication, that leaks——an article appears that leaks

15   Alameda's balance sheet.  Now the article has the effect of

16   causing some of FTX customers to start withdrawing assets from

17   the exchange, which ultimately, toward the end of the week,

18   sets off what Sam called a run on the exchange.  In his view,

19   the run was all the customers on the exchange or almost all of

20   them suddenly want to be taken off the exchange.  And what's

21   his reaction when it comes out, when the article comes out?

22   Well, they talk about how to address it.  A tweet is put up to

23   address it, and things move forward.

24          What happens then?  On November 6th, there's a tweet

25   from CZ, the CEO of Binance we all heard so much about.  And he

1    tweets that he planned to sell his substantial FTT holdings

2    because the balance sheet that had been leaked had showed that

3    Alameda owned a lot of FTT.  And this has a more dramatic

4    effect.  Because now this is a disclosure not about how the

5    market is going in general, how the crypto market is declining

6    in general; this is a disclosure that affects FTT specifically

7    and therefore affects Alameda, which owns a lot of FTT.  And

8    now you heard right after that tweet on November 6th, Gary

9    testified that withdrawals skyrocketed.  That's at page 568 of

10   Gary's testimony and 567.  He told you that prior to

11   November 6th, a typical withdrawal volume for FTX was 5 to

12   10 million an hour, but on November 6, FTX starts getting

13   withdrawal requests of over a hundred million dollars an hour,

14   which amounts to over a billion dollars in the first day, which

15   is——I think Sam also told you.

16          Now this is becoming an unprecedented situation.  So

17   in this crazy situation, with the storm going on outside in the

18   general market but now a specific storm about FTT and about

19   Alameda and the value going down, we submit Sam acts

20   appropriately, as best he can.  What did Caroline say about

21   what Sam did?  She said that Sam "said to liquidate Alameda's

22   positions and send the money to FTX."  That's at page 893.  And

23   that is a sensible thing for a CEO to do during that period.

24   Sam also continues with efforts to raise capital because he's

25   thinking, I still have this liquidity issue, Alameda's NAV is

1    positive but things are getting tight, and I'm going to need to

2    raise capital.  And in the course of raising, seeking to raise

3    capital, Sam reached out to a number of lenders——excuse

4    me——investors, and he asked others on the team to reach out to

5    a number of investors.  And one of those lenders——excuse

6    me——investors that they reached out to was a company called

7    Apollo, which is a leading investment firm in New York, and you

8    heard a lot about that.

9            Now this is where we bring Can Sun back into the

10   picture.  Sam had reached out to Apollo, investments were

11   handled by——investor relations, you heard, were handled by Sam

12   and a fellow named Ramnik Arora, who is there in the Bahamas

13   also working on this, and Can told you that he learned that Sam

14   had sent a balance sheet to Alameda——to Apollo, and the balance

15   sheet he sent reflected the fiat@ liability.  It's the opposite

16   of seeking to deceive Apollo.  He sent them the balance sheet

17   that was now updated to show the effect of the fiat@ liability.

18   Even Can admitted that.  And then there was a conversation that

19   Sam was going to have with Apollo where they'd asked questions

20   about how could things have happened from a legal and

21   compliance perception, and Can does research and he goes over

22   it with Sam, and the net of it is, based on what we found so

23   far as regards the fiat@ liability, we don't have an

24   explanation from a legal or compliance point of view.  And Sam,

25   in his style, says, *Yup, okay, that means I can't tell that to*

1   *Apollo.*  And he doesn't.  And he's on the call with Apollo

2   right after speaking with Can, and Can is not on the call.

3        What else happens during that week?  Well, on

4   November 9th, there's an all hands meeting that we heard so

5   much about that Caroline has for Alameda.

6        And if we could call up slide 29.

7        And let me set the stage for this, ladies and

8   gentlemen.  This was a regularly scheduled meeting.  Sam is not

9   going to attend.  It's for Alameda people only.  And you saw

10  this exhibit in evidence that Caroline reaches out to Sam and

11  others about how to approach the meeting.  And she says:

12       "Thinking about what to tell people at Alameda all

13  hands."

14       "Right now I'm thinking a vibe of 'Alameda is probably

15  going to wind down, if you don't want to stay or want to take

16  some time off no pressure, if you do want to help with stuff

17  like making sure our lenders get repaid it's super

18  appreciated'"

19       "Does that seem right?"

20       And Sam says, over here, "and maybe something about

21  there being a future of some sort for those who are excited but

22  that you can't know for sure what it is."

23       Well, how did the government present this to you?

24  They presented it in two ways.  Sort of, again, the "heads I

25  win, tails you lose" way.  First they said, Aha, you see, this

1     meeting was really Caroline confessing that they'd all been

2     committing crimes for the last few years, three, four years.

3     But if you read the setup to this meeting that Sam's involved

4     in, he's not at the meeting, this is not written by someone

5     who's planning to confess.

6             The second alternative, government says, well, if you

7     don't like that one, here's another one.  This is part of a

8     coverup.  It's a way to get people to keep working without

9     telling them anything about what's happening.  It's about a

10    vibe.  We submit this doesn't support that interpretation

11    either.  And in fact, after the meeting, Caroline reaches back

12    out to the same group and she said she "thought it had gone

13    well."  And that's the tape you listened to.  Neither excerpt

14    is consistent with someone who is covering anything up, who's

15    doing anything at the direction of Sam.

16            Just to complete that week, Sam is reaching out

17    wherever he can to raise capital.  No question they need

18    capital.  Alameda is very tight.  Sam still believes until the

19    very end of the week that it has a liquidity issue, not a

20    solvency issue, although by the end of the week, that comes.

