UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

SAMUEL BANKMAN-FRIED,

                    Defendant.

Case No. 22-cr-673 (LAK)


**SAMUEL BANKMAN-FRIED'S SENTENCING MEMORANDUM**

Marc L. Mukasey
Torrey K. Young
Thomas E. Thornhill
Michael F. Westfal
Stephanie Guaba

MUKASEY YOUNG LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
(212) 466-6400

*Attorneys for Samuel Bankman-Fried*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

PROCEDURAL HISTORY ............................................................................... 5

THE OFFENSE CONDUCT ............................................................................. 7

I.  THE ADVISORY GUIDELINES ANALYSIS ........................................... 11

    A.  The Sentencing Guidelines Calculations Set Forth In The PSR .......... 12
    B.  The PSR's Loss Calculation Is Unsupported ...................................... 13
        1.  Statement of Facts Relevant to the Issue of Loss ....................... 14
        2.  Ten Billion Is Not A "Reasonable Estimate" ............................. 15
        3.  "Loss" Under Guideline 2B1.1 Is Limited to Actual, Not Intended, Loss ........................................................................ 16
        4.  The Most Reasonable Estimate of Loss is Zero ......................... 17
        5.  If Not Zero, the Actual Loss is Customers' Estimated Cost of Collection in Bankruptcy ........................................................ 22
        6.  In The Alternative, Intended Loss is Zero ................................. 23
    C.  The Enhancement For Fraudulent Actions In The Course Of A Bankruptcy Proceeding Is Inapplicable ............................................. 24
    D.  FTX Was Not Located Outside The U.S. To Evade Law Enforcement ............... 24
    E.  The Enhancement For Deriving More Than $1,000,000 In Gross Receipts From A Financial Institution Is Inapplicable ......................... 25
    F.  Sam Was Not In A Position Of Public Or Private Trust ...................... 25
    G.  The Enhancement For Obstruction Of Justice Is Unwarranted ........... 26
    H.  Sam Was Precluded From Rebutting The Government's Campaign Finance Evidence ................................................................... 27
    I.  The Offense Level Substantially Overstates The Seriousness Of The Offense ..... 28

II.  FACTORS UNDER TITLE 18 U.S.C. SECTION 3553(a) .......................... 37

    A.  Title 18, Section 3553, Subsection (a)(1) ........................................ 38
        Sam Bankman-Fried's Personal History and Characteristics ............... 39
        1.  Sam's Early Life ..................................................................... 39
        2.  College ................................................................................... 42
        3.  Wall Street ............................................................................. 43
        4.  Alameda Research ................................................................... 44
        5.  FTX ....................................................................................... 45
        6.  Sam's Philosophy And Philanthropy ........................................ 46
        7.  Sam Is Not Motivated By Greed ............................................... 50
        8.  Sam's Caring For Individuals .................................................. 52
        9.  Sam's Work Ethic ................................................................... 54
        10.  Sam's Remorse ..................................................................... 55
        11.  Sam's Low-Level Culpability ................................................. 56

12. Sam's Condition ...................................................................57

B. Title 18, Section 3553, Subsection (a)(2)(A) ............................59

1. Sam Is Already Being Punished .............................60

2. Collateral Consequences ........................................64

C. Title 18, Section 3553, Subsection (a)(2)(B) ............................66

D. Title 18, Section 3553, Subsection (a)(2)(C) ............................69

E. Title 18, Section 3553, Subsection (a)(2)(D) ............................69

F. Title 18, Section 3553, Subsection (a)(3) ..................................70

G. Title 18, Section 3553, Subsection (a)(4) ..................................70

H. Title 18, Section 3553, Subsection (a)(6) ..................................71

I. Title 18, Section 3553, Subsection (a)(5) ..................................82

J. Title 18, Section 3553, Subsection (a)(7) ..................................82

III. FORFEITURE ...............................................................................85

SAM BANKMAN-FRIED'S SENTENCE REQUEST ............................89

# TABLE OF AUTHORITIES

## CASES

*Agudelo v. United States*,
   724 F. Supp. 1110 (E.D.N.Y. 1989) ....................................................................... 13

*Gall v. United States*,
   552 U.S. 38, 128 S. Ct. 586 (2007) ............................................................... passim

*Kaley v. United States*,
   571 U.S. 320, 134 S. Ct. 1090 (2014) ............................................................ 67, 86

*Kimbrough v. United States,*
   552 U.S. 85, 128 S. Ct. 558 (2007) ............................................................... 35, 37

*Kisor v. Wilkie*,
   588 U.S. ----, 139 S. Ct. 2400 (2019) .................................................................. 16

*Lora v. United States*,
   599 U.S. 453, 143 S. Ct. 1713 (2023) .................................................................. 32

*Pepper v. United States*,
   562 U.S. 476, 131 S. Ct. 1229 (2011) ............................................................ 38, 57

*Peugh v. United States*,
   569 U.S. 530, 133 S. Ct. 2072 (2013) .................................................................. 59

*Rita v. United States*,
   551 U.S. 338, 127 S. Ct. 2456 (2007) ............................................................ 36, 39

*Spears v. United States*,
   555 U.S. 261, 129 S. Ct. 840 (2009) .................................................................... 37

*Tsatstin v. United States*,
   Case No. 18 Civ. 5975 (LAK) (GWG), 2019 WL 4266186 (S.D.N.Y. Sept. 10, 2019) .......... 61

*United States v. Abiodun*,
   536 F.3d 162 (2d Cir. 2008) ........................................................................... 22, 30

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........................................................... passim

*United States v. Algahaim*,
   842 F.3d 796 (2d Cir. 2016) ........................................................................... 28, 35

*United States v. Altman,*
   48 F.3d 96 (2d Cir.1995) .................................................................................... 71

*United States v. Anderson*,
   267 F. App'x 847 (11th Cir. 2008) ...................................................................... 64

*United States v. Anderson*,
   533 F.3d 623 (8th Cir. 2008) .............................................................................. 64

*United States v. Bankman-Fried*,
   Case No. 22-cr-0673 (LAK), 2023 WL 4194773 (S.D.N.Y. June 27, 2023 ................... 27

*United States v. Banks,*
  55 F.4th 246 (3d Cir. 2022) ............................................................................ 16

*United States v. Barinas,*
  865 F.3d 99 (2d Cir. 2017) .............................................................................. 27

*United States v. Berg,*
  250 F.3d 139 (2d Cir. 2001) ............................................................................ 24

*United States v. Booker,*
  543 U.S. 220, 125 S. Ct. 738 (2005) ............................................................... 71

*United States v. Carrion-Melendez,*
  26 F.4th 508 (1st Cir. 2022) ...................................................................... 15, 16

*United States v. Catoggio,*
  326 F.3d 323, 328 (2d Cir. 2003) .................................................................... 83

*United States v. Chavez,*
  Case No. 22-CR-303 (JMF), 2024 WL 50233 (S.D.N.Y. Jan. 4, 2024) .................. 61

*United States v. Confredo,*
  528 F.3d 143 (2d Cir. 2008) ...................................................................... 23, 24

*United States v. Contorinis,*
  692 F.3d 136, 145 n.3 (2d Cir. 2012) .............................................................. 87

*United States v. Corsey,*
  723 F.3d 366 (2d Cir. 2013) ...................................................................... 29, 30

*United States v. Durham,*
  766 F.3d 672 (7th Cir. 2014) ..................................................................... 19, 20

*United States v. El-Hage,*
  589 F. App'x 29 (2d Cir. 2015) ....................................................................... 11

*United States v. Emmenegger,*
  329 F. Supp. 2d 416 (S.D.N.Y. 2004) .............................................................. 28

*United States v. Faibish,*
  No. 12-cr-265 (ENV), 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015) ..................... 59

*United States v. Fisher,*
  Case Nos. 22-1575, 22-1647, 2024 WL 277704 (3d Cir. Jan. 25, 2024) ............. 17

*United States v. Gupta,*
  904 F. Supp. 2d 349 (S.D.N.Y. 2012) .................................................... 13, 29, 72

*United States v. Hollnagel,*
  No. 10 CR 195-1, 3, 2013 WL 5348317 (N.D. Ill, Sept. 24, 2013) ................ 87, 88

*United States v. Huggins,*
  844 F.3d 118 (2d Cir. 2016) ...................................................................... 25, 26

*United States v. Irving,*
  No. S3 03 CRIM. 0633 LAK, 2007 WL 831814 (S.D.N.Y. Mar. 19, 2007) ............ 11

*United States v. Johnson*,
   964 F.2d 124 (2d Cir. 1992) ........................................................................ 37

*United States v. Johnson*,
   Case No. 16-CR-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. April 27, 2018) ............... 29, 72

*United States v. Jolly*,
   102 F.3d 46 (2d Cir. 1996) ........................................................................... 25

*United States v. Jones*,
   531 F.3d 163 (2d Cir. 2008) ......................................................................... 36

*United States v. Kalish*,
   No. 06 Cr. 656 (RPP), 2009 WL 130215 (S.D.N.Y. Jan. 13, 2009); ...................... 87

*United States v. Kirschner*,
   995 F.3d 327 (3d Cir. 2021) ......................................................................... 16

*United States v. Knott*,
   638 F. Supp. 3d 1310 (M.D. Ala. 2022) ....................................................... 58

*United States v. Lauersen*,
   348 F.3d 329 (2d Cir. 2003) .................................................................. 30, 34

*United States v. Lee*,
   427 F.3d 881 (11th Cir. 2005) ...................................................................... 30

*United States v. Malik*,
   424 F. App'x 122 (3d Cir. 2011) ................................................................... 64

*United States v. Milikowsky*,
   65 F.3d 4 (2d Cir. 1995) ............................................................................... 37

*United States v. Mitrow*,
   Case No. 13 Cr. 633 (PAE), 2015 WL 5245281 (S.D.N.Y. Sept. 8, 2015) ............ 59

*United States v. Musgrave*,
   647 F. App'x 529 (6th Cir. 2016) .................................................................. 72

*United States v. Nasir*,
   982 F.3d 144 (3d Cir. 2020) ......................................................................... 16

*United States v. Ntshona,*
   156 F.3d 318 (2d Cir. 1998) ......................................................................... 26

*United States v. Olis*,
   Criminal No. H-03-217-01, 2006 WL 2716048 (S.D. Tex. Sept. 22, 2006) ........... 64

*United States v. Parris*,
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) .......................................... 31, 32 36, 72

*United States v. Redemann*,
   295 F.Supp.2d 887 (E.D. Wis. 2003) ............................................................ 64

*United States v. Ricciardi*,
   989 F.3d 476 (6th Cir. 2021) ........................................................................ 16

*United States v. Santos*,
553 U.S. 507 128 S. Ct. 2020 (2008) ................................................ 88

*United States v. Samaras*,
390 F.Supp.2d 805 (E.D. Wis. 2005) ................................................ 64

*United States v. Spears*,
533 F.3d 715 (8th Cir. 2008) .......................................................... 37

*United States v. Sponaugle*,
Case No. 19-103-LPS, 2022 WL 4079197 (D. Del. Sept. 6, 2022) ........ 64

*United States v. Springer*,
684 F. App'x 37 (2d Cir. 2017) ....................................................... 70

*United States v. Stewart*,
590 F.3d 93, 141 (2d Cir. 2009) ..................................................... 65

*United States v. Vigil*,
476 F.Supp.2d 1231 (D.N.M. 2007) ................................................ 64

*United States v. Viloski*,
814 F.3d 104 (2d Cir. 2016) .......................................................... 88

*United States v. Yagar*,
404 F.3d 967 (6th Cir. 2005) ....................................................... 30

*United States v. Zimmerman*,
No. 10-CR-598 (JG), 2012 WL 3779387 (E.D.N.Y. June 19, .............. 70

*Wasman v. United States*,
468 U.S. 559 104 S. Ct. 3217 (1984) ........................................ 38, 57

## STATUTES

18 U.S.C. § 3553(a) .............................................................. passim

18 U.S.C. § 3563 ......................................................................... 75

18 U.S.C. § 3584(a) ..................................................................... 34

18 U.S.C. § 3584(b) ..................................................................... 41

18 U.S.C. § 3663A(c)(1)(B) ........................................................... 88

## OTHER AUTHORITIES

Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*,
18.2 OHIO ST. J. CRIM. L. 605 (2021) ............................................. 73

C.E. Robertson and J.A. McGillivray, *Autism Behind Bars: A Review of the Research Literature and Discussion of Key Issues*, J. of Forensic Psychiatry & Psychology, 2015 Vol. 26, No. 6, 719-736 at 720 ........................................................................... 58

Paterson, P. (2008), *How well do young offenders with Asperger syndrome cope in custody?*,
British Journal of Learning Disabilities, 36, 54-58 .......................... 58

U.S.S.G. § 2B1.1 ......................................................................................... 16, 28, 30

U.S.S.G. § 3C1.1 .............................................................................................. 26

U.S.S.G. § 5B1.3 .............................................................................................. 70

U.S.S.G. § 5G1.2(d) .......................................................................................... 32

U.S.S.G. § 6A1.3(a) .......................................................................................... 15

U.S.S.G. Ch. 1, pt. A.3 ...................................................................................... 71

U.S.S.G. Ch. 5, Part A ...................................................................................... 32

U.S.S.G. Manual, Amendment 821, "Reason for Amendment," (eff. Nov. 1, 2023) .................. 69

This Sentencing Memorandum is respectfully submitted on behalf of defendant Samuel Bankman-Fried, who is scheduled to be sentenced on March 28, 2024.

## PRELIMINARY STATEMENT

*"I don't like that man.  I must get to know him better."*

Abraham Lincoln

Sam Bankman-Fried has been described as a "sociopath," "a man with no morals, remorse or empathy," who is an "an ice-cold manipulator, bully and shameless liar."  He has been labeled "one of history's most notorious fraudsters," and compared to Bernie Madoff, Charles Ponzi, a robber-baron, and the devil. "[John Ray] looked at his picture and thought, *There's something wrong going on with him*."[1]

But they don't know the true Sam Bankman-Fried.

Those who know Sam see someone who "cares deeply about other people." (Ex. A-22). Who exhibits "kindness and loyalty." (Ex. A-17).  Whose "heart [is] in the right place." (Ex. A-28).  Someone who "has always been dedicated to doing good in the world." (Ex. A-19).

Those who know Sam know he is selfless, altruistic and a young man who has demonstrated throughout his life "a genuine concern for those less fortunate around the world." (Ex. A-12).  Well before Alameda or FTX ever existed, Sam committed his life to philanthropy, pledging to earn money and give it away, with the goal of "helping the world's poorest people." (Ex. A-7).  "[A]s an intern at Jane Street Capital, [he] gave the majority(!) of his earnings to charity."  (Ex. A-23). "As a society, we need more people like him . . ." (Ex. A-20).

Those who know Sam see that his philanthropic commitment runs deeper than money: he is "thoughtful," "curious" and "well-informed" about complex global issues.  And his

---

[1] Michael Lewis, *Going Infinite: The Rise and Fall of a New Tycoon* 234 (W.W. Norton & Co., Inc. 2023).

philanthropic work was not a façade or an affectation. "He did not self-aggrandize through self-named institutions, nor did he create bureaucratic machinery to benefit himself and friends." (Ex. A-11). His passion for pandemic prevention was prescient and his commitment to "a better world" was steadfast. (Ex. A-4).

Those who know Sam recognize that he also "thought soberly and seriously about ethical issues." (Ex. A-10). "Morality wasn't just something [to be] talked about or felt, it was something [to be] thought deeply about and acted on." (Ex. A-3). He was "commit[ted] to his principles." (Ex. A-17).

Those who know Sam acknowledge that, although he often stumbles when trying to express himself, his values never waver:

> [Sam] wouldn't make small talk about your dog, but he'd subsist on bread and water in prison to avoid eating an animal. He was never good at apologizing, but always quick to admit fault. He would be uncomfortable giving me a hug, but I know he would give me a kidney if I needed one.

(Ex. A-3).

Those who know Sam have heard him say that when a billion people live in poverty, spending on luxury items is immoral. That's why "Sam has always lived a very modest life. Even as a billionaire, he drove the most basic car that was available. He wore ragged t-shirts and shorts. He cooked most of his own meals, usually frying . . . vegan meat with sparse vegetables, making enough for any housemates or drop-ins." (Ex. A-16). Sam simply had "no interest in material goods." (Ex. A-2).

Those who know Sam understand that his conduct was "never motivated by greed or status," (Ex. A-15) and that portrayals of him living an extravagant lifestyle are nothing short of fabrications. "He eschews materialistic trappings. . . [h]is focus lies squarely on the substance of

his work rather than superficial appearances . . . prioritizing functionality over extravagance." (Ex. A-27).

Those who know Sam are sensitive to the tragic fact that nothing in life brings him real happiness. Sam suffers from anhedonia, a severe condition characterized by a near-complete absence of enjoyment, motivation, and interest. He has been that way since childhood.

Those who know Sam also know how deeply, deeply sorry he is for the pain he caused over the last two years. And that he believes there is nothing he will ever be able to do to "'make [his] lifetime impact net positive,' a devastating self-assessment for someone who has devoted his life to improving the welfare of others." (Ex. A-16). "[E]ven if the jury's verdict had been innocent on all counts, the guilt of all the damage he's caused would gnaw away at him for many years." (Ex. A-10).

Those who know Sam respect how Sam admitted in an interview:

> At the end of the day, I was C.E.O. of FTX, and that means whatever happened, why ever it happened—I had a duty. I had a duty to all of our stakeholders, to our customers, our creditors. I had a duty to our employees, to our investors and to the regulators of the world to do right by them and make sure the right things happened at the company. And clearly, I did not do a good job with that.
>
> Clearly I made a lot of mistakes. There are things I would give anything to be able to do over again. I did not ever try to commit fraud on anyone. I was excited about the prospects of FTX a month ago. I saw it as a thriving, growing business. I was shocked by what happened this month. And reconstructing it, were there things I wish I had done differently.[2]

Those who know Sam can testify that his sole focus after the collapse of FTX was making customers whole:

> [Sam] worked almost around the clock, to the point of exhaustion. His sole focus was on helping to get customers repaid in full. . . . He routinely ignored advice . . . to work on assembling a legal defense team in the event he was prosecuted. He had

---

[2] *Transcript of Sam Bankman-Fried's Interview at the DealBook Summit*, New York Times (Dec. 1, 2022), https://www.nytimes.com/2022/12/01/business/dealbook/sam-bankman-fried-dealbook-interview-transcript.html.

no patience for conversations about defending himself. Instead, he offered whatever help he could give to [American and Bahamian] bankruptcy professionals. . . . [T]hat early cooperation from Sam (and his other co-founders) saved . . . dozens if not hundreds of millions of dollars for the FTX estate.

(Ex. A-9).

Those who know Sam know he was vindicated in January 2024, when the FTX bankruptcy estate announced that it could "cautiously predict" exactly what Sam had been saying since November 2022: customers AND general unsecured creditors with allowed claims will eventually be paid in full:

> [T]he ongoing effort to provide recovery to victims here has been and continues to be some of the most rewarding work any of us will ever do as restructuring professionals. It will be one for the history books. And today we can now cautiously predict some measure of success. Based on our results to date and current projections[,] we anticipate filing a disclosure statement in February describing how customers and general unsecured creditors, customers and general unsecured creditors with allowed claims, will eventually be paid in full. I would like the court and stake holders to understand this is not as a guarantee, but as an objective. There is still a great amount of work and risk between us and that result, but we believe the objective is within reach and we have a strategy to achieve it.

Transcript of Hearing at 18:11-25, *In re FTX Trading Ltd.*, Case No. 22-bk-11068 (JTD) (Bankr. D. Del. Jan. 31, 2024) (ECF No. 6908).

Those who know Sam appreciate that he "is an exceptionally brilliant 31 year old who can still have a significant, positive impact on this world, allowing him an opportunity to make amends for the damage he has done." (Ex. A-16).

Those who know Sam are blunt: the most productive years of his life should not be wasted in prison. "He has great gifts to offer the world." (Ex. A-3).

A sentence of decades-long duration would end Sam's ability to lead a meaningful life and contribute to the neediest in society and would be greater than necessary to serve the purposes of 18 U.S.C. § 3553(a)(2).

