Hon. Lewis A. Kaplan
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 1007-1312

Dear Judge Kaplan:

Thank you for the opportunity to allow me to say a few words about my son, Sam Bankman-Fried, that I believe bear on a just sentence in this case.

As a child, Sam had impressive powers of logic and perseverance, and was by nature an outside-the-box thinker. But he also had some challenges many of which are associated with some of those same strengths. I will return to them at the end. But first, I would like to talk about the whole person-- the Sam I have watched grow up, slowly find himself, and decide how he wanted to live his life.

From an early age, he loved math and complicated games and wanted to talk about the world. He was uncomfortable around other children and childhood play, and as a result was a loner in many peer social settings until he got to college. By the time he was ten or so, he had no interest in material goods. We would ask him what he wanted for his birthday or Chanukah, and he would say "nothing." We ended up agreeing that we wouldn't keep asking him about it, but that he should tell us if he had changed his mind and wanted anything. He never did.

He was, however, always interested in the material conditions of other peoples' lives, in particular those around the world most desperately in need. He took a job on Wall Street to earn to give, and ultimately left Wall Street to work full-time for one of the charities he had helped fund. He worried, though, that without his annual donations, the charity would have trouble making ends meet. He started trading cryptocurrency on the side to help support the charity. As it happened, he was so successful trading that he again decided that his highest and best use was not working directly for the charity but instead as a funder, and decided to go into business for himself. This was a path I never imagined he would take.

As I discuss more below, while running FTX, Sam's primary focus was business; he worked day and night. But he continued to work on charity, both as a funder and as an active participant in decision-making. Sam organized, participated in, and ultimately funded a group that is carrying out groundbreaking vaccine trials that may change the face of pandemic prevention and the prevention and treatment of other infectious diseases around the world

In 2022, I took a year's leave of absence from my Stanford job to work on other philanthropic projects worthy of funding by FTX. My own work focused on education and health care, areas in which I have both experience and a strong professional interest. I loved this work, and could go on and on about the promising philanthropic projects underway at the time of FTX's implosion, but I am mindful of the court's time in reading this document.

Ex. A-2

Sam also supported efforts to realize the potential of a digital infrastructure for money transfers to people in the poorest parts of the world. One project involved remittances – cross-border transfers of money, generally from children in a wealthy country to parents in a poorer country. The recipients do not have bank accounts to transfer funds into. Right now, the sender typically goes to a company such as Western Union, pays for the remittance there, and parents pick up the money from a Western Union office in their own country. The process is expensive and time consuming. Using its cryptocurrency infrastructure, FTX estimated it could offer free, instantaneous transfers, receivable in local currency, at a minimal cost to itself. A beta version of this program - offering free remittances between the US and 28 countries in Africa --was about to begin at the time of the bankruptcy. I was lucky enough to be able to work on this project and would have regarded its implementation as the most socially valuable thing I had done with my life.

Although Sam started FTX as a way to earn to give, he never saw the business solely as a means to an end to fund good works. For the entirety of FTX's existence, his time was pretty much consumed with building the company, which included creating a social environment that fostered creativity and met the needs of employees. Subject to the increasing demands on his time as a CEO of a rapidly growing business, he tried always to be there for his employees. The company was housed in an office park-like complex, with a number of connected or adjoining buildings. Sam worked in the busiest building, on a desk next to dozens of other desks. He had no office and no other personal perks. It was a bare-bones place, much less attractive than the typical workplaces in law firms, government offices or universities, and most businesses, but it was in keeping with Sam's commitment to egalitarianism and facilitated goals that were a high priority to Sam.

The office layout was also designed to give any employee access to Sam. Sam was a great listener and treated employees like family. He wasn't good at small talk and was likely to look down or away when he spoke to them, but employees knew he wasn't dissing them. That's just the way he was. He paid employees what he thought was their rightful contribution to profits, which was almost always far above what they could have earned elsewhere and in many cases would have asked for themselves, and when they came to him with personal problems, his first and usually last impulse was to give them what they needed without asking any questions.

He treated other stakeholders in the business with similar respect. He did customer service himself, and gave employees instructions to resolve any plausible complaints in the customer's favor even if it cost the company a nontrivial amount of money. He also believed in fair dealing in negotiations with others. He would generally decide what a fair price was, explain why he thought it was fair, and stick to it. He'd instruct his lawyers not to press minor issues in reaching agreements with counterparties.

