UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

UNITED STATES OF AMERICA      :

   -*v.*-                       :      S6 22 Cr. 673 (LAK)

SAMUEL BANKMAN-FRIED,      :

                Defendant.      :

-------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Danielle Kudla
Samuel Raymond
Thane Rehn
Nicolas Roos
Danielle R. Sassoon
Assistant United States Attorneys
Southern District of New York
    - *Of Counsel* -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ................................................................................................................... 4

    I.   The Offense Conduct Proven at Trial ................................................................. 5

         A.   *Fraud on FTX Customers* ........................................................................... 5

         B.   *Fraud on FTX Investors* ........................................................................... 15

         C.   *Fraud on Alameda's Lenders* ................................................................... 17

    II.  The Defendant's Scheme to Make Unlawful Political Contributions ............................. 18

    III. The Defendant's Scheme to Bribe Chinese Government Officials ................................. 22

    IV. The Defendant's Banking Misconduct ........................................................................ 24

    V.  The Defendant Tried to Deflect Blame and Evade Responsibility After FTX Declared Bankruptcy .................................................................................................. 27

    VI. The Defendant Obstructed Justice .............................................................................. 28

         A.   *Use of Signal to Auto-Delete Messages* ................................................. 28

         B.   *The Defendant's Witness Tampering* ........................................................ 29

         C.   *The Defendant's Perjury* .......................................................................... 31

APPLICATION OF THE SENTENCING GUIDELINES ................................................... 32

    I.   Calculation of the Applicable Sentencing Guidelines .................................................. 32

    II.  The Defendant's Challenges to the Guidelines Calculation Lack Merit ......................... 36

         A.   *The Evidence at Trial Proved That the Loss Amounts Is at Least $10 Billion* .......... 36

           1.  Applicable Law .............................................................................. 36

           2.  The Trial Evidence Regarding Loss Amount ................................... 37

           3.  The Defendant's Assertion That the Loss Amount for FTX Customers Is Zero Is Meritless ...................................................... 39

           4.  Even Setting Aside FTX Customers, the Loss Amount to FTX Investors Is Greater Than $1.7 Billion ............................................ 46

           5.  In the Alternative, the Intended Loss Is Even Greater Than $10 Billion ............... 47

          B.   *The Number of Victims Enhancement Is Applicable* ................................. 52

          C.   *The Bankruptcy Fraud Enhancement Is Applicable* ................................. 54

          D.   *The "Relocating," "Outside the United States," or "Sophisticated Means" Enhancement Applies* ............................................ 57

          E.   *The Enhancement for Deriving More Than $ Million in Gross Receipts From a Financial Institution Is Applicable* .............................. 58

          F.   *The Enhancement for Abuse of Trust Is Applicable* ................................. 60

          G.   *The Enhancement for Obstruction of Justice Is Warranted* ....................... 61

    III. The Guidelines Do Not Overstate the Seriousness of the Offense ................................... 65

A SENTENCE OF 40 TO 50 YEARS' IMPRISONMENT IS NECESSARY ........................... 70

    I. The Nature, Circumstances, and Seriousness of the Offense Warrant a Very Significant Sentence ........................................................................... 71

    II. A Sentence of 40 to 50 Years Is Necessary to Protect the Public and for Specific Deterrence ........................................................................... 85

    III. A Very Significant Sentence Is Necessary for General Deterrence ................................. 90

    IV. The Defendant's History and Characteristics Do Not Warrant a Significant Variance ... 93

    V. A Sentence of 40 to 50 Years Is Necessary to Avoid Sentencing Disparities ................. 96

RESTITUTION AND FORFEITURE ....................................................................... 101

    I. Applicable Law ........................................................................... 101

    II. The Court Should Order Forfeiture ........................................................ 104

    III. The Court Should Order Victim Compensation Through Remission as an Alternative to Restitution ................................................................ 109

CONCLUSION ........................................................................................ 113

The Government respectfully submits this memorandum in advance of the sentencing of Samuel Bankman-Fried, presently scheduled for March 28, 2024, and in response to the defendant's sentencing memorandum dated February 27, 2024 ("Def. Mem.").

## PRELIMINARY STATEMENT

Samuel Bankman-Fried was convicted of orchestrating one of the largest financial frauds in history, and what is likely the largest fraud in the last decade. The enormous scale of the fraud at FTX is measured not just by the amount of money that was stolen, although the more-than-$8 billion of customer money that was misappropriated puts this crime in a class of cases that can be counted on one hand. The unprecedented scope of the fraud at FTX may also be measured in the number and types of victims, in the fraud's geographic reach, and in the breadth and frequency of the unlawful and unethical acts undertaken by the defendant in service of a scheme to use other people's money for his own benefit and influence. The defendant victimized tens of thousands of people and companies, across several continents, over a period of multiple years. He stole money from customers who entrusted it to him; he lied to investors; he sent fabricated documents to lenders; he pumped millions of dollars in illegal donations into our political system; and he bribed foreign officials. Each of these crimes is worthy of a lengthy sentence. The losses from each of the defendant's frauds—on customers, investors, and lenders—would alone put the defendant's advisory sentencing range at the top of the Guidelines. His unlawful political donations to over 300 politicians and political action groups, amounting to in excess of $100 million, is believed to be the largest-ever campaign finance offense. His bribe of Chinese government officials—totaling $150 million—was one of the single largest by an individual. Even following FTX's bankruptcy and his subsequent arrest, Bankman-Fried shirked responsibility, deflected blame to market events and other individuals, attempted to tamper with witnesses, and lied repeatedly under oath.

With all the advantages conferred by a comfortable upbringing, an MIT education, a prestigious start to his career in finance, and a worthy idea for a startup business, Bankman-Fried could have pursued the rewarding, productive, and altruistic life he has sketched out in his sentencing submission. But instead, his life in recent years has been one of unmatched greed and hubris; of ambition and rationalization; and courting risk and gambling repeatedly with other people's money. And even now Bankman-Fried refuses to admit what he did was wrong. Having set himself on the goal of amassing endless wealth and unlimited power—to the point that he thought he might become President and the world's first trillionaire—there was little Bankman-Fried did not do to achieve it. While he did not spend the money he stole on nice clothes or cars, that does not mean his life has not been defined by excess. The trial record puts the lie to the statements in his submission that he was "never motivated by greed" and "eschews materialistic trappings." Using customers' and investors' money, the defendant bought luxury real estate; he made risky investments that he otherwise could not afford; he made charitable donations (for which he still takes credit) using other people's money; he made political contributions using other people's money to get unrivaled access to political leaders; he promoted his company in a Super Bowl ad; he named a basketball arena after his company; and he paid for access to celebrities, to name just a few of the things on which he spent money. And unlike so many defendants before this Court, there are no persuasive mitigating conditions to explain his criminal conduct. His crimes are not the product of dire financial circumstances, passion or impulse, or a momentary lapse of judgment. Unlike other white collar offenders, the losses the defendant is responsible for are not borne exclusively by sophisticated investors or extrapolated based on a stock price drop.

The victims, on the other hand, include tens of thousands of everyday people. People who entrusted the defendant with their money, and relied on it being there when they wanted to

withdraw it. The victims in this case include people who deposited their retirement funds and nest eggs with FTX; they include people in war-torn or financially insecure countries, who counted on FTX as a place to keep money safe; they include people who could not afford to have their money taken or rendered unavailable. They include people who lost their "entire life savings," no longer have money to pay for a sick family member or children's education, were deprived of the chance to "break generational poverty," and are "devastated" and "heartbroken." So the fact that two years later victims may receive some money back through FTX's bankruptcy is of little comfort for those victims who needed the money in November 2022. The suffocating sense of dread and despair that victims felt when they could not withdraw their money, their shame and embarrassment, and the resulting damage to lives and businesses, cannot be undone through the bankruptcy. The assertions that customers will be repaid in full omit critical context about the nature of the claims allowed in the bankruptcy. And even as victims are repaid, that is the result of extensive work in the bankruptcy process and criminal forfeiture, not the result of the defendant's actions, which in many respects have been counterproductive.

All of this conduct was willful. In every part of his business, and with respect to each crime committed, the defendant demonstrated a brazen disrespect for the rule of law. He understood the rules, but decided they did not apply to him. He knew what society deemed illegal and unethical, but disregarded that based on a pernicious megalomania guided by the defendant's own values and sense of superiority. And he knew his customers' expectations—that he would hold their money safe—but he disregarded them based on a callous belief that he could put their money to better use.

The scope, duration, nature, and sheer number of Bankman-Fried's crimes, the resulting harm they have caused, the willful disregard of the rule of law, and the absence of countervailing

mitigating circumstances render him exceptionally deserving of a sentence that is sufficiently severe to provide justice for the defendant's crimes and to dissuade others from committing similar crimes, and that will permit the defendant to return to liberty only after society can be assured that he will not have the opportunity to turn back to fraud and deceit. Although it is unlikely (but not impossible) that the defendant will work in finance again, and will likely forfeit all of his ill-gotten gains, justice requires that he receive a prison sentence commensurate with the extraordinary dimensions of his crimes. For these reasons, the legitimate purposes of punishment require a sentence of 40 to 50 years' imprisonment.

## **BACKGROUND**

On November 2, 2023, following a month-long trial, the defendant was convicted of seven counts: wire fraud and conspiracy to commit wire fraud on FTX's customers; wire fraud and conspiracy to commit wire fraud on Alameda Research's lenders; conspiracy to commit securities fraud on FTX's investors; conspiracy to commit commodities fraud on FTX's customers; and conspiracy to commit money laundering. Although the Court is familiar with the facts underlying those convictions, having presided over the trial, the defendant's criminal conduct, which led to FTX's collapse and resulting bankruptcy, is described below.

These facts make the following clear about the defendant's criminal conduct: (i) the criminality permeated many aspects of the defendant's business and life; (ii) the defendant was the leader of the schemes, was intimately involved in executing them, and gave specific directions to his co-conspirators to carry them out; (iii) only the defendant was involved in all aspects of the schemes, and even his co-conspirators were excluded from parts of them; (iv) while some of the defendant's co-conspirators were not involved at the beginning or end of the fraud, the defendant's involvement was pervasive throughout; (v) the defendant took or directed others to take many

brazen acts that were unambiguously criminal; (vi) the defendant committed additional crimes, such as lying to banks, as part of his larger fraud at FTX; (vii) the defendant was repeatedly confronted by others about the risks posed by continuing down the criminal path he had set them on, and repeatedly he chose to continue the fraud; (viii) the crimes resulted in extraordinary financial loss to tens of thousands of victims; and (ix) the defendant has failed to take genuine responsibility for his role in the collapse of FTX and the loss of customer funds.

I.      **The Offense Conduct Proven at Trial**

A.      ***Fraud on FTX Customers***

On FTX.com, customers could buy and sell cryptocurrencies, such as Bitcoin and Ethereum, convert dollars to cryptocurrency and vice versa, and trade in cryptocurrency derivatives including swaps and futures. To trade on FTX, customers had to deposit money on the platform in the form of fiat currency or cryptocurrency. For fiat currency deposits, customers made deposits into bank accounts in the names of FTX, Alameda, and a company called North Dimension, via wire transfers. For cryptocurrency deposits, customers made deposits to FTX via transfers over the relevant cryptocurrency blockchain.

The defendant directly, and through FTX, represented to customers that the exchange was safe and trustworthy, that customers' money belonged to them and was custodied, and that their funds would not be used by FTX. For example, as seen at trial, in advertisements featuring celebrities FTX represented that "FTX is the safest and easiest way to buy and sell crypto." (GX-900, GX-905). FTX's terms of service stated that "none of the digital assets in [a customer's] account are the property of, or shall or may be loaned to, FTX Trading." (GX-558). In FTX's "safeguarding of assets & digital token management policy," which was submitted to regulators in The Bahamas and shared with some customers, FTX stated that the company had "a responsibility to ensure that customer assets are appropriately safeguarded and segregated from its

own funds." (GX-340). That policy further stated that "customer assets (both fiat and virtual assets) are segregated from its own assets," that "all third-party service providers are aware that customer funds do not represent property of [FTX]," and that "all third-party providers are aware that customer assets are held in trust." (*Id.*). Likewise, in Bankman-Fried's testimony to the United States Congress, he stated that FTX had a robust risk management system and protected customer deposits by "maintaining adequate liquid resources to ensure the platform can return the customer's assets upon request," ensuring "customer assets are custodied," and protecting "against misuse or misallocation of customer assets." (GX-914A, GX-916T).

The FTX website also represented that customers owned the funds they deposited. Bankman-Fried repeatedly stated that "by logging in to the customers' account at FTX, the customer can immediately view the types of assets they own held in custody by FTX." (GX-914A, GX-916T). When customers logged into their accounts on FTX, they saw the assets that FTX indicated they had in their accounts, which they believed they could withdraw. (GX-425, GX-539; Tr. 79-80, 1293). The website also represented that customers could withdraw all the funds that their account showed that they had.

Contrary to those statements and representations, the defendant conspired with Caroline Ellison, Gary Wang, and Nishad Singh to defraud FTX's customers by fraudulently inducing customers to deposit funds on FTX, by misappropriating those funds by directing them to Alameda, and by making false statements to lull customers into not withdrawing their money. As Ellison testified at trial, the defendant viewed FTX customer funds as "a good source of capital, and he set up [a] system that allowed Alameda to borrow from FTX." (Tr. 654).

In his sentencing submission, the defendant claims that FTX was a "legitimate, *bona fide*, valid, innovative business." (Def. Mem. at 8). But this case is not about whether FTX had

legitimate features. Whether or not the exchange could have operated as a "legitimate" business, the fact is that the defendant intentionally used its infrastructure to misappropriate billions of dollars, and that customer deposits were not safely custodied for them from the outset.

The defendant and others working at his direction at FTX and Alameda misappropriated FTX customer funds through two primary means. (Tr. 644). First, at Bankman-Fried's direction, FTX told customers to deposit funds into bank accounts controlled by Alameda, some of which had been set up in the name of North Dimension. (Tr. 156-57, 654-55; GX-568). Alameda regularly took customer funds from those bank accounts, transferred the funds to other bank accounts under Alameda's control, and used or spent the funds. (Tr. 656; GX-1050). As a result of the spending of customers' deposits, FTX and Alameda had a multi-billion-dollar deficit of customer funds. Second, Bankman-Fried and others secretly introduced special features into FTX's computer code, which permitted Alameda to spend and withdraw unlimited amounts of money from FTX. (Tr. 358-59, 390-91). While the defendant publicly and repeatedly asserted on Twitter, in response to reporters' inquiries, in statements to his investors, and in other private and public fora, that Alameda did not have privileged access to FTX, (Tr. 279, 402), Bankman-Fried directed Wang to alter FTX's computer code to allow Alameda to accrue a negative balance on FTX's exchange, (Tr. 358-59). Those specific code provisions included an "allow negative" feature, which permitted Alameda to accrue a negative balance when making transfers and withdrawals; a $65 billion line of credit; and an exemption from the automatic liquidation feature on FTX. (GX-644). While for a typical client FTX would have automatically liquidated a client's account once its negative balance exceeded the amount of any posted collateral, net of fees, FTX permitted Alameda to maintain a negative balance, draw on a multi-billion-dollar line of credit, borrow funds from FTX without sufficient collateral, evade auto-liquidation, and withdraw funds

from the exchange. Over time, Bankman-Fried directed that Alameda's credit limit be raised so high that, in practice, Alameda was permitted to draw on FTX accounts funded by customer assets on an unlimited basis—in amounts that exceeded FTX revenue and tapped into customer funds. (Tr. 390).

As a result of Alameda's ability to "go negative" and its $65 billion line of credit, Bankman-Fried was able to take or "borrow" billions of dollars of customer funds on FTX, accruing a multi-billion-dollar negative balance in Alameda's account. (GX-1004). When Alameda had a negative balance on FTX and withdrew funds, it was taking customer money. (Tr. 1364-65). By spending customer funds, FTX had a significant deficit in its cryptocurrency wallets and in the bank accounts that were supposed to be holding fiat deposits. (GX-1051). Bankman-Fried used customer deposits for billions of dollars in spending unrelated to the operation of FTX, including to pay for his own personal expenses, real estate in The Bahamas, speculative venture investments, a wide-ranging political influence operation, and to repay Alameda's lenders.

At trial, including in its principal summation, the Government highlighted multiple milestones in 2021 and 2022 when the defendant decided to double down on the fraud, rather than put an end to his misconduct. Each time—whether it involved significantly enlarging the misuse of customer funds and the size of Alameda's debt to FTX customers, or overriding a co-conspirator's concern about their wrongdoing, or both—Bankman-Fried knowingly pushed ahead, directing the misappropriation and spending of customer funds. Each of these points in time were, alone, a basis for the defendant's conviction. And it is easy to imagine any one of these incidents giving rise to a criminal prosecution and significant sentence. The fact that the defendant repeatedly pushed forward with misusing customer money when confronted with the wrongfulness

and the risk of what he was doing evinces willfulness and callousness that must be reflected in his sentence.

One of the first inflection points highlighted at trial came during the conversations that Ellison had with the defendant about repurchasing FTX stock that was owned by Binance, and the defendant's subsequent direction to use customer funds to go through with the acquisition. As background, when FTX was founded, Bankman-Fried sold FTX stock to Binance, another cryptocurrency exchange. By the middle of 2021, Binance was FTX's primary competitor and Bankman-Fried wanted to buy back Binance's FTX stock. Bankman-Fried repeatedly told Ellison that buying back the stock was "really important" to him, largely because Binance was a major competitor and the defendant viewed Binance's leader as a rival. (Tr. 668). At the time, Binance's equity in FTX was worth approximately $2 billion, and FTX's revenue was only half that amount. According to her trial testimony, Ellison told Bankman-Fried, "We don't really have the money for this, we'll have to borrow from FTX to do it." (Tr. 668). Bankman-Fried responded, "That's okay. I think this is really important, we have to get it done." (*Id.*). Bankman-Fried then repurchased the FTX shares owned by Binance using a mix of FTX funds and customer deposits. (GX-1024). The transfer came from Alameda's main account on FTX, which was able to make the transfer, notwithstanding the fact that it had insufficient funds, because of the allow negative feature that had been enabled on its account. The transfers were directed personally by Bankman-Fried. (GX-317).

Several months later there was another inflection point. In the fall of 2021, Bankman-Fried asked Ellison to determine what would happen if Alameda spent $3 billion more on venture investments. (Tr. 707-10). Ellison prepared an analysis, which she shared with Bankman-Fried. (GX-36). As background, Alameda did not have outside investors. Instead, its trading operations

were funded primarily through open term loans by third party cryptocurrency lenders such as BlockFi, Genesis Capital, BitGo, Ledn, Celsius, Voyager, and others. Those loans were typically structured as follows: Alameda pledged collateral in the form of FTT, FTX's "native token," to the third-party lender, and then the lender lent dollars, Bitcoin, or Ethereum to Alameda, which agreed to repay the lent funds with interest on demand. In the fall of 2021, Ellison told Bankman-Fried that Alameda had more loans than assets, and that without certain FTX-related cryptocurrencies such as FTT, Solana, and Serum, Alameda's net asset value was negative $2.7 billion. (Tr. 710). Her analysis also showed that in the event of a market downturn and the recall of Alameda's loans, the only way to repay third-party loans would be to borrow billions of dollars of FTX customer funds. (GX-36). Ellison told Bankman-Fried that she thought that new venture investments were a bad idea and too risky. (Tr. 710-11). Notwithstanding the risks, Bankman-Fried told her "he wanted to go ahead with billions of dollars of venture investments." (Tr. 729). From late 2021 through the first quarter of 2022, Bankman-Fried directed billions of dollars in spending, which used FTX customers' money. Those expenditures included investments of hundreds of millions of dollars each into Genesis Digital Assets (a crypto mining company), K5 (an investment firm, which the defendant used to connect with politicians and celebrities), Dave Inc. (an online bank), Anthropic PBC (an artificial intelligence company), purchase of stock in the company Robinhood, over $100 million in real estate purchases in the Bahamas (including a $30 million penthouse apartment for Bankman-Fried and his friends), and political donations. (GX-1045).

A third inflection point came in June 2022, when Bankman-Fried's spending caught up with him. In May 2022, the cryptocurrency stablecoin Terra and its sister token, Luna, collapsed in value, triggering a collapse of several other cryptocurrency businesses such as the firm Three

Arrows and the lenders Celsius and Voyager. The instability in the cryptocurrency market caused Alameda's lenders to recall nearly all of their loans, and Alameda was required to repay in excess of $6 billion on demand. Ellison raised the issue with Bankman-Fried, who had been copied on some of the repayment demands from lenders, and asked what to do. As several witnesses testified at trial, Bankman-Fried asked Ellison, Wang, and Singh to work on a spreadsheet to calculate Alameda's balances on FTX and net asset value. (Tr. 425-26). That spreadsheet indicated that Alameda had a negative $11 billion balance on FTX, and was borrowing $13 billion in customer funds. (GX-50). Bankman-Fried reviewed the spreadsheet and then participated in a conversation with Ellison, Wang, and Singh about Alameda's balances. (Tr. 439-40). After that conversation, Bankman-Fried turned to Ellison and told her to "go ahead and return the borrows" to "lenders who loaned Alameda money and were asking for it back." (Tr. 440-41). After that, according to Ellison, Bankman-Fried continued to direct her "to use FTX customer funds to repay loans." (Tr. 765). Alameda proceeded to repay the third-party lenders using FTX customer funds. (GX-1017A to GX-1017K). Of the $6.5 billion that was repaid to Alameda's lenders, almost 70 percent was customer money. (GX-1018). This scenario was far from unexpected—it was precisely the market downturn scenario that Bankman-Fried had asked Ellison to analyze in the fall of 2021, and a reason that she had advised against additional venture investing. Consistent with their analysis in the fall of 2021, Bankman-Fried and Ellison both understood that the only way to repay lenders in this scenario was by using customer funds—the only difference was that by June 2022, FTX had billions of dollars more in customer deposits available for Alameda to misappropriate, which was used to repay lenders in full.

By September 2022, the defendant had spent so much customer money that it became clear that it could not be repaid. As of September 1, 2022, Alameda was borrowing approximately $13.7

billion in customer money from FTX. (GX-19). On September 7, Bankman-Fried had a conversation with Ellison, Wang, and Singh, in which they discussed Alameda's substantial negative balance on FTX and its inability to repay those funds. (Tr. 823, 1403). This was another inflection point, and again, the defendant chose to forge ahead with his crimes. After his conversation with his co-conspirators, Bankman-Fried had a private conversation with Singh on the balcony of his penthouse apartment, during which Singh told Bankman-Fried that he was very concerned about Alameda's substantial negative balance on FTX and its inability to repay the money. Bankman-Fried acknowledged that they were "a little short on deliverable," meaning short on the money that was owed to FTX customers. (Tr. 1407). At that time, Singh asked Bankman-Fried to refrain from additional spending that might exacerbate the problem and increase the size of FTX's deficit. However, notwithstanding the significant deficit, Bankman-Fried continued to spend money that necessarily was coming from customer funds. On September 7, 2022, Bankman-Fried directed a $45 million payment to Skybridge for an investment. (Tr. 1419; GX-14B). On September 16, 2022, Bankman-Fried caused a $10 million transfer to an account in his name. (GX-141A, 1089). On September 22, 2022, Bankman-Fried caused a $4 million transfer to an account in his name. (*Id.*). On September 26, 2022, Bankman-Fried directed a $250 million transfer to Modulo Capital for an investment. (Tr. 1418). On October 3, 2022, Bankman-Fried caused a $6 million transfer to an account in his name, which was used to make a political donation. (GX-141A, 1089).

A final decision point came in November. Following the online publication of a leaked Alameda balance sheet on November 2, 2022, and subsequent Tweets by the founder of Binance, customers began withdrawing funds from FTX. Over the next several days, as FTX customer withdrawals surged and FTX was unable to satisfy the withdrawals, Bankman-Fried sent a series

of false and misleading Tweets to induce FTX customers to leave their money on the FTX platform and deter them from seeking to withdraw their money. Specifically, on November 7, 2022, Bankman-Fried tweeted: "A competitor is trying to go after us with false rumors. FTX is fine. Assets are fine." (GX-866). He added in a second Tweet, in part, "FTX has enough to cover all client holdings. We don't invest client assets (even in treasuries). We have been processing all withdrawals, and will continue to be." (*Id.*). In a third Tweet, Bankman-Fried wrote, "It's heavily regulated, even when that slows us down. We have GAAP audits, with > $1B excess cash. We have a long history of safeguarding client assets, and that remains true today." (*Id.*). As each of the defendant's co-conspirators testified at trial, as well as other witnesses, those Tweets were false because at the time FTX had a multi-billion dollar hole and had insufficient assets to cover customer withdrawals. (Tr. 1465-66).

