# Exhibit A

# Statement I

brownrudnick

KENNETH AULET
kaulet@brownrudnick.com

March 12, 2024

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

**RE: *United States v. Samuel Bankman-Fried*, S6 22 Cr. 673 (LAK)**

Dear Judge Kaplan,

Mohsin Meghji as Plan Administrator of the BlockFi Wind-Down Debtors and the functional representative of over 300,000 BlockFi customers, submits via counsel this victim impact statement to provide the Court necessary context concerning the magnitude of harm inflicted upon BlockFi customers as a direct result of the criminal activities of Samuel Bankman Fried ("Bankman-Fried"). The undersigned is a partner with the law firm of Brown Rudnick, counsel to the Plan Administrator and the BlockFi Wind-Down Debtors in connection with BlockFi's post-confirmation chapter 11 proceedings in the United States Bankruptcy Court for the District of New Jersey.

**A. Fraudulent Documents Provided to BlockFi to Induce Billions of Loans.**

Historically, BlockFi was one of the largest lenders to Alameda Research Ltd. ("Alameda"), the hedge fund arm of the FTX group, and one of the largest depositors on the FTX exchanges. Bankman-Fried fraudulently directed the creation of several materially false balance sheets and other diligence documents and communications. These knowingly fraudulent communications, among other things: (a) concealed the misappropriation of billions of FTX customer assets; (b) omitted billions of related party loans FTX had outstanding to FTX insiders; and (c) falsely created the impression of corporate separateness between Alameda and the FTX exchange.

As this court is aware from the lengthy evidentiary record in this criminal proceeding, Bankman-Fried's conduct was in many instances specifically directed at BlockFi, as Alameda's primary lender. As such, BlockFi and its many customers suffered particular harm that is not analogous to those of other depositors on the FTX exchange. Rather, in reliance upon these fraudulent communications, BlockFi lent billions of dollars' worth of digital assets originating from deposits of BlockFi's retail customer base. When BlockFi experienced a short-term liquidity





crunch in mid-2022, it entered into a financing arrangement with FTX relying, again, on materially and knowingly false statement concerning the health and viability of the FTX enterprise. Moreover, BlockFi conducted significant trading activity on the FTX exchange, depositing hundreds of millions' worth of customer-originated assets.

When Bankman-Fried's crimes were exposed in November 2022, BlockFi lost the ability to call in loans, retrieve deposits, and draw on its liquidity facility. BlockFi commenced its own bankruptcy proceedings days after FTX as a direct result of these events.

B. **FTX Creditors – like BlockFi – Are Not Recovering Full Repayment.**

BlockFi has recently settled its disputes with the FTX estate (subject to court approval) that would give it allowed claims in the FTX bankruptcy proceeding. Even if these claims receive 100% of their allowed amount, however, BlockFi will not be "paid in full" and will suffer losses that will be passed on to BlockFi's customers. This will cause permanent losses of BlockFi customer life savings, as discussed further below.

BlockFi's customers lent BlockFi cryptocurrencies that BlockFi then re-lent to Alameda Research, or placed on the FTX exchange to facilitate trading for those customers. Alameda's obligations to BlockFi debts were denominated "in-kind": for the vast majority of BlockFi's loans to Alameda, BlockFi lent a specific number of BTC or ETH and was to receive repayment of that amount of BTC or ETH.

As a result of FTX's bankruptcy, those "in-kind" debts were converted into claims in US dollars, based on the values as of the petition date, pursuant to Section 502(b) of the Bankruptcy Code. FTX hopes (not guarantees) to make distributions representing 100% of the U.S. dollar-denominated market value of claims on the FTX petition date (*i.e.*, as of November 11, 2022).

It is important to recognize that in a bankruptcy proceeding, except in rare "solvent debtor" cases, that there is not enough money to pay the legitimate debts of the debtor. The Bankruptcy Code contains a number of provisions where Congress has determined how to allocate those limited assets – and thus, the losses – between creditors. Section 502(b) is such a section, limiting the recoveries of some creditors. BlockFi's recovery is, thus, limited to the dollar value of its claims and not what it is owed by contract (1 BTC for each 1 BTC lent).

