

570 Lexington Avenue, Suite 3500
New York, NY 10022
212-466-6400

March 20, 2024

<u>**VIA ECF**</u>
The Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Bankman-Fried*, 1:22 CR 673 (LAK)

Dear Judge Kaplan:

      This letter-brief is respectfully submitted on behalf of Sam Bankman-Fried in further reply to the government's Sentencing Memorandum in the captioned matter. (ECF 410). Sam respectfully maintains his objections to the PSR set forth in his Sentencing Memorandum (ECF 407, "Def. Br.") and his March 19, 2024 letter-brief (ECF 413), and adds the following thereto.[1]

      1.    <u>*Kisor* and Actual Loss</u>

      Sam's Sentencing Memorandum demonstrated that the application of intended loss is impermissible under *Kisor v. Wilkie*, 588 U.S. ----, 139 S. Ct. 2400 (2019), and a series of appellate decisions spanning nearly five years. Def. Br. at 16-17. In response, the government asserts that the "Second Circuit and district courts within this Circuit have, even after *Kisor*, consistently applied the commentary on 'intended loss' when calculating the Guidelines range." Gov. Br. at 48. But all the government cites is a single, unpublished, non-precedential summary order from the Second Circuit that quotes a decision from five years before *Kisor*, that did not consider this *Kisor* argument, and that ultimately applied actual instead of intended loss. Indeed, the language cited by the government from *United States v. Powell*, 831 F. App'x. 24, 25 (2d Cir. 2020) is neither a statement of law post-*Kisor* nor is it "consistently applied" within this Circuit.

      To the contrary, two judges within the Eastern District of New York have considered *Kisor*'s application to the guidelines' loss calculation and concluded that intended loss is inapplicable. In *United States v. Gary*, Judge Donnelly refused to apply intended loss to a § 2B1.1 loss calculation and said the following about *Kisor*:

---

[1] For purposes of sentencing, Sam accepts the jury's verdict. He disputes many of the facts in the government's submission and preserves all rights to do so on appeal.

> Judge Amon had the opportunity to consider this recently. And this is all on the subject of whether intended loss is something that courts should consider. Intended loss is mentioned in the comments. Judge Amon said that the idea that loss means intended loss rather than actual loss is not the kind of ambiguity that the Supreme Court in *Kisor* was talking about. I think Judge Amon's reasoning is correct for a lot of the reasons, the practical reasons that she cited in that opinion . . . But for whatever it's worth, I think under *Kisor*, this idea of intended loss, at least for purposes of the guidelines, it adds something that the guidelines themselves don't say. Obviously, a court can consider what a defendant's intended loss was in considering the statutory factors. But I don't think, for purposes of the guidelines themselves, that that's what we should do.

See Ex. A, August 24, 2023 Hearing Transcript, at 6:22-7:22, Case No. 20-cr-440 (AMD) (E.D.N.Y.).[2]

The government also claims that "[o]ther courts" have rejected attempts to rely on *Kisor* in this manner, but again cites only a single decision from the Sixth Circuit in *United States v. You*, 74 F.4th 378, 396-98 (6th Cir. 2023). Gov. Br. at 48. But even that lone decision has been criticized within the Sixth Circuit. *See United States v. Kennert*, No. 22-1998, 2023 WL 4977456, at *4 (6th Cir. Aug. 3, 2023) (Murphy, J., concurring) (as to the guidelines' commentary that loss can include intended loss, "make no mistake, I find this interpretation implausible. If considering this question from scratch, I would have agreed with the views of our colleagues on the Third Circuit . . . 'Loss' means 'loss' . . . [J]ust because 'loss' can refer to [ ] different harms does not mean that it can refer to nonexistent ones too.").

To the extent that "other courts" are considering *Kisor* in the context of loss calculations, like *Gary*, *Beebe*, and the line of cases cited in Sam's sentencing submission, they are coming out in favor of defendants and against the government. *See United States v. Patel,* Case No. 19-CR-80181-RAR, 2023 WL 5453747, at *1-3 (S.D. Fla. Aug. 23, 2023) ("Here, § 2B1.1 is unambiguous. So, the Court cannot consider the commentary and is bound by § 2B1.1's plain text."); *United States v. Wheeler*, No. 5:22-CR-38-FL-1, 2023 WL 4408939, at *1-3 (E.D.N.C. July 6, 2023) ("In sum, the weight of present authority supports limiting 'loss' to actual loss.").

