# Exhibit B

1

1          UNITED STATES BANKRUPTCY COURT
              DISTRICT OF DELAWARE
2

3   IN RE:                      .   Chapter 11
                                .   Case No. 22-11068 (JTD)
4   FTX TRADING LTD., *et al.,* .
                                .   (Jointly Administered)
5          Debtors.            .
    . . . . . . . . . . . . . . .
6                               .
    FTX TRADING LTD., WEST      .
7   REALM SHIRES SERVICES, INC.,.
    AND ALAMEDA RESEARCH LTD.,  .
8                               .
           Plaintiffs,          .
9                               .
           -against-            .   Adv. Pro. No. 23-50759 (JTD)
10                              .
    MIRANA CORP., BYBIT FINTECH .
11  LTD., TIME RESEARCH LTD.,   .
    SIN WEI "SEAN" TAN, WEI LIN .
12  "GERMAINE" TAN, WEIZHENG YE,.
    AND NASHON LOO SHUN LIANG,  .
13                              .
           Defendants.          .
14  . . . . . . . . . . . . . . .

15  ALAMEDA RESEARCH LLC, FTX   .   Adv. Pro. No. 23-50419 (JTD)
    TRADING LTD., WEST REALM     .
16  SHIRES, INC., AND WEST      .
    REALM SHIRES SERVICES INC.  .
17  (D/B/A FTX.US),             .
                                .
18         Plaintiffs,          .
                                .
19   v.                         .   Courtroom No. 5
                                .   824 North Market Street
20  DANIEL FRIEDBERG,           .   Wilmington, Delaware 19801
                                .
21         Defendant.           .   Wednesday, January 31, 2024
    . . . . . . . . . . . . . . .   10:30 a.m.
22

23              TRANSCRIPT OF HEARING
         BEFORE THE HONORABLE JOHN T. DORSEY
24            UNITED STATES BANKRUPTCY JUDGE

