```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                           22 CR 673 (LAK)

 5    SAMUEL BANKMAN-FRIED,

 6              Defendant.                   Sentence
      ------------------------------x

 7
                                            New York, N.Y.
 8                                          March 28, 2024
                                            9:30 a.m.
 9

10    Before:

11
                         HON. LEWIS A. KAPLAN,
12
                                            District Judge
13
                           APPEARANCES
14
      DAMIAN WILLIAMS
15         United States Attorney for the
           Southern District of New York
16    BY:  DANIELLE R. SASSOON
           NICOLAS ROOS
17         DANIELLE KUDLA
           SAMUEL RAYMOND
18         THANE REHN
           Assistant United States Attorneys
19
      MUKASEY YOUNG LLP
20         Attorneys for Defendant
      BY:  MARC L. MUKASEY
21         TORREY K. YOUNG
           THOMAS E. THORNHILL
22
      Also Present:
23    Luke Booth, FBI
      Kristin Allain, FBI
24

25
```

1          (Case called)

2          THE DEPUTY CLERK:  Government, are you ready?

3          MR. ROOS:  Yes, good morning, your Honor.  Nicholas

4    Roos, Daniel Sassoon, Sam Raymond, Thane Rehn, and Danielle

5    Kudla for the United States.  We're joined at the table

6    immediately behind us by Special Agents Kristin Allain and Luke

7    Booth from the FBI.

8          THE COURT:  Good morning.

9          THE DEPUTY CLERK:  Defendant, are you ready?

10         MR. MUKASEY:  We are.  Good morning, your Honor.  Marc

11   Mukasey for the defendant, Sam Bankman-Fried, who is present in

12   court to my left.  Next to him is my partner Torrey Young, who

13   may share some of the duties today if necessary, and Tom

14   Thornhill.

15         THE COURT:  Good morning.

16         Mr. Mukasey, have you and Mr. Bankman-Fried had the

17   presentence report for the necessary period and both read it?

18         MR. MUKASEY:  Yes, Judge.

19         THE COURT:  Mr. Bankman-Fried, did you read the entire

20   presentence report, including, among other things, the proposed

21   conditions of supervised release at the end of any sentence of

22   imprisonment that might be imposed?

23         THE DEFENDANT:  Yes, your Honor.

24         THE COURT:  Thank you.

25         The presentence report will be sealed and made

 1  available to counsel in the event of an appeal.

 2       I know that there are differences between the parties

 3  in relation to the guideline computation, but are there any

 4  other objections to the presentence report that, in the view of

 5  counsel, are material and need to be resolved?

 6       MR. MUKASEY:  No, Judge.

 7       MR. ROOS:  No, your Honor.

 8       THE COURT:  Then apart from the guideline issues,

 9  which I'm going to take up next, I adopt the presentence report

10  and the guideline computation and range it contains.

11       Now, there are quite a number of disagreements about

12  the guidelines.  They've been briefed fully, to say the least,

13  by the lawyers.  We'll start with the government's contention

14  that there should be a 30-level upward adjustment for a loss in

15  excess of $550 million and the defendant's contention that

16  there was no loss.

17       Anybody want to be heard on this?

18       MR. MUKASEY:  Judge, we're going to rest on our

19  papers.

20       MR. ROOS:  And unless your Honor has any questions for

21  us, we'll do the same.

22       THE COURT:  Thank you.

23       I'm reminded that I just want to put on the record

24  that one of my new law clerks, that is, law clerk post-trial,

25  was previously an associate at WilmerHale.  WilmerHale

1    represents Caroline Ellison.  He didn't work on the matter

2    there and he's not working on this matter here, but I just

3    wanted to let everybody know.

4            If you rest on the papers, then I will rule.

5            I define "loss" for this purpose solely with reference

6    to the text of the guideline and without regard to the

7    commentary.  I do that without expressing a view one way or the

8    other as to whether the guideline should be construed as

9    suggested in the commentary to the sentencing guideline.

10           I reject entirely the defendant's argument that there

11   was no actual loss.  The defendant's argument hinges on what

12   amounts to an assumption that customers of FTX are going to be

13   made whole in the bankruptcy.  Even if that were true, they

14   would not be entitled to a reduction of the loss amount by

15   virtue of crediting any bankruptcy recovery against loss for

16   reasons stated by the government at pages 39 and 40 of the

17   government's memorandum.

18           Any case and without limiting the generality of my

19   reasons for rejecting the argument, I do so both on the law and

20   on the facts.  The defendant's assertion that FTX customers and

21   creditors will be paid in full is misleading, it is logically

22   flawed, it is speculative.

23           It is misleading because the defendants equate loss

24   for guidelines purposes with the dollar value of claims allowed

25   in the bankruptcy case as of the bankruptcy petition date.

1    They equate that with loss as a foreseeable consequence of

2    defendant's crimes, and that simply is wrong at least to a very

3    substantial number of customers.  It's certainly wrong as to

4    investors and as to lenders who were injured parties as a

5    result of these claims.

6        In my view, it's logically flawed, also.  The crimes

7    here included, though they were not limited to taking FTX

8    customer money to which the defendant had no right and using it

9    for his own purposes.  Those purposes included speculative

10   investments by Alameda, which the defendant and one of his

11   colleagues wholly owned, and a variety of other things.  The

12   fact that a combination of success in some of those investments

13   persistence by the current leadership of FTX bankruptcy estate

14   in clawing back stolen assets, and a fortuitous, but radical

15   runup in the value of some cryptocurrencies might result in

16   benefit to some creditors.  It bears no real logical

17   relationship to the gravity of the crimes that were committed.

18       To put it in more colloquial terms, a thief who takes

19   his loot to Las Vegas and successfully bets the stolen money is

20   not entitled to a discount on the sentence by using his

21   Las Vegas winnings to pay back all or part of what he stole if

22   and when he gets caught.

23       Finally, for the reasons very well articulated by

24   Mr. Rehn in the submission on behalf of the debtor's estate,

25   even the premise that customers will be paid dollar-for-dollar

1    for the dollarized losses as of the petition date is pretty

2    speculative, even at this stage.

3            So, my finding is that the loss amount readily exceeds

4    $550 million, which is the top bracket in the loss table in

5    Section 2B1.1 of the sentencing guidelines.  I find that there

6    was a loss to investors of $1.7 billion, a loss to Alameda

7    lenders of $1.3 billion, and a loss to FTX customers of

8    approximately $8 billion.

9            Now, I recognize, first of all, that for guideline

10   computation purposes, anything above $550 million is, again, to

11   put it colloquially and without minimizing the seriousness, is

12   gravy.  Once you hit $550 million, the rest of it has no effect

13   on the guidelines computation.

14           The second thing I would say is that the loss table,

15   which is one of the significant driving forces of the guideline

16   computation, that I am obliged by law to do, though it is not

17   binding on me, is a debatable proposition.  Any number of my

18   colleagues have criticized it on various grounds.  As I

19   understand its genesis, there's really no empirical basis for

20   the brackets assigned or for the assignment of different losses

21   to different brackets.  I share many of those criticisms and

22   concerns with my colleagues.  I have never regarded myself,

23   once Booker was decided, as in any way bound by guideline

24   computations that depend on the loss table in 2B1.1.  I do not

25   regard myself as bound by it now.

1          I'm going to vary downward from the guideline range

2    that will be computed as a result of this process we're going

3    through right now, and I think any disagreement concerning the

4    loss amount and how you get to it and all of that ultimately is

5    going to prove quite immaterial to the sentence in this case.

6          Now, the next point on which there's a disagreement is

7    with respect to the government's proposal for a six-level

8    upward adjustment based on substantial hardship to 25 or more

9    victims.  I know that defense disagrees with that.

10         Does anyone want to address this orally?

11         MR. MUKASEY:  I would just note for the record, Judge,

12   that at the time that we submitted our sentencing memorandum,

13   I'm fairly certain we had not received most, if not all of the

14   victim impact letters, so we took the position we did at the

15   time.  I don't want to withdraw the objection, I just want to

16   explain, in light of what's rolled in since our sentencing

17   memo, why we took that position.

18         THE COURT:  So you're not withdrawing the position,

19   but you're really signaling me that you fully understand

20   there's not much merit to it.  You don't have to answer that

21   question.  The objection is overruled.

22         The next one on the list is a proposed two-point

23   enhancement for, I'll refer to it loosely as fraud intention

24   with bankruptcy.

25         Anyone want to be heard any further on that?

1           MR. MUKASEY:  No, Judge.

2           MR. ROOS:  No.

3           THE COURT:  I adopt the government's position on that.

4           The next one is the proposed two-point adjustment for

5    the use of sophisticated means.

6           Anyone want to be heard on that?

7           (Pause)

8           Hearing none, I agree with the government's position

9    on that, as well.

10          The next proposed enhancement is a two-point upward

11   adjustment for obtaining over $1 million in revenue from one or

12   more financial institutions.

13          Anyone want to be heard orally on that?

14          (Pause)

15          Hearing none, I agree with the government's position

16   on that.

17          There is a two-point upward adjustment for conviction

18   under Section 1956 of the criminal code.

19          I take it that's entirely not controversial; right?

20          MR. ROOS:  Correct.

21          MR. MUKASEY:  Correct.

22          THE COURT:  So that adjustment will be made.

23          There is a proposed four-point upward adjustment for

24   the defendant's alleged leadership role in these crimes.

25          Is there anything anyone wants to say with respect to

1    that proposed objection?

2              (Pause)

3              Hearing none, that adjustment will be made.

4              There's a proposed upward adjustment of two points for

5    the defendant's abuse of a position of trust.  I've read your

6    papers.

