UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

RYAN SALAME,

        Defendant.

Case No. 22 Cr. 673
(LAK)

<br/>

## DEFENDANT'S SENTENCING MEMORANDUM

<br/>

Jason Linder
MAYER BROWN LLP
1999 K Street Northwest
Washington, DC 20006
(202) 263-3207
jlinder@mayerbrown.com

Gina M. Parlovecchio
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
gparlovecchio@mayerbrown.com

*Attorneys for Ryan Salame*

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................ 1

II.   RYAN'S PERSONAL HISTORY AND CHARACTERISTICS ...................................... 3

    A.    Early Life and Family ................................................................ 3

    B.    Education and Early Work History ................................................... 4

    C.    Alameda ............................................................................. 6

    D.    FTX Digital Markets ................................................................. 9

    E.    Ryan's Political Activity ........................................................... 10

    F.    Ryan's Philanthropic Efforts ....................................................... 11

    G.    Substance Abuse .................................................................... 14

    H.    Current Family Life ................................................................ 14

    I.    Ryan's Cooperation with the Government's Investigation and Prosecution ......... 15

    J.    Ryan's Payment of Restitution ...................................................... 16

III.  OBJECTIONS TO THE PRESENTENCE REPORT ............................................... 16

IV.   THE COURT SHOULD GRANT A SUBSTANTIAL VARIANCE UNDER 18 U.S.C. § 3553(A) ........... 17

    A.    Standard for Granting a Downward Variance .......................................... 18

    B.    Nature and Circumstances of the Offense ............................................ 20

        1.    Ryan's Role in the Unlicensed Money Transmitting Offense ................... 21

        2.    Ryan's Role in the Campaign Finance Conspiracy ............................. 22

    C.    A Downward Variance Will Avoid Unwarranted Sentencing Disparities ............... 22

    D.    Ryan's Personal History and Characteristics ........................................ 25

        1.    Personal and Educational Background ....................................... 25

        2.    Current Family Role ....................................................... 26

        3.    Philanthropy and Community Service ........................................ 26

        4.    Attempted Cooperation ..................................................... 28

    E.    Ryan Has Satisfied His Restitution and Made Substantial Strides Toward Satisfying Forfeiture ........................................................... 29

    F.    The Purpose of Retribution and Adequate Deterrence Does Not Warrant a Lengthy Sentence ................................................................. 29

        1.    Specific Deterrence ....................................................... 29

        2.    General Deterrence ........................................................ 31

    G.    The Sentences for Counts One and Two Should Run Concurrently ................... 32

**Page**

V.     CONCLUSION.................................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re FTX Trading Ltd.*,
    No. 22-11068-JTD (Bankr. Del.) .....................................................................11, 16

*Gall v. United States*,
    552 U.S. 38 (2007) ...........................................................................................18, 19

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ............................................................... *passim*

*United States v. Alshafei*,
    No. 15-cr-34, Dkt. No. 50 (W.D. Wash.Jan. 22, 2016) .........................................23

*United States v. Bankman-Fried*,
    No. 22-cr-673 (S.D.N.Y) ................................................................................. *passim*

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008) (*en banc*) .................................................................18

*United States v. Cohen*,
    No. 22-cr-265, Dkt. No. 29 (E.D. Pa. Mar. 27, 2024) ...........................................23

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013)...................................................................................19

*United States v. Dorvee*,
    616 F.3d 174 (2d Cir. 2010)...................................................................................18

*United States v. Edwards*,
    595 F. 3d 1004 (9th Cir. 2010) ..............................................................................31

*United States v. Fitch*,
    No. 16-cr-123, Dkt. No. 19 (S.D. Cal. Apr. 14, 2016) ...........................................23

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012)........................................................20, 25, 30

*United States v. Hayes*,
    No. 20-cr-500 (S.D.N.Y.) ................................................................................23, 24

*United States v. Johnson*,
    No. 16-CR-457-1, 2018 U.S. Dist. LEXIS 71257 (E.D.N.Y. Apr. 27, 2018) .........20

*United States v. Nesbeth*,
    188 F. Supp. 3d 179 (E.D.N.Y. 2016) ..................................................................31

*United States v. Ofer*,
    No. 21-cr-00174, Dkt. No. 98 (E.D.N.Y. Aug. 31, 2023) ......................................23

*United States v. Panzera*,
    No. 11-cr-591, Dkt. No. 106 (E.D.N.Y. June 20, 2014) ........................................23

*United States v. Parnas*,
    No. 19-cr-725 (S.D.N.Y. 2019) ........................................................................24, 25

## Statutes

18 U.S.C. § 3553(a) ............................................................................ *passim*

18 U.S.C. § 3584(a) ....................................................................................32

## I.   PRELIMINARY STATEMENT

The discovery in November 2022 that FTX was a fraud, let alone one that may have stolen billions from customers, was as shocking and dismaying to Ryan Salame as to everyone else in the world.  As was true for thousands of other FTX employees, customers, investors, and lenders, Ryan lost years of hard work and nearly his entire net worth almost instantaneously.

Ryan, who was not part of Sam Bankman-Fried's innermost circle, was unaware of the crimes at the center of this case.  As Caroline Ellison testified at Bankman-Fried's trial, even as the FTX exchange was collapsing on November 6, 2022, she and Bankman-Fried conspired to keep Ryan in the dark about their fraud, misleading him just as they had misled the rest of the world.[1]

While Ryan has fully accepted responsibility for the crimes to which he has pleaded guilty—conspiracy to operate an unlicensed money transmitting business and to engage in campaign finance fraud—he had absolutely no knowledge that the four people at the center of Alameda and FTX had conspired to lie and to steal from their customers.  Ryan stole from no one.  He did not lie to customers.  And he was duped, as was everyone else, into believing that

---

[1] "Q. Looking at the bottom here you wrote: Ryan is asking me if FTX can meet all withdrawals. What should I say. Who is Ryan?
A. That's Ryan Salame. He was an employee at FTX.
Q. Why are you asking about what to say to Ryan about whether FTX could meet all withdrawals?
A. I mean, I knew that FTX could not meet all withdrawals, but that was a fact that we had tried to conceal in the past, and I was wondering whether I should continue trying to conceal it or just start being honest with people about it once it was becoming evident . . . .
Q. Can you read the defendant's message?
A. It says: Maybe something like we can meet a ton, though it's already getting large.
Q. What's IDK?
A. I don't know.
Q. At that point in time what did you think was the accurate response to Ryan Salame's question as to whether FTX could meet all withdrawals?
A. I thought the accurate response was, no, we could not."

Trial Transcript at 897:11-898:8, *United States v. Bankman-Fried*, No. 22-cr-673, Dkt. No. 360 (S.D.N.Y. Dec. 12, 2023).

the companies were legitimate, solvent, and wildly profitable. Indeed, when he finally understood the FTX fraud, he was the first person to blow the whistle to authorities in the Bahamas who regulated FTX Digital Markets ("FDM"), FTX's Bahamian subsidiary Ryan headed.

During the three years that Ryan spent as an employee, and then as an executive, at Alameda and FDM, he had his own lapses in judgment. But, at each turn, his actions were motivated by the desire to build a thriving, lawful business that served customers well and to advance the utility of cryptocurrency for societal good. He facilitated FTX customers' onboarding and offboarding of fiat currency through a bank account owned and operated by an Alameda subsidiary to provide them better service and better access to a trading platform he believed to be legitimate. In doing so, he truly believed he was helping customers—not acting as a link in the chain that would eventually lead to their harm. Similarly, Ryan made donations using money transferred from Alameda to political action committees and candidates who were both supportive of cryptocurrency and biosecurity causes, believing those policies would benefit society.

Over the past year and a half, Ryan's life has been decimated in nearly every possible way and in very public fashion. He went from becoming an executive in a world-famous company he believed was legitimate to suffering complete financial and professional ruin. He has brought shame and instability to his family, his life partner, and others in his life with whom he has close relationships.

Facing those setbacks, Ryan has started a new chapter in his life. In addition to accepting responsibility for his crimes, he welcomed his first child with his longtime partner in November 2023. He has begun to grapple seriously with a substance abuse problem that had plagued him

during the course of his criminal conduct. He has also devoted the past year to volunteering for an organization that creates educational materials for prisons, focusing on creating material that teaches incarcerated individuals about emerging technologies to better equip them to reenter society and be gainfully employed. Ryan has decided to pursue a law degree; he has taken the LSAT and has built relationships with formerly incarcerated individuals who were able to pass the bar, become lawyers, and help less fortunate individuals. Finally, in part to atone for any harm he has caused to the democratic process through his crimes, Ryan has begun laying the groundwork for an organization that will make it easier for constituents to connect with their representatives.

Ryan is a fundamentally decent person, regarded by those who know him well as "the warmest, most generous, friendliest, and most caring" and a "hard working, generous, old soul." Ex. A-2 (Ltr. From Paul Aranha); Ex. A-11 (Ltr. From B. Ferrando). He is "loyal and dedicated to his family and friends" and his community. Ex. A-11. He is still only thirty years old and has decades ahead of him to contribute positively to the world. He is devoted to his young family and never meant to harm anyone. In fact, as explained below, he has spent much of his young adult life helping others in his community. His record, until this case, was spotless. For the reasons that follow below, we respectfully request that the Court impose a below-Guidelines sentence of eighteen (18) months' imprisonment in addition to the substantial restitution and forfeiture obligations to which Ryan has agreed and has already made substantial strides in meeting.

## II.    RYAN'S PERSONAL HISTORY AND CHARACTERISTICS

### A.    Early Life and Family

Ryan had a working-class upbringing in a small rural town in the Berkshires of Massachusetts. Born on August 27, 1993, Ryan was raised by his parents, Susan and Michael

Salame in Sandisfield, Massachusetts.  His mother was a radiologic technologist, and his father served as a police officer and then worked in construction.  While his parents were at work, Ryan's grandmother—who had had substance abuse issues of her own but who had achieved thirty years of sobriety when she passed away in 2007—looked after Ryan and his older brother Scott.

From an early age, Ryan excelled in academics and extracurricular activities.  Starting in second grade, Ryan began studying Tae Kwon Do, eventually obtaining a fifth-degree black belt and competing internationally.

Ryan applied this same level of determination and developed a strong work ethic through his teenage years.  At twelve years old, Ryan started a lawn mowing business.  Several years later, at fifteen, he began working as a busboy at Martin's Restaurant in a neighboring small town in the Berkshires, and displayed his "solid character" and "strong work ethic."  Ex. A-15 (Ltr. of R. Hyman).  "Whether doing dishes, clearing tables, serving meals or other tasks, he was dependable, conscientious and determined to help the owner in any way he could.  People could rely on Ryan to be there and do what was asked of him."  *Id.*  Throughout high school, Ryan taught Tae Kwon Do to children at the Martial Arts Institute of the Berkshires.  In this role, Ryan embraced the lesson that "barriers can be overcome by hard work and determination," and he was regarded as one of the "top instructors" during his high school years.  Ex. A-5 (Ltr. of T. Brown).  During the summer, Ryan worked for catering companies and started his own small businesses, including an iPod repair business.

### B.     Education and Early Work History

In 2011, Ryan enrolled at the University of Massachusetts, Amherst and majored in accounting and economics.  Ryan worked while attending school full time, including stints in the college dining hall, rock climbing gym, and at a Pew Research call center.  With the help of

loans and work, Ryan supported himself through college. Over the summers, he continued working back home at Martin's Restaurant and with multiple catering companies. He also volunteered to provide free tax preparation to less fortunate members of the local community. In 2015, Ryan graduated *cum laude* with a dual degree in accounting and economics, with a minor in African-American studies.

While in college, in addition to balancing his busy class and work schedule, Ryan "distinguished himself as much in academia as he did in community service." Ex. A-18 (Ltr. of Prof. J. Merton). Ryan participated in a cross-country charity bike ride from Connecticut to California, which raised money for affordable housing and included stops along the course to build affordable housing. *See* Ex. A-15 (Ltr. of R. Hyman). Ryan also became involved in a support team for an individual who participated in a cycling race, Race Across America, to raise money for a scholarship fund for underserved college students. *See* Ex. A-11 (Ltr. of B. Ferrando).

During his senior year of college, Ryan interned in Ernst & Young's Boston office, working 80-hour weeks. Ryan did well there and accepted an offer for full-time employment after his college graduation. As a full-time employee, Ryan "arrived early each day and stayed until the job was done," "took his work seriously," and received excellent reviews. Ex. A-25 (Ltr. of K. Spanos). During that same period of time, he enrolled in Georgetown University's Masters of Finance online degree program, and became a registered CPA in 2017. Ryan devoted what little free time he had to volunteer work, including organizing inner city youth study halls, a running club, and charity events to continue raising money for affordable housing and poverty alleviation.

In August 2017, Ryan joined Circle—a cryptocurrency and peer-to-peer payments technology start-up that primarily provided large institutional investors an onramp to purchasing digital assets—as a trade analyst in its Boston office. As a trade analyst, Ryan supported the trading desk and assisted with Circle's compliance and onboarding function, as well as with the reconciliation processes involved in its annual audit. Roughly a year later, in September 2018, Ryan transitioned within Circle to over-the-counter ("OTC") trading and shortly after relocated to Hong Kong to run its local OTC desk. This position helped Ryan build substantial relationships in the crypto community.

In January 2019, while working at Circle's Hong Kong office, Ryan attended Blockchain Week, a conference co-hosted by two then-large players in the cryptocurrency industry: Alameda Research and Binance. There, Ryan met Sam Bankman-Fried and was impressed, as many other powerful, ostensibly perceptive, and wealthy people would continue to be, with Bankman-Fried's intellect and work ethic. Ryan was captivated, too, by Bankman-Fried's stated commitment to improving the world, as many continue to be.[2] Several months after that initial encounter, Bankman-Fried hired Ryan to join Alameda.

### C. Alameda

At Alameda, Ryan served as the Head of OTC Trading.[3] Ryan's greatest value to Alameda (and later to FDM) was his talent for people, operations, and logistics—for building relationships and getting things done. Ryan quickly distinguished himself for not only his professional dedication but also his kindness. One former co-worker noted that, during their

---

[2] *See* Sentencing Submission, Exhibit A, *United States v. Bankman-Fried*, No. 22-cr-673, Dkt. No. 407 (S.D.N.Y. Feb. 27, 2024).

[3] Unlike OTC trading in the traditional securities context, OTC trading in the cryptocurrency context consists of two parties trading digital assets or currency directly, without using an exchange or other centralized platform. Laura Shin, *What Are Crypto OTC Desks And How Do They Work?*, COINDESK (Jan. 11, 2024, 4:00 PM), https://www.coindesk.com/learn/what-are-crypto-otc-desks-and-how-do-they-work/.

regular 18-hour days, Ryan "was always the one to notice if I had missed a meal during these grueling stretches and would leave food on my desk, a small act of kindness that exemplified his thoughtful nature." Ex. A-28 (Ltr. of T. Tsui).

Among other roles, Ryan served a business development function where he engaged with customers and sought to expand Alameda's relationships with its lenders. Ryan was also active in hiring accountants and teams to reconcile Alameda's books to keep pace with the company's rapid growth.

After Bankman-Fried launched the FTX cryptocurrency exchange in May 2019, Ryan and his team facilitated the acceptance of wire deposits of fiat currencies from FTX customers into Alameda's accounts at Silvergate Bank, a bank that serviced almost exclusively crypto companies. Once Alameda received the wire deposit, the team Ryan supervised would credit the FTX customer an equivalent amount in stablecoin on their FTX account.

This method was one of several by which FTX customers could onboard USD stablecoin onto the FTX exchange. Ryan believed that the conversion of fiat currency to USD stablecoin through accounts controlled by Alameda facilitated FTX customers' access to a sophisticated and useful cryptocurrency exchange platform. Misguided as it was, given that Alameda did not have a money transmitting license,[4] Ryan truly believed he was meeting customer demand—and providing better service to them—by facilitating these wires, while customers clamored for a more convenient means to onboard and offboard their fiat currency to and from FTX.[5]

---

[4] Ryan understood that there were in-house counsel who were responsible for obtaining these licenses.
[5] Notably, the presentence investigation report ("PSR") notes that $1.5 billion attributed to Ryan's involvement in the conspiracy to commit unlicensed money transmitting comprised transactions either when "customers deposited or withdrew" fiat currency. PSR ¶ 32. The government has proffered that deposits to Alameda and North Dimension accounted for only $10 million (less than one percent of the figure cited in the PSR), which suggests that a greater proportion of Ryan's conduct allowed funds to leave the platform.

Ryan believed that onboarding fiat currency in this way made up only a small fraction of the money that customers moved onto and off of the FTX platform. The vast majority of users onboarded and offboarded funds by other means, primarily by transferring cryptocurrencies directly between FTX and another exchange.[6] As part of the conversion process, the settlement team that Ryan supervised at Alameda communicated with FTX customers concerning wires to or from Alameda's accounts and provided assistance in the event an intermediary bank stopped a wire.

Nonetheless, as the volume of FTX's trading business rapidly grew, so, too, did the volume of customers seeking to convert fiat currency to USD stablecoin through wires to and from Alameda. Intermediary banks halted those wires with increasing frequency. Ryan understood that intermediary banks typically halted these wires because they could see in the wire instructions that Alameda or FTX (both prominent cryptocurrency firms) had a connection to the transaction, and the intermediary banks wanted to avoid the risk of being involved in cryptocurrency-related transactions. Silvergate employees assisted in resolving issues related to the stopped wires. Even with that assistance, however, customers found the process of resolving stopped wires burdensome; it could take weeks or longer for them to get their money back.

Ryan understood that to avoid suggesting that the wires were affiliated with a known cryptocurrency firm, Bankman-Fried directed Alameda employees, including Alameda's General Counsel, Dan Friedberg, to incorporate North Dimension—a new entity with no publicly known connection to Alameda or FTX—to replace Alameda in accepting FTX customers' USD wires.[7]

---

[6] To contrast the amount at issue here with how much value was on the FTX platform as a whole, at its peak, FTX was handling $14 billion in trading volume every day. Over a five-month span, Ryan conspired to transmit a total of about $1.5 billion without proper licensing, most of which was funds customers were offboarding.

[7] Although North Dimension did not have a publicly known connection to Alameda or North Dimension, its website, which is still available as of the date of this filing at www.northdimension.org, did and does indicate it is a cryptocurrency company.

In 2021, Ryan participated with Friedberg and others in the opening of an account for North Dimension at Silvergate Bank. Ryan, again, did so with the belief that the account would help FTX customers by avoiding difficulties relating to onboarding or offboarding fiat currency to the exchange, even though it did not possess the proper license.

### D.    FTX Digital Markets

As one of the few Alameda employees skilled in operations, Bankman-Fried and others consistently asked Ryan to help with a wide variety of tasks, and the hours became grueling. By August 2021, Ryan was burned out and expressed a desire to leave Alameda. Friedberg, the general counsel, instead persuaded Ryan to take a position with the title of CEO of FDM, a Bahamian entity through which FTX could be regulated as a digital asset business under the Bahamas's Digital Assets and Registered Exchanges Act. At the time, Ryan believed the position would afford him a greater work-life balance, as he would be alone in the Bahamas while the rest of the company's personnel remained in Hong Kong. Ryan moved, alone, to the Bahamas in August 2021 and began serving as the CEO of the Bahamian subsidiary, while Bankman-Fried retained control over the parent and other entities.

Functionally, the company remained the same. and Bankman-Fried remained in full control of the company. In fact, at this time, while Ryan worked to help create ways to integrate FTX into the community in the Bahamas and made other efforts to support the community, he was functionally uninvolved in the company's decision making. As one of his colleagues, FDM's outside counsel in the Bahamas, observed in her two years knowing him, Ryan was "straightforward, honest and meticulous in his dealings with others and about compliance with the law." Ex. A-12 (Ltr. of A. Maynard Gibson).

### E.     Ryan's Political Activity

Shortly after he started his role as the CEO of FDM, Ryan became more politically involved and dedicated himself to using his own resources to support political causes in which he had a personal interest.  In September 2021, Ryan and two other individuals, neither of whom were affiliated with FTX or Alameda, formed GMI, a nonpartisan political action committee ("PAC") focused on supporting pro-crypto candidates from both major parties running for House and Senate seats.  The PAC aimed to increase support for cryptocurrency without regard to political affiliation.

In light of Ryan's increased political activity, Gabe Bankman-Fried approached Ryan about supporting Guarding Against Pandemics ("GAP"), a PAC that Gabe Bankman-Fried, Sam Bankman-Fried's brother, established to promote technological innovation to prevent future pandemics.  Thereafter, in January 2022, Ryan met with Republican officials to discuss pandemic preparedness or biosecurity issues.  Ryan was also active in supporting other causes about which he cared deeply, including marriage equality.

In March 2022, Ryan began making personal donations to PACs, independent expenditure committees, and primary candidates who supported the causes in which he had an interest.  Ryan worked with an experienced consulting firm, Allegiance Strategies, LLC, to assist him with this activity.

At Friedberg's suggestion,[8] Ryan funded these political activities with millions of dollars of transfers from Alameda.  Although Alameda's internal ledgers reflected that these transfers were loans to Ryan, and Ryan executed a loan agreement drafted by in-house lawyer Can Sun for

---

[8] In court filings, the FTX Estate stated that Friedberg facilitated "personal 'loans'" and "other means of transfer, including . . . hundreds of millions of dollars in charitable and political contributions." Adversary Complaint ¶ 5, *In re FTX Trading Ltd.*,  No. 22-11068-JTD, Dkt. No. 1727  (Bankr. Del. June 27, 2023).

the first substantial transfer of just under $5 million,[9] Ryan had no intent to repay Alameda for them and understood that the money was not his.

Ryan coupled those donations with substantial and sustained political activity and engagement. Ryan met on multiple occasions with governmental leaders, including Senator Mitch McConnell and then-Congressman Kevin McCarthy. For each meeting, Ryan had a set of talking points and strategies developed in consultation with Allegiance that focused on pandemic preparedness. Whatever the topic, Ryan's ultimate purpose for these meetings was eventually to influence cryptocurrency policy.

### F.     Ryan's Philanthropic Efforts

Those who know Ryan best regard him as an "outstanding member of [the] community" who makes "significant community contributions" and seeks to "make a positive impact in the world." *See* Ex. A-3 (Ltr. of J. Blanchard); Ex. A-1 (Ltr. of Prof. J. Angel); Ex. A-18 (Ltr. of Prof. J. Merton). For example, in the summer of 2020, Ryan used the resources he amassed through his compensation and trading in crypto to buy a number of restaurants in Lenox, Massachusetts, near his hometown, which were struggling because of the COVID-19 pandemic. Having gotten his start as a busboy at a restaurant in the area, Ryan felt a strong connection to the community and wanted to give back. When Lenox's Firefly Gastropub faced closure after the pandemic hurt its sales, Ryan bought it and kept its team of 40 employees intact and working. Jane Blanchard, the manager of the restaurant and a longtime family friend, observed that Ryan's purchase of the Firefly "saved the business and the employees' livelihood." *See* Ex. A-3 (Ltr. of J. Blanchard). Further, Ms. Blanchard states that "Ryan has *always* done right by me and our team. Together, Ryan and I have worked hard to provide a living wage and retain our valuable

---

[9] Ryan also consulted with Friedberg, Joe Bankman, and lawyers at an outside firm to document the subsequent transfers as loans, but those agreements were not drafted prior to FTX's collapse.

staff during and after the COVID-related crisis in the service industry" and that Ryan has "focused on creating a positive environment with happy employees." *Id.*

Ryan's commitment to giving back to the Berkshires extended beyond the restaurant industry. In 2021, Ryan founded the Digital Asset Fund to provide scholarships for students of the two high schools he attended in the Berkshires and his *alma mater* the University of Massachusetts, Amherst.

Ryan has directed his generosity and philanthropic efforts far beyond his hometown. He has also had a positive impact in the communities where he lived. For example, when Ryan lived in the Bahamas, he mentored numerous individuals, helped them obtain work with FTX and ensured that their needs—including childcare and mental health—were met and that they felt valued. Ryan "was responsible for leading the charitable endeavors at FTX in the Bahamas and was the model of what a good corporate citizen could mean for [the Bahamas]." Ex. A-2 (Ltr. of P. Aranha). During his short time in the Bahamas, Ryan's friend, a Bahamian business owner, noted that:

> [Ryan's] work on carbon credit proposals sought to protect our sea beds and mangroves while turning them into revenue generating spaces for our country. He spoke fondly of the tools that he was developing to enable his team to implement literacy and numeracy tutoring programs for elementary school children. He supported their newfound relevancy in business society by allowing them to have time out of their workdays to participate on boards that advanced female empowerment, educational access and scholarships.

*Id.* In addition, Ryan sought to foster the establishment of a flight school that would allow local Bahamians to acquire skills to give them more economic opportunities. Another colleague noted that Ryan "personally visited several soup kitchens and ensured that they were able to feed the hungry and clothe children and the elderly, for whom he was especially concerned." Ex. A-12 (Ltr. of A. Maynard Gibson); *see also* Ex. A-13 (Ltr. of C. Howells) (recounting spending

"countless hours" with Ryan doing community service, including "distributing 2,000 toys to children and supporting local church feeding programs"). Valdez Russell, an individual with whom Ryan worked in the Bahamas, observed that during his time there "Ryan possessed an extraordinary capacity for kindness and thoughtfulness, seeing the inherent goodness in all individuals, irrespective of differing perspectives." Ex. A-21 (Ltr. of V. Russell). In particular, Mr. Russell noted that Ryan's "past endeavors serve as a testament to the positive impact he has had on countless individuals, a ripple effect that will undoubtedly continue to reverberate in the years to come." *Id.* Another person with whom Ryan worked in the Bahamas, Ceri Howells, recalled how Ryan provided opportunities for work for himself and others in need, and observed that "Ryan's social impact on the Bahamian people cannot be overstated." Ex. A-13 (Ltr. of C. Howells).

