# EXHIBIT E

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 2659** |

## DEBTORS' OBJECTION TO THE MOTION OF ISLAND AIR CAPITAL AND PAUL F. ARANHA FOR RELIEF FROM THE AUTOMATIC STAY, TO THE EXTENT APPLICABLE, AND RELATED RELIEF

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") respectfully submit this objection (this "Objection") to the *Motion of Island Air Capital and Paul F. Aranha for Relief from the Automatic Stay, to the Extent Applicable, and Related Relief* [D.I. 2659] (the "Motion" or "Mot.")[2] filed by Island Air Capital ("IAC") and its beneficial owner Paul F. Aranha ("Aranha" and collectively, with IAC the "Movants"). In support of this Objection, the Debtors rely on the contemporaneously filed *Declaration of Jacob M. Croke in Support of Debtors' Objection to the Motion of Island Air Capital and Paul F. Aranha for Relief from the Automatic Stay, to the Extent Applicable, and Related Relief* (the "Debtors' Declaration") and accompanying exhibits, and respectfully state as follows:

---

[1] The last four digits of Alameda Research LLC's tax identification number is 4063. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in this Objection or in the Motion.

**PRELIMINARY STATEMENT**

1.     This Motion is premature, unfounded and seeks relief to which the Movants are not entitled—neither in this procedural posture nor substantively.  The Movants ask this Court to (i) enter an order finding that two private planes—a Bombardier Global 500 (the "Global") and an Embraer Legacy (the "Legacy," and, together with the Global, the "Planes")—that were purchased *entirely with the Debtors' funds* are, in fact, *solely owned by the Movants*; (ii) in the alternative, grant the Movants relief from the automatic stay to use or sell the Planes as they see fit; and (iii) in the alternative, grant the Movants a lien on the Planes totaling several million dollars based solely on unsupported and facially implausible statements.  The Court should reject these requests.

2.     *First*, the Movants' request is barred by 21 U.S.C. 853(k), which provides that "no party claiming an interest in property subject to forfeiture [] may . . . commence an action at law or equity against the United States concerning the validity of his alleged interest in the property subsequent to the filing of an indictment or information alleging that the property is subject to forfeiture under this section."  The Movants acknowledge that the U.S. Department of Justice (the "Government") seized the Global on February 8, 2023, and that the Government has asserted that both Planes are subject to forfeiture as proceeds of the criminal conduct charged in the indictments against Samuel Bankman-Fried ("Bankman-Fried") and other senior FTX Group[3]

---

[3]     The "FTX Group" is comprised of four silos.  These silos include:  (a) a group composed of Debtor West Realm Shires, Inc., Debtor West Realm Shires Services, Inc., and their Debtor and non-Debtor subsidiaries; (b) a group composed of Debtors Alameda Research Ltd., Alameda Research LLC and their Debtor subsidiaries; (c) a group composed of Debtors Clifton Bay Investments LLC, Clifton Bay Investments Ltd., Island Bay Ventures Inc. and FTX Ventures Ltd. ("FTX Ventures"); and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

executives.  (Mot. at ¶ 3).[4]  The Debtors are (and have long been) in communication with the Government regarding the Planes, and, in light of the Government's stated intention to forfeit the Planes and the implications of section 853(k), have refrained from taking any action in these Chapter 11 Cases to assert their interests in the Planes.[5]  In bringing the Motion, the Movants not only attempt to circumvent section 853(k) by asserting an interest in property that is subject to forfeiture, but also attempt to construe the Debtors' compliance with section 853(k) as evidence that the Debtors have no interest in the Planes.  Not so.

3.      *Second*, the Motion is procedurally improper and seeks relief that can be obtained only through an adversary proceeding.  Bankruptcy Rule 7001 provides that an adversary proceeding is required "to recover money or property," "to determine the validity, priority, or extent of a lien or other interest in property," "to obtain . . . equitable relief," and "to obtain a declaratory judgement."  Fed. R. Bankr. P. 7001(1), (2), (7), (9).  The Motion's requested relief clearly falls within the scope of Bankruptcy Rule 7001, in that the Movants are seeking a ruling that the Planes are not estate property (Mot. at ¶ 46) or a determination that the Movants have a valid lien on the Planes (Mot. at ¶ 58).  Because the Movants failed to commence an adversary proceeding to obtain the requested relief, as required pursuant to Bankruptcy Rule 7001, the Motion should be denied.  *See* Fed. R. Bankr. P. 7003.

4.      *Third*, even if the Movants' requests were not barred by section 853(k) or Bankruptcy Rule 7001, the Movants would not be entitled to the relief that they seek.  At its heart,

---

[4]   Indeed, on October 4, 2023, the Government filed a Forfeiture Bill of Particulars alleging that the Planes are subject to forfeiture as property traceable to the proceeds of Bankman-Fried's criminal offenses and as property involved in money laundering.  *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 314 (Oct. 4, 2023).

[5]   The Debtors understand that the Government will be filing its own objection to the Motion on October 11, 2023.

this Motion asks this Court to issue an order finding that, although the FTX Group and its employees selected the Planes, paid every penny of the approximately $27.4 million to acquire the Planes, and paid Aranha millions more to make extensive renovations to the Planes to fit their specific needs, the Planes are actually owned entirely by the Movants because Aranha purports to have reached an oral "handshake deal" with Bankman-Fried to treat these tens of millions of dollars in transfers as an undocumented, unsecured, zero-interest loan to Aranha. The only "support" that the Movants provide is a declaration from Aranha attaching a handful of documents that are silent as to the core issues. As set forth in more detail below, although the Court need not make a finding on these issues at this stage and on this Motion, the Debtors expect to establish at the appropriate time that the Movants' claims regarding the Planes are nonsensical, internally inconsistent and thoroughly contradicted by the evidence. To the extent that the Court is inclined to consider the Movants' requests, the Debtors believe that discovery and an evidentiary hearing are necessary, and respectfully request that the Court direct the parties to negotiate a scheduling order regarding those issues.

5. *Fourth*, the Movants cannot satisfy their burden of proof to demonstrate that "cause" exists to lift the automatic stay. The Movants focus entirely on their purported hardships suffered and flatly ignore the hardship on the Debtors if the stay were lifted—a critical element to demonstrate cause. Moreover, there is no need for the Movants to incur any further hardship—the Movants could simply unburden themselves by turning the Legacy over to the Government.

6. *Fifth*, contrary to their assertions, the Movants have failed to demonstrate the application of section 550 of the Bankruptcy Code or the Movants' entitlement to liens over

the Plans.  Accordingly, the Motion should be denied, and the Debtors will, at the appropriate time,

seek to enforce their rights with respect to the Planes and their claims against Aranha and IAC.[6]

## BACKGROUND

### A.    The Debtors and Their Chapter 11 Cases

7.      On November 11, 2022 and on November 14, 2022 (as applicable, the

"Petition Date"), the Debtors filed with the Court voluntary petitions for relief under title 11 of the

United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code").  The Debtors continue to

operate their businesses and manage their properties as debtors-in-possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of these Chapter 11 Cases

was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128].   On

December 15, 2022, the Office of the United States Trustee for the District of Delaware (the "U.S.

Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to

section 1102 of the Bankruptcy Code [D.I. 231].

8.      Additional factual background relating to the Debtors' businesses and the

commencement of these chapter 11 cases (the "Chapter 11 Cases") is set forth in the *Declaration*

*of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the

*Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings*

[D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings*

[D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day*

*Pleadings* [D.I. 93].

---

[6]    Movant Island Air Capital is an airplane holding company of Aranha's charter company, Trans Island Airways ("TIA").

### B.   The Purchase of the Planes

9.      Aranha and TIA provided services for Bankman-Fried and other FTX Group personnel beginning in late 2021.  Shortly thereafter, senior FTX employees expressed a desire for the FTX Group to acquire private planes, but noted concerns about the potential reaction if the FTX Group's ownership of those planes were publicly known.  FTX Group executives considered various options, including making a potential equity investment in TIA, but ultimately decided not to proceed with that investment.

