# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

C.A. No. 1:22-cr-673 (LAK)

| |
|---|
| United States of America |
| |
| v. |
| |
| Samuel Bankman-Fried a/k/a "SBF", |
| |
| Defendant. |

**ANCILLARY PETITION FOR HEARING TO ADJUDICATE VALIDITY OF
LEGAL INTEREST AND RIGHT TO FORFEITED PROPERTY
UNDER 21 U.S.C. § 853(n)**

2024 JUN 14 PM 4:38

RECEIVED

Claimants Alexander Chernyavsky, Kyle Rupprecht, Mike Livieratos, and Sunil Kavuri ("Individual Claimants"), both individually and on behalf of the MDL Class, by and through MDL Co-Lead Counsel in *In Re: FTX Cryptocurrency Exchange Collapse Litigation* (MDL No. 3076) pending before the Honorable K. Michael Moore in the Southern District of Florida (the "FTX MDL"), respectfully petition this Court for a hearing Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure and 21 U.S.C. § 853(n) to adjudicate the validity of their interests in the assets identified in Exhibit A to the Preliminary Order of Forfeiture / Money Judgment, issued on March 29, 2024 (together, the "Forfeited FTX Customer Assets"). The Individual Claimants herein are named plaintiffs and putative class representatives in the FTX MDL who have moved for preliminary approval, on behalf of the putative class of FTX victims (together, the "MDL Plaintiffs"), of several class action settlements with FTX Insiders and Promoters, including Defendant Sam Bankman-Fried ("SBF").

Each MDL Plaintiff is an FTX customer whose digital assets were stolen by SBF. When SBF committed the theft and fraudulent acts for which he was found guilty by a jury of his peers in this Court, each MDL Plaintiff held all right, title, and interest to these digital assets. The assets of the MDL Plaintiffs were the principal targets of SBF. The Court presiding over the FTX MDL has already found that court-appointed Co-Lead counsel would be able to fairly and efficiently represent the interest of the MDL Plaintiffs in the consolidated proceedings. Accordingly, MDL Plaintiffs respectfully suggest that the MDL is best situated to distribute the funds discussed herein.

# BACKGROUND

*The FTX Fraud*

1.      In May 2019, SBF and his co-founders, Gary Wang and Nishad Singh, launched FTX, which, along with various subsidiaries, affiliates and related entities, operated the FTX Platform, which FTX purported to be a centralized digital asset exchange aimed at "the mass market and first-time users" of cryptocurrencies. FTX portrayed itself as a trustworthy and law-abiding member of the cryptocurrency industry, focused not only on profits, but also on investor and client protection. FTX claimed to employ security measures such as segregation of customer funds and managing or eliminating conflicts, including SBF's ownership of quantitative crypto trading firm, Alameda, which was a trader on the FTX Platform, in order to curate a security-first persona to lure in inexperienced and unwitting investors to the platform.

2.      However, FTX was none of these things. Instead of managing conflicts, the FTX Group actively embraced them, using funds from FTX Trading, FTX.US, and Alameda interchangeably to prop up the enterprise, including FTX customer assets as an interest-free source of capital for Alameda's and SBF's private ventures.

3.      For many years, SBF directed that FTX customer funds be wired to bank accounts held by North Dimension, a wholly owned subsidiary of Alameda, which were then commingled with Alameda's funds and misappropriated by SBF. This improper relationship between FTX and Alameda was further detailed by SBF, who admitted that "people wired $8b to Alameda and . . . it was never delivered to FTX." Often, SBF used the misappropriated customer funds to pay for Alameda's, increasingly riskier, leveraged trades and investments. Additionally, FTX created a backdoor in their code to allow Alameda to circumvent FTX's risk engine, which would auto-liquidate accounts with a negative balance. Instead, Alameda was allowed to go into an estimated

$65 billion negative balance, effectively giving Alameda a line of credit in that amount which was collateralized with FTX customer funds.

*FTX Insider Liability*

4.     For their roles in this fraud, SBF, Gary Wang, Nishad Singh, and Caroline Ellison ("FTX Insiders") have been criminally charged by the United States, sued by customers in civil suits so numerous that they are now consolidated in the FTX MDL, and individually named in adversary proceedings initiated by the debtor in the FTX bankruptcy.

5.     In this Court, SBF was charged with seven counts: wire fraud, conspiracy to commit wire fraud on FTX's customers, conspiracy to commit securities fraud on FTX's investors, conspiracy to commit commodities fraud on FTX's customers, and conspiracy to commit money laundering.

6.     He was convicted on all seven counts. MDL Insider Defendants Caroline Ellison, Gary Wang, and Nishad Singh have all pled guilty to charges related to their involvement in the fraudulent activities at FTX and cooperated with the government in the case against SBF. Their testimonies established the extensive fraud and misappropriation of customer funds now subject to forfeiture.

7.     The MDL Plaintiffs have sued the FTX Insiders for fifteen causes of action and were careful not to include any claims that would arguably belong to the FTX Bankruptcy Estate:

- Claims for unlawful promotion and sale of unregistered securities (Counts I, XII);

- State law consumer protection claims for unfair and deceptive practices under Florida and California law (Counts II, XIV, XV);

- Contract and tort claims for civil conspiracy, fraud, aiding & abetting fraud, conversion, aiding and abetting conversion, negligent misrepresentation, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment (Counts III–XI); and

- Federal RICO claims under 18 U.S.C. § 1962(c) (Count XIII).

8.       In the bankruptcy court, certain FTX customers have filed claims against SBF and other FTX Insiders for breach of fiduciary duty and for other related claims (Adv. Proc. 22-50513-JTD). The FTX Debtors have filed adversary proceedings asserting fraudulent transfer and other claims against SBF and other entities (Adv. Proc. 22-11068-JTD) and asserting claims for breach of fiduciary duties and other claims against SBF and other FTX Insiders (Adv. Proc. 23-50448-JTD).

### *FTX MDL Settlement*

9.       The MDL Plaintiffs have already reached proposed settlements in the FTX MDL with 11 defendants, including SBF and the FTX Insiders. *See* FTX MDL, ECF No. 565 at 10–11. Motions for preliminary approval these settlements are pending.

10.       Through these settlements, the MDL Plaintiffs have obtained documents and information relevant to their other claims, assistance in pursuing those claims, and an agreement not to object to the distribution of the forfeiture funds at issue here through the MDL, among other things.  (See Section IV, *infra*, for further details.)

### *SBF Criminal Verdict: SBF Stole from Customers, Not FTX Trading*

11.       As charged in his Superseding Indictment, SBF stole FTX customer funds to "finance exorbitant spending unrelated to the operation of the FTX platform," including "to pay for his own personal expenses, real estate in The Bahamas, speculative venture investments, a wide-ranging political influence operation, and to repay Alameda's lenders." (Superseding Indictment, ¶ 7).

