*U.S. Department of Justice*

*United States Attorney
Southern District of New York*

*The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278*

September 17, 2024

**BY ECF**

Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

  Re:  *United States v. Caroline Ellison*, 22 Cr. 673 (LAK)

Dear Judge Kaplan:

  The Government writes in advance of defendant Caroline Ellison's sentencing scheduled for September 24, 2024, at 3:00 p.m., to advise the Court of her extraordinary cooperation that was crucial to the Government's successful prosecution of Samuel Bankman-Fried for one of the largest financial frauds in history. This letter describes Ellison's substantial assistance in the investigation of wrongdoing at Alameda Research and FTX, and the trial of Bankman-Fried.

  As detailed below, Ellison's testimony was a cornerstone of the trial against Bankman-Fried. As Alameda's nominal CEO and Bankman-Fried's former girlfriend, Ellison was uniquely positioned to explain not only the what and how of Bankman-Fried's crimes, but also the why. Her credible and compelling testimony was notably consistent with her statements to the Government beginning before she was ever criminally charged, and with statements she made during FTX's collapse before she became aware of the Government's investigation. Throughout, she was forthcoming about her own grave misconduct and the role she played in furthering Bankman-Fried's scheme and its concealment. In her many meetings with the Government, Ellison approached her cooperation with remarkable candor, remorse, and seriousness. She dedicated herself to extensive document review that helped identify key corroborating documents in an investigation hamstrung by Bankman-Fried's systematic destruction of evidence. And she persevered despite harsh media and public scrutiny and Bankman-Fried's efforts to publicly weaponize her personal writings to discredit and intimidate her.

  In light of these facts, and assuming that Ellison continues to comply with the terms of her cooperation agreement, commits no additional crimes before sentencing, and appears for her sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1

1

of the U.S. Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), that the Court sentence Ellison in light of the factors set forth in Section 5K1.1(a) of the Guidelines.[1]

## Offense Conduct

Ellison played a core role in Bankman-Fried's criminal schemes, but as the Government noted in Bankman-Fried's sentencing submission, only he was involved in all aspects of the schemes. Ellison never worked at FTX and played no role in designing the coding systems that granted Alameda special treatment on FTX and permitted Alameda to accrue a negative balance on FTX by withdrawing FTX customer funds. And Ellison worked as a trader at Alameda at the time Bankman-Fried, as then-CEO of Alameda, implemented a system to use Alameda bank accounts to accept, and then spend, FTX fiat deposits. (Tr. 657). Once she became aware of these features, however, Ellison exploited them at Bankman-Fried's direction to misappropriate FTX customer funds. She had no knowledge of, or involvement in, Bankman-Fried's illegal campaign finance scheme.

Although not an architect of Alameda's capacity to spend FTX customer funds, as Ellison's responsibilities at Alameda grew, and as greater intimacy and trust developed with Bankman-Fried, she was given an increasingly significant role in Bankman-Fried's crimes. One of the earliest examples is when Bankman-Fried sold FTX stock to Binance, another cryptocurrency exchange. By the middle of 2021, Binance was FTX's primary competitor and Bankman-Fried wanted to buy back Binance's FTX stock. Bankman-Fried repeatedly told Ellison that buying back the stock was "really important" to him, largely because Binance was a major competitor and Bankman-Fried viewed Binance's leader as a rival. (Tr. 668). At the time, Binance's equity in FTX was worth approximately $2 billion, and FTX's revenue was only half that amount. According to her trial testimony, Ellison told Bankman-Fried, "We don't really have the money for this, we'll have to borrow from FTX to do it." (Tr. 668). Bankman-Fried responded, "That's okay. I think this is really important, we have to get it done." (*Id.*). Bankman-Fried then repurchased the FTX shares owned by Binance using a mix of FTX funds and customer deposits. (GX-1024). The transfer came from Alameda's main account on FTX, which was able to make the transfer, notwithstanding the fact that it had insufficient funds, because of the allow negative feature that had been enabled on its account. The transfers were directed personally by Bankman-Fried. (GX-317). This incident is one among several examples where despite voicing reservations to Bankman-Fried that what they were doing was wrong, Ellison nonetheless willingly participated in misconduct. (*See, e.g.*, Tr. 664 ("I remember one conversation we had about when FTX was first being audited, when I asked him whether this line of credit would show up on the FTX audit because I was concerned that, you know, it would raise concerns with investors and other people who were seeing the audit, and he said, like, *No, don't worry, the auditors aren't going to look at that*.")).

