UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>NISHAD SINGH,<br><br>                Defendant. | Case No. 22-CR-00673 |

## SENTENCING SUBMISSION ON BEHALF OF NISHAD SINGH

## REDACTED PUBLIC FILING

## I.    PRELIMINARY STATEMENT

Nishad Singh is a unique criminal defendant, and his sentence should reflect who he is and his role in this case.  He is situated differently not only from Sam Bankman-Fried and Ryan Salame, but also from the other cooperators who pled guilty in the wake of the collapse of FTX. Indeed, his circumstances are extraordinary in every way that matters to sentencing: his personal history and characteristics, his role in the charged offenses, the speed with which he cooperated, his response to the collapse of FTX, and how he has rebuilt his life since then.

First, the person Nishad is.  He is an uncommonly selfless individual who, at barely 29 years old, has lived a life of remarkably good works.  More than 100 people from all aspects of Nishad's life – including before, during, and after his time at FTX – have submitted letters on his behalf, an outpouring of support from those who truly know him.  The letters detail example after example of Nishad's consideration of and help for others, from waking up at 5am to run and train with a socially isolated young girl who had developmental challenges, to quietly donating the proceeds from a college internship for the purchase of bed nets in Africa, to personally taking a young unhoused individual suffering from severe cellulitis to the hospital and staying by his side until he received care.  At Alameda and then FTX, Nishad began as a novice programmer and was later promoted to manage junior members of the engineering team precisely because others recognized his unparalleled work ethic, his sense of empathy for others, and his commitment to supporting his team.  Eighteen former FTX and Alameda employees – all of whom are aware of Nishad's criminal conduct – nonetheless steadfastly support him and have provided letters demonstrating what a truly special colleague he was.

Second, Nishad's role in the charged offenses.  Put simply, his role was *far more limited* than any other defendant.  He does not minimize his conduct; he pled guilty to serious crimes at the outset of this case and will regret his actions for the rest of his life.  But his sentence should recognize that Nishad did not join the conspiracy at the heart of this case – the theft of FTX customer funds – until September 2022, just two months before the collapse of FTX, and *after* the core decisions were made by Sam Bankman-Fried and Caroline Ellison to use billions of dollars

in customer funds to shore up Alameda's finances and pay back its lenders. Nishad was not part of that conduct. And even as Nishad became complicit in the fraud in its final two months, hiding the awful truth from customers and fellow employees, he simultaneously tried in multiple ways to get Bankman-Fried to cut back on expenditures and conserve funds. With respect to the campaign finance conspiracy, Nishad allowed himself to be used as a straw at other people's direction and for other people's benefit. His role was almost entirely passive.

Third, Nishad's cooperation. It was immediate and exemplary. As customers started trying to pull their money out of FTX, Nishad separated himself from Bankman-Fried and other employees as they put out misleading public statements trying to persuade customers not to make withdrawals. Nishad then left the Bahamas before FTX declared bankruptcy and immediately began taking screenshots of Signal messages that became critical to the government's prosecution. He had his counsel reach out to the government on November 14 – within three days of FTX's announcement that it would declare bankruptcy – and he flew to New York for the first of more than 20 proffer sessions one week later, on November 21. The evidence Nishad provided in those early meetings was critical to helping the government bring both Sam Bankman-Fried and Ryan Salame to justice.

Fourth, the way Nishad has responded to the events of this case. At the time of FTX's collapse, Nishad was shattered and on the brink of suicide as he came to terms with how he and FTX had hurt so many people. His reaction reflected his moral compass: he knew he had become part of something that was so contrary to his values that he could no longer function. Since then he has done everything he can to try to make things right and turn his life around. In addition to cooperating with SDNY, multiple other government agencies, the bankruptcy estate, and the plaintiffs in the MDL class action, Nishad has found full time employment as a software engineer and has become an "invaluable" employee who is "beloved" by his colleagues; he volunteers regularly at a daytime sanctuary for the unhoused in San Francisco; he became engaged to his now-fiancée and has started running ultramarathons again; in his extra time he is building software for an affordable housing project; and with the support of his family and a commitment to therapy,

his mental health has steadily improved. The Court's sentence should recognize the progress Nishad has made and the exemplary life he is committed to leading.

At the sentencing of Caroline Ellison, the Court distinguished her conduct from that of Bankman-Fried and recognized her extensive cooperation, but imposed a term of incarceration in part to show that cooperation cannot be a "get out of jail free card" given the seriousness of her actions. That message is unnecessary in fashioning an appropriate sentence for Nishad. Nishad's situation is different first and foremost because of his far more limited role in the charged offenses. It is critical to encourage people in Nishad's position, with lesser levels of culpability, to cooperate with the government – and to do so in the immediate and exemplary way Nishad did here. The Court also should consider Nishad's exceptional character and record of charitable works as evidenced by the unprecedented support accompanying this submission, and the way he has rebuilt his life since the collapse of FTX, dedicating his energies to helping others and demonstrating genuine rehabilitation. We respectfully submit that the only appropriate sentence for Nishad, given all of these circumstances, is time served and a period of supervised release.

## II.    PERSONAL HISTORY

### A.    Family Background

Nishad was born in 1995 and raised in the Bay Area of California.  Pre-Sentence Report, ECF No. 513 ("PSR") ¶ 74.  He is the first person in his family born in America.  Nishad's younger brother Malhar was born two years later; the two remain the closest of friends to this day.

Nishad's parents grew up in India with modest means.  Nishad's mother was raised in a single-room home, sharing an outdoor bathroom with three other families.  Ex. A at 41 (A. Singh). She followed her brother to the United States, where she earned a doctorate in psychology. Nishad's father was able to immigrate to the U.S. by virtue of a scholarship to study electrical engineering, and arrived with "only a suitcase and $600."  Ex. A at 45 (G. Singh).  They worked hard to provide a community-centric life for Nishad and Malhar, raising them at first "in a shared home with [their] cousins, aunt, uncle, and two other family friends." Ex. A at 52  (M. Singh); *see* Ex. A at 41 (A. Singh) (explaining that Nishad grew up calling everyone in the home "aunt," "uncle," or "cousin," even though not all were related by blood, because they were family "in the only ways that matter").  As Nishad's parents found professional success in the U.S., in many ways achieving the American dream, they took great care to impart the values of hard work, selflessness, and compassion to their children.

Even as a child, Nishad had an extraordinary capacity for kindness, empathy, and generosity.  Appended to this submission are letter after letter recounting Nishad's uniquely compassionate nature from a young age and continuing through every stage of his life.  He was the six year-old who connected with a young autistic boy being bullied by others and chose to play with the boy, often in silence; the eight year-old who comforted his distraught and panicking aunt on the way to the hospital while *he* was having a severe asthma attack; and the 10 year-old who approached his close friend's mother after seeing her crying to give her a hug and tell her everything would be okay.  Ex. A at 193 (I. Almeia), 110 (V. Redmore), 198 (L. Patil).

At the age of seven, Nishad visited India with his parents for a wedding. His mother described the impact it had on Nishad, and on her: "At the edge of the party, mothers and their children were begging for food, arms reaching through the gates." Ex. A at 41 (A. Singh). Nishad's mother, despite having grown up around such poverty, was "ashamed to admit that [she] barely registered" the women and children. *Id.* But "Nishu tugged at my sari and asked if they were okay. Through his young eyes, I saw clearly again. We discreetly took food over and handed it through the gate." *Id.* Throughout the evening, Nishad peppered his mother with questions about why everyone was ignoring the families in need. Nishad "couldn't bear it," and "[o]ver the rest of the trip, he gave away every toy he brought to children as we passed on the street." *Id.* at 41–42.

Nishad's middle school teacher, Jeffrey Nichols, "first met Nishad as a brilliant, compassionate, and empathetic 11-year-old student." Ex. A at 65 (J. Nichols). "Nishad always stood out . . . you immediately recognize that he radiates goodness and compassion[.]" *Id.* During a field trip to San Francisco in the eighth grade, in "a moment he likely thought nobody noticed, he hung behind the class and gave [an unhoused] individual his lunch money for that day." *Id.* Despite teaching hundreds of students over the years, Nichols specifically remembers Nishad's acts of kindness, writing that "[i]t is not hyperbole to say that Nishad is one of the nicest people on the planet." *Id.*

Nishad's childhood classmate and lifelong friend, Connor Hegarty, reflects on their friendship. As children, Hegarty viewed Nishad as a "bit of a pushover" due to his "willingness to sacrifice his own wants" and "put others first." Ex. A at 134 (C. Hegarty). With age, he came to see Nishad's generosity instead as a "strength." *Id.* Hegarty explains:

> My perception of [Nishad's] kindness is not the result of any one event, but an accumulation of decades of consistent behavior. Years and years of consistent small actions and words that have resulted in my tremendous respect for his character. ***He's not kind in performative ways, or generous only when convenient. His consideration for others permeates his thinking and his actions***, and I'm honored to consider him one of my best friends to this day.

*Id.* at 135 (emphasis added).

### B.    High School & College

For high school, Nishad attended Crystal Springs Upland School in the Bay Area, where he became close friends with Gabe Bankman-Fried.  PSR ¶ 90; Trial Tr. 1301:20–1302:1, 2310:21–24; *see* Ex. A at 143 (G. Bankman-Fried).  During this time, Nishad met Sam Bankman-Fried, though Sam was older and Nishad largely only saw him in passing.  Trial Tr. at 2310:20–24.  Gabe, who has not seen or spoken to Nishad in the two years since FTX's collapse, submitted a letter in which he describes Nishad as "one of the kindest people [he has] ever known," writing:

> Nishad had his struggles, but he handled them with grace. When Nishad felt insecure, instead of bragging to compensate, he would apologize for the tiniest of missteps – and when his friends would tell him to stop apologizing so much, he would apologize for that too. When Nishad felt stressed, he would bottle it up to avoid burdening his friends. When Nishad felt tension with someone, he would often blame himself, working tirelessly to get along with him even when others could see they didn't deserve the effort.

Ex. A at 143 (G. Bankman-Fried).

When Nishad started high school, he was eager to pursue athletics, something that his asthma had made difficult throughout most of his childhood. He joined but struggled to perform well on the high school cross country team, still limited by his breathing.  Nishad's family friend Samir Vaidya (whom he calls his "cousin") explains how Nishad responded: "like he always does, he figured out a way to solve his problems: by running longer but slower."  Ex. A at 122 (S. Vaidya).  Inspired by his mother's own long-distance running, Nishad went on to run marathons and eventually ultramarathons (*i.e.*, races longer than 26.2 miles).  At the age of fifteen, Nishad completed his first 100-mile run—a distance regarded by many as the pinnacle accomplishment of ultramarathoning—while raising money for the Allergy and Asthma Foundation of America. Ex. A at 191 (A. Simha).

The same compassion he showed as a child continued in his approach to sport.  For instance, Nishad would stay with struggling runners until medical attention arrived, sacrificing his

own race times. Ex. A at 49 (R. Patel). He encouraged and supported Vaidya, who struggled with his weight at the time, to run with him. Vaidya recalls training with Nishad as "one of the most important health choices [he] ever made and it is all thanks to Nishad." Ex. A at 122 (S. Vaidya). Nishad's then-coach, now stepfather, shares how Nishad volunteered to help a "socially isolated, young girl with developmental challenges" train to become a runner. Ex. A at 50 (R. Patel). Nishad "would wake up very early at 5:00am and take her out for a run around the neighborhood. . . . His kindness and patience with her were so beautiful to watch." *Id.* Both Vaidya and the young girl would go on to complete ultramarathons of their own. *Id.*

At the age of sixteen, Nishad ran a 100-mile race again, setting the world record for his age group while raising money for his high school. The same year, he helped train a boy named Miguel, who completed his own 100-miler the following year at the age of thirteen, breaking Nishad's record. Ex. A at 50–51 (R. Patel). "Where others might have felt a pang of jealousy at being overtaken, Nishad's heart swelled with pride. He celebrated Miguel's achievement as if it were his own." *Id.* at 51. "Nishad's inner fire did not manifest itself as a zero-sum, competitive drive. . . . He took joy in his victories, but also took real pride in those of others." *Id.* at 50.

Nishad was accepted into UC Berkeley with the same Regents Scholarship his father had received to come to the U.S., a merit-based full scholarship offered to a small number of students each year. *See* PSR ¶¶ 90–91. He ultimately graduated with a degree in electrical engineering and computer science with highest honors. *Id.* ¶ 91. As in childhood, Nishad continued to be characterized by his "dedication . . . toward[s] his friends and the people around him," and would "often take just as much time helping [his friends] as he would completing his own project[s]." Ex. A at 154 (I. Yang), 160 (R. Varadarajan); *see, e.g.*, Ex. A at 152 (C. Zumar). One classmate recalls "Nishad patiently walking a group or 5 or 6 of us through . . . the key to solving the problem we'd all been stuck for 3-4 hours on . . . without a hint of ego, . . . simply a desire to help." Ex. A at 162 (V. Tolani). Another classmate remembers not learning until years after they graduated that Nishad had excelled academically, writing:

> I was surprised because Nishad never exhibited anything but
> gratefulness to be studying with us and always made the rest of us
> feel respected and admired. In hindsight I shouldn't have been, this
> was quintessential Nishad: I think he really was grateful, really did
> admire us, and really did outperform us, all at the same time.

Ex. A at 167 (S. Kobori).

In keeping with his character for selflessness, Nishad started practicing effective altruism on a small scale while in college. As one classmate recalls, Nishad "was never boastful of it, and it was only in circles of his closest friends where he would open up about raising awareness for animal rights" or donating "internship proceeds to buying bed nets to prevent Malaria in Africa." Ex. A at 160 (R. Varadarajan). Another friend shares that in such discussions, Nishad was "self-perceptive and humble" and "would jokingly lambaste himself. . . . Nishad would find a way to downplay his own actions." Ex. A at 157 (R. Mukherjee).

