O9OQellS - corrected

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                              22 CR 673 (LAK)

5  CAROLINE ELLISON,

6               Defendant.                  Sentence
   ------------------------------x

7
                                           New York, N.Y.
8                                          September 24, 2024
                                           3:00 p.m.

9

10 Before:

11
                       HON. LEWIS A. KAPLAN,
12
                                           District Judge
13
                           APPEARANCES
14
   DAMIAN WILLIAMS
15      United States Attorney for the
        Southern District of New York
16 BY:  DANIELLE R. SASSOON
        NICOLAS ROOS
17      DANIELLE KUDLA
        THANE REHN
18      Assistant United States Attorneys

19

20 WILMER CUTLER PICKERING HALE & DORR LLP
        Attorneys for Defendant
21 BY:  ANJAN SAHNI
        STEPHANIE AVAKIAN
22      NICHOLAS WERLE
        PETER GILLIES NEIMAN

23

24 Also Present:
   Luke Booth, FBI
25 Kristin Allain, FBI


SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (In open court; case called)

2          DEPUTY CLERK:  Government, are you ready?

3          Please put your appearances on the record.

4          MS. SASSOON:  Yes, your Honor.

5          Danielle Sassoon for the United States.  I'm joined by

6   my colleague Thane Rehn, Nick Roos and Danielle Kudla and by

7   Special Agents Kristin Allain and Luke Booth.

8          THE COURT:  Good afternoon.

9          DEPUTY CLERK:  Defendant, are you ready?

10         MR. SAHNI:  Yes.  Good afternoon, your Honor.

11         Anjan Sahni on behalf of Ms. Ellison, joined by my

12  colleagues from Wilmer Hale, Stephanie Avakian, Nick Werle and

13  Peter Neiman.

14         THE COURT:  Good afternoon.

15         Just for the record, although I've said this earlier

16  in an appearance in this case, one of my law clerks worked for

17  Wilmer Hale, and I think is going back to Wilmer Hale, but he

18  has nothing to do with this case.  He is present, but he has

19  nothing to do with it.

20         The second thing before we really get started, is

21  this:  What is proposed to be done about restitution in this

22  case and when?

23         MS. SASSOON:  Yes, your Honor.  We're asking that the

24  Court follow the same process as requested at the sentencing of

25  Sam Bankman-Fried, which is the Court declined to order

1  restitution, and instead granted the government's motion to

2  authorize the government to compensate victims with forfeited

3  assets through a remission process.  We make the same motion

4  here:  That we be authorized to compensate victims with

5  forfeited assets through a remission process.

6         THE COURT:  Is that in the -- does that presume that

7  what you're going to do is use the remission process or are you

8  asking for authority to do either?

9         MS. SASSOON:  I believe that it's our intention to use

10  the remission process, and that is what the Court authorized at

11  the prior sentencing, but I'll turn it over to my forfeiture

12  expert.

13         MR. REHN:  Your Honor --

14         THE COURT:  Here's the forfeiture expert.

15         MR. REHN:  I don't know that I'm a forfeiture expert.

16         THE COURT:  You'd better be now.

17         MR. REHN:  I'll do my best.  The provision having to

18  do with restitution that's applicable here is in 18 U.S.C.

19  3663(a)(c)(3), which provides that restitution is not required

20  in the case of an offense if there are one of two facts:

21  (1) the number of identifiable victims is so large as to make

22  restitution impracticable, or (2) if determining complex issues

23  of fact related to the cause or amount of the victims losses

24  would complicate or prolong the sentencing process.

25         We detailed in our written submission with respect to

O9OQellS - corrected

1    the Bankman-Fried sentencing why both of those criteria are met

2    here.  There is an extremely large number of victims, and

3    ascertaining the specific loss for each victim would be

4    difficult to do in a proceeding such as this and to memorialize

5    in a restitution order.  So it is the intention of the

6    government pursuant to Department of Justice policy to engage

7    in a remission process are where we obtain forfeited funds both

8    from this defendant and the other defendants in the case and

9    then work to provide those funds to victims through that

10   process.

11            THE COURT:  If it's too complicated to do here, how is

12   it going to happen there?

13            MR. REHN:  Your Honor, we're still working on the

14   specifics of the procedure.  We are looking to prior cases,

15   such as the Madoff case, in which the same order was entered at

16   sentencing as this Court did at Bankman-Fried's sentencing.

17            THE COURT:  And they're still at it, right?

18            MR. REHN:  And they're still at it.  And we anticipate

19   this will be a lengthy process.  We've already recovered in

20   excess of $1 billion of assets.  We expect that number will

21   continue to increase, and it will either be a claims

22   administration process administered by the Department of

23   Justice's money laundering asset recovery section, often known

24   as MLARS, or, as in the Madoff case, we will work with the

25   existing claims process in the FTX bankruptcy to identify

1  victims of the crimes here.  There's obviously substantial

2  overlap with claimants in the FTX bankruptcy, and then use the

3  existing kind of pipelines for providing funds to victims in

4  the bankruptcy proceeding to also provide forfeited funds to

5  victims.

6         THE COURT:  You're not proposing to hand it over to

7  the MDL litigation.

8         MR. REHN:  That's correct, your Honor.  The MDL

9  plaintiffs are in a settlement posture with the FTX debtors and

10  bankruptcy.

11         THE COURT:  I understand that.

12         MR. REHN:  But we are not planning to hand it over to

13  them.

14         THE COURT:  Fine.  Very well.

15         Mr. Sahni, have you and your client had the

16  presentence report for the necessary period?

17         MR. SAHNI:  We have, your Honor.

18         THE COURT:  Ms. Ellison, have you read the presentence

19  report?

