

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

November 13, 2024

**BY ECF**

Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

    Re:    *United States v. Gary Wang*, 22 Cr. 673 (LAK)

Dear Judge Kaplan:

    The Government writes in advance of defendant Gary Wang's sentencing scheduled for November 20, 2024, at 10:00 a.m., to advise the Court of his outstanding cooperation, which was significant to the Government's ability to bring criminal charges within a month of FTX's bankruptcy, convict Samuel Bankman-Fried at trial, and recover hundreds of millions of dollars in assets for the benefit of victims. This submission describes Wang's substantial assistance in the investigation of wrongdoing at FTX, the prosecution and trial of Bankman-Fried, and in other matters.

    As detailed below, Wang was the first of Bankman-Fried's co-conspirators to begin cooperating with the Government and the first cooperating witness to testify at Bankman-Fried's trial and describe the fraud scheme. As the first co-conspirator to cooperator, he disclosed firsthand knowledge that established that Bankman-Fried had committed fraud, and information that was used to obtain legal process relating to other FTX and Alameda Research employees, indict Bankman-Fried within a month of FTX's collapse, and seize and forfeit hundreds of millions in assets. At Bankman-Fried's trial, Wang provided crucial testimony about the special privileges that had been granted to Alameda Research on the FTX exchange, and how Bankman-Fried and others abused those features to steal billions of dollars in customer funds. Prior to and at trial, Bankman-Fried had falsely suggested that he was unaware of Alameda's special privileges and did not know how to do computer coding. Wang proved those assertions to be lies, and provided important testimony about how Bankman-Fried directed the creation of those features of the code and was involved in abusing those features. In addition to his trial testimony, Wang has aided the bankruptcy estate in recovering assets, assisted other law enforcement agencies in their own investigations, and made himself available to testify in other criminal cases.

    Wang has also provided substantial assistance – and in the process taken steps to right past wrongs – by putting his extraordinary computer programing skills to use in detecting potential fraud in the stock and cryptocurrency markets. As described in the redacted portion of this

submission, using principles that Wang developed at FTX for know-your-customer due diligence and improper trading detection, Wang has built an interface that the Government has begun using for detecting potential fraud by publicly traded companies. Wang has also been working on a tool for detection of potential illegal activity in cryptocurrency markets, which in the event Wang is sentenced to a period of time served, the Government understands he will complete as part of his ongoing cooperation.

What is particularly notable about Wang's cooperation in this case is that he decided to cooperate immediately, even though he was not involved in many aspects of the criminal enterprise, and there was little documentary evidence linking Wang to the frauds on FTX's customers and investors. Specifically, while Wang was involved in implementing certain computer code provisions, it was not until late 2021 or 2022 that he learned Alameda had made use of approximately $3 billion in customer funds. And like Nishad Singh, it was not until September 2022 that Wang learned that Alameda had used in excess of $10 billion in customer funds and would not be able to repay its debt. While Wang remained employed at FTX following these realizations, he did not spend a dime of customer money, and took minimal steps to further the fraud at that point. Unlike Bankman-Fried and his co-conspirators, Wang did not make false statements to customers, lenders, or investors; he was not involved in spending customers' money at any time; he did not falsify revenue, engage in money laundering, or commit campaign finance violations; and he did not profit from the scheme. In fact, there were very few documents in the trial evidence, beyond the computer code, implicating Wang in the fraud. It is easy to imagine another person in Wang's position who would have denied awareness and responsibility, argued he was merely present and nothing more, or at a minimum waited to see how the Government's investigation developed to determine whether he or could elude responsibility. Wang's decision, instead, to immediately accept responsibility, and in the process provide evidence to the Government that allowed it to bring charges so quickly is in and of itself remarkable.

In light of these facts, and assuming that Wang continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), that the Court sentence Wang in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

I.    **Background and Offense Conduct**

Wang was born in China and moved to the United States when he was seven years old. (Presentence Investigation Report (PSR) ¶¶ 63-64, ECF No. 514). During high school, Wang met Bankman-Fried at a summer math camp. (Trial Tr. at 310). Wang attended college at MIT, where he reconnected with Bankman-Fried, who was also a student. (Trial Tr. at 310-11). After college, Wang became a software engineer at Google in Boston, while Bankman-Fried moved to New York to become a trader at Jane Street. (Trial Tr. 188; PSR ¶ 66).

In 2017, Bankman-Fried approached Wang about starting a cryptocurrency trading firm. (Trial Tr. at 312). They moved to Berkeley, California, where Bankman-Fried founded Alameda Research. (Trial Tr. at 312-16). Wang was made a 10% owner of the firm. (*Id.*). However, he was not one of the publicly named co-founders, nor was he in a leadership position. Instead, he focused

on writing computer code to assist Alameda in its trading operations. As Bankman-Fried conceded during his own testimony at trial, Wang was "basically building out the computer systems themselves." (Trial Tr. at 2310). Wang never took on a greater role at Alameda.

