Clerk of Court
USDC
500 Pearl Street
New York, NY 10007

February 5, 2026

To Whom It May Concern:

Enclosed please find a pro se motion for a new trial under Rule 33 of the Fed. R. Crim. Proc. On behalf of Samuel Bankman-Fried, along with a supporting Memorandum of Law and a Declaration in support of the motion from Daniel Chapsky.

Although Mr. Bankman-Fried is proceeding pro se, because he is currently incarcerated he has authorized me to file this on his behalf.  If you have any questions concerning this motion or the supporting papers, please address them to me.  My contact information is below.

Sincerely,

Barbara H. Fried
Saunders Professor of Law, Emerita
Stanford Law School
barbarafried1110@gmail.com
(650) 776-6877

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATE OF AMERICA,**
Plaintiff

**v.**

**SAMUEL BANKMAN-FRIED,**
Defendant

Case No.  22 Cr. 673 (LAK)

**NOTICE OF MOTION BY DEFENDANT SAMUEL BANKMAN-FRIED FOR A NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE AND THE DUE PROCESS CLAUSE OF THE US CONSTITUTION**

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law and Attached Declaration (Exhibit A), Samuel Bankman-Fried hereby moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure and the Due Process Clause of the US Constitution.

Dated: February 5, 2026

Respectfully submitted,

/s/ *Samuel Bankman-Fried*

Samuel Bankman-Fried
Defendant, pro se
Reg. No. 37244-510
FCI Terminal Island
San Pedro, CA

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATE OF AMERICA,**
Plaintiff

**v.**                                      Case No.  22 Cr. 673 (LAK)

**SAMUEL BANKMAN-FRIED,**
Defendant

## MEMORANDUM OF LAW IN SUPPORT OF A MOTION FOR A NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE AND THE DUE PROCESS CLAUSE OF THE US CONSTITUTION

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION.............................................................................................  1

BACKGROUND..............................................................................................  2

THE TESTIMONY THAT SILENCED WITNESSED WOULD HAVE GIVEN............  4

A.     Daniel Chapsky..................................................................................  4

     1.     Why Mr. Chapsky Did Not Testify ...................................................  5

     2.     Potential Testimony ......................................................................  5

          a.     FTX was solvent at the time of its liquidity crisis in November 2022...  6

          b.     At the time of trial, it was clear that customers could be repaid.........  10

          c.     Alameda's customer account on FTX ran a net *positive* balance in the billions of dollars throughout 2022...........................................  10

          d.     The Government "fundamentally misrepresent[ed]" the meaning of negative balance in the fiat@ftx.com ledger. .............................  12

          e.     The Debtors deliberately manipulated FTX's financial data to support the prosecution's case...........................................  13

B.     Ryan Salame........................................................................................  16

     1.     Why Mr. Salame Did Not Testify....................................................  16

     2.     Potential Testimony......................................................................  18

          a.     Bank Accounts ...................................................................  18

          b.     Mr. Bankman-Fried's character..............................................  20

          c.     Campaign contributions........................................................  21

C.     Nishad Singh...................................................................................     21

    1.     Early Proffers..........................................................................     22

    2.     Threats Against Mr. Singh........................................................     23

    3.     Mr. Singh's Changed Proffers and Testimony...............................     23

ARGUMENT..............................................................................................     24

A.     A new trial is required under Fed. R. Crim. Proc. 33(b)(1).................     24

B.     A new trial is required under the Due Process Clause of the US Constitution........     25

C.     The court should order the prosecution to release withheld Brady material
    bearing on witness coercion and credibility.............................................     26

    1.     Nishad Singh...........................................................................     27

    2.     Ryan Salame...........................................................................     27

3.     Order directing the release of missing *Brady* material.........................     27

REQUEST THAT A NEW JUDGE BE ASSIGNED TO RULE ON THIS MOTION.........     28

CONCLUSION............................................................................................     28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Buie v. Sullivan,*
923 F.2d 10 (2d Cir. 1990).........................................................................................26

*United States ex rel. Jones v. DeRobertis,*
766 F.2d 270 (7th Cir. 1985).....................................................................................26

*United States v. Archer,*
977 F.3d 181 (2nd Cir. 2020)....................................................................................25

*United States v. Ferguson,*
246 F.3d 129 (2d Cir. 2001)......................................................................................24

*United States v. Pinto,*
850 F.2d 927 (2d Cir. 1988) .....................................................................................26

*United States v. Sanchez,*
969 F.2d 1409 (2d Cir. 1992) ..............................................................................24, 25

*United States v. Stofsky,*
527 F.2d 237 (2d Cir. 1975) .....................................................................................25

*United States v. Valenzuela-Bernal,*
458 U.S. 858 (1982)..................................................................................................26

*United States v. Vavages,*
151 F.3d 1185 (9th Cir. 1998) ..................................................................................26

*United States v. Williams,*
205 F.3d 23 (2d Cir. 2000).........................................................................................26

**INTRODUCTION**

Sam Bankman-Fried was indicted on the false allegation that he had stolen customer assets from the FTX cryptocurrency exchange, leaving customers with billions of dollars in losses.

Since the trial, multiple people have spoken out about how a weaponized DOJ pressured them into withdrawing as witnesses for Bankman-Fried's defense—in one case threatening his pregnant fiancée with baseless political charges if he did not comply. At the end of the day, five former FTX employees testified for the DOJ in return for protection from threatened sentences of up to 100 years, while every prospective defense witness dropped out.

To quote Ryan Salame:

> One of my (many) regrets is actually letting my lawyers scare me into not testifying on SBFs defense...
>
> No one got up [at Mr. Bankman-Fried's trial] to counter any of the government's narrative, because then you get threatened with more time in prison.

To quote Daniel Chapsky:

> Other former FTX employees I spoke with told me that they had received similar warnings. Out of a concern for my well-being and those around me, I directed my counsel to tell Sam Bankman-Fried's team that I was not willing to testify [for his defense].

The result was, as Mr. Salame put it, "one-sided coerced legal theater." The prosecution told the jury that "the customers' money[] was gone" and that they "were left with billions of dollars in losses." (Tr. 26). With no one left to defend him at trial, Mr. Bankman-Fried was convicted and sentenced to 25 years in prison.

Six weeks later, the Debtors Estate announced that the money wasn't "missing" after all-- it was there the whole time (Matt Levine, "FTX Found the Money," Bloomberg, May 8, 2024).

Defendant Samuel Bankman-Fried moves for a new trial based on newly discovered evidence under Rule 33 of the Federal Rules of Criminal Procedure and the Due Process Clause of the US Constitution.

Finally, the defendant asks that Judge Kaplan recuse himself from ruling on this motion because of the manifest prejudice he has demonstrated towards Mr. Bankman-Fried.

