UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATE OF AMERICA,
Plaintiff

v.

SAMUEL BANKMAN-FRIED,
Defendant

Case No. 22 Cr. 673 (LAK)

# EXHIBIT A

## DECLARATION OF DANIEL CHAPSKY IN SUPPORT OF SAMUEL BANKMAN-FRIED'S RULE 33 MOTION FOR A NEW TRIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**AFFIDAVIT OF DANIEL CHAPSKY IN SUPPORT OF RULE 33 MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE**

I, Daniel Chapsky, being duly sworn, declare as follows:

I was Head of Data Science at FTX (globally) prior to its bankruptcy filing in November 2022. After the filing, I continued in that role for the FTX US Debtors as well as the Joint Official Liquidators (JOL) of FTX Digital Markets (FDM), the Bahamian-based parent company of the international FTX exchanges. I am submitting this declaration to provide the Court with accurate information regarding critical aspects of the FTX bankruptcy proceedings as they relate to the prosecution of Sam Bankman-Fried.

# I. Background And Qualifications

**1.** At FTX, I held a unique split role with responsibilities divided between FTX US (50%) and FDM (50%). Prior to joining FTX, I led a data science research team within the marketing science department at Meta (Facebook). Sam Bankman-Fried and I were colleagues, but not personal friends—our relationship was purely professional.

**2.** As part of my responsibilities at FTX, I built and maintained the company's analytics database and managed regulatory reporting for numerous jurisdictions including the United States, Japan, European Union, and Australia. To date, there have been no issues identified with any regulatory reporting by any of the regulatory bodies or bankruptcy professionals who have thoroughly scrutinized the data I generated during my tenure and relied on it in their filings. Regardless of my senior role, I did no work related to Alameda nor any Alameda related code on the platform. As a result I had no knowledge of the implications of the "special features" that were added to the Alameda "info@" account on FTX. The week prior to the bankruptcy filing, I helped put together information such as the November 10, 2022, net asset value balance sheets provided to the Debtors when they took over FTX on November 11, 2022, and due diligence documents for the potential Binance acquisition of FTX.

**3.** After the bankruptcy filing, I continued working for the FTX Debtors as well as the JOL appointed by the Bahamian government to oversee the management of FDM assets. I was the only employee who worked with both groups simultaneously, because I had unique knowledge of FTX's data systems and data that was essential to both groups' work.

**4.** In my role serving the US Debtors, I led what was internally referred to as the "Data Team," which was responsible for analyzing FTX's financial records and teaching debtor professionals how to navigate the company's systems. In early January, 2023, at the request of the US Debtors, I did an independent analysis of assets and liabilities of FTX as of November 11, 2022. My report was used as the basis for the first presentation to the Unsecured Creditors' Committee (UCC) on January 17, 2023. The US Debtors continue to rely on the data analytics infrastructure I developed.

**5.** In my role serving the JOL, I led the development of a proof of concept for "FTX 2.0," a plan to reboot both the FTX and FTX US exchanges. That proof of concept was presented to John Ray in mid-January 2023 by the JOL and initiated a year-long dedicated workstream within the bankruptcy proceedings until the Debtors abandoned any plans to reboot the exchanges.

## II. Why I Did Not Testify At Trial

**6.** On July 13, 2023, Sam Bankman-Fried's legal team contacted my counsel to request that I provide testimony during the forthcoming trial. My sole commitment throughout this process has been to maximize creditor recovery. This commitment led me to work with both the US Debtors and JOL following FTX's shutdown in November 2022. Similarly, I believed that testifying truthfully about FTX's financial condition—regardless of which party called me—would serve creditors' best interests by ensuring the Court had accurate information. I was therefore prepared to answer questions under oath from both defense and prosecution. I initially informed my counsel that I was willing to testify and that I could offer testimony on several key issues at the heart of the Government's case.

**7.** However, shortly thereafter, my counsel as well as several other attorneys at different law firms all strongly advised me not to testify, stating that I would likely be exposed to media attacks and faced potential retaliatory action by the prosecution.