21            So he even reaches back out to Binance, FTX's

22    bitterest rival, his own personal rival, and he says, hey, you

23    have capital, will you do a deal with us, and Binance signs a

24    letter of intent with them.  And there's negotiations over a

25    frenetic day about, hey, maybe we can sell FTX to Binance.  And

1   just to drill down on what that would mean, that would mean

2   selling the equity that Sam owned in FTX to Binance so that

3   funds could come in to pay expenses, to pay lenders, investors,

4   and customers.  So Sam is, as he always was, willing to give up

5   everything he had in order to take in the capital if he could

6   and save the situation.  So that's what happens during that

7   week.

8           Now let me come to the second part I want to talk to

9   you about the week, which is, what did Sam say during the

10   November crisis?  Now the government, again, because in their

11   movie Sam's a villain, or mega villain, says that all week he's

12   just sort of wheeling and dealing, he's lying to his employees,

13   he's lying to the outside world, he's doing anything he can to

14   hold on to the company and keep people from making withdrawals,

15   even though they've had billions of dollars of withdrawals, all

16   of which had been paid.  And then when we look at the actual

17   evidence from that period, we submit it doesn't support what

18   the government says.

19           If we could pull up slide 30.

20           This was the November 6th tweet regarding the leaked

21   balance sheet.  And there was testimony——and you saw an earlier

22   draft of it.  This was something that Caroline worked on with

23   Sam and others.  We ought to put out a tweet to respond to the

24   CoinDesk story.  We ought to tell the market what we think

25   happened.

1          And the tweet makes three points.  First, at the top,

2     Caroline says——and certainly Sam is on board with this——"A few

3     notes on the balance sheet info that has been circulating

4     recently," meaning the leaked balance sheet.  "That specific

5     balance sheet is for a subset of our corporate entities, we

6     have greater than 10 billion of assets that aren't reflected

7     there."  And is that accurate?  It certainly is.  If you look

8     at the corporate entities, which include Alameda's assets on

9     and off the exchange, FTX's equity and other assets, it's an

10    accurate statement.

11         What does Caroline next say?  "The balance sheet

12    breaks out a few of our biggest long positions."  Long is where

13    you've bought something.  "We obviously have hedges that aren't

14    listed."  Is that accurate?  It certainly is.  You heard a lot

15    of testimony, not just from Sam but from Caroline and others,

16    about there was a sequence going through the year of putting on

17    hedges, talking about putting them on, and for the first part

18    of the year no hedges were put on, but finally, by this period,

19    at the end of November——in the middle of November, hedges had

20    been put on.  Now they don't work as well as they should have.

21    By the way, that's not anyone's fault.  We're not faulting

22    Caroline, we're not faulting Sam.  The hedges they finally put

23    on were to the general market, if the general market was down.

24    The problem they had was the move was about FTT and Alameda's

25    specific assets so the hedges don't really work as well as they

1    could.  But that statement is accurate.

2              "Given the tightening in the crypto credit space this

3    year we've returned most of our loans by now."  And they had.

4    They had paid back the lenders.  So that statement on

5    November 6th by Caroline, or Caroline working with Sam, doesn't

6    advance the government's case.  It doesn't move the needle at

7    all.

8              And let's look at the next slide, 32.

9              This is right after CZ makes——go back.  Go back to the

10   other one.  This is right after CZ makes the offer to buy——sell

11   his FTT at $22.  Caroline writes——and she said she consulted

12   with Sam and others on that, and that's right——"CZ, if you're

13   looking to minimize the market impact on your FTT sales,

14   Alameda will happily buy it all from you today at $22" per

15   token.  That's an accurate statement.  $22 was a fair market

16   price.  It was the six-month low.  You heard that that from

17   Sam.  Sam believed that they had the wherewithal to buy the

18   tokens if they needed to.

19             Now I think there was some concern by Sam and Caroline

20   that maybe CZ wasn't really selling, he was just doing this to

21   hurt FTT——FTX.  Maybe he was, maybe he wasn't, but this

22   statement in response was accurate.

23             If we could go to the next one.

24             And I'm going to go out on a limb here.  I think this

25   is the government's favorite piece of evidence.  I don't think

1    there's a witness they haven't showed this to more than one

2    time.  And they used it again and again in their

3    opening—excuse me—in their summation.  But let's talk about

4    what really happens here.  This is November 7th in the morning.

5    Sam tweets, "A competitor is trying to go after us with false

6    rumors."  He believes that.  That's CZ, Binance.  Sam believes

7    they are going after us with false rumors.  And then he says,

8    "FTX is fine.  Assets are fine."  And he told you why he felt

9    he could write that.  And it's the same thing we've been

10   discussing.  As of the morning of November 7th, from a

11   liquidity point of view, Sam believed that Alameda had assets

12   on and off the exchange that could address the liquidity issue

13   and that FTX also had assets that could address the issue.

14           And here's the critical companion to this, the part

15   that the government didn't ask any of its witnesses, even

16   though they showed this slide to all of them.  By the next day,

17   by November 8th, the price of FTT—remember, that's what's

18   causing the specific run, FTT is plummeting.  Because of all

19   the things that are happening, the price of FTT has dropped,

20   Sam told you, to all the way down to close to zero, $5 a token.

21   What does that mean?  It means assets are not fine.  So what

22   does he do?  He takes the tweet down.  And this was

23   corroborated by the stipulation we read to you showing that in

24   fact on November 8th, this tweet was taken down.  So again, if

25   all he's doing this week is wheeling and dealing like a

1    fraudster, why would he do that?  Why wouldn't he put up an

2    even more outrageous tweet?  He wouldn't, because he's reacting

3    in realtime as events are unfolding, and once he sees that

4    because of what's happened to FTT, I can't say this anymore, he

5    takes it down.

6           The other thing that happens during that week is——if

7    we can call up the next slide

8           ——is the following:  And let me just set the stage for

9    this.  We've had a lot of testimony from all the witnesses.