# PROCEDURAL HISTORY

On December 9, 2022, a grand jury in the Southern District of New York returned an eight-count indictment against Sam Bankman-Fried. (ECF No. 1). The original indictment charged Sam as follows: Count One - conspiracy to commit wire fraud on FTX's customers (18 U.S.C. § 1349); Count Two - wire fraud on FTX's customers (18 U.S.C. § 1343); Count Three - conspiracy to commit wire fraud on Alameda's lenders (18 U.S.C. § 1349); Count Four - wire fraud on Alameda's lenders (18 U.S.C. § 1343); Count Five - conspiracy to commit commodities fraud (18 U.S.C. § 371); Count Six - conspiracy to commit securities fraud (18 U.S.C. § 371); Count Seven - conspiracy to commit money laundering (18 U.S.C. § 1956(h)); and Count Eight - conspiracy to defraud the United States and to violate the campaign finance laws (18 U.S.C. § 371).

On December 10, 2022, the United States provided The Bahamas with a diplomatic note, attaching an arrest warrant issued in the Southern District of New York for Sam's arrest. Both the diplomatic note and the arrest warrant listed the eight counts charged in the original indictment.

On December 12, 2022, the Royal Bahamas Police Force arrested Sam on the provisional arrest warrant. He was held in the notorious Fox Hill Prison, in Nassau, Bahamas, where he was forced to sleep in a fetid cell for eight days.

On December 21, 2022, Sam appeared in a Bahamian court to consent to a simplified extradition process, and a Bahamian judge ordered him detained for extradition. After the court proceeding, the Bahamian Minister of Foreign Affairs executed a warrant of surrender of the defendant whereupon he was taken into U.S. custody. The warrant of surrender listed seven of

the eight charges in the original indictment but omitted the charge for conspiracy to violate the campaign finance laws.

On December 22, 2022, Sam was arraigned in the Southern District of New York on the original indictment before Magistrate Judge Gorenstein and admitted to bail.

The government later superseded the original indictment twice as to Sam, the first time on February 23, 2023 (ECF No. 80, the "S3 Indictment") and the second on March 28, 2023 (ECF No. 115, the "S5 Indictment"). The S3 Indictment added four charges to those already contained in the original eight-count indictment: a substantive commodities fraud count, a substantive securities fraud count, a bank fraud conspiracy count, and an unlicensed money transmitting conspiracy count. The S5 Indictment added a count for conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), for a total of thirteen counts.

On June 15, 2023, without a specialty waiver from The Bahamas for the newly added charges, the Court severed Counts Four, Six, Nine, Ten, and Thirteen of the S5 Indictment and set them down for a separate trial in March 2024. (ECF No. 165). The government later determined not to pursue those charges.

On August 11, 2023, the defendant's bail was revoked. He has been in custody at the Metropolitan Detention Center ever since.

On August 14, 2023, a grand jury returned another superseding indictment – S6 – that charged Sam in seven counts and was the operative charging instrument at trial. (ECF No. 202). Count One charged wire fraud on customers of FTX, in violation of 18 U.S.C. § 1343. Count Two charged conspiracy to commit wire fraud against customers of FTX, in violation of 18 U.S.C. § 1349. Count Three charged wire fraud on lenders to Alameda Research, in violation of 18 U.S.C. § 1343. Count Four charged conspiracy to commit wire fraud on lenders to Alameda

Research, in violation of 18 U.S.C. § 1349. Count Five charged conspiracy to commit securities fraud on investors in FTX, in violation of 18 U.S.C. § 371. Count Six charged conspiracy to commit commodities fraud on customers of FTX in connection with purchases and sales of cryptocurrency and swaps, in violation of 18 U.S.C. § 371. Count Seven charged conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). A forfeiture allegation was also included.

Trial commenced on October 3, 2023. On November 2, 2023, the jury returned guilty verdicts on all counts.

In December 2023, the government opted not to proceed to trial on the severed and dropped charges but indicated its desire to have the Court consider the alleged conduct as "relevant conduct" at sentencing.

## THE OFFENSE CONDUCT

In November 2017, Sam Bankman-Fried co-founded Alameda Research ("Alameda") as a private, quantitative cryptocurrency trading firm. (Tr. 2304-05). Sam was new to the crypto world at the time, but figured it was a burgeoning space that was expanding rapidly, and offered an opportunity for someone who did not have extensive business experience to grow a firm. (Tr. 2305). Alameda bought Bitcoin and other cryptocurrencies in one part of the world and sold them in another, making its profit on the difference in price ("arbitrage"). (Tr. 2305-06). Alameda's capital initially came from Sam and loans from friends of his co-founders, and later from crypto lenders. (Tr. 2307). Alameda used the "leverage" — or borrowed money — to fuel its trades and make bigger returns.

Sam explained as follows:

Q: When you established Alameda, what was your goal for the company from a business model?

A:     At a high level, doing arbitrage, something similar to what Jane Street did, but in the new market.  In particular, there were a lot of places you could buy and sell cryptocurrencies, called exchanges.  Coinbase, Binance are two well-known examples.  And in late 2017, when I started looking into it, it appeared, from my initial overview of public data, that there might be really, really large arbitrage opportunities available.

(Tr. 2305:21-2306:5).

Sam, in a 2018 writing, described the early days of Alameda:

I threw myself into Alameda, and it absorbed me.  I gave it all of myself in a way I'd never given before.  I spent so many nights at the office, 36 hours since I'd last slept.  My eyes would hurt, begging to close.  My heart made it clear it could only beat so quickly, and a slight buzzing in my head reminded me that I'd missed my last dose of trazedone.  But I'd want, so despeartely [sic], to stay awake longer—to see the next hour of markets unfold.  I felt like a new parent worried that he'd miss his baby's first words if he went to sleep.

(Ex. B).

Then Sam and Gary Wang started to build what would become FTX International ("FTX"), a non-U.S. crypto exchange for non-U.S. residents.  (Tr. 2313).  At the time, the crypto industry did not have any sophisticated exchanges for trading futures on margin; Sam and Gary aimed to build a better exchange.  (Tr. 2315; 2335).  The evidence at trial showed that FTX was lawfully organized and founded, and operated as a legitimate, *bona fide*, valid, innovative business in the new, changing, volatile and largely unregulated crypto world.  A significant percentage of customers on FTX traded on margin, including Alameda; margin and leveraged trading represented the vast majority of volume and assets on the exchange.  (DX-1618 and DX-1619).

By 2019, Alameda's trading was proving successful, ultimately making roughly $1 billion per year in trading profits, and Sam eventually transitioned away from his active role at Alameda to focus on FTX.  In 2020, he founded FTX US, a U.S.-based crypto exchange for U.S.

customers. Sam worked tirelessly—sometimes up to 22 hours a day—in the hopes of building the FTX entities into successful businesses. (Tr. 2648:19-25).

In just a few years, Sam and Gary and their colleagues created a fantastically successful crypto exchange worth billions of dollars. At its 2021-2022 peak, FTX had roughly one million user accounts, it handled $15 billion in trades per day, and it generated $3 million in revenue per day. (Tr. 552-53; 2346:21-25). FTX was also a rare example of a crypto company that engaged auditors to provide audited financial statements.

As FTX grew, Sam became a champion for regulation in the cryptocurrency markets:

> Q. Why was having a more built-out regulatory instruction -- structure important to you?
>
> A. It was important for multiple reasons. One was, we thought it was appropriate for there to be regulatory oversight of ourselves and the rest of the exchanges, and the second is that, frankly, whether or not we wanted it, we felt like there was going to be regulatory oversight that regulators were going to be involved, licenses were going to be required, and we didn't want to be on the wrong end of that.

(Tr. 2334:3-11; *see also* Tr. 2423:22-2424:17).

In late 2021 and early 2022, Alameda made investments and failed to hedge either its investments or its third-party loans. (Tr. 2457:17-2458:24). The "crypto winter" followed, with the price of Bitcoin declining drastically as "the whole crypto market fell." (Tr. 2450:7-2451:6; DX 1614).

Alameda's failure to hedge its positions, the market crash, and a massive customer "run" on FTX led to a liquidity crisis in November 2022. Even amidst that crisis, Sam was resolute: Alameda and FTX each and together remained solvent, and assets were available for all customers to be paid in full. Sam's hopes of facilitating that goal were stymied when the companies were placed in an omnibus Delaware bankruptcy.

*     *     *

Early on in his business ventures, Sam was forced to confront the reality that he was "like many other mathematically inclined, socially awkward [persons] who disproportionately make up start-up leadership . . . really smart at one thing . . . but poor at many others, including management." (Ex. A-9). Sam acknowledged as much in his trial testimony:

> Q. Mr. Bankman-Fried, did you make any mistakes along the way?
>
> A. Yes, I made a number of small mistakes and a number of larger mistakes. By far the biggest mistake was we did not have a dedicated risk management team, we didn't have a chief risk officer. We had a number of people who were involved to some extent in managing risk, but no one dedicated to it, and there were significant oversights.

(Tr. 2298:2-8).

Sam summarized his triumphant and tragic FTX journey as follows:

> Q. What was your vision for FTX when you founded it?
>
> A. We thought that we might be able to build the best product on the market, an exchange that would combine the elements that we thought were best from traditional financial products with the elements we thought were best from the big crypto ecosystem, that it could move the—move the ecosystem forward.
>
> Q. Did it turn out that way?
>
> A. No, it turned out basically the opposite of that. A lot of people got hurt—customers, employees—and the company ended up in bankruptcy.

(Tr. 2296:16-25).

\*     \*     \*

Sam never stopped believing that it was his responsibility to do right by FTX's customers. He never shirked responsibility or shied away from the pain he caused:

> Stephanopoulos:     But you're ultimately responsible . . .

| Bankman-Fried: | Ultimately, absolutely.  Look, I should have been on top of this and I feel really, really bad and regretful that I wasn't and a lot of people got hurt and that's on me.[3] |
|---|---|

Sam acknowledges the jury's service in this matter, he respectfully maintains his innocence, and he intends to appeal his convictions.

## I.       THE ADVISORY GUIDELINES ANALYSIS

The PSR recommends that the Court sentence Sam to *100 years* in prison.  That recommendation is grotesque.

Sam is a 31-year-old, first-time, non-violent offender, who was joined in the conduct at issue by at least four other culpable individuals, in a matter where victims are poised to recover—*were always* poised to recover—a hundred cents on the dollar.  A hundred-year sentence should be reserved for the kind of heinous conduct this Court confronted in *United States v. El-Hage*, 589 F. App'x 29, 32 (2d Cir. 2015) (defendant sentenced to life imprisonment where his conduct as "a member of [al-Qaeda] conspiracies to kill Americans" resulted in "catastrophic loss of life and injuries totaling thousands of people").  *See also United States v. Irving*, No. S3 03 CRIM. 0633 LAK, 2007 WL 831814, at *1 (S.D.N.Y. Mar. 19, 2007) (imposing 262 months' imprisonment on defendant in his late fifties convicted of traveling outside U.S. to engage in sexual acts with children under age 12 and possession of child pornography).

This Court should reject the PSR's barbaric proposal.

---

[3] *Transcript of Sam Bankman-Fried denies 'improper use' of customer funds*, ABC News (Dec. 1, 2022), https://abcnews-nwsdynamic.aws.seabcnews.go.com/GMA/News/video/ftx-founder-sam-bankman-fried-denies-improper-customer-94268098.

**A.     The Sentencing Guidelines Calculations Set Forth In The PSR**

At a total offense level of 43, and a Criminal History Category of I, the Sentencing Table

yields a sentence of life imprisonment.  Because a sentence of life exceeds the statutory

maximum for each of the counts of conviction, the Guidelines, pursuant to § 5G1.2(b), provide

for a maximum sentence of 1,320 months (or 110 years), the total of the maximum statutorily

authorized sentences for the seven counts of conviction.  PSR (ECF No. 400) ¶¶ 128-29.

Using U.S.S.G. § 2S1.1, the PSR calculates the Guidelines range as follows:

| | |
|---|---:|
| Base Offense Level (2S1.1(a)(1)/2B1.1(a)(2)) | 6 |
| Loss in Excess of $550 million (2B1.1(b)(1)(P)) | +30 |
| 10 or more victims and substantial hardship (2B1.1(b)(2)(A)(i) & (iii)) | +2 |
| Fraudulent Actions in Bankruptcy Proceeding (2B1.1(b)(9)(B)) | +2 |
| Sophisticated Means (2B1.1(b)(10)) | +2 |
| Derived $1,000,000 from Financial Institution (2B1.1(b)(17)(A)) | +2 |
| Convicted of 18 U.S.C. § 1956 (2S1.1(b)(2)(B)) | +2 |
| Sophisticated Money Laundering (2S1.1(b)(3)) | +2 |
| Role as organizer, leader in the offense (3B1.1(a)) | +4 |
| Abuse of Position of Public or Private Trust (3B1.3) | +2 |
| Obstruction of Justice (3C1.1) | +2 |
| Adjusted Offense Level | 56 |
| Total Offense Level (U.S.S.G. Ch. 5, Part A (comment n.2)) | 43 |
| At Criminal History Category I          =          1,320 months / 110 years | |

PSR ¶¶ 74-89.  The PSR recommends a downward variance of 10 years, yielding a

recommended sentence of 100 years.  PSR at 53.

The calculations in the PSR demonstrate the fundamental flaws that lie at the heart of the entire Guidelines regime. "The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense." *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) (Rakoff, J.).

The PSR's Guidelines range is driven by an incorrect loss enhancement and several other objectionable enhancements.[4] Additionally, the offense level substantially overstates the seriousness of Sam's offense, which warrants a downward departure; and the arbitrary application of consecutive sentences, rather than concurrent sentences, results in the ruthless Guidelines outcome.

### B.      The PSR's Loss Calculation Is Unsupported

Sam objects to the PSR's loss amount enhancement, which increases the Adjusted Offense level by 30 points. In arriving at its Guidelines calculation, the PSR includes a 30-level increase in the base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(P), driving more than half of the PSR's offense level calculation. *See* PSR ¶ 75. This is based on the assumption that the offense involved a loss of ten billion dollars. *Id.* The 30-level increase is incorrect for many reasons.

---

[4] Counsel submitted lengthy objections to the Presentence Investigation Report. Probation almost entirely dismissed these objections, adopting wholesale the government's responses that the PSR is accurate and was either proven beyond a reasonable doubt at trial or can be proven by a preponderance of the evidence. Probation is of course required to fulfill its role as a "neutral gatherer of information." *See Agudelo v. United States*, 724 F. Supp. 1110, 1111 (E.D.N.Y. 1989) ("A federal probation officer is an arm of the court and not an agent of the government *qua* prosecutor. The probation officer's role in the sentencing process is not an adversarial one. Rather, [s]he acts as a neutral gatherer of information from many sources to be used by the judge in imposing sentence."). Despite Probation outright dismissing this information, we rely on the previously submitted objections, and will not revisit these objections herein.

### 1.     Statement of Facts Relevant to the Issue of Loss

At trial, *the amount*—as distinct from *the fact*—of illegal money transfers was not at issue.  Neither the amount nor the financial impact, of course, were elements of any offense; the jury was not asked to find, and therefore did not find, any dollar amount (which necessarily would also require a finding as to the appropriate time at which to measure loss).

Notwithstanding, the government made repeated statements about losses to customers and lenders that left the misimpression that the money no longer existed and victims would never get their money back.  The government offered or elicited that "customers lost 8 billion dollars" *97 times* during the trial—a statement the average person would understand to mean lost for good as opposed to any statutory definition of loss.  The testimony elicited from the three alleged victim witnesses likewise implicitly or explicitly conveyed that their money vanished.  (*See, e.g.,* Tr. 92:3-8; Tr. 1294:14-16) ("Q. Mr. Morad, since November 10, 2022, have you been able to withdraw funds from FTX?  A.  No, I haven't.  Mr. Raymond: No further questions, your Honor.").

The government packaged that information, then repackaged that information and testimony—as fact—and repeated it in summation to the jury.  *See, e.g.*, Tr. 2912:1-12 ("With each additional click of the withdrawal button, their dread turned to despair.  Their money was gone.  FTX was bankrupt.  Billions of dollars from thousands of people gone."); Tr. 2912:20-2913:1 ("This was a pyramid of deceit built by the defendant on a foundation of lies and false promises, all to get money, and eventually it collapsed, leaving countless victims in its wake.  That's what happened.  That's where the money went."); Tr. 2914:25-2915:6 ("Third, there is no serious dispute that around $10 billion went missing . . . Billions of dollars missing in cryptocurrency, billions of dollars missing from bank accounts, and there is no serious dispute

about that."); Tr. 3023:12-3024:1 ("Let me leave you with this thought. This was a fraud that occurred on a massive scale. Thousands of people lost billions of dollars. Everyday people lost savings, companies went bankrupt, all because of this defendant's fraud, because he wanted more money to do whatever he wanted with."); Tr. 3126:7-10 ("She cried on that stand and she told you about the worst months of her life, when she knew she was committing crimes and was waiting to get caught, waiting for customers to realize that their money was gone.").

At sentencing, by contrast, the question of amount of loss is squarely presented. On that issue, the PSR adopts the government's narrative wholesale, using the amounts urged by the government—ten billion dollars. This is flawed.

### 2. Ten Billion Is Not A "Reasonable Estimate"

In general, a "reasonable estimate" may suffice to establish loss. Information on which a sentencing court relies, however, must have "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). Here, the PSR, without a scintilla of support, propounds a loss number of $10 billion. The PSR proposes this number absent evidence or analysis and rubberstamps the government's meager explanation.

When determining the amount of loss, a court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." § 6A1.3(a). "But, where [as here] an objection has been raised, the mere inclusion in the PSR of factual allegations does not convert facts lacking an adequate evidentiary basis with sufficient indicia of reliability into facts a district court may rely upon at sentencing." *United States v. Carrion-Melendez*, 26 F.4th 508, 512 (1st Cir. 2022) (internal quotation marks omitted). A court abuses its discretion when it relies on an insufficiently proven allegation made in a PSR. *Id*. at 513.

**3.** **"Loss" Under Guideline 2B1.1 Is Limited to Actual,**
**Not Intended, Loss**

The PSR refers to the government's characterization of the loss as both actual and

intended. *See* PSR at 49-50. First, considering *Kisor v. Wilkie*, 588 U.S. ----, 139 S. Ct. 2400

(2019), the Court must limit its analysis to the Guideline text, which provides for offense-level

enhancements only in the case of "loss"—that is, actual harm. U.S.S.G. § 2B1.1(b)(1). The

directive to consider intended loss comes not from the plain language of the Guideline text, but

rather from the *commentary*. *See* U.S.S.G. § 2B1.1 cmt. n.3(A) ("'Actual loss' means the

reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1 cmt. n.3(A)(i).

"'Intended loss,'" in contrast, "means the pecuniary harm that the defendant purposely sought to

inflict[.]" *Id.* cmt. n.3(A)(ii)(I)).

Under *Kisor*, however, a court may give Guideline commentary effect only when the

Guideline text is "genuinely ambiguous" after exhausting all the traditional tools of construction,

and only if the commentary falls within the "zone of ambiguity" identified in the text. 139 S. Ct.

at 2415–16. Here, the textual term "loss" is unambiguous—it means "an amount that is lost."

*Loss*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/loss (last

visited Feb. 27, 2024). Accordingly, the commentary is inapplicable and this Court should

impose no enhancement under § 2B1.1 as there was no actual loss. *See United States v.*

*Ricciardi*, 989 F.3d 476, 479–80 (6th Cir. 2021) (applying *Kisor*, rejecting commentary to

§ 2B1.1 in loss calculation); *United States v. Kirschner*, 995 F.3d 327, 333 (3d Cir. 2021) (noting

that "[b]y interpreting 'loss' to mean intended loss, it is possible that the commentary 'sweeps

more broadly than the plain text of the Guideline'") (quoting *United States v. Nasir*, 982 F.3d

144, 177 (3d Cir. 2020) (en banc) (Bibas, J., concurring)); *United States v. Banks,* 55 F.4th 246,

256 (3d Cir. 2022) ("If the Sentencing Commission's commentary sweeps more broadly than the

plain language of the guideline it interprets, we must not reflexively defer.  The judge's lodestar must remain the law's text, not what the [Sentencing] Commission says about that text."); *United States v. Fisher*, Case Nos. 22-1575, 22-1647, 2024 WL 277704, at *2 (3d Cir. Jan. 25, 2024) ("In view of [*Banks*], the Government now concedes that the District Court erred when it used intended loss to apply § 2B1.1(b)(1)(C)'s 4-point enhancement") (internal quotation marks omitted).