The company owned the top floor of an apartment complex near the office. It housed eight or so of the top employees and their partners, and served both as an informal headquarters of sorts, a place to entertain prospective business partners, and a gathering place for employees to relax, eat dinner together (usually cooked by Sam) and play complicated board games, the diversion of choice. It was festooned with computer screens and desks, and for one week the entire

programming staff used it for a Hackathon. Sam lived in it and - paid rent for that privilege - for six months—about half of the time he was in the Bahamas. Even when he was officially living in the apartment, he was more likely to be found elsewhere – often sleeping on a bean bag chair in the office. Like everything about Sam, that wasn't an affectation. He just doesn't care about the creature comforts that most of us value. He is similarly uninterested in hobnobbing with the rich and famous and generally uncomfortable with attention. He did what he thought he had to do for the good of the company, often at some significant personal cost to himself. What FTX spent on advertising, travel, and housing is in line with what comparable multibillion dollar companies spend, and a small fraction of what many do spend. For anyone who knows Sam, the popular portrayal of him as a high-rolling, celebrity-seeking, CEO driven by greed is simply bizarre.

I am the son of a small businessman and told Sam what I believe my father would have told him: take some money out for yourself and put it somewhere safe. Or buy something special, so you can enjoy life more. Others, including senior counsel, told Sam the same thing. According to one business journal, by 2022, Sam had a net worth of more than $20 billion. He could easily have sold a billion dollars' worth of stock. He wouldn't do that, though. He wanted to leave every penny in the business to finance its growth. He had a salary of $200,000, which was more than enough for his personal consumption needs. He had nothing "salted away" when the crash came.

Barbara and I stayed with Sam in the Bahamas for the month following the collapse, and witnessed firsthand his single-minded focus on getting money back to depositors, long after there was any possibility he would be able to save any of his equity or wealth. About a week after the implosion, Sam and I were speaking to a prospective defense counsel. The lawyer was aghast when Sam told him that he was spending all of his time working with the Bahamian government to get depositors their money back. The lawyer strongly advised Sam to focus on his defense. "Are you aware," asked the lawyer, "that even as we speak, there is probably a room of bright, hard-working and ambitious people somewhere whose goal is to put you in jail?"

"Yup," answered Sam, "and that's pretty much irrelevant to me compared to helping depositors."

I recognize that the Sam I have described is strongly at odds with how the public sees him, and may seem unbelievable to the readers of this letter, including this court. I could add hundreds of other examples of his kindness and genuine and deep concern for others, but I'm not sure how much difference they would make, and doing so would surely try the patience of readers. I will add only that were the social costs of saying anything positive about Sam at this moment in time not prohibitive, I am confident many others who have known him throughout his life would describe much the same person.

I want now to return to the challenges I referred to at the start, and their implications for sentencing. Sam has struggled throughout his life to learn and control things most of us take for granted, such as eye contact, small talk, and responding to social cues.

There is a positive side to this struggle. Sam's life experience has made him tolerant of diversity in the way most of us cannot be. Sam hired employees with communication difficulties so great that they could not otherwise get or keep another job. I remember him

telling me about one trader who fit that description. "He's brilliant, but he'll drive everybody else nuts," Sam said, "so he'll work only with me." As Barbara has written, Sam was open about some of his own mental health struggles, and hired a psychiatrist to help coach employees with emotional issues. Alameda and FTX had a diverse group of employees -- in gender, race, nationality and character traits. The companies employed some of the most extroverted people I have ever known. But they were also a haven for those with who, for reasons having nothing to do with their abilities, would be deemed too odd or "weird" to work with.

As the company grew, Sam was thrust more and more into the public eye, and asked to give hundreds of interviews a month. When he agreed to do them, characteristically, he spoke very quickly, and gave long complicated answers when he thought that was what logic required, and answers that were jarringly short (a quick sharp 'yup') otherwise. He couldn't always manage his gestures, eye contact or tone of voice. The press didn't care, though, as long as he talked about business. He was extremely wealthy, and that made everything he said presumptively correct. Often, interviewers edited out his comments about charity as uninteresting or unimportant.

Once the company crashed and his wealth was gone, people became less forgiving, and have interpreted these same characteristics (lack of eye contact, odd gestures, answers that seem too long or too short, etc) as a sign of disrespect, evasion, or lying.

A draconian sentence would likely lead to a placement in a high (or at best medium) security prison. Such a setting would put Sam in an environment where his responses to social cues will sometimes be seen as odd, inappropriate and disrespectful; when that happens, he will be in significant physical danger. Nothing he has done can justify putting him at that risk.

Sam has never run afoul of the law in his life until now, and I do not believe there is any possibility he would even get close to the line in the future. Once free, he has the potential to benefit others. That is all he has ever wanted to do.

Thank you for your consideration, onside

*[signature]*

Allan Joseph Bankman

4

**Ex. A-2**