At the time Bankman-Fried made those public statements, he knew they were not true—over the preceding months, he and Ellison had spent billions of dollars of FTX customer money to repay Alameda's lenders and on other expenses and investments. Moreover, in an internal document that he authored on or about November 6, 2022—the day before tweeting—Bankman-Fried wrote that FTX only had "enough to process ~1/3 of remaining client assets." (GX-21). Additionally, in a Signal group thread called "small group chat," Bankman-Fried wrote just hours before tweeting that FTX only $3.9 billion of the total $12 billion, meaning there was an $8.1 billion shortfall. (GX-406). These documents reflected Alameda's borrowing of customer funds that Bankman-Fried had authorized, and of which he had been aware for months. Bankman-Fried nonetheless posted what he called a "confident tweet thread" (GX-21) to lull FTX's customers into keeping their funds on FTX. As a result of Bankman-Fried's false and misleading Twitter thread,

FTX customers did not withdraw their money and left it on the exchange. (Tr. 89, 1292). Bankman-Fried subsequently deleted these Tweets.

As FTX struggled to meet customer demands, Bankman-Fried approved halting customer withdrawals from the exchange. Shortly thereafter, however, Bankman-Fried—who was residing in The Bahamas at the time—reopened withdrawals *only* for customers in The Bahamas in order to curry favor with the Bahamian government. In an email to Ryan Pinder, Attorney General of The Bahamas on November 10, 2022, Bankman-Fried wrote in part:

> We are deeply grateful for what The Bahamas has done for us, and deeply committed to it. We are also deeply sorry about this mess. As part of this: we have segregated funds for all Bahamian customers on FTX. And we would be more than happy to open up withdrawals for all Bahamian customers on FTX, so that they can, tomorrow, fully withdraw all of their assets, making them fully whole. It's your call whether you want us to do this--but we are more than happy to and would consider it the very least of our duty to the country, and could open it up immediately if you reply saying you want us to. If we don't hear back from you, we are going to go ahead and do it tomorrow.

(GX-248). Opening withdrawals exclusively for Bahamians resulted in millions of dollars being withdrawn from the exchange by Bahamians and FTX insiders located in The Bahamas, while other customers of FTX.com had no ability to access withdrawals.

On November 11, 2022, FTX, FTX US, Alameda, and other related entities all filed for bankruptcy. As discussed in detail below, after FTX entered bankruptcy, Bankman-Fried told Wang that Bankman-Fried was still CEO of the FTX Bahamian entity because the bankruptcy applied only to FTX and FTX US. Bankman-Fried took Wang to meet with Bahamian regulators. (Tr. 465). Prior to meeting with the regulators, Bankman-Fried told Wang that he was going to offer to transfer FTX's remaining assets to the regulators to curry favor with officials in The Bahamas. (Tr. 465-66, 471). After Bankman-Fried met with Bahamian regulators outside Wang's

presence, Bankman-Fried and the Bahamian regulators directed Wang to move FTX funds to a Bahamian cold wallet and Wang complied. (Tr. 466). Bankman-Fried told Wang to stall with those representing the U.S. bankruptcy if they tried to engage Wang in securing additional assets, and to tell the lawyer that he was still with Bahamian regulators. (Tr. 467). As Wang moved the assets to the Bahamians, Bankman-Fried also sent messages to those trying to resume securing assets for the U.S. bankruptcy, stating that he and Wang were unavailable because they were still meeting with regulators. (Tr. 467-69; GX-543). Ultimately the FTX assets that Bankman-Fried and Wang were able to access were transferred to the authorities in The Bahamas, not to the bankruptcy estate.

### B.    Fraud on FTX Investors

Bankman-Fried also defrauded his investors. This alone was a more than one billion-dollar fraud: investors had to write down over a billion dollars in investments to zero.

By way of background, FTX had equity investors that purchased shares of FTX stock at increasing valuations over time. (GX-26). In the course of making those investments, FTX's equity investors conducted due diligence. Bankman-Fried represented to FTX investors that FTX acted as a custodian of its customers' deposits, and they understood this to mean that customer funds were segregated and not used by FTX or Alameda for other purposes. (Tr. 273-74, 2015). Indeed, several FTX investors conducted due diligence on whether Alameda received any special treatment and were told by Bankman-Fried and others acting at his direction that Alameda received no special treatment on FTX. (Tr. 278-81, 2013-14). Those representations were false for multiple reasons, including that Bankman-Fried directed Alameda be afforded preferential treatment in FTX's computer code, he directed it to engage in extensive borrowing from FTX, and he directed that Alameda be exempt from FTX's auto-liquidation engine, which Bankman-Fried had

highlighted to investors as a key part of the FTX business model that reduced risks to the business. (Tr. 280, 2011-12). Had FTX's equity investors known about the use of customer funds or Alameda's special treatment, they would not have invested. (Tr. 274, 280-82, 2014-15).

Bankman-Fried engaged in additional deceptive courses of conduct intended to mislead investors. For instance, in 2021, after an FTX user engaged in a form of market manipulation, causing a large loss on the platform, Bankman-Fried secretly shifted the loss to Alameda so that it would not appear on FTX's books (the so-called "MobileCoin" incident, after one of the cryptocurrencies the user was believed to manipulate). (Tr. 1455-56). Bankman-Fried also made public statements about FTX having an "insurance fund" to cover losses associated with customer accounts that were liquidated. (Tr. 409; GX-751). But at Bankman-Fried's direction, FTX's website was coded to publicly display a fake value for the insurance fund, which overstated the actual money that FTX had available in the insurance fund. (Tr. 412). To conceal the fact that FTX lacked sufficient money in its insurance fund to cover all liquidation losses, Bankman-Fried directed that some of those losses be transferred to Alameda. (Tr. 412).

In order to make FTX's 2021 revenues appear larger than they were—specifically, so that they would appear to be a billion dollars—Bankman-Fried directed Singh at the end of 2021 to add fake additional revenue to FTX's books from "staking," which is a form of lending, of the cryptocurrency Serum. (Tr. 1445-48). At Bankman-Fried's direction, Singh entered multiple Serum staking transactions and then backdated them in FTX's database. (Tr. 1450-51). Bankman-Fried also signed a Serum staking agreement, backdated to January 2021, which was provided to FTX's auditors. (Tr. 1453-54; GX-323). These actions had the effect of making it appear, falsely, that FTX had revenue of more than $1 billion for FY 2021.

Finally, Bankman-Fried also used FTX investor money to finance Alameda's operations and cover expenses. Indeed, after receiving money from investors, Bankman-Fried directed that some of those funds be transferred over to Alameda. (GX-1050). Those funds were spent on real estate, including a house for Bankman-Fried's parents, among other things. (GX-1023).

## C.     Fraud on Alameda's Lenders

In a third scheme to obtain money illegally, the defendant defrauded lenders to Alameda. The losses from this fraud also exceeded a billion dollars.

As explained above, Alameda financed its trading operation principally through large, open-term loans from third-party lenders, like Genesis, BlockFi, Voyager, Ledn, BitGo, and others. In May and June 2022, those lenders recalled nearly all of their loans, which Alameda repaid using customer funds. (Tr. 645, 753-54). After that point, in order to obtain new loans from these third-party lenders, the lenders requested that Alameda provide an updated balance sheet. After receiving these requests, Ellison sent Bankman-Fried a draft balance sheet and said, "I think it looks bad, I don't think we can send this to Genesis, do you agree?" (Tr. 785). And he said, "Yeah, that sounds right." (*Id.*).

The reason Bankman-Fried and Ellison believed they could not send the real balance sheet to lenders was because it showed that Alameda was borrowing around $10 billion from FTX and had made about $5 billion in related-party loans to FTX executives like Bankman-Fried, Wang, and Singh. (GX-44). Then Bankman-Fried told Ellison to "prepare some alternative ways of presenting the information and send them to him." (Tr. 786). Ellison prepared seven alternatives to the real balance sheet, which omitted or hid Alameda's borrowing from FTX and the large loans to FTX executives. (GX-44). Bankman-Fried told Ellison "we should use alternative 7" (Tr. 795), referring to one of the tabs of a spreadsheet she shared with him, and she sent that to Genesis and other lenders. (GX-17, GX-419). The spreadsheet was misleading in several ways: among other

things, it concealed that Alameda was borrowing billions of dollars from FTX and that these loans were callable at any time; it overstated Alameda's assets and understated its liabilities; and it concealed the billions of dollars of related-party loans made by Alameda to FTX insiders, like Bankman-Fried.

After receiving the fraudulent balance sheet, Alameda's lenders extended new loans. (GX-1014). Had the lenders know about the undisclosed borrowing from FTX's customers, and the true state of the balance sheet, they would not have lent Alameda money. (Tr. 1217-24). But because of the defendant's fraud, a number of lenders had large loans to Alameda outstanding at the time of its bankruptcy. Alameda's defaults on those loans threw several lenders into financial crisis and, in the case of BlockFi, caused the firm's bankruptcy just a few weeks after FTX's bankruptcy. (Tr. 1228).

## II.    The Defendant's Scheme to Make Unlawful Political Contributions

In addition to the offenses of conviction, Bankman-Fried was charged with conspiring to violate the Federal Election Campaign Act and defraud the Federal Election Commission. While Bankman-Fried consented to extradition on that count, the government of The Bahamas informed the United States after the extradition that Bankman-Fried had not been extradited on the campaign finance count. (Dkt. 181). For that reason alone, the Government was unable to proceed to trial on what was Count Eight of the original Indictment. Nonetheless, the Court ruled that the Government could present evidence of the campaign finance scheme as direct evidence of the other charged crimes, including to show motive and the relationship between co-conspirators. (Dkt. 289 at 3).

At trial, the Government proved Bankman-Fried's involvement in a conspiracy to make over $100 million in political donations to federal and state officials from both parties, as well as political action committees, all funded with funds from Alameda (and ultimately customers). As

the trial evidence established, the defendant passed these donations through accounts belonging to Ryan Salame and Singh (both of whom pled guilty to conspiracy to violate the campaign finance laws). (GX-1088, 1089, 1090). All of the contributions that were funded by Alameda or the defendant, but reported in the names of Salame or Singh, violated the campaign finance laws. Likewise, all of the contributions that were funded by Alameda, a corporation, and made to individual candidates violated the prohibition on corporate contributions to candidates.

The defendant's scheme spanned several years and was plainly designed to permit the defendant to amass power and influence. Beginning in or around 2020, Bankman-Fried began donating large sums of funds to political candidates, at least in part to improve his personal standing in Washington, D.C., increase FTX's profile, and curry favor with candidates that could help pass legislation favorable to FTX or Bankman-Fried's personal agenda, including legislation concerning regulatory oversight over FTX and its industry. To accomplish these goals, Bankman-Fried caused substantial contributions to be made in support of candidates of both major political parties and across the political spectrum. Bankman-Fried, however, did not want to be known as a left-leaning partisan, or to have his name publicly attached to Republican candidates. (GX-477). In order to obscure his association with certain contributions, Bankman-Fried conspired with others including Salame and Singh, to make some of the contributions in the names of Salame and Singh, instead of in the names Bankman-Fried or Alameda. (Tr. 1420-23; 1427-36). As Salame explained in a private message to a confidant, the purpose of these bipartisan donations would be "to weed out anti crypto dems for pro crypto dems and anti crypto repubs for pro crypto repubs," and that donations would likely be routed through Salame "to weed out that republican side." (GX-505).

Between in or about the fall of 2021 and the November 2022 election, Salame, Bankman-Fried, and Singh collectively made tens of millions of dollars in contributions, including in "hard money" contributions to federal candidates from both major political parties. (GX-28). The money used to make these political donations or to compensate for donations made by credit card originated from Alameda or FTX bank accounts and included funds that had been deposited by FTX customers. (GX-1088, 1089, 1090). Notwithstanding his awareness of the campaign finance laws, in order to conceal the true source of the funds, Bankman-Fried agreed with others that funds for contributions would be transferred from Alameda's bank accounts to bank accounts in the name of the political donors, and then quickly transferred from those individuals' bank accounts to political campaigns.

To further conceal the scheme, Bankman-Fried and his co-conspirators recorded the outgoing wire transfers from Alameda to individuals' bank accounts for purposes of making contributions as Alameda "loans" or "expenses." (GX-480A; Tr. 1458-61). But unlike other loans that were made to FTX executives, most of these outgoing wire payments were not documented in agreements or on term sheets, and there were no set interest rates, no interest payments, no collateral, and no evidence of repayment.

In total, Bankman-Fried and his co-conspirators made over 300 political contributions, totaling tens of millions of dollars, that were unlawful because they were made in the name of a straw donor or paid for with corporate funds. The proposed preliminary order of forfeiture lists the contributions identified by the Government. In dozens of instances, use of straw donors allowed Bankman-Fried to evade contribution limits on individual donations to candidates to whom Bankman-Fried had already donated. As a result of this fraudulent conduct, Bankman-Fried and

his co-conspirators caused false information to be reported by campaigns and PACs to the FEC, which had the result of impairing and impeding the FEC's reporting and enforcement functions.

The defendant argues that the Court should not consider the defendant's unlawful political contributions for two reasons. (Def. Mem. at 27). First, he argues that the Government did not prove this conduct by a preponderance of the evidence at trial. But at trial Singh testified that funds were transferred from Alameda to his bank account and then Salame, as part of the conspiracy with the defendant, would transfer those funds to political campaigns as if those were donations from Singh. (Tr. 1420-38). The Government also introduced documentary evidence at trial of this scheme. Government Exhibit 475, the "Donation Processing" Signal chat, provides evidence that Bankman-Fried coordinated sending Alameda funds through the accounts of Singh, Salame, and Bankman-Fried. Government Exhibit 477, a Signal chat between Singh and another person working for the defendant, also shows that certain donations would be made in Singh's name instead of the defendant's name. Government Exhibit 28 is a spreadsheet that was maintained by the defendant to track contributions being made in his name, Singh's name, and Salame's name. The Government also traced funds from Alameda through bank accounts in the names of Singh, Salame, and Bankman-Fried, on to the accounts of political campaigns. Those tracing charts were admitted into evidence as Government Exhibits 1088, 1089, and 1090. Based on all of that evidence, there is sufficient proof for the Court to conclude by a preponderance of the evidence that the defendant committed violations of the campaign finance laws. To the extent the defendant's willfulness is at issue, it was established by the inherent aspects of concealment involved in the crime, and the fact that, as several witnesses discussed, the defendant was sophisticated when it came to politics. Additionally, while it is not necessary here, the Court is not constrained by the trial record and may consider additional evidence in connection with

sentencing, or hold a hearing, at which the Government would establish that the defendant acted willfully.

Second, the defendant complains that he was not permitted to call Bradley Smith as an expert witness at trial. But the testimony for which he was noticed is irrelevant for this proceeding. The defendant says that "Professor Smith would have offered expert testimony concerning '[c]ommon, established, and well-known practices for large-scale political giving campaigns,' as well as testimony 'to rebut evidence which may be offered by the Government concerning issues of campaign finance and political donations.'" (Def. Mem. at 28 (quoting Def.'s Expert Notice)). But such general testimony would not undermine the clear evidence that money was being laundered through straw donors' accounts to make illegal contributions. And under the Rules of Evidence, Professor Smith would not be permitted to testify about the defendant's mental state, Fed. R. Evid. 704(b), so it is not clear how his noticed testimony would have been probative of any of the sentencing issues. If it were, the defendant would have presumably offered some of Professor Smith's opinions as part of his sentencing submission.

### III. The Defendant's Scheme to Bribe Chinese Government Officials

In addition to the offenses of conviction, Bankman-Fried was also charged in a severed count with conspiring to violate the Foreign Corrupt Practices Act by engaging in bribery of one or more Chinese government officials. While the Government ultimately determined that it was not in the interests of justice to proceed with a second trial, that was in part because the Court may still consider this criminal conduct at sentencing as the underlying conduct was proven at trial. (Tr. 827-40).

In early 2021, the Public Security Bureau in Changge, China froze two cryptocurrency trading accounts held by Alameda on two of China's largest cryptocurrency exchanges. (Tr. 827-

28). Collectively the accounts contained approximately $1 billion in cryptocurrency. (Tr. 828). Bankman-Fried was informed that the accounts had been frozen by Chinese law enforcement authorities as part of an ongoing money laundering investigation of a particular Alameda trading counterparty. (Tr. 827-28). Shortly after the accounts were frozen, Bankman-Fried directed a handful of FTX/Alameda Chinese employees that Bankman-Fried trusted and/or had connections to China to try to get the accounts unfrozen. (Tr. 827). Those early attempts included communicating directly with representatives of the Chinese exchanges; retaining local Chinese attorneys to negotiate with Chinese law enforcement; and with the assistance of Salame, opening new accounts on the Chinese exchanges in the names of Thai sex workers, and attempting to transfer the cryptocurrency from the frozen accounts to the new accounts in an effort to circumvent the Chinese authorities' freeze orders. (Tr. 829-30). Bankman-Fried was updated about the status of these efforts. (Tr. 830).

In November 2021, after several months of failed attempts to unfreeze the accounts, Bankman-Fried directed one Chinese FTX employee to make a multi-million-dollar bribe to government officials to have the accounts unfrozen. (Tr. 830-34, 839-40; GX-1631). Bankman-Fried told Ellison and another Alameda employee that cryptocurrency transfers should be made to private cryptocurrency addresses provided by the Chinese FTX employee to unfreeze the accounts. (Tr. 832). On or about November 16, 2021, the first bribe payment of cryptocurrency then worth approximately $40 million was transferred from Alameda's main trading account to a private cryptocurrency wallet. Shortly thereafter, the accounts were unfrozen. After confirmation that the accounts were unfrozen, Bankman-Fried authorized the transfer of an additional approximately $100 million of dollars in cryptocurrency to complete the bribe. (Tr. 832, 842-43, GX-64).

## IV.    The Defendant's Banking Misconduct

The evidence at trial, as well as other evidence summarized in the Presentence Investigation Report ("PSR"), also establish that the defendant operated an unlicensed money transmitting business and lied to Silvergate Bank in order to open an account that he used as part of that transmission business. While unlicensed money transmission and bank fraud were charges severed from the trial, the proof underlying those charges was established by a preponderance of the evidence. This conduct, therefore, may be considered at sentencing.

It is unlawful to operate an unlicensed money transmitting business in the United States. Exchanges that allow customers to exchange fiat for cryptocurrency are required under federal law to register with the Department of Treasury as money services businesses, and file suspicious activity reports when appropriate. *See, e.g., United States v. Murgio*, 209 F. Supp. 3d 698, 705-07 (S.D.N.Y. 2016), *conviction aff'd*, 32 F.3d 40, 49 (2d Cir. 2019). As a result, before opening accounts for cryptocurrency exchanges, U.S. banks usually require evidence of the appropriate licensure. (PSR ¶ 44).

When Bankman-Fried first founded FTX, access to the U.S. banking system was necessary for the company's growth. Without bank accounts, FTX was unable to do fiat-to-cryptocurrency conversions, which were both a source of business income and a prerequisite for many cryptocurrency traders who wanted to fund their FTX accounts. (Tr. 654). But U.S. financial institutions were reluctant to open accounts for cryptocurrency businesses, and in many instances refused altogether. (GX-917; Tr. 313). When banks did open accounts, they typically conducted an enhanced due diligence process, including requesting evidence that the entity had the appropriate registrations with the Department of Treasury. (PSR ¶ 46).

Rather than following the rules, and in order to circumvent U.S. money transmission laws and banks' unwillingness to do business with cryptocurrency exchanges, Bankman-Fried and others used existing Alameda bank accounts to process customer deposits and withdrawals. (Tr. 654). Alameda never told Silvergate Bank that it was using its accounts to process FTX customer deposits and withdrawals. Besides the accounts at Silvergate, FTX also used a bank account at Signature Bank to transmit money for customers without an appropriate license. Bankman-Fried and others affirmatively lied to Signature Bank to convince the bank to continue to process FTX customer fiat deposits and withdrawals. For example, on May 14, 2020, an employee at Signature emailed FTX.com and Alameda personnel asking about a transfer which was received by a bank account held in the name of Alameda but which said it was related to FTX. Instead of telling the truth, at Bankman-Fried's direction and with his knowledge, an Alameda employee falsely responded that the transfer was actually related to Alameda. (PSR ¶ 47).

There came a time when certain of Alameda's wire transfers were being rejected, so Bankman-Fried and others acting at his direction explored opening new bank accounts, including at Silvergate Bank where Alameda already had accounts. Silvergate Bank made clear, however, that it would not open an account for customer deposits and withdrawals absent evidence that FTX was licensed and registered, including registered federally as a money services business, and that, in any event, Silvergate Bank would need to conduct an enhanced due diligence process before opening any account used to process customer deposits and withdrawals. Bankman-Fried learned from Silvergate that Bankman-Fried should not attempt to open an account for FTX, and that if he wished to open an account to process customer deposits and withdrawals for FTX US, FTX's business in the United States, FTX US would need to register with the Department of Treasury. (PSR ¶ 46).

Notwithstanding those warnings from Silvergate Bank, in August 2020, to further obscure the relationship between FTX and Alameda, Bankman-Fried directed the incorporation of a new U.S.-based entity, North Dimension. Bankman-Fried was listed as sole owner, CEO, and president of North Dimension, which had no employees or business operations outside of its bank account. Bankman-Fried and others chose the name "North Dimension" in part to conceal that there was a relationship between North Dimension, on the one hand, and FTX or Alameda, on the other, from banks approving transactions with the North Dimension bank account. Once North Dimension was created, under Bankman-Fried's supervision, employees of Alameda completed an account application with Silvergate Bank that falsely stated that the purpose of the North Dimension bank account was "trading" and "market making." (PSR ¶ 48). Silvergate Bank was also given a completed North Dimension due diligence questionnaire—which Bankman-Fried signed—that falsely stated that North Dimension "trades on multiple cryptocurrency exchanges worldwide for its own account" and that North Dimension "also participates in direct peer-to-peer, OTC purchases and sales with certain third parties for its own account." (GX-267). Furthermore, despite the fact that North Dimension was created for the purpose of transmitting customer deposits on and off the FTX exchange, the due diligence questionnaire falsely claimed that North Dimension was not a money services business.

In April 2021, Silvergate approved the opening of the North Dimension account, based on those misrepresentations, without enhanced due diligence or review by Silvergate Bank's executive committee, as would have been required had the true purposes of North Dimension's account been disclosed to Silvergate Bank. Once the North Dimension bank account was opened, FTX directed customer dollar deposits to the North Dimension account. In the period from when the North Dimension account was opened until it ceased being the primary means for unlicensed

money transmission in about January 2022, customers transmitted billions of dollars through the account. (PSR ¶ 49). At no point did FTX.com ever obtain the appropriate license.

## V. The Defendant Tried to Deflect Blame and Evade Responsibility After FTX Declared Bankruptcy

The defendant's fraud did not end with FTX's declaration of bankruptcy. Rather, over the next month, and even after he had been arrested, the defendant disclaimed responsibility, blamed others, and tried to perpetuate his fraud further. For instance, Bankman-Fried told *The Wall Street Journal* on December 6, 2022, that FTX's collapse was the result of a large "margin position" on FTX that "got hit a few times, and then got hit massively." He gave a similar explanation to *Forbes* on December 13, 2022, and at the *New York Times* Dealbook event, which is cited in the defendant's submission. (The evidence at trial proved, however, that the defendant's fraud was unrelated to Alameda's margin trading.) In an interview on Good Morning America, Bankman-Fried blamed the deficit in customer funds on FTX's borrow/lending facility (GX-923B), despite an earlier conversation with FTX's General Counsel, Can Sun, after FTX's collapse that this was not an adequate or genuine explanation for the shortfall in FTX customer funds. (Tr. 1960-63, 1966 ("Q: And was the borrow-lend facility a potential justification that you had discussed with the defendant on November 7, 2022? A: Yes. Q: And what had you said to the defendant about that? A: It was not supported by the facts. Q: And what was his response? A: He acknowledged it.")).