A hypothetical depositor of one BTC at FTX, if they were truly to be repaid "in full," would receive a distribution today of one BTC, which just reached an all-time-high value of over $70,000. But the FTX plan would – if confirmed, and once effective, and if so only months from now, perhaps two years or more after commencement of bankruptcy proceedings – return to an FTX depositor the value of one BTC on November 11, 2022: $16,871.63.

In other words, each deposit of one BTC on the FTX exchange, if the depositor is "paid in full" as Bankman-Fried's counsel represents, constitutes a loss of approximately $50,000. For




each 1 BTC lent, BlockFi will get enough dollars to purchase approximately 0.24 BTC (assuming $70,000 per BTC).

BlockFi had lent over 25,000 BTC to Alameda as of November 11, 2022. This BTC came from BlockFi customers. That loss of $50,000 per BTC today is borne by BlockFi customers: a loss of over $1.25 billion on the lent BTC alone. Thousands more BTC were placed on FTX's trading platform, and over 133,000 ETH were lent to Alameda Research. Each of these claims represents losses of hundreds of millions of dollars even if paid "in full" under the FTX plan. Each lost dollar – due to Bankman-Fried's criminal conduct – is a lost dollar for BlockFi's customers.

BlockFi, like FTX, hopes to distribute to its customers as soon as possible the maximum amount permitted by its confirmed plan of reorganization, i.e., the dollarized face amount of allowed claims. But the Plan Administrator does not believe that all creditors can receive the full dollarized face amount of allowed claims. Truly repaying BlockFi's customers "in full," though, would cost billions of dollars more than the BlockFi estates can hope to recover upon their allowed claims in the FTX proceedings. These losses are directly attributable to Bankman-Fried's conduct.

In essence, Bankman-Fried uses the Bankruptcy Code's automatic conversion between currencies to obscure the damage done by his criminal conduct. Bankman-Fried left crypto assets at the FTX debtors that were a fraction of what was owed to their creditors. Those assets – no thanks to Bankman-Fried – rose in value after he was arrested. That rise in value, however, was owed to his victims. And had prices fallen, those victims would have borne those losses. Bankman-Fried's claims can be analogized to stealing half of a pile of gold bars, and if gold doubles in value by weight, declaring no harm, no foul.

BlockFi has no realistic possibility of recovering what it is *actually owed* thanks to its allowed claims in FTX's bankruptcy. If prices are similar to today's, BlockFi will receive approximately .24 BTC for every BTC it is owed. That, under the bankruptcy code, may constitute "payment in full" such that BlockFi cannot claim more from the FTX estate. But it is not what BlockFi is owed. And thus, BlockFi has no possibility of paying to its customers what they are actually owed.

**C. Grave Harm Inflicted Upon BlockFi Customers.**

The harm to BlockFi customers from this criminal fraud cannot be overstated. BlockFi's bankruptcy proceeding left BlockFi customers without access to their funds. The vast majority of BlockFi's customers were individuals, investing their savings. When FTX collapsed, BlockFi too collapsed – and those customers abruptly lost access to their savings on November 10, 2022. BlockFi's employees and advisors, including undersigned counsel, receive daily, detailed pleas from customers attesting to suffering caused by these events.




Facts and figures – how much money was lost, and by how many people – can obscure the human toll of this crime. Each BlockFi customer represents a victim – usually an individual who placed a meaningful portion of their life savings with BlockFi. Because of Bankman-Fried's criminal conduct, they have lost access to all of that amount for a year or more, and most will never be made whole.

Customers have expressed desperation regarding their inability to obtain access to their savings. For example, one customer wrote to me regarding their situation: they had sold their house and put the proceeds in a BlockFi account, planning to use it for a down payment on a new house. After BlockFi collapsed, they lost access to those funds – and, thus, the ability to purchase a new house. Even if their funds were eventually returned in full, that would not give them back the years they spent unable to purchase a house. Other customers have discussed how BlockFi had their retirement savings, preventing them from retiring or if they had already retired, wondering how they will fund their retirement. One creditor informed us that if he could ever begin construction on a house – and what that house would look like – entirely depended on the Plan Administrator's success in recovering funds.