    2.    <u>*Kisor* and Credits Against Loss</u>

The government misinterprets *Kisor* with respect to other guidelines issues, as well. For example, the government asserts that "the plain text of the Guidelines does not provide for any reduction in loss amount based on the possibility that victims will receive compensation in the bankruptcy." Gov. Br. at 40. There is no such restriction in the guidelines themselves, which explains why the government cites *commentary* to support its sweeping assertion. *Id.* at 36-37, 39-40. *Kisor* and the cases interpreting its application to the guidelines instruct that loss means

---

[2] Judge Donnelly cited a sentencing decision from Judge Amon of the Eastern District in *United States v. Beebe*, Case No. 21-cr-197 (CBA) (E.D.N.Y.). That sentencing transcript is not accessible on PACER and undersigned counsel was unable to obtain a copy in advance of this filing.

an amount that is actually lost, consequently, Sam should be credited for payouts that customers, lenders, and investors receive from the bankruptcy.

The government repeatedly decries that customers have missed out on the upside of market swings since the petition was filed. *See* Gov. Br. at 42-46. The government does not deny that bankruptcy payouts will be made eventually, and any delays and missed market swings should be attributed to operation of the bankruptcy code and not to Sam's alleged crimes. Moreover, it is not clear the government is correct that customers will miss out on the upside of market swings. A February 28, 2024 summary of the bankruptcy distribution plan submitted by the debtor estate to the government suggests that customers may also receive the appreciated value of digital assets. *See* Ex. B at 2.

Nor does the case law cited by the government support the argument that the Court should not credit Sam for the inevitable bankruptcy payouts to creditors. *United States v. Ware*, 399 F. App'x 659, 662 (2d Cir. 2010), is not precedential, was decided nine years before *Kisor*, and provides no details as to how the company's bankruptcy filings were relevant to loss in a contempt prosecution for disobeying court orders in a civil lawsuit. *Id.* Similarly, *United States v. Bergstein*, 788 F. App'x 742, 747 (2d Cir. 2019) is a non-precedential summary order that did not consider *Kisor* and determined that intended loss was "the appropriate measure of loss," rendering any discussion of funds subsequently recovered by the company mere dicta. The government urges the Court to disregard the Seventh Circuit's calculation of loss in *United States v. Durham*, 766 F.3d 672 (7th Cir. 2014), but offers no reason why it should do so. It asserts that "the evidence at sentencing did not show exactly how much the defendants had misappropriated, so the district court relied on the amounts invested by investors minus the amount recovered in bankruptcy as a reasonable proxy for that loss." Gov. Br. at 41. But there was no such statement about the evidence at sentencing in *Durham*. To the contrary, the Seventh Circuit described the district court's loss calculation as being based on a report prepared by the corporate bankruptcy trustee "[a]fter a thorough review of [the company's] books and the claims submitted by investors[.]" 766 F.3d at 687.

Finally, the government argues that the holding of *United States v. Abiodun*, 536 F.3d 162 (2d Cir. 2008), a fraud case involving monetary losses that were reimbursed by victims' financial institutions, "is that the costs of collection should be added to the total loss amount, not that such costs are the only permissible loss amount." Gov. Br. at 46. The government misreads that decision. The Second Circuit described the district court's calculation of the number of victims as taking "individuals who had spent an appreciable amount of time securing reimbursement for the financial losses from their banks or credit card companies" and considering them "together with the 'dozens' of corporate victims and the 'small percentage of individuals *who actually did lose money*[.]'" 536 F.3d at 166 (emphasis added). The "corporate victims" were the financial institutions that reimbursed the first category of individuals for their losses. There is no indication that the district court counted the reimbursements paid to the first group of individuals as cognizable monetary losses suffered by those individuals. To the contrary, the Second Circuit held that the district court erred when it "took lost time into account when calculating the number of victims affected by defendants' conduct but failed to include the monetary value of this lost time when calculating the actual loss[.]" *Id.* at 169. *Abiodun* therefore fully supports Sam's

position that bankruptcy payouts should be credited against loss and that the fees incurred by the FTX Creditors Committee in the bankruptcy proceedings are a reasonable alternative estimate of actual loss in this case. Def. Br. at 22-23.