25

```
 1   APPEARANCES:

 2   For the Debtors:          Adam Landis, Esquire
                               LANDIS RATH & COBB LLP
 3                             919 Market Street
                               Suite 1800
 4                             Wilmington, Delaware 19801

 5                             Andrew Dietderich, Esquire
                               Brian Glueckstein, Esquire
 6                             Alexa Kranzley, Esquire
                               SULLIVAN & CROMWELL LLP
 7                             125 Broad Street
                               New York, New York 10004
 8
     For the U.S. Trustee:     Jonathan Lipshie, Esquire
 9                             Linda Richenderfer, Esquire
                               Benjamin Hackman, Esquire
10                             OFFICE OF THE UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
11                             Lockbox 35
                               Wilmington, Delaware 19801
12
     For the Official
13   Committee:                Kenneth Pasquale, Esquire
                               Kris Hansen, Esquire
14                             PAUL HASTINGS LLP
                               200 Park Avenue
15                             New York, New York 10166

16   For the Joint Official
     Liquidators of FTX:       Brett Bakemeyer, Esquire
17                             WHITE & CASE LLP
                               1221 6th Avenue
18                             New York, New York 10020

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Dana L. Moore, ECRO

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1   <u>APPEARANCES (CONTINUED)</u>:

2   For Aurus Tech LTD:        David Klauder, Esquire
                               BIELLI & KLAUDER, LLC
3                              1204 North King Street
                               Wilmington, Delaware 19801

4
                               Thomas Bielli, Esquire
5                              BIELLI & KLAUDER, LLC
                               1095 Spruce Street
6                              Philadelphia, Pennsylvania 19103

7   For TMSI:                  Mark Minuti, Esquire
                               SAUL EWING LLP
8                              1201 North Market Street
                               Suite 2300
9                              Wilmington, Delaware 19801

10  For MAPS Vault:            Dennis O'Donnell, Esquire
                               DLA PIPER (US) LLP
11                             1251 Avenue of the Americas
                               New York, New York 10020

12
    For BOBA Foundation:       John Weiss, Esquire
13                             PASHMAN STEIN WALDER HAYDEN P.C.
                               Court Plaza South, East Wing
14                             21 Main Street
                               Suite 200
15                             Hackensack, New Jersey 07601

16  For Steadview Capital:     Douglas Mintz, Esquire
                               SCHULTE ROTH & ZABEL
17                             555 13th Street, NW
                               Suite 6W
18                             Washington, DC 20004

19  For Foundation
    Serendipity/Elements:      Kurt Gwynne, Esquire
20                             REED SMITH LLP
                               1201 North Market Street
21                             Suite 1500
                               Wilmington, Delaware 19801

22
    For Michael Lusk:          Michael Lusk, Esquire
23                             MICHAEL LUSK ATTORNEY AT LAW
                               1030 Noble Street
24                             Anniston, Alabama

25

1                                   INDEX

2    BENCH RULING:                                          PAGE

3        JUDGE'S RULING ON IRS ESTIMATION MOTION          7

4
     MOTIONS:                                              PAGE
5
     Agenda
6    Item 24: Update Regarding Chapter 11 Cases            17

7    Agenda
     Item 25: Motion of Debtors to Estimate Claims         34
8             Based on Digital Assets
              [D.I. 5202; Filed 12/27/23]
9
              Court's Ruling:                              128
10

11   EXAMINATIONS:                                         PAGE

12       EDWARD MOSLEY
         Cross-examination by Mr. Bielli                   39
13       Cross-examination by Mr. Gwynne                   46
         Redirect examination by Mr. Glueckstein          58
14
         KEVIN LU
15       Direct examination by Mr. Glueckstein            64

16       SABRINA HOWELL
         Direct examination by Mr. Glueckstein            69
17       Cross-examination by Mr. Bielli                  73

18
     DECLARATIONS:                                         PAGE
19
     1) Edward Mosley                                      37
20
     2) Sabrina Howell                                     72
21

22

23

24

25

1          (Proceedings commence at 10:34 a.m.)

2          (Call to Order of the Court)

3               THE COURT:  Good morning, everyone.  Thank you.

4    Please be seated.

5               Before we begin, Mr. Landis, I want to lay out how

6    we are going to proceed today.  First, I am going to give the

7    ruling that I said I would give on the burden of proof issue

8    for the IRS estimation hearing.  We will do that first and

9    get that out of the way.

10              As for timing, today we will take a break for

11   lunch at 12:10. I have an internal meeting I have to attend.

12   We will take an hour lunch break and then we will come back.

13   We will end at 5 p.m. today. I am assuming we will finish

14   today, but if we don't I have tomorrow and Friday available

15   so we can continue the hearing if we need to.

16              Today, for this hearing, we took a little bit

17   different approach on access to the Zoom.  Under our new

18   procedures parties and counsel have access to the live Zoom.

19   They can see the proceedings on the Zoom call.  Those who are

20   not participants normally would sign up and receive a

21   telephone number to dial in.  In this case we have, and

22   because we expected a large number of people interested, a

23   YouTube channel and those who tried to sign up for the phone

24   number received an email saying go to the YouTube channel.

25              During the course of the hearing, if we have --

1    and I am going to ask people who are on Zoom please keep your

2    video off unless I call on you.  For people on the Zoom, when

3    witnesses are testifying under our new procedures established

4    by the Judicial Council, they cannot continue to listen.  So,

5    they will be disconnected.  I will make an announcement ahead

6    of time.  Apparently it takes a few minutes for that to

7    happen.

8            So, when the witnesses are called, we will take a

9    short five-minute recess to allow the YouTube channel to be

10   turned off.  Then once the witnesses are done, we will

11   reestablish the YouTube channel and bring those people back

12   in, then we will take another short break to allow that time

13   to happen.

14           When signing up we had a large number of people

15   who did not follow the procedures on the website that you

16   sign up by 4 o'clock the day before the hearing.  Close to

17   100, I think, signed up late.  I am not going to allow that

18   to happen in the future. If you don't sign up by 4 o'clock

19   the day before you are not going to be able to participate.

20   So, make sure you pay attention.

21           Then one other issue that I will get to after I do

22   my reading of the bench ruling on the IRS issue, I am going

23   to make a preliminary ruling in this matter based on the

24   filings that were provided to the Court. I don't need oral

25   argument on that issue, so I will let you know what that

1   issue is and that has to do with the time for when estimation

2   is established, when to establish the value of a claim.  So,

3   I will address that issue as well.

4           First, let's get to the bench ruling on the IRS

5   issue.  The question before me today is which party should

6   bear the burden of proof in the upcoming Section 502(c)

7   estimation of the IRS's claim against the debtors.

8           As Judge Swain noted in her opinion, estimating

9   the net revenue claim of certain bondholders in financial

10  oversight and management board for Puerto Rico, 2023 Westlaw

11  4189779 at Page 7, Footnote 11, District Court for the

12  District of Puerto Rico June 26th, 2023:

13          "It is not clear that the Court has to address

14  evidentiary burden at all in the context of an estimation

15  hearing where the predication of hypothetical outcomes is

16  committed to the Court's discretion."

17          However, as Judge Swain did in her case, I will

18  provide guidance to the parties on how the evidentiary

19  hearing should proceed and allocate the burden of proof.

20          Following an acute onset of financial distress in

21  November 2022 the debtors commenced this bankruptcy

22  proceeding when they voluntarily filed for relief under

23  Chapter 11 of the Bankruptcy Code.  By now it is widely known

24  that, as debtors' counsel writes that: "The debtors

25  prepetition management utterly failed to implement corporate

1    controls and left behind a complete absence of trustworthy

2    financial information," that is D.I. 4204 at 6, "creating

3    uncertainty as to the debtors' potential tax liabilities."

4            The IRS filed proofs of claim in April 2023

5    claiming approximately $44 billion in tax liabilities.  From

6    the outset the IRS noted that these values are estimates that

7    consider information from the debtors' tax returns along with

8    the fact that the debtors were actively engaged in fraudulent

9    activity.  As such, the amounts claimed by the IRS were

10   designated to be adjusted as necessary.  The IRS amended some

11   of its claims in November 2023 to reduce the total to

12   approximately $24 billion and more recently to $8 billion.

13           In response, the debtors filed a motion to

14   establish a schedule and appropriate procedures for

15   estimating the IRS claims pursuant to Section 502(c) of the

16   Code.  A hearing was conducted on December 13th, 2023, where

17   I decided that estimation was appropriate under Section

18   502(c) because the IRS's claim was unliquidated.

19           At the hearing I requested additional briefing

20   from each party specifically on the issue of which party

21   bears the burden of proving or disproving the validity of the

22   IRS's estimates.  Further argument on the burden of proof

23   issue was presented during the January 17th, 2024 status

24   conference.  The IRS argues that the burden of proof rests

25   with the debtors because the IRS is entitled to a presumption

1 of correctness for all reasonable estimates it makes.  The

2 debtors disagree, contending that the IRS bears the burden of

3 proof because:

4        One, the presumption of correctness only applies

5 to circumstances where the IRS has issued a formal deficiency

6 assessment, which has not been done here and;

7        Two, because they believe that the estimated value

8 of the claims qualify as arbitrary and excessive.

9        Because it is impossible for me to determine from

10 the face of the IRS's proofs of claim the basis for its

11 conclusion that the debtors owe an estimated $8 billion of

12 taxes, I will require the IRS to first present its case

13 setting forth the basis for its estimation.  The debtors will

14 then have the opportunity to prevent evidence to contradict

15 the IRS's position and the IRS shall have a chance to rebut

16 the debtors' evidence.  For the reasons discussed below, the

17 burden of proof at the estimation hearing will rest on the

18 IRS.

19        At the outset it should be noted that bankruptcy

20 judges are afforded substantial discretion in directing the

21 estimation process.  That is Bittner v. Borne Chemical

22 Company, 691 F.2d 134 at 135, Third Circuit 1982.  The

23 bankruptcy code itself is "Silent as to the manner in which

24 contingent or unliquidated claims are to be estimated."  The

25 Courts have acknowledged that estimation is "At best an

1  imprecise and uncharted process."  That is <u>In Re Frascella</u>

2  <u>Enterprises, Inc.</u>, 360 B.R. 435 at 458, Eastern District of

3  Pennsylvania 2007.

4          This Court has maintained that "Bankruptcy courts

5  may use whatever method is best suited to the case as long as

6  the procedure is consistent with fundamental bankruptcy

7  policies which require speed and efficiency."  <u>In Re Pacific</u>

8  <u>Sunwear of California, Inc.</u>, 216 Westlaw 4250681 at Page 3,

9  Bankruptcy District of Delaware August 8th, 2016.

10          However, there are a few generally accepted

11  principals that govern the burden of proof to be used in

12  estimation procedures.  First, it has been widely noted that

13  "The estimation process is merely a microcosm of the ordinary

14  claims determination process."  That is <u>In Re FGR, Inc.</u>, 121

15  B.R. 451 at 456, Bankruptcy Eastern District of Pennsylvania

16  1990, and <u>In Re Financial Oversight and Management Board</u>,

17  2023 Westlaw 4189779 at 7.

18          Accordingly, the burden of proof should be the

19  same in both claim estimation and a proceeding to determine

20  the merits of the claim.  Second, Courts frequently recognize

21  that "Where non-bankruptcy law identifies the burden of

22  proof, the ultimate burden of proof for a particular claim is

23  determined consistent with that law."  <u>In Re Stone & Webster,</u>

24  <u>Inc.</u>, 457 B.R. 588 at 608, Bankruptcy District of Delaware

25  2016.

1          Although Section 502 of the Bankruptcy Code and

2    Bankruptcy 3001(f) establish a burden shifting scheme

3    predicated upon the proper filing of a proof of claim courts

4    recognize that "Bankruptcy does not alter the burden of proof

5    imposed by applicable non-bankruptcy law."  In Re Refco

6    Public Commodity Pool, L.P., 554 B.R. 737 at 741, Bankruptcy

7    District of Delaware 2016, citing Wiley v. Illinois

8    Department of Revenue, 530 U.S. 15 at 21, 2000 Supreme Court

9    case.

10          As both parties have pointed out, this idea traces

11   back to Wiley v. Illinois Department of Revenue where the

12   Supreme Court wrote: "Creditors entitlements in bankruptcy

13   arise in the first instance from the underlying substantive

14   law creating the debtor's obligation."  In the context of

15   claims litigation "The burden of proof is a substantive

16   aspect of a claim," 530 U.S. 15 at 20 to 21.

17          Taken together these principals require "A

18   bankruptcy court adjudicating a tax claim by the IRS to apply

19   the burden of proof rubric normally applied under tax law."

20   In Re Desert Capital REIT, Inc., 2014 Westlaw 3907972 at Page

21   11, Bankruptcy Appellate Ninth Circuit August 11th, 2014,

22   quoting Nelson vs. United States, In Re Olshan, 356 F.3d 1078

23   at 1084, Ninth Circuit 2004.

24          While there are no clear examples of the

25   allocation of the burden of proof between the government and

1  a taxpayer specifically setting up a bankruptcy claims

2  estimation the law is clear that the burden falls on the IRS

3  in this case: "In an action by the government for collection

4  of taxes the burden of proof is upon the United States under

5  the rule that the party that alleges must prove," Mertens Law

6  of Federal Tax Income, 49E:54, 2023; Psaty v. United States,

7  442 F.3d 1154 at 1159, Third Circuit 1971.

8          The IRS meets its initial burden by introducing

9  evidence of properly certified tax assessment.  The tax

10  assessment is afforded a "presumption of correctness" which

11  shifts the burden to the taxpayer to disprove the accuracy of

12  the government's assessment.  The majority of tax collection

13  cases includes such an assessment and so in the normal case

14  the taxpayer usually has the burden of disproving the IRS's

15  assessment; see In Re Anastasio v. CIR, 794 F.2d 884 at 886-

16  88, Third Circuit 1986.

17          Because there has been no assessment here the IRS

18  bears the burden of proven the accuracy of the figures

19  contained in its proofs of claim.  In Re Brown, 169 B.R. 59

20  at 61, Southern District of Iowa 1994: "This Court believes

21  that when taxes and penalties have not been assessed, the

22  better rule is that the IRS bears the ultimate burden of

23  proof."

24          Also, U.S. v. Kontaratos, 36 B.R. 924-931,

25  District of Maine 1984: "The presumption of correctness is

1   accorded a proof of claim only because there has been a valid

2   assessment."  The policy behind the presumption of

3   correctness also supports this conclusion which maintains

4   that the existence of the formal assessment itself implies

5   "that the IRS commissioner who made the assessment has done

6   so with sufficient evidence at his disposal."  In Re Fidelity

7   American Financial Corp., 1990 Westlaw 299418 at 4,

8   Bankruptcy Eastern District of Pennsylvania 1990.

9          Under this logic the IRS's estimates cannot be

10  presumed correct as there is no indication that the values of

11  its claims are supported by an equally sufficient basis as

12  the values informal assessments.  The United States offers

13  the Greco and In Re Fidelity cases for the proposition that

14  "The presumption of correctness also applies to estimated tax

15  liabilities."  That is D.I. 5410 at 4.

16         The Greco case isn't applicable here because in

17  that case the Court examined the permissibility of estimated

18  values within a formal tax assessment, 380 F. Supp. 2d 598 at

19  612, Middle District of Pennsylvania 2005.  While it is

20  settled that the IRS may use estimations within its formal

21  assessments, U.S. v. Fior D'Italia, Inc., 536 U.S. 238 at 245

22  (2002), there has been no formal assessment here.

23         I am also unpersuaded by the government's

24  implication of In Fidelity for the notion that "Unassessed

25  taxes presented in a proof of claim should be presumed

1  correct," D.I. 5410 at 4.  That case acknowledges one example

2  of a Court treating a proof of claim as though it were an

3  assessment but the Court ultimately refused to attach the

4  presumption of correctness to the proof of claim precisely

5  because "There had been no prepetition IRS tax assessment,"

6  1990 Westlaw 299418 at 6, Bankruptcy Eastern District of

7  Pennsylvania, February 8th, 1990.

8          For these reasons I disagree with the United

9  States contention that all reasonable IRS estimates made

10 without formal assessments are entitled to a presumption of

11 correctness.  Claim estimation of bankruptcy is an imprecise

12 process that is neither designed nor intended to yield exact

13 numbers.  Nevertheless, I conclude that the IRS bears the

14 burden of substantiating suggested estimation of the debtors'

15 tax liabilities where there has been no formal assessment.

16          Any questions?

17     (No verbal response)

18          THE COURT:  One other issue before we get started.

19 On the question of the estimation hearing for today I

20 received a number of objections that the debtors selection of

21 the petition date as the date for determining the value of

22 the digital assets that are being estimated today is

23 inappropriate because it's unfair; however, the code is very

24 clear.  The code says that a claim is to be determined in

25 U.S. dollars as of the petition date. I think that is Section

1   502(b).

2           Its no different in the context of a determination

3   of the validity of a claim as it is for the estimation

4   hearing under 502(c).  There are limited exceptions to this

5   requirement, none of which are applicable here and,

6   therefore, based on the filings that I received, and the

7   objections that I reviewed, the debtors' position as well, I

8   conclude that the debtors' use of the petition date as the

9   date for determining the value of the digital asset claims is

10  appropriate.  I have no wiggle room on that. The code says

11  what it says and I am obligated to follow the code.

12          I understand those who have filed objections,

13  mostly, I think all of them were pro se litigants, feel that

14  this is unfair to them because of value of certain of the

15  digital assets may have increased since the filing of the

16  petition date.  The opposite is also true, some of the

17  digital assets decreased in value since the petition date.

18  Congress determined that we have to pick a date and they

19  chose the petition date.  And, therefore, I am bound by that

20  obligation under 502.

21          So, all objections to the timing of the date upon

22  which the debtors chose to determine the estimated value of

23  the claims are overruled on that basis; therefore, I don't

24  need to hear argument on those issues.

25          Mr. Landis.

1          MR. LANDIS:  Thank you, Your Honor.  May I please

2     the Court, Adam Landis from Landis Rath & Cobb on behalf of

3     FTX Trading Ltd., and its affiliated debtors.

4          Your Honor just cleared out a number of opening

5     comments I was going to make about the manner in which we

6     proceed.

7          THE COURT:  Sorry for stealing your thunder.

8          MR. LANDIS:  No, not at all.  We thank you very

9     much for the well-reasoned opinion and ruling with respect to

10    the digital assets motion.

11         With that, Your Honor, we can go through the

12    agenda relatively quickly.  Items 1 through 9 have been

13    adjourned.  Item No. 10 was withdrawn.  Items 11 through 23

14    have been resolved with orders entered and the debtors are

15    grateful for the Court's having reviewed those matters and

16    entered many, many orders.

17         With respect to Item No. 24, the debtors have a

18    status update that we would like to give and I would yield

19    the podium to Mr. Dietderich for that.  I understand as well

20    that counsel to the joint official liquidators in the Bahamas

21    they want to give a status update in that case.  So, after

22    Mr. Dietderich we would propose to have them give their

23    update and then we would proceed with No. 25, the digital

24    assets motion.

25         THE COURT:  Okay.  Thank you.

1           MR. LANDIS:  Thank you, Your Honor.

2           MR. DIETDERICH:  Thank you, Mr. Landis.

3           For the record Andy Dietderich, Sullivan &

4    Cromwell.

5           May I please the Court, I have an update on the

6    status of the case broadly this morning.  The financial

7    situation of the debtors today is radically different then it

8    was when the case began.  We remember what it was like in

9    November 2022.  This was an emergency filing on no notice. It

10   took us weeks to have even a first day hearing.  We started

11   with no reliable digital asset security, no adequate books

12   and records, no clear list of who worked at the company, no

13   idea even who were the officers and directors of some of the

14   applicable legal entities.  We had boards of entities that

15   had never met.  There was a bank run on the exchanges and a

16   bank run on Alameda.

17           In response assets have transferred to favored

18   insiders at the last minute, entities and assets have been

19   seized by regulators.  We had a pending insolvency in

20   Australia and a pending insolvency in the Bahamas.  Two

21   different black hat hacks had stolen hundreds of millions in

22   cryptocurrency.  We had FBO customer accounts intermingled

23   with operating accounts.  We had no reliable list of our

24   banks or bank accounts.  We had billions of assets registered

25   in the names of friends, romantic interests, relatives, and

1    employees.  We had a business record that was largely on

2    signal a disappearing messaging app or in the head of Mr.

3    Bankman-Fried.  And Mr. Bankman-Fried was not only in

4    custody, but had declared "bleep the regulators, all I have

5    to do is win a jurisdictional war with Delaware."

6              Its been a very long 15 months.  On behalf of Mr.

7    Ray and the entire team I would like to say two things:

8              First, we recognize the profile that this case

9    require scrutiny and we welcome it.  We will continue to be

10   as transparent as our duties allow.

11             Second, the ongoing effort to provide recovery to

12   victims here has been and continues to be some of the most

13   rewarding work any of us will ever do as restructuring

14   professionals.  It will be one for the history books.  And

15   today we can now cautiously predict some measure of success.

16             Based on our results to date and current

17   projections we anticipate filing a disclosure statement in

18   February describing how customers and general unsecured

19   creditors, customers and general unsecured creditors with

20   allowed claims, will eventually be paid in full.  I would

21   like the Court and stakeholders to understand this not as a

22   guarantee, but as an objective.  There is still a great

23   amount of work and risk between us and that result, but we

24   believe the objective is within reach and we have a strategy

25   to achieve it.

1            I would like to drill down on our assets, our

2    liabilities, and the upcoming schedule.  First are assets.

3    We have had some disappointment.  We had very discouraging

4    financial results to our initial M&A exercises.  Businesses

5    FTX bought for hundreds of millions of dollars shortly before

6    the petition time proved to have little substantial value and

7    few interested buyers.

8            LedgerX was a horrible investment by FTX.  It was

9    sold for only a fraction of its acquisition price.  Embed was

10   worse and could not be sold at all.  A related disappointment

11   is FTX 2.0.  We still have valuable customer data and

12   information to monetize, but after an exhausted effort no

13   investor has been ready to commit the needed capital to a

14   restart of the offshore exchange, nor has a buyer emerged for

15   that exchange as a going concern.

16           Why?  The exchange, as I said before, was not what

17   it appeared to be.  It existed for only a few brief years and

18   never required substance.  The costs and risks of creating a

19   viable exchange from what Mr. Bankman-Fried left in the

20   dumpster were simply too high.  So, our current Chapter 11

21   plan does not include the expectation of any recoveries from

22   a restart of FTX.com.

23           We know there will always be true believers out