7              Anything else anybody wants to say?

8              MR. ROOS:  No, your Honor.

9              MR. MUKASEY:  No, Judge.

10             THE COURT:  I will make that adjustment.

11             We come now to the proposed adjustment for obstruction

12    of justice.  Subject to anything further anybody wants to say

13    on it, I propose to make that adjustment.

14             After further consideration, I conclude by a

15    preponderance of the evidence that Mr. Bankman-Fried's text to

16    the man I remember as having been the former general counsel of

17    FTX U.S., which was the subject of quite a lot of discussion at

18    the time I revoked bail, did in fact constitute attempted

19    witness tampering.  And so, the adjustment is warranted on that

20    ground alone.

21             In addition, after considering your submissions, I

22    make three specific perjury findings based on trial testimony,

23    again, subject to anything you want to say, and if I'm mistaken

24    in some regard, I will fess up.

25             The legal standard is that an adjustment for

1  obstruction in the form of perjured trial testimony is

2  appropriate where a defendant willfully and materially

3  committed perjury, which is the intentional giving of false

4  testimony as to a material matter.  I find, subject to anything

5  counsel says after I complete this, that Mr. Bankman-Fried gave

6  perjured testimony at trial as to material matters in at least

7  the following respects:

8         First, he falsely testified that until the fall of

9  2022, he had no knowledge that Alameda had spent FTX customer

10  deposits.  I refer to page 2761 of the transcript at lines 7 to

11  16;

12         Second, I find that he testified falsely, that he

13  first learned that Alameda had a roughly $8 billion liability

14  to FTX in October 2022.  Transcript references page 2473, line

15  9, through 2477, line 7;

16         Finally, he falsely testified that he did not know

17  that repayment of called third-party loans to Alameda, in or

18  about mid June 2022, would require Alameda to borrow more

19  customer funds from FTX.  Transcript references page 2721, line

20  21, to 2722, line 4.

21         Now, counsel want to address any of those four points?

22         MR. MUKASEY:  I'm sorry, Judge?

23         THE COURT:  Do you wish to address any of those four

24  points?

25         MR. MUKASEY:  I do not wish to address those four

1    points.

2              THE COURT:  Okay.  Mr. Roos.

3              MR. ROOS:  No, your Honor.

4              THE COURT:  I also think it appropriate, to be clear,

5    that I have limited my findings with respect to obstruction to

6    what I thought necessary and prudent to justify the two-point

7    adjustment.  This does not necessarily exhaust my view as to

8    occasions when the defendant obstructed justice by perjury and

9    otherwise in relation to this case.

10             Accordingly, the total base offense level is 60.

11   Under the sentencing guidelines, once you cross 43, the

12   adjusted offense level is adjusted back to 43.  The guideline

13   imprisonment range is life in prison.  Since that would exceed

14   the statutory maximum, the maximum possible sentence in this

15   case is 1320 months.

16             With the modifications inherent now in my rulings on

17   the computation of the guideline range, I adopt the presentence

18   investigation report in all respects.

19             Now, are there victims of the offense who wish to

20   address the Court?  If so, how many?

21             MR. ROOS:  So, your Honor, two things.

22             First, just on the guidelines computation, and my

23   apologies if I missed it, I think one of the enhancements that

24   was not contested, but is included in your Honor's calculation

25   of an offense level of 60 before the reduction is the one set

1    forth at paragraph 81 of the PSR, which is sophisticated money

2    laundering in addition to the 1956.

3            THE COURT:  Yes.  I inadvertently omitted that.

4            MR. ROOS:  Your Honor, in response to your question,

5    we understand there is one victim here, Sunil Kavuri, who

6    wishes to speak.

7            THE COURT:  Okay.  Mr. Kavuri.  Please take a spot

8    there at the lectern.

9            MR. KAVURI:  Thank you, your Honor.

10           Your Honor, I'm here to say a word on behalf of FTX

11   victim, and I'm here from London not just for myself, but on

12   behalf of over 200 victims who have sent impact statements to

13   yourself as well as the thousands of creditors across the world

14   who haven't got the opportunity to come and speak to you.  So,

15   yeah, I would like to thank you very much, Judge Kaplan, for

16   allowing me to speak today.

17           So, yeah, my lawyers sent you my victim letter last

18   week.  I hope you read it.  I would want to come over here and

19   speak to you in person.  It's a real privilege and honor to

20   stand here before you today.  You did a fantastic job in trial

21   and I thank you greatly and so do a lot of other creditors

22   around the world.

23           I followed the FTX trial live.  I live the FTX

24   nightmare every day for almost two years, every day, every

25   night, a lot of crying, sleepless nights.  I have a new baby

1    son and another toddler.  And I have spoken to tens of

2    thousands of victims just like myself who had their dreams

3    destroyed as a result of this bankrupt -- this FTX fraud.  My

4    house, the money which I wanted to spend on a family home,

5    taken away, as well as my children's education.

6         I'd like to address one key point.  The harmed

7    customers, lenders, and investors -- and Sam was vindicated

8    when the bankruptcy estate concluded all victims will be paid

9    in full.  And that they continue to do this constantly.

10   They've done it in the media constantly, saying I personally

11   suffered zero damage, other creditors suffered zero damage, FTX

12   customers, that we all will be paid in full.  And I -- I

13   definitely dispute this.  I suffered every day, every week for

14   the past two years, and we still continue to suffer from how

15   this FTX fraud has been handled.  Simply put, this is a

16   continuous lie that we are all made whole.

17        So I'll go into several points why this has occurred.

18        First of all, the bankruptcy estate is assuming or

19   mischaracterization of us as unsecured creditors.  We're not

20   unsecured creditors.  Our assets were our property.  We gave

21   it -- it's held in constructive trust in FTX.  We had property

22   rights.  And you can't just take a property, sell it for a

23   profit, and keep the profit.  That's not how it works.  This is

24   not the law.  The petition date ruling is not the law as I

25   understand it.  Otherwise, someone can just steal my house,

1     sell it for a profit, and give back how much -- the price at

2     which they stole my house for and say, okay, you're made whole

3     at the petition date, we'll keep the profits.  This is not how

4     it works in my view, and I don't believe this is not how it

5     works in your court.

6              So, I'll give you three examples as a result of what

7     has destroyed creditor value for us in addition to the FTX

8     fraud.

9              So, Sullivan Cromwell and bankruptcy estate has

10    trampled over our property rights.  The terms of service, which

11    you rightly ruled was our property, our crypto and Fiat

12    deposits were rightly ours in your court of law.  They have

13    liquidated billions of dollars of crypto assets, and I'll give

14    you clear examples which has cost us, as creditors, customers,

15    billions of dollars.

16             The first example is Sui, so there is a token, and

17    Mysten Labs.  The Sullivan Cromwell and bankruptcy estates sold

18    it for $100 million at 11 cents, it's now trading at $2, and

19    they gave away the free ones, which cost the bankruptcy estate

20    $1.5 billion to $2 billion loss.

21             The second biggest -- I don't say this lightly because

22    this is seemingly intentionally to destroy our value.  It

23    saddens me because this is the pain we're living through every

24    day now as we thought this would end after the bankruptcy, but

25    literally I'm seeing this, this is what happened.  So, at the

1    bankruptcy, I believe FTX had about 50 million worth of Solana

2    tokens, which, at current market price, is close to

3    $10 billion.  This is just Solana.

4          So what happened was that they resent -- they started

5    selling Solana, the token, at the 70-percent discount to the

6    market prevailing market price.  So Solana's is trading at

7    current market price, is about $180, they're selling it about

8    $60, each Solana and, unfortunately, they're selling it to

9    their own clients.

10         So Solomon Cromwell has a conflict of interest with

11   Galaxy and Katerra, and they sold it, which is destroying

12   customer value.  So -- which is estimated, was a loss at

13   $4.5 billion for myself and customers, and this is our

14   property.  We own -- it's our property.  We're not unsecured

15   creditors, we're customers who own these digital assets.

16         And the third, the really, really -- there's a third

17   thing, another one, which, obviously, were the Thane documents,

18   so you know.  So the third one is Anthropic.  So in this court,

19   as you rightly ruled, our customer deposits were used to

20   acquire the Anthropic -- the AI company, and Peter Easton has

21   provided testimony for that.

22         So customers should -- it's our property.  However,

23   when Sullivan Cromwell wants to sell it -- so I objected with

24   other creditors, and I know thousands of other creditors

25   supported my objection, and I know this, that couldn't stop

1   them from selling it, and now saying that Anthropic is their

2   own property, the FTX -- they're saying it's his property.

3   It's not FTX's property, it's customers' property, and they

4   sold it anyway.  So this has caused significant losses for

5   myself in addition to the FTX bankruptcy -- in addition to the

6   FTX bankruptcy.

7              THE COURT:  Sir, I appreciate the points you are

8   making, but I'm here to sentence Mr. Bankman-Fried, not to

9   address what the bankruptcy estate should or shouldn't have

10  done.  I accept your broad point that the assertion that FTX

11  customers will be made whole is, for one of any better phrase

12  at the moment, incorrect.  I agree with you on that.  The

13  points you are now raising, it seems to me, are issues for the

14  bankruptcy court.  If you wish to raise them there, I don't

15  have anything to do with that.

16             MR. KAVURI:  Right.  Okay.  Great.  Thank you.

17             I guess the reason I pulled it up is because you

18  rightly ruled these assets are owned in your court, so -- and

19  profit was clearly owned by customers.