More recently, since the summer of 2023, Ryan has channeled his desire to help others by volunteering his time for Prison Professors Charitable Corporation, a public benefit corporation that creates and distributes educational content and training programs to help incarcerated people who want to prepare for law-abiding lives and contribute to society after their terms have ended. Ryan has created courses educating incarcerated individuals on the digital economy, which will help them prepare for productive lives upon their release. The program that Ryan helped create included materials in several different formats, including softcover books, audible books and a podcast series. Ryan's work has assisted with the growth of the non-profit so they can have a greater impact on reducing recidivism and "building safer communities [by] improving opportunities for participants to live as contributing law-abiding citizens." Ex. A-23 (Ltr. from M. Santos, Dir. Prison Professors).

Ryan has also begun laying the groundwork for an organization that will make it easier for constituents to connect to their representatives. During Ryan's brief stint in the political arena, he observed the significant barriers that regular constituents faced when trying to communicate their concerns to their representatives, especially on the federal level. Ryan's organization seeks to solve that problem and improve our democratic system.

### G.    Substance Abuse

Despite these professional successes and community connections, Ryan has struggled with substance abuse. Ryan began abusing drugs and alcohol at the age of fifteen. He drank excessively throughout college and in his early career, and by the time he was employed at Alameda, Ryan drank to excess on a daily basis. Ryan also habitually abused drugs during his time at Alameda and FTX.

Until FTX's collapse, Ryan was in denial about his substance abuse problem. The events of November 2022 and the legal process that followed, as well as the birth of his first child and his relationship with his partner's two children, have allowed him to reflect on the impact drugs and alcohol had on his decision making. Ryan is committed to a future of sobriety for himself and his family and has already sought counseling to embark upon the process of seeking it.

### H.    Current Family Life

Ryan lives with his partner, Michelle; their infant child, █████; and her two young children from her marriage. Ryan is a devoted father and seeks to provide his son a quiet, stable environment in which to grow up. Ryan also has a close relationship with Michelle's children for whom he has "become an integral part of her family, serving in a stepparent role to her young kids." Ex. A-27 (Ltr. of S. Trabucco). As one of Ryan's closest friends observed, "I can see how much he means to them." *See id.* One of Ryan's current neighbors noted that "[o]ne aspect of Ryan's character that has particularly impressed me is his unwavering commitment to his

family." Ex. A-24 (Ltr. of A. Schwartz). Ryan spends every other week with Michelle's two young children, during which he cooks dinner for them every night, plays with them, helps them with their homework, assists with their medical appointments, and provides them with love and support. Ryan's close friend observed, Ryan "loves them as though they were his own kids, and they clearly adore him." Ex. A-27 (Ltr. of S. Trabucco). Ryan has watched with anguish the way the prospect of his incarceration has affected them. As a testament to Ryan's devotion to his family, his friend and neighbor observed "Ryan is a true family man." Ex. A-24 (Ltr. of A. Schwartz).

## I. Ryan's Cooperation with the Government's Investigation and Prosecution

Ryan has cooperated with Bahamian and U.S. authorities from the outset of this investigation. As described above, Ryan contacted the Securities Commission of the Bahamas ("SCB"), FDM's regulator, as soon as he learned about the fraud that Bankman-Fried and others had committed. Ryan contacted SCB to alert them to the fact that "assets which may have been held with FTX Digital were transferred to Alameda Research" and that "such transfers were not allowed and therefore may constitute misappropriation, theft, fraud or some other crime." *See* Ex. B at 48 (Affidavit of Christina Rolle). Ryan further informed the SCB that the only three people who had the necessary codes or passwords to transfer clients' assets were Bankman-Fried, Nishad Singh and Gary Wang. *Id.* This information appears to have initiated the Bahamian investigation into FTX and those three individuals. *See id.*

With respect to the government's investigation here in the U.S., Ryan voluntarily produced documents without a grand jury subpoena to the U.S. Attorney's Office and other authorities, identified key documents among the sets he had produced, and provided multiple attorney proffers. After his guilty plea before this Court on September 7, 2023, Ryan further offered assistance and cooperation to the government as it prepared for the Bankman-Fried trial.

From a review of the transcript of that trial, at least some of the questions the government asked during its cross-examination of Bankman-Fried came from information Ryan furnished.

### J. Ryan's Payment of Restitution

As part of his plea agreement with the government, Ryan agreed to pay $5,593,177.91 in restitution to the FTX Estate to help compensate victims of FTX's collapse. Ryan reached an agreement with the FTX Estate that not only satisfies this amount in full but exceeds that amount. *See* Motion to Approve Compromise under Rule 9019, *In re FTX Trading Ltd.*, No. 22-11068-JTD, Dkt. No. 13631 (Bankr. Del. May 1, 2024).

## III.    OBJECTIONS TO THE PRESENTENCE REPORT

Paragraphs 29 and 30 of the PSR state that Ryan, Bankman-Fried, and others "chose the name 'North Dimension' in part to conceal that there was a relationship between North Dimension, Alameda, and FTX.com from banks approving transactions with the North Dimension bank account" (¶ 29), and further that Ryan, Bankman-Fried, and others "completed an account application that falsely stated that the purpose of the North Dimension bank account was for 'trading' and 'market making'" (¶ 30). While Ryan eventually became aware of the name of the North Dimension bank account, Ryan had no role in choosing the name "North Dimension." Nor did Ryan have a role in determining what specific false statements and information Alameda provided to Silvergate Bank in connection with opening the account.

Instead, it was Friedberg who decided what information would be included in the opening documents for the North Dimension account. Adversary Complaint ¶¶ 41, 44-45, *In re FTX Trading Ltd.*, No. 22-11068-JTD, Dkt. No. 1727 (Bankr. Del. June 27, 2023). Ryan does not dispute that he later became aware of these false statements and DocuSigned documents containing them.

## IV. THE COURT SHOULD GRANT A SUBSTANTIAL VARIANCE UNDER 18 U.S.C. § 3553(A)

A sentence of no more than eighteen (18) months' imprisonment is appropriate, and the Court should therefore grant a substantial variance under 18 U.S.C. § 3553(a). At least four reasons support that variance.

First, the Guidelines as calculated in the PSR vastly overstate the seriousness of the offenses, because (a) they are driven almost entirely by the amount of money involved in the two schemes, which is uncorrelated to either the harm that conduct caused or Ryan's level of culpability;[10] (b) they combine enhancements from two separate Guidelines provisions, artificially inflating the offense level; and (c) Ryan occupied the lowest rung of the conspiracies to which he pleaded guilty and received a role enhancement solely because he managed employees in Alameda's settlements group who credited wire transfers made to the North Dimension account to individual customers' FTX accounts—none of whom have been publicly alleged to have been aware of or involved in any criminal activity. The culmination of those vastly overinflated Guidelines enhancements is a natural guideline range of life imprisonment or, after acceptance of responsibility, 292-365 months. Either range would be absurd for a first-time offender who did not defraud or steal a dollar from anyone. Even the ten-year statutory cap is wildly overly punitive. Absent the Guidelines' artificial enhancements, Ryan's applicable guideline range would be substantially lower.

Second, the Court should vary substantially below the Guidelines to avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). Defendants who have committed financial regulatory crimes similar to Ryan's involvement in the unlicensed money transmitting

---

[10] Indeed, as described above, the vast majority of the $1.5 billion involved in the unlicensed money transmitting was for funds being *offboarded* from the exchange, which would have the effect of shielding those funds from the fraud in which Bankman-Fried and others were engaging.

conspiracy have largely received non-custodial sentences. Ryan's involvement in the unlicensed money transmitting scheme is less culpable than the conduct of some of those defendants, and his sentence should be commensurate with that level of culpability.

Third, Ryan's conduct, even in this case, and his own personal characteristics make him extremely unlikely to recidivate, and so he is unlikely to commit further crimes from which the public might need his protection. 18 U.S.C. § 3553(a)(2)(C). As a result, a substantial sentence is not required to ensure adequate deterrence or to protect the community from further crimes.

Fourth, Ryan's efforts at cooperation show that he has truly accepted responsibility for his crimes and attempted to make amends by taking steps to assist the U.S. and Bahamian governments. Taking all of these factors together, a substantial sentence would not serve the purposes set forth by Section 3553(a).

## A. Standard for Granting a Downward Variance

The Court "has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188-89 (2d Cir. 2008) (en banc). Although the Sentencing Guidelines are the starting point for the calculation of an appropriate sentence, a court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). Likewise, a court may not presume the reasonableness of a statutory maximum sentence, even if it is "far below" the Guidelines range—"[i]n all events, even a statutory maximum sentence must be analyzed using the § 3553(a) factors." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010). "[T]he amount by which a sentence deviates from the applicable Guidelines range is not the measure of how 'reasonable' a sentence is." *Id.* Rather, the Court "must make an individualized assessment based on the facts" of each case, *Gall*, 552 U.S. at 50, using the statutory sentencing factors

described in Section 3553(a), and impose a sentence that is "sufficient, *but not greater than necessary*," to serve the purposes of sentencing. 18 U.S.C. § 3553(a)(2) (emphasis added).

Section 3553(a) requires that the Court consider the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The Court must also assess (a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; (b) the need to afford adequate deterrence to criminal conduct; (c) the need to protect the public from further crimes by the defendant; and (d) the need for rehabilitation. *Id.* § 3553(a)(2). Additionally, the Court must review (1) the kinds of sentences available; (2) any pertinent Sentencing Commission policy statement; (3) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (4) where applicable, the need to provide restitution to any victims of the offense. *Id.* § 3553(a)(3)-(a)(7).

Where the Guidelines calculation results in an "inordinate emphasis" on "putatively measurable quantities," like financial loss, a court should place even "greater reliance on" the 3553(a) factors. *United States v. Adelson*, 441 F. Supp. 2d 506, 509-12 (S.D.N.Y. 2006). Here, the Guidelines calculation is largely driven by 2B1.1(b)(1), which adds 30 levels due to the unlicensed money transmission transaction amount exceeding $550 million.

Courts commonly view Guidelines ranges driven by the loss table as unduly severe and disproportionate to the harm caused by non-violent offenses, such as the crimes at issue. *See United States v. Corsey*, 723 F.3d 366, 378-80 (2d Cir. 2013) (Underhill, J. concurring) (noting Sentencing Commission's lack of empirical approach to the Sentencing Guidelines on this topic yields "[t]he widespread perception that the loss guideline is broken[,]" and "fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges."). Courts have criticized the loss table under

2B1.1(b)(1) as "not result[ing] from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." *United States v. Johnson*, No. 16-CR-457-1, 2018 U.S. Dist. LEXIS 71257 at *11-12 (E.D.N.Y. Apr. 27, 2018).

This Court has itself in this very case recognized the lack of connection between the loss amount table and a reasonable, empirical approach.

> [T]he loss table, which is one of the significant driving forces of the guideline computation, that I am obliged by law to do, though it is not binding on me, is a debatable proposition. Any number of my colleagues have criticized it on various grounds. As I understand its genesis, there's really no empirical basis for the brackets assigned or for the assignment of different losses to different brackets. I share many of those criticisms and concerns with my colleagues. I have never regarded myself, once Booker was decided, as in any way bound by guideline computations that depend on the loss table in 2B1.1.

*United States v. Bankman-Fried*, 22-cr-673, Dkt. No. 426 at 6:14-24.

Other judges in this district have observed that this lack of a reasoned approach "effectively guarantee[s]" that sentences largely driven by the loss table "would be irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012). Putting such a heavy emphasis on the transaction amount in this case would "maximiz[e] the risk of injustice." *Id.* Under such circumstances, a greater reliance on the Section 3553(a) factors to reach a just sentence, rather than the Guidelines calculation, is not only warranted, but necessary. *See Adelson*, 441 F. Supp. 2d at 509.

## B. Nature and Circumstances of the Offense

The PSR recognizes that a downward variance from the Sentencing Guidelines may be warranted by Ryan's volunteer work, substance use disorder, and family support. But the PSR advises against such a variance because of "the high value of illegal transactions in the offense"—in other words, relying solely on the loss table that courts in this Circuit have widely criticized and often eschewed. *See* PSR Recommendation at 39.

The conduct to which Ryan has pleaded guilty is far less serious than the Guidelines calculation would suggest. In determining the nature and circumstances of the offense, courts have considered the defendant's role in and motivation behind the offense conduct. *E.g.*, *Adelson*, 441 F. Supp. 2d at 513. Ryan stands before the Court having accepted responsibility for (i) conspiring to make political contributions in his name that were funded by money that was Alameda's, not his, and (ii) conspiring, while still at Alameda, to wire FTX customer deposits into and out of bank accounts when Alameda did not have the proper money transmitting license.

Ryan's role in each bears critical importance. Ryan was not a member of Bankman-Fried's innermost circle; he did not participate in, know about, or condone the multibillion-dollar fraud for which Bankman-Fried has been convicted and his co-conspirators have pleaded guilty. The government—after an exhaustive investigation—notably has not contended otherwise.

Rather, misguided though it may have been, Ryan's motivation in undertaking the conduct for which he has pleaded guilty was in many ways no different than that which has driven him through his life: to bring positive change and assist others. Though unlawful, the political contributions Ryan made were meant to support candidates and causes in which he genuinely believed. And Ryan believed that facilitating FTX customer deposits and withdrawals benefited customers by making it easier for them to use the FTX platform and take advantage of the value he believed it provided.

### 1. Ryan's Role in the Unlicensed Money Transmitting Offense

Before Bankman-Fried's and his co-conspirators' scheme to steal FTX customer funds became public in November 2022, Ryan had no idea that either Bankman-Fried or his co-conspirators were misusing customer funds in the Alameda or North Dimension accounts. And Ryan had no idea until November 2022—nor was it reasonably foreseeable to him—that Alameda's unlicensed money transmitting activity was part of Bankman-Fried's scheme to steal

21

customer funds. Rather, at all times during the relevant period, although neither Alameda nor North Dimension possessed money transmitting licenses, Ryan believed that onboarding and offboarding customers' fiat currency through those accounts would only *benefit* FTX's customers by providing easier access to the FTX platform and the successful financial services it offered. Ordinarily, getting funds onto a cryptocurrency exchange was a cumbersome, multi-step process; Ryan thought he was providing a service to a relatively small proportion of FTX customers by offering a simpler way to onboard and offboard their fiat currency to the FTX platform.

### 2. Ryan's Role in the Campaign Finance Conspiracy

Unlike many straw donors, Ryan was genuinely involved in political activity and made contributions that reflected his policy and political commitments on topics including pandemic preparedness, cryptocurrency, and marriage equality.[11] His involvement in the contributions that the other members of the conspiracy—Bankman-Fried and Singh—made was ministerial and consisted almost entirely of processing and making wire payments at their direction. He had no say into what causes or candidates they would support, nor visibility into how those decisions were made.

### C. A Downward Variance Will Avoid Unwarranted Sentencing Disparities

In imposing a sentence, the Court must "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Defendants convicted of financial regulatory crimes like unlicensed money transmitting or other crimes related to the Bank Secrecy Act ("BSA") have mostly received

---

[11] Notably, Ryan exhibited a belief in cryptocurrency's potential to benefit society long before he became a successful businessperson in that industry. As his former Ernst & Young co-worker and early roommate from 2015 noted, "I'll never forget Ryan's joyful exuberance as he described how crypto could make the world a better place. He saw it as a new frontier for human innovation and opportunity for everyone." Ex. A-25 (Ltr. of K. Spanos).

probationary sentences. *See, e.g.*, *United States v. Cohen*, No. 22-cr-265, Dkt. No. 29 (E.D. Pa. Mar. 27, 2024) (sentencing a check cashing business owner to probation for failing to maintain an effective AML program and filing false currency transaction reports); *United States v. Ofer*, No. 21-cr-174, Dkt. No. 98 (E.D.N.Y. Aug. 31, 2023) (sentencing bank executive to probation for failure to maintain effective AML program); *United States v. Fitch*, No. 16-cr-123, Dkt. No. 19 (S.D. Cal. Apr. 14, 2016) (sentencing money transmitter to probation for failure to maintain an adequate AML program); *United States v. Alshafei*, No. 15-cr-34, Dkt. No. 50 (W.D. Wash. Jan. 22, 2016) (sentencing defendant to time served for operating an unlicensed money transmitting business); *United States v. Panzera*, No. 11-cr-591, Dkt. No. 106 (E.D.N.Y. June 20, 2014) (sentencing owner of a company involved in a fraudulent check-cashing scheme for failure to maintain an effective AML program).

A recent example from this district is the BitMEX case, in which the defendants were sentenced to probation. In that case, which involved the founders of a global crypto exchange, the three founders pleaded guilty to failing to implement an effective AML program under the BSA and the court sentenced them to probation. *See United States v. Hayes, et al.*, No. 20-cr-500 (S.D.N.Y. 2020). Significantly, the conduct alleged against the BitMEX co-founders lasted for a longer duration (five years) than Ryan's conduct (about five months), *see* PSR ¶ 32, and both offenses involved billions of dollars in transaction volume. Unlike Alameda, the government alleged that BitMEX, because of its lack of AML controls, was in effect a money laundering platform and "a vehicle for money laundering and sanctions violations," and there was evidence that the defendants in that case knew of these issues. Indictment ¶ 24, *Hayes*, No. 20-cr-500, Dkt. No. 2 (S.D.N.Y. Sept. 21, 2020). By contrast, Ryan was unaware that his involvement in the unlicensed money transmitting conspiracy might have been connected to

serious money laundering, fraud, or other crimes. While Ryan was aware that the North

Dimension account, which was involved in the unlicensed money transmitting activity, was

opened based on false statements, the BitMEX defendants, too, allegedly made false statements

to a bank for the purpose of accessing and maintaining a bank account while concealing that the

account would be used for purposes related to cryptocurrency. Sentencing Letter by USA at 6,

*Hayes*, No. 20-cr-500, Dkt. No. 334 (S.D.N.Y. May 12, 2022).

As to other sentences in cases involving campaign finance fraud, a recent case from this

district is instructive. In *United States v. Parnas*, No. 19-cr-725 (S.D.N.Y. 2019), a jury

convicted the defendant of being involved in a complex straw donor scheme, making political

contributions by a foreign national, participating in a wire fraud conspiracy, and making false

statements and falsifying records. The court sentenced the defendant to twenty months'

imprisonment. While the *Parnas* case involved a smaller campaign donation amount than here,

the purpose and core of Parnas's crime—secretly corrupting the U.S. political system with

foreign money—was far more serious and harmful than the purpose of Ryan's involvement in

this campaign finance conspiracy. Unlike Parnas' scheme, all of the donations Ryan made could

have lawfully been made by either Alameda as a U.S. corporation in its own name or by

Bankman-Fried. A significant majority of the value of those donations supported independent

expenditure committees, which may accept unlimited donations from U.S. persons and entities.

The remainder, such as donations to federal candidates, were within applicable limits and could

have been made by Bankman-Fried personally. The purpose in having Ryan make them was to

obscure Bankman-Fried's role in funding them.

Parnas' twenty-month sentence also took into account the fact that he had defrauded

investors of $2 million. Similarly, Parnas' co-defendant, Igor Fruman, engaged in the same

complex straw donor scheme, but was sentenced to only a year and a day after pleading guilty. Judgment as to Igor Fruman, *Parnas*, No. 19-cr-725, Dkt. No. 298 (S.D.N.Y. 2019 Jan. 21, 2022). Considering their complex scheme to deceive the public and Parnas' additional crimes, if the Court were to impose the five-year sentence that Probation recommends for Ryan's campaign finance violations in this case, it would create the type of unwarranted sentence disparities that Congress sought to avoid under Section 3553(a)(6).

### D. Ryan's Personal History and Characteristics

"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *Adelson*, 441 F. Supp. 2d at 513-14. Ryan's overall life—his personal history and characteristics—screams for leniency. He has been a good man who has done much good in this world, who conspired to commit two crimes while in the thrall of a criminal leader who had beguiled captains of industry and politics far savvier than Ryan. Courts have exercised their discretion to impose non-Guidelines sentences in exactly such situations. *E.g.*, *Gupta*, 904 F. Supp. 2d at 353 (premising downward variance, in part, on defendant's "big heart and helping hand"); *Adelson*, 441 F. Supp. 2d at 513 (premising downward variance, in part, on defendant's "good works and deep humanity," "generosity of spirit," and "integrity"). The Court here, too, should give substantial weight to all the good that Ryan has done and all the good of which he is capable when released and grant him a substantial downward variance.

#### 1. Personal and Educational Background

Ryan's personal characteristics and history warrant a non-Guidelines sentence. Ryan is 30 years old. During the charged period, in addition to the fact that he can be "naïve when it comes to people and he tends to be over trusting," *see* Ex. A-15 (Ltr. from J. Huemmer) *and* A-

25

21 (Ltr. from V. Russell) (observing Ryan can "find himself prone to trusting too quickly"), Ryan was in an impressionable period in his early adult life. He was just 25 when he met Bankman-Fried, and had just turned 26 in 2019, at the beginning of the charged period. Since that time, as detailed above and shown in his letters of support, Ryan has matured substantially. In addition, Ryan's educational background makes it markedly less likely he will recidivate and enables him to contribute meaningfully to society upon release.[12]

### 2. Current Family Role

Ryan is deeply devoted to his partner. He plays a critical role to her two children and considers them his stepchildren, as they regard him as their second father. In addition, approximately six months ago, Ryan welcomed a child of his own for the first time. This was a life-changing event that has further forced Ryan to re-examine his life choices and commit to being a better person. Certainly, the fact that a term of imprisonment will cause Ryan to miss his son's earliest milestones and first birthdays weighs heavily on him.

### 3. Philanthropy and Community Service

Ryan's generosity to others with his time and resources and deep involvement in his community counsel in favor of leniency. Even Probation agrees that this characteristic would weigh in favor of a downward variance. *See* PSR at 39. Well before Ryan became prominent through his work in the crypto industry, and throughout every phase of his young adult life, Ryan has been enormously generous with his time and resources to individuals and his community alike. While in college and as a young professional, Ryan used what little free time he had outside his work and studies to give back to his community, from providing tax service *pro bono*

---

[12] Studies by the U.S. Sentencing Commission show that offenders with college degrees have the lowest rate of recidivism. *See* U.S. Sent. Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* at 24 (Mar. 2016), https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview.

to organizing study halls for young people in inner city Boston and charity biking events for affordable housing. Later, during the pandemic, Ryan sought to save struggling restaurants in the community where he grew up. In the Bahamas, in a short period of time, Ryan became an integral part of the community who donated his time to causes supporting children and alleviating food insecurity, started educational initiatives, encouraged members of the business community to get involved with more civic engagement and arranged services to make life easier for Bahamian employees. Ryan currently spends his time volunteering to assist incarcerated individuals by creating programs that will help them re-integrate in their community. None of these "good deeds were [] performed to gain status or enhance his image." *Adelson*, 441 F. Supp. 2d at 513. Rather, they were and are rooted in Ryan's commitment to "strive[] to give more to the world than he asks of it." Ex. A-1 (Ltr. of Prof. James Angel).

Finally, Ryan has demonstrated deep insight into the personal circumstances that helped lead him to his current legal situation. As one friend stated about Ryan:

> I observed a sense of remorse and regret in him that was palpable and genuine. Ryan's acknowledgment of his mistakes and misdeeds, and of the consequences of his actions reflected a deep sense of accountability and a desire to make amends for what he had done. It was evident that he was genuinely troubled by the impact of his choices and the harm it caused.

Ex. A-10 (Ltr. of D. Dingman). Another friend has observed Ryan's "proactive steps he's taking toward growth." Ex. A-28 (Ltr. of T. Tsui).

As part of gaining this insight, Ryan has confronted his substance abuse struggles that have plagued him since age fifteen. Throughout the period of the charged conduct, Ryan drank alcohol to excess and used drugs. Though he is still working on his sobriety, the collapse of FTX was a wakeup call for Ryan. He recognizes and deeply regrets the role that his addiction played in his decision making while at Alameda and FDM. Recently, and even more intensely since the

birth of his son, Ryan has taken steps toward achieving sobriety. He has consulted a substance abuse counselor and attended Alcoholics Anonymous; he intends to pursue continued treatment whenever available after sentencing.[13] The Court should impose a sentence that reflects Ryan's willingness to course correct and gives due consideration to this aspect of Ryan's rehabilitation.

### 4. Attempted Cooperation

While Ryan did not plead guilty pursuant to a cooperation agreement, he did endeavor to assist the U.S. and Bahamian governments' investigation of Bankman-Fried and other FTX insiders. From the first available opportunity, Ryan alerted Bahamian regulators as soon as he learned of the fraud committed by Bankman-Fried and his inner circle.

Once Ryan learned of the U.S. government's investigation, he voluntarily provided documents and information through multiple fulsome attorney proffers, the production of 595, 217 pages of documents, and the identification and description of the key documents amid that mass of materials. The documents and information Ryan provided—regarding his interactions with Bankman-Fried, for example—meaningfully aided the government during trial. In fact, the government used information that Ryan provided to them in their cross-examination of Bankman-Fried.[14]

---

[13] If the Court imposes a sentence involving incarceration, we respectfully request that the Court recommend that Ryan be admitted to the Bureau of Prisons' RDAP program to continue working toward his sobriety.