10.     To obscure the FTX Group's acquisition of the Planes, the FTX Group executives settled on a different approach.  On February 1, 2022, at the FTX Group's direction, TIA entered into a letter of intent to purchase the Global for $15.9 million.  (Decl. Ex. A.)  On February 2, 2022, Debtor Alameda Research Ltd. ("Alameda") wired a $500,000 deposit directly to the Global's escrow agent, and, on March 3, 2022, a senior FTX Group executive caused another $15.4 million of Alameda funds to be transferred to the escrow agent to complete the purchase of the Global.  (*Id*., Exs. B, C.)  The Debtors thus paid the entire $15.9 million purchase price of the Global.

11.     On March 16, 2022, after the purchase of the Global already had been completed, FTX Ventures and Aranha executed a term sheet relating to a potential equity investment in TIA.  (*Id*., Ex. D.)  The term sheet explicitly stated that FTX Ventures was not obligated to proceed with an investment—in fact, the only binding part of the term sheet was a confidentiality provision barring TIA from disclosing "this proposal *and any related discussions and correspondence*" without prior written approval, consistent with the FTX Group executives' desire to conceal the FTX Group's ownership of private planes.

12.     In addition to the Global, FTX Group executives instructed Aranha to find a second plane for the FTX Group.  Aranha eventually identified the Legacy as a potential

acquisition, and, on August 16, 2022, Debtor Alameda transferred $11,545,000 directly to the Legacy's escrow agent, representing the entire purchase price of the Legacy. (*Id*., Ex. E.) The Debtors thus paid a total of $27,445,000 to purchase the Planes—Aranha and TIA paid nothing.

13. In addition to selecting the Planes and paying their entire purchase price, the FTX Group also instructed Aranha to make extensive renovations to the Planes to satisfy the whims of senior FTX Group executives. Between July and October 2022, Aranha invoiced the Debtors more than $4 million for purported upgrades to the Planes and other related expenses, including, among other things, nearly $1.3 million for Wifi upgrades, approximately $900,000 for interior renovations and "Aircraft Bed Systems," and $975 for "Board Game Purchases for SBF for Airplane." (*Id*., Ex. F.) The Debtors paid each of these invoices in full.[7]

### C. Post-Petition Events

14. The Debtors' first communications with the Movants regarding the Planes was in May 2023, months after the Debtors had begun discussing the Planes with the Government.[8] The Debtors have repeatedly urged the Movants to agree to the most logical and cost-effective path forward, which is to cooperate with the Government to arrange for interlocutory sales of both Planes, as doing so would allow the parties to address at the appropriate time any disputes as to their respective entitlement to the sale proceeds, without the Movants incurring further maintenance and storage costs. As to the Global currently in the Government's possession, the Movants have professed a willingness to agree to a sale, yet have for months sought to impose on the Government and the Debtors a shifting series of conditions with respect to the sale process and

---

[7] The Movants assert that, "as of the Petition Date, the Debtors owe TIA approximately $2.6 million for unpaid Flight Services" (Mot. at ¶ 14). The Debtors have requested copies of these purported invoices from the Movants, but to date the Movants have not provided them.

[8] Contrary to the Movants' claims, the Debtors did not request that the Joint Provisional Liquidators speak with Aranha on the Debtors' behalf.

treatment of proceeds for any sale.  As to the Legacy, the Movants have flatly refused to commit to conducting a sale, instead using their current possession of the Legacy as leverage to try to force the Debtors to grant the Movants an unjustified windfall or to fund the Movants' business operations.

## ARGUMENT

### I. THE REQUESTED RELIEF IS BARRED BY 21 U.S.C. 853(K)(2)

15.     The Motion is fatally flawed because it seeks relief that this Court cannot grant.  21 U.S.C. § 853(k)(2) provides that "no party claiming an interest in property subject to forfeiture [] may . . . commence an action at law or equity against the United States concerning the validity of his alleged interest in the property subsequent to the filing of an indictment or information alleging that the property is subject to forfeiture under this section."  In enacting this provision, Congress "impose[d] an absolute bar on *all* suits claiming an interest in forfeitable property" save for claims pursued in ancillary forfeiture proceedings pursuant to 21 U.S.C. § 853(n).  *In re The American Basketball League, Inc*., 317 B.R. 121, 129 (Bankr. N.D. Cal. 2004) (emphasis in original) (granting United States' motion for summary judgment in adversary action on partial ground that relief requested by Debtors' plan administrator was barred by § 853(k)); *see also In re Rothstein Rosenfeldt Adler, P.A*., 2012 WL 4320479, at *5 (S.D. Fla. Aug. 30, 2012) (granting United States' cross-motion for summary judgment in adversary action because ancillary proceeding was exclusive forum for considering trustee's motion under § 853(k)).  Under the relation-back doctrine, "all right, title, and interest" in property subject to forfeiture vests in the United States "upon commission of the act[s] giving rise to [its] forfeiture."  21 U.S.C. § 853(c).

16.     The Movants run squarely into this statutory bar.  According to the Government's Superseding Indictment of Bankman-Fried (the "Indictment"), beginning as early as 2019, Bankman-Fried defrauded customers, investors and banks via the misappropriation of

billions of dollars of FTX Group assets, enabling "exorbitant spending unrelated to the operation of the FTX platform." (Indictment at ¶ 7.) The Indictment contains forfeiture allegations seeking "any and all property, real and personal, that constitutes or is derived from proceeds traceable" to the charged money-laundering, commodities fraud and wire fraud offenses, and the related Bill of Particulars specifically identifies the Planes as subject to forfeiture as property derived from the proceeds of the charged fraud offenses and property involved in money laundering.[9]

      17.    The Movants acknowledge that the Government has asserted that the Planes are subject to forfeiture as proceeds of this criminal scheme and/or property involved in money laundering, and that the Government has obtained a seizure warrant and seized the Global. (Mot. at ¶ 32). The Motion, is, for all intents and purposes, an action against the United States. Courts have consistently held that a claim brought against a private party regarding property vested in the United States qualifies as an action against the United States:

> Although the foreclosure action was technically brought against Phillips, Jr. and not the United States, subsection (c) provides that title to the properties at issue had already vested in the United States at the time of the foreclosure sale. Because the Government held title to the properties at the time of the sale, the foreclosure action constituted "an action at law or equity against the United States" and was statutorily barred under § 853(k).

*United States* v. *Phillips*, 185 F. 3d 183, 188 (4th Cir. 1999). *See also In re Rothstein Rosenfeldt Adler, P.A.*, 2012 WL 4320479, at *6 (S.D. Fla. Aug. 30, 2012) (barring claim against private party under 853(k) as to property vested in the United States); *In re Duval at Gulf Harbors, LLC*, 515 B.R. 884, 887 (Bankr. M.D. Fla. 2014) (same). As the Government has filed an Indictment and

---

[9]    *See* Superseding Indictment ¶ 97-99, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115 (Aug. 14, 2023); Bill of Particulars, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022) ECF No. 314 (Oct. 4, 2023).

related Bill of Particulars alleging the Planes are subject to forfeiture, section 853(k) prohibits Aranha from litigating his interest in the Planes outside of the ancillary proceeding in the Bankman-Fried prosecution as required by section 853(n).

## II.     THE MOTION IS PROCEDURALLY DEFECTIVE

18.     The Movants allege that they are "the rightful owners of the Aircraft," and ask the Court to enter an order to that effect.  (Mot. at ¶¶ 46, 49.)  Pursuant to Bankruptcy Rule 7001, a determination regarding ownership of an asset may be obtained only through an adversary proceeding.  *See* Fed. R. Bankr. P. 7001(1), (2), (7), (9) (adversary proceeding required "to recover money or property," "to determine the validity, priority, or extent of a lien or other interest in property," "to obtain . . . equitable relief," and "to obtain a declaratory judgement").