12.       On November 3, 2023, a jury convicted SBF for misappropriating FTX customer funds, *not* funds owned by FTX Trading or any other corporate entity. SBF was convicted of

conspiracy to commit wire fraud on FTX's **customers** (Count I), wire fraud on FTX's **customers** (Count II), and conspiracy to commit commodities fraud on FTX's **customers** (Count V). See ECF No. 1 at 1 – 2, 5; Gov't Sentencing Mem., ECF No. 410, at 4. The assets SBF stole were customer assets that should be returned to the customers through a procedural process best suited to accomplish that—i.e., the claims administration process that will already be occurring in the FTX MDL for other class settlements. Experienced MDL judges like Judge Moore in the Southern District of Florida routinely oversee this kind of process in a fair and efficient manner.

13. As the Government further explains: "The defendant directly, and through FTX, represented to customers that the exchange was safe and trustworthy, that customers' money belonged to them and was custodied, and that their funds would not be used by FTX." Gov't Sentencing Mem., at 5; *see id.* at 6 ("The FTX website also represented that customers owned the funds they deposited."). Notwithstanding these representations, SBF "conspired" with other FTX Insiders to "defraud FTX's customers by fraudulently inducing customers to deposit funds on FTX, by misappropriating those funds by directing them to Alameda, and by making false statements to lull customers into not withdrawing their money." *Id.* at 6.

14. MDL Co-Lead Counsel and named Plaintiff Sunil Kavuri appeared at SBF's March 28, 2024, sentencing to give voice to the harm wrought by SBF's criminal misconduct, testifying that the MDL Plaintiffs suffered severe financial losses that have caused personal and family distress, depression, lost time from work and even suicide. His testimony underscored the reality that the most direct victims of SBF's crimes are the putative class of customers in the FTX MDL.

15. Thus, this Court has been clear, and the law of the case moving forward is clear: the assets at issue here belong to the customers from whom they were stolen. As such, they deserved to be returned to those customers in the most efficient manner. (*See* Section IV, *infra*.)

*SBF's Forfeiture Order and Apportionment of Funds for Customers*

16.    The Court's Preliminary Order of Forfeiture directed the forfeiture of 259 specific properties tied to the fraudulent activities of SBF and other insiders. These assets include substantial amounts of cryptocurrency, cash, and other financial instruments held in various accounts and entities linked to SBF and the other FTX Insiders. These assets are primarily the proceeds of wire fraud and property involved in money laundering and include, as examples:

- The Robinhood Shares, of which this Court authorized the sale for a total of $605,694,411.50, (Prelim. Order at 3), were purchased by Alameda using the line of credit "ultimately coming from customer funds," as Co-Defendant Ellison testified at trial. (Tr. at 732).

- The $21 million of United States currency seized by the Government from accounts at ED&F Man Capital Markets in the name of "Emergent Fidelity Technologies," (Prelim. Order at 3), are converted FTX customer deposits. (Tr. at 1740 and GX-1032).

- The $50 million of United States seized by the Government from accounts at Moonstone Bank held in the name of "FTX Digital Markets," (Prelim. Order at 2), are converted FTX customer deposits. (Dkt. 49). MDL Plaintiffs have sued Moonstone, along with its affiliate, Deltec Bank, and their co-owner, Jean Chalopin, for conspiring with Defendant Sam Bankman-Fried and other co-conspirators to misappropriate customer funds through accounts at those banks, including the $50 million on deposit at Moonstone that the Government has already seized.

- The United States currency seized by the Government from accounts at Silvergate Bank held in the name of "FTX Digital Markets," (Prelim. Order at 2), are converted FTX customer deposits. (Tr. at 1286-88 and GX-1050).

- The funds held at Signature Bank in the name of SBF and Luk Wei Chan, (Prelim. Order, Ex. A. ¶ 258), are converted FTX customer funds. (Tr. at 1861 and GX-1089).

- The various cryptocurrencies in Debtors' Binance accounts (Prelim. Order, Ex. A. ¶¶ 2-255), are converted property of FTX customers or were purchased with FTX customer funds. (Tr. at 1715).

- The Bombardier Global 5000 BD-700-1A11 and Embraer Legacy EMB-135BJ aircraft, (Prelim. Order, Ex. A. ¶¶ 257-58), were purchased with FTX customer funds. (Tr. at 1715).

- The political contributions made by SBF, Co-Defendant Nishad Singh, and/or Co-Defendant Ryan Salame, (Prelim. Order, Ex. A. ¶¶ 259-261), were funded with FTX customer funds. (Tr. at 1862-69).

17. This Court sentenced SBF to twenty-five (25) years in prison and ordered that SBF forfeit to the United States the sum of $11,020,000,000, pursuant to the Preliminary Order entered by the Court the next day. As the Government noted in its Sentencing Memorandum, of that forfeiture amount, $8,000,000,000 is a conservative estimate of the forfeiture amount that should flow to FTX's customers (the "Forfeited FTX Customer Funds"), while the remaining $3,020,000,000 is to be distributed to Alameda's lenders and FTX's investors (the "Forfeited FTX Investor Funds").[1] (Gov. Mem. at 104).

18. Proceedings in the bankruptcy court are now ongoing, with a hearing on the Debtors' disclosure statement (to which the MDL Plaintiffs objected) currently set for June 25, 2024. In addition, adversary proceedings against SBF and other FTX Insiders remain pending.

***The Assets Being Forfeited Belong to the MDL Plaintiffs[2]***

19. As this Court has already ruled, the converted customer assets have always, and continue to be, owned solely by the individual customers as individual property. They were not owned, ***at any point***, by any FTX Group entity or FTX Insider. The FTX.US User Agreement dated May 6, 2022, Section 6, "Account Services," makes clear that "Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to

---

[1] To the extent this Court agrees with this, or any other, apportionment of funds as between customers and lenders/investors, the MDL Plaintiffs make no claim regarding how the latter funds should be distributed.

[2] To the extent the Court decides that the language in FTX' Terms of Use is not clear, and thus may consider extrinsic evidence for their interpretation, Class Counsel have already discussed this issue with the FTX insiders that drafted these sections and are prepared to provide those materials to the Court.

FTX.US," and "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US." Similarly, the FTX International User Agreement dated May 13, 2022. Section 8.2.6 makes clear that "Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading," and "None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

20.     Schedule 1, "Definitions and Interpretation," of the FTX International Terms, defines digital assets as "BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenized futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform." Further, Section 8.3 makes clear that FTX International "IS NOT A DEPOSITORY INSTITUTION."

21.     In order for customers to engage in "Complex Products" trading (including but not limited to Futures Contracts, Options Contracts, and MOVE Volatility Contracts), customers were required to post collateral in the form of fiat currency or Digital Assets, both of which always remained titled to and owned by FTX customers, not FTX International, as indicated by the foregoing terms.