As another example, despite cautioning Bankman-Fried against it, Ellison was complicit in Bankman-Fried's decision to make billions of dollars of additional venture investments in the fall of 2021, despite the known risk that this would put Alameda in a position of having to repay

---

[1] Prior to sentencing, the Government also expects that the parties will submit a consent preliminary order of forfeiture that, among other things, will require Ellison to forfeit property constituting proceeds traceable to the wire fraud offenses.

its lenders using FTX customer funds in the event of a market downturn. Specifically, in the fall of 2021, Bankman-Fried asked Ellison to determine what would happen if Alameda spent $3 billion more on venture investments. (Tr. 703-10). Ellison prepared an analysis, which she shared with Bankman-Fried. (GX-36). As background, Alameda did not have outside investors. Instead, its trading operations were funded primarily through open term loans by third party cryptocurrency lenders such as BlockFi, Genesis Capital, BitGo, Ledn, Celsius, Voyager, and others. Those loans were typically structured as follows: Alameda pledged collateral in the form of FTT, FTX's "native token," to the third-party lender, and then the lender lent dollars, Bitcoin, or Ethereum to Alameda, which agreed to repay the lent funds with interest on demand. In the fall of 2021, Ellison told Bankman-Fried that Alameda had more loans than assets, and that without certain FTX-related cryptocurrencies such as FTT, Solana, and Serum, Alameda's net asset value was negative $2.7 billion. (Tr. 710). Her analysis also showed that in the event of a market downturn and the recall of Alameda's loans, the only way to repay third-party loans would be to borrow billions of dollars of FTX customer funds. (GX-36). Ellison told Bankman-Fried that she thought that new venture investments were a bad idea and too risky. (Tr. 710-11). Notwithstanding the risks, Bankman-Fried told her "he wanted to go ahead with billions of dollars of venture investments." (Tr. 729). From late 2021 through the first quarter of 2022, Bankman-Fried directed billions of dollars in spending, which used FTX customers' money. For a period of time, the details of these investments were unknown to Ellison, who later had to track down information on where the money was spent.

The risks Ellison predicted in the Fall of 2021 became a reality in June 2022. In May 2022, the cryptocurrency stablecoin Terra and its sister token, Luna, collapsed in value, triggering a collapse of several other cryptocurrency businesses such as the firm Three Arrows and the lenders Celsius and Voyager. The instability in the cryptocurrency market caused Alameda's lenders to recall nearly all of their loans, and Alameda was required to repay in excess of $6 billion on demand. Ellison raised the issue with Bankman-Fried, who had been copied on some of the repayment demands from lenders, and asked what to do. As several witnesses testified at trial, Bankman-Fried asked Ellison, Wang, and Singh to work on a spreadsheet to calculate Alameda's balances on FTX and net asset value. (Tr. 425-26). That spreadsheet indicated that Alameda had a negative $11 billion balance on FTX, and was borrowing $13 billion in customer funds. (GX-50). Bankman-Fried reviewed the spreadsheet and then participated in a conversation with Ellison, Wang, and Singh about Alameda's balances. (Tr. 439-40). After that conversation, Bankman-Fried turned to Ellison and told her to "go ahead and return the borrows" to "lenders who loaned Alameda money and were asking for it back." (Tr. 440-41). After that, as Ellison testified, Bankman-Fried continued to direct her "to use FTX customer funds to repay loans." (Tr. 765). Alameda proceeded to repay the third-party lenders using FTX customer funds. (GX-1017A to GX-1017K). Of the $6.5 billion that was repaid to Alameda's lenders, almost 70 percent was customer money. (GX-1018). This scenario was far from unexpected—it was precisely the market downturn scenario that Bankman-Fried had asked Ellison to analyze in the Fall of 2021, and a reason that she had advised against additional venture investing. Consistent with their analysis in the Fall of 2021, Bankman-Fried and Ellison both understood that the only way to repay lenders in this scenario was by using customer funds—the only difference was that by June 2022, FTX had billions of dollars more in customer deposits available for Alameda to misappropriate, which

was used to repay lenders in full.  By September 2022, it was clear to Bankman-Fried and Ellison that Alameda had spent so much customer money that it could not be repaid.

To conceal their wrongdoing, and at Bankman-Fried's direction, Ellison created misleading versions of Alameda's balance sheet, and sent fraudulent balance sheets to Alameda's lenders to forestall demands for repayment and obtain new loans.  As explained above, Alameda financed its trading operation principally through large, open-term loans from third-party lenders, like Genesis, BlockFi, Voyager, Ledn, BitGo, and others.  In May and June 2022, those lenders recalled nearly all of their loans, which Alameda repaid using customer funds.  (Tr. 645, 753-54).  After that point, in order to obtain new loans from these third-party lenders, the lenders requested that Alameda provide an updated balance sheet.  After receiving these requests, Ellison sent Bankman-Fried a draft balance sheet and said, "I think it looks bad, I don't think we can send this to Genesis, do you agree?"  (Tr. 785).  And he said, "Yeah, that sounds right."  (*Id.*).