At Berkeley, Nishad met Claire Watanabe, his now fiancée. PSR ¶ 78. Claire's initial impression was that she "hadn't met anyone with a bigger heart or a greater willingness to act on it." Ex. A at 35 (C. Watanabe). She shares several moments that stand out. Once, during a flight, Nishad sat next to an "older gentleman named Stan, who had recently lost his wife and was heartbroken." *Id.* at 38. "They spoke for hours" about Stan's life and his upcoming move to be closer to his adult children. *Id.* After they exited the flight, Nishad stopped midway through the terminal and ran back to Stan, and offered him his phone number, stating, "If you need help with the move or anything else, please let me know—it would make my day." *Id.* Another deeply personal act of kindness came when ███████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████ Claire describes: "While this is my mom's story of strength and courage,

Nishad's proactive, thoughtful, and gentle support played a key role in making it possible. Having my mom healthy today is one of the greatest gifts I've ever and will likely ever receive." *Id.*

Unsurprisingly, Claire's relatives have come to consider Nishad "a cherished" and "integral part" of their family. Ex. A at 89 (J. Whitsitt), 86 (E. Schroader). Claire's only sibling, Erick Watanabe, considers Nishad "one of the best people that [he] know[s]," sharing how after FTX's collapse, Nishad helped him transition into a career in software engineering: "Despite everything on his plate, he met with me weekly for over a year, creating a personalized list of practice problems and running mock interviews. His thoughtfulness and commitment, even in such a difficult time for him, was extraordinary." Ex. A at 92 (E. Watanabe). On trips to Claire's family's farm in rural Indiana, including while Nishad was at the height of his wealth at FTX, he always volunteered for the least desirable tasks, like "cleaning out the nasty, neglected cellar," sleeping in an "RV travel trailer behind the house," or being the "designated dish do-er." Ex. A at 90 (D. Binford), 88 (J. Whitsitt), 84 (B. E. Schroader). On one such trip, Nishad spent time with Elizabeth, a cousin of Claire's who had been diagnosed with incurable brain cancer in 2019 at the age of 30. Ex. A at 90 (D. Binford). The trip wound up being Elizabeth's last; her mother recalls, "I came to check on her, and I found Nishad spoon feeding her. No one else was around. No one asked him. He just saw the need and stepped up to help. It almost brought me to tears." *Id.*

### C.    Nishad's First Job

After graduating from Berkeley, Nishad started his professional career as a software engineer at Facebook, finally being able to work towards his desire to "earn to give." Nishad's father, concerned that he might not save enough for his own future, connected him with a financial advisor. The advisor writes that "[w]hat struck" him about his conversations with Nishad seven years ago – from when Nishad was first entering the professional workforce – was his "preference to help others financially almost to the detriment of his own financial well-being." Ex. A at 58 (N. Epstein). When advised about the benefits of fully funding his 401(k), Nishad "would counter with how it was more important to give away that same money." *Id.* "Enriching himself was not his goal nor desire." *Id.* His accountant, Alan Watters, explains that Nishad resembled his other

tech clients in some ways, but differed in his "remarkable generosity"; their "discussions centered around charitable donations from the start." Ex. A at 57 (A. Watters).

After joining Facebook, Nishad began the team-matching process, where he explored different teams. He earned a spot with his top choice: the team building the Donations product, a feature that allows Facebook users to raise money for charities. Before accepting the spot, Nishad talked with Gabe Bankman-Fried, his high school friend, about an idea Nishad had to prioritize effective charities within the product. Gabe connected him to his brother, Sam, to help refine the idea. Nishad "barely knew Sam but he looked up to him as he had a reputation for being a genius" and for his then-stated devotion to charitable causes. Ex. A at 42 (A. Singh). Nishad pitched his idea to the Donations team, but did not succeed, and left feeling discouraged. *Id.* Although Nishad eventually joined a separate, prestigious machine learning team at Facebook, he remained unfulfilled. Claire writes, "Nishad felt disconnected from his values and what he actually wanted to contribute to the world." Ex. A at 35 (C. Watanabe).

Shortly after, Sam Bankman-Fried called Nishad and told him about his venture, Alameda Research. Nishad visited Alameda's offices in late 2017. "[E]veryone he chatted with seemed at the time to share Nishad's values . . . The group had pledged to donate 50% of Alameda's profits to charity and were willing to work long, hard hours." Ex. A at 35 (C. Watanabe). "Nishad was blown away . . . Here was an opportunity where Nishad could more directly affect positive change, and at a scale way beyond what he thought was individually possible." *Id.*

Because Nishad was still relatively unknown to Bankman-Fried and a novice engineer only six months out of college, Bankman-Fried requested Nishad complete an informal trial period before he would offer a full-time job. Nishad spent multiple weeks volunteering his nights and evenings "on a trial basis at Alameda." Ex. A at 45 (G. Singh). After receiving a formal job offer, Nishad was on the fence about leaving his secure job at Facebook. Nishad invited his father to visit the Alameda office to get his advice about moving forward with the potential job switch. *Id.* Eventually, one of Alameda's senior employees said they would personally donate $50,000 to

charity if Nishad accepted the job offer that week.  Ex. A at 36 (C. Watanabe).  The magnitude and unhesitating commitment behind that donation was enough for Nishad to agree to say yes.

### D.    Nishad's Time at Alameda and FTX

As described below and at trial, while Nishad started at Alameda as a low-level software engineer, over time he became a valuable engineer and manager to Alameda and then to FTX.  He has been described by many, including the national media, as a member of Sam Bankman-Fried's "inner circle."[1]  In some ways – such as managing junior members of FTX's engineering team or being the person employees felt comfortable approaching with concerns – Nishad was among the company's leaders.  In most ways, however, Nishad was in a significantly different position than his co-defendants.  He was not a founder of FTX or Alameda.  He did not control company funds for either FTX or Alameda.  He was not the CEO or CTO and could not make major decisions on his own.  Instead, Nishad started at the proverbial bottom as a ground-level engineer, and even by the end of his time at FTX, when he was Head of Engineering, Nishad worked under Gary Wang's supervision and did not have nearly the same level of authority or autonomy as Wang.  He grew to be regarded as a leader due to his example, not his authority.  Because of this – precisely because he was trusted and looked up to by many – his choice *not* to reveal the hole to others when he learned of it in September 2022 was that much more damaging.

Below we discuss Nishad's time and role at FTX generally, before proceeding to describe the offense conduct.

### 1.    Nishad's Path to Becoming a "Valuable Dev"

When Nishad started working at Alameda as a software engineer at the end of 2017, it was a small entity led by its cofounders, Bankman-Fried and Wang.  Trial Tr. at 1302:17–1303:2. Nishad had no managerial responsibilities at first.  *Id.*  Having graduated from college just six months earlier and with only four months of entry-level experience, Nishad could perform a small

---

[1] *See, e.g.*, David Yaffe-Bellany, J. Edward Moreno, *Sam Bankman-Fried's Closest Friends Become His Foes in Courtroom Clash*, THE NEW YORK TIMES (Oct. 12, 2023), available at: https://www.nytimes.com/2023/10/12/technology/sam-bankman-fried-friends-witnesses.html.

subset of engineering tasks and required direct supervision.  In a performance review in 2018, Bankman-Fried described Nishad as an "unfailing[ly] nice person" but a "relatively weak programmer."  Ex. C at 2.

Four months into Nishad's time at Alameda, a dispute with Bankman-Fried led half of Alameda's employees, including several engineers, to leave.  Ex. A at 36 (C. Watanabe).  As part of his response to the departures, Bankman-Fried authored a Google document where he described Gary Wang as "the default choice to manage the developers" as he could "design and build large systems, [] was the first developer," and "built up most of Alameda's code base."  Ex. D at 2.  However, Wang was "not particularly interested in or motivated to manage people."  *Id*. at 4.  In Nishad's relatively short time at Alameda, Bankman-Fried had recognized his ability to work well with others, writing at the time:

> Nishad in particular put in a herculean effort to fix the dev team.  He took on all of the unrewarding code-cleanup tasks, dove in to [sic] the codebase--messy as it was--and tried as hard as he could to mend up dev team ego contests. He quickly emerged as the second most productive and valuable dev, despite his lack of experience, and as someone the trading team was excited to interface with.

*Id.* at 2.

With few other options, Bankman-Fried asked Nishad if he would "supervise and grow the engineering team," despite Nishad's youth and inexperience.  Ex. A at 46 (G. Singh).  Nishad was hesitant to become a manager, but Bankman-Fried maintained that "Gary would figure out how [engineering priorities] should be done, and Sam needed Nishad to handle people-management and training."  *Id*.  Nishad accepted the position and "knew he had much to learn."  *Id.*; *see, e.g.*, Ex. A at 14 (L. Zhang).

Nishad was tasked with people-management, and he deferred entirely on deciding strategic direction.  One of his coworkers observed that Nishad "performed admirably when thrust into a management position at a young age," but "he sometimes seemed to struggle with asserting his own views, particularly when they might conflict with those of more dominant personalities in the

company," even in areas in which Nishad was "more of a domain expert." Ex. A at 14 (L. Zhang).
This included often deferring entirely to Bankman-Fried, who at the time Nishad looked up to as
a role model who had all the answers. In his testimony, Nishad admitted, "I have always been
intimidated by Sam." Trial Tr. at 1308:10. "Sam is a formidable character, brilliant, so I had a lot
of admiration and respect for him." *Id.* at 1308:17–19.

In 2018, Bankman-Fried and Wang relocated to Hong Kong to start FTX, while Nishad
stayed in Berkeley working for Alameda. Beginning in mid-2019, after Wang had built and
launched the exchange, Nishad began pitching in on some FTX engineering work. By the end of
2019, Nishad found himself among the last employees left in Berkeley. *See* Ex. A at 14 (L. Zhang).
With the 15-hour time difference, Nishad felt he was "isolated and missing . . . guidance." Ex. A
at 46 (G. Singh). Nishad's father, whom he spoke to for advice often in this period, writes:

> [Nishad] wasn't in regular meetings with the leadership, but felt
> even more out of the loop because they had moved to Hong Kong.
> He looked up to Gary and saw him as a genius, but who was often
> unavailable for days to answer questions. Nishad found it difficult
> to get the technical guidance he needed. Being responsible for
> guiding the other engineers only compounded the issue.

*Id.*

Though he was reluctant to leave his family, friends, and girlfriend in California, Nishad
ultimately relocated to Hong Kong in February 2020. *See* Ex. A. at 46 (G. Singh). By this point,
Nishad had fully transitioned to coding for FTX, although he continued to occasionally help with
Alameda-related engineering tasks for the next year. Trial Tr. at 1303:12–19, 1310:22–23. As
before, Nishad reported to Bankman-Fried and Wang. *Id.* at 1305:7–9. "Gary [Wang] was in
charge of all of the code and technical systems," and Bankman-Fried was responsible for
essentially everything else. *Id.* at 1306:5–13. Wang supervised Nishad throughout their time at
FTX. As Nishad explained during trial, the two "weren't equals," and Nishad took direction from
and deferred to Wang on "every technical decision of importance." *Id.* at 1304:8–11.[2]

---

[2] *See, e.g.*, Trial Tr. at 1304:8–11 ("On every technical decision of importance, [Nishad] would either get direction
from [Wang,] or leave it to him."); 1348:10–17 ("I asked Gary how I could help . . . Gary thought it was not a great

At FTX, Nishad improved his technical abilities, but what made him a valued engineer was his unparalleled work ethic and ability to support the engineers he managed. Numerous former FTX colleagues write that "Nishad worked longer hours than any other developer in the company and carried an astounding burden." Ex. A at 17 (A. Kalinich). Nishad believed that the more he worked, the more he and the company would ultimately be able to contribute to worthy causes. Andrea Lincoln, a former FTX developer and now a professor of computer science, explains that Nishad spent "long hours in the office, [] at home, and even [] through illness." Ex. A at 9 (A. Lincoln). While Nishad did not architect the core technical infrastructure of FTX, he was determined to be valuable, handling many of the other engineering tasks that arose.

Adam Yedidia, a former FTX developer who testified at trial, describes that in addition to working "between 70 and 80 hours a week in the office," Nishad was also the "primary engineer on call," for which he was "on average woken up in the middle of the night 3-4 times per week to deal with issues." Ex. A at 6 (A. Yedidia). Two former FTX customer support teammates explain what this entailed. Ashish Suvarna shares how he "often called Nishad, waking him up at 3am his time for critical issues." Ex. A at 19 (A. Suvarna). While not always sure if an issue was critical, "Nishad always encouraged us to err on the side of caution and call him anyway." *Id.* Reynaldo Suero writes: "It didn't matter if other developers caused the issue, were more knowledgeable, or were supposed to be 'on call,' Nishad was the one who actually responded to us and our customers. Over time, Nishad became the person that the customer support team knew they could count on." Ex. A at 11 (R. Suero).

Adam Jin, another former FTX colleague, recalls "a rare half-day" social outing "to go wake surfing in Hong Kong." Ex. A at 23 (A. Jin). Just as Nishad started to gain his balance on the board, his phone went off back in the boat. "Without a moment's hesitation, [Nishad] jumped into the water, swam back to the boat, dripping wet, pulled out the mobile phone and laptop, and

---

attempt, so he took his own stab at it. I deleted my page and we went with Gary's."); 1350:16 (". . . I know what Gary told me to generate there."); 1523:9–14 ("I asked Gary how I could help. Gary told me that I could try my best to identify the accounts . . . I took a stab. My stab was ignored."); 1529:14 ("Gary ended up pulling them"); 1542:1 ("I asked Gary about this."); 1551:15–16 ("Gary dug into why it was the case . . .").

immediately started working . . ." *Id.* Adam Kalinich, another FTX engineer, shares that "if a complicated or urgent situation arose," Nishad would always "jump on it" and "stick around to be as helpful as possible even when he needed to call in more experienced developers." Ex. A at 17 (A. Kalinich). Even when on vacation with his family, "[e]verywhere Nishad went, there was the ever present backpack" with his computer, and he would constantly get on "calls to help solve [technical] problems." Ex. A at 82 (K. Watanabe), 118 (M. Thirumale).

Nishad's work ethic and example led him to be seen as a leader at the company. As his colleagues explain: "People in the company looked up to Nishad as a leader despite his young age and only Director title, and because of how hard he worked and how well he treated others." Ex. A at 11 (R. Suero). Another colleague writes: "Seeing Nishad work relentlessly all the time and look after others drove us further and all of us worked harder. Although Nishad was often the youngest person in the room, he led by example and earned the respect of others through his actions." Ex. A at 20 (A. Suvarna).

### 2.    A "Beloved Colleague" and Manager

As a manager, Nishad was adored, as the letters included with this submission make clear. Yedidia refers to Nishad as "easily the best boss I've ever had," describing him as "warm and patient, extremely kind and hardworking," and writes that "[m]any if not most of [his] fondest memories of FTX are being [Nishad's] coworker." Ex. A at 7 (A. Yedidia). Yedidia "admired him deeply" at FTX and still does. *Id.* at 6. Phillipe Maes, a former FTX engineer, writes that he "doubt[s] there would have been a better place to grow professionally" than at FTX, which "wouldn't have been possible without Nishad's endless trust and patience." Ex. A at 21 (P. Maes). Another FTX engineer shares how Nishad "clearly" enjoyed finding ways to make his team happy like "[f]iguring out which projects [they would] enjoy" or "who [they would] like working with." Ex. A at 12 (W. Kaufman). Nishad regularly checked in with the employees he was managing on a personal level, asking if they were doing well or "if he could do something to make" someone's life "easier." Ex. A at 21 (P. Maes). Kalinich calls Nishad "one of the most selfless individuals [he has] ever known," noting how, despite being able to delegate almost any task,

Nishad "would always take on the most unpleasant tasks himself" to avoid placing the burden on his team. Ex. A at 17 (A. Kalinich). While working long hours at FTX, Kalinich opened up to Nishad about the suicide of his best friend. Kalinich shares that Nishad's "empathy during that difficult period meant more to me than words can express" and how he "learned invaluable lessons about treating colleagues with kindness and respect." *Id.* at 18.