20         THE DEFENDANT:  Yes, I have, your Honor.

21         THE COURT:  Have you read every word of it?

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  The presentence report will be sealed and

24  available to counsel in the event of an appeal.

25         Mr. Sahni, are there any unresolved objections to the

1  presentence report?

2            MR. SAHNI:  Not from us, your Honor.  Thank you.

3            THE COURT:  Any from the government, Ms. Sassoon?

4            MS. SASSOON:  No, your Honor.

5            THE COURT:  I adopt the presentence report and the

6  guideline computation and range that it contains.

7            I have received in relation to the sentencing a letter

8  from Wilmer Hale dated today, the presentence report, a draft

9  consent preliminary order of forfeiture, a letter from the

10  government of the 17th of September, a letter from the

11  government, I guess this is the plea agreement, the

12  December 18th plea agreement, and a submission on behalf of the

13  defense that includes a great many exhibits.

14            Is there anything else of which I ought to be aware?

15            MS. SASSOON:  No, your Honor.

16            MR. SAHNI:  No, your Honor.

17            THE COURT:  All right.  Well then, Mr. Sahni, I will

18  hear from you on behalf of the defendant.

19            MR. SAHNI:  Thank you, Judge.

20            THE COURT:  Whenever you're ready.

21            MR. SAHNI:  Thank you, your Honor.

22            It has been a privilege to know Caroline Ellison over

23  these last two years.  I should start by saying that she has

24  many remarkable strengths, a brilliant mind, a deep sense of

25  obligation to do good in the world, kindness, decency and

1    toughness that have shown through despite highly adverse

2    circumstances.

3            I would like to recognize, Judge, that her parents,

4    Sara and Glenn, and her two sisters, Anna and Kate, are here in

5    court.  Today is a very difficult day for all of them.  But

6    they have a lot to be proud of in their eldest daughter and

7    their big sister.

8            What is so tragic and devastating about this case,

9    Judge, is how rapidly and needlessly the trajectory of

10   Ms. Ellison unraveled.  Caroline wasn't involved in the fraud

11   in the beginning.  She was a 24-year-old trader at Alameda when

12   she began when Sam Bankman-Fried, Gary Wang and Nishad Singh

13   founded FTX and when they installed the back door that gave

14   Alameda unlimited borrowing ability.  But as Bankman-Fried gave

15   Caroline more responsibility at Alameda, her knowledge and

16   participation in the fraud increased, and to be sure, there

17   were chances to say no, to quit, and to protect herself.

18           Your Honor, the question that she and we have wrestled

19   with is the why.  Why did Caroline go along when Bankman-Fried

20   brought her into this fraud?  Why didn't she just walk away

21   before it was too late?  Caroline has never minimized her roles

22   in these crimes.  She has accepted full responsibility for the

23   choices she made during the time that she worked at Alameda.  I

24   would like to highlight a few points that I think are relevant

25   to understanding the question of why she participated in these

1    crimes.

2           One of the things, Judge, that jumps out of her

3    private writings which were excerpted in our sentencing

4    submission and the government's 5K letter, is just how

5    concerned she was with not being "good enough for Sam

6    Bankman-Fried," how much her sense of self-worth got tied up in

7    what he thought of her, both romantically and professionally.

8    You can see where that came from.  Caroline met Bankman-Fried

9    when she was still in college.  She had a crush on him from the

10   beginning.  And then she saw him achieve staggering levels of

11   succeed, building billion dollars businesses from scratch and

12   becoming famous and powerful.  On the one hand, it was

13   genuinely thrilling for her when he expressed romantic interest

14   or valued something that she did at work.  On the other hand,

15   it was devastating when he was emotionally distant, withholding

16   of affection or critical of her trading decisions.  Over time

17   her whole professional and personal life came to revolve around

18   Bankman-Fried.

19          And he wasn't hesitant about taking advantage of the

20   power that he had over her.  For example, when she was thinking

21   of leaving Alameda in the summer of 2021, he told her that he

22   loved her, lured her back to return to Hong Kong.  He exploited

23   her commitment to effective altruism, convincing her that

24   working for him at Alameda was her highest calling, even when

25   she wanted to leave the bubble that he had constructed around

1  himself.

2      Caroline should have left.  Every day she profoundly

3  regrets her decision not to have done so.  She had the

4  opportunity to leave at several points, but, Judge, despite how

5  unpleasant much of her day-to-day life was, she could not bring

6  herself to leave Bankman-Fried's orbit.  She followed him

7  around the world, and in doing so, she became increasingly

8  isolated from her family, from her friends, from anyone who did

9  not admire Bankman-Fried.

10      In hindsight, she sees that it was crazy to stay at

11  Alameda.  She realizes now that it was wrong to single-mindedly

12  seek validation in what he said and what he did.  Eventually,

13  Caroline understood that all of this would likely end in

14  disaster, but, unfortunately, that was after Bankman-Fried had

15  disregarded her advice and plunged Alameda deep into debt to

16  finance a highly ill-considered venture funding spree, and it

17  was after the crypto markets had crashed and Alameda's lenders

18  had demanded their money back, and by then it was too late, and

19  she could see no way out for herself that wouldn't only hasten

20  that disaster.