In 2019, Bankman-Fried suggested that he and Wang found a cryptocurrency exchange, which became known as FTX. (Trial Tr. at 318). Wang was the chief technical officer. (Trial Tr. at 303). He made $200,000 a year and was granted equity in FTX. (Trial Tr. at 324). Bankman-Fried owned 60 percent while Wang owned 17 percent and Singh owned 5 percent. (*Id.*). Wang and Bankman-Fried did not share responsibilities equally. (Trial Tr. at 322). Wang was responsible for writing the computer code and reviewing others' code. (*Id.*). As Singh testified, their jobs were "similar in that [they] both wrote code." (Trial Tr. at 1304). Bankman-Fried, on the other hand, was involved in public relations, talking to investors, speaking to the media, talking to customers, giving interviews, doing advertisements, raising funds, lobbying, directing strategy, and directing spending. (Trial Tr. at 323). Wang did none of those things. When Wang and Bankman-Fried disagreed about something, Bankman-Fried made the decision. (*Id.*).

Over time, Wang's role – particularly any notional leadership role – diminished. Wang worked so much on correcting "bugs" in FTX's computer code that his colleagues, such as Adam Yedidia, "were concerned" that he "might burn out." (Trial Tr. at 213). By the time FTX moved to the Bahamas in 2021, Wang was no longer seated near Bankman-Fried (Singh was). Wang did not supervise any software engineers. (Trial Tr. at 323). Wang considered leaving at various points, but was concerned about what would happen to FTX since the technical coding team at FTX was small.

### A. Fraud on FTX Customers

The evidence at Bankman-Fried's trial proved that over the course of multiple years, Bankman-Fried stole and directed the misappropriation of billions of dollars in customers' funds. The fraud is one of the largest financial frauds ever, resulting in billions of dollars in losses and thousands of affected victims. While Wang was not the mastermind of this fraud, and was not directly involved in the actual misappropriation of customers' funds, he contributed to the fraud by unwittingly putting in place computer code, which, he later came to understand, was used by Bankman-Fried to misappropriate customer money. As Wang described at trial, he "gave special privileges to Alameda Research on FTX, which allowed it to withdraw unlimited amounts of funds from the platform," and together with his co-conspirator they "lied about this to the public." (Trial Tr. at 304). Wang testified about two special privileges, in particular, that allowed Alameda to take customer funds: (1) the "ability to withdraw funds or transfer funds regardless of what [Alameda] had in its account, even if that would cause the account balance to become negative," and (2) "a very large line of credit which allowed [Alameda] to have open orders and open positions, essentially without limit." (Trial Tr. at 305-06, 350). As a result of Alameda's ability to incur a negative balance on FTX, and its line of credit, it withdrew over $8 billion from FTX, leaving the exchange unable to pay customers. (Trial Tr. at 309-10, 351). This was an incredibly serious crime, for which Wang has accepted responsibility and expressed remorse.

Wang's involvement began, unwittingly, early in his time at FTX. In July 2019, Bankman-Fried asked Wang and Singh to make an addition to FTX's code to permit Alameda to have a

negative balance in its account. (Trial Tr. at 352-53). Bankman-Fried told Wang and Singh that he wanted to pay for various FTX-related expenses from Alameda's accounts, including expenses relating to FTT, the native cryptocurrency of FTX. (Trial Tr. at 352-53, 359). Bankman-Fried also told Wang that the ability for FTX to maintain a negative balance was necessary for making conversions from U.S. dollars to stablecoins. (Trial Tr. at 364). At that time, Singh added an "allow negative" feature to FTX's computer code. (Trial Tr. at 359-60).

In late 2019, Wang overheard Bankman-Fried talking to an Alameda trader about Alameda having a negative balance on FTX. (Trial Tr. at 375). At that time, the Alameda trader had asked Bankman-Fried whether it was permissible for Alameda to continue to withdraw from FTX, even if it had a negative balance. (*Id.*). Bankman-Fried responded that as long as the amount withdrawn from FTX was less than FTX's total trading revenue (between $50 and $100 million), it was fine for Alameda to keep withdrawing. (*Id.*).

Then, by chance, at the very end of 2019 or in early 2020, Wang did a database query to check what Alameda's balances were at the time. When he checked, Wang observed that the balance was negative by more than what FTX's trading revenue was at the time. (Trial Tr. at 376). The implication of this discovery was that Alameda was taking FTX customer funds. (*Id.*). Wang was "surprised because it didn't line up with what [he had] heard [Bankman-Fried] say earlier," so Wang went to speak to Bankman-Fried. (Trial Tr. at 377). In response, Bankman-Fried insisted that Wang was mistaken, and asked Wang whether he was including the value of Alameda's FTT. (*Id.*). Including the value of Alameda's FTT meant that Alameda's balance was no longer negative by more than what FTX's trading revenue. As the trial evidence established, including Alameda's FTT did not truly address Alameda's negative balance because the FTT was illiquid and could not be sold at the value on the balance sheet, as Bankman-Fried well knew. Bankman-Fried's explanation did not make "total sense" to Wang but he mistakenly "trusted his judgment." (Trial Tr. at 380).