## **BACKGROUND**

In 2019, Sam Bankman-Fried founded the cryptocurrency exchange FTX. Within two years, it was generating $1 billion in annual trading fees and had become one of the world's largest crypto platforms. In November 2022, a rival exchange announced it would dump a large position in FTX's token, triggering a run on customer deposits. Over the next two days, FTX processed roughly $5 billion in withdrawal requests. To meet the sudden liquidity shock, Alameda Research—a trading firm majority-owned by Mr. Bankman-Fried that also served as the exchange's primary payment processor—began liquidating assets. Withdrawals were briefly paused and then partially resumed. FTX remained solvent and was on track to meet all obligations within a week or two.

FTX always had sufficient assets to repay customer deposits in full. What it faced was a short-term liquidity crisis caused by a run on the exchange, not insolvency. In May 2024, after Mr. Bankman-Fried had been convicted and sentenced, the Debtors finally acknowledged that all customer deposits would be repaid at 119% to 143% of their value as of November 11, 2022. (22-110680-JTD Dkt. 19143 at 8).[1] They have now all been repaid.

---

[1] This, notwithstanding the $1 billion paid to restructuring professionals (22-11068-JTD Dkt. 530 at 33-39; Jonathan Randles, "FTX's $950 Million Bankruptcy Fees Among Costliest Since Lehman," Bloomberg News, Feb. 26, 2025) and the $100 billion+ of value dissipated through the Debtors' mismanagement of the Estate (Sam Bankman-Fried, "Where Did the Money Go," Sep. 2025, https://drive.google.com/file/d/1e2v-rcUqSFy4VI1MlWTLkJe-IeaFYBnl).

However, on November 11, 2022, FTX's outside counsel took control of the company, froze withdrawals with roughly $8 billion in customer deposits still on the platform, and placed FTX into bankruptcy. From that point forward, the public narrative of what happened was controlled by the restructuring professionals now in charge of it. Within a week, they had branded the previous management as "potentially compromised individuals," speculated that "a substantial portion of [the Estate] may be missing or stolen," and asserted that they "d[id] not believe it appropriate for stakeholders or the Court to rely on the audited financial statements as a reliable indication of the financial circumstances." (22-11068-JTD, Dkt. 24 (filed 11/17/22). Mr. Bankman-Fried was indicted the following month on seven counts of fraud and conspiracy.

In November 2023, Mr. Bankman-Fried was convicted at trial on all seven counts based primarily on the testimony the Government obtained from five former FTX employees, all actual or potential targets of the prosecution. Each of them testified in return for protection from the Government—three with cooperation agreements, one with a grant of immunity, and one with a non-prosecution agreement. (Tr. 105, 310, 644, 1301, 1996). The three co-defendants who testified pursuant to cooperation agreements were facing 50, 75, and 100 years in prison. In return for providing testimony that the Government itself acknowledged to be essential in convicting Mr. Bankman-Fried (Dkt 502), two received no jail time, and the third was released after serving one year.

In March 2024, Mr. Bankman-Fried was sentenced to 25 years in prison, which he is currently serving at Terminal Island Federal Correctional Institution in San Pedro, California. An appeal of his conviction is pending before the Second Circuit Court of Appeals.

As detailed below and in Mr. Daniel Chapsky's Declaration, attached as Exhibit A, the testimony of the Government's witnesses and the narrative the Government built from it were false or misleading in critical parts.

In addition to satisfying the requirements for a new trial under Fed. R. Crim. Pro. 33(b)(1), the prosecution's reliance on intimidation and threats to scare off defense witnesses and coerce testimony favorable to the Government from its own witnesses constitutes a serious Due Process violation that independently warrants a new trial.

## THE TESTIMONY THAT SILENCED WITNESSED WOULD HAVE GIVEN

### A. DANIEL CHAPSKY

Daniel Chapsky has submitted a declaration ("Chapsky Decl.") (Exhibit A) providing the broad outlines of the testimony he would have given at trial had he felt safe in doing so.

Daniel Chapsky was Head of Data Science at FTX, and later for the Debtors' Estate. (Chapsky Decl. intro ¶2). Before that, he led a data science research team at Meta (Facebook). (Chapsky Decl. ¶1).

As the architect of FTX's internal database, Mr. Chapsky was more knowledgeable about the correct interpretation of the financial data it contained than anyone else. Accordingly, in January 2023, when the CEO of the successor Debtor entity sought an analysis of FTX's solvency

as of the time control was transferred on November 11, 2022, the expert he hired to perform it was Mr. Chapsky. (Chapsky Decl. ¶¶4, 10).

### 1.   Why Mr. Chapsky Did Not Testify

On July 13, 2023, Mr. Bankman-Fried's counsel reached out to Mr. Chapsky's counsel to ask if he would testify for the defense. (Chapsky Decl. ¶6). From Mr. Chapsky's attached Declaration:

> I initially informed my counsel that I was willing to testify and that I could offer testimony on several key issues at the heart of the Government's case.   [Chapsky Decl. ¶6]

However, he ultimately declined to testify. In his words:

> [M]y counsel as well as several other attorneys at different law firms all strongly advised me not to testify, stating that I would likely be exposed to media attacks and faced potential retaliatory action by the prosecution.
>
> Other former FTX employees I spoke with told me that they had received similar warnings. Out of concern for my well-being and those around me, I directed my counsel to tell Sam Bankman-Fried's team I was not willing to testify. [Chapsky Decl. ¶¶7, 8]

### 2.   Potential Testimony

In Mr. Chapsky's words, his testimony would have "refuted the errors in the prosecution's representations about FTX's financial condition and provided the jury with more accurate information." (Chapsky Decl. ¶34).

In particular, he would have refuted the three principal claims the Government made about FTX's financial condition on which its allegations of fraud rested: that FTX was insolvent on November 11, 2022; that as of the time of the trial, there was no prospect that customers would ever be repaid; and that Alameda regularly ran a multi-billion-dollar deficit in its user account on

Relatedly, Mr. Chapsky would have testified about the improper role he witnessed the Debtors playing in the prosecution of Mr. Bankman-Fried through their efforts to conceal FTX's solvency.

### a.    FTX was solvent at the time of its liquidity crisis in November 2022.

The prosecution told the jury that "when [Mr. Bankman-Fried] said FTX had enough to cover all client holdings [at the time of the liquidity crisis], that was a lie." (Tr. 3136). FTX, they said, was "10 billion plus in the hole . . . deeply in the red, totally under water" (Tr. 2978), with "more loans than assets" (Tr. 2956, 2957, 2965).

In fact, as Mr. Chapsky attests, FTX and Alameda were never insolvent: their assets always exceeded their liabilities—even in November 2022—contrary to what the prosecution repeatedly told the jury. (Chapsky Decl. ¶¶12, 22). In November 2022 they suffered a liquidity crisis, caused by a run on deposits that led customers to withdraw several billion dollars over the course of two days. But they remained solvent: "illiquid, but solvent." (Matt Levine, "FTX Found the Money," Bloomberg, May 8, 2024).



Figure 1. Historical and modeled FTX assets and liabilities over time, based on balance sheets produced by the Government in *United States v. Bankman-Fried*.