**8.** Other former FTX employees I spoke with told me that they had received similar warnings. Out of concern for my well-being and those around me, I directed my counsel to tell Sam Bankman-Fried's team I was not willing to testify.

## III. Key Testimony I Could Have Given

### A. Refuting the Debtors' False Claims of FTX's Insolvency

**9.** The CEO of the Debtors, John Ray, was provided with balance sheets created by FTX management on November 10, 2022. The balance sheets showed that FTX US was solvent and liquid, with sufficient assets on hand to return all customer deposits on the spot, and that the international FTX exchange was solvent but with a substantial short-term liquidity shortfall. In his First Day Petition filed on November 17, 2022, Ray announced that he would not credit these balance sheets "because [they] w[ere] produced while the Debtors were controlled by Mr. Bankman-Fried."[1]

**10.** To my knowledge, Ray did not independently seek to obtain "trustworthy" balance sheets for FTX US or the international exchange until he asked the Data Team to generate them on January 5, 2023, almost two months after his first public statement and three weeks after Bankman-Fried had been indicted and imprisoned. Despite the claimed absence of any trustworthy financial information about FTX and hence what course of action would be in the best interests of the creditors, within days of taking over Ray put the FTX entities into an omnibus bankruptcy and shut down both FTX.us and FTX.com.

---

[1] Affidavit/Declaration in Support of First Day Motion (Declaration of John J. Ray III) (November 17, 2022) https://restructuring.ra.kroll.com/FTX/Home-DocketInfo, Doc 24.

11. The financial analysis that the Data Team produced on January 5th largely corroborated the balance sheets prepared by FTX management on November 10, 2022. When questions arose regarding specific calculation details that I could not determine with complete confidence, we consulted Gary Wang—the principal author of the November 10 calculations and a witness for the prosecution. That the two analyses came to similar conclusions was unsurprising, as the January 5th team utilized the same data sources, analytical code, and methodology that had been used for the original calculations.

12. Both analyses showed that while the international FTX exchange did have a substantial (roughly $8 billion) liquidity shortfall as of November 11, 2022, it was solvent - meaning that it had enough assets to cover customers' deposits. In my professional opinion, given the nature and value of the assets in FTX's possession on November 11th, customers of these solvent entities could have been made whole within months - not years - had the exchanges not been placed into omnibus bankruptcy proceedings and abruptly shut down.

13. Both analyses showed that FTX US was solvent and liquid on November 11, 2022, with sufficient cash reserves to fully repay customers on the spot. That finding was subsequently validated by the Independent Examiner appointed by the bankruptcy court.[2]

14. In addition, later analysis our team did showed that FTX JP (Japan) and FTX EU were both solvent and with sufficient liquidity to repay all customers on the spot.

15. Ray shared selected portions of the January 5th team's analysis at the first public presentation to the Committee of Unsecured Creditors on January 17, 2023,[3] but significantly misrepresented our findings.

16. Our analysis determined that on November 11, 2022, the international FTX exchange had roughly $5.5 billion in liquid assets; $3.8 billion in semi-liquid or illiquid cryptocurrencies; and a portfolio of over 300 venture investments with a book value of approximately $4.6 billion, as separately calculated by other teams within the Debtors' organization. In presenting this data to the Unsecured Creditors, Ray arbitrarily chose to assign zero value to the semi-liquid and illiquid cryptocurrencies as well as to the venture portfolio, implying that FTX was substantially insolvent. In my opinion, this wholly incorrect impression colored public opinion about what had happened to FTX as well as the entire trial.

17. Our analysis also showed that on November 11, 2022, FTX US had a minimum of $178 million in cash[4] and $181 million in highly liquid digital assets, for a total of $359 million in liquid assets. Outstanding liabilities to customers totaled around $200 million. By any measure, FTX US was solvent with a substantial cash surplus. In presenting this data to the Unsecured Creditors, Ray accurately reported total assets, but in calculating solvency inexplicably failed to include the $178 million in cash as well as the $250 million in callable cash held by a non-debtor subsidiary, LedgerX. Comparing digital assets alone to customer liabilities, he concluded that FTX US was insolvent. Ray maintained that FTX US had been insolvent on November 11, 2022, until the Independent Examiner finally laid that claim to rest in September 2024.