10   Maybe this is the second favorite topic, after the last slide,

11   about deletion, and auto-deletion, and the government said,

12   Aha, you know how we know Sam's a fraudster?  You know how we

13   know he's nefarious?  Is because on a few occasions, he deleted

14   Signal messages 'cause he was trying to hide evidence.  And

15   what Sam told you was in fact, FTX, like a lot of companies,

16   had a data retention policy, or data protection policy, and his

17   understanding of it was it created three categories.  One were

18   messages you had to preserve, things that you might show to

19   regulators, for example; the second category is things you had

20   to destroy, things like people's Social Security information,

21   personal data; and the third category was sort of everything

22   else, which, as Sam understood it, allowed the person who was

23   dealing with the chat to set the delete or not as they saw fit.

24   And even with all that——and so over time, Sam and others would

25   delete certain messages.

1          And even with all that, here we are in November, the

2    week of November 11th, the worst week in the history of the

3    company, and what does Sam do in the three chats called out?

4    The first one is Hashtag Organization.  Its participants are

5    him, Nishad, Gary, and Caroline.  He turns off auto-deletion,

6    on November 9th.  The next one are messages just between him

7    and Caroline.  On November 10th, he turns it off.  And again,

8    him and Gary, he turns it off.  We submit this is the opposite

9    of someone who was running a fraudulent scheme would do.

10          Your Honor, we may have hit a natural breaking point.

11          THE COURT:  You mean for the day?

12          MR. COHEN:  Well, I have a lot more to do, so—

13          THE COURT:  Sidebar, please.

14          MR. COHEN:  Sure.

15          (At the sidebar)

16          THE COURT:  If you want to break, we'll take a break.

17          MR. COHEN:  I'm just concerned, your Honor, it's been

18    a very long day, and I'm concerned that the jury is not going

19    to be paying attention as we get to 5:30, 6:30.

20          THE COURT:  Do you have a view?

21          MS. SASSOON:  No objection.

22          THE COURT:  We'll go on.

23          MR. COHEN:  Can we take a break, your Honor?

24          THE COURT:  Yes, sure.

25          (In open court)

1           THE COURT:  We'll take a break, but I'm told we should

2    finish by 6 or 6:30, and unless somebody has a serious problem

3    with that, which you'll let me know by a note when you come

4    back from the break, I'd like to go on, but if there's a

5    serious problem, I won't.  So we'll take a 15-minute break.

6           (Recess)

7           (Continued on next page)

1          THE COURT:  The jury was given an opportunity to make

2   calls to enable them to stay, and we are going to continue; not

3   indefinitely, but continue.

4          Let's bring them in.

5          MR. COHEN:  Thank you, your Honor.

6          THE COURT:  I think it is in everyone's interest to

7   get the case to the jury.

8          MR. COHEN:  I understand, your Honor.

9          (Jury present)

10         THE COURT:  Defendant and the jurors all are present.

11         Ladies and gentlemen, thank you so much for

12  accommodating this later-than-usual sitting this evening.  We

13  are simply trying to complete the matter in an appropriate way.

14         You may continue.

15         MR. COHEN:  Thank you, your Honor.

16         Again, thank you, everybody, for staying.  We really

17  appreciate it.  This obviously could not be more important to

18  me and my client.  Thank you.

19         When we broke, I was just finishing talking about the

20  period that ended in November 2022.  There is one last piece I

21  wanted to cover quickly that goes into December.

22         The government, in its summation, talked about Sam's

23  talking to journalists in November and December, and the

24  government's theory apparently was this is yet another example

25  of Sam the criminal mastermind.

1          And we submit that when you think of it with your

2    real-world experience, their theory makes no sense.  He decided

3    to speak with something like 50 journalists in November and

4    December.  He did that even though he had no access to his

5    records, not even to his email, and even though, as with Good

6    Morning America, he didn't know what he would be asked.  And

7    the notion that he was somehow going to navigate 50 interviews

8    as part of an elaborate coverup just doesn't make any sense,

9    and we submit you shouldn't put any weight on it.

10          The last piece from this period is the testimony you

11   heard that the government elicited from Gary Wang about the

12   Bahamas in the period right after November 11.  And the

13   testimony and certainly the implication from the government is

14   that not only was Sam running this criminal enterprise for

15   three years, not only was he along the way lying to Congress,

16   not only was he, I guess, lying to the media to create a

17   coverup, in his last vengeful act he was also trying to curry

18   favor with the government of the Bahamas so that he could keep

19   control of FTX, even after the bankruptcy.  That's the theory.

20          The evidence, of course, came nowhere close to showing

21   that.  In fact, it showed quite the opposite.

22          I just want to focus on two pieces for you, ladies and

23   gentlemen, quickly.  First was GX-248, which we looked at

24   yesterday, both -- two days ago, both on Sam's direct and --

25   his cross-examination and his redirect, and that document is a

1   series of emails between Ryan Pinder, who was the Attorney

2   General of the Bahamas, and Sam and others getting into what

3   had happened with FTX, what was going to happen going forward.

4        And the government, in its examination of Sam, read

5   only one part of the same paragraph, and they suggested that in

6   that paragraph what Sam was doing was opening up withdrawals

7   from FTX only for customers who were based in the Bahamas as a

8   way to get favor with the Bahamian government.  They left out

9   the very next sentence.  You can see it here, the bottom

10  paragraph, in which we brought up with Sam in which he goes on

11  to say:  It is your call whether you want us to do this, but we

12  are more than happy to and would consider it, at the very

13  least, of our duty to the country, and we could open it up

14  immediately if you reply saying you want us to.