For the reasons set forth herein, the Court should apply the Guidelines based on actual loss.

### 4.	The Most Reasonable Estimate of Loss is Zero

On January 31, 2024, debtors' counsel in the consolidated FTX and Alameda bankruptcy proceeding stated in summary that customers and creditors who can prove their losses are expected to get back all of their money.  *See* Transcript of Hearing at 18:11-25, *In re FTX Trading Ltd.*, Case No. 22-bk-11068 (JTD) (Bankr. D. Del. Jan. 31, 2024) (ECF No. 6908).

This return of funds has been widely reported in the media.  *See, e.g.*, Andrew Ross Sorkin, Ephrat Livni, & Sarah Kessler, *Was SBF (sort of ) Right? What Happens to FTX Clawback Cases if the Company Repays Its Creditors?*, New York Times (Feb. 3, 2024), https://www.nytimes.com/2024/02/03/business/dealbook/what-happens-to-ftx-clawback-cases-if-the-company-repays-its-creditors.html; Steven Church & Jonathan Randles, *FTX Plans to Repay Customers in Full, Drop Exchange Relaunch*, Yahoo! Finance (Jan. 31, 2024), https://finance.yahoo.com/news/ftx-plans-repay-customers-full-212056056.html; MacKenzie Sigalos, *As Sam Bankman-Fried Awaits Prison Sentence, FTX Customers Await a Surprise: Full Repayment*, CNBC Crypto World (Feb. 10, 2024), https://www.cnbc.com/2024/02/10/as-sam-bankman-fried-awaits-jail-ftx-customers-await-full-repayment.html.

As discussed further *infra*, the payment in full to customers and creditors does not depend on any windfall of current crypto market conditions. Rather, the company was solvent at the time of the bankruptcy petition. The money was there—not lost.

*The harm to customers, lenders, and investors is zero.*

**Customers.** The $8 billion figure for customers that the government uses does not reflect customer losses as of the bankruptcy petition date. It reflects the temporary shortfall in *liquid* assets to cover the unprecedented level of customer withdrawal requests beginning on November 6, 2022, which reached $4 billion per day the morning of November 8, 2022.[5] For example, if FTX had halted withdrawals on November 8th with $8 billion in withdrawal requests pending and then resumed withdrawals on November 15th after selling sufficient assets to cover the $8 billion, then there would not have been any customer "losses." Thus, as of the bankruptcy petition date, a reasonable measure of customer losses is the amount that liabilities exceeded the assets—that is, the extent of insolvency.

During the week of November 6, 2022, Gary Wang and Sam prepared balance sheets for FTX US and FTX.com identifying solvency. *See e.g.*, Ex. D (FTX Intl Assets and Liabilities); *see also In re FTX Trading Ltd.*, Case No. 22-bk-11068 (JTD), ECF No. 530 (Bankr. D. Del. Jan. 19, 2023) ("the tech team checked the wallets and had told the FTX International general counsel at the time of the disclosure of the customer deficit that FTX.US was not affected."). However, not enough of the FTX.com assets could be liquidated immediately to cover the unprecedented level of withdrawal requests. This led to the $8 billion liquidity shortfall on November 8, 2022—but does not mean the customer money was "lost."

---

[5] Such temporary liquidity events are known occurrences with banks and other similar businesses. More directly relevant to FTX, the existence of *any* leverage, margin, derivatives, or borrow/lending in a platform necessarily results in some risk of a liquidity crisis. *See e.g.*, Ex. C.

The liquidity crisis began on November 6, 2022. Sam was strongly encouraged to step down on November 11, 2022 and was thereafter no longer responsible for FTX's actions. *See, e.g.,* Ex. E.

John Ray, the CEO of the successor Debtor Entity to FTX, has released his own valuations of FTX US and FTX.com beginning in January 2023. *See, e.g.*, *In re FTX Trading Ltd.*, Case No. 22-bk-11068 (JTD), ECF No. 507-1 (Bankr. D. Del. Jan. 17, 2023), attached as Ex. F; *see also In re FTX Trading Ltd.*, Case No. 22-bk-11068 (JTD), ECF No. 792-1 (Bankr. D. Del. Mar. 2, 2023), attached as Ex. G. The financials he released for FTX US as part of the bankruptcy proceeding similarly display solvency as of the petition date, with a reasonable interpretation of a Net Asset Value ("NAV") of hundreds of million sufficient to cover all FTX US customer deposits. Likewise, the reports describe billions sufficient to cover FTX.com customer deposits. *Id.*[6] For FTX.com, the presentation to the Creditors Committee in January 2023 reported over $10 billion of assets.[7] The total shortfall in the final days of FTX, after liquidating various positions, was around $8 billion. *See* Tr. at 456-58. Even with a liquidity discount for assets in a thinly traded market, early documentation that did not account for all assets supports that FTX.com was solvent as of the date of the bankruptcy petition.

Sam respectfully submits that FTX US and FTX.com were solvent as of the petition date. Thus, the correct loss figure is zero. A calculation of zero loss is also consistent with the Seventh Circuit's methodology in *United States v. Durham*, 766 F.3d 672 (7th Cir. 2014). The court found that the defendants in *Durham* turned "a previously well-established and respected

---

[6] The January report (Ex. F) details $181 million in crypto assets (p. 10 of 21) and $428.1 million in bank accounts (p. 8 of 21), for a total of approximately $609 million. The March report (Ex. G) identifies $335 million in liabilities (p. 15 of 25).

[7] The total appears to include $5.5 billion in liquid assets (cash, Category A crypto, and brokerage investments, chiefly) (p. 7 of 21), venture investments with a book value of approximately $4.6 billion (p. 14 of 21), real estate holdings with a book value of approximately $253 million (p. 17 of 21). Additional assets appear to not to have been valued at that time, too.

business" into their "personal piggy bank[,]" eventually driving the company into bankruptcy. *Id.* at 675. After the bankruptcy filing, more than 5,000 investors filed claims totaling more than $208 million and the bankruptcy trustee recovered only $5.6 million. *Id.* at 687. The Seventh Circuit affirmed the district court's calculation of $202 million in actual loss in which it deducted the assets recovered by the trustee from the investors' total bankruptcy claims. *Id.*

As stated by debtors' counsel in bankruptcy court last month, the same methodology in this case leads to a loss calculation of zero.

**Lenders.** The government is asserting that losses as of petition date were $1.3 billion, equal to the outstanding balance of all loans to Alameda from third party lenders. But FTX's liabilities to third-party lenders are reflected in Sam's finding that both exchanges had positive NAVs as of the petition date and by the Debtor's Estate recent announcement of repayment to creditors.

**Investors.** The government argues that, unlike customers and lenders, the actual loss to investors *should* be calculated based on their expected recovery under the bankruptcy plan, but offers no principled explanation for why this benchmark is appropriate here, but not there. Relying on the Debtor Estate's statement that investors would get nothing under the proposed plan, the government concludes that "[t]he equity in FTX is now worthless," and that the actual losses to investors are therefore $1.72 billion, the capital they still had invested in the company when it was put into bankruptcy.

While the proposed plan excludes investors, it neither claims nor provides any supporting evidence that the Debtor Estate lacks sufficient assets to repay investors. *See* Ex. F. Moreover, investors received an equity stake, not a "cash-back guarantee." Put differently, there is a different expectation for investors as compared to customers or lenders. No asset list or balance

sheet for the Debtor Estate appears to have been provided since September 11, 2023, but a conservative reading of that report identified an even greater value of assets than previously adopted by the Debtor Estate.[8] (*See In re FTX Trading Ltd.*, Case No. 22-bk-11068 (JTD), ECF No. 2463-1 (Bankr. D. Del. Sept. 11, 2023), attached as Ex. H).

Since then, the value of the Estate's assets increased significantly due to a sharp rise in the market price of the Estate's token assets. For example, a notable increase has been Solana, one of FTX's biggest token holdings. On August 31, 2023, the valuation date reflected in the September 11, 2023 report, Solana closed at $19.33. *See* https://www.coingecko.com/research/publications/ftx-crypto-holdings. FTX held 55.8 million Solana tokens at the time. On February 26, 2024, Solana closed at $112, resulting in a roughly $4 billion increase in the Estate over the last six months.[9]

Many of the remaining venture investments have also increased in value significantly. The Debtor Estate's 7.8% interest in Anthropic (an AI company) that was purchased for $500 million is now valued between $1 billion and $1.4 billion.[10]

Given the sheer amount of assets identified, there is no basis on which to conclude that investors will suffer any losses due to the charged crimes, regardless of the Debtor Estate's decision to exclude them from the bankruptcy recovery.

---

[8] The total includes approximately $6.3 billion in liquid assets (cash, Category A crypto, and brokerage investments, chiefly) (p. 13, 14, and 15 of 40), venture investments with a book value of approximately $4.5 billion (p.16 of 40), real estate investment with a value of $222 million (p. 18 of 40), token investments approximately, $506 million (p.17 of 40).

[9] FTX sold approximately 13.22 billion Solana tokens between October 4th and December 14th, generating $666 million in cash. https://coingape.com/is-solanas-sol-market-performance-tied-to-ftx-alameda-liquidations/. The remaining 42.5 million Solana tokens can be valued at approximately $4.8 billion. The cash from the sales plus the value of the tokens the Estate still holds represent about a $4 billion increase.

[10] Recent media accounts have valued FTX's 8 percent stake in Anthropic at around $1.4 billion. https://www.theblock.co/post/275898/ftx-seeks-permission-to-speedily-sell-8-stake-in-anthropic; https://blockworks.co/news/ftx-offloading-anthropic-shares. An independent valuation put the value between $1.1 and $1.4 billion as of January 31, 2024. (Ex. H).

### 5. If Not Zero, the Actual Loss is Customers' Estimated Cost of Collection in Bankruptcy

In the alternative, the Court should apply the loss methodology approved by the Second Circuit in *United States v. Abiodun*, 536 F.3d 162 (2d Cir. 2008). In *Abiodun*, the defendants were convicted of a five to six-year fraud scheme in which they stole credit reports from hundreds of victims, on average accessing $4,000 in available credit per stolen report. *Id.* at 164. In calculating actual loss, the district court included individuals "who had spent an appreciable amount of time securing reimbursement for their financial losses from their banks or credit card companies." *Id.* at 166. The district court determined that those individuals qualified as victims of the defendants' theft, even though their financial losses were fully reimbursed by the individuals' financial institutions. *Id.*

The Second Circuit affirmed, finding that such individuals could be considered victims so long as, "as a practical matter—they suffered (1) an adverse effect (2) as a result of the defendant's conduct that (3) can be measured in monetary terms." *Id.* at 168-69. The Court agreed with the district court's finding that fully reimbursed individuals nevertheless "had to spend an appreciable amount of time securing reimbursement from their banks or credit card companies" and that "this 'loss of time' could be measured in monetary terms." *Id.* at 169. The Court then vacated the defendants' sentences and remanded, ordering the district court to include the "monetary value of this lost time when calculating the actual loss resulting from defendants' offenses." *Id.*

Here, a reasonable estimate of the monetary value of the time spent by FTX customers securing reimbursement for their claims can be measured by the professional fees incurred by the advisors to the Official Committee of Unsecured Creditors ("UCC") representing customers' interests in the bankruptcy proceeding. Although such fees are paid out of the Debtor Estate, the

Court could deem those fees a reasonable estimate of the lost time spent by customers securing what the estate expects to be full reimbursement of their claims. According to currently available information from the bankruptcy docket, the total fees incurred by advisors to the UCC appears to be approximately $57.5 million.[11] Mr. Bankman-Fried respectfully submits that under *Abiodun*, this is a far more reasonable estimate of actual loss, to the extent there was any, than the PSR's estimate of $10 billion.

### 6. In The Alternative, Intended Loss is Zero

Should the Court reject *Kisor* and apply an intended loss theory for assessing a Guidelines loss number, then the appropriate calculation remains zero. The conviction does not address whether Sam intended to pay the money back. He did. Witness statements, the company financials discussed above, and the ability for full repayment in bankruptcy corroborate Sam's intention to repay FTX customers. *See* Ex. A-9 (describing Sam as "someone obsessively trying to help" and "resolute that he would not leave as long as he thought he could do some good by staying. He worked almost around the clock, to the point of exhaustion. His sole focus was on helping to get customers repaid in full."); *see also* Ex. F at 18, n.1 (noting that the "sharp rise in deposits in the days immediately prior to the petition date include in large part from Alameda"). The Second Circuit recognizes that a criminal defendant in a case involving fraudulently obtained loans should have the opportunity to persuade the sentencing judge that the loss he intended was less than the full face value of the loans obtained. *See e.g., United States v. Confredo*, 528 F.3d 143, 152–53 (2d Cir. 2008). In *Confredo*, the sentencing judge ruled that the "intended loss" resulting from the defendant's crime was the combined face value of all the loans for which the defendant's customers had applied. *See id.* at 148. The Second Circuit remanded,

---

[11] This estimate is based on the "Certificates of No Objection" filed by the UCC's professional advisors concerning their fee applications. *See In re FTX Trading Ltd.*, Case No. 22-bk-11068 (JTD) (Bankr. D. Del.).

explaining that "[a] defendant who applied for, or caused someone else to apply for, a $1 million loan, fully expecting at least $250,000 to be repaid, intended a loss of no more than $750,000 (although, if no repayment is made, he would be subject to punishment for an actual loss of $1 million)." *See id.* at 152.

**C.**     **The Enhancement For Fraudulent Actions In The Course Of A Bankruptcy Proceeding Is Inapplicable**

Probation recommends a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(9)(B), which applies to an offense that involved "a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding." *See* PSR ¶ 77. This enhancement is typically applied to defendants who have given testimony or filed fraudulent statements within a bankruptcy proceeding. *See, e.g., United States v. Berg,* 250 F.3d 139, 144-45 (2d Cir. 2001). It is not enough that a bankruptcy proceeding may be in existence at the time the defendant commits the underlying offense.

Sam never made a false statement in a U.S. bankruptcy proceeding; in fact, he never made *any* statements in the Delaware court. Nor did he ever violate a specific order of a U.S. bankruptcy court. He objects to this enhancement to the extent it is based on transfers of assets to The Bahamas, as described elsewhere in the PSR. *See* PSR ¶ 31.

**D.**     **FTX Was Not Located Outside The U.S. To Evade Law Enforcement**

Probation recommends a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(10). Sam objects to this enhancement to the extent that it is based on the erroneous claim that Sam "deliberately located FTX outside of the United States to evade law enforcement or regulatory officials." PSR ¶ 78. The record is clear that FTX was created in Hong Kong in 2019 because that is where Sam was living and working at the time and he considered it to be the "global epicenter of crypto" with a "clearer regulatory environment for cryptocurrency exchanges." (Tr.

2312:12-2313:23, Tr. 2333:7-2334:2).  Sam further testified that he chose to move FTX to The

Bahamas because it "had actually rolled out full regulatory frameworks for crypto exchanges."

(Tr. 2393:23-2394:02).  Additionally, Sam was not seeking to avoid scrutiny by U.S. authorities.

In fact, he incorporated FTX US in the United States to lawfully serve U.S. customers. (Ex. J).

### E.     The Enhancement For Deriving More Than $1,000,000 In Gross Receipts From A Financial Institution Is Inapplicable

Probation recommends a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(17)(A),

which applies if "the defendant *derived* more than $1,000,000 in gross receipts from one or more

financial institutions *as a result of the offense*."  PSR ¶ 79 (emphasis added).  This enhancement

applies only where the financial institution is the source of funds involved in the offense and

suffers some loss.  *See United States v. Huggins*, 844 F.3d 118, 122-23 (2d Cir. 2016).  Sam

objects because it does not apply to a defendant who simply withdraws funds from an account

over which he has control where those funds did not come from the financial institution itself.

*See id.* at 122 ("The Guidelines provide no basis to enhance penalties for a defendant who stores

his fraudulent proceeds in a financial institution before withdrawing, while allowing a defendant

who avoids use of a financial institution to receive a lesser punishment.").

### F.     Sam Was Not In A Position Of Public Or Private Trust

Probation recommends a 2-level enhancement pursuant to U.S.S.G. § 3B1.3(a), which

applies to a defendant who "abused a position of public or private trust … in a manner that

significantly facilitated the commission or concealment of the offense."  PSR ¶ 84.

Sam did not occupy a position of public or private vis-à-vis the alleged victims.  First,

"[a] purely arm's-length contractual relationship between the defendant and the victims does not

create a position of trust."  *Huggins,* 844 F.3d at 125 (citing *United States v. Jolly*, 102 F.3d 46,

48 (2d Cir. 1996)).  Second, "an abuse of trust enhancement must involve a fiduciary-like

relationship that goes beyond 'simply the reliance of the victim on the misleading statements or conduct of the defendant." *Id.* (citing *United States v. Ntshona,* 156 F.3d 318, 320 (2d Cir. 1998) (citation omitted)).  Here, Sam did not have any fiduciary-like relationship with FTX's customers.  *See* GX-558 (FTX Terms of Service) § 38.6 ("Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other cooperative entity between the parties for any purpose whatsoever."); *see also id.* §§ 2.1.3, 2.2.2.

### G.    The Enhancement For Obstruction Of Justice Is Unwarranted

Probation also recommends a 2-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1.  PSR ¶ 85.  For the reasons already stated on the record and in our PSR objections, Sam objects to the assertion that he "instructed employees to set messages to auto-delete to evade law enforcement scrutiny," and that he "tampered with witnesses." PSR ¶ 85.

Sam further objects to the assertion that he "gave false testimony during the trial and in doing so committed perjury."  PSR ¶ 55.  Neither the government nor Probation identifies a single specific line of alleged perjurious testimony, which is enough to reject this enhancement. In any event, the Guidelines caution that "[t]his provision is not intended to punish a defendant for the exercise of a constitutional right[,]" and that "[i]n applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." U.S.S.G. § 3C1.1, commentary n.2.  The silence on this issue speaks volumes.

## H. Sam Was Precluded From Rebutting The Government's Campaign Finance Evidence

Probation includes within its description of the offense conduct Sam's alleged "involvement in a conspiracy to commit campaign finance violations." *See* PSR ¶¶ 37-41. In response to Sam's objections to this description, the government argued that the Court is free to consider such facts as relevant conduct provided that they were proven by a preponderance of the evidence. *See* PSR at 47 (citing U.S.S.G. § 6A1.3). The government also argued that evidence concerning uncharged alleged campaign finance violations was properly admitted at trial and that Sam therefore had an opportunity and reason to attempt to rebut it.

The government is wrong, and the Court should not consider the campaign finance-related evidence at sentencing, for two reasons.[12] First, as Sam made clear in his objections to the PSR, the government failed to prove a conspiracy to violate campaign finance laws by a preponderance of the evidence. Instead, the government called a single fact witness, Nishad Singh, whose testimony failed to establish Sam's knowing and willful violation of the campaign finance laws. (Tr. 1420-23; Tr. 1427-42; Tr. 1571-81). Second, the government inaccurately argues that given its admission as "direct evidence" of the charged crimes, the defendant had an opportunity at trial to rebut it. The Court precluded the defense from offering expert testimony to rebut that evidence. ECF No. 287 (Order On Motions To Exclude Proposed Expert Testimony), at 2 (Sept. 21, 2023). The defense's expert notice for Professor Bradley A. Smith

---

[12] Mr. Bankman-Fried also objected to Probation's consideration of the campaign finance-related evidence under the rule of specialty and Article 14 of the Extradition Treaty Between the Government of the Commonwealth of The Bahamas and the Government of The United States of America, signed March 9, 1990 (the "Extradition Treaty"). *See* PSR at 47. Mr. Bankman-Fried acknowledges the Court's prior ruling that he does not have standing to invoke the rule of specialty under the Extradition Treaty and the Second Circuit's decision in *United States v. Barinas*, 865 F.3d 99, 105 (2d Cir. 2017). *United States v. Bankman-Fried*, Case No. 22-cr-0673 (LAK), 2023 WL 4194773, at *4-5 (S.D.N.Y. June 27, 2023). In light of the Court's interpretation of *Barinas*, Mr. Bankman-Fried maintains his objection under the rule of specialty to preserve for appeal his argument that he has standing under the Extradition Treaty, and that the Court's consideration of the campaign finance-related evidence at sentencing violates the rule of specialty under Article 14 of that treaty.

established that Professor Smith would have offered expert testimony concerning "[c]ommon, established, and well-known practices for large-scale political giving campaigns," as well as testimony "to rebut evidence which may be offered by the Government concerning issues of campaign finance and political donations." *See* ECF No. 236-5, at 3 (Aug. 28, 2023 Expert Notice of Bradley Smith). As such, the Court should not consider any of the campaign finance-related evidence at sentencing.