In interviews, Bankman-Fried also tried to distance himself from the misconduct by falsely claiming that he was not running Alameda, that he had not been involved at all in Alameda trading for years, and that he was walled off from Alameda trading decisions in 2022. (*See, e.g.*, GX-2503, 2508, 2508-T). (He, of course, ultimately admitted otherwise on the stand in the face of irrefutable trial evidence.) (Tr. 2570-82). He also claimed that he did not "knowingly commingle funds" and

that he was unaware of Alameda's debts to FTX due to an "accounting mistake"—more lies in the aftermath of FTX's collapse that were disproved at trial. On January 12, 2023, after he was indicted, the defendant posted a blog post on Substack called "FTX Pre-Mortem Overview" in which he claimed that "Alameda failed to sufficiently hedge," there were losses in November 2022 when "an extreme, quick, targeted crash precipitated by the CEO of Binance made Alameda insolvent," and "then Alameda's contagion spread to FTX and other places." (The evidence at trial proved this was not true: there was already a $14 billion deficit in customer funds before the "crash" in November 2022.) Bankman-Fried also lied about his intent, publicly claiming, "I did not ever try to commit fraud," but the evidence overwhelmingly showed that he did intentionally take money that belonged to others and that he lied about it.

## VI. The Defendant Obstructed Justice

### A. Use of Signal to Auto-Delete Messages

At trial, the evidence established that the defendant instructed employees to use Signal, an end-to-end encrypted messaging application, with an auto-delete feature enabled so as to prevent regulators from reviewing communications.

Specifically, Adam Yedidia testified that the defendant instructed employees to use Signal with a feature enabled that would automatically delete each message after a certain amount of time had elapsed since the message was sent. (Tr. 175). Bankman-Fried stated that "it was all downside for messages to be kept around" because "if regulators found something they didn't like in those messages, that could be bad for the company." (Tr. 176). Similarly, Ellison testified that the defendant "directed [them] to use the disappearing messaging setting on [their] Signal, meaning that all messages [they] sent in these conversations would disappear after seven days." (Tr. 825). Bankman-Fried said that FTX and Alameda employees "should be very careful about what [they]

put in writing" because "putting things in writing was one of the primary ways that financial firms got in legal trouble." (*Id.*). After those directives, FTX and Alameda employees increasingly used Signal messages for "sensitive" communications. (Tr. 825-26). Government Exhibit 1083 is a chart of all of the Signal chats on Wang's device that were set to auto-delete. The chart shows that many of the chats' auto-delete function was set by the defendant.

### B. The Defendant's Witness Tampering

While on bail pending trial on this case, Bankman-Fried twice attempted to tamper with witnesses.

On January 15, 2023, Bankman-Fried contacted the former General Counsel of FTX US, Ryne Miller, over Signal and by email, writing in part: "I would really love to reconnect and see if there's a way for us to have a constructive relationship, use each other as resources when possible, or at least vet things with each other," and suggested they speak further by phone. Bankman-Fried and Miller had not spoken since the bankruptcy more than two months earlier, and the Government had already informed Bankman-Fried of its extensive investigation. Miller through his counsel informed the Government of this reach-out, and the Government brought the matter to the Court's attention. The Court stated that on its face the message "appears to have been an effort to . . . sing out of the same hymn book" (Dkt. 17.1 at 5), and expressed concerns at the time that the then-existing bail conditions would not be sufficient to prevent witness tampering. The Court imposed more substantial bail conditions including restrictions of the defendant's use of electronic devices.

Despite these warnings, Bankman-Fried again attempted to tamper with a witness in July 2023. On July 20, 2023, the *New York Times* published an article entitled *Inside the Private Writings of Caroline Ellison, Star Witness in the FTX Case* (the "Article"). The Article quoted

from private electronic journal entries written by Ellison, but in Bankman-Fried's possession, that describe her feelings and insecurities with respect to her work at Alameda and her personal relationship with Bankman-Fried. After Bankman-Fried's counsel confirmed that Bankman-Fried was the source for private documents quoted in the Article, the Government alerted the Court that Bankman-Fried had provided private and potentially embarrassing writings of Ellison—his ex-girlfriend, former CEO of Alameda, and cooperating witness—to the *New York Times* in order to discredit her, paint her in an unfavorable light, and influence a future jury's perception of the case. (Dkt. 176).

In a letter to this Court, Bankman-Fried claimed he had done "nothing improper" by covertly leaking Ellison's writings, but agreed to an order limiting extrajudicial statements about the case. (Dkt. 178). Bankman-Fried also asserted that he had merely given "comment on a story in progress." (Dkt. 178 at 4). Reviewing data from a pen register on Bankman-Fried's phone and email, however, the Government learned that over the prior several months, Bankman-Fried had sent over 100 emails to, and had over 1,000 phone calls with, members of the media, including over 100 phone calls with one of the Article's authors. Many of these communications occurred prior to the publication of other articles about Ellison. Of course, Bankman-Fried's contacts with the press—regardless of the volume—were not inherently problematic and did not form a basis for revocation of bail; rather the frequency and nature of the communications belied Bankman-Fried's factual claim that he had merely given "comment on a story in progress" (Dkt. 178 at 4), rather than attempted to inject unfavorable information about Ellison into the press and turn potential jurors against her.

At a conference on July 26, 2023, the Government requested that the Court revoke Bankman-Fried's bail and order him detained. At Bankman-Fried's request, the Court ordered

additional briefing from the parties, and held a bail hearing on August 11, 2023. After hearing from the parties, this Court found that there was probable cause to believe that Bankman-Fried twice committed attempted witness tampering in violation of 18 U.S.C. § 1512(b) while on pretrial release, giving rise to the rebuttable presumption under 18 U.S.C. § 3148(b)(2)(B) that no conditions would assure the safety of the community. (Dkt. 17.2 at 25-38). This Court found that the presumption had not been overcome, and that, in light of Bankman-Fried's continued evasions of his pretrial release conditions, Bankman-Fried was unlikely to abide by conditions of release. (*Id.* at 38-40). The Court's revocation of Bankman-Fried's bail was affirmed on appeal. *United States v. Bankman-Fried*, No. 23-6914, Dkt. 32.1 (September 21, 2023). The Second Circuit held that the record supported this Court's "conclusion that there was probable cause to believe" that Bankman-Fried "attempted to tamper with two witnesses in violation of 18 U.S.C. § 1512(b), and specifically that he acted with unlawful intent to influence those witnesses." (*Id.* at 1). The Circuit further explained that this Court "correctly determined that when a person engages in speech to commit a criminal offense such as witness tampering, the speech falls outside the zone of constitutional protection." (*Id.* at 2).

The record before this Court with respect to bail revocation likewise demonstrates by a preponderance of the evidence that Bankman-Fried twice attempted to tamper with witnesses after he was indicted and while awaiting trial.

### C. The Defendant's Perjury

Bankman-Fried also obstructed justice by giving false testimony during the trial. Among other things, and as discussed further below, Bankman-Fried falsely testified that he did not know about Alameda spending customer deposits, that he did not know until late 2022 that FTX's code

features were being improperly used to take customer money, and that he thought in November 2022 that his tweets were accurate and not misleading.

## APPLICATION OF THE SENTENCING GUIDELINES

## I.     Calculation of the Applicable Sentencing Guidelines

The Probation Department calculated that the adjusted offense level subtotal is 56, which is reduced to a total offense level of 43 pursuant to Chapter 5, Part A, comment n.2, since the total offense level is in excess of level 43. (PSR ¶¶ 70-89). The Government agrees with the Probation Department's conclusion that the total offense level is 43. The Government, however, submits that the adjusted offense level subtotal is 60, not 56: six levels should be added under U.S.S.G. § 2B1.1(b)(2) because the offense resulted in substantial financial hardship to 25 or more victims (rather than the 2-level enhancement proposed by Probation for at least one victim experiencing financial hardship). Besides that modification, the Government agrees with the Probation Department's calculation, and submits that the Court should calculate the applicable Sentencing Guidelines as follows:

- Counts One through Six are grouped for guideline calculation purposes because the offense level is determined largely on the basis of the total amount of harm or loss. U.S.S.G. § 3D1.2(d). These counts are grouped with Count Seven, the money laundering conspiracy, pursuant to U.S.S.G. § 3D1.2(c) and Application Note 6 to U.S.S.G. § 2S1.1, because the defendant was convicted of conspiring to launder the funds derived from the underlying wire fraud offense charged in Count One. Pursuant to U.S.S.G. § 3D1.3(a), since the counts are grouped, the offense level applicable to the group is the highest offense level of the counts in the groups, which is the offense level for money laundering conspiracy.

- *Base Offense Level:* The applicable guideline section for a violation of 18 U.S.C. § 1956(h) is U.S.S.G. § 2S1.1. Pursuant to U.S.S.G. § 2S1.1(a)(1), the guideline set forth in U.S.S.G. § 2B1.1 is used. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is <u>6</u>.[1]

- *Loss Amount*: The total loss to FTX's customers was in excess of $8 billion; the total loss to FTX's equity investors was in excess of $1 billion; and the total loss to Alameda's lenders was in excess of $1 billion. Because the loss involved was $10 billion or more, which exceeds $550 million, an increase of <u>30</u> levels is required by U.S.S.G. § 2B1.1(b)(1)(P).

- *Number of Victims:* The offense involved at least one million victims, and resulted in substantial financial hardship to 25 or more victims. First, as the PSR correctly indicates, the defendant's offense involved over one million victims, and the trial evidence indicated that at least one victim, BlockFi, experienced substantial financial hardship as a result of the defendant's conduct, declaring bankruptcy soon after FTX.com's bankruptcy was revealed. (Tr. 1228). BlockFi's bankruptcy is a sufficient basis to find that at least one victim experienced substantial hardship. *See* U.S.S.G. § 2B1.1, Application Note 4(F)(i)-(ii) ("substantial financial hardship" includes insolvency and filing for bankruptcy under Chapter 11). Accordingly, at a minimum, an increase of 2 levels is required by U.S.S.G. § 2B1.1(b)(2)(A). However, as described below, more than 25 individual customers experienced substantial hardship, losing their life savings on FTX. *See* U.S.S.G. § 2B1.1, Application Note 4(F)(i), (iii)

---

[1] The base offense level is not 7 because money laundering is not an offense referenced to U.S.S.G. § 2B1.1.

("substantial financial hardship" includes insolvency and suffering substantial loss of a retirement, education, or other savings or investment fund).[2] Accordingly, an increase of <u>6</u> levels is required by U.S.S.G. § 2B1.1(b)(2)(C).

- *Fraudulent Action During Bankruptcy:* Because the offense involved a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding, a <u>2</u>-level increase is required by U.S.S.G. § 2B1.1(b)(9).

- *Conduct Outside of the United States and Sophisticated Means:* Because the defendant deliberately located FTX outside of the United States to evade law enforcement or regulatory officials, because a substantial part of the fraudulent scheme was committed from outside of the United States, and because the offense otherwise involved sophisticated means, a <u>2</u>-level increase is required by U.S.S.G. § 2B1.1(b)(10).

- *Gross Receipts from a Financial Institution:* Because the defendant derived more than $1 million in gross receipts from one or more financial institutions as a result of the offense, a <u>2</u>-level increase is required by U.S.S.G. § 2B1.1(b)(17).

- *Conviction Under Section 1956:* Because the defendant was convicted under 18 U.S.C. § 1956, a <u>2</u>-level increase is required by U.S.S.G. § 2S1.1(b)(2)(B).

- *Sophisticated Money Laundering:* Because the defendant was involved in sophisticated money laundering, specifically through the use of offshore accounts and multiple layers of transactions, a <u>2</u>-level increase is required by U.S.S.G. § 2S1.1(b)(2)(C).

- *Role Adjustment:* The defendant was the CEO of FTX, and through his decision-making authority, directed and led his employees to commit criminal activities as part

---

[2] At the time the PSR was drafted, the Probation Department did not have the victim impact information that is the basis for an enhancement under this section of the Guidelines.

of the fraud and money laundering conspiracies. As such, he was an organizer and leader of criminal activity that involved five or more participants or was otherwise extensive. Accordingly, a 4-level increase is required by U.S.S.G. § 3B1.1(a).

- *Abuse of Trust Adjustment:* The defendant misappropriated customer deposits that had been entrusted to him and FTX as part of the wire fraud scheme. Therefore, he abused a position of private trust in a manner that significantly facilitated the commission of the offense; a 2-level increase is required by U.S.S.G. § 3B1.3.

- *Obstruction of Justice Adjustment:* The defendant willfully obstructed and impeded, and attempted to obstruct and impede, the administration of justice with respect to the investigation, this prosecution, and sentencing in several manners. First, as the PSR notes and as discussed above, the defendant instructed employees to set Signal messages to auto-delete to evade law enforcement scrutiny. (PSR ¶ 85). Second, as discussed above, on two occasions the defendant attempted to tamper with potential trial witnesses. Third, the defendant perjured himself when he testified which, as discussed herein, is a basis to impose the adjustment for obstruction of justice. Accordingly, a 2-level increase is required by U.S.S.G. § 3C1.1.

- *No Acceptance of Responsibility*: Because at no time has the defendant clearly demonstrated acceptance of responsibility for the offense, there is no offense level decrease under U.S.S.G. § 3E1.1.

Based on the foregoing, the adjusted offense subtotal is 60. Because any offense level in excess of 43 is treated as an offense level of 43, 43 is the total applicable offense level. (PSR ¶ 89). The defendant's criminal history score is zero, which puts him in Criminal History Category I. (PSR ¶ 92). Based upon these calculations, Bankman-Fried's advisory Guidelines imprisonment

range is life. (PSR ¶ 129). However, because the statutorily authorized maximum sentence is 110 years' imprisonment, which is less than life imprisonment, the applicable Guidelines sentence is 110 years' (1,320 months) imprisonment. U.S.S.G. §§ 5G1.1(a), 5G1.2(d).

## II. The Defendant's Challenges to the Guidelines Calculation Lack Merit

In his sentencing submission, the defendant makes several challenges to the Guidelines calculation set forth in the PSR. Specifically, he challenges the calculation of the loss amount, the enhancement for fraudulent action in the course of a bankruptcy proceeding, the enhancement for conduct outside of the United States, the gross receipts from a financial institution enhancement, the abuse of trust enhancement, and the obstruction of justice enhancement. While all of these objections lack merit, it bears noting that with the exception of his challenge to the loss amount, none of his other objections will affect the calculation of the total offense level, which would be 43 with or without those enhancements. However, even though the objections are immaterial to the calculation of the Guidelines, the defendant is wrong on the facts and the law, and in any event the Court should consider the conduct underlying the enhancement in imposing a sentence.

### A. The Evidence at Trial Proved That the Loss Amounts Is at Least $10 Billion

The defendant takes issue with the loss amount as calculated in the PSR. His arguments, however, are entirely meritless and fail to address the facts of this case or the governing law. The evidence at trial proved that the losses to FTX customers are *conservatively* estimated to be at least $8 billion, the losses to FTX investors are at least $1.7 billion, and the losses to Alameda lenders are at least $1.3 billion. The total actual loss amount from the defendant's interlocking fraudulent schemes, therefore, is at least in excess of $10 billion.

#### 1. Applicable Law

"Loss" is defined in the Guidelines as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. 3(A). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that

resulted from the offense." *Id.*, cmt. 3(A)(i). And "reasonably foreseeable pecuniary harm" is defined as "pecuniary harm"—that is, "harm that is monetary or that otherwise is readily measurable in money"—that "the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.*, cmt. 3(A)(iii), (iv)). "Intended loss" is defined as "the pecuniary harm that the defendant purposely sought to inflict," and includes any "intended pecuniary harm that would have been impossible or unlikely to occur." *Id.*, cmt. 3(A)(ii). The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States v. Bryant*, 128 F.3d 74, 75-76 (2d Cir. 1997). Instead, a court "need only make a reasonable estimate of the loss," given the "available information." U.S.S.G. § 2B1.1, cmt. 3(c).

### 2.  The Trial Evidence Regarding Loss Amount

Here, there are three categories of losses: (1) losses to FTX customers; (2) losses to FTX's equity investors; and (3) losses to Alameda's lenders.

First, the defendant's fraud on FTX customers resulted in a loss to those customers in excess of $8 billion. This number is calculated by conservatively estimating the total shortfall on the FTX exchange, that is, the amount by which customer account balances exceeded the amount of assets that FTX had available to return to those customers when FTX declared bankruptcy on November 11, 2022. The trial evidence fully supports this amount, which, if anything, is a conservative estimate. For instance, Professor Easton testified that in June 2022, as much as $12.6 billion in customer funds had been misappropriated. (Tr. 1773; GX-1005). Wang testified that in September 2022, it was around $14 billion. (Tr. 450). Ellison also maintained a spreadsheet, which she shared with the defendant in September 2022, showing that Alameda had taken around $13.7 billion from FTX customers. (Tr. 813).

By November 1, 2022, according to Professor Easton, the amount of misappropriated customer funds had been reduced to approximately $9.2 billion. (Tr. 1773; GX-1005). The shortfall decreased in the final days of FTX because the defendant returned some of the money he had misappropriated back to FTX to cover customer withdrawals. The Guidelines provide that the loss amount "shall be reduced" by the amount of "money returned … to the victim before the offense was detected," U.S.S.G. § 2B1.1, cmt. 3I(i).[3] However, even if the defendant is given credit for these pre-bankruptcy returns of funds, the evidence at trial shows that there was still a total shortfall of around $8 billion in customer funds when FTX collapsed. For example, Wang testified that there was still a $8 billion shortfall (Tr. 456-58), and the defendant himself sent a text message on November 7, 2022, in which he acknowledged that there was a shortfall of $8 billion in customer assets that FTX was unable to repay, even if he could liquidate certain Alameda assets (Tr. 2789). Accordingly, the trial evidence fully supports the PSR's conclusions that customer losses amount to $8 billion.

Second, the evidence at trial clearly supports the PSR's conclusion that the losses to investors amounted to $1.72 billion, which was the total amount of equity investments in FTX.com

---

[3] Arguably, the defendant should not benefit from this provision, because he returned these funds in an effort to conceal his fraud and prevent more customers from making withdrawal requests. To the extent the Court were to find that the defendant's return of misappropriated funds between September and November 2022 was intended to keep his fraudulent schemes operating, the loss amount to customers would be properly calculated at $14 billion, rather than $8 billion. *See, e.g., United States v. Vilar*, 729 F.3d 62, 96 n.34 (2d Cir. 2013) (rejecting the argument that loss amount should be reduced by amount returned to investors because "defendants should not benefit from attempting to ensure the continuation of their scheme"); *United States v. Carrozzella*, 105 F.3d 796, 805 (2d Cir. 1997), *abrogated in part on other grounds, United States v. Kennedy,* 233 F.3d 157, 160-61 (2d Cir. 2000) ("We have held that loss in fraud cases includes the amount of property taken, even if all or part has been returned.... One reason for this rule is that … the return of money as interest or other income is often necessary for the scheme to continue."); *United States v. Mucciante*, 21 F.3d 1228, 1237-38 (2d Cir. 1994) ("Although [defendant] returned some of [victim-1]'s money, and repaid [victim-2] and [victim-3], he did so as part of a meretricious effort to maintain their confidences. He is therefore not entitled to credit for sums returned, or for sums spent for [victim-1]'s benefit.").

that the defendant fraudulently obtained. (GX-26 (listing the total amounts invested in the Series B, B-1, and C round investments in FTX.com)). None of these investors received any return on their investment while FTX was operating, and the equity in FTX is now worthless. Accordingly, the actual loss to investors is the full amount of their investment.

Third, the evidence at trial showed that Alameda obtained approximately $1.7 billion in new loans from May to November 2022, the time period in which the defendant conspired to provide lenders with false financial information to induce them to continue lending. (GX-1014). Of that amount, approximately $1.3 billion were outstanding at the time of bankruptcy. (*Id.*). Thus, even if the defendant were given credit for pre-bankruptcy returns of funds, the actual loss for the lender fraud is $1.3 billion.

3. The Defendant's Assertion That the Loss Amount for FTX Customers Is Zero Is Meritless

The defendant does not seriously dispute any of these numbers or the evidence supporting them. Rather, he argues that the actual loss should be estimated at zero based on developments that have happened long after his fraud was exposed and his companies declared bankruptcy. (Def. Mem. at 17-21). The sole basis for the defendant's argument on loss amount is a statement by counsel for the debtors in the FTX and Alameda bankruptcy proceeding that FTX customers and creditors "will eventually be paid in full." *See* Transcript of Hearing at 18:11-25 ("Bankruptcy Transcript"), *In re FTX Trading Ltd.*, et al., 22 -11068 (JTD) (Bankr. D. Del. Jan. 31, 2024), Dkt. 6908. The defendant's arguments relying on that representation, however, are fatally flawed both on the law and the facts.

First, as a legal matter, any potential recovery to victims in the bankruptcy proceeding should not be used to reduce the loss amount for purposes of the Guidelines. Pursuant to U.S.S.G. § 2B1.1 cmt. 3(E), there are only two circumstances where it is appropriate for a district court to

make "credits against loss": (1) where there are funds returned to victims "before the offense was detected," and (2) in certain cases "involving collateral pledged or otherwise provided by the defendant." Neither of those circumstances applies here. As to the first circumstance, the potential recovery to victims from the bankruptcy did not happen before detection of the fraud. On the contrary, as of this date, nearly a year and a half after FTX declared bankruptcy and months since the defendant's conviction at trial, his victims have received no recovery and there is no timeline for when any such payments will be made. As to the second circumstance, it plainly does not apply here, as this is not a fraudulent loan case in which the defendant pledged collateral. Rather, this case involved the misappropriation of funds by the defendant, secretly taking money from the FTX exchange and moving it to Alameda, his own investment company, after assuring his customers he would do no such thing. Customers were never pledged any collateral for their FTX deposits. Thus, the plain text of the Guidelines does not provide for any reduction in loss amount based on the possibility that victims will receive compensation in the bankruptcy.

The defendant's position is contradicted by case law as well. The Second Circuit has held that a defendant's "arguments that the loss calculation should be offset … by his company's bankruptcy filings are unpersuasive," because the Guidelines only allow for reduction of the loss amount for money returned "before the offense was detected." *United States v. Ware*, 399 F. App'x 659, 662 (2d Cir. 2010) (quoting U.S.S.G. § 2B1.1 cmt. 3(E)(i)); *see also United States v. Bergstein*, 788 F. App'x 742, 747 (2d Cir. 2019) (where defendant had misappropriated funds invested in company, affirming district court's decision not to reduce the loss amount by the funds subsequently recovered by the company). Thus, the law is clear that the loss amount should not be reduced by "funds received in bankruptcy *after* the conspiracy was uncovered, or to the potential

value of a future bankruptcy payout." *United States v. Bryson*, 101 F. Supp. 3d 147, 157 (D. Conn. 2015).[4]

In his submission, the sole case that the defendant relies on is *United States v. Durham*, 766 F.3d 672 (7th Cir. 2014), which affirmed a district court's calculation of loss amount as the amount owed to investors less the amount recovered in bankruptcy. (Def. Mem. at 19-20). But the defendant's reliance on *Durham* is flawed. In *Durham*, unlike here, the evidence at sentencing did not show exactly how much money the defendants had misappropriated, so the district court relied on the amounts invested by investors minus the amount recovered in bankruptcy as a reasonable proxy for that loss. *Id.* at 687. The Seventh Circuit merely affirmed the district court's methodology as reasonable and did not suggest that as a general rule, loss amount should be reduced by the amount of money recovered in bankruptcy. Indeed, the issue was not even litigated in *Durham*, because the Guidelines range was not affected by whether or not bankruptcy recoveries were reduced from the loss amount. *Id.*[5]

The defendant's argument is also contrary to common sense. In many criminal fraud cases, the combined efforts of the Government and the bankruptcy system are able to achieve substantial recoveries for victims. For instance, the Government recently announced that victims of the

---

[4] Additionally, the defendant was convicted of money laundering, and the Section 2S1.1 Guideline groups with Section 2B1.1. There is no "credit against loss" in the money laundering context: under Section 2S1.1, defendants who launder money are accountable for the "offense level for the underlying offense from which the laundered funds were derived." U.S.S.G. § 2S1.1(a)(1); *United States v. Eckstein*, No. CR 12-3182 JB, 2016 WL 546663, at *7 (D.N.M. Feb. 3, 2016) (no "credit against loss" in money laundering case because that credit "would not reflect a money laundering scheme's full impact.").

[5] Even if *Durham* did support the defendant's position here, it is contrary to the Second Circuit's decisions in *Ware* and *Bergstein*. And the district court's sentencing in *Durham* is hardly persuasive authority for this Court. As the district court in *Durham* itself said: "I don't know about what goes on in the Southern District of New York. I visit there only rarely. This is the Heartland. This is where we work hard. … We drive Chevies and Buicks and Fords, not Bugattis." *Durham*, 766 F.3d at 685.