But these stories are not limited to "high dollar" accounts. Smaller accounts held meaningful portions or the entirety of the life savings of some individuals, whose financial situation was precarious to begin with and the loss of hundreds or thousands of dollars devastating. In at least one case this led to an email from a BlockFi customer referencing suicide, despite the relatively small value of their account.

Bankman-Fried's fraud will not simply lead to a delay in BlockFi customers receiving their funds. Even if the rise in cryptocurrency prices ensures that FTX is able to make its hoped-for 100% distributions, it is possible certain BlockFi customers will receive "100%" of their bankruptcy claim value. But we do not have any expectation that all BlockFi customers will receive 100% of their claim value. Tens of thousands of people – largely individual American citizens – will lose meaningful portions of their net worth.

Even for BlockFi customers who may ultimately receive "100%" distributions, for many of those customers the distribution will not make them whole from the effects of Bankman-Fried's criminal conduct. Again, "100%" distributions are an artifact of the Bankruptcy Code converting claims into dollars at a specific time. Customers who chose to invest their savings in cryptocurrency prior to BlockFi'd bankruptcy will receive only a fraction of that cryptocurrency back, even if they obtain a "100%" distribution. They are permanently poorer thanks to Bankman-Fried's criminal conduct.





**D. Conclusion.**

Bankman-Fried's felonious conduct has caused irreparable harm to hundreds of thousands of BlockFi customers. Bankman-Fried's efforts to utilize quirks of the Bankruptcy Code and shifting conversion rates are dishonest and should not be permitted to obscure that harm.

Hundreds of thousands of individuals, throughout the United States and the rest of the world, rich and poor, have been made permanently poorer as a result of Bankman-Fried's conduct. Their lives will be affected as a result. The efforts of the FTX Debtors, and the Plan Administrator, to ameliorate that harm as much as possible given what is left after Bankman-Fried's felonious conduct (efforts that have cost huge sums of money, ultimately borne by those victims) will never be able to make victims whole.

In determining an appropriate sentence for Bankman-Fried, the Plan Administrator asks that those hundreds of thousands of victims, through BlockFi, and the harm done to their lives be taken into consideration. Each one of those hundreds of thousands of BlockFi customers have a story about how their life is impacted by Bankman-Fried's conduct – many desperately sad. Bankman-Fried's efforts to pretend they have suffered no harm are insulting and should be rejected.

Sincerely,

**BROWN RUDNICK LLP**

Kenneth J. Aulet

# Statement II




**13 March 2024**

To whom it may concern,

**Re: FTX Victim Impact Statement**

At Wincent, we considered FTX one of the more trusted exchanges. FTX breached this trust, and we lost around $35MM (27% NAV) of our total assets under management.

Our LP investors were shaken; they were scared and angry. Many of them took their money elsewhere and we faced immediate redemptions of $26MM (23% NAV). But we lost something more important than money here—we lost trust and bonds we were building with these people over many years.

Wincent doesn't charge a management fee and the performance fee is contingent on the high-water mark. We were going to be with no revenue for the months to come. Wincent is our people; now we had to let go of 28 of our colleagues (29%). We could no longer afford them. Those who remained had it hard as well. Everyone got their compensation temporarily reduced by 25%.

I believe that the recovery will eventually reach 100%. Unfortunately, that won't bring us back investors and colleagues we lost along the way.

That much more grateful I am to colleagues and investors who stayed with us throughout this crisis. Their support made us stronger; we all built a strong bond and trust that will make us get through anything.

This quagmire did have a silver lining. Customers started demanding responsible behavior from crypto exchanges. Some of them listened; we noticed a slight, but promising, shift towards more transparency.

Finally, I believe that the FTX collapse can be good for the fledgling crypto industry. Yes, there is fraud in crypto. But the world should also learn that fraudsters can't escape justice. That's a strong message this industry needs to hear.

Yours sincerely,

Samuel Hapak

Samuel Hapak
(CEO Wincent Capital Management Ltd)

Wincent Investment Fund PCC Limited

Old Police Station, 120B Irish Town

GX11 1AA Gibraltar