    3.    <u>Intended Loss</u>

In the event the Court considers intended loss despite *Kisor*, the government asserts that even if Sam "hoped that those investments would prove profitable, enabling him to escape detection for his misuse of victim funds, that is not sufficient to reduce the intended loss calculation." Gov. Br. at 52. The government offers no basis for the Court to disregard *United States v. Confredo*, 528 F.3d 143 (2d Cir. 2008), which held that evidence of a defendant's subjective intent to repay fraudulently obtained loans can be sufficient to reduce intended loss. *Id.* at 152. In response to just such evidence, the government complains that the letter cited in Sam's sentencing submission was from "an FTX employee who did not begin directly working with the defendant until around November 7, 2022[.]" Gov. Br. at 51. But that is the point. That employee had no prior relationship with Sam, and nonetheless provided a neutral but striking account of Sam "work[ing] almost around the clock, to the point of exhaustion[,]" with a "sole focus on helping to get customers repaid in full." *See* ECF 407-10 at 2. Likewise, the government discounts without explanation Sam's good faith associated with the "sharp rise" (*see* ECF 407-36, fn. 1) in Alameda deposits into FTX prior to the petition date. Gov. Br. at 52; *see contra* ECF 413 at 1, ECF 413-1.

    4.    <u>Investor "Loss"</u>

As to FTX investors, the government argues that Sam is accountable for $1.7 billion, the "full amount of the funds invested" by some of the world's most sophisticated venture capital firms and investment funds. (Gov. Br. at 46-47). They cite *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007) for the proposition that the appropriate measure of investor loss is "the difference between pre- and post-disclosure share prices." *Id.* at 179. But *Rutkoske* concerned a publicly traded stock whose price decline in the public market followed disclosure of a boiler-room style fraud. *Id.* at 179. Not so here. FTX stock was privately held and no measurable price drop was proven at trial. Rather, two trial witnesses "estimate[d]" that their companies' FTX stock was worth zero at the time of trial. (Trial Tr. 290; 2022). *Rutkoske* does not endorse a "choose your own loss" approach to the guidelines in which victims apply accounting principles to "wr[i]te the value of their investments down to zero," regardless of the true value of FTX stock. Gov. Br. at 47.

Furthermore, recent discovery produced by the government refutes the contention that "the equity in FTX is now worthless." Gov. Br. at 39. A February 14, 2024 letter from Debtors' counsel to the Bankruptcy Trustee ("S&C Letter") set forth the Debtors' "current projected recovery analysis" based on the value of their assets as of December 31, 2023. *See* Ex. C at 3. That analysis projected as much as $13.7 billion in total assets in the bankruptcy estate, $12.6 billion in non-investor claims (including post-petition interest), $16.9 billion in government

claims, and $2 billion in investor claims (which the government confirms is really $1.7 billion). *Id*. Two weeks later, on February 28, 2024, Debtors' counsel revised its estimate such that the "total amount of Governmental Claims is expected to be $3-5 billion." *See* Ex. B at 2. Apparently, part of what is standing in the way of recovery for FTX investors is government claims.