24   there and if there still are they should call Perella and

25   make a bid.  We know that for a time FTX played a function in

1   the cryptocurrency markets or, at least, pretended to.  If

2   that function is to be replaced it will be by new operators

3   with a new name and a better business plan and, hopefully,

4   much better business practices.

5          We, as an estate, will continue to consider all

6   options and are open to all options, but the plan of

7   confirmation, the plan of reorganization and the confirmation

8   process have to move forward now in order to give money back

9   to victims.  That plan, as of today, does not currently

10  include a reboot.  This will be important when Mr.

11  Glueckstein rises later today to speak about the value of FTT

12  and is reflected in the evidentiary record for the estimation

13  motion.

14         Despite these setbacks we have also benefited from

15  some even more significant positive developments.  The first,

16  and perhaps the most important, is the runway created by the

17  jurisdiction of this Court and the fact that substantially

18  completely around the world our automatic stay has been

19  respected.  The runway this created ended the bankruptcy and

20  allowed us the time necessary to deliberately create a new

21  balance sheet.  We would be nowhere without the time -- this

22  time under the protection of the stay.

23         The second fact that we benefited from is the

24  profile of the case.  We have been in front of you for

25  litigation matters, of course, but not as frequently as could

1  have been necessary.  The main reason is that counterparties

2  have been cooperative in settlement negotiations and we have

3  secured hundreds of millions of dollars in voluntary turnover

4  without ever filing public complaints.

5       A third main benefit to recoveries has been our

6  relationship with governmental authorities. As I mentioned in

7  the early days of the case, Your Honor, in the first months

8  the board determined that spending estate resources to

9  cooperate with governmental investigations was in the best

10 interests of our debtors.  This was expensive given the

11 extent of those government investigations and the sheer

12 number of them, but it is proven to be the right call.

13      There has been no criminal indictment of any

14 debtors (indiscernible).  Governmental entities have worked

15 with us collaboratively all around the world to secure

16 assets.  We hope to have a coordinated distribution scheme

17 for the value that we control and over a billion dollars

18 under the control of governmental authorities that avoids the

19 massive duplication of expenses that was seen in cases like

20 Madoff and other cases.  Finally, and critically, we continue

21 to contemplate that over $9 billion of governmental claims

22 for fines and penalties will be voluntarily subordinated to

23 victims in our plan of reorganization.

24      The fourth main benefit has been the special

25 nature of some of the relief granted by this Court. In

1  particular, the Court's advance approval of our digital asset

2  sales.  This was novel relief, but --

3          THE COURT:  Could you give me access as well,

4  please, so I can kick people off who don't follow my rules.

5  Thank you.

6          MR. DIETDERICH:  Thank you, Your Honor.  The

7  relief for digital assets in particular, Your Honor, was

8  novel relief but incredibly valuable. The advance approval of

9  our digital asset sales, rather then needing to bring

10 individual transactions back to the Court has allowed us to

11 liquidate our digital assets gradually based on day-to-day

12 trading opportunities with the sophistication of a major

13 trading operation.  It has been a resounding success.

14         A fifth main benefit is that we have to date

15 avoided unnecessary litigation.  There have been negotiated

16 understandings with government stakeholders including

17 discussions underway with the CFTC and the SEC.  We have

18 settled our customer adversary proceedings subject to

19 confirmation of the plan.  We have settlements early with the

20 JPL's in Australia and now happily with the JOL's in the

21 Bahamas.

22         I am pleased to add to this list today of

23 settlements, Your Honor, a settlement in principal that we

24 reached only a few days ago with the founders of FTX EU who,

25 as Your Honor knows, are litigation defendants and have filed

1  many motions.  All these matters, these EU matters, will be

2  resolved by the settlement which is being documented and will

3  be presented shortly with the Court for approval.

4         Finally, Your Honor, the last benefit is the

5  incredible work done by Ernst & Young and the team on federal

6  taxes.  Not surprisingly, FTX not only misappropriated funds

7  from the exchange and went to the casino, but they lost money

8  again, and again, and again.  Despite all the work done to

9  maximize the recoverable value of assets and some individual

10 success stories the portfolio remains a net loser.

11        Accordingly, we believe we have billions of

12 dollars of lost carryforwards from previous bad investments

13 and subject, of course, to the resolution of our disputes

14 with the IRS, our plan does not currently expect that

15 creditor recoveries will be materially reduced by federal

16 taxes.

17        Taken together, the results of everyone's efforts

18 are substantial recoveries; not what was lost, but

19 substantial recoveries.  This hopefully puts to bed the

20 alternative narrative that this business was just fine all

21 along, it was not.  It was not a healthy business facing a

22 bankrupt.  It did not have a mere liquidity crisis.  It was

23 an irresponsible sham created by a convicted felon.

24        I would like to talk about claims.  If our asset

25 recovery effort is on the verge of being a qualified success

1  the next equally immense challenge is claim management.  When

2  I asked Mr. Coverick of A&M this morning to remind me the

3  amount of claims filed by our bar dates he told me it was

4  $23.6 quintillion.  I had to ask him how many zeros in

5  quintillion and the answer is 18.  I then asked him to run

6  recoveries if we allowed all of those claims and everyone

7  would get a millionth of a percent.  So, we have a job to do.

8            As I said earlier, we currently anticipate that we

9  will have sufficient funds to pay all allowed customer and

10 creditor claims in full.  By "allowed," I mean claims of

11 exchange customers and general unsecured creditors for their

12 actual petition time losses, as calculated by the debtors.

13           And in order to have enough to pay these

14 legitimate claims, several assumptions have to hold.  First,

15 and most critically, our relationship with governmental

16 stakeholders has to continue on its current path.  In

17 particular, as I mentioned, we face over $9 billion of

18 government claims that our plan contemplates will voluntarily

19 support subordinate to the pecuniary losses of victims.  If

20 this does not happen and we have to contest the merits of

21 those governmental claims, recovery to customers and general

22 creditors could decrease dramatically.

23           Second, we have to successfully contest the

24 allowance of claims that we believe are not legitimate or, if

25 legitimate, should be subordinated to the losses of customers

1  and general creditors.  There were several categories of

2  these contested claims, some Mr. Glueckstein will address

3  shortly.  Other material disputed claims include claims

4  related to the OXY, MAPS, SRM, and other tokens, billions of

5  dollars in general allegations of fraud, and other claims the

6  debtors believe unsubstantiated, and, of course, the claims

7  asserted by the IRS.

8       The frustrating fact is that we must hold over $10

9  billion in distributable value until both, a plan is

10  confirmed and this claims-resolution process is well

11  underway.  We're not a bank and we should not be holding this

12  money any longer than is needed; it is not ours.

13       With respect to the first step, confirming a plan,

14  we are on schedule to file the disclosure statement next

15  month and proceed to a hearing and solicitation promptly,

16  subject, of course, to any need to wait on the resolution of

17  any other matters.  As I mentioned, we currently expect the

18  disclosure statement to project that customers and creditors

19  will eventually be paid in full.  I should say customers and

20  general unsecured creditors in our defined class of general

21  unsecured creditors will eventually be paid in full.

22       However, again, no one listening should hear that

23  and think funds can come immediately.  In terms of making

24  distributions, neither confirmation, nor effectiveness is the

25  long pole in our tent.  The long pole is now the quintillion

1    dollars of asserted claims.  We cannot pay the legitimate

2    creditors until we resolve these claims.

3           Customarily, as your knows, debtors have waited

4    until after the plan is effective to begin claims

5    reconciliation in earnest.  We're not waiting.  As the Court

6    knows, we're not waiting.  Our hope is that we can not only

7    have a plan become effective in 2024, but start making

8    material distributions, as well.

9           We recognize in advance that this will place

10   demands on the Court and we are sequencing matters to make

11   sure that the most material claims resolution matters are

12   first in the queue, such as the allowance of the dispute with

13   the IRS and the next motion with Mr. Glueckstein today.

14           Thank you, Your Honor.

15           THE COURT:  Thank you.

16           Let me ask you while I have you up there, any

17   update on the issuance of the mandate by the Third Circuit in

18   the matter we talked about the other day?

19           MR. DIETDERICH:  Let me ask for it exactly.  Give

20   me a moment.

21       (Counsel confers)

22           THE COURT:  Ms. Richenderfer might know, too.

23           MR. DIETDERICH:  Your Honor, we expect to be

24   filing a consensual joint motion to the Third Circuit either

25   today or tomorrow.

 1              THE COURT:  All right.  Anything different?

 2              MS. RICHENDERFER:  Thank you, Your Honor.  Linda

 3   Richenderfer, on behalf of the Office of the United States

 4   Trustee.

 5              Yes, we received the other day -- I think it was

 6   yesterday, we received a draft motion from debtors' counsel

 7   and it has been, I think, circulated to all interest holders,

 8   including the Civil Appellate Division of DOJ, which

 9   represents the U.S. Trustee's Office in terms of the appeal.

10   And we have conceptually agreed to it.  I think it's being

11   under review right now and I would anticipate it's going to

12   be filed either today or tomorrow.

13              THE COURT:  Okay.  Great.  Thank you.

14              MS. RICHENDERFER:  We would hope, therefore, that

15   the Third Circuit would react quickly to such an event.

16              THE COURT:  Okay.  Thank you.

17              MR. DIETDERICH:  Thank you, Your Honor.

18              Any other questions?

19              THE COURT:  Nope.  No other questions.  Thank you.

20              MR. DIETDERICH:  Okay.  Thank you.

21              I think I'll cede the podium to Mr. Shore for

22   the -- or excuse me --

23              MS. BAKEMEYER:  Bakemeyer.

24              MR. DIETDERICH:  -- Bakemeyer -- I knew the name,

25   just not the pronunciation --

1          MS. BAKEMEYER:  No, it's fine.

2          MR. DIETDERICH:  -- for the JOLs, thank you.

3          THE COURT:  Thank you.

4          MS. BAKEMEYER:  Good morning, Your Honor.  Brett

5   Bakemeyer of White & Case on behalf of the Joint Official

6   Liquidators of FTX Digital Markets Ltd.

7          First, we'd just like to thank Your Honor,

8   chambers, and the debtors for giving us just a bit of time

9   this morning on the calendar to provide the Court with an

10  update with respect to FTX Digital's Chapter 15 case.  I know

11  there were a few, small lo just call hurdles we had to get

12  through, so thank you.

13         Second, I do want to mention that two of your JOLs

14  are here today in the court, Mr. Brian Simms KC and Mr. Peter

15  Greaves.  They've come to attend the estimation hearing,

16  which has an effect on what we'll adopt in the Bahamas.

17         I'll be brief.  I would just like to speak to the

18  global settlement agreement that was recently entered into

19  and approved by Your Honor in the Bahamas court between FTX

20  DM and the debtors.  I think it might be helpful to just make

21  a few notes for any dot com customers listening and I'll just

22  finish with some important dates and notes, with respect to

23  the Bahamas liquidation proceeding if that's all right with

24  Your Honor?

25         THE COURT:  Thank you.

1          MS. BAKEMEYER:   The GSA, the global settlement

2    agreement itself represents a monumental effort of the

3    parties to solve the bespoke and complicated cross-border

4    issue that warranted many months that it took for us to get

5    here.   As explained in prior hearings, the issue from the

6    JOLs' perspective was always to define the scope of FTX DM's

7    assets and liabilities.   That set up a conflict between the

8    debtors and the JOLs regarding whose assets were whose.

9          After Your Honor's urging to resolve the issues,

10   over the past six months, the JOLs and the debtors engaged in

11   hundreds of hours of negotiations to come up with a solution.

12   The global settlement is structured around one key concept:

13   that dot com customers have the same claim against both

14   estates.   The solution embodied in the global settlement is

15   that customers can now have their claim resolved by their

16   choice of jurisdiction in a manner that will not prejudice

17   them and allows both estates to run their individual

18   processes in tandem.

19          More specifically, if any of the dot com customers

20   with a deposit on the FTX.com platform -- not the U.S., just

21   the international platform -- wish to have their claim

22   adjudicated, treated, and paid out by the Bahamas, they may

23   simply make an election on the debtors' ballots or submit a

24   proof of debt in the Bahamas.   Once they make their election,

25   they release the other estate from that underlying claim.

1          Then the estate that the customer elects will

2    evaluate, adjudicate, and pay out that claim on, largely, the

3    same parameters.  So, we'll be working hand-in-hand with the

4    debtors and the plan administrator with respect to the claims

5    adjudication process.

6          The dot com customers KYC procedures and

7    preference offer, if any, will also not change depending on

8    which estate they choose, and importantly, all dot com

9    customers will get substantially the same percentage of

10   recoveries on the substantially same timeline.

11         Now, I'd just like to note some important dates,

12   with respect to the Bahamas liquidation proceedings for Your

13   Honor.

14         THE COURT:  Okay.

15         MS. BAKEMEYER:  This past November on the

16   anniversary of the appointment of the JOLs, the Bahamas Court

17   sanctioned the winding-up order of FTX DM, placing it into

18   full liquidation and appointing the JOLs as official

19   liquidators.  On January 22nd, 2022, [sic], just last Monday,

20   the JOLs had a hearing with the Bahamas Court and the global

21   settlement was approved by the Bahamas Court with all

22   ancillary (indiscernible).

23         Now that the global settlement has been Court-

24   approved, FTX DM can officially launch its claims process.

25   As a first step, the JOLs will host a meeting for FTX DM's

1  creditors, including dot com customers, sometime before

2  March 15th.  Thereafter, customers can begin submitting

3  claims or proofs of them.

4          On or about the first week of April, FTX DM will

5  open up its claims portal online, allowing dot com customers

6  and other claimants to submit their proofs of debt.  The

7  JOLs' claims portal will be substantially similar to the

8  debtors', so dot com customers experiences should be

9  seamless.  The JOLs are working around the clock to get this

10 portal up and running, with the assistance of the debtors.

11         Also, as Mr. Dietderich just mentioned, in the

12 first week of April, the debtors are anticipating to send

13 their ballots out, which provides that mechanism for dot com

14 customers to elect into the Bahamas.  The JOLs have set a bar

15 date of May 15th, 2024, which is also currently the debtors'

16 anticipated voting deadline on the plan.  That's the proposed

17 date in which those ballots must be submitted.  These dates

18 are intentionally matched up to help create a clean cutoff

19 for the Bahamas election.

20         We don't anticipate needing the Chapter 15 Court

21 for anything throughout this process, but we'll continue to

22 keep the Court apprised of any material developments as we go

23 along and we expect to have another status conference with

24 respect to the Chapter 15 case right around the plan

25 confirmation hearing.

1          And unless Your Honor has any questions, I'll cede

2    the podium back over to the debtors.

3          THE COURT:  Okay.  Thank you, no questions.  I

4    appreciate the update.

5          MR. DIETDERICH:  Your Honor, Andy Dietderich,

6    again for the record.

7          I should just add, given the sequence here of the

8    approval of the Bahamas settlement before the hearing, that

9    from our side, this is also a significant event and to thank,

10   on behalf of the debtors, the team for the JOLs, the three

11   JOLs, and, you know, all of their advisors, including, of

12   course, our colleagues at White & Case.  The conversations,

13   as you know, were very contentious early, but I think as soon

14   as we came to the breakthrough idea that the customers, we

15   could create an architecture where the customers would

16   receive, effectively, the same recovery, regardless of where

17   they put in claims, we were indifferent whether, you know,

18   the claims were reconciled there or here, as long as there

19   are safeguards to make sure that no one is using the Bahamas

20   to recover more than they would recover in Chapter 11.

21         And once we had that central idea, the execution

22   of that idea by JOLs and their team was consummately

23   professional.  They have been a pleasure to work with and

24   it's nice to be on a first-name basis.

25         (Laughter)

1          MR. DIETDERICH:  So, thank you, Your Honor.

2          THE COURT:  Thank you.

3          MR. HANSEN:  Good morning, Your Honor.  Kris

4    Hansen with Paul Hastings on behalf of the Official

5    Committee.

6          Your Honor, just a brief note.  We want to say

7    froth Committee's perspective, we appreciate the update,

8    especially the effort and the contribution of all the core

9    parties in advancing the cases to this point.  That includes

10   the principals and professionals for all of the parties.

11         We want to point out for the Court that when the

12   debtors, with respect to the update, it is the watershed

13   moment for the debtors, obviously, to report that the

14   disclosure statement will be filed in February, which will

15   include, likely, payment in full of all customer claims and

16   general unsecured creditors.  But as Your Honor held, that

17   payment in full is based on the petition date values of those

18   claims.

19         Many of those claims are premised upon currencies

20   which declined dramatically in value in that tumultuous

21   period leading up to the petition date, so many customers and

22   creditors who are out there likely won't feel that that's a

23   true payment in full from where they started, but we

24   recognize that the petition date is the date that needs to be

25   used.  As a result of that, Your Honor, all of the parties

1   are committed to continue to work together as we assess

2   assets and liabilities to try to determine a way to continue

3   to provide maximum recovery for all parties in interest.

4           Thank you, Your Honor.

5           THE COURT:  Thank you, Mr. Hansen.

6           MR. GLUECKSTEIN:  Good morning, Your Honor.  For

7   the record, Brian Glueckstein, Sullivan & Cromwell, for the

8   debtors.

9           With that, I think that brings us to the remaining

10  agenda item on the today's calendar, which is the debtors'

11  motion to statement claims based on digital assets.  Your

12  Honor, just to kind of set the stage and if a few

13  housekeeping points at the outset.  As reflected in the

14  revised form of order that was filed this morning, and as

15  noted in our reply papers that we filed on Sunday, the

16  valuation component, assuming the estimation motion is

17  approved and proceeds today, the valuation component on a

18  small subset of four of the (indiscernible) tokens, MAPS,

19  OXY, SRM, and BOBA, as well as certain related tokens, locked

20  versions, and the like, as reflected in the schedule, are

21  being deferred to a future evidentiary hearing that we expect

22  to occur in consultation with chambers on March 20th, to

23  allow for the completion of discovery on those particular

24  digital assets.

25          The relief that we expect that that schedule, as

1  far as kind of a second evidentiary hearing on those discrete

2  digital assets would be, you know, a single hearing for those

3  assets that don't proceed to conclusion today, which, again,

4  from the debtors' perspective are four.  The remainder of the

5  relief in the motion is we are proceeding with today, Your

6  Honor, and we appreciate Your Honor's ruling at the outset

7  and that certainly helps streamline the proceedings today.

8          We have been in discussions with numerous of the

9  objectors and various parties and are pleased to report that

10  the revised order that we filed this morning, by our

11  understanding -- and I know some folks will want to be heard

12  over the course of the day -- has fully resolved both, the

13  informal comments we received from the United States

14  Trustee's Office, as well as objections filed by Avalanche at

15  5685; the MDL plaintiffs at 5628; Three Arrows Capital, 5615;

16  and Sunil Kavuri, and others who joined in that, at Docket

17  5232.

18          We have also, as I noted, adjourned the objection

19  of the BOBA Foundation.  Its BOBA token will go on the

20  evidentiary track, as well as TMSI, who is contesting SRM-

21  related issues.  That litigation is proceeding -- that

22  discovery process, with respect to those tokens has

23  proceeded.  The MAPS and OXY folks reached out to us very

24  early on to make clear what was necessary.  We've been

25  working collaboratively to advance that process to that

1  hearing hopefully in March.

2           As far as today, Your Honor, unless the Court

3  would like to proceed in a different manner, we would propose

4  to address the evidentiary issues first and then proceed to

5  argument of the motion, including, with respect to the

6  various objections.  The debtor has testimony in the form of

7  declarations, primarily, which I'll get to in a moment, from

8  three witnesses that we are offering in support of the relief

9  requested today.  Each witness has submitted written

10 declarations as direct testimony, although, Your Honor, for

11 our expert, subject to the Court's preference, we would like

12 to briefly supplement those declarations with direct to

13 qualify them and their reports.

14          So, subject to Your Honor's views, we would be

15 prepared to proceed with the evidence.

16          THE COURT:  Okay.  Let's go ahead and proceed with

17 the evidence.

18          MR. GLUECKSTEIN:  Okay.  Thank you, Your Honor.

19          THE COURT:  With that, as I said at the outset, we

20 need to take a short break so that we can disconnect the

21 audio from the YouTube channel and then we'll -- so let's

22 just take a very short, five-minute recess.  Let's come back

23 at -- it's 11:22 -- let's come back at 11:27.  We'll come

24 back.

25          MR. GLUECKSTEIN:  Thank you, Your Honor.

1        (Recess taken at 11:22 a.m.)

2        (Proceedings resumed at 11:27 a.m.)

3            THE CLERK:  All rise.

4            THE COURT:  We're back, everybody.  Please be

5    seated.

6            Mr. Glueckstein, do you want to call your first

7    witness.

8            MR. GLUECKSTEIN:  Thank you, Your Honor.

9            Are you ready to proceed?

10           THE COURT:  Yes.

11           MR. GLUECKSTEIN:  Okay.  Thank you.

12           Again, Brian Glueckstein, Sullivan & Cromwell, for

13   the debtors.  The first witness the debtors are presenting in

14   support of the motion is Edward Mosley, a managing director

15   at Alvarez & Marsal.  Mr. Mosley submitted a declaration at

16   Docket 6728-3 and we would respectfully request that that

17   declaration be admitted into evidence as his direct

18   testimony.

19           Mr. Mosley is in the courtroom today, available

20   for cross-examination.

21           THE COURT:  Is there any objection?

22       (No verbal response)

23           THE COURT:  It's admitted, without objection.

24       (Mosley Declaration received in evidence)

25           THE COURT:  Anyone wish to cross-examine

1  Mr. Mosley?

2           MR. BIELLI:  Good morning, Your Honor.  Thomas

3  Bielli from Bielli & Klauder.  I'm not admitted in this

4  court, but I was admitted *pro hac* last night.  My law partner

5  David Klauder is present today.

6           Your Honor, we represent Aurus Tech, Ltd.  We

7  filed an objection to the estimation motion.

8           Before we start, Your Honor, with the examination,

9  I did want to briefly status on our objection.

10          THE COURT:  We're doing witnesses now.  Do you

11 want to cross-examine the witness or not?

12          MR. BIELLI:  Yes, Your Honor.

13          THE COURT:  Okay.  Have the witness come forward.

14          Please take the stand and remaining standing for

15 the oath.

16          THE CLERK:  Please raise your right hand.

17          Please state your full name and spell your last

18 name for the record.

19          MR. MOSLEY:  Edward William Mosley II, M-o-s-l-e-

20 y.

21      EDWARD W. MOSLEY, II, DEBTOR'S WITNESS, SWORN

22          THE WITNESS:  I will.

23          THE CLERK:  You may be seated.

24          THE COURT:  Go ahead.

25                      CROSS-EXAMINATION