20             Anyway, so we continue to suffer, all the creditors

21  continue to suffer not only monetary loss, but emotional and

22  mental distress.  So I'm in contact with thousands of other FTX

23  victims.  I speak to them daily.  I get hundreds of messages

24  daily and people are on medication recovering, mental health

25  issues, depression, and obviously sadly, really sadly, at least

1   three people I've heard of have committed suicide as a result

2   of this FTX fraud.

3            So why -- so when this FTX bankruptcy -- so I guess

4   I'll carry on.  So why I personally feel is that how it relates

5   to Sam, obviously, it's hurt me and, emotionally, it's caused

6   me great stress, and I've spent probably 70 to 80 percent of my

7   time over the last two years helping other FTX creditors,

8   customers around the world.  So -- and this is without any pay,

9   I'm not getting paid by debtors or anyone else.  I'm doing this

10  just because I would like to help others to maximize recovery.

11  I do feel that there were other former aiders and abettors in

12  addition to Sam.  So I do feel that for customers to be made

13  whole, other coconspirators, former aiders and abettors, they

14  have to be held accountable.  And I do believe that will help

15  us in restitution, as well.

16            So, for example, a lot of the assets which were seized

17  by the government rightly so, the money which went for

18  customers to, like, for example, the Robinhood stake and all

19  these other assets which were used -- using customer deposit,

20  they have to go to the victims directly under the class action

21  loss, not to the bankruptcy stake, which have specifically --

22  is transferring assets from customers to other unsecured

23  creditors.

24            THE COURT:  I think it would be helpful if you could

25  bring your remarks to a close soon.

 1                MR. KAVURI:  Yeah, that's it.

 2                THE COURT:  Thank you very much.

 3                Anyone else?

 4                MR. MOSKOWITZ:  Your Honor, I would like to.  May it

 5     please the Court, your Honor, my name is Adam Moskowitz.  I'm

 6     an honor to be appointed colead counsel for the multi-district

 7     litigation FTX.  We have talked to hundreds of thousands of

 8     customers in the past year, so I just wanted to give you one

 9     point they asked me to come make.  We gave you about 230 impact

10     statements and I think it expresses their desire, their

11     interest.

12                I want to make one point, and I'm glad your Honor was

13     on the MBL panel for nine years.  We're trying to help the

14     victims, that's what we're doing.  And I attended the trial,

15     which was wonderful, here in New York.  I did that because

16     we're also cooperating with the FTX insiders and with Sam and

17     his team.  Yesterday, in federal court in Miami, we moved for

18     preliminary approval of our settlement with the insiders, and

19     their cooperation has been incredibly helpful.  And we filed 71

20     claims against people.

21                I just want to say that Sam and his team since that

22     date have been helpful to us.  It's not my job to decide his

23     guilt or innocence, but as the class action counsel, my job is

24     to find the most recovery for the victims who've lost billions,

25     and his help, as well as the help of the insiders, has been

 1  very helpful.

 2          And all I think is, if people help in these class

 3  action recoveries, there should be some consideration for that.

 4  I can't tell you how much or I can't tell you what, but I do

 5  like the fact that people know if they help the class action

 6  find recovery, there may be something in it for them.  And I

 7  would respectfully ask on behalf of many of our victims that

 8  you at least just honorably respectfully consider that.

 9          THE COURT:  Thank you.

10          MR. MOSKOWITZ:  Thank you.

11          THE COURT:  Anyone else?

12          (Pause)

13          Now, ordinarily, I enumerate on the record the various

14  papers that I have considered in preparing to pass sentence.

15  I'm going to depart in a certain respect.  As of 9 o'clock last

16  night, this morning, submissions with respect to this sentence

17  to me have totaled 1,929 pages.  I can thank the defendant for

18  451 pages and the government for about the same, exclusive of

19  victim impact statements, and then there were a whole bunch of

20  victim impact statements.

21          Now, whatever there is either is or will be on the

22  public record, save the presentence report.  So I'm not going

23  to waste your time or mine listing about the way I usually do.

24  It was in the nature of an avalanche.

25          At this point, I'll recognize Mr. Mukasey on behalf of

1   his client.

2               MR. MUKASEY:  Thank you, your Honor.

3               Judge, I just want to preface my remarks today by

4   saying that I don't want anything that I say today to be taken

5   as disrespect for the jury service or the verdict that they

6   returned.  Obviously we disagree with the verdict, we're going

7   to appeal the verdict, but nothing we say here today should be

8   taken as any disrespect for the jury's hard work.

9               And with respect to the victims, those that are here,

10  those that are not here, we've read the victim impact

11  statements.  We have listened to the comments today.  We think

12  we understand the intensity of the pain of the victims and we

13  understand with sort of crystal clarity that people have

14  suffered financially, emotionally, and otherwise, and everyone

15  at the defense table's sympathies are with the victims, and I

16  truly mean that down to my core.

17              I also appreciate, Judge, that my team is young and

18  Mr. Thornhill did not live through the prior proceedings with

19  most of the people who are here in the well of the courtroom,

20  but I am confident that we have a very strong hold on the

21  record and also a keen appreciation of the atmospherics, if you

22  will.

23              So I want to start out, Judge, by talking a little bit

24  about the nature and seriousness of the offense here.  The

25  government points in their brief to some truly vile defendants.

1    They point to James Nicholson, who looked widows in the eye and

2    stole their life savings at the same time.  They talk about

3    Carl Greenwood, who was recently sentenced by Judge Ramos, who

4    referred to his victims as "marks" and "idiots."  They referred

5    to Bernie Madoff, who looked Holocaust survivors in the eye and

6    took their money.

7         These defendants are what I would consider stone cold

8    financial assassins.  They targeted innocent people, they

9    trained their sights on vulnerable victims.  That level of

10   depravity and cruelty and blameworthiness is nowhere that I saw

11   in the testimony in this case, it's nowhere that I saw in the

12   materials that I reviewed in this case, and it's nowhere in

13   Sam's history as a person, which I'll talk about in a minute,

14   because I don't think it's anywhere in Sam's heart.

15        Sam is on the opposite end of the culpability scale

16   that they talk about for fraud crimes.  He's not the defendant

17   who looks someone in the eye while he took money out of their

18   pocket.  And I submit there's nothing in this case, Judge, that

19   shows that Sam wanted to personally inflict pain or hurt or

20   harm on anyone in any way.

21        It's the bottom line about the nature and seriousness

22   of the offense.  It's obviously a serious offense, but Sam was

23   not a ruthless financial serial killer who set out every

24   morning to hurt people.  There was nothing predatory or

25   rapacious or venal or mercenary or exploitive about his

1   conduct, and that's, as I'm going to get into, because Sam

2   Bankman-Fried doesn't make decisions with malice in his heart,

3   he makes decisions with math in his head.

4          What I mean by that, Judge, is it's necessary to

5   understand who he is as a person.  Obviously, when you want to

6   find out who someone is as a person, you start out with their

7   mom.  I'm mindful of his mother's observation that any effort

8   to understand Sam truly, which is what I think we have to do

9   here today, and any chance of truthfully understanding him

10  through the lens of sort of normal behavior and motivation is

11  probably going to end up misunderstanding Sam.

12         I think that's exactly what happened here.  The real

13  Sam Bankman-Fried, the real person, his real motivations were

14  misapprehend and misunderstood, and I suspect that that

15  happened because it's pretty easy to slot people into kind of

16  an old fashioned familiar story.  And in this case, the old

17  fashioned familiar story of the arrogant, greedy swindler who

18  thought he could get away with fleecing the hard earned money

19  of innocent people and use it to satisfy his own hedonistic

20  pleasures, if you punctuate that with a supposedly sensational

21  lust for power and you top it off with a bankruptcy, well, that

22  makes it all look really bad and you got yourself a pretty good

23  story.

24         The only problem is, I would submit, it's sort of a

25  crock.  The perception is not the reality here.  There's a

1    radical difference between the public persona that I just

2    described and the real person.  Maybe the best evidence of that

3    is that Sam never scurried away with billions of dollars in a

4    Swiss bank account or under his mattress or in his personal

5    pockets, and I think he's firm in his belief that he may well

6    have been able to solve what he viewed as a black swan

7    liquidity crisis.  He didn't flee, he stayed until the end.  He

8    tried to help John Ray, he was rebuffed.  He tried to help the

9    bankruptcy team, he was rebuffed.  He tried to do whatever he

10   could, he offered to give more, and I'm sure he'll tell you

11   more about how much it means to him that people get repaid.

12          If you ask anybody who really knows Sam, not the

13   dehumanized one-size-fits-all trial caricature of Sam, but

14   anybody who really knows Sam, they'll say he's not a greedy,

15   power-hungry feign.  There's no one I've come across who truly

16   knows him who says this tragedy came about because he was

17   greedy or covetous or materialistic or mean or nasty or

18   voracious.

19          Really, he's an awkward math nerd.  He thinks in

20   probabilities about everything.  He speaks in expected value

21   calculations.  He loves video games and veganism, and he's

22   compassionate to animals and children.  And he has a tireless

23   work ethic.  Even on his legal matters, he has a tireless work

24   ethic and a completely, and I don't say this lightly, a

25   completely off-the-charts, mind-blowing intellect.

1          A lot has been made in the popular media about how Sam

2    loves puzzles.  I mention that because Sam himself is sort of a

3    beautiful puzzle.  He's at once hyperrational, but not cold or

4    robotic.  He's super focused on some things, but completely

5    absent minded about other things.  He can parse words better

6    than a talmudic scholar, but he can completely misread the

7    surroundings.  He can concentrate like a laser beam, but also

8    be fidgeting at 100 miles an hour.  He was a billionaire, but

9    completely unconcerned about material possessions.