[14] As one example, the government used anecdotal evidence concerning statements Bankman-Fried made to Ryan concerning investment of FTX customer funds during its cross of Bankman-Fried:

> Q. And after you raised more than a billion dollars from investors, you told Ryan
> Salame to transfer that money to Alameda, didn't you?
> A. Nope.
> Q. Didn't you tell Ryan Salame something to the effect of, why would you leave
> the fucking funds just sitting there?

Trial Transcript at 2695:20-25, *United States v. Bankman-Fried*, No. 22-cr-673, Dkt. No. 378 (S.D.N.Y. Dec. 12, 2023).

### E. Ryan Has Satisfied His Restitution and Made Substantial Strides Toward Satisfying Forfeiture

As noted above, Ryan has demonstrated his acceptance of responsibility and desire to make amends for his crimes by reaching an agreement with the FTX Estate that will allow him to satisfy his restitution obligation in full and provide additional recompense to the FTX Estate and, by extension, the victims of the FTX collapse. Ryan anticipates making significant strides in satisfying the vast majority of his forfeiture obligation by the date of his sentencing and anticipates being able to make full payment by the end of August 2024, after he finishes liquidating additional assets.

### F. The Purpose of Retribution and Adequate Deterrence Does Not Warrant a Lengthy Sentence

The need to afford adequate deterrence to criminal conduct and protect the public from further crimes by Ryan would not be served by a lengthy custodial sentence within the Guidelines.

#### 1. Specific Deterrence

A lengthy term of imprisonment is unnecessary to protect the public from Ryan or to deter him from committing future offenses. Ryan is not a danger to society. While his underlying conduct shows lapses in judgment, at the time Ryan engaged in that conduct, he did not do it to prey upon any individual or entity. He has, of his own accord, already undertaken efforts to rehabilitate himself, including undertaking treatment for substance abuse. He has acknowledged the mistakes he made while at Alameda and FDM and has no interest in repeating them.

Under the terms of his plea agreement, Ryan is obligated to forfeit a monetary payment in the amount of $6 million, two properties and a business, and to make restitution in the amount of $5,593,177.91 to the FTX Estate, an aggregate amount that, when combined with what he

intends to transfer to the FTX Estate apart from his forfeiture and restitution, will leave him with no remaining assets. Ryan will face further financial peril in civil actions that may follow this case. The financial consequences for not only Ryan but also his family members, friends, business partners, and many employees who rely on him, have been grave. The guilt and shame that weighs on Ryan is with him every day.

Moreover, the incessant media criticism of FTX and all else within Bankman-Fried's orbit has ensured Ryan will be punished for the rest of his life. Ryan has been portrayed negatively in news stories, books, and even on the floor of Congress for the past eighteen months and has received death threats for his role at FTX. Public filings by the FTX Estate have portrayed top executives, including Ryan, as unprofessional and incompetent. Ryan will never be able to seek another job without the negative caricature acting as a barrier, or without the words "metaphorical dumpster fire"[15] ringing in the interviewers' ears. And though he knew nothing of Bankman-Fried's fraud at the center of this case, the coverage has had a deeply negative impact on his personal relationships. "As to specific deterrence, it seems obvious that, having suffered such a blow to his reputation, [the defendant] is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result." *Gupta*, 904 F. Supp. at 355.

Ryan's plea has also resulted in a "civil death" that will prevent him from fully reintegrating into society, even after serving his sentence. *United States v. Nesbeth*, 188 F. Supp. 3d 179, 180, 184-86 (E.D.N.Y. 2016) (describing the "nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons"

---

[15] Letter by Alameda Research Ltd. at 1, *United States v. Bankman-Fried*, No. 22-cr-673, Dkt. No. 415 (S.D.N.Y. Mar. 20, 2024).

covering a "range of subject matter" that "can be particularly disruptive to an ex-convict's efforts at rehabilitation and integration into society").

## 2. General Deterrence

A sentence of imprisonment is also unnecessary to achieve retributive and general deterrence objectives. Section 3353(a)(2)(B) "does not require the goal of general deterrence be met through a period of incarceration." *United States v. Edwards*, 595 F. 3d 1004, 1016 (9th Cir. 2010). "[O]ften . . . release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose." S. Rep. No. 98-25 at 92 (1983); *see also* United States Department of Justice National Institute of Justice, *5 Things About Deterrence* (2016) ("[I]t is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment."). "White-Collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty." Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005). However, to the extent that the Court believes incarceration is necessary to achieve the objectives of Section 3353(a)(2)(B), "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514.

The heavy financial penalties, intense regulatory and media scrutiny to which Ryan has already been subjected, and the broader impact on his loved ones are more than sufficient to deter others from committing similar crimes in the future. Any would-be white collar offender, having watched Ryan's case play out in news headlines for the past year and a half, would understand the consequences of conspiring to engage in unlicensed money transmitting or to violate the campaign finance laws, independent of any prison term.

**G.     The Sentences for Counts One and Two Should Run Concurrently**

The PSR recommends without explanation that the Court run Ryan's sentences on his two counts of conviction consecutively, for a total of ten years' imprisonment, despite the statutory default to run multiple sentences concurrently, *see* 18 U.S.C. § 3584(a).  In doing so, Probation does not provide a reason or point to which Section 3553(a) factors would compel such a result.  That is because no Section 3553(a) factors require such a result.  The only conceivable reason for this recommendation is the only basis Probation gives for its ultimate sentencing recommendation—the transaction amount—the very metric widely criticized by judges in this Circuit and by this Court itself.  To the contrary, as discussed above, the Section 3553(a) factors counsel in favor of a sentence far below the Guidelines and, in any case, no more than eighteen (18) months' imprisonment.

**V.     CONCLUSION**

The Court's charge is to fashion a sentence that is "sufficient, but not greater than necessary," to serve the purposes of sentencing in this case.  18 U.S.C. § 3553(a).  For the reasons stated above, a sentence of no more than eighteen (18) months' imprisonment is sufficient to comply with the purposes set forth in Section 3553(a).  Such a sentence would satisfy the purposes of sentencing under Section 3553(a), while allowing Ryan to have the opportunity to continue contributing positively toward society.

Dated: May 14, 2024                    Respectfully submitted,

                                       */s/ Jason Linder*
                                       Jason Linder
                                       MAYER BROWN LLP
                                       1999 K Street Northwest
                                       Washington, DC 20006
                                       (202) 263-3207
                                       jlinder@mayerbrown.com

                                       */s/ Gina M. Parlovecchio*
                                       Gina M. Parlovecchio
                                       MAYER BROWN LLP
                                       1221 Avenue of the Americas
                                       New York, New York 10020
                                       (212) 506-2522
                                       gparlovecchio@mayerbrown.com

                                       *Attorneys for Defendant Ryan Salame*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2024, I filed the foregoing using the Court's CM/ECF system which sent notice to all counsel of record.

*/s/ Jason Linder*
Jason Linder

# EXHIBIT A

| Number | Name |
|---|---|
| Letters in Support of Ryan Salame's Sentencing Submission | |
| 1 | James J. Angel, Ph.D., CFP, CFA |
| 2 | Paul Francis Aranha |
| 3 | Jane Blanchard |
| 4 | Michelle Bond |
| 5 | Thomas R. Brown |
| 6 | Craig and Kimberly Buckland |
| 7 | Emily Chappelle |
| 8 | Luke Chappelle |
| 9 | Oumou Coulibaly |
| 10 | David R. Dingman |
| 11 | Bob and Beth Ferrando |
| 12 | Allyson Maynard Gibson |
| 13 | Ceri Howells |
| 14 | John M. Huemmer |
| 15 | Robin Hyman |
| 16 | Seth Kornfeld |
| 17 | Daniel McCarthy |
| 18 | Jennifer F. Merton, Esq. |
| 19 | Catherine Sciorella-Pepin |
| 20 | Reynaldo Ramirez |
| 21 | Valdez K. Russell |
| 22 | Susan and Mike Salame |
| 23 | Michael Santos |
| 24 | Andrew L. Schwartz, Esq. |
| 25 | Katie Spanos |
| 26 | Ashish Survarna |
| 27 | Sam Trabucco |
| 28 | Troy Tsui |

**GEORGETOWN UNIVERSITY McDonough**
SCHOOL *of* BUSINESS

James J. Angel, Ph.D., CFP, CFA
Associate Professor of Finance
Georgetown University
McDonough School of Business
Washington DC 20057

February 25, 2024

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Kaplan:

I am writing to provide a character reference for Mr. Ryan Salame, whom I had the pleasure of teaching during his enrollment in the Masters of Science in Finance (MSF) program at Georgetown University.

Ryan was a student in my investments class during the fall semester of 2018 and then again for the subsequent global consulting course in the spring of 2019. With over a decade of experience teaching these subjects and more than thirty years at Georgetown, I can attest to his competence and dedication as a student.

In the Georgetown MSF program, we make our students do a consulting project for a company that does business outside the United States. Ryan led a student team on a project for Paratus Telecom, a major telecommunications company in Namibia. I travelled with Ryan and other MSF students to Namibia in 2019 where Ryan delivered his project. He demonstrated not only his proficiency but also his commitment to delivering excellence in diverse and challenging environments.

Following his graduation, Ryan and I have maintained a professional relationship, and I have had the privilege of witnessing his impressive personal and professional growth. I will always fondly remember him showing me his trading desk at Circle Internet Financial and generously sharing time and wisdom. His insights into cryptocurrency market structures and hands-on experience have been invaluable in enhancing my understanding of fintech, allowing me to pass these lessons on to hundreds of students.

Beyond his professional accomplishments, I have found Ryan to be a person of exceptional character and integrity. He possesses a remarkable intellect, entrepreneurial spirit, and a genuine desire to create value

and make a positive impact in the world. I believe firmly that this aspiration is his core motivation and that he strives to give more to the world than he asks of it.

Please let me know if there is any additional information that would be helpful for you.

Respectfully submitted,

*James J. Angel*

James J. Angel, Ph.D.

DocuSign Envelope ID: 268B88F7-87BB-412A-938F-0AE08E80B8D2

Paul Francis Aranha



May 6, 2024

Hon. Lewis A. Kaplan
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York, 10007-1312

      Re:     <u>*U.S v. Salame Sentencing*</u>

Dear Judge Kaplan,

      I am the President and Director of Operations of Trans Island Airways Ltd., a Bahamian aviation charter and aircraft management company that is also a FTX creditor and a victim of Samuel Bankman Fried's fraud. In full disclosure, I am also a claimant who may soon be appearing before this Court in connection with the pending FTX-related criminal forfeiture of two jets the government seized from me. But today I write to you as Ryan Salame's friend and supporter in advance of his sentencing. As I think back on my experiences with the man whom you are to sentence in the coming days, two lines come to mind from Marc Antony's funeral speech in Shakespeare's Julius Caesar: "the evil that men do lives after them; The good is oft interred with their bones". I appreciate the opportunity to speak about the good that my friend has done in his life so that not only his wrongdoings are remembered.

      In my private aviation career, I have interacted with thousands of clients. Even among the most considerate, respectful, and kind in that group, Ryan stood out as by far the warmest, most generous, friendliest, and most caring. The first time we met I was hired to pilot him from Nassau to New York. The trip began with a Customs delay, which in turn would delay him, so our very first conversation required me to notify him of the inconvenience. Instead of the push back, complaints, and aggravation I was expecting, Ryan instead invited me to sit with him and asked about my day. From that point, our friendship grew. Yes, we had things in common – both of us were entrepreneurial, ambitious, and young, and we were experiencing rapid growth in our companies (mine on a smaller scale, certainly) – but that is not what I valued about Ryan. The best way to explain the source of my respect and admiration is to describe what I witnessed of Ryan as he represented FTX in its new Bahamian headquarters shortly after our government had opened its doors to the world of crypto with the Digital Asset and Registered Exchange Act.

      First, Ryan was genuinely excited to share his knowledge of digital currencies with anyone that wanted to learn, regardless of their economic circumstance, background, or

Ex. A-2

DocuSign Envelope ID: 268B88F7-87BB-412A-938F-0AE08E80B8D2

future business potential. He spent many hours teaching, not only me, but also many of the TIA pilots and support staff he met about the crypto. Suddenly, Bitcoin, Solana, and Stable coins were no longer an unintelligible quagmire that was inaccessible to regular Bahamians. Ryan's efforts to educate and inform created access for our citizens to the real opportunities, both direct and indirect, of this new frontier.

Of course, it is impossible to address the good that was done in The Bahamas without acknowledging the vast harms SBF perpetrated, including many that would have come to light during SBF's second trial. But if there was one person whose actions serve as a counterpoint to those harms, it is Ryan, who was responsible for leading the charitable endeavors at FTX in the Bahamas and was the model of what a good corporate citizen could mean for my country. While I recognize that much of the funding for Ryan's corporate responsibility flowed directly from SBF's fraud, that should not completely overshadow Ryan's impressive accomplishments during his short time in the Bahamas as FTX's ambassador. Ryan used his kindness and influence in the business community to address long ignored and oft overlooked issues. When Ryan encountered a lopsided labor relations situation in the Bahamas, he made sure to fix that for FTX employees by creating a welcoming and inclusive work environment unlike anything seen before in this country. His company recognized that staff at all levels faced challenges associated with childcare, homemaking, and mental health, amongst others, and actively created policies that allowed parents to support their children's development, engage in their lives and get the support they needed. If his supportive and open relationship with his housekeeping staff is any measure of the man, many of us, me included, fall short. The community was beautified by Ryan's influence in many areas where he leveraged his position to accomplish clean ups in neighborhoods. One notable instance was when he refused to work with a contractor until they had removed decades-old concrete that they had dropped on the road.

Ryan fell in love with the Bahamian culture and our environment, championing causes that would protect our spaces and promote our nation and its people. His work on carbon credit proposals sought to protect our seabeds and mangroves while turning them into revenue generating spaces for our country. He spoke fondly of the tools that he was developing to enable his team to implement literacy and numeracy tutoring programs for elementary school children. He supported their newfound relevancy in business society by allowing them to have time out of their workdays to participate on boards that advanced female empowerment, educational access, and scholarships. Ryan lifted the Bahamas up at every conference, highlighting our talents and ability. The seeds Ryan planted in the Bahamas during his time there, although brief, and now long behind him, have already grown trees whose shade he will not benefit from, but will provide a foundationally better nation for others.

Ryan's work ethic inspired me to push harder and work more effectively. His tireless dedication to his job, round-the-clock accessibility, and desire to build the industry that he was in served as a beacon for me to strive for. But there is more to Ryan than just his business; his kindness extends into his personal life. Having flown thousands of passengers from all walks of life, I have encountered every type of personality, yet never before have I or my other crewmembers been treated the way we were by Ryan. When I faced a potential

unwarranted business storm in May 2022, Ryan dropped everything and dedicated the better part of a day to assist. There was never an ask too big or too small.

Ryan's kindness not only extended to sharing his knowledge and bettering the country he called home, but while on trips, he welcomed my crew into his. I cannot forget the image of Ryan's mother dancing with the company's pilots in his hometown and the happiness that his family shared. His friends became our friends and visited the Bahamas recounting stories of their childhood and their time growing up in the rural region of Massachusetts, the Berkshires. It was truly incredible to listen to their stories of riding across the country with Ryan working on side projects with his friends to create opportunities for them, often placing their needs ahead of his. Ryan is a collector of people with the unique gift of being able to connect individuals from around the world, all walks of life, regardless of creed, color and ideology. I am fortunate to have been brought into his world.

Ryan is also committed to his home life, and nothing illustrates that better than his devotion to his partner's children. From the outset, he embraced them as if they were his own, earning the nickname "Ry Ry" in the process. He readily engaged in helping with homework, playing games, and actively participating in their home and social lives, fostering a warm and supportive environment. Witnessing their journey in attempting to conceive over a year, I've seen Ryan's joy multiply with the recent arrival of his own child, further enriching their family dynamic. His interests have evolved from cars and planes to drums and dolls, and now revolve around onesies and nap times. Though I've only glimpsed him with his child on a few occasions, it's evident that he cherishes every moment, relishing in discussions about their future.

Your Honor, while I understand the severity of the charges he faces and the maximum penalty they carry, I implore you to consider leniency for my friend. I have seen Ryan's genuine remorse and regret for his actions. But more importantly, I know in my heart he has so much more to offer the world from beyond the confines of prison cell. To paraphrase the last lines of Marc Anthony's speech... my heart is on the stand there with Ryan, and I must pause til it come back to me.

With Humility,

DocuSigned by:

E6B7FF10678B4E7...

Paul Francis Aranha

February 16, 2024

Jane Blanchard

██████████████

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Kaplan:

I am writing this character reference letter on behalf of my friend and employer, Ryan Salame, whom I have known for over 20 years. Ryan has been an outstanding member of our community and a constant positive presence in my family's life. I'm grateful for the opportunity to share my understanding of the man with you.

I first met Ryan when he was 11 or 12 years old through my son, Sam, who is the same age. Ryan spent much of his time at our home for a couple of years as his family lived further away, and he was training in karate. He would often stay for dinner or sleepovers with Sam.

Even at a young age, Ryan stood out as an exceptionally outgoing, respectful, engaged, and ambitious boy. He was always involved in numerous activities – school, karate, friends, and he worked many summers catering events with me. Ryan did a phenomenal job catering – even when I would put the boys "in the swamp" on dishwashing duty. I believe it provided him with valuable character-building experiences at a formative time that he's taken forward into his adult life.

When Ryan later went off to college, I would see him every now and again. I knew enough to know he was doing well, but we had largely fallen out of contact as he made his way into the world. Ryan evidently spent his years in college staying as engaged as ever, working his way through a variety of restaurant jobs, from waiting tables to cleaning to cooking. My family occasionally ate at the restaurant where he worked.

The busy child I knew had grown into a busy young man. As an example, while juggling school and work, he would participate in a cross-country charity bike program over the summer. Even though Ryan was not an avid cyclist, he trained hard with a professor and completed the journey, stopping to build houses along the way. After graduation, Ryan continued his education as a grad student in Washington, D.C. Though we lost touch at times, I never worried about Ryan. He always landed on his feet.

Out of the blue, several years later, Ryan walked into the restaurant I manage, Firefly, while on a trip back from working abroad. It had been quite a while since I had seen him, but he seemed happy and thriving. Not long after his visit, COVID hit, and it dramatically impacted the

Ex. A-3

hospitality industry. The owner decided it was time to sell. My son, Sam, suggested I contact Ryan to see if he would be interested in buying it. Ryan enthusiastically called me to say he would love to purchase Firefly and keep our team intact. He wanted me to run the business the same way I had been, with the same people and practices that had allowed us to thrive. It was an ideal situation we never could have imagined. It truly saved the business and the employee's livelihood.

Though Ryan didn't live locally and deferred to my leadership, he remained involved in and committed to Firefly's success. We maintained open communication about any relevant financial or operational issues, and he was always quick to see that our staff had the resources needed to perform their jobs safely and well. When another local restaurant, the Heritage, came up for sale, Ryan and I decided it was a good opportunity. He purchased it, and we have maintained its heritage and traditions.

There are well over 40 employees involved in these operations, and during a time of upheaval and serious staff shortages, not a single one has ever felt slighted or voiced a desire to leave. This is not hyperbole. Ryan has *always* done right by me and our team. Together, Ryan and I have worked hard to provide a living wage and retain our valuable staff during and after the COVID-related crisis in the service industry. With both restaurants, he has focused on creating a positive environment with happy employees.

Most recently, one of Ryan's restaurants was seized. I won't claim any particular knowledge of the case, but I bring it up because I think it is illustrative. Even in this difficult time, Ryan's first concern has been his employees. He continues to pay me to keep the restaurant operating as it has been until it can be passed on to a new owner. He understands the importance of stability and continuity for the employees. He does this quietly, without the expectation of thanks or recognition, and certainly without any financial gain. At his core, wants to help other people succeed.

Over the 20 years I have known Ryan, I've come to see him as someone who is unafraid of challenges and who operates with integrity. His commitment to doing the right thing for others is commendable. I do not doubt that he will carry these traits with him as he confronts his punishment.

While I have not followed the specifics of the case that brings him before this Court, I understand that there will be consequences for his actions. What I ask is that, in considering an appropriate punishment, you consider the type of man that Ryan has continually demonstrated himself to be and the value he adds to our community.

If you would like any additional information, please don't hesitate to contact me.

Sincerely,

Jane Blanchard

Jane Blanchard

May 14, 2024

Michelle Bond

████████████████

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Regarding: U.S.–v–Ryan Salame

Dear Judge Kaplan:

It is a privilege to convey my sincere observations about a man whom I have grown to deeply admire and care for—Ryan Salame.

When I first met Ryan at a conference in mid-2021, I admit my initial judgment was colored by my own biases. My impression of him was that of a stereotypical young, attractive, finance-type whom I hoped I would not have to interact with much. However, fate had other plans, and we crossed paths again approximately six months later at a subsequent conference. Then, my assumptions began to crumble, revealing the genuinely kind person he is.

Since then, Ryan and I have been inseparable, a journey not without its logistical tribulations. Amid my long, drawn-out divorce process (which commenced in 2019), Ryan has been a pillar of support by working exceptionally hard to better my children's lives—████, now 10, and ████, now 8. He has brought an unprecedented level of love, happiness and support that was previously foreign to us.

Ryan's presence has transformed our understanding of family. ████████████████ have been captivated by his loving nature, and through him, they are learning about nurturing and commitment. He is not just a presence in their lives but an active participant—helping with homework daily, planning educational outings, and sharing life's small, beautiful moments, like teaching ████ to ride a bicycle and ████ to swim. Our home is filled with laughter, silliness, games, diligence, hard work, and happiness. Even when ████████████ stay with their father, they choose to FaceTime Ryan frequently so they are always connected to him.

His innate paternal instinct inspired our decision to expand our family. Although we faced the heartache of a miscarriage in the summer of 2022, we welcomed our son, ████, in November 2023. Ryan's bond with ████ is palpable and sweet. I wish you could see him doing household

chores wearing a baby Bjorn, his pride in our son, and his plans for raising him and our future as a family.

Ryan's compassion is boundless, extending beyond family. What I would like this Honorable Court to see are the quiet acts of service he pursues, such as, during the pandemic, accepting responsibility for supporting local businesses and their employees in his hometown. Another person could see the dire financial situation of these businesses and run, but he thinks–first and always–about the *human* component of enterprises and always strives to do what is best for his community and beyond, above all self-interest.

In Ryan, I see a man who is not only intelligent, devoted, funny, and generous—but also someone who faces his obligations head-on. I know he cares deeply for me, ███████, and ███ and has taken multiple steps to ensure their safety and privacy during this very difficult time. As important, he's been deliberate about preparing our family for the possibility of incarceration by spending as much time with us as he can now, assisting with multiple medical and mental health resources for the kids, and assisting me with getting back on my feet given all the loss experienced as a result of FTX's collapse.

I am fully cognizant of his acceptance of the legal ramifications he faces. This acceptance of responsibility is why he retains my utmost respect and why I believe he will navigate this chapter of his life with integrity. While it was shocking to learn what happened, what is consistent with what I know is how Ryan is accepting responsibility, learning from his mistakes, and solemnly facing the consequences.

Ultimately, I wish for the Court to recognize the character of the man I know—a person who enriches the lives of those around him, regardless of what that requires of him. He is a person I never thought I would be so lucky as to have in my life. Ryan's accountability and actions have earned him my continuing love and commitment, and I pray every day that these factors will influence your perspective.

Ryan means so much to us, and I deeply fear how any loss of him will impact our family. I believe he has already derived lessons from this experience that he is using to enrich the lives of those around him. I beg of you to understand that Ryan adds value to every community he's a part of, yet he will be able to add more to the world if permitted to remain in it. He already carries the weight of the world in this very difficult situation, and I pray that you will be as lenient as you believe warranted given the circumstances.

Thank you for considering my observations of Ryan character.

Respectfully,

*Michelle Bond*

Michelle Bond

Thomas R. Brown

████████████

March 21, 2024

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Kaplan:

I am writing this letter not to dispute the legal process or to comment on the charges before you, but rather to offer insight into the character of Ryan Salame, whom I have known since he was a young boy of six or seven. It was at this tender age that he first stepped onto the mats of my Taekwondo studio, beginning a path that I have had the honor to witness and guide until his departure for college.

Ryan achieved the rank of 4th-degree black belt, earning the title of Master, a title reserved for those who not only master the physical aspects of Taekwondo but also embody the principles of integrity, honesty, and character that are foundational to our discipline. Ryan has consistently upheld these standards.

I recall an instance during his training when, on a day he found himself the sole attendee, I had to momentarily step away for administrative duties. Upon my return, Ryan, having made some minor mistakes, chose to restart his practice from the beginning to maintain the integrity of the lesson at my request. Months later, he approached me with a question that reflected his deep-seated commitment to integrity: "If I make a mistake when practicing, should I start over?" This encapsulates the core of who Ryan is—a person of deep respect and firm commitment.

The art of Taekwondo is as much about building confidence and self-esteem as it is about physical prowess. It is a tool through which individuals learn that barriers can be overcome through hard work and determination. Ryan embraced these lessons but, crucially, also imparted them to others as one of my top instructors during his high school years. His competence as an instructor was enhanced by his passion for the art and his empathy for the abilities of the students, qualities that enabled my students to flourish under his tutelage.