19.     *First*, the Movants' request for a ruling that the Planes are not estate property (Mot. at ¶ 46) clearly falls within Bankruptcy Rule 7001.  *See In re DBSI, Inc.*, 432 B.R. 126, 135 (Bankr. D. Del. 2010) (finding a creditor's motion seeking a judgment regarding its alleged interest in certain property "procedurally improper" because the creditor had to proceed through an adversary proceeding); *see also In re Fin. Oversight and Mgt. Bd. for Puerto Rico*, 631 B.R. 589, 593-94 (D.P.R. 2021) (finding procedurally defective creditor's motion for declaratory relief concerning the extent of his interest in a motor vehicle); *In re Colafranceschi*, 577 B.R. 817, 825 (Bankr. D. Idaho 2017) ("Ordinarily, [a]ny disagreement or question of whether property is or is not property of the estate requires adjudication through an adversary proceeding.").

20.     *Second*, the Movants' request that the Court, in the alternative, find that the Movants are entitled to a lien totaling several million dollars—without citing a shred of evidence substantiating those figures—also is procedurally improper.  Bankruptcy Rule 7001(2) expressly applies to proceedings "to determine the validity, priority, or extent of a lien."  Fed. R. Bankr. P.

7001(2);[10] *see, e.g.*, *In re Glenbrook Grp., Inc.*, 552 B.R. 735, 738 (Bankr. N.D. Ill. 2016) (noting that the "appropriate avenue" for determining a party's "equitable interest" in property is an adversary proceeding).

21.     Adversary proceedings must be commenced by the filing of a complaint, pursuant to Bankruptcy Rule 7003.  Fed. R. Bankr. P. 7003.  This Motion is a paradigmatic example of the rationale for these rules—the Movants have asked this Court to find, on a paper-thin record consisting primarily of Aranha's say-so, that the Debtors have *no interest* in two Planes that were purchased and renovated at the Debtors' direction, using more than $30 million of Debtor assets.  It bears noting that Aranha's story rests in large part on his retelling of a purported March 22, 2022 in-person meeting with Bankman-Fried, during which Aranha claims that he and Bankman-Fried reached an "oral agreement" related to an amorphous and undocumented "loan."  Aranha's declaration also contains many irreconcilable inconsistencies—as just one example, the purported March 2022 "oral agreement" was reached *nearly two months* after the agreement to purchase the Global was signed, and weeks after the Debtors had completed that purchase.

22.     To the extent that the Movants believe they have a valid claim to ownership of the Planes, they are required to commence an adversary proceeding in which those assertions will be subject to discovery and a full evidentiary hearing.  As it stands, the Motion is procedurally defective and must be denied.  *See, e.g., In re Aftandilian*, 2014 WL 1244789, at *5 (Bankr. App. 9th Cir. Mar. 26, 2014) (holding that "[t]he bankruptcy court correctly ruled that the movant's

---

[10]    Rule 7001(2) provides only two exceptions to requiring the commencement of an adversary proceeding: proceedings under Bankruptcy Rule 3012 or Bankruptcy Rule 4003(d)—neither of which involves the determination of a lien under section 550(e), as the Movants seek here.  *See* Fed. R. Bankr. P. 7001(2), 3012, 4003(d).

failure to present his declaratory relief motion as an adversary proceeding was a sufficient ground, by itself, to justify denial of the motion").

## III.    THE MOVANTS CANNOT ESTABLISH THAT THEY ARE THE "SOLE OWNERS" OF THE PLANES

23.      Procedural defects aside, if this Court is inclined to consider the merits of these issues, the Debtors request that there be discovery and a full evidentiary hearing.  As it stands, the evidence available to the Debtors, including records of the Debtors' payments and communications between Aranha and senior FTX Group personnel, fundamentally undermines Movants' claims.

24.      At the outset, the Debtors respectfully submit that, on the current record, Movants have not established that they have *any* valid interest in the Planes, much less that they are entitled to an order declaring them to be the "sole owners" of the Planes such that the automatic stay does not apply.  (Mot. ¶ 46.) (Decl. ¶ 2).  Section 541 of the Bankruptcy Code provides that estate property includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).  This provision is interpreted broadly.  *In re A. Bus. and Community Corp*., 901 F.2d 325, 327 (3d Cir. 1990).  *See United States* v. *Whiting Pools, Inc*., 462 U.S. 198, 205 (1983) ("The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad.").  It extends to property "wherever located and *by whomever held*." *Matter of Contl. Airlines, Inc*., 134 B.R. 536, 541 (Bankr. D. Del. 1991) (citing *In re Mays*, 85 B.R. 955, 960 (Bankr. E.D. Pa 1988)) (emphasis added).

25.      The Movants acknowledge that the Debtors paid the entire $27.4 million purchase price for the Planes and directed extensive further renovations.  (Mot. at ¶¶ 19-20.)  Movants also conspicuously do not assert that they paid *a single penny out of pocket* toward the purchase price or those upgrades, asserting only that they are owed certain amounts related to post-

Petition services and upkeep.  Movants' claim that "[t]here is, quite simply, no indicia of the Debtors' ownership" is nonsensical (Mot. at ¶ 48); *see, e.g., In re LTG, LLC*, at \*6 (Bankr. M.D. Fla. Aug. 4, 2020) (noting that, in determining whether a boat was property of the estate, the court could consider "who paid the purchase price").

26.      The fact that the Planes are not titled and registered to the Debtors does not come close to demonstrating that Debtors have no ownership interest in the Planes.  In *In re Le*, for example, the court determined that, although debtors did not have legal title to two vessels, debtors had an equitable interest in the vessels because, along with other indicia of ownership, the debtors had paid the purchase price for the vessels, and had paid all subsequent expenses.  WL 4197515, at \*2 (Bankr. S.D. Tex. Nov. 21, 2007).  The same is true here.

27.      Moreover, "[i]n determining whether a debtor has a 'legal' or 'equitable' interest in property, the court must turn to state law as the determination of property rights in the assets of a bankruptcy estate is governed by state law."  *In re Competrol Acq. Partn., L.P.*, 203 B.R. 914, 917 (Bankr. D. Del. 1996) (citations omitted); *see Butner* v. *United States*, 440 U.S. 48 (1979) ("Property interests are created and defined by state law.").  Delaware law recognizes that even where property is registered in the name of one party, another party may have an ownership interest in that property if, for example, that party paid to purchase the property.  *See, e.g.*, *Malloy* v. *U.S. Fid. & Guar. Co.*, WL 179511, at \*3 (Del. Super. June 16, 1992) (finding that the individual named on the certificate of title of a vehicle may not be the equitable owner of the vehicle); *W. Am. Ins. Co.* v. *Bogush*, 2006 WL 1064069, at \*1 n.6 (Del. Super. Apr. 12, 2006) ("[O]wnership can be established in equity based on the circumstances surrounding the acquisition

and/or use of property even though legal ownership may lie elsewhere") (citing *Malloy*, 1992 WL 179511 at *3).[11]

## IV. THE MOVANTS HAVE NOT SHOWN CAUSE TO LIFT THE AUTOMATIC STAY PURSUANT TO SECTION 362(d)(1) OF THE BANKRUPTCY CODE

28.    In the alternative, the Movants seek relief from the automatic stay "to permit them to use, operate, preserve, maintain, and, if they desire to do so, sell the [Planes]." (Mot. at ¶ 50.) Section 362(d) of the Bankruptcy Code allows a party to obtain relief from the automatic stay only "for cause," and, as the Movants acknowledge, the party seeking to lift the automatic stay bears the initial burden to make a *prima facie* showing of "cause" for relief. *In re Trib. Co.*, 418 B.R. 116, 127 (Bankr. D. Del. 2009); *see* (Mot. at ¶ 51); *see also In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006), *subsequently aff'd*, 359 Fed. Appx. 352 (3d Cir. 2010) ("Failure to prove a *prima facie* case requires denial of the requested relief."). To succeed on this claim, the Movants must show that there is "cause" to lift the automatic stay by proving that the hardship suffered by the Movants as a result of the stay "*considerably outweigh*" the hardship on the Debtors and the estate if the stay were lifted. *In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992).