## ARGUMENT

## I.     CLAIMANTS HAVE A SUPERIOR INTEREST IN THE ASSETS SUBJECT TO FORFEITURE

22.     The Government has repeatedly and correctly observed that the assets involved in this case were derived from criminal activity and have numerous victims. Specifically, the Sentencing Memorandum notes that "the defendant misappropriated those funds to invest in a variety of speculative assets" and "every dollar stolen from customers was taken out of their

deposits on FTX and went into the defendant's (or his companies') pockets[.]" Sentencing Memorandum at 52, 73. Furthermore, the Sentencing Memorandum emphasizes the profound impact on victims, including those who lost their "entire life savings" and experienced severe financial and emotional distress as a result of the defendant's actions. *Id.* at pp. 3, 79.

23.     The Individual Claimants and MDL Plaintiffs here are those victims. They invested millions of dollars' worth of digital funds to purchase unregistered FTX securities, including YBAs and FTT. It is those digital funds that are source for all of the Forfeited FTX Customer Assets identified in the Preliminary Order of Forfeiture.

24.     Those assets include but are not limited to the following accounts which have the very tokens in them that SBF misappropriated from the MDL Plaintiffs and, in particular, from the Individual Claimants:

- 1.3773854 units of Bitcoin (BTC) formerly held in Binance.us account number 35000066 in the name of Alameda Research LTD

- 24.4135385 units of Bitcoin (BTC) formerly held in Binance.us account number 35155204 in the name of Alameda Research LTD

- 657.92 units of Bitcoin (BTC) formerly held in Binance.us account number 94086678 in the name of Alameda Research LTD

- 19.98876671 units of ChainLink (LINK) formerly held in Binance.us account number 35000066 in the name of Alameda Research LTD

- 98591.64417196 units of ChainLink (LINK) formerly held in Binance.us account number 94086678 in the name of Alameda Research LTD

- 29.50308659 units of Ethereum (ETH) formerly held in Binance.us account number 35000066 in the name of Alameda Research LTD

- 289.65502554 units of Ethereum (ETH) formerly held in Binance.us account number 35155204 in the name of Alameda Research LTD

- 4620.58 units of Ethereum (ETH) formerly held in Binance.us account number 94086678 in the name of Alameda Research LTD

- 3.52598049 units of Litecoin (LTC) formerly held in Binance.us account number 35000066 in the name of Alameda Research LTD

- 550 units of Litecoin (LTC) formerly held in Binance.us account number 35155204 in the name of Alameda Research LTD

- 31341.27163278 units of Litecoin (LTC) formerly held in Binance.us account number 94086678 in the name of Alameda Research LTD

- 19.1760689 units of Polygon (MATIC) formerly held in Binance.us account number 35000066 in the name of Alameda Research LTD

- 122572.64205808 units of Polygon (MATIC) formerly held in Binance.us account number 94086678 in the name of Alameda Research LTD

- 0.50728742 units of Solana (SOL) formerly held in Binance.us account number 35000066 in the name of Alameda Research LTD

- 15242.1 units of Solana (SOL) formerly held in Binance.us account number 94086678 in the name of Alameda Research LTD

- 17.27458532 units of Uniswap (UNI) formerly held in Binance.us account number 35000066 in the name of Alameda Research LTD

- 298179.10587996 units of Uniswap (UNI) formerly held in Binance.us account number 94086678 in the name of Alameda Research LTD

A. **The Claimants' Property Rights**

25.     Individual Claimants Alexander Chernyavsky, Kyle Rupprecht, Mike Livieratos, and Sunil Kavuri assert their property rights in the following assets subject to forfeiture as set out in the chart here, both individually, and as representative examples of MDL Plaintiffs investments:

| Name | Name of Crypto | Quantity | Dates Acquired/Deposited |
|---|---|---|---|
| Alexander Chernyavsky | Bitcoin (BTC) | 2.501863 | On or after 3/11/2022 through 11/11/2022 |
| Alexander Chernyavsky | Ethereum (ETH) | 32.227 | On or after 3/11/2022 through 11/11/2022 |
| Alexander Chernyavsky | Solana (SOL) | 224.3172 | On or after 3/11/2022 through 11/11/2022 |
| Alexander Chernyavsky | Litecoin (LTC) | 37.03018 | On or after 3/11/2022 through 11/11/2022 |
| Alexander Chernyavsky | ChainLink Token (LINK) | 238.0017 | On or after 3/11/2022 through 11/11/2022 |
| Alexander Chernyavsky | Uniswap Protocol Token (UNI) | 175.3097 | On or after 3/11/2022 through 11/11/2022 |
| Kyle Rupprecht | Bitcoin (BTC) | 11.67976 | On or about 2021 through 11/11/2022 |
| Kyle Rupprecht | Ethereum (ETH) | 12.03103 | On or about 2021 through 11/11/2022 |
| Mike Livieratos | Bitcoin (BTC) | 1.003525 | 10/18/2022 (1 BTC) |
| Mike Livieratos | Ethereum (ETH) | 9.751568 | 10/18/2022 (8 ETH), 10/28/2022 (1.75 ETH) |
| Mike Livieratos | Solana (SOL) | 406.1113 | 10/18/2022 (200 SOL), 10/28/2022 (205 SOL) |
| Mike Livieratos | Polygon (MATIC) | 5042.246 | 10/18/2022 (7.59 MATIC), 10/28/2022 (3002.21 MATIC), 8/11/2022 (2000 MATIC) |
| Sunil Kavuri | Bitcoin (BTC) | 15.73505 | Various dates between 11/8/2021 – 10/19/2022 |
| Sunil Kavuri | Ethereum (ETH) | 799.943 | 8/11/2022, 12/2022 |

26.     Altogether these four Individual Claimants assert a superior right, title, and/or interest to the following assets both individually, and as representative examples of MDL Plaintiffs investments:

- Bitcoin (BTC): 30.920198

- ChainLink Token (LINK): 238.0017

- Ethereum (ETH): 853.952598

- Litecoin (LTC): 37.03018

- Polygon (MATIC): 5042.246

- Solana (SOL): 630.4285

- Uniswap Protocol Token (UNI): 175.3097

27.     As a class, the MDL Plaintiffs assert a superior right, title, and interest over the Forfeited FTX Customer Assets, which were obtained with assets they held on FTX prior to the date of the bankruptcy, and which the Court ruled in the Preliminary Forfeiture Order that Bankman-Fried converted to make those purchases. Such information is readily ascertainable by the Court, and can be obtained by MDL Co-Lead Counsel through a subpoena issued in this action if desired.

28.     The Individual Claimants and MDL Plaintiffs retain all title and ownership to the assets they placed into FTX accounts. The terms of use for FTX.US and FTX Trading both specify, using substantially similar language, that FTX does not claim any title or ownership to customer assets placed into accounts on any of the FTX platforms and that FTX does not purport to be a depository institution. *See* Declaration of B. Alexander ("Alexander Decl."), Ex. A (FTX.US Terms of Service), Section 6; *Id.*, Ex. B (FTX Trading Terms of Service), Section 8.2.6, 8.3, and Schedule 1. Even in instances of complex products, which require collateral, customers retained all title and ownership of the collateral property.