The reason Bankman-Fried and Ellison believed they could not send the real balance sheet to lenders was because it showed that Alameda was borrowing around $10 billion from FTX and had made about $5 billion in related-party loans to FTX executives like Bankman-Fried, Wang, and Singh.  (GX-44).  Then Bankman-Fried told Ellison to "prepare some alternative ways of presenting the information and send them to him."  (Tr. 786).  Ellison prepared seven alternatives to the real balance sheet, which omitted or hid Alameda's borrowing from FTX and the large loans to FTX executives.  (GX-44).  Bankman-Fried told Ellison, "[W]e should use alternative 7" (Tr. 795), referring to one of the tabs of a spreadsheet she shared with him, and she sent that to Genesis and other lenders.  (GX-17, GX-419).  The spreadsheet was misleading in several ways: among other things, it concealed that Alameda was borrowing billions of dollars from FTX and that these loans were callable at any time; it overstated Alameda's assets and understated its liabilities; and it concealed the billions of dollars of related-party loans made by Alameda to FTX insiders, like Bankman-Fried.

After receiving the fraudulent balance sheet, Alameda's lenders extended new loans.  (GX-1014).  Had the lenders known about the undisclosed borrowing from FTX's customers, and the true state of the balance sheet, they would not have lent Alameda money.  (Tr. 1217-24).  But because of the fraud, a number of lenders had large loans to Alameda outstanding at the time of its bankruptcy.  Alameda's defaults on those loans threw several lenders into financial crisis and, in the case of BlockFi, caused the firm's bankruptcy just a few weeks after FTX's bankruptcy.  (Tr. 1228).

In the face of snowballing FTX customer concerns and withdrawals in November 2022, Ellison acceded to Bankman-Fried's request to post tweets meant to reassure FTX customers about Alameda's balance sheet, despite believing the tweets to be misleading, after Bankman-Fried said, "I can't be the one to tweet because I don't want to be associated with Alameda."  (Tr. 898-900).  As Ellison acknowledged in her testimony, over the course of her time at Alameda working for Bankman-Fried she became more willing to lie.  (*See* Tr. 807-08 ("I think [Bankman-Fried's expressed attitude about lying and stealing] made me more willing to do things like lie and steal over time.  When I started working at Alameda, I don't think I would have believed it if you told me that a few years later I would be sending false balance sheets to our lenders or taking customer

4

money, but over time it was something that I became more comfortable with when I was working there.")).

As FTX collapsed, Bankman-Fried persisted in publicly denying knowledge and fault. Ellison, on the other hand, expressed relief that the fraud was exposed, and responsibility for her wrongdoing. In an all-hands meeting with her Alameda employees on November 9, 2022—which unbeknownst to Ellison was being recorded—Ellison shared with her employees what had happened over the course of 2022, including that "Alameda had made billions of dollars of venture investments and had bought back FTX equity from Binance using open-term loans and that when the loans had been recalled, we had to use or we did use FTX customer funds to repay them, which had caused the shortfall," that those involved had been Ellison, Bankman-Fried, Wang, and Singh, and that Bankman-Fried had made the decision on using user deposits. (Tr. 931, 1093-94; GX-433E-T; *see also* Tr. 1142-1151 (Drappi testimony about the all-hands meeting)). While others, like Ryan Salame, tried to withdraw substantial sums of money from their FTX accounts in the days before FTX declared bankruptcy, Ellison did not.

As Ellison also disclosed to the Government, although it was not her responsibility to interface directly with FTX investors, she played a limited role in the conspiracy to defraud FTX investors, including by agreeing to hide information from FTX auditors. (Tr. 664). She also flagged certain chats that related to a scheme to inflate the value of FTT, FTX's native cryptocurrency token, through Alameda trading activity. (Tr. 671-77). Bankman-Fried created the token, and then conspired to engage in trading that would inflate its value. FTT was a substantial portion of the value on Alameda's balance sheet, but Ellison and Bankman-Fried were well aware that its paper value far exceeded its liquid value if Alameda were ever to sell large quantities of the token. (Tr. 678-81). Bankman-Fried repeatedly touted that Alameda had positive net asset value, even accounting for its borrowing from FTX customers. But he and Ellison well knew that they could never repay Alameda's debt to FTX customers by selling FTT and other "Sam coins" on Alameda's balance sheet, which were illiquid coins that would have plummeted in value if sold in large quantities. (Tr. 678-83).