Former FTX General Counsel Can Sun, who testified at trial, writes that Nishad "consistently demonstrated kindness and consideration for others, both in and out of the workplace." Ex. A at 26 (C. Sun). Nishad "was someone his colleagues could rely on, not only for his professional contributions but also for his empathy and willingness to support those around him." *Id.* And even as Ryan Salame publicly criticized Nishad for cooperating with prosecutors in a series of Twitter posts, he also described Nishad as "one of the most genuinely nice human beings I've ever met. The guy absolutely wrecked me, and I still think this."[3]

Perhaps most indicative of Nishad's good-heartedness is how he treated people he had no professional relationship with. Christian Drappi, another witness at trial, explains that while "it was all too common for higher-ranking FTX employees to treat the Bahamas staff with much less than the respect they deserved . . . Nishad was the opposite" and "was warm to everyone he came across, no matter who they were." Ex. A at 25 (C. Drappi). A former house cleaner during Nishad's time at FTX in Hong Kong writes that Nishad was unlike any other boss she has ever worked for because he treated her "like family," someone who worked long hours but still had time to check in with her at the end of the day, and who stayed in contact even after moving from Hong Kong to the Bahamas. Ex. A at 68 (G. Benag). A former personal trainer in Hong Kong, Charles Dunford, who was facing significant financial hardship after a series of business decisions and COVID restrictions in Hong Kong, writes about Nishad taking "concrete" steps to introduce him to FTX employees as a potential clientele base. Ex. A at 69 (C. Dunford). While Nishad could have "looked down" on Dunford, who is much older than Nishad, "he did the opposite" and

---

[3] Ryan Salame (@rsalame7926), X (F/K/A TWITTER), https://x.com/rsalame7926/status/1811235249197576303.

as a result, Dunford is "grateful for the friendship and support" Nishad gave him during this difficult time. *Id.* And Jack Zhang, FTX's former chef, writes that he remains grateful for Nishad's help in finding a school for his daughter when his family moved to the Bahamas, and how his respect for Nishad only grew when he learned that Nishad treated all employees with the same level of care. Ex. A at 16 (J. Zhang).

### 3. Nishad Was Not Focused on Personal Fortune

Even as Nishad became, on paper, worth tens and eventually hundreds of millions of dollars before FTX collapsed, he was not focused on personal fortune. He did, however, use his newfound financial circumstances to help others – both those close to him and charitable organizations. For example, as noted above, Nishad paid for ███████████████████ for Claire's mother. Ex. A at 38 (C. Watanabe). On another occasion, he paid for a friend's medical and living expenses after a severe injury. *Id.* Nishad's close friend Colin Smith writes that in traveling to the same location for vacation together, he discovered Nishad flew internationally in economy even though Nishad had purchased a business class ticket for Smith. Ex. A at 140 (C. Smith). As Smith notes: "Spending on others is fine for Nishad. He loves spending on charity and making his loved ones happy. Spending on himself, however, is awkward, uncomfortable, and ultimately shameful." *Id.*

In another example, Nishad's brother describes a situation in which an engineer quit after personal conflict with some of the personalities at FTX. Ex. A at 54 (M. Singh). As a part of the engineer's exit agreement, Bankman-Fried had agreed to donate a large sum to the charity of the engineer's choice in lieu of the engineer's outstanding bonus. *Id.* When Bankman-Fried would not make the donation, "Nishad used his own money to fulfill the promise." *Id.* What is more, as with every one of his donations, Nishad did not seek credit for this, and never informed the engineer that the money had come from him personally. *Id.*

Indeed, in keeping with his reason for joining Alameda in the first place, Nishad donated considerably to charity. For example, after Nishad and Claire (his now fiancée) conferred with charitable giving advisors for months, Nishad ultimately donated more than $10 million to five

nonprofits in need of funding. Ex. A at 36 (C. Watanabe). And in another instance, described in more detail below, Nishad provided several million dollars to a philanthropic foundation he trusted for donations that they believed would have the most effect.

At no point did Nishad ever attempt to draw attention to his philanthropic giving, let alone his wealth, for his own reputational benefit – whether that attention was from the press or internally within FTX and Alameda. To the contrary, he actively sought to avoid it, which distinguished him from other leaders at the company. For example, Bankman-Fried,[4] Wang,[5] and Ellison[6] each chose to participate in Forbes' various lists for the wealthiest individuals or "30 Under 30." Nishad was offered the opportunity to do so, but declined. Ex. A at 53 (M. Singh). Put simply, Nishad used his wealth in genuinely altruistic ways, and never engaged in self-aggrandizement while at Alameda or at FTX. *See, e.g.*, Ex. A at 8 (C. Howells) ("Despite his significant role, [Nishad] always shied away from the spotlight. He had no interest in mingling with famous personalities who often visited the company or being interviewed.").

Indeed, Nishad's financial selflessness extended to the company and was, at times, taken advantage of by others. This was most evident with respect to Nishad agreeing to forgo cash bonuses,[7] refraining from selling his assets, and taking on company loans as advised by Bankman-Fried and FTX's legal team. It is these "loans" – which were for the benefit of the company, and often to the detriment of Nishad – that comprise what has been reported as more than $500 million

---

[4] Steven Ehrlich, et al., *Meet the World's Richest 29-Year-Old: How Sam Bankman-Fried Made a Record Fortune in the Crypto Frenzy*, FORBES (Apr. 21, 2022), available at: https://www.forbes.com/sites/stevenehrlich/2021/10/06/the-richest-under-30-in-the-world-all-thanks-to-crypto.

[5] Chase Peterson-Withorn, *The Forbes 400 2022: 10 Riches Newcomers*, FORBES (Sept. 22, 2022) (listing Wang at #8, worth $4.6 billion), available at:  https://www.forbes.com/pictures/632c9961494bcfca4923daa8/8gary-wang/.

[6] Maria Abreu, et al., *Forbes 30 Under 30 North America 2022*, FORBES (2022) (listing Ellison as co-CEO of Alameda Research), available at: https://www.forbes.com/30-under-30/2022/finance.

[7] In 2020, Bankman-Fried advised Nishad to take equity options and forgo future cash bonuses, arguing it would result in better long-term tax treatment if Nishad intended to donate them. This also helped preserve company cash in the short term. Nishad agreed. Every other employee, except for Bankman-Fried and Wang, received cash bonuses. Unlike Bankman-Fried and Wang, who were founders of FTX and held equity at no cost from the start, Nishad received options that needed to be exercised at substantial cost later.

that Nishad supposedly received from Alameda.[8]

By far the most significant example of such a transaction occurred in late 2021. Earlier that year, Nishad sought to exercise his equity options in FTX for the purpose of either donating the options or eventually selling them and donating the proceeds. Trial Tr. at 1514:5–8. Nishad proposed selling his FTT and other crypto holdings to fund the exercise. Instead, months later, Bankman-Fried and his advisors, including company attorneys, asked Nishad to acquire the equity through different means: taking on a $477 million loan from Alameda to acquire the shares at a strike price over four times *higher* than the price Nishad was entitled to under the terms of his options. This benefitted FTX from a tax perspective, but came at a huge financial disadvantage to Nishad (who easily could have sold his tokens at that time in order to exercise the options at their then-significantly lower strike price). *Id.* at 1459:13–19, 1621:6–1622:6. Feeling pressured, Nishad agreed to the transaction, and was praised by the attorneys for his generosity to the company. No money was actually received by Nishad (or indeed ever left Alameda's bank accounts, as far as Nishad understands), with the result simply being an on-paper $477 million debt owed by Nishad to Alameda. *Id.* at 1621:6–7. In the following months and throughout 2022, company attorneys asked Nishad to sign additional loan agreements in connection with FTX U.S. acquisitions, which he agreed to do. *See, e.g.*, Trial Tr. at 1420:1–16, 1459:20–1460:6. Similarly, none of these loans benefited Nishad personally or involved funds reaching his bank account.

### 4.    Nishad's Efforts at FTX To Do the Right Thing

Just as Nishad's caring nature distinguished him among FTX's leadership, so did his moral compass. We do not raise this point to diminish the serious moral errors which Nishad also made, and for which he takes full responsibility, as we address in detail below. But it is important to note that on numerous occasions, and as virtually everyone who got to know him at FTX would agree, Nishad "tr[ied] his best to do the right thing in so many difficult circumstances . . ." Ex. A at 7

---

[8] *See, e.g.*, Ben Weiss, *Prosecutors say a private message from Sam Bankman-Fried shows criminal intent. SBF says he was just trying to comfort a friend in distress*, FORTUNE (Oct. 30, 2023) (discussing approximately $500 million in loans that Nishad received), available at: https://fortune.com/crypto/2023/10/30/prosecutors-private-message-nishad-singh-sam-bankman-fried-sbf-criminal-intent-friend-distress-suicidal.

(A. Yedidia).

As one example, a former FTX colleague recalls how Nishad "advocated for higher salaries for the Bahamian staff when he realized the discrepancies that existed" and how "[h]e didn't just talk about making changes; he took action to ensure that everyone, regardless of their background, was compensated fairly." Ex. A at 8 (C. Howells).

For customers of FTX, Nishad was often their advocate within the company. Adam Jin explains how Nishad resolved an issue regarding "unsupported" token deposits. Ex. A at 23 (A. Jin). Nishad developed a new system to recover these assets for customers, saving them "millions of dollars in potentially lost funds" and setting a new standard in the industry. Jin explains that "Nishad undertook this task out of a genuine desire to protect users and their assets. *Id.* In a separate instance, Yedidia recalls Nishad working from his bed with COVID to prevent an ongoing scam that exploited elderly users by convincing them to wire their savings to the perpetrators. Nishad "called and gently talked to [the victims] to figure out what was wrong and reassure them," "developed a system for preventing this species of scam," and successfully pushed "for the company to reimburse the users who had been scammed, at the company's expense." Ex. A at 7 (A. Yedidia).[9]

Nishad was also the leading and often lone voice against irresponsible spending and risky or needless business deals. As the Government elicited during trial, while Nishad often learned of large expenditures after the fact, he would "frequently go to Sam" and express his concerns, which varied depending on the expenditure, including by telling Bankman-Fried how some were "a bad business decision" or "how much it all wreaked [sic] of excess and flashiness." Trial Tr. at 1312:22–1313:7. Bankman-Fried's reactions to Nishad varied, ranging from telling Nishad he lacked sufficient context to evaluate certain expenditures, to dismissing his input by saying his views had already been factored in and that "[he] didn't need to continue sharing them," or even

---

[9] Other staff at FTX were not unanimously in favor of using corporate funds to repay victims, but Nishad insisted that it was the right thing to do. This occurred in a Signal chat called "Wire Fraud," a channel that was misreported about in the press as possibly being related to furthering the customer fraud scheme in this case. Ed Pilkington, *Sam Bankman-Fried and other FTX staff allegedly had 'Wirefraud' chat group*, THE GUARDIAN (Dec. 13, 2022), available at: https://www.theguardian.com/business/2022/dec/13/sam-bankman-fried-ftx-signal-wirefraud-chat-alameda.

outright public humiliation. *Id.* at 1313:8–22. For instance, when Nishad told Bankman-Fried that he believed FTX "had been fleeced for $20 million," Bankman-Fried became "visibly mad" and said – in the middle of the office at daytime, in front of others at the company, including people Nishad was responsible for managing – "that it was [] people like [Nishad] sowing seeds of doubt in the company decisions that were the real insidious problem here." *Id.* As Nishad testified, this was a "humiliating" experience. *Id.*

During Bankman-Fried's trial, Nishad spoke about other instances where he pushed back against Bankman-Fried's excessive spending:

- Nishad testified about living in the "Orchid" penthouse, which Bankman-Fried wanted to purchase because he "really liked" it and is a "fan of views." Trial Tr. at 1340:20–1341:8. Nishad felt uncomfortable about living at Orchid "because it was really expensive, [and] in part because it's just super ostentatious." *Id.* Nishad expressed these concerns directly to Bankman-Fried. Bankman-Fried responded that "he would pay $100 million for the drama to just be done with and go away, which [Nishad] took as a pretty clear sign that [he] should shut up and we should move forward with this." *Id.* Text messages between Nishad and his mother from mid-2022 reveal how uncomfortable he was living at Orchid, so much so that he asked his family to stay elsewhere during their visit out of sheer embarrassment. *See* Ex. A at 43 (images of texts from Nishad to his mother: "I think living here is wearing on me too; I find justifying the home to myself very effortful and draining. Was just talking with Claire now about maybe moving out"; ***"I know it's not on me but it feels so incongruent with my values"; "Walking into here is so uncomfortable"*** (emphasis added)).

- Nishad testified about FTX's investment in K5, an entity that Bankman-Fried wanted to use to boost his social standing with politicians and celebrities, including figures like Hillary Clinton and the pop star Katy Perry. Nishad was "shocked" when he saw the term sheet contemplating bonuses over $100 million and an investment of up to $1 billion. Trial Tr. at 1328:11–16. He interrogated Bankman-Fried about the deal, asking if there was a way to reconsider but was told it was "basically done." *Id.* at 1329:5–11. Nishad warned that an investment into K5 would be "really toxic" to the culture of a company Nishad had joined explicitly because of its stated charitable mission. *Id.* at 1329:22–1330:7. Bankman-Fried went ahead anyway.

- Nishad testified about a $1 billion investment that Alameda had made into Genesis Digital Assets, a cryptocurrency mining company in Kazakhstan. Trial Tr. at 1315:8–1318:12. After learning about the investment, Nishad urged Bankman-Fried to either get out of the deal or to sell the stake back to the company. Sam did not take meaningful steps to do so.

Around the time FTX employees relocated to the Bahamas, Nishad recognized a distinct shift in the company's culture. It had devolved from an idealistic and altruistically oriented startup to a chaotic, sprawling, and greedy organization. Claire's mother, Pam Watanabe, visited Claire and Nishad around this time. She describes that Nishad "talked earnestly about how embarrassed and alone he felt over the amount and kind of spending at the company." Ex. A at 80 (P. Watanabe). Pam summarizes her impressions from that visit: "He seemed overwhelmed by the enormity of the job, but still felt resolute about the good he believed they could achieve . . . I was torn between feeling proud of him and worried for him. It was clear he was exhausted and lonely." *Id.*

The rampant growth of the company, and Bankman-Fried's tendency to approve business ideas he found promising without regard to engineering resources, left Nishad in an extremely difficult place. Nishad would often be charged with the engineering work associated with the new investment or partnership of the day. As Claire (who ultimately worked at FTX as well) describes, Nishad could either try to "challenge" and "reverse[]" the arrangement, or could do the engineering work "so the money wouldn't be wasted," and "[h]e often tried both." Ex. A at 38 (C. Watanabe). Simultaneously, Nishad had to manage and attend to the morale of his team, interpreting vague dictates from a jet-setting and rarely present Bankman-Fried, or seeking advice from an increasingly hard-to-reach Wang, all while working through the middle of the night to solve problems. *Id.* at 37. Nishad's coworkers noticed that this all came at the "apparent detriment of his own health." Ex. A at 17–18 (A. Kalinich).

In the midst of this, Nishad's mother went to visit him in February 2022. She writes of that visit:

> The moment I saw him, I knew he was doing much worse. He had gained a lot of weight and was exhausted in a way that was not just explained by the long hours . . . We went on a walk just the two of us, and he confided in me that he felt like the company was losing what made it special. People were focused on compensation instead of work, and Sam kept agreeing to more that stretched the team thinner . . . . He said he felt he was constantly fighting battles he

wished he didn't have to.