21      And so, as you heard her testify at trial over the

22  course of three days, she spent the months ahead living in

23  dread, until finally the collapse came.  And your Honor will

24  recall Caroline's testimony about the "worst week of her life"

25  when she felt both indescribable sadness for all the harm that

O9OQellS - corrected

 1 | they had caused, all the people they had betrayed, but also an
 2 | overwhelming feeling of relief from no longer having to lie.
 3 | Your Honor heard the tape of the all-hands meeting on
 4 | November 9 of 2022 when she became the first person to publicly
 5 | reveal the truth, and that meeting really marked a turning
 6 | point in her life.  Since then she has done all that she can to
 7 | atone for her crimes.
 8 |         As the letter from John Ray describes, which is among
 9 | the materials attached to our submission, "While others were
10 | helping Bankman-Fried try to move assets to the Bahamas,
11 | Caroline was working tirelessly to help FTX bankruptcy counsel
12 | secure assets in the chaotic first days after Bankman-Fried had
13 | resigned as CEO."  Mr. Ray credits Caroline's assistance with
14 | "the recovery of hundreds of millions of dollars in debtor
15 | assets for the benefit of creditors."
16 |         Time was of the essence in those early days, and
17 | Caroline immediately began helping the debtor bankruptcy
18 | advisors within 24 hours of commencing the Chapter 11 cases.
19 | In fact, she prioritized helping FTX's bankruptcy counsel
20 | secure assets, even over engaging her own personal counsel, and
21 | we submit that this shows that her first instincts weren't to
22 | protect herself but to try to make things right and to try to
23 | begin helping those she had harmed.
24 |         She voluntarily returned to the United States and
25 | promptly began cooperating with the U.S. Attorney's Office, the

O9OQellS - corrected

1   SEC, and the CFTC.  As the government recounts in its 5K

2   letter, your Honor, Caroline's cooperation was "extraordinary,

3   exemplary, crucial, a cornerstone of the trial, and marked by

4   remarkable candor, remorse and seriousness."

5           Judge, I just want to highlight one part of what makes

6   her cooperation in this case so extraordinary.  Caroline began

7   meeting with the government just a few weeks after FTX

8   collapse, and this was before many of the documents that ended

9   up being used at trial had been located or reviewed either by

10  her or by the government.  From the beginning of her meetings

11  with the government, she spoke with unusual transparency,

12  clarity and honesty about what she and others did at Alameda.

13  And as new documents surfaced, they repeatedly confirmed what

14  she had said from the very beginning of her meetings.  Over the

15  ensuing months, she met regularly with the government to assist

16  the government in the course of its investigation.  She

17  conducted extensive document review to help identify critical

18  evidence, several pieces of which the government relied upon in

19  its closing argument before your Honor.

20          Caroline was unflinching in describing to the

21  government and ultimately to the jury and to the Court the

22  dynamics of her relationship with Bankman-Fried.  She didn't

23  shy away from the details, however embarrassing they were.  Her

24  honesty and openness was ultimately critical to the

25  government's case.  And as the Court saw, she was able to

1    recount for the jury key aspects of Bankman-Fried's motives and

2    his mindset, including his desire to transform his wealth into

3    political power, his disregard for telling the truth, and his

4    highly cavalier attitude toward taking enormous risk.

5          Caroline now comes before the Court ready to accept

6    whatever sentence your Honor deems just.  For the reasons

7    explained in our submission, we respectfully submit that

8    justice does not require sentencing her to imprisonment.

9    Obviously, this was an enormous and extraordinary fraud.

10   Caroline will carry the shame of her participation in this

11   crime for the rest of her life.  But against that, your Honor,

12   we ask the Court to weigh the unusual circumstances here,

13   including the reasons why she became involved in these crimes,

14   the fact that as the government noted in its 5K, it "found no

15   evidence that she enjoyed the wealth generated by the fraud,"

16   and everything she has done to assist in recovering assets and

17   attempting to bring justice for victims.  This starts with her

18   exemplary cooperation with the Justice Department, with the

19   SEC, the CFTC, the debtors, and the MDL plaintiffs.

20         Were the Court to decline to imprison Caroline, it

21   would send a powerful message about the value of timely, honest

22   and full cooperation with the government in cases of financial

23   crime.  She has also sought to make amends through the

24   forfeiture process.  As explained in our brief, she had the

25   vast majority of her savings on FTX, funds that she, unlike

O9OQellS - corrected

1   other insiders, left there long after she knew that a collapse

2   was likely.  She did not believe that it would be fair to move

3   her assets off of the platform to protect herself while other

4   customers and victims remained at risk.  She has abandoned any

5   claim to the assets she once held on FTX and with regard to her

6   off-FTX assets, she has entered into settlements with the

7   government and the FTX debtors that will leave her with nothing

8   that she earned at Alameda research.  She has also agreed to

9   assign to the government the rights to any income from telling

10  her story, meaning that she will never profit in the future

11  from her role in this crime.  She will also continue

12  cooperating with the debtors in their continuing adversary

13  proceedings against the recipients of funds from Alameda to

14  continue to help recover assets, and as Mr. Ray's letter notes:

15  "Her cooperation will continue to be important to maximize

16  recovery for the creditors."  Likewise, your Honor, as noted in

17  the submission from counsel to the MDL plaintiffs, Caroline

18  will continue to cooperate with MDL counsel and has agreed to

19  provide them with information and testimony to facilitate

20  recovery for victims.

21          Finally, Judge, we submit that imprisoning Caroline is

22  unnecessary to safeguard the public.  The letters on her behalf

23  and her cooperation over the last almost two years demonstrate

24  that she has recovered her moral compass that guided her before

25  she started working at Alameda.  She will never ever engage in

1  criminal conduct.  She has accepted lifetime bans from the SEC

2  and the CFTC that will prevent her from serving as an officer

3  or director in any public company and from working in the

4  finance commodities or crypto business in the future.

5      Your Honor, Caroline Ellison is a good person who at

6  29 years old can still make a positive impact in the world.