At some time not long after FTX's founding, Bankman-Fried directed Wang to grant a line of credit on FTX to Alameda. Initially, the line of credit was not particularly large. Alameda was one of the main market markers on FTX, and over time there were instances when Alameda ran into issues doing market making because it did not have enough collateral on FTX. (Trial Tr. at 398). When that happened, Alameda traders told Bankman-Fried, who, in turn, told Wang to "take up Alameda's line of credit." (*Id.*). After this happened a few times, Bankman-Fried told Wang to take the line of credit high enough so this would not be an issue again. (*Id.*). Wang told Bankman-Fried he could set it to $65 billion, and Bankman-Fried told him to do it. (*Id.*).

In late 2021, Wang did a database query and saw that Alameda had withdrawn approximately $3 billion from FTX using its line of credit. (Trial Tr. at 400). He mentioned it to Bankman-Fried. (*Id.*). While Wang had no involvement in using Alameda's special privileges or withdrawing customer funds, he did not – as his sentencing submission observes – "disable" the special privileges and "continued to maintain FTX's overall digital infrastructure." (Wang Sent. Sub. at 16, ECF No. 535).

In June 2022, prices for several cryptocurrencies had fallen, and some of Alameda's lenders were asking for their money back. (Trial Tr. at 422). Bankman-Fried asked Wang to help figure

out Alameda's balances on FTX. (*Id.*). Wang was not involved in Alameda's borrowing from lenders and did not know how much had been borrowed. (Trial Tr. at 441). Wang worked on a spreadsheet about Alameda's balances with Singh and Caroline Ellison, and Bankman-Fried reviewed it. (Trial Tr. at 426; *see also* GX-50). Wang determined that Alameda's main account on FTX had a negative balance of $2.7 billion, and Alameda owed $11 billion in fiat deposits that had been processed by the firm. (Trial Tr. at 433-34). In total, combining all of Alameda's accounts, Wang saw that Alameda's total balance on FTX was negative $11 billion. (Trial Tr. at 436). Because FTX's revenues were approximately $1.5 billion, Wang knew in June 2022 that the remaining amount of funds taken by Alameda had to be customer funds. (Trial Tr. at 437-38). After doing these calculations, Wang met with Bankman-Fried, Ellison, and Singh, and after some discussion, Bankman-Fried told Ellison that Alameda could go ahead and return borrowed funds to Alameda's lenders. (Trial Tr. at 440). Wang had no involvement in repaying those lenders, did not know how they were being repaid, and did not know the amount of the repayment.

Then, in September 2022, Bankman-Fried and Ellison learned that *Bloomberg* was planning to publish an article about the relationship between FTX and Alameda. (Trial Tr. at 442). Bankman-Fried said it would be bad for FTX. (Trial Tr. at 443). Soon thereafter, Bankman-Fried shared a Google document with Wang and Singh about shutting down Alameda. (*Id.*; *see also* GX-18). Bankman-Fried, Wang, and Singh discussed the idea, and then had a second discussion that included Ellison. (Trial Tr. at 447-48). In that second discussion, Wang asked Ellison how much money Alameda had borrowed from FTX, and she said $14 billion. (Trial Tr. at 449). Wang then told Bankman-Fried that, in his opinion, such a large deficit meant that Alameda could not shut down because it did not have the assets to repay the debt. (Trial Tr. at 450). Bankman-Fried did not shut down Alameda. (*Id.*).

On Sunday, November 6, 2022, FTX customers had begun to withdraw their money from the exchange. (Trial Tr. at 451). Singh woke up Wang at his apartment and told him there was a large amount of customer withdrawals, and they were getting backed up in the system. (*Id.*). Wang started working to speed up customer withdrawals. (Trial Tr. at 452). Bankman-Fried instructed Wang to calculate how much additional money needed to be deposited on to FTX so that customers could withdraw all their funds. (Trial Tr. at 452-53). Wang totaled customer balances, excluding Alameda, and found that there was sufficient money to cover customer withdrawals. (Trial Tr. at 453). Wang gave that conclusion to Bankman-Fried, who responded by asking whether Wang was counting "the special Korean accounts." (Trial Tr. at 453-54). Wang did not know what Bankman-Fried was talking about, so Bankman-Fried explained that there was a hidden account that displayed Alameda's "fiat" liability, meaning the amount of money it had taken in fiat deposits. (*Id.*). Singh knew about the account and shared the account information with Wang. (Trial Tr. at 454). After including that hidden account, Wang determined that FTX was $8 billion short of having sufficient funds to cover customer withdrawals. (Trial Tr. at 457). Between November 7 and November 10, Wang worked principally to liquidate funds and facilitate customer withdrawals.