When restructuring attorney John J. Ray III took control of FTX on November 11, 2022, customer withdrawals had started to resume and Mr. Bankman-Fried had secured commitments of $6-8 billion in new funding to close the remaining liquidity gap within a week or two. (Dkt. 407-34 at 34, 42, 44-45; https://x.com/justinsuntron/status/1590585495649923073 (Nov. 10, 2022).

However, within a day of taking control of FTX, the new management shut down both the international and U.S. exchanges, cut off contact with Mr. Bankman-Fried, his attorneys, and prospective funders, and filed to put all FTX-related entities in an omnibus bankruptcy they controlled. This, despite being told by multiple sources that both exchanges were solvent, a claim confirmed by the balance sheets they were given at the time that were prepared by one of the Government's cooperating witnesses, Gary Wang.[2] (Chapsky Decl. ¶¶9, 11). When Mr. Ray

---

[2] Mr. Wang reluctantly confirmed that fact on cross-examination at trial. (Tr. 573).

finally sought an independent analysis of FTX's petition-date solvency in January 2023 (Chapsky Decl. ¶10), Mr. Chapsky was the person he tasked with preparing that analysis (Chapsky Decl. ¶4). As Mr. Chapsky attests, after an exhaustive review of the data, he and his team affirmed the conclusions in the original balance sheets Mr. Ray had been given on November 10, 2022: FTX was solvent when the Debtors took it over, and FTX US was both solvent and had sufficient liquid assets to immediately cover all customer deposits. (Chapsky Decl. ¶¶12, 13).

As Mr. Chapsky attests, the Debtors "significantly misrepresented" his team's findings at its first presentation to FTX creditors on January 17, 2023, falsely claiming that both FTX US and FTX, the international exchange, were insolvent on November 11, 2022. In particular, they counted only the $5.5 billion in *liquid* assets that Chapsky's team had identified, omitting semi-liquid and illiquid cryptocurrency assets and the "Venture Portfolio" Mr. Bankman-Fried had amassed, which Mr. Chapsky's team had previously valued at $8.4 billion. (Chapsky Decl. ¶¶15-17). Today, those assets—including substantial stakes in Anthropic, Robinhood, and Solana—would be worth over $50 billion. The Debtors also excluded the going concern value of FTX, likely worth $10+ billion at the time.[3] The result, as Mr. Chapsky states, was "a wholly incorrect impression [that] colored public opinion about what had happened to FTX as well as the entire trial." (Chapsky Decl. ¶16).

At trial, the prosecution shored up the Debtors' false claims about FTX and FTX US's insolvency with false testimony it elicited from its expert witness, Peter Easton, that *Alameda* was

---

[3] FTX received an outside valuation of $32 billion in January 2022, while FTX US was valued at $8 billion. Even with the temporary crash of the crypto market and plunge in the value of FTX following the run on the exchange, based on offers Mr. Bankman-Fried received from interested equity buyers in the days following the run on the exchange, the going concern value of the exchange was still in excess of $10 billion. See Figure 1 above. But all of the going concern value of the exchanges was lost when the Debtors decided to stonewall the many third parties who had reached out to them with serious inquiries about purchasing all or a portion of FTX ("FTX 2.0"). (Chapsky Decl. ¶5).

insolvent at the time of the liquidity crisis. As Mr. Chapsky reports (Chapsky Decl. ¶33) and Mr. Easton conceded on cross-examination,[4] he never performed a net asset evaluation in the case—the only basis on which one could make any claim about solvency. In Mr. Chapsky's words, he "looked only at Alameda balances held on the FTX platform, omitting billions of dollars in assets held on other exchanges, in bank accounts, and in venture capital investments."[5] Mr. Chapsky's testimony would have established that "all of those assets were transferred to FTX at the time of the liquidity crisis, and were included in the analysis prepared for the Debtors that showed that as of the Petition Date FTX.com was solvent if not liquid and FTX.us, FTX.jp and FTX.eu were all solvent and liquid." (Chapsky Decl. ¶33)

As Mr. Chapsky would have testified (Chapsky Decl. ¶22), the prosecution parlayed the lie about FTX's insolvency on November 11, 2022, into a number of false claims to the jury, including:

- "[Bankman-Fried] knows that there's this giant, massive, unrepayable hole."[6]
- "[W]hen [Bankman-Fried] said FTX had enough to cover all client holdings, that was a lie."[7]
- "[FTX] was 10 billion plus in the hole… so they are deeply in the red, totally under water."[8]
- "[In June 2022, Bankman-Fried] knows they're deeply in the red."[9]
- "[T]he customers' money[] was gone. . . . [C]ustomers were left with billions of dollars in losses."[10]

---

[4] Tr. 1803.

[5] Tr. 1802-03.

[6] Tr. 3134.

[7] Tr. 3136.

[8] Tr. 2978.

[9] Tr. 2964.

[10] Tr. 26.

### b.    At the time of trial, it was clear that customers could be repaid.

As highlighted in Mr. Chapsky's Declaration, prosecutors made repeated claims throughout the trial that customers had suffered "'billions of dollars in losses'" they would never recover, that customer funds were "'unrepayable,'" "'gone'"—claims that Mr. Chapsky would have testified were "false." (Chapsky Decl. ¶22). Indeed, six weeks after Mr. Bankman-Fried's conviction was secured, the Debtors announced that all customer deposits would be repaid at 119% to 143% of their value. (22-110680-JTD Dkt. 19143 at 8).

But the prosecution knew or should have known that its claims were false when it made them. Three weeks before Mr. Bankman-Fried's trial, the Debtors revealed that "[a]cross FTX.com and FTX US, they have scheduled $10.9B of customer claims" (22-11068-JTD Dkt. 2463-1). To meet those obligations, the Debtors listed liquid assets totaling "~$7 Billion" (22-11068-JTD Dkt. 2463-1), but once again assigned zero value to semi-liquid and illiquid cryptocurrency assets and the "Venture Portfolio" Mr. Bankman-Fried had amassed, which Mr. Chapsky's team had previously valued at $8.4 billion (Chapsky Decl. ¶¶15-16). The heavily publicized "$7 billion" in liquid assets alone covered the vast majority of anticipated customer liabilities, putting a lie to the prosecution's repeated claims throughout the trial that "the customers' money[] was gone." (Tr. 26). But the prosecution, which was in daily contact with the Debtors at the time (Dkt. 137-9 at 17), either knew or should have known about the additional billions of dollars sitting in the Estate that the Debtors had chosen to place zero value on.

### c.    Alameda's customer account on FTX ran a net *positive* balance in the billions of dollars throughout 2022.

Relying on erroneous testimony from its expert witness and highly misleading if not false testimony elicited from its cooperating witnesses, the prosecution claimed that Alameda regularly ran a multi-billion-dollar deficit in its customer (user) account on FTX, the mechanism it allegedly

used to steal billions of dollars from other customers. (Tr. 2937). As Mr. Chapsky would have testified, the claim was provably false. (Chapsky Decl. ¶26). Alameda ran a significant positive balance in its customer account, averaging around (positive) $2 billion, over the course of 2022. (Chapsky Decl. ¶30). Like many FTX customers, Alameda borrowed funds from and lent funds to other customers. But the amounts it borrowed through that account—typically around $1 to $2 billion in 2022—were fully collateralized with on-exchange assets and were essentially paid off in full at the start of FTX's liquidity crisis.