---

[2] Final Report of the FTX Independent Examiner, 2024-09-25, pp. 113-114, https://restructuring.ra.kroll.com/FTX/Home-DocketInfo, Doc 25679
[3] Case 22-11068-JTD Doc 507-1.
[4] FTX US had an additional $250 million in cash set aside in an insurance fund. As FTX's right to use that money to refund customers was disputed, I have not included it in my calculations.

18. In the year and a half following FTX's collapse, I was repeatedly shocked by Ray's false public statements concerning FTX's solvency and his description of the Debtor Estate he had taken over as a "dumpster fire."[5] Such statements could only diminish expected recoveries for creditors by devaluing the company and its assets in the eyes of prospective investors, and seemed to suggest that the Debtors were prioritizing Bankman-Fried's prosecution and conviction over the interests of creditors.

19. After the first set of filings to the bankruptcy Court, I contacted the primary director at Alvarez & Marsal who was leading A&M's work on the bankruptcy and serving as my point of contact, notifying him of various errors in the data presented in the Debtors' public statements. He responded that the misrepresentations weren't a mistake—they were a strategic decision[6]. These errors were corrected in later post-petition date filings.

20. On December 13, 2022, the day after Bankman-Fried was arrested, Ray testified before Congress that the international FTX exchange had "lost $8 billion of customer money" and "[w]e still have a hole in [FTX] US, so as we sit here today, it is not solvent."[7] As noted above, both claims were untrue. Given that Ray had been given balance sheets when he took over FTX on November 11th that showed both FTX and FTX US to be solvent and did not start the process of calculating balances independently until Jan 5, weeks later, I do not believe Ray could have had a good faith basis for making these claims. His claim in the same testimony that "[l]iterally there's no record-keeping whatsoever" similarly could not have been made in good faith. Ray had to have known that the claim was highly misleading, as the records maintained by my team, the engineering team and the US, EU and JP accounting teams during FTX's pre-petition operations were the same records being used to generate post-petition calculations relied on by the US Debtors.

21. John Ray's pre-sentencing memorandum submitted in Bankman-Fried's case similarly mischaracterized FTX's financial situation. Contrary to his assertion that repayments to creditors of the Estate were being financed in significant part by Debtors' recovery of allegedly stolen funds,[8] the vast majority of repayments have been made out of assets that were located precisely where they have always been: in the consolidated wallets of Alameda and FTX voluntarily turned over to the Debtors on November 11, 2022.

## B. Refuting The Evidence Relied On By Prosecution

22. Relying in part on misleading information provided by the Debtors and its key expert witness, Peter Easton, the Government repeatedly claimed that FTX was insolvent on November 11, 2022, and that customer funds had been irretrievably lost. The prosecution made the following false claims to the jury:

---

[5] Case 22-11068-JTD Doc 511, pp. 2, 4.
[6] FTX internal Slack, ~November 22, 2022
[7] House Financial Services Committee hearing, 2022-12-13: "[Bankman-Fried] said if he had not been arrested ahead of today's hearings, that he alleges that FTX US has been and remains solvent and could pay off all of its customers tomorrow. Given the evidence you have and what you gathered, is there any degree of truth to this claim?" Ray: "We still have a hole in the US, so as we sit here today, it is not solvent." See also Press Release provided by FTX on 2023-01-17 ("Confirmed Material Shortfalls at Both International and US Exchanges") and FTX on X on 2023-03-02 ("New Information Describes Magnitude of the Shortfalls Discovered at the FTX.COM and FTX.US Exchanges"), referencing Case 22-11068-JTD Doc 792-1, p. 8.
[8] Case 1:22-cr-00673-LAK Doc 415 (letter filed 03/20/24)

- "[Bankman-Fried] knows that there's this giant, massive, unrepayable hole."[9]
- "[W]hen [Bankman-Fried] said FTX had enough to cover all client holdings, that was a lie."[10]
- "[FTX] was 10 billion plus in the hole… so they are deeply in the red, totally under water."[11]
- "[In June 2022, Bankman-Fried] knows they're deeply in the red."[12]
- "[T]he customers' money[] was gone. . . . [C]ustomers were left with billions of dollars in losses."[13]

**23.** The prosecution leaned heavily on Prof. Easton's testimony to support its argument that the loans FTX made to Alameda constituted a theft of customer assets.