15       What's happening there?  When you live in a country

16  and the Attorney General reaches out to you, you better return

17  the call.  You better respond to the email.  And Sam believed,

18  and he shows he is unclear, that, in part, this might be what

19  the government of the Bahamas wanted him to do.  If they wanted

20  him to do it, he was going to do it.

21       We can take that down.

22       The second piece that they elicited from Gary, and the

23  government claimed this again showed nefarious conduct,

24  involved Sam's interview with the SCB, which was the securities

25  commission of the Bahamas, and the decision after that to

1    transfer certain assets to the SCB.  Again, that was portrayed

2    to us as, you know, yet again Sam currying favor with the

3    Bahamas or somehow trying to control the process.  But, again,

4    that's not what the record showed.

5          Remember our first witness on defense was Ms. Krystal

6    Rolle, the very distinguished Bahamas attorney who flew all the

7    way here to testify for you.  She told you she is now a King's

8    Counsel.  She used to be a Queen's Counsel.  There is 40 of

9    them in the Bahamas.  She is one of the most distinguished

10   attorneys in the Bahamas, and she told you, there was no

11   fooling around.  Sam was ordered to go to this meeting at the

12   SCB.  He went there with her.  They met with the SCB and its

13   leadership.  They also met with something called the joint

14   provisional liquidators.  And then they went from that meeting

15   to FTX offices and, under an order, transferred the funds.

16   Nothing nefarious about that.

17         Let me turn to the next part of my presentation.  And

18   just to orient you, I am now going to make -- talk a bit about

19   the government's case and then just make some concluding

20   remarks.  Again, thank you for bearing with me.

21         Let me talk about the government's case.  I want to

22   talk about three things:  Their cooperating witnesses, the

23   specific counts relating to customers, lenders, and investors,

24   and how to think about the testimony of Professor Easton and

25   Agent Owens who you heard from.

1          Let me talk about their cooperating witnesses.  It's

2    really, really interesting because in a three-and-a-half-hour

3    summation the government didn't mention their cooperation

4    agreements at all.  They didn't mention at all that they might

5    have some incentive to testify in a certain way or not.

6          Let me talk about how to think about them.  Now, we

7    expect the Court will give you an instruction on how to weigh

8    evidence and, as always, it's Judge Kaplan's word that

9    controls.  But we ask that as you deliberate you keep in mind a

10   few things when you think of what the cooperating witnesses

11   said, and here I'm talking about Gary, Nishad, and Caroline,

12   who had cooperation agreements, and I'm also talking about Adam

13   Yedidia, who had an immunity agreement, and Can Sun, the

14   attorney who had a nonprosecution agreement.  Let me suggest a

15   way to think about those witnesses and their testimony as you

16   deliberate.

17         First, of course, is what matters is Sam's state of

18   mind.  Counting up the number of people who did or didn't

19   testify against him doesn't matter.  What matters is what Sam

20   believed in good faith at the time.  As we mentioned when we

21   started in an opening, we didn't have to present any evidence

22   at all, so the number of witnesses presented by each side

23   doesn't matter.

24         Second, if you examine their testimony carefully, as

25   we know you will, you will see that when you view it against

1   your real-world experience, you cannot rely on it to carry the

2   government's burden of proof as to Sam.  Think about the three

3   main cooperating witnesses, what they said about when they

4   realized there was a problem with Alameda borrowing FTX's

5   assets.  You heard different answers from them.  They were even

6   inconsistent among themselves.  Gary claimed he became aware of

7   the issue as far as back as 2019 or 2020, when he happened to

8   be sitting next to Sam at Alameda, and overheard an Alameda

9   trader mentioning Alameda having a negative account balance at

10  FTX.  By the way, what did he do about it at the time?

11  Nothing.

12          Nishad, on the other hand, claimed he never knew about

13  the size of Alameda's borrows and the possible impact of the

14  fiat@ liability until June of 2022, and he didn't think there

15  was a problem with what was happening until September.  Now,

16  Nishad worked right alongside Gary for years, and you heard the

17  government tell you how Nishad and Gary were the engines behind

18  setting up the secret codes and the code base, yet they gave

19  you conflicting accounts of what happened there.

20          Then there was Caroline, who fell somewhere in

21  between.  She testified she was aware of Alameda borrowing its

22  funds using its line of credit sometime in 2020, but, again,

23  didn't do anything about it, but she didn't consider there to

24  be a problem until June 2022, when we had the bug sequence that

25  we talked to you about.

1          The three of them are working side by side with each

2    other and with Sam, their friend, for the entire time, but they

3    claim they learned this information at different times and in

4    different ways and that they did essentially nothing about it

5    until November 2022.  It doesn't make sense if you thought at

6    the time -- if you thought for years you were doing something

7    wrong that you wouldn't take action.

8          Another thing to consider when you think about the

9    number of witnesses, and if we can put up the next slide.

10         A lot of the witnesses weren't actually additive

11    witnesses.  They were just repeating things they had heard from

12    some other witness.  You will recall you heard testimony from

13    Caroline about the all-hands meeting in which she said there

14    was the fiat liability and that was causing the problem.  You

15    then heard from Adam Yedidia that he resigned when he heard

16    about what happened at the all-hands meeting, not that he was

17    there, not that he even spoke to someone that was there, but he

18    spoke to Leila Clark, who spoke to someone who was there and,

19    based on that, he resigned.  Think about that for a moment.

20    Adam was a developer.  Adam could access the code.  Adam could

21    work on the bug fix.  And he tells you that he based everything

22    he was doing, he based his conclusion that Sam had done wrong

23    on something he heard from someone who heard from someone who

24    had been at the meeting.  That doesn't make sense.

25         Same thing with Christian Drappi, the individual with

1    whom the recording was played with.  He was also a developer

2    like Adam.  He could have verified or not verified what he was

3    being told, but he just acted on it.