## I. The Offense Level Substantially Overstates The Seriousness Of The Offense

Application Note 21(C) to § 2B1.1, entitled "Downward Departure Consideration," provides, in pertinent part: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." This is such a case. For the reasons set forth below, a downward departure is warranted.

In fraud cases, "the amount of loss . . . [has] become the principal determinant of the adjusted offense level and hence the corresponding sentencing range." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). "This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider." *Id*.

Many cases, furthermore, recognize that the Guidelines go too far in fraud cases: the Guidelines place "inordinate emphasis . . . on the amount of actual or intended financial loss." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) ("The Guidelines place undue weight on the amount of loss involved in the fraud.").

The Guidelines do not "explain[] why it is appropriate to accord such huge weight to such factors." *Adelson*, 441 F. Supp. 2d at 509. Certainly, "the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." *United States v. Johnson*, 2018 WL 1997975, at *3 (E.D.N.Y. April 27, 2018). Rather, "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice." *Gupta*, 904 F. Supp. 2d at 351; *see also Johnson*, 2018 WL 1997975, at *4 (describing the loss enhancement as a "grievous wrong" and noting "the rigidity of the loss amount overriding the diverse reality of complex financial crimes [and] the lack of any consideration of danger to society[]"). To further highlight the irrationality of the Guidelines, at a total offense level of 43—of which 30 points is based on a "loss" that will be repaid—the fact that Sam has zero criminal history points is deemed literally irrelevant. At a total offense level of 43, the sentence is "life" regardless of the defendant's criminal history. Thus, the Guidelines "advise" that Sam, who has an unblemished past, should receive the same sentence as a career criminal.

For such reasons, one District Judge summarized—accurately, we submit—as follows: "The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring). This failure to apply an empirical, reasonable approach yields "[t]he widespread perception that the loss guideline is broken[,]" *id*. at 378, and "fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *Id*. at 380. Therefore, "district judges

can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." *Id*. at 379.

Other Specific Offense Characteristics, finally, yield even more overstatement. Section 2B1.1 directs a court to add offense levels based on the amount of loss—but also to add still more levels based on factors such as the number of victims, the use of "sophisticated means" (which includes activity outside of the United States), and deriving more than $1,000,000 from a financial institution. *See* U.S.S.G. § 2B1.1(b)(2)(A), (b)(10), and (b)(17)(A). This accumulation of offense levels "has a significant effect upon the applicable sentencing range[,]" *United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003), and "represents . . . the kind of 'piling-on' of points for which the guidelines have frequently been criticized." *Adelson*, 441 F. Supp. 2d at 510.

Sam objects to the inclusion of the "number of victims" enhancement. Relying on the Sixth Circuit's decision in *United States v. Yagar,* 404 F.3d 967 (6th Cir. 2005), individuals who were "fully reimbursed for their temporary financial losses" are not "victims" under the Guidelines. *Id.* at 971. Sam acknowledges the Second Circuit's distinction of *Yagar* on the ground that the Sixth Circuit qualified that "there may be situations in which a person would be considered a 'victim' under the Guidelines even though he or she is ultimately reimbursed." *Abiodun*, 536 F.3d at 168 (quoting *Yagar*, 404 F.3d at 971). Relying on that language and the Eleventh Circuit's decision in *United States v. Lee*, 427 F.3d 881 (11th Cir. 2005), the Second Circuit held that reimbursed individuals may be considered victims, so long as their time and effort spent to secure reimbursement was caused by the defendant's conduct and could be measured in monetary terms. *Abiodun*, 536 F.3d at 168-69. Neither the government nor

Probation has identified any evidence that would allow the Court to make such a calculation here to justify the PSR's enhancement based on the number of victims.

In short, "the guidelines' fetish with abstract arithmetic" can result in a "travesty of justice" and in "harm . . . visit[ed] on human beings[,] if not cabined by common sense." *Adelson*, 441 F. Supp. 2d at 512; s*ee also United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (describing "another example where the guidelines in a securities-fraud [case] 'have so run amok that they are patently absurd on their face[]'") (cleaned up).

*      *      *

Sam's offense level, determined under § 2S.1.1 and, by reference, § 2B1.1, substantially overstates the seriousness of the offense. A downward departure is therefore warranted, for the following reasons.

*First*, the loss calculation—standing alone—substantially overstates the seriousness of the offense. Sam's offense level—which is off the chart—leads to a Guidelines sentence that amounts to a term that is more than 35% longer than the average American's expected life span, even with his unblemished past. This is an absurd result and indeed the "travesty of justice" to which *Adelson* refers. *See* 441 F. Supp. 2d at 512. "[I]t is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance." *Parris*, 573 F. Supp. 2d at 751.

*Second*, the asserted $10 billion "loss" is illusory. As noted above, on January 31, 2024, counsel for the bankruptcy estate announced the objective for repayment in full. Transcript of Hearing at 18:11-25, *In re FTX Trading Ltd.*, Case No. 22-bk-11068 (JTD) (Bankr. D. Del. Jan. 31, 2024) (ECF No. 6908). The Court should therefore discount this enhancement, which contributes heavily to the overstatement of the seriousness of the offense. *See Parris*, 573 F.

Supp. 2d at 754 ("[W]e now have an advisory guidelines regime where, as reflected in this case, any officer or director of virtually any public corporation who has committed securities fraud will be confronted with a guidelines calculation either calling for or approaching lifetime imprisonment.").

*Third*, the PSR piles-on still further, by recommending consecutive rather than concurrent sentences without explanation.  Contrary to the statutory default to run concurrently (*see* 18 U.S.C. § 3584(a)), the PSR stacks the maximum statutory sentence for each of the counts of conviction to reach an absurd guidelines sentence of 110 years.  With a total offense level of 43 and zero criminal history points, the sentencing table provides for a sentence of "life."  U.S.S.G. Ch. 5, Part A.  For statistical purposes, the Joint Sentencing Information platform (JSIN), an online public resource provided by the U.S. Sentencing Commission, treats a "life" sentence as a sentence of 470 months.[13]    Here, the Guidelines effectively give Sam a nearly triple "life" sentence.  The silliness of this process is hard to miss as the ultimate Guidelines range is determined not by the nature of the conduct, but by how the prosecution decides to charge the case.  Here, the conduct in the PSR is grouped, demonstrating overlapping conduct and victims, yet the calculation effectively treats the conduct as separate and distinct.

Section 5G1.2(d) provides that "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, *but only to the extent necessary to produce a combined sentence equal to the total punishment.*"  U.S.S.G. § 5G1.2(d) (emphasis added).  *Cf. Lora v. United States*, 599 U.S. 453, 464, 143 S. Ct. 1713, 1720 (2023) (vacating sentence and remanding because district judge erred in concluding that he did not have discretion to impose

---

[13] See U.S. Sent. Comm'n, Joint Sent. Info., available at
https://jsin.ussc.gov/analytics/saw.dll?Dashboard#USSCAskJSINCustomPopupClose.

concurrent sentences).  Here, the PSR elects consecutive maximum sentences for all seven counts, without addressing what the "total punishment" should be or why three times the maximum sentence length used by the Commission itself in its own sentencing statistics calculations is "necessary."  In fact, the PSR appears to explicitly approach its calculation by first running all counts consecutively, and then departing downward by 10 years, writing that "in order to vary to a sentence where the defendant could possibly be released during his lifetime, the variance would have to be so significant as to cut the guidelines term in half."  PSR at 55.

The PSR provides no sound justification for why such a downward variance is not warranted in this case, but apparently was appropriate in the recent case of Mark Scott—"one of the most prolific money launderers ever prosecuted in this District"—who was sentenced by Judge Ramos only a month ago.  *United States v. Scott*, Case No. 17-cr-630-ER, ECF No. 607 (Govt. Sentencing Memorandum), at 1 (S.D.N.Y. Jan. 19, 2024).  According to the government's sentencing submission, Scott faced a Guidelines range of 600 months, or 50 years, and yet Probation recommended a sentence of 20 years.  *Id.* at 1-2.  Probation's recommendation is especially notable given that Scott, an attorney, built a "custom money laundering vehicle" for the OneCoin cryptocurrency fraud scheme and "used his know-how as a corporate lawyer with experience in private equity to disguise hundreds of millions of dollars in illicit proceeds."  *Id.* at 1-2.  Unlike FTX, the government described OneCoin as "worthless" and "a fraud from day one."  *Id.* at 3.  Scott laundered $400 million from that fraud, *id.* at 18, earning himself $50 million which he used to buy three oceanfront homes, a yacht, and four luxury vehicles.  *Id.* at 13-17.  According to the government, Scott "was motivated by an unquenchable greed" and "ha[d] not shown an ounce of remorse."  *Id.* at 24, 36.  Yet Probation determined he was deserving of the "significant" downward variance of over 50% that it refused to recommend for

Sam. As set forth in § 5G1.2, that is the incorrect approach; the correct approach—utilizing the same departure as the PSR—would be to first determine the appropriate sentence; then run counts consecutively "*only to the extent necessary to produce*" that sentence, and then depart downward by 10 years.

*Fourth*, courts consider the cumulative effect of enhancements, which, like those imposed here, dramatically increase the sentencing range. The *Lauersen* case, although decided before *Booker*, remains a good example. There, the defendant's "offense level ha[d] already been increased by 13 levels because of the large amount of money involved in his fraud." *Lauersen,* 348 F.3d at 343. The government, nevertheless, on a cross-appeal, sought an additional four levels, on the ground that the offense affected a financial institution.

The Second Circuit agreed with the government but then tempered its holding because "the cumulative effect of [the] enhancements has a significant effect upon the applicable sentencing range." *Id*. at 344. "[T]he four-level enhancement . . . increase[d] the minimum of [the defendant's] sentencing range by four years . . . . [W]e think that the cumulation of such substantially overlapping enhancements, when imposed upon a defendant whose adjusted offense level translates to a high sentencing range . . . . permits a sentencing judge to make a downward departure." *Id*.

Here, for similar reasons, the Court should depart downward. The PSR already increases the offense level, from 6 to 36, based on the amount of the loss. The accumulation of 20 more levels increases the PSR's Adjusted Offense level from 36 to 56, which, in turn, increases the minimum sentencing range by over 94 years (1,132 months). The government's position here would increase the sentencing ranges far more than the four years at issue in *Lauersen*.

*Fifth*, courts examine the proportionality between the base offense level and the "adjusted offense level, driven by the monetary loss amount[.]" *Algahaim*, 842 F.3d at 800. In *Algahaim*, the loss amount led to "a three-fold increase[]" in the base offense level. The Court concluded: "Where the Commission has assigned a rather low base offense level . . . and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id*.

Here, the PSR, based on the loss amount, sextupled the base offense level (from 6 to 36). *A fortiori*, under *Algahaim*, the Court is entitled to consider a non-Guidelines sentence, either by downward departure, as urged here, or under § 3553, as urged below in this memorandum.

*Sixth*, Paragraph 148 of the PSR provides: "The Probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range." Here, however, the Court should depart downward in light of Sam Bankman-Fried's medical condition (discussed *infra*), which distinguishes this case from typical cases covered by the Guidelines.

\*     \*     \*

In addition to being merely advisory, the Guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States,* 552 U.S. 85, 90, 128 S. Ct. 558, 564 (2007). While a sentencing court must begin the process of determining an appropriate sentence for a criminal defendant by calculating the applicable Guidelines range, it "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 552 U.S. 38, 49-50, 128 S. Ct. 586, 596 (2007).

"[T]he Sentencing Guidelines for white-collar crimes" should not "be a black stain on common sense." *Parris*, 573 F. Supp. 2d at 754. The Court here—applying common sense—should vary downward from the Guidelines calculations and the resulting sentencing range.

While a court may impose a Guideline-authorized downward departure in an appropriate case, such downward departure is no longer required in order to justify a below-guidelines sentence. After *Booker*, a sentencing court need not find that a particular § 3553(a) factor is "extraordinary" or sufficient to take a case out of the "heartland" in order to justify a below-guidelines sentence. *See Gall*, 552 U.S. at 47, 128 S. Ct. at 595; *Rita v. United States*, 551 U.S. 338, 351, 127 S. Ct. 2456, 2465 (2007). Even those factors that would not necessarily result in the granting of a downward departure or that were expressly prohibited or deemed irrelevant by the Sentencing Guidelines must now be considered under the mandate of § 3553(a). *See United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008) ("[J]ust as we may not bar a district court from considering facts simply because they were also considered by the Commission, the district court 'may not presume' the reasonableness of the Commission's Guidelines sentencing ranges. Rather, in every case, the district court 'must make an individualized assessment' of the appropriate sentence 'based on the facts presented' and the factors detailed in § 3553(a).") (citations omitted).

A non-Guidelines sentence is also warranted where a sentencing judge finds that a particular Guideline or Guideline range fails to properly reflect § 3553(a) considerations, reflects "unsound judgment" or when "the case warrants a different sentence regardless." *Rita*, 551 U.S. at 351, 357, 127 S. Ct. at 2465, 2468. The Supreme Court clarified this point:

> Even when a particular defendant . . . presents no special mitigating circumstances [such as] no outstanding service to country or community, no unusually disadvantaged childhood, no overstated criminal history score, no post-offense rehabilitation—a sentencing court may vary downward from the advisory guideline

range. . . . The only fact necessary to justify such a variance is the sentencing court's disagreement with the guidelines[.]

*Spears v. United States*, 555 U.S. 261, 263-64, 129 S. Ct. 840, 842 (2009) (per curiam) (quoting

*United States v. Spears*, 533 F.3d 715, 719 (8th Cir. 2008) (Colloton, J., dissenting)).

## II.     FACTORS UNDER TITLE 18 U.S.C. SECTION 3553(a)

Ultimately, sentencing is governed by 18 U.S.C. § 3553(a), which provides, in pertinent part: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553(a)(2), discussed below.  Accordingly, after the Court considers the advisory Guidelines calculation, the Court must proceed to an individualized assessment of the case-specific factors, set forth in § 3553(a), to determine whether, "in [this] particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." *Kimbrough*, 552 U.S. at 91, 128 S. Ct. at 564 (quoting 18 U.S.C. § 3553(a)).  A sentencing court "may not presume that the Guidelines range is reasonable" but instead must, using the factors set forth in § 3553(a), "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 49-50, 128 S. Ct. at 596.  The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in § 3553(a).  18 U.S.C. § 3584(b).  "[T]he Sentencing Guidelines 'do not require a judge to leave compassion and common sense at the door to the courtroom.'" *United States v. Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995) (quoting *United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992)).

Title 18 U.S.C. § 3553(a) provides:

The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

(3) the kinds of sentences available;

(4) the kinds of sentences and the sentencing range established [under the Sentencing Guidelines] subject to any amendments made to such guidelines by act of Congress…;

(5) any pertinent policy statement . . . issued by the Sentencing Commission . . . subject to any amendments made to such policy statement by an act of Congress…;

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to the victims of the offense.

We address below the statutory factors.

A.    **Title 18, Section 3553, Subsection (a)(1)**

18 U.S.C. § 3553(a)(1) requires the court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant[.]"  As part of this analysis, a sentencing court must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50, 128 S. Ct. at 597 (2007).  "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'"  *Pepper v. United States*, 562 U.S. 476, 488, 131 S. Ct. 1229, 1240 (2011) (quoting *Wasman v. United States*, 468 U.S. 559, 564, 104 S. Ct. 3217, 3220 (1984)).

**Sam Bankman-Fried's Personal History and Characteristics**

"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *Adelson*, 441 F. Supp. 2d at 513-14.

Sam is not the "evil genius" depicted in the media or the greedy villain described at trial. He is a 31-year-old son, brother, friend, humanitarian, and philanthropist. He is a brilliant, complex and humane person. He does not use drugs, rarely drinks alcohol, and has never had any involvement with the criminal justice system before this case. The letters submitted on his behalf illuminate his character, his good deeds, and his charitable works. *See Rita*, 551 U.S. at 364-65, 127 S. Ct. at 2472-73 (Stevens, J., concurring) (§ 3553(a) authorizes the sentencing judge to consider charitable or public service matters).

### 1. Sam's Early Life

Sam was born on March 5, 1992, and raised in Stanford, California. His parents, Alan Joseph ("Joe") Bankman and Barbara Fried, are esteemed professors at Stanford Law School. Joe is a leading scholar in the field of tax law. Barbara, who is now a Professor of Law *Emerita*, has focused on those areas where law, economics, and philosophy intersect. In addition to being a law professor, Joe is also a clinical psychologist. Sam has one brother, Gabe, who is three years his junior.

Sam's early years in California were stable and comfortable. Sam "was a quiet child, introverted, and demanded and desired very little attention from the outside world. But he was paying close attention to others." (Ex. A-14). He was shy and often struggled socially. That is not to say that he had no friends, but they were few. The father of one his childhood friends describes Sam as a "sweet and curious boy with a big smile, big brain, and a desire to do

good." (Ex. A-1). Sam tried sports such as baseball and tennis, but spent much more time playing "chess, board games, card games and computer games" with his friends. (Ex. A-8).

"From an early age, Sam loved math and complicated games and wanted to talk about the world." (Ex. A-2). Sam attended a "voluntary 'Sunday Math' group at Stanford where they would attend a lecture from a faculty member and then work through some math problems together." (Ex. A-1). He also attended an early morning advanced math class at school. (Ex. A-17). Sam would later attend summer math camps at colleges during his high school years.

At math camp the summer after his freshman year in high school, Sam "was introduced to the Puzzle Hunt, a legendary day-long scavenger hunt at MIT, in which the clues are challenging brainteasers. The following year he organized and ran his own Puzzle Hunt for Bay-Area high school students, to share with them the pleasure of the Hunt." (Ex. A-14). Sam "worked for weeks to prepare, writing clues, recruiting participants, and handled all the logistical arrangements." (Ex A-14; *see also* Ex. A-22). The event was a such a resounding success that Sam sponsored two more events before going to college with "[hundreds] of students from around the area competing each year." (Ex. A-22).

One of Sam's neighbors, Stephen Boyd, a Professor in the School of Engineering at Stanford, got to know Sam in high school because of Sam's interest in math. The two met several times while Sam was in high school to "chat about math." (Ex. A-5). Professor Boyd found himself "having a more sophisticated conversation with Sam than [he does] typically with advanced PhD students." *Id.* One thing in particular that struck Professor Boyd about Sam was that Sam's "interest in math was not just intellectual, but purpose driven. What he wanted most to know was, how could one use math to do good?" *Id.*

"Sam was not a typical teenager that concerned himself with pop music, clothes or popular culture." (Ex. A-1). Rather, unlike most American children, Sam "enjoyed being around adult academics and particularly enjoyed conversations about ideas and application of numbers and logic." *Id.*

It was in high school that Sam began to suffer from fairly severe insomnia which continues to this day. During the years he was building Alameda Research and FTX, he tried to make use of it: rather than toss and turn in bed all night only to get three hours of sleep, Sam placed a beanbag beside his desk so that he could simply take naps to get the same three hours of sleep.

It was also in high school that Sam realized he was anhedonic, or unable to experience joy or pleasure. He was at a summer camp that he was not enjoying and, to understand why he was not enjoying himself, he tried to contrast the situation with other times in his life when he had been happy. He realized, there were none. As Sam describes it, he experiences negative emotions in ways that are not very different from many other people—neither much more extreme, nor much less negative. But he does not feel pleasure, or happiness, or joy, even when something very good happens to him. In college, he was officially diagnosed as suffering from anhedonic depression and he has been on antidepressant medication ever since.