Madoff fraud scheme have been repaid at "91% of their fraud losses," and that efforts to recover funds are ongoing. Press Release, *Justice Department Announces Distribution of Over $158.9M to Nearly 25,000 Victims of Madoff Ponzi Scheme* (Dec. 11, 2023), available at https://www.justice.gov/opa/pr/justice-department-announces-distribution-over-1589m-nearly-25000-victims-madoff-ponzi. But that does not mean that the loss amount calculated at Madoff's sentencing in 2009 was incorrect, or that the court in that case should have attempted to predict how much money victims would ultimately be able to recover.

Here, as in Madoff and many other cases, the defendant misappropriated funds from his victims and put large amounts of the money into assets such as real estate, stock in publicly traded companies, and other more illiquid assets for his own benefit. Many of those assets are recoverable, and can be liquidated to repay his victims, but that is due to the extensive efforts of the administrators of the bankruptcy proceeding and due to this prosecution, and these recoveries do not affect the appropriate measure of loss for sentencing purposes. As debtors' counsel in the bankruptcy recently explained: "Had these Chapter 11 Cases not been filed in November 2022, or had different choices been made in the early months, customers of FTX.com and potentially other FTX creditors would have faced a near total loss." Fourth Motion of Debtors for Entry of an Order Extending the Exclusive Periods During Which Only the Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof ("Debtors Motion"), *In re FTX Trading, Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Mar. 5, 2024), Dkt. 8621, at 2.

In addition to being legally baseless, the defendant's argument that the loss to FTX customers should be reduced to zero is premised on a distorted depiction of the bankruptcy proceeding. The defendant seizes on one statement at a recent hearing that "customers and general unsecured creditors with allowed claims, will eventually be paid in full." Transcript of Hearing at

18:11-25, *In re FTX Trading Ltd.*, et al., 22-11068 (JTD) (Bankr. D. Del. Jan. 31, 2024), Dkt. 6908. But he overlooks critical context for that statement. First, the meaning of "paid in full" here is that customers are expected to receive, at some point in the future, "100% of their allowed claims over time, measured at petition time value and subject to agreement by certain governmental creditors to voluntarily subordinate their own very large and impaired claims." (Debtors Motion at 2).

There is a significant difference between the defendant's claim that customers will "get back all of their money" (Def. Mem. at 17), and the Debtors' more measured statement that it hopes to return "100% of their allowed claims over time." The example of the two customer witnesses who testified at trial demonstrates this difference. Marc-Antoine Julliard, for instance, transferred the equivalent of about $140,000 in fiat currency to his FTX account in April and May 2022. (Tr. 78). Julliard used his deposits to purchase Bitcoin, and intended to hold Bitcoin for five to ten years. (Tr. 73-74). He purchased the Bitcoin based on the defendant's false representations that when an FTX customer purchased Bitcoin in the spot market, FTX was holding Bitcoin that the customer could withdraw on demand. (Tr. 80). Julliard used almost all of his deposited funds to purchase three Bitcoin, which were trading around $40,000 at the time of his purchase. (GX-425). As of approximately November 11, 2022, FTX was still representing to Julliard that his account contained three Bitcoin, which were then valued at a total of approximately $52,000, or around $17,000 per Bitcoin. (GX-425). This was the lowest price Bitcoin had closed at since November 2020.[6] In fact, however, FTX was not holding any Bitcoin for Julliard, nor was it holding his initial fiat currency deposits of $140,000. Instead, the defendant had used that money,

---

[6] Though not necessary for the Court's analysis, the Government has every reason to believe that at least a significant causal factor in the drop in Bitcoin's value in the weeks leading up to FTX's collapse was market instability due to revelations about the defendant's misconduct.

along with the deposits of countless other FTX customers, to fund investments through his private investment company, Alameda.

Similarly, Tareq Morad funded his FTX account with approximately $500,000 in fiat currency. (Tr. 1288). Like Julliard, Morad bought cryptocurrency on the spot market, and simply held those funds. When FTX declared bankruptcy, the company was still falsely representing to Morad that his account held more than two Bitcoin and 86 Ethereum as well as certain other cryptocurrencies, with a total value at the time of $257,000. (GX-539). But due to the defendant's misappropriation of funds, the company was holding neither the cryptocurrency that Morad had been told he had purchased, nor his initial fiat deposits.

Since FTX's bankruptcy, cryptocurrency prices have increased. Bitcoin is currently trading at more than $60,000, and Ethereum is trading at nearly $4,000. Thus, if not for the defendant's fraud, Julliard would currently be holding three Bitcoin that he would be able to withdraw for approximately $180,000, and Morad would be holding cryptocurrency worth well in excess of $400,000. But instead, Julliard and Morad are holding a claim in bankruptcy for the dollar value of their FTX accounts as of the bankruptcy date, which are $52,000 and $257,000, respectively, and have no clear timeline for when those claims will actually be paid. Thus, even if the Debtors are successful in paying "100% of their allowed claims over time," Julliard and Morad will never get back either the amount of actual fiat money they deposited in FTX nor the cryptocurrency they were falsely told their deposits had been used to purchase. The defendant's fraud took away these funds from these victims: he left them stuck not with "all of their money," but with a claim for future receipt of the dollar value of their cryptocurrency as of the time of the bankruptcy petition.

Several victim impact statements make this point: the bankruptcy recovery, as currently conceived, will not in their view make them whole.[7] (*See, e.g.*, Victim Impact Statements Nos. 32, 33, 38).

The defendant's claims about customer recovery additionally lack context because they fail to take into account the substantial efforts undertaken by the bankruptcy estate to recover value for FTX customers. This has included, for example, lawsuits to claw back money given to the defendant's parents and money invested in K5 for the defendant's benefit. *See* Debtor's Motion at 10-11 (describing efforts undertaken to recover assets, including "significant litigation claims"). As proven at trial, these funds were customer money that the defendant invested for his own benefit, and the fact that these funds may be recoverable through the bankruptcy proceeding does nothing to reduce the defendant's culpability. (Tr. 1320-22 (Singh testimony about defendant's investment of customer funds in K5)).

Thus, the defendant is engaged in nothing more than fanciful speculation when he suggests, without citing any evidence, that FTX could have simply "resumed withdrawals on November 15th after selling sufficient assets to cover the $8 billion." (Def. Mem. at 18). In the real world, even in March 2024, and after sustained effort by the bankruptcy estate, the company has not yet paid out any customer claims, has not yet been able to recover all the assets misappropriated by the defendant, and has not yet been able to fully liquidate the assets that it has recovered. Similarly, the defendant's suggestion that FTX was "solvent as of the date of the bankruptcy petition" is contradicted by overwhelming evidence. As noted, the defendant himself circulated internal messages in the days before declaring bankruptcy in which he acknowledged that there was an $8

---

[7] Some FTX customers are receiving even lower value in bankruptcy. Holders of FTX's token FTT are near the bottom of the priority list—sitting in thirteenth place—and the Government understands that it is unlikely that holders of that token will receive compensation from the estate. *See In re FTX Trading Ltd.*, et al., 22-11068 (JTD) (Bankr. D. Del. Jan. 31, 2024), Dkt. 4861 at 27-28.

billion hole in customer deposits that could not be repaid on any short-term time horizon. (Tr. 2789). Even now, the defendant acknowledges that he would have had to suspend FTX withdrawals while he attempted to liquidate assets that he was holding in a separate company, Alameda, in order to keep the business operating. That is the textbook definition of insolvency. *Pereira v. Farace*, 413 F.3d 330, 343 (2d Cir. 2005) (under Delaware law, "a company is insolvent if it is unable to pay its debts as they fall due in the usual course of business").

The defendant suggests in the alternative that the loss to FTX customers should be calculated based on their "cost of collection in bankruptcy." (Def. Mem. at 22). That argument is flawed for the reasons already given, because it would only come into play if the defendant could claim credit for bankruptcy recoveries to reduce the loss amount, which he cannot. And the defendant's citation to *United States v. Abiodun*, 536 F.3d 162 (2d Cir. 2008), provides no support for his position. In the section of *Abiodun* relied on by the defendant, the Second Circuit was considering how to quantify the "number of victims affected by defendants' conduct," for purposes of the Guidelines enhancement for number of victims. *Id.* at 167-68. In that context, the court held that victims of an identity theft scheme who had been reimbursed by their credit card companies could still be counted as victims, if the district court included the monetary value of the time those victims spent seeking reimbursement in the total loss amount for the offense. *Id.* at 169. Thus, the holding of *Abiodun* is that the costs of collection should be *added to* the total loss amount, not that such costs are the only permissible loss amount. *See id.* at 169 (remanding for district court to "recalculate the loss amount … to include the time lost by these potential victims").

4. Even Setting Aside FTX Customers, the Loss Amount to FTX Investors Is Greater Than $1.7 Billion

As discussed, the defendant's arguments attempting to minimize FTX customer losses are legally and factually meritless. However, even if all of the defendant's arguments about customer

losses were credited, that would have no effect on his Guidelines range because the losses to FTX investors alone are far greater than the highest loss amount enhancement in the Guidelines. The defendant was convicted of securities fraud for his scheme to fraudulently obtain more than $1.7 billion in equity investments into FTX.com, and even the defendant acknowledges that equity investors are not expected to recover from the bankruptcy plan on which he relies for his arguments about customers. (Def. Mem. at 20). Instead, he simply tries to wave off the losses to investors by saying that they "received an equity stake, not a 'cash-back guarantee.'" (Def. Mem. at 20).

That is not the law. In a securities fraud case, the loss amount is calculated as the decline in value of the securities purchased by investors, insofar as that decline is a "result of the fraud." *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007). In cases where the securities decline in value over time for multiple reasons in addition to a defendant's fraud, the "portion of a price decline caused by other factors must be excluded from the loss calculation." *Id.* at 179. In this case, however, the defendant raised funds from investors at a valuation of $32 billion for FTX.com in early 2022, and continued to seek fundraising at that valuation into the fall of 2022. Then, once his fraud was exposed, the company declared bankruptcy within a matter of days and the investors immediately wrote the value of their investments down to zero. This is therefore an example of a case "where share price drops so quickly and so extensively immediately upon disclosure of a fraud that the difference between pre- and post-disclosure share prices is a reasonable estimate of loss caused by the fraud." *Id.* Accordingly, the full amount of the funds invested is the appropriate measure of loss.

5. In the Alternative, the Intended Loss Is Even Greater Than $10 Billion

U.S.S.G. § 2B1.1, defines "loss" as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). The commentary further defines "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict," even if that loss did not occur or was impossible, *id.*

47

cmt. n.3(A)(ii). Due to the more than $8 billion dollars of actual losses suffered by the countless victims of the defendant's fraudulent scheme, there is minimal need to turn to "intended loss" to assess "the seriousness of the offense and the defendant's relative culpability." *See* U.S.S.G. § 2B1.1 cmt. (background); *see id*. App. C Supp., at 104-05 (Amend. 793) (noting "the Commission's belief that intended loss is an important factor" because it focuses "specifically on the defendant's culpability"). If, however, intended loss was applied in lieu of actual loss, the result would be no different for Guideline purposes. The trial record makes clear that the defendant intended to cause more than $14 billion in combined losses to FTX customers, investors, and Alameda lenders.

As a threshold matter, the defendant's attempt to have this Court disregard the Guidelines commentary regarding § 2B1.1's definition of "loss" based on the Supreme Court's reasoning in *Kisor v. Wilkie*, 588 U.S. ---, 139 S. Ct. 2400 (2019), should be rejected. (Def. Mem. at 16). The Second Circuit and district courts within this Circuit have, even after *Kisor*, consistently applied the commentary on "intended loss" when calculating the Guidelines range. Specifically, the law is clear that, "[f]or the purposes of calculating the Guidelines range, loss is defined as 'the greater of actual loss or intended loss.'" *United States v. Powell*, 831 F. App'x 24, 25 (2d Cir. 2020) (quoting *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 103 (2d Cir. 2014)). This makes sense because "the larger intended amount is a better measure for the defendant's culpability." *United States v. Lacey*, 699 F.3d 710, 720 (2d Cir. 2012). Other courts have also rejected attempts to rely on *Kisor* to disregard the Guidelines use of intended loss. *See United States v. You,* 74 F.4th 378, 396–98 (6th Cir. 2023) (finding—after canvassing several dictionaries—that the term "loss" in § 2B1.1. "has no one definition," "can mean different things in different contexts," and deferring to the Sentencing Commission's interpretation).

The defendant relies on the Third Circuit's decision in *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022), to argue that "loss" "unambiguously" means "actual loss." (Def. Mem. at 16). But *Banks* is neither binding on this Court, nor persuasive. As noted in *You*, "without consulting the 'traditional tools' of the commentary's 'structure, history, and purpose' to reach that conclusion, *Kisor*, 139 S. Ct. at 2415, *Banks*'s attempt to impose a one-size-fits-all definition is not persuasive." 74 F.4th at 397. Where the Guidelines note that the purpose of estimating "loss," including intended loss, is designed to assess the "seriousness of the offense and the defendant's relative culpability," § 2B1.1 cmt. (background), the defendant's interpretation would lead to vastly different sentences for similarly culpable defendants where one successfully stole money before causing actual losses, but the other did not. Moreover, the Guidelines commentary with respect to § 2B1.1 "loss" is the very type of "fair and considered [agency] judgment" described in *Kisor* that has been applied by courts and litigants across the country for years to uniformly calculate loss where fraud schemes, thefts, and embezzlements often vary significantly. *See Mistretta v. United States*, 488 U.S. 361, 379 (1989) (rejecting a constitutional challenge to the Sentencing Commission and finding that "[d]eveloping proportionate penalties for hundreds of different crimes by a virtually limitless array of offenders is precisely the sort of intricate, labor-intensive task for which delegation to an expert body is especially appropriate"). For these reasons, the Sentencing Commission's § 2B1.1 "loss" guidance is perfectly appropriate to consider when evaluating the defendant's Guidelines range.

Turning to the facts established at trial, it is clear that the defendant intended to deprive FTX customers and investors, along with Alameda lenders, of even more than the $8 billion suffered in actual losses. *See United States v. Jacobs*, 117 F.3d 82, 95 (2d Cir. 1997) ("[T]he concept underlying the distinction between actual and intended loss is that the defendant may have

the goal of depriving the victim or victims of more than the constraints of the situation 'actually' permit. The significance is that the defendant's acts should be measured by intentions.").

Here, witness testimony and internal spreadsheets established that between June and November 2022 the defendant knew Alameda owed FTX billions of dollars, up to around $14 billion by September 2022, which could not be legitimately repaid. With the assistance of Government Exhibit 50, a spreadsheet titled "Alameda Balances by FTX sub-info," dated June 14, 2022, Wang testified that the defendant reviewed the spreadsheet and knew at that time that Alameda owed FTX $11 billion. (Tr. 436-437; GX-50). When excluding Alameda accounts, such as Cottongrove, which contained large amounts of illiquid FTT, Alameda's debt expanded to $16 billion. (Tr. 619-20). Yet, even after discussing this disastrous financial situation, Bankman-Fried ordered that Alameda's lenders be repaid with FTX customer money, which enabled the fraud to continue undetected. (Tr. 440, 620). Wang, Ellison, and Singh all testified that by September 2022, conversations circulated amongst the group, including the defendant, that Alameda could not be shut down because it owed FTX—and therefore, FTX customers—approximately $14 billion. (Tr. 447-449, 817-20, 1403, GX-11). When confronted by Singh on the balcony of the Orchid 6 penthouse, the defendant admitted that "in 24 hours, if pressed" FTX could only "deliver around $5 billion," which left a $8 billion shortfall. (Tr. 1407). Even after this confrontation with Singh, the defendant continued to take FTX customer money and put it into his own investments, which belies his claims that he intended no losses to customers. (Tr. 1417-18).

In his submission, the defendant relies on *United States v. Confredo*, 528 F.3d 143 (2d Cir. 2008), to support his assertion that the Court should credit that the intended loss is zero because he purportedly intended to repay his victims. (Def. Mem. at 23). But in *Confredo*, the Second Circuit was interpreting a special Guideline amendment to U.S.S.G. § 2F1.1, which applied only

to fraudulent loan and contract procurement cases. *Id.* at 150-51. The court's reasoning, therefore, does not apply to this case. And even if *Confredo* applied here, it would mean only that the Court could consider whether there was evidence that the defendant had an intent to repay. *Id.* at 152-53 (remanding to allow defendant to present evidence of his intent). Such evidence would need to take the form of a concrete expectation that the losses would be lower than the potential losses implicated in the scheme, such as the anticipated loan repayments at issue in *Confredo*. Nothing in *Confredo* suggests that intended loss can be reduced based on the defendant's general hope that things would "work out," or his expectation that he could reap personal profits from his investments and then return victim funds before his fraud was discovered. To reduce the intended loss amount on that vague basis would be inconsistent with the Second Circuit's admonition that "where some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from defendant's fraudulent conduct." *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998).

Here, the evidence undermines the defendant's claim that he did not intend any loss. Aside from his own self-serving claims, he cites just two things. The first is a letter from an FTX employee who did not begin directly working with the defendant until around November 7, 2022, and who claims that the defendant was seeking to recover funds for customers after that point in time. (Def. Ex. A-9). But even if the defendant was working to recover funds for customers at that time, those efforts to repay victims took place after his fraud had been exposed, when he had an incentive to reduce his potential liability. It says nothing about his intent when he was engaged in the actual fraudulent conduct in the years prior. Moreover, there is no real evidence that the defendant actually undertook any efforts that facilitated customer recovery during this time.

Notably, the Debtors' counsel in the bankruptcy has never suggested that the defendant provided any significant assistance. And one of the few concrete actions the defendant took during this time period was to file an affidavit attempting to claim personal ownership of the $650 million worth of stock that he had purchased with FTX customer funds, in an apparent effort to prevent the bankruptcy estate from recovering those assets. (Tr. 2710-11; GX-933).

The second item on which the defendant relies is a footnote in the March 2023 FTX Debtors' report, which states that there were a number of deposits into FTX from Alameda in the days immediately prior to the bankruptcy. (Def. Mem. at 23 (citing Def. Ex. G at 18 n.1)).[8] But those returns of funds at the very end could just as well be evidence of the defendant's continuing fraudulent intent, in that the defendant was trying to cover customer withdrawals and reinforce his false public statements that FTX had sufficient funds on hand. Nothing cited by the defendant comes close to countering the overwhelming trial evidence that during the fraud scheme, he intended to deprive customers, investors, and lenders of billions of dollars for his personal benefit. The defendant misappropriated those funds to invest in a variety of speculative assets. Even if he hoped that those investments would prove profitable, enabling him to escape detection for his misuse of victim funds, that is not sufficient to reduce the intended loss calculation.

Based on the trial record, there is ample evidence to establish that at the height of FTX's decline, Bankman-Fried intended to cause in excess of $14 billion of losses to FTX/Alameda victims, which he had no intention of ever *legitimately* repaying.

### B. The Number of Victims Enhancement Is Applicable

Pursuant to Section 2B1.1(b)(2) of the Guidelines, a two-level enhancement is warranted if the offense "involved 10 or more victims" or "resulted in substantial financial hardship to one

---

[8] The defendant's brief erroneously cites Ex. F rather than Ex. G.

or more victims." U.S.S.G. § 2B1.1(b)(2)(A). The PSR concluded that this enhancement applies.

Section 2B1.1(b)(2) also provides that where the offense "resulted in substantial financial hardship to 25 or more victims" a six-level enhancement is warranted. U.S.S.G. § 2B1.1(b)(2)(C). Because the offense resulted in substantial financial harm to more than 25 FTX customers, depriving many of them of their life savings, the six-level enhancement is appropriate. More than 25 victims have submitted letters in which they describe such effects as an inability to make their mortgage payments, inability to support family members, and other severe financial effects from the defendant's fraud, and this is just a small subset of the many thousands of FTX customers who suffered financial hardship as a result of the defendant's fraud.

The defendant objects to any enhancement based on substantial financial hardship to victims, relying on the Sixth Circuit's decision in *United States v. Yagar*, 404 F.3d 967, 971 (6th Cir. 2005), which held that victims who "only temporarily lost funds … because their banks reimbursed them for their losses" were not "victims" under the Guidelines. (Def. Mem. at 30). However, as the defendant acknowledges, the Second Circuit has held that "individuals who have been fully reimbursed for their financial losses may be deemed victims for purposes of the sentencing enhancement set forth at U.S.S.G. § 2B1.1(b)(2)." *Abiodun*, 536 F.3d at 168. Distinguishing *Yagar* as a case where the loss was "short-lived and immediately covered," the Second Circuit explained that the victim enhancement applies where the victims "suffered (1) an adverse effect (2) as a result of the defendant's conduct that (3) can be measured in monetary terms." *Id.* 168-69; *see also United States v. Smith*, 751 F.3d 107, 119 (3d Cir. 2014) (joining the Second, Ninth, and Eleventh Circuits in holding that "individuals who expend time, effort, and money before successfully obtaining reimbursement suffer an actual loss and remain victims under § 2B1.1(b)(2)").

Here, the enhancement plainly applies. None of the victims of the defendant's fraud have received reimbursement. The defendant's argument relies on speculation that *every* victim may someday be made whole through the bankruptcy. But that is not a certainty, and the defendant has not cited any authority for the proposition that the enhancement under Section 2B1.1(b)(2) does not apply when victims may someday be reimbursed. Indeed, this is not a case, as in *Yagar*, where the loss was "short-lived and immediately covered." Rather, as of the sentencing, tens of thousands of victims will still be experiencing losses, despite the time, effort, and in some cases money they have spent seeking to recoup their money or file claims in bankruptcy. By cutting off these victims' access to their life savings for over a year, the defendant has already caused substantial financial hardship to them, even if they receive some measure of reimbursement at some point in the future.

### C. The Bankruptcy Fraud Enhancement Is Applicable

Bankman-Fried objects to the two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(9)(B), which applies to an offense that involved "a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding," *id.* (*See* Def. Mem. at 24). Specifically, he claims that because he did not make any false statements in the bankruptcy proceeding, the enhancement does not apply. (*Id.*). But this enhancement is supported by facts and law.

The defendant directed Wang to transfer assets to regulators in The Bahamas, despite the existence of a U.S. bankruptcy and a directive from attorneys not to do so. Specifically, Wang testified that on November 12, 2022—the day after FTX's bankruptcy—the defendant asked Wang to drive with him to The Bahamas Securities Commission. (Tr. 465). During that drive, the defendant told Wang that "ideally [they] should transfer [customer assets] to the Bahamas liquidators or the Bahamas regulators." (*Id.*). The reason the defendant wanted to transfer FTX assets to Bahamas authorities, as opposed to the U.S. bankruptcy, is because "they seemed friendly

and seemed willing to let [the defendant] stay in control of the company." (Tr. 465-66, 471). Once they got to The Bahamas Securities Commission, the defendant, his father, and his attorney met with the Securities Commission, while Wang waited. (Tr. 466). According to the defendant's attorney, Krystal Rolle, the meeting, which began at noon, went for a little under three hours, and then they left and went back to the FTX offices. (Tr. 2089-90). She did not testify about what was discussed at the meeting. But according to Wang, the defendant said, "the meeting went well," "the securities commission believed … things he told her," and "they were going to order us to transfer the assets … to the Bahamas." (Tr. 466). While the defendant and Wang were driving back to FTX's offices, the defendant said that the "bankruptcy lawyers that had taken over FTX" in the United States were "asking [him] to finish transferring the remaining assets to the U.S., and [the defendant] told [Wang] that [they] should try to stall them." (Tr. 467).

Once Bankman-Fried and Wang got back to FTX's offices, they started working on transferring the assets to the Bahamas authorities. (Tr. 467, 2090). According to Rolle, at some point they were shown an order on a laptop that purported to require the transfer of the assets to the Bahamas authorities. (Tr. 2090). Then, over several hours, until approximately 2 a.m., Wang and the defendant transferred the remaining customer assets to the Bahamas authorities. (Tr. 2098). The process took a while because the Bahamian regulators were struggling to figure out how to do a cryptocurrency transfer. (Tr. 467). While Wang and the defendant were transferring the assets, they received instructions from the U.S. bankruptcy attorneys not to transfer assets to the Bahamian regulators. (*Id.*). Over a Signal chat, the defendant told the U.S. bankruptcy team that The Bahamas Securities Commission was directing them to transfer the assets to them. (GX-543; Tr. 469). Ryne Miller, an attorney for FTX who was working with the U.S. bankruptcy team, instructed Bankman-Fried, who by that time was no longer an executive of FTX, that there was "a

significant question of who owns the assets" and that the defendant "cannot transfer any funds that are the subject of the bankruptcy estate." (GX-543). Miller added, "Before folks transfer to Bahamas, absolutely consult with me and I will bring in the appropriate counsel." (*Id.*). The defendant, however, instructed Wang to "ignore the instructions and continue transferring the funds." (Tr. 470). Ultimately, millions of dollars in assets were transferred.