The Debtors' most recent disclosure in the bankruptcy proceeding paints an even more optimistic picture for FTX investors. On March 5, 2024, the Debtors asked the bankruptcy court for a fourth extension of the deadline to file a Chapter 11 plan. *In re FTX Trading Ltd*., Case No. 22-11068 (JTD), ECF 8621, at 10 (Bank. D. Del. Mar. 5, 2024) ("Extension Motion"). That Extension Motion asserted that in the period between January 26, 2024, and the date of the motion (March 5), the Debtors had "[c]ontinued to identify and recover billions of dollars in liquid assets." Extension Motion at 10. While the full amount of the "billions of dollars in liquid assets" recovered during that period is not known to us, it appears more and more likely that FTX investors may be in a position to recover 100% of their claims in the bankruptcy. That conclusion is bolstered by the Debtors' representation that even after paying creditors postpetition interest as a result of "improved projections as to distributable value," there will be "exit liquidity" left over. Extension Motion at 10. The Debtors' reference to "exit liquidity" undercuts the government's assertion that the FTX equity is "worthless[.]"

     5.     <u>Abuse of Position of Trust</u>

The government's argument to apply an enhancement for abuse of a position of trust misses the mark. They first cite *United States v. Lebedev*, 932 F.3d 40, 57 (2d Cir. 2019), for the proposition that "[a] position of trust is held by one who was accorded discretion by the victim and abused a position of fiduciary or quasi-fiduciary status." *Id.* (citation and internal quotes omitted). But the government provides no evidence to support its contention that the customers of FTX accorded Sam any degree of discretion with respect to funds they placed on the FTX platform. Sam's role as CEO of FTX had nothing in common with that of an attorney serving as a guardian, as the government suggests. Gov. Br. at 60.

The government claims that customers "entrusted their money to [Sam's] care (through FTX)." Gov. Br. at 60. But they conflate mere "trust" with a "position of trust." Trust is a component of many contractual relationships. For example, one trusts that an online vendor will send the merchandise one has paid for in advance, but that does not put the vendor in a "position of trust" vis-à-vis the customer. The relationship remains contractual despite the existence of some degree of trust.

Pointing to *United States v. Christiansen*, 958 F.2d 285 (9th Cir. 1992), the government compares Sam to a credit union manager who embezzled funds. Gov. Br. at 60. Again, the government overshoots. In *Christiansen*, the Ninth Circuit found that the defendant credit union manager held a position of trust with respect to her credit union employer, the victim of the embezzlement, not with respect to the customers of the credit union. *See* 958 F.2d at 286

("Christiansen embezzled over $96,000 from the credit union she managed, *breaching the trust vested in her by her employer*." (emphasis added)). Sam may well have held a position of trust with respect to FTX, but that does not suffice to support this enhancement.

6. "Relocation"

The government's argument with respect to the enhancement pursuant to Section 2B1.1(b)(10) provides a clear example of distorting the facts to fit the narrative. The government argues that the enhancement is "appropriate where the defendant 'moved his scheme … in an effort to avoid detection." Gov. Br. at 57 (citing *Warner v. United States*, 21 F. App'x 43, 46 (2d Cir. 2001)). The government then contends that Sam "relocated FTX and Alameda outside of the United States in part to take advantage of the more permissive regulatory environment that allowed FTX.com to offer cryptocurrency derivative products that are not lawful to sell as a U.S.-based offering its products to U.S. retail customers without an appropriate license from the CFTC." Gov. Br. at 57. But Alameda never offered cryptocurrency derivative products to any customers and FTX.com was never located in the United States. The only move involving FTX.com was from Hong Kong to The Bahamas, in the middle of a worldwide pandemic. The government provides no support for its insinuation that this move was part of an effort to avoid detection by law enforcement personnel of any nation.

7. Bankruptcy Fraud Enhancement

The government claims that a two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(9)(B) should apply because the offense involved "a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding." Gov. Br. at 54. This falls flat. The government does not dispute that Sam made no misrepresentation in any bankruptcy proceeding. Yet they contend that Sam's compliance with an order of Bahamian authorities to transfer certain assets to those Bahamian government authorities constituted fraudulent conduct. The government, casting Sam's conduct as "shielding" assets from the U.S. bankruptcy process, Gov. Br. at 56, argues that that is a "legally sufficient basis to impose this enhancement." Gov. Br. at 56. In support, the government cites only *United States v. Simpson*, 796 F.3d 548, 555 (5th Cir. 2015). In *Simpson*, however, the defendant had conspired with a bankruptcy debtor (and received payment) to shield assets so that the debtor could retain them for himself outside of the bankruptcy proceeding. *Id.* at 555. Sam, on the other hand, complied with an order of a foreign government with physical jurisdiction over him. He did not seek to transfer the assets to himself; he transferred them to the foreign government. And, unlike Simpson, he received no compensation for his efforts.