```
 1  BY MR. BIELLI:

 2  Q    Good morning, can you hear me okay?

 3  A    I can.

 4  Q    Thank you.

 5            THE COURT:  Hold on.  Hold on.

 6            Can you move closer to the microphone, Mr. Mosley.

 7            Thank you.

 8  BY MR. BIELLI:

 9  Q    I'll try again.

10       Can you hear me okay?

11  A    I can.

12  Q    Okay.

13            MR. BIELLI:  Can Your Honor hear the witness okay?

14            THE COURT:  Yes, thank you.

15            MR. BIELLI:  Thank you, Your Honor.

16            May I proceed?

17            THE COURT:  Yes.

18  BY MR. BIELLI:

19  Q    What analysis have you conducted that the estimation

20  process, without the estimation process, there would be undue

21  delay on the bankruptcy cases?

22  A    The analysis by which I drew that conclusion, there's a

23  bunch of different pieces.  First, the recovery analysis,

24  that was built by Alvarez & Marsal under my direction and it

25  is a fairly detailed model of all the assets and claims of
```

1   the debtors.  We make projections as to what we think the

2   assets will be recovered by the date effective and then what

3   will be remaining, and those are -- the other pieces are

4   valued.  Then, the distributed proceeds to the allowed claims

5   proceed down the waterfall, based on the absolute priority

6   rule.  So that's one piece.

7        Another piece would be that the claims resolution

8   analyses of all the claims filed and where we stand with

9   those, those claims, what objections are yet to be made and

10  what we think the claims will end up at.

11       And I guess the last piece, it's not truly analysis,

12  but knowledge of the process of adjudicating those claims of

13  how we would get there.

14  Q    Let's talk about that last part, how you would get

15  there.

16  A    Okay.

17  Q    Was there an estimate on how long the claims

18  adjudication process would take under a normal or ordinary

19  procedure?

20  A    We've talked through what would need to happen for our

21  plan, that includes the estimation motion.  If by "normal,"

22  you're talking, what if we do it without the estimation

23  motion; is that what you're asking?

24  Q    Well, let's back up, then.

25       What would you say the normal claims objection process

1    would be?

2    A     In this case, with these facts and circumstances, I

3    think this is the right way to adjudicate the claims.

4    Q     Are there other claims?

5    A     Sure.

6    Q     What are the other ways?

7    A     The debtor could, for the 87,000 claims, you know, go

8    and try to adjudicate each one separately, instead of having

9    one motion to have all of the values for each of the, we call

10   them "tickers," you could just go one by one for each of

11   those claims filed and go through a process, by which you

12   say, the debtors object to your filed claim.  We do give them

13   time to respond.  We go through a discovery process and we

14   negotiate on whether or not we think we can come to some sort

15   of resolution.  We have experts involved and we have, you

16   know, (indiscernible) and motions to go put in front of the

17   Court to adjudicate that claim.

18   Q     And is it your testimony that has to be done

19   separately, claim by claim?

20   A     No, I want it to be done in the estimation motion.

21   Q     Are they the only two ways, claim by claim or

22   estimation?

23   A     You could try to do it via omnibus, as well.

24   Q     Can you explain that to us, as well, please.

25   A     So an omnibus objection process is where we're going to

1    take claims by that we think have the same objection to a set

2    of claims and object on that basis to say all of these

3    claims, we object on this basis and put that in front of the

4    Court.

5    Q     Have you done an analysis as to whether or not this

6    debtor can do, as you mentioned, a separate claims objection

7    for each claim or an omnibus process for the claims?

8    A     My team is still working through the 87,000 claims that

9    have been put on file.  It takes a long time; you've got to

10   look at each one.  And so, no, we do not have a feel for how

11   long it would take or which buckets we would put each of

12   these 87,000 claims into to bucket them up into various

13   omnibus objections.  We are moving forward with the

14   estimation motion.

15   Q     Okay.  I want to talk about, a little bit about the

16   estimation methodology, okay?

17   A     Okay, other than -- I mean, obviously, I'm --

18   everything that's in my declaration makes sense, but if

19   you're asking about things that aren't under my purview, like

20   the valuation of each -- of each of the tokens, I can't speak

21   to that.

22   Q     Okay.  Have you been involved -- in your scope in this

23   case, have you begun any omnibus claim objection procedure?

24   A     Yes.

25   Q     And what steps have you taken?

1   A      So my team has first and foremost tried to take the

2   filed claims and match them up with customer accounts.  If we

3   can match up that claim with a customer account and, thus,

4   you know, something that's on the schedules and in our books

5   and records, then we can say, okay, this is what we thought

6   the claim should have been, here's the variants, let's now

7   try to put it into, you know, where are we different.  And

8   then we have like a process to say, okay, what are the ways

9   that we can object to this in an omnibus manner.  We only get

10  three shots at each claim with omnibus, so you've got to be

11  careful on how you do it.  You can't just like come up with

12  an omnibus and file it, you've got to make sure that you can

13  get everything you need done with that particular claim, done

14  with three shots at it.

15      With regard to everything else that we don't have a way

16  of matching it up to a customer account, that has to be, you

17  know, manually done where we're pulling it up and looking at

18  the claim, trying to match it up with a customer, seeing

19  where it came from, going through a discovery process, et

20  cetera.  That's going to take time for those 87,000.

21  Q      When did you start that process for this debtor -- for

22  these debtors?

23  A      Before the end of the bar date.  I mean, I don't

24  remember exactly when our bar date was, but over the summer

25  is kind of when we started.

```
1   Q      And when did you abandon that course of action?

2   A      It's not abandoned, we --

3   Q      Oh.

4   A      -- continue to reconcile all the claims.

5   Q      Okay.  So you'll be filing omnibus claims objections?

6   A      We will be filing omnibus claims objections.

7   Q      Okay.  Was -- when a claim objection -- when a proof of

8   claim is filed with the Bankruptcy Court, it is deemed

9   allowed, correct?

10  A      I'm -- I don't know.

11  Q      If you don't know, that's okay.

12  A      I don't know.

13  Q      Okay.  If a debtor files or if anybody else files an

14  objection to a proof of claim that's filed, there would be a

15  response, correct?

16  A      If the debtor files an objection, they don't have to

17  respond, but, yes, they can respond.

18  Q      But they can respond, right?  A creditor would have the

19  right to respond?

20  A      Correct.

21  Q      And how about discovery?  Did you mention that earlier

22  in your testimony that there would be discovery after a

23  claimant filed a response to a claim objection?

24  A      Yes, we can do discovery afterwards.

25  Q      And then you said there would be an evidentiary hearing
```

1   too, didn't you?

2   A      You can have an evidentiary hearing, yes.

3   Q      Are the claimants given that opportunity here if the

4   estimation motion is granted?

5   A      Not -- well, I mean, first of all --

6           MR. BIELLI:  Thank you, Your Honor.  I don't have

7   any other questions.

8           THE COURT:  He didn't answer the question.

9           You can answer, Mr. Moseley.

10          THE WITNESS:  So not for -- not for the pieces

11  that we are saying are in the estimation motion, so the value

12  of each token.  We're going to have evidentiary hearings on,

13  you know, how many tokens that they have, if we have a

14  disagreement on that.  The estimation motion is for the

15  valuation of the particular token.

16          MR. BIELLI:  I don't have any other questions at

17  this time, Your Honor.  If there's going to be, I guess, I

18  don't know if it would be redirect, perhaps I'd like the

19  opportunity to recross, but I don't think so.

20          THE COURT:  I don't allow recross.

21          MR. BIELLI:  Thank you, Judge.

22          THE COURT:  Anyone else wish to cross?

23          MR. GWYNNE:  Good morning, Your Honor, Kurt Gwynne

24  from Reed Smith on behalf of the Foundation Serendipity and

25  Foundation Elements creditors.

```
 1                        CROSS-EXAMINATION

 2   BY MR. GWYNNE:

 3   Q      Good morning, Mr. Moseley.

 4   A      Good morning.

 5   Q      In paragraph 2 of your declaration, you describe some

 6   industries in which you have experience; do you recall that?

 7   A      It would be better if I had the declaration in front of

 8   me.

 9   Q      You don't have a copy of it with you?

10   A      No.

11          MR. GLUECKSTEIN:  Your Honor, may I provide the

12   witness a copy?

13          THE COURT:  Yes.

14          MR. GLUECKSTEIN:  Does Your Honor need a copy?

15          THE COURT:  No.  Thank you.

16          THE WITNESS:  Thanks.  I'm there, sir.

17   BY MR. GWYNNE:

18   Q      Do you see in paragraph 2 where it lists a number of

19   different industries in which you tout your 20 years of

20   restructuring and distressed investment experience?

21   A      Yes, sir.

22   Q      Is the cryptocurrency industry one of those industries

23   in which you have restructuring -- you list that you have

24   restructuring and distressed debt experience?