10         And I submit that's not an image that he crafted in

11   2019 or 2020 to try to sell FTX.  The letters that I've seen

12   are unanimous that from a very young age, Sam wanted to do good

13   in the world.  In middle school, when most people are thinking

14   about, you know, peanut butter sandwiches and baseball games,

15   he was thinking about his ethical obligations to the global

16   population.  In high school, he dedicated himself to the idea

17   that each of us has a strong obligation to alleviate suffering

18   in the world.  In college, he spent a whole bunch of time

19   helping animals.  And his first job on Wall Street has been

20   well documented.  He gave away his earnings to charity, a

21   charity that was working on disease prevention in Africa.

22   That's as a young man.  That's about, I think, through age 21.

23   My point here is a simple one:  Sam's devotion to others

24   predated Alameda, it predated FTX.  It was not a cocktail party

25   affectation that he took on when he became a billionaire.  It's

1    the truth.

2            Another truth about Sam is that even though he started

3    two legit successful crypto firms, he never even set out to be

4    the king of crypto.  He never sought out the fancy apartment or

5    coasted the private jet.  He was out there to have the largest

6    positive impact in the world.

7            Now, I want to be clear, that's not to be taken at all

8    as an ends justified means argument.  That's by no means what

9    happened here.  That would do more harm than good to the

10   altruistic movement and that would defeat the positive purpose.

11   So this was not an ends justify the means run.

12           I think you can see the bona fide nature, Judge, of

13   his dedication to philanthropy, the integrity of his commitment

14   in giving not in the people that the government put up at trial

15   to sort of make him look vain and image conscious like Tom

16   Brady and Steph Curry and Katy Perry.  You see who's actually

17   standing by Sam now, it's not those people.  The people

18   standing by him now are the scientists, the humanitarians, the

19   global health providers, the people who saw closeup that he was

20   committed and passionate and steadfast, even at a young age.

21   And even now that he's broke and ruined and has no more to

22   give, they're still standing up to his commitment to giving.

23   And I hope that tells the Court that it was not pretension or

24   artifice or posing.  Sam Bankman-Fried made a real authentic

25   commitment to doing good, and his commitment to doing good made

1    other people commit to doing good.

2            I'm just going to point real quick to exhibit A24 to

3    our main brief, the letter written by someone who left their

4    career as a trader on Wall Street to work for the FTX

5    Foundation.  He said:  "If it weren't for Sam, I would

6    certainly be working a comfortable job on Wall Street and

7    thinking that the best way I could make a difference in the

8    world was to write a check every December.  My time at the FTX

9    Foundation has left me with the conviction that the

10   unconventional thinking can transform the way that we discover

11   new medicines, and now I don't expect that I'll ever go back to

12   working as a trader.  Sam believed I could do more good than I

13   could believe.  I'm glad that he did.  I trusted him on that.

14   I'm grateful.  His impact on my life has pushed me to raise my

15   sights higher than they were before."  To me, that's an

16   extraordinary statement, Judge, about Sam and the amazing

17   impact he has had, he continues to have, and he will have in

18   the future if given the chance.

19           To me, it's also sort of the tip of the iceberg

20   because, as we've submitted, Sam's done a whole lot of things

21   that people who just want to sit around and be rich and fat and

22   happy don't do, like organizing conferences on head trauma,

23   like vaccine delivery, and digital mental health discussions.

24   That's not what you do if you're just happy being rich.  And if

25   people still think that Sam's commitment to lifting people up

1    and helping people out is a sham, I'm told that he has been

2    tutoring people with no fanfare at the MDC for high school

3    diplomas, you don't do that to hone your image, you do that to

4    help.

5              I'm going to submit, Judge, that Sam possesses this

6    generosity of spirit, this compassion, this empathy because he

7    knows the other side all too well from his own life.  He knows

8    quite well what it's like to be in pain, to be misunderstood,

9    to come across as unlikeable, to practice making eye contact

10   the right way, to be unsure of his emotions, to have a hard

11   time making connections.  Sam's always been socially

12   uncomfortable.  He's experienced bouts of depression.  His

13   mother says there's a terrific sadness at his core, and that's

14   been a constant presence in his life.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              MR. MUKASEY:  Years ago, before anybody would claim

2    that Sam had ulterior motives or was trying to craft an image,

3    he wrote in a journal that he doesn't feel pleasure or

4    happiness, that he feels an aching hole in his brain where

5    happiness should be.  I find that crushing.  The truth is,

6    though, his own happiness has always been subordinated to the

7    happiness of those less fortunate in the world.

8              And this person, my client, who people may think lives

9    to take for himself, actually lives to give to others.  And I

10   think the person that best ties this together is his brother.

11   His brother comes the closest to solving this beautiful puzzle

12   that is Sam Bankman-Fried.  His brother says:  Sam would be

13   uncomfortable giving me a hug, but I know he would give me a

14   kidney if I needed it.  I think that's extraordinary.

15             Sam is an incredibly kindhearted and generous person

16   who may not always demonstrate all the social norms, but is

17   giving and selfless beyond most norms.

18             Those are the personal history and characteristics of

19   Samuel Bankman-Fried.

20             I want to address a comment your Honor made this

21   morning.  He made it in the context of the obstruction

22   enhancement.  I think it goes to specific deterrence, which has

23   to be a concern here.

24             We addressed the government's specific deterrence

25   argument as unfounded alarmism, but I know the Court probably

1    shares this specific deterrence concern based on the bail

2    issues, for example.

3         Let me say this.  Sam has lost everything.  Losing the

4    people in your life and being publicly shamed by the entire

5    globe, to me, seems like enough deterrence.  On top of that, he

6    has probably been in the worst federal jail in the country for

7    the past seven months.  And while the government says a

8    significant prison term is necessary to deter him from future

9    crimes, a significant prison term, I say this.  Every day in

10   prison is significant.  Every night in a four-by-four iron box

11   is significant.  Every strip search, every 4 a.m. wakeup call,

12   every time you have to use the bathroom in front of your

13   cellmate, that's significant.  Every time you can't get your

14   medication, it's significant.  So Sam certainly doesn't need

15   more time to feel the significance of prison as a deterrent.

16   And even the PSR, and I think I have made my feelings known

17   about the PSR, even the PSR doesn't seem to suggest that Sam is

18   going to commit more crimes.  So I submit this prosecution has

19   achieved specific deterrence.

20        I don't propose to lecture the Court at all about the

21   concept and theories behind general deterrence.  We cited in

22   our papers studies that show increasing the severity of

23   punishment does quite little to deter crime, but I've always

24   thought anecdotally, with respect to general deterrence, if

25   you're the kind of person that's not going to want to go to

1    federal prison and is beaten and abused and understood and

2    taken advantage of, you are going to be deterred by the idea of

3    going for a day or a week or a month, or a year.  That's who

4    general deterrence speaks to.

5            I also understand, Judge, there has to be a perception

6    that justice is done and people get their just deserts.  I'm

7    mindful of comments that I know you have made that when you

8    impose a sentence, it should be a sentence that the average

9    person in the street, knowing what happened, would accept as

10   fair and reasonable and sensible and wouldn't want to make them

11   rise up and say the system is crazy.

12           I know this is a different kind of case that I'm about

13   to talk about, but I'm reminded of the case of Stefan Irving.

14   I think probably you, me, and Dan Gitner are the only people

15   who remember Stefan Irving, but Stefan Irving was a

16   pediatrician who was a recidivist child sexual predator

17   convicted in the state, then rearrested for traveling, by the

18   feds, to Mexico to sexually assault prepubescent boys.  To make

19   matters worse, he had been the pediatrician at a New York

20   school district, so God knows what else he had been up to.

21           I know it's a different kind of case, and I know

22   Irving was a bit of an older guy, but I respectfully submit

23   that if you're judging by the average person in the street, no

24   reasonable person would say that Sam is even half as dangerous

25   or irredeemable or incorrigible or as bad as Stefan Irving, who

1    got 21 years.

2          But, obviously, I have no idea what it's like to

3    impose sentence on another person, and I know you've obviously

4    been doing it for a long time.  I think I read somewhere that

5    you said that the longer you sit up there, the harder it gets.

6    That's probably because people have the power to change.  You

7    just don't know.

8          People overcome.  Judge Underhill has written about

9    it.  There is a lot of work about it.  It doesn't take a

10   decade.  I'm asking the Court not to destroy the prime of this

11   complicated, brilliant, gentle, complex, kind young man's life.

12   Don't deprive him of the opportunity to meet a partner or have

13   a baby or work at a charity or teach kids or use his beautiful

14   mind.  If the government thinks he's greedy, sentence him to

15   work hard and give it all the way.  Victims want their money

16   back, and they should get it, all of it.

17         I'll close with this.  I read that a few years ago

18   Judge Koeltl wrote an article about Judge Weinfeld, and I

19   gather Judge Koeltl clerked for Judge Weinfeld.  He said that

20   Judge Weinfeld sort of had a policy that he would sentence

21   white-collar defendants to some term of imprisonment because he

22   thought that was necessary for deterrence.  But there was one

23   defendant in a white-collar case before Judge Weinfeld who had

24   led a life that the judge thought was characterized by acts of

25   quiet charity, long before it was in that defendant's interest

1    to do so.  Judge Weinfeld did not sentence him to prison.  He

2    broke his policy.  Apparently, Judge Weinfeld said that the

3    bread that that defendant had spread on the waters had now

4    returned to him.

5         In the same vain, Judge, we hope that one can't be as

6    kindhearted as Sam has been without receiving a harvest of

7    kindheartedness in return.  His life is hanging in the balance

8    here.