Since Ryan's graduation from high school and subsequent transition into adult life, we have remained in contact. When he is in the area, he visits my studio not as a trainer or student but as an honored guest, displaying a humility that is rare. Because he no longer trains, he often refrains from claiming the title of Master out of respect for the discipline and those who continue to

dedicate themselves to its practice. This humility, alongside his respect for others, is characteristic of the man I know him to be.

As you consider the circumstances before you, I ask that you also consider Ryan as I know him—a man whose actions have consistently been guided by a strong moral compass and a profound respect for the principles instilled in him from a young age.

Thank you for allowing me the opportunity to provide this character reference. If there are any further details I can provide, please do not hesitate to contact me.

Sincerely,

Thomas R. Brown
Grandmaster & Founder
Martial Arts Institute of the Berkshires (MAIB)

Craig & Kimberly Buckland



May 2, 2024

Honorable Lewis A. Kaplan
US District Court Judge
Daniel Patrick Moynihan US Court House
500 Pearl Street
New York, NY 10007-1312

Dear Judge Kaplan,

We understand and respect that Ryan Salame has plead guilty on charges of making unlawful political contributions and conspiracy to operate an unlicensed money-transmitting business. We are writing this letter to give you a broader perspective of Ryan and an appreciation that he is someone whose potential for positive contribution to his community and society far outweigh his offenses.

We have known Ryan and his family since 1994 when we moved into their neighborhood. Since meeting Ryan and his family, we have been very close and have had the opportunity to see Ryan grow and prosper from a vigorous toddler to the man he is today.

It is probably obvious based on Ryans academic accomplishments, career trajectory and investments that he is an intelligent and passionate entrepreneur. What may not be obvious is his care and compassion for others; his family, his friends, his community as well as broader society. Even before Ryan became successful, he contributed his time and effort to help others. As examples, he participated in Bike & Build and Habitat for Humanity to build homes for those less fortunate. He volunteered to assist UMASS international students with tax preparation and was involved with tutoring inner-city youth while he was located in Boston. Once successful, he gave back to his home, the Berkshires, by funding a local high school scholarship and establishing Lenox Eats to improve the infrastructure and economic success of a local town.

Ex. A-6

Almost to a fault, Ryan is very family oriented and dedicated to his family and friends. In fact, on a less serious note, we could not even throw his parents a surprise party because he could not lie to his parents! With everything that he has accomplished in his life, he has always intimately involved his family and friends to ensure their success and happiness before his own. We do not have children but if we did, we would be honored if Ryan was our son.

It is primarily Ryans dedication to his family and community that spurs us to write this letter. We strongly feel that if Ryan realized the enormity of the impact that his actions/decisions would have on his immediate family and his community, he would have not made those decisions and would have questioned those actions that have brought him before you today.

We strongly believe that Ryan has much more to offer us all and would better be able to serve his community, society as well as be the much-needed rock for his family if he did not have to serve time. For this reason, we ask that you consider the minimum sentence for Ryan.

Whatever decision is made with regard to Ryans future, please accept our sincere thanks for your time and consideration.

Best Regards,

Craig & Kimberly Buckland

May 7, 2024

Emily Chappelle

████████████████████████

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Dear Judge Kaplan:

My name is Emily Chappelle, and I am Ryan's and his family's neighbor. Although we met just before the current legal proceedings began, my impression of Ryan has been profoundly positive, shaped not by headlines but by the person he is day-to-day.

Our families met while trick-or-treating last year, each of us with children the same age as Ryan's stepchildren, ████ and ████. Ryan and Michelle were dressed in the Incredibles costumes, a visible sign of their shared commitment to their kids' wellbeing. It was this image—a fun, caring, and engaged family—that first introduced me to Ryan, not his professional affiliations or any external circumstances.

From the outset, Ryan struck me as a dedicated and genuine person, deeply committed to his family. He is, without a doubt, the most involved and caring father I have ever witnessed. Not long after their youngest child, ████, was born, I remember sending a joking text to Michelle asking how many diapers Ryan had changed, to which she replied that she hadn't changed a single one. Ryan's dedication to his role as a father is evident in every aspect of his life.

Despite the unsettling situation that has unfolded, Ryan has maintained his integrity and dedication. Perhaps ironically, he is often the disciplinarian in the family, guiding ████ and ████ with a gentle yet firm hand. His ability to handle this immense pressure with such grace is nothing short of admirable. His core values, his demeanor, and his actions remain unchanged—showing me his true character.

I remain perplexed by the charges against him, as they contrast starkly with the man I know. Ryan has always been a pillar of our community, a devoted partner and parent, and someone who brings positivity and stability to those around him.

This challenging time has revealed Ryan's strength and the depth of his character. For instance, right after being approached by law enforcement, they made sure their kids' concert plans for that weekend came together. It is my belief that his fundamental decency and the positive impact he continues to have on his family and community will carry him through this ordeal. I look forward to a time when this is behind him, and he can continue to be an active and contributing member of our community.

Thank you for considering my perspective in your deliberations. It is my sincere hope that it provides a fuller picture of Ryan's character and the many lives he touches in a positive way.

Sincerely,

*Emily Chappelle*
Emily Chappelle

Ex. A-7

May 7, 2024



Luke Chappelle

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Kaplan:

I am Luke Chappelle, a neighbor of Ryan, whom I met in October 2022 during a neighborhood trick-or-treating event. Our families were both new to the area at the time, and it was the age similarity of our children that initially brought us together. Since then, our families have formed a close bond, spending nearly every weekend together, sharing meals, and enjoying community activities.

One of the most refreshing aspects of my friendship with Ryan is his ability to keep our interactions light and enjoyable. He never burdens others with his personal affairs nor probes into theirs; our gatherings are always about quality time and genuine enjoyment, even when the conversation turns to more serious topics.

Ryan is exceptionally kind-hearted and genuinely cares for many people, evident in how he interacts with everyone in our community. He is the type of neighbor everyone would want: always busy and productive. We feel lucky to have him as a friend and neighbor.

One aspect of Ryan's character that stands out to me is his role as a stepfather. At only 30 years old, he has embraced this challenging role with a sense of duty that is admirable. He has also shown immense maturity in handling complex family dynamics, especially concerning the children's relationship with their biological father. Whatever the children's biological father does or says about him, he never fails to actively encourage ▇▇▇▇▇▇▇▇ to have a good relationship with him.

Ryan's commitment to his family and loved ones, his productivity, and his positive spirit make him an invaluable member of our community. I wholeheartedly wish to see him return to his everyday life, continuing his role as a great dad and a supportive partner.

Thank you for reading,

*Luke Chappelle*

May 7, 2024

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Kaplan,

My name is Oumou Coulibaly. I take care of Ryan and Michelle's children and have been with them for more than four years. I am like family to them, joining them in daily life and on vacations. I am writing to tell you about Ryan, who has been a wonderful father figure and an important source of love and stability for his children.

Ryan came into ██████████████ lives about three years ago. Right from the start, it was clear how much he loves being with the children. He really connects with them and makes sure to spend quality time together. The children look forward to seeing him so much that they always ask if he will be home after school. They have a very strong bond.

Ryan's relationship with the children is very meaningful, especially because of the challenges they face. For example, ████████████████████████████████
████████. But Ryan has a special way of ████████████████████████████. He is patient and kind, which really helps ████ feel better. ████████████████████████
████████████████ and Ryan really helps ████████ navigate a lot of these issues by helping him with ████████████████████████████████.

████ loves sports, and she always waits for Ryan to take her to her soccer practice and swimming. She also loves to ride bikes and play games with him. When she is at her dad's house, she spends a lot of time texting or calling Ryan, looking forward to what they will do next. ████ really relies on Ryan and her mom for emotional support, especially when she is having a difficult time when she can't be with her mother due to the divorce. Ryan's love and attachment to ████████████ are what you would expect to see with a biological father.

Ryan pays attention to every little thing in their lives. He helps them with their school work, cleans their lunch boxes, and makes sure they eat well. He takes care of these things because he loves them and wants the best for them. Ryan's way of caring for the children is very special. He knows how to be a good parent. He enjoys the happy times and handles the hard times with love.

It has been so special to be a part of Ryan and Michelle's family as they welcomed the birth of their son. Ryan took care of Michelle first through a difficult miscarriage and then through another difficult pregnancy. Now that ████ is here, born in November 2023, Ryan is the proud

father I always expected him to be. ████████ looks exactly like his father, it's so sweet. Ryan adores him – he plays with him, feeds him, and wants to make the baby comfortable at all times. It's so clear how much he loves all three kids, and they know it and love him so much.

I ask you to see the good things Ryan does and how much he means to his children. He gives them the love and support they need to grow up happy and confident. ████████████ are going to be devastated if they lose Ryan in any way, and █████ loves and needs his dad.

Thank you for listening to what I have to say. I hope it helps you understand what kind of person Ryan is to his family.

Yours sincerely,

Oumou Coulibaly

**David R. Dingman**



May 6, 2024

Honorable Lewis A. Kaplan
US District Court Judge
Daniel Patrick Moynihan US Court
House 500 Pearl Street
New York, NY 10007-1312

Dear Judge Kaplan:

    I am writing as a personal character reference for Ryan Salame, and to hopefully provide some relevant information for his upcoming sentencing. I have never had any business dealings with FTX, and I have no personal knowledge of his business illegality. In that regard, I hope and trust that this illegality was isolated and out of character for him.

    Rather, I got to know Ryan on a personal level during his time in the Bahamas, and where I got to know him well and observe him closely. During his time in The Bahamas, Ryan Salame demonstrated a genuine and substantial commitment to charitable causes, and he showed kindness and compassion towards those less fortunate and who were in need of help. Ryan's efforts to support local communities and individuals in need were commendable and left a lasting impression on those who interacted with him. I witnessed firsthand his dedication to making a beneficial difference and his willingness to contribute to the betterment of others.

    Moreover, when the truth about Ryan's criminality came to light, I observed a sense of remorse and regret in him that was palpable and genuine. Ryan's acknowledgment of his mistakes and misdeeds, and of the consequences of his actions reflected a deep sense of accountability and a desire to make amends for what he had done. It was evident that he was genuinely troubled by the impact of his choices and the harm caused.

    In light of these observations, and from what I saw in my interactions with Ryan, I believe that he has the capacity for redemption and rehabilitation. His previous positive contributions in the Bahamas and his display of genuine remorse speak to a character that is capable of growth and change. I respectfully urge Your Honor to consider these aspects of Mr. Salame's character and conduct when determining an appropriate sentence.

    Thank you for considering my perspective.

Sincerely,

Ex. A-10

Bob and Beth Ferrando



May 5, 2024

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
500 Pearl Street
New York, New York 10007-1312

Dear Judge Kaplan:

While we are happy to write this letter on behalf of our nephew, Ryan Salame, the circumstances for it have taken us by surprise.  We have known Ryan his whole life.  He is a hard working, generous, old soul.

As long as we have known him, Ryan has always understood the benefit of hard work.  He was working when he was 15.  He didn't spend his money like most kids would. He saved that money and made smart investments. He studied hard and was rewarded with acceptance to Isenberg School of Management at UMass Amherst.  When he was ready to graduate college, he already had several employment offers from prestigious accounting firms.

When Ryan was only 22, he organized a fundraiser for Bike & Build, an organization that was working to address the affordable housing crisis.  He rode his bike from Connecticut to California and assisted with building houses along the way.  This led him to becoming part of a support team for an individual who was participating in a cycling race,  Race Across America.  Ryan and the team raised money for a scholarship fund that was used to enable underserved students attend college.

Ryan is loyal and dedicated to his family and friends.  When Ryan was in middle school and high school, he would come to our home just to sit and talk with his grandmother.  He would play Cribbage and Mancala with her and let her tell her stories over and and over again.  We don't know if he realized what that time together meant to his grandmother.  When our grandchildren were born, Ryan presented their parents with an unexpected but very generous gift.  Most recently, he hosted them at his home for a vacation.  ██████ (6) and ████ (4) still talk about their vacation with "Cousin Ryan" and how much fun they had.  They talked about their trip to Washington DC, swimming in the pool and playing video games. Knowing he created a kid friendly atmosphere for my grandchildren is an indication of how special Ryan is.

Ryan once told us that he just wants people to be happy and if he can help bring happiness to people, that's  all he needs.

Ryan is now a father.  We believe that ██████, Ryan's son, will grow up being proud and happy that Ryan is his father.


Thank you for your time.


Bob Ferrando


Beth Ferrando

*Allyson Maynard Gibson K C*

*P.O. Box N.623*

*Nassau,*

*The Bahamas*

May 3rd, 2024

The Hon Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan Bldg.
500 Pearl St.
New York, NY 10007-1312
U.S.A.

Your Honor:

I write in support of **Ryan Salame**.

Our law firm advised FTX for its registration in The Bahamas and other matters for which it sought legal advice from non in house counsel. I was in charge of the FTX matter. This gave me the pleasure of working with Ryan for almost 2 years while he lived and worked in The Bahamas. In all of my dealings with him I found him to be straightforward, honest and meticulous in his dealings with others and about compliance with the law. I also found him to be a kind and generous man with deep concern for his team members and for those in need. He personally visited several soup kitchens and ensured that they were able to feed the hungry and clothe children and the elderly, for whom he was especially concerned.

In my capacity as Chair of the Board of Trustees of the University of The Bahamas, I also know that he was also committed to assuring that training and micro credentialling opportunities be provided for young people to find employment in the technology sector.

I believe that his generosity and concern for others was also exhibited by his investments in restaurants in his hometown, Lenox. He recalled, as a youth, being a dishwasher in a restaurant. He wished to provide sustainable employment opportunities and through these investments encourage people to visit Lenox, thereby further growing that economy, and positively impacting the lives of residents.

Ex. A-12

These are some examples of the person, Ryan, whom I found to be a community minded person, who sought ways to help those less fortunate and to foster strong community spirit.

I believe that he is genuinely sorry for any harm that he caused and that this is exhibited by his desire to make amends.

I respectfully hope that these views may assist Your Honor in your deliberations about an appropriate sentence.

Yours sincerely,

Ceri Howells

███████████████

May 2, 2024

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Kaplan,

I am writing to you about Ryan, who I know well and hold in the highest regard. I understand the seriousness of this moment and respect the court's effort to administer justice. My intention in writing this letter is to share the Ryan I know, the man whose actions and character have had a profound impact on my life and the community around us. It is a genuine honor to speak on his behalf during this moment.

I first met Ryan during one of the most challenging periods of my life. It was shortly after Hurricane Dorian had devastated our area, leaving me with nothing. Around the same time, my father was critically ill in Nassau. I had to make the painful choice to quit my job and move to be with my father, as my employer at the time showed no flexibility or understanding of my dire situation.

When I was introduced to Ryan, I was struggling to rebuild my life while supporting my dying father. Ryan, after hearing my story, offered not just sympathy but provided me with an opportunity that proved to be the turning point. He trusted me to handle some shipping tasks for his business, an opportunity that allowed me to stand on my own feet again.

Thanks to Ryan's support, I used my last $200 to secure a business license and begin shipping under my own name. Now, that business has now grown into a thriving enterprise. It's no lie to say this opportunity changed my life, while also creating employment for many others in our community.

In the years that followed, Ryan and I developed a strong personal friendship that extended beyond the professional. Over shared meals and working in the community together, I've gotten to know him and his character. His generosity and kindness have been a constant in my life, something for which I and many others are extremely grateful.

Together, we have spent countless hours participating in community service, especially during the holiday seasons, distributing over 2,000 toys to children and supporting local church feeding programs. Moreover, Ryan's kindness extends beyond large charitable activities. He once

helped secure a job for his housekeeper's husband, who needed special consideration due to his unique challenges. Beyond the money he has brought in, Ryan's social impact on the Bahamian people cannot be overstated.

I have always known Ryan to be a compassionate, respectful, and exceedingly generous individual. His demeanor and conduct have consistently been of the highest standard, with never a word out of place or an action that would cause distress to others. His presence brings joy and laughter, and I often get people asking me, "When's Ryan coming back?"

As someone who has been significantly impacted by Ryan's kindness and who has seen his positive influence spread throughout our community, I hope my perspective offers some insight into the kind of man Ryan is, beyond the circumstances he currently faces.

Thank you for considering this letter. I pray for a fair consideration of Ryan's case, trusting that the man I know will have the opportunity to continue contributing positively to society.

Yours sincerely,

Ceri Howells

Honorable Lewis A. Kaplan                                    May 2, 2024
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312


Dear Judge Kaplan,

I have known Ryan Salame for over 20 years as I met him when he was ten years old. I am a friend of the family and have watched him grow from a young child to the man and father he is today. I can say without reservation, that he has always been an honest and respectful person. He actually is an over achiever succeeding in almost everything he does. He competed as a young teen in Tae Kwan Do winning in South Korea, when he was 14. I watched him work as a busser and dishwasher at a local restaurant as a teenager. He was always a hard worker.    He is an open minded, very accepting person who gets along with everyone.

Ryan applied to Isenberg School of Management at UMass and was accepted and went on to graduate and work for Ernst Young.   During trips home on holidays he would make a point of stopping in to visit us regularly.
Ryan did a Cross Country Bicycle Charity event to raise money for Habitat for Humanity while working there. When he reached Missouri, he went out of his way to check on and visit my daughter who had graduated and made that her home.  He always has watched out for all his friends and family.
While working for Ernst he went on to receive his Masters from Georgetown.    I am very proud of him for the type of person he has become.   Ryan set very high goals for himself and worked very hard to achieve them.

In all of Ryan's accomplishments he has always tried to bring those around him with him.  I believe that matters to him more than his own success.  He has always been very charitable helping high school friends and neighbors ,  those less fortunate when he can.  He has never been one to tout his accomplishments. He is very humble in that respect ,  so we do it for him.

I would say if Ryan has a fault it would be that he is a little naïve when it comes to people and he tends to be over-trusting, expecting  everyone to be like himself.   In my view, the world would be a much better place if we had more people like Ryan in it.

Please contact me if you should want more specifics or any further information as I can give many more real life examples   upporting Ryan's character and morality. He is a good man!

Sincere


   M. Huemmer

May 1, 2024

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Kaplan:

This letter is written on behalf of Mr. Ryan Salame who I have known for more than twenty years. He and his family are close friends of my husband and me.

To demonstrate his solid character, starting as a young teenager, Ryan showed a strong work ethic while working for a local restaurant. Whether doing dishes, clearing tables, serving meals, or other tasks, he was dependable, conscientious and determined to help the owner in any way he could. People could rely on Ryan to be there and do what was asked of him.

Always an excellent student, inquisitive to learn more, Ryan sought out the study of martial arts (Taekwondo) to learn its philosophy, its method of self-discipline and master its physical demands at the highest level. My husband and I personally witnessed an event with students that showed his leadership and mastery in action.

Upon graduating high school, Ryan committed over the summer to ride with Bike and Build, a nonprofit organization where young people participated in building affordable housing. He biked from Connecticut to California and completed this commitment.

Since I have known him, Ryan has maintained his integrity and core values. He is a pleasant, respectful, honest young man who loves his family. We have been honored to know him.

Respectfully submitted,

*Robin Hyman*

Robin Hyman

May 7, 2024

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Kaplan:

My name is Seth, and I reside in the same neighborhood as Ryan and his family. I have had the pleasure of knowing them since shortly after the birth of my third child, when we moved out of the city and settled in the same neighborhood. Our families crossed paths in a rather serendipitous manner during trick-or-treating, after I learned that Michelle had worked with a teammate of mine from my softball team. Since that encounter, our families have grown to see each other a few times a month, sharing many neighborhood and family events.

Ryan is a caring, generous, fun-loving, and kind individual, qualities that resonate deeply with anyone who spends time with him. My family and I have always enjoyed our interactions with Ryan and Michelle, finding great joy and camaraderie in their company. Despite the complexities of the current situation, our appreciation for them as neighbors and friends has only grown.

From the very beginning, Ryan has been an integral part of our neighborhood fabric. He has consistently demonstrated his dedication to his family and to those around him. Whether it's a casual meet-up during a community event or a more personal interaction, Ryan has always shown up as a steadfast friend and neighbor.

One of the most telling aspects of his character is how he interacts with his children. ███████, for instance, often calls him for homework help even when she's at her dad's house, a testament to the trust and bond they share. His role as a stepfather and a mentor to his children is something that I admire greatly.

I am writing this letter not out of obligation but out of a genuine belief in Ryan's character. My family and I cherish the relationship we have with Ryan and his family, and we remain committed to supporting them through these trying times. Ryan has assured us of his resolve to continue being a good person, neighbor, husband, and father, and I have no doubt that he will maintain these roles with the same integrity he has always shown.

Respectfully submitted,

Seth Kornfeld
███████████████

**Daniel McCarthy**

████████████
████████████

May 7, 2024

Honorable Lewis Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

Dear Judge Kaplan:

My name is Daniel McCarthy and Ryan Salame is my cousin. Ryan and I have been very close for our entire lives, so I was heartbroken to hear about his legal trouble. A few months ago, Ryan and I had a long conversation about what went wrong in this case. My cousin shared his pain and regret, particularly about the people who were hurt when FTX collapsed. We spoke about how he used poor judgment and how he got carried away with some of his political activities. I admire Ryan for taking responsibility for his actions and facing the consequences with dignity.

When we were growing up, I spent a lot of time with Ryan and his family at their humble home in the woods. Everyone could see Ryan's intelligence and charisma from a very early age. Other kids were naturally drawn to Ryan's humor, kindness, and warmth. I remember Ryan hosting camp-outs with groups of friends near his family's pond. Ryan knew how to make anyone feel welcome and comfortable.

Ryan taught himself how to fix computers and started his own iPhone repair company. His hard work and determination made him a great entrepreneur. As usual, other people liked doing business with him and he did a great job. Even though Ryan was younger than me, I looked up to him for his special genius with technology, business, and people. He approached every challenge and every person with a sense of openness and fun.

Years later, Ryan invited me to stay with him whenever I was in Boston for work. He was surrounded by amazing friends and of course he went above and beyond to be a good host. I also felt proud of Ryan for participating in a coast-to-coast charity cycling event. I attended a fundraiser where he described his plans to build affordable housing at various stops along the cycling route. Those events showed Ryan's true character. He could light up a room with his enthusiasm for big ideas that helped people in need.

Ryan and I stayed in touch while he lived in Hong Kong. I knew his company was making a splash, but he was always the same kid to me. Ryan's parents are salt-of-the-earth, hard-working people with traditional values. His mother is a radiology tech and his father worked in construction. Even though he has gone through some big ups and downs, Ryan is still the same kind, brilliant, thoughtful person.

During my recent visit, I got to see Ryan as a new father. I remember changing Ryan's diapers, so it blew me away to see him take care of his son, ██████. Ryan is such a good dad. It's devastating to think about Ryan and ██████ being apart. Still, Ryan has been clear about his poor choices in this case. He talks openly about what he wishes he had done differently and blames no one but himself for his situation.

Your Honor, I know my cousin will make positive contributions to society in the years ahead. He cares about other people and would give the shirt off his back to anyone. I hope this court will look at this case in the context of Ryan's good life and service to others.

Respectfully,


Daniel McCarthy

Jennifer F. Merton

███████████████

Monday, March 24, 2024

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Regarding: U.S.—v—Ryan Salame

Dear Judge Kaplan:

I am writing to you regarding Ryan Salame, whom I have known for many years, first as a student in the Isenberg School of Management at the University of Massachusetts-Amherst and later as a notable alumnus. Throughout the time I have known Ryan, he has consistently demonstrated a commitment to community engagement and education. It's my privilege to share what I know about a man who, to me, is characterized by his capacity for encouraging growth in others.

During his undergraduate studies, Ryan was a capable student in my Introduction to Law (MGMT 260; Now SCH-MGMT 260) class, where he expressed a genuine interest in the full panoply of issues and concerns raised by the materials that we covered. His approach to learning went beyond mere knowledge acquisition; he showed a real curiosity and he collaborated with peers and faculty alike to develop new knowledge and understanding. I also recall him as a student who distinguished himself not only in academia but also with community service. For example, Ryan balanced his rigorous academic commitments with significant community contributions, such as regularly participating in the pan-Massachusetts bike ride.

His later collaboration with our ethics team at the Isenberg School of Management at the University of Massachusetts-Amherst further exemplified Ryan's investment in others' education to benefit the broader community. Here, he freely gave of his time by helping us with extensive research and facilitating valuable connections related to a cryptocurrency project for our students. His participation in our ethics speaker series and his dedication to mentoring students after lectures have left a lasting impression on both faculty and students, as well as me personally. Just as in Lenox, where I understand he has accepted responsibility for the well-being of others, Ryan's efforts to support our students have only further demonstrated his commitment to service.

Ex. A-18

As a faculty member deeply invested in ethics and compliance, who has directed and/or coached numerous ethics competitions, I can confidently say that Ryan's presence and contributions have always been welcome and highly regarded by faculty, students, and fellow alumni. I firmly believe in his capacity to contribute to the education of future business leaders — perhaps even more so now. His insights into not merely avoiding pitfalls but also rectifying and learning from missteps can provide invaluable lessons and his thoughtfulness and sincerity will enhance the effectiveness of his message.

While I understand that consequences will necessarily follow from his actions, I nevertheless look forward to watching Ryan's bright future. His proactive approach to both learning from and contributing to his environment is a rare and valuable trait that I look forward to including in my classroom again someday soon.

Please don't hesitate to contact me at the address, email, or phone listed below if there is any additional information that I can provide to this Honorable Court.