29.    This is a heavy burden, and one that the Movants have not come close to meeting. Indeed, "[t]he automatic stay is one of the most fundamental protections provided by the Bankruptcy Code" and "[t]he scope of the automatic stay is very broad." *In re THG Holdings LLC*, 604 B.R. 154, 160 (Bankr. D. Del. 2019) (Dorsey, J.). Unsubstantiated, undocumented

---

[11]    The Movants also suggest that the Debtors' relatively limited references to the Planes as estate property in the Debtors' prior public filings somehow demonstrates that the Debtors have no ownership right in the Planes. This borders on bad faith. Over the past several months, the Movants have repeatedly asked the Debtors and the Government to refrain from any public statements regarding the Planes, on the theory that minimizing public attention could help maximize value in any interlocutory sales of the Planes.

allegations are insufficient to show "cause" to lift the stay. *In re Irish Bank Resol. Corp. Ltd.*, 2019 WL 4740249, at *7 (D. Del. Sept. 27, 2019) ("Determining whether 'cause' has been shown requires a fact-specific inquiry, in which the movant must substantiate its case with an evidentiary showing of a factual and legal right to the relief it seeks.").

       30.     In the Third Circuit, courts typically examine three factors to determine whether the movant has made a showing of "cause" for relief from the stay:

> (1) Whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;
>
> (2) Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and
>
> (3) Whether the creditor has a probability of prevailing on the merits.

*In re Rexene Prods. Co*., 141 B.R. at 576. This balancing test places the burden on the movant to show that "the balance of hardships from not obtaining relief tips *significantly* in its favor." *In re Am. Classic Voyages, Co*., 298 B.R. 222, 225 (D. Del. 2003) (citations omitted) (emphasis added).

       31.     First and foremost, the Movants fail to make a *prima facie* showing of "cause" for relief from the stay because they do not even attempt to address the potential for prejudice to the Debtors. As this Court recently observed in denying a request for stay relief in this proceeding, "in order to lift the stay, the burden is on the Movant to prove cause," which involves, among other things, showing that "there would be no harm to the bankruptcy estate." (Apr. 12, 2023 Hr'g Tr. 52:16–18, 53:1–3) (emphasis added). The potential harm here is clear— the Movants are located outside of the United States and are asking this Court to lift the stay and grant them unfettered discretion to "use" and/or "sell" two planes that were purchased and renovated using more than $30 million of Debtor assets.

       32.     If the stay is lifted, the Debtors—and potentially also the Government— would be forced to expend resources to litigate the ownership of the Planes now. As explained by

the Third Circuit, the purpose of the automatic stay is three-fold:  (1) "to prevent certain creditors from gaining a preference for their claims against the debtor," (2) "to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it," and (3) "to avoid interference with the orderly liquidation or rehabilitation of the debtor."  *Borman* v. *Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991) (quoting *St. Croix Condominium Owners* v. *St. Croix Hotel*, 682 F.2d 446, 448 (3d Cir. 1982)).  The Movants' motion for relief from the stay runs roughshod over all three of these underlying policies.  *See e.g.*, *In re DBSI, Inc.*, 407 B.R. 159, 167 (Bankr. D. Del. 2009) (denying relief from the stay and noting that, "by lifting the stay, I may encourage a race to the courthouse by parties seeking similar orders, which will cause undue hardship and expense to the estate"); *see also United States* v. *Nicolet, Inc.*, 857 F.2d 202, 207 (3d Cir. 1988).

33.    Moreover, the Movants cannot show that any hardship they might face under the automatic stay "considerably outweighs" the hardship to the Debtors if the stay were lifted.  *See, e.g.*, *In re Aleris Int'l Corp.*, 456 B.R. 35, 48 (Bankr. D. Del. 2011) (finding the movants had not shown cause to lift the stay because although the creditor alleged hardship as a result of the stay, "it has not shown that its continued dispossession would cause it greater hardship than the hardship on the Debtor").  At the outset, there is no need for the Movants to incur any further hardship at all—the Movants could unburden themselves simply by turning the Legacy over to the Government.  Similarly, the Movants are under no obligation to continue to maintain the Global (and have not been since the Government seized the Global nearly eight months ago).  The Movants' assertion that they need relief on account of "their large cash expenditure required to maintain the Aircraft. . . [that will] continu[e] indefinitely into the future" (Mot. at ¶ 54) is a false choice entirely of the Movants' own creation.

-16-

34.     The Movants offer similarly inadequate allegations in support of *Rexene*'s third prong:  the likelihood they will prevail on the merits of their claims against the Debtors.  *In re Rexene Prods. Co.*, 141 B.R. at 576.  As set out above, the Debtors have an ownership interest in the Planes.  Although the Movants recognize that "FTX wired the deposits and balances [for the Planes] directly into escrow" (Mot. at ¶ 19), they neither acknowledge the Debtors' clear ownership interest, nor offer any showing that they would prevail against the Debtors' interest.  *See, e.g.*, *In re Aleris Int'l Corp.*, 456 B.R. at 48 (applying the *Rexene* factors to deny a creditor's motion for relief from the stay, including because the creditor, who had an unperfected security interest in property in possession of the Debtors, had "made no showing that it is likely to prevail against the Debtor on the strength of its security interest").

35.     The Movants have failed to satisfy the *Rexene* factors to demonstrate that cause exists to lift the automatic stay and, accordingly, the requested relief must be denied.

## V.     THE MOVANTS FAIL TO PROVE ENTITLEMENT TO A LIEN UNDER SECTION 550(e) OF THE BANKRUPTCY CODE

36.     The Movants further allege that they are entitled to a lien pursuant to section 550(e) of the Bankruptcy Code on the Debtors' property to secure the costs they allegedly incurred "improv[ing]" the property.  (Mot. at ¶ 56.)  Under section 550(e), when a transfer is avoided under section 544, 545, 547, 548, 549, 553(b) or 724(a), the transferee may assert a claim for a lien to secure the cost of any improvements made after the transfer of the property, "if, and only if, the transferee accepted the transfer in good faith."  *In re Consol. Yacht Corp.*, 337 B.R. 711, 714 (Bankr. S.D. Fla. 2006); 11 U.S.C. § 550(a), (e).  The Movants' claim that they are entitled to a "substantial lien" under section 550(e) (Mot. at ¶ 56) is unavailing for two reasons.  *First*, the Movants are not transferees of the Legacy or the Global.  *Second*, even if the Movants *could* establish they were transferees, the Movants cannot establish "good faith."

-17-

37.     As an initial matter, the Movants do not offer any basis for the applicability of section 550(e) to the Planes.  The statute specifically refers to improvements "made after the *transfer*."  11 U.S.C. § 550(e); *see, e.g.*, *In re Cowan*, 273 B.R. 98, 107 (Bankr. App. 6th Cir. 2002), *aff'd,* 70 Fed. Appx. 797 (6th Cir. 2003) (finding section 550(e) inapplicable where there was no transfer that had to be avoided because "§ 550 only comes into play if the Trustee avoids a transfer."); *see also In re Saunders*, 413 B.R. 722, 726 (Bankr. D. Idaho 2009) (finding that, "absent an avoided transfer, § 550 appears to have no relevance").

38.     The Movants have not alleged facts or provided any evidentiary support to show that the Debtors transferred the Planes to Aranha or IAC, nor did the Debtors ever transfer the Planes or express their intent to effect a transfer of them.  Merely placing the Movants' name on the title of the Planes did not constitute a "transfer" within the meaning of section 550.  As the court explained in *In re Saunders*, "[a]n impermissibly expansive reading of § 550 would be required" in order to find that placing someone else's name on the title of a vehicle constituted a "transfer." 413 B.R at 726.  Accordingly, since there was no transfer of the Planes, section 550(e) does not apply.