**B.     The MDL Plaintiffs' Interests in the Forfeited FTX Customer Assets Are Directly Traceable to Their Investments**

29.     Here, all of the Forfeited FTX Customer Assets were obtained with FTX customer funds. The jury convicted SBF for "defraud[ing] FTX customers … b]y exploiting the[ir] trust," as SBF "misappropriated and embezzled FTX customer deposits … billions of dollars in stolen

funds for a variety of purposes, including, among other things, to enrich himself, to support the operations of FTX; to fund speculative venture investments; to help fund over a million dollars in campaign contributions to Democrats and Republicans to seek to influence cryptocurrency regulation; and to pay for Alameda's operating costs" including "to repay Alameda's lenders." (Superseding Indictment, ¶¶ 1, 7).

30.     The jury found that SBF stole no less than $8 billion from FTX customers to fund these purchases, which purchases include the Specific Property subject to forfeiture by the Court's Preliminary Order as previously described.

31.     As Mr. Can Sun, one of FTX's in-house attorneys, testified at SBF's trial, neither SBF nor any Debtor had the right to spend $8 billion in FTX customer funds on the Specific Property or other purchases; instead, Mr. Sun testified, FTX "customer assets, when deposited onto the platform continued to belong to the customers and FTX ha[d] no rights to customer assets," consistent with FTX's terms of service providing that "[t]itle to [FTX customer] assets shall at all times remain [with the customer]" and "[n]one of [those assets] are the property of, or shall or may be loaned to, FTX Trading." (Tr. at 1915–16). Accordingly, the Forfeited FTX Customer Assets, comprised primarily of U.S. dollars and cryptocurrencies, belong to FTX customers in the MDL class, *not* the Bankruptcy Estate.

## II.     CLAIMANTS ARE ENTITLED TO THE RETURN OF THEIR ASSETS

32.     "Under 21 U.S.C. § 853(n), any third party 'asserting a legal interest in property which has been ordered forfeited to the United States' may 'petition the court for a hearing to adjudicate the validity of his alleged interest in the property.'" *United States v. Daugerdas*, 2020 WL 364601 at *2-3 (S.D.N.Y. Jan. 22, 2020); *see also U.S. v. Erpenbeck*, 682 F.3d 472,475 (6th Cir. 2012) ("To obtain title to property through criminal forfeiture, the government must give third

parties a chance to assert competing interests in the property… If anyone files a petition, the court must hold an ancillary hearing to determine the bona fides of his alleged interest."). Congress created the procedure in 21 U.S.C. § 853(n) "to protect the rights of certain innocent third parties." *U.S. v. Huntington Nat. Bank*, 682 F.3d 429, 433 (6th Cir. 2012).

33.     "At the hearing, the petitioner must first establish his standing to challenge the forfeiture order by demonstrating a 'legal interest' in the forfeited property under § 853(n)(2)." *United States v. Watts*, 786 F.3d 152, 160 (2d Cir. 2015). Then the claimant must demonstrate that they have "a legal right, title, or interest in the property, … that was vested in the [claimant] rather than the defendant or was superior to any right, title or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property." 21 U.S.C. § 853(n)(6)(A); *Watts*, 786 F.3d at 160.   As a result, the Individual Claimants are entitled to relief because they can show either that their interest vested *before* SBF's interest and that they had a superior vested interest. *Watts*, 786 F.3d at 160.

34.     The Second Circuit has embraced the Fourth Circuit's "broader view of legal interests" in concluding that "the term 'legal interest' in § 853(n)(2) encompasses all legally protected rights, claims, titles, or shares in real or personal property." *U.S. v. Schwimmer*, 968 F.2d 1570, 1582 (2d Cir. 1992) (citing *Reckmeyer*, 836 F.2d 200 (4th Cir. 1987)). In the Second Circuit, a claimant may also assert an interest in property via constructive trust when the relevant state law recognizes the creation of a constructive trust. *Willis Mgmt. (Vermont) Ltd. v. U.S.*, 652 F.3d 236, 245 (2d Cir. 2011).

35.     Claimants can show that right, title, or interest to the seized assets was vested in the Claimants rather than the Defendant because Defendant Bankman-Fried never had any *legitimate* ownership interest in the Victims' Crypto-Assets.

36.     Notwithstanding this absence of legitimate interest, SBF caused the transfer of the Forfeited FTX Customer Assets to the Binance.US accounts identified above as well as to other accounts and destinations identified in the Court's Preliminary Order of Forfeiture. As a result, the interest in those Forfeited FTX Customer Assets was vested solely in Individual Claimants and the MDL Class. Moreover, the Individual Claimants and the MDL Class can show their right, title or interest was superior to any right, title, or interest of the defendant "at the time of the commission of the acts which gave rise to the forfeiture of the property," because if SBF had any interest in Claimants' cryptocurrencies—and he does not—SBF's interest would have vested *after* Claimants still maintained possession of their cryptocurrencies and thus Claimants' right, title, or interest was superior in time to Defendant's.

## III.     THE CLAIMANTS' INTERESTS IN THE PROPERTY ARE SUPERIOR TO DEFENDANT'S INTEREST

37.     The MDL Plaintiffs have a specific interest in the Forfeited FTX Customer Assets set out above—they are not merely general creditors of FTX. Similarly, the MDL Plaintiffs—including the Individual Claimants—have specific interest in each category of the properties set out above (i) by virtue of the fact that the assets are directly traceable to assets the MDL Plaintiffs placed on or attempted to transfer to the FTX Platform and/or (ii) by recognition of a constructive trust. *See Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 103 (2d Cir. 2005) (*quoting Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)) ("[A] constructive trust or equitable lien is imposed when, 'in the eyes of equity,' a plaintiff is 'the true owner' of funds or property, and the 'money or property identified as belonging in good conscience to the plaintiff [can] clearly be traced back to particular funds or property in the defendant's possession'").

38.     Claimants thus have "a legal right, title, or interest in the property, and such right, title, or interest . . . was superior to any right, title, or interest of the defendant at the time of the

commission of the acts which gave rise to the forfeiture of the property under this section." 21 U.S.C. § 853. The statute "requires that the third party's interest in any forfeited property must have been superior to the defendant's 'at the time of the commission of the acts which gave rise to the forfeiture.'" *United States v. Daugerdas*, 892 F.3d 545, 554 (2d Cir. 2018) (quoting 21 U.S.C. § 853(n)(6)(A)).

39.     Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard. In its terms of service, FTX represented to Class Members that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit;" that "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.;" and that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US." FTX Trading's terms of service similarly represented that no customer funds were "the property of, or shall be loaned to, FTX Trading," and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading." *See* Alexander Decl., Ex. A (FTX.US Terms of Service), Section 6; *Id.*, Ex. B (FTX Trading Terms of Service Section), 8.2.6, 8.3, Schedule 1.