Without any indication that the Government knew about Bankman-Fried's bribery of Chinese officials (which the Government had heard about from another witness, and would later corroborate with additional former Alameda employees), Ellison informed the Government about Bankman-Fried's conspiracy to unfreeze Alameda's Chinese cryptocurrency accounts by bribing an official of the Chinese government. Bankman-Fried told Ellison that cryptocurrency transfers should be made to private cryptocurrency addresses provided by another Alameda employee, David Ma, to unfreeze the accounts. A total of approximately $140 million in bribes was transferred to such private crypto wallets. (PSR ¶ 34).

## Procedural History

On November 16, 2022, five days after FTX filed for bankruptcy, federal law enforcement agents executed a judicially authorized search warrant at the residence where Ellison was then living, and seized her cellphone and other electronic devices. That same day, Ellison's attorneys relayed Ellison's interest in assisting the Government. Ellison's attorneys provided an attorney

proffer to the Government on December 7, 2022, and Ellison began proffering with the Government the next day, on December 8, 2022.

On December 9, 2022, a grand jury sitting in the Southern District of New York returned an eight-count Indictment charging Bankman-Fried with conspiracy to commit wire fraud, wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States and commit campaign finance violations.  *See United States v. Bankman-Fried*, 22 Cr. 673 (LAK), Dkt. 1.  The charges against Bankman-Fried were unsealed on December 13, 2022, the same day the SEC and CFTC announced the initiation of civil proceedings against Bankman-Fried, and after Bankman-Fried was arrested in the Bahamas on a federal arrest warrant.

Ellison proffered with the Government several times in December 2022 and provided credible and detailed information to the Government about her own crimes and those of her coconspirators, including Bankman-Fried.  On December 19, 2022, Ellison pleaded guilty before the Honorable Ronnie Abrams pursuant to a cooperation agreement with the Government.  Ellison pleaded guilty to a Superseding Information that charged Ellison in seven counts with: (1) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; (2) wire fraud on customers, in violation of 18 U.S.C. § 1343; (3) conspiracy to commit wire fraud on lenders, in violation of § 1349; (4) wire fraud on lenders, in violation of 18 U.S.C § 1343; (5) conspiracy to commit commodities fraud, in violation of 18 U.S.C. § 371; (6) conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371; and (7) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  *See United States v. Bankman-Fried*, 22 Cr. 673 (LAK), Dkt. 8.

Bankman-Fried consented to extradition and arrived in the United States on December 21, 2022, after which Ellison's and Gary Wang's guilty pleas were unsealed.

Subsequent to her guilty plea, Ellison met with the Government approximately 20 times, and spent additional time outside of these meetings reviewing documents, emails, and spreadsheets in order to identify and decode relevant documents for the Government.

Ellison testified at Bankman-Fried's trial in October 2023.  Ellison testified for approximately three days.  At the conclusion of the trial, Bankman-Fried was convicted on all seven counts of the Superseding Indictment: wire fraud and conspiracy to commit wire fraud on FTX's customers; wire fraud and conspiracy to commit wire fraud on Alameda Research's lenders; conspiracy to commit securities fraud on FTX's investors; conspiracy to commit commodities fraud on FTX's customers; and conspiracy to commit money laundering.

## The Presentence Investigation Report and the Applicable Guidelines Range

The U.S. Probation Office issued a final Presentence Investigation Report on July 10, 2024. In the PSR, the Probation Office calculates the otherwise applicable Guidelines sentence to be life imprisonment, based on an offense level of 43 and a criminal history category of I. (PSR ¶ 95). Because this exceeds the statutorily authorized maximum sentences, the guideline term of imprisonment is 1,320 months. (PSR ¶ 95). The calculations of the Probation Office, which are not disputed by the parties, are set forth in paragraphs 50 through 68 of the Presentence Report. The offense level is driven principally by the loss amount of over $10 billion, which under U.S.S.G. § 2B1.1(b)(1)(P), results in a 30-level increase to the offense level. (PSR ¶ 55).

## Cooperation and Significance of Assistance

By the measure of each factor set forth in Section 5K1.1(a) of the Guidelines, Ellison's cooperation was not only substantial, but exemplary.

### *Timeliness of Ellison's Cooperation*

Ellison's cooperation was very timely. Although she did not blow the whistle on any misconduct before FTX's collapse, she came clean prior to FTX's declaring bankruptcy to her employees on November 9, 2022. She voluntarily traveled back to the United States from Hong Kong, assisted the FTX bankruptcy in the time-sensitive recovery of assets, and expressed interest in cooperating immediately after a search of her residence, prior to being charged. What is particularly unusual about the speed of Ellison's cooperation is how many times she met with the Government in a short span of time, and how quickly she pleaded guilty to the full slate of misconduct related to her participation in a complex financial fraud. That required numerous lengthy meetings with the Government in short succession, as well as a mindset that she was prepared to be fully candid with the Government from the outset of her cooperation, and accept complete responsibility for her crimes without minimization or evasion. The timeliness of Ellison's cooperation contributed to the speed with which the Government was able to indict Bankman-Fried, ensuring that he did not flee the Bahamas or further obstruct the Government's investigation. It also enabled the Government to prepare for trial on a timeline that was atypically fast for a case of this nature.