Ex. A at 43 (A. Singh).

As discussed in more detail below, just months later, Nishad's distress at the company's direction turned into horror when he learned of the devastating reality: that Alameda had effectively stolen billions of dollars in FTX customer funds. Nishad chose to stay at FTX, and he fought even more aggressively to prevent reckless company spending of what he had just learned were customer funds and mitigate Bankman-Fried's worst instincts. But by choosing to stay, he also became complicit in Bankman-Fried's scheme in its final two months, and took actions that harmed customers. This conduct was wrong, and Nishad regrets his participation every day.

### III.    NISHAD'S ROLE IN THE OFFENSE CONDUCT

On February 28, 2023, Nishad pled guilty before the Court to a six-count indictment, taking responsibility for his participation in three different schemes: customer fraud, investor fraud, and campaign finance violations. *See* ECF Nos. 90–91.  We address the factual predicates for each of these below, as well as Nishad's role relative to the other defendants.

### A.    Customer Fraud (Counts One, Two, and Three)

The customer fraud counts focus on Alameda's theft of roughly $8 billion from FTX customers.  Though it had been going on for years, Nishad only learned about the fraud in September of 2022, two months before FTX's collapse.  As the trial evidence made clear, Nishad neither orchestrated nor planned the fraud, nor had he been among its facilitators for the vast majority of its existence.  As the Probation Department notes in the Final Presentence Report, though Bankman-Fried's scheme involved the loss of billions of dollars in customer funds, "much of [it] predated Singh's involvement."  PSR ¶ 42, pg. 40.  In these regards, Nishad is not similarly situated to his co-conspirators, who knew about and took steps to further the fraud over the course of a far longer time period.

#### 1.    Relative Knowledge and Conduct of Cooperators

To the extent that there was an "inner circle" aware of the customer fraud scheme, Nishad was not part of it until near the end.  By contrast, Gary Wang and Caroline Ellison knew in 2019 that Bankman-Fried was lying to customers and stealing their funds.  Ellison testified that even before she became CEO of Alameda, when she was still a trader, she learned directly from Bankman-Fried that Alameda was taking FTX customer funds.  Trial Tr. at 653:12–21.  After becoming CEO of Alameda, she agreed with Bankman-Fried to use FTX customer funds as a source of capital for various investments and expenditures.  *Id.* at 654:2–6, 644:13–18 ("Alameda took several billion dollars of money from FTX customers and used it for our own investments and to repay debts that we had.").  In June of 2022, when the cryptocurrency market crashed and Alameda's lenders called their loans, Ellison – at Bankman-Fried's direction – repaid Alameda's lenders using billions of dollars in FTX customer assets.  *Id.* at 808:17–21.  Nishad was not a part

of that decision and did not learn until later that customer funds were being used to shore up Alameda's finances.

Wang similarly testified to knowing that Alameda was misappropriating customer funds early in the scheme. In particular, Wang testified that he learned in late 2019 or early 2020 that Alameda had a negative balance of "around $200 million" at a time when FTX had trading revenue of "around $150 million." Trial Tr. at 376:14–21, 377:13–19. From this, Wang recognized "that Alameda was taking customers' money." *Id.* at 377:2–4. He discussed the matter with Bankman-Fried, who continued permitting Alameda to withdraw customer funds. *Id.* at 377:20–25. Wang then engaged in additional conduct over the course of months and years that furthered the customer fraud scheme. *Id.* at 367:20–24, 373:9–14, 374:10–17 (changing functionality of the "allow negative" flag to prevent Alameda from being liquidated, at Bankman-Fried's direction).

### 2.    2019: Allow-Negative and Alameda's Banking Setup

Alameda was able to access FTX customer funds in two ways: (1) by making use of customer fiat withdrawals into Alameda bank accounts; and (2) by withdrawing crypto in a "negative" amount – effectively making use of customer funds – via an "allow negative" functionality in the FTX code. Although Nishad implemented the initial version of the "allow negative" functionality in July 2019 at Wang and Bankman-Fried's direction, at the time, the functionality was not intended (at least insofar as Nishad, and even Wang at first, understood) to be used in an improper matter. As both Nishad and Wang testified, the original purpose of the allow negative function was to facilitate the transfer of locked forms of FTT from several accounts, including Alameda's.[10] Trial Tr. at 352:22–25, 353:8–12, 1365:19–23. The feature would go on to be used by other developers, too, for legitimate purposes. Nishad and other engineers knew that

---

[10] The "allow negative" code change was made the day after the FTT token was launched and was executed in a manner transparent to other developers. The feature updated a page that all FTX staff could access, allowing them to transfer different types of FTT tokens from specific accounts, including some belonging to Alameda. This page also specified which accounts to use for various FTT transactions. "Allow negative" was also used to facilitate on-chain token staking with designated customer funds (*i.e.* interest payments paid for cryptocurrency that is subject to a lockup period where no trading is permitted), and converting cryptocurrency into fiat currency (also known as "fiat settlement"). As with locked FTT transfers, Alameda's account was used to facilitate these types of transactions, which required it to go negative for temporary periods and by relatively incidental amounts.

Alameda had access to accounts with the allow-negative function; what was secret and unknown to them at the time was that Bankman-Fried, as the de facto head of both Alameda and FTX, was abusing the function to steal funds.

With respect to fiat, it was widely known within the companies – including by Nishad – that FTX customer fiat deposits were, for some time, made directly into Alameda bank accounts. *See, e.g.*, Trial Tr. at 1356:14–19. Alameda was supposed to track this fiat using "an accounting-orientated account" on FTX's database referred to as "fiat@FTX.com." *Id.* at 1351:17–19. As Ellison explained, "if a customer deposited money into an Alameda bank account, then there would be a negative ledger entry created in this account to offset the money that Alameda was receiving," and in the event of a customer withdrawal, there should have been a positive ledger entry created. *Id.* at 655:15–656:4. As early as December 2019, based on conversations that he overheard, Nishad believed that the fiat@ account was being tracked by Alameda employees in order for Alameda to verify the amount of customer funds it was required to have in bank accounts. *Id.* at 1354:17–1355:11. In either November or December 2021, after an accounting error was discovered for the first time (referred to as the "bug" during trial), Nishad specifically asked Ellison whether Alameda was tracking the fiat@ account, and she confirmed that it was. *Id.* at 1517:17–19, 1520:4–9.

In other words, for most of FTX's existence, although he was aware of the "allow negative" functionality and of the custodying of FTX customer funds with Alameda, Nishad did not know that Alameda was using these structures to misappropriate customer funds, and played no role in the customer fraud scheme. Nor did he need to know this information to carry out his principal role at FTX – managing other members of FTX's engineering team. Even as Nishad pushed back against Bankman-Fried's excesses over the years and worried that some of it "wreaked [sic] of excess and flashiness," Trial Tr. at 1313:1–7, he did not know until the fall of 2022 that the reality was far worse: not only was Bankman-Fried extremely cavalier with the company's finances, he was using customer assets to do so.

### 3.    *June 2022: Nishad Learns of the Abuse of "Allow Negative"*

In June 2022, Nishad participated in an effort to determine the amount of money that Alameda had on FTX.  Trial Tr. at 1346:8–1347:18.  Nishad was looped into this project by Ellison, not because of his accounting expertise or familiarity with Alameda's finances, but because the project required reviewing FTX's database, and he "had comfort in those technical systems."  *Id.* at 1347:9–18.  As the Government elicited from Nishad at trial, he had no "involvement . . . [in] looking at Alameda's balances prior to June 2022, and while the project did not "fit into [his] overall responsibilities at FTX," Nishad "didn't have any hesitation about jumping on things that needed help."  *Id.* at 1347:2–11.  Once he was looped in, Nishad asked Wang "how [he] could help" because he "wasn't sure what the areas of uncertainty might be" for this project.  *Id.* at 1348:9–11.  Wang instructed Nishad to identify any account on FTX that belonged to Alameda or Bankman-Fried, and so Nishad attempted to do so.  *Id.* at 1348:11–15.  "Gary thought it was not a great attempt, so he took his own stab at it" and Nishad "deleted [his] page" and "went with Gary's."  *Id.* at 1348:15–17.

The resulting page Wang created showed Nishad that Alameda had used the "allow negative" flag to incur a negative $2.7 billion balance in its main account—which "seriously concerned" him because it "seemed like a real abuse of a feature that until this point [he] believed was serving FTX, not hurting it." Trial Tr. 1366:11–16.  Prior to this point, as noted above, Nishad believed that Alameda's use of "allow negative" was in service of legitimate, non-controversial purposes, such as converting cryptocurrency into fiat currency.  These uses would have resulted in accounts going "negative for incidental reasons and in small amounts and then . . . would be topped off shortly after," but as Nishad testified, $2.7 billion was "not a small amount" and did "not strike" him "as incidental."  *Id.* at 1367:12–17.

Despite being troubled, Nishad was unaware of what the $2.7 billion figure represented, and it appeared to be exceeded by positive balances in different Alameda subaccounts.  Trial Tr. at 1404:6–8.  As Nishad testified, Wang's page reflected that "Alameda had positive balances on FTX, that it was borrowing lots in some places but that overall they had more money than they

didn't." *Id.*  Nishad took further comfort that the negative $2.7 billion figure in Alameda's main account would have been "a front-and-center number in all of Alameda's trading systems.  It's the sort of thing from [Nishad's] time at Alameda [he] couldn't imagine being missed or ignored by anyone there." *Id* at 1367:21–24.  In addition, far from expressing concern, when the result of the exercise was the discovery of a bug that had erroneously overstated Alameda's liability as $19 billion instead of the correct $11 billion figure, Nishad recalls "sensing from [the] others a palpable sense of relief and even celebration." *Id.* at 1530:7–8.  The majority of the liability consisted of FTX customer *fiat* that was supposed to be housed in Alameda bank accounts, and nothing about the exercise suggested to Nishad that those funds were not in the bank accounts.  Ellison had even confirmed months earlier that Alameda was tracking this fiat liability. *Id.* at 1517:17–19, 1520:4–9.  When Nishad was asked during trial "whether or not Alameda had $11 billion in its bank account" at this point in time, he stated, "I believed it did, but I didn't know either way." *Id.* at 1359:25–1360:2.

Nor did Nishad appreciate at the time that among the purposes of this project was to assess Alameda's ability to pay back margin calls, and Nishad played no role in the decision in June 2022 to use billions of dollars in customer funds to make payments to Alameda's lenders.

4.    *September 2022: Discovers Use of Customer Funds and the Hole*

A little less than three months later, Nishad learned the truth about Alameda's financial condition and the theft of customer funds.  Specifically, on September 7, 2022, Bankman-Fried authored and circulated a document titled, "*We came, we saw, we researched,*" in which Bankman-Fried proposed shutting down Alameda because of high public relations costs due to constant questions about the proximity between Alameda and FTX.  Trial Tr. at 870.  Nishad proposed that rather than shut down Alameda entirely, Bankman-Fried could consider "Alameda shutting off or stopping its FTX trading," listing in a Signal chat all of the necessary steps that he could think of that it would require, which included Alameda closing out its accounts on FTX. *Id.* at 870:2–4.  In the chat, Ellison interjected: "That's impossible." *Id.* at 1403:10–11.  This startled Nishad, so he asked Ellison "[w]hich part of" his proposal was impossible.  Ellison responded, "the part about

closing out accounts." *Id.* at 1403:12–16.

"At this point Gary said Alameda is borrowing 13 billion from FTX." Trial Tr. at 1403:22–23. Nishad was "afraid" of what he heard and "was really hoping that [he] misunderstood," and "called for a meeting immediately" with Bankman-Fried, Wang, and Ellison. *Id.* at 1403:24–1404:4. Bankman-Fried "seemed unsurprised and made up what [Nishad] understood to be a false excuse for dodging [the] meeting," but the others attended. *Id.* at 1404:22–23, 1405:1–2. After talking to Wang and Ellison, Nishad began to understand for the first time that Alameda had made active use of billions of dollars in FTX customer funds and that it was not in a position to be able to repay it. *Id.* at 1405:5–8 ("Before the meeting I was really hoping that I misunderstood what had been said . . . After the meeting I was significantly less hopeful").

Nishad was stunned. He demanded a one-on-one conversation with Bankman-Fried the same evening. Trial Tr. 1405:9–12. Such a request was uncharacteristic of Nishad. As he testified, he and Bankman-Fried "almost never met [alone]; very, very rarely," *id.* at 1405:15, but that night, their conversation lasted over an hour, *id.* at 1406:8–10. Nishad testified in detail about this "balcony meeting" at the Orchid complex, and it featured significantly in the Government's presentation of evidence and closing arguments, complete with photographs of the location on the balcony where the meeting took place.

Nishad opened the conversation by telling Bankman-Fried: "Caroline's really freaked out about the NAV [net asset value] situation and so am I." Trial Tr. at 1406:13–16 (explaining this was a "crude way of referring to the hole"). Bankman-Fried deflected at first: "I'm not sure what there is to worry about. NAV is fantastic by almost any measure. It was super positive even if you don't include FTX and FTX.US equity." *Id.* at 1406:21–1407:1. Nishad persisted, asking directly: "Well, what about what Caroline said today and Gary said today, that there's 13 billion borrowed and we can't pay it at all?" *Id.* at 1407:5–7. Bankman-Fried finally engaged: "Right, that. We are a little short on deliverable." *Id.* at 1407:7–8. After Nishad learned more detail about what had been happening with customer funds, at one point, he said to Bankman-Fried, "Jesus F'ing Christ.*"* *Id.* at 1407:20–21. Bankman-Fried responded, "Yeah, this has been taxing me

some 5 to 10 percent of my productivity." *Id.* at 1407:21–22.  Nishad countered, "I think this is going to be doing a lot more damage to me, hitting me a lot harder." *Id.* at 1407:24–25.  Bankman-Fried's immediate instinct was regret that he shared this information with Nishad: "Yeah, I was worried about this.  In hindsight, it might have been a mistake for me to circulate that document this morning.  People are [] going to freak out." *Id.* at 1407:25–1408:3.

Nishad was one of them.  After his confrontation with Bankman-Fried, Nishad "was blindsided and horrified."  Trial Tr. at 1409:5–6.  He testified:

> I felt really betrayed, that five years of blood, sweat, and tears from me and so many employees, driving towards something that I thought was a beautiful force for good, had turned out to be so evil. I knew that customers were betrayed.  So many customers had . . . put their trust in us.
>
> And, you know, according to Sam's take, chances to rebuild this hole depended enormously on me continuing to try to make the company successful, and I knew that would require me betraying customers and employees.

*Id.* at 1409:6–11.