7  Her notoriety will likely leave her unemployable in the future,

8  as it has for the last two years.  But she is already doing

9  small things to directly help people where she can, and you saw

10  this from some of the submissions that were provided to the

11  Court -- sending books to prisoners, helping low-income people

12  do their taxes, serving at a soup kitchen, writing a math

13  textbook for gifted high schoolers.  Caroline remains committed

14  to doing everything in her power to atone for the harm that she

15  caused.

16      Your Honor, the last almost two years have been

17  devastatingly difficult for her.  She has lived with deep

18  uncertainty and fear and anxiety about what will happen to her.

19  Every aspect of her personal life has been poured over and over

20  again and reported by the press.  Her physical appearance has

21  been the subject of internet fascination and scrutiny.  Her

22  most private thoughts and reflections were plastered all over

23  the press after Bankman-Fried leaked them.  Personal details

24  that she shared with a therapist were divulged in a

25  best-selling book that was published on the very eve of trial

O9OQellS - corrected

1    in this matter.  She and her family have been repeatedly

2    harassed in public.  She has essentially been forced to live in

3    hiding since all of this unraveled.

4          As noted in its 5K letter, Judge, "the government

5    cannot think of another cooperating witness in recent history

6    who has received a greater level of attention and harassment."

7    But throughout this personal upheaval for her, she has shown

8    remarkable resilience and has concentrated singularly on what

9    it means to be a cooperating witness with the government.

10          Your Honor, I've worked with a lot of cooperators over

11    the years, and I'm deeply struck by her level of commitment to

12    her obligations and her seriousness of purpose.  Not once has

13    she embellished a single fact or memory.  Not once has

14    something she has reported to the government been contradicted

15    later.  For someone who still isn't 30 years old, she has

16    endured unimaginable pressure and the unremitting glare of the

17    entire world with striking focus and strength.

18          Consistent with the probation office's recommendation,

19    we respectfully submit that a term of supervised release would

20    be appropriate and in the interests of justice.  Your Honor,

21    Caroline still has a lot to give of herself to this world, and

22    we respectfully ask the Court to give her a second chance.

23    Thank you.

24          THE COURT:  Thank you.

25          Ms. Ellison, you have the right to speak before you

O9OQellS - corrected

1  are sentenced.  Is there anything you'd like to say?

2                  THE DEFENDANT:  Yes, there is, your Honor.

3                  THE COURT:  If you wouldn't mind going over to the

4  dais, to the lectern.

5                  THE DEFENDANT:  I want to start by saying how sorry I

6  am.  I want to apologize most of all to the victims, to all the

7  customers, lenders and investors who lost money as the result

8  of my actions.  I also want to apologize to FTX and Alameda

9  employees who lost their jobs, to my family and friends, and to

10  everyone I lied to or misled over the course of my time in

11  Alameda.  It's been almost two years since the collapse of FTX

12  and not a day goes by when I don't think about all the people

13  I've hurt.

14          The human brain is bad at truly understanding big

15  numbers.  I ran into this a lot when I worked at Alameda and

16  had to make decisions involving millions or billions of

17  dollars.  So I think on some level my brain can't even truly

18  comprehend the scale of the harms I've caused.  That doesn't

19  mean I don't try.  So to all the victims and everyone I harmed

20  directly or indirectly, I am so, so sorry.  I can't even begin

21  to imagine the pain I must have caused to so many of you.  I

22  have participated in a criminal conspiracy that ultimately

23  stole billions of dollars from people who put their trust in

24  us.  We abused that trust in the worst possible way, and I am

25  deeply ashamed of what we've done.  Without excusing my

O9OQellS - corrected

1  actions, I want to try to offer an explanation of how I ended

2  up doing this.

3         If you had told me back in 2018 that in just a few

4  years I would find myself pleading guilty to fraud, I would

5  life told you that you were crazy.  I've always thought of

6  myself as an honest person, as someone with integrity, and as

7  someone who tries to do the right thing and to help others.

8  But at Alameda, I gradually found myself drifting away from the

9  kind of person I wanted to be.  The longer I worked at Alameda,

10  the more my sense of self became inextricably intertwined with

11  what Sam thought of me and the more I subordinated my own

12  values and judgment to his own.  Work increasingly became my

13  life, and I was surrounded by other FTX employees and isolated

14  from the rest of my friends and family.  The culture that

15  promoted positivity and discouraged worries and criticism made

16  it hard for me to be a dissenting voice.

17         At each stage of the process, it felt harder and

18  harder to extricate myself and to do the right thing.  There

19  were times when I wanted to confide in someone on the outside

20  about what was going on, but every time I thought about it, I

21  heard Sam's voice in my head from past times he had admonished

22  me for sharing information about Alameda too freely, even

23  within the company.  Ignoring that voice in my head and

24  speaking out would have been brave.  I'm sorry I wasn't brave.

25         I've had a lot of time in the past two years to think

O9OQellS - corrected

1   about how to move on from this and what to do now.  For many

2   years, it was my dream to do something really good for the

3   world.  Now I know that achieving that dream will be much

4   harder, but I don't think that means I should give up.  For one

5   thing, I found it meaningful to tell the truth about everything

6   that happened.  Lying isn't something that comes naturally to

7   me, and the pressure I felt to lie over the years I was at

8   Alameda was often a great source of stress.  Since the collapse

9   of FTX, it's been a relief to be able to be completely honest

10  and open with investigators, prosecutors, and the Court about

11  everything.  I know it isn't much, but cooperating fully feels

12  like the least I can do for the victims.

13          And for another thing, I found meaning in just trying

14  to be a good person every day in small and normal ways.  If I

15  can help a family get the tax credits they're entitled to or

16  help a student get her high school equivalency diploma or send

17  a book that will brighten an incarcerated person's day, these

18  things may just be grains of sand on the cosmic scale, but at

19  least they're moving it in the right direction.