On November 11, 2022, FTX declared bankruptcy. On November 12, Bankman-Fried asked Wang to drive with him to the Bahamas Securities Commission. (Trial Tr. at 465). During the drive, Bankman-Fried expressed a preference for transferring FTX's remaining assets to Bahamas regulators or liquidators. (*Id.*). Bankman-Fried preferred authorities in the Bahamas

because "they seemed friendly and seemed willing to let him stay in control of the company." (Trial Tr. at 465-66). After arriving at the Bahamas Securities Commission, Bankman-Fried, his father, and attorneys met with the regulators while Wang was left outside to wait. (Trial Tr. at 466). After his meeting with the regulators, Bankman-Fried told Wang that the regulators were "going to order us to transfer the assets … to the Bahamas." (*Id.*). Bankman-Fried, Wang, and the Bahamas regulators went back to FTX's office. (Trial Tr. at 467). The U.S. bankruptcy estate's attorneys told Bankman-Fried that he should not transfer any funds that were the subject of the bankruptcy, but he told Wang to "ignore the instructions and continue transferring the funds." (Trial Tr. at 470).

### B. Fraud on FTX Investors

In addition to accepting responsibility for his involvement in FTX's fraud on its customers, Wang also took responsibility for securities fraud. Wang never spoke to the media and had very little contact with investors. Nonetheless, because FTX had an open floor plan, he overhead some of Bankman-Fried's conversations with investors. (Trial Tr. at 400). During some of those calls, Wang overheard Bankman-Fried make statements that Alameda did not receive special treatment on FTX, which Wang knew were false because Alameda had unique functionality on FTX. (PSR ¶ 43). At the time Wang heard Bankman-Fried lying to investors, he did not yet know that Alameda was exploiting special privileges to withdraw customer money. But after learning that, he continued to operate the code in a way that he knew was incompatible with information provided to FTX investors.

### C. Compensation, Spending, and Loans

Wang received an annual salary of $200,000 from FTX. (PSR ¶ 78). He did not withdraw any significant amount of money from FTX. In contrast to all of his co-defendants, Wang did not engage in significant personal spending: indeed, he is able to return some of his salary as forfeiture because he did not spend it all.

At various times during his tenure at FTX, Wang was given loans from Alameda to make investments in companies affiliated with FTX, or in which Bankman-Fried wanted to invest. (Trial Tr. at 325, 580). Bankman-Fried or attorneys acting at his direction presented the loan agreements to Wang. (*Id.*). They told Wang that the loans were for corporate investments, but did not give him additional details. (Trial Tr. at 608-10). Wang understood that the expectation was that he would sign the loans. (*Id.*). Those loans totaled $200 to $300 million. (Trial Tr. at 326). None of the money went to Wang; instead, it was used for investments by FTX, Alameda, or Bankman-Fried. (Trial Tr. at 639). To the extent Wang's name was listed on some of those investments – such as a purchase of Robinhood stock – he did not know about it. In connection with his plea and sentencing, Wang has also agreed to forfeit any interest he might have in any company investment on which he was listed as an owner.

The only money that Wang ever received beyond his salary was an unsolicited, one-time loan of $1 million that Bankman-Fried sent to Wang's FTX account after Wang expressed that he was anxious about paying interest on the company loans that Wang had signed. (Trial Tr. at 324-25). At some point Wang drew $200,000 from that line of credit. (Trial Tr. at 575-76). He feared

that his then-fiancée would have nowhere to live in the event of a conflict between the United States and China, so he loaned her $200,000 to purchase a small property in hopes of securing residency in St. Kitts. (Trial Tr. at 583). Wang's then-fiancée soon thereafter repaid the money to Wang, and he used it to pay taxes. In other words, Wang did not ultimately spend any of that line of credit on anything other than taxes.

## II.     Procedural History

On November 13, 2022, counsel for Wang contacted the Government about cooperating with its investigation. On November 14, Wang's counsel informed the Government that Wang wished to leave the Bahamas to travel to New York and meet with the Government. There was, however, a problem: authorities in the Bahamas had made Wang surrender his passport. (Trial Tr. at 592-93). Although he had been advised that he would be getting the passport back, there were unexplained delays in it being returned. To get Wang out of the Bahamas, the Government arranged for him to go to the U.S. embassy, request an emergency passport, and leave the country. On November 16, Wang left the Bahamas and traveled to the United States. On the morning of November 17, Wang met with the Government and proffered for several hours. (Trial Tr. at 471). At the time Wang met with the Government, he had not been arrested or charged with any crimes. (*Id.*). He was the first FTX employee, first member of the conspiracy, and first trial witness to be interviewed by the Government.