As Mr. Chapsky attests, "[t]he only figure relevant for determining whether Alameda's user account ran a negative balance is the aggregate balance in all of the user [sub]accounts." (Chapsky Decl. ¶25). As the Debtors knew, that number was significantly positive for the period in question. The division of assets and liabilities among different subaccounts was an internal bookkeeping matter of no relevance to solvency.

But to create a false impression of insolvency, the prosecution, using both its cooperating witnesses (Chapsky Decl. ¶24) and its expert witness (Chapsky Decl. ¶28), directed the jury's attention to particular subaccounts that were negative, to conclude that "Alameda ran a multi-billion-dollar deficit in [its customer] account on FTX for the entire period from January 1, 2021, to November 11, 2022." (Chapsky Decl. ¶24). Mr. Chapsky would have rebutted this testimony:

> That conclusion is false. . . . Alameda's user balance on FTX was significantly positive for almost all of its existence, including the majority of the period from May to September 2022, when Easton's analysis showed it to be net negative [by billions of dollars].

(Chapsky Decl. ¶¶25, 26).

The false or misleading testimony the government elicited from its witnesses concerning the balance in Alameda's user account went to the heart of the prosecution's case and featured prominently in its closing argument.

11

In the government's summation, the prosecution pointed to the $2.78 billion negative balance in subaccount #9 and said to the jury, "Taking a look at this exhibit, you immediately can see that Alameda has a lot of negative balances, including almost 3 billion negative in its main account. It's right there."[11] Mr. Easton's false claim that Alameda ran a multi-billion-dollar negative balance on its FTX user accounts became the centerpiece of the government's closing argument. The government reintroduced 18 of the slides Easton had presented, reminded the jury that they would have access to all 51 of his slides during their deliberations, encouraged them to consult them, and concluded that "[t]hey all show that the defendant stole money and moved money."[12] As Mr. Chapsky attests, they showed no such thing. "The slides in question do not in fact show that customer money was stolen, and instead reflect a misunderstanding [by Mr. Easton] of which accounts managed which activities." (Chapsky Decl. ¶32).

Summing up, the prosecution urged the jury that "[i]f you conclude that the defendant stole customer money [by running a negative balance in its user account], . . . . *you can and you should find him guilty on that basis alone.* . . because he's just ripping money right off the FTX exchange."[13]

### d.    The Government "fundamentally misrepresent[ed]" the meaning of the negative balance in the fiat@ftx.com ledger.

Finally, Mr. Chapsky would have testified that the alternative means by which the prosecution alleged Mr. Bankman-Fried stole customer assets—via the negative balance in the fiat@ftx.com ledger— stemmed from "Easton's misunderstanding of what th[at] negative balance

---

[11] Transcript, p. 2967.

[12] Tr. 3010-11.

[13] Tr. 2937 (emphasis added)

. . . represented." In Mr. Chapsky's words, "The negative balance recorded in the ledger . . . mirrored commensurate cash and other assets held by Alameda off-exchange." Reporting only the former "without netting the corresponding bank balances and other off-exchange assets that collateralized it fundamentally misrepresents financial reality." (Chapsky Decl. ¶29)

In sum, the testimony Mr. Chapsky could have given at trial had he not faced serious threats of retaliation from the Government would have refuted extensive false or misleading witness testimony and false claims made by the prosecution at trial, which together formed the core of the government's case against Mr. Bankman-Fried.

### e.   The Debtors deliberately manipulated FTX's financial data to support the prosecution's case.

The critical role played by the Debtors, and in particular Sullivan & Cromwell as Counsel to the Debtors, in securing Mr. Bankman-Fried's indictment and conviction is summarized in the Defense's Appellate Brief (24-961 Dkt. 28.1, pp. 65-78) and the defense's Pretrial Motion #5 (Dkt. 143) seeking discovery from the Debtors on the ground that they were an arm of the prosecution. By the Debtors' own acknowlededweren't ement, they spent virtually all of their time in the first 90 days aiding the prosecution,[14] billing the Estate tens of millions of dollars for their efforts.  John Ray credited Sullivan & Cromwell for SDNY's success in indicting Bankman-Fried and securing guilty pleas from two of his co-founders in record time.[15]  For their work on the Bankruptcy,

---

[14] *In re FTX Trading, Ltd.*, No. 22-11068 (Bankr. D. Del. Jan. 17, 2023), ECF No. 511 (hereinafter Ray Supp. Retention Decl.); Transcript of the February 6, 2023, hearing on Vara's motion to appoint an Independent Examiner, Case 1:22-cr-00673-LAK Document 137-9 Filed 05/08/23, pp. 51-52, 66 ("I made it very, very clear from the beginning of my taking control, on virtually the day of the control, that we would do whatever the Government requested relative to cooperation. . . . This is an ongoing, you know, circular effort, right, you know, answers, we get questions, we provide information, that information gets synthesized, that turns into new inquiries, new questions, and we're continuing to evolve in the process. We have been at it 90 days. Its night and day.")

[15] Indeed, he even conflated the role of the Debtors and the prosecution, stating that "[t]he *Debtors*, through . . . most importantly, the tireless work of F*ederal prosecutors* . . . have made it quite clear exactly what transpired, how it occurred, who was principally involved and the results of their actions." *Id.*, ¶ 9 (emphasis added).

including their considerable aid to the prosecution, the Debtors have paid Sullivan & Cromwell and other consultants working with them over $1 billion to date from the FTX Estate.[16]

Sullivan & Cromwell had serious conflicts of interest, arising both from its own role in the conduct it was purportedly investigating and the hundreds of millions of dollars it stood to extract from the Estate as Counsel. Those conflicts, which should have precluded Sullivan & Cromwell lawyers from playing any role in the prosecution, let alone the critical role they played,[17] were serious enough for the US Trustee, Andrew Vara, to move to disqualify Sullivan & Cromwell as Counsel to the Bankruptcy Estate.[18] Four US Senators wrote the bankruptcy court judge describing Sullivan & Cromwell's claim to be a "disinterested party" as "shocking."[19]

Despite those conflicts of interest, SDNY chose to deputize Sullivan & Cromwell as an arm of the prosecution, entrusting to it critical prosecutorial functions and control over the FTX data base and corporate files. When the US Trustee moved to disqualify Sullivan & Cromwell, the SDNY and the DOJ secretly intervened in the bankruptcy process at Sullivan & Cromwell's request in order to protect its job, thereby protecting the Government's most valuable asset in securing a conviction of Bankman-Fried.[20]

---

[16] See fn. 1 *supra.*

[17] For a discussion of Sullivan & Cromwell's conflicts of interest, see Jonathan Lipson & David Skeel, "FTX'd," 77 Stanf. L. Rev. 369, 417-427 (2025); Brief of Amicus Curiae Bankruptcy Law Professors, Case: 24-961, 09/20/2024, DktEntry: 38.