**24.** Easton testified that Alameda ran a multi-billion-dollar deficit in it's "info@" account on FTX for the entire period from January 1, 2021, to November 11, 2022, enabled by two "special privileges" on some of the sub-accounts: a high credit limit, and a coding feature that allowed it to "go negative." As one example, relying on a series of flowcharts that purported to trace payments Alameda made to third party lenders and others back to Alameda's account #9 on FTX, Easton testified that because that particular account was net negative, the payments out of it must have come from customer funds on the FTX exchange rather than Alameda's own funds.[14] The government elicited misleading testimony from its three cooperating witnesses, Gary Wang, Caroline Ellison, and Nishad Singh, that appeared to support Easton's conclusion. Focusing their attention on "account #9," which had a negative $2.8 billion balance on the particular day in question, the government got each of them to imply that the negative balance in account #9 meant that the aggregate balance in Alameda's user accounts was net negative as well.[15]

**25.** That conclusion is false. Easton's analysis ignores the positive balances in *dozens* of other Alameda accounts, intended to cross-collateralize each other. The only figure relevant for determining whether Alameda's user account ran a negative balance is the aggregate balance in all of the user accounts.

**26.** A separate analysis prepared for one of FTX's international regulators, drawn from the same data Easton used, showed that Alameda's user balance on FTX was significantly positive for almost all of its existence, including the majority of the period from May to September 2022, when Easton's analysis showed it to be net negative.

**27.** In support of his erroneous claim that Alameda's aggregate user account consistently ran a multi-billion dollar negative balance, Easton produced two graphs. The first (GX 1002) looked only at those subaccounts on Alameda's user account that had the "allow negative" feature turned on. It purported to show that the aggregate balance in those accounts ranged between negative $6 billion and negative $12 billion in the period from May 2022 to November 2022.[16] The second (GX 1005) looked at all of Alameda's user subaccounts, including those without the "allow negative" feature turned on. It purported to show that the

---

[9] Tr. 3134.
[10] Tr. 3136.
[11] Tr. 2978.
[12] Tr. 2964.
[13] Tr. 26.
[14] Tr. 1760-63; 1765-66; 1769-72.
[15] Tr. 361, 363, 394, 433-34, 1360-61, 1365-67, 1507.
[16] Tr. 1763.

aggregate balance in all of those accounts over the same period was also billions of dollars negative. The numbers in GX 1005 cannot be reconciled with GX 1002. At various points over those six months, GX 1005 was billions of dollars *more* negative than GX 1002[17] — a mathematical impossibility, given that the accounts without the 'allow negative' feature by definition could not have increased the aggregate negative balance. When the discrepancies between GX 1002 and GX 1005 were pointed out during cross-examination, Prof. Easton acknowledged that he must have been tracking different variables in the two graphs.[18] Without knowing what those variables were, it is impossible to identify with certainty all of the errors that were responsible for producing his inaccurate and inconsistent conclusions. But as someone extremely familiar with these systems—indeed, who helped build some of them— I can infer two likely culprits.

**28.** The first potential explanation for this mistake is evident from Easton's slides: for the "allow-negative" accounts, Easton appears to have included only Fiat, USDT, BTC and ETH in assets. If those assets were being used as collateral for other tokens and open positions, they would have been "locked" and assigned a negative value so as not to double-count assets. But he then excluded all of the other tokens and open positions which that collateral had been used to purchase. In short, he may have counted only the negative numbers while unintentionally excluding the positive collateralized positions. This would make it virtually impossible for Alameda's user accounts ever to show a positive balance. Indeed, the aggregate balance for Alameda's user accounts shown on GX 1005 is negative for all of 2022.