4            Nishad told you, at the bottom of the chart, that he

5    based his conclusion on what was happening with the liability

6    on a conversation with Caroline in September and then Can told

7    you he based it on Nishad.

8            There is a lot of telephone going on here and the

9    point is it's not four, five, six witnesses giving you

10   firsthand knowledge.  It's four or five witnesses just

11   repeating what they have heard down the chain.

12           You can take that down.

13           Turning back to the three cooperating witnesses, Gary,

14   Caroline, and Nishad, a few things you should consider when you

15   evaluate their testimony, which you should do very carefully.

16           Let's put up the next slide.

17           You will recall there was testimony about their

18   compensation.  Going into November 2022, these were extremely

19   wealthy people who had made significant salary, significant

20   cash bonuses, and certainly, based on the equity value, were

21   each billionaires.  You should keep that in mind as you

22   consider their testimony.

23           Let's go through now what each of them did.

24           If you can pull up the next slide.  Actually, take

25   that down for a moment.

1              Again, Gary tells you that he first heard of a problem

2    in 2019 in the trader conversation, but he didn't do anything

3    about it, that between 2019 and 2022, he becomes a billionaire.

4    And certainly had he thought there was anything wrong going on,

5    he could have cashed out, he could have resigned, he could have

6    left, he could have contacted an attorney and notified the

7    authorities.  He doesn't do any of that.

8              Same thing with Caroline.  She goes through the same

9    sequence.  She tells you she first learns of the problem in

10   June 2022, but even after that she doesn't resign, she doesn't

11   leave the company, she doesn't hire any advisers.  Why?

12   Because they don't think they are doing anything wrong.

13             Then there is Nishad.  He testified that they were

14   doing wrong in September, and he had, shall we say, an

15   interesting view about what was right and wrong at that time.

16   He said what was wrong in September was, quote, spending

17   dollars.  Spending anything after September was necessarily

18   digging the customer deficit hole deeper.  That's Nishad at

19   page 416.  But did he really believe that?  Just like the

20   others, he didn't resign, he didn't leave, he didn't seek an

21   attorney.

22             And, more than that, remember Nishad admitted on

23   cross-examination that, in October, he borrowed $3.7 million

24   off the FTX exchange to buy a house for himself and his

25   friends.  If he actually thought what they were doing was

1    wrong, would he have bought a house with funds borrowed from

2    the exchange?

3            Now, if you can put up the next slide.

4            This just returns to a theme we talked about in

5    opening, the cooperating witnesses then and now.  Again, it

6    just summarizes the points that I have just made.

7            Think about it.  Five of the seven counts that Sam is

8    charged with are from being part of a conspiracy, presumably

9    with one or more of these people.  In light of what we have

10   just discussed, how could he have been in a conspiracy with any

11   of them?

12           We can take that down.

13           Now let's talk about what happens with the three of

14   them during that very, very fateful week of November or ten

15   days or 11 days, November 11, 1 to 11.  No question, we can all

16   agree, this is a very chaotic time.  This is a very stressful

17   time.  The companies are on the verge, by the end, of going

18   bankrupt, and they do go bankrupt.

19           And what happens?  As that week unfolds, what the

20   cooperating witnesses do, as FTX's situation become more and

21   more desperate, as regulators pop up in the Bahamas and

22   elsewhere, as there is chaos at the door, something subtle

23   happens.  Blame is shifted to Sam.  They are doing what they

24   need to do to get out from under.

25           How do we know that?  We know that from their own

1    testimony, both on direct and cross-examination.  Remember the
2    all-hands call we just talked about.  At a certain point in the
3    call, and this is the part the government played for you,
4    Caroline is asked what happened and who made the decisions.
5    Now, to hear the government tell it in summation, certainly
6    Caroline made the decisions.  She was part of it.  But how does
7    she respond to this group of people who, by definition, are not
8    in the conspiracy?  Quote:  Sam, I guess.

9           And you recall we saw a Signal conversation with
10   Nishad and Sam on November 6 which the government played for
11   you today where Nishad told Sam, one thing that would seriously
12   help me is if I didn't have any debts.  And to erase his debts,
13   on November 6, Nishad proposes a fake transaction that's going
14   to be backdated that would net out his loans.

15          And a fair reading of this tweet -- and the testimony
16   is at 1459 through 1461 -- fair reading of this tweet is as
17   things are unfolding and things are getting tighter and tighter
18   and tighter, Nishad to starting to something focus on himself,
19   how to get out from under.  Sam told you -- and it was not just
20   Sam; others testified to this -- he regarded Nishad as suicidal
21   during this period.

22          So he responds, sure, we can probably do that, but he
23   told you on his testimony, he's not planning to do a backdated
24   transaction with Nishad.  He is just agreeing because he
25   doesn't want his friend to do anything drastic.  What his

1    friend is doing is focusing on himself.

2          Two days later, on November 8, Sam -- Nishad sends a

3    chat to Sam which the government actually showed you today, I

4    was surprised, that says, quote, this is wildly selfish of me,

5    but they may need to know that it wasn't a ton of people

6    orchestrating it.  The government suggests that the it is the

7    crime here, but a fair reading is the it is problem, the mess,

8    the disaster going on.

9          To put this in context, Nishad sends this same chat,

10   and within a few days he goes from buying a $3.7 million home

11   for himself with funds off of the FTX exchange to sending this

12   kind of chat.

13         What about Gary?  Gary goes from the meeting with the

14   regulators at the SCB in the Bahamas, where he certainly knows

15   things are up, the wind is up to his lawyers from the U.S.

16   coming to get him in the Bahamas and going back to the U.S.

17         The point here is not that Gary, Nishad, and Caroline

18   are bad people.  We haven't said that at all during this case.

19   We actually have empathy for the situation they found

20   themselves in and what they felt they needed to do.  But they

21   were under pressure to get out from under, and that meant

22   pointing at Sam.