In high school, Sam "became a magnet for classmates who were sad, depressed, living through a difficult parental divorce. He would occasionally ask [his parents'] advice on behalf of a troubled classmate, but for the most part kept his (and their) counsel and did what he could for them." (Ex. A-14).

###### 2.     College

Despite finding many of his classes boring in high school, Sam did extremely well.  He was accepted at MIT, where he majored in physics and minored in math.  For the first time, through what MIT calls an "independent living group," he developed a fairly close group of friends, some of whom would later come to work with him at Alameda and FTX.

It was at MIT that Sam began to take seriously his obligation to the world.  Sam had long wanted to do whatever he could to maximize the ultimate, long-run, aggregate happiness of the world.  In college, Sam decided to move beyond the theoretical and began to take action.  His first area of focus was animal welfare.  Although Sam had been an avowed carnivore all his life, his calculations led him to the conclusion that the pleasure he gained from eating meat was far outweighed by the suffering the animals endured on the way to his plate.  So Sam decided to commit himself to eating a vegan diet.  (Exs. A-17, A-22).  And he has kept true to that commitment for the past 10 years, even when his circumstances have made it extremely difficult to do so, such as during his incarceration in The Bahamas and at the MDC.  (Ex. A-25).

Committing to a vegan lifestyle was not enough for Sam.  He engaged in various, ultimately ineffective, efforts to raise awareness about animal welfare issues.  Frustrated, he talked with people who worked at animal welfare organizations and asked them what he, personally, could do that would help them save the most animals.  Their answer, given Sam's background, was that the best he could do for them was to go work on Wall Street and donate his earnings to them.

Around the same time, Sam was introduced to a theory of philanthropy founded by the Princeton philosopher Peter Singer.  (Ex. A-7).  Professor Paul Brest, an expert on philanthropy who teaches at Stanford, explains that "one's philanthropy, and indeed one's life, should be

devoted to doing as much good as possible.  In practice, this translates into helping the world's poorest people and to addressing existential threats such as climate change."  *Id.*

The big question for Sam was what he should do with his life to have the greatest positive practical impact.  "Soon after completing college, [Sam] realized that he could make the greatest difference through Dr. Singer's proposed 'earning to give' strategy – by earning a great deal of money and giving it to these causes."  *Id.*  For someone with Sam's skillset, Wall Street seemed to be the place to go to earn money to give away.

### 3.       Wall Street

Sam interned at Jane Street, an elite quantitative trading firm in New York, during the summer before his senior year of college and then joined the firm full-time as a trader when he graduated in 2014.  It was an exciting job for Sam, and a very good fit for his skillset: it required fast-paced processing of both quantitative and qualitative information to update models for the value of different assets.  Sam excelled at Jane Street.  He earned hundreds of thousands of dollars each year in salary and bonus, reaching approximately one million dollars in his third and last year there.  Unlike your typical recent college graduate working as a trader on Wall Street, Sam donated the majority of what he made there to several charities that he had become involved with in college.  (Ex. A-23).  Sam was told that if he stayed at the firm ten years and continued to do as well as he had, he could expect to be making from $15 million to $75 million per year.[14]

Sam had an extremely positive experience with Jane Street itself, although in large part because of his anhedonia, Sam was not happy and found New York oppressive and lonely.  He also missed having a community of people nearby committed to doing good, like those he had in his independent living group in college.

---

[14] Michael Lewis, *Going Infinite: The Rise and Fall of a New Tycoon* 72 (W.W. Norton & Co., Inc. 2023).

Around 2016, during his time at Jane Street, Sam wrote the following:

> I don't feel pleasure. I don't feel happiness. Somehow my reward system never
> clicked. My highest highs, my proudest moments, come and pass and I feel nothing
> but the aching hole in my brain where happiness should be.

(Ex. K).

After three years, Sam reevaluated his career options, and decided that there were a few things he could try that each had a potential impact that rivaled what he was able to accomplish on Wall Street. He worked, briefly, for a charity, helping to manage their strategic goals and community and financial growth, but he quickly realized that there was a far bigger opportunity to make—and, more importantly, donate—money: cryptocurrency trading.

### 4.    Alameda Research

Sam moved back to California and founded Alameda in late 2017, primarily for the purpose of donating the money that it would make from engaging in arbitrage trading in cryptocurrency markets. As Sam put it, he wanted Alameda to be "a vessel to save some vast number of lives[,]" instead of "just a place where people go to play games and increase the number in their bank account."[15] Sam used his last Jane Street bonus as seed money and recruited several like-minded effective altruists to start Alameda Research.

One prototypical strategy involved buying Bitcoin at, say, $10,000 per coin on American exchanges, and then selling it for around $11,000 per coin on Japanese exchanges—a 10% premium. In brief, Sam and his colleagues built out computer systems, international corporate structures, and a capital base to buy the Bitcoin in the U.S., send it to Japan, sell it for the yen equivalent of $11,000, convert the yen into dollars, and then wire that money back to the U.S.

---

[15] *See* Michael Lewis, *Going Infinite: The Rise and Fall of a New Tycoon* 81 (W.W. Norton & Co., Inc. 2023).

Sam dedicated himself to Alameda much more than he had to anything else before in his life. He worked 18 hours a day, seven days a week. Most nights Sam would sleep in a beanbag in his office, only making quick stops at his apartment to shower and change clothes.

Alameda was founded primarily for the purpose of donating the profits it would hopefully make. At the end of 2018, the company donated half of its profits after taking into account all interest payments, capital costs, and other expenses. That amounted to a few million dollars. By 2020, Alameda was making roughly $1 billion per year doing arbitrage and similar trades.

### 5. FTX

In 2019, frustrated by the limitations of current cryptocurrency exchanges, Sam and a few other Alameda employees started FTX. At the beginning, they were forced to divide their time between both Alameda and FTX, but ultimately shifted most of their time over to FTX. FTX was first formed when Sam and the others were living and working in Hong Kong. Sam and FTX moved to The Bahamas in 2021, in part because The Bahamas had one of the most developed regulatory structures for cryptocurrency exchanges.

FTX was founded on the thought that cross-margining, stablecoin to U.S. dollar fungibility, and norms from traditional finance could help to make a cryptocurrency derivatives exchange more efficient. FTX's innovations quickly became industry norms, and FTX grew to one of the top five exchanges globally over its first few years. In 2021, FTX would generate roughly $1 billion in revenue.

According to Sam's father:

Although Sam started FTX as a way to earn to give, he never saw the business solely as a means to an end to fund good works. For the entirety of FTX's existence, his time was pretty much consumed with building the company, which included creating a social environment that fostered creativity and met the needs of

employees.  Subject to the increasing demands on his time as a CEO of a rapidly growing business, he tried always to be there for his employees.

(Ex. A-2).  FTX's former head of public relations and Sam's executive assistant, Natalie Tien, describes how she "witnessed firsthand [Sam's] diligence, as he personally respond[ed] to inquiries from clients … regarding questions such as 'How to verify KYC at FTX', pertaining to inquiries outside the purview of his professional duties, demonstrating his hands-on approach to leadership."  (Ex. A-27).  Former FTX Foundation employee Ross Rheingans-Yoo echoes these sentiments, noting that "Sam always seemed inconceivably busy with the business of FTX, but in that time I never knew him to be too busy to keep abreast of my philanthropic work."  (Ex. A-24).

### 6.    Sam's Philosophy and Philanthropy

As early as middle school, "Sam began to think more systematically and globally about ethical obligations."  (Ex. A-14).  When Sam was twelve, his mother, who herself has written extensively on issues of moral philosophy, learned that Sam "was working his way through the vast literature on utilitarianism, a strain of moral philosophy that argues that each of us has a strong ethical obligation to live so as to alleviate the suffering of those less fortunate than ourselves.  The premises of utilitarianism obviously resonated strongly with what Sam had already come to believe on his own, but gave him a more systematic way to think about the problem and connected him to an online community of like-minded people deeply engaged in the same intellectual and moral journey."  *Id*.  Sam's brother says that he and Sam "have spent hundreds of hours talking about what activities or changes could make the world a better place. Sam has put his heart and time and energy into his philanthropy, and I believe it has made the world a better place."  (Ex. A-3).

Sam does not just talk about making the world a better place, he takes action. Ross Rheingans-Yoo, now a researcher and strategy consultant to companies developing new drugs and other medicines, has known Sam for nearly ten years. They met when Sam was a new trader at Jane Street and Mr. Rheingans-Yoo was an intern. Mr. Rheingans-Yoo writes:

> That summer, I had little idea what I wanted to do professionally. Sam was the first person I had met who was 'earning to give,' working at a highly paid job that would allow him to donate at least ten percent of his income to charity, then actually following through on it. I thought that I could follow that example, so that winter I donated $3,400 of the $34,000 I had earned that year, mainly to a nonprofit protecting African children and families from malaria-carrying mosquitoes.

(Ex. A-24). Both Sam and Mr. Rheingans-Yoo have been members of Giving What You Can, a community of effective givers who pledge to give at least 10% of their income to charity, since 2016. Their pledges are recorded at https://www.givingwhatwecan.org/about-us/members. *Id.*

To further his philanthropic interests, Sam formed the FTX Foundation in 2021 as a philanthropic collective that aimed to find and support the most effective solutions to the world's most pressing problems. In particular, the Foundation made grants and investments to improve global health, prevent pandemics, reduce animal suffering, protect the climate, and improve humanity's prospects of long-term survival and flourishing. The majority of the Foundation's funding was provided by Sam and other senior principals of FTX. In addition, the FTX Foundation donated one percent of all fees collected by FTX. Ultimately, the FTX Foundation donated roughly $150 million to charities working on issues such as pandemic prevention, animal welfare, and funding anti-malarial mosquito netting in Africa.

At the end of 2021, soon after Sam created the FTX Foundation, Mr. Rheingans-Yoo contacted him about working at Alameda. Sam was interested in hiring Mr. Rheingans-Yoo, but not to trade cryptocurrency at Alameda. Sam asked Mr. Rheingans-Yoo if he would be

interested in working for the FTX Foundation. Mr. Rheingans-Yoo accepted the challenge. He

recounts his experience at the FTX Foundation as follows:

> Over the following ten months, Sam and I talked nearly every week as I developed
> a plan for a new Life Sciences division at the FTX Foundation, made grants to
> support university labs in virology and immunology, made impact investments in
> fledgling biotech companies, and funded a clinical trial that found an alternative
> treatment for Covid-19 that cost less than a dollar a day for patients in poorer parts
> of the world. I was – and am – proud of the work that we did.

*Id*.

One primary focus of Sam's philanthropy is pandemic prevention, which arose well

before the COVID-19 pandemic. Sam truly cared about the destruction and harm that could stem

from a pandemic. Mark Dybul, a former Ambassador and current Professor of Medicine at

Georgetown University Medical Center, recounts his experience with Sam when "the FTX

Foundation hosted a group of leading medical scientists for a planning workshop on how

investments by the FTX Foundation could save the largest number of lives during the pandemic

and in the future[:]"

> During my conversations with Mr. Bankman-Fried, I observed a genuine concern
> for those less fortunate around the world, a desire to solve complex medical needs
> through investment in entities that could move fast to create new drugs and
> vaccines, and a plan to prevent future pandemics. As you can imagine, as he is [a]
> young man without medical training, I was impressed by his knowledge and
> concern and big vision for creating solutions. At the time, we discussed making a
> big plan to prioritize poor countries and the people with greatest needs. He was
> very supportive of the ideas put forward during the workshops and made
> subsequent investments in not-for-profit and for-profit entities whose aim matched
> the outcomes of that workshop. It is a great misfortune that these plans will not
> come to bear fruit.

(Ex. A-12).

Edward Mills, PhD, a Professor of Health Sciences at McMaster University in Hamilton,

Ontario, also spent time with Sam in The Bahamas. At the time, Professor Mills "was

conducting one of the largest clinical trials evaluating therapies for COVID-19 during the

pandemic" and "was connected to Sam by a colleague because Sam had expressed interest in supporting the trial financially." Professor Mills observes that:

> Sam has tirelessly worked to contribute to various social causes, ensuring his actions bring warmth, hope, and respite to those underprivileged and in need, which reflects his benevolent nature and keen dedication to serving the people who are in dire need of assistance.

> Sam's substantial understanding of global issues, his commitment to resource allocation and his innovative approach to problem-solving are qualities that are not just unique, but also exceedingly rare. He possesses a vision that penetrates through the complexity of global issues and an ability to devise insightful strategies, reflecting the values of justice, fairness, and human dignity.

(Ex. A-20).

Professor Francois Venter is the Executive Director of a research group in Johannesburg, South Africa that conducts important clinical trials of medication and behavioral interventions for health conditions affecting South Africans. He "met Sam in The Bahamas in March of 2022 on his invitation to Purpose Life Sciences to discuss funding and collaboration opportunities of our work on advancing clinical trial readiness in Africa." Professor Venter observes that:

> Sam's leadership on generating new funding mechanisms through which innovative ideas like new approaches to clinical research and pandemic preparedness could be channeled in more efficient ways to deliver results quicker was refreshing and welcomed. I believe he cared about maximizing this through philanthropy and that he understood the challenges and limitations to funding innovation through more traditional global health philanthropic mechanisms. He also understood the important needs of Africa and the unique hurdles we face for doing timely and efficient research of something so fast moving and evolving as a pandemic.

(Ex. A-28).

Jamie Forrest, PhD, the Executive Advisor to Purpose Africa, a project of Purpose Life Sciences that seeks to strengthen African health systems through public health and clinical research, was also part of the group of researchers who Sam invited to The Bahamas in early 2022. Dr. Forrest's work "focused on building capacity in Africa for high quality clinical research that could detect pandemics early and respond rapidly." (Ex. A-13). Dr. Forrest and the

others spent a week with Sam "discussing every detail of our proposal." *Id*. In his letter to the

Court, Dr. Forrest provides the following observations:

> I believe that Sam was deeply motivated by a desire to make the world a better place. His substantial understanding of global issues, and his commitment to service were formidable traits for someone his age in the global philanthropic community. His vision of what is possible with just the right investment in the right group with the right ideas, reflected a man whose values were deeply rooted in global justice, fairness, and human dignity.

*Id*.

Another issue that has been important to Sam is animal welfare. As mentioned above,

Sam became a vegan while in college. He made this decision "even though he loved meat, and

knew it made things more difficult for himself." (Ex. A-3). Sam's brother Gabe explains that

Sam did not become vegan "to lecture other people" or "because he felt a sense of oneness with

other creatures . . . . He did it because he believed it was the right thing to do." *Id.*

It was the right thing to do because animals raised for his consumption suffered

enormously only to bring him a small amount of pleasure. Animal rights activist Wayne Hsiung

met Sam in 2014 while Sam was still at MIT and marveled that Sam, "who had his choice of

professions before him, … spent an inordinate amount of time on … helping animals." (Ex. A-

15). Mr. Hsiung noticed how Sam "regularly engaged in deep discussions on how to reduce the

suffering of animals, even with those he disagreed." *Id*.

### 7. Sam Is Not Motivated By Greed

"By the time [Sam] was ten or so, he had no interest in material goods. We would ask him

what he wanted for his birthday or Chanukah, and he would say 'nothing.'" (Ex. A-2). "He was,

however, always interested in the material conditions of other peoples' lives, in particular those

around the world most desperately in need." *Id*. Sam's brother's recollection is consistent with

his father's:

Sam was never interested in luxury material things as a kid or an adult. When he visited me in D.C., he would sleep on my couch, rather than a 5-star hotel. We would eat at Chipotle. The trappings of fame and wealth were something we joked about. Sam never took himself seriously. He was always willing to laugh at himself. He was open to criticism and willing to listen.

(Ex. A-3).

Professor Edward Mills, a clinical researcher who visited The Bahamas to discuss pandemic prevention with Sam and other scientists, met with Sam at his office and his apartment and saw that "Sam led a frugal life and quite contrary to [how] the media portrayed his lifestyle." (Ex. A-20).

Dr. George Lerner, Sam's psychiatrist and a former "in-house coach" at FTX, also disagrees with the public perception that Sam's actions as CEO of FTX were driven by greed. Dr. Lerner notes the following about Sam:

None of this was for show. He just doesn't care about the things most people care about. It was an interesting revelation to me when he refused to speak at the World Economic Forum, even though a number of people had put pressure on him to do so. This made me question his ability to receive normal human ego-gratification.

(Ex. A-16). Sam's father expresses similar observations and sentiments:

He just doesn't care about the creature comforts that most of us value. He is similarly uninterested in hobnobbing with the rich and famous and generally uncomfortable with attention. He did what he had to do for the good of the company, often at some significant personal cost to himself.

(Ex. A-2).

The fact is that, perhaps in no small part because of his anhedonia, Sam gets no enjoyment from expensive and fancy things. He does not enjoy upscale restaurants or luxury cars, so they are wasted on him. He disdains fashion, so he does not spend money on designer clothes. Because he only has so many productive years in which to make a difference in the world, he did not take vacations. The things that interest materialistic people simply do not

interest Sam.  As Sam's father explains, "For anyone who knows Sam, the popular portrayal of him as a high-rolling, celebrity-seeking, CEO driven by greed is simply bizarre."  (Ex. A-2).

The government and the press have fixated on the Orchid penthouse apartment in The Bahamas as a symbol of his purported excessive, billionaire lifestyle.  The truth is far less interesting.  The apartment, which had been purchased by FTX, housed "eight or so of the top employees and their partners, and served both as an informal headquarters of sorts, a place to entertain prospective business partners, and a gathering place for employees to relax, eat dinner together (usually cooked by Sam) and play complicated board games, the diversion of choice." *Id*.  Furthermore, Sam lived in the apartment—in the smallest bedroom, the one without a bathroom (Ex. A-24)—for only six months and, like each of the other inhabitants, paid rent, perhaps $50,000 in total.  That's roughly equivalent to what an accomplished professional might pay for an apartment in Manhattan.  Daniel Chapsky, a former FTX employee, who has had the courage to write to the Court on Sam's behalf, points out that:

> The perks that FTX provided to employees are standard in start-ups, but [FTX] often took extra steps to make those perks work in the Bahamas.  Giving employees three meals a day and subsidized housing for moving are fairly standard perks in the tech industry.  Marketing strategies involving celebrity endorsements are also similarly common.

(Ex. A-9).  Again, Sam's father agrees, noting that "[w]hat FTX spent on advertising, travel, and housing is in line with what comparable multibillion dollar companies spend, and small fraction of what many do spend."  (Ex. A-2).

### 8.    Sam's Caring for Individuals

"Sam's desire to do good on a large scale never crowded out his concern for individuals." (Ex. A-14).

While Sam's social awkwardness and hyper-rationality may cause others to view him as detached, those who know him know that "[h]e cares deeply about other people."  (Ex. A-22).  As an example, Sam's long-time friend Matt Nass tells of Sam's compassion for him when his father ███████████████████.  At the time, both Sam and Matt were attending college in Massachusetts, Sam at MIT and Matt at Worcester Polytechnic Institute, 3,000 miles from their home in California.  Matt had been very close to his father, so his mother did not want him to be alone when he heard the news.  So Sam drove from Cambridge to Worcester to tell Matt the news in person.  (Exs. A-14 and A-22).  Sam then took Matt with him back to MIT, "stayed up playing board games all night with him, and then took him to the airport the next day and waited with him until his flight back to California."  (Ex. A-14).

> Sam's friend Edward Dodds cautions that one should not be deceived by Sam's affect:
>
> His is an unusual character, and maybe his mathy brain might not strike the average observer as naturally sympathetic, but I have no doubt that this is a good man who deserves a second glance and a second chance, who has never been motivated by self-enrichment or fame, who has never demonstrated to me the slightest propensity for criminal behaviour or intentionally unethical conduct, who has always been a delightfully strange young man motivated purely by doing good for the world, doing kindnesses to strangers, and decreasing extinction risk to humanity as quickly and effectively as possible.

(Ex. A-10).