This evidence established the following facts, which are a basis for this enhancement: (1) the defendant knew about the existence of a bankruptcy proceeding in the United States; (2) he came up with the idea to transfer customer assets to the Bahamian regulators *before* he met with his lawyer or the regulators; (3) his purpose in transferring the assets to them was to curry favor so as to stay in control of the company; (4) he was told by the U.S. bankruptcy team not to transfer assets to the Bahamas without further discussion; and (5) the defendant instructed Wang to ignore the U.S. bankruptcy team and to continue to transfer assets, thereby shielding them from the U.S. bankruptcy process. That is a legally sufficient basis to impose this enhancement. *United States v. Simpson*, 796 F.3d 548, 555 (5th Cir. 2015) (affirming application of the § 2B1.1(b)(9)(B) enhancement where the defendant "transferred" assets to a third party "with the intent of shielding … assets from creditors"). The enhancement need not be premised exclusively on making a false statement in a bankruptcy proceeding or violating a court order. The defendant has cited no law cabining the enhancement to such a narrow set of facts.

**D. The "Relocating," "Outside the United States," or "Sophisticated Means" Enhancement Applies**

The defendant objects, based on his own trial testimony, to the recommendation in the PSR that a two-level enhancement applies for locating FTX outside of the United States. (Def. Mem. at 24). There is no merit to this objection.

Pursuant to Section 2B1.1(b)(10)(C) of the Guidelines, a two-level enhancement is warranted if (a) "the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials," (b) "a substantial part of a fraudulent scheme was committed from outside the United States," or (c) the offense "involved sophisticated means." U.S.S.G. § 2B1.1(b)(10). The "relocating" enhancement is appropriate where the defendant "moved his scheme … in an effort to avoid detection." *Warner v. United States*, 21 F. App'x 43, 46 (2d Cir. 2001). A two-level increase is appropriate based on each of these bases for the enhancement. The defendant relocated FTX and Alameda outside of the United States in part to take advantage of the more permissive regulatory environment that allowed FTX.com to offer cryptocurrency derivative products that are not lawful to sell as a U.S.-based company offering its products to U.S. retail customers without an appropriate license from the CFTC. (*Accord* GX-913 (defendant's testimony before the U.S. House seeking to "work with the Commodity Futures Trading Commission" so that FTX US could offer margined derivative products to U.S. customers)).

In any event, the defendant does not dispute that a substantial part of the fraudulent scheme was committed from outside the United States, and that the offense otherwise involved sophisticated means. Both are plainly true. Therefore, the enhancement pursuant to U.S.S.G. § 2B1.1(b)(10) applies. *See* U.S.S.G. § 2B1.1 cmt n.9(B) ("Conduct such as hiding assets or transactions, or both, through the use of fictious entities, corporate shells, or offshore financial

accounts" can be "sophisticated means," as can an "especially complex or especially intricate offense").

### E.   The Enhancement for Deriving More Than $ Million in Gross Receipts From a Financial Institution Is Applicable

The defendant argues against application of the two-level enhancement for obtaining more than $1 million in gross receipts from a financial institution as a result of the offense. (Def. Mem. at 25). His argument appears to be that Silvergate Bank, which opened accounts for the defendant in the names of Alameda and North Dimension, may have transmitted more than $1 million in gross receipts, but it did not suffer any losses. But that argument lacks merit. First, Silvergate Bank's financial soundness was in fact affected by the defendant's conduct. Second, the defendant derived more than $1,000,000 from multiple other financial institutions, and his false statements to Silvergate Bank are not the sole basis for this enhancement.

Pursuant to Section 2B1.1(b)(17)(A) of the Guidelines, a two-level enhancement is warranted if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." U.S.S.G. § 2B1.1(b)(17)(A). The defendant argues that Silvergate Bank was a mere conduit for his receipt of fraud proceeds, and that this enhancement only applies where the financial institution "is the source of funds involved in the offense and suffers some loss." (Def. Mem. at 25 (citing *United States v. Huggins*, 844 F.3d 118, 122-23 (2d Cir. 2016))). But this case is distinguishable from *Huggins*. First, unlike the bank accounts at issue in *Huggins*, the Silvergate bank account here was not merely a "conduit" for the fraud. Rather, the defendant here made affirmative misrepresentations to Silvergate Bank to induce it to open a bank account that was an essential component of the fraudulent scheme. That account ultimately processed billions of dollars' worth of transactions and put the bank's "financial safety and soundness at risk." *Huggins*, 844 F.3d at 123. Indeed, Silvergate Bank declared insolvency in

March 2023, just a few months after the collapse of FTX, in significant part because the defendant's misrepresentations exposed the bank to risks it might not have otherwise taken on. *See* Recent Bank Failures and the Federal Regulatory Response, Hearing Before the Committee on Banking, Housing, and Urban Affairs, 118th Cong (Mar. 27, 2023) (Statement of FDIC Chairman Martin J. Gruenberg) (FTX's bankruptcy led to additional "outflows of deposits from digital asset customers" which in turn "caused Silvergate Bank to sell debt securities to cover deposit withdrawals, resulting in a net earnings loss of $1 billion," and its subsequent bankruptcy).

However, the Court does not need to reach the question of whether the enhancement applies to the conduct directed at Silvergate Bank because there is no real dispute that the defendant defrauded multiple other financial institutions as that term is defined in the Guidelines. The definition of "financial institution" includes any "investment company," "union or employee pension fund," and "brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission." U.S.S.G. § 2B1.1 Application Note 1. The defendant defrauded multiple victims who fit into these categories of more than $1 million. That includes investment companies, such as BlackRock, and an international pension fund, which were equity investors in FTX and were defrauded by the defendant's securities fraud. *See, e.g.*, BlackRock Private Investment Fund Registration Statement, www.sec.gov/Archives/edgar/data/1816389/00011931 2520184172/d945449dn2.htm (noting the company's registration under the Investment Company Act of 1940).

This enhancement also applies because BlockFi was an investment company. BlockFi reached a settlement with the SEC in 2022 acknowledging that it was required to be so registered, and agreeing to pursue registration as an investment company. BlockFi was also a victim of the defendant's fraud as both a lender to Alameda and a customer of FTX, and its CEO testified at

trial regarding the fact that BlockFi lost approximately $650 million due to the defendant's fraud, which is significantly more than what is required for the enhancement. (Tr. 1164-65).

Accordingly, the defendant derived more than $1,000,000 in gross receipts from financial institutions and the enhancement applies.

### F.  The Enhancement for Abuse of Trust Is Applicable

The defendant objects to the two-level enhancement for abuse of a position of public or private trust. (Def. Mem. at 25-26). A defendant's offense level is increased by two levels pursuant to Section 3B1.3(a) of the Guidelines "[i]f the defendant abused a position of public or private trust … in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. "A position of trust 'is held by one who was accorded discretion by the victim and abused a position of fiduciary or quasi-fiduciary status.'" *United States v. Lebedev*, 932 F.3d 40, 57 (2d Cir. 2019) (quoting *Huggins*, 844 F.3d at 124). The enhancement applies, for example, "in the case of an embezzlement of a client's funds by an attorney serving as a guardian" or "a bank executive's fraudulent loan scheme." U.S.S.G. § 3B1.3, cmt. 1. Indeed, courts routinely apply the abuse of trust enhancement when a defendant embezzles customer or client funds. *See, e.g.*, *United States v. Friedberg*, 558 F.3d 131, 133-35 (2d Cir. 2009) (enhancement appropriate where secretary of fraternal order embezzled organization's funds); *United States v. Christiansen*, 958 F.2d 285, 288 (9th Cir. 1992) (enhancement appropriate where credit union manager embezzled funds).

The evidence at trial established that FTX's customers entrusted their money to the defendant's care (through FTX) with the understanding—based on the defendant's representations and conduct—that the assets in the defendant's care belonged to them and would be held safely for their benefit. The defendant's embezzlement and misappropriation of customers' funds in

connection with the wire fraud scheme therefore abused the trust of those customers. Arguing otherwise, the defendant asserts that he was in a "purely arm's-length contractual relationship." (Def. Mem. at 25). The trial evidence proved the contrary—as the jury concluded. Can Sun, an attorney at FTX, testified that "customer assets [were] held in trust," meaning "that you hold them, that you are not the beneficial owner of them, and you are holding it for the benefit of someone else; in this case, customers." (Tr. 1941). The FTX customers who testified similarly stated that they believed their assets were being held in trust—in other words, a fiduciary-like relationship existed. (Tr. 80-81, 1289-90). The same can be inferred from FTX's policies that existed at the time. (GX-340; GX-558). Indeed, FTX policy documents shared with FTX customers stated that "customer assets are held in trust." (GX-513).

To support his argument that there was no fiduciary-like relationship—a conclusion contrary to the jury's verdict—the defendant cites FTX's terms of service (GX-558), highlighting language disclaiming the existence of a fiduciary relationship. But *Huggins* instructs that the existence of a fiduciary relationship should be assessed from the standpoint of the victim, not by what is in the terms of service, which victims may not have (and indeed in some cases did not) read. Furthermore, the general disclaimer of a fiduciary relationship in a portion of the terms of service does not eliminate such a relationship. *See United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017).

Accordingly, the defendant's objection should be denied.

### G. The Enhancement for Obstruction of Justice Is Warranted

Section 3C1.1 of the Sentencing Guidelines mandates a two-level increase in a defendant's offense level "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing

of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1. Examples of covered conduct include "intimidating, or otherwise unlawfully influencing a … witness," "committing … perjury," or "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation." U.S.S.G. § 3C1.1 cmt. n. 4. The enhancement applies not just to obstructive conduct that "occurred with respect to the investigation," but also obstructive conduct "that occurred prior to the start of the investigation of the instant offense of conviction … if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1 cmt. n. 1.

There are three bases for this enhancement, all discussed above: the defendant's instruction that employees should implement the auto-deletion of messages; the defendant's witness tampering; and the defendant's perjury at trial.

The defendant objects to the statements in the PSR that he instructed employees to auto-delete messages and that he tampered with witnesses. (Def. Mem. at 26). However, the factual record is clear on his instructions to destroy evidence, and this Court has already made factual findings relating to the defendant's witness tamping—each set of facts would alone be sufficient for this enhancement to apply.

That said, because it is also relevant to the application of the Section 3553(a) factors, the Government respectfully submits that the Court should make factual findings at sentencing regarding the defendant's perjury during trial. "'A witness testifying under oath or affirmation violates' 18 U.S.C. § 1621, the federal perjury statute, 'if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of

confusion, mistake, or faulty memory.'" *United States v. Norman*, 776 F.3d 67, 84 (2d Cir. 2015) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94, 113 (1993)). The Guidelines enhancement for obstruction of justice may be based on a defendant committing perjury. U.S.S.G. § 3C1.1, cmt. n. 4(b); *see also United States v. Ben-Shimon*, 249 F.3d 98, 102 (2d Cir. 2001) ("an enhancement for obstruction of justice based on perjured testimony may be imposed only where the sentencing court finds 'that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter'" (quoting *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997))). Where, as here, "a defendant objects to a sentence enhancement resulting from [his] trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction of, justice, or an attempt to do the same, under th[is] perjury definition.'" *Id.* (quoting *Dunnigan*, 507 U.S. at 95). As the Second Circuit explained in *Norman*, the Supreme Court in *Dunnigan* held that the enhancement was sufficiently supported where the sentencing court found that the defendant was "untruthful at trial with respect to material matters in the case and that her false testimony was designed to substantially affect the outcome of the case." 776 F.3d at 84 (internal quotation marks, citation, and emphases omitted).

Like the defendant in *Norman*—where the Second Circuit affirmed application of the obstruction enhancement for perjurious trial testimony—Bankman-Fried gave untruthful testimony that was designed to affect the outcome of the case. And as in *Norman*, this Court should not credit Bankman-Fried's testimony "in the face of other evidence that revealed his mendacity," including the testimony of three cooperating witnesses that Bankman-Fried watched during trial. Most egregious was Bankman-Fried's willfully dishonest testimony that, until the fall of 2022, he had no knowledge that Alameda had spent FTX customer deposits. The evidence at trial

established that he set up Alameda bank accounts to receive and spend FTX customer dollar deposits and that he oversaw changes to FTX's codebase that enabled Alameda to spend FTX cryptocurrency deposits. The evidence was also overwhelming that he approved Alameda spending billions of dollars of FTX customer money to pay its expenses and debts, and was aware that Alameda secretly owed FTX customers billions of dollars as a result.

Bankman-Fried's minimization and false explanations concerning such conduct was pervasive during his testimony. As one example, he claimed that he first learned that Alameda had a roughly $8 billion fiat liability to FTX in October 2022. (Tr. 2523-24). That was a lie, as is evidenced by the testimony of Yedidia, Ellison, Wang, and Singh, all of whom testified that they discussed Alameda's fiat liability to FTX with Bankman-Fried months earlier. (Tr. 167, 173-74, 436-37, 439-40, 619-20, 769-71, 1346, 1348, 1359; GX-50). The documentary evidence also proved that Bankman-Fried was not telling the truth during his testimony. Government Exhibit 50, for example, a June 2022 spreadsheet which was viewed by the defendant, showed a roughly $11 billion fiat liability owed by Alameda to FTX. (GX-50).

Because Bankman-Fried deliberately lied on the stand, his argument that the obstruction enhancement sometimes does not apply to false testimony is misplaced. To be sure, U.S.S.G. § 3C1.1 points out that the "provision is not intended to punish a defendant for the exercise of a constitutional right" and that "[i]n applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory…." U.S.S.G. § 3C1.1, cmt. n. 2. Bankman-Fried's repeated and brazen lies about the core misconduct in this case cannot be chalked up to confusion or faulty memory. He committed himself to parts of his false story prior to his indictment, at a time when he thought most incriminating documents (such as his messages

with coconspirators) had been deleted and before he knew that the Government was able to recover metadata that showed he accessed several incriminating spreadsheets. Additionally, as the Court certainly observed during the defendant's testimony, body language, decision to look away during certain questions, and non-responsiveness to answers all demonstrate concerted acts of evasiveness, not simply a failure of memory.

The defendant's willful dishonesty is also clear from his elaborate contortions to marry up his false testimony with the Government's inculpatory documentary evidence. An example is his testimony about the spreadsheet that Ellison shared with him showing seven alternative balance sheets that they could send to Alameda's lenders to conceal its true financial picture. (GX-44). Because there was metadata showing that Bankman-Fried had accessed the document, he was unable to testify that he had never seen the document before. So instead, he lied and claimed that while he may have seen part of the spreadsheet, he only saw one tab of it, which by chance was the version sent to lenders. (Tr. 2732). The gymnastics that Bankman-Fried had to perform to explain the evidence proves that his false testimony was not the product of confusion, mistake, or faulty memory.

Accordingly, for each of the reasons set forth above, imposition of the obstruction enhancement is warranted.

## III.    The Guidelines Do Not Overstate the Seriousness of the Offense

Bankman-Fried argues that the fraud Guidelines are not based on empirical evidence and "substantially overstate the seriousness of the offense." (Def. Mem. at 28). This argument is misguided for several reasons: the current fraud Guideline is the result of extensive and iterative work by the Sentencing Commission, and is based on sound policy choices, and even if the fraud

Guidelines were overly reliant on loss as a general matter—a point the Government does not concede—they are an appropriate measure of the seriousness of the offense in this case.

"One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008). "[T]he sentencing guidelines sought to address the inequities of prior sentencing practices that tended to punish white collar economic crimes less severely than other comparable blue collar offenses." *Fishman*, 631 F. Supp. 2d at 403. Over a five-year period between 1996 and 2001, the Commission engaged in a deliberative process to address the Guidelines' treatment of white-collar offenses, with the involvement of relevant stakeholders including the defense bar, the Department of Justice, probation officers, and the U.S. Judicial Conference. *See* Federal Register Notice BAC2210-40, 62 Fed. Reg. 152, 171-74 (1997) (proposals by the Commission for comment regarding economic crime sentencing reform). The Commission explained that the resulting amendments, which became effective on November 1, 2001, were based on the determination that "loss serves as a measure of the seriousness of the offense and the defendant's relative culpability." Sentencing Guidelines for the United States Courts, 66 Fed. Reg. 30,512, 30,533 (June 6, 2001). Thus, the 2001 amendments to Section 2B1.1 reflected the considered view of the Commission, following a collaborative process with relevant stakeholders, that loss amount should be a central consideration in determining the seriousness of an offense to which that Guideline applies. Indeed, "[e]ven if the enhancements may lack robust empirical support related to deterrence, they have foundations in empirical data and national experience related to the goals of fair sentencing and retribution." *United States v. Moose*, 893 F.3d 951, 958 (7th Cir. 2018).

In 2002, following major corporate fraud at Enron, WorldCom, and Adelphia, Congress instructed the Commission to amend the Guidelines for white-collar crime again, this time as part of the Sarbanes-Oxley Act, and in response the Commission amended the modified loss-amount enhancement in Section 2B1.1 for high-loss cases — that is, cases involving loss amounts in excess of $200 million. *See* U.S. Sentencing Comm'n, Emergency Guidelines Amendments, 15 Fed. Sentencing Reporter 281, 283 (Apr. 1, 2003) ("[T]he amendment expands the loss table at §2B1.1(b)(1) to punish adequately offenses that cause catastrophic losses of magnitudes previously unforeseen, such as the serious corporate scandals that gave rise to several portions of the Act."), *available at* 2003 WL 22016909. Thus, to the extent Section 2B1.1 emphasizes loss amount to the degree it does, that was an intentional decision by the Commission based on years of consideration and guidance from Congress. *See Ebbers*, 458 F.3d at 129 ("[T]he Guidelines reflect Congress's judgment as to the appropriate national policy for [white collar] crimes."). The few district court opinions cited by Bankman-Fried seem not to have considered the Commission and legislative history. *See, e.g.*, *United States v. Johnson*, No. 16 Cr. 457 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (cited by Bankman-Fried for the incorrect proposition that "as far as [that] court can tell" the loss guidelines were not the "result from any reasoned determination").

The defendant's argument otherwise draws on language from Judge Rakoff's decision in *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), Judge Block's decision in *United States v. Parris*, 573 F. Supp. 2d 744, 753 (E.D.N.Y. 2008), and Judge Underhill's concurrence in *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013), which quotes from *Adelson*. All of those cases involved extremely lengthy sentencing ranges recommended by the Sentencing Guidelines for defendants who personally had no participation in causing any actual

loss. For example, "Adelson was not the originator of the fraud, and, as the jury found in effect, Adelson did not participate in the fraudulent conspiracy until its final months," during which time the company's "stock was not further inflated." *Adelson,* 441 F. Supp. 2d at 513. In other words, "Adelson was closer (though not identical) to an accessory after the fact." *Id.* As a result, Judge Rakoff recognized that the Guidelines range of 85 years in prison could not account for the nuanced way in which the defendant participated in the scheme and resulted in a patently unjust advisory sentencing range. *Id.* Even after taking that factor into account, though, Judge Rakoff noted the importance of considering general deterrence in financial-fraud cases and imposed a three-and-a-half-year sentence: "notwithstanding all the mitigating factors outlined above, meaningful prison time was necessary to achieve retribution and general deterrence." *Id.* at 514. *Adelson* thus advocates implementing a meaningful custodial sentence in fraud cases, even when "it was undisputed at the time of sentencing that [a defendant's] past history was exemplary." *Id.* at 513.

In *Parris*, the defendants were engaged in a two-month "pump and dump" scheme in the penny stock market that resulted in approximately $2,500,000 in losses among hundreds of victims who traded the stock. 573 F. Supp. 2d at 746-49. As a result of their brief penny-stock fraud, even with no criminal history, the defendants faced an advisory Guidelines range starting at 30 years' imprisonment. Judge Block found this crime with that Guidelines range "not of the same character and magnitude as the securities-fraud prosecutions of those who have been responsible for wreaking unimaginable losses on major corporations." *Id.* at 746. The district court asked the government and the defendants to provide the court with a compendium of factually analogous cases nationally. *Id.* at 751-52. After considering those cases, the court ultimately sentenced the defendants to 60 months' imprisonment.

*Corsey* presented a similarly unusual situation warranting a variance. In *Corsey*, the defendants were prosecuted for trying to carry out an outlandish scheme against, what turned out to be, an FBI informant. "This was a clumsy, almost comical, conspiracy to defraud a nonexistent investor of three billion dollars. That scheme never came close to fruition." *Corsey*, 723 F.3d at 378. "This scheme amounted to a series of absurd lies piled on top of even more absurd lies." *Id*. at 379. However, the defendants in *Corsey* immediately faced a Guidelines calculation that was above the statutory maximum of 20 years and close to life in prison. It is in this context that Judge Underhill, in a concurring opinion, found the Guidelines to be of "low marginal value" for the case at hand. But he did not say the guidelines were always of such little import. In fact, Underhill quoted *Adelson* in holding that in other instances, the Guidelines are "of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable." *Id*. at 380.

Whatever merit there is to the argument that the Guidelines overstate the seriousness of the offense generally, this case is a particularly poor vehicle through which to make it. While reasonable minds can disagree about the precise workings of the fraud Guidelines and whether they are unduly driven by loss, no one would argue that the size and scope of a financial fraud should be unrelated to the resulting sentence. It stands to reason that a defendant who engages in a longer, bigger fraud involving more victims should be punished more harshly than a defendant who engages in a short-term scheme (as in *Parris*), only joins the scheme late (as in *Adelson*), or does not harm real victims (as in *Corsey*). Here, by any measure, the defendant's crime was historic. By dollars, the loss amount was at least twenty times the top of the Guidelines range. And this was not merely the "loss amount," it was the amount of money actually stolen from customers and lenders. Thus, this case is unlike the fraud in *Adelson* and other securities fraud cases, where

the "ordinary measure of loss" is "the decline in the price of stock when the fraud is revealed." 441 F. Supp. 2d at 506.

Here, by contrast, the loss is simply the amount of money that the defendant stole from his victims as of the time that the fraud collapsed. In other words, Bankman-Fried fixed his own Guidelines range by misappropriating billions of dollars. Indeed, the Guidelines commentary suggests that in a case like this one, an *upwards* departure may be appropriate (although that is not what the Government seeks here). *See* U.S.S.G. § 2B1.1, cmt. n. 21(A) (upwards departure may be appropriate where the "offense caused or risked substantial non-monetary harm," such as "psychological harm, or severe emotional trauma," or where the "offense created a risk of substantial loss beyond the loss determined for purposes of subsection (b)(1), such as a risk of significant disruption of a national financial market").

## A SENTENCE OF 40 TO 50 YEARS' IMPRISONMENT IS NECESSARY

A criminal sentence must be crafted, among other things, to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and deter future criminal conduct. *See* 18 U.S.C. § 3553(a)(2). The "starting point" in making any sentencing determination, however, remains the United States Sentencing Guidelines. *Gall v. United States*, 552 U.S. 38, 49 (2007). In this case, the breadth and depth of the defendant's misconduct is reflected in an offense level beyond the highest level for which the Guidelines provide an advisory range, resulting in an advisory Guidelines sentence equal to the combined statutory maximum sentences for the defendant's crimes of conviction. *See* U.S.S.G. § 5G1.2(d).

Applying the Guidelines and taking into account all of the factors set forth in 18 U.S.C. § 3553(a), as fully set forth below, a sentence of 40 to 50 years' imprisonment—though one that will permit the defendant to return to liberty after society can be assured that he will not have the

opportunity to turn back to fraud and deceit—is necessary to reflect the seriousness of the defendant's crimes, to promote respect for the law, to provide just punishment for the defendant's grievous criminal conduct, to adequately deter criminal conduct, and to protect the public from further crimes of the defendant.