8. Forfeiture

Sam does not object to the forfeiture of the property specified in the preliminary forfeiture order, which is not to acknowledge that he had a personal interest in any of it in the first place. The government has already seized most of the identified assets, and the remaining assets are under the control of the debtor's estate. *See* ECF 400 at 60-61; ECF 413-3. Yet, the government seeks a money judgment against Sam for $11 billion. This is draconian.

As an initial matter, a money judgment is not authorized by the forfeiture statutes. The government seeks forfeiture against Sam pursuant to 18 U.S.C. §§ 981(a)(1)(c) and 982(a)(1), and 28 U.S.C. § 2461(c). Those statutes do not, however, authorize a forfeiture money judgment, as opposed to the forfeiture of specific assets derived from the crime (or substitute assets, pursuant to the procedures of 21 U.S.C. § 853(p)). Where—as here—the text of the statutes at issue do not explicitly provide for a forfeiture money judgment, courts lack the power to impose one. *See, e.g.*, *United States v. Nejad*, 933 F.3d 1162, 1164-65 (9th Cir. 2019) ("The criminal forfeiture statutes at issue … lack any textual basis for imposing a personal money judgment."); *United States v. Surgent*, No. 04-CR-364 (JG)(SMG), 2009 WL 2525137, at *5-16 (E.D.N.Y. Aug. 17, 2009) (holding that neither § 982 nor § 853 authorize forfeiture money judgments; discussing flawed reasoning of decisions imposing such judgments; observing that "Congress knows how to explicitly authorize" a forfeiture money judgment when it desires to).

A money judgment is particularly inappropriate here because the government relies in part on 18 U.S.C. § 982(a)(1), which broadly authorizes any property "involved in" or "traceable to" a money laundering offense, whether or not the property is the proceeds of a crime or otherwise represents an ill-gotten gain.

A money judgment, as opposed to forfeiture of specific property, is also unnecessary here given that the government has already seized the property. *See* ECF 389 at 6-7 (identifying properties "seized by the government"). Sam did not object to the forfeiture of the already seized assets. He does object to forfeiture in the form of a money judgment, which is a new and distinct burden.

As to the money received from investors and lenders in connection with the wire fraud counts, 18 U.S.C. § 981(a)(1)(C) does not apply. There is nothing "inherently unlawful" about exchanging equity for investments or taking loans. *See United States v. Contorinis*, 692 F.3d 136, 145 n.3 (2d Cir. 2012). The government cites to *Milton* to justify that "embezzlement, soliciting funds as part of a Ponzi scheme" are "inherently unlawful." Govt. Br. at 103. However, Judge Ramos noted "the difficulty of determining whether § 981(a)(2)(A) or (a)(2)(B) applies to a particular defendant's conduct" and "[t]he case law provides no clear way to delineate" as to which definition of "proceeds" applies. *United States v. Milton*, 21 Cr. 478 (ER), 2024 WL 779210, at *4 (S.D.N.Y. Feb. 26, 2024). Additionally, Milton is appealing.

As a factual matter, the government cites GX 26 to support its claim that the Court should direct the forfeiture of $1,720,000,000 for investors "which represents the proceeds of the defendant's securities fraud." Gov. Br. 105. GX 26 is a spreadsheet that lists the amounts invested in the Series B, B-1, and C round investments in FTX.com. This spreadsheet was admitted through the testimony of former FTX general counsel Can Sun. Mr. Sun testified that he "[c]onsistently told our investors that FTX and Alameda are two fully independent and separate companies … [b]ased on representations made to [him] by Sam." Trial Tr. at 1945. But it is improbable that Mr. Sun could have made any representations to all Series B round investors that induced their investments (whether based on Sam's representations to him or otherwise) because the Series B round closed in July 2021 and Mr. Sun did not start at FTX until August

2021. Trial Tr. at 1943. Thus, except for the two Series B round investors who testified at trial that Sam personally made representations to them regarding the relationship between FTX and Alameda (representatives of Paradigm and Third Point), the trial record does not support the inference that the funds received from Series B round investors are proceeds of securities fraud. Consequently, any forfeiture ordered with respect to proceeds of security fraud should not include the approximately $733 million received from the Series B round investors other than Paradigm and Third Point.