25   A      Not before this case.
```

1    Q      Okay.  Can you please take a look at paragraph 3 of

2    your declaration?

3    A      I'm there.

4    Q      Do you see where you talk in paragraph 3 about the

5    Chapter 11 restructurings in which you have been involved?

6    A      This is some of the list, but, yes, I see it.

7    Q      Are any of those cryptocurrency cases?

8    A      As I stated before, I have not been involved in a

9    crypto case before this one.

10   Q      Now, you believe that scheduled or filed proofs of

11   claim that were asserted in crypto quantities need to be

12   estimated so they can be converted to U.S. dollars, correct?

13   A      Correct.  I think that's what the -- you know, the

14   general -- I don't think that's what my declaration says

15   exactly, to be honest.

16   Q      Okay.

17   A      My declaration says I think we need to dollarize the

18   claims.

19   Q      All right.  Well, do you need to dollarize scheduled

20   claims?

21   A      Correct.

22   Q      And do you need to dollarize proofs of claim?

23   A      We want to dollarize all of the filed claims, yes.

24   Q      Now, the debtors have, you say, over two million in

25   scheduled claims, right?

1  A      Correct.

2  Q      Who scheduled the debtors' claims?

3  A      The debtors.  So, myself, my team, in concert with the

4  management team, as well as, you know, other professionals in

5  the case.

6  Q      And the debtors and you and your team scheduled the

7  customers' claims in crypto quantities, right?

8  A      Correct.

9  Q      You didn't schedule the claims in U.S. dollars, right?

10 A      No, we scheduled them in quantities with the estimation

11 motion process in mind.

12 Q      Okay.  And that was the debtors' choice whether to file

13 the scheduled claims in quantities or U.S. dollar values,

14 right?

15 A      Yes, it was our choice.

16 Q      Did you ever suggest to the debtor that it simply

17 schedule the claims in U.S. dollars amounts?

18 A      The price of the tokens, we didn't feel like we had a

19 reliable source in the AWS system.  Obviously, the exchange

20 had a price for every item on the exchange, but, you know, as

21 with everything else with the IT at FTX, we didn't trust it,

22 you know, we were using -- we were looking at other sources.

23 And so we didn't feel comfortable taking a stance at that

24 time on exactly what the value of each token would be as of

25 the petition time.

1  Q      So you didn't suggest that the debtor value the claims

2  in its schedules in U.S. dollar amounts; is that correct?

3  A      I'm not a valuation expert and when I didn't feel like

4  we had a good, you know, reliable source for the price of

5  each token because they're all complicated and different, we

6  didn't feel like we could put that on the schedules.

7  Q      Okay.  Let's talk about the filed proofs of claim.  You

8  say the debtor has approximately 87,000 filed proofs of

9  claim, right?

10 A      Yes, sir.

11 Q      And isn't it true that the debtor asked the customers

12 to file those proofs of claim in crypto quantities, not U.S.

13 dollar amounts?

14 A      There are -- we asked them to respond to our crypto

15 quantity amounts.  There's a portion of the proof of claim

16 form where they could fill in whatever they want, and they

17 did.

18 Q      And you're entitled to explain your answer, but can you

19 answer yes or no to whether or not the debtor requested all

20 of its customers to file the proofs of claim in quantities,

21 crypto quantities, not U.S. dollar amounts?

22 A      We did ask them to do that, yes, but as I said before,

23 the proof of claim form is the debtors interacting with the

24 customers and on that sheet we asked them to fill in anything

25 else that they -- that isn't in our table, and that's where

1    they have their opportunity and if they -- some of them put

2    in dollars into that.

3    Q    So the debtor, who decided to file its schedules in

4    crypto quantities and to ask creditors to file their proofs

5    of claim in crypto quantities, is now complaining that it has

6    too many claims in crypto quantities and therefore needs to

7    estimate them, correct?

8    A    The debtor is asking to estimate all of the claims,

9    scheduled and filed.  Does that answer your question?

10   Q    Well, you agree then, I was correct in what I said,

11   right?

12   A    Please ask it again.

13           THE COURT:  He's asking you to explain your

14   question, he didn't understand it.

15   BY MR. GWYNNE:

16   Q    Did you understand my question?

17   A    Please ask it again.

18   Q    The debtor -- the debtors, who chose to schedule claims

19   in cryptocurrency quantities, not dollars, and who asked its

20   creditors to file proofs of claim in crypto quantities, not

21   U.S. dollars, is now saying, Your Honor, we have too many

22   crypto quantity claims, we can't possibly litigate all of

23   them to a dollar value, right?

24   A    I disagree with how you said that.  We asked for

25   cryptocurrency amounts for each token and we want that.  We

1   need to know how much of each token they think they had as of

2   the petition date, and that's a valid data point, we need

3   that to do our process.

4         In addition, though, to dollarize the claims, I have to

5   turn those cryptocurrency token amounts, quantity amounts,

6   into a dollar amount via a market price as of the petition

7   time, and that's what we're doing here with the estimation

8   motion.

9   Q    And a creditor also can dollarize its claim, as you

10  indicated, by completing that portion of the proof of claim,

11  right?

12  A    Some of the creditors put in different tokens -- or the

13  same tokens and a price, and, you know, the math that spit

14  out.  Some of it was with errors, but, you know, some of the

15  people put in what they thought the price should be in there.

16  Q    Are you aware that the Foundation Serendipity and

17  Foundation Elements' proofs of claim total approximately $300

18  million?

19  A    I don't -- I didn't memorize all the proofs of claim,

20  sorry.  No, I don't know that.

21  Q    Do you know -- did you hear debtors' counsel tell the

22  Court, I believe he used the phrase a small subset of digital

23  currencies aren't being valued today?

24  A    I heard him say that, yes.

25  Q    And did you hear him include the OXY -- do you remember

1   the tokens he said that were not being valued today, one was

2   OXY --

3   A     I'm fairly certain it was MAPS, OXY, BOBA, and I think

4   Serum, but I don't remember the last one.

5   Q     And do you know what percentage of the outstanding

6   unsecured claims are represented by the OXY and MAPS

7   creditors?

8   A     I'm sure I could -- I'm sure I have that in files

9   somewhere, but I do not have it committed to memory.  As I

10  said, there's two million claims, 87,000 filed claims, I

11  don't have them committed to memory.  I'm sorry.

12  Q     Did you hear debtors' counsel tell the Court that the

13  debtors have $26 quintillion in claims filed against them?

14  A     I think that number is a little off, but 20 -- over 20

15  quintillion, yes.

16  Q     And is it fair to say that the claims of creditors that

17  hold OXY and MAPS tokens are a very small portion of that 20-

18  plus quintillion dollars in claims?

19  A     Tell me what your threshold for small is.  I mean, it's

20  very objective what you're asking and I've told you a couple

21  times that I don't remember.  I didn't commit them to memory,

22  I don't know what the -- to do that math, I'd have to know

23  what their amount is and divide it by 20 quintillion, which

24  is a big number.

25  Q     Okay.  Well, I'll give you a -- you asked me for a

1  threshold of what I would call a small amount.  Is it less

2  than one percent?

3  A     It is going to be less than one percent, yes.

4  Q     Is it less than a half of a percent?

5  A     I don't have that math.  I'm sorry.

6  Q     It's common for debtors to put a range of potential

7  recoveries in a disclosure statement, right?

8  A     It is common, yes.

9  Q     And it's also common for debtors to object to claims

10  post-confirmation, right?

11  A     Correct.  The claims resolution process continues --

12  continues on normally at post-effective date.

13  Q     And it's also common for a debtor to establish a

14  disputed claims reserve at confirmation to actually litigate

15  claims post-confirmation, right?

16  A     It's common to do that, but I will tell you that it is

17  difficult to do that when the number of -- the number and

18  amount of the claims in question is as large as we're talking

19  about.

20  Q     Well, you concede here that the debtor will have a

21  reserve to deal with disputed claims, right?

22  A     I believe the debtor will have some sort of reserve for

23  disputed claims.  We're going to do our best to try to get

24  through as many of them, but there will probably be some that

25  follow post-emergence.

1    Q      Okay.  And is it fair to say that you believe that it's

2    important to dollarize the cryptocurrency claims so that it

3    will most accurately reflect claims amounts and estimated

4    recoveries in the disclosure statement?

5    A      Can you please ask that question again?

6    Q      Do you believe it's important to dollarize the value of

7    the digital asset claims so that the disclosure statement

8    accurately reflects claims amounts and estimated recoveries?

9    A      In my opinion, it's essential.  I can't do the recovery

10   amounts without having some sort of value for the claims, you

11   know, the math, I need that denominator.

12   Q      And you also believe it's important to permit creditors

13   to make an informed decision when voting on the plan, right?

14   A      Indeed.

15   Q      And if there was a claim or right, for example, that

16   somebody was asserting that could take all the assets away,

17   all the digital assets away, you would want to have that

18   resolved before the disclosure statement hearing, right?

19   A      That's a hypothetical, there's a bunch of facts and

20   circumstances associated with it.  I mean, there's always

21   going to be claims that are big and, you know, you need to

22   know the facts and circumstances of that case to say whether

23   or not it has to be taken care of before you can feel

24   comfortable with your range.

25   Q      So you're saying it's possible that you could have a

1   claim to the debtors' assets that could take them all out of

2   the estate where creditors would get nothing under a plan,

3   but there are some circumstances where you wouldn't have to

4   address that in the disclosure statement, you wouldn't have

5   to have that claim resolved before the disclosure statement

6   is sent out?

7   A    Once again, that's a hypothetical, but I'm sure that I

8   could get comfortable with certain claims.  You know, if

9   there was no merit to them, if I knew they were duplicative,

10  right, I could get comfortable with that, but I'd need to

11  know the facts and circumstances of the hypothetical before I

12  could tell you with certainty whether or not we're

13  comfortable saying that it has to be done pre-emergence or

14  not.

15  Q    Have you ever read the service guidelines for the

16  debtors' -- FTX's crypto exchange?

17  A    The service guidelines?

18  Q    Yeah, the rules of -- that are on the website for

19  customers?

20  A    The terms of service?

21  Q    Yes.

22  A    I've read most of it in the context of other parts of

23  what we're doing, but clearly that's not in my declaration.

24         MR. GLUECKSTEIN:  Your Honor, I'm going to object

25  to this.  We're now going way beyond the scope of the direct

1  and we are now into the terms of service, which they are not

2  at issue for today's hearing.

3          MR. GWYNNE:  Your Honor, the witness testified in

4  his declaration about undue delay.  He also testified about

5  needing certain information to have in the disclosure

6  statement for people to make an informed choice.  And one of

7  the things I'm going to ask him about those terms of service

8  is the fact that they say the customers own the assets and

9  that there's a customer claim to those assets, and whether he

10  thinks that's something that should be in the disclosure

11  statement.  So I think it's well within the scope of his

12  testimony.

13          THE COURT:  Limit it to that particular issue.

14          You can answer the question.

15          MR. GWYNNE:  I'll just re-ask it just in case --

16          THE WITNESS:  Okay.

17  BY MR. GWYNNE:

18  Q      You say you've read the terms of service for customers

19  of FTX's crypto exchange, right?

20  A      I've read part of them, yes.

21  Q      Did you read the part of it that says the customers

22  actually own the assets in their accounts?

23  A      I've read parts of it in which folks have, you know,

24  pointed to as this is the reason why, you know, they think

25  they have ownership of it or not, but I'm not a lawyer.  I

1  don't make a determination on whether or not I think that's

2  valid or what it says or -- you know, I've read it from a

3  businessperson's perspective.

4  Q    And so you're aware that customers are relying on that

5  language to assert that they own the digital assets in their

6  accounts, right?

7  A    I haven't talked with any customers, so I don't know

8  what they're relying on.

9  Q    Do you think that's an important thing to know as the

10  debtors' financial adviser who's testifying regarding the

11  debtors' disclosure statement?

12  A    I know what the Code says and the process around the

13  claims adjudication, you know, not often do I read a terms of

14  service with customers and make a determination without

15  counsel on whether or not, you know, they have a claim.

16  Q    Well, and not often have you been involved in a

17  cryptocurrency case either, right?

18  A    I've never been involved in a cryptocurrency case

19  before this.

20        MR. GWYNNE:  I have nothing further, Your Honor.

21  Thank you.

22        THE COURT:  Thank you.

23        Any other cross?

24    (No verbal response)

25        THE COURT:  Redirect?

1        MR. GLUECKSTEIN:  Thank you, Your Honor.  Brian
2   Glueckstein for the debtors, just briefly.
3                    REDIRECT EXAMINATION
4   BY MR. GLUECKSTEIN:
5   Q    Mr. Moseley, could you just turn to your declaration?
6   Do you still have that in front of you?
7   A    Yep.
8   Q    I just want to make sure the record is clear.
9   Paragraph 6 of your declaration, you state in there that the
10  debtors have over two million scheduled claims and 87,000
11  filed claims that include at least a single digit of assets.
12  Do you see that?
13  A    Yes, sir.
14  Q    You go on to say that the claims are scheduled and
15  filed almost exclusively in quantities.  Do you see that?
16  A    Yes, sir.
17  Q    So, Mr. Moseley, in order to have the information that
18  you need and that customers need to understand the value of
19  their claim, what needs to happen?
20  A    I need to be able to multiply the number of tokens for
21  each of these tokens by a price in dollars and, to do that, I
22  need a price, I need a price for each token in dollars.
23  Q    Okay.  And with respect to the SPA tokens, with respect
24  to tokens in particular cryptocurrencies, do the debtors have
25  a price that you could have provided in the schedules that

1  you believed was reliable or accurate?

2  A     Say that again?

3  Q     Did the debtors at the petition date a price with

4  respect to SPA tokens that you could have put into the

5  schedules and dollarize the claims yourselves?

6  A     We didn't feel comfortable using the price that was on

7  the exchange server as the price for that token.  You know,

8  we felt that we needed to say what is the market price to

9  sell this token somewhere else, what would that price be, and

10 for that -- we didn't have that handy at the time.

11 Q     There were some questions, Mr. Moseley, about the

12 process in a claims objection process, as opposed to

13 estimation; do you recall that?

14 A     Yep.

15 Q     There was questions about whether there would be

16 discovery and an evidentiary hearing; do you recall that?

17 A     Yes.

18 Q     In your experience, do individual claims objections,

19 that discovery and evidentiary process take time?

20 A     They do.

21 Q     Do you have a sense -- do those get resolved,

22 generally, in a week?

23 A     Based on my experience, it's, you know, two to three

24 months, right, to go through the full process of doing --

25 having the objection on file, giving the claimant time to

1  respond, having some negotiation, doing discovery, picking

2  experts, putting those reports on, you know, doing

3  depositions, et cetera, and then going back to court.

4  Q     Have you seen claims objections take longer periods of

5  time, in your experience?

6  A     For sure.

7  Q     There was a question about whether there would be an

8  evidentiary hearing with respect to the estimation motion; do

9  you recall that?

10 A     I do.

11 Q     Is it your understanding that we're having an

12 evidentiary hearing today?

13 A     I thought my testimony was evidence.  So, yes, I

14 thought we were doing it, but maybe I've got the terminology

15 wrong.

16            MR. GLUECKSTEIN:  Thank you, Your Honor.  No

17 further questions.

18            THE COURT:  Thank you.  Thank you, Mr. Moseley.

19 You may step down.

20            All right, we're at 12:02.  It doesn't make sense

21 to call another witness for just a few minutes.  So why don't

22 we take our break a little bit earlier and we'll come back at

23 1 o'clock, and we'll reconvene and we'll go from there.

24            Let me just get an understanding, we have two more

25 -- are you calling both of your experts for supplemental --

1           MR. GLUECKSTEIN:  I am, Your Honor, but very

2    briefly, only five to ten minutes for each.

3           THE COURT:  All right.  And do the parties who

4    have cross, do you intend to cross-examine the expert

5    witnesses as well?  Mr. Gwynne, Mr. Bielli?

6           MR. GWYNNE:  I'm sorry, Your Honor?

7           THE COURT:  Do you both intend to cross-examine

8    both of the expert witnesses that the debtors are calling?

9           MR. GWYNNE:  Kurt Gwynne, for the record, Your

10   Honor.  I do not intend to cross-examine those witnesses

11   because we agreed that the valuation of our clients' claims,

12   if it's going to be estimated, will be -- is not being

13   handled today.  We're part of the small subset of claims that

14   aren't being valued today.

15          The reason I cross-examined the first witness is

16   because the issue that we are litigating today is whether or

17   not estimation of our clients' claims is appropriate or

18   whether we should have a regular claims allowance proceeding.

19   So that's why we crossed that witness and will not be

20   crossing the other two.

21          THE COURT:  All right.

22          MR. GWYNNE:  Thank you, Your Honor.

23          MR. O'DONNELL:  Your Honor, Dennis O'Donnell, DLA

24   Piper, on behalf of MAPS Vault.  We're similarly aligned.  We

25   have reached an agreement with the debtors that those

1   witnesses, to the extent they affect that future valuation

2   hearing, we'll come in today for what's on the calendar

3   today, not what's going to happen in March.  So we will not

4   be cross-examining.

5           THE COURT:  All right.  Thank you.

6           MR. MINUTI:  Good afternoon, Your Honor, Mark

7   Minuti from Saul Ewing.  Your Honor, I represent TMSI.  The

8   token that my clients are concerned with is Serum and,

9   consistent with Mr. Gwynne's statements, those issues are not

10  going to be decided today.  So we're going to reserve our

11  rights on cross when we have the further evidentiary hearing

12  with respect to that token.

13          THE COURT:  All right.  Thank you.

14          MR. MINUTI:  Thank you.

15          MR. KLAUDER:  Good afternoon, Your Honor, David

16  Klauder with Mr. Bielli on behalf of Aurus.  I think we'll

17  have cross with respect to one of the experts, I believe it's

18  Dr. Howell.

19          THE COURT:  Okay.

20          MR. KLAUDER:  So we'll work over the lunch break

21  to try to make that focused.

22          THE COURT:  All right.  Great, thank you.

23          MR. KLAUDER:  Thank you.

24          THE COURT:  All right, then we are recessed until

25  1:00 p.m.  Thank you -- oh, one more?  Sorry.

1           MR. WEISS:  Sorry, Your Honor, John Weiss on

2    behalf of BOBA Foundation, essentially just to reserve rights

3    as well.  We were put over to the hearing that will be held

4    in March, I believe, with respect to the estimation issues.

5           THE COURT:  All right.  Thank you.

6           MR. WEISS:  Thank you, Your Honor.

7           THE COURT:  Anyone else?

8       (No verbal response)

9           THE COURT:  All right, thank you.  We're in recess

10   until 1:00.  I'll see everybody then.

11      (Recess taken at 12:05 p.m.)

12      (Proceedings resumed at 1:02 p.m.)

13          THE COURT:  Let's go.

14          MR. GLUCKSTEIN:  Okay.  Thank you.  Again, Brian

15   Gluckstein for the debtors.  The next witness that the

16   debtors are calling is Kevin Lu, who's the director of data

17   science and product at Coin Metrics, Inc.  Mr. Lu submitted a

18   declaration containing his price analysis at Docket Number

19   5204.

20          Before requesting his declaration be admitted into

21   evidence, we would like to call Mr. Lu briefly to the stand

22   to provide some foundation for the Court.

23          THE COURT:  All right.  Thank you.  Mr. Lu, please

24   come forward.  Take the stand and remain standing for the

25   oath.

1          THE CLERK:  Please raise your right hand.  Please

2   state your full name and spell your last name for the record.

3          THE WITNESS:  Kevin Lu.  Last name is L-U.

4          THE CLERK:  Do you affirm you will tell the truth,

5   the whole truth, and nothing but the truth to the best of

6   your knowledge and ability?

7          THE WITNESS:  Yes, I do.

8          THE CLERK:  You may be seated.

9          THE WITNESS:  Thank you.

10         MR. GLUCKSTEIN:  Your Honor, may I first the

11  witness with a copy of his declaration?

12         THE COURT:  Sure.

13         MR. GLUCKSTEIN:  Does Your Honor need one?

14         THE COURT:  I have it.  Thank you.

15         THE WITNESS:  Thank you.

16                    DIRECT EXAMINATION

17  BY MR. GLUCKSTEIN:

18     Q.   Good afternoon, Mr. Lu.

19     A.   Good afternoon.

20     Q.   Mr. Lu, can you please describe for the Court

21  where you're currently employed?

22     A.   I'm currently employed at Coin Metrics.

23     Q.   And what is your role at Coin Metrics?

24     A.   I'm a director of data science and product.

25     Q.   What formal education degrees do you hold?

1        A.   I studied at the University of California, where I

2   received -- Berkeley -- where I received a bachelor's in

3   business administration and a bachelor's in economics with

4   distinction.

5        Q.   Did you have professional experience in data

6   sciences prior to joining Coin Metrics?

7        A.   Yes.  My professional experience consists of about

8   15 years at various companies, all of which involved

9   applications of data science to financial data, including

10  data sets that relate to prices for financial assets.

11       Q.   Mr. Lu, when did you join Coin Metrics?

12       A.   I joined five years ago.

13       Q.   Could you briefly explain for the Court what Coin

14  Metrics is and what it does?

15       A.   Sure.  Coin Metrics is a data provider of

16  cryptocurrency-related data.  We have several product

17  offerings that range from market data, network or blockchain-

18  related data, indexes, and risk products.  And our clients

19  are financial institutions and companies engaged in the

20  digital assets space.

21       Q.   Mr. Lu, what do you do in your role at Coin

22  Metrics as director of data science?

23       A.   I have a range of responsibilities.  I oversee

24  many product lines, but one of the product lines I oversee is

25  the Coin Metrics prices.  This is one of our commercial data

1   offerings, and it represents prices that we calculate for a

2   wide range of cryptocurrency and digital assets at various

3   frequencies using various methodologies, and they're used by

4   our clients for a wide range of purposes.

5         Q.   What role did you personally have in the

6   development of the Coin Metrics prices?

7         A.   As I said, I joined five years ago when the

8   company was founded.  This was when the company was pre-

9   revenue and didn't have any commercial product offerings.  I

10  played a key role in developing the Coin Metrics prices and

11  bringing it from inception to a successful commercial

12  offering today.  I was the principal author and designer of

13  its methodology, and on a day-to-day basis, I oversee its

14  performance and evaluate its performance during times of

15  market stress, volatile price movements, and other

16  situations.

17        Q.   Mr. Lu, what were you asked to do when you were

18  retained by the debtors in these Chapter 11 cases?

19        A.   The scope of my assignment was to calculate prices

20  for certain digital assets that were listed on the FTX

21  exchanges, as well as to calculate a confidence interval

22  reflecting the uncertainty of my determination of the price.

23  I was also tasked with writing a declaration that would

24  contain my qualifications and the methodology that I used.

25        Q.   And did you, in fact, prepare a declaration

1  detailing your pricing and methodology?

2       A.   Yes, I did.

3       Q.   And can you summarize at a high level, just very

4  high level, what you did to provide the pricing set that's

5  set forth in that declaration?

6       A.   I leveraged the data and methodology that are used

7  in the Coin Metrics prices and applied that to calculate the

8  prices of the assets within the scope of my work.  At a very

9  high level, my methodology consists of two components.  One

10 is to select a set of high quality constituent markets as

11 input in the calculation of the price of an asset.

12      And the second component is the application of

13 statistical methods to actually calculate the price and the

14 confidence interval.  I applied these steps to the 428 assets

15 within the scope of my work.

16      Q.   Mr. Lu, do you have a copy of your declaration in

17 front of you?

18      A.   Yes.

19      Q.   Is this the declaration that you prepared for

20 submission to the Court in this case?

21      A.   Yes, it is.

22      Q.   Okay.  And is that declaration an accurate

23 reflection of the Coin Metrics pricing that was provided to

24 the debtors here?

25      A.   Yes, it is.

1            MR. GLUCKSTEIN:  Your Honor, at this time, I'd like

2   to move Mr. Lu's declaration, Docket 5204, into evidence in

3   support of the motion.

4            THE COURT:  Any objection?  Submitted without

5   objection.

6            MR. GLUCKSTEIN:  No further questions, Your Honor.

7   He's available for cross, obviously.

8            THE COURT:  I believe I asked before we broke for

9   lunch if anyone was going to cross.  I don't think anybody

10  was going to cross Mr. Lu is that correct?  Thank you.

11           Mr. Lu, thank you.  You may step down.

12           MR. GLUCKSTEIN:  Okay.  Then moving right along,

13  Your Honor, our third and final witness on behalf of the

14  debtors is Sabrina T. Howell, who's the Associate Professor

15  of Finance at the NYU Stern School of Business.  Dr. Howell

16  submitted a declaration that attached an expert report at

17  Docket Number 5203, as well as a supplemental written

18  declaration filed at Docket 67284.

19           And similarly, before requesting her declarations

20  be admitted, we would like to call Dr. Howell to the stand to

21  provide some foundation to the Court.

22           THE COURT:  Dr. Howell, please come forward, take

23  the stand, and remain standing for the oath.

24           THE CLERK:  Please raise your right hand.  Please

25  state your full name and spell your last name for the record.

1          THE WITNESS:  Sabrina T. Howell, H-O-W-E-L-L.

2          THE CLERK:  Do you affirm that you will tell the

3   truth, the whole truth, and nothing but the truth to the best

4   of your knowledge and ability?

5          THE WITNESS:  I do.

6          THE CLERK:  You may be seated.

7          THE WITNESS:  Thank you.

8                    DIRECT EXAMINATION

9   BY MR. GLUCKSTEIN:

10     Q.   Good afternoon.  Professor Howell, could you

11  please describe to the Court where you are currently

12  employed.

13     A.   The NYU Stern School of Business.

14     Q.   And what is the focus of your work at the NYU

15  Stern School?

16     A.   My research and teaching focus on Fintech,

17  entrepreneurial finance, and innovation, among other topics.

18     Q.   What formal educational degrees do you hold?

19     A.   I have a BA in economics and East Asian studies

20  from Yale University, a master's in economics from Harvard

21  University, and a Ph.D. in the economics track of the

22  political economy and government program at Harvard

23  University.

24     Q.   Do you have any professional experience in the

25  areas of economics and finance outside of your role as a

1   professor at the Stern School?

2       A.   I worked for two years as an economic consultant

3   at Charles River Associates.

4       Q.   Professor Howell, do you have experience in your

5   teaching and academic writings with valuation and digital

6   asset related issues?

7       A.   I do.  I designed and teach a course at Stern on

8   Fintech-focused entrepreneurial finance, where we value

9   blockchain-related digital assets.  And in my research, I

10  wrote a paper about initial coin offerings, which to my

11  knowledge is the most highly cited paper on that topic, with

12  about 700 citations, and published in a top finance journal.

13      And in that research, there are several elements that

14  are directly relevant to my work on this case, including

15  evaluating the market capitalization of tokens, analyzing

16  price data, looking at token vesting and lockup schedules,

17  and studying how tokens are listed on exchanges.

18      Q.   Dr. Howell, what were you asked to do when you

19  were retained by the debtors in these bankruptcy cases?

20      A.   So I was asked to assist the debtors in

21  determining the value of customer claims.  I understand that

22  the debtor is liquidating its holdings of all the digital

23  assets that it has.  And as part of that, I was asked to

24  consider whether there may be any appropriate discounts that

25  should apply to the various classes of assets that are being

1    liquidated and to which there are customer claims.

2         Q.    And could you just, at a high level, summarize for

3    the Court the types of -- the discounts that you considered

4    in your analysis in this case?

5         A.    Sure.  So I considered three types of discounts

6    within the scope of my assignment.  The first reflects the

7    fact that the markets for some of the assets that the debtors

8    are holding are relatively illiquid, and the debtor is

9    holding a very large quantity relative to regular trading

10   volume.

11        So I estimate the price at which the debtor could

12   likely sell its holdings, and in some cases, there is a

13   shortfall due to price impact from selling these very large

14   holdings.  I call that an asset liquidation discount, and I

15   applied an asset liquidation discount to 71 of the 1,321

16   unique digital assets to which customers have claims.

17        The second type of discount reflects the fact that some

18   claims are to assets with marketability restrictions.  So for

19   these, I apply a discount for this lack of marketability.

20        And finally, I consider claims to equity and equity-

21   like instruments, and this includes FTT, and I assign zero

22   value to these claims.

23        Q.    Dr. Howell, did you prepare a declaration and

24   report detailing your opinions and findings?

25        A.    I did.

1          MR. GLUCKSTEIN:  Your Honor, can I approach the

2   witness to give her a copy of her declarations?

3          THE COURT:  Yes.

4   BY MR. GLUCKSTEIN:

5      Q.   Do you have a copy of your declaration with the

6   annexed report in front of you, Dr. Howell?

7      A.   I do.

8      Q.   Is this the report that you prepared in connection

9   with submission to the Court in this case?

10     A.   It is.

11     Q.   Do you also have a copy of your supplemental

12  declaration?

13     A.   I do.

14     Q.   And you also prepared that declaration in support

15  of the motion in this case?

16     A.   I did.

17         MR. GLUCKSTEIN:  Your Honor, at this time, I'd like

18  to move Professor Howell's declaration with annexed report at

19  Docket 5203, as well as her supplemental declaration at 6728-

20  4 to evidence in support of the debtor's motion.

21         THE COURT:  Any objection?  Admitted with without

22  objection.

23      (Howell declaration received into evidence)

24         MR. GLUCKSTEIN:  Thank you, Your Honor.  No further

25  questions.