9         We ask that you sentence Sam today, Judge, with an

10   open mind and a compassionate heart.

11        THE COURT:  Thank you.

12        Mr. Bankman-Fried, you have the right to speak before

13   you're sentenced.  Is there anything you would like to say?

14        THE DEFENDANT:  Yes, your Honor.

15        Thank you, your Honor.

16        I appreciate a lot of what Marc said about me.  I also

17   don't know that the most important thing here today is my

18   emotional life or hypothetical future kids.  It's that we are

19   standing here today and there are millions of people who

20   haven't been paid.  That's what matters far more.

21        There are customers who -- I agree with most of what

22   Sunil said about what they have gone through about, obviously,

23   having money they didn't think they would lose, and now, even

24   when they are hoping they may get it back, being deprived of

25   the gains from what they had.  They have been waiting, I guess,

1  for a year and a half.

2         And what matters also is the colleagues that I had who

3  worked for FTX who poured themselves into the company for

4  years, then watched me throw away everything that they had

5  built.

6         I know a lot of people feel really let down, and they

7  were right, they were, were very let down.  I'm sorry about

8  that.  I'm sorry about what happened at every stage, things I

9  should have done and said, things I shouldn't have.  I failed

10 everyone that I care about and everything I care about too.

11        I remember the colleagues, obviously.  They are the

12 ones that I knew best and was closest to here who followed --

13 the company followed me across the earth, across continents,

14 burning the midnight oil, working until 2 a.m., 4 a.m.,

15 dedicated to FTX.  I remember -- there are so many of them, but

16 Natalie, who in a year taught herself to run an entire media

17 department and when it came to think about hiring a team, it

18 was clear she was already doing ten people's jobs better than

19 anyone else I had seen at any place I had seen.  I gave my

20 brother -- who had a crazy idea of a way to save maybe millions

21 of lives.  He worked tirelessly on it for years.  After a few

22 years he called me one day.  It was actually -- looked like it

23 was going to happen, like it was going to work.

24        From far earlier on, Gary sent me a message one day, a

25 link.  He had been quiet for the past couple of months.  It is

1   a link to a crypto exchange that he built over those few

2   months.  Over the next couple of years the industry -- the

3   whole industry rebuilt itself in the image of what Gary had

4   made cross margin a lot of other -- so many things about what

5   he felt became the industry standard.

6          I remember back earlier on, 2018, Alameda was in

7   danger of falling apart.  I got a message one day.  Explained

8   what I needed to do to fix things in a way that I hadn't been

9   able to see myself.  There was an anonymous message, but it had

10  sort of a combination of empathy and logic in it that made it

11  clear it had to be from Nishad.  He was famously humble and

12  that often hid how brilliant he was as well.

13         Caroline is 20 something, mostly self taught, running

14  a billion dollar company, making a billion dollars a year

15  trading.  She asked me for advice sometimes on her reviews of

16  employees.  And when I read through those, I learned more from

17  one review that she wrote than I ever did from people she was

18  reviewing.  It was incredibly impressive.  A lot of other

19  people who probably don't want me to say their names right now,

20  but they all built something really beautiful.  They threw

21  themselves into it.  And then I threw all of that away.

22         It haunts me every day.  I made a series of bad

23  decisions.  They weren't selfish decisions.  They weren't

24  selfless decisions.  They were bad decisions.

25         And those culminated with a bunch of other factors

1    along with the liquidity crisis for Alameda in November of

2    2018.  It wasn't bankrupt.  FTX wasn't bankrupt.  Alameda

3    wasn't bankrupt.  There were no losses to socialize to

4    customers.

5          But my mismanagement, among other things, meant that

6    most of Alameda's gains had been lost, most of what it had ever

7    made.  It was more leverage, more levered than it should have

8    been, and that we had to liquidate an $8 billion collateral, we

9    had to liquidate to pay off its debts, to meet the run on at

10   FTX that was developing, and then shutting Alameda down.  It

11   would have meant customers were paid in full.  May have taken a

12   couple of weeks.  FTX would have survived.  Alameda wouldn't

13   have.  Would have been shut down.  It would have been a huge

14   disappointment for everyone who had built Alameda and an

15   unpleasant few weeks for FTX for its customers and its

16   partners, and there are a lot of mistakes that I made that led

17   to that.

18         That's also not how this story ended, of course,

19   because I wasn't done screwing up.  Customers, obviously, they

20   weren't paid back that week.  They still haven't been.  It has

21   been a year and a half.  Withdrawals, they didn't resume.  They

22   still have them.  They never will because FTX isn't going to

23   resume.  FTX didn't survive that.  Obviously, Alameda didn't

24   either.

25         Customers, creditors, lenders, over the last year and

1   a half, they have not been paid back.  They have been given

2   conflicting claims.  That's caused a lot of damage.

3         They could have been paid back.  There were enough

4   assets, there are enough assets to pay back all customers, all

5   creditors in full at current prices, at prices at the time,

6   with interest.  And paying -- what Sunil said was absolutely

7   right.  They do deserve that.  They don't just deserve to get

8   back sort of some simile of the value they had.  They deserved

9   to get that a year and a half ago, in November 2022, and they

10  deserve now to get the actual assets they had, the value that

11  those are worth now.  There are enough assets for that.  There

12  always have been.

13        It's not because of a rise in the price of crypto.

14  That hasn't hurt, certainly, or recoveries or things like that.

15  There always was enough value to do that, and that should have

16  happened in November 2022.  It didn't, obviously.

17        It's just not about the money for customers, as Sunil

18  said.  He pointed to the gains they are missing out on.  He

19  pointed to the emotional pain to -- it must be an excruciating

20  feeling waiting every day not knowing what's going to happen,

21  feeling like you may have lost everything.  It was present

22  throughout the letters, and outside the letters throughout

23  things customers have told me, things I have read since shortly

24  after the collapse.

25        Marcello in his letter talked about the impact on his

1    physical health, Alasantro about the impact of his family

2    relationship, and pretty much everyone talked about the piece

3    of mind they have not had this last year and a half.

4            Basic question, I guess, of why they have not been

5    paid back now.  There are enough assets.  There always were

6    enough assets to do it.  There was, to be fair, a liquidity

7    crisis.  And that was, in part, my doing.  That was a mess and

8    it was going to -- was going to be a messy and tense November

9    2022.  But we are not in November 2022.  We are not in 2022 or

10   in 2023 anymore.

11           This isn't the time or place to tell that full story

12   for why they are still waiting, for why they are not sure if

13   they are going to get petition-date value or current values.

14           But a good place to start with is Dan Friedberg's

15   affidavit that he filed a bit over a year ago in bankruptcy

16   court.  It was a brief affidavit.  I don't think he made a lot

17   of friends for filing that.  I suspect he made some enemies.

18           There are a few people who have stood up for customers

19   over the last year and a half.  The JPLs in the Bahamas have

20   been working pretty tirelessly for them below the radar often.

21   Adam Moskowitz has been fighting for them in court.  I am

22   grateful for what they have been doing.  Christina Rolle, the

23   head regulator in the Bahamas, FTX's -- the regulator who was

24   FTX's head regulator when it was still a thing, a few days -- I

25   guess about a day after the bankruptcy filing, there was a hack

1    on the estate's assets.  I was in the Bahamas then that day.

2    Christina Rolle came to FTX's headquarters to make sure that

3    the assets were protected, to make sure that they ended up in

4    custody, that they couldn't be further depleted.  She wasn't

5    going to leave until that was done.  She was going to

6    participate in it, made sure it happened, made sure that the

7    focus was on customers on what mattered for them.  I think this

8    was a Friday or Saturday night, and she was there until 3 a.m.

9    making sure that happened.  It was inspiring.

10         But there have been some people who have stood up for

11   customers who have done more than was expected of them, mostly

12   customers who have been failed.  They have been failed by more

13   people than I can count, not least of which myself.  It has

14   been excruciating to watch all of this unfold in slow motion.

15   Customers don't deserve any of that pain.

16         I was the CEO of the FTX.  I was its leader.  That

17   means that I was responsible for what happened to it.  At the

18   end of the day I was responsible.  I was responsible that it

19   went well.  It doesn't matter why things go bad when you're

20   responsible for something.  It's on you.  I was responsible for

21   FTX and it collapses on me.

22         I am not the one who matters the most at the end of

23   the day.  What matters is the customers, the creditors, the

24   employees, people who suffered a lot because of this.

25         Some of them wrote letters for me for sentencing.  It

1    was incredibly moving.  It meant a lot to me.

2        I know Ross said in his letter that there was a cost

3    to them being written, cost to the letter writers.  I know he

4    is right about that.  I have seen people pay that cost over the

5    last year and a half.  And even if I were worthy of the

6    letters, I am not sure that they are worth that cost because,

7    at the end of the day, my useful life is probably over.  It has

8    been over for a while now, from before my arrest.  I have long

9    since given everything that I had to give, and I would do

10   anything to be out there right now trying to help, but I know

11   that's not going to happen, and I can't really do that from

12   prison.  I can't really help, whether I get a 30-year sentence

13   or four or five, at the end of the day.

14       I know how people see me.  I know how the prosecution

15   sees me.  I know how the Court sees me, the media.  I

16   understand why.  I keep coming back to that Ryne Miller

17   message, I know you referenced it earlier today, that the

18   former general counsel of FTX US -- at least former general

19   counsel of the bankruptcy estate.  I don't know if he still is.