Respectfully submitted,

Jennifer F. Merton, Esq.
Associate Department Chair
Law Lecturer Coordinator and Senior Lecturer
Management Department
Isenberg School of Management

Isenberg School of Management; 229C
University of Massachusetts Amherst
121 Presidents Drive
Amherst, MA 01003

May 14, 2024

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Kaplan:

My name is Catherine, and I am a friend of Ryan Salame and his partner Michelle. Over the years, Ryan has shown himself to be a remarkable individual, whose character and actions consistently affirm the belief that "a good person remains a good person," no matter the circumstances.

Ryan is one of the most honest and genuine individuals I have ever known. His approach to life is marked by a sincerity and openness that might be seen as naive, but it is this very quality that makes him so refreshingly genuine. He treats everyone with the utmost respect, regardless of their background or status. His soft heart is especially evident in his support for those who help others. For instance, he helped a pilot who was involved in the Hurricane Dorian relief efforts to build his business, a testament to his willingness to assist those in need.

I have also had ample opportunity to observe Ryan as a father. It is often said that one's true character is revealed through their actions as a parent. Ryan's dedication to Michelle's children, whom he treats as his own, is a clear indication of his deep integrity and commitment to family. His seamless transition into the role of a stepfather was both impressive and inspiring. It is evident how invested Ryan is in their lives, engaging with them actively and with profound care.

Ryan's conversations often revolve around his children, revolve around his 3 children, the youngest whom is just a few months old. His constant focus on their wellbeing and development is not just a sign of his love but also of his maturity and clarity of purpose. From the moment he chose to be a father, he has dedicated himself to being the best parent he can be.

Ryan's consistent display of compassion, integrity, and dedication in both his personal and professional life speaks volumes about his character. It is this foundation that I believe will enable him to learn from past mistakes and continue to contribute positively to his community.

Thank you for reading this letter, one which I would not have written if I had anything less than complete confidence in Ryan's ability to return to a life of meaning and purpose.

Gratefully,

Catherine Sciorella-Pepin

Reynaldo Ramirez

████████████████████████

May 1, 2024

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Hello Judge Kaplan,

Ryan Salame is a man of strong character but a tender heart. Thanks to Ryan, my life took a turn in 2019 when he considered me to work and support FTX's mission in customer support. Ryan not only gave me an opportunity to prove myself but also showed compassion. In times of need, I asked for his help multiple times, and without expecting anything in return, Ryan was there.

Throughout my time with Ryan, he was always someone who swiftly shared his ideas and pursued what was right rather than what would benefit him. The way he interacts and manages himself with people showcases someone who is honest, respectful, fair, and caring.

Ryan is someone who would never turn his back on those in need; he sees the light that shines in people and helps them as he can. His strong character, along with this quality, makes him a great leader, a friend, someone that I will never forget and always hold dear in my heart.

With all due regards,

Rey

February 16, 2024

Valdez K. Russell

██████████████

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312


Dear Judge Kaplan:

On life's journey, we occasionally encounter individuals who embody the essence of divinity amidst our earthly existence. It is with great pleasure and sincerity that I pen this character reference letter for my esteemed colleague and friend, Ryan Salame.

From the outset of our acquaintance in 2021, it became evident that Ryan possessed an extraordinary capacity for kindness and thoughtfulness, seeing the inherent goodness in all individuals, irrespective of differing perspectives. His ability to embody grace is unparalleled, a trait that permeates through every little interaction that characterizes his workplace behavior.

Our professional relationship blossomed, evolving into a mentoring dynamic that Ryan navigated with unexpected grace. As my supervisor during our endeavors with FTX in the Bahamas, I witnessed firsthand his innate ability to lead, mentor, and consult with a level of wisdom far beyond his years.

One of Ryan's most remarkable attributes lies in his profound capacity to recognize and nurture the strengths of those around him, fostering an environment conducive to personal and professional growth. He is not one to seek the limelight for his contributions but rather revels in the recognition of others' achievements, a testament to his selflessness and humility. I won't claim to speak for the experiences of others, but I know he's been instrumental in charting my forward trajectory, both personally and professionally.

Despite the challenges we faced together, particularly in navigating the complexities of human behavior and diverse personalities, Ryan's unwavering commitment to finding solutions and fostering positive change remained resolute. His solutions-focused mindset, coupled with an innate drive to inspire goodness in others, sets him apart as a beacon of leadership and grace.

While Ryan may occasionally find himself prone to trusting too quickly, it is this very trait that enables him to make a profound impact in the lives of those he encounters. This is because he trusts people quickly enough to allow opportunities to flourish. His legacy, I believe, will be defined by his commitment to showing up and striving to do better each day—a sentiment echoed in his daily greetings of "Good morning, I hope you're well."

Looking ahead, I have every confidence that Ryan's best days lie before him. His past endeavors serve as a testament to the positive impact he has had on countless individuals, a ripple effect that will undoubtedly continue to reverberate in the years to come. As he undergoes this period of transformation and reconciliation, Ryan's capacity to inspire and drive others toward excellence will undoubtedly catalyze his own positive change, supported by the many people whose lives he's impacted.

Recently, I was reminded of the cherished moments Ryan and I shared over meals, where his characteristic optimism and generosity were always on display. His grace, kindness, and commitment to doing good are qualities that I hold in the highest regard and am honored to bear witness to.

Thank you for taking the time to read this letter.

Peace,

Valdez K. Russell

Susan and Mike Salame
74 Rood Hill Rd.
Sandisfield, MA 01255

May 2, 2024

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Kaplan:

As Ryan's mother, this is perhaps the most difficult letter I've ever set out to write. Both his father, Mike, and I have always been proud of the man Ryan has grown into, and we have supported him through every phase of his life. Today, I wish to share with you the essence of Ryan's character, which has always been grounded in generosity, kindness, and a keen sense of duty towards others.

From a young age, Ryan exhibited an intuitive understanding of the needs of those around him. I recall a moment when he was in the sixth grade; there was a child at his school who was often ostracized for being difficult and mean. Instead of shunning him, Ryan reached out to his tae kwon do instructor to see if the boy could join their class. Ryan believed that what this boy needed was a sense of belonging and structure, something he hoped tae kwon do could provide. Here, this young boy excelled, finding companionship and self-worth. At his core, Ryan seeks to be a catalyst for good in the lives of others.

Ryan's compassion wasn't just evident outside our home; it was part of his daily life. He had a wonderful relationship with his grandmother, who lived with us for 17 years. He often accompanied her to the senior center, where he enjoyed participating in activities and was especially good at engaging with the elderly, whether it was playing bingo or just sharing a meal.

His sense of responsibility also showed when, at just 14, he traveled 30 minutes from home for his first job at a restaurant. There, he made an impression not only through his work but also in how he treated everyone with respect and kindness. I distinctly remember how he once made the day of a special needs child by simply sitting down at their table and taking the time to ask her what she wanted for breakfast, treating her with the dignity she deserved.

As Ryan grew older, his commitment to serving others remained unchanged. He biked across America with a group building homes for Habitat for Humanity, despite never cycling before. He was one of the few who never opted to ride in the support van. Funnily enough, I don't recall him taking up cycling again after this, but we couldn't have been prouder. He's always set big goals for himself and followed through on them no matter what it took.

These stories illuminate the core values Ryan has always lived by: kindness, generosity, and a relentless commitment to finishing what he starts. It is these qualities that make him not just a good son but a genuinely thoughtful person—the most considerate I've ever met, bar none.

As you weigh the appropriate course of punishment in this case, I hope you will see Ryan not only for the man he has been but for the man he will continue to be. He is someone who deeply values his relationships and responsibilities and who will always strive to contribute positively to those around him. We have no doubt that whatever challenges lie ahead, Ryan will face them with the intention of making the world a better place.

Thank you for taking the time to consider my perspective as his mother. I trust that your judgment will take into account not just the past but the promising future Ryan has ahead of him.

Gratefully,

Susan and Mike Salame

March 19, 2024



Ryan Salame

██████████████

Dear Ryan:

On behalf of our entire team at the Prison Professors Charitable Corporation, I want to extend our deepest gratitude for the contributions you have made to helping us grow our offerings since you began volunteering with us, in the early summer of 2023. Your dedication and commitment to our cause have been truly extraordinary, and we are immensely grateful for the more than 250 hours you have devoted to creating digital courses that we are now using to teach and empower individuals in prisons across the country.

You've always been candid with me about the challenges you're facing with the criminal justice system. It's my understanding that your research led you to an article on the BOP's website that described the reentry programs we're developing for people in the Bureau of Prisons.

Your research in search of programs that would help you make amends led you to contact our nonprofit.

When you asked about the work that we do, I explained that we create courses to help people in prison prepare for law-abiding, contributing lives. I directed you to our website so that you could read more about our efforts to improve outcomes for people in prison:

> » https://prisonprofessors.com/ppnonprofit/

When you asked how you could volunteer, I invited you to work with me to create a masterclass that we would distribute to people in jails and prisons across America. The attorneys representing you, or other stakeholders, may want to see the evidence of that initial class.

Anyone can view the initial project with the following link:

> » Success after Prison Master Class: Ryan
> » URL: https://prisonprofessors.com/success-after-prison-masterclass-ryan/
> » Password: Master

Currently, our programs are available in every federal prison, in every state prison in California, and through the Edovo platform, more than 300,000 people in jails and prisons. Those people will have access to your course, and in collaboration with the Edovo Foundation, we'll be able to begin collecting data from course participants before the end of this calendar year.

You've been honest in speaking openly with me about your challenges with the criminal justice system. As a well-educated professional, you recognized that every citizen has a duty and a responsibility to abide by the law.

Although you wanted to speak openly about your remorse and your efforts to make amends, for the purpose of our course, I urged you to focus primarily on teaching people in prison. We had one goal, which was to help more people in prison prepare for law-abiding, contributing lives upon release. You agreed, and committed yourself fully to helping us develop a curriculum that we could use to make an impact on the lives of others.

Following the completion of the lesson plan, you asked if there was more that you could contribute. Recognizing changes in the world, with artificial intelligence and Web 3.0 developments, I asked if you could volunteer more time to develop an entire course that would help people in prison understand the digital economy. The initial lesson was great, but I hoped to provide people in prison with more expert guidance.

You agreed to work with me daily on this project. As a result, we created a comprehensive program, at an introductory level. We've published the course, "Introduction to the Digital Economy" in several formats, including: 1) softcover workbook; 2) audible book; 3) PDF format; 4) web based format; 5) podcast series; and 6) non-fungible token that will allow us to measure progress of each participant.

Our mutual goal is to help people understand how they can use the digital economy to prepare for law-abiding, contributing lives upon release.

We could not have made this impact without your generous contribution of time. For that reason, I express my gratitude for the time, energy, and support you've given to our program.

I don't know whether community service is a possibility for you, but if authorities will authorize, we would be grateful if you could continue volunteering with our nonprofit as a form of community service while you serve your sentence, or upon your completion of the sentence.

To confirm, we're an IRS approved 501c3 with the following identification number:

Prison Professors Charitable Corporation
IRS Number: 85-2603315

Since 2009, our team has worked to build safer communities. We create programs to teach and inspire people in prison, at-risk youth, and we open employment opportunities for formerly

incarcerated people. Your background helps our mission in meaningful ways, and makes a huge impact on the people we serve.

Thank you for the time you devoted to help us develop a self-directed learning course for vulnerable populations. People who enroll in our program will benefit from the contributions you've made. Your efforts will go a long way toward building safer communities, and to improving opportunities for participants to live as contributing, law-abiding citizens.

Justice-impacted people sometimes struggle to find employment because of their criminal history. Our entire society benefits when leaders like you provide guidance in job training, or learning about the digital economy.

We could not make an impact on the lives of more than 300,000 people in jails and prisons without your contributions.

When the time comes for you to interact with a probation officer, please show the contributions you've helped us create.

As soon as you have clarity with regard to your availability, please let us know. We will begin assigning tasks and measuring hours. To complete these tasks, you will work directly with me in developing ongoing coursework to teach people in jails and prisons.

Thank you, again, for the time you've donated to the Prison Professors Charitable Corporation.

We appreciate the generous contributions of time that you've made so far, and we look forward to you joining us as a fulltime team member at the soonest possibility.

Sincerely,

*Michael Santos*

Michael Santos,
███████████████████████
Director, Prison Professors Charitable Corporation
███████████████

May 13, 2024

1101 Wootton Parkway
Suite 700
Rockville, Maryland 20852



Honorable Lewis Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:    Ryan Salame

Dear Judge Kaplan:

I have practiced law for nearly 19 years and currently am a Partner at Stein Sperling Bennett De Jong Driscoll PC in Rockville, MD, in the Business/Corporate law department. I am writing to express my strong support for Ryan Salame and to request leniency in his sentencing.

In the time that Ryan has been my neighbor, he has consistently exhibited qualities that set him apart as an exceptional individual. Since moving into our neighborhood in 2022, Ryan has exemplified kindness, generosity, and a strong sense of community. He effortlessly unites people, ensuring that everyone feels included and appreciated at the events and gatherings he orchestrates.

One aspect of Ryan's character that has particularly impressed me is his unwavering dedication to his family. As a devoted partner to Michelle and father to his son, ▇▇▇, who is approximately 5 months old, Ryan's love and care for his family are evident to all who know him. When ▇▇▇ was born, the neighborhood celebrated, a testament to the strong bonds Ryan has forged within our community. Ryan is a true family man and one who I would trust to watch over my own children in an emergency.

Although I am aware of Ryan's current legal situation, our conversations have always centered around our families and shared interests. Throughout it all, Ryan has maintained a positive and optimistic outlook, qualities that I believe will serve him well in the future.

Professionally, I have had the pleasure of discussing business ideas with Ryan, and I have always been impressed by his intelligence, creativity, and vision. I am confident that he has a bright future ahead of him, and I would enthusiastically support any future ventures he pursues.

In conclusion, despite the allegations against Ryan and his plea agreement, I wholeheartedly believe in Ryan's trustworthiness and honor. I urge the Court to take into account his unwavering commitment to his family and his numerous positive contributions to our community. I respectfully request that the Court show Ryan the mercy and leniency that his character warrants.

Respectfully,

Andrew L. Schwartz, Esq.

Ex. A-24

Katie Spanos

May 2, 2024

Honorable Lewis Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

Dear Judge Kaplan:

Thank you for taking time to review this letter about my dear friend, Ryan Salame.

Ryan and I studied accounting at the University of Massachusetts Amherst and completed our internships at Ernst & Young (EY) in Boston. After we graduated in 2015, EY hired us both for full-time positions—Ryan in tax, me in audit. Ryan, two other friends, and I shared an apartment near Boston for about two years.

At work, Ryan had a reputation for being a positive presence in the office and a team player on tasks. He arrived early each day then stayed late until the job was done. Ryan organized the EY Running Club to bring people together and get outside for a fun group activity. Ryan took his work seriously while bringing genuine light and life to that buttoned-down accounting firm.

At home, Ryan was an authentically good-natured and reliable roommate. When the four roommates first toured the apartment, Ryan volunteered to take the tiniest room with no closet. He was always helpful with household tasks, oftentimes even shoveling the neighbor's side of the driveway without being asked. One day, our roommate came home with severe swelling around her face. Ryan leapt into action and drove her to the hospital for emergency care, waiting until she was cleared to go home. Ryan jump-started my car one morning and, when I moved out, he cheerfully helped move my furniture.

Ryan taught me a lot about hospitality while we lived together. Ryan made every single guest feel right at home. He was super-accommodating and would routinely check in to see if there was something he could do. Ryan pays close attention to other people and will do anything to be helpful and caring. Ryan never asks for or expects anything in return.

Ryan loved talking about the great possibilities for cryptocurrency. He imagined this new global financial system based on cutting-edge technology. I'll never forget Ryan's joyful exuberance as he described how crypto could make the world a better place. He saw it as a new frontier for human innovation and opportunity for everybody.

By the time I moved out of that apartment, I considered Ryan a close friend. We stayed in touch while he lived in Hong Kong and saw each other whenever he visited home. Ryan's success did not change his personality or fundamental decency. It was a few years before

I had any notion of his financial success. I don't think money or material possessions ever mattered, or will ever matter, to Ryan.

Your Honor, I know Ryan pled guilty to violating federal law. I do not know the full details of his case, but I feel confident he will handle this legal process with integrity. Ryan's case did not change my opinion of his fine character or his potential. I would definitely hire him or work for him in the future. He is a truly wonderful man and I feel very grateful to know him.

I strongly urge this Honorable Court to hand down the most lenient possible sentence to Ryan Salame.

Respectfully,

Katie Spanos

May 14, 2024

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Kaplan:

My name is Ash, and I began working with Ryan in March 2020, primarily assisting with customer support via Telegram. Due to my effective handling of customer inquiries, Ryan encouraged my transition to manage VIP clients, a role that offered me significant professional growth, thanks to his trust and support.

Our interaction was largely digital until I moved to the Bahamas, where I had the pleasure of finally meeting him in person. Our rapport, built over countless online conversations, translated seamlessly into a genuine friendship. Ryan was as supportive in person as he had been virtually, always willing to lend a hand or share advice.

During the challenging period of bankruptcy, many were understandably reticent to communicate. Ryan made a point of seeing how I was doing, despite the chaos unfolding around him. His initiative to inquire about my well-being, especially when I was in another country at the time, spoke volumes about his character. It was a reassurance that the values he practiced were not just professional but deeply personal.

Ryan's ability to remain considerate of others even in challenging times has only reinforced my respect for him. His dedication to his work and the people around him is evident in everything he does. If given the opportunity, I would not hesitate to work with him again, confident in his capability and integrity to apply himself fully to any endeavor.

I believe Ryan is a remarkable individual, capable of making positive contributions regardless of the circumstances he faces. Thank you for considering my insights.

Sincerely yours,

Ashish Suvarna

May 6, 2024

Sam Trabucco

████████████████████

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Subject: Character Reference Letter for Ryan Salame

Dear Judge Kaplan:

My name is Sam Trabucco. I've known Ryan Salame since 2019, when he was hired at Alameda
Research when I was a trader there. He was originally hired to be the head of the over-the-
counter trading business there. Still, Sam Bankman-Fried (SBF) quickly expanded his role and
eventually asked him to shift his focus to his other company, FTX. We got to know each other
through long days (and nights) in Alameda's office, where we were working incredibly hard but
also managed to have fun — we shared a wicked sense of humor that kept the mood light.

Simply put, Ryan is my best friend. He has also committed crimes. He's acknowledged that and
is prepared to accept the consequences. I want those consequences to be fair – not too light, not
too excessive, but fair. Because, like anyone, Ryan doesn't deserve to be defined by his worst
actions. He's a complex person who made mistakes, not some one-dimensional villain, and I
know his punishment will reflect that. So, I'd like to share some of the things that make Ryan
special to me, to help you understand Ryan as a person beyond just the worst things he's ever
done.

On paper, it makes very little sense that Ryan and I are so close – so committing it to words is a
little odd. He loves to be social; I love to play board games. He's effortlessly popular; I'm a nerd
who's hard to connect with. But unlike many who look and sound like him, Ryan sees easily past
the superficial. He doesn't see a dweeb not worth his time when he looks at me — he sees
someone with different interests to his own and complementary skills who is worth getting to
know *because* of our differences. Without that openness, we never would have learned how
hilarious we find each other — outsiders describe our conversations as more like improv than
anything — and we'd also have missed out on what I consider a very unique friendship, which I
treasure immensely.

Ryan was a sought-after employee in the crypto space, and when we overlapped at Alameda, I
saw firsthand why. He's affable and gets along with basically anyone. He'd been steeped in
crypto for longer than any of us — he knew the space inside and out, which came in handy
continually. He's creative, always striving to figure out solutions to the many idiosyncratic
problems crypto trading brought with it, and succeeding much more often than others. He's a

1

Ex. A-27

Scanned with CamScanner

great manager, able to extract the very best work from his reports while also keeping the environment lighthearted and fun. And, perhaps most important, he works incredibly hard. Right from the start, he was with us, working way too long, literally every single day. He doesn't care about status — if a task needed doing, he would do it. And he'd do it quickly and without complaining — it's no wonder he became so rapidly indispensable.

My two years in Hong Kong working for Alameda were very challenging. I was half the world away from all my friends and family, and I was working 100-hour weeks consistently — it was quite lonely. In addition to working hard and lightening the load somewhat, Ryan was also my lifeline. We didn't know each other well yet, but he always invited me to hang out outside work, whether at a bar or on a hike, or learning to paraglide. He had plenty of friends — literally, everyone loves him — and was just as overworked as I was, but he still made a point to include me, displaying a level of empathy you rarely see. Without him, I'm honestly not sure how I would have made it through those years — he single-handedly made the hardest period of my life bearable by being a great friend to someone who he could tell needed one, and I'll never forget that.

He only got more impressive to me in 2021 when SBF called on him to lead the buildout of FTX's Bahamian office. I wasn't directly part of any of that work and certainly missed having him at Alameda, but he found solutions for housing, office space, transportation, local support staff, food, and many other things for hundreds of people. I was honestly baffled, but I shouldn't have been — I had seen firsthand how hard Ryan works and how creative he is. so it was inevitable that he'd nail this.

And he didn't stop there — he wanted to make sure that employees were happy, so he organized many social events and opportunities for everyone to explore the natural beauty of the Bahamas. He also recognized that his company represented a lot more wealth than most of the locals had ever experienced, so he spearheaded many initiatives to give back to the Bahamians who'd been so welcoming to him. It's easy to imagine the locals being cold toward their boss who showed up and demanded all sorts of things done quickly — but, like everyone else he's ever met, they all loved him (and loved working for him).

Outside work, I've seen Ryan's relationship with Michelle Bond from the beginning, when he would send her funny texts while she was visible on a C-SPAN broadcast to watch her stifle the inevitable giggles. They're perfect for each other in many ways — both work very hard and both love a good laugh. He loves her as much as you'll ever see someone love someone else — within the first month of their relationship, he had 80 photos of her hanging in his home. That number is not hyperbole.

I've been lucky to become close friends with Michelle, as well, and I can see how important Ryan is to her and what a wonderful addition to her life he has been. Her busy schedule can leave her stressed at times, and no one does a better job easing her mind than Ryan. He dives headfirst into anything she's passionate about as her supportive partner. And more important than anything, he's just there for her and loves her regardless of what's going on — which is something they've both needed lately more than ever in their lives.

2

Ex. A-27



Ryan isn't just a great partner to Michelle, though — he's also become an integral part of her family, serving in a stepparent role to her young kids, ███████████. He dove into this role headfirst, as well — on their very first visit to the Bahamas, I remember how he played with them for hours on end and seeing photos of him with them hanging out with flamingos at Baha Mar. And now, years after that, I can see how much he means to them — "Ry Ry," as they call him, cooks them dinner every night, plays Minecraft with ████, helps ████ with homework, and overall has become such an important part of their family that it's hard to imagine how they'll function without him. He loves them as though they were his own kids, and they clearly adore him.

And this past November, Ryan and Michelle welcomed their son, ████. Like many expectant fathers, Ryan wasn't sure he'd be ready — but within hours of ████'s birth, he told me he already felt like a natural. Fatherhood has brought out a new, fantastic side to Ryan — he's so sweet and loving and cherishes every aspect of the job (even the thankless ones). I remember watching him make ████ laugh for ten minutes in a row by making silly faces at him, and I don't think I've ever seen a happier baby — or a happier father. Ryan is so excited about being ████'s dad and everything that comes with it — every milestone lights Ryan's face up; every bit of work is no problem because it's for his son, and every time ████ smiles, so does Ryan. He is and will continue to be a wonderful influence on ████'s life, regardless of the uncertain circumstances of their future.

The sentence you pass down will punish Ryan, but he is aware that the consequences of his actions will impact many others as well. His passion, creativity, and incredible work ethic have all been mobilized toward the goal of preparing those around him for whatever comes next. Michelle will be missing a soulmate and partner in all aspects of her life. ███████████ will be missing one of the best influences they have and their sense of stability, so he's identified ways to continue providing that guiding light. ████ will be missing the most attentive and loving father you can imagine, so he's spending every moment he can with him. And, selfishly, I will be missing the funniest, most passionate, most supportive friend I've ever had — someone who I can say with certainty has made my life a lot better and will continue doing so.

Unsurprisingly, over the past year and a half, Ryan has kept his focus on the future more than I can imagine anyone else in his shoes doing. He's preparing for grad school exams and focusing on health (mental and physical) so that he can come out with an overall improved version of himself after all this. He's never lost confidence in himself to be able to bounce back and create something to leave the world a better place than when he found it — be that by publishing a book to promote inmate education (which he's already done), or by using his many skills to create innovative solutions to weird problems like only he can (he's got a lot of exciting ideas, to say the least). His steadfast belief that he can do anything he sets his mind to is inspiring (especially right now), and, having seen him in action for years, I know that he's right.

Ryan deserves to face the consequences of his actions — he intimately understands that. All I want is for those consequences to be fair — for him, but also for the world, which will be so much worse off not having him fully in it.

Ex. A-27

Scanned with CamScanner

Thank you very much for reading and taking this under consideration — I know you don't take these decisions lightly, and I earnestly hope I've provided some context that facilitates the difficult choices before you.

Sam Trabucco

Ex. A-27

Scanned with CamScanner

Honorable Lewis A. Kaplan
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Kaplan:

My name is Troy, and I am writing to you as a close friend and former colleague of Ryan Salame. I met Ryan shortly after he joined Alameda, where I was among the first employees. Our friendship began almost immediately, partly due to the adventures we shared in Hong Kong, where I was new but Ryan had been living for a few years.