39.     Even if the Movants were transferees of the Planes under the meaning of section 550, which they are not, the Movants are not "good faith" transferees, as required to assert a claim for a lien under section 550(e).  "Good faith" is not a defined term in the Bankruptcy Code, and is properly determined on a case-by-case basis.  *In re Sherman*, 67 F.3d 1348, 1355 (8th Cir. 1995) (citing *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983)).  When assessing the circumstances under which a transferee establishes "good faith," courts have observed that "[t]he bona fide purchaser for good faith, creating entitlement to a lien for improvements, is meant to be

reserved for situations involving an arms length transfer to an outside third party." *In re Blitstein*, 105 B.R. 133, 137 (Bankr. S.D. Fla. 1989).

40.     The Movants attempt to establish their status as good-faith transferees by alleging "there is no allegation, much less evidence, that the Movants had any reason to know of [the FTX Group executives'] fraud or otherwise lacked good faith." (Mot. at ¶ 57.)  Yet, "an absence of fraudulent intent does not mean that the transaction was necessarily entered into in good faith.  The lack of good faith imports a failure to deal honestly, fairly and openly." *In re Greenbrook Carpet Co., Inc.*, 22 B.R. 86, 90-91 (Bankr. N.D. Ga. 1982) (citing *S. Indus., Inc.* v. *Jeremias*, 66 A.D.2d 178, 183 (N.Y. App. Div. 2d Dep't 1978)).  Courts have found bad faith when the dealings between the creditor and the debtor lack the attributes of an arm's-length transaction, for instance, where a creditor has an economic interest in pleasing the debtor, or anticipates a reward of the debtors' "largess." *In re Am. Way Serv. Corp.*, 229 B.R. 496, 505, 511-512 (Bankr. S.D. Fla. 1999).  As set forth above, the Movants' dealings with Bankman-Fried and the other FTX Group executives exhibit similar indications of bad faith, and the Movants thus have failed to establish that they were transferees in good faith as required under section 550(e).[12]

41.     The Movants further allege they are entitled to adequate protection of their "550(e) lien on the Aircraft" and the "improvements . . . that the Movants have made to the Aircraft" under 11 U.S.C. § 361(1). (Mot. at ¶¶ 59, 61.)  For the reasons set out above, the Movants are not entitled to any lien under section 550(e), and thus cannot prevail on this claim.

---

[12]   Movants also have failed to offer any evidence demonstrating that any purported costs that they incurred qualify as "improvements" under Section 550(e).  For example, by his own account, in the days following the FTX Group's collapse, Aranha repainted the Global to hide its affiliation with Aranha, transferred the Global's title to a company not owned by Aranha, and took steps to attempt to sell the Global, all *prior* to any communications with the Debtors or the Government.  (Aranha Decl. ¶ 15.)  There are many ways to describe those actions, but "improvements" is not one of them.

42.     The Movants' claim to adequate protection is additionally unavailing because the Movants are not secured creditors. "The purpose of adequate protection is to protect a secured creditor from diminution in the value of its interest in the particular *collateral*." *In re Energy Future Holdings Corp*., 546 B.R. 566, 581 (Bankr. D. Del. 2016) (citing *In re Satcon Tech. Corp*., No. 12–12869, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012). The Movants have no entitlement to adequate protection for the Planes given that they have not established the Planes are collateral or that they are secured creditors. Unsecured creditors are not entitled to adequate protection under section 361(1) of the Bankruptcy Code. *In re Chama, Inc*., 265 B.R. 662, 669 (Bankr. D. Del. 2000) (finding that, since the debtors had avoided the creditor's security interest, the creditor was merely a "general unsecured creditor . . . not entitled to any adequate protection").

43.     Finally, the Movants also fail to establish a claim under section 361(1) to the extent that they seek protection "in the amount of approximately $6 million (plus a minimum of $65,000 per month for the ongoing maintenance and preservation of the Legacy)." (Mot. at ¶ 61.)[13] Courts have endorsed the view that a creditor "can only receive adequate protection to the extent the collateral declined in value *after* the secured creditor filed its motion for adequate protection, rather than receiving compensation for all postpetition decline in value." *In re Cont'l Airlines, Inc*., 154 B.R. 176, 180-81 (Bankr. D. Del 1993) (citing *In re Best Products, Inc*., 138 B.R. 155, 157-58 (Bankr. S.D.N.Y. 1992)) (emphasis added). The Movants are not entitled to adequate protection—they have no section 550(e) lien and they are not secured creditors—but even if they were, that protection would apply only to cover depreciations in value since the

---

[13]  Although Aranha previously had offered to provide the Debtors with documentation to substantiate his claimed $6 million in post-Petition "services," he changed course after the Debtors took him up on that offer. This is not surprising, as Aranha's claims appear facially implausible—for example, he asserts that "the Debtors also owe me $3,397,958 for maintaining and preserving the Global since the Petition Date" (Aranha Decl. at ¶ 30), notwithstanding that the Global was seized by the Government on February 8, 2023, *less than three months* after the Petition Date.

Movants filed the Motion on September 21, 2023.  Accordingly, the requested relief must be denied.

## **RESERVATION OF RIGHTS**

44.     In filing this Objection, the Debtors have not waived any rights, and the Debtors expressly reserve all of their rights, powers, privileges and remedies under applicable law or otherwise with respect to the Movants and the Planes.  The Debtors may elect to exercise any or all of their rights, at their sole option without the necessity of any further notice, demand or other action on the part of the Movants.  Nothing contained in this Objection or any delay by the Debtors in exercising any rights, powers, privileges and remedies under applicable law with respect to the Movants or the Planes now existing or hereafter arising shall be construed as a waiver or modification of such rights, powers, privileges or remedies.

## **CONCLUSION**

45.     For the foregoing reasons, the Motion should be denied.

Dated: October 5, 2023
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       crokej@sullcrom.com
       kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | Ref. No.2659 |

### DECLARATION OF JACOB M. CROKE
### IN SUPPORT OF DEBTORS' OBJECTION TO THE MOTION OF ISLAND AIR
### CAPITAL AND PAUL F. ARANHA FOR RELIEF FROM THE AUTOMATIC STAY,
### TO THE EXTENT APPLICABLE, AND RELATED RELIEF

I, Jacob M. Croke, declare under penalty of perjury as follows:

1.     I am a partner in the law firm of Sullivan & Cromwell LLP, counsel to the Debtors.  I submit this declaration (the "Declaration") in support of *Debtors' Objection to the Motion of Island Air Capital and Paul F. Aranha for Relief from the Automatic Stay, to the Extent Applicable, and Related Relief* (the "Objection"),[2] filed concurrently herewith, to place before the Court certain documents and information referred to in the Objection.

2.     Except as otherwise indicated, all facts set forth in this Declaration are based upon information learned from my review of documents stored in the Debtors' document repository or obtained from counsel to former FTX Group personnel, or from information

---

[1]    The last four digits of Alameda Research LLC's tax identification number is 4063.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

[2]    Capitalized terms used but otherwise not defined shall have the meaning ascribed to them this Declaration or in the Objection.

supplied by persons working directly with me or under my supervision, direction or control and/or from the Debtors' professionals and advisors.  If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

3.        Attached hereto as **Exhibit A** are true and correct copies of a February 2022 email chain and its attachments, sent by Paul Aranha to a senior FTX Group executive.

4.        Attached hereto as **Exhibit B** is a true and correct copy of a February 2, 2022 notification of a wire transfer of $500,000 from a Silvergate Bank account ending #456 held in the name of Debtor Alameda Research Ltd. ("Alameda") to AIC Title Agency, LLC, the escrow agent for the Global.

5.        Attached hereto as **Exhibit C** is a true and correct copy of a March 2, 2022 notification of a wire transfer of $15,400,000 from a Silvergate Bank account ending #738 held in the name of Debtor North Dimension Inc. to AIC Title Agency, LLC, the escrow agent for the Global.

6.        Attached hereto as **Exhibit D** is a true and correct copy of an executed term sheet dated March 16, 2022, signed by Trans Island Airways Group ("TIA"), Paul Aranha, and FTX Ventures.

7.        Attached hereto as **Exhibit E** is a true and correct copy of an August 16, 2022 notification of a wire transfer of $11,545,000 from a Silvergate Bank account ending #456 held in the name of Debtor Alameda to Aerotitle, the escrow agent for the Legacy.