40.     The MDL Plaintiffs' particular and specific interests in the Victim's Crypto-Assets were maintained at all times after they acquired each asset. Claimants maintained this superior interest at the time that the Victim's Crypto-Assets were transferred, wrongfully, into the several Binance accounts identified in the Preliminary Order of Forfeiture and enumerated above. As a result, Claimants' interests were superior to those of SBF's at all time. *See* 21 U.S.C. § 853(n)(6)(A) ("[T]he right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property.").

41.     The MDL Plaintiffs are thus third parties who had an interest in property before the subject crime was committed (and before the Defendant's interest vested). *United States v. Egan*, 811 F. Supp. 2d 829 (S.D.N.Y. 2011) (standing found where "petitions plausibly assert legal interests in portions of the seized funds").

42.     Claimants are thus entitled to the return a portion of the Forfeited FTX Customer Assets equivalent to their investment in those assets through FTX or the functional equivalent thereof. A proceeding under 21 U.S.C. § 853 provides just such a mechanism to allow Claimants to receive their assets in return—after being deprived of such assets by SBF, FTX, and others participating in the FTX fraud.

## IV.    DISTRIBUTION MECHANISMS

43.     Justice would be served by directing the proceeds of the forfeiture through the MDL and the already-establish Claims Administration Process. In all events, as explained further below, neither the Court nor the Justice Department should divert the proceeds of the forfeiture to be distributed via the FTX bankruptcy proceedings because the bankruptcy process will not make the victims—including MDL class members—"whole" and because the involvement of counsel for Debtors presents serious conflicts that have not yet been resolved.

44.     The claims of all of the specific injured FTX customers—each, a member of the MDL class—are represented by counsel in the FTX MDL, and distribution of the $8 billion or more in Forfeited FTX Customer Assets, which is comprised of those FTX customer funds, would better flow to them through the MDL process and the Claims Administration Process that has been

established there, which will be administered by JND, one of the premier legal administration firms in the country,[3] and who are extremely experienced in these distribution matters.[4]

45.     ***First***, the jury found that the $8 billion Forfeited FTX Customer Assets are derived from SBF's fraud on *FTX customers*, not the FTX companies (now represented by the bankruptcy estate). It was *FTX customer funds* that SBF spent on "more than $200 million of real estate properties in The Bahamas," that he took in the form of "more than $1 billion" in personal loans, that he misappropriated for "over $100 million in political contributions in advance of the 2022 election," that he "authorized Alameda to draw down billions … to use to repay Alameda's lenders," that he "used … to make billions of investments for his own interest and the interests of his businesses," including "$605 million worth of shares in Robinhood Markets Inc." (the "Robinhood Shares") and other property subject to this Court's forfeiture order. (Superseding Indictment, ¶¶ 8, 9, 10, 38). And it was *FTX customer funds* that he diverted to Debtors' accounts at conventional banks and on cryptocurrency platforms, fiat and crypto assets that this Court has now ordered be forfeited to the United States. (Prelim. Order at 4–7). The forfeited assets are not, therefore, property of the FTX bankruptcy estates (collectively, the "Bankruptcy Estate").

46.     ***Second***, unlike the bankruptcy process, as this Court is fully aware, the MDL process is not restricted by the Bankruptcy Code's distribution scheme, which requires that FTX

---

[3] With more than 250 employees, JND operates out of its 35,000 square-foot headquarter office in Seattle and has additional offices in Los Angeles, Minneapolis and New York. JND works with plaintiff and defense firms, federal and state government agencies, and Fortune 500 companies.

[4] All Parties have, and will continue to discuss, the best possible manner and method of distribution of the forfeited proceeds directly to the FTX victims, whether through the MDL and/or the Chapter 11 case, commenced by FTX Trading Ltd. and its affiliates (collectively, the "Debtors") in the United States Bankruptcy Court for the District of Delaware, captioned In re FTX Trading Ltd., Case No. 22-11068 (the "Chapter 11 Cases").

customer claims be dollarized and "***measured at petition time value***." (Gov. Mem. at 46) (emphasis added).[5]

47.     Not only was the FTX bankruptcy filed during a "crypto winter,"[6] where crypto prices as measured in U.S. Dollars saw a dramatic drop in value from where they were less than a year before, when most customers invested in FTX, but the value of cryptocurrencies has since recovered remarkably to those previous values since the FTX fraud collapsed. The Bankruptcy Code's requirement that FTX customer claims are measured as of the petition date therefore deprives those customers of billions in value lost because of SBF's criminal conduct. It would be profoundly unfair for FTX customers to be deprived of their investment. If not for SBF's crimes for which he was convicted—i.e., the theft and misuse of customer assets—the customers would have today owned their crypto investments.

48.     For example, since the petition date, the price of Solana (SOL) has increased from approximately $16 to over $145[7]—an increase of more than 9 times, such that the value of customers' SOL improperly held by FTX or other entities as a result of SBF's crimes has increased more than $7.8 billion since the petition date.[8] During the same period of time, the price of Bitcoin

---

[5] On February 7, 2024, the Bankruptcy Court entered its *Order Granting Motion of Debtors to Estimate Claims Based on Digital Assets* [Bankruptcy Docket No. 7090] (the "Claim Estimation Order"), pursuant to which the Bankruptcy Court established the value of digital assets as of the petition date (along with additional value discounts for certain types of cryptocurrency).

[6] "Crypto winter" is a common expression that refers to a poorly performing cryptocurrency market, and is comparable to a bear market in the stock market, usually signified where the downturn comes with a double-digit percentage drop in crypto values. *See* https://www.investopedia.com/crypto-winter-5496605 (accessed June 12, 2024).

[7] See the historical price chart below, reflecting a current trading price of $145.29 as of June 14, 2024. https://www.coindesk.com/price/solana/

[8] https://rates.coinmetrics.io/ as of 3:47 p.m. (Eastern Time) on June 1, 2024. On September 11, 2023, the Debtors reported holding $1.162 billion worth of SOL, which was valued as of August

(BTC) has more than quadrupled, from approximately $16,871 to approximately $67,552—an increase of $50,681 per coin, such that the value of BTC[9] in FTX's possession has increased more than $1.03 billion since the petition date. There is no equitable justification for placing the Forfeited Assets through a bankruptcy procedure under which FTX or other entities will invariably obtain the investments that belong to the customers, and which would have always remained in customers' possession but for SBF's theft. The Bankruptcy Estate apparently sold a majority of its position in SOL at a steep discount for $1.9 billion, reportedly to an affiliate in charge of liquidating the Estate's cryptocurrency holdings.[10]

---

31, 2023 when SOL's price was approximately $19.73 ($1.162 billion / $19.73 ≈ 58.9 million SOL). *See* Notice of Presentation to Stakeholders [Bankruptcy Docket No. 2463].