### *The Value of Ellison's Cooperation*

Ellison's testimony was critical to indict and convict Bankman-Fried, and to understanding both the timeline of the fraud schemes, and the various layers of wrongdoing. In short, the "what" and "how" of the crimes, as well as the "why," would have been difficult to prove without Ellison's testimony, and, at the very least, the Government's evidence on these points would have been incomplete.

A common refrain from Bankman-Fried in the aftermath of FTX's collapse was that he did not learn of Alameda's debt to FTX until the eleventh hour, and that he was at most negligent in overseeing his businesses. Ellison's testimony gave the lie to that narrative. The trial evidence established that Bankman-Fried directed Ellison to create spreadsheets, make monetary transfers, post tweets, and communicate with outside parties in a deliberate and self-protective attempt to

7

leave no trace of his own fingerprints. Bankman-Fried appointed Ellison and Sam Trabucco co-CEOs of Alameda in the summer of 2021, explaining "that he thought it was important to separate Alameda and FTX more optically and not have [Bankman-Fried] be too officially associated with Alameda" because "it was a concern that a lot of FTX customers had that Alameda and FTX's relationship was too close and, therefore, that FTX might favor Alameda over other traders." (Tr. 683). Upon being appointed CEO, Ellison's salary did not change, Bankman-Fried did not grant her an equity stake in Alameda (over which he retained 90% ownership), and Ellison continued to report to Bankman-Fried. (Tr. 685-87). As Ellison explained, "for any major decisions I would always run them by Sam, and I would always ultimately defer to Sam if he thought that we should do something." (Tr. 687). The purpose of this arrangement was laid bare in the aftermath of FTX's collapse.

After Alameda's spending of FTX customer funds was exposed, Bankman-Fried launched a public relations campaign that revolved around the false assertion that he "was not involved at all in Alameda trading and hadn't been for years," and that he was "intentionally not getting involved in it because [he] was concerned about a conflict of interest." (Tr. 2578-80). He also claimed that he had "walled" himself off from Alameda trading and risk management, effectively laying the blame at Ellison's feet, Alameda's nominal CEO. (Tr. 2581-82). This fiction was impossible to maintain at trial in the face of overwhelming evidence of Bankman-Fried's oversight of Alameda, including, most prominently, the facts that Ellison recounted during her testimony. (*See, e.g.*, Tr. 2570 (Bankman-Fried testimony that he had "some involvement" in "higher-level discussions and hedging-related trading discussions")). Despite Bankman-Fried's care not to draft a single spreadsheet and to autodelete his Signal communications, the documentary evidence corroborated Ellison's account that not only was Bankman-Fried well aware of Alameda's misuse of FTX customer funds, but he was also the ultimate decision-maker who engineered the fraud against FTX customers and investors, and Alameda's lenders. (*See, e.g.*, GX-44, GX-50, and associated metadata exhibits GX-44M, GX-50M; *see also, e.g.*, Tr. 737-38 (describing update documents about Alameda that Ellison "regularly" sent to Bankman-Fried for "comments and feedback")).

Of the cooperating witnesses, Ellison was the only one who worked at Alameda through 2022. She was therefore uniquely positioned to describe Bankman-Fried's continued oversight of Alameda's trading, his involvement in repaying Alameda's lenders with FTX customer funds in 2022, the state of Alameda's balance sheet throughout 2022, Alameda's inability to repay its gargantuan debt to FTX customers, and Bankman-Fried's continued insistence on making additional investments using FTX customer funds into the Fall of 2022. Ellison rebutted Bankman-Fried's false assertion that he did not know about Alameda's negative balance on FTX until the Fall of 2022, and that he was too distracted and overextended to pay sufficient attention to Alameda. (*See, e.g.*, Tr. 764-77). Her testimony was corroborated by other witnesses, including Singh and Wang, who also described the discussions with Bankman-Fried in June 2022 about the size of Alameda's negative balance on FTX. (*See* GX-50, GX-50M). Ellison also provided significant assistance in understanding Alameda's finances. After FTX's collapse, it became clear that, by design, FTX and Alameda lacked appropriate corporate controls and trustworthy systems for tracking financial information. This made reconstructing the flow of funds particularly challenging. Ellison provided information about the significance of various Alameda accounts to assist in calculating Alameda's NAV and the use of FTX customer funds, and helped translate various financial spreadsheets that did not conform to traditional accounting conventions.