### 5.    *Post-September 2022: Nishad's Conduct After Learning of the Hole*

Nishad considered quitting "every day" after learning about the customer fraud scheme, but did not do so because he thought his departure would cause other employees to quit and hasten the collapse that ultimately occurred anyway.  *See* Trial Tr. at 1409:15–20.  When Nishad was asked during trial why he stayed, he explained: "How could I live with myself if my departure precipitated a fall that might have been [] avoidable." *Id.* at 1409:17–20.  It was a panicked, self-delusional, and ultimately criminal error in judgement. And a few weeks later, when Nishad asked for updates on the ability to repay customers, he recalls Bankman-Fried reiterating: "The main line plan remains, making FTX successful and growing it, and that depends on a huge part in you. You're one of the few people, Nishad, that can take that kind of work off my plate so I can focus on the rest of this." *Id.* at 1412:2–10.

Nishad knew that staying at FTX meant hiding the existence of the hole from customers,

and that he would be taking otherwise routine steps that, in these circumstances, would perpetuate the fraud. For example, Nishad continued to approve transactions in his "role as a member of the leadership team" as well as other spending (including campaign contributions, discussed below) in the weeks that followed, including at least one multi-million dollar acquisition spearheaded by Bankman-Fried that required Nishad to sign documents to carry out the transaction. Plea Hr'g Tr. at 29:2–11.[11]

Most regrettably, in October 2022, Nishad closed on the purchase of a vacation home in the State of Washington for $3.7 million that was intended to be used by him and his childhood friends. Trial Tr. at 1604:6–18. He did so by using his personal FTX account to withdraw dollars against his personal token holdings. *Id.* at 1604:19–21. Though this was the type of withdrawal that typical customers could make, Nishad did so at a time when he was aware of the hole (although before the run on the exchange that led to the collapse). While it was plainly wrong to do so, two things bear noting: first, this was the first and only significant personal expense that Nishad made during his entire tenure at Alameda and FTX. Second, Nishad's friend group had been pursuing a home purchase for almost an entire year, well pre-dating Nishad's knowledge of the hole. Much earlier in 2022, the group had entered into a contract on a different home, but the seller backed out that August. Ex. A at 141 (C. Smith), 137 (P. Korolog). They then entered into a contract and sent an initial deposit on the house on September 6, 2022, Ex. A at 141 (C. Smith), which was the literal day before Nishad learned about the theft of customer funds in September 2022. Nishad proceeded to close on the house in October after learning about the hole. He should have tried to back out of his contract to purchase the home but did not. As he told the jury during trial, he is "embarrassed and ashamed" that he did not, has accepted criminal responsibility, and readily forfeited the house. Trial Tr. at 1619:21–25. Once FTX's collapse began with the leak of

---

[11] This was the Embed acquisition by FTX US. Nishad had opposed the transaction but after Bankman-Fried insisted on proceeding with it, in October 2022 Nishad signed loan documentation related to the final $50 million of the $250 million acquisition. This expenditure was accomplished via on-paper "loans" from Alameda to Bankman-Fried, Wang, and Nishad, who – again, on paper – used those funds to acquire shares in FTX U.S., which then used the proceeds to acquire Embed. This transaction mirrored prior FTX U.S. acquisitions, structured by FTX attorneys, that Nishad had ostensibly participated in *before* knowing about the hole.

Alameda's balance sheet to the public on November 2, Nishad did not touch any money in his personal FTX account or the bank accounts funded by his personal FTX account, which accounted for nearly all his funds, and he is forfeiting or providing to the bankruptcy estate all of his assets tied to FTX.

Even as Nishad made these plainly wrong decisions, he – perhaps naively – spent far more of his time and attention focused on filling "the hole" in customer funds or preventing making it deeper. Indeed, it was the principal reason he stayed in the first place. He told himself that he would leave if the situation did not improve, and, despite his complicity, took concrete steps to convince Bankman-Fried to cut expenditures so that Alameda would stop digging itself and FTX deeper. The government elicited testimony about these efforts during Nishad's direct examination:

- The moment Nishad learned about the customer fraud scheme while on the balcony of the Orchid penthouse, he asked "if now, Sam would take seriously cutting expenses or—and curbing them going forward. This included cutting "various endorsement deals" of athletes, celebrities, and others. Trial Tr. at 1418:8. "[Bankman-Fried] said yes, definitely, he's working . . . on that with Ramnik." *Id.* at 1408:23–1409:3.

- Nishad "spoke to [Bankman-Fried] about reversing the Embed acquisition," a "company that FTX.US acquired at Brett Harrison's behest to list FTX.US stocks." Trial Tr. at 1414:5–9, 1414:19-21. Nishad asked Bankman-Fried and FTX lawyers if it was possible to back out of this transaction, although Bankman-Fried and FTX ultimately did not do so.

- In September of 2022, after many prior attempts, Nishad convinced Bankman-Fried to cancel the plans for a new FTX office in order to save money. "[I]t was going to be [the shape of] a big F—that cost—at first I heard 50 million, eventually 250 million." Trial Tr. at 1414:8–13; Ex. A at 7 (A. Yedida). Once Bankman-Fried agreed, Nishad confirmed with operational staff that there would be no outgoing payments. Afterward, he successfully pushed for consolidation of all FTX US offices (which were in Chicago, San Francisco, Miami, and New York) to a location in Miami, that would have led to substantial cost reductions.

- In October of 2022, Nishad objected to Bankman-Fried's deal with Telegram. Trial Tr. at 1415:25–1416:6. Bankman-Fried described the deal as exchanging FTX services (*i.e.*, building a payment-processing product) for Telegram's cryptocurrency (*i.e.*, TON). *Id.* at 1416:7-14. But another FTX employee then clarified that FTX would "also pay $120 million for" the TON. *Id.* This made Nishad "extremely nervous," because "[i]f either FTX or Alameda was spending liquid funds to acquire more illiquid stuff that was not for customers, that was

necessarily spending customer funds, not for customer benefit." *Id.* at 1416:15–1417:2. While Nishad did not explain his worry about deepening the customer hole further, because "[n]ot everyone knew about it" in this particular conversation, he did "raise[] a number of other objections, as did Caroline." *Id.* at 1417:3–. Bankman-Fried told the entire group: "We're going ahead with this, Ramnik and I are. You guys shouldn't feel responsible for it. That's not why I shared it. Unless you have any serious new objections, we're going ahead." *Id.*

- Nishad "spoke to [Bankman-Fried] about reversing the AZA acquisition," a "payments company," because Nishad believed it was "still a reversible transaction." Trial Tr. at 1414:8–10, 15–18. Although not elicited at trial, Nishad successfully convinced Bankman-Fried to unwind the deal, which was valued at around $250 million.

- There also were several additional examples, not elicited at trial, when Nishad tried to convince Bankman-Fried to cut expenditures after learning about the hole:

  ○ *Product Costs*. Nishad tried to convince Bankman-Fried to shut down the FTX Earn program, which was costing the companies over $150 million. It also incentivized further user deposits, making it even more problematic from Nishad's perspective. When he failed to convince Bankman-Fried to end the program, Nishad instead negotiated and singlehandedly implemented changes to reduce to reduce the program's cost, and worked with lawyers and coded a much lower-cost replacement dubbed FTX Rewards, but FTX collapsed before it was taken live.

  ○ *Eliminating Cash Bonuses*. Nishad tried to convince Bankman-Fried to halt any cash bonuses for employees, which would have saved nearly $80 million that year. Bankman-Fried rejected Nishad's idea.

  ○ *Bloomberg Transaction*. Bankman-Fried agreed to make a $20 million donation in connection with currying favor with Michael Bloomberg, and Nishad unsuccessfully tried to convince Bankman-Fried to not go through with the payment.

Ultimately, over just a two-month period, Nishad successfully convinced Bankman-Fried to "cut[] maybe a couple hundred million dollars of spend." Trial Tr. at 1413:20–1414:4. However, after reviewing a spreadsheet previously unknown to him that "described outlays of future spend on endorsement deals," Nishad became "really upset." *Id.* at 1415:3–12. "There were way more [endorsement deals] than [Nishad] knew about," and "[m]any of the numbers [were] much bigger than what [he had] been told" previously. *Id.* So Nishad confronted Bankman-Fried directly about them, stating: "You know, this is crazy. We need to cut as much of this as we can. I thought you

were on this." *Id.* Bankman-Fried responded these were not "bad" expenditures and then "challenged" Nishad "to point to one that was worth cutting," which Nishad did. *Id.* at 1414:13–21. The spreadsheet and interaction revealed "much more" that Nishad felt "was either cuttable or [should] at least [be] strongly curtailed" and "that Sam simply wasn't cutting." *Id.*

In addition to cutting expenditures after learning about the fraud scheme in September 2022, Nishad took tangible steps to protect customers and shield funds where he could:

- *Protecting FTX Japan Customers.* FTX Japan custodied its customer assets in a particular kind of "cold wallet" that Bankman-Fried and Wang could not access. Bankman-Fried and Wang told the COO of FTX Japan to switch over to a different system that would give them access to those funds. After Nishad learned about the hole in customer funds, he called the COO and convinced him not to switch over to the system, precisely because he knew Bankman-Fried and Wang could improperly use the funds. In the final days of FTX, this meant that FTX Japan's customer funds could not be used improperly to repay the debt owed to non-Japan FTX users. Only four months after the collapse of FTX, FTX Japan was able to re-open withdrawals for its customers.[12]

- *Refusing to Build Certain Products.* Nishad also refused, or hindered, building new features and products at FTX that would have encouraged new users to deposit their funds on FTX, which Nishad felt like he was being asked to do so that FTX could use those new funds to satisfy the debt it incurred after taking existing customer funds. For instance, Nishad did not build a system that would have allowed users of other platforms to easily transition their assets to FTX; he slow-rolled a new program that would have encouraged users to "stake," or give FTX, even more of their cryptocurrency; and just days before the collapse, he reversed a code change directed by Bankman-Fried that would have treated user collateral in a more favorable way to users, when Nishad realized it might be intended to incentivize additional customer deposits.

In other words, upon learning of the fraud in September, Nishad did not stay at FTX out of self-interest or to try to save Bankman-Fried, Ellison, or Wang. Nishad appreciated the wrongfulness of the scheme at the time he learned about it. He understood that by staying, he was complicit in it, and he continued to approve expenses that necessarily dug the hole deeper. For these reasons, to be clear, Nishad's conduct in these final two months was criminal. But the greater context of

---

[12] Darryn Pollock, *FTX Japan Delivers on Promise to Re-Open Withdrawals*, THE DAILYCOIN (Feb. 21, 2023), available at: https://dailycoin.com/ftx-japan-delivers-on-promise-to-re-open-withdrawals.

Nishad's decision to stay while being complicit is relevant.

6.    *November 2022: Nishad and the Collapse of FTX*

Nishad's naivete in thinking that collapse could be prevented was shattered within two months when the run on the exchange began. As events unfolded in November 2022, Nishad first attempted to assist in the efforts to track and locate assets, and advocated – repeatedly and unsuccessfully – to Bankman-Fried and Wang that FTX freeze further customer withdrawals. Trial Tr. at 1465:12–13. But the enormity of what was happening, and Nishad's coming to terms with the fact that he had been complicit in perpetrating *and* hiding it for the past two months, proved too much to bear. Within a couple days, Nishad found himself unable to cope. He was devastated, distraught, and ultimately suicidal.

During those final days, Nishad saw Bankman-Fried and others plan to put out false and misleading statements to try to dissuade customers from withdrawing assets. Nishad refused to go along. On November 6, 2022, a group of employees were "workshopping" false and misleading tweets for Bankman-Fried to make, "discussing whether or not to characterize FTX as solvent or well capitalized." Trial Tr. at 1464:15–23. Nishad made clear he was "not comfortable" with the "really dishonest" tweet ideas. *Id* at 1464:17–18, 1465:12. After acknowledging that he did not "have the power to stop them," Nishad leaned over the couch and told the group that he was "recusing" himself from the discussion—which the group "acknowledged in a kind of annoyed way." *Id.* at 1464:8–22. What proceeded was the now-infamous "FTX is fine; assets are fine" tweet. Two days later, Nishad also asked that Bankman-Fried tell others to refrain from saying anything misleading and urged Bankman-Fried to accept responsibility in a direct Signal chat. *Id.* at 1472:8–21; *see* GX 480C.

Deeply ashamed about his own role in the customer fraud scheme, Nishad spent much of his time apologizing to those of his friends and colleagues who had not known of the hole, though he did not have the words or mental state to do so coherently. Adam Yedidia, a trial witness, describes how "[i]n the final week, as FTX was collapsing, [Nishad] came to my room and apologized, sobbing on the floor, completely inconsolable." In Yedidia's mind, "there is no doubt

whatsoever that Nishad was deeply contrite and felt enormously guilty for what happened."  Ex. A at 7 (A. Yedidia).  Can Sun testified at trial about a scene in the final days: "Nishad was sitting there.  His entire face was pale, grey.  It looked like his soul had been plucked away from him."  Trial Tr. at 1958:10–16.  And in private moments, Nishad's fiancée Claire attempted to "convince him hourly why he shouldn't kill himself," "frantically reach[ing] out to psychiatrists."  Ex. A at 39 (C. Watanabe).  "His teammates, not even fully aware of his mental state, sent [Claire] a constant stream of messages asking how they could help him, and telling me they loved him."  *Id.*  The night of Tuesday, November 8th, "about ten of the people he worked closest with, mostly customer support and engineers, came to him.  They formed a line to give him a hug, one-by-one.  He couldn't stop apologizing to every one of them."  *Id.*  Gabe Bankman-Fried, who has not spoken to Nishad in two years but "think[s] about him most days," shares the following story:

> In November of 2022, I learned as the world did about FTX's crash.  As it was happening, Sam called me, and told me that Nishad needed me, so I flew to Nassau to comfort Nishad.  What I found was a broken man.  He was unable to speak.  Unable to cry.  He was shocked by the weight of what was happening.  For a man that had lived a life of kindness, both to friends and strangers, he never could have imagined he would play a role, however small, in something that hurt people.  I never could have imagined that either.  As we held each other in his room in Nassau, he told me that the only thing keeping him from killing himself was that he couldn't do that to his family and friends.

Ex. A at 143 (G. Bankman-Fried).

On the morning of November 10th, while the efforts to track assets and stave off collapse were still ongoing, Nishad, Claire, and their dog Gopher got on a plane to return to the United States.  Nishad did not remain around for the final couple of days, so he did not participate in Bankman-Fried's efforts, aided by Wang, to transfer assets to the custody of Bahamas regulators.  Instead, Nishad retreated into the care of his family in California.  When he arrived home, his mother writes, "I held him as tightly as I could, rocking him back and forth as he wept . . . He was

riddled with guilt and consumed by shame." Ex. A at 43–44 (A. Singh). His fiancée Claire writes of that time:

> It's hard to convey just how deeply Nishad's soul was broken. His mind could only think of the suffering and pain: of his family, his girlfriend, his team, the public and the tens of thousands of customers who trusted them . . . The cognitive dissonance between who he believed he was and the person staring back at him in the mirror was more than he could handle.
>
> Two days after we arrived in the U.S., Nishad asked me about suicide and forgiveness again. I'm not sure where I found the composure but I responded something along the lines of 'If we truly believe your future holds nothing but sadness and shame, then yes, I'll find a way to forgive you. But we're not certain of that yet so let's wait to confirm before deciding anything.' Nishad listened. I still remember his dark, sunken eyes. After a long moment of silence, he agreed.