20          Finally, I have some people I want to thank.  Lots of

21  people in my life have been angry at what I've done or

22  disappointed in my actions.  Many have wanted to end their

23  friendship or association with me.  I don't blame them one bit.

24  But I do appreciate immensely the people who have supported me:

25  My family who is here today and has been completely unwavering;

O9OQellS - corrected

1   my partner, I don't know how I could have done any of this

2   without you; everyone who has written me a letter of support;

3   my old friends who stuck by me and new friends who have been

4   incredibly kind and welcoming; the people I volunteered with

5   who have made me feel like a valued member of the team; those

6   with criminal records who have turned their lives around and

7   opened up to me and shared their stories, you guys are an

8   inspiration; the man I served food to in a soup kitchen who

9   told me that with what I was going through, he figured I might

10  need a friend.  To all of you, your support and faith in me

11  means more than words can say.  Whatever happens here today I

12  will spend the rest of my life trying to be worthy of it.

13              THE COURT:  Thank you.

14              Ms. Sassoon.

15              MS. SASSOON:  Yes, your Honor.

16              THE COURT:  I assume you want to make your motion for

17  the record.

18              MS. SASSOON:  Yes, your Honor, the government moves

19  for the Court to sentence Ms. Ellison in light of the factors

20  set forth in Section 5K1.1(a) of the guidelines.

21              THE COURT:  Thank you.  The motion is granted.

22              MS. SASSOON:  I want to begin where your Honor left

23  off at Mr. Bankman-Fried's sentencing.  The Court spoke about

24  the importance of public respect for the criminal justice

25  system and sometimes, as in the case of Sam Bankman-Fried, that

1    means incapacitating and deterring criminals who have committed

2    serious crimes, have shown no remorse, and pose a significant

3    risk to society.

4    Just as important for the integrity and fairness of

5    our justice system is that we recognize also when leniency is

6    warranted, even in the case of very serious crimes; that we

7    distinguish between the mastermind of criminal scheme and the

8    willing accomplice, between the con artist and the person who

9    committed fraud but is unlikely to do it again, and between the

10   defendant who deflects blame and feigns ignorance and the

11   person who accepts responsibility, assists the government and

12   exhibits substantial remorse and rehabilitation.  By these

13   measures, Caroline Ellison deserves leniency, and, as I noted,

14   the government is moving for the Court to sentence her in light

15   of the Section 5K1.1 factors.

16   Ms. Ellison's supporters have asked the Court to

17   extend mercy and impose a lenient sentence.  In the

18   government's view, a lenient sentence is also what is just.

19   The government put in a lengthy letter, so I want to use this

20   time to offer a few additional observations that might assist

21   the Court.

22   Your Honor had the opportunity to observe

23   Ms. Ellison's demeanor on the stand and evaluate her testimony

24   at trial.  The woman the Court saw on the stand in October 2023

25   is the same person who came to proffer with the government in

1    early December of 2022, and the same person who spoke to her

2    employees at the all-hands meeting on November 9 of 2022.  This

3    exemplifies both the remarkable speed of her cooperation and

4    also her consistent truthfulness.  Part of why Ms. Ellison's

5    testimony was so devastating and such powerful proof of

6    Bankman-Fried's guilt and why cross-examination even by very

7    able attorneys did not damage her credibility, was because of

8    her candor and her refusal to minimize her own role or sidestep

9    the most humiliating aspects of her conduct.  A diligent lawyer

10   combing the proffer notes for inconsistent statements was just

11   not going to find them.  Simply from the standpoint of

12   demeanor, this was a powerful contrast with Bankman-Fried's

13   testimony during which he was inconsistent, evasive, even

14   contemptuous and unwilling to answer questions directly.  After

15   observing the two on the stand, the jury easily credited

16   Ms. Ellison.

17          On the substance, I cannot overstate the importance of

18   Ms. Ellison's testimony in convicting Bankman-Fried, the

19   architect of one of the largest financial frauds in recent

20   history who very much tried to get away with it.  As your Honor

21   knows, he put in place his cover story before FTX even

22   collapsed, and his cover involved recruiting Ms. Ellison to do

23   his dirty work and ultimately take the fall.  He doubled down

24   on that cover story in the media after FTX's collapse,

25   simulating sorrow that mistakes were made but taking no genuine

1  responsibility.  And he tried to sell that story to the jury.

2  That might have succeeded without Ms. Ellison's cooperation

3  which, together with the other trial evidence, proved beyond

4  any reasonable doubt his criminal knowledge and intent.  I

5  won't walk through all the evidence again, but the government's

6  closing argument focused on several points along the way where

7  Bankman-Fried intentionally doubled down on the scheme and

8  deliberately expanded its scale.  Much of that proof derived

9  from Ms. Ellison's testimony, the evidence that corroborated

10  it, including documents Ms. Ellison helped the government

11  identify within discovery.

12      The 5K1.1 factors overwhelmingly favor a reduction in

13  the sentence Ms. Ellison would otherwise face, and they also

14  bear on the traditional sentencing factors under Section

15  3553(a).  In particular, concerns about specific deterrence and

16  incapacitation, which were at the forefront of

17  Mr. Bankman-Fried's sentencing, are not salient here in light

18  of Ms. Ellison's substantial cooperation and rehabilitation.