At Wang's first meeting, he voluntarily surrendered his laptop and two phones, which contained voluminous data, including FTX's codebase, Slack, emails, and preserved Signal messages. At that first meeting, and multiple other meetings in November and December 2022, Wang walked the Government through FTX's code, with a particular focus on the code portions that permitted Alameda to have special privileges on FTX.

On December 9, 2022, a grand jury sitting in the Southern District of New York returned an eight-count Indictment charging Bankman-Fried with conspiracy to commit wire fraud, wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States and commit campaign finance violations. On December 12, 2022, Bankman-Fried was arrested. The charges against Bankman-Fried were unsealed on December 13, 2022, the same day the SEC and CFTC announced the initiation of civil proceedings against Bankman-Fried.

On December 19, 2022, Wang pleaded guilty before the Honorable Ronnie Abrams to four counts: (1) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; (2) wire fraud on customers, in violation of 18 U.S.C. § 1343; (3) conspiracy to commit commodities fraud, in violation of 18 U.S.C. § 371; and (4) conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371. Wang was uninvolved in the wire fraud on Alameda's lenders, the money laundering conspiracy, or the campaign finance violations, and as a result he did not plead guilty to any of those offenses.

In total, Wang met with the Government at least 20 times, and spent additional time outside of these meetings reviewing computer code, documents, emails, and spreadsheets in order to identify and decode relevant documents for the Government.

Wang testified at Bankman-Fried's trial in October 2023 for three days. He was the first cooperating witness to testify. At the conclusion of the trial, Bankman-Fried was convicted on all seven counts of the superseding indictment.

### III. The Presentence Investigation Report and the Applicable Guidelines Range

The United States Probation Office issued a final Presentence Investigation Report on September 30, 2024. In the PSR, the Probation Office calculates the otherwise applicable Guidelines sentence to be 292 to 365 months' imprisonment, based on an offense level of 40 and a criminal history category of I. (PSR ¶ 83). The calculations of the Probation Office are set forth in paragraphs 44 through 61 of the Presentence Report. The offense level is driven principally by the loss amount of over $10 billion, which under U.S.S.G. § 2B1.1(b)(1)(P), results in a 30-level increase to the offense level. (PSR ¶ 47). Of the four defendants convicted of the fraud on FTX's customers, Wang is the only defendant whose guidelines are not life imprisonment.

### IV. Wang's Cooperation and the Significance of his Assistance

Under Section 5K1.1 of the Guidelines, the appropriate reduction in a defendant's sentence for his cooperation is determined based on, among other things, "the significance and usefulness of the defendant's assistance," the "truthfulness, completeness, and reliability" of his information, the "nature and extent" of his cooperation, and the "timeliness of the defendant's assistance." As measured by those factors, Wang's cooperation was not only timely, significant, and reliable, but extraordinary.

#### A. The Timeliness of Wang's Cooperation

Wang's cooperation was very timely. FTX declared bankruptcy on November 11, 2022, and on November 17, 2022, Wang was interviewed at the U.S. Attorney's Office. While Wang began proffering less than a week after the company's collapse, it appears his cooperation would have started even sooner, but for the fact that he was detained in the Bahamas by being deprived of his passport. It took intervention by the Government to get Wang out of the Bahamas, and he began proffering the morning after he returned to the United States.

Wang was the first FTX employee to be interviewed by the Government. At the time of Wang's interview, the Government had interviewed one other witness – a former Alameda employee who would not end up being a trial witness. Wang was the first witness to give the Government any information about the code-based ways in which Bankman-Fried misappropriated money from FTX customers. Thus, it was after Wang's first interview that the Government began to have an understanding of how Bankman-Fried had stolen customers' money. Wang was the first cooperating witness to be interviewed and the first to be thoroughly debriefed. Wang was interviewed four times before Bankman-Fried was indicted, and by the time of Bankman-Fried's indictment, the Government was already in a position to enter into a cooperation agreement with Wang. By comparison, Ellison was interviewed for the first time the day before Bankman-Fried's indictment, and while Singh was interviewed in November 2022, he was not fully debriefed and signed to a cooperation agreement until early the next year. Measured against almost any other white collar prosecution, the timeliness of Wang's cooperation was extraordinary.

The timeliness of Wang's assistance contributed to the Government's ability to seek an indictment against Bankman-Fried. Before Wang started cooperating, the Government did not know the ways in which Bankman-Fried and his co-conspirators had misappropriated money from FTX customers. Wang immediately advanced the investigation by describing one of the means by which Bankman-Fried stole money, providing sufficient evidence for the Government to bring fraud charges. Wang also provided the Government with valuable documentary evidence that was not previously in its possession. The Government first obtained access to FTX's computer code, including the portions that gave special advantages to Alameda, from Wang's laptop. Wang also provided the Government with Slack and Signal messages, which the Government did not have access to prior to that point.