[18] Case 22-11068-JTD Doc 496 Filed 01/13/23.

[19] https://www.hickenlooper.senate.gov/wp-content/uploads/2023/01/1.9.23-Hickenlooper-Letter-to-FTX-Bankruptcy-Court-Judge-FINAL-Signed.pdf

[20] Sullivan & Cromwell's billing records for December 1- 31, 2022 (Case 22-11068-JTD Doc 721-2 Filed 02/14/23, pp. 410-433), document that the day Vara filed his original motion on December 1, 2022, Sullivan & Cromwell partners reached out to SDNY to seek their help in warding off the appointment of an Independent Examiner. Over the next five days, Sullivan and Cromwell lawyers billed over 40 hours preparing a memo for the SDNY and the DOJ on why the appointment of an Independent Examiner in the FTX case was discretionary, culminating in a two-hour secret meeting on December 6th between eight Sullivan & Partners, the SDNY, and the DOJ. The same day, Vara tabled the Independent Examiner motion on his own initiative. When he filed a motion on January 13, 2023, to

As Mr. Chapsky outlined in his Declaration, during this period he witnessed how Mr. Ray:

- ignored FTX assets worth approximately $8.4 billion at the time, thereby "implying that FTX was substantially insolvent" (Chapsky Decl. ¶16);

- ignored $428 million in cash at FTX US, enabling him to "maintain[] that FTX US had been insolvent on November 11, 2022, until the Independent Examiner finally laid that [false] claim to rest in September 2024" (Chapsky Decl. ¶17);

- gave Congressional testimony that FTX had "'lost $8 billion of customer money'" and that FTX US was "'not solvent,'" even though "both claims were untrue," the balance sheets given to Mr. Ray "showed both FTX and FTX US to be solvent," and Mr. Ray "did not start the process of calculating balances independently until . . . weeks later" (Chapsky Decl. ¶20);

- generally "made false public statements concerning FTX's solvency . . . seem[ing] to suggest that the Debtors were prioritizing Bankman-Fried's prosecution and conviction over the interests of creditors" (Chapsky Decl. ¶18).

Most significantly, the Debtors' leadership confirmed to Mr. Chapsky that:

the "various errors in the data presented in the Debtors' public statements . . . weren't a mistake—they were a strategic decision" (Chapsky Decl. ¶19),

This provides further evidence that the Debtors and the prosecution collaborated from the start to falsely portray the financial condition of FTX to increase the probability of obtaining a conviction of Mr. Bankman-Fried.

---

disqualify Sullivan & Cromwell instead, the law firm once again reached out to the SDNY, on January 13 and 15, for help.  The night before the January 20, 2023, hearing on Vara's disqualification motion, Vara withdrew his motion without explanation. The meetings recorded in the billing records and other circumstantial evidence strongly support the inference that he did so pursuant to orders of higher ups at the DOJ, to whom he reported.

The Debtors' false statements even impacted sentencing. In Mr. Chapsky's words, "Ray's pre-sentencing memorandum submitted in Bankman-Fried's case similarly mischaracterized FTX's financial situation." (Chapsky Decl. ¶21). Judge Kaplan subsequently cited Mr. Ray's submission in support of the draconian sentence he imposed: "for the reasons very well articulated . . . in the submission on behalf of the debtor's estate, even the premise that customers will be paid dollar-for-dollar for the dollarized losses as of the petition date is pretty speculative, even at this stage." (Dkt. 426 at 5-6).

**B.     Ryan Salame**

A second prospective defense witness, Ryan Salame, former co-CEO of FTX Digital Markets, has come forward to state publicly that he, too, would have testified for Mr. Bankman-Fried at trial had he not feared retaliation from the prosecution.

**1.     Why Mr. Salame Did Not Testify**

When defense counsel first contacted Mr. Salame's counsel before trial, he was told that Mr. Salame was inclined to testify for Mr. Bankman-Fried. Following the Government's threats against him and his coerced guilty plea, Mr. Salame dropped out as a prospective defense witness on advice of his attorneys that the Government might retaliate against him if he did. He subsequently tweeted:[21]

> One of my (many) regrets is actually letting my lawyers scare me into not testifying on SBFs defense

(@rsalame7926, X.com, Aug. 15, 2024)

He later elaborated:

> If I'd been on the defense for [Mr. Bankman-Fried]—a lot of that stuff was just not accurate the way they were describing it. But no one got up to counter any of the government's narrative, because

---

[21] See https://x.com/rsalame7926/status/1823905900983165069.

> then you get threatened with more time in prison. . . . I flirted with
> the idea of being on the defense for Sam . . . I note this to my lawyers
> and the lawyers said, "You could face an extra ten years for doing
> that. Do you really want to, sort of, risk that?" . . . And so the
> bankruptcy lawyers in conjunction with the government keep
> everyone silent.

(Ryan Salame interview, The Tucker Carlson Show, Oct. 2024)

Over the months before Mr. Bankman-Fried's trial, the prosecution put enormous pressure on Mr. Salame to plead guilty to multiple charges and testify *against* Mr. Bankman-Fried. When Mr. Salame refused to either, even after an aggressive raid of his house, to force his hand the prosecution threatened to indict Michelle Bond, former Republican Congressional candidate and his then pregnant fiancée, on baseless campaign finance charges. United States v. Salame, No. 22-cr000673-LAK, ECF No. 470.

On the eve of Mr. Bankman-Fried's trial, Mr. Salame pleaded guilty to two of the government's proposed charges on the condition that the prosecution would drop its investigation of Ms. Bond. His resulting plea was weaponized by the prosecution at Mr. Bankman-Fried's trial. Mr. Salame was mentioned 85 times by eight different witnesses during trial. (E.g., Tr. 1442, 1618). A document was introduced by the prosecution based on the coerced plea (Tr. 2068) and the prosecution weaponized it again in their summation to the jury (Tr. 3010).

Although he dropped out as a *defense* witness due to fears of retaliation by the Government, Mr. Salame remained the only FTX defendant who refused to testify *for the Government* against Mr. Bankman-Fried. After the trial ended, he stated publicly that had he done so, his testimony would have had "nothing to offer [the prosecution] without lying"[22] (@rsalame7926, X.com, Jun.

---

[22] See https://x.com/rsalame7926/status/1802178470832701467.

16, 2024). In his words, he "refused to tell lies they wanted me to"[23] (@rsalame7926, X.com, Jan. 2, 2026).

Since the trial, he has been outspoken about the Government's "completely false narrative"[24] (@rsalame7926, X.com, Aug. 18, 2024), about how the Government "pressured Nishad [Singh] into lying"[25] (@rsalame7926, X.com, Jul. 17, 2024), and about how "Nishad and Caroline . . . l[ied] to save themselves"[26] (@rsalame7926, X.com, Aug. 19, 2024).