**29.** A second and independent set of errors appears to stem from Easton's misunderstanding of what the negative balance in fiat@ftx.com represented, and his conflating that liability with amounts Alameda borrowed through its user accounts on FTX. The negative balance in fiat@ftx.com reflected net amounts deposited by FTX customers into bank accounts Alameda owned, to be credited to their accounts on FTX. FTX tracked those net deposits in its internal ledger (the fiat@ftx.com balance) as amounts payable to customers, and hence a liability of FTX. The negative balance recorded in the ledger therefore mirrored commensurate cash and other assets held by Alameda off-exchange; it was not margin or borrowing by Alameda's trading account. Treating that liability as an on-exchange loan without netting the corresponding bank balances and other off-exchange assets that collateralized it fundamentally misrepresents financial reality.

**30.** Easton's combined errors turned what was a positive balance on FTX's user account averaging around $2 billion into a negative balance ranging between $6 billion and $12.6 billion.

**31.** In its narrative at trial, the government compounded that error by implying, with the help of misleading testimony from its cooperating witnesses, that Alameda was able to run that negative balance because of two secret "special features" on its user account.[19] Those features may have made it *possible* for Alameda to run a negative balance on its user account. But as Singh and Wang testified, they were not built for that purpose. The government's claim that they were used for that purpose is contradicted by my analysis, which showed that

---

[17] On May 12, 2022, for example, the aggregate balance in GX 1005 was negative $12.6 billion, while the aggregate balance in GX 1002 was between negative $8 and negative $9 billion.
[18] Tr. 1789-90.
[19] Tr. 304-07, 354, 367, 612, 614, 644, 2929.

in aggregate Alameda's user accounts did not in the ordinary course of business run a negative balance.

**32.** Easton's false claim that Alameda ran a multi-billion-dollar negative balance on its FTX user accounts and therefore that any amount paid out of that account was "stolen" from FTX customers was a centerpiece of the prosecution's closing argument.[20] The government reintroduced 18 of the slides Easton had presented, reminded the jury that they would have access to all 51 of his slides during their deliberations, encouraged them to consult them, and concluded that "[t]hey all show that the defendant stole money and moved money, and engaged in money laundering to conceal the source of the fund."[21] Finally, it advised them that "[i]f you conclude that the defendant stole customer money using these code features that I've just described, you can and you should find him guilty on that basis alone. It doesn't matter what happens with those fiat deposits because he's just ripping money right off the FTX exchange."[22] My previous points on errors in the analysis done by Easton make it clear that many of the slides in question do not in fact show that customer money was stolen, and instead reflect a misunderstanding of which accounts managed which activities.

**33.** Additionally, as Easton conceded on cross-examination, he never performed a net asset evaluation in the case.[23] In concluding that Alameda itself was in the hole, he looked only at Alameda balances held on the FTX platform, omitting billions of dollars in assets held on other exchanges, in bank accounts, and in venture capital investments.[24] All of those assets were transferred to FTX at the time of the liquidity crisis, and were included in the analysis prepared for the Debtors that showed that as of the Petition Date FTX.com was solvent if not liquid and FTX.us, FTX.jp and FTX.eu were all solvent and liquid.

**34.** My testimony could have refuted the errors in the prosecution's representations about FTX's financial condition and provided the jury with more accurate information.

## IV. Declaration

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

*Respectfully submitted,*



Notarized remotely online using communication technology via Proof.

Daniel Chapsky
01/01/2026

---

[20] Tr. 2927-37; 2947-48; 2952; 2967; 2969. "When Alameda was borrowing billions, it was right off the FTX platform, and it was borrowing 10 billion or so, 5 billion, 10 billion. . . . If you conclude that the defendant stole customer money using these code features that I've just described, you can and you should find him guilty on that basis alone. It doesn't matter what happens with those fiat deposits because he's just ripping money right off the FTX exchange." Tr. 2937.
[21] Tr. 3010-11.
[22] Tr. 2937.
[23] Tr. 1803.
[24] Tr. 1802-03.