23         Sam, of course, never tried to do those things.

24   Remember that these witnesses ultimately entered into

25   cooperation agreements with the government.

1                    We can pull up the next slide.

2                    They entered into a cooperation agreement, and they

3        agreed to plead guilty to the various charges that expose them

4        to serious, serious jail time.  And they were asked about that

5        both on direct and on cross-examination.  And at first we got

6        sort of a boilerplate answer, I'm just here to testify.  I am

7        just here to tell the truth.  I have no expectation about the

8        sentence I might get.  I am just here to tell what happened.

9                    But then Gary slipped, and that's at page 477, and he

10       said:  You know, ideally, I don't want any jail time.  That's

11       what this was about.  And they are not going to get it.  They

12       are not going to get the kind of cooperation agreement they

13       want, the kind of sentence reduction motion by saying, you

14       know, at the time we really didn't think anything was wrong.

15       They are not going to get it by saying, you know, we all made

16       business decisions, we made mistakes, we did some dumb things,

17       and they turned out wrong.  They are not going to get it that

18       way.  And they are not going to get it by saying, you know, Sam

19       was our friend.  He was a good guy.  We built businesses

20       together.  He worked really hard, and at the end he was trying

21       to save FTX and customers.  So they did what they had to do.

22                    And in that regard think about this.  Caroline was up

23       front with you in her direct and cross that she had really

24       nothing to do with investors.  Her business as CEO of Alameda

25       was to work with outside lenders and to run the company and,

1    yet, she pleaded guilty to one of the counts, committing fraud

2    with respect to investors.

3         Nishad told you in his direct and cross that he didn't

4    feel he had done anything wrong with respect to making

5    political donations, and he originally thought that the

6    donations were properly characterized.  But he pleaded guilty

7    to a campaign finance charge among the counts he pleaded to.

8         Again, we don't fault them.  They did what they had to

9    do under the circumstances, but it means you should consider

10   their testimony overall very carefully.  Someone who will plead

11   guilty to something they are unsure of or didn't even think

12   they did is someone whose testimony you should think about very

13   carefully.

14        As for Adam Yedidia, he received an immunity

15   agreement, even though he told you he didn't think he did

16   anything wrong.  It seems inconsistent.

17        And Can Sun, the attorney, told you he received a

18   nonprosecution agreement two days before he testified.

19        Now, let me move on and talk about some of the

20   specific counts in the indictment and customers, lenders, and

21   investors.

22        Just to go back to where I started, Sam's good faith

23   is a defense to all the counts in the indictment.  If you find

24   he acted in good faith, you must find him not guilty on all

25   seven counts.  But there are also specific defenses and

1    specific problems with some of the individual charges in the

2    indictment as well, and I want to point them out to you now.

3            If we could call up the next slide.

4            This is Count One, wire fraud on customers.  Again,

5    these are not controlling.  What controls as to the elements is

6    what Judge Kaplan will tell you.  But as to the customer

7    counts, we ask that you consider the evidence on that.  And

8    when you do, we ask that you think about the fact that the

9    government called two customers, and we submit that their

10   testimony did not carry the day.

11           First, you heard from Mr. Julliard, the French person

12   who lives in London who was the very first witness called in

13   the case.  Now, he told you he was a commodities trader,

14   sophisticated commodities trader who traded in cocoa.  And he

15   admitted on the stand that he agreed to but never reviewed

16   FTX's terms of service, and instead he initially claimed that

17   the reason he put assets on FTX was because of the

18   advertisements FTX had put up.  He remembered the one involving

19   Gisele.  He didn't remember her last name.  And he thought

20   based on these ads there must be good financials behind the

21   company.

22           Does that testimony make sense to you, is that someone

23   who is a cocoa commodities trader would actually act in the

24   real world?  It isn't.  And I don't think you can give his

25   testimony any weight in considering the counts against

1    customers.

2         The other customer we heard from was Mr. Morad.  He

3    testified that he was very familiar with crypto, that he had

4    accounts on many, many exchanges, and he had traded on many of

5    them.  Of course, like all the witnesses, except Can Sun, he

6    never read the terms of service, and he claimed to make his

7    investment decisions based on Sam's tweets.  Does that make

8    sense to you?  Again, we don't think that moves the needle at

9    all, so we suggest that that lack of evidence means that there

10   is an additional problem with respect to Count One and Count

11   Two.  Count One is wire fraud on customers and Count Two is

12   conspiracy to commit wire fraud on customers.

13        Now let's turn to Count Three and Four, which are the

14   conspiracy to commit wire fraud claims against lenders, if we

15   can go to the next slide.

16        Now, you heard testimony from Caroline about

17   interaction with lenders, and I am not going to redo that.  You

18   heard our view on why that doesn't carry the day as to proving

19   Sam acted with criminal intent.

20        And the only lender the government called was Zac

21   Prince, the CEO of BlockFi, and we submit that his testimony

22   also doesn't move the needle on the lender counts.  He told

23   you, I went over with him that BlockFi had done a credit memo

24   on whether to make a loan to Alameda.  And in that credit memo

25   his credit team had received everything they asked for, and

1   they were fully aware of all the factors they thought were

2   material or important to them.

3        For example, one issue we have talked about in this

4   case a lot was that one of Alameda's main sources of collateral

5   was FTT, the token that FTX had backed.  And sure enough

6   Mr. Prince told you, yeah, his team knew that.  We analyzed the

7   FTT.  We insisted that because FTT was illiquid, we would be

8   overcollateralized in FTT.  There was nothing misleading to him

9   when they made the loans, loans that were then paid back in

10  full.  As I mentioned before, Mr. Prince also then had --

11  during the crisis he had conversations directly with Sam in

12  which he was asking Sam if FTX would invest or loan money to

13  BlockFi, which did happen.

14       One last piece on the lenders, and this actually

15  applies to the investors and the customers.  Because the

16  directive doesn't the really move the needle, the government

17  does the following.  They ask the investors and lenders some

18  variant of the following question.  If I told you that Sam had

19  stolen customer assets, would that have been important for you

20  to know?  Who is going to say no to that?  But that's what was

21  happening in real time.  That is the conclusion the government

22  has reached after bringing its case.  That's not a fair

23  analysis of materiality.