"Beyond his professional demeanor, Sam exhibits kindness and empathy in his interactions with others. … It is crucial to recognize that the portrait of Sam portrayed in some media outlets is often misunderstood and misrepresented.  The Sam I knew and worked with never acted out of greed or self-interest.  Instead, he consistently demonstrated a commitment to ethical business practices and genuine desire to make a positive impact on the world."  (Ex. A-27).  There is not a shred of evidence from Sam's personal life that he was ever inclined to spite, nastiness, ill will, cruelty, or callousness.

Although prison offers precious few opportunities to "do good in the world" (Ex. A-26), in the six months Sam has been at the MDC, we are told that "he has run a tutoring session to prep fellow inmates for their GED exams" and has helped other inmates "organize the relevant facts, research the relevant law, and write up summaries of [their cases] for their (newly hired) lawyers."  (Ex. A-14).

### 9.     Sam's Work Ethic

Several of the individuals who have written to the Court on Sam's behalf have commented on his extraordinary work ethic.  Natalie Tien, who, among other roles, served as Sam's executive assistant, was well-placed to "observe Sam's behaviors and attitudes firsthand." She attests to Sam's "unparalleled work ethic": "[Sam] never takes a day off.  Every waking minute is dedicated to advancing the company's goals and understanding every aspect of its operations."  (Ex. A-27).  Sam's mother also notes how Sam worked many hours seven days per week for three years after forming FTX.  She and Sam's father expressed their concern about how hard Sam was driving himself.  Sam's response was that "all he cared about was living long enough to make a significant difference in the world."  (Ex. A-14).

In the spring of 2022, a psychiatrist at FTX became concerned about Sam's lack of sleep, poor diet, and lack of physical activity.  He told Sam that his focus on work at the expense of his personal health could well shorten his life.  Sam's response was stunning; he asked the psychiatrist only "if it would impact the next five years of his life."  Sam "was not concerned about his health past that." (Ex. A-16).  He simply "didn't care what happened to him after that" because "he was in a unique place to help others right now… he had been steadfast and invariable in his goal of benefitting the world through earning to give, and almost completely

unconcerned about his own happiness." *Id.* The psychiatrist concluded that anyone who tries to understand [Sam] through the lens of normal human desires will misunderstand him. *Id.*

### 10. Sam's Remorse

Sam has consistently expressed his deep remorse for the damage caused to FTX's customers, lenders, and employees. Sam's mother recounts that "[Sam] has been wracked with remorse for not having prevented the implosion of FTX and the damage that followed. It is, he has told me, the first thing he thinks about when he wakes up and the last thing he thinks about when he goes to sleep, and it occupies many moments in between." *Id*.

Former FTX employee Daniel Chapsky worked closely with Sam in the period between FTX's collapse and Sam's arrest in The Bahamas. Chapsky writes that "[a]t one point in mid-November, I said to [Sam] only half-facetiously, 'you know, if I could get people their money back by putting you in prison, I would.' [Sam] agreed enthusiastically." (Ex. A-9).

Sam is also full of regret for the enormous damage that he has caused to his (former) friends, family, partners, colleagues, and the causes he cared so deeply about. Sam is simply devastated that the advice, mentorship, and funding that he has given to the animal welfare, global poverty, and pandemic prevention movements does not begin to counteract the damage done to them by virtue of their association with him.

Sam's remorse is evident not just to his mother, but also to his fellow inmates at the MDC. One of his bunkmates, a former police officer, who has grown close with Sam over the past six months, has observed that:

> Even though Sam disagrees with the Government[']s perspective of events that does not mean that he has not shown remorse or empathy for those that lost money… Over [the past six months], he has shown an immense amount of remorse and regret for whatever mistakes he made that potentially led to the collapse of FTX. I am not use[d] to this; every other person that I have interacted with here places the blame on someone else.

(Ex. A-25).  Sam has, "personally expressed deep remorse for his mistakes and his stated desire to find a way, any way to contribute positively."  (Ex. A-26).

11.     **Sam's Low-Level Culpability**

In a report concerning reform of the federal sentencing for economic crimes, the Criminal Justice Section of the American Bar Association proposed assigning a culpability level to an offense.[16]  "One factor in the culpability level is the defendant's motive or the nature of the offense."[17]  Among the highest level of culpability are "predatory" offenses.  These offenses— accompanied by no legitimate purpose—are among the most culpable types of offenses sentenced under this guideline.  Sam *was not* predatory.  He did not set out to prey on the elderly, the unsophisticated, or implement a plan to poach pension assets.  His conduct falls far lower on the culpability scale.  "Legitimate *ab initio*" offenses arise from otherwise legitimate efforts that have crossed over into criminality as a result of unexpected difficulties.  Even though such offenses may be intended to cause loss for the purpose of generating personal gain to the defendant or to others involved in the criminal undertaking, they rank lower on the culpability scale than predatory offenses.  Sam does not fall within this category either as he never intended to cause loss for the purpose of his own personal gain.

It would be far more accurate to characterize the conduct as "risk shifting."  Those offenses are not specifically intended to cause loss.  Instead, they shift the risk of any potential loss from the defendant (or from others involved in the criminal undertaking) to a third party, such as the victim of the offense.  Examples include false statements for the purpose of obtaining

---

[16] *See* The A.B.A. Crim. Just. Sect., A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes (Final Draft) (Nov. 10, 2014), available at https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf.
[17] *Id.* at 2.

a bank loan that is intended to be repaid.  Such offenses are generally less culpable than those where loss is specifically intended.  *Id.*

### 12.    Sam's Condition

Sam presents at times as a paradox.  Not because he is deliberately deceiving or conniving, but rather because that is how he is "wired" as a human. He has an exceptional IQ, but difficulty with conventional styles of communication, especially around emotion.  *See* Exs. A-16 and A-21.

Neurodiversity is a medical concept that recognizes the variation in human neurology.  It acknowledges that neurological differences, such as those associated with Asperger's, ASD, and ADHD are part of the spectrum of diversity of the human brain that exists.  Sam's condition manifests in a wide variety of ways.  No two individuals on the spectrum are exactly alike.  It is not a disease or a condition that needs to be cured.  Instead, it is a fundamental aspect of an individual's identity—an aspect to be considered at sentencing.  *See Pepper*, 562 U.S. at 488, 131 S. Ct. at 1240 (2011) (citing *Wasman*, 468 U.S. at 564, 104 S. Ct. at 3220).  (1984)).

Sam's neurodiversity greatly affects how he perceives and is perceived.  Sam moves through the world assessing risk at times with a different relative valuation of emotions versus ultimate impact than many people do.  He also has outward characteristics typical of neurodiversity, such as inconsistent eye contact, as well as facial gestures and tone of voice that lead to miscommunication.  Sam is aware of the challenges and has done what he can to overcome them.  He has practiced facial expressions.  He tries to force himself to make eye contact.  (Ex. A-2).  But coming up with "normal" affective responses is neurologically difficult for Sam, especially when he is under pressure and does not have time to prepare.  He can be perceived as abrupt, dismissive, evasive, detached or uncaring.  People with Sam's diagnosis

tend to "lack [] conventional affect[s], combined with odd gestures and lack of eye contact, [this] can reduce our ability to feel empathy towards them, and can lead us to jump to negative conclusions about their true motivations and feelings." (Ex. A-16); *see also* C.E. Robertson and J.A. McGillivray, *Autism Behind Bars: A Review of the Research Literature and Discussion of Key Issues*, J. of Forensic Psychiatry & Psychology, 2015 Vol. 26, No. 6, 719-736 at 720.

It follows that Sam is uniquely vulnerable in a prison population. (Ex. A-21). Individuals with ASD are often at considerably greater risk of physical harm and extortion in prison than other inmates. *United States v. Knott*, 638 F. Supp. 3d 1310, 1316 (M.D. Ala. 2022) (defendant's Autism Spectrum Disorder (ASD) would render him extraordinarily vulnerable to abuse in prison and weighed in favor of granting downward variance). Because individuals with ASD may have difficulty responding to certain social cues and contexts, they are at risk from both other inmates and prison guards who may view their failure to respond "appropriately" to social cues as disrespectful or disobedient. *See* Paterson, P. (2008), *How well do young offenders with Asperger syndrome cope in custody?*, British Journal of Learning Disabilities, 36, 54-58. In addition, prison often requires inmates to follow the "unwritten rules," as defined by other inmates—rules that are often highly reliant on social and emotional communication of deference and power and often at conflict with the written rules. The social dynamics in prison and the scrutiny he is receiving is likely to result in him facing physical violence. *See Knott*, 638 F. Supp. 3d at 1316, 1318.

Sam's personal history and characteristics, summarized above, and set forth at length in the outpouring of letters submitted by friends, family, business colleagues and others, strongly support a lenient sentence.

**B.** **Title 18, Section 3553, Subsection (a)(2)(A)**

18 U.S.C. § 3553(a)(2)(A) provides that the Court shall consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

While the Court may, as a technical matter, be required to assess the Guidelines, the Guidelines here are draconian under the facts of this case as to this defendant, and accordingly we respectfully request the Court temper justice with mercy and impose a sentence not greater than necessary. *See Peugh v. United States*, 569 U.S. 530, 536, 133 S. Ct. 2072, 2080 (2013) ("The district court 'may not presume that the Guidelines range is reasonable,' and it 'may in appropriate cases impose a non-Guidelines sentence based on disagreement with the [Sentencing] Commission's views[.]'") (citation omitted).

In assessing the seriousness of this offense and just punishment for Sam, the real-world financial impact of the conduct warrants consideration. *See United States v. Faibish*, No. 12-cr-265 (ENV), 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) (Vitaliano, J.) (refusing to "peg [the defendant's] fate to a guidelines computed loss amount" where, using "common sense," the court found that "a strict application of the existing guidelines derived from the existing loss table in this case would unfairly balloon [the defendant's] sentencing range beyond any reasonable proportion to his crimes"). And, as Judge Engelmayer noted in *dicta* in *United States v. Mitrow*, Case No. 13 Cr. 633 (PAE), 2015 WL 5245281, at *10 (S.D.N.Y. Sept. 8, 2015), regardless of whether a court credits a defendant for customers' full reimbursement, substantial payment "reflects favorably on [defendant] and is relevant under § 3553(a)."

### 1. Sam Is Already Being Punished

Sam's punishment will not begin when the Court imposes its sentence. In many ways, his sentence began 18 months ago.

After his arrest in The Bahamas in December 2022, Sam was detained for a brief period at Fox Hill Prison in Nassau. A U.S. State Department report last year observed that prisoners and pre-trial detainees at the [Bahamas Fox Hill] facility reported infrequent access to nutritious meals and long delays between daily meals. . . . Inmates removed human waste by bucket. Prisoners complained of the lack of beds and bedding. Some inmates developed bedsores from lying on bare ground. Sanitation was a general problem, and cells were infested with rats, maggots, and insects.[18]

The conditions at Fox Hill were overcrowded and unsanitary. Sam was locked in a small room with six other inmates and a toilet that didn't flush. The water was not potable, so Sam tried to get by with a couple of water bottles for the duration. He was not allowed phone calls, and on most days could not meet with his attorneys. He survived on a single peanut butter sandwich each day as there were no other vegan options. He did not see the sky while he was there.

As the Court is aware, since August 2023, Sam has been incarcerated at the Metropolitan Detention Center (MDC) in Brooklyn, the conditions of which are well known to the Court. Judge Colleen McMahon described the MDC as "disgusting" and "inhuman," *see* Sentencing Transcript at 19-21, *United States v. Days*, Case No. 19-CR-619 (CM) (S.D.N.Y. Apr. 29, 2021)

---

[18] *See* U.S. Dep't of State, Bureau of Democracy, Human Rights and Labor, *The Bahamas 2021 Human Rights Report* at 2-3, https://www.state.gov/wp-content/uploads/2022/02/313615_BAHAMAS-2021-HUMAN-RIGHTS-REPORT.pdf.

(ECF No. 35), and Judge Cheryl L. Pollak described it as a "third world country" prison.[19] Earlier this year, Judge Jesse M. Furman had the following to say about the conditions at the MDC:

> In the winter of 2019, a power outage left inmates without light or heat for a full week while a polar vortex swept the East Coast. Since that time, the dockets of this Court and the Eastern District have been filled with cases in which defendants complain about near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care. Contraband – from drugs to cell phones – is widespread. At least four inmates have died by suicide in the last three years. It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable.

*United States v. Chavez*, Case No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024) (internal footnotes omitted).

Judge Furman ultimately held that "the conditions at the MDC constitute 'exceptional reasons' why detention of most defendants who do not pose a risk of flight or danger to the community … 'would not be appropriate'" *Id.* at *8 (citation omitted). Sam's fellow inmate, Carmine Simpson, adds that "[b]etween the constant lockdowns, lack of basic items such as toothpaste, medicine or pillows and going days or weeks without the ability to contact family, friends and legal representation[,] [s]pending six months here is easily comparable to spending [two] years at any other federal holding center." (Carmine Simpson Letter). *See, e.g., Tsatsin v. United States*, Case No. 18 Civ. 5975 (LAK) (GWG), 2019 WL 4266186, at *4 (S.D.N.Y. Sept. 10, 2019) (making allowance for severity of prison conditions overseas).

In addition to the deprivations common to many detainees at the MDC, such as limited social visits, lack of access to an outdoor area, and exposure to violence, Sam has had difficulty

---

[19] *See* also John Marzulli, *Judge Refuses to Send Women to Brooklyn Jail With 'Third World' Conditions*, N.Y. Daily News (Oct. 7, 2016), https://www.nydailynews.com/2016/10/07/exclusive-judge-refuses-to-send-women-to-brooklyn-jail-with-third-world-conditions/.

with access to materials for his legal representation and, as the Court is aware, issues with medication for his attention deficit disorder. He has lost a significant amount of weight since the remand. Mr. Simpson, Sam's neighboring inmate, adds that Sam's commitment to a vegan diet, which the MDC does not provide, means that "twelve out of every fourteen of Sam's weekly meals are just undercooked rice, a scoop of disgusting-looking beans and week-old brown lettuce." (Ex. A-25). Mr. Simpson also notes that Sam being the "least physically intimidating person … has and will lead to him being frequently targeted for hazing, harassment, and assault more so than the average inmate." *Id.* In addition, Mr. Simpson explains that the extensive media coverage of Sam's case and his erstwhile net worth has "[led] to multiple extortion attempts." *Id.*

News of Sam's arrest and conviction spread like wildfire through virtually every major mainstream and social media news outlet on Earth. He has been condemned worldwide. Sensationalized portrayals of Sam and his life and family have caused enormous pain that is unfixable. He will be scorned by many people wherever he goes for the rest of his life.

Humiliating and hateful news stories were only the beginning. Sam also became a target of harassment, menacing and threats. Tabloids hired speedboats so that photographers with extremely high-powered, long-range cameras could take pictures of Sam in his living room. When he was on house arrest at his parents' home, a black car drove into the metal barricade set up outside their home. Three men got out of the car and then responded to a security guard with something to the effect of: "You won't be able to keep us out." ECF No. 46 at 2-3.

Sam and his family were also subjected to shocking and unspeakable harassment online and through the mail. Examples of messages Sam and his parents have received include:

- . . . They're going to put you in a box until you stop moving. Then they'll put you in a smaller Sam-shaped box. I'm sure the judge will take your parole conditions violations into account when sentencing.

- "You son is a dirty, filthy, rotten typical criminal hooky-nosed selfish greedy jew.  He belongs in prison.  And so do you for your role in the Enron matter.

- Dear Sam, you stole billions. Darkness comes for you, Sam. You will be locked away, alone, in darkness, until you cease to be.  Or perhaps those you stole from will end you first.  In any case, all good things have come to an end for you, Sam. You are cursed. There is nothing to do now but surrender to despair and madness. Then finally, disollution [sic]. You will cease to be. You will remain in a prison grave, forgotten but for ridicule. This all there is or will be for you, Sam. Night falls. Darkness comes. There will be no dawn. Love from reality, your harsh mistress.

- Barb you prove that any FUCKing idiot raised by your rear end does not know right from wrong 🤩 Will you be willing to have me interview you for my documentary entitled, "HOW A FAT SOY BOY CONNED THE FINANCIAL WORLD SANS ME" HAHAHAHA

- BARB, IF SBF DOES NOT GO TO JAIL YOUR HUBBIE WILL SOAK ON YOUR TOES. THE MOST SEX YOU HAVE HAD SINCE YOU BIRTHED SAM. I MEAN SINCE YOU TOOL A BIG DUMP AND SAM POPPED OUT 🤩 I HAVE TOLD CONGRESSMAN JORDON THAT WHEN SAM GOES TO PRISON TO MAKE HIS CELLMATE THE MOST HUNG BBC IN THE PRISON SYSTEM, AND TO INSURE THAT THE COMMISSARY HAS PLENTY OF Vaseline. STILL LAUGHING NOW BARB. SBF GOING BYE BYE FOR 50 YRS. I LOVE THIS BARB. I REALLY DO HAHAHAHA 🤩

The abuse did not stop even after Sam's remand to the MDC.  Following his conviction, We are informed that the expletive-laden and gloating hate mail increased, arriving at his bunk more consistently than legal mail.

## 2. Collateral Consequences

We respectfully submit that the Court should consider in fashioning a sentence the serious collateral consequences of conviction that have already befallen Sam and will continue to plague him in the future.[20]

For a person like Sam with no prior criminal history, a conviction by itself imposes serious punishment. He will now suffer the routine yet harsh "collateral consequences" of a felony conviction, under both state and federal law. He will likely lose the right to vote, to hold office, to sit on a jury and perhaps to obtain professional licenses. The csgjusticecenter.org puts it as follows:

> Collateral consequences remain obscure and are increasingly complex. Because collateral consequences are civil in nature—and not part of a person's criminal punishment—they are generally imposed without the involvement of sentencing courts and are not referenced alongside the state and federal laws that govern

---

[20] Courts frequently take collateral consequences into account at sentencing. *See, e.g.*, *United States v. Sponaugle*, Case No. 19-103-LPS, 2022 WL 4079197, at *6-7 (D. Del. Sept. 6, 2022) (identifying "significant punitive components" of non-custodial sentence, including financial punishment, collateral consequences of "greatly reduced job prospects" and impact on defendant's reputation); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (upholding below-Guidelines sentence in part because district court found that "defendant had suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming a below-Guidelines sentence in part because defendant lost his job and income); *United States v. Jasen*, 15-CR-00214 (M.D. Fla. Jan. 28, 2016), ECF No. 86 at 53-54 (imposing probation because, in part, "one who makes a mistake in judgment...should be, in my judgment, absent other aggravating circumstances, be able to go on with their life and suffer the humiliating and devastating effects of being prosecuted...which will... harm your reputation, your social status..."); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming a below-Guidelines sentence in part because the defendant "was punished by the reputational harm he suffered as a result of the criminal action"); *United States v. Redemann*, 295 F.Supp.2d 887, 894–97 (E.D. Wis. 2003) (downward departure warranted where defendant suffered serious collateral consequences from conviction); *United States v. Samaras*, 390 F.Supp.2d 805, 809 (E.D. Wis. 2005) (imposing below-Guideline sentence in part because, "as a consequence of his conviction and sentence, defendant lost a good public-sector job, a factor not considered by the Guidelines."); *United States v. Anghaie*, 09-CR-0037 (N.D. Fla. Nov. 29, 2011), ECF No. 238 (imposing below-Guidelines sentence and noting that defendants "received significant punishment through financial loss, loss to reputation and career opportunities."); *United States v. Vigil*, 476 F.Supp.2d 1231, 1315 (D.N.M. 2007) (observing that, in considering justness of sentence, "it is important to consider all other forms of punishment [defendant] has already suffered," including loss of job and damage to his personal and professional reputation); *United States v. Olis*, Criminal No. H-03-217-01, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (finding a substantial variance warranted in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct").

criminal offenses or procedure. Instead, they are scattered throughout various portions of state statutory and regulatory codes, making it difficult for a person to identify all of the consequences that may stem from a conviction for a particular crime in a particular jurisdiction. In a single state, employment barriers may be embedded in a state's civil service code, trade and occupations code, and any other place that regulates business practices. And because collateral consequences are not criminal, they are generally implemented by state agencies through obscure and often complex administrative policies and internal practices that may drastically alter their operation and impact.