Bankman-Fried's crimes were serious and long-running, causing billions of dollars in losses and significant harm to tens of thousands of victims financially and emotionally. The sheer enormity of the loss in this case, and the fact that the loss came in the form of stealing of victims' money, puts Bankman-Fried in a category of defendants where sentences of forty years or more is appropriate. In some cases, like those of Bernard Madoff and Allen Stanford, a defendant's theft of billions of dollars has necessitated a sentence of 100 years or more. And in some respects, such a sentence here would serve the interests of justice and deterrence because of the extraordinary nature of the defendant's criminal conduct. But at the same time, given the defendant's age relative to other defendants who have committed enormous frauds, a life sentence (or a sentence that is effectively a life sentence) is greater than necessary to comply with the purposes of Section 3553(a). The Government is not asking the Court to impose a life sentence.

The aims of sentencing would not be served, however, by the defendant's proposed sentence. The facts and circumstances of this case do not bear any material resemblance to those of the Michael Milken prosecution. A sentence of 6 years, as the defendant proposes, would be woefully inadequate to satisfy the purposes of sentencing, and would send the wrong message to the defendant, to others considering committing fraud, to victims, and to society at large.

## I.     The Nature, Circumstances, and Seriousness of the Offense Warrant a Very Significant Sentence

The nature and circumstances of the defendant's crimes are extraordinarily serious. Bankman-Fried implemented, perpetuated, and concealed a multi-billion-dollar fraud scheme that

victimized tens of thousands of victims—a fraud in which FTX's customers and investors, and Alameda's lenders suffered actual losses of at least $10 billion. For many reasons, the defendant's serious crimes call for severe punishment: (1) he aggregate losses to tens of thousands of victims worldwide were over $10 billion, with each of the defendant's frauds—on customers, investors, and lenders—alone involving losses that exceeded the top of the loss table in the Guidelines; (2) the crimes were ongoing, complex, and involved systematic deception over a period of years; (3) the losses suffered by victims were severe and life changing, and had significant collateral consequences to them; (4) the defendant's criminality was pervasive, as evidenced not just by his crimes of conviction, but by the fact that he committed several other significant crimes while running FTX; (5) as evidenced by his witness tampering and perjury, the defendant did not cease his criminal conduct after being arrested; and (6) at no point has the defendant accepted responsibility for his crimes. Each of these elements of the defendant's criminal conduct bear on the seriousness of the offense and warrant the imposition of a very severe sentence.

First, the sheer scale of Bankman-Fried's fraud calls for severe punishment. The amount of loss—at least $10 billion—makes this one of the largest financial frauds of all time. Indeed, there does not appear to have been such a fraud of this magnitude—measured by loss—prosecuted in this country, let alone in this District, since the prosecution of Bernie Madoff. While the Madoff fraud resulted in a larger financial loss to investors, Bankman-Fried's fraud affected tens of thousands of victims all over the world. There is no fraud that is equivalent in the loss amount attributable to the fraud, the number of victims, and its geographic reach. The fraud on FTX's customers alone was approximately seven times the top of the loss table in the Guidelines. The fraud on FTX's investors, likewise, is nearly double the top figure in the loss table. The same is

true for the fraud on Alameda's lenders. Any one of these frauds, based on actual losses alone, would be a basis to impose a sentence at the top of the applicable Guidelines.

And the way in which the losses occurred here are significant. While there have been a few cases where the amount of loss exceeds a billion dollars, in many of those cases the loss stems from lost share value attributable to accounting fraud or other corporate malfeasance. But here, the loss occurred by theft directly from the victims. Every dollar stolen from customers was taken out of their deposits on FTX and went into the defendant's (or his companies') pockets. The crimes were personal to the customers, both small and large, to whom the defendant owed a fiduciary duty. The severity of the sentence must reflect the largely unprecedented direct losses that the defendant caused millions of victims, and his wholesale breach of duty further warrants the stiffest of punishments.

Second, the severity of the defendant's crimes is further amplified by the fact that they were long-running, not the product of a momentary lapse of judgement, and complex and highly orchestrated. Not long after the founding of FTX, the defendant instructed Wang to start giving Alameda special privileges that would allow it to borrow from other customers and incur a negative balance. The defendant began using those special privileges to give Alameda preferential treatment on FTX, all so that Alameda could profit at customers' expense. And while customers did not realize at the time that their money was being used, or that the defendant's public statements were false, that does not diminish the seriousness of the defendant's conduct.

The defendant's crimes were not a one-time event arising, for example, from a split-second decision made under financial duress or momentary bad judgment. Rather, Bankman-Fried's crimes were the product of a series of decisions made over the course of years, and it was within his power to stop his crimes at any point in time. That was made apparent through the trial

testimony of his co-conspirators. Over and over again the defendant was confronted with the fact that he was using customer funds. That happened when he wanted to buy back shares from Binance; when he wanted to make new venture investments in 2021 and early 2022; when he sought to repay lenders in June 2022; when was confronted again with the reality of the deficit in September 2022; and even in November 2022 when he tweeted falsely that everything was fine. And on every one of those occasions, and during all the time in between, the defendant continued with his fraudulent scheme. On this score, the testimony of Ellison and Singh is particularly telling. In 2021, the defendant asked Ellison to determine whether he could spend billions of dollars on new venture investments. She did the math, determined it was unwise and could spell billions in losses, that it would necessitate using billions of dollars in customer funds in the event of a market downturn, warned the defendant against going down that road, and yet he proceeded anyway. When Bankman-Fried went headfirst into new, risky spending using customer money, he knew exactly what he was doing; as he wrote to Ellison: it "could get worse." (GX-49A). And when it had gotten much worse in September 2022, Singh confronted the defendant on the balcony of their penthouse about the nearly $14 billion deficit in customer funds, telling him that his stress about the fraud was "doing a lot [of] damage to [him]." (Tr. 1407). Bankman-Fried at the time conceded that it had been "taxing" him some, but he did not cease the fraud, rather he continued to spend money and perpetrate the scheme against his victims. (*Id.*). At all times, it was within the defendant's power to stop the entire fraud. He chose not to do so.

The crimes were exceedingly complex, reflecting meticulous orchestration, sophisticated maneuvering, and cunning deception. Take, for example, the defendant's fraud on FTX's customers. In order to perpetrate it, he had Wang implement secret privileges into FTX's code, he created a new shell company (North Dimension) to receive payments, he used loan agreements

and round-trip transactions to conceal money movements, he even had Wang create a fake "insurance fund" number on FTX's website to make it appear there was security for customers' deposits. He also went to great lengths to dupe investors. He instructed Singh to create backdated transactions in FTX's transaction database to falsely create revenue for the company, and then created a backdated contract to paper that transaction. And when it came to Alameda's lenders, he told Ellison to make seven alternative versions of the firm's balance sheet so that he could select which best concealed the fact that he had been stealing billions of dollars through the company. Each of these elaborately deceptive acts reflects a deliberateness and cunning to the defendant's crimes that go directly to the seriousness of the offense.

Third, Bankman-Fried's crimes are extremely serious because of their profound effect on the victims. References to the victims' enormous losses simply do not capture the harm the defendant inflicted. To the extent there has been any suggestion that the victims of the defendant's crimes were cryptocurrency gamblers who had money to spend and could tolerate their losses, that is simply wrong. For one, when customers like Julliard deposited money on FTX to buy Bitcoin, they assumed the risk that Bitcoin prices might rise and fall, not that the defendant would make speculative bets with their deposits. The enormity of the defendant's fraud—and the way he casually treated billions of dollars entrusted to him as his personal supply—should not drown out the individual harm suffered by many people of far more limited means who were seduced by the defendant's representations of trustworthiness and security. Examining even a handful of emails and statements by victims of Bankman-Fried's fraud paints a bleak picture of the terrible impact the defendant's crimes had on thousands of people. As these statements demonstrate, the conspiracy perpetrated through FTX by the defendant and others wiped out the resources of many families—resources that, in some instances, represented hard work and life savings. In the days

following the crash, the defendant himself received thousands of messages from victims through Twitter and email; and since then, the Government and the bankruptcy estate have continued to hear from individuals who lost money. Here are some examples:

- A victim who lost his "entire life savings" because he "entrusted [his] savings to FTX.com," "not to buy or sell crypto, but to take advantage of the interest-bearing savings account" on FTX. The financial loss to this victim "has been devastating" and has "significantly impacted [his] ability to achieve financial stability and [has] caused immense stress and anxiety." (Victim Impact Statement No. 6, dated March 6, 2024).

- A victim who deposited money on FTX that she "received as compensation for a car crash that left [her] disfigured when [she] was 19 years old." She "kept this money 'untouched' for 30 years because [she] thought they could be the only way to give [her] an old age with dignity." After the victim's money was taken by the defendant, she went through a "devastating period," during which she became "very depressed, coping with suicidal thoughts and obliging [her] partner to a life beyond miserable." (Victim Impact Statement No. 15, dated March 8, 2024).

- A victim who "lost most of [his] savings" on FTX who wrote that "what kills me from inside is the same, disappointment and sadness I have to share with my wife; I am ashamed of myself when I have to look at my kids." (Ex. A, victim direct message dated November 8, 2022).

- A victim who wrote: "I am writing to you not just as a victim of financial fraud, but as a human being whose life has been profoundly disrupted and whose dreams have been put on hold due to the collapse of FTX and the actions of Samuel Bankman-Fried…. The collapse of FTX … [has] not only resulted in a substantial financial loss but also inflicted deep psychological scars…. Weigh not only the financial discrepancies but the human cost of his actions. We, the victims, are not abstract entities represented by figures in a bankruptcy filing; we are individuals whose lives have been irrevocably altered." (Victim Impact Statement No. 29, dated March 10, 2024).

- A victim who wrote: "the callous disregard for the well-being of victims displayed by FTX and Sam Bankman-Fried exacerbates the emotional toll of this ordeal. To have one's trust violated in such a flagrant manner by entities entrusted with safeguarding assets is a betrayal that cuts deep and leaves scars that may never fully heal." (Victim Impact Statement No. 13, dated March 9, 2024).

- A victim who put $250,000 on FTX and "hoped to use that money for [his] brother, who has a disability and need[ed] [his] help." (Ex. A, victim direct message dated November 9, 2022).

- A victim who had "been working hard to slowly build [his] account up for years" and then lost his "entire life savings." He wrote, "Trusting you and FTX ruined an entire

life's worth of hard work. I'm not some kid in my 20s… I can't just start over. Beyond devastated." (Ex. A, victim direct message dated November 9, 2022).

- A victim who wrote that the financial loss he experienced from FTX "has had a profound impact on [his] health and personal well-being. The stress and anxiety caused by the uncertainty of recovering [his] assets have taken a toll on [his] mental health. [He has] experienced sleep disturbances, loss of appetite, and heightened levels of anxiety, which have significantly impacted [his] ability to function on a daily basis. Furthermore, the financial strain resulting from this loss caused significant person problems, including difficulty in meeting financial obligations, strained relationships, and a sense of hopelessness about the future." (Victim Impact Statement No. 16, dated March 9, 2024).

- A victim who described herself as "a single mom struggling" who "lost [her] life savings" as a result of the collapse of FTX. (Ex. A, victim direct message dated November 9, 2022).

- A victim who "trusted FTX" and had "almost all of [his] savings" on the exchange. The money, which the victim described as "not a small amount" but "insignificant" to the defendant "was money that could have brought [his] family a better life, and it is now money [he] can't remove." (Ex. A, victim direct message dated November 9, 2022).

- A victim living in Africa who accumulated 3 bitcoins as his "family savings," all of which was "hard earned to break the generational poverty." The victim wrote, "Now you have swooped in and stolen all of this…. You have single-handedly broken a self-made opportunity…. You ruin[ed] the precious life of so many people, and your own, for what? (Ex. A, victim direct message dated November 9, 2022).

- A victim who wrote: "The financial loss we incurred was significant—not just in monetary terms, but in the stability it provided our family. We were brought to the brink of losing our home, struggling to meet mortgage payments and maintain a semblance of normalcy for our child. The psychological strain of this situation cannot be overstated. My relationship with my spouse suffered, creating tensions that, to this day, we are working to overcome. The pressure and hopelessness of our predicament led me to entertain thoughts of suicide, marking the darkest period of my life. This ordeal was not simply a financial setback; it was a threat to the very foundation of my family and my own existence." (Victim Impact Statement No. 23, dated March 10, 2024).

- A victim living in Argentina who "trusted [the defendant's] company with 100k." The victim wrote that "[t]his is a big part of my family savings! I have a son with autism disorder. Life is not easy to us." (Ex. A, victim direct message dated November 9, 2022).

- A victim who had USDT (tether stablecoin) on FTX "for [his] XMAS presents." He was not trading on FTX, just holding the tokens. According to the victim, as a result of the loss he would need to tell "his children they can't have Christmas presents this year." (Ex. A, victim direct message dated November 9, 2022).

- A victim who "left Ukraine during the war" and "lived in [a] basement for 14 days" with his child while his "house was destroyed by a bomb." The victim wrote: "We lost everything in Ukraine and I sent my savings to FTX." (Ex. A, victim direct message dated November 10, 2022).

- A victim in Nigeria who had "nearly every penny to his name" on FTX because the "banking system in Nigeria is not safe" and now does not have access to "the money to support his siblings and new wife," as well as money he had "earmarked … for a trip to Canada where he intended to study at university."[9]

- A victim who wrote: "I have a huge chunk of my family's savings stuck on FTX…. The $200k I have stuck represents everything I was hoping to invest for my 2 young kids and their future." (Ex. A, victim direct message dated November 10, 2022).

- A victim who wrote: "I am about to get married. I won't be able to survive, those were my life's earnings 100%. I got nothing left." (Ex. A, victim direct message dated November 10, 2022).

- A victim from France who "in one day … lost everything [he] had invested in one year" and as a result "canceled holidays" with his son, has to be "careful about what [they] spend," and is "in the red with [his] bank."[10]

- A victim who wrote: "I beg you to let me withdraw some of my funds please… it's my family's life saving and I'm having a kid next year I really need that money back... I'm hopeless right now and I can't end my life because my wife and my unborn still needs me." (Ex. A, victim direct message dated November 10, 2022).

- A victim who wrote: "I'm literally ruined because of this crash. I'm a[] working man on a[n] average salary and was doing so well. You big guys in crypto always win and the smaller guys lose everything." (Ex. A, victim direct message dated November 11, 2022).

---

[9] The Block, *Pissed, Pessimistic and Paranoid, FTX Clients Face New Reality: 'It's All Gone'* (Nov. 14, 2022), https://www.theblock.co/post/186520/pissed-pessimistic-and-paranoid-ftx-clients-panic-money-likely-gone.

[10] RFI (France), *What Next for French Victims of the FTX Cryptocurrency Exchange Collapse* (Jan. 21, 2023), https://www.rfi.fr/en/france/20230121-what-next-for-french-victims-of-the-ftx-cryptocurrency-exchange-collapse.

- A victim who wrote: "Lost my life savings. Don't know how I'm going to pay for my family anymore. Was hoping to save and take my grandma on vacation before she gets too old to travel. Pay her home off later. A dream and future destroyed…. This is heartbreaking for me." (Ex. A, victim direct message dated November 11, 2022).

- A victim who wrote: "I have a baby due in 8 days, and I have lost 99% of my crypto because of this. You have stolen a life from me." (Ex. A, victim direct message dated November 13, 2022).

- A victim who wrote: "I am a father, a husband, a firefighter. I have lost everything. Over 6 figures of life savings, my famil[y's] life will never be the same. I have learned a painful lesson. Your actions as mine have real life consequences. Dreams, hopes, unbound potential gone." (Ex. A, victim direct message dated November 17, 2022).

- A victim who told *Money Watch* that he put his "entire life savings" on FTX and was planning to withdraw it because he was planning to buy an "engagement ring he was eyeing."[11]

- A victim who wrote: "The aftermath of this event has been devastating. The financial plans I had meticulously crafted over years vanished, leaving me to confront a future drastically different from what I had planned. The tail end of 2022 marked the begging of an arduous period for me, characterized by relentless efforts to recuperate my lost savings. This pursuit, however, came at a great personal cost. My relationship with my girlfriend, along with connections to friends, suffered irreparable damage as I became ensnared in a cycle of endless work. The ensuing isolation propelled me into a state of depression, a battle I have only recently begun to emerge from in mid-2023." (Victim Impact Statement No. 24, dated March 10, 2024).

- A victim who wrote: "I haven't been able to sleep for days because I lost all my money on FTX. I worked hard and saved for 6 years. I do not know what to do. I can no longer pay my bills. I am devastated…. I don't know what to do with my family we can't go on living like this." (Ex. A, victim direct message dated November 17, 2022).

- A 23-year-old victim from Morocco who wrote: "I come from a family of five family members, and we are facing severe financial difficulties. My father suffers from both mental and physical health problems, leaving him unable to work, and as the oldest son, the responsibility of supporting my family falls heavily on my shoulders. I have been working part-time while studying to fund my education and provide for my family. All my hard-earned life savings were invested in bitcoin on the FTX platform, hoping to secure a better future for my family and myself. However, the actions of SBF and FTX have shattered those hopes. The scam has caused immense emotional distress,

---

[11] Market Watch, *FTX Victims Are Setting Up GoFundMe Fundraisers to Try to Get Their Money Back: 'It's $10,000 Completely Gone'* (Nov. 22, 2022), https://www.marketwatch.com/story/ftx-victims-are-setting-up-gofundme-fundraisers-to-try-to-get-their-money-back-its-10-000-completely-gone-11668715451.

leading to constant thoughts of suicide. Additionally, my academic performance has suffered as I struggle to cope with the betrayal and loss inflicted by the scam… Despite these challenges, I maintain my faith in the justice system of the great country of the USA. I implore the court to consider the devastating impact this crime has had on me and my family. We seek not only financial restitution but also closure and justice." (Victim Impact Statement No. 48, dated March 8, 2024).

The defendant's crimes also damaged institutions. As the Court heard during the trial, the defendant's investors had to write off their investments. As a result of the defendant's fraud, several cryptocurrency lenders were significantly damaged or had to declare bankruptcy due to their losses. As the Court heard from Zac Prince, the former CEO of BlockFi, the company was forced to declare bankruptcy and lay off employees because Alameda did not repay its loans. The same was true for the lender Genesis, which filed for bankruptcy in January 2023. As a result, the losses to victims are not limited to FTX customers; the customers of these lenders—like BlockFi and Genesis, among others—have also suffered. As BlockFi explained in its victim impact statement:

> The vast majority of BlockFi's customers were individuals, investing their savings. When FTX collapsed, BlockFi too collapsed – and those customers abruptly lost access to their savings on November 10, 2022…. Customers have expressed desperation regarding their inability to obtain access to their savings. For example, one customer wrote to me regarding their situation: they had sold their house and put the proceeds in a BlockFi account, planning to use it for a down payment on a new house. After BlockFi collapsed, they lost access to those funds – and, thus, the ability to purchase a new house…. Other customers have discussed how BlockFi had their retirement savings, preventing them from retiring or if they had already retired, wondering how they will fund their retirement…. Smaller accounts held meaningful portions or the entirety of the life savings of some individuals, whose financial situation was precarious to begin with and the loss of hundreds or thousands of dollars devastating. In at least one case this led to an email from a BlockFi customer referencing suicide, despite the relatively small value of their account…. Tens of thousands of people – largely individual American citizens – will lose meaningful portions of their net worth…. They are permanently poorer thanks to Bankman-Fried's criminal conduct.

(Victim Impact Statement No. 2, from BlockFi, dated March 12, 2024).

The defendant argues that the Court should consider the possible reimbursement of victims through bankruptcy as part of its consideration of the Section 3553(a) factors. (Def. Mem. at 59). But, as discussed above, victims have not yet been reimbursed, they will not be made fully whole, and even if they were, it could never address the hardship victims have experienced in the intervening period.

Fourth, Bankman-Fried's criminality was pervasive, as evidenced not just by his fraud crimes, but by the fact that he committed several other significant crimes while running FTX. Specifically, over a multi-year period the defendant, who studied politics and routinely engaged in lobbying in Washington, D.C., engaged in an unlawful scheme to funnel millions of dollars into the political system in order to promote his own political agenda. There were two criminal elements to this scheme: first, the defendant used corporate funding, from Alameda, to pay for donations to individual candidates who are not allowed to receive corporate contributions; and second, the defendant concealed the source of the funds, and in some cases his own involvement, by sending the money through bank accounts in the names of Singh and Salame. While it is difficult to know how, if at all, these illegal contributions affected elections, the very existence of illegal donations undermines the appearance of fairness in our elections. The Government believes this is the largest violation of the campaign finance laws in history, at least as measured by the number of donations and the amount of money involved. This is far more that an ancillary violation of the election laws: the sheer scale of this scheme would justify a significant sentence even if this was the only crime the defendant was charged with.

The same is true for the defendant's violation of the FCPA. By several measures, the defendant's conspiracy to pay a bribe to Chinese government officials to have Alameda's funds

unlocked is one of the largest foreign bribes ever paid by a U.S. person. That is true whether you consider the amount of the bribe ($150 million) or the amount of money he was able to unfreeze as a result of the bribe (in excess of $1 billion). Like the defendant's violation of the campaign finance laws, the bribing of Chinese government officials alone would merit a significant term of incarceration.

Taken together, the defendant's frauds, money laundering, violation of the campaign finance laws, bribery, bank fraud, unlicensed money transmitting, obstruction of justice, and perjury demonstrate that the defendant routinely chose to conduct his business in a manner that violated the law, and indeed, paid no heed whatsoever to legal, ethical, or moral rules when faced with a business or personal decision. The pervasiveness of the criminality demands a severe sentence.

Fifth, Bankman-Fried demonstrated his willingness to deceive not only through his execution and management of the fraud at FTX, but also through his deceit in the face of investigation and indictment. Prior to the collapse of FTX, imagining a day where there could be an investigation, Bankman-Fried instructed his employees not to put anything in writing, and if they did, to put it on Signal and turn on the auto-delete function. As a result, and by the defendant's design, his conspiratorial conversations during critical moments in the fraud were unavailable to the Government during its investigation. And then after he was indicted, the defendant attempted to tamper with witnesses, flouted the terms of his pretrial supervision, and broke the law. Again, when it came to his own testimony, the defendant engaged in perjury intended to deceive the jury about core facts of this commission of the fraud. Bankman-Fried's hostility to and deception of law enforcement demand a significant sentence.

Finally, since November 2022, Bankman-Fried has never accepted responsibility for what he has done. At no point has he shown any willingness to admit culpability for fraud and deceit or show genuine remorse for his conduct.

Bankman-Fried, however, tells a different story in his sentencing submission, claiming that he "has consistently expressed his deep remorse for the damage caused to FTX's customers, lenders, and employees." (Def. Mem. at 55). As evidence of his purported repentance, he has highlighted statements during some of his public interviews after FTX's bankruptcy and before he was arrested. (Def. Mem. at 3). But those public statements, when considered as a whole, demonstrate that even after FTX collapsed—exposing that customer funds had been misappropriated—Bankman-Fried tried to prolong and protect his scheme and feign ignorance of the fraud, despite being its mastermind.

As an example, the defendant's submission points to his statement at the *New York Times* Dealbook Summit that, as the CEO of FTX, he "had a duty" to stakeholders, customers, creditors, FTX employees, investors, and regulators to "make sure the right things happened at the company," but that "[c]learly I made a lot of mistakes" and "I did not ever try to commit fraud on anyone." (Def. Mem. at 3). Similarly, the defendant's submission emphasizes that when George Stephanopoulos confronted Bankman-Fried by stating that he was "ultimately responsible," Bankman-Fried responded: "Ultimately, absolutely. Look, I should have been on top of this and I feel really, really bad and regretful that I wasn't and a lot of people got hurt and that's on me." (Def. Mem. at 11). Far from expressing genuine remorse, these statements are precisely the sort of calculated, faux confession of regret that in fact serves to deflect blame, suggest that others—not Bankman-Fried—had genuine culpability, and further promote Bankman-Fried's misrepresentations to the public that he had been dedicated to protecting customer funds and that

he was an honest broker, not a fraudster. His acceptance of responsibility as FTX's CEO is no acceptance of responsibility at all: what he claims here is that, as CEO, he is willing to bear responsibility *notwithstanding* that he committed no wrongdoing and did not know that anything was amiss. With these and similar statements, Bankman-Fried tried to generate respect, sympathy, and even admiration, so that the public might credit his falsehoods.