Lastly, the government requests that the Court order remission. Sam in no way objects to remission occurring, but maintains his objection to a forfeiture money judgment and notes that only the Attorney General or his designee has authority to order remission. *See United States v. Pescatore*, 637 F.3d 128 (2d Cir. 2011).

9. <u>Constitutional Rights</u>

Not only is the proposed forfeiture legally and factually unsupported, it is unconstitutional. The Supreme Court in *Bajakajian* has noted "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Bajakajian*, 524 U.S. 321, 334, 118 S. Ct. 2028, 2036 (1998) (citing *Austin v. United States*, 509 U.S. 602, 622-623, 113 S. Ct. 2801, 2812 (1993) (noting Court of Appeals' statement that "'the government is exacting too high a penalty in relation to the offense committed'"); *Alexander v. United States*, 509 U.S. 544, 559, 113 S. Ct. 2766, 2776 (1993) ("It is in the light of the extensive criminal activities which petitioner apparently conducted . . . that the question whether the forfeiture was 'excessive' must be considered")).

The forfeiture would be ruinous to Sam's ability to earn a livelihood in the future. If a forfeiture can be characterized as punitive, a court must consider "whether the forfeiture is unconstitutionally excessive." *United States v. Viloski*, 814 F.3d 104, 110 (2d Cir. 2016). In *Bajakajian*, the Supreme Court "emphasize[d] that the Excessive Fines Clause grew out of the English constitutional tradition, including Magna Carta, which required that a fine 'should not deprive a wrongdoer of his livelihood.'" *Viloski*, 814 F.3d at 111. The Second Circuit has held that, in appropriate cases, courts should consider "[w]hether a forfeiture would destroy a defendant's livelihood" in addition to the non-exhaustive *Bajakajian* factors, because "hostility to livelihood-destroying fines is deeply rooted in our constitutional tradition." *Id.* at 111-12. The potential Eighth Amendment violation here would be particularly pronounced if the forfeiture is in the form of a money judgment that would attach to Sam indefinitely.

Independent of any other factors bearing on proportionality, the Court should reject the proposed forfeiture because—given its massive size—it would undisputedly be "ruinous" to Bankman-Fried's ability to earn a livelihood in the future. *See United States v. Levesque*, 546 F.3d 78, 83-85 (1st Cir. 2008) (holding that question whether a forfeiture would destroy a defendant's future livelihood is "separate" from the test for proportionality). If the money

judgment sought by the government is granted, it is simply inconceivable that Sam will *ever* be in a position to satisfy it. That appears to be the point.

Finally, in *Libretti v. United States*, 516 U.S. 29, 48-49, 116 S. Ct. 356, 367-368 (1995), the Supreme Court held that criminal defendants have no constitutional right to a jury determination on forfeiture. The Second Circuit has held that criminal forfeiture is not subject to the *Apprendi* doctrine. *United States v. Stevenson*, 834 F.3d 80, 85, (2d Cir. 2016). But *Southern Union Co. v. United States,* 567 U.S. 343, 132 S. Ct. 2344 (2012), which held that *Apprendi* applies to certain criminal fine provisions, *undermines* Stevenson. In light of *Southern Union Co.*, Sam preserves for further review on appeal the argument that the proposed forfeiture order, and in particular any money judgment, would violate his Fifth and Sixth Amendment rights because it was not based on facts found by a jury beyond a reasonable doubt.

                                                Respectfully submitted,

                                                /s/ Marc L. Mukasey
                                                Marc L. Mukasey
                                                Torrey K. Young
                                                Thomas E. Thornhill
                                                Michael F. Westfal

cc:       All counsel (via ECF)