```
 1              THE COURT:  Thank you.  Cross exam.
 2              MR. BIELLI:  Good afternoon, Your Honor.
 3                        CROSS-EXAMINATION
 4  BY MR. BIELLI:
 5       Q.   Good afternoon, Ms. Howell.
 6       A.   Good afternoon.
 7       Q.   Thomas Bielli on behalf of RS Tech Limited.  Can
 8  you hear me okay, Dr. Howell?
 9       A.   I can.  Thank you.
10       Q.   Thank you.  Dr. Howell, who retained you to
11  prepare this report?
12       A.   Sullivan & Cromwell, on behalf of the debtors.
13       Q.   When did they do that?
14       A.   I believe in late summer.
15       Q.   Do you remember who you spoke to about the
16  retention?
17       A.   The lawyers here, Brian and Julie.
18       Q.   Did you ever speak to anybody at FTX?
19       A.   Yes.  I spoke to Mr. John Ray as part of the
20  retention, as well.
21       Q.   Do you have an engagement letter or retention
22  letter that governs the scope of your engagement?
23       A.   I do.
24       Q.   And who is that from?
25       A.   It is from Sullivan & Cromwell.
```

1          Q.   Did you receive any instructions in late summer of

2    2023 as to what they were looking for this report?

3          A.   Yes.  I was asked to examine any -- I was asked to

4    consider the various types of assets to which customers have

5    claims and was told that the debtors would be liquidating all

6    of their holdings of digital assets in an orderly fashion,

7    starting on the petition date, and I was asked to assess

8    whether any -- there should be any discounts applied as a

9    result of that liquidation process.

10         Q.   And who gave you those instructions?

11         A.   The lawyers at Sullivan & Cromwell in concert with

12   the team that I've been working and that has been working

13   under my direction at Analysis Group.

14         Q.   Okay.  I'm going to back up for a second.  Before

15   we get into the Analysis Group, and maybe my question wasn't

16   clear, but what I'm looking for is who gave you the

17   assignment.  Was it one lawyer?  Was it a group of lawyers?

18   Was it FTX?  Was it a Zoom?  Was it a phone call?  How did

19   you get this assignment?

20         A.   The assignment, I believe, was from Brian

21   Gluckstein and his team at Sullivan & Cromwell.

22         Q.   Okay.  Was that your initial interaction --

23         A.   And I think that -- sorry.

24         Q.   I'm sorry.  Oh sorry, go ahead, Dr. Howell.

25         A.   Just to be -- if I can just clarify.

1      Q.   Sorry.

2      A.   Sorry, just to clarify.  My understanding is that

3  they are acting on behalf of and under instructions from John

4  Ray and the management at the FTX estate.  But I'm not a

5  lawyer, and so I -- and I -- I don't -- I can't speak exactly

6  to the hierarchy on that side of things.

7      Q.   Right.  No, I'm not trying to trip you up.  I'm

8  really asking, you know, who gave you instruction.  And is it

9  your testimony that your assignment, the instructions for

10 your assignment, were given to you by debtor's counsel at

11 Sullivan & Cromwell; is that correct?

12     A.   That's correct.

13     Q.   Okay.

14     A.   I think acting on behalf of the debtors.

15     Q.   Okay.  And you received that engagement in the

16 summer, later summer of 2023, correct?

17     A.   Yes.

18     Q.   Okay.  When was your report completed?

19     A.   In -- at the -- at -- in late December of 2023.

20     Q.   Your report's dated December 27th, 2023.  I assume

21 it was completed prior to that date or close to that date.

22     A.   Yes.

23     Q.   Okay.  Was it completed before December 16th?

24     A.   No, it was completed on the date it was filed.

25     Q.   Okay.  When you completed your report, did you

 1  send it to anybody for review before it was filed?

 2       A.   I was the final reviewer.

 3       Q.   Okay.  And your testimony is you reviewed it on

 4  December 27th, 2023, two days after Christmas?

 5       A.   Correct.

 6       Q.   Okay.  Are you full-time facility at Stern?

 7       A.   I am.

 8       Q.   So do you -- how many classes do you teach?

 9       A.   My teaching load, as we say, is --

10       Q.   Sorry.

11       A.   -- three classes per year.  I teach less than that

12  because I usually buy some out with grants.

13       Q.   Okay.  So how many classes did you teach in the

14  fall of 2023?

15       A.   None.

16       Q.   Okay.  You mentioned a group.  I think it was the

17  Assigned Group.  I apologize.  I don't have it in front of

18  me.  Who's the name of your -- the group that you work with

19  in your preparation?

20       A.   Analysis Group.

21       Q.   Analysis Group.  Who or what is the Analysis

22  Group?

23       A.   Analysis Group is an economic consulting firm.

24       Q.   What does that mean?

25       A.   It means that they conduct various types of

```
 1  analytic work to support, as I understand, a range of clients

 2  in the private and public sectors.

 3          Q.   Are you a client of that group?

 4          A.   No.

 5          Q.   Okay.  What was that group's involvement in this

 6  expert report?

 7          A.   At my direction, they conducted analyses of data

 8  and markets and conducted various calculations that I

 9  requested.

10          Q.   Were they paid for that?

11          A.   I believe so, yes.

12          Q.   By whom or who?

13          A.   I believe by the debtor and the estate.

14          Q.   So is it your understanding that they were -- this

15  group, the Analysis Group, was separately retained by the

16  debtor and not by you?

17          A.   I believe there is a single engagement letter that

18  covers all of the work that I did and the Analysis Group team

19  did under my direction, but I can't say for sure whether

20  there may be any additional engagement letters.

21          Q.   Do you have an approximation as to how many hours

22  you and the Analysis Group spent on this report from the late

23  summer of 2023 through December 27th, 2023, exclusive of your

24  preparation for today?