20   I thought it was clear at the time that I was trying, and

21   obviously failing completely, to help the estate to --

22   basically, it's desperate for them to pay back customers, to

23   stop stalling on it.  It still seems clear to me that that's

24   what I meant.  But it's not how the prosecutors, it's not how

25   the media saw it, the Court.  It's not how a lot of people saw

1    it.  That's that.

2          There is -- I do want to apologize to -- I want to try

3    something Sunil said about the filings that we had made.  I

4    understand what he meant when he said that he found them

5    offensive, that it seemed like they were implying that there

6    was no pain to customers, that we were denying that there was.

7    That's not what I meant.  I mean, now that he says that, I can

8    see -- I can certainly see how he can read it that way.  I

9    think, more than that, I can see how their focus may not have

10   been entirely in the right place.  I think they far undersold

11   the extent to which has been -- ultimately, customers have been

12   suffering.  I don't think the reasons for that and the process

13   for that are very well understood.  I think it's a story that

14   mostly hasn't been told.  I think it's -- hasn't been told

15   correctly.  But I didn't at all mean to minimize that.  It's

16   not what I intended, but I also think that was also something

17   that was missing from what I have said over the course of this

18   process.  I'm sorry for that.

19          At the end of the day, there is -- there is maybe

20   self-reliance to some of this.  It looks like customers

21   hopefully will finally be paid.  They should be paid in full,

22   not just petition-date value, but current value of assets.

23   There is plenty of assets to do that.  There is billions more

24   than is necessary.  It has been true for the whole time.  It's

25   true of customers.  It's true of lenders as well and investors.

1    I'm hopeful and optimistic that that's finally going to happen.

2    I guess I wish I had been able to do more to help that.  I

3    think I failed at that.  I'm not sure why, but I do think I

4    did.

5          I guess there is a big opportunity in the world to do

6    what the world thought I would do, what it hoped I would do, at

7    least for a while, what I hoped I would do for the world, not

8    what I ended up doing.  And 300 people that I used to work

9    with, incredibly talented, selfless, impressive people were

10   looking for something to do.  If that happens, if they do what

11   they could for the world, then hopefully I'll be able to see

12   their success, not just my own failures each night.

13         Thank you, your Honor.

14         THE COURT:  Thank you.

15         Who is going to speak for the government?

16         MR. ROOS:  Yes, your Honor.

17         Samuel Bankman-Fried stole over $8 billion in customer

18   money, as your Honor found earlier today, and I emphasize stole

19   because it was not a liquidity crisis or an act of

20   mismanagement or poor oversight from the top.  It was the theft

21   of billions of dollars from customers spread all over the

22   world.  It was not a bloodless financial loss on paper.  It was

23   a loss, as the victim-impact statements note, that affected

24   people significantly in their lives and caused extreme

25   emotional and personal damage.

1    And since the government submitted its submission,

2    there have been, I think, at least 100 additional victim

3    letters that have been filed.  Since we didn't have a chance to

4    comment on all of those in our sentencing submission, I want to

5    identify a few things in them for the Court's attention that I

6    think exemplify the harm in this case.

7    One of those harms is the financial harm and the

8    defendant says, you know, there is an untold story.  The

9    financial harm was immediate.  It was a theft.  There was

10    suddenly no money.  And over and over, the victim-impact

11    statements make clear that they lost their life savings, they

12    were financially damaged, they didn't know how they could go on

13    with their lives financially, and they have not been made

14    whole.

15    What really stuck out to me was what these statements

16    also say about the emotional toll to the victims here.  I was

17    struck by not just how life altering the defendant's crimes and

18    fraud were to these individuals, but how it affected so many

19    different types of people in different walks of life.

20    To give your Honor three examples, we have Fabrizio

21    Cossutta, who lives in Portugal.  The day before FTX declared

22    bankruptcy, his daughter was born.  He wrote to the Court

23    about -- on the special day of his daughter's birth, he was

24    marred by the ominous specter of financial instability.  His

25    losses, in his words, have been severe and enduring, casting a

1    shadow over his family's financial security and his daughter's

2    future.  It caused stress.  It caused anxiety.  It strained the

3    bonds of his family.

4            That's not just an act of mismanagement.  It's not a

5    process that's playing out.  It's a real harm to the victims.

6    Take someone in the middle of their life.  Your Honor received

7    a letter from a victim, age 23, who lives in Morocco.  He is

8    the oldest of a family of five.  His father suffers from

9    physical and mental problems, leaving the father unable to care

10   for the family.  The eldest son is the victim.  That

11   responsibility, in his words, fall heavily on his shoulders.

12   And he was trying for years to balance caring and providing for

13   his family, while also going to school in order to, to use his

14   words, secure a better life for his family and his own future.

15   So he kept money on FTX not to make a wild investment or to

16   loan it out to the defendant, but for the security of it, and

17   the fraud has set him back.  It's compromised his education,

18   it's compromised his family security, and it has caused

19   emotional distress that he wrote about in his letter.

20           One more.  A couple in the later stages of their life,

21   both in their late sixties, they invested their life savings,

22   Sneh Patel and her husband.  They lost sleep.  They were

23   embarrassed and ashamed for being what they described as

24   gullible, depressed.  They had to work to support themselves.

25   They had to return back to work after they retired.  They

1    suffered physically as a result.  They are uncertain whether

2    they will have to work for the rest of their lives.

3            Mr. Mukasey said this crime is different than the

4    other crimes described in the government's sentencing

5    submission because Mr. Bankman-Fried did not look people in the

6    eyes as he was stealing their money.  I disagree.  It's because

7    nowadays a defendant can look people in the eyes through

8    Twitter, through social media, through the Internet.  And

9    that's exactly what happened here.  He told them their money

10   was safe.  He said trust me.  He put himself in the forefront

11   and he caused these people losses.  It's not the result of a

12   process or an unwinding or a liquidity crisis.  It caused

13   immediate harm and that's attributable to his fraud.

14           The second point I want to make, as your Honor

15   considers the sentence here, it's not just about the $8 billion

16   fraud on customers.  As your Honor found, the defendant took

17   $1.7 billion from investors based on lies.  Those investments

18   are now worthless.  A billion dollar fraud from investors alone

19   would necessitate a large prison sentence.  Some of the other

20   cases outlined in the government's submission were just crimes

21   on investors and for less than a billion dollars and resulted

22   in a sentence of 40 or more years.

23           The defendant obtained over a billion dollars from

24   lenders based on false documents and lies and those loans were

25   not repaid.  Two of the lenders went bankrupt.  The companies

1    were destroyed.  Their employees lost their jobs.  And this too

2    would have been a basis for the Court to impose a severe

3    sentence on its own.

4         The evidence also showed at trial that the defendant

5    committed the largest election crime in United States history.

6    He paid a massive bribe, one of the largest individual bribes

7    in United States history.  He lied to banks.  He unlawfully

8    transmitted money.  He interfered, as your Honor found, with

9    the bankruptcy collection, asset collection process.  He

10   obstructed justice.  He committed perjury.

11        It's hard to understand in some ways how a person

12   could be responsible for all of these significant crimes in

13   such a relative short amount of time.  The criminality here,

14   it's massive in scale.  It was pervasive in all aspects of the

15   business.  This was not, as was suggested, a great business

16   that had a problem at the end.  This was a business that was

17   pervaded with criminality throughout, and it was all

18   destructive, and the sentence, we submit, has to reflect that.

19        Then the final point I want to make, your Honor, is

20   the danger that the defendant poses and the risks that he will

21   commit crimes again in the future.  Our submission outlines

22   good reasons to believe the defendant could commit crimes

23   again:  The number of crimes he committed, the commission of

24   criminality while on pretrial release, the efforts he took to

25   rehabilitate and rebrand his image, his own writings reveal a

1    plan to relaunch FTX or something similar, to change his image,

2    to revive his story.

3         The Court is, of course, aware of the defendant's

4    false statements during the commission of the crimes, after the

5    commission of the crimes, postbankruptcy, and then on the

6    witness stand.  And then of course you have the defendant's

7    cost-benefit philosophy that would allow him to justify doing

8    like this again in the future.

9         And Mr. Mukasey said, this the not a defendant who

10   acts with malice.  He acts with mathematics.  While the line

11   sounds good, it's troubling because what it says is that if

12   Mr. Bankman-Fried thought the mathematics would justify it, he

13   would do it again.

14        Now, I don't want to repeat everything we have

15   written, but I do want to point out the following about what we

16   heard today and what was in some of the reply briefs.

17        The replies point to general statements about the

18   typical low risk of recidivism.  They note that

19   Mr. Bankman-Fried has said he screwed up.  And today, of

20   course, we heard Mr. Bankman-Fried talk about mismanagement, a

21   painful few weeks, that he made a mistake.

22        What we did not hear is accepting responsibility for

23   lying, for stealing, or for fraud.  He recognizes errors were

24   made.  He does not recognize, though, that they were because of

25   wrongs he committed.  He didn't swear off doing it again.  As a

1    matter of fact, I was struck at the end by the comments that

2    there is an opportunity here, that there is an opportunity that

3    someone, maybe his former coworkers, maybe someone else, could

4    relaunch FTX, or something of an equivalent and, without the

5    mismanagement or the liquidity crisis, things could work out.

6    And that, I submit, tells the Court exactly where things could

7    have.  We cannot see into the future.

8            But the defendant's statements today express not one

9    of acceptance of responsibility but one of recognizing errors

10   that, had they not been committed, could have let him get away

11   with it for longer, so a sentence here is necessary of at least

12   40 years to ensure that the defendant cannot do it again.