Ryan quickly became part of my circle through our shared experiences hiking, dining out, and exploring the city. Transitioning to a new place can be daunting, but Ryan's genuine and amiable nature made my early days in Hong Kong feel like home. His openness and approachability didn't just resonate with me but made him a well-liked figure among all our colleagues for both his personality and his professional dedication.

During our tenure at Alameda, there were periods of intense work where 18-hour days without holidays or weekends became our norm. While such demanding schedules hardened some, Ryan maintained his upbeat spirit. We may have smiled less those days, but his essential optimism never waned. He was always the one to notice if I had missed a meal during these grueling stretches and would leave food on my desk, a small act of kindness that exemplified his thoughtful nature.

After I left the firm, Ryan and I envisioned regaining control over our lives, aspiring for something brighter, including well-deserved vacations. Ryan took a hiatus while I moved on permanently. However, as events with the company unfolded, our contact was naturally limited as he navigated the complexities of his situation.

Despite this, in the past few months, we reconnected and caught up on life and future aspirations, including Ryan's ever-growing list of books he hopes to read. Understanding the potential for incarceration from this case, I've volunteered to ensure he has a continual supply of tools to achieve his goals.

Ryan has always been more than just a friend or a colleague; he's someone whose resilience and capacity for kindness under pressure have continually impressed me. His commitment to maintaining relationships and pursuing personal growth, even in trying times, speaks volumes about his character.

I support Ryan in this challenging time with all my heart. I believe in his ability to learn, adapt, and continue contributing positively to his community. His fundamental decency and the proactive steps he's taking toward growth reassure me that, no matter what, Ryan will continue finding ways to give to those around him.

Sincerely,

Troy Tsui



# Exhibit B

**COMMONWEALTH OF THE BAHAMAS**

**IN THE SUPREME COURT**

**COMMERCIAL DIVISION**

**2022**

**COM/com/**

### IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020 (as amended)

### AND IN THE MATTER OF the Companies (Winding Up Amendment) Act, 2011

### AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.
(A Registered Digital Asset Business)

---

### AFFIDAVIT OF CHRISTINA R. ROLLE

---

**I, CHRISTINA R. ROLLE,** Executive Director of the Securities Commission of The Bahamas **("the Commission")** of the Island of New Providence, one of the Islands of the Commonwealth of The Bahamas, make Oath and Say as follows

1.  I make this Affidavit on behalf of the Commission, the Petitioner herein in my capacity as the Executive Director of the Commission.

2.  The facts and matters referred to herein are, unless otherwise stated, within my own knowledge or are obtained from information and documents in possession of the Commission or its legal advisors as the case may be, and are true to the best of my knowledge, information and belief. Where the matters deposed hereto are not within my knowledge, they are derived from the sources which I identify and are true to the best of my information and belief.

3.  There is now produced and shown to me marked **"CR-1"** a paginated bundle of documents to which I shall refer in the course of my Affidavit. References to page numbers in this Affidavit are references to page numbers in the said paginated bundle unless otherwise stated.

1

4. This Affidavit is made in support of an application by way of Summons for Directions dated 10th November 2022 seeking among other things, an Order that Mr. Brian Simms KC be appointed as the provisional liquidator of FTX Digital Markets Ltd. **("FTX Digital" or "the Company")** on the basis that among other things, the Commission considers such action is in the public interest in order to protect the interest of clients or creditors of FTX Digital and the wider public interest in the orderly and secure management of the business of digital assets in the Commonwealth of the Bahamas.

5. As a preliminary, I would respectfully request this Honourable Court to note that this matter is extremely urgent and the investigation of the Commission relative to the matters as set out below are ongoing. Nonetheless, the Commission is of the considered view that the intervention of this Honourable Court is necessary in order to protect the assets of the Company and to maintain the integrity of the regulatory framework for digital assets within this jurisdiction.

6. I should also make clear that if this Honourable Court accedes to the relief sought in the Summons to appoint Mr Brian Simms KC as a provisional liquidator, he has informed me and I believe, that he will take urgent steps to obtain the urgent assistance of one of the big four accountancy firms to assist him in his role and, in due course, seek the appointment of a partner of one those firms to join him in a joint appointment as a provisional liquidator. In the time available it has not been possible for a partner of one of the big four to obtain clearance to act.

7. Due to time constraints and the urgency of this matter, I set out herein only the basic facts and information known to the Commission at this time. I am not able at this stage to comprehensively address each and every fact associated with this matter as there is simply insufficient time. Further our investigations are at a preliminary stage and new facts are emerging all the time. I will, however, to the extent necessary and appropriate supplement this affidavit as more information becomes available to the Commission.

## Background

8. FTX Digital is a company duly incorporated under the laws of The Bahamas and is registered as a digital asset business under the *Digital Assets and Registered Exchanges Act, 2020* **("the DARE Act")**. FTX Digital is a subsidiary of FTX Trading Ltd, a company incorporated in Antigua and Barbuda (collectively referred to as **"FTX")**.

At pages **[1]-[7]** of Exhibit **"CR-1"** is a true copy of the jurisdiction, regulations, licensing and practices page obtained from FTX.com.

9.    The Commission is the regulator of FTX Digital under the DARE Act.

10.   Under the DARE Act, FTX Digital is registered as a digital asset business and is approved to provide the following services as (i) an exchange between digital assets and fiat currency; (ii) an exchange between one or more forms of digital assets; and (iii) the transfer of digital assets.

11.   The officers of FTX Digital as registered with the Commission are:

    Ryan Salame (Chairman and Director)

    Sam Bankman Fried (Director Chief Executive Officer)

    Daniel Friedberg (Secretary)

    Metered Limited (Assistant Secretary)

12.   At pages **[8]-[9]** of Exhibit **"CR-1"** is an organizational chart relative to FTX Digital, its subsidiaries, affiliates and otherwise.

13.   The likely property and assets of FTX Digital consist in broad outline of the following:

    13.1. Tokens (i.e., digital assets that are built on top of existing blockchain (using smart contracts).

    13.2. Non-fungible tokens;

    13.3. Crypto currency coins (which are native to their own blockchain and not built on top of existing blockchains, such as BTC and ETC);

    13.4. Fiat Currency

    13.5. Crypto currency Derivative Contracts

    13.6. Realty;

    13.7. traditional stocks and bonds in other companies;

    13.8. private equity and venture capital investments and possible partnerships.

    13.9. loans to margin customers and related entities, and third parties.

14. In the time available and due to the unresponsiveness of the management of the Company it has not been possible to obtain any greater or more specific clarity of the property and assets of the Company.

15. In recent days, there have been reports in both the international and local media, which directly relate to and impact FTX Digital, including but not limited to the financial stability of FTX and allegations of possible misappropriation and/or negligence vis-à-vis clients' assets. At pages **[10]-[25]** of Exhibit **"CR-1"** are true copies of articles from Bloomberg, the Wall Street Journal and the Financial Times relative to FTX Digital.

16. On 9th November 2022, Bloomberg reported (see page **[10]** of Exhibit **"CR-1"**) that,

> *"Sam Bankman-Fried told FTX.com investors Wednesday that without a cash injection the company would need to file for bankruptcy, according to a person with direct knowledge of the matter.*
>
> ***On a call before Binance pulled an about-face and bailed on its takeover offer, Bankman-Fried informed investors his crypto exchange faced a shortfall of up to $8 billion and needed $4 billion to remain solvent, the person said, asking not to be named discussing private talks. FTX is attempting to raise rescue financing in the form of debt, equity, or a combination of the two, the person said."***

*[Emphasis added]*

17. Further, Yahoo! Finance reported on 8th November 2022 that FTX halted all non-fiat customer withdrawals, *See **pages [13]-[17]** of Exhibit **"CR-1"***. In effect and substance, if this article is accurate it means that clients were unable to retrieve their funds from FTX despite the representation on FTX's website that *"FTX maintains 24/7 withdrawal availability." At page **[5]** of Exhibit **"CR-1"** is a true copy of said representation.

### *Investigation of the Commission*

18. The investigation of the Commission relative to the present state of affairs of FTX Digital is at a preliminary stage. For the reasons as set out herein, the Commission has grave concerns relative to the operations and affairs of FTX Digital.

19. On 8th November 2022, I sent an e-mail to SBF and Ms. Jessica Murray (in her capacity as the Compliance Officer and Money Laundering Reporting Officer **("MLRO")**) of FTX

Digital requesting a meeting to discuss these recent developments, that is, the liquidity issues and potential acquisition of FTX by Binance.

20. It should be noted that Ms. Murray has apparently since resigned as the Compliance Officer and MLRO of FTX Digital.

21. The potential acquisition of FTX by Binance was reported in the media. Binance is said to be the largest cryptocurrency exchange in the world in terms of daily trading volume of cryptocurrencies.

22. For these purposes, it must be noted that Binance has since released the following statement on the social media platform, Twitter on 9th November 2022:

> *"As a result of corporate due diligence, as well as the latest news reports regarding mishandled customer funds and alleged US agency investigations, we have decided that we will not pursue the potential acquisition of FTX.com."*
>
> *[Emphasis Added]*

At page **[26]** of Exhibit **"CR-1"** is a true copy of the social media post.

23. On 8th November, Ms. Murray responded to my e-mail as referred to above at paragraph 19 as follows:

> *"Your e-mail is well received. Let me confirm a day and time and revert."*

24. I responded and requested that it would be good if the call could take place *"today"* [8th November 2022] and received the following response from SBF,

> *"Hey! I'm pretty pressed for time but will make sure that we talk to you ASAP; I'll briefly say that, as of now, no sale has happened or been finalized although there are active talks. We'll keep you updated about those."*

25. On 9th November 2022, I sent follow up questions to FTX Digital on behalf of the Commission about client assets but have not yet received a response to the queries. The e-mail stated as follows:

> *"Further to my note below, please see some initial queries from the Securities Commission of The Bahamas with respect to ongoing issues. Please advise as follows:*
>
> 1. *Number of clients registered on the FDM platform, total value of assets held for all FDM clients and whether those assets are held in a segregated account;*
> 2. *Total value of client withdrawals from FDM platform over the past week. Have there been any withdrawal requests that were unsatisfied or that remain outstanding?*

3. The extent to which FDM clients' assets may have been invested, loaned, used as collateral or otherwise hypothecated or encumbered on behalf of FDM, Alameda, other related parties and/or third parties;

Please also provide an explanation with respect to the following:

1. Which FTX Group entity is party to the non-binding LOI with Binance? What are the terms of the LOI and what is the potential impact for clients of FDM;

2. Details of the connection between FDM and Alameda. Were there any services provided by Alameda to FDM or vice versa? Were there any related party or counterparty transactions between the entities.

Please also provide a sample of FDM's client agreement (including general terms and conditions).

Your urgent attention and response by end of day is needed. If you wish to discuss, please feel free to reach out to us.

*[Emphasis Added]*

At pages **[27]-[30]** of Exhibit **"CR-1"** is a true copy of the said e-mails.

26. On 9ᵗʰ November 2022 at 9:27PM, SBF sent the following e-mail to Mr. Ryan Pinder KC, the Attorney General of The Bahamas, to which I was copied:

'Hi all,

I'm really sorry about the delayed responses here -- it's been a hectic week but that's on me. Myself, and Joe (cc'ed), will be responsive going forward.

And I'm also deeply sorry for ending up in this position in the first place.

I'll give the answers I can give right now and try to get to the others ASAP.

1) Right now we are focused on one thing: making customers whole. We are focusing exclusively on doing that this week. We are ceasing all nonessential operations beyond that. I am doing everything I can to try to do right by our customers.

2) I have not briefed the securities commission. I would be more than happy to have a phone call with you, the PM, and the SCB in the next few days to give a thorough overview of the situation.

3) I am cautiously optimistic that we will be able to survive the turmoil and have enough liquidity for all customer withdrawals, and that is my sole focus this week. I will keep you guys updated.

4) We are investigating a more thorough answer to this question; we did not intend to, but are concerned that poor risk management lead to a liquidity issue.

5) As you saw, Binance did not end up following through on their transaction. However, we are in the middle of a separate process to make users whole; we will know within a week if that comes through. So far, we have strong

*indications of interest that would be more than enough to cover all liquidity needs; we are working on confirming those. I am cautiously optimistic that we will be able to.*

*6) We are deeply grateful for what The Bahamas has done for us, and deeply committed to it. We are also deeply sorry about this mess.*

*As part of this: we have segregated funds for all Bahamian customers on FTX. And* **we would be more than happy to open up withdrawals for all Bahamian customers on FTX, so that they can, tomorrow, fully withdraw all of their assets, making them fully whole**. *It's your call whether you want us to do this--but we are more than happy to and would consider it the very least of our duty to the country, and could open it up immediately if you reply saying you want us to. If we don't hear back from you, we are going to go ahead and do it tomorrow."*

At pages **[31]-[35]** of Exhibit **"CR-1"** is a true copy of the said e-mail.

27. The Commission has grave concerns as a result of the lack of responsiveness on the part of SBF (and FTX Digital generally) to the correspondence *from* the Commission.

28. The Commission regards the lack of responsiveness on the part of FTX Digital and its officers as a breach of their statutory obligations under the DARE Act, including but not limited to the duty to provide information relevant to the operations of the business as the Commission may require, and to deal openly, honestly and co-operatively with the Commission.

29. SBF acknowledged in his e-mail set out above at paragraph 26 that he has not briefed the securities commission.

30. Further SBF's e-mail gives rise to further concerns on the part of the Commission. Particularly, SBF has advised that FTX has *"segregated funds for Bahamian customers"* and are willing to allow those customers to withdraw those funds. The question that ultimately arises is whether such transactions would be characterized as voidable preferences under the insolvency regime and subsequently result in attempts to claw back funds from Bahamian customers. In any event, the Commission cannot condone the preferential treatment of any investor or client of FTX Digital or otherwise.

31. Ultimately, there is a paucity of information available to the Commission at this stage, including the financial affairs of FTX Digital. The vague representations in SBF's e-mail above does not quell the concerns on the part of the Commission and seemingly contradicts the reports in the media that FTX is in effect and substance in a liquidity crisis.

### *Teleconference with Ryan Salame*

32. As stated above, Ryan Salame is the Chairman and Director of FTX Digital. On 9th November 2022, I had a call with Ryan Salame, Allyson Maynard-Gibson KC (in her capacity as local counsel on behalf of FTX Digital) and Ryne Miller, Counsel for FTX US in an attempt to gather further information.

33. The statements made by Mr. Salame has exacerbated the need for the intervention of this Honourable Court on an urgent basis.

34. Specifically, Mr. Salame advised that clients' assets which may have been held with FTX Digital were transferred to Alameda Research **("Alameda")** to cover financial losses of Alameda. Alameda and FTX Digital are related companies, that is, SBF is the beneficial owner of both.

35. I understood Mr. Salame during the call as advising the Commission that the transfer of clients' assets in this manner was contrary to the normal corporate governance and operations of FTX Digital. Put simply, that such transfers were not allowed or consented to by their clients.

36. Mr. Salame further advised the Commission that there were only three **(3)** persons who had the necessary codes (or passwords) to transfer clients' assets to Alameda in this manner, that is, the founders of FTX namely Sam Bankman Fried, Nishad Singh and Zixiao (Gary) Wang. Given such actions may be deemed criminal, the Commission has requested by way of letter dated 9th November 2022 that the Royal Bahamas Police Force carry out on an investigation relative to same. At pages **[36]-[37]** of Exhibit **"CR-1"** is a true copy of the said letter.

37. As set out above at paragraphs 27 and 28 the Commission has not received a response from SBF relative to the transfer of assets to Alameda.

### *Appointment of Provisional Liquidator*

38. In light of the foregoing, particularly the representations made by Mr. Salame, it is paramount that the Commission protect the welfare of investors, creditors and clients of

FTX Digital, as well as maintain the integrity and reputation of The Bahamas in the digital asset space.

39. In the circumstances, I hereby confirm that the Commission has determined that it is in the public interest of FTX Digital's investors and clients and the reputation of the Commonwealth's finance industry generally for a provisional liquidator to be appointed immediately to safeguard FTX Digital's assets until further order of this court.

40. This case satisfies the conditions for the appointment of a provisional liquidator in that:

    40.1. FTX Digital is an International Business Company duly incorporated under the laws of The Bahamas with property and carrying on business in the Bahamas within the meaning of the Companies (Winding Up Amendment) Act 2011 **("CWUA Act")**, s.185 (d). It is therefore subject to the winding up jurisdiction of this Honourable Court.

    40.2. The Commission is a regulator within the meaning of that term in CWUA Act s.183. As a regulator the Commission is given authority to present a winding up petition against FTX Digital under CWUA Act, s.190(4). S.190(4) is extremely widely drafted. It provides that a winding up petition may be presented *"by a relevant regulator in respect of any company which is carrying on a regulated business ... for any other reason as provided under the regulatory laws or any other law"*.

    40.3. Accordingly, this Honourable Court may appoint a provisional liquidator pursuant to CWUA Act, s.199 on the application of the Commission if there is a prima facie case for making a winding up order and the appointment of a provisional liquidator is necessary (i) to prevent the dissipation or misuse of the company's assets and/or (ii) prevent mismanagement or misconduct on the part of the company's directors, or (iii) in the public interest.

41. There is a prima facie case for making a winding up order in this case. CWUA Act, s.186(c) provides that a company may be wound up by the Court if it is insolvent. CWUA Act, s.187 defines insolvent as (a) where the company is unable to pay its debts as they fall due or (b) the value of the company's liabilities exceeds its assets. The definition in s.187(a) is

expanded by s.188(c) which provides that a company shall be deemed unable to pay its debts if it is proved to the satisfaction of the court that the company is unable to pay its debts. As detailed above FTX Digital's management has not been forthcoming about its finances or the security of its investors' assets. However, the Bloomberg report referred to at paragraph 16 above indicates that FTX Digital may be insolvent by at least $4 billion. Further the fact that FTX Digital's clients can no longer withdraw their funds despite the representation on FTX's website that *"FTX maintains 24/7 withdrawal availability"* is yet further evidence that the company is insolvent. Accordingly, there is a prima facie case for making a winding up order in this case.

42. The evidence detailed above makes out a strong case that the assets of FTX Digital including investors' assets need protection and that there may have been director misconduct and/or mismanagement. There is also a strong case for taking action in the public interest.

43. Further and/or alternatively, the Commission has certain powers under the DARE Act, where there has been a failure to comply with the DARE Act by a registrant [i.e., FTX Digital]. Specifically, the Commission may impose an administrative sanction for such failure, which such sanction in accordance with s.46 (1) (f) includes applying to this Honourable Court for an order to take such action as the Commission considers necessary to protect the interest of clients or creditors of registrant.

44. As set out above at paragraph 27, the Commission regards the lack of responsiveness on the part of FTX Digital and its officers as a breach of their statutory obligations under the DARE Act, including but not limited to the duty to provide information relevant to the operations of the business as the Commission may require, and to deal openly, honestly and co-operatively with the Commission.

45. The Commission has determined that the sanction warranted in the circumstances is for the winding-up of the Company and the appointment of a provisional liquidator to protect the interest of clients or creditors of FTX Digital. The Commission (as the regulator of FTX Digital) has jurisdiction under *s. 190 (4)* of CWUA Act in the circumstances for the reasons as aforementioned to present the winding-up petition for any other reason as provided under the laws of The Bahamas.

46. Additionally, on 10 November 2022 the Commission has suspended the license of FTX Digital under **s.19 (1)** of the DARE Act pending the completion of an investigation of the matters as set out herein. That is, the Commission is of the considered view that among other things:

> 46.1. the suspension would be in the public interest;

> 46.2. the digital asset business is being conducted in breach of the DARE Act or in breach of other laws of The Bahamas; and/or

> 46.3. that the persons operating the digital asset business and the digital token exchange, may no longer be fit and proper persons to provide these services.

47. This Honourable Court, pursuant to **s.186 (f)** of the *CWUAA* has the jurisdiction to wind up FTX Digital. That is, a company may be wound up by the court if a regulator [i.e., the Commission] petitions for the winding up of a company over which it has regulatory authority and whose license or registration has been suspended or revoked.

**Conclusion**

48. Based on the foregoing, the Commission humbly prays that this Honourable Court do grant the relief as prayed for in the Summons for Directions dated 10 November 2022, that is, an Order that *inter alia* Mr. Simms KC be appointed as the provisional liquidator of FTX Digital pending the hearing of the Petition.

49. The Commission is of the view that there are exceptional circumstances as set out above which justifies the application being made ex-parte.

**SWORN TO** before me this )
**10th day** of November, 2022 at )
Nassau, N.P., The Bahamas )

Before me,

**NOTARY PUBLIC**

**COMMONWEALTH OF THE BAHAMAS**

**2022**

**IN THE SUPREME COURT**

**COM/com/**

**COMMERCIAL DIVISION**

**IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020
(as amended)**

**AND IN THE MATTER OF the Companies (Winding Up Amendment) Act, 2011**

**AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.**
(A Registered Digital Asset Business)

---

**CERTIFICATE**

---

I hereby certify that the attached is a true copy of **Exhibit "CR-1"** referred to in the Affidavit of Christina Rolle sworn before me this **10th day** of **November A.D., 2022.**

_____

**NOTARY PUBLIC**

 **FTX**

FTX Exchange  ›  Getting Started with FTX  ›  Legal

Search Help Center

# Jurisdiction, regulations, licensing, and practices

 FTX Crypto Derivatives Exchange
Updated 2 months ago

**BROWSE** ⌄

## <u>Licensure and Regulation</u>

1. FTX Trading Ltd is incorporated in Antigua and Barbuda.

2. FTX Digital Markets Ltd, a subsidiary of FTX Trading Ltd, is licensed under The Bahamas' Digital Assets and Registered Exchange Act, 2020 and regulated by the Securities Commission of the Bahamas.

3. FTX Trading Ltd owns, through its Gibraltar subsidiary Zubr Exchange Limited, a crypto derivatives exchange licensed by the Gibraltar Financial Services Commission as a distributed ledger technology provider.

4. FTX provides services to Australian customers via FTX Express Pty Ltd, an AUSTRAC-registered digital currency exchange provider, and FTX Australia Pty Ltd, an Australian Financial Services Licensee.

5. FTX Digital Markets Ltd does not currently facilitate



stocks or prediction markets. All other services and users currently are or soon will be facilitated by FTX Digital Markets Ltd.

6. FTX Europe's domain is approved through K-DNA Financial Services Ltd., a duly incorporated Investment Firm in Cyprus that is passported to the European Economic Area. FTX is a brand operated by K-DNA Financial Services Ltd. and regulated by the Cyprus Securities and Exchange Commission, with license number 273/15.

7. FTX offers tokenized stock trading in partnership with K-DNA and FTX Switzerland GmbH, utilizing a German license in concert with FTX Trading GmbH. See here for details.

8. FTX's subsidiary, FTX Switzerland GmbH, can provide financial services and limited custody services. It is registered for AML purposes with SRO Treuhand Suisse and is a member of Finanzombudsstelle Schweiz (FINOS)

9. FTX's subsidiary, DAAG Certificates GmbH, has an approved base prospectus for various tokenized financial instruments, which is valid in Switzerland and is passported across the EEA.

10. FTX's subsidiary DAAG Trading, DMCC, is a licensed proprietary trader and swap dealer in the United Arab Emirates.

11. FTX's subsidiary, FTX Exchange FZE, is licensed and prudentially supervised as a Virtual Asset Exchange and Clearing House in the United Arab Emirates by the Virtual Asset Regulatory Authority (VARA).

12. FTX's subsidiary, FTX Japan Corporation (formerly Quoine Corporation), is licensed as a cryptocurrency exchange business (Cryptocurrency Exchange Business Kanto Finance Bureau Director No. 00002), and a Type 1 Financial Instruments Business by the Japan Financial Services Agency.

13. FTX's subsidiary, Quoine Pte Ltd, has been granted an exemption from holding a licence under the Singapore Payment Services Act with respect to digital payment token services.



South African customers may use the representative of OVEX FSP (Proprietary) Limited (authorized FSP 50776).

15. FTX International is not offered in the United States of America. If you are looking for a US platform, you can go to FTX US, which, along with its subsidiaries, holds Money Transmitter, Money Service Business, Derivatives Clearing Organization, Designated Contract Market, Swap Execution Facility, Broker Dealer, and other licenses in the United States.

## **Various Jurisdictions**

1. United States:

    1. FTX does not allow residents of the United States of America to trade on its platform.

    2. FTT is not offered in the United States of America.

    3. FTX.US, a separate trading platform not owned by FTX, does operate in the United States, and maintains a variety of US regulatory licenses, including an MSB, MTLs, DCO, DCM, and SEF.

2. China:

    1. FTX does not maintain an office in mainland China.

    2. FTX does not offer RMB trading or access in any way.

3. Japan:

    1. FTX serves all Japanese residents via FTX Japan.

4. Restricted Jurisdictions

    1. FTX does not onboard or provide services to personal accounts of current residents of restricted jurisdictions or corporate accounts of entities established in restricted jurisdictions

    2. The restricted jurisdictions may include the



Donetsk People's Republic, Iran, Afghanistan, Syria, and North Korea. FTX also does not onboard any users from Ontario, and FTX does

not permit non-professional investors from Hong Kong purchasing certain products. Other jurisdictions may be added to this list.

3. Various other services on FTX, potentially including prediction markets, may have further restricted jurisdictions or be restricted to certain users, potentially including Australia, Hong Kong, Singapore, and Canada.