8.        Attached hereto as **Exhibit F** are true and correct copies of certain invoices sent by Paul Aranha, on behalf of TIA, to a senior FTX Group executive related to, among other things, expenses for renovations of the Planes.

9.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and correct.

Dated: October 5, 2023                    By: /s/ *Jacob M. Croke*
New York, New York                        Jacob M. Croke
                                          Sullivan & Cromwell LLP

# Exhibit A

**To:**      Emma Dalessio[emmajdalessio@gmail.com]; ryan.salame@gmail.com[ryan.salame@gmail.com]
**From:**    Paul Francis Aranha[paularanha@gmail.com]
**Sent:**     Mon 2/28/2022 3:11:18 PM (UTC)
**Subject:**   Payment Balance for Global 5000 Purchase
[Aircraft Deposit Instructions.pdf](Aircraft Deposit Instructions.pdf)
[Letter of Intent Global 5000 sn 9295_2.01.2022.pdf](Letter of Intent Global 5000 sn 9295_2.01.2022.pdf)

Hey,

We are ready to accept the aircraft.

Can you please arrange for the balance of $15,400,000.00 to the attached escrow account.

I am going to send over the High Speed Internet, paint and interior deposit information in the next days.

If you can let me know when sent I can inform escrow

---------- Forwarded message ---------
From: **Paul Francis Aranha** <[paularanha@gmail.com](mailto:paularanha@gmail.com)>
Date: Wed, Feb 2, 2022 at 10:37 AM
Subject: Deposit Information for Global 5000 Purchase
To: <[ryan.salame@gmail.com](mailto:ryan.salame@gmail.com)>, <[emmajdalessio@gmail.com](mailto:emmajdalessio@gmail.com)>

Hi Ryan/Emma,

I have attached the LOI and the escrow instructions for the Global 5000.

If you could please send the $500,000 refundable deposit to the escrow agent and let me know when sent it would be great.

We are planning on starting the initial records inspection today, the visual inspection tomorrow or Friday and then continue from there.

We were able to get the aircraft inspection scheduled in HK so it will be leaving from there to come to South Florida for the Wifi, Paint and Interior.

Please let me know,

Best,

Paul

**Paul Francis Aranha**
President | Director Operations
Trans Island Airways

242-427-8888

paularanha@gmail.com

www.transislandairways.com

7th Floor, ALBANY Financial Center, Nassau, Bahamas

--
Best,

Paul

**Paul Francis Aranha**
President | Director Operations
Trans Island Airways

242-427-8888

paularanha@gmail.com

www.transislandairways.com

7th Floor, ALBANY Financial Center, Nassau, Bahamas



# WIRE TRANSFER INSTRUCTIONS
# FOR AIC TITLE SERVICE ESCROW ACCOUNT

## BANK OF AMERICA

### ABA# 026009593
### FOR CREDIT TO: AIC TITLE AGENCY, LLC
### ACCOUNT# **305005374465**
### ATTN: Suzanne M. Pruitt
### RE: G5000 - 9295

FOR INTERNATIONAL WIRES - SWIFT CODE: BOFAUS3N
PLEASE NOTE WE DO NOT ACCEPT ACH TRANSFERS FOR ESCROW CLOSINGS

NOTE: OUR ESCROW ACCOUNT IS A NON-INTEREST BEARING ACCOUNT. FUNDS CANNOT BE TRANSFERRED OUT OF OUR ESCROW ACCOUNT AFTER 3:00 P.M. (CENTRAL TIME) FOR DOMESTIC WIRES AND 2:00 P.M. (CENTRAL TIME) FOR INTERNATIONAL WIRES. DISBURSEMENTS AUTHORIZED AFTER THESE TIMES WILL NOT BE TRANSMITTED UNTIL THE MORNING OF THE NEXT BUSINESS DAY.

NOTE: ALL ESCROW FEES MUST BE "PAID IN FULL" AT THE TIME OF CLOSING.

BANK OF AMERICA
211 N ROBINSON AVE
OKLAHOMA CITY, OK 73102
Bank Contact: Angela Parks

REFUNDABLE DEPOSITS: IN THE ABSENCE OF CONTRARY INSTRUCTIONS FROM THE REMITTER OF FUNDS, DEPOSITS ARE CONSIDERED TO BE FULLY REFUNDABLE TO AND UNDER THE CONTROL OF THE REMITTER. WRITTEN DIRECTIONS THAT GOVERN THE DISBURSEMENT OR DISPOSITION OF THE DEPOSITS AND THAT MAY BE PROVIDED FOR **IN ANY** LETTERS OF INTENT, AIRCRAFT PURCHASE AGREEMENTS, OR ANY OTHER AGREEMENTS BETWEEN THE REMITTER AND ANY OTHER PARTIES, ARE CONSIDERED TO BE "CONTRARY INSTRUCTIONS".

Beneficiary address:
6350 W Reno, OKLAHOMA CITY, OK 73127
800-288-2519 - 405-948-1811 - FAX 405-948-1869



## Letter of Intent

Trans Island Airways, Bahamas (**"Purchaser"**) or assigns hereby offers to purchase from Carolina Corporate Jets, Inc., USA (**"Seller"**) one Bombardier Global 5000 manufacturer's serial number 9295 upon the following terms and conditions:

1. Purchase Price: The purchase price for the Aircraft is $15,900,000 USD.

2. Deposit: Upon acceptance of this LOI, **Purchaser** to place a $500,000 USD deposit in escrow with AIC Title Service, LLC in Oklahoma City, OK within two (2) business days. The deposit shall become non-refundable upon execution of an Aircraft Purchase Agreement (the "Purchase Agreement"), except in the event of Seller's default as further defined in the Purchase Agreement.

3. Condition: Aircraft shall be delivered by the **Seller** in the following condition:
    a. In airworthy condition, with all calendar and hourly inspections current through the date of delivery; avionics and systems functioning in accordance with the manufacturer's specifications.
    b. With all Mandatory AD's and Mandatory Service Bulletins in compliance.
    c. With all original logbooks, manuals and drawings.
    d. Free and clear of all liens and encumbrances.
    e. With no material damage history and no material corrosion that cannot be rectified by Seller prior to delivery of the Aircraft. "Damage History" shall mean (a) damage, the repair of which would constitute a "major repair" as such term is defined in 14 C.F.R. Part 43, Appendix A, Paragraph (b) or (b) damage, the repair of which would require the issuance of an FAA Form 337 or its equivalent.
    f. Engines on Rolls Royce RRCC Enhanced; APU on MSP and airframe on Smart Parts to be fully paid and transferrable at closing.
    g. The Aircraft to be de-registered from the San Marino registry.

4. Inspections: The **Purchaser** shall conduct a Visual Inspection of the Aircraft on or about February 4, 2022 or at a date mutually agreed by both parties. If the Visual Inspection is successful, the Aircraft will be subject to a mutually agreeable Inspection work scope, Records Review and Test Flight at **Purchaser's** expense at a mutually agreeable Bombardier approved facility (the "Inspection Facility"). Ferry flights to and from the Inspection Facility shall be borne by the Purchaser.

5. Acceptance: **Purchaser** shall accept or reject the Aircraft in writing after the Inspection, Records Review and Test Flight, provided the Buyer may only reject the aircraft in the event the Inspection Facility determines it cannot be rendered to meet the delivery conditions or in the event of Seller's default of his obligations under the Purchase Agreement.

6. Closing and Delivery: Closing to occur with three (2) business days after the Aircraft is Returned to Service (RTS) by the Inspection Facility. Delivery to occur at a mutually agreeable location and the positioning cost shall be borne by the **Purchaser.**

7. This offer is valid until close of business on Wednesday, February 2, 2022.

If the terms and conditions of this LOI are acceptable, please acknowledge below and an Aircraft Purchase Agreement (APA) consisting of industry standard terms will be prepared by Seller within 5 working days, for both parties to sign. If a mutually agreeable APA cannot be reached within 10 working days after issuance of the Purchase Agreement, then this LOI shall become null and void and the deposit shall be immediately returned.