[9] https://rates.coinmetrics.io/ as of 3:52 p.m. (Eastern Time) on June 11, 2024. September 11, 2023, the Debtors reported holding $560 million worth of BTC, which was valued as of August 31, 2023 when BTC's price was approximately $27,500 ($560 million / $27,500 ≈ 20,363 BTC). *See* Notice of Presentation to Stakeholders [Bankruptcy Docket No. 2463].

[10]      https://news.bitcoin.com/ftx-nets-1-9b-in-solana-sale-at-64-per-sol-discount-price-draws-creditor-scrutiny/



49.     As a result of the strictures of the Bankruptcy Code, despite the remarkable recovery in market prices of cryptocurrencies since the petition date, the economic injury to FTX customers would be exacerbated because they would not recoup anywhere near the full value of their crypto assets through the bankruptcy process, a result that the Debtors freely acknowledge. By valuing FTX customer crypto holdings in this way, the Bankruptcy Estate deprives customers of billions of dollars in recoveries. The MDL does not.

50.     Moreover, the bankruptcy code requires that holders of certain cryptocurrencies (*e.g.*, holders of FTT) receive nothing. The bankruptcy court's treatment of FTT, FTX's exchange token, will leave "[s]ome FTX customers [to] receiv[e] even lower value in bankruptcy." The court determined that FTX's token, FTT, is akin to an equity interest in FTX, such that the token should

21

be valued at $0, even though the token's current market capitalization exceeds $575 million.[11] Because of the bankruptcy court's zero-dollar valuation of FTT, and because of the code's requirement to prioritize certain creditors over others,[12] such that "[h]olders of FTX's token FTT are near the bottom of the priority list[,] it is unlikely that holders of that token will receive compensation from the estate." Gov. Mem. at 45 n.7.

51.     Lastly, the Chapter 11 proceedings include a waterfall model that creates a distribution prioritization hierarchy divided into twenty-eight classes and sub-classes. This waterfall model provides for different levels of distribution for different classes and sub-classes and prioritizes the compensation of some over others. Customers are not at the top of this waterfall.[13]

52.     Conversely, the MDL plans to return assets to their rightful owners on a 1:1 basis.

53.     These features of the bankruptcy process have left FTX customers feeling "aggrieved and robbed," many of whom view the bankruptcy process as a "second act of theft"[14] and that the "FTX bankruptcy estate remains to be the same fraudulent corporate entity" as was the enterprise run by SBF.[15] The MDL is not restricted by the confines of the Bankruptcy Code in this way and allows for FTX customers to be made whole through this Court's forfeiture process.

---

[11] https://coinmarketcap.com/currencies/ftx-token/ as of 8:30 AM (Eastern Time) on April 3, 2024.

[12] *See* Exhibit 1 to Claim Estimation Order (Cryptocurrency No. 509 – FTT – valued at $0.00).

[13] To the extent any of the forfeited funds are permitted to flow through the bankruptcy, the MDL Plaintiffs respectfully request that this Court outline strict procedures for administration that maintain the funds at all times outside of the waterfall and establish independent allocation rules for those monies.

[14] *In re FTX Trading Ltd., et al.*, 22-11068 (JTD) (Bankr. D. Del. Jan. 31, 2024), Dkt. 5447.

[15] D.E. 411-4, Victim Impact Statement by Sunil Kavuri [D.E. 411-4 at 16–26], at 19.

Even though the FTX Debtors have begun investigating claims and initiating adversary proceedings against various former FTX Group executives, employees, professionals, business partners, and other parties seeking to avoid transfers or disallow claims in the bankruptcy, the Chapter 11 proceedings would be less effective than the MDL in furthering the ultimate goal of compensating those who suffered losses as a result of the FTX fraud.

54. **_Third_**, the Bankruptcy Estate is laden with conflicts that may risk compromising the just distribution of the Forfeited FTX Customer Assets to FTX customers, as well as possibly the integrity of that distribution process. The Bankruptcy Estate owes a fiduciary duty to its _creditors_, which comprises, at best, only a subset of FTX customers harmed by SBF's criminal conduct. Pursuant to that duty, the estate must prioritize recovery to creditors over recovery to non-creditor FTX customers, who together suffered the largest economic loss and most devastating impact of SBF's misconduct.

55. Indeed, the Bankruptcy Estate has already committed Forfeited FTX Customer Assets to non-customer creditors, including the Robinhood Shares, which the estate has agreed to effectively pay to BlockFi by providing BlockFi with an allowed secured claim in the amount of $250 million, which will be paid ahead of FTX customers. _See Order (A) Authorizing the Debtors to Enter Into Global Settlement Agreement with BlockFi; (B) Approving the Global Settlement Agreement; and (C) Granting Related Relief_ [Bankruptcy Docket No. 10331]. But many of the forfeited assets being used to pay FTX's secured debts did not belong to FTX. Those investments belonged to the customers.

56. Moreover, many of the Bankruptcy Estate's creditors are not victims of Bankman-Fried's crimes as charged and convicted, including for example the _New York Times_, the _Wall Street Journal_, Netflix, and Apple. The Bankruptcy Estate is therefore obligated to maximize

recovery for only some of SBF's victims, those who are also creditors of the Bankruptcy Estate, and to maximize recovery for all creditors—including creditor non-victims—above the FTX customers who it cannot make whole.

57.     Additionally, the Bankruptcy Estate is represented by counsel that also represents many of the Bankruptcy Estate's non-customer creditors, including BlockFi, Coinbase, Gemini, Kraken and Sequoia Capital, each of which filed hundred-million-dollar-plus claims in the bankruptcy. Many of those non-customer creditors—such as Sequoia and other venture capital firms—have already been sued in the MDL for aiding and abetting SBF's conduct. Compounding these conflicts, FTX's lead bankruptcy counsel provided prepetition services not only to FTX entities, but also to SBF personally, during the pendency of the fraud on FTX customers.

58.     In fact, several of the court-appointed law firms on the FTX MDL Steering Committee have filed suit against FTX's lead bankruptcy counsel, Sullivan & Cromwell, based on such counsel's pre-petition conduct.[16] These claims include civil conspiracy, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and a RICO claim under 18 U.S.C. § 1962(d).

---

[16]     In *Wildes v. BitConnect Int'l PLC,* 25 F.4th 1341 (11th Cir. 2022), the Eleventh Circuit clearly articulated the standard for mass solicitation of unregistered securities, ruling that spokespersons who promoted a crypto Ponzi scheme had engaged in "solicitation" of securities by "urg[ing] people to buy [crypto tokens] in online videos," even if the offering's promoters did not directly target particular purchasers. *Id.* at 1346.