Ellison's cooperation was also important to charge and prove Bankman-Fried's fraud on Alameda's lenders, a serious fraudulent scheme in its own right that ultimately threw several of Alameda's lenders into financial crisis, and, in the case of BlockFi, caused the firm's bankruptcy just a few weeks after FTX's bankruptcy. (Tr. 1228). Ellison was Bankman-Fried's sole co-conspirator in the scheme to defraud Alameda's lenders. At the outset of her cooperation, she described creating a spreadsheet with multiple tabs at Bankman-Fried's direction; the first tab contained Alameda's accurate balance sheet, and the remaining tabs were different ways Ellison proposed of obfuscating Alameda's true financial condition in order to deceive its lenders. Ellison described Bankman-Fried selecting which fraudulent balance sheet to share with Alameda's lenders. That balance sheet became the template used in the ensuing months to forestall the recall of Alameda's loans and mislead Alameda's lenders into extending new loans. At the time Ellison described the fraud on Alameda's lenders, the Government had yet to identify the seven-tab spreadsheet. The spreadsheet was ultimately identified because in addition to proffering with the Government, Ellison combed through hundreds of google documents and excel spreadsheets in the Government's discovery to identify relevant evidence, including the seven-tab spreadsheet. The document metadata confirmed Ellison's account: the spreadsheet was created at the time of Alameda's fraud on its lenders, after one of Alameda's lenders had asked for an updated balance sheet. (*See* GX-44M). Metadata also showed that Bankman-Fried reviewed the spreadsheet immediately before Ellison converted one of the fraudulent spreadsheet tabs into a balance sheet to send to an Alameda lender. (*See* GX-44M; Tr. 783-803). There could be no innocent or credible explanation for his review of the spreadsheet, and Ellison's testimony about the spreadsheet, the spreadsheet itself, and the accompanying metadata, led to the inescapable conclusion that Bankman-Fried was lying when he claimed no intent to defraud, and no knowledge of Alameda's debt to FTX customers in the Spring of 2022.

In her review of discovery materials, Ellison also flagged the importance of Government Exhibit 36, a spreadsheet entitled "NAV Minus Sam Coins." As described above, this spreadsheet contained Ellison's analysis in response to Bankman-Fried's request that Ellison determine the risks if Alameda spent $3 billion more on venture investments. (Tr. 707-10). At first glance, the spreadsheet was impenetrable and looked nothing like a traditional financial analysis. The second tab of the spreadsheet, "questions," contained over 120 rows, some with mathematical calculations, others with questions, and some additional analysis out of sequence in columns E, F, and G. Without Ellison's testimony, the context of this document, and its meaning, would have been impossible to relay coherently to the jury. But with her testimony, it was proof of Bankman-Fried's guilty intent, his knowledge, and his motive. As Ellison explained, her analysis in the spreadsheet showed: (1) Alameda's positive net asset value depended on large amounts of "Sam coins" on the balance sheet, which had dubious liquid value, and without which Alameda had a negative net asset value; (2) Alameda was already borrowing heavily from FTX customers; and (3) if Alameda made an additional $3 billion in venture investments, in the event of a market downturn, it would not be able to repay its lenders without borrowing billions more from FTX customers. After reviewing this analysis with Ellison, Bankman-Fried did not dispute the risks, but decided to make the investments anyway. (Tr. 710-29; GX-36). Ellison spent substantial amounts of time explaining this spreadsheet to the Government, and then preparing to testify about the spreadsheet in a manner that would be accessible to a jury.

Ellison's testimony about Government Exhibit 36 is just one example of how her testimony gave the jury a more complete picture of how the criminal scheme escalated, and refuted Bankman-

Fried's excuses that he inadvertently got in over his head. Given Bankman-Fried's disingenuous campaign in the media—and then in his testimony—to portray himself as well-meaning but hapless, this was a case where it was particularly important to shed light on Bankman-Fried's motive, even if it was not an element of the crime. As Bankman-Fried's former associate and romantic partner, Ellison described Bankman-Fried's outsize appetite for risk, his desire for power and influence, and his cavalier attitude about honesty, in a compelling and credible manner. Her testimony about Bankman-Fried's influence and power over her was all the more credible because Ellison at no point has attempted to wield that as an excuse for her own misjudgments and wrongdoing. Instead, she expressed genuine shame and remorse on the stand, as she does now before sentencing.

The information Ellison provided about bribery of Chinese officials was crucial to charging Bankman-Fried with conspiracy to commit FCPA bribery. Without the Bahamas consent, the Government did not proceed on this count at trial, but Ellison testified about the bribery scheme to help the jury understand how the criminal relationship of trust between Ellison and Bankman-Fried developed, and how Bankman-Fried had a cavalier attitude about the law when it served the needs of his business. (Tr. 827-40).