Ex. A at 39 (C. Watanabe).

As the Government stated in its closing argument in describing Nishad's mental state upon learning of the fraud: "He was shocked, he was blindsided, and eventually he was suicidal. That is not somebody who didn't think he was doing anything wrong." Trial Tr. at 3126:11–24. For someone who set out on the Alameda and then FTX journey because he believed it to be a force for good – a way for him and others to use earnings generated by both entities to donate to important causes – the realization that not only had it been a force for evil, but that he had participated in it, was nearly too much to bear. Nishad's reaction – the utter and pure guilt that wracked him in the final days and beyond – stands out among his co-defendants, even though they had been living with the truth for much longer. He understood what he had done, and what was so devastating was how his actions had been inconsistent with how he saw himself and what he had spent his whole life standing up for. And he has spent every day since then trying to make things right – including, as described below, by beginning to cooperate within *days* of the collapse.

### B.    Investor Fraud (Count Four)

Nishad pled guilty to one count of securities fraud for defrauding FTX's investors. The

basis for this plea was principally two-fold: first, in the final two months after learning about the hole in customer funds, Nishad "understood [] implicitly that [Bankman-Fried] would not share FTX's full financial condition" with investors from whom the company was attempting to raise money to plug the hole. Plea Hr'g Tr. at 29:22–30:18. Nishad played no affirmative role in those fundraising efforts, but he effectively assented to them.

Second, Nishad participated in an effort to artificially create and then shift earnings from EcoSerum, an entity controlled by Bankman-Fried, to FTX in an effort to make FTX's 2021 revenue exceed $1 billion. As Nishad informed the Government and testified to at trial, on December 30th or 31st, 2021, he was looped into a conversation between Bankman-Fried, Wang, and possibly others, about ways to have FTX's revenue exceed $1 billion, given that it was likely to fall just short. Trial Tr. at 1446:9–12, 1447:14–16. Bankman-Fried decided to retroactively have EcoSerum pay FTX for "staking fees" (or interest payments for tokens that are held by FTX for a set period) for the Serum token, thereby increasing FTX's revenue. *Id.* at 1446:15–1447:13. Although Serum was technically promoted by an entirely separate entity (Eco Serum), that entity too was controlled by Bankman-Fried. *Id.* at 1445:24–1446:1.

To effectuate his plan, Bankman-Fried instructed Nishad "to make it appear as though [Eco Serum] had been getting charged throughout the year," even though it had not been, and, in the FTX code, "to backdate the transactions associated with paying this fee." Trial Tr. at 1447:21–25. Nishad did so at Bankman-Fried's direction. He was not involved in other aspects of the plan, which apparently involved creating a false contract between FTX and Eco Serum to support these backdated transactions. *Id.* at 1455:1–3. But Nishad knew it was wrong to backdate the transactions, did so at Bankman-Fried's direction, and is deeply sorry for his actions.

Importantly, the Government *did not know about this conduct* – including both Bankman-Fried's fraudulent plan and Nishad's role in it – until Nishad affirmatively brought it to the prosecutors' attention during proffer sessions. It was not part of the main investor fraud under investigation, but Nishad nonetheless volunteered this set of facts to the Government as part of his effort to disclose any and all wrongful conduct. He then took responsibility and pleaded guilty to

his role, even though it is not clear that he would or could otherwise have been charged with any crime related to it, and it is unlikely that the Government would have discovered the issue without Nishad bringing it to the Government's attention. In addition, because of Nishad's proffer of information, the Government was able to locate a copy of the doctored contract Bankman-Fried made to support these backdated transactions, and used that contract during trial to corroborate Nishad's testimony and offer further proof against Bankman-Fried. *See* GX 323.

### C. Campaign Finance Violations and Money Laundering (Counts Five and Six)

#### 1. *Nishad's Donations Begin With an Altruistic Focus*

Nishad has always been determined to live a life of giving. He joined Alameda to be able to donate more substantially, and after getting there he donated much of his bonuses to initiatives he cared about such as Proposition 12 (the Prevention of Cruelty to Farm Animals Act) in California. Trial Tr. at 1571:1–6. Around the same time, Nishad watched with admiration as his friend Gabe Bankman-Fried left a lucrative career at Jane Street to work in Washington, DC with a goal of eventually lobbying for legislation about their shared goals: principally, animal welfare and pandemic preparedness.

In 2020, as he began to earn more money, Nishad began to solicit both Gabe's advice and the advice of Barbara Fried – Gabe and Sam's mother and herself the co-founder of a political fundraising organization – about where to donate. Nishad originally donated from his personal Wells Fargo account; that account ultimately did not have high enough withdrawal limits for these larger donations, so a member of FTX's financial operations team opened a Prime Trust bank account (with higher limits) for Nishad. Though recommended by Gabe and Barbara, these early donations were targeted toward organizations that Nishad believed in and were consistent with his values. For most of those early donations, the funding came both from Nishad himself and from funds that Nishad genuinely believed (as his documented repayment attempts demonstrate) he was borrowing from Sam Bankman-Fried. Bankman-Fried would delay fulfilling Nishad's requests to sell Nishad's FTT tokens in order to make donations, telling Nishad that he would prefer to work out the details at a later time (which he would not do) and that in the interim, he would lend Nishad

the money.

In addition, throughout his time at Alameda and then FTX, Nishad was in frequent touch with an established charitable grantmaking foundation about giving, and solicited its advice about where to donate. Nishad sought to donate larger amounts, but his time grew more scarce as his work at FTX became all-consuming. In a communication in 2021 with this grantmaking organization, Nishad wrote:

> It's one of my regrets that I haven't been searching hard enough for giving opportunities in the last few years… I can't provide too much of my own time… I'm happy to do away with any formalities and just make the most of that dynamic. I'm pretty happy to receive advice / don't take offense easily if the advice implies I'm making a mistake in how I give or spend my time / etc. I'd much rather get this right.

Ex. A at 36 (C. Watanabe).

In ensuing conversations, the grantmaking foundation suggested that what would be most useful from its perspective would be funds that they could disburse with little red tape. Nishad enthusiastically agreed, opening and funding a new Prime Trust bank account with several million dollars of his own money, and giving the grantmaking team access and authority to make grants on his behalf. When the grantmaking group wanted to make a disbursement with these funds, they would log into Nishad's bank account and input the wire details, triggering a confirmation email to Nishad. Nishad would then be prompted by text message to click an 'Approve' button on the corresponding email, which Nishad would do. These donations were truly charitable, and Nishad neither sought nor obtained any recognition for them.

## 2. The Offense Conduct

Near the end of 2021, through conversations with Gabe Bankman-Fried, Nishad was persuaded to increase his political donating, while still of the view that these donations would go toward candidates and organizations that aligned with his priorities. After agreeing, Nishad was invited to a Signal channel called "Donations Processing." At that point, including through the Signal channel, a large number of individuals – from Sam Bankman-Fried, to political consultants

working with Gabe, to Ryan Salame, to eventually former CFTC commissioner and then-FTX executive Mark Wetjen, among others – became involved in recommending, selecting and coordinating donations by numerous individuals at FTX, including Nishad.  As 2022 progressed, this effort coincided – not coincidentally – with the 2022 midterm elections, and the resulting donations grew not only more frequent, but more crassly political and for the benefit of Sam Bankman-Fried and the FTX enterprise.

Nishad was typically delayed or forgetful in making recommended donations, and Sam Bankman-Fried suggested that Nishad offload the operational legwork by giving his Prime Trust bank account credentials (which had been set up by the company in the first place) directly to Salame, who Bankman-Fried explained was already doing the same for him.  This was analogous to the setup Nishad had already arranged with the grantmaking foundation, and Nishad readily agreed to give Salame his credentials, especially as the Prime Trust Account was not his regular bank account.  Nishad similarly signed blank checks from his bank account to be used for donations that did not accept wires.  After this point, others – principally Salame – would handle all the donation logistics, including for Nishad's donations, and Nishad's involvement was typically limited, again, to clicking an "Approve" button on an email that would be sent to him to confirm the bank transfer.  Even there, Nishad – distracted by his engineering responsibilities – almost always had to be prompted multiple times to click the button.  *See, e.g.*, GX 475 (Salame messages Nishad, "got about 30 small dollar ones rolling in if you can confirm in your email" and then "bumping" his previous message three hours later).  Nishad almost never engaged in the Donations Processing Signal thread.

In one instance shared at trial, Nishad was confused about why he was being asked to donate to a particular PAC and asked Michael Sadowsky, one of Gabe's associates, what the purpose was. Trial Tr. at 1434:22–1436:21; GX 477. Sadowsky attempted to persuade Nishad that the donation was ultimately for a candidate who was "good on pandemics," a cause he knew Nishad cared about, but also conceded that the group was using Nishad as the "center left face of our spending," which would require Nishad to give to a variety of causes, including "woke" ones.

*Id.*  Nishad was uncomfortable, and said that he needed to think about it, but ultimately made the donation and continued to donate at the behest of the group – not for personal benefit but out a misguided sense that he should be a "team player".

More problematically, Nishad also realized, as 2022 progressed, that Salame – or others on Salame's team – must have been wiring Alameda money into Nishad's Prime Trust account, in order for that money to be used for donations.  Salame was generally responsible for the banking setup of both Alameda and FTX, and as such, had access not only to Nishad's bank account, but also to Alameda's and FTX's.  Some incoming money continued to be Nishad's own – for example, Gabe Bankman-Fried would sometimes directly ask Nishad to make a political donation, and Nishad would transfer money from his personal FTX account to Prime Trust to do it.  On other occasions, however, Salame would transfer Alameda money to Nishad's Prime Trust account to facilitate donations being recommended by the larger group.

Because Nishad had ceded his account credentials, and was paying little attention to the process, he did not realize Alameda funds were being sent into his account for some time.  But when he learned of it, he did not put a stop to it.  At first, Nishad convinced himself to think of the incoming Alameda money as a loan; as noted above, he had been loaned funds in the past when Bankman-Fried told him not to sell FTT, and he could well have afforded to make these donations with his own funds.  But Nishad also knew that if these were loans, they were so in the loosest sense.  He thus came to understand that Alameda was funding donations made in his name, and by the fall of 2022 he knew that money from Alameda was effectively coming from FTX customer funds.  As he stated in his plea allocution, while Nishad did not know whether any campaign finance laws were being violated, he understood that there was something duplicitous and misleading about his role in the process, including allowing his name to be used in this manner, and he chose not to investigate further.

### 3.    Nishad's Conduct, Relative Participation, and Government Assistance

We note all of the above because it provides relevant context for Nishad's role in what was concededly a large campaign finance offense.  That role was wholly unlike the role played by

Bankman-Fried or Salame. Fundamentally, Nishad started giving in sincere and legal ways, but eventually let himself be used as a straw. He began donating because he wanted to make it his life's mission, and he took advice from many in the FTX and Effective Altruism orbits regarding where to donate. As time went on and especially in 2022, that advice was co-opted and diverted to a more plainly political purpose – and one Nishad was increasingly uncomfortable with. But he went along with it, and assented to the use of his bank account so that donations originating from Alameda could be registered as his own. That is exactly what a straw does, and that is why Nishad pleaded guilty. But it is also why he is far from similarly situated to the other implicated individuals. Indeed, it is not uncommon for individuals who play the role of straw to *not* be prosecuted federally, whereas the true source of funds (in this case, fundamentally Bankman-Fried) *is* prosecuted. Nishad pled guilty because he is guilty, felt ashamed by his participation in the offense, and wished to accept full responsibility as part of his cooperation. But it is important – even before his significant cooperation is factored in – to place his role in context.

What perhaps brings the distinction between Nishad and the other defendants into starkest relief is their motives, and the manner by which the others, unlike Nishad, used the scheme to accumulate political influence and reputational gain. Sam Bankman-Fried's goal was to use the donations, including Nishad's, to amass political power for FTX but also for himself. He regularly met with politicians and government officials (including Bill Clinton, Hillary Clinton, Ron Desantis, Kathy Hochul and others) and became a very public darling of certain politicians and political sectors. As Ellison testified, Bankman-Fried was "very interested in politics and talked about wanting to use his money to have influence in politics." Trial Tr. at 650:15–19. Bankman-Fried even alluded to running for President of the United States at some point in the future. *Id.*

For his part, Salame acknowledged to this Court that he "coupled [his] donations with substantial and sustained political activity and engagement." ECF No. 433 at 11. Salame's donations similarly allowed him to meet with powerful politicians in Congress, including former leaders of both chambers, former Congressman Kevin McCarthy and Senator Mitch McConnell. *Id.* at 10–11. And still to this day, Salame boasts on his online social media profile that he was

43

formerly a "US Republican Mega-donor."[13]

Unlike Bankman-Fried or Salame, Nishad had no interest – whatsoever – in developing a political profile or exploiting his donations for personal influence or gain. With the exception of one local politician who was a friend of Nishad's girlfriend before his involvement in politics, Nishad never *once* met or communicated with the recipients of his donations or any other political figures. He affirmatively did not want to be affiliated with or publicly noted for his giving or political activism. As noted above, he actively sought to stay off of any Forbes' lists. And consistent with his general discomfort, he expressed outward disdain for Bankman-Fried's efforts to spend time and money on meeting with high-profile political figures. And he is ashamed that what he wanted to be his life's mission – donating for *good* – ended in precisely the opposite fashion.

Nishad's relative culpability, in itself, is highly relevant to determining the appropriate measure of punishment – but of course it must also be coupled with his significant cooperation in the Government's campaign finance investigation. Without Nishad's cooperation, the Government may not have been able to charge Bankman-Fried, or to charge and convict Salame, for their respective roles. Nishad proffered on multiple occasions about the donations scheme, testified about it at Bankman-Fried's trial, and stood ready to testify at any trial of Ryan Salame had he not pleaded guilty. And beyond his information and testimony, Nishad provided critical documents, including email communications, financial records, and – perhaps most importantly – the Donations Processing Signal chat (GX 475) showing how the scheme operated in real time. Nishad preserved this chat immediately upon leaving the Bahamas, and then turned it over to prosecutors. This evidence allowed the Government to bolster significantly its investigation into both Bankman-Fried and Salame – an investigation into conduct that may not have fully come to light without Nishad's cooperation.

---

[13] Ryan Salame (@rsalame7926), X (F/K/A TWITTER), https://x.com/rsalame7926.