19  Finally, I want to speak too about the characteristics of

20  Ms. Ellison, which is another factor for the Court to consider.

21      I spent time over the past two weeks reading the

22  letters submitted on behalf of Ms. Ellison.  Sometimes letters

23  of support illuminate aspects of a person's character or

24  personal life that were otherwise unknown to the government,

25  even after a lengthy investigation and many interviews.  That

1    was not the case here.  The content of the letters echoed some

2    of what the government learned about Ms. Ellison over the

3    course of speaking with numerous former Alameda and FTX

4    employees, many hours interviewing Ms. Ellison and preparing

5    her for trial, and after reviewing countless pages of

6    contemporaneous notes and journal entries.  Unlike

7    Bankman-Fried, she is not cunning.  There is no evidence that

8    she was driven by greed or that an appetite for risk or power

9    is part of her nature.  To be sure, she was too willing to

10   serve Alameda and Bankman-Fried at all costs, and she made

11   terrible misjudgments and took catastrophic actions that she

12   knew were wrong.  Her crimes, as she has acknowledged, have

13   grave, real-world consequences for a staggering number of

14   people.

15          It is still important to highlight key differences

16   between Bankman-Fried and Ellison.  And while the size of the

17   fraud ballooned, so did Bankman-Fried's influence and power.

18   He took the stage with the likes of Bill Clinton, he illegally

19   expanded his influence in our political system, and continued

20   to invest money that was not his and that he could not repay.

21   At that time, Ellison's journal entries expressed misery and

22   anxiety.  Her primary sizable purchase was $10 million of

23   anthropic shares, which she is now forfeiting to the government

24   if your Honor enters the consent preliminary order of

25   forfeiture.

1          As has been discussed already today, contemporaneous

2    messages confirm the relief Ms. Ellison felt when her crimes

3    were exposed and she came clean to her employees.  And unlike

4    Ryan Salame, who the Court has already sentenced, she did not

5    jump into the lifeboat.  She left her assets on FTX and turned

6    her attention to helping the bankruptcy and then the federal

7    government.

8          Time and again courts have recognized that this type

9    of cooperation that helps expose wrongdoing and holds others to

10   account merits serious consideration.  Rightly so, especially

11   here, where Bankman-Fried used his considerable guile to deny

12   responsibility, and where leniency in this case will send a

13   widely received public message that encourages acceptance of

14   responsibility, cooperation with the government, and sends a

15   message about the promise of redemption even after very serious

16   wrongdoing.

17         For her critical role in holding Bankman-Fried

18   accountable and for the other reasons discussed here today and

19   in our letter, a sentence substantially below the guidelines is

20   sufficient here to meet the goals of sentencing and promote

21   respect for the law.

22         THE COURT:  Thank you.

23         There are a number of remarks related to explaining

24   the system in which I am operating that I want to make, and

25   since Mr. Bankman-Fried already has been sentenced and

O9OQellS - corrected

1    Ms. Ellison was a party to the fraud for which he was sentenced

2    that are relevant to the differences between them.

3            First of all, a number of years ago Sentencing

4    Guidelines were adopted which in their inception bound federal

5    judges in sentencing defendants.  A guideline range was

6    computed.  I was looking for the manual.  The manual is now

7    about an inch and a half thick.  Everything had a point range

8    and so forth, and there was a grid at the end of it, and it

9    still does, and we were all bound by it.  It made life easier.

10           In due course, the Supreme Court said it was not

11   binding on federal judges.  Federal judges, however, must

12   consider the guideline range computed under the big manual, but

13   I am not bound by it.  In either case - that is, either the

14   period of time in which the guidelines were mandatory or the

15   subsequent period in which we've been living for a number of

16   years - the court was freed of adherence to the guidelines if

17   the government wrote something called a 5K letter.  That's a

18   letter in which the prosecution says that the defendant to be

19   sentenced rendered substantial assistance to the government,

20   and thus would be eligible, if the Court agreed, to be

21   sentenced outside the guideline range altogether.  That

22   explains some of the legal jargon that you've heard so far this

23   afternoon.

24           In any case, however, the Sentencing Reform Act, which

25   long preceded the guidelines, as I remember it, requires us to

1    consider the nature and circumstances of the offense, the

2    history and characteristics of the defendant, the need to

3    reflect the seriousness of the offense, to promote respect for

4    law and to provide just punishment, and to afford deterrence of

5    two different kinds:  Deterrence against others who might be

6    deterred from committing crimes by the example of the sentence

7    in the case under consideration, and deterrence of the

8    violator, the defendant who is being sentenced, in the sense

9    that if you lock them up, they're not going to do it while they

10   are in jail.  And all of this was subject to something called

11   the parsimony clause, which provides that in no event shall the

12   sentence be greater than is necessary to accomplish the

13   objectives of which I just spoke.

14          Those are the governing principles wherein the

15   nonbinding guidelines range, the 5K application the government

16   made which I've granted in relation to Ms. Ellison's very, very

17   substantial cooperation, would, under either regime - mandatory

18   or otherwise - give me a largely free hand to do what I think

19   is appropriate in light of all of these factors, which cut in

20   different directions in this case and in almost every other

21   case.

22          Now, a word about how this relates to the sentence

23   I've previously imposed in this case.  The guideline range for

24   both Bankman-Fried and Ms. Ellison computed according to the

25   manual is the same:  110 years in prison.  When

O9OQellS - corrected

 1   Mr. Bankman-Fried was up for sentence, I think the probation

 2   department recommended that I depart from that and sentence him

 3   to merely 104 years, isn't that right?  I believe that's right.

 4   With all due respect, I thought that was absurd.  And it was

 5   absurd then, and it's most certainly absurd here.  This is the

 6   real world now.  This isn't what a bunch of professors cooked

 7   up with a chart and a whole bunch of factors.

 8           The first difference, of course, between

 9   Mr. Bankman-Fried and Ms. Ellison is she cooperated, and he

10   denied the whole thing.  And to coin a phrase that a late

11   former partner of mine used on occasion:  He denied the

12   allegations and the alligators who made them.  He went to

13   trial, as was his right, and it didn't work out so well.  The

14   reason it didn't work out so well in some significant part is

15   that Ms. Ellison cooperated.  You folks have all heard from

16   Ms. Sassoon already about the value and the quantum of

17   cooperation she provided.