The significance of the timing of Wang's cooperation is also underscored by what the Government did not know when Wang began proffering. At the time of Wang's first interview, the Government did not have sufficient evidence to charge Wang – it was he who inculpated himself at that very first interview. While the Government may well have developed sufficient information to bring charges, without Wang's early acceptance of responsibility, the Government would not have been able to bring charges against Bankman-Fried, Wang, or any co-conspirators with the speed and efficiency that it did, which, in turn, might have posed additional risk to the Government's ability to arrest and try Bankman-Fried, secure assets, and reassure victims and the public of its ability to render justice swiftly and effectively. With respect to Wang, given the paucity of documentary evidence inculpating him, and his absence from several important events in 2021 and 2022, its possible that it would have been difficult to amass the evidence to charge Wang with any type of expediency. Thus, the timing of his cooperation is notable both in assessing the substantial assistance he provided, but also in considering his early acceptance of responsibility.

### B. The Nature, Extent, Usefulness, and Significance of Wang's Cooperation

Wang's extensive cooperation has come in three forms, all significant. First, he provided substantial assistance in the investigation and prosecution of Bankman-Fried, and the recovery of stolen assets. Second, he has aided other law enforcement agencies and the bankruptcy estate. Third, he has used his computer programing skills to aid prosecutors in the development of tools to detect potential fraud in financial markets.

   1. <u>Wang's Assistance in the Prosecution of Bankman-Fried</u>

Wang's information and testimony were crucial to bringing charges against Bankman-Fried, securing a conviction at trial against Bankman-Fried, and seizing assets that have been forfeited as crime proceeds.

First, Wang provided substantial assistance in the investigation of the collapse of FTX and the prosecution of Bankman-Fried. Over his first several interviews with the Government, Wang described in detail FTX's computer code and the hidden special advantages that had been granted to Alameda. That information was important because it helped to reveal one of the ways in which Bankman-Fried misappropriated customers' money. While Singh also provided information about FTX's code, Wang's cooperation stands out because he was the first to provide the information,

and because he recalled specific, one-on-one conversations with Bankman-Fried about the code provisions in question. For instance, as described above, Wang informed the Government about the existence of Alameda's $65 billion line of credit, how the line of credit came to be so large, what such a large line of credit allowed Alameda to do, and Bankman-Fried's involvement in directing the line of credit to be so large. There was no other witness that the Government met with who had direct conversations with Bankman-Fried about setting such a large line of credit.

Wang also provided valuable information about Bankman-Fried's mental state. Like Singh, Wang did not have a lot of visibility into Alameda's balances or its spending until the fall of 2022. However, while he may not have appreciated its significance at the time, Wang was able to recount the exercise in June 2022 that revealed an Alameda liability in excess of $10 billion. And he recalled that after doing that calculation, Bankman-Fried instructed Ellison to repay lenders, which ultimately corroborated Ellison's testimony at trial. Wang, like Singh, recalled conversations around Bankman-Fried's proposal in September 2022 to shut down Alameda. From his involvement in those conversations, Wang was able to testify about Bankman-Fried's knowledge of the large, unrepayable hole in FTX's balance sheet. Additionally, because Ellison was not a FTX employee, and Wang was uniquely positioned to describe the falsity of Bankman-Fried's tweets in November 2022.

Second, Wang provided important information about Bankman-Fried's location prior to Bankman-Fried's arrest. Following FTX's bankruptcy, there was uncertainty as to where Bankman-Fried was residing in the Bahamas. Bankman-Fried appeared in several televised interviews, and the backdrop did not appear to be the penthouse apartment that Bankman-Fried had once lived in. Without precise location information, the Government was concerned that authorities in the Bahamas would not arrest Bankman-Fried. Wang was able to identify Bankman-Fried's location. Specifically, the Government provided Wang with several still photographs of Bankman-Fried's televised appearances in November and December 2022. From those Wang correctly identified the apartment Bankman-Fried was living in, leading to Bankman-Fried's arrest.

Third, Wang provided important trial testimony. Wang was the first cooperating witness to testify. He testified over three days. Wang began his testimony by candidly describing his own culpability in the fraud on FTX customers. (Trial Tr. at 304-10). He then described how FTX, its code, and its database function. As part of that testimony, Wang described the special features that Bankman-Fried had directed be added to FTX's code, and the result of those features being in place. That testimony was particularly important because Bankman-Fried had claimed publicly before trial that he did not know how to code and was unfamiliar with the coding features at issue in the case. Wang testified about conversations in June and September 2022, which established Bankman-Fried's knowledge of the fraud on FTX customers and Alameda's large negative balance on FTX. For example, Wang described how Bankman-Fried asked him to include in Alameda's balance calculation the secret account of their "Korean friend," which reflected Alameda's total fiat liability. That testimony was one of several examples of Bankman-Fried acting deceptively and concealing his criminal conduct. Wang also testified about the false statements Bankman-Fried made to investors, and the false statements Bankman-Fried made on Twitter in November 2022. Like his other testimony, Wang's information rebutted one of Bankman-Fried's trial defenses, that he did not know his tweets were false, and did not intend to mislead when he tweeted.