He paid dearly for his principles. He is now serving a 7 ½-year sentence on two minor and baseless charges unrelated to the central alleged fraud at FTX—over three times the *combined* sentence of the cooperating witnesses who adopted the Government's narrative at trial.

### 2.    Potential Testimony

#### a.    Bank Accounts

The prosecution's case depended on convincing the jury that Mr. Bankman-Fried "set up two secret ways through which Alameda could take or borrow customer money." The first was "by withdrawing it from . . .its cryptocurrency wallets [on FTX] in unlimited amount." The second was "by taking it out of the bank accounts that received those customer deposits." (Tr. 2922-2923).

As the head of Alameda's settlements team from late 2019 until mid-2021, Mr. Salame could have testified at length about the second alleged "secret way," and in particular the payment processing arrangement pursuant to which Alameda received FTX customers' fiat deposits into its bank accounts.

---

[23] See https://x.com/rsalame7926/status/2006904638872662493.

[24] See https://x.com/rsalame7926/status/1824979981266510005.

[25] See https://x.com/rsalame7926/status/1813396283555749908.

[26] See https://x.com/rsalame7926/status/1825367673045217627.

For instance, while prosecutors alleged that "[Mr. Bankman-Fried] even lied to a bank" (Tr. 30), Mr. Salame has since come forward to affirm, "There was no lying to any banks . . . and this [arrangement] included lawyers on our end, this included external lawyers, this included lawyers on their end, and [the] management team of Silvergate [Bank]" (Ryan Salame interview, Unchained Crypto, Oct. 2024).

Prosecutors also told the jury that Mr. Bankman-Fried lied to customers about the arrangement:

> When customers sent dollars to FTX, the company would tell them that the money was in their accounts at FTX. . . . But the defendant was keeping his customers in the dark about what is really happening. In fact, the money never actually made it to FTX. . . . So when customers thought their money was going to the exchange, they were actually sending their money right into the defendant's pocket.

(Tr. 30).

According to Mr. Salame, customers were not kept "in the dark" about this arrangement and he has the receipts to prove it: "It was all over the terms of service" (*id.*); "I have [a] mountain of chat with individual users where I describe this process" (*id.*); "I'm completely confused how we could have anymore easily stated you were wiring money to alameda given that the wire instructions literally were alameda"[27] (@rsalame7926, X.com, Sep. 15, 2024).

Summarizing the absurdity of the allegation that Mr. Bankman-Fried stole from customers by allowing Alameda to "tak[e] [customer money] out of the bank accounts," Mr. Salame stated, "This whole argument has never made any sense for multiple reasons - FTX literally couldn't custody users dollars 1:1 because of the stablecoin basket, FTX publicly told users they were otc

---

[27] See https://x.com/rsalame7926/status/1835331932034597064.

trading their usd into ftx stablecoin basket, terms of service noted this, AND FTX allowed margin borrowing which tons of clients utilized."[28] (@rsalame7926, X.com, Sep. 15, 2024).

### b.    Mr. Bankman-Fried's Character

As Mr. Bankman-Fried's colleague, Mr. Salame could have challenged the prosecution's portrayal of Mr. Bankman-Fried.

When the prosecution described Mr. Bankman-Fried as someone who "lived in a $30 million apartment in the Bahamas [and] jetted around the world on private planes" (Tr. 24), Mr. Salame could have countered that Mr. Bankman-Fried "hated flying private"[29] (@rsalame7926, X.com, Aug. 19, 2024), "hated the penthouse it just had the right number of bedrooms" (*id.*), and "hated luxury things" (Ryan Salame interview, Unchained Crypto, Oct. 2024).

When the prosecution characterized Mr. Bankman-Fried's and co-defendant Caroline Ellison's relationship as one in which "the defendant had all the power" (Tr. 3123)—so persuasively that the sentencing judge declared that Mr. Bankman-Fried had "exploited" her (Dkt. 527 at 30:21-23)—Mr. Salame could have testified, "The narrative that Sam could emotionally coerce Caroline, to me, if you know the two of them, it's just not possible" (Ryan Salame interview, Unchained Crypto, Oct. 2024).

And when prosecutors pointed to Mr. Bankman-Fried's lack of eye contact as evidence that he was lying under oath (Tr. 2917), Mr. Salame could have explained, "Social situations are harder for him than the average person. . . . Eye contact—difficult things like that" (Ryan Salame interview, The Tucker Carlson Show, Oct. 2024).

---

[28] See https://x.com/rsalame7926/status/1835281837268070419.

[29] See https://x.com/rsalame7926/status/1825378115012481484.

### c.     Campaign Contributions

Finally, Mr. Salame could have provided important testimony on Republican political donations. The prosecution used them as a basis for one of the charges against Mr. Bankman-Fried, and Judge Kaplan emphasized Mr. Salame's donations at sentencing, alleging that Mr. Bankman-Fried "set up a vehicle for making political donations to the right through straws that wouldn't come back to him." (Dkt 426 at 50). Following the prosecution's pressure, Mr. Singh flipped his story and supported the prosecution's narrative at trial (see section C (3) below). But in Mr. Salame's telling, those donations had full legal approval and were properly disclosed (@rsalame7926, X.com, Sep. 10, 2024).

Mr. Salame began speaking out in Mr. Bankman-Fried's defense seven months after the trial ended. In retaliation, the Southern District of New York indicted his wife, Michelle Bond, breaking its plea agreement with Mr. Salame. Since then, Mr. Salame has become outspoken about his own innocence and the Governments coercion, stating unequivocally, "I was forced to plead guilty to crimes I didn't commit."[30] (@rsalame7926, X.com, Dec, 26, 2025). Hearings are underway in Ms. Bond's criminal trial on the defense's motion to dismiss the charges against her, based on the Government's broken promise not to indict her if Mr. Salame pleaded guilty. (1:24-cr-00494-GBD Dkt. 38).

## C. Nishad Singh

Nishad Singh was Head of Engineering at FTX. Like Mr. Salame, Mr. Singh did not originally plead guilty, and his early proffers contradicted key parts of the Government's version of events. But following threats from the Government, Mr. Singh changed his proffers to fit the Government's narrative and pleaded guilty to charges carrying up to 75 years in prison, with a

---

[30] See https://x.com/rsalame7926/status/2004652795736293384

promise from the prosecution that it would recommend little or no jail time if it concluded that his assistance in prosecuting Mr. Bankman-Fried was "substantial."[31]

### 1.  Early Proffers

After announcing the guilty pleas of Ms. Ellison and Mr. Wang, Damian Williams, the U.S. Attorney for the Southern District of New York, took to the podium to pronounce:

> If you participated in misconduct at FTX or Alameda, now is the time to get ahead of it. We are moving quickly, and our patience is not eternal.
> (Chris Prentice and Luc Cohen, Reuters, Dec. 22, 2022)

Mr. Williams' press conference was for an audience of one: Mr. Singh. On January 14, 2023, prosecutors informed Mr. Singh's lawyers that they were "not going to be offering him a non-prosecution agreement" (3501-051), meaning that he would likely face up to 75 years in prison unless he cooperated with the Government.