24       Speaking of the investors, the government called two

25  investors:  Matt Huang, who was from a company called Paradigm;

1   and I am going to mispronounce this, but Mr. Robert Boroujerdi,

2   who was from Third Point.

3          And here are some important points about the investor

4   count, which is Count Five related to securities fraud.  They

5   each made their investments by January of 2022.  Remember the

6   chart we showed you about all the different offerings.  So they

7   made their investments before the events of May -- June through

8   November 2022, before Sam did all the horrible things that the

9   government says he did.  If they made their investments before

10  that, how could his later conduct have been material to them?

11  It couldn't have been.  Again, they ask the default question.

12  If I told you that to prove my case, would that be important to

13  you?  OK.  That's not proof.

14         On the investors as well, we had the piece where we

15  talked about the call with Apollo at the end of November or the

16  first week of November.  A few facts there to emphasize.  They

17  don't show support for the investor count.  This we received

18  from Can Sun.

19         First of all, Can admitted that in reaching out to

20  Apollo, Sam sent them the balance sheet that contained the

21  fiat@ liability, so nothing was kept from them.  And then Sam

22  spoke with Can.  Can went over the discussion with you in which

23  he said you can't use the borrow lending order book as a way of

24  explaining what had happened.  Sam said yup.  And Can said they

25  refused looking into what margin assets in general might have

1    covered that.  They never got to it.  But, more importantly,

2    Sam did have the call with Apollo and didn't say any of those

3    things.

4              And when you think about that sequence, think about

5    this.  Apollo ended up not investing and, more to the point,

6    the government didn't bring Apollo before you to testify that

7    Sam had said anything different.

8              They also didn't bring before you Ramnik Arora, who

9    was deeply involved in all the investment decisions.  The

10   government may say, well, the defense could have brought them

11   in too if they wanted you to hear from them, but, you know, we

12   don't have a burden.  We don't have to call any witnesses.  So

13   consider that.

14             Because their proof doesn't get them there on the

15   investor counts, remember none of the cooperating witnesses,

16   Gary, Nishad, or Caroline, had anything to do with investors,

17   because they didn't call Ramnik or anyone else because the two

18   individual investors I mentioned don't get them there.

19             We had these elaborate convoluted stories about the

20   Ecoserum sequence and the MobileCoin sequence.  What is that

21   all about?  It trying to back into some convoluted way to say

22   that Sam somehow did something with Nishad that would have

23   misled investors.

24             And we submit the story on Ecoserum is convoluted and

25   inconsistent, and Sam told you, look, I didn't tell Nishad to

1    backdate anything with regard to ECO Serum.  The fact that he

2    signed an agreement that others prepared for him doesn't move

3    the needle.

4         And on MobileCoin, which is, again, another effort to

5    backdoor into some sort of proof of the investor count, Sam

6    told you, yeah, there was a loss on FTX and I felt, I Sam, felt

7    I had mishandled it.  So I moved it to Alameda where I would

8    personally take most of the loss.  That seems like trying to

9    help investors, not hurt them.

10        Let me briefly talk about the money laundering count.

11   Quickly, let me go to Count Six.  Excuse me.

12        Count Six.  Count Six is the conspiracy to commit

13   commodities fraud count and that's basically the Count Five

14   securities fraud count repackaged as a commodities fraud count.

15   To the extent, for the reasons I have just said, the securities

16   fraud count fails, this one must fail as well.

17        Let me turn finally, to the money laundering count,

18   which is the last count.  I want to talk about the two types of

19   money laundering that the government has alleged here and how

20   the proof that you actually receive doesn't support it.  The

21   first one is called concealment money laundering.  That's where

22   someone is making -- has illicit sources of funds and seeks to

23   conceal them.

24        When you think about the government's theory here, it

25   makes no sense.  They say that the way Sam and others were

1    seeking to conceal assets they have taken from Alameda was by

2    making political donations with them.  Think about that.  Why

3    would someone conspire to steal funds and then try to conceal

4    them by making political donations, which are some of the most

5    regulated publicized and scrutinized forms of spending there

6    is?  Why would they go through the further trouble of hiring

7    political consultants and give them access to the internal

8    workings of FTX in a chat called Donation Processing, which is

9    what happened here, if the entire purpose was to secretly

10   launder money?  The government's theory doesn't make any sense.

11          The same goes for its second theory, money laundering

12   above a monetary threshold.  The theory essentially is, the way

13   the government has presented it, that basically any transaction

14   involving Alameda funds that may have been connected to FTX

15   customer funds, however they come up with the connection, is

16   per se money laundering, and you will hear the instruction, but

17   we submit that that theory goes too far and should be rejected.

18          Last in this section let me talk briefly about

19   Professor Easton and Agent Owens, who the government presented.

20          Now, the government spent a lot of time with Professor

21   Easton, and we saw chart after chart after chart after chart,

22   and you are invited at the end of the government's summation to

23   look at those charts again.  They really give you a suggested

24   way to think of Professor Easton's testimony.

25          At a very high level, if you find that Sam acted in

1   good faith and in good faith believed that he could spend or

2   FTX or Alameda could spend the funds it did when it did, then

3   really Professor Easton is beside the point.  All he did was

4   trace outflow of funds.