"In many states, a criminal record is a stain you can't wash off." Steven Slivinksi, Economist, Center For the Study of Economic Liberty, Arizona State University, csgjusticecenter.org. A host of sanctions and disqualifications will continue to accompany Sam for the rest of his life. Such consequences not only affect whether punishment will afford adequate deterrence, they also impact the need "to provide just punishment for the offense," as outlined in § 3553(a)(2). *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."). Here, there is no dispute that significant collateral consequences have resulted. The very status of "convicted felon" therefore delivers a significant blow and inflicts a major punishment in this case—more than sufficient to satisfy the statutory requirements.

There is more. Sam's personal assets are gone. Insufficient funds remain even for payment of a fine. *See* PSR at 62. Legal proceedings will follow him for the rest of his life. The ability to obtain employment, bank, borrow, travel, and adopt, among other things, may be implicated. More painful for Sam is that the companies he built and loved—and which had so much lawful success and even more potential—are gone. And Sam is utterly heartbroken that he may have caused collateral damage to the philanthropic community that he so loved.

### C.      Title 18, Section 3553, Subsection (a)(2)(B)

According to 18 U.S.C. § 3553(a)(2)(B), an appropriate sentence should "afford adequate deterrence to criminal conduct[.]"

Here, the government, through its investigation and highly publicized prosecution of Sam, has surely achieved adequate general deterrence of the conduct of conviction.  In the wake of Sam's arrest, trial, and conviction, the Court can reasonably conclude that the entire world is aware of Sam's arrest and conviction.  *See, e.g.,* ECF No. 42 (unsealing request by various news organizations, including The Associated Press, Bloomberg L.P., The Financial Times Ltd., CNBC LLC, Reuters, News & Media Inc., Dow Jones & Co., Inc., publisher of The Wall Street Journal, Insider, Inc., and WP Company LLC, publisher of The Washington Post).

The events at FTX even caught the attention of Congress.  On November 29, 2022, the Congressional Research Service issued an insight, "What Happened at FTX and What Does It Mean for Crypto?"  The report acknowledges that while "[c]alls for greater regulation of the industry preceded FTX's collapse"… "the events at FTX …shine a light on practices by U.S.-based exchanges that may be of interest to Congress." [21]

 In a publication by the National Institute of Justice ("NIJ")—the research, development, and evaluation agency of the U.S. Department of Justice—the NIJ summarized that "increasing the severity of punishment does little to deter crime."  Certainty has a greater impact on deterrence than severity of punishment.  *Severity* refers to the length of a sentence.  Studies show that for most individuals convicted of a crime, short to moderate prison sentences may be a deterrent but longer prison terms produce only a limited deterrent effect.  In addition, the crime prevention benefit of long sentences falls far short of the social and economic costs.

---

[21] Paul Tierno, *What Happened at FTX and What Does It Mean for Crypto?*, Cong. Res. Serv. (Nov. 29, 2022), https://crsreports.congress.gov/product/pdf/IN/IN12047.

*Certainty* refers to the likelihood of being caught and punished for the commission of a crime. Research underscores the more significant role that certainty plays in deterrence than severity— it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment. Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In other words, the message of certainty has been made loud and clear.[22]

Here, the United States Attorney's Office issued detailed press releases warning the cryptocurrency industry that the United States Attorney's Office has "no patience for it…This case is also a warning to every fraudster…"[23] In sum, the public is undoubtedly aware, reacting, and more than adequately deterred.

Moreover, Kat Woods, who has written a letter to the Court despite never having met Sam, puts it succinctly: "[M]ost [white collar criminals] would consider losing all of your wealth and being publicly shamed by the entire globe to be more than enough of a deterrence." (Ex. A-29).

This prosecution has also already achieved specific deterrence. Even the merciless PSR does not suggest that Sam is likely to commit further crimes. Furthermore, to the extent there is any criminal forfeiture ordered, criminal forfeiture is a punitive measure and serves as a specific deterrent. *Kaley v. United States*, 571 U.S. 320, 323, 134 S. Ct. 1090, 1094 (2014) ("Forfeitures … at once punish wrongdoing, deter future illegality, and 'lessen the economic power' of criminal enterprises") (citations omitted). Indeed, before any legal action was taken against him,

---

[22] National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence#%E2%80%9Cincreasing-the-severity-of-punishment-does-little-to-deter-crim.
[23] Press Release, Statement of U.S. Attorney Damian Williams on the Conviction of Samuel Bankman-Fried (Nov. 2, 2023), https://www.justice.gov/usao-sdny/pr/statement-us-attorney-damian-williams-conviction-samuel-bankman-fried.

Sam had *already* surrendered essentially all his assets to the bankruptcy teams, ensuring that forfeiture was effectively enacted from before his arrest.

Sam is a first-time, non-violent offender. He has already suffered tremendously throughout this prosecution. It has cost him—and will continue to cost him—financially. It has cost him close relationships. It has cost him his company—his livelihood.

More than that, according to Sam's own "calculations," the fallout from the collapse of FTX has turned the current expected value of his life into negative territory. (Ex. A-16). As recounted by one of Sam's fellow inmates:

> Even after this hole in his life, Sam's goal is still [to] make the world a better place for others. This in itself is shocking because most people's reaction would be to give up on that dream. There is zero doubt in my mind that the sooner Sam is released[,] he will work and strive to improve the world.

(Ex. A-25). Sam's aunt adds:

> I know that Sam Bankman Fried can make a positive and lasting difference in this world, if given the chance.

(Ex. A-19). Sam, in sum, is not a risk of committing further crimes—quite the opposite. We are told that Sam has spent his time in prison helping other prisoners in his unit to obtain their GEDs. This encapsulates Sam's commitment to devoting his life from here on out to helping improve the lives of others. PSR ¶ 102.

Again, Kat Woods, who has never met Sam personally, observes that "[Sam's] actions are just not consistent with somebody who is pretending to do good. He is genuinely trying to do good and I think that affects the likelihood that he's an ongoing danger to society." (Ex. A-29).

The data on which the Sentencing Commission relied in promulgating recent amendments to the Guidelines, effective November 1, 2023, supports the conclusion that Sam is not a risk for future crimes. Sam is a so-called zero-point offender—that is, he has no criminal history points. The Commission's data shows that zero-point offenders "have considerably

lower recidivism rates than other offenders, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point." U.S.S.G. Manual, Amendment 821, "Reason for Amendment," (eff. Nov. 1, 2023) (citation omitted). In short, the criminal justice system generally has no need or reason to imprison the zero-point offender because he or she—like Sam—is so unlikely to reoffend.

### D. Title 18, Section 3553, Subsection (a)(2)(C)

18 U.S.C. § 3553(a)(2)(C) sets forth that an appropriate sentence shall "protect the public from further crimes of the defendant[.]" Neither the PSR nor the government suggests that the public needs protection from Sam Bankman-Fried. He will never have the opportunity to repeat the offense of conviction. He will never again be in the position of running a financial company, or accepting customers' funds. And it is highly unlikely that he will ever again be in a position to raise money from investors.

The letters of support confirm that the public needs no protection from Sam. Sam, in short, presents the very opposite of the potential recidivist for whom prison is necessary.

### E. Title 18, Section 3553, Subsection (a)(2)(D)

18 U.S.C. § 3553(a)(2)(D) provides that the court shall consider "the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]" Sam needs no further education or training. He has no history of drug or alcohol abuse, but he does have several medical conditions, namely anhedonia and ADHD (attention deficit hyperactivity disorder), for which he requires medication. He does not need rehabilitation or correctional treatment.

**F.      Title 18, Section 3553, Subsection (a)(3)**

18 U.S.C. § 3553(a)(3) provides that the court shall consider "the kinds of sentences

available[.]"

Imprisonment is concededly a more onerous form of punishment, and different in kind

from supervision, but imprisonment is not the only punishment available.  Supervised release

entails significant restrictions on a defendant's liberty and can include a number of discretionary

conditions.  *See* 18 U.S.C. § 3563; see also U.S.S.G. § 5B1.3.  Offenders on supervised release:

> may not leave the judicial district, move, or change jobs without notifying, and in
> some cases receiving permission from, their probation officer or the court.  They
> must report regularly to their probation officer, permit unannounced visits to their
> homes, refrain from associating with any person convicted of a felony, and refrain
> from excessive drinking.

*United States v. Zimmerman*, No. 10-CR-598 (JG), 2012 WL 3779387, at *6 (E.D.N.Y. June 19,

2012) (citing and quoting *Gall*, 552 U.S. at 48-49, 128 S. Ct. at 595-96); *see also United States v.*

*Springer*, 684 F. App'x 37, 40 (2d Cir. 2017) (referring to Supervised Release as "conditional

liberty").

BOP consultant Shannon Race states as follows: Sam "has no history of violence, his

instant offense is not one that the BOP considers violent, he has no criminal history involving

past incarceration and his physical mannerisms and stature pose a risk for him adjusting in a

higher security institution.  In my opinion, a low security prison could safely house a defendant

like Mr. Bankman-Fried while meeting society's need for justice and cost effectiveness."  (Ex. L

– Shannon Race Decl.).

**G.      Title 18, Section 3553, Subsection (a)(4)**

18 U.S.C. § 3553(a)(4)(A) provides that the court shall consider "the kinds of sentences

and the sentencing range established for . . . the applicable category of offense committed by the

applicable category of defendant as set forth in the guidelines[.]"  This memorandum discusses above the issues arising under the advisory Guidelines.  Sam respectfully directs the Court's attention to that discussion.

### H.        Title 18, Section 3553, Subsection(a)(6)

18 U.S.C. § 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"  Because fraud is a crime of infinite variety, *see generally United States v. Altman,* 48 F.3d 96, 101 (2d Cir.1995), it presents particular challenges for sentencing courts striving to achieve proportionality in sentencing while reducing unwarranted disparity, *see generally* U.S.S.G. Ch. 1, pt. A.3 (identifying reduced disparity and proportionality based on the severity of the offense as two key goals of the Sentencing Reform Act of 1984, 18 U.S.C. § 3551 *et seq.*); *United States v. Booker,* 543 U.S. 220, 264, 125 S. Ct. 738, 767 (2005) (explaining that post-*Booker* sentencing contemplates consideration of Guidelines to serve goals of "avoiding unwarranted sentencing disparities" and "proportionality").

On this issue, the PSR sets forth certain Judiciary Sentencing Information ("JSIN") obtained from the Sentencing Commission's database.  Specifically, the PSR—using its Total Offense Level of 43—provides as follows:

> During the last five fiscal years (FY2018-2022), there were 57 defendants whose primary guideline was §2S1.1, with a Final Offense Level of 43 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 55 defendants (96%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 283 month(s) and the median length of imprisonment imposed was 292 month(s).

*See* PSR at 37.

As for this data, "[i]n cases where the court imposes a sentence of life imprisonment, sentences are reported as 470 months, a length consistent with the average life expectancy of federal criminal offenders given the average age of federal offenders."[24] Here, the PSR recommends a Guidelines sentence that is more than double what the United States Sentencing Commission data even contemplates. As has been noted by other New York federal courts, the loss table results are "patently absurd" (*Adelson*, 441 F. Supp. 2d at 515), and "a black stain on common sense" (*Parris*, 573 F. Supp. 2d at 754), that rely upon a "flawed methodology for tabulating white-collar sentences." *Johnson*, 2018 WL 1997975, at *4. The Guidelines here effectively guarantee a sentence that would be irrational on its face. *See Gupta*, 904 F. Supp. 2d at 351.

Based on the disproportionately severe sentences that result from the economic loss Guidelines, courts routinely conclude that these Guidelines do not serve as a reliable benchmark for culpability, and issue sentences well below the Guidelines range. *See, e.g.*, *United States v. Musgrave*, 647 F. App'x 529, 530, 538 (6th Cir. 2016) (affirming downward variance for defendant with offense level of 25 and a $1.7 million loss to a sentence of one day of imprisonment, reasoning that "because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances."); *Johnson*, 2018 WL 1997975, at *3-4 (criticizing loss enhancement as a "grievous wrong" and imposing 24-month sentence following downward variance from Guidelines range of 87-108 months); *United States v. Milton*, Case No. 21-cr-478-ER, ECF No. 327 (Judgment) (S.D.N.Y. Jan 17, 2024) and Sentencing Tr. at 25:16-26:3 (ECF No. 322) (S.D.N.Y. Dec. 18, 2023) (48-month sentence for defendant with offense level of 41 and

---

[24] *Judiciary Sentencing Information*, U.S. SENT'G COMM'N, https://www.ussc.gov/guidelines/judiciary-sentencing-information#:~:text=In%20cases%20where%20the%20court,average%20age%20of%20federal%20offenders.

Guidelines range of 324 to 405 months); *United States v. Scott*, Case No. 17-cr-630-ER, ECF

Nos. 607 (Govt. Sentencing Memorandum) and 611 (Judgment) (S.D.N.Y. 2024) (120-month

sentence for lawyer who laundered $400 million in fraud proceeds and received $50 million in

payments despite Guidelines range of 600 months); *Adelson*, 441 F. Supp. 2d at 512 (imposing

42-month sentence for defendant with offense level of 46 and describing "the utter travesty of

justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the

harm that guideline calculations can visit on human beings if not cabined by common sense").

The Interactive Data Analyzer shows that judges are more likely to vary below the

Guideline range in § 2B1.1 cases than the average federal criminal case. *Interactive Data

Analyzer*, U.S. SENT'G COMM'N, https://ida.ussc.gov.

Indeed, courts appear to depart or vary below the Guidelines in the majority of cases

applying a § 2B1.1 loss enhancement. For example, from 2015 through 2019, more than 50

percent of sentences issued to fraud offenders were below the Guideline range. *See* Barry Boss

& Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18.2 OHIO

ST. J. CRIM. L. 605, 622 (2021).[25]

The median sentences from 2015 through 2019 for fraud offenses had 45 through 50

percent downward variances given under § 2B1.1. *Id.* at 622 (citing Sent'g Comm'n Sourcebook

of Federal Sentencing Statistics for years 2015-2019). This significant trend of substantial

downward variances under § 2B1.1, accordingly, underscores the substantial degree to which

this particular Guideline has lost judicial confidence.

*     *     *

---

[25] Available at https://moritzlaw.osu.edu/sites/default/files/2021-10/how%20the%20economic.pdf.

This Court should resist the temptation to compare Sam's case to some of the more notorious scandals of the recent past:

A. *United States v. Madoff*, Case No. 09-CR-213 (DC)

The PSR's recommendation of a 100-year term of imprisonment naturally calls to mind the Madoff case. *United States v. Madoff*, Case No. 09-CR-213 (DC). Based on the oversized media coverage, sensational allegations involving billions of dollars, and a defendant who was demonized and portrayed as his generation's face of "greed," comparisons to Madoff's 150-year sentence might seem apt. They are not.

In 2009, Madoff pleaded guilty to an eleven-count information charging securities fraud, investment adviser fraud, mail fraud, wire fraud, three counts of money laundering, false statements, perjury, false filings with the United States Securities and Exchange Commission ("SEC"), and theft from an employee benefit plan. Then-District Judge Denny Chin sentenced him to 150 years and ordered him to forfeit $170 billion.

Madoff's conduct featured numerous aggravating factors not present in Sam's case. As a threshold matter, Madoff's "investment advisory business" was never real; it was set up as a fraud almost from the beginning. In contrast, and notwithstanding the verdict in this case, there can be little dispute that Alameda and FTX were lawfully conceived, actual, functional, and legitimately profitable entities.

The Madoff case also dwarfs the instant matter in duration and dollars. Over more than 20 years, "some $170 billion flowed into [Madoff's] business as a result of his fraudulent scheme." Sentencing Tr. at 43, *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. June 29, 2009) (ECF No. 103). Madoff also preyed, in large part, on a tight network of families

and pension funds that believed they were investing in a conservative vehicle.  The crypto investor/trader has a very different risk profile.

Madoff also acknowledged that he took large sums "for his personal use and the use of his family, friends, and colleagues," including Manhattan real estate, two yachts, and multiple country club memberships.  *Id.* at 44-45.  Madoff himself "told his sons that there were $50 billion in losses."  *Id.* at 43.  Sam, on the other hand, never valued or desired great personal wealth or status.  And it has taken nearly 15 years to claw back portions of the misappropriated Madoff funds and return them to victims.  *See* Press Release, Justice Department Announces Distribution of Over $158.9M to Nearly 25,000 Victims of Madoff Ponzi Scheme (Dec. 11, 2023), https://www.justice.gov/opa/pr/justice-department-announces-distribution-over-1589m-nearly-25000-victims-madoff-ponzi.  As set forth above, the bankruptcy estate has confirmed that there will be no actual losses in this case, as Sam had contended was true from the beginning.

It is also important to remember that Madoff was 71 years old when he was sentenced, so his 150-year sentence was in many ways symbolic.  Sentencing Tr. at 47, *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. June 29, 2009) (ECF No. 103).  He served less than 10% of that sentence—12 years—before his death.  Sam, in contrast, will have just turned 32 when he is sentenced and could end up serving a much higher percentage of any sentence that the Court orders, possibly in a very dangerous facility.  Also, Judge Chin pointed out that "not a single letter" of support was submitted by Madoff, which no doubt influenced the judge's determination that Madoff's scheme was "extraordinarily evil."  *Id.* at 46-47.

In sum, the differences between the two cases are far more striking than the similarities. The Madoff sentence should not impact this Court's decision.

B.      *United States v. Greenwood*, S16 17 Cr. 630 (ER)

A more recent case that might, on the surface, invite comparison is *United States v. Greenwood*, Case No. 17 Cr. 630 (ER).  The defendants in that case sold a fake cryptocurrency called OneCoin through a global multi-level-marketing network.  As a result of misrepresentations that Greenwood and his coconspirators made about OneCoin, millions of victims worldwide invested and lost over $4 billion. Judge Ramos noted that the *Greenwood* case "has been described nefariously as the largest international fraud known at least to this district." Sentencing Tr. at 35:25-36:1, *United States v. Greenwood*, Case No. 17 Cr. 630 (ER) (S.D.N.Y. Sept. 12, 2023) (ECF No. 581). One of the co-defendants remains on the FBI's Top Ten Most Wanted List. After a guilty plea, Greenwood was sentenced principally to a term of 20 years' imprisonment.

*Greenwood* is readily distinguishable.  The OneCoin scheme was designed from the outset as a fraud.  OneCoins were entirely worthless; there was never any chance that Greenwood's victims would get any return on their investments and indeed investors were left with nothing.  The proceeds were used only to fund the conspirators' extravagant lifestyles. Greenwood lined his own pockets with over $300 million.  And Greenwood targeted his victims—whom he described as "idiots"—precisely because they were "easy marks."  *Id.* at 37-38.  Greenwood was predatory: he convinced investors that OneCoin was the next "can't miss" investment opportunity.

Alameda and FTX were not created as cynical mechanisms to fleece people.  Relatedly, Sam did not act in a greedy or mean-spirited way and he never sought to hurt anyone.  There is nothing in the record even approaching the level of Greenwood's avarice and calculated, willful

malevolence.  And, as mentioned elsewhere in this memorandum, it appears there will be few, if any, actual losses in this case.

C.      The Early 2000s Public Company Scandals: Worldcom and Adelphia

Nor should Sam's conduct be compared to that of the corporate executives at the helm of well-known public company frauds.  For example, in 2005, Bernard Ebbers, the Chief Executive Officer of WorldCom, Inc., a publicly traded global telecommunications company, was convicted of running an $11 billion scheme to disguise WorldCom's declining operating performance by falsifying its financial reports.  Judge Barbara S. Jones sentenced Ebbers to a term of 25 years' imprisonment.  Due to health problems, Ebbers was released after serving 12 years.

In *United States v. Rigas*, Case No. 02-CR-1236 (KMW) (S.D.N.Y.), the father and son executives of the Adelphia Communications Corporation were charged with concocting a variety of schemes to mislead auditors, banks, creditors, and investors concerning the financial condition and operating performance of Adelphia.  The multi-billion-dollar fraud became public after the company disclosed that it had lied about its financial condition to cover up accounting fraud and looting of its assets.  Father and son were sentenced to 12 and 17 years in prison, respectively.