The same goes for his proclamations that he "did not ever try to commit fraud." The evidence at trial proved, overwhelmingly, that Bankman-Fried did intentionally take money that belonged to others and that he lied about it. What is obvious is that he never intended to get caught. In his efforts to evade detection, he unsuccessfully tried to raise money from investors to conceal the hole, and took increasingly risky bets that he hoped would pay off. As of November 2022, many of those investments remained illiquid and speculative, meaning that the customer funds the defendant misappropriated to make those investments remain tied up to this day. Bankman-Fried's supposed dedication in November 2022 "for all customers to be paid in full," (Def. Mem. at 9), must be understood through this lens too. Prior to FTX's collapse in November 2022, Bankman-Fried showed no urgency or concern about repaying misappropriated customer funds. Instead, he continued to make speculative investments and to grow Alameda's deficit to FTX customers. It was only once he was exposed, and faced the risk of criminal prosecution, that Bankman-Fried tried to liquidate assets to satisfy customer withdrawals—a self-serving exercise once suspicions of fraud were percolating.

Despite all of his statements, Bankman-Fried has never owned up to what he did. He has lied, obfuscated, feigned apology, and tried to minimize his own involvement. Through all of that, the lack of contrition is galling. In assessing the seriousness of the offense, the Court should weigh

heavily the fact that the defendant has never accepted responsibility, and that too warrants a very significant sentence.

In sum, the nature, circumstances, and seriousness of the defendant's conduct necessitate a very significant sentence. Each of the defendant's acts of criminality alone would warrant a very serious term of incarceration; when considered together, they require a sentence of 40 to 50 years.

## II. A Sentence of 40 to 50 Years Is Necessary to Protect the Public and for Specific Deterrence

Under Section 3553(a), the need for the sentence to "protect the public from further crimes of the defendant" and "afford adequate deterrence to criminal conduct" must be considered. 18 U.S.C. § 3553(a)(2)(B), (C). Here, a sentence in the range of 40 to 50 years, but short of a life sentence, is necessary to serve this purpose.

As this Court has observed previously in sentencing a defendant, "[i]t's very easy sometimes … to say, well, look at all the trouble the defendant has gotten himself into, look at the harm that's been done to his family, look at the loss he suffered himself, there is no way he'll ever do something like this again." *United States v. Laguardia*, No. 19 Cr. 893 (LAK) (S.D.N.Y. Aug. 31, 2021) (Sent. Tr. at 45). But "in the case of someone who, at least when they got into it, thought everything was going to work out fine," there is the possibility that "the next time temptation comes along, you'll think it will work out fine, too, and the bad outcome the first time was a mistake," and so the sentence must "reflect[] some of that risk." (*Id.*) Indeed, the fact that a past fraud does not necessarily deter a future one is evidenced by the number of first-time fraudsters in this district who have become recidivists. *See, e.g.*, *United States v. Jonathan Ghertler*, No. 23 Cr. 100 (ER) (investment fraud scheme following over a dozen prior convictions); *United States v. Franklin Ray*, No. 22 Cr. 228 (AT) (orchestrating a Ponzi scheme after having served a prior two-year sentence for bank and wire fraud); *United States v. Vitaly Borker*, No. 22 Cr. 273 (JSR)

(defendant convicted of wire fraud for operation of fraudulent eyeglasses website after two prior federal convictions for the same conduct); *United States v. Joseph Meli*, No. 19 Cr. 480 (RA) (defendant convicted of participating in a Broadway ticket resale investment fraud scheme after previously serving a 78 month sentence for the same scheme); *United States v. Edward Durante*, No. 15 Cr. 171 (ALC) (beginning a new investment fraud scheme while serving a 121 month sentence for fraud); *United States v. John Galanis*, No. 15 Cr. 643 (PKC) (defendant convicted of securities fraud after 1973 and 1988 convictions for mail fraud and securities fraud).

The risk of recidivism here is real, and little of the defendant's sentencing submission addresses it. It is necessary that the sentence imposed disable the defendant from being in a position in the future where he could perpetrate a fraud. A sentence that resulted in the release of the defendant while he is at a working age would leave open the very real possibility that he perpetrates again. That is the case for several reasons.

First, the defendant's criminal conduct to date demonstrates that the defendant is undeterred from criminal conduct based on the potential to damage to others, the possibility of incarceration, or respect for the law or the common ethical and moral understandings that members of society observe in every-day life. Bankman-Fried not only engaged in one of the largest frauds in history, but he demonstrated a willingness to engage in other criminal conduct with impunity. He committed what is believed to be the largest campaign finance offense of all time. He authorized the payment of a foreign bribe in excess of $100 million. He broke the federal laws around licensing, and lied to a bank. That track record makes clear that this defendant is uninhibited when it comes to engaging in additional criminal conduct.

Second, the defendant's time on pretrial supervision shows that even when the defendant is confronted with the imminent prospect of a substantial restraint on his liberty, he is not deterred

from engaging in criminal conduct. As the Court knows well, prior to being detained, the defendant had several infractions during his period of home incarceration. Those repeatedly resulted in further restrictions and admonitions from the Court. Nonetheless, believing he would get away with it, the defendant engaged in witness tampering. While the severity of that conduct pales in comparison to what he did to FTX's customers and investors, it is evidence of the fact that a restriction on the defendant's liberty alone is not a deterrent to future misconduct.

Third, the defendant's sentencing submission asserts "[h]e will never again be in the position of running a financial company, or accepting customers' funds." (Def. Mem. at 69). But the defendant's say so does not make it true. There is a significant likelihood that if the defendant is released back into society at a young enough age he will have the opportunity to engage in another fraud. Con artists who turn back to crime after being caught take advantage of humanity's willingness to extend a second chance, the shortness of society's memory, and recidivists' ability to persuade people that things are not what they seem to be. The defendant has already proven adept at crafting a self-serving public image, and his sentencing submission itself shows that he is already attempting to reframe his crimes as mere mistakes or misunderstandings. And so it is conceivable that someday, if he is released from prison, the defendant will start anew, launch a new cryptocurrency exchange or another business, which he will say has been done the right way because he has learned his lesson. And people may hand over their money again, and history could repeat itself. That is not just speculation. In the days following FTX's bankruptcy, and even after the defendant had been indicted, he mused about launching "Archangel LTD," which would be an alternative to FTX's bankruptcy and would result in the re-launching of an exchange. (Ex. B, Google Document by Samuel Bankman-Fried). He mused about ideas for restoring his image, like "focus on the fact that the Chapter 11 team has no idea how to run FTX" and is "run by a cartel of

lawyers," "come out as extremely pro crypto, pro freedom," "go on Tucker Carlsen, come out as a republican," "have Michael Lewis interview me," "radical honesty on Twitter," or some other narrative like "SBF died for our sins." (Exs. C and D, Google Documents by Samuel Bankman-Fried). The point is that the defendant is motivated to launch his redemption narrative and has already been thinking about how to spin it. It is realistic that he will settle on a narrative, lean into it, and convince other people to part with their money based on lies and the promise of false hope. And, of course, one does not need to run a large company to instill confidence in others and then abuse that confidence for personal gain.

Fourth, the defendant may feel compelled to do this fraud again, or a version of it, based on his use of idiosyncratic, and ultimately for him pernicious, beliefs around altruism, utilitarianism, and expected value to place himself outside of the bounds of the law that apply to others, and to justify unlawful, selfish, and harmful conduct. Time and time again the defendant has expressed that his preferred path is the one that maximizes his version of societal value, even if imposes substantial short term harm or carries substantial risks to others. During trial, Ellison told a story about the defendant's willingness to take risks: "He talked about being willing to take large coin flips, like a coin flip where—if it comes up tails, you might lose $10 million, but if it comes up heads, you might make slightly more than $10 million," and he "talked about this in the context of thinking about what was good for the world, saying that he would be happy to flip a coin, if it came up tails and the world was destroyed, as long as if it came up heads the world would be like more than twice as good." (Tr. 694-95). The defendant talked about this concept on Twitter, saying that "[i]f you look at the scale of funds spent on disease, global warming, emerging technological risk, animal welfare, nuclear warfare safety, etc., you get numbers reaching into the trillions," and "when the backdrop is trillions of dollars, there's essentially no risk aversion on the

scale of thousands or millions." (Ex. E, Twitter thread by Samuel Bankman-Fried). He added that that "mean[s] you should be willing to accept a significant chance of failing to do much good sometimes…. And that's ok. If it was the right play in EV [expected value], sometimes you win and sometimes you lose." (*Id.*) And in the days after FTX's collapse, the defendant told the journalist Kelsey Piper in a conversation he believed was off the record that while he had previously said a person should not "do unethical shit for the greater good," that was "not true," just a "PR" answer, and the ethics stuff was mostly a "front."[12] Of course, the criminal law does not select among personal philosophies or punish particular moral codes. But it does punish equally someone who claims that their unlawful conduct was justified by some personal moral system, and the goals of sentencing require consideration of the way in which the defendant's manipulation of intellectual and moral philosophy to justify his illegal and harmful conduct makes it likely that he will reoffend. In this case, the defendant's professed philosophy has served to rationalize a dangerous brand of megalomania—one where the defendant is convinced that he is above the law and the rules of the road that apply to everyone else, who he necessarily deems inferior in brainpower, skill, and analytical reasoning.

The trial evidence made clear that the defendant justified enriching and aggrandizing himself, burnishing his own image, and putting billions of dollars of other people's money at his own disposal, because he believed in the virtue of his own power, decision-making, superiority, and spending. By that same token, the defendant believed and appears still to believe that it is rational and necessary for him to take great risks including imposing those risks on others, if he determines that it will serve what he personally deems a worthy project or goal, even if the risks

---

[12]  Kelsey Piper, *Sam Bankman-Fried Tries to Explain Himself*, Vox (Nov. 16, 2022), https://www.vox.com/future-perfect/23462333/sam-bankman-fried-ftx-cryptocurrency-effective-altruism-crypto-bahamas-philanthropy.

he takes are unethical, illegal, and likely to result in a "loss." Under this philosophy, if the defendant is released from prison, and has the opportunity to advance his own distorted version of what is best for him and society, even if it requires breaking the law and harming others, he *should* do that again. Indeed, according to his sentencing submission, by his own "calculations" the "expected value of his life" is presently in the "negative territory." (Def. Mem. at 68). Such a calculus will inevitably lead him to trying again. And, evidently, the possibility of further incarceration would not alter that value calculus.

Thus, the defendant's sentence needs to be of a sufficient enough length that it will not just *deter* a white collar defendant, but that it will *disable* this defendant from committing crimes again. *See, e.g., United States v. Valente*, 915 F.3d 916, 925 (2d Cir. 2019) (Lynch, J., concurring) (noting that the purposes of sentencing in Section 3553(a)(2) include "protecting the public from future crimes the defendant might commit (incapacitation)"). The defendant argues in his sentencing submission that the collateral consequences of his conviction, and the loss of his personal assets are sufficient punishment. (Def. Mem. at 64-65). But everything about the defendant's history suggests such damage and discomfort will not deter him. While the Government does not believe the defendant needs to spend the rest of his life in prison to protect the public, a sentence of 40 to 50 years is necessary to ensure that the defendant cannot be released from prison and given the opportunity to commit fraud again.

## III. A Very Significant Sentence Is Necessary for General Deterrence

A very significant sentence of imprisonment is also necessary in this case to afford adequate general deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B). "Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144,

1149 (7th Cir. 1994); *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quotation marks and citation omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). Here, a sentence of 40 to 50 years is necessary to serve that purpose.

The enormity and audacity of Bankman-Fried's crimes has understandably captured the attention of both the public, generally, and those involved in cryptocurrency or finance specifically. Thus, the deterrent message and effect of the sentence imposed by the Court in this case will resonate significantly with any individual or institution tempted to engage in conduct similar to that of the defendant. This need for deterrence is especially important in the area of cryptocurrency, where some individuals have operated under the misimpression that they are unregulated, not subject to criminal laws, or can avoid scrutiny or significant jail time.

Bankman-Fried contends that the loss of his reputation and finances is sufficient to deter him (and others who have seen what has happened) from further misconduct. (Def. Mem. at 66-69). But that is simply not the case. As Judge Swain cogently explained in sentencing Peter Madoff:

> The Court is also very much aware that [the defendant] and his family have lost the assets, reputation, financial security and social position that they had enjoyed.… That punishment while indisputably severe is not alone sufficient to effect a punishment that is just, given the nature, magnitude and context of the crimes for which [the defendant] is being sentenced today. Many people and institutions have suffered the same fall from wealth, privilege and in many cases even basic levels of financial security as a result of the massive fraud. Ordinary wage-earning people who had planned for ordinary comfortable retirements are among the victims here too…. Proper punishment also requires a lengthy term of imprisonment, the punitive loss of [the defendant's] personal freedom. Such a

> sentence is also necessary to serve the deterrence function of
> sentencing…. the world in which [the defendant's] conduct took
> place is full of many temptations and opportunities to breach trust
> relationships for personal gain. The consequences of such behavior
> must be harsh to help deter others from taking the path of dishonesty
> and theft.

*United States v. Peter Madoff*, No. 10 Cr. 228 (LTS) (S.D.N.Y. Dec. 20, 2012) (Sent. Tr. at 28-29). That reasoning applies with greater force to this defendant. The studies cited by the defendant, on the other hand, are wrong, or at least do not apply here. (Def. Mem. at 66). The prospect of punishment, and not the severity, may be enough in some cases to deter. But not here. This case presents an appropriate opportunity for the Court to send a strong signal to market participants. *See, e.g., United States v. Ulbricht*, 858 F.3d 71, 94 (2d Cir. 2017) (affirming district court's sentence which took into account, among other things, general deterrence and the fact that the sentence imposed "could have a powerful general deterrent effect because the case had attracted an unusually large amount of publicity"). A sentence of the length proposed by the defendant would have the perversely opposite effect: it would send the message that "the defendant's crime is not so serious," "the punishment is not so severe," "it is not like the major frauds of the past." Especially in light of the publicity to which the defendant points, an unjustifiably lenient sentence would encourage others who might be tempted to engage in fraud that the rewards of such wrongful activity may be worth the price.

Bankman-Fried also argues that the negative publicity from the prosecution is enough of a deterrent. But simply because a case has been widely reported on and drawn notoriety does not suggest that imprisonment is not required to promote deterrence. As the Second Circuit has explained:

> [T]he circumstances referred to by the district court do not constitute
> punishment. The public nature of criminal prosecutions is part of
> our constitutional fabric; the public humiliation suffered by one

prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment." Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment. And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view—i.e., that Freedman's public humiliation and the public nature of his prosecution were punishment enough—would mean that the more flagrant the crime, the less actual statutorily prescribed "punishment" it would require. And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes.

*United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008).

Here, general deterrence is of the utmost important in this case, and that is why a lengthy term of imprisonment in line with other defendants who embezzled hundreds of millions or billions in customer funds is necessary.

## IV. The Defendant's History and Characteristics Do Not Warrant a Significant Variance

Bankman-Fried's personal history and characteristics do not warrant a variance from what should be a lengthy sentence of incarceration. Unlike many criminals who come before the Court who began life with almost nothing, Bankman-Fried began with and continued throughout his life to enjoy substantial advantages over others in society. (*See* Def Mem. at 39-43 (summarizing Bankman-Fried's comfortable upbringing and education at MIT)). After getting a sought-after job at an "elite quantitative trading firm" earning hundreds of thousands of dollars (Def. Mem. at 43), Bankman-Fried started two companies that could have been successful without fraud. Indeed, as he emphasized during trial, FTX earned around a billion dollars a year in transaction fees by users. But the defendant chose to abandon honest work to pursue profit and influence through crime, and

he used the proceeds of those crimes to enjoy his own lifestyle of affluence. The fact that he chose to engage in a massive fraud is an aggravating factor, not a mitigating one.

Urging leniency, the defendant has submitted several letters from friends and family attesting to his character. From those, he argues that the evidence at trial did not show the "real Sam." The fact that the version of the defendant presented at trial is unrecognizable to his family and friends does not mean that the defendant did not willfully engage in enormously damaging conduct. Humans are complicated, and the capacity of one person to be generous while also committing heinous crimes is almost unexplainable. Famously, Madoff was described by several people as a "generous person" who paid for employees' honeymoons, purchased a machine to read to a blind man, arranged for medical care of an employee's mother after a stroke, and assisted another employee in her efforts to adopt a child. *See United States v. Bonventre*, No. 10 Cr. 228 (LTS) (S.D.N.Y.) (Trial Tr. 2649, 2850, 7550, 9501, 10198). This is all to say that the defendant could be honest with his family while he lied to customers and investors; he could behave in a selfless manner with friends while being motivated by influence, power, fame, and wealth in his business. The defendant's father, brother, and psychiatrist all submitted letters suggesting that Bankman-Fried is not motivated by greed. (Def. Mem. at 50-52). While that may be their experience, the trial record demonstrates otherwise: the defendant engaged in a myriad of fraudulent conduct to maximize his business's earnings and his own wealth. He may have claimed that he intended to give all his money away, but the evidence at trial demonstrated that the defendant lived in an expensive penthouse apartment, owned other properties, bought a home for his parents, gifted his parents millions of dollars, named the Miami Heat's sports arena after FTX, paid for a Superbowl advertisement, paid millions of dollars to K5 to be connected to celebrities

and politicians, made risky venture investments, flew around in a private jet, and made millions of dollars in political donations.

The defendant makes a point in his sentencing submission to note his charitable giving. (Def. Mem. at 46-50). But that was charity with other people's money. The defendant's contributions to the FTX Foundation, which he now highlights, and his brother's pandemic prevention non-profit, Guarding Against Pandemics, were paid for with customers' funds routed through Alameda. (GX-1035, 1040). Even if that were not the case, prior charitable works, however commendable and extensive, by professionally successful defendants rarely, if ever, should be considered a materially mitigating factor because, as courts have previously recognized, it is not extraordinary for such individuals to be involved in charities. *See, e.g.*, *United States v. Barbera*, No. 02 Cr. 1268 (RWS), 2005 WL 2709112, at *12-13 (S.D.N.Y. Oct. 21, 2005); *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009) (a defendant's "good name and good works" should not serve as "the human shield he raises to seek immunity or dramatic mitigation of punishment when he is caught"). Indeed, many defendants do not have the resources—in time, money, or social standing—to perform such deeds, and so the law is reticent to show leniency to the few defendants who are fortunate enough to have such options. *See, e.g.*, *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card."); *United States v. Ali*, 508 F.3d 136, 149 & n.17 (3d Cir. 2007) (charitable service is "evaluated with reference to the offender's wealth and status in life" because defendants "who enjoy sufficient income and community status . . . have the opportunities to engage in charitable and benevolent activities." (citations and quotation marks omitted)); *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("[E]xcellent character references are not out of the ordinary

for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her."). Bankman-Fried should not be credited with charitable giving when it was done with fraud proceeds and its benefits pale in comparison to the damage done by his fraud.

## V.     A Sentence of 40 to 50 Years Is Necessary to Avoid Sentencing Disparities

Among the factors a sentencing court must consider in imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress adopted Section 3553(a)(6) "to eliminate unwarranted disparities nationwide." *United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008). No scheme to defraud since Madoff can be compared to this one in terms of its size, scope, and amount of loss. The PSR notes that sentencing data from the last five years shows that the average sentence for a defendant sentenced under the fraud Guidelines with offense level (43) is approximately 24 years' imprisonment. The United States Sentencing Commission's Judiciary Sentencing Information database does not indicate, however, what conduct resulted in these sentences. Nor does it indicate what the largest sentences were. Because of the range of potential white collar crimes that fall under the Guidelines in Section 2B1.1, the Government submits that a more focused approach is necessary to avoid unwanted sentencing disparities. Specifically, the Government submits that other fraud cases where the loss amounts were at the top of the loss table—and in particular, those involving embezzlement—is the relevant body of cases to evaluate.

Below is a table of sentences imposed since *Booker* on defendants where the loss amount exceeded $100 million, and the money was stolen through a Ponzi scheme or some other form of misappropriation or embezzlement.

| Defendant | Case No. | Age | Loss Amount | Sentence |
|---|---|---|---|---|
| Bernard Madoff | 09 Cr. 213 (S.D.N.Y.) | 71 | $ 13,000,000,000.00 | 150 years |
| Robert Allen Stanford | 09 Cr. 342 (S.D. Tex.) | 62 | $ 5,900,000,000.00 | 110 years |
| Lee Bentley Farkas | 10 Cr. 200 (E.D. Va.) | 58 | $ 2,900,000,000.00 | 30 years |
| Thomas Petters | 08 Cr. 364 (D. Minn.) | 52 | $ 1,800,000,000.00 | 50 years |
| Edwin Fujinaga | 15 Cr. 198 (D. Nev.) | 72 | $ 1,570,000,000.00 | 50 years |
| Scott Rothstein | 09 Cr. 60331 (S.D. Fla.) | 47 | $ 429,300,000.00 | 50 years |
| Karl Greenwood | 17 Cr. 630 (S.D.N.Y.) | 46 | $ 300,000,000.00 | 20 years |
| Russell R. Wasendorf | 12 Cr. 2021 (N.D. Iowa) | 64 | $ 215,500,000.00 | 50 years |
| Timothy S. Durham | 11 Cr. 42 (S.D. Ind.) | 50 | $ 200,000,000.00 | 50 years |
| Fred Davis Clark | 13 Cr. 10034 (S.D. Fla.) | 57 | $ 190,000,000.00 | 40 years |
| David Schwarz | 16 Cr. 10039 (S.D. Fla.) | 60 | $ 180,000,000.00 | 40 years |
| James M. Nicholson | 09 Cr. 414 (S.D.N.Y.) | 44 | $ 140,900,000.00 | 40 years |
| Edward Okun | 08 Cr. 132 (E.D. Va.) | 58 | $ 100,000,000.00 | 100 years |

As the table makes clear, most defendants who steal their clients' or customers' money with $100 million dollars in losses or more receive sentences ranging from 40 to 50 years' imprisonment. Indeed, in cases with $200 million or more in losses, courts have typically imposed a sentence of 50 years imprisonment or more. For instance, in a case with similar facts to those here, Russell Wasendorf, the CEO of a futures commission merchant, embezzled more than $215 million in customers' funds, and was sentenced to 50 years' imprisonment. There are exceptions, of course, but it also bears noting that the defendant's fraud would rank second, right below Madoff, in terms of total losses. Accordingly, to avoid unwarranted sentencing disparities amongst like defendants, a sentence of 40 to 50 years' imprisonment is necessary.

The defendant's submission cites and then distinguishes several other fraud prosecutions involving large losses. Starting with Madoff, the defendant says it is not an apt comparison because Madoff embezzled more money, engaged in fraud from the beginning, was older, and used millions in stolen funds for himself. (Def. Mem. at 75). Bankman-Fried is right that there are differences between his and Madoff's case, but those do not justify disregarding the Madoff sentence as a benchmark. Like Madoff, the defendant misappropriated billions of dollars of customer money

over a multi-year period, spending much of it on his own ventures, and causing massive harm to his victims. *United States v. Madoff*, Nio. 09 Cr. 213 (DC), Dkt. 92 (Gov't Sentencing Mem.). And unlike Madoff, Bankman-Fried has not accepted responsibility; rather, he obstructed justice, he perjured himself, and he committed other significant crimes. The defendants' ages are certainly a distinguishing factor. Age, of course, cuts both ways. A shorter sentence because the defendant is relatively young means he will have an opportunity to commit fraud again when released. And a shorter sentence because of his age also undermines general deterrence, as it could signal to would-be young fraudsters that it is worthwhile to attempt a massive fraud, because either they will get away with it, or the prison sentence will allow them a second chance to make money. Even if age were a reason why this Court should impose a shorter sentence than the one imposed on Madoff— a sentence that gives Bankman-Fried the possibility of release someday—it is not a reason to disregard the Madoff sentence given the similarities to the case.

Next, the defendant distinguishes Judge Ramos's recent 20-year sentence of Karl Greenwood, who was involved in the fake cryptocurrency scheme OneCoin. (Def. Mem. at 76-77). That sentence is distinguishable, but not for the reasons in the defendant's brief. Greenwood received a sentence shorter than what Bankman-Fried deserves, not a longer one. Greenwood pled guilty and was remorseful for his conduct. At sentencing, Judge Ramos stated that while the defendant's criminal conduct "compelled" a substantial sentence, there were "substantial reasons" for granting "some measure of lenity, including "horrific conditions" that the defendant endured in a Thailand jail. *United States v. Greenwood*, No. 17 Cr. 630 (ER) (S.D.N.Y. Sept. 12, 2023), Sent. Tr. at 39. Those conditions included being "stripped naked," "shaved down," "chained to other inmates for 24 hours," "forced to sleep on the floor full of cockroaches and rodents," "food filled with magots," "forced to sit outside in the heat for hours," and some particular circumstances,

which are under seal, that "resulted in lasting health effects and health consequences." (*Id.* at 18-19).[13] The particular circumstances of Greenwood's case distinguish it, and make it an imperfect precedent for the sentence here.