25          A.   I don't have that off the top of my head.
```

1        Q.   Were you paid a flat rate or an hourly rate for

2   your services?

3        A.   An hourly rate.

4        Q.   Okay.  Do you know how many hours you billed to

5   this engagement?

6        A.   I would have to go and look.  I don't remember

7   each month.

8        Q.   Okay.  Have you submitted invoices for your

9   engagement to either Sullivan & Cromwell or FTX as of today?

10        A.   I have.  I submit in my invoices via Analysis

11   Group, which, as I understand, aggregates them and submits

12   them to Sullivan & Cromwell.

13        Q.   And as you sit here today, you don't know the

14   amount of hours you've spent; is that correct?

15        A.   I don't.  I think ballpark, I can give a ballpark

16   number --

17        Q.   Sure.

18        A.   -- around the order of 80, but that's just an

19   estimate.  I --

20        Q.   And is that estimate your hours or --

21        A.   My hours.

22        Q.   Not the asset group's hours or Analysis --

23        A.   Analysis Group.

24        Q.   -- Group's hours?

25        A.   Correct.

1          Q.   Okay.  Do you have any ballpark of what the

2    Analysis Group spent on this report?

3          A.   I do not.

4          Q.   You mentioned during your direct, and I think you

5    mentioned it in one of my questions, that you were tasked

6    with valuing the debtor's assets to be liquidated as of the

7    petition date.  Does that generally sound what you testified

8    to?

9          A.   I was asked to assess the likely prices at which

10   the debtor would be able to sell its holdings of digital

11   assets in an orderly liquidation, commencing at the petition

12   date, as well as to account for a lack of marketability, and

13   finally to assess the fundamental value of FTT and equity

14   claims in FTX.

15         Q.   Okay.  On the assets that could be liquidated, how

16   long would that take?  In other words, you were doing it as

17   of the petition date with the debtor's intention to liquidate

18   it.  How long would that take, the liquidation?

19         A.   It was not part of my assignment to estimate the

20   time to liquidation.

21         Q.   Do you know what it would be?

22         A.   No.  It would depend on how the liquidation

23   occurred.

24         Q.   Did you review the debtor's plan that was filed on

25   December 16th, 2023?

1        A.    No.

2        Q.    Okay.  Do you know that the debtor filed a plan on

3  December 16th, 2023?

4        A.    I do, but I did not read it.

5        Q.    Understood.  You testified during your direct that

6  -- strike that.

7        If I say the debtor's books and records, do you know

8  what I mean?

9        A.    I think so.

10        Q.    Okay.  Did you review the debtor's books and

11  records when you prepared this report?

12        A.    I did not.

13        Q.    Okay.  Why not?

14        A.    Because that was not within the scope of my

15  assignment.

16        Q.    Okay.  It's your testimony that you did not value

17  the debtor's -- or these assets that were held by the debtor

18  as of the petition date, but rather a liquidation commencing

19  as of the petition date, correct?

20        A.    That's right.  I have the --

21        Q.    Thank you.

22        A.    -- just to be clear.  I observe the holdings of

23  each digital assets -- sorry -- of each digital asset, and

24  then, I observe petition time prices and market data, and I

25  use that information to calculate the likely prices at which

1    the debtor could have sold its digital assets in an orderly

2    liquidation.

3         Q.   And that's where you apply the asset liquidation

4    discount, correct?

5         A.   Correct.

6         Q.   Okay.  Did you come up with the asset liquidation

7    discount or was that provided to you by either debtor's

8    counsel or the debtors?

9         A.   I came up with it.

10        Q.   Okay.  Who authorized you to file the declaration

11   and the expert report?

12        A.   I think this is a legal question.  No?  I think I

13   authorized counsel to file on my behalf.

14        Q.   On behalf of who?  Your behalf?

15        A.   On my behalf.

16        Q.   Okay.

17             MR. BIELLI:  I don't have any further questions,

18   Your Honor.  Thank you very much.  Thank you, Dr. Howell.

19             THE COURT:  Thank you.  Any other cross?  I think

20   that was the only one that was mentioned before the break.

21   Redirect?

22             MR. GLUCKSTEIN:  No redirect, Your Honor.

23             THE COURT:  All right.  Thank you, Dr. Howell.  You

24   step down.

25             MR. GLUCKSTEIN:  Your Honor, that concludes the

1   debtor's presentation of evidence on the motion.

2            THE COURT:  Does anyone else have any evidence they

3   intend to introduce at the hearing?  And we heard nothing.

4   We can go into closing arguments.

5            MR. GLUCKSTEIN:  Thank you, Your Honor.  Your

6   Honor, as detailed this morning by Mr. Diederich and

7   otherwise before the Court, debtors have worked tirelessly

8   since the petition date to secure, preserve, and maximize the

9   value of their assets for the benefit of customers and other

10  creditors.  These assets --

11           THE COURT:  Oh, I'm sorry.  Hold on one second.

12           MR. GLUCKSTEIN:  Yes.

13           THE COURT:  I forgot about our YouTube folks.  We

14  need to let them back in so they can hear the closing

15  argument.

16           MR. GLUCKSTEIN:  Absolutely.

17           THE COURT:  So let's take a five minute recess, and

18  we'll come back and let them -- we'-- recess until 11:35.

19           (Off the record at 1:28 p.m.)

20           (On the record at 1:34 p.m.)

21           THE BAILIFF:  All rise.

22           THE COURT:  Be seated.  Sorry for cutting you off

23  there, Mr. Gluckstein.  Why don't we rewind and start over

24  again?

25           MR. GLUCKSTEIN:  Absolutely.  I had forgotten as

1    well, but it's all fine, Your Honor, of course.  Brian

2    Gluckstein for the debtors, Your Honor.

3              As Your Honor is aware, and as the Court heard, and

4    the parties heard as recently as this morning from Mr.

5    Diederich, the debtors have worked tirelessly since the

6    petition date to secure, preserve, and maximize the value of

7    their assets for the benefit of their customers and other

8    creditors.

9              These efforts, led by Mr. Ray, have been extremely

10   successful to date.  As the Court is aware, the size of these

11   Chapter 11 cases are massive, with more than 2 million

12   scheduled and filed claims by customers and other creditors

13   located around the world.

14             This scope of these Chapter 11 cases also dwarfs

15   other cryptocurrency exchange bankruptcies for, among other

16   reasons, as reflected in the digital assets conversion table

17   attached to the proposed order today, there are 1,321

18   different digital assets that are the subject of customer

19   claims.

20             The debtors are in position to commence the plan

21   confirmation process with the path to emergence from Chapter

22   11, and most importantly, returning value to creditors within

23   sight.  We continue to build consensus around our plan.

24             As set forth in Mr. Moseley's declaration and his

25   testimony today, the debtors need to be able to provide

1   adequate information in our disclosure statement, permit

2   creditors meaningful information to vote on the plan, permit

3   the debtors to project claims recovery information, set

4   reserves, and ultimately make distributions -- that's why

5   we're here -- to customers and their other creditors.

6           To accomplish these critical tasks, the debtors

7   need to value every claim that's based on a digital asset.

8   This case is unusual in that every one of those millions of

9   claims based on digital assets is currently unliquidated.

10          While the majority of the value of claims are

11  denominated in fiat or stablecoin, there are approximately 79

12  percent, as set forth in Mr. Moseley's declaration, of all

13  creditor claims that include at least a component, in part,

14  claims based on digital assets that are not readily converted

15  to us dollar values.

16          As has been clear from the first day of these

17  cases, due to the fraud committed by Mr. Bankman-Fried and

18  other insiders, the debtors did not have sufficient digital

19  assets on the petition date to consider a structure of

20  returning digital assets to all customers in kind.

21          Armed with the orders entered by this Court, the

22  debtors have been, as Mr. Diederich discussed this morning,

23  strategically monetizing its remaining digital assets, where

24  appropriate, to maximize the cash assets that ultimately will

25  be available for distribution to creditors.

1          The plan that's on file is premised on providing

2     U.S. dollar recoveries to creditors, and it is therefore

3     necessary for these claims to all be dollarized and to permit

4     them to be addressed alongside the existing fiat and

5     stablecoin claims that the debtors have.

6          To do that, prices for the claims based on digital

7     assets need to be established, and the debtors seek to do so

8     by estimating those claims pursuant to Section 502(c) of the

9     Bankruptcy Code in accordance with the proposed valuation

10    table that's attached to the revised order.

11         As detailed in our papers and the evidence that is

12    now before the Court today, the debtors believe the pricing

13    and methods for setting those prices before the Court is both

14    appropriate and fair to creditors.

15         We noticed this motion to millions of stakeholders,

16    and while we certainly have received objections, the

17    overwhelming majority of those creditors have not objected to

18    either the process or the pricing that's set forth in that

19    table.

20         And Your Honor, the disparate and often conflicting

21    positions that have been taken by certain of the objectors,

22    who plainly are looking for ways to increase their claim

23    recoveries at the expense of others from a finite set of

24    assets, necessitates a comprehensive solution that both

25    complies with the requirements of the Bankruptcy Code and

1  treats creditors and their finite pool of distributable

2  assets most fairly.

3         As Mr. Moseley's testimony establishes, any need to

4  liquidate the value of each claim based on digital assets on

5  an individual basis would unduly delay these cases and

6  distribution to creditors.

7         This is due to the fact that the claims based on

8  digital assets, as we've heard, are scheduled and filed in

9  quantities of digital assets in accordance with the procedure

10 set out in the bar date, notice, and order that was approved

11 by this Court.

12        This issue has been identified since the early

13 stages of the case and certainly noticed out to all creditors

14 as early as the bar date notices that went out last year.  We

15 submit there cannot be a serious argument that these claims

16 that are held in denominated digital assets are, in fact,

17 liquidated.

18        In considering the question, courts look at the

19 question of whether a claim is capable of ready determination

20 or not, and that has been done in the context of estimation

21 proceedings under 502(c), as well as many other analogous

22 contexts.

23        There's a suggestion today to Mr. Moseley that the

24 debtor could have simply priced these assets and scheduled

25 the claims in dollars.  And we heard from Mr. Moseley that

1   the debtor's conclusion was that with respect to the spot

2   assets on the tokens and coins, they did not have reliable

3   information to do that in the books and records of the

4   company.

5           And so, Your Honor, for the debtors to have done

6   such an exercise would have been the debtors unilaterally

7   choosing some form of a market price to determine the value

8   of these digital asset claims.

9           And while there have been some complaints around

10  this estimation process that have been lodged, we submit what

11  the debtors have done here has provided more due process and

12  more transparency than has happened certainly in even some of

13  the other large bankruptcy, crypto bankruptcy cases.

14          We filed the motion.  We noticed it to all

15  creditors, millions of people.  Everyone has had an

16  opportunity to come forward.  Everyone had the opportunity to

17  interpose an objection.

18          Everyone had an opportunity to say, I need time, in

19  advance of today, to contest the valuation with respect to

20  any aspect of the experts of Mr. Lu's testimony or Dr.

21  Howell's testimony that were presented to Your Honor today.

22          A handful of those objectors did so.  We've been

23  working constructively with those objectors, as I outlined

24  this morning at the outset of the hearing, to set a

25  subsequent hearing date on the valuation of that small subset

1   of tokens that Your Honor will consider subsequent to today,

2   currently on March 20.

3          But it is clear from the evidence that is now

4   before the Court and how that evidence was put together, and

5   analyzed, and calculated that how pricing to establish a

6   valuation for these novel digital assets trading on markets

7   that are at different prices, different times around the

8   world is far from readily determinable or easy.

9          We submit the evidence before the Court details a

10  comprehensive and deliberative process that was undertaken to

11  arrive at the estimated asset value set forth on the digital

12  assets conversion table.  Mr. Lu explains how he and Coin

13  Metrics set baseline petition time pricing for the digital

14  assets that they priced.

15         Professor Howell explained how each and every

16  digital asset, all 1,300 plus, was analyzed to determine if a

17  further adjustment to the valuation was necessary due to the

18  particular facts and circumstances involving the asset and

19  these debtors on the petition date.

20         We have addressed in our reply papers that were

21  filed at length the various objections, but I want to just

22  touch on a few points in summary fashion at this time.

23         Professor Howell, in her testimony today, touched

24  on the question of FTT, one of the areas she looked at.

25  That's the native token of the FTX exchange.  And her

1   conclusion and that of the debtor is that that token has no

2   fundamental value because it has no utility outside of an

3   operating exchange which did not exist on the petition date,

4   as Mr. Diederich updated the Court and the stakeholders this

5   morning, will not exist at this point going forward.

6        Without an operating exchange, every source of FTT

7   value is eliminated.  Professor Howell explains that the

8   market prices for FTT were unreliable and likely distorted in

9   the period leading up to the petition day due to concealed

10  fraud at FTX.

11       Professor Howell's report and supplemental

12  declaration explains the valuation of claims based on futures

13  positions, as though futures positions had been closed out by

14  the holder at the petition time.  One of the objectors that

15  has been active asking questions today is such a holder of

16  futures positions.

17       The debtor's view, as expressed by Dr. Howell, is

18  that this is the most consistent way that future contracts

19  operated, and consistent with how futures contracts operated,

20  and with the fact that the debtors ceased operations and

21  filed for bankruptcy.  That testimony, as an evidentiary

22  matter, is now unrefuted and in the record of the Court.

23       Futures traded on FTX were not an exchange of

24  assets between the parties but rather resulted in fiat

25  denominated profit and losses for that transaction's betting

1   on winners and losers.

2           Perpetual futures, which are common with respect to

3   digital assets, use a funding mechanism in which two parties

4   in the contract make periodic payments depending on whether

5   the future's price is above or below the price of the

6   underlying reference asset.  As the price of the P&L changes,

7   the customer's P&L changes.

8           As explained in Dr. Howell's testimony, every day

9   the debtors conducted an exercise every 24 hours to reprice

10  supposedly mispriced perpetual futures contracts, meaning

11  that creditors would have potentially received payments

12  through this system prior to the petition date.

13          The arguments and the objections that have been put

14  forward objecting to the debtor's pricing of futures fail for

15  numerous reasons that we detail in our papers and in Dr.

16  Howell's supplemental declaration, which is, very briefly, as

17  testimony explains, that's now before the Court.

18          The debtors bankruptcy filing cannot be equated

19  with an accelerated settlement and delisting event, which is

20  the primary argument that's put forward by the (inaudible).

21  We have no evidence to the contrary.  The debtors did not

22  delist the futures or underlying tokens, but rather the

23  debtors ceased operations in their entirety.

24          Second, unlike spot tokens, futures and other

25  derivatives were FTX-specific financial contracts whose

1    payoffs were inherently tied to the market dynamics of the

2    debtor's exchanges.  As a result, customers with futures

3    positions on the debtor's exchanges were exposed to the risks

4    of the debtor's futures markets specifically.

5         And third, Your Honor, making after-the-fact

6    adjustments to futures prices would be inconsistent with how

7    the debtor's exchange has operated historically and could

8    certainly result in negative balances for certain of our

9    customers.

10        Repricing supposedly mispriced perpetual futures

11   contracts could also unfairly benefit those creditors who

12   could have received payments through the funding rate system

13   that's detailed in our papers.

14        The proposal that's being made is simply a

15   reallocation of value between customers and presumably, if

16   adopted, would be objectionable to other customers who are

17   not here today.

18        This highlights the issue more broadly.  The

19   debtors, through this motion, have sought the most fair and

20   reasonable valuation of claims based on digital assets so

21   that we can set a fair and reasonable process and march

22   forward towards returning that value to our creditors.

23        Finally, Your Honor, I want to just note that

24   numerous of the pro se and other objectors raise different

25   versions of an objection that customers may claim a property

1   interest in certain of the digital assets.

2          The revised order that's before the Court makes

3   clear that nothing in this motion, or the order that we have

4   asked the Court to enter, seeks to address or preclude any

5   party's rights with respect to whether any digital assets

6   constitute customer or other creditor property.

7          All parties' rights reserved with such arguments

8   are fully reserved.  We've discussed that issue.  We've

9   announced the settlement we have with the ad hoc adversary

10  proceeding, which is the only adversary proceeding that's

11  been filed on an issue.  But we understand that those

12  arguments remain outstanding for certain creditors.  They can

13  be asserted.  We will address that issue in connection with

14  plan confirmation.

15         But there is nothing about anybody asserting I have

16  a property right that is precluded by entry of the order

17  we're asking today.  And we clarified that and made that

18  expressly clear in the revised form of order.

19         The revised order similarly contains some other

20  reservation of rights, provisions to make clear that certain

21  other issues that could arise in this case are unaffected by

22  this order.  That has -- we've worked with other parties to

23  address.

24         And of course, all valuation arguments with respect

25  to the four tokens is deferred until the March hearing are

1   fully reserved, as we've been talking about over the course

2   of the day.

3        So I'll pause there, Your Honor.  I'm happy to take

4   questions from the Court or let others speak.  I would

5   request time on rebuttal to the extent based on any arguments

6   that are made today with respect to any of the still

7   outstanding objections.

8        THE COURT:  Okay.  Thank you.  I have no questions

9   at this time.

10        MR. GLUCKSTEIN:  Thank you, Your Honor.

11        THE COURT:  Let me hear from anyone who wants to

12   speak in support of the debtors.

13        MR. PASQUALE:  Thank you, Your Honor.  Excuse me.

14   Ken Pasquale from Paul Hastings for the committee.  Your

15   Honor, for such an important motion, I actually have very

16   little to say right now.  And the reason for that is the

17   committee has been working very closely with the debtors over

18   a number of months with respect to the evidence and the

19   arguments that are being presented today.

20        For the committee in its role as a fiduciary for

21   all creditors, the committee can't pick winners and losers.

22   And so our role, as we saw it in this process, was to make

23   sure that the methodology being applied to value all of the

24   digital assets as of the petition date was fair and

25   reasonable, and that the methodology was appropriate across

1   the board for all creditors, regardless of their digital

2   assets, holdings.  And we think that the presentation, the

3   evidence today, Your Honor, satisfies that standard.

4           The only other thing I'd like to say now, Your

5   Honor, and I'll reserve any other comments for rebuttal, if I

6   may, is just with respect to the estimation process.

7           Obviously, and I think Mr. Moseley testified well

8   as to how long it would take to litigate each and every one

9   of the customer claims with respect to the value of digital

10  assets.  Just look at the number of individual objections

11  that were filed to this motion raising individual issues and

12  individual values for their respective holdings.  To litigate

13  all of those would take us -- I won't even estimate.

14  Certainly would not make the committee or our constituency

15  happy to delay confirmation.  And more importantly, what

16  follows.  And that's the distributions.

17          The other thing, Your Honor, that I think is

18  important to note is the uniformity that the estimation

19  process would provide if the debtors and the estates had to

20  litigate each and every one of the individual's claims on an

21  individual basis.

22          We can talk about collateral estoppel and the

23  like, but none of those findings would be binding on any

24  other customer.  They would be binding, perhaps, on the

25  estates.  It's obviously a process that is completely

1   inefficient and not equitable for the estates, generally, and

2   the creditors, specifically.

3           So unless the Court has any questions, I'll defer

4   any further comments.

5           THE COURT:  No questions.  Thank you.

6           MR. PASQUALE:  Thank you.

7           THE COURT:  Anyone else would speak in support of

8   the motion?

9           MR. MINTZ:  Good afternoon, Your Honor.  Doug

10  Mintz of Schulte, Roth and Zabel for Steadview Capital,

11  Mauritius Limited, which holds a preferred equity, holds

12  preferred equity interests, which are detailed both on Docket

13  450, as well as Steadview's proofs of interest.

14          Last month, we read the original motion to

15  estimate as well as the order and Dr. Howell's testimony and

16  the conversion table to seek to value preferred equity

17  somehow at $0.  We were concerned in particular, with, among

18  other things, paragraph 33 of the motion, paragraph 85 of Dr.

19  Howell's testimony in lines 509 through 521 of the conversion

20  table.

21          We reached out shortly thereafter to debtor's

22  counsel and raised this concern with them, which they

23  addressed with us very constructively.  And we appreciate

24  that.  We worked collaboratively with them as well as some

25  others, and they acknowledged that wasn't their intent.  We

1    worked together to develop what is now paragraph 5 of the

2    order, which I believe makes clear the intent here is not to

3    estimate the preferred equity in any way, shape, or form and

4    reserve those issues for another day.  I'll let the language

5    speak for itself.  But we appreciate that those issues have

6    been reserved, presumably, for some process as part of

7    confirmation.

8              I don't have anything else for Your Honor.  If you

9    have any questions, happy to answer them.

10             THE COURT:  No questions.  Thank you.

11             MR. MINTZ:  Thank you, Your Honor.

12             THE COURT:  Anyone else in support of the motion?

13   All right, turn to the objectors.  Who wants to go first?

14             MR. BIELLI:  Good afternoon, Your Honor.  Thomas

15   Bielli on behalf of RS Tech Limited.  Can Your Honor hear me

16   okay?

17             THE COURT:  I can.  Thank you.

18             MR. BIELLI:  Your Honor, my client's objection

19   falls into three categories.  First one being procedural,

20   second one being substantive, the third one being the

21   methodology.

22             Procedurally, this is an unfair process, Your

23   Honor.  Frankly, this is a violation of my client and every

24   other creditor subject to this motion's due process.  This

25   was filed two days after Christmas on December 27, the week

1  between Christmas and New Year's on 14 days' notice.

2  Contains two expert reports totaling over 100 pages and

3  predicated on thousands of pages of data.  It curtails our

4  client's and other creditors' rights to the normal, ordinary

5  claims reconciliation and adjudication process that was

6  outlined by the debtor's expert.

7          That's because what this is, ultimately, is a

8  claim objection or claim disallowance motion.  Claims are

9  deemed allowed when they're filed, Your Honor.  The debtors

10  then filed an objection, claim objection, to which creditors

11  have a right to respond to.  There's limited discovery filed

12  by an evidentiary hearing and this Court's adjudication of

13  that claim.

14          But that won't happen here.  What's being proposed

15  by these debtors turns the ordinary normal claims

16  adjudication process on its head.

17          THE COURT:  This isn't a claims adjudication

18  process.  It's an estimation process.  The Courts are very

19  clear.  An estimation process is subject to the discretion of

20  the bankruptcy judge.

21          MR. BIELLI:  Are they are used, Your Honor, in

22  asbestos, mass tort claims.  And the debtors cite to those

23  cases in their motion.  But they don't link it to this case

24  here, Your Honor, because there's estimation -- in those

25  cases, the estimation process is akin to a trial process

 1   where those claims do get adjudicated.  Experts are retained,

 2   they're examined.  That's not going to happen here.  But I'll

 3   move on, Your Honor.

 4          THE COURT:  It's not required.  There are other

 5   cases where the courts have said I could look at the

 6   pleadings of the case and decide the value on an estimated

 7   basis of that claim.

 8          MR. BIELLI:  I understand, Your Honor, and I do

 9   understand that.  And I know that other courts in other

10   crypto cases, like the Celsius case, for example, up in the

11   southern district, under Rule 1009, the judge ordered that

12   the debtors take this digital asset conversion table, attach

13   it to their amended Schedule AB, and then list it.  Because

14   that's what we're doing, Judge.  We're valuing the debtor's

15   assets.  We're doing a liquidation analysis.  That's what

16   this is.

17          Dr. Howell testified on the stand that what she

18   did at the debtor's direction was a liquidation analysis, and

19   it took her 80 hours.  We had the debtor's expert, Mr.

20   Moseley, testify that his process took two to three months.

21   And for Your Honor to rule or for Your Honor to make a

22   finding that we have this undue delay, unduly delayed the

23   bankruptcy process, we had expert testimony today, or

24   testimony from the debtor and testimony from Dr. Howell.  She

25   spent 80 hours.  Mr. Moseley spent two to three months.

1        There's delay.  And delay is okay because Your

2   Honor has a pretty big job to do here.  And delay is okay

3   because the creditors, committee's constituents, everybody on

4   Zoom, they want Your Honor to get it right.  They want you to

5   get it right.  They don't want to have this rushed by the

6   debtor and their expert, who, quite frankly, have been

7   working on this since the summer, and then file it, lob it

8   out two days after Christmas.

9        THE COURT:  Did you file a motion for a

10  continuance?

11       MR. BIELLI:  No, Your Honor.  I'm going to move on

12  to the substance, Your Honor.  In the Dow case, the

13  bankruptcy law's general rules to liquidate, not to estimate,

14  Your Honor.  I tied that into the procedural objection.  Your

15  Honor would need to make a finding that the normal, ordinary

16  claims process will unduly delay these bankruptcy cases.  The

17  bankruptcy process in itself.  The debtors haven't made that

18  showing, Your Honor.

19       And as I mentioned, the delay is okay.  It's

20  unduly delaying the case that's the problem, not just any

21  delay.  Some delay is justified, and Your Honor will need to

22  make that finding.

23       In some of the other cases I knew Your Honor was

24  getting to, especially with respect to the mass torts that I

25  mentioned, those estimations were done when a distribution

1  was imminent, and the distribution would be delayed if this

2  estimation wasn't the case.  That's not where we are in this

3  case.  In fact, Your Honor, these debtors filed a plan, a

4  good faith plan, on December 16th that now is going to be

5  changed based on something filed eleven days later, which was

6  this motion.

7       What Your Honor didn't mention or, Your Honor,

8  excuse me.  What the debtors didn't mention today, and I

9  didn't hear anything about this, was other types of

10 valuations of the petition date.  We heard a little bit about

11 the books and records, but we didn't hear as to -- or at

12 least in depth -- as to why the debtors -- because, again,

13 we're valuing the debtors assets is what they're seeking to

14 do, and they're calling it the claims, but they're valuing

15 what the debtors holding as of the petition date, presumably

16 the debtors books and records, has this information.

17       We've heard testimony from Mr. Moseley was really

18 the response to that was we didn't rely on that, and it

19 stopped there.  I don't want to put words in his mouth -- or

20 we didn't trust that information, and it stopped there

21 without any further information.  I think that's important,

22 Judge.

23       THE COURT:  Well, let me ask you a question.  You

24 asked questions to Mr. Moseley about why the debtors didn't

25 do this and ask the claimants to file their proofs of claim

1   in dollar amounts instead of the amount of crypto they held.

2   In particular, type of crypto they held.  But whether they

3   did it as the amount of crypto they held or the dollar

4   amount, I'd be in the same position.  I'd still have to

5   determine whether that dollar amount was correct or not.  I'd

6   still be estimating the claims.

7           MR. BIELLI:  Well, Your Honor, if they -- Your

8   Honor, allow me on this.  If a creditor put in their proof of

9   claim, if they listed a dollar amount, then I'd argue that

10  that claim is liquidated.  And Your Honor has to make two

11  findings.  You have to make a finding that these claims are

12  either unliquidated and contingent, and that the claims

13  adjudication process or liquidating those claims is going to

14  unduly delay this case.

15          THE COURT:  Well, I think you're making the case

16  for why it would unduly delay the case.  Because if someone

17  put in their proof of claim, I held Bitcoin on the petition

18  date, but I'm going to value it three months later when the

19  Bitcoin went up, now, I got a question.  Okay, now, there's

20  an objection to that.

21          And then there's someone else who files -- has a

22  different type of cryptocurrency, and they say, hey, on the

23  petition date, my crypto was worth x, and now it's worth much

24  less than that.  I want you to use the petition date.  Now,

25  I've got to decide all those issues on an individual basis.

1   And don't forget, I've done this before.  I sat on the other

2   side of this bench before.  I know how this process works.

3          MR. BIELLI:  I understand, Your Honor.  I

4   understand what you're saying.  I understood Your Honor's

5   ruling with respect to the IRS on that estimation.  And it

6   will be done on the petition date, or, I'm sorry, your

7   preliminary ruling today that it will be done on the petition

8   date.

9          And if a creditor signs, under penalty of perjury,

10  their claim objection that they have Bitcoin worth x on the

11  petition date, that's deemed to be a valid claim until

12  someone files a claim objection.  Well, now it isn't if Your

13  Honor grants this motion.  It's not.

14         THE COURT:  I'm not adjudicating the claims.  I'm

15  not allowing or disallowing any claim.  I'm estimating what

16  the claims are.  That process happens later.

17         MR. BIELLI:  I understand, Your Honor, and that's

18  all I have for my argument, and I appreciate Your Honor

19  listening to me today.

20         THE COURT:  Okay, thank you.

21         MR. BIELLI:  Thank you, Your Honor.

22         MR. GWYNNE:  Kurt Gwynne from Reed Smith on behalf

23  of the Foundation Serendipity and Foundation Elements,

24  creditors.  Your Honor, the debtors have neither a right nor

25  a need to estimate our clients' proofs of claim.  Section 502

1    only authorizes the estimation of contingent or unliquidated

2    claims.  On page 13, footnote 8 of the debtor's omnibus

3    reply, the debtors concede that our clients' claims are not

4    contingent.

5           Our clients' claims also are not unliquidated.  As

6    the debtors acknowledge in paragraph 30 of their omnibus

7    reply, our clients did file claims in U.S. dollar amounts,

8    approximately 300 million, based on a conversion rate for

9    MAPS and OXY tokens.  And by the way, our proofs of claim,

10   Your Honor, were filed based on the values on the petition

11   date or very near the petition date, whichever information

12   was available.

13          But the debtors argue in paragraph 27 that a claim

14   is liquidated when the amount of it can be determined with

15   relative ease.  Well, it really doesn't get much simpler than

16   the liquidation of a claim here, Your Honor.  You take the

17   number of tokens you have, and you multiply them by the

18   conversion rate.  It's that easy.

19          The debtors dispute the claim.  They may dispute

20   the amount of the claim, they may dispute whether the

21   conversion rate is appropriate, but the claim itself is

22   easily liquidated.  It's no different than if a debtor was

23   objecting to a creditor's -- a secured creditor's claim on

24   the basis that the interest was calculated incorrectly.

25   Maybe they used the wrong SOFA or the wrong base rate.  It's

1    similar to that situation.  This is a dispute regarding the

2    claim.  It's not a dispute regarding whether the claim is

3    liquidated.

4              For that reason alone, as a matter of law, Your

5    Honor, 502(c) does not apply, and the debtor cannot estimate

6    our client's claims regardless of any alleged delay in the

7    confirmation process.

8              Now, even assuming that our clients' claims are

9    unliquidated, and they're not, the debtor still cannot

10   estimate the claims because there would be no undue delay in

11   the administration of the case with respect to resolution of

12   our claims in the normal process.  There should be neither a

13   delay nor an unduly long delay for several reasons.

14             First, Your Honor, I do want to point out, this is

15   a problem that the debtor has created itself, and this motion

16   was the solution to the problem they created.  The debtors

17   filed their schedules.  There was testimony.  Well, at that

18   time, we weren't comfortable with the available conversion

19   rates.  And I think technically what the witness said is he

20   wasn't comfortable with the debtor's systems regarding what

21   the conversion rate was.

22             But the debtors have filed multiple amendments to

23   their schedules.  And in fact, on the exhibit list for today,

24   they listed amended schedules that were filed in June of

25   2023, and then again in January 23rd or 24th of 2024.

1          When the debtor files its amended schedules, it

2     can list claims as disputed.  It can put the dollar amounts

3     in there.  It could list all the two million claims, list

4     them as disputed.  If the creditors don't object or don't

5     file a proof of claim, then that would resolve those claims.

6     But the debtor chose not to do that.

7          The other thing the debtor could have done is, in

8     the bar date motion, not to just ask creditors to file proofs

9     of claim in the amount of the tokens that they held, but to

10    put a dollar value on them.  Because in many cases, the

11    debtor may agree with them.  The debtor may use the same --

12    would have used the same conversion rate, or one very close

13    to it.

14         And I do agree, Your Honor, if someone files a

15    claim and they're valuing it in a dollar amount, but they're

16    not using the petition date, then that would be wrong.  And

17    that claim is one that debtor may be able to object to.  But

18    I don't know that it's an estimation.  It's that the claim is