13           One final comment.

14           Mr. Mukasey, in his writings and today, asserted that

15   the government has painted Mr. Bankman-Fried as a villain or a

16   monster, and never once have we said that.  That's attacking a

17   straw man.  And at the same time they have said that the

18   defendant is virtuous, that people who really know him know he

19   doesn't mean these types of things.

20           I'm reminded by something that the author Diana

21   Henriques wrote about a similar argument that was made by

22   Bernie Madoff.  I think these words apply here.  He is not

23   inhumanely monstrous.  He is monstrously human.  He was greedy

24   to use people's money and advance his own ambition, arrogantly

25   sure of his capacity to pull it off, smugly dismissive of the

1    skeptics, the critics, the rule of law, and his victims.

2           And the fact that Mr. Bankman-Fried spent the money on

3    investments, rather than sports cars, or whatever you might

4    expect for someone classically greedy, does not make him not

5    greedy or does not express a motive of greed.  The fact that he

6    had ambitions that seem altruistic does not make him not

7    ambitious, is not a motive for doing these things.

8           The defendant is not a monster, but he is someone who

9    committed gravely serious crimes that affected hundreds of

10   thousands or more people in indescribable ways.  There is a

11   real possibility that, given the opportunity, he would consider

12   doing it again.

13          So justice and all of the other 3553(a) factors

14   require a sentence of 40 to 50 years.  Thank you.

15          THE COURT:  Thank you, Mr. Roos.

16          I have, of course, considered the sentencing

17   guidelines and the 3553 factors.  I want to make some comments

18   before I get to the actual sentence about things that, to me,

19   are salient.

20          Much that was said, a good deal of it on paper rather

21   than here this morning, about the defendant's background is

22   undisputed.  He had an exceptionally privileged background.  He

23   was raised by loving and devoted parents.  He had every

24   advantage that they could confer on him.  Went to the best

25   private schools.  He went to MIT.  He is extremely smart.  And

he suffers from autism, which is a condition that affects

different afflicted persons very differently frequently.  He, I

gather, is what one would call a very high-achieving autistic

person, which means, among other things, that he's capable of

huge accomplishments, and he has frequently asocial awkwardness

and a way of interacting with people that's unusual and

sometimes off-putting.  I take that all as a given.

          After school he went to Jane Street, a very successful

investment firm, where he was extremely successful, made a lot

of money, gave a lot of it away.  I remember testimony at trial

that I think is relevant here.  I frankly don't remember

whether it was the defendant's testimony or someone else's.

But I remember learning, I think, that the people at Jane

Street were encouraged to play quantitative games, bets to

analyze options in terms of expected value, about which I am

going to have something to say later, and Samuel Bankman-Fried

was all the way in on that.

          He has been exceptionally ambitious and aware of his

talents through his entire life, as far as I can see.

          Ms. Ellison testified he was very ambitious.  He

talked about wanting Alameda and eventually FTX to be

successful and to end up being huge companies that did a wide

variety of things.  He was also very interested in politics and

talked about wanting to use his money to have influence on

politics.  He said at one point he thought there was a 5

1    percent chance he would become president some day.

2         The behavior in this case demonstrates brilliantly the

3    accuracy of that testimony.  Mr. Roos talked about the biggest

4    political financial crime in history, I think that's the way

5    you put it, but something like that.  And indeed

6    Mr. Bankman-Fried did that too, in addition to destroying FTX.

7    And he did it because he wanted to be a hugely, hugely

8    politically influential person in this country.

9         And lest anyone think that his attention was devoted

10   all to the left end of the spectrum, it wasn't.  I don't know

11   how the numbers worked out in terms of contributions on each

12   side, but he set up a vehicle for making political donations to

13   the right through straws that wouldn't come back to him.  But

14   the goal was just the same as the donations the other way.  It

15   was influence for Samuel Bankman-Fried.

16        Some of this at one point might have been attributed

17   to his having presented himself as the good guy all in favor of

18   appropriate regulation of the crypto industry which, in the

19   United States, relatively speaking, was unregulated, at least

20   in the way that the securities industry and the commodities

21   futures industry are regulated.  In my judgment, that was an

22   act, and he admitted it, ultimately.

23        Shortly after the bankruptcy, I believe on November 16

24   or 15, he was interviewed by a reporter named Kelsey Piper,

25   whom he knew well and with whom he had talked before.  And in

1   the course of a much longer conversation Ms. Piper said to

2   Mr. Bankman-Fried:  You said a lot of stuff about how you

3   wanted to make regulations, just good ones.  Was that pretty

4   much just PR too?

5            "THE DEFENDANT:  There is no one really out there

6   making sure good things happen and bad things don't.  Usually,

7   there is only one toggle:  Do more or do less.  Yeah.  Just PR.

8   Fuck regulators.  They make everything worse.  They don't

9   protect the customers at all."

10           The goal was power and influence.

11           We mentioned a moment ago, and Mr. Roos certainly did,

12   and appropriately so, expected value and how -- I think Mr.

13   Mukasey did as well, how this is an individual who was a math

14   nerd who looked at decisions in terms of math, expected value.

15   You might say cost-benefit analysis, but that's not their

16   terminology.

17           I am going to read you something else that Caroline

18   Ellison said:

19   "Q.  During your time working with the defendant, how, if at

20   all, did he describe his approach to risk taking?

21   "A.  He described himself as truly risk neutral, meaning that

22   most people are risk averse, meaning that they would rather not

23   take a risk if they don't have to, or they try to avoid risks.

24   But he said that he was totally comfortable taking a risk as

25   long as he thought it was a positive EV, EV meaning expected

1    value.

2    "Q.  What do you mean by positive EV?

3    "A.  EV stands for expected value, so that was a term that we

4    used a lot when talking about trading.  So, yeah, positive EV

5    just means that sort of, on average, you expect it to pay off

6    well, even if maybe there are lots of cases where you will end

7    up with zero, or you'll end up losing lots of money, because

8    there are like some cases where you make a lot of money.

9    "Q.  Did the defendant ever give any example to describe his

10   approach to risk taking?

11   A.  Yeah.  He talked about being willing to take large coin

12   flips, like a coin flip where if it comes up tails you might

13   lose $10 million.  But if it comes up heads, you make slightly

14   more than $10 million.

15   "Q.  Did he ever give other coin-flip examples?

16   "A.  Yeah.  I guess he also talked about this in the context of

17   thinking about what was good for the world, saying that he

18   would be happy to flip a coin if it came up tails and the world

19   was destroyed.  As long as if it came up heads, the world would

20   be like more than twice as good.

21              (Continued on next page)

22

23

24

25

1          THE COURT:  In other words, a man willing to flip a

2     coin as to the continued existence of life and civilization on

3     earth, if the chances were imperceptively greater that it would

4     come out without that catastrophic outcome, that's really a

5     leitmotif in my judgment of this entire case.

6          Mr. Bankman-Fried knew for a protracted period that

7     Alameda was spending large sums of FTX customer funds on risky

8     investments, political contributions, Bahamas real estate, and

9     other things in circumstances in which FTX was seriously

10    exposed to downside of market deterioration, loan calls, and

11    other risks.  He knew that FTX customer funds were not to be

12    used for those purposes, they were not his to use, and that his

13    use of them was not only wrong.  It was flatly inconsistent

14    with the image of safety and security that he vigorously and

15    endlessly portrayed for himself and his company to the world

16    and to prospective investors and customers.  He was betting on

17    expected value.

18         In the head of this mathematical wizard, his own

19    counsel tells us, in substance, that he was viewing the cost of

20    getting caught, discounted by probability or improbability,

21    against the gain of getting away without getting caught, given

22    the probabilities.  That was the game.  It started at least as

23    early as Jane Street and it continued to the very end.  It's

24    his nature.  And you don't have to take my word for it —

25    everybody has said that.

54

1          So that's one point I think appropriate to make.

2          Another thing that I think is important in this

3    equation are the protestations of sorrow about the losses to

4    and the disruptions of customers that were caused.

5    Mr. Bankman-Fried, no doubt, very well advised and

6    appropriately so, says, "mistakes were made."  I think one of

7    his pithier expressions was, "I fucked up," but never a word of

8    remorse for the commission of terrible crimes.

9          Now, Mr. Bankman-Fried has the right to put the

10   government to its proof, to plead not guilty, go to trial, and

11   see if the government can prove his guilt beyond a reasonable

12   doubt.  I don't hold that against him.  I want to be very clear

13   about that.  Everybody's got that right.  But, at the end of

14   the day, I keep coming back to Ms. Ellison's testimony that I

15   read to you a few minutes ago.  He knew it was wrong, he knew

16   it was criminal, he regrets he made a very bad bet about the

17   likelihood of getting caught, but he's not going to admit

18   anything, as is his right.

19          A word about specific deterrence.

20          There is absolutely no doubt that Mr. Bankman-Fried's

21   name right now is pretty much mud around the world, but one of

22   the things he is is persistent, and another of the things he is

23   is a great marketing guy.  Mr. Roos is right that the outlines

24   of Sam Bankman-Fried's revised version of his story are clear

25   to everybody as we sit here.  The same skills and drive that

1    had him, even after his arrest, pitching his story to a huge

2    number of media people — and he had every right to do that, we

3    had a big discussion of that in the bail context — demonstrates

4    that he knows how to do it and the will is there.  The mistakes

5    were made, other people are to blame, the bankruptcy people

6    screwed up, this lawyer had a conflict of interest, that lawyer

7    the other thing.  It doesn't take much of an imagination to see

8    the outlines of the campaign.  I certainly am not prescient, I

9    make no such claim.  But there is a risk that this man will be

10   in a position to do something very bad in the future, and it's

11   not negligible risk, not a negligible risk at all.  So, in

12   part, my sentence will be for the purpose of disabling him, to

13   the extent that can appropriately be done, for a significant

14   period of time.