4. FTX does not offer derivatives products to users from Brazil.

5. FTX does not onboard or provide services to any sanctioned individuals or entities. In addition, FTX does not allow transactions with Russian banks or the Russian Ruble. For more information, see here.

6. FTX offers tokenized stock trading in partnership with K-DNA and FTX Switzerland GmbH, utilizing a German license in concert with FTX Trading GmbH. See here for details.

7. FTX is owned by FTX Trading LTD, a company incorporated in Antigua and Barbuda, and headquartered in the Bahamas as FTX Digital Markets Ltd.

8. FTX's market identifier code (MIC) under ISO 10383 is XFTX.

## Trading

1. FTX offers a platform for users to match against each other.

2. FTX does not actively trade itself.

3. FTX does not use any other exchanges for trading.

4. FTX maintains backstop funds to prevent losses or clawbacks

5. In its history, FTX has *never* clawed back legitimate



# Deposits and Withdrawals

1. FTX strives to process all deposits and withdrawals promptly; FTX maintains 24/7 withdrawal availability.

2. FTX has *never* had an outage of deposit or withdrawal services.

3. Users who deposit to incorrect addresses may lose their funds, though in some cases FTX may be able to recover them for a fee. Please create a request at https://ftx.com/support if you do so.

4. FTX has *never* clawed back or restricted legitimate user funds due to any security issues on its behalf. FTX encourages its customers to make use of the full suite of tools available to protect their accounts, and mandates 2-factor authentication on all active accounts.



← Previous

Location Restrictions

Next →

Privacy Policy

**ARTICLES IN THIS SECTION**

How To Contact Us

Copyright Information

Security Policy

Location Restrictions

**Jurisdiction, regulations, licensing, and practices**

Privacy Policy

FTX Terms of Service

FTX Australia Legal



**RELATED ARTICLES**

Location Restrictions

FTX Terms of Service

Tokenized Stocks

Individual Account KYC

Blockchain Deposits and Withdrawals

**PROMOTED ARTICLES**

Introducing New Fee and Ratelimit Tiers to the FTX VIP & Market Maker Program

Deposit to your FTX account to earn VIP status

VIP Program and Market Maker Policy

FTX partners with Paradigm for one-click futures spreads trading

## Didn't find what you were looking for?

Create a support ticket

## Community

   

## Was this article helpful?

| Yes | No |

0 out of 0 found this helpful





English (US) ⌄

FTX Services and FTX Token (FTT) are not available in the United States or other prohibited jurisdictions



A related Bahamian entity, under common ownership, has secured a lease on office premises at Building 27, Veridian Corporate Center, Western Road, Nassau, The Bahamas. Negotiations are underway to purchase the entire land and buildings at Veridian Corporate Center, with the intention of establishing the FTX Campus.

## Corporate Structure

FDM is a wholly-owned subsidiary of FTX, a company incorporated in Antigua and Barbuda. FTX is majority-owned by Sam Bankman-Fried, who is the ultimate beneficial owner of FDM.



## Corporate Governance

FDM is governed by a board of directors (the **Board**) comprising Sam Bankman-Fried and Ryan Salame. The Board intends to expand its composition in line with the growth of the business.

The role of the Board is to ensure FDM's prosperity while meeting the appropriate interests of the company's shareholders and relevant stakeholders, including the Securities Commission of

The Bahamas (**SCB)**. It oversees the performance of the executive team and sets strategic objectives and policies. It is responsible for the company's risk management and compliance frameworks, and compliance with local and international legal and regulatory requirements.

The Board will meet once a quarter and, additionally, as necessary and needed.

FDM's officers are:

| Chairman | Sam Bankman-Fried |
|---|---|
| Chief Executive Officer & President | Ryan Salame |
| Secretary | Daniel Friedberg |

# Executive Team

As CEO & President, Ryan Salame will have overall responsibility for FDM's day-to-day affairs. The CEO is accountable to the Board of Directors. A US and St Kitts and Nevis citizen, Mr Salame, will be permanently resident in The Bahamas, subject to the issue of a work permit.

FDM's Compliance Officer is Jessica Ferguson-Murray, a Bahamian citizen. She reports to the CEO but is accountable, and has direct access, to the Board of Directors.

Both roles are subject to SCB approval.



**Crypto**
+ Wealth

# FTX Warns of Bankruptcy Without Rescue for $8 Billion Shortfall

- ■ Bankman-Fried said his firm faced up to $8 billion shortfall
- ■ Binance bailed on FTX takeover, citing finances and probes

By Gillian Tan

9 November 2022 at 16:57 GMT-5 *Updated on 9 November 2022 at 22:31 GMT-5*

Sam Bankman-Fried told FTX.com investors Wednesday that without a cash injection the company would need to file for bankruptcy, according to a person with direct knowledge of the matter.

On a call before Binance pulled an about-face and bailed on its takeover offer, Bankman-Fried informed investors his crypto exchange faced a shortfall of up to $8 billion and needed $4 billion to remain solvent, the person said, asking not to be named discussing private talks. FTX is attempting to raise rescue financing in the form of debt, equity, or a combination of the two, the person said.

"I f--ed up," Bankman-Fried told investors on the call, according to people with knowledge of the conversation. He said he would be "incredibly, unbelievably grateful" if investors could help.



Sam Bankman-Fried  *Photographer: Ting Shen/Bloomberg*

An FTX representative declined to comment.

The acknowledgment of his firm's deepening troubles and limited options is a stunning turn for the crypto industry's onetime wunderkind, who was once worth $26 billion and likened to John Pierpont Morgan. It also underscores the uncertainty hanging over FTX, its clients and cryptocurrency markets.

Hanging in the balance as the exchange teeters is not just the fate of its investors and lenders but anyone who has been unable to retrieve customer assets since it halted some withdrawals earlier in the week. The failure of crypto firms Celsius and Voyager saw billions in client money tied up in bankruptcy proceedings.

FTX has a prominent list of backers such as Sequoia Capital, BlackRock Inc., Tiger Global Management and SoftBank Group Corp. Sequoia wrote down the full value of its holdings in FTX.com and FTX.us, an indication that the firm sees no clear path to recouping its investment.

Still, Bankman-Fried remained defiant during a hectic period of roughly 24 hours that included mounting speculation that Binance wouldn't go through with the deal.

He repeatedly told investors during the conference call on Wednesday afternoon that it was simply not true that Changpeng Zhao was walking away from the takeover, the person said.

About an hour later, Binance said it was indeed backing out.

Read more: Binance Backs Out of FTX Rescue, Citing Finances, Investigations

"Our hope was to be able to support FTX's customers to provide liquidity, but the issues are beyond our control or ability to help," Binance, the crypto exchange founded by Zhao, said in a statement.

In addition to the financial strains, FTX is drawing attention from US authorities.

The Securities and Exchange Commission and the Commodity Futures Trading Commission are investigating whether the firm properly handled customer funds, as well as its relationship with other parts of Bankman-Fried's crypto empire, including his trading house Alameda Research, Bloomberg News reported Wednesday. Officials from the Justice Department also are working with SEC attorneys, one of the people said.

Zhao said in a memo earlier on Wednesday that there was no "master plan" to take over FTX, and that "user confidence is severely shaken."

The renewed concern about contagion risk is showing up in the plunging prices of digital assets. Bitcoin fell below $16,000, the lowest in two years, after Binance's announcement.

Coinbase Chief Executive Officer Brian Armstrong said Tuesday in a Bloomberg TV interview that if the deal with Binance fell through, it would likely mean FTX customers would take losses.

"That's a not a good thing for anybody," he said.

For crypto market prices: {CRYP}; for top crypto news: {TOP CRYPTO}.

FOR MORE COVERAGE

---

Crypto Chaos Stirs Fresh Wall Street Selling as CPI Report Looms

Evercore's Emanuel Warns Bitcoin Plunge May Take Stocks to Lows

Binance Backs Out of FTX Rescue, Citing Finances, Investigations

'Ethereum Killer' Solana Falls Prey to Binance-FTX Deal Turmoil

Tiger Global, SoftBank Stare Down Fresh Losses on FTX Wagers

US Probes FTX Empire Over Handling of Client Funds, Lending

*– With assistance by Yueqi Yang and Hannah Miller*

*(Updates with Sequoia Capital writing down FTX investment in the seventh paragraph.)*

---

Terms of Service  Do Not Sell My Info (California)  Trademarks  Privacy Policy
©2022 Bloomberg L.P. All Rights Reserved
Careers  Made in NYC  Advertise  Ad Choices  Help



HOME    MAIL    NEWS    FINANCE    SPORTS    ENTERTAINMENT    LIFE    SEARCH    SHOPPING    YAHOO PLUS    MORE...

yahoo!finance

Search for news, symbols or companies

Sign in    Mail

Finance    Watchlists    My Portfolio    Crypto    Yahoo Finance Plus    News    Screeners    Markets    Videos    Personal Finance    Industries    Contact U

123RF — Create outstanding sales with stunning images

U.S. markets close in 1 hour 24 minutes

| S&P 500 | Dow 30 | Nasdaq | Russell 2000 | Crude Oil | Gold |
|---|---|---|---|---|---|
| 3,923.10 | 33,544.28 | 10,993.55 | 1,857.74 | 86.64 | 1,754.50 |
| +174.53 (+4.66%) | +1,030.34 (+3.17%) | +640.37 (+6.19%) | +97.34 (+5.53%) | +0.81 (+0.94%) | +40.80 (+2.38%) |

 CoinDesk

# FTX Exchange Halts All Crypto Withdrawals

💬 11

**Tracy Wang**
Tue, November 8, 2022 at 4:51 PM · 1 min read



Alex Wong

Crypto exchange FTX has halted all non-fiat customer withdrawals, an FTX support employee confirmed in the company's official Telegram group Tuesday afternoon.

"Any transfers besides fiat are halted," wrote the FTX Support employee. The halt highlights the deteriorating condition of the exchange, which was previously still processing withdrawals, albeit at a slower pace.

Many FTX customers in Telegram posted that they had been waiting hours to withdraw their funds.

"It's been a full 11 hours since I've requested my withdrawal," one user wrote.

Just hours earlier, FTX co-founder Sam Bankman-Fried tweeted that FTX had reached a non-binding agreement to be acquired by crypto exchange rival, Binance. Bankman-Fried tweeted that "all assets will be covered 1:1."


123RF — Create a powerful brand presence with stunning images — CREATE NOW

Quote Lookup

**TRENDING**

1. FTX Latest: Junior Employees Try to Sell Assets With Boss Away
2. GLOBAL MARKETS-Wall St jumps, dollar slides as easing inflation fuels Fed abatement hopes
3. Where inflation is improving the most
4. REFILE-US STOCKS-Wall Street soars on sign of cooling inflation
5. California sues 3M, Dupont over toxic 'forever chemicals'


123RF — Create effective digital marketing campaigns with stunning images — CREATE NOW

HOME  MAIL  NEWS  FINANCE  SPORTS  ENTERTAINMENT  LIFE  SEARCH  SHOPPING  YAHOO PLUS  MORE...



Search for news, symbols or companies

Sign in  Mail

Finance  Watchlists  My Portfolio  Crypto  Yahoo Finance Plus  News  Screeners  Markets  Videos  Personal Finance  Industries  Contact U

Things have come full circle, and FTX.com's first, and last, investors are the same: we have come to an agreement on a strategic transaction with Binance for FTX.com (pending DD etc.).

ftx.com
FTX
Cryptocurrency Derivatives Exchange

**SBF** ✔
@SBF_FTX · **Follow**

2) Our teams are working on clearing out the withdrawal backlog as is. This will clear out liquidity crunches; all assets will be covered 1:1. This is one of the main reasons we've asked Binance to come in. It may take a bit to settle etc. –- we apologize for that.

11:03 AM · Nov 8, 2022  ⓘ

❤ 4.9K  💬 Reply  🔗 Copy link

**Read 269 replies**

It appears customers can still withdraw their assets to fiat, although opting for the fiat option could see the funds take up to five business days for settlement.

Reuters reported FTX saw withdrawals totaling $6 billion in the past several days, citing an internal message to company employees sent by Bankman-Fried.

An FTX employee in the Telegram Support chat told panicked customers: "no eta for now, sorry."

Advertisement

Advertisement

**yahoo!**finance

Search for news, symbols or companies

Sign in    Mail

Finance   Watchlists   My Portfolio   Crypto   Yahoo Finance Plus   News   Screeners   Markets   Videos   Personal Finance   Industries   Contact



Dillard's (DDS) third quarter earnings on November 9 will be significant and insightful into the effects an economic downturn is having on the economy. Earnings estimate revisions trending higher is a good sign that the company may beat earnings...

2d ago



Zacks

**Dillard's (DDS) Beats Q3 Earnings and Revenue Estimates**

Dillard's (DDS) delivered earnings and revenue surprises of 125.05% and 3.61%, respectively, for the quarter ended October 2022. Do the numbers hold clues to what lies ahead for the stock?

6h ago



Ad • Dailysportx   •••

**20 Actors With Martial Arts Skills**

This list covers actors and celebs that are actually skilled in one or more martial arts disciplines, and some of the entries may surprise you...



Benzinga

**Dillard's Pops On Q3 Earnings Beat**

Dillard's Inc (NYSE: DDS) reported third-quarter FY22 sales growth of 4.1% year-on-year to $1.57 billion, beating the consensus of $1.48 million. Total retail sales increased by 3% for Q3. Sales in comparable stores increased by 3%. Stronger...

3h ago



CoinDesk

**FTX Blowup Puts Trove of Prized Bored Apes at Risk of Liquidation**

Yuga Labs, the NFT collective behind the majority of tokens held in the crypto empire's wallet, has previously raised capital from FTX Ventures, though Alameda Research is in control of the wallet.

22h ago



CoinDesk

**Top FTX Lawyer Orders Documents Preserved as Investigations Ramp Up**

FTX US General Counsel Ryne Miller called the turn of events "disappointing."

2h ago



Ad • Aeropost   •••

**The Bahama's biggest marketplace is here**

Millions of products at one fully landed price



Reuters

**Trading in crypto derivatives surges as investors hedge positions after FTX shock**

Trading volumes in bitcoin futures and exchange traded funds (ETFs) has exploded as investors scrambled to hedge their positions after this week's slump in digital tokens triggered by turmoil at crypto exchange FTX. CME bitcoin futures Novembe...

1h ago

CoinDesk

**FTX US Warns of Trading Halt Hours After Bankman-Fried Says It's '100% Liquid'**

FTX US warned that it might halt trading in a banner on its website Thursday.

1h ago

Yahoo Finance Video

**Crypto market facing chaos amid the collapse of FTX**

Yahoo Finance's David Hollerith explains what happened to crypto exchange FTX, the fallout across the crypto industry, and what it means for investors.

**yahoo!** finance

Search for news, symbols or companies

Sign in          Mail

Finance    Watchlists    My Portfolio    Crypto    Yahoo Finance Plus    News    Screeners    Markets    Videos    Personal Finance    Industries    Contact



That's when my friend told me to place a crayon in my wallet when traveling. The...



**Bloomberg**

**How Binance, FTX Deal Rocked the Crypto World and Then Collapsed**

(Bloomberg) -- It's been a tumultuous few days in the largely unregulated cryptocurrency world, with mudslinging on Twitter, a shock exchange takeover bid — which then collapsed — and plunging token values.Most Read from BloombergSam...

21h ago



**CoinDesk**

**Bitcoin Miner Marathon Digital Misses Q3 Revenue Estimates, Lowers Hashrate Outlook for 2022**

The miner is targeting 9 EH/s for the end of the year, but maintains it will reach 23 EH/s by the middle of 2023.

2d ago



**CoinDesk**

**Tron's Justin Sun 'Putting Together Solution' for Troubled Crypto Exchange FTX**

Justin Sun, the founder of the Tron cryptocurrency network and Grenada's ambassador to the World Trade Organization, tweeted late Wednesday that he and his team were "putting together a solution" with beleaguered cryptocurrency...

4h ago



Ad • AMD

**20% Faster Performance. How Did They Do It?**

Mercedes-AMG Petronas F1 team raced to 20% better performance by using AMD processors. Read their story to find out how.



**CoinDesk**

**Tron's DAO to Purchase $1B USDT to 'Safeguard' Against Market Slump**

USDT slipped as low as 93 cents in the European afternoon hours.

7h ago



**CoinDesk**

**Solana Blockchain Hit by FTX Tremors as Nearly $800M SOL Tokens Set to Be Unstaked**

The scheduled-to-be-unlocked SOL tokens represent around 15% of the token's circulating supply.

23h ago



**CoinDesk**

**FTX Website Experiences Temporary Outage, Warns Users Not to Make Deposits**

While the FTX US website remains operational, FTX.com is experiencing widespread outages.

22h ago



Ad • Pro Sports Trivia

**What Sport Should You Start Playing? Take The Quiz**

Answer These Personality Questions and We'll Tell You What Sport You Should Get Into Next!

**Forkast News**

**Binance buys FTX: Updates on what it means for the crypto industry**

The following is a running compilation of views and comments on Binance's takeover of the FTX exchange amid speculation of solvency problems at FTX.



Search for news, symbols or companies

Sign in    Mail

Finance    Watchlists    My Portfolio    Crypto    Yahoo Finance Plus    News    Screeners    Markets    Videos    Personal Finance    Industries    Contact



exchange, turned to a rescue from its...

1d ago



**CoinDesk**

**FTX Balances Tumbled 87% in 5 Days in Epic Crypto Deposit Run, Data Shows**

A glance at data from Arkham Intelligence shows the behind-the-scenes operational reality that drove billionaire Sam Bankman-Fried's beleaguered FTX exchange to order a withdrawal halt this week.

3h ago



**Fortune**

**Sam Bankman-Fried quietly deletes his claim that FTX customer funds are safe**

The future of client assets locked on crypto exchange FTX remains uncertain, with a Binance deal that can bail out the company depending on a closer look at the books.

1d ago



**MarketWatch**

**Disney stock tumbles to worst day since 2001 after 'massive earnings downgrade'**

Walt Disney Co. has a profit problem, and that's helped send shares of the media giant to their worst daily performance in more than two decades.

18h ago



**Simply Wall St.**

**Increases to CEO Compensation Might Be Put On Hold For Now at Western Digital Corporation (NASDAQ:WDC)**

The underwhelming share price performance of Western Digital Corporation ( NASDAQ:WDC ) in the past three years would...

9h ago

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/binance-is-said-to-be-likely-to-walk-away-from-deal-to-buy-ftx-11668020963

MARKETSCURRENCIESCRYPTOCURRENCY

# Binance Walks Away From Deal to Rescue FTX

Crypto exchange's decision leaves FTX with uncertain future as it faces multibillion-dollar shortfall

*By Patricia Kowsmann* [Follow] *, Caitlin Ostroff* [Follow] *and Berber Jin* [Follow]

Updated Nov. 9, 2022 9:33 pm ET

Crypto exchange Binance reversed course on a rescue offer for FTX Wednesday, leaving the prominent digital firm with an uncertain future as it faces a shortfall of up to $8 billion, according to people familiar with the matter.

Binance chose not to go ahead with the nonbinding offer following a review of the company's finances, the exchange said. "In the beginning, our hope was to be able to support FTX's customers to provide liquidity, but the issues are beyond our control or ability to help," Binance said in a statement.

In a call Wednesday with investors in FTX, founder and Chief Executive Sam Bankman-Fried said he needs emergency funding because of customer withdrawal requests received in recent days, the people familiar with the matter said. Those requests sparked a debilitating liquidity squeeze.

FTX told investors that it was hoping to raise up to $4 billion in equity to fill the shortfall, people familiar said.

The implosion of the Binance rescue deal weighed on financial markets already rattled by uncertainty around the outcome of U.S. midterm elections. The Nasdaq dove around 2.5% Wednesday while the Dow Jones Industrial Average and S&P 500 both fell around 2%.

Bitcoin, the biggest and best-known cryptocurrency, fell around 16%, bringing its value below $16,000 for the first time since November 2020. It is now down around 75% from an all-time high reached in November 2021.

Also on Wednesday, Securities and Exchange Commission Chairman Gary Gensler issued a stern warning to crypto platforms, after more than a year of encouraging them publicly to register with his agency. He also likened the broader crypto market to a stack of Jenga blocks that gets weaker with each failure.

Once seen as a shining survivor in a struggling industry, FTX's fall has sent shock waves through the cryptocurrency industry. Just months ago, Mr. Bankman-Fried committed nearly a billion dollars to bail out struggling cryptocurrency lenders and was an active lobbyist considered widely to be the face of crypto in Washington.

Binance's retreat now leaves FTX's fate unclear; the cause and full extent of FTX's financial problems are unknown. FTX declined to comment.

In an internal FTX slack channel, Mr. Bankman-Fried on Wednesday wrote, "We obviously just saw Binance's statement; they relayed that to the media first, not to us, and had not previously informed us or expressed those reservations," according to a copy of the message reviewed by The Wall Street Journal.

Mr. Bankman-Fried wrote that he was working on next steps and doing what he can to protect customers, employees and investors. "I'm deeply sorry that we got into this place, and for my role in it. That's on me, and me alone, and it sucks, and I'm sorry, not that that makes it any better."



FTX founder and Chief Executive Sam Bankman-Fried told investors on Wednesday that the exchange needs emergency funding due to customers' recent withdrawal requests.
PHOTO: JEENAH MOON/BLOOMBERG NEWS

Besides the firm and Mr. Bankman-Fried, well-known institutions that invested in the exchange are on the hook for potentially big losses. Among investors in a $900 million fundraising last year were SoftBank Group Corp., Sequoia Capital, hedge fund Third Point and tech-oriented private-equity firm Thoma Bravo.

In a letter to its investors late Wednesday, Sequoia said it is writing off the $150 million that one of its funds invested in FTX because of "solvency risk" for the crypto company. "The full nature and extent of this risk is not known at this time," the letter said. "Based on our current understanding, we are marking out investment down to $0."

Individual traders could also lose funds. FTX has halted withdrawals of both crypto and fiat currencies from the exchange, according to a pinned post in its official Telegram channel.

Michael Turský, a European crypto trader, said he hasn't been able to withdraw his nearly $11,000 from FTX since midday Wednesday. Those funds represented around 70% of his liquid net worth, he said.

He said he tried to withdraw his cash multiple times, to no avail. "Knowing FTX's brand and name, I would have never thought it would go under in a few days," Mr. Turský said. "Even if it did, I would have never expected them to stop all withdrawals"

Losses related to FTX spread beyond the firm itself. Stock investors dumped shares of publicly traded companies that are tied to cryptocurrencies with holdings of them or that derive fees from trading them.

Shares in Coinbase Global Inc. fell almost 10% despite assurances from its chief executive on Twitter that the company has sufficient assets for customer withdrawals and doesn't have any material exposure to FTX. Coinbase closed at its lowest level since going public last year when it fetched an $85 billion valuation. Its market value Wednesday was around $10 billion.

Shares of Silvergate Capital Corp., the closest U.S. bank to the crypto world, dropped 12% and have shed some 75% of their value this year. Shares of MicroStrategy Inc., which pivoted from business software into largely a buy-and-hold vehicle for bitcoin, fell nearly 20%.

Brokerage app Robinhood Markets Inc., which offers trading in more than just crypto, was burned by fears that one of its biggest shareholders, Mr. Bankman-Fried, would have to dump his shares. Robinhood shares dropped nearly 14% on Wednesday, bringing losses for the week to more than 30%.

The cause of the FTX liquidity squeeze still isn't known, but some investors and crypto holders are asking if links between the exchange and a related company, Hong Kong crypto-trading firm Alameda Research, could have contributed to the crisis. Alameda is majority owned by Mr., Bankman-Fried, and he founded both FTX and Alameda.

Questions about the depth and extent of FTX and Alameda's financial relationship grew last week after CoinDesk published a report that indicated much of Alameda's balance sheet was made up of FTT, a cryptocurrency created by FTX.



Changpeng Zhao, CEO of the crypto exchange Binance, which decided it wouldn't go forward with an offer for FTX after a review of its finances.

PHOTO: ZED JAMESON/BLOOMBERG NEWS

Cryptocurrency exchanges, like their counterparts in the world of traditional, regulated finance, rely on a mix of partners to provide digital assets for trading, like bitcoin or ether. So-called market makers help traders buy and sell. They get paid by collecting a small difference between the bid and offer price.

Having ties between an exchange and market maker raised governance issues and the potential for conflicts of interest. In theory, such ties could allow a market maker to potentially trade on privileged information or use the exchange to inflate or deflate prices of a given security.

"These related-party relationships are all red flags that any regulator would recognize," said Larry Harris, a finance professor at the University of Southern California's Marshall School of Business and a former Securities and Exchange Commission chief economist.

In traditional financial markets for equities and futures, exchanges are required to be neutral platforms. Regulators discourage them from being intertwined with trading firms. In the unregulated world of crypto, though, there aren't any such constraints.

There were other links between FTX and Alameda, which besides being a market maker traded for its own purposes. The firm used FTX's FTT tokens as collateral for loans it took out from other crypto lenders, according to people familiar with the matter.

FTT went into free fall in the days after the CoinDesk report and has lost around 90% of its value.

Mr. Bankman-Fried previously rebutted the idea Alameda was intertwined with FTX, saying to the Journal in February that none of FTX's market makers have access to any nonpublic market data. And while Alameda trades on FTX, he said, "their volume is a very small fraction of overall exchange volume, and their account's access is the same as others."