_____          Date: ___February 1, 2022_____
Trans Island Airways (**Purchaser**)

_Tony Ryan_____          Date: ___February 1, 2022_____
Carolina Corporate Jets, Inc. (**Seller**)

# Exhibit B

| From: | customerservice@silvergate.com[customerservice@silvergate.com] |
|---|---|
| Sent: | Wed 2/2/2022 8:08:24 PM (UTC) |
| To: | fiats@alameda-research.com[fiats@alameda-research.com] |
| Subject: | Advice of Debit - Bank Confidential |

## WIRE TRANSFER OPERATIONS ADVICE OF DEBIT

ON Wed Feb 02 00:00:00 UTC 2022 , WE DEBITED YOUR ACCOUNT *******456 FOR USD 500000.00

## DETAILS OF PAYMENT

PAYMENT DATE AND TIME: 2022-02-02 20:08:23.204
PAID AMOUNT: USD 500000.00
METHOD OF PAYMENT: FED
TRANSACTION NUMBER: M022K08187A2O18N
OMAD(CYCLE DATE/LTERM/OMSN): 20220202B6B7HU1R01158302021508FT01
IMAD(CYCLE DATE/LTERM/IMSN): 20220202MMQFMPUR001185
REFERENCE: 1224699601
UETR: 8ab34ed4-1b1c-497f-ae2e-3e8e5f39ebc0

BENEFICIARY:
Acct: *********465
AIC TITLE AGENCY, LLC
6350 W RENO, OKLAHOMA CITY OK 73127

BENEFICIARY BANK
ABA: 026009593
BIC:
NAME: BANK OF AMERICA, N.A., NY

RECEIVER BANK
ABA: 026009593
BIC:
NAME: BANK OF AMERICA, N.A., NY

DEBITED FROM:
ALAMEDA RESEARCH LTD
TORTOLA PIER PARK, BLDG. I SECOND FLOOR WICKHAM CAY I. ROAD TOWN
TORTOLA BRITISH VIRGIN ISLAN

ORIGINATOR TO BENEFICIARY INFO: ATTN: SUZANNE M. PRUITTRE: G5000-92 95

# Exhibit C

| From: | customerservice@silvergate.com[customerservice@silvergate.com] |
|---|---|
| Sent: | Wed 3/2/2022 4:03:52 PM (UTC) |
| To: | fiats@alameda-research.com[fiats@alameda-research.com] |
| Subject: | Advice of Debit - Bank Confidential |

## WIRE TRANSFER OPERATIONS ADVICE OF DEBIT
ON 2022-03-02 , WE DEBITED YOUR ACCOUNT *******738 FOR USD 15400000.00

## DETAILS OF PAYMENT

PAYMENT DATE AND TIME: 2022-03-02 16:03:51.142
PAID AMOUNT: USD 15400000.00
METHOD OF PAYMENT: FED
TRANSACTION NUMBER: M032E3831Q95H198
OMAD(CYCLE DATE/LTERM/OMSN): 20220302B6B7HU2R00636203021103FT01
IMAD(CYCLE DATE/LTERM/IMSN): 20220302MMQFMPUR000952
REFERENCE: 74142200
UETR: 6da17da7-29ad-4fef-a08e-bd44c795d525

BENEFICIARY:
Acct: *********465
AIC TITLE AGENCY, LLC
6350 W RENO, OKLAHOMA CITY OK 73127, US

BENEFICIARY BANK
ABA: 026009593
BIC:
NAME: BANK OF AMERICA, N.A., NY

RECEIVER BANK
ABA: 026009593
BIC:
NAME: BANK OF AMERICA, N.A., NY

DEBITED FROM:
NORTH DIMENSION INC.
2000 CENTER ST STE 400 BERKELEY CA 94704-1996

ORIGINATOR TO BENEFICIARY INFO: SUZANNE M. PRUITT G5000 - 9295

# Exhibit D



**Terms of Investment**

The following is a summary of the principal terms ("**_Summary of Terms_**") with respect to the proposed investment to [Trans Island Airways Group][1] (the "**_Company_**").

| | |
|---|---|
| **Closing** | Within 30 days of signing this proposal (the "**_Closing_**"). |
| **Securities** | Common stock (or the most senior class of stock) of the Company. |
| **Investment** | FTX will invest $12 million at the Valuation. |
| **Secondary Purchase** | FTX will purchase $5 million worth of shares from Paul Francis Aranha (CEO of the Company) at the Valuation. |
| **Valuation** | Price per share to be calculated based on a post-money valuation of $42.5 million on a fully-diluted basis, which will include the conversion of all outstanding convertible instruments. |
| **Confidentiality** | This proposal and any related discussions and correspondence may not be disclosed by the Company to any party (other than to legal counsel and the accountants of the Company in order for such persons to render advice in connection with the proposed transaction, and other than to existing stockholders of the Company) without the prior written approval of FTX. |
| **Binding Terms** | Except for the provision labeled "Confidentiality", which is explicitly agreed to be legally binding agreements among the parties hereto, this Summary of Terms is not intended to create any legally binding obligation on either party, and no such obligation shall be created unless and until the Investors have completed satisfactory due diligence and the parties have entered into definitive written agreements evidencing such agreement as described above. |

The parties to this term sheet acknowledge their agreement to the terms contained herein.

DocuSigned by:

_E6B7FF1067BB4E7_

[Trans Island Airways Group]

Date: 3/16/2022 , 2022

DocuSigned by:

Paul Francis Aranha

Date: 3/16/2022 , 2022

DocuSigned by: _Amy Wu_

FTX Ventures

Amy Wu

---

[1] Note to Company: please confirm full legal corporate name.

# Exhibit E

**Ross, Luke W.**

| | |
|---|---|
| **From:** | customerservice@silvergate.com |
| **Sent:** | Tuesday, August 16, 2022 5:00 PM |
| **To:** | fiats@alameda-research.com |
| **Subject:** | Advice of Debit - Bank Confidential |

## WIRE TRANSFER OPERATIONS ADVICE OF DEBIT
ON 2022-08-16 , WE DEBITED YOUR ACCOUNT *******456 FOR USD 11545000.00

## DETAILS OF PAYMENT

PAYMENT DATE AND TIME: 2022-08-16 20:59:32.680
PAID AMOUNT: USD 11545000.00
METHOD OF PAYMENT: FED
TRANSACTION NUMBER: M08GG3926G3B63C6
OMAD(CYCLE DATE/LTERM/OMSN): 20220816B1QGC01R07731508161659FT03
IMAD(CYCLE DATE/LTERM/IMSN): 20220816MMQFMPUR001626
REFERENCE: 3207766601
UETR: 40f26ee2-b464-48eb-ab65-6ec4fcc35ea2

BENEFICIARY:
Acct: ******018
AEROTITLE
1200 METROPOLITAN AVE. OKLAHOMA CITY, OK 73108

BENEFICIARY BANK
ABA: 021000021
BIC:
NAME: JPMORGAN CHASE BANK, NA

RECEIVER BANK
ABA: 021000021
BIC:
NAME: JPMORGAN CHASE BANK, NA

DEBITED FROM:
ALAMEDA RESEARCH LTD
TORTOLA PIER PARK, BLDG. I SECOND FLOOR WICKHAM CAY I. ROAD TOWN TORTOLA
BRITISH VIRGIN ISLAN