The Honorable Edgardo Ramos of the S.D.N.Y. in *SEC v. Genesis Global Capital, LLC et al.* No. 1:23-cv-00287-ER, ECF No. 56 (S.D. NY. March 18, 2024) (the "Final Judgment"), found that "[u]nder both *Howey* and *Reves,* the SEC has plausibly alleged that Defendants offered and sold unregistered securities through the Gemini Earn program"—a program where Gemini customers could earn interest from defendants' lending activities if they held eligible crypto assets in their Gemini accounts—and that "the SEC has sufficiently alleged that Gemini was a necessary participant or substantial factor in the scheme," *see* ECF No. 230, Ex. A at 28.

Most recently, on March 27, 2024, in *SEC v. Coinbase, Inc. et. al.,* 23 Civ. 4738 (KPF), ECF No. 105 (S.D.N.Y. Mar. 27, 2024) the Honorable Katherine Polk Failla of the SD.N.Y. found

59.     Furthermore, as noted above, Examiner Robert Cleary was appointed by the bankruptcy court to investigate the engagement of Sullivan & Cromwell, among other things. Notably, Mr. Cleary was appointed only after the Third Circuit reversed the bankruptcy court's initial refusal to name an examiner, based on assurances by Sullivan & Cromwell that it was unnecessary for its conduct to be reviewed. *See In re FTX Trading, Ltd., et al.,* Bankr. D. Del., 22-11068-JTD, ECF No. 15545 (dated May 20, 2024), at 12–57. After concluding this phase of investigations, the Examiner recommended two additional areas of investigation: (1) regarding Sullivan & Cromwell's representation of SBF in connection with the purchase of Robinhood Shares and (2) Debtors' claims against former shareholders of Ledger Holdings, Inc. (a holding company for LedgerX) that sold their interests to West Realm Shires Inc. in a pre-petition sale. These investigations have not yet occurred, and the Independent Examiner's Motion to authorize this phase of investigations is pending before the Bankruptcy Court.[17]

---

"the SEC has sufficiently pleaded that Coinbase operates as an exchange, as a broker, and as a clearing agency under the federal securities laws, and, through its Staking Program, engages in the unregistered offer and sale of securities." *Id*. at 84.1 Judge Failla also found that the SEC had pleaded "control person liability" for Coinbase Global. *Id.*

[17] All interested Parties will greatly benefit from the upcoming findings by the FTX Independent Examiner, who requested (with no objection) investigating just three narrow areas of FTX inquiry. The Independent Examiner suggests that these areas of inquiry are *crucial* for deciding issues relating to allocating assets for the FTX victims. The Bankruptcy Court issued an order concerning the scope of the Examiner's investigation (the "Scope Order"). ECF No. 9883 (the "Scope Order"). The Scope Order instructed the Examiner to issue a Report regarding the investigations, and directed the Examiner to investigate the following topics, which the Third Circuit expressly enumerated in its opinion: "… whether there are potential conflicts of interest … which were not adequately addressed by the Court's hearing."

On May 23, 2024, Robert Cleary, the FTX Independent Examiner, filed his 225-page Report. ECF No. 15545. The Report was greeted with broad support from the FTX Debtors and the FTX victims. The Independent Examiner's work is crucially important for instilling public confidence in the proceedings and Petitioners respectfully submit it would be relevant for the Court to review it.

60.     At the end of the day, the MDL may be the only avenue for all FTX victims to truly be made "100% whole."

61.     ***Fourth,*** the MDL has already settled claims the MDL Class had with SBF and Co-Defendants Caroline Ellison, Gary Wang, and Nishad Singh, each of whom is jointly and severally liable for the $8 billion Forfeited FTX Customer Assets derived from FTX customer funds, and administration of those settlements dovetails with the distribution of the forfeiture proceeds. The MDL presents the opportunity to efficiently streamline satisfaction of those settlements. While the FTX Debtors filed an Adversary Proceeding in the FTX Bankruptcy after the MDL Plaintiffs and FTX Insiders sought preliminary approval of their settlements, claiming that the settlements attempt to settle claims belonging to the Estate, the settlements themselves only release any claims that the FTX Customer class members have against the FTX Insiders.

62.     Pursuant to those settlements, Ms. Ellison, Mr. Wang, and Mr. Singh have agreed to cooperate with MDL Plaintiffs to assist in the prosecution of Plaintiffs' claims on behalf of FTX customers. Their assistance—in the form of proffer sessions, sworn declarations, and document productions—has proven already to be tremendously helpful, and Ms. Ellison, Mr. Wang, and Mr. Singh appear eager to continue to help FTX customers in this way, as set forth in the settlement agreements.[18]

63.     MDL Plaintiffs recognize that any monetary compensation in exchange for settlement of the MDL claims against these Co-Defendants would be subordinate to an order of restitution and/or forfeiture by this Court, including the Preliminary Order for which the Co-

---

[18] *See In re FTX Cryptocurrency Exchange Collapse Litigation*, Case No. 1:23-md-03076-KMM (S.D. Fla.), ECF No. 565 and Exhibits thereto.

Defendants are jointly and severally liable. MDL Plaintiffs likewise recognize that the $11 billion forfeiture amount set forth in the Preliminary Order, in addition to any other forfeiture amount ordered by this Court, swallows any amounts that the Co-Defendants will likely ever be able to pay. MDL Plaintiffs therefore agreed to defer their pursuit of any monetary consideration for settlement of their claims against Co-Defendants to the restitution processed provided by the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A and/or the forfeiture process provided by 18 U.S.C. § 981.

64.     MDL Plaintiffs expect that the Court will find that restitution by the Co-Defendants is not possible, as it did in sentencing SBF, such that forfeiture of assets will be the exclusive avenue for monetary compensation for MDL Plaintiffs from Ms. Ellison, Mr. Wang, and Mr. Singh. The forfeiture process pursuant to the instant Preliminary Order against SBF and forthcoming orders of similar nature against Co-Defendants Ellison, Wang, and Singh will likely proceed simultaneously, given the overlap in assets subject to forfeiture among them, and the distribution of funds recovered in that process through the MDL will compensate FTX customers as contemplated by applicable statute and the settlement agreements between MDL Plaintiffs and these Defendants.

65.     The MDL and forfeiture processes dovetail in other ways, as Co-Defendants Ellison, Wang, and Singh are not the only parties jointly and severally liable for the forfeiture amount ordered by this Court against SBF. Specifically, the Preliminary Order provides that "any other co-conspirators" are also jointly and severally liable for the money judgment "up to the amount of forfeiture money judgments that may be entered against them," which could, presumably, include the Bankruptcy Estate. Prelim. Order at 5. MDL Plaintiffs have filed claims of aiding and abetting the FTX fraud, conversion, and other misconduct, as well as claims of civil conspiracy to do the

same, against dozens of banks, venture capital firms, accountants, law firms, and other co-conspirators ("Third Party Co-Conspirators"). The Bankruptcy Estate has thus far brought none of these claims, and in fact many of these Co-Conspirators are creditors in the bankruptcy or are actively assisting the FTX Debtors in administering the Bankruptcy. Distribution of funds recovered from through the forfeiture process against those Co-Conspirators may be best achieved in the MDL, where claims against them are currently, and exclusively, pending.