As confirmed by SEC and CFTC, Ellison also provided valuable assistance to the SEC and CFTC in their parallel investigations for similar reasons. From her first proffer, Ellison answered questions in a room filled with law enforcement agents, Assistant U.S. Attorneys, and representatives from the SEC and CFTC who were conducting their own parallel investigations. The SEC's civil complaints relied in part on information provided by Ellison or corroborated by her. In addition to the SEC's interest in the fraud on FTX investors, Ellison provided the SEC with detailed information about the potential manipulation of "Sam coins," including FTT, and information useful to ongoing investigations of other cryptocurrency frauds and market manipulation by other market makers in the crypto industry.

As described by the CFTC, Ellison voluntarily provided substantial assistance to the CFTC in its civil enforcement actions against Mr. Bankman-Fried, the FTX and Alameda entities, and others. Ms. Ellison entered into a written Cooperation Agreement with the CFTC's Division of Enforcement on December 20, 2022, and the CFTC entered into a Consent Order of Judgement on Liability as to the CFTC's civil charges against her on December 23, 2022. *See CFTC v. Bankman-Fried et al.*, No. 22-cv-10503 (S.D.N.Y. Dec. 23, 2022), ECF No. 26. In that order, Ellison admitted that she engaged in the charged conduct and accepted responsibility for her actions.

Both before and after the date of Ellison's cooperation agreement with the Division of Enforcement, she provided material assistance in connection with the CFTC's action against FTX, Alameda and Bankman-Fried. The CFTC's action against the FTX and Alameda entities resulted in a $12.7 Billion consent judgment, with all monetary relief used to compensate to FTX customers and victims of FTX's fraud. See Consent Order For Permanent Injunction and Other Equitable Relief Against Defendants FTX Trading Ltd. d/b/a FTX.com and Alameda Research, LCC, CFTC v. Bankman-Fried et al., No. 22-cv-10503 (S.D.N.Y. Aug. 7, 2024), ECF No. 44. The CFTC's action against Bankman-Fried continues, and Ms. Ellison has agreed to continue providing information to the CFTC, and to testify in that action, as needed.

*Ellison's Truthfulness and Reliability*

As noted above, Ellison stood out not only for the speed of her cooperation, but for her consistent candor beginning in her very first meeting with the Government. She accepted full responsibility from her very first proffer and did not minimize or shift blame. She provided as much detail as possible about crimes that the Government was already investigating, and alerted the Government to other criminal activity too. Among other things, she disclosed the conspiracy to defraud Alameda's lenders, as well as the bribery of Chinese officials. Even before she knew what documents the Government had obtained, or what information the Government had about the creators of those documents, Ellison was forthright that she drafted some of the most incriminating documents in the case, including the seven-tab spreadsheet of misleading balance sheets used to defraud Alameda's lenders. She was candid that although she raised concerns with Bankman-Fried at several points along the way, she ultimately put up minimal resistance to participating in wrongdoing and deceit. She was also honest that she became more comfortable with lying and deceit the longer she worked at Alameda.

Ellison's testimony was credible for its consistency and her earnest demeanor on the stand. But it was also corroborated by exhibits, spreadsheets, chats, the testimony of other witnesses (such as Yedidia, Drappi, Singh, and Wang), and the Government's interviews with other former Alameda employees.

Documents contemporaneous with the fraud show that Bankman-Fried wielded significant influence over Ellison in their personal and professional relationship—a dynamic that does not excuse Ellison's misjudgments but that corroborates her role and culpability in the fraud schemes relative to Bankman-Fried. Ellison's private writings during her employment at Alameda and her on-again, off-again romantic relationship with Bankman-Fried illustrate the imbalanced power dynamic between Ellison and Bankman-Fried, and that she routinely deferred to him and sought his approval (witnesses who were familiar with Ellison and Bankman-Fried's relationship made similar observations to the Government). Ellison's handwritten journal, which law enforcement seized from Ellison's residence, and for which she gave consent to search, described her unhappiness at work in the Bahamas where she felt her "self-worth" was "coming from Sam's approval." She wrote that the times "I feel worst" are "interacting with Sam" and "feeling left out and powerless in group decisions." Even when Ellison and Bankman-Fried were romantically involved, she confided in him that when he avoided her it made her "feel insecure," that she felt "we're always in manager/employee mode," and that "when you are around, I have an instinct to shrink and become smaller and quieter and defer to others." The Government found no evidence that Ellison enjoyed the wealth generated by the fraud. Instead, in a letter to Bankman-Fried that is characteristic of the sentiments she was expressing during her time in the Bahamas, she described being "stretched beyond [her] limits at work," "unhappy and overwhelmed" by her job, unexcited to go to work, and feeling "like there's [no] end in sight." (*See also* Tr. 763 (Ellison describing her "constant state of dread" in the Spring of 2022)).