## IV.    NISHAD'S REMORSE AND COOPERATION

Nishad "feel[s] overwhelmed and [his] gut clenches when [he tries] to think about the enormity of the harm [he] caused and [took] part in." Ex. B at 2. For that, he is "so incredibly sorry." *Id.* As he told the Court when he pleaded guilty, his hope then was "that in accepting responsibility, assisting the government, and forfeiting assets, [he could] begin to make it right." Plea Hr'g Tr. at 34:24–35:1. As Peter Buckley, who was in the Bahamas during FTX's collapse, explains, "the person who took the situation the hardest was, by far, Nishad. He was deeply devastated, and clearly not because he had lost personal wealth or the fact that he might be in legal trouble. He felt terrible that all of the effort he had put into building a company that was meant to improve the world would instead cause pain, disappointment, and devastation." Ex. A at 145 (P. Buckley). Another former FTX employee, Willie Kaufman, writes that during the collapse Nishad "expressed [] deep remorse and concern over the harm his actions had caused without a thought for himself." Ex. A at 12–13 (W. Kaufman). During the Presentence Investigation process, Nishad explained his feelings of remorse and regret to the Probation Department:

> [I] obviously failed in character and action, I am sickened by what I did and heartbroken by the pain I caused. . . . I tried to stay and fix things when I learned of the criminal scheme . . . [Comparing himself to a frog in a boiling pot] I was in that pot, but I was turning up the temperature, I now know not to turn up the temperature, even one degree. If I was watching the news about someone else who did what I did, I would loathe them, the scale is so enormous, I will never get over this, but I don't think I should because I can only make a dent in fixing the harm I caused, I did too little and was too late to help.

PSR ¶ 49.

Consistent with Nishad's understanding in the final days of FTX that he had participated in something deeply wrong, he was the first of the charged defendants to step away as the collapse unfolded. As noted above, in the days before he left the Bahamas, Nishad explicitly started to remove himself from various situations, including from discussions regarding convincing customers to keep their assets on the platform. *See, e.g.*, Trial Tr. at 1415:3–12. He then left the

Bahamas before Bankman-Fried or Wang, and before Ellison left Hong Kong, flying to the Bay Area on November 10, 2022, where he has lived since. As Nishad left the Bahamas, he started to preserve evidence that he thought might be relevant to an investigation into FTX's collapse. This included taking screenshots of Signal messages before they were automatically deleted pursuant to company policy. These screenshots presented a unique picture into FTX's daily affairs, even before a collapse became inevitable, and were thus crucial pieces of evidence introduced at trial.[14] No other witness or co-conspirator preserved as much documentary evidence introduced at trial as Nishad, and he did so very early on, because he wanted to do what he could to start to make things right.

Consistent with his remorse and the steps he had already taken to preserve evidence, Nishad immediately began a dialogue with the Government regarding his desire to assist. He had no hesitation in cooperating, and within days of arriving back to the Bay Area, Nishad flew to New York and had his initial meeting with the Government on November 21, 2022.[15]

As we anticipate will be described in the Government's submission, Nishad's cooperation has been timely, extensive, and significant. Prior to trial, he made seven cross-country trips to New York (paid for by family or Nishad's salary from his new job, as Nishad has preserved all of his FTX-related assets for forfeiture) and had over 25 days of meetings with the Government and regulatory agencies. In addition, Nishad had multiple virtual meetings, including "coding" sessions in which he created primers for the CFTC's software engineers explaining how FTX's

---

[14] This included the "Donations Processing" Signal chat showing how political donations were facilitated, GX 475, the Signal chat between Nishad and Bankman-Fried discussing *inter alia* who was responsible for the customer fraud scheme, GX 480C, the Signal chat between Nishad and Michael Sadowsky in which Nishad expressed hesitation about making a particular donation, GX 477, and finally, messages between Bankman-Fried and Ellison in the final days revealing that the fraud scheme weighed heavily on her, GX 480D. Although Nishad was not in the chat between Bankman-Fried and Ellison, he was able to preserve them because Bankman-Fried sent Nishad a screenshot of the conversation between Bankman-Fried and Ellison, and then Nishad subsequently took a screenshot of his entire conversation with Bankman-Fried – which included the screenshot between Bankman-Fried and Ellison. In the relevant message, Ellison wrote to Bankman-Fried, "I think I just had an increasing dread of this day that was weighing on me for a long time, and now that it's actually happening, it just feels great to get it over with one way or another." Trial Tr. at 914:8–11.

[15] By contrast, Ellison began cooperating in December following the search of her family home and the seizure of her electronic devices and personal journal. Trial Tr. at 926:25–927:11.

code and database worked. Finally, as noted above, Nishad produced key internal messages shedding light on FTX's affairs that the Government relied upon during trial.

As this Court knows, Nishad was the final cooperator to testify at trial. Over two days, he provided helpful, and emotional, trial testimony – including explaining the instances where he sought to curb Bankman-Fried's excessive spending at FTX even in the face of public humiliation by Bankman-Fried, the tense moments when he confronted Bankman-Fried about the hole and the visible anger displayed by Bankman-Fried in response, and his shame and suicidality as he reckoned with the tremendous harm he caused to countless people through his own complicity – all before this Court, the jury, and the public.

Given the weight of Nishad's direct examination, he unsurprisingly faced one of the toughest cross-examinations. Unlike the strategy taken for the other co-conspirators, Bankman-Fried's counsel attempted to paint Nishad as a forgetful witness willing to say anything to please the Government. But painting Nishad as forgetful and willing to please did not work because Nishad's testimony was credible and corroborated by other evidence. The Government relied on Nishad's truthfulness and his candid and damaging testimony in both its main summation and in its rebuttal. Trial Tr. at 2918:5–6 ("Because to believe the defendant's story . . . [y]ou would have to ignore the testimony of . . . Nishad Singh . . ."); 2962:3–5 ("Remember it was the defendant who really wanted to invest in K5. Nishad Singh told you about how he told the defendant it was an awful idea . . ."); 3124:3 (". . . if you believe Nishad, the defendant is guilty.").

In addition to his substantial cooperation, Nishad preserved all of his assets for forfeiture in this matter, including shares of an artificial intelligence company obtained in 2021 that have since increased in value by millions of dollars, as well as the home he purchased in Washington state. The vast majority of whatever funds Nishad has left will be provided to the Government or to the debtors' estate in the FTX bankruptcy, including the full value of his own accounts on FTX worth tens of millions of dollars, even though nearly all of those funds were received before

Nishad's knowledge of and participation in the fraud.[16]  Nishad will be left with virtually nothing after forfeiture and civil settlements.

Nishad's cooperation also extended well beyond this case, as he assisted a variety of agencies and representatives over the past two years, and continues to do so.  First, Nishad sat for virtual interviews with the SEC regarding separate inquiries (nor directly related to FTX's downfall) on three separate occasions, and produced documents in his possession relevant to those inquiries.  Second, just this month, Nishad sat for a virtual interview with the CFTC to assist them with a separate, nonpublic investigation.  Third, Nishad has cooperated with three investigations being conducted at the state level, including sitting for interviews with two state investigatory authorities to assist in their own investigations,[17] and producing documents in connection with a third state investigation.  Fourth, Nishad has reached a settlement with the civil multi-district litigation plaintiffs that asserted various causes of action against the co-conspirators for their respective roles in FTX's downfall, agreeing to cooperate with the plaintiffs in their ongoing litigations. Ex. A at 59 (D. Boies).  As part of his assistance, Nishad has already sat for an interview and submitted a declaration in support of the MDL plaintiffs' amended complaint, and will sit for additional interviews upon request.  *See id.*; Declaration of Nishad Singh in Support of Amended Complaint, *In re FTX Cryptocurrency Exch. Collapse MDL Litig.*, Case No. 1:23-md-03076 (S.D. Fla. Feb. 17, 2024), ECF No. 493-1 at 210.  Fifth, Nishad has engaged with the FTX debtors in the bankruptcy proceeding and offered any assistance he can provide, and, as of this filing, has agreed

---

[16] In April 2021, before Nishad knew about the fraud and before his involvement in any of the charged conspiracies, he sought to sell $10 million of his FTT holdings to pay for various expenses of, and provide assistance to, a number of family members and friends, including expenses that arose out of a family emergency.  Bankman-Fried directed Nishad not to sell any FTT and instead provided Nishad with $10 million as a loan, which Nishad then provided to family members and friends.  He also used some of the money to pay taxes and make a large donation to a charitable organization.  Nishad documented the fact that he owed this money back and continued to follow up with Bankman-Fried about it.  In the wake of the FTX bankruptcy, counsel for Nishad and counsel for the bankruptcy estate have been discussing the possibility of recovering funds that may remain with Nishad's family and friends, even though the transfers reflect no misconduct on Nishad's part and occurred well before any of his criminal activity.

[17] *Singh-DPO Donation Investigation Finds Insufficient Evidence to Support Criminal Charges*, OREGON DEPARTMENT OF JUSTICE (July 17, 2024), available at: https://www.doj.state.or.us/media-home/news-media-releases/singh-dpo-donation-investigation-finds-insufficient-evidence-to-support-criminal-charges/.

to surrender property nominally in his name for the purpose of recovering customer assets.[18] Nishad also offered assistance to the FTX debtors well before he became a formal Government cooperator, shortly after FTX declared bankruptcy in November 2022, by providing information and guidance on how to reboot the exchange, and real-time assistance with triaging the hack on November 10, 2022. Sixth, Nishad has assisted the examiner appointed by the bankruptcy court to investigate various aspects of FTX.US, including by providing information during a virtual interview and attorney proffers.

---

[18] This includes a property purchased by FTX in the Bahamas under Nishad's name, as well certain equity in FTX-related companies.

## V.    NISHAD'S LIFE SINCE FTX'S COLLAPSE

As described above, Nishad began cooperating with the Government within days of leaving the Bahamas, at a time when his mental health had cratered: ███████████

████████████████████████████████████████████████

██████ Ex. A at 62 (K. DeVaul).

For the next several months, Nishad lived with his father, who along with his fiancée and other family members helped take care of Nishad and accompanied him on his many trips to New York to assist the government.  Cooperation with the government gave Nishad "a renewed sense of purpose," offering him a path to remedy some of the wrongs he perpetrated at FTX.  Ex. A at 55 (M. Singh). With the support network of his brother, fiancée, parents, aunts and uncles, and friends, among others, and a commitment to therapy, Nishad's mental health has slowly improved. Ex. A at 63 (K. DeVaul).

As a result of this support and therapy, while Nishad will always carry tremendous regret and remorse about his role at FTX, he has used the past 20 months to rebuild his life.  He now lives in San Francisco with his fiancée, Claire, and they are looking forward to getting married in the future.  For the past 14 months, Nishad has been employed as a software engineer at a private company (not in the cryptocurrency, financial services, or investment sectors). *See* PSR ¶ 92.  The company founder writes that Nishad has already become "invaluable" and "sticks out as a huge innovator at the company." *Id.*  The company recently presented three new products at a leading artificial intelligence conference in San Francisco, two of which were built by Nishad and were considered a "hit" at the event.  *Id.*  Likewise, Nishad has become "a beloved staple" of the company's Bay Area office by chatting with coworkers during lunch, joining an informal workout group, and closely mentoring an intern who is currently attending Berkeley.  *Id.*  Nishad's "track record at the company and friendly disposition have made him a highly requested resource," and as a result, the company founder writes "it would be a major blow for Nishad's team and the broader company to lose him for any amount of time." *Id.*

In addition to working, Nishad volunteers at The Gubbio Project, a daytime sanctuary for

the unhoused in San Francisco. PSR ¶ 79. Andy McCabe, the program manager and formerly unhoused himself, writes that "[m]eeting someone as kind as Nishad has been a blessing." Ex. A at 73 (A. McCabe). McCabe describes how Nishad has "enabled [the organization] to secure grants and attract new donors," by creating a mobile application for the team that tracks key metrics, such as the number of visitors and time spent at the shelter. *Id.* at 71–72. Nishad's contributions, however, extend well beyond his technical expertise.

McCabe writes that a regular visitor of the shelter had "a severe case of cellulitis in both legs" and a "high fever of 102 degrees." Ex. A at 72 (A. McCabe). This visitor was "afraid to take the step himself" in getting treatment at the hospital, Ex. A at 76 (M. O'Connor), and McCabe was "worried that when he got to the hospital, he wouldn't get the treatment he needed and deserved," Ex. A at 72 (A. McCabe). Nishad, who had taken the time to connect with this young man over many weeks, "went out of his way not only to take him to the hospital himself but also to stay by his side for several hours as an advocate." *Id.* As McCabe notes, "this isn't something we had asked Nishad to do (or would ever ask a volunteer to do)." *Id.* at 72–73 (explaining the visitor, following his recovery, was able to get "off the streets" and into "semi-permanent supportive housing"). Over the last year, McCabe has "really grown to care about Nishad, not just as someone who volunteers at [his] program, but as a truly, genuinely kind human being." *Id.* at 73. As another volunteer writes, seeing firsthand how Nishad interacts with the guests, generous with his time and empathetic in his conversations, gives her "hope that our young adults really do care about our basic human needs for food, shelter, health care, and respect." Ex. A at 77 (M. O'Connor).

In addition to his volunteer work with the Gubbio Project, Nishad also became involved in a separate initiative led by Brendan Tailaferro, a friend of Nishad's brother. Tailaferro reached out to Nishad for help building software for an affordable housing project. Ex. A at 74–75 (B. Tailaferro). Despite his full-time job, Nishad responded not only by providing advice and guidance, but also volunteered hundreds of hours to help build the software for the project. Tailaferro writes, "[a]midst an extremely difficult and stressful time in his life, [Nishad] has proven

to be single-handedly the kindest, most supportive, and most capable person I have ever had the privilege to collaborate with." *Id.* at 74.

In more recent visits to Claire's extended family's farm in rural Indiana, Nishad can be found "cement[ing] his tradition of doing crosswords projected on the TV as a family" or playing with the toddlers. Ex. A at 85 (E. Schroader). Jake Whitsitt, Claire's cousin, shares, "[t]hey tug at him to play," and he can be found "pretending to be a shark or train conductor" or "braid[ing] their hair (and let them braid his hair)." *Id.*; Ex. A at 88 (J. Whitsitt). Brian Moyer, another family relative, writes that while he tries to set the best example as a role model for his toddler, "there are a select few out there that can offer him even more," and looks to Nishad in particular—despite Nishad's role in FTX—because he "is everything I want my son [] to be." Ex. A at 95 (B. Moyer).

Nishad has also resumed running, something he had not done regularly in nearly eight years. Recently, he recently completed his first ultramarathon since his teenage years, on the same path that he had once run his 100-mile ultramarathons years ago. PSR ¶ 82; Ex. A at 51 (R. Patel). As his stepfather and former running coach writes, he "hoped and prayed that [Nishad] would return home in every sense of the word, and [he] feel[s] that he has." Ex. A at 51 (R. Patel). And as his younger brother writes, Nishad "has found the spirit to live instead of simply crumpling into a ball or worse." Ex. A at 55 (M. Singh). It was unclear if Nishad "[would] ever get to this place," but seeing how far Nishad has come, his younger brother is "so proud of him." *Id.*

## VI.    SENTENCING GUIDELINES, 18 U.S.C. § 3553(a), AND § 5K1.1.

In determining an appropriate sentence, the Court should consider the factors set forth in 18 U.S.C. § 3553(a).  Among others, these include "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as "the need for the sentence . . . to reflect the seriousness of the offense" and "to afford adequate deterrence." § 3553(a).  Upon the Government's motion, as is the case here, the Court should also consider whether a sentence reduction is appropriate for a cooperating witness who provides "substantial assistance" in an investigation or prosecution based on the non-exhaustive factors set forth in § 5K1.1 of the U.S. Sentencing Guidelines.  These "include, but are not limited to," the following:

> (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3) the nature and extent of the defendant's assistance;
>
> (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and
>
> (5) the timeliness of the defendant's assistance.