18           I've seen a lot of cooperators in 30 years here.  I've

19   never seen one quite like Ms. Ellison.  I don't remember a

20   single time when she was caught in the slightest error of fact,

21   the slightest inconsistency with whatever she had told the

22   government months before and what she said on the stand.  Not

23   one.  I saw no inconsistency at all between the documentary

24   evidence and what she said on the stand.  And what she said on

25   the stand was very incriminating of herself, and she pulled no

1    punches about it.

2          One of the remarkable parts, and it's only one - there

3    were a great many - related to what I will always remember as

4    the seven balance sheets.  There was a time when lenders were

5    calling in the loans to Alameda, and one of them, I believe

6    Genesis, asked Alameda for a balance sheet, and Ms. Ellison

7    prepared a rough balance sheet and showed it to

8    Mr. Bankman-Fried.  He said, "Boy, that doesn't look too good"

9    or words to that effect, or agreed with her assessment of that

10   to the same effect.  He told her to see what she could do to

11   obscure more effectively the disastrous condition that Alameda

12   was in.  So she did a spreadsheet on her computer or I guess an

13   Excel worksheet, an Excel spreadsheet with multiple worksheets,

14   and prepared seven different balance sheets, each one more

15   fraudulent than the last.  And she showed it to him, and he

16   picked the last and said, "Send that one."  It hid almost

17   everything.  It was an outrageous fraud.

18          But as I understand what I have been told of the story

19   about how that piece of evidence wound up at trial, it is that

20   Ms. Ellison remembered it when she was talking to the

21   government before they had the spreadsheet, before the document

22   was in their hands or had been looked at, at any rate.  And she

23   described it, as I understand it in detail, and eventually in

24   going through documents that the government obtained, I think

25   it was Ms. Ellison who found it.  Am I correct, Ms. Sassoon?

MS. SASSOON: Yes.

THE COURT: She found it and said, "Here it is." And darned if it wasn't exactly what she had described before the government had or before she had the spreadsheet, and she knew it because she remembered everything about that spreadsheet and how it came to be. That was one of the huge pieces of evidence in this case. And my recollection is - and it may be flawed because I can't commit to memory a trial transcript in every case I try - is that when Mr. Bankman-Fried was first asked about it at trial, he said something like either he had never seen it or he had never seen anything with the seven different versions, I forget which. And then it turned out there was metadata on the computer file that proved that he had been through it.

Now, if I made a mistake here on my facts, I ask both counsel, do I have it right?

MS. SASSOON: That's generally right, your Honor.

THE COURT: Generally right.

Mr. Sahni?

MR. SAHNI: Yes, your Honor.

THE COURT: Okay.

Well, that's cooperation. Mr. Bankman-Fried was the opposite.

So, Ms. Ellison, while you were gravely culpable in this fraud, there is no doubt about it, that remarkable

1    cooperation - not just that incident either - is a fundamental

2    distinction between you and Mr. Bankman-Fried.  You were also

3    less culpable even before you started cooperating.  The

4    government in their closing statement -- strike that.  The

5    government in their argument when I sentenced Mr. Bankman-Fried

6    said something that I thought was accurate.  I still think it

7    is accurate, and it's relevant here.  They said he, and I quote

8    "was greedy to use people's money and advance his own ambition,

9    arrogantly sure of his capacity to pull it off and smugly

10   dismissive of the skeptics, the critics, the rule of law and

11   his victims."

12        Ms. Ellison was less so.  She was by no means free of

13   culpability.  She was seriously culpable, but it wasn't greed

14   to use other people's money.  It certainly wasn't to advance

15   her own ambition beyond her belief in effective altruism that

16   she should make as much money as she could so she could give it

17   away.  She had doubts and she voiced them to Bankman-Fried at

18   the time.  So why did you do it?  Well, both counsel have

19   addressed that.

20        You're a very strong person, Ms. Ellison, in some

21   ways, but you are not inviolable, and somehow, for some reason

22   that is hard for me to understand, Mr. Bankman-Fried had your

23   kryptonite.  You were vulnerable, and you were exploited.  You

24   shouldn't have allowed it.  You knew better.  That's why you

25   were indicted.  But there is an order of magnitude of

O9OQell5 - corrected

 1 difference in my mind between how you came to be a culpable

 2 person and how he came to be a culpable person.

 3         The third thing I want to say, of course, is obvious

 4 at this point.  You are genuinely remorseful.  I think

 5 Mr. Bankman-Fried is sorry too.  He's sorry that the gamble he

 6 improperly took didn't work out, and he's really sorry he got

 7 caught.  Your remorse is the real thing, and that was evident

 8 when you were on the witness stand, but it surely became

 9 evident a lot earlier, and mention was made, I think by both

10 counsel, of what happened when everything began to hit the fan

11 on November 9 of 2022.  You were in Hong Kong.  You called an

12 all-hands meeting.  You spoke to your colleagues there.  You

13 were being recorded, but you didn't know it, but everyone has

14 now heard the recording, and you made a clean breast of what

15 had happened.  You admitted your own culpability, you

16 apologized for it, and your subsequent behavior indicates that

17 that was all sincere.  Your testimony was honest.

18 Mr. Bankman-Fried, as I said, at his sentencing perjured

19 himself.

20         Let me say a word about deterrence or even before I

21 come to that, one other thing.

22         Your cooperation in this case has come at a serious

23 price that you have paid emotionally and personally. I needn't

24 go into the details.  Counsel have done that already.  But your

25 life, every part of your life, has been turned inside out in

1  public to an unusual degree, and now that's probably,

2  hopefully, going to relax.