Wang finished his testimony by describing Bankman-Fried's late-stage efforts to transfer FTX assets to regulators in the Bahamas who Bankman-Fried perceived as "more likely to let him stay in control of the company." (Trial Tr. at 470). While Wang was largely excluded from Bankman-Fried's conversations with authorities in the Bahamas, and it is likely the case that Bankman-Fried was misleading Wang about the circumstances, Wang's testimony was valuable in establishing that Bankman-Fried committed bankruptcy fraud.

Fourth, Wang provided valuable documentary evidence to the Government. The most notable piece of evidence was the full FTX computer code. In addition, Wang provided a trove of Slack and Signal communications, many of which may have been deleted but for Wang's efforts to preserve them.

Finally, Wang provided substantial assistance in the recovery of victims' money. In the wake of FTX's bankruptcy, Wang worked many hours aiding the bankruptcy estate in transferring assets for safekeeping. Once he began cooperating with the Government, Wang also provided valuable information that aided the Government in obtaining crime proceeds for seizure.

2. <u>Wang's Assistance to Other Law Enforcement Agencies and the Bankruptcy Estate</u>

Wang has also provided substantial assistance to other law enforcement agencies and the FTX bankruptcy estate, and offered to testify in two other criminal trials.

Wang has assisted the Department of Justice in other investigations. He has met with the FBI to help analyze FTX's database for evidence of criminality by third parties unrelated to the fraud at FTX. He has volunteered to testify in two other criminal trials. Ultimately he was not needed for one of the trials, in which he would have testified about the values at which certain cryptocurrencies were trading on FTX. The other trial is pending, and he may be called to testify about the hack of FTX by third parties shortly after FTX's bankruptcy. Wang has also assisted the Department of Justice's National Cryptocurrency Enforcement Team and the United States Attorney's Office for the District of Columbia in connection with a separate investigation concerning the hack of FTX by answering questions about, among other things, how FTX held assets and its security protocols.

Beyond the Department of Justice, as confirmed by the SEC and the CFTC, Wang provided valuable assistance to both agencies in their parallel investigations. From his first proffer, Wang answered questions in a room filled with law enforcement agents, Assistant U.S. Attorneys, and representatives from the SEC and CFTC who were conducting their own parallel investigations. Based on conversations with the SEC and our review of the SEC's civil complaints, we understand that the SEC's civil complaints relied in part on information provided by Wang or corroborated by him.

With respect to the CFTC, Wang provided substantial assistance to the CFTC in its civil enforcement actions against Bankman-Fried and the FTX and Alameda Research entities, as well as in related matters involving possible violations of the Commodity Exchange Act. On December 19, 2022, Wang entered into a cooperation agreement with the CFTC, and on December 23, 2022, he entered into a consent order of judgment on liability with the CFTC. Both before and after the

date of Wang's cooperation agreement, he provided material assistance in connection with the CFTC's action against FTX, Alameda and Bankman-Fried. The CFTC's action against the FTX and Alameda Research entities resulted in a $12.7 billion consent judgment, with all monetary relief to be used to compensate to FTX customers and victims of FTX's fraud. *See* Consent Order For Permanent Injunction and Other Equitable Relief Against Defendants FTX Trading Ltd. d/b/a FTX.com and Alameda Research, LCC, *CFTC v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y. Aug. 7, 2024), ECF No. 44. The CFTC's action against Bankman-Fried continues, and Wang has agreed to continue providing information to the CFTC, and to testify in that action, as needed.

Wang also cooperated with an investigation being conducted by the New York Attorney General's Office. Wang shared information on three occasions, and the state prosecutors found his information helpful in advancing their investigation.

Finally, Wang has helped the FTX debtors since the bankruptcy. Wang assisted in preserving assets after FTX's cybersecurity breach in the first hours of the bankruptcy. As the Government understands it, by working through the night, Wang was able to help preserve approximately $800 million dollars in assets. Wang has also assisted the bankruptcy by answering technical questions about the exchange's code, database, and security infrastructure. Furthermore, Wang has provided information that may assist the estate in its adversary proceedings. Wang also made himself available to the bankruptcy's independent examiner, and has had multiple meetings providing information.