A month after Ms. Ellison's and Mr. Wang's guilty pleas, Mr. Singh was still contradicting the Government's narrative in his proffer sessions, stating that he "didn't see a hole" and "wouldn't have seen a hole that could be plugged as a major concern" (3501-021), and that even as late as a few days before the liquidity crisis hit, he "believed everything would be okay" (3501-029). He stated that he "believed he was the donor" for campaign contributions made in his name (3501-028) and "knew that he would owe the donations made through his bank account" (*id.*) And he proffered that "nobody asked [him] to create a backdoor" (3501-012) and that he "didn't see [Alameda's] borrowing [from FTX] as wrong" (3501-021).

---

[31] Federal Sentencing Guidelines, §5K1.1.

### 2.    Threats Against Mr. Singh

On January 19 and 20, 2023, the prosecution delivered Mr. Singh and his counsel an ultimatum. They were "banging on [the] table" about their "concern" regarding "both [the] substance and the demeanor" of Mr. Singh's proffers, adding that they "had not found [it] entirely credible when he had indicated memory hazy/ didn't remember what [he] thought/felt." (3501-053). His attorney responded, "I understand your concerns" (3501-053).

### 3.    Mr. Singh's Changed Proffers and Testimony

Mr. Singh got the message. After the Government's outburst, he began his next proffer on January 24 (3501-031) by saying he felt "ashamed. . .for how [the] last proffer went" and would change his testimony going forward.

Contrary to his earlier proffers, he now stated that there was a "clear hole [that Alameda]. . . could not repay" and that was "wrong and unfixable in September 2022" (3501-031). He stated that there was a "red flag about special treatment for A[lameda]" that he "strongly assume[d]" Mr. Bankman-Fried was not "telling investors about." (3501-031) And he proffered that the campaign contributions that were made in his name "aren't [his] donations." (3501-031). His testimony at trial tracked his later proffers. (Tr. 1365-1367, 1404-1405, 1434, 1439.)

The testimony Mr. Singh ultimately gave played a material role in Mr. Bankman-Fried's conviction. His testimony about solvency was cited repeatedly in summation. (E.g., Tr. 2989.) The campaign finance allegations against Mr. Bankman-Fried[32] were based primarily on Mr. Singh's guilty plea and testimony (Tr. 1618), even though Mr. Singh originally proffered that he was not a straw donor for Mr. Bankman-Fried (3501-029). The prosecution relied heavily on Mr. Singh's testimony on Alameda's 'special treatment' at trial, including it in summation (Tr. 2947-2948),

---

[32] The charge was formally dropped but the allegations were nonetheless put in front of the jury.

and used it to shore up its false claim about the negative balance on Alameda's user account "by implying, . . . that Alameda was able to run [that balance] because of two secret 'special features' on its user account." (Chapsky Decl. ¶31). Finally, the details Mr. Singh filled in after the Government declared his "haziness" unacceptable (3501-008, 3501-009, 3501-021) resulted in demonstrably false trial testimony that Mr. Bankman-Fried "seemed unsurprised" at hearing bad news in September 2022 and "made up . . . a false excuse for dodging [a] meeting" (Tr. 1404). As confirmed by phone, GPS, and calendar logs, Mr. Bankman-Fried was 1000 miles away at that time, meeting with congressional staff in DC. (GX 1118, pp. 655-660). This false testimony was cited by the prosecution in summation as evidence of Mr. Bankman-Fried's guilty mind (Government summation slide 154) and inspired a jury instruction on criminal intent (Tr. 2881).[33]

## ARGUMENT

### A.   A New Trial Is Required Under Fed. R. Crim. Proc. 33

Rule 33(a) confers "broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). In deciding such a motion, the court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). "The ultimate test . . . is whether letting a guilty verdict stand would be a manifest injustice." *Id.* (citing Sanchez, 969 F.2d at 1414).

---

[33] To convict him of fraud, the Government had to establish that Mr. Bankman-Fried acted with criminal intent. It presented no direct evidence of such. Instead, it relied heavily on claims from witnesses like this one that he looked unsurprised upon hearing bad news (Tr. 449, 1404, 1963, highlighted in summation at Tr. 2986, 2988, 3015), from which the witnesses and the Government inferred a guilty mind. There is reason to doubt their good faith in drawing these inferences. In an interview on the eve of the trial, right after the publication of *Going Infinite*, his book about Mr. Bankman-Fried, Michael Lewis stated, "I saw the prosecutor's list of witnesses. . . . They're using the same characters I use to tell the story. . . . I want to see how these characters behave differently than [they] behave with me. And I'm in touch with most of [them]. I've been interviewing them since it all fell apart. And they've told me what they're going to say, and some of them have said to me, I think Sam is innocent." (Michael Lewis interview, Washington Post, Oct. 6, 2023).

A district court may not grant a Rule 33 motion based on the weight of the evidence alone "unless the evidence preponderates heavily against the verdict." *United States v. Archer*, 977 F.3d 181 (2nd Cir. 2020)(citing *Sanchez*, 969 F.2d at 1414). The court in *Sanchez*, relying on *United States v. Stofsky*, 527 F.2d 237, 245-46 (2d Cir. 1975), articulated two standards for meeting that burden. In general, the defendant must show that the jury "probably" would have been acquitted absent the false testimony. *United States v. Sanchez*, 969 F.2d at 1414. However, "in the rare instance where it can be shown that the prosecution knowingly used false testimony," a less stringent standard applies, allowing "the granting of a new trial where the jury 'might'' have acquitted absent the perjury." *Id.*

Mr. Chapsky's missing testimony alone satisfies the more stringent interpretation of "preponderates heavily" announced in *Sanchez* and *Archer*. If the jury had known that all of Mr. Bankman-Fried's representations about FTX's solvency in November 2022 were true; that FTX always had the assets to repay customers in full; that they could have been repaid within weeks if the Debtors had so chosen; that the principal purported mechanism by which FTX stole customer funds off the exchange—having Alameda run a negative balance in its FTX user account—was a falsehood promulgated by the government; and that the government's alternative argument that the funds were stolen through the *fiat@* bank accounts "fundamentally misrepresents financial reality," the jury "probably" would have acquitted Mr. Bankman-Fried. Letting the guilty verdict stand based on the false information supplied to the jury would be a "manifest injustice."