5          The question is not what the flows were:  Did it go to

6   account 1, account 2, account 3, or ABC?  The question is why?

7   Why was Sam doing it and what did he believe he was doing?  On

8   that basis alone, you need not -- you're welcome to, but you

9   need not go through all of these charts.  Because if you find,

10  as we submit you should, that Sam acted in good faith,

11  Professor Easton is besides the point.  He is just simply

12  taking the government's theory, assuming it's true, which, of

13  course, is what is up to you to determine, and then tracing out

14  those funds.

15         We also think, and again you may not need to get to it

16  at this level, that there were some things in his testimony

17  that were not reliable.  He said he knew the importance of

18  net-asset valuation, but yet when he did his analysis, his flow

19  of funds, he didn't look at that when it came to Alameda.  He

20  didn't look at Alameda's assets that were held off the exchange

21  or FTX or other assets.

22         He also told you in some of his analysis -- by the

23  way, that's at transcript 1802 and 1804.  He also told you in

24  some parts of his analysis that he concluded transfers must

25  have come from customer funds because they were, quote, in the

1    immediate vicinity of customer funds.  That's at 1750.  That

2    doesn't sound very scientific to me and not something to rely

3    on.

4           Finally, you heard from Agent Owens of the FBI, who

5    did a flow-of-funds analysis relating to political donations.

6    Again, the easiest way to think about her is from a high-level

7    point of view.

8           If you conclude, as we submit you should, that Sam

9    acted in good faith, including in making political donations,

10   then she traced out the funds, whether they went to account A

11   or B or C, is beside the point.

12          Like Professor Easton, if you want to get into the

13   specifics, some of her analysis was not reliable.  She told you

14   she used the last in, first out LIFO method, but then we showed

15   her a major expenditure that she had to admit on the stand

16   actually didn't follow that method, so a reason to be skeptical

17   there.

18          That brings me to my concluding remarks finally.  We

19   want to thank you again for sitting with us through this trial.

20   You have done a great job keeping an open mind and listening

21   carefully and intently, and we thank you for giving up the time

22   in your personal lives to hear this case.  It is important to

23   us.

24          Now, after I speak, tomorrow the government gets to

25   speak again.  It's called a rebuttal summation.  As I

1   mentioned, they get to do that because they get two because

2   they have the burden of proof and it never shifts.

3          But, even so, the defense can still be heard.  What do

4   I mean by that?  You can speak for us.  When you hear something

5   in the government's rebuttal, and as you evaluate it later in

6   the jury room, please consider they are making points that we

7   might make, asking questions we would ask.

8          For example, if the government says, well, once the

9   fiat liability was discovered, Sam should not have come to a

10  different view about Alameda's liquidity and Gary, Caroline

11  and, Nishad.  Please ask, why not?  Wasn't this in the end a

12  difference in business judgment?  If the government says in

13  rebuttal, well, please disregard what the defense told you

14  about how to think about the cooperating witnesses and their

15  agreements, about all the real-world pressures on them, about

16  the shift in what they said between then and now, please ask,

17  why should we do that?  Shouldn't we be very skeptical of their

18  testimony and not accept it due to those concerns and so on?

19         As you listen to the rebuttal summation and as you go

20  into the jury room we ask you, please, to think about the

21  questions we would ask and consider them as you go through the

22  evidence.

23         Because in the end we submit that Sam did his best to

24  start and operate two companies that became multibillion dollar

25  businesses in a new industry.  Some decisions and judgments

1   turned out very well.  FTX wound up with 6 million users,

2   managed billions and billions of dollars of trade.  Some

3   decisions turned out poorly, especially without hedges.

4   Holding long-term assets against short-term liabilities was a

5   decision that turned out poorly.  It led to FTX and Alameda's

6   liquidity gap and ultimately to the bankruptcy filings.  As I

7   have said many times now, business decisions made in good faith

8   are not grounds to convict.

9           We submit that when Sam testified before you, he told

10  you the truth, the messy truth, that in the real world

11  miscommunications happen, mistakes happen, delays happen.  And

12  the borrowing happening in the case of Alameda here, in the

13  case of Alameda depositing or withdrawing hundreds of millions

14  of dollars a day, in a process that swept in customer fiat

15  assets, there were mistakes, there were failures of corporate

16  controls in risk management, and there was bad judgment.  That

17  does not constitute a crime.

18          This has been an extraordinary journey.  In Sam's life

19  he has gone through more than most do in a lifetime.  One day

20  he's a college student.  Then he's in an apartment with his

21  close friends starting a crypto company.  They are working

22  around the clock, moving all over the world.  The company is

23  becoming amazingly innovative and successful, worth billions.

24  Then there is a market crash and then this.

25          And here we are, finally before you, in your hands,

1    the jury, so I'll speak last for Sam, for my client.  Consider

2    the evidence in light of your real-world experience.  We submit

3    you will find that Sam acted in good faith throughout, that he

4    made the best business decisions he could at every stage.  He

5    didn't want to hurt anyone, far from it.  He didn't want to

6    defraud anyone and he didn't.  He didn't intend to defraud

7    anyone.

8            So, with respect, the greatest of respect, we ask that

9    when you deliberate, you find him not guilty on all counts.

10           Thank you.

11           THE COURT:  Thank you.

12           Ladies and gentlemen, thank you for staying.  We will

13   tomorrow morning hear any rebuttal argument by the government,

14   and I will charge you and you will get the case.

15           I should add, in full disclosure, I am informed during

16   the day -- and, again, I'm not commenting on how long this

17   should take or how quickly you should be done one way or the

18   other -- if we do stay late enough to get something to eat,

19   it's pizza.  It didn't used to be that way.  I'm sorry, but

20   that's what it is.

21           (Adjourned to November 2, 2023, at 9:30 a.m.)

22

23

24

25