The harsh sentences visited upon Ebbers and the Rigas defendants no doubt reflected the fact that they consciously and intentionally circumvented the very corporate controls that they knew were in place to prevent fraud.  Their conduct was carefully engineered to evade bank and securities regulators, boards of directors, experienced management teams, and sophisticated audit and accounting firms.  Ebbers' fraud scheme was so intricate that it "extended from the middle-management levels of [WorldCom], all the way to its top executive."  Press Release, Statement of Attorney General Alberto R. Gonzalez on the Bernard Ebbers Conviction (Mar. 15, 2005),

https://www.justice.gov/archive/opa/pr/2005/March/05_ag_122.htm.  Similarly, the *Rigas*

defendants ". . .  used many of the most sophisticated tricks in the corporate fraud playbook,"

according to the U.S. Attorney at the time.  Harry Berkowitz, *Adelphia Founder Indicted*, L.A.

Times (Sept. 24, 2002), https://www.latimes.com/archives/la-xpm-2002-sep-24-fi-nuadelphia24-

story.html.  Sam's conduct was guileless by comparison.

Put simply, Ebbers and the Rigas defendants engaged in conduct that far outdistances

Sam's in terms of planning, scheming and calculation.  Those defendants were experienced

public company executives who had been in the business world for decades.  Ebbers was 63

years old and had been CEO of WorldCom for approximately 17 years at the time he was

charged.  John Rigas had been in business for 50 years, and Timothy Rigas was 46 years old and

a public company CFO.  Sam, although brilliant, was *28 years old*, in the infancy of his business

career.  He was making thousands of business decisions a day, for the first time, in an immature

and undisciplined cryptocurrency market, surrounded only by a group of similarly inexperienced

(albeit very bright) twenty-somethings.  Regretfully, Sam had no CFO, no board of directors, and

no risk management specialist in place.  He was, in essence, flying by the seat of his cargo

shorts.  Although it is certainly true that one need not have decades of business experience to

know that stealing is wrong, it is equally true that more guidance, more formal management, and

more corporate controls were necessary, and Sam acknowledges as much.

On the surface, this case may appear similar to *United States v. Holmes*, Case No. 18-CR-

00258 (EJD) (N.D. Cal.).  At age 19, Elizabeth Holmes founded Theranos, a privately held blood

testing company.  The government alleged that Holmes raised $800 million from investors by

claiming that Theranos had developed a device that was able to perform a full range of clinical

tests using small blood samples drawn from a finger stick.  According to the government,

Holmes knowingly made materially false representations to investors and potential investors about the analyzer. Among other things, the government claimed that she knew the device had accuracy and reliability problems; she used conventional machines bought from third parties to perform much of Theranos's blood testing; she represented to investors that Theranos had been comprehensively validated by numerous major pharmaceutical companies; and she made numerous misrepresentations to potential investors about Theranos's financial condition and future prospects. Reports claimed that Theranos eventually reached a peak of valuation of approximately $10 billion, and Holmes personally of $4 billion, before the technology was exposed as defective and Holmes's statements as false.

Holmes was convicted after trial on wire fraud and conspiracy charges. The government recommended a sentence of 180 months in custody. Holmes was sentenced principally to a term of imprisonment of 135 months.

There are parallels between Elizabeth Holmes and Sam Bankman-Fried. Both founded private start-up companies at a very young age. Each lacked business and management experience. Each became billionaires on paper, flirted with politicians and graced the cover of *Forbes*. Each is a quirky, strange personality, and each has been vilified and pilloried as a greedy, fame-seeking, media-conscious, power-hungry egomaniac. Sadly, according to those who know them, each is brilliant, worked tirelessly, and was sincerely dedicated to philanthropy, the greater good, and changing the world for the better. Neither one "cashed out." Each stayed till the end. Each failed publicly and spectacularly. Each testified in their own defense at trial and each was convicted of multiple counts of fraud on customers and investors. Each was in their early 30s when convicted. Each of their cases involves losses at the highest end of the

Guidelines' loss chart.  Each is a first-time offender, and the Guidelines called for a potential life sentence in both cases.

In the wake of these similarities, one could readily conclude that the 135-month term of imprisonment imposed on Holmes would be suitable for Sam as well.  It would not be, however.  Holmes is actually far more culpable.

Holmes operated in the health care space.  She put patients at risk.  According to the government's sentencing memorandum, "As money was drying up, [Holmes] went to market with an unproven and unreliable medical device…. During her fraud scheme, women received wrong tests about their pregnancies, Theranos generated wrong results for cancer tests, and one victim was led to believe she had the virus that causes AIDS.  *United States v. Holmes*, Case No. 18-CR-00258 (EJD), ECF No. 1643 (Gov't Sentencing Memo.) at 1 (N.D. Cal. Nov. 11, 2022).  One witness who testified was concerned about patients, who "think that they're getting accurate results, and they're making very important medical decisions about what their treatments are, what their diagnoses are, what medications they take…."  *Id*. at 9.  That danger explains why the government argued that "a two-level increase is warranted under U.S.S.G. § 2B1.1(b)(16)(A), reflecting the fact that Holmes' conduct involved a conscious or reckless risk of death or serious bodily injury imposed on Theranos patients."  *Id*. at 25-26.

Sam Bankman-Fried could not and would not cause physical harm or bodily injury to another living being.  The notion of endangering others flies in the face of everything he stands for.  *See* Exs. A-3 and A-22.  He parts company with Holmes on this score.  He is significantly less blameworthy for this reason and deserves a significantly lesser sentence than the 135 months she received.

We respectfully submit that the best comparison to this case is *United States v. Milken*, No. SS 89 Cr. 41 (KMW) (S.D.N.Y.). As this Court knows well, Michael Milken was one of the best-known figures on Wall Street in the 1980s. Widely known as the "Junk Bond King," he was the most highly paid financier of his time, collecting more than $1.1 billion in compensation between 1983 and 1987 from Drexel Burham Lambert, his investment bank, while earning income from other investments as well. But he soon became the face of corporate greed and excess, and the target of securities fraud and RICO investigations. Drexel eventually collapsed, and at the age of 43, Milken pled guilty to a six-count felony information charging him with conspiracy, securities fraud, mail fraud, market manipulation and tax fraud. At the time, *The New York Times* called the case against Milken "the largest criminal action against a Wall Street figure." Stephen Labaton, *'Junk Bond' Leader is Indicted by U.S. in Criminal Action*, New York Times (Mar. 30, 1989), https://www.nytimes.com/1989/03/30/business/junk-bond-leader-is-indicted-by-us-in-criminal-action.html. Milken was initially sentenced to a term of ten years' imprisonment, but he ended up serving two years based on his cooperation with authorities, among other things.

Sam's ascendance to an influential position in the financial world at such a young age, using cryptocurrency, a new financial product, mirrors the young Milken's meteoric rise using "junk" bonds on Wall Street in the 1980s. The genius of both men is undeniable, their contributions were vast, their wealth and fame were unplanned, their means and methods were questioned by prosecutors, and their downfall was swift and tragic. But the greatest similarity may ultimately be found in each man's redemption and contributions to society.

Milken was released from custody at an age when he was young enough to still make a positive impact. And he became a tremendous force for good in the world.

[He] is now recognized for his three decades of driving medical research toward cures and improved treatments for all serious diseases. He launched the Melanoma Research Alliance in 2007 to accelerate research progress against fatal skin cancers, and he serves as chairman of FasterCures, a Washington-based think tank dedicated to accelerating progress against all life-threatening diseases. A decade earlier, in 1993, he founded the Prostate Cancer Foundation, whose grants to nearly 1,300 medical studies worldwide make it the world's largest philanthropic funder of prostate-cancer research.

He also chairs the widely respected Milken Institute, a non-partisan economic think tank whose scholars consult for government and private organizations, publish influential reports and host major conferences on regional and global economic issues. The Institute's annual Global Conference brings 3,000 decision makers from more than 50 nations to Los Angeles every year.

Michael Milken, *Milken Family Foundation*, https://www.mff.org/about-the-foundation/leadership/view/michael-milken.

Milken's two-year sentence gave him a second chance. He has changed the lives of countless others for the better with that chance. Given the same chance, Sam would dedicate his post-prison life to charitable works, finding the best ways to help others, and put them into practice, consistent with his commitment to effective altruism.

Milken's example should be a guiding force in fashioning Sam's sentence.

### I.      Title 18, Section 3553, Subsection (a)(5)

18 U.S.C. § 3553(a)(5) provides that the court shall consider any "pertinent policy statement . . . issued by the Sentencing Commission[.]" This memorandum, again, discusses above the policy statements and issues arising under the advisory Guidelines. Sam respectfully directs the Court's attention to that discussion.

### J.      Title 18, Section 3553, Subsection (a)(7)

18 U.S.C. § 3553(a)(7) provides that the court shall consider "the need to provide restitution to any victims of the offense." The MVRA applies only when "an identifiable victim

or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B).  As noted above, Sam disputes the existence of any loss amount subject to restitution.

Regardless, the Court may decline to order restitution if it finds that determining restitution in a case is too complex or if the victims have not been identified.  *See* 18 U.S.C. § 3663A(c)(3).  The government has not provided any Victim Impact Statements as noted in the PSR, and has made no effort to identify specific victims or to quantify the loss of any alleged "victim."  Identification of victims is a statutory prerequisite to the application of the MVRA. *See United States v. Catoggio*, 326 F.3d 323, 328 (2d Cir. 2003).  The government detailed to Probation that restitution here is complicated by the ongoing bankruptcy proceeding.

The PSR only makes note that the trial record identified one victim, BlockFi, "that experienced financial hardship as a result of Sam's conduct."  *See* ECF No. 400 at 22. Restitution to BlockFi is not warranted.  BlockFi and FTX are in negotiations for settlement of their claims.  FTX debtors can now pursue their arguments, defenses, counterclaims, setoffs, or otherwise concerning the BlockFi claims in the FTX bankruptcy proceeding.  Repayment to BlockFi pursuant to a restitution order would be duplicative of ongoing processes.  As noted even by the government, per 18 U.S.C. § 3663A(c)(3), the Court may forego restitution and distribute seized funds.

Absent identification of any victims or amounts outside the ongoing omnibus bankruptcy proceedings and private litigation that are restoring funds, it would be premature to order restitution.  Furthermore, the lack of *any* expected losses means that it is unlikely that restitution will be warranted.  Essentially all of Sam's assets were controlled by the companies which make up the omnibus bankruptcy proceedings such that he has already given everything he had to give.

*      *      *

As noted, Sam Bankman-Fried respectfully objects to the PSR. The Court, for the reasons set forth herein and in the memorandum, dated January 19, 2024, should sustain those objections in determining the applicable Guidelines.

The Sentencing Commission, furthermore, promulgated a new Guideline, § 4C1.1, effective November 1, 2023.[26] That new Guideline addresses the case of the so-called "zero-point offender," who—like Sam—has no criminal history points. Subsection (a) of that new Guideline provides:

> ADJUSTMENT.—If the defendant meets all of the following criteria:
>
> (1) the defendant did not receive any criminal history points from Chapter Four, Part A;
>
> (2) the defendant did not receive an adjustment under § 3A1.4 (Terrorism);
>
> (3) the defendant did not use violence or credible threats of violence in connection with the offense;
>
> (4) the offense did not result in death or serious bodily injury;
>
> (5) the instant offense of conviction is not a sex offense;
>
> (6) the defendant did not personally cause substantial financial hardship;
>
> (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (8) the instant offense of conviction is not covered by § 2H1.1 (Offenses Involving Individual Rights);
>
> (9) the defendant did not receive an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or § 3A1.5 (Serious Human Rights Offense); and
>
> (10) the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;
>
> decrease the offense level determined under Chapters Two and Three by 2 levels.

---

[26] *See* Adopted Amendments (Effective November 1, 2023), UNITED STATES SENTENCING COMMISSION, https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023.

Proposed amended Commentary—specifically, a new Application Note 4(A) to §

5C1.1—drives home the Commission's view that zero-point offenders, who would qualify for an

adjustment under § 4C1.1(a), generally should not go to prison. That new Application Note

provides: "If the defendant received an adjustment under § 4C1.1 . . . and the defendant's

applicable guideline range is in Zone A or B . . . a sentence other than a sentence of

imprisonment, in accordance with subsection . . . (c)(3), is generally appropriate."

Sam meets at least nine of the ten requirements for the § 4C1.1 adjustment. As to

subsection (6), the present record does not reflect substantial financial hardship *personally*

caused by Sam.[27] In fact, the government has not identified any specific victims for restitution.

Accordingly, Sam likely meets the requirements and warrants consideration under this new

Guide

## III.     FORFEITURE

The PSR, recommends forfeiture of Sam's interest in the following property to the United

States:

> a) 5,273,469 shares of the stock of Robinhood Markets Inc. from Account Number
> 499-30500 at ED&F Man Capital Markets, Inc., a/k/a "Marex," held in the name
> of "Emergent Fidelity Technologies," seized by the Government on or about
> January 4, 2023;

> b) $20,746,713.67 in United States currency formerly on deposit in Account
> Numbers 499-30500 and 429-30500 at ED&F Man Capital Markets, Inc., a/k/a
> "Marex," held in the name of "Emergent Fidelity Technologies," seized by the
> Government on or about January 4, 2023;

> c) $49,999,500 in United States currency formerly on deposit in Account Number
> 9000-1924-02685 at Farmington State Bank d/b/a "Moonstone Bank" held in the
> name of "FTX Digital Markets," seized by the Government on or about January 4,
> 2023;

---

[27] The PSR identifies that the evidence at trial indicated BlockFi as a victim that "experienced substantial financial hardship as a result of the defendant's conduct, declaring bankruptcy soon after FTX.com's bankruptcy was revealed." ECF 400 at 20. This does not establish personal causation of substantial financial hardship by Sam. The decision for FTX.com to enter bankruptcy was made by many others, including appointed executives acting with legal counsel. Furthermore, BlockFi was already suffering financially. *See* Tr. 2481-2482.

d) $5,322,385.32 in United States currency formerly held on deposit in Account Number 0000005090042549 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

e) $719,359.65 in United States currency formerly on deposit in Account Number 0000005090042556 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

f) $1,071.83 in United States currency formerly on deposit in Account Number 0000005090042564 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 11, 2023;

g) $94,570,490.63 in United States currency formerly on deposit in Account Number 0000005091010037 at Silvergate Bank held in the name of "FTX Digital Markets," seized by the Government on or about January 19, 2023;

h) Any and all monies, assets, and funds contained in Binance account number 94086678;

i) Any and all monies, assets, and funds contained in Binance.us account number 35000066; and

j) Any and all monies, assets, and funds contained in Binance.us account number 35155204.

The government has not yet submitted a preliminary forfeiture order as required by Fed R. Crim. P. 32.2.  The Indictment seeks forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), which allows forfeiture for "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [various sections of 18 U.S. Code] or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

Criminal forfeiture is a punitive measure and serves as a specific deterrent.  *See Kaley*, 571 U.S. at 323, 134 S. Ct. at 1094 ("Forfeitures…at once punish wrongdoing, deter future illegality, and 'lessen the economic power' of criminal enterprises").  The extent of criminal forfeiture is determined by the conviction.  Thus, the forfeiture must correspond in nature and scope to the underlying criminal conduct of which the defendant was convicted.

Section 981(a)(1)(C) makes forfeitable "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" the crime. Section 981(a)(2) defines forfeitable "proceeds," and draws a distinction between cases involving inherently illegal goods and services, and "lawful goods or lawful services that are sold or provided in an illegal manner." *Compare* § 981(a)(1)(C) *with* § 981(a)(2)(B). With respect to the latter, the Second Circuit relies on 18 U.S.C. § 981(a)(2)(B) to determine what constitutes "proceeds" in securities cases. The analysis here should be guided by Section 981(a)(2)(B) because there was nothing inherently unlawful about the transactions at issue in Counts One through Four. *See United States v. Contorinis*, 692 F.3d 136, 145 n.3 (2d Cir. 2012) ("§ 981(a)(2)(B) supplies the definition of 'proceeds' in cases involving fraud in the purchase or sale of securities."). Likewise, courts in this District and elsewhere have held: (1) that wire and mail fraud offenses are governed by (a)(2)(B), *e.g.*, *United States v. Kalish*, No. 06 Cr. 656 (RPP), 2009 WL 130215, at *6-8 (S.D.N.Y. Jan. 13, 2009); *United States v. Hollnagel*, No. 10 CR 195-1, 3, 2013 WL 5348317, at *2 (N.D. Ill, Sept. 24, 2013); and (2) that repayments to fraud victims—even if made after the fraud is uncovered—are properly deducted from any forfeiture. *Id.* at *4 ("The forfeiture statute at issue . . . does not view this timing as material.").

In making a forfeiture determination, a court can rely on "evidence already in the record" as well as additional information or evidence submitted by the parties that the Court accepts as relevant and reliable. Fed. R. Crim. P. 32.2(b)(1)(A). The Second Circuit has further noted that criminal forfeiture "focuses on the disgorgement by a defendant of his ill-gotten gains. Thus, the calculation of a forfeiture amount in criminal cases is usually based on the defendant's actual gain." *Contorinis*, 692 F.3d at 146-47 (citations omitted). Forfeiture is "concerned not with how much an individual has but with how much he received in connection with the commission of the

crime." *United States v. Viloski*, 814 F.3d 104, 113 (2d Cir. 2016) (citations omitted). Put differently, "proceeds" means "profits" not "receipts." *See United States v. Santos*, 553 U.S. 507, 511-512, 128 S. Ct. 2020, 2023-24 (2008).

The forfeiture amount in this case should be reduced to zero for several reasons. First, customer and creditors will receive a return of their funds via the bankruptcy. *See Hollnagel* at *4. Since § 981(a)(2)(B) "targets the profits that [the defendant] enjoyed, not net gains or intended loss," the forfeiture proceeds should be reduced by the money that will be returned to the investors, as these payments are part of the direct costs incurred in providing goods and services. *See Hollnagel*, 2013 WL 5348317, at *4 (deducting the funds paid back to investors from the forfeiture analysis under 18 U.S.C. § 981(a)(2)(B)).

Second, none of the accounts identified for forfeiture were for Sam's personal benefit. The accounts listed were not profits "enjoyed" by Sam, but rather maintained on behalf of the companies.[28]

Lastly, Sam no longer has custody of the accounts identified for forfeiture in the PSR. By its own acknowledgement, the government seized most of these accounts last year, and so the Government may request that the Court forego restitution pursuant to 18 U.S.C. § 3663A(c)(3) in favor of a remission process from funds seized and forfeited. ECF 400 at 22. As of disclosure of the final PSR, the Government intends to seize approximately $1 billion mostly from a myriad of cryptocurrency/Bitcoin accounts. The remission process would obviate both restitution and forfeiture orders.

In short, the ongoing bankruptcy proceedings have control of the relevant assets, such that a criminal forfeiture order is not warranted.

---

[28] It is unknown at this time if the Binance accounts identified only by number were company or personal accounts, but Sam is of the belief that regardless he no longer has access or custody of these accounts.

## SAM BANKMAN-FRIED'S SENTENCE REQUEST

Sam Bankman-Fried respectfully submits that, for the reasons set forth above, an appropriate method of arriving at a just sentence would be to consider the Adjusted Offense Level (Subtotal) of 56, reduced by 30 levels based on zero loss, which yields an advisory Guidelines range of 63-78 months.  When the § 3553(a) factors are considered, including Sam's charitable works and demonstrated commitment to others, a sentence that returns Sam promptly to a productive role in society would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Dated: New York, New York
      February 27, 2024

Respectfully submitted,

By:   /s/ Marc L. Mukasey     
     Marc L. Mukasey
     Torrey K. Young
     Thomas E. Thornhill
     Michael F. Westfal
     Stephanie Guaba

     MUKASEY YOUNG LLP
     570 Lexington Avenue, Suite 3500
     New York, New York 10022
     (212) 466-6400

     *Attorneys for Defendant*
     *Sam Bankman-Fried*

**CERTIFICATE OF SERVICE**

I, Marc L. Mukasey, hereby certify that on February 27, 2024, this document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
      February 27, 2024

    /s/ Marc L. Mukasey
    Marc L. Mukasey