Bankman-Fried argues that the sentences imposed on defendants from the public company scandals from the early 2000s are poor comparisons. (Def. Mem. at 77). The Government agrees. Bernard Ebbers of WorldCom and John Rigas of Adelphia Communications were convicted of perpetrating large accounting frauds that resulted in losses to the companies' investors. These were securities fraud cases, but the nature of the losses was different: the losses did not involve the theft of customers' or clients' funds that were entrusted to the defendant. Rather, in both cases, there was ambiguity as to whether the companies' losses were fully attributable to the fraud. *United States v. Ebbers*, 458 F.3d 110, 127 (2d Cir. 2006) ("The loss to investors who hold during the period of an ongoing fraud is not easily quantifiable because we cannot accurately assess what their conduct would have been had they known the truth," and recognizing that "the dot-com bubble burst and its likely negative future effect on WorldCom's business was public knowledge," which caused "a downward pressure on share price not attributable to the defendant."); *United States v. Rigas*, 583 F.3d 108, 119–20 (2d Cir. 2009) (recognizing that "[t]he loss must be the result of the fraud, as opposed to other, non-fraudulent occurrences") (citation omitted). That distinguishing feature is critical because, as the above table indicates, courts have routinely imposed lengthier sentences on defendants who have stolen from people who trusted them.

Bankman-Fried acknowledges similarities to Elizabeth Holmes. (Def. Mem. at 78-79). But the similarities are superficial. Bankman-Fried stole billions from customers who entrusted him

---

[13] The specifics of these circumstances are sealed. If the Court believes the details of those circumstances are necessary in determining how, if at all, to consider the sentence in *Greenwood*, the Government will provide the information to the Court on a sealed basis.

with money. The loss amount in Holmes's case was less than $150 million, and those losses were borne by private investors, not the general public. *United States v. Holmes*, 18 Cr. 258 (N.D. Cal.), Dkt. 1712 (Court Order on Sentencing), at 1 ("the loss in this case can be reasonably found to be $120,146,247"), 6 (list of investors). The defendant claims that Holmes's conduct was worse because her scheme resulted in parties receiving inaccurate medical information. But Bankman-Fried caused a similar type of trauma to his victims, but at a grander scale. He led victims to believe their money was safe and in accounts, to be used as needed. As the witness statements above make clear, people put their life savings in the defendant's hands. So like the Theranos patient who got inaccurate medical results and was traumatized, the FTX customers have experienced devastating emotional and psychological trauma from the defendant's fraud. The difference is, however, that the Theranos patients ultimately learned that the tests were junk and were able to right their lives. The same is not true for FTX's customers, who have not gotten their money back.

Finally, the defendant settles on Michael Milken as the "best comparison" for this case. There is very little about the defendant's fraud that is any way like the crimes for which Milken was prosecuted. Although Milken was associated with Drexel Burnham's leveraged buyouts and "junk bonds," the charges to which Milken *pled guilty* had nothing to do with those practices; nor did they involve insider trading associated with Ivan Boesky. While Milken pled guilty to six offenses, they related to the following: Milken guaranteed Boesky against loss and helped him evade the net-capital rules in some transactions, he made adjustments in the price of securities bought and sold for another client without disclosing this to the fund's customers, and he helped the same client lower his takes by arranging unprofitable trades. Milken's convictions neither involved theft of customers' funds, nor did they involve anything close to the amount of losses sustained here. Milken's sentence is not a fair comparison for the conduct here.

Arguing otherwise, Bankman-Fried cites to personal similarities to Milken—they were both young, had a "meteoric rise" in their industry, were "geniuses," and had an interest in charity. (Def. Mem. at 81-82). But Section 3553 requires consideration of whether a sentence will create an unwarranted sentence disparity among defendants "who have been found guilty of similar conduct," not defendants who may or may not be similar. Milken did not steal customers' money. He did not steal over $10 billion dollars. He did not perpetrate multiple frauds with losses in the billions. He did not refuse to accept responsibility, obstruct justice, and perjure himself. A sentence equivalent to the one imposed on Milken of 10 years (let alone the two-year sentence he later received based on his cooperation) would be unreasonable here given the facts.

At bottom, defendants who are in a position of trust and steal $100 million or more appropriately are sentenced to 40 to 50 years, or more. Such a sentence is necessary here and would be in line with the sentences meted out to other defendants who engaged in similar conduct.

## RESTITUTION AND FORFEITURE

The Government has already seized over a billion dollars in assets. At sentencing, the Court should impose a money judgment of $11,020,000,000, along with forfeiting the defendant's interest in the specific property listed in the preliminary order of forfeiture submitted as an exhibit to this memorandum. Such a money judgment represents the appropriate measure for forfeiture, under the facts and under the law; indeed it is a particularly conservative sum. For most of the specific property listed in the preliminary order of forfeiture, the defendant does not object to forfeiture of his interests; for the other property, the evidence at trial, and if need be at a hearing, amply supports its forfeitability.

## I.   Applicable Law

As the Court is well aware, "[c]riminal forfeiture statutes empower the Government to confiscate property derived from or used to facilitate criminal activity. Such statutes serve

important governmental interests such as separating a criminal from his ill-gotten gains, returning property, in full, to those wrongfully deprived or defrauded of it, and lessen[ing] the economic power of criminal enterprises." *Honeycutt v. United States*, 581 U.S. 443, 447 (2017) (citation and internal quotation marks omitted).

Forfeiture is mandatory in cases involving fraud and money laundering. *United States v. Torres*, 703 F.3d 194, 204 (2d Cir. 2012); 28 U.S.C. § 2461(c) ("If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case."). Where forfeiture is sought in the form of a personal money judgment, the district court "must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). The court's determination "may be based on evidence already in the record," Fed. R. Crim. P. 32.2(b)(1)(B), including evidence from trial. *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007). The "calculation of forfeiture amounts is not an exact science. '[T]he court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information.'" *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011) (quoting *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)). A court "may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." *Treacy*, 639 F.3d at 48. As "an aspect of sentencing," *Libretti v. United States*, 516 U.S. 29, 49 (1995), forfeiture amounts are determined by a preponderance of the evidence, *Capoccia*, 503 F.3d at 116. The purpose of forfeiture is "punitive rather than restitutive." *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011). Absent Eighth Amendment concerns, the defendant's ability to pay a money judgment is irrelevant. *United States v. Awad*, 598 F.3d 76, 78-79 (2d Cir. 2010); *United States v. Viloski*, 814 F.3d 104, 114-15 (2d Cir. 2016) (upholding forfeiture money judgment exceeding $1 billion as

consistent with defendant's future ability to "earn[] a living upon his release from prison."); *United States v. Bonventre*, 646 F. App'x 73, 92 (2d Cir. 2016) (upholding forfeiture money judgment exceeding $19 billion in Madoff Ponzi scheme).

There are two bases for the underlying forfeiture here. First, under 18 U.S.C. § 981(a)(1)(C), any property "which constitutes or is derived from proceeds traceable" to wire fraud or securities fraud, among other offenses, is forfeitable. 18 U.S.C. § 981(a)(1)(C); *see also* 18 U.S.C. §§ 1956(c)(7), 1961(1); *see also* 28 U.S.C. § 2461(c) (allowing forfeiture for any crime "for which the civil or criminal forfeiture of property is authorized"). Whether the proceeds subject to forfeiture include all property obtained from the offense or whether the proceeds subject to forfeiture are limited to the net gain or profit depends on whether the conduct involves "illegal goods, illegal services, [and] unlawful activities." *See* 18 U.S.C. § 981(a)(2). "[E]mbezzlement, soliciting funds as part of a Ponzi scheme," among other types of conduct, are "inherently unlawful." *United States v. Milton*, 21 Cr. 478 (ER), 2024 WL 779210, at *3 (S.D.N.Y. Feb. 26, 2024) (citations omitted). For such "inherently unlawful" acts, the term "proceeds" is defined as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A). In other words, "[p]roceeds" are "property that a person would not have but for the criminal offense." *United States v. Daugerdas*, No. 09 Cr. 581 (WHP), 2012 WL 5835203, at *2 (S.D.N.Y. Nov. 7, 2012) (quoting *United States v. Grant*, No. 05 Cr. 1192 (NRB), 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008)).

There is a second basis for forfeiture, which does not involve proof that the funds are "proceeds." Under 18 U.S.C. § 982(a)(1), for a money laundering "offense in violation of section

1956," a court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."

Besides seeking a personal money judgment, the Government can also seek forfeiture of specific property. The Court "must determine whether the government has established the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A). The applicable law to determine if the requisite nexus is shown is the same as the underlying forfeiture law: here, 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 982(a)(1). *See, e.g.*, *Capoccia*, 503 F.3d at 115. Once again, to determine whether specific property is forfeitable, the court may consider "evidence already in the record," or "any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." If forfeiture of specific property is contested, the court must conduct a hearing. Fed. R. Crim. P. 32.2(b)(1)(A).

## II.     The Court Should Order Forfeiture

The Court should impose the proposed forfeiture money judgment. This number is derived as follows: First, the Court should direct the forfeiture of $8,000,000,000, which is a conservative estimate of the proceeds of the defendant's wire fraud and conspiracy to commit wire fraud on FTX's customers, and the property involved in his conspiracy to launder the proceeds of that wire fraud. As funds that the defendant obtained through false statements and promises, and then misappropriated, they are plainly "proceeds" pursuant to 18 U.S.C. § 981(a)(1)(C). *See Bonventre*, 646 F. App'x at 90 (calculating forfeiture based on "an amount representing the total client investment"); *United States v. Kenner*, 443 F. Supp. 3d 354, 378 (E.D.N.Y. 2020) (defining proceeds forfeiture as amount "received . . . as a result of the fraud."). The total of $8 billion also represents property involved in the defendant's money laundering. The reason FTX had such a deficit was that the defendant and his co-conspirators had agreed to launder those funds to and through Alameda.

Second, the Court should direct the forfeiture of $1,300,000,000, which represents the proceeds of the defendant's wire fraud and conspiracy to commit wire fraud on Alameda's lenders. This sum represents the amount that Alameda owed lenders to whom it had defrauded by making false statements about its balance sheet, calculated as of the date of the bankruptcy filing. (GX-1014).

Third, the Court should direct the forfeiture of $1,720,000,000, which represents the proceeds of the defendant's securities fraud. This sum is the amount FTX raised from investors in exchange for equity on fraudulent pretenses. (GX-26 (listing the total amounts invested in the Series B, B-1, and C round investments in FTX.com)).

The defendant, however, asserts that he owes no forfeiture because "customers and creditors will receive a return of their funds via the bankruptcy." (Def. Mem. at 88). This argument is factually unsupported and legally wrong. Starting with the facts, as discussed above, it is far from certain that FTX customers and lenders will be made whole, and the bankruptcy will almost certainly not cover losses by FTX's equity investors (the victims of the conspiracy to commit security fraud), which were approximately $1.72 billion.

As a matter of law, there is no basis for reducing the forfeiture judgment based on repayment to victims in bankruptcy. For money laundering based forfeiture under 18 U.S.C. § 982(a)(1), there is no suggestion in the forfeiture statutes that repayment to victims could reduce the judgment. Indeed, Section 982(a)(1) contemplates the opposite, since it is based on the "property involved" in the money laundering. *See United States v. Elfgeeh*, 515 F.3d 100, 139 (2d Cir. 2008) (for money transmitting offense, which similarly applies Section 982(a)(1) for forfeiture, affirming judgment for total amount transmitted even though there are no victims); *United States v. Waked Hatum*, 969 F.3d 1156, 1164 (11th Cir. 2020) (in money laundering case

where victims suffered no loss, affirming forfeiture judgment of total sum of laundered money, because "the government's interest in the [laundered property] vests 'the moment' such property is laundered"). The same is true for wire fraud based forfeiture. While the defendant asserts that the proper measure of forfeiture here is the *net* proceeds under Section 981(a)(2)(B), rather than *gross* proceeds under Section 981(a)(2)(A), (Def. Mem. at 87-88), he is wrong. As the trial record showed, the defendant embezzled billions of dollars of FTX customer funds, and induced investors to part with money based on false statements. That is "inherently unlawful" conduct and therefore the gross proceeds rule under Section 981(a)(2)(A) applies. *See United States v. Bodouva*, 853 F.3d 76, 80 (2d Cir. 2017) (Section 981(a)(2)(A) applies to embezzlement); *Milton*, 2024 WL 779210, at *5 (selling securities for which prices have been inflated by "misleading statements" is "more analogous to cases involving Ponzi schemes" and thus Section 981(a)(2)(A) applies). And under Section 981(a)(2)(A), the law is clear: "there is no statutory authorization for an offset" even for payments to victims. *Bodouva*, 853 F.3d at 80.

The single case cited by the defendant for the proposition that return of funds through bankruptcy should offset victim losses is a decade-old, distinguishable decision from the Northern District of Illinois. *See United States v. Hollnagel*, No. 10 Cr. 195, 2013 WL 5348317 (N.D. Ill. Sept. 24, 2013). There, the district court reduced a forfeiture judgment to zero because the "[d]efendants returned the investors' investments over time" before their arrests. *Id.* at *4. Not only did the defendant not return the $8 billion he stole before his arrest, but the Second Circuit has explicitly rejected the reasoning of *Hollnagel*, under Section 981(a)(2)(B). *United States v. Shkreli*, 779 F. App'x 38 (2d Cir. 2019) (summary order). In *Shkreli*, the Court held that because "'forfeiture is gain based', not based on the losses (or gains) to victims," a defendant should be

required to forfeit "the total amount invested by investors" *even* if investors were paid back by the defendant during the scheme. *Id.* at 42 (citing *Torres*, 703 F.3d at 203).

The defendant next asserts that "none of the accounts identified for forfeiture were for [his] personal benefit," "were not profits 'enjoyed' by [him], but rather maintained on behalf of the companies," and therefore are not subject to forfeiture. (Def. Mem. at 88). This is legally and factually wrong. While the word "enjoyed" is found in *Hollnagel*, the law is clear that the Government can forfeit corporate assets based on a defendant's crimes when those assets were maintained through and on behalf of a company the defendant "extensively controls" or "dominates," such that "money paid to the corporation was effectively" under the defendant's control. *United States v. Peters*, 732 F.3d 93, 103-04 (2d Cir. 2013) (forfeiture proceeding under Section 982); *United States v. Tartaglione*, 15 Cr. 491, 2018 WL 1740532, at *21 (E.D. Pa. Apr. 11, 2018) (same for Section 981), *aff'd*, 815 F. App'x 648 (3d Cir. 2020). The trial evidence of course established the defendant's control and dominance of FTX, Alameda, and its affiliated entities.

Finally, the defendant asserts that the Court should order no forfeiture because he "no longer has custody of the accounts identified for forfeiture in the PSR" since the Government seized the accounts. (Def. Mem. at 88). This is utterly meritless—there is no authority even suggesting that the Government's seizure of assets traceable or involved in a defendant's crimes somehow precludes the Government from seeking forfeiture of the defendant's interest in those assets. Indeed, the forfeiture laws expressly authorize seizure as part of the forfeiture process. In order for the Government to effect forfeiture of the specific property described in the preliminary order of forfeiture, the Court must first order forfeiture of the defendant's interests in that specific property. *United States v. Daugerdas*, 892 F.3d 545, 549 (2d Cir. 2018) ("At stage one of

[forfeiture process], before entering a preliminary order of forfeiture, the court is directed to adjudicate the government's interest vis-à-vis the defendant"). Only once the Court has forfeited the defendant's rights in the property can the Court move on to "stage two," by "resolv[ing] any third-party petitioner's interests vis-à-vis the defendant." *Id.* If no third-party has a cognizable interest in the property superior to the defendant's, then the specific property can be finally forfeited to the Government.

In the preliminary order of forfeiture, the Government lists specific property beyond that listed in the forfeiture allegations in the S6 Indictment and the bill of particulars. (Dkt. 314).[14] That specific property is all forfeitable as proceeds of the defendant's wire frauds or as property involved in money laundering. The property listed in Ex. A(1) is another account in the name of Emergent Fidelity Technologies, which was seized at the same time and pursuant to the same legal authority as the property listed in the S6 Indictment ¶¶ 38(a), (b), 40(a), (b). Ex. A(2)-(255) are the specific forms of cryptocurrency maintained in the Binance accounts described in S6 Indictment ¶¶ 38(h), (i), (j), 40(h), (i), (j). Ex. A(258) is a bank account in the name of the defendant and another FTX employee, which received transfers from the account at Silvergate Bank in the name of Alameda ending in -4456, which as described in Government Exhibit 1050 accepted customer fiat deposits.

The Government also seeks to forfeit the defendant's interests in certain contributions traceable to his criminal conduct that he, Salame, and Singh made to political candidates and committees, during the relevant period. Beginning in March 2023, the Government, working with the United States Marshals Service and the FBI, sent letters to those candidates and committees who the Government had identified had received donations from the defendant, Salame, and Singh,

---

[14]   The airplanes listed at Ex. A(256) and (257) are the property listed in the bill of particulars.

requesting return of the donations as forfeitable property, and because the donations were illegal. As of today, 251 candidates and committees have returned $3,348,957.23.[15] The Preliminary Order of Forfeiture lists the identified campaigns, including those that have returned funds to the Government, in Ex. A(259) to (261). As evidenced at trial, the defendant's interests in the political donations are forfeitable because the donations were made using the proceeds of the defendant's wire fraud on customers and were themselves manifestation of his money laundering. (GX-1039; 1044; 1088; 1089; 1090).

## III. The Court Should Order Victim Compensation Through Remission as an Alternative to Restitution

The Government seeks to return all stolen assets that are finally forfeited to victims of the defendant's crimes in the most efficient manner possible. Because of the complexity of the case and the number of victims involved, awarding restitution to victims in accordance with 18 U.S.C. § 3663A would be extremely costly and administratively impractical. The cost and time associated with calculating each victim's loss, determining whether the victim has already been compensated through the pending bankruptcy, and then paying out a percentage of the victim's losses, will delay payment and diminish the amount of money actually paid to victims. Therefore, consistent with the Government's frequent approach in complex cases with numerous victims, the Government moves for entry of an order authorizing the United States to compensate victims with finally-forfeited assets through a remission process, as restitution would be impracticable in this case. 18 U.S.C. § 3663A(c)(3). As noted in the defendant's submission, he consents to this request.

---

[15]   The Government is also coordinating with the FTX Debtors, so that the estate retrieves some of the political contributions. In some circumstances, a political candidate or committee has sought to or did return funds to the estate rather than the Government. As of today, the Government understands that the estate has received $281,356 from 8 candidates and committees.

Restitution to persons "directly and proximately harmed" by fraud and money laundering is ordinarily mandatory. *See* 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii). In such a case, the Court is authorized to determine a restitution amount and a schedule of victims and payments. However, an order of restitution is not required when "the number of identifiable victims is so large as to make restitution impracticable," or when imposing restitution would require "determining complex issues of fact related to the cause or amount of the victim's losses" which "would complicate or prolong the sentencing process." *Id.* § 3663A(c)(3). In those situations, instead of ordering restitution, courts have authorized the Government to compensate victims through the process of remission under the forfeiture statutes and related regulations. *See, e.g.*, *United States v. Madoff*, 09 Cr. 213 (DC), Dkt. 106 & *United States v. Bonventre*, 10 Cr. 228, Dkt. 318 (Madoff Ponzi scheme); *United States v. Sharma*, 18 Cr. 340, Dkt. 407 (multi-million dollar cryptocurrency scheme); *United States v. Dos Santos*, 20 Cr. 398, Dkt. 283 (multi-million dollar cryptocurrency scheme).

The forfeiture statutes authorize the Attorney General to "grant petitions for mitigation or remission of forfeiture, restore forfeited property to victims of a violation of this subchapter, or take any other action to protect the rights of innocent persons which is in the interest of justice and which is not inconsistent with the provisions of this section." 21 U.S.C. § 853(i)(1). The applicable regulations are set forth in 28 C.F.R. Part 9. In order to qualify for remission, a crime victim must provide information to support specific elements, including that they suffered a specific pecuniary loss directly caused by the criminal offense, that the victim did not contribute to the offense, that the victim has not been in compensated for the loss from another means, and that the victim has no other recourse available. *See generally* 28 C.F.R. § 9.8(b).

It is the policy of the Department of Justice, consistent with the Crime Victims' Rights Act, to ensure that crime victims receive "full and timely restitution as provided in law." *See* 18 U.S.C. § 3771(c)(1). Accordingly, when the Government seizes property in connection with a criminal case, the Government's goal is to forfeit the property and then, in remission proceedings administered by the Attorney General through his delegee, the Chief of the Money Laundering and Asset Recovery Section of the Department of Justice's Criminal Division ("MLARS"), to distribute funds to victims. Frequently MLARS will distribute those assets through a remission program by which victims may petition for portions of forfeited property. *E.g. United States v. Sharma*, 18 Cr. 340 (LGS), 2022 WL 1910026, at *2 (S.D.N.Y. June 3, 2022). In a multi-victim or complex case, the process of notifying potential victims, processing petitions, verifying losses, and recommending a distribution of available funds may be managed on behalf of the Department of Justice by a Special Master or trustee, as authorized by 28 C.F.R. § 9.9(c).

While use of such means is common, there are other methods of distribution that the Department has used. In cases that also involve bankruptcy proceedings, the Department has at times worked with the bankruptcy estate to distribute forfeited assets. *E.g. United States v. $7,206,157,717 on Deposit at JP Morgan Chase Bank, N.A.*, 10 Civ. 9398, Dkt. 2 (S.D.N.Y. December 17, 2010) (stipulation and court ordered settlement whereby the estate of Jeffry Picower, who had received billions of dollars from Bernie Madoff, forfeited more than $7 billion; the Government agreed to credit $5 billion in payment to the bankruptcy estate to be allocated under bankruptcy rules, and then named the trustee as administrator for the remaining funds).

Victims' interests will be best served in this case by ordering remission of finally forfeited funds and by using the remission process. The Government has been in frequent communication

with MLARS about the most efficient way to do this, including by retaining a claims administrator or by transferring funds into the FTX bankruptcy estate upon specified conditions.[16]

An alternative arrangement whereby restitution is calculated and distributed to victims by the Government and the Court would be nearly impossible administratively, and would come at great expense to victims' recovery. In order to enter an order of restitution, the Court would need to determine and corroborate each victim's losses. That would require determining and corroborating for each customer victim both the amount of funds he or she transferred to FTX, and any funds withdrawn. That task, challenging as it would ever be for the global fraud which the defendant led, is compounded here further for victims who transferred funds via cryptocurrencies, given their ever-fluctuating value. There are millions of potential victims and substantial complexity in computing each victim's investments and withdrawals. Restitution in this case is even more complicated by the different classes of victims: FTX's dozens of equity investors, and the Alameda lenders who often lent or received funds via cryptocurrency.

Instead, a process whereby the Government distributes finally forfeited funds, either through a claims administrator or through a distribution to the bankruptcy estate, will more be efficient, and not "would complicate or prolong the sentencing process." 18 U.S.C. § 3663A(c)(3).

---

[16] The creditor class in the bankruptcy overlaps substantially but is not a perfect match with the victims of the defendant's crimes. For example, customers of FTX's US branch are not victims of the defendant's crimes as charged in the Indictment, but are expected to recover in the FTX bankruptcy; conversely, equity investors are victims of the charged offenses but may not recover their losses in the bankruptcy.

## **CONCLUSION**

In view of all of the facts and factors set out above, Bankman-Fried is deserving of a severe sanction, proportionate to his role in this historic fraud. While a Guidelines sentence – which would exceed 100 years, effectively a life sentence – is not necessary, the Government urges the Court to impose a sentence that underscores the remarkably serious nature of the harm to thousands of victims; prevents the defendant from ever again committing fraud; and sends a powerful signal to others who might be tempted to engage in financial misconduct that the consequences will be severe. A sentence of 40 to 50 years is necessary to serve such purposes.

Dated: New York, New York
       March 15, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    s/ Nicolas Roos
       Nicolas Roos
       Danielle Kudla
       Samuel Raymond
       Thane Rehn
       Danielle R. Sassoon
       Assistant United States Attorneys