19    improper because it's using the wrong conversion rate.

20         THE COURT:  Wouldn't I have to look at every

21    single claim and the debtor would have to look at every

22    single claim to see if when the claimant filed their proof of

23    claim that the dollar amount they put in was actually the

24    dollar amount on the petition date and not some other date?

25         MR. GWYNNE:  Yeah, but the debtor has to do that

1   anyway.  Even when Your Honor estimates claims, right, the

2   debtor has to look at each individual claim and determine

3   what the value of that claim is based on your ruling.  They

4   have to do that anyway, either in objecting to the claim or

5   determining, okay, Your Honor says -- like you said today --

6   this is the relevant date for the valuation of creditors'

7   claims to petition date.

8           So debtor is going to have to make sure claims

9   comply with that.  Just estimating them and saying that's

10  true and waving the magic wand doesn't mean that someone

11  doesn't have to review the claims to make sure that they

12  comply with your ruling.  That has to happen in any event.

13          THE COURT:  But they're estimating them as a

14  whole, not one off.  And I don't have hundreds or thousands

15  or tens of thousands or hundreds of thousands of objections.

16  When the debtor files an omnibus claim objection and all of a

17  sudden I've got thousands and thousands of claimants filing

18  objections saying, wait a minute, no, that's not how I valued

19  it.  Or they're saying, wait a minute, I didn't hold one

20  Bitcoin.  I held three Bitcoins.  Or, no, I didn't do this.

21  I didn't do that.  I have to do them individually.  That

22  process would take forever.  Tell me how I would shortcut

23  that process.

24          MR. GWYNNE:  Well, Your Honor, I don't know that

25  you need to shortcut that process here, but I think I already

1   said how it could be shortcut.  One is if the debtor filed

2   amended claims and you list the claims with the appropriate

3   amount that you think the claim should be asserted in.  If

4   the creditor files a proof claim, then it's challenging.  If

5   it doesn't, that amount is binding.  Or you list it as

6   disputed.  And if they don't file a proof of claim, then that

7   amount governs.

8           But that's a lot fairer than this process, Your

9   Honor, which was started between Christmas and New Year's Eve

10  and giving people 15 days' notice to deal with what really

11  amounts to a disallowance of claims.

12          THE COURT:  I'll ask you the same question.  Did

13  you file a motion for a continuance?

14          MR. GWYNNE:  We did not, Your Honor, but we had

15  negotiate it -- we negotiated, as I indicated earlier, that

16  our claims aren't being valued today.  The only question for

17  our clients is whether or not estimation is appropriate.  Our

18  claims are not going to be estimated or valued based on Your

19  Honor's ruling today, and that won't prejudice us in any way

20  as the agreement that we have with the debtor is set forth in

21  their revised proposed order.

22          By the way, that's important because this proposed

23  asset liquidation discount is unprecedented, has nothing to

24  do with the creditor's claim.  It's the debtor's assets.  But

25  that -- we'll deal with that later in connection with our

1  claim.

2         We're prepared to proceed on the liquidation of

3  our claim in the first week or two of April.  The debtor is

4  proposing the estimation of our clients' claims, the OXY and

5  MAPS claims, on March 20th.  That's not undue delay to push

6  it back for a couple more weeks.  That, I think --

7         THE COURT:  That issue is not in front of me

8  today.

9         MR. GWYNNE:  Well, but the issue of whether

10 estimating our claims or not is appropriate is before you.

11 And what I'm telling Your Honor is that we are prepared to go

12 forward on a regular litigation of the claims in early April,

13 and I think that should be relevant to Your Honor and whether

14 you decide that estimation is appropriate with respect to our

15 clients' claims.

16        And that's just really a few more weeks more than

17 what the debtor is proposing for an estimation hearing, and

18 we're saying we don't need the estimation hearing.  Let's

19 just have the claims allowance or disallowance hearing a

20 couple of weeks later.

21        Additional month, I don't think it's undue delay

22 when you look at the process here.  The debtor's witness took

23 approximately four months to prepare their expert report.  We

24 were given 15 days over the holidays to respond.  We did

25 respond.  We have retained experts as a backup plan, have an

1  agreement that if we have to have an estimation, that it

2  wouldn't be today, it would be in the future.  But reserve

3  the right to say that we shouldn't have an estimation

4  hearing.  We should have an allowance or disallowance of our

5  claim.

6           Dr. Howell, according to her report, reviewed over

7  200 legal documents, articles, books, studies, websites, and

8  data sources.  The creditors should have a similar

9  opportunity, Your Honor, to conduct that type of review and

10  analysis.  And of course, they have another expert report

11  from Mr. Lu.  And all of these were being -- all of that work

12  was being done when the creditors had no idea what was

13  coming.  Debtors counsel says, we noticed this to people

14  before.

15           All the debtors said was at some point they would

16  come up with valuation.  They never said we would try to

17  estimate everyone's claim on 15 days' notice over the

18  holidays.  That was never noticed to the creditors.  And Your

19  Honor does have -- if estimation is proper, under 502(c),

20  Your Honor does have discretion to determine the method.  And

21  what we're saying, Your Honor, is if you're going that route,

22  we should be given a little more time, fair opportunity, and

23  just have --

24           THE COURT:  You've been giving that.  Are you

25  speaking on behalf of other creditors?

1            MR. GWYNNE:  Well, no, I'm speaking on behalf of

2   our client.  And Your Honor, when you talk --

3            THE COURT:  You already got that taken care of.

4   There's going to be another hearing.

5            MR. GWYNNE:  Right.  But we don't have -- the

6   issue we don't have taken care of is whether we're going to

7   go to that estimation hearing or we're going to have a claims

8   allowance hearing or disallowance, a regular hearing, not an

9   estimation.

10            The debtor's witness testified that our clients'

11   claims are less than half a percent of all the claims.  If

12   the concern is we need to give an estimate in our disclosure

13   statement as to the recoveries, and we need to give an

14   estimate that has some reliability so people can determine

15   whether to vote in favor of the plan or not, well, then not

16   estimating our clients' claim still gives everyone else 99.5

17   percent certainty because our claims are a small subset, as

18   debtor's counsel said.  We're just actually a part of that

19   small subset of claims that aren't being estimated today.

20            If the debtor gets the relief it's asking for and

21   all the other claims are estimated, then there's really no

22   reason that our claim needs to be estimated at that point,

23   because now we don't have all these claims that have to be

24   estimated.  We have a small handful.

25            And I would request that Your Honor give us that

1    opportunity to have the regular claims hearing, because the

2    debtor is seeking to disallow our claims in full.  And that's

3    significant.  And when you're determining the type of

4    estimation proceeding or whether or not -- the Third Circuit,

5    you mentioned Bittner earlier, and the fact that Bittner said

6    that, in some instances, well, you had indicated there was

7    case law saying, in some instance, you can maybe just decide

8    estimations on the papers.

9              But in Bittner, on page 135, the Third Circuit

10   said, in some cases, maybe a rare or unusual case, but in

11   some cases, you might actually need a jury trial to estimate

12   a claim.  So obviously, there's a big, wide disparity in what

13   might be required to estimate a claim.  And here, rather than

14   fight about that, seems easiest that if the debtor gets the

15   relief it's looking for today, that we just deal with our

16   claim on the claims allowance process, not an estimation

17   process.

18             That's all I have, Your Honor, unless you have any

19   questions.

20             THE COURT:  Thank you.  No questions.

21             MR. GWYNNE:  Thank you.

22             THE COURT:  Anyone else?

23             MR. O'DONNELL:  Your Honor, Dennis O'Donnell, DLA

24   Piper, again, on behalf of MAPS Vault Limited.  Your Honor,

25   MAPS Vault holds over 7 billion tokens, MAPS, OXY, and Serum

1    tokens, which, based on publicly available prices on the

2    petition date, were valued, as we state in our proofs of

3    claim, at approximately $525 million.

4            If the debtors estimation, as currently proposed,

5    were to be accepted, all but a couple of million dollars of

6    that $525 million would go away.  So, clearly, we have a lot

7    at stake here and want to make sure that this process works

8    as best as it can for us.

9            As Mr. Gluckstein indicated, we have been among

10   the group, I think we were the initial member of the group,

11   working cooperatively with them to come up with a process

12   that works.  And we do have a schedule in place which

13   involved the delivery of an expert's report this past week, a

14   rebuttal coming from them next week, and discovery to follow

15   that, which we believe covers most of what we need to cover.

16           But that being said, we still think that we have

17   an entitlement to more because we don't think that

18   estimation, as presented here, with respect to the millions

19   of claims, should necessarily control how a very small subset

20   of the claims, which includes the MAPS, OXY, and Serum

21   claims.  I mean, basically the 71 claims that Professor

22   Howell referred to amongst the 71 tokens, amongst the 1,321

23   is a subset that should have really been on a separate track

24   to start with.  And of those 71, I think there's only a

25   fraction of those which may well be represented by the

1  parties who have now been moved into this later hearing that

2  should be entitled to a separate process.

3         Whether we call that process estimation or

4  allowance may be at this point a matter of just terminology.

5  I think what we have on the table going forward will be a

6  full process with discovery and a hearing, an evidentiary

7  hearing with witnesses that will take place as proposed now

8  on March 20th.

9         But again, because I think we have an entitlement

10  that I'll get to in a second, I would only ask that we have

11  flexibility built into that process.  We now have four or

12  five, six different participants in it.  It may be that

13  things need to get moved around.  It may be that hearing

14  needs to get moved to some extent.  And based on the fact

15  that I think properly there should have been an allowance

16  hearing, that flexibility should be acknowledged.

17         And to reiterate much of what Mr. Gwynne said,

18  there are two reasons why, at least as to our clients, we're

19  not talking about the millions and millions that would create

20  great headaches for the Court and the debtors.  We're talking

21  about this small subset of customers here which include my

22  client.

23         As to them, number one, their claim is, from their

24  perspective, I think from any reasonable perspective,

25  liquidated.  As Kevin Lu, one of the debtor's witnesses,

1    acknowledged, there are parties -- maybe it was Mr. Moseley.

2    There are many parties who did, in fact, include dollarized

3    amounts, dollarized claims on their proofs of claim, and our

4    client was one of them.

5             And they did that not, as the debtors would

6    portray it, as a customer's estimate.  They did a very simple

7    calculation which comports with what doesn't require

8    estimation, which is that something that could be determined

9    with precision by a pure mathematical computation.

10            And what they used here was an input -- with two

11   inputs, the number of tokens they have multiplied by a

12   publicly available, trustworthy source for what the price was

13   on the petition date.  They used Coin Market Cap, which is

14   the same source that is acknowledged in Professor Howell's

15   report as a source to which she went when Coin Metrics could

16   not provide the source or provide pricing data for that date,

17   and it's also a source that she cites 51 times in her report

18   for other reasons.

19            So again, a reliable source, quoting a price

20   applicable on the petition date, multiplied by the number of

21   tokens that no one disputes that were held by our clients on

22   that date.  That sounds to me like more than a customer's

23   estimate and suggests that the claim is, in fact, liquidated.

24   The fact that the debtors want to dispute it doesn't change

25   the fact that it's liquidated.  It simply means they're going

1   to dispute it as they would any other type of purportedly

2   liquidated claim.

3         There's also no undue delay that would be caused

4   here by turning this into a full-fledged 502 AB allowance

5   scenario, because I think we'd be effectively somewhere where

6   we are already.  Even though the debtors wanted to do this in

7   about three weeks, we're now talking about doing it in about

8   two to three months with flexibility.

9         Again, because I think we would have an

10  entitlement, we have every right to argue as to this subset

11  of creditors that this should have been teed up as an

12  allowance process.  Going forward with what we have on the

13  table as modified to accommodate everyone who's now part of

14  the mix here should be something that, again, if we need to

15  come back to the Court, we will come back to the Court to

16  talk about whether that needs to be modified.

17        As currently memorialized, it is not actually an

18  order.  I think what we probably need to do is to build that

19  schedule into some kind of order that will permit

20  modification if need be, if issues arise.  Don't foresee them

21  at the moment, but if issues arise, we may need to come back

22  to the Court to address them.

23        THE COURT:  Thank you.  Anyone else wish to be

24  heard?

25        MR. MCNEILL:  Good afternoon, Your Honor.  For the

1  record, Steve McNeill from Potter, Anderson & Corroon here on

2  behalf of the Layer Zero Group.  Your Honor, unlike the

3  others, I bring good news, Your Honor.  During the course of

4  the hearing, I was able to resolve the remaining aspects of

5  my client's objection with the debtors.

6           Just for background, we had asserted -- my client

7  holds potential 502(h) claims related to an avoidance action

8  that's been filed against them.  We asserted that 502(h)

9  claims were different and should be excluded from the

10  process.

11          The debtors had added some language to the

12  proposed order carving out those claims.  We had some

13  additional tweaks.  That is in, I believe, it's paragraph 8

14  of the proposed order that was filed this morning.

15          Just wanted to note for the record that we have a

16  couple of additional, little bit of modified language to that

17  paragraph, Your Honor, and specifically paragraph 8(b).

18  Right after the (b) we are adding have any precedential value

19  or before the word prejudice that's there currently, and

20  right below that treatment of any claims asserted in, we are

21  adding or arising from before any action, Your Honor.  And

22  with those changes, my client's objection is resolved.  I

23  would ask counsel for the debtor to confirm that on the

24  record.  But that is the resolution we have agreed to, Your

25  Honor.

1              THE COURT:  Okay.  Thank you.  Anyone else in the

2       courtroom?  Mr. Lusk, I see you have raised your hand.  Do

3       you want to say something?

4              Can you give me co-hosting rights, please?

5              Mr. Lusk?

6              MR. LUSK:  Yes, Your Honor.

7              THE COURT:  Can you turn on your camera?  You need

8       to turn on your camera, please, so I can see you.

9              MR. LUSK:  I cannot start video because the host

10      has stopped it.  Could someone please report that problem?

11             THE COURT:  Mr. Lusk -- we need to give him video

12      back.  Once you disconnect him from video, he can't turn it

13      back on again unless you give permission.  There you go.  Go

14      ahead, Mr. Lusk.

15             MR. LUSK:  Okay, great.  Thank you.  So, I would

16      like to raise an objection to the motion in terms of the

17      generality of the language envisaged in the second paragraph.

18      The debtors refer generally to authorization to determine the

19      value of claims based on digital assets, and in my view, this

20      is far too general.

21             In my particular case, I held at the petition date

22      or had deposited on the ftx.com exchange digital assets, and

23      I received afterwards a schedule in which I saw that the

24      debtors had purported to mischaracterize my claims as general

25      unsecured claims in an indeterminate amount.  However, they

1  did correctly specify the precise amount of crypto assets I

2  held on the exchange.

3      So I filed a proof of claim in which I objected

4  against the mischaracterization of the nature of my claim and

5  stated very clearly that my claim is, in fact, a claim for

6  restitution in specie of the particular crypto assets which

7  are specified in the claim.

8      These claims are held in accordance with the terms

9  of service interest under English law as specified therein,

10 and I requested relief in the form of immediate return of my

11 crypto assets because these assets are my property.  They are

12 not the property of the debtors.  They cannot possibly be

13 part of the debtor's bankruptcy estate, and therefore, they

14 cannot be a subject of any estimation that Your Honor may

15 make which can only relate to the debtor's bankruptcy estate.

16     The language which is set forth in the proposed

17 motion is far too broad, and it doesn't resolve the issue

18 that the debtors have issued schedules in which claims are

19 mischaracterized.  It does not take into account that there

20 are on the docket objections, including objections at the

21 proof of claim stage to their miscorrect characterization of

22 such claims.

23     I have filed not only an objection at the proof of

24 claim stage on the 29th of September 2023 but I also have

25 objected on the 9th January of this year to the debtor's

1  motion to estimate claims, and on the same basis that they

2  have mischaracterized the nature of my claims, I claim

3  immediate restitution in specie of my crypto assets because

4  these are not assets of the debtors, they are my assets as is

5  specified in the terms of service.

6          The debtors have not disputed that at any stage,

7  despite what Mr. Gluckstein has said for the debtors, at no

8  stage have the debtors responded in any way to either of my

9  objections.  Much time has passed.  It must therefore be

10  understood that the debtors have nothing to contend contrary

11  to what I have stated in objection at proof of claim stage

12  and in the present month.

13          And therefore, I would request not only that the

14  (inaudible) be suitably amended in the proposed order to

15  carve out the case of my claim and that of the further FTX

16  customers in my position, but also that there is no reason

17  whatever why the debtors should not now be awarded, with

18  immediate effect, to restore return my crypto assets to the

19  addresses that I've specified in my most recent objection,

20  dated the 9 January and filed on the 12th of January.  It is

21  document 5684 on the docket.

22          THE COURT:  Mr. Lusk, I'll let Mr. Gluckstein

23  respond to you in more detail, but as was discussed at the

24  beginning of the hearing or the opening statement by Mr.

25  Gluckstein, the issue of whether or not any particular

1   claimant has title to the crypto that is being held by the

2   debtor is an open issue, and they have included in their

3   order language to make clear that that issue is not being

4   decided by the estimation process, and it is something that

5   can be raised at a later date.  So that's something that will

6   be resolved later on.

7           For today's purposes, I'm being asked to estimate

8   the claims so that the debtors can file their disclosure

9   statement in order to solicit votes on the proposed plan that

10  they are putting forward for resolving the bankruptcy case.

11  Allowance of claims or disallowance of claims happens at a

12  later time.  What I'm doing today in an estimation process is

13  not allowing or disallowing any particular claim.  It's only

14  estimating the claims for purposes of allowing the debtors to

15  move the case forward.  Did I make that clear?  Is that

16  understandable?

17          MR. LUSK:  The language which appears in the

18  document referred to in the agenda, which is Document 5202

19  filed on the 27th of December 2023, states in the proposed

20  order at item two, the debtors are authorized to determine

21  their claim based on digital assets and fiat currency for the

22  purposes of any plan in these Chapter 11 cases, based on the

23  value set forth in the digital assets conversion table

24  attached hereto, Exhibit 1.  It is this language which I say

25  is too broad.

1        THE COURT:  Well, that language is in the motion.

2   And the only thing that's going to govern here is the order

3   that I enter, and the order that the debtors have put forward

4   says that the issue of ownership is still an open issue and

5   is not being decided today.  So it's my order that governs

6   how the process goes, not what the debtors may or may not

7   have put in their motion seeking the estimation process.

8        MR. LUSK:  I understand (inaudible) speaking

9   against the motion.

10        THE COURT:  Right.  But as I said, that issue, the

11  debtors went back later and added additional language to say

12  -- to resolve this issue, because it had been raised by other

13  claimants that there was a question about who owns the

14  crypto.  And the debtors have resolved that by including

15  language in the form of order that says that's still an open

16  issue.  It's not being decided today.

17        MR. LUSK:  Okay, well, I think we have clarity on

18  the point.

19        THE COURT:  Okay.

20        MR. LUSK:  Thank you, Your Honor.

21        THE COURT:  Thank you.

22        MR. LUSK:  Yes, sir.

23        THE COURT:  All right, Mr. Gluckstein, any

24  response?

25        MR. GLUCKSTEIN:  Yes, Your Honor, Brian Gluckstein

1   for the debtors.  Happy to -- I'd like to make just a few

2   points in rebuttal on what we've heard here from the

3   objectors, starting with Mr. Lusk's point there.

4            Your Honor obviously hit the issue on the head.

5   What I'm hearing him articulate is effectively a property

6   argument.  We have added what's in paragraph 4 now of the

7   proposed form of order, a clear reservation of rights on that

8   issue, as I discussed earlier.

9            Obviously, the debtors reserve all of their

10  rights, as well, with respect to those arguments, but they're

11  not before the Court today.

12           With respect to the other objectors, what we heard

13  from Oros (phonetic) about process.  We're here, Your Honor.

14  We're having an evidentiary hearing today.  They could have

15  served discovery on us.  They could have sought to take

16  discovery of our experts.  They didn't do so.  The reference

17  with respect to the way this was done in some other cases, it

18  was a reference to Celsius by counsel, where we just tacked

19  some schedule on.  Our view was this process is actually

20  providing due process.  We are not unilaterally deciding what

21  is a complex question, which I'll come to in a moment.

22           This idea that some delay is fine, it's just fine

23  to have delay.  Well, the debtors don't believe it's fine.

24  We don't believe our creditors.  Maybe Oros thinks it's fine.

25  But we've certainly heard from the creditors' committee and

1   we've heard from many of our creditors directly.  They want

2   their money back.  And as we've been talking about all day,

3   the debtor's job here is to maximize the value of these

4   estates and to return that value to our creditors.  And we're

5   working hard to do that, and this process is a key part of

6   that effort.

7            This idea that was raised by the MAPS and OXY

8   holders, well, let's just carve them out.  It's fine.  We can

9   get the relief from everybody else today and we can just

10  carve them out and do something different.  That's precisely

11  the problem, Your Honor.  We need a comprehensive process

12  where we're estimating the value of these assets for all

13  holders.  There are other holders of MAPS and OXY tokens.  We

14  need their claims valued.  There's nothing special about the

15  fact that these holders stepped forward with counsel and

16  said, I don't want to be part of a 503(c) estimation.  I want

17  a claims objection process.

18           Other people presumably might want that as well.

19  But as we've been talking about all day, it's simply not

20  practical for the purposes we're talking about here, which is

21  to be able to advance these cases through confirmation and

22  through distributions, we need to set the value of the

23  digital assets.  We need to do it in a comprehensive way and

24  in a way that is transparent and that is fair to everybody on

25  an aggregate basis.  And we think we've done that.

1          Certain of these holders have come forward.  These

2     claimants have come forward and said they needed some

3     additional time for expert discovery.  They intended to bring

4     forward a competing expert on the valuation of these few

5     tokens.  And we understood and said, okay, let's work on a

6     process with the understanding that we have to get to an

7     estimation outcome decided by Your Honor that is consistent

8     with the case timeline and the process we've been talking

9     about.  That schedule was agreed to.

10          Now, I'm hearing maybe a little bit of

11     backtracking from that this afternoon.  So we will get that

12     schedule in front of Your Honor.  But we've been proceeding

13     on that schedule, and we have been constructively moving that

14     process forward that will get an answer not just for the

15     movants here, but on evaluation of those tokens so that Mr.

16     Moseley and the debtor's team can do the necessary

17     calculations to advance the disclosure statement, to advance,

18     ultimately, confirmation and distributions out to creditors,

19     if and when, we hope, a little later this year, a plan is

20     confirmed.

21          THE COURT:  Well, let me ask you a question.

22          MR. GLUCKSTEIN:  Yes.

23          THE COURT:  You indicated that the debtors are

24     planning on issuing or sending out their disclosure statement

25     in February.  Correct?  But I'm not going to have hearings on

1  these other estimation motions until March.  How is that

2  going to affect the process here?

3            MR. GLUCKSTEIN:  What we have said, Your Honor, is

4  that we will file an updated plan and disclosure statement.

5  Our case timeline contemplates that we will have a decision

6  from Your Honor on these issues before we begin the

7  solicitation process.  And we ask Your Honor to enter the

8  solicitation order, so effectively prior to our disclosure

9  statement hearing, so that at the time -- and our

10 solicitation motion expressly contemplates using these

11 values.

12            So at the time Your Honor is asked to approve our

13 disclosure statement for solicitation, we anticipate having

14 the carved out issues that have been put off here today

15 decided by Your Honor.  That's consistent with the overall

16 schedule that we've been working through with the committee

17 and others.

18            THE COURT:  Okay.  Got you.  Thank you.

19            MR. GLUCKSTEIN:  The other argument we heard,

20 which I want to address, is we heard from these objectors

21 that, well, maybe our claims are different because we

22 purported to write down an amount of the value of that

23 claims.  And it's a very simple calculation.  We looked at a

24 pricing source and we wrote it down.

25            And that is the heart of the issue.  The assets

1  that we're talking about, Your Honor, are not simply black

2  and white valuations.  We heard today from Mr. Lu, the

3  process that he went through to come up with petition day

4  pricing.  We heard the process that Dr. Howell went through

5  to look at not only the third party market pricing, but what

6  are the facts and circumstances of this case to value these

7  claims.

8          This is not a situation where just because an

9  amount was written down that that liquidates the claim.  And

10 we knew that this issue could arise.  And we wrote in our bar

11 date notice, we made very clear that because of this issue,

12 parties should come forward with their quantities of digital

13 assets and that we would be seeking relief from Your Honor to

14 actually estimate -- to actually set the value of those

15 claims, and that we considered any number that somebody wrote

16 down to be an estimate, because by definition it is.  There

17 is no answer.  And this goes back to the cases that we cite.

18          The question is, is this readily ascertainable?

19 Is this easy to calculate?  And so, yes, once you have the

20 conversion rate, it is correct that it is a simple

21 mathematical calculation to take the number of tokens you

22 have and multiply it by the conversion rate.  The question

23 is, what is the conversion rate?  And our submission here,

24 and has been for many months, is that there is not a

25 liquidated claim on these digital assets until this Court

1  fixes one.  And that's what we're here today to do.

2           And so we believe that all of the creditors should

3  be subject to this process.  Yes, there's going to be a

4  secondary hearing.  That's in recognition of certain of the

5  arguments that those creditors have stepped forward and said

6  they want to make.  We recognize that some more time was

7  appropriate for that discovery and expert process, primarily

8  because they would bring forward to bring forward a competing

9  expert, we need to take discovery of their expert and

10  everything as well.

11           But it's all within the framework of 502(c), and

12  we submit that the evidence before Your Honor, between Mr.

13  Moseley and our experts with respect to process, establishes

14  not only that estimation is necessary and appropriate here,

15  which brings us in the rubric of 502(c), that the methodology

16  and the process that we have put before the Court the

17  evidence that's undisputed for purposes of today's hearing,

18  there's been no competing evidence presented, is fair and

19  reasonable to the creditor body as a whole, and we would ask

20  Your Honor to overrule the remaining objections and enter the

21  order.

22           We do have, as alluded to by counsel, one of the

23  counsels who just stood up for Layer Zero, a slightly revised

24  further form of order based on a few tweaks to some of these

25  reservation rights paragraphs that we've continued to discuss

1 over the course of today with the hearing.  So in the event

2 that Your Honor were to approve the motion, we would submit a

3 slightly updated version of the order, but the substance of

4 it is unchanged.

5          THE COURT:  Okay, thank you.

6          MR. GLUCKSTEIN:  Thank you.

7          THE COURT:  All right, let me take a recess here.

8 I'll come back and give you my decision.  Let's recess until

9 3:30 and come back.  Thank you.

10          (Off the record at 2:43 p.m.)

11          (On the record at 3:32 p.m.)

12          THE BAILIFF:  All rise.

13          THE COURT:  Thank you, everyone.  Please be

14 seated.  All right.  It has been recognized that neither the

15 code nor the Federal Rules of Bankruptcy Procedure provide

16 any procedures or guidance for estimation and bankruptcy

17 court -- and a bankruptcy court has a wide discretion in

18 accomplishing that estimation, in re Chemtura Corp. 448 BR

19 635 at 648, Bankruptcy, Southern District of New York, 2011.

20          In estimating a claim, the Bankruptcy Court should

21 use whatever method is best suited to the circumstances.  In

22 re Bittner versus Bourne Chemical Company, Inc. 691 F.2d. 134

23 at 135, Third Circuit, 1982.

24          It is conceivable that in rare and unusual cases,

25 arbitration or even a jury trial on all or some of the issues

1    may be necessary to obtain a reasonably accurate evaluation

2    of the claims.  This is in re Bittner.  Such methods,

3    however, usually will run counter to the efficient

4    administration of the bankruptcy's estate, and where there is

5    sufficient evidence on which to base a reasonable estimate of

6    the claim, the bankruptcy judge should determine the value --

7    determine in this case that there is sufficient basis for me

8    to determine the value.

9            Courts may employ a wide variety of means,

10   including a summary trial, a full blown evidentiary hearing,

11   or a review of pleadings and briefs, followed by oral

12   argument of counsel.  In re AMR Corp., Case No. 11-15463 SLH

13   2021, Westlaw 295-4824 at 4 Bankruptcy, Southern District of

14   New York, 2021, and have specifically recognized that it is

15   often inappropriate to hold time consuming proceedings which

16   would defeat the very purpose of Section 11 -- excuse me, of

17   Section 502(c)(a) to avoid undue delay.

18           Thus, a truncated process under Section 502(c) has

19   been found to be consistent with the dictates of due process

20   of law.  Debtors here seek to estimate the two million claims

21   arising from certain digital assets, including specifically

22   digital tokens.  There were a number of objections, many by

23   pro se litigants.  I've already ruled on the objection based

24   on debtors use of the petition date and overruled that

25   objection because the code specifically provides that I have

1   to value them as of the petition date in U.S. dollars.

2          The debtor presented the testimony of three

3   witnesses, including two experts, who provided a reasonable

4   basis for the estimation of the claims as of the petition

5   date.  That testimony was unrebutted, and I conclude that the

6   testimony was credible and presented a fair and reasonable

7   basis for the determination of the estimated value of the

8   digital assets.

9          Several objectors argued that estimation was

10  unnecessary under 502(c) because the value of the claims

11  could be determined through the claim allowance process

12  without undue delay.  I disagree.

13         The assets at issue are unique.  An evaluation and

14  conversion to U.S. dollars using an allowance process would

15  take an inordinate amount of time in a case where the fees

16  and costs already exceed $300 million.  This is evidenced by

17  the three objectors asking for a claims allowance process.

18  Each asserts that they need discovery, and each asserts that

19  they intend to call their own experts at a future hearing to

20  estimate their individual claims.  Undercuts their argument

21  that it's a quick process.

22         One objector claimed that their claim is not

23  contingent or unliquidated.  Again, I disagree.  The fact

24  that we have to have experts come in to give me a valuation

25  shows that it is not a liquidated claim.  It's not a

1    contingent claim, but it's an unliquidated claim.

2              One objector asserted that the estimation process

3    violates their due process rights because they didn't have

4    sufficient time to review and object to the debtor's motion.

5    That party, however, did not seek a continuance, and as

6    previously noted, courts, including the Third Circuit, have

7    found that the truncated process provided for in the code

8    does, in fact, comport with due process.

9              Other objectors, including Mr. Lusk, who argued

10   before me today, said that estimation will determine the

11   question of who owns the digital assets, and it's his

12   contention that he owns them.  The debtors, however, revised

13   the form of order reserving that issue for a later date.  And

14   nothing I do today will affect the rights of the claimants to

15   contest ownership or the debtor's right to contest or the

16   debtor's right to contest that ownership issue.

17             Based on the evidence presented and the arguments

18   provided in the papers and at the hearing, I find that

19   estimation is appropriate, and the debtor's methodology for

20   estimating the claims is fair and reasonable, and all

21   objections to the motion are overruled.  Are there any

22   questions?  Anything further from the debtors for today?

23             MR. GLUCKSTEIN:  No, Your Honor.  Thank you very

24   much.  We will submit the further updated form of order to

25   chambers, and I think that is it for today.

1          THE COURT:  Okay.  Thank you.

2          MR. GLUCKSTEIN:  Thank you.

3          THE COURT:  We are.

4     (End of Proceedings.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                February 1, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                February 1, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Coleen Rand                       February 1, 2024

18   Coleen Rand, CET-341

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25