15          We had some talk about general deterrence.

16   Mr. Mukasey is a very fine defense lawyer.  I think it is fair

17   to say I've seen him on both sides of the bar for his entire

18   career, and I've heard these arguments about general deterrence

19   probably deployed by him against and in favor of defendants,

20   but I can't swear to that.  I've certainly heard a lot of good

21   lawyers deploy those arguments both ways.  But the argument

22   just isn't all that persuasive.  I appreciate that part of the

23   premise of substantial punishment for the purpose of general

24   deterrence makes assumptions about the mental processes by

25   which people decide to commit crimes that are, for many crimes

1    and many people, just not sensible assumptions.  The

2    assumptions maybe have more validity in white collar cases

3    where people, I think more often than we can give credit for,

4    think about the risk of getting caught and what getting caught

5    means before embarking on criminal behavior of certain kinds,

6    but that's ultimately not here or there for me.  What's here or

7    there for me, Mr. Mukasey already alluded to.

8           At the end of the day, the criminal justice system in

9    this country or any country can enjoy the support of the

10   population, which is essential to its functioning in more ways

11   than I could describe, only if on the whole people think it

12   works fairly that guilty people get their just deserts, that

13   innocent people aren't wrongly convicted, and that they can get

14   their arms around the case as they hear about it -- say, "well,

15   I might have decided that a little differently, but it sounds

16   reasonable, it sounds fair."  That's what we depend on.  If

17   that's not happening, we're back to trial by combat, folks, or

18   something like it.  And so, the judgment has to adequately

19   reflect the seriousness of the crime, and this was a very

20   serious crime.

21          Naturally, folks, I have misplaced a piece of paper

22   that I need, so bear with me while I find it.

23          The defendant will rise for the imposition of

24   sentence, please.

25          As I said at the beginning, I've considered all of the

1  3553 factors, the Sentencing Reform Act, the sentencing

2  guidelines, the presentence report, and the enormously

3  voluminous submissions of the lawyers, not just voluminous, but

4  good submissions.  I know that the probation department has

5  recommended a sentence of 105 years and the government a

6  sentence of 40 to 50 years.

7         I've concluded that the sentences recommended by the

8  probation department and the government would be substantially

9  greater than is necessary to serve the purposes of the

10  Sentencing Reform Act.  Nobody should misunderstand, I'm not

11  saying that the defendant didn't commit very serious crimes, I

12  am not diminishing in any way the enormous harm that he did,

13  the brazenness of his actions, his exceptional flexibility with

14  the truth, his apparent lack of any real remorse, and the need

15  to deter others engaging in comparable behavior.

16         I also want to add one further thought.  I did not

17  think it a fruitful use of time to spell out every time I

18  thought Mr. Bankman-Fried testified willfully and knowingly

19  falsely at trial.  There are more than the ones I've

20  articulated, but that suffices.

21         And when he wasn't outright lying, he was often

22  evasive, hairsplitting, dodging questions and trying to get the

23  prosecutor to reword questions in ways that he could answer in

24  ways he thought less harmful than a truthful answer to the

25  question that was posed would have been.  I've been doing this

1    job for close to 30 years.  I've never seen a performance quite

2    like that.  All of that said, I am not going to impose a

3    sentence of 40 years, let alone 105 years.

4              It is the judgment of this Court, Mr. Bankman-Fried,

5    that you be committed to the custody of the Attorney General of

6    the United States for a term of imprisonment of 240 months on

7    each of Counts One through Four, and Count Seven.  The terms on

8    Counts One, Two, and Seven shall be served concurrently with

9    each other.  The term on each of Counts Three and Four shall be

10   served concurrently with each other.  The first 180 months of

11   the terms on each of Counts Three and Four shall be served

12   concurrently with the terms on Counts One, Two, and Seven.  The

13   balance of 60 months on the terms of each of Counts Three and

14   Four shall be served consecutively to the terms on Counts One,

15   Two, and Seven.  It is further adjudged that you be committed

16   to the custody of the Attorney General of the United States for

17   a term of imprisonment of 60 months on each of Counts Five and

18   Six.  The terms on Counts Five and Six shall be served

19   concurrently with each other, consecutively to those on Counts

20   One, Two, and Seven, and concurrently with the 60-month

21   portions of the terms on Counts One, Two, and Seven, and

22   concurrently with the 60-month portions on the terms on Counts

23   Three and Four that are to be served consecutively to the terms

24   on Counts One, Two, and Seven.  The foregoing results in an

25   aggregate term of imprisonment of 300 months.

1        You thereafter shall serve a term of three years on

2   supervised release, and you shall pay the mandatory assessment

3   of $700.

4        The term of supervised release shall be subject to the

5   mandatory, the standard, and the special conditions set forth

6   at pages 56 to 58 of the presentence report, which you

7   indicated you have read.

8        Does any counsel want me to read the conditions

9   verbatim?

10        Mr. Mukasey.

11        MR. MUKASEY:  No need, Judge.

12        MR. ROOS:  No, your Honor.

13        THE COURT:  It is further adjudged, Mr. Bankman-Fried,

14   that you forfeit to the United States the sum of

15   $11,020,000,000, including the specific property identified in

16   the preliminary order of forfeiture that I will be signing

17   today, all on the terms and conditions there set forth.  I

18   decline to order restitution due to the complexity of the case

19   and the number of victims.  I instead grant the government's

20   motion to authorize the United States to compensate victims

21   with finally forfeited assets through a recognition process as

22   restitution would be impractical in this case.

23        I strongly recommend to the Bureau of Prisons that

24   defendant be designated initially to a medium security facility

25   or any lower security institution the BOP considers

1    appropriate, and I do so for two reasons.  First, I have no

2    reason to believe that the defendant would initiate any act of

3    violence against another prisoner or any BOP staff, and he

4    therefore does not require the close confinement of a maximum

5    facility institution that, in part, is designed to prevent such

6    acts.  Second, defendant's notoriety.  His association with

7    vast wealth — regardless of his present and actual financial

8    resources — and his autism and social awkwardness are likely to

9    make him more than usually vulnerable to misconduct by other

10   inmates in the environment of a maximum security facility.  I

11   further recommend that the designated facility be as close to

12   the San Francisco Bay area as possible for the purpose of

13   facilitating family visitation.

14        I advise you, Mr. Bankman-Fried, that you have the

15   right to appeal from the judgment imposing this sentence.  If

16   you wish to appeal from the judgment, you must file a written

17   notice of appeal to the clerk of the district court no later

18   than 14 days after the date of the judgment is entered, which

19   could be as soon as today.  In the event you wish to appeal and

20   can't afford to pay the fees necessary to do so, you have the

21   right to apply for permission to appeal as a poor person.  If

22   that application were granted, you'd be permitted to appeal

23   without payment of the fees.  And if you couldn't afford

24   counsel, counsel would be appointed at public expense to

25   represent you on appeal.

1          You may be seated.

2          Now, I also suspend the mandatory drug testing

3    condition because I regard the defendant as a low risk of

4    substance abuse.

5          All of that said, I invite counsel, if they think I

6    made a demonstrable error of fact than something you just wish

7    I'd come out differently on, but a factual error that you think

8    is material to bring to my attention, and if I agree with you,

9    I'll change it.

10          Mr. Mukasey.

11          MR. MUKASEY:  Nothing from us, Judge.

12          THE COURT:  Mr. Roos.

13          MR. ROOS:  Just two very minor matters from us, your

14    Honor.

15          One, just in light of a circuit precedent, would you

16    also just allocute the defendant that he doesn't need you to

17    read the conditions out loud.

18          THE COURT:  All right.  I thought counsel had the

19    ability to do that, but, Mr. Bankman-Fried, would you like me

20    to read the conditions to which I referred out loud to you all

21    in court?

22          THE DEFENDANT:  No.

23          THE COURT:  Thank you.

24          MR. ROOS:  Thank you, your Honor.

25          The other item would just be to the extent there are

1  open counts or underlying indictments, the government would

2  move to dismiss them.

3          THE COURT:  They're dismissed.

4          Are there any other requests by the defendant for

5  recommendations?

6          MR. MUKASEY:  Judge, we may submit, a little later

7  this afternoon, some particular language that I understand is

8  perhaps persuasive to the Bureau of Prisons with respect to

9  designation.  I think your Honor made all the right noises in

10  your reading of the proposed recommendation, but we may be

11  able -- in fact, I think I can hand up to Andy some of the

12  language that may tick the right toggles for us.

13          THE COURT:  Let me see it.  Show it to Mr. Roos first.

14          MR. MUKASEY:  It's probably the formal version of

15  perhaps the more colloquial things that you said.

16          THE COURT:  I will do something close to this, but not

17  exactly like this.

18          MR. MUKASEY:  If the 10-day --

19          THE COURT:  Well, that's one of the things I was

20  proposing to leave out.  Why is --

21          MR. MUKASEY:  We're on the same page.  I don't think

22  that that kind of deadline is necessary.

23          THE COURT:  And giving the Bureau of Prisons deadlines

24  is only an invitation for missed deadlines.

25          MR. MUKASEY:  Thank you, your Honor.

1            THE COURT:  There's no objection, I take it, Mr. Roos?

2            MR. ROOS:  No, your Honor.

3            THE COURT:  Anything else we can usefully accomplish

4    this afternoon?

5            MR. MUKASEY:  No, thank you.

6            THE COURT:  Okay.  I thank counsel on both sides for

7    all 18 or 1900 pages.

8                                    *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25