*—Juliet Chung, Alexander Osipovich, Eric Wallerstein, Paul Kiernan, Eliot Brown, Gunjan Banerji and Elaine Yu contributed to this article.*

---

# Cryptocurrency Markets

Related coverage, selected by the editors

SIGN UP FOR THE WSJ CRYPTO
NEWSLETTER

### Binance Walks Away From Deal to Rescue FTX

### Streetwise: What We Can Learn From FTX Moment

### Justice Department Announces Large Bitcoin Seizure

### Bitcoin-Mining Machines Go on Discount

### Crypto Firms Step Up Campaign

### 401(k) Plans Now Allow Cryptocurrency

**Donations**

**NFT Prosecution Sparks Debate Over Insider Trading**

**Andreessen Horowitz Went In on Crypto Before the Plunge**

FTX Trading Ltd

## FTX on brink of collapse after Binance abandons rescue

Sam Bankman-Fried's crypto exchange dashes to fill $8bn hole as Sequoia writes down equity on 'solvency risk'



Sam Bankman-Fried has appealed to investors for support to prop up FTX as customers fearful of its financial health demanded their money back © Bloomberg

**Joshua Oliver** in London, **Richard Waters** in San Francisco, **Ortenca Aliaj** and **James Fontanella-Khan** in New York, and **William Langley** and **Chan Ho-him** in Hong Kong 11 HOURS AGO

### Receive free FTX Trading Ltd updates

We'll send you a *myFT Daily Digest* email rounding up the latest FTX Trading Ltd news every morning.

| Enter your email address | Sign up |
|---|---|

FTX is on the brink of collapse as chief Sam Bankman-Fried races to secure billions of dollars to salvage his empire after Binance ditched an eleventh-hour rescue of one of the world's biggest crypto exchanges.

Venture capital firm Sequoia Capital said it would mark down its $214mn investment in FTX to zero after a run on the exchange in recent days blew a massive hole in its balance sheet and cast serious doubts over its survival.

"In recent days, a liquidity crunch has created solvency risk for FTX," Sequoia said in a note on Wednesday to investors in its fund.

The abrupt change in fortune for FTX and its sister trading firm Alameda Research marks a spectacular fall for Bankman-Fried, a 30-year-old trader and entrepreneur who is one of the industry's most prominent figures. Bankman-Fried was one of the world's richest people just months ago, but large swaths of his $24bn fortune will evaporate if FTX and

Alameda Research go bust.

A collapse would also deal a blow to FTX's blue-chip backers, which include BlackRock, Canada's Ontario Teachers' Pension Plan, SoftBank and hedge fund billionaires Paul Tudor Jones and Izzy Englander.

In recent days, Bankman-Fried has appealed to investors for support to prop up the exchange as customers fearful of its financial health demanded their money back. FTX needs $8bn to steady the ship, according to people with knowledge of the matter.

Bankman-Fried also turned to rival crypto exchanges including OKX and Binance for a bailout, which led to a shortlived plan by Binance chief executive Changpeng Zhao to buy FTX and backstop customers' funds.

Zhao walked away from the table after less than 48 hours of due diligence, having concluded the scale of the financial problems and potential wrongdoing at FTX made the deal impossible.

"As a result of corporate due diligence, as well as the latest news reports regarding mishandled customer funds and alleged US agency investigations, we have decided that we will not pursue the potential acquisition of FTX.com," Binance said.

The US Securities and Exchange Commission has expanded an investigation into FTX, which includes examining the platform's cryptocurrency lending products and the management of customer funds, according to a person familiar with the matter.

Wall Street's regulator launched the probe months ago but sought additional information after Binance's acquisition plans were announced on Tuesday, the person added. The agency is also examining FTX's relationship with a US entity, FTX US.

Bitcoin, the largest cryptocurrency and a barometer of confidence in the sector, tumbled as low as $15,700 before steadying at $16,600, down 10 per cent from Wednesday morning. Investors and traders fear the collapse of FTX and Alameda will trigger another wave of market panic and losses for those exposed to the firms via lending and trading relationships.

"Given the size and interlinkages of both FTX and Alameda Research with other entities of the crypto ecosystem . . . it looks likely that a new cascade of margin calls, deleveraging and crypto company [and] platform failures is starting similar to what we saw last May [and] June following the collapse of Terra," JPMorgan analysts wrote.

Analysts at Moody's said the spillover from turmoil in the crypto sector to the traditional financial world was likely to be limited.

Fadi Massih, vice-president at Moody's Investors Service said: "The lack of regulatory oversight and the sector's overall opacity facilitate risky financial strategies, exposing firms to an environment in which rumours of illiquidity can become self-fulfilling prophecies."

Copyright The Financial Times Limited 2022. All rights reserved.

10/11/2022, 17:49    Binance on Twitter: "As a result of corporate due diligence, as well as the latest news reports regarding mishandled customer funds and all…

**Page 26 of 37**



← **Thread**

As a result of corporate due diligence, as well as the latest news reports regarding mishandled customer funds and alleged US agency investigations, we have decided that we will not pursue the potential acquisition of FTX.com.

4:00 PM · Nov 9, 2022 · Twitter Web App

💬          🔁          ♡          ⬆

**Binance** ✔ @binance · Nov 9                                    ···
Replying to @binance
In the beginning, our hope was to be able to support FTX's customers to provide liquidity, but the issues are beyond our control or ability to help.

💬 303        🔁 1,236        ♡ 8,573        ⬆

**Binance** ✔ @binance · Nov 9                                    ···
Every time a major player in an industry fails, retail consumers will suffer. We have seen over the last several years that the crypto ecosystem is becoming more resilient and we believe in time that outliers that misuse user funds will be weeded out by the free market.

💬 290        🔁 989        ♡ 8,631        ⬆

**Binance** ✔ @binance · Nov 9                                    ···
As regulatory frameworks are developed and as the industry continues to evolve toward greater decentralization, the ecosystem will grow stronger.

💬 400        🔁 751        ♡ 7,504        ⬆

**Show more replies**

## More Tweets

**Elon Musk** ✔ @elonmusk · 5h                                    ···
I love when people complain about Twitter … on Twitter 🤣🤣

💬 53K        🔁 72.9K        ♡ 663.1K        ⬆

**Fascinating** @fasc1nate · 19h                                    ···
Black herons use their wings to create shade that will attract fish.



💬 1,123        🔁 24.2K        ♡ 220K        ⬆

**Elon Musk** ✔ @elonmusk · 6h                                    ···
**Good morning**

**New to Twitter?**

Sign up now to get your own personalized timeline!

G  **Sign up with Google**

🍎  **Sign up with Apple**

**Sign up with phone or email**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.



**Relevant people**

**Binance** ✔                    Follow
@binance
The world's leading blockchain ecosystem and digital asset exchange.
#Binance ◆ #BNB ◆ For support: @BinanceHelpDesk

**Trends for you**

TV stars · Trending
#TPMP
72.7K Tweets

Sports · Trending
#LazioMonza
2,120 Tweets

Trending worldwide
#موعد_مع_الحربه
102K Tweets

Trending worldwide
#GelsinHayatBildiğiGibi
21.4K Tweets

Only on Twitter · Trending
Sonia
31.9K Tweets

Only on Twitter · Trending
#LaIslaDeLasTentaciones8
17.8K Tweets

Sports · Trending
住宅火災
7,018 Tweets

Only on Twitter · Trending
#ليله_الجمعه
19K Tweets

**Don't miss what's happening**
People on Twitter are the first to know.

Log in        Sign up

🔍  Search Twitter

16.2K Tweets

**From:** Christina Rolle
**Sent:** 09 November 2022 10:17 AM
**To:** sam@ftx.com; jmurray@ftxdigitalmarkets.com
**Cc:** 'ryan@ftxdigitalmarkets.com' <ryan@ftxdigitalmarkets.com>; Mechelle Martinborough <mmartinborough@scb.gov.bs>; Gawaine Ward <gward@scb.gov.bs>; Renaldo Harding <rharding@scb.gov.bs>; Ashley Poitier <apoitier@scb.gov.bs>
**Subject:** RE: FTX Liquidity / Sale Rumours

Good morning Sam,

Further to my note below, please see some initial queries from the Securities Commission of The Bahamas with respect to ongoing issues. Please advise as follows:

1. Number of clients registered on the FDM platform, total value of assets held for all FDM clients and whether those assets are held in a segregated account;
2. Total value of client withdrawals from FDM platform over the past week. Have there been any withdrawal requests that were unsatisfied or that remain outstanding?
3. The extent to which FDM clients' assets may have been invested, loaned, used as collateral or otherwise hypothecated or encumbered on behalf of FDM, Alameda, other related parties and/or third parties;

Please also provide an explanation with respect to the following:
1. Which FTX Group entity is party to the non-binding LOI with Binance? What are the terms of the LOI and what is the potential impact for clients of FDM;
2. Details of the connection between FDM and Alameda. Were there any services provided by Alameda to FDM or vice versa? Were there any related party or counterparty transactions between the entities.

Please also provide a sample of FDM's client agreement (including general terms and conditions).

Your urgent attention and response by end of day is needed. If you wish to discuss, please feel free to reach out to us.

With kind regards,

**From:** Christina Rolle
**Sent:** 08 November 2022 3:11 PM
**To:** sam@ftx.com; jmurray@ftxdigitalmarkets.com
**Cc:** Ashley Poitier <apoitier@scb.gov.bs>; Renaldo Harding <rharding@scb.gov.bs>
**Subject:** RE: FTX Liquidity / Sale Rumours

Thank you for your note, Sam
We are keen to understand the issues as they specifically relate to the regulated entity including potential impact for clients. Please get in touch soonest.
Due to the Tropical Storm alert, we will be working from home until the all clear is given but I will be reachable by email and by phone (422-4058).
Take care and kind regards,

1

Sent from my Galaxy


-------- Original message --------
From: Sam Bankman-Fried <sam@ftx.com>
Date: 11/8/22 2:48 PM (GMT-05:00)
To: Christina Rolle <crolle@scb.gov.bs>, jmurray@ftxdigitalmarkets.com
Cc: Ashley Poitier <apoitier@scb.gov.bs>, Renaldo Harding <rharding@scb.gov.bs>
Subject: Re: FTX Liquidity / Sale Rumours

Hey!  I'm pretty pressed for time but will make sure that we talk to you ASAP; I'll briefly say that, as of now, no sale has happened or been finalized although there are active talks.  We'll keep you updated about those.

—
Sam Bankman-Fried

On November 8, 2022 at 8:43 PM GMT+3 crolle@scb.gov.bs wrote:

Thanks for the acknowledgement, Jessica.

I will be tied up from 13:00 to 15:00… it would be good it that call can take place today.

With kind regards,


**From:** Jessica Murray [mailto:jmurray@ftxdigitalmarkets.com]
**Sent:** 08 November 2022 12:08 PM
**To:** Christina Rolle <crolle@scb.gov.bs>; sam@ftx.com
**Cc:** Ashley Poitier <apoitier@scb.gov.bs>; Renaldo Harding <rharding@scb.gov.bs>
**Subject:** Re: FTX Liquidity / Sale Rumours


Hello Ms. Rolle,


Your email is well received. Let me confirm a day and time and revert.


Kind Regards,

Jessica

—

Jessica Murray

On November 8, 2022 at 11:37 AM EST [crolle@scb.gov.bs](mailto:crolle@scb.gov.bs) wrote:

Good morning Sam / Jessica,

Please advise your availability to meet with the Securities Commission of The Bahamas to discuss recent press regarding liquidity issues as well as the potential acquisition of FTX by Binance.

We would appreciate to meet as soon as today, if possible. Let us know and we will set up a Zoom/Teams link for a call.

With kind regards,

**Christina Rolle** • Executive Director
e-mail: crolle@scb.gov.bs
telephone: (242) 397-4100      fax: (242) 356-7530      Web: www.scb.gov.bs

Poinciana House | North Building, 2nd Floor | 31A East Bay St | P. O. Box N-8347 | Nassau, The Bahamas

 Please consider the environment before printing this email message.

The information in this e-mail (including attachments) is confidential and may be legally privileged. It is intended solely for the addressee. Access to this e-mail by anyone else is unauthorized. If you are not the intended recipient, any review, disclosure, reproduction, distribution or any action taken or omitted to be taken in reliance on the e-mail message, is prohibited. If you have received this e-mail in error, please notify the sender by return e-mail and delete all parts of this e-mail from your computer(s) and eventual service provider computer(s).

The Securities Commission of The Bahamas (the Commission) is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt. While the Commission has taken every reasonable precaution to ensure that any attachment to this e-mail has been scanned for viruses, the Commission does not accept any liability for the presence of any viruses and/or any loss or damage suffered as a result. Any opinion expressed are those of the author and are not necessarily endorsed by the Commission.

**Christina Rolle**  Executive Director

e-mail: crolle@scb.gov.bs

telephone: (242) 397-4100         fax: (242) 356-7530         Web: www.scb.gov.bs

Poinciana House | North Building, 2nd Floor | 31A East Bay St | P. O. Box N-8347 | Nassau, The Bahamas

 Please consider the environment before printing this email message.

The information in this e-mail (including attachments) is confidential and may be legally privileged. It is intended solely for the addressee. Access to this e-mail by anyone else is unauthorized. If you are not the intended recipient, any review, disclosure, reproduction, distribution or any action taken or omitted to be taken in reliance on the e-mail message, is prohibited. If you have received this e-mail in error, please notify the sender by return e-mail and delete all parts of this e-mail from your computer(s) and eventual service provider computer(s).

The Securities Commission of The Bahamas (the Commission) is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt. While the Commission has taken every reasonable precaution to ensure that any attachment to this e-mail has been scanned for viruses, the Commission does not accept any liability for the presence of any viruses and/or any loss or damage suffered as a result. Any opinions expressed are those of the author and are not necessarily endorsed by the Commission.

**From:** Sam Bankman-Fried [mailto:sam@ftx.com]
**Sent:** 09 November 2022 9:27 PM
**To:** RYAN PINDER <ryanpinder@bahamas.gov.bs>
**Cc:** Joe Bankman <joebankman@gmail.com>; Can Sun <can@ftx.com>; rsalame@ftx.com; constance@ftx.com; Christina Rolle <crolle@scb.gov.bs>; allyson@clementmaynard.com
**Subject:** Re: FTX / Binance

Hi all,

I'm really sorry about the delayed responses here -- it's been a hectic week but that's on me.  Myself, and Joe (cc'ed), will be responsive going forward.

And I'm also deeply sorry for ending up in this position in the first place.

I'll give the answers I can give right now and try to get to the others ASAP.

1) Right now we are focused on one thing: making customers whole.  We are focusing exclusively on doing that this week.  We are ceasing all nonessential operations beyond that.  I am doing everything I can to try to do right by our customers.

2) I have not briefed the securities commission.  I would be more than happy to have a phone call with you, the PM, and the SCB in the next few days to give a thorough overview of the situation.

3) I am cautiously optimistic that we will be able to survive the turmoil and have enough liquidity for all customer withdrawals, and that is my sole focus this week.  I will keep you guys updated.

4) We are investigating a more thorough answer to this question; we did not intend to, but are concerned that poor risk management lead to a liquidity issue.

5) As you saw, Binance did not end up following through on their transaction.  However, we are in the middle of a separate process to make users whole; we will know within a week if that comes through.  So far, we have strong indications of interest that would be more than enough to cover all liquidity needs; we are working on confirming those.  I am cautiously optimistic that we will be able to.

6) We are deeply grateful for what The Bahamas has done for us, and deeply committed to it.  We are also deeply sorry about this mess.

As part of this: we have segregated funds for all Bahamian customers on FTX.  And **we would be more than happy to open up withdrawals for *all* Bahamian customers on FTX, so that they can, *tomorrow, fully* withdraw *all* of their assets, making them fully whole**.  It's your call whether you want us to do this--but we are more than happy to and would consider it the very least of our duty to the country, and could open it up immediately if you reply saying you want us to.  If we don't hear back from you, we are going to go ahead and do it tomorrow.

—

Sam Bankman-Fried

On November 9, 2022 at 6:00 PM EST ryanpinder@bahamas.gov.bs wrote:

Thank you Sam.  Joe, Constance, Ryan - please provide me with a brief and answers to the questions below so I can provide the Prime Minister an update

Ryan

**L. Ryan Pinder, K.C.**
**Senator, Attorney General of The Commonwealth of The Bahamas**
**Office of the Attorney-General and Ministry of Legal Affairs**
Paul L. Adderley Building
No. 18 John F. Kennedy Drive
P. O. Box N-3007
Nassau, N.P., The Bahamas

-----"Sam Bankman-Fried" <sam@ftx.com> wrote: -----
To: "RYAN PINDER" <ryanpinder@bahamas.gov.bs>
From: "Sam Bankman-Fried" <sam@ftx.com>
Date: 11/09/2022 04:16PM
Cc: "Can Sun" <can@ftx.com>, "rsalame@ftx.com" <rsalame@ftx.com>, "constance@ftx.com" <constance@ftx.com>, "Joe Bankman" <joebankman@gmail.com>
Subject: Re: FTX / Binance

Hey!

Sorry giving updates as I can.  Things moving quickly.

I can't give as confident answers as I'd like to all of those.  My currently only priority is doing right by customers, and doing whatever I can for that; right now that means prioritizing, above everything else, getting funding to fill the liquidity gap so that all customers can be made liquid.

cc'ing Joe/Constance/Ryan who can give more details.

—
Sam Bankman-Fried

On November 9, 2022 at 8:03 AM EST ryanpinder@bahamas.gov.bs wrote:

Thank you Dan and Can,

As I understand the structure, FTX.com (the entity subject of the LOI with Binance) is the trading platform and exchange operations and in a corporate structure separate from FTX Digital Markets, the Bahamian licensed entity.  FTX DM however is in a corporate structure with Alameda Research who is an upstream shareholder of FTX DM.  We are mindful of the balance sheet exposure that is reported for Alameda to FTT whose value has collapsed in the open market.  As such, The Government of The Bahamas would like to ask some questions, and get an update on the current situation.  I will be briefing the Prime Minister later today.  Can you please assist with a briefing update as well as addressing the following questions:

1) Has a decision been made on the operations of FTX DM in The Bahamas?  If so, what are they?

2) Has the Securities Commission been briefed on the matters affecting FTX and the reciprocal effects on FTX DM, the regulated entity?  If so, please forward that brief.

3) What is the financial situation of Alameda and do you anticipate it to survive the current market turmoil?

4) At any time, and especially in the recent months and currently, has any company in the corporate structure of FTX DM, inclusive of Alameda, leveraged or exposed client assets in any way and for any purpose?

5) What are the timeframes to complete the Binance transaction, assuming it goes through, and how would that affect Alameda, FTX DM and the US operations of FTX?

6) What is the ongoing commitment to The Bahamas?

Thank you,

Ryan

**L. Ryan Pinder, K.C.**
**Senator, Attorney General of The Commonwealth of The Bahamas**
**Office of the Attorney-General and Ministry of Legal Affairs**
Paul L. Adderley Building
No. 18 John F. Kennedy Drive
P. O. Box N-3007
Nassau, N.P., The Bahamas

-----"Daniel Friedberg" <dan@ftx.com> wrote: -----
To: "Can Sun" <can@ftx.com>, "RYAN PINDER" <RYANPINDER@bahamas.gov.bs>
From: "Daniel Friedberg" <dan@ftx.com>
Date: 11/08/2022 04:58PM
Cc: sam@ftx.com
Subject: Re: FTX / Binance

Hi Ryan - sorry for the delay. Can is on island and will coordinate.

On Tue, Nov 8, 2022 at 11:29 AM RYAN PINDER <RYANPINDER@bahamas.gov.bs> wrote:

Good morning, I know it must be a hectic time. Is there more information you can share with us regarding the purported LOI between FTX and Binance?

Ryan

**L. Ryan Pinder, K.C.**
**Senator, Attorney General of The Commonwealth of The Bahamas**
**Office of the Attorney-General and Ministry of Legal Affairs**
Paul L. Adderley Building
No. 18 John F. Kennedy Drive
P. O. Box N-3007
Nassau, N.P., The Bahamas

This e-mail message and the information and any attachments contained herein are confidential to the addressee and may be subject to professional privilege. No other person may place any reliance on this e-mail nor its contents, nor copy or distribute it to any other person or use the contents in any unauthorised manner without the express permission of the sender. If you are not the addressee of this e-mail, or an employee or agent responsible for delivering this message to the addressee, please delete it and notify the sender as soon as possible. Thank You.

This e-mail message and the information and any attachments contained herein are confidential to the addressee and may be subject to professional privilege. No other person may place any reliance on this e-mail nor its contents, nor copy or distribute it to any other person or use the contents in any unauthorised manner without the express permission of the sender. If you are not the addressee of this e-mail, or an employee or agent responsible for delivering this message to the addressee, please delete it and notify the sender as soon as possible. Thank You.

This e-mail message and the information and any attachments contained herein are confidential to the addressee and may be subject to professional privilege. No other person may place any reliance on this e-mail nor its contents, nor copy or distribute it to any other person or use the contents in any unauthorised manner without the express permission of the sender. If you are not the addressee of this e-mail, or an employee or agent responsible for delivering this message to the addressee, please delete it and notify the sender as soon as possible. Thank You.

**Christina Rolle** • Executive Director
e-mail: crolle@scb.gov.bs
telephone: (242) 397-4100        fax: (242) 356-7530        Web: www.scb.gov.bs

Poinciana House | North Building, 2nd Floor | 31A East Bay St | P. O. Box N-8347 | Nassau, The Bahamas

 Please consider the environment before printing this email message.

The information in this e-mail (including attachments) is confidential and may be legally privileged. It is intended solely for the addressee. Access to this e-mail by anyone else is unauthorized. If you are not the intended recipient, any review, disclosure, reproduction, distribution or any action taken or omitted to be taken in reliance on the e-mail message, is prohibited. If you have received this e-mail in error, please notify the sender by return e-mail and delete all parts of this e-mail from your computer(s) and eventual service provider computer(s).

The Securities Commission of The Bahamas (the Commission) is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt. While the Commission has taken every reasonable precaution to ensure that any attachment to this e-mail has been scanned for viruses, the Commission does not accept any liability for the presence of any viruses and/or any loss or damage suffered as a result. Any opinions expressed are those of the author and are not necessarily endorsed by the Commission.

Poinciana House
North Building, 2nd Floor
31A East Bay Street
PO Box N-8347
Nassau, The Bahamas

VIA EMAIL: CLAYTON.FERNANDER@OUTLOOK.COM

9th November 2022

Clayton Fernander
Commissioner of Police
**Royal Bahamas Police Force**
East Street,
Nassau, Bahamas

Dear Commissioner Fernander,

**RE: Request for Police Investigation - FTX Digital Markets Ltd**

The Securities Commission of The Bahamas **("the Commission")** hereby writes to request that the Royal Bahamas Police Force **("RBPF")** Financial Crimes Investigation Branch conducts an investigation relative to FTX Digital Markets Ltd **("FTX Digital")**.

FTX Digital is a company duly incorporated under the laws of The Bahamas and is registered as a digital asset business under the ***Digital Assets and Registered Exchanges Act, 2020*** ("**the DARE Act**"). The Commission is the regulator of FTX Digital.

The RBPF may be aware of the reports in both the international and local media, which directly relates to and impacts FTX Digital, including the possible mishandling of clients' assets.

Regrettably, the Commission was informed today by Mr. Ryan Salame **("Mr. Salame")** who is the Chairman of FTX Digital that clients' assets which may have been held with FTX Digital were transferred to Alameda Research **("Alameda")**. Alameda and FTX Digital are related companies, specifically, Mr. Samuel Bankman-Fried is a founder of both FTX Digital and Alameda.

The Commission understood Mr. Salame as advising that the transfer of clients' assets in this manner was contrary to the normal corporate governance and operations of FTX Digital. Put simply, that such transfers were not allowed and therefore may constitute misappropriation, theft, fraud or some other crime.

Mr. Salame further advised the Commission that there were only three **(3)** persons who had the necessary codes (or passwords) to transfer clients' assets to Alameda in this manner, that is, the founders of FTX Digital who are: (i) Mr. Samuel Bankman-Fried; (ii) Mr. Nishad Singh and (iii) Mr. Zixiao (Gary) Wang.

Given this possible unlawful activity and the ramifications associated with same, we wish for the RBPF to investigate this matter on an urgent basis

Clayton Fernander
Commission of Police
Re: Request for Police Investigation – FTX Digital Markets
9 November 2022

Based on the Commission's knowledge, Mr. Bankman-Fried, Mr. Nishad Singh and Mr. Zixiao (Gary) Wang are presently on the Island of New Providence and all normally reside at Albany. Mr. Salame is not in the jurisdiction and is reportedly in Washington, DC at present.

Please do not hesitate to contact me if you require further information from the Commission at this stage.

Yours sincerely,

Christina Rolle
**Executive Director**

**COMMONWEALTH OF THE BAHAMAS**

**IN THE SUPREME COURT**

**Commercial Division**

**IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020 (as amended)**

**AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.**
(A Registered Digital Asset Business)

**AND IN THE MATTER OF the Companies (Winding Up Amendment) Act, 2011**

---

**AFFIDAVIT OF CHRISTINA R. ROLLE**

---

2022
COM/com

SECURITIES COMMISSION OF THE BAHAMAS

**Securities Commission of The Bahamas**
2nd Floor Poinciana House,
North Building
31A East Bay Street
Nassau, N.P., The Bahamas
*Attorneys for the Petitioner/Applicant*