ORIGINATOR TO BENEFICIARY INFO: REFERENCE: JACINDA JANKO 14500967

# Exhibit F



| **Invoice # 189092** | (Aircraft Expenses) 17-July-2022 |
|---|---|

| **Prepared For** | Ryan Salame<br>FTX Bahamas | **Pay To:** | Trans Island Airways<br>Banyan Air Service<br>5360 NW 20th Terrace<br>Fort Lauderdale FL 33309<br>United States |
|---|---|---|---|

| **Aircraft** | Global 5000 |
|---|---|

| | |
|---|---:|
| Pre Purchase Inspection Expenses for Global 5000 9124 | 49,958.00 |
| Closing Costs and Title Search | 6,750.00 |
| Delivery Flight Costs from Hong Kong to Ft. Lauderdale | 97,700.00 |
| Insurance Expense through November 2022 | 33,630.00 |
| Pilot Training - Simulator Training | 270,000.00 |
| Pilot Training – Expenses and Salary for the Periods at Training (Hotels, Airfare, Meals, Transportation) | 128,160.00 |
| Interior Refurbishment Progress Payment – May | 128,088.00 |
| Interior Refurbishment Progress Payment – June | 175,540.00 |
| Interior Refurbishment Progress Payment – July | 175,540.00 |
| Interior Refurbishment Progress Payment – August | 175,540.00 |
| Rolls Royce Corporate Care Payment – June | 51,924.00 |
| Rolls Royce Corporate Care Payment – July | 51,924.00 |
| Rolls Royce Corporate Care Payment – August | 51,924.00 |
| Pre Purchase Inspection on Global 9324 and Travel for Legacy | 69,612.00 |
| Honeywell APU Program Transfer Cost | 7,000.00 |
| Smart Parts Coverage – April | 20,360.00 |
| Smart Parts Coverage – May | 20,360.00 |
| Smart Parts Coverage – June | 20,360.00 |
| Smart Parts Coverage – July | 20,360.00 |
| Smart Parts Coverage – August | 20,360.00 |
| Aircraft Strip and Paint | 165,000.00 |
| **Total** | **$1,740,090.00** |



Trans Island Airways
Phone: 242.362.4006 | 954.727.3377
Fax: 954.727.5599
Email: sales@tia.aero
Website: http://www.tia.aero

**Invoice # BDE-08-2022**     (Aircraft Expenses) 21-Aug-2022

| **Prepared For** | Ryan Salame<br>FTX Bahamas | **Pay To:** | Trans Island Airways<br>Banyan Air Service<br>5360 NW 20th Terrace<br>Fort Lauderdale FL 33309<br>United States |
|---|---|---|---|

**Aircraft**     Legacy Shuttle

| | |
|---|---:|
| Aviation Manuals MEL for Shuttle (Legacy) | 1,600.00 |
| Pre Purchase Inspection Costs for Shuttle | 49,700.00 |
| Scheme Designers Guidelines for Shuttle Paint | 2,075.00 |
| Closing Costs and Title Search for Shuttle (Legacy) | 7,950.00 |
| Wifi and USB Charger Installation for Shuttle | 450,843.10 |
| Insurance Coverage for Shuttle Through November 2022 | 12,800.00 |
| APG iPreflight Genesis Runway Analysis | 1,740.00 |
| SchedAero Subscription for Shuttle | 3,600.00 |
| Paint Deposit for Shuttle | 165,000.00 |
| Foreflight Subscriptions - Annual | 1,440.00 |
| Aileron ADS-B Subscription - Annual | 2,450.00 |
| CAA-B Airworthiness / Registration / Noise / Radio Certificate Fees | 2,969.09 |
| USCBP DTOPS | 30.53 |
| iPads for Shuttle | 3,636.00 |
| Escrow Company and Title Search Fees for Shuttle | 7,950.00 |
| **Total** | **713,783.72** |



Trans Island Airways
Phone: 242.362.4006 | 954.727.3377
Fax: 954.727.5599
Email: sales@tia.aero
Website: http://www.tia.aero

**Invoice # SPR-08-2022** (Aircraft Expenses) 21-Aug-2022

| | |
|---|---|
| **Prepared For** | Ryan Salame |
| | FTX Bahamas |

**Pay To:** Trans Island Airways
Banyan Air Service
5360 NW 20th Terrace
Fort Lauderdale FL 33309
United States

**Aircraft** Global 5000

| | |
|---|---:|
| Rolls Royce Corporate Care Payment – September | 51,924.00 |
| Smart Parts Coverage – September | 20,360.00 |
| Autumn Elizabeth Design Deposit - Interior Designer and Design Oversight for Global Interior Work | 40,000.00 |
| Pilot Training - Scott International Procedures Course | 11,950.00 |
| Maintenance Training – Technician to Rolls Royce for BD700 Engine Course and Borescope (Travel and Expenses) | 5637.00 |
| Aviation Manuals MEL for Global | 3,200.00 |
| Aircraft Parts – 2 x Spare Nose Wheel Assy for Global | 60,000.00 |
| Aircraft Parts – 2 x Spare Main Wheel Assy for Global | 220,000.00 |
| Aircraft Operations Manuals Subscriptions for Global | 12,392.20 |
| Banyan Wifi Install Final Payment for Global | 845,321.00 |
| Interior Refurbishment Progress Payment - September - Final Discrepancy Payment Only Remains After Install Complete | 175,540.00 |
| Scheme Designers Guidelines for Global Paint | 2,075.00 |
| Pilot Foreflight Subscription | 1,440.00 |
| USCBP DTOPS | 30.53 |
| Aileron ADS-B Subscription - Annual | 2,450.00 |
| CAA-B Airworthiness / Registration / Noise / Radio Certificate Fees | 2,969.06 |
| APG iPreflight Genesis | 1,740.00 |
| iPads for Global | 3,636.00 |
| SchedAero Subscription for Global | 3,600.00 |
| **Total** | **1,464,264.79** |



Trans Island Airways
Phone: 242.362.4006 | 954.727.3377
Fax: 954.727.5599
Email: sales@tia.aero
Website: http://www.tia.aero

**Invoice # BDE-10-2022**     (Aircraft Expenses) 26-Oct-2022

| **Prepared For** | Ryan Salame | **Pay To:** | Trans Island Airways |
|---|---|---|---|
| | FTX Bahamas | | Banyan Air Service |
| | | | 5360 NW 20th Terrace |
| | | | Fort Lauderdale FL 33309 |
| | | | United States |

**Aircraft**     Legacy 600

| | |
|---|---|
| Test and Delivery Flight Costs from Riga to Fort Lauderdale | 98,900 |
| Pilot Training - Simulator Training | 124,500 |
| Pilot Training – Expenses and Salary for the Periods at Training (Hotels, Airfare, Meals, Transportation) | 97,910 |
| Embraer - SB 145LEG-31-0025 | 5,147 |
| Embraer - Aircraft Operations Manuals Subscription | 12,750 |
| Embraer - Aircraft Maintenance Manuals Subscription | 12,000 |
| CAMP Systems - Maintenance Tracking Software Subscription | 18,400 |
| Bruce Custom Covers - Aircraft Covers Order | 12,590 |
| USCBP DTOPS 2023 | 32.62 |
| TLD – Ground Support Equipment NBL | 63,849.90 |
| **Total** | 446,079.52 |



Trans Island Airways
Phone: 242.362.4006 | 954.727.3377
Fax: 954.727.5599
Email: sales@tia.aero
Website: http://www.tia.aero

**Invoice # SPR-10-2022**     (Aircraft Expenses) 26-Oct-2022

| | |
|---|---|
| **Prepared For** | Ryan Salame |
| | FTX Bahamas |

| | |
|---|---|
| **Pay To:** | Trans Island Airways |
| | Banyan Air Service |
| | 5360 NW 20th Terrace |
| | Fort Lauderdale FL 33309 |
| | United States |

**Aircraft**     Global 5000

| | |
|---|---|
| Rolls Royce Corporate Care Payment – October | 51,924.00 |
| Smart Parts Coverage – October | 20,360.00 |
| Rolls Royce Corporate Care Payment – November | 51,924.00 |
| Smart Parts Coverage – November | 20,360.00 |
| Amazon – Board Game Purchases for SBF for Aiplane | 975.00 |
| Diep Sleep – Deposit on Aircraft Bed Systems | 24,030.00 |
| TLD – Ground Support Equipment AC GPU-406-E-CUP | 64,250.00 |
| US Customs – DTOPS Sticker for Calendar Year 2023 | 32.62 |
| **Total** | **233,847.62** |