66. To administer these settlements, the MDL class has already engaged JND, one of the premier legal administration firms in the country, to act as claims administrator for the settlement distributions to class members. The MDL class members therefore comprise the broadest group of victims holding, in the aggregate, the largest claim for losses, such that recovery of funds forfeited pursuant to this Court's Preliminary Order should flow through the FTX MDL, especially given that FTX customers will not be made whole by way of the FTX bankruptcy, and to ensure that the forfeiture amounts compensate FTX customers to the fullest extent possible pursuant to the Court's Preliminary Order.

67. Lee Reiners ("Reiners Rpt."), a lecturing fellow at Duke University with expertise in cryptocurrency regulation, supports MDL Class Counsel's request to route the $8 billion forfeited by Samuel Bankman-Fried through the FTX MDL for the benefit of FTX customers as discussed in his independent report to this Court attached to the Alexander Declaration as Exhibit C (the "Reiners Rpt."). Reiners Rpt. at 2. Reiners has extensive experience in this field, having published numerous academic papers, testified before U.S. congressional committees, and advised government agencies on cryptocurrency-related issues. *Id.* His assessment is based on his work as an independent expert witness with MDL co-lead counsel Adam Moskowitz since shortly after the FTX collapse in November 2022. *Id.*

68.    Reiners argues that the digital assets held by the bankruptcy estate are the property of the customers, not the estate. *Id*. at 3.

69.    Reiners draws a parallel between *In re Celsius Network LLC*, Case No 22-10964(MG) (Bankr. S.D.N.Y. Jan. 4, 2022) and the current FTX proceedings to underscore his argument that digital assets should be considered the property of FTX customers. *Id*. at 8–9. In the Celsius case, Chief Judge Martin Glenn ruled that "[t]he issue of ownership of the assets in the [Celsius] Earn Accounts is a contract law issue[,]" ultimately determining that the Terms of Use transferred title and ownership of the digital assets to Celsius. *Id*. at 8. Reiners emphasizes that the FTX Terms of Service are even clearer, stating explicitly that "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading." By applying Judge Glenn's reasoning to the FTX case, Reiners asserts that the FTX Terms of Service are unambiguous in that digital assets are the property of FTX customers. *Id*. at 10. This perspective forms part of the basis for his recommendation to route forfeited funds through the FTX MDL, ensuring that the assets are returned to their rightful owners—the FTX customers. According to Reiners, the FTX MDL has demonstrated relentless advocacy for FTX victims and has the expertise to maximize recovery on their behalf. *Id*. at 3.

*     *     *

70.    For the reasons stated above, the Court should hold a hearing pursuant to 21 U.S.C. § 853(n), to adjudicate the interests of the Individual Claimants and the MDL Plaintiffs in the Forfeited Assets identified above. Pursuant to such a hearing, the Court should ultimately conclude Individual Claimants and the MDL Plaintiffs have a superior right, title, and/or interest, in the Forfeited FTX Customer Assets subject to the Preliminary Order of forfeiture and distribute that property accordingly.

**PRAYER FOR RELIEF**

WHEREFORE, the Individual Claimants and the MDL Plaintiffs respectfully request that the Court:

1. Hold a hearing to adjudicate the validity of their claim of legal right, title, and interest with respect to the value of the Forfeited Assets;

2. Issue an Order amending the Preliminary Order of Forfeiture/Money Judgment to recognize that the Individual Claimants and the MDL Plaintiffs have established that they have a superior legal right, title, or interest in the property and/or the status of bona fide purchaser with respect to their interests therein; and

3. Grant such additional relief as the Court deems just and proper.

Date: June 14, 2024                                    Respectfully submitted,

**By: */s/ Adam Moskowitz***                           **By: */s/ David Boies***

Adam M. Moskowitz                                      David Boies
Florida Bar No. 984280                                 Alexander Boies
Joseph M. Kaye                                         Brooke A. Alexander
Florida Bar No. 117520                                 **BOIES SCHILLER FLEXNER LLP**
**THE MOSKOWITZ LAW FIRM, PLLC**                       333 Main Street
Continental Plaza                                      Armonk, NY 10504
3250 Mary Street, Suite 202                            914-749-8200
Coconut Grove, FL 33133                                dboies@bsfllp.com
Office: (305) 740-1423                                 aboies@bsfllp.com
adam@moskowitz-law.com                                 balexander@bsfllp.com
joseph@moskowitz-law.com                               *Co-Lead MDL Counsel*
service@moskowitz-law.com
*Co-Lead MDL Counsel*

## INDIVIDUAL CLAIMANT SIGNATURES

I hereby attest under penalty of perjury that the contents of this petition are true and accurate to the best of my knowledge, and that I have authorized the filing of this document.

**Alexander Chernyavsky**

DATE: 6/14/2024

SIGNATURE:

**Kyle Rupprecht**

DATE: _____

SIGNATURE: _____

**Mike Livieratos**

DATE: _____

SIGNATURE: _____

**Sunil Kavuri**

DATE: _____

SIGNATURE: _____

## <u>INDIVIDUAL CLAIMANT SIGNATURES</u>

I hereby attest under penalty of perjury that the contents of this petition are true and accurate to the best of my knowledge, and that I have authorized the filing of this document.

**Alexander Chernyavsky**

DATE: _____

SIGNATURE: _____

**Kyle Rupprecht**

DATE: June 14, 2024

SIGNATURE: _____

**Mike Livieratos**

DATE: _____

SIGNATURE: _____

**Sunil Kavuri**

DATE: _____

SIGNATURE: _____

31

## INDIVIDUAL CLAIMANT SIGNATURES

I hereby attest under penalty of perjury that the contents of this petition are true and accurate to the best of my knowledge, and that I have authorized the filing of this document.

**Alexander Chernyavsky**

DATE: _____

SIGNATURE: _____

**Kyle Rupprecht**

DATE: _____

SIGNATURE: _____

**Mike Livieratos**

DATE: _6/14/24_____

SIGNATURE: _M P_____

**Sunil Kavuri**

DATE: _____

SIGNATURE: _____

31

# <u>INDIVIDUAL CLAIMANT SIGNATURES</u>

I hereby attest under penalty of perjury that the contents of this petition are true and accurate to the best of my knowledge, and that I have authorized the filing of this document.

**Alexander Chernyavsky**

DATE: _____

SIGNATURE: _____

**Kyle Rupprecht**

DATE: _____

SIGNATURE: _____

**Mike Livieratos**

DATE: _____

SIGNATURE: _____

**Sunil Kavuri**

DATE: _____ 14 June 2024 _____

SIGNATURE: _____

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing to be filed via hand-delivery with the Court Security Officers for the Southern District of New York at 500 Pearl Street New York, NY 10007, as instructed by Clerk's Office. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system when this document is filed electronically by Court personnel.

/s/ Brooke Alexander

Brooke Alexander