Oftentimes, a defendant will come before the Government or the Court to accept responsibility and express remorse, and it requires a degree of trust that these are not merely self-serving remarks to obtain a lower sentence or a disingenuous appeal to the Court's mercy. Rarely, however, does the Court have an independent basis to credit the defendant's earnest remorse and acceptance as it does here in the form of Ellison's remarks at the November 9, 2022 all-hands meeting, which Ellison did not know were being recorded, and during which she acknowledged her wrongdoing not out of self-interest, but because she understood that she had wronged her employees, FTX customers, Alameda's lenders, and others affected by FTX's collapse.

*Professional and Personal Consequences from Cooperation*

Ellison cooperated at great personal and professional cost, enduring harsh media and public scrutiny and attempted witness tampering by Bankman-Fried.

During her time as CEO of Alameda, Ellison kept a relatively low profile, doing few interviews and public appearances. Ellison's attitude toward the spotlight places her in marked contrast with Bankman-Fried, who graced the covers of magazines like Fortune and Forbes, and cultivated a high public profile. (*See* GX-1619 (January 5, 2022 chat where Ellison says her "instincts are more toward under the radar," and Bankman-Fried responds, "Same, except exactly the opposite.")). In part because of FTX's astounding rise and fall, and in part because of Bankman-Fried's former relationship with the media, this case received outsized press attention. Substantial media attention was directed at Ellison in particular, due to her role in the crimes, Bankman-Fried's statements that he was not responsible for what took place at Alameda, and her prior relationship with Bankman-Fried and cooperation against her former boyfriend.

Unlike typical press and public attention for criminal conduct, the scrutiny of Ellison was extremely personal and probing. The most salient example is the *New York Times* article published on July 20, 2023, *Inside the Private Writings of Caroline Ellison, Star Witness in the FTX Case.* The article claimed to "offer new insight into Ms. Ellison's psychology during the final months of FTX," drew from Ellison's "thoughts on private Google documents" that were "personal and raw," dissected her former romantic relationship with Bankman-Fried, and quoted Ellison's private writings about being unhappy and overwhelmed, and hurt and rejected by Bankman-Fried. Bankman-Fried provided Ellison's otherwise private documents to the *New York Times* in an effort to damage her credibility and reputation in the court of public opinion, and to intimidate her in advance of her trial testimony. As the Court observed at Bankman-Fried's detention hearing about the documents Bankman-Fried provided to the press:

> [T]he content of these documents in some respects tends to support the conclusion they are extremely, in some parts, personal and intimate. Those parts are relationship oriented, not business, commercially or legally oriented . . . parts of the content . . . are something that someone who has been in a relationship, or is in a

> relationship, would be very unlikely to share with anybody, le[a]st [of all] the New York Times, except to hurt, discredit, and frighten the subject of the material.

(8/11/2023 Tr. at 36-37).

While public scrutiny of a criminal defendant's or cooperator's criminal misconduct is understandable, Ellison endured far more than that. She was mobbed outside the courthouse for comment and photographs, making it difficult to enter and exit without an escort, her physical appearance was scrutinized and criticized, and she was mocked in memes and other content on social media. She was featured in Michael Lewis's *New York Times* bestseller, *Going Infinite*, which included details about Ellison that she had shared with a therapist, who in turn divulged that information to Lewis. Her cooperation required her to testify against her former boss and boyfriend, who at the time of their personal and professional relationship held the lion's share of power and influence at FTX and Alameda. And on top of humiliating her in the press, Bankman-Fried laughed, visibly shook his head, and scoffed at Ellison during her testimony. (Tr. 873). News articles about her trial testimony, accompanied by her photograph, abounded. Numerous films and TV shows are in production about the downfall of FTX, which will only perpetuate the public scrutiny Ellison has faced to date. The Government cannot think of another cooperating witness in recent history who has received a greater level of attention and harassment. The attendant professional consequences of this level of notoriety are obvious and unlikely to be short-lived. Throughout, however, and certainly during her testimony, Ellison steadfastly remained candid and dedicated to telling the truth—as embarrassing as it often was for her—and in assisting with bringing the most culpable party to justice.

**Conclusion**

As set forth above, the Government believes that Ellison provided substantial assistance to the Government. Accordingly, as discussed, assuming Ellison continues to comply with the terms of her cooperation agreement, the Government intends to request at sentencing that the Court sentence Ellison in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   /s/ Danielle R. Sassoon
     Danielle R. Sassoon
     Danielle Kudla
     Thane Rehn
     Nicolas Roos
     Assistant United States Attorneys
     Southern District of New York

cc:    Anjan Sahni, Esq. (by ECF)
       Stephanie Avakian, Esq.
       Peter G. Neiman, Esq.
       Nicholas Werle, Esq.