§ 5K1.1(a)(1)–(5).  Here, we respectfully submit that a sentence of time served for Nishad fulfills the goals of § 3553(a) and § 5K1.1.

### A.    Nature and Circumstances of Offense

These were undeniably serious offenses.  At their core, they involved the theft of billions of dollars of hard-earned assets from FTX customers and a web of deception to further the scheme. But in weighing this factor the Court must take into account the defendant's specific role in the offense and his relative culpability.  As the trial testimony showed, and as we believe the Government does not dispute, Nishad's role in the core customer fraud was limited in duration and scope, particularly in comparison to his co-defendants.  Indeed, the Probation Department – in

recognition of Nishad's limited role in the core customer fraud charge – has recommended an extremely significant variance from the Guidelines *without* accounting for Nishad's extensive cooperation.

Nishad learned about the customer fraud scheme, which had been ongoing for years, just two months before FTX collapsed and declared bankruptcy.  For the vast majority of his time at Alameda and FTX, Nishad did not knowingly further the conspiracy to steal customer assets.  And when Nishad did learn about what happened, he was appalled.  As the Government stated in describing Nishad's role and actions:

> And let's talk about Nishad.  The defense made a big deal out of the fact that he learned of the conspiracy and joined it a little later.  I expect Judge Kaplan is going to instruct you that different people can play different roles in a conspiracy.  You can play a minor role, you can play a major role, you can join at a different time.  You're still part of the conspiracy.  And so it's no surprise that Nishad, who didn't work at Alameda, didn't have visibility into all the spending and all the use of customer money, but when he did, when it sunk in, he didn't say, oh, nothing wrong going on here.  He confronted the defendant on that balcony.  He was shocked, he was blindsided, and eventually he was suicidal.  That is not somebody who didn't think he was doing anything wrong.

Trial Tr. at 3126:11–24.

In other words, Nishad became a participant in the wrongdoing at a very late stage, and even as he did, he was incredibly distressed with what was happening.  Of course, though his role pales in comparison to his co-conspirators, Nishad still engaged in conduct that was illegal.  After learning about the customer fraud scheme, he continued to approve expenditures, including campaign donations, that he understood effectively must have been coming from customer funds.  We do not suggest, by any means, that Nishad's conduct here was appropriate.  But his misconduct in the customer fraud scheme is substantially fractional to the other participants, and his motive to stay once he learned of the scheme is relevant: he took steps to mitigate the damage the existing fraud would cause.  As described above, Nishad tried to convince Bankman-Fried to make substantial spending cuts with varying levels of success, including cutting back endorsement deals,

unwinding company acquisitions, and leading the effort to cancel a new multi-hundred-million-dollar FTX office space; he successfully safeguarded segments of user funds from Bankman-Fried; and he refused to build certain features that would have encouraged customers, old and new, to deposit even more money.

By contrast, Bankman-Fried orchestrated the core customer fraud scheme and engaged in conduct for years that furthered this crime. Wang and Ellison were also knowing participants for years. They were critical to carrying out Bankman-Fried's scheme in a manner that Nishad, who worked under Wang's supervision, was not – precisely why Nishad was kept in the dark about the scheme for years and only found out about it when the problems grew too large to fix. And Nishad, unlike Ellison, did not deceive Alameda's lenders, and did not play a role the decision to use billions of dollars in FTX customer money to pay those lenders.

Nishad also pleaded guilty to campaign finance violations. His culpability stems from allowing individuals at FTX, including Bankman-Fried, to use his name to make political donations – and consciously avoiding learning about the relevant law when he began to see red flags. The broader offense is serious, but it is relevant that this scheme was not intended to personally benefit Nishad at all. It furthered Bankman-Fried's interests first and foremost, and FTX's secondarily (although, because Bankman-Fried was the face of FTX, this too furthered his interests). Nor did Nishad benefit from it in practice. He never spoke to, let alone met with, any politicians or government officials who received the donations for which he was used as a straw (nor was he interested in doing so), and did not engage in any other conduct suggesting that he was using the political donations to bolster his standing within certain political communities – making him unlike both Bankman-Fried and Salame. Although Nishad should have removed himself once he learned that many of the later donations were being funded by Alameda – and were more crassly for the benefit of FTX and Bankman-Fried – Nishad continued to sign off on donations made under his name out of a misguided sense of loyalty, despite growing increasingly tormented. In this sense, Nishad was a true "straw" donor, and significantly less culpable than others involved in the scheme.

Finally, it bears repeating that the full scope of the campaign finance scheme likely would not have been revealed absent Nishad's cooperation and preservation of relevant materials to the Government. The campaign finance charges against Bankman-Fried and Salame were predicated substantially on Nishad's cooperation.

We note all of this to make clear that when the Court fashions a sentence that takes into consideration Nishad's significant cooperation, that sentence – as the Probation Department appears to have recognized in crafting its own recommendation – should *start* from a pre-cooperation baseline that considers Nishad's significantly lesser culpability relative to the others involved.

### B.    History and Characteristics of Defendant

As Nishad's sentencing letters demonstrate, notwithstanding the flaws that caused him to engage in the charged conduct, he is a uniquely special person. He recently turned 29 years old, and yet by any measure has already lived a life of immense good works that have had lasting impacts on many, many people. At his core, Nishad is a compassionate and empathetic young man who takes great care in the way he treats others. The many stories demonstrating this are not limited to certain periods in his life, nor do they materially vary based on the author of his sentencing letters. Rather, individuals from all walks of life – whether a close family member or friend, a fellow software engineer, a housecleaner, or a homeless shelter volunteer – write that Nishad is one of the most genuinely caring individuals they have ever met, and each one points to specific examples where Nishad demonstrated his selflessness and compassion. Unsurprisingly, Nishad had been a role model to many of his peers – and still is to this day, despite his serious criminal conviction. Even knowing his conduct and the harm it has directly caused them, coworkers from his time at FTX "truly hope to one day have the opportunity to work with him again." Ex. A at 7 (A. Yedidia); *see, e.g.*, Ex. A at 11 (R. Suero). Indeed, eighteen former employees have written letters in support of Nishad, including every employee that served as a witness at trial that was not himself or herself a defendant. Ex. A at 6–33. Though the Court has surely sentenced defendants whose offense conduct is otherwise anomalous to their character, that

anomaly is particularly stark here.

It is thus not surprising that for the vast majority of his time at FTX, Nishad was a uniquely *positive* force there. Nishad was a beloved manager and co-worker. More significantly, no other individual, let alone one of the other defendants, took it upon themselves the way Nishad did to address issues within FTX as they arose. As his relationship with Bankman-Fried evolved from "admiration and respect" to eventual "distrust," Nishad's approach evolved, too. Trial Tr. at 1308:17–19. Early on, he shared his views on moral or personnel issues with Bankman-Fried, offering advice lightly and at times anonymously, as Bankman-Fried told this Court during his own sentencing hearing.[20] Over time, Nishad became more vocal, serving as the voice against "excessive" and "flashy" expenditures, and ultimately confronting Bankman-Fried in face-to-face conversations in ways that others simply did not have the courage to do. Nishad took these actions because he fundamentally *did not* have a broken moral compass.

Indeed, after learning about the scheme and becoming complicit, Nishad immediately understood and appreciated its severity. In particular, after his conversation with Bankman-Fried on the Orchid balcony, Nishad's first thoughts were about how "evil" the scheme was because he understood "that customers were betrayed," many of whom "put their trust in" Nishad and the larger FTX enterprise. Trial Tr. at 1409:6–11.

While he faltered and fell significantly at points during his time at FTX, Nishad is someone with a true moral compass. He cares about others more than himself; he knows right from wrong; and he will forever regret his involvement in wrongdoing at FTX.

## C. General and Specific Deterrence

There is no dispute that general deterrence is an important consideration. The Court has

---

[20] Bankman-Fried stated:

> I remember back earlier on, 2018, Alameda was in danger of falling apart. I got a message one day. Explained what I needed to do to fix things in a way that I hadn't been able to see myself. There was an anonymous message, but it had sort of a combination of empathy and logic in it that made it clear it had to be from Nishad. He was famously humble and that often hid how brilliant he was as well.

Bankman-Fried Sentencing Tr. at 34:6–12.

referred to it in prior sentences in this case, and it has been reflected in those sentences, including significant terms of imprisonment imposed on Bankman-Fried (25 years) and Salame (7 years). And in sentencing Ellison, a cooperator, the Court declined her request for time served, noting the need to send a deterrent message – and specifically to avoid the message that cooperation is a "get out of jail free card" given the seriousness of her conduct. *See* Ellison Sentencing Tr. at 32:19– 21. We respect the Court's reasoning in that instance. But this need not be – and of course, is not – a message that must be sent every time a cooperator comes before the Court. And it need not apply across the board to every cooperator in a given case, however significant. Courts have a responsibility to distinguish between defendants based on their underlying conduct and personal circumstances and characteristics. *See* 18 U.S.C. § 3553(a)(6) ("the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

Here, in deciding whether a message of general deterrence must be sent again, the Court should consider Nishad's level of culpability relative to the others involved. As reflected throughout this submission and what we expect will be in the Government's submission, Nishad is situated differently. He came to understand what was happening very late in the game, and for the vast majority of the scheme did nothing to further it. With respect to campaign finance, his role was that of a straw. The Probation Office recognized the disparity between Nishad's culpability and that of the others by recommending a dramatic variance from the Guidelines for Nishad even before considering his extensive cooperation.

A sentence of incarceration here could send the *opposite* kind of deterrent message that the Court intends. In deciding whether to cooperate, individuals with somewhat lower levels of culpability (and defense counsel advising those individuals) often assess the punishment they would receive without cooperating, and that assessment is necessarily informed by precedent in the relevant district. Sentencing someone like Nishad to a term of imprisonment – especially one approaching the term accorded to Ellison – would send precisely the wrong message to individuals on the lower end of the culpability spectrum in future Southern District investigations who are

evaluating whether to cooperate. It could deter such individuals from coming forward. In other words, it is not simply that cooperator sentences should be lenient because "[s]uccessful prosecutions frequently depend upon the credibility of cooperating witnesses in the eyes of the jury." *United States v. Doe*, 348 F.3d 64, 68 (2d Cir. 2003); *cf. United States v. Singh*, No. 13-cr-570, 2014 WL 4773982, at *2 (E.D.N.Y. Sept. 18, 2014) (explaining noncustodial sentences for government cooperators "provid[es] an incentive for criminal defendants to cooperate with the government in the future"). It is that successful prosecutions depend on both the "partner in crime" coming forward *and* the individual with lesser culpability coming forward. Evaluating the right message to send in sentencing a cooperator should not be a one-size-fits-all approach, because potential cooperators on different ends of the culpability spectrum face vastly different decisions.

For these reasons, courts in the Southern District have typically imposed noncustodial sentences for cooperators who are similarly situated to Nishad, and even for those whose involvement in the offense was greater than Nishad's. *See, e.g.*:

- *United States v. Seth Horowitz*, Case No. 19-cr-861 (Ramos, J.): Sentence of time served for a cooperating defendant, the chief operating officer of a public company, who pled guilty to securities fraud and other offenses related to a scheme to inflate the company's publicly reported revenue and earnings per share.

- *United States v. Eric Rohr*, Case No. 19-cr-595 (Abrams, J.): Sentence of time served for a cooperating defendant, the chief financial officer of a large private company, who pled guilty to securities and wire fraud offenses related to a scheme to obtain millions of dollars in secured loans for the company by grossly inflating the prices of bonds used as collateral.

- *United States v. Amin Majidi*, Case No. 18-cr-328 (Polk Failla, J.): Sentence of time served for a cooperating defendant, a portfolio manager for a hedge fund, who pled guilty to securities fraud offenses related to a scheme to inflate the "net asset value" of the fund, and who lied to the Government during his cooperation about a potential violation of U.S. sanctions law.

- *United States v. Jordan Fogel*, Case No. 17-cr-308 (Kaplan, J.): Sentence of time served for a cooperating defendant who pled guilty to securities fraud offenses related to his involvement in an insider trading scheme at his former company; in addition to his offenses, the defendant lied to the Government about his drug relapse during his cooperation.

- *United States v. Daniel Tzvetkoff*, Case No. 10-cr-336 (Kaplan, J.): Sentence of time served for a cooperating defendant who pled guilty to money laundering and bank fraud offenses in connection with processing more than $500 million in internet gambling proceeds.

With respect to specific deterrence, Nishad is an extremely unlikely recidivist. As noted above, he had a strong moral compass throughout his time at FTX. He knew right from wrong, particularly when it came to the theft of customer assets, which his trial testimony demonstrates. The gravity of what had happened sunk in immediately for Nishad – before he had ever been contacted by prosecutors, let alone faced the reality of pleading guilty here. Grappling with his own suicidality and guilt in the aftermath of FTX's collapse has sufficiently deterred him from ever engaging in remotely similar behavior.

What is more, Nishad has substantially turned his life around in the two years since the collapse of FTX. In addition to his extensive cooperation, Nishad has started to live a busy, fulfilling, and productive life, supported by a network of family and friends. Returning home after living abroad for several years has grounded Nishad and, in some ways, it has been a full circle moment for him. As one example out of many, he recently ran his first ultramarathon since high school last month (after failing to take care of his health while working at Alameda and FTX). PSR ¶ 82. He is working in a far more stable and "routine" job while making use of his engineering skills, and his employer writes that Nishad has quickly become a valuable asset to the company. *Id.* ¶ 92.

Nishad also became recently engaged to his long-time girlfriend Ms. Watanabe, who he lives with, and the two will consider a wedding date after Nishad's sentencing. PSR ¶ 82. He is also engaging in other soul-fulfilling activities, such as volunteering at a day-time shelter for the unhoused (a topic that has touched Nishad personally ever since his first field trip to San Francisco at eight years old), rekindling old friendships, and playing with his two dogs in the local park nearby. *Id.* Finally, to his credit, Nishad has regularly sought treatment from a psychiatrist for his mental health, which has steadily improved since mid-2023. *Id.* ¶¶ 86–87. With the obvious exception of his sentencing in this case, Nishad has much to look forward to, both in the near and

long terms, and is slowly becoming the happy young man he once was.

## VII.   CONCLUSION

| | |
|---|---|
| Dated:  New York, New York<br>         October 16, 2024 | Respectfully submitted,<br><br>COOLEY LLP<br><br>By:  */s/Andrew Goldstein*<br>    Andrew D. Goldstein<br>    Russell Capone<br>    Anupam Dhillon (*not admitted PHV*)<br><br>55 Hudson Yards<br>New York, NY 10001-2157<br>Tel. (212) 479-6000<br>Email: agoldstein@cooley.com<br>      rcapone@cooley.com<br>      adhillon@cooley.com<br><br>*Attorneys for Defendant Nishad Singh* |

### CERTIFICATE OF SERVICE

I hereby certify that, on October 16, 2024, the foregoing document and its exhibits were served electronically to all parties of record by CM/ECF system.

*/s/ Andrew D. Goldstein*
Andrew D. Goldstein