3          And finally, I want to talk about deterrence.

4  Specific deterrence, which refers to imposing a sentence that

5  would incapacitate you from committing further crimes, in my

6  estimation is entirely unnecessary in this case.  There is no

7  way you are ever going to do something like this again, I am

8  persuaded.  But here is the thing.  This was, if not the very

9  greatest financial fraud ever perpetrated in this country and

10  probably anywhere else, close to it.  And fraud particularly,

11  though obviously not exclusively, in the worlds of finance,

12  commodities, investments, cryptocurrencies, is easy, and it has

13  attracted a lot of perpetrators.  And it's all very well to say

14  that a remorseful and a cooperative defendant who helps the

15  government against all the bad actors should get substantial

16  cooperation -- excuse me -- substantial consideration.  It's a

17  feature of our system.  There is no question about it.  It's

18  important to the ability of the justice system to function.

19  All of us who have functioned in it know that.  But for it in a

20  case this serious to be literally a get-out-of-jail-free card

21  is not something I can see my way clear to.  There is a balance

22  in sentencing between the seriousness of the crime, the need to

23  deter others, and the need to promote respect for the law, all

24  of which argue for an incarceratory sentence, against the very,

25  very substantial credit to which I believe you're entitled for

O9OQellS - corrected

 1    your genuine remorse and your very substantial assistance to

 2    the government.

 3           That said, please rise for the imposition of sentence.

 4           Ms. Ellison, it is the judgment of this Court that you

 5    be committed to the custody of the Attorney General of the

 6    United States or his designee for a term of imprisonment of

 7    24 months on each count, the terms to run concurrently; that

 8    you thereafter are to serve a term of supervised release of

 9    three years; and that you pay the mandatory special assessment

10    of $700.  It is further adjudged that you forfeit to the United

11    States the sum of $11 billion 20 million dollars on the terms

12    and as more fully set forth in the order of forfeiture that I

13    have signed today; and that you pay such restitution, if any,

14    as the Court may require in a subsequent proceeding.

15           The term of supervised release shall be subject to the

16    mandatory, the standard, and the special conditions of

17    supervision set forth in the presentence report (which you have

18    told me you have read) for the first 18 months of the

19    three-year term.  The term of supervised release will be

20    subject to those conditions for the first 18 months of the

21    three-year term.  Throughout the entire three-year term, it

22    will be subject to one additional special condition, which is

23    that you continue to cooperate with the government, including

24    the SEC, the Commodities Futures Trading Commission, and with

25    the bankruptcy Estate of FTX Trading if and to the extent you

1  are requested to do so.

2          You may be seated.

3          I recommend to the Bureau of Prisons that the term of

4  imprisonment be served at a minimum security facility.  This

5  defendant is simply not someone who has any risk of flight or

6  any danger to anyone else.

7          I advise you, Ms. Ellison, that you have the right to

8  appeal from the judgment imposing this sentence if you wish to

9  do so.  If you wish to do so, you have the obligation to file a

10  written notice of appeal with the Clerk of the district court

11  no later than 14 days after the date on which judgment is

12  entered, which may be as soon as today.  If you wish to appeal

13  and you can't afford to pay the fees necessary to do so, you

14  can file for permission to appeal as a poor person.  If that

15  application were granted, you'd be permitted to appeal without

16  payment of the fees.  And if you couldn't afford a lawyer, a

17  lawyer would be appointed for you at government expense.

18          Counsel, any objection in point of law to the sentence

19  as I've imposed it?  Anything you think I should alter, not

20  because you disagree with it because it's erroneous?

21          MR. REHN:  Your Honor, just the one thing as we

22  discussed at the beginning, if the Court could just include

23  that restitution is not mandatory because of the conditions

24  that I outlined earlier, the number of identifiable trial court

25  victims is too large and determining complex issues of fact

O9OQellS - corrected

1    would unduly burden the sentencing.

2            THE COURT:  I will certainly say that as to the second

3    factor.  I so find as to the second factor.

4            Mr. Sahni?

5            MR. SAHNI:  Yes, Judge, we would ask the Court to

6    recommend that Ms. Ellison be designated to a facility as close

7    to the Boston area as possible.

8            THE COURT:  So recommended.

9            Anything else?

10           MR. SAHNI:  We would also ask, Judge, for a surrender

11   date of 45 days, assuming she has received a designation by

12   that time.  And if she has not, we would ask that it be delayed

13   until such time as she has received a designation.

14           THE COURT:  Well, here is what we will do:  Andy, give

15   me a date around then, please.

16           DEPUTY CLERK:  I think that would be November 7,

17   Judge.

18           THE COURT:  Okay.  Ms. Ellison, you are continued on

19   bail on the condition that you voluntarily surrender to the

20   Bureau of Prisons on the date and by the time specified by it

21   at the institution where you will serve your sentence.  I also

22   direct that you comply with this condition.  Any violation may

23   result in the revocation of your bail and of further

24   prosecution for escape.  The date for surrender shall be set by

25   the Bureau of Prisons on or after November 7, 2024.

O9OQellS - corrected

1          If for any reason, Mr. Sahni, we're coming up to

2     November 7 and the Bureau of Prisons has not made a

3     designation, get in touch with my chambers, and unless there's

4     some unforeseen condition, I will postpone the surrender date

5     to permit the Bureau of Prisons to designate it.

6          MR. SAHNI:  Thank you, Judge.

7          THE COURT:  Okay.

8          I want to thank both counsel for excellent

9     presentations.  The papers on this sentencing were excellent

10    and unusually helpful.  Thank you.

11         (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25