3. Wang's Assistance in Creating Tools to Detect Future Financial Fraud

According to every witness the Government interviewed, Wang is an exceptional computer programmer. While the special privileges granted to Alameda were a central part of Wang's trial testimony, that programming work represented a tiny fraction of the coding work Wang did at FTX. Most of Wang's work was unrelated to the criminal enterprise, and some of the programming innovations at FTX were considered industry leading thanks to Wang's skill. At FTX, Wang created an automated know-your-customer system, which used forms of filtering and geographic blocking to exclude potential problematic users and accounts. Wang also created a risk and liquidation engine, which monitored accounts' trading behavior to make sure they did not become over-leveraged or engage in manipulative trading.

The computer coding concepts that Wang implemented at FTX have implications for fraud detection. Since he began cooperating with the Government, Wang has created a tool for the detection of potential fraud in the stock market.[1] Specifically, ████████████████████████████████████████████████████████████████████████████████████████████

---

[1] The Government respectfully requests that the portion of its sentencing brief providing details about the fraud detection tools being developed by Wang be maintained under seal. The public disclosure of those details could potentially undermine the effectiveness of the tool. The proposed redaction and sealing will still permit the public discussion of the general nature of Wang's proactive cooperation.





The tool has significant potential value to the Government.

To provide further assistance, Wang is in the process of developing a similar tool for cryptocurrency markets, which – if he is sentenced to a time served sentence – the Government hopes it will be able to take advantage of early next year.

Wang's willingness to use his skills proactively, to help detect other criminal activity in financial markets, distinguishes his cooperation from the vast majority of cooperating witnesses to appear before this Court.

### C. Wang's Truthfulness and Reliability

Wang's testimony was truthful and was corroborated by other evidence. From his first meeting, Wang took responsibility for his involvement in the fraud on FTX's customers. While there were several parts of the fraud that Wang was not involved in, he immediately took responsibility for his conduct and pled guilty for his involvement in crimes. Wang was entirely forthcoming in his first proffer, and in the next 19 meetings with the Government. While he never made publicly false or deceptive statements, was not involved in spending customer money, and was not tied to the fraud through a paper record, he immediately disclosed his role. He also volunteered details, including conversations with Bankman-Fried, that inculpated Wang and that the Government would never have discovered but for his cooperation.

Wang was consistent in every single meeting and throughout his trial testimony. He approached interviewing with the Government with seriousness and dedication. Wang took a multi-hour bus ride every time he met with the Government, each time dressed in a suit. He was focused on every interview, was willing to go over portions of the computer code again and again until investigators understood it, and made preparations in between interviews so that the time would be productive. The cross-examination of Wang at trial was uneventful in large part because there were no inconsistencies, even unintentional, in what Wang had told the Government in any of his meetings with the Government or in his testimony that defense counsel could exploit.

In short, Wang was fully committed to cooperation, and to telling the truth. He brought information and evidence to the Government's attention, and the information uncovered by the Government in its own investigation corroborated things that Wang disclosed previously.

## V. Restitution and Remission

At Bankman-Fried's sentencing, the Court declined to order restitution "due to the complexity of the case and the number of victims," and instead granted the Government's motion to authorize the United States to compensate victims with finally forfeited assets through a remission process. (ECF No. 424 at 6). The Court ordered the same at Ellison's and Singh's sentencings. The Court should do the same here. As explained in the Government's submission ahead of Bankman-Fried's sentencing, ordering restitution would be extremely costly and administratively impractical in this case. (ECF No. 410 at 109-112). Therefore, the Government seeks to return all stolen assets to victims through a remission process, consistent with its frequent approach in complex fraud cases with numerous victims. *See id.* at 110 (citing *United States v. Madoff*, 09 Cr. 213 (DC), Dkt. 106 & *United States v. Bonventre*, 10 Cr. 228, Dkt. 318 (Madoff Ponzi scheme); *United States v. Sharma*, 18 Cr. 340, Dkt. 407 (multi-million dollar cryptocurrency scheme); *United States v. Dos Santos*, 20 Cr. 398, Dkt. 283 (multi-million dollar cryptocurrency scheme)).

Accordingly, the Government respectfully requests that the Court include the following language regarding restitution in its sentence and judgment:

> The Court declines to order restitution, based on its finding that determining complex issues of fact related to the cause and amount of the victim's losses would complicate and prolong the sentencing process. It instead grants the government's motion to authorize the United States to compensate victims with finally forfeited assets through a remission process, as restitution would be impractical in this case.

## VI.  Conclusion

The Government believes that Wang provided – and continues to provide – substantial assistance to the Government in its investigation and prosecution of wrongdoers, and in its recovery of assets for victims. Accordingly, as discussed, assuming Wang continues to comply with the terms of his cooperation agreement, the Government intends to request at sentencing that the Court sentence Wang in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:  /s/ Nicolas Roos
Danielle R. Sassoon
Danielle Kudla
Thane Rehn
Nicolas Roos
Assistant United States Attorneys
Southern District of New York

cc: Ilan Graff, Esq.
Alex Miller, Esq.