## B.   A NEW TRIAL IS REQUIRED UNDER THE DUE PROCESS CLAUSE

"Under certain circumstances, intimidation or threats that dissuade a potential defense witness from testifying may infringe a defendant's due process rights," for instance if a "prosecutor's intimidating interview of [a] witness before start of [the] defense case and indirect warnings concerning potential criminal liability dissuaded [the] witness from testifying." *United*

*States v. Pinto*, 850 F.2d 927, 932 (2d Cir. 1988). "The circumstances will warrant reversal only if the government's conduct interfered substantially with a witness's 'free and unhampered choice to testify'" involving, for instance, "'threats of prosecution'" if they were to testify. *Id.* "A court also will look to factors beyond the government's control to determine whether a witness's decision not to testify resulted from the government's conduct. *Id.*, citing *United States ex rel. Jones v. DeRobertis*, 766 F.2d 270, 274-75 (7th Cir. 1985) (witness "feared prosecution").

Where—as in the instant case—"under the totality of the circumstances, 'the substance of what the prosecutor communicates to the witness is a threat over and above what the record indicates is necessary, and appropriate, the inference that the prosecutor sought to coerce a witness into silence is strong.'" *United States v. Vavages*, 151 F.3d 1185, 1190 (9th Cir. 1998). The defendant must generally show "that he was deprived of material and exculpatory evidence" due to "bad faith on the part of the government," and "that the absence of fundamental fairness infected the trial." *United States v. Williams*, 205 F.3d 23, 29-30 (2d Cir. 2000) (citing *Pinto*, 850 F.2d at 933-34; *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982); and *Buie v. Sullivan,* 923 F.2d 10, 11-12 (2d Cir. 1990). "Because [such a case represents] constitutional error," a conviction can stand "only if that error is harmless beyond a reasonable doubt." *Pinto*, 850 F.2d at 933. It is clear from the totality of the record that witnesses did not have a "free and unhampered choice to testify" for Mr. Bankman-Fried's defense, and that the missing evidence was 'material'. This alone requires reversal.

## C.  THE COURT SHOULD ORDER THE PROSECUTION TO TURN OVER WITHHELD BRADY MATERIAL BEARING ON WITNESS COERCION AND CREDIBILITY.

In the case of at least two witnesses—Nishad Singh and Ryan Salame—the prosecution withheld crucial information that would have revealed the coercive tactics it used in proffer sessions to obtain testimony favorable to the prosecution and suppress exculpatory testimony. That

information would have materially altered the defense's cross-examination of Government witnesses, introduction of evidence, and requested jury instructions. Given the pervasiveness of the prosecution's coercive tactics, it also would have undermined the credibility of the Government's case across the board.

### 1. Nishad Singh

There is a hole in the proffer notes supplied to the defense, at precisely the time that the prosecution issued its ultimatum to Mr. Singh's lawyers. The proffer session the day after the crucial January 19, 2023, proffer session in which the prosecution was "banging on [the] table" begins with Ms. Sassoon saying: "DS: already debriefed with you after the proffer, but had a chance to discuss further internally . ." (3501-053) The notes given to the defense for January 19, 2023 do not contain any references to this "debrief" (3501-029), and the defense was never told what the prosecution communicated to Mr. Singh's lawyers during it. As a result, the defense was unable to properly investigate—or present evidence regarding—the pressure the Government placed on Mr. Singh. The potential significance of the missing information is obvious.

### 2. Ryan Salame

The earliest proffers given to the defense involving Mr. Salame or his counsel are from August 2023. Yet it has recently come to light that months earlier—on April 28, 2023—the prosecution met with Mr. Salame's counsel to threaten Ms. Bond and coerce a guilty plea as a co-conspirator with Mr. Bankman-Fried. (Dkt. 470). The defense was given no record of this meeting, let alone details of what transpired.

### 3. Order directing the release of missing *Brady* material.

Mr. Bankman-Fried respectfully requests that the Court order the prosecution to release: (i) a detailed description of and any documents related to its oral "debrief" with Mr. Singh's counsel

following the January 19, 2023 proffer session, including its substantive objections to statements

he made in prior proffers and its 'suggestions' of testimony it would like to see before offering the

defense a cooperation agreement; (ii) a detailed description of and any documents related to its

meetings with Mr. Salame's counsel prior to August 2023, including any threats made to prosecute

Ms. Bond, suggestions that it would drop its investigation of Ms. Bond if Mr. Salame would plead

guilty, and indications of what Mr. Salame would be required to plead guilty to, including (if

relevant) being Mr. Bankman-Fried's co-conspirator.

### REQUEST THAT A NEW JUDGE BE ASSIGNED TO RULE ON THIS MOTION

In its appellate brief to the Second Circuit, enumerating the many instances of extreme

prejudice against Mr. Bankman-Fried that Judge Kaplan displayed throughout the trial, Mr.

Bankman-Fried's lawyers requested that if the case were remanded for a new trial, it be assigned

to a different District Court judge. (24-961 Dkt. 28.1). For the same reason, the defense respectfully

asks that Judge Kaplan recuse himself from ruling on this motion and request the Southern District

of New York to reassign it to a different District Court judge.

### CONCLUSION

For the foregoing reasons, Defendant Bankman-Fried respectfully requests that the Court

grant his Motion for a New Trial under Rule 33 of the Federal Rules of Criminal Procedure and

the Due Process Clause of the US Constitution, and all other appropriate relief.


Date: February 5, 2026                                 Respectfully submitted,

                                                       *Samuel Bankman-Fried*
                                                       Samuel Bankman-Fried
                                                       Defendant, pro se
                                                       Reg. No. 37244-510
                                                       FCI Terminal Island
                                                       San Pedro, CA

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP13F © U.S. Postal Service; October 2023; All rights reserved.

*Retail*

UNITED STATES
POSTAL SERVICE®

**E**

**US POSTAGE PAID**

**$33.25**

Origin: 94305
02/05/26
0558050191-50

**PRIORITY MAIL EXPRESS®**

0 Lb 8.10 oz

RDC 07

NO WEEKEND DELIVERY

SCHEDULED-DELIVERY DAY 02/08/26 08:00 PM

C099

BARBARA FRIED
743 COOKSEY LN
STANFORD CA 94305-8417

SHIP
TO:
CLERK OF COURT
500 PEARL ST
NEW YORK NY 10007-1316



**USPS TRACKING® #**

9570 1128 5992 6036 7188 16

PRIORITY MAIL EXPRESS®

FOR DOMESTIC
PLACE

FEB 10 202

RECEIVED
FEB 10 2026
CLERK'S OFFICE
S.D.N.Y.

Criminal Docketing

- Guaranteed de
- Guaranteed de
- USPS Tracking
  and many inte
- Pick up availa
- Domestic ship
  (restrictions a
- Signature incl

* Money Back Guaran
  select International
  See DMM and IMM

** Insurance does not
   claims exclusions se
   http://pe.usps.com.

† Money Back Guaran

WHEN USED INTERNATION

how2recycle.info

PAPER
POUCH

EP13F October 2023
OD: 12 1/2 x 9 1/2

PRIORITY
MAIL
XPRESS®

T RATE
ELOPE
E ANY WEIGHT

dule free Package Pickup,
can the QR code.

PS.